IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 23-975-RGA |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

Defendant Liquidia Technologies, Inc. ("Liquidia" or "Defendant") hereby files its answer, defenses, and counterclaims ("Answer") to the First Amended Complaint filed by Plaintiff United Therapeutics Corporation ("UTC" or "Plaintiff"). Each of the paragraphs below corresponds to the same numbered paragraphs in the First Amended Complaint. In responding to the First Amended Complaint, Liquidia has kept Plaintiff's headings for ease of reference, but in so doing, Liquidia is not admitting to the accuracy of any statements made or agreeing with any characterizations made in such headings. Liquidia denies all allegations in the First Amended Complaint, whether express or implied, that are not specifically admitted below. Liquidia further denies that Plaintiff is entitled to the relief requested in the First Amended Complaint, or to any other relief.

## NATURE OF THE ACTION

1.    Liquidia admits that the First Amended Complaint purports to assert a Hatch-Waxman patent infringement action. Liquidia admits that U.S. Patent No. 10,716,793 (the "'793 patent") bears the title "Treprostinil Administration by Inhalation" and U.S. Patent No. 11,826,327

(the "'327 patent") bears the title "Treatment for Interstitial Lung Disease." Liquidia admits that Exhibits A and B attached to the First Amended Complaint appear to be copies of the '793 and '327 patents. Liquidia admits that the Patents-in-Suit are listed in the FDA's *Approved Drug Products with Therapeutic Equivalents* publication (also known as the "Orange Book"). Liquidia adds that the '793 patent has been invalidated by the Patent Trial and Appeal Board ("PTAB") and that the PTAB's decision was affirmed by the Federal Circuit on December 20, 2023 and thus must be de-listed from the Orange Book. Ex. 1 (Fed. Cir. '793 Decision). Liquidia has also filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent. Liquidia denies the remaining allegations in paragraph 1.

2.      Liquidia admits that UTC markets TYVASO® (treprostinil) inhalation solution, which was first approved by the FDA in 2009. Liquidia further admits that UTC markets TYVASO DPI® (treprostinil) inhalation powder, which was approved by the FDA on May 23, 2022. Liquidia further admits it obtained tentative approval to market YUTREPIA®, a dry powder formulation of treprostinil, in the United States on November 4, 2021, prior to the FDA's approval of TYVASO DPI®. Liquidia denies the remaining allegations in paragraph 2.

3.      Liquidia admits that it submitted New Drug Application ("NDA") No. 213005 and an amendment thereto under § 505(b)(2) of the Federal Food, Drug and Cosmetic Act ("Liquidia's NDA") to the FDA seeking approval to engage in the commercial manufacture, use, or sale of YUTREPIA® (treprostinil) for inhalation ("Liquidia's Product"). Liquidia denies the remaining allegations in paragraph 3.

4.      Liquidia admits that there was a prior bench trial (*United Therapeutics Corp., v. Liquidia Techs., Inc.*, C.A. No. 1:20-cv-755-RGA-JLH) where the United States District Court for the District of Delaware found that Liquidia's Product infringed certain claims of the '793 patent.

*United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 1:20-cv-755-RGA-JLH, D.I. 436 at ¶ 3 (D. Del. Sept. 9, 2022). Liquidia admits that the prior District of Delaware action did not involve the '327 patent. Liquidia admits that this action purports to allege that Liquidia's Product infringes the claims of the '793 and '327 patents. Liquidia denies the remaining allegations in paragraph 4.

## THE PARTIES

5. Liquidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5, and therefore denies them.

6. Liquidia admits the allegations in paragraph 6.

## JURISDICTION AND VENUE

7. Liquidia admits that this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, provided that standing and other requirements are met. Liquidia denies that the Plaintiff's claims in its First Amended Complaint have any merit or that Plaintiff is entitled to any relief. Liquidia admits that venue is proper for the purposes of this case. Liquidia denies the remaining allegations in paragraph 7.

8. Liquidia admits that this Court has personal jurisdiction over Liquidia for purposes of this case. Liquidia denies the remaining allegations in paragraph 8.

9. Liquidia admits it has submitted and maintained a § 505(b)(2) Application seeking approval to engage in the commercial manufacture, use, and/or sale of Liquidia's Product. Liquidia denies the remaining allegations in paragraph 9.

10. Liquidia admits that this Court has personal jurisdiction over Liquidia for purposes of this case. Liquidia admits it is incorporated under the laws of the State of Delaware and it has been party to the following actions: *United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No.

1:20-cv-755-RGA-JLH (D. Del.); *United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 1:21-mc-377-RGA-JLH (D. Del.); *United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 1:21-mc-325-RGA (D. Del.). Liquidia denies the remaining allegations in paragraph 10.

## **BACKGROUND**

11.     Liquidia admits the allegations in paragraph 11.

12.     Liquidia admits that TYVASO® was approved by the FDA in the United States on July 20, 2009, and, according to the TYVASO® prescribing information, is indicated "for the treatment of pulmonary arterial hypertension (PAH; WHO Group I) to improve exercise ability." Ex. 2. (2009 TYVASO® Label).  Liquidia admits that TYVASO® was approved for "the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability."  *Id.*  Liquidia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 12, and therefore denies them.

13.     Liquidia admits that TYVASO DPI® (treprostinil) inhalation powder was approved by the FDA in the United States on May 23, 2022, and, according to the TYVASO DPI® prescribing information, is indicated "for the treatment of pulmonary arterial hypertension (PAH; WHO Group I) to improve exercise ability" and "the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability." Ex. 3 (TYVASO DPI® Label).  Liquidia denies the remaining allegations in paragraph 13.

14.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

15.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

16.     Liquidia admits that the '327 patent is entitled "Treatment For Interstitial Lung Disease" and was issued by the USPTO on November 28, 2023, and names as inventors Leigh Peterson, Peter Smith, and Chunqin Deng.  Liquidia denies the remaining allegations in paragraph 16.

17.     Liquidia admits the allegations in paragraph 17.

### [ALLEGED] ACTS GIVING RISE TO THIS ACTION

18.     Liquidia admits it notified UTC that it had submitted an amendment to NDA No. 213005 to the FDA seeking approval in a letter dated July 24, 2023 ("July 2023 Notice Letter"). Liquidia admits this Notice Letter does not mention the '327 patent, but upon issuance of the '327 patent, Liquidia provided a Notice Letter to UTC, dated December 12, 2023 (the "'327 Patent Notice Letter").  Liquidia denies the remaining allegations in paragraph 18.

19.     Liquidia admits that its amendment to NDA No. 213005 describes a modification to the original application and submission of the amendment required a "Paragraph IV" certification.  Liquidia denies the remaining allegations in paragraph 19.

20.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.  To the extent a response is required, Liquidia admits that the July 2023 Notice Letter included a statement pursuant to 21 U.S.C. § 355(b)(3)(D)(ii) and 21 C.F.R. § 314.52(c)(6) detailing the factual and legal basis of Liquidia's belief that the claims of the '793 patent are invalid, unenforceable, and will not be infringed by the commercial manufacture, use or sale of the Liquidia Product.  The July 2023 Notice Letter also included an Offer of Confidential Access,

granting UTC the ability to receive Liquidia's NDA, an offer UTC refused to address. Liquidia admits the claims of the '793 patent were invalidated in a decision by the Patent Trial and Appeal Board ("PTAB") following an *Inter Partes* Review ("IPR") proceeding. Liquidia admits that the PTAB's decision of invalidity was affirmed by the Federal Circuit on December 20, 2023. Liquidia denies the remaining allegations in paragraph 20.

21.   Liquidia admits that its July 2023 Notice Letter refers to 21 U.S.C. § 355(b)(3)(D)(ii) and 21 C.F.R. § 314.52(c)(6).

22.   Liquidia admits that UTC filed its Complaint on September 5, 2023.

23.   Liquidia denies that UTC is entitled to a 30-month stay. Liquidia denies the remaining allegations in paragraph 23.

24.   Liquidia admits that it acknowledged UTC was expected to receive a patent on November 28, 2023. Liquidia denies the remaining allegations in paragraph 24.

25.   Liquidia admits that it submitted its NDA to the FDA seeking approval to engage in the commercial manufacture, use, and/or sale of the Liquidia Product. Liquidia denies the remaining allegations in paragraph 25.

26.   Liquidia admits it will manufacture Liquidia's Product for release, use, and/or sale upon FDA approval. Liquidia denies the remaining allegations in paragraph 26.

27.   Liquidia denies the allegations in paragraph 27.

28.   Liquidia denies the allegations in paragraph 28 to the extent they infer Liquidia is not entitled to the Safe Harbor protections under the Hatch-Waxman Act. Liquidia denies the remaining allegations in paragraph 28.

29.     Liquidia admits that it submitted its NDA to the FDA seeking approval to engage in the commercial manufacture, use, and/or sale of the Liquidia Product.  Liquidia denies the remaining allegations in paragraph 29.

**COUNT I: [ALLEGED] INFRINGEMENT OF
U.S. PATENT NO. 10,716,793 UNDER 35 U.S.C. § 271(E)**

30.     Liquidia incorporates by reference its responses to Paragraphs 1 through 29 of the First Amended Complaint.

31.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

32.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

33.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

34.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

35.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

36. Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

37. Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

## COUNT II: [ALLEGED] INFRINGEMENT OF
## U.S. PATENT NO. 10,716,793 UNDER 35 U.S.C. §§ 271(a)-(c)

38. Liquidia incorporates by reference its responses to Paragraphs 1 through 37 of the First Amended Complaint.

39. Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

40. Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

41. Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

42. Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

43.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

44.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

45.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

46.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

47.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

48.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

49.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

50.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

51.     Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus a response to this paragraph is not yet required.

## COUNT III: [ALLEGED] INFRINGEMENT OF<br>U.S. PATENT NO. 11,826,327 UNDER 35 U.S.C. §271(e)

52.     Liquidia incorporates by reference its responses to Paragraphs 1 through 51 of the First Amended Complaint.

53.     Liquidia denies the allegations in paragraph 53.

54.     Liquidia admits that it submitted its NDA to the FDA seeking approval to engage in the commercial manufacture, use, and/or sale of the Liquidia Product.  Liquidia denies the remaining allegations in paragraph 54.

55.     Liquidia denies the allegations in paragraph 55.

56.     Liquidia denies the allegations in paragraph 56.

57.     Liquidia admits it is aware of the existence of the '327 patent.  Liquidia denies the remaining allegations in paragraph 57.

58.     Liquidia denies the allegations in paragraph 58.

59.     Liquidia denies the allegations in paragraph 59.

## COUNT IV: [ALLEGED] INFRINGEMENT OF<br>U.S. PATENT NO. 11,826,327 UNDER 35 U.S.C. §§ 271(a)-(c)

60.     Liquidia incorporates by reference its responses to Paragraphs 1 through 59 of the First Amended Complaint.

61.     Liquidia admits that it submitted its NDA to the FDA seeking approval to engage in the commercial manufacture, use, and/or sale of the Liquidia Product.  Liquidia denies the remaining allegations in paragraph 61.

62.     Liquidia denies the allegations in paragraph 62.

63.     Liquidia denies the allegations in paragraph 63.

64.     Liquidia denies the allegations in paragraph 64.

65.     Liquidia denies the allegations in paragraph 65.

66.     Liquidia denies the allegations in paragraph 66.

67.     Liquidia denies the allegations in paragraph 67.

68.     Liquidia denies the allegations in paragraph 68.

69.     Liquidia denies the allegations in paragraph 69.

70.     Liquidia denies the allegations in paragraph 70.

71.     Liquidia admits that it is aware of the '327 patent.  Liquidia denies the remaining allegations in paragraph 71.

72.     Liquidia denies the allegations in paragraph 72.

73.     Liquidia denies the allegations in paragraph 73.

## RESPONSE TO PLAINTIFF'S PRAYER FOR RELIEF

Liquidia incorporates by reference all preceding paragraphs of this Answer as if fully set forth herein.  Liquidia denies any and all allegations of patent infringement alleged in the First Amended Complaint.  Liquidia denies all allegations that Plaintiff is entitled to any relief requested in paragraphs 1 – 9 of the First Amended Complaint's Prayer for Relief, or any other relief.

## AFFIRMATIVE DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(c), and without altering any applicable burdens of proof, Liquidia asserts the following defenses to the First Amended Complaint and

reserves its rights to assert additional defenses. Liquidia has filed a Partial Motion to Dismiss Counts I and II of UTC's First Amended Complaint directed to the '793 patent and thus any affirmative defense with respect to the '793 patent is not yet required.

## FIRST DEFENSE – FAILURE TO STATE A CLAIM

Plaintiff fails to state a claim upon which relief can be granted.

## SECOND DEFENSE – NON-INFRINGEMENT

Liquidia does not infringe, has not infringed and will not infringe, directly, indirectly, or under the Doctrine of Equivalents, any valid claim of the '327 patent.

## THIRD DEFENSE – INVALIDITY

One or more claims of the '327 patent are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112 and are invalid for obviousness-type double patenting. For example: (1) the claims of the '327 patent are invalid under §§ 102 and/or 103 at least over Plaintiff's prior art patents and publications, including, but not limited to, the '793 patent, the TYVASO® Label dating from at least 2009, U.S. Patent Pub. No. 2013/00966200 entitled "Treprostinil Treatment for Interstitial Lung Disease and Asthma" by Wade et al., and the article titled "Safety and Tolerability of High-dose Inhaled Treprostinil in Pulmonary Hypertension" authored by Parikh et al.; and (2) the claims of the '327 patent are invalid for obviousness-type double patenting over Plaintiff's prior issued and now invalid '793 patent.

## FOURTH DEFENSE – PROSECUTION HISTORY ESTOPPEL

Plaintiff's claims are barred or limited from recovery, in whole or in part, by the doctrine of prosecution history estoppel.

## FIFTH DEFENSE – INEQUITABLE CONDUCT

All claims of the '327 patent are unenforceable as a result of inequitable conduct during prosecution before the USPTO, as particularly explained and alleged in the Fifth Counterclaim.

## SIXTH DEFENSE – COLLATERAL ESTOPPEL

Plaintiff is barred from bringing an action for infringement of the '793 patent by the doctrine of collateral estoppel. The '793 patent was previously adjudicated and held to be invalid in a prior proceeding before the PTAB. The Federal Circuit then affirmed the PTAB's finding that the '793 patent is invalid. The '793 patent was also previously litigated in the District Court for the District of Delaware ("District Court litigation") and therefore subject to the District Court's findings, including the construction of terms in the '793 patent claims, which the Federal Circuit affirmed. The Plaintiff was a party to the prior proceeding and had a full and fair opportunity to litigate the issue. Because the validity of the '793 patent has already been litigated, Plaintiff is estopped from asserting the '793 patent's validity in this proceeding and from asserting any position inconsistent with the District Court's prior findings with respect to the '793 patent, including the construction of terms in the '793 patent claims.

## RESERVATION OF RIGHTS

Liquidia hereby reserves the right to amend its Answer and reserves all defenses set out in Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and other defenses, at law or in equity, which become applicable after the substantial completion of discovery or otherwise in the course of litigation.

## LIQUIDIA'S COUNTERCLAIMS

For its Counterclaims against Plaintiff United Therapeutics Corporation ("UTC"), Counterclaim Plaintiff Liquidia Technologies, Inc. ("Liquidia") alleges as follows:

**PARTIES**

1.      Liquidia is a biopharmaceutical company focused on the development and commercialization of innovative therapeutics using its proprietary PRINT® technology to transform the lives of patients.

2.      Liquidia's Product, a dry powder formulation of treprostinil, was designed using Liquidia's proprietary PRINT® technology to enhance deep-lung delivery using a convenient, palm-sized, low-resistance, disposable dry powder inhaler ("DPI") for the treatment of pulmonary arterial hypertension ("PAH"). Liquidia's proprietary PRINT® technology allows for LIQ861 particles of a precise size and highly uniform shape.

3.      LIQ861 has the potential to maximize the therapeutic benefits of treprostinil in treating PAH by safely delivering higher doses into the lungs compared to currently approved conventional inhaled therapies, including TYVASO® and TYVASO DPI®.  LIQ861 is also more convenient to use than currently approved nebulized therapies, including TYVASO®, as LIQ861 is more conveniently administered and contained in a small carrying pouch as opposed to a nebulizer.

4.      Liquidia's clinical trials of Liquidia's Product showed safe dosing of treprostinil of more than twice the target maintenance dosage of TYVASO®, thereby providing physicians a broader dosing range to provide symptom relief with fewer tolerance issues than with TYVASO®, while also providing patients a more convenient treatment option, if approved.  As a result of Liquidia's investment into the development of novel treatments for PAH, resulting in LIQ861, Liquidia filed New Drug Application No. 213005 under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("Liquidia's NDA").

5.      In July 2023, Liquidia amended its NDA to add the treatment of pulmonary hypertension associated with interstitial lung disease ("PH-ILD") in order "to ensure that patients

may access YUTREPIA for both the PAH and PH-ILD indications as soon as possible." Ex. 4 (Liquidia Press Release July 27, 2023). The FDA confirmed that the addition of the indication to treat PH-ILD would not require additional clinical studies. *Id.*

6. Liquidia is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 419 Davis Drive, Suite 100, Morrisville, NC 27560.

7. Upon information and belief, UTC is a corporation organized and existing under the laws of the State of Delaware and having a place of business at 1000 Spring Street, Silver Spring, Maryland 20910.

## JURISDICTION

8. Liquidia incorporates by reference paragraphs 1-7 of its Counterclaims above.

9. These Counterclaims arise under the patent laws of the United States, Title 35, United States Code. The jurisdiction of this Court is proper under at least 35 U.S.C. § 271 *et seq.*, and 28 U.S.C. §§ 1331, 1338, 1367, and 2201-02.

10. UTC has consented to the personal jurisdiction of this Court at least by commencing its action for patent infringement in this District, as set forth in its Complaint.

11. Based solely on the filing of this action, venue is proper in this District pursuant to at least 28 U.S.C. § 1400(b).

## COUNT I – DECLARATION OF INVALIDITY OF THE '327 PATENT

12. Liquidia incorporates by reference paragraphs 1-11 of its Counterclaims above.

13. UTC alleges ownership of U.S. Patent No. 11,826,327 ("the '327 patent") and has brought claims against Liquidia alleging infringement of the '327 patent including under 35 U.S.C. § 271(e) based upon the submission of Liquidia's NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product.

14. The '327 patent is listed in the FDA's *Approved Drug Products and Therapeutic*

*Equivalents* publication for TYVASO® and TYVASO DPI®. Ex. 5 (Orange Book Listing for TYVASO®); Ex. 6 (Orange Book Listing for TYVASO DPI). It is listed along with U.S. Patent Nos. 10,716,793 ("the '793 patent") 9,339,507 ("the '507 patent"), 9,358,240 ("the '240 patent"), 10,376,525 ("the '525 patent), 11,723,887 ("the '887 patent). *See id.* UTC previously asserted against Liquidia U.S. Patent Nos. 9,593,066 and 9,604,901, also listed in the Orange book for TYVASO®, and the issue of validity and infringement with respect to both patents have been resolved in Liquidia's favor with respect to the Liquidia Product. On December 12, 2023, Liquidia sent a Notice Letter ("December 2023 Notice Letter") to UTC, notifying UTC that the claims of the '327 patent are not infringed, invalid and unenforceable. Liquidia's December 2023 Notice Letter also included an Offer of Confidential Access permitting UTC to request a copy of Liquidia's NDA to assess whether UTC had a basis to file suit. UTC has not asserted the '507, '240, '525, and '887 patents against Liquidia. Liquidia requested UTC provide a covenant not to sue on the '507, '240, '525, and '887 patents, but UTC refused. Ex. 42 (December 6, 2023 E-mail from W. Jackson to S. Sukduang). In refusing to provide a covenant not to sue, UTC admitted that it only asserted patents to which UTC had a good faith belief of infringement and/or validity, thereby implying UTC does not have a good faith basis to assert the '507, '240, '525, and '887 patents against Liquidia with respect to the Liquidia Product. *Id.*

15.     Based on the filing of UTC's First Amended Complaint for patent infringement, an actual controversy has arisen and now exists between the parties as to the validity of the '327 patent.

16.     All asserted claims of the '327 patent are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112, and are invalid for obviousness-type double patenting.

17.     By way of example only, the claims of the '327 patent are invalid under §102 at least over the '793 patent disclosing methods for treating pulmonary hypertension associated with interstitial lung disease by administering a dose of at least 15 micrograms of the inhalation formulation of treprostinil in a single event with each breath containing at least 6 micrograms.

| '793 Patent Claim 1 | '327 Patent Claim 1 |
|---|---|
| 1. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths. | 1. A method of improving exercise capacity in a patient having pulmonary hypertension associated with interstitial lung disease, comprising administering by inhalation to the patient having pulmonary hypertension associated with interstitial lung disease an effective amount of at least 15 micrograms up to a maximum tolerated dose of treprostinil or a pharmaceutically acceptable salt thereof in a single administration event that comprises at least 6 micrograms per breath. |

18.     As demonstrated above, claim 1 of the '793 patent discloses each limitation of claim 1 of the '327 patent. *See* D.I. 8-1, Ex. A ("'793 patent"), claim 1. In particular, in a prior litigation between UTC and Liquidia concerning the '793 patent, the District Court for the District of Delaware construed "pulmonary hypertension" in claim 1 of the '793 patent to include all 5 pulmonary hypertension Groups, which would include pulmonary hypertension associated with interstitial lung disease. Ex. 7 at 41 (District Court Opinion D.I. 433). That construction was affirmed by the Federal Circuit. *See* Ex. 8 at 12 (Fed. Cir. July 2023 Decision); *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1368–69 (Fed. Cir. 2023). Therefore, the "method of treating pulmonary hypertension" disclosed and claimed in the '793 patent necessarily encompasses the "method of improving exercise capacity in a patient having pulmonary hypertension associated with interstitial lung disease" in claim 1 of the '327 patent.

19.     Moreover, Example 1 of the '793 patent discloses the administration, by inhalation,

of at least 6 micrograms per breath ("TRE was delivered in 2 breaths (1000 μg/ml aerosol concentration; 30 μg dose; n=12), 3 breaths (1000 μg/ml; 45 μg; n=9) or 2 breaths (2000 μg/ml; 60 μg; n=20)"). '793 patent, 9:5–10. The '793 patent also discloses that a dose of 15 μg could be applied in one single breath. *Id.*, 17:44–46. The specification of the '793 patent further discloses that "[t]reprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution." *Id.*, 11:62–66.

20. Table 3 of the '793 patent, which discloses the "Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids," identifies under "Etiology," patients with pulmonary fibrosis, which is also known as interstitial lung disease—the same disease ("pulmonary hypertension associated with interstitial lung disease") in claim 1 of the '327 patent. *See*'793 patent, Table 3 (cols. 13-14); '327 patent. Additionally, improvement of exercise capacity in a pulmonary hypertension patient (described in the 2009 TYVASO® label) and the limitations in claims 2-10 and 17-19 of the '327 patent are inherent properties of the administration of treprostinil by inhalation. As such, the '793 patent anticipates claims 1-10 and 17-19 of the '327 patent. Further, the '793 patent disclosed the limitations of claims 11-14 of the '327 patent. *See id.*, cls. 3 and 4; *id.*, 7:7–49. Finally, the limitations of claims 15-16 of the '327 patent are disclosed by the '793 patent, and thus the '793 patent anticipates these claims. *See id.*, 7:55–64.

21. By way of example only, to the extent the '793 patent does not anticipate the claims of the '327 patent, the claims are rendered obvious under § 103 by the '793 patent alone because a person of ordinary skill in the art would be motivated to modify the disclosure of the '793 patent to treat PH-ILD patients in a manner to improve their exercise capacity. A POSA would have a

reasonable expectation of success because the '793 patent discloses and claims treatment of all five pulmonary hypertension groups through the inhalation of treprostinil and Table 3 discloses treating patients with PH-ILD.

22.     By way of example only, the claims of the '327 patent are also invalid as obvious under § 103 at least over Plaintiff's prior art patents and publications, including the '793 patent in combination with the TYVASO® label from at least 2009, U.S. Patent Pub. No. 2013/00966200 entitled "Treprostinil Treatment for Interstitial Lung Disease and Asthma" by Wade et al. (Ex. 9 ("Wade")), and/or the article titled "Safety and Tolerability of High-dose Inhaled Treprostinil in Pulmonary Hypertension" authored by Parikh et al. and published in the Journal of Cardiovascular Pharmacology, Volume 67, No. 4, pp. 322-325 (Ex. 10 ("Parikh 2016")) disclosing methods improving exercise capacity in patients with pulmonary hypertension associated with interstitial lung disease by administering a dose of at least 15 micrograms of the inhalation formulation of treprostinil in a single event with each breath containing at least 6 micrograms and a demonstrated improvement in the 6 minute walk test.

23.     By way of example only, the claims of the '327 patent are invalid for obviousness-type double patenting over Plaintiff's prior issued '793 patent. This deficiency cannot be cured by filing a terminal disclaimer, because the '793 patent has been invalidated.

24.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the claims of the '327 patent are invalid for failure to comply with one or more of the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112, and are invalid for obviousness-type double patenting.

## COUNT II – DECLARATION OF NON-INFRINGEMENT OF THE '327 PATENT

25.     Liquidia incorporates by reference paragraphs 1-24 of its Counterclaims above.

26. The manufacture, use, or sale of Liquidia's Product would not infringe any valid and enforceable claim of the '327 patent, either directly, indirectly or under the Doctrine of Equivalents.

27. The proposed label for Liquidia's Product includes two separate indications: "[F]or the treatment of pulmonary arterial hypertension (PAH) to improve exercise ability[;]" and for "the treatment of pulmonary hypertension associated with interstitial lung disease" to improve exercise ability. Ex. 11 (Liquidia Press Release November 8, 2021); 12 (Liquidia Press Release September 25, 2023).

28. Claims 1-19 of the '327 patent are limited to a "method of improving exercise capacity in a patient having pulmonary hypertension associated with interstitial lung disease[.]" D.I. 8-2, Ex. B ("'327 patent"), claim 1. Accordingly, claims 1-19 of the '327 patent do not cover the indication in Liquidia's proposed label directed to "the treatment of pulmonary arterial hypertension (PAH) to improve exercise ability," and, as such, the Liquidia Product does not infringe, directly, indirectly, or under the Doctrine of Equivalents, claims 1-19 of the '327 patent with respect to the PAH indication.

29. Liquidia does not perform the method steps recited in claims 1-19 and thus Liquidia cannot directly infringe any of claims 1-19 of the '327 patent.

30. Use of Liquidia's Product will not directly or indirectly infringe claims 4-5 and claims 9-10 of the '327 patent because the proposed label for Liquidia's Product does not provide any information regarding NT-proBNP or FVC.

31. Liquidia's Product will not directly or indirectly infringe claim 11 of the '327 patent, because Liquidia's Product does not utilize a "pulsed inhalation device." Because claims 12-14 depend from claim 11, Liquidia's Product cannot infringe those claims.

32.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the manufacture, use, or sale of Liquidia's Product would not infringe any valid and enforceable claim of the '327 patent.

## COUNT III – DECLARATION OF UNENFORCEABILITY OF THE '327 PATENT

33.     Liquidia incorporates by reference paragraphs 1-32 of its Counterclaims above.

34.     Stephen Maebius is an attorney at Foley & Lardner LLP who prosecuted the '327 patent.  Ex. 13 (Foley & Lardner Stephen Maebius Bio Page); Ex. 14 (Application Data Sheet).

35.     Shaun Snader is UTC's Vice President & Associate General Counsel of Intellectual Property.  Ex. 15 (Shaun Snader LinkedIn Page).

36.     The '327 patent is unenforceable due to the inequitable conduct committed by UTC's patent counsel, Stephen Maebius, and UTC, including Shaun Snader, during prosecution of the '327 patent.

## Pulmonary Hypertension

37.     Pulmonary hypertension refers to abnormally high blood pressure in the lungs.  It covers a range of conditions classified in five different WHO groups: Group 1, pulmonary arterial hypertension; Group 2, pulmonary venous hypertension; Group 3, pulmonary hypertension associated with disorders damaging the lungs; Group 4, pulmonary hypertension caused by chronic thrombotic or embolic disease, including chronic blood clots in the lungs; and Group 5, a miscellaneous category for conditions that do not fit well into the other four groups.

38.     Interstitial lung disease ("ILD") refers to a group of lung diseases that cause progressive scarring of lung tissue.  This scarring can affect a patient's ability to breathe and get enough oxygen into their bloodstream.  As a lung disease, interstitial lung disease falls under Group 3 of the WHO classification system for pulmonary hypertension.  PH-ILD is also referred to as pulmonary fibrosis.

### The '327 Patent

39.     The '327 patent states that there is "a need for the identification of new pharmaceutical treatments for [interstitial lung disease]." '327 patent, 1:34–35.

40.     The '327 patent is directed to a method of improving exercise capacity in patients with pulmonary hypertension associated with interstitial lung disease using the administration of treprostinil. Independent claim 1 of the '327 patent recites:

> 1. A method of improving exercise capacity in a patient having pulmonary hypertension associated with interstitial lung disease, comprising administering by inhalation to the patient having pulmonary hypertension associated with interstitial lung disease an effective amount of at least 15 micrograms up to a maximum tolerated dose of treprostinil or a pharmaceutically acceptable salt thereof in a single administration event that comprises at least 6 micrograms per breath.

41.     The '327 patent also includes 18 dependent claims. Dependent claims 2-10 and 17-19 merely recite the inherent benefits of administering treprostinil including a "statistically significant increase of a 6 minutes walk distance in the patient after 8 weeks, 12 weeks, or 16 weeks of the administering" (claim 2); "a statistically significant reduction of at least one exacerbations of the interstitial lung disease" (claim 6); and an increase of "a 6 minutes walk distance of the patient by at least 10 m after 8 weeks of the administering" (claim 17). '327 patent, cls. 2, 6, 17.

42.     Dependent claims 11-14 describe the device used to administer the treprostinil. Claim 11 recites that "administering is performed by a pulsed inhalation device" wherein the pulsed inhalation device "contains an inhalation solution" (claim 12), could be a "nebulizer" (claim 13) or "a dry powder inhaler comprising a dry powder comprising treprostinil or a pharmaceutically acceptable salt thereof[]" (claim 14). '327 patent, cls. 11, 12, 13, 14.

43.     Dependent claim 15 limits the "effective amount of treprostinil or a

pharmaceutically acceptable salt administered to the patient in a single inhalation administration event" to "15 µg to 100 µg." '327 patent, cl. 15. Claim 16 limits the single inhalation administration event to not exceed "15 breaths by the patient." *Id.*, cl. 16.

## Overview Of The Prosecution History Of The '327 Patent

44.     U.S. Patent Application No. 17/233,061 (the "'061 application"), entitled "Treatment for Interstitial Lung Disease" was filed on April 16, 2021 and claims priority to Provisional Application No. 63/011,810 filed on April 17, 2020. The '061 application issued as the '327 patent on November 28, 2023.

45.     The Application Data Sheet submitted with the '061 application names United Therapeutics Corporation as the applicant and Mr. Stephen Maebius as the patent practitioner. Ex. 14 (Application Data Sheet).

46.     Mr. Shaun Snader signed the "Power of Attorney to Prosecute Applications Before the USPTO" on behalf of UTC. Ex. 16 (Power of Attorney).

47.     On May 12, 2021, Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader and the inventors of the '327 patent submitted 136 references in its First Information Disclosure Statement ("IDS") during prosecution. Ex. 17 (IDS filed May 12, 2021). Among the 136 references submitted in the First IDS was the '793 patent. *Id.* at p.2.

48.     Four months later, on September 21, 2021, Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader and the inventors of the '327 patent submitted a Second IDS adding 7 references disclosing a total of 143 references. Ex. 18 (IDS filed September 21, 2021).

49.     Five months after that, on February 16, 2022, Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader and the inventors of the '327 patent submitted a

staggering 329 references in a Third IDS disclosing a total of 472 references. Ex. 19 (IDS filed Feb. 16, 2022). Among the 329 references submitted in the Third IDS was the IPR Petition for U.S. Patent No. 10,716,793, which had been filed July 1, 2021. *Id.* at p.14.

50.    Every reference included in the Third IDS, filed February 16, 2022, was published prior to the submission date of the Second IDS, submitted on September 21, 2021, indicating that they could have been disclosed in the Second IDS or even earlier during prosecution. Ex. 19 (IDS filed Feb. 16, 2022).

51.    The original independent claim 1 of the '327 patent was directed to "[a] method of treating a pulmonary hypertension due to a condition which is selected from a chronic lung disease, hypoxia, and a combination thereof[.]" Dependent claim 4 specified that the pulmonary hypertension being treated was specifically associated with interstitial lung disease. Ex. 20, p.74, cls. 1, 4 (Original '061 Application).

52.    On March 6, 2023, the Examiner rejected claims 1-16 and 18-26 under 35 U.S.C. § 102(a)(1) as anticipated by five separate references. The Examiner found that claims 1-16 and 18-26 were anticipated by Malinin et al. (WO2015/138423), Zhang et al. (WO2016/205202), Morgans et al. (WO2012/009097), Wade et al. (WO2008/098196) and Bosc et al. (WO2016/176399). Ex. 21, pp.2–4 (Non-final Rejection).

53.    On May 10, 2023, Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader, amended claim 1 as follows:

> 1.    (Currently Amended) A method of <u>improving exercise capacity in a patient having</u> ~~treating a~~ pulmonary hypertension <u>associated with interstitial lung disease</u> ~~due to a condition which is selected from a chronic lung disease, hypoxia and a combination thereof~~, comprising administering by inhalation to <u>the patient having pulmonary hypertension associated with interstitial lung disease</u> ~~a subject having the pulmonary hypertension due to the condition selected from a chronic lung disease, hypoxia and a~~

combination thereof an effective amount of <u>at least 15 micrograms up to a maximum tolerated dose of</u> treprostinil or a pharmaceutically acceptable salt thereof in <u>a single administration event that comprises</u> ~~an amount of~~ at least 6 micrograms per breath.

Ex. 22, p.2 (Applicant's Amendment and Remarks from prosecution of the '327 patent).

54. Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader, remarked that Malinin, Wang, Morgans, and Bosc do not teach or suggest elements of amended claim 1, including the dose, the amount of treprostinil per breath, and the improvement of exercise capacity in a patient with pulmonary hypertension associated with interstitial lung disease. Ex. 22, pp.5–8 (Applicant's Amendment and Remarks from prosecution of the '327 patent).

55. Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader, further remarked that Morgans and Bosc teach "nothing regarding administering treprostinil by inhalation[,]" and that "[b]ecause Bosc [and Morgans] teach[] nothing regarding administering treprostinil by inhalation, Bosc [and Morgans] also teach[] nothing about either treprostinil doses for inhalation or an amount of treprostinil administered per breath. Furthermore, Bosc [and Morgans] teach[] nothing regarding improving exercise capacity in any patient." Ex. 22, pp.7–8 (Applicant's Amendment and Remarks from prosecution of the '327 patent).

56. The only remark made by Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader, regarding the anticipatory reference Wade was that "Wade does not teach or suggest '<u>a single administration event that comprises at least 6 micrograms per breath</u>' as amended claim 1 recites." Ex. 22, p.7 (Applicant's Amendment and Remarks from prosecution of the '327 patent).

57. On June 28, 2023, the Examiner issued a Notice of Allowance and stated in the "Reasons for Allowance" that "the methods were not found to be obvious or anticipated by the prior art of record. The prior art does not teach or suggest the methods encompassing compounds

substituted in the manner claimed by the Applicant." Ex. 23, p.6 (Notice of Allowance). The PTO provided an "Issue Notification" on November 8, 2023, indicating the '327 patent would issue on November 28, 2023. Ex. 24 (Issue Notification).

### The '793 Patent

58. The '793 patent, entitled "Treprostinil Administration by Inhalation" issued on July 21, 2020, from application No. 16/778,662, filed January 31, 2020.

59. The '793 patent is directed to methods of treating pulmonary hypertension where treprostinil is delivered by inhalation. '793 patent, Abstract, claims 1–8. The '793 patent issued with 8 claims, of which claim 1 is independent and reads as follows:

> 1. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

*Id.*, cl. 1.

60. The '793 patent discloses that "[p]ulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention[.]" '793 patent, 1:41–44. It does not disclose any limitations restricting the scope of "pulmonary hypertension" to any particular subset of pulmonary hypertension patients.

61. Table 3 of the '793 patent discloses, among other things, the "patient characteristics," of patients treated with inhaled treprostinil. *See* '793 patent, Table 3 (cols. 13-14). The Table includes patients with pulmonary fibrosis, which is also known as interstitial lung disease. *Id.*

62.     Claim 1 and the specification of the '793 patent disclose inhalation of a single event dose of an effective amount of at least 15 micrograms of treprostinil.  '793 patent, 7:55–57, cl. 1. Claim 1 of the '793 patent claims "administering by inhalation" a "single event dose" comprising "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof[.]" *Id.*, cl. 1.  The '793 patent further discloses and claims that "[t]reprostinil can be administered by inhalation" and that "[t]he dose of treprostinil that can be administer using a metered dose inhaler in a single event can be from about 15 μg to about 100 μg[.]" *Id.*, 7:55–57.  Finally, the '793 patent claims that the "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" is "delivered in 1 to 3 breaths." *Id.*, cl. 1.

63.     The '793 patent also discloses that administering "treprostinil in a single event can be carried out in a limited number of breaths by a patient.  For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less.  Preferably, treprostinil is administered in 3, 2 or 1 breaths." '793 patent, 7:60–64.

64.     Example 1 of the '793 patent discloses the administration, by inhalation, of at least 6 micrograms per breath ("TRE was delivered in 2 breaths (1000 μg/ml aerosol concentration; 30 μg dose; n=12), 3 breaths (1000 μg/ml; 45 μg; n=9) or 2 breaths (2000 μg/ml; 60 μg; n=20)"). '793 patent, 9:5–10.  The patent also discloses that a dose of 15 μg could be applied in one single breath. *Id.*, 17:44–46.

65.     The specification of the '793 patent further discloses that "[t]reprostinil is tolerated at high doses with no systemic side effects.  The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution." '793 patent, 11:62–66.

### The '793 Patent IPR

66.     Prior to the filing of the application leading to the '327 patent, Liquidia petitioned the PTAB on January 7, 2021, for *Inter Partes* Review to invalidate the '793 patent ("'793 patent IPR"), which the PTAB instituted on August 11, 2021. Ex. 25 (Liquidia's Petition); 26 (Decision to Institute).

67.     Mr. Stephen Maebius was identified as lead counsel for UTC in the '793 patent IPR.  Ex. 27 (Patent Owner Mandatory Notices).

68.     Mr. Shaun Snader was identified as backup counsel for UTC in the '793 patent IPR. Ex. 27 (Patent Owner Mandatory Notices).

69.     During the '793 patent IPR, UTC asserted in its Patent Owner Response filed on November 10, 2021 by Mr. Maebius and Mr. Snader, that the '793 patent satisfies a long felt need by providing a treatment for pulmonary hypertension in patients with interstitial lung disease. UTC stated that "[t]he claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension."  Ex. 28, p.61 (Patent Owner Response).  UTC continued to describe the invention in the '793 patent, stating that "[i]nhaled treprostinil is currently approved for pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease."  *Id*.  UTC emphasized "[a]s of May 2006 – in fact, even as of January 28, 2021 – no therapies were approved for the treatment of pulmonary hypertension in patients with interstitial lung disease."  *Id.* at 62.

70.     In his '793 patent IPR Declaration, UTC's expert, Dr. Aaron Waxman, stated that "[i]nhaled treprostinil is also approved to treat a broader range of pulmonary hypertension patients than the therapeutics available at the time of the invention."  Ex. 29, p.47 ¶ 95 (Waxman IPR Declaration).  Dr. Waxman asserts that "[a]t the time of the claimed invention and even as of today,

there are no other therapies approved for the treatment of pulmonary hypertension in patients with interstitial lung disease." *Id.*, pp. 47 ¶ 96.

71.    In the Patent Owner Response and supporting Declaration of Dr. Waxman, Mr. Maebius, Mr. Snader, UTC, and Dr. Waxman all cited to and relied on Liquidia's expert, Dr. Igor Gonda, and his testimony from the District Court litigation concerning the '793 patent that there was "a completely unmet medical need" where "[t]here [is] nothing that these patients were getting as a therapy for their problems[,]" in order to support their claims that the invention claimed in the '793 patent met the needs of patients with interstitial lung disease. *See* Ex. 30, p.62 (Patent Owner Response (citing Gonda Dep. Tr. 106:6–8)); Ex. 29, pp.47 ¶ 96 (Waxman IPR Declaration (citing Gonda Dep. Tr. 106:6–8)).

72.    Mr. Maebius and Mr. Snader, as lead and backup IPR counsel, respectively, were aware of and submitted these positions on behalf of UTC, including testimony from the corresponding '793 patent District Court litigation.

73.    The PTAB issued a Final Written Decision ("FWD") invalidating the '793 patent on July 19, 2022, almost a full year before the Notice of Allowance for the '327 patent was issued, and well before Mr. Maebius' May 10, 2023 amendments to the pending '327 patent claims.  Ex. 31 (FWD).

74.    In its FWD, the PTAB found claims 1-8 of the '793 patent unpatentable as obvious over the prior art under 35 U.S.C. § 103 finding "that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and would have had a reasonable expectation of success in doing so[.]" Ex. 31, p.34 (FWD). Mr. Maebius and Mr. Snader, as lead and backup counsel, respectively, received a copy of the PTAB's FWD.

75.     Mr. Maebius and Mr. Snader, on behalf of UTC, filed a request for rehearing by the PTO's Precedential Opinion Panel, which was denied on October 26, 2022, but with directions for the PTAB panel to further assess the public availability prior art status of Voswinckel JESC and Voswinckel JAHA.  Ex. 32 (Order Denying Request).

76.     On February 2, 2023, the PTAB panel denied UTC's request for rehearing and confirmed that Voswinckel JESC and Voswinckel JAHA were publicly accessible before the '793 patent's priority date, although modifying the grounds for that holding.  Ex. 33, pp.7–13 (Decision Denying Request).  In doing so, the PTAB strengthened its FWD.  Mr. Maebius and Mr. Snader, as lead and backup counsel, respectively, received a copy of the PTAB's rehearing denial prior to Mr. Maebius' May 10, 2023 amendments to the pending claims of the '327 patent.

77.     Mr. Maebius on behalf of UTC, filed the Notice of Appeal of the PTAB panel's FWD to the Federal Circuit.  Ex. 34 (Notice of Appeal).

78.     Mr. Snader entered an appearance on behalf of UTC in the Federal Circuit appeal from the PTAB's decision finding the '793 patent invalid.  Ex. 35 (UTC Entry of Appearance).  Mr. Snader also appears as counsel on the front cover of UTC's Opening Brief.  Ex. 36 (UTC's Opening Brief).

79.     On December 20, 2023, the Federal Circuit issued its opinion affirming the PTAB's decision finding the '793 patent invalid.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 2023-1805, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023).

80.     Because Mr. Maebius and Mr. Snader represented and were substantively involved in the PTAB proceeding and appeal, they were aware of, and specifically advocated on behalf of UTC's position that the '793 patent specification and claims covered interstitial lung disease.

## The District Court Proceedings

81.     Prior to the filing of the application leading to the '327 patent, UTC filed a complaint in the United States District Court for the District of Delaware on June 4, 2020.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 1:20-cv-755-RGA-JLH, D.I. 1 (D. Del. Sept. 9, 2022).

82.     UTC amended its complaint to further assert that Liquidia infringed its '793 patent on July 22, 2020.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 1:20-cv-755-RGA-JLH, D.I. 16 (D. Del. Sept. 9, 2022).

83.     At trial, and prior to allowance of the '327 patent, Liquidia's expert, Dr. Nicholas Hill, testified that a person of ordinary skill in the art (POSA) would understand the term "pulmonary hypertension" as it is used in claim 1 of the '793 patent to encompass all 5 groups of pulmonary hypertension, saying "'[p]ulmonary hypertension' as used, as far as I can tell in the patent, and would be used as a general term by a POSA comprises all the five different groups.  It refers to . . . any condition where . . . there's an elevation of the pulmonary pressure, pulmonary pressures."  Ex. 37, 575:22–576:1 (Trial Tr. March 29, 2022).

84.     Dr. Hill also testified that this understanding of pulmonary hypertension was informed by column 1 line 41 of '793 patent: "the first sentence says that pulmonary hypertension may occur due to various reasons, and the different entities of pulmonary hypertension were classified, based on clinical and pathological grounds, in five categories according to the latest WHO convention."  Ex. 37, 576:13–17 (Trial Tr. March 29, 2022).

85.     Dr. Hill also testified that the pulmonary hypertension patients described in Example 1 of the '793 patent included patients in pulmonary hypertension Group 3, which includes patients with interstitial lung disease.  Ex. 37, 578:18–20 (Trial Tr. March 29, 2022).

86.     Mr. Snader was present during the March 2022 trial concerning the '793 patent.

87.     On August 31, 2022, based on the specification of the '793 patent, the District Court concluded in its opinion ("District Court Opinion") that the scope of "treating pulmonary hypertension" in claim 1 includes "treating all five Groups of PH."  Ex. 7 at 41 (District Court Opinion D.I. 433); *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, 624 F. Supp. 3d 436, 464 (D. Del. 2022).  The District Court issued its opinion prior to Mr. Maebius' amendment to the pending claims of the '327 patent and prior to allowance of the '327 patent.  As noted in paragraph 71 above, Mr. Maebius submitted at least the deposition testimony of Dr. Igor Gonda from this same District Court litigation, establishing that Mr. Maebius was aware of, was monitoring, and had access to information and testimony from the District Court litigation involving the '793 patent.

88.     Mr. Maebius was aware of the District Court proceedings because UTC submitted documents from the District Court proceedings during the '793 IPR including the testimony of Dr. Hill and Dr. Gonda, as well as Dr. Gonda's Opening Expert Report.  Mr. Maebius was also present at the oral hearing before the PTAB where discussions took place regarding the admissibility and relevance of evidence from the District Court proceedings.  Ex. 38, p.2 (Identifying the presence of Mr. Maebius), pp.5–14 (Discussion of submitting supplemental information from the District Court proceedings), 26–29, 51–52 (Discussion of District Court proceedings related to enablement), 79 (Discussion of District Court proceedings related to enablement) (June 6, 2022 PTAB Oral Hearing).

89.     On July 24, 2023, the Federal Circuit affirmed the District Court's decision, affirmatively stating "we agree with the district court that 'treating pulmonary hypertension' includes treating all five groups of pulmonary hypertension patients."  Ex. 8 at 12 (Fed. Cir. July

2023 Decision); *see United Therapeutics Corp.*, 74 F.4th at 1368. The Federal Circuit issued its opinion prior to allowance of the '327 patent.

90.     Mr. Snader appeared as counsel for UTC in the Federal Circuit appeal from the District Court's decision. Ex. 35 (UTC Entry of Appearance, District Court Appeal). Mr. Snader also appears on the front of UTC's Principal and Responsive Brief. Ex. 36 (UTC's Principle and Responsive Brief). Thus, Mr. Snader was aware of the Federal Circuit's affirmance of the District Court's construction of the '793 patent claims.

91.     Mr. Snader publicly commented on the District Court Opinion on the '793 patent, saying "[w]e're pleased with the Court's decision on the '793 patent" and "[t]oday's decision vindicates our claims that Yutrepia is an infringing product, and we will continue to vigorously defend our intellectual property." Ex. 39 (UTC Press Release August 31, 2022). Furthermore, Mr. Snader publicly commented on the Federal Circuit's affirmance of the District Court's decision regarding the '793 saying "[t]oday's decision vindicates our position, as confirmed earlier by the district court, that Yutrepia is an infringing product. We will continue to vigorously defend our intellectual property." Ex. 40 (UTC Press release; July 24, 2023).

92.     Mr. Snader's involvement in the appeal as well as his public commentary on both the District Court's decision and the Federal Circuit's affirmance indicate that he was substantially involved with both proceedings and knew or should have known of the positions taken as well as the District Court's claim construction and Federal Circuit's affirmance of that construction, both before issuance of the '327 patent. Additionally, Mr. Maebius' knowledge of the District Court litigation, as evidenced by his submission of information from that litigation in the '793 patent IPR indicates that before issuance of the '327 patent he knew, or should have known of the District Court's claim construction regarding the scope of pulmonary hypertension in the '793 patent and

the Federal Circuit's affirmance of the claim construction.

### The Parikh 2016 Article

93.     Prior to the filing of the application leading to the '327 patent, the article titled "Safety and Tolerability of High-dose Inhaled Treprostinil in Pulmonary Hypertension" was authored by Parikh, et al. ("Parikh 2016").  The article published in the Journal of Cardiovascular Pharmacology, Volume 67, No. 4, pp. 322-325 four years before the earliest filing date of the '327 patent.

94.     The authors of Parikh 2016 include Victor F. Tapson, MD, and Abby D. Poms, RRT.

95.     Dr. Tapson consults for UTC and UTC funds his research.  Ex. 10, "disclosures" (Parikh 2016).

96.     Ms. Poms is on the advisory board for UTC and is also a member of the speaker's bureau for UTC.  Ex. 10, "disclosures" (Parikh 2016).

97.     UTC funded the database creation and analysis for the Parikh 2016 article.  Ex. 10, "acknowledgements" (Parikh 2016).  Given the purpose of the Parikh 2016 article, UTC's support of the research and its relationship with both Dr. Tapson and Ms. Poms, UTC, and upon information and belief Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, had knowledge of the Parikh 2016 article during the prosecution of the '327 patent.

98.     Another article, written by S. Shaprio et al. and entitled "Survival and drug persistence in patients receiving inhaled treprostinil at doses greater than 54 µg (nine breaths) four times daily" ("Shapiro 2021"), cites to Parikh 2016.  It was published in Volume 11 No. 4 of the Pulmonary Circulation in 2021, while the prosecution of the '327 patent was on-going.  Its authorship includes five UTC employees: Eric Shen, Meredith Broderick, Youlan Rao, Dasom

Lee, and Andrew C. Nelsen. Because the Shapiro 2021 article cites Parikh 2016, UTC, and upon information and belief Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, had knowledge of the Parikh 2016 article during the prosecution of the '327 patent.

99. Upon information and belief, UTC's legal department, including at least Mr. Snader, provides authorization before any UTC paper is submitted for publication.

100. Parikh 2016 discloses the use of inhaled treprostinil to treat pulmonary hypertension including WHO Group 3 which includes interstitial lung disease.

101. Parikh 2016 also discloses a single administration dosing protocol of 3 breaths (18 mcg)/initial session, 6 breaths (36 mcg)/second session, and then titration as tolerated, based on side effects, by 1 breath daily until a maximum dosage of 12 breaths (72 mcg) four times daily is achieved. Ex. 10, p. 2 (Parikh 2016). At each dosing regimen, at least 6 mcg of treprostinil was administered per breath.

102. Parikh 2016 discloses that treprostinil in various forms improves symptoms, reduces the plasma concentration of NT-proBNP, and 6 minute walk distance in PAH patients including a 20 meter increase in the 6 minute walk distance at 12 weeks of treatment. Ex. 10, p. 2 (Parikh 2016).

103. UTC's financial contribution to the Parikh 2016 article, the active participation of its consultant and advisory board member in writing it, UTC's five employees who referenced Parikh 2016 in the Shapiro 2021 article, UTC's and Mr. Snader's authorization prior to publication submission, and the Parikh 2016 article's relation to the '327 patent's subject matter demonstrate that UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader, knew or should have known about Parikh 2016 article during the prosecution of the '327 patent.

**Mr. Stephen Maebius and UTC, including Mr. Shaun Snader and the Named Inventors on the '327 Patent, Owed a Duty of Candor to The Patent Office During Prosecution of the '327 Patent**

104.    Under 37 C.F.R. § 1.56(a) and (c)(3), each attorney who prepares or prosecutes the application and any other person substantively involved in the preparation or prosecution of an application who is associated with the applicant have a "duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to the individual to be material to patentability."  Thus, Mr. Maebius and UTC, including Mr. Snader and the named inventors on the '327 patent, all owed a duty of candor and good faith dealing to the USPTO during the prosecution of the '061 application, which led to the '327 patent.

105.    Mr. Maebius and UTC, including Mr. Snader, further understood their obligations on the duty of candor to the USPTO and the need to submit material information from District Court litigation and IPR proceedings.   In particular, during prosecution of U.S. Patent No. 11,723,887, which is also listed in the Orange Book for TYVASO®, Mr. Maebius and UTC submitted documentation from those district court proceedings (including invalidity contentions) as well as IPR proceedings (including Petitions, Demonstratives, Patent Owner's Responses, Petitioner's Reply to Patent Owner Responses, and Final Written Decisions).  *See* Ex. 41, pp. 3–6 ('887 patent IDS filed October 7, 2019).  Accordingly, Mr. Maebius and UTC, including Mr. Sander, understood their obligations to submit material information from the District Court litigation concerning the '793 patent as well as party submissions and the FWD from the '793 IPR.

**The '793 Patent, UTC's Submissions During the '793 IPR, the District Court's '793 Patent Trial Opinion and the Federal Circuit's Affirmance Thereof and Parikh 2016 Are Material to the Patentability of the '327 Patent**

106.    Information is material to patentability when it is not cumulative of information already of record or being made of record in the application, and (1) it establishes, by itself or in

combination with other information, a prima facie case of unpatentability of a claim; or (2) it refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability." 37 C.F.R. § 1.56(b). Information from prior patent litigation proceedings is material. *See Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1362 (Fed. Cir. 2010) (finding patentee's failure to disclose existence of earlier related litigation was "material" to its application for patent even though patentee claimed it was not material because patentee succeeded on validity of patents in earlier litigation); *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1224 (Fed. Cir 2007) (holding that the existence of earlier related litigation itself was material information.)

107. The '793 patent and its disclosure, interpretation, and validity is highly material to the '327 patent because the '793 patent and the '327 patent are listed in the FDA's "Orange Book" for both UTC's TYVASO® and TYVASO DPI® products. *See* Ex. 5 (Orange Book Listing for TYVASO®); Ex. 6 (Orange Book Listing for TYVASO DPI®); *see also*, ¶¶ 70–77, *supra*. UTC's listing of both patents in the Orange Book for the same two products establishes UTC's knowledge that both patents claim related subject matter.

108. The submissions by Mr. Maebius and Mr. Snader, on behalf of UTC, during the '793 IPR are material because there, Mr. Maebius, Mr. Snader and UTC argued that the disclosure and claims of the '793 patent cover interstitial lung disease–the subject matter of the issued claims of the '327 patent. *See* ¶¶ 81–84, *supra*. More specifically, these submissions, by themselves, or in combination with the '793 patent itself and/or other prior art of record cited by the PTO Examiner, render unpatentable the claims of the '327 patent and refute the arguments made by Mr. Maebius, with the knowledge and permission of Mr. Snader, regarding the alleged deficiencies of the prior art cited during prosecution and the alleged patentability of the '327 claims.

109.    Dr. Hill's District Court trial testimony, the District Court's Opinion, and the Federal Circuit's affirmance of that opinion are material because they confirm that the claims of the '793 patent, including the mode of administration (inhalation), dosing, and number of breaths, and dose per breath are utilized for all five PAH Groups, including patients with interstitial lung disease–the subject matter of the issued claims of the '327 patent.  More specifically, the trial testimony and decisions, by themselves, or in combination with the '793 patent itself, the '793 IPR submissions made on behalf of UTC and/or other prior art of record cited by the PTO Examiner, render unpatentable the claims of the '327 patent and refute the arguments made by Mr. Maebius, with the knowledge and permission of Mr. Snader, regarding the alleged deficiencies of the prior art cited during prosecution and the alleged patentability of the '327 claims.

110.    Parikh 2016 is material to the '327 patent for at least the information it discloses as described in paragraphs 100-102 above.  More specifically, Parikh 2016 expressly discloses the treatment of interstitial lung disease patients with TYVASO® utilizing at least 6 mcg per breath, with a total of at least 15 mcg per single administration event, and achieving positive results including improvement of exercise capacity via the 6 minute walk test.  Upon information and belief, Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, were aware of Parikh 2016 and the information it disclosed.  This is the very information Mr. Maebius, with the knowledge and permission of Mr. Snader, argued was missing from the prior art cited by the Examiner.  *See* Ex. 22 (Applicant's Amendment and Remarks from prosecution of the '327 patent)  As such, Parikh 2016, alone and/or in combination with the '793 patent, and/or UTC's 793 IPR submissions, and/or the District Court and Federal Circuit decisions concerning the '793 patent and/or prior art of record cited by the PTO Examiner, render unpatentable the claims of the '327 patent and refute the arguments made by Mr. Maebius, with the knowledge and

permission of Mr. Snader, regarding the alleged deficiencies of the prior art cited during prosecution and the alleged patentability of the '327 claims.

111. Despite submitting three IDSs, with a total of 472 references, Mr. Maebius and the named inventors of the '327 patent, with the knowledge and permission of Mr. Snader, failed to submit UTC's '793 IPR arguments, Dr. Hill's District Court trial testimony, the District Court's Opinion, the Federal Circuit's affirmance of that opinion, and Parikh 2016–all of which were available and known to Mr. Maebius and UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader, prior to allowance and issuance of the '327 patent.

### The Most Reasonable Inference to Be Drawn Is That Mr. Stephen Maebius and UTC, Including The Named Inventors of the '327 Patent and Mr. Shaun Sander, Intended to Deceive the USPTO

112. Despite knowing that material information must be disclosed and despite submitting three IDSs, Mr. Maebius and UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader, intentionally buried the '793 patent and '793 IPR Petition in its IDS submissions, and failed to submit or otherwise notify the Examiner about documents material to the '327 patent, including the following: UTC's '793 IPR submissions, Dr. Hill's District Court trial testimony, the District Court's Opinion, the Federal Circuit's affirmance of the District Court's Opinion, and the Parikh 2016 article.

113. On May 10, 2023, Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader, amended the '327 patent claims to overcome prior art rejections to recite: "improving exercise capacity in a patient having pulmonary hypertension associated with interstitial lung disease." Ex. 22, pp. 6–8 (Applicant's Amendment and Remarks from prosecution of the '327 patent).

114.     Mr. Maebius on behalf of UTC, with the knowledge and permission of Mr. Snader, hid the '793 patent and the Petition for an IPR filed by Liquidia in the 472 documents listed in the IDSs.  *See Molins PLC v. Textron Inc.*, 48 F. 3d 1172, 1184 (Fed. Cir. 1995) ("'burying' a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith.")  In view of the actual rejections made during prosecution and the amendments and arguments made to overcome those rejections, Mr. Maebius and UTC, including Mr. Snader, knew or should have known that bringing the '793 patent to the specific attention of the Examiner would have resulted in further anticipatory, obviousness and double patenting rejections.   In particular, Mr. Maebius, with the knowledge and permission of Mr. Snader, intentionally withheld this information from the Examiner because this information directly refutes the arguments made concerning the alleged deficiencies of the cited prior art.  Further in view of Mr. Maebius's and UTC's, including Mr. Snader's, knowledge of the positions taken concerning the scope of the '793 patent claims to cover interstitial lung disease, the most reasonable inference to be drawn is that Mr. Maebius and UTC, including Mr. Snader, intentionally buried '793 patent and '793 IPR Petition with an intent to deceive the PTO and obtain allowance of the '327 patent.

115.     Mr. Maebius on behalf of UTC, including Mr. Snader, did not disclose that on November 10, 2021, prior to the above amendment to the pending '327 patent claims, they submitted arguments to the PTAB during the '793 patent IPR asserting that the '793 patent fulfilled a long-felt need of providing treatment to those with interstitial lung disease.  *See* ¶ 83, *supra*.  In view of the actual rejections made during prosecution and the amendments and arguments made to overcome those rejections, Mr. Maebius and UTC, including Mr. Snader, knew or should have known that bringing the '793 patent to the specific attention of the Examiner, coupled with the arguments submitted during the '793 patent IPR, would have resulted in further anticipatory,

obviousness and double patenting rejections. Being intimately involved in the '793 patent IPR and the arguments submitted therein, and with knowledge of the amendments made to the pending '327 patent claims, the most reasonable inference to be drawn is that Mr. Maebius and UTC, including Mr. Snader, intentionally withheld the arguments made concerning the scope of the '793 patent claims during the '793 patent IPR with an intent to deceive the PTO and obtain allowance of the '327 patent.

116. Mr. Maebius on behalf of UTC, including Mr. Snader, did not disclose any of the following, all of which are material to the ''327 patent: (1) that on March 29, 2022, prior to the above amendment to the pending '327 patent claims, Dr. Hill testified in the District Court that the '793 patent claims cover all 5 PH Groups, which would include patients with interstitial lung disease; (2) that on August 31, 2022, prior to the above amendment to the pending '327 patent claims, the District Court issued its Opinion determining the '793 patent claims cover all 5 PH Groups, which would include interstitial lung disease; or (3) that on July 24, 2023, prior to the issuance of the '327 patent claims, the Federal Circuit affirmed the District Court's Opinion that the '793 patent claims included all 5 PH Groups, which would include interstitial lung disease. In view of the actual rejections made during prosecution and the amendments and arguments made to overcome those rejections, Mr. Maebius and UTC, including Mr. Snader, knew or should have known that bringing the '793 patent to the specific attention of the Examiner, coupled with Dr. Hill's District Court trial testimony, the District Court's Opinion and the Federal Circuit's affirmance thereof, would have resulted in further anticipatory, obviousness and double patenting rejections. Being intimately involved in, and having knowledge of the District Court trial, opinion and Federal Circuit affirmance, the most reasonable inference to be drawn is that Mr. Maebius and UTC, including Mr. Snader, intentionally withheld this information concerning the scope of the

'793 patent claims with an intent to deceive the PTO and obtain allowance of the '327 patent.

117.    UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader, did not disclose its knowledge of the Parikh 2016 article which discloses the use of inhaled treprostinil to treat pulmonary hypertension including interstitial lung disease among other limitations claimed in the '327 patent prior to the above amendment to the pending '327 patent claims. *See* ¶¶ 93–103, *supra*.  In view of the subject matter originally claimed in the application leading to the '327 patent, the rejections made during prosecution and the amendments and arguments made to overcome those rejections, UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Sander, knew or should have known that bringing the Parikh 2016 article to the attention of the Examiner would have resulted in further anticipatory and obviousness rejections.  Having knowledge of the Parikh 2016 article through UTC's involvement with the Parikh 2016 article and the Shapiro 2021 article citing it, and with knowledge of the amendments made to the pending '327 patent claims, the most reasonable inference to be drawn is that UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader, intentionally withheld the Parikh 2016 article with an intent to deceive the PTO and obtain allowance of the '327 patent.

### The Claims of the '327 Patent are Unenforceable

118.    "Where the subject matter for which a patent is being sought is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner or other appropriate official at the U.S. Patent and Trademark Office." MPEP § 2001.06(c).

119. As discussed above, each claim of the '327 patent is drawn to improving exercise capacity in patients with interstitial lung disease. Mr. Maebius on behalf of UTC, including Mr. Snader, had specific knowledge, and actually advocated to the PTAB, that the '793 patent disclosed this same subject matter. Mr. Maebius and UTC, including Mr. Snader, also had specific knowledge that Dr. Hill testified and the District Court, as affirmed by the Federal Circuit, determined that the '793 patent claims covered all 5 PAH Groups, which includes interstitial lung disease–the same subject matter of the '327 patent and filling the gaps of the alleged deficiencies of the prior art cited during prosecution. Accordingly, Mr. Maebius and UTC, including Mr. Snader, had a duty to bring to the Examiner's attention the '793 patent and disclose the related '793 patent litigation and IPR submissions to the PTO during prosecution of the '327 patent.

120. Disclosing, albeit buried among over 400 references, the '793 patent and the Petition for an IPR of the '793 patent does not excuse Mr. Maebius and UTC, including Mr. Snader, from disclosing other related litigation or additional information from the '793 IPR because the absence of this information prevented the Patent Office from appreciating the scope and significance of the '793 patent during the prosecution of the '327 patent. *Graphics Properties Holdings, Inc. v. Google, Inc.*, No. 12-1394-LPS, 12-1397-LPS, 2014 WL 6629021, at *2 (D. Del. Nov. 20, 2014) (Court dismissed argument that the patentee had no need to disclose further litigation after disclosing the underlying appealed district court order because the Federal Circuit opinion contained relevant statements not in the district court opinion).

121. Mr. Maebius's and UTC's, including Mr. Snader's, intentional withholding of material information constituted a breach of the duty of candor owed to the USPTO with a specific intent to deceive and constitutes inequitable conduct that renders all of the claims of the '327 patent unenforceable.

122. UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader, also had specific knowledge that the Parikh 2016 article disclosed the use of inhaled treprostinil to treat pulmonary hypertension, including interstitial lung disease, among other limitations of the '327 patent claims. Accordingly, UTC, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader, had a duty to disclose the Parikh 2016 article to the PTO during prosecution of the '327 patent.

123. Because the Parikh 2016 article discloses each limitation of the claims of the '327 patent, UTC's, including Leigh Peterson, Peter Smith, and Chunqin Deng, the named inventors on the '327 patent, and Mr. Snader's, failure to disclose material information to the PTO during prosecution constituted a breach of the duty of candor owed to the USPTO with a specific intent to deceive and constitutes inequitable conduct that renders all the claims of the '327 patent unenforceable.

124. Per the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Liquidia requests a declaration by the Court that the claims of the '327 patent are unenforceable as a result of the multiple instances of inequitable conduct described above.

## PRAYER FOR RELIEF

**WHEREFORE**, Liquidia prays that this Court grant the following relief:

A. A judgment dismissing UTC's First Amended Complaint, in its entirety, with prejudice;

B. A judgment declaring that all asserted claims of the '793 patent are invalid;

C. A judgment declaring that all asserted claims of the '327 patent not infringed;

D. A judgment declaring that all asserted claims of the '327 patent are invalid and/or

unenforceable;

E.      A judgment declaring that Liquidia's Product will not directly, indirectly or under the Doctrine of Equivalents infringe any valid and enforceable claim of the '793 and '327 patents under any subsection of 35 U.S.C. § 271, and is not now directly, indirectly or under the Doctrine of Equivalents infringing, any valid and enforceable claim of the '793 and '327 patents under any subsection of 35 U.S.C. § 271;

F.      An order enjoining UTC, their officers, agents, servant, employees, attorneys, and representatives and any successors and assigns thereof, from charging or asserting infringement of any claim of the '793 and '327 patents against Liquidia, or anyone in privity with Liquidia;

G.      A judgment declaring that this case stands out from others and as such is an exceptional case pursuant to 35 U.S.C. § 285 and ordering UTC to pay Liquidia's costs and reasonable attorneys' fees incurred in this action;

H.      An award of costs and expense in this action to Liquidia; and

I.      Such further and other relief as the Court deems just and proper.

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant*

OF COUNSEL:
Sanya Sukduang
Jonathan Davies
Brittany Cazakoff
Rachel Preston
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Lauren Strosnick
Kyung Taeck Minn
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: January 8, 2024