# EXHIBIT 28

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

_____

IPR2021-00406
U.S. Patent No. 10,716,793

_____

**PATENT OWNER RESPONSE**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................1
II.     BACKGROUND ..........................................................................................2
     A.     Pulmonary Hypertension .................................................................2
     B.     The Inventors Developed a Novel Method of Treating
            PAH That Overcame Limitations of Existing Treatments ..................4
III.    Claim Construction and Person of Ordinary Skill in the Art ...................7
IV.     PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT
        CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR
        OBVIOUS ...................................................................................................8
     A.     Ground 1: the '212 Patent, Voswinckel JESC, and
            Voswinckel JAHA Fail to Render Claims 1-8 Obvious ..................10
            1.     Petitioner Has Not Established That Voswinckel
                   JAHA And Voswinckel JESC Were Publicly
                   Accessible Prior Art Before The Priority Date ........................11
            2.     None of the identified references teaches a single
                   event dose of 15 micrograms to 90 micrograms in 1
                   to 3 breaths .............................................................................18
            3.     A POSA would not have a reasonable expectation
                   of success in combining the '212 patent,
                   Voswinckel JESC and JAHA or have been
                   motivated to combine them ......................................................23
     B.     Ground 2: the '212 Patent and Voswinckel JESC Fail to
            Render Claims 1-8 Obvious ...........................................................38
     C.     Grounds 3-6 Fail Because Each Ground Relies On
            Publications That Petitioner Has Failed to Establish Are
            Prior Art .......................................................................................44
            1.     Ghofrani ...................................................................................46
            2.     Voswinckel 2006 ......................................................................51
V.      OBJECTIVE INDICIA OF NONOBVIOUSNESS ...............................55
     A.     Unexpected Results ........................................................................55
     B.     Copying ..........................................................................................57
     C.     Long-Felt Unmet Need ...................................................................61
VI.     CONCLUSION .........................................................................................63

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acceleration Bay, LLC v. Activision Blizzard Inc.*,
908 F.3d 765 (Fed. Cir. 2018) ....................................................12, 13, 14, 15, 18

*In re Aller*,
220 F.2d 240 (CCPA 1955) .................................................................................55

*Allergan, Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014) .............................................................45, 50, 54

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) .......................................................11, 12, 18, 27

*Cellco Partnership v. Bridge and Post, Inc.*,
IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019)...................................45, 50

*In re Cronyn*,
890 F.2d 1158 (Fed. Cir. 1989) ..........................................................................27

*CSL Behring LLC v. Bioverative Therapeutics Inc.*,
IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019).........................................52

*E.I. DuPont de Nemours & Company v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018) ............................................................................55

*In re Geisler*,
116 F.3d 1465 (Fed. Cir. 1997) ..........................................................................55

*In re Katz*,
687 F.2d 450 (CCPA 1982) ......................................................45, 48, 49, 52

*In re Klopfenstein*,
380 F.3d 1345 (Fed. Cir. 2004) ..........................................................................12

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) ..........................................................................12

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*
322 F.3d 1335 (Fed. Cir. 2003) ..........................................................................44

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
    941 F.3d 1133 (Fed. Cir. 2019) .................................................................57, 58

*In re Lister*,
    583 F.3d 1307 (Fed. Cir. 2009) ........................................................................15

*Ormco Corp. v. Align Technology, Inc*,
    463 F.3d 1299 (Fed. Cir. 2006) ........................................................................55

*Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009) ..........................................................................61

*Trans Ova Genetics, LC v. XY, LLC*,
    IPR2018-00250, paper 35 (PTAB Jun. 26, 2019) .......................................45, 50

**Federal Statutes**

35 U.S.C. § 102(a) ...........................................................................10, 44, 45, 50

35 U.S.C. § 316I....................................................................................................8

**Regulations**

37 C.F.R. § 42.108 ................................................................................................8

**Other Authorities**

IPR2017-01621 and -01622 ...........................................................................47, 48

IPR2017-01622, Paper 9 .................................................................................49, 50

MPEP § 2132.01 .................................................................................................45

PubMed, *available at* <u>https://pubmed.ncbi.nlm.nih.gov/</u> (last visited Nov. 1,
    2021) ................................................................................................................16

EXHIBIT LIST

| Exhibit | Description |
|---------|-------------|
| EX2001 | Declaration of Dr. Aaron Waxman |
| EX2002 | Dr. Waxman's *curriculum vitae* |
| EX2003 | Declaration of Dr. Werner Seeger |
| EX2004 | Declaration of Dr. Hossein A. Ghofrani |
| EX2005 | Declaration of Dr. Frank Reichenberger |
| EX2006 | Declaration of Dr. Friedrich Grimminger |
| EX2007 | Tyvaso Orange Book listing |
| EX2008 | Hill, N., 2005, *Therapeutic Options for the Treatment of Pulmonary Hypertension,* Medscape Pulmonary Medicine 9(2). |
| EX2009 | Substantive Submission filed in 12/591,200 (Mar. 9, 2015) |
| EX2010 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-1 (public docket). |
| EX2011 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-11 (public docket). |
| EX2012 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-16 (public docket). |
| EX2013 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), unnumbered docket entry dated 7/30/2020 |
| EX2014 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-20 (public docket)(excerpted). |
| EX2015 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-29 (public docket). |
| EX2016 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-45 (public docket). |

| Exhibit | Description |
|---------|-------------|
| EX2017 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-21 (public docket). |
| EX2018 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-41 (public docket). |
| EX2019 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-49 (public docket). |
| EX2020 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-68 (public docket). |
| EX2021 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-71 (public docket). |
| EX2022 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-40 (public docket). |
| EX2023 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-47 (public docket). |
| EX2024 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-75 (public docket). |
| EX2025 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-80 (public docket). |
| EX2026 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-81 (public docket). |
| EX2027 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-92 (public docket). |

| Exhibit | Description |
|---------|-------------|
| EX2028 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-74 (public docket). |
| EX2029 | Hess *et al.,* 2007, A guide to aerosol delivery devices for respiratory therapists. American Association for Respiratory Care |
| EX2030 | Dennis JH, 2002, Standardization issues: in vitro assessment of nebulizer performance. Respir. Care. 47(12):1455-1458 |
| EX2031 | Hess *et al*., 1996, Medication nebulizer performance. Effects of diluent volume, nebulizer flow, and nebulizer brand. Chest, 110(2):498-505 |
| EX2032 | Rubin BK *et al.*, 2008 Treatment Delivery Systems (in Clinical Asthma), *available at* https://www.sciencedirect.com/topics/medicine-anddentistry/nebulizer |
| EX2033 | Gardenhire, D.S. *et al.*, 2017, A Guide to Aerosol Delivery Devices for Respiratory Therapists (4th Ed.) American Association for Respiratory Care |
| EX2034 | Tyvaso® Label 2021 |
| EX2035 | Bourge *et al., Cardiovascular Therapeutics*, 31:38-44 (2013) |
| EX2036 | McLaughlin *et al.*, *Efficacy and safety of treprostinil: an epoprostenol analog for primary pulmonary hypertension*, J. Cardiovascular Pharmacology, 41:293-299 (2003) |
| EX2037 | Springer website (from fn 13 of Hall-Ellis Decl) |
| EX2038 | (Intentionally Left Blank) |
| EX2039 | Springer website (from fn 14 of Hall-Ellis Decl) |
| EX2040 | University of Wisconsin–Madison Library Catalog Search for holdings of *Circulation: the journal of the American Heart Association* |
| EX2041 | Declaration of Ms. Pilar Wyman |
| EX2042 | Ms. Pilar Wyman's *curriculum vitae* |
| EX2043 | Deposition Transcript of Sylvia Hall-Ellis, Ph. D. |
| EX2044 | American Heart Association Listing of *Circulation* Supplements |

| Exhibit | Description |
|---------|-------------|
| EX2045 | Chemical Abstracts Plus Search Results Transcript |
| EX2046 | Ovid Search Results for "Voswinckel" |
| EX2047 | PubMed Search Results for "Voswinckel" |
| EX2048 | Compilation Showing Search Results for Descriptor Terms |
| EX2049 | Oxford Academic Listing of *European Heart Journal* Supplements |
| EX2050 | Simonneau *et al.*, *Updated Clinical Classification of Pulmonary Hypertension.*, J Am. College of Cardiol, 62(25)D34-D42 at D34-D35 (2013) |
| EX2051 | Sitbon and Noordegraaf, *Epoprostenol and pulmonary arterial hypertension:* 20 years of clinical experience, Eur. Respir Rev. 26:160055 (2017) |
| EX2052 | Second Declaration of Dr. Aaron Waxman |
| EX2053 | Declaration of Dr. Jason McConville |
| EX2054 | Dr. McConville's *curriculum vitae* |
| EX2055 | Deposition of Dr. Nicholas Hill |
| EX2056 | Deposition of Igor Gonda, Ph. D. |
| EX2057 | *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, Johns Hopkins Medicine, *available at* https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure |
| EX2058 | Pharmacokinetics of Inhaled Drugs, *available at* https://media.lanecc.edu/users/ driscolln/RT127/Softchalk/Pharmcology_SFTCHLK_Lesson/ Pharmacology_lesson10.html |
| EX2059 | (Intentionally Left Blank) |
| EX2060 | Waxman *et al., Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, N. Eng. J. Med. 384:325-334 (2021) |
| EX2061 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, Declaration of Dr. Robert Roscigno (EX2048) |

| Exhibit | Description |
|---------|-------------|
| EX2062 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2049) |
| EX2063 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2050) |
| EX2064 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2051) |
| EX2065 | Declaration of Dr. Werner Seeger regarding Application No. 11/748,205 |
| EX2066 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2020) |
| EX2067 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Hossein A. Ghofrani (EX2026) |
| EX2068 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Frank Reichenberger (EX2027) |
| EX2069 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Friedich Grimminger (EX2028) |
| EX2070 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2097) |
| EX2071 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Second Declaration of Dr. Werner Seeger (EX2098) |
| EX2072 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2101) |
| EX2073 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2102) |
| EX2074 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Second Declaration of Dr. Hossein A. Ghofrani (EX2099) |
| EX2075 | Le Brun *et al.*, *A review of the technical aspects of drug nebulization*, Pharmacy World & Science, 22(3):75-81 (2000) |
| EX2076 | Kendrick, *et al.*, *Selecting and Using Nebuliser Equipment*, Thorax, 52(Suppl 2):S92-S101 (1997) |
| EX2077 | Rau *et al.*, *Performance Comparison of Nebulizer Designs: Constant-Output, Breath-Enhanced, and Dosimetric*, Respiratory Care, 49(2):174-179 (2004) |

| Exhibit | Description |
|---------|-------------|
| EX2078 | Rau, *The Inhalation of Drugs: Advantages and Problems*, Respiratory Care, 50(3):367-382 (2005) |
| EX2079 | Hess *et al.*, *Medication Nebulizer Performance*, Laboratory and Animal Investigations, 110(2):498-505 (1996) |
| EX2080 | FDA Guidance 2002 |
| EX2081 | Newman *et al.*, *Efficient Delivery to the Lungs of Flunisolide Aerosol from a New Portable Hand-Held Multidose Nebulizer*, 1996 85(9) J. Pharm Sciences 960 (1996) |
| EX2082 | Dubus *et al.*, *Aerosol Deposition in Neonatal Ventilation*, PEDIATRIC RESEARCH, 58(1):10-15 (2005) |
| EX2083 | Treprostinil, PubChem, *available at* https://pubchem.ncbi.nlm.nih.gov/compound/Treprostinil |
| EX2084 | Roscigno *et al.*, 2020 *Pharmacokinetics and tolerability of LIQ861, a novel dry-powder formulation of treprostinil.* Pulmonary Circulation, 10(4):1-9 (2020) |
| EX2085 | Roscigno *et al.*, *Comparative bioavailability of inhaled treprostinil administered as LIQ861 and Tyvaso® in healthy subjects,* Vascular Pharmacology 138:106840 (2021) |
| EX2086 | Declaration of Dr. Roham T. Zamanian regarding Application No. 12/591,200 |
| EX2087 | Sandifer *et al.*, *Potent Effects of aerosol compared with intravenous Treprostinil on the pulmonary circulation*, J. Appl. Physiol. 99:2363-2368 (2005) |
| EX2088 | U.S. Patent Publication No. 2012/0177693 (Cipolla *et al.*) |
| EX2089 | Liquidia SEC Form 10-K (2020) |
| EX2090 | Preston *et al.*, *Safety and efficacy of transition from inhaled treprostinil to parenteral treprostinil in selected patients with pulmonary arterial hypertension.* Pulm Cir. 4(3):456-461 (2014) |
| EX2091 | Expert Report of Dr. Igor Gonda (D. Del) (excerpts) |

## I.    INTRODUCTION

Liquidia Technologies, Inc. ("Petitioner") has failed to meet its burden of proving claims 1-8 of U.S. Patent No. 10,716,793 ("the '793 patent") are unpatentable because it relies on references that are not, in fact, prior art and bases its arguments on impermissible hindsight rather than teachings in the prior art.

First, each of Petitioner's six unpatentabily grounds rely upon references that Petitioner has failed to establish constitute prior art.  Grounds 1, 2, and 4 expressly rely on Voswinckel JESC and/or Voswinckel JAHA, but Petitioner has not set forth sufficient evidence to show that either abstract was publicly accessible as of the priority date of the claimed inventions.  Grounds 3-6 expressly rely on Ghofrani and/or Voswinckel 2006, but Petitioner has not set forth sufficient evidence to show that either of these references are antedating or "by others."  This fundamental failure of proof is fatal to Petitioner's case-in-chief.

Second, Petitioner's unpatentability grounds based on the combination of the '212 patent, Voswinckel JESC, and/or Voswinckel JAHA cobble together bits of disclosure guided by impermissible hindsight and expert declarations that rely on unsupported assumptions and unreliable calculations.  None of these references disclose administration of a single event dose from 15-90 μg to a human, let alone delivery of that dose in 1-3 breaths.  The '212 patent discloses sheep data delivered over 30 or more minutes. Voswinckel JESC and JAHA disclose concentrations, but

not single event doses. Petitioner therefore cites an undated device manual that Petitioner has not proven was publicly available and relies on assumptions of its experts in an attempt to calculate a single event dose. The POSA, however, would not perform these calculations and the calculations are flawed. Without disclosure of the claimed single event dose, Petitioner's grounds fail.

Accordingly, Petitioner has not carried its burden to prove unpatentability and the claims are patentable over all of the cited grounds.

## II. BACKGROUND

The '793 patent relates to the treatment of pulmonary hypertension and is listed in the Orange Book for Tyvaso® (treprostinil) Inhalation Solution, a drug-device combination for delivery of treprostinil by inhalation marketed by Patent Owner, United Therapeutics Corporation ("UTC"). EX1001, 18:22-23; EX2007.

### A. Pulmonary Hypertension

Pulmonary hypertension is a disease associated with high blood pressure in the pulmonary vasculature. *See generally* EX2050. At the time of the invention, as is the case even today, pulmonary hypertension is a poorly understood, often fatal, disease with limited treatment options.

Epoprostenol is a prostacyclin and was the first and only FDA-approved drug for the treatment of pulmonary arterial hypertension ("PAH") from 1995 to 2001. EX2051. The use of epoprostenol had substantial shortcomings. The half-life of

epoprostenol is only a few minutes, meaning that it is cleared from the body very quickly has a short duration of action. EX2008, 7-10. Thus, epoprostenol required administration by continuous intravenous infusion to maintain adequate levels in the body. Unfortunately, the need for a permanent transcutaneous intravenous catheter posed risks of infection, occlusion, and sepsis. Moreover, even a short interruption in infusion could increase the risk of hemodynamic collapse and even death because the half-life of epoprostenol is so short. Epoprostenol also requires daily mixing and refrigeration, which meant the patient must carry a cold pack to avoid degradation at room temperature and an infusion pump to administer the drug, which adversely affect patient compliance.

In 2004, a synthetic prostacyclin analog, iloprost (Ventavis®), was approved as an inhaled treatment for PAH. *Id.* at 10. Although inhaled iloprost had a slightly longer duration of action than epoprostenol, doctors still preferred intravenous administration of a prostacyclin analog over inhaled delivery of iloprost for a number of reasons. *Id*. For instance, iloprost has a half-life between 20-25 minutes and needs to be used 6-9 times a day, as frequently as every 2 hours, which is considered challenging for patients. *Id.* at 21, 23-24. Moreover, the fact that iloprost has a short half-life results in periods of patients being under-medicated while asleep unless they wake at regular intervals to take another dose. *Id.*

Treprostinil, the compound described in the '793 patent, was approved to treat PAH as a subcutaneous formulation (Remodulin®) by 2002 and for intravenous use in 2004. *Id.* Treprostinil offered benefits over both epoprostenol and iloprost such as room temperature stability and a half-life of several hours versus several minutes. Patients no longer needed to carry ice packs to ensure the stability, safety, and efficacy of the drug. *Id.* However, there were still significant limitations to subcutaneous and intravenous delivery of treprostinil, such as severe site pain for some patients, and systemic side effects. EX1018, 1.

### B. The Inventors Developed a Novel Method of Treating PAH That Overcame Limitations of Existing Treatments

At the time of the invention, the inventors recognized a need for improving existing pulmonary hypertension treatments. The '793 patent relates to a breakthrough method of treating pulmonary hypertension using high dose administration of inhaled treprostinil that addressed many of the substantial shortcomings of other existing treatments. The '793 patent claims methods of treating pulmonary hypertension using a single event dose of 15-90 micrograms of treprostinil, or a salt thereof, delivered by inhalation in only 1 to 3 breaths. By using the inhalation route of administration, the claimed methods overcame limitations to subcutaneous and intravenous administration, such as site pain injection, systemic side effects, and the need for patients to lug around bulky pumps. The inventors also improved the safety and efficacy of treatment with the surprising discovery that

treprostinil could be delivered at higher drug concentrations and shorter inhalation times (3 breaths) with fewer side effects.

The '793 patent issued from an application filed on January 31, 2020 and claims priority to a provisional application, 60/800,016, filed on May 15, 2006. Petitioner does not contest this priority date.

The '793 patent has 1 independent claim and 7 dependent claims. Independent claim 1 recites:

> A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

EX. 1001, claim 1. Dependent claims 2 through 5 require specific types of inhalation devices, namely a soft mist inhaler (claim 2), a pulsed ultrasonic nebulizer (claim 3), a dry powder inhaler (claim 4) or a pressurized metered dose inhaler (claim 5). Dependent claim 6 requires the formulation to be a dry powder, and dependent claim 7 requires the powder to comprise particles less than 5 micrometers in diameter. Dependent claim 8 requires the formulation to contain no metacresol.

The '793 patent teaches that administration of treprostinil using the claimed methods resulted in a significant reduction in pulmonary vascular resistance (PVR) and pulmonary artery pressure (PAP) and an increase in cardiac output. EX1001,

FIG. 10; 16:32-42. The specification describes the surprising result of clinical studies showing that the time of inhalation could be reduced by increasing the concentration of treprostinil aerosol. *Id.* at 16:61-63, 17:44-46. This single-breath drug administration induced pulmonary vasodilation for longer than 3 hours with minimal side effects. *Id.* at 18:1-6. Surprisingly, very high concentrations of treprostinil were well tolerated (*id.*), even though initial clinical trials showed that increasing concentration from 16 mcg/ml to 64 mcg/ml led to significant side effects without increasing pulmonary vasodilation. EX1007 (at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects").

The commercial embodiment of the '793 patent, Tyvaso® (treprostinil) Inhalation Solution, has shown distinct advantages over the other available treatments for pulmonary hypertension. Tyvaso® has a much longer half-life than Ventavis®. Thus, there is less risk of undermedication when the patient is asleep or otherwise unable to take the medication. Additionally, Tyvaso® does not need to be administered as frequently as Ventavis® (only 4 times a day, down from 6-9 times/day). Less frequent dosing leads to higher patient compliance, time savings of 1.4 hours per day (EX2052, ¶43) and lower risk of rebound hypertension. Patients transferring from inhaled iloprost to inhaled treprostinil also had improved six-minute walk distances (a common metric to assess pulmonary hypertension), improved patient satisfaction, and improved quality of life. *Id.* at 8-9. Notably, once

Tyvaso® entered the market, it was clinically preferred to Ventavis®. As illustrated below, Tyvaso® rapidly increased its market share after launch at Ventavis®'s expense, indicating the clinical advantages that Tyvaso® has over Ventavis®:



EX2086, ¶18.

## III. CLAIM CONSTRUCTION AND PERSON OF ORDINARY SKILL

The parties agree that all claim limitations of the '793 patent should be given their plain and ordinary meaning in the art by a person of ordinary skill in the art (POSA) as of May 15, 2006.

A POSA, with respect to the '793 patent, would have an M.D. or a graduate degree (Masters or Ph.D.) in a field relating to drug development and at least two years practical experience in either (i) the investigation or treatment of pulmonary

hypertension; or (ii) in the development of potential drug candidates, specifically in the delivery of drugs by inhalation. EX2052, ¶¶13-16; EX2053, ¶¶28-31.

## IV. PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR OBVIOUS

Petitioner has "the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316I; *see also* 37 C.F.R. § 42.108. Petitioner has failed to carry that burden for any of its six Grounds:

**Ground 1 (Claims 1-8)**: Obvious over '212 Patent, Voswinckel JESC, and Voswinckel JAHA
**Ground 2 (Claims 1-8)**: Obvious over '212 Patent and Voswinckel JESC
**Ground 3 (Claim 1)**: Anticipated by Ghofrani
**Ground 4 (Claims 1, 3, and 8)**: Obvious over Voswinckel JAHA and Ghofrani
**Ground 5 (Claims 1 and 3)**: Anticipated by Voswinckel 2006
**Ground 6 (Claims 2 and 4-8)**: Obvious over Voswinckel 2006 and the '212 Patent

Grounds 1 and 2 rely upon a combination of the '212 patent and Voswinckel JESC (Ground 2) and in further view of Voswinckel JAHA (Ground 1). Petitioner has failed to show that Voswinckel JAHA and Voswinckel JESC were publicly accessible prior art. Even setting aside this fatal flaw, none of the references

expressly teach a "single event dose"[1] of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." In an effort to fill this gap, Petitioner relies on flawed calculations and assumptions and an undated Operating Instruction Manual (EX1037) for a device referred to by Petitioner as "Optineb 2005." Pet., 23; *see also, e.g.*, EX1004, ¶¶74, 108; EX1002, ¶47.[2] In addition to improperly relying on the undated OptiNeb Manual, the POSA would not be able to calculate a delivered dose based on the scant information in Voswinckel JAHA or JESC, let alone with any reasonable accuracy. Accordingly, Petitioner cannot meet its burden of establishing that the '212 patent, Voswinckel JESC and/or Voswinckel JAHA teaches or suggests the claimed dose or that a POSA would have been motivated to combine the teachings of these prior art references to achieve the claimed invention with a reasonable expectation of success.

---

[1] A POSA would understand "single event dose" to mean the dose administered in one sitting, which could be one or multiple breaths. EX2053, ¶50 n.5; EX2052, ¶48 n.4.

[2] Both Drs. Gonda (EX1004, ¶108) and Hill (EX1002, ¶47) rely on the specification of the '793 patent as disclosing that a "pulsed" feature of the Optineb device was known, but the modifications that gave rise to this "pulsed" feature in the Optineb device are not prior art. EX2003, ¶26.

Further, Grounds 3 through 6 explicitly rely on Ghofrani and/or Voswinckel 2006. Ghofrani and Voswinckel 2006 do not qualify as prior art under § 102(a) because they are not "by another" as Drs. Seeger, Ghofrani, Reichenberger, and Grimminger explain, the information relied upon by Petitioner for these two references was solely the work of the inventors of the '793 patent. As discussed below, these references are also antedated because the claimed invention was invented prior to the publication date of Ghofrani and Voswinckel 2006 and are thus, not qualifying prior art.

## A. Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA Fail to Render Claims 1-8 Obvious

The Petition fails to establish by a preponderance of the evidence that any of the challenged claims are invalid as obvious over the combination in Ground 1 for several reasons. First, Petitioner has not set forth sufficient evidence to show that Voswinckel JAHA and Voswinckel JESC were publicly accessible prior art. Specifically, Petitioner failed to establish that either of these abstracts were received by a library before the priority date. Furthermore, Petitioner failed to identify how a POSA could allegedly locate these abstracts through the exercise of reasonable diligence before the priority date. To the contrary, the evidence shows that the Voswinckel JAHA and Voswinckel JESC abstracts are not indexed and difficult to find even today.

Second, none of the cited prior art references teaches or suggests a "single event dose" of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." The '212 patent specified a broad range of delivered doses, but on a per kilogram and a per minute basis – not a total dose delivered. Voswinckel JESC and Voswinckel JAHA only provide the initial concentration of a pre-aerosolized drug solution and the length of time that the drug is inhaled. As explained in more detail below, the single event dose delivered for any given patient using an inhalation device depends upon numerous factors relating to the type of inhalation device used and use by the patient. The information provided by Voswinckel JESC and Voswinckel JAHA is insufficient for a POSA to determine what single event dosage was administered. Only impermissible hindsight fills this hole in the references.

Third, Petitioner has failed to show that a POSA would have had a reasonable expectation of success for treatment of a patient with pulmonary hypertension by modifying the dosage ranges of the '212 patent to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths.

### 1. Petitioner Has Not Established That Voswinckel JAHA And Voswinckel JESC Were Publicly Accessible Prior Art Before The Priority Date

The determination of whether a document is a "printed publication" that qualifies as prior art hinges on "public accessibility." *Blue Calypso, LLC v.*

*Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). Public accessibility is the "touchstone in determining whether a reference constitutes a printed publication," and a reference is considered publicly accessible only if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence[] can locate it." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (internal citations omitted).

For references stored in libraries, public accessibility requires that the reference be both available at the library and sufficiently indexed or catalogued by the priority date. *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016); *In re Klopfenstein*, 380 F.3d 1345, 1349 (Fed. Cir. 2004). In many circumstances, whether a reference is publicly accessible will turn on whether it was "meaningfully indexed such that an interested artisan exercising reasonable diligence would have found it." *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 774 (Fed. Cir. 2018).

### a) No Evidence That A Library Received Voswinckel JAHA Or Voswinckel JESC Before The Priority Date

Petitioner has failed to show that either Voswinckel JAHA (EX1008) or Voswinckel JESC (EX1007) were received by a library before the priority date. Neither reference contains a "received by" or "accepted" stamp or notation and

Petitioner's expert, Dr. Hall-Ellis, admitted the same. *See generally* EX1007; EX1008; EX2043, 150:16-23; EX2041, ¶¶13, 18-19, 33.

Dr. Hall-Ellis' reliance on the publication frequency for the journal *Circulation* and the *European Heart Journal* does not establish the public availability of the relevant abstracts appearing in the *supplements* of those journals. *See* EX2041, ¶¶10-14, 30-33. Voswinckel JAHA and Voswinckel JESC are abstracts appearing in special supplements of the journal *Circulation*, published by the American Heart Association (the "Circulation Supplement"), and the *European Heart Journal*, published by the European Society of Cardiology ("EHJ Supplement"), respectively. *Id.*, ¶¶6, 10, 28, 30; *see also* EX2043, 108:15-25, 219:1-23. The *Circulation* and *EHJ* Supplements are not normal issues, and instead constitute irregularly published supplements, each containing thousands of disjointed abstracts. *Id*.

Importantly, supplements compiling conference abstracts can sometimes publish years after the conference in question, putting the *Circulation* and *EHJ* Supplements' availability (if any) past the priority date. EX2041, ¶¶10-11, 30-31. Thus, the publication frequencies for normal issues of *Circulation* and *EHJ* do not establish when a library might have received a print copy of the irregularly published supplements. *Id.* at ¶¶9-14, 29-33. Accordingly, Petitioner has not provided any evidence showing if or when *Circulation* and *EHJ* Supplements were actually

received by a library.  *Id*. at ¶¶14, 27, 33; *see also* EX2043, 150:16-151:7, 157:6-11, 217:11-13, 222:1-10.

Library Machine-Readable Cataloging ("MARC") and Library of Congress ("LOC") records containing metadata fields cited by Dr. Hall-Ellis likewise fail to establish when the *Circulation* or *EHJ* Supplements were publicly accessible.  All of the records provided by Dr. Hall-Ellis relate only to the journal *Circulation* and the *EHJ – i.e.*, the publications at large, comprising all published issues spanning decades – not the *Circulation* and *EHJ* Supplements that actually contain the Voswinckel JAHA and JESC abstracts.  *See* EX1036, ¶¶63, 69; *see also* EX2043, 157:1-5, 222:12–224:2; EX2041, ¶¶20-22, 34-35.  Because the metadata fields in MARC and LOC records cited by Dr. Hall-Ellis also relate to the entire journals Circulation and the EHJ, the records do not establish receipt of the *Circulation* or *EHJ* Supplements before the priority date.  *Id.*

### b) Insufficient Evidence that Voswinckel JAHA and JESC Could Have Been Located with Reasonable Diligence

Even assuming Voswinckel JAHA and JESC were received by the University of Wisconsin-Madison and University of Iowa libraries, respectively, before the priority date, Petitioner has still failed to show that the abstracts were meaningfully catalogued and indexed before the priority date such that a POSA could have located

them through reasonable diligence.[3] *Acceleration Bay*, 908 F.3d at 774. There are two major shortcomings with Petitioner's alleged evidence.

First, Petitioner has not offered any evidence that Voswinckel JAHA and Voswinckel JESC were meaningfully catalogued or indexed at a library or in a database before the priority date, or why and how a POSA would search for or find the *Circulation* and *EHJ* Supplements. *See* EX2041, ¶¶16-17, 34-37. Even if a POSA found the Supplements, Voswinckel JAHA shares the page with three-and-a-half other abstracts and is just one of many thousands of abstracts spanning 1,102 pages in the full version of the *Circulation* Supplement. *Id*. at ¶10. Petitioner has not submitted any evidence that the *Circulation* Supplement contained a table of contents or subject matter index through which the cited abstract (number 1,414) could be located. *Id*. at ¶¶7-8, 25-26. Similarly, Voswinckel JESC cited by Petitioner shares the page with three other abstracts and is just one of 3,850 abstracts spanning over 700 pages in the full version of the *EHJ* Supplement. *Id*. at ¶28. Although there is a list of "Contents" included within Voswinckel JESC, it is not

---

[3] The Federal Circuit has held that proof of indexing in a "meaningful way," together with evidence that the indexing occurred by the critical date, may be necessary before the burden shifts to Patent Owner to prove otherwise. *In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009).

organized alphabetically or otherwise ordered by subject. *Id.* at ¶35. As a result, Petitioner has not shown that the POSA could locate either Voswinckel JAHA or JESC using reasonable diligence.

To the contrary, it is undisputed that Voswinckel JAHA and Voswinckel JESC remain difficult to find even today. For example, Dr. Hall-Ellis admitted she either did not search for Voswinckel JESC using typical searches, such as through a common database like PubMed,[4] or was unable to locate Voswinckel JESC. *See* EX2043, 242:11–245:22. Ms. Wyman searched all of the databases cited by Dr. Hall-Ellis (*see id.* at 41:1-42:4; 242:11-243:18 (listing Ovid, PubMed, MEDLINE, Index Medicus, and Chemical Abstracts)), but neither abstract is listed in any of these databases today, and Petitioner has failed to show they were listed in 2006. EX2041, ¶¶5, 16-17, 37. Moreover, the *Circulation* Supplement cannot be found on the *Circulation* Journal's website, AHA online archives, or even in a list of supplements to the journal. *Id.* at ¶¶12, 15. Similarly, the *EHJ* Supplement cannot be found on *European Heart Journal's* website or online archives. *Id.* at ¶32.

---

[4] PubMed.gov searches "more than 33 million citations for biomedical literature from MEDLINE, life science journals, and online books." *See* PubMed, *available at* https://pubmed.ncbi.nlm.nih.gov/ (last visited Nov. 1, 2021).

Second, the MARC and LOC records cited by Dr. Hall-Ellis do not establish meaningful indexing either. Dr. Hall-Ellis cites two subject headings or descriptor terms, "Cardiology $x Societies" and "Heart $x Diseases $v Periodicals," as alleged evidence of meaningful indexing. EX1036, ¶64. However, these terms only indicate the entire journals themselves were allegedly indexed with these terms and are not unique to the cited abstracts. EX2041, ¶¶20-23, 34-35. *Circulation* has been published for more than 50 years (*id*. at ¶24), and the *EHJ* has been published for about 40 years (*id*. at ¶35), so merely locating the journals would not help a POSA find the Supplements, let alone the specific Voswinckel abstracts buried among many thousands of other disparate abstracts. *Id.* at ¶¶4, 20-24, 34-35. Any searches using Dr. Hall-Ellis' descriptor search terms would be futile as they would return hundreds of thousands of hits, including hundreds of journals having decades of issues.[5] *Id.* at ¶¶4, 23-25, 34-35; *see also* EX2043, 158:5-160:2.

---

[5] Dr. Hall-Ellis admitted that researchers typically only look at the first three pages of search results, (EX2043, 88:7-9), which confirms the difficulty the POSA would have in locating the Voswinckel abstracts when faced with so many journals, issues, and articles hitting on Dr. Hall-Ellis's search terms.

The law requires Petitioner to provide evidence establishing that Voswinckel JAHA and Voswinckel JESC were received at a library and meaningfully indexed before the priority date.[6]  Petitioner's evidence falls far short of that standard (EX2041, ¶¶3-4, 27, 38), and the Board should find that Petitioner has failed to prove that the Voswinckel JAHA and JESC abstracts were publicly accessible prior art.

### 2. None of the identified references teaches a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths

None of the '212 patent, Voswinckel JAHA, or Voswinckel JESC references teach a single event dose of treprostinil of 15 micrograms to 90 micrograms, delivered in 1 to 3 breaths.  Petitioner concedes that the '212 patent and Voswinckel JESC do not explicitly disclose these limitations.  Pet., 37-39.

### a) The '212 patent

U.S. Patent No. 6,521,212 ("the '212 patent") issued February 8, 2003 and is titled "Method for Treating Peripheral Vascular Disease by Administering Benzindene Prostaglandins by Inhalation."  The '212 patent teaches methods of delivering benzindene prostaglandins by inhalation generally.  EX1006, Abstract.  The '212 patent states, "aerosolized treprostinil] has a greater potency as compared to intravascularly administered [treprostinil]."  *Id.* at 8:9-10.  The '212 patent

---

[6] *Blue Calypso,* 815 F.3d at 1348; *Acceleration Bay,* 908 F.3d at 774.

provides examples, wherein intravenous or aerosolized treprostinil is administered to sheep at 30, 60 or 90 minutes at a concentration of 250, 500, or 1000 ng/kg/min. *See, e.g., Id.* at FIGS 3-18, Examples I-V.

The '212 patent does not teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. Instead, the '212 patent describes a very broad range of dosages delivered over a period of minutes. The disclosed dosages either specify a "daily infusion dose" or "per kilogram bodyweight per minute" dose, which are not inhaled single event doses as claimed by the '793 patent but *rates* (*e.g.*, μg per unit of body mass per day) or *daily* doses:

> In the case of treating *peripheral vascular disease* by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to **a daily infusion dose** in the range of 25 μg to 250 mg; typically from 0.5 tg[sic] to 2.5 mg, preferably from 7 μg to 285 μg, **per day per kilogram bodyweight**. For example, an intravenous dose in the range 0.5 μg to 1.5 mg **per kilogram bodyweight per day** may conveniently be administered as an infusion of from 0.5 [μg] to 1.0 μg **per kilogram bodyweight per minute**. A preferred dosage is 10 **ng/kg/min**.

EX1006, 5:56-67 (emphasis added).

Further, the dosages described in the '212 patent are contemplated for use in a continuous nebulization device. For example, the '212 patent describes an "AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM" as the preferred device, and it is the only specific device mentioned anywhere in the patent. EX1006, 5:34-36;

EX2052, ¶53. This device is a *continuous* nebulizer designed to deliver small amounts of medication in a dosing event *spread over several minutes using dozens or hundreds of breaths*. EX2087, 2364; EX2052, ¶50. This type of device lacks the precision to deliver a measured amount of drug in the range of 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in only 1 to 3 breaths. EX2052. ¶55.

Similarly, the working examples of the '212 patent use continuous delivery of a treprostinil solution over 30, 60, or 90-minute intervals. EX1006, 10:44, 11:11-13. Treprostinil is delivered at a concentration of 250, 500 or 1000 ng/kg/min. None of these modes of administration disclose or teach a single event dose of 15 micrograms to 90 micrograms. EX2041, ¶52. Nor could a POSA determine the amount delivered in 1 to 3 breaths from the experimental descriptions of Examples I-V. EX2053, ¶¶49-50.

### b) Voswinckel JESC

Voswinckel JESC is a quarter-page abstract dated August/September 2004 and titled "Inhaled treprostinil is a potent vasodilator in severe pulmonary hypertension." EX1007. Voswinckel JESC generally describes the delivery of treprostinil over a six-minute interval using an OptiNeb ultrasound nebulizer with a pre-aerosolized starting solution of 16, 32, 48 and 64 µg/mL. EX1007. The abstract observed that "[a]t higher doses, local and systemic side effects may occur." *Id.*

Indeed, all patients who received the 64 µg/mL complained of headache, cough or bronchoconstriction, including one patient who complained of a major headache. *Id.* The reference concludes that, at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects." *Id.* Thus, Voswinckel JESC teaches away from titrating up to higher drug concentrations over an even shorter time interval.

Petitioner admits that Voswinckel JESC does not teach a single event dose of 15 micrograms to 90 micrograms, but instead describe solution concentrations and a nebulization time of 6 minutes[7] that their experts admit lack many details that bear on the actual delivered dose. Pet., 38. As explained in more detail below, the actual dose delivered for any given patient using an inhalation device depends upon a number of factors including the type of inhalation device used, pre-aerosolized drug concentration, gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions. Without accounting for any of these factors, Petitioner relies on unsupported calculations (discussed in section IV.A.3 below), that Petitioner alleges would lead a POSA to the claimed dosage range.

---

[7] A POSA would understand that the plain and ordinary meaning of the claimed dose of 15-90 µg is the dose delivered to the patient (as opposed to a quantity placed into a nebulizer or starting solution). EX2053, ¶55; EX2052, ¶65 n. 8.

c)     **Voswinckel JAHA**

Voswinckel JAHA is a quarter-page abstract dated October 26, 2004 and titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension." EX1008. Voswinckel JAHA generally describes the delivery of inhaled treprostinil sodium to 17 patients with severe pulmonary hypertension using a "pulsed" Optineb® ultrasound nebulizer in three breaths, with a pre-aerosolized treprostinil solution of 600 µg/ml. *Id.*

Petitioner does not contend that Voswinckel JAHA teaches a dosage of 15 micrograms to 90 micrograms. Instead, Petitioner relies on Voswinckel JAHA for teaching "a low number of breaths for the aerosolized delivery of treprostinil specifically for the treatment of pulmonary hypertension." *Id.* at 40. A POSA, reading Voswinckel JAHA, would not be able to determine the delivered dose in 1 to 3 breaths based on the disclosure of JAHA. EX2053, ¶52. The dosage delivered using an unknown pulsed nebulizer would depend on a number of factors including the amount of aerosol delivered per pulse, the number of pulses generated per breath, the shape of the mouthpiece or mask, and the breathing pattern of the patient. *Id.*

Accordingly, because none of the identified references in Ground 1 teach a single event dosage of 15 micrograms to 90 micrograms or provide any motivation for administering this amount, this ground must fail even if all of the references are prior art (which they are not).

### 3. The POSA Would Not Be Motivated To Combine The '212 Patent, Voswinckel JESC, and Voswinckel JAHA With A Reasonable Expectation of Success

Petitioner concedes that neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. Instead, Petitioner incorrectly argues that these two references render this limitation obvious based on three erroneous calculations. The first erroneous calculation relies on an undated Optineb manual, which Petitioner suggests provides a nebulization rate for an OptiNeb® ultrasound nebulizer. Yet there is no evidence that this manual is prior art or refers to a device that was available, much less used, in the reported studies. Petitioner incorrectly relies on this assumption to argue that the patients described in Voswinckel JESC may have received more than 1 ml of solution and leaps to conclude that these subjects received dosages of treprostinil within the claimed ranges.

The second erroneous calculation relies on unsupported assumptions provided by the testimony of Drs. Hill and Gonda that nebulizers are usually prescribed to deliver more than 1 ml of solution. Moreover, Dr. Hill relies on his experience as an investigator in the Tyvaso® clinical trials and approved drug label – the drug embodying disclosure of the '793 patent. EX2055, 96:3-101:12. Petitioner incorrectly relies on these unsupported assumptions to argue that the patients

described in Voswinckel JESC received more than 1 ml of solution and further received dosages of treprostinil within the claimed ranges.

The third erroneous calculation relies on the teaching in the '212 patent that "the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." EX1006, 8:8-12, *see* Pet., 38-39. Petitioner and Dr. Hill provide calculations of an inhaled dose based on this 10-50% fraction and the dosing calculations approved by the FDA for intravascular treatment with treprostinil. But as Dr. Hill acknowledged, it is misleading to compare blood levels during infusion as compared to after inhalation and not an accurate measure of the relative potency of treprostinil in aerosolization versus intravascular administration. EX2055, 102:13-104:15.

As discussed in detail below, each of these erroneous calculations is unsupported by the record.

> **a) Petitioner Fails to Establish That the Undated Optineb Manual or Optineb Device Was Publicly Available at the Priority Date**

As a preliminary matter, while agreeing that Petitioner has not established that the undated Optineb manual is prior art (Institution Decision at 23), the Institution Decision relied on the undated Optineb manual "as evidence of the general knowledge in the art at around the time of the invention." *Id.* at 24 (citing *Koninklijke Philips N.V. v. Google LLC,* 948 F.3d 1330, 1337-1338 (Fed. Cir.

2020)). But even on this basis, Petitioner fails to show that the information disclosed in the undated Optineb manual was general knowledge as of the priority date.

The undated Optineb manual appears to be a translation of an Operating Instruction manual for "Optineb®-ir", a microprocessor-controlled, mobile ultrasonic nebulizer (Model No. ON-100/2-2.4 MHz). EX1037. This undated Optineb manual discloses certain technical features, including that the nebulizer output (what Petitioner's expert, Dr. Hill refers to as "nebulizing rate") is provided as 0.6 mL/min. *Id.* at 28. Petitioner relies on this technical detail to argue that Voswinckel JESC teaches "an effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil."

Dr. Hill first notes that Voswinckel JESC teaches "[d]oses of treprostinil in solution . . . of 16, 32, 48, and 64 μg/mL using an OptiNeb® ultrasound nebulizer." EX1002, ¶64. Dr. Hill next argues, without evidence, that nebulizers at the time were known to nebulize at least 1 mL by citing his personal experience and Petitioner's other expert, Dr. Gonda.[8] *Id.* at ¶65. As an initial matter, Dr. Hill

---

[8] But Dr. Hill admitted that he did not recall reviewing Dr. Gonda's declaration prior to signing his own declaration that cites to Dr. Gonda's declaration; rather he relied on his attorneys' "verbal" explanations "relay[ing] the content to [him]." EX2055, 132:20-134:5.

testified that his personal experience was based drugs for other indications, not prostcyclins for the treatment of pulmonary hypertension. EX2055, 146:16-23. Dr. Gonda cites three drug labels, but only one involved a pulmonary hypertension treatment and none of the cited drugs used an OptiNeb device. Dr. Hill further argues that "[a] POSA would further confirm that 16-64 μg was the administered dosage in Voswinckel JESC by using his understanding of the rate of solution delivery for OptiNeb® device available before 2006." *Id.* at ¶67. Citing only the undated Optineb manual for the proposition that the nebulizing rate of Voswinckel JESC would be 0.6 mL/min, Dr. Hill argues that continuous delivery of inhaled treprostinil across 6 minutes as described in Voswinckel JESC would have resulted in a dosage of 57.6 μg (16 μg/mL * 0.6 mL/min * 6 min). *Id.*

Dr. Hill's analysis of Voswinckel JESC in view of the undated Optineb manual fails based on several unsupported assumptions.

*First*, neither Petitioner nor Dr. Hill provide any evidence for their assertion that the undated Optineb manual was publicly available before 2006. The undated Optineb manual does not provide any copyright information that would indicate when it was first published. Nor does Petitioner make any effort to fulfill its burden to demonstrate public accessibility before 2006. Indeed, Petitioner provides no indication that the Optineb manual was disseminated or publicly available and indexed in a manner substantiating public accessibility since there is no evidence

that it could be located before the critical date using key words. *Blue Calypso*, 815 F.3d at 1349; *see also In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989)." Dr. Hill merely assumed that the undated Optineb manual was available before 2006 and testified that the only basis for his conclusion that this document was available in 2005 was "from the attorneys." He did not "know where the derivation was beyond that." EX2055, 63:3-64:2, 83:8-22. Further, Petitioner retained an expert to authenticate the publication date of other documents, but that declaration is completely silent on EX1037. *See* EX1036. Regardless, the inventors of the '793 patent, who contributed to development of Optineb, have confirmed it was not available before the 2006. EX2003, ¶26; EX2071 (IPR2017-01621, EX2098) (Seeger Decl.), ¶14 (citing EX2101-EX2102). In sum, Petitioner has failed to make *any* evidentiary showing that Exhibit 1037, the undated Optineb manual was publicly accessible as of the critical date of the '793 patent.

*Second*, there is no evidence that the Optineb manual reflects "general knowledge in the art at around the time of the invention." Institution Decision at 24. The Optineb manual is not being used for general knowledge, such as the existence of nebulizers capable of delivering drug within the recited parameters. Dr. Hill specifically used the Optineb manual to determine "the rate of solution delivery for the OptiNeb® device available before 2006," *i.e.*, the deliver rate of a prior art device. EX1002, ¶67. Dr. Hill confirmed that in addition to relying on EX1037 in

forming his opinion, he had no personal basis for his conclusion that this document was available in 2005, stating only that he "got it from the attorneys." EX2055, 63:3-64:2. He further testified that as of 2006 he had never used an OptiNeb device and that he had not tried to verify whether EX1037 came from the 2005. *Id.* Nonetheless, Dr. Hill relies on the Optineb manual for a specific fact integral to his calculations: an alleged nebulizing rate of 0.6 mL/min. There is no evidence that 0.6 mL/min or even a similar nebulization rate was general knowledge at the time of invention, suggesting reliance on hindsight.

*Third*, Dr. Hill assumes without evidence that the "OptiNeb ultrasound nebulizer, Nebu-tec, Germany" is *the same Optineb device* described in the undated Optineb manual. However, Dr. Hill conceded that he did not know what the "IR" refers to or whether the various Optineb models are the same or different devices. EX2055, 61:10-62:25. In fact, Dr. Hill did not know whether the Optineb device of EX1037 was the same device used in Voswinckel JESC because the reference does not identify which model was used. *Id.* at 81:12-22; 83:3-7.

Further, while the undated Optineb manual states the nebulizer output is 0.6 ml/min (EX1037, 28), that number is far too unsubstantiated and unclear to support any conclusions about actual nebulizer output in any specific instance. EX2053, ¶81. For example, the manual states that this particular nebulizer model has six different programs or modes (EX1037 at 18-20). In certain modes (P1, P2, and P3),

the device generates aerosol at intermittent intervals, while in other modes, it generates aerosol continuously. *Id.* Moreover, EX1037 fails to explain whether the 0.6 number is a maximum, minimum, or average; whether the number is a theoretical output based on the electrical components in the nebulizer or the ultrasonic horn driving nebulization of the aerosol; or, if the 0.6 ml/min was derived empirically, whether the measurements were of nebulization of pure water, or a solvent, or a mix of both, or if there was a drug or placebo in the solution. EX2053, ¶¶81-83. All of these variables could affect the amount of drug in the nebulizer output. *Id.*

As a result, even if the Optineb device disclosed in Voswinckel JESC were the same nebulizer described in the undated Optineb manual, there are too many unknowns such that a POSA could not calculate a single event dose. For example, Voswinckel JESC does not describe which program, face mask or mouthpiece, type of tubing, operation frequency, or which baffle plate was used, and all of these variations can effect the device's output. EX2053, ¶¶75-83. Thus, a POSA would not have been able to determine the dosage delivered in Voswinckel JESC with any reasonable certainty.

Because all of the factors addressed above affect the amount of aerosolized treprostinil delivered to the patient and are thus necessary factual predicates for Petitioner's statement that Voswinckel JESC teaches the claim element "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90

micrograms of treprostinil or a pharmaceutically acceptable salt thereof," Grounds 1 and 2, which rely only upon Voswinckel JESC when read in view of the undated Optineb manual to supply this limitation, must fail.

### b) Petitioner Fails to Establish That Fill Volume is Sufficient to Determine the Single Event Dose

With respect to Voswinckel JESC, Petitioner's argument that "a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least 16, 32, 48, or 64 µg of treprostinil were delivered to different dosing groups in this study" (*see* Petition at 23, EX1002, ¶99; EX1004, ¶56) is flawed on several grounds.

*First*, the single event dose of treprostinil delivered to a patient using a continuous nebulizer cannot be meaningfully determined using only the fill volume (*i.e.* the amount of pre-aerosolized solution loaded into the nebulizer). In practice, patients may be administered an inhaled therapeutic through a continuous nebulizer until the solution in the reservoir has been completely nebulized. *See* EX2052, ¶83. For example, each of the FDA approved labels, which Dr. Gonda cites to in his declaration, involve administering the solution until the contents of the reservoir of the nebulizer are emptied. EX.1004, 56, n. 4. But Voswinckel JESC does not describe nebulization until the reservoir is emptied. It mentions a six-minute time period, and there is no guarantee that the entire fill volume would be completely nebulized in six minutes. EX2052, ¶83; EX2053, ¶45.

The labels Dr. Gonda relies on indicate wide variability in the time required to nebulizer all of the solution. For example, the AccuNeb® Label referred to by Dr. Gonda teaches that it may take anywhere from 5 to 15 minutes for the 3 mL solution to be nebulized.[9] EX.1004, 56, n. 4; EX1066. Voswinckel JESC does not provide either the starting volume of treprostinil solution or identify whether the entire volume had been nebulized at 6 minutes. The AccuNeb® label also explicitly recognizes that *delivery* of a dose to the patient – as opposed to what is converted to an aerosol by nebulization – depends not only the nebulizer itself, but also on patient factors. EX2053, ¶61.

*Second*, even if Voswinckel JESC taught a starting volume of solution with a specified concentration of treprostinil, and further taught that the solution was completely nebulized – which Voswinckel JESC does not – a POSA still would not be able determine the single event dosage over that six-minute interval without additional information about the nebulization device. Fill volume is just one of many variables that may affect drug dosage. EX2001, ¶41; EX2053, ¶¶55-56. Additional factors that may affect the dose of drug received by a patient through a continuous

---

[9] Dr. Hill admitted that AccuNeb® is not used to treat pulmonary hypertension and there may be different considerations in determining whether a particular medication is suitable via a particular mode of administration. EX2055, 136:8-141:18.

nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern, and device interface. *See, e.g.,* EX2033, 11-12; EX2001, ¶13; EX2053, ¶55-56. These factors are not uniform between nebulization devices or patients; EX2053, ¶61. Thus, without additional information regarding the numerous factors mentioned above, the single event dose delivered to patients in Voswinckel JESC cannot be determined. EX2053, ¶¶55-60, 68.

*Third*, it is not true that all continuous nebulizers deliver a dosage of between 1 and 5 mL of aerosolized solution. *See, e.g.,* EX2082, 13; EX2053, ¶¶69-73. Certain commercially available nebulizers –available as of the priority date – were suitable for use with at least 0.5 mLs. *See, e.g.,* EX2082; EX2053, ¶71. Other nebulizers were known to deliver more than 5 mL of aerosolized solution. *See, e.g.,* EX2053, ¶71. A POSA would not know one way or the other whether the ultrasonic Optineb device of Voswinckel JESC was filled with more than 1 mL or less than 5 mL of solution. EX2053, ¶72.

*Finally*, as discussed in Section IV.A.2.a), it is impossible to extrapolate what an appropriate single event dose should be from the data included in Voswinckel JESC because the delivery efficiencies and pharmacokinetics of a continuous nebulizer to do not predictably translate to devices capable of delivering consistent

dosages in just 1 to 3 breaths. *See, e.g.*, EX2061, ¶¶11, 14-15 (citing IPR2017-01622, EX2049, EX2050, EX2051).

### c) Petitioner's Calculation of Dose Based on the Teachings of the '212 Patent are Flawed For Several Reasons.

Alternatively, Petitioner starts from the premise that the '212 patent "discloses a dosage range for intravascular administration of treprostinil for the treatment of pulmonary vascular disease, and discloses that only 10-50% of the dosage delivered intravascularly would be needed via inhalation *to have the same therapeutic effect*." *See, e.g.,* Petition at 30-31, 38-39. Petitioner's incorrect calculation starts with the fact that intravascular treprostinil is approved to treat pulmonary hypertension at a dosage of 1.25 ng/kg/min. Petitioner then calculates that a patient weighing between 60 and 65 kg would receive a dosage of 108 to 117 micrograms per day. Petitioner argues that a POSA would then "apply the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing to achieve a dosage of 10.8 to 58.5 micrograms." This analysis is flawed, because (i) the '212 patent does not provide a mathematical calculation for converting an intravascular dosage to an inhaled dosage; and (ii) Petitioner's flawed calculation establishes a *daily* dose not a *single event* dose.

What the '212 patent actually teaches is that "aerosolized [treprostinil] has a *greater potency* as compared to intravascularly administered [treprostinil]." EX1006, 8:8-10 (emphasis added). The '212 patent further explains, "the actual

amount of [treprostinil] delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:10-13. However, the '212 patent notes that "the mechanism(s) that accounts for the greater potency and efficacy for aerosolized UT-15 is unknown." *Id.* at 8:13-15.

Petitioner improperly reads into this disclosure a mathematical formula for converting a therapeutically effective dose of intravascularly administered treprostinil into a therapeutically effective dose of inhaled treprostinil. But the '212 patent provides no such formula. The '212 patent simply notes that inhaled solutions are more potent despite the fact that the delivered dose may only be 10-50% of the aerosolized solution. Nor do the examples support such a calculation. The examples described in the '212 patent simply demonstrate that at the *same dosage* (250, 500 and 1000 ng/kg/min) and *same duration* (30 and 60 minutes), UT-15 is more potent in aerosolized form than intravenous form. *See* EX1006, 11:7-13. There is nothing in this data to suggest a formula for calculating the therapeutic dosage of inhaled treprostinil from an approved intravascular treprostinil treatment.

Further, Petitioner's oversimplified calculation fails to take into account the difference in pharmacokinetic effects of a large dose of treprostinil delivered in 1-3 breaths. Large doses of treprostinil were known to produce "dose-limiting side effects" such as nausea, vomiting, headache, dizziness, and anxiety. *See, e.g.,* EX2037. For subcutaneous administration, the maximal tolerated dose is just 10

ng/kg/min, which is 2 orders of magnitude lower than the claimed dosage of the '793 patent. *Id.* As discussed above, intravascular treprostinil is approved at a much lower dosage of 1.25 ng/kg/min. EX1018.

Dr. Hill admits that it "is misleading to rely on blood levels, circulating levels" and "rough measures of relative potency between intravascular and aerosolized delivery." EX2055, 103:21-104:6; *see also* EX2090, 460. And Dr. Hill, outside of this IPR proceeding, would never rely upon the calculation he puts forward here. In his own publications, including one 8 years after the priority date, when not being paid by Liquidia to say the opposite, Dr. Hill told his colleagues that "how the pharmacokinetics and the effectiveness of inhaled forms compare to parental forms [i.e. intravenous and subcutaneous] of prostanoids at the currently approved doses . . . has not been adequately studied." EX2090, 460; *see also* EX2061, ¶11 (noting risk of spillover effect when inhaled amount of treprostinil is increased). Instead, "clinicians need to rely on clinical assessment as proof of response to therapy." *Id.*

Iloprost, the only other inhaled prostacyclin analogue as of the priority date, approved for dosages of 5 micrograms or less in a single event dose, demonstrated adverse systemic effects at doses as low as 7.5 micrograms per single event dosage. EX1001, 17:15-22. Given these dose limiting side effects, a POSA would not have been motivated to achieve a dose of 15 to 90 micrograms in just 1 to 3 breaths with any reasonable expectation of success.

Finally, even if the Board were to accept Petitioner's calculation, it does not result in a single event dose between 15 micrograms and 90 micrograms. Remodulin® intravenous infusion is dosed *continuously*, and 108 to 117 micrograms would be the dosage over *24 hours*. *Id.*, EX1018. The '212 patent teaches, therefore, that 10.8 to 58.5 micrograms would be the expected *daily* inhaled dose, and not a single event dosage. *Id.* As Dr. Hill admits, this calculation is comparing "apples and oranges." EX2055, 100:15-25.

The continuous nature of the drug delivery in the prior art confirms that one single event dose is insufficient to control PAH for an entire day. *Id.* For example, Voswinckel JAHA, which has itself not been established to be prior art, confirms that 4 individual dosing events were required throughout the day to treat pulmonary hypertension. *Id*; EX1008. Even at the high end, the simple math demonstrates that a 58.5 microgram daily dose would amount to less than 15 micrograms of treprostinil sodium per single event dose when spread over four individual dosing events. *Id*.

Surprisingly, during Dr. Hill's deposition, Petitioner asked about "dose adjustments" of Remodulin as described on the label on redirect. Dr. Hill testified that the dose of Remodulin may be adjusted "no more than 2.5 nanograms per kilogram per minute per week". *Id.* at 174:15-21. Dr. Hill then testified that these dose adjustments would "end up in that 15 to 90 microgram range taking into account dividing the dose in paragraph 100 by four." *Id.* at 176:5-10. Patent Owner

objects to this testimony because it is outside the scope of a proper redirect examination and presents new theories of invalidity that were not presented in the Petition. Further, following the dosage instructions from the Remodulin label would ultimately result in dosages significantly above a single event dose of 15 to 90 micrograms even if Petitioner's calculation methodology had any scientific merit, which it does not. *See, e.g.,* EX2052, ¶60.

For at least these reasons, a POSA would not be motivated to combine the disclosure of the '212 patent with the teachings of Voswinckel JESC and JAHA in a way that would result in a single event dose of 15 to 90 micrograms in 1 to 3 breaths with a reasonable expectation of success. There is simply no motivation offered by Petitioner that would override a POSA's serious concerns about side effects to support modifying the Voswinckel references and '212 patent in order to achieve a single event dose of 15 to 90 micrograms in 1 to 3 breaths. In fact, Voswinckel JESC warns in its Conclusion that "at a concentration of 16 µg/ml, near maximal pulmonary vasodilation is achieved without adverse effects" but "[a]t higher doses, local and systemic side effects may occur." EX1007. Nowhere does the Petition address why a POSA would increase the dose or have a reasonable expectation of success if the dose is increased by shortening the single event dose of Voswinckel JESC to 1 to 3 breaths using a much higher dose per breath. In fact, Petitioner's expert Dr. Gonda remarks in his own inhaled treprostinil patent

application that it would be preferable to *reduce* the treprostinil dosage taught by Voswinckel 2006 in order to reduce systemic levels and adverse side effects. EX2091, ¶¶25, 26, 29-32. If anything, a POSA would be motivated to lower the dose based on Voswinckel 2006 (if it were prior art at all).

### 4. Claims 4, 6, and 7: Petitioner's Arguments Regarding Obviousness Are Contradicted And Undermined By Its Arguments Regarding Enablement

Here, Petitioner asserts that claims 4, 6, and 7 are obvious. But in co-pending litigation between Petitioner and Patent Owner, Petitioner says the claims are not enabled. Petitioner cannot have it both ways.

Petitioner uses half of a page to assert that claim 4 would be obvious. Pet. 44. Petitioner cites the '212 patent, which describes an "inhaler" and references powder formulations in the specification and a claim, and an article stating that "dry powder inhalers were well known and 'widely accepted' as of 2006." *Id.* (citing EX1038, 1311). Petitioner cites the '212 patent again for claims 6-7, using four and three lines, respectively. Pet. 45. Dr. Gonda's declaration asserts that "because dry powder inhalers were well-known and 'widely accepted' by May 2006, … a POSA would have had a reasonable expectation of success that the "powder" disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." EX1004, ¶80 (citing EX1019, 33).

Dr. Gonda asserts the opposite in his district court expert report. Spanning twenty pages, Dr. Gonda identifies a litany of alleged challenges that he contends demonstrate a lack of enablement.[10] EX2091, 40-61. According to Dr. Gonda, "a POSA would have to engage in excessive (undue) experimentation to develop a treprostinil powder formulation and corresponding dry powder inhaler that achieve [sic] effective administration as required by claims 1, 4, 6, and 7 of the '793 patent." *Id.* at 42. "[T]he level of unpredictability in the art was high." *Id.* at 44. "Without guidance from the '793 Patent, *a POSA would be unable* to formulate a treprostinil powder suitable for administration via a dry powder inhaler for PH patients without excessive experimentation." *Id.* at 47 (emphasis added); *see also, e.g.*, *id.* at 49 (treprostinil would be more challenging that other drugs used with DPIs); 51 (powders present unique challenges).

Dr. Gonda's opinions in the district court completely contradict his assertions before the Board. *Compare* EX2091, 40-61 *with* Pet. 44 *and* EX1004, ¶¶76-80. This is particularly true where Petitioner and Dr. Gonda contend that "the '212 patent's disclosure that one can use a powder formulation of treprostinil is nearly identical to that of the '793 patent's disclosure of treprostinil powder formulations." EX1004,

---

[10] Patent Owner disputes Petitioner's claims of invalidity for lack of written description and enablement and obviousness.

¶78 n.8. "[N]early identical" disclosures cannot support both a reasonable expectation of success (*without* the '793 patent's guidance on dosing) and a conclusion of undue experimentation (*with* the '793 patent's guidance).

Dr. Gonda purports to condition his opinions on enablement, stating that the claims are not enabled "[t]o the extent [Petitioner] contends that he asserted claims are not obvious," but this does not resolve his inconsistency. *See, e.g.*, EX2091, 40. Patent Owner primarily contends the claims are nonobvious because the prior art lacks disclosure of a single event dose of 15-90 μg delivered in 1-3 breaths, regardless of the form of administration (liquid or powder). Whether the Board or Court agrees does not affect how difficult it allegedly was in 2006 to prepare a powder formulation for use with a DPI. Petitioner's conclusory evidence of obviousness is contradicted by its lengthy district court assertions and it has therefore failed to show Claims 4, 6, or 7 to be obvious by a preponderance of the evidence.

## B.    Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious

Petitioner's rationale under Ground 2 is identical to Ground 1, except with respect to the claim limitation "delivered in 1 to 3 breaths."  Rather than relying on Voswinckel JAHA for this limitation, Petitioner argues that this limitation "would have been obvious over the '212 Patent and Voswinckel JESC in view of a POSA's general knowledge in the field and/or by applying routine optimization."  To the

extent that Ground 2 relies on arguments set forth under Ground 1, Patent Owner incorporates the arguments from Section IV.A.

Petitioner is incorrect that a "POSA's general knowledge in the field" would motivate a POSA to "minimize the number of breaths required for administration of treprostinil." As discussed above, there were known dose limiting side effects associated with treprostinil and prostacyclin molecules generally that would have prevented a POSA from expecting that such a high dosage in just 1 to 3 breaths would be well tolerated. *See* Section IV.A.3.c). The "general knowledge" relied upon by Petitioner does not support the notion that the "the general state of the art had established safety and efficacy of high dosages of inhaled therapeutics delivered over a small number of breaths."

As a preliminary matter, Petitioner relies on publications that are not "prior art" as discussed in Section IV.C below (*i.e.*, Voswinckel 2006 (EX1009) and Ghofrani (EX1010)).

Second, even the actual prior art relied upon relate to different types of molecules with different indications and mechanisms of action. Geller 2003, for example, which Petitioner also relies upon, teaches inhalation of recombinant human deoxyribonuclease (rhDNase) for the treatment of cystic fibrosis. EX1034, Abstract. A POSA would understand that the ability of an inhaled therapeutic to be well tolerated at high concentrations in just 1 to 3 breaths is highly dependent on the

nature of the compound inhaled. EX2052, ¶89. The pharmacokinetic profile and potential side effects of inhaled rhDNase are completely unrelated to treprostinil or other prostacyclin analogues. *Id*. And Frijlink 2004 (EX1039) simply teaches that dry powder inhalers may be used to deliver high fine particle fractions to the lung resulting in relatively high lung deposition. It does not teach that high concentrations of treprostinil in just 1 to 3 breaths would be well tolerated in the case of a totally different patient population, namely pulmonary hypertension patients. Indeed, Dr. Hill acknowledged that there are different considerations in determining whether a particular medication is suitable via a particular mode of administration when treating different diseases. EX2055, 136:8-141:18. Finally, Petitioner relies upon Voswinckel JAHA, but as explained in Section IV.A.2.c) above, this abstract does not teach dosages of treprostinil of 15 micrograms to 90 micrograms.

Petitioner has likewise failed to explain *why* it would have been "routine optimization" to arrive at the claimed dosage in just 1 to 3 breaths in view of the general disclosures of the '212 patent and Voswinckel JESC. As discussed in Sections IV.A.2.a) and IV.A.2.b) above, neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms or teach administration of treprostinil in just 1 to 3 breaths. In fact, Voswinckel JESC teaches away from using higher concentrations due to side effects as described above.

Petitioner incorrectly assumes that a POSA could readily titrate dosage up from the teachings of the '212 patent and Voswinckel JESC to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. However, both the '212 patent and Voswinckel JESC utilize continuous nebulization to deliver a dosage of treprostinil over a longer duration. It would not be possible to administer a single event dose in 1 to 3 breaths of the claimed invention using these devices. Further, as discussed *supra*, with continuous nebulization, a patient breathes in a very small fraction of the nebulized output of the device over a substantial time period without knowing the precise dosage that is ultimately administered. *Id.* ("only 10% of the total dose loaded in a [continuous] nebulizer is in reality deposited in the lungs"). The patient wears a mask and breathes in unmeasured portions of the entire nebulized output delivered through the mask:



EX2033, EX2052, ¶37.

Various factors that would affect the dose of drug received by a patient through a continuous nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface. *Id.* at ¶38. Petitioner overlooks the fundamental difference between operating principles of continuous nebulization devices and other types of inhalation devices and erroneously combines elements from incompatible references throughout its Petition.

Petitioner's assertions of obviousness of claims 4, 6, and 7 fail for the same reasons as cited above with respect to Ground 1.

## C. Grounds 3-6 Fail Because Each Ground Relies On Publications That Petitioner Has Failed to Establish Are Prior Art

Petitioner does not dispute that Ghofrani and Voswinckel 2006 were both published less than one year prior to the date of the application that resulted in the '793 patent. *See, e.g.,* Petition at 25 (admitting that Ghofrani was published in June of 2005, *i.e.*, less than one year prior to the date of application); *Id.* at 27 (admitting that Voswinckel 2006 was published on January 17, 2006, *i.e.*, less than one year prior to the date of application). Accordingly, Petitioner bears the burden of establishing that Ghofrani and Voswinckel 2006 are prior art "by others" under 35 U.S.C. § 102(a). *See, e.g., Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.* 322 F.3d 1335, 1346 (Fed. Cir. 2003) (an inventor's own disclosure 'will

not anticipate his later invention" unless published more than one year prior to the application date).

Ghofrani and Voswinckel 2006 are not prior art unless they are the work of another. *In re Katz,* 687 F.2d 450, 454 (CCPA 1982). "[T]he fact that a reference does not list any co-inventors as authors, or that it lists other authors, is certainly not dispositive in itself." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); MPEP § 2132.01 (II) ("[a]n inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). A common inventive entity may still exist even where a co-inventor is not listed as an author on the purported prior art reference. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, paper 35, at 7-8, n. 8 (PTAB Jun. 26, 2019). The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019) (citing *In re Land,* 368 F.2d 866, 878 (CCPA 1996) and *In re DeBaun*, 687 F.2d 459, 462-63 (CCPA 1982)).

The declarations of inventors Drs. Seeger and Roscigno, together with the deposition testimony of Dr. Rubin and the corroboration provided by non-inventor Dr. Ghofrani, establish that the relevant portion of the Ghofrani reference was

reduced to practice by the present inventors prior to the publication date of the Ghofrani reference. EX2071, ¶5; EX2074, ¶8. In addition, Dr. Roscigno confirms and identifies corroborating regulatory documents demonstrating that the inventors had conceived of and reduced to practice all limitations of the independent claims by 2003, and certainly no later than January 2005. EX2061, ¶¶16-17 (citing EX2062-EX2064). Certainly, the inventors had reduced to practice at least the limitations alleged in Ghofrani by the end of 2003 and no later than January 2005. *Id.* at ¶14-15. The same is true in relation to Voswinckel 2006. Accordingly, Ghofrani and Voswinckel 2006 are not qualifying prior art.

### 1. Ghofrani

Ghofrani is a review article, published in German, describing "New therapies in the treatment of pulmonary hypertension." In addition to describing recent developments relating to inhaled treprostinil, the review article also describes other "new therapy approaches, which are partially still under development, and that can find their way into the therapy guidelines in the near future" including inhaled iloprost, selective endothelin A receptor antagonists (sitaxsentan and ambrisentan), and PDE5-inhibors (e.g., sildenafil). EX1010, 297.

The Ghofrani review article was co-authored by Drs. Seeger and Voswinckel (inventors of the '793 patent) as well as Drs. Ghofrani, Reichenberger, and Grimminger (non-inventors). Drs. Seeger and Voswinckel testified that they

contributed to portions of the Ghofrani review article relating to inhaled iloprost and inhaled treprostinnil. *See* EX2066, 3 (IPR2017-01621, EX2020) (Seeger Decl.). Drs. Ghofrani, Reichenberger, and Grimminger have each submitted declarations stating that they did not contribute to the sections of the Ghofrani review article relating to the studies on inhaled treprostinil. EX2004, ¶ 5; EX2005, ¶ 5; EX2006, ¶ 5; *see also* EX2067-EX2069 (IPR2017-01621 and -01622) (Ghofrani, Grimminger, Reichenberg Decls.) (EX2026, EX2099, EX2028, EX2027). Further, Drs. Ghofrani, Reichenberger, and Grimminger have each declared that they did not design the inhaled treprostinil clinical trials and that the information on the clinical trials mentioned in the Ghofrani article were designed and conducted by Drs. Voswinckel and Seeger based on their work with Drs. Olschewski, Rubin, Schmehl, Sterritt, and Roscigno. *Id.*

Instead, Drs. Ghofrani, Reichenberger, and Grimminger contributed to other sections of Ghofrani not relevant to the Petitioner's grounds for *inter partes* review. Dr. Ghofrani stated that his contribution was to the section on phosphodiesterase inhibitors. EX2004, ¶4. Dr. Ghofrani has experience in the use of phosphodiesterase inhibitors for treatment of pulmonary hypertension. *Id.* His contribution to the Ghofrani publication was drafting the section of the article relating to phosphodiesterase inhibitors and jointly drafting the sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of

pulmonary hypertension, as well as the introduction. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Reichenberger stated that his contribution was to the section on selective endothelin A receptor antagonists. EX2005, ¶4. Dr. Reichenberger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani was jointly drafting the section on selective endothelin A receptor agonists with Dr. Grimminger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Grimminger stated that his contribution was also to the section on selective endothelin A receptor antagonists. EX2006, ¶4. Dr. Grimminger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani consisted of jointly drafting the section on selective endothelin A receptor agonists with Dr. Reichenberger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Petitioner. *Id.* at ¶¶4-6.

As noted in *In re Katz*, "authorship of an article by itself does not raise a presumption of inventorship with respect to the subject matter disclosed in the article. Thus, co-authors may not be presumed to be co-inventors merely from the

fact of co-authorship." 687 F.2d at 455. The explanations provided by Seeger and *each of the non-inventor co-authors* – Drs. Seeger, Ghofrani, Reichenberger, and Grimminger – is consistent not only with the content of the article, but also with the nature of the publication, *i.e.*, a review article summarizing different advances in the treatment of pulmonary hypertension. *Id.* (accepting the Appellant's explanation "consistent not only with the content of the article but with the nature of the publication"). From such a fact pattern, joint inventorship with Drs. Ghofrani, Reichenberger, and Grimminger cannot be inferred.

Further, Petitioner appears to accept UTC's explanation for why Drs. Ghofrani, Reichenberger, and Grimminger are not inventors of the relevant subject matter of Ghofrani based on declarations submitted by these authors in IPR2017-01621. *See,* Pet. at 26 ("PO encountered this issue in IPR2017-01621 and IPR2017-01622 and submitted an affidavit attesting that these authors did not contribute to the relevant portion of Ghofrani. *See* IPR2017-01621; Paper 10 at 12-14; IPR2017-01622, Paper 9 at 12-15.")

Nonetheless, Petitioner contends that because "Olschewski, Rubin, Schmehl, Sterritt, and Roscigno were not listed as authors on the Ghofrani article"[11] there is an "inference that they did not make any contribution to Ghofrani's disclosure." *Id.* at 27. This distinction between authorship and inventorship is legally irrelevant. The fact that a reference does not list certain co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. There is no requirement that every listed inventor on the '793 patent be listed as a co-author to disqualify a reference under § 102(a) as not by another. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, Paper 35 at 7-8, n. 8. The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *See, e.g.*, *Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, Paper 40 at 20.

Here, the declaration of Dr. Seeger explains that these other co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical

---

[11] Robert Roscigno is a named inventor of the '793 patent, and was later employed as an executive of, and is currently a consultant for, Liquidia. Petitioner failed to present *any* evidence on these points.

studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶12, 22-27. Many of the specific parameters used in these studies performed by the co-inventors were not fully reported in Ghofrani. *Id.* at ¶¶11-12. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Ghofrani were conceived by the named inventors and not by the non-inventor co-authors of these references. EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on the Ghofrani review article is irrelevant to whether Ghofrani is "by another."

### 2. Voswinckel 2006

Voswinckel 2006 is a short "Clinical Observation" published in the Annals of Internal Medicine, titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," which describes clinical observations on three patients with severe pulmonary hypertension, who were treated with administration of a single 15 µg dose of treprostinil, inhaled in three breaths through a modified Optineb ultrasonic inhalation device.

Voswinckel 2006 was co-authored by Drs. Seeger, Voswinckel, and Dr. Olschewski (inventors of the '793 patent) as well as Drs. Ghofrani and Grimminger (non-inventors). Drs. Ghofrani and Grimminger have each submitted declarations stating that they did not contribute to design or control of the clinical trial described in Voswinckel 2006, and that all of the work performed by Drs. Ghofrani and/or

Grimminger was at the direction of or under the supervision and control of Drs. Seeger, Voswinckel, and Olschewski. EX2004, ¶¶7-12; EX2006, ¶¶7-12; *see also* EX2070, ¶6; EX2065. A publication is not the work of another where the work described was performed solely at the direction and supervision of the listed inventor(s). *See In re Katz,* 687 F.2d at 450, 455-456 (holding that a publication that identified an inventor and two students as authors was not the work of others, and thus not prior art, because the work performed by students in "testing features of the invention" was performed under the direction and supervision of the inventor); *see also CSL Behring LLC v. Bioverative Therapeutics Inc.,* IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019) (holding a publication is not the work of another where the patent owner can show that the non-inventor co-authors "carried out experiments under [the inventor's] direction and control," and that it was the inventor who "designed and lead the … project, and experiments performed by the co-authors.").

As set forth in the declarations, the dosage amounts of administered inhaled treprostinil to give to patients, the inhalation time and/or number of breaths employed, the particular equipment and administration devices and methods to use, the spacing between inhalation events, the analysis of the hemodynamic and pharmacokinetic effects over time in the study with inhaled treprostinil were all determined Drs. Seeger, Voswinckel, and/or Olschewski. Drs. Ghofrani and Grimminger did not participate in the design of any of the studies, did not select the

dosing regimen, and did not conduct analysis of patient results discussed in Voswinckel 2006. EX2004, ¶¶11-12; EX2006, ¶¶11-12.

As explained in the declarations of Drs. Seeger, Ghofrani, and Grimminger, it was standard practice within the group to include *all* group members as authors on clinical observation reports such as Voswinckel 2006, even when that group is broader than the individuals actually involved in inventing the methods or devices and designing the trials disclosed in that publication. EX2003, ¶21; EX2004, ¶¶10-11; EX2006, ¶¶10-11. This explanation is consistent with industry practice for publishing clinical observation reports such as this one. Joint inventorship with Ghofrani and Grimminger cannot be inferred in these circumstances.

Petitioner contends that "Olschewski, Roscigno,[12] Rubin, Schmehl, and Sterritt are identified as inventors of the '793 patent, but are not authors of Voswinckel 2006." Pet., 29. As a preliminary matter, UTC notes that Dr. Olschewski is an author on Voswinckel 2006.

Petitioner is also incorrect to state that, because these other co-inventors "are not authors on Voswinckel 2006, [this] supports the inference that they did not make any contribution to that disclosure." Pet. at 29. As discussed above with respect to Ghofrani, this fact is legally irrelevant. The fact that a reference does not list certain

––––––––––––––––––––

[12] *See* footnote 4, above.

co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. Rather, as is the case here, the non-author co-inventors, contributed to aspects of one or more of the claimed inventions, not disclosed by the publication that Petitioner is relying on.

Here, Dr. Seeger explains that these co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶19-20, 22-27. Many of the specific parameters used and the particulars of these studies performed by the co-inventors were not fully reported in Voswinckel 2006 (for example, the particular details of the "*modified* OptiNeb® ultrasonic device"). *Id.* at ¶19. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Voswinckel 2006 were conceived by the named inventors and not by the non-inventor co-authors of these references. EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on Voswinckel 2006 is not dispositive on the issue.

## V.    OBJECTIVE INDICIA OF NONOBVIOUSNESS

There are a number of secondary considerations that establish that the claims of the '793 patent are not obvious as of the priority date, including unexpected results, copying and unmet need.

### A.    Unexpected Results

For the reasons discussed above, Petitioner has failed to establish a prima facie case of obviousness under any one of Grounds 1-6.  Moreover, the specification teaches the claimed single event dose of "15 micrograms to 90 micrograms of treprostinil" "delivered in 1 to 3 breaths" unexpectedly achieved a therapeutically effective dose that was well tolerated which further supports non-obviousness of the claimed inventions.  A claimed dosage regimen as claimed in the '793 patent is non-obvious where it "produce[s] a new and unexpected result which is different in kind and not merely in degree from the results of the prior art." *In re Aller*, 220 F.2d 240, 456 (CCPA 1955); *E.I. DuPont de Nemours & Company v. Synvina C.V.,* 904 F.3d 996, 1007 (Fed. Cir. 2018); *In re Geisler,* 116 F.3d 1465, 1471 (Fed. Cir. 1997). Further, said critical range may be non-obvious, where the prior art taught away from the claimed range.  *Ormco Corp. v. Align Technology, Inc*, 463 F.3d 1299, 1311 (Fed. Cir. 2006).  Here, high doses of treprostinil were known in the art to produce dose-limiting side effects.  As a result, a POSA would not have expected such dosage ranges delivered in just a few breaths to be well tolerated.  EX2061, ¶¶11, 14-16

(citing IPR2017-01622, EX2049, EX2050, EX2051) (inventors "discovered unexpectedly that [they] could deliver more treprostinil in a shorter period of time with fewer side effects (increasing the treprotinil [sic] dose more than 10-fold compared with iloprost…was not obvious to anyone")).

Prostacyclin analogues were known to produce dose limiting adverse side effects. EX2036. For example, intravenous epoprostenol and intravenous treprostinil can induce headache, nausea, chest pain, jaw pain, backache and restlessness at certain concentrations. *Id*. EX2037 teaches that the maximum tolerated dose for intravenous treprostinil is 24.6 ± 4.0 ng/kg/min. Based on Dr. Hill's assumptions for a person's weight between 60 and 65 kg, the average maximal tolerated dose would have been between 1.47 micrograms/min and 1.59 micrograms/min. Even if a person were to take an entire minute to inhale the one to three breaths, the dosage of 15 micrograms to 90 micrograms, would be an order of magnitude larger than what was considered the maximal tolerated dose. *See also* EX2055, 113:23-114:10 (testifying that if he applied the calculation described in paragraph 100 of his report to the maximal tolerated dose of intravenous treprostinil the maximal tolerated dose of inhaled treprostinil should be 53.125 micrograms).

As of the priority date, only one approved inhalation therapy for the treatment of pulmonary hypertension – Ventavis® (iloprost) – was available. EX1029. Ventavis® was approved for a single event dose of 2.5 micrograms or 5 micrograms

to be taken 6 to 9 times per day.  Even at these doses, at least 39% of patients experienced at least one adverse event.  *Id.* at 8.  The Ventavis® label further teaches – in a study where health volunteers were given inhaled doses of iloprost solution every 2 hours increasing from 5 mcg to up to 20 mcg – 32% of subjects failed to reach the highest scheduled dose.  Both iloprost and treprostinil are prostacyclin analogs.  A POSA reading the iloprost label, would not have thought that dosages as high as 15 micrograms to 90 micrograms delivered in 1 to 3 breaths would have been well tolerated.

### B.  Copying

Petitioner's deliberate copying of Tyvaso®, Patent Owner's commercial product embodying the claimed invention, is further evidence of nonobviousness of the claimed inventions.  *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1136 (Fed. Cir. 2019) (copying by a competitor is evidence of nonobviousness) (citing *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1325 (Fed. Cir. 2004)).  Petitioner's commercial product is referred to in its press releases, corporate filings, patents and publications as LIQ861.  LIQ861 is an inhaled, dry-powder formulation of treprostinil.  It comes in four "capsule strengths" ranging from approximately 25 to 100 micrograms.  EX2084.  In clinical trials, LIQ861 has been administered using the Plastiape RS00 Model 8 dry powder inhaler in 2 breaths per capsule.  *Id.* at 2.  The pharmacokinetics and bioavailability of a 79.5 microgram capsule dose (which

delivers a single event dose of approximately 58.1 micrograms) was directly compared with Patent Owner's commercial product. EX2085. This study demonstrated that Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range. *Id.* at Abstract, 5; *see also* EX2036.

Evidence of copying is further supported by Petitioner's patent filings, which disclose that LIQ861 can deliver a single event dosage of treprostinil between 15 micrograms to 90 micrograms in 1 to 3 breaths. EX2088. Finally, Petitioner has chosen to submit an NDA to the FDA for LIQ861 under the 505(b)(2) regulatory pathway with Tyvaso® as the reference listed drug – relying in part on FDA's previous findings of efficacy and safety of Tyvaso® for the treatment of PAH. EX2089, 3.

**Comparison of Claims of '793 Patent to LIQ861**

| Claim 1 | LIQ861 |
|---|---|
| 1. A method of treating pulmonary hypertension comprising | "***LIQ861 is*** an investigational, inhaled, dry-powder formulation of treprostinil…***for the treatment of PAH***" EX2084, 2 <br><br> "Based on these results, a phase 3 study (INSPIRE; Clinicaltrials.gov Identifier NCT03399604) evaluating the long-term safety and tolerability of ***LIQ861 in patients with pulmonary arterial hypertension*** was initiated." EX2084, Abstract |

| | |
|---|---|
| administering by inhalation to a human suffering from pulmonary hypertension | "*LIQ861* is an investigational, ***inhaled***, dry-powder formulation of treprostinil…"<br>EX2084, 2 |
| a therapeutically effective single event dose of a formulation | "*LIQ861* has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***."<br>EX2084, 2<br><br>"*LIQ861*…safely delivering doses to the lungs ***in 1 to 2 breaths***."<br>EX2085, Abstract |
| comprising treprostinil or a pharmaceutically acceptable salt thereof | "*LIQ861 is* an investigational, inhaled, dry-***powder*** ***formulation*** ***of*** ***treprostinil***…"<br>EX2084, 2 |
| with an inhalation device, | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH."<br>EX2084, 2 |
| wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of | "…treprostinil exposure from LIQ861 (79.5 µg capsule [approximate delivered dose of 58.1 µg treprostinil])…"<br>EX2085, Abstract |

| treprostinil or a pharmaceutically acceptable salt thereof | |
|---|---|
| delivered in 1 to 3 breaths. | "***LIQ861*** has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***."<br>EX2084, 2<br><br>"***LIQ861***…safely delivering doses to the lungs ***in 1 to 2 breaths***."<br>EX2085, Abstract |
| **Claim 4** | **LIQ861** |
| 4. The method of claim 1, | *See above* |
| wherein the inhalation device is a dry powder inhaler. | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH."<br>EX2084, 2 |
| **Claim 6** | **LIQ861** |
| 6. The method of claim 4, | *See above* |
| wherein the formulation is a powder. | "***LIQ861*** is an investigational, inhaled, ***dry-powder formulation*** of treprostinil…"<br>EX2084, 2 |
| **Claim 7** | **LIQ861** |
| 7. The method of claim 6, | *See above* |

| wherein the powder comprises particles less than 5 micrometers in diameter. | "LIQ861 particles are a precise, uniform size (1µm) and trefoil pollen-like shape." |
| | Roscigno, Poster presentation at the Pulmonary Vascular Research Institute (PVRI) 12th Annual World Congress, Jan. 2018. Available online here. |

### C. Long-Felt Unmet Need

The claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension. *See, e.g., Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.,* 566 F.3d 989, 998 (Fed. Cir. 2009) ("Secondary considerations of non-obviousness include . . . [the claimed invention's] satisfaction of a long-felt need."). *First*, inhaled treprostinil is indicated for a broader range of pulmonary hypertension patients than the therapeutics available at the time. *Second,* even for the treatment of pulmonary arterial hypertension, many patients found the existing therapies either intolerable or ineffective.

Inhaled treprostinil is currently approved for pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease. *Compare* EX2034 (2021 Tyvaso® label) *with* EX1018. The '793 patent further suggests that inhaled treprostinil in doses of 15 to 90 micrograms may also be effective for other types of pulmonary hypertension. *See, e.g.,* EX1001, 9:44-50 (explaining that the study described in example 1 included patients with idiopathic PAH, PAH other,

chronic thromboembolic pulmonary hypertension (CTEPH) and pulmonary fibrosis).

As of May 2006 – in fact, even as of January 28, 2021 – no therapies were approved for the treatment of pulmonary hypertension in patients with interstitial lung disease.  EX2060, 325.  As Petitioner's own expert acknowledged, there is "a completely unmet medical need" where "[t]here [is] nothing that these patients were getting as a therapy for their problems."  EX2056, 105:6-8 (discussing the unmet need provided by Pulmozyme).

Even where other therapies had been approved, for example, for the treatment of pulmonary arterial hypertension, there still existed a need for the inhaled dosing regimen described in the claims of the '793 patent.  By Petitioner's own admission, the claimed invention of the '793 patent satisfies a long-felt unmet need.  EX2089, F-7.  In promoting its own product, LIQ861 – which infringes and is an embodiment of the claimed invention, Petitioner touts that the claimed invention as embodied by LIQ861 satisfies a long-felt unmet need.  EX2085.  ("Given the comparable treprostinil bioavailability and similar safety profiles of LIQ861 and Tyvaso®, LIQ861 fulfills a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler").

## VI. CONCLUSION

For the foregoing reasons, the claims are patentable over the cited grounds,

and Petitioner has not carried its burden to prove unpatentability.

Respectfully submitted,

Date November 10, 2021

FOLEY & LARDNER LLP

3000 K St., NW

Washington Harbour

Washington, DC 20007

Telephone: (202) 672-5569

Facsimile: (202) 672-5399

By /Stephen B. Maebius/

Stephen B. Maebius

Registration No. 35,264

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Patent Owner Response complies with the type-volume limits of 37 C.F.R. § 42.24(b)(1) because it contains 13,906 words (which is less than the 14,000 permitted), according to the word-processing system used to prepare this Patent Owner Preliminary Response, excluding the portions exempted by 37 C.F.R. 42.24(a)(1)).

Date November 10, 2021                    By /Stephen B. Maebius/
FOLEY & LARDNER LLP                    Stephen B. Maebius
3000 K St., NW                                   Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Patent Owner

Response and accompanying Exhibits was served on counsel of record

for Petitioner on November 10, 2021 by delivering a copy via email to the counsel

of record for the Petitioner at the following addresses:

zLiquidiaIPR@cooley.com
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com

Date November 10, 2021                         By /Stephen B. Maebius/
FOLEY & LARDNER LLP                            Stephen B. Maebius
3000 K St., NW                                 Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399