# EXHIBIT 29

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

————————————

IPR2021-00406
U.S. Patent No. 10,716,793

————————————

**DECLARATION OF AARON WAXMAN, M.D., PH.D**

**IPR2021-00406
United Therapeutics EX2052**

# **Table of Contents**

I.     INTRODUCTION ......................................................................................1

       A.     Scope of Analysis .........................................................................1

       B.     Qualifications ...............................................................................1

       C.     Materials Considered....................................................................3

II.    PERSON OF ORDINARY SKILL IN THE ART .....................................4

III.   LEGAL STANDARDS PROVIDED BY COUNSEL.................................6

       A.     Claim Construction .......................................................................6

       B.     Anticipation ..................................................................................7

       C.     Obviousness..................................................................................8

IV.    BACKGROUND .....................................................................................11

       A.     The '793 Patent and Priority Date...............................................11

       B.     General Overview of Pulmonary Hypertension...........................12

       C.     General Overview of Inhalation Therapies .................................14

       D.     Overview of the Claimed Invention ............................................17

V.     VALIDITY OF THE '793 PATENT ........................................................19

       A.     Overview of the Challenged Grounds and Cited
              References....................................................................................19

              1.     The '212 Patent (EX1006) ................................................22

              2.     Voswinckel JESC (EX1007)..............................................31

              3.     Voswinckel JAHA (EX1008) ............................................35

       B.     Ground 1: the '212 Patent, Voswinckel JESC, and
              Voswinckel JAHA Fail to Render Claims 1-8 Obvious................37

1. "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"................38

2. "delivered in 1 to 3 breaths" ......................................................39

C. Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious ..........................................................44

VI. OBJECTIVE INDICIA OF NON-OBVIOUSNESS.....................................46

VII. CONCLUSION...............................................................................52

## I. INTRODUCTION

### A. Scope of Analysis

1. I, Aaron Waxman, M.D., Ph.D., submit this declaration on behalf of United Therapeutics Corporation ("UTC" or "Patent Owner") in connection with responding to the Petition for *Inter Partes* Review ("IPR" or "Petition") of U.S. Patent No. 10,716,793 ("the '793 patent") filed by Liquidia Technologies, Inc. ("Liquidia" or "Petitioner"). I am over the age of eighteen and otherwise competent to make this declaration.

2. I am being compensated at my standard consulting rate for my time in connection with this matter. My compensation is not contingent on the substance of my opinions or the outcome of the proceedings.

3. I understand that Petitioner has asserted six grounds of unpatentability in this IPR challenging claims 1 to 8 of the '793 patent by relying upon allegations that the claims are anticipated and/or obvious. I further understand that the scope of issues to be considered in an IPR are limited to those grounds disclosed in the Petition, and so I limit my opinions to those grounds.

### B. Qualifications

4. I am a pulmonary critical physician in Boston, Massachusetts. I have been practicing as a pulmonary and critical care doctor for over 20 years. As a practicing physician, one of the areas in which I specialize includes all aspects of

pulmonary vascular disease including pulmonary hypertension, and more specifically pulmonary arterial hypertension. I have treated thousands of patients with pulmonary hypertension using intravenous, subcutaneous, oral and inhaled forms of medications. Importantly, dosing between all the various forms of administration has shown great variability, ranging from nanograms to milligrams.

5. I am Executive Director of the Center for Pulmonary and Heart Disease in the Heart and Vascular and Lung Centers, and Director of the Pulmonary Vascular Disease Program at Brigham and Women's Hospital in Boston, Massachusetts. I am board certified in Internal Medicine, Pulmonary Disease and Critical Care Medicine. I am also a member of the American College of Chest Physicians, The American Thoracic Society, the Pulmonary Hypertension Association, and the Pulmonary Vascular Research Institute.

6. I am an Associate Professor of Medicine at Harvard Medical School and have dual appointments in the Pulmonary Critical Care and Cardiovascular Medicine divisions at Brigham and Women's Hospital. I have previously served as an assistant professor in Medicine at the Yale University School of Medicine and Tufts University School of Medicine.

7. I received my Bachelor's degree from George Washington University. I received a Ph.D. in Anatomy and Neuroscience at the Albany Medical College, and an M.D. from Yale University School of Medicine. I completed my internship

and residency in Internal Medicine at Yale New Haven Hospital. I also completed

a Fellowship in Pulmonary and Critical Care at the Yale School of Medicine.

8.     I have authored or co-authored more than 150 peer-reviewed journal

articles, book chapters and reviews. The primary focus of my research has been the

inflammatory basis of pulmonary vascular remodeling, and deep pathophysiologic

phenotyping of patients with various forms of pulmonary hypertension. Part of my

work has included the development of new therapies and the design and conduct of

a number of clinical trials that have led to FDA approval of multiple drugs, including

inhaled treprostinil.

9.     I am qualified based on my education and experience to provide expert

testimony in this matter. My education and experience qualify me as a person of at

least ordinary skill in the art at the time of the invention in 2006. A true and correct

copy of my *curriculum vitae* is attached as EX2002.

10.     In forming my opinions, I relied on my knowledge and experience in

the field, as well as on documents and information referenced in this declaration.

All statements in my declaration, unless indicated otherwise, are based on my

knowledge and experience in the field.

## C.     Materials Considered

11.     In forming my opinions in this declaration, in addition to my knowledge

and experience, I have also considered documents and materials that I have obtained

3

or that have been provided to me. I have also reviewed the declarations and deposition testimony in support of Petitioner by Drs. Nicholas Hill and Igor Gonda. To the extent I am provided additional documents and/or information, I reserve the right to supplement, amend and/or modify my analysis and offer further opinions.

12.     In forming my opinions in this declaration, I have relied on my professional experience and personal knowledge. I have also considered documents and materials in this case, including the petition, exhibits cited by Petitioner and UTC, and including but not limited to the '793 patent, '212 patent, Voswinckel JESC and JAHA, and the materials cited throughout this report. To the extent I am provided additional documents and/or information, I reserve the right to supplement, amend and/or modify my analysis and offer further opinions.

## II.     PERSON OF ORDINARY SKILL IN THE ART

13.     I have been informed by counsel that a patent is to be interpreted from the perspective of a hypothetical person referred to as the person of ordinary skill in the art ("POSA") to which the patent pertains. I further have been informed that a determination of the level of ordinary skill is based on, among other things, the type of problems encountered in the art, prior art solutions to those problems, rapidity with which innovations are made, sophistication of the art, and the educational level of active workers in the field. I have been informed that in any particular case, not every factor may be present, and one or more factors may predominate.

14. I understand that Petitioner asserts that, as of May 15, 2006, *i.e.*, the time of the invention:

> [The POSA] would have a medical degree with a specialty in pulmonology or cardiology, plus at least two years of experience treating patients with pulmonary hypertension as an attending, including with inhaled therapies, or equivalent degree or experience. EX1002, ¶¶17-19. With respect to inhaled formulations used in the method to treat pulmonary hypertension, a POSA would be a Ph.D. in pharmaceutical science or a related discipline like chemistry or medicinal chemistry, plus two years of experience in pharmaceutical formulations, including inhaled products, or equivalent (*e.g.*, an M.S. in the same fields, plus 5 years of experience). EX1004, ¶¶9-11.

Pet. at 14 (citing a declaration by Dr. Hill, EX1002, and a declaration by Dr. Gonda, EX1004).

15. Based on my knowledge and experience in the relevant field, as of May 15, 2006, the person having ordinary skill in the art ("POSA") would have an M.D. or a graduate degree (Masters or Ph.D.) in a field relating to drug development and at least two years of practical experience in either (i) the investigation or treatment of pulmonary hypertension or (ii) the development of potential drug candidates, specifically in the delivery of drugs by inhalation.

16. While I disagree with Petitioner and Drs. Hill and Gonda's interpretation as to the level of one of ordinary skill in the art, my conclusions would not change if Drs. Hill and Gonda definition of a POSA is adopted.

## III.   LEGAL STANDARDS PROVIDED BY COUNSEL

17.   I am not an attorney or an expert in patent law.  I understand that the issues presented in this IPR must be considered in view of particular legal standards. UTC's counsel informed me of the legal standards as they relate to patent invalidity and validity to guide my analysis.

### A.   Claim Construction

18.   I understand that the first step in performing a validity analysis of a patent claim is to interpret the meaning and scope of the claims by construing the terms and phrases found in those claims.  In this proceeding, I understand that Board's decision instituting IPR of the '793 patent does not construe any claim.  *See* Board's Decision (Paper No. 18) at 5 ("Neither party presents any terms for construction…Accordingly, we determine that no express construction of any claim term is necessary in order to decide whether to institute trial").  I also understand that, in litigation between Liquidia and UTC, the Court did not construe any claim terms for the '793 patent, either.  *See United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 20-755 (RGA) (JLH) (D. Del.), D.I. 119 at 1-2 (Claim Construction Order).  In performing my analyses and formulating the opinions in this declaration, I therefore interpreted the asserted claims of the '793 patent according to their plain and ordinary meaning as understood by the person of

ordinary skill in the art as of the priority date of the '793 Patent.[1]  I reserve the right

to supplement, amend and/or modify my analysis in light of any further ruling(s) on

claim construction from the Board or the Court.  I understand that those terms that

the parties have not requested the Court construe should be given their plain and

ordinary meaning to a person having ordinary skill in the art at the time of the patent.

### B. Anticipation

19.    I have been informed by counsel and understand that to anticipate a

patent claim, all of the requirements of that claim must be shown to be present in a

single prior art reference, device or method that was known of, used, or described in

a single previous printed publication or patent.  The test for anticipation must be

assessed on a claim-by-claim basis.  I also understand that anticipation can occur

when an undisclosed limitation is literally missing, but is present because the prior

art must necessarily function in accordance with, or must include, the undisclosed

limitation.

20.    I have further been informed that only a single reference should be

relied upon to conclude that a claim is anticipated, unless any further references are

cited solely to: (a) prove that the primary reference contains an "enabled disclosure;"

(b) explain the meaning of a term used in the primary reference; or (c) show that a

---

[1] I address the priority date of the '793 patent in section IV.A. below.

characteristic not disclosed in the reference is inherent. I understand that to anticipate a claim, the prior art does not need to use the same words as the claim, but all of the requirements of the claim must have been disclosed, either stated expressly or implied to a person having ordinary skill in the art in the technology of the invention. I understand that for a reference to anticipate a patent claim, that reference must also enable one of ordinary skill in the art to make and use the full scope of the claimed invention without undue experimentation.

21.     I have been informed by counsel and understand that if all the requirements of a claim are present in a single previous device, or method, or reference, then knowledge or use of such device, or method, or reference in the United States can constitute an anticipation only if such knowledge or use is accessible to the public, meaning there is no deliberate attempt to keep it secret. An anticipating public use must constitute a commercial exploitation or be accessible to the public, but public use will not be considered anticipatory if it is conducted for testing purposes.

### C.     Obviousness

22.     I have been instructed by counsel and understand that a combination of prior art references may render a claim obvious if, at the time of the invention, a person of ordinary skill in the art would have selected and combined those prior art elements in the normal course of research and development to yield the claimed

invention. I understand that in making an obviousness inquiry, one should consider the *Graham* factors: the scope and content of the prior art; the differences between the claimed inventions and the prior art; the level of ordinary skill in the art; and certain secondary considerations, identified below.

23. I further understand that an obviousness analysis is to be performed on a claim-by-claim basis. I understand that a person of ordinary skill in the art is a person of ordinary creativity, not an automaton. I have been instructed by counsel and understand that demonstrating obviousness requires more than merely showing that the prior art includes separate references covering each separate limitation in a claim under examination. I understand that a conclusion of obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have been motivated to combine those references, and, in making that combination, a person of ordinary skill in the art would have a reasonable expectation of success. I also understand that a fact-finder must be aware of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning. Counsel has instructed me that when considering obviousness, I should not consider what is known today or what was learned from the asserted patents. Instead, I should put myself in the position of a person of ordinary skill in the field at the time of the invention. In particular, I understand that it is improper to use the invention as a roadmap to find its prior art components, because the approach discounts the value

of combining various existing features or principles in a new way so as to achieve a new result. I understand that an invention would not have been obvious to try when one would have had to try all possibilities in a field unreduced by direction of the prior art. Stated another way, when what would have been "obvious to try" would have been to vary all parameters or to try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices would be likely to be successful, an invention would not have been obvious. Furthermore, an invention is not obvious to try where the prior art does not guide one toward a particular solution.

24. I also have been instructed by counsel that demonstrating obviousness requires an account of the workings of the prior art combinations in sufficient detail to support a conclusion that a person of ordinary skill in the art would have been motivated to make the combination with a reasonable expectation of success. This account requires a showing in sufficient detail of how a person of ordinary skill in the art would have combined the prior art reference to meet the claimed limitations, including what a person of ordinary skill in the art would have reasonably expected of how the combination would work.

25. It is my understanding that I must also consider certain objective evidence of nonobviousness if present, which includes prior art as a whole teaching

away from the invention, long-felt need for the invention, the failure of others, copying, and industry recognition/praise by others, among others.

## IV. BACKGROUND

### A. The '793 Patent and Priority Date

26. The '793 patent, filed on January 31, 2020, is entitled "Treprostinil Administration by Inhalation," and was issued on July 21, 2020. EX1001. The '793 patent is directed to the treatment of pulmonary hypertension by administering treprostinil (or salts thereof) by inhalation. *See, e.g.*, EX1001, 7:7-12.

27. The '793 patent claims priority through a series of applications dating back to a provisional patent application filed on May 15, 2006. I understand, therefore, that the priority date for the '793 patent is May 15, 2006. I further understand from counsel and from my review of the Petition that the Petitioner does not dispute this priority date. As such, I have adopted May 15, 2006 as the priority date for purposes of my analysis and opinions.

28. I have reviewed the claims and specification of the '793 patent. In contrast to the then-existing technologies, the '793 patent relates to a method of treating pulmonary hypertension by administering by inhalation a therapeutically effective single event dose that comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

29. Claim 1 of the '793 patent recites:

> A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

EX1001, Claim 1.

30.  Dependent claims 2 through 5 require specific types of inhalation devices, namely a soft mist inhaler (claim 2), a pulsed ultrasonic nebulizer (claim 3), a dry powder inhaler (claim 4) or a pressurized metered dose inhaler (claim 5). Dependent claim 6 requires the formulation to be a dry powder, and dependent claim 7 requires the powder to comprise particles less than 5 micrometers in diameter. Dependent claim 8 requires the formulation to contain no metacresol.

31.  I disagree with Dr. Hill's and Dr. Gonda's opinions that any of these claims are anticipated or rendered obvious to a POSA by May 15, 2006 as further explained below.  EX1002, ¶49.

**B.    General Overview of Pulmonary Hypertension**

32.  As of the priority date of the '793 patent (as is the case today) pulmonary hypertension is a poorly understood, often fatal, disease with limited treatment options.  The first FDA approved treatment for pulmonary hypertension – and the sole approved treatment for over five years (from 1995-2001) – was

epoprostenol, which had substantial shortcomings and posed significant burdens to patients.

33.    Epoprostenol can only be administered by continuous intravenous infusion because it has a short half-life[2] of only a few minutes and is cleared from the body very quickly.    EX2008.    Further, the short duration of action of epoprostenol means that even a brief interruption in infusion could increase the risk of hemodynamic collapse and even death because of delivery complications.  *Id.* Moreover, epoprostenol requires daily mixing and refrigeration, thus requiring the patient to carry a cold pack to avoid degradation at room temperature and an infusion pump in order to safely administer the drug.  *Id.*

34.    Later-approved subcutaneous (in 2002) and intravenous (in 2004) administration of treprostinil had some benefits over epoprostenol.  *Id.*  For example, it is stable at room temperature and has a half-life of several hours rather than several minutes.  This freed patients of having to carry ice packs to ensure the safety and efficacy of the drug.  *Id.*  There were still limitations to intravenous and subcutaneous delivery of treprostinil, such as intolerable site pain in some instances and systemic side effects.  EX1018, 1.

---

[2] "Half-life" refers to the time it takes for half of the concentration of drug to be metabolized and eliminated from the body.

35.     By the 2006 priority date of the '793 patent, clinicians had begun to explore inhalation therapies for the treatment of pulmonary hypertension.  *See, e.g.,* EX1007.  At that time, the only FDA-approved prostacyclin-type drug that could be given in an inhalable form was iloprost, marketed as Ventavis®.  The results of an Aerosolized Iloprost Randomized (AIR) Study documenting the effects of inhaled iloprost had been public about three and a half years, and Ventavis®, which was approved in 2004, had been on the market for about one and a half years.  EX2009, 21.

36.     Clinicians were still largely of the opinion, however, that intravenous administration of a prostacyclin analog was preferable to inhaled delivery of iloprost for a number of reasons.  *Id.*  For instance, iloprost has a half-life between 20-25 minutes.  *Id.* at 21, 23-24.  As a result, iloprost needs to be administered 6-9 times a day, as frequently as every 2 hours, which was considered challenging for patients to implement.  *Id.*  Moreover, the fact that iloprost has a short half-life results in periods where patients may be off-medication or under-medicated while asleep unless they wake up to take a dose of the drug.  *Id.*

### C.     General Overview of Inhalation Therapies

37.     As of 2006, there were several known methods for delivering a drug using inhalation.  One class of inhalation devices were "continuous nebulizers." Continuous nebulizers deliver small amounts of drug by converting drug solutions

or suspensions into aerosols, which the patient inhales over a specified period of time (frequently between 5 and 30 minutes). EX2032 ("only 10% of the total dose loaded in a [continuous] nebulizer is in reality deposited in the lungs"). The patient wears a mask (or uses a mouthpiece) and breathes in unmeasured portions of the entire nebulized output delivered through the device and the components leading to the patient's mouth:



EX2033.

38.    Continuous nebulizers are designed to be used with a broad range of liquid formulations, but they have several drawbacks. They require delivery over a longer period of time, and the dosage is difficult to control. Various types of continuous nebulizers were available at the priority date of the '793 patent, and several studies indicated that performance varies between manufacturers and also between nebulizers from the same manufacturer. EX2029-EX2031. Various factors that can affect the dose of drug received by a patient through a continuous nebulizer

include gas flow and pressure, fill and dead volumes, gas density, humidity and temperature conditions, breathing patterns, nebulizer settings and programming, and the nebulization device interface (*e.g.*, whether it prompts or guides the patient during use in any way, or adapts to ongoing use). *Id.*

39.     Other types of inhalation devices are capable of delivering a more precise amount of a medication in a <u>specific number of breaths</u> over a single inhalation event.  They can provide a fixed dose of medication per breath.  Examples of these types of inhalers that I have used in my practice include pressurized metered-dose inhalers, soft-mist inhalers, pulsed ultrasonic nebulizers, breath-actualized nebulizers, and dry powder inhalers.  Pressurized metered dose inhalers generally contain a propellant that, when the device is activated, provides a force for administering a dose of medication.  An example soft mist inhaler is the Respimat device disclosed in the '793 patent.  EX1001, 7:33.  It works by using the force of a spring to propel drug solution through small nozzles and create an inhalable mist. EX1061 at 4.  Ultrasonic nebulizers use ultrasonic frequency to create an aerosol. Continuous nebulizers run, as the term implies, continuously.  "Pulsed nebulizers" operate with some type of pulse, which could turn the nebulizer on or off at fixed times, or there can be additional features that attempt to coordinate the patient's breaths with nebulization by the device.  *See generally* EX1026 at 1; EX1029 at 1. For example, with the pulsed ultrasonic nebulizer described in the '793 patent and

employed with Tyvaso®, the patient completely inhales the nebulized output in one

"pulse" of the device by enclosing the device's mouthpiece within their mouth and

inhaling at the time indicated after the fixed amount of aerosol per breath is

generated:



EX2034.

### D. Overview of the Claimed Invention

40.     In my opinion, the inventors of the '793 patent overcame many of the

limitations of the existing methods of pulmonary hypertension treatments by

developing a method that utilizes a high administration of inhaled treprostinil in 1 to

3 breaths.

41.     While I am familiar with earlier treprostinil treatments that employed

continuous nebulization methods, the method of treatment described in the '793

patent surprisingly demonstrated that a therapeutically effective dose of 15

micrograms[3] to 90 micrograms could be safely delivered to a patient in just a few breaths. EX1001 at 16:61-63; *see also id.* at 17:44-46 (study "successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 µg/ml treprostinil solution, thereby applying a dose of 15 µg"). Surprisingly, high concentrations of treprostinil were shown to be well tolerated by patients with even a single breath administration of the drug, which induced pulmonary vasodilation for longer than 3 hours with minimal side effects. *Id.* at 18:1-6. This result was surprising because treprostinil was known to be a potent drug and another prostacyclin analog, iloprost, was approved in delivered doses of only 2.5 to 5.0 µg because of side effects. EX1083 at 9.

42.     I have regularly prescribed Tyvaso® (inhaled treprostinil), which I understand to be the commercial embodiment of the '793 patent, because Tyvaso® has shown distinct advantages over Ventavis®, the only other available inhalation treatment for pulmonary hypertension. For example, Tyvaso® (inhaled treprostinil) does not need to be administered as frequently as Ventavis®, leading to higher patient compliance and less risk of rebound pulmonary hypertension. Tyvaso® (inhaled treprostinil) has a much longer half-life than Ventavis® when inhaled by

---

[3] A microgram is a unit of mass equal to one millionth of a gram. A microgram is commonly abbreviated as mcg or µg. As such, I may use microgram, mcg and/or µg interchangeably throughout my declaration.

human subjects suffering from pulmonary hypertension. This allows Tyvaso® to be administered markedly less frequently – about 4 times a day. I have observed that patients are more likely to comply with a regimen that requires less frequent administrations. Furthermore, because Tyvaso® has a longer half-life than Ventavis®, there is less risk when the patient is asleep or otherwise unable to take the medication.

43. A study reported that "the transition from inhaled iloprost to inhaled treprostinil resulted in a time saving of approximately 1.4 h per day." EX2035, 5. Patients transferring from inhaled iloprost to inhaled treprostinil also had improved six-minute walk distances (a common metric to assess pulmonary hypertension), improved patient satisfaction, and improved quality of life. *Id.* at 5-6.

## V. VALIDITY OF THE '793 PATENT

### A. Overview of the Challenged Grounds and Cited References

44. I have been informed that Petitioner has asserted six grounds of invalidity as set forth below:

| Ground | '793 Patent Claims | Alleged Basis |
|--------|--------------------|---------------|
| 1 | 1-8 | Obviousness: '212 patent, Voswinckel JAHA, Voswinckel JESC |
| 2 | 1-8 | Obviousness: '212 patent and Voswinckel JESC |
| 3 | 1 | Anticipation: Ghofrani |
| 4 | 1, 3, 8 | Obviousness: Voswinckel JAHA and Ghofrani |
| 5 | 1, 3 | Anticipation: Voswinckel 2006 |
| 6 | 2, 4-8 | Obviousness: Voswinckel 2006 and '212 patent |

45. I understand that Petitioner is relying on the following references or combinations thereof as alleged prior art:

- United States Patent no. 6,521,212 (the "'212 patent") (EX1006)

- Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," *European Heart Journal* 25:22 (2004) ("Voswinckel JESC") (EX1007)

- Voswinckel, R., et al., Abstract 1414: "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonayr Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, *Circulation,* 110(17 Suppl.):III-295 (October 26, 2004) ("Voswinckel JAHA") (EX1008)

- Voswinckel, R., et al., "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine*, 144(2)149-50 (January 2006) ("Voswinckel 2006") (EX1009)

- Ghofrani, H.A., et al., Neue Therapieoptionen in der Behandlung der pulmonarlarteriellen Hypertonie, 30(4):296-302 (Junen 2005) ("Ghofrani") (translated) (EX1010)

46. I have been advised that Voswinckel 2006 and Ghofrani are not qualifying prior art, which causes Grounds 3-6 to fail. Thus, I have been asked to

provide opinions regarding Grounds 1-2, and the '212 patent, Voswinckel JESC and Voswinckel JAHA references cited therein, only.

47.    In my opinion, these references do not teach or suggest each and every limitation of the claims of the '793 patent. Among other reasons, for example, none of these three references, alone or in combination, teach a "therapeutically effective single event dose of 15 micrograms to 90 micrograms … delivered in 1 to 3 breaths."

48.    Rather than disclosing the required single event dose,[4] these three references *only* provide the initial concentration of the pre-aerosolized drug and the length of time that the drug is inhaled. As explained in more detail below, the actual dose delivered to the patient using an inhalation device depends upon numerous variables, including for example, the type of inhalation device used, gas (air) flow, pressure, and density, fill and dead volumes (how much is put into the device, and how much is left over when the administration is complete), humidity, temperature, the patients breathing patterns, and the inhalation device interface. EX2029-EX2031. I note however, that many of these critical details and information are not disclosed in the '212 patent, Voswinckel JESC, or Voswinckel JAHA, as further summarized below:

---

[4] A POSA would understand "single event dose" to mean the amount of treprostinil inhaled in a single treatment session. *See, e.g.*, EX1001, 7:60-67 (stating that the single event can be carried out in a limited number of breaths), claim 1 (referring to the single event dose delivered in 1 to 3 breaths).

| Reference | Disclosure |
|-----------|------------|
| '212 Patent<br><br>(EX1006) | <u>Device</u>: "AM-601 Medicator Aerosol Delivery System<sup>TM</sup>" (Healthline Medical) (5:30-36)<br><u>Pre-aerosolized conc.</u>: 31.25 mcg/mL (9:3-8)<br><u>Nebulization Rate</u>: 0.28 mL/min (9:7-8; 10: 43-44; 11:9-10)<br><u>Duration</u>: 30, 60 or 90 min (9:14; 10:43-44; 11:11-13)<br><br><u>Single Event Dose</u>: Unknown |
| Voswinckel JESC (EX1007) | <u>Device</u>: "OptiNeb ultrasound nebulizer, Nebu-tec, German"<br><u>Pre-aerosolized conc.</u>: 6, 32, 48, and 64 mcg/mL<br><u>Duration</u>: 6 min<br><u>Single Event Dose</u>: Unknown |
| Voswinckel JAHA (EX1008) | <u>Device</u>: "pulsed OptiNeb® ultrasound nebulizer"<br><u>Pre-aerosolized conc.</u>: 600 mcg/mL<br><u>Duration</u>: Three breaths<br><u>Single Event Dose</u>: Unknown |

49. In my opinion, a POSA would not read any of these references, alone or in combination, to teach or suggest "a therapeutically effective single event dose of 15 μg to 90 μg" "delivered in 1 to 3 breaths" for at least the reasons discussed below.

### 1. The '212 Patent (EX1006)

50. The '212 patent teaches methods of delivering benzindene prostaglandins by inhalation generally and describes studies involving continuous nebulization over an extended period of time. The '212 patent provides examples wherein intravenous or aerosolized treprostinil is administered to tracheotomized

sheep for 30, 60, or 90 minutes at a concentration of 250, 500, or 1000 ng/kg/min. *See, e.g.,* EX1006, FIGS 3-18, Examples I-V. The minimum time period for administration is 30 minutes, and if that time period was used with a human patient inhaling from a nebulizer, the patient would take approximately 360 to 480 breaths, orders of magnitude beyond the upper limit of the "3 breaths" requirement in claim 1 of the '793 patent. EX2057, *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, Johns Hopkins Medicine (stating the average respiration rate for an adult is 12-16 breaths per minute).

51. A POSA would understand that the way a drug affects the body, including the lungs, is different when a drug is administered over 30-90 minutes at a low rate, versus over a fraction of a minute at a high rate (*e.g.*, almost a bolus dose). In particular, a POSA would understand that at low rates of administration, the lungs may absorb all of the drug, and the pharmacokinetics (*e.g.*, blood levels) may never spike; rather, plasma levels of the drug are more likely to slowly rise to a steady state. With a bolus dose, or one inhaled in only 1 to 3 breaths, a POSA could expect a faster and higher spike in blood levels. And with inhalation administration, there could be spillover from the lungs (site of absorption by the body) into systemic circulation; such spillover would be much less likely with a slower rate of administration (for example, from a lengthier continuous nebulization). The

following figure illustrates the complexity of balancing local and systemic (spillover) actions of the drug using an inhalation mode of administration:



Fig. 2-6. Orally inhaled aerosol drugs distribute to the respiratory tract and to the stomach through swallowing of oropharyngeally deposited drug. *Top left:* The inhalation devices shown include a metered dose inhaler *(top)*, a nebulizer *(middle)*, and a dry powder inhaler *(bottom)*. *GI,* Gastrointestinal.

Mosby items and derived items © 2008, 2002 by Mosby, Inc., an affiliate of Elsevier Inc.

EX2058, Pharmacokinetics of Inhaled Drugs.

52. The '212 patent does not teach "a therapeutically effective single event dose of 15 µg to 90 µg" "delivered in 1 to 3 breaths" as required by the '793 patent claims. Rather, the '212 patent is directed to providing continuous nebulization and

describes a broad range of dosages delivered over a period of time. The disclosed

dosages either specify a "daily infusion dose" or "per kilogram bodyweight per

minute" dose, which are *rates* (*e.g.*, μg per unit of body mass per day) or *daily* doses,

not inhaled single event doses as claimed by the '793 patent. For example, the '212

patent teaches:

> In the case of treating ***peripheral vascular disease*** by inhalation of a
> benzindene prostaglandin of the present invention, the dosage for
> inhalation, taking into account that some of the active ingredient is
> breathed out and not taken into the bloodstream, should be sufficient to
> deliver an amount that is equivalent to a ***daily infusion dose*** in the range
> of 25 μg to 250 mg; typically from 0.5 tg[sic] to 2.5 mg, preferably
> from 7 μg to 285 μg, per day per kilogram bodyweight. For example,
> an intravenous dose in the range 0.5 μg to 1.5 mg per kilogram
> bodyweight ***per day*** may conveniently be administered as an infusion
> of from 0.5 [μg] to 1.0 μg per kilogram bodyweight ***per minute***. A
> preferred dosage is 10 ng/kg/min.

EX1006, 5:56-67 (emphasis added).

53.    Indeed, the '212 patent only discloses a continuous nebulizer as the

means for delivering the described dosages, namely an "AM-601 MEDICATOR

AEROSOL DELIVERY SYSTEM" (a nebulizer manufactured by Healthline

Medical in Baldwin Park, Calif.). EX1006, 5:34-36. This particular nebulizer is

described as the preferred device and is the only specific device mentioned anywhere

in the '212 patent.

54.    This device is a continuous nebulizer designed to deliver small amounts

of medication in a dosing event spread over hundreds of breaths over long dosing

intervals. EX2087 (Sandifer 2005) at 2364. There is nothing in the '212 patent that teaches or would motivate a POSA to try to use a continuous nebulizer to deliver – not just place into the nebulizer reservoir – 15 micrograms to 90 micrograms of treprostinil in only 1 to 3 breaths.[5]

55. The working examples in the '212 patent also utilize continuous nebulization of a treprostinil solution over 30, 60 or 90-minute intervals. EX1006, 10:44, 11:11-13. In my opinion, a POSA would understand that each of these dosing events would contain hundreds of breaths. Such a device lacks the precision to deliver a measured amount of drug in the range of 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in only 1 to 3 breaths.

56. Dr. Hill also opines that a POSA could calculate a therapeutically effective dose of inhaled treprostinil based on the '212 patent's general statement that "aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."

---

[5] Indeed, Petitioner appears to agree, as it rests its contention that the prior art discloses a single event dose of 15-90 μg on Voswinckel JESC, which lacks any dose information and instead mentions only solution concentrations and nebulization time of 6 minutes, which is around 20-60 times longer than the claimed 1-3 breaths. Pet. At 37-38 (Section X.B.1.c., "Voswinckel JESC renders obvious claim element 1[c]").

EX1006, 8:9-13.  He provides two calculations relying on this disclosure in the '212 patent to conclude that a POSA would achieve the claimed dosage.  EX1002, ¶100, fn 4.  I disagree with Dr. Hill's calculations.

### a)  First Calculation

57.  First, Dr. Hill looks to the specific dosages for Remodulin®, the FDA-approved intravascular treprostinil sodium solution.  Using the Remodulin® prescribing information, Dr. Hill calculates an intravascular dose as 108 to 117 micrograms for a patient weighing 60 to 65 kg, to which he applies "the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing" to reach an inhaled dosage of 10.8 to 58.5 micrograms.  EX1002, ¶100.

58.  In my opinion, however, the POSA would not use that 10-50% number to calculate an inhaled dose.  The percentages Dr. Hill cites are based upon sheep data, and the range is broad (40% wide).  And even Dr. Hill admitted that he was not sure that 10-50% was an accurate measure of the relative potency of treprostinil in aerosolization versus intravascular administration.  EX2055 (Hill Dep. Tr.) at 102:4-103:20.  Thus, a POSA would not understand the '212 patent as providing a mathematical algorithm for converting therapeutically effective intravascular dosages to therapeutically effective inhaled dosages in humans.

59.  Moreover, as mentioned above, the pharmacokinetic effect of a given dose of a pulmonary drug administered by continuous intravenous infusion over a

30-minute time interval (or 60 or 90-minute interval) is completely different from the effect of the same pulmonary drug administered as a bolus or in a few breaths, such as with a metered dose inhaler or dry powder inhaler. In the case of claim 1 of the '793 patent, 15 to 90 micrograms of treprostinil are delivered in 1 to 3 breaths, which the POSA would expect would to lead to more drug potentially entering systemic circulation (due to spillover from the lungs into systemic circulation) than is the case when much smaller amounts per breath are delivered to the lungs over 30-90 minutes.

60. Instead of teaching 1-3 breaths, or anything even close, the '212 patent describes employing a continuous nebulization process with a low concentration solution to match the pharmacodynamics of continuous intravenous infusion of treprostinil. Based on my knowledge and experience, such an approach would be expected to reduce peaks and troughs in the level of medication to avoid side effects. Remodulin® intravenous infusion is dosed *continuously*, and 108 to 117 micrograms would be the dosage over a *continuous 24 hours*. EX1018. In my opinion, the '212 patent teaches, therefore, that 10.8 to 58.5 micrograms would be the expected *daily* inhaled dose, and not a single event dose. Furthermore, the continuous nature of the drug delivery in the prior art confirms that one single event dose is insufficient to control PAH for an entire day. For example, Voswinckel JAHA confirms that 4 individual dosing events were required throughout the day to treat pulmonary

hypertension.  EX1008.  Even at the high end, the simple math demonstrates that a 58.5 microgram daily dose would amount to less than 15 micrograms of treprostinil sodium per single event dose when spread over four individual dosing events.  In any event, I agree with Dr. Hill that such calculation amounts to comparing "apples and oranges."  EX2055, Hill Dep. Tr. at 100:15-25.

61.     Second, Dr. Hill relies on the '212 patent's general description of "an inhalation dosage for ***treating peripheral vascular disease*** that should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 µg to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight."   EX1002, ¶100, fn 4 (citing EX1006 at 5:54-62) (emphasis added).  Using this daily infusion dosage range, he again applies "the '212 patent's 10-50% adjustment between intravascular and inhaled dosing" to reach an alleged "effective daily dose of 2.5 µg to 125 mg of inhaled treprostinil. *Id.*  Again, I disagree with Dr. Hill's calculation using this data as it is not meaningfully accurate.[6]  As a preliminary matter, the description in the '212 patent that Dr. Hill relies on relates to treatment of peripheral vascular disease.  Based on my knowledge and experience, a POSA would not use this data to infer or calculate delivered doses

---

[6] I note that the Board also did not appear to give this calculation any considerable weight. *See generally* Decision Granting Institution of *Inter Partes* Review (Paper 018).

for the treatment of pulmonary hypertension because dosing is quite different for treatment of different conditions.

62.     In my opinion, a POSA would not infer or calculate a single event therapeutically effective dose of inhaled treprostinil based from a daily infusion dose used with tracheotomized sheep where there is no data that provides dosage administered to humans.   As a practicing clinician, I would rely on clinical assessment as proof of response to a given therapy or treatment.   Even Dr. Hill admits that it "is misleading to rely on blood levels, circulating levels" and "rough measures of relative potency between intravascular and aerosolized delivery." EX2055 (Hill Dep. Tr.) at 103:21-104:15; *see also* EX2090 at 460 (Preston *et al.*, 2014, *Safety and efficacy of transition from inhaled treprostinil to parenteral treprostinil in selected patients with pulmonary arterial hypertension.*  Pulm Cir. 4(3):456-461).

63.     Based on my knowledge and experience, a POSA would not understand the '212 patent to teach administration of 15-90 mcg to humans in a single event dose.  Even Petitioner's expert, Dr. Hill, acknowledges that the '212 patent does not explicitly disclose a single event dose of 15 to 90 mcg.  As such, I disagree with Dr. Hill's conclusory opinions that his calculations are "consistent" with the '212 patent or that a POSA would have a reasonable expectation of success that 2.5 ug to 125 mg would be effective in treating pulmonary hypertension.

64.   In my opinion, the '212 patent does not direct a POSA to a single event dose that would fall within the 15 microgram to 90 microgram requirement delivered in 1 to 3 breaths of claim 1 of the '793 patent.

### 2.   Voswinckel JESC (EX1007)

65.   Voswinckel JESC is a brief abstract[7] spanning approximately a quarter of a single page that generally describes a clinical study that used <u>continuous</u> nebulization at concentrations of 16, 32, 48, and 64 µg/mL of treprostinil with a time period of 6 minutes.  EX1007.  Voswinckel JESC provides the concentration of the drug in the pre-aerosolized solution, but does not specify the dose delivered to the patient.[8]  In my opinion, Drs. Hill and Gonda improperly impute a dosage to the teaching of Voswinckel JESC by applying multiplying a "nebulization rate" (in mL/min) by the stated concentrations (in µg/mL) by the deliver time (6 minutes). *See, e.g.,* EX1002, ¶65.  This analysis is flawed for a number of reasons.

66.   *First*, disclosure of a nebulization rate, concentration and time is insufficient for a POSA to determine the actual dose delivered by a continuous

---

[7] I note that a POSA would not likely rely on abstracts such as Voswinckel JESC and Voswinckel JAHA because conference abstracts are not peer-reviewed to the same rigor as published journal articles, and further often report preliminary data which may or may not translate into actual results.

[8] A POSA would understand that a claimed single event dose of 15 micrograms to 90 micrograms means the dose delivered to the patient – not the amount of the starting solution.

nebulizer. *See* EX1001, claim 1 (requiring the single event dose be "delivered in 1 to 3 breaths"); *id.* at 13:46-62 (describing – based on biophysical characterization – the delivered doses that corresponded to certain concentrations for the formulation and device used, and identifying doses of, for example, 15, 30, 60, and 90 μg.) Based on my knowledge and experience, a POSA would also need to account for the gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface, among other things. EX2029-EX2031. None of these parameters are disclosed in Voswinckel JESC and, in my opinion, a POSA would be unable to determine the actual single event dose administered in the described study described in Voswinckel JESC. Even if a POSA were to attempt a rough estimate of an administered dose, the range would be very broad and unreliable.

67. *Second*, based on my knowledge and experience, the relevant parameters for determining a single event dose can vary significantly not only between manufacturers, but also between nebulizers from the same manufacturer. *Id.* Voswinckel JESC generally states that an "OptiNeb, ultrasound nebulizer (Nebu-tec, Germany)" was used in connection with the study, but does not provide a catalogue number, or any identifying information that would allow a person of ordinary skill in the art to determine the particular OptiNeb ultrasound nebulizer that was used by the authors. In fact, Dr. Hill agreed, testifying that he did not know

whether the Optineb device of the undated Optineb manual was the same device used in Voswinckel JESC because Voswinckel JESC does not specify a model number or give any other identifying information that would suggest what actual model used in connection with the study. EX2055 (Hill Dep. Tr.) at 81:12-22 (Dr. Hill didn't know whether it was an Optineb-IR, Optineb-Pro or Optineb ON-100-2); 83:3-7.

68. Indeed, I note that Dr. Hill agreed that it was unclear whether the Optineb device of the undated Optineb manual upon which he relies on for the proposition that the nebulizing rate of Voswinckel JESC would be 0.6 mL/min was the same device used in Voswinckel JESC because Voswinckel JESC does not specify a model number or give any other identifying information that would suggest what actual model used in connection with the study. EX2055 (Hill Dep. Tr.) at 61:5-62:25; 81:12-22; 83:3-7. Similarly, Dr. Gonda admitted that it was unclear whether the Optineb device of the undated Optineb manual was a 1.6 or 2.4 megahertz model. EX2056 (Gonda Dep. Tr.) at 83:2-24. I agree and further note that the undated Optineb manual lacks any discussion of suitable doses for drug delivery. Thus, in my opinion, the undated Optineb manual was not "general knowledge of the art around the time of the invention."

69. *Third,* even if a POSA could determine the dosage based on the simplified formula used by Dr. Hill in his declaration, Dr. Gonda's assertion that

"[a] POSA would have known that nebulizers conventionally deliver between 1 and 5 mL dose" (para 56 and n. 4) and Dr. Hill's assertion that he had in his own practice "prescribed volumes of at[sic] least 1 mL for inhalation therapy using nebulizers" (paragraph 65) is irrelevant, because neither experts' statements take into account the particular drug to be administered or the concentration of that drug solution. For example, Dr. Hill stated that his experience delivering 1 mL or more of solution was based upon different indications and drugs. EX2055 (Hill Dep. Tr.), 146:16-23 (identifying bronchodilators for asthma/COPD, inhaled corticosteroids, and anticholinergics as "the main things I would have nebulized"). Dr. Hill did not mention experience nebulizing 1 mL or more of treprostinil. In my opinion, the fact that Ventavis® – a drug with a different potency and a different half-life – is prescribed such that a total volume of 2.5-5 mLs is placed into the nebulizer does not suggest to a POSA how much treprostinil was added to the nebulizer in Voswinckel JESC.

70.     *Finally,* the pharmacokinetic effects of inhaling a low concentration of a medication over a long period of time (several minutes) are different than the pharmacokinetic effects of receiving that same dose over a shorter period of time (such as 1-3 breaths). For example, during a 6-minute dosing event, the expected number of breaths would be in the range of 72 to 96 breaths per minute. EX2057, *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*,

Johns Hopkins Medicine (stating the average respiration rate for an adult is 12-16 breaths per minute). I note Dr. Hill also agreed that the "pharmacokinetics of inhaled doses are very different than continuous" because "it's different routes of administration, different pharmacokinetics, apples and oranges." EX2055 (Hill Dep. Tr.) at 110:17-111:17.

71. In my clinical experience, it is not uncommon to see higher breathing rates in patients with pulmonary hypertension, closer to 18-22 breaths per minute. The number of breaths per minute may depend on the individual patient and severity of illness. Regardless, this is orders of magnitude beyond the upper limit of 3 breaths in claim 1 of the '793 patent and a POSA would have been concerned with the completely different pharmacokinetic effects of administering treprostinil very quickly instead of over several minutes (*e.g.*, the amount of spillover treprostinil that enters systemic circulation is far lower with continuous nebulization).

### 3. Voswinckel JAHA (EX1008)

72. Voswinckle JAHA is a brief abstract spanning approximately a quarter of a single page in the Circulation Journal of the American Heart Association. It generally describes preliminary data of an open-label study of "TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml." EX1008. This abstract discloses a pre-aerosolized concentration for the treprostinil solution of 600 μg/mL for inhalation over a specific number of

breaths.  Voswinckel JAHA also does not describe a therapeutically effective single event dose of 15 micrograms to 90 micrograms.

73.    Dr. Hill and Petitioner do not argue that Vosinckel JAHA discloses any particular single event dose.  That is consistent with my opinion that Voswinckel JAHA does not provide sufficient detail for a POSA to determine the precise dosage each patient received.  For example, based on my knowledge and experience, a POSA would not be able to determine the "single event dose" without knowing critical details of the pulsed Optineb device, including the time between pulse generation and breath, volume of nebulized solution per breath, and features that allow the patient to inhale one pulse with each breath after it is generated.  None of these factors are disclosed in Voswinckel JAHA and, in my opinion, a POSA would be unable to determine the actual single event dose administered in the described study described in Voswinckel JAHA.

74.    Although Voswinckel JAHA discloses a concentration, it also mentions – contrary to Voswinckel JESC – that the nebulizer is "pulsed." EX1008. But there is no information about the pulses (such as how long the pulse was, and how much time in between pulses) that would aid the POSA in any effort to determine how much treprostinil was delivered to the patient per pulse. Indeed, Voswinckel JAHA does not explain if or how the patients were instructed to coordinate their breaths

with the pulses (and coordinating breathing with dispensed medication is a challenge, as is known for pressurized metered dose inhalers).

### B. Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA Fail to Render Claims 1-8 Obvious

75.     The Petition and Drs. Hill and Gonda opine that claims 1-8 of the '793 patent are rendered obvious over the combination of the '212 patent, Voswinckel JESC and Voswinckel JAHA.[9] I provided an overview of these references in Section V.A.

76.     I disagree because, in my opinion, the combination of these references, individually or together, fail to disclose or suggest every limitation of the '793 patent claims and therefore, cannot render obvious claims 1-8 of the '793 patent. Further, a POSA would not be motivated to combine these references or have a reasonable expectation of success in doing so as discussed further below.

77.     The '212 patent, Voswinckel JESC and Voswinckel JAHA, individually or together, do not teach a single event dose of 15 to 90 micrograms of

---

[9] I understand that Patent Owner has asserted that Petitioner has not set forth sufficient evidence to show that Voswinckel JESC and Voswinckel JAHA were publicly accessible prior art. I have not been asked to assess whether Voswinckel JESC and Voswinckel JAHA qualify as prior art as of the time of the claimed invention. For purposes of my declaration, I provide an analysis of the disclosures set forth in Voswinckel JESC and Voswinckel JAHA irrespective of whether it is found to qualify as prior art as of the time of the claimed invention.

treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths as required by claim 1 of the '793 patent.

### 1. "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"

78. The '212 patent, Voswinckel JESC and Voswinckel JAHA, individually or together, do not teach a single event dose of 15 to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof. The '212 patent describes a very broad range of dosages (25 mcg to 250 mg) administered to tracheotomized sheep, not humans, and delivered by inhalation using a continuous nebulizer. The working examples use continuous delivery over an extended period of time, *i.e.*, 30, 60 or 90-minute intervals using dozens or hundreds of breaths. Petitioner, Dr. Hill, and Dr. Gonda make no assertion that the '212 patent describes a single event dose of 15 to 90 micrograms of treprostinil (*see* EX1002 at ¶95) and I agree that this claim limitation is not disclosed by the '212 patent.

79. It is also undisputed that Voswinckel JESC fails to disclose a dose of 15-90 μg. Instead, Voswinckel JESC only describes delivery of treprostinil with a pre-aerosolized starting solution with concentrations of 16, 32, 48, or 64 μg/mL (*see* EX1002 at ¶99). Likewise, Voswinckel JAHA only describes delivery of treprostinil with a pre-aerosolized starting solution of 600 μg/mL. As I explained above, I disagree with Dr. Hill's unsupported calculations which fail to account for variables

a POSA would consider in determining an actual dose delivered to a patient. Because none of the reference individually disclose a dose from 15 to 90 μg, the combination of the three references do not, either.

### 2. "delivered in 1 to 3 breaths"

80. The '212 patent, Voswinckel JESC, and Voswinckel JAHA also fail to disclose an actual dose delivered to a patient in 1 to 3 breaths. The '212 patent describes doses administered to tracheotomized sheep over at least 30 minutes, not humans in 1-3 breaths. Voswinckel JESC discloses concentrations (not doses) administered over 6 minutes, which would involve many more than 3 breaths. EX2057, *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, Johns Hopkins Medicine (stating the average respiration rate for an adult is 12-16 breaths per minute). Voswinckel JAHA does not disclose any particular single event dose. The POSA would not be able to determine the delivered dose in 1 to 3 breaths based on the general disclosures of Voswinckel JAHA. Based on my knowledge and experience, the actual delivered dosage would depend on variables associated with a particular nebulizer's features – none of which Dr. Hill addresses in his declaration. Thus, Voswinckel JAHA also fails to disclose a single event dose of 15-90 μg delivered in 1-3 breaths.

81. As I understand it, the Petition relies on two additional references to argue "a POSA would have expected to succeed in reducing the number of breaths

when delivering 15-90μg of inhaled treprostinil." Pet. at 34. The first reference is Ghofrani (EX1010). I understand from counsel that Ghofrani is not properly considered prior art and have thus focused my analysis on the second reference. The second reference is a publication by Geller *et al.* (EX1034), which discloses delivery by inhalation of rhDNase (also known as Pulmozyme®) for the treatment of cystic fibrosis. EX1034. rhDNase is a much larger molecule (a 260-amino acid glycoprotein) designed to treat a different disorder (cystic fibrosis). *Id.* Based on my knowledge and experience, the feasibility of delivering an aerosolized large-molecule protein at a concentration of "0.45 mg loaded dose per inhalation"[10] is irrelevant to the feasibility of the claimed inhalation therapy for treprostinil.

82. A POSA would not be motivated to combine or have a reasonable expectation of success from combining the '212 patent, Voswinckel JESC and Voswinckel JAHA. Drs. Hill and Gonda provide several calculations in an attempt to establish that these references taught or suggested the range of treprostinil doses

---

[10] Petitioner erroneously asserts that EX1034 teaches "delivery of 0.45 mg of drug in 3 breaths." Based on my review of this publication however, Geller actually states that "[t]he daily dose of AERx rhDNase in this study consisted of three inhalations (1.35 mg total loaded dose, or 0.45 mg loaded dose per inhalation). This would be the equivalent of 1,350 micrograms in a single event dose. Thus, even if the dosages of this biologic were considered relevant in considering the proper dosage of treprostinil – which a POSA would consider relevant – it is well outside the range of the "15 micrograms to 90 micrograms" required by the claimed invention of the '793 patent.

recited in the '793 patent that are full of unsupported assumptions. I disagree with the veracity of these calculations because a single event dosage that is delivered to a patient cannot be determined using only the concentration and nebulization time; rather, it should be found using laboratory testing. EX2056 (Gonda Dep. Tr.) at 82:7-83:24 (Dr. Gonda agreed that he would conduct laboratory testing as well).

83. I also note that Voswinckel JESC does not disclose either the starting volume of treprostinil solution that was used or whether the entire volume had been nebulized at the 6-minute mark. Even if such information was disclosed, it is my opinion that a POSA would not be able determine the single event dosage over that six-minute interval without additional information about the nebulization device because fill volume is just one of many variables that may affect drug dosage. Some of these variables can include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface. Moreover, based on my experience, these variables may vary from patient to patient. Dr. Hill does not address these variables in his calculations. In my opinion, a POSA would not extrapolate an actual dose delivered to a patient in 1 to 3 breaths based on the disclosures in the '212 patent, Voswinckel JESC and Voswinckel JAHA. As such, a POSA would not "reasonably assume" a given amount of treprostinil solution was administered based on these references as Dr. Hill contends. EX1002, ¶79.

84.    I also disagree with Dr. Hill's reliance on the Remodulin® label to extrapolate an actual dose delivered to a patient in 1 to 3 breaths. Remodulin® is an intravenous infusion that is dosed continuously, and 108 to 117 micrograms would be the expected dosage over the course of 24 hours. EX1018. Based on my experience as a practicing physician, a POSA would understand that following the dosage instructions from the Remodulin® label would result in dosages significantly above a single event dose of 15 to 90 micrograms. In fact, Dr. Hill agreed, testifying that using the Remodulin® label to calculate a single event dose of 15 to 90 micrograms of treprostinil is like comparing "apples and oranges." EX2055 (Hill Dep. Tr.) at 100:15-25. A POSA would not look to other drug labels to guide their treatment of a different patient with a different drug.

85.    Moreover, a POSA's knowledge of and concern about side effects weighs against any alleged motivation to combine the '212 patent, Voswinckel JESC and Voswinckel JAHA to achieve a single event dose of 15 to 90 micrograms in 1 to 3 breaths. Voswinckel JESC teaches away from using higher concentrations because the authors warn that at higher doses than 16 µg/ml, "local and systemic side effects may occur." EX1007 at 7. Indeed, about a third of the patients receiving the 32, 48, and 64 µg/mL concentrations had side effects, whereas the patients receiving 16 µg/mL had none. *Id.* Dr. Hill also agreed that increasing the dose per administration could increase local side effects including airway irritability and

coughing. EX2055 (Hill Dep. Tr.) at 124:10-12. In addition, iloprost, the only other approved inhalable prostacyclin analog, exhibited significant side effects. *See, e.g.*, EX1065 at 6 (Table 4) (disclosing statistically significant adverse effects from iloprost, including syncope (5% of patients), increased coughing (39% of patients), flushing (26.7%), and jaw pain (11.9%)). Thus, in my opinion, a POSA would be motivated to lower the dose to avoid side effects, not increase it. Even if a POSA desired to try a higher concentration to reduce the number of breaths, a POSA would not have a reasonable expectation of success in view of the risk of serious adverse effects, as described above. Voswinckel JAHA, moreover, would not assuage the POSA's concerns with side effects. The abstract provides no information on side effects for the 15 patients that were only given the single "acute test" dose. The abstract claims that no side effects were observed for the two patients treated for "more than 3 months." A POSA would not rely on such a small data set (n=2) to draw conclusions about treprostinil tolerability.

86. Thus, in my opinion, the combination of '212 patent, Voswinckel JESC and Voswinckel JAHA, individually or together, fail to disclose or suggest every limitation of the '793 patent claims and therefore, cannot render obvious claims 1-8 of the '793 patent. Further, a POSA would not be motivated to combine these references or have a reasonable expectation of success in doing so.

**C.     Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious**

87.     The Petition asserts and Drs. Hill and Gonda opine that claims 1-8 of the '793 patent are also rendered obvious over the combination of the '212 patent and Voswinckel JESC for substantially the same reasons set forth in Ground 1. *See, e.g.*, EX1002, ¶124.   Accordingly, I also incorporate my opinions set forth for Ground 1 that are applicable here.

88.     The only difference is that Petitioner argues that a POSA's general knowledge in the field and/or by applying routine optimization would supply the claim limitation "delivered in 1 to 3 breaths" rather than relying on Voswinckel JAHA for this limitation.  I disagree because based on my experience, a POSA was well aware of the local and systemic side effects associated with high dosages of treprostinil and thus, would not have been motivated or expected such a high dosage in just 1 to 3 breaths to be well-tolerated by a patient without the potential for serious side effects.

89.     Dr. Hill points to prior art references that in my view would not guide a POSA to administer higher doses of treprostinil delivered in 1 to 3 breaths.  For example, Geller 2003 teaches inhalation of recombinant human deoxyribonuclease (rhDNase) for the treatment of cystic fibrosis. EX1034 at Abstract.  A POSA would understand that the ability of an inhaled therapeutic to be well tolerated at high

concentrations in just 1 to 3 breaths depends on the nature of the compound inhaled and indication for which it is used. A POSA would further understand that the pharmacokinetic profile and potential side effects of inhaled rhDNase are completely unrelated to treprostinil or other prostacyclin analogues. As another example, Frijlink 2004 generally states that dry powder inhalers may be used to deliver high fine particle fractions to the lung resulting in relatively high lung deposition. EX1039. There is no disclosure or data showing high concentrations of treprostinil in 1 to 3 breaths whatsoever, or that it would be well tolerated in a completely different patient population, *i.e.*, pulmonary hypertension patients. I note that Dr. Hill agrees that there are different considerations in determining whether a particular medication is suitable through a particular mode of administration when treating different diseases. EX2055 (Hill Dep. Tr.) at 136:8-141:18.

90. Further, as explained above, a POSA would be concerned with serious side effects if a POSA considered administering the claimed 15 to 90 micrograms in 1 to 3 breaths based on the prior art. If anything, the prior art taught away from using higher concentrations due to potential local and systemic side effects. *See* ¶85 above; *see also* EX1007 (disclosing side effects for one-third of patients provided the 32, 48, and 64 µg/mL doses, and concluding that, "[a]t higher doses, local and systemic side effects may occur").

91.    Thus, in my opinion, the combination of '212 patent, Voswinckel JESC and a POSA's general knowledge, individually or together, fail to disclose or suggest every limitation of the '793 patent claims and therefore do not render obvious claims 1-8 of the '793 patent.  Further, a POSA would not be motivated to combine these references or have a reasonable expectation of success in doing so.

## VI.    OBJECTIVE INDICIA OF NON-OBVIOUSNESS

92.    In my opinion, several objective factors also establish the non-obviousness of claims 1-8 of the '793 patent.

93.    The claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension.

94.    As of the priority date, many patients found existing therapies for the treatment of pulmonary arterial hypertension to be intolerable or ineffective.  As a practicing clinician, when Tyvaso® (which I understand is a commercial embodiment of the '793 patent) was approved, and as of and before the priority date, Tyvaso® was a significant advance over other available treatments for pulmonary hypertension because it did not and does not need to be administered as frequently, leading to better patient compliance.  Intravenous administration involves the use of needles, chronic indwelling central venous catheters (Hickman Catheter), and complicated drug administration procedures, which patients do not prefer, and subcutaneous administration also can involve pain and includes the risk of infection.

An inhaled solution only four times per day was much safer and easier for the patient, avoiding the risks and complexities of a central venous catheter and chronic infusion pump.

95.    Inhaled treprostinil is also approved to treat a broader range of pulmonary hypertension patients than the therapeutics available at the time of the invention. *See, e.g.,* EX1001 at 9:44-50 (explaining that the study described in example 1 included patients with idiopathic PAH, PAH other, chronic thromboembolic pulmonary hypertension (CTEPH) and pulmonary fibrosis); *see also* EX2034 (Tyvaso® label) as compared to EX1018 (Remodulin® label) (inhaled treprostinil is currently approved for pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease).

96.    At the time of the claimed invention and even as of today, there are no other therapies approved for the treatment of pulmonary hypertension in patients with interstitial lung disease. EX2060, Waxman *et al., 2021, Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, N. Eng. J. Med. 384:325-334.   I note that Petitioner's expert agrees with me that there is "a completely unmet medical need" where "[t]here [is] nothing that these patients were getting as a therapy for their problems."  EX2056 (Gonda Dep. Tr.) at 105:6-8.

97.    Petitioner has also acknowledged that an inhaled dosing regimen for the treatment of pulmonary arterial hypertension as described in the claims of the

'793 patent satisfies a long-felt unmet need. EX2036 ("Given the comparable treprostinil bioavailability and similar safety profiles of LIQ861 and Tyvaso®, LIQ861 fulfills a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler").

98.    In my opinion, the following unexpected results also support non-obviousness of claims 1-8 of the '793 patent.

99.    As of the time of the claimed invention, it was well known that prostacyclins produced systemic side effects even with inhalation therapies, and as such, limit the drug dose that is delivered to a patient. For example, a 2003 study showed dose limiting effects were similar for intravenous epoprostenol and intravenous treprostinil and can induce headache, nausea, chest pain, jaw pain, backache and restlessness at certain concentrations. EX2036 McLaughlin 2003 at 295; *see also* Table 6 (listing clinically significant adverse effects of treprostinil versus placebo which included vomiting, hypotension, bradycardia, vasovagal, syncope, insomnia, infusion site erythema/induration and infusion site pain).

100.    Iloprost, the only approved inhalation therapy for the treatment of pulmonary hypertension as of the time of the invention, was known to produce dose limiting side effects at much lower doses than those claimed in the '793 patent. Ventavis® was approved for a single event dose of 2.5 micrograms or 5 micrograms

to be taken 6 to 9 times per day. EX1029. Even at these doses, at least 39% of patients experienced at least one adverse event. *Id.* at 8. The Ventavis® label further teaches – in a study where health volunteers were given inhaled doses of iloprost solution every 2 hours increasing from 5 mcg to up to 20 mcg – 32% of subjects failed to reach the highest scheduled dose.

101. The higher doses in Voswinckel JESC were also found to include more side effects than the 16 µg/mL dose.

102. In view of the potential for side effects, the inventors of the '793 patent made the surprising discovery that therapeutically effective, high doses of treprostinil could be delivered to a patient in a shorter period of time with fewer side effects by developing a method that combined higher dosing in fewer breaths using a modified inhalation device (*e.g.*, modified Optineb pulsed ultrasonic nebulizer). *Watson Laboratories v. United Therapeutics*, IPR2017-01622, EX2048, Roscigno Declaration, ¶11 (inventors "discovered unexpectedly that [they] could deliver more treprostinil in a shorter period of time with fewer side effects (increasing the treprotinil [sic] dose more than 10-fold compared with iloprost…was not obvious to anyone"). This was a more than 10-fold increase in the treprostinil dose as compared with iloprost, the only other inhaled treprostinil therapy available as of 2006. *Id.*

103. The claimed invention relies on the unexpected interplay of treprostinil's pharmacodynamic properties following inhalation, including a slower

time to reach peak plasma concentration.  As one of the inventors of the '793 patent

explained:

> Unexpectedly, when we used treprostinil at a much higher dose in our second study with the Optineb ultrasonic nebulizer device, we discovered that treprostinil has a slower transpulmonary transit time (time of drug 'spillover' into the blood to reach peak plasma concentration) of 10 to 15 minutes when administered to pulmonary hypertension patients … compared to iloprost … This slower time to reach peak plasma concentration is important.  It obviously allows: a) to avoid major systemic side effects even when high total inhalation doses are used (nevertheless the high local concentrations in the lung already provide the desired therapeutic effect); b) to reduce the inhalation time to even a few breaths (made possible by switching to a pulsed ultrasonic nebulized in the further course of the studies); and c) to increase the overall inhaled treprostinil dose more than one order of magnitude over the overall inhaled tolerable iloprost dose.  In a subsequent trial, we modified the Optineb device to include both pulsing and an opto-acoustical trigger, while using a high enough concentration of pre-aerosolized treprostinil solution to permit high dosing in a small number of breaths coordinated with each of the aerosol pulses … which dramatically shortened the overall time of each treatment session.

EX2071, *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621, Second

Declaration of Dr. Werner Seeger (EX2098, ¶¶13-14) (internal citations omitted).

These properties are the result of the claimed invention achieving the right balance

of local delivery of treprostinil to the diseased pulmonary vasculature and circulatory

spillover.  EX2061, Declaration of Dr. Robert Roscigno, EX2048, ¶ 11 (noting risk

of spillover effect when inhaled amount of treprostinil is increased); *see also*

EX1048 Walmrath 1993 at 962 (describing that "an increase in the dose of

aerosolised prostacyclin might cause 'spillover' of the prostanoid into the systemic circulation.").

104.    Further, Petitioner and Dr. Hill has argued that it would be obvious to a POSA to titrate up the dose and decrease the time of inhalation.  Early studies in which PAH patients were administered varying doses of treprostinil by inhalation over different time periods however, demonstrated that doubling the concentration and shortening the administration time by half did not lead to better results:



EX2061, *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, EX2049; *see also* Declaration of Dr. Robert Roscigno, EX2048, ¶¶ 11, 14-15 (citing EX2049, EX2050, EX2051).  As such, Dr. Roscigno, one of the inventors of the 793 patent explained it was unexpected that going to an even shorter interval than 1 minute to the claimed "1 to 3 breaths" would lead to better results, and that it was not obvious to try higher concentrations at 1 to 3 breaths.

## VII. CONCLUSION

105.    In my opinion, none of the claims 1-8 of the '793 patent would have been obvious in view of the disclosures of the '212 patent, Voswinckel JESC and Voswinckel JAHA.  Further, as discussed above, neither the Petition nor testimony by Petitioner's experts, Drs. Hill and Gonda, provide evidence that would support a finding of obviousness of the '793 patent.

106.    In my opinion, none of the claims 1-8 of the '793 patent would have been obvious in view of the disclosures of the '212 patent and Voswinckel JESC. Further, as discussed above, neither the Petition nor testimony by Petitioner's experts, Drs. Hill and Gonda, provide evidence that would support a finding of obviousness of the '793 patent.

107.    In my opinion, several objective factors also establish the non-obviousness of claims 1-8 of the '793 patent, including long-felt unmet need and unexpected results.

I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Respectfully submitted,

Date: November 10, 2021

_____
Aaron B. Waxman, M.D., Ph.D.