# EXHIBIT 36

**No. 2023-1805**

# United States Court of Appeals for the Federal Circuit

————————————

UNITED THERAPEUTICS CORPORATION,

*Appellant,*

– v. –

LIQUIDIA TECHNOLOGIES, INC.,

*Appellee.*

————————————

APPEAL FROM THE PATENT TRIAL & APPEAL BOARD
IPR2021-00406

————————————

**OPENING BRIEF OF APPELLANT
UNITED THERAPEUTICS CORPORATION**

————————————

**UNITED THERAPEUTICS CORPORATION**
Shaun R. Snader
1735 Connecticut Ave., NW
2nd Floor, Washington, DC 20009
Tel: +1 202 304 1701
ssnader@unither.com

**MCDERMOTT WILL & EMERY LLP**
Douglas H. Carsten
Arthur P. Dykhuis
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
Tel: +1 949 851 0633
dcarsten@mwe.com
adykhuis@mwe.com

**GOODWIN PROCTER LLP**
William Jackson
1900 N St., NW
Washington, DC 20036
Tel: +1 202 346 4216
wjackson@goodwinlaw.com

Adam W. Burrowbridge
500 North Capitol Street, NW
Washington, DC 20001-1531
Tel:  +1 202 756 8797
aburrowbridge@mwe.com

*Counsel for Appellant United Therapeutics Corporation*

# REPRESENTATIVE CLAIMS

U.S. Patent No. 10,716,793 ("the '793 Patent"):

<u>Independent Claim 1</u>:

A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

<u>Dependent Claim 7</u>[1]:

A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a [<u>powder</u>] formulation [<u>,wherein the powder comprises particles less than 5 micrometers in diameter</u>,] comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device [that is a <u>dry powder inhaler</u>], wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

---

[1] Brackets incorporate referenced limitations from claims 6, 4, and 1.

# CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

**1.      The full name of every party represented by me is:**

United Therapeutics Corporation.

**2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

None.

**3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:**

BlackRock Inc., collectively through different BlackRock entities, may own 10% or more of its stock.

**4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:**

Foley & Lardner: Stephen B. Maebius, Michael Houston, George Quillin, Jason N. Mock; McDermott Will & Emery: Judy Mohr, Ph.D., April E. Weisbruch, Mandy Kim

**5.      The title and number of any case known to me to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal are:**

*United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Nos. 2022-2217, 2023-1021 (Fed. Cir.); originating from *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, 1-20-cv-755 (D. Del.)

**6.     Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):**

None.

Dated: August 4, 2023           _/s/ Douglas H. Carsten_
                                     Douglas H. Carsten

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................III

GLOSSARY .......................................................................................VI

STATEMENT OF RELATED CASES ................................................ VII

JURISDICTIONAL STATEMENT .....................................................VIII

INTRODUCTION ............................................................................... 1

ISSUES PRESENTED ........................................................................ 6

STATEMENT OF THE CASE ............................................................. 7

    I.     Pulmonary Hypertension and UTC's '793 Patent ................. 7

    II.    State of the Treprostinil Inhalation Art ............................... 8

        A.    Solution Dosing Art ....................................................... 8

        B.    State of the Dry Powder Inhalation Art ...................... 11

    III.   Inter Partes Review ............................................................. 18

        A.    The Board's Prior Art Analysis .................................... 19

        B.    The Board's Solution Dosing Obviousness Analysis ... 21

        C.    The Board's Dry Powder Obviousness Analysis .......... 23

SUMMARY OF THE ARGUMENT ....................................................... 26

STANDARD OF REVIEW .................................................................. 30

ARGUMENT .................................................................................... 31

    I.     The Board erred in determining that JAHA and JESC are prior art. ......................................................................... 31

        A.    The Board improperly raised and decided theories not advanced in Liquidia's Petition. ................................... 32

i

B.     The Board's conclusion that JAHA and JESC were "sufficiently distributed" is unsupported. ..................... 39

II.     The Board's claim 1 obviousness analysis is flawed. ........... 44

A.     The Board erred by relying on hindsight to find the claimed solution dose. .................................................. 44

B.     The Board independently erred by overlooking UTC's secondary considerations arguments. .......................... 51

III.     The Board erred by finding the dependent dry powder claims obvious. ................................................................................. 52

A.     The Board committed legal error in evaluating the dry-powder dependent claims. ........................................... 53

B.     The Board's obviousness conclusion for the dry powder claims is unsupported by substantial evidence. ........... 64

CONCLUSION ....................................................................................... 71

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Abbott Labs v. Sandoz, Inc.,*
    544 F.3d 1341 (Fed. Cir. 2008) ............................................................. 58

*Allergan, Inc. v. Apotex Inc.,*
    754 F.3d 952 (Fed. Cir. 2014) ...................................................... 31, 54

*Arendi S.A.R.L. v. Apple Inc.,*
    832 F.3d 1355 (Fed. Cir. 2016) ............................................. 62, 63, 69

*Circuit Check Inc. v. QXQ Inc.,*
    795 F.3d 1331 (Fed. Cir. 2015) ............................................................. 64

*In re Cuozzo Speed Techs., LLC,*
    793 F.3d 1268 (Fed. Cir. 2015) ............................................................. 30

*DSS Tech. Mgmt., Inc. v. Apple Inc.,*
    885 F.3d 1367 (Fed. Cir. 2018) ...................................................... 57, 62

*Endo Pharms. Sols., Inc. v. Custopharm Inc.,*
    894 F.3d 1374 (Fed. Cir. 2018) ............................................................. 60

*In re Google LLC,*
    56 F.4th 1363 (Fed. Cir. 2023) ............................................................. 33

*Graham v. John Deere Co. of Kansas City,*
    383 U.S. 1 (1966) ............................................................................. 58, 59

*Henny Penny Corp. v. Frymaster LLC,*
    938 F.3d 1324 (Fed. Cir. 2019) ............................................................. 33

*Honeywell Int'l Inc. v. Mexichem Amanco Holdings S.A. de
C.V.,*
    865 F.3d 1348 (Fed. Cir. 2017) ............................................................. 61

*Hybritech Inc. v. Monoclonal Antibodies, Inc.,*
    802 F.2d 1367 (Fed. Cir. 1986) ............................................................. 55

*Interconnect Planning Corp. v. Feil,*
    774 F.2d 1132 (1985) ............................................................................. 53

*In re Klopfenstein,*
   380 F.3d 1345 (Fed. Cir. 2004) ............................................................... 36

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC,*
   381 F.3d 1142 (Fed. Cir. 2004) ............................................................... 70

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007) .................................................................. 49, 58, 70

*Leeds & Catlin v. Victor Talking Machine Co.,*
   213 U.S. 301 (1909) ............................................................................. 53

*In re Magnum Oil Tools Int'l, Ltd.*
   829 F.3d 1364 (Fed. Cir. 2016) ................................................... 61, 62, 63

*Mass. Inst. of Tech. v. AB Fortia,*
   774 F.2d 1104 (Fed. Cir. 1985) ............................................................... 36

*Norian Corp. v. Stryker Corp.,*
   363 F.3d 1321 (Fed. Cir. 2004) ......................................................... 40, 41

*Novosteel SA v. U.S.,*
   284 F.3d 1261 (Fed. Cir. 2002) ......................................................... 40, 42

*In re NuVasive, Inc.,*
   841 F.3d 966 (Fed. Cir. 2016) .......................................................... 30, 31

*Oren Techs., LLC v. Proppant Express Invs. LLC,*
   No. 2019-1778, 2021 WL 3120819 (Fed. Cir. July 23, 2021) ................. 62

*Power Integrations, Inc. v. Lee,*
   797 F.3d 1318 (Fed. Cir. 2015) ............................................................... 30

*Raytheon Techs. Corp. v. General Electric Co.*
   993 F.3d 1374 (Fed. Cir. 2021) ......................................................... 62, 63

*Samsung Elecs. Co. v. Infobridge Pte. Ltd.,*
   929 F.3d 1363 (Fed. Cir. 2019) ............................................................... 38

*Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.,*
   66 F.4th 1373 (Fed. Cir. 2023) ............................................................... 61

iv

*SAS Inst., Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ....................................................... 32, 36

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ................................................................... 33

*Sirona Dental Sys. GmbH v. Institut Straumann AG*,
   892 F.3d 1349 (Fed. Cir. 2018)................................... 33, 35, 36

*In re Stepan Co.*,
   868 F.3d 1342 (Fed. Cir. 2017)............................................. 57

*Takeda Pharm. Co. Ltd. v. Torrent Pharms. Ltd.*,
   844 F. App'x 339 (Fed. Cir. 2021) ...................................... 61

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
   18 F.4th 1377 (Fed. Cir. 2021) ............................................ 54

*TQ Delta, LLC v. Cisco Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019).....................................*passim*

*UCB, Inc., v. Accord Healthcare, Inc.*, 890 F.3d 1313 (Fed. Cir.
   2018)........................................................................................ 66

*In re Van Os*,
   844 F.3d 1359 (Fed. Cir. 2017)............................................. 52

**Statutes**

5 U.S.C. § 554(b)(3) ...................................................................... 33

35 U.S.C § 112 ...................................................................... 6, 54, 63

35 U.S.C. § 282 ............................................................................... 63

35 U.S.C. § 288 ............................................................................... 63

35 U.S.C. § 311(b) .......................................................................... 32

35 U.S.C. § 312(a)(3) ..................................................................... 32

35 U.S.C. § 316(e).................................................................... 30, 63

# GLOSSARY

'212 Patent ................. U.S. Patent No. 6,521,212 (Appx1207-1233)

'793 Patent ................. U.S. Patent No. 10,716,793 (Appx1001-Appx1025)

Board .......................... Patent Trial and Appeal Board

JAHA.......................... IPR Exhibit 1008: Excerpted pages from
*Circulation: Journal of the American Heart
Association* (Appx1241-Appx1243)

JESC........................... IPR Exhibit 1007: Excerpted pages from
*European Heart Journal: Journal of the
European Society of Cardiology* (Appx1234-
Appx1240)

Liquidia ...................... Appellee Liquidia Technologies, Inc.

UTC ............................ Appellant United Therapeutics Corporation

# STATEMENT OF RELATED CASES

The following case is related to this appeal, as defined by Fed. Cir. R. 47.4(a)(5):

*United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Nos. 2022-2217, 2023-1021 (Fed. Cir.)

## JURISDICTIONAL STATEMENT

The Board entered its final written decision on July 19, 2022. Appx0001-Appx0049. The Board denied UTC's request for rehearing on February 2, 2023. Appx0050-Appx0067. UTC filed a timely notice of appeal on April 5, 2023. Appx0889-Appx0893. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## INTRODUCTION

The Board erred at three levels: (1) erroneously holding that certain asserted references are prior art based on an unasserted theory of public accessibility by not-in-evidence "abstract books"; (2) reaching an obviousness conclusion based on hindsight rather than substantial evidence; and (3) failing to properly analyze the limitations and evidence regarding dependent claims directed to dry powder administration. These errors require reversal.

First, the Board erred in holding that references critical to its obviousness conclusion constitute prior art. The Petition asserted that two Voswinckel abstracts were publicly accessible before the critical date because one was published in the *Journal of the European Society of Cardiology* ("JESC") and the other in the *Journal of the American Heart Association* ("JAHA"). The Board, after prompting by the USPTO's Precedential Opinion Panel, rejected this argument. The Board created a new theory: "abstract books" including abstracts somehow corresponding to JESC and JAHA were disseminated to conference attendees making abstracts in those "abstract books" publicly accessible printed publications. The Petition makes no mention of these alleged

"abstract books," and no "abstract book" was offered into evidence.  There is no first-hand evidence of how or when these abstract books were allegedly made available to attendees.

The Board erred in manufacturing this dissemination-by-abstract-book theory, which is not identified in the Petition.  An IPR is bounded by the arguments set forth in the petition, and the petitioner must identify its supporting evidence with particularity.  Liquidia's Petition never advanced any argument about abstract books or their dissemination.  Liquidia relied on publication in journals—a theory the Board did not credit.  Indeed, with respect to the JAHA abstract, Liquidia's Petition did not even mention a conference.

Even if Liquidia's Petition had presented a theory of conference dissemination, the Board's determination that both Voswinckel abstracts were available to conference attendees lacked evidentiary support.  The Board effectively created a presumption that abstracts identified in a professional conference journal were necessarily available during the conference itself.  That rule would flip the statutory burden of proof and arbitrarily discard the usual fact-bound analysis.  Because Liquidia failed to prove that the Voswinckel abstracts were prior art, and because the

Board did not credit any other public-accessibility theory, this Court need not go further—it can reverse the Board's holding on that basis alone.

Second, even if the Voswinckel abstracts constitute prior art, the Board erred in finding that they made the claims obvious. All claims require delivery of a "therapeutically effective single event dose compris[ing] from 15 micrograms to 90 micrograms of treprostinil" or a treprostinil salt. Appx1025 (18:28-29). The Board determined that JESC "does not disclose the amount of solution administered." Appx0015. Nonetheless, it deemed this delivered-dose limitation obvious based on a calculation—which rested on an erroneous assumption—that JESC disclosed the administration of 16-80, 32-160, 48-240, or 64-320 micrograms of treprostinil to patients. Appx0016; *infra* 48-49. As the Board acknowledged, however, JESC did not disclose any *amounts* of treprostinil delivered. Appx0015. It identified only the *concentration* of drug solution placed into the nebulizer (a device that delivers medicinal solutions in the form of an inhaled aerosol), but not the amount of solution or drug actually delivered. The Board attempted to bridge the gap between concentrations of drug in solution and the amount of drug delivered to patients but made no factual findings regarding the factors

determining delivered dose: fill volume, output rate, and efficiency. The Board's analysis overlooks the complexity of the art and relies on conclusory opinions unsupported by substantial evidence.

Third, the Board erred in its analysis of dependent claims directed to a dry powder (claims 4, 6, and 7) because the Board's analysis addressed only a subset of limitations in isolation rather than the dry powder claims as a whole. Specifically, the Board concluded that it would be obvious to substitute a powder for a solution without considering the other dosing and delivery limitations of the claim. But a dependent claim consists of *all* applicable limitations, including those incorporated by reference from a preceding claim. Here, that means the Board was required to assess the dependent limitations within the context of the referenced limitations in, *e.g.*, independent claim 1. The Board failed to do so and looked only at the "additional limitations" in the dependent claims. In failing to assess the proper scope of the dependent dry powder claims the Board applied a legally deficient obviousness analysis.

Even if the Board had considered the right question, there is no substantial evidence that would allow the Board to interchange delivery of *solutions* with the dosing and delivery of dry *powders* claimed in the

patent.  The Board's *sub silentio* treatment of solutions as equivalent to dry powder—where uncontroverted record evidence establishes that the two are "completely different"—is error.  Because the Board's analysis of the dry-powder dependent claims rested on legal and factual errors, the Board's decision with respect to those claims should be reversed.

## ISSUES PRESENTED

1.    Whether the Board erred in treating two key references as publicly accessible prior art on grounds that Liquidia's Petition did not assert and that lacked any meaningful evidentiary support.

2.    Whether the Board erred in relying on solution dosing calculations even though the inputs of those calculations explicitly assume technical facts unsupported by substantial evidence; and whether the Board failed to recognize, much less address, UTC's secondary considerations arguments.

3.    Whether the Board erred in analyzing the dry powder dependent claims as mere "additional limitations" rather than analyzing the claim as a whole by "incorporat[ing] by reference all the limitations of the claim to which it refers" as mandated by 35 U.S.C § 112; and whether substantial evidence supports the Board's conclusion that the dry powder claims would be obvious where Liquidia's expert admits that "high" unpredictability exists and "extensive" non-routine experimentation is required to achieve the claimed dry powder inventions.

6

## STATEMENT OF THE CASE

## I.     Pulmonary Hypertension and UTC's '793 Patent

Pulmonary hypertension ("PH") is a medical condition characterized by elevated blood pressure in the blood vessels between the heart and lungs. Appx1017.  UTC's '793 Patent relates to a breakthrough treatment for pulmonary hypertension: administering by inhalation a high concentration of treprostinil in a single event in just one to three breaths.

To arrive at the '793 Patent's innovative dosing-device combination, the inventors investigated whether a specific treprostinil inhalation regimen would be advantageous over a prior art PH treatment.  Given its short half-life, the prior art option, iloprost, needs to be inhaled six to nine times a day (as frequently as every two hours) in increasing dosages with a nebulizer, which proves challenging for patients.   Appx0364.  Indeed, one study found that nearly one third of patients failed to reach the highest scheduled dose.  Appx0418.  The inventors' work established that inhaled treprostinil can be delivered in higher doses with shorter inhalation times (only one to three breaths) while still resulting in significant improvements in a patient's pulmonary vascular resistance, pulmonary artery pressure, and cardiac output—all measures of the seriousness of a PH patient's condition. Appx1014; Appx1024 (16:32-42).

7

Based on their work, the inventors developed the specific method of treating pulmonary hypertension claimed in the '793 Patent. Independent claim 1 claims a method of treating pulmonary hypertension through administration of "a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises 15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths." Appx1025. Dependent claims 2 through 8 further limit the claimed treatment with respect to the device and formulation.  For example, claim 4 requires the use of a dry powder inhaler ("DPI"), claim 6 further requires the formulation to be a dry powder, and claim 7 further requires the powder to comprise particles less than 5 micrometers in diameter.  *Id*.

## II.    State of the Treprostinil Inhalation Art

### A.    Solution Dosing Art

As discussed, the '793 Patent claims a 15 to 90 microgram single event dose delivered in 1-3 breaths.  That specific dosing regimen was not previously taught anywhere—including the JESC and JAHA abstracts.[2]

---

[2] As discussed in greater detail below, these abstracts do not constitute prior art.  *See infra* 31-39.

### 1. *Voswinckel JESC*

Voswinckel JESC was excerpted from a supplement to the "Journal of the European Society of Cardiology" ("JESC") and is asserted as prior art. Appx1234-Appx1240. JESC contains a Voswinckel abstract that disclosed a clinical study investigating the acute hemodynamic response to inhaled treprostinil solution (*i.e.*, liquid form) in 29 patients. Patients in the study inhaled aerosolized treprostinil for six minutes through an OptiNeb ultrasound nebulizer loaded with an unknown quantity of drug solution in concentrations of 16, 32, 48, and 64 micrograms per milliliter (μg/mL). The abstract reports that patients that inhaled the nebulized (aerosolized) solution for 6 minutes experienced pulmonary vasodilation (*i.e.*, dilation of the blood vessels in the lungs).

Notably, the abstract did not disclose the *quantity* of drug delivered to patients—it listed only the *concentration* of drug in the nebulizer. Nor did the abstract disclose variables affecting the dose delivered to the patients, such as the nebulizer's nebulization rate and efficiency, its fill and dead volumes, humidity and temperature conditions, gas flow, density, pressure, and the patients' breathing patterns. Appx4827-Appx4831; Appx5155-Appx5157 (81:17-20, 81:22-82:11, 83:17-24); Appx5159 (85:9-14); Appx5167 (93:16-25). The abstract is similarly silent regarding other factors affecting output, including the specific

model and the program, face mask or mouthpiece, type of tubing, operation frequency, and baffle plate. Appx4827-Appx4830.

### 2. *Voswinckel JAHA*

Voswinckel JAHA was excerpted from a supplement to the "Journal of the American Heart Association" ("JAHA") and is asserted as prior art. Appx1241-Appx1243. JAHA contains a Voswinckel abstract that disclosed an open-label study investigating inhaled treprostinil conducted on 17 patients with severe pulmonary hypertension. The patients inhaled three breaths of aerosolized treprostinil through a non-specific "pulsed" OptiNeb ultrasound nebulizer loaded with a treprostinil solution in a concentration of 600 µg/mL. The study showed that inhaled treprostinil solutions resulted in sustained, highly pulmonary-selective vasodilation over 120 minutes. Like the JESC abstract, the JAHA abstract does not disclose any information to inform the delivered dose, such as the nebulizer used, the fill volume, the dead volume, the volume of nebulized solution per breath, or how the patients inhaled each pulse after the solution was nebulized. Appx4825-Appx4826; Appx5155-Appx5157 (81:17-20, 81:22-82:11, 83:17-24); Appx5159 (85:9-14); Appx5167 (93:16-25).

## B.    State of the Dry Powder Inhalation Art

As discussed, dependent claims of the '793 Patent claim the delivery of a dry-powder formulation by dry-powder inhaler to achieve a 15-90 mg therapeutically single event dose of treprostinil.

Liquidia's expert, Dr. Igor Gonda, submitted an extensive expert report (Appx5940-Appx5966) concluding that the art of dry powders, dry-powder inhalers, and dry powder delivery was notoriously unpredictable: "[w]ithout guidance from the '793 Patent, a POSA would [have] be[en] unable to formulate a treprostinil powder suitable for administration via a dry powder inhaler for PH patients without excessive experimentation." Appx5945, Appx5951.  Unsurprisingly, no prior art reference—including those on which Liquidia has relied—taught the limitations of the '793 Patent's dry-powder claims.

### 1.    The '212 Patent

Liquidia asserted U.S. Patent No. 6,521,212 ("the '212 Patent"), which is assigned to UTC and has a priority date of March 18, 1999, as prior art.  Each example in the '212 Patent describes animal studies where a treprostinil solution—not powder—was administered via "tracheostromy" in sheep with induced hypertension.  A tracheostromy uses a tube inserted through an incision in the neck into the windpipe to

administer treprostinil to the lungs. This allows for "direct aerosolization of substances into the lung . . . thereby preventing swallowing of drugs and thus eliminating a possible secondary route of administration[.]" Appx1230 (9:20-23).

Having considered the '212 Patent, Liquidia's inhalation device expert, Dr. Gonda, concluded that "no treprostinil powder formulation suitable for delivery using a dry powder inhaler had been developed or disclosed as of May 15, 2006." Appx5949.

### 2. *Unpredictability in the dry-powder art*

Dr. Gonda submitted an extensive expert report addressing dry powder treprostinil, "the state of the prior art, the level of skill in the art, [and] the level of predictability in the art" as of May 15, 2006, in parallel district court proceedings. Appx5945. Dr. Gonda's opinions, submitted as evidence to the Board, concluded that, "the level of unpredictability in the art was high" (Appx5948), dry powders present "unique design challenges" (*id.*), and that the "state of the art" for "powder formulations of treprostinil" and for PH was "relatively minimal" (Appx5945, Appx5949).

Dr. Gonda explained that a POSA would have understood that a dry powder inhaler "operates in a much different manner than inhalers that administer solutions such as nebulizers, soft mist inhalers, or

metered dose inhalers that use propellants to form aerosols containing treprostinil." Appx5947. Accordingly, "[a] POSA would need to identify a dry powder inhaler that suits the needs of the specific patient population (i.e., PH)" even though "there was no experimental work reported on the use of DPIs in PH patients." Appx5947-Appx5948. Indeed, technical challenges would require "a significant amount of experimentation" with different formulations and dry powder inhalers "to effectively deliver treprostinil in a dry powder form to PH patients . . . [because] [i]t was well-known that different DPIs had different flow resistance and therefore required different inspiratory effort *to be functional*." Appx5948, Appx5950 (emphasis added).

Dr. Gonda provided five specific reasons why these sources of unpredictability would have left a skilled artisan unable to develop a dry powder treprostinil formulation for PH patients without excessive non-routine experimentation.

*First*, Dr. Gonda explained, there is no equivalence between solutions and powders: "it is well-accepted in the field that nebulized solutions . . . are not compatible with dry powder inhalers," and that "a dry powder inhaler cannot deliver solutions." Appx5951-Appx5952. As Dr. Gonda explained, "formulation of dry powder formulations is completely different than formulation of nebulized solutions." Appx5953.

*Second*, Dr. Gonda explained, non-routine and "excessive" experimentation would have been required to develop a dry powder treprostinil formulation and dosing regimen for pulmonary hypertension due to treprostinil's high potency. Appx5951-Appx5952. To precisely dose a potent drug like treprostinil, it is necessary to formulate treprostinil with a carrier that enables therapeutic delivery. Such work would "not be routine." Appx5952. This is because for dry powder treprostinil "the delivery *has to be* precise." Appx5953 (emphasis added). Developing a treprostinil-specific dry powder formulation inhaler combination would be "*more challenging* than for drugs which were routinely delivered by inhalation pre-2006 in the form of dry powder inhalers." *Id.* As of the priority date, matching "each type of solid form of treprostinil or its salt" with an appropriate carrier would "not be routine"; instead, it would have required extensive experimentation to determine "the chemical and physical stability of such combinations during processing and storage." Appx5951-Appx5952. Dr. Gonda explained, for dry powders "there were very few carriers available with proven tolerability and safety by inhalation as of May 2006." Appx5954. Moreover, even if a non-toxic and tolerable carrier is identified, "a POSA must ensure that the carrier does not react chemically with the API (i.e., treprostinil)." *Id.*

14

*Third*, Dr. Gonda explained, a POSA must ensure that dosing is "uniform[]" and "reproducible"—a requirement that presented "unique design challenges" for powders "because, among other reasons, they are 2-phase gas-solid systems." Appx5955. "When static, powders behave as solids; when flowing, powders behave as liquids; and when dispersed in the air, powders behave as their carrier gas." *Id*. "As a consequence, equations describing the behavior of solids are less predictive than their fluid counterparts." *Id*. According to Dr. Gonda, this unpredictability is worsened by PH patients' breathing difficulties and poses a "significant challenge to reproducibility of drug delivery" because dry powder inhalers "use the patient's breathing effort to elicit the powder from the inhaler and disperse the powder in the device into respirable particles of the correct size." Appx5955-Appx5956. Thus, "the development of a dry powder inhaler product requires matching the compatibility of the device and the formulation also with the ability of the PH patients to inhale the formulation such that a reproducible precise dosing is possible." Appx5956. This matching is "more challenging" for treprostinil because uniform distribution is difficult to achieve with "high potency" drugs "formulated in such a low concentration of drug to carrier." Appx5957.

Dr. Gonda further explained that just as there is no equivalence between solutions and powders, there is no equivalence between dry

powder formulations and devices. The ability of patients to use dry powder inhalers "cannot be generalized, and neither can be adequate performance with one powder formulation with one device be a guarantee of success of the same formulation in another device (or vice versa, using the same device with a different population)." *Id.*

*Fourth*, Dr. Gonda explained, the unpredictable nature of treprostinil was so "problematic" such that "a POSA *would not have known which, if any*, of the forms of treprostinil or its salts would have been suitable for dry powder inhaler formulation." Appx5958-Appx5959 (emphasis added). Therefore, "a POSA would need to identify a chemically and physically stable form of treprostinil to ensure that the physical properties of the formulation do not change during manufacture, storage, and administration." Appx5958. However, "[c]rystallinity and polymorphism" presented "a unique challenge to powder formulations because changes in structure can result in changes to the size, shape, density and dispersibility of the drug powders" (Appx5959) as well as "different properties, including stability, solubility, and even bioavailability" (*id.*) (brackets and quotation marks omitted).

According to Dr. Gonda, other treprostinil-specific properties would also have led to unpredictability in the delivered dose of a treprostinil dry powder. Appx5959. For example, the prior art did not disclose

16

treprostinil's "aerodynamic size distribution" or "fine particle fraction"—properties "important to dry powder inhaler performance." *Id.* These "physical properties of the formulation ultimately leads to variable delivery" if changes in aerodynamic size distribution and fine particle fraction are not controlled. Appx5960.

The development of a powder formulation of treprostinil suitable for administration via dry powder inhaler would have been "further exacerbated" by treprostinil's "known hygroscopicity" (*i.e.*, its tendency to take on moisture), which "present[s] a greater risk of physical instability," Dr. Gonda explained. *Id.* And treprostinil's "low melting point" would have made it an "unattractive candidate for micronization [*i.e.*, the process of reducing particle size for effective delivery] because the high temperatures involved with the process would risk melting of the crystalline structure" which "causes transformation into an amorphous form." Appx5961. Such unpredictability in treprostinil transformation is "difficult to control at the time of manufacture but also can continue during storage"—highlighting that the "[i]dentification of a chemically and physically stable treprostinil form is especially important for dry powder formulations." *Id.*

*Fifth*, Dr. Gonda explained, "a POSA would need to engage in extensive experimentation with different device-formulation

combinations" requiring the development of "proprietary" dry powder technologies. Appx5963. Dr. Gonda explained that both Liquidia and a UTC-Mannkind partnership developed device-formulation products and "neither company used routine or conventional technologies to develop their treprostinil powder formulations." *Id.* Dry powder is different in kind; "a unique interdependence exists between approved dry powder formulations and their dry powder inhalation devices." Appx5962. This unpredictability was known in the field: "even when the same chemical entity is delivered . . . outcomes are not always the same with all dry powder inhalers," thus requiring "extensive" experimentation with different device-formulation combinations. Appx5963.

Dr. Gonda's opinions concerning a POSA's understanding of treprostinil dry powder as of the priority date were unrebutted below.

## III. Inter Partes Review

Liquidia petitioned for inter partes review of the '793 Patent, and the Board instituted review. The Board rejected four of Liquidia's asserted grounds because Liquidia did not meet its burden to prove that two of the asserted references (Ghofrani and Voswinckel 2006) were prior art. Appx0036-Appx0041. But the Board held that Liquidia had carried

its burden on one ground, demonstrating the obviousness of claims 1-8 over three references: the '212 Patent, JAHA, and JESC.[3]  Appx0035.

## A.    The Board's Prior Art Analysis

Liquidia's Petition asserted that the JAHA abstract was prior art because it was "published" in *Circulation: Journal of the American Heart Association* on October 26, 2004.  Appx0135.  Similarly, the Petition asserted that the JESC abstract was prior art because it was "published" in the *European Heart Journal*[4] on October 15, 2004.  Appx0133.  For JESC, Liquidia also asserted that it was "presented" at the European Society of Cardiology Congress ("ESC Congress") from August 28 to September 1, 2004, in Munich.  *Id.*  Liquidia argued that the citation of these Voswinckel abstracts in other articles—"research aids"—made the asserted exhibits publicly accessible prior to the '793 Patent's critical date.  Appx0471-Appx0472, Appx0474-Appx0476.  UTC disputed these contentions.

The Board agreed with Liquidia in its final written decision that the proffered "research aids" were sufficient to establish the public

---

[3] The Board found it unnecessary to consider an alternative combination of only the '212 Patent and JESC.  Appx0046 n.11; Appx0064 n.2.

[4] The *European Heart Journal* is subtitled the *Journal of the European Society of Cardiology*, Appx1234, hence the abbreviation "JESC."

accessibility of the Voswinckel abstracts. Appx0011-Appx0012. UTC sought rehearing before the Board and petitioned the USPTO's Precedential Opinion Panel. Appx0862-Appx0880, Appx0881-Appx0883, Appx0884-Appx0888. As UTC explained, the Board erred in relying on Liquidia's "research aids" to establish the Voswinckel abstracts as prior art because the "research aids" were not themselves pre-priority documents. The Precedential Opinion Panel agreed: "[The Board] did not address adequately whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art." Appx0885. The Panel directed the Board to "clarify whether the relied upon research aids were available prior to the critical date and whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library." Appx0886.

On rehearing, the Board abandoned its prior conclusion that the Voswinckel abstracts *as published in the Journal of the American Heart Association and the European Heart Journal* were publicly available prior-art printed publications. Indeed, the Board conceded that it had "overlooked" UTC's refutation of that theory. Appx0054-Appx0056.

Instead, the Board substituted a new rationale for each abstract. As to JESC, the Board determined that an attendee of the 2004 ESC

Congress "would have received a copy of the abstract book from which Voswinckel JESC is excerpted, either at the meeting itself or as a distribution before the meeting." Appx0059. The Board reached a similar conclusion for JAHA: "a copy of the abstract book from which Voswinckel JAHA is excerpted would have been provided to all attendees at [the American Heart Association's] Scientific Sessions 2004." Appx0061. The Board reached these conclusions even though Liquidia's Petition had not argued that either Voswinckel abstract was disseminated at a professional conference via an "abstract book."

## B.    The Board's Solution Dosing Obviousness Analysis

To reach the 15-90 micrograms of treprostinil limitation from claim 1 of the '793 Patent, Liquidia cited JESC's disclosure that 29 patients were administered solutions containing 16, 32, 48, and 64 µg/mL treprostinil for 6 minutes via the OptiNeb ultrasound nebulizer. Appx0133. Liquidia argued that "a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least 16, 32, 48, or 64 µg of treprostinil were delivered to different dosing groups in this study." Appx0134. As support, Liquidia relied on one paragraph from each of Drs. Hill's and Gonda's declarations. *Id.* Specifically, Dr. Hill stated that a POSA would understand JESC to have used a volume of "at least 1 mL

21

because nebulizers at the time were known to nebulize (i.e. aerosolize liquid) at least that volume." Appx0134 (quoting Appx1054). Dr. Hill's only support for this claim is a paragraph from Dr. Gonda's declaration. *See* Appx1054. Yet Dr. Gonda did not substantiate how much nebulizers "deliver[ed]" as of the priority date. Instead, he cited three non-treprostinil drug labels and their various device fill volumes *before* nebulization to treat different diseases. *See* Appx1166 n.4. Dr. Hill also stated that he prescribed volumes of "at least 1 mL of volume for delivery" in his own practice but provided no additional citations or evidentiary support to substantiate this statement. Appx1054.

UTC explained in response that JESC lacks many of the necessary details required to determine a "delivered dose," including "the type of inhalation device used, pre-aerosolized drug concentration, gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions." Appx0382. The dose delivered using a continuous nebulizer cannot be meaningfully determined only using fill volume. Appx0391. Moreover, even if JESC provided a fill volume and taught that it was completely nebulized, a POSA still would not be able to determine the delivered dose because "[f]ill volume is just one of many variables that may affect drug dosage." Appx0392. UTC provided examples showing commercially available nebulizers with 0.5 mL fill

22

volumes and, thus, it cannot be assumed that the non-commercial nebulizers used in the JESC study delivered greater volumes of 1-5 mL. Appx0393; Appx6673; Appx4838-Appx4840.    Lastly, it would be impossible to extrapolate the single event dose from JESC because "the delivery efficiencies and pharmacokinetics of a continuous nebulizer to do not predictably translate to devices capable of delivering consistent dosages in just 1 to 3 breaths." Appx0393-Appx0394.

The Board agreed with UTC that, as a factual matter, JESC "does not disclose the amount of solution administered, which is necessary in order to calculate the amount of treprostinil administered." Appx0015. Despite JESC's silence concerning the fill volume *and* delivered dose, the Board concluded that JESC's disclosure taught 15-90 µgs of treprostinil based the solution volumes "normally delivered" according to the testimony of "Petitioner's declarants." Appx0014. That testimony, as explained above, boils down to fill volume examples for different drug solutions used with different devices to treat different diseases.

## C.    The Board's Dry Powder Obviousness Analysis

Liquidia's Petition argued generally, in a single sentence with no explanation, that a POSA "would expect" JESC's solution dosing and JAHA's solution-nebulizer breath limitation "to be a therapeutically effective dosing regimen for PH" for a dry powder based on the

'212 Patent's limited disclosure concerning "solid formulations, usually in the form of a powder." Appx0145. Liquidia did not explain *why* a POSA would be motivated to make the specific dry powder modifications or *why* a POSA would have a reasonable expectation of success in achieving the claimed therapeutically effective single event dose comprising from 15-90 micrograms of a dry powder treprostinil formulation via dry powder inhaler, wherein the dose is delivered in 1 to 3 breaths.

The only other dry powder argument provided in the Petition was directed to specific dependent claim elements divorced from the referenced independent claim elements. With no additional argument concerning differences between the claims and the prior art, motivation to combine the prior art, and reasonable expectation of success, the Petition argued—in one sentence per dry powder claim—that the dependent claims were obvious. *See* Appx0154-Appx0156.

UTC responded by entering as evidence a 22-page expert report from Liquidia's expert, Dr. Gonda, in the co-pending district court case. He assessed the same '793 Patent dry powder claims in light of the same prior art and concluded that a POSA would find "the level of unpredictability in the art was high" and that "[w]ithout guidance from the '793 Patent, *a POSA would be unable* to formulate a treprostinil

24

powder suitable for administration via a dry powder inhaler for PH patients without excessive experimentation." Appx0400 (emphasis added). UTC argued that Dr. Gonda's lengthy sworn statements detailing the state of dry powder art and concluding that treprostinil was "more challenging" for dry powder inhalation use and presented "unique challenges," "completely contradict[ed] his assertions before the Board." *Id.* UTC argued that Dr. Gonda's "conclusory evidence" in the IPR was unsupported in view of the specific treprostinil evidence *he himself* swore a POSA would rely on, as of the priority date. Appx0401. Liquidia deflected and did not substantively respond to UTC's arguments that it failed to prove obviousness of the dry powder dependent claims.

In its final written decision, the Board analyzed the "additional limitations" of the dependent dry powder claims and held that the dependent claims were unpatentable. Appx0031, Appx0034, Appx0035. The Board never analyzed or provided a reasoned basis for why the proper scope of the dependent claims—*i.e.*, including the dosing elements incorporated by reference from preceding claims which the dependent claims depend—would be obvious. The Board dismissed Dr. Gonda's extensive discussion of unpredictability and challenges by drawing a distinction between enablement—the subject of his report—and obviousness. Yet the Board never grappled with the unrebutted factual

assertions regarding a POSA's understanding of the "unpredictability" in the dry powder art and the extensive technical challenges in achieving the dry powder treprostinil inventions of the '793 Patent, which are directly relevant to obviousness. Instead, the Board relied on a single conclusory sentence in Dr. Gonda's declaration, claiming that a POSA "would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler," and on citations to non-asserted prior art references concerning dry powder inhalers generally. Appx0033.

## SUMMARY OF THE ARGUMENT

I.      JAHA and JESC are not prior art. The Board's obviousness decision relies on the hypothetical existence of "abstract books"—neither of which were produced in evidence and neither of which would in any event qualify as § 102(b) prior art—that supposedly contain the abstracts corresponding to JAHA and JESC. First, Liquidia's Petition asserted only that two journal publications, JAHA and JESC, were prior art. The Petition did not assert that any other printed publication—such as an "abstract book"—contained a similar disclosure was also prior art. The Board went beyond the Petition to nonetheless hypothesize that non-asserted, never-seen, and not-in-evidence "abstract book[s] from which [JAHA/JESC] [were] excerpted" were distributed at some unknown time

26

(*i.e.*, "either at the meeting itself or as a distribution before the meeting"). Appx0059, Appx0061.   In going beyond the Petition, the Board also exceeded the scope of its mandate to issue a decision based on the printed publications identified in a petition.  Appx0058-Appx0064.  The Board's reliance on the public availability of not-in-evidence "abstract books" not asserted in the Petition, rather than JESC and JAHA exhibits as-asserted, is reversible error.  Appx0059, Appx0061.

Relatedly, Liquidia's Petition failed to assert, and thus forfeited, any theory that JESC and JAHA were publicly accessible based on the hypothetical distribution of "abstract books" at a conference.   Liquidia stated—in a single sentence—that "JESC" was presented at a conference. Yet IPRs may be based only on printed publications asserted, and Liquidia never suggested that JESC was contained in an abstract book from the conference, or that Liquidia was relying on such an abstract book.  Liquidia's argument with respect to JAHA was even more deficient because Liquidia's Petition did not even identify a conference for that abstract.   Liquidia's forfeiture cannot be rehabilitated by the Board.   On that basis alone, the Board's decision cannot stand.   Moreover, the Board's refusal to provide UTC an opportunity to present evidence on this forfeited theory (Appx0894-Appx0895; Appx6415-Appx6420; Appx0540) is a violation of UTC's due process rights under the APA.

27

Second, the Board erred by finding "JESC" and "JAHA" were "[s]ufficiently [d]istributed" at conferences absent any evidence concerning actual distribution of those exhibits *or* the actual distribution of hypothetical "abstract books." Appx0058, Appx0060. The Board's ruling amounts to an unprecedented presumption that abstracts made available before or after a conference are *per se* publicly accessible as of the date of the conference. This ruling conflicts with precedent, which requires a fact-specific proof-bound inquiry into actual availability. The Board's finding of public accessibility in this case lacks substantial evidence and thus compels reversal.

II.    The Board erred by relying on hindsight-based assumptions to calculate the solution dose delivered in JESC. The study disclosed in JESC provides no information concerning solution fill volume in the nebulizer much less the dose actually delivered to the patients. To fill these technical gaps, the Board relied on unsupported conclusory say-so from Liquidia's experts concerning the dose a POSA would assume to have been delivered in the JESC study. These assumptions are based on the "fill volume" for other drugs in different nebulizers. Without this hindsight-driven assumption of "at least 1 mL" delivered dose filling the gap in the prior art, Liquidia's post-hoc calculation and purported JESC

teaching crumbles. The Board's obviousness decision is not supported by substantial evidence and must be reversed.

III. Finally, the Board erred by (a) analyzing the dependent dry powder claims divorced from the claim elements inherited from their parent claims, and (b) concluding that a POSA would be motivated to modify the prior art with a reasonable expectation of success in delivering the claimed dry powder dose to a patient. The Board's obviousness analysis of the dry powder claims treated the dependent claim elements as mere "additional limitations" without considering them as part of the parent claims. This was legal error. The Board was required to consider the invention claimed in the dependent claim limitations, including all limitations of parent claims, as a whole. This is particularly important where, as here, the unrebutted record is clear that treprostinil dry powder formulations, dosing, and delivery are "unique" and not equivalent to treprostinil solution, dosing, and delivery. Because Liquidia failed to provide any evidence concerning all limitations of the dependent claims, the Board's decision must be reversed.

Relatedly, substantial evidence does not support the Board's obviousness conclusions and for good reason. Liquidia failed to provide any evidence that the dependent dry powder claims—*with all their referenced limitations*—would be obvious. The Board's reliance on one

expert's conclusory opinion—completely contradicted by his other opinions—and two citations concerning dry powder inhalers *generally* does not amount to substantial evidence that a POSA would be motivated to modify the treprostinil prior art with a reasonable expectation of success. The Board's dry powder obviousness decision is not supported by substantial evidence and must be reversed.

## STANDARD OF REVIEW

An IPR petitioner bears the burden of proving obviousness by a preponderance of the evidence. 35 U.S.C. § 316(e). The Board's "ultimate determination" as to whether a petitioner proved obviousness by a preponderance of the evidence "is a question of law," based on underlying factual findings. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015).

This Court "review[s] the Board's conclusions of law de novo and its findings of fact for substantial evidence." *In re NuVasive, Inc.*, 841 F.3d 966, 971 (Fed. Cir. 2016). That review "is confined to the grounds upon which the Board actually relied." *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015) (quotation marks omitted). "The substantial evidence standard asks whether a reasonable fact finder could have arrived at the agency's decision, and involves examination of the record as a whole, taking into account evidence that both justifies and detracts

from an agency's decision." *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019). "Conclusory expert testimony does not qualify as substantial evidence." *Id.*

Whether the Board relied on a new ground of unpatentability in its final written decision is a legal issue that this Court reviews *de novo*. *NuVasive*, 841 F.3d at 970. So is "[f]ailure to consider the appropriate scope of the . . . claimed invention in evaluating the reasonable expectation of success." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 966 (Fed. Cir. 2014). Under the Administrative Procedure Act, this Court "must 'hold unlawful and set aside agency action . . . not in accordance with law [or] . . . without observance of procedure required by law.'" *NuVasive*, 841 F.3d at 970 (quoting 5 U.S.C. § 706).

## ARGUMENT

## I.    The Board erred in determining that JAHA and JESC are prior art.

Two errors are embedded in the Board's conclusion that JAHA and JESC are prior art. First, the Board's analysis was not limited to the theories Liquidia set forth in its Petition. The Board thus exceeded its statutory authority in relying on a theory of public accessibility (a hypothetical conference "abstract book" dissemination) not preserved by Liquidia's Petition. Second, there is no substantial evidence to support

the Board's conclusion that hypothetical not-in-evidence "abstract books" even exist, let alone sufficiently disseminated to establish public accessibility.

## A. The Board improperly raised and decided theories not advanced in Liquidia's Petition.

1. By statute, it is the petition alone that defines the scope of an IPR proceeding. 35 U.S.C. §§ 311(b) & 312(a)(3). That petition must "identif[y], in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. § 312(a)(3).

Courts have consistently enforced § 312 to limit the scope of IPR proceedings to issues that the petition raised "with particularity." The Supreme Court has explained, for example, that "the statute envisions that a petitioner will seek an inter partes review of a particular kind— one guided by a petition describing 'each claim challenged' and 'the grounds on which the challenge to each claim is based.'" *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (quoting § 312(a)(3)). "[I]n an inter partes review the petitioner is master of its complaint" who "gets to define the contours of the proceeding." *Id.* This Court, too, has cautioned that "it is of the utmost importance that petitioners in the IPR proceedings

adhere to the requirement that the initial petition identify with particularity the evidence that supports the grounds for the challenge to each claim." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330 (Fed. Cir. 2019) (cleaned up; citations omitted); *see also Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018) ("It would thus not be proper for the Board to deviate from the grounds in the petition and raise its own obviousness theory[.]"); USPTO, *PTAB Consolidated Patent Trial Practice Guide* (Nov. 21, 2019) ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g.[,] to make out a prima facie case of unpatentability.").

Accordingly, petitioner controls the arguments advanced limiting the scope of review to those set forth in its petition.  It follows that the Board cannot raise and decide unpatentability theories not advanced in the Petition just as this Court may affirm an agency's decision "only on the grounds that the agency invoked when it took the action." *In re Google LLC*, 56 F.4th 1363, 1367 (Fed. Cir. 2023) (citation omitted); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  Going beyond the petition's theories violates not just the IPR statute but the Administrative Procedure Act.  5 U.S.C. § 554(b)(3).

2.     The Board violated these bedrock principles.  As described above, the Board concluded that the two Voswinckel abstracts were publicly accessible before the critical date because they were printed in hypothetical not-in-evidence "abstract books" that were supposedly disseminated at professional conferences in 2004.  *See supra* 19-21; Appx0009, Appx0060-Appx0061.  But even if the "abstract books" exist— and there is no direct evidence they do, *infra* 39-44—Liquidia did not assert them either as the prior art or as a basis for the public accessibility of the Voswinckel abstracts it did rely upon.  Instead, Liquidia's Petition relied on entirely different arguments, asserting that JESC and JAHA were published in 2004 in the *European Heart Journal* and the *Journal of the American Heart Association*, respectively, and submitting exhibits of those journals.  An accompanying expert declaration speculated that they likely would have been received, catalogued, and indexed by libraries by late 2004 (without providing evidence that they actually were).  Appx0133, Appx0135, Appx1165, Appx1167.  The Petition also vaguely said that JESC was "presented" at the 2004 ESC Congress. Appx0133.

The Board's initial final written decision did not rely on either of these grounds.[5]  Instead, the Board concluded that a POSA could have found the JAHA and JESC by using other articles as "research aids." Appx0011-Appx0012.[6]  After the Precedential Opinion Panel decision ordered reconsideration given Liquidia's failure to demonstrate that the "research aids" were publicly accessible more than one year before the priority date, the Board reversed itself and rejected the research-aids theory.  Appx0055-Appx0056.  But instead of finding that Liquidia had failed to establish these references' prior-art status, it substituted its dissemination-by-hypothetical-abstract-book theory, which Liquidia had advanced for the first time in its Reply.  *See* Appx0474-Appx0475.

The Board was not entitled to rely on a theory not presented in the Petition.  *See Sirona Dental*, 892 F.3d at 1356 ("It would thus not be proper for the Board to deviate from the grounds in the petition and raise

---

[5] The abstracts were not included in normal issues but rather in irregularly circulated supplements containing thousands of disjointed abstracts, and there was no evidence that these supplements had been received, catalogued, and indexed by libraries more than a year before the priority date.  Appx0374-Appx0375, Appx4539, Appx4542-Appx4545, Appx4555-Appx4557.  Indeed, these sources remain difficult to find even today.  Appx0377, Appx4542; Appx4552.

[6] Notably, the research aids make no mention of "abstract books," further calling into question the existence of the not-in-evidence "abstract books."

its own obviousness theory[.]"); *see also id.* at 1358 ("Petitioners are, in essence, attempting to add references to the ground of unpatentability put forth in their petition."). The Board must proceed "in accordance with or in conformance to the petition." *SAS*, 138 S. Ct. at 1356. Thus, the Board was required to follow the Petition and determine only whether JAHA and JESC were made publicly available through their publication in the JESC and JAHA journals. The Board exceeded its authority in resting on a theory never advanced in the Petition.

3. Liquidia forfeited any theory of conference distribution to establish the prior art status of JESC and JAHA under § 102(b). While Liquidia's Petition stated in passing that the JESC abstract was "presented" at the 2004 ESC Conference, Liquidia never argued that any such presentation constituted a publicly-accessible printed publication, and never offered any of the facts this Court considers when determining the public accessibility of alleged conference publications. Appx0133-Appx0134; *see also, e.g., Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1108-09 (Fed. Cir. 1985); *In re Klopfenstein*, 380 F.3d 1345, 1349-50 n.4 (Fed. Cir. 2004).

Liquidia has even less to stand on for JAHA. Liquidia's petition makes no reference to JAHA being presented at the American Heart Association's 2004 Scientific Sessions Conference. Instead, Liquidia's

Petition argued only that JAHA was "published in the Journal of the American Heart Association on October 26, 2004." Appx0135. The Petition never claimed that some other version of JAHA—one that was *not* "published" on October 26, 2004—was distributed at a conference in a hypothetical "abstract book" in November 2004. Liquidia thus forfeited any theory of a printed prior art publication stemming from the November Scientific Sessions Congress.

The Board effectively recognized as much in its final written decision. Liquidia argued in its *reply brief* that JESC and JAHA were presented at the 2004 ESC Congress and 2004 Scientific Sessions, respectively. Appx0470, Appx0474. UTC argued that these public-presentation arguments were untimely. The Board determined that "[t]he argument that *Voswinckel JESC* was publicly presented is not a change in theory from the Petition, because Petitioner presented this argument in the Petition." Appx0010 (citing Appx0133). Notably, the Board made no similar finding for JAHA—nor could it. The Petition never argued that JAHA was presented or disseminated during the 2004 ESC Congress. Instead, the *only* "argument[] made by Petitioner" concerning JAHA that the Board found timely was "that Voswinckel JAHA was referenced in a publicly accessible document" (Appx0010)—*i.e.*, the Journal of the American Heart Association. Appx0135. Neither

the Precedential Opinion Panel nor the Board revisited the FWD's conclusion that Liquidia waived any argument that Voswinckel JAHA was "presented publicly." Appx0885; Appx0060-Appx0061; *see also Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1370 (Fed. Cir. 2019) (finding waiver "[t]o the extent [patent challenger] can be understood to be arguing distribution"). The Board's subsequent conclusion that "Voswinckel JAHA" was "[s]ufficiently [d]istributed" at a conference in November 2004 stands at odds with Liquidia's failure to make that argument in the Petition at all.

* * *

For all these reasons, the Board committed legal error in finding JESC and JAHA constitute prior art, and its decision must be reversed. The Board lacked authority to go beyond the theories of prior-art status that Liquidia presented in its Petition, and Liquidia forfeited any other theories by omitting them. Thus, reversal rather than remand is the correct disposition. Alternatively, if the Court finds that the Board could rely on the prior art rationale it ultimately adopted, the Court should remand for additional factfinding. The Board denied UTC's request to submit evidence discrediting Liquidia's belated theories of public accessibility, precluding a substantive opposition from UTC. Appx0894-Appx0895; Appx6415-Appx6420; Appx0540. This violated UTC's due

process rights under the APA. Accordingly, at minimum, a remand is required to allow UTC to present countervailing evidence.

### B. The Board's conclusion that JAHA and JESC were "sufficiently distributed" is unsupported.

Even if Liquidia's Petition had asserted that the two Voswinckel abstracts were distributed in hypothetical abstract books at professional conferences, the Board erred in relying on that theory because it is not supported by substantial evidence. The Board's finding of public availability—absent any evidence of actual existence or dissemination—amounts to an unprecedented *per se* rule that hypothetical scientific conference "abstract book[s]" are presumed to have been printed and distributed—even if never-seen and not-in-evidence.

The only evidence supporting this theory was conclusory expert testimony that conference attendees "would have" received a collection of abstracts before or while attending the conference, with zero evidence that any such dissemination actually occurred. *See* Appx5142 (68:9-25) (Dr. Gonda admitting he "d[id]n't cite any evidence about specific people or attendees who were at the conference associated with the article" because he "did not attend the conference"); *see also* Appx1164-Appx1167 (Dr. Gonda opining a POSA would have "read the abstracts published *after* the conference[s]") (emphasis added). This Court has made clear

39

that post-hoc "speculation does not constitute 'substantial evidence.'" *Novosteel SA v. U.S.*, 284 F.3d 1261, 1276 (Fed. Cir. 2002). Indeed, the Court has specifically considered the public availability of abstracts at professional conferences and held that "testimony that it was the general practice . . . for presenters to hand out abstracts to interested attendees" is not "substantial evidence of *actual* availability." *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004) (emphasis added). Yet, that is all Liquidia offered here. Just as in *Norian*, that is not enough to show "actual availability" or actual "dissemination of the Abstract[s]." *Id.*

1. With respect to JAHA, the Board offered several reasons why it believed the reference was publicly distributed at some point during the Scientific Sessions conference. But the Board's reasons do not amount to substantial evidence of actual availability.

First, the Board cited the Journal of the American Heart Association's cover page for the proposition that the Scientific Sessions conference "occurred 'November 7-10.'" Appx0060 (quoting Appx1241). But the journal issue that the Board cited is dated October 26, 2004, *predating* the November conference. Prognostication in a pre-conference

40

journal supplement cannot constitute substantial evidence for what subsequently "occurred" at the conference itself.[7]

Second, the Board cited Dr. Hill's and Dr. Waxman's testimony that a copy of an abstract book containing the Voswinckel JAHA abstract "would have been" provided to conference attendees. But neither expert attended the conference or testified to having received (or even knowing of anyone who received) any such hypothetical "abstract book" containing the relevant abstract. This failure is noteworthy considering that over 18,000 professionals in the "cardiovascular system" and "pulmonary circulation" field supposedly attended the conference. Appx0061. This is precisely the type of post-hoc "testimony that it was the general practice at [scientific] meetings for presenters to hand out abstracts to interested attendees" that this Court has held is not "substantial evidence of actual availability." *Norian*, 363 F.3d at 1330. That is especially so in an IPR, which is limited to prior art consisting of patents and "printed publications." An abstract book is a distinct "printed publication" from a journal, and no abstract book has been introduced into evidence here. The fact that a highly motivated party such as Liquidia could not produce

_____

[7] The Board's reliance on the hearsay (Fed. R. Ev. 802) November date compounds its error in finding JAHA "[s]ufficiently [d]istributed" on a date not asserted in the Petition. Appx0060; Appx0347-Appx0348.

a copy of the "abstract book" alleged to have been distributed, or even find a single person to testify to having received this hypothetical "abstract book," is telling. Speculation alone is not substantial evidence of actual distribution. *See Novosteel*, 284 F.3d at 1276.

Third, the Board cited evidence having nothing to do with the actual availability of JAHA. For example, the Board said that the Scientific Sessions 2004 "was large," that a POSA "would have attended," and that there was no "expectation of confidentiality." Appx0060-Appx0061. While these are relevant factors to assess whether a publication *that was actually distributed* is sufficiently "publicly available" under § 102(b), they do not show that the publication existed and was actually distributed in the first place. The Board's statement that "[t]he distribution of thousands of copies of Voswinckel JAHA at the conference is strong evidence that Voswinckel JAHA was a printed publication as of the date of the conference" assumes the conclusion, *i.e.* actual existence and distribution. Appx0061. There is no evidence—direct, circumstantial, or otherwise—to indicate that attendees of the Scientific Sessions 2004 actually received a never-seen, not-in-evidence "abstract book" containing the Voswinckel JAHA abstract.

2.  The Board's treatment of the JESC abstract fares no better. In essence, the Board relied on the same three categories of evidence as

it did with respect to JAHA.  First, the Board cited the European Heart Journal, "Volume 25 Abstract Supplement August/September 2004" to establish the date of the ESC Congress.  Appx0058.  But the journal supplement contains no information about actual distribution of the abstract—nor is the supplement *itself* the "abstract book" that was purportedly distributed at the conference.  Second, the Board cited Drs. Hill's and Waxman's testimony that a conference attendee "would have received" an abstract book with the Voswinckel JESC abstract—without any direct evidence that such a book existed or was actually distributed.  Appx0059.  Third, the Board cited information about the conference's size, attendee qualifications, and expectations of confidentiality—information that only makes Liquidia's inability to find a single copy of the hypothetical abstract book to place into evidence, or a single declarant to attest to first-hand knowledge of its existence, all the more conspicuous.

\* \* \*

The Board's finding of a publicly available printed publication—absent any evidence of actual existence and distribution—amounts to an unprecedented *per se* rule that an abstract associated with a scientific conference is presumed to have been printed and made publicly

accessible through a conference "abstract book."[8]  But that is not the law.

The Board credited no record evidence sufficient to show that the Voswinckel abstracts were publicly accessible printed publications as of the '793 Patent's critical date.  Liquidia thus failed to meet its burden to prove that either is prior art.  And the Board has already found against Liquidia on the only grounds of unpatentability that did not rely on either of these two references.  *See* Appx0064, Appx0036-Appx0041.  The Board's decision therefore must be reversed.

## II.    The Board's claim 1 obviousness analysis is flawed.

### A.    The Board erred by relying on hindsight to find the claimed solution dose.

The Board's obviousness analysis relies on impermissible hindsight to fill technical holes in the prior art for which no substantial evidence exists.  JESC does not disclose a dose and assumptions cannot fill the gaps in JESC's disclosure.

Independent claim 1 requires a "therapeutically effective single event dose compris[ing] from 15 micrograms to 90 micrograms of treprostinil" or a treprostinil salt.  Appx1025 (18:28-29).  The Board deemed that limitation obvious because, it said, JESC disclosed the

---

[8] There is also no evidence that the disclosure of the hypothetical "abstract books" was the same as that disclosed in JAHA and JESC.

administration of 16, 32, 48, or 64 micrograms of treprostinil to patients. But the Board relied on impermissible hindsight to extrapolate from JESC's disclosure of four *concentrations* of drug solution in the nebulizer device to the claimed *dose amounts delivered* to the patient.

Undisputed facts demonstrate the fallacy behind the Board's flawed extrapolation. JESC does not disclose the amount of treprostinil delivered to patients in the study, or even the amount of solution—instead, it gives four distinct solution concentrations. Appx0015; Appx0133. To bridge this gap, Liquidia's experts offered testimony about nebulizer "fill volumes." But it is undisputed that no nebulizer is 100% efficient, and thus no nebulizer's fill volume equals the amount of solution "delivered" to the patient. Appx5188-Appx5189 (114:10-115:5); Appx5033 (149:8-12); Appx3271-Appx3272 (67:9-68:6); Appx4817-Appx4818. Thus, any attempt to calculate delivered doses from fill volumes for a continuous nebulizer must account for a host of factors that determine the actual delivered dose, including the patient's breathing volume and patterns, the quantity of solution remaining in the device after administration ends (the residual volume), and issues relating to the particular nebulizer used. Appx4829-Appx4830; *see also* Appx4831-Appx4834. For example, each device nebulizes solution—*i.e.*, generates an aerosol from the liquid—at different rates and, due to losses as the

45

aerosol moves through the device, outputs aerosol at the device's mouthpiece at a lower rate than the rate at which aerosol is originally generated. Appx4832-Appx4833; Appx4838-Appx4840; Appx5188-Appx5189 (114:10-20, 114:23-115:5). Moreover, the Board specifically found that the asserted prior art "does not disclose the amount of solution administered, *which is necessary in order to calculate the amount of treprostinil administered*." Appx0015 (emphasis added). This much is not in dispute.

Liquidia's experts attempted to escape these real-world technical complexities by baking in certain assumptions not supported by substantial evidence. These assumptions were made with hindsight to extrapolate from the general prior art disclosures to the specific elements claimed. The Board's reliance on these assumptions is reversible error.

First, the Board erred in crediting Dr. Gonda's statement that "in May 2006 . . . nebulizers conventionally *deliver[ed]* between 1 and 5 mL" of solution. Appx0015 (emphasis added). Dr. Gonda's support for this statement is non-existent. Dr. Gonda cites three FDA-approved labels but each details fill volume, *not* "delivered" volume. Appx1166 at n.4. Specifically, the AccuNeb label states that a "ready-to-use vial containing 3 mL of solution" is supplied. Appx2403. The Ventavis label similarly discloses "clear glass single-use ampules (20 mcg iloprost per 2 mL

ampule)." Appx1794. Finally, the Pulmozyme label specifies that "[e]ach Pulmoyzme single-use ampule will deliver 2.5 mL of the solution to the nebulizer bowl"; it does not specify the amount delivered to the patient. Appx2231-Appx2232. These labels do not support his conclusory opinion that "nebulizers conventionally deliver[ed] between 1 and 5 mL" of solution. Liquidia admits as much. Appx0478 ("Gonda presented evidence that nebulizers at the time typically *involved fill volumes of 1-5mL*") (citing Appx1166) (emphasis added). As does Dr. Gonda. Appx5198-Appx5199 (124:23-125:9). Any reliance on Dr. Gonda's testimony as evidence of the volume of treprostinil "delivered" is therefore erroneous.

Second, the Board likewise erred in relying on Dr. Hill (Appx1054) for a "delivered" dose. Dr. Hill did not provide any opinion about the actual delivered dose, nor did he cite any evidence establishing any particular delivered dose. Instead, he simply said that "nebulizers at the time were known to nebulize (i.e., aerosolize liquid) at least [1 mL] volume," citing only Dr. Gonda's unsupported and uncredited declaration.[9]

---

[9] Worse, Dr. Hill blindly relied on Dr. Gonda's conclusion without having reviewed Dr. Gonda's declaration before signing his declaration.

Even if Dr. Hill's testimony regarding the amount of liquid nebulized is credited, it still does not support the Board's conclusion. Dr. Hill opined only to the volume *nebulized*, not the volume actually *delivered* to the patient. Specifically, Dr. Hill states that a POSA reading JESC "would assume" use of a "sufficient volume of treprostinil solution for 6 minutes of delivery which a POSA would understand to be at least 1 mL *because* nebulizers at the time were known to nebulize (i.e. aerosolize liquid) at least that volume." Appx1054 (emphasis added). Dr. Hill did *not* testify that "at least 1 mL" would be "delivered" to the patient. Instead, he testified only that nebulizers were known to "aerosolize liquid" of "at least that volume." *Id.* That is, Dr. Hill makes no affirmative statement accounting for decreases in liquid from aerosolization until it is delivered to the patient—he "assume[s]" past it. *Id.* Dr. Hill's statement thus fails to do the work for which the Board cites it, *i.e.*, "the *actual delivered solution volume*" where "something less than the entire fill volume was delivered to the patient, either because it was not nebulized or because other factors resulted in the nebulized

_____

Appx5027 (143:2-7); Appx5017 (133:6-22). An expert's reliance on another expert's unsupported opinion cannot establish substantial evidence.

solution not reaching the mouthpiece." Appx0016-Appx0017 (emphasis added).

"Assuming at least 1 mL of volume for delivery," as Dr. Hill did, is particularly pernicious here. Without this hindsight-driven input for Liquidia's calculations, Liquidia is unable to extrapolate from the general disclosures of JESC, which "does not disclose the amount of solution administered which is necessary in order to calculate the amount of treprostinil administered." Appx0015. Dr. Hill's assumption "allow[s] [Liquidia] to use the challenged patent as a roadmap to reconstruct the claimed invention using disparate elements from the prior art—i.e., the impermissible *ex post* reasoning and hindsight bias that *KSR* warned against." *TQ Delta*, 942 F.3d at 1361. That is, Liquidia knew that an assumption of "at least 1 mL" would simplify its calculations and land within the claimed dose range. Appx6223 (26:1-10), Appx6242-Appx6243 (104:14-105:6). This assumption is pure hindsight and not based on JESC's disclosure.[10] The Board's reliance on Liquidia's unsubstantiated assumption is error.

Dr. Hill also refers generally to his "own practice." Appx1054. However, Dr. Hill states only that he "prescribed" (not delivered) fill

---

[10] Liquidia failed to provide any evidence concerning the volume of treprostinil delivered to the 29 patients in JESC.

volumes of "at least 1 mL" of some undescribed "inhalation therapy." *Id*. He fails to provide any supporting details such as the specific prescribed drug, the specific dosing, the specific nebulizer, the specific indication, etc. Aside from not opining on the relevant "delivered" dose, such general/conclusory testimony does not amount to substantial evidence concerning the teachings of JESC. *See TQ Delta*, 942 F.3d at 1359. (obviousness "cannot be sustained by mere conclusory statements").

Finally, the Board referred to Dr. Waxman's testimony concerning the "fill volume" of "standard nebulizers" and his practice. Like the Board's reliance on Dr. Hill's testimony, Dr. Waxman's testimony does not support calculation of the "actual delivered solution" in the study described in JESC. Dr. Waxman's testimony was limited to fill volume (not delivered volume), and in particular the fill volume of "old style nebulizer[s]"—not the nebulizer disclosed in JESC. Appx3185 (153:8-22) ("holds about 3 to 5 MLs"; "would take 3 to 5 MLs of solution"). Indeed, Dr. Waxman made clear, "I don't know that we could really say for certain how much was delivered because some of it adheres to the vehicle . . . but also with a standard nebulizer there is inhalation and exhalation, and you see that mist coming out when they breath out so you really don't know." Appx3186 (154:2-17). Again, the fact that Dr. Waxman did not oversee "treatments for pulmonary hypertension with a nebulizer that

utilized less than 1 mil of drug solution" says nothing about JESC's fill volume or, even assuming a greater than 1 mL fill volume, how much was "delivered" to the patient.  Appx3188 (156:12-16).

As the Board correctly determined, JESC "does not disclose the amount of solution administered which is necessary in order to calculate the amount of treprostinil administered." Appx0015.  The evidence relied on by the Board does not fill this undisputed gap in the prior art.  Absent substantial evidence supporting "the amount of solution administered" in JESC the dose of treprostinil "delivered" is unknown.  Liquidia's best evidence relates only to "fill volumes" for other drug-inhaler combinations, not the amount of treprostinil delivered by the Optineb device disclosed in JESC.  The evidence set forth by Liquidia and relied on by the Board is deficient justifying reversal.

## B. The Board independently erred by overlooking UTC's secondary considerations arguments.

At minimum, the Board's decision must be remanded as the Board clearly erred by concluding that "Patent Owner does not even allege that the results of the challenged claims are unexpected over [the inhaled treprostinil] references." Appx0023.  This is incorrect.  UTC specifically argued that "the ability to administer treprostinil at high doses in only 1-3 breaths and with fewer side effects was unexpected" over the inhaled

treprostinil references.  Appx0585.  UTC's argument was well supported and did not rely on newly-submitted evidence.  *Id.* (citing Appx3983, ¶25; Appx4795-Appx4797, ¶¶101-104; Appx5524, ¶¶29-32).   The Board's failure to acknowledge, much less assess UTC's unexpected results arguments mandates remand.  *See In re Van Os*, 844 F.3d 1359, 1362 (Fed. Cir. 2017) (remanding because "[t]he agency tribunal must make findings of relevant facts, and present its reasoning in sufficient detail that the court may conduct meaningful review of the agency action.").

## III.  The Board erred by finding the dependent dry powder claims obvious.

At the very least, the Court should reverse the Board's decision as to claims 4, 6, and 7—three dependent claims directed to claim 1's dosing regimen and the delivery of treprostinil using a dry-powder inhaler with dry powder formulations.  The Board's analysis of those claims was legally flawed, as it failed to assess the entirety of the claimed dry powder inventions including the limitations from the parent claims.  In addition, the Board's conclusions lack factual support because the Board treated dry powder as equivalent to solution when the evidence established the opposite.

**A. The Board committed legal error in evaluating the dry-powder dependent claims.**

*1. The Board failed to assess all of the limitations of the dry-powder dependent claims*

The Board erred as a matter of law by failing to analyze each dependent dry powder claim as a complete and independent invention with all its limitations. Instead, the Board erroneously analyzed the dependent claims as mere "additional limitations" divorced from the limitations of the parent claims. Specifically, the Board failed to analyze whether a POSA would be motivated to modify the asserted prior art with a reasonable expectation of success in being able to perform the claimed method of treating pulmonary hypertension with a therapeutically effective single event dose of 15 to 90 micrograms of *dry powder* treprostinil delivered in 1 to 3 breaths. This was error.

The law is clear that all claims are separate inventions. *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (1985) ("[I]t is well settled that each claim of a patent is entitled to a presumption of validity and is to be treated as a complete and independent invention.") (citing 35 U.S.C. §§ 282, 288; *Leeds & Catlin v. Victor Talking Machine Co.*, 213 U.S. 301, 319 (1909). That "complete and independent" principle applies just as much to dependent claims: "A claim in dependent form shall be construed to incorporate by reference all the limitations of the

claim to which it refers." 35 U.S.C. § 112. Thus, a dependent claim's invention is defined by all limitations in the claim itself in combination with its parent claims. Despite this, the Board considered the "additional limitations" in the dependent claims standing alone. *See* Appx0031-Appx0035 (discussing only whether a dry powder would be obvious rather than the use of a dry powder in the specific dosage regimen recited). Thus, the Board's analysis failed to follow these legal and statutory mandates.

This Court's cases indisputably establish that a failure to consider the appropriate scope of the invention—*i.e.*, the right set of limitations defining the invention—is reversible error. "The reasonable-expectation-of-success analysis must be tied to the scope of the claimed invention." *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021); *see also Allergan*, 754 F.3d at 966 ("[F]ailure to consider the appropriate scope of the . . . claimed invention in evaluating the reasonable expectation of success . . . constitutes a legal error."). For example, as applied here, it was Liquidia's burden to prove the following invention of claim 7 obvious:

A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a [powder] formulation[, wherein the powder comprises particles less than 5 micrometers in diameter,] comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device [that is a dry powder inhaler], wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.[11]

Because the Board failed to analyze whether a POSA would be motivated to modify the prior art to achieve all limitations of this "complete and independent invention" with a reasonable expectation of success, it erred as a matter of law. *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1383 (Fed. Cir. 1986) ("Focusing on the obviousness of substitutions and differences instead of on the invention as a whole . . . was [] legally improper").

Rather than assess "all limitations" of the dry powder dependent claims—as it must—the Board credited Dr. Gonda's testimony that "the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." Appx0033. Even if Dr. Gonda's conclusory statement were correct and supported by sufficient evidence, his testimony *concerning the '212 Patent* is legally insufficient to conclude

---

[11] Claim 7 incorporates the limitations of claims 6, 4, and 1.

that the '793 Patent is obvious. It is indisputable that the two patents have distinct claim scope. The Board never analyzed or provided any rationale explaining *why* a POSA would have a reasonable expectation of success using the "powder" of the '212 patent to deliver a "single event dose compris[ing] 15 micrograms to 90 micrograms of treprostinil . . . delivered in 1 to 3 breaths" to treat a human with pulmonary hypertension as of the priority date. Nor could it, as Liquidia never made that case.

The Board's analysis instead relies on publications not asserted as grounds for unpatentability. *See* Appx0033 (citing Appx2082-Appx2090 (*Atkins*) and Appx1650-Appx1671 (*Stein*)). Even if considered to support Dr. Gonda's conclusory opinions *about the '212 Patent*, publications generally stating that dry powder inhalers are "widely accepted" and "approved in the U.S." are not probative of the specific therapeutically effective treprostinil dosing formulation and delivery limitations of the '793 Patent. The record evidence is undisputed: "dry powder inhalers are not interchangeable" (Appx5962), Dr. Gonda never opined otherwise, and the Board made no factual finding that a POSA would expect an *existing* "approved" dry powder inhaler to work as claimed for treprostinil.

The only other evidence cited by the Board to support its obviousness analysis is the '212 Patent's claims. But again, the Board

provides no analysis concerning dry powder dosing and dry powder delivery of a therapeutically effective single event doses in 1-3 breaths as incorporated into the dependent claims. Nor does the Board explain why a POSA would reasonably expect to succeed in preparing a therapeutically effective *dry powder* formulation and delivering it in alleged doses and in a number of breaths only used for *solutions*.

The Board's conclusory statement that the claims of the '212 Patent "presumably" would have rendered a POSA "more likely" to expect success in achieving claims 4, 6, and 7 of the '793 Patent is not a factual finding concerning the reasonable expectation of success in achieving the proper scope of the '793 Patent's dry powder inventions. The '212 Patent neither claims nor discloses any dry powder doses. As discussed above, the '212 Patent is based on the administration of solution to sheep and does not claim a single event dose of 15-90 micrograms of dry powder treprostinil delivered in 1-3 breaths by dry powder inhaler. The Board noted the '212 Patent claims a "powder," but that alone "cannot close these gaps without additional, reasoned analysis." *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1374–77 (Fed. Cir. 2018); *see also In re Stepan Co.*, 868 F.3d 1342, 1346-47 (Fed. Cir. 2017) ("[The] Board must provide some rationale underpinning explaining why a person of ordinary skill in the art would have arrived at the claimed invention

through routine optimization."). The Board's obviousness decision concerning the dependent dry powder claims is fatally flawed.

> 2. *The Board further erred by not accounting for unrebutted evidence establishing that a dry powder is completely different than a solution*

The Board was required to "examin[e] . . . the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *TQ Delta,* 942 F.3d at 1358; *see also Abbott Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008) ("Each case must be decided in its particular context, including the characteristics of the science or technology, its state of advance, the nature of the known choices, the specificity or generality of the prior art, and the predictability of results in the area of interest."). Specific to the claimed dry powder method of treatment, "[u]nder § 103, the scope and content of the prior art are to be determined" and "differences between the prior art and the claims at issue are to be ascertained." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). These "factors continue to define the inquiry that controls." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007). Accordingly, only "[a]gainst this background, the obviousness or nonobviousness of the subject matter is determined." *Graham*, 383 U.S. at 17.

The Board erred in its direct *sub silentio* application of *solution dosing/delivery and breath count* references (JESC and JAHA) to the dry powder inventions without analyzing the "differences between the prior art and the [dependent dry powder] claims at issue." *Graham*, 383 U.S. at 17.[12]    The Board explicitly rejected reliance on the '212 Patent (Liquidia's only dry powder reference) as a basis for teaching the claimed dosing range, stating that Liquidia's "third ['212 Patent] calculation methods do not demonstrate that the prior art taught or suggested a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms[.]" Appx0015.  Instead, the Board relied "on Voswinckel JESC's *solution* concentrations and *solution* volumes normally delivered according to the testimony of Petitioner's declarants." (Appx0014-Appx0015) (emphasis added).

The Board's use of solution references as a direct stand-in for dry powder dosing is reversible error where the unrebutted record established that (1) it was "well-accepted in the field that nebulized solutions . . . are *not compatible* with dry powder inhalers" (Appx5951-Appx5952) (emphasis added); (2) "a dry powder inhaler cannot deliver

---

[12] In fact, the Board failed to make any factual findings concerning the state of the art for dry powder treprostinil dosing/delivery and breath count as of the priority date.

solutions" (*id.*); (3) "dry powder formulation[] is *completely different* than formulation of nebulized solutions, and that devices for delivery of solutions are unsuitable for delivery of dry powder formulations" (Appx5953) (emphasis added); and (4) "[d]ose uniformity is a challenge in the performance of [dry powder inhalers]," which is a "greater concern with powders than with liquids" (Appx5955). The Board made no contrary factual findings, nor could it, based on the conclusory testimony relied on by Liquidia. At bottom, the solution dosing references relied on by the Board are silent on dry powder dosing and delivery.

Liquidia, moreover, has admitted that "the level of unpredictability in the art was high" (Appx5948); "the behavior of solids are less predictive than their fluid counterparts" (Appx5955); treprostinil dry powder formulation development would "not be routine" (Appx5952); and that "a POSA would have to engage in excessive experimentation to formulate a powder formulation of treprostinil or its pharmaceutically acceptable salt and dry powder inhaler suitable to deliver the treprostinil powder formulation as required by the asserted claims of the '793 patent" (Appx5965).

Such unpredictability—*specific to the claimed invention*—is the hallmark of nonobviousness. *See, e.g., Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1385-86 (Fed. Cir. 2018) (finding no

reasonable expectation of success where formulations "behave in unpredictable ways and that such dose and regimen changes would require more than routine experimentation."); *Honeywell Int'l Inc. v. Mexichem Amanco Holdings S.A. de C.V.*, 865 F.3d 1348, 1355-56 (Fed. Cir. 2017) ("Unpredictability of results equates more with nonobviousness rather than obviousness."); *Takeda Pharm. Co. Ltd. v. Torrent Pharms. Ltd.*, 844 F. App'x 339, 342 (Fed. Cir. 2021) (finding no reasonable expectation of success where defendant "did not present any testimony or evidence as to the *predictability* of the resulting properties") (emphasis added). Had the Board examined "the record as a whole"—as it must—it would have concluded based on unrebutted evidence that the dry powder claims of the '793 Patent are nonobvious.

### 3.    *The Board's legal errors require reversal*

This Court has "routinely held" that the petitioner has the burden of proving unpatentability. *Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*, 66 F.4th 1373, 1378 (Fed. Cir. 2023) (collecting cases and reversing the Board). When the Board erroneously invalidates a patent without holding the petitioner to its statutory burden of proof, reversal is the appropriate remedy. For example, in *Magnum Oil*, the Court concluded that it "must reverse" because "the Board did not require the petitioner to support its claim of obviousness." *In re Magnum Oil Tools*

*Int'l, Ltd.* 829 F.3d 1364, 1378-79 (Fed. Cir. 2016). Like here, where neither the Board nor petitioner explained why the asserted solution references would apply to the dry powder claims, the Board's decision was reversible because "[n]either the Board nor the petitioner explained why borrowing the rationale for combining the first set of references equally applies to the second set of references." *Id.* at 1378; *see also Oren Techs., LLC v. Proppant Express Invs. LLC*, No. 2019-1778, 2021 WL 3120819, *8 (Fed. Cir. July 23, 2021) ("We reverse . . . the Board's finding of obviousness because the Board impermissibly relied on a theory not raised by petitioner[.]").

The proper remedy here is reversal because Liquidia "failed to provide an evidenced-based case" on a dispositive issue. *Raytheon Techs. Corp. v. General Electric Co.* 993 F.3d 1374 at 1377, 1381-82 (Fed. Cir. 2021) (reversing where petitioner "never put forth any evidence suggesting a skilled artisan could have made [the limitations] recited in the claims."). Reversal is further required because the Board relied on Liquidia's "conclusory statements and unspecific expert testimony" to satisfy "a key limitation" missing from the prior art. *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1366-67 (Fed. Cir. 2016) (reversing where the Board's "presumption" that the limitations "would be 'common sense' was conclusory and unsupported by substantial evidence"); *accord DSS Tech.,*

885 F.3d at 1376-77 (reversing Board where petitioner's expert testimony "admitted . . . facts" and "suffer[ed] from . . . serious deficiencies").

As in *Magnum Oil*, *Raytheon*, and *Arendi*, here, the Board overstepped its statutory authority by absolving Liquidia of its burden under § 316(e). "[T]his is not a case where a more reasoned explanation than that provided by the Board can be gleaned from the record," *Arendi*, 832 F.3d at 1366, because Liquidia never analyzed the dependent dry powder claims in light of the referenced limitations. A remand would be futile. Reversal is the natural result from the Board's adoption of Liquidia's legally erroneous framework, wherein the dependent dry powder claims were treated as mere "additional limitations"—rather than "separate and independent" inventions that "incorporate by reference all the limitations of the claim to which it refers." Liquidia's faulty framing of the claimed inventions infected the motivation and reasonable expectation of success inquiries and the Board's ultimate legal conclusion of obviousness. *See* 35 U.S.C. §§ 112, 282, 288. The Board's conclusion that the dependent dry powder claims are obvious must be reversed.

## B.    The Board's obviousness conclusion for the dry powder claims is unsupported by substantial evidence.

Even if the Board's legal and procedural errors were excused, its decision cannot stand because substantial evidence does not support the Board's dry powder obviousness decision.    The Board's obviousness analysis, which tracked the Petition, is critically flawed.  For example, the Petition failed to set forth any evidence, much less substantial evidence, that a POSA would have a reasonable success in achieving the dependent dry powder claims—*with all their referenced limitations.  See Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1337 (Fed. Cir. 2015) ("there must be evidence presented on the obviousness of the claim as a whole").

The asserted prior art is silent on dosing of a treprostinil dry powder formulation delivered by dry powder inhaler for treatment of pulmonary hypertension in 1-3 breaths.  The undisputed record is that the level of unpredictability "in developing a dry powder formulation and suitable dry powder inhaler device" was "high" and would present "unique design challenges."  Appx5948.  Nevertheless, Liquidia relied only on asserted prior art dosing for *solutions*.  *Supra* 21-23.  JESC, which Liquidia relied on for calculating the claimed doses, makes no mention of dry powder and does not attempt to solve the associated design

challenges—detailed by Liquidia's own expert—relating to formulating, dosing, and delivering a treprostinil dry powder to a PH patient.

Liquidia submitted no evidence concerning the expectation of success in achieving the dosing limitations of the dependent dry powder claims. For example, Liquidia conducted no testing and cited no evidence proving that dry powder dosing, delivery, and treatment would be inherent or necessarily equivalent to solution dosing, delivery, and treatment. In fact, Liquidia admitted the opposite. Appx5953 ("[F]ormulation of dry powder formulations is *completely different* than formulation of nebulized solutions, and . . . devices for delivery of dry powders are *unsuitable* for delivery of solutions.") (emphases added).

Dr. Gonda explained that, even years after the '212 Patent issued, a POSA would face myriad challenges unique to dry powder formulations, the high potency of treprostinil, and the difficulties with treating PH by dry powder inhaler. *Supra* 12-18. The Board erroneously disregarded Dr. Gonda's unrebutted expert testimony concerning a POSA's expectations based on the prior art, the high unpredictability in

the art, and the quantity of experimentation needed to achieve the claimed invention.[13]

Dr. Gonda also explained that there were significant technical gaps in the prior art for achieving the claimed treatment regimen, including treprostinil-specific complications with dry powder formulation-device development, dosing, and delivery, stating:[14]

- "[I]t is well-accepted in the field that nebulized solutions . . . are *not compatible* with dry powder inhalers" and "a dry powder inhaler *cannot* deliver solutions." Appx5951-Appx5952.

- "[F]ormulation of dry powder formulations is *completely different* than formulation of nebulized solutions, and . . . devices for delivery of dry powders are unsuitable for delivery of solutions." Appx5953.

- "*[E]xcessive*" experimentation would be required to develop a dry powder treprostinil formulation and dosing due to treprostinil's high potency. Appx4951-Appx5952.

---

[13] To the extent the Board read *UCB, Inc., v. Accord Healthcare, Inc.,* 890 F.3d 1313, 1327 (Fed. Cir. 2018) as somehow precluding the relevance of Dr. Gonda's own testimony concerning the state of the art as of the priority date as it relates to the claimed inventions, it further erred. *UCB* addressed a different issue, *i.e,* whether a patent's presumption of enablement establishes a reasonable expectation of success "as a matter of law." On that issue, *UCB* supports UTC insofar as the Board determined that presumed enablement of a different patent (the '212 Patent) established a reasonable expectation of success for the '793 Patent: "Appellants argue that this presumption establishes a reasonable expectation of success as a matter of law. We disagree." *Id*.

[14] Emphases added.

- Treprostinil "dry powder formulation *needs to be* such that a precise amount of treprostinil is delivered to a patient in each dose using a dry powder inhaler," *i.e.*, "*the delivery has to be precise*." Appx5953.

- Developing a treprostinil device-formulation combination would be "*more challenging* than for drugs which were routinely delivered by inhalation pre-2006 in the form of dry powder inhalers." *Id.*; Appx5957 ("[f]or treprostinil, doses are . . . below the range of inhaled drugs approved for DPIs as of May 2006.").

- "Dose uniformity is a challenge in the performance of DPIs" and is a "*greater concern* with powders than with liquids because of the size and discrete nature of the particulates." Appx5955.

- "[I]t was well-known that powders present *unique design challenges* compared to liquid formulations because, among other reasons, they are 2-phase gas-solid systems." *Id.*

- "[E]quations describing the behavior of solids are *less predictive* than their fluid counterparts." *Id.*

- "[T]he development of a dry powder inhaler product requires matching the compatibility of the device and the formulation also with the ability of the PH patients to inhale the formulation such that a reproducible precise dosing is possible." Appx5956.

- Properties specific to treprostinil complicate the "delivered dose" of treprostinil dry powder such as (1) treprostinil's unknown aerodynamic size distribution and fine particle fraction, (2) treprostinil's known hygroscopicity, and (3) treprostinil's low melting point. Appx5959-Appx5961.

- "[A] *unique interdependence* exists between approved dry powder formulations and their dry powder inhalation devices." Appx5962.

- "[A] POSA would need to engage in *extensive experimentation* with different device-formulation combinations" requiring the development of "proprietary" dry powder technologies. Appx5963.

Despite these admitted technical challenges, Dr. Gonda concludes in a single sentence that "a POSA would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." Appx1176.[15] No reasonable factfinder examining the "record as a whole" and accounting for evidence that "detracts from [the] agency's decision," as it must, could conclude that this single sentence meets Liquidia's burden to prove a POSA's reasonable expectation of success in achieving the claimed dry powder inventions. *TQ Delta*, 942 F.3d at 1358.

First, as discussed above, Dr. Gonda did the wrong "reasonable expectation of success" inquiry and focused on the scope of the '212 Patent that does not include "all limitations" of the '793 Patent's dependent claims. That is, Liquidia had no evidence concerning a POSA's motivation and reasonable expectation of success in treating PH by delivering dry powder treprostinil by dry powder inhaler in a single event dose of 15-90 micrograms in 1-3 breaths. For that reason alone, substantial evidence of unpatentability for the dependent dry powder claims does not exist.

---

[15] Dr. Gonda also cited *Atkins* with over a dozen other references to conclude that a POSA would be unable to achieve the claimed inventions without non-routine and "extensive" experimentation. Appx5951-5963.

Second, even if Dr. Gonda's single conclusory sentence were appropriately directed at the asserted dependent claims, its only alleged support merely discusses dry powder inhalers *generally*. The first citation, *Atkins* (Appx2082-Appx2090), states that dry powder inhalers "are a widely accepted inhaled delivery dosage form." Appx2082, Appx1176. The second citation, *Stein* (Appx1650-Appx1671), states that "10 dry powder inhalers" were "approved in [the] U.S. by 2006." Appx1176. Dr. Gonda "provides no express discussion of, nor any connection to" the unique treprostinil dry powder formulation-inhaler combination that could deliver 15-90 mgs in 1-3 breaths. *TQ Delta*, 942 F.3d at 1362. And Dr. Gonda "fails to identify any other evidence that provides this necessary link." *Id.* Absent this evidence the Board is unable to provide any rationale for how these citations support a reasonable expectation of success for the claimed inventions. *See Arendi*, 832 F.3d at 1366 (reversing because "this is not a case where a more reasoned explanation than that provided by the Board can be gleaned from the record.").

Third, as discussed above, the Board's statement that the '212 Patent "presumably" would have rendered a POSA "more likely" to expect success in achieving claims 4, 6, and 7 is insufficient. The '212 Patent is silent on dry powder dosing or the ability to deliver a single

event dose in a breath-actuated dry powder inhaler in 1-3 breaths.  *See, e.g.*, Appx0014-Appx0015 (rejecting '212 Patent-based dosing calculations).  Having considered the teachings of the '212 Patent, Liquidia's device expert concluded that "no treprostinil powder formulation suitable for delivery using a dry powder inhaler had been developed or disclosed as of May 15, 2006."  Appx5949.

Dr. Gonda's single conclusory sentence cited by the Board to support its reasonable expectation of success analysis for the dry powder claims does not amount to substantial evidence and is legally insufficient.  This Court has "underscored" that such "conclusory statements and unspecific expert testimony" does "not qualify as substantial evidence that could support the Board's conclusions regarding obviousness."  *TQ Delta*, 942 F.3d at 1360-61; *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) ("General and conclusory testimony . . . does not suffice as substantial evidence of invalidity.").  The reasons for such evidentiary minimal standards are not academic.  This Court has "repeatedly expressed concerns that crediting such testimony risks allowing the challenger to use the challenged patent as a roadmap to reconstruct the claimed invention using disparate elements from the prior art—i.e., the impermissible *ex post* reasoning and hindsight bias that *KSR* warned against."  *TQ Delta*, 942 F.3d at 1361.  Because the

record does not contain substantial evidence to support the Board's factual determination that a POSA would have had a reasonable expectation of success in achieving the independent inventions of dependent claims 4, 6, and 7, the Board's decision must be reversed.

## CONCLUSION

The Court should reverse the Board's decision finding claims 1-8 of the '793 Patent unpatentable.

Respectfully submitted,


/s/ *Douglas H. Carsten*
Douglas H. Carsten
Shaun R. Snader
William Jackson
Adam W. Burrowbridge
Arthur P. Dykhuis

*Attorneys for Appellant*
*United Therapeutics Corporation*

Dated: August 4, 2023

# ADDENDUM

## TABLE TO ADDENDUM

| Description | Page No. |
|---|---|
| Final Written Decision | Appx0001-Appx0049 |
| Decision on Request for Rehearing | Appx0050-Appx0067 |
| U.S. Patent No. 10,716,793 | Appx1001-Appx1025 |

Trials@uspto.gov                                    Paper 78
Tel: 571-272-7822                          Entered: July 19, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

IPR2021-00406
Patent 10,716,793 B2

———————————

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges.*

KAISER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

INTRODUCTION

*A. Background*

Liquidia Technologies, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–8 of U.S. Patent No. 10,716,793 B2 (Ex. 1001, "the '793 patent"). United Therapeutics Corporation ("Patent Owner") filed a Preliminary Response. Paper 13 ("Prelim. Resp.").

On August 11, 2021, we instituted *inter partes* review of claims 1–8 of the '793 patent on all grounds set forth in the Petition. Paper 18 ("Inst. Dec."). After institution of trial, Patent Owner filed a Response (Paper 29, "PO Resp."), Petitioner filed a Reply (Paper 44), and Patent Owner filed a Sur-Reply (Paper 55). In addition, both parties filed Motions to Exclude Evidence (Papers 65 and 66), Oppositions to their respective opponents' Motions to Exclude (Papers 68 and 69), and Replies in support of their own Motions to Exclude (Papers 71 and 72). At the request of both parties, we held an oral hearing, the transcript of which has been entered into the record. Paper 77 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the challenged claims of the '793 patent. For the reasons discussed below, we determine Petitioner has established by a preponderance of the evidence that each of claims 1–8 of the '793 patent is unpatentable.

*B. Related Matters*

The parties identify *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, 1:20-cv-00755-RGA (D. Del.) ("the District Court proceeding"), as a related matter. Pet. 1; Paper 3, 1.

IPR2021-00406
Patent 10,716,793 B2

### C. The Asserted Grounds of Unpatentability

Petitioner contends that claims 1–8 of the '793 patent are unpatentable based on the following grounds (Pet. 30–68):[1]

| Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 1–8 | 103(a) | '212 patent,[3] Voswinckel JESC,[4] Voswinckel JAHA[5] |
| 1–8 | 103(a) | '212 patent, Voswinckel JESC |
| 1 | 102(a) | Ghofrani[6] |
| 1, 3, 8 | 103(a) | Voswinckel JAHA, Ghofrani |
| 1, 3 | 102(a) | Voswinckel 2006[7] |

---

[1] Petitioner also relies on declarations from Nicholas Hill, M.D., and Igor Gonda, Ph.D. Exs. 1002, 1004, 1106, 1107.

[2] The '793 patent claims a priority date of May 15, 2006, and Petitioner "assumes the relevant priority date . . . is May 15, 2006." Pet. 12; Ex. 1001, code (60). Accordingly, patentability is governed by the versions of 35 U.S.C. §§ 102 and 103 preceding the amendments in the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284 (2011).

[3] US 6,521,212 B1, issued Feb. 18, 2003 (Ex. 1006) (alleged to be prior art under 35 U.S.C. §§ 102(a), (b), (e)).

[4] Voswinckel, R., et al., *Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension*, 25 EUROPEAN HEART J. 22 (2004) (Ex. 1007) (alleged to be prior art under 35 U.S.C. § 102(b)).

[5] Robert Voswinckel, et al., *Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension*, in Abstracts from the 2004 Scientific Sessions of the American Heart Association, 110 CIRCULATION III-295 (Oct. 26, 2004) (Ex. 1008) (alleged to be prior art under 35 U.S.C. § 102(b)).

[6] Hossein Ardeschir Ghofrani, et al., *Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie*, 30 HERZ 296–302 (June 2005) (Ex. 1010) (alleged to be prior art under 35 U.S.C. § 102(a)). We rely on the English translation that follows the German original article as part of Ex. 1010.

[7] Robert Voswinckel, et al., *Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension*, 144 ANNALS OF INTERNAL MEDICINE

IPR2021-00406
Patent 10,716,793 B2

| Claim(s) Challenged | 35 U.S.C. §² | Reference(s)/Basis |
|---|---|---|
| 2, 4–8 | 103(a) | Voswinckel 2006, '212 patent |

### D. The '793 Patent

The '793 patent, titled "Treprostinil Administration by Inhalation," issued on July 21, 2020.  Ex. 1001, codes (45), (54).  The patent "relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits."  *Id.* at 1:20–23.

Treprostinil "is a prostacyclin analogue" that may be used to treat pulmonary hypertension.  *Id.* at 5:37–41.  According to the '793 patent, it was previously known to administer treprostinil by intravenous, subcutaneous, or inhalation routes to treat any of several conditions, including pulmonary hypertension.  *Id.* at 5:42–58.

The '793 patent relates to the administration of treprostinil in high concentrations over a short inhalation time.  *Id.* at 16:61–63, 17:44–46.  This method of administration is described as reducing pulmonary vascular resistance and pulmonary artery pressure, as well as increasing cardiac output.  *Id.* at 16:32–42, Fig. 10.

### E. Illustrative Claim

Claims 1–8 of the '793 patent are challenged.  Claim 1 is independent and illustrative; it recites:

> 1. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a

---

149–50 (January 2006) (Ex. 1009) (alleged to be prior art under 35 U.S.C. § 102(a)).

> formulation comprising treprostinil or a
> pharmaceutically acceptable salt thereof with an
> inhalation device, wherein the therapeutically
> effective single event dose comprises from 15
> micrograms to 90 micrograms of treprostinil or a
> pharmaceutically acceptable salt thereof delivered
> in 1 to 3 breaths.

Ex. 1001, 18:23–31.

## ANALYSIS

### A. Claim Construction

In an *inter partes* review, we construe a claim in an unexpired patent "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2020). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Neither party presents any terms for construction. Pet. 12–13 ("Petitioner does not believe construction of any claim term is required"); PO Resp. 7 (not proposing construction of any terms). Accordingly, we determine that no express construction of any claim term is necessary in order to decide whether to institute trial. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)

("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.")).

### B. Asserted Obviousness over '212 Patent, Voswinckel JESC, and Voswinckel JAHA

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Pet. 30–46. Patent Owner argues that Petitioner fails to show that Voswinckel JESC and Voswinckel JAHA are prior art to the '793 patent. PO Resp. 11–18. Patent Owner also argues that Petitioner fails to show that this combination of references teaches or suggest all the limitations of any of the challenged claims. PO Resp. 18–22, 38–40. In addition, Patent Owner also argues that Petitioner fails to show that a person of ordinary skill in the art would have had a reason to combine the teachings of these references. *Id.* at 23–38.

### 1. '212 Patent

The '212 patent teaches "[a] method of delivering benzindene prostaglandins to a patient by inhalation." Ex. 1006, code (57). In particular, the '212 patent teaches the use of "[a] benzindene prostaglandin known as UT-15," which "has unexpectedly superior results when administered by inhalation compared to parenterally administered UT-15 in sheep with induced pulmonary hypertension." *Id.* There is evidence in the present record that "UT-15" was also known as "Remodulin" or "treprostinil sodium." Ex. 1035, 582. According to the '212 patent, the UT-15 may be delivered either as droplets formed "from a solution or liquid containing the active ingredient(s)" via a nebulizer, or as a solid-phase powder via an inhaler. Ex. 1006, 5:30–41.

According to the '212 patent, this method may be used to "treat[] pulmonary hypertension in a mammal." *Id.* at 14:9–12. Moreover, the '212 patent teaches "medical use" of its method in a "human." *Id.* at 7:4–5. The necessary dose to achieve "a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of the effect desired by the patient's doctor. Titration to effect may be used to determine proper dosage." *Id.* at 6:66–7:3. "[A]erosolized UT-15 has a greater potency as compared to intravascularly administered UT-15," so the '212 patent teaches delivering "only a fraction (10–50%) of the dosage delivered intravascularly" when using its inhalation delivery method. *Id.* at 8:8–12. Even at "high doses," however, the '212 patent teaches a lack of "significant non-lung effects, i.e., heart rate, cardiac output." *Id.* at 10:51–54.

### 2. *Voswinckel JESC*

Voswinckel JESC discusses a study to investigate "the acute hemodynamic response to inhaled treprostinil." Ex. 1007, 7. Of the 29 patients in the study, eight were administered a placebo, groups of six patients each were administered 16, 32, and 48 μg/mL solutions of treprostinil, and three patients were administered a solution containing 64 μg/mL of treprostinil. *Id.* Each administration used an "OptiNeb ultrasound nebulizer, [made by] Nebu-Tec, Germany" for six minutes. *Id.* For each patient, various measurements were taken before administration of the treprostinil and at 0, 15, 30, 60, 90, 120, 150, and 180 minutes after administration. *Id.* According to Voswinckel JESC, "[t]reprostinil inhalation results in a significant long-lasting pulmonary vasodilatation,"

and, "at a concentration of 16 µg/mL, near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.*

### 3. *Voswinckel JAHA*

Voswinckel JAHA discusses a study of 17 patients with "severe pulmonary hypertension" who received treprostinil inhalations. Ex. 1008, 3. These inhalations each involved "3 single breaths" using a "pulsed OptiNeb® ultrasound nebulizer" and a "600 µg/mL" treprostinil solution. *Id.* In addition, "[t]wo patients with idiopathic PAH received compassionate treatment with 4 inhalations of TRE per day after the acute test" and were "treated for more than 3 months." *Id.* According to Voswinckel JAHA, "inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing," and "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)." *Id.*

### 4. *Prior-Art Status of Voswinckel JESC and Voswinckel JAHA*

In arguing that claims 1–8 would have been obvious, Petitioner relies on Voswinckel JESC and Voswinckel JAHA, but Patent Owner argues that Petitioner fails to show sufficiently that either of these references qualifies as a "printed publication." PO Resp. 11–18.

Only "prior art consisting of patents or printed publications" may form "the basis of" an *inter partes* review. 35 U.S.C. § 311(b). Neither Voswinckel JESC nor Voswinckel JAHA is a patent, so Petitioner may not rely on these references unless they are "printed publications." *Id.* Public accessibility is the "touchstone in determining whether a reference constitutes a printed publication," and a reference is considered publicly

8

accessible only if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (quoting *SRI Int'l, Inc. v. Internet Sec. Sys. Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008); *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)).

Patent Owner argues that, because Petitioner relies on Voswinckel JESC and Voswinckel JAHA having been "stored in libraries, public accessibility requires that the reference be both available at the library and sufficiently indexed or catalogued by the priority date." PO Resp. 12 (citing *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016); *In re Klopfenstein*, 380 F.3d 1345, 1349 (Fed. Cir. 2004)). According to Patent Owner, Petitioner fails to show sufficiently either of these requirements. *Id.* at 12–18.

But Petitioner does not rely solely on availability in libraries to show the prior-art status of Voswinckel JESC and Voswinckel JAHA. Instead, Petitioner also argues that "Voswinckel JESC is an abstract presented at the European Society of Cardiology (JESC) Congress," that Voswinckel JAHA "was publicly presented at the 2004 Scientific Sessions of the American Heart Association," and that both references were cited in other documents dating from before the priority date of the '793 patent whose public accessibility is not at issue. Pet. 22; Reply 3–4, 6–8.

Patent Owner objects that Petitioner's public-presentation and citation-in-other-references arguments are untimely because they should have been, but were not, presented in the Petition. Sur-Reply 2–3. We disagree. First, the argument that Voswinckel JESC was presented publicly

9

appears in the Petition. Pet. 22. Second, although other of Petitioner's arguments appear for the first time in the Reply, they are not untimely. Reply 3–4, 6–8.

Petitioner is permitted a "limited opportunit[y]" to present new evidence in or with its Reply, as long as that new evidence is "responsive to the prior briefing" and does not constitute "changing theories after filing [the] petition." *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29, at 14–15 (PTAB Dec. 20, 2019) (precedential). Here, both of the arguments that Patent Owner alleges are new—the argument that Voswinckel JESC and Voswinckel JAHA were presented publicly and the argument that these references were cited in other publicly available references—respond to Patent Owner's argument in the Patent Owner Response that Voswinckel JESC and Voswinckel JAHA were not publicly accessible. PO Resp. 11–18. The argument that Voswinckel JESC was publicly presented is not a change in theory from the Petition, because Petitioner presented this argument in the Petition. Pet. 22. As to both Voswinckel JESC and Voswinckel JAHA, Petitioner's Reply evidence showing citation to the references in other publicly accessible documents is merely additional evidence supporting Petitioner's original theory that a person of ordinary skill in the art could have located the references. Accordingly, we find that the following arguments made by Petitioner are not untimely: (1) that Voswinckel JESC was presented publicly, (2) that Voswinckel JESC was referenced in a publicly accessible document, and (3) that Voswinckel JAHA was referenced in a publicly accessible document.

Given the evidence supporting Petitioner's timely arguments, we are persuaded that Petitioner has shown by a preponderance of the evidence that

IPR2021-00406
Patent 10,716,793 B2

Voswinckel JESC and Voswinckel JAHA were publicly accessible. "[T]he presence of a 'research aid' can . . . establish public accessibility" of a reference if that research aid "provide[s] a skilled artisan with a sufficiently definite roadmap leading to" the reference by "provid[ing] enough details [to] determine that an interested party is reasonably certain to arrive at the destination: the potentially invalidating reference." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1350 (Fed. Cir. 2016).

Here, Petitioner directs us to research aids for finding both Voswinckel JESC and Voswinckel JAHA: a "June 2005 Ghofrani article in the journal *Herz*" for the former, and "a March 2005 article authored by Roxana Sulica et al. in the *Expert Review of Cardiovascular Therapy*" for the latter. Reply 3, 7 (citing Ex. 1010, 298, 301; Ex. 1104, 359). The Ghofrani article cites Voswinckel JESC as providing a solution to patients experiencing "pain at the injection site" by replacing injected treprostinil for "pulmonary arterial hypertension" with "*inhaled* treprostinil." Ex. 1010, 298 (citing reference 6), 301 (defining reference 6 as Voswinckel JESC). The Ghofrani article also discusses the study reported in Voswinckel JESC, summarizing both the "major reduction in pulmonary selective pressure and resistance" and the lack of "adverse effects" described in Voswinckel JESC. *Id.* The Sulica article cites to Voswinckel JAHA, explaining that the reference reports that "inhaled treprostinil demonstrated substantial pulmonary vasodilatory efficacy in acute administration, as well as symptomatic and functional benefit in chronic use in a small number of PAH patients." Ex. 1104, 351, 359. Thus, both the Ghofrani article and the Sulica article provide roadmaps directing a person of ordinary skill in the art looking for successful studies discussing the use of inhaled treprostinil in

11

pulmonary arterial hypertension straight to Voswinckel JESC or Voswinckel JAHA.  Because these articles provide these roadmaps, they are "research aid[s]" that "establish [the] public accessibility" of Voswinckel JESC and Voswinckel JAHA.  *Blue Calypso*, 815 F.3d at 1350.

     5.   *Analysis*

Petitioner argues that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the subject matter of claims 1–8 and that a person of ordinary skill in the art would have had a reason to combine the teachings of these references with a reasonable expectation of success.  Pet. 30–46.  Patent Owner argues that this combination of references fails to teach or suggest delivering a dose of treprostinil within the dose range of the challenged claims in a single dosing event of one to three breaths.  Prelim. Resp. 42–55.

    a.  Claim 1

        (1) *"A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof"*

Claim 1 recites "[a] method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof."  Ex. 1001, 18:23–27.  Petitioner argues that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this limitation.  Pet. 35–37.  Patent Owner does not dispute this argument.  PO Resp. 10–40.

The '212 patent teaches treating pulmonary hypertension via inhalation of a benzindene prostaglandin called UT-15, which was also known as "treprostinil sodium." Ex. 1006, code (57) (identifying "benzindene prostaglandin" as "UT-15"), 2:66–3:5 ("This invention relates to . . . a method of treating pulmonary hypertension by administering an effective amount of a benzindene prostaglandin to a mammal in need thereof by inhalation."); Ex. 1035, 582 ("UT-15" also known as "treprostinil sodium"). Voswinckel JAHA teaches treating "patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)" with "3 single breaths" of "TRE solution 600 µg/ml," resulting in "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." Ex. 1008, 3. Voswinckel JESC describes "the acute hemodynamic response to inhaled treprostinil" following the administration to patients of nebulized treprostinil solution in concentrations of 16, 32, 48, and 64 µg/ml for six minutes, resulting in "significant long-lasting pulmonary vasodilatation" without "adverse effects." Ex. 1007, 7.

Accordingly, Petitioner has shown by a preponderance of the evidence that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this portion of claim 1.

*(2) "With an inhalation device"*

Next, claim 1 recites "with an inhalation device." Ex. 1001, 18:27–28. Petitioner argues that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this limitation. Pet. 37. Patent Owner does not dispute this argument. PO Resp. 10–40. The '212 patent teaches the use in its inhalation method of "a nebulizer, inhaler, atomizer or aerosolizer" to "form[] droplets from a solution or liquid containing the

active ingredient(s)." Ex. 1006, 5:30–32. Both Voswinckel JESC and Voswinckel JAHA teach the use of a "nebulizer" in their inhalation methods. Ex. 1007, 7 ("OptiNeb ultrasound nebulizer"); Ex. 1008, 3 ("the pulsed OptiNeb® ultrasound nebulizer"). Dr. Hill testifies that a person of ordinary skill in the art would have understood "that nebulizers and inhalers are inhalation devices." Ex. 1002 ¶ 94. Accordingly, Petitioner has shown by a preponderance of the evidence that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this limitation of claim 1.

> (3) *"Wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"*

Claim 1 recites "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof." Ex. 1001, 18:28–30. Petitioner argues that the combination of the '212 patent and Voswinckel JESC teaches or suggests this limitation. Pet. 37–40. Patent Owner disagrees. PO Resp. 18–38.

Petitioner calculates the dose that the prior art teaches delivering by inhalation in three separate ways: (1) relying on Voswinckel JESC's solution concentrations and solution volumes taught by Ex. 1037, (2) relying on Voswinckel JESC's solution concentrations and solution volumes normally delivered according to the testimony of Petitioner's declarants, and (3) relying on the '212 patent's conversion from an intravascular treprostinil dose to an equivalent inhaled dose. Pet. 22–24, 38–39. According to Petitioner, each of these three calculation methods results in a teaching of a

IPR2021-00406
Patent 10,716,793 B2

therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil.  *Id.*

We agree with Patent Owner that Petitioner's first and third calculation methods do not demonstrate that the prior art taught or suggested a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil, and we do not discuss these calculations any further.  The preponderance of the evidence, however, supports Petitioner's argument that its second calculation demonstrates that the prior art taught or suggested a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil.

Voswinckel JESC teaches that "patients inhaled solvent solution (placebo) (n=8) or treprostinil for 6 min (OptiNeb ultrasound nebulizer, Nebu-tec, Germany) in concentrations of 16, 32, 48, and 64 µg/ml (n=6, 6, 6, and 3 patients)."  Ex. 1007, 7.  Although this teaching shows administration to patients of inhaled solutions with particular concentrations of treprostinil, it does not disclose the amount of solution administered, which is necessary in order to calculate the amount of treprostinil administered.  *Id.*  Petitioner directs us to the testimony of its declarants, Dr. Nicholas Hill and Dr. Igor Gonda, to understand how a person of ordinary skill in the art would have interpreted Voswinckel JESC's disclosure.  Pet. 23 (citing Ex. 1002 ¶ 65; Ex. 1004 ¶ 56).  Dr. Gonda testifies that "in May 2006 . . . nebulizers conventionally deliver[ed] between 1 and 5 mL" of solution.  Ex. 1004 ¶ 56.  Relying on Dr. Gonda's testimony as well as his own experience, Dr. Hill testifies that a person of ordinary skill in the art in 2006 would have understood that "nebulizers . . . nebulize (i.e. aerosolize liquid) at least" 1 mL of solution.  Ex. 1002 ¶ 65.

15

Multiplying Voswinckel JESC's 16, 32, 48, or 64 micrograms of treprostinil per milliliter of solution by the 1 to 5 milliliters of solution in the testimony of Drs. Hill and Gonda, a person of ordinary skill in the art would have interpreted Voswinckel JESC as teaching the delivery of 16–80, 32–160, 48–240, or 64–320 micrograms of treprostinil. Each of those four dose ranges has at least one endpoint that falls within the 15–90 microgram claimed range.

Patent Owner argues that this evidence is insufficient to show that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil. Specifically, Patent Owner argues that the volume of solution that Drs. Hill and Gonda testify was typically used in nebulizers is "the fill volume," or the amount of solution loaded into a nebulizer to be nebulized, which cannot be used with the concentrations in Voswinckel JESC to arrive at the amount of treprostinil actually delivered to a patient. PO Resp. 30–31. This is because "there is no guarantee that the entire fill volume would be completely nebulized in" the time period over which Voswinckel JESC teaches delivering its dose of treprostinil. *Id.* at 30. In addition, Patent Owner argues that there were other factors that might have caused less than all the solution nebulized by a nebulizer to be actually delivered to the patient, none of which Petitioner accounts for. *Id.* at 31–32.

Petitioner "presented evidence that nebulizers at the time typically involved fill volumes of 1-5mL." Reply 10–11. To the extent that something less than the entire fill volume was delivered to the patient, either because it was not nebulized or because other factors resulted in the

nebulized solution not reaching the mouthpiece, the preponderance of the evidence still supports the actual delivered solution volume being at least one milliliter.  Dr. Hill testifies that the "at least 1 mL" of solution he discusses is the volume that "nebulizers at the time were known to nebulize," not the amount of liquid loaded into the nebulizer.  Ex. 1002 ¶ 65. Patent Owner's declarant, Dr. Aaron Waxman, testifies that standard nebulizers had fill volumes of "3 to 5 [milliliters]" and that he had never administered a dose as low as one milliliter to a patient.  Ex. 1108, 153:1–22; 156:12–16.

Thus, Voswinckel JESC teaches delivering solution with a treprostinil concentration of 16, 32, 48, or 64 micrograms per milliliter, and the preponderance of the evidence supports a finding that a person of ordinary skill in the art would have understood the volume of solution delivered in Voswinckel JESC to be at least one milliliter.  Accordingly, Petitioner has shown by a preponderance of the evidence that Voswinckel JESC teaches or suggests a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil.

*(4) "Delivered in 1 to 3 breaths"*

Claim 1 recites "delivered in 1 to 3 breaths."  Ex. 1001, 18:31. Petitioner argues that Voswinckel JAHA teaches or suggests this limitation. Pet. 40–41.  Patent Owner does not dispute this teaching of Voswinckel JAHA.  PO Resp. 10–40.

Voswinckel JAHA teaches delivering to patients "a TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml)."  Ex. 1008, 3.  It also reports that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3

breaths)." *Id.* Accordingly, Petitioner has shown by a preponderance of the evidence that Voswinckel JAHA teaches or suggests this limitation of claim 1.

> b. Reason to Combine with a Reasonable Expectation of Success

As discussed above, Petitioner has shown sufficiently on the present record that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests every limitation of claim 1. This alone is not sufficient to show that the challenged claims would have been obvious; Petitioner also must show that a person of ordinary skill would have had a reason to combine the teachings of the references and would have had a reasonable expectation of success in doing so.

Petitioner argues that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Pet. 30–34. Patent Owner argues that a person of ordinary skill in the art would have had "serious concerns about side effects" that would have persuaded them not to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. PO Resp. 37–38.

The '212 patent teaches the use of inhaled treprostinil sodium for the treatment of pulmonary hypertension at doses between 10 and 50 percent of the doses needed for intravascular delivery. Ex. 1006, code (57), 6:1–2, 8:8–12. According to the '212 patent, the inhaled treprostinil sodium is used in sheep, which are a model for pulmonary hypertension in humans. *Id.* at 9:14–27. Dr. Hill testifies that, based on these teachings, a person of ordinary skill in the art would have looked for further information regarding "experimentation [with] inhaled treprostinil in humans." Ex. 1002 ¶ 78. On

the present record, such information can be found in Voswinckel JESC, which reports on a study in which humans with pulmonary hypertension inhaled treprostinil and experienced "significant long-lasting pulmonary vasodilatation . . . without adverse effects." Ex. 1007, 7.

Dr. Hill testifies that, based on the teachings of these references a person of ordinary skill would reasonably have expected that treprostinil could safely and effectively treat pulmonary hypertension in humans. Ex. 1002 ¶ 79. Dr. Hill also testifies that a person of ordinary skill in the art "would have been motivated to further decrease the 6 minute administration time in Voswinckel JESC." Ex. 1002 ¶ 80. Specifically, Dr. Hill testifies that patients often did not adhere to "inhalation therapy for respiratory diseases," that "[p]oor adherence to medication was known to correlate with worse outcomes," and that "reducing administration time or the number of breaths required for therapy [was known to] improve adherence rates." *Id.* (citing Ex. 1002 ¶¶ 36–37; Ex. 1030, 63; Ex. 1032, 179–80; Ex. 1077, 4). Voswinckel JAHA teaches administering treprostinil in three breaths using a high concentration of treprostinil in the aerosolized solution. Ex. 1008, 3. Accordingly, Dr. Hill testifies that a person of ordinary skill in the art would have looked to Voswinckel JAHA to improve patient adherence to the treatment suggested by the combination of the '212 patent and Voswinckel JESC, providing a reason to combine its teachings with those of the other two references. Ex. 1002 ¶¶ 80–82.

Against this evidence, Patent Owner directs us to the report in Voswinckel JESC that "there were no significant adverse effects" at the lowest treprostinil concentration but that "mild and transient" "[h]eadache, cough or bronchoconstriction were observed" in some patients at higher

19

doses, and that one patient at Voswinckel JESC's highest treprostinil dose "complained of major headache for 1 hour." Ex. 1007, 7; *see* PO Resp. 37–38. As Patent Owner puts it, "Voswinckel JESC warns in its Conclusion that 'at a concentration of 16 μg/ml, near maximal pulmonary vasodilation is achieved without adverse effects' but '[a]t higher doses, local and systemic side effects may occur.'" PO Resp. 37–38 (quoting Ex. 1007, 7). Because Petitioner's proffered reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA requires an increase in treprostinil concentration in order to administer the full dose in three breaths, Patent Owner argues that Voswinckel JESC's warning about side effects at higher doses would have persuaded a person of ordinary skill in the art not to pursue such a course. *Id.*

The preponderance of the evidence supports Petitioner's position. Patent Owner is correct that Voswinckel JESC notes that side effects could occur more frequently at higher doses than at lower doses. Ex. 1007, 7. But there is considerable evidence of record that a person of ordinary skill in the art would not have avoided increasing Voswinckel JESC's dose due to the side effects reported in Voswinckel JESC. First, Dr. Hill testifies that "[p]otential side effects are always weighed against potential clinical benefit, and pulmonary arterial hypertension is a serious, life-threatening disease where physicians and patients are more willing to tolerate side effects . . . to obtain clinical benefit." Ex. 1106 ¶ 74. Second, Dr. Waxman testifies that "[u]sually the headache goes away" and "there are things that can be done to help ameliorate the cough so in general we are able to get over that issue." Ex. 1108, 101:19–102:10. Together with Voswinckel JESC's description of potential side effects as "mild and transient," this evidence supports a

20

IPR2021-00406
Patent 10,716,793 B2

finding that a person of ordinary skill in the art would not have been deterred from pursuing the course that is supported by the evidence to which Petitioner directs us.

With respect to reasonable expectation of success, Petitioner argues that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA because Voswinckel JAHA teaches that "[t]olerability is excellent" for its short-duration, high-concentration treprostinil inhalation therapy. Pet. 33 (citing Ex. 1008, 3). Other than the argument discussed above about side effects reported in Voswinckel JESC, Patent Owner does not raise any timely counter to this argument.[8] PO Resp. 10–40. The record supports Petitioner's argument. Ex. 1008, 3.

Accordingly, Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and that they reasonably would have expected to succeed in doing so.

---

[8] In the Sur-Reply, Patent Owner raises for the first time three arguments against a reasonable expectation of success. Sur-Reply 21–22 (arguing that a person of ordinary skill in the art would not expect success in delivering Voswinckel JESC's dose over Voswinckel JAHA's three breaths because (1) it would require "increas[ing] the number [of] doses per day," (2) Voswinckel JAHA "lacked any placebo arm," and (3) Voswinckel JESC and Voswinckel JAHA used patients with differing pulmonary vascular resistances). "A sur-reply may only respond to arguments raised in the corresponding reply." 37 C.F.R. § 42.23(b). Petitioner's Reply did not raise any argument regarding a reasonable expectation of success. Reply 1–27. Therefore, we do not consider these newly raised arguments as they exceed the proper scope of the Sur-Reply.

IPR2021-00406
Patent 10,716,793 B2

c.  Objective Indicia of Nonobviousness

Patent Owner directs us to evidence of three objective indicia that Patent Owner argues show the nonobviousness of the challenged claims.  PO Resp. 55–62.  Petitioner argues that the claims would have been obvious despite the evidence to which Patent Owner directs us.  Reply 23–27.

*(1) Unexpected Results*

First, Patent Owner directs us to evidence that allegedly demonstrates that the challenged claims would have been nonobvious because they "unexpectedly achieved a therapeutically effective dose that was well tolerated" despite the fact that such "high doses of treprostinil were known in the art to produce dose-limiting side effects."  PO Resp. 55.  According to Patent Owner, the challenged claims "produce[d] a new and unexpected result which is different in kind and not merely in degree from the results of the prior art," which is evidence of those claims' nonobviousness.  *Id.* at 55–57 (quoting *In re Aller*, 220 F.2d 454, 456 (CCPA 1955)).  Specifically, Patent Owner argues that the inhaled treprostinil dose recited in the challenged claims represented an increase of "an order of magnitude" over "the maximal tolerated dose" of "intravenous epoprostenol" or "intravenous treprostinil."  *Id.* at 56.  Similarly, Patent Owner argues that the challenged claims cover doses of inhaled treprostinil higher than a dose of inhaled iloprost that many patients were unable to tolerate.  *Id.* at 56–57.

"[U]nexpected results must establish . . . a difference between the results obtained and those of the closest prior art."  *Bristol-Myers Squibb v. Teva Pharms. USA*, 752 F.3d 967, 977 (Fed. Cir. 2014).  Petitioner argues that the prior art over which Patent Owner argues the challenged claims showed unexpected results is not the closest prior art.  Reply 24.  We agree.

22

IPR2021-00406
Patent 10,716,793 B2

As noted above, Patent Owner argues that the challenged claims show unexpected results over inhaled iloprost, intravenous epoprostenol, and intravenous treprostinil. PO Resp. 55–57. But the challenged claims recite inhaled treprostinil, and, as discussed above, inhaled treprostinil is taught by each of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Ex. 1001, 18:22–44; Ex. 1006, code (57); Ex. 1007, 7; Ex. 1008, 3; Ex. 1035, 582. Patent Owner does not even allege that the results of the challenged claims are unexpected over these references.[9] Accordingly, we find that the evidence of record does not establish that the challenged claims produced a result that was unexpected over the closest prior art.

### (2) Copying

Second, Patent Owner directs us to evidence that allegedly demonstrates that the challenged claims would have been nonobvious because Petitioner copied Patent Owner's product, Tyvaso, which is an embodiment of the challenged claims, when Petitioner developed its product, LIQ861. PO Resp. 57–61.

"[F]or objective indicia of nonobviousness to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33, 32 (PTAB Jan. 24, 2020) (precedential) (citing *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016)). A patentee is entitled to a presumption of nexus "when the patentee shows that

---

[9] Patent Owner argues that Voswinckel JESC and Voswinckel JAHA are not prior art to the '793 patent. PO Response 44–55; Sur-Reply 2–11, 25. As discussed above, however, Petitioner has shown by a preponderance of the evidence that these references qualify as prior art.

IPR2021-00406
Patent 10,716,793 B2

the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000))).

Here, Patent Owner does not allege, let alone "show[]" as required by *Fox Factory*, that Petitioner's LIQ861 product "is coextensive with" the features claimed in the '793 patent. 944 F.3d at 1373; *see* PO Resp. 57–61; Sur-Reply 26. Patent Owner does allege that the LIQ861 product embodies the challenged claims, PO Resp. 58–61, and we presume for purposes of our analysis that Patent Owner's allegation on this issue is correct. But *Fox Factory* requires both a showing that the product in question embodies the claims and a showing that the product in question is coextensive with the claims, and Patent Owner satisfies at most one of those two requirements. Accordingly, we find that a presumption of nexus is inappropriate.

"A finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. "To the contrary, the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). "Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to

24

some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011) (emphasis in original).

On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016). A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* Ultimately, the fact finder must weigh the secondary considerations evidence presented in the context of whether the claimed invention as a whole would have been obvious to a skilled artisan. *Id.* at 1331–32.

Here, Patent Owner directs us to several pieces of evidence that it contends show the LIQ861 product has a nexus to the challenged claims. First, as noted above, Patent Owner argues that LIQ861 embodies those claims. PO Resp. 58–61. Second, Patent Owner notes that "[t]he pharmacokinetics and bioavailability of a 79.5 microgram capsule dose [of LIQ861] was directly compared [by Petitioner] with Patent Owner's commercial product," demonstrating that "Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range." *Id.* at 57–58 (citing Ex. 2085). Third, Patent Owner directs us to the new drug application Petitioner filed with the FDA, "relying in part on FDA's previous findings of efficacy and safety of Tyvaso® for the treatment of PAH." *Id.* at 58 (citing Ex. 2089, 3).

IPR2021-00406
Patent 10,716,793 B2

Taking these pieces of evidence in reverse order, we note first that the new drug application for LIQ861 was filed "under the 505(b)(2) regulatory pathway." *Id.*; *see also* Reply 25; Ex. 2089, 3. As Petitioner notes, Reply 25, and as Patent Owner does not dispute, Sur-Reply 26, applications for drugs under this pathway do not necessarily copy all aspects of the original drug, but they may rely on the investigations that showed the safety and efficacy of the original drug that uses the same active ingredient. 21 U.S.C. § 355(b)(2). In this respect, they differ from applications under the § 505(j) regulatory pathway, under which the new drug must generally have the same "active ingredient," "route of administration," "dosage form," "strength," and "labeling" as the original drug. 21 U.S.C. § 355(j)(2). Because the challenged claims here recite limitations requiring administration by inhalation of a particular amount of treprostinil in a particular number of breaths (and in some cases using a particular type of device and with the drug in a particular form), evidence that Petitioner merely relied on previous studies of the safety and efficacy of the recited active ingredient is not particularly strong evidence of copying.

Next, we consider the evidence that Petitioner compared the pharmacokinetics and bioavailability of its LIQ861 product with those of Patent Owner's Tyvaso product. Ex. 2085. Patent Owner argues that this evidence shows that "Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range." PO Resp. 57–58. Regardless of whether an objective indicium of nonobviousness has its nexus to a single "aspect of the claim not already in the prior art," *Kao*, 639 F.3d at 1068–69, or to "the claimed combination as a whole," *WBIP*, 829 F.3d at 1331, it still must have some nexus to the claim

26

IPR2021-00406
Patent 10,716,793 B2

in question. The challenged claims, however, do not recite any limitations for treprostinil bioavailability or pharmacokinetics. Ex. 1001, 18:22–44. Accordingly, evidence that Petitioner formulated its product to have similar bioavailability and pharmacokinetics to Patent Owner's product is, at most, very weak evidence of copying as to the claims at issue here.

Finally, we consider the evidence that LIQ861 embodies the challenged claims. PO Resp. 58–61. "Not every competing product that arguably falls within the scope of a patent is evidence of copying; otherwise, 'every infringement suit would automatically confirm the nonobviousness of the patent.'" *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (quoting *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)). Proof of copying requires "actual evidence of copying efforts as opposed to mere allegations regarding similarities between the accused product and a patent." *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137–38 (Fed. Cir. 2019). Thus, evidence that LIQ861 embodies the challenged claims is not evidence that could, without more, support a finding that Petitioner copied Patent Owner's patented method. As discussed above, to the extent there is any evidence of what *Liqwd* refers to as "copying efforts" beyond mere similarity between LIQ861 and the challenged claims, that evidence shows that Petitioner copied only features that appear in the prior art, are not recited in the challenged claims, or both. Accordingly, we do not find that Patent Owner has shown that Petitioner copied the method of the challenged claims.

*(3) Long-Felt and Unmet Need*

Patent Owner directs us to evidence that allegedly demonstrates that the challenged claims would have been nonobvious because "[t]he claimed

invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension." PO Resp. 61–62; *see* Sur-Reply 26. Patent Owner relies on three separate theories to demonstrate this long-felt need. First, in the Response, Patent Owner argues that the approval of inhaled treprostinil as the first treatment for "pulmonary hypertension associated with interstitial lung disease" satisfied "a completely unmet medical need." PO Resp. 61–62 (quoting Ex. 2056, 105:6–8). Second, also in the Response, Patent Owner argues that Petitioner admitted that its LIQ861 product "fulfill[ed] a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler." *Id.* at 62 (quoting Ex. 2085). Third, in the Sur-Reply, Patent Owner argues that its Tyvaso product satisfied a need for an "inhaled treatment for pulmonary hypertension" that avoided the "inconvenient dosing and side effects of Ventavis," the only previously approved treatment. Sur-Reply 26 (citing Ex. 1002 ¶ 42; Ex. 1108, 44:19–21, 49:17–50:10; Ex. 2055, 28:22–29:20). Each of these arguments fails for a different reason.

We begin with Patent Owner's third argument, that Tyvaso satisfied a need for an inhaled treatment that avoided the dosing problems and side effects of Ventavis. Patent Owner offers this argument for the first time in the Sur-Reply. *Id.* "A sur-reply may only respond to arguments raised in the corresponding reply." 37 C.F.R. § 42.23(b). "'Respond,' in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing." Patent Trial and Appeal Board Consolidated Trial Practice Guide 74 (Nov. 2019), available at https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf.

IPR2021-00406
Patent 10,716,793 B2

As discussed in more detail below, in its prior filings, Patent Owner's only positions with respect to long-felt need were (1) that the patented method satisfied a need for a treatment for pulmonary hypertension associated with interstitial lung disease and (2) that Petitioner admitted that its product satisfied a need.  PO Resp. 61–62.  Neither of those positions related to a need for a treatment that avoided the problems associated with Ventavis.  *Id.* Accordingly, Patent Owner's argument in the Sur-Reply is a new argument that we do not consider further.

Next, we consider Patent Owner's argument that the method of the '793 patent provided the first treatment for pulmonary hypertension associated with interstitial lung disease.  *Id.*  Even if this is true, it is extremely weak evidence of the nonobviousness of the claims at issue because those claims do not cover treatment of pulmonary hypertension associated with interstitial lung disease.  There are multiple groups of pulmonary hypertension conditions.  Ex. 1088, 1.  In addition to other groups not relevant here, these groups include "WHO Group 1," or "[p]ulmonary arterial hypertension," and "WHO Group 3," or "[p]ulmonary hypertension associated with interstitial lung disease."  *Id.*  Patent Owner's declarant, Dr. Waxman, testifies that all pulmonary hypertension groups other than Group 1 fall outside the scope of the claims of the '793 patent. Ex. 1132, 116:9–119:12.  Dr. Hill agrees.  Ex. 1106 ¶ 100.  Thus, to the extent the challenged claims satisfied a long-felt and unmet need for a treatment for pulmonary hypertension associated with interstitial lung disease, Patent Owner has not shown that that need is tied to any limitation of the challenged claims or to any challenged claim as a whole.

29

Finally, we consider Patent Owner's argument that Petitioner admitted that its LIQ861 product "fulfill[ed] a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler." PO Resp. 62 (quoting Ex. 2085). "Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer that the need would not have persisted had the solution been obvious." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1056 (Fed. Cir. 2016). Patent Owner directs us to two pieces of evidence. First, Patent Owner directs us to Exhibit 2085, which states that LIQ861 "fulfill[ed] a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler." Ex. 2085, 1. This demonstrates that Petitioner believed its product satisfied a particular "significant unmet need," but it does not demonstrate how long that need persisted. *Id.* Second, Patent Owner directs us to page F-7 of Exhibit 2089, but this page does not address the filling of any need by LIQ861. Ex. 2089, F-7. Thus, Patent Owner does not show that any previously unmet need satisfied by LIQ861 was a need that had persisted, as required by *Apple v. Samsung*. Accordingly, we do not find that Patent Owner has shown that the patented method satisfied any previously unmet and long-felt need.

### d. Dependent Claims

Claims 2–8 of the '793 patent depend directly or indirectly from claim 1. Ex. 1001, 18:32–45. Petitioner argues that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests

IPR2021-00406
Patent 10,716,793 B2

the additional limitations of these claims.  Pet. 41–46.  Patent Owner does not dispute these arguments, except with respect to claims 4, 6, and 7.  PO Resp. 38–40.

We have reviewed the evidence cited by Petitioner with respect to dependent claims 2, 3, 5, and 8, and we are persuaded that Petitioner has shown by a preponderance of the evidence that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the subject matter of these claims.  For example, claim 2 depends from claim 1 and recites a further limitation that requires that "the inhalation device [be] a soft mist inhaler," and Petitioner directs us to evidence that soft mist inhalers were known in the prior art, as well as evidence that soft mist inhalers were known to be suitable for inhaled delivery of drugs in a small number of breaths.  Ex. 1001, 7:33–39, 18:32–33; Ex. 1002 ¶¶ 106–110; Ex. 1004 ¶¶ 66–71; Ex. 1006, 5:30–32; Ex. 1034, 175.

The parties dispute the obviousness of claims 4, 6, and 7.  Claim 4 depends from claim 1 and recites a limitation requiring that "the inhalation device [be] a dry powder inhaler."  Ex. 1001, 18:36–37.  Claim 6 depends from claim 4 and adds a limitation requiring that "the formulation [be] a powder."  *Id.* at 18:40–41.  Claim 7 depends from claim 6 and adds a limitation requiring that "the powder comprise[] particles less than 5 micrometers in diameter."  *Id.* at 18:42–43.  Petitioner argues that each of these limitations is taught or suggested by the '212 patent.  Pet. 43–45 (citing Ex. 1006, 5:30–32, 5:37–41, 14:19–21; Ex. 1002 ¶¶ 116–117; Ex. 1004 ¶¶ 77–80; Ex. 1038, 311).  Patent Owner argues that Petitioner's obviousness argument with respect to these claims is inconsistent with Petitioner's argument in the parallel District Court proceeding that these

31

claims are not enabled. PO Resp. 38–40. Specifically, Patent Owner argues that Dr. Gonda's testimony here that a person of ordinary skill in the art "would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler" contradicts Dr. Gonda's testimony in District Court that a person of ordinary skill in the art "would be unable to formulate a treprostinil powder suitable for administration via a dry powder inhaler for [pulmonary hypertension] patients without excessive experimentation." PO Resp. 38–39 (quoting Ex. 1004 ¶ 80; Ex. 2091, 40–61). Because Dr. Gonda's District Court testimony is more "lengthy" than his testimony here, Patent Owner argues that the District Court testimony is more reliable and that, accordingly, we should not rely on Dr. Gonda's testimony here. *Id.* at 40.

Dr. Gonda's testimony here provides support for Petitioner's argument that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA in order to arrive at the invention of claims 4, 6, and 7. Ex. 1004 ¶ 80. Reasonable expectation of success is a separate inquiry from enablement. *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1327 (Fed. Cir. 2018) (finding no "authority for the proposition that the presumption of" enablement of prior art "precludes . . . finding that there was no reasonable expectation of success"). Accordingly, the mere fact that Dr. Gonda testifies to a lack of enablement in one forum and to the presence of a reasonable expectation of success in a second forum does not render unreliable the testimony in either forum. Therefore, we credit the unrebutted testimony of Dr. Gonda that a

person of ordinary skill in the art "would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." Ex. 1004 ¶ 80.  In addition, Dr. Gonda's testimony in this proceeding is supported by a citation to Ex. 1038, an October 2005 article that states that dry powder inhalers "are a widely accepted inhaled delivery dosage form," as well as to Ex. 1019, an article stating that 14 separate dry powder inhalers were approved in the United States by 2006.  Ex. 1019, 33; Ex. 1038, 1311.  This evidence provides us with an additional reason to credit Dr. Gonda's testimony as to reasonable expectation of success.

Moreover, even if there were some connection between enablement and reasonable expectation of success, Patent Owner concedes that the '212 patent enables its own claims.  Tr. 43:6–50:9.  In other words, the '212 patent provides enough information for a person of ordinary skill in the art to have made and used the invention defined by the claims of the '212 patent.  *See* 35 U.S.C. § 112.  That invention includes "[a] method for treating pulmonary hypertension in a mammal comprising delivering to said mammal an effective amount of [treprostinil] or its pharmaceutically acceptable salt or ester by inhalation," wherein the treprostinil "is inhaled in powder form comprising particles less than 10 micrometers in diameter."  Ex. 1006, 14:9–12, 14:19–21.  To the extent that, despite *UCB*, 890 F.3d at 1327, there remains any connection at all between a reasonable expectation of success and enablement, the fact that a person of ordinary skill in the art was enabled to make and use this invention presumably would have rendered that person more likely to expect success in achieving the similar invention of claims 4, 6, and 7 of the '793 patent.

Further, as discussed above with respect to the reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA, Petitioner directs us to other evidence that a person of ordinary skill in the art would have had a reasonable expectation of success.

For all these reasons, we determine that Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and would have had a reasonable expectation of success in doing so in order to arrive at the invention of the challenged claims, including claims 4, 6, and 7.

Thus, we move on to whether the prior art teaches or suggests the additional limitations of claims 4, 6, and 7. Petitioner argues that the '212 patent teaches or suggests each of these limitations, and Patent Owner does not dispute that argument. Pet. 43–45; PO Resp. 38–40. Claim 4 recites a limitation requiring that "the inhalation device [be] a dry powder inhaler." Ex. 1001, 18:36–37. The '212 patent teaches using an "inhaler" to deliver treprostinil, that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention," and that treprostinil "is inhaled in powder form." Ex. 1006, 5:30–32, 5:37–39, 14:19–21. Dr. Hill testifies that a person of ordinary skill in the art would have known that the "inhaler" used to deliver the "powder" of the '212 patent was a dry powder inhaler. Ex. 1002 ¶ 116. Claim 6 depends from claim 4 and adds a limitation requiring that "the formulation [be] a powder." Ex. 1001, 18:40–41. The '212 patent teaches that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention," as well as that treprostinil "is inhaled in powder form." Ex. 1006, 5:37–39, 14:19–

21. Claim 7 depends from claim 6 and adds a limitation requiring that "the powder comprise[] particles less than 5 micrometers in diameter." Ex. 1001, 18:42–43. The '212 patent teaches that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." Ex. 1006, 5:39–41. Accordingly, Petitioner has shown by a preponderance of the evidence that the '212 patent teaches or suggests the additional limitations of claims 4, 6, and 7 of the '793 patent.

e.  Conclusion

As discussed above, Petitioner has shown by a preponderance of the evidence that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the subject matter of claims 1–8. Petitioner also has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and would have had a reasonable expectation of success in doing so to arrive at the invention of the challenged claims.  In addition, the preponderance of the evidence shows that there is at most very weak evidence of objective indicia of nonobviousness, including unexpected results, copying, and long-felt but unmet need.  Weighing together the evidence of the prior art teaching or suggesting the subject matter of the claims, of a reason to combine the teachings of the prior art with a reasonable expectation of success, and of objective indicia of nonobviousness, we conclude that Petitioner has demonstrated that claims 1–8 of the '793 patent would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and, accordingly, that those claims are unpatentable.

### C. Asserted Obviousness over '212 Patent and Voswinckel JESC

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent and Voswinckel JESC. Pet. 46–50. Because Petitioner has shown by a preponderance of the evidence that all of the challenged claims would have been obvious over the similar combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA, we need not reach this asserted ground.

### D. Grounds Relying on Ghofrani or Voswinckel 2006

Petitioner argues that claim 1 was anticipated by Ghofrani; that claims 1, 3, and 8 would have been obvious over the combination of Voswinckel JAHA and Ghofrani; that claims 1 and 3 were anticipated by Voswinckel 2006; and that claims 2 and 4–8 would have been obvious over the combination of Voswinckel 2006 and the '212 patent. Pet. 50–64. Patent Owner argues that each of these grounds fails because Petitioner fails to show sufficiently that Ghofrani and Voswinckel 2006 qualify as prior art. PO Resp. 44–54. Petitioner disagrees, arguing that these references qualify as prior art under 35 U.S.C. § 102(a). Pet. 25–30.

In the institution decision, we determined that, on the preliminary record available at the time, Petitioner had not shown that either Ghofrani or Voswinckel 2006 qualified as prior art. Inst. Dec. 37–43. Since that decision, Petitioner has neither supplemented the record nor made any additional arguments on this issue. Reply 1–27. During the hearing, Petitioner did not agree that it had abandoned its argument on the grounds asserting Ghofrani or Voswinckel 2006. Tr. 35:13–36:10. Nevertheless, in the absence of any new evidence or argument, we have been directed to nothing that persuades us to reach any decision other than we reached

36

IPR2021-00406
Patent 10,716,793 B2

initially. Accordingly, our analysis below mirrors the analysis we conducted in the institution decision.

###### 1.    Prior-Art Status of *Ghofrani*

Ghofrani is an article published in the German journal Herz in June 2005, less than one year before the priority date of the '793 patent. Pet. 25; Ex. 1010, 9; Ex. 1036 ¶¶ 47–55.  Petitioner argues that Ghofrani is prior art to the '793 patent under 35 U.S.C. § 102(a).  Pet. 25–27.  Patent Owner disagrees, arguing that Petitioner has not shown sufficiently that Ghofrani is "by others" under § 102(a).  PO Resp. 44–51.

As both parties acknowledge, establishing prior-art status under § 102(a) requires showing that the reference is "by others," meaning that it was authored by an entity different from the entity that invented the challenged patent.  Pet. 26–27; PO Resp. 44–46; *see Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1346 (Fed. Cir. 2003) ("it is well-settled law that an inventor's own disclosure will not anticipate his later invention" unless published more than one year prior to the priority date (internal quotation marks omitted)).

The authors of Ghofrani are "Hossein Ardeschir Ghofrani, Robert Voswinckel, Frank Reichenberger, Friedrich Grimminger, [and] Werner Seeger." Ex. 1010, 9.  The inventors of the '793 patent are Horst Olschewski, Robert Roscigno, Lewis J. Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt, and Robert Voswinckel.  Ex. 1001, code (72).  Thus, there are, as Petitioner argues, "inventors listed on the '793 Patent that are not listed as authors on Ghofrani, and vice versa." Pet. 26.  Specifically, Ghofrani, Reichenberger, and Grimminger authored the Ghofrani reference but were not inventors of the '793 patent; and Olschewski, Roscigno, Rubin,

37

Schmehl, and Sterritt were inventors of the '793 patent but not authors of the Ghofrani reference.

Petitioner argues that these differences alone are sufficient to show that Ghofrani is "by others." *Id.* at 26–27. We agree that it is possible, depending on the state of the rest of the evidence of record, for any difference between the authors of an alleged prior-art reference and the inventors of a challenged patent to render the reference "by others" for purposes of § 102(a). *See, e.g.*, *In re Katz*, 687 F.2d 450, 455 (CCPA 1982) ("ambiguity [was] created by the printed publication" where authors included people not named as inventors); *cf. In re Land*, 368 F.2d 866, 877 (CCPA 1966) (for purposes of § 102(e), reference authored by one co-inventor was "by another").

That said, it is not always sufficient for Petitioner merely to show a difference between a list of authors and a list of inventors. Where the record contains evidence that the reference was derived entirely from the work of the inventors or at least one joint inventor, this evidence may be sufficient to show that the reference is not "by others" for purposes of § 102(a). *Katz*, 687 F.2d at 455–56 (finding inventor's declaration of sole inventorship sufficient to render reference authored by inventor and others not "by others"). Although the testimony of an inventor that the reference in question was derived from the inventors' work may be sufficient on its own, at least where it is not "a mere pro forma restatement of the oath in [the inventor's] application," affidavits from the other authors disclaiming the invention are particularly strong evidence that the reference is not "by others." *Id.* ("Submission of such affidavits or declarations would have ended the inquiry . . . ."). Here, for the reasons discussed below, the

IPR2021-00406
Patent 10,716,793 B2

preponderance of the evidence persuades us that, despite the differences between its list of authors and the list of the inventors of the '793 patent, Ghofrani is not "by others" for purposes of § 102(a).

Petitioner's first argument that Ghofrani is "by others" is that there are people who are authors of Ghofrani who are not inventors of the '793 patent. Pet. 26. But Dr. Seeger, one of the inventors of the '793 patent, as well as an author of Ghofrani, describes the roles of the other authors of Ghofrani, explaining that Dr. Ghofrani drafted the portion of the article "relating to phosphodiesterase inhibitors," that Drs. Reichenberger and Grimminger drafted the portion of the article relating to "the use of selective endothelin A receptor agonists for treating pulmonary hypertension," and that he and Dr. Voswinckel—another co-inventor—drafted the portion of the article relating to "the use of inhaled iloprost and inhaled treprostinil for treatment of pulmonary hypertension," the only portion on which Petitioner's unpatentability case rests. Ex. 2003 ¶¶ 4–8. Dr. Seeger's testimony is corroborated by the testimony of Drs. Ghofrani, Reichenberger, and Grimminger, each of whom testifies that they "did not make material contributions to" the portion of the Ghofrani reference relating to inhaled treprostinil. Ex. 2004 ¶¶ 4–5; Ex. 2005 ¶¶ 4–5; Ex. 2006 ¶¶ 4–5. This is precisely the type of testimony that the *Katz* court held should "end[] the inquiry" into whether Ghofrani was "by others." 687 F.2d at 455–56. Accordingly, this evidence overcomes Petitioner's argument that the difference between the Ghofrani authors and the inventors of the '793 patent is sufficient to show that Ghofrani is "by others."

Petitioner also argues that the failure to include some of the inventors of the '793 patent—Olschewski, Roscigno, Rubin, Schmehl, and Sterritt—as

39

IPR2021-00406
Patent 10,716,793 B2

authors of Ghofrani renders Ghofrani "by others." Pet. 26–27. But "the fact that a reference does not list any co-inventors as authors . . . is certainly not dispositive in itself." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); *see* MEEP § 2132.01(I) ("An inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). Moreover, Dr. Seeger explains the roles of the other named inventors in designing trials and clinical studies leading to the patent application. Ex. 2003 ¶¶ 22–27. In particular, Dr. Seeger testifies that the Ghofrani reference did not report on the details of the studies and trials that were in part designed by these other authors, explaining why they did not contribute to writing Ghofrani, even though they were involved in the related work that gave rise to the '793 patent. *Id.* ¶¶ 11–12. Dr. Seegar further explains that, "any study that formed the basis of our discussion of inhaled trepostinil in [Ghofrani and two other references] was performed by me in conjunction with my ongoing collaboration with Drs. Voswinckel, Olschewski, Rubin, Schmehl, Sterrit, and Roscigno." *Id.* ¶ 12. Again, then, the preponderance of the evidence supports a determination that Ghofrani is not "by others" for purposes of § 102(a).

### 2. *Prior-Art Status of Voswinckel 2006*

The issues and arguments regarding Voswinckel 2006 are quite similar to those discussed above regarding Ghofrani. Petitioner argues that Voswinckel 2006 qualifies as prior art under § 102(a) and that it is "by others" both because some of its authors—specifically, Ghofrani and Grimminger—are not inventors of the '793 patent and because some

IPR2021-00406
Patent 10,716,793 B2

inventors of the '793 patent—specifically, Olschewski, Roscigno, Rubin, Schmehl, and Sterritt—are not authors of Voswinckel 2006. Pet. 27–30. Patent Owner disagrees, pointing to the testimony of Drs. Seeger, Ghofrani, and Grimminger explaining the role that the other inventors of the '793 patent played, as well as making clear that neither Ghofrani nor Grimminger authored the portion of Voswinckel 2006 that is relevant as prior art. PO Resp. 44–46, 51–54; Ex. 2003 ¶¶ 20–21 (describing the roles of Drs. Ghofrani and Grimminger, explaining that they "did not participate in the design of any of the studies, did not select the dosing regimen, and did not conduct analysis of patient results discussed in . . . Voswinckel 2006"); 19 ("any study that formed the basis of our discussion of inhaled treprostinil in this reference was performed by me in connection with my ongoing collaboration with [the other inventors]").

For the same reasons discussed above with respect to Ghofrani, we determine that the preponderance of the evidence shows that Petitioner has not shown sufficiently that Voswinckel 2006 is "by others."

### 3. Conclusion

For the reasons discussed above, Petitioner has not shown that either Ghofrani or Voswinckel 2006 qualifies as prior art. Accordingly, Petitioner has not shown the unpatentability of any challenged claim on any ground that relies on either Ghofrani or Voswinckel 2006.

### E. Motions to Exclude Evidence

Each party filed a motion to exclude evidence. Paper 65; Paper 66. We consider each motion separately below.

41

IPR2021-00406
Patent 10,716,793 B2

### 1. *Petitioner's Motion to Exclude*

Petitioner moves to exclude Exhibits 2092, 2100, 2101, 2102, and 2103 as not authenticated and, for Ex. 2092, as incomplete. Paper 65, 1. Petitioner also moves to exclude the portions of Patent Owner's Sur-Reply that rely on these exhibits. *Id.*

We do not rely on any of the exhibits Petitioner challenges in reaching our decision in this case. Accordingly, we dismiss Petitioner's motion to exclude as moot.

### 2. *Patent Owner's Motion to Exclude*

Patent Owner moves to exclude Exhibits 1037, 1114, 1117, and 1120 as hearsay and, for Ex. 1037, as not authenticated, irrelevant, and lacking the original writing. Paper 66, 2. Patent Owner also moves to exclude Exhibits 1029, 1050, 1066, 1074, and 1078 as not authenticated. *Id.* Patent Owner moves to exclude Exhibit 1087 as lacking personal knowledge and as irrelevant. *Id.* Patent Owner also moves to exclude portions of Exhibit 1112 as not based on sufficient facts and analysis. *Id.* Further, Patent Owner moves to exclude the portions of Petitioner's Petition and Reply, as well as the portions of Exhibits 1002 and 1004, that cite these exhibits. *Id.* at 2–3.

We do not rely on any of the exhibits or portions of exhibits Patent Owner moves to exclude in reaching our decision in this case, with two exceptions: paragraphs 36 and 42 of Ex. 1002, which cite Ex. 1029, and paragraph 56 of Ex. 1004, which Patent Owner argues cites Ex. 1029, Ex. 1050, and Ex. 1066. We dismiss as moot Patent Owner's motion to exclude, except as to these paragraphs of Exhibits 1002 and 1004. We discuss the remaining portions of Patent Owner's motion to exclude below.

a. Paragraphs 36 and 42 of Exhibit 1002

Patent Owner moves to exclude paragraphs 36 and 42 of Exhibit 1002 because they rely on Exhibit 1029, which Patent Owner argues lacks authentication.  Paper 66, 2–3.

Certain items are self-authenticating under Federal Rule of Evidence ("FRE") 902, and, for items that are not self-authenticating, FRE 901 provides that "the proponent [of the evidence in question] must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  The evidence showing "that the items is what the proponent claims it is" may include "[t]estimony that an item is what it is claimed to be," or "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the  circumstances," among other things.  Fed. R. Evid. 901(b).

Here, Dr. Hill, Petitioner's declarant, testifies three times that Exhibit 1029 is the "Ventavis Label 2004."  Ex. 1002 ¶¶ 36, 41, 42.  Dr. Gonda, another declarant for Petitioner, testifies that Exhibit 1029 is the "Ventavis (iloprost) Label."  Ex. 1004 ¶ 56 n.4.  Dr. Waxman, Patent Owner's declarant, cites to Exhibit 1029 twice as support for the approved dose for, and side effects experienced by, patients taking Ventavis.  Ex. 2052 ¶ 100.  The "appearance, contents, substance, internal patterns, [and] other distinctive characteristics," Fed. R. Evid. 901(b), of Ex. 1029 confirm the testimony of Drs. Hill, Gonda, and Waxman.  The document contains sections titled "description," "clinical pharmacology," "indications and usage," "contraindications," "warnings," "precautions," "adverse reactions," "overdosage," "dosage and administration," "how supplied," "storage," and "patient information," with each section providing information related to

43

"Ventavis." Ex. 1029, 1–17. This information is consistent with a drug label for Ventavis, which is what Dr. Hill and Dr. Gonda testify, what Dr. Waxman assumes, and what Petitioner argues, Ex. 1029 is. Accordingly, we find that Petitioner has "produce[d] evidence sufficient to support a finding that [Ex. 1029] is what [Petitioner] claims it is." Fed. R. Evid. 901(a). Because Ex. 1029 does not lack authentication, we deny Patent Owner's motion to exclude paragraphs 36 and 42 of Ex. 1002, which cite to Ex. 1029.

### b. Paragraph 56 of Exhibit 1004

Patent Owner moves to exclude paragraph 56 of Exhibit 1004 because it relies on Exhibits 1029, 1050, and 1066, all of which Patent Owner argues lack authentication. Paper 66, 2–3. We discuss Exhibit 1029 above, finding that it is sufficiently authenticated. The situation with respect to Exhibits 1050 and 1066 is similar. Dr. Gonda testifies that Ex. 1050 is the "Pulmozyme® Label" and that Ex. 1066 is the "AccuNeb® Label." Ex. 1004 ¶ 56 n.4. Moreover, Dr. Gonda's testimony about what Exhibits 1050 and 1066 are is confirmed by the contents of those exhibits. Exhibit 1050 contains sections titled "description," "clinical pharmacology," "indications and usage," "contraindications," "warnings," "precautions," "adverse reactions," "overdosage," "dosage and administration," and "how supplied," with each section providing information related to "Pulmozyme." Ex. 1050, 1–2. Exhibit 1066 contains sections titled "description," "clinical pharmacology," "indications and usage," "contraindications," "warnings," "precautions," "adverse reactions," "overdosage," "dosage and administration," "how supplied," "storage," and "patient's instructions for use," with each section providing information related to "AccuNeb."

IPR2021-00406
Patent 10,716,793 B2

Ex. 1066, 1–2.  This information is consistent with drug labels for
Pulmozyme and AccuNeb, which is what Dr. Gonda testifies, and what
Petitioner argues, Exhibits 1050 and 1066 are.  Accordingly, we find that
Petitioner has "produce[d] evidence sufficient to support a finding that
[Ex. 1050 and Ex. 1066 are] what [Petitioner] claims [they are]."  Fed. R.
Evid. 901(a).  Because Exhibits 1050 and 1066 do not lack authentication,
we deny Patent Owner's motion to exclude paragraph 56 of Ex. 1004, which
cites to those exhibits.

45

IPR2021-00406
Patent 10,716,793 B2

CONCLUSION[10]

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 1–8 of the '793 patent are unpatentable.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| 1–8 | 103(a) | '212 patent, Voswinckel JESC[11] | | |
| 1 | 102(a) | Ghofrani | | 1 |
| 1, 3, 8 | 103(a) | Voswinckel JAHA, Ghofrani | | 1, 3, 8 |
| 1, 3 | 102(a) | Voswinckel 2006 | | 1, 3 |
| 2, 4–8 | 103(a) | Voswinckel 2006, '212 patent | | 2, 4–8 |
| **Overall Outcome** | | | 1–8 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

[11] This Final Written Decision does not reach these grounds because Petitioner has proven all challenged claims are unpatentable based on obviousness over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

46

**Appx0046**

IPR2021-00406
Patent 10,716,793 B2

## ORDER

It is hereby

ORDERED that, based on the preponderance of the evidence, claims 1–8 of the '793 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot;

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied as to paragraphs 36 and 42 of Exhibit 1002 and as to paragraph 56 of Exhibit 1004;

FURTHER ORDERED that Patent Owner's Motion to Exclude is dismissed as moot in all other respects; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
dcheek@cooley.com
jdavies@cooley.com

For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
Jiaxiao Zhang
Mandy Kim

IPR2021-00406
Patent 10,716,793 B2

Arthur Dykhuis
Amy Mahan
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

49

Trials@uspto.gov                                    Paper 82
Tel: 571-272-7822                        Entered: February 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

IPR2021-00406
Patent 10,716,793 B2

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges.*

KAISER, *Administrative Patent Judge.*

DECISION
Denying Patent Owner's Request on Rehearing of Final Written Decision
*37 C.F.R. § 42.71(d)*

IPR2021-00406
Patent 10,716,793 B2

## INTRODUCTION

Liquidia Technologies, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–8 of U.S. Patent No. 10,716,793 B2 (Ex. 1001, "the '793 patent"). United Therapeutics Corporation ("Patent Owner") filed a Preliminary Response. Paper 13 ("Prelim. Resp.").

On August 11, 2021, we instituted *inter partes* review of claims 1–8 of the '793 patent on all grounds set forth in the Petition. Paper 18 ("Inst. Dec."). After institution of trial, Patent Owner filed a Response (Paper 29, "PO Resp."), Petitioner filed a Reply (Paper 44), and Patent Owner filed a Sur-Reply (Paper 55). In addition, both parties filed Motions to Exclude Evidence (Papers 65 and 66), Oppositions to their respective opponents' Motions to Exclude (Papers 68 and 69), and Replies in support of their own Motions to Exclude (Papers 71 and 72). At the request of both parties, we held an oral hearing, the transcript of which was entered into the record. Paper 77 ("Tr.").

On July 19, 2022, we issued a Final Written Decision determining that Petitioner had proven by a preponderance of evidence that all the challenged claims were unpatentable. Paper 78 ("Final Dec."). On August 18, 2022, Patent Owner requested rehearing and filed a request that rehearing be conducted by the Precedential Opinion Panel. Paper 79 ("Req. Reh'g"); Paper 80. The request for rehearing by the Precedential Opinion Panel was denied, returning jurisdiction to us to consider the rehearing request itself. Paper 81.

For the reasons discussed below, we deny Patent Owner's Request for Rehearing. Where the present decision differs from the Final Written

2

IPR2021-00406
Patent 10,716,793 B2

Decision, the present decision controls. Otherwise, the Final Written Decision remains in force.

ANALYSIS

*A. The Final Written Decision*

Petitioner asserted the unpatentability of the challenged claims on six separate grounds. Final Dec. 3–4. Four of those grounds relied on references referred to as Voswinckel 2006 and Ghofrani, both of which we determined did not qualify as prior art. *Id.* at 3–4, 36–41. The remaining two grounds both relied on a reference referred to as Voswinckel JESC, and one of the grounds also relied on a reference referred to as Voswinckel JAHA. *Id.* at 3.

Patent Owner argued during the trial that Petitioner had not proven that either Voswinckel JESC or Voswinckel JAHA had been made publicly accessible early enough to qualify as prior art in the way that Petitioner argued they did. PO Resp. 11–18; Sur-Reply 2–11. Petitioner countered these arguments with several arguments for the public accessibility of Voswinckel JESC and Voswinckel JAHA. Reply 2–9. In particular, Petitioner argued that each of these references was cited in a publicly available journal article that could have served as a research aid to help a person of ordinary skill in the art locate the references. *Id.* at 3–4 (arguing that Voswinckel JESC was cited in Ghofrani), 7–8 (arguing that Voswinckel JAHA was cited in Sulica).

In the Final Written Decision, we were persuaded by Petitioner's argument regarding these research aids. Final Dec. 10–12. Based in part on our determination that these research aids established the public accessibility of Voswinckel JESC and Voswinckel JAHA, we determined that Petitioner

3

had proven by a preponderance of the evidence that each of the challenged claims would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. *Id.* at 12–35.

### B. The Rehearing Request

Patent Owner seeks rehearing of our Final Written Decision on the ground that we overlooked Patent Owner's argument that the Ghofrani and Sulica research aids had been "published *after* the critical §102(b) date of May 15, 2005." Req. Reh'g 1 (emphasis in original). Patent Owner notes that this argument appeared in the Sur-Reply. *Id.* at 5 (citing Sur-Reply 9). According to Patent Owner, had we not overlooked this argument, we would have determined that Petitioner had not shown that Voswinckel JESC and Voswinckel JAHA were publicly accessible in the way necessary to treat them as prior art to the '793 patent. *Id.* at 5–14.

When it requested rehearing, Patent Owner also requested that the rehearing be conducted by the Precedential Opinion Panel. Ex. 3003. The Precedential Opinion Panel denied that request and directed us to consider Patent Owner's rehearing request. Paper 81, 3. The Precedential Opinion Panel directed us, "in [our] consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and specified that "[s]uch analysis shall clarify whether the relied upon research aids were available prior to the critical date and whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library." *Id.*

IPR2021-00406
Patent 10,716,793 B2

### C. Standard of Review

A request for rehearing of an institution decision is reviewed under the abuse of discretion standard. 37 C.F.R. § 42.71(c). "The burden of showing a decision should be modified lies with the party challenging the decision." 37 C.F.R. § 42.71(d). "The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, reply, or a sur-reply." *Id.* An abuse of discretion may be found where a decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 442 (Fed. Cir. 2015) (quoting *Abrutyn v. Giovanniello*, 15 F.3d 1048, 1050–51 (Fed. Cir. 1994) (citation omitted)).

### D. We Overlooked Patent Owner's Argument

Patent Owner is correct that its argument that the Ghofrani and Sulica research aids were dated after May 15, 2005, appeared in the Sur-Reply. Sur-Reply 9–11. Patent Owner also is correct that we overlooked this argument in relying on these research aids as supporting that Petitioner had established that Voswinckel JESC and Voswinckel JAHA were prior art to the '793 patent. Final Dec. 11–12; Paper 81, 2 ("the Board's analysis did not consider whether the research aids themselves were available prior to the critical date").

IPR2021-00406
Patent 10,716,793 B2

### E. *Reconsideration of the Record Shows that the Research Aids Did Not Establish the Prior-Art Status of Voswinckel JESC and Voswinckel JAHA*

Petitioner argued that Voswinckel JESC and Voswinckel JAHA were "prior art to the '793 Patent under at least 35 U.S.C. § 102(b)." Pet. 22, 24. In the Final Written Decision, we determined that Petitioner had shown that these references were prior art based on the existence of research aids. Final Dec. 10–12. As noted above, that determination overlooked Patent Owner's argument that the research aids themselves were published too late for their mention of Voswinckel JESC and Voswinckel JAHA to render those references prior art under § 102(b). We now consider that argument.

To qualify as prior art under § 102(b), a reference must have been publicly accessible "more than one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b) (2006). Here, the parties agree that the application that ultimately led to the issuance of the '793 patent was filed May 15, 2006. Pet. 12; PO Resp. 5. Thus, to qualify as § 102(b) prior art, Voswinckel JESC and Voswinckel JAHA must have been publicly accessible before May 15, 2005.

Petitioner argues that Voswinckel JESC "was cited in the June 2005 Ghofrani article in the journal *Herz* . . . , an article that was publicly accessible." Reply 3 (citing Ex. 1010, 298, 301). Patent Owner argues that "Ghofrani bears a July 2005 date-stamp." Sur-Reply 9 (citing Ex. 1121, 1). Petitioner does not explain its characterization of Ghofrani as a "June 2005" article. The pages of Ghofrani cited by Petitioner do not indicate a June 2005 publication date. Ex. 1010, 298, 301. The same article appears, however, as Exhibit 1121, which bears a date of July 7, 2005. *Compare* Ex. 1010, *with* Ex. 1121. Accordingly, Patent Owner's characterization of

6

IPR2021-00406
Patent 10,716,793 B2

Ghofrani as having been published in July 2005 is better supported by the evidence of record than is Petitioner's characterization of Ghofrani as having been published in June 2005. Even if the evidence of record supported Petitioner's June 2005 publication date, that date is still later than May 15, 2005, so the citation of Voswinckel JESC in Ghofrani does not show that Voswinckel JESC was prior art under § 102(b).

Petitioner argues that Voswinckel JAHA "was cited by a March 2005 article authored by Roxana Sulica et al. in the *Expert Review of Cardiovascular Therapy*." Reply 7 (citing Ex. 1104, 359). Patent Owner argues that the Sulica article "shows only the year 2005." Sur-Reply 9 (citing Ex. 1104, 347). We agree with Patent Owner. The Sulica article bears a 2005 copyright date but otherwise does not indicate when it was published. Ex. 1104, 347. The 2005 copyright date does not support a finding that the Sulica article was published before May 15, 2005, so the citation of Voswinckel JAHA in the Sulica article does not show that Voswinckel JAHA was prior art under § 102(b).

### F. Reexamination of the Record Shows that Voswinckel JESC and Voswinckel JAHA Were Prior Art to the '793 Patent Due to Distribution at Conferences

The Precedential Opinion Panel directed us, "in [our] consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and specified that "[s]uch analysis shall clarify . . . whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library." Paper 81, 3. Accordingly, we consider below whether the evidence of record establishes the prior-art status of Voswinckel JESC and Voswinckel

7

IPR2021-00406
Patent 10,716,793 B2

JAHA due to presentation and/or inclusion in distributed materials. We answer this question in the affirmative.

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touch-stone in determining whether a reference constitutes a 'printed publication.'" *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1356 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it." *Id.* at 1355–56 (citing *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)). Under at least some circumstances, a reference may be a printed publication under § 102(b) if it was "displayed to the public," even if it "was not later indexed in any database, catalog, or library." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). There are several factors relating to whether such a display is sufficient to constitute a printed publication, including "the length of time the display was exhibited, the expertise of the target audience, the existence (or lack thereof) of reasonable expectations that the material displayed would not be copied, and the simplicity or ease with which the material displayed could have been copied." *Id.* In addition, distribution of a reference at a professional conference may, under at least some circumstances, constitute sufficient dissemination to show public accessibility. *Nobel Biocare Services AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375–80 (Fed. Cir. 2018); *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380–83 (Fed. Cir. 2018).

> 1. *Voswinckel JESC Was Sufficiently Distributed at a Conference to be Publicly Accessible as of the Conference Date*

A reference may be "[a] printed publication ' . . . if it was sufficiently disseminated at the time of its publication.'" *Medtronic*, 891 F.3d at 1381 (quoting *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1365 (Fed. Cir. 2014)). Several factors are relevant to the determination of whether distribution of a reference at a conference constitutes such sufficient dissemination. *Id.* at 1381–82. These include "the size and nature of the meetings and whether they are open to people interested in the subject matter of the material disclosed," as well as "whether there is an expectation of confidentiality between the distributor and the recipients of the materials." *Id.* at 1382. "The expertise of the target audience can [also] be a factor in determining public accessibility." *Id.* To the extent that these factors are addressed via testimonial evidence, corroboration of that evidence may be necessary. *Nobel Biocare*, 903 F.3d at 1377–78. "Corroborating evidence may include documentary or testimonial evidence," and "[c]ircumstantial evidence can be sufficient corroboration." *Id.* (citing *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1301 (Fed. Cir. 2016)).

Voswinckel JESC is an abstract contained in "Volume 25 Abstract Supplement August/September 2004" of "European Heart Journal," with a subtitle indicating that the journal is the "Journal of the European Society of Cardiology" and that the supplement relates to "ESC Congress 2004," held "28 August – 1 September" in "Munich, Germany." Ex. 1007, 1; *see also* Ex. 1089, 1. The Table of Contents organizes abstracts into categories, including "Epidemiology and treatment of pulmonary arterial hypertension," with each category associated with an entry corresponding to a day of the

9

conference, such as "Day 2—Sunday 29 August 2004." *Id.* at 2. Each of these categories points to a page or pages in the supplement, with those pages containing abstracts that report the "Background," "Methods," "Results," and "Conclusion" of studies. *Id.* at 7.

The conference with which Voswinckel JESC is associated "is the largest medical congress in Europe and among the top three cardiology meetings in the world," and "it has become an established forum for the exchange of science as much as education." Ex. 1105, 19. Attendees of the conference include "basic scientists, nurses and allied professionals working in the field of cardiovascular care of patients." *Id.* At the 2004 conference, there were "24,527 attendees," including "18,413 professionals, 4,715 exhibitors, 636 journalists and 763 accompanying persons." *Id.* Both Petitioner's declarant, Dr. Nicholas Hill, and Patent Owner's declarant, Dr. Aaron Waxman, testify that anyone who paid to attend the ESC Congress 2004 would have received a copy of the abstract book from which Voswinckel JESC is excerpted, either at the meeting itself or as a distribution before the meeting. Ex. 1106 ¶ 28; Ex. 1108, 105:16–108:1.

Thus, the evidence of record shows that Voswinckel JESC was distributed to more than twenty thousand people before or at the time of the ESC Congress 2004 in late August and early September of 2004. Those twenty thousand recipients included both highly skilled professionals, including scientists, nurses, and other clinicians, as well as journalists and those who accompanied the professionals and the journalists. That the recipients included journalists and "accompanying persons" suggests very strongly that there was no expectation that the contents of Voswinckel JESC would be kept confidential. Moreover, Drs. Hill and Waxman corroborate

10

IPR2021-00406
Patent 10,716,793 B2

one another's testimony, and their testimony is further corroborated by the contents of both Voswinckel JESC itself and Exhibit 1105. The distribution of Voswinckel JESC to over twenty thousand recipients, including thousands of experts in the field of cardiology, with no expectation of confidentiality, establishes that Voswinckel JESC was a printed publication as of the date of the conference at which that distribution occurred. Because that conference occurred in August and September 2004, more than one year before the May 15, 2006 application date of the '793 patent, Voswinckel JESC was a printed publication early enough to qualify as prior art under 35 U.S.C. § 102(b).

> 2. *Voswinckel JAHA Was Sufficiently Distributed at a Conference to be Publicly Accessible as of the Conference Date*

Like Voswinckel JESC, Voswinckel JAHA is associated with a professional conference. Ex. 1008. It is an abstract that has been extracted from a document headed "Supplement to Circulation," subtitled "Journal of the American Heart Association" and "Abstracts from Scientific Sessions 2004," indicating that those sessions occurred "November 7–10." *Id.* at 1. The abstract in question appears in a section titled "Pulmonary Arterial Hypertension: New Therapies," subtitled "Subspecialty: Integrative Biology" and indicating that the session occurred on "Wednesday" in "Hall I2" of the "Ernest N Morial Convention Center." *Id.* at 3. We take official notice that the range of dates from November 7, 2004, to November 10, 2004, includes Wednesday, November 10, 2004.

Both Dr. Hill and Dr. Waxman agree that attendance at the Scientific Sessions 2004 conference was large. Ex. 1106 ¶ 22 ("a [person of ordinary skill in the art] would have attended the Scientific Sessions 2004

11

IPR2021-00406
Patent 10,716,793 B2

Conference, as it is one of the principal conferences on the circulatory system and diseases and conditions affecting circulation"); Ex. 1108, 116:4–21 (testifying that attendance at Scientific Sessions 2004 was likely larger than the 18,000 professionals who attended ESC Congress 2004).  Dr. Hill testifies that the conference was "attended by physicians and researchers working on and studying the cardiovascular system, including pulmonary circulation." *Id.*  Both Dr. Hill and Dr. Waxman also agree that a copy of the abstract book from which Voswinckel JAHA is excerpted would have been provided to all attendees at Scientific Sessions 2004.  Ex. 1106 ¶ 23; Ex. 1108, 108:3–20.  We have not been directed to any evidence of record indicating there was any expectation of confidentiality.  The distribution of thousands of copies of Voswinckel JAHA at the conference is strong evidence that Voswinckel JAHA was a printed publication as of the date of the conference.  Because that conference occurred in November 2004, more than one year before the May 15, 2006 application date of the '793 patent, Voswinckel JAHA was a printed publication early enough to qualify as prior art under 35 U.S.C. § 102(b).

### 3.    Conclusion

As instructed by the Precedential Opinion Panel, we have considered "whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and in particular "whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference."  Paper 81, 3.  As discussed above, we find that both references were distributed sufficiently at professional conferences to be publicly accessible at the time of those conferences.  By virtue of this public accessibility, both Voswinckel

12

IPR2021-00406
Patent 10,716,793 B2

JESC and Voswinckel JAHA were printed publications early enough to qualify as prior art under 35 U.S.C. § 102(b).

### G. Asserted Obviousness over '212 Patent, Voswinckel JESC, and Voswinckel JAHA

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Pet. 30–46. As discussed above, Petitioner has shown by a preponderance of the evidence that both Voswinckel JESC or Voswinckel JAHA qualify as prior art. Accordingly, we do not disturb the obviousness analysis in the Final Written Decision, which relies on the prior-art status of Voswinckel JESC and Voswinckel JAHA. Final Dec. 12–35.

### H. Remaining Grounds

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent and Voswinckel JESC. Pet. 46–50. We do not disturb the determination in the Final Written Decision that we need not reach this ground "[b]ecause Petitioner has shown by a preponderance of the evidence that all of the challenged claims would have been obvious over the similar combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA." Final Dec. 36.

Petitioner argues that claim 1 was anticipated by Ghofrani; that claims 1, 3, and 8 would have been obvious over the combination of Voswinckel JAHA and Ghofrani; that claims 1 and 3 were anticipated by Voswinckel 2006; and that claims 2 and 4–8 would have been obvious over the combination of Voswinckel 2006 and the '212 patent. Pet. 50–64. These grounds fail for the reasons discussed in the Final Written Decision. Final Dec. 36–41.

13

CONCLUSION[1]

For the reasons discussed above, Patent Owner has shown that we overlooked its argument regarding the date of availability of the research aids that Petitioner argued showed that Voswinckel JESC and Voswinckel JAHA qualified as prior art. A proper consideration of that argument shows that the research aids do not establish the prior-art status of Voswinckel JESC and Voswinckel JAHA, but there is no change to the outcome with respect to Petitioner's asserted grounds of unpatentability, because the distribution of Voswinckel JESC and Voswinckel JAHA at professional conferences proves the prior-art status of those references. Accordingly, we deny Patent Owner's request for rehearing.

When all arguments are properly considered, Petitioner has shown by a preponderance of the evidence that claims 1–8 of the '793 patent are unpatentable.

Outcome of Decision on Rehearing:

| Claims | 35 U.S.C § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| Overall Outcome | | | 1–8 | |

[1] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2021-00406
Patent 10,716,793 B2

Final Outcome of Final Written Decision after Rehearing:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| 1–8 | 103(a) | '212 patent, Voswinckel JESC[2] | | |
| 1 | 102(a) | Ghofrani | | 1 |
| 1, 3, 8 | 103(a) | Voswinckel JAHA, Ghofrani | | 1, 3, 8 |
| 1, 3 | 102(a) | Voswinckel 2006 | | 1, 3 |
| 2, 4–8 | 103(a) | Voswinckel 2006, '212 patent | | 2, 4–8 |
| **Overall Outcome** | | | 1–8 | |

ORDER

It is hereby

ORDERED that Patent Owner's Request for Rehearing is denied;

FURTHER ORDERED that the determination in the Final Written Decision that the research aids relied on by Petitioner show the prior-art status of Voswinckel JESC and Voswinckel JAHA is overturned and replaced with the determination in the present decision that the distribution

---

[2] Neither the Final Written Decision nor this Rehearing Decision reaches this ground because Petitioner has proven all challenged claims are unpatentable based on obviousness over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

IPR2021-00406
Patent 10,716,793 B2

of Voswinckel JESC and Voswinckel JAHA at professional conferences establishes the prior-art status of those references;

FURTHER ORDERED that, based on the preponderance of the evidence, claims 1–8 of the '793 patent have been shown to be unpatentable;

FURTHER ORDERED that all other rulings in the Final Written Decision remain undisturbed; and

FURTHER ORDERED that parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

16

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
dcheek@cooley.com
jdavies@cooley.com

For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr
Jiaxiao Zhang
Mandy Kim

17

IPR2021-00406
Patent 10,716,793 B2

Arthur Dykhuis
Amy Mahan
MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

18

US010716793B2

(12) **United States Patent** (10) Patent No.: **US 10,716,793 B2**
Olschewski et al. (45) **Date of Patent:** *Jul. 21, 2020

(54) **TREPROSTINIL ADMINISTRATION BY INHALATION**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Horst Olschewski**, Graz (AT); **Robert Roscigno**, Chapel Hill, NC (US); **Lewis J. Rubin**, LaJolla, CA (US); **Thomas Schmehl**, Giessen (DE); **Werner Seeger**, Giessen (DE); **Carl Sterritt**, Weybridge (GB); **Robert Voswinckel**, Giessen (DE)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/778,662**

(22) Filed: **Jan. 31, 2020**

(65) **Prior Publication Data**

US 2020/0171044 A1 Jun. 4, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/536,954, filed on Aug. 9, 2019, which is a continuation of application No. 15/011,999, filed on Feb. 1, 2016, now Pat. No. 10,376,525, which is a division of application No. 13/469,854, filed on May 11, 2012, now Pat. No. 9,339,507, which is a division of application No. 12/591,200, filed on Nov. 12, 2009, now Pat. No. 9,358,240, which is a continuation of application No. 11/748,205, filed on May 14, 2007, now abandoned.

(60) Provisional application No. 60/800,016, filed on May 15, 2006.

(51) **Int. Cl.**
*A61K 31/557* (2006.01)
*A61K 9/00* (2006.01)
*A61K 31/192* (2006.01)

(52) **U.S. Cl.**
CPC ............ *A61K 31/557* (2013.01); *A61K 9/008* (2013.01); *A61K 9/0078* (2013.01); *A61K 31/192* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,664,337 A | 5/1972 | Lindsey et al. |
| 4,001,650 A | 1/1977 | Romain |
| 4,007,238 A | 2/1977 | Glenn |
| 4,281,113 A | 7/1981 | Axen et al. |
| 4,306,075 A | 12/1981 | Aristoff |
| 4,306,076 A | 12/1981 | Nelson |
| 4,349,689 A | 9/1982 | Aristoff |
| 4,473,296 A | 9/1984 | Shofner et al. |
| 4,486,598 A | 12/1984 | Aristoff |
| 4,495,944 A | 1/1985 | Brisson et al. |
| 4,635,647 A | 1/1987 | Choksi |
| 4,668,814 A | 5/1987 | Aristoff |
| 4,677,975 A | 7/1987 | Edgar et al. |
| 4,683,330 A | 7/1987 | Aristoff |
| 4,692,464 A | 9/1987 | Skuballa et al. |
| 4,708,963 A | 11/1987 | Skuballa et al. |
| 4,976,259 A | 12/1990 | Higson et al. |
| 4,984,158 A | 1/1991 | Hillsman |
| 5,063,922 A | 11/1991 | Hakkinen |
| 5,080,093 A | 1/1992 | Raabe et al. |
| 5,153,222 A | 10/1992 | Tadepalli et al. |
| 5,234,953 A | 8/1993 | Crow et al. |
| 5,322,057 A | 6/1994 | Raabe et al. |
| 5,361,989 A | 11/1994 | Merchat et al. |
| 5,363,842 A | 11/1994 | Mishelevich et al. |
| 5,497,763 A | 3/1996 | Lloyd et al. |
| 5,551,416 A | 9/1996 | Stimpson et al. |
| 5,727,542 A | 3/1998 | King |
| 5,865,171 A | 2/1999 | Cinquin |
| 5,881,715 A | 3/1999 | Shibasaki |
| 5,908,158 A | 6/1999 | Cheiman |
| 6,054,486 A | 4/2000 | Crow et al. |
| 6,123,068 A | 9/2000 | Lloyd et al. |
| 6,357,671 B1 | 3/2002 | Cewers |
| 6,521,212 B1 | 2/2003 | Gilles et al. |
| 6,626,843 B2 | 9/2003 | Hillsman |
| 6,756,033 B2 | 6/2004 | Cloutier et al. |
| 6,765,117 B2 | 7/2004 | Moriarty et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 1999959533 B2 | 2/2000 |
| DE | 19838711 C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.

Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren

*Assistant Examiner* — Michael J Schmitt

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

**8 Claims, 12 Drawing Sheets**

Liquidia's Exhibit 1001
Page 1

Appx1001

**US 10,716,793 B2**

Page 2

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,172,557 | B1 | 2/2007 | Parker |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,261,102 | B2 | 8/2007 | Barney et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,544,713 | B2 | 6/2009 | Phares et al. |
| 7,726,303 | B2 | 7/2010 | Tyvoll et al. |
| 9,339,507 | B2 * | 5/2016 | Olschewski ............. A61P 9/12 |
| 9,358,240 | B2 * | 6/2016 | Olschewski ............. A61P 43/00 |
| 10,376,525 | B2 * | 8/2019 | Olschewski ............. A61P 11/00 |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19934582 A1 | 1/2001 |
| FR | 2783431 A1 | 3/2000 |
| JP | 2003-522003 A | 7/2003 |
| JP | 2004-512101 A | 4/2004 |
| JP | 2005-034341 A | 2/2005 |
| WO | WO 93/00951 A1 | 1/1993 |
| WO | WO 01/58514 A1 | 8/2001 |
| WO | WO 01/85241 A1 | 11/2001 |
| WO | WO 02/34318 A2 | 5/2002 |

OTHER PUBLICATIONS

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:Suppl.S):56S-61S.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor , G. and Starko, K. (2003) Lung Deposition of

Interferon Gamma-1b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Byron, Peter R., "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al., "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf (Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Final Office Action dated Oct. 10, 2014 in U.S. Appl. No. 12/591,200.
Final Office Action dated Oct. 17, 2012 in U.S. Appl. No. 12/591,200.
Final Office Action dated Nov. 4, 2013 in U.S. Appl. No. 12/303,877.
Final Office Action dated Dec. 22, 2011 in U.S. Appl. No. 12/591,200.
Final Office Action dated Jul. 2, 2013 in U.S. Appl. No. 13/120,015.
Final Office Action dated Jul. 20, 2015 in U.S. Appl. No. 13/120,015.
Final Office Action dated Aug. 1, 2012 in U.S. Appl. No. 12/303,877.

Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), 2005, 4:296-302, with English translation.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous *Iloprost* in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

(56)          **References Cited**

OTHER PUBLICATIONS

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Hoeper et al., "Long term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue," New England Journal of Medicine, 2000, 342, 1866-1870.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320,aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.

Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.

Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21(Suppl.33):3, Abstract No. 084.

National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.

Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instrutions, Sep. 2005.

Non-Final Office Action dated Jan. 29, 2015 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Oct. 11, 2011 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Oct. 31, 2012 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Dec. 30, 2014 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 15, 2013 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 9, 2014 in U.S. Appl. No. 12/591,200.

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources.

Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Notice of Allowance dated Jun. 11, 2015 in U.S. Appl. No. 12/303,877.

Olschewski et al. For the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

OPTINEB®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 13 pages, verified English translation.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin $H_2$ Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensin Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe pulmonary hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

Liquidia's Exhibit 1001

Page 3

**US 10,716,793 B2**

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.

Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.

Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension," Journal of the American College of Cardiology, 2006, 48(8):1672-1681.

Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.

Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 2004, Abstract 1414, 110, 17 Supplement.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.

Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.

Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C2.

Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.

Wensel et al., "Effects of iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.

Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.

Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iliprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.

Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.

Zanen et al., "The optimal particle size for β-adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.

* cited by examiner

# FIGURE 1



Liquidia's Exhibit 1001
Page 5

U.S. Patent

Jul. 21, 2020

Sheet 2 of 12

US 10,716,793 B2



# FIGURE 2



Liquidia's Exhibit 1001
Page 6

FIGURE 3



Liquidia's Exhibit 1001
Page 7

Case: 23-1805    Document: 17    Page: 160    Filed: 08/04/2023

FIGURE 4



Liquidia's Exhibit 1001
Page 8

Case: 23-1805     Document: 17     Page: 161     Filed: 08/04/2023

FIGURE 5



FIGURE 6



Liquidia's Exhibit 1001
Page 10

FIGURE 7

U.S. Patent        Jul. 21, 2020        Sheet 7 of 12        US 10,716,793 B2

Case: 23-1805        Document: 17        Page: 163        Filed: 08/04/2023



Liquidia's Exhibit 1001
Page 11

Appx1011

FIGURE 8



Liquidia's Exhibit 1001
Page 12

FIGURE 9



Liquidia's Exhibit 1001
Page 13

FIGURE 10



Liquidia's Exhibit 1001
Page 14

# FIGURE 11



Liquidia's Exhibit 1001

FIGURE 12

Liquidia's Exhibit 1001
Page 16

US 10,716,793 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## TREPROSTINIL ADMINISTRATION BY INHALATION

### CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 16/536,954, filed Aug. 9, 2019, which is a Continuation of U.S. application Ser. No. 15/011,999, filed Feb. 1, 2016, which is a Divisional of U.S. application Ser. No. 13/469,854, filed May 11, 2012, Divisional of U.S. application Ser. No. 12/591,200, filed Nov. 12, 2009, which is a Continuation of U.S. application Ser. No. 11/748,205, filed May 14, 2007, which claims priority to U.S. provisional application No. 60/800,016 filed May 15, 2006, which are incorporated herein by reference in their entirety.

### FIELD OF THE INVENTION

The present application relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits.

### BACKGROUND OF THE INVENTION

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. The above described condition is referred to as pulmonary hypertension (PH). Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S. Pulmonary hypertension can be a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to alveolar hypoxia due to lung diseases or high altitude, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. In addition, certain infectious diseases, such as HIV and liver diseases with portal hypertension may cause pulmonary hypertension. Autoimmune disorders, such as collagen vascular diseases, also often lead to pulmonary vascular narrowing and contribute to a significant number of pulmonary hypertension patients. The cases of pulmonary hypertension remain where the cause of the increased resistance is as yet inexplicable are defined as idiopathic (primary) pulmonary hypertension (iPAH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension and are in the majority of cases related to a genetic mutation in the bone morphogenetic protein receptor-2 gene. The cases of idiopathic

pulmonary arterial hypertension tend to comprise a recognizable entity of about 40% of patients cared for in large specialized pulmonary hypertension centers. Approximately 65% of the most commonly afflicted are female and young adults, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short without specific treatment, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, disease progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12-15 mm Hg. Pulmonary hypertension, on the other hand, can be defined as mean PAP above 25 mmHg, assessed by right heart catheter measurement. Pulmonary arterial pressure may reach systemic pressure levels or even exceed these in severe forms of pulmonary hypertension. When the PAP markedly increases due to pulmonary venous congestion, i.e. in left heart failure or valve dysfunction, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal. Pulmonary edema, however, is not a feature of even severe pulmonary hypertension due to pulmonary vascular changes in all other entities of this disease.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, collagen vascular diseases, pulmonary hypercirculation due to left-to-right shunt, HIV infection, portal hypertension or a combination of genetic mutation and unknown causes as in idiopathic pulmonary arterial hypertension.

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241-273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12-50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also ultimately result in a potentially fatal heart condition known as "cor pulmonale," or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device, such as a metered dose inhaler.

### SUMMARY OF THE INVENTION

One embodiment is a method of delivering to a subject in need thereof a therapeutically effective amount of trepros-

Liquidia's Exhibit 1001
Page 17

US 10,716,793 B2

3

tinil, or treprostinil derivative or a pharmaceutically acceptable salt thereof comprising administering to the subject a therapeutically effective amount of the treprostinil or treprostinil derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Another embodiment is a method for treating pulmonary hypertension comprising administering to a subject in need thereof treprostinil or its derivative, or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Yet another embodiment is a kit comprising a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or treprostinil derivative, or a pharmaceutically acceptable salt thereof.

And yet another embodiment is a kit for treating pulmonary hypertension in a subject, comprising (i) an effective amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; (ii) a metered dose inhaler; (iii) instructions for use in treating pulmonary hypertension.

Administration of treprostinil using a metered dose inhaler can provide patients, such as pulmonary hypertension patients, with a high degree of autonomy.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 pulmonary and systemic changes in hemodynamics following the inhalation of placebo (open circles), 30 μg treprostinil (triangles), 45 μg treprostinil (squares) or 60 μg TREprostinil (black circles) applied by a Metered Dose Inhaler (MDI-TRE). A single short inhalation of treprostinil induced sustained reduction of PAP and PVR that outlasted the observation period of 120 minutes at doses of 45 and 60 μg MDI-TRE. Systemic arterial pressure and resistance were not significantly affected. PAP=mean pulmonary artery pressure; PVR=pulmonary vascular resistance; SAP=mean systemic arterial pressure; SVR=systemic vascular resistance. Data are given as mean value±standard error of the mean (SEM).

FIG. 2 presents hemodynamic changes induced by the inhalation of placebo (open circles), 30 μg treprostinil (triangles), 45 μg treprostinil (squares) or 60 μg treprostinil (black circles) applied by a metered dose inhaler. Treprostinil induced sustained elevation of cardiac output. Heart rate was rather unchanged as a sign for low spillover of MDI-TRE to the systemic circulation. Gas exchange was not negatively affected. CO=cardiac output; HR=heart rate; SaO2=arterial oxygen saturation; SvO2=central venous oxygen saturation. Data are given as mean value±SEM.

FIG. 3 shows areas under the curve for changes in pulmonary vascular resistance (PVR) calculated for an observation period of 120 minutes after inhalation treprostinil using a metered dose inhaler. PVR was markedly lowered by treprostinil inhalation. The increased pulmonary vasodilation over time with the two highest doses mainly relies on the more sustained effect over time. Data are shown as mean value±95% confidence intervals.

FIG. 4 demonstrates Ventilation-perfusion matching measured with the multiple inert gas elimination technique. Five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems were investigated for changes in ventilation-perfusion ratios. All patients had significant shunt flow at baseline. Shunt-flow and low V/Q areas were not significantly changed by nitric oxide (NO) inhalation or treprostinil inhalation using a metered dose inhaler (MDI-TRE). MDI-TRE applied at high treprostinil concentrations did not negatively affect ventilation-perfusion matching and gas-exchange. Data are given as mean value±95% confidence intervals.

4

FIG. 5 presents response of pulmonary vascular resistance (PVR) to inhaled treprostinil vs. iloprost—period effects. a) First inhalation with treprostinil (n=22) vs. first inhalation with iloprost (n=22); b) second inhalation with treprostinil (n=22) vs. second inhalation with iloprost (n=22). The PVR decrease with treprostinil was delayed and prolonged, compared to iloprost. Due to carryover effects from the first period, in the second period, the effects of both drugs appeared shortened. Data are shown as percent of baseline values (mean value±95% confidence interval).

FIG. 6 presents response of PVR and systemic arterial pressure (SAP) to inhalation of treprostinil vs. iloprost—dose effects. a) Inhalation of 7.5 μg iloprost (in 6 min) vs. 7.5 μg treprostinil (6 min) (n=14, in a randomized order). b) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (6 min) (n=14, in randomized order). c) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (3 min) (n=16, in randomized order). Data are shown as percent of baseline values (mean±95% confidence interval). Iloprost, filled circles; Treprostinil, open triangles.

FIG. 7 presents hemodynamic response to inhalation of treprostinil vs. iloprost. Data from n=44 patients, who inhaled both drugs in randomized order, shown as percent of baseline values (mean value±95% confidence interval). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 8 presents pharmacodynamics after treprostinil inhalation vs. placebo. Placebo or treprostinil in doses of 30 μg, 60 μg or 90 μg were inhaled (means±95% confidence intervals). Maximal decrease of PVR was comparable for all doses. The duration of pulmonary vasodilation (PVR-decrease) appeared to be dose dependent. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output; SaO2, arterial oxygen saturation; SvO2, mixed venous oxygen saturation.

FIG. 9 presents Areas Between the placebo and the treprostinil Curves (ABC). ABCs were calculated for a 3-hour period after inhalation of TRE or placebo from the relative changes of hemodynamic parameters (means±95% confidence intervals). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; SVR, systemic vascular resistance.

FIG. 10 presents hemodynamic responses to the inhalation of 15 μg treprostinil. The inhalation time by increasing treprostinil concentration. A pulse of aerosol was generated every 6 seconds. TRE aerosol was inhaled in concentrations of 100 μg/ml (18 pulses; n=6), 200 μg/ml (9 pulses; n=6), 600 μg/ml (3 pulses; n=21), 1000 μg/ml (2 pulses; n=7) and 2000 μg/ml (1 pulse; n=8). Placebo data correspond to FIG. 8. Data are shown as means±95% confidence intervals. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 11 presents areas between the placebo curve and the responses to 15 μg treprostinil applied at increasing concentrations to minimize inhalation time. Mean±SEM of relative changes of hemodynamic parameters (observation time 120 min). PAP, pulmonary arterial pressure, SAP, systemic arterial pressure, PVR, pulmonary vascular resistance, CO, cardiac output, SaO2, systemic arterial oxygen saturation, SvO2, pulmonary arterial oxygen saturation.

FIG. 12 presents pharmacokinetics of treprostinil after a single inhalation. Treprostinil plasma levels after inhalation of 30 μg, 60 μg, 90 μg or 120 μg treprostinil (6 min

Liquidia's Exhibit 1001
Page 18

inhalation period; experiments correspond to those shown in FIGS. **8** and **9**). Data with error bars represent mean values±SEM.

## DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, the term "a" or "an" used herein shall mean "one or more."

The present application incorporates herein by reference in its entirety Voswinckel R, et al. J. Am. Coll. Cardiol. 2006; 48:1672-1681.

The inventors discovered that a therapeutically effective dose of treprostinil can be administered in a few single inhalations using a compact inhalation device, such as a metered dose inhaler. Furthermore, the inventors discovered that such administering does not cause significant side effects, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Accordingly, one embodiment of the invention is a method of delivering to a subject in need thereof, such as a human being, a therapeutically effective amount of treprostinil comprising administering to the subject a formulation comprising a therapeutically effective amount of treprostinil, its derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler. Treprostinil can be administered via a metered dose inhaler to a subject affected with a condition or disease, which can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

Another embodiment of the invention is a method for treating pulmonary hypertension, comprising administering to a subject in need thereof, such as a human being, treprostinil or its derivative, or a pharmaceutically acceptable salt using a metered dose inhaler.

Treprostinil, or 9-deoxy-2',9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1'3'-interphenylene)-13,14-dihydro-prostaglandin F1, is a prostacyclin analogue, first described in U.S. Pat. No. 4,306,075. U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. US patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. US patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. provisional application No. 60/900, 320 filed Feb. 9, 2007, discloses treprostinil treatment of pulmonary fibrosis.

The term "acid derivative" is used herein to describe C1-4 alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C1-4 alkyl groups.

The present invention also encompasses methods of using Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof. In one embodiment, a method uses Treprostinil sodium, currently marketed under the trade name of REMODULIN®. The FDA has approved Treprostinil sodium for the treatment of pulmonary arterial hypertension by injection of dose concentrations of 1.0 mg/mL, 2.5 mg/mL, 5.0 mg/mL and 10.0 mg/mL. The chemical structure formula for Treprostinil sodium is:



Treprostinil sodium is sometimes designated by the chemical names: (a) [(1R,2R,3aS,9aS)-2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid; or (b) 9-deoxy-2',9-α-methano-3-oxa-4,5,6-trinor-3,7-(1',3'-interphenylene)-13,14-dihydroprostaglandin $F_1$. Treprostinil sodium is also known as: UT-15; LRX-15; 15AU81; UNIPROST™; BW A15AU; and U-62,840. The molecular weight of Treprostinil sodium is 390.52, and its empirical formula is $C_{23}H_{34}O_5$.

In certain embodiments, treprostinil can be administered in combination with one or more additional active agents. In some embodiments, such one or more additional active agents can be also administered together with treprostinil using a metered dose inhaler. Yet in some embodiments, such one or more additional active agents can be administered separately from treprostinil. Particular additional active agents that can be administered in combination with treprostinil may depend on a particular disease or condition for treatment or prevention of which treprostinil is administered. In some cases, the additional active agent can be a cardiovascular agent such as a calcium channel blocker, a phosphodiesterase inhibitor, an endothelial antagonist, or an antiplatelet agent.

The present invention extends to methods of using physiologically acceptable salts of Treprostinil, as well as non-physiologically acceptable salts of Treprostinil that may be used in the preparation of the pharmacologically active compounds of the invention.

The term "pharmaceutically acceptable salt" refers to a salt of Treprostinil with an inorganic base, organic base, inorganic acid, organic acid, or basic or acidic amino acid. Salts of inorganic bases can be, for example, salts of alkali metals such as sodium or potassium; alkaline earth metals such as calcium and magnesium or aluminum; and ammonia. Salts of organic bases can be, for example, salts trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, and triethanolamine. Salts of inorganic acids can be, for example, salts of hydrochloric acid, hydroboric acid, nitric acid, sulfuric acid, and phosphoric acid. Salts of organic acids can be, for example, salts of formic acid, acetic acid, trifluoroacetic acid, fumaric acid, oxalic acid, lactic acid, tartaric acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, and p-toluenesulfonic acid. Salts of basic amino acids can be, for example, salts of arginine, lysine and ornithine. Salts of acidic amino acids can include, for example, salts of aspartic acid and glutamic acid. Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sul-

Liquidia's Exhibit 1001
Page 19

<table>
<tr><td>7</td><td>8</td></tr>
</table>

phates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Preferred pharmaceutically acceptable salts are disclosed, for example, in US patent application publication No. 20050085540.

Treprostinil can be administered by inhalation, which in the present context refers to the delivery of the active ingredient or a combination of active ingredients through a respiratory passage, wherein the subject in need of the active ingredient(s) through the subject's airways, such as the subject's nose or mouth.

A metered dose inhaler in the present context means a device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs. One example of the inhalation device can be a pressurized metered dose inhaler, a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions.

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.

The metered dose inhaler can be a soft mist inhaler (SMI), in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles. The aerosol generation can be achieved in SMI, for example, by mechanical, electromechanical or thermomechanical process. Examples of soft mist inhalers include the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated). For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34. The aerosol for SMI can be generated from a solution of the respiratory drug further containing pharmaceutically acceptable excipients. In the present case, the respiratory drug is treprostinil, its derivative or a pharmaceutically acceptable salt thereof, which can be formulated in SMI as a solution. The solution can be, for example, a solution of treprostinil in water, ethanol or a mixture thereof. Preferably, the diameter of the treprostinil-containing aerosol particles is less than about 10 microns, or less than about 5 microns, or less than about 4 microns.

Treprostinil concentration in an aerosolable formulation, such as a solution, used in a metered dose inhaler can range from about 500 µg/ml to about 2500 µg/ml, or from about 800 µg/ml to about 2200 µg/ml, or from about 1000 µg/ml to about 2000 µg/ml.

The dose of treprostinil that can be administered using a metered dose inhaler in a single event can be from about 15 µg to about 100 µg or from about 15 µg to about 90 µg or from about 30 µg to about 90 µg or from about 30 µg to about 60 µg.

Administering of treprostinil in a single event can be carried out in a limited number of breaths by a patient. For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less. Preferably, treprostinil is administered in 3, 2 or 1 breaths.

The total time of a single administering event can be less than 5 minutes, or less than 1 minute, or less than 30 seconds.

Treprostinil can be administered a single time per day or several times per day.

In some embodiments, the method of treatment of pulmonary hypertension can further comprise administering at least one supplementary agent selected from the group consisting of sildenafil, tadalafil, calcium channel blockers (diltiazem, amlodipine, nifedipine), bosentan, sitaxsentan, ambrisentan, and pharmaceutically acceptable salts thereof. In some embodiments, the supplementary agents can be included in the treprostinil formulation and, thus, can be administered simultaneously with treprostinil using a metered dose inhaler. In some embodiments, the supplementary agents can be administered separately from treprostinil. In some embodiments, the application of intravenous prostacyclin (flolan), intravenous iloprost or intravenous or subcutaneous treprostinil can be administered in addition to treprostinil administered via inhalation using a metered dose inhaler.

The present invention also provides a kit that includes a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with a disease or condition that can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

In some cases, the kit is a kit for treating pulmonary hypertension, that includes (i) a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

As used herein, the phrase "instructions for use" shall mean any FDA-mandated labeling, instructions, or package inserts that relate to the administration of Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof, for treatment of pulmonary hypertension by inhalation. For example, instructions for use may include, but are not limited to, indications for pulmonary hypertension, identification of specific symptoms associated with pulmonary hypertension, that can be ameliorated by Treprostinil, recommended dosage amounts for subjects suffering from pulmonary hypertension and instructions on coordination of individual's breathing and actuation of the metered dose inhaler.

The present invention can be illustrated in more detail by the following example, however, it should be understood that the present invention is not limited thereto.

Example 1

Open Label Study Upon Acute Safety, Tolerability and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds

A study was conducted of acute vasodilator challenge during right heart catheter investigation to determine the safety, tolerability and pulmonary vasodilatory potency of inhaled treprostinil applied in seconds by a soft mist inhaler (SMI-TRE). The study produced evidence for a long lasting

US 10,716,793 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

favourable effect of SMI-TRE on pulmonary hemodynamics in absence of systemic side effects and gas exchange disruptions.

Summary:

Inhaled nitric oxide (20 ppm; n=45) and inhaled treprostinil sodium (TRE; n=41) or placebo (n=4) were applied once during right heart catheter investigation. TRE was delivered in 2 breaths (1000 µg/ml aerosol concentration; 30 µg dose; n=12), 3 breaths (1000 µg/ml; 45 µg; n=9) or 2 breaths (2000 µg/ml; 60 µg; n=20) from a Respimat® SMI. Pulmonary hemodynamics and blood gases were measured at defined time points, observation time following TRE application was 120 minutes. TRE doses of 30 µg, 45 µg and 60 µg reduced pulmonary vascular resistance (PVR) to 84.4±8.7%, 71.4±17.5% and 77.5±7.2% of baseline values, respectively (mean±95% confidence interval). The 120 minute area under the curve for PVR for placebo, 30 µg, 45 µg and 60 µg TRE was 1230±1310, −870±940, −2450±2070 and −2000±900 min %, respectively. Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes. Reduction of systemic vascular resistance and pressure was negligible, showing a high pulmonary selectivity for SMI-TRE. Intrapulmonary selectivity was also provided by SMI-TRE as ventilation/perfusion matching, assessed by the multiple inert gas elimination technique in 5 patients with gas exchange problems, was not significantly different after SMI-TRE compared to inhaled nitric oxide or no treatment. No significant side effects were observed.

Conclusions: The acute application of inhaled treprostinil with a metered dose inhaler in 2-3 breaths was safe, well tolerated and induced a strong and sustained pulmonary selective vasodilation.

Methods and Patients

A total number of 45 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics were: female to male ratio (f/m)=29/16, age 59±2.3 years, pulmonary artery pressure (PAP) 45±1.8 mmHg, pulmonary vascular resistance (PVR) 743±52 dynes·s·cm⁻⁵, pulmonary artery wedge pressure (PAWP) 8.6±0.5 mmHg, central venous pressure (CVP) 6.4±0.7 mmHg, cardiac output (CO) 4.5±0.2 l/min, central venous oxygen saturation (SvO2) 62.3±1.2 mmHg (mean±Standard Error of the Mean). Disease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4). Table 1 presents the patient characteristics of the different groups.

TABLE 1

Patient characteristics of the different treatment groups.
Data are given as mean ± Standard Error of the Mean (SEM).

| | Placebo (n = 4) | 30 µg TRE (n = 12) | 45 µg TRE (n = 9) | 60 µg TRE (n = 20) |
|---|---|---|---|---|
| Age [years] | 61 ± 8 | 53.9 ± 3.9 | 54.2 ± 5.7 | 65.5 ± 3.1 |
| PAP [mmHg] | 49.5 ± 10.1 | 45 ± 3.1 | 54.3 ± 2.8 | 39.7 ± 2.0 |
| PVR [Dynes] | 896 ± 163 | 597 ± 53.9 | 1049 ± 107 | 663 ± 81 |
| CO [l/min] | 4.46 ± 0.9 | 5.2 ± 0.4 | 3.9 ± 0.4 | 4.4 ± 0.3 |
| SAP [mmHg] | 98 ± 8.1 | 90.1 ± 3.2 | 82.8 ± 3.9 | 86.1 ± 2.0 |
| SaO2 [%] | 85.3 ± 4.5 | 90.0 ± 1.1 | 89.6 ± 1.1 | 90.6 ± 0.5 |
| SvO2 [%] | 57.5 ± 3.9 | 66.0 ± 1.6 | 59.1 ± 3.4 | 62.5 ± 1.6 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

Baseline values were determined 20-30 minutes after placement of the catheter. Heart rate, pulmonary and systemic blood pressure and cardiac output were measured and blood gases were taken during each pharmacological intervention at defined time points. Pharmacological interventions included the inhalation of 20 ppm nitric oxide (NO) after evaluation of baseline parameters (n=45) and the consecutive inhalation of placebo (n=4), 30 µg SMI-TRE (n=12), 45 µg SMI-TRE (n=9) or 60 µg (n=20) SMI-TRE. Placebo and treprostinil was applied with the Respimat® SMI. For filling of this device with treprostinil solution, the placebo solution was withdrawn from the device with a syringe and treprostinil solution was injected into the device under sterile conditions. Aerosol quality was controlled before and after refilling of the SMI devices by laser diffractometry, see e.g. Gessler T., Schmehl T., Hoeper M. M., Rose F., Ghofrani H. A., Olschewski H. et al. Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension. Eur. Respir. J. 2001; 17:14-19 incorporated herein in its entirety. The aerosol sizes before (placebo) and after filling (treprostinil) were unchanged. The aerosol particles mass median aerodynamic diameter of treprostinil-aerosol was 4-5 µm, which can be at the upper limit for alveolar deposition. The aerosol volume delivered by one cycle from the SMI was 15 µl. The solution used for aerosol generation was prepared from treprostinil sodium salt using a standard protocol. The SMI was either filled with a concentration of 1000 µg/ml treprostinil sodium (one aerosol puff=15 µg TRE) or with 2000 µg/ml (one puff=30 µg TRE). The different doses were applied as 2 puffs 1000 µg/ml (30 µg), 3 puffs 1000 µg/ml (45 µg) and 2 puffs 2000 µg/ml (60 µg). The placebo was inhaled as 2 puffs from a placebo-SMI. Hemodynamics and gas-exchange parameters were recorded for 120 minutes after TRE inhalation. This study used the Respimat® device, because the implemented "soft mist" technology was well suited for the deposition of such highly active drugs like prostanoids.

The impact of SMI-TRE on ventilation-perfusion matching was assessed in five patients (30 µg TRE, n=2; 45 µg TRE, n=1; 60 µg TRE, n=2) with pre-existing gas exchange problems by use of the multiple inert gas elimination technique (MIGET), see e.g. Wagner P D, Saltzman H A, West J B. Measurement of continuous distributions of ventilation-perfusion ratios: theory. J Appl Physiol. 1974; 36:588-99; Ghofrani H A, Wiedemann R, Rose F, Schermuly R T, Olschewski H, Weissmann N et al. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. Lancet. 2002; 360:895-900, both incorporated herein in their entirety.

Statistics:

Mean values, standard deviation, standard error of mean and 95% confidence intervals were calculated. Statistical analysis was done by use of a paired t-test.

Results:

The inhalation of treprostinil sodium from the metered dose inhaler (SMI-TRE) was well tolerated, only mild and transient cough for a maximum of one minute was reported. No systemic side effects like headache, flush, nausea or dizziness were observed.

Two to three breaths of SMI-TRE induced a strong pulmonary vasodilation that outlasted the observation time of 120 minutes (45 and 60 µg). The lower dose of 30 µg TRE induced a somewhat shorter effect on pulmonary vascular resistance; however, the maximal pulmonary vasodilation was comparable. In contrast, placebo inhalation did not induce pulmonary vasodilation. In fact a slight increase in PVR over the time of the right heart catheter investigation could be recorded following placebo inhalation (FIG. 1). The effect of SMI-TRE on systemic vascular resistance and

Liquidia's Exhibit 1001
Page 21

| 11 | 12 |

pressure was very small and not clinically significant. Cardiac output was significantly increased over the whole observation period, whereas heart rate was rather unchanged. Gas exchange was not influenced by SMI-TRE (FIG. **2**). The maximal changes in hemodynamic and gas-exchange parameters compared to baseline values are depicted in Table 2.

TABLE 2

Extremes of the relative changes of hemodynamic and gas exchange parameters compared to baseline after inhalation of Placebo (n = 4), 30 μg treprostinil (n = 12), 45 μg treprostinil (n = 9) and 60 μg treprostinil (n = 20). Highest (max) and lowest (min) values during the observation period are shown. Data are given as percent of baseline values (mean ± SEM).

|  | Placebo | 30 μg TRE | 45 μg TRE | 60 μg TRE |
|---|---|---|---|---|
| PAP (min) | 99.4 ± 3.0 | 83.4 ± 3.2 | 77.6 ± 6.8 | 79.5 ± 2.4 |
| PVR (min) | 101.4 ± 1.9 | 84.4 ± 4.4 | 71.4 ± 8.9 | 77.5 ± 3.7 |
| CO (max) | 99.7 ± 1.1 | 108.8 ± 3.8 | 108.6 ± 5.6 | 103.8 ± 2.0 |
| SVR (min) | 104.3 ± 4.3 | 97.7 ± 4.2 | 92 ± 3.9 | 91.3 ± 2.1 |
| SAP (min) | 102.7 ± 1.7 | 97.3 ± 1.9 | 96.1 ± 1.5 | 93.6 ± 2.9 |
| HR (max) | 105 ± 2.1 | 106.1 ± 2.9 | 99.1 ± 2.4 | 101.1 ± 0.9 |
| SaO2 (min) | 98.2 ± 0.4 | 101 ± 0.3 | 94.4 ± 1.8 | 95.8 ± 0.9 |
| SvO2 (max) | 104.5 ± 1.4 | 102.4 ± 1.3 | 104.5 ± 4.4 | 102 ± 1.0 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; SVR = systemic vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; HR = heart rate; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

The areas under the curve for PVR were calculated for placebo and the different SMI-TRE doses over the 120 minute observation period (FIG. **3**). A dose effect of SMI-TRE with a trend to a more sustained effect with the two highest doses could be observed.

The inhalation of a highly concentrated aerosol can be in theory prone to disturbances of gas exchange because the deposition of even small amounts of aerosol may deliver high doses locally and thereby antagonize the hypoxic pulmonary vasoconstriction in poorly ventilated areas. This would then lead to increased shunt flow or increase of low ventilation/perfusion (V/Q) areas. This question was addressed in five patients with the multiple inert gas elimination technique (MIGET), the gold-standard for intrapulmonary V/Q ratio determination. The MIGET patients were selected for pre-existing gas exchange limitations. Characteristics of these patients were: PAP 54.6±3.2 mmHg, PVR 892±88 dynes, SaO2 91.7±0.5%, SvO2 65.2±1.8%. Etiologies were iPAH (n=1), CTEPH (n=3), pulmonary fibrosis (n=1). The maximal relative reduction of SaO2 after inhalation of SMI-TRE in these patients was −3.8±1.5% compared to baseline values. Shunt flow at baseline, NO-inhalation and 60 minutes after SMI-TRE was 6.4±4.3%, 5.4±3.0% and 8.3±3.4%, respectively (mean±95% confidence interval; FIG. **4**).

No significant increase in low V/Q areas or shunt fraction after inhalation of SMI-TRE was observed, in fact the distribution of perfusion was not different to that at baseline and during nitric oxide inhalation. This proves an excellent intrapulmonary selectivity of SMI-TRE, which is also reflected by unchanged arterial oxygen saturation.
Conclusion:

Treprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution. Treprostinil can be applied by a metered dose inhaler, such as Respimat® soft mist inhaler.

Example 2

Investigation of the Effects of Inhaled Treprostinil on Pulmonary Hemodynamics and Gas Exchange in Severe Pulmonary Hypertension

This study investigated the effects of inhaled treprostinil on pulmonary vascular resistance in severe pulmonary hypertension and addressed systemic effects and gas exchange as well as tolerability and efficacy of high doses of treprostinil given in short time. A total of 123 patients with a mean pulmonary artery pressure of about 50 mmHg were investigated in three separate randomized studies. Inhaled treprostinil exerted potent sustained pulmonary vasodilation with excellent tolerability and could be safely applied in a few breaths or even one breath.

Summary:

Three different studies were conducted on a total of 123 patients by means of right heart catheterization: i) a randomized crossover-design study (44 patients), ii) a dose escalation study (31 patients) and iii) a study of reduction of inhalation time while keeping the dose fixed (48 patients). The primary endpoint was the change in pulmonary vascular resistance (PVR).

The mean pulmonary artery pressure of the enrolled patients was about 50 mmHg. Hemodynamics and patient characteristics were similar in all studies. In study i) TRE and Iloprost (ILO), at an inhaled dose of 7.5 μg, displayed comparable PVR decrease, with a significantly different time course (p<0.001), TRE exhibiting a more sustained effect on PVR (p<0.0001) and less systemic side effects. In study ii) placebo, 30 μg, 60 μg, 90 μg or 120 μg TRE were applied with drug effects being observed for 3 hours after inhalation. A near-maximal acute PVR decrease was observed at 30 μg TRE. In study iii) TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered dose inhaler. 15 μg TRE was inhaled with 18 pulses (TRE concentration 100 μg/ml), 9 pulses (200 μg/ml), 3 pulses (600 μg/ml), 2 pulses (1000 μg/ml) or 1 pulse (2000 μg/ml), each mode achieving comparable, sustained pulmonary vasodilation.

Inhaled treprostinil exerts sustained pulmonary vasodilation with excellent tolerability at doses, which may be inhaled in a few or even one breath. Inhaled treprostinil is advantageous to inhaled iloprost in terms of duration of effect and systemic side effects. Inhaled treprostinil is well tolerated in concentrations up to 2000 mg/ml (bringing down inhalation time to a single breath) and in high doses (up to 90 μg).
Methods:

All inhalations were performed with the OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany).

Study i) was a randomized, open-label, single-blind crossover study. The primary objective was to compare the acute hemodynamic effects and the systemic side effects of inhaled treprostinil with inhaled iloprost at comparable doses. A total number of 44 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics and hemodynamic as well as gas exchange parameters are outlined in Table 3.

Liquidia's Exhibit 1001
Page 22

**13**                                                                 **14**

TABLE 3

Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids.

| | N | Age | Gender f/m | Etiology i/o/t/f | PAP [mmHg] | PVR [dyn * s * cm⁻⁵] | SAP [mmHg] | CVP [mmHg] | PAWP [mmHg] | CO [l/min] | SaO2 [%] | SvO2 [%] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a | 14 | 55.1 ± 4.8 | 11/3 | 4/4/2/4 | 53.8 ± 3.1 | 911 ± 102 | 95.4 ± 3.6 | 7.4 ± 1 | 8.0 ± 0.8 | 4.3 ± 0.4 | 93.8 ± 2 | 63.9 ± 2.4 |
| 1b | 14 | 54.1 ± 3.3 | 10/4 | 1/6/5/2 | 47.4 ± 3.8 | 716 ± 80 | 90.6 ± 3.3 | 5.9 ± 1.4 | 6.4 ± 0.7 | 4.7 ± 0.4 | 92 ± 1 | 64.4 ± 2.3 |
| 1c | 16 | 56 ± 2.9 | 7/9 | 6/3/6/1 | 47.5 ± 4.5 | 777 ± 102 | 92 ± 4.5 | 8.3 ± 1.4 | 8.6 ± 1.4 | 4.4 ± 0.5 | 91.4 ± 0.9 | 59.8 ± 2.6 |
| 2a | 8 | 60.8 ± 4 | 4/4 | 2/2/3/1 | 51.9 ± 4.9 | 849 ± 152 | 95.9 ± 4.8 | 7.6 ± 1.4 | 11.1 ± 1.7 | 4.4 ± 0.6 | 89.6 ± 2.8 | 60.1 ± 2.8 |
| 2b | 8 | 52.8 ± 6.6 | 6/2 | 1/3/3/1 | 49 ± 4 | 902 ± 189 | 92.4 ± 2.4 | 4.8 ± 1.1 | 7.2 ± 1.3 | 4.0 ± 0.4 | 92.4 ± 2.4 | 62.5 ± 1.7 |
| 2c | 6 | 56.8 ± 5.9 | 4/2 | 0/2/2/2 | 44.2 ± 3.5 | 856 ± 123 | 96.3 ± 3.9 | 5 ± 1.1 | 6 ± 1 | 3.8 ± 0.3 | 92.8 ± 1.5 | 63.6 ± 1.8 |
| 2d | 6 | 51.2 ± 3.8 | 4/2 | 2/2/2/0 | 55.5 ± 4.9 | 940 ± 110 | 91.2 ± 8.1 | 11.2 ± 1.2 | 10 ± 0.7 | 3.9 ± 0.4 | 92 ± 1.9 | 62 ± 5.8 |
| 2e | 3 | 57.3 ± 9.1 | 1/2 | 0/1/0/2 | 45.3 ± 5.2 | 769 ± 267 | 99 ± 3.2 | 5 ± 2.1 | 9 ± 0.6 | 4.5 ± 0.6 | 94.2 ± 1.3 | 66.3 ± 1.5 |
| 3a | 6 | 52.7 ± 6.6 | 4/2 | 2/4/0/0 | 53.8 ± 6.7 | 928 ± 145 | 92.7 ± 7.9 | 8.7 ± 2.7 | 8.8 ± 1.3 | 4.2 ± 0.6 | 90.4 ± 2.8 | 64.8 ± 4.3 |
| 3b | 6 | 58.3 ± 3.5 | 4/2 | 3/1/1/1 | 54.2 ± 6.1 | 808 ± 156 | 94.3 ± 2.8 | 7 ± 1.4 | 10 ± 1.3 | 5 ± 0.7 | 91.9 ± 0.7 | 63.5 ± 2.9 |
| 3c | 21 | 57.4 ± 5.6 | 8/3 | 7/7/6/1 | 46.1 ± 2.5 | 900 ± 99 | 88 ± 2.8 | 9 ± 1.4 | 9.2 ± 0.5 | 3.7 ± 0.3 | 91.7 ± 0.5 | 59.7 ± 2 |
| 3d | 7 | 55.6 ± 5.8 | 3/4 | 0/4/3/0 | 53.1 ± 7.1 | 732 ± 123 | 91.4 ± 5.6 | 7.9 ± 3.1 | 8.6 ± 1.3 | 5 ± 0.4 | 90.7 ± 1.4 | 61.3 ± 3.7 |
| 3e | 8 | 59 ± 5.2 | 7/1 | 0/4/4/0 | 45.1 ± 3.9 | 733 ± 114 | 92.8 ± 6.8 | 4.6 ± 0.8 | 8.1 ± 1.1 | 4.3 ± 0.2 | 90.7 ± 0.8 | 66.3 ± 2.8 |

Group 1 corresponds to study i); randomized crossover study comparing inhaled iloprost (ILO) and inhaled treprostinil (TRE).

a = 7.5 µg ILO vs. 7.5 µg TRE,

b = 7.5 µg ILO vs. 15 µg TRE (6 min inhalation time),

c = 7.5 µg ILO vs. 15 µg TRE (3 min inhalation time).

Group 2 corresponds to study ii); evaluation of maximal tolerated dose of TRE.

a = placebo inhalation,

b = 30 µg TRE,

c = 60 µg TRE,

d = 90 µg TRE,

e = 120 µg TRE.

Group 3 corresponds to study iii); reduction of inhalation time by increase of TRE concentration, aiming at a total inhaled dose of 15 µg.

a = 18 pulses of 100 µg/ml TRE,

b = 9 pulses of 200 µg/ml TRE,

c = 3 pulses of 600 µg/ml TRE,

d = 2 pulses of 1000 µg/ml TRE,

e = 1 pulse 2000 µg/ml TRE.

Etiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f).

Each patient inhaled both iloprost and treprostinil on the same day during right heart catheter investigation; the drugs were administered consecutively with a one hour interval between the drug applications. One half of the study patients initially inhaled treprostinil and then inhaled iloprost (n=22), while the other half initially inhaled iloprost and then inhaled treprostinil (n=22). Patients were randomized to one of the two groups and blinded as to the study drugs. Drug effects were monitored for 60 minutes after each inhalation. Iloprost was inhaled at 4 µg/ml (6 min inhalation time; n=44) and treprostinil was inhaled at a concentration of 4 µg/ml (6 min inhalation; n=14), 8 µg/ml (6 min inhalation; n=14) or 16 µg/ml (3 min inhalation; n=16). Based on previous biophysical characterization of the ultrasonic device with iloprost- and treprostinil-solution, this corresponds to a total inhaled dose of 7.5 µg treprostinil and iloprost (4 µg/ml) and 15 µg treprostinil (8 µg/ml and 16 µg/ml), respectively.

Study ii) was a randomized, open-label, single blind, placebo controlled study. The primary objectives were to describe the pharmacodynamic and pharmacokinetic effects of inhaled treprostinil at a well tolerated dose (30 µg) and to explore the highest tolerated single dose. A total number of 31 patients inhaled either placebo or treprostinil; each patient received one inhalation. The first 16 patients were randomized to 30 µg TRE (16 µg/ml, n=8) or placebo (stock solution in a concentration corresponding to TRE 16 µg/ml). Subsequent patients received 60 µg TRE (32 µg/ml; n=6), 90 µg TRE (48 µg/ml; n=6) and 120 µg TRE (64 µg/ml; n=3). Inhalation time was 6 minutes in all groups. Hemodynamics and gas-exchange as well as arterial treprostinil concentrations were recorded for 180 minutes.

Study iii) was a randomized, open-label, single blind study. The primary objective was to explore the shortest possible inhalation time for a 15 µg dose of inhaled treprostinil. A total of 48 patients inhaled one dose of TRE during right heart catheter investigation. The drug was applied in 18, 9, 3, 2 or 1 breaths. The aerosol was generated by a pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Elsenfeld, Germany) in cycles consisting of 2 seconds aerosol production (pulse) and 4 seconds pause. The device included an opto-acoustical trigger for the patient to synchronize the inspiration to the end of the aerosol pulse, thereby providing exact dosage. The TRE dose of 15 µg was either generated during 18 cycles (OPTINEB® filled with 100 µg/ml TRE, n=6), 9 cycles (200 µg/ml TRE, n=6), 3 cycles (600 µg/ml TRE, n=21), 2 cycles (1000 µg/ml TRE, n=7) or 1 cycle (2000 µg/ml TRE, n=8). Hemodynamics and gas exchange were recorded for 120-180 minutes.

Treprostinil plasma concentrations were assessed in study ii) at 10, 15, 30, 60 and 120 minutes after inhalation. Treprostinil quantification was done by Alta Analytical Laboratory (El Dorado Hills, Calif., USA) with a validated liquid chromatography atmospheric-pressure ionization tandem mass spectrometry as previously described Wade M., et al. J. Clin. Pharmacol. 2004; 44:503-9. Mixed venous blood was drawn at the depicted time points (FIG. **11**) after inhalation, centrifuged and the plasma frozen at −80° C. until temperature controlled shipping on dry ice.

Statistics:

For statistical analysis of study i) the repeated PVR measurements after inhaled iloprost and treprostinil were subjected to a three-factorial analysis of variance (ANOVA; factors: time (A), drug (B), treprostinil concentration (C)) to avoid multiple testing. The time to maximum PVR decrease after inhalation of iloprost versus treprostinil was compared by paired t-test. Area under the curve (AUC) was calculated from start of inhalation until 60 min after inhalation. Means, standard error of the mean (SEM) and 95% confidence

| 15 | 16 |

intervals were calculated. For study ii) and iii) areas between curves (ABC) were calculated between placebo inhalation (study ii) and the respective treprostinil inhalation until 180 min (study ii)) and 120 min (study iii)) after end of inhalation.

Results:

The inhalation of iloprost as well as treprostinil in study i) resulted in a rapid decrease in PVR and PAP (FIG. **5-7**). No significant differences were observed for the areas under the curve (AUC) of PVR decrease after inhalation of 7.5 µg TRE in 6 minutes (AUC −12.6±7.0%), 15 µg TRE in 6 minutes (AUC −13.3±3.2%) and 15 µg TRE in 3 minutes (AUC −13.6±4.3%). The AUC for PVR after the inhalation of 7.5 µg iloprost in 6 minutes was −7.7±3.7% (mean±95% confidence interval). An overview of the pooled data of treprostinil inhalation as compared to iloprost inhalation is given in FIG. **7**. The maximum effect of iloprost and treprostinil on PVR was comparable but this effect was reached significantly later after treprostinil inhalation (18±2 min) compared to iloprost (8±1 min; mean±SEM, p<0.0001) and lasted considerably longer (after 60 min, PVR values in the treprostinil group had not yet returned to baseline). The increase in cardiac output was less acute but prolonged after treprostinil inhalation. Systemic arterial pressure (SAP) was unaffected by treprostinil inhalation, whereas a transient decrease was observed after iloprost inhalation. Iloprost and treprostinil did not affect gas exchange. Three-factorial ANOVA for PVR demonstrated a significant difference between repeated measurements after inhalation ($p_{(A)}$<0.0001), no significant difference between drugs ($p_B$=0.1), no difference between treprostinil concentrations ($p_{(C)}$=0.74) and a significant drug×time interaction ($p_{(A×B)}$<0.0001). This translates into a significant effect of both drugs on PVR with comparable drug potency but a prolonged drug effect of treprostinil compared to iloprost.

In this study the occasionally observed mild side effects of iloprost inhalation at the given dose (transient flush, headache) were not observed with inhaled treprostinil. Bad taste was reported by most of the patients after inhalation of TRE. This was later found to be attributable to the metacresol preservative contained in the treprostinil solution.

In study ii) pharmacodynamics of inhaled placebo or treprostinil were observed for 180 minutes. Placebo inhalation was followed by a gradual increase in PVR over the entire observation time. Due to reduced patient numbers in the 120 µg TRE group (because of side effects, see below), the hemodynamic results for this dose are not included in the graphs of this study (FIG. **8-9**). All TRE doses lead to comparable maximal decreases of PVR to 76.5±4.7% (30 µg), 73.7±5.8% (60 µg), 73.3±4.3% (90 µg) and 65.4±4.1% (120 µg) of baseline values. An extended duration of pulmonary vasodilation was noted, surpassing the 3 hour observation period for the 60 µg and 90 µg (and 120 µg) TRE doses, whereas in the 30 µg dose group the hemodynamic changes had just returned to baseline within this period. Even at the highest doses, TRE had only minor effects on systemic arterial pressure (FIG. **8**). Cardiac output was increased to a maximum of 106.8±3.2% (30 µg), 122.9±4.3% (60 µg), 114.3±4.8% (90 µg) and 111.3±3.9% (120 µg TRE). The areas between the response curves after placebo versus TRE inhalation were calculated for PVR, PAP, SVR and SAP (FIG. **9**). Areas between the curves for PVR were not significantly different for 30 µg, 60 µg and 90 µg TRE, a nearly maximal effect on PVR was already observed with 30 µg TRE. Effects on PAP and SAP were small and did not show a dose-response relationship. Gas exchange was not affected at doses up to 90 µg TRE, but

arterial oxygen saturation was significantly decreased at a dose of 120 µg TRE in all 3 patients. Further dose increments were omitted due to this side effect and severe headache in one patient.

Again, bad taste of the TRE aerosol was reported by most patients. Other side effects were flushing (n=1; 30 µg TRE), mild transient cough (n=3; 60 µg TRE), mild transient bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 30 µg TRE), moderate bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 120 µg TRE), and severe headache (n=1; 120 µg TRE). The bad taste, the bronchoconstriction and the drop in SaO2 was attributed to metacresol in the original TRE solution. With the use of a metacresol-free solution of TRE (University Hospital Giessen, Germany; produced according to the manufacturer's protocol) in the following study, these side effects did no longer occur.

Study iii) was performed with metacresol-free TRE solution, having no specific taste and smell. A total of 48 patients were enrolled. This study aimed at the reduction of inhalation time and aerosol volume needed for pulmonary drug delivery. A modified OPTINEB® inhalation device was programmed to produce a constant amount of aerosol during repeatable pulses of aerosol generation. With this device, treprostinil could be safely utilized up to a concentration of 2000 µg/ml without considerable side effects. No relationship of number or type of side effects to TRE concentration was observed. Reported side effects were mild transient cough (n=6), mild headache (n=2) and mild jaw pain (n=1).

The reduction of PVR and PAP was comparable between all groups (FIG. **10**). TRE inhalation reduced PVR to 76.3±5.6% (18 pulses, 100 µg/ml), 72.9±4.9% (9 pulses, 200 µg/ml), 71.2±6.0% (3 pulses, 600 µg/ml), 77.4±4.5% (2 pulses, 1000 µg/ml) and 80.3±5.2% (1 pulse, 2000 µg/ml). PAP was reduced to 84.2±4.5% (18 pulses, 100 µg/ml), 84.2±4.1% (9 pulses, 200 µg/ml), 81.1±4.1% (3 pulses, 600 µg/ml), 86±4% (2 pulses, 1000 µg/ml) and 88±5.4% (1 pulse, 2000 µg/ml). Cardiac output was moderately increased in all groups, whereas systemic arterial pressure was not significantly affected.

The areas between the curves (ABC) for changes in hemodynamic and gas-exchange parameters after inhalation of 15 µg TRE versus placebo were calculated for an observation time of 120 minutes (FIG. **11**). The ABC for both PVR and PAP was comparable between all groups.

Pharmacokinetic results from study ii): Peak plasma concentrations of treprostinil were found 10-15 minutes after inhalation. Maximal treprostinil plasma concentrations ($C_{max}$) for the 30 µg, 60 µg, 90 µg and 120 µg doses were 0.65±0.28 ng/ml (n=4), 1.59±0.17 ng/ml (n=4), 1.74 ng/ml (n=1) and 3.51±1.04 ng/ml (n=2), respectively (mean±SEM; FIG. **12**).

Discussion:

These studies investigated whether i) the acute effects of inhaled treprostinil would be comparable to or possibly advantageous over inhaled iloprost in pulmonary hypertensive patients, ii) the inhaled prostanoid dose might be increased without substantial local or systemic side effects, and iii) if the time of inhalation, which is 6-12 minutes for iloprost, could be reduced significantly by increasing the concentration of treprostinil aerosol.

The patient population in these studies included different forms of precapillary pulmonary hypertension. All these patients had a need for therapy of pulmonary hypertension and reflected the typical population of a pulmonary hyper-

Liquidia's Exhibit 1001
Page 24

US 10,716,793 B2

| 17 | 18 |

tension center. No major differences in patient characteristics or hemodynamic baseline values existed between the different groups (table 3).

In study i) it was shown that the inhalation of treprostinil and iloprost in similar doses resulted in a comparable maximum pulmonary vasodilatory effect. However, marked differences in the response profile were noted. The onset of the pulmonary vasodilatory effect of inhaled treprostinil was delayed compared to iloprost, but lasted considerably longer, with the PVR decrease continuing beyond the one-hour observation period. Although the average dose of treprostinil was higher than the iloprost dose, no systemic effects were noted after treprostinil inhalation, whereas flush and transient SAP decrease, accompanied by more prominent cardiac output increase, occurred after iloprost inhalation. Such side effects were more prominent than in previous studies with inhaled iloprost. This may have been caused by the fact that the iloprost dose used in this study was 50% higher than the recommended single inhalation dose (5 µg) and that the preceding treprostinil inhalation may have added to the systemic side effects caused by the iloprost inhalation. Surprisingly, with TRE there was no such systemic side effect, although the average effect on PVR was as potent as with iloprost.

This study used a cross-over design in order to minimize the effects of inter-individual differences in response to prostanoids. The short observation period of 1 hour was used to avoid an uncomfortably long catheter investigation. As a study limitation, the short observation interval may have caused carryover effects of the first to the second period as suggested by FIG. 5. However, this still allowed for the interpretation of the study, that both drugs are potent pulmonary vasodilators and that treprostinil effects are significantly sustained compared to the iloprost effects.

The longer duration of action and the virtual absence of side effects (except the bitter taste of treprostinil aerosol, later attributed to metacresol) encouraged increasing the applied treprostinil dose in study ii). Observation time was extended to 3 hours to obtain precise pharmacodynamic data. Inhaled treprostinil resulted in a strong pulmonary vasodilation that outlasted the observation time of 3 hours when compared to placebo inhalation. Surprisingly, inhaled treprostinil was tolerated in doses up to 90 µg.

Study iii) successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 µg/ml treprostinil solution, thereby applying a dose of 15 µg.

This drug administration with a single breath induced pulmonary vasodilation for longer than 3 hours compared to placebo inhalation. Side effects were minor, of low frequency and not related to drug concentration. It was a surprising finding that such high concentrations of treprostinil were so well tolerated.

Conclusion:

Inhaled treprostinil can be applied in high doses (up to 90 µg) with a minimal inhalation time. Inhaled treprostinil exerts high pulmonary selectivity and leads to a long-lasting pulmonary vasodilation.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**2**. The method of claim **1**, wherein the inhalation device is a soft mist inhaler.

**3**. The method of claim **1**, wherein the inhalation device is a pulsed ultrasonic nebulizer.

**4**. The method of claim **1**, wherein the inhalation device is a dry powder inhaler.

**5**. The method of claim **1**, wherein the inhalation device is a pressurized metered dose inhaler.

**6**. The method of claim **4**, wherein the formulation is a powder.

**7**. The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter.

**8**. The method of claim **1**, wherein the formulation contains no metacresol.

\* \* \* \* \*

Liquidia's Exhibit 1001
Page 25

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for United Therapeutics Corporation certifies that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 13,919 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.


Dated: August 4, 2023            /s/ *Douglas H. Carsten*
                                 Douglas H. Carsten

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on August 4, 2023, the foregoing document was filed using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: August 4, 2023              /s/ *Douglas H. Carsten*
                                   Douglas H. Carsten