# EXHIBIT 38

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.
_____

IPR2021-00406
Patent 10,716,793 B2
_____

Record of Oral Hearing
Held: May 13, 2022
_____

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER, and
DAVID COTTA, *Administrative Patent Judges*.

APPEARANCES

ON BEHALF OF THE PETITIONER:

SANYA SUKDUANG, ESQ.
IVOR R. ELRIFI, ESQ.
ERIK B. MILCH, ESQ.
DEEPA KANNAPPAN, ESQ.
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, D.C. 20004
(202) 842-7800

ON BEHALF OF THE PATENT OWNER:

DOUGLAS H. CARSTEN, ESQ.
McDERMOTT WILL & EMERY
18565 Jamboree Road
Suite 250
Irvine, California 92612
(949) 851-0633
   - and -
STEPHEN B. MAEBIUS, ESQ.
MICHAEL R. HOUSTON, ESQ.
FOLEY & LARDNER LLP
11988 El Camino Real
Suite 400
San Diego, California 92130
(858) 847-6700

The above-entitled matter came on for hearing on May 13, 2022, commencing at 1:00 p.m. EST, by video/by telephone.

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | JUDGE KAISER:  All right.  Good afternoon.  Thank |
| 3 | you to everyone for being here. |
| 4 | This is a hearing in IPR2021-00406, captioned |
| 5 | Liquidia Technologies Incorporated v. United Therapeutics |
| 6 | Corporation. |
| 7 | I am Judge Kaiser, and the other members of the |
| 8 | Panel are Judges Franklin and Cotta. |
| 9 | Before we get started, I'd like to do a rollcall |
| 10 | of anyone else who's here.  Let's start with anyone |
| 11 | representing Petitioner. |
| 12 | MR. SUKDUANG:  Good afternoon, Your Honors. |
| 13 | Sanya Sukduang.  I will be arguing on behalf of |
| 14 | Petitioner, Liquidia.  On the Webex link with us is Erik |
| 15 | Milch and Deepa Kannappan, and I believe lead counsel, |
| 16 | Ivor Elrifi, is on the public line. |
| 17 | JUDGE KAISER:  Okay.  Thank you. |
| 18 | Anyone here on behalf of Patent Owner? |
| 19 | MR. CARSTEN:  Yes, Your Honor, good afternoon. |
| 20 | This is Doug Carsten at McDermott Will & Emery.  And along |
| 21 | with me on the Webex link is Michael Houston of Foley & |
| 22 | Lardner.  Lead counsel is -- since he's not presenting, is |
| 23 | participating via the public link, and that is Stephen |
| 24 | Maebius. |
| 25 | JUDGE KAISER:  Okay.  Thank you. |
| 26 | All right.  According to the order setting up |

1   this hearing, each side will have a total of 60 minutes to

2   present its arguments.  We'll start with Petitioner's

3   presentation, then continue with Patent Owner's response.

4   And then, each party will have however much time it

5   reserves for its rebuttal.  Again, starting with

6   Petitioner and concluding with Patent Owner

7       Just a few last-minute reminders.  First, I

8   believe neither party has let us know that they plan to

9   discuss any confidential information today.  There is, as

10  you've both indicated, a public access feed for this

11  hearing.  And other than the counsel that you both

12  mentioned, I haven't been told that anyone is listening to

13  the hearing via that feed, but please keep in mind before

14  you discuss anything nonpublic that this hearing isn't

15  closed.

16      The Panel has access to the demonstrative

17  exhibits that each side filed, as well as the entire

18  record in the proceeding.  So please free to direct us to

19  any portion of the record if you think it's helpful.  If

20  you're going to do so, please give us an exhibit number or

21  a paper number, as well as page, column, or line numbers

22  that's appropriate.

23      For demonstrative exhibits, please state which

24  slide you're discussing, because it helps us make a clear

25  record which is useful for our deliberations and

26  decision-making.

1    Finally, we're all appearing remotely by video
2    which presents different challenges than being in the same
3    room together.  And although some amount of talking over
4    one another is probably inevitable, it will make the
5    reporter's job much easier and help us make a clearer
6    record if we all do whatever we can to minimize that as
7    much as possible.
8    Also, when you're not speaking, please mute your
9    microphone, and try to identify yourself when you begin
10   speaking in case the reporter has trouble seeing who's
11   talking.
12   So with those admonitions, we're nearly ready to
13   begin, but before we get to the hearing itself, we have a
14   preliminary matter to address.  So Patent Owner emailed
15   the Board on Wednesday night, and Petitioner responded
16   yesterday, regarding authorization to file as supplemental
17   information several filings from the parallel
18   District Court proceeding relating to the parties'
19   arguments on the asserted obviousness of Claims 4, 6 and 7
20   of the challenged patent.  We don't intend to count any
21   time that we spend discussing this issue against either
22   party's 60-minute time limit, but we also don't intend to
23   get bogged down discussing what's really a pretty minor
24   piece of why we're here today.
25   So with that in mind, I'll ask each party,
26   starting with Patent Owner, to explain very briefly your

1  position on the case. And I guess, Mr. Carsten, I'll give

2  you a -- a question to get you started on your

3  presentation, which is it sounds from your email as though

4  the information you want to present is in response to

5  something that appears on Petitioner's demonstrative Ex.

6  12. And I -- you know, I would remind you that as we're

7  all aware, demonstrative exhibits aren't evidence, and so

8  while there are lots of ways to go wrong in putting

9  together a demonstrative exhibit, I'm not sure that I've

10  ever seen a case where substantive evidence was necessary

11  to respond to something that appeared on a demonstrative.

12  So I wonder if you might address at least that issue of,

13  well, why -- that is why the evidence you'd like to submit

14  is necessary to respond to what's on that slide, and why

15  in particular it's necessary in light of the substantial

16  amount of evidence that already exists in the case.

17      MR. CARSTEN:  Thank you, Judge Kaiser.

18      This is Doug Carsten on behalf of Patent Owner,

19  United Therapeutics.

20      I recognize that there already is voluminous

21  materials that have been submitted, and we're in receipt

22  of your email yesterday.

23      The reason that I think it's important to

24  identify slide 12 is that Liquidia, Petitioner here,

25  indicated that there is no dispute pertaining to certain

26  dependent claims, 4, 6 and 7. And in fact, that is very

1   much in dispute.  It was disputed in the Patent Owner

2   Response, and in the reply, they added no further

3   evidence.  All they said was, We said enough, and the fact

4   that there are contrary positions in District Court is of

5   no moment.  Essentially.  I'm paraphrasing very much, but

6   it wasn't a large response.

7       As you all know, we had the trial back in March.

8   And just last Wednesday, so nine days ago, there was a

9   filing made of the post-trial briefing pertaining from

10   Liquidia's part to the invalidity.  In that invalidity

11   filing, they, for the first time, took a position that

12   solutions and powder formulations are completely

13   different.  And they went on to say that, A person of

14   skill in the art would understand that development of a

15   treprostinil solution does not inform the development of a

16   treprostinil powder formulation.

17       Those are new arguments which have been

18   essentially doubling down on the what we see as the lack

19   of evidence that was -- that was provided with respect to

20   why a person of skill in the art would understand that

21   there'd be a reasonable expectation to success with

22   respect to Claims 4, 6 and 7.

23       We received that nine days ago.  We received

24   their slides seeing this on Monday afternoon.  And then,

25   on Tuesday morning -- I'm sorry, on Monday afternoon.  On

26   Wednesday morning, we reached out to them.  We tried to do

1   this as timely as -- as timely as we could.  And with

2   respect to in the email, the interest of justice, you

3   know, Your Honor, I think it's within the interest of

4   justice for us to be able to point out we're for the very

5   first time, not a witness, this is Liquidia themselves,

6   actually taking a position pertaining to reasonable

7   expectation of success in the context of enablement.  That

8   is absolutely contradictory to the cursory evidence that

9   they presented in their -- in their opening petition and

10  never added to.  And so we believe that it is one document

11  that we're seeking to add, and in fact, we could excerpt

12  that document if that makes the Panel's job easier.

13  Obviously, we want to make sure that you have as much

14  completeness as you need.  But it's not a very lengthy

15  document, it's less than 40 pages, I believe.  And I think

16  the pages that we're looking at total out to be roughly 15

17  pages or so, if we were to do some kind of cropping for --

18  for the Panel's submission.

19        But I think that it is important that you see

20  that Liquidia has been talking out of both sides of its

21  mouth.  We have identified some record of evidence, but

22  this is not cumulative, because for the very first time,

23  they really do double down and say that everything to do

24  with solutions, which is the sum total of what they rely

25  upon for their obviousness position, don't inform dry

26  powders whatsoever.  And that's the gravamen of 4, 6, and

1    7, which in our Patent Owner response, we pointed out the

2    lack of evidence.

3        JUDGE KAISER: Okay. I will be the first to

4    admit that the Board's juris prudence on the issue of

5    whether parties can take contrary positions in multiple

6    parallel related proceedings is not a model of clarity.

7    But I guess I wonder whether it's more important that

8    Petitioner is taking, let's call them for the sake of

9    argument, at least contrary positions here, and in the

10   District Court proceeding, or whether it's more important

11   that there is some evidence of a, you know, failure of

12   enablement or a lack of reasonable expectation to success,

13   or however you want to term Dr. Gonda's District Court

14   testimony that seems to perhaps contradict what he says

15   here.

16       In light of the fact that that testimony is

17   already in the record, along with your argument stemming

18   from it, is what Petitioner argues in the District Court

19   of all that importance to our decision-making here?

20       MR. CARSTEN: I -- with respect, Your Honor, I do

21   believe it is. You're proper to raise -- there are two

22   issues here. One is the talking out of both sides of the

23   mouth issue. The second has to do with specific

24   positions, and what we see as admissions by Liquidia, the

25   very party here, about the ability of a person of skill in

26   the art to adapt information pertaining to solutions over

1   to dry powders. And that's front and center for these

2   dependent Claims 4, 6 and 7, which are very much in

3   dispute. So we're not talking necessarily about what Dr.

4   Gonda said. In fact, we didn't even move after the

5   trial -- the trial happened back in March -- we didn't

6   move after the trial to admit Dr. Gonda's trial testimony.

7   That is what it is. I think that may be cumulative.

8   What's not cumulative here is the fact that Liquidia, the

9   very party at issue, has now taken this position in a

10   stronger way than ever. And I think that is an admission

11   and -- and gets into that second bucket that Your Honor

12   identified in terms of its pertinence to the Panel's

13   decision-making.

14         JUDGE KAISER: Okay. All right. Thank you very

15   much.

16         Petitioner, I will turn to you, and let me also

17   give you a question to start with, which is assuming we

18   find that Patent Owner hasn't shown enough -- well, let me

19   -- let me narrow the issue here for a second.

20         So the issue that we're discussing really is

21   whether we should have a, you know, a motion and a

22   response to that motion and perhaps a reply, and on

23   Petitioner's side, I guess perhaps also a motion and a

24   response to a motion and a reply, as opposed to whether

25   those motions themselves have enough merit to grant. And

26   so let me -- with that background, let me ask Petitioner,

1   you've suggested that you'd like to submit some -- some

2   papers as well.  I think perhaps just as things that

3   respond to what Patent Owner is looking to submit, and you

4   know, perhaps just for completeness, and you know, that's

5   understandable, I think.  If we weren't to admit the

6   evidence that Patent Owner seeks to submit at this point,

7   would you want to submit that information?

8        MR. SUKDUANG:  Sure, so I'll address that

9   question first.

10        If -- if you were not to admit Patent Owner's

11   request, then we would similarly withdraw our request,

12   because it does address directly the issue Mr. Carsten has

13   raised.  And Mr. Carsten actually highlighted the problem

14   with the argument.  He said, expressly, that with respect

15   to enablement, there is a reasonable expectation of

16   success.  That is, of course, wrong.  Enablement is

17   whether there is undue experimentation.  Obviousness is

18   reasonable expectation of success.

19        So what we're dealing with here in the District

20   Court is an argument based on what does the '793 Patent

21   teach for a person of ordinary skill in the art.  And that

22   is enablement with respect to undue experimentation.

23        The question before the Panel, before the Board,

24   is obviousness.  What does the prior art teach to a person

25   of ordinary skill in the art.  Those two inquiries are

26   vastly different.  And in fact, there is no dispute, as

1    Mr. Carsten says with respect to the dependent claims.

2    Mr. Carsten says, incorrectly, that our argument with

3    respect to dependent claims rest solely -- and that was

4    his word -- solely on solutions.  That is entirely

5    incorrect.  When you look at our petition, the '212 Patent

6    expressly, expressly teaches dry powder formulations from

7    treprostinil, dry powders and inhalers, and also the

8    different nebulizers in the dependent claims, as well as

9    the size of the particle.  That was not, as doc -- as Mr.

10   Carsten said, disputed in their response.  It was not

11   disputed in their preliminary response.  Dr. Waxman and

12   Dr. McConville do not have testimony responding to that.

13        So with respect to the issue of dispute -- and

14   we'll cover this in the primary argument, but with respect

15   to the issue of dispute, this is -- this is a new argument

16   backfilling by Petitioner, because when you look at the

17   prior art, the '212, ,it expressly teaches that.

18        With respect to the issues of Mr. Gond -- Dr.

19   Gonda in the District Court versus here, he was talking

20   about whether based on the '793 Patent, whether there

21   would be undue experimentation to make a powder

22   formulation.  Here, he's talking about with respect to

23   obviousness what is literally disclosed by UTC's own

24   patent, the '212 Patent.  It's their own patent.  They

25   can't dispute that.  Those are literal terms.  And our

26   argument here is obviousness, but those dependent claim

1   limitations are anticipated by the '212 Patent.  Right?

2   We can argue obviousness because all of those dependent

3   claim -- excuse me, anticipation, because all of those

4   dependent claims are from one, but those are literally

5   disclosed.  Mr. Carsten cannot dispute that.  None of

6   their experts can dispute that.  202847

7           With respect to our evidence that we seek to

8   admit, UTC's experts at the District Court, Dr. Clarke and

9   Dr. Smith (phonetic), took the '793 Patent, and just

10  discloses it with no dispute, the word, powder.  That's

11  all it has.  A powder and a dry powder inhaler.  And they

12  said, "Looking at those two words alone, it would be easy

13  within three weeks with the knowledge of person already

14  skilled in the art to make a dry powder formulation."

15          Well, that evidence - if they want to bring in

16  their evidence - that evidence supports the obviousness of

17  the claims, because the '212 Patent has the same

18  disclosure as '793. And if Dr. Clarke and Dr. Smithe says,

19  "All I need to do is see the word, treprostinil powder, and

20  that's enough to make a dry powder formulation", then the

21  '212 Patent and our arguments here support the obviousness

22  of the dependent claims.

23          So again , it's Dr. Clarke and Dr. Smithe

24  testified on the issue of enablement.  Patent Owner wants

25  to submit Dr. -- our brief on the issue of enablement, and

26  so if you permit that, then a complete record on the issue

1    of enablement, which is, of course, not before the Board,

2    but if that's what Patent Owner wants, then, the Board

3    should have the complete record with respect to the issue

4    of enablement of the '793 Patent.

5         JUDGE KAISER:  Okay.  Thank you.

6         I think I will open the floor to the rest of the

7    Panel here in case they have any questions to ask of

8    either of you.  But from my part, I think I've heard

9    enough, and unless the rest of the Panel has questions,

10   we'll take the issue of whether to allow some sort of

11   briefing on a motion to submit supplemental information

12   under advisement and will in due course let the parties

13   know whether we've -- whether we'll authorize the motion

14   or not.

15        And I only take that course because I -- I'm just

16   not prepared without some discussion with the Panel to

17   make a decision on the fly here.  In part because that's

18   how the Board does things, and in part because I want to

19   give it some thought.  But -- but I don't think I have any

20   questions for the parties, and it sounds like neither does

21   the rest of the Panel.

22        So thank you both for your argument on that.  So

23   now, having dealt with all of I believe -- I believe all

24   of the under-cart fights, we'll move on to the main event.

25        Petitioner, we'll start with you on the merits of

26   your petition.  You've got 60 minutes in total.  How much

1    of that would you like to reserve for rebuttal?

2    MR. SUKDUANG:  Thank you, Your Honor.  I'd like

3    to reserve 25 minutes.

4    JUDGE KAISER:  Okay.  So you have 35 minutes, and

5    you can begin whenever you would like.  And I'll let you

6    know when you start to run into your rebuttal time.

7    MR. SUKDUANG:  Thank you, Your Honors.  Sanya

8    Sukduang on behalf of Petitioner, Liquidia Technologies.

9    I know that you have the slides in front of you,

10   so I will refer to slide numbers.  And I'd like to start

11   with slide 5.  The grounds that we are going to present

12   today are Grounds 1 and 2.  Both of which cover all of the

13   claims in the '793 Patent.  Claim 1 and dependent Claims 2

14   through 8.  Ground 1 rests on the combination of the '212

15   Patent, the Voswinckel JESC reference, and the Voswinckel

16   JAHA.  I'll be referring to those as JESC and JAHA for

17   brevity.

18   It's important to note that all three references

19   are UTC references.  They are representations that they've

20   made, they've disclosed to the public all before the

21   priority date of the '793 Patent.

22   The '212 Patent discusses and claims treatment of

23   pulmonary hypertension, the subject matter of Claim 1,

24   with an inhaled treprostinil product, again, the subject

25   of Claim 1, with inhalation devices.  Both a nebulizer,

26   dry powder inhalers, soft mist inhalers, all of which were

1    little bit more detail, but I want to go to slide 9, our

2    demonstrative 9, and those are Claim 1.  The -- when you

3    -- when you read Patent Owner's response in earnest, the

4    only dispute that they raise is whether the references

5    disclose the claimed dose.  And you could look at Dr.

6    Waxman's and Dr. McConville's declarations, that is what

7    they address.

8            With respect to therapeutically effective single

9    event dose, this is slides 10 and 11, Dr. Waxman

10   admitted -- Dr. Waxman is Patent Owner's expert -- that

11   JESC discloses a therapeutically effective single event

12   dose.  And JESC is an acute dose, one dose, single event.

13           In slide 11, Dr. Waxman admitted that JAHA

14   teaches a therapeutically effective single event dose.

15   That is what Patent Owner says, that is what the

16   references discloses, and that is the issue you need to

17   look for with respect to obviousness.

18           Going to slide 12, and we discussed this in our

19   preliminary matter with respect to the dependent claims,

20   but what -- in earnest, and if Patent Owner is -- is -- is

21   truthful in their presentation, there is no dispute with

22   respect to the disclosure of the dependent claims.  The

23   '212 Patent discloses each of these limitations expressly.

24   Their preliminary response doesn't address it, their

25   Patent Owner response doesn't dispute it, and neither do

26   Wax -- Dr. Waxman and Dr. McConville dispute those.  So

1  again, the primary issue is whether the dose is obvious in

2  light of the prior art references.

3      JUDGE KAISER:  And can I just ask you to wrestle

4  with one matter that's related to that for a minute.  I

5  believe -- I believe it's Patent Owner who cites the case.

6  The case is Raytheon v. General Electric.  It was the case

7  about a -- there was a piece of prior art -- so the claim

8  was to a particular type of composite material for use in

9  a turbine engine, and there is a piece of prior art that

10  very clearly disclose exactly what was in the claim.  It

11  was, in other words, it was this turbine engine, but the

12  Patent Owner in that case had put in significant evidence

13  that there was -- that that was just sort of imaginary,

14  you know, hoped for, hortatory, the sort of thing that

15  people hoped to do one day, but that couldn't have been

16  actually built at the time, and in fact, at the time of

17  trial, still couldn't be built.

18      And so there was a question that went up to the

19  Federal Circuit about whether there was enough enablement

20  in the obviousness case as a whole.  And so, in light of

21  that case, I mean, I take your point, that the '212 Patent

22  does seem to sort of disclose, or teach, or at least

23  suggest everything that's in Claims 4, 6 and 7 that's not

24  in Claim 1.  But I don't know if that's enough in light of

25  that case.  In other words, you got to show some degree of

26  enablement in the light of Dr. Gonda's testimony in the

1   District Court, which is now part of the record in this

2   case. Have you shown enough on enablement, and I presume

3   your answer to that is yes, but why?

4       MR. SUKDUANG: Sure. So as you know under the

5   case law, prior art is presumed to be enabled. Right.

6   That's when you're looking at presumes. So the '212 is

7   presumed to be enabled. And the question is whether --

8   whether the Patent Owner, in the case you just cited,

9   whether they present evidence calling into question the

10   enablement of that reference. The Patent Owner hasn't

11   submitted that. In their Patent Owner response, they do

12   not question the enablement of the prior art. They don't.

13   They had at that time information if they wanted to

14   question that. And the reason why Patent Owner cannot

15   question the enablement of the '212 Patent is because if

16   they do, and the '793 Patent in the District Court is not

17   enabled. The reason being is that the information in the

18   '212 Patent is identical to the information with respect

19   to powder formulations in the '793 Patent. In fact, the

20   sentences, if you put them side-by-side are almost

21   verbatim. They disclose powder formulations, they

22   disclose powder inhalers, they disclose the particle size.

23   Right.

24       Now, the question of -- the question that Dr.

25   Gonda was posed is whether the -- the '793 Patent is

26   enabled. He was never asked whether the '212 Patent is

1  enabled.  He was never asked whether that information is

2  sufficient.  And again, Dr. Gonda never testified that a

3  person of ordinary skill in the art could not do this.

4  The question for enablement is whether in light of the

5  '793 Patent, whether there would have been undue

6  experimentation required.

7      For obviousness, when you look at the '793

8  Patent, you just have to have a reasonable expectation of

9  success.  Would there be an obvious -- would it be obvious

10  to try this.  And clearly, the '793 Patent -- excuse me,

11  the '212 Patent tells you it's obvious to do powder

12  formulations.  That is what the '212 Patent specifically

13  says.

14      And again, when you look at this issue, if the

15  '212 Patent -- the Patent Owner has every motivation to

16  prevail.  They did not raise this issue in their

17  preliminary response, they did not raise this issue with

18  respect to enablement in their response.  Dr. McConville

19  didn't raise the issue.  Dr. Waxman didn't raise the

20  issue.  In fact, when you look at their references, when

21  you look at their declarations, they make scant discussion

22  of the '212 Patent, and particularly, with this

23  disclosure.

24      So in light of those cases where there was

25  evidence, ample evidence questioning this hypothetical,

26  whether you can do this composition, that is not the same

1  issue we have here.  It is literally disclosed, all of the

2  experts acknowledge its disclosure, and none of the

3  experts in this matter dispute the enablement of the

4  disclosure of the '212 Patent.  And that is the question.

5  If you're considering that question, and you're

6  considering Patent Owner's issue on that, that is the

7  question.

8      Now, you mentioned Dr. Gonda and the District

9  Court.  That's why we mentioned Dr. Clarke and Dr. Smithe

10  because they say based on those words alone, and I

11  mentioned this preliminarily, based on those words alone,

12  you're enabled.  So that's an admission in a public forum

13  by UTC that the '212 Patent is similarly enabled.  They're

14  talking about whether we're talking about two sides of our

15  mouth.  We're not.  It's two different legal standards,

16  two different issues; what the patent says versus what the

17  prior art says.  That's not talking out of two sides of

18  the mouth, Your Honor.  That is literally addressing what

19  the case law is, what the law is, in separate sections of

20  the Patent Act.

21      Now, going to the dose, this is slide 17.  Again,

22  we discussed this earlier about but 1 mL delivered of

23  these concentrations give you the dose.  Dr. Waxman

24  testified, consistent with Dr. Hill and consistent with

25  Dr. Gonda, that the average fill volume of a nebulizer is

26  3 to 5 mLs.  Even if you consider the issue of efficiency,

1   if you're at 5 mLs in the fill volume, and only 50 percent

2   of that is actually delivered because it's only 50 percent

3   efficient, you're still within 40, 80, 120 and 160

4   micrograms delivered.  The 16 and 32 at 50 percent

5   efficiency give you 40 micrograms.  The 32 gives you 80

6   micrograms.

7        So that's even considering Dr. Waxman's

8   testimony.  And if you look at Dr. Waxman's declaration,

9   Ex. 2052, he admits in paragraph 48 that the '212 Patent

10   discloses a specific nebulizer, the AM-160.  And that

11   nebulizer delivers .28 mLs per minute.  When you take that

12   nebulizer, as admitted by Dr. Waxman, and apply it to the

13   16 to 48 micrograms per mL concentrations in JESC, you get

14   28.8, 26.8, 53.7, 80.6, and 107.52 micrograms delivered to

15   the patient.  That's based on what the '212 Patent

16   discloses, that's based on what JESC discloses, and that

17   is exactly what Dr. Waxman puts in his expert report.

18   When you consider 50 percent loss -- again, going to your

19   question, Judge Kaiser, about efficiency, you're still

20   between 13 and 53 micrograms delivered when you look at

21   the 16 to 64.

22        So again, Patent Owner wants to bring out these

23   issues of different nebulizers, different efficiencies,

24   fill volumes.  When you look at the heart of the matter,

25   when you look at what a person of ordinary skill in the

26   art knows, when you look at these particular authors and

1   smart authors believed that it was just a trivial math

2   problem in order to derive the dose, why on earth would

3   they go to lengths to conceal the dose by not including

4   it.  They knew how to say what the dose was.  They

5   specifically chose not to.  And that absolutely undermines

6   and supports the nuance and careful assessment by Dr.

7   Waxman and Dr. McConville here.  It's not a simple math

8   problem as much as Mr. Sukduang or Liquidia would have you

9   believe that to be the case.

10         I'm not sure where I am on time -- oh, I still

11  have a fair bit of time.

12         So I think --

13         JUDGE KAISER:  Just a question --

14         MR. CARSTEN:  -- that -- I hope that responds to

15  your questions, both -- both Judge Kaiser and Judge Cotta.

16         If you have further questions, absolutely

17  interrupt me.  I mean, this -- this is designed to help

18  you render a decision, and Judge Franklin as well.  If

19  there's anything that you guys need, just please free to

20  ask me.  I want to make this as helpful of a 45 minutes or

21  an hour session for you.

22         JUDGE KAISER:  Can I --

23         MR. CARSTEN:  Turning --

24         JUDGE KAISER: Can I interrupt you, I'm sorry,

25  before you turn away from this topic.  There's a -- so you

26  see this all the time in -- in sort of unhelpful political

1  discussions, right, where someone says, "The people in my
2  party are right on issue X and issue Y," but the people in
3  the other party who take the opposite position on both of
4  those issues are hypocrites because they take those
5  positions. And I'm pointing out that to you, of course,
6  only proving that your own party is also a hypocrite. And
7  so it doesn't tend to move ball very far forward in terms
8  of proving that you're right on either issue X or issue Y.
9  And it feels a little bit like there's something similar
10 going on here with respect to this enablement issue,
11 right, where there's -- there's an argument in the
12 District Court over well, the -- the challenged patent is
13 not enabled, or it is enabled. And that argument by -- by
14 the defendant in the District Court means perforce that
15 the defendant is saying that the prior art isn't enough to
16 enable these claims either. And then, they come here and
17 they argue as Petitioner that the claims are obvious over
18 this combination of prior art, which has to include an
19 enablement portion, right. I mean, it isn't something
20 that people usually talk about in obviousness grounds
21 because usually the prior art is presumed enabling. You
22 know, unless there is some evidence in the record to
23 suggest that it's not. And both parties are kind of
24 dancing around the issue because there's some sensitivity
25 to understandably just saying something that is going to
26 result -- in other words, you can't come in in this

1    proceeding and say, "Look, the prior art is not enabling,"

2    or at least you have to be very careful about saying that,

3    because if you're not very careful about how you say it,

4    then, you may end up with your own claims being found not

5    enabled in the District Court. And Petitioner can't come

6    in and say, Well, the prior art is enabling, because then,

7    they're going to lose on non-enablement in the District

8    Court proceeding. And so both parties are being very

9    careful not to say anything that's not all that helpful

10    upon the issue of whether Petitioner has proven enough on

11    the enablement portion of its obviousness ground.

12        And I don't know that I have a very helpful

13    question to ask beyond sort of what do we do with this?

14    You know, we see this from time to time on things like

15    claim construction where, you know, Petitioner will come

16    to us and say, "We think you should construe the claims

17    this way for purposes of this proceeding," but we don't --

18    we don't actually think that's the right claim

19    construction and we're just using it because that's what's

20    going on in the District Court or something.

21        And we've often struggled with that, and I'm not

22    sure what to do with arguments that a party makes that it

23    doesn't believe. I don't think they're wrong because the

24    party doesn't believe in them, but it's also really

25    difficult to figure out how to treat them. And I don't

26    know if you have any advice on that, and particularly any

1    authority to back up what your advice is on that.

2         MR. CARSTEN:  Well, I always have advice.  I

3    often don't have authority to back up my advice.  But you

4    know, I think that the enablement of the '212 Patent is --

5    is a distraction, frankly, and I think it doesn't

6    necessarily matter whether the '212 Patent or the '212

7    Patent claims, as I mentioned earlier, is enabled.  The

8    question isn't whether the '212 Patent is enabled to

9    prepare a dose -- to prepare a dry powder form.  The

10   question is has Liquidia established that a person of

11   skill in the art reading the '212 Patent coupled with JESC

12   and JAHA would be -- would have a reasonable expectation

13   of succeeding in preparing and administering a dose -- a

14   dry powder form for Claim 4 containing 15 to 90 micrograms

15   of -- administering 15 to 90 micrograms of treprostinil to

16   treat pulmonary hypertension in 1 to 3 breaths.

17        And I -- my -- my view on that, Your Honor, is it

18   doesn't matter whether the '212 Patent with its claims is

19   enabled or not to address whether or not Liquidia has met

20   its burden to establish all of that.  What instead they're

21   trying to do, it seems to me, is to sort of pick and

22   choose from various pieces, and just rely upon, in

23   violation of Arendi (phonetic), this sort of general

24   knowledge to say, "Oh, yeah, you would do it and it would

25   be fine."

26        And I think that's the failure of proof that I

53

1   in looking at that issue, would it be obvious to try?

2   That's clearly here.  The prior art tells you everything

3   you need to know.  The prior art provides the motivation

4   to do so.  The prior art tells you the motivation to go

5   from intravenous to inhaled, from inhaled continuous to --

6   to a number of breaths.  And the prior art tells you both

7   with '212 and JAHA that you're going to have a reasonable

8   expectation of success in making that combination.

9       Importantly, if -- if -- if UT believed that

10   there lacked -- we, the Petitioner, lacked and did not

11   meet our burden, they would have called this us out.  If

12   you look at their response, their response is paper 29.

13   Starting at page 38, going to page 39 and a little bit on

14   page 40, this is the only place where they talk about the

15   dependent claims, 4, 6 and 7.  Nowhere do they mention

16   enablement, which was what Mr. Carsten's primary argument

17   was.  And then, he acknowledged really enablement is not

18   an issue.  They never mentioned here that you wouldn't be

19   motivated to use the JESC doses.  They don't mention here

20   that you wouldn't get to the JAHA breaths because they

21   know with '212, Claim 9, you have to use a number of

22   breaths.  All they say is we didn't meet our burden.  We

23   didn't meet our burden.

24       Well, just arguing we didn't meet our burden

25   doesn't help.  And they don't point to anything where we

26   missed that.  Our Petition made our burden.  Our sur-reply

1   -- excuse me, our reply addresses these arguments.

2   There's nothing to address with respect to the dependent

3   claims in our reply if they don't bring anything up in

4   their response.  So he's asking me what -- he said to you

5   a number of times, We walked away from this issue, we

6   walked away from this issue.  There's no issue to walk

7   away from.  All they say is we didn't meet our burden.

8   What more do we need to say than the art literally

9   discloses this and we did meet our burden.

10       So all the arguments you heard today and coming

11  back to trying to bring in the District Court issue with

12  respect to enablement, I think Mr. Carsten wished --

13  wishes, he put that in their -- in their response.  They

14  didn't.  Those are truly new arguments.  Those are truly

15  new arguments.  But even if you consider these new

16  arguments, we did meet our burden, there is a motivation

17  with an expectation of success laid out explicitly in our

18  petition in the first instance and re -- and bolstered in

19  our reply.

20       Judge Cotta, any other questions?  Did I not

21  precisely, or -- or is there something more nuanced that

22  you'd like me to address with respect to your question?

23       JUDGE COTTA:  No.  Thank you.  That was helpful.

24       MR. SUKDUANG:  So if there are no further

25  questions, I appreciate your time.  Again, if you do have

26  anything, I'm happy to use the last minute or two I have

1   left.  But again, we -- Liquidia appreciates your time, an

2   d we appreciate your time, Your Honors.

3         JUDGE KAISER:  All right.  Thank you very much.

4         Okay.  So I think Mr. Carsten, you're -- you're

5   back up.  You've got about 15 minutes left if you care to

6   use them, and you can begin whenever you're ready.

7         MR. CARSTEN:  Great.  Thank you so much, Your

8   Honors.  Yeah, I would like to use at least some of them,

9   and I'll try to keep it brief.

10        You know, righteous indignation.  You know, I

11   always try to be righteous.  I often try not be indignant,

12   and so but that is what it is.

13        You know, I've heard a lot of new arguments.

14   Obvious to try.  That's brand new, that's nowhere in -- in

15   the Petition.  You know it's yet again another new

16   argument.

17        I'd just like to sort of rattle through some of

18   the things that Mr. Sukduang said.  He said that iloprost

19   was six to nine times, you know, about, you know, 12

20   minutes continuous, and that was the problem.  And he said

21   that because of that, the motivation would be to go to

22   bolus.  But that's not what happened in real life.  I

23   mean, that we have real world evidence of what happened.

24   And we have the Gessler reference.  Gessler didn't go to

25   bolus.  Gessler went to truncating the amount of

26   continuous time.  It went from 12 to 4.