IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | **Redacted - Public Verfsion** |
| v. | ) ) ) | C.A. No. 23-975-RGA-SRF |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | ██████████ - |
| Defendant. | ) | |

**DEFENDANT LIQUIDIA TECHNOLOGIES, INC'S APPENDIX OF EXHIBITS
IN SUPPORT OF ITS ANSWERING BRIEF IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

| Ex. No. | Description | Page No. |
|:---:|---|:---:|
| 1 | United Therapeutics Corporation FQ1 2018 Earnings Call (May 2, 2018) (LIQ_PH-ILD_00000001) | DA0001 |
| 2 | UTC Q4 2022 Earnings Call Edited Transcript (LIQ_PH-ILD_00000013) | DA0014 |
| 3 | Email from Sanya Sukduang dated Feb. 26, 2024 (LIQ_PH-ILD_00000024) | DA0026 |
| 4 | Mar. 15, 2024 Deposition Transcript of Dr. Frederic Selck (LIQ_PH-ILD_00000597) | DA0034 |
| 5 | Email from Michael Flynn dated Feb. 22, 2024 (LIQ_PH-ILD_00000031) | DA0106 |
| 6 | U.S. Patent No. 11,826,327 (UTC_PH-ILD_005310) | DA0110 |
| 7 | U.S. Patent No. 10,716,793 (UTC_PH-ILD_009772) | DA0162 |
| 8 | Sept. 15, 2021 Deposition Transcript of Dr. Lewis Rubin (excerpted) (LIQ_PH-ILD_00000668) | DA0188 |
| 9 | Mar. 10, 2024 Deposition Transcript of Dr. Steven Nathan (LIQ_PH-ILD_00000677) | DA0198 |
| 10 | *United Therapeutics Corp. v. Liquidia Techs.*, C.A. No. 20-755 (RGA) (JLH) (D. Del.), Trial Transcript (Mar. 30, 2022) (excerpted) (LIQ_PH-ILD_00000792) | DA0314 |

| Ex. No. | Description | Page No. |
|---|---|---|
| 11 | *United Therapeutics Corp. v. Liquidia Techs.*, C.A. No. 20-755 (RGA) (JLH) (D. Del.), Joint PTO Ex. 2 (UTC's Statement of Contested Facts) (LIQ_PH-ILD_00000801) | DA0324 |
| 12 | *United Therapeutics Corp. v. Liquidia Techs.*, C.A. No. 20-755 (RGA) (JLH) (D. Del.), Rebuttal Expert Report of Dr. Andrew Clark (excerpted) (LIQ_PH-ILD_00000841) | DA0365 |
| 13 | United Therapeutics Corporation's Letter to the FDA regarding Yutrepia™ NDA (Feb. 12, 2024) (LIQ_PH-ILD_00000847) | DA0372 |
| 14 | *Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, U.S. Patent No. 10,716,793, Patent Owner Response (Paper 29) (LIQ_PH-ILD_00000110) | DA0391 |
| 15 | 2022 Tyvaso Label (UTC_PH-ILD_005268) | DA0467 |
| 16 | *United Therapeutics Corp. v. Liquidia Techs.*, C.A. No. 20-755 (RGA) (JLH) (D. Del.), Initial Expert Report of Dr. Andrew Clark (excerpted) (LIQ_PH-ILD_00000865) | DA0484 |
| 17 | *United Therapeutics Corp. v. Liquidia Techs.*, C.A. No. 20-755 (RGA) (JLH) (D. Del.), Initial Expert Report of Dr. Aaron Waxman (excerpted) (LIQ_PH-ILD_00000871) | DA0491 |
| 18 | *United Therapeutics Corp. v. Liquidia Techs.*, C.A. No. 20-755 (RGA) (JLH) (D. Del.), January 14, 2022 Deposition Transcript of Dr. Andrew Clark (excerpted) (LIQ_PH-ILD_00000879) | DA0500 |
| 19 | February 10, 2017 Version of Clinicaltrials.gov Webpage for NCT02630316 (INCREASE Trial) (LIQ_PH-ILD_00000185) | DA0518 |
| 20 | Steven D. Nathan et al., *Inhaled treprostinil and forced vital capacity in patients with interstitial lung disease and associated pulmonary hypertension: a post-hoc analysis of the INCREASE study*, 9 LANCET RESPIRATORY MED. 1266 (2021) (LIQ_PH-ILD_00000216) | DA0550 |
| 21 | Agarwal M, et al., *Inhaled Treprostinil in Group-3 Pulmonary Hypertension*, J HEART LUNG TRANSPLANT 2015; 34: Suppl:S343. Abstract (UTC_PH-ILD_009828) | DA0561 |
| 22 | Rajeev Saggar et al., *Changes in right heart haemodynamics and echocardiographic function in an advanced phenotype of pulmonary hypertension and right heart dysfunction associated with pulmonary fibrosis*, 69 THORAX 123 (2014) (LIQ_PH-ILD_00000226) | DA0563 |
| 23 | Aaron Waxman et al., *Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, 384 N. Eng. J. Med. 325-34 (2021) (UTC_PH-ILD_010790) | DA0585 |

| Ex. No. | Description | Page No. |
|---|---|---|
| 24 | Clinical Trial Protocol for Aaron Waxman et al., *Inhaled treprostinil in pulmonary hypertension due to interstitial lung disease*, 384 N. Eng. J. Med. 325 (2021) (LIQ_PH-ILD_00000247) | DA0626 |
| 25 | Draft Yutrepia™ Label (LIQ_PH-ILD_00000896) | DA0862 |
| 26 | United Therapeutics Tyvaso Forecast (2023-2035) (UTC_PH-ILD_009410) | DA0878 |
| 27 | Edited Transcript of United Therapeutics Corp. at TD Cowen Health Care Conference (Mar. 5, 2024) (LIQ_PH-ILD_00000482) | DA0888 |
| 28 | Edited Transcript of UTC Q1 2023 Earnings Call (LIQ_PH-ILD_00000503) | DA0899 |
| 29 | Tyvaso DPI Instructions for Use (Nov. 2023), available at https://www.tyvaso.com/pdf/TYVASO-DPI-instructions-for-use.pdf (LIQ_PH-ILD_00000514) | DA0911 |
| 30 | United Therapeutics Announces FDA Acceptance of Tyvaso DPI™ New Drug Application for Priority Review (June 16, 2021), available at https://pipeline.unither.com/wp-content/uploads/2021/06/2021-06-16-DPI-accept-FINAL-formatted.pdf (LIQ_PH-ILD_00000530) | DA0928 |
| 31 | Savan Patel et al., *Robustness of Yutrepia™, a Dry-Powder Inhaled Formulation of Treprostinil, in Patient Misuse Scenarios*, CHEST (Oct. 25, 2022), available at https://investors.liquidia.com/static-files/0f869d92-5ad1-4db6-b75d-45149818ec2a (LIQ_PH-ILD_00000535) | DA0934 |
| 32 | Liquidia Corporation Corporate Overview (June 20, 2022), available at https://www.liquidia.com/static-files/be6ab802-4090-4627-ade0-6623b6c09f24 (LIQ_PH-ILD_00000536) | DA0936 |
| 33 | United Therapeutics Corporation Reports Fourth Quarter and Full Year 2023 Financial Results (Feb. 21, 2024), available at https://ir.unither.com/press-releases/2024/02-21-2024-110027752 (LIQ_PH-ILD_00000564) | DA0965 |
| 34 | K. Parikh., et al., *Safety and Tolerability of High-dose Inhaled Treprostinil in Pulmonary Hypertension*, J. CARDIOVASC PHARMACOL. 67(4); 322–25 (2016) (UTC_PH-ILD_010599) | DA0979 |
| 35 | M. Faria-Urbina, et al., Inhaled Treprostinil in Pulmonary Hypertension Associated with Lung Disease, *Lung* 196:139–46 (2018) (UTC_PH-ILD_009936) | DA0992 |
| 36 | United Therapeutics Corporation Announces $1 Billion Accelerated Share Repurchase Program (Mar. 25, 2024), available at https://ir.unither.com/press-releases/2024/03-25-2024-110046740 (LIQ_PH-ILD_00000577) | DA1001 |

| Ex. No. | Description | Page No. |
|---------|-------------|----------|
| **37** | *Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, U.S. Patent No. 10,716,793, Jan. 8, 2022 Deposition Transcript of Dr. Aaron Waxman (Ex. 1108) (LIQ_PH-ILD_00000579) | DA1004 |
| **38** | Physician endorsed letter advocating for the availability of Yutrepia™ to meet the need of PH-ILD patients (LIQ_PH-ILD_00000596) | DA1022 |
| **39** | July 2009 Tyvaso Label (UTC_PH-ILD_010692) | DA1024 |

OF COUNSEL:
Sanya Sukduang
Phillip E. Morton
Jonathan Davies
Adam Pivovar
Brittany Cazakoff
Rachel Preston
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
(202) 842-7800

Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Daniel Knauss
Lauren Strosnick
Kyung Taeck Minn
Sam Blankenship
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: April 1, 2024

*/s/ Nathan R. Hoeschen*
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on April 1, 2024, this document was served on

the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

Douglas Carsten
Art Dykhuis
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633
dcarsten@mwe.com
adykhuis@mwe.com

William C. Jackson
Katherine Cheng
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4000
wjackson@goodwinlaw.com
katherinecheng@goodwinlaw.com

Eric T. Romeo
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
eromeo@goodwinlaw.com

Adam W. Burrowbridge
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8000
aburrowbridge@mwe.com

*/s/ Nathan R. Hoeschen*
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant*

# EXHIBITS  1 - 20

# EXHIBIT 1

**S&P Global**
Market Intelligence

# United Therapeutics Corporation
# NasdaqGS:UTHR
# FQ1 2018 Earnings Call Transcripts
## Wednesday, May 02, 2018 1:00 PM GMT
### S&P Global Market Intelligence Estimates

|  | -FQ1 2018- | | | -FQ2 2018- | -FY 2018- | -FY 2019- |
|---|---|---|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** | **CONSENSUS** | **CONSENSUS** | **CONSENSUS** |
| **EPS Normalized** | 4.00 | 3.76 | ▼(6.00 %) | 3.90 | 13.14 | 11.35 |
| **Revenue  (mm)** | 393.96 | 389.20 | ▼(1.21 %) | 379.61 | 1432.88 | 1221.76 |

Currency: USD
Consensus as of  May-01-2018 11:15 AM GMT



Stock Price [USD] vs. Volume [mm] with earnings surprise annotations

| - EPS NORMALIZED - | | | |
|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** |
| **FQ2 2017** | 3.66 | 4.37 | ①19.40 % |
| **FQ3 2017** | 4.80 | 4.69 | ▼② (2.29 %) |
| **FQ4 2017** | 4.58 | 3.89 | ▼③ (15.07 %) |
| **FQ1 2018** | 4.00 | 3.76 | ▼④ (6.00 %) |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

DA0002

LIQ_PH-ILD_00000001

# Table of Contents

Call Participants .................................................................. 3

Presentation .................................................................. 4

Question and Answer .................................................................. 8

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

**EXECUTIVES**

**James C. Edgemond**
*CFO & Treasurer*

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

**Michael I. Benkowitz**
*President & COO*

**ANALYSTS**

**Geoffrey Christopher Meacham**
*Barclays Bank PLC, Research
Division*

**Hartaj Singh**
*Oppenheimer & Co. Inc., Research
Division*

**Terence C. Flynn**
*Goldman Sachs Group Inc.,
Research Division*

**Vasiliana Vireen Moussatos**
*Wedbush Securities Inc., Research
Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

DA0004

LIQ_PH-ILD_00000003

# Presentation

**Operator**

Good morning and welcome to the United Therapeutics Corporation First Quarter 2018 Earnings Call. My name is Ashley, and I will be your conference operator today. [Operator Instructions]

I would now like to turn the conference over to James Edgemond, Chief Financial Officer of United Therapeutics.

**James C. Edgemond**
*CFO & Treasurer*

Good morning. It is my pleasure to welcome you to the United Therapeutics Corporation First Quarter 2018 Earnings Call. Accompanying me today on the call are Dr. Martine Rothblatt, our Chairman and Chief Executive Officer; and Mr. Michael Benkowitz, our President and Chief Operating Officer.

Remarks today will include forward-looking statements representing our expectations or beliefs regarding future events. These statements involve risks and uncertainties that may cause actual results to differ materially. Our latest SEC filings, including Form 10-K and 10-Q, contain additional information on these risks and uncertainties. We assume no obligation to update forward-looking statements.

Today's remarks may also include financial measures that are not prepared in accordance with U.S. Generally Accepted Accounting Principles. Reconciliations of non-GAAP financial measures to the most directly comparable GAAP financial measures can be found on our earnings release available on our website at www.unither.com.

Today's remarks may discuss the progress and results of clinical trials or other developments with respect to our products. These remarks are intended to solely educate investors and are not intended to serve as the basis for medical decision making or to suggest that the products are safe and effective for any unapproved or investigational uses. Full prescribing information for the products is available on our website.

Now I want to turn the call over to Dr. Rothblatt for an overview of the first quarter 2018 business activity of United Therapeutics.

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Thank you, James. Good morning, everyone. As James mentioned, I'm glad to also be joined on this earnings call for the first time, Mike Benkowitz, our President and Chief Operating Officer.

After my introductory remarks, we'll open up the call to any questions. And if there are questions of a financial nature, I will ask that they be answered by James, our CFO. If there are questions of a commercial nature, I'll ask that they be answered by Mike Benkowitz as our President. And if there are questions of a clinical development type of nature, then I will handle those myself.

Starting with our top line financial results. For the first quarter of 2018, our quarterly revenues totaled $389 million, an increase of 5% year-over-year. Orenitram posted a fourth consecutive quarter of greater than 20% revenue growth on a year-over-year basis. In addition, we continue to treat an increasing number of pulmonary arterial hypertension patients with our prostacyclin product franchise, which consists of Orenitram, Remodulin and Tyvaso, confirming our belief in the organic growth opportunity for these proven therapies.

The sequential drop in our total revenues from the fourth quarter of 2017 reflects consistent historical patterns as our first quarter revenues tend to be either down or virtually flat when compared to the prior year fourth quarter. This pattern reflects distributor purchases that are typically placed once a month based on current utilization trends and contractual minimum inventory requirements. As a result, quarterly

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000004

DA0005

sales of Remodulin, Tyvaso and Orenitram can vary depending on the timing and magnitude of these orders and do not precisely reflect changes in underlying patient demand.

So let's now transition to our pipeline, which currently has over 20 investigational programs, including therapies for PH and other forms of pulmonary hypertension, drug delivery devices, gene therapy, oncology and technologies to ultimately create an unlimited supply of tolerable, transplantable manufactured organs for those who suffer from end-stage organ disease.

The first of our near-term and medium-term pipeline products is the Implantable System for Remodulin, or ISR. Excitement and anticipation from both physicians and patients continues to build around potential FDA approval of the ISR. This should be a game-changing technology for PH patients, and we continue to believe that thousands of patients will eventually use the ISR.

I am reminded through videos and e-mails directly from ISR clinical trial patients of the numerous ways that the ISR has impacted their lives, even for some of the most basic activities that many of us just take for granted. Activities like sleeping, showering and swimming become more straightforward for patients using the ISR. The ISR also has the potential to address complications currently associated with the use of external microinfusion pumps, including the serious risk of external catheter-related infections, like sepsis, while returning to patients the lost several hours of pump management and therapy preparation time each day to productive use.

From a regulatory perspective, the FDA approved Medtronic's PMA for the ISR in December 2017, which is 1/2 of the regulatory process. We then resubmitted our NDA for use of Remodulin in the ISR, which has been accepted as a Class II resubmission for a 6-month review. We anticipate FDA action on our NDA by July 30, 2018.

Although no FDA process is free from doubt, we remain confident that the FDA will approve the ISR in 2018. We are approaching the ISR launch with our partner, Medtronic, with precision and care to ensure that implant surgeons, refill centers, reimbursement pathways and other healthcare service organizations are all in place and properly trained and ready for commercial launch by early 2019. Our expectation that it will be ultimately used by thousands of patients is a longer-term goal as launching a surgically impacted device needs to be done carefully, thoughtfully and systematically.

Yet another next-generation drug delivery system we are advancing is RemUnity, a small, lightweight external subcutaneous pump we are developing under an exclusive agreement with DEKA Research & Development Corp. The RemUnity system uses acoustic volume-sensing technology to deliver Remodulin with a high degree of precision, representing a significant advance in microinfusion technology. In February 2018, DEKA filed RemUnity with the FDA under a 510(k) submission that was accepted for review by the FDA.

Let me now provide you an update on 4 of our 7 ongoing Phase III clinical trials.

FREEDOM-EV. FREEDOM-EV is a Phase III clinical trial using Orenitram in combination with a single ETRA or PDE-5 background therapy for PAH WHO Group I patients. This trial has a primary endpoint of time to clinical worsening. FREEDOM-EV enrolled nearly 700 patients. And we have now accumulated enough events needed to meet the required 205 adjudicated clinical worsening events that's required to unblind the study, which are expecting to do later this year.

It is also worth noting that Orenitram is the only true oral prostacyclin analog which could be dosed to therapeutic benefit. Based on patient and physician feedback, I believe that we will see continued Orenitram growth, further accelerated in the event that a possible FREEDOM-EV readout, providing the Orenitram label with a morbidity, mortality endpoint supported by good clinical trial data in use of combination therapy.

Another major and exciting event we anticipate by year end 2018 is the unblinding of our BEAT combination therapy clinical trial for PAH WHO Group I patients. This is a unique clinical trial that has never been tried in PAH before combining Tyvaso, our inhaled treprostinil therapy to treat PAH where the alveoli meet the pulmonary arterials, with Tysuberprost, and orally administered therapy to treat PAH systemically, where the blood flows from the right side of the heart into the pulmonary arteries all the way

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000005

down to the pulmonary arterials. Our data demonstrates that attacking the disease in these 2 different ways may yield better results. And similar to FREEDOM-EV, the BEAT clinical trial has a primary endpoint of time to clinical worsening.

To illustrate how we are endeavoring to create new Blue Ocean market opportunities in pulmonary hypertension WHO Group III, where we think we can have a significant and positive impact on patients with unmet medical needs, I would like to now discuss 2 additional Phase III clinical trials.

Our INCREASE trial is examining the effect of Tyvaso for WHO Group III PH associated with interstitial lung disease. Currently, this Phase III study is about 50% enrolled. There are no approved therapies for this indication. And in fact, systemic drugs like our own tablets and parenteral therapies, as well as those of our competitors, are contraindicated for this condition.

Next, I would like to move to another subset of WHO Group III PH associated with chronic obstructive pulmonary disease, or COPD, in our PERFECT Phase III clinical trial. No therapy has ever been approved by the FDA for pulmonary hypertension incident to so many of these COPD patients. And I really want to salute Dr. Waxman and his great team up at Boston who have brought this unmet medical need to our attention.

Finally, I would like to talk about UT's revenue growth strategy, particularly as we are facing increasing generic competition. As previously discussed, we expect our 2018 revenues to decrease compared to 2017 primarily due to the impact of anticipated generic competition for Adcirca beginning in mid-2018 as well as generic Remodulin, which could be launched as early as June '18. Our strategy to take advantage of the existing organic growth opportunity we have within the treated PAH patient with our existing prostacyclin product franchise including Remodulin, Tyvaso and Orenitram and to combine this with our new and improved formulations and delivery devices that I described earlier to enable us to resume revenue growth by the end of 2019.

Now I'd like to walk you through how we expect to drive this growth. First, we believe that Remodulin will continue to be a steady performer, but it will look very different from the Remodulin you see today. It will be delivered through multiple next-generation drug delivery systems intended to enhance safety, tolerability and convenience, including the ISR and RemUnity which I previously mentioned. In addition, we are developing RemoPro, a prodrug version of treprostinil expected to reduce or eliminate site pain associated with the subcutaneous Remodulin. We expect to file an IND for RemoPro later this year as we begin Phase I clinical studies.

On Monday, we also announced an agreement to acquire SteadyMed Limited. Assuming that deal closes later this year, their pipeline product, Trevyent, will sit well within UT's next generation of innovative drug-delivery systems for PAH patients.

Second, we will continue to believe in the organic growth opportunity of the treated PAH population, which we believe currently underutilizes prostacyclin therapy. Unlike other therapies on the market, UT's prostacyclin analogs can be titrated to therapeutic benefit as PAH progresses, therefore offering patients the opportunity to transition between Remodulin, Tyvaso and Orenitram as each contains the same proven active ingredient, treprostinil. This is our continuum of care advantage.

Third, we expect to grow through the introduction of new products and new indications. We currently have 6 Phase III studies in PH and 1 Phase III study in oncology. Let me itemize what these are. Two clinical trials, FREEDOM-EV and BEAT in PAH, are expected to unblinded in 2018. Three clinical trials, INCREASE, PERFECT and SOUTHPAW in PH, are currently enrolling patients and remain on track to launch commercially within the timelines currently provided in our website. These 3 clinical trials for PH are in indications which we do not have any approved therapies in place today. Three, our SAPPHIRE gene therapy study for PAH. And lastly, our DISTINCT study of dinutuximab in small cell lung cancer. These and other R&D programs are designed to provide revenue growth in the near and medium term while additional R&D programs are underway to develop technologies in organ manufacturing over the longer term.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000006

In closing, at United Therapeutics, we are focused on the development and commercialization of innovative products to address the unmet medical needs of patients to deliver long-term revenue growth to our stakeholders. We continue to advance numerous pipeline priorities to help keep patients alive, and in effect, building bridges for them as we pursue new technologies to create an unlimited supply of tolerable, transplantable manufactured organs.

Thank you for joining us on the call today. Operator, I would like now to open the call to questions.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000007

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Terence Flynn of Goldman Sachs.

**Terence C. Flynn**
*Goldman Sachs Group Inc., Research Division*

Martine, I think there was some new commentary in the Q about potential launch dynamics of the implantable pump. I think you're -- it sounds like Medtronics Limited do about 100 pumps out of the gates and then maybe making some improvements upon that. Can you give us a little bit more details about kind of the process, next steps and how to think about that ramp as we look into 2019 and beyond?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Yes, Terence. Good to actually hear you on the phone, so that's amazing. As far as the implantable pump program, I don't -- I wouldn't get hung up on any limits or I can't give credence to the numbers that you mentioned at all. What is the situation with the Medtronic pump is that we are awaiting approval of the second half of the NDA from the FDA. And we expect that we should have -- we should hear from the FDA by the end of July. Once that happens, Medtronic and us intend to roll out these pumps to every pulmonary hypertension patient that can benefit from it. And I do believe that, that number is in the thousands, and in the high thousands. The reason for that, Terence, is that the pump allows the treatment of the disease to be all but forgettable for the patients. There's nothing they have to do to prepare their infusions. They have no open wounds or painful marks on their skin. And the drug can automatically be delivered systemically, providing them an ideal sort of PK/PD situation on treprostinil. The physicians are very, very happy with the drug. The patients are very, very happy with the drug. Now there is a fair amount of intriguing research, although nothing that has ever been approved on a label, to show that the earlier you start treating a patient with a true prostacyclin, the longer the patient is going to live. And this data has been presented at medical conferences like the American Heart, American Thoracic Society, going back to the early 2000s. The problem, Terence, is that it's been so difficult to provide a patient continuously bioavailables, in other words, 0-order delivery, true prostacyclin that patients, instead of starting on it at the very beginning of their disease, they take it at the very end. And as we all know, when 1 or 2 leaves are maybe turning brown on a plant, you could do some nutrients and get it going again. But once the plant is on its last leg, it's very hard to do things to bring it back to being a fresh, green plant again. So the remarkable thing about the Implantable System for Remodulin is that physicians could prescribe this as a front line therapy for person that has pulmonary hypertension. And instead of a patient saying, "Oh, why do I have to be burdened with an indwelling Hickman catheter?" Or "Why do I have to be burdened with transcutaneous, transdermal site pain?" They won't have to ask those questions. It will be actually easier than the Adcirca pill that they would swallow. So it will become the easiest way to treat pulmonary hypertension. And at least from the study that was used for Flolan to be approved, a very, very potent and powerful study, drug when used earlier. As you know, in the Flolan study, it was actually shown to provide a [indiscernible] benefit by starting the patients on Flolan. So we're really excited about that. I think the numbers of patients, I think I mentioned a couple of times, are going to be in the thousands. To give -- and actually, as I mentioned, I think we're probably looking at much closer to 10,000 than the number of patients that you see on parenteral drugs today which are in the low single digit thousands. And in fact, there are some physicians that we've been talking to that, if they went ahead and were to use this as front line therapy, as I've just sketched out, you would actually have something like 20,000, 30,000 patients on the Implantable System for Remodulin. As these patients live longer, that number would grow to 40,000 to 50,000 because the total prevalence of pulmonary hypertension would increase, given that the incidence is fairly constant. So this is a -- I think the word I used in my introductory remarks, this is a game-changer, Terence. And we at UT are really not hung up, we're not counting, we're not projecting what the number of patients are going to be quarter to quarter to quarter. We're committed to this program for the long haul, for the balance of the 2020s. And I personally am quite

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000008

convinced that once approved by the FDA and opened up to the market, you will see high numbers of thousands of patients on this therapy. Thanks, Terence, for the question.

**Operator**

Our next question comes from Geoff Meacham of Barclays.

**Geoffrey Christopher Meacham**
*Barclays Bank PLC, Research Division*

So let me ask you a question on Orenitram. When you look at the FREEDOM-EV study, it sounds like you have -- may have data by year end. What would you characterize as an incremental PH patient that could go on, assuming you have positive data? And is there a hurdle you think you have to hit in terms of time to worsening? Is it comparative to Actellion, or is it just a stat sig benefit?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Yes, thanks, Geoff. Great question. Because that's really a kind of a commercial operations question in terms of who would be the patients that would most likely form the growing number of Orenitram patients. As you heard, we're doing quarter after quarter after quarter of strong revenue growth on that, over 20% up every time year-over-year. But all that is great tribute to the med affairs and the reimbursement. There's global supply chain management. And last but not least, the sales and marketing force that is under Mike Benkowitz. So Mike, could you answer Geoff's question?

**Michael I. Benkowitz**
*President & COO*

Sure. Thanks, Martine. Thanks for the question. Yes, I think the -- what we're seeing in the marketplace right now is the typical Orenitram patient tend to be your earlier-diagnosed patients or patients that are earlier on in their disease state because they need the time to start on therapy, titrate up. And what we have found is starting those patients earlier, when they have time to titrate up on therapy, they're able to manage the side effects better, and they just have, just generally, a better experience with the drug. And I think even without the clinical worsening label, we feel like we're getting a good share of those patients in relation to what J&J is seeing with Uptravi. I think the label -- the benefit of the clinical worsening label will put us on par with Uptravi, and I think, will allow us to capture even a greater portion of those patients because we'll now have the same clinical worsening benefit on our label in addition to being, really, a true prostacyclin. And then having the ability to put patients on that prostacyclin earlier, titrate them up, and then as Martine talked about in her comments, as the disease progresses, easily transition them over to Tyvaso or Remodulin as they continue in their disease.

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Excellent, Mike. Excellent, excellent.

**Operator**

Our next question comes from Hartaj Singh of Oppenheimer.

**Hartaj Singh**
*Oppenheimer & Co. Inc., Research Division*

Just -- I just want to see, Martine, if you could dig a little bit deeper into the scientific rationale going in Tyvaso in ILD and then also in COPD; and then Orenitram and the heart failure, the Phase III studies. I mean, what's the thought, the scientific sort of rationale behind, and the mechanism of action using treprostinil to go after these disorders?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000009

Thank you, Hartaj. Great, great question. So let's talk about the science between -- behind the INCREASE and the PERFECT studies which are the ILD and COPD studies, respectively; and the science behind the SOUTHPAW study, which is the left heart failure study. So given the limitations on the time on the call, let me, in a sense, drop to one kind of bottom line, starting with the COPD and ILD. Treprostinil, Tyvaso is not on label for patients with these indications. And as you would expect, it's not an inexpensive therapy, and payers don't just, like, blindly push the pay button on Tyvaso. Every patient is carefully assessed by payers in ensuring that it's an appropriate patient that they're obligated to pay for and not an experimental patient. Having said that, both through the effort of our medical affairs group over the years in supporting investigator-sponsored studies and through the kindness and generosity of certain payers around the country who have gone ahead and upon the initiative of their physicians, were able to enable some WHO Group III patients to benefit, there were unmistakable signals the some of the leading physicians in this field. I called out one of them on the call, Dr. Waxman, but there are many others, who said to UT, "This drug works." In fact, they believe that this drug works even better in that indication than in the Group I indication in terms of, at least, the exercise ability that they saw in their patients, discounting any placebo effects that might be involved. So with that kind of data, some of which has been presented in posters and maybe even publications -- I don't know, but I've definitely seen posters, we went ahead and then had the statistics to power of the study for statistical significance, the one in the ILD population and the other in the COPD population, which are 2 distinct populations. I believe that when you take a look at animal models of pulmonary hypertension and even when you take a look at autopsy of pulmonary hypertensive lungs after they've -- autopsy is not the right word, sorry. Biopsied. Pulmonary hypertension lungs, after they've been ex-planted for a lung transplant, you could see that the disease has a unique, and I would say, worst-case phenotype in the pulmonary arterial immediately adjacent to the alveoli. And this is the part of the arterial that is being reached most densely by Tyvaso before it dissipates through the venous drainage and circulation. So we think that the triple properties that treprostinil and Tyvaso in particular are known for, namely the vasodilating, the de-platelet-ing, but most important of all, the cytoprotective property of prostacyclin is they will lead to stop a damaged phenotype from getting more damaged, and in fact, to mitigate against damage setting in, in an inflammation setting in the first place. This cytoprotective property for this kind of -- it's hard to imagine, but if you dive deep, deep, deep in the lungs, when you get, like, past 16, 17 branches and you're have at these 10-micron wide arterials that then wrap around the air sac or alveoli, those are the ones that spell doom for the patients with pulmonary hypertension secondary to ILD or COPD. And that's what Tyvaso directs itself to immediately. At the same time, because these patients have a great difficulty with ventilation due to these deteriorated arterials around their alveoli, if you go ahead and you just give -- you just take advantage of the anatropic properties of prostacyclin, mainly kind of making the heart pump stronger, then you get into this thing called perfusion ventilation mismatch or V/Q mismatch. And that, unfortunately, can lead to fatal events for the patient. So the strongest science here is really on the ability to help pulmonary hypertension patients who have COPD and ILD, so-called WHO Group III pulmonary hypertensions. They have some other distinctive characteristics. They're in the tens of thousands. They are not being treated for their pulmonary hypertension today. There's nothing on label for it. To be able to treat them with the only type of agent, an inhaled agent that can successfully treat them where they need the help the most and where it will not cause the devastating side effects of V/Q mismatch. Now turning over to the last part of your question, on SOUTHPAW, there are 2. Hartaj, it's gone back for -- actually for decades, that people thought treprostinil would be useful for left heart failure. And indeed, it was -- its very first trial was in congestive heart failure back when this was a molecule owned by Burroughs Wellcome. So what the problem is though is, to do a proper CHF trial, you're usually talking about thousands of patients, and it was tried just in a couple dozen patients. And it was a -- what we would call, I mean, if you wanted to map the word from cancer over to left heart failure, it was like a basket study. It was just everybody was thrown in there with no understanding of the distinctions among the patients. There has been opinions over the years, strengthened again with the same kind of evidence that I described for the PERFECT and INCREASE studies, that if you targeted just the subset of heart failure patients that had preserved ejection fraction, that the suite of properties associated with prostacyclin, I had mentioned the unique anatropic profile of this agent, would in fact be very, very helpful for these patients. And we were really blessed to be led in the area by a superb cardiologist with great experience, Dr. Mardi Gomberg. And she is the lead investigator for our SOUTHPAW study. And I think it has always been a strong property of prostacyclin to impact the heart. The problem is to do so in the way without making things worse and to do so in a

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000010

way that it addresses a particular type of heart failures that the individual has. SOUTHPAW is -- I'm sorry, Orenitram, of course, is not any kind of a cure for heart failure per se. But if part of your heart failure is accompanied by HFpEF heart failure with preserved injection fraction, then we believe the data that led us to our hypothesis with HF, is that there is a significant likelihood that we can moderate the overall heart failure rate of decline by addressing the subset that has HFpEF. And so that's the group that we'll be targeting with this agent.

I'm being told that we have time for one more question.

**Operator**

Our last question comes from Liana Moussatos of Wedbush.

**Vasiliana Vireen Moussatos**
*Wedbush Securities Inc., Research Division*

You mentioned that the DEKA pump has been accepted by the FDA, a 510(K). And when do you think you can get it approved? Last call, you said early 2019. Is it on track for that?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Thanks, Hartaj -- I mean, thanks, Liana. Sorry about that. Yes. So let me, like, back up. Whatever I said in the last call, I still think is good. So I'm not changing anything from the last call. The pump is a really fascinating piece of machinery, Liana. And the more I see it in operation, the more just kind of completely blown away I am by it. It's got virtually no moving parts. In fact, actually the pump itself has no moving parts. And I think it's a kind of like a Tesla of pumps. Like a regular car has something like thousands of moving parts, and a Tesla, I think they advertised it as 20 or 25 moving parts. So of course, regular infusion pumps don't have thousands of parts, but they got a lot of parts. And just ask the poor patients who have to put all the pieces together every day or 2 on their table, takes up like half a dining room table. But with the DEKA unity pump, there are no moving parts due to the inventive geniuses of those folks. So this is going to be a super cool device. Of course, we will ship it to the patient with the drug already supplied to eliminate the need for the patients to have any errors in the process of drug fill. And also to buy back for the patient a very, very valuable hours of their time, which is otherwise spent on refilling these pumps. We also have the rights, Liana, to use this pump technology for additional drugs for other [ orphan ] diseases. And we have now begun a program in Parkinson's disease based on using the same pump technology, the same pumps, actually. So it's really a super exciting program. Of course, and as I mentioned in my introductory remarks, nobody can predict the FDA exactly. And the FDA is going to make the decision. And I've been right sometimes, been wrong sometimes, I'm not going to -- like, I don't make any more bets on the these things. But I will say this, that you were looking at a sponsor, DEKA, that has successfully obtained FDA approvals for every product that they have taken through the FDA, including some truly revolutionary products, such as bioelectronic prosthetic arms, Class III medical devices. I mean, very, very challenging approval. Dialysis machines for Baxter, multiple generations of those. So this is an organization that definitely has, to my knowledge, 100% success record at the FDA. And I'm confident that they will take this through. And wow, these are not -- United Therapeutics also has 100% success record at the FDA, because Remodulin, Tyvaso, Orenitram, Unituxin. So I believe, between the 2 of us, I could not be more confident, Liana, that we will be able to successfully launch this RemUnity pump. Exactly which month, who knows? It's up to the FDA. But I stand by everything I've said before.

Thanks, Liana. And operator, if you could please do your wrap up comments.

**Operator**
Thank you for participating in today's United Therapeutics Corporation Conference Call. A rebroadcast will be available for replay for 1 week by dialing 1 (855) 859-2056, with international callers dialing 1 (404) 537-3406 and using access code 5778455.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**LIQ_PH-ILD_00000011**

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

# EXHIBIT 2

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT
UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

EVENT DATE/TIME: FEBRUARY 22, 2023 / 2:00PM GMT

**OVERVIEW:**

Co. reported 4Q22 results.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000013

FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

## CORPORATE PARTICIPANTS

**Dewey Steadman** *United Therapeutics Corporation - Head of IR*

**James C. Edgemond** *United Therapeutics Corporation - CFO & Treasurer*

**Leigh Peterson**

**Martine A. Rothblatt** *United Therapeutics Corporation - Founder, Chairman & CEO*

**Michael I. Benkowitz** *United Therapeutics Corporation - President & COO*

## CONFERENCE CALL PARTICIPANTS

**Andreas Argyrides** *Wedbush Securities Inc., Research Division - Analyst*

**Ashwani Verma** *UBS Investment Bank, Research Division - Director of Americas Equity Research & US Specialty Pharma Analyst*

**Hartaj Singh** *Oppenheimer & Co. Inc., Research Division - Research Analyst*

**Jessica Macomber Fye** *JPMorgan Chase & Co, Research Division - Analyst*

**Joseph John-Charles Thome** *Cowen and Company, LLC, Research Division - MD & Senior Research Analyst*

**Justin Hovsep Simonian Phillips** *Morgan Stanley, Research Division - Research Associate*

## PRESENTATION

**Operator**

Good morning and welcome to the United Therapeutics Corporation Fourth Quarter and Full Year 2022 Earnings Webcast. My name is Devin, and I will be your conference operator today. (Operator Instructions) I will now turn the webcast over to Dewey Steadman, Head of Investor Relations at United Therapeutics.

---

**Dewey Steadman** *- United Therapeutics Corporation - Head of IR*

Thanks, Devin, and good morning. It is my pleasure to welcome you to the United Therapeutics Corporation Fourth Quarter and Full Year 2022 Earnings Webcast. Accompanying on today's webcast are Dr. Martine Rothblatt, our Chairperson and Chief Executive Officer; Michael Benkowitz, our President and Chief Operating Officer; James Edgemond, our Chief Financial Officer and Treasurer; Pat Poisson, our Executive Vice President of Technical Operations; and Dr. Leigh Peterson, our Senior Vice President of Product Development.

Remarks today will include forward-looking statements representing our expectations or beliefs regarding future events. These statements involve risks and uncertainties that may cause actual results to differ materially. Our latest SEC filings, including Forms 10-K and 10-Q, contain additional information on these risks and uncertainties. We assume no obligation to update these forward-looking statements.

Today's remarks may also discuss the progress and results of clinical trials or other developments with respect to our products. These remarks are intended solely to educate investors and are not intended to service the basis for medical decision-making or to suggest that any products are safe and effective for any unapproved or investigational use. Full prescribing information for the products are available on our website.

And United Therapeutics executives will participate in 3 investor conferences in March. First, Michael Benkowitz will participate in a fireside chat at the Cowen Healthcare Conference on Tuesday, March 7. Dr. Martine Rothblatt will participate in a fireside chat at the Oppenheimer Healthcare Conference on Monday, March 13, and our Chief Medical Officer, Gil Golden will participate in the JPMorgan Napa Valley Biotech Forum on Tuesday, March 21.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000014

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

Now I will turn the call over to Dr. Rothblatt for an overview of the fourth quarter and full year 2022 financial results and business activities of United Therapeutics. Dr. Rothblatt?

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Dewey, and good morning, everyone. I feel very excited to lead this call because we have so much positive news to report about 2022.

In fact, I -- reflecting back on the past few years, this is actually the best year United Therapeutics has ever had. And it augurs even more, I think, positively to what we're going to see coming up in 2023, 2024 and 2025.

Let me hit a few highlights. First, 2022 was our highest revenue year ever. Second, 2022 was our most profitable year ever. Third, 2022 was our highest operational cash flow year ever. And fourth, we ended 2022 with more patients on our treprostinil medicines than ever before.

I think you have to agree with me that these are fantastic results. And now I'd like to give a few indications of why I think that as great as these results are, they are not laurels for us to rest upon but instead a launching pad for yet greater results in 2023, 2024 and 2025.

In fact, the patient uptake of our new Tyvaso DPI medicine has been so rapid that we can project a doubling of our revenues by 2025. This doubling of revenues is helped by the unique nature of each of our medicines including Tyvaso DPI. For example, Tyvaso DPI is the only inhaled treprostinil product that enables deep lung penetration via high-resistance low-flow device.

Another example, our Remodulin product is the only parenteral prostacyclin delivered by the small, easy, super accurate Remunity device. The differentiated aspects of Remodulin has allowed us revenues to remain steady at about $0.5 billion a year through the past 3 years running.

Our Orenitram product is also very unique because it is the only titratable oral prostacyclin product. We currently expect it's 1/3 of $1 billion a year revenue to continue growing as physicians become aware of the results of our recently released EXPEDITE study. That study showed Remodulin patients can be switched directly to Orenitram. And Orenitram will soon be joined by new products from our pipeline.

In the field of pulmonary arterial hypertension, we expect to complete our Phase III trials of ralinepag by 2025. That will enable the first once-daily dosing of a prostacyclin pill in the pulmonary hypertension field.

In the field of pulmonary fibrosis, we expect to complete our Phase III trials of Tyvaso by 2025 as well. That will, we hope, create the first disease-modifying treatment for pulmonary fibrosis, a true landmark in the field.

And in the area of transplantation we hope to commence clinical trials of manufactured organs within the next few years. That would be a major contribution to ending so many deaths on the organ transplant list and unfortunately, even more deaths from end-stage organ disease off the transplant list.

In summary, our business, our patient count, our pipeline is growing longer and faster than ever before. 2022 marked the continuation of that growth factor into 2023. We have achieved a very nice balance of growth and strength. We intend to continue building on this platform in the years to come.

To provide now some additional, very median I think, extremely exciting details of how we are continuing to build on this platform, I'd like to introduce our President and Chief Operating Officer, Michael Benkowitz. Mike?

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

3

**REFINITIV**

LIQ_PH-ILD_00000015

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Thanks, Martine, and good morning, everyone. From a commercial standpoint, as Martine said, 2022 was a phenomenal year for us. We're extremely pleased with the progress of the Tyvaso DPI launch as referrals starts and active patients for both Tyvaso and Tyvaso DPI are among the best that we've seen to date.

We were also very excited to achieve our goal of doubling the number of Tyvaso patients following the PH-ILD approval in early 2021. This was a goal that Unitarians across the organization rallied around and supported. So we're really proud and appreciative of everyone's hard work over the last couple of years to help us reach this milestone.

Importantly, reaching this goal reinforces to us the impact that Tyvaso and Tyvaso DPI are having not only in helping patients with PH-ILD treat this serious progressive disease for which there are no other available options, but also the impact Tyvaso DPI will have in PAH. With the simple convenience of a small inhaler that fits in the palm of the patient's hand and an elegant ease of use following the simple mantra of open, load, inhale. We believe Tyvaso DPI will meaningfully expand the use of inhaled treprostinil in both indications.

The Tyvaso DPI inhaler device developed by our partner, MannKind, is able to efficiently deliver treprostinil deep into the lung and one breadth per cartridge using less active ingredient to the nebulizer reference. The convenience and efficacy of our DPI device, coupled with Tyvaso's known tolerability profile has us well positioned to expand our reach in PH-ILD and to move the use of treprostinil therapies like Tyvaso DPI and PAH even earlier than IP receptor agonist like selexipag.

We're seeing this play out with our prescribers as evidenced by several positive trends. Since the PH-ILD launch, we've increased the total number of Tyvaso prescribers by about 70%, an increase by almost 60%, the number of prescribers with 3 or more patients in their practice.

This last point is an intra marker we look at to gauge product support. We have found that once a physician has at least 3 patients on one of our products, they tend to become what we call supporters and start using the product much more frequently and regularly.

We're also making headway with traditionally loyal selexipag prescribers. Of the top 100 selexipag prescribers, 70% have now written Tyvaso DPI and 50% of those have written 5 or more prescriptions. From a revenue standpoint, we're very pleased with how the quarter and the year wrapped up for Tyvaso, but there are a few key points I want to highlight.

First and most relevant to the fourth quarter of 2022 is that we're still in a launch mode for Tyvaso DPI and even for the PH-ILD indication for that matter. As such, our specialty pharmacy distributors are still rightsizing product orders based on estimated underlying patient demand, both in total and between Tyvaso nebulized and Tyvaso DPI. Therefore, our distributors are placing orders more frequently than their once or twice a month historical cadence. And these new ordering patterns did impact the timing and size of product orders and thus our product revenues during the quarter.

Second, we're also building Tyvaso DPI inventory as we're launching a product. So our distributors are not yet able to order a sufficient product to reach contractual inventory levels per their usual practice. We expect over the next several quarters, these 2 factors will normalize, and our specialty pharmacy distributors will shift back to a more historical type cadence of product orders. For these reasons and the usual historical seasonality to our business that we have discussed on prior calls, we think annual revenue trends are a better lens through which to view and evaluate our business.

The last thing I want to touch on with Tyvaso is our patient assistance program or PAP. Patient utilization of our program -- of our PAP program for Tyvaso DPI which is covered under Medicare Part D and has high patient co-pays, has been higher than anticipated, including by many PH-ILD patients who were on the nebulizer and nPAP last year and has since transitioned to DPI.

We anticipate that this will be a short-term phenomenon and that many of these patients will be covered under their Medicare Part D plan starting in 2024 and continuing into 2025, once changes to the Part D provisions of the Inflation Reduction Act begin to go into effect.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000016

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

Turning to Orenitram. We see continued momentum for Orenitram as we ended the fourth quarter with the highest number of patients on therapy since its launch. We're also excited about the recent top line EXPEDITE data we press released in October of last year that demonstrated that prostacyclin induction with Remodulin can lead to double the average Orenitram dose when patients shift to oral therapy compared to patients who do not have a Remodulin induction.

Following up on this top line data, we plan to present additional details on EXPEDITE at scientific meetings this year, along with a peer-reviewed manuscript detailing the study in the second quarter.

And finally, we continue to be pleased with the performance of Remodulin in the U.S. as the fourth quarter was one of our highest referral quarters ever. The Remunity pump for Remodulin is gaining momentum with approximately 1/3 of subcutaneous patients now on Remunity especially as Remunity is the only subcu pump widely available for any patients to treprostinil therapy.

So to wrap up, after reaching our goal of doubling the number of Tyvaso patients, we're confident in our ability to double our annual revenue run rate for approximately $2 billion today to $4 billion by the end of 2025. We expect continued Tyvaso and Tyvaso DPI uptake in both PAH and PH-ILD to drive most of our near-term revenue growth, supplemented by Orenitram growth through the expedite protocol and other research and supported by continued Remodulin resilience. With that, I'll turn the call back over to Martine.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Michael, thank you so much for providing that wealth of detailed information supporting this great growth vector we have going here from 2022 into 2023, '24, '25.

Operator, feel free to open up the lines to any questions now.

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) Our first question comes from Jessica Fye with JPMorgan.

**Jessica Macomber Fye** - *JPMorgan Chase & Co, Research Division - Analyst*

I have 2, if that's okay. First, can you provide some of the assumptions, specifically around Tyvaso and Tyvaso DPI to help underpin your target to roughly double your revenue run rate for the overall company by the end of 2025.

And then second, just following up on Michael's comments in prepared remarks, I was hoping if you could elaborate a little bit more on that comment about the utilization of the PAP program for DPI being higher than anticipated among PH-ILD patients who transitioned to DPI. Is that to say that because of the higher out-of-pocket in Part D in the short term that they're receiving free drug? And how should we reconcile that with, I think, what was anticipated to be a bit of a tailwind in 2023 from PAP patients transitioning on to reimbursed product this year?

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Yes. Thank you, Jess, and good morning. Good to hear your voice this morning. Generally, we try to like limit to one question for questioner because there are so many people in queue. But because your 2 questions are in a sense kind of like a tag team question, one way close into the next, Mike, I'll kind of ask if you can handle both questions.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV** ⟋⟍

LIQ_PH-ILD_00000017

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So I think, Jess, your first question around the assumption, the underlying assumptions for our confidence in the growth of Tyvaso in both PAH and PH-ILD is, in some ways, it's a little bit of a math -- kind of a math exercise, but also just I think -- I think just the excitement and enthusiasm we're seeing around DPI.

So if you think about in the PAH or the WHO Group 1 market, there's about, I mean, roughly 50,000 patients in the U.S. diagnosed with PAH, still and shockingly and sadly, it's probably only about, I would say, about 30% to 35% of those patients are on a prostacyclin. And there's a lot of reasons for that, and a lot of it comes down to the fact that the delivery mechanisms for prostacyclin are -- they're not terribly convenient. But I think that is changing on Tyvaso DPI. So we feel very confident that we will be able to -- with the convenience of the DPI inhaler to be able to expand the use of prostacyclins in the PAH market meaningfully.

So I think we feel like even though it's a crowded market, even though Tyvaso has been out there, we still think that there's a lot of opportunity within the WHO Group 1 market to grow the use of prostacyclin and particularly Tyvaso.

And then a similar story, but maybe a little bit easier on the PH-ILD side because there, you have a market that's conservatively 30,000 patients with no other approved therapy. And so we've roughly tapped into about 10% of that over the last couple of years, and we think we have another other 90% available to us. So we still feel like we have a lot of runway there to grow with Tyvaso. And again, I think just with the convenience of DPI, it's going to get easier for doctors to prescribe that drug for those patients that have PH-ILD.

And then shifting to your second point on the PAP. So yes, so the issue is that we had patients in PH-ILD, patients on Medicare and our PAP program for 2021, 2022, expected a lot of those to roll over starting in 2023. And a lot of those have started to roll over in 2023. It's not as high as -- the number that are rolled over, it's not as high as we expected for a couple reasons.

One is I think at the end of the third quarter, I think we reported that there were about 700-ish patients in the PAP program. So some of those discontinued which we expected. Some of those even after becoming -- even with the CMS coverage, still qualified for PAP. And so they stayed in PAP. And then as I said in my prepared remarks, we did have a number of patients that transition to DPI between the end of the third quarter and the beginning of the first quarter. And so with the higher co-pays and Part D, they were then eligible to remain in PAP.

So I think we still had about half, slightly more than half of those patients convert over. I think they're still -- they're kind of working through the system, but it's a little bit less than we were expecting, I think, when we had the call in the third quarter.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Those are great answers. Jess, one just additional shade of color I could add on top of Mike's remarks with regard to your question as to what kind of parameters can I provide to provide greater assurance about the doubling of revenues by the end of '25 is the uptake of Tyvaso DPI has been dramatic. And as Mike mentioned, he provided some metrics, for example, the very high number of selexipag prescribers who have not previously prescribed on Tyvaso now prescribing Tyvaso DPI.

So when we achieve the doubling of our patients on Tyvaso over a period of just 18 months, I can't really overemphasize what an important metric that is. Just to give you kind of a sense, Tyvaso was approved 10 years ago. So it took like 10 years to get up to a certain level of patient penetration for this drug and then in under 2 years, it doubles. I mean that's -- it's an unmistakable sign in addition to the steps that Mike shared with you that this product is going to penetrate very, very rapidly.

Now while one might think that in an area such as PH Group III, which has been penetrated by no pulmonary hypertension medicines like, oh, these are all just like people dying of thirst and just going to just slap up this new medicine right away, the reality in a disease like pulmonary hypertension is that it just doesn't happen like that. Instead, it's a very kind of blocking and tackling exercise of physician by physician, center by center working through all of the rigorous of talking to the right payers and getting the payers to understand the right procedures and going through all the procedures and the pre-approval, diagnoses, requirements, the catheterizations and all of these things.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000018

So while we did create like special teams focused on PH Group III before we launched into that indication, in the field of pulmonary hypertension, one year of kind of preparation is sort of like nothing compared to how much activity is needed to build a bulk of patients. So now that 1 year is more than 2 years behind us, we've now had a year of actual practice, okay, you can actually put these patients on medicines.

As Mike referred to, the payer aspects, especially with regard to Medicare, we're just very, very recently resolved favorably in our direction. And so the -- it's just you have to like first have not just 1 year and not just like there wasn't like a waiting bolus of patients in Group III just waiting for a launch, you have to like develop this market and really kind of till the soil for a number of years. We've now done that, and we're experienced in those clinics and it's this reason why we think out of those 30,000 PH Group III patients. Fortunately, none of them have been touched by pulmonary hypertension treatment that we can rapidly grow our numbers of patients at the same rate that we've been growing them for the past year with this doubling of the number of patients on Tyvaso and thereby reach a number of total treprostinil patients, something that would be in the 20,000 that would correlate when you multiply that times the reimbursement per patient to the $4 billion per year.

And of course, it's important. In addition to this, not to be losing revenue from Remodulin or Orenitram. But not only are we not losing revenue, we're solidifying our hold on the Remodulin revenues as Mike referred to the very rapid penetration that the Remunity pump has made and we're growing our revenues in Remodulin -- in Orenitram as a result of the EXPEDITE study that Mike described. So we feel that doubling revenues in 3 years is really a very doable too.

Operator, next question, please?

**Operator**

Our next question comes from Terence Flynn with Morgan Stanley.

**Justin Hovsep Simonian Phillips** - *Morgan Stanley, Research Division - Research Associate*

This is Justin Phillips on for Terence. Just one question for me. I was wondering if you could provide any details today on the Tyvaso trends for January and February.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Sure. Mike, would you like to take that?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. I'm not going to get into too much detail in terms of previewing the quarter. I mean, I think what I can tell you is and really I have got about a month of data behind us, but I can tell you that the trends in terms of referrals, that's what we call prescriptions for Tyvaso in January are very strong, had like a record level for January.

So -- and at least what I'm seeing through kind of there's a lag on the February data, but February is continuing that. So again, I think we're really pleased, just to echo what Martine said, I think we're really pleased with the uptake of generally and specifically with DPI.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Mike. That's so nice to hear. Record January referrals after a record year, fantastic. Next question, please.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

LIQ_PH-ILD_00000019

## FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

**Operator**

Our next question comes from Hartaj Singh with Oppenheimer & Company.

---

**Hartaj Singh** - *Oppenheimer & Co. Inc., Research Division - Research Analyst*

Just a quick question on a slightly different topic with your plan to potentially double revenues by 2025, you still got the Tyvaso IPF Phase III trial reading out around then which is positive. Martine sense another nice little runway there. Could you maybe just go over -- remind us again if Gil is on the call, the data behind that, your certainty around that project? And then just some basic sizing of the market.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Sure, Dr. Singh, so happy to hear your voice this morning, and thank you for asking a science question. We love those questions best of all. We have on our call, Dr. Leigh Peterson, and she is our Chief Scientist for the program, and she's also running the TETON clinical trials. People often wonder why they are named TETON, and it's because Dr. Peterson is from Wyoming. So it makes perfect sense. And Leigh, if you could provide Hartaj with some of the scientific reasons why we feel very confident that the Phase III trials of Tyvaso in IPF are rightly sized and that the endpoints are rightly chosen.

---

**Leigh Peterson**

Yes, sure. Thank you for the question. As you know from the results of our INCREASE study, we had an exploratory endpoint, which was forced vital capacity. And that was really -- for the PH-ILD population, it was really a safety assessment in the study but it turned out, we actually saw an improvement of that endpoint in patients on Tyvaso and so -- relative to placebo.

And so between the results of this study, increase in PH-ILD patients as well as quite a few -- quite a bit of evidence in the literature of in vitro in nonclinical studies that Tyvaso or treprostinil does have an impact on fibrosis.

It's very reasonable that we would be able to have a positive impact in an IPF population. And so using the statistics and the treatment effect that we saw, an increase in specifically IPF patients, we were able to do sample size calculations in order to predict that we would have a successful study with a sufficient p-value to get approval. And we're actually doing 2 studies, one TETON 1 study in the U.S. and Canada as well as TETON 2, which is outside of U.S. and Canada in order to -- in each of those studies, about 400 patients -- almost 400 patients, and enrollment is going well as expected.

And as Martine -- that we expect to read out in around the 2025 time frame of both of those studies. They both have an FVC endpoint again, same as what we saw, a positive sense in INCREASE. And we have a year-long follow-up period. We've also had some published results of the INCREASE. You might remember that the randomized part of the study an INCREASE was 16 weeks, but we continue to follow patients -- those patients in a long-term open-label extension study. And so we've been collecting long-term FVC data as well, which looks promising and also gives us confidence that the TETON studies will be successful, but to be determined in 2025 time frame.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Well, thank you so much, Leigh. And I just want to and toot your horn just for a moment to the hundreds of people on the call that there was similar skepticism as to whether or not Tyvaso could work in Group III patients and you proved that it could. And I believe your results were published in the New England Journal of Medicine. So congratulations again. Next caller, please.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000020

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

**Leigh Peterson**

Thank you. Yes, they were.

---

**Operator**

Our next question comes from Ash Verma with UBS.

---

**Ashwani Verma** - *UBS Investment Bank, Research Division - Director of Americas Equity Research & US Specialty Pharma Analyst*

I have one. So for Tyvaso, was there any inventory buildup in 3Q that bind you down mostly in 4Q or do you think inventory is still at an elevated level during 4Q? I think you mentioned that specialty distributors are still rightsizing the orders.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Ash. Thank you for that question. Fortunately, we have our Chief Financial Officer, on the phone, James Edgemond. And James, if you could perhaps help Ash with the inventory question.

---

**James C. Edgemond** - *United Therapeutics Corporation - CFO & Treasurer*

Yes. Thank you, Martine. Thank you for your question. I think there's kind of 2 ways to answer. One is Michael addressed and talked about the Tyvaso and Tyvaso DPI ordering patterns in his prepared remarks. And I think if you look at B as part of the answer, the other products there was no unusual ordering or inventory activity and our specialty pharmaceutical distributors were in line with their contractual requirements on inventory. So hopefully, that provides you insight in terms of your question this morning. So thank you, and back to you, Martine.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, James. Operator, next question please.

---

**Operator**

Our next question comes from Joseph Thome with Cowen and Company.

---

**Joseph John-Charles Thome** - *Cowen and Company, LLC, Research Division - MD & Senior Research Analyst*

We're going to be seeing the full mark of sotatercept Phase III data at ACC in about 11 days. And I was just curious how you see a potential future sotatercept launch impacting the PAH market broadly and maybe how this is reflected in that 2025 revenue run rate guidance that you announced.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Yes. Thanks for the question. So it's really like super speculative to provide any kind of a meaningful answer to the question because we don't know what the regulatory time frame is going to be for sotatercept. So it's all but impossible to give you any kind of accurate sense.

I will say that our revenue forecast is agnostic with regard to whether or not sotatercept is approved or not. In other words, we will remain confident about achieving the doubling of our revenues by 2025 without regard to its launch. There -- it's a very large and diversely treated patient population. Changes in treatment patterns are relatively slow and cautious especially other than frontline treatments such as like ETRAs or PD5s. So I'd be very,

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000021

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

very skeptical that you would see an impact of sotatercept on United Therapeutics revenue profile or product uptake across the board, whether it's Remodulin, Tyvaso, Tyvaso DPI or Orenitram.

More broadly, the experience has been that when new agents have been introduced into the market, it has grown the market for all of the existing patients. It's kind of like a market growth thing. You saw this with, for example, back in the day when we launched Remodulin and J&J's precursor Actelion launched bosentan, the treprostinil revenues did not shrink. In fact, they grew and then later on, when PD5s were introduced, the market for ETRAs, and treprostinil did not shrink. In fact, it grew, it grew quite a bit. And this has been just a continuous process, and it harkens back to the landmark number that you should keep in your mind that Michael Benkowitz mentioned in his remarks was 50,000, that's 5-0 thousand. That's the number of patients diagnosed with pulmonary hypertension. And all of these drugs have just like scratched the surface of being able to really treat the patients and get them back to a New York Heart Association Functional Class I or even Functional Class II level.

So there is so much robust room for growth and improvement in pulmonary hypertension. We at United Therapeutics, welcome any new agent that can help the health of the pulmonary hypertension patient population. And by the way, all that is with respect to WHO Group I pulmonary hypertension. So everything I just said, then you've got this other huge pool that Dr. Peterson opened up with her New England Journal article, WHO Group III, 30,000 patients, that's 3-0 thousand, of which the only approved treatment right now is our Tyvaso drug.

And I think sotatercept, I would love to see another good drug to help people with pulmonary hypertension. I don't think it's going to have any effect on our revenue growth.

Next question, operator, and we'll have to cut it after that due to coming to the end of time.

---

**Operator**

Our final question comes from Andreas Argyrides with Wedbush Securities.

---

**Andreas Argyrides** - *Wedbush Securities Inc., Research Division - Analyst*

Congrats on a great year. Just a quick one here on Tyvaso DPI. Are you still seeing more rapid up taking new patients versus transition? And what is the split between new and transition patients?

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

A very good question. Mike, can you give us our final answer on the call?

---

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Yes. So it's -- I think it's -- I have to go back to look, I haven't look at it in a couple of weeks, but I think it's still weighted towards new patients in terms of DPI. I mean the transitions are coming. It's just as I think I said on the last call, I think what physicians are doing is they're waiting until patients come in for the regular checkup. So they're kind of coming -- they are coming in at a healthy clip, healthier than what we were seeing and I think that will continue through the course of the year.

And so I fully expect at the end of the year, those patients that want to transition to DPI will transition to DPI. So it's certainly a kind of a point of emphasis for our sales team. And certainly, as I said -- certainly, I think the physicians are aware of it and as those patients come in and they decide that the patient is eligible to transition, they'll move them over.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000022

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Mike. Well, to wrap up the call, we are tremendously excited about 2022. This is the year that we hit our $2 billion revenue run rate that has been our goal for really much of the past several years. And we are even more jazzed and more pumped by the fact that the $2 billion level, makes it very clear to us that $4 billion is achievable with all of the products that we are currently marketing and explaining to physicians, the scientific and medical benefits of.

And then beyond that, as Hartaj indicated in his question, we have a whole another slew of type -- of products coming out of our Phase III pipeline, particularly a whole new disease indication, pulmonary fibrosis and then on top of that, a best-in-class treatment for pulmonary hypertension, which would be Ralinepag. So 2022 was amazing, a huge kudos to everybody on the team for achieving it. 2023 is looking even better. And with that, operator, you can close out the call.

**Operator**

Thank you for participating in today's United Therapeutics Corporation Earnings Webcast. A rebroadcast of this webcast will be available for one week by visiting the Events and Presentations section of the United Therapeutics Investor Relations website at ir.unither.com. Have a good day.

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2023, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000023

# EXHIBIT 3

| | |
|---|---|
| **From:** | Sukduang, Sanya |
| **Sent:** | Monday, February 26, 2024 6:05 PM |
| **To:** | Jackson, William C; Flynn, Michael J. |
| **Cc:** | Davies, Jonathan; kkeller@shawkeller.com; Nate Hoeschen; Dcarsten@mwe.com; Cheng, Katherine; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis; Romeo, Eric; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 |
| **Subject:** | RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion |

William,

We agree a TRO is a waste of time, resources and not well supported.  This is an issue completely of UTC's own making.  UTC knew from the date of FDA approval of PH-ILD that its regulatory exclusivity would expire at the end of March 2024.  UTC filed suit in September 2023 asserting the 793 patent based on Liquidia's addition of PH-ILD and knew Liquidia intended to launch upon FDA approval.  Yet, UTC did not file a PI at that time.  UTC amended its complaint on November 30, 2023 to add the '327 patent, knowing Liquidia would launch and knowing the date of expiry of regulatory exclusivity—no PI was filed.  On December 6, 2023, upon a direct request from you, Liquidia expressly and unequivocally informed UTC that it will launch upon final FDA approval.  UTC did not file a PI then.  Thus, the immediacy and harm UTC alleges is a fallacy and nonetheless, caused by UTC.  These facts are not in dispute.

Liquidia will not agree to delay launching until resolution of UTC's PI motion.

Thanks
Sanya

**From:** Jackson, William C <WJackson@goodwinlaw.com>
**Sent:** Monday, February 26, 2024 5:02 PM
**To:** Sukduang, Sanya <ssukduang@cooley.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

**[External]**

Sanya:

It has occurred to us that the briefing schedule that you requested means that UTC's regulatory exclusivity on ILD will expire before the briefing on the PI is complete.  It is possible that the FDA may act in the interim.  Will Liquidia agree not to launch before Judge Andrews rules on the preliminary injunction motion?  If not, we will be forced to file a request for a temporary restraining order, which we think is a waste of time and resources.

Let us know.

**William C Jackson**



Goodwin Procter LLP

1

LIQ_PH-ILD_00000024

1900 N Street, NW
Washington, DC 20036
o  +1 202 346 4216
m +1 202 270 6622
f   +1 202 478 0819
WJackson@goodwinlaw.com



---

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Monday, February 26, 2024 9:11 AM
**To:** Jackson, William C <WJackson@goodwinlaw.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

***EXTERNAL***
William,

We disagree with many of UTC's positions below, but the facts concerning UTC's prior notice of Liquidia's intent to launch have been confirmed in your email below.  We see no need for a further meet and confer.

Thanks
Sanya

---

**From:** Jackson, William C <WJackson@goodwinlaw.com>
**Sent:** Saturday, February 24, 2024 3:54 PM
**To:** Sukduang, Sanya <ssukduang@cooley.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

**[External]**

---

Sanya:

As I am sure you expected, there are a number of statements and characterizations in your email below with which we disagree.  For example:

1. **Question 1**:  Liquidia currently is enjoined from launching based on the judgment from the prior D. Del. case.  But Liquidia has a pending Rule 60 motion for relief from that judgment.  The Court could rule on that motion at any time.  Should that motion be granted, there would be no impediment to Liquidia launching its LIQ861 product.  Should the Court grant the motion and Liquidia launch its product for ILD, UTC would be irreparably harmed.  **UTC proposed that, in order to avoid having to brief a preliminary injunction now, the parties agree that, if the Court were to grant the pending Rule 60 motion in the prior case, UTC would have 5 days to file a preliminary injunction motion and Liquidia would not launch its product for the ILD indication**

LIQ_PH-ILD_00000025

**during the pendency of those preliminary injunction proceedings.**  Such an agreement would obviate the need for a preliminary injunction motion now (and potentially at all).  Liquidia has now rejected that proposal.

2. **Question 2**:  The APA action against the FDA asserts that the FDA violated its own "Bundling Rule" and allowed Liquidia to seek to add the ILD indication as an amendment rather than a separate NDA.  Those proceedings, alleging a violation of the Administrative Procedures Act, are entirely distinct from these proceedings in which UTC alleges that Liquidia is infringing its '327 patent.  Nor is Liquidia even a party to those proceedings.

3. **Questions 3-4**:  The parties did meet and confer in December about entirely different issues in this case.  During that conversation, the possibility of a preliminary injunction was referenced.  But I believe the focus of the meet and confer in December was the schedule for Liquidia answering or otherwise responding to the Amended Complaint that UTC had filed.

4. **Question 5**:  As I indicated, in the NC case UTC has consistently sought to accommodate both parties' reasonable scheduling requests.  By contrast, after providing an expert report in the NC case, Liquidia stated that its expert was available for deposition on a single day in the entire expert discovery period, including weekends, and refused to agree to extend the expert discovery period to accommodate the schedules of those involved.  It was for that reason that we were forced to seek the NC court's assistance.  We are corresponding with you and NC counsel with respect to the proposal to adjust the NC expert deposition calendar.

5. **Questions 6-8**:  We agree with your summaries below and look forward to hearing from you with respect to the deposition dates for Dr. Nathan and Mr. Selck.

We are available should Liquidia believe that further meet and confer efforts would be productive.  Thanks.

**William C Jackson**



Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
o  +1 202 346 4216
m +1 202 270 6622
f   +1 202 478 0819
WJackson@goodwinlaw.com



---

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Friday, February 23, 2024 4:47 PM
**To:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Jackson, William C <WJackson@goodwinlaw.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

***EXTERNAL***
Counsel,

I write to summarize the parties' meet and confer concerning UTC's anticipated PI motion, which was attended by Sanya Sukduang, Karen Keller, and Lauren Strosnick for Liquidia and William Jackson, Doug Carsten, and Michael Flynn for UTC.

The parties addressed the questions presented below.

LIQ_PH-ILD_00000026

Question 1, UTC recognized that it was seeking an injunction despite already having an injunction preventing the launch of Yutrepia.  UTC offered to hold-back its proposed PI until after the Court decides Liquidia's Rule 60 Motion if Liquidia agreed to (a) grant UTC 5 days to decide to file a PI; and (b) if filed, not launch until the PI was resolved.  **We presented this offer to Liquidia, but Liquidia cannot agree to this proposal**.

Question 2, UTC asserted that the APA action against the FDA seeks different relief than the proposed PI.  Liquidia disagreed, indicating that the PI seeks to enjoin Liquidia from launching in PH-ILD and UTC's FDA action seeks to compel the FDA to revoke any approval of Yutrepia for PH-ILD and force Liquidia to refile.  In short, both seek to enjoin Liquidia from launching Yutrepia in PH-ILD.

Questions 3-4, UTC asserted that it became aware of "recent" press release regarding Liquidia's anticipated launch and this "recent" notice was required to file a PI.  UTC acknowledged, however, that the parties did conduct a meet and confer prior to December 25, 2023 (the exact date was December 6, 2023), where Liquidia provided notice, as expressly requested by UTC's counsel Mr. Jackson, that it would launch Yutrepia immediately upon FDA approval.  UTC's counsel also agreed that during the December 6, 2023 meet and confer, Mr. Flynn suggested the parties contact the Court to address a PI briefing schedule.

Question 5, Liquidia asked if UTC would be amenable to postpone the UTC witness expert depositions in the NC trade secret case, to which UTC said it was.  **Liquidia will submit a proposal to NC counsel shortly**.

Question 6, UTC indicated it intends to file its PI motion on Monday or Tuesday of next week.

Question 7, UTC has identified 2 experts (Dr. Nelson and Mr. Selck).  Dr. Nelson is available for deposition on March 10 and Mr. Selck sometime thereafter.  Liquidia is looking to see if those dates work.

Question 8, Liquidia requests an extension, until **April 5, 2024** to file its opposition, which UTC indicated it would consent to.  UTC's requested two-weeks after Liquidia files its opposition to file its reply, to which Liquidia consents.

Thanks
Sanya

---

**From:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Sent:** Thursday, February 22, 2024 12:50 PM
**To:** Sukduang, Sanya <ssukduang@cooley.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; William Jackson (Goodwin) <wjackson@goodwinlaw.com>; Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com) <dcarsten@mwe.com>; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com) <adykhuis@mwe.com>; Burrowbridge, Adam W. (MWE) <aburrowbridge@mwe.com>; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

**[External]**

---

Sanya,

We are available at 12:00 ET on Friday for a call and look forward to discussing your questions below.

Click to join meeting: https://meet.loopup.com/45xeX0IXC8

**Or dial in:**

4

LIQ_PH-ILD_00000027

US Toll Free: 1 877 304 9269
Passcode: **3023519661#**

Mobile Quick Join: tel://+18773049269,,3023519661#

_____

**MICHAEL J. FLYNN**
Partner | Morris, Nichols, Arsht & Tunnell LLP
(302) 351-9661 Direct
**mflynn@morrisnichols.com**

---

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Wednesday, February 21, 2024 9:51 PM
**To:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; William Jackson (Goodwin) <wjackson@goodwinlaw.com>; Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com) <dcarsten@mwe.com>; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com) <adykhuis@mwe.com>; Burrowbridge, Adam W. (MWE) <aburrowbridge@mwe.com>; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** [EXT] Re: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

Michael

We aren't available tomorrow, but can be Friday except between 3:00-4:00 pm, contingent upon UTC's ability to respond to the issues below .

During the call, we expect UTC to specifically address the following, and failure to do so will be raised with the Court:

1. Why UTC believes a PI is needed in this action given UTC's position, articulated as recently as yesterday, that the Court's 793 injunction cannot be lifted until the 793 claims are cancelled by the Director;

2. Why a PI is needed given UTC's complaint against the FDA that Yutrepia should not be launched;

3. UTC's delay, until February 21, 2024, to address a PI given the parties' specific discussion with you and William Jackson of a PI request prior to December 25, 2023 and Liquidia's request to address any potential PI briefing such that UTC does not force Judge Andrews to act expeditiously;

4. Why, despite filing a complaint 3 months ago concerning the '327 patent, UTC has waited to file a PI;

5. Why a PI is warranted given UTC's request for a 30 day extension of time to answer Liquidia's counterclaims based on proceedings in an unrelated litigation in NC and why Liquidia is also not entitled to rely on the schedule in NC to support a non-conflicting schedule;

6. The specific date UTC intends to file its PI motion and any declarations it may file in support;

7. The dates any UTC declarant is available for a deposition; and

8. The briefing schedule UTC proposes.

This above list is non-limiting and Liquidia may raise additional issues based on UTC's responses.

5

LIQ_PH-ILD_00000028

If UTC is prepared to fully address each issue above, Liquidia can be available on Friday except between 3:00-4:00 PM EST.

Thanks
Sanya

On Feb 21, 2024, at 6:07 PM, Flynn, Michael J. <mflynn@morrisnichols.com> wrote:

[External]

Counsel,

UTC intends to file a Motion for Preliminary Injunction to enjoin the launch of Yutrepia for treatment of pulmonary hypertension associated with interstitial lung disease upon the expiration of UTC's regulatory exclusivity on April 1, 2024, pending resolution of UTC's infringement claims for U.S. Patent No. 11,826,327 asserted in this action.  We would like to discuss with you the timing of that motion and a briefing schedule.

Can you please let us know your availability **tomorrow**, **February 22,** for a call to discuss?  We are available any time except 12-1 ET.

Thanks,
Michael

_____
**MICHAEL J. FLYNN**
Partner | Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 351-9661 Direct
**mflynn@morrisnichols.com | vcard | bio | www.morrisnichols.com**

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

LIQ_PH-ILD_00000029

If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

DA0033

LIQ_PH-ILD_00000030

# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED THERAPEUTICS
CORPORATION,

       Plaintiff,

                      Case No. 23-975

   v.

LIQUIDIA TECHNOLOGIES, INC.,

       Defendant.

_____


HIGHLY CONFIDENTIAL

ATTORNEYS' EYES ONLY



VIDEOTAPED DEPOSITION OF

FREDERIC SELCK, Ph.D.




Washington, D.C.
March 15, 2014



Reported by:
Misty Klapper, RMR, CRR, CSR
Job No.: 1111116



Page 2

```
1
2                 Friday, March 15, 2024
3                    9:11 a.m. EDT
4
5
6    Held at the offices of:
7       GOODWIN PROCTER LLP
         1900 N Street, N.W.
8        Washington, D.C. 20036
         (202) 346-4000
9
10
11
12
13
14
15
16
17       Taken pursuant to notice, before Misty
18   Klapper, Registered Professional Reporter,
19   Certified Realtime Reporter, Certified Shorthand
20   Reporter and Notary Public in and for the District
21   of Columbia.
22
```

Page 3

```
1    APPEARANCES:
2    ON BEHALF OF PLAINTIFFS:
3         KATHERINE CHENG, ESQUIRE
          GOODWIN PROCTER LLP
4         1900 N Street, N.W.
          Washington, D.C. 20036
5         (202) 346-4000
          E-mail: katherinecheng@goodwinlaw.com
6
               AND
7
          ADAM W. BURROWBRIDGE, ESQUIRE
8         LILLIAN J. SPETRINO, ESQUIRE
          McDERMOTT WILL & EMERY LLP
9         500 North Capitol Street, N.W.
          Washington, D.C. 20001-1531
10        (202) 756-8000
          E-mail: aburrowbridge@mwe.com
11            lspetrino@mwe.com
12
     ON BEHALF OF DEFENDANT LIQUIDIA TECHNOLOGIES, INC.:
13
          PHILLIP MORTON, ESQUIRE
14        SANYA SUKDUANG, ESQUIRE
          JOHN HABIBI, ESQUIRE
15        COOLEY LLP
          1299 Pennsylvania Avenue, N.W., Suite 700
16        Washington, D.C. 20004-2400
          (202) 842-7800
17        E-mail: pmorton@cooley.com
              ssukduang@cooley.com
18            jhabibi@cooley.com
19
20   ALSO PRESENT:
21        NORMAN REYNOLDS, VIDEO OPERATOR
22
```

Page 4

```
1            CONTENTS
2    WITNESS:      EXAMINATION BY:      PAGE:
3    Frederic Selck   Mr. Morton        6
4
5
6
7            EXHIBITS
8    NO.:      DESCRIPTION:          PAGE:
9    Exhibit 1   Preliminary Injunction Declaration
10        of Frederic Selck, Ph.D., dated
11        2/26/24              7
12   Exhibit 2   United Therapeutics Tyvaso
13        Forecast (2023-2035)      81
14
15
16
17
18
19
20
21
22
```

Page 5

```
1            PROCEEDINGS
2        VIDEO OPERATOR:  We are now on
3    the record.  This begins the
4    videotaped deposition of Frederic
5    Selck, Ph.D., taken in the matter of
6    United Therapeutic Corporation versus
7    Liquidia Technologies, in the United
8    States District Court for the District
9    of Delaware, Case Number 23975.
10       Today's date is March 15th
11   2024.  The time is 9:11.  This
12   deposition is being held at
13   1900 N Street, Northwest, Washington,
14   D.C.
15       The court reporter is Misty
16   Klapper on behalf of Magna Legal
17   Services.  The videographer is Norman
18   Reynolds on behalf of Magna Legal
19   Services.  All counsel will be noted
20   on the stenographic record.
21       Will the court reporter please
22   swear in the witness.
```



2  (Pages 2 to 5)

**Page 6**

1      MS. REPORTER:  One moment.
2      FREDERIC SELCK, Ph.D.,
3      The witness herein, called for
4   examination by counsel for the Defendant ,
5   having been duly sworn, was examined and
6   testified as follows:
7   EXAMINATION BY COUNSEL FOR DEFENDANT
8      BY MR. MORTON:
9      Q.   All right.  Good morning.
10     A.   Good morning.
11     Q.   Please state your name for the
12  record.
13     A.   Fred Selck.
14  ████████████ ████████
    █ ██████ ███████
    █ ███████████ ████
    █ ██████████████████████ ██████████ .
19     Q.   All right.  And I -- I take it
20  you've been deposed before?
21     A.   Yes.
22     Q.   So you understand that you're

**Page 7**

1   under oath and you have an obligation to
2   answer my questions as truthfully and
3   completely as possible?
4      A.   Yes.
5      Q.   If you don't understand any of my
6   questions today, please ask me to clarify.
7   Can we do that?
8      A.   Yes.
9      Q.   All right.  Is there any reason
10  you can't give your best and complete
11  testimony today?
12     A.   No.
13     Q.   All right.  We've premarked
14  Exhibit 1, which is a copy of your
15  preliminary injunction declaration.
16          (Thereupon, Selck Exhibit 1 was
17       marked for identification.)
18        MR. MORTON:  I'll hand you a
19  copy.
20        MS. CHENG:  Thank you.
21        BY MR. MORTON:
22     Q.   Could you please confirm this is

**Page 8**

1   the declaration that you submitted in this
2   case.
3      A.   Yes, it is.
4      Q.   How many times have you had your
5   deposition taken before?
6      A.   This is my tenth time.
7      Q.   Okay.  And is -- if you turn to
8   Attachment A-1 of your Exhibit 1., that's a
9   copy of your CV, right?
10     A.   Yes, it is.
11     Q.   All right.  And if you turn to
12  the second page of that Attachment A-1,
13  there's a list of testimony there.
14          Is that a complete list of the
15  cases in which you've provided testimony?
16     A.   Yes.
17     Q.   And how many of those cases were
18  patent infringement cases?
19     A.   None of these were -- were patent
20  infringement cases.
21     Q.   Have you ever given expert
22  testimony on damages in a patent infringement

**Page 9**

1   case?
2      A.   Submitted an expert report
3   rebutting a damages claim by Sanofi/Regeneron
4   related to an injunction in Germany.  And
5   that report was submitted to the Munich court
6   in -- in Germany.
7      Q.   Okay.  So you've never quantified
8   damages in a U.S. patent infringement case?
9      A.   I've -- I've quantified damages.
10  As -- as far as offering expert testimony or
11  testifying in court to those damages, I -- I
12  have not done that.
13     Q.   All right.  Turn back to the
14  first page of Attachment A-1.  This reflects
15  your -- our education and -- and prior work
16  experience; is that correct?
17     A.   That's correct.
18     Q.   And looks like you've got several
19  degrees in economics; is that right?
20     A.   Yes.
21     Q.   And you do not have a medical
22  degree?

**MAGNA**
LEGAL SERVICES

Page 10

1    A.    No, I do not.
2    Q.    Do you have any type of life
3 sciences degree?
4    A.    I'm a -- my field as -- as -- as
5 a Ph.D. economist was in health and -- and
6 a -- and a subset of health is -- is life
7 sciences.
8    Q.    Okay.  But you're not holding
9 yourself out here as a -- a medical expert,
10 right?
11    A.    No.
12    Q.    Or a scientific expert?
13    A.    I do have graduate training in
14 epidemiology and -- and biostatistics.  So
15 from that perspective, in -- in terms of
16 quantification of -- or comparisons of things
17 like clinical trial data and -- and things of
18 that sort, I feel like I'm qualified to do.
19 But I'm not a -- I'm not somebody that you
20 would come and see and -- and get health care
21 for.
22    Q.    Fair enough.

Page 11

1    Have you ever been involved in
2 the treatment of pulmonary hypertension?
3    A.    No.
4    Q.    Or -- or pulmonary arterial
5 hypertension?
6    A.    No.
7    Q.    Or pulmonary hypertension-
8 interstitial lung disease?
9    A.    No.
10    Q.    Is this the first time you've
11 worked on a matter on behalf of United
12 Therapeutics?
13    A.    Yes.
14    Q.    Is this the first time you've
15 worked on a matter involving any form of
16 pulmonary hypertension?
17    A.    Yes.
18    Q.    And you're relying on Dr. Nathan
19 for your understanding of the infringement
20 and issues in this case?
21    MS. CHENG:  Object to form.
22    THE WITNESS:  With respect to

Page 12

1 infringement, but in addition to that,
2 I'm relying on Dr. Nathan for his
3 descriptions on how prescribers or
4 providers would view Yutrepia and --
5 and -- and Tyvaso.
6    BY MR. MORTON:
7    Q.    Do you rely on Dr. Nathan for
8 anything else?
9    A.    No.
10    Q.    When were you retained in this
11 case?
12    A.    Can't recall the -- the exact
13 date, but the retention occurred in -- in
14 middle of -- mid of -- middle of December.
15    Q.    Middle of December of 2023?
16    A.    '23.
17    Q.    And when did you start work on
18 your declaration in this case?
19    A.    Immediately after -- after my
20 retention.
21    Q.    So you started work on your --
22 your declaration in December of 2023?

Page 13

1    A.    That's correct.
2    Q.    And how much time did you spend
3 preparing your declaration?
4    A.    Do you mean in -- in terms of
5 hours?
6    Q.    Um-hmm.
7    A.    I can't say for sure, given
8 the -- I haven't looked specifically at --
9 at -- at the bills yet, but anywhere between
10 150 to -- to 200 hours.
11    Q.    And you -- you -- you said you
12 started work on this declaration in December.
13    Were there -- were you working on
14 it consistently from December to February,
15 when it was served?
16    A.    Yes.  And I should add in -- in
17 conjunction with staff members who -- who
18 reported to me in -- in -- in preparing
19 this -- this declaration.
20    Q.    Okay.  Who are those staff
21 members that reported to you?
22    A.    Ryan Marsh.  He's a Ph.D. at --



4  (Pages 10 to 13)

Page 14

1  at my firm, Intensity.
2     Q.   Um-hmm.  Anyone else?
3     A.   Anu Subramaniam, who's also a
4  Ph.D.
5     Q.   I -- I didn't catch that.  Arun
6  Subramaniam?
7     A.   Anu.
8     Q.   Anu?
9     A.   Yes.
10    Q.   Any Subramaniam.  Okay.  Thank
11 you.
12      Anyone else?
13    A.   And Kristyn Berretta.  There were
14 other staff members on that team as well,
15 Ryan Sherrard, but Anu, Ryan Marsh and -- and
16 Kristyn were the -- the principals on the
17 team.
18    Q.   How much time did your team spend
19 on the declaration?
20    A.   I haven't looked at the total
21 number of hours that -- that -- that --
22 billed to the case, so I -- I -- can't tell

Page 15

1  you for sure.
2     Q.   Okay.  And I assume you're being
3  compensated for your work on this declaration
4  here?
5     A.   Yes.
6     Q.   Okay.  And what -- what is your
7  hourly rate that you're being compensated at?
8     A.   Looking --
9     Q.   Not sure I saw it in there.
10 That's why I'm asking.
11    A.   I believe --
12    Q.   Maybe I overlooked it.
13    A.   No, I -- I don't think it's in
14 there.  It's $1,050 an hour.
15    Q.   Who drafted your declaration?
16    A.   I drafted my declaration.
17    Q.   You drafted every word in your
18 declaration?
19    A.   I had assistance from -- from my
20 team, but I reviewed everything that was --
21 that was put into the declaration and I'm
22 responsible for everything that's in my

Page 16

1  declaration.
2     Q.   And which portions of the
3  declaration did you write?
4     A.   I wrote the entire declaration.
5     Q.   You wrote every word in the
6  declaration?
7     A.   I've had team members provide
8  material to me as part of research tasks that
9  I've given them.  But as -- as it's put into
10 the declaration, I review it and put it into
11 my own words.  So I -- I -- from my
12 perspective, I've -- I've written my
13 declaration.
14    Q.   Are there any sections of the
15 declaration you did not write?
16    A.   No.
17    Q.   So just so I'm clear, you wrote
18 every word in this declaration?  That's your
19 testimony here?
20    MS. CHENG:  Object to form.
21    THE WITNESS:  I've reviewed
22 material that was provided to me by my

Page 17

1  team and, as it was put into the
2  declaration, reviewed and refined
3  every word that's -- that's in this
4  declaration.
5     BY MR. MORTON:
6     Q.   Are there any errors that you
7  want to correct at this time in your
8  declaration?
9     A.   I think in the headers where I
10 describe PCSK9 inhibitors, we may have
11 transposed or I may have transposed the S and
12 the C and -- and so I'd like to -- yes.
13    So if you look at paragraph 82,
14 where -- where we have -- where I have PSCK9
15 inhibitors, that should be PCSK9 inhibitors.
16    Q.   Fair enough.  All right.
17    Looks like it may not only be in
18 the header, but there's a few other places
19 that have that typo.
20    A.   I -- I apologize ahead of time.
21    Q.   Any other errors that you want to
22 correct in your declaration?

**MAGNA** ◆
LEGAL SERVICES

5  (Pages 14 to 17)

Page 18

```
 1     A.    Not that I'm aware of.
 2     Q.    I see that you spoke to several
 3  people in support of your declaration; is
 4  that correct?
 5     A.    Yes.
 6     Q.    You spoke to Dr. Steven Nathan,
 7  correct?
 8     A.    Yes.
 9     Q.    And when did you speak to
10  Dr. Nathan?
11     A.    On February 9th 2024.
12     Q.    Is that the only time you spoke
13  to Dr. Nathan?
14     A.    Yes.
15     Q.    How long was your conversation
16  with Dr. Nathan?
17     A.    We had scheduled an hour.  I
18  don't know if we took the -- the whole hour,
19  but -- but up to an hour.
20     Q.    You spoke to Dr. Nathan for less
21  than an hour, right?
22     A.    Up to an hour.
```

Page 19

```
 1     Q.    Was it closer to 30 minutes?
 2     A.    No, I -- I -- I think it was
 3  closer to an hour or up to an hour.
 4     Q.    All right.  And was that a phone
 5  conversation or a videoconference?
 6     A.    Videoconference.
 7     Q.    Who else was present for that
 8  conversation?
 9     A.    I know United's counsel was --
10  was on that call.  I don't know if I can
11  recall everybody that was there.  I know
12  Katie Cheng was -- was there.  The three
13  individuals that I described on my team, Ryan
14  Marsh, Anu Subramaniam and -- and Kristyn
15  Berretta, were -- were also there.
16     Q.    Anyone else you recall that was
17  present for the conversation with Dr. Nathan?
18     A.    I -- I don't want to misremember
19  who was there on -- on United's counsel.
20  The -- the -- the only one I know for sure
21  was -- was Katie.
22     Q.    You think there may have been
```

Page 20

```
 1  other counsel there?
 2     A.    Yes.
 3     Q.    Was there any in-house counsel
 4  from United Therapeutics there?
 5     A.    Not that I recall.
 6     Q.    Is there any written record of
 7  the conversation you had with Dr. Nathan?
 8     A.    I didn't take any notes.
 9     Q.    Did anybody take notes for you?
10     A.    I'm not aware if anybody took
11  notes for me.
12     Q.    Did anybody provide you notes
13  after the conversation with Dr. Nathan?
14     A.    No.
15     Q.    Did you have a copy of
16  Dr. Nathan's declaration when you had the
17  conversation --
18     A.    No.
19     Q.    -- with him?
20           Did you ever have a copy of
21  Dr. Nathan's declaration?
22     A.    The only time I saw Dr. Nathan's
```

Page 21

```
 1  declaration was after it was submitted.
 2     Q.    Okay.  So before your declaration
 3  was submitted, you did not review
 4  Dr. Nathan's declaration; is that correct?
 5     A.    That is correct.
 6     Q.    And what did you discuss with
 7  Dr. Nathan during this conversation?
 8     A.    I was primarily interested in --
 9  in getting background on treprostinil and
10  more detail on pulmonary hypertension, as
11  well as pulmonary arterial hypertension
12  and -- and pulmonary hypertension-
13  interstitial lung disease or -- I often refer
14  to it as PH-ILD in my report.
15           There are also -- and -- and I
16  might use this interchangeably as -- as we --
17  as we talk, but they're also referred to
18  as -- as Group 1 or -- or Group 3 under the
19  WHO classifications.
20           So I -- I -- we -- we talked a
21  bit about that.  And then we had a
22  conversation as to whether he thought
```



6  (Pages 18 to 21)

Page 22

1   providers and prescribers would -- would view
2   Yutrepia and -- and Tyvaso DPI as
3   interchangeable.
4       Q.    Did you discuss anything else
5   with Dr. Nathan?
6       A.    I think that summarizes the
7   entirety of our conversation.
8       Q.    Okay.  Just so the record's
9   clear, you -- you referred to Group 1.
10          That refers to pulmonary arterial
11  hypertension, or PAH, right?
12      A.    That's correct.
13      Q.    Okay.  And then Group 3, that
14  refers to pulmonary hypertension-interstitial
15  lung disease, or PH-ILD?
16      A.    That's correct.
17      Q.    Okay.  And we'll use -- probably
18  end up using those terms interchangeably
19  today, so -- but you understand that
20  terminology?
21      A.    Group 3 rolls -- rolls off the
22  tongue a -- a little bit better.

Page 23

1       Q.    It does.  I -- I -- I will agree
2   with you on that.
3           And you also prepared a
4   declaration in a matter involving the FDA; is
5   that correct?
6       A.    That's right.
7       Q.    And -- and when did you start
8   your work on that declaration?
9       A.    The scope of charge for the FDA
10  matter was exactly what the scope of charge
11  was in -- in this declaration.  And so the
12  identification and -- and description of the
13  harms, that work started in mid-December.
14      Q.    Okay.  When you say the scope of
15  charge is the same, what do you mean by that?
16      A.    My assignment.
17      Q.    And -- and what do you view your
18  assignment as here?
19      A.    From a high level is to describe
20  the -- the economic harms that United
21  would -- would suffer as a result of
22  Yutrepia's entry in the PH-ILD market.

Page 24

1       Q.    Is your declaration in the FDA
2   matter the same as the declaration that you
3   submitted in this matter?
4       A.    There are modest differences
5   between -- or modest changes between my -- my
6   FDA declaration and -- and this one, in part
7   because the -- what's being asserted as the
8   mechanism for -- that the assertions with --
9   in -- in the FDA matter are different than
10  they are in -- in this -- in this matter.
11      Q.    I'll -- we'll unpack that a
12  little bit.
13          So what you -- what are the
14  changes that you made to this declaration for
15  submission for the FDA declaration?
16      A.    In this -- in this particular --
17  in this matter we're describing the harms
18  that would -- that would result, absent a --
19  a -- a preliminary injunction as -- as the
20  infringement allegations are -- are
21  litigated.
22          In the FDA matter the allegations

Page 25

1   are that the FDA improperly moved forward on
2   the application for -- for PH-ILD or for
3   Liquidia and, as a result, did not give
4   United the opportunity to -- to assert a
5   30-month stay.
6       Q.    Okay.  But my question was about
7   what are the changes that you made to the
8   declaration.  You told me what the difference
9   was between the -- the cases.
10          What are the changes you made to
11  the declaration for submission to the -- in
12  the FDA matter?
13      A.    In terms of -- in terms of the
14  substance, the descriptions of -- of the
15  matter itself are specific to -- to the two
16  matters.  And -- and those -- those were
17  changes.
18          To the degree that the context
19  of -- of the matters were different, you
20  know, I -- I think that resulted in some
21  modest changes between the -- the two
22  declarations.



7 (Pages 22 to 25)



Page 26

1        But, for the most part, in terms
2    of substance, the -- the declarations are the
3    same.
4        Q.   So if we go through the table of
5    contents in your declaration here -- because
6    I don't have a copy of the FDA declaration,
7    so I don't know what you said in there --
8    what -- what are the difference -- or what
9    sections are the same in the FDA matter as in
10   this matter?
11           MS. CHENG:  And, Counsel, you
12       don't have the a copy of the FDA
13       declaration that we could compare?
14           MR. MORTON:  No, I don't.  It
15       wasn't provided to us.
16           THE WITNESS:  No, I would --
17       I'd -- I'd -- I'd -- I'd hesitate
18       to -- to offer an exact comparison
19       without having the -- the FDA
20       declaration in front of me.
21



8  (Pages 26 to 29)

Page 30



```
16        BY MR. MORTON:
17    Q.    You understand that United has
18 other treprostinil products that predate
19 Tyvaso, right?
20    A.    Yes.
21    Q.    And those go back to 2004 or
22 earlier, right?
```



9 (Pages 30 to 33)

Page 34



1        MS. CHENG:  Object to form.
2        THE WITNESS:  I -- I -- I can't
3    recall exactly what -- what -- what
4    year it goes back to.
5        BY MR. MORTON:
6    Q.



10  (Pages 34 to 37)





11 (Pages 38 to 41)





12 (Pages 42 to 45)

HIGHLY CONFIDENTIAL

DA0046

LIQ_PH-ILD_00000608





13 (Pages 46 to 49)

Page 50



8    Q.    Now, in preparation for your
9    declaration, you didn't speak to any payors
10   directly, correct?
11       A.    That is correct.
12       Q.    You didn't speak to any insurance
13   companies, right?
14       A.    Not -- not specifically to this
15   matter.  And even if I did, payors are quite
16   reluctant to disclose any -- any negotiating
17   posture or anything like that with -- with
18   respect to manufacturers.
19       Q.    You didn't discuss -- or you
20   didn't -- strike that.
21           You didn't speak to any pharmacy
22   benefit managers?



14  (Pages 50 to 53)

Page 54

1    A.    Not for this matter, no.
2    Q.    You didn't speak to anyone from
3  Medicare or Medicaid?
4    A.    No.
5    Q.    You didn't speak to any other
6  providers, other than Dr. Nathan; is that
7  right?
8    A.    That's correct.
9    Q.    And you didn't speak to any
10 patients that have been diagnosed with PAH or
11 PH-ILD?
12   A.    I didn't speak to any patients.
13 I did review some YouTube videos that were
14 available that showed patients taking either
15 the nebulized or -- or -- or the dry powder
16 formulations.
17   Q.    What YouTube videos were those?
18   A.    They were ones that I just
19 Googled and -- and -- and found online.
20   Q.    Are they cited in your materials
21 considered in Attachment A-2?
22   A.    No, they -- they weren't

Page 55

1  necessary for my opinion.  It was just
2  something that -- that did I out of
3  curiosity.
4    Q.    Okay.  Besides the YouTube
5  videos, is Attachment A-2 a complete list of
6  the materials you considered in rendering
7  your opinions in the declaration you've
8  entered in this matter?
9    A.    Yes, it is.  And -- and -- and to
10 be clear, the YouTube videos I didn't -- I
11 didn't consider at all in -- in formulating
12 my opinion.
13   Q.    During any of your conversations



Page 56

Page 57

1  the -- the materials that -- that I
2  considered; and I spent several hours with
3  counsel yesterday.
4    Q.    Okay.  How -- how much time did
5  you spend with counsel?
6    A.    We were together from 10:00 in
7  the morning until about 5:00 in the
8  afternoon.
9    Q.    How much time in total did you
10 spend preparing for your deposition today?
11   A.    In -- in between reviewing my
12 declaration, time with counsel, and reviewing
13 materials and, you know, discussing things
14 with my team, anywhere between 25 or
15 30 hours.
16   Q.    Did you speak with any United
17 Therapeutics personnel in preparation for
18 your deposition?
19   A.    No.
20   Q.    Did you speak with Dr. Nathan in
21 preparation for your deposition?
22   A.    No.

20   Q.    What did you do to prepare for
21 your deposition here today?
22   A.    I read my declaration; reviewed



**MAGNA** ›
LEGAL SERVICES

15  (Pages 54 to 57)

1          MS. CHENG:  Counsel, we've been
2   going about an hour.  Could we get a
3   break --
4          MR. MORTON:  Yeah, sure.
5          MS. CHENG:  -- at a good point?
6          MR. MORTON:  We can do that.
7          VIDEO OPERATOR:  Going off the
8   record at 10:15.
9          (Thereupon, a brief recess was
10   taken.)
11          VIDEO OPERATOR:  We're back on
12   the record at 10:31.
13          BY MR. MORTON:
14   Q.     Welcome back.
15          Were you involved in any
16   discussions about your testimony during the
17   break?
18   A.     No.
19   Q.     What is your understanding of
20   Liquidia's Yutrepia product?
21   A.     Yutrepia is a treprostinil-based
22   dry powdered inhaler.

1   Q.     Are there -- or how is Yutrepia
2   different than Tyvaso DPI?
3          MS. CHENG:  Object to form.
4          THE WITNESS:  Based on my
5   understanding, the particle shapes,
6   what constitutes the powder within --
7   within -- within the capsules are
8   different between Yutrepia and -- and
9   Tyvaso.  And I understand that the --
10   the device that's used to -- to
11   contain the capsule is different from
12   the one that's containing the Tyvaso
13   capsule.
14          BY MR. MORTON:
15   Q.     Any other differences that you're
16   aware of between Yutrepia and Tyvaso DPI?
17   A.     No.
18   Q.     You agree that Yutrepia is not a
19   generic version of the Tyvaso products,
20   right?
21   A.     I agree that Yutrepia was
22   approved under the 505(b)(2) FDA approval

1   process.
2   Q.     You agree that Yutrepia's a
3   branded product, right?
4   A.     Yes.
5   Q.     You'd agree that Yutrepia is a
6   strongly differentiated product from the
7   Tyvaso products, right?
8          MS. CHENG:  Object to form.
9          THE WITNESS:  I disagree.
10   Performed my -- my own comparisons
11   where I looked at the proposed labels,
12   assessed the addressable patient
13   populations for -- both products.
14          I also understand that they
15   both share the same active ingredient.
16   And I also understand from Dr. Nathan
17   that he thinks it's likely that
18   prescribers and providers will view
19   these products as interchangeable.
20          BY MR. MORTON:
21   Q.     You agree that Liquidia has
22   preliminary approval from the FDA to -- to

1   launch Yutrepia for the PAH indication?
2          MS. CHENG:  Object to form.
3          THE WITNESS:  I understand that
4   they have received tentative approval
5   for -- for PAH from the FDA.
6          BY MR. MORTON:
7   Q.     And -- and you'd agree that the
8   injunction that's being sought in this case,
9   that would not impact the launch of Yutrepia
10   for at least the PAH indication, right?
11          MS. CHENG:  Object to form.
12          THE WITNESS:  I understand that
13   the injunction that's being sought is
14   specific -- specific to the PH-ILD
15   indication.
16          BY MR. MORTON:
17   Q.     Okay.  So the injunction that is
18   being sought in this case would not impact
19   Liquidia's ability to launch Yutrepia for
20   PAH, right?
21          MS. CHENG:  Object to form.
22          THE WITNESS:  I think even with



Page 62

1    a -- with an injunction in place for
2    PH-ILD that Yutrepia would enter
3    and -- and compete in the PAH
4    indication space.
5         BY MR. MORTON:
6    Q.   And you're not claiming there is
7    any irreparable harm here based on Liquidia
8    launching Yutrepia for the PAH indication,
9    right?
10        MS. CHENG:  Object to form.
11        THE WITNESS:  I think the entry
12   of Yutrepia in -- in PAH is going to
13   affect United's behavior in the PH-ILD
14   space and that there will be potential
15   price erosion effects, even with
16   Yutrepia's entry in -- in PAH.
17        BY MR. MORTON:
18   Q.   When Yutrepia launches for the
19   PAH indication, the only inhaled treprostinil
20   products on the market will be the Tyvaso
21   products and Yutrepia; is that correct?
22   A.   In inhaled products, yes, that --

Page 63

1    that's my understanding.  I just want to
2    refer back and -- and confirm that -- there
3    is one other product.  I just want to confirm
4    it's -- it's not inhalable in PAH.
5         I guess I -- I would say that
6    Yutrepia and -- and Tyvaso would be the --
7    the only treprostinil-based inhalation
8    products for -- for PAH.
9    Q.   And if Yutrepia launches for the
10   PH-ILD indication as well, Yutrepia and
11   Tyvaso would be the only treprostinil-based
12   inhalation products for PH-ILD on the market,
13   right?
14   A.   That's my understanding, yes.
15   Q.   Now, you acknowledge in your
16   report that there -- based on your
17   conversation with Dr. Nathan that there can
18   be challenges in diagnosing whether a patient
19   has PAH or PH-ILD, right?
20   A.   Yes, in particular, that for --
21   diagnosing pulmonary hypertension in general
22   requires an invasive procedure called the

Page 64

1    right heart catheterization.
2    Q.   But you agree that it can be
3    challenging to diagnose whether a patient has
4    PAH or PH-ILD?
5    A.   My understanding is that from
6    what Dr. Nathan indicated, the ability to
7    differentiate between the two groups can be
8    difficult for some patients.
9    Q.   And -- and you rely on your
10   conversations with Dr. Nathan for your
11   understanding of the challenges of diagnosing
12   patients with PAH or PH-ILD?
13   A.   In addition to -- to Dr. Nathan,
14   I have some background on -- on both -- some
15   cited materials and background in the
16   background in my report.
17   Q.   But you don't have any of your
18   own opinions about how patients are diagnosed
19   with PAH or PH-ILD, right?
20   A.   That's correct.
21   Q.   You don't have any opinions about
22   the -- I mean -- strike that.

Page 65

1    You don't have any of your own
2    opinions about the challenges of diagnosing
3    patients with PAH or PH-ILD, correct?
4    A.   That's correct.
5    Q.   And you don't have any of your
6    own opinions about how medical professionals
7    categorize patients with PAH or PH-ILD?
8    A.   Only that medical professionals
9    or providers generally categorize --
10   categorize these patients in -- in one group
11   or the other.
12   Q.   Is that your opinion, that
13   medical professionals categorize patients in
14   one group or another or is that -- you're
15   just reciting what Dr. Nathan told you?
16   A.   Excuse me.  My understanding is
17   that, you know, patients are diagnosed in --
18   in one group or -- or the other.
19   Q.   And your understanding that
20   patients are diagnosed in one group or the
21   other, that comes from Dr. Nathan; is that
22   right?

**MAGNA** ◗
**LEGAL SERVICES**

17  (Pages 62 to 65)

Page 66

1    A.    And my reading of -- of -- of --
2  of the other materials that I cite in the
3  background of my report.
4    Q.    Now, you acknowledge in your
5  report there are other products on the market
6  that are used to treat PH-ILD but are not
7  approved for PH-ILD, right?
8        MS. CHENG:  Object to form.
9        THE WITNESS:  Can you point
10  to -- to me in my report where I say
11  that?
12        BY MR. MORTON:
13    Q.    You have a discussion of PDE-5
14  inhibitors as one example.  Paragraph 151 is
15  one place where you talk about that.
16    A.    151?
17    Q.    Yes.
18    A.    Yes.
19    Q.    And your understanding is that
20  these PDE-5 inhibitors, such as sildenafil,
21  are described for PH-ILD off label?
22        MS. CHENG:  Object to form.

Page 67

1        THE WITNESS:  That's my
2  understanding, yes.
3        BY MR. MORTON:
4    Q.    And when Yutrepia's on the market
5  and in the event there's an injunction
6  entered here for PH-ILD, a physician could
7  still prescribe Yutrepia for PH-ILD off
8  label, right?
9        MS. CHENG:  Object to form,
10  foundation.
11        THE WITNESS:  So the -- the use
12  of other products or off-label use of
13  other products is -- you know, my
14  health economist, whose dissertation
15  was -- was studying physician and --
16  and prescriber behaviors.
17        If -- if there are no other
18  treatments available, it's not unusual
19  to -- to see physicians try therapies
20  that -- that aren't necessarily
21  indicated for a particular disease.
22        However, the introduction of

Page 68

1  Tyvaso is the first product that's
2  been shown to -- to -- to be safe and
3  effective in -- in -- in the treatment
4  of PH-ILD.  And I think the available
5  of a -- of an on-label treatment that
6  has demonstrated safety and efficacy
7  for the treatment of -- of ILD
8  incentivizes physicians to prescribe
9  Tyvaso for -- for PH-ILD, as opposed
10  to a -- to -- to an off-label
11  alternative.
12        BY MR. MORTON:
13    Q.    All right.  Well, my -- my
14  question was much simpler.  I'm -- all I'm
15  asking is a physician -- if Yutrepia was on
16  the market, a physician could prescribe --
17  strike that.
18        If Yutrepia was on the market and
19  the injunction was entered in the -- that's
20  being sought in this case for PH-ILD, a
21  physician could still prescribe Yutrepia for
22  PH-ILD off label if they chose to do so?

Page 69

1        MS. CHENG:  Object to form,
2  asked and answered, foundation,
3  outside the scope.
4        THE WITNESS:  Not necessarily.
5  One of the features of this particular
6  market, I think one of the
7  idiosyncrasies of this particular
8  market, is you have payors and PBMs
9  who are held to having products on
10  their formularies that are consistent
11  with their label.  And the only
12  product, if there was an injunction in
13  place, that would be available in the
14  formulary for the treatment of PH-ILD
15  would be Tyvaso D -- Tyvaso.
16        BY MR. MORTON:
17    Q.    Okay.  My -- my question wasn't
18  about the PBMs or the payors.  My question
19  was just about the doctors.
20        Could the doctor prescribe
21  Yutrepia for PH-ILD off label if the
22  injunction was entered in this case?



18  (Pages 66 to 69)

Page 70

```
 1          MS. CHENG:  Object to form,
 2    asked and answered, foundation,
 3    outside the scope.
 4          THE WITNESS:  The -- a -- a
 5    physician is able to prescribe, you
 6    know, according to -- to what their
 7    practice is.  But in practicality, in
 8    writing a prescription for Yutrepia
 9    for an indication for which it's not
10    indicated would likely be rejected by
11    the payor or the PBM.
12          BY MR. MORTON:
13      Q.   Given that the -- strike that.
14          Given that the Tyvaso products
15    have been approved for PH-ILD, have doctors
16    stopped using PDE-5 inhibitors like
17    sildenafil for PH-ILD?
18          MS. CHENG:  Object to form,
19    foundation, outside the scope.
20          THE WITNESS:  I -- I -- I
21    haven't evaluated, nor was it my
22    assignment to -- to assess the -- the
```

Page 71

```
 1    level of off-label use of -- of other
 2    products for -- for PH-ILD.
 3          I do know that with the
 4    introduction of -- of Tyvaso for --
 5    for PH-ILD, the growth in -- in -- the
 6    use of Tyvaso for that indication has
 7    been substantial and is an indication
 8    of physicians and -- and other
 9    prescribers' desire for -- for
10    treatment for -- for -- for this
11    indication.
12          BY MR. MORTON:
13      Q.    Do you know whether Dr. Nathan
14    still uses sildenafil for PH-ILD?
15      A.    I'm not aware.
16      Q.    If the -- if Yutrepia's device
17    were easier to use for PH-ILD patients than
18    the Tyvaso DPI device, wouldn't that be
19    another reason for doctors to use Yutrepia
20    off label for PH-ILD?
21          MS. CHENG:  Object to form,
22    foundation, outside the scope,
```

Page 72

```
 1    incomplete hypothetical.
 2          THE WITNESS:  I haven't seen
 3    any -- any indication or any kind of
 4    head-to-head comparisons demonstrating
 5    that Yutrepia is -- is easier or -- or
 6    better to use or superior in any
 7    fashion to -- to -- to Tyvaso dry
 8    powder formulation.
 9          BY MR. MORTON:
10      Q.    So throughout your report you
11    reference a, quote, PH-ILD market.  But I --
12    I didn't see a definition for that clearly.
13          Could you please tell me what
14    your definition of the PH-ILD market is.
15      A.    PH-ILD market consists of
16    patients who have interstitial lung disease
17    and also have pulmonary hypertension and who
18    would be an eligible population for the
19    treatments that are available for -- for
20    PH-ILD.
21      Q.    Did you use any test to define
22    the PH-ILD market?
```

Page 73

```
 1      A.    What -- what -- what -- what kind
 2    of tests are -- are you referring to?
 3      Q.    Well, for example, I -- I'm
 4    familiar with a test called the -- the SSNIP
 5    test.
 6          Are you familiar with that test?
 7      A.    I'm familiar with the SSNIP test.
 8      Q.    Okay.  Did you use the SSNIP test
 9    to define the PH-ILD market?
10      A.    For -- for -- for the purposes
11    of -- of identifying the addressable
12    population or -- or the addressable market
13    in -- in -- in this particular instance, I
14    didn't think a -- a -- a SSNIP test was --
15    was necessary.
16      Q.    Did you apply -- well, strike
17    that.
18          What -- what is your
19    understanding of the SSNIP test?
20          MS. CHENG:  Objection, outside
21    the scope.
22          THE WITNESS:  As a -- as -- as
```



19 (Pages 70 to 73)

Page 74

1    a general matter, SSNIP stands for
2    the -- a -- a small, but
3    significant -- or significant
4    sustainable increase in price to
5    evaluate whether the market would
6    tolerate that increase in price.
7            And again, I'm -- I'm -- I'm
8    probably mangling the -- the -- the
9    definition, but it's a way of
10   evaluating whether there are
11   elasticities in the background that
12   cause switching or substitution.
13           BY MR. MORTON:
14       Q.    And -- and just so the record's
15   clear, the SSNIP test is SSNIP, correct?
16       A.    Correct.
17       Q.    But you didn't use any test like
18   the SSNIP test or any -- any other economics
19   test to define the market here?
20           MS. CHENG:  Object to form.
21           THE WITNESS:  For -- for -- for
22   the purposes of my opinion and from --

Page 75

1    from a -- from a -- from a high level,
2    the market is already well-defined
3    in -- in part because the market
4    consists of observable
5    characteristics.  And -- and the
6    observable characteristics in this
7    case are sufferers of interstitial
8    lung disease who also have pulmonary
9    hypertension.
10           BY MR. MORTON:
11       Q.    You also reference a PAH market
12   in your report.  How are you defining the PAH
13   market?
14       A.    In essentially the same fashion.
15   These are observable characteristics amongst
16   patients who suffer from pulmonary arterial
17   hypertension.
18       Q.    So like the PH-ILD market, you're
19   defining the PAH market as the -- the
20   patients that have either PAH or PH-ILD,
21   right?
22           MS. CHENG:  Object to form,

Page 76

1    mischaracterizes --
2            BY MR. MORTON:
3        Q.    That -- yeah, let me redo that
4    question.
5            So you're defining the -- the --
6    the PAH market in your declaration as the
7    group of patients that have observable
8    characteristics of pulmonary arterial
9    hypertension, right?
10           MS. CHENG:  Object to form.
11           THE WITNESS:  I'm defining it
12   as -- as patients that have the
13   condition that could or -- that could
14   be diagnosed using right heart
15   catheterization as -- as having
16   pulmonary arterial hypertension.
17           MS. REPORTER:  Would you repeat
18   the end of that answer?
19           THE WITNESS:  Sorry.  Pulmonary
20   arterial --
21           MS. REPORTER:  No.
22           THE WITNESS:  Right -- right

Page 77

1    heart catheterization.  Sorry.
2



HIGHLY CONFIDENTIAL        DA0054        LIQ_PH-ILD_00000616





21 (Pages 78 to 81)





22 (Pages 82 to 85)

HIGHLY CONFIDENTIAL

DA0056

LIQ_PH-ILD_00000618





23 (Pages 86 to 89)





24 (Pages 90 to 93)





HIGHLY CONFIDENTIAL

DA0059

LIQ_PH-ILD_00000621





26 (Pages 98 to 101)

Page 102





27 (Pages 102 to 105)





HIGHLY CONFIDENTIAL

DA0062

LIQ_PH-ILD_00000624





HIGHLY CONFIDENTIAL

DA0063

LIQ_PH-ILD_00000625





30 (Pages 114 to 117)





31 (Pages 118 to 121)





32 (Pages 122 to 125)





33 (Pages 126 to 129)

HIGHLY CONFIDENTIAL

DA0067

LIQ_PH-ILD_00000629





34 (Pages 130 to 133)

Page 134





35 (Pages 134 to 137)



Page 138

1

Page 139

1

13    MR. MORTON:  All right.  Why
14  don't we take a break.
15    VIDEO OPERATOR:  Going off the
16  record at 12:28.
17    (Thereupon, at 12:28 p.m. EDT, a
18    lunch recess was taken.)
19
20
21
22

Page 140

1    AFTERNOON SESSION    (1:13 p.m. EDT)
2    VIDEO OPERATOR:  We're back on
3  the record at 13:13.
4    BY MR. MORTON:
5  Q.    Welcome back.
6  A.    Thank you.
7  Q.    Were you involved in any
8  discussions regarding your testimony during
9  the break?
10  A.    No.
11

Page 141

1



36  (Pages 138 to 141)

Page 142



Page 143

3    BY MR. MORTON:
4    Q.   All right.  I'd like to turn to
5  Section 5.5 of your report, which starts at
6  page 68.
7        Let me know when you're there.
8    A.   I'm there.
9    Q.   And in -- in this section you are
10  discussing your opinions about Liquidia's
11  ability to compensate United for any damages
12  in this case; is that right?
13   A.   What I'm describing is a -- is
14  Liquidia's limited ability to compensate
15  United, properly compensate United.
16   Q.   Yeah, when -- when I read this
17  section, it -- you appear to discuss the
18  sales of PH-ILD and whether Liquidia could
19  compensate United for the sales of PH-ILD
20  that are allegedly lost.  But I didn't see
21  you have any discussion in here about sales
22  of PAH.

Page 144

1        Did -- did you talk -- did you
2  consider that at all in your consideration of
3  whether Liquidia could pay any damages award
4  in this case?
5    MS. CHENG:  Object to form.
6    THE WITNESS:  From a high
7  level, from a -- from an economics
8  perspective, one of the things that
9  express the expected value of the firm
10  is its market capitalization.  So
11  Liquidia is a publicly traded firm,
12  has shares that are traded and -- and
13  have a -- a price and a market
14  capitalization that we can -- that we
15  can capture.
16        And, in essence, that market
17  capitalization captures what investors
18  think is both the -- well, what --
19  what they think the value of -- of
20  Liquidia's enterprise is moving
21  forward.
22        That implicitly captures

Page 145

1  expectations regarding PAH sales.
2    BY MR. MORTON:
3    Q.   But did you consider the revenues
4  that Liquidia would obtain from PAH sales
5  once it is permitted to launch that?
6    MS. CHENG:  Object to form.
7    THE WITNESS:  I -- I considered
8  PAH sales, along with expectations of
9  other products and -- and their -- and
10  their revenue performance in -- in
11  Liquidia's portfolio by using
12  Liquidia's market capitalization as
13  a -- an indicator for that.
14    BY MR. MORTON:
15    Q.   So you only used the market
16  capitalization.  You didn't take into account
17  any revenues that Liquidia may earn from
18  selling Yutrepia for the PAH indication?
19    MS. CHENG:  Object to form,
20  mischaracterizes testimony.
21    THE WITNESS:  I did -- I did
22  consider PAH revenues, as well as --



37  (Pages 142 to 145)

Page 146

```
1        and -- and really, the -- the correct
2    financial metric to -- to apply in
3    this particular instance is profits
4    from the portfolio products that
5    Liquidia has and -- and potentially
6    will -- will bring to market and
7    Liquidia's market capitalization can
8    in some ways -- and -- and -- and to
9    be clear, there are limitations to
10   this, but can in some ways be a
11   reflection of what that value is.
12        BY MR. MORTON:
13        Q.   Okay.  Besides Liquidia's market
14   capitalization on February 12th 2024, can you
15   point me to anywhere in your report where
16   you're discussing Liquidia's revenues for
17   Yutrepia for the PAH indication?
18        A.   Well, what -- what I'm showing
19   here is even under conservative assumptions
20   with respect to market share and -- and price
21   erosion in the ILD market as a result of
22   Yutrepia's entry, under those conservative
```

Page 147

```
1    assumptions, it would just take a -- a short
2    period of time of that entry to exceed
3    Liquidia's market capitalization, which, in
4    turn, captures all these streams of revenues.
5        But from a forward-looking what
6    would revenues be for -- for PAH for -- for
7    Liquidia, I didn't consider that specifically
8    as part of this analysis.
9        Q.   Okay.  And you didn't consider
10   specifically Liquidia's profits on a
11   going-forward basis for PAH?
12        MS. CHENG:  Object to form.
13        THE WITNESS:  My calculation
14   and my approach to this assumes that
15   the market capitalization captures the
16   expectations of not just profits,
17   but -- profits from PAH, but also
18   profits from all the other potential
19   portfolio products for Liquidia.
20        BY MR. MORTON:
21        Q.   Okay.  But it's -- you didn't
22   consider on a stand-alone basis Liquidia's
```

Page 148

```
1    profits for selling Yutrepia for PAH?
2        A.   For the purposes of this
3    calculation, I -- I did not.
4
5
6
7
8
9
10
11
12
13
14        Q.   You understand the injunction
15   that is sought here that you're providing a
16   declaration about, that -- that injunction is
17   only through the conclusion of the trial in
18   this case, right?
19        MS. CHENG:  Object to form.
20        THE WITNESS:  I understand that
21   the cumulative loss that occurs could
22   be constrained by whatever outcome
```

Page 149

```
1    occurs as a -- as a result of this
2    litigation.
3        BY MR. MORTON:
4        Q.   Okay.  But the injunction that
5    we're focused on right now for the purposes
6    of your declaration, that's from the time
7    period from when Yutrepia launches for the
8    PH-ILD indication to trial and the decision
9    in the trial of this case, right?
10        MS. CHENG:  Object to form.
11        THE WITNESS:  Yes, I -- I -- I
12   don't know exactly when the -- the
13   preliminary injunction would expire,
14   for lack of a better term, but it
15   would be -- that would limit the --
16   the cumulative losses that -- that are
17   projected here.
18        BY MR. MORTON:
19        Q.   So it would only be for that time
20   period between the launch of Yutrepia for
21   PH-ILD and whenever the preliminary
22   injunction expires in this case, right?
```



38  (Pages 146 to 149)

Page 150

1      A.    Conditional on whatever outcomes
2 extend beyond that.  You know, obviously
3 there's a -- there -- there's uncertainty
4 with whether there will be, you know,
5 depending upon the outcome, other injunctions
6 or things of that sort.  But that -- that
7 could be a constraint, yes.
8      Q.    Or the outcome could be that my
9 client wins and there is no injunction,
10 right?
11      A.    That's correct.
12      Q.    Okay.  So the time period of
13 potential loss that you're addressing with
14 this preliminary injunction is from the time
15 that Yutrepia launches for the PH-ILD
16 indication until the preliminary injunction
17 expires, right?
18      A.    That's -- that's one -- one way
19 to limit the -- the projection in this case,
20 yes.
21      Q.    Okay.  So the amount of loss that
22 Liquidia might need to compensate United for

Page 151

1 would be limited to the revenues that are
2 allegedly lost from the time that Yutrepia
3 launches for the PH-ILD indication until the
4 preliminary injunction expires, right?
5      MS. CHENG:  Object to form.
6      THE WITNESS:  I would
7 characterize it a little -- a little
8 bit differently.
9      So -- so, again, I -- I want to
10 revisit specifically the -- that the
11 purpose of -- of the calculation, one,
12 is -- is it doesn't encompass all the
13 loss.  As I describe in my report,
14 there are multiple avenues of -- of
15 harms that United will -- will suffer.
16      So, you know, this, again, just
17 kind of illustrates, you know,
18 under -- under a set of assumptions
19 what -- what those numbers could be.
20      But the point of -- of the --
21 of the calculation itself was to
22 indicate even -- even with the

Page 152

1 relatively short period of time, from
2 2024 to 2025 and even -- even through
3 potentially 2026, under -- under these
4 broad assumptions and -- and not
5 really encompassing all the -- all the
6 sources of loss to United, I still --
7 we still end up with a cumulative
8 present value of the loss of north of
9 $1.4 billion.
10      BY MR. MORTON:
11      Q.    During what time period is that
12 $1.4 billion calculation?
13      A.    From 2024 through 2026.
14      Q.    Okay.  Well, you understand the
15 trial in this case has been scheduled for
16 June 23rd of 2025?
17      A.    Yes.
18      Q.    Okay.  So that -- that's when
19 there would be some sort of decision that
20 would result in the preliminary injunction
21 being lifted or, you know, some other
22 injunction being entered, right?

Page 153

1      MS. CHENG:  Object to form,
2 incomplete hypothetical.
3      THE WITNESS:  It -- it's --
4 it's conditioned on a variety of
5 different things, including if the --
6 if the trial date holds.
7      So there -- you know, I'm not
8 setting a definitive line here as --
9 as to what -- what I think that
10 constraint is going to be.  Again, I'm
11 trying to illustrate that even if you
12 took into account the entire market
13 capitalization of Liquidia now, given
14 conservative assumptions with respect
15 to market share and price erosion,
16 those losses could be substantial.
17      It would comprise -- even if
18 you were to limit it to just one or
19 two years, would comprise a
20 significant proportion of Liquidia's
21 market capitalization.
22

39 (Pages 150 to 153)

MAGNA®
LEGAL SERVICES

Page 154

1          BY MR. MORTON:
2      Q.   Okay.  But then Liquidia would
3  still be able to sell Yutrepia for the PAH
4  indication going into the future, right,
5  because there would be no limitation on that
6  once Yutrepia is permitted to launch for PAH,
7  right?
8          MS. CHENG:  Object to form,
9      incomplete hypothetical.
10         THE WITNESS:  It's hard to say
11     what -- what Liquidia is going to be
12     able to do in the event that it does
13     have to compensate, even under
14     conservative assumptions, for damages
15     to -- to United.  And that might
16     include insolvency for -- for
17     Liquidia.
18         BY MR. MORTON:
19     Q.   Setting that aside, I -- I just
20  want to get to the basic point that you agree
21  that Yutrepia could be sold for the PAH
22  indication going into the future and Liquidia

Page 155

1  could continue to accrue revenues and earn
2  profits on those sales, right?
3          MS. CHENG:  Same objections,
4      asked and answered.
5          THE WITNESS:  Yeah, I -- I -- I
6      guess I wasn't clear.  That assumes
7      Liquidia's ability to continue to
8      finance its -- its PAH production
9      operations, given its exposure to a --
10     a substantial liability of several
11     hundreds of millions of dollars in an
12     initial period of time.  So that's why
13     I mentioned the -- the insolvency
14     point.
15         BY MR. MORTON:
16     Q.   Okay.  Do you have any
17  understanding of what type of revenues
18  Liquidia may be able to earn on the sale of
19  PAH-indicated Yutrepia?
20     A.   It would be some fraction of --
21  of revenues that are currently generated by
22  United through its Tyvaso franchise for PAH.

Page 156

1      Q.   But do you know how much those
2  revenues would be?
3      A.   It depends on a variety of
4  different factors.  The aggressiveness of --
5  of Liquidia's discounting of its -- of its
6  Yutrepia product as it competes head to head
7  with Tyvaso in -- in PAH has a direct
8  relationship on the net revenues that it's
9  going to receive.
10         On the flip side of that, based
11  on that aggressive or -- or not aggressive
12  stance with -- with respect to discounting,
13  is Liquidia's market share that it's able to
14  capture in -- in PAH as -- as a result of
15  that competition.
16         So it's hard to say exactly, you
17  know, what -- what that percentage is going
18  to be.
19     Q.   Okay.  And you haven't considered
20  here what revenues Liquidia may be able to
21  earn for selling Yutrepia for PAH, right?
22         MS. CHENG:  Object -- object to

Page 157

1      form, asked and answered,
2      mischaracterizes testimony.
3          THE WITNESS:  So what I
4      would -- again, just to summarize, you
5      know, what -- what I've done here,
6      is -- is just illustrate how quickly a
7      lower bound or what one could consider
8      a lower bound of damages would be,
9      making conservative assumptions.
10         That doesn't include all the
11     other harms that -- that United will
12     suffer as a result of Yutrepia entry
13     that become a substantial fraction of
14     Liquidia's market capitalization,
15     which in turn is, in some respects, a
16     reflection of the market's expectation
17     for Liquidia's ability to earn profits
18     not just from PAH, but from its
19     other --
20         BY MR. MORTON:
21     Q.   Okay.  And you --
22     A.   -- portfolio products.



40  (Pages 154 to 157)

Page 158

1     BY MR. MORTON:
2     Q.    And you haven't attempted to
3   protect what revenues Liquidia may earn from
4   selling Yutrepia for the PAH indication, have
5   you?
6         MS. CHENG:  Object to form.
7         THE WITNESS:  As I've indicated
8     before, it's -- it's dependent upon a
9     variety of different factors and ones
10    that we haven't observed yet.  That
11    includes Liquidia's stance with --
12    with respect to discounting Yutrepia
13    as part of its efforts to -- to
14    capture market share; its success
15    in -- in being able to capture that
16    market share.
17        There's -- there's a lot --
18    there's a lot of moving parts that go
19    into what the expected revenues are
20    going to be.
21        BY MR. MORTON:
22    Q.    I'm just -- I asked for a simple

Page 159

1   question.
2         Have you attempted to project
3   what the revenues would be for Liquidia
4   selling PAH or selling Yutrepia for the PAH
5   indication?
6         MS. CHENG:  Object to form.
7         BY MR. MORTON:
8     Q.    Yes or no?
9         MS. CHENG:  Same objection.
10        THE WITNESS:  For all -- for
11    all the reasons that I've described,
12    I've -- I've not done a projection.
13        BY MR. MORTON:
14    Q.    Okay.  And you haven't done a
15  projection of Liquidia's profits for the sale
16  of Yutrepia for the PAH indication, correct?
17    A.    For all the reasons that I've
18  described, you know, the -- not knowing, you
19  know, the -- the different parameters that
20  kind of go into estimating those -- those
21  type -- those type of projections, I
22  haven't -- I haven't done a projection of --

Page 160

1   of -- of what those sales might be.
2     Q.    My question was about profits,
3   but --
4     A.    Excuse me, for -- for profits.
5     Q.    Gotcha.  Okay.
6         All right.  Earlier you mentioned
7   that you had other forecasts for Tyvaso sales
8   when I was asking you about the 2021 or 2022
9   projections.
10        What -- what documents were those
11  in, because I haven't seen those?
12    A.    I -- I thought that there were
13  projections in -- in either United's 10-Ks or
14  in some of the slide decks that describe
15  United's marketing strategy.  But I would --
16  I would have to have them in front of me in
17  order for me to point them out.
18    Q.    Okay.  You don't recall right now
19  which document that was in?
20    A.    Not -- not immediately.
21    Q.    Want to talk a little bit about
22  your section on first mover advantages,

Page 161

1   Section 4.4.  It starts on page 49.
2     A.    Okay.
3     Q.    You there?
4     A.    Yes.
5     Q.    Okay.  Thank you.
6         So you claim that United will
7   lose its first mover advantage if Yutrepia is
8   on the market for the PH-ILD indication; is
9   that right?
10    A.    My understanding is Tyvaso is --
11  is the first indicated treatment for -- for
12  PH-ILD and -- and as a result, United is a --
13  is a first mover in that space.
14    Q.    Okay.  Did you take into account
15  any impact on United's first mover advantage
16  due to Yutrepia being on the market for the
17  PAH indication?
18        MS. CHENG:  Object to form.
19        THE WITNESS:  I wasn't asked
20    to -- to examine the -- the -- the PAH
21    market or the effect of -- of Yutrepia
22    on -- on the PAH market.

**MAGNA** ▶
LEGAL SERVICES

41  (Pages 158 to 161)

Page 162

1      BY MR. MORTON:
2      Q.    Do you agree that United claims
3  that it's built substantial brand recognition
4  through its investments in the Tyvaso
5  products prior to obtaining approval for the
6  PH-ILD indication?
7      A.    Where do -- where do you see
8  that?
9      Q.    I was summarizing what -- what
10 you said in your report.
11          Well, you do talk about brand
12 recognition in your report, don't you?  Like
13 it -- for example, paragraph 97 you mention
14 it.  96 also talks about the brand name of
15 Tyvaso.
16     A.    Think your question related to
17 brand recognition within the -- within the
18 PAH market; am I -- is -- is that correct?
19     Q.    It -- my question was about you
20 contend that United has built substantial
21 brand recognition through its investments in
22 the Tyvaso products prior to obtaining

Page 163

1  approval for the PH-ILD indication; is that
2  right?
3          MS. CHENG:  I say, you know,
4      through its investments in the Tyvaso
5      products in -- in paragraph 95.  I
6      say, Through its investments in -- in
7      the Tyvaso products, United has
8      engaged in an effort to increase its
9      brand recognition for the Tyvaso
10     products among both physicians and
11     patients.
12          BY MR. MORTON:
13     Q.    Yeah.  And United has long been
14 known as one of the most significant
15 suppliers of therapies to treat pulmonary
16 hypertension, right?
17          MS. CHENG:  Object to form and
18     foundation.
19          THE WITNESS:  I don't know if
20     I -- if I say that to -- if -- if you
21     have an area in my report where I say
22     that, I'm -- I'm happy to review it.

Page 164

1      BY MR. MORTON:
2      Q.    Well, we've talked about today
3  how United's been in -- in the market for
4  almost 20 years in various treatments for
5  pulmonary hypertension, right?
6          MS. CHENG:  Object to form,
7      mischaracterizes testimony.
8          THE WITNESS:  I think we --
9      we -- we specifically discussed that
10     United had introduced a Tyvaso
11     nebulizer in 2009 and has had that
12     product on the -- on the market since
13     2009 and then introduced Tyvaso dry
14     powdered inhalation form in -- in
15     2022.  And I think we discussed how
16     they've -- they had other products on
17     the market prior to that.
18          But that's -- whether that's
19     resulted in brand recognition for --
20     for United, I don't think I -- I -- I
21     state anything specifically in my
22     report about that.

Page 165

1      BY MR. MORTON:
2      Q.    Okay.  So you didn't take into
3  account the other therapies that United has,
4  like Remodulin or Orenitram for PAH?
5          MS. CHENG:  Object to form.
6          THE WITNESS:  No.  And --
7      and -- and with respect to the --
8      the -- the first mover advantage I
9      describe here, as I understand it,
10     both in my conversations with
11     Dr. Nathan and Mr. Bottorff, the
12     physicians that engage in treatment
13     for PH-ILD are in many ways distinct
14     from the physicians that -- that treat
15     PAH.
16          So even if there were brand
17     recognition within the PAH market,
18     it's not clear to me that that carries
19     over and has the same effect for the
20     physicians or -- or prescribers that
21     would -- that would prescribe
22     treatment for PH-ILD.



42  (Pages 162 to 165)

Page 166

1      BY MR. MORTON:
2      Q.    All right.  Setting -- setting
3  that aside, are you contending that all of
4  the first mover advantage that United had
5  built over the years is going to be disrupted
6  or eliminated based on a small startup
7  entrant that you claim could go bankrupt?
8      MS. CHENG:  Object to form.
9      THE WITNESS:  I think
10  innovators like United who expend
11  considerable resources to develop new
12  products and -- and enter into a -- a
13  new space that is populated by
14  providers that may not have been
15  exposed to their -- to their products
16  before in many -- in many respects, I
17  expect to be recognized for that
18  innovation and -- and -- and for those
19  efforts.
20      And that could be
21  short-circuited by -- by premature
22  entry by another entrant, small or

Page 167

1  otherwise.
2      BY MR. MORTON:
3      Q.    So you're saying that Liquidia,
4  a -- a small startup entrant, is going to
5  disrupt United's first mover advantage in the
6  treprostinil market?
7      MS. CHENG:  Object to form.
8      THE WITNESS:  To be clear,
9  it's -- it's not the treprostinil
10  market.  It's -- it's the market
11  for -- for PH-ILD patients, which,
12  again, as I understand it, is -- is
13  distinct from the physicians and
14  prescribers that treat PAH patients.
15      And because they're -- they're
16  different and distinct, there's no
17  reason to assume that the PH-ILD
18  physicians are aware of the innovator
19  status that -- that United has.
20      BY MR. MORTON:
21      Q.    And -- and your understanding of
22  the distinction that you're drawing between

Page 168

1  the physicians and prescribers of P -- for
2  PAH patients and PH-ILD patients, you got
3  that understanding from Dr. Nathan, correct?
4      MS. CHENG:  Object to form,
5  mischaracterizes testimony.
6      THE WITNESS:  I got it from
7  both Dr. Nathan and -- and
8  Mr. Bottorff.  I also understand that
9  from United's marketing documents as
10  well.
11      BY MR. MORTON:
12      Q.    All right.  I think I'm wrapped
13  up.
14      MS. CHENG:  No questions.
15      MR. MORTON:  Okay.  We're done.
16      VIDEO OPERATOR:  Okay.  Stand
17  by.  This concludes today's
18  deposition.
19      We're off the record at 13:51.
20      (Thereupon, signature having not
21      been waived, at 1:51 p.m. EDT
22      the deposition concluded.)

Page 169

1      CERTIFICATE OF DEPONENT
2      I, Frederic Selck, Ph.D., do hereby
3  certify that I have read the foregoing pages,
4  which contain a correct transcript of the
5  answers given by me to the questions
6  propounded to me herein, except for changes,
7  if any, duly noted on the enclosed errata
8  sheet.
9
10
11  _____
       FREDERIC SELCK, Ph.D.
12
13
14
15      Sworn and subscribed to before me
16  this ___ day of _____, 2024.
17
18
19  My commission expires:      Notary Public:
20  _____      _____
21
22



43  (Pages 166 to 169)

Page 170

```
 1    CASE:  United Therapeutics Corporation v.
 2        Liquidia Technologies, Inc., et al.
 3    DEPOSITION OF:  Frederic Selck, Ph.D.
 4    TAKEN:  March 15, 2024
 5    PAGE  LINE  ERROR        CORRECTION        REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21        _____
          FREDERIC SELCK, Ph.D.
22
```

Page 171

```
 1            CERTIFICATE OF NOTARY
 2        I, MISTY KLAPPER, the officer before whom
 3    the foregoing deposition was taken, do hereby
 4    certify that the witness whose testimony appears in
 5    the foregoing deposition was duly sworn by me; that
 6    the testimony of said witness was taken by me in
 7    shorthand and thereafter reduced to typewriting by
 8    me; that said deposition is a true record of the
 9    testimony given by said witness; that I am neither
10    counsel for, related to, nor employed by any of the
11    parties to the action in which this deposition was
12    taken; and, further, that I am not a relative or
13    employee of any attorney or counsel employed by the
14    parties hereto, nor financially or otherwise
15    interested in the outcome of this action.
16
17
          _____
          Misty Klapper, RMR, CRR, CSR
18        Notary Public
19
20
21
22
```



44 (Pages 170 to 171)

**A**

**ability**
61:19 64:6 143:11,14
155:7 157:17
**able**
70:5 132:5 154:3,12
155:18 156:13,20
158:15
**absent**
24:18
**aburrowbridge@...**
3:10
**account**
95:17 145:16 153:12
161:14 165:3
**accounting**
51:6 52:18
**accrue**
155:1
**accuracy**
89:11 90:8,12
**accurate**
106:22 112:19
**accurately**
83:2 84:9,14
**acknowledge**
63:15 66:4
**action**
171:11,15
**active**
60:15
**actual**
117:2 123:4
**actuality**
88:16
**ADAM**
3:7
**add**
13:16 84:6
**addition**
12:1 64:13 137:17
**additional**
133:6
**address**
6:16

**addressable**
60:12 73:11,12 87:18
97:9
**addressing**
150:13
**adjustments**
128:18 148:9
**advance**
29:17 31:7 46:9
52:12
**advantage**
161:7,15 165:8 166:4
167:5
**advantages**
160:22
**advise**
89:15 90:15 92:12,22
**affect**
62:13
**afternoon**
57:8 140:1
**aggressive**
31:3 34:7,20 156:11
156:11
**aggressiveness**
156:4
**agree**
23:1 59:18,21 60:2,5
60:21 61:7 64:2
83:1 106:7 110:19
110:21 131:9
132:12 133:16
135:11 154:20
162:2
**ahead**
17:20 93:8
**al**
170:2
**allegations**
24:20,22
**alleged**
148:6
**allegedly**
143:20 151:2
**alternative**
68:11

**amount**
37:2 150:21
**analysis**
147:8
**Anatomy**
134:10
**announcements**
49:11,21
**answer**
7:2 76:18 89:20,22
90:20 92:18 93:6,22
94:3,11 138:21
**answered**
38:7 69:2 70:2 77:22
79:17 80:16 85:21
98:2 122:17 135:16
140:14 155:4 157:1
**answers**
169:5
**anticipate**
48:11
**anticipating**
96:3
**anticipation**
35:7
**Anu**
14:3,7,8,15 19:14
28:7
**anybody**
20:9,10,12 28:21
29:3 101:3
**apologize**
17:20 44:16
**apparently**
99:9
**appear**
110:22 143:17
**APPEARANCES**
3:1
**appears**
101:15 171:4
**Appendix**
84:3 115:8
**application**
25:2
**applied**

**118:3,18 119:15**
**apply**
73:16 115:6 120:3
146:2
**appreciably**
133:11
**appreciate**
31:6
**approach**
79:6 147:14
**approval**
59:22 60:22 61:4
162:5 163:1
**approved**
32:22 59:22 66:7
70:15
**area**
163:21
**arterial**
11:4 21:11 22:10
75:16 76:8,16,20
**Arun**
14:5
**aside**
154:19 166:3
**asked**
38:7 41:1 42:13
52:17,21 69:2 70:2
77:18,22 79:17
80:12,16 85:21 98:2
122:17 135:16
140:13 141:22
142:11 155:4 157:1
158:22 161:19
**asking**
15:10 68:15 160:8
**assert**
25:4
**asserted**
24:7
**asserting**
123:18
**assertions**
24:8
**assess**
70:22



**assessed**
60:12
**assessments**
87:17
**assignment**
23:16,18 70:22
**assistance**
15:19
**Associate**
27:7
**assume**
15:2 120:8 134:1
  136:4,21 138:17
  167:17
**assumed**
120:12 128:8
**assumes**
147:14 155:6
**assuming**
120:21 123:8 127:22
  138:22 139:5,7
**assumption**
102:1 119:16 120:22
  121:2 124:16
  129:11 136:10,16
**assumptions**
83:22 88:13 98:6
  104:17 105:14
  119:12 146:19
  147:1 151:18 152:4
  153:14 154:14
  157:9
**Attachment**
8:8,12 9:14 46:21
  54:21 55:5 84:4
  85:18 116:1,6
  117:11 118:4,19
  120:8 123:18
  127:14 136:9 139:1
  148:5
**attempted**
158:2 159:2
**attendees**
28:17
**attorney**
171:13

**attorneys**
1:11 93:2
**attorney-client**
89:17 90:17 92:13
**authorization**
43:20 44:8
**automatically**
136:4,6
**availability**
137:12
**available**
32:17,20 54:14 67:18
  68:4 69:13 72:19
  94:21,22 95:13,22
  96:14 103:3 125:18
  131:5 133:4 137:1
  138:5
**Avenue**
3:15 6:17
**avenues**
151:14
**award**
144:3
**aware**
18:1 20:10 29:3 46:4
  46:7 51:21 52:7,10
  56:15,18 59:16
  71:15 96:9 141:13
  141:15 167:18
**awareness**
30:6 133:3
**A-1**
8:8,12 9:14
**A-2**
46:21 54:21 55:5
**a.m**
2:3

_____
**B**
_____
**B**
4:7
**back**
9:13 33:21 34:4
  40:10 43:14 58:11
  58:14 63:2 107:17
  107:20 108:6 127:5

**132:18 134:9
135:10 140:2,5
142:10
background**
21:9 30:2 64:14,15
  64:16 66:3 74:11
  130:15
**back-of-the-envelo...**
83:20 85:12 86:10
  87:7 88:19 107:7
  112:2,16 121:2
  136:15
**bankrupt**
166:7
**bargain**
36:7
**Barton**
27:1,4,10,14,16,18
  27:20 28:5,19,22
  29:6,8,10,17,21
  30:13,19 34:7,14
  35:4,12,14 36:9,15
  36:20 37:4 40:6
  41:7 42:14 43:3,8
  43:11,17 44:5 45:3
  45:5 55:14,18 56:2
  56:5,10 77:4 78:17
  79:1,20 80:7,21
  81:3 121:18 122:20
  137:10
**Barton's**
40:22 56:17
**based**
46:13 50:16 52:17
  59:4 62:7 63:16
  94:9 95:4 114:5
  121:17 128:8
  134:15 136:9 142:3
  156:10 166:6
**basic**
154:20
**basis**
107:7 147:11,22
**Bates**
81:18 109:7 111:3
**becoming**

95:13 138:12
**beginning**
82:4 94:17 95:8 97:6
  112:13
**begins**
5:3
**behalf**
3:2,12 5:16,18 11:11
  27:12
**behavior**
62:13
**behaviors**
67:16
**belief**
96:19 97:20
**believe**
15:11 30:14 45:10
  49:13 82:3 84:8
  88:5 89:19 105:7
  106:16 108:14
  109:3 116:7 134:15
  140:16 141:4
  142:20
**believed**
84:10 104:10
**believes**
84:15
**benchmark**
88:18
**benefit**
30:4 31:21 53:22
**Berretta**
14:13 19:15 28:8
**best**
7:10
**better**
22:22 72:6 83:19
  135:3 149:14
**beyond**
43:4 119:10 150:2
**bids**
35:8
**billed**
14:22
**billion**
152:9,12



**bills**
13:9
**biostatistics**
10:14
**bit**
21:21 22:22 24:12
27:22 86:20 124:2
138:21 151:8
160:21
**blood**
132:7 134:13
**bottom**
105:5 111:10
**Bottorff**
44:14,15,16,19 45:6
45:9,16,21 46:5,9
46:15 47:5,15 49:19
50:22 55:14,19 56:2
56:6 137:9 165:11
168:8
**bound**
83:21 157:7,8
**brand**
162:3,11,14,17,21
163:9 164:19
165:16
**branded**
60:3
**break**
58:3,17 90:5 107:12
108:1 125:7 139:14
140:9
**Brian**
51:2
**brief**
58:9 107:15
**bring**
52:20 146:6
**broad**
152:4
**build**
104:18
**built**
162:3,20 166:5
**BURROWBRIDGE**
3:7

**business**
132:11

---

**C**

**C**
4:1 5:1 17:12 122:5
**calculated**
123:17
**calculation**
82:19 83:12,16,20
85:1,12 86:10 87:7
88:19 100:17
101:11 105:22
107:8 112:2,16
113:11 115:11,12
115:19 120:5,8
121:13 128:13
129:13 136:15
139:7 147:13 148:3
151:11,21 152:12
**calculations**
112:17 115:7 127:14
136:8 138:22 148:4
**call**
19:10 42:6 122:11
**called**
6:3 63:22 73:4
**calls**
90:3
**cannibalize**
136:11
**capitalization**
144:10,14,17 145:12
145:16 146:7,14
147:3,15 153:13,21
157:14
**Capitol**
3:9
**capsule**
59:11,13
**capsules**
59:7
**capture**
114:18 115:14 118:4
118:14,16,20
119:13,16 136:22

139:2 144:15
156:14 158:14,15
**captured**
129:17
**captures**
144:17,22 147:4,15
**care**
10:20 137:20
**cared**
48:3
**Caremark**
31:12
**carries**
165:18
**case**
1:5 5:9 8:2 9:1,8
11:20 12:11,18
14:22 61:8,18 68:20
69:22 75:7 113:12
119:6 131:19
132:16 143:12
144:4 148:18 149:9
149:22 150:19
152:15 170:1
**cases**
8:15,17,18,20 25:9
**catch**
14:5
**categorize**
65:7,9,10,13
**catheterization**
64:1 76:15 77:1
130:19 135:9
**cause**
74:12 132:21 135:5
**caution**
99:14
**cells**
134:11
**certain**
34:8
**certainly**
94:22
**CERTIFICATE**
169:1 171:1
**Certified**

2:19,19
**certify**
169:3 171:4
**challenges**
63:18 64:11 65:2
**challenging**
64:3
**change**
139:10
**changes**
24:5,14 25:7,10,17
25:21 169:6
**characteristics**
75:5,6,15 76:8
**characterize**
115:10 151:7
**charge**
23:9,10,15
**Cheng**
3:3 7:20 11:21 16:20
19:12 26:11 28:12
33:7 34:1 36:1,12
37:8,17 38:6,12,21
39:7,13,21 40:19
41:17 42:12 45:18
49:3 50:14 51:18
58:1,5 59:3 60:8
61:2,11,21 62:10
66:8,22 67:9 69:1
70:1,18 71:21 73:20
74:20 75:22 76:10
77:8,17,21 78:21
79:16 80:11,15 83:5
84:11 85:20 86:16
87:14 88:8 89:14
90:2,14 92:11,22
93:19 94:8 96:5,22
98:1 99:1,11 100:7
100:13 101:6,18
102:8 103:12
104:13 105:10
106:8,18 107:9
108:12,22 109:13
110:12,20 111:19
112:7 114:1,21
116:13,17,20



MAGNA
LEGAL SERVICES

117:19 118:7,22
119:3,19 120:11
122:16 123:11
124:11 126:15,19
127:19 129:20
131:12 132:14
133:20 135:15
136:13 137:2
140:13 141:1
142:13,16 144:5
145:6,19 147:12
148:19 149:10
151:5 153:1 154:8
155:3 156:22 158:6
159:6,9 161:18
163:3,17 164:6
165:5 166:8 167:7
168:4,14
**choice**
133:6
**chose**
68:22 85:18
**CIGNA**
31:19
**cite**
66:2 91:15
**cited**
54:20 64:15 91:6,20
**claim**
9:3 161:6 166:7
**claiming**
62:6
**claims**
162:2
**clarify**
7:6 30:16 33:9 78:2
123:13
**classifications**
21:19
**clear**
16:17 22:9 55:10
74:15 85:13 98:5
127:3 132:10 146:9
155:6 165:18 167:8
**clearly**
72:12

**client**
150:9
**clinical**
10:17 53:2
**closer**
19:1,3
**Columbia**
2:21
**come**
10:20 123:9 129:17
130:2
**comes**
65:21
**coming**
123:20 129:7 130:6
139:3
**commission**
169:19
**communications**
89:18 90:17
**companies**
53:13
**compare**
26:13
**comparison**
26:18
**comparisons**
10:16 60:10 72:4
**compensate**
143:11,14,15,19
150:22 154:13
**compensated**
15:3,7
**compete**
62:3
**competes**
156:6
**competition**
35:7 80:1 111:12,15
121:4,12 122:2,9
128:21 156:15
**competitive**
48:17 49:1,8,17
50:19
**competitors**
32:11

**compiled**
84:14
**complement**
111:16
**complete**
7:10 8:14 55:5
**completely**
7:3
**comprise**
134:11 153:17,19
**concept**
78:10
**concerning**
122:4
**concessions**
79:2
**concluded**
109:13 168:22
**concludes**
168:17
**conclusion**
90:3 148:17
**condition**
76:13
**Conditional**
150:1
**conditioned**
153:4
**CONFIDENTIAL**
1:10
**confirm**
7:22 63:2,3
**confirmed**
48:4
**conjunction**
13:17
**conservative**
83:22 121:10 122:7
146:19,22 153:14
154:14 157:9
**consider**
55:11 92:4 112:5
144:2 145:3,22
147:7,9,22 157:7
**considerable**
166:11

**consideration**
144:2
**considered**
54:21 55:6 57:2
84:18 85:4,19 86:12
86:14 92:1 145:7
156:19
**consistent**
35:1 40:3 69:10 85:9
86:2 87:3,16 98:13
104:22 105:19
107:3 115:20 127:7
**consistently**
13:14
**consists**
72:15 75:4
**constitutes**
59:6
**constrained**
148:22
**constraint**
150:7 153:10
**contain**
59:11 169:4
**containing**
59:12
**contains**
116:6
**contend**
162:20
**contending**
166:3
**contents**
26:5 89:16 90:16
92:13 93:1,3,7
99:15
**context**
25:18
**continue**
155:1,7
**continuing**
48:1
**conversation**
18:15 19:5,8,17 20:7
20:13,17 21:7,22
22:7 28:5,19,22



29:5,9,18,22 30:15
40:10 43:4,8,9,18
45:2,2,6,16,21 50:1
50:11 51:16 52:1,4
63:17 80:7,20 92:16
122:20 130:16
**conversations**
40:7,12,15,17,21
55:13,21 56:3,8,17
64:10 77:3 121:18
165:10
**convincing**
130:20
**COOLEY**
3:15
**copy**
7:14,19 8:9 20:15,20
26:6,12
**corporate**
51:6
**Corporation**
1:3 5:6 170:1
**correct**
9:16,17 13:1 17:7,22
18:4,7 21:4,5 22:12
22:16 23:5 27:3,15
33:2 34:10 44:14
46:19 51:8,14 53:10
53:11 54:8 62:21
64:20 65:3,4 74:15
74:16 78:15 82:16
84:5,6 113:22
141:17,18 146:1
150:11 159:16
162:18 168:3 169:4
**CORRECTION**
170:5
**correctly**
98:20 138:4
**counsel**
5:19 6:4,7 19:9,19
20:1,3 26:11 28:8
28:10 45:19 51:19
57:3,5,12 58:1 89:5
89:7,13 90:13,19
92:16 93:21 94:2,10

99:7,17 171:10,13
**court**
1:1 5:8,15,21 9:5,11
**cover**
44:4
**covered**
43:5
**CRR**
1:20 171:17
**CSR**
1:20 171:17
**cumulative**
148:21 149:16 152:7
**curiosity**
55:3
**current**
43:17,18 44:6
**currently**
155:21
**CV**
8:9
**CVS**
31:12
**cycle**
93:11,14
**C-1**
84:3,4 85:18 115:8
116:1,6 117:11
118:4,19 120:8
123:18 127:14
136:9 139:1 148:5

---

**D**

**D**
5:1 69:15
**damages**
8:22 9:3,8,9,11 115:7
115:11 143:11
144:3 154:14 157:8
**data**
10:17 82:17 84:21
85:4,7,14,15,17
86:1,8 97:7 98:10
100:15,20 116:7,9
**date**
5:10 12:13 153:6

**dated**
5:1
4:10 82:6
**David**
27:1,4,10
**day**
169:16
**December**
12:14,15,22 13:12,14
**decided**
80:8 81:9
**decision**
149:8 152:19
**decks**
160:14
**declaration**
4:9 7:15 8:1 12:18,22
13:3,12,19 14:19
15:3,15,16,18,21
16:1,3,4,6,10,13,15
16:18 17:2,4,8,22
18:3 20:16,21 21:1
21:2,4 23:4,8,11
24:1,2,6,14,15 25:8
25:11 26:5,6,13,20
27:2 53:9 55:7
56:22 57:12 76:6
95:4 99:8 112:6
140:22 141:7
148:16 149:6
**declarations**
25:22 26:2
**decrease**
120:9 123:8,19 129:7
**Defendant**
1:7 3:12 6:4,7
**define**
72:21 73:9 74:19
**defined**
125:1
**defining**
75:12,19 76:5,11
**definition**
72:12,14 74:9
**definitions**
78:6
**definitive**

**153:8**
**degree**
9:22 10:3 25:18
52:22 121:22
**degrees**
9:19
**Delaware**
1:2 5:9
**demand**
77:11 79:2
**demanded**
34:12 36:10,21 37:3
**demanding**
34:21 40:8 56:13
80:3
**demands**
35:18
**demonstrated**
68:6
**demonstrating**
72:4
**dependent**
158:8
**depending**
150:5
**depends**
156:3
**DEPONENT**
169:1
**deposed**
6:20
**deposition**
1:13 5:4,12 8:5 56:21
57:10,18,21 92:8
168:18,22 170:3
171:3,5,8,11
**describe**
17:10 23:19 38:14
115:15 142:6
151:13 160:14
165:9
**described**
19:13 34:14 37:19
48:9 50:2 66:21
98:11 100:18 102:2
126:10 139:9



159:11,18
**describing**
24:17 31:11 128:14
143:13
**description**
4:8 23:12
**descriptions**
12:3 25:14
**designation**
109:15
**desire**
71:9
**detail**
21:10
**develop**
35:5 52:19 166:11
**developed**
91:16
**developing**
114:4
**device**
59:10 71:16,18
**diagnose**
64:3 135:7
**diagnosed**
54:10 64:18 65:17,20
76:14 125:13 132:2
134:4,20 138:4
**diagnosing**
63:18,21 64:11 65:2
**diagnosis**
48:7 130:11,21 131:4
133:12 137:22
138:2
**difference**
25:8 26:8
**differences**
24:4 59:15
**different**
24:9 25:19 59:2,8,11
97:19 125:9 126:18
132:18,21 153:5
156:4 158:9 159:19
167:16
**differentiate**
64:7

**differentiated**
60:6
**differently**
151:8
**difficult**
64:8
**digit**
38:15 39:10
**direct**
80:1 156:7
**directly**
53:10
**disagree**
60:9
**disclose**
53:16
**disclosures**
49:11,20 105:1 142:4
**discount**
35:22 36:10,22 37:6
37:15 38:5 43:13
**discounting**
34:22 156:5,12
158:12
**discounts**
31:6 34:16 35:8,16
35:19 36:5,17 37:11
37:22 38:11,16,19
39:1,5,19 40:1,8,16
41:8,11,15 42:1,4,9
42:21 56:12 77:12
80:3,22 81:5
**discovery**
94:20
**discuss**
21:6 22:4 29:20
30:12 43:2,16 47:4
52:15 53:19 82:9
122:3 143:17
**discussed**
34:7 44:3 48:4 49:19
50:22 53:3 124:8
164:9,15
**discussing**
57:13 143:10 146:16
**discussion**

66:13 135:11 143:21
**discussions**
27:11 47:6,9 58:16
93:2 99:16 107:22
140:8,21
**disease**
11:8 21:13 22:15
67:21 72:16 75:8
125:5,15 134:6,7,15
134:18,22 135:1
136:3
**disrupt**
167:5
**disrupted**
166:5
**dissertation**
67:14
**distinct**
165:13 167:13,16
**distinction**
167:22
**District**
1:1,2 2:20 5:8,8
**doctor**
69:20
**doctors**
69:19 70:15 71:19
**document**
52:11 81:16,20 82:1
82:9,13,20 88:21
89:12 90:8,12 101:9
101:14 106:10
124:13 126:1,21
140:11 141:5
160:19
**documentation**
29:16 43:12 46:8
52:12 56:16
**documents**
55:16,20 56:1,7
86:19 91:13 142:6
160:10 168:9
**doing**
28:14 87:6 114:8
**dollars**
155:11

**DPI**
22:2 59:2,16 71:18
108:11,20 109:19
109:21 110:10
113:10 116:15
120:9,13
**Dr**
6:15 11:18 12:2,7
18:6,10,13,16,20
19:17 20:7,13,16,21
20:22 21:4,7 22:5
27:14,16 29:6,8
49:18 50:22 54:6
57:20 60:16 63:17
64:6,10,13 65:15,21
71:13 81:14 82:1
130:16 137:11
165:11 168:3,7
**drafted**
15:15,16,17
**drawing**
167:22
**drug**
78:5
**dry**
32:10 52:19 54:15
58:22 72:7 86:6
97:11 109:19,21
117:5 164:13
**due**
161:16
**duly**
6:5 169:7 171:5
**D.C**
1:17 2:8 3:4,9,16
5:14 6:18

——————— E ———————

**E**
4:1,7 5:1,1
**earlier**
33:22 43:15 44:1,4
118:13 124:8 142:3
160:6
**early**
89:3 140:18



earn
145:17 155:1,18
156:21 157:17
158:3
easier
47:2 71:17 72:5
economic
23:20 83:21
economics
9:19 74:18 135:20
144:7
economist
10:5 67:14
economists
131:15
EDT
2:3 139:17 140:1
168:21
educate
131:8
education
9:15
educational
137:19 138:1
effect
84:1 161:21 165:19
effective
68:3
effects
62:15
efficacy
68:6
effort
48:11 163:8
efforts
47:11 48:14,20 49:12
49:21 50:13 131:6
137:19 138:1
158:13 166:19
either
41:19 42:5 54:14
75:20 91:16 99:3
104:19 108:10,20
124:20 141:16
160:13
elasticities

74:11
eligible
72:18 138:13
eliminated
166:6
EMERY
3:8
employed
171:10,13
employee
171:13
employees
140:21 141:6
enclosed
169:7
encompass
151:12
encompassing
152:5
encouraging
48:7 137:21
ends
119:8 126:8
engage
165:12
engaged
49:12 131:7 137:18
163:8
engaging
130:19 131:4
enjoyed
32:7 33:14
enjoys
32:16 40:4
enter
62:2 166:12
entered
41:19 42:5 47:12
55:8 67:6 68:19
69:22 94:19 152:22
enterprise
144:20
enters
41:4
entire
16:4 153:12

entirely
129:7
entirety
22:7
entrant
166:7,22 167:4
entry
23:22 30:7,9,16,17
30:20 31:7 41:13
42:18 62:11,16 84:1
88:3 91:18 95:11,17
95:21 96:3,11,21
97:22 100:2 131:2
131:14 139:12
146:22 147:2
157:12 166:22
environment
42:17 43:19 44:6
epidemiology
10:14
erode
136:17
erosion
62:15 121:11,22
122:8,12,15 146:21
153:15
errata
169:7
ERROR
170:5
errors
17:6,21
ESQUIRE
3:3,7,8,13,14,14
essence
83:18 85:14 132:5
135:1 144:16
essentially
75:14
estimate
101:22 121:10 122:7
124:5
estimates
86:13 103:19,21
104:1 124:18,19
125:6

estimating
159:20
et
170:2
evaluate
74:5
evaluated
70:21
evaluating
74:10
event
67:5 154:12
everybody
19:11
exact
12:12 26:18 27:8
46:18
exactly
23:10 34:3 50:17
99:4 140:16 141:9
149:12 156:16
examination
4:2 6:4,7
examine
161:20
examined
6:5 97:4
example
66:14 73:3 162:13
examples
122:4 131:21
exceed
147:2
excess
102:18
exchange
80:4 81:1
exclusivity
32:7,16 33:3,10,12
33:14 40:4
Excuse
65:16 148:10 160:4
Exhibit
4:9,12 7:14,16 8:8
81:11,16 82:21 85:6
88:22 89:4,7 92:10



HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000647

92:21 93:18 94:6
95:16 96:18,20
97:21 98:21 100:5
101:4,14 102:5
104:9 105:5 108:5,7
109:7 111:4,6 116:2
116:5 117:18 118:3
118:13,18 124:10
126:6 128:8 140:11
141:5
**expand**
130:6 133:12 135:22
**expanding**
131:17,17
**expands**
136:6
**expansion**
132:22
**expect**
37:10 41:4,11,20
42:9,15,20 79:19
94:20 95:3 166:17
**expectation**
157:16
**expectations**
35:5,11 36:3,16
47:10 91:17 105:2
107:4 119:9 142:7
145:1,8 147:16
**expected**
38:1 41:15 79:1
120:1 144:9 158:19
**expecting**
34:16 118:4,19
**expects**
48:15 50:18 103:10
**expend**
166:10
**experience**
9:16 47:18 79:21
**expert**
8:21 9:2,10 10:9,12
**expire**
149:13
**expires**
149:22 150:17 151:4

169:19
**exposed**
166:15
**exposure**
155:9
**express**
31:21 89:10 90:7,11
144:9
**expressed**
87:5 98:14
**extend**
124:1 150:2
**extending**
112:10
**extent**
30:14 93:5 98:17
**extrinsic**
131:16
**EYES**
1:11
**E-mail**
3:5,10,17

---

### F

**faces**
123:1
**fact**
29:5 81:8
**factors**
156:4 158:9
**Fair**
10:22 17:16 27:18
**fairly**
122:6 130:17
**familiar**
73:4,6,7 78:11 81:19
105:14
**far**
9:10
**fashion**
72:7 75:14
**FDA**
23:4,9 24:1,6,9,15,22
25:1,12 26:6,9,12
26:19 59:22 60:22
61:5

**features**
69:5
**February**
13:14 18:11 27:14
29:21 43:3,9 44:21
51:3,4 89:3 98:21
99:5 140:18 146:14
**feel**
10:18
**felt**
49:16
**field**
10:4 48:16 49:1
50:18
**figuring**
79:5
**fill**
132:5
**finally**
48:9 117:7
**finance**
155:8
**financial**
142:1,4 146:2
**financially**
171:14
**firm**
14:1 144:9,11
**first**
9:14 11:10,14 68:1
78:1 102:22 103:3
105:5 108:6 115:9
117:3 160:22 161:7
161:11,13,15 165:8
166:4 167:5
**flip**
156:10
**focused**
149:5
**folks**
28:6,13 45:17 51:17
102:18 105:15
132:1
**follows**
6:6
**force**

49:15,17
**forecast**
4:13 82:2,18 83:2,9
84:8,13,19,22 85:2
85:5,8 88:11 91:1,4
92:9 95:7,16,19
97:4,5,15 98:9,21
99:4 100:5 102:11
103:8 104:9 106:17
112:12 113:7 116:4
116:8 117:6,18
118:3,18 119:8
120:17 124:10
128:8 141:10,12,14
141:21 142:12,19
142:21 148:8
**forecasting**
83:3 106:5 110:9
126:13 129:9
**forecasts**
88:5 91:7,10,19 92:4
92:20 93:11,17 94:6
95:5 96:17,20 97:21
105:7 110:3 111:6
160:7
**foregoing**
169:3 171:3,5
**form**
11:15,21 16:20 33:7
34:1 36:1,12 37:8
37:17 38:6,12,21
39:7,13,21 40:19
41:17,21 42:1,12
49:3 50:14 59:3
60:8 61:2,11,21
62:10 66:8,22 67:9
69:1 70:1,18 71:21
74:20 75:22 76:10
77:8,17,21 78:21
79:16 80:11,15 83:5
84:11 85:20 86:16
87:14 88:8 89:14
90:2 96:5,22 98:1
99:1,11 100:7,13
101:6,18 102:8
103:12 104:13



105:10 106:8,18
108:12 109:13,16
109:22 110:12,20
111:19 112:7 114:1
114:21 116:13,17
117:19 118:7,22
119:3,19 120:11
122:16 123:11
124:11 126:19
127:19 129:20
131:12 132:14
133:20 135:15
136:13 137:2 141:1
142:16,20 144:5
145:6,19 147:12
148:19 149:10
151:5 153:1 154:8
157:1 158:6 159:6
161:18 163:17
164:6,14 165:5
166:8 167:7 168:4
**formed**
91:16
**former**
49:14
**formularies**
69:10
**formulary**
36:7 43:18 44:6
69:14 80:4 81:1
**formulate**
99:21 100:21 101:9
101:11 143:2
**formulated**
32:10
**formulating**
55:11 80:18 81:8
121:19 122:22
**formulation**
52:20 72:8 86:6
**formulations**
54:16
**forward**
25:1 112:18,21
144:21
**forward-looking**

147:5
**found**
54:19
**foundation**
67:10 69:2 70:2,19
71:22 83:6 96:7
97:1 98:2 99:12
101:19 102:9
103:13 104:14
105:11 106:9,19
108:13 111:20
114:22 118:8 119:4
119:20 124:13
126:20 129:21
135:16 163:18
**four**
28:16 85:14
**fraction**
155:20 157:13
**franchise**
155:22
**Fred**
6:13
**Frederic**
1:14 4:3,10 5:4 6:2
169:2,11 170:3,21
**Friday**
2:2
**front**
26:20 27:9 160:16
**fulfill**
126:9
**full**
45:11
**further**
43:7 128:17 171:12
**future**
154:4,22

———— **G** ————

**G**
5:1
**gain**
121:21
**general**
30:10 36:16 37:5,20

40:18 63:21 74:1
79:21 131:14
132:20 134:5
135:18,19 141:22
**generally**
65:9
**generated**
95:8,19 155:21
**generating**
98:8 105:16
**generic**
59:19
**Germany**
9:4,6
**getting**
21:9
**give**
7:10 25:3 35:14 49:7
99:7 121:5
**given**
8:21 13:7 16:9 31:1
32:4 49:16 70:13,14
92:15 94:16 95:7
97:14,14 101:8
107:5 124:2 134:1,1
153:13 155:9 169:5
171:9
**go**
26:4 33:21 43:14
93:8 102:11 134:13
148:5,9 158:18
159:20 166:7
**goes**
34:4 117:13
**going**
35:9 49:14 50:3 58:2
58:7 62:12 79:6,10
90:19 92:11,18,22
98:16 99:14 107:13
110:3 112:20 122:1
122:8 123:9 129:2
136:18 139:15
153:10 154:4,11,22
156:9,17 158:20
166:5 167:4
**going-forward**

147:11
**good**
6:9,10 58:5
**GOODWIN**
2:7 3:3
**Googled**
54:19
**Gotcha**
160:5
**gotten**
41:2
**GPO**
31:11
**GPOs**
35:17,20
**graduate**
10:13
**Greg**
44:14
**group**
21:18,18 22:9,13,21
30:17,18,18,20,20
32:16,18,20 33:1
65:10,14,18,20 76:7
101:21 102:3,13,18
102:19 103:18
106:12 108:8,18
111:12 114:16
126:7 138:14
**groups**
64:7
**grow**
104:11 131:11
**growing**
102:3 137:7
**grows**
132:13 133:18
135:13
**growth**
71:5 86:2 87:4 105:2
111:14,15 115:21
127:8 137:5 138:9
138:16,17 139:9,11
**guess**
33:8 63:5 155:6



**H**

**H**
4:7
**HABIBI**
3:14
**half**
51:11 117:21
**hand**
7:18
**handing**
81:15
**happen**
115:13
**happy**
163:22
**hard**
119:10 154:10
156:16
**harm**
62:7 83:21
**harms**
23:13,20 24:17 99:22
101:12 115:14
151:15 157:11
**head**
156:6,6
**header**
17:18
**headers**
17:9
**head-to-head**
72:4 80:1 122:2,9
**health**
10:5,6,20 67:14
**heart**
64:1 76:14 77:1
130:18 135:9
**held**
2:6 5:12 69:9
**helpful**
83:11 95:1 97:8,16
**hepatitis**
122:5
**hereto**
171:14

**hesitate**
26:17
**high**
23:19 75:1 144:6
**higher**
103:22
**highlighted**
34:19
**HIGHLY**
1:10
**hints**
34:14 35:3,13
**historically**
30:22 35:15 40:2
**holding**
10:8
**holds**
153:6
**home**
6:16
**hour**
15:14 18:17,18,19,21
18:22 19:3,3 27:21
28:1 45:10,11 51:11
58:2
**hourly**
15:7
**hours**
13:5,10 14:21 57:2
57:15
**hundreds**
155:11
**hurdle**
133:9
**hurdles**
125:9
**hypertension**
11:2,5,7,16 21:10,11
21:12 22:11 48:8
63:21 72:17 75:9,17
76:9,16 114:6 125:4
125:12,14 130:12
132:3 135:6,8
137:22 163:16
164:5
**hypertension-inter...**

22:14
**hypothetical**
72:1 153:2 154:9

**I**

**identification**
7:17 23:12 81:12
130:10
**identified**
82:5 109:10
**identify**
48:2
**identifying**
73:11
**idiosyncrasies**
69:7
**ignored**
112:17
**ILD**
32:15 48:1,3 68:7
102:14 104:6
115:22 127:7,11
130:11 132:16
133:8,15 134:4
137:13,20 146:21
**illustrate**
153:11 157:6
**illustrates**
151:17
**illustration**
115:12 129:5
**illustrative**
120:4 127:21 139:7
**immediately**
12:19 134:1 160:20
**impact**
61:9,18 111:13
161:15
**implicitly**
144:22
**improperly**
25:1
**inaccurate**
88:7 105:9 106:17
**incentivizes**
68:8

**include**
108:9,19 154:16
157:10
**included**
84:2 92:9 109:4
110:2 116:4
**includes**
158:11
**including**
32:9 43:20 124:19
125:9 153:5
**incomplete**
72:1 153:2 154:9
**incorporate**
95:9
**increase**
74:4,6 81:4 111:1
131:16 133:2,3
138:2,3 163:8
**increased**
35:18
**increases**
106:13
**increasing**
110:4,11,14,15,18
**indicate**
101:15 138:11
151:22
**indicated**
30:5 31:12 34:22
37:18,21 40:11
41:10,18 42:3,19
47:22 50:2,16 64:6
67:21 70:10 77:9
86:18 121:17
135:17 136:1
137:13 142:3,18
158:7 161:11
**indicating**
31:5 46:9 52:12
**indication**
41:9 61:1,10,15 62:4
62:8,19 63:10 70:9
71:6,7,11 72:3
104:11 106:4
117:17 127:2,4



128:10 145:18
146:17 149:8
150:16 151:3 154:4
154:22 158:4 159:5
159:16 161:8,17
162:6 163:1
**indications**
41:12,16 42:20 80:21
86:14 103:4
**indicator**
145:13
**individuals**
19:13 125:18
**inform**
85:3
**information**
46:1 52:18 90:1
92:9,14 93:4,8
94:15 95:10,12,20
96:12,14 97:13,16
98:6 99:8,18,20
100:5,6 101:4
**infringement**
8:18,20,22 9:8 11:19
12:1 24:20
**ingredient**
60:15
**inhalable**
63:4
**inhalation**
63:7,12 97:12 109:21
117:5 164:14
**inhaled**
62:19,22 109:20
130:7 138:6
**inhaler**
58:22 128:2,16
**inhibitors**
17:10,15,15 66:14,20
70:16 122:6
**initial**
35:8 113:8 155:12
**injunction**
4:9 7:15 9:4 24:19
61:8,13,17 62:1
67:5 68:19 69:12,22

148:14,16 149:4,13
149:22 150:9,14,16
151:4 152:20,22
**injunctions**
150:5
**innovation**
166:18
**innovator**
167:18
**innovators**
166:10
**inputs**
86:9
**insolvency**
154:16 155:13
**instance**
73:13 146:3
**instructed**
89:20
**instruction**
90:14,19 92:17 93:19
93:21 94:2,8,10
**insurance**
53:12
**Intensity**
14:1
**interchangeable**
22:3 60:19
**interchangeably**
21:16 22:18
**interested**
21:8 30:1 137:14
171:15
**internal**
56:15 142:6
**internally**
105:15
**interrupt**
107:9
**interstitial**
11:8 21:13 72:16
75:7 125:5,14 134:6
134:14
**introduced**
131:10 132:12
133:17 135:13

164:10,13
**introduction**
67:22 71:4 77:10
79:22 132:17
135:21 136:5,10
**invasive**
63:22 130:18 132:8
**investments**
162:4,21 163:4,6
**investors**
144:17
**involved**
11:1 58:15 107:21
140:7
**involves**
134:7
**involving**
11:15 23:4
**in-house**
20:3
**irreparable**
62:7
**issues**
11:20
**item**
101:21

_____
J
_____

**J**
3:8
**January**
89:3 99:5 140:17
**jhabibi@cooley.com**
3:18
**Job**
1:21
**JOHN**
3:14
**July**
33:15
**jump-start**
131:3
**June**
152:16

_____
K
_____

**KATHERINE**
3:3
**katherinecheng@g...**
3:5
**Katie**
19:12,21 28:12 45:18
51:18
**kind**
29:11,13 72:3 73:1
104:17 105:20
131:4 151:17
159:20
**Klapper**
1:20 2:18 5:16 171:2
171:17
**knew**
46:13 88:15
**know**
18:18 19:9,10,11,20
25:20 26:7 28:12
31:18 33:9 35:19
37:19 39:4,18,22
41:2 43:22 47:19
49:10 50:5,8 57:13
65:17 67:13 70:6
71:3,13 79:3,13
83:7,10 84:12 85:1
86:7,18 88:10,12
92:20 93:17 94:16
95:10 103:1 104:3,5
104:16 106:22
114:14 119:5,6,9
120:4 122:18
124:22 130:22
131:6,20 132:4
133:1 134:4,10
135:19 137:11
141:11 143:7
149:12 150:2,4
151:16,17 152:21
153:7 156:1,17
157:5 159:18,19
163:3,19
**knowing**
159:18
**knowledge**



29:1
**known**
163:14
**Kristyn**
14:13,16 19:14 28:7

**L**

**label**
66:21 67:8 68:22
69:11,21 71:20
**labeled**
128:12
**labels**
60:11
**lack**
83:19 135:3 149:14
**larger**
101:16 102:6 103:10
**largest**
32:13
**launch**
61:1,9,19 77:7 78:20
79:15 80:10 145:5
149:20 154:6
**launches**
62:18 63:9 149:7
150:15 151:3
**launching**
62:8
**lead**
27:11 114:4
**legal**
5:16,18 90:3
**Let's**
108:4 109:6
**level**
23:19 71:1 75:1
144:7
**leveraged**
100:16
**liability**
155:10
**life**
10:2,6
**lifted**
152:21

**likelihood**
95:11,21 96:11,12
**LILLIAN**
3:8
**limit**
149:15 150:19
153:18
**limitation**
154:5
**limitations**
146:9
**limited**
143:14 151:1
**limiting**
130:10,22 131:21
132:1
**line**
101:21 103:14,15
106:12 107:1
108:17 153:8 170:5
**lines**
46:12
**Liquidia**
1:6 3:12 5:7 25:3
42:5 47:10 48:12
49:1 50:2,18 60:21
62:7 86:4 103:22
105:1 107:4 111:12
113:4 127:10
143:18 144:3,11
145:4,17 146:5
147:7,19 150:22
153:13 154:2,11,17
154:22 155:18
156:20 158:3 159:3
167:3 170:2
**Liquidia's**
47:11 48:14,20 49:10
49:15,20 50:13
58:20 61:19 85:9
115:21 124:19
131:2 143:10,14
144:20 145:11,12
146:7,13,16 147:3
147:10,22 153:20
155:7 156:5,13

157:14,17 158:11
159:15
**list**
8:13,14 55:5
**listed**
46:20 92:1
**litigated**
24:21
**litigation**
94:18 149:2
**little**
22:22 24:12 27:22
47:1 124:2 138:21
151:7,7 160:21
**LLP**
2:7 3:3,8,15
**long**
18:15 27:19 45:8
51:9 163:13
**long-standing**
31:4
**look**
17:13 42:17 98:16
102:13 113:13
122:8 137:3
**looked**
13:8 14:20 43:19
60:11 97:13 118:12
**looking**
15:8 46:14 113:21
119:6 126:5,5
**looks**
9:18 17:17 85:15
106:4 110:17
123:16
**lose**
129:1 161:7
**losing**
128:19
**loss**
148:21 150:13,21
151:13 152:6,8
**losses**
149:16 153:16
**lost**
121:3 143:20 148:6

151:2
**lot**
158:17,18
**low**
40:2
**lower**
83:21 120:14,21
157:7,8
**lspetrino@mwe.com**
3:11
**lunch**
139:18
**lung**
11:8 21:13 22:15
72:16 75:8 125:5,15
134:6,10,12,14,14
134:17,22 135:2
**lungs**
134:8

**M**

**Magna**
5:16,18
**major**
31:13,18,20 35:1
**making**
83:22 157:9
**managed**
27:6
**management**
44:9
**manager**
51:6
**managers**
30:4 31:21 53:22
**mangling**
74:8
**manifest**
112:21
**manufacturers**
53:18 87:17 105:20
**March**
1:17 2:2 5:10 170:4
**margin**
131:16
**marked**



7:17 81:12,15
**market**
23:22 31:2 32:5,12
32:13,14,15,16 33:5
41:5 42:6 47:12,22
49:13,21 52:20
62:20 63:12 66:5
67:4 68:16,18 69:6
69:8 72:11,14,15,22
73:9,12 74:5,19
75:2,3,11,13,18,19
76:6 77:7 78:5 79:6
84:16 85:11 86:5,13
95:17 96:4,21 97:22
98:16 101:16,17
102:6,6 103:4
104:18 105:2,21
113:13,21 114:11
114:13,18 115:22
117:17 118:5,14,16
118:20 119:13,17
121:3,11,22 122:7
122:12,14 123:21
124:5,7,17 125:1
127:9 129:19 130:3
130:6,7 131:1,11,11
131:17,22 132:11
132:13,13,21 133:8
133:11,15,16,17,18
134:2 135:11,12,13
135:22 136:6 137:1
137:7 139:2 144:10
144:13,16 145:12
145:15 146:6,7,13
146:20,21 147:3,15
153:12,15,21
156:13 157:14
158:14,16 161:8,16
161:21,22 162:18
164:3,12,17 165:17
167:6,10,10
**marketing**
46:16 47:8,11,16
48:6,11,14,16,20
49:2,9 50:13,19
86:18 91:12 131:6

131:20 133:2 142:4
142:7 160:15 168:9
**markets**
27:6 41:20 79:22
**market's**
112:20 157:16
**Marsh**
13:22 14:15 19:14
28:7
**Massachusetts**
6:17
**material**
16:8,22
**materialize**
84:16
**materials**
50:6,9 54:20 55:6
56:19 57:1,13 64:15
66:2 91:6 94:21
130:15 141:22
142:5,21
**math**
109:2
**matter**
5:5 11:11,15 23:4,10
24:2,3,9,10,17,22
25:12,15 26:9,10
53:15 54:1 55:8
56:8 74:1 81:17
131:14 132:20
135:18
**matters**
25:16,19
**max**
106:5 114:17 118:13
118:15
**maxes**
117:11
**McDERMOTT**
3:8
**mean**
13:4 23:15 32:6,21
64:22 78:3 93:16
100:10 123:14
**means**
36:6 82:18

**mechanism**
24:8
**mechanisms**
132:21
**Medicaid**
54:3
**medical**
9:21 10:9 65:6,8,13
**Medicare**
54:3
**members**
13:17,21 14:14 16:7
**memorializing**
56:16
**memos**
56:16
**mention**
162:13
**mentioned**
44:1 133:7 155:13
160:6
**mess**
135:3
**metric**
146:2
**mid**
12:14
**middle**
12:14,14,15
**mid-December**
23:13
**mid-February**
40:11
**millions**
155:11
**mind**
123:5
**minutes**
19:1 45:12
**mischaracterizes**
76:1 96:6 97:1 98:3
99:12 106:9 124:12
126:20 145:20
157:2 164:7 168:5
**mispronouncing**
44:17

**misremember**
19:18
**Misty**
1:20 2:17 5:15 171:2
171:17
**modest**
24:4,5 25:21
**moment**
6:1 132:19
**morning**
6:9,10 57:7
**Morton**
3:13 4:3 6:8 7:18,21
12:6 17:5 26:14,21
33:16 34:5 36:8,19
37:13 38:2,9,17
39:3,9,17 40:5 41:6
42:2 43:1 49:6
50:20 58:4,6,13
59:14 60:20 61:6,16
62:5,17 66:12 67:3
68:12 69:16 70:12
71:12 72:9 74:13
75:10 76:2 77:2,13
77:19 78:8 79:11
80:5,13 81:2,13
83:15 84:17 86:11
87:9,19 88:20 89:21
90:4,21 92:19 93:15
94:4,12 96:15 97:17
98:19 99:6 100:3,11
101:1,13 102:4,20
104:7 105:3 106:2
106:15 107:11,19
108:3,16 109:5,17
110:16 111:2 112:4
113:1 114:7 115:5
116:14,18,21 118:1
118:11 119:1,14
120:6,18 123:6,15
125:21 126:16
127:12 128:3 130:4
132:9 133:13 134:3
136:7,20 138:19
139:13 140:4,19
141:3 142:14 143:3



145:2,14 146:12
147:20 149:3,18
152:10 154:1,18
155:15 157:20
158:1,21 159:7,13
162:1 163:12 164:1
165:1 166:1 167:2
167:20 168:11,15
**moved**
25:1
**mover**
160:22 161:7,13,15
165:8 166:4 167:5
**moving**
112:21 128:18,18
144:20 158:18
**multiple**
151:14
**Munich**
9:5

### N

**N**
2:7 3:4 4:1,1 5:1,13
**name**
6:11 162:14
**names**
28:17
**Nathan**
11:18 12:2,7 18:6,10
18:13,16,20 19:17
20:7,13 21:7 22:5
54:6 57:20 60:16
63:17 64:6,10,13
65:15,21 71:13
130:16 137:11
165:11 168:3,7
**Nathan's**
20:16,21,22 21:4
**near**
95:12,13
**nebulized**
54:15 86:5 97:11
109:16 113:9 117:4
**nebulizer**
32:10 108:11,21

109:12 164:11
**necessarily**
67:20 69:4
**necessary**
55:1 73:15 100:20
101:8
**need**
150:22
**needed**
143:1
**needs**
133:10
**negative**
53:5
**negotiate**
30:22 32:4 41:21
**negotiating**
42:17 53:16
**negotiations**
30:3 42:21
**neither**
171:9
**net**
78:10,18 79:14 80:9
87:21 88:6,17 97:10
109:8,9 112:9,17
113:8 116:15 117:8
156:8
**never**
9:7
**new**
48:1 95:9,12 131:10
132:12,17 133:16
135:12,21 136:5
137:12 166:11,13
**Nodding**
53:5
**Norman**
3:21 5:17
**north**
3:9 124:21 152:8
**Northwest**
5:13
**Notary**
2:20 169:19 171:1,18
**note**

83:9 111:18,22 112:1
112:5,8 113:3
114:15 115:1,6
118:12,15
**noted**
5:19 104:20 112:9
169:7
**notes**
20:8,9,11,12 28:21
29:2,3,4 46:1,3 52:3
52:6 56:11 111:5,8
**notice**
2:17
**number**
5:9 14:21 81:18
87:12 102:17 103:8
104:2 105:8 109:7
111:3 117:10
119:22 120:1,13,16
121:6,6,8 123:5
124:20 125:2,16
126:1,12 128:11,14
138:3
**numbers**
83:14 87:2 102:2,11
105:17 106:1 107:2
109:2 110:22
115:17 117:3
123:17 137:4
138:11 139:10
151:19
**N.W**
2:7 3:4,9,15

### O

**O**
4:1 5:1
**oath**
7:1 29:8,12,14 46:6
52:9
**object**
11:21 16:20 33:7
34:1 36:1,12 37:8
37:17 38:6,12,21
39:7,13,21 40:19
41:17 42:12 49:3

50:14 59:3 60:8
61:2,11,21 62:10
66:8,22 67:9 69:1
70:1,18 71:21 74:20
75:22 76:10 77:8,17
77:21 78:21 79:16
80:11,15 83:5 84:11
85:20 86:16 87:14
88:8 89:14 90:2
92:11 96:5,22 98:1
99:1,11 100:7,13
101:6,18 102:8
103:12 104:13
105:10 106:8,18
108:12 109:13
110:12,20 111:19
112:7 114:1,21
116:13,17 117:19
118:7,22 119:3,19
120:11 122:16
123:11 124:11
126:15,19 127:19
129:20 131:12
132:14 133:20
135:15 136:13
137:2 141:1 142:13
142:16 144:5 145:6
145:19 147:12
148:19 149:10
151:5 153:1 154:8
156:22,22 158:6
159:6 161:18
163:17 164:6 165:5
166:8 167:7 168:4
**objection**
73:20 116:20 140:13
159:9
**objections**
108:22 155:3
**obligation**
7:1
**observable**
75:4,6,15 76:7 88:15
**observe**
98:10
**observed**



117:8 158:10
**obtain**
145:4
**obtaining**
162:5,22
**obviously**
150:2
**occur**
95:11 122:1
**occurred**
12:13 88:16
**occurs**
148:21 149:1
**offer**
26:18
**offered**
38:14,18 39:5,19
**offering**
9:10 35:11
**officer**
171:2
**offices**
2:6
**off-label**
67:12 68:10 71:1
**oh**
46:22 98:7 126:4
  148:9
**okay**
8:7 9:7 10:8 13:20
  14:10 15:2,6 21:2
  22:8,13,17 23:14
  25:6 34:6 35:21
  38:3 42:3 47:3
  48:13 50:8 55:4
  57:4 61:17 69:17
  73:8 79:12 81:3
  87:10 94:5 96:16
  99:7 103:7 106:3
  109:18 110:8 111:3
  116:1 117:9,16
  118:2 120:7,19
  127:13 128:22
  129:6,14 133:14
  135:10 136:21
  138:20 141:15,20

142:10 146:13
147:9,21 148:11
149:4 150:12,21
152:14,18 154:2
155:16 156:19
157:21 159:14
160:5,18 161:2,5,14
165:2 168:15,16
**once**
47:12 145:5 154:6
**ones**
54:18 95:1 158:9
**ongoing**
40:14
**online**
54:19
**on-label**
68:5
**operations**
155:9
**OPERATOR**
3:21 5:2 58:7,11
  107:13,17 139:15
  140:2 168:16
**opinion**
55:1,12 65:12 74:22
  91:9,11 95:2 99:22
  100:21 101:10,11
  142:9 143:2
**opinions**
55:7 64:18,21 65:2,6
  82:16 85:3 143:10
**opportunity**
25:4
**opposed**
68:9 103:15,17
**options**
133:4
**Optum**
31:21
**order**
133:11 160:17
**Orenitram**
165:4
**outcome**
148:22 150:5,8

171:15
**outcomes**
150:1
**outdated**
100:12 101:5
**outside**
28:10 69:3 70:3,19
  71:22 73:20 101:10
  131:6 138:18 139:3
  139:8
**overall**
86:22 123:21
**overcome**
125:8 133:10
**overlooked**
15:12

---

### P

**P**
5:1 168:1
**page**
4:2,8 8:12 9:14 105:5
  108:6 109:7 111:10
  143:6 161:1 170:5
**pages**
169:3
**PAH**
22:11 32:12 41:12
  42:5,10 47:8,17,19
  47:21 54:10 61:1,5
  61:10,20 62:3,8,12
  62:16,19 63:4,8,19
  64:4,12,19 65:3,7
  75:11,12,19,20 76:6
  86:14,22 101:15
  102:6 103:10
  104:11,19 106:3
  108:8 111:12
  143:22 145:1,4,8,18
  145:22 146:17
  147:6,11,17 148:1
  154:3,6,21 155:8,22
  156:7,14,21 157:18
  158:4 159:4,4,16
  161:17,20,22
  162:18 165:4,15,17

167:14 168:2
**PAH-indicated**
155:19
**paragraph**
17:13 66:14 162:13
  163:5
**parameters**
159:19
**paraphrase**
30:21
**part**
16:8 24:6 26:1 28:14
  49:15 75:3 84:22
  112:1 137:8 138:15
  138:15 147:8
  158:13
**particle**
59:5
**particular**
24:16 63:20 67:21
  69:5,7 73:13 95:7
  131:1,19 146:3
**particularly**
34:19 78:4 87:1
**parties**
86:20 87:5 98:14
  171:11,14
**parts**
158:18
**patent**
8:18,19,22 9:8 33:10
  33:11
**patient**
60:12 63:18 64:3
  103:3 104:10,21
  139:3
**patients**
47:21 48:3,8 54:10
  54:12,14 64:8,12,18
  65:3,7,10,13,17,20
  71:17 72:16 75:16
  75:20 76:7,12 87:12
  97:12 102:12,15,17
  103:2,9 105:6,9
  106:6 108:7,9,19
  111:9 114:17 116:3



116:10 117:2,5,10
118:6,21 119:7,18
120:2,10,13,20
121:15 123:8,10,14
123:20,22 124:8
125:3,8 126:9,12
127:17,22 128:5,7
128:12,15,20 129:2
129:7,8,14,16,18
130:11 136:12,17
136:22 137:16,21
138:4,9,14 139:1,8
163:11 167:11,14
168:2,2
**Patterson**
51:3,5,10,16 52:1,4,9
52:13,16,17 53:4
55:15,19 56:2,6
**pay**
144:3
**payor**
36:21 37:2,16 38:4
70:11
**payors**
27:12 30:3,5 31:1,3,8
31:13,15,20 32:4
34:8,15 35:2,5,17
35:19 37:6,20 38:11
38:16,19 39:2,6,19
40:7,16 41:1,3,8,10
41:14 42:3,8,16
44:9 53:9,15 56:12
56:17 69:8,18 77:11
79:1 80:3 123:1
**payor's**
31:18
**PBM**
70:11
**PBMs**
27:12 30:4 35:17,20
69:8,18 80:3
**PCSK9**
17:10,15 122:5
**PCY**
111:14
**PDE-5**

66:13,20 70:16
**Pennsylvania**
3:15
**people**
18:3 28:16 128:14
**percent**
34:17,22 36:6,10,18
36:21 37:6,12,15
38:1,5 39:5,12,16
110:18 111:1,13,14
111:14 114:17
117:16 118:5,13,16
118:20 119:17
120:9,14,20,22
121:6,15 122:6,12
123:7,19 128:19,22
129:6
**percentage**
38:15,16,19,22 39:5
39:11,14 156:17
**perform**
83:13,17,18
**performance**
100:17 145:10
**performed**
60:10 113:11 130:21
148:5
**performing**
82:18 112:15 115:19
**period**
142:22 147:2 149:7
149:20 150:12
152:1,11 155:12
**permitted**
145:5 154:6
**personnel**
57:17
**perspective**
10:15 16:12 31:18
49:16 83:21 105:13
105:17 106:21
112:19 115:16
123:4 144:8
**pharmacy**
30:4 31:20 53:21
**PHILLIP**

3:13
**phone**
19:4
**physician**
67:6,15 68:15,16,21
70:5 125:10
**physicians**
49:13,22 67:19 68:8
71:8 130:20 131:3,8
137:14,20 163:10
165:12,14,20
167:13,18 168:1
**PH-ILD**
21:14 22:15 23:22
25:2 41:9,12 42:6
42:10 47:9,17 53:2
54:11 61:14 62:2,13
63:10,12,19 64:4,12
64:19 65:3,7 66:6,7
66:21 67:6,7 68:4,9
68:20,22 69:14,21
70:15,17 71:2,5,14
71:17,20 72:11,14
72:15,20,22 73:9
75:18,20 86:14 87:1
101:17,22 102:6
103:10 104:20
107:1 108:18
114:16 115:18
116:3,10 117:2,9,17
118:5,21 119:17
123:21 124:4,6,8
127:18 128:5,10,12
130:8 134:19
135:12 136:11
137:1 138:5 139:2
143:18,19 149:8,21
150:15 151:3 161:8
161:12 162:6 163:1
165:13,22 167:11
167:17 168:2
**Ph.D**
1:14 4:10 5:5 6:2
10:5 13:22 14:4
169:2,11 170:3,21
**place**

62:1 66:15 69:13
**placement**
36:7 80:4 81:1
**places**
17:18
**Plaintiff**
1:4
**PLAINTIFFS**
3:2
**plans**
94:13
**please**
5:21 6:11 7:6,22
72:13 93:8 111:4
**plumbing**
135:4,5
**pmorton@cooley.c...**
3:17
**point**
39:1 44:12 58:5 66:9
84:16 95:6,19
127:10 140:17
146:15 151:20
154:20 155:14
160:17
**pointing**
125:22
**points**
82:17 84:21 85:5,8
85:14,16,17 86:1
97:7 98:11 100:15
100:20 116:7,9
**populated**
166:13
**population**
72:18 73:12 86:22
87:18 97:9 102:2
103:3 104:6,10
127:16 139:4
**populations**
60:13
**portfolio**
145:11 146:4 147:19
157:22
**portion**
130:3



**portions**
16:2
**position**
46:13
**positioning**
30:2 31:1 32:5
**positions**
31:14,16
**possibility**
96:10 125:11
**possible**
7:3
**posture**
53:17
**potential**
30:7,9 62:14 147:18
150:13
**potentially**
125:16 126:9 135:22
146:5 152:3
**powder**
32:10 54:15 59:6
72:8 86:6 109:20,21
117:5
**powdered**
52:19 58:22 97:11
164:14
**practicality**
70:7
**practice**
70:7
**predate**
33:18
**preliminary**
4:9 7:15 24:19 60:22
149:13,21 150:14
150:16 151:4
152:20
**premarked**
7:13
**premature**
166:21
**preparation**
27:1 53:8 57:17,21
92:7
**prepare**

56:20
**prepared**
23:3 84:9
**preparing**
13:3,18 57:10
**prescribe**
67:7 68:8,16,21
69:20 70:5 165:21
**prescribed**
125:19
**prescriber**
67:16
**prescribers**
12:3 22:1 47:20 48:2
60:18 71:9 165:20
167:14 168:1
**prescribing**
137:15
**prescription**
70:8 78:5
**prescriptions**
47:21
**present**
3:20 19:7,17 28:4
45:5,15 51:15 152:8
**presentations**
50:5 91:13
**president**
46:16
**pretty**
35:1
**previously**
38:18
**price**
62:15 74:4,6 77:5,15
78:3,7,13,19 79:14
80:9 97:10 110:4,10
112:9,17 113:8
117:8 144:13
146:20 153:15
**prices**
88:17
**pricing**
78:10 79:2 87:21
88:6 109:8,9,10,19
110:1 116:16

**primarily**
21:8 30:1
**primary**
130:10
**principals**
14:16
**prior**
9:15 43:20 44:7 88:3
91:17 96:13 113:15
113:15 114:13
162:5,22 164:17
**privileged**
89:17 90:1,16 92:14
93:4,7 99:17
**probably**
22:17 74:8
**procedure**
63:22 130:18 132:8
**process**
60:1 79:5 121:19
122:21
**PROCTER**
2:7 3:3
**produced**
81:17 83:9 96:13
**product**
32:11 33:13 40:3
58:20 60:3,6 63:3
68:1 69:12 80:2
124:3 131:14
132:17 135:21
136:5 156:6 164:12
**production**
155:8
**products**
32:9 33:18 34:13
37:16 39:20 47:8,17
59:19 60:7,13,19
62:20,21,22 63:8,12
66:5 67:12,13 69:9
70:14 71:2 77:6,16
78:19 79:14 80:9
81:5 87:22 88:6
113:14 114:5,12
126:13 128:9
131:10 132:12

133:17 135:13
138:7 145:9 146:4
147:19 157:22
162:5,22 163:5,7,10
164:16 166:12,15
**Professional**
2:18
**professionals**
65:6,8,13
**profits**
146:3 147:10,16,17
147:18 148:1 155:2
157:17 159:15
160:2,4
**project**
159:2
**projected**
86:3 123:10,14
149:17
**projection**
150:19 159:12,15,22
**projections**
87:11,21 97:8 116:3
142:1 159:21 160:9
160:13
**projects**
136:18
**properly**
143:15
**proportion**
153:20
**proposed**
60:11
**proposition**
135:20
**propounded**
169:6
**protect**
158:3
**provide**
16:7 20:12 35:16
37:11 55:15,19
56:10
**provided**
8:15 16:22 26:15
29:4 38:10 40:1



HIGHLY CONFIDENTIAL                                                                    LIQ_PH-ILD_00000657

91:5,14 105:7
**provider**
124:3
**providers**
12:4 22:1 47:20 48:2
   54:6 60:18 65:9
   166:14
**providing**
148:15
**PSCK9**
17:14
**public**
2:20 49:11,20 50:6
   104:22 142:3
   169:19 171:18
**publicly**
144:11
**pulmonary**
11:2,4,7,16 21:10,11
   21:12 22:10,14 48:8
   63:21 72:17 75:8,16
   76:8,16,19 114:6
   125:4,12,13 130:12
   132:2 135:6,8
   137:22 163:15
   164:5
**purpose**
151:11
**purposes**
73:10 74:22 83:8
   84:13 87:6 88:10
   105:21 113:6
   115:18 121:13
   127:21 128:13
   129:4,13 139:6
   148:2 149:5
**pursuant**
2:17
**put**
15:21 16:9,10 17:1
   82:2 104:1 112:12
   124:20
**p.m**
139:17 140:1 168:21

---

**Q**

---

**qualified**
10:18
**quantification**
10:16
**quantified**
9:7,9
**quantify**
53:1
**question**
25:6 43:15 68:14
   69:17,18 76:4 90:6
   93:6,16,22 94:3
   97:18 108:17
   122:10,14 142:10
   159:1 160:2 162:16
   162:19
**questionnaire**
132:6
**questions**
7:2,6 82:12 108:5
   168:14 169:5
**quickly**
157:6
**quite**
53:15 86:20
**quote**
34:7 72:11

---

**R**

---

**R**
5:1
**range**
34:16 36:5,14 37:22
**rate**
15:7 130:10,21
   131:21 132:1 139:9
   139:11
**rates**
86:2 87:4 138:2
**reached**
93:13
**reaches**
117:14
**reacting**
30:7
**read**

48:5 56:22 143:16
   169:3
**reading**
66:1 130:14
**real**
107:10
**really**
146:1 152:5
**Realtime**
2:19
**rearranged**
135:5
**reason**
7:9 71:19 84:7 88:4
   105:7 106:16 141:4
   167:17 170:5
**reasons**
136:2 159:11,17
**rebates**
31:6 78:13
**rebutting**
9:3
**recall**
12:12 19:11,16 20:5
   28:13 31:11 34:3,17
   36:14 37:1 43:6
   44:1,11 46:18 47:14
   48:21 49:5 56:9
   98:20 140:16 141:9
   160:18
**receive**
29:16 46:8,11 52:11
   90:22 92:3 140:12
   156:9
**received**
35:4 56:7 61:4 80:20
   89:2 91:20 99:4,19
   141:5 142:22
**receiving**
42:16
**recess**
58:9 107:15 139:18
**reciting**
65:15
**recognition**
162:3,12,17,21 163:9

164:19 165:17
**recognized**
166:17
**recognizes**
125:10
**record**
5:3,20 6:12 20:6
   28:18 45:20 50:10
   51:22 58:8,12
   107:14,18 139:16
   140:3 168:19 171:8
**record's**
22:8 74:14
**redo**
76:3
**reduce**
77:15 79:14 80:8
**reduced**
121:16 171:7
**reducing**
77:5 78:18
**refer**
21:13 63:2 131:15
**reference**
32:1,3 34:9 72:11
   75:11
**referred**
21:17 22:9
**referring**
33:4 73:2 126:3
**refers**
22:10,14
**refined**
17:2
**reflect**
83:3 84:9 96:20
   97:21 110:22
**reflected**
126:12
**reflection**
112:20 146:11
   157:16
**reflects**
9:14 84:15 126:17
**regarding**
95:20 113:4 140:8



145:1
**Registered**
2:18
**regular**
93:11
**reimbursements**
27:6
**rejected**
70:10
**related**
9:4 41:9 43:12
102:12 142:1
162:16 171:10
**relationship**
156:8
**relationships**
31:4
**relative**
120:14 171:12
**relatively**
40:9 152:1
**reliable**
84:19 85:6,19 86:15
87:13
**relied**
84:21 85:5 87:22
**reluctant**
53:16
**rely**
12:7 64:9 84:19
**relying**
11:18 12:2 101:8
**remains**
117:14
**remember**
99:3
**reminded**
112:11
**Remodulin**
165:4
**rendering**
55:6
**repeat**
76:17
**replacement**
41:22

**report**
9:2,5 21:14 38:14
63:16 64:16 66:3,5
66:10 72:10 75:12
82:6 84:3,20 91:6
91:15,21 92:2,5
94:14 115:15 116:2
122:3 143:5 146:15
151:13 162:10,12
163:21 164:22
**reported**
1:20 13:18,21
**reporter**
2:18,19,20 5:15,21
6:1 76:17,21
**represents**
124:5 125:17
**request**
35:22
**requested**
38:4
**requesting**
40:16 41:8
**requests**
43:13
**required**
80:22 99:21
**requirements**
43:21 44:9
**requires**
63:22 130:16
**research**
16:8
**reside**
6:14
**resources**
166:11
**respect**
11:22 30:2 32:8
34:12 35:6 47:7,10
48:6 53:18 86:21
87:20 91:7 99:22
100:15 119:12
121:3 146:20
153:14 156:12
158:12 165:7

**respects**
157:15 166:16
**response**
40:22
**responsible**
15:22
**result**
23:21 24:18 25:3
80:2 100:2 121:4,11
122:1 131:15
139:11 146:21
149:1 152:20
156:14 157:12
161:12
**resulted**
25:20 164:19
**retained**
12:10 113:16
**retention**
12:13,20
**reveal**
89:16 90:1,15 92:12
93:1,3 99:15,17
**revealing**
93:6
**revenue**
145:10
**revenues**
145:3,17,22 146:16
147:4,6 148:6 151:1
155:1,17,21 156:2,8
156:20 158:3,19
159:3
**review**
16:10 21:3 54:13
56:1 163:22
**reviewed**
15:20 16:21 17:2
50:9 56:22 82:15
**reviewing**
57:11,12
**revisit**
151:10
**Reynolds**
3:21 5:18
**right**

6:9,19 7:9,13 8:9,11
9:13,19 10:10 17:16
18:21 19:4 22:11
23:6 26:22 27:2,7
27:14 33:1,6,19,22
34:9 37:7 38:5
39:20 41:16 44:13
45:3,4,5 46:17
50:21 51:3 53:13
54:7 59:20 60:3,7
61:10,20 62:9 63:13
63:19 64:1,19 65:22
66:7 67:8 68:13
75:21 76:9,14,22,22
80:14 81:14 82:7
84:3,18,20 85:19
86:15 87:13 88:1
89:8 98:22 101:5,17
102:7,21 103:11
104:8,12 108:4
109:6,20 110:11
114:9,15 116:5,11
116:22 117:12,18
118:6,14 119:2,18
120:10 123:10,22
124:10 127:18
128:10 129:9,10
130:18 133:19
135:9,14 136:12
139:13 143:4,12
148:7,11,18 149:5,9
149:22 150:10,17
151:4 152:22 154:4
154:7 155:2 156:21
160:6,18 161:9
163:2,16 164:5
166:2 168:12
**RMR**
1:20 171:17
**robust**
48:11
**rolls**
22:21,21
**room**
28:11
**roughly**



87:3 98:13 104:21
105:18 107:3
115:20
**row**
117:3 126:7,11
**rudimentary**
134:16
**Ryan**
13:22 14:15,15 19:13
28:6

**S**

**S**
4:1,7 5:1 17:11
**sacs**
134:10
**safe**
68:2
**safety**
68:6
**sale**
155:18 159:15
**sales**
46:16 47:11 48:16
49:2,9,15,17 50:19
83:4 95:5 142:8
143:18,19,21 145:1
145:4,8 155:2 160:1
160:7
**Sanofi/Regeneron**
9:3
**SANYA**
3:14
**saw**
15:9 20:22 112:8
**saying**
95:18 126:1,17
127:15 129:1 167:3
**says**
111:12 114:17
118:15 128:4
**scenario**
126:10
**scheduled**
18:17 27:22 152:15
**sciences**

10:3,7
**scientific**
10:12
**scope**
23:9,10,14 69:3 70:3
70:19 71:22 73:21
**Scripts**
31:22
**second**
8:12 116:15
**section**
102:22 103:4,8 109:8
111:5 143:5,9,17
160:22 161:1
**sections**
16:14 26:9
**see**
10:20 18:2 28:16
36:4 67:19 72:12
103:5 109:8 110:1,6
110:9,13 111:5,11
115:1 118:10 126:6
127:2,4,7 143:20
162:7
**seeing**
36:16
**seen**
49:10 50:16 72:2
103:21 125:10
160:11
**Selck**
1:14 4:3,10 5:5 6:2
6:13,15 7:16 81:11
81:14,15 82:1 169:2
169:11 170:3,21
**sell**
154:3
**selling**
145:18 148:1 156:21
158:4 159:4,4
**senior**
46:16
**sense**
79:4,8,9 80:17
**separate**
45:1

**September**
82:4,6 95:9 96:2 97:6
112:13 120:17
**series**
119:10
**served**
13:15
**Services**
5:17,19
**SESSION**
140:1
**set**
151:18
**setting**
36:3 153:8 154:19
166:2,2
**shapes**
59:5
**share**
32:13 60:15 121:3,11
121:22 122:8,12,14
123:21 146:20
153:15 156:13
158:14,16
**shares**
144:12
**sheet**
169:8
**Sherrard**
14:15
**short**
147:1 152:1
**shorthand**
2:19 171:7
**short-circuited**
166:21
**showed**
54:14
**showing**
146:18
**shown**
68:2
**shows**
110:3
**side**
156:10

**signaling**
41:11
**signals**
34:15 35:3,14 41:3
42:15
**signature**
168:20
**significant**
35:16 74:3,3 133:9
153:20 163:14
**sildenafil**
66:20 70:17 71:14
**similar**
31:14,16 111:13
**simple**
158:22
**simpler**
68:14
**simplify**
138:20
**simply**
131:4
**single**
38:15,15,19,22 39:10
39:14
**sitting**
79:12
**skepticism**
89:11 90:7,11
**skipped**
103:1
**slide**
160:14
**small**
74:2 166:6,22 167:4
**sold**
154:21
**somebody**
10:19 121:5
**sorry**
30:4,17 49:18 76:19
77:1 98:7 107:9
126:4 148:10
**sort**
10:18 43:21 142:2
150:6 152:19



**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000660

Sotaracept
111:15
sought
61:8,13,18 68:20
148:15
sound
82:7
sounds
46:19 130:17
sources
152:6
Southeast
6:17
space
62:4,14 161:13
166:13
speak
18:9 27:19 45:8 51:9
53:9,12,21 54:2,5,9
54:12 57:16,20
speaking
56:11
specific
25:15 34:18 35:13
36:15,21 37:2,2
38:4 39:4 61:14,14
79:9 80:6 84:4,21
136:2
specifically
13:8 31:10 34:11,21
35:21 39:18 42:14
53:14 147:7,10
151:10 164:9,21
specifics
49:7
specified
31:10
speculation
104:14 106:19
spend
13:2 14:18 52:19
57:5,10
spent
53:1 57:2
SPETRINO
3:8

split
86:5 97:10 113:9
117:4
spoke
18:2,6,12,20 26:22
27:9,13 44:13,19
51:2 141:6
SSNIP
73:4,7,8,14,19 74:1
74:15,15,18
ssukduang@coole...
3:17
staff
13:17,20 14:14 49:14
stages
94:17
stale
99:8 100:6,10
stance
31:3 34:8 156:12
158:11
Stand
168:16
stands
74:1
stand-alone
147:22
start
12:17 23:7
started
12:21 13:12 23:13
33:13 40:13
starting
117:14
starts
81:17 102:14 106:12
126:7 143:5 161:1
startup
166:6 167:4
state
6:11 164:21
statement
115:4
States
1:1 5:8 101:16 103:9
118:6,21 119:18

124:9
status
167:19
stay
25:5
stays
106:14
stenographic
5:20
step
130:10,22 131:22
132:1
Steven
18:6
stopped
70:16 107:10
stops
137:6
strategies
142:7
strategy
47:7,16 48:6 79:10
80:19 81:9 121:20
122:22 160:15
streams
147:4
Street
2:7 3:4,9 5:13
strike
32:2 53:20 64:22
68:17 70:13 73:16
96:18 129:15,15
strongly
60:6
structural
134:21
structure
134:2,17
studying
67:15
subject
44:7
subjecting
132:6
submission
24:15 25:11

submitted
8:1 9:2,5 21:1,3 24:3
submitting
112:6
Subramaniam
14:3,6,10 19:14 28:7
subscribed
169:15
subset
10:6
substance
25:14 26:2
substantial
71:7 94:19 153:16
155:10 157:13
162:3,20
substitution
74:12
success
158:14
suffer
23:21 75:16 100:1
151:15 157:12
sufferers
75:7
sufficient
87:8 107:6 113:10
142:8
sufficiently
115:14
suggested
43:13
Suite
3:15
SUKDUANG
3:14
summarize
157:4
summarizes
22:6
summarizing
162:9
superior
72:6
supplement
94:14



suppliers
163:15
support
18:3
sure
13:7 15:1,9 19:20
27:16 58:4 89:1
131:2
surprised
31:2,9 35:18
sustainable
74:4
swear
5:22
switching
74:12
sworn
6:5 169:15 171:5

**T**

T
4:1,1,7
table
26:4
take
6:19 20:8,9 28:21
29:2 45:11 46:1
52:3,6 95:16 107:12
139:14 145:16
147:1 161:14 165:2
taken
2:17 5:5 8:5 58:10
107:16 139:18
170:4 171:3,6,12
talk
21:17 66:15 101:2
137:19 144:1
160:21 162:11
talked
21:20 114:10 140:22
164:2
talking
102:21 103:2 112:10
137:9
talks
162:14

tasks
16:8
TD-300
109:10,15 110:4
120:9
team
14:14,17,18 15:20
16:7 17:1 19:13
28:6 45:17 48:16
49:2,9 50:19 51:17
57:14
Technologies
1:6 3:12 5:7 170:2
tell
14:22 36:9,20 38:3
47:16 50:12 72:13
78:17 89:1
telling
37:5
tentative
61:4
tenth
8:6
term
83:19 135:3 149:14
terminology
22:20
terms
10:15 13:4 22:18
25:13,13 26:1
test
72:21 73:4,5,6,7,8,14
73:19 74:15,17,18
74:19 132:7
testified
6:6
testifying
9:11
testimony
7:11 8:13,15,22 9:10
16:19 41:14 42:11
58:16 95:15 96:1,6
97:2 98:3 99:13
107:22 124:12
126:20 140:8
145:20 157:2 164:7

168:5 171:4,6,9
tests
73:2
Thank
7:20 14:10 140:6
148:12 161:5
Therapeutic
5:6
Therapeutics
1:3 4:12 11:12 20:4
51:7 57:17 77:5,15
78:18 79:13 80:8
81:4 82:3,10 83:8
86:13 87:11,21 88:5
89:8,12 90:9,13
91:20 96:2 101:3
104:9 105:8 106:4
110:2,9 113:3 114:3
121:15 170:1
Therapeutic's
27:5
therapies
67:19 130:7 163:15
165:3
thing
113:6
things
10:16,17 43:21 44:2
57:13 142:2 144:8
150:6 153:5
think
15:13 17:9 19:2,22
22:6 25:20 27:17,22
29:10 31:19 35:6,8
35:10 36:2 46:20
49:16 61:22 62:11
68:4 69:6 73:14
81:7,9 82:5 86:17
89:22 91:14 93:12
93:22 96:9 97:15
98:13 99:2 101:7
103:22 107:10
114:10 121:9,10,20
122:14 123:1,2
124:1,20 131:18
132:15 133:21

142:2 144:18,19
153:9 162:16 164:8
164:15,20 166:9
168:12
thinking
40:10
thinks
60:17 125:3
thought
21:22 37:5 48:10
49:8 85:8 86:1 87:8
87:10,15 97:7 98:17
107:6 160:12
three
19:12 28:16 85:7,14
116:6,7,9
tied
109:2
time
5:11 8:6 11:10,14
13:2 14:18 17:7,20
18:12 20:22 57:4,9
57:12 95:19 104:12
107:10 147:2 148:7
149:6,19 150:12,14
151:2 152:1,11
155:12
times
8:4
timing
97:15
tissue
134:7,12 135:2
title
27:8 46:18
today
7:6,11 22:19 38:4
43:5 56:21 57:10
79:12 164:2
today's
5:10 168:17
told
25:8 37:10,14 50:8
65:15 79:20
tolerate
74:6



**MAGNA**
**LEGAL SERVICES**

**tongue**
22:22
**top**
124:15 125:2
**total**
14:20 57:9 124:5,7
124:17 127:9
128:14
**traded**
144:11,12
**training**
10:13
**transcript**
169:4
**transposed**
17:11,11
**treat**
66:6 163:15 165:14
167:14
**treated**
87:12 102:12,15
103:2 104:20 105:6
105:9 106:6 108:7
108:10,20 111:9
114:16 116:3,10
117:10 119:7 120:2
120:10,13 123:8,10
123:19 126:13
127:17 128:1,5,9,12
128:15 138:6 139:4
**treatment**
11:2 32:17,21,22
68:3,5,7 69:14
71:10 125:19
137:13,15 138:13
161:11 165:12,22
**treatments**
32:20 67:18 72:19
122:5 164:4
**treats**
124:4
**trend**
104:19,21 112:9
117:1 127:6,7,8
137:5
**trends**

113:8
**treprostinil**
21:9 33:4,11,12,18
62:19 113:13,21
130:7 167:6,9
**treprostinil-based**
32:9 58:21 63:7,11
114:5 128:2,16
138:7
**trial**
10:17 148:17 149:8,9
152:15 153:6
**trials**
53:2
**true**
171:8
**truthfully**
7:2
**try**
67:19
**trying**
50:7 121:21 153:11
**turn**
8:7,11 9:13 109:6
111:3 138:2 143:4
147:4 157:15
**Turning**
105:4 135:10
**two**
25:15,21 64:7 85:7
128:19 153:19
**type**
10:2 38:10 155:17
159:21,21
**typewriting**
171:7
**typo**
17:19
**Tyv**
111:14
**Tyvaso**
4:12 12:5 22:2 31:2
32:5,16 33:13,19
34:13 36:22 37:15
38:5,20 39:1,20
42:4 43:19 44:6,7

47:8,17,21 52:19
56:13 59:2,9,12,16
59:19 60:7 62:20
63:6,11 68:1,9
69:15,15 70:14 71:4
71:6,18 72:7 77:6
77:16 78:19 79:14
80:9 81:5 83:4 84:8
87:12,22 88:6 95:5
98:6,7 102:12,13,17
103:1 105:6,9
106:11 108:7,8,11
108:11,17,20,20
109:10,12,16,19,20
110:4,10 111:9,11
114:11,16 116:10
116:15 117:9 119:7
120:3,15 126:6,13
127:17 128:5,9,12
136:12,19 139:4
155:22 156:7 160:7
161:10 162:4,15,22
163:4,7,9 164:10,13

—————————
U
—————————
**ultimately**
91:8
**Um-hmm**
13:6 14:2 113:12
**unable**
94:1,3,11
**uncertainty**
86:21 104:4 150:3
**underlying**
88:12
**understand**
6:22 7:5 22:19 27:4
27:10,13 33:17 50:7
59:9 60:14,16 61:3
61:12 78:9 89:6
93:9 113:20 114:2
114:12 130:1
133:15 134:5
137:18 148:14,20
152:14 165:9
167:12 168:8

**understanding**
11:19 29:15 58:19
59:5 63:1,14 64:5
64:11 65:16,19
66:19 67:2 73:19
81:22 94:18 96:17
109:11,14 111:17
111:22 114:19
115:3 121:21
130:14 134:16
137:8 155:17
161:10 167:21
168:3
**understood**
126:11
**United**
1:1,3 4:12 5:6,7
11:11 20:4 23:20
25:4 27:5,12 28:8
30:22 32:3,7,12
33:17 34:12 35:15
36:6 41:20 45:19
48:18 49:14 51:6,18
52:19 53:1 57:16
77:4,14 78:18 79:4
79:13 80:7,18 81:4
82:3,10 83:8,22
84:15 86:4,8,12
87:11,20 88:5 89:7
89:12 90:9,12 91:20
93:10,12 96:2,9
98:8 100:1 101:3,12
101:16 103:9 104:9
105:1,8,15 106:4
107:5 110:2,9 113:3
113:18 114:3
115:20 118:6,21
119:18 120:1
121:14,18 122:20
124:9,16 125:3
127:10 131:7
136:18 143:11,15
143:15,19 150:22
151:15 152:6
154:15 155:22
157:11 161:6,12

162:2,20 163:7,13
164:10,20 165:3
166:4,10 167:19
170:1
**UnitedHealthcare**
31:19
**United's**
19:9,19 30:2 32:1
33:11 47:7 48:6
62:13 79:9 85:10
89:5,7 123:3 137:18
138:10 142:5
160:13,15 161:15
164:3 167:5 168:9
**unpack**
24:11
**unusual**
67:18
**update**
93:10 95:3
**updated**
92:8,21 93:18 94:6
94:14 95:4 99:10
**use**
21:16 22:17 67:11,12
71:1,6,17,19 72:6
72:21 73:8 74:17
82:20 84:22 85:2,18
92:4 95:1 98:18
112:1 113:7
**uses**
71:14
**UT**
129:15
**UTC**
33:4 38:10,13,18
39:19 46:17 83:3
84:9 94:15 95:5
103:9 113:20 116:4
118:2,19 119:16
122:11 124:2
126:12 129:1,8
140:21 141:6
**UTC's**
83:2 99:7 117:18
119:11 123:9,14,20

132:11
**UTC_PH-ILD_009...**
81:18
**utilization**
44:8
**utilize**
91:11
**utilized**
91:8
**U.S**
9:8 86:13 104:10,18
117:17 129:18

———————
**V**
**v**
1:5 170:1
**vague**
100:8
**value**
144:9,19 146:11
152:8
**values**
83:11
**variable**
88:15
**variety**
125:8 132:20 153:4
156:3 158:9
**various**
50:5 78:6 164:4
**varying**
125:6
**Ventavis**
111:13
**version**
59:19 90:22 109:12
109:20 141:12,16
**versions**
91:4 141:14,21
142:12
**versus**
5:6 97:11
**vessels**
134:13
**vice**
46:16

**VIDEO**
3:21 5:2 58:7,11
107:13,17 139:15
140:2 168:16
**videoconference**
19:5,6 28:2 45:13
51:13
**videoconferencing**
28:15
**videographer**
5:17
**videos**
54:13,17 55:5,10
**videotaped**
1:13 5:4
**view**
12:4 22:1 23:17
60:18 77:6 78:19
79:15 80:9 85:10
100:4 129:3
**viewed**
105:20
**views**
115:21
**virtue**
81:7 122:19 128:19
138:8
**VP**
27:5

———————
**W**
**W**
3:7
**waived**
168:21
**want**
17:7,21 19:18 36:4
50:9 63:1,3 83:16
151:9 154:20
160:21
**wanted**
37:6,14 42:4 83:12
83:18 113:7
**Washington**
1:17 2:8 3:4,9,16
5:13 6:18

**wasn't**
26:15 45:5 69:17
95:22 101:8 155:6
161:19
**way**
74:9 135:4,7 150:18
**ways**
146:8,10 165:13
**Welcome**
58:14 107:20 140:5
**well-defined**
75:2
**weren't**
54:22 100:20
**we'll**
22:17 24:11
**we're**
24:17 58:11 94:17,17
102:22 107:17
140:2 149:5 168:15
168:19
**we've**
7:13 43:4 58:1 164:2
**wins**
150:9
**witness**
4:2 5:22 6:3 11:22
16:21 26:16 33:8
34:2 36:2,13 37:9
37:18 38:8,13,22
39:8,14,22 40:20
41:18 42:13 49:4
50:15 59:4 60:9
61:3,12,22 62:11
66:9 67:1,11 69:4
70:4,20 72:2 73:22
74:21 76:11,19,22
77:9 78:1,22 79:18
80:17 83:7 84:12
85:22 86:17 87:15
88:9 89:15,19 90:15
90:18 92:12,15 93:1
93:9,20 94:9 96:8
97:3 98:4 99:2,15
99:19 100:9,14
101:7,20 102:10



103:14 104:15
105:12 106:11,20
108:14 109:1,14
110:13,21 111:21
112:8 114:2 115:1
117:20 118:9 119:5
119:21 120:12
122:18 123:12
124:14 126:22
127:20 129:22
131:13 132:15
133:21 135:17
136:14 137:3
140:15 141:2
142:17 144:6 145:7
145:21 147:13
148:20 149:11
151:6 153:3 154:10
155:5 157:3 158:7
159:10 161:19
163:19 164:8 165:6
166:9 167:8 168:6
171:4,6,9
**word**
15:17 16:5,18 17:3
**words**
16:11 31:16
**work**
9:15 12:17,21 13:12
15:3 23:8,13
**worked**
11:11,15
**working**
13:13 107:10
**worksheet**
110:15 115:18
**wouldn't**
71:18 115:9 130:5
131:9
**wrapped**
168:12
**write**
16:3,15 47:20
**writing**
46:12 70:8
**written**

16:12 20:6 28:18
45:20 51:22 103:19
**wrote**
16:4,5,17

---

**X**

**X**
4:7

---

**Y**

**yeah**
58:4 76:3 82:5
107:11,12 110:17
118:17 126:22
143:16 148:11,13
155:5 163:13
**year**
34:4 102:16 110:5,11
110:18 111:1
117:12 127:15
**years**
113:22 114:9,14
120:3 126:14
153:19 164:4 166:5
**yesterday**
57:3
**YouTube**
54:13,17 55:4,10
**Yutrepia**
12:4 22:2 30:8,10,16
30:17,20 40:17 41:4
41:9,19 42:6 47:12
58:20,21 59:1,8,16
59:18,21 60:5 61:1
61:9,19 62:2,8,12
62:18,21 63:6,9,10
67:7 68:15,18,21
69:21 70:8 71:19
72:5 77:10 78:20
79:15 80:10 81:6
91:17 95:11,17,22
96:3,21 97:22 121:4
121:12 122:2
128:21 129:2,17
130:5 131:5 136:11
136:17,22 139:2,12

145:18 146:17
148:1 149:7,20
150:15 151:2 154:3
154:6,21 155:19
156:6,21 157:12
158:4,12 159:4,16
161:7,16,21
**Yutrepia's**
23:22 31:7 41:13
42:18 60:2 62:16
67:4 71:16 77:6
84:1 96:11 100:2
146:22

---

**Z**

**zero**
39:15
**Zinc**
31:11 34:9,12,18,19
34:20 35:14,17,20
35:21 36:2,9,15

---

**$**

**$1,050**
15:14
**$1.4**
152:9,12

---

**1**

**1**
4:9 7:14,16 8:8 21:18
22:9 30:17,18,20
39:11 102:3,13,19
103:18 106:12
108:8 111:12 116:2
**1,950**
102:15 126:7
**1:13**
140:1
**1:51**
168:21
**10**
111:13
**10-Ks**
160:13
**10:00**

57:6
**10:15**
58:8
**10:31**
58:12
**100**
85:15
**101**
134:10
**11:32**
107:14
**11:47**
107:18
**1111116**
1:21
**12th**
146:14
**12:28**
139:16,17
**1299**
3:15
**13:13**
140:3
**13:51**
168:19
**1320**
6:17
**14**
29:21 43:3,9
**14th**
27:14 44:21
**15**
1:17 2:2 170:4
**15th**
5:10
**15,000**
117:12,14,15,20
126:8 137:6
**150**
13:10
**151**
66:14,16
**16th**
51:3,4
**1900**
2:7 3:4 5:13



**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000665

**2**

**2**
4:12 81:11,16 82:21
85:6 88:22 89:4,7
92:10,21 93:18 94:6
95:16 96:18,20
97:21 98:21 100:5
101:4,14 102:5
104:9 105:5 108:5,7
109:7 111:4,6 116:5
117:18 118:3,13,18
124:10 126:6 128:8
140:11 141:5
**2/26/24**
4:11
**20**
34:17,22 36:5,10,17
36:21 37:6,11,15,22
38:4 113:22 114:9
114:14 120:9,14,20
120:22 121:6 122:6
123:7,19 128:19,22
129:6 164:4
**200**
13:10 85:15
**20001-1531**
3:9
**20003**
6:18
**20004-2400**
3:16
**20036**
2:8 3:4
**2004**
33:5,21
**2009**
33:15 114:11 164:11
164:13
**2014**
1:17
**202**
2:8 3:5,10,16
**2021**
141:16,21 142:11,19
160:8

**2022**
88:2,17 97:10 103:16
117:8 137:5 141:12
141:21 142:11
160:8 164:15
**2023**
12:15,22 40:14 82:4
82:6 95:13 96:2
102:16 112:14,18
120:17
**2023-2035**
4:13
**2024**
2:2 5:11 18:11 96:21
97:22 103:18
111:13 116:19
117:13 127:15
128:10 129:9
146:14 152:2,13
169:16 170:4
**2025**
106:14 152:2,16
**2026**
152:3,13
**2030**
117:12,14,15 137:6
**2031**
106:14 112:11 119:8
126:9
**2032**
148:9
**2035**
110:3,11 148:6,10
**23**
12:16
**23rd**
152:16
**23-975**
1:5
**23975**
5:9
**24,400**
129:18
**25**
57:14

**3**

**3**
21:18 22:13,21 30:18
30:20 32:16,18,20
33:1 101:21 102:18
108:18 114:16
126:7 138:14
**3,150**
102:14 106:13
**3,500**
106:13,14
**30**
19:1 34:17,22 36:6
36:10,18,21 37:6,12
37:15 38:1,5 45:12
57:15
**30,000**
101:22 103:15,16
117:21 124:9
138:12
**30-month**
25:5
**31**
117:15
**32**
117:15
**346-4000**
2:8 3:5
**3500**
106:5

**4**

**4.4**
161:1
**45**
45:12
**49**
161:1

**5**

**5**
110:18 111:1,14,14
**5,600**
117:13 127:22
128:20
**5.5**

143:5
**5:00**
57:7
**50**
114:17 117:16 118:5
118:13,16,20
119:17
**50,000**
102:3 103:16
**500**
3:9
**505(b)(2)**
59:22
**54,000**
103:17
**5600**
127:16 128:5 129:8

**6**

**6**
4:3 82:6
**68**
143:6

**7**

**7**
4:11
**70,000**
104:2 124:21,22
**700**
3:15
**756-8000**
3:10

**8**

**81**
4:13
**82**
17:13
**842-7800**
3:16

**9**

**9**
39:12,16
**9th**



18:11
**9:11**
2:3 5:11
**9411**
109:7
**9416**
111:3
**95**
163:5
**96**
162:14
**97**
162:13



HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000667

# EXHIBIT 5

## Minn, Robert

| | |
|---|---|
| **From:** | Flynn, Michael J. <mflynn@morrisnichols.com> |
| **Sent:** | Thursday, February 22, 2024 9:50 AM |
| **To:** | Sukduang, Sanya |
| **Cc:** | Davies, Jonathan; kkeller@shawkeller.com; Nate Hoeschen; William Jackson (Goodwin); Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com); Cheng, Katherine; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com); Burrowbridge, Adam W. (MWE); Lobel, Louis; Romeo, Eric; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 |
| **Subject:** | RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion |

**[External]**

Sanya,

We are available at 12:00 ET on Friday for a call and look forward to discussing your questions below.

      Click to join meeting: https://meet.loopup.com/45xeX0IXC8

      **Or dial in:**
      US Toll Free: 1 877 304 9269
      Passcode: **3023519661#**

      Mobile Quick Join: tel://+18773049269,,3023519661#

---

**MICHAEL J. FLYNN**

Partner | Morris, Nichols, Arsht & Tunnell LLP
(302) 351-9661 Direct
**mflynn@morrisnichols.com**

---

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Wednesday, February 21, 2024 9:51 PM
**To:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; William Jackson (Goodwin) <wjackson@goodwinlaw.com>; Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com) <dcarsten@mwe.com>; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com) <adykhuis@mwe.com>; Burrowbridge, Adam W. (MWE) <aburrowbridge@mwe.com>; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** [EXT] Re: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

Michael

We aren't available tomorrow, but can be Friday except between 3:00-4:00 pm, contingent upon UTC's ability to respond to the issues below .

During the call, we expect UTC to specifically address the following, and failure to do so will be raised with the Court:

LIQ_PH-ILD_00000031

1.  Why UTC believes a PI is needed in this action given UTC's position, articulated as recently as yesterday, that the Court's 793 injunction cannot be lifted until the 793 claims are cancelled by the Director;

2.  Why a PI is needed given UTC's complaint against the FDA that Yutrepia should not be launched;

3.  UTC's delay, until February 21, 2024, to address a PI given the parties' specific discussion with you and William Jackson of a PI request prior to December 25, 2023 and Liquidia's request to address any potential PI briefing such that UTC does not force Judge Andrews to act expeditiously;

4. Why, despite filing a complaint 3 months ago concerning the '327 patent, UTC has waited to file a PI;

5. Why a PI is warranted given UTC's request for a 30 day extension of time to answer Liquidia's counterclaims based on proceedings in an unrelated litigation in NC and why Liquidia is also not entitled to rely on the schedule in NC to support a non-conflicting schedule;

6. The specific date UTC intends to file its PI motion and any declarations it may file in support;

7.  The dates any UTC declarant is available for a deposition; and

8. The briefing schedule UTC proposes.

This above list is non-limiting and Liquidia may raise additional issues based on UTC's responses.

If UTC is prepared to fully address each issue above, Liquidia can be available on Friday except between 3:00-4:00 PM EST.

Thanks
Sanya


> On Feb 21, 2024, at 6:07 PM, Flynn, Michael J. <mflynn@morrisnichols.com> wrote:
>
> **[External]**
> _____
> Counsel,
>
> UTC intends to file a Motion for Preliminary Injunction to enjoin the launch of Yutrepia for treatment of pulmonary hypertension associated with interstitial lung disease upon the expiration of UTC's regulatory exclusivity on April 1, 2024, pending resolution of UTC's infringement claims for U.S. Patent No. 11,826,327 asserted in this action.  We would like to discuss with you the timing of that motion and a briefing schedule.
>
> Can you please let us know your availability **tomorrow**, **February 22,** for a call to discuss?  We are available any time except 12-1 ET.
>
> Thanks,
> Michael
>
> _____
> **MICHAEL J. FLYNN**
> Partner | Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347

2

LIQ_PH-ILD_00000032

Wilmington, DE  19899-1347
(302) 351-9661 Direct
**mflynn@morrisnichols.com | vcard | bio | www.morrisnichols.com**

---

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

DA0109

LIQ_PH-ILD_00000033

# EXHIBIT 6

US011826327B2

(12) **United States Patent**
　　Peterson et al.

(10) Patent No.: **US 11,826,327 B2**
(45) Date of Patent: **Nov. 28, 2023**

(54) **TREATMENT FOR INTERSTITIAL LUNG DISEASE**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Leigh Peterson**, Hillsborough, NC (US); **Peter Smith**, Durham, NC (US); **Chunqin Deng**, Chapel Hill, NC (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 263 days.

(21) Appl. No.: **17/233,061**

(22) Filed: **Apr. 16, 2021**

(65) **Prior Publication Data**
US 2021/0330621 A1　Oct. 28, 2021

**Related U.S. Application Data**

(60) Provisional application No. 63/011,810, filed on Apr. 17, 2020, provisional application No. 63/160,611, filed on Mar. 12, 2021.

(51) **Int. Cl.**
*A61K 31/192* (2006.01)
*A61P 9/12* (2006.01)
*A61K 9/00* (2006.01)

(52) **U.S. Cl.**
CPC .......... *A61K 31/192* (2013.01); *A61K 9/0075* (2013.01); *A61K 9/0078* (2013.01); *A61P 9/12* (2018.01)

(58) **Field of Classification Search**
CPC ................................................. A61K 31/192
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,664,337 A | 5/1972 | Lindsey et al. |
| 4,001,650 A | 1/1977 | Romain |
| 4,007,238 A | 2/1977 | Glenn |
| 4,281,113 A | 7/1981 | Axen et al. |
| 4,306,075 A | 12/1981 | Aristoff |
| 4,306,076 A | 12/1981 | Nelson |
| 4,349,689 A | 9/1982 | Aristoff |
| 4,473,296 A | 9/1984 | Shofner et al. |
| 4,486,598 A | 12/1984 | Aristoff |
| 4,495,944 A | 1/1985 | Brisson et al. |
| 4,635,647 A | 1/1987 | Choksi |
| 4,668,814 A | 5/1987 | Aristoff |
| 4,677,975 A | 6/1987 | Edgar et al. |
| 4,683,330 A | 7/1987 | Aristoff |
| 4,692,464 A | 9/1987 | Skuballa et al. |
| 4,708,963 A | 11/1987 | Skuballa et al. |
| 4,976,259 A | 12/1990 | Higson et al. |
| 4,984,158 A | 1/1991 | Hillsman |
| 5,063,922 A | 11/1991 | Haekkinen |
| 5,080,093 A | 1/1992 | Raabe et al. |
| 5,153,222 A | 10/1992 | Tadepalli et al. |
| 5,234,953 A | 8/1993 | Crow et al. |
| 5,322,057 A | 6/1994 | Raabe et al. |
| 5,361,989 A | 11/1994 | Merchat et al. |
| 5,363,842 A | 11/1994 | Mishelevich et al. |
| 5,497,763 A | 3/1996 | Lloyd et al. |
| 5,551,416 A | 9/1996 | Stimpson et al. |
| 5,727,542 A | 3/1998 | King |
| 5,865,171 A | 2/1999 | Cinquin |
| 5,881,715 A | 3/1999 | Shibasaki |
| 5,908,158 A | 6/1999 | Cheiman |
| 6,054,486 A | 4/2000 | Crow et al. |
| 6,123,068 A | 9/2000 | Lloyd et al. |
| 6,242,482 B1 | 6/2001 | Shorr et al. |
| 6,357,671 B1 | 3/2002 | Cewers |
| 6,441,245 B1 | 8/2002 | Moriarty et al. |
| 6,521,212 B1 | 2/2003 | Cloutier et al. |
| 6,528,688 B2 | 3/2003 | Moriarty et al. |
| 6,626,843 B2 | 9/2003 | Hillsman |
| 6,700,025 B2 | 3/2004 | Moriarty et al. |
| 6,756,033 B2 | 6/2004 | Cloutier et al. |
| 6,756,117 B1 | 6/2004 | Barnes |
| 6,765,117 B2 | 7/2004 | Moriarty et al. |
| 6,803,386 B2 | 10/2004 | Shorr et al. |
| 6,809,223 B2 | 10/2004 | Moriarty et al. |
| 7,172,557 B1 | 2/2007 | Parker et al. |
| 7,199,157 B2 | 4/2007 | Wade et al. |
| 7,261,102 B2 | 8/2007 | Barney et al. |
| 7,384,978 B2 | 6/2008 | Phares et al. |
| 7,417,070 B2 | 8/2008 | Phares et al. |
| 7,544,713 B2 | 6/2009 | Phares et al. |
| 7,726,303 B2 | 6/2010 | Tyvoll et al. |
| 7,879,909 B2 | 2/2011 | Wade et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 1999959533 B2 | 2/2000 |
| DE | 19838711.1 C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 63/036,561, filed Jun. 9, 2020, Batra et al.

(Continued)

*Primary Examiner* — Paul V Ward

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Methods of treating of interstitial lung disease, reducing pulmonary function decline in a subject with interstitial lung disease (ILD), and increasing forced vital capacity (FVC) in a subject suffering from ILD are provided, wherein the methods include administration of treprostinil.

**19 Claims, 15 Drawing Sheets**

UTC_PH-ILD_005310

**US 11,826,327 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,999,007 | B2 | 8/2011 | Jeffs et al. |
| 8,232,316 | B2 | 7/2012 | Phares et al. |
| 8,242,305 | B2 | 8/2012 | Batra et al. |
| 8,252,839 | B2 | 8/2012 | Phares et al. |
| 8,349,892 | B2 | 1/2013 | Phares |
| 8,350,079 | B2 | 1/2013 | Walsh |
| 8,410,169 | B2 | 4/2013 | Phares et al. |
| 8,461,393 | B2 | 6/2013 | Sharma |
| 8,481,782 | B2 | 7/2013 | Batra et al. |
| 8,497,393 | B2 | 7/2013 | Batra et al. |
| 8,536,363 | B2 | 9/2013 | Phares et al. |
| 8,563,614 | B2 | 10/2013 | Wade et al. |
| 8,609,728 | B2 | 12/2013 | Rothblatt et al. |
| 8,653,137 | B2 | 2/2014 | Jeffs et al. |
| 8,658,694 | B2 | 2/2014 | Jeffs et al. |
| 8,747,897 | B2 | 6/2014 | Kidane et al. |
| 8,765,813 | B2 | 7/2014 | Wade et al. |
| 8,940,930 | B2 | 1/2015 | Batra et al. |
| 9,029,607 | B2 | 5/2015 | Mcgowan et al. |
| 9,050,311 | B2 | 6/2015 | Phares et al. |
| 9,155,846 | B2 | 10/2015 | Kern |
| 9,156,786 | B2 | 10/2015 | Batra et al. |
| 9,199,908 | B2 | 12/2015 | Phares et al. |
| 9,255,064 | B2 | 2/2016 | Malinin et al. |
| 9,278,901 | B2 | 3/2016 | Phares et al. |
| 9,278,902 | B2 | 3/2016 | Tang et al. |
| 9,278,903 | B2 | 3/2016 | Tang et al. |
| 9,339,507 | B2 | 5/2016 | Olschewski et al. |
| 9,346,738 | B2 | 5/2016 | Jain et al. |
| 9,358,240 | B2 | 6/2016 | Olschewski et al. |
| 9,371,264 | B2 | 6/2016 | Becker et al. |
| 9,388,154 | B2 | 7/2016 | Yiannikouros et al. |
| 9,394,227 | B1 | 7/2016 | Zhang et al. |
| 9,422,223 | B2 | 8/2016 | Phares et al. |
| 9,469,600 | B2 | 10/2016 | Malinin et al. |
| 9,505,737 | B2 | 11/2016 | Becker et al. |
| 9,624,156 | B2 | 4/2017 | Phares et al. |
| 9,643,911 | B2 | 5/2017 | Zhang et al. |
| 9,701,616 | B2 | 7/2017 | Zhang et al. |
| 9,713,599 | B2 | 7/2017 | Wade |
| 9,758,465 | B2 | 9/2017 | Laing |
| 9,776,982 | B2 | 10/2017 | Becker et al. |
| 9,845,305 | B2 | 12/2017 | Becker et al. |
| 9,878,972 | B2 | 1/2018 | Phares et al. |
| 9,957,200 | B2 | 5/2018 | Beall et al. |
| 10,010,518 | B2 | 7/2018 | Malinin et al. |
| 10,053,414 | B2 | 8/2018 | Zhang et al. |
| 10,076,505 | B2 | 9/2018 | Wade |
| 10,246,403 | B2 | 4/2019 | Zhang et al. |
| 10,343,979 | B2 | 7/2019 | Malinin et al. |
| 10,344,012 | B2 | 7/2019 | Becker et al. |
| 10,376,525 | B2 | 8/2019 | Olschewski et al. |
| 10,450,290 | B2 | 10/2019 | Becker et al. |
| 10,464,877 | B2 | 11/2019 | Zhang et al. |
| 10,464,878 | B2 | 11/2019 | Zhang et al. |
| 10,494,327 | B2 | 12/2019 | Laing |
| 10,526,274 | B2 | 1/2020 | Malinin et al. |
| 10,695,308 | B2 | 6/2020 | Wade |
| 10,703,706 | B2 | 7/2020 | Zhang et al. |
| 10,716,793 | B2 | 7/2020 | Olschewski et al. |
| 10,752,733 | B2 | 8/2020 | Ishihara |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0080140 | A1 | 4/2005 | Hatae et al. |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |

| | | | |
|---|---|---|---|
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2009/0124697 | A1 | 5/2009 | Cloutier et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0124941 | A1 | 5/2012 | Wade et al. |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |
| 2012/0197041 | A1 | 8/2012 | Batra et al. |
| 2012/0216801 | A1 | 8/2012 | Olschewski et al. |
| 2013/0096200 | A1 | 4/2013 | Wade et al. |
| 2013/0184295 | A1 | 7/2013 | Sprague et al. |
| 2013/0331593 | A1 | 12/2013 | Mcgowan et al. |
| 2014/0018431 | A1 | 1/2014 | Phares et al. |
| 2014/0024856 | A1 | 1/2014 | Giust et al. |
| 2014/0275262 | A1 | 9/2014 | Phares et al. |
| 2014/0275616 | A1 | 9/2014 | Batra et al. |
| 2014/0323567 | A1 | 10/2014 | Laing |
| 2015/0148414 | A1 | 5/2015 | Malinin et al. |
| 2015/0299091 | A1 | 10/2015 | Batra et al. |
| 2015/0315114 | A1 | 11/2015 | Hering et al. |
| 2015/0328232 | A1 | 11/2015 | Malinin et al. |
| 2015/0376106 | A1 | 12/2015 | Batra et al. |
| 2016/0030355 | A1 | 2/2016 | Kidane et al. |
| 2016/0030371 | A1 | 2/2016 | Phares et al. |
| 2016/0045470 | A1 | 2/2016 | Reddy et al. |
| 2016/0051505 | A1 | 2/2016 | Phares et al. |
| 2016/0107973 | A1 | 4/2016 | Batra et al. |
| 2016/0129087 | A1 | 5/2016 | Christe et al. |
| 2016/0143868 | A1 | 5/2016 | Olschewski et al. |
| 2016/0152548 | A1 | 6/2016 | Gao et al. |
| 2016/0175319 | A1 | 6/2016 | Freissmuth et al. |
| 2017/0095432 | A1 | 4/2017 | Phares et al. |
| 2018/0153847 | A1 | 6/2018 | Phares et al. |
| 2019/0321290 | A1 | 10/2019 | Guarneri et al. |
| 2019/0365778 | A1 | 12/2019 | Olschewski et al. |
| 2021/0054009 | A1 | 2/2021 | Phares et al. |
| 2021/0177787 | A1 | 6/2021 | Wade |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| DE | 19934582.2 | C2 | 9/2003 | |
| FR | 2783431 | A1 | 3/2000 | |
| JP | 2003-522003 | A | 7/2003 | |
| JP | 2004-512101 | A | 4/2004 | |
| JP | 2005-034341 | A | 2/2005 | |
| WO | WO-93/00951 | A1 | 1/1993 | |
| WO | WO-00/57701 | A1 | 10/2000 | |
| WO | WO-01/58514 | A1 | 8/2001 | |
| WO | WO-01/85241 | A1 | 11/2001 | |
| WO | WO-02/34318 | A2 | 5/2002 | |
| WO | WO-2005/007081 | A3 | 1/2005 | |
| WO | WO2008/098196 | * | 8/2008 | .......... A61K 31/496 |
| WO | WO-2008/098196 | A1 | 8/2008 | |
| WO | WO2012/009097 | * | 1/2012 | .......... A61K 31/496 |
| WO | WO-2012/009097 | A1 | 1/2012 | |
| WO | WO-2014/085813 | A1 | 6/2014 | |
| WO | WO2015/138423 | * | 9/2015 | .......... A61K 31/496 |
| WO | WO-2015/138423 | A1 | 9/2015 | |
| WO | WO-2016/038532 | A1 | 3/2016 | |
| WO | WO-2016/055819 | A1 | 4/2016 | |
| WO | WO-2016/081658 | A1 | 5/2016 | |
| WO | WO-2016/105538 | A1 | 6/2016 | |
| WO | WO2016/176399 | * | 11/2016 | .......... A61K 31/496 |
| WO | WO-2016/176399 | A1 | 11/2016 | |
| WO | WO2016/205202 | * | 12/2016 | .......... A61K 31/496 |
| WO | WO-2016/205202 | A1 | 12/2016 | |
| WO | WO-2017/192993 | A1 | 11/2017 | |
| WO | WO-2018/058124 | A1 | 3/2018 | |
| WO | WO-2019/237028 | A1 | 12/2019 | |

OTHER PUBLICATIONS

U.S. Appl. No. 63/125,145, filed Dec. 14, 2020, Phares et al.

Agarwal et al., "Inhaled Treprostinil in Group-3 Pulmonary Hypertension," J. Heart Lung Transplant., 2015 34(Suppl S343):959, abstract.

UTC_PH-ILD_005311

## US 11,826,327 B2

Page 3

(56)            **References Cited**

OTHER PUBLICATIONS

Bajwa et al., "The safety and tolerability of inhaled treprostinil in patients with pulmonary hypertension and chronic obstructive pulmonary disease," Pulmonary Circulation, 2017, 7(1):82-88.

Bonner et al., "Susceptibility of Cyclooxygenase-2-Deficient Mice to Pulmonary Fibrogenesis," American Journal of Pathology, Aug. 2002, 161(2):459-470.

Collard et al., "Acute Exacerbation of Idiopathic Pulmonary Fibrosis: An International Working Group Report," Am. J. Respir. Crit. Care Med., Aug. 1, 2016, 194(3):265-275.

Dernaika et al., "Iloprost Improves Gas Exchange and Exercise Tolerance in Patients with Pulmonary Hypertension and Chronic Obstructive Pulmonary Disease," Respiration, 2010, 79:377-382.

Du Bois et al., "Six-Minute-Walk Test in Idiopathic Pulmonary Fibrosis," Am. J. Respir. Crit. Care Med., 2011, 183:1231-1237.

Faria-Urbina et al., "Inhaled Treprostinil in Pulmonary Hypertension Associated with Lung Disease," Lung, 2018, 196:139-146.

Keerthisingham et al., "Cyclooxygenase-2 Deficiency Results in a Loss of the Anti-Proliferative Response to Transforming Growth Factor-Beta in Human Fibrotic Lung Fibroblasts and Promotes Bleomycin-Induced Pulmonary Fibrosis in Mice," American Journal of Pathology, Apr. 2001, 158(4):1411-1422.

King et al., "The Trouble With Group 3 Pulmonary Hypertension in Interstitial Lung Disease," Chest, 2020, 158(4):1651-1664.

Lettieri et al., "The distance-saturation product predicts mortality in idiopathic pulmonary fibrosis," Respiratory Medicine, 2006, 100:1734-1741.

McLaughlin et al., "Addition of Inhaled Treprostinil to Oral Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2010, 55(18):1915-1922.

Meyer et al., "Role of pirfenidone in the management of pulmonary fibrosis," Therapeutics and Clinical Risk Management, 2017, 13:427-437.

Nathan et al., "Pulmonary Hypertension due to Lung Disease and/or Hypoxia," Clin. Chest Med., 2013, 34:695-705.

Nathan et al., "Pulmonary hypertension in interstitial lung disease," Int. J. Clin. Pract., Jul. 2008, 62(Suppl. 160):21-28.

Nathan et al., "Riociguat for idiopathic interstitial pneumonia-associated pulmonary hypertension (RISE-IIP): a randomised, placebo-controlled phase 2b study," Lancet Respir. Med., 2019, 7:780-790.

Nathan et al., "Validation of test performance characteristics and minimal clinically important difference of the 6-minute walk test in patients with idiopathic pulmonary fibrosis," Respiratory Medicine, 2015, 109:914-922.

Simonneau et al., "Haemodynamic definitions and updated clinical classification of pulmonary hypertension," Eur. Respir. J., 2019, 53:1801913, 13 pages.

Sorbera et al.n "UT-15. Treatment of Pulmonary Hypertension Treatment of Peripheral Vascular Disease," Drug of the Future, 2001, 26(4):364-374.

Trammell et al., "Use of pulmonary arterial hypertension-approved therapy in the treatment of non-group 1 pulmonary hypertension at US referral centers," Pulm. Circ., 2015, 5(2):356-363.

Wang et al., "Hemodynamic and gas exchange effects of inhaled iloprost in patients with COPD and pulmonary hypertension," International Journal of COPD, 2017, 12:3353-3360.

Whittle et al., "Binding and activity of the prostacyclin receptor (IP) agonists, treprostinil and iloprost, at human prostanoid receptors: Treprostinil is a potent DP1 and EP2 agonist," Biochemical Pharmacology, 2012, 84:68-75.

Osterwell, Neil, "Inhaled treprostinil improves walk distance in patients with ILD-associated pulmonary hypertension," Chest Physician, Jul. 6, 2020, 1-5.

Steven et al., "Pulmonary hypertension in chronic lung disease and hypoxia," Eur. Respir. J., Dec. 13, 2018, https://doi: 10.1183/13993003.01914-2018, 15 pages.

U.S. Appl. No. 17/486,721, filed Sep. 27, 2021, Olschewski et al.

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.

AccuNeb label, Jun. 2005, 2 pages.

Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

Anderson, Paula A M.D., "History of Aerosol Therapy: Liquid Nebulization to MDIs to DPIs," Respiratory Care, Sep. 2005, 50(9):1139-1150.

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation Form 10-Q for the quarterly period ended Jun. 30, 2009, 37 pages.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Atkins, Paul J., Ph.D., "Dry Powder Inhalers: An Overview," Respiratory Care, Oct. 2005, 50(10):1304-1312.

ATS 2020 Virtual Preview: Clinical Trials Session, Jun. 24, 2020, conference.thoracic.org/program/session-information/virtual-clinical-trials.php.

Azmacort label, May 2003, 16 pages.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:SupplS):56S-61S.

Beasley et al., "Preservatives in Nebulizer Solutons: Risks without Benefit," Pharmacotherapy, 1998, 18(1):130-139.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Bender et al., "Nonadherence in asthmatic patients: is there a solution to the problem?", Ann. Allergy Asthma Immunol., 1997, 79:177-186.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor, G. and Starko, K. (2003) Lung Deposition of Interferon Gamma-1 b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Boyle et al., "So Many Drugs, So Little Time: The Future Challenge of Cystic Fibrosis Care," Chest, Jan. 2003, 123(1):3-5.

Byron, Peter R. "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Chattaraj, Sarat C., "Treprostinil sodium Pharmacia," Current Opinion in Investigational Drugs, Apr. 2002, 3(4):582-586.

Chew et al., "Pharmaceutical Dry Powder Aerosol Delivery," Kona, 2001, 19:46-56.

Clark, A.R., "Medical Aerosol Inhalers: Past, Present, and Future," Aerosol Science and Technology, Jun. 12, 2007, 22(4):374-391.

UTC_PH-ILD_005312

## US 11,826,327 B2

Page 4

(56) **References Cited**

OTHER PUBLICATIONS

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Dalby et al., "A review of the development of Respimat Soft Mist Inhaler," International Journal of Pharmaceutics, 2004, 283:1-9.

De Wet et al., "Inhaled prostacyclin is safe, effective ana affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery," J. Thoracic Cardiovasc. Surg., 2004, 127:1058-1067.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and U.S. Pat. No. 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Denyer et al., "The Adaptive Aerosol Delivery (AAD) Technology: Past, Present, and Future," Journal of Aerosol Medicine and Pulmonary Drug Delivery, 2010, 23(Suppl):S1-S10.

Dolovich et al., "Device Selection and Outcomes of Aerosol Therapy: Evidence-Based Guidelines," Chest, Jan. 2005, 127(1):335-371.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al,. "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

Eli Lilly Press Release, "Eli Lilly and Company Licenses U.S. Rights forTadalafil PAH Indication to United Therapeutics Corporation," Nov. 17, 2008, 4 pages.

English translation of OptiNeb User Manual, 2005, 33 pages.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf (Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999, English summary on first page.

Farber et al., "Pulmonary Arterial Hypertension," The New England Journal of Medicine, 2004, 351:1655-1665.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Flolan label, Sep. 2002, 24 pages.

Frijlink et al., "Dry Powder inhalers for pulmonary drug delivery," Expert Opin. Drug Deliv., 2004, 1(1):67-86.

Geller et al., "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis," Journal of Aerosol Medicine, 2003, 16(2):175-182.

Geller, David E., M.D., "Comparing Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler," Respir. Care, 2005, 50(10):1313-1321.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), Jun. 2005, 30(4):296-302, with English translation.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Goldsmith et al., "Inhaled Iloprost In Primary Pulmonary Hypertension," Drugs, 2004, 64(7):763-773.

Gonda, Igor, "A semi-empirical model of aerosol deposition in the human respiratory tract for mouth inhalation," J. Pharm. Pharmacol., 1981, 33:692-696.

Gonda, Igor, "Study of the effects of polydispersity of aerosols on regional deposition in the respiratory tract," J. Pharm. Pharmacol., 1981, 33(Supp):52P.

Hache et al., "Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac surgery," The Journal of Thoracic and Cardiovascular Surgery, Mar. 2003, 125:642-649.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous Iloprost in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hill et al., "Inhaled Therapies for Pulmonary Hypertension," Respiratory Care, Jun. 2015, 60(6):794-805.

Hoeper et al., "Long-term Treatment of Pulmonary Hypertension with Aerosolized Iloprost, a Prostacyclin Analogue," The New England Journal of Medicine, Jun. 22, 2000, 342:1866-1870.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and Pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Laliberte et al., "Pharmacokinetics and Steady-State Bioequivalence of Treprostinil Sodium (Remodulin) Administered by the Intravenous and Subcutaneous Route to Normal Volunteers," J. Cardiovasc. Pharmacol, Aug. 2004, 44(2):209-214.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Liquidia Technologies Press Release, "Liquidia Announces FDA Acceptance of New Drug Application for LIQ861 (treprostinil) Inhalation Powder for the Treatment of Pulmonary Arterial Hypertension," Apr. 8, 2020, 3 pages.

Liquidia Technologies Press Release, "Liquidia Submits New Drug Application for LIQ861 (treprostinil) Inhalation Powder to U.S. Food and Drug Administration for the Treatment of Pulmonary Arterial Hypertension (PAH)," Jan. 27, 2020, 3 pages.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320,aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

US 11,826,327 B2
Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.

Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.

Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21 (Suppl.33):3, Abstract No. 084.

National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.

Nauser et al., "Pulmonary Hypertension: New Perspectives," CHF, 2003, 9:155-162.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 10 pages, Dec. 19, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 10 pages, Dec. 7, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Feb. 1, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Jan. 12, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Mar. 1, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Mar. 17, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Mar. 9, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Apr. 13, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Feb. 9, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 13, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 19, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 31, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 5, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jun. 19, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jun. 2, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Mar. 27, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, May 19, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treporstinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13, pages, Aug. 16, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Oct. 13, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 1, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 12, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 14, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 20, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 8, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 14 pages, Nov. 14, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 14 pages, Oct. 25, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Dec. 20, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Mar. 6, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 10, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 23, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 28, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 8, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Apr. 15, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Apr. 19, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Apr. 24, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 13, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 14, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 17, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 3, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 7, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Dec. 13, 2018.

UTC_PH-ILD_005314

## US 11,826,327 B2

Page 6

(56)                **References Cited**

OTHER PUBLICATIONS

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Dec. 17, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Dec. 20, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Feb. 14, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Feb. 4, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jan. 24, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jan. 8, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jan. 9, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jul. 11, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jul. 20, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 14, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 14, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 18, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 21, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 25, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Mar. 13, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Mar. 29, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, May 16, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, May 24, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Nov. 2, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Nov. 21, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Nov. 7, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Oct. 1, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Oct. 11, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Oct. 22, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Sep. 24, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 5 pages, Dec. 11, 2015.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 5 pages, Feb. 24, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Mar. 14, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Aug. 15, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Jun. 23, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Jun. 6, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Jun. 7, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, May 23, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, May 31, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, May 5, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Aug. 26, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Jul. 12, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Jul. 21, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Jul. 5, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Sep. 9, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Apr. 30, 2020.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Feb. 26, 2020.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Jan. 7, 2020.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, May 29, 2020.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Nov. 17, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Nov. 9, 2016.
Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instrutions, Sep. 2005.
Newman, S.P., "Aerosols," Chapter from Encyclopedia of Respiratory Medicine, 2006, 58-64.

# US 11,826,327 B2

Page 7

(56)          **References Cited**

OTHER PUBLICATIONS

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources. Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Olin, Jeffrey W., D.O., "Thromboangiitis Obliterans (Buerger's Disease)," N. Engl. J. Med., 2000, 343:864-869.

Olschewski et al. for the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," The New England Journal of Medicine, Aug. 1, 2002, 347(5):322-329.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

Optineb®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.

Orenitram label, Oct. 2019, 17 pages.

Osterweil, Neil, "Treprostinil Improves Walk Distance in Pulmonary Hypertension," Jul. 9, 2020, 9 pages, www.medscape.com/viewarticle/933674.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Petition for Inter Partes Review of U.S. Pat. No. 10,716,793, *Liquidia Technologies, Inc.* (petitioner) v. *United Therapeutics Corporation* (patent owner), IPR2021-00406, and Exhibits 1002, 1003, 1004, 1005 and 1036.

Pitcairn et al., "Deposition of Corticosteroid Aerosol in the Human Lung by Respimat Soft Mist Inhaler Compared to Deposition by Metered Dose Inhaler or by Turbuhaler Dry Powder Inhaler," Journal of Aerosol Medicine, 2005, 18(3):264-272.

Prober et al., "Technical Report: Precautions Regarding the Use of Aerosolized Antibiotics," Pediatrics, Dec. 2000, 106(6):1-6.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Pulmozyme label, Apr. 2005, 2 pages.

Rau, Joseph L., "Determinants of Patient Adherence to an Aerosol Regimen," Respiratory Care, Oct. 2005, 50(10):1346-1359.

Remodulin label, Nov. 2004, 11 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.

Ruan et al., "Prostacyclin therapy for pulmonary arterial hypertension," Texas Heart Institute Journal (2010) vol. 37, No. 4, pp. 391-399.

Rubin et al., "Evaluation and Management of the Patient with Pulmonary Arterial Hypertension," Ann. Intern. Med., 2005, 143:282-292.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin H2 Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensis Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stein et al., "The History of Therapeutic Aerosols: A Chronological Review," Journal of Aerosol Medicine and Pulmonary Drug Delivery, 2017, 30(1):20-41.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Telko et al., "Dry Powder Inhalation Formulation," Respiratory Care, Sep. 2005, 50(9):1209-1227.

Tyvaso label, 2009, 49 pages.

United Therapeutics Press Release, "United Therapeutics Announces FDA Approval of Third Generation Nebulizer for the Tyvaso Inhalation System," Oct. 23, 2017, 5 pages.

Vachiery et al., "Transitioning From IV Epoprostenol to Subcutaneous Treprostinil in Pulmonary Arterial Hypertension," Chest, 2002, 121:1561-1565.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.

Ventavis (iloprost) Inhalation Solution product information, Dec. 2004, 15 pages.

Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.

Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension: Results from Randomized Controlled Pilot Studies" J. Am. Coll. Cardiol., 48(8):1672-1681 (2006).

Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.

Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.

Voswinckel et al., Abstract 1414, "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, Circulation, Oct. 26, 2004, 110(17Supp):III-295.

US 11,826,327 B2

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

Voswinckel et al., Abstract 218, "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, 2004, 25:22.

Walmrath et al., "Aerosolized prostacyclin in adult respiratory distress syndrome," Lancet, 1993, 342:961-962.

Walmrath et al., "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome," Am. J. Respir. Crit. Care Med., 1996, 153:991-996.

Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.

Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics, Inc.* (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C318.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics, Inc.* (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.

Waxman et al., "Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease," The New England Journal of Medicine, 2021, 284:325-334.

Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.

Welsh, Erin T., Ma, "Inhaled treprostinil improves outcomes in ILD-associated pulmonary hypertension," Jun. 30, 2020, 2 pages, www.healio.com/news/pulmonology/20200630/inhaled-treprostinil-improves-outcomes-in-ildassociated-pulmonary-hypertension.

Welsh, Erin T., Ma., FDA approves inhaled treprostinil for pulmonary hypertension associated with ILD, Apr. 5, 2021, www.healio.com/news/pulmonology/20210405/fda-approves-inhaled-treprostinil-for-pulmonary-hypertension-associated-with-ild.

Wensel et al., "Effects or iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.

Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.

Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iliprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.

Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.

Zanen et al., "The optimal particle size for -adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.

Ziegler et al., "Comparison of Cascade Impaction and Laser Diffraction for Particle Size Distribution Measurements," Journal of Aerosol Medicine, 2005, 18(3):311-324.

Zierenberg et al., "The Respimat, a New Soft Mist Inhaler for Delivering Drugs to the Lungs," Modified-Release Drug Delivery Technology, 2002, Chapter 78, 925-933.

* cited by examiner

UTC_PH-ILD_005317



Figure 1

UTC_PH-ILD_005318



Figure 2

UTC_PH-ILD_005319



Figure 3

UTC_PH-ILD_005320



Figure 4

UTC_PH-ILD_005321

Figure 5

UTC_PH-ILD_005322



Figure 6

UTC_PH-ILD_005323



Figure 7

UTC_PH-ILD_005324



Figure 8

UTC_PH-ILD_005325



Figure 9

UTC_PH-ILD_005326



Figure 10

UTC_PH-ILD_005327

Figure 11



removable purple mouthpiece cover

white mouthpiece

cartridge

cartridge cup

purple base

UTC_PH-ILD_005328



Figure 12

UTC_PH-ILD_005329



Figure 13

UTC_PH-ILD_005330



Figure 14

UTC_PH-ILD_005331

Figure 15



UTC_PH-ILD_005332

US 11,826,327 B2

1

# TREATMENT FOR INTERSTITIAL LUNG DISEASE

## RELATED APPLICATIONS

The present application claims priority to U.S. provisional application No. 63/011,810 filed Apr. 17, 2020 and U.S. provisional application No. 63/160,611 filed Mar. 12, 2021, each of which is incorporated herein by reference in its entirety.

## FIELD

The present application generally relates to methods of treating a disease with prostacyclins and more particularly, to treating a disease with treprostinil.

## BACKGROUND

Interstitial lung disease (ILD), or diffuse parenchymal lung disease (DPLD), is a group of lung diseases affecting the interstitium (the tissue and space around the alveoli, including air sacs of the lungs). It concerns alveolar epithelium, pulmonary capillary endothelium, basement membrane, and perivascular and perilymphatic tissues. It may occur when an injury to the lungs triggers an abnormal healing response. Such abnormal response may result in idiopathic pulmonary fibrosis (IPF). Currently, two drugs are approved by FDA for treatment of IPF, which is the most common form of PF: nintedanib and pirfenidone. The average rate of survival for someone with interstitial lung disease is currently between 3 and 5 years (Meyer et al., 2017). There exists a need for the identification of new pharmaceutical treatments for ILD.

## SUMMARY

In one aspect, a method of treating a pulmonary hypertension due to a condition which is selected from a chronic lung disease, hypoxia and a combination thereof, comprises administering to a subject having the pulmonary hypertension due to the condition selected from a chronic lung disease, hypoxia and a combination thereof an effective amount of treprostinil, a prodrug thereof or a pharmaceutically acceptable salt thereof.

In one aspect, a method of treating interstitial lung disease (ILD) in a subject in need thereof is provided, comprises administering to the subject a therapeutically effective amount of treprostinil, a prodrug, salt, or ester thereof. In an embodiment, the subject has pulmonary hypertension associated with ILD.

In one aspect, a method of reducing pulmonary function decline in a subject with ILD is provided, comprises administering to the subject treprostinil, a prodrug, salt, or ester thereof.

In one aspect, a method of increasing forced vital capacity (FVC) in a subject suffering from ILD is provided, comprises administering to the subject treprostinil, a prodrug, salt, or ester thereof. In some embodiments, administration of treprostinil, a prodrug, salt, or ester thereof may result in an increase of FVC of at least 20%, at least 40%, at least 60%, at least 80%, at least 90%, or at least 100% compared to the FVC prior to the start of treatment. The FVC can be assessed prior to the start of treatment and at intervals after the start of treatment. For example, the pre-treatment FVC

2

can be compared to the FVC measured at one week, four weeks, eight weeks, or sixteen weeks after the start of treatment.

In some embodiments, administering an effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide an improvement, which may be statistically significant, in forced vital capacity (FVC) in a subject with a condition selected from a chronic lung disease, such as an ILD or IPF and/or hypoxia. For example, the FVC may be higher in a patient subpopulation with the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks, or at least 28 weeks or at least 32 weeks, or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks, compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the FVC value may be higher by at least 10 ml or at least 15 ml or at least 20 ml or at least 25 ml or at least 30 ml or at least 35 ml or at least 40 ml or at least 45 ml after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering in the patient subpopulation with the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug compared to the patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. In patients with a chronic lung disease, such as interstitial lung disease, and/or hypoxia, an FVC value usually decreases with time when untreated. Thus, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt may increase an FVC value compared to an FVC value before the administering; maintain an FVC value within 5%, 10% or 20% within the FVC value prior to the administering; or reduce a decrease of an FVC value with time compared to a decrease in an FVC value with no administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt, such a decrease in an FVC value when placebo is administered instead of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt.

In some embodiments, the ILD comprises one or more of idiopathic pulmonary fibrosis (IPF), desquamative interstitial pneumonia (DIP), acute interstitial pneumonia (AIP), nonspecific interstitial pneumonia (NSIP), respiratory bronchiolitis-associated interstitial lung disease (RB-ILD), cryptogenic organizing pneumonia (COP), lymphoid interstitial pneumonia (LIP), sarcoidosis, rheumatoid arthritis, systemic lupus erythematosus, systemic sclerosis, polymyositis, dermatomyositis, antisynthetase syndrome, silicosis, asbestosis, occupational lung disease, chronic hypersensitivity pneumonitis, idiopathic interstitial pneumonia (IIP), an autoimmune ILD, lymphangioleiomyomatosis (LAM), Langerhan's cell histiocytosis (LCH), drug associated ILD, vasculitis, granulomatosis, and berylliosis. In some embodiments, the ILD comprises IPF.

UTC_PH-ILD_005333

US 11,826,327 B2

3

In some embodiments, the ILD comprises systemic scle-rosis-associated interstitial lung disease (SSc-ILD).

In some embodiments, the ILD was induced from anti-biotics, chemotherapy, antiarrhythmic agents, coronavirus disease 2019 (COVID-19), atypical pneumonia, pneumo-cystis pneumonia, tuberculosis (TB), *Chlamydia trachoma-tis*, respiratory syncytial virus, or lymphangitic carcinoma-tosis.

In some embodiments, the subject has one or more of surfactant-protein-B deficiency, surfactant-protein-C defi-ciency, ABCA3-deficiency, brain lung thyroid syndrome, congenital pulmonary alveolar proteinosis, alveolar capil-lary dysplasia, mutations in telomerase reverse transcriptase, mutations in telomerase RNA component, mutations in the regulator of telomere elongation helicase 1, and mutations in poly(A)-specific ribonuclease.

In some embodiments, the subject has one or more symptoms of shortness of breath, fatigue, weight loss, dry cough, chest pain, and lung hemorrhage. In some embodi-ments, after administration the symptom is improved by about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, about 80%, about 85%, about 90%, about 95%, or about 100%, as measured by a medically-recognized technique. In some embodiments, the medically-recognized technique comprises one or more of Modified Medical Research Council (MMRC) Dyspnoea Scale, Modified Borg Dysp-noea Scale (0-10), Chalder Fatigue Scale, weight measure-ment scale, visual analogue scale (VAS) for cough, King's Brief Interstitial Lung Disease Questionnaire, Leicester Cough Questionnaire (LCQ), Living with IPF (L-IPF, see e.g. Am J Respir Crit Care Med Vol 202, Iss 12, pp 1689-1697, Dec. 15, 2020), computed tomography (CT) scan, X-ray, multiple magnetic resonance imaging (MRI), pulmonary function testing (PFT), spirometry, lung vol-umes, maximal respiratory pressure, diffusing capacity, oxy-gen desaturation, and arterial blood gas evaluation.

In some embodiments, treprostinil, a prodrug, salt, or ester thereof is administered in a pharmaceutical composi-tion comprising treprostinil, a prodrug, salt, or ester thereof and a pharmaceutically acceptable carrier or excipient.

In some embodiments, the administration comprises at least one of oral, inhalation, subcutaneous, nasal, intrave-nous, intramuscular, sublingual, buccal, rectal, vaginal, and transdermal administration. In some embodiments, the administration comprises inhalation. In some embodiments, one inhalation dosing event comprises from 1 to 20 breaths, wherein at least one inhalation dosing event per day is administered.

In some embodiments, the method comprises administra-tion of at least one additional active agent to treat the ILD. In some embodiments, the at least one additional active agent comprises a corticosteroid, mycophenolic acid, myco-phenolate mofetil, azathioprine, cyclophosphamide, ritux-imab, pirfenidone, or nintedanib. In some embodiments, the at least one additional active agent and treprostinil, a prod-rug, salt, or ester thereof, are administered via a method selected from the group consisting of (a) concomitantly; (b) as an admixture; (c) separately and simultaneously or con-currently; and (d) separately and sequentially.

In some embodiments, administration is once, twice, thrice, four times, five times, or six times per day. In some embodiments, administration is for a period selected from the group consisting of about 1 day, about 1 day to about 3 days, about 3 days to about 6 days, about 6 days to about 9 days, about 9 days to about 12 days, about 12 days to about

4

15 days, about 15 days to about 18 days, about 18 days to about 21 days, about 21 days to about 24 days, about 24 days to about 27 days, about 27 days to about 30 days, or about greater than 30 days.

In some embodiments, a method of treating a pulmonary hypertension due to a condition which is selected from a chronic lung disease, hypoxia and a combination thereof, comprises administering to a subject having the pulmonary hypertension due to the condition selected from a chronic lung disease, hypoxia and a combination thereof an effective amount of treprostinil, a prodrug thereof or a pharmaceuti-cally acceptable salt thereof.

In some embodiments, the subject is a human.

FIGURES

FIG. 1 shows a Kaplan-Meier plot of time to exacerbation of underlying lung disease over a 16-week period of trepro-stinil treatment. CI stands for confidence interval; HR stands for hazard ratio. Subjects who discontinued from the study early had their time to first clinical worsening event cen-sored at their last visit. Subjects who did not experience a clinical worsening event had their time to first clinical worsening event censored at the study termination date. (1) P-value was calculated with log-rank test stratified by base-line 6-minute walk distance category. (2) Hazard ratio, 95% CI, and p-value were calculated with proportional hazards model with treatment and baseline 6-minute walk distance (continuous) as explanatory variables.

FIG. 2 outlines a plan for the clinical study presented in Example 3. Of 462 patients screened for eligibility, 326 patients underwent randomization and received at least one dose of the assigned treprostinil or placebo (included in the intention-to-treat and safety populations). Of the patients who underwent randomization, 40 patients in the treprostinil group and 38 in the placebo group discontinued the assigned regimen prematurely. These patients were not withdrawn from the trial but were encouraged to remain and complete assessments through week 16; 33 patients in the treprostinil group and 35 in the placebo group discontinued trial par-ticipation before week 16.

FIG. 3 shows mean change from baseline in peak 6-min-ute walking distance through week 16 in the clinical study presented in Example 3. Shown are mean (±SE) changes from baseline (dashed line) in peak 6-minute walk distance over the 16-week trial period. The data shown are for patients with available data (observed) as well as for the results of two analysis methods used to account for missing data. The values shown at each data point indicate the number of patients assessed at that time point. The primary analysis used mixed-model repeat-measurement (MMRM) methods, with the assumption that missing data were miss-ing at random. The model included the change from baseline to peak 6-minute walk distance as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and the baseline 6-minute walk distance as a covariate. A sensitivity analysis for the primary end point was performed with the use of a multiple imputation approach with a multivariate normal imputation model using the Markov chain Monte Carlo (MCMC) method. The imputation model included treatment group, all scheduled visits, patient's sex, and patient's age at randomization. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

FIG. 4 shows 6-Minute Walk Distance Treatment Effect Using Mixed Model Repeated Measurement Through Week 16. A longitudinal data analysis using mixed model repeated

UTC_PH-ILD_005334

US 11,826,327 B2

5

measurement was also performed to estimate the treatment difference in change in peak 6-minute walk distance at Week 16. The mixed model repeated measurement includes the change from baseline in peak 6-minute walk distance as the dependent variable; treatment, week, and treatment by week interaction as fixed effects; and baseline 6-minute walk distance as a covariate. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

FIG. **5** shows Forest Plot on Subgroup Analyses of Peak 6-Minute Walk Distance (meter) at Week 16. 6MWD stands for 6-minute walk distance; CI stands for confidence interval; ILD stands for interstitial lung disease; PH stands for pulmonary hypertension; PVR stands for pulmonary vascular resistance; LS mean differences and their 95% confidence intervals, and p-values are from the mixed model repeated measures. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects. For etiology, the "other" category includes chronic hypersensitivity pneumonitis and occupational lung disease.

FIG. **6** shows 6-Minute Walk Distance Treatment Effect Using Multiple Imputation Through Week 16. Multiple imputation approach using a multivariate normal imputation model with the Markov Chain Monte Carlo method. P-values are obtained from 100 multiple imputations using Markov Chain Monte Carlo estimation with ANCOVA model with change from Baseline in 6-minute walk distance as the dependent variable, treatment as fixed effect, and Baseline 6-minute walk distance measurement as a covariate.

FIG. **7** shows NT-proBNP Results by Study Visit (pg/mL). CI stands for confidence interval; IQR stands for interquartile range; NT-proBNP stands for N-terminal pro-brain natriuretic peptide. As displayed above, inhaled treprostinil was associated with a 42% reduction in NT-proBNP compared to placebo at Week 16 (Treatment Ratio 0.58; 95% CI: 0.47, 0.72; P<0.001). Only subjects with a Baseline NT-proBNP measurement are included in this analysis. P-values, estimated treatment ratio, and associated 95% CIs (LS Mean difference expressed as ratio) are obtained from the analysis of covariance with change from baseline in log transformed data in NT-proBNP as the dependent variable, treatment as the fixed effect, and log-transformed baseline NT-proBNP as a covariate. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

FIG. **8** shows Hodges-Lehmann Estimate of Treatment Effect for 6-Minute Walk Distance Through Week 16. For those subjects who withdrew early due to death, were too ill to walk, or had no 6-minute walk distance measurement due to a clinical worsening event, the 6-minute walk distance was set to 0; for all other withdrawals without a measurement, last observation carried forward was used for imputation. P-values are obtained from nonparametric ANCOVA adjusted for Baseline 6-minute walk distance category.

FIG. **9** is a plot showing a relationship between treprostinil AUC0-5 and dose for Treprostinil Inhalation Powder (TreT) administered by a dry powder inhaler and nebulized treprostinil administered by Tyvaso nebulizer.

FIG. **10** is a plot showing a relationship between treprostinil Cmax and dose for Treprostinil Inhalation Powder (TreT) administered by a dry powder inhaler and nebulized treprostinil administered by Tyvaso nebulizer.

FIG. **11** shows a dry powder inhaler, which has a cartridge with a dose of Treprostinil Inhalation Powder (TreT).

6

FIG. **12** shows a design of a study of Example 5. During the Optional Extension Phase (OEP), dosing titration is encouraged; the dose of TreT is titrated upward, as clinically tolerated, to identify a maximum stable dose in each subject.

FIG. **13** shows a number of subjects for various maintenance TreT doses in the OEP.

FIG. **14** shows a change in 6 minute walk distance (6MWD) with respect to a baseline 6MWD as a function of duration of TreT treatment.

FIG. **15** is a plot reporting satisfaction of participants of the study of Example 5.

## DETAILED DESCRIPTION

It is noted that, as used herein and in the appended claims, the singular forms "a," "an," and "the" include plural referents unless the context clearly dictates otherwise. It is further noted that the claims may be drafted to exclude any optional element. As such, this statement is intended to serve as antecedent basis for use of such exclusive terminology as "solely," "only" and the like in connection with the recitation of claim elements or use of a "negative" limitation.

As used herein, the term "comprising" or "comprises" is intended to mean that the compositions and methods include the recited elements, but do not exclude others. A composition or method "consisting essentially of" the elements as defined herein would not exclude other materials or steps that do not materially affect the basic and novel characteristic(s) of the claimed technology. "Consisting of" shall mean excluding more than trace elements of other ingredients and substantial method steps. Embodiments defined by each of these transition terms are within the scope of this technology. When an embodiment is defined by one of these terms (e.g., "comprising") it should be understood that this disclosure also includes alternative embodiments, such as "consisting essentially of" and "consisting of" for said embodiment.

"Subject" refers to an animal, such as a mammal (including a human), that has been or will be the object of treatment, observation or experiment. "Subject" and "patient" may be used interchangeably, unless otherwise indicated. The methods described herein may be useful in human therapy and/or veterinary applications. In some embodiments, the subject is a mammal. In some embodiments, the subject is a human.

The terms "therapeutically effective amount," "effective amount," and "pharmaceutically effective amount" are used interchangeably and refer to an amount of a compound that is sufficient to effect treatment as defined below, when administered to a patient (e.g., a human) in need of such treatment in one or more doses. The therapeutically effective amount will vary depending upon the patient, the disease being treated, the weight and/or age of the patient, the severity of the disease, or the manner of administration as determined by a qualified prescriber or care giver. The therapeutically effective amount can be determined by titrating the dose upwards from a starting dose, either in terms of dose by administration or frequency of administration. In some embodiments, the therapeutically effective dose is determined by titrating the dose upwards until the maximum tolerated dose for the individual subject is determined.

The term "treatment" or "treating" means administering a compound disclosed herein for the purpose of (i) delaying the onset of a disease, that is, causing the clinical symptoms of the disease not to develop or delaying the development thereof, (ii) inhibiting the disease, that is, arresting the

UTC_PH-ILD_005335

US 11,826,327 B2

7

development of clinical symptoms; and/or (iii) relieving the disease, that is, causing the regression of clinical symptoms or the severity thereof.

The term "pulmonary fibrosis" is a condition characterized by scarring and thickening of the lungs. Symptoms include shortness of breath, fatigue, weakness, chronic dry, hacking cough, loss of appetite, and discomfort in the chest. Eventually the scarring in the lung becomes replaced with fibrotic tissue resulting in loss of the lung's ability to transfer oxygen to the blood.

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this present technology belongs. Although any methods and materials similar or equivalent to those described herein can also be used in the practice or testing of the present technology, representative illustrative methods and materials are described herein.

All numerical designations, e.g., pH, temperature, time, concentration, dose, and molecular weight, including ranges, are approximations which are varied (+) or (−) by increments of 0.05%, 1%, 2%, 5%, 10% or 20%. It is to be understood, although not always explicitly stated that all numerical designations are preceded by the term "about."

Where a range of values is provided, it is understood that each intervening value, to the tenth of the unit of the lower limit unless the context clearly dictates otherwise, between the upper and lower limit of that range and any other stated or intervening value in that stated range, is encompassed within the present technology. The upper and lower limits of these smaller ranges may independently be included in the smaller ranges and are also encompassed within the present technology, subject to any specifically excluded limit in the stated range. Where the stated range includes one or both of the limits, ranges excluding either or both of those included limits are also included in the present technology.

In an aspect, the present disclosure provides a method of treating interstitial lung disease (ILD) in a subject in need, comprising administering to the subject a therapeutically effective amount of treprostinil, a prodrug, salt, or ester thereof.

Treprostinil is used for the treatment of pulmonary arterial hypertension. Treprostinil is a synthetic analog of prostacyclin (PGI$_2$) having the structure:



8

Treprostinil, the active ingredient in Remodulin® (treprostinil) Injection, Tyvaso® (treprostinil) Inhalation Solution, and Orenitram® (treprostinil) Extended Release Tablets, was described in U.S. Pat. No. 4,306,075. Methods of making treprostinil and other prostacyclin derivatives are described, for example, in Moriarty, et al., J. Org. Chem. 2004, 69, 1890-1902, Drug of the Future, 2001, 26(4), 364-374, U.S. Pat. Nos. 6,441,245, 6,528,688, 6,700,025, 6,809,223, 6,756,117, 8,461,393, 8,481,782; 8,242,305, 8,497,393, 8,940,930, 9,029,607, 9,156,786 and 9,388,154 9,346,738; U.S. Published Patent Applications Nos. 2012-0197041, 2013-0331593, 2014-0024856, 2015-0299091, 2015-0376106, 2016-0107973, 2015-0315114, 2016-0152548, and 2016-0175319; PCT Publications No. WO2016/0055819 and WO2016/081658.

Various uses and/or various forms of treprostinil are disclosed, for example, in U.S. Pat. Nos. 5,153,222, 5,234,953, 6,521,212, 6,756,033, 6,803,386, 7,199,157, 6,054,486, 7,417,070, 7,384,978, 7,879,909, 8,563,614, 8,252,839, 8,536,363, 8,410,169, 8,232,316, 8,609,728, 8,350,079, 8,349,892, 7,999,007, 8,658,694, 8,653,137, 9,029,607, 8,765,813, 9,050,311, 9,199,908, 9,278,901, 8,747,897, 9,358,240, 9,339,507, 9,255,064, 9,278,902, 9,278,903, 9,758,465; 9,422,223; 9,878,972; 9,624,156; U.S. Published Patent Applications Nos. 2009-0036465, 2008-0200449, 2008-0280986, 2009-0124697, 2014-0275616, 2014-0275262, 2013-0184295, 2014-0323567, 2016-0030371, 2016-0051505, 2016-0030355, 2016-0143868, 2015-0328232, 2015-0148414, 2016-0045470, 2016-0129087, 2017-0095432; 2018-0153847 and PCT Publications Nos. WO00/57701, WO20160105538, WO2016038532, WO2018/058124.

A "prodrug" of treprostinil may refer to compounds which are converted in vivo to treprostinil or its pharmaceutically active derivatives thereof, or to a compound described in PCT publication No. WO2005/007081; U.S. Pat. Nos. 7,384,978, 7,417,070, 7,544,713, 8,252,839, 8,410,169, 8,536,363, 9,050,311, 9,199,908, 9,278,901, 9,422,223; 9,624,156, 9,878,972, 9,371,264, 9,394,227, 9,505,737, 9,758,465, 9,643,911, 9,701,616, 9,776,982, 9,845,305, 9,957,200, 10,494,327, 10,053,414, 10,246,403, 10,344,012, 10,450,290, 10,464,877, 10,464,878, 10,703,706, 10,752,733, 9,255,064, 9,469,600, 10,010,518, 10,343,979, 10,526,274; U.S. Patent Application Publications Nos. 2018-0153847 and 2021-0054009; U.S. provisional patent application No. 63/036,561 filed Jun. 9, 2020; U.S. provisional patent application No. 63/125,145 filed Dec. 14, 2020, each of which is incorporated herein by reference in their entirety.

Prostacyclin is a small molecule that has been previously shown to cause dilation of large blood vessels, relaxation of smooth muscle, inhibition of smooth muscle proliferation, as well as inhibition of platelet aggregation, which is involved in the blood clotting process. Similar actions by treprostinil at the microvascular level and on capillaries near the skin are believed to help enhance cutaneous blood flow and heal and/or prevent ischemia lesions or ulcers associated with scleroderma, Buerger's disease, Raynaud's disease, Raynaud's phenomenon, and other conditions.

UTC_PH-ILD_005336

US 11,826,327 B2

**9**

An "ester" of treprostinil may refer to a compound of formula:



wherein
$R^1$ is H, optionally substituted $C_1$-$C_{10}$ alkyl, optionally substituted $C_3$-$C_{10}$ cycloalkyl, optionally substituted $C_2$-$C_{10}$ alkenyl, optionally substituted $C_2$-$C_{10}$ alkynyl, optionally substituted aryl, optionally substituted heteroaryl, or optionally substituted heterocyclyl;

$R^2$ and $R^3$ are each independently —C(O)$R^4$; and

each $R^4$ is independently optionally substituted $C_1$-$C_{10}$ alkyl, optionally substituted $C_3$-$C_{10}$ cycloalkyl, optionally substituted $C_2$-$C_{10}$ alkenyl, optionally substituted $C_2$-$C_{10}$ alkynyl, optionally substituted aryl, optionally substituted heteroaryl, or optionally substituted heterocyclyl;

wherein at least one of $R^1$, $R^2$, and $R^3$, is not H.

"Optionally substituted" refers to a group selected from that group and a substituted form of that group. Substituents may include any of the groups defined below. In one embodiment, substituents are selected from $C_1$-$C_{10}$ or $C_1$-$C_6$ alkyl, substituted $C_1$-$C_{10}$ or $C_1$-$C_6$ alkyl, $C_2$-$C_6$ alkenyl, $C_2$-$C_6$ alkynyl, $C_6$-$C_{10}$ aryl, $C_3$-$C_5$ cycloalkyl, $C_2$-$C_{10}$ heterocyclyl, $C_1$-$C_{10}$ heteroaryl, substituted $C_2$-$C_6$ alkenyl, substituted $C_2$-$C_6$ alkynyl, substituted $C_6$-$C_{10}$ aryl, substituted $C_3$-$C_8$ cycloalkyl, substituted $C_2$-$C_{10}$ heterocyclyl, substituted $C_1$-$C_{10}$ heteroaryl, halo, nitro, cyano, —CO$_2$H or a $C_1$-$C_6$ alkyl ester thereof.

"Alkyl" refers to monovalent saturated aliphatic hydrocarbyl groups having from 1 to 10 carbon atoms and preferably 1 to 6 carbon atoms. This term includes, by way of example, linear and branched hydrocarbyl groups such as methyl (CH$_3$—), ethyl (CH$_3$CH$_2$—), n-propyl (CH$_3$CH$_2$CH$_2$—), isopropyl ((CH$_3$)$_2$CH—), n-butyl (CH$_3$CH$_2$CH$_2$CH$_2$—), isobutyl ((CH$_3$)$_2$CHCH$_2$—), sec-butyl ((CH$_3$)(CH$_3$CH$_2$)CH—), t-butyl ((CH$_3$)$_3$C—), n-pentyl (CH$_3$CH$_2$CH$_2$CH$_2$CH$_2$—), and neopentyl ((CH$_3$)$_3$ CCH$_2$—).

"Alkenyl" refers to monovalent straight or branched hydrocarbyl groups having from 2 to 10 carbon atoms and preferably 2 to 6 carbon atoms or preferably 2 to 4 carbon atoms and having at least 1 and preferably from 1 to 2 sites of vinyl (>C═C<) unsaturation. Such groups are exemplified, for example, by vinyl, allyl, and but 3-en-1-yl. Included within this term are the cis and trans isomers or mixtures of these isomers.

"Alkynyl" refers to straight or branched monovalent hydrocarbyl groups having from 2 to 10 carbon atoms and preferably 2 to 6 carbon atoms or preferably 2 to 3 carbon atoms and having at least 1 and preferably from 1 to 2 sites

**10**

of acetylenic (—C≡C—) unsaturation. Examples of such alkynyl groups include acetylenyl (—C≡CH), and propargyl (—CH$_2$C≡CH).

"Substituted alkyl" refers to an alkyl group having from 1 to 5, preferably 1 to 3, or more preferably 1 to 2 substituents selected from the group consisting of alkoxy, substituted alkoxy, acyl, acylamino, acyloxy, amino, substituted amino, aminocarbonyl, aminothiocarbonyl, aminocarbonylamino, aminothiocarbonylamino, aminocarbonyloxy, aminosulfonyl, aminosulfonyloxy, aminosulfonylamino, amidino, aryl, substituted aryl, aryloxy, substituted aryloxy, arylthio, substituted arylthio, carboxyl, carboxyl ester, (carboxyl ester)amino, (carboxyl ester)oxy, cyano, cycloalkyl, substituted cycloalkyl, cycloalkyloxy, substituted cycloalkyloxy, cycloalkylthio, substituted cycloalkylthio, cycloalkenyl, substituted cycloalkenyl, cycloalkenyloxy, substituted cycloalkenyloxy, cycloalkenylthio, substituted cycloalkenylthio, guanidino, substituted guanidino, halo, hydroxy, heteroaryl, substituted heteroaryl, heteroaryloxy, substituted heteroaryloxy, heteroarylthio, substituted heteroarylthio, heterocyclic, substituted heterocyclic, heterocyclyloxy, substituted heterocyclyloxy, heterocyclylthio, substituted heterocyclylthio, nitro, SO$_3$H, substituted sulfonyl, substituted sulfonyloxy, thioacyl, thiol, alkylthio, and substituted alkylthio, wherein said substituents are as defined herein.

"Substituted alkenyl" refers to alkenyl groups having from 1 to 3 substituents, and preferably 1 to 2 substituents, selected from the group consisting of alkoxy, substituted alkoxy, acyl, acylamino, acyloxy, amino, substituted amino, aminocarbonyl, aminothiocarbonyl, aminocarbonylamino, aminothiocarbonylamino, aminocarbonyloxy, aminosulfonyl, aminosulfonyloxy, aminosulfonylamino, amidino, aryl, substituted aryl, aryloxy, substituted aryloxy, arylthio, substituted arylthio, carboxyl, carboxyl ester, (carboxyl ester) amino, (carboxyl ester)oxy, cyano, cycloalkyl, substituted cycloalkyl, cycloalkyloxy, substituted cycloalkyloxy, cycloalkylthio, substituted cycloalkylthio, cycloalkenyl, substituted cycloalkenyl, cycloalkenyloxy, substituted cycloalkenyloxy, cycloalkenylthio, substituted cycloalkenylthio, guanidino, substituted guanidino, halo, hydroxyl, heteroaryl, substituted heteroaryl, heteroaryloxy, substituted heteroaryloxy, heteroarylthio, substituted heteroarylthio, heterocyclic, substituted heterocyclic, heterocyclyloxy, substituted heterocyclyloxy, heterocyclylthio, substituted heterocyclylthio, nitro, SO$_3$H, substituted sulfonyl, substituted sulfonyloxy, thioacyl, thiol, alkylthio, and substituted alkylthio, wherein said substituents are as defined herein and with the proviso that any hydroxyl or thiol substitution is not attached to a vinyl (unsaturated) carbon atom.

"Substituted alkynyl" refers to alkynyl groups having from 1 to 3 substituents, and preferably 1 to 2 substituents, selected from the group consisting of alkoxy, substituted alkoxy, acyl, acylamino, acyloxy, amino, substituted amino, aminocarbonyl, aminothiocarbonyl, aminocarbonylamino, aminothiocarbonylamino, aminocarbonyloxy, aminosulfonyl, aminosulfonyloxy, aminosulfonylamino, amidino, aryl, substituted aryl, aryloxy, substituted aryloxy, arylthio, substituted arylthio, carboxyl, carboxyl ester, (carboxyl ester) amino, (carboxyl ester)oxy, cyano, cycloalkyl, substituted cycloalkyl, cycloalkyloxy, substituted cycloalkyloxy, cycloalkylthio, substituted cycloalkylthio, cycloalkenyl, substituted cycloalkenyl, cycloalkenyloxy, cycloalkenylthio, substituted cycloalkenylthio, substituted cycloalkenyloxy, cycloalkenylthio, substituted cycloalkenylthio, guanidino, substituted guanidino, halo, hydroxy, heteroaryl, substituted heteroaryl, heteroaryloxy, substituted heteroaryloxy, heteroarylthio, substituted heteroarylthio, heterocyclic, substituted heterocyclic, heterocyclyloxy, sub-

US 11,826,327 B2

11

stituted heterocyclyloxy, heterocyclylthio, substituted heterocyclylthio, nitro, $SO_3H$, substituted sulfonyl, substituted sulfonyloxy, thioacyl, thiol, alkylthio, and substituted alkylthio, wherein said substituents are as defined herein and with the proviso that any hydroxyl or thiol substitution is not attached to an acetylenic carbon atom.

"Alkoxy" refers to the group 0 alkyl wherein alkyl is defined herein. Alkoxy includes, by way of example, methoxy, ethoxy, n propoxy, isopropoxy, n butoxy, t butoxy, sec butoxy, and n pentoxy.

"Substituted alkoxy" refers to the group 0 (substituted alkyl) wherein substituted alkyl is defined herein.

"Acyl" refers to the groups H—C(O)—, alkyl-C(O)—, substituted alkyl-C(O)—, alkenyl-C(O)—, substituted alkenyl-C(O)—, alkynyl-C(O)—, substituted alkynyl-C(O)—, cycloalkyl-C(O)—, substituted cycloalkyl-C(O)—, cycloalkenyl-C(O)—, substituted cycloalkenyl-C(O)—, aryl-C(O)—, substituted aryl-C(O)—, heteroaryl-C(O)—, substituted heteroaryl-C(O)—, heterocyclic-C(O)—, and substituted heterocyclic-C(O)—, wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein. Acyl includes the "acetyl" group $CH_3C(O)$—.

"Acylamino" refers to the groups —$NR^{47}C(O)$alkyl, —$NR^{47}C(O)$substituted alkyl, —$NR^{47}C(O)$cycloalkyl, —$NR^{47}C(O)$substituted cycloalkyl, —$NR^{47}C(O)$cycloalkenyl, —$NR^{47}C(O)$substituted cycloalkenyl, —$NR^{47}C(O)$alkenyl, —$NR^{47}C(O)$substituted alkenyl, —$NR^{47}C(O)$alkynyl, —$NR^{47}C(O)$substituted alkynyl, —$NR^{47}C(O)$aryl, —$NR^{47}C(O)$substituted aryl, —$NR^{47}C(O)$heteroaryl, —$NR^{47}C(O)$substituted heteroaryl, —$NR^{47}C(O)$heterocyclic, and $NR^{47}C(O)$substituted heterocyclic wherein $R^{47}$ is hydrogen or alkyl and wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein.

"Acyloxy" refers to the groups alkyl-C(O)O—, substituted alkyl-C(O)O—, alkenyl-C(O)O—, substituted alkenyl-C(O)O—, alkynyl-C(O)O—, substituted alkynyl-C(O)O—, aryl-C(O)O—, substituted aryl-C(O)O—, cycloalkyl-C(O)O—, substituted cycloalkyl-C(O)O—, cycloalkenyl-C(O)O—, substituted cycloalkenyl-C(O)O—, heteroaryl-C(O)O—, substituted heteroaryl—C(O)O, heterocyclic-C(O)O—, and substituted heterocyclic-C(O)O— wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein.

"Amino" refers to the group $NH_2$.

"Substituted amino" refers to the group —$NR^{48}R^{49}$ where $R^{48}$ and $R^{49}$ are independently selected from the group consisting of hydrogen, alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, aryl, substituted aryl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, heteroaryl, substituted heteroaryl, heterocyclic, substituted heterocyclic, $SO_2$ alkyl, —$SO_2$-substituted alkyl, —$SO_2$-alkenyl, —$SO_2$-substituted alkenyl, —$SO_2$-cycloalkyl, —$SO_2$-substituted cycloalkyl, —$SO_2$-cycloalkenyl, —$SO_2$-substituted cylcoalkenyl, —$SO_2$-aryl, —$SO_2$-substituted aryl, —$SO_2$-heteroaryl, —$SO_2$-substituted heteroaryl, —$SO_2$-heterocyclic, and

12

—$SO_2$-substituted heterocyclic and wherein $R^{48}$ and $R^{49}$ are optionally joined, together with the nitrogen bound thereto to form a heterocyclic or substituted heterocyclic group, provided that $R^{48}$ and $R^{49}$ are both not hydrogen, and wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein. When $R^{48}$ is hydrogen and $R^{49}$ is alkyl, the substituted amino group is sometimes referred to herein as alkylamino. When $R^{48}$ and $R^{49}$ are alkyl, the substituted amino group is sometimes referred to herein as dialkylamino.

When referring to a monosubstituted amino, it is meant that either $R^{48}$ or $R^{49}$ is hydrogen but not both. When referring to a disubstituted amino, it is meant that neither $R^{48}$ nor $R^{49}$ are hydrogen.

"Pharmaceutically acceptable salt" may refer to physiologically acceptable salts of treprostinil, as well as non-physiologically acceptable salts of treprostinil. Pharmaceutically acceptable salts of compounds described herein are within the scope of the present technology and include acid or base addition salts which retain the desired pharmacological activity and is not biologically undesirable (e.g., the salt is not unduly toxic, allergenic, or irritating, and is bioavailable). When the compound of the present technology has a basic group, such as, for example, an amino group, pharmaceutically acceptable salts can be formed with inorganic acids (such as hydrochloric acid, hydroboric acid, nitric acid, sulfuric acid, and phosphoric acid), organic acids (e.g., alginate, formic acid, acetic acid, benzoic acid, gluconic acid, fumaric acid, oxalic acid, tartaric acid, lactic acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, naphthalene sulfonic acid, and p toluenesulfonic acid) or acidic amino acids (such as aspartic acid and glutamic acid). When the compound of the present technology (treprostinil, an ester, prodrug, or derivative thereof) has an acidic group, such as for example, a carboxylic acid group, it can form salts with metals, such as alkali and earth alkali metals (e.g., $Na^+$, $Li^+$, $K^+$, $Ca^{2+}$, $Mg^{2+}$, $Zn^{2+}$), ammonia or organic amines (e.g., dicyclohexylamine, trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, triethanolamine) or basic amino acids (e.g., arginine, lysine and ornithine). Such salts can be prepared in situ during isolation and purification of the compounds or by separately reacting the purified compound in its free base or free acid form with a suitable acid or base, respectively, and isolating the salt thus formed.

ILD may include a range of diseases and disorders, for example, idiopathic pulmonary fibrosis (IPF), desquamative interstitial pneumonia (DIP), acute interstitial pneumonia (AIP), nonspecific interstitial pneumonia (NSIP), respiratory bronchiolitis-associated interstitial lung disease (RB-ILD), cryptogenic organizing pneumonia (COP), lymphoid interstitial pneumonia (LIP), sarcoidosis, rheumatoid arthritis, systemic lupus erythematosus, systemic sclerosis, polymyositis, dermatomyositis, antisynthetase syndrome, silicosis, asbestosis, occupational lung disease, chronic hypersensitivity pneumonitis, idiopathic interstitial pneumonia (IIP), an autoimmune ILD, lymphangioleiomyomatosis (LAM), Langerhans cell histiocytosis (LCH), drug associated ILD, vasculitis, granulomatosis, and berylliosis.

"Pulmonary function" as used herein, refers to the ability of the lungs to absorb oxygen and expand and contract. Pulmonary function, decline thereof, or reduction of the decline, may be assessed using medically recognized tools known to those having ordinary skill in the art. Methods

UTC_PH-ILD_005338

US 11,826,327 B2

13

14

include pulmonary function testing (PFT), spirometry, lung volumes, maximal respiratory pressure, diffusing capacity, oxygen desaturation, and arterial blood gas evaluation.

"Forced vital capacity" as used herein, refers to the amount of air that can be forcibly exhaled from the lungs after taking the deepest breath possible, as measured by spirometry.

Further aspects of the present invention are concerned with the use of treprostinil or its derivatives, prodrugs, esters, or pharmaceutically acceptable salts thereof, in the manufacture of a medicament for the treatment or prevention of interstitial lung disease or a condition associated with interstitial lung disease. In some embodiments, the medicament is formulated for inhalation. When administered by inhalation, the formulation can be nebulized or formulated for a dry powder inhaler (DPI).

The amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof, that is required in methods may depend on a number of factors, such as the specific indication it is being used for, the nature of the particular compound used, the mode of administration, the concentration, and the weight and condition of the subject. A daily dose per subject for ILD, or conditions associated with ILD may be in the range 25 µg to 250 mg or 7 µg to 285 µg, per day per kilogram bodyweight. In some embodiments, the daily dose may be in the range of about 150 µg to about 350 µg per day, about 200 µg to about 300 µg per day, or about 225 µg to about 275 µg per day. Intravenous doses in the range 0.5 µg to 1.5 mg per kilogram bodyweight per day may be administered as an infusion of from 0.5 ng to 1.0 µg per kilogram bodyweight per minute.

The treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, can be administered using any suitable treatment schedule. In some embodiments, the drug will be administered multiple times a day (1, 2, 3, 4, or 5), and in other embodiments, the drug can be continuously administered, such as by using an infusion pump. The duration of treatment can vary depending on the severity of disease, treatment goals, or individual circumstances. In some embodiments, the duration of treatment is at least one week, at least two weeks, at least four weeks, at least eight weeks, or at least sixteen weeks. In some embodiments, the duration of treatment is indefinite, e.g., treatment can continue for the life of the subject or until disease symptoms decrease below some threshold.

Pharmaceutical compositions described herein or administered to subjects, hereinafter referred to as a "formulation" or "composition," of treprostinil and/or its prodrugs, esters, derivatives, and/or pharmaceutically acceptable salts thereof, may be admixed with, inter alia, an acceptable carrier. The carrier may be compatible with any other ingredients in the formulation and not deleterious to the subject. The carrier may be a solid or a liquid, or both. One or more of treprostinil or its derivatives, esters, prodrugs, or pharmaceutically acceptable salts thereof, may be incorporated in the formulations of the invention. Formulations administered include those suitable for parenteral, oral, inhalation, rectal, topical, buccal and transdermal administration.

Parenterally administered compositions may be isotonic with the blood of the intended recipient. Subcutaneous injection, intravenous, intramuscular or intradermal injection may be used. Such preparations may conveniently be prepared by admixing the compound with water or a glycine or citrate buffer and rendering the resulting solution sterile and isotonic with the blood.

Formulations suitable for oral administration may be presented as capsules, cachets, lozenges, or tablets, each containing a specific amount of treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof; as a powder or granules; as a solution or a suspension in an aqueous or non-aqueous liquid; or as an oil-in-water or water-in-oil emulsion. Oral formulations that may be administered include those described in U.S. Pat. Nos. 7,384,978 and 8,747,897 (including the commercial product Orenitram® (treprostinil) Extended-Release Tablets), the entire disclosures of which are hereby incorporated by reference. In general, the formulations of the invention are prepared by uniformly and intimately admixing treprostinil, an ester, prodrug, or salt thereof with a liquid or finely divided solid carrier, or both, and then, if necessary, shaping the resulting mixture.

Formulations suitable for buccal (sub-lingual) administration include lozenges comprising treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, in a flavored base, usually sucrose and acacia or tragacanth; and pastilles comprising the compound in an inert base such as gelatin and glycerin or sucrose and acacia.

Formulations suitable for rectal administration are preferably presented as unit dose suppositories. These may be prepared by admixing treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, with one or more solid carriers.

Topical and transdermal formulations me be an ointment, cream, lotion, paste, gel, spray, aerosol, or oil. Carriers possible include vaseline, lanoline, polyethylene glycols, alcohols, and combinations thereof.

Treprostinil, prodrugs, esters, and salts thereof are conveniently prepared by methods the same as or analogous to those described in U.S. Pat. Nos. 4,306,075, 6,528,688 and 6,441,245, the disclosures of which are hereby incorporated by reference.

In some embodiments of the present methods, the treprostinil administered is provided as a kit with instructions for use in treating ILD. In certain kit embodiments, the treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, is in a form suitable for subcutaneous administration, continuous subcutaneous infusion, intravenously administration or inhalation. Subcutaneous formulations administered to the subject may include any of those described in U.S. Pat. No. 7,999,007 (including the commercial product Remodulin® (treprostinil) Injection), the entire disclosure of which is hereby incorporated by reference. In other kit embodiments, the treprostinil or its derivative, or a pharmaceutically acceptable salt thereof, is in an orally available form selected from the group consisting of tablets and capsules.

The effects of the method on pulmonary fibroses (PF) can be ascertained via an animal model of PF such as bleomycin and vanadium pentoxide (V205) models as described in Bonner J C, Rice A B, Ingram J L, Moomaw C R, Nyska A, Bradbury A, Sessoms A R, Chulada P C, Morgan D L, Zeldin D C, and Langenbach R. Susceptibility of cyclooxygenase-2-deficient mice to pulmonary fibrogenesis. *Am J Pathol* 161: 459-470, 2002; 23; and Keerthisingam C B, Jenkins R G, Harrison N K, Hernandez-Rodriguez N A, Booth H, Laurent G J, Hart S L, Foster M L, and McAnulty R J. Cyclooxygenase-2 deficiency results in a loss of the anti-proliferative response to transforming growth 31 factor-beta in human fibrotic lung fibroblasts and promotes bleomycin-induced pulmonary fibrosis in mice. *Am J Pathol* 158: 1411-1422, 2001, incorporated herein by reference in their entirety.

UTC_PH-ILD_005339

US 11,826,327 B2

15

In preferred embodiments, treprostinil is administered via inhalation. Inhaled compositions comprising treprostinil may include sprays, aerosols, and dry powder compositions. Said compositions may include a variety of excipients. Inhalable compositions administered may include any of those described in U.S. Pat. No. 9,339,507 (including the commercial product Tyvaso® (treprostinil) Inhalation Solution), WO2017192993 and WO2014085813, the entire disclosures of which are hereby incorporated by reference.

The excipient or excipients of the pharmaceutical composition according to the invention may have water solubility greater than 5 g/l and often greater than 100 g/l and more. They are preferably chosen among sugars, salts or amino acids and have double function of minimizing the effect of the inhaled composition on the fluid's cellular outcome. Regarding the composition in its solid dry form, the excipient also forms the solid matrix in which the treprostinil, a prodrug, ester, salt, or derivative thereof is dispersed.

The composition may include excipients such as lactose, corn starch, or the like, glidants such as magnesium stearate, etc., emulsifying agents, suspending agents, stabilizers, and isotonic agents, etc. If desired, a sweetening agent and/or a flavoring agent may be added. Exemplary excipients include, without limitation, polyethylene glycol (PEG), hydrogenated castor oil (HCO), cremophors, carbohydrates, starches (e.g., corn starch), inorganic salts, antimicrobial agents, antioxidants, binders/fillers, surfactants, lubricants (e.g., calcium or magnesium stearate), glidants such as talc, disintegrants, diluents, buffers, acids, bases, film coats, combinations thereof, and the like. Other examples of soluble excipients that may be used in the composition according to the invention are alitame, acesulfame potassium, aspartame, saccharin, sodium saccharin, sodium cyclamate, sucralose, threalose, xylitol, citric acid, tartaric acid, cyclodextrins, dextrins, hydroxyethylcellulose, gelatine, malic acid, maltitol, maltodextrin, maltose, polydextrose, tartaric acid, sodium or potassium bicarbonate, sodium or potassium chloride, sodium or potassium citrate, phospholipids, lactose, sucrose, glucose, fructose, mannitol, sorbitol, natural aminoacids, alanine, glycine, serine, cysteine, phenylalanine, tyrosine, tryptophan, histidine, methionine, threonine, valine, isoleucine, leucine, arginine, lysine, aspartic acid, glutamic acid, asparagine, glutamine, proline, their salts, and their possible simple chemical modifications such as in N-acetylcysteine, and carbocysteine.

The preferred soluble excipients are alkaline metals salts such as sodium chloride or potassium chloride, and sugars, such as lactose. Specific carbohydrate excipients include, for example, monosaccharides, such as fructose, maltose, galactose, glucose, D-mannose, sorbose, and the like; disaccharides, such as lactose, sucrose, trehalose, cellobiose, and the like; polysaccharides, such as raffinose, melezitose, maltodextrins, dextrans, starches, and the like; and alditols, such as mannitol, xylitol, maltitol, lactitol, xylitol, sorbitol (glucitol), pyranosyl sorbitol, myoinositol, and the like.

As far as the low morphology of the particles of the dry powder is concerned, the composition requires the presence of a soluble excipient, preferably a sugar like lactose, able to form in the beginning of the solvent evaporation phase during preparation of the composition, during spray-drying, the backbone of the particle, producing high porosity particles.

In some embodiments, the excipient comprises a surfactant. The surfactant of the composition can be chosen among different classes of surfactants of pharmaceutical use.

Surfactants suitable to be used in the present invention are all those substances characterized by medium or low

16

molecular weight that contain a hydrophobic moiety, generally readily soluble in an organic solvent but weakly soluble or insoluble in water, and a hydrophilic (or polar) moiety, weakly soluble or insoluble in an organic solvent but readily soluble in water. Surfactants are classified according to their polar moiety. Therefore, surfactant with a negatively charged polar moiety are called anionic surfactants, while cationic surfactants have a positively charged polar moiety. Uncharged surfactant are generally called non-ionic, while surfactant charged both positively and negatively are called zwitterionic. Examples of anionic surfactants are salts of fatty acids (better known as soaps), sulfates, sulfate ethers and phosphate esters. Cationic surfactants are frequently based on polar groups containing amino groups. Most common non-ionic surfactants are based on polar groups containing oligo-(ethylene-oxide) groups. Zwitterionic surfactants are generally characterized by a polar group formed by a quaternary amine and a sulfuric or carboxylic group.

Specific examples of this application are the following surfactants: benzalkonium chloride, cetrimide, docusate sodium, glyceryl monolaurate, sorbitan esters, sodium lauryl sulfate, polysorbates, phospholipids, biliary salts.

Non-ionic surfactants, such as polysorbates and polyethylene and polyoxypropylene block copolymers, known as "Poloxamers" may be used. Polysorbates are described in the CTFA International Cosmetic Ingredient Dictionary as mixtures of sorbitol and sorbitol anhydride fatty acid esters condensed with ethylene oxide. Particularly preferred are non-ionic surfactants of the series known as "Tween," in particular the surfactant known as "Tween 80," a polyoxyethylensorbitan. Additional exemplary excipients include surfactants such as other polysorbates, e.g., "Tween 20" and pluronics such as F68 and F88 (both of which are available from BASF, Mount Olive, N.J.), sorbitan esters, lipids (e.g., phospholipids such as lecithin and other phosphatidylcholines, and phosphatidylethanolamines), fatty acids and fatty esters, steroids such as cholesterol, and chelating agents, such as EDTA, zinc and other such suitable cations.

The presence of a surfactant, and preferably of Tween 80, may be necessary to reduce electrostatic charges found in compositions without it, the flow of the powder and the maintenance of the solid state in a homogeneous way without initial crystallization. According to the present invention, phospholipids are included in the above-mentioned definition of surfactants or excipients.

The inhalatory formulation according administered can include a hydrophobic substance in order to reduce sensitivity to humidity. Such hydrophobic substance is preferably leucine, which makes the particle disaggregation easier.

In case of production of a solid product in powder form, this can occur using different techniques, well consolidated in the pharmaceutical industry. The preparation of fine particles through spray-drying represents a preferred method according to the invention. In case of industrial production, this technique is undoubtedly preferred to freeze-drying, which at the moment is the most expensive drying process, both for the apparatus used, and for the yield and production times.

The pharmaceutical composition according to the invention can include other components, such as pH buffers and preservatives. Buffers include, but are not limited to, citric acid, sodium chloride, potassium chloride, sodium sulfate, potassium nitrate, sodium phosphate monobasic, sodium phosphate dibasic, and combinations thereof.

Further, a composition administered may optionally include one or more acids or bases. Non-limiting examples of acids that can be used include those acids selected from

UTC_PH-ILD_005340

US 11,826,327 B2

17

the group consisting of hydrochloric acid, acetic acid, phosphoric acid, citric acid, malic acid, lactic acid, formic acid, trichloroacetic acid, nitric acid, perchloric acid, phosphoric acid, sulfuric acid, fumaric acid, and combinations thereof. Non-limiting examples of suitable bases include bases selected from the group consisting of sodium hydroxide, sodium acetate, ammonium hydroxide, potassium hydroxide, ammonium acetate, potassium acetate, sodium phosphate, potassium phosphate, sodium citrate, sodium formate, sodium sulfate, potassium sulfate, potassium fumerate, and combinations thereof.

The excipients may include an antioxidant, for example, ascorbyl palmitate, butylated hydroxyanisole, butylated hydroxytoluene, hypophosphorous acid, monothioglycerol, propyl gallate, sodium bisulfite, sodium formaldehyde sulfoxylate, sodium metabisulfite, and combinations thereof.

The term "dry powder" in reference to the composition of the invention, refers to a powder, granulate, tablet form composition, or any other solid form with a humidity content that assures to the composition chemical stability in time. More precisely, the term "dry" refers to a solid composition with water content lower than 10% w/w, normally less than 5% and preferably less than 3%.

The amount of any excipient in the dry powder composition of the invention can change within a wide range. The amount of any individual excipient in the composition will vary depending on the role of the excipient, the dosage requirements of the active agent components, and particular needs of the composition. Generally, however, the excipient will be present in the composition in an amount of about 1% to about 99% by weight, preferably from about 5% to about 98% by weight, more preferably from about 15% to about 95% by weight of the excipient. In general, the amount of excipient present in a composition of the disclosure is selected from the following: at least about 2%, 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, or even 95% by weight.

The treprostinil composition administered may be provided as a kit that includes a metered dose inhaler containing a pharmaceutical composition comprising treprostinil or its derivative, ester, prodrug, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with ILD that can be treated by treprostinil. In some cases, the kit is a kit for treating ILD, that includes (i) a metered dose inhaler containing a pharmaceutical composition comprising treprostinil or its derivative, ester, prodrug, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

The present disclosure also provides a method of treating a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia (low oxygen levels) by administering to a subject, such as a human being, with such the pulmonary hypertension an effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug. Pulmonary hypertension due to a chronic lung disease and/or hypoxia belongs Group 3 pulmonary hypertension according to the World Health Organization (WHO) classification.

The chronic lung disease may include an obstructive lung disease in which the lung airways are narrow and make it difficult to exhale, such as chronic obstructive pulmonary disease (COPD) and emphysema; a restrictive lung disease

18

in which the lungs have a difficult time expanding when one inhales, such as interstitial lung disease or pulmonary fibrosis; sleep apnea; living in an area of high altitude for a long period of time; and various combinations of the above conditions.

In some embodiments, the chronic lung disease may include idiopathic interstitial pneumonia, such as idiopathic pulmonary fibrosis, idiopathic nonspecific interstitial pneumonia, respiratory bronchiolitis (e.g. respiratory bronchiolitis associated with interstitial lung disease), desquamative interstitial pneumonia, acute interstitial pneumonia; chronic hypersensitivity pneumonitis, occupational lung disease, pulmonary fibrosis, emphysema, connective tissue disease or any combination of the above conditions.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide an increase, which may be statistically significant, in a six minute walk distance (6MWD) in a subject with a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia compared to a baseline 6MWD value, i.e. a 6MWD value prior to the administering. For example, the 6MWD value may be statistically significantly increased after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks of the administering. In some embodiments, the administering may provide an increase of at least 5 m, at least 10 m or at least 15 m in the 6MWD compared to the baseline 6MWD value after at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks of the administering. In some embodiments, the administering may provide an increase of at least 5 m, at least 10 m, at least 15 m, at least 18 m or at least 20 m in the 6MWD compared to the baseline 6MWD value after at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide a reduction, which may be statistically significant, in a plasma concentration of NT-proBNP in a subject with a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia compared to a baseline NT-proBNP plasma concentration, i.e. a NT-proBNP plasma concentration value prior to the administering. For example, the NT-proBNP plasma concentration may be statistically significantly reduced after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks of the administering. In some embodiments, the administering may provide a reduction of at least 50 pg/ml, at least 100 pg/ml, at least 150 pg/ml, at least 200 pg/ml, at least 250 pg/ml, at least 300 pg/ml or at least 350 pg/ml in the NT-proBNP plasma concentration compared to

UTC_PH-ILD_005341

US 11,826,327 B2

19

20

the baseline the NT-proBNP plasma concentration value after at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug to a subject with a pulmonary hypertension due to a chronic lung disease may provide a reduction, which may be statistically significant, of a number of exacerbation(s) of the chronic lung disease. For example, a number of exacerbation(s) of the chronic lung disease may be lower in a patient subpopulation with the pulmonary hypertension due to the chronic lung disease, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks, compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the number of exacerbation(s) may be lowered by at least 10%, at least 20%, at least 30%, at least 40%, at least 50%, at least 60%, at least 70% or at least 80%. The exacerbation(s) may include an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug to a subject with a pulmonary hypertension due to a chronic lung disease and/or hypoxia may provide a reduction, which may be statistically significant, of a number of clinical worsening event(s). For example, a number of clinical worsening event(s) may be lower in a patient subpopulation with the pulmonary hypertension due to the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the number of clinical worsening event(s) may be lowered by at least 10%, at least 20%, at least 30%, at least 40%, at least 50%, at least 60%, at least 70% or at least 80%. The clinical worsening event(s) may include one or more of hospitalization due to a cardiopulmonary indication, a decrease in a 6MWD by more than 15% from a baseline 6MWD value, death or a lung transplantation.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide an improvement, which may be statistically significant, in forced vital capacity (FVC) in a subject with a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia. For example, the FVC

may be higher in a patient subpopulation with the pulmonary hypertension due to the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks, or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks, compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the FVC value may be higher by at least 10 ml or at least 15 ml or at least 20 ml or at least 25 ml or at least 30 ml or at least 35 ml or at least 40 ml or at least 45 ml after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering in the patient subpopulation with the pulmonary hypertension due to the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug compared to the patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. In patients with a chronic lung disease, such as interstitial lung disease, and/or hypoxia, an FVC value usually decreases with time when untreated. Thus, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt may increase an FVC value compared to an FVC value before the administering; maintain an FVC value within 5%, 10% or 20% within the FVC value prior to the administering; or reduce a decrease of an FVC value with time compared to a decrease in an FVC value with no administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug, such a decrease in an FVC value when placebo is administered instead of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt.

In some embodiments, treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may be administered by inhalation, which may be, for example, an oral inhalation or a nasal inhalation. In some embodiments, treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may be administered by an inhalation device, which may be for example, a pulsed inhalation device, such as a metered dose inhaler and/or a pulsed nebulizer. Pulsed inhalation devices are disclosed, for example, in U.S. patent application publication No. 20080200449, U.S. Pat. Nos. 9,358,240; 9,339,507; 10,376, 525; and 10,716,793, each of which is incorporated herein by reference in its entirety.

In some embodiments, the inhalation device, such as a pulsed inhalation device, may contain a solution or a suspension comprising treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug. For example, such solution or suspension may be used for aerosolizing or a nebulizing by an inhalation device, such as a nebulizer and/or a metered dose inhaler. One example of a solution may be a commercial product Tyvaso®. A concentration of treprostinil in such solution may vary. In some embodiments, the treprostinil concentra-

UTC_PH-ILD_005342

US 11,826,327 B2

21

tion may be from 200 µg/ml to 2000 µg/ml or from 300 µg/ml to 1500 µg/ml or from 400 µg/ml to 1200 µg/ml or any value or subrange within these ranges. For example, in a certain embodiment, the treprostinil concentration may be 600 µg/ml.

In some embodiments, the inhalation device, such as a pulsed inhalation device, may be a dry powder inhaler, which may contain a dry powder composition or formulation comprising treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug. For example, a dry powder inhaler and a dry powder composition or formulation comprising treprostinil are disclosed in WO2019/237028, which incorporated herein by reference in its entirety. In some embodiments, in addition to treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug, the dry powder composition may further a dike-topiperazine, such as (E)-3,6-bis[4-(N-carbonyl-2-propenyl) amidobutyl]-2,5-diketopiperazine (FDKP).

Treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may be administered by inhalation in a single administering event which may involve a limited number of breaths (or inhalations) by the subject. For example, in some embodiments, a number of breaths in the single administering event may not exceed 20 breaths (or inhalations) or 19 breaths (or inhalations) or 18 breaths (or inhalations) or 17 breaths (or inhalations) or 16 breaths (or inhalations) or 15 breaths (or inhalations) or 14 breaths (or inhalations) or 13 breaths (or inhalations) or 12 breaths (or inhalations) or 11 breaths (or inhalations) or 10 breaths (or inhalations) or 9 breaths (or breaths (or inhalations) inhalations) or 8 breaths (or inhalations) or 7 breaths (or inhalations) or 6 breaths (or inhalations) or 5 breaths (or inhalations) or 4 breaths (or inhalations) or 3 breaths (or inhalations) or 2 breaths (or inhalations) or 1 breath (or inhalation).

A dose of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug administered by inhalation in a single administering event may vary. In some embodiments, the single administering event dose may be from 7.5 µg to 100 µg or 10 µg to 100 µg or 15 µg to 100 µg from 15 µg to 90 µg or from 15 µg to 75 µg or from 30 µg to 75 µg or any value or subrange within these ranges.

A number of single administering events per day for administering treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug administered by inhalation may vary. For example, the number of single administering events per day may be 1, 2, 3, 4, 5 or 6 per day.

The table below provides exemplary doses of treprostinil in a dry powder formulation, which may be used in a dry powder inhaler, and how they may compare with treprostinil doses in Tyvaso® inhalation solution.

| DPI (treprostinil) Inhalation Powder Cartridge Strength (QID) | Tyvaso (treprostinil) Inhalation Solution Number of Breaths (QID) |
| --- | --- |
| 16 mcg | 2 to 4 (18 to 24 mcg) |
| 32 mcg | 5 to 7 (30 to 42 mcg) |
| 48 mcg | 8 to 10 (48 to 60 mcg) |
| 64 mcg | 11 to 13 (66 to 78 mcg) |

The disclosure of all publications cited above are expressly incorporated herein by reference in their entireties to the same extent as if each were incorporated by reference individually.

The examples described herein are illustrative of the present invention and are not intended to be limitations thereon. Different embodiments of the present invention

22

have been described according to the present invention. Many modifications and variations may be made to the techniques described and illustrated herein without departing from the spirit and scope of the invention. Accordingly, it should be understood that the examples are illustrative only and are not limiting upon the scope of the invention.

EXAMPLES

Example 1: Inhaled Treprostinil Results on Underlying Lung Disease

An exacerbation of underlying lung disease is defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality (Collard et al., 2016). The present example shows that treatment with inhaled treprostinil resulted in significantly fewer exacerbations of underlying lung disease in patients.

Subjects receiving underlying lung disease were treated with inhaled treprostinil over 16 weeks. Subjects initiated inhaled treprostinil or placebo at a dose of 3 breaths (18 mcg) 4 times daily (during waking hours). Study drug doses were maximized throughout the study. Dose escalations (additional 1 breath 4 times daily) could occur up to every 3 days with a target dosing regimen of 9 breaths (54 mcg) 4 times daily and a maximum dose of 12 breaths (72 mcg) 4 times daily, as clinically tolerated. Subjects were assessed during Screening and Baseline to determine eligibility for the study. Once eligible, 5 Treatment Phase visits to the clinic were required at Week 4, Week 8, Week 12, Week 15, and Week 16 (final study visit). An Early Termination (ET) Visit was conducted for subjects who discontinued prior to Week 16; all assessments planned for the final Week 16 Visit were conducted during the ET Visit, if applicable. Subjects were contacted at least weekly by telephone or email to assess tolerance to study drug, adverse events (AEs), and changes to concomitant medications.

Efficacy assessments consisted of 6MWD, plasma NT-proBNP concentration, and time to clinical worsening. Exploratory endpoints included SGRQ, change in DSP, time to exacerbation of underlying disease, and pulmonary function tests. Safety assessments consisted of the development of AEs, vital signs, clinical laboratory parameters, ECG parameters, hospitalizations due to cardiopulmonary indications, exacerbations of underlying lung disease, and oxygenation.

Treatment resulted in significantly fewer exacerbations of underlying lung disease over the 16-week treatment period (26.4% in Inhaled Treprostinil group and 38.7% in placebo group; p=0.018) and decreased risk of an exacerbation of underlying lung disease (hazard ratio 0.66 or 34% reduction in risk) as shown in FIG. 3.

In addition, the following FVC suggestive data was obtained from this study. Among patients treated with inhaled treprostinil, overall results from intent to treat group were:

Overall ITT
   28.47 mL and 44.40 mL in FVC at Weeks 8 and 16
   Percent predicted FVC at Week 8 (1.79%; p=0.0139) and Week 16 (1.80%; p=0.0277).
  Subset IIP etiology:
    46.48 mL and 108.18 mL (p=0.0229) at Weeks 8 and 16
    Percent predicted FVC at Week 8 (1.95%, p=0.0373) and Week 16 (2.88%; p=0.0096)
  Subset IPF etiology:
    84.52 mL and 168.52 mL (p=0.0108) at Weeks 8 and 16
    Percent predicted FVC at Week 8 (2.54%; p=0.0380) and Week 16 (3.50%; p=0.0147)
Nintedanib: IPF~109 mL (3.2% predicted) at 52 weeks
Pirfenidone: IPF~153-193 mL at 52 weeks

UTC_PH-ILD_005343

US 11,826,327 B2

**23**

Placebo corrected, rate of decline (not improvements)

In comparison to the known treatments for ILD (nintedanib and pirfenidone) shown above, inhaled treprostinil achieves comparable effects with shorter treatment duration.

Pulmonary function testing was initially conducted as a safety assessment (Safety Population) during the study. The results indicated that although most PFT parameters remained stable for subjects in the study, a notable improve-

**24**

ment in FVC (% predicted) was observed at Week 16 in the inhaled treprostinil group (median improvement of 1.0% compared to a 1.0% reduction in the placebo group). As a result, post hoc MMRM analyses of FVC data were performed for the ITT Population and are presented in Table 1 (ITT Population), Table 2 (by PH ILD Etiology of IIP) and Table 3 (for subjects with IPF), shown below.

TABLE 1

Analysis of FVC Data Using Mixed Model Repeated Measurement - ITT Population

| Visit | Treatment | N | LS Mean | Contrast | Estimated Difference | 95% CI | p-value |
|---|---|---|---|---|---|---|---|
| | | | | FVC (mL) | | | |
| Week 8 | Inhaled treprostinil | 142 | 5.49 | Inhaled treprostinil – Placebo | 28.47 | −30.81, 87.74 | 0.3453 |
| | Placebo | 141 | −22.98 | | | | |
| Week 16 | Inhaled treprostinil | 130 | 9.77 | Inhaled treprostinil – Placebo | 44.40 | −25.25, 114.05 | 0.2106 |
| | Placebo | 126 | −34.63 | | | | |
| | | | | FVC (% predicted) | | | |
| Week 8 | Inhaled treprostinil | 142 | 0.77 | Inhaled treprostinil – Placebo | 1.79 | 0.37, 3.21 | 0.0139 |
| | Placebo | 141 | −1.02 | | | | |
| Week 16 | Inhaled treprostinil | 130 | 1.07 | Inhaled treprostinil – Placebo | 1.80 | 0.20, 3.39 | 0.0277 |
| | Placebo | 126 | −0.72 | | | | |

Abbreviations:
CI, confidence interval;
FVC, forced vital capacity;
ITT, Intent-to-Treat;
LS, least square;
MMRM, mixed model repeated measurement
LSMean, p-values, estimated difference, and associated 95% CI were from the MMRM with the change from baseline in FVC/% predicted FVC as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; baseline FVC/% predicted FVC as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

TABLE 2

Analysis of FVC Data Using Mixed Model Repeated Measurement for PH-ILD Etiology of IIP - ITT Population

| Visit | Treatment | N | LS Mean | Contrast | Estimated Difference | 95% CI | p-value |
|---|---|---|---|---|---|---|---|
| | | | | PH-ILD Etiology: IIP | | | |
| | | | | FVC (mL) | | | |
| Week 8 | Inhaled treprostinil | 58 | 9.27 | Inhaled treprostinil – Placebo | 46.48 | −32.55, 125.51 | 0.2467 |
| | Placebo | 71 | −37.21 | | | | |
| Week 16 | Inhaled treprostinil | 52 | 22.16 | Inhaled treprostinil – Placebo | 108.18 | 15.25, 201.10 | 0.0229 |
| | Placebo | 63 | −86.02 | | | | |
| | | | | FVC (% predicted) | | | |
| Week 8 | Inhaled treprostinil | 58 | 0.92 | Inhaled treprostinil – Placebo | 1.95 | 0.12, 3.79 | 0.0373 |
| | Placebo | 71 | −1.03 | | | | |
| Week 16 | Inhaled treprostinil | 52 | 1.66 | Inhaled treprostinil – Placebo | 2.88 | 0.72, 5.05 | 0.0096 |
| | Placebo | 63 | −1.23 | | | | |

Abbreviations:
CI, confidence interval;
CPFE, combined pulmonary fibrosis and emphysema;
CTD, connective tissue disease;
FVC, forced vital capacity;
ILD, interstitial lung disease;
IIP, idiopathic interstitial pneumonia;
ITT, Intent-to-Treat;
LS, least square;
MMRM, mixed model repeated measurement
LSMean, p-values, estimated difference, and associated 95% CI were from the MMRM with the change from baseline in FVC/% predicted FVC as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; baseline FVC/% predicted FVC as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

UTC_PH-ILD_005344

US 11,826,327 B2

25      26

Table 3: Analysis of FVC Data Using Mixed Model Repeated Measurement for Subjects with IPF - ITT for IIP Subjects

| | | | IPF FVC (mL) | | | | |
|---|---|---|---|---|---|---|---|
| Week 8 | Inhaled treprostinil | 31 | 41.69 | Inhaled treprostinil - Placebo | 84.522 | −20.409, 189.454 | 0.1128 |
| | Placebo | 47 | −42.83 | | | | |
| Week 16 | Inhaled treprostinil | 28 | 38.24 | Inhaled treprostinil - Placebo | 168.52 | 40.078, 296.970 | 0.0108 |
| | Placebo | 42 | −130.3 | | | | |
| | | | FVC (% predicted) | | | | |
| Week 8 | Inhaled treprostinil | 31 | 1.60 | Inhaled treprostinil - Placebo | 2.543 | 0.145, 4.941 | 0.0380 |
| | Placebo | 47 | −0.94 | | | | |
| Week 16 | Inhaled treprostinil | 28 | 1.62 | Inhaled treprostinil - Placebo | 3.504 | 0.712, 6.295 | 0.0147 |
| | Placebo | 42 | −1.88 | | | | |

Abbreviations:
CI, confidence interval;
FVC, forced vital capacity;
IPF, idiopathic pulmonary fibrosis;
ITT, Intent-to-Treat;
LS, least square; MMRM, mixed model repeated measurement

LSMean, p-values, estimated difference, and associated 95% CI were from the MMRM with the change from baseline in FVC/% predicted FVC as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; baseline FVC/% predicted FVC as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

Treatment with inhaled treprostinil resulted in improvements of 28.47 mL and 44.40 mL in FVC at Weeks 8 and 16, respectively; significant when presented as % predicted FVC at Week 8 (1.79%; p=0.0139) and Week 16 (1.80%; p=0.0277).

When FVC was analyzed by PH-ILD etiology of IIP, treatment with inhaled treprostinil resulted in improvements of 46.48 mL and 108.18 mL (p=0.0229) when compared to placebo at Weeks 8 and 16, respectively. The between group differences for % predicted FVC were statistically significant at Week 8 (1.95%; p=0.0373) and Week 16 (2.88%; p=0.0096).

Further analysis of FVC for subjects with an IPF etiology (using only the IIP subjects in the ITT Population), showed that treatment with inhaled treprostinil resulted in improvements of 84.52 mL and 168.52 mL (p=0.0108) compared to placebo at Weeks 8 and 16, respectively. The between group differences for % predicted FVC were statistically significant at Week 8 (2.54%; p=0.0380) and Week 16 (3.50%; p=0.0147).

Example 2

The following prophetic example will assess efficacy of treprostinil as indicated for the treatment of chronic fibrosing interstitial lung diseases (CF-ILDs) including Idiopathic Interstitial Pneumonias (IIPs) including IPF, chronic hypersensitivity pneumonitis (CHP), and environmental/occupational fibrosing lung disease.

Patients may be treated with inhaled treprostinil up to 15 breaths QID based upon tolerability. Change from baseline to Week 24 of treatment in FVC (absolute or percent predicted) as primary efficacy endpoint will be assessed. Parameters that may be assessed include time to exacerbation of underlying lung disease, 6 meter walk distance test (6MWD), all-cause mortality/survival, time to death, additional analyses of FVC (e.g. absolute and relative change), changes from baseline in SpO₂, diffusing capacity of the lungs for carbon monoxide (DLCO), NT-proBNP, and King's Brief Interstitial Lung Disease Questionnaire.

REFERENCES

1. Collard et al., American Journal of Respiratory and Critical Care Medicine, Volume 194 Number 3, pg. 265.

2. Meyer et al., (Apr. 3, 2017). Therapeutics and Clinical Risk Management. 13: 427-437.

Example 3: Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease

No therapies are currently approved for the treatment of pulmonary hypertension in patients with interstitial lung disease. The safety and efficacy of inhaled treprostinil for patients with this condition are unclear.

Methods

We enrolled patients with interstitial lung disease and pulmonary hypertension (documented by right heart catheterization) in a multicenter, randomized, double-blind, placebo-controlled, 16-week trial. Patients were assigned in a 1:1 ratio to receive inhaled treprostinil, administered by means of an ultrasonic, pulsed-delivery nebulizer in up to 12 breaths (total, 72 µg) four times daily, or placebo. The primary efficacy end point was the difference between the two treatment groups in the change in peak 6-minute walk distance from baseline to week 16. Secondary end points included the change in N-terminal pro-B-type natriuretic peptide (NT-proBNP) level at week 16 and the time to clinical worsening.

Results

A total of 326 patients underwent randomization, with 163 assigned to inhaled treprostinil and 163 to placebo. Baseline characteristics were similar in the two groups. At week 16, the least-squares mean difference between the treprostinil group and the placebo group in the change from baseline in the 6-minute walk distance was 31.12 m (95% confidence interval [CI], 16.85 to 45.39; P<0.001). There was a reduction of 15% in NT-proBNP levels from baseline with inhaled treprostinil as compared with an increase of 46% with placebo (treatment ratio, 0.58; 95% CI, 0.47 to 0.72; P<0.001). Clinical worsening occurred in 37 patients (22.7%) in the treprostinil group as compared with 54 patients (33.1%) in the placebo group (hazard ratio, 0.61;

UTC_PH-ILD_005345

US 11,826,327 B2

27                                                                                   28

95% CI, 0.40 to 0.92; P=0.04 by the log-rank test). The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea.

### Conclusions

In patients with pulmonary hypertension due to interstitial lung disease, inhaled treprostinil improved exercise capacity from baseline, assessed with the use of a 6-minute walk test, as compared with placebo.

Precapillary pulmonary hypertension is defined as an elevation in mean pulmonary arterial pressure and pulmonary vascular resistance.[1] In the World Health Organization (WHO) classification of pulmonary hypertension, precapillary pulmonary hypertension due to lung disease is classified as group 3. The most common lung diseases associated with group 3 pulmonary hypertension are chronic obstructive pulmonary disease and interstitial lung disease.

Pulmonary hypertension has been reported in up to 86% of patients with interstitial lung disease and is associated with reduced exercise capacity, greater need for supplemental oxygen, decreased quality of life, and earlier death.[2-4] Despite the global prevalence and poor clinical course of pulmonary hypertension due to interstitial lung disease, there are currently no approved therapies for these patients. Although data are limited, therapies approved for group 1 pulmonary hyper-tension (pulmonary arterial hypertension) have been used to treat group 3 pulmonary hypertension.[5] Previous studies of vasodilator therapies have shown conflicting results. The largest trial to date evaluated the soluble guanylate cyclase stimulator riociguat in a patient population with group 3 pulmonary hypertension and was stopped early owing to serious harm.[6] Treprostinil is a stable analogue of prostacyclin, which promotes direct vasodilation of pulmonary and systemic arterial vascular beds and inhibits platelet aggregation.[7] An inhaled formulation of treprostinil was previously shown to improve exercise capacity after 12 weeks of therapy in patients with group 1 pulmonary hypertension.[8] Data from previously completed pilot studies suggest that inhaled treprostinil can improve hemodynamics and functional capacity in patients with group 3 pulmonary hypertension.[9-12] Therefore, the objective of the INCREASE trial was to evaluate the safety and efficacy of inhaled treprostinil in patients with pulmonary hypertension due to interstitial lung disease.

### Trial Design and Oversight

INCREASE was a multicenter, randomized, double-blind, placebo-controlled trial. The trial was monitored by an independent data and safety monitoring committee and was conducted in accordance with Good Clinical Practice guidelines.

### Trial Population

The trial population consisted of patients 18 years of age or older in whom interstitial lung disease was diagnosed on the basis of evidence of diffuse parenchymal lung disease on computed tomography of the chest (not centrally adjudicated) performed within 6 months before randomization. Confirmation of group 3 pulmonary hypertension by right heart catheterization within 1 year before randomization was required. Group 3 pulmonary hypertension was defined by pulmonary vascular resistance of more than 3 Wood units, pulmonary capillary wedge pressure of 15 mm Hg or lower, and mean pulmonary arterial pressure of 25 mm Hg or higher. Patients with group 3 pulmonary hypertension due to connective tissue disease were also required to have a baseline forced vital capacity of less than 70%. Eligible patients also had to walk at least 100 m during a 6-minute walk test. Patients receiving drug treatment (i.e., pirfenidone or nintedanib) for their underlying lung disease were required to have been receiving a stable dose for at least 30 days before undergoing randomization. Patients receiving approved therapy for pulmonary arterial hypertension within 60 days before randomization were not eligible for enrollment. Written informed consent was obtained from all the patients.

TABLE 4

| Characteristics of the Patients at Baseline.* | | | |
|---|---|---|---|
| Characteristic | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
| Female sex - no. (%) | 85 (52.1) | 68 (41.7) | 153 (46.9) |
| Mean age at randomization (range) - yr | 65.6 (26-90) | 67.4 (36-85) | 66.5 (26-90) |
| Age distribution - no. (%) | | | |
| <65 yr | 64 (39.3) | 48 (29.4) | 112 (34.4) |
| 65 to <80 yr | 83 (50.9) | 100 (61.3) | 183 (56.1) |
| ≥80 yr | 16 (9.8) | 15 (9.2) | 31 (9.5) |
| Race or ethnic group - no. (%)† | | | |
| White | 112 (68.7) | 126 (77.3) | 238 (73.0) |
| Black or African American | 41 (25.2) | 30 (18.4) | 71 (21.8) |
| American Indian or Alaska Native | 2 (1.2) | 1 (0.6) | 3 (0.9) |
| Asian | 7 (4.3 | 5 (3.1) | 12 (3.7) |
| Multiple | 0 | 1 (0.6) | 1 (0.3) |
| Unknown | 1 (0.6) | 0 | 1 (0.03) |
| Hispanic or Latino ethnic group - no. (%)† | | | |
| Yes | 11 (6.7) | 16 (9.8) | 27 (8.3) |
| No | 152 (93.3) | 146 (89.6) | 298 (91.4) |
| Data missing | 0 | 1 (0.6) | 1 (0.3) |
| Mean time since diagnosis - yr | 0.54 ± 1.16 | 0.54 ± 1.31 | 0.54 ± 1.23 |

UTC_PH-ILD_005346

US 11,826,327 B2

29 30

TABLE 4-continued

Characteristics of the Patients at Baseline.*

| Characteristic | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
|---|---|---|---|
| Cause of lung disease - no. (%) | | | |
| Idiopathic interstitial pneumonia | 65 (39.9) | 81 (49.7) | 146 (44.8) |
| Chronic hypersensitivity pneumonitis | 10 (6.1) | 9 (5.5) | 19 (5.8) |
| Occupational lung disease | 5 (3.1) | 1 (0.6) | 6 (1.8) |
| Combined pulmonary fibrosis and emphysema | 42 (25.8) | 40 (24.5) | 82 (25.2) |
| Connective tissue disease | 40 (24.5) | 32 (19.6) | 72 (22.1) |
| Other | 1 (0.6) | 0 | 1 (0.3) |
| Idiopathic interstitial pneumonia subcategory - no. (%) | | | |
| Idiopathic pulmonary fibrosis | 37 (22.7) | 55 (33.7) | 92 (28.2) |
| Idiopathic nonspecific interstitial pneumonia | 21 (12.9) | 16 (9.8) | 37 (11.3) |
| Respiratory bronchiolitis associated with interstitial lung disease | 2 (1.2) | 0 | 2 (0.6) |
| Desquamative interstitial pneumonia | 0 | 1 (0.6) | 1 (0.3) |
| Acute interstitial pneumonia | 0 | 1 (0.6) | 1 (0.3) |
| Unclassified idiopathic interstitial pneumonia | 5 (3.1) | 8 (4.9) | 13 (4.0) |
| Use of supplemental oxygen - no. (%) | 119 (73.0) | 114 (69.9) | 233 (71.5) |
| Background therapy - no (%) | | | |
| None | 133 (81.6) | 119 (73.0) | 252 (77.3) |
| Pirfenidone only | 19 (11.7) | 25 (15.3) | 44 (13.5) |
| Nintedanib only | 11 (6.7) | 19 (11.7) | 30 (9.2) |

*Plus-minus values are means ± SD. Additional patient characteristics at baseline are provided in Table S2 in the Supplementary Appendix. Percentages may not total 100 because of rounding.
†Race and ethnic group were reported by the patient.

Trial Procedures

Within 30 days after screening, eligible patients were randomly assigned in a 1:1 ratio to receive inhaled treprostinil (Tyvaso, United Therapeutics) or placebo in a double-blind manner. Randomization, based on permuted blocks, was stratified by baseline 6-minute walk distance (≤350 m vs. >350 m) and was implemented through an interactive Web-response system.

Inhaled treprostinil (0.6 mg per milliliter) was administered by means of an ultrasonic, pulsed-delivery nebulizer at 6 μg per breath. Placebo was administered similarly as a visually identical solution. The first dose of trial drug (3 breaths) was administered in the clinic, followed by at least a 1-hour observation period. The dose of treprostinil or placebo was adjusted, with dose escalation (an additional 1 breath four times daily) occurring as often as every 3 days, with a target dose of 9 breaths four times daily and a maxi-mum dose of 12 breaths four times daily. Investigators adjusted the dose on an individual patient basis to achieve the maximum tolerated dose leading to functional improvement.

Trial Assessments

The 6-minute walk test was performed and laboratory data were obtained at baseline and at weeks 4, 8, 12, and 16, or at the time of early discontinuation of treprostinil or placebo. Each 6-minute walk test was performed 10 to 60 minutes after the most recent dose of active drug or placebo, which is the time of peak plasma treprostinil exposure. A trough test was performed at week 15 at least 4 hours after the participant received a dose of treprostinil or placebo and at least 24 hours before the week 16 test. Pulse oximetry was performed immediately before, during, and after each 6-minute walk test. Measurement of N-terminal pro-B-type natriuretic peptide (NT-proBNP) levels and pulmonary function tests were performed at baseline and at weeks 8 and 16 (or at early discontinuation) after the patients recovered from the 6-minute walk test. The St. George's Respiratory Questionnaire (SGRQ), a quality-of-life measure, was completed at baseline and week 16 or at the time of early discontinuation.

Outcome Measures

The primary end point of the trial was the difference between the two groups in the change in peak 6-minute walk distance from baseline to week 16. Secondary efficacy end points were analyzed in the following hierarchical testing order: the change in NT-proBNP level from baseline to week 16, the time to clinical worsening, the change in 6-minute walk distance and peak plasma treprostinil level at week 12, and the change in 6-minute walk distance at trough treprostinil level at week 15. The time to clinical worsening was evaluated from the time of randomization until the patient's withdrawal from the trial and was defined as the time until the occurrence of any one of the following events: hospitalization for a cardiopulmonary indication, a decrease in 6-minute walk distance greater than 15% from baseline that was directly related to the disease under study at two consecutive visits and at least 24 hours apart, death from any cause, or lung transplantation.

Exploratory end points were the changes in peak 6-minute walk distance at weeks 4 and 8, quality of life as measured with the use of the SGRQ at week 16, and the distance-saturation product (calculated by multiplying the total distance walked by the lowest oxygen saturation measurement during the 6-minute walk) at week 16. Safety end points included adverse events, abnormal laboratory results, oxy-

UTC_PH-ILD_005347

US 11,826,327 B2

31

genation as measured by pulse oximetry (Spo2) and supplemental oxygen requirement, changes in pulmonary function test results, hospitalization for a cardiopulmonary indication, and investigator-reported exacerbations of underlying lung disease, defined as acute, clinically significant respiratory deterioration characterized by evidence of new widespread alveolar abnormality.

### Statistical Analysis

Original estimates suggested that with 266 patients randomly assigned in a 1:1 ratio to receive inhaled treprostinil or placebo, the trial would have at least 90% power at a significance level of 0.05 (two-sided) to detect a between-group difference of 30 m in the change in peak 6-minute walk distance from baseline at week 16, assuming a standard deviation of 75 m. To account for approximately 15% of participants discontinuing the trial, 314 patients would need to be enrolled.

For the primary efficacy analysis, the change in 6-minute walk distance was analyzed by mixed-model repeated-measures methods, under the assumption that missing data were missing at random. The model included the change from baseline to peak 6-minute walk distance as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and the baseline 6-minute walk distance as a covariate. A sensitivity analysis for the primary end point was performed by means of a multiple imputation approach with a multivariate normal imputation model according to the Markov chain Monte Carlo method. The imputation model included treatment group, all scheduled visits, the patient's sex, and the patient's age at randomization. If the result for the primary efficacy end point was significant, secondary efficacy end points were to be evaluated according to a hierarchical testing procedure. Confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects for secondary efficacy end points.

### Results

### Patients

Of 462 patients screened for eligibility, 326 were enrolled at 93 centers and were randomly assigned to receive placebo

32

(163 patients) or inhaled treprostinil (163 patients) (FIG. 2). Baseline characteristics were similar in the two groups (Table 4). The mean age of the patients was 66.5 years, 46.9% were female, and the most common diagnosis was idiopathic interstitial pneumonia (in 44.8%). At baseline, the mean 6-minute walk distance was 259.6 m, the mean pulmonary vascular resistance was 6.2 Wood units, and the mean NT-proBNP level was 1832.9 pg per milliliter.

### Exposure and Follow-up

Patients in the treprostinil group took a median of 11 breaths from the inhaler (66 µg) at each of four daily sessions at week 12 and 12 breaths (72 µg) per session at week 16. The percentage of patients in this group who took 10 to 12 breaths (60 to 72 µg) per session was 57.0% at week 12 and 57.8% at week 16. In the placebo group took a median of 12 breaths from the inhaler per session at weeks 12 and 16.

Forty patients assigned to receive inhaled treprostinil (24.5%) and 38 assigned to placebo (23.3%) discontinued the assigned regimen pre-maturely. These patients were encouraged to remain in the trial and complete assessments through week 16; 33 patients in the treprostinil group and 35 in the placebo group discontinued participation in the trial. The reasons for discontinuation are shown in FIG. 2.

### Primary End Point

Mean within-group changes in the 6-minute walk distance are shown in FIG. 2. Mixed-model repeated-measures analysis showed that the least-squares mean difference between the treprostinil group and the placebo group in the change from baseline to peak 6-minute walk distance was 31.12 m (95% confidence interval [CI], 16.85 to 45.39; P<0.001) (Table 5 and FIG. 4). Similar effects were observed across subgroups, including subgroups defined by disease cause and severity (as measured by baseline 6-minute walk distance), baseline hemodynamics, and dose group (FIG. 5). In addition, the between-group difference in the change from baseline in peak 6-minute walk distance at week 16 was significant when analyzed with multiple imputation according to the Markov chain Monte Carlo method (30.97 m; 95% CI, 16.53 to 45.41; P<0.001) (FIG. 6).

TABLE 5

| Summary of Primary and Secondary End Points.* | | | | |
|---|---|---|---|---|
| End Point | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | Treatment Effect (95% CI) | P Value |
| Primary end point | | | | |
| Change in peak 6-minute walk distance from baseline to wk 16 - m¶ | 21.08 ± 5.12 | −10.04 ± 5.12 | 31.12 ± 7.25 (16.85 to 45.39)‡ | <0.001 |
| Secondary end points§ | | | | |
| Change in plasma concentration of NT-proBNP from baseline to wk 16¶ | | | | |
| Mean (±SD) change - pg/ml | −396.35 ± 1904.90 | 1453.95 ± 7296.20 | | |
| Median - pg/ml | −22.65 | 20.65 | | |
| Range - pg/ml | −11,433.0 to 5373.1 | −5483.3 to 87,148.3 | | |
| Ratio to baseline | 0.85 ± 0.06 | 1.46 ± 0.11 | ±0.58 ± 0.06 (0.47 to 0.72)‖ | <0.001 |

UTC_PH-ILD_005348

US 11,826,327 B2

33

34

TABLE 5-continued

Summary of Primary and Secondary End Points.*

| End Point | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | Treatment Effect (95% CI) | P Value |
|---|---|---|---|---|
| Occurrence of clinical worsening - no. (%) | | | 0.61 (0.4 to 0.92)** | 0.04 |
| Any event | 37 (22.7) | 54 (33.1) | | |
| Hospitalization for cardiopulmonary indication | 18 (11.0) | 24 (14.7) | | |
| Decrease in 6 minute walk distance of >15% from baseline | 13 (8.0) | 26 (16.0) | | |
| Death from any cause | 4 (2.5) | 4 (2.5) | | |
| Lung transplantation | 2 (1.2) | 0 | | |
| Least-squares mean change in peak 6- minute walk distance from baseline to wk 12 - m† | 18.77 ± 4.99 | −12.52 ± 5.01 | 31.29 ± 7.07 (17.37 to 45.21)‡ | <0.001 |
| Least-squares mean change in trough 6- minute walk distance from baseline to wk 15 - m | 9.3 ± 5.5 | −12.7 ± 5.5 | 21.99 ± 7.7± (6.85 to 37.14)† | 0.005††† |

*Plus-minus values are means ± SE, unless otherwise indicated. For secondary end points, the confidence intervals (CIs) have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects. NT-proBNP denotes N-terminal pro-B-type natriuretic peptide.
†The effect of inhaled treprostinil as compared with placebo on the change in 6-minute walk distance was evaluated with the use of a mixed-model repeat measurement with the change from baseline in peak 6-minute walk distance as the dependent variable; treatment, week, and treatment-by-week interaction as the fixed effects; baseline 6-minute walk distance as the covariate; and subject as the random effect. Results are shown in Figures S1 and S3.
‡This is a least-squares mean difference between the groups.
§The effect of inhaled treprostinil as compared with placebo on the change in log-transformed NT-proBNP was evaluated with the use of a mixed-model repeat measurement with the change from baseline in log-transformed NT-proBNP as the dependent variable; treatment, week, and treatment-by-week interaction as the fixed effects; and log-transformed baseline NT-proBNP as the covariate. Ratio to baseline is the least-squares mean of the change from baseline in log-transformed data.
¶The change in plasma concentration of NT-proBNP from baseline to week 16 was assessed in 156 patients in the treprostinil group and 160 in the placebo group.
‖This is the treatment ratio, which is the ratio of ratios between two treatment groups.
**This is a hazard ratio, calculated from a Cox proportional-hazards model. The P value was calculated with the use of a log-rank test stratified by the baseline 6-minute walk distance category.
†††The P value was obtained from 100 multiple imputations with Markov chain Monte Carlo estimation with the use of analysis of covariance (ANCOVA) modeling, with the change from baseline in peak 6-minute walk distance as the dependent variable, treatment as a fixed effect, and baseline 6-minute walk distance as a covariate.

35

### Secondary and Exploratory End Points

Patients assigned to inhaled treprostinil, as compared with those assigned to placebo, showed significant improvements in each of the secondary end points (Table 5). The NT-proBNP level decreased 15% from baseline with inhaled treprostinil and increased 46% from baseline with placebo, as assessed by the least-squares mean for the log-transformed ratio to the baseline level at week 16 (treatment ratio, 0.58; 95% CI, 0.47 to 0.72; P<0.001) (FIG. **7**). Clinical worsening occurred in 37 patients (22.7%) in the treprostinil group, as compared with 54 patients (33.1%) in the placebo group (hazard ratio, 0.61; 95% CI, 0.40 to 0.92; P=0.04 by

the log-rank test) (FIG. **1**). The least-squares mean change from baseline to week 12 in peak 6-minute walk distance was 31.29 m greater in the treprostinil group than in the placebo group (P<0.001), and the change from baseline to week 15 in trough 6-minute walk distance was 21.99 m greater in the treprostinil group (P=0.004). There was no significant between-group difference in patient-reported quality of life as assessed with the SGRQ or in the distance-saturation product at week 16.

### Safety End Points

TABLE 6

Summary of Adverse Events

| Variable | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | P Value* |
|---|---|---|---|
| Total no. of adverse events | 890 | 793 | |
| Patients with ≥1 adverse event - no. (%) | 152 (93.3) | 149 (91.4) | 0.68 |
| Total no. of serious adverse events† | 53 | 89 | |
| Patients with ≥1 serious adverse event - no. (%) | 38 (23.3) | 42 (25.8) | 0.70 |
| Total no. of adverse events leading to withdrawal of treprostinil or placebo | 47 | 38 | |
| Most frequently occurring adverse events - no. of patients (%)‡ | | | |
| Cough | 71 (43.6) | 54 (33.1) | 0.07 |
| Headache | 45 (27.6) | 32 (19.6) | 0.12 |
| Dyspnea | 41 (25.2) | 51 (31.3) | 0.27 |
| Dizziness | 30 (18.4) | 23 (14.1) | 0.37 |
| Nausea | 25 (15.3) | 26 (16.0) | >0.99 |

UTC_PH-ILD_005349

US 11,826,327 B2

35      36

### TABLE 6-continued

Summary of Adverse Events

| Variable | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | P Value* |
|---|---|---|---|
| Fatigue | 23 (14.1) | 23 (14.1) | >0.99 |
| Diarrhea | 22 (13.5) | 19 (11.7) | 0.74 |
| Throat irritation | 20 (12.3) | 6 (3.7) | 0.007 |
| Oropharyngeal pain | 18 (11.0) | 4 (2.5) | 0.003 |
| NT-proBNP increased | 9 (5.5) | 25 (15.3) | 0.006 |

*P values were calculated with the use of Fisher's exact test.
‡Shown are the most frequently occurring adverse events occurring in more than 10% of patients in either group in the safety population, which comprised all patients who underwent randomization and received at least one dose of treprostinil or placebo.

The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea (Table 6). Most of these events were of mild-to-moderate intensity.

Serious adverse events occurred in 23.3% of the patients who received inhaled treprostinil and in 25.8% of those who received placebo. No serious adverse events were reported significantly more frequently in the treprostinil group than in the placebo group.

Significantly fewer patients in the treprostinil group than in the placebo group had exacerbations of underlying lung disease (43 [26.4%] vs. 63 [38.7%]; P=0.02 by Fisher's exact test. Fewer patients in the treprostinil group than in the placebo group had a first occurrence of clinical worsening that involved hospitalization for a cardiopulmonary indication (18 [11.0%] vs. 24 [14.7%]; P=0.41). Inhaled treprostinil had no deleterious effect on any pulmonary function test variable during the trial. There were no significant treatment-related changes in pulse oximetry or supplemental oxygen use in either group over the trial period.

### Discussion

Pulmonary hypertension frequently complicates the treatment of patients with interstitial lung disease and is associated with worse functional status, greater need for supplemental oxygen, and worse outcomes.[3, 13] In the INCREASE trial, patients treated with inhaled treprostinil had significant improvements in exercise capacity, as evidenced by changes in the 6-minute walk distance. Treatment with inhaled treprostinil was also associated with a lower risk of clinical worsening than that in patients who received placebo, as well as reductions in NT-proBNP levels and fewer exacerbations of underlying lung disease, over the 16-week treatment period. The safety profile of inhaled treprostinil observed in this vulnerable patient population was similar to that reported in previous studies. The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea. The use of inhaled treprostinil was not associated with any decrement in lung function.

Patients with group 3 pulmonary hypertension are often treated with systemic pulmonary vasodilators, which are currently approved only for treatment of group 1 pulmonary hypertension. However, there is concern that such agents could worsen ventilation-perfusion matching in patients with group 3 pulmonary hypertension. Inhaled agents have the advantage of preferentially redirecting blood flow to the best-ventilated lung units, thus reducing the risk of ventilation-perfusion mismatching.[9, 14] Indeed, a retrospective study of inhaled treprostinil in patients with group 3 pulmonary hypertension showed that such patients had improvements in functional class and 6-minute walk distance without any adverse effect on peripheral oxygen saturation, rein-forcing the concept of unchanged or even improved ventilation-perfusion matching with inhaled treprostinil.[10] Similarly, in the current trial, we found no evidence of worsened oxygenation, which further allays concerns about ventilation-perfusion mismatching.

The INCREASE trial was not without its limitations. The trial was of short duration, and 21% of the patients discontinued the trial prematurely (before week 16). In addition, events of clinical worsening and exacerbation of underlying lung disease were investigator-reported and not adjudicated by an independent review committee. Finally, the size of the favorable treatment effect on the 6-minute walk distance with inhaled treprostinil is similar to estimates of the minimum clinically important difference for this test in patients with pulmonary disease (21.7 to 37 m in a study by Nathan et al., and 24 to 45 m in a study by du Bois et al.).[15, 16]

This study showed that among patients with pulmonary hypertension due to interstitial lung disease, treatment with inhaled treprostinil improved exercise capacity as shown by improvement in the 6-minute walk distance through the end of the 16-week treatment period. In addition, treatment with inhaled treprostinil was associated with a lower risk of clinical worsening than that with placebo, a reduction in NT-proBNP levels, and fewer exacerbations of underlying lung disease.

Supplemental Information

### TABLE 7

Additional Baseline Patient Characteristics.

| | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
|---|---|---|---|
| 6-minute walk distance, meters; mean (range) Median | 254.1 (100-538) 256.0 | 265.1 (30-505) 260.0 | 259.6 (30-538) 259.0 |
| Pulmonary vascular resistance, Woods units; mean (range) Median | 6.369 (3.11-8.05) 5.570 | 6.013 (3.06-17.62) 5.060 | 6.191 (3.06-18.05) 5.275 |
| NT-proBNP, pg/mL; mean (range) | 1857.53 (10.2-21942.0) | 1808.86 (23.0-16297.0) | 1832.88 (10.2-21942.0) |

UTC_PH-ILD_005350

US 11,826,327 B2

37                                                                                                      38

### TABLE 7-continued

Additional Baseline Patient Characteristics.

| | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
|---|---|---|---|
| Median* | 550.50 | 420.80 | 503.85 |
| Pulmonary arterial pressure, mmHg; mean (range | 37.2 (25-74) | 36.0 (25-61) | 36.6 (25-74) |
| Median | 35.0 | 35.0 | 35.0 |
| Pulmonary capillary wedge pressure, mmHg; mean (range) | 10.1 (2-20) | 9.6 (0-15) | 9.8 (0-20) |
| Median | 10.0 | 10.0 | 10.0 |
| Pulmonary function tests | | | |
| FEV1% Predicted; mean (range) | 63.9 (23, 120) | 65.0 (22, 145) | |
| Median | 63.0 | 63.0 | |
| FVC % Predicted; mean (range) | 62.5 (24, 130) | 63.8 (20, 134) | |
| Median | 60.0 | 61.0 | |
| TLC % Predicted; mean (range) | 62.9 (25, 126) | 64.2 (30, 109) | |
| Median | 62.0 | 62.5 | |
| DLCO % Predicted; mean (range) | 30.0 (5, 86) | 28.1 (1, 86) | |
| Median | 29.0 | 26.0 | |

DLCO, lung diffusion capacity;
FEV1, forced expiratory volume in 1 second;
FVC, forced vital capacity;
NT-proBNP, N-terminal pro-brain natriuretic peptide;
TLC, total lung capacity
*N = 156 inhaled treprostinil; N = 160 placebo

### TABLE 8

St. George's Respiratory Questionnaire Results.

| | Inhaled Treprostinil N = 163 | | Placebo N = 163 | |
|---|---|---|---|---|
| Visit Statistic | Value | Change from Baseline | Value | Change from Baseline |
| Baseline | | | | |
| n | 143 | | 134 | |
| Mean (SD) | 57.17 (15.77) | | 57.67 (15.78) | |
| Median | 59.80 | | 56.30 | |
| Interquartile | 45.60, 67.90 | | 46.50 70.70 | |
| Min, Max | 14.7, 94.9 | | 18.4 88.6 | |
| Week 16 | | | | |
| n | 143 | 143 | 134 | 134 |
| Mean (SD) | 55.91 (17.07) | −1.25 (10.99) | 57.49 (15.33) | −0.18 (10.72) |
| Median | 56.30 | −0.70 | 55.50 | 0.10 |
| Interquartile | 40.50, 67.00 | −7.10, 5.20 | 46.80 69.70 | −6.50, 6.10 |
| Min, Max | 3.5, 92.0 | −40.4, 29.0 | 16.9 96.5 | −31.9, 33.3 |
| LS Mean (SE) | | −1.30 (0.87) | | −0.13 (0.90) |
| LS Mean Difference (SE) and (95% CI) | | −1.18, (1.25) (−3.63, 1.28) | | |

ANCOVA, analysis of covariance;
CI, confidence interval;
LS Mean, least squares mean;
SD, standard deviation;
SE, standard error

UTC_PH-ILD_005351

US 11,826,327 B2

39

The St. George's Respiratory Questionnaire has a range of results from 0 to 100, with higher scores indicating greater impairment and with a minimum clinically important difference of 4 points.

The changes from baseline in Total Score and each of the 3 domain scores were analyzed by parametric ANCOVA with no imputation for missing data.

The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

TABLE S4

| Distance Saturation Product Results by Study Visit (m %). | | |
|---|---|---|
| Visit/Variable Statistic | Inhaled Treprostinil N = 163 | Placebo N = 163 |
| Baseline | | |
| n | 118 | 109 |
| Mean (SD) | 208.140 (81.130) | 218.247 (77.405) |
| Median | 201.320 | 215.760 |
| Interquartile | 150.060, 256.750 | 170.800, 268.800 |
| Min, Max | 77.04, 421.07 | 63.00, 417.35 |
| Week 16 Change from Baseline | | |
| n | 118 | 109 |
| Mean (SD) | 7.607 (45.680) | −4.803 (53.026) |
| Median | 8.385 | −1.950 |
| Interquartile | −12.960, 34.890 | −38.180, 32.000 |
| Min, Max | −217.26, 117.42 | −184.85, 129.28 |
| LS Mean (SE) | 7.2 (4.5) | −4.3 (4.7) |
| LS Mean Difference (SE) and 95% CI | 11.51 (6.5), 95% CI (−1.33, 24.35) | |

ANCOVA, analysis of covariance;
CI, confidence interval;
LS Mean, least squares mean;
SD, standard deviation;
SE, standard error;
$SpO_2$, saturation of peripheral capillary oxygenation

Change in distance saturation product is the product of distance walked and lowest $SpO_2$ recorded during the 6-minute walk test.[7] Change from baseline to Week 16 in distance saturation product was analyzed by parametric ANCOVA with no imputation for missing distance saturation product values.

The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

TABLE 9

| Serious Adverse Events by Preferred Term | | |
|---|---|---|
| Serious Adverse Events | Inhaled treprostinil N = 163 n | Placebo N = 163 n |
| Any Serious Event | 53 events in 38 patients (23.3%) | 89 events in 42 patients (25.8%) |
| Acute respiratory failure | 4 | 5 |
| Death with unknown cause | 3 | 1 |
| Dyspnoea | 3 | 7 |
| Interstitial lung disease | 3 | 2 |
| Bronchitis | 2 | 1 |
| Chronic obstructive pulmonary disease | 2 | 2 |
| Chronic respiratory failure | 2 | 0 |
| Respiratory failure | 2 | 5 |
| Upper respiratory tract infection | 2 | 1 |
| Acute myocardial infarction | 1 | 2 |
| Acute right ventricular failure | 1 | 0 |

40

TABLE 9-continued

| Serious Adverse Events by Preferred Term | | |
|---|---|---|
| Serious Adverse Events | Inhaled treprostinil N = 163 n | Placebo N = 163 n |
| Arrhythmia | 1 | 0 |
| B-cell lymphoma | 1 | 0 |
| Bronchopulmonary aspergillosis | 1 | 0 |
| Cardiac arrest | 1 | 2 |
| Cardiac failure congestive | 1 | 2 |
| Cardiopulmonary failure | 1 | 0 |
| Cellulitis | 1 | 0 |
| Cerebral haemorrhage | 1 | 0 |
| Chest pain | 1 | 1 |
| Combined pulmonary fibrosis and emphysema | 1 | 0 |
| Cor pulmonale | 1 | 0 |
| Haemoptysis | 1 | 0 |
| Hyperglycaemia | 1 | 0 |
| Hypervolaemia | 1 | 0 |
| Hypoxia | 1 | 0 |
| Idiopathic pulmonary fibrosis | 1 | 4 |
| Influenza | 1 | 1 |
| Left ventricular failure | 1 | 0 |
| Pain in extremity | 1 | 0 |
| Pneumonia | 1 | 9 |
| Pneumothorax | 1 | 0 |
| Pulmonary hypertension | 1 | 1 |
| Pulmonary oedema | 1 | 0 |
| Rhinovirus infection | 1 | 0 |
| Right ventricular failure | 1 | 2 |
| Syncope | 1 | 1 |
| Tachycardia | 1 | 0 |
| Abdominal pain | 0 | 2 |
| Acute kidney injury | 0 | 1 |
| Aspiration | 0 | 1 |
| Atrial fibrillation | 0 | 1 |
| Bradycardia | 0 | 1 |
| Cardiac failure | 0 | 2 |
| Cardiac failure acute | 0 | 1 |
| Cardiogenic shock | 0 | 1 |
| Chronic right ventricular failure | 0 | 1 |
| Coagulopathy | 0 | 1 |
| Cor pulmonale acute | 0 | 1 |
| Coronary artery disease | 0 | 1 |
| Disease progression | 0 | 2 |
| Epistaxis | 0 | 1 |
| Fluid overload | 0 | 4 |
| Haematochezia | 0 | 1 |
| Hypertension | 0 | 1 |
| Lumbar vertebral fracture | 0 | 1 |
| Metabolic encephalopathy | 0 | 1 |
| Pain | 0 | 1 |
| Pneumonia influenzal | 0 | 1 |
| Post procedural infection | 0 | 1 |
| Presyncope | 0 | 2 |
| Pulmonary congestion | 0 | 1 |
| Respiratory distress | 0 | 1 |
| Scleroderma | 0 | 1 |
| Sepsis | 0 | 2 |
| Transplant dysfunction | 0 | 1 |
| Urosepsis | 0 | 1 |

UTC_PH-ILD_005352

US 11,826,327 B2

**41**

TABLE 10

Analysis of Lung Function Test Parameters Using Mixed Model Repeated Measurement.

| Variable Visit Treatment | N | LS Mean | Contrast: Inhaled treprostinil – Placebo Estimated Difference (95% CI) | P-value |
|---|---|---|---|---|
| FVC (mL) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | 5.49 | 28.47 | 0.35 |
| Placebo | 141 | −22.98 | (−30.81, 87.74) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | 9.77 | 44.40 | 0.21 |
| Placebo | 126 | −34.63 | (−25.25, 114.05) | |
| FVC (% predicted) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | 0.77 | 1.79 | 0.01 |
| Placebo | 141 | −1.02 | (0.37, 3.21) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | 1.07 | 1.80 | 0.03 |
| Placebo | 126 | −0.72 | (0.20, 3.39) | |
| FEV1 (mL) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | −21.34 | −8.95 | 0.72 |
| Placebo | 141 | −12.39 | (−57.16, 39.26) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | −32.18 | −2.56 | 0.93 |
| Placebo | 126 | −29.62 | (−57.67, 52.55) | |
| FEV1 (% predicted) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | −0.18 | 0.57 | 0.43 |
| Placebo | 141 | −0.75 | (−0.83, 1.96) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | −0.24 | 0.38 | 0.65 |
| Placebo | 126 | −0.62 | (−1.25, 2.01) | |
| TLC (mL) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 135 | −38.75 | −16.23 | 0.80 |
| Placebo | 136 | −22.51 | (−141.9, 109.41) | |
| Week 16 | | | | |
| Inhaled treprostinil | 127 | 45.43 | 17.37 | 0.85 |
| Placebo | 116 | 28.06 | (−158.9, 193.61) | |
| TLC (% predicted) | | | | |

**42**

TABLE 10-continued

Analysis of Lung Function Test Parameters Using Mixed Model Repeated Measurement.

| Variable Visit Treatment | N | LS Mean | Contrast: Inhaled treprostinil – Placebo Estimated Difference (95% CI) | P-value |
|---|---|---|---|---|
| Week 8 | | | | |
| Inhaled treprostinil | 135 | −0.05 | 0.28 | 0.76 |
| Placebo | 136 | −0.32 | (−1.49, 2.05) | |
| Week 16 | | | | |
| Inhaled treprostinil | 127 | 2.52 | 1.49 | 0.34 |
| Placebo | 116 | 1.03 | (−1.57, 4.54) | |
| DLCO (mL/min/mmHg) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 136 | −0.27 | 0.19 | 0.56 |
| Placebo | 136 | −0.47 | (−0.45, 0.84) | |
| Week 16 | | | | |
| Inhaled treprostinil | 128 | −0.61 | 0.02 | 0.96 |
| Placebo | 112 | −0.63 | (−0.73, 0.76) | |
| DLCO (% predicted) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 136 | −0.13 | 1.07 | 0.13 |
| Placebo | 136 | −1.20 | (−0.32, 2.47) | |
| Week 16 | | | | |
| Inhaled treprostinil | 128 | −1.14 | 0.60 | 0.44 |
| Placebo | 112 | −1.74 | (−0.93, 2.14) | |

CI, confidence interval;
DLCO, diffusing capacity of the lungs for carbon monoxide;
FEV1, forced expiratory volume in 1 second;
FVC, forced vital capacity;
TLC, total lung capacity;;
LS Mean, least squares mean;
SE, standard error;
TLC, total lung capacity

LS Mean (SE), P-values, estimated difference (SE), and associated 95% CIs are from the mixed model repeated measurement with the change from Baseline in pulmonary function test parameter as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; Baseline measurement as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

The confidence intervals and p-values have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

TABLE 11

SpO₂ (%) Measured by Pulse Oximetry Results at Baseline and Week 16.

| Visit Statistic | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | |
|---|---|---|---|---|---|
| | Value | Change from Pre- walk | Value | Change from Pre- Walk | P-value* |
| Baseline Pre-walk SpO₂ (%) | | | | | |
| n | 163 | | 162 | | |
| Mean (SD) | 95.3 (3.95) | | 94.5 (4.81) | | |
| Median | 96.0 | | 96.0 | | |
| Min, Max | 72, 100 | | 68, 100 | | |

UTC_PH-ILD_005353

US 11,826,327 B2

43                                                                                    44

TABLE 11-continued

SpO₂ (%) Measured by Pulse Oximetry Results at Baseline and Week 16.

| Visit Statistic | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | P-value* |
|---|---|---|---|---|---|
| | Value | Change from Pre- walk | Value | Change from Pre- Walk | |
| Baseline During Walk SpO₂ (%) | | | | | |
| n | 154 | 154 | 153 | 153 | 0.13 |
| Mean (SD) | 80.3 (8.22) | −15.0 (7.87) | 78.5 (8.20) | −16.1 (7.76) | |
| Median | 81.0 | −14.0 | 78.0 | −15.0 | |
| Min, Max | 53, 99 | −41, 2 | 53, 98 | −39, 4 | |
| Baseline Post-walk SpO₂ (%) | | | | | |
| n | 163 | 163 | 162 | 162 | 0.17 |
| Mean (SD) | 85.3 (7.31) | −9.9 (6.50) | 83.7 (8.74) | −10.9 (8.06) | |
| Median | 86.0 | −10.0 | 83.5 | −11.0 | |
| Min, Max | 59, 100 | −26, 5 | 57, 99 | −39, 7 | |
| Week 16 Pre-walk SpO₂ (%) | | | | | |
| n | 130 | | 122 | | |
| Mean (SD) | 94.5 (4.35) | | 94.5 (4.22) | | |
| Median | 95.0 | | 95.0 | | |
| Min, Max | 74, 100 | | 78, 100 | | |
| Week 16 During Walk SpO₂ (%) | | | | | |
| n | 123 | 123 | 114 | 114 | 0.27 |
| Mean (SD) | 76.8 (7.70) | −17.6 (7.01) | 78.2 (9.28) | −16.6 (9.04) | |
| Median | 77.0 | −17.0 | 79.0 | −16.0 | |
| Min, Max | 46, 99 | −38, −1 | 28, 98 | −61, −1 | |
| Week 16 Post-walk SpO₂ (%) | | | | | |
| n | 128 | 128 | 122 | 122 | 0.07 |
| Mean (SD) | 82.1 (9.24) | −12.4 (8.05) | 83.7 (7.75) | −10.8 (7.09) | |
| Median | 83.0 | −13.0 | 84.0 | −11.5 | |
| Min, Max | 51, 100 | −29, 3 | 65, 100 | −31, 6 | |

SD, standard deviation;
SpO₂, saturation of peripheral capillary oxygenation
*P-values are calculated from analysis of covariance with change from pre-walk as dependent variable, treatment as fixed effect, and baseline SpO₂ as covariate.

TABLE 12

Supplemental Oxygen Use (L/min) at Baseline and Week 16.

| Visit Statistic | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | P-value* |
|---|---|---|---|---|---|
| | Value | Change from Baseline | Value | Change from Baseline | |
| Baseline Pre-walk (L/min) | | | | | |
| n | 163 | | 163 | | |
| Mean (SD) | 2.7 (2.2) | | 2.4 (2.0) | | |
| Median | 3.0 | | 2.0 | | |
| Min, Max | 0, 10 | | 0, 8 | | |
| Baseline During Walk (L/min) | | | | | |
| n | 163 | | 163 | | |
| Mean (SD) | 4.9 (4.0) | | 4.5 (3.8) | | |
| Median | 4.0 | | 4.0 | | |
| Min, Max | 0, 25 | | 0, 15 | | |
| Week 16 Pre-walk (L/min) | | | | | |
| n | 131 | 131 | 129 | 129 | 0.18 |
| Mean (SD) | 3.0 (2.5) | 0.4 (1.4) | 2.9 (2.4) | 0.6 (1.3) | |
| Median | 3.0 | 0.0 | 3.0 | 0.0 | |
| Min, Max | 0, 10 | −3, 6 | 0, 10 | −3, 5 | |

UTC_PH-ILD_005354

US 11,826,327 B2

45 46

### TABLE 12-continued

Supplemental Oxygen Use (L/min) at Baseline and Week 16.

| | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | |
|---|---|---|---|---|---|
| Visit Statistic | Value | Change from Baseline | Value | Change from Baseline | P-value* |
| Baseline During Walk (L/min) | | | | | |
| n | 129 | 129 | 123 | 123 | 0.39 |
| Mean (SD) | 4.9 (4.0) | 0.1 (0.8) | 4.6 (3.7) | 0.1 (0.3) | |
| Median | 4.0 | 0.0 | 4.0 | 0.0 | |
| Min, Max | 0, 25 | −2, 8 | 0, 15 | 0, 3 | |

SD, standard deviation
Subjects who did not use supplemental oxygen were coded as 0 in the summaries.
Subjects who received supplemental oxygen during the Baseline 6-minute walk test continued to receive the same flow rate at all subsequent 6-minute walk test assessments.
*P-values are calculated from analysis of covariance with change from baseline as dependent variable, treatment as fixed effect, and baseline oxygen use as covariate.

### REFERENCES

1. Simonneau G, et al Eur Respir J 2019; 53: 1801913.
2. Nathan S D. Int J Clin Pract Suppl 2008; 160:21-8.
3. Nathan S D, et al. Clin Chest Med 2013; 34:695-705.
4. King C S, et al. Chest 2020; 158:1651-64.
5. Trammell A W, et al. Pulm Circ 2015; 5:356-63.
6. Nathan S D, et al. Lancet Respir Med 2019; 7:780-90.
7. Whittle B J, et al. Biochem Pharmacol 2012; 84:68-75.
8. McLaughlin V V, et al. J Am Coll Cardiol 2010; 55:1915-22.
9. Faria-Urbina M, et al. Lung 2018; 196:139-46.
10. Agarwal M, et al. J Heart Lung Transplant 2015; 34: Suppl:S343. abstract.
11. Bajwa A A, et al. Pulm Circ 2017; 7:82-8.
12. Wang L, et al. Int J Chron Obstruct Pulmon Dis 2017; 12:3353-60.
13. Lettieri C J, et al. Respir Med 2006; 100:1734-41.
14. Dernaika T A, et al. Respiration 2010; 79:377-82.
15. Nathan S D, et al. Respir Med 2015; 109:914-22.
16. du Bois R M, et al. Am J Respir Crit Care Med 2011; 183:1231-7.

Example 4. Aerosolized and Powder Inhaled Treprostinil

Randomized, 6-treatment, 6-period, 6-sequence, cross-over study (6x6 Williams design) in 36 healthy volunteers was performed to compare nebulized inhaled treprostinil administered by Tyvaso® nebulizer and Treprostinil inhalation powder (TreT) administered via a dry powder inhaler (published US Patent Application 20190321290). 4 subjects discontinued the study early (COVID-19, n=2; withdrawal by subject, n=1; non-compliance with study requirements, n=1).

| Tyvaso Dose | TreT Dose |
|---|---|
| 18 µg (3 nebulizer breaths) | 16 µg cartridge |
| 54 µg (9 nebulizer breaths) | 48 µg cartridge |
| 72 µg (12 nebulizer breaths) | 64 µg cartridge |

### TABLE 14

Pharmacokinetic results for various doses for Tyvaso and TreT administered treprostinil. See also FIG. 9 and 10.

| Comparison | Parameter | Geometric LSM (TreT) [CV %] | Geometric LSM (Tyvaso) [CV %] | Geometric LSM Ratio (%) [TreT/Tyvaso] | 90% Confidence Interval |
|---|---|---|---|---|---|
| TreT 16 µg vs. Tyvaso 18 µg | AUC0-5 | 0.268 [24.1%] | 0.233 [44.1%] | 115 | (104.59, 127.42) |
| | Cmax | 0.377 [26.6%] | 0.291 [59.8%] | 130 | (115.55, 145.95) |
| TreT 48 µg vs. Tyvaso 54 µg | AUC0-5 | 0.766 [21.8%] | 0.757 [42.5%] | 101 | (91.63, 111.65) |
| | Cmax | 1.07 [28.9%] | 0.764 [53.4%] | 139 | (124.13, 156.73) |
| TreT 64 µg vs. Tyvaso 72 µg | AUC0-5 | 0.937 [23.8%] | 1.02 [41.9%] | 91.5 | (83.16, 100.78) |
| | Cmax | 1.27 [28.5%] | 1.02 [54.7%] | 124 | (110.56, 139.61) |

UTC_PH-ILD_005355

US 11,826,327 B2

47                                                                      48

TABLE 15

| Adverse events for various doses for Tyvaso and TreT administered treprostinil. | | | | | | |
|---|---|---|---|---|---|
| | TreT 16 µg N = 34 n (%) | Tyvaso 18 µg N = 34 n (%) | TreT 48 µg N = 34 n (%) | Tyvaso 54 µg N = 34 n (%) | TreT 64 µg N = 33 n (%) | Tyvaso 72 µg N = 35 n (%) |
| Adverse Events | 16 (47.1) | 13 (38.2) | 23 (67.6) | 21 (61.8) | 22 (66.7) | 25 (71.4) |
| Cough | 15 (44.1) | 11 (32.4) | 20 (58.8) | 18 (52.9) | 21 (63.6) | 24 (68.6) |
| Headache | 2 (5.9) | 3 (8.8) | 4 (11.8) | 7 (20.6) | 6 (18.2) | 6 (17.1) |
| Throat irritation | 1 (2.9) | 1 (2.9) | 3 (8.8) | 5 (14.7) | 3 (9.1) | 4 (11.4) |
| Dizziness | 1 (2.9) | 2 (5.9) | 1 (2.9) | 4 (11.8) | 2 (6.1) | 2 (5.7) |
| Nausea | 0 | 0 | 0 | 2 (5.9) | 2 (6.1) | 1 (2.9) |
| Chest discomfort | 1 (2.9) | 0 | 3 (8.8) | 2 (5.9) | 0 | 2 (5.7) |

## Conclusions

AUC0-5 was generally comparable for each TreT and Tyvaso dose level. Cmax values for TreT were slightly higher than Tyvaso Cmax values across dose comparisons. AE profile consistent with known prostacyclin effects and previous studies of Tyvaso. Between-subject variability for both AUC0-5 and Cmax was approximately two-fold less for TreT compared to Tyvaso. AUC0-5 and Cmax for TreT and Tyvaso increased in an approximately dose-proportional manner. Median Tmax: ~10 minutes for TreT and ~10 to 15 minutes with Tyvaso.

## Example 5. Aerosolized and Powder Inhaled Treprostinil. Safety Evaluation

### Primary Objective

To evaluate the safety and tolerability of Treprostinil Inhalation Powder (TreT) administered by a dry powder inhaler, such as the one shown in FIG. **11**, in subjects with pulmonary arterial hypertension (PAH) currently treated with Tyvaso® (treprostinil inhalation solution administered via a nebulizer).

### Secondary Objectives

To evaluate systemic exposure and pharmacokinetics (PK) of treprostinil in subjects with PAH when delivered as Tyvaso® and TreT. To evaluate 6-Minute Walk Distance (6MWD) at study entry and after 3 weeks of treatment with TreT. To evaluate subject satisfaction with and preference for TreT with the Preference Questionnaire for Inhaled Treprostinil Devices (PQ-ITD). To evaluate patient reported PAH symptoms and impact with the PAH-Symptoms and Impact Questionnaire (PAH-SYMPACT).

### Eligibility Criteria

Diagnosis of WHO Group I PAH.

Subject must have started Tyvaso≥3 months prior to Baseline and on a stable regimen (no change in dose within 30 days of Baseline Visit) of Tyvaso (6 to 12 breaths QID).

Background therapy for PAH (eg, endothelin receptor antagonist or phosphodiesterase-5-inhibitor or both), on stable dose for a minimum of 30 days prior to Screening. Exclude other prostacyclin analogue or agonist (selexipag, epoprostenol, iloprost, or beraprost).

Excluding subjects with WHO Functional Class IV at Screening.

Subject is not able to perform inhalation maneuvers that meet inspiratory training criteria.

Exclude conditions which limits ambulation or ability to complete 6MWT (Baseline 6MWD>150 m).

Excluded initiation of pulmonary rehabilitation within 12 weeks prior to the Baseline Visit.

FIG. **12** shows a design of the study. Table 16 presents information relating Tret and Tyvaso doses.

TABLE 16

| Tyvaso dose (QID) | TreT Dose (QID) | Device usage |
|---|---|---|
| 6 to 7 breaths | 32 µg | 32 µg cartridge |
| 8 to 10 breaths | 48 µg | 48 µg cartridge |
| 11 to 12 breaths | 64 µg | 32 µg + 32 µg cartridges |

TABLE 17

| Baseline demographics | |
|---|---|
| Age (years) | |
| Median | 57.0 (range: 23-82) |
| Sex, n (%) | |
| Female | 43 (84.3) |
| Male | 8 (15.7) |
| Current PAH Diagnosis, n (%) | |
| Idiopathic/familial | 29 (56.9) |
| Associated with unrepaired/repaired congenital shunts | 4 (7.8) |
| Associated with collagen vascular disease | 14 (27.5) |
| Associated with HIV | 1 (2.0) |
| Associated with appetite suppressant/ other drug or toxin use | 3 (5.9) |
| WHO Functional Class at Screening, n (%) | |
| I | 6 (11.8) |
| II | 31 (60.8) |
| III | 14 (27.5) |

UTC_PH-ILD_005356

US 11,826,327 B2

49

50

TABLE 12

Summary of Subject Accountability

| | TreT Dose in Treatment Phase | | | |
|---|---|---|---|---|
| | 32 mcg N = 2 n (%) | 48 mcg N = 27 n (%) | 64 mcg N = 22 n (%) | Overall N = 51 n (%) |
| Number of Subjects Enrolled | 2 | 27 | 22 | 51 |
| Received TreT | 2 (100.0) | 27 (100.0) | 22 (100.0) | 51 (100.0) |
| Enrolled in Optional Extension Phase | 2 (100.0) | 26 (96.3) | 21 (95.5) | 49 (96.1) |
| Subjects Who Discontinued Treatment Phase | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) |
| Adverse Event | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) |
| Subjects Who Discontinued OEP* | 0 | 3 (11.1) | 0 | 3 (5.9) |
| Adverse Event | 0 | 2 (7.4) | 0 | 2 (3.9) |
| Lost to Follow-up | 0 | 1 (3.7) | 0 | 1 (2.0) |

TABLE 13

Summary of background PAH medication

| | Overall N = 51; n (%) |
|---|---|
| ERA | 43 (84.3%) |
| Ambrisentan | 24 (47.1%) |
| Bosentan | 2 (3.9%) |
| Macitentan | 17 (33.3%) |
| PDE5-I | 41 (80.4%) |
| Sildenafil | 17 (33.3%) |
| Tadalafil | 24 (47.1%) |
| sGC | 7 (13.7%) |
| Riociguat | 7 (13.7%) |

Of the 51 subjects enrolled, assigned TreT doses for 3-week treatment period were 32 µg for 2 subjects; 48 µg for 27 subjects; 64 µg for 22 subjects. 49 subjects rolled into the Optional Extension Phase (OEP). FIG. **13** shows a number of subjects for various maintenance TreT doses in the OEP.

FIG. **14** shows a change in 6 minute walk distance (6MWD) with respect to a baseline 6MWD as a function of duration of TreT treatment. The change from Baseline in 6MWD for TreT overall demonstrated a significant improvement (11.5 m increase; p=0.0217) at Week 3. The improvements in 6MWD for TreT overall were sustained in the Optional Extension Phase.

Patient Reported Outcome Measures

The PQ-ITD is a patient-reported outcome questionnaire to evaluate subject satisfaction with and preference for inhaled treprostinil devices. The PQ-ITD was given at Baseline to evaluate the Tyvaso Inhalation System and at Week 3 to evaluate the TreT Inhaler.

The distribution of responses to each question on the PQ-ITD was significantly improved (p≤0.0003) between Baseline (Tyvaso nebulizer) and Week 3 (TreT inhaler).

Overall satisfaction with the TreT inhaler was significantly improved at Week 3 (95.7%, p<0.0001) compared to satisfaction with the Tyvaso nebulizer at Baseline, FIG. **14**.

PAH SYMPACT

The PAH-SYMPACT is a well validated patient-reported outcome questionnaire given to assess PAH symptoms and effects. The PAH-SYMPACT contains four domains (Cardiopulmonary Symptoms, Cardiovascular Symptoms, Physical Impacts, Cognitive/Emotional Impacts) and was given at Baseline, Week 3, and Week 11.

Analysis of patient-reported PAH SYMPACT data revealed a trend of improvement at both Week 3 and Week 11 for subjects receiving TreT.

Mean change from Baseline was lower for all domain scores of the PAH-SYMPACT at both weeks (range: −0.05 to −0.22), with significant improvements for physical impacts (range: −1.1 to 1.0; p=0.0438) and cognitive/emotional impacts (range: −1.3 to 0.5; p=0.0048) at Week 3.

TABLE 18

Overall Safety

| | TreT Dose in Treatment Phase | | | |
|---|---|---|---|---|
| Treatment Phase | 32 mcg N = 2 n (%) | 48 mcg N = 27 n (%) | 64 mcg N = 22 n (%) | Overall N = 51 n (%) |
| Total number of AEs | 0 | 37 | 22 | 59 |
| Total number of SAEs | 0 | 1 | 1 | 2 |
| AEs leading to withdrawal of study drug | 0 | 1 | 1 | 2 |
| Optional Extension Phase | 0 | | | |
| Total number of AEs | 2 | 51 | 29 | 82 |
| Total number of SAEs | 0 | 10 | 4 | 14 |
| AEs leading to withdrawal of study drug | 0 | 3 | 0 | 3 |

TABLE 19

Most frequent adverse events during the treatment phase

| | Treatment Phase Dose | | | | TRIUMPH | |
|---|---|---|---|---|---|---|
| Preferred Term | 32 mcg N = 2 n (%) | 48 mcg N = 27 n (%) | 64 mcg N = 22 n (%) | Overall N = 51 n (%) | Tyvaso n (%) | Placebo n (%) |
| Cough | 0 | 9 (33.3) | 4 (18.2) | 13 (25.5) | 62 (54) | 35 (29) |
| Headache | 0 | 4 (14.8) | 4 (18.2) | 8 (15.7) | 47 (41) | 27 (23) |

UTC_PH-ILD_005357

US 11,826,327 B2

51

52

**TABLE 19-continued**

Most frequent adverse events during the treatment phase

| | Treatment Phase Dose | | | Overall | TRIUMPH | |
|---|---|---|---|---|---|---|
| | 32 mcg | 48 mcg | 64 mcg | | | |
| Preferred Term | N = 2 n (%) | N = 27 n (%) | N = 22 n (%) | N = 51 n (%) | Tyvaso n (%) | Placebo n (%) |
| Dyspnoea | 0 | 2 (7.4) | 1 (4.5) | 3 (5.9) | 6 (5) | 6 (5) |
| Flushing | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) | 17 (15) | 1 (<1) |
| Nausea | 0 | 2 (7.4) | 0 | 2 (3.9) | 22 (19) | 13 (11) |
| Throat irritation | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) | 29 (25)* | 17 (14)* |

*TRIUMPH groups together Throat Irritation and Pharyngolaryngeal Pain.

**TABLE 20**

Most frequent adverse events during the treatment
phase during the optional extension phase

| | TreT Dose in Treatment Phase | | | Overall |
|---|---|---|---|---|
| | 32 mcg | 48 mcg | 64 mcg | |
| Preferred Term | N = 2 n (%) | N = 26 n (%) | N = 21 n (%) | N = 49 n (%) |
| Cough | 0 | 3 (11.5) | 2 (9.5) | 5 (10.2) |
| Dyspnoea | 1 (50.0) | 2 (7.7) | 2 (9.5) | 5 (10.2) |
| Headache | 0 | 2 (7.7) | 2 (9.5) | 4 (8.2) |
| Diarrhoea | 0 | 1 (3.8) | 2 (9.5) | 3 (6.1) |
| Pneumonia | 0 | 2 (7.7) | 1 (4.8) | 3 (6.1) |
| Arthralgia | 0 | 2 (7.7) | 1 (4.8) | 3 (6.1) |
| Dizziness | 0 | 2 (7.7) | 1 (4.8) | 3 (6.1) |

### Conclusions

Transition from Tyvaso to TreT was safe and well tolerated in this study. Most adverse effects (AEs) were mild to moderate in severity and occurred at severities and frequencies consistent with those seen in other inhaled treprostinil studies in patients with PAH.

Following 3 weeks of TreT administration, subjects switching from Tyvaso to TreT demonstrated:

Significant improvements in 6MWD (8.0 m increase; p=0.0217) at Week 3. As of 23 Dec. 2020 (data cut-off date), improvements in 6MWD for TreT overall were sustained in the OEP Significant satisfaction with and preference for the use of the TreT inhaler (PQ-ITD) Significant improvement in PAH impact scores, and a trend of improvement in PAH symptom scores (PAH SYMPACT).

### Additional Embodiments

1. A method of treating interstitial lung disease (ILD) or pulmonary fibrosis in a subject in need, comprising administering to the subject a therapeutically effective amount of treprostinil, a prodrug, salt, or ester thereof.

2. A method of reducing pulmonary function decline in a subject with interstitial lung disease (ILD) or pulmonary fibrosis, comprising administering to the subject treprostinil, a prodrug, salt, or ester thereof.

3. A method of increasing forced vital capacity (FVC) in a subject suffering from ILD or pulmonary fibrosis, comprising administering to the subject treprostinil, a prodrug, salt, or ester thereof.

4. The method of any one of embodiments 1-3, wherein the ILD comprises one or more of idiopathic pulmonary fibrosis (IPF), desquamative interstitial pneumonia (DIP),

acute interstitial pneumonia (AIP), nonspecific interstitial pneumonia (NSIP), respiratory bronchiolitis-associated interstitial lung disease (RB-ILD), cryptogenic organizing pneumonia (COP), lymphoid interstitial pneumonia (LIP), sarcoidosis, rheumatoid arthritis, systemic lupus erythematosus, systemic sclerosis, polymyositis, dermatomyositis, antisynthetase syndrome, silicosis, asbestosis, occupational lung disease, chronic hypersensitivity pneumonitis, idiopathic interstitial pneumonia (IIP), an autoimmune ILD, lymphangioleiomyomatosis (LAM), Langerhan's cell histiocytosis (LCH), drug associated ILD, vasculitis, granulomatosis, and berylliosis.

5. The method of embodiment 4, wherein the ILD comprises IPF.

6. The method of any one of embodiments 1-5, wherein the ILD comprises systemic sclerosis-associated interstitial lung disease (SSc-ILD).

7. The method of any one of embodiments 1-6, wherein the ILD was induced from antibiotics, chemotherapy, anti-arrhythmic agents, coronavirus disease 2019, atypical pneumonia, pneumocystis pneumonia, tuberculosis (TB), *Chlamydia trachomatis*, respiratory syncytial virus, or lymphangitic carcinomatosis.

8. The method of any one of embodiments 1-7, wherein the subject has one or more of surfactant-protein-B deficiency, surfactant-protein-C deficiency, ABCA3-deficiency, brain lung thyroid syndrome, congenital pulmonary alveolar proteinosis, alveolar capillary dysplasia, mutations in telomerase reverse transcriptase, mutations in telomerase RNA component, mutations in the regulator of telomere elongation helicase 1, and mutations in poly(A)-specific ribonuclease.

9. The method of any one of embodiments 1-8, wherein the subject has one or more symptoms of shortness of breath, fatigue, weight loss, dry cough, chest pain, and lung hemorrhage.

10. The method of embodiment 9, wherein after administration the symptom is improved by about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, about 80%, about 85%, about 90%, about 95%, or about 100%, as measured by a medically-recognized technique.

11. The method of embodiment 10, wherein the medically-recognized technique comprises one or more of Modified Medical Research Council (MMRC) Dyspnoea Scale, Modified Borg Dyspnoea Scale (0-10), Chalder Fatigue Scale, weight measurement scale, visual analogue scale (VAS) for cough, King's Brief Interstitial Lung Disease Questionnaire, Leicester Cough Questionnaire (LCQ), computed tomography (CT) scan, X-ray, multiple magnetic

UTC_PH-ILD_005358

US 11,826,327 B2

53

resonance imaging (MRI), pulmonary function testing (PFT), spirometry, lung volumes, maximal respiratory pressure, diffusing capacity, oxygen desaturation, and arterial blood gas evaluation.

12. The method of any one of embodiments 1-11, wherein treprostinil, a prodrug, salt, or ester thereof is administered in a pharmaceutical composition comprising treprostinil, a prodrug, salt, or ester thereof and a pharmaceutically acceptable carrier or excipient.

13. The method of claim any one of embodiments 1-12, wherein the administration comprises at least one of oral, inhalation, subcutaneous, nasal, intravenous, intramuscular, sublingual, buccal, rectal, vaginal, and transdermal administration.

14. The method of any one of embodiments 1-13, wherein the administration comprises inhalation.

15. The method of any one of embodiments 1-14, wherein a single inhalation administration event comprises from 1 to 20 breaths.

16. The method of any one of embodiments 1-15, comprising administration of at least one additional active agent to treat the IRD.

17. The method of embodiment 16, wherein the at least one additional active agent comprises a corticosteroid, mycophenolic acid, mycophenolate mofetil, azathioprine, cyclophosphamide, rituximab, pirfenidone, or nintedanib.

18. The method of embodiment 16 or 17, wherein the at least one additional active agent and treprostinil, a prodrug, salt, or ester thereof, are administered via a method selected from the group consisting of

(a) concomitantly;

(b) as an admixture;

(c) separately and simultaneously or concurrently; and

(d) separately and sequentially.

19. The method of any one of embodiments 1-18, wherein administration is once, twice, thrice, four times, five times, or six times per day.

20. The method of any one of embodiments 1-19, wherein administration is for a period selected from the group consisting of about 1 day, about 1 day to about 3 days, about 3 days to about 6 days, about 6 days to about 9 days, about 9 days to about 12 days, about 12 days to about 15 days, about 15 days to about 18 days, about 18 days to about 21 days, about 21 days to about 24 days, about 24 days to about 27 days, about 27 days to about 30 days, or about greater than 30 days.

21. The method of any one of embodiments 1-20, wherein the subject is a human.

22. The method of any one of embodiments 1-21, wherein the method results in an increased FVC compared to the FVC at the start of or prior to the start of administration.

23. The method of embodiment 22, wherein the administration results in an increased FVC at sixteen weeks after the start of administration compared to the FVC at the start of or prior to the start of administration.

24. The method of any one of embodiments 22-23, wherein the increase in FVC is at least 20%.

25. The method of embodiment 24, wherein the increase is FVC is at least 75%.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

54

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

1. A method of improving exercise capacity in a patient having pulmonary hypertension associated with interstitial lung disease, comprising administering by inhalation to the patient having pulmonary hypertension associated with interstitial lung disease an effective amount of at least 15 micrograms up to a maximum tolerated dose of treprostinil or a pharmaceutically acceptable salt thereof in a single administration event that comprises at least 6 micrograms per breath.

2. The method of claim 1, wherein said administering provides a statistically significant increase of a 6 minutes walk distance in the patient after 8 weeks, 12 weeks, or 16 weeks of the administering.

3. The method of claim 1, wherein said administering increases a 6 minutes walk distance of the patient by at least 10 m after 8 weeks, 12 weeks, or 16 weeks of the administering.

4. The method of claim 1, wherein said administering provides a statistically significant reduction of a plasma concentration of NT-proBNP in the patient after 8 weeks, 12 weeks, or 16 weeks of the administering.

5. The method of claim 1, wherein said administering reduces a plasma concentration of NT-proBNP in the patient by at least 200 pg/ml after 8 weeks, 12 weeks, or 16 weeks of the administering.

6. The method of claim 1, wherein said administering provides a statistically significant reduction of at least one exacerbations of the interstitial lung disease.

7. The method of claim 1, wherein said administering provides a statistically significant reduction of clinical worsening events due to the interstitial lung disease.

8. The method of claim 7, wherein the clinical worsening events comprise at least one of hospitalization for cardiopulmonary indication and a decrease in a 6-minute walk distance by more than 15% compared a baseline 6-minute walk distance prior to the administering.

9. The method of claim 1, wherein said administering provides a statistically significant improves of forced vital capacity (FVC) in the patient after 8 weeks, 12 weeks or 16 weeks of the administering.

10. The method of claim 9, wherein said administering improves the forced vital capacity (FVC) in the patient by at least 20 ml after 8 weeks, 12 weeks, or 16 weeks of the administering.

11. The method of claim 1, wherein said administering is performed by a pulsed inhalation device.

12. The method of claim 11, wherein the pulsed inhalation device contains an inhalation solution comprising treprostinil or a pharmaceutically acceptable salt thereof.

13. The method of claim 11, wherein the pulsed inhalation device is a nebulizer.

14. The method of claim 11, wherein the pulsed inhalation device is a dry powder inhaler comprising a dry powder comprising treprostinil or a pharmaceutically acceptable salt thereof.

15. The method of claim 1, wherein the effective amount of treprostinil or a pharmaceutically acceptable salt administered to the patient in a single inhalation administration event is from 15 μg to 100 μg.

16. The method of claim 15, wherein the single inhalation administration event does not exceed 15 breaths by the patient.

UTC_PH-ILD_005359

US 11,826,327 B2

55                                                                              56

**17**. The method of claim **1**, wherein said administering increases a 6 minutes walk distance of the patient by at least 10 m after 8 weeks of the administering.

**18**. The method of claim **1**, wherein said administering increases a 6 minutes walk distance of the patient by at least 15 m after 12 weeks of the administering.

**19**. The method of claim **1**, wherein said administering increases a 6 minutes walk distance of the patient by at least 15 m after 16 weeks of the administering.

\* \* \* \* \*

UTC_PH-ILD_005360

# EXHIBIT 7

US010716793B2

(12) **United States Patent**       (10) **Patent No.:**       **US 10,716,793 B2**
Olschewski et al.                    (45) **Date of Patent:**       *****Jul. 21, 2020**

(54) **TREPROSTINIL ADMINISTRATION BY INHALATION**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Horst Olschewski**, Graz (AT); **Robert Roscigno**, Chapel Hill, NC (US); **Lewis J. Rubin**, LaJolla, CA (US); **Thomas Schmehl**, Giessen (DE); **Werner Seeger**, Giessen (DE); **Carl Sterritt**, Weybridge (GB); **Robert Voswinckel**, Giessen (DE)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/778,662**

(22) Filed: **Jan. 31, 2020**

(65) **Prior Publication Data**

US 2020/0171044 A1       Jun. 4, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/536,954, filed on Aug. 9, 2019, which is a continuation of application No. 15/011,999, filed on Feb. 1, 2016, now Pat. No. 10,376,525, which is a division of application No. 13/469,854, filed on May 11, 2012, now Pat. No. 9,339,507, which is a division of application No. 12/591,200, filed on Nov. 12, 2009, now Pat. No. 9,358,240, which is a continuation of application No. 11/748,205, filed on May 14, 2007, now abandoned.

(60) Provisional application No. 60/800,016, filed on May 15, 2006.

(51) **Int. Cl.**
*A61K 31/557*       (2006.01)
*A61K 9/00*       (2006.01)
*A61K 31/192*       (2006.01)

(52) **U.S. Cl.**
CPC ............ *A61K 31/557* (2013.01); *A61K 9/008* (2013.01); *A61K 9/0078* (2013.01); *A61K 31/192* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,664,337 A | 5/1972 | Lindsey et al. | |
| 4,001,650 A | 1/1977 | Romain | |
| 4,007,238 A | 2/1977 | Glenn | |
| 4,281,113 A | 7/1981 | Axen et al. | |
| 4,306,075 A | 12/1981 | Aristoff | |
| 4,306,076 A | 12/1981 | Nelson | |
| 4,349,689 A | 9/1982 | Aristoff | |
| 4,473,296 A | 9/1984 | Shofner et al. | |
| 4,486,598 A | 12/1984 | Aristoff | |
| 4,495,944 A | 1/1985 | Brisson et al. | |
| 4,635,647 A | 1/1987 | Choksi | |
| 4,668,814 A | 5/1987 | Aristoff | |
| 4,677,975 A | 7/1987 | Edgar et al. | |
| 4,683,330 A | 7/1987 | Aristoff | |
| 4,692,464 A | 9/1987 | Skuballa et al. | |
| 4,708,963 A | 11/1987 | Skuballa et al. | |
| 4,976,259 A | 12/1990 | Higson et al. | |
| 4,984,158 A | 1/1991 | Hillsman | |
| 5,063,922 A | 11/1991 | Hakkinen | |
| 5,080,093 A | 1/1992 | Raabe et al. | |
| 5,153,222 A | 10/1992 | Tadepalli et al. | |
| 5,234,953 A | 8/1993 | Crow et al. | |
| 5,322,057 A | 6/1994 | Raabe et al. | |
| 5,361,989 A | 11/1994 | Merchat et al. | |
| 5,363,842 A | 11/1994 | Mishelevich et al. | |
| 5,497,763 A | 3/1996 | Lloyd et al. | |
| 5,551,416 A | 9/1996 | Stimpson et al. | |
| 5,727,542 A | 3/1998 | King | |
| 5,865,171 A | 2/1999 | Cinquin | |
| 5,881,715 A | 3/1999 | Shibasaki | |
| 5,908,158 A | 6/1999 | Cheiman | |
| 6,054,486 A | 4/2000 | Crow et al. | |
| 6,123,068 A | 9/2000 | Lloyd et al. | |
| 6,357,671 B1 | 3/2002 | Cewers | |
| 6,521,212 B1 | 2/2003 | Gilles et al. | |
| 6,626,843 B2 | 9/2003 | Hillsman | |
| 6,756,033 B2 | 6/2004 | Cloutier et al. | |
| 6,765,117 B2 | 7/2004 | Moriarty et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 1999959533 B2 | 2/2000 |
| DE | 19838711 C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.
Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

**8 Claims, 12 Drawing Sheets**

UTC_PH-ILD_009772

US 10,716,793 B2

Page 2

(56)                References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,172,557 | B1 | 2/2007 | Parker |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,261,102 | B2 | 8/2007 | Barney et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,544,713 | B2 | 6/2009 | Phares et al. |
| 7,726,303 | B2 | 7/2010 | Tyvoll et al. |
| 9,339,507 | B2 * | 5/2016 | Olschewski ............ A61P 9/12 |
| 9,358,240 | B2 * | 6/2016 | Olschewski ............ A61P 43/00 |
| 10,376,525 | B2 * | 8/2019 | Olschewski ............ A61P 11/00 |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19934582 A1 | 1/2001 |
| FR | 2783431 A1 | 3/2000 |
| JP | 2003-522003 A | 7/2003 |
| JP | 2004-512101 A | 4/2004 |
| JP | 2005-034341 A | 2/2005 |
| WO | WO 93/00951 A1 | 1/1993 |
| WO | WO 01/58514 A1 | 8/2001 |
| WO | WO 01/85241 A1 | 11/2001 |
| WO | WO 02/34318 A2 | 5/2002 |

OTHER PUBLICATIONS

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:Suppl.S):56S-61S.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor , G. and Starko, K. (2003) Lung Deposition of

Interferon Gamma-1b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Byron, Peter R., "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al., "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf (Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Final Office Action dated Oct. 10, 2014 in U.S. Appl. No. 12/591,200.
Final Office Action dated Oct. 17, 2012 in U.S. Appl. No. 12/591,200.
Final Office Action dated Nov. 4, 2013 in U.S. Appl. No. 12/303,877.
Final Office Action dated Dec. 22, 2011 in U.S. Appl. No. 12/591,200.
Final Office Action dated Jul. 2, 2013 in U.S. Appl. No. 13/120,015.
Final Office Action dated Jul. 20, 2015 in U.S. Appl. No. 13/120,015.
Final Office Action dated Aug. 1, 2012 in U.S. Appl. No. 12/303,877.
Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), 2005, 4:296-302, with English translation.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous Iloprost in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

UTC_PH-ILD_009773

US 10,716,793 B2

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Hoeper et al., "Long term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue," New England Journal of Medicine, 2000, 342, 1866-1870.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320,aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.

Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.

Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21(Suppl.33):3, Abstract No. 084.

National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.

Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instrutions, Sep. 2005.

Non-Final Office Action dated Jan. 29, 2015 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Oct. 11, 2011 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Oct. 31, 2012 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Dec. 30, 2014 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 15, 2013 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 9, 2014 in U.S. Appl. No. 12/591,200.

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources.

Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Notice of Allowance dated Jun. 11, 2015 in U.S. Appl. No. 12/303,877.

Olschewski et al. For the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

OPTINEB®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin $H_2$ Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensis Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

UTC_PH-ILD_009774

US 10,716,793 B2

Page 4

(56)         **References Cited**

OTHER PUBLICATIONS

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.

Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.

Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension," Journal of the American College of Cardiology, 2006, 48(8):1672-1681.

Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.

Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 2004, Abstract 1414, 110, 17 Supplement.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.

Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.

Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C2.

Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.

Wensel et al., "Effects of iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.

Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.

Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iloprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.

Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.

Zanen et al., "The optimal particle size for β-adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.

* cited by examiner

UTC_PH-ILD_009775



FIGURE 1

UTC_PH-ILD_009776



FIGURE 2

UTC_PH-ILD_009777



FIGURE 3

UTC_PH-ILD_009778



FIGURE 4

UTC_PH-ILD_009779





FIGURE 5

UTC_PH-ILD_009780

FIGURE 6



UTC_PH-ILD_009781



FIGURE 7

UTC_PH-ILD_009782

FIGURE 8



UTC_PH-ILD_009783

FIGURE 9



**UTC_PH-ILD_009784**

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 182 of 1048 PageID #: 4690

FIGURE 10



**UTC_PH-ILD_009785**

FIGURE 11



UTC_PH-ILD_009786



FIGURE 12

UTC_PH-ILD_009787

US 10,716,793 B2

1

# TREPROSTINIL ADMINISTRATION BY INHALATION

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 16/536,954, filed Aug. 9, 2019, which is a Continuation of U.S. application Ser. No. 15/011,999, filed Feb. 1, 2016, which is a Divisional of U.S. application Ser. No. 13/469,854, filed May 11, 2012, Divisional of U.S. application Ser. No. 12/591,200, filed Nov. 12, 2009, which is a Continuation of U.S. application Ser. No. 11/748,205, filed May 14, 2007, which claims priority to U.S. provisional application No. 60/800,016 filed May 15, 2006, which are incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present application relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits.

## BACKGROUND OF THE INVENTION

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. The above described condition is referred to as pulmonary hypertension (PH). Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S. Pulmonary hypertension can be a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to alveolar hypoxia due to lung diseases or high altitude, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. In addition, certain infectious diseases, such as HIV and liver diseases with portal hypertension may cause pulmonary hypertension. Autoimmune disorders, such as collagen vascular diseases, also often lead to pulmonary vascular narrowing and contribute to a significant number of pulmonary hypertension patients. The cases of pulmonary hypertension remain where the cause of the increased resistance is as yet inexplicable are defined as idiopathic (primary) pulmonary hypertension (iPAH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension and are in the majority of cases related to a genetic mutation in the bone morphogenetic protein receptor-2 gene. The cases of idiopathic

2

pulmonary arterial hypertension tend to comprise a recognizable entity of about 40% of patients cared for in large specialized pulmonary hypertension centers. Approximately 65% of the most commonly afflicted are female and young adults, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short without specific treatment, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, disease progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12-15 mm Hg. Pulmonary hypertension, on the other hand, can be defined as mean PAP above 25 mmHg, assessed by right heart catheter measurement. Pulmonary arterial pressure may reach systemic pressure levels or even exceed these in severe forms of pulmonary hypertension. When the PAP markedly increases due to pulmonary venous congestion, i.e. in left heart failure or valve dysfunction, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal. Pulmonary edema, however, is not a feature of even severe pulmonary hypertension due to pulmonary vascular changes in all other entities of this disease.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, collagen vascular diseases, pulmonary hypercirculation due to left-to-right shunt, HIV infection, portal hypertension or a combination of genetic mutation and unknown causes as in idiopathic pulmonary arterial hypertension.

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241-273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12-50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also ultimately result in a potentially fatal heart condition known as "cor pulmonale," or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device, such as a metered dose inhaler.

## SUMMARY OF THE INVENTION

One embodiment is a method of delivering to a subject in need thereof a therapeutically effective amount of trepros-

UTC_PH-ILD_009788

US 10,716,793 B2

3

tinil, or treprostinil derivative or a pharmaceutically acceptable salt thereof comprising administering to the subject a therapeutically effective amount of the treprostinil or treprostinil derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Another embodiment is a method for treating pulmonary hypertension comprising administering to a subject in need thereof treprostinil or its derivative, or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Yet another embodiment is a kit comprising a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or treprostinil derivative, or a pharmaceutically acceptable salt thereof.

And yet another embodiment is a kit for treating pulmonary hypertension in a subject, comprising (i) an effective amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; (ii) a metered dose inhaler; (iii) instructions for use in treating pulmonary hypertension.

Administration of treprostinil using a metered dose inhaler can provide patients, such as pulmonary hypertension patients, with a high degree of autonomy.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 pulmonary and systemic changes in hemodynamics following the inhalation of placebo (open circles), 30 µg treprostinil (triangles), 45 µg treprostinil (squares) or 60 µg TREprostinil (black circles) applied by a Metered Dose Inhaler (MDI-TRE). A single short inhalation of treprostinil induced sustained reduction of PAP and PVR that outlasted the observation period of 120 minutes at doses of 45 and 60 µg MDI-TRE. Systemic arterial pressure and resistance were not significantly affected. PAP=mean pulmonary artery pressure; PVR=pulmonary vascular resistance; SAP=mean systemic arterial pressure; SVR=systemic vascular resistance. Data are given as mean value±standard error of the mean (SEM).

FIG. 2 presents hemodynamic changes induced by the inhalation of placebo (open circles), 30 µg treprostinil (triangles), 45 µg treprostinil (squares) or 60 µg treprostinil (black circles) applied by a metered dose inhaler. Treprostinil induced sustained elevation of cardiac output. Heart rate was rather unchanged as a sign for low spillover of MDI-TRE to the systemic circulation. Gas exchange was not negatively affected. CO=cardiac output; HR=heart rate; SaO2=arterial oxygen saturation; SvO2=central venous oxygen saturation. Data are given as mean value±SEM.

FIG. 3 presents areas under the curve for changes in pulmonary vascular resistance (PVR) calculated for an observation period of 120 minutes after inhalation treprostinil using a metered dose inhaler. PVR was markedly lowered by treprostinil inhalation. The increased pulmonary vasodilation over time with the two highest doses mainly relies on the more sustained effect over time. Data are shown as mean value±95% confidence intervals.

FIG. 4 demonstrates Ventilation-perfusion matching measured with the multiple inert gas elimination technique. Five patients (30 µg TRE, n=2; 45 µg TRE, n=1; 60 µg TRE, n=2) with pre-existing gas exchange problems were investigated for changes in ventilation-perfusion ratios. All patients had significant shunt flow at baseline. Shunt-flow and low V/Q areas were not significantly changed by nitric oxide (NO) inhalation or treprostinil inhalation using a metered dose inhaler (MDI-TRE). MDI-TRE applied at high treprostinil concentrations did not negatively affect ventilation-perfusion matching and gas-exchange. Data are given as mean value±95% confidence intervals.

4

FIG. 5 presents response of pulmonary vascular resistance (PVR) to inhaled treprostinil vs. iloprost—period effects. a) First inhalation with treprostinil (n=22) vs. first inhalation with iloprost (n=22); b) second inhalation with treprostinil (n=22) vs. second inhalation with iloprost (n=22). The PVR decrease with treprostinil was delayed and prolonged, compared to iloprost. Due to carryover effects from the first period, in the second period, the effects of both drugs appeared shortened. Data are shown as percent of baseline values (mean value±95% confidence interval).

FIG. 6 presents response of PVR and systemic arterial pressure (SAP) to inhalation of treprostinil vs. iloprost—dose effects. a) Inhalation of 7.5 µg iloprost (in 6 min) vs. 7.5 µg treprostinil (6 min) (n=14, in a randomized order). b) Inhalation of 7.5 µg iloprost (6 min) vs. 15 µg treprostinil (6 min) (n=14, in randomized order). c) Inhalation of 7.5 µg iloprost (6 min) vs. 15 µg treprostinil (3 min) (n=16, in randomized order). Data are shown as percent of baseline values (mean±95% confidence interval). Iloprost, filled circles; Treprostinil, open triangles.

FIG. 7 presents hemodynamic response to inhalation of treprostinil vs. iloprost. Data from n=44 patients, who inhaled both drugs in randomized order, shown as percent of baseline values (mean value±95% confidence interval). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 8 presents pharmacodynamics after treprostinil inhalation vs. placebo. Placebo or treprostinil in doses of 30 µg, 60 µg or 90 µg were inhaled (means±95% confidence intervals). Maximal decrease of PVR was comparable for all doses. The duration of pulmonary vasodilation (PVR-decrease) appeared to be dose dependent. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output; SaO2, arterial oxygen saturation; SvO2, mixed venous oxygen saturation.

FIG. 9 presents Areas Between the placebo and the treprostinil Curves (ABC). ABCs were calculated for a 3-hour period after inhalation of TRE or placebo from the relative changes of hemodynamic parameters (means±95% confidence intervals). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; SVR, systemic vascular resistance.

FIG. 10 presents hemodynamic responses to the inhalation of 15 µg treprostinil. The inhalation time by increasing treprostinil concentration. A pulse of aerosol was generated every 6 seconds. TRE aerosol was inhaled in concentrations of 100 µg/ml (18 pulses; n=6), 200 µg/ml (9 pulses; n=6), 600 µg/ml (3 pulses; n=21), 1000 µg/ml (2 pulses; n=7) and 2000 µg/ml (1 pulse; n=8). Placebo data correspond to FIG. 8. Data are shown as means±95% confidence intervals. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 11 presents areas between the placebo curve and the responses to 15 µg treprostinil applied at increasing concentrations to minimize inhalation time. Mean±SEM of relative changes of hemodynamic parameters (observation time 120 min). PAP, pulmonary arterial pressure, SAP, systemic arterial pressure, PVR, pulmonary vascular resistance, CO, cardiac output, SaO2, systemic arterial oxygen saturation, SvO2, pulmonary arterial oxygen saturation.

FIG. 12 presents pharmacokinetics of treprostinil after a single inhalation. Treprostinil plasma levels after inhalation of 30 µg, 60 µg, 90 µg or 120 µg treprostinil (6 min

UTC_PH-ILD_009789

US 10,716,793 B2

5

inhalation period; experiments correspond to those shown in FIGS. **8** and **9**). Data with error bars represent mean values±SEM.

### DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, the term "a" or "an" used herein shall mean "one or more."

The present application incorporates herein by reference in its entirety Voswinckel R, et al. J. Am. Coll. Cardiol. 2006; 48:1672-1681.

The inventors discovered that a therapeutically effective dose of treprostinil can be administered in a few single inhalations using a compact inhalation device, such as a metered dose inhaler. Furthermore, the inventors discovered that such administering does not cause significant side effects, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Accordingly, one embodiment of the invention is a method of delivering to a subject in need thereof, such as a human being, a therapeutically effective amount of treprostinil comprising administering to the subject a formulation comprising a therapeutically effective amount of treprostinil, its derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler. Treprostinil can be administered via a metered dose inhaler to a subject affected with a condition or disease, which can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

Another embodiment of the invention is a method for treating pulmonary hypertension, comprising administering to a subject in need thereof, such as a human being, treprostinil or its derivative, or a pharmaceutically acceptable salt using a metered dose inhaler.

Treprostinil, or 9-deoxy-2',9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1'3'-interphenylene)-13,14-dihydro-prostaglandin F1, is a prostacyclin analogue, first described in U.S. Pat. No. 4,306,075. U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. US patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. US patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. provisional application No. 60/900, 320 filed Feb. 9, 2007, discloses treprostinil treatment of pulmonary hypertension.

The term "acid derivative" is used herein to describe C1-4 alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C1-4 alkyl groups.

The present invention also encompasses methods of using Treprostinil or its derivatives, or a pharmaceutically acceptable salts thereof. In one embodiment, a method uses Treprostinil sodium, currently marketed under the trade name of REMODULIN®. The FDA has approved Trepro-

6

stinil sodium for the treatment of pulmonary arterial hypertension by injection of dose concentrations of 1.0 mg/mL, 2.5 mg/mL, 5.0 mg/mL and 10.0 mg/mL. The chemical structure formula for Treprostinil sodium is:



Treprostinil sodium is sometimes designated by the chemical names: (a) [(1R,2R,3aS,9aS)-2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid; or (b) 9-deoxy-2',9-α-methano-3-oxa-4,5,6-trinor-3,7-(1',3'-interphenylene)-13,14-dihydro-prostaglandin $F_1$. Treprostinil sodium is also known as: UT-15; LRX-15; 15AU81; UNIPROST™; BW A15AU; and U-62,840. The molecular weight of Treprostinil sodium is 390.52, and its empirical formula is $C_{23}H_{34}O_5$.

In certain embodiments, treprostinil can be administered in combination with one or more additional active agents. In some embodiments, such one or more additional active agents can be also administered together with treprostinil using a metered dose inhaler. Yet in some embodiments, such one or more additional active agents can be administered separately from treprostinil. Particular additional active agents that can be administered in combination with treprostinil may depend on a particular disease or condition for treatment or prevention of which treprostinil is administered. In some cases, the additional active agent can be a cardiovascular agent such as a calcium channel blocker, a phosphodiesterase inhibitor, an endothelial antagonist, or an antiplatelet agent.

The present invention extends to methods of using physiologically acceptable salts of Treprostinil, as well as non-physiologically acceptable salts of Treprostinil that may be used in the preparation of the pharmacologically active compounds of the invention.

The term "pharmaceutically acceptable salt" refers to a salt of Treprostinil with an inorganic base, organic base, inorganic acid, organic acid, or basic or acidic amino acid. Salts of inorganic bases can be, for example, salts of alkali metals such as sodium or potassium; alkaline earth metals such as calcium and magnesium or aluminum; and ammonia. Salts of organic bases can be, for example, salts trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, and triethanolamine. Salts of inorganic acids can be, for example, salts of hydrochloric acid, hydroboric acid, nitric acid, sulfuric acid, and phosphoric acid. Salts of organic acids can be, for example, salts of formic acid, acetic acid, trifluoroacetic acid, fumaric acid, oxalic acid, lactic acid, tartaric acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, and p-toluenesulfonic acid. Salts of basic amino acids can be, for example, salts of arginine, lysine and ornithine. Salts of acidic amino acids can include, for example, salts of aspartic acid and glutamic acid. Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sul-

UTC_PH-ILD_009790

US 10,716,793 B2

**7**

phates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Preferred pharmaceutically acceptable salts are disclosed, for example, in US patent application publication No. 20050085540.

Treprostinil can be administered by inhalation, which in the present context refers to the delivery of the active ingredient or a combination of active ingredients through a respiratory passage, wherein the subject in need of the active ingredient(s) through the subject's airways, such as the subject's nose or mouth.

A metered dose inhaler in the present context means a device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs. One example of the inhalation device can be a pressurized metered dose inhaler, a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions.

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.

The metered dose inhaler can be a soft mist inhaler (SMI), in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles. The aerosol generation can be achieved in SMI, for example, by mechanical, electromechanical or thermomechanical process. Examples of soft mist inhalers include the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated). For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34. The aerosol for SMI can be generated from a solution of the respiratory drug further containing pharmaceutically acceptable excipients. In the present case, the respiratory drug is treprostinil, its derivative or a pharmaceutically acceptable salt thereof, which can be formulated in SMI is as a solution. The solution can be, for example, a solution of treprostinil in water, ethanol or a mixture thereof. Preferably, the diameter of the treprostinil-containing aerosol particles is less than about 10 microns, or less than about 5 microns, or less than about 4 microns.

Treprostinil concentration in an aerosolable formulation, such as a solution, used in a metered dose inhaler can range from about 500 µg/ml to about 2500 µg/ml, or from about 800 µg/ml to about 2200 µg/ml, or from about 1000 µg/ml to about 2000 µg/ml.

The dose of treprostinil that can be administered using a metered dose inhaler in a single event can be from about 15 µg to about 100 µg or from about 15 µg to about 90 µg or from about 30 µg to about 90 µg or from about 30 µg to about 60 µg.

Administering of treprostinil in a single event can be carried out in a limited number of breaths by a patient. For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less. Preferably, treprostinil is administered in 3, 2 or 1 breaths.

The total time of a single administering event can be less than 5 minutes, or less than 1 minute, or less than 30 seconds.

**8**

Treprostinil can be administered a single time per day or several times per day.

In some embodiments, the method of treatment of pulmonary hypertension can further comprise administering at least one supplementary agent selected from the group consisting of sildenafil, tadalafil, calcium channel blockers (diltiazem, amlodipine, nifedipine), bosentan, sitaxsentan, ambrisentan, and pharmaceutically acceptable salts thereof. In some embodiments, the supplementary agents can be included in the treprostinil formulation and, thus, can be administered simultaneously with treprostinil using a metered dose inhaler. In some embodiments, the supplementary agents can be administered separately from treprostinil. In some embodiments, the application of intravenous prostacyclin (flolan), intravenous iloprost or intravenous or subcutaneous treprostinil can be administered in addition to treprostinil administered via inhalation using a metered dose inhaler.

The present invention also provides a kit that includes a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with a disease or condition that can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

In some cases, the kit is a kit for treating pulmonary hypertension, that includes (i) a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

As used herein, the phrase "instructions for use" shall mean any FDA-mandated labeling, instructions, or package inserts that relate to the administration of Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof, for treatment of pulmonary hypertension by inhalation. For example, instructions for use may include, but are not limited to, indications for pulmonary hypertension, identification of specific symptoms associated with pulmonary hypertension, that can be ameliorated by Treprostinil, recommended dosage amounts for subjects suffering from pulmonary hypertension and instructions on coordination of individual's breathing and actuation of the metered dose inhaler.

The present invention can be illustrated in more detail by the following example, however, it should be understood that the present invention is not limited thereto.

Example 1

Open Label Study Upon Acute Safety, Tolerability and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds

A study was conducted of acute vasodilator challenge during right heart catheter investigation to determine the safety, tolerability and pulmonary vasodilatory potency of inhaled treprostinil applied in seconds by a soft mist inhaler (SMI-TRE). The study produced evidence for a long lasting

UTC_PH-ILD_009791

US 10,716,793 B2

9

favourable effect of SMI-TRE on pulmonary hemodynamics in absence of systemic side effects and gas exchange disruptions.

Summary:

Inhaled nitric oxide (20 ppm; n=45) and inhaled treprostinil sodium (TRE; n=41) or placebo (n=4) were applied once during right heart catheter investigation. TRE was delivered in 2 breaths (1000 μg/ml aerosol concentration; 30 μg dose; n=12), 3 breaths (1000 μg/ml; 45 μg; n=9) or 2 breaths (2000 μg/ml; 60 μg; n=20) from a Respimat® SMI. Pulmonary hemodynamics and blood gases were measured at defined time points, observation time following TRE application was 120 minutes. TRE doses of 30 μg, 45 μg and 60 μg reduced pulmonary vascular resistance (PVR) to 84.4±8.7%, 71.4±17.5% and 77.5±7.2% of baseline values, respectively (mean±95% confidence interval). The 120 minute area under the curve for PVR for placebo, 30 μg, 45 μg and 60 μg TRE was 1230±1310, −870±940, −2450±2070 and −2000±900 min %, respectively. Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes. Reduction of systemic vascular resistance and pressure was negligible, showing a high pulmonary selectivity for SMI-TRE. Intrapulmonary selectivity was also provided by SMI-TRE as ventilation/perfusion matching, assessed by the multiple inert gas elimination technique in 5 patients with gas exchange problems, was not significantly different after SMI-TRE compared to inhaled nitric oxide or no treatment. No significant side effects were observed.

Conclusions: The acute application of inhaled treprostinil with a metered dose inhaler in 2-3 breaths was safe, well tolerated and induced a strong and sustained pulmonary selective vasodilation.

Methods and Patients

A total number of 45 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics were: female to male ratio (f/m)=29/16, age 59±2.3 years, pulmonary artery pressure (PAP) 45±1.8 mmHg, pulmonary vascular resistance (PVR) 743±52 dynes·s·cm$^{-5}$, pulmonary artery wedge pressure (PAWP) 8.6±0.5 mmHg, central venous pressure (CVP) 6.4±0.7 mmHg, cardiac output (CO) 4.5±0.2 l/min, central venous oxygen saturation (SvO2) 62.3±1.2 mmHg (mean±Standard Error of the Mean). Disease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4). Table 1 presents the patient characteristics of the different groups.

TABLE 1

Patient characteristics of the different treatment groups. Data are given as mean ± Standard Error of the Mean (SEM).

| | Placebo (n = 4) | 30 μg TRE (n = 12) | 45 μg TRE (n = 9) | 60 μg TRE (n = 20) |
|---|---|---|---|---|
| Age [years] | 61 ± 8 | 53.9 ± 3.9 | 54.2 ± 5.7 | 65.5 ± 3.1 |
| PAP [mmHg] | 49.5 ± 10.1 | 45 ± 3.1 | 54.3 ± 2.8 | 39.7 ± 2.0 |
| PVR [Dynes] | 896 ± 163 | 597 ± 53.9 | 1049 ± 107 | 663 ± 81 |
| CO [l/min] | 4.46 ± 0.9 | 5.2 ± 0.4 | 3.9 ± 0.4 | 4.4 ± 0.3 |
| SAP [mmHg] | 98 ± 8.1 | 90.1 ± 3.2 | 82.8 ± 3.9 | 86.1 ± 2.0 |
| SaO2 [%] | 85.3 ± 4.5 | 90.0 ± 1.1 | 89.6 ± 1.1 | 90.6 ± 0.5 |
| SvO2 [%] | 57.5 ± 3.9 | 66.0 ± 1.6 | 59.1 ± 3.4 | 62.5 ± 1.6 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

Baseline values were determined 20-30 minutes after placement of the catheter. Heart rate, pulmonary and sys-

10

temic blood pressure and cardiac output were measured and blood gases were taken during each pharmacological intervention at defined time points. Pharmacological interventions included the inhalation of 20 ppm nitric oxide (NO) after evaluation of baseline parameters (n=45) and the consecutive inhalation of placebo (n=4), 30 μg SMI-TRE (n=12), 45 μg SMI-TRE (n=9) or 60 μg (n=20) SMI-TRE. Placebo and treprostinil was applied with the Respimat® SMI. For filling of this device with treprostinil sodium, the placebo solution was withdrawn from the device with a syringe and treprostinil solution was injected into the device under sterile conditions. Aerosol quality was controlled before and after refilling of the SMI devices by laser diffractometry, see e.g. Gessler T., Schmehl T., Hoeper M. M., Rose F., Ghofrani H. A., Olschewski H. et al. Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension. Eur. Respir. J. 2001; 17:14-19 incorporated herein in its entirety. The aerosol sizes before (placebo) and after filling (treprostinil) were unchanged. The aerosol particles mass median aerodynamic diameter of treprostinil-aerosol was 4-5 μm, which can be at the upper limit for alveolar deposition. The aerosol volume delivered by one cycle from the SMI was 15 μl. The solution used for aerosol generation was prepared from treprostinil sodium salt using a standard protocol. The SMI was either filled with a concentration of 1000 μg/ml treprostinil sodium (one aerosol puff=15 μg TRE) or with 2000 μg/ml (one puff=30 μg TRE). The different doses were applied as 2 puffs 1000 μg/ml (30 μg), 3 puffs 1000 μg/ml (45 μg) and 2 puffs 2000 μg/ml (60 μg). The placebo was inhaled as 2 puffs from a placebo-SMI. Hemodynamics and gas-exchange parameters were recorded for 120 minutes after TRE inhalation. This study used the Respimat® device, because the implemented "soft mist" technology was well suited for the deposition of such highly active drugs like prostanoids.

The impact of SMI-TRE on ventilation-perfusion matching was assessed in five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems by use of the multiple inert gas elimination technique (MIGET), see e.g. Wagner P D, Saltzman H A, West J B. Measurement of continuous distributions of ventilation-perfusion ratios: theory. J Appl Physiol. 1974; 36:588-99; Ghofrani H A, Wiedemann R, Rose F, Schermuly R T, Olschewski H, Weissmann N et al. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. Lancet. 2002; 360:895-900, both incorporated herein in their entirety.

Statistics:

Mean values, standard deviation, standard error of the mean and 95% confidence intervals were calculated. Statistical analysis was done by use of a paired t-test.

Results:

The inhalation of treprostinil sodium from the metered dose inhaler (SMI-TRE) was well tolerated, only mild and transient cough for a maximum of one minute was reported. No systemic side effects like headache, flush, nausea or dizziness were observed.

Two to three breaths of SMI-TRE induced a strong pulmonary vasodilation that outlasted the observation time of 120 minutes (45 and 60 μg). The lower dose of 30 μg TRE induced a somewhat shorter effect on pulmonary vascular resistance; however, the maximal pulmonary vasodilation was comparable. In contrast, placebo inhalation did not induce pulmonary vasodilation. In fact a slight increase in PVR over the time of the right heart catheter investigation could be recorded following placebo inhalation (FIG. 1). The effect of SMI-TRE on systemic vascular resistance and

UTC_PH-ILD_009792

US 10,716,793 B2

11

pressure was very small and not clinically significant. Cardiac output was significantly increased over the whole observation period, whereas heart rate was rather unchanged. Gas exchange was not influenced by SMI-TRE (FIG. 2). The maximal changes in hemodynamic and gas-exchange parameters compared to baseline values are depicted in Table 2.

TABLE 2

Extremes of the relative changes of hemodynamic and gas
exchange parameters compared to baseline after inhalation
of Placebo (n = 4), 30 µg treprostinil (n =
12), 45 µg treprostinil (n = 9) and 60 µg treprostinil
(n = 20). Highest (max) and lowest (min) values during
the observation period are shown. Data are given as percent
of baseline values (mean ± SEM).

|  | Placebo | 30 µg TRE | 45 µg TRE | 60 µg TRE |
|---|---|---|---|---|
| PAP (min) | 99.4 ± 3.0 | 83.4 ± 3.2 | 77.6 ± 6.8 | 79.5 ± 2.4 |
| PVR (min) | 101.4 ± 1.9 | 84.4 ± 4.4 | 71.4 ± 8.9 | 77.5 ± 3.7 |
| CO (max) | 99.7 ± 1.1 | 108.8 ± 3.8 | 108.6 ± 5.6 | 103.8 ± 2.0 |
| SVR (min) | 104.3 ± 4.3 | 97.7 ± 4.2 | 92 ± 3.9 | 91.3 ± 2.1 |
| SAP (min) | 102.7 ± 1.7 | 97.3 ± 1.9 | 96.1 ± 1.5 | 93.6 ± 2.9 |
| HR (max) | 105 ± 2.1 | 106.1 ± 2.9 | 99.1 ± 2.4 | 101.1 ± 0.9 |
| SaO2 (min) | 98.2 ± 0.4 | 101 ± 0.3 | 94.4 ± 1.8 | 95.8 ± 0.9 |
| SvO2 (max) | 105.4 ± 1.4 | 102.4 ± 1.3 | 104.5 ± 4.4 | 102 ± 1.0 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; SVR = systemic
vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; HR = heart rate;
SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

The areas under the curve for PVR were calculated for placebo and the different SMI-TRE doses over the 120 minute observation period (FIG. 3). A dose effect of SMI-TRE with a trend to a more sustained effect with the two highest doses could be observed.

The inhalation of a highly concentrated aerosol can be in theory prone to disturbances of gas exchange because the deposition of even small amounts of aerosol may deliver high doses locally and thereby antagonize the hypoxic pulmonary vasoconstriction in poorly ventilated areas. This would then lead to increased shunt flow or increase of low ventilation/perfusion (V/Q) areas. This question was addressed in five patients with the multiple inert gas elimination technique (MIGET), the gold-standard for intrapulmonary V/Q ratio determination. The MIGET patients were selected for pre-existing gas exchange limitations. Characteristics of these patients were: PAP 54.6±3.2 mmHg, PVR 892±88 dynes, SaO2 91.7±0.5%, SvO2 65.2±1.8%. Etiologies were iPAH (n=1), CTEPH (n=3), pulmonary fibrosis (n=1). The maximal relative reduction of SaO2 after inhalation of SMI-TRE in these patients was −3.8±1.5% compared to baseline values. Shunt flow at baseline, NO-inhalation and 60 minutes after SMI-TRE was 6.4±4.3%, 5.4±3.0% and 8.3±3.4%, respectively (mean±95% confidence interval; FIG. 4).

No significant increase in low V/Q areas or shunt fraction after inhalation of SMI-TRE was observed, in fact the distribution of perfusion was not different to that at baseline and during nitric oxide inhalation. This proves an excellent intrapulmonary selectivity of SMI-TRE, which is also reflected by unchanged arterial oxygen saturation.

Conclusion:

Treprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution. Treprostinil can be applied by a metered dose inhaler, such as Respimat® soft mist inhaler.

12

Example 2

Investigation of the Effects of Inhaled Treprostinil on Pulmonary Hemodynamics and Gas Exchange in Severe Pulmonary Hypertension

This study investigated the effects of inhaled treprostinil on pulmonary vascular resistance in severe pulmonary hypertension and addressed systemic effects and gas exchange as well as tolerability and efficacy of high doses of treprostinil given in short time. A total of 123 patients with a mean pulmonary artery pressure of about 50 mmHg were investigated in three separate randomized studies. Inhaled treprostinil exerted potent sustained pulmonary vasodilation with excellent tolerability and could be safely applied in a few breaths or even one breath.

Summary:

Three different studies were conducted on a total of 123 patients by means of right heart catheterization: i) a randomized crossover-design study (44 patients), ii) a dose escalation study (31 patients) and iii) a study of reduction of inhalation time while keeping the dose fixed (48 patients). The primary endpoint was the change in pulmonary vascular resistance (PVR).

The mean pulmonary artery pressure of the enrolled patients was about 50 mmHg. Hemodynamics and patient characteristics were similar in all studies. In study i) TRE and Iloprost (ILO), at an inhaled dose of 7.5 µg, displayed comparable PVR decrease, with a significantly different time course (p<0.001), TRE exhibiting a more sustained effect on PVR (p<0.0001) and less systemic side effects. In study ii) placebo, 30 µg, 60 µg, 90 µg or 120 µg TRE were applied with drug effects being observed for 3 hours after inhalation. A near-maximal acute PVR decrease was observed at 30 µg TRE. In study iii) TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered dose inhaler. 15 µg TRE was inhaled with 18 pulses (TRE concentration 100 µg/ml), 9 pulses (200 µg/ml), 3 pulses (600 µg/ml), 2 pulses (1000 µg/ml) or 1 pulse (2000 µg/ml), each mode achieving comparable, sustained pulmonary vasodilation.

Inhaled treprostinil exerts sustained pulmonary vasodilation with excellent tolerability at doses, which may be inhaled in a few or even one breath. Inhaled treprostinil is advantageous to inhaled iloprost in terms of duration of effect and systemic side effects. Inhaled treprostinil is well tolerated in concentrations up to 2000 mg/ml (bringing down inhalation time to a single breath) and in high doses (up to 90 µg).

Methods:

All inhalations were performed with the OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany).

Study i) was a randomized, open-label, single-blind crossover study. The primary objective was to compare the acute hemodynamic effects and the systemic side effects of inhaled treprostinil with inhaled iloprost at comparable doses. A total number of 44 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics and hemodynamic as well as gas exchange parameters are outlined in Table 3.

UTC_PH-ILD_009793

US 10,716,793 B2

13                                                                                           14

TABLE 3

Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids.

| | N | Age | Gender f/m | Etiology i/o/t/f | PAP [mmHg] | PVR [dyn * s * cm⁻⁵] | SAP [mmHg] | CVP [mmHg] | PAWP [mmHg] | CO [l/min] | SaO2 [%] | SvO2 [%] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a | 14 | 55.1 ± 4.8 | 11/3 | 4/4/2/4 | 53.8 ± 3.1 | 911 ± 102 | 95.4 ± 3.6 | 7.4 ± 1 | 8.0 ± 0.8 | 4.3 ± 0.4 | 93.8 ± 2 | 63.9 ± 2.4 |
| 1b | 14 | 54.1 ± 3.3 | 10/4 | 1/6/5/2 | 47.4 ± 3.8 | 716 ± 80 | 90.6 ± 3.3 | 5.9 ± 1.4 | 6.4 ± 0.7 | 4.7 ± 0.4 | 92 ± 1 | 64.4 ± 2.3 |
| 1c | 16 | 56 ± 2.9 | 7/9 | 6/3/6/1 | 47.5 ± 4.5 | 777 ± 102 | 92 ± 4.5 | 8.3 ± 1.4 | 8.6 ± 1.4 | 4.4 ± 0.5 | 91.4 ± 0.9 | 59.8 ± 2.6 |
| 2a | 8 | 60.8 ± 4 | 4/4 | 2/2/3/1 | 51.9 ± 4.9 | 849 ± 152 | 95.9 ± 4.8 | 7.6 ± 1.4 | 11.1 ± 1.7 | 4.4 ± 0.6 | 89.6 ± 2.8 | 60.1 ± 2.8 |
| 2b | 8 | 52.8 ± 6.6 | 6/2 | 1/3/3/1 | 49 ± 4 | 902 ± 189 | 92.4 ± 2.4 | 4.8 ± 1.1 | 7.2 ± 1.3 | 4.0 ± 0.4 | 92.4 ± 2.4 | 62.5 ± 1.7 |
| 2c | 6 | 56.8 ± 5.9 | 4/2 | 0/2/2/2 | 44.2 ± 3.5 | 856 ± 123 | 96.3 ± 3.9 | 5 ± 1.1 | 6 ± 1 | 3.8 ± 0.3 | 92.8 ± 1.5 | 63.6 ± 1.8 |
| 2d | 6 | 51.2 ± 3.8 | 4/2 | 2/2/2/0 | 55.5 ± 4.9 | 940 ± 110 | 91.2 ± 8.1 | 11.2 ± 1.2 | 10 ± 0.7 | 3.9 ± 0.4 | 92 ± 1.9 | 62 ± 5.8 |
| 2e | 3 | 57.3 ± 9.1 | 1/2 | 0/1/0/2 | 45.3 ± 5.2 | 769 ± 267 | 99 ± 3.2 | 5 ± 2.1 | 9 ± 0.6 | 4.5 ± 0.6 | 94.2 ± 1.3 | 66.3 ± 1.5 |
| 3a | 6 | 52.7 ± 6.6 | 4/2 | 2/4/0/0 | 53.8 ± 6.7 | 928 ± 145 | 92.7 ± 7.9 | 8.7 ± 2.7 | 8.8 ± 1.3 | 4.2 ± 0.6 | 94.2 ± 2.8 | 64.8 ± 4.3 |
| 3b | 6 | 58.3 ± 3.5 | 4/2 | 3/1/1/1 | 54.2 ± 6.1 | 808 ± 156 | 94.3 ± 2.8 | 7 ± 1.4 | 10 ± 1.3 | 5 ± 0.7 | 91.9 ± 0.7 | 63.5 ± 2.9 |
| 3c | 21 | 57.4 ± 5.6 | 8/3 | 7/7/6/1 | 46.1 ± 2.5 | 900 ± 99 | 88 ± 2.8 | 9 ± 1.4 | 9.2 ± 0.5 | 3.7 ± 0.3 | 91.7 ± 0.5 | 59.7 ± 2.2 |
| 3d | 7 | 55.6 ± 5.8 | 3/4 | 0/4/3/0 | 53.1 ± 7.1 | 732 ± 123 | 91.4 ± 5.6 | 7.9 ± 3.1 | 8.6 ± 1.3 | 5 ± 0.4 | 90.7 ± 1.4 | 61.3 ± 3.7 |
| 3e | 8 | 59 ± 5.2 | 7/1 | 0/4/4/0 | 45.1 ± 3.9 | 733 ± 114 | 92.8 ± 4.6 | 4.6 ± 0.8 | 8.1 ± 1.1 | 4.3 ± 0.2 | 90.7 ± 0.8 | 66.3 ± 2.8 |

Group 1 corresponds to study i); randomized crossover study comparing inhaled iloprost (ILO) and inhaled treprostinil (TRE).
a = 7.5 g ILO vs. 7.5 μg TRE,
b = 7.5 μg ILO vs. 15 μg TRE (6 min inhalation time),
c = 7.5 g ILO vs. 15 μg TRE (3 min inhalation time).
Group 2 corresponds to study ii); evaluation of maximal tolerated dose of TRE.
a = placebo inhalation,
b = 30 μg TRE,
c = 60 μg TRE,
d = 90 μg TRE,
e = 120 μg TRE.
Group 3 corresponds to study iii); reduction of inhalation time by increase of TRE concentration, aiming at a total inhaled dose of 15 μg.
a = 18 pulses of 100 μg/ml TRE,
b = 9 pulses of 200 μg/ml TRE,
c = 3 pulses of 600 μg/ml TRE,
d = 2 pulses of 1000 μg/ml TRE,
e = 1 pulse 2000 μg/ml TRE.
Etiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f).

Each patient inhaled both iloprost and treprostinil on the same day during right heart catheter investigation; the drugs were administered consecutively with a one hour interval between the drug applications. One half of the study patients initially inhaled treprostinil and then inhaled iloprost (n=22), while the other half initially inhaled iloprost and then inhaled treprostinil (n=22). Patients were randomized to one of the two groups and blinded as to the study drugs. Drug effects were monitored for 60 minutes after each inhalation. Iloprost was inhaled at 4 μg/ml (6 min inhalation time; n=44) and treprostinil was inhaled at a concentration of 4 μg/ml (6 min inhalation; n=14), 8 μg/ml (6 min inhalation time; n=14) or 16 μg/ml (3 min inhalation time; n=16). Based on previous biophysical characterization of the ultrasonic device with iloprost- and treprostinil-solution, this corresponds to a total inhaled dose of 7.5 μg iloprost and treprostinil (4 μg/ml) and 15 μg treprostinil (8 μg/ml and 16 μg/ml), respectively.

Study ii) was a randomized, open-label, single blind, placebo controlled study. The primary objectives were to describe the pharmacodynamic and pharmacokinetic effects of inhaled treprostinil at a well tolerated dose (30 μg) and to explore the highest tolerated single dose. A total number of 31 patients inhaled either placebo or treprostinil; each patient received one inhalation. The first 16 patients were randomized to 30 μg TRE (16 μg/ml, n=8) or placebo (stock solution in a concentration corresponding to TRE 16 μg/ml). Subsequent patients received 60 μg TRE (32 μg/ml; n=6), 90 μg TRE (48 μg/ml; n=6) and 120 μg TRE (64 μg/ml; n=3). Inhalation time was 6 minutes in all groups. Hemodynamics and gas-exchange as well as arterial treprostinil concentrations were recorded for 180 minutes.

Study iii) was a randomized, open-label, single blind study. The primary objective was to explore the shortest possible inhalation time for a 15 μg dose of inhaled treprostinil. A total of 48 patients inhaled one dose of TRE during right heart catheter investigation. The drug was applied in 18, 9, 3, 2 or 1 breaths. The aerosol was generated by a pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Eisenfeld, Germany) in cycles consisting of 2 seconds aerosol production (pulse) and 4 seconds pause. The device included an opto-acoustical trigger for the patient to synchronize the inspiration to the end of the aerosol pulse, thereby providing exact dosage. The TRE dose of 15 μg was either generated during 18 cycles (OPTINEB® filled with 100 μg/ml TRE, n=6), 9 cycles (200 μg/ml TRE, n=6), 3 cycles (600 μg/ml TRE, n=21), 2 cycles (1000 μg/ml TRE, n=7) or 1 cycle (2000 μg/ml TRE, n=8). Hemodynamics and gas exchange were recorded for 120-180 minutes.

Treprostinil plasma concentrations were assessed in study ii) at 10, 15, 30, 60 and 120 minutes after inhalation. Treprostinil quantification was done by Alta Analytical Laboratory (El Dorado Hills, Calif., USA) with a validated liquid chromatography atmospheric-pressure ionization tandem mass spectrometry as previously described Wade M., et al. J. Clin. Pharmacol. 2004; 44:503-9. Mixed venous blood was drawn at the depicted time points (FIG. 11) after inhalation, centrifuged and the plasma frozen at −80° C. until temperature controlled shipping on dry ice.

Statistics:

For statistical analysis of study i) the repeated PVR measurements after inhaled iloprost and treprostinil were subjected to a three-factorial analysis of variance (ANOVA; factors: time (A), drug (B), treprostinil concentration (C)) to avoid multiple testing. The time to maximum PVR decrease after inhalation of iloprost versus treprostinil was compared by paired t-test. Area under the curve (AUC) was calculated from start of inhalation until 60 min after inhalation. Means, standard error of the mean (SEM) and 95% confidence

UTC_PH-ILD_009794

US 10,716,793 B2

15                                                                          16

intervals were calculated. For study ii) and iii) areas between curves (ABC) were calculated between placebo inhalation (study ii) and the respective treprostinil inhalation until 180 min (study ii)) and 120 min (study iii)) after end of inhalation.

Results:

The inhalation of iloprost as well as treprostinil in study i) resulted in a rapid decrease in PVR and PAP (FIG. **5-7**). No significant differences were observed for the areas under the curve (AUC) of PVR decrease after inhalation of 7.5 µg TRE in 6 minutes (AUC $-12.6\pm7.0\%$), 15 µg TRE in 6 minutes (AUC $-13.3\pm3.2\%$) and 15 µg TRE in 3 minutes (AUC $-13.6\pm4.3\%$). The AUC for PVR after the inhalation of 7.5 µg iloprost in 6 minutes was $-7.7\pm3.7\%$ (mean$\pm95\%$ confidence interval). An overview of the pooled data of treprostinil inhalation as compared to iloprost inhalation is given in FIG. **7**. The maximum effect of iloprost and treprostinil on PVR was comparable but this effect was reached significantly later after treprostinil inhalation ($18\pm2$ min) compared to iloprost ($8\pm1$ min; mean$\pm$SEM, p<0.0001) and lasted considerably longer (after 60 min, PVR values in the treprostinil group had not yet returned to baseline). The increase in cardiac output was less acute but prolonged after treprostinil inhalation. Systemic arterial pressure (SAP) was unaffected by treprostinil inhalation, whereas a transient decrease was observed after iloprost inhalation. Iloprost and treprostinil did not affect gas exchange. Three-factorial ANOVA for treprostinil demonstrated a significant difference between repeated measurements after inhalation ($p_{(A)}$<0.0001), no significant difference between drugs ($p_{(B)}$=0.1), no difference between treprostinil concentrations ($p_{(C)}$=0.74) and a significant drug$\times$time interaction ($p_{(A\times B)}$<0.0001). This translates into a significant effect of both drugs on PVR with comparable drug potency but a prolonged drug effect of treprostinil compared to iloprost.

In this study the occasionally observed mild side effects of iloprost inhalation at the given dose (transient flush, headache) were not observed with inhaled treprostinil. Bad taste was reported by most of the patients after inhalation of TRE. This was later found to be attributable to the metacresol preservative contained in the treprostinil solution.

In study ii) pharmacodynamics of inhaled placebo or treprostinil were observed for 180 minutes. Placebo inhalation was followed by a gradual increase in PVR over the entire observation time. Due to reduced patient numbers in the 120 µg TRE group (because of side effects, see below), the hemodynamic values for this group were not included in the graphs of this study (FIG. **8-9**). All TRE doses lead to comparable maximal decreases of PVR to 76.5$\pm$4.7% (30 µg), 73.7$\pm$5.8% (60 µg), 73.3$\pm$4.3% (90 µg) and 65.4$\pm$4.1% (120 µg) of baseline values. An extended duration of pulmonary vasodilation was noted, surpassing the 3 hour observation period for the 60 µg and 90 µg (and 120 µg) TRE doses, whereas in the 30 µg dose group the hemodynamic changes had just returned to baseline within this period. Even at the highest doses, TRE had only minor effects on systemic arterial pressure (FIG. **8**). Cardiac output was increased to a maximum of 106.8$\pm$3.2% (30 µg), 122.9$\pm$4.3% (60 µg), 114.3$\pm$4.8% (90 µg) and 111.3$\pm$3.9% (120 µg TRE). The areas between the response curves after placebo versus TRE inhalation were calculated for PVR, PAP, SVR and SAP (FIG. **9**). Areas between the curves for PVR were not significantly different for 30 µg, 60 µg and 90 µg TRE, a nearly maximal effect on PVR was already observed with 30 µg TRE. Effects on PAP and SAP were small and did not show a dose-response relationship. Gas exchange was not affected at doses up to 90 µg TRE, but arterial oxygen saturation was significantly decreased at a dose of 120 µg TRE in all 3 patients. Further dose increments were omitted due to this side effect and severe headache in one patient.

Again, bad taste of the TRE aerosol was reported by most patients. Other side effects were flushing (n=1; 30 µg TRE), mild transient cough (n=3; 60 µg TRE), mild transient bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 30 µg TRE), moderate bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 120 µg TRE), and severe headache (n=1; 120 µg TRE). The bad taste, the bronchoconstriction and the drop in SaO2 was attributed to metacresol in the original TRE solution. With the use of a metacresol-free solution of TRE (University Hospital Giessen, Germany; produced according to the manufacturer's protocol) in the following study, these side effects did no longer occur.

Study iii) was performed with metacresol-free TRE solution, having no specific taste and smell. A total of 48 patients were enrolled. This study aimed at the reduction of inhalation time and aerosol volume needed for pulmonary drug delivery. A modified OPTINEB® inhalation device was programmed to produce a constant amount of aerosol during repeatable pulses of aerosol generation. With this device, treprostinil could be safely utilized up to a concentration of 2000 µg/ml without considerable side effects. No relationship of number or type of side effects to TRE concentration was observed. Reported side effects were mild transient cough (n=6), mild headache (n=2) and mild jaw pain (n=1).

The reduction of PVR and PAP was comparable between all groups (FIG. **10**). TRE inhalation reduced PVR to 76.3$\pm$5.6% (18 pulses, 100 µg/ml), 72.9$\pm$4.9% (9 pulses, 200 µg/ml), 71.2$\pm$6.0% (3 pulses, 600 µg/ml), 77.4$\pm$4.5% (2 pulses, 1000 µg/ml) and 80.3$\pm$5.2% (1 pulse, 2000 µg/ml). PAP was reduced to 84.2$\pm$4.5% (18 pulses, 100 µg/ml), 84.2$\pm$4.1% (9 pulses, 200 µg/ml), 81.1$\pm$4.1% (3 pulses, 600 µg/ml), 86$\pm$4% (2 pulses, 1000 µg/ml) and 88$\pm$5.4% (1 pulse, 2000 µg/ml). Cardiac output was moderately increased in all groups, whereas systemic arterial pressure was not significantly affected.

The areas between the curves (ABC) for changes in hemodynamic and gas-exchange parameters after inhalation of 15 µg TRE versus placebo were calculated for an observation time of 120 minutes (FIG. **11**). The ABC for both PVR and PAP was comparable between all groups.

Pharmacokinetic results from study ii): Peak plasma concentrations of treprostinil were found 10-15 minutes after inhalation. Maximal treprostinil plasma concentrations ($C_{max}$) for the 30 µg, 60 µg, 90 µg and 120 µg doses were 0.65$\pm$0.28 ng/ml (n=4), 1.59$\pm$0.17 ng/ml (n=4), 1.74 ng/ml (n=1) and 3.51$\pm$1.04 ng/ml (n=2), respectively (mean$\pm$SEM; FIG. **12**).

Discussion:

These studies investigated whether i) the acute effects of inhaled treprostinil would be comparable to or possibly advantageous over inhaled iloprost in pulmonary hypertensive patients, ii) the inhaled prostanoid dose might be increased without substantial local or systemic side effects, and iii) if the time of inhalation, which is 6-12 minutes for iloprost, could be reduced significantly by increasing the concentration of treprostinil aerosol.

The patient population in these studies included different forms of precapillary pulmonary hypertension. All these patients had a need for therapy of pulmonary hypertension and reflected the typical population of a pulmonary hyper-

UTC_PH-ILD_009795

US 10,716,793 B2

17

tension center. No major differences in patient characteristics or hemodynamic baseline values existed between the different groups (table 3).

In study i) it was shown that the inhalation of treprostinil and iloprost in similar doses resulted in a comparable maximum pulmonary vasodilatory effect. However, marked differences in the response profile were noted. The onset of the pulmonary vasodilatory effect of inhaled treprostinil was delayed compared to iloprost, but lasted considerably longer, with the PVR decrease continuing beyond the one-hour observation period. Although the average dose of treprostinil was higher than the iloprost dose, no systemic effects were noted after treprostinil inhalation, whereas flush and transient SAP decrease, accompanied by more prominent cardiac output increase, occurred after iloprost inhalation. Such side effects were more prominent than in previous studies with inhaled iloprost. This may have been caused by the fact that the iloprost dose used in this study was 50% higher than the recommended single inhalation dose (5 μg) and that the preceding treprostinil inhalation may have added to the systemic side effects caused by the iloprost inhalation. Surprisingly, with TRE there was no such systemic side effect, although the average effect on PVR was as potent as with iloprost.

This study used a cross-over design in order to minimize the effects of inter-individual differences in response to prostanoids. The short observation period of 1 hour was used to avoid an uncomfortably long catheter investigation. As a study limitation, the short observation interval may have caused carryover effects of the first to the second period as suggested by FIG. 5. However, this still allowed for the interpretation of the study, that both drugs are potent pulmonary vasodilators and that treprostinil effects are significantly sustained compared to the iloprost effects.

The longer duration of action and the virtual absence of side effects (except the bitter taste of treprostinil aerosol, later attributed to metacresol) encouraged increasing the applied treprostinil dose in study ii). Observation time was extended to 3 hours to obtain precise pharmacodynamic data. Inhaled treprostinil resulted in a strong pulmonary vasodilation that outlasted the observation time of 3 hours when compared to placebo inhalation. Surprisingly, inhaled treprostinil was tolerated in doses up to 90 μg.

Study iii) successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 μg/ml treprostinil solution, thereby applying a dose of 15 μg.

18

This drug administration with a single breath induced pulmonary vasodilation for longer than 3 hours compared to placebo inhalation. Side effects were minor, of low frequency and not related to drug concentration. It was a surprising finding that such high concentrations of treprostinil were so well tolerated.

Conclusion:

Inhaled treprostinil can be applied in high doses (up to 90 μg) with a minimal inhalation time. Inhaled treprostinil exerts high pulmonary selectivity and leads to a long-lasting pulmonary vasodilation.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**2**. The method of claim **1**, wherein the inhalation device is a soft mist inhaler.

**3**. The method of claim **1**, wherein the inhalation device is a pulsed ultrasonic nebulizer.

**4**. The method of claim **1**, wherein the inhalation device is a dry powder inhaler.

**5**. The method of claim **1**, wherein the inhalation device is a pressurized metered dose inhaler.

**6**. The method of claim **4**, wherein the formulation is a powder.

**7**. The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter.

**8**. The method of claim **1**, wherein the formulation contains no metacresol.

* * * * *

UTC_PH-ILD_009796

# EXHIBIT 8



Deposition of:
## Lewis J. Rubin, M.D.

*September 15, 2021*

In the Matter of:

## United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

1          HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.
2              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
3

        UNITED THERAPEUTICS     :
4       CORPORATION,            :  C.A. No. 20-755-RGA
                Plaintiff,      :
5                               :
                vs.             :
6       LIQUIDIA                :
        TECHNOLOGIES, INC.,     :
7              Defendant.       :
8
9              VIDEOTAPE DEPOSITION OF:
10               LEWIS J. RUBIN, M.D.
11               NEW YORK, NEW YORK
12           WEDNESDAY, SEPTEMBER 15, 2021
13
14
15
16
17
18
19
20
21
22
23
24      REPORTED BY:
        SILVIA P. WAGE, CCR, CRR, RPR
25      JOB NO. 4792048

HIGHLY CONFIDENTIAL                DA0190                LIQ_PH-ILD_00000669

Page 2

1          HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.

2

3

                                    SEPTEMBER 15, 2021
4                                    9:10 a.m.
5              Videotape deposition of LEWIS J. RUBIN,
6         M.D., held at the offices of COOLEY LLP, 55
7         Hudson Yards, 44th Floor Conference Room, New
8         York, New York, pursuant to agreement before
9         SILVIA P. WAGE, a Certified Shorthand Reporter,
10        Certified Realtime Reporter, Registered
11        Professional Reporter, and Notary Public for the
12        States of New Jersey, New York and Pennsylvania.

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL                    DA0191                    LIQ_PH-ILD_00000670

```
                                              Page 3

 1        HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.
 2        A P P E A R A N C E S:
 3
          GOODWIN PROCTER LLP
 4        Attorneys for Plaintiff
          1900 N Street N.W.
 5        Washington D.C.  20036
          (202) 346-4216
 6        Wjackson@goodwinlaw.com
          Hgunn@goodwinlaw.com
 7        BY:  WILLIAM JACKSON, ESQ.
          BY:  HARRISON GUNN, ESQ.
 8
 9        COOLEY LLP
          Attorneys for Defendant
10        1299 Pennsylvania Avenue NW, Suite 700
          Washington, DC 20004
11        (202) 776-2982
          Ssukduang@cooley.com
12        Bcazakoff@cooley.com
          BY:  SANYA SUKDUANG, ESQ.
13        BY:  BRITTANY CAZAKOFF, ESQ.
14
          OSTRAGER CHONG FLAHERTY & BROITMAN P.C.
15        Attorneys for Deponent
          437 Madison Avenue
16        New York, New York
          (212) 681-0600
17        Gostrager@ocfblaw.com
          BY:  GLENN OSTRAGER, ESQ.
18
19        A L S O   P R E S E N T
20        CARLOS KING
          VIDEOGRAPHER
21
22
23
24
25
```

HIGHLY CONFIDENTIAL                     DA0192                     LIQ_PH-ILD_00000671

Page 7

1          HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D.

2                    THE VIDEOGRAPHER:  Good morning.  We      09:08:17

3          are going on the record at 9:10 a.m. on           09:08:18

4          September 15, 2021.                                09:08:23

5                    Please note that the microphones are     09:08:26

6          sensitive and may pick up whispering, private      09:08:27

7          conversations and cellular interference.  Please   09:08:30

8          turn off all cell phones or place them away from   09:08:33

9          the microphones, as they can interfere with the    09:08:36

10         deposition audio.                                  09:08:38

11                   Audio and video recording will           09:08:39

12         continue to take place unless all parties agree    09:08:40

13         to go off the record.                              09:08:42

14                   This is Media Unit No. 1 of the video    09:08:44

15         recorded deposition of Mr. Lewis J. Rubin taken    09:08:47

16         by Counsel for Defendant in the matter of United   09:08:51

17         Therapeutics Corporation versus Liquidia           09:08:56

18         Technologies Inc., filed in the United States      09:08:59

19         District Court for the District of Delaware, Case  09:09:01

20         No. 20-755-RGA.                                    09:09:09

21                   This deposition is being held at the     09:09:12

22         offices of Cooley LLP located at 55 Hudson Yards,  09:09:14

23         New York, New York.                                09:09:18

24                   My name is Carlos King from the firm     09:09:20

25         of Veritext and I'm the Videographer.  The Court   09:09:21

HIGHLY CONFIDENTIAL                    DA0193                    LIQ_PH-ILD_00000672

Page 8

```
 1        HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D.
 2     Reporter is Silvia Wage also from Veritext.  I'm    09:09:24
 3     not authorized to administer an oath.  I'm not     09:09:26
 4     related to any party in this action.  Nor am I     09:09:29
 5     financially interested in the outcome.            09:09:31
 6            Counsel and all present in the room         09:09:32
 7     and everyone attending remotely will now state     09:09:35
 8     their appearance and affiliation for the record.   09:09:37
 9     If there are any objections to the proceedings,    09:09:39
10     please state them at the time of your appearance   09:09:42
11     beginning with the noticing attorney.             09:09:43
12            MR. SUKDUANG:  Sanya Sukduang and           09:09:46
13     Brittany Cazakoff from Cooley LLP on behalf of     09:09:48
14     Defendant Liquidia.                               09:09:51
15            MR. OSTRAGER:  Glenn Ostrager of the        09:09:55
16     firm of Ostrager Chong Flaherty & Broitman on      09:09:56
17     behalf of Dr. Rubin.                              09:09:57
18            MR. JACKSON:  William Jackson and           09:10:00
19     Harrison Gunn from the law firm of Goodwin         09:10:01
20     Procter LLP on behalf of United Therapeutics.      09:10:04
21            THE VIDEOGRAPHER:  Can the Court            09:10:08
22     Reporter please swear in the witness.             09:10:09
23     LEWIS J. RUBIN, M.D.,                             09:10:09
24        690 Orchard Shore Road, Colchester, Vermont    09:10:09
25        05446, after having been duly sworn, was       09:10:09
```

HIGHLY CONFIDENTIAL                DA0194                LIQ_PH-ILD_00000673

Page 9

|   |   |   |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D. | |
| 2 | examined and testified as follows: | 09:10:16 |
| 3 | THE STENOGRAPHER:  Thank you. | 09:10:16 |
| 4 | You may proceed. | 09:10:18 |
| 5 | EXAMINATION BY MR. SUKDUANG: | 09:10:19 |
| 6 | Q.  Good morning, Dr. Rubin. | 09:10:19 |
| 7 | A.  Good morning. | 09:10:19 |
| 8 | Q.  My name is Sanya Sukduang.  And I'm | 09:10:20 |
| 9 | here to ask you some questions today regarding | 09:10:23 |
| 10 | some of the work you've done on pulmonary | 09:10:26 |
| 11 | arterial hypertension and treprostinil, okay? | 09:10:30 |
| 12 | A.  Sure. | 09:10:33 |
| 13 | Q.  I understand you've been deposed in | 09:10:34 |
| 14 | the past; is that correct? | 09:10:36 |
| 15 | A.  Yes. | 09:10:38 |
| 16 | Q.  Okay.  It's probably been a while, so | 09:10:38 |
| 17 | I'm going to go a little bit of the ground rules | 09:10:40 |
| 18 | just to refresh everyone's memory. | 09:10:44 |
| 19 | So, as I said before, I'm here to ask | 09:10:45 |
| 20 | you questions and I ask that you answer them to | 09:10:47 |
| 21 | the best of your ability; is that okay? | 09:10:50 |
| 22 | A.  Sure. | 09:10:52 |
| 23 | Q.  If I ask you something and my | 09:10:53 |
| 24 | question is unclear or you don't understand what | 09:10:54 |
| 25 | I'm -- what I'm asking, please let me know and | 09:10:58 |

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 38

1              HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D.

2              A.  Yes.                                    10:01:22

3              Q.  Okay.  Under the umbrella of PH,        10:01:22

4       pulmonary hypertension, other than PVH and PAH,   10:01:25

5       are there any other manifestations that would     10:01:27

6       fall under that umbrella?                          10:01:29

7              A.  Well, I wouldn't say,                   10:01:31

8       "manifestations."  I would say etiologies or      10:01:34

9       conditions, again, according to the               10:01:41

10      classification.                                   10:01:45

11              So classification very simply is --       10:01:46

12      No. 1 is pulmonary arterial hypertension, PAH,    10:01:51

13      and then the subclassification lists a number of  10:01:54

14      different disease processes that cause PAH.       10:01:57

15              No. 2 is pulmonary hypertension due       10:02:03

16      to left heart disease and that, in general,       10:02:07

17      causes pulmonary venous hypertension, but it's    10:02:13

18      not the only cause of pulmonary venous            10:02:20

19      hypertension.  It's the most common but it's not  10:02:23

20      the only one.                                     10:02:26

21              And then Group 3 is chronic lung          10:02:26

22      diseases that can cause pulmonary hypertension,   10:02:29

23      emphysema, pulmonary fibrosis, those sorts of     10:02:32

24      things, cystic fibrosis.                          10:02:38

25              Group 4 is chronic thromboembolic         10:02:41

Page 39

```
 1        HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.

 2     pulmonary hypertension.  So blood clots that are    10:02:44

 3     chronic that plug up the vasculature in the lungs    10:02:48

 4     and cause the back pressure to be elevated.          10:02:53

 5     That's intrinsic clots within the lungs.             10:03:00

 6              And Group 5 is a grab bag of                10:03:04

 7     miscellaneous causes, less common diseases that      10:03:06

 8     can be associated with pulmonary hypertension.       10:03:14

 9     Cycle cell disease is one, sarcoidosis is            10:03:15

10     another.  There is a list of, you know,              10:03:20

11     relatively uncommon diseases that, you know, the     10:03:24

12     experts will see from time to time, but, you         10:03:27

13     know, that practitioners in the field it's worth     10:03:32

14     their, at least, having some awareness that can      10:03:37

15     be associated.                                       10:03:40

16          Q.  I want to turn to your discussion           10:03:46

17     about or your testimony regarding working on FDA     10:03:47

18     approved drugs for PAH.                              10:03:53

19          A.  Uh-huh.                                     10:03:55

20          Q.  Okay.  In your testimony, you               10:03:57

21     mentioned you worked on the first drug FDA           10:04:01

22     approved for PAH.                                    10:04:04

23              Do you recall that?                         10:04:06

24          A.  Yes.                                        10:04:07

25          Q.  What was that drug?                         10:04:07
```

HIGHLY CONFIDENTIAL                DA0197                LIQ_PH-ILD_00000676

# EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


--------------------------------

UNITED THERAPEUTICS CORPORATION, )

      Plaintiff,              )C.A. No. 23-975(RGA)

    v.                      )

LIQUIDIA TECHNOLOGIES, INC.,    )

--------------------------------

Washington, D.C.

Sunday, March 10, 2024


      Deposition of STEVEN D. NATHAN, M.D., a
witness herein, called for examination by counsel
for the Defendant in the above-entitled matter,
pursuant to notice, the witness being duly sworn by
Barbara J. Moore, a Notary Public in and for the
District of Columbia, taken at the offices of
GOODWIN PROCTOR, LLP, 1900 N Street, NW,
Washington, D.C., at 9:00 a.m., and the proceedings
being taken down by Stenotype by BARBARA MOORE,
CRR, RMR, and transcribed under her direction.



Page 2

```
1   APPEARANCES:
2
3        On Behalf of the Plaintiff:
4        McDermott Will & Emery
5        BY: ARTHUR P. DYKHUIS, ESQ.
6        18565 Jamboree Road, Suite 250
7        Irvine, CA 92612-2565
8        949.989.8292
9        adykhuis@mwe.com
10
11       On behalf of the Defendant:
12       Cooley LLP
13       BY:  JONATHAN DAVIES, ESQ.
14       BRITTANY CAZAKOFF, ESQ.
15       SANYA SUKDUANG, ESQ.
16       GABRIEL FERRANTE, ESQ.
17       1299 Pennsylvania Avenue, NW
18       Suite 700
19       Washington, DC 20004
20       202.842-7889
21       Jdavies@cooley.com
22
23
24   Bradley Loy, Videographer
25
```

Page 3

```
1             TABLE OF CONTENTS
2    STEVEN D. NATHAN
3    By Attorney Davies           6
4    By Attorney Dykhuis          248
5    By Attorney Davies           254
6             EXHIBITS
7
8    EXHIBIT    DESCRIPTION          PAGE
9    Exhibit 1  Notice of Deposition    10
10   Exhibit 2  Declaration             11
11   Exhibit 3  Document Bates-stamped
                UTC_PH-IL_010830 to
12              -838TR:1}{P}
13   Exhibit 4  Document entitled Sildenafil   145
                Preserves Exercise Capacity in
14              Patients with Idiopathic
                Pulmonary Fibrosis and
15              Right-sided Ventricular
                Dysfunction
16
     Exhibit 5  Document entitled Riociguat for   153
17              Idiopathic Interstitial
                Pneumonia-Associated Pulmonary
18              Hypertension, (RISE-IIP): a
                Randomized Placebo-Controlled
19              Phase 2B Study
20   Exhibit 6  Document Bates-stamped      165
                UTC_PH-ILD_010487 through -0496
21
     Exhibit 7  Supplementary Appendix        166
22
     Exhibit 8  Document Bates-stamped UTC   179
23              PH-ILD-009772 through -796
24   Exhibit 9  Document Bates-stamped        189
                UTC_PH-ILD_005310
25
```

Page 4

```
1    EXHIBIT    DESCRIPTION          PAGE
2    Exhibit 10  Document Bates-stamped     196
                 UTC_PH-ILD_9828
3
     Exhibit 11  Document Bates-stamped
4                UTC_PH-ILD_010790 through
                 -829TR:1}{P}
5
     Exhibit 12  Document Bates-stamped     209
6                UTC_PH-ILD_010692 to -708
7    Exhibit 13  Document Bates-stamped     209
                 UTC_PH-ILD_010744 through-758.
8
     Exhibit 14  Document Bates-stamped     210
9                UTC_PH-ILD_010727 through -742
10   Exhibit 15  Document Bates-stamped     216
                 UTC_PH-ILD_009844 through -9852
11
     Exhibit 16  Document Bates-stamped     218
12               UTC_PH-ILD_009936 through
                 -09943
13
     Exhibit 17  Document Bates-stamped     224
14               UTC_PH-ILD_010782 through -789
15   Exhibit 18  Document Bates-stamped     228
                 UTC_PH-ILD_010599 through -610
16
     Exhibit 19  Document Bates-stamped     233
17               UTC_PH-ILD_010774 through -781
18
19
20
21
22
23
24
25
```

Page 5

```
1           P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are now on
3    the record.  This begins videotape
4    Number 1 in the deposition of Dr. Steven
5    Nathan in the matter of United
6    Therapeutics Corporation v. Liquidia
7    Technology in the District Court of
8    Delaware, Case No. 23-975.
9        Today is March 10, 2024.  The time
10   is 9:01.  This deposition is being taken
11   at 1900 N Street, NW, Washington, D.C.,
12   at the request of Cooley, LLC.
13       The videographer is Bradley Loy of
14   Magna Legal Services, and the court
15   reporter is Barbara Moore, Magna Legal
16   Services.
17       Would counsel please state their
18   appearances and who they represent.
19       ATTORNEY DAVIES:  Jonathan Davies
20   from Cooley for the defendant Liquidia,
21   and with me today are my colleagues,
22   Brittney Cazakoff and Sanya Sukduang.
23       ATTORNEY DYKHUIS:  Art Dykhuis
24   with McDermott Will & Emery for the
25   plaintiff and the witness, Liquidia
```



2  (Pages 2 to 5)

Page 6

```
 1          Therapeutics.  Also with me is Gabriel
 2   Ferrante.
 3          ***********************
 4          STEVEN D. NATHAN, M.D.,
 5   having been called as a witness on behalf of the
 6   Plaintiff and having been first duly sworn, was
 7   examined and testified as follows:
 8   EXAMINATION BY
 9   ATTORNEY DAVIES:
10          Q.    Okay.  Good morning, Dr. Nathan.
11   How are you?
12          A.    I'm good.  How are you doing?
13          Q.    Could you state your address for the
14   record.
15          A.    It's 1252 Cobble Pond Way, Vienna,
16   Virginia, 22182.
17          Q.    Have you been deposed before?
18          A.    Yes, I have.
19          Q.    About how many times?
20          A.    It's in my declaration, but I
21   believe it's three or four times.
22          Q.    So today you understand you're under
23   oath, and it's the same oath that you would be
24   under if you were testifying in court; correct?
25          A.    Yes.
```

Page 7

```
 1          Q.    Okay.  Today you're being recorded
 2   both by video and also stenographically, so we ask
 3   that you give verbal responses rather than just
 4   head nods or hand gestures.
 5          Does that make sense?
 6          A.    Yes.
 7          Q.    I'll try to be clear with my
 8   questioning.  If I'm not clear, you can ask me to
 9   clarify my questions, but if you provide an answer,
10   I'll assume that you understood my questions.
11          Does that make sense?
12          A.    Sounds good.
13          Q.    Your counsel may object at various
14   times today, but you understand that you still need
15   to respond to my questions unless your counsel
16   instructs you not to answer?
17          A.    I understand.
18          Q.    Okay.  I'll take breaks, as we
19   discussed, periodically.  If you need a break, at
20   any time, the only thing I ask is that if there's a
21   pending question, you answer that question and we
22   can take a break, okay?
23          A.    I understand.
24          Q.    Is there any reason why you can't
25   provide truthful and accurate testimony today?
```

Page 8

```
 1          A.    None.
 2          Q.    When was the first time that you
 3   were contacted by counsel for United Therapeutics
 4   about assisting in this matter?
 5          A.    It was sometime at the beginning of
 6   February.
 7          Q.    February of this year?
 8          A.    2024, yes.
 9          Q.    And who contacted you?
10          A.    I think it was a gentleman by the
11   name of Adam Horowitz.
12          Q.    When did you begin working on the
13   declaration that you submitted in this case?
14          A.    It was also sometime around the
15   beginning of February.
16          Q.    First week of February, do you
17   think?
18          A.    Approximately.
19          Q.    And in preparing your declaration,
20   what attorneys did you work with?
21          A.    I worked with a bunch of different
22   attorneys, some of whom are sitting here today, and
23   the others I'm sure were involved as well.
24          Q.    Did you work with Mr. Dykhuis on the
25   case?
```

Page 9

```
 1          A.    You know, I'm not sure if he was
 2   part of helping with the declaration, but I suspect
 3   he did.
 4          Q.    How generally was your declaration
 5   in this case prepared?
 6          ATTORNEY DYKHUIS:  Object to form
 7   and also just caution you, Dr. Nathan,
 8   don't divulge of substance of any
 9   communications with counsel, but you can
10   describe generally.
11          THE WITNESS:  It was a -- the
12   declaration was formulated by myself
13   together with assistance of the counsel.
14   BY ATTORNEY DAVIES:
15          Q.    Do you recall any of the names of
16   the counsel that assisted with the preparation?
17          ATTORNEY DYKHUIS:  Object to form.
18          THE WITNESS:  There were a number
19   of people on the email chain, and I'm not
20   sure who exactly assisted.  It seems like
21   it was a combined effort on the part of
22   counsel.
23   BY ATTORNEY DAVIES:
24          Q.    Did you have any in-person meetings
25   to prepare your declaration?
```



3  (Pages 6 to 9)

Page 10

1     A.   No.
2     Q.   Did you draft any portions of your
3  declaration?
4          ATTORNEY DYKHUIS:  Object to form.
5          THE WITNESS:  Yes, I did.
6  BY ATTORNEY DAVIES:
7     Q.   Do you recall, sitting here today,
8  which portions you drafted?
9     A.   Most -- or if not all of the medical
10  stuff is what I wrote, primarily.
11          (Exhibit 1 was marked for
12          identification.)
13     Q.   Dr. Nathan, I've marked as Exhibit 1
14  a deposition notice entitled Defendant Liquidia,
15  Inc.'s Notice of Deposition of Steven D. Nathan.
16  I'm going to pass that to you.  I just ask you
17  because of the weird shape of the table, would you
18  mind passing one copy to counsel all the way
19  around?
20     A.   Sure.
21     Q.   Thank you very much.
22     Doctor, you should keep the copy with the
23  yellow stickers on it, if that makes sense.
24     A.   Yes.
25     Q.   And you understand that you're here

Page 11

1  today testifying in a case between United
2  Therapeutics and Liquidia in which you submitted a
3  declaration; correct?
4     A.   Yes.
5          (Exhibit 2 was marked for
6          identification.)
7     Q.   So I've marked as Exhibit 2 a
8  document titled "Declaration of Steven D. Nathan,
9  M.D, in support of Plaintiff's motion for
10  preliminary injunction."
11     And, again, I'm going to pass to you one
12  extra copy if you can pass that to Mr. Dykhuis,
13  please.
14     And Dr. Nathan, is Exhibit 2 that I just
15  passed you, is that the copy of the declaration
16  that you submitted in this case?
17     A.   I just want to check to see what
18  else is in there.
19     Yes, it is.
20     Q.   This copy that I passed you
21  includes Attachments A, B, and C; correct?  And
22  they begin at page 90 of your declaration.
23     A.   Attachment A?  After 90?  This is C
24  at the end.  I don't dispute it.
25     Q.   Does this appear to be a complete

Page 12

1  copy of the report that you submitted in this case?
2     A.   It does appears to be it.
3     Q.   Could you turn to what would be
4  page 90.  It's the last page of your report before
5  the attachments.
6     A.   (Witness complies with request.)
7     Yes.
8     Q.   And that's your signature on
9  page 90?
10     A.   Yes, it is.
11     Q.   And it's dated February 26, 2024?
12     A.   Yes.
13     Q.   With respect to this declaration,
14  are there any mistakes or errors in this
15  declaration that you're aware of sitting here
16  today?
17     A.   There must be one or two typos that
18  I saw subsequently.  For example, an "and" instead
19  of "an" and one of the footnotes there's also a
20  typo.
21     Q.   Could you point me to the footnote
22  that's a typo.
23     A.   Oh, gosh.  Give me a minute.  Okay.
24  Sorry it's taking a while.  I have a lot of
25  documents to go through.

Page 13

1     I didn't see it in the first run.  If I
2  may, may I ask counsel to point me to where there's
3  that footnote?  Would that be okay, or do I have to
4  keep looking?
5     Q.   I would not object to asking your
6  counsel which one it is.
7          ATTORNEY DYKHUIS:  I think you
8          might be thinking of Paragraph 119.
9          (Pause)
10          THE WITNESS:  So that's page 43
11          you're talking about?
12  BY ATTORNEY DAVIES:
13     Q.   Do you believe the error is in
14  either footnotes 99, 100, or 101 on page 43,
15  Doctor?
16     A.   No, I think it's another footnote.
17     Q.   Okay.
18     A.   I apologize.
19     Q.   Do you recall the nature of the
20  error, Dr. Nathan?
21     A.   It was just really a minor error --
22     Q.   Okay.
23     A.   -- that just had an incorrect
24  reference to what the subject matter was.  It
25  wasn't really pertinent to anything, really.  And



4  (Pages 10 to 13)

Page 14

1    I'm not sure if we go through this if I might come
2    across it as we go through.
3        Q.    So other than an "and" rather than
4    and "an" and a minor footnote -- a minor typo in a
5    footnote, are there any other errors or typos that
6    you're aware of in your report today?
7        A.    None that I'm aware of.
8        Q.    Okay.  Can you go to Attachment B of
9    your declaration, Exhibit 2.
10       A.    (Witness complies with request.)
11       Q.    Just let me know once you're there.
12       A.    Attachment B is one page, and I see
13   here that I had said four.  I might be mistaken.
14   There might have been one many, many years ago that
15   wasn't picked up.  I apologize if that is an
16   oversight on my part.
17       Q.    The one many, many years ago, was
18   that a -- did you act as an expert in that case
19   many, many years ago?
20       A.    I believe so, yes.
21       Q.    Okay.  Did that case concern
22   pulmonary hypertension?
23       A.    I don't recall the details of the
24   case.
25       Q.    Do you recall if that was a patent

Page 15

1    litigation case?
2        A.    It was not a patent litigation case.
3        Q.    Okay.  What type of case was it,
4    generally?
5        A.    It was an medicolegal case.
6        Q.    Like a med malpractice?
7        A.    Yes.
8        Q.    In the Genentech v. Aurobindo Pharma
9    case, that's the first one in your prior testimony,
10   did you author an expert report in that case?
11       A.    I believe I did, yes.
12       Q.    Were you deposed in that case?
13       A.    As I recall, I was.
14       Q.    Did you testify at trial in that
15   case?
16       A.    That I did, yes.
17       Q.    And I'm not asking for confidential
18   information, but can you tell me generally what the
19   subject matter of your testimony in that case?
20       A.    It was regarding the validity of the
21   patent over which the companies were having -- were
22   contesting.
23       Q.    And which of the parties were you
24   consulting with?
25       A.    I was consulting on behalf of

Page 16

1    Genentech.
2        Q.    So on behalf of the patentee?
3        A.    That's correct.
4            ATTORNEY DYKHUIS:  Object to form.
5        Q.    Do you remember generally the
6    subject matter of the patent at issue in that case?
7        A.    I do.
8        Q.    And what was it?
9        A.    There were two clauses pertaining to
10   checking liver function tests and another clause
11   pertaining to drug-drug interactions.
12       Q.    Is the Christopher -- the next case
13   on your list, the Christopher Mee versus Robertson
14   [sic], is that a medical malpractice case?
15           ATTORNEY DYKHUIS:  Object to the
16       form.
17           THE WITNESS:  It is.
18       BY ATTORNEY DAVIES:
19       Q.    And the Washington verus American
20   Homes, what type of case was that?
21       A.    I don't recall exactly the details
22   of that.  It might have been, but I'm not sure,
23   just by judging by the names, there was one case I
24   was involved in where the -- I guess it would be
25   the plaintiff had some exposure to chlorine.  And

Page 17

1    just by virtue of the names here, it might have
2    been that one, but I'm not certain.
3        Q.    So other than the four cases that
4    we've talked about, any other cases that you've
5    testified either by deposition or at trial that you
6    can recall sitting here today?
7            ATTORNEY DYKHUIS:  Object to form.
8            THE WITNESS:  As I mentioned,
9        there might have been another one way
10       back, and I just don't remember the
11       details of that.  It wasn't patent
12       litigation.  It was not medical
13       malpractice.
14       BY ATTORNEY DAVIES:
15       Q.    Okay.  Can you go, Doctor, to
16   Exhibit A, please.  I'm sorry, Attachment A of your
17   declaration.  Apologies.
18       A.    Attachment A looks like my CV.
19       Q.    Is this the most current copy of
20   your CV?
21       A.    I keep my CV updated as publications
22   and talks come out.  So my CV is updated, can be
23   weekly, depending on what's going on.  There
24   haven't been substantive changes to my CV.
25       Q.    Did you update this CV after being

**MAGNA**
LEGAL SERVICES

Page 18

1  contacted by counsel for United Therapeutics in
2  this case?
3         ATTORNEY DYKHUIS:  Object to form.
4         THE WITNESS:  As I say, I'm
5     constantly updating it depending on what
6     I'm doing.  And so whenever I'm contacted
7     to forward my CV, I forward the most
8     recent copy of it.
9  BY ATTORNEY DAVIES:
10     Q.    Do you recall, sitting here today,
11  whether you updated it after being contacted by
12  counsel for UTC regarding work in this case?
13         ATTORNEY DYKHUIS:  Object to form.
14         THE WITNESS:  Yes, I do, because I
15     know that I've had papers accepted or
16     published.  When I have a paper accepted
17     or published, I'll go back to my CV and
18     update it.
19  BY ATTORNEY DAVIES:
20     Q.    This CV was updated in -- on
21  January 17 of 2024.  Is that right?
22     A.    That's the date on the CV.
23     Q.    Okay.
24     A.    So that was -- whenever I was
25  contacted, that was the last time I updated it, so

Page 19

1  this is the most current iteration of my CV when I
2  was asked for it.
3     Q.    So United Therapeutics would have
4  contacted you before February 17, 2024?
5         ATTORNEY DYKHUIS:  Object to form.
6         THE WITNESS:  Regarding this case
7     do you mean?
8  BY ATTORNEY DAVIES:
9     Q.    Correct, yes.
10     A.    I don't recall being contacted
11  previously by United Therapeutics.
12     Q.    I apologize.  I may have misheard
13  your prior testimony, but I thought you said that
14  you had updated this after being contacted by
15  counsel for United Therapeutics.
16         ATTORNEY DYKHUIS:  Object to form.
17  BY ATTORNEY DAVIES:
18     Q.    For this case.
19     A.    No.
20     Q.    You did not.
21     A.    I got contacted, to the best of my
22  knowledge, at the beginning of February,
23  Dr. Nathan, please send us your CV.  I got back
24  and I sent my CV.  The last time I updated was on 1/17.
25  So there might have been a two-week window where I

Page 20

1  had nothing to input to update it.
2     Q.    Understood.  Thank you.
3  Can you go to page 2, please, Dr. Nathan.
4     A.    I'm on page 2.
5     Q.    And it describes your postgraduate
6  education at the top of the CV.  Is that correct?
7     A.    That's correct.
8     Q.    Can you describe what you consider
9  to be your areas of specialty with regard to
10  medical practice?
11         ATTORNEY DYKHUIS:  Object to form.
12         THE WITNESS:  My areas of
13     specialty would be pulmonary and critical
14     as well as lung transplantation with
15     subsequent initial expertise in
16     interstitial lung disease, pulmonary
17     hypertension, in other 25 of advanced
18     lung disease.
19  BY ATTORNEY DAVIES:
20     Q.    Doctor, I think you said "with
21  subsequent initial expertise in interstitial lung
22  disease and pulmonary hypertension."
23     A.    Additional.
24     Q.    Subsequent additional expertise.
25  Was that your testimony?

Page 21

1     A.    Correct.
2     Q.    Okay.
3     A.    There's no formal training for
4  those, but those are areas that I've gravitated
5  towards.
6     Q.    And when did you gain this
7  subsequent additional expertise in interstitial
8  lung disease and pulmonary hypertension?
9     A.    It's accrued over the years.
10  There's no formal training for interstitial lung
11  disease and pulmonary hypertension, at least that
12  wasn't in my day.
13  But I've been involved in pulmonary
14  hypertension since my fellowship at Cedar Sinai,
15  which was the referral center for patients with
16  primary pulmonary hypertension at that time.  So
17  I've been seeing patients with pulmonary
18  hypertension since the start of my fellowship,
19  which was in 1988, if not before.  I did see some
20  cases as well as a resident.
21     Q.    Are you currently employed?
22     A.    Yes, I am.
23     Q.    And where are you currently
24  employed?
25     A.    I'm employed at Inova Fairfax

Page 22

1  Hospital.
2      Q.    And what is your position at Inova?
3      A.    I'm the medical director of the
4  advanced lung disease and lung transplant program.
5      Q.    In your CV it identifies a medical
6  director position at Inova Fairfax that began in
7  May 2018.
8      Do you see that?
9      A.    Yes.
10     Q.    Okay.  And then it says "inactive."
11     A.    Yes.
12     Q.    What does "inactive" mean in your
13 CV?
14     A.    Inova has gone through various
15 iterations of how they want to organize pulmonary.
16 And initially the pulmonary service line asked us
17 to direct, to reorganize.  And so the service line
18 concept went away.
19     Q.    Do you have any academic positions
20 other than your employment at Inova Fairfax?
21     A.    I have an employment as professor of
22 medical education at University of Virginia.
23     Q.    Any other academic appointments?
24     A.    Not at this time.
25     Q.    Any other employers other than Inova

Page 23

1  Fairfax currently?
2      A.    No.
3      Q.    It also has a position as a
4  professor of medical education at the University of
5  Virginia.  Are you still involved with that?
6      A.    Yeah, that's the appointment that I
7  just mentioned.
8      Q.    Okay.  There is also a professional
9  professor of medicine position at Virginia
10 Commonwealth University.
11     A.    Yes.
12     Q.    Are they two positions, or are they
13 the same thing?
14     A.    That probably should read as ended,
15 because what happened was that Inova has
16 affiliations with VCU Medical School, and at that
17 time I was professor of medicine at VCU.  And then
18 they changed their medical school affiliation to
19 UVA, and that's when I got the subsequent
20 appointment.
21     So effectively -- and I apologize, it's
22 very hard to keep everything up to date -- that
23 that should have ended at the same time that the
24 UVA appointment started.
25     Q.    My CV is about four pages long, and

Page 24

1  I don't even keep that accurate so I have no
2  doubt that it's more difficult for you to do so.
3      In your current position at Inova, can you
4  describe to me generally your responsibilities in
5  that position.
6      A.    I oversee the advanced lung disease
7  and lung transplant program.  In the context of
8  their advanced lung disease program, we had various
9  other programs, including a pulmonary hypertension
10 program, which is accredited by the Pulmonary
11 Hypertension Association as one of the care
12 centers.
13     We have an interstitial lung disease
14 program that's accredited by the Pulmonary Fibrosis
15 Foundation.  We have a cystic fibrosis program
16 that's accredited by the CF Foundation, and we have
17 a comprehension saccharidosis program, that's
18 accredited by the World's Association for
19 Saccharidosis and Other Granulomatous Diseases.
20     Q.    Do you still -- maybe I used the
21 wrong word here.
22     Do you still see patients in the clinic?
23     A.    Yes, I do.
24     Q.    Okay.  And how many days a week are
25 you working in the clinic seeing patients?

Page 25

1      A.    I work -- I work 10 and a half days
2  in the clinic seeing patients, but then sometimes
3  I'll add patients on if they need to be seen on an
4  emergency or I want to squeeze them in, I might see
5  them on a day that I'm not in the clinic.
6      Q.    And is that split with your clinical
7  practice, has that been true since about 2018?
8          ATTORNEY DYKHUIS:  Object to form.
9          THE WITNESS:  That's approximately
10     correct.  I don't remember exactly when I
11     went to 2.5 or what effectively works out
12     at a .5 clinical FD.  I don't recall
13     exactly when that was.
14 BY ATTORNEY DAVIES:
15     Q.    How many pulmonary hypertension
16 patients are currently under your care?
17     A.    Since it follows, in the range of
18 about 400 to 500 patients with group 1 pulmonary
19 arterial hypertension.  And then we have
20 approximately 11 to 1200 patients with interstitial
21 lung disease, many of whom have pulmonary
22 hypertension associated with interstitial lung
23 disease.
24     There are a number of providers, but I see
25 a good proportion of patients with pulmonary



7  (Pages 22 to 25)

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000683

Page 26

1  arterial hypertension, patients with interstitial
2  lung disease and patient with IOVPH.
3      Q.    Can you go to page 5 of your CV.
4      A.    (Witness complies with request.)
5  I'm on page 5.
6      Q.    And it looks like it actually begins
7  on page 4, there's a heading entitled "Committees."
8  Do you see that?
9      A.    Yes.
10     Q.    And it appears to include your
11 membership on steering committees for various
12 clinical studies.  Is that correct?
13     A.    That's correct.
14     Q.    If you go to the top of page 5,
15 there's a study, the very first one, 2016 to 2021,
16 steering committee member of phase 2B study of
17 Sildenafil added to pirfenidone in advanced IPF in
18 an immediate or high probability of Group 3 PH.
19 Do you see that?
20     A.    I do.
21     Q.    Do you recall the study name?
22     A.    There was an acronym that went with
23 it.  I don't recall what that acronym was.
24     Q.    Was there a publication that issued
25 from that study?

Page 27

1          ATTORNEY DYKHUIS:  Object to form.
2          THE WITNESS:  Yes, it was.  I
3  believe it was published in the Advanced
4  Respiratory Medicine.
5  BY ATTORNEY DAVIES:
6      Q.    Were you one of the authors on that
7  paper?
8      A.    As I recall, I was the second author
9  on that paper.
10     Q.    Do you recall generally the outcome
11 of that study?
12     A.    The study was a negative study.
13     Q.    In what sense was it a negative
14 study?
15     A.    It didn't meet its primary endpoint.
16     Q.    What was the primary endpoint?
17     A.    As I recall, it was time to clinical
18 worsening.
19          (Reporter clarification)
20     Q.    Were there any other primary
21 endpoints?
22          ATTORNEY DYKHUIS:  Object to form.
23          THE WITNESS:  There were -- not at
24 the primary endpoints.  Typically in the
25 studies you only have one primary

Page 28

1          endpoint.  On rare occasions there could
2      be two primary endpoints.
3  BY ATTORNEY DAVIES:
4      Q.    If you go down -- I'll find it.  If
5  you go down to the next -- I'm sorry.
6          If you go down to the next entry, there's a
7  steering committee member for RIN PH 201, the
8  INCREASE study.
9  Do you see that?
10     A.    I do.
11     Q.    Okay.  When was the steering
12 committee formed for INCREASE?
13     A.    Based on my CV, it appeared that it
14 was in 2016.
15     Q.    So that indicates the beginning of
16 your involvement as a steering committee member?
17          ATTORNEY DYKHUIS:  Object to form.
18          THE WITNESS:  Based on my CV, I
19     believe that would be correct.
20 BY ATTORNEY DAVIES:
21     Q.    Who else was a member of the
22 steering committee for INCREASE?
23     A.    There were two other members:
24 Dr. Aaron Waxman and Dr. Richard Tapson.
25     Q.    Can you repeat the second member of

Page 29

1  the steering committee for INCREASE, Doctor.
2      A.    Victor Tapson.
3      Q.    Victor Tapson?
4      A.    Yes.
5      Q.    What was the responsibility of the
6  steering committee with respect to the design of
7  the INCREASE?
8          ATTORNEY DYKHUIS:  Object to form.
9          THE WITNESS:  We were all involved
10 in coming up with the design in terms of
11     inclusion, exclusionary criteria, and
12     endpoints, as I best recall.
13 BY ATTORNEY DAVIES:
14     Q.    What was your contribution, in your
15 view, to the design of the INCREASE study?
16     A.    I don't remember my individual
17 contribution.  We're talking, I guess, nine years
18 ago now.  I'm sure that I had some kind of
19 contribution, and at the end of the day it was a
20 consensus in terms of how the study was designed.
21     Q.    Other than the three steering
22 committee members, did anyone else have involvement
23 in the study design of the INCREASE study?
24          ATTORNEY DYKHUIS:  Object to form.
25          THE WITNESS:  Yes, there were.



8  (Pages 26 to 29)

Page 30

1    There were representatives from United
2  Therapeutics.  It was their study, and
3  Peter Smith was one of them.  C.Q. Quinn,
4  who was the biostatistician, was also
5  involved in terms of figuring out how
6  we're going to analyze the data
7  statistically.
8  BY ATTORNEY DAVIES:
9      Q.    Anyone else you recall?
10     A.    I don't remember.  I made a mistake.
11  I said nine years ago.  My math was incorrect.
12  It's eight years ago.
13     Q.    No problem.  We all get grades today
14  because we lost an hour last night.
15     A.    We lost what?
16     Q.    We lost an hour last night.
17     A.    I thought you were going to say that
18  you were a Duke fan.
19     Q.    Do you recall anything about
20  Dr. Aaron Waxman's contribution to the design of
21  the INCREASE study?
22     A.    I do not.
23     Q.    Do you recall anything about
24  Dr. Victor Tapson's contribution to the design of
25  the INCREASE study?

Page 31

1      A.    I do not.  As I said, we've all
2  contributed in our own way, and then the study
3  design ultimately was a consensus against everyone,
4  including the folks from United Therapeutics.
5      Q.    Okay.  There's no end date for the
6  steering committee membership for the INCREASE
7  study in your CV.  Is that steering committee still
8  active?
9      A.    We don't meet as a steering
10  committee.  However, where there is activity are
11  various post hoc analyses of the INCREASE study
12  which remain ongoing, and that's probably the
13  reason that I haven't closed it out.
14     Q.    Are there any current post hoc
15  analyses of INCREASE that are ongoing?
16     ATTORNEY DYKHUIS:  Object to form.
17     THE WITNESS:  Yes, they there.
18  BY ATTORNEY DAVIES:
19     Q.    And what are they?
20     A.    We've done numerous post hoc
21  analyses.  There's one paper that's in submission
22  about treating patients with more mild pulmonary
23  hypertension as the subject of analysis.
24  There is another paper being developed
25  pertaining to a risk score in terms of the patients

Page 32

1  who were enrolled in the INCREASE study.
2      Q.    You said it's corresponding to a
3  risk score?
4      A.    Risk score.  Risk stratify the
5  patients who have pulmonary hypertension who were
6  in the study.
7      Q.    Are there any post hoc analyses
8  concerning FVC?
9      A.    There was one that was published in
10  Advanced Respiratory Medicine.
11     Q.    Are you an author on that paper?
12     A.    Yes.
13     Q.    Why was there a post hoc analysis of
14  the INCREASE study done with respect to FVC?
15     ATTORNEY DYKHUIS:  Object to form.
16     THE WITNESS:  The FVC looked at --
17  at baseline and then at the end of the
18  study, and what we saw appeared to be a
19  difference favoring inhaled treprostinil
20  in terms of preservation of the FVC in
21  comparison to the placebo arm, and that
22  was the basis for the post hoc analysis.
23  BY ATTORNEY DAVIES:
24     Q.    So with respect to the initial
25  INCREASE study, you said you saw what appeared to

Page 33

1  be a difference; is that correct?
2      ATTORNEY DYKHUIS:  Object to form.
3      THE WITNESS:  Correct.
4  BY ATTORNEY DAVIES:
5      Q.    Was in your opinion -- with the
6  initial analysis of INCREASE, was there a
7  statistically significant difference in FVC with
8  inhaled treprostinil treatment?
9      ATTORNEY DYKHUIS:  Object to form.
10     THE WITNESS:  As best I recall,
11  there was based on percent predicted, but
12  not absolute in terms of milliliters.
13  However, those became significant when we
14  looked at various subgroups, including
15  those patients with idiopathic
16  interstitial pneumonia and a further
17  subgroup of those patients, the patients
18  with idiopathic pulmonary fibrosis.
19  BY ATTORNEY DAVIES:
20     Q.    So at least with the initial
21  INCREASE study, there was not a significant
22  difference in FVC with treprostinil treatment
23  across all patients; correct?
24     ATTORNEY DYKHUIS:  Object to form.
25     THE WITNESS:  There was.  There



9 (Pages 30 to 33)

Page 34

```
1       are two ways you can look at the FVC.
2       You can look at the absolute number,
3       which is how many ccs or milliliters, or
4       you can look at it as a percent
5       predicted, and there was a statistical
6       difference when you looked at it based on
7       percent predicted.
8    BY ATTORNEY DAVIES:
9       Q.   Which of those two measures or
10   analyses do you feel is more accurate?
11          ATTORNEY DYKHUIS:  Object to form.
12          THE WITNESS:  They are both
13       accurate.  They just tell you different
14       ways of looking at the FVC.
15   BY ATTORNEY DAVIES:
16       Q.   What's the significance to you as a
17   clinician where one method produces a statistically
18   significant difference and the other does not?
19          ATTORNEY DYKHUIS:  Object to form.
20          THE WITNESS:  It really doesn't
21       make a difference to me how I look at the
22       data, to be quite honest.
23   BY ATTORNEY DAVIES:
24       Q.   What do you mean, it doesn't make a
25   difference to you how you look at the data?
```

Page 35

```
1       A.   I look at the compendium of the
2    data.  One is positive, one is negative.  I
3    wouldn't say "negative."  It probably was a trend;
4    I don't remember what the P value was.  But the
5    study wasn't powered to look at the FVC.
6       So it's an interesting observation that
7    remained to be further validated and that is
8    currently ongoing.
9       Q.   Was the post hoc analysis powered to
10   look at FVC?
11          ATTORNEY DYKHUIS:  Object to the
12       form.
13          THE WITNESS:  No, you can't power
14       a study retrospectively.
15   BY ATTORNEY DAVIES:
16       Q.   Why -- whose decision was it to do
17   the post hoc analysis for FVC?
18          ATTORNEY DYKHUIS:  Object to form.
19          THE WITNESS:  It was an easy group
20       decision, because we saw the signal when
21       we looked at the FVC, and it was somewhat
22       surprising and unexpected.
23          FVC was initially looked at as a
24       safety measure.  We're giving a
25       medication by the inhaled drug to
```

Page 36

```
1       patients who had interstitial lung
2       disease, and we didn't know if we would
3       be hurting these patients because they
4       are very different from Group 1 PAH
5       patients that have parenchymal lung
6       disease and getting anything inhaled is
7       the possibility you could harm them.  And
8       that was why it was labeled as a safety
9       endpoint.
10   BY ATTORNEY DAVIES:
11       Q.   Sitting here today, are you
12   confident that administration of inhaled
13   treprostinil produced a statistically significant
14   improvement in FVC in the INCREASE study?
15          ATTORNEY DYKHUIS:  Object to form.
16          THE WITNESS:  If you look at
17       percent predicted, I'd have to go to the
18       paper, if you have it, just to make sure
19       what I'm saying is the truth.  But as
20       best I recall, there was a statistically
21       significant difference.  So I'm confident
22       with that.
23          I would need to look at the paper
24       to make sure that what I'm telling you is
25       correct, but that's the best of my
```

Page 37

```
1       recollection.  So I'm confident in the
2       analyses that were done in the post hoc
3       analysis.
4    BY ATTORNEY DAVIES:
5       Q.   And what about the initial analyses
6    in the absence of the post hoc analyses?  In your
7    opinion, does that support a statistically
8    significant improvement in FVC, or was it uncertain
9    with the initial analysis?
10          ATTORNEY DYKHUIS:  Object to form.
11          THE WITNESS:  I believe the
12       initial analysis showed the same thing.
13       It's just that in the post hoc analysis
14       we dug deeper into it, and that's when we
15       did the subgroup analyses.
16   BY ATTORNEY DAVIES:
17       Q.   So to the best of your recollection,
18   with respect to FVC, INCREASE showed a significant
19   difference in percent predicted.  Is that correct?
20          ATTORNEY DYKHUIS:  Object to form.
21          THE WITNESS:  In favor of inhaled
22       treprostinil versus placebo.
23   BY ATTORNEY DAVIES:
24       Q.   Is that correct?
25       A.   Correct.
```



10  (Pages 34 to 37)

Page 38

```
 1        Q.    But with respect to absolute
 2   improvements in FVC, there was not a significant
 3   difference following treatment with inhaled
 4   treprostinil in the INCREASE study; correct?
 5                ATTORNEY DYKHUIS:  Object to form.
 6                THE WITNESS:  I wouldn't regard it
 7        as improvement.  I believe that's what
 8        you said.  It was placebo-corrected
 9        difference.
10        BY ATTORNEY DAVIES:
11        Q.    So there was not a significant
12   difference in absolute FVC in the INCREASE study;
13   correct?
14                ATTORNEY DYKHUIS:  Object to form.
15                THE WITNESS:  That's to the best
16        of my recollection.
17        BY ATTORNEY DAVIES:
18        Q.    Okay.
19        A.    For the patients as a whole, but for
20   the subgroups it was.
21        Q.    When was the -- when was the
22   post hoc analysis on FVC, when was that started?
23                ATTORNEY DYKHUIS:  Object to form.
24                THE WITNESS:  I don't recall the
25        exact date.  I think that it was probably
```

Page 39

```
 1        2021 sometime, early 2021, but I don't
 2        recall the exact date.  Sorry.
 3        BY ATTORNEY DAVIES:
 4        Q.    No problem.
 5        You mentioned that the INCREASE study was
 6   designed by a consensus of the five committee
 7   members that you can recall; correct?
 8                ATTORNEY DYKHUIS:  Objection to
 9        form.
10                THE WITNESS:  It was the three
11        steering committee members and the
12        sponsor.
13        BY ATTORNEY DAVIES:
14        Q.    Okay.  And the protocol for INCREASE
15   was designed as a consensus of the three committee
16   members; is that correct?
17                ATTORNEY DYKHUIS:  Object to form.
18                THE WITNESS:  Together with the
19        sponsor.
20        BY ATTORNEY DAVIES:
21        Q.    Okay.  Do you remember any input
22   that the sponsor offered UTC -- strike that.  Let
23   me start over.
24        Can you recall sitting here today
25   any specific -- let me try it one more time.
```

Page 40

```
 1        Sitting here today, can you recall any
 2   specific input or contribution of United
 3   Therapeutics's representatives to the design of the
 4   INCREASE study?
 5                ATTORNEY DYKHUIS:  Objection to
 6        form.
 7                THE WITNESS:  They had a
 8        substantial contribution.  The way it
 9        worked is that we were sent a cursory
10        protocol, and then we provided input in
11        terms of, you know, maybe think about
12        this, maybe think about that, but they
13        really provided the foundation for the
14        study.
15        BY ATTORNEY DAVIES:
16        Q.    Do you recall sitting here today any
17   belief by the study members -- strike that.
18        Do you recall sitting here today any belief
19   by the steering committee members that the study
20   would not be successful?
21                ATTORNEY DYKHUIS:  Object to the
22        form.
23                THE WITNESS:  Yes.  I had my
24        doubts that it would be successful for
25        sure.
```

Page 41

```
 1        BY ATTORNEY DAVIES:
 2        Q.    Why did you believe it would not --
 3   well, why did you have doubts regarding the success
 4   of the study?
 5        A.    Because it had been no prior
 6   randomized controlled study in PH-ILD demonstrating
 7   success, and personally I had just come off being
 8   the chair of the steering committee of the RISE IP
 9   study, which was riociguat for the same indication,
10   PH-ILD, and not only was that a negative study, but
11   it was a harmful study.
12        Q.    Do you recall Dr. Waxman expressing
13   any belief that the study would not be successful?
14                ATTORNEY DYKHUIS:  Objection,
15        form.
16                THE WITNESS:  I don't recall that.
17        BY ATTORNEY DAVIES:
18        Q.    Okay.  Do you recall Dr. Victor
19   Tapson expressing any belief that the study would
20   not be successful?
21                ATTORNEY DYKHUIS:  Object to the
22        form.
23                THE WITNESS:  I don't recall that.
24        BY ATTORNEY DAVIES:
25        Q.    Okay.  Regarding your feelings about
```



11  (Pages 38 to 41)

Page 42

1  the study in your past experience from the RISE
2  study, why were you willing to be a member of the
3  steering committee, given your past experience with
4  RISE?
5          ATTORNEY DYKHUIS:  Objection to
6  the form.
7          THE WITNESS:  I was asked to be a
8      steering committee member, and I valued
9      the opportunity.  And we have many
10     negative studies in medicine that have
11     subsequently been followed by positive
12     studies.
13         So I think the history of medicine
14     is such that if you have one negative
15     study, you don't necessarily give up.  If
16     you look at another disease that I deal
17     with, idiopathic pulmonary fibrosis, for
18     which there are two anti-fibrotics that
19     are approved, there are about 10 RCTs,
20     randomized studies, prior to that before
21     those came back positive.
22         So, you know, if we just gave up
23     on all treatments, we wouldn't have
24     anything for cancer today.
25

Page 43

1  BY ATTORNEY DAVIES:
2      Q.   So when during the development of
3  the INCREASE study did you become optimistic that
4  it would succeed?
5          ATTORNEY DYKHUIS:  Object to the
6      form.
7          THE WITNESS:  When I heard the
8      results.
9  BY ATTORNEY DAVIES:
10     Q.   So until you heard the results of
11  the INCREASE study, you were not optimistic that
12  the study would succeed?
13         ATTORNEY DYKHUIS:  Object to the
14     form.
15         THE WITNESS:  I had my doubts.
16  BY ATTORNEY DAVIES:
17     Q.   And when did you first hear the
18  results of the INCREASE study?
19         ATTORNEY DYKHUIS:  Objection to
20     form.
21         THE WITNESS:  It was sometime
22     towards the end of February of 2020.
23  BY ATTORNEY DAVIES:
24     Q.   Do you recall who communicated those
25  results to you?

Page 44

1      A.   Peter Smith.
2      Q.   Who is Peter Smith?
3      A.   He was one of the two UT members,
4  and he led the study from the sponsor standpoint
5  for United Therapeutics.
6      Q.   Do you recall United Therapeutics
7  ever expressing any skepticism that the INCREASE
8  study would not be successful?
9          ATTORNEY DYKHUIS:  Objection to
10     form.
11         THE WITNESS:  No.
12  BY ATTORNEY DAVIES:
13     Q.   The communication in February 2020
14  that you received from Peter Smith regarding the
15  data, was the study data locked at that point, or
16  what stage in data collection was ongoing at that
17  point?
18         ATTORNEY DYKHUIS:  Objection to
19     form.
20         THE WITNESS:  The study was
21     locked, and they had done the analysis of
22     the primary endpoint, and I believe at
23     that time some of the secondary endpoints
24     as well.
25

Page 45

1  BY ATTORNEY DAVIES:
2      Q.   So by the time you got -- you heard
3  the results from Peter Smith, the study had been
4  locked and there had been analysis on both the
5  primary and secondary endpoints as well; correct?
6          ATTORNEY DYKHUIS:  Objection to
7      form.
8          THE WITNESS:  As best I recall.
9  BY ATTORNEY DAVIES:
10     Q.   And this was the first time that you
11  were optimistic that the study would be successful;
12  correct?
13         ATTORNEY DYKHUIS:  Objection to
14     form.
15         THE WITNESS:  That's correct.
16  BY ATTORNEY DAVIES:
17     Q.   Did Leigh Peterson contribute to the
18  design or conduct of the INCREASE study?
19         ATTORNEY DYKHUIS:  Object to form.
20         THE WITNESS:  I don't recall
21     specifically that she could well have.  I
22     suspect that there was a lot of
23     communication behind the scenes that the
24     steering committee members were not
25     necessarily privy to.



12  (Pages 42 to 45)

Page 46

1    BY ATTORNEY DAVIES:
2        Q.    To your knowledge, who is Leigh
3    Peterson?
4            ATTORNEY DYKHUIS:  Object to form.
5            THE WITNESS:  She's an employee of
6        United Therapeutics.
7    BY ATTORNEY DAVIES:
8        Q.    Do you know generally what her
9    responsibilities were, if any, with respect to the
10   INCREASE study?
11       A.    I do not.
12       Q.    Did you ever have any conversations
13   with Leigh Peterson regarding the INCREASE study?
14       A.    I don't recall any.
15       Q.    Do you know if Peter Smith had any
16   contribution to the design or conduct of the
17   INCREASE study?
18           ATTORNEY DYKHUIS:  Object to the
19       form.
20           THE WITNESS:  I'm pretty sure he
21       did without knowing a hundred percent.
22       He led the study, so I think it's
23       reasonable to assume that he had some
24       essential contributions, but I can't tell
25       you for sure.

Page 47

1    BY ATTORNEY DAVIES:
2        Q.    What about Chung Kun Dang?  Did he
3    have any role in the conduct or design of the
4    INCREASE study?
5            ATTORNEY DYKHUIS:  Object to form.
6            THE WITNESS:  Yes, he did, because
7        he's the biostatistician that helps to
8        come up with the statistical analysis
9        plan.
10   BY ATTORNEY DAVIES:
11       Q.    Below -- going back to your CV,
12   Doctor, I'm sorry, your CV is Attachment A to your
13   declaration, which is Exhibit 2.
14       The next steering committee membership I
15   wanted to ask you about began in 2016, steering
16   committee member for RIN PH 203 study.
17   Do you see that?
18           ATTORNEY DYKHUIS:  Object to the
19       form.
20           THE WITNESS:  Yes, I do.
21   BY ATTORNEY DAVIES:
22       Q.    Does that have a study name?
23       A.    Yes, it does.  That is known as the
24   PERFECT study.
25       Q.    Who else was on the steering

Page 48

1    committee for the PERFECT study?
2        A.    It was myself, Vic Tapson -- Victor
3    Tapson, Aaron Tapson, and there was an additional
4    member, Todd Bull, B-u-l-l.
5        Q.    And is that steering committee still
6    active as well?
7            ATTORNEY DYKHUIS:  Object to the
8        form.
9            THE WITNESS:  The paper pertaining
10       to that study is currently in
11       development, and so with regards to
12       fine-tuning the paper, the steering
13       committee still has input into that.
14           The study got stopped early for
15       lack of efficacy and a signal of
16       potential harm, and this was inhaled
17       trepostinil in patients, with COPD.
18   BY ATTORNEY DAVIES:
19       Q.    Is PH due to COPD, is that a
20   Group 3?
21       A.    That's correct.
22           ATTORNEY DYKHUIS:  Object to the
23       form.
24       Q.    I'm sorry.  I want to just ask, I'll
25   try to rephrase that a little bit better.

Page 49

1        Is pulmonary hypertension due to chronic
2    obstructive -- strike that.
3        How many -- you're aware that there's five
4    groups of pulmonary hypertension; correct?
5        A.    That's correct.
6        Q.    Okay.  Which of those five groups
7    does pulmonary hypertension due to chronic
8    obstructive pulmonary disease fall into?
9        A.    Group 3.
10       Q.    Do you know whether United
11   Therapeutics was still investigating the use of
12   inhaled treprostinil for PH COPD?
13       A.    I don't believe they are.
14       Q.    Why do you believe that that study
15   failed?
16           ATTORNEY DYKHUIS:  Objection to
17       form.
18           THE WITNESS:  I don't know why the
19       study failed.  There are many moving
20       parts to a successful study design.  I
21       think it just underscores a point that
22       not all forms of lung disease which are
23       conflicted by pulmonary hypertension
24       necessarily behave the same or respond
25       the same to therapy.



13  (Pages 46 to 49)

Page 50

```
1        BY ATTORNEY DAVIES:
2        Q.    If you turn to page 8, there's a
3   list of your publications that begins on page 8.
4        A.    Okay.
5        Q.    And I believe you testified that
6   you're not aware of any significant additions to
7   that list of publications.
8            ATTORNEY DYKHUIS:  Object to form.
9            THE WITNESS:  There have been some
10       publications that have been added.  Maybe
11       one or two.  I can't recall exactly right
12       now.
13       BY ATTORNEY DAVIES:
14       Q.    Are there any that you're aware of
15   that are or that concern the use of treprostinil?
16           ATTORNEY DYKHUIS:  Object to form.
17           THE WITNESS:  I'll have to go and
18       see what the last entry is here.
19           No, I don't believe -- let me just
20       double-check, I apologize.  I don't
21       believe that there are any new
22       publications pertaining to inhaled --
23       trepostinil.
24       BY ATTORNEY DAVIES:
25       Q.    If you turn to page 29 of your CV,
```

Page 51

```
1   and this appears to be a list of publications in
2   submission or preparation.  Is that correct?
3        A.    Correct.
4            ATTORNEY DYKHUIS:  Object to form.
5        Q.    We talked about the post hoc
6   analysis with regard to FVC that was done for the
7   INCREASE study.
8        Do you recall that?
9            ATTORNEY DYKHUIS:  Object to form.
10           THE WITNESS:  Yes.
11       BY ATTORNEY DAVIES:
12       Q.    Is 18 the in-preparation publication
13   of those results and analysis?
14       A.    No.  This isn't the FVC.  That was
15   the question you had.
16       Q.    Correct.
17       A.    I can direct you to that one,
18   because that's not in preparation.  That has been
19   published.
20       It's publication number 137.
21       Q.    What is the post hoc analysis of
22   INCREASE that's described at 18 on page 29 of your
23   CV?
24       A.    There's no mention of efficacy that
25   I can see in Number 18.
```

Page 52

```
1        Q.    And I'm sorry, Doctor, I may not
2   have been clear.  What is the post hoc analysis of
3   INCREASE that's described at Number 18 on page 29
4   of your CV?
5        A.    That was looking at outcomes in
6   patients with less severe pulmonary hypertension.
7   It didn't pertain to the FVC.
8        Q.    And why did you decide to do this
9   post hoc analysis that's described in 18?
10           ATTORNEY DYKHUIS:  Object to form.
11           THE WITNESS:  There have been many
12       ideas that have come out with this very
13       rich dataset, and that was one of them.
14       Despite the overwhelmingly positive
15       results, that does still exist in the
16       community skepticism around the INCREASE
17       study, and specifically enough
18       patients with more mild pulmonary
19       hypertension are responders.
20           And that was a reason to do an
21       analysis into patients who had more mild
22       pulmonary hypertension just to drill down
23       on all the potential benefits that you
24       could see with if patients with mild
25       pulmonary hypertension were treated.
```

Page 53

```
1        BY ATTORNEY DAVIES:
2        Q.    And what were the results of that
3   post hoc analysis with respect to this more mild PH
4   patient population?
5            ATTORNEY DYKHUIS:  Object to form.
6            THE WITNESS:  Once you do post hoc
7        analyses, the numbers get smaller.  And
8        when the numbers get smaller, it becomes
9        much more difficult to show statistical
10       significance.
11           But the point estimates in what we
12       call the hazard ratios for clinical
13       worsening did appear to favor inhaled
14       trepostinil, as well as the point
15       estimate for the risk of acute
16       exacerbations did fail to -- I'm sorry,
17       did favor inhaled trepostinil.  It didn't
18       reach statistical significance, and then
19       the change in the biomarker were used,
20       which is called the NT-ProBNP also showed
21       a favorable effect in the group that got
22       inhaled trepostinil.  And I think the
23       NT-ProBNP hits statistical significance.
24       BY ATTORNEY DAVIES:
25       Q.    Did you examine change in six-minute
```



14  (Pages 50 to 53)

Page 54

1 walk distance analysis in this post hoc analysis?
2    A.   The change in the six-minute walk
3 distance had been reported in the primary INCREASE
4 publication in patients with more mild pulmonary
5 hypertension.  Honestly, I don't recall how much we
6 reported out on the six-minute walk in this
7 post hoc analysis.  I think we did.
8        The paper is still in revision at the
9 moment, but without having the paper in front of
10 me, I can't tell you a hundred percent.  I'm pretty
11 sure that we must have examined the six minute walk
12 distance.
13    Q.   Do you recall whether there was a
14 statistically significant difference in six-minute
15 walk distance in this patient population subgroup
16 with more mild pulmonary hypertension?
17        ATTORNEY DYKHUIS:  Object to form.
18        THE WITNESS:  Well, if you go back
19     to the primary paper, in the supplement
20     to the primary paper there's an analysis
21     of patients with pulmonary vascular
22     resistances between three and four, and
23     it did not appear to be any effect on the
24     six-minute walk.
25        Hence, the skepticism, and hence

Page 55

1 the reason we did this deeper dive
2 looking at these other outcome measures
3 which did appear to show benefit in this
4 group of patients.
5 BY ATTORNEY DAVIES:
6    Q.   You mentioned, I believe, in one of
7 your earlier responses, Doctor, exacerbations of
8 interstitial lung disease.
9        Did I recall that correctly?
10    A.   Yes.
11    Q.   What is an exacerbation of
12 interstitial lung disease?
13    A.   There's a strict definition for what
14 an exacerbation of interstitial lung disease is and
15 the guidelines for that in terms of worsening
16 infiltrates on chest imaging, worsening shortness
17 of breath over a time period of less than four
18 weeks.  Worsening gas exchange and ruling out other
19 causes like infection or heart failure.
20        So it's -- and then if you rule all those
21 out, you're left with an acute exacerbation of
22 interstitial lung disease.
23    Q.   With respect to this more mild PH
24 subgroup of patients, was there a statistically
25 significant difference with respect to

Page 56

1 exacerbations of interstitial lung disease?
2        ATTORNEY DYKHUIS:  Object to form.
3        THE WITNESS:  The points estimate
4     was way to the left favorable for inhaled
5     trepostinil.  I think that it was
6     something like an 80 percent risk
7     reduction, if I recall the point estimate
8     exactly.  Because the numbers were very
9     small, the error bars were very wide and
10     crossed the line of unity so that the
11     post hoc analysis suffered from
12     insufficient numbers to have a definitive
13     answer that the point estimate suggested
14     strongly that there was a substantial
15     benefit.
16 BY ATTORNEY DAVIES:
17    Q.   But there was not a statistically
18 significant difference; correct?
19        ATTORNEY DYKHUIS:  Objection to
20     form.
21        THE WITNESS:  Because of the small
22     numbers, that's correct, yes.
23 BY ATTORNEY DAVIES:
24    Q.   With regard to the entire patient
25 population within the INCREASE study, was there a

Page 57

1 statistically significant difference in
2 exacerbations of interstitial lung diseases on
3 treatment with inhaled trepostinil?
4        ATTORNEY DYKHUIS:  Object to form.
5        THE WITNESS:  I believe that there
6     was.
7 BY ATTORNEY DAVIES:
8    Q.   Why do you believe there was an
9 effect seen in the larger patient population but
10 not in the subgroup of more mild PH patients with
11 respect to an effect on exacerbations in ILD?
12        ATTORNEY DYKHUIS:  Objection.
13     Form.
14        THE WITNESS:  It's purely because
15     of the numbers.  We had, as I recall, 336
16     patients in the group as a whole, and
17     then those who had mild PH -- I don't
18     remember what the number was, it was 60
19     to 80 -- and once you have smaller
20     numbers, it becomes much more difficult
21     to hit statistical significance.
22 BY ATTORNEY DAVIES:
23    Q.   Going back to your CV on page 29 --
24 and just let me know when you're back there --
25 there's an entry Number 24.



15 (Pages 54 to 57)

Page 58

1    Do you see that?
2    A.    I do.
3    Q.    And it refers to a derivation of a
4  simple risk calculator for predicting clinical
5  worsening in patients with pulmonary hypertension
6  due to interstitial lung disease.
7    Do you see that?
8    A.    I do.
9    Q.    And what does that paper describe,
10 generally?
11    A.    That's the paper that I mentioned
12 earlier that's still in development, looking at all
13 the patients from an INCREASE study and looking at
14 their baseline characteristics to see if we can
15 identify a high-risk group versus a lower risk
16 group, a group of patients who are generally pretty
17 high risk.
18    Q.    And what do you mean by "high risk"?
19    A.    For having an event like mortality,
20 hospitalization, being events that are notable or
21 sometimes you put that in a compass endpoint of
22 clinical worsening.  So that risk of having a bad
23 outcome or higher risk of having a bad outcome.
24    Q.    Is that risk based on treatment with
25 inhaled treprostinil, or is that just they're high

Page 59

1  risk due to their disease generally?
2    ATTORNEY DYKHUIS:  Object to form.
3    THE WITNESS:  High risk due to
4  their disease generally.  I believe the
5  way we're doing it is we're just looking
6  at the placebo arm to rule out the effect
7  of inhaled trepostinil on their own
8  interests.
9  BY ATTORNEY DAVIES:
10    Q.    Other than your work in this case,
11 are you consulting with United Therapeutics in any
12 other matter?
13    A.    I do consult with them in other
14 matters, you know, depending on what's going on.
15 You know, they have a working group, for example,
16 that talks about PH-ILD, and I'm part of that
17 working group.  I'm on their speakers bureau.
18    So are there other ways in which I
19 collaborate with United Therapeutics.
20    Q.    Other than being on the working
21 group with PH-ILD and the speakers group, how else
22 do you collaborate with United Therapeutics?
23    A.    I'm the chair of the steering
24 committee for the Teton study.
25    Q.    Anything else?

Page 60

1    A.    Not that springs to mind at the
2  moment.
3    Q.    Have you received funding as
4  research grants from United Therapeutics?
5    A.    Yes, I have.
6    Q.    Do you have any sense for the amount
7  of money that you received in research grants from
8  United Therapeutics over the years?
9    ATTORNEY DYKHUIS:  Object to form.
10    THE WITNESS:  I don't have a good
11  sense.
12  BY ATTORNEY DAVIES:
13    Q.    Is it more than $100,000?
14    ATTORNEY DYKHUIS:  Object to form.
15    THE WITNESS:  I didn't get any
16  money from them for research.  It goes to
17  my institution.
18  BY ATTORNEY DAVIES:
19    Q.    Do you personally receive any other
20 grants from United Therapeutics which aren't for
21 research purposes?
22    ATTORNEY DYKHUIS:  Object to form.
23    THE WITNESS:  No.
24  BY ATTORNEY DAVIES:
25    Q.    Can you turn to page 44 of your CV.

Page 61

1    A.    (Witness complies with request.)
2    Q.    This is in a section -- I'm sorry.
3  Are you there, Doctor?
4    A.    I am there, yes.
5    Q.    Okay.  And if you flip over a page
6  or two, this is in a section of your CV titled
7  "Research Grants, Pharmaceutical Multicenter
8  Studies."
9    Do you see that?
10    A.    Yes.
11    Q.    Can you look at entry Number 31 on
12 page 44.
13    A.    (Witness complies with request.)
14    Q.    Are you there?
15    A.    Yeah.
16    Q.    What was your involvement in the
17 protocol for the LTI-301 study?
18    ATTORNEY DYKHUIS:  Object to form.
19    THE WITNESS:  I wasn't involved in
20  this protocol development.  As I recall,
21  we were asked to be a center, and Moreau
22  [phon.] was the subinvestigator.  I
23  wasn't even the principal investigator on
24  that.
25

**MAGNA** ◗
LEGAL SERVICES

16  (Pages 58 to 61)

Page 62

1    BY ATTORNEY DAVIES:
2        Q.    What was your role as a
3    subinvestigator in the study?
4        A.    The fact that I was a
5    subinvestigator just enabled me to see patients
6    when they come in for study limits.  Nothing more
7    than that in terms of data analysis or anything
8    else.
9        Q.    Are you familiar with -- well, as
10   your role as a subinvestigator and seeing patients
11   as they came in, you've seen the dry powder inhaler
12   that's used for administration of Yutrepia;
13   correct?
14           ATTORNEY DYKHUIS:  Object to form.
15           THE WITNESS:  I haven't seen the
16       Yutrepia device.
17   BY ATTORNEY DAVIES:
18       Q.    Do you know what the Yutrepia device
19   is?
20       A.    I don't have a good idea what the
21   device is.
22       Q.    You do not?
23       A.    I do not.  I might have seen a
24   picture of it, but I've never held one in my hands,
25   no.

Page 63

1        Q.    Were you familiar with a Plastiape
2    inhaler, that's RS00 Model 8?
3            ATTORNEY DYKHUIS:  Object to form.
4            THE WITNESS:  I don't believe I
5        am.
6    BY ATTORNEY DAVIES:
7        Q.    Okay.  So when patients came in as
8    part of the LTI-301 study, what was your role as a
9    subinvestigator when those patients came in?
10           ATTORNEY DYKHUIS:  Object to form.
11           THE WITNESS:  To be honest, I
12       don't even remember seeing any of these
13       patients.  I might have been a sub-I on
14       the protocol that we submitted without
15       ever having seen one of these patients.
16   BY ATTORNEY DAVIES:
17       Q.    When is the first time that you can
18   recall hearing about Yutrepia or LIQ-861?
19       A.    It's actually interesting, if I may.
20   When you pointed me to this, I wasn't even aware
21   that this was Liquidia's product.  That's how much
22   I recall about this study.  I was very peripheral,
23   and I've never saw any of these patients, and I
24   never saw the device.
25           I was just listed as a sub-I at the start

Page 64

1    of the study, as were a bunch of our associates.
2    The reason we do that is in case a PI is not
3    available, someone can substitute for them and see
4    a patient, but that never happened to me.
5        Q.    Do you know who the PI was at your
6    institution for this?
7        A.    I believe it was Dr. Oxanna Slobin.
8        Q.    We've been going for about an hour.
9    Do you want take a break?
10       A.    I'm good.  We can carry on unless
11   you need to take a break.
12           ATTORNEY DAVIES:  I need to take a
13       break, so if you don't mind, let's take a
14       quick break.
15           THE VIDEOGRAPHER:  We are off the
16       record at 10:12.
17           (Recess taken from
18           10:12 a.m. to 10:21 a.m.)
19           THE VIDEOGRAPHER:  We are on the
20       record at 10:21.
21   BY ATTORNEY DAVIES:
22       Q.    Welcome back, Doctor.  Thank you for
23   accommodating my request for a break, I appreciate
24   that.
25           You mentioned earlier this morning an

Page 65

1    initial protocol for the INCREASE study.
2        Do you recall that?
3            ATTORNEY DYKHUIS:  Object to form.
4            THE WITNESS:  We did talk about
5        the INCREASE study and how it was
6        formulated, yes.
7    BY ATTORNEY DAVIES:
8        Q.    And I believe you testified that
9    there had been a draft of a protocol that was
10   provided from United Therapeutics, and you
11   commented and had input on that; is that correct?
12           ATTORNEY DYKHUIS:  Object to form.
13           THE WITNESS:  That's correct.
14   BY ATTORNEY DAVIES:
15       Q.    Do you know what the basis or
16   rationale was for the INCREASE protocol draft from
17   United Therapeutics?
18           ATTORNEY DYKHUIS:  Object to form.
19           THE WITNESS:  The premise was to
20       give inhaled treprostinil and to see if
21       it would be of benefit in patients with
22       pulmonary hypertension associated with --
23       interstitial lung disease.
24   BY ATTORNEY DAVIES:
25       Q.    Are you aware of whether it relied



17   (Pages 62 to 65)

Page 66

1  on any results from prior studies to support in the
2  design of the INCREASE protocol?
3         ATTORNEY DYKHUIS:  Object to form.
4         THE WITNESS:  I'm not aware of,
5     you know, the studies, I'm sure the
6     studies looked at all the studies in the
7     literature prior to that, but I don't
8     know of anyone that they leaned on.
9  BY ATTORNEY DAVIES:
10     Q.    Can you go back to the beginning of
11  your declaration, which is Exhibit 2.  And if you
12  go to the table of contents for your declaration,
13  just let me know when you're there.
14     A.    (Witness complies with request.)
15     Yes.
16     Q.    You mentioned that you drafted the
17  medical portions of your declaration.  Can you
18  identify the portions of your declaration in the
19  table of contents that you prepared?
20         ATTORNEY DYKHUIS:  Object to form.
21     I would say that I -- all portions I had
22     input on.  I might have not been the
23     first draftee, but, you know, the
24     legalese stuff, there was the foundation
25     provided by counsel and, certainly if

Page 67

1     there was anything that I didn't
2     understand it was explained to me.  So it
3     was a lot of wordsmithing that went
4     around that.
5         But if we go through the medical
6     stuff, I know that -- I think it's just
7     about 58 points looks like it's more
8     legal stuff.
9  BY ATTORNEY DAVIES:
10     Q.    When you said "points," Doctor,
11  you're referring to the first 58 paragraphs or more
12  of legal stuff that you didn't prepare?
13         ATTORNEY DYKHUIS:  Object to form.
14         THE WITNESS:  I wouldn't say I
15     didn't prepare it.  I didn't prepare
16     necessarily the first draft, but then I
17     had input subsequently of the things that
18     I didn't understand; they were laid out
19     differently and I might have done some
20     wordsmithing myself amongst all the
21     different paragraphs.  I don't recall
22     exactly what.
23         But if you look at from Scientific
24     Background, 59, 68, 69, 70, I believe
25     counsel helped put this table together.

Page 68

1     I think I provided the names of the
2     drugs, if I recall correctly.
3         Seventy-three, 74, this all looks
4     medical.  Seventy-five, 76, 77, and then
5     all prior studies, I wrote that.  I think
6     counsel was aware of some of these
7     studies and might have mentioned it, but
8     I really provided the verbiage that I
9     went through with each of these studies.
10     RISE IP, Sildenafil, pirfenidone, we
11     spoke about that.
12         The PERFECT study was mentioned.
13     I don't know if you wanted me to make my
14     way through the whole document and pick
15     out areas that I was involved in.  The
16     INCREASE study, I believe that I was a
17     primary person who wrote that.
18         But then when you come to areas
19     like patent, you know, that's where
20     counsel helped to lay out the initial
21     foundation in terms of the first draft.
22  BY ATTORNEY DAVIES:
23     Q.    There's reference on page 36 to the
24  prosecution history of the '327 patent.
25     A.    Yeah.

Page 69

1     Q.    What is the prosecution history of
2  the '327 patent?
3     A.    It's kind of a dying --
4         ATTORNEY DYKHUIS:  Object to form.
5     Sorry, give me a moment to make any
6     objections.
7         THE WITNESS:  I'm sorry.
8         ATTORNEY DYKHUIS:  The other thing
9     I would say, Dr. Nathan, in this line of
10     questioning just a reminder I caution you
11     not to reveal of substance of any
12     communications with counsel, but you can
13     explain.
14         THE WITNESS:  Thank you.
15         To my understanding, the
16     prosecution history is going backwards
17     and forwards between the courts in terms
18     of the lawsuit is brought and it's
19     revised and then the decision and then
20     you've got a counterclaim or whatever.
21     So that's how it's being prosecuted
22     historically.
23  BY ATTORNEY DAVIES:
24     Q.    Do you recall reviewing the
25  prosecution history of the '327 patent in terms of



18  (Pages 66 to 69)

Page 70

```
1   preparing your report?
2           ATTORNEY DYKHUIS:  Object to form.
3           THE WITNESS:  I did.
4       BY ATTORNEY DAVIES:
5       Q.   You did.
6   Can you go to page 43.
7       A.   (Witness complies with request.)
8       Q.   And there's a section of your report
9   here entitled, "Liquidia will infringe the asserted
10  claims of the '327 patent."
11      Do you see that?
12      A.   I do.
13      Q.   Did you prepare this section of the
14  report on the infringement of the claims of the
15  '327 report, or is this legal opinion?
16          ATTORNEY DYKHUIS:  Object to form.
17          THE WITNESS:  It's my opinion.
18      BY ATTORNEY DAVIES:
19      Q.   Did you prepare any portions of
20  those, or did counsel prepare them?
21          ATTORNEY DYKHUIS:  Object to form.
22          THE WITNESS:  Honestly, I can't
23      remember who contributed what to this
24      first draft.  It might well have been
25      counsel because I wasn't familiar which
```

Page 71

```
1       claims were being contested, but I
2       certainly had input into this.
3       BY ATTORNEY DAVIES:
4       Q.   We talked a little bit about
5   statistical significance in a couple of different
6   context earlier this morning.
7       Do you recall that?
8       A.   Yes.
9       Q.   Is it possible to determine whether
10  there has been a statistically significant
11  difference within a single patient with respect to
12  a treatment?
13          ATTORNEY DYKHUIS:  Object to form.
14          THE WITNESS:  No.
15      BY ATTORNEY DAVIES:
16      Q.   Why not?
17      A.   You need --
18          ATTORNEY DYKHUIS:  Sorry, object
19      to form.
20          THE WITNESS:  You need a large
21      study to determine the statistical
22      significant.  There's a lot of things
23      that can happen by chance in an
24      individual patient, which if under
25      treatment may or may not be attributable
```

Page 72

```
1       to the treatment.  So you can't determine
2       statistical significance in a single
3       patient.
4       BY ATTORNEY DAVIES:
5       Q.   Just to make it clear, and I don't
6   think you heard me correctly, but I believe your
7   testimony was that you cannot determine whether
8   there is a statistically significant difference in
9   a patient with respect to a treatment; correct?
10      A.   Correct.
11          ATTORNEY DYKHUIS:  Object to form.
12          Just while there's a pause again,
13      Doctor, just give me a moment to get in
14      any objections.
15          THE WITNESS:  Yes.
16      BY ATTORNEY DAVIES:
17      Q.   We've talked about pulmonary
18  hypertension.  What in your -- what in your words
19  is pulmonary hypertension, Doctor?
20      A.   Pulmonary hypertension is a build-up
21  of pressure in the pulmonary arterial circulation.
22      Q.   And how do you diagnose a patient
23  with pulmonary hypertension in your practice?
24          ATTORNEY DYKHUIS:  Object to form.
25          THE WITNESS:  The diagnosis always
```

Page 73

```
1       relies on a right heart catheterization
2       to analyze the pressures.
3       BY ATTORNEY DAVIES:
4       Q.   And what pressures from that right
5   heart catheterization would indicate to you as a
6   clinician there is pulmonary hypertension present?
7           ATTORNEY DYKHUIS:  Object to form.
8           THE WITNESS:  It depends which
9       definition you're talking about, because
10      there have been a lot of changes to the
11      definition.
12          When the INCREASE study was
13      undertaken, we used what is known, an
14      older definition of a mean pulmonary
15      artery pressure of 25 milliliters or more
16      accompanied by pulmonary vascular
17      resistance of three or more wood units.
18          That definition was subsequently
19      changed at the Sixth World Symposium in
20      2018, and the mean pulmonary artery
21      pressure was lowered to greater than 20
22      milliliters of mercury with the pulmonary
23      vascular resistance remaining the same at
24      three or more wood units.
25          More recently, the European
```

**MAGNA** ❯
**LEGAL SERVICES**

19 (Pages 70 to 73)

Page 74

```
1        Society of Cardiology and the European
2    Respiratory Society came up with another
3    new division -- sorry, definition, where
4    they kept the mean pulmonary artery
5    pressure the same, greater than
6    20 milliliters of mercury but decided to
7    take the pulmonary vascular resistance
8    halfway down to two.
9        So based on the ESCERS guidelines
10   from 2022, the current definition is a
11   mean pulmonary artery pressure of 20 or
12   more milliliters of mercury accompanied
13   by a pulmonary vascular resistance of
14   greater than two wood units.
15   BY ATTORNEY DAVIES:
16   Q.    And what was the definition that you
17   would have applied as of April 2020 with respect to
18   pulmonary hypertension?
19           ATTORNEY DYKHUIS:  Object to form.
20           THE WITNESS:  In 2020, we had the
21   definition from the World Symposium in
22   2018.  But 2020 was the time that the
23   INCREASE study results came out, which
24   was formulated under the guise of the old
25   definition.
```

Page 75

```
1        So what I would regard as
2    hypertension -- let me back up a little
3    bit.
4        Pulmonary hypertension is defined
5    by a mean pulmonary artery pressure of
6    greater than 20 milliliters of mercury.
7    You're talking about precapillary
8    pulmonary hypertension, then you need the
9    pulmonary vascular resistance component
10   of it.
11       So in 2020 what I would regard as
12   pulmonary hypertension would be a mean
13   pulmonary artery pressure of 20 or more
14   milliliters of mercury.
15       However, with regards to putting
16   patients on inhaled treprostinil, we have
17   to revert to the old definition because
18   we only know that the drug works in that
19   population of patients in the study.
20   BY ATTORNEY DAVIES:
21   Q.    So you're saying the INCREASE study
22   applied a different definition of PH, which is more
23   narrow than the definition that existed in 2020; is
24   that correct?
25           ATTORNEY DYKHUIS:  Object to the
```

Page 76

```
1    form.
2        THE WITNESS:  That's true.  It's
3    not by designed.  The INCREASE study was
4    implemented and undertaken when we were
5    all functioning under the guise of the
6    old definition.
7    BY ATTORNEY DAVIES:
8    Q.    We had talked earlier about the
9    groups of patients within pulmonary hypertension.
10   Do you recall that?
11   A.    Yes.
12   Q.    Which group do PH-ILD patients fall
13   into?
14   A.    That would be Group 3.
15   Q.    You also mentioned precapillary PH.
16   Which groups out of the five are precapillary, in
17   your opinion?
18   A.    Group 1, Group 1, Group 3, Group 4,
19   and Group 5.
20   Q.    And with respect to these groups, do
21   you view them as strict delineations, or do you
22   have patients that may have a mix of different
23   groups in your practice and experience?
24           ATTORNEY DYKHUIS:  Object to form.
25           THE WITNESS:  Most commonly it is
```

Page 77

```
1    a mix.
2    BY ATTORNEY DAVIES:
3    Q.    Can you explain that?  What do you
4    mean by "Most commonly it is a mix"?  What does
5    that mean?
6    A.    The patients we see don't behave in
7    strict categories and frequently have comorbidities
8    where they have some lung disease and pulmonary
9    hypertension.  Some heart disease and pulmonary
10   hypertension overlaid with chronic thromboembolic
11   pulmonary hypertension.
12       I said half jokingly that my favorite group
13   of pulmonary hypertension is group 10 where you
14   have some one, some two, some three, and some four,
15   because some patients are never quite that keen.
16       These categories are man-made, and we kind
17   of box ourselves into a corner by trying to put
18   patients in distinct categories, and the patients
19   don't always behave the way we would like it to be,
20   so they tend to cross over.
21   Q.    So it would be common to see a
22   crossover, for example, of a patient who shows
23   signs of PAH, Group 1 might also shows signs of
24   Group 3 PH-ILD.  Is that fair?
25           ATTORNEY DYKHUIS:  Object to form.
```



20  (Pages 74 to 77)

Page 78

1    THE WITNESS:  That's a common
2  debate when it's a Group 1 with a little
3  bit of lung disease and when it's a
4  Group 3.
5  BY ATTORNEY DAVIES:
6    Q.   So you would agree that in your
7  practice you do see patients who are a mix of both
8  Group 1 and Group 3; correct?
9    ATTORNEY DYKHUIS:  Object to form.
10    THE WITNESS:  It's very difficult
11  to sort out well, you know, this
12  percentage from Group 1 and this percent
13  is from Group 3.
14    The question becomes how much lung
15  disease is permissible in order to call
16  it Group 1 versus Group 3.  And it's a
17  spectrum.  And some people can look at
18  the same case and say, Well, I think this
19  is more Group 1, and other people might
20  look at the same case and say, No, I
21  think this is more Group 3.
22    When we look and try to make that
23  delineation, we look at how severe the
24  human dynamic impairment is, how severe
25  the lung impairment is based on lung

Page 79

1    function tests, and we look at the CAT
2  scan to see how much lung scarring there
3  is in terms of making that determination.
4  BY ATTORNEY DAVIES:
5    Q.   In your experience, what percent
6  of -- strike that.
7    So in your clinical experience, what
8  percent of the PH patients with treatment you've
9  overseen or been involved in have been a mix of
10  more than one of the groups of PH?
11    ATTORNEY DYKHUIS:  Object to form.
12    THE WITNESS:  That's a hard number
13  through the years to come up with.  You
14  know, I would say maybe one-third could
15  have a compound into something else going
16  on, but that's not something I actively
17  collect to show.
18  BY ATTORNEY DAVIES:
19    Q.   We've talked a lot about
20  interstitial lung disease.  What is interstitial
21  lung disease, in your words?
22    ATTORNEY DYKHUIS:  Object to form.
23    THE WITNESS:  The interstitium of
24  the lung refers to the lattice lock
25  network within the lung parenchymal which

Page 80

1  surrounds the alveola or intersects.  The
2  interstitium of the lungs.
3    When there's infiltration of the
4  interstitium usually in a diffuse matter
5  by scarring or fibrosis and/or
6  inflammation, the results are manifested
7  in interstitial lung disease.
8  BY ATTORNEY DAVIES:
9    Q.   And have there been other words that
10  are used to describe interstitial lung disease in
11  the literature?
12    ATTORNEY DYKHUIS:  Object to form.
13    THE WITNESS:  The wording can be
14  confusing.
15  BY ATTORNEY DAVIES:
16    Q.   I agree.
17    A.   Pulmonary fibrosis, it refers to
18  lung scarring, and most of the patients with
19  interstitial lung disease of note, especially those
20  who have superimposed pulmonary hypertension, will
21  have pulmonary fibrosis.
22    And then even within the endopulmonary
23  fibrosis, if you open any textbooks, there are
24  probably over 200 courses of pulmonary fibrosis.
25  And so, one of the jobs we have when you see a

Page 81

1  patient with ILD is to try to figure out what kind
2  of ILD they have.
3    Q.   When did you first begin treating
4  pulmonary hypertension patients?
5    A.   I remember seeing my first patient
6  with primary pulmonary hypertension, which is what
7  I used to call it when I was a resident in New York
8  in the late eighties.
9    Q.   What is primary pulmonary
10  hypertension?
11    A.   We changed the nomenclature.  It's
12  now idiopathic pulmonary arterial hypertension.  It
13  was changed in about 1996, if I recall.  When I was
14  a fellow at Cedar Sinai Medical Center, we were one
15  of the few centers in the country to do the study
16  of REE treprostinil.
17    So as a person who enrolled in the study as
18  a fellow in 1988, and so you can say the late
19  eighties was the first time I started treating.
20  Although at that time we didn't know if the
21  medication worked or not.  But then REE
22  treprostinil got approved in 1994, and then I was
23  treating off of it.
24    Q.   What was the first time you recall
25  treating an ILD patient?

**MAGNA**
LEGAL SERVICES

21  (Pages 78 to 81)

Page 82

1    ATTORNEY DYKHUIS: Object to form.
2    Q.    I'll rephrase it.
3    When was the first time you can recall
4  treating a patient with ILD, interstitial lung
5  disease?
6    A.    I actually do remember the patient I
7  had with ILD, idiopathic pulmonary fibrosis, and
8  that was in 1982 when I was an intern back in South
9  Africa.  I didn't treat her, because we had no
10 treatment.  But that was the first time I saw a
11 patient with interstitial lung diseases.
12   Q.    Did that patient have -- also have
13 pulmonary hypertension, or were they just -- not
14 just, did they solely have interstitial lung
15 disease?
16   A.    At that point, I don't think we were
17 even aware of pulmonary hypertension complicating
18 interstitial lung disease.  We're talking 1982.
19   Q.    Do you recall roughly when there was
20 a recognition in the art of pulmonary hypertension
21 complicating interstitial lung disease?
22   ATTORNEY DYKHUIS: Object to form.
23   THE WITNESS:  If you go back to
24 the literature, there are some papers
25 from the 1980s describing pulmonary

Page 83

1  hypertension complicating interstitial
2  lung disease.  It was only in the early
3  2000s that more literature began to
4  emerge about this.
5    BY ATTORNEY DAVIES:
6    Q.    You mentioned, I believe, a couple
7  different kinds of PH-ILD.  Is that correct?
8    A.    I didn't.
9    Q.    You didn't?  Is there only one type
10 of PH-ILD, in your mind?
11   A.    Yeah.  You have different kinds of
12 ILDs.  When you talk about PH-ILD as a group, and
13 there's just one kind.  It hasn't been segmented
14 out.  There might be some people who talk about
15 severe pulmonary hypertension, and that came out
16 from the European guidelines.  But in my mind, it's
17 all one big basket.
18   Q.    With respect to the differences in
19 the underlying ILD, in your opinion did the
20 INCREASE study evaluate PH-ILD patients who had all
21 the different kinds of underlying ILD, or were
22 there some groups that were excluded?
23   ATTORNEY DYKHUIS: Object to form.
24   THE WITNESS:  We included many
25 different forms of PH-ILD.  Connective

Page 84

1  tissue disease, the effect of
2  interstitial pneumonias with IPF
3  being the major subgroup.  Chronic
4  hypersensitivity being another one.
5  CPFE, combined chronic fibrosis with
6  emphysema being another one.
7  There are other courses, as I
8  mentioned.  Some of those are broad
9  categories.  I don't recall if we had
10 occupational lung disease in there or
11 not.  If we did, it might have been one
12 or two patients at the most.
13   BY ATTORNEY DAVIES:
14   Q.    Any other types of ILD that were not
15 covered by the patient population in the INCREASE
16 study?
17   ATTORNEY DYKHUIS: Objection to
18 form.
19   THE WITNESS:  What I would say is
20 just numerically, probably 95 to
21 99 percent of the disease categories were
22 covered by the INCREASE study.
23 So let me qualify that.  I said in
24 terms of causes, some of them are
25 extremely rare.  The most common ones and

Page 85

1  what I'm trying to articulate is that of
2  the universe of patients with
3  interstitial lung disease, fibrotic
4  interstitial lung disease, we probably
5  covered the bases for 95 to 99 percent.
6  And that's a rough guesstimate on my
7  part.
8    BY ATTORNEY DAVIES:
9    Q.    When was the first time that you
10 recall prescribing treprostinil to a patient?
11   A.    When it first became available
12 subcutaneously, and I believe it was in 2002 or
13 thereabouts.
14   Q.    Do you recall what you used that to
15 treat in 2022?
16   ATTORNEY DYKHUIS: Object to form.
17   THE WITNESS:  Some form of
18 pulmonary arterial hypertension.
19   BY ATTORNEY DAVIES:
20   Q.    And when is the first time you can
21 recall using inhaled treprostinil in a patient?
22   A.    I think it was approved around 2010,
23 I believe.  At least that's when the paper came
24 out.  So soon thereafter, I believe.
25   Q.    When was the first time that you

MAGNA
LEGAL SERVICES

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000698

Page 86

1  used inhaled treprostinil to treat PH-ILD?
2       ATTORNEY DYKHUIS:  Object to form.
3       THE WITNESS:  I don't recall that.
4       What I would say -- and this goes back to
5       that spectrum of Group 1 versus
6       Group 3 -- there are patients who have
7       lung disease whose hemodynamics are
8       severe enough out of proportion, so to
9       speak, from the lung disease that I would
10      regard them as having Group 1 pulmonary
11      arterial hypertension even in the context
12      of having interstitial lung disease.
13           So under that guise, I would treat
14      patients with PAH who had lung disease.
15  BY ATTORNEY DAVIES:
16      Q.    When was the first time that you can
17  recall treating a patient who had PAH with
18  underlying interstitial lung disease with inhaled
19  treprostinil?
20           ATTORNEY DYKHUIS:  Objection to
21      form.
22           THE WITNESS:  I don't recall that.
23  BY ATTORNEY DAVIES:
24      Q.    Was it before the INCREASE study?
25           ATTORNEY DYKHUIS:  Objection to

Page 87

1      form.
2           THE WITNESS:  Yes.
3  BY ATTORNEY DAVIES:
4      Q.    Okay.  Was it soon after inhaled
5  treprostinil's approval around 2009?
6           ATTORNEY DYKHUIS:  Object to form.
7           THE WITNESS:  I don't think so.  I
8      doubt it.  I don't recall specifically.
9  BY ATTORNEY DAVIES:
10     Q.    Why did you choose to use inhaled
11  treprostinil to treat patients with PAH and
12  underlying ILD?
13           ATTORNEY DYKHUIS:  Object to form.
14           THE WITNESS:  We had the INCREASE
15      study results, and I knew about them
16      before the drug was approved.
17  BY ATTORNEY DAVIES:
18     Q.    But you used inhaled treprostinil in
19  PAH patients with underlying IDL before 2016,
20  didn't you?
21           ATTORNEY DYKHUIS:  Objection to
22      form.
23           THE WITNESS:  You know, going back
24      many years, I don't remember a distinct
25      case, to be quite honest.

Page 88

1           Just by virtue of the patient
2      volumes I see with PH, with interstitial
3      lung disease, I'm assuming that I
4      probably did, but I don't know for sure.
5      Any time distinctly that I remember using
6      it was after the INCREASE study results
7      were known and off-label at that time
8      because the drug wasn't approved as yet.
9  BY ATTORNEY DAVIES:
10     Q.    You were aware that others were
11  using inhaled treprostinil to treat patients with
12  PAH and underlying ILD before recruitment for the
13  INCREASE study, though; correct?
14           ATTORNEY DYKHUIS:  Object to form.
15           THE WITNESS:  Based on some of the
16      papers in the literature, it does appear
17      so, yes.
18  BY ATTORNEY DAVIES:
19     Q.    So why were you personally
20  comfortable prescribing inhaled treprostinil to
21  these PAH patients with underlying ILD?
22           ATTORNEY DYKHUIS:  Objection to
23      form.
24           THE WITNESS:  As I said, any time
25      I remember distinctly was after INCREASE

Page 89

1      became available.  Patients -- prior to
2      that I would treat patients with some
3      interstitial lung disease if their
4      pulmonary hypertension was
5      disproportionate and I regarded them as
6      having more of a Group 1 phenotype.
7           Typically at that point inhaled
8      treprostinil wasn't my go-to drug.  The
9      easiest drug to get was Sildenafil, which
10     is generally what I used if I was going
11     to treat patients who had any form of
12     lung disease and associated pulmonary
13     hypertension.
14  BY ATTORNEY DAVIES:
15     Q.    So even though you can't recall a
16  particular time, you do agree that you used inhaled
17  treprostinil to treat PH patients whose PH was
18  disproportionate to their underlying ILD before the
19  INCREASE study; right?
20           ATTORNEY DYKHUIS:  Object to form.
21           THE WITNESS:  I probably did.
22      We're going back many years now.  If you
23      look at one group of patients, and that's
24      connective tissue disease patients like
25      scleroderma who form at least about



23  (Pages 86 to 89)

Page 90

```
 1          30 percent of the Group 1 PH patients, if
 2      you look at the CAT scans, it's very
 3      unusual for them not to have some lung
 4      disease.
 5          And so even if the clinical trials
 6      of Group 1 PH, there were likely a bunch
 7      of connective tissue disease patients who
 8      had some lung disease that we just didn't
 9      know about.
10      BY ATTORNEY DAVIES:
11          Q.   So I believe you said even in the
12  clinical trials of inhaled trepostinil for Group 1
13  PAH, there were likely some patients with
14  underlying ILD as part of that study as well?
15              ATTORNEY DYKHUIS:  Object to form.
16              THE WITNESS:  I'm speculating.
17      What we -- for all the clinical trials in
18      Group 1 PAH, what we used as the cut
19      point to get into the study was the
20      forced vital capacity.
21          If the forced vital capacity was
22      greater than about 70 percent, then the
23      patient goes into the study.  Can we rule
24      out that a patient with the FVC of
25      72 percent didn't have a little bit of
```

Page 91

```
 1      lung disease, no, we can't, but we don't
 2      know.
 3          So I'm speculating that maybe
 4      there was some patients who were included
 5      in the study, but these were patients who
 6      were defined as Group 1 PAH based on our
 7      criteria at the time.
 8      BY ATTORNEY DAVIES:
 9          Q.   I believe you said it was likely
10  that such patients would have been in those
11  studies; correct?
12              ATTORNEY DYKHUIS:  Object to form.
13              THE WITNESS:  It's possible, and
14      it's speculative on my part, because I
15      don't know.
16      BY ATTORNEY DAVIES:
17          Q.   When was the first time that you can
18  recall treating a PH-ILD patient with inhaled
19  trepostinil?
20          A.   After the INCREASE study results
21  came out.  That's when I first can recall treating
22  a patient with PH-ILD with inhaled treprostinil.
23          But it was a patient, once again, who had
24  more of the Group 1 phenotype with more moderate to
25  severe pulmonary hypertension.
```

Page 92

```
 1          Q.   And when did the results come out
 2  for INCREASE?
 3              ATTORNEY DYKHUIS:  Object to form.
 4              THE WITNESS:  I was first made
 5      aware of the results ruts, as I said
 6      earlier when you asked me earlier towards
 7      the end of February 2020.  There was a
 8      press release from the company around
 9      that time just providing the top line
10      results, and then there was a publication
11      in the New England June Journal of
12      Medicine which I think was around January
13      of 2021.
14      BY ATTORNEY DAVIES:
15          Q.   And when was the first time that you
16  recall treating a PH-ILD patient with Sildenafil?
17              ATTORNEY DYKHUIS:  Object to form.
18              THE WITNESS:  I don't recall
19      exactly, you know, going back 15 years,
20      maybe more.
21      BY ATTORNEY DAVIES:
22          Q.   So at least 15 years ago?
23          A.   It could have been less than that.
24  I don't know.
25          Q.   But it would have -- you would have
```

Page 93

```
 1  treated a patient, a PH-ILD patient with Sildenafil
 2  before receiving the results of the INCREASE study;
 3  correct?
 4              ATTORNEY DYKHUIS:  Object to form.
 5              THE WITNESS:  Let me qualify that.
 6      These are patients who had more of a PAH
 7      phenotype in the context of some
 8      underlying interstitial lung disease.  So
 9      I wouldn't regard them as PH-ILD.  I
10      would regard them as having some lung
11      disease but more of a Group 1 PAH
12      phenotype.
13      BY ATTORNEY DAVIES:
14          Q.   When was the first time under your
15  definition of PH-ILD you can recall treating a
16  patient with Sildenafil?
17              ATTORNEY DYKHUIS:  Object to form.
18              THE WITNESS:  PH-ILD, if you go by
19      the new definition versus the old
20      definition, MPAP, mean pulmonary artery
21      pressure greater than 20, greater than
22      25.  It's a spectrum.  And only if they
23      were on the more severe end of the
24      spectrum would I treat them.
25          So when you say PH-ILD, it was
```



24  (Pages 90 to 93)

Page 94

1    around that time, but it was the much
2    more severe patients who had more of the
3    Group 1 PAH phenotype.
4        BY ATTORNEY DAVIES:
5        Q.    You said it was around that time.
6    What time are you referring to?  About 15 years
7    ago?
8        A.    About 15 years ago.
9        Q.    When is the first time that you
10   recall using Iloprost to treat PH-ILD?
11            ATTORNEY DYKHUIS:  Object to form.
12            THE WITNESS:  We were part of the
13        a study that's called Active Study
14        looking at Iloprost to treat pulmonary
15        hypertension associated with IPF.
16            So it was a specific IPF
17        subpopulation of ILD, and it was a
18        negative study.  And I don't recall ever
19        using inhaled Iloprost for pulmonary
20        hypertension with interstitial lung
21        disease.
22        BY ATTORNEY DAVIES:
23        Q.    You mentioned the phrase earlier
24   that in some of these patients their pulmonary
25   hypertension is out of proportion to their

Page 95

1    underlying ILD.
2        Do you recall saying that?
3        A.    I do.
4        Q.    And when you write prescriptions
5    that would have been off-label at the time for
6    PH-ILD patients, is that the language that you use
7    on those prescriptions when you prescribe inhaled
8    treprostinil?
9            ATTORNEY DYKHUIS:  Object to form.
10           THE WITNESS:  As I said, I don't
11       recall prescribing it.  I withdraw that.
12       I thought you said, I heard inhaled
13       Iloprost.  Inhaled treprostinil.
14           The language I would use
15       post-INCREASE was that this patient gets
16       to have interstitial lung disease, but
17       clearly the pulmonary hypertension is out
18       of proportion to the extent of the
19       underlying interstitial lung disease;
20       therefore I believe they have a Group 1
21       phenotype.
22       BY ATTORNEY DAVIES:
23       Q.    Did you use that language and
24   descriptions for inhaled treprostinil prior to
25   results of the INCREASE study?

Page 96

1            ATTORNEY DYKHUIS:  Object to form.
2            THE WITNESS:  I don't recall doing
3        that.
4        BY ATTORNEY DAVIES:
5        Q.    You never recall doing that?
6        A.    As I mentioned, my go-to medication
7    at that time just because it was cheaper to get a
8    hold of and easier was Sildenafil.  Can I attest to
9    that a hundred percent?  I can't remember every
10   prescription I wrote.  But that wasn't my standard
11   practice by far.
12       Q.    So sitting here today, you have no
13   recollection of ever prescribing inhaled
14   treprostinil in a PH-ILD patient prior to receiving
15   notice of the results of the INCREASE study; is
16   that correct?
17       A.    Not to my recollection, but once
18   again, I can't remember every prescription I've
19   written.
20       Q.    And even though you don't have a
21   specific recollection, you would agree that
22   probably did happen prior to you receiving the
23   results of the INCREASE study?
24           ATTORNEY DYKHUIS:  Object to form.
25           THE WITNESS:  I don't recall it

Page 97

1    happening.
2        BY ATTORNEY DAVIES:
3        Q.    Okay.  Do you believe it did happen
4    nonetheless?
5            ATTORNEY DYKHUIS:  Object to the
6        form.
7            THE WITNESS:  I don't recall it
8        happening.
9        BY ATTORNEY DAVIES:
10       Q.    And I'm not asking whether or not
11   you recall or not.  I'm saying do you believe that
12   it happened based on the number of patients that
13   you saw, based on the lack of clear delineations
14   between the groups of PH?
15           ATTORNEY DYKHUIS:  Objection to
16       form.
17           THE WITNESS:  I don't think it
18       happened, because I don't believe it
19       happened, but I cannot attest to it a
20       hundred percent, having written thousands
21       of prescriptions over the years.  I don't
22       know.
23       BY ATTORNEY DAVIES:
24       Q.    You mentioned -- you mentioned using
25   Sildenafil for treatment of PH-ILD; correct?

25  (Pages 94 to 97)

**MAGNA** ◆
**LEGAL SERVICES**

Page 98

```
 1            ATTORNEY DYKHUIS:  Object to form.
 2            THE WITNESS:  For patients who had
 3       some ILD and associated pulmonary
 4       hypertension that appeared more severe
 5       than the extent of the underlying lung
 6       disease.  I do want to make that
 7       distinction rather than the broad blanket
 8       term of PH-ILD, which can be any PH in
 9       the context of ILD.
10       BY ATTORNEY DAVIES:
11       Q.    And with regard to those patients,
12  in your opinion their PH-ILD was treated; correct?
13            ATTORNEY DYKHUIS:  Object to form.
14            THE WITNESS:  Are you referring to
15       the PH component or the ILD component?
16       BY ATTORNEY DAVIES:
17       Q.    Well, let me -- is there a
18  distinction in your mind?
19       A.    Yeah, we treat the ILD and we'll
20  treat the PH.  PH-ILD is really two diseases
21  together.
22       Q.    So if I have a PH-ILD patient and I
23  treat the PH component in that patient, do you
24  consider that treatment of PH-ILD or not?
25            ATTORNEY DYKHUIS:  Object to form.
```

Page 99

```
 1            THE WITNESS:  Are you talking
 2       about currently or prior to the INCREASE
 3       study?
 4       BY ATTORNEY DAVIES:
 5       Q.    Let's start with prior to the
 6  INCREASE study.
 7       A.    Yes.  I considered treating PH-ILD
 8  in that context, but once again, I feel like I have
 9  to qualify it every time you mention PH-ILD prior
10  to the INCREASE study as patients who had pulmonary
11  hypertension that appeared to be out of proportion
12  to their interstitial lung disease.
13       Q.    When you say prior to the INCREASE,
14  you're talking about the prior to initiation of
15  that study or some other time point?
16       A.    Prior to the results coming out of
17  the meeting where there were results.
18       Q.    So prior to you being aware of the
19  results from the INCREASE study, if you prescribed
20  a medication to a patient with PH-ILD, did you
21  consider -- let me start this whole thing over.
22            Prior to you hearing the results of the
23  INCREASE study, did you consider yourself to have
24  treated PH-ILD in a patient if you just impacted
25  the PH component of the disease?
```

Page 100

```
 1            ATTORNEY DYKHUIS:  Objection to
 2       form.
 3            THE WITNESS:  I didn't know if I
 4       was treating it.  I was hoping I was
 5       treating it.  I'd like to make the
 6       distinction of treating PH versus helping
 7       the patient, because we know that these
 8       drugs, Sildenafil, inhaled treprostinil,
 9       they lower the pressures in the lung.
10       That's treating the pulmonary
11       hypertension.
12            What I didn't know is if treating
13       and lowering the pressures potentially
14       would result or manifest as a clinical
15       benefit.
16       BY ATTORNEY DAVIES:
17       Q.    And what in your mind was a clinical
18  benefit?
19       A.    There could be multiple
20  manifestations of the clinical benefit.  If the
21  patient comes back and says, Gosh, I feel better,
22  that's benefit.  If they come back and their
23  six-minute walk distance has increased, they say I
24  feel better, then that's a benefit.
25            So in my mind, every patient who I've
```

Page 101

```
 1  treated like that was an end of point study.  They
 2  told me how they were doing.  If they felt better,
 3  great.  If not, then frequently I would stop the
 4  medication.
 5            What I didn't know, even if they felt
 6  better, is whether or not it was an effect of the
 7  drug or not.  Because you know that there could be
 8  a big placebo component even if you go to the
 9  INCREASE study.  There were patients who were
10  treated with inhaled treprostinil -- sorry, with
11  placebo who had increases in their walk distance.
12  The only way you can tell if the drug works or not
13  are these big population-based studies like
14  INCREASE, where you have a large group that gets
15  drug and a large group that doesn't get drug.
16       Q.    So in an individual patient setting,
17  how do you know if the treatments that you are
18  giving to your patients are actually effective or
19  not since it's not in a large group setting?
20            ATTORNEY DYKHUIS:  Objection to
21       form.
22            THE WITNESS:  As long as a patient
23       tells me they feel better, I don't really
24       concern myself if it's a placebo effect
25       or if it's real.  If they feel better,
```



26 (Pages 98 to 101)

Page 102

```
1          I'll do anything and continue any
2      medication that they perceive as making
3      them feel better.
4   BY ATTORNEY DAVIES:
5      Q.   But in your mind, is treatment -- in
6   your mind, is the definition of treatment only
7   those instances where the drug has a demonstrated
8   impact on the patient?
9          ATTORNEY DYKHUIS:  Objection to
10     form.
11         THE WITNESS:  No, that's not my
12     definition of treatment.
13  BY ATTORNEY DAVIES:
14     Q.   Okay.  If there's a placebo
15  treatment, is that treatment?
16         ATTORNEY DYKHUIS:  Objection to
17     form.
18         THE WITNESS:  Yes.  If the patient
19     feels better, you've done something via
20     placebo and it's resulted in improvement,
21     so I would regard that as treatment.
22  BY ATTORNEY DAVIES:
23     Q.   Treprostinil is in part a
24  vasodilator; correct?
25     A.   That's correct.
```

Page 103

```
1      Q.   What hemodynamics impacted by
2   treprostinil, in your mind, inform whether or not
3   there has been a treatment effect?
4          ATTORNEY DYKHUIS:  Object to form.
5          THE WITNESS:  If you go back to
6      the definition, if you lower the mean
7      pulmonary artery pressure and you lower
8      the pulmonary vascular resistance, then
9      the drug has acted as a vasodilator and
10     has been a treatment effect.
11         The key element is whether or not
12     that treatment effect translates to
13     clinical benefit for the patient.  Let me
14     go back as an example to the RISE IP
15     study where we know clearly that
16     riociguat is a pretty potent vasodilator
17     and lowers the pressures, and yet
18     patients didn't benefit and in actual
19     fact they were harmed by them riociguat.
20         So A frequent effect on the
21     pulmonary hypertension doesn't equate
22     necessarily to clinical benefit for the
23     patient.
24  BY ATTORNEY DAVIES:
25     Q.   Do you measure -- in your clinical
```

Page 104

```
1   practice, do you measure the hemodynamics of
2   patients on inhaled trepostinil as part of
3   monitoring those patients?
4      A.   Typically, no.  Once we start them
5   on treatment, unless an additional question arises,
6   it is an invasive test on riociguat and I ask a
7   specific question you need answered by the test,
8   then typically no.
9      Q.   Which hemodynamic -- strike that.
10         Which improvements in which hemodynamic
11  parameters would, in your mind, be indicative of a
12  clinical improvement?
13         ATTORNEY DYKHUIS:  Object to form.
14         THE WITNESS:  None.
15  BY ATTORNEY DAVIES:
16     Q.   None?
17     A.   None.
18     Q.   Is it your testimony that based on
19  hemodynamic data you cannot predict in any way the
20  clinical effects of treprostinil?
21         ATTORNEY DYKHUIS:  Form.
22         THE WITNESS:  Let me differentiate
23     Group 1 from Group 3.
24  BY ATTORNEY DAVIES:
25     Q.   Okay.
```

Page 105

```
1      A.   Because Group 1, the hemodynamic
2   effect is a good surrogate for likely clinical
3   benefit.  There probably have been instances, I
4   can't cite them and I'm sure there have been
5   instances of drugs that have had a hemodynamic
6   effect that haven't come to market because they
7   haven't manifested clinical benefit.
8          In Group 3 or PH-ILD, all bets are off,
9   because now you have the superimposed interstitial
10  lung disease, and so my definitive no was more
11  directed to PH-ILD.
12         What I'm saying is Group 1 is a good
13  surrogate, not always, but in Group 3 it's not
14  necessarily a surrogate for benefit.
15     Q.   Why, in your mind, is it not
16  necessarily a surrogate for clinical benefit in
17  Group 3?
18         ATTORNEY DYKHUIS:  Object to form.
19         THE WITNESS:  Because you have the
20     added layer of the pulmonary parenchymal
21     interstitial lung disease.  I'm happy to
22     do a deep dive into it if you like.  Let
23     me do it so maybe you can -- because I'll
24     try to do it as best I can.
25
```



27 (Pages 102 to 105)

Page 106

```
 1        BY ATTORNEY DAVIES:
 2        Q.    Go ahead.
 3        A.    If you have fibrosis of the lung,
 4   there are many things that contribute to the
 5   pulmonary hypertension.  You have obliteration of
 6   the vessels, you have distortion of the vessels.
 7   There's a lot of different things going on in the
 8   lungs as opposed to Group 1 PAH where they
 9   typically have normal lung disease, let's say.
10        When -- let's say you have 50 percent of
11   your pulmonary vasculature that's totally
12   obliterated and unavailable for perfusion, then the
13   right side of the heart has to put out the whole
14   cardiac outputs into 50 percent of the vasculature.
15        So when you talk about the velocity of the
16   blood flow, the sheer stretch involved, we don't
17   know if that's harmful to the vasculature itself.
18   And we don't know when you have distortion of the
19   vasculature and you have these accelerated blood
20   cells coming in how that impacts overall well-being
21   of the patient.
22        Another concept to remember is take the
23   same example where you have 50 percent of your
24   blood flow -- say a hundred percent of your blood
25   flow going to residual 50 percent of the vascular,
```

Page 107

```
 1   and let's say the velocity has to be processed fast
 2   to maintain your cardiac output.
 3        Well, you also need gas exchange between
 4   the alveoli line and the blood flowing through it,
 5   and now you have fibrosis interlaced.  Typically in
 6   a normal person when a red blood cell traverses the
 7   alveoli and the capillaries, it gets fully
 8   oxygenated one-third of the way through.
 9        But now you have a situation of fibrosis
10   and you have these accelerated red cell particles
11   that are more accelerated because there's been
12   vasodilation, an ability to fix gas exchange
13   becomes impaired.
14        So that just one example -- two examples of
15   how lung disease makes it very different in terms
16   of lowering the pressures enabling more blood to go
17   through, and there can be a negative downside to
18   that.
19        Q.    Why, in your opinion, see a
20   treatment affect with inhaled treprostinil in
21   PH-ILD patients in the INCREASE study?
22             ATTORNEY DYKHUIS:  Object to form.
23             THE WITNESS:  I think a
24        difference, for example, we can apply
25        riociquat to what I just said.  A
```

Page 108

```
 1        difference with inhaled treprostinil is,
 2        number one, it's inhaled.  So most of the
 3        drug is going to the best ventilated
 4        areas of the lung.
 5             If the drug is going to the best
 6        ventilated areas of the lung and dilating
 7        the blood vessels in those best
 8        ventilated areas, then you get the blood
 9        redirected to the best ventilated areas.
10             That's would be just one example
11        of how that might be different to the
12        scenario you I gave you, which is more
13        applicable, say, to a systemically
14        administered agent.  You also have more
15        drug deposition within the area of the
16        lung where you want it to go compared to
17        a systemically administered drug where in
18        the context of fibrotic lung disease you
19        don't know where the drug is going.
20             So more local deposition and, you
21        know -- but to your point, that's how I
22        was skeptical that the INCREASE study
23        would be positive.  And -- but at the end
24        of the day it was unequivocably positive
25        with benefit in the primary secondary
```

Page 109

```
 1        biomarker.  And so thankfully it works
 2        and, you know, it's available to help the
 3        patients.
 4   BY ATTORNEY DAVIES:
 5        Q.    You talk about VQ mismatch a number
 6   of times in your declaration.
 7        Do you recall this?
 8             ATTORNEY DYKHUIS:  Object to form.
 9             THE WITNESS:  Yes.
10   BY ATTORNEY DAVIES:
11        Q.    What is VQ mismatch?
12        A.    I thought I explained it pretty well
13   in my declaration.  I'm not going to read it.  I'm
14   sure you've read it.
15        Q.    If you can explain it.
16        A.    It's easier for me just to read from
17   my declaration.
18        Q.    That's fine.
19        A.    I'll explain.  For gas exchange to
20   take place, you need VQ matching.  The air going
21   into the lungs and into the alveola sac has to be
22   accompanied by blood through the capillaries to
23   interface with the air.
24             If you have areas of the lung where you
25   have VQ mismatch, there are two extremes of that.
```



28  (Pages 106 to 109)

Page 110

1   You can have no air and blood flow; and we refer to
2   it as shunt.  The area is being shunted to the
3   lungs without opportunity for gas exchange.
4       If you have areas of the lung, opposite end
5   of the spectrum where you just have air flow, no
6   blood flow because there's been fibrosis, the blood
7   vessels has been destroyed, then we could talk
8   about that as dead space ventilation.  Air is going
9   in and going out and not participating in gas
10  exchange.
11      Between those two extremes of dead space
12  ventilation and shunt physiology, we have a
13  gradation in the spectrum once again and VQ
14  mismatch with the amount of ventilation going in
15  doesn't match up with the perfusion going by.
16  Q.   So a concern with giving a, for
17  example, systemic oral vasodilator, maybe you
18  actually exacerbate that VQ mismatch by attempting
19  to have blood go to areas of the alveoli that can't
20  actively participate in oxygen exchange; correct?
21          ATTORNEY DYKHUIS:  Object to form.
22          THE WITNESS:  That is a theory of
23      concern.
24  BY ATTORNEY DAVIES:
25  Q.   Okay.  Do you believe that theory?

Page 111

1       ATTORNEY DYKHUIS:  Object to form.
2           THE WITNESS:  It's possible that
3       it does happen.  It's possible that it
4       happens in different lung units in the
5       same patient.
6           There have been studies around
7       this, I believe, for many years ago that
8       maybe a test of VQ mismatch being an
9       issue.  I can't recall that study.  I'm
10      speculating, there are probably studies
11      out there that demonstrated that.
12          So it's a theory, and it's
13      something we lean on sometimes when you
14      can't find a good explanation for
15      worsening oxygenation.
16          So, I think it probably does
17      happen in some patients, yes.
18  BY ATTORNEY DAVIES:
19  Q.   In your opinion, was the fact that
20  riociquat was a systemic orally administered
21  vasodilator, do you believe that that was a reason
22  for why you had increased death in the study
23  population and the reason why that study failed?
24          ATTORNEY DYKHUIS:  Objection to
25      form.

Page 112

1           THE WITNESS:  We don't know, but
2       it could have been a contributing factor,
3       but we don't know.
4   BY ATTORNEY DAVIES:
5   Q.   I think you said one of the
6   advantages of an inhaled therapy is that it
7   actually preferentially directed to the healthy
8   portions of the lung and you avoid some of the
9   concerns associated with the VQ mismatch.  Is that
10  correct?
11          ATTORNEY DYKHUIS:  Object to form.
12          THE WITNESS:  Theoretically
13      possible.  Not healthy, relatively
14      healthier, and so -- but you've got the
15      general principle correct.
16  BY ATTORNEY DAVIES:
17  Q.   In your opinion, is that part of the
18  reason why inhaled treprostinil showed a clinical
19  benefit in the INCREASE study?
20          ATTORNEY DYKHUIS:  Objection to
21      form.
22          THE WITNESS:  It's possible it
23      might have had a role, but we don't know.
24  BY ATTORNEY DAVIES:
25  Q.   What is your opinion?

Page 113

1           ATTORNEY DYKHUIS:  Objection to
2       form.
3           THE WITNESS:  Why the study was
4       positive?
5   BY ATTORNEY DAVIES:
6   Q.   Correct.
7   A.   I don't know.  I actually when I'm
8   giving talks I get asked this question all the
9   time.  What is the reason, what's the biologic
10  reason, and I don't think anyone can say for sure
11  what the biologic reason is.
12      But what I say is we can make sure they
13  have a sound biologic reason of why a drug should
14  work but doesn't, or would you have some questions
15  about how it does work and not know exactly and yet
16  it has clinical benefits -- benefit.  I would much
17  rather take the benefits to the patient than know
18  exactly how it works.
19      There are all these theories that, you
20  know, it goes to the best ventilated areas.  Just
21  enough drug and the enough dose to provide benefit,
22  but we don't know for sure how or why it works.
23      You know, on a cellular level there are all
24  sorts of pathways to show positive benefits, and we
25  don't know which one might have been of benefit to



29 (Pages 110 to 113)

Page 114

1  the patients. So we can't pinpoint exactly how it
2  works, and it probably works by multiple different
3  ways in terms of providing benefit.
4      Q.    We talked earlier about the fact
5  that Tyvaso was initially approved in Group 1 in
6  2009.
7      Do you recall that?
8      A.    Yes.
9      Q.    That was a nebulized formulation in
10  2009; is that correct?
11     A.    Yes.
12     Q.    So in 2009 with the approval of
13  Tyvaso inhaled, practitioners in the field would
14  have recognized that that treprostinil was going to
15  be preferentially delivered to the vaso ventilated
16  portions of the lung; correct?
17              ATTORNEY DYKHUIS:  Object to form.
18              THE WITNESS:  It was approved for
19         Group 1 PAH patients who generally don't
20         have lung disease, so you don't have this
21         VQ imbalance in Group 1 patients as you
22         do with patients with lung disease.
23              I just want to come back to the
24         question that you asked previously.
25              There might be people who say that

Page 115

1  inhaled treprostinil works because it's a
2  vasodilator, it's clear it's a
3  vasodilator that you see in patients and
4  that's why it worked.
5      But in patients with lung disease,
6  we know it's not as simple as that we
7  have other drugs like riociquat, which
8  are also very good vasodilators and it
9  failed. So I think to say well, it's a
10  vasodilator, it's obvious that it worked.
11  It's kind of naive without taking into
12  account the prior literature.
13  BY ATTORNEY DAVIES:
14     Q.    Isn't the difference in
15  administration between riociguat being systemically
16  administered -- let me start over.
17     The fact that riociguat is a systemic
18  vasodilator because it's given orally, it's a
19  differentiating factor as compared to inhaled
20  treprostinil; correct?
21              ATTORNEY DYKHUIS:  Object to form.
22              THE WITNESS:  It's one of many
23         differentiating factors.
24  BY ATTORNEY DAVIES:
25     Q.    I want to go back to a question I

Page 116

1  asked you earlier.
2      So after receiving -- after you received
3  the first report of results from the INCREASE
4  study, did you believe that you were treating the
5  PH-ILD in a patient if you were just treating the,
6  or impacting the PH component?
7              ATTORNEY DYKHUIS:  Object to form.
8              THE WITNESS:  I want to make sure
9         I understood that correctly.  Whenever I
10         treat a patient, I want to benefit the
11         patient.
12              So after the INCREASE study, I
13         believe that we were treating the patient
14         because they were having benefit.
15  BY ATTORNEY DAVIES:
16     Q.    So your -- is it true that your
17  definition of treatment, both before and after the
18  INCREASE study, was that if you saw a benefit in
19  the patient, it didn't matter whether the effects
20  of the inhaled treprostinil were on PH or were on
21  the ILD component.  Either way you consider that to
22  be treatment if there was an improvement in the
23  patient?
24              ATTORNEY DYKHUIS:  Object to form.
25              THE WITNESS:  Improvement in the

Page 117

1  patient is very likely -- much more
2  likely related to the PH component.
3      When you treat the fibrosis
4  component and you've seen this with
5  anti-fibrotic drugs, all it does is delay
6  progression of the fibrosis.  Once
7  scarring is there, you can't reverse it.
8  So my belief was that it was related
9  mostly to an impact on the pulmonary
10  hypertension.
11  BY ATTORNEY DAVIES:
12     Q.    Okay.  Do you believe that inhaled
13  treprostinil in the INCREASE study had any role on
14  reversing the pulmonary fibrosis in those patients?
15     A.    That would be speculative.  I mean,
16  there are mechanisms whereby it could have
17  anti-fibrotic properties, and that's the reason for
18  the Teton study to see if we can validate that.
19     What we saw, specifically in the subgroups
20  post hoc analysis or the numbers, is that it did
21  appear, the FVC was about the zero line, the line
22  of unity starting out at 16 weeks.
23     So it gives the appearance of apparent
24  improvement.  But the error bars crossed the zero
25  line, and so there can be vacillations in the FVC.

**MAGNA** ◗
**LEGAL SERVICES**

30  (Pages 114 to 117)

Page 118

1  So we don't know.  To say that there's an
2  improvement in the fibrosis is very speculative.
3        When you have fibrosis being laid down,
4  there are various stages of fibrosis from early
5  collagen deposition, fiberblast activation, early
6  scarring to end stage honeycombing.
7        Is it conceivable that anti-fibrotic drugs
8  can reverse the earlier stages of fiberblast
9  proliferation and collagen deposition?  It's quite
10 possible.
11       But advanced fibrosis it doesn't reverse.
12 Whether the inhaled treprostinil has any
13 independent anti-fibrotic properties, we don't
14 know.  What we can say about the post hoc analysis
15 from the INCREASE study was that it was
16 hypothesis-generating and now we're testing that
17 hypothesis in the Teton program.
18    Q.    So based on that, is it fair to say
19 that you believe the majority of the treatment
20 effects that you saw an increase for inhaled
21 treprostinil are due to treatment of the PH
22 component?
23           ATTORNEY DYKHUIS:  Object to form.
24           THE WITNESS:  I believe that's
25        much more likely.

Page 119

1  BY ATTORNEY DAVIES:
2     Q.    Was the INCREASE study designed to
3  evaluate the treatment effects of inhaled
4  treprostinil on the fibrosis component of PH-ILD?
5           ATTORNEY DYKHUIS:  Object to form.
6           THE WITNESS:  No, it wasn't.
7  BY ATTORNEY DAVIES:
8     Q.    Why not?
9     A.    Because at that time before the
10 study we had no notional idea that it might have
11 independent anti-fibrotic properties.
12    Q.    And even after the INCREASE study,
13 you can't say with certainty whether or not
14 treprostinil has anti-fibrotic properties and
15 that's why you're conducting additional studies;
16 correct?
17           ATTORNEY DYKHUIS:  Object to the
18        form.
19           THE WITNESS:  That's correct.
20        It's been shown in animal models that it
21        might have anti-fibrotic properties.  But
22        whether or not that translates into human
23        subjects remains to be determined by the
24        Teton study.
25

Page 120

1  BY ATTORNEY DAVIES:
2     Q.    Prior to the INCREASE study, did you
3  believe inhaled treprostinil would be safe in the
4  PH-ILD patient population?
5           ATTORNEY DYKHUIS:  Object to form.
6           THE WITNESS:  We didn't know, and
7        that's why spirometry, which captures
8        FVC, was included as a safety endpoint.
9  BY ATTORNEY DAVIES:
10    Q.    So was the INCREASE study designed
11 to assess the impact of inhaled treprostinil on
12 the PH component of PH-ILD?
13           ATTORNEY DYKHUIS:  Objection to
14        form.
15           THE WITNESS:  It was designed to
16        evaluate if it had clinical benefit.  It
17        wasn't designed to test PH, because
18        otherwise we would have had to write off
19        that as our primary endpoint.
20 BY ATTORNEY DAVIES:
21    Q.    Was the INCREASE study designed to
22 evaluate the clinical benefit of inhaled
23 treprostinil in the PH component of PH-ILD?
24           ATTORNEY DYKHUIS:  Object to form.
25           THE WITNESS:  The thought was that

Page 121

1        if it were to have benefit, it would be
2        through the PH component, yes.
3  BY ATTORNEY DAVIES:
4     Q.    Was it designed to actually assess
5  that, though?  Was it powered to assess that?
6           ATTORNEY DYKHUIS:  Objection to
7        form.
8           THE WITNESS:  The clinical
9        benefit, yes.
10 BY ATTORNEY DAVIES:
11    Q.    Sitting here today, what treatments
12 that are approved for Group 1 PH have you
13 prescribed in your Group 3 PH patients?
14           ATTORNEY DYKHUIS:  Objection to
15        form.
16           THE WITNESS:  I have to go through
17        them all in my head.  I mentioned
18        Sildenafil.  Certainly not riociguat.
19        Not inhaled iloprost.  We don't use
20        anti-receptive antagonists.
21           (Reporter clarification)
22    Q.    Maybe just let me reask my question
23 and we'll just try to go through a little bit
24 slower.
25        So what treatments approved for Group 1



31  (Pages 118 to 121)

Page 122

1    pulmonary hypertension have you prescribed for
2    Group 3 patients?
3            ATTORNEY DYKHUIS:  Objection to
4        form.
5        THE WITNESS:  Without going
6        through the exhaustive list of available
7        therapies, Sildenafil, as I mentioned.
8        Inhaled treprostinil, IV treprostinil,
9        and maybe subcutaneous treprostinil.  And
10       maybe tadalafil, t-a-d-a-l-a-f-i-l.
11   BY ATTORNEY DAVIES:
12       Q.    With respect to IV treprostinil, did
13   you give that to a Group 3 patient prior to
14   receiving the results of the INCREASE study?
15           ATTORNEY DYKHUIS:  Objection to
16       form.
17       THE WITNESS:  IV and subcutaneous
18       treprostinil are given parenchymally,
19       which means subcutaneously or
20       intravenously.  Those we reserve for the
21       most severe form of hypertension, so
22       these were patients clearly below the
23       Group 1 PAH component but had some lung
24       disease in the context of that.  Those
25       are the patients who got those therapies.

Page 123

1    BY ATTORNEY DAVIES:
2        Q.    You prescribed that in those
3    patients prior to receiving the results of the
4    INCREASE study; correct?
5        A.    Correct.
6            ATTORNEY DYKHUIS:  Object to form.
7        Q.    With Tadalafil, did you prescribe
8    that in Group 3 patients prior to receiving the
9    results of the INCREASE study?
10           ATTORNEY DYKHUIS:  Object to form.
11       THE WITNESS:  Probably so.
12       There's very little data on Tadalafil.
13       And I might have mentioned it because I
14       might have.  As I mentioned, Sildenafil
15       was more about to go to PDE5 inhibitor.
16       Tadalafil is just a more convenient
17       version of a PDE5 inhibitor given once a
18       day versus three times a day.
19   BY ATTORNEY DAVIES:
20       Q.    In your opinion, are there any
21   hemodynamic changes that would be indicative of an
22   improvement in exercise capacity for a PH-ILD
23   patient?
24           ATTORNEY DYKHUIS:  Objection to
25       form.

Page 124

1        THE WITNESS:  None.
2    BY ATTORNEY DAVIES:
3        Q.    In your opinion, do hemodynamic
4    changes have any predictive benefit in suggesting
5    an improvement in exercise capacity for a PH-ILD
6    patient?
7            ATTORNEY DYKHUIS:  Objection.
8        THE WITNESS:  I apologize.
9    BY ATTORNEY DAVIES:
10       Q.    That's no problem at all.
11       A.    I just want to note that I
12   apologized for the cough.  I don't know if you
13   capture a cough, but I was apologizing for the
14   record.  For the record, I'm coughing a lot, and I
15   apologize for that.
16       Q.    Not a problem.  Would you like me to
17   repeat the question?
18       A.    Yes.
19       Q.    So in your opinion, do hemodynamic
20   changes have any predictive value in suggesting an
21   improvement in exercise capacity for a PH-ILD
22   patient?
23           ATTORNEY DYKHUIS:  Object to form.
24       THE WITNESS:  What I would say is
25       that they do have somewhat of a

Page 125

1        predictive capability in the more severe
2        patients that I just described to you.
3        The ones who are so severe that they
4        require parenchymal therapy.
5            So when you have very high
6        pressure in a high pulmonary vascular
7        resistance there's a greater likelihood
8        and certainly a greater hope that we will
9        see some benefit.
10           Otherwise, for more general
11       population of PH-ILD, most of whom have
12       more mild to moderate pulmonary
13       hypertension, they are generally
14       unpredictive.
15           (Discussion held off the
16       record.)
17           ATTORNEY DAVIES:  We can keep
18       going until lunch and we can take a
19       break?  It's another 30 minutes?
20           ATTORNEY DYKHUIS:  Sure.
21   BY ATTORNEY DAVIES:
22       Q.    And if you decide that was a bad
23   decision and you want to break before then, you can
24   let me know.
25       A.    Yeah.

**MAGNA** >
**LEGAL SERVICES**

32  (Pages 122 to 125)

Page 126

```
1      Q.    Is six-minute walk distance a
2  measure of increased exercise capacity?
3           ATTORNEY DYKHUIS:  Objection to
4      form.
5           THE WITNESS:  We regard it as a
6      surrogate for what patients might be
7      capable of doing.  So the answer to that
8      would be yes.
9  BY ATTORNEY DAVIES:
10     Q.    Other than six-minute walk distance,
11 are there any other measures of increased exercise
12 capacity?
13          ATTORNEY DYKHUIS:  Object to form.
14          THE WITNESS:  There are things
15     like cardiopulmonary exercise testing.
16     There are --
17 BY ATTORNEY DAVIES:
18     Q.    I'm sorry, go ahead.
19     A.    There are patient report outcomes
20 where we ask them about how much they can do.  The
21 other test that we generally go to, like the Shekel
22 test, and so there are various forms of evaluating
23 exercise.  But the six-minute walk is the most
24 commonly accepted one in terms of what we do in the
25 clinic and in clinical trials.
```

Page 127

```
1      Q.    Are you currently using inhaled
2  treprostinil to treat PH-ILD patients?
3      A.    Yes.
4      Q.    Are you using nebulized Tyvaso to
5  treat PH-ILD patients?
6           ATTORNEY DYKHUIS:  Object to form.
7           THE WITNESS:  Nebulized and the
8      dry powder inhaler.
9  BY ATTORNEY DAVIES:
10     Q.    Have you seen any switching in your
11 PH-ILD patients who you've started on the dry
12 powder inhaler switching to the nebulized Tyvaso?
13     A.    Yes.
14     Q.    And why do you think that is
15 occurring?
16          ATTORNEY DYKHUIS:  Object to form.
17          THE WITNESS:  They sometimes don't
18     tolerate it.  Sometimes because it's one
19     breath, especially in the context of
20     interstitial lung disease, they might not
21     be able to take a deep breath to get the
22     drug down into the areas you want it.
23          So in some patients I feel more
24     comfortable using the nebulized version
25     because I feel more assured that at least
```

Page 128

```
1      they're taking six, nine, 12 risks that
2      some of the drug is getting down versus
3      one hit of the DPI, one cough, and the
4      drug comes out.
5           So I think it's the most reliable
6      way of treating these patients that I do
7      use both, depending on the individual
8      patient.  But you can well imagine
9      someone coughing right after they get the
10     DPI and they get into drug.
11 BY ATTORNEY DAVIES:
12     Q.    Do you have a sense for the percent
13 of patients that you started on Tyvaso DPI that
14 have switched back to the Tyvaso nebulized
15 formulation?
16          ATTORNEY DYKHUIS:  Object to form.
17          THE WITNESS:  25, 30 percent.  I'm
18     guessing, though, that it's not one of
19     two.
20 BY ATTORNEY DAVIES:
21     Q.    Are you familiar with the Dreamboat
22 device?
23          ATTORNEY DYKHUIS:  Object to form.
24          THE WITNESS:  I am not.
25
```

Page 129

```
1  BY ATTORNEY DAVIES:
2      Q.    Are you aware that the Dreamboat is
3  the dry powder inhaler that's used for Tyvaso DPI?
4           ATTORNEY DYKHUIS:  Object to form.
5           THE WITNESS:  I'm familiar with
6      the DPI for Tyvaso.  I didn't know if it
7      was called the Dreamboat.
8  BY ATTORNEY DAVIES:
9      Q.    In your opinion, is the DPI for
10 Tyvaso a high-resistance device?
11          ATTORNEY DYKHUIS:  Objection to
12     form.
13          THE WITNESS:  I believe it is a
14     high-resistance device.
15 BY ATTORNEY DAVIES:
16     Q.    What is a high-resistance device?
17          ATTORNEY DYKHUIS:  Object to form.
18          THE WITNESS:  I've never
19     researched it myself, to be honest, but I
20     suspect when they take a breath in, it's
21     more of a resistance to taking the breath
22     in versus a low-resistance device.
23 BY ATTORNEY DAVIES:
24     Q.    Why do you believe that the Tyvaso
25 DPI device is a high-resistance device?
```



33  (Pages 126 to 129)

Page 130

1       ATTORNEY DYKHUIS:  Object to form.
2       THE WITNESS:  I have no idea.
3   BY ATTORNEY DAVIES:
4       Q.    Okay.  What, in your opinion, is a
5   pulsed inhalation device?
6       ATTORNEY DYKHUIS:  Objection to
7       form.
8       THE WITNESS:  One that's not
9       continuous, that it comes out in one
10      pulse.
11  BY ATTORNEY DAVIES:
12      Q.    Is the Tyvaso DPI a pulse inhalation
13  device?
14      ATTORNEY DYKHUIS:  Objection to
15      form.
16      THE WITNESS:  I believe it is
17      regarded as such.
18  BY ATTORNEY DAVIES:
19      Q.    And what is that belief based on?
20      A.    That you actuate it, and it comes
21  out as a pulse while the patient is taking a breath
22  in.
23      Q.    When you say you actuate it, you're
24  equating the breath in with the pulse; is that
25  correct?

Page 131

1       ATTORNEY DYKHUIS:  Object to form.
2       THE WITNESS:  I'm assuming it is.
3   BY ATTORNEY DAVIES:
4       Q.    But you don't know for certain;
5   correct?
6       ATTORNEY DYKHUIS:  Object to form.
7       THE WITNESS:  I think it's a good
8       assumption.
9   BY ATTORNEY DAVIES:
10      Q.    Okay.  But you don't know for
11  certain; correct?
12      ATTORNEY DYKHUIS:  Object to form.
13      THE WITNESS:  I don't know the
14      technicalities of when the pulse comes
15      out versus when the patient takes the
16      breath in.  I've never taken a hit
17      myself.  I might have, you know, on a
18      placebo device when it first came out,
19      but I don't know technically how the
20      pulse relates to the breath going in.
21  BY ATTORNEY DAVIES:
22      Q.    Have you ever -- sitting here today,
23  do you recall any publication where you referred to
24  a dry powder inhaler as a pulse inhalation device?
25      ATTORNEY DYKHUIS:  Object to form.

Page 132

1       THE WITNESS:  I've written many
2       things over the years, and it could be
3       something where there's something about a
4       pulse inhalation device, but I don't
5       recall if I did or I didn't.
6   BY ATTORNEY DAVIES:
7       Q.    And sitting here today, you can't
8   recall any presentation that you've given where
9   you've referred to a dry powder inhaler as a pulsed
10  inhalation device; correct?
11      ATTORNEY DYKHUIS:  Object to form.
12      THE WITNESS:  I've given many
13      presentations.  And I don't know if I
14      have or I haven't.  I may have.
15  BY ATTORNEY DAVIES:
16      Q.    Sitting here today you can't recall
17  any particular circumstance; correct?
18      ATTORNEY DYKHUIS:  Object to form.
19      THE WITNESS:  That's correct.
20      Q.    Do you know whether the Tyvaso DPI
21  pulses the drug independently of the patient's
22  inhalation?
23      ATTORNEY DYKHUIS:  Object to form.
24      THE WITNESS:  No, the patient has
25      got to be taking a breath in for the

Page 133

1       pulse to occur.  Otherwise, you know,
2       they would be walking around with it in
3       their pocket and it would go off.  So
4       there's got to be something to activate
5       the device.
6   BY ATTORNEY DAVIES:
7       Q.    Do you consider the nebulizer that's
8   provided with Tyvaso to be a pulsed inhalation
9   device?
10      ATTORNEY DYKHUIS:  Object to form.
11      THE WITNESS:  My understanding is
12      that it's more continuous.  That's my
13      understanding.
14  BY ATTORNEY DAVIES:
15      Q.    What is that understanding based on?
16      ATTORNEY DYKHUIS:  Object to form.
17      THE WITNESS:  The fact that it's a
18      nebulizer, which are generally
19      continuous.  Whether there are little
20      pulses in the context of that nebulizer,
21      I don't know, but I've always regarded
22      nebulizers to be more continuous.
23  BY ATTORNEY DAVIES:
24      Q.    And you have never seen the dry
25  powder inhaler for Yutrepia; correct?



34  (Pages 130 to 133)

Page 134

```
1              ATTORNEY DYKHUIS:  Object to form.
2         THE WITNESS:  Not that I can
3     recall.
4     BY ATTORNEY DAVIES:
5     Q.    You've never seen any schematics or
6  drawings of the dry powder inhaler for Yutrepia;
7  correct?
8     A.    I believe I might have.
9     Q.    Okay.  When do you believe you might
10 have?
11             ATTORNEY DYKHUIS:  Object to form.
12        THE WITNESS:  There might be a
13     picture in my declaration.  I thought
14     there was something from the proposed
15     label.  Let's see if I'm correct.  I
16     thought there was.  I could be wrong.
17     No.
18        I thought there might be a little
19     picture of it on this label, but there
20     isn't.  My apologies.
21        I might have -- you know, it's
22     been around for all these years, I can't
23     answer to if I haven't Googled an image
24     before, so I probably have, but I'm not a
25     hundred percent certain.
```

Page 135

```
1              BY ATTORNEY DAVIES:
2     Q.    Okay.  Sitting here today, you have
3  no knowledge of whether the Yutrepia DPI provides
4  the powder continuously or in pulses in any way;
5  correct?
6              ATTORNEY DYKHUIS:  Object to form.
7         THE WITNESS:  My assumption is if
8     it's a dry powder, then it should be
9     pulsed, that's my assumption.
10    BY ATTORNEY DAVIES:
11    Q.    But you can't say with certainty
12 because you've never seen the device or seen it
13 described; correct?
14             ATTORNEY DYKHUIS:  Object to form.
15        THE WITNESS:  That's correct.
16    BY ATTORNEY DAVIES:
17    Q.    You mentioned that the Tyvaso DPI,
18 in your opinion, was a high-resistance device.  Do
19 you believe that you would see less switching if
20 patients were provided with a low-resistance DPI
21 with the same efficacy?
22             ATTORNEY DYKHUIS:  Objection to
23     form.
24        THE WITNESS:  No idea.  I don't
25     think it's necessarily a function of the
```

Page 136

```
1     resistance.
2     BY ATTORNEY DAVIES:
3     Q.    What do you think it's a function
4  of?
5              ATTORNEY DYKHUIS:  Form.
6         THE WITNESS:  Just general
7     tolerability.  Every patient is
8     different, and there could be an
9     irritation of the particles.
10        I would hypothesize if you have a
11     low-resistance device and suddenly you
12     get a rush of the particles to the back
13     of your throat, that might induce more
14     coughing and perhaps make patients less
15     tolerable of the device.
16    BY ATTORNEY DAVIES:
17    Q.    In your clinical practice, how do
18 you determine whether there's been an improvement
19 in exercise capacity in your patients?
20             ATTORNEY DYKHUIS:  Objection to
21     form.
22    Q.    Let me restate that.
23    In your PH patients, how do you determine
24 whether there has been an improvement in
25 exercise-type capacity?
```

Page 137

```
1              ATTORNEY DYKHUIS:  Objection to
2     form.
3         THE WITNESS:  Talking to the
4     patients always helps in terms of what
5     they can do versus what they used to be
6     able to do.  And then we look at the
7     six-minute walk test, and that gives us
8     an idea of what the exercise capabilities
9     are.
10    BY ATTORNEY DAVIES:
11    Q.    What information would a patient
12 provide you, short of performing a six-minute walk
13 test, that would inform you as to improvement of
14 the exercise capacity?
15             ATTORNEY DYKHUIS:  Object to form.
16        THE WITNESS:  They might come in
17     and say, Gosh, Doc, thanks for that
18     medicine.  I feel so much better.  Before
19     I got shortness of breath going to the
20     bathroom, and now I can go to the
21     bathroom and get the mail that I couldn't
22     do before.  That's really dependent on
23     the individual patient.
24    BY ATTORNEY DAVIES:
25    Q.    What is an exacerbation of
```

**MAGNA** ◗
LEGAL SERVICES

35 (Pages 134 to 137)

Page 138

1    interstitial lung disease?
2        A.    I believe you asked that earlier,
3    but just to reiterate, our form of the definition
4    from our society where it's a worsening of
5    shortness of breath over approximately a four-week
6    period accompanied by worsening oxygenation,
7    accompanied by increased infiltrates on chest
8    imaging, and ruling out other potential causes for
9    this such as heart failure, for example.
10       Q.    And how would you determine whether
11   there had been a reduction in one of those
12   exacerbations?
13           ATTORNEY DYKHUIS:  Object to form.
14           THE WITNESS:  You cannot determine
15       that on an individual patient basis.  It
16       takes large studies, much like we had in
17       INCREASE where you compare the one group
18       to the other to see what the incidence is
19       in the one group versus the other.
20           So on an individual patient you
21       can't know if you're having any impact on
22       preventing acute exacerbations.
23   BY ATTORNEY DAVIES:
24       Q.    So in a patient you couldn't
25   determine whether or not you were improving an

Page 139

1    exacerbation.  You would need to look at a large
2    study population to do that; correct?
3           ATTORNEY DYKHUIS:  Object to the
4       form.
5           THE WITNESS:  What you just said
6       is a little bit different.  Prevention
7       versus treatment, which is what you just
8       alluded to, I think.
9           Treatment of acute exacerbations
10      is very, very difficult.  What we saw in
11      the INCREASE study was fewer acute
12      exacerbations.  So less incidence of
13      acute exacerbations versus as a treatment
14      for acute exacerbation.
15   BY ATTORNEY DAVIES:
16       Q.    We talk about FVC.  Could you tell
17   me what FVC stands for?
18           ATTORNEY DYKHUIS:  Object to form.
19           THE WITNESS:  Forced vital
20      capacity.
21   BY ATTORNEY DAVIES:
22       Q.    What is forced vital capacity?
23       A.    It's the amount of air that a
24   patient can blow out after taking a full
25   inspiration and then blowing out as hard as they

Page 140

1    can until they can't blow out anymore.  That would
2    be the forced vital capacity.
3        Q.    And how would you determine in a
4    patient that there has been an improvement in
5    forced vital capacity?
6        A.    There's some inherent variability
7    around the forced vital capacity as much as
8    10 percent.  So if there's a 3 percent improvement,
9    we don't know if it's test-test variability or if
10   it's real.
11           When we get beyond the 10 percent number,
12   either up or down, then you can be more certain
13   that the change you're seeing is real.
14       Q.    So if you're seeing less than a
15   10 percent change in forced vital capacity in a
16   patient, you personally would not be confident that
17   that's a real change; correct?
18           ATTORNEY DYKHUIS:  Objection.
19           THE WITNESS:  Like everything
20      else, it's a spectrum.  Nine percent is
21      more of a change than 1 percent, so
22      there's no definite cutoff.  And
23      11 percent is worse than 10 percent, but
24      we typically regard 10 percent as a
25      threshold of a meaningful change.  But it

Page 141

1       could be that changes of less than
2       5 percent are meaningful, but because
3       it's a spectrum it's not as meaningful as
4       a 10 percent change.
5    BY ATTORNEY DAVIES:
6        Q.    In the INCREASE study, do you recall
7    to the extent there was a change in FVC if that was
8    greater than or less than 3 percent?
9           ATTORNEY DYKHUIS:  Objection to
10      form.
11           THE WITNESS:  Are you talking
12      about the difference to the placebo arm?
13   BY ATTORNEY DAVIES:
14       Q.    Correct.
15       A.    I don't recall what that exact
16   number was.  I do recall that it was statistically
17   significant.  The 5 percent, 10 percent quality is
18   for the individual patient.  For a population-based
19   study where you have many contributors, you can
20   have a change as small as 1 or 2 percent which
21   might be statistically significant.
22       Q.    But you could not determine whether
23   there had been a -- let me restart here.
24           You couldn't determine in a patient whether
25   there had been a statistically significant

**MAGNA**
**LEGAL SERVICES**

36  (Pages 138 to 141)

Page 142

1   difference in FVC; correct?
2   ATTORNEY DYKHUIS:  Object to the
3   form.
4   THE WITNESS:  No.  As I mentioned
5   previously, you can't determine
6   statistically -- statistical significance
7   in an individual patient.
8   ATTORNEY DAVIES:  I'm going to
9   move to some other stuff.  Do you want to
10  take a break for lunch now, because I
11  think we have to grab something.
12  ATTORNEY DYKHUIS:  Sounds good.
13  THE VIDEOGRAPHER:  We are off the
14  record at 11:51.
15  (Recess taken from 11:51 a.m
16  to 12:46 p.m.)
17  THE VIDEOGRAPHER:  We are on the
18  record at 12:46.
19  BY ATTORNEY DAVIES:
20  Q.   Welcome back, Doctor.  I'm just
21  going to grab two documents here.
22  So I'm marking as Exhibit Number 3 a
23  publication entitled "Controlled Trial of
24  Sildenafil and Advanced Idiopathic Pulmonary
25  Fibrosis" by Zisman, et al., and bearing production

Page 143

1   number UTC_PH-ILD_010830 to -838.
2   (Exhibit 19 was marked for
3   identification.)
4   Q.   And, Doctor, I'm going to ask for
5   your help in passing a copy to counsel as well.
6   A.   (Witness complies with request.)
7   Q.   My first question for you is have
8   you seen Exhibit 3 before?
9   A.   Yes, I have.
10  Q.   And what is Exhibit 3?
11  A.   It's a report of a controlled trial
12  of "Sildenafil and Advanced Idiopathic Pulmonary
13  Fibrosis" published in the New England Journal of
14  Medicine in 2010.
15  Q.   If you turn to page 627 of this
16  paper, and it's near the bottom of the page the
17  author says, "Although the study did not meet its
18  prespecified primary outcome and the therapeutic
19  efficacy of Sildenafil is far from established, our
20  data provides the clinical equipoise needed to
21  conduct further trials involving patients with
22  advanced idiopathic pulmonary fibrosis."
23  Do you see that?
24  ATTORNEY DYKHUIS:  Object to form.
25  THE WITNESS:  I'm sorry.  Where

Page 144

1   about did you say it was?
2   BY ATTORNEY DAVIES:
3   Q.   If you go to the bottom of the first
4   column --
5   A.   Okay.
6   Q.   -- do you see there's a sentence
7   that says, "Although this study"?
8   A.   Yes.
9   Q.   And then if you continue on to the
10  next column, it refers to the data providing the
11  clinical equipoise regarding the trials.  What is
12  clinical equipoise?
13  A.   Equipoise to me always means the
14  balance, clinical balance, so they're suggesting
15  that there should be further trials involving
16  patients with advanced IPF.
17  Q.   And does this study examine the
18  impact of Sildenafil in six-minute walk distance in
19  patients with advanced idiopathic pulmonary
20  fibrosis?
21  ATTORNEY DYKHUIS:  Object to form
22  and foundation.
23  THE WITNESS:  Yes, it did.
24  BY ATTORNEY DAVIES:
25  Q.   Is this study referred to as the

Page 145

1   STEP-IPF study in your report?
2   ATTORNEY DYKHUIS:  Object to form.
3   THE WITNESS:  Yes.
4   Q.   I'm now going to enter as Nathan
5   Exhibit 4 an article entitled "Sildenafil Preserves
6   Exercise Capacity in Patients with Idiopathic
7   Pulmonary Fibrosis and Right-sided Ventricular
8   Dysfunction" published in Chest by Han et al. in
9   June of 2013.
10  (Exhibit 4 was marked for
11  identification.)
12  Q.   Doctor, have you seen this paper
13  before?
14  A.   Yes, I have.
15  Q.   What is this?
16  A.   This paper, as best I recall, was a
17  subgroup analysis of the STEP-IPF study in those
18  patients who had echocardiographic evidence of
19  right ventricular dysfunction.
20  Q.   So in the Chest publication, are
21  they describing an evaluation of a subgroup of the
22  patients within the STEP-IPF trial that was
23  described in Exhibit 3?
24  ATTORNEY DYKHUIS:  Object to the
25  form and foundation.

37 (Pages 142 to 145)

Page 146

1  THE WITNESS: I'd have to check,
2  but I don't think they talked about the
3  STEP study, which is a post hoc study in
4  the paper that was published in the New
5  England Journal, and I think that I
6  mentioned that, and I need to read
7  the paper to be certain about that.
8  BY ATTORNEY DAVIES:
9  Q. But you agree that Exhibit 2 is a
10 subgroup study of the earlier STEP-IPF Zisman
11 publication; correct?
12 ATTORNEY DYKHUIS: Object to form.
13 THE WITNESS: Yes, I do.
14 BY ATTORNEY DAVIES:
15 Q. And with respect to this subgroup
16 analysis, I'm looking on the first page of
17 Exhibit 62, in the -- under Results, do you see the
18 Results section in that box?
19 ATTORNEY DYKHUIS: Object to form.
20 THE WITNESS: Yes, I do.
21 BY ATTORNEY DAVIES:
22 Q. So at least with this subgroup of
23 subjects, the authors report, "In the subgroup of
24 subjects with RVSD, subjects treated with
25 Sildenafil experienced less detriment in six-minute

Page 147

1  walk distance, 99.3 meters, P equals .01 and
2  greater improvement in SGRQ and EuroQol analog
3  scores than subjects receiving placebo."
4  Do you see that?
5  A. I do.
6  ATTORNEY DYKHUIS: Object to form.
7  Q. Okay. I apologize. Just so it's --
8  and I screwed up the exhibit number, so just to
9  make it clear, I apologize. I was referring to
10 Exhibit 4 instead of Exhibit 62.
11 So in Exhibit 4 you would agree that the
12 authors with respect to this subgroup are reporting
13 a significantly -- a statistically significant
14 improvement in six-minute walk distance with
15 treatment of Sildenafil as compared to placebo;
16 correct?
17 ATTORNEY DYKHUIS: Object to form.
18 THE WITNESS: That's what they're
19 reporting on, yes.
20 BY ATTORNEY DAVIES:
21 Q. They also report a significantly --
22 a statistically significant improvement in SGRC
23 within this subgroup as well; correct?
24 ATTORNEY DYKHUIS: Object to form.
25 THE WITNESS: SGRQ, yes.

Page 148

1  BY ATTORNEY DAVIES:
2  Q. And they also report a statistically
3  significant improvement in the EuroQOL visual
4  analog scores within this subgroup of patients from
5  the larger STEP-IPF study; correct?
6  ATTORNEY DYKHUIS: Object to form.
7  THE WITNESS: Yes.
8  BY ATTORNEY DAVIES:
9  Q. So at least with respect to the
10 subgroup of patients that are further analyzed in
11 the Chest publication in Exhibit 4, the STEP-IPF
12 trial showed safety and efficacy; correct?
13 ATTORNEY DYKHUIS: Object to form.
14 THE WITNESS: I disagree with
15 that.
16 BY ATTORNEY DAVIES:
17 Q. Why.
18 A. Let me draw your attention to the
19 primary publication, and in terms of the methods,
20 if you go to the methods, if you go to page 621,
21 the last paragraph.
22 "The trial was conducted in two periods:
23 Period 1 was a 12-week double-blind
24 placebo-controlled study of Sildenafil. Period 2
25 was a 12-week open-label extension with all

Page 149

1  patients on Sildenafil."
2  Now, draw your attention to Table 3.
3  Q. I'm sorry, Doctor. Which are we --
4  A. Still the primary publication.
5  Q. Okay.
6  A. Table 3, this was an intent to treat
7  analysis of mortality. So patients were analyzed
8  in whichever group they were originally assigned
9  to.
10 So if you look numerically, they were at
11 week 28. There were four deaths in the Sildenafil
12 arm, 11 deaths in the placebo arm. So it looks
13 like numerically Sildenafil does better than
14 placebo because this is an intent to treat.
15 Sometimes I say intent to treat is intent
16 to trick. I'll show you the trick here. The trick
17 is that all patients on placebo were switched to
18 Sildenafil. So the additional deaths in the
19 placebo arm were on Sildenafil. There were seven
20 additional deaths. So safety, no.
21 When you do a post hoc analysis, you are
22 taking out patients who died or dropped out, and at
23 best I would say that Chest paper is hypothesis
24 generating. But these numbers if they had analyzed
25 the patients on therapy, the number of deaths would



38  (Pages 146 to 149)

Page 150

1  have switched.  There would have been 11 on
2  Sildenafil and four on placebo, and that's why I
3  disagree.
4       Sometimes you have studies that have
5  discordant outcomes.  They might make patients feel
6  better, but patients can die earlier.
7       Q.   The New England Journal of Medicine
8  paper at Exhibit 3 looks like it was published in
9  2010; correct?
10      A.   Correct.
11      Q.   And you mentioned that you used
12 Sildenafil in the treatment of PH-ILD patients;
13 correct?
14      A.   Correct.
15      Q.   And did you continue to do so after
16 the publication of this study in 2010?
17           ATTORNEY DYKHUIS:  Object to form.
18           THE WITNESS:  I did if they had PH
19      of sufficient severity.  Another point
20      around this is we don't know which of
21      these patients have pulmonary
22      hypertension because they didn't have
23      riociquat.  This was a study in advanced
24      IPF, not in patients with PH and IPF.
25

Page 151

1           BY ATTORNEY DAVIES:
2       Q.   Going back to Exhibit 4, which is
3  the Chest paper.  You would agree though, that with
4  respect to the subgroup reported on, in Exhibit 4,
5  these patients did appear to have a significant
6  increase in their six-minute walk distance of
7  nearly 100 meters; correct?
8           ATTORNEY DYKHUIS:  Object to the
9      form.
10          THE WITNESS:  After the patients
11     who died dropped out and weren't analyzed
12     and you take a specific subgroup, that's
13     what's reported in the paper.
14          BY ATTORNEY DAVIES:
15     Q.   Have you ever heard of the term
16 "patient phenotyping"?
17     A.   Yes.
18     Q.   What's patient phenotyping?
19     A.   That's looking at the chemical
20 characteristics of patients that bind them together
21 in terms of having specific clinical
22 characteristics that warrant them being considered
23 as a separate group.
24     Q.   And what role does patient
25 phenotyping play in -- let me ask you this.  Did

Page 152

1  patient phenotyping play any role in the design of
2  the INCREASE trial?
3           ATTORNEY DYKHUIS:  Object to form.
4           THE WITNESS:  I wouldn't
5      characterize it as patient phenotyping.
6      Patients had to have pulmonary
7      hypertension associated with interstitial
8      lung disease.  If you want to call
9      patients who are associated with
10     pulmonary hypertension in a patient with
11     interstitial lung disease phenotyping,
12     then you can make that argument.
13          Let me follow that up as well by
14     saying that STEP-IPF in the subgroup
15     analysis grew to be short-term.  The one
16     study that you brought to my attention
17     earlier, which was Sildenafil plus
18     pirfenidone, which was a long term study,
19     showed no difference between the groups.
20          So the longer term even if you
21     infer that there was some kind of benefit
22     from this, another robust randomized
23     control study did not validate that these
24     effects were -- you know, there were any
25     long-term benefits.

Page 153

1           BY ATTORNEY DAVIES:
2       Q.   Do you know whether the patients
3  that you've treated with -- strike that.
4       Do you know whether the PH-ILD patients
5  you've treated show an improvement in six-minute
6  walk distance?
7           ATTORNEY DYKHUIS:  Object to form.
8           THE WITNESS:  Some of them do and
9      some of them don't.
10          ATTORNEY DAVIES:  I've marked as
11     Exhibit 5 a publication titled "riociguat
12     for Idiopathic Interstitial
13     Pneumonia-Associated Pulmonary
14     Hypertension, (RISE-IIP):  A randomized
15     Placebo-Controlled Phase 2B Study."
16          (Exhibit 5 was marked for
17     identification.)
18          ATTORNEY DAVIES:  I'm sorry, just
19     for clarity of the record, it bears Bates
20     numbers UTC_PH-ILD_010530 to -540.
21          BY ATTORNEY DAVIES:
22     Q.   And, Doctor, what is this
23 publication?
24     A.   This is a report on the randomized
25 controlled study of riociguat for idiopathic



39 (Pages 150 to 153)

Page 154

```
1   interstitial pneumonia associated with pulmonary
2   hypertension, which was a randomized double-blind
3   controlled, placebo-controlled study.
4        Q.   And this is the RISE IIP study that
5   you've described earlier today?
6        A.   That's correct.
7        Q.   And this is the RISE IIP study
8   that's talked about in your declaration?
9        A.   Correct.
10       Q.   And there's a Steven D. Nathan
11  that's the first author on this publication.  Is
12  that you?
13       A.   That would be me.
14       Q.   You've testified that you believe
15  that the study was a failure.  Is that correct?
16            ATTORNEY DYKHUIS:  Object to form.
17            THE WITNESS:  I wouldn't
18       characterize it as a failure.  It was
19       successfully completed.  The drug didn't
20       work and appeared to be harmful to
21       patients, but study itself was a very
22       well-done study.
23  BY ATTORNEY DAVIES:
24       Q.   At the time -- why was the trial
25  stopped?
```

Page 155

```
1            ATTORNEY DYKHUIS:  Object to form.
2            THE WITNESS:  The trial was
3       stopped -- every study such as this
4       randomized control study has a dataset
5       for the monitoring committee.  You look
6       at the data, blind it and, you know,
7       sometimes blind and sometimes not, making
8       sure that there's no harm, no foul to the
9       individuals that have entered and
10      continue to be enrolled in the study.
11      And that's a safeguard for patient
12      safety.
13           And that effect, the monitoring
14      committee meets every couple of months,
15      looks at the data and decided when they
16      looked at the data at one point that
17      there was a signal of harm in the
18      riociguat arm that warranted
19      discontinuation of the study.
20  BY ATTORNEY DAVIES:
21       Q.   Why, in your opinion, did you see
22  the safety signals that required the study to be
23  stopped?
24            ATTORNEY DYKHUIS:  Object to form.
25            THE WITNESS:  If you go Table 2 --
```

Page 156

```
1   BY ATTORNEY DAVIES:
2        Q.   Which page is that on, Doctor?
3        A.   -785.
4        Q.   Yes.
5        A.   And you look at the main phase of
6   the study and you see in the last horizontal
7   deaths, you can see that in the main phase of the
8   study there were eight deaths on riociguat and
9   three on placebo, which numerically by itself is
10  not a big difference.  And any time a death
11  happens, a monitoring committee recommends halting
12  a study, they wouldn't be fairly certain of what's
13  going on.
14           But then what happened is after the main
15  phase, all patients were placed on long-term
16  open-label extension.
17           Now go across to Column C and 4, and we see
18  one death in the real arm and eight deaths in the
19  former placebo arm.  In other words, patients who
20  are dying who were previously on placebo and then
21  rolling over to receive open-label riociguat.
22           And there are more patients coming through
23  the study who are going over from placebo to get
24  riociguat.  So the dataset monitoring committee did
25  the right thing in informing us and getting us to
```

Page 157

```
1   hold the study.
2        This goes actually back to the STEP-IPF
3   study, because this was on treatment mortality.  If
4   STEP had done on treatment mortality those numbers,
5   as I mentioned, would have flipped around and might
6   have looked similar to this.
7        Q.   Okay.  Do you believe you saw the
8   safety issues because of the -- you had the wrong
9   patient population in the study?
10            ATTORNEY DYKHUIS:  Object to form.
11            THE WITNESS:  That might have been
12       a part of it.
13  BY ATTORNEY DAVIES:
14       Q.   Riociguat was given to these
15  patients orally; is that correct?
16       A.   That's correct.
17       Q.   So it would have had systemic
18  effects?
19            ATTORNEY DYKHUIS:  Object to form.
20            THE WITNESS:  That's correct.
21  BY ATTORNEY DAVIES:
22       Q.   If you go to page 781 and you see a
23  little shaded box here in your paper that says,
24  "Research in context."
25       A.   Yes.
```

40 (Pages 154 to 157)

Page 158

1    Q.    Do you see there's a reference, it's
2  about half the way down, to a small phase 2
3  randomized control study of riociguat suggested a
4  beneficial response.
5        Do you see that?
6    A.    Yes.
7    Q.    It's about halfway down in the first
8  column.
9    A.    I see small phase two, yes, I see
10 that.
11       Q.    What study are you referring to
12 there?
13       ATTORNEY DYKHUIS:  Object to form.
14       THE WITNESS:  It was a study that
15   had as the first author Marius Hoeper,
16   H-o-3-p-e-r.  I want to say it was
17   published in the European Respiratory
18   Journal, but I'm not a hundred percent
19   certain about that.
20  BY ATTORNEY DAVIES:
21       Q.    And why did you choose to discuss
22 that publication in your paper on riociguat?
23    A.    I want to provide a context for why
24 riociguat was studied in this study, and that's
25 phase 2 -- I would revise the phase 2A study,

Page 159

1  provided scientific rationale for why it did not
2  work in the study that we did.
3        And this is an example of Rio can -- will
4  treat pulmonary hypertension or lower the
5  pressures, but it was harmful to patients.  So you
6  have to divorce treating pulmonary hypertension
7  away or from clinical benefit.
8    Q.    In your declaration, you talk about
9  when you presented the results of this RISE-IIP
10 study you were, quote, admonished by one of the
11 session heads.
12       Do you remember saying that?
13    A.    I do.
14    Q.    Other than being admonished by that
15 one session head, did anyone else at the meeting
16 admonish you for conducting this study with
17 riociguat?
18    A.    I don't recall that.  As I said, I
19 found the people in the audience, none of the other
20 chairs jumped to my defense.  You know, you could
21 construe silence as complicity.
22       I do remember that Mario Succa [phon.]
23 himself was sitting in the front row, and he tried
24 to defend, you know, having done the study because
25 he was the first author on the study that laid the

Page 160

1  foundation for the study.
2        But, yeah, I don't know what other people
3  are feeling, but the chairperson who was the
4  chairperson in that session who was renowned leader
5  in the PH field, and he might have influenced
6  people in the field to believe what he espoused,
7  and that was that we shouldn't be treating PH
8  associated with lung disease.
9    Q.    And in your report at Paragraph 84
10 you state that the session lead told you, "Everyone
11 knows that treating pulmonary hypertension
12 associated with lung disease does not work."
13       Do you see that?
14    A.    I remember that, yes.
15    Q.    And other than this one session
16 chair, no one else at this meeting of over 500
17 participants expressed that view to you; correct?
18       ATTORNEY DYKHUIS:  Object to form.
19       THE WITNESS:  There was a lot of
20   discussion afterwards and people coming
21   up to me.  I suspect that people were of
22   that belief, and he had said what he
23   said.  There was probably no further need
24   to come up and admonish me.  The work had
25   been done.

Page 161

1  BY ATTORNEY DAVIES:
2    Q.    Did anyone else at the meeting come
3  up and admonish you for the work?
4        ATTORNEY DYKHUIS:  Object to form.
5        THE WITNESS:  No one else came up
6    to me, but I do believe that this thought
7    leader, highly regarded in the PH field,
8    probably reflects the views of many other
9    people he was speaking for.  It might not
10   have just been speaking for himself.  He
11   might have been speaking for many other
12   people, and he probably influenced a
13   bunch of the people in the audience who
14   ended up being the same after the
15   session.
16       You have a negative study that
17   harmed patients, and then the session
18   lead, who is a very renowned figure in
19   the PH world, admonishing me for thinking
20   that treating PH and ILD could never
21   work, and this should never have been
22   done.
23  BY ATTORNEY DAVIES:
24    Q.    Who was the session lead who
25 admonished you?



41 (Pages 158 to 161)

Page 162

1    A.    Dr. Lewis Rubin.
2    Q.    You had mentioned that this
3  earlier -- this earlier paper by Hoeper laid the
4  foundation for your RISE study; correct?
5         ATTORNEY DYKHUIS:  Object to form.
6         THE WITNESS:  That's correct.
7  BY ATTORNEY DAVIES:
8    Q.    Okay.  And in what way did that
9  study lay the foundation for your RISE study?
10        ATTORNEY DYKHUIS:  Object to form.
11        THE WITNESS:  It showed that Rio
12        could potentially be a treatment modality
13        for patients with pulmonary hypertension
14        associated with interstitial lung
15        disease.
16  BY ATTORNEY DAVIES:
17    Q.    After your RISE study, do you
18  personally still believe that in the way patient
19  population Rio could be used for treatment of
20  PH-ILD?
21    A.    I can't rule it out.  But I wouldn't
22  start it in any patient.  There could be one in 10
23  patients, but I don't want to knock off another
24  three patients to find that one in 10 patient.
25    Q.    When you say "one in 10 patients,"

Page 163

1  what one in 10 patients do you believe it would be
2  likely to work in for PH-ILD?
3         ATTORNEY DYKHUIS:  Objection to
4    form.
5         THE WITNESS:  I'm hypothesizing
6    and speculating.  I'm giving an example.
7    Any medication that's harmful, it might
8    be the odd patient that it's helpful, but
9    we suspended it because we would harm
10    more patients than helping.  And those
11    are the medications that are generally
12    population-based regarded as harmful even
13    though there might be one or two patients
14    who actually benefit.
15  BY ATTORNEY DAVIES:
16    Q.    Can you go back to Exhibit 3, which
17  should be the Zisman, et al, paper.
18    A.    Yes.
19    Q.    And do you agree that this STEP-IPF
20  study described in this publication showed the
21  proof of concept for using a Group 1 therapy
22  Group 3 PH?
23         ATTORNEY DYKHUIS:  Object to form.
24         THE WITNESS:  You can take proof
25    of concept -- let me say that you could

Page 164

1    pick out some of the results from the
2    study like some of the secondary
3    endpoints and say, Yeah, it benefited
4    there, and maybe this is a therapy that
5    you can consider, but it didn't prove
6    anything.  It was hypothesis-generating.
7         Let me qualify that.  The Hoeper
8    article was proof of concept as well, and
9    then subsequently we had a follow-up
10    study that went the other way and proved
11    to be harmful.
12         So proof of concept don't always
13    equate to a positive study and can result
14    in a negative study.
15  BY ATTORNEY DAVIES:
16    Q.    So when you used the term "proof of
17  concept" with respect to a clinical study, what do
18  you intend that to mean?
19         ATTORNEY DYKHUIS:  Object to form.
20         THE WITNESS:  As proof that the
21    concepts of what you're trying to treat
22    with what you're trying to treat must be
23    a beneficial therapy.  It's the concept
24    that subsequently remains to be further
25    tested.

Page 165

1  BY ATTORNEY DAVIES:
2    Q.    And when -- what would be required
3  in your mind to show that a proof of concept study
4  actually results in treatment?  Does that require a
5  phase 3 placebo-controlled randomized trial?
6    A.    Correct.
7         ATTORNEY DYKHUIS:  Object to form,
8    foundation.
9    Q.    I'm going to pass you two documents,
10  Doctor.  The first is Exhibit 6, titled
11  "Nintedanib."
12         (Exhibit 6 was marked for
13    identification.)
14    A.    Okay.
15    Q.    It's titled "Nintedanib."
16    A.    Correct.
17    Q.    Plus Sildenafil inpatients with
18  idiopathic pulmonary fibrosis.  The first author is
19  Martin Kolb published in the New England Journal of
20  Medicine 2018, bearing Bates numbers beginning
21  UTC_PH-ILD 010487.
22         And I'm also going to pass you Exhibit 7,
23  which is Supplementary Appendix and refers to the
24  New England Journal that I just identified as
25  Exhibit 6.  I'm going to pass you that.



42  (Pages 162 to 165)

Page 166

1     (Exhibit 7 was marked for
2     identification.)
3         ATTORNEY DYKHUIS:  Wait.
4     Exhibit 6?
5         ATTORNEY DAVIES:  Exhibit 6 is the
6     New England Journal of Medicine article,
7     and then Exhibit 7 is the supplementary
8     appendix to that same article.
9         ATTORNEY DYKHUIS:  Thank you.
10        ATTORNEY DAVIES:  Okay.
11    BY ATTORNEY DAVIES:
12    Q.    So have you seen Exhibit 6 before,
13    Doctor?
14    A.    Yes, I have.
15    Q.    And does Exhibit 6 describe the
16    end-stage study that's discussed in your
17    declaration?
18        ATTORNEY DYKHUIS:  Object to form.
19        THE WITNESS:  Yes, it does.
20    BY ATTORNEY DAVIES:
21    Q.    And if you look at Exhibit 7, is
22    Exhibit 7 the Supplementary Appendix that the
23    authors provided along with the publication of
24    their article in the New England Journal of
25    Medicine in Exhibit 6?

Page 167

1         ATTORNEY DYKHUIS:  Object to form
2     and foundation.
3         THE WITNESS:  Yes, it is.
4     BY ATTORNEY DAVIES:
5     Q.    What were the authors -- what drug
6     was being examined in the end-stage study that's
7     described in Exhibit 6?
8     A.    Sildenafil.
9     Q.    In what patient population was it
10    being examined in?
11        ATTORNEY DYKHUIS:  Object to form.
12        THE WITNESS:  Patients with
13    idiopathic pulmonary fibrosis who are on
14    Nintedanib.
15    BY ATTORNEY DAVIES:
16    Q.    Would that include PH-ILD patients?
17        ATTORNEY DYKHUIS:  Object to form.
18        THE WITNESS:  It might.  It
19    doesn't look for PH.  But there might
20    have been some patients in there who had
21    PH.
22    BY ATTORNEY DAVIES:
23    Q.    What was the measure that they used
24    for the primary outcome in the end-stage study
25    described in Exhibit 6?

Page 168

1         ATTORNEY DYKHUIS:  Object to form.
2         THE WITNESS:  The primary endpoint
3     was changed from baseline in the total
4     score in St. George's Respiratory
5     Questionnaire at week 12.
6     BY ATTORNEY DAVIES:
7     Q.    And did that show an improvement?
8     Did they see an improvement in the use of that
9     questionnaire after treatment with Sildenafil or
10    not?
11    A.    No, they did not.
12    Q.    Okay.  Can you turn to Exhibit 7.
13    A.    I've got it.
14    Q.    Can you turn to Figure S3.
15    A.    (Witness complies with request.)
16    Yes.
17    Q.    What is described in Figure S3 of
18    the Exhibit 7 supplementary appendix?
19        ATTORNEY DYKHUIS:  Objection to
20    form and foundation.
21        THE WITNESS:  This is a figure
22    depicting the two arms of the study
23    looking at change from baseline in the
24    UCSD shortness of breath questionnaire at
25    the time from zero to 24 weeks.

Page 169

1     BY ATTORNEY DAVIES:
2     Q.    So if the authors had used the UCSD
3     shortness of breath questionnaire, do you agree
4     that their treatment with Sildenafil would have
5     shown an improvement over placebo?
6         ATTORNEY DYKHUIS:  Object to form.
7         THE WITNESS:  That is, I would
8     say, speculative.
9     BY ATTORNEY DAVIES:
10    Q.    Why do you say it's speculative?
11    A.    Once you choose your primary
12    endpoint, you are a prisoner of your primary
13    endpoint.  If you have 20 secondary endpoints in a
14    clinical study, invariably one of them is going to
15    be positive and you can go back and say, If we had
16    chosen this as our primary, this would have been a
17    positive study.  This is, once again,
18    baseline-generated.
19    Q.    They use the same data in Figure S3,
20    though, that they use for their analysis using the
21    St. George's respiratory questionnaire; correct?
22        ATTORNEY DYKHUIS:  Object to form.
23    Excuse me.
24        THE WITNESS:  You have to direct
25    me to that figure so I can compare them



43  (Pages 166 to 169)

Page 170

1     off the primary.  Actually, it's right
2     next to it.  It's Figure S2.
3     BY ATTORNEY DAVIES:
4        Q.   Right.
5        A.   So you're asking me the same
6     analysis in Figure S3 is the same as S2?
7        Q.   Correct.
8              ATTORNEY DYKHUIS:  Object to form.
9              THE WITNESS:  It's the same
10            analysis, but based on the primary, there
11            wasn't a significant difference between
12            the two arms.
13     BY ATTORNEY DAVIES:
14        Q.   Why do you believe that there was a
15     significant difference if analasized using the UCSD
16     shortness of breath questionnaire when there was
17     not with the St. George's respiratory questionnaire
18     in this study?
19            ATTORNEY DYKHUIS:  Object to form,
20            foundation.
21            THE WITNESS:  They asked -- these
22            are both what we call PROs, patient
23            reported outcomes that ask very different
24            questions.  So it really depends on the
25            questions that are asked and how the

Page 171

1     patients answer them.
2            So it's entirely feasible that one
3     can show a difference and the other one
4     does not.
5     BY ATTORNEY DAVIES:
6        Q.   Can you turn to Figure F5.
7        A.   S5 or F5?
8        Q.   S5, I mean.  Still on Exhibit 7 in
9     the appendix.
10            Do you see that?
11        A.   I do.
12        Q.   What is shown in Figure S5?
13            ATTORNEY DYKHUIS:  Objection to
14            form.
15            THE WITNESS:  It's a change from
16            baseline in FVC over time.  And the two
17            treatment arms Nintedanib --
18            (Reporter clarification)
19            THE WITNESS:  The two treatment
20            arms, the one is nintedanib plus
21            Sildenafil, and the other one is
22            Nintedanib plus placebo, and it's looking
23            at FVC over time.
24     BY ATTORNEY DAVIES:
25        Q.   Would you agree that Figure S5 shows

Page 172

1     a difference in the change of FVC, which favors the
2     combination of Sildenafil and Nintedanib as
3     compared to Nintedanib and placebo alone?
4            ATTORNEY DYKHUIS:  Object to the
5            form and foundation.
6            THE WITNESS:  At first glance I
7            can see how you make the deduction, but
8            you always have to contextualize it.  But
9            says this is hypothesis generating and it
10            depends on how they did the analysis.
11            If you look at the number of
12            patients at the bottom, you started out
13            from the study, it was 137 versus 136.
14            And then as the study progresses at 24
15            weeks, you have 109 versus 108.
16            So you had patients who dropped
17            out, patients who didn't have data points
18            to record.  Which raises a whole lot of
19            questions about what you see in the
20            draft.  If you look at Nintedanib plus
21            Sildenafil, that's 28 patients.  How do
22            they contribute to the FVC initially
23            versus the end.
24            If these were the sickest patients
25            who dropped out, those 28, if they

Page 173

1     continued to 24 weeks, they would have
2     dragged this curve down.  So there are a
3     lot of holes in this, and as I said, it's
4     at best hypothesis-generating, but you
5     have to contextualize it as a post hoc
6     analysis.  And my best summation is that
7     this is hypothesis-generating.
8     BY ATTORNEY DAVIES:
9        Q.   What is the hypothesis that it's
10     generating?
11            ATTORNEY DYKHUIS:  Object to form.
12            THE WITNESS:  That does Sildenafil
13            have some kind of effects on fibrosis.
14            But this is a far measure from proving
15            anything.  It just raises that question.
16            So once again, I don't know how
17            that dealt with the dropouts.  If they
18            had imputed zero values, which some
19            people do, and assume that there was zero
20            that were no longer around if they died,
21            would that have dragged the new curve all
22            the way down?
23            So there are many different ways
24            to deal with missing data, but when you
25            see that -- I don't know what the percent

44  (Pages 170 to 173)

Page 174

```
 1          is, it's at least 20 percent of the
 2     patients have missing data and how that
 3     was dealt with can alter these curves
 4     pretty dramatically.
 5     BY ATTORNEY DAVIES:
 6          Q.   Can you turn to Figure S7 in the
 7     appendix in Exhibit 7?
 8          A.   Yes.
 9          Q.   What's shown at Figure S7?
10               ATTORNEY DYKHUIS:  Object to form.
11               THE WITNESS:  This is change from
12          baseline in brain natriuretic peptide at
13          week 24 between the two groups in the
14          Nintedanib plus Sildenafil arm, the
15          antichromium P was reduced and in the
16          treatment arm -- sorry, in the placebo
17          arm it did go up, getting a difference
18          there of minus 51.3.
19               I'm not sure if this is
20          statistically significant or not.  I'm
21          not if they show that in the paper.  It
22          looks like the confidence intervals are
23          really quite wide.  So I'm not sure if
24          it's of statistical significance or not.
25          I know that they provided a P value to go
```

Page 175

```
 1          with this.
 2     BY ATTORNEY DAVIES:
 3          Q.   What do you use levels of brain
 4     natriuretic peptide for in clinical studies you've
 5     participated in for PH?
 6               ATTORNEY DYKHUIS:  Object to form.
 7               THE WITNESS:  It's a blood test
 8          that's a biomarker, which usually
 9          reflects cardiac stress and strain.  The
10          higher the level, the more stress the
11          heart is under, and the lower the level,
12          the less stress the heart is in.
13     BY ATTORNEY DAVIES:
14          Q.   So would you agree that Figure S7
15     shows that in the Nintedanib plus Sildenafil arm it
16     showed less stress on the heart than the Nintedanib
17     plus placebo alone?
18               ATTORNEY DYKHUIS:  Object to form
19          and foundation.
20               THE WITNESS:  That is a test and
21          see what they said about Figure 7.  I'm
22          just curious to see if it's statistically
23          significant.
24     BY ATTORNEY DAVIES:
25          Q.   Sure.
```

Page 176

```
 1          A.   Let's see if I talk about S7 here.
 2               (Pause)
 3          A.   I see on page 172 that I do talk
 4     about the BNP change of baseline.  They didn't even
 5     provide a P value.  I suspect that because it's
 6     speculative they weren't allowed to provide a P
 7     value.  That is not a reason why there wouldn't be
 8     a P value here.
 9          So I'm not sure if it was statistically
10     significant or not.  But actually you can figure it
11     out because 95 percent confidence intervals are
12     minus 85 to minus 17.6.  So this isn't outside the
13     confidence interval.
14          So my interpretation of this would be that
15     it's not statistically significant.  Hopefully I've
16     got that the right way around.
17          Q.   So you would agree it shows a change
18     in the levels -- Figure S7 shows a change in the
19     levels, but you can't say sitting here whether or
20     not it was statistically significant; right?
21               ATTORNEY DYKHUIS:  Objection to
22          form.
23               THE WITNESS:  The 95 percent
24          confidence intervals include the number
25          minus 51.  So my interpretation based on
```

Page 177

```
 1          this is that it wasn't statistically
 2          significant.
 3     BY ATTORNEY DAVIES:
 4          Q.   So there's a difference, but it's
 5     not statistically significant?
 6          A.   Correct.
 7               ATTORNEY DYKHUIS:  Object to form.
 8          Q.   When was the first time that you
 9     were optimistic that you were going to get a good
10     result out of the INCREASE trial?
11               ATTORNEY DYKHUIS:  Object to form.
12               THE WITNESS:  I don't remember.
13          When I saw the results.
14     BY ATTORNEY DAVIES:
15          Q.   When was that again.
16          A.   It was towards the end of February
17     of 2020.
18          Q.   When in your mind during disease
19     progression does PH become a driver for treatment
20     outcomes in PH-ILD patients?
21               ATTORNEY DYKHUIS:  Objection to
22          form.
23               THE WITNESS:  We don't know that.
24          We hypothesize, though, that when it does
25          occur it becomes the main driver of
```

**MAGNA** ▶
LEGAL SERVICES

45 (Pages 174 to 177)

1    outcomes compared to the underlying
2    primary disease, but we don't know that
3    for sure.
4         The two intersect so closely and
5    kind of feed off one another that it's
6    hard to unwind the two from one another
7    is what I would say.
8    BY ATTORNEY DAVIES:
9         Q.   You would agree that at some point
10   there's an inflection point where PH becomes the
11   driver of treatment outcomes rather than ILD;
12   correct?
13              ATTORNEY DYKHUIS:  Object to form.
14              THE WITNESS:  It sounds like
15        you've read a -- you've seen a document
16        that I produced in a couple of journals
17        where I show that exact figure of an
18        inflection point where -- but that's
19        hypothetical.  I don't know that for
20        sure.
21   BY ATTORNEY DAVIES:
22        Q.   Okay.  But you presented on that;
23   correct?
24              ATTORNEY DYKHUIS:  Object to form.
25              THE WITNESS:  I presented on that

1    because it gives the concept, yes.
2    BY ATTORNEY DAVIES:
3         Q.   So the idea that at some point the
4    PH severity reaches a level that the treatment of
5    the PH component becomes the driver for the
6    treatment outcome.  Is that what you're trying to
7    convey by that?
8              ATTORNEY DYKHUIS:  Object to form.
9              THE WITNESS:  That's possible.
10   BY ATTORNEY DAVIES:
11        Q.   Okay.  Do you agree with that
12   sitting here today?
13              ATTORNEY DYKHUIS:  Object to form.
14              THE WITNESS:  I think it's more
15        complex than this or that.  As I said,
16        the two are so closely intertwined that
17        it's hard to really figure out.  But it's
18        possible that the PH is what's driving
19        the outcomes.
20   BY ATTORNEY DAVIES:
21              (Exhibit 8 was marked for
22        identification.)
23              ATTORNEY DAVIES:  I'm going to
24        enter as Exhibit 8 a document titled
25        United States Patent 10,716,793 bearing

1    UTC Bates numbers UTC_PH-ILD-009772
2         through -796.  Exhibit 8.
3         Q.   And Doctor, is this the '793 patent
4    that you offer opinions on in your report?
5         A.   Yes, it appears to be.
6    BY ATTORNEY DAVIES:
7         Q.   Do you have any understanding as to
8    whether the '793 patent -- the claims of the '793
9    patent claims a method of treating PH-ILD?
10             ATTORNEY DYKHUIS:  Objection to
11        form.
12             THE WITNESS:  That is the last
13        page in this Column 18.  What it's
14        claiming is a method of treating
15        pulmonary hypertension.  So in answer to
16        your question, it states it there.
17   BY ATTORNEY DAVIES:
18        Q.   So you would agree that it
19   describes a method of --
20        A.   Sorry, hang on one second.
21        Q.   Go ahead.
22        A.   A method of treating pulmonary
23   hypertension, it doesn't say interstitial lung
24   disease.  So my error.  It says a method of
25   treating pulmonary hypertension.

1         Q.   Okay.  Do you understand that the
2    method of treating pulmonary hypertension described
3    in the '793 patent includes treatment of PH-ILD?
4              ATTORNEY DYKHUIS:  Objection to
5         form.  Speaks for itself.
6              THE WITNESS:  I think there is
7         mentioned somewhere in the patent of
8         treating pulmonary hypertension without
9         being specific to the cause.  So I would
10        regard that as any form of pulmonary
11        hypertension.
12   BY ATTORNEY DAVIES:
13        Q.   If you look at table 3.  Let me know
14   when you're there.  Columns 13 and 14.
15             And do you see under the table there's some
16   very small words where it's describing the patient
17   characteristics, hemodynamic parameters and gas
18   exchange values of baseline before challenged with
19   inhalative proteinoids is the title of the table.
20        A.   Yes, I see that.
21        Q.   And the last little line at the
22   bottom of the table refers to pulmonary fibrosis.
23        A.   I see the F.  I'm not seeing the
24   legend to say that it's pulmonary fibrosis.  Let me
25   see.

46  (Pages 178 to 181)

**HIGHLY CONFIDENTIAL**   DA0244   LIQ_PH-ILD_00000722

Page 182

1    Q.    Do you see the words right before
2  the F that say "pulmonary fibrosis"?
3    A.    I see IOTF. I'm not seeing where it
4  says "pulmonary fibrosis."
5    Q.    So, Doctor, go below the table. The
6  very last line there says, "Etiology of pulmonary
7  hypertension was classified as," and then it gives
8  a list of the types of pulmonary --
9    A.    Yes.
10   Q.    Do you see there that it refers to
11 pulmonary fibrosis?
12   A.    Yes.
13   Q.    Do you understand that to be PH-ILD?
14        ATTORNEY DYKHUIS:  Object to form.
15        THE WITNESS:  I'm looking at the
16   pulmonary artery pressure in the top.
17   But it doesn't say that this is the
18   systolic pulmonary artery pressure, the
19   mean pulmonary artery pressure.
20        So I'm a little uncertain.  You
21   can have a high systemic pulmonary
22   pressure without having pulmonary
23   hypertension.  The PDR, I'm used to
24   operating in wood units.  You have to
25   divide these numbers by 80 to see if they

Page 183

1  have pulmonary hypertension.
2        But the PDRs do look quite high
3  for the group as a whole.  What I don't
4  know, though, is if you look at -- let's
5  assume all these patients -- let's assume
6  some of these patients at least might
7  have had pulmonary hypertension.  I don't
8  know how many of the four had pulmonary
9  hypertension and what their pressures
10 were.
11        So there's not enough clarity and
12 granularity to this table to make any
13 definitive contribution.
14 BY ATTORNEY DAVIES:
15   Q.    Doctor, do you recall --
16   A.    Let me make one more point.  This
17 is values at baseline before challenge with
18 enolated proteinoids.  It's just some baseline
19 values of groups of patients from assumably three
20 different studies.  I'm assuming one, two and three
21 refer to three-different studies.
22   Q.    In your declaration, do you recall
23 offering opinions that the '327 patent is not
24 invalidated by the disclosure or claims of the '793
25 patent.

Page 184

1        Do you recall offering those opinions?
2    A.    I do.
3    Q.    When you offered those opinions, did
4  you, in your opinion, understand that the '793
5  patent covered a method of treating PH-ILD?
6        ATTORNEY DYKHUIS:  Objection to
7    form.
8        THE WITNESS:  It was treating any
9    form of pulmonary hypertension, which
10   does include PH associated with
11   interstitial lung disease.  But treating
12   pulmonary hypertension is taking a
13   pressure that's high and making it lower.
14        And what we don't know and what
15   I've alluded to is if it can or will
16   result in clinical benefit or if that can
17   or will result in clinical harm and what
18   that clinical benefit may or may not be
19   if, indeed, there is a clinical benefit.
20        So treating pulmonary hypertension
21   does not equate to treating the patient.
22 BY ATTORNEY DAVIES:
23   Q.    So is it your opinion that there's
24 not enough data provided in the '793 patent to
25 convince you that it's directed to a method of

Page 185

1  treating PH-ILD in a patient?
2        ATTORNEY DYKHUIS:  Object to form.
3        THE WITNESS:  It does talk about
4    treating PH-ILD in a patient, but it
5    doesn't talk about treating the patient.
6    It's saying the pressures are high, we're
7    going to make them lower.  What does that
8    mean?  Benefit arm neutral, we don't
9    know.
10 BY ATTORNEY DAVIES:
11   Q.    What data would you have expected to
12 see in the '793 patent for you to conclude that --
13 you described treating a PH-ILD with inhaled
14 trepostinil?
15        ATTORNEY DYKHUIS:  Object to form.
16   Speculation.
17        THE WITNESS:  As I just said, it's
18   providing a treatment to the patient.
19   Whether the treatment will be beneficial
20   to the patient is an unknown.
21        It also depends on your -- one's
22   notion of what treatment is.  Giving
23   someone a medication is arguably
24   treatment, but is it directed to the
25   question or disease in hand.  You need to

47  (Pages 182 to 185)

**MAGNA ◆**
**LEGAL SERVICES**

Page 186

1    make that connection.  There's no
2    connection here to having any clinical
3    benefit for the patient, or it just says
4    we have a drug, we'll take a drug, and
5    we'll lower the pressures in the lung,
6    and that's where it ends.
7    BY ATTORNEY DAVIES:
8    Q.    So in your opinion, the '793 patent
9    provides no evidence as to a clinical benefit for a
10   patient following administration of an inhaled
11   treprostinil; correct?
12         ATTORNEY DYKHUIS:  Object to form.
13   Lack of foundation.
14         THE WITNESS:  That would be
15   correct.  I mean, there's no mention of
16   any clinical consequence of treating a
17   pulmonary hypertension.
18   BY ATTORNEY DAVIES:
19   Q.    If you look at Table 2, and that's
20   at Column 11 in the '793 patent.  Just let me know
21   once you're there.
22   A.    Yeah.
23   Q.    And you see Table 2 has some
24   hemodynamic parameters that compares placebo versus
25   30 micrograms treprostinil, 45 micrograms

Page 187

1    treprostinil, and 60 micrograms treprostinil.
2    Do you see that?
3    A.    Yes.
4    Q.    And in your opinion, does Table
5    2 provide any evidence of actually treating the
6    patients with inhaled treprostinil?
7          ATTORNEY DYKHUIS:  Objection to
8    form.
9          THE WITNESS:  I see the -- once
10   again, I'm uncertain if it's a systolic
11   pulmonary artery pressure or the mean
12   pulmonary artery pressure because they
13   are different.  I see the pressures do
14   come down numerically.  Whether that's
15   statistically significant or not, I'm not
16   sure.
17   BY ATTORNEY DAVIES:
18   Q.    So you reading the '793 patent could
19   not conclude anything about the treatment of a
20   patient with inhaled treprostinil from the data
21   provided in Table 2; correct?
22         ATTORNEY DYKHUIS:  Objection to
23   form.  Mischaracterizes.
24         THE WITNESS:  You can treat a
25   patient with inhaled treprostinil, and

Page 188

1    you can cause the pressures to come down.
2    And this might be what you're looking at.
3    Whether it's significant detriment or
4    not, I'm uncertain.  There's not enough
5    there yet.  So it is treating the
6    pulmonary hypertension, but there's no
7    mention of any kind of clinical benefit.
8          And, once again, sometimes taking
9    the pressures down might impose harm in a
10   patient rather than helping the patient.
11   BY ATTORNEY DAVIES:
12   Q.    And what data would you have needed
13   to be provided in the '793 patent to convince you
14   that there was a clinical benefit based on
15   administration of inhaled treprostinil in these
16   patients?
17         ATTORNEY DYKHUIS:  Objection to
18   form.  Speculation.
19         THE WITNESS:  I would need to see
20   the study.  I don't know if a patent
21   application is going to convince me that
22   medication is of benefit.  I need to see
23   primary study, I think.
24   BY ATTORNEY DAVIES:
25   Q.    Would you need a phase

Page 189

1    3 placebo-controlled randomized trial to conclude
2    that?
3          ATTORNEY DYKHUIS:  Same
4    objections.
5          THE WITNESS:  Correct.
6    BY ATTORNEY DAVIES:
7          (Exhibit 9 was marked for
8          identification.)
9    Q.    This is going to be Exhibit --
10   Doctor, I'm entering as Exhibit 9 a document
11   entitled United States patent 11,826,327 B2,
12   bearing production Number UTC_PH-ILD_005310 through
13   -5360.
14         And, Doctor, is Exhibit 9 the '327 patent
15   that you discussed in your report, your declaration
16   in this case?
17   A.    It appears to be.
18   Q.    Can you go to the claims of the '327
19   patent, and I'm going to ask you to have the '327
20   patent open to the claims at the end and also the
21   '793 patent, which is Exhibit 8.
22   A.    Okay.
23   Q.    I want you to specifically look at
24   the dosing that's described in Claim 1 of the '327
25   and the dosing that's described in Claim 1 of the

**MAGNA** ◗
**LEGAL SERVICES**

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000724

Page 190

1  '793 patent.  Just let me know if you've had an
2  opportunity to do that.
3       A.   So the '327 says an amount -- an
4  effective amount of at least 50 micrograms up to a
5  maximum accelerated dose, okay.
6       Now, go to the '793, that says effective
7  comprises from 15 to 19.
8       Q.   So Claim 1 of both the '327 patent
9  and the '793 patent describe the use of at least 15
10 micrograms of inhaled treprostinil; correct?
11           ATTORNEY DYKHUIS:  Object to the
12      form.
13           THE WITNESS:  Correct.
14 BY ATTORNEY DAVIES:
15      Q.   And then do you see the '327 patent
16 refers to a single administration event that
17 comprises at least six micrograms per breath?
18      A.   I see that.
19      Q.   And the '793 patent, do you see it
20 refers to one to three breaths?
21      A.   I see that.
22      Q.   Okay.  If I administered -- and you
23 agree that, for example, 18 micrograms would be
24 between 15 and 90 in the '793 patent; correct?
25           ATTORNEY DYKHUIS:  Object to form.

Page 191

1            THE WITNESS:  18 doses between 15
2       and 19.
3  BY ATTORNEY DAVIES:
4       Q.   And if I delivered 18 micrograms in
5  accordance with the '793 patent of inhaled
6  treprostinil in three breaths, how many micrograms
7  per breath would I be administering under the '793
8  patent?
9            ATTORNEY DYKHUIS:  Objection to
10      form.
11           THE WITNESS:  I believe it would
12      be three breaths.
13 BY ATTORNEY DAVIES:
14      Q.   I'm sorry.  If I delivered 18
15 micrograms -- 18 micrograms of inhaled
16 treprostinil, according to the '793 patent, in
17 three breaths, how many micrograms of treprostinil
18 would I be delivering per breath?
19           ATTORNEY DYKHUIS:  Objection to
20      form.  Incomplete hypothetical.
21           THE WITNESS:  Do you want me to
22      multiply 18 times three?
23 BY ATTORNEY DAVIES:
24      Q.   I think it's 18 divided by three?
25      A.   I said that.  Six.

Page 192

1       Q.   Okay.  I apologize.  And '327 patent
2  also describes the use of six micrograms per
3  breath; correct?
4            ATTORNEY DYKHUIS:  Objection to
5       the form.  Mischaracterizes.
6            THE WITNESS:  Yes.
7  BY ATTORNEY DAVIES:
8       Q.   So you would agree that the dosing
9  described in the '793 and the '327 of inhaled
10 treprostinil covers the same dosing regime;
11 correct?
12           ATTORNEY DYKHUIS:  Objection to
13      form.  Mischaracterizes.
14           THE WITNESS:  They appear to
15      overlap.  It seems to be limited in one
16      and not limited in the other.
17 BY ATTORNEY DAVIES:
18      Q.   But you would agree that they
19 overlap; correct?
20      A.   They overlap.
21      Q.   Okay.  Both in terms of the total
22 amount delivered and the amount given per breath;
23 correct?
24           ATTORNEY DYKHUIS:  Object to form.
25           THE WITNESS:  They overlap.

Page 193

1  BY ATTORNEY DAVIES:
2       Q.   Do you see that '327 is directed
3  to -- look at Claim 1.  So Claim 1 is directed to a
4  method of proof, improving exercise capacity in a
5  patient having pulmonary hypertension associated
6  with interstitial lung disease.
7       Do you see that?
8       A.   Yes, I do.
9       Q.   Do you believe that Claim 1 of the
10 '793 patent also includes a method of improving
11 exercise capacity in a patient having pulmonary
12 hypertension associated with interstitial lung
13 disease?
14           ATTORNEY DYKHUIS:  Object to form.
15           THE WITNESS:  That's what it says.
16           ATTORNEY DYKHUIS:  Sorry.  I note
17      my objection.  My objection is to form
18      and foundation.
19 BY ATTORNEY DAVIES:
20      Q.   Both the '327 -- both Claim 1 of the
21 '327 patent and Claim 1 of the '793 patent require
22 the administration of inhaled treprostinil;
23 correct?
24           ATTORNEY DYKHUIS:  Object to form.
25           THE WITNESS:  That's correct.



49  (Pages 190 to 193)

Page 194

```
1       BY ATTORNEY DAVIES:
2       Q.    I'm sorry, Doctor.  I don't think
3   your answer came through.
4       A.    That's correct.
5       Q.    The data that's described in the
6   '327 patent, does this -- was this data from the
7   INCREASE study?
8           ATTORNEY DYKHUIS:  Object to the
9       form.  Foundation.
10          THE WITNESS:  I'm not sure you can
11      call it data.  It's a claim that appears
12      to reflect some of the findings from the
13      INCREASE study.
14      BY ATTORNEY DAVIES:
15      Q.    Maybe just let me be a little bit
16  more particular.
17          So moving away from the claim, and if you
18  just look through the '327 patent, there is a
19  number of figures that provide resulting data.  And
20  then if you look in the specification, flipping
21  through it again, there's data regarding treatment
22  using inhaled treprostinil versus placebo.
23          Is it your understanding that this data in
24  the '327 patent came from the INCREASE study?
25          ATTORNEY DYKHUIS:  Objection to
```

Page 195

```
1   form.  Foundation.
2           THE WITNESS:  Let me look.
3           There's a lot of data.  I'm trying
4       to be sure.
5           A lot of the data is from the
6       INCREASE study, that was your question.
7       I'm looking at something on Table 16,
8       which is not from the INCREASE study.
9       Unless there's other tables amongst the
10      2020 tables, that is from the INCREASE.
11      BY ATTORNEY DAVIES:
12      Q.    So sitting here today, you can't say
13  for certain one way or the other; is that fair?
14          ATTORNEY DYKHUIS:  Object to form.
15      Q.    I'll ask that again with the mic on.
16  So sitting here today, you're not sure one
17  way or another the source of the data in the '327
18  patent, where it came from; correct?
19      A.    It seems to be from a number of
20  studies.  I see Table 19 there's mention of the
21  TRIUMPH study, for example.  It could be increased
22  TRIUMPH, and then I think the switch study -- I
23  forget what it was called -- from Tyvaso ultrasonic
24  nebulizer to Tyvaso DPI.  There might be one table
25  from there.
```

Page 196

```
1       Q.    I'm going to mark as Exhibit 10 an
2   abstract bearing the number S343 entitled "Inhaled
3   treprostinil in Group 3 pulmonary hypertension by
4   Agarwal and AV Waxman" and bearing production
5   number UTC_PH-ILD_9828.
6           (Exhibit 10 was marked for
7       identification)
8           ATTORNEY DYKHUIS:  Is this a good
9       time for a break?
10          ATTORNEY DAVIES:  That's fine.
11      BY ATTORNEY DAVIES:
12      Q.    Let me just -- have you seen this
13  before.
14      A.    I have.
15      Q.    Okay.
16          THE VIDEOGRAPHER:  We are off the
17      record at 13:57.
18          (Recess taken from 1:57 p.m.
19      to 2:07 p.m.)
20          THE VIDEOGRAPHER:  We are on the
21      record at 2:07 p.m.
22      BY ATTORNEY DAVIES:
23      Q.    Going back to the Exhibit 10, which
24  is the Agarwal abstract.  Do you have that in front
25  of you?
```

Page 197

```
1       A.    Yes.
2       Q.    Have you seen this abstract before?
3       A.    Yes.
4       Q.    Do you cite to this abstract in your
5   declaration?
6       A.    Yes, I do.
7       Q.    What's the title of this abstract?
8       A.    The title is "Inhaled trepostinil in
9   Group 3 pulmonary hypertension."
10      Q.    And PH-ILD is a Group 3 pulmonary
11  hypertension?
12          ATTORNEY DYKHUIS:  Object to form.
13          THE WITNESS:  That's correct.
14      BY ATTORNEY DAVIES:
15      Q.    Do you know who AB Waxman is?
16      A.    Yes, I do.
17      Q.    Who is he?
18      A.    Aaron Waxman.  I'm not sure what his
19  middle initial stands for.
20      Q.    And he's an author on this abstract?
21      A.    Yes, he is.
22      Q.    Was he also on the steering
23  committee for INCREASE?
24      A.    Yes, he is.
25          ATTORNEY DYKHUIS:  Object to form.
```

50 (Pages 194 to 197)

**MAGNA** ▶
LEGAL SERVICES

Page 198

1    Q.    Do you know Dr. Waxman?
2         ATTORNEY DYKHUIS:  Object to form.
3         THE WITNESS:  Yes, I do.
4    BY ATTORNEY DAVIES:
5    Q.    Would you consider him to be an
6  expert in the treatment of PH-ILD?
7         ATTORNEY DYKHUIS:  Object to form.
8         THE WITNESS:  I think he has
9     expertise in this area.
10   BY ATTORNEY DAVIES:
11   Q.    Who is M. Agarwal?
12   A.    I don't know who M. Agarwal is.
13   Q.    Do you see the statement in the
14  second sentence of the Purpose says, "Inhaled
15  treprostinil therapy is delivered directly to
16  well-ventilated lung units, preserving VQ, and
17  reducing undesirable alterations in perfusion."
18    Do you see that sentence?
19   A.    Yes.
20   Q.    Do you agree with that sentence?
21        ATTORNEY DYKHUIS:  Object to form.
22    Foundation.
23        THE WITNESS:  I would phrase it
24    differently.  I think that we theorize
25     that this is something that might happen,

Page 199

1     and it doesn't happen necessarily in
2  every patient, but it's not definitive as
3  to what happens.
4    BY ATTORNEY DAVIES:
5    Q.    If you look under results in this
6  abstract, what is the mean change in the six-minute
7  walk distance that's reported for the group who
8  were administered inhaled treprostinil?
9         ATTORNEY DYKHUIS:  Object to form.
10        THE WITNESS:  The mean change in
11    the six-minute walk distance was
12    60.85 meters with what looks like a
13    standard deviation of 92.6 meters.
14   BY ATTORNEY DAVIES:
15   Q.    And was that a statistically
16  significant improvement?
17        ATTORNEY DYKHUIS:  Object to form.
18        THE WITNESS:  Based on the P
19    value, it does appear to be statistically
20    significant.
21   BY ATTORNEY DAVIES:
22   Q.    And the author concluded in this
23  abstract that Group 3 PH can be effectively and
24  safely treated with inhaled treprostinil.
25    Do you see that?

Page 200

1    A.    That's what's written in the
2  conclusion.
3    Q.    Do you see the Methods discussion?
4    A.    I see the Methods section, yes.
5    Q.    And do you see it describes the
6  dosing starting at three breaths of inhaled
7  treprostinil?
8         ATTORNEY DYKHUIS:  Object to form.
9         THE WITNESS:  Yes, I've seen it.
10   BY ATTORNEY DAVIES:
11   Q.    And it's increased to a goal of 9 to
12  12 breaths four times daily as tolerated.
13    Do you see that?
14   A.    I do see that.
15   Q.    And you would agree that the dosing
16  of inhaled treprostinil described here overlaps
17  with the dosing described in Claim 1 of the '327
18  patent; right?
19        ATTORNEY DYKHUIS:  Object to form.
20    Foundation.
21        THE WITNESS:  Yes, I do.
22   BY ATTORNEY DAVIES:
23   Q.    You can put that exhibit aside.
24   A.    Can I make a comment?
25   Q.    You can make a comment if you need

Page 201

1  to.
2    A.    I do note here that the pulmonary
3  vascular resistance of the group was 8.7, which is
4  very high.  And in this group of patients without
5  having further details about their lung disease,
6  they could potentially be regarded as, you know,
7  more than Group 1 PAH phenotype based on the very
8  high pulmonary vascular resistance, which is
9  different to the mean pulmonary vascular resistance
10  of the patients which entered the INCREASE study
11  which is around four, if I remember correctly.
12    So to your point about phenotypes, it
13  appears to be a phenotype with more severe
14  pulmonary hypertension that could be more
15  successfully treated based on this abstract.
16   Q.    But you would agree that the
17  patients in this abstract would have included
18  PH-ILD, you're saying a different subset from those
19  that you examined in INCREASE?
20        ATTORNEY DYKHUIS:  Object to form.
21    Mischaracterizes.
22        THE WITNESS:  They were -- I want
23    to see the number.  They called them
24    restrictive disease.  There's a
25    difference between restrictive disease



51  (Pages 198 to 201)

Page 202

1    and interstitial lung disease, which goes
2    to what restriction is in patients who
3    have restricted lung physiology and have
4    reduced FVCs, which could be interstitial
5    lung disease. But there are other things
6    that could give restriction like if you
7    have muscle weakness or if you have
8    tremendous obesity, it can also manifest
9    as restrictive disease. But I would
10   assume for all intents and purposes that
11   most, if not all of these patients, did
12   have interstitial lung disease.
13   BY ATTORNEY DAVIES:
14       Q.   I'm going to enter as Exhibit 11 New
15   England Journal of Medicine article entitled
16   "Inhaled Treprostinil in Pulmonary Hypertension Due
17   to Interstitial Lung Disease" published in 2021,
18   first author Waxman, last author Steven D. Nathan,
19   M.D., bearing production number UTC_PH-ILD_010790
20   through -829.
21       Pass to you, Doctor.
22           (Exhibit 11 was marked for
23           identification.)
24       Q.   Doctor, what is Exhibit 11?
25       A.   Exhibit 11 is a reproduction of a

Page 203

1    study entitled, "Inhaled treprostinil in pulmonary
2    hypertension due to interstitial lung disease" that
3    was published in the New England Journal of
4    Medicine reflecting the results of the INCREASE
5    study.
6        Q.   And Doctor, you mentioned earlier
7    that -- a change in FVC that was observed during
8    the INCREASE study. Can you point me to where in
9    this publication that's described?
10       A.   As I recall, and it's been a while,
11   it might just be in the supplements. Let me go
12   straight there and see if I can find it -- I can
13   find it.
14       Q.   Doctor, if you go to Table S2, and
15   you can look at whatever you want, but if you go to
16   Table S2, the supplement, it's page 21 of the
17   supplement, does that describe a change in FVC?
18           ATTORNEY DYKHUIS: Object to form.
19           THE WITNESS: It does. No. Hang
20   on a second. This is baseline
21   characteristics so it doesn't. Let's
22   move on.
23           Give me one minute. It looks like
24   it could be in S6. S6, this looks like
25   it. So what we see at week 16 is a

Page 204

1        difference in percent predicted at 1.8,
2        which was statistically significant at
3        .03.
4    BY ATTORNEY DAVIES:
5        Q.   Doctor, which page is that on?
6        A.   I'm sorry, it's page 26, Table S6.
7        Q.   You're looking at --
8        A.   At the top you can see FVC and MLs
9    and FVC in percent predicted.
10       Q.   So with respect to FVC MLs, was
11   there a difference between the treatment group and
12   the inhaled treprostinil group? I'm sorry. Let me
13   try that again.
14       With respect to FVC milliliters, was there
15   a difference between the group given inhaled
16   treprostinil versus the placebo group?
17           ATTORNEY DYKHUIS: Object to form.
18           THE WITNESS: It was a numeric
19   difference of 44.4 MLs, but it wasn't
20   statistically significant with a P value
21   of 1.21.
22   BY ATTORNEY DAVIES:
23       Q.   And with respect to the change in
24   FVC percent predicted, was there a difference
25   between the treprostinil treatment group and the

Page 205

1    placebo group?
2            ATTORNEY DYKHUIS: Object to form.
3            THE WITNESS: There was a
4    difference of 1.8 percent, which was
5    significant with a P value of .03 at 16
6    weeks.
7    BY ATTORNEY DAVIES:
8        Q.   Do you see if you go to the
9    page 326, so out of the supplement but back into
10   the article itself, and I'm looking at page 326.
11   Just let me know once you're there.
12       A.   Yes, I'm there.
13       Q.   Do you see the statement, it's
14   pretty close to the Methods section at the bottom
15   that says, "The data from previously completed
16   pilot studies suggest that inhaled treprostinil
17   could improve hemodynamics and functional capacity
18   in patients with Group 3 pulmonary hypertension."
19       Do you see that?
20       A.   I do.
21       Q.   And there's references 9 through 12
22   that are cited there?
23       A.   Yes.
24       Q.   If you go to the references in the
25   last page of the article. Are you there?



52 (Pages 202 to 205)

Page 206

1    A.    I am.
2    Q.    And reference 10 refers to an
3  abstract by Agarwal and Waxman.  Is that the
4  Agarwal abstract that we've been talking about?
5          ATTORNEY DYKHUIS:  Object to form.
6          THE WITNESS:  Yes, it appears to
7  be.
8    BY ATTORNEY DAVIES:
9    Q.    And for that statement you also
10 relied on a publication by Faria-Urbina entitled
11 "Inhaled Trepostinil and Pulmonary Hypertension
12 Associated with Lung Disease."
13    Do you see that?
14    A.    I do see that.
15    Q.    Do you agree that you also cited to
16 and relied on a publication by Bajwa, et al,
17 entitled "The Safety and Tolerability of Inhaled
18 Trepostinil in Patients with Pulmonary Hypertension
19 and Chronic Obstructive Pulmonary Disease"
20 published in circulation in 2017?
21          ATTORNEY DYKHUIS:  Object to form.
22          THE WITNESS:  I see that.
23    Q.    And you also relied on a publication
24 by Wang et al entitled "Hemodynamic and Gas
25 Exchange Effects of Inhaled iloprost in patients

Page 207

1  with COPD and Pulmonary Hypertension" published in
2  the International Journal of Chronic Obstructive
3  Pulmonary Disorders in 2017.
4    Do you see that?
5          ATTORNEY DYKHUIS:  Object to form.
6          THE WITNESS:  I do see that.
7    BY ATTORNEY DAVIES:
8    Q.    Are there any errors in this New
9  England Journal of Medicine article that you're
10 aware of sitting here today?
11          ATTORNEY DYKHUIS:  Object to form.
12          Foundation.
13          THE WITNESS:  I'm not aware of any
14          errors, but if I may comment on those
15          references.
16          It looks like the paper number 9,
17          a lot of times when you have this, you
18          have an abstract first, you present it at
19          international meeting followed by a
20          paper.
21          So I'm not sure how many of the
22          same patients that were in 10 carried
23          over to 9.  There's a chance that this is
24          a report on the same paper -- patients,
25          just that one was reported as an abstract

Page 208

1          and the other as a manuscript, and that's
2          not uncommon.  The statement that you
3          read is data from previously computed --
4          (Reporter admonition)
5          THE WITNESS:  Going back to the
6          statement you previously read, data from
7          previously completed pilot studies
8          suggest that inhaled trepostinil can
9          improve hemodynamics and functional
10         capacity inpatients with Group 3
11         pulmonary hypertension.
12         Two of these papers, the last two
13         appears to be COPD, which is another form
14         of Group 3 pulmonary hypertension.  So
15         the reference really to this kind of
16         improvement, this comes back to that one
17         group of patients for the most part in
18         terms of ILD.
19    BY ATTORNEY DAVIES:
20    Q.    Those are the group of patients that
21 you believe are described in both the Faria-Urbina
22 publication and the Waxman abstract, which is
23 Exhibit -- the Waxman-Agarwal abstract which is
24 Exhibit 10 that we've introduced already; correct?
25          ATTORNEY DYKHUIS:  Object to form.

Page 209

1          THE WITNESS:  Yes, I'm not a
2          hundred percent certain about it, but
3          without having that paper and knowing
4          exactly that it's the same patients, but
5          that's what I suspect because it's not
6          uncommon to have an abstract first
7          followed by a full manuscript.
8    BY ATTORNEY DAVIES:
9    Q.    Okay, Doctor.  So I'm going to enter
10 three exhibits.  The first is Exhibit 12, which if
11 you to the flip to the second page is entitled
12 "Highlights of Prescribing Information" From Tyvaso
13 trepostinil inhalation solution, revised July 2009
14 and bearing production number UTC_PH-ILD_010692 to
15 -708.
16          (Exhibit 12 was marked for
17          identification.)
18    Q.    I'm going to also introduce as
19 Exhibit 13 a document entitled "Highlights of
20 Prescribing Information" Tyvaso, treprostinil
21 inhalation solution revised both 03/2021 bearing
22 Bates number UTC_PH-ILD_010744 through-758.
23          (Exhibit 13 was marked for
24          identification.)
25    Q.    And the last one, Exhibit 14.  If

53  (Pages 206 to 209)

Page 210

1  you turn to the second page after the exhibit
2  cover, it is entitled Highlights of Prescriptions
3  information, Tyvaso DPI for oral administration,
4  revised 06/2023 and bearing production numbers
5  UTC_PH-ILD_010727 through -742. I'll pass these
6  over to you.
7       And let me know when you've had a chance to
8  look at them.
9            (Exhibit 14 was marked for
10           identification.)
11      Q.   There should be three there. So
12  Exhibit 12 was the Tyvaso 2009 label.
13      A.   Okay.
14           ATTORNEY DAVIES: It says
15      Exhibit 2 on the front. That's how you
16      guys cite it in the report.
17           ATTORNEY DYKHUIS: So 2009.
18  BY ATTORNEY DAVIES:
19      Q.   2009 is Exhibit 12. The 2021 label
20  is Exhibit 13. And the Tyvaso DPI 23 label is 14.
21      Have you had a chance to look at them,
22  Doctor?
23      A.   Oh, gosh, do you want me to read all
24  of them, or are you going to direct me where to go?
25      Q.   And with respect to Exhibit 12, do

Page 211

1  you recognize that as the Tyvaso 2009 label for
2  nebulized inhaled Tyvaso?
3           ATTORNEY DYKHUIS: Object to form.
4      Q.   And I'll point you to the next page
5  on the second page is the July 2009.
6      A.   Yes, I do.
7      Q.   And with respect to Exhibit 13, do
8  you agree that is the 2021 label for nebulized
9  Tyvaso inhalation solution?
10           ATTORNEY DYKHUIS: Objection to
11      form.
12           THE WITNESS: Yes.
13  BY ATTORNEY DAVIES:
14      Q.   For Exhibit 14, do you agree that 14
15  is the 2023 label for the Tyvaso DPI product?
16           ATTORNEY DYKHUIS: Object to form.
17           THE WITNESS: Yes.
18  BY ATTORNEY DAVIES:
19      Q.   So if you go to the -- let's go
20  to -- sorry. Exhibits 12, 13, and 14 you'll recall
21  are all cited in your declaration in this case;
22  correct?
23      A.   I'm sure they probably were, and I
24  feel like I'll need to double check. But if you
25  tell me that they were, then I'm good with that.

Page 212

1      Q.   If you would like to double-check,
2  that's totally fine.
3      A.   I believe that they were.
4      Q.   Okay. Going to Exhibit 12, what
5  indication was Tyvaso approved for in 2009 in
6  Exhibit 12?
7      A.   It was approved for WHO Group 1
8  pulmonary arterial hypertension and NYHA Class III
9  symptoms.
10      Q.   In 2009, was Tyvaso approved for
11  treatment of PH-ILD?
12      A.   No, it wasn't.
13      Q.   Okay. Can you turn to Exhibit 13,
14  the 2021 Tyvaso label.
15      A.   Yes. (Witness complies with
16  request.)
17      Q.   Just let me know once you're there.
18      A.   I'm there.
19      Q.   What was Tyvaso approved for in 2021
20  in the 2021 label of Exhibit 13?
21      A.   So the difference in the two labels
22  is that in addition to Group 1 PAH, Tyvaso was then
23  approved in 2021 for pulmonary hypertension
24  associated with interstitial lung disease -- that's
25  PH-ILD -- to improve exercisability.

Page 213

1      Q.   If you look at the dosing section of
2  the 2021 label, you'll agree that the same dosing
3  is used for treatment of both PAH Group 1 and
4  PH-ILD Group 3; correct?
5           ATTORNEY DYKHUIS: Object to form.
6      Foundation.
7           THE WITNESS: That appears to be
8      the case, yes.
9  BY ATTORNEY DAVIES:
10      Q.   And you agree that the dosing of
11  inhaled trepostinil in the 2021 Tyvaso label is the
12  same dosing administration described in the 2009
13  label for nebulized Tyvaso; correct?
14           ATTORNEY DYKHUIS: Objection to
15      form. Foundation.
16           THE WITNESS: Let me double-check
17      that. I'm not seeing specific reference
18      to 9 to 12 breaths, yeah, as the
19      recommended dose unless I'm missing it.
20      It gives a dosing table. Sorry, that's
21      the DPI. I'm sorry.
22  BY ATTORNEY DAVIES:
23      Q.   No problem. I can ask my question
24  again, if that would be helpful.
25      Do you agree that the dosing of inhaled



54 (Pages 210 to 213)

Page 214

1   trepostinil in the 2021 Tyvaso label is the same
2   dosing administration described in the 2009 label
3   for nebulized Tyvaso; correct?
4           ATTORNEY DYKHUIS:  Object to form
5       and vague.
6           THE WITNESS:  What I'm seeing in
7       the 2009 is maximum recommended dose is
8       nine breaths of Tyvaso four times a day.
9       It says 9 to 12 breaths.  So it's not
10      exactly the same.
11  BY ATTORNEY DAVIES:
12      Q.   Have you changed the way that you
13  dose Tyvaso to PH patients as compared to 2009?
14          ATTORNEY DYKHUIS:  Object to form.
15          THE WITNESS:  I wouldn't say so.
16      I didn't use much Tyvaso for PAH.  So
17      limited experience for PAH, but certainly
18      a lot of experience with PH-ILD, where
19      typically I'll try and get them to at
20      least nine and preferably 12.  And even
21      though that's a dosing recommendation,
22      sometimes we go beyond there.
23  BY ATTORNEY DAVIES:
24      Q.   If you go to the 2009 label and go
25  to page 2 at Section 2.1.

Page 215

1       A.   Okay.
2       Q.   And do you see there there's a
3   reference to the Tyvaso inhalation system?
4       A.   Yes.
5       Q.   And it's referred to as the
6   OPTINEB-ir model ON-100/7.
7       Do you see that?
8       A.   I do see that.
9       Q.   Do you see there that at least the
10  label describes it as a pulse delivery device?
11      A.   I do see that, yes.
12      Q.   Okay.  And that's different than
13  your understanding earlier in the day when you
14  understood the nebulized device to be not a pulse
15  delivery device; correct?
16      A.   Yeah, that was my mistake.
17      Q.   If you go to Exhibit 14, which is
18  the DPI label.
19      A.   (Witness complies with request.)
20      Yes.
21      Q.   And in the 2023 label for Tyvaso
22  DPI, what is Tyvaso DPI approved for?
23      A.   It's approved for the treatment of
24  pulmonary arterial hypertension as well as
25  pulmonary hypertension associated with interstitial

Page 216

1   lung disease.
2       Q.   And if you look at the dosing and
3   administration section in the 2023 Tyvaso DPI
4   label, do you agree that the same dosing and
5   administration is used for both of those two
6   indications; correct?
7           ATTORNEY DYKHUIS:  Object to form.
8           THE WITNESS:  It appears to be so.
9       BY ATTORNEY DAVIES:
10      Q.   Doctor, I'm going to enter as
11  Exhibit 15 an article from Pulmonary Circulation
12  entitled "The safety and Tolerability of Inhaled
13  Trepostinil in Patients with Pulmonary Hypertension
14  and Chronic Obstructive Pulmonary Disease," first
15  author Aboobacker A. Bajwa bearing Bates number
16  UTC_PH-ILD_009844 through -9852.
17      Doctor, have you seen this paper before.
18          (Exhibit 15 was marked for
19      identification.)
20      A.   Let me see if I reference that.  I
21  don't recall.  Oh, yeah, here we go, yeah.
22      Q.   And Doctor, do you recall that this
23  was also one of the publications that was cited in
24  your INCREASE paper as a rationale for the study?
25          ATTORNEY DYKHUIS:  Object to form.

Page 217

1       Foundation.
2           THE WITNESS:  It was part of the
3       background.  Once again, this is COPD
4       versus ILD, which are entirely different.
5   BY ATTORNEY DAVIES:
6       Q.   You as the author, though, did cite
7   it in that INCREASE study publication; correct?
8       A.   Correct, as background for potential
9   treatment of Group 3 pulmonary hypertension, not
10  for potential treatment of PH-ILD.  And just to
11  contextualize it, even though it's COPD,
12  subsequently inhaled trepostinil has been shown not
13  to work in PH associated with COPD.
14      Q.   In your opinion, does this
15  publication justify using inhaled trepostinil for
16  PH-ILD or not?
17          ATTORNEY DYKHUIS:  Object to form
18      and foundation.
19          THE WITNESS:  No, it does not.
20  BY ATTORNEY DAVIES:
21      Q.   Does this paper form any part of the
22  rationale, in your opinion, for the use of inhaled
23  trepostinil in treating PH-ILD?
24          ATTORNEY DYKHUIS:  Same objection.
25          THE WITNESS:  It formed the



HIGHLY CONFIDENTIAL   DA0253   LIQ_PH-ILD_00000731

Page 218

1  rationale for studying therapies for
2  Group 3 pulmonary hypertension, which
3  includes both ILD and COPD.
4      So the concept of treating
5  pulmonary hypertension associated with
6  lung disease was supported, but this was
7  somewhat tangential to ILD because this
8  was COPD, a totally different disease.
9  BY ATTORNEY DAVIES:
10     Q.   I'm going to enter as Exhibit 16 a
11 publication entitled "Inhaled Trepostinil and
12 Pulmonary Hypertension Associated with Lung
13 Disease," first author Mariana Faria-Urbina, last
14 author Aaron B. Waxman bearing Bates number
15 UTC_PH-ILD_009936 through -09943.
16          (Exhibit 16 was marked for
17          identification.)
18     Q.   Have you seen this paper before,
19 Doctor?
20     A.   I have seen it before, but I don't
21 believe I saw it in the context of my declaration,
22 but I could be wrong.  Let me double-check that.
23     Sorry.  Yes, so it was part of the volume
24 of material that I considered for my declaration.
25     Q.   And this also is one of the

Page 219

1  publications that you as an author in the New
2  England Journal of Medicine article for the
3  INCREASE trial cited as rationale for that INCREASE
4  study; correct?
5          ATTORNEY DYKHUIS:  Object to form.
6          THE WITNESS:  That is correct.
7      Part of the foundation for looking at the
8      therapies in Group 3 pulmonary
9      hypertension, yes.
10 BY ATTORNEY DAVIES:
11     Q.   And this article at what is
12 Exhibit 16 by Faria-Urbina, how did this form the
13 foundation for the INCREASE study?
14          ATTORNEY DYKHUIS:  Objection to
15     form.
16          THE WITNESS:  It provided proof of
17      concept.  It was hypothesis-generating
18      that we actually could treat pulmonary
19      hypertension associated with Group 3 with
20      inhaled trepostinil.
21 BY ATTORNEY DAVIES:
22     Q.   And, in fact, if you look at the
23 results -- strike that.
24     You would agree that the patient population
25 described in Exhibit 16 in the Faria-Urbina article

Page 220

1  includes PH-ILD; correct?
2          ATTORNEY DYKHUIS:  Object to form.
3     Foundation.
4          THE WITNESS:  Yes, it did.
5  BY ATTORNEY DAVIES:
6     Q.   Your response was "Yes, it did,"
7  Doctor; is that correct?
8          ATTORNEY DYKHUIS:  Object to form.
9          THE WITNESS:  I'm double-checking
10     to see exactly what they said with
11     regards to the population, but I'm sure
12     that it did.  I just want to see how they
13     state the patients with ILD, how they
14     presented them.
15          Well, in Table 1 they have inhaled
16     trepostinil as nine of the patients.  An
17     additional five with combined pulmonary
18     fibrosis and emphysema.
19 BY ATTORNEY DAVIES:
20     Q.   So you would agree that the patient
21 population in Faria-Urbina does include PH-ILD
22 patients; correct?
23          ATTORNEY DYKHUIS:  Object to form.
24          THE WITNESS:  Correct.
25

Page 221

1  BY ATTORNEY DAVIES:
2     Q.   And if you look at the results on
3  the first page, the authors report a significant
4  improvement in both functional class and six-minute
5  walk distance.
6     Do you see that?
7     A.   I do.
8     Q.   And that improvement in six-minute
9  walk distance for patients treated with inhaled
10 trepostinil, is that statistically significant?
11          ATTORNEY DYKHUIS:  Object to form.
12          THE WITNESS:  It has a P value of
13     .022, which would qualify it as
14     statistically significant.
15          However, N equals 11, and there
16     were 17 -- 22 patients.  So I'm not sure
17     who those 11 patients are they're
18     reporting on.  There were 14 and how many
19     of them had interstitial lung disease
20     versus the other condition.
21 BY ATTORNEY DAVIES:
22     Q.   In your opinion, does this -- this
23 paper in Exhibit 16, does this provide a
24 justification to use inhaled trepostinil for the
25 treatment of PH-ILD patients?

**MAGNA** > **LEGAL SERVICES**

56  (Pages 218 to 221)

Page 222

1      A.    No, not at all.  Not at all.
2      Q.    Not at all?
3      A.    No.
4      Q.    Why not?
5      A.    It's a retrospective study.  So
6   arguably there's some bias to retrospective papers.
7   I did point out previously that the pulmonary
8   vascular resistance was quite high, and the
9   pulmonary artery pressure was quite high.
10       So these were the patients who were leaning
11  more to Group 1 PH-ILD phenotype.  And then
12  whenever you have a retrospective study, you are
13  limited in terms of missing data, and I pointed
14  that out that they reported on the six-minute walk
15  distance of only 11 out of 22 patients.  So what
16  happened to the other half and what did they do.
17  How did they treat their members.
18       So I think for all those reasons
19  retrospective, missing data, this is
20  hypothesis-generating.  Even the authors themselves
21  say the potential role of PH-specific drugs in
22  Group 3 PH should be further assessed in the larger
23  retrospective study.  So they recognize their
24  limitations.
25       Q.    Do you know whether Dr. Waxman

Page 223

1   considered this paper to provide a justification
2   for the INCREASE study?
3              ATTORNEY DYKHUIS:  Object to form.
4       Calls for speculation.
5              THE WITNESS:  I don't know for
6       sure, but I suspect he did.
7       BY ATTORNEY DAVIES:
8       Q.    Did you ever discuss this paper with
9   Dr. Waxman?
10      A.    I did not.
11      Q.    Why do you suspect that he did
12  believe this was a justification?
13             ATTORNEY DYKHUIS:  Object to form.
14             THE WITNESS:  Because he had the
15      study.  He had the experience of the
16      individual patients, and so I'm sure that
17      he ultimately believed this was a
18      justification for an INCREASE study.
19             And I also believe that there was
20      a justification for the PERFECT study.
21      One worked for out great for ILD, the
22      other one didn't work great for COPD
23      using the same paper as justification.
24             So one went in a positive
25      direction, the other one went to a

Page 224

1       negative direction, which underscores the
2       point that I made earlier which is that
3       you cannot use this paper as a
4       justification for treating PH as in the
5       context of pulmonary hypertension.
6       BY ATTORNEY DAVIES:
7       Q.    I'm going to enter as Exhibit 17 a
8   paper entitled "Hemodynamic and Gas Exchange
9   Effects on Inhaled iloprost in patients with COPD,
10  Pulmonary Hypertension" by Lan Wang, et al,
11  published in the International Journal of COPD
12  bearing production Number UTC_PH-ILD_010782 through
13  -789.
14       Doctor, have you seen this paper before?
15             (Exhibit 17 was marked for
16       identification.)
17      A.    Let me see.  Sorry.
18             ATTORNEY DYKHUIS:  Excuse me.
19      Could I have a copy?
20      Q.    We're asking you to do a lot.
21  That's normally not part of your job doing a
22  deposition, but you're doing fine.
23      A.    I preface that, I'm not as sharp as
24  I should be because of this nagging cold and my
25  nasal stuffiness.

Page 225

1       Let me see if this is one of the cited
2   references from my report.  So this is Wang.
3   Indeed it was.
4       Q.    And this was also one of the
5   publications that we looked at earlier that you had
6   cited to in your New England Journal of Medicine
7   INCREASE study publication for support for the
8   rationale of that study; correct?
9              ATTORNEY DYKHUIS:  Objection to
10      form.
11             THE WITNESS:  That's correct.
12      BY ATTORNEY DAVIES:
13      Q.    In your opinion, does this Wang 2017
14  paper provide a justification for using inhaled
15  treprostinil to treat PH-ILD?
16      A.    No, not at all.
17      Q.    Why not?
18      A.    Because this isn't PH-ILD.  This is
19  PH COPD.
20      Q.    Do you know any of the authors of
21  this study?
22      A.    I do not.
23      Q.    Did you ever discuss this study with
24  any of the other members of the steering committee
25  for the INCREASE study?

**MAGNA**
**LEGAL SERVICES**

HIGHLY CONFIDENTIAL                DA0255                LIQ_PH-ILD_00000733

Page 226

1    A.   I did not.  I don't recall
2  discussing this paper at all.
3    Q.   Do you believe that this study
4  provides a justification for using inhaled
5  trepostinil in a Group 3 patient population?
6         ATTORNEY DYKHUIS:  Object to form.
7         THE WITNESS:  No.  Not at all.
8    It's a totally different drug.  It's
9    iloprost, not treprostinil.  Given by a
10   different system.  If you have a
11   different drug or a different drug
12   formulation given by a different system,
13   the results can be entirely different
14   than what has been seen or what might be
15   seen with another drug.
16  BY ATTORNEY DAVIES:
17   Q.   Do you believe that this publication
18  provides any justification for using a Group 1 PH
19  therapy in a Group 3 PH patient?
20         ATTORNEY DYKHUIS:  Object to form.
21   Foundation.
22         THE WITNESS:  It does appear to be
23   a reduction in the pulmonary pressures is
24   as much as I can say.  Four patients
25   received a single dose of iloprost; it's

Page 227

1    a nasal dilator.  Then there's a bunch of
2    things including the mean pulmonary
3    arterial pressure and the pulmonary
4    vascular resistance and it went down.
5         So what that means is the drug did
6    what it's supposed to do.  It's a
7    pulmonary vasodilator with one dose.  It
8    has no meaning in terms of clinical
9    benefit, and there's no long-term data
10   here.
11        So this just is very, very -- just
12   adds to the existing literature of what
13   we knew already.
14  BY ATTORNEY DAVIES:
15   Q.   Can you go back to Exhibit 15, which
16  is the Bajwa article.
17   A.   (Witness complies with request.)
18   Okay.
19   Q.   Are you there?
20   A.   Yes, sir.
21   Q.   In your opinion, does the Bajwa 2017
22  article at Exhibit 15 provide any justification for
23  the use of a Group 1 PH treatment in the treatment
24  of Group 3 PH?
25         ATTORNEY DYKHUIS:  Objection to

Page 228

1    form and foundation.
2         THE WITNESS:  No, it doesn't.
3    It's the same onset, provides a
4    rationale, perhaps, to chase the
5    hypothesis of inhaled trepostinil, and in
6    this case specifically in COPD.  But I
7    don't believe that this particular series
8    had any ILD patients.
9         So as I said earlier, this was
10   cited in NJM article for Group 3 as a
11   whole, which includes COPD and ILD.  This
12   by itself doesn't really provide
13   justification for treating PH-ILD.  It
14   provides a rationale for studying inhaled
15   trepostinil in PA COPD.  That study was
16   done and unfortunately was a negative
17   study.  And that was a PERFECT study.
18  BY ATTORNEY DAVIES:
19        (Exhibit 18 was marked for
20        identification.)
21        (Discussion held off the
22        record.)
23   Q.   Dr. Nathan, I've given you what I've
24  marked as Exhibit 18, a document titled "Safety and
25  Tolerability of High-dose Inhaled Trepostinil in

Page 229

1    Pulmonary Hypertension," first author Kishan Parikh
2    bearing production number UTC_PH-ILD_ 010599
3    through -610.
4         Have you seen this publication before,
5    Doctor?
6    A.   Yes, I have.
7    Q.   And this is the Parikh article that
8    you discussed in your declaration; is that correct?
9    A.   That's correct.
10   Q.   In your opinion, does the Parikh
11   article provide any justification for the use of
12   inhaled trepostinil in the treatment of PH-ILD?
13   A.   No, it does not.
14         ATTORNEY DYKHUIS:  Object to form.
15   Q.   Why not?
16   A.   Because there's no evidence of any
17   efficacy of clinical improvement, or their primary
18   endpoint was that it was safe and tolerable.  But
19   there, once again, are holes in any study that's
20   retrospective and single-centered.
21        So basically it's just going back through I
22   don't know how many charts in cobbling the data
23   together and putting this paper together.  For that
24   very reason all I can say is it was safe and
25   tolerable but there's no evidence of efficacy.



58  (Pages 226 to 229)

HIGHLY CONFIDENTIAL              DA0256                    LIQ_PH-ILD_00000734

Page 230

1    If you look, for example, there were a
2  total of 80 patients, 31 -- 32 percent -- 31.6 to
3  be exact, had PH secondary to lung disease.  31.6.
4  Then if you're looking for any efficacy measure,
5  they do report the six-minute walk at follow-up
6  visits one and two.
7        There's no set time interval.  This is just
8  the average time interval, 5.2 minutes is a wide
9  range, and 20 minutes was an even wider range.  And
10  let's see what they said for the walk distance.
11        Something in here.  Efficacy, six-minute
12  walk, okay.  Average change was 3.9 X from baseline
13  to follow app.  Out of 80 patients, there were 39.
14  So what happened to the other 41?  Did that drop
15  out all the patients with PH ILD?  We have no idea.
16        These could all be patients with PH, for
17  all we know.  And 31.6 meters sounds great, but
18  what happened to the risk of the dropouts and who
19  were the patients who dropped out and who were the
20  ones that were included?
21        So there's always inherent bias to a
22  retrospective study.  Obviously the patients who we
23  followed up on are the ones probably going to stick
24  on the drug and probably going to do well.  So
25  there's inherent bias to the patients who were less

Page 231

1  than 50 percent, and here we have I think 34
2  patients out of 80 who managed to stick on drug and
3  eventually eke out -- not eke out, have a
4  difference in the six-minute walks of 31.6 meters.
5        But that's why you need the randomized
6  control studies to account for the patients who
7  drop out, the patients who die, and for the
8  patients to be blinded to therapy.
9        If we go back to the INCREASE study, there
10  were patients in the placebo arms who had
11  improvements in their numbers.  So we don't know,
12  once again, if this is a drug effect or if this is
13  something else that's going on in these patients.
14  We don't know how many of these patients went into
15  pulmonary rehab, for example.
16        Pulmonary rehab will improve the six-minute
17  walk distance.  That's why you need the rigors of a
18  randomized control study where patients can't
19  leave.  They can't initiate pulmonary rehab during
20  the course of the study.  So this really is totally
21  uninformative in terms of efficacy.
22    Q.   Do you know any of the authors on
23  the Parikh publication in Exhibit 18?
24    A.   I do.  I know Victor Tapson.  He was
25  one of the steering committee members together with

Page 232

1  myself and Aaron Waxman.  And I do know Abby Poms.
2    Q.   Do you know whether Dr. Tapson
3  believed that this article formed a justification
4  for the use of inhaled trepostinil in PH-ILD?
5        ATTORNEY DYKHUIS:  Object to form.
6        Speculation.
7        THE WITNESS:  I can't speak for
8        him.  There's a good chance that he might
9        have.  I don't know.
10  BY ATTORNEY DAVIES:
11    Q.   Did you ever talk to -- strike that.
12    Who is Abbe D. Poms?
13    A.   Abby Poms is a coordinator there.  I
14  think she is involved in the pulmonary rehab
15  program at Duke.  I'm not sure if she's still at
16  Duke or not.
17    Can I take that back.  I think she's the
18  pulmonary hypertension coordinator at Duke or was.
19    Q.   That's Abby Poms?
20    A.   Abby Poms, yes.
21    Q.   Do you know if United Therapeutics
22  funded this study at Exhibit 18, the Parikh
23  publication?
24        ATTORNEY DYKHUIS:  Objection to
25        form and foundation.

Page 233

1        THE WITNESS:  It does say at the
2        end, Acknowledgments, that it was funded
3        by United Therapeutics as well as an NIH
4        grant.
5  BY ATTORNEY DAVIES:
6    Q.   I'm introducing as Exhibit 19 a
7  document entitled "United States Patent Application
8  publication" to Wade et al, Publication Number U.S.
9  2013/0096200 A1 and bearing production numbers
10  UTC_PH-ILD_010774 through -781.
11        (Exhibit 19 was marked for
12        identification.)
13    Q.   My first question, and I see you're
14  already looking, is have you seen this document
15  before?
16    A.   Yes, I have.
17    Q.   And is this one of the documents
18  that you relied on in your declaration?
19    A.   Yes, it is.
20    Q.   Who was the applicant for this
21  United States patent application?
22        ATTORNEY DYKHUIS:  Object to form.
23        THE WITNESS:  United Therapeutics
24        Corporation.
25



59 (Pages 230 to 233)

Page 234

1   BY ATTORNEY DAVIES:
2       Q.    Then you see some inventors listed
3   below there?
4       A.    Uh-huh.
5       Q.    Do you know Michael Wade?
6       A.    I do not.  I meet a lot of people.
7   I might have met him at some point.
8       Q.    Do you know Stewart Rich?
9       A.    I do know Stewart Rich, yes.
10      Q.    Who is Stewart Rich?
11      A.    He's a PH expert and cardiologist in
12  the Chicago area.
13      Q.    Does he work for United
14  Therapeutics?
15      A.    At one point he did, but at this
16  time I don't believe he does.
17      Q.    Do you know Eugene Sullivan?
18      A.    I do know Eugene Sullivan.
19      Q.    Who is that?
20      A.    He's a physician.  I believe he's a
21  pulmonologist by training.  He used to be with FDA
22  and then United Therapeutics, and now he's with
23  another company.
24      Q.    Do you know Robert Roscigno?
25      A.    I do know Robert Roscigno, yes.

Page 235

1       Q.    Who is Robert Roscigno?
2       A.    He used to have been with United
3   Therapeutics, and he's moved around a little bit.
4   I know that he has Liquidia -- with Liquidia and
5   I'm not sure currently, it was a while ago that I
6   knew him.  I haven't seen him for a long time.
7       Q.    Have you ever worked with Robert
8   Roscigno?
9       A.    I've never worked directly with him,
10  no.
11      Q.    Have you ever been involved in any
12  clinical studies with Robert Roscigno?
13      A.    Not that I recall.  As you can tell
14  from my CV when you went through it, there was some
15  funding from UT many few years ago.  I can't
16  remember when exactly I met him.  And it was
17  involving a study somewhere.
18      Q.    Do you know Roger Jeffs?
19      A.    I do know Roger Jeffs, yes.
20      Q.    Who is Roger Jeffs?
21      A.    Roger Jeffs is the former CEO of
22  United Therapeutics and to my understanding the
23  current CEO of Liquidia.
24      Q.    If you flip over to, I guess, page 1
25  of this application and look at the -- do you see

Page 236

1   the heading "Field" for paragraph 2?
2       A.    Yes.
3       Q.    And paragraph 2 states, "The
4   invention relates to the use of treprostinils or
5   its derivatives or pharmaceutically acceptable salt
6   thereof to treat and/or prevent interstitial lung
7   disease or asthma or a condition associated with
8   interstitial lung disease or asthma."
9       Do you see that?
10      A.    I do.
11      Q.    Is PH-ILD a condition associated
12  with interstitial lung disease?
13          ATTORNEY DYKHUIS:  Objection to
14      form.
15          THE WITNESS:  Yes, it is.
16      BY ATTORNEY DAVIES:
17      Q.    If you look at paragraph 17, let me
18  know once you're there.
19      A.    Yes.
20      Q.    Okay.  It states, "The current
21  invention relates to therapies that enhance blood
22  flow by increasing blood flow through smaller
23  vessels and capillaries and are effective to treat
24  and prevent interstitial lung disease or conditions
25  associated with interstitial lung disease such as

Page 237

1   pulmonary fibrosis."
2       Do you see that?
3       A.    Yes.
4       Q.    So do you understand this patent
5   application be directed to treatments for
6   conditions associated with interstitial lung
7   disease including PH-ILD?
8           ATTORNEY DYKHUIS:  Objection to
9       form.
10          THE WITNESS:  Actually, I have a
11      slightly different take on that, because
12      when they say "such as pulmonary
13      fibrosis," what they mean by "conditions
14      associated with interstitial lung
15      disease" appears to be conditions
16      associated under the broad banner of
17      interstitial lung disease.
18          Otherwise they might have said
19      pulmonary hypertension, which is more
20      like a complication rather than discrete
21      clinical entities under the broad
22      umbrella of interstitial lung disease.
23      BY ATTORNEY DAVIES:
24      Q.    You understand that's just an
25  example, though, and it doesn't limit the

**MAGNA**
**LEGAL SERVICES**

Page 238

1  associated conditions for interstitial lung
2  disease, correct?
3         ATTORNEY DYKHUIS:  Objection to
4     form.  Vague.
5         THE WITNESS:  I do understand
6     that, and they could have put other
7     conditions like connective tissue-related
8     pulmonary fibrosis, scleredema-related
9     pulmonary fibrosis.  So to me they -- I
10    can understand when it says conditions
11    associated with interstitial lung disease
12    you can go one of two ways.  Are they
13    talking about condition under the banner
14    of ILD or conditions associated as
15    comorbidities with the ILD.
16        That seems like the broad group of
17    conditions and the ILD that I can see how
18    someone else might interpret this is
19    well, maybe this could include pulmonary
20    hypertension, but that wouldn't have been
21    my interpretation of this.  My
22    interpretation would have been what I
23    described.
24  BY ATTORNEY DAVIES:
25    Q.   If you go to Paragraph 30.

Page 239

1     A.   Uh-huh.
2     Q.   Do you see it says, "The present
3  invention encompasses methods of using treprostinil
4  or its derivatives or pharmaceutically acceptable
5  salts thereof."
6     Do you see that?
7     A.   I do.
8     Q.   So this patent application is
9  directed to the use of treprostinil as a treatment?
10        ATTORNEY DYKHUIS:  Objection to
11    form.
12        THE WITNESS:  Yes.
13  BY ATTORNEY DAVIES:
14    Q.   If you go to Paragraph 37, it's on
15  page 3, second column.
16    A.   Okay.
17    Q.   In Paragraph 37 it's describing some
18  formulations of the invention.
19    Do you see that?
20        ATTORNEY DYKHUIS:  Objection to
21    form.
22        THE WITNESS:  Yes, I do.
23  BY ATTORNEY DAVIES:
24    Q.   And do you see one of the
25  formulations of the invention that is described as

Page 240

1  inhalation in solid and liquid form?
2     A.   I see it.
3     Q.   So you understand this patent to be
4  describing the use of inhaled treprostinil in either
5  solid or liquid forms as a treatment?
6         ATTORNEY DYKHUIS:  Objection to
7     form.  Misstates.
8         THE WITNESS:  Yes.
9  BY ATTORNEY DAVIES:
10    Q.   Could you go to Example 4 on page 5
11  beginning with paragraph 61.
12    A.   Okay.
13    Q.   Here Example 4 refers to the effects
14  of treprostinil, either in the form of Remodulin or
15  inhaled, on patients analyzed using the six-minute
16  walk test.
17    Do you see that?
18    A.   I do.
19    Q.   And then it goes on to describe the
20  six-minute walk test as a standard assessment of
21  exercise capacity and breathlessness in patients
22  with lung disease.
23    Do you see that?
24    A.   I do.
25        ATTORNEY DYKHUIS:  Object to form.

Page 241

1         THE WITNESS:  I do.
2  BY ATTORNEY DAVIES:
3     Q.   Do you agree with that statement?
4         ATTORNEY DYKHUIS:  Object to form.
5         THE WITNESS:  Yes.
6  BY ATTORNEY DAVIES:
7     Q.   So this patent application describes
8  the assessment of inhaled trepostinil therapy using
9  a six-minute walk test as an assessment of exercise
10  capacity; correct?
11        ATTORNEY DYKHUIS:  Object to form.
12    Mischaracterizes.
13        THE WITNESS:  It appears to be so.
14  BY ATTORNEY DAVIES:
15    Q.   Doctor, can you look at
16  Paragraph 82, which is Example 6 or the start of
17  Example 6, I should say.
18    A.   Okay.
19    Q.   Just let me know once you're there.
20    A.   Yes.
21    Q.   So here it's describing, "The
22  following study shows the vehicle of intravenous
23  treprostinil in patients with idiopathic pulmonary
24  fibrosis and pulmonary hypertension."
25    Do you see that?

**MAGNA** ◗
**LEGAL SERVICES**

61  (Pages 238 to 241)

Page 242

1    A.   I do.
2    Q.   With that description in Paragraph
3  82, do you understand that this patent is, in fact,
4  directed to PH including PH-ILD?
5         ATTORNEY DYKHUIS:  Object to form.
6         Form. Foundation. Speculative.
7         THE WITNESS:  You know, I can't
8         answer that because these are just
9         examples. These are not specific claims,
10        as far as I can tell. These are just 19
11        examples in the literature. So there's
12        no specific claim here.
13        So if you look at this example,
14        it's intravenous treprostinil anyway.
15        Small segment of IPF for pulmonary
16        hypertension. I guess I don't know if
17        you're going to go to the claim, there's
18        a claim, and this is beyond my realm of
19        expertise in terms of how the patents are
20        formulated and what they cover.
21        But there's mention put in this of
22        many different things, and I'm not sure
23        just because they mention it you can
24        connect the dots in terms of what it
25        covers.

Page 243

1    BY ATTORNEY DAVIES:
2    Q.   Can you go to Paragraph 50, Doctor,
3  and that's back on page 4. And it's right before
4  the Example section.
5    A.   (Witness complies with request.)
6    Q.   And Example 50 provides a
7  description of what the examples are. It states,
8  "The examples described herein are illustrative of
9  present invention and are not intended to be
10 limitations thereon."
11       Do you see that?
12   A.   I do.
13   Q.   So from what you understand the
14 examples in the patent to actually be illustrations
15 of the present inventions described in this patent?
16        ATTORNEY DYKHUIS:  Object to form.
17        Foundation and calls for a legal
18        conclusion.
19        THE WITNESS:  I think it's beyond
20        my expertise to comment on that.
21   BY ATTORNEY DAVIES:
22   Q.   PH IPH is a form of PH-ILD; right?
23   A.   Yes.
24   Q.   If you go to Paragraph 24 of this
25 patent application description, let me know once

Page 244

1  you're there.
2    A.   Yeah.
3    Q.   And Paragraph 24 states, "Many acute
4  and chronic lung disorders with variable degrees of
5  inflammation and fibrosis are collectively referred
6  to as interstitial lung diseases. Because of the
7  stiff fibrosis of the lung, pulmonary or arterial
8  hypertension, PAH, is often a late complication of
9  some forms of ILD."
10       Do you see that?
11   A.   I do.
12   Q.   Do you understand that to be
13 describing PH-ILD?
14        ATTORNEY DYKHUIS:  Object to form.
15        THE WITNESS:  That actually
16        doesn't. It's describing PAH, which is
17        Group 1 pulmonary hypertension, and this
18        goes to what I mentioned earlier that
19        sometimes patients will develop what I
20        would regard as pulmonary hypertension
21        disproportionate to the extent of their
22        lung disease, in which case I would
23        regard them as having Group 1 pulmonary
24        arterial hypertension. So that's what I
25        mean.

Page 245

1    BY ATTORNEY DAVIES:
2    Q.   So if you have a patient with PAH as
3  well as ILD complications, you would not consider
4  that to be a PH-ILD patient. Is that correct?
5         ATTORNEY DYKHUIS:  Objection to
6         form.
7         THE WITNESS:  It goes down to
8         where are you going to group the patient.
9         And so to me, the way this reads is we're
10        talking about ILD complicated by
11        pulmonary hypertension or associated with
12        pulmonary hypertension that is severe
13        enough and out of proportion to the lung
14        disease to be regarded as Group 1 PAH.
15        Any time you say "PAH," that
16        defaults to Group 1. PH covers one to
17        five, but PAH is purely Group 1.
18   BY ATTORNEY DAVIES:
19   Q.   Do other people in the field view
20 that distinction the same way as you, or is there a
21 difference in opinions as to that point as to
22 whether a patient with PAH and underlying ILD would
23 be a PH-ILD patient or not?
24        ATTORNEY DYKHUIS:  Objection to
25        form. Speculation.



62  (Pages 242 to 245)

HIGHLY CONFIDENTIAL                DA0260                LIQ_PH-ILD_00000738

## Page 246

1    THE WITNESS: I think anyone who
2 is familiar with the field of pulmonary
3 hypertension knows and recognizes that
4 distinction. You could catch someone who
5 is not. It's a common misconception
6 amongst people who go into pulmonary
7 hypertension to talk about PAH and PH
8 interchangeably, but not amongst people
9 who know pulmonary hypertension.
10    If you say "PAH," you're referring
11 to Group 1 pulmonary hypertension.
12 BY ATTORNEY DAVIES:
13    Q.   Have you ever seen a patient in your
14 clinical practice who you would consider to have --
15 who you would consider to have been suffering from
16 both Group 1 PAH and Group 3 PH-ILD?
17    ATTORNEY DYKHUIS: Object to form.
18    THE WITNESS: No. That's a
19 theoretic concept that's impossible to
20 figure out. You either make the
21 distinction that that is more of a
22 Group 1 phenotype or this is Group 3.
23 You can't say there's, you know, a little
24 bit of three in some. It's impossible to
25 thread that needle.

## Page 247

1 BY ATTORNEY DAVIES:
2    Q.   How do you decide where the dividing
3 line is between these patients?
4    A.   That's a problem and one of a lot of
5 debate. There are cases that are clearly Group 3,
6 cases that are clearly Group 1, and there's a
7 spectrum between them. And I think I've alluded to
8 it earlier.
9    You look at the severity of the lung
10 disease in relation to the severity of the
11 hemodynamic impairment, and it becomes a subject of
12 judgment call where they best reside, Group 1 or
13 Group 3.
14    ATTORNEY DAVIES: Let's take a
15 break if that's okay.
16    (Discussion held off the
17 record.)
18    THE VIDEOGRAPHER: We are off the
19 record at 15:18.
20    (Recess taken from 3:18 p.m.
21 to 3:43 p.m.)
22    THE VIDEOGRAPHER: We are the
23 record at 15:43.
24 BY ATTORNEY DAVIES:
25    Q.   Welcome back, Dr. Nathan. At any of

## Page 248

1 the breaks today, did you have any discussions with
2 counsel about your testimony?
3    A.   No.
4    ATTORNEY DAVIES: Okay. I have no
5 further questions, but obviously reserve
6 the right to follow-up based on what you
7 may or may not ask, Art.
8 EXAMINATION BY
9 ATTORNEY DYKHUIS:
10    Q.   Dr. Nathan, I have a few questions
11 for you.
12    Understanding you have not been feeling all
13 that well today and wanted to clarify some of the
14 testimony after lunch.
15    Do you recall some questions about the '793
16 patent claims and then how, if at all, they relate
17 to improving exercise capacity?
18    ATTORNEY DAVIES: Objection.
19 Form.
20    THE WITNESS: I do.
21 BY ATTORNEY DYKHUIS:
22    Q.   Let's get out, it's Exhibit 8 and 9.
23 You have a number in front of you. Find 8 and 9.
24    A.   (Witness complies with request.)
25    Q.   I think Exhibit 9 is the '327

## Page 249

1 patent; correct?
2    A.   That's correct.
3    Q.   Let's turn to the claim at the end
4 if you would, please.
5    A.   Okay.
6    Q.   Can you look at Claim 1.
7    A.   Yes.
8    Q.   And Claim 1 recites a method of
9 improving exercise capacity in a patient having
10 pulmonary hypertension associated with interstitial
11 lung disease.
12    Do you see that?
13    ATTORNEY DAVIES: Objection.
14 Form.
15    THE WITNESS: I do.
16 BY ATTORNEY DYKHUIS:
17    Q.   So Claim 1 of the '327 patent
18 involves explicitly improving exercise capacity in
19 a patient having pulmonary hypertension associated
20 with interstitial lung disease?
21    A.   Yes.
22    ATTORNEY DAVIES: Objection.
23 Form.
24    Q.   Then if you can turn to the '793
25 patent, which is Exhibit 8.

63 (Pages 246 to 249)

Page 250

1    A.   Okay.
2    Q.   And let's go to the claims of the
3  '793 patent.  Tell me when you've got those pulled
4  up.
5    A.   I'm here.
6    Q.   Does Claim 1 of the '793 patent
7  say -- have any words about improving exercise
8  capacity?
9    A.   No, it does not.
10   Q.   Let's keep those two handy, but then
11 your declaration is Exhibit 2.  And then let's go
12 to Paragraph 176, please.
13   A.   Yes.  I'm at 176.
14   Q.   Did counsel direct you specifically
15 to Paragraph 176 at all today?
16       ATTORNEY DAVIES:  Objection.
17   Form.
18       THE WITNESS:  No.
19 BY ATTORNEY DAVIES:
20   Q.   Could you read 176 just to yourself
21 and let me know when you're finished.
22       ATTORNEY DAVIES:  Same objection.
23       THE WITNESS:  I remember now
24   opining on this, that the '793 patent
25   does not teach anything about what the

Page 251

1  '327 patent has as its claim in terms of
2  improving exercise tolerance, FVC and
3  other things that are within the -327
4  claim.
5  BY ATTORNEY DYKHUIS:
6    Q.   So why is it your opinion that the
7  '793 patent doesn't teach anything about the '327
8  patent improving exercise capacity?
9       ATTORNEY DAVIES:  Objection.
10   Form.
11       THE WITNESS:  There are a lot of
12   examples thrown within it.  I'm sorry.
13   This is -- I was getting my patents
14   confused.  Let me start again.
15       The '793 patent, all that does is
16   it talks about treating pulmonary
17   hypertension.  And treating pulmonary
18   hypertension means taking pressures that
19   are high within the lungs and making them
20   lower.
21       There's no mention of any kind of
22   clinical benefit in the original '793
23   patent, and that's what the '327 patent
24   gets into.
25

Page 252

1  BY ATTORNEY DYKHUIS:
2    Q.   Okay.  You can close your
3  declaration there.  And then you still have the
4  '327 and '793 patent in front of you, Doctor?
5    A.   '793 and '327, yes.
6    Q.   Which one do you have on the left?
7    A.   This is the '793.
8    Q.   Could you open that '793 back to the
9  claims again.
10   A.   (Witness complies with request.)
11 Okay.
12   Q.   And I'd like to do a little
13 side-by-side there.  You can hold it if you like.
14 I actually want to ask you about a specific
15 question again in a moment.
16   A.   Okay.
17   Q.   So you were asked a question
18 earlier, and I'm just going to read it.
19   "Do you believe that Claim 1 of the '793
20 patent also includes a method of improving exercise
21 capacity in a patient having pulmonary hypertension
22 associated with interstitial lung disease?"
23       There was an objection, and then you said,
24 "That's what it says."
25       Do you recall that question and answer from

Page 253

1  earlier today?
2    A.   I don't recall specifically, but I
3  told you wrong.  I think that I was thinking about
4  the '327 patent when that question was posed at me.
5  So I apologize for getting the numbers confused.
6  Clearly it does, which the '793 patent does not
7  mention anything about improving exercise capacity,
8  so that was not -- my mistake.
9    Q.   So when you said "That's what it
10 says," you were referring to the '327 patent?
11       ATTORNEY DAVIES:  Objection.
12   Form.
13       You can answer.
14       THE WITNESS:  Yes, that's correct.
15 BY ATTORNEY DYKHUIS:
16   Q.   I think on the left you have the
17 '793 patent.  Let's look at the cover page.
18       You were asked some questions earlier today
19 about -- I think it was a conference of some sort
20 where you were admonished publically over the
21 RISE-IIP study?
22   A.   That's correct.
23   Q.   That was something that was in front
24 of 500 people or so?
25   A.   Yes.

**MAGNA** ▶
**LEGAL SERVICES**

64  (Pages 250 to 253)

Page 254

1    Q.    Who was it who was admonishing you?
2    A.    It was Dr. Lewis Rubin.
3    Q.    So on the cover of the '793 patent,
4  do you see a section Inventors, and it lists a few
5  people?
6    A.    Yes.
7    Q.    One of the inventors is Lewis J.
8  Rubin?
9    A.    Yes, indeed.  It's the same person.
10         ATTORNEY DYKHUIS:  No further
11  questions.
12  EXAMINATION BY
13  ATTORNEY DAVIES::
14    Q.    Just a couple additional questions
15  for me, Doctor.
16         If you look back at the '793 patent at
17  Claim 1, just let me know once you're there.
18    A.    I'm there.
19    Q.    Okay.  So is it your opinion that
20  Claim 1 of the '793 patent excludes a method of
21  improving exercise capacity in a patient with
22  PH-ILD?
23         ATTORNEY DYKHUIS:  Object to form.
24  Foundation.
25         THE WITNESS:  Yes, it does.

Page 255

1  BY ATTORNEY DAVIES:
2    Q.    Counsel directed you to
3  paragraph 176 of your declaration.  Do you recall
4  that?
5    A.    I don't recall that.
6    Q.    Can you go to paragraph 176 of your
7  declaration.
8    A.    Okay.
9    Q.    Did you prepare paragraph 176 in
10  your declaration, or was that prepared by counsel?
11         ATTORNEY DYKHUIS:  Objection to
12  form.
13         THE WITNESS:  To be honest, I
14  don't recall.  We all had a hand in this
15  declaration, and I don't recall who had
16  the original version.  It might have been
17  counsel.  There were many iterations
18  going backwards and forwards.  So I can't
19  a hundred percent attest to that.
20         I certainly had a role in this in
21  terms of editing, adding, and deleting
22  things that I didn't think was necessary
23  to make it my own words.
24         ATTORNEY DAVIES:  We have no
25  further questions at this time.

Page 256

1         ATTORNEY DYKHUIS:  No further
2  questions for UTC.
3         THE VIDEOGRAPHER:  We are off the
4  record at 15:54.
5         (Proceedings adjourned at
6         3:54 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 257

1  DISTRICT OF COLUMBIA:            SS
2    I, Barbara Moore, a Registered Court Reporter
3  of the District of Columbia, do hereby certify that
4  these proceedings took place before me at the time
5  and place herein set out, and the proceedings were
6  recorded stenographically by me and this transcript
7  is a true record of the proceedings.
8
9    I further certify that I am not of counsel to
10  any of the parties, nor an employee of counsel nor
11  related to any of the parties, nor in any way
12  interested in the outcome of this action.
13
14
15
16  _____
17  BARBARA MOORE, CRR, RMR
18
19  _____
20  My Commission Expires:
21  September 30, 2028
22
23
24
25



65  (Pages 254 to 257)

Page 258

```
 1   CERTIFICATE OF READING AND SIGNING
 2
 3   I, _____, the deponent herein, do
 4   hereby certify that I have read the foregoing
 5   deposition and certify that it is a true and
 6   accurate transcription of my testimony given in the
 7   above-captioned matter, except for any corrections
 8   as noted on the enclosed errata sheet.
 9            _____
10               STEVEN D. NATHAN
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 259

```
 1              E-R-R-A-T-A
 2
 3   RE:  UNITED THERAPEUTHE COURTICS v. LIQUIDIA
 4
 5   Enclosed is the transcript of your deposition
 6   testimony.  Please review the transcript,  complete
 7   and distribute the signed errata sheet and
 8   acknowledgment page to all parties, including this
 9   office, within 30 days.  Any changes and/or
10   corrections should be listed below and not made
11   upon the transcript itself:
12
13     PAGE  LINE  CHANGE OR CORRECTION       REASON
14
15
16
17
18
19
20
21
22
23   DATE_____ SIGNATURE_____
24               STEVEN NATHAN, M.D.
25
```



66 (Pages 258 to 259)

**A**

**Aaron**
28:24 30:20 48:3
197:18 218:14
232:1
**AB**
197:15
**Abbe**
232:12
**Abby**
232:1,13,19,20
**ability**
107:12
**able**
127:21 137:6
**Aboobacker**
216:15
**above-captioned**
258:7
**above-entitled**
1:15
**absence**
37:6
**absolute**
33:12 34:2 38:1,12
**abstract**
196:2,24 197:2,4,7
197:20 199:6,23
201:15,17 206:3,4
207:18,25 208:22
208:23 209:6
**academic**
22:19,23
**accelerated**
106:19 107:10,11
190:5
**acceptable**
236:5 239:4
**accepted**
18:15,16 126:24
**accommodating**
64:23
**accompanied**
73:16 74:12 109:22
138:6,7

**account**
115:12 231:6
**accredited**
24:10,14,16,18
**accrued**
21:9
**accurate**
7:25 24:1 34:10,13
258:6
**acknowledgment**
259:8
**Acknowledgments**
233:2
**acronym**
26:22,23
**act**
14:18
**acted**
103:9
**action**
257:12
**activate**
133:4
**activation**
118:5
**active**
31:8 48:6 94:13
**actively**
79:16 110:20
**activity**
31:10
**actual**
103:18
**actuate**
130:20,23
**acute**
53:15 55:21 138:22
139:9,11,13,14
244:3
**Adam**
8:11
**add**
25:3
**added**
26:17 50:10 105:20
**adding**

**account**
255:21
**addition**
212:22
**additional**
20:23,24 21:7 48:3
104:5 119:15
149:18,20 220:17
254:14
**additions**
50:6
**address**
6:13
**adds**
227:12
**adjourned**
256:5
**administered**
108:14,17 111:20
115:16 190:22
199:8
**administering**
191:7
**administration**
36:12 62:12 115:15
186:10 188:15
190:16 193:22
210:3 213:12 214:2
216:3,5
**admonish**
159:16 160:24 161:3
**admonished**
159:10,14 161:25
253:20
**admonishing**
161:19 254:1
**admonition**
208:4
**advanced**
20:17 22:4 24:6,8
26:17 27:3 32:10
118:11 142:24
143:12,22 144:16
144:19 150:23
**advantages**
112:6
**adykhuis@mwe.com**

**2:9**
**affect**
107:20
**affiliation**
23:18
**affiliations**
23:16
**Africa**
82:9
**Agarwal**
196:4,24 198:11,12
206:3,4
**agent**
108:14
**ago**
14:14,17,19 29:18
30:11,12 92:22 94:7
94:8 111:7 235:5,15
**agree**
78:6 80:16 89:16
96:21 146:9 147:11
151:3 163:19 169:3
171:25 175:14
176:17 178:9
179:11 180:18
190:23 192:8,18
198:20 200:15
201:16 206:15
211:8,14 213:2,10
213:25 216:4
219:24 220:20
241:3
**ahead**
106:2 126:18 180:21
**air**
109:20,23 110:1,5,8
139:23
**al**
142:25 145:8 163:17
206:16,24 224:10
233:8
**allowed**
176:6
**alluded**
139:8 184:15 247:7
**alter**



174:3
**alterations**
198:17
**alveola**
80:1 109:21
**alveoli**
107:4,7 110:19
**American**
16:19
**amount**
60:6 110:14 139:23
190:3,4 192:22,22
**analasized**
170:15
**analog**
147:2 148:4
**analyses**
31:11,15,21 32:7
34:10 37:2,5,6,15
53:7
**analysis**
31:23 32:13,22 33:6
35:9,17 37:3,9,12
37:13 38:22 44:21
45:4 47:8 51:6,13
51:21 52:2,9,21
53:3 54:1,1,7,20
56:11 62:7 117:20
118:14 145:17
146:16 149:7,21
152:15 169:20
170:6,10 172:10
173:6
**analyze**
30:6 73:2
**analyzed**
148:10 149:7,24
151:11 240:15
**and/or**
80:5 236:6 259:9
**animal**
119:20
**answer**
7:9,16,21 56:13
126:7 134:23 171:1
180:15 194:3 242:8

252:25 253:13
**answered**
104:7
**antagonists**
121:20
**antichromium**
174:15
**anti-fibrotic**
117:5,17 118:7,13
119:11,14,21
**anti-fibrotics**
42:18
**anti-receptive**
121:20
**anymore**
140:1
**anyway**
242:14
**apologies**
17:17 134:20
**apologize**
13:18 14:15 19:12
23:21 50:20 124:8
124:15 147:7,9
192:1 253:5
**apologized**
124:12
**apologizing**
124:13
**app**
230:13
**apparent**
117:23
**appear**
11:25 53:13 54:23
55:3 88:16 117:21
151:5 192:14
199:19 226:22
**appearance**
117:23
**appearances**
2:1 5:18
**appeared**
28:13 32:18,25 98:4
99:11 154:20
**appears**

12:2 26:10 51:1
180:5 189:17
194:11 201:13
206:6 208:13 213:7
216:8 237:15
241:13
**appendix**
3:21 165:23 166:8,22
168:18 171:9 174:7
**applicable**
108:13
**applicant**
233:20
**application**
188:21 233:7,21
235:25 237:5 239:8
241:7 243:25
**applied**
74:17 75:22
**apply**
107:24
**appointment**
23:6,20,24
**appointments**
22:23
**appreciate**
64:23
**approval**
87:5 114:12
**approved**
42:19 81:22 85:22
87:16 88:8 114:5,18
121:12,25 212:5,7
212:10,19,23
215:22,23
**approximately**
8:18 25:9,20 138:5
**April**
74:17
**area**
108:15 110:2 198:9
234:12
**areas**
20:9,12 21:4 68:15
68:18 108:4,6,8,9
109:24 110:4,19

113:20 127:22
**arguably**
185:23 222:6
**argument**
152:12
**arises**
104:5
**arm**
32:21 59:6 141:12
149:12,12,19
155:18 156:18,19
174:14,16,17
175:15 185:8
**arms**
168:22 170:12
171:17,20 231:10
**art**
5:23 82:20 248:7
**arterial**
25:19 26:1 72:21
81:12 85:18 86:11
212:8 215:24 227:3
244:7,24
**artery**
73:15,20 74:4,11
75:5,13 93:20 103:7
182:16,18,19
187:11,12 222:9
**ARTHUR**
2:5
**article**
145:5 164:8 166:6,8
166:24 202:15
205:10,25 207:9
216:11 219:2,11,25
227:16,22 228:10
229:7,11 232:3
**articulate**
85:1
**aside**
200:23
**asked**
19:2 22:16 42:7
61:21 92:6 113:8
114:24 116:1 138:2
170:21,25 252:17



253:18
**asking**
13:5 15:17 97:10
170:5 224:20
**asserted**
70:9
**assess**
120:11 121:4,5
**assessed**
222:22
**assessment**
240:20 241:8,9
**assigned**
149:8
**assistance**
9:13
**assisted**
9:16,20
**assisting**
8:4
**associated**
25:22 65:22 89:12
94:15 98:3 112:9
152:7,9 154:1 160:8
160:12 162:14
184:10 193:5,12
206:12 212:24
215:25 217:13
218:5,12 219:19
236:7,11,25 237:6
237:14,16 238:1,11
238:14 245:11
249:10,19 252:22
**associates**
64:1
**Association**
24:11,18
**assumably**
183:19
**assume**
7:10 46:23 173:19
183:5,5 202:10
**assuming**
88:3 131:2 183:20
**assumption**
131:8 135:7,9

**assured**
127:25
**asthma**
236:7,8
**Attachment**
11:23 14:8,12 17:16
17:18 47:12
**attachments**
11:21 12:5
**attempting**
110:18
**attention**
148:18 149:2 152:16
**attest**
96:8 97:19 255:19
**Attorney**
3:3,4,5 5:19,23 6:9
9:6,14,17,23 10:4,6
13:7,12 16:4,15,18
17:7,14 18:3,9,13
18:19 19:5,8,16,17
20:11,19 25:8,14
27:1,5,22 28:3,17
28:20 29:8,13,24
30:8 31:16,18 32:15
32:23 33:2,4,9,19
33:24 34:8,11,15,19
34:23 35:11,15,18
36:10,15 37:4,10,16
37:20,23 38:5,10,14
38:17,23 39:3,8,13
39:17,20 40:5,15,21
41:1,14,17,21,24
42:5 43:1,5,9,13,16
43:19,23 44:9,12,18
45:1,6,9,13,16,19
46:1,4,7,18 47:1,5
47:10,18,21 48:7,18
48:22 49:16 50:1,8
50:13,16,24 51:4,9
51:11 52:10 53:1,5
53:24 54:17 55:5
56:2,16,19,23 57:4
57:7,12,22 59:2,9
60:9,12,14,18,22,24
61:18 62:1,14,17

63:3,6,10,16 64:12
64:21 65:3,7,12,14
65:18,24 66:3,9,20
67:9,13 68:22 69:4
69:8,23 70:2,4,16
70:18,21 71:3,13,15
71:18 72:4,11,16,24
73:3,7 74:15,19
75:20,25 76:7,24
77:2,25 78:5,9 79:4
79:11,18,22 80:8,12
80:15 82:1,22 83:5
83:23 84:13,17 85:8
85:16,19 86:2,15,20
86:23,25 87:3,6,9
87:13,17,21 88:9,14
88:18,22 89:14,20
90:10,15 91:8,12,16
92:3,14,17,21 93:4
93:13,17 94:4,11,22
95:9,22 96:1,4,24
97:2,5,9,15,23 98:1
98:10,13,16,25 99:4
100:1,16 101:20
102:4,9,13,16,22
103:4,24 104:13,15
104:21,24 105:18
106:1 107:22 109:4
109:8,10 110:21,24
111:1,18,24 112:4
112:11,16,20,24
113:1,5 114:17
115:13,21,24 116:7
116:15,24 117:11
118:23 119:1,5,7,17
120:1,5,9,13,20,24
121:3,6,10,14 122:3
122:11,15 123:1,6
123:10,19,24 124:2
124:7,9,23 125:17
125:20,21 126:3,9
126:13,17 127:6,9
127:16 128:11,16
128:20,23 129:1,4,8
129:11,15,17,23
130:1,3,6,11,14,18

131:1,3,6,9,12,21
131:25 132:6,11,15
132:18,23 133:6,10
133:14,16,23 134:1
134:4,11 135:1,6,10
135:14,16,22 136:2
136:5,16,20 137:1
137:10,15,24
138:13,23 139:3,15
139:18,21 140:18
141:5,9,13 142:2,8
142:12,19 143:24
144:2,21,24 145:2
145:24 146:8,12,14
146:19,21 147:6,17
147:20,24 148:1,6,8
148:13,16 150:17
151:1,8,14 152:3
153:1,7,10,18,21
154:16,23 155:1,20
155:24 156:1
157:10,13,19,21
158:13,20 160:18
161:1,4,23 162:5,7
162:10,16 163:3,15
163:23 164:15,19
165:1,7 166:3,5,9
166:10,11,18,20
167:1,4,11,15,17,22
168:1,6,19 169:1,6
169:9,22 170:3,8,13
170:19 171:5,13,24
172:4 173:8,11
174:5,10 175:2,6,13
175:18,24 176:21
177:3,7,11,14,21
178:8,13,21,24
179:2,8,10,13,20,23
180:6,10,17 181:4
181:12 182:14
183:14 184:6,22
185:2,10,15 186:7
186:12,18 187:7,17
187:22 188:11,17
188:24 189:3,6
190:11,14,25 191:3

MAGNA
LEGAL SERVICES

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000745

191:9,13,19,23
192:4,7,12,17,24
193:1,14,16,19,24
194:1,8,14,25
195:11,14 196:8,10
196:11,22 197:12
197:14,25 198:2,4,7
198:10,21 199:4,9
199:14,17,21 200:8
200:10,19,22
201:20 202:13
203:18 204:4,17,22
205:2,7 206:5,8,21
207:5,7,11 208:19
208:25 209:8
210:14,17,18 211:3
211:11,10,13,16,18
213:5,9,14,22 214:4
214:11,14,23 216:7
216:9,25 217:5,17
217:20,24 218:9
219:5,10,14,21
220:2,5,8,19,23
221:1,11,21 223:3,7
223:13 224:6,18
225:9,12 226:6,16
226:20 227:14,25
228:18 229:14
232:5,10,24 233:5
233:22 234:1
236:13,16 237:8,23
238:3,24 239:10,13
239:20,23 240:6,9
240:25 241:2,4,6,11
241:14 242:5 243:1
243:16,21 244:14
245:1,5,18,24
246:12,17 247:1,14
247:24 248:4,9,18
248:21 249:13,16
249:22 250:16,19
250:22 251:5,9
252:1 253:11,15
254:10,13,23 255:1
255:11,24 256:1
**attorneys**

8:20,22
**attributable**
71:25
**audience**
159:19 161:13
**Aurobindo**
15:8
**author**
15:10 27:8 32:11
143:17 154:11
158:15 159:25
165:18 197:20
199:22 202:18,18
216:15 217:6
218:13,14 219:1
229:1
**authors**
27:6 146:23 147:12
166:23 167:5 169:2
221:3 222:20
225:20 231:22
**AV**
196:4
**available**
64:3 85:11 89:1
109:2 122:6
**Avenue**
2:17
**average**
230:8,12
**avoid**
112:8
**aware**
12:15 14:6,7 49:3
50:6,14 63:20 65:25
66:4 68:6 82:17
88:10 92:5 99:18
129:2 207:10,13
**a.m**
1:20 64:18,18 142:15
**A1**
233:9

━━━━━━━━━  B  ━━━━━━━━━

**B**
11:21 14:8,12 218:14

**back**
17:10 18:17 19:23
42:21 47:11 54:18
57:23,24 64:22
66:10 75:2 82:8,23
86:4 87:23 89:22
92:19 100:21,22
103:5,14 114:23
115:25 128:14
136:12 142:20
151:2 157:2 163:16
169:15 196:23
205:9 208:5,16
227:15 229:21
231:9 232:17 243:3
247:25 252:8
254:16
**background**
67:24 217:3,8
**backwards**
69:16 255:18
**bad**
58:22,23 125:22
**Bajwa**
206:16 216:15
227:16,21
**balance**
144:14,14
**banner**
237:16 238:13
**Barbara**
1:17,21 5:15 257:2
257:17
**bars**
56:9 117:24
**based**
28:13,18 33:11 34:6
58:24 74:9 78:25
88:15 91:6 97:12,13
104:18 118:18
130:19 133:15
170:10 176:25
188:14 199:18
201:7,15 248:6
**baseline**
32:17 58:14 168:3,23

171:16 174:12
176:4 181:18
183:17,18 203:20
230:12
**baseline-generated**
169:18
**bases**
85:5
**basically**
229:21
**basis**
32:22 65:15 138:15
**basket**
83:17
**Bates**
153:19 165:20 180:1
209:22 216:15
218:14
**Bates-stamped**
3:11,20,22,24 4:2,3,5
4:7,8,10,11,13,15
4:16
**bathroom**
137:20,21
**bearing**
142:25 165:20
179:25 189:12
196:2,4 202:19
209:14,21 210:4
216:15 218:14
224:12 229:2 233:9
**bears**
153:19
**began**
22:6 47:15 83:3
**beginning**
8:5,15 19:22 28:15
66:10 165:20
240:11
**begins**
5:3 26:6 50:3
**behalf**
2:3,11 6:5 15:25 16:2
**behave**
49:24 77:6,19
**belief**



40:17,18 41:13,19
117:8 130:19
160:22
**believe**
6:21 13:13 14:20
15:11 27:3 28:19
37:11 38:7 41:2
44:22 49:13,14 50:5
50:19,21 55:6 57:5
57:8 59:4 63:4 64:7
65:8 67:24 68:16
72:6 83:6 85:12,23
85:24 90:11 91:9
95:20 97:3,11,18
110:25 111:7,21
116:4,13 117:12
118:19,24 120:3
129:13,24 130:16
134:8,9 135:19
138:2 154:14 157:7
160:6 161:6 162:18
163:1 170:14
191:11 193:9
208:21 212:3
218:21 223:12,19
226:3,17 228:7
234:16,20 252:19
**believed**
223:17 232:3
**beneficial**
158:4 164:23 185:19
**benefit**
55:3 56:15 65:21
100:15,18,20,22,24
103:13,18,22 105:3
105:7,14,16 108:25
112:19 113:16,21
113:25 114:3
116:10,14,18
120:16,22 121:1,9
124:4 125:9 152:21
159:7 163:14
184:16,18,19 185:8
186:3,9 188:7,14,22
227:9 251:22
**benefited**

164:3
**benefits**
52:23 113:16,17,24
152:25
**best**
19:21 29:12 33:10
36:20,25 37:17
38:15 45:8 105:24
108:3,5,7,9 113:20
145:16 149:23
173:4,6 247:12
**bets**
105:8
**better**
48:25 100:21,24
101:2,6,23,25 102:3
102:19 137:18
149:13 150:6
**beyond**
140:11 214:22
242:18 243:19
**bias**
222:6 230:21,25
**big**
83:17 101:8,13
156:10
**bind**
151:20
**biologic**
113:9,11,13
**biomarker**
53:19 109:1 175:8
**biostatistician**
30:4 47:7
**bit**
48:25 71:4 75:3 78:3
90:25 121:23 139:6
194:15 235:3
246:24
**blanket**
98:7
**blind**
155:6,7
**blinded**
231:8
**blood**

106:16,19,24,24
107:4,6,16 108:7,8
109:22 110:1,6,6,19
175:7 236:21,22
**blow**
139:24 140:1
**blowing**
139:25
**BNP**
176:4
**bottom**
143:16 144:3 172:12
181:22 205:14
**box**
77:17 146:18 157:23
**Bradley**
2:24 5:13
**brain**
174:12 175:3
**break**
7:19,22 64:9,11,13
64:14,23 125:19,23
142:10 196:9
247:15
**breaks**
7:18 248:1
**breath**
55:17 127:19,21
129:20,21 130:21
130:24 131:16,20
132:25 137:19
138:5 168:24 169:3
170:16 190:17
191:7,18 192:3,22
**breathlessness**
240:21
**breaths**
190:20 191:6,12,17
200:6,12 213:18
214:8,9
**BRITTANY**
2:14
**Brittney**
5:22
**broad**
84:8 98:7 237:16,21

238:16
**brought**
69:18 152:16
**build-up**
72:20
**Bull**
48:4
**bunch**
8:21 64:1 90:6
161:13 227:1
**bureau**
59:17
**B-u-l-l**
48:4
**B2**
189:11

---

**C**

**C**
5:1 11:21,23 156:17
**CA**
2:7
**calculator**
58:4
**call**
53:12 78:15 81:7
152:8 170:22
194:11 247:12
**called**
1:14 6:5 53:20 94:13
129:7 195:23
201:23
**calls**
223:4 243:17
**cancer**
42:24
**capabilities**
137:8
**capability**
125:1
**capable**
126:7
**capacity**
3:13 90:20,21 123:22
124:5,21 126:2,12
136:19,25 137:14

139:20,22 140:2,5,7 140:15 145:6 193:4 193:11 205:17 208:10 240:21 241:10 248:17 249:9,18 250:8 251:8 252:21 253:7 254:21

**capillaries**
107:7 109:22 236:23

**capture**
124:13

**captures**
120:7

**cardiac**
106:14 107:2 175:9

**cardiologist**
234:11

**Cardiology**
74:1

**cardiopulmonary**
126:15

**care**
24:11 25:16

**carried**
207:22

**carry**
64:10

**case**
5:8 8:13,25 9:5 11:1 11:16 12:1 14:18,21 14:24 15:1,2,3,5,9 15:10,12,15,19 16:6 16:12,14,20,23 18:2 18:12 19:6,18 59:10 64:2 78:18,20 87:25 189:16 211:21 213:8 228:6 244:22

**cases**
17:3,4 21:20 247:5,6

**CAT**
79:1 90:2

**catch**
246:4

**categories**
77:7,16,18 84:9,21

**catheterization**
73:1,5

**cause**
181:9 188:1

**causes**
55:19 84:24 138:8

**caution**
9:7 69:10

**Cazakoff**
2:14 5:22

**ccs**
34:3

**Cedar**
21:14 81:14

**cell**
107:6,10

**cells**
106:20

**cellular**
113:23

**center**
21:15 61:21 81:14

**centers**
24:12 81:15

**CEO**
235:21,23

**certain**
17:2 131:4,11 134:25 140:12 146:7 156:12 158:19 195:13 209:2

**certainly**
66:25 71:2 121:18 125:8 214:17 255:20

**certainty**
119:13 135:11

**CERTIFICATE**
258:1

**certify**
257:3,9 258:4,5

**CF**
24:16

**chain**
9:19

**chair**

41:8 59:23 160:16

**chairperson**
160:3,4

**chairs**
159:20

**challenge**
183:17

**challenged**
181:18

**chance**
71:23 207:23 210:7 210:21 232:8

**change**
53:19,25 54:2 140:13 140:15,17,21,25 141:4,7,20 168:23 171:15 172:1 174:11 176:4,17,18 199:6,10 203:7,17 204:23 230:12 259:13

**changed**
23:18 73:19 81:11,13 168:3 214:12

**changes**
17:24 73:10 123:21 124:4,20 141:1 259:9

**characteristics**
58:14 151:20,22 181:17 203:21

**characterize**
152:5 154:18

**charts**
229:22

**chase**
228:4

**cheaper**
96:7

**check**
11:17 146:1 211:24

**checking**
16:10

**chemical**
151:19

**chest**

55:16 138:7 145:8,20 148:11 149:23 151:3

**Chicago**
234:12

**chlorine**
16:25

**choose**
87:10 158:21 169:11

**chosen**
169:16

**Christopher**
16:12,13

**chronic**
49:1,7 77:10 84:3,5 206:19 207:2 216:14 244:4

**Chung**
47:2

**circulation**
72:1 206:20 216:11

**circumstance**
132:17

**cite**
105:4 197:4 210:16 217:6

**cited**
205:22 206:15 211:21 216:23 219:3 225:1,6 228:10

**claim**
189:24,25 190:8 193:3,3,9,20,21 194:11,17 200:17 242:12,17,18 249:3 249:6,8,17 250:6 251:1,4 252:19 254:17,20

**claiming**
180:14

**claims**
70:10,14 71:1 180:8 180:9 183:24 189:18,20 242:9 248:16 250:2 252:9



HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000748

**clarification**
27:19 121:21 171:18
**clarify**
7:9 248:13
**clarity**
153:19 183:11
**class**
212:8 221:4
**classified**
182:7
**clause**
16:10
**clauses**
16:9
**clear**
7:7,8 52:2 72:5 97:13
   115:2 147:9
**clearly**
95:17 103:15 122:22
   247:5,6 253:6
**clinic**
24:22,25 25:2,5
   126:25
**clinical**
25:6,12 26:12 27:17
   53:12 58:4,22 79:7
   90:5,12,17 100:14
   100:17,20 103:13
   103:22,25 104:12
   104:20 105:2,7,16
   112:18 113:16
   120:16,22 121:8
   126:25 136:17
   143:20 144:11,12
   144:14 151:21
   159:7 164:17
   169:14 175:4
   184:16,17,18,19
   186:2,9,16 188:7,14
   227:8 229:17
   235:12 237:21
   246:14 251:22
**clinician**
34:17 73:6
**close**
205:14 252:2

**closed**
31:13
**closely**
178:4 179:16
**Cobble**
6:15
**cobbling**
229:22
**cold**
224:24
**collaborate**
59:19,22
**collagen**
118:5,9
**colleagues**
5:21
**collect**
79:17
**collection**
44:16
**collectively**
244:5
**Columbia**
1:18 257:1,3
**column**
144:4,10 156:17
   158:8 180:13
   186:20 239:15
**Columns**
181:14
**combination**
172:2
**combined**
9:21 84:5 220:17
**come**
14:1 17:22 41:7 47:8
   52:12 62:6 68:18
   79:13 92:1 100:22
   105:6 114:23
   137:16 160:24
   161:2 187:14 188:1
**comes**
100:21 128:4 130:9
   130:20 131:14
   208:16
**comfortable**

88:20 127:24
**coming**
29:10 99:16 106:20
   156:22 160:20
**comment**
200:24,25 207:14
   243:20
**commented**
65:11
**Commission**
257:20
**committee**
26:16 28:7,12,16,22
   29:1,6,22 31:6,7,10
   39:6,11,15 40:19
   41:8 42:3,8 45:24
   47:14,16 48:1,5,13
   59:24 155:5,14
   156:11,24 197:23
   225:24 231:25
**committees**
26:7,11
**common**
77:21 78:1 84:25
   246:5
**commonly**
76:25 77:4 126:24
**Commonwealth**
23:10
**communicated**
43:24
**communication**
44:13 45:23
**communications**
9:9 69:12
**community**
52:16
**comorbidities**
77:7 238:15
**companies**
15:21
**company**
92:8 234:23
**compare**
138:17 169:25
**compared**

108:16 115:19
   147:15 172:3 178:1
   214:13
**compares**
186:24
**comparison**
32:21
**compass**
58:21
**compendium**
35:1
**complete**
11:25 259:6
**completed**
154:19 205:15 208:7
**complex**
179:15
**complicated**
245:10
**complicating**
82:17,21 83:1
**complication**
237:20 244:8
**complications**
245:3
**complicity**
159:21
**complies**
12:6 14:10 26:4 61:1
   61:13 66:14 70:7
   143:6 168:15
   212:15 215:19
   227:17 243:5
   248:24 252:10
**component**
75:9 98:15,15,23
   99:25 101:8 116:6
   116:21 117:2,4
   118:22 119:4
   120:12,23 121:2
   122:23 179:5
**compound**
79:15
**comprehension**
24:17
**comprises**



190:7,17
**computed**
208:3
**conceivable**
118:7
**concept**
22:18 106:22 163:21
163:25 164:8,12,17
164:23 165:3 179:1
218:4 219:17
246:19
**concepts**
164:21
**concern**
14:21 50:15 101:24
110:16,23
**concerning**
32:8
**concerns**
112:9
**conclude**
185:12 187:19 189:1
**concluded**
199:22
**conclusion**
200:2 243:18
**condition**
221:20 236:7,11
238:13
**conditions**
236:24 237:6,13,15
238:1,7,10,14,17
**conduct**
45:18 46:16 47:3
143:21
**conducted**
148:22
**conducting**
119:15 159:16
**conference**
253:19
**confidence**
174:22 176:11,13,24
**confident**
36:12,21 37:1 140:16
**confidential**

15:17
**conflicted**
49:23
**confused**
251:14 253:5
**confusing**
80:14
**connect**
242:24
**connection**
186:1,2
**connective**
83:25 89:24 90:7
238:7
**consensus**
29:20 31:3 39:6,15
**consequence**
186:16
**consider**
20:8 98:24 99:21,23
116:21 133:7 164:5
198:5 245:3 246:14
246:15
**considered**
99:7 151:22 218:24
223:1
**constantly**
18:5
**construe**
159:21
**consult**
59:13
**consulting**
15:24,25 59:11
**contacted**
8:3,9 18:1,6,11,25
19:4,10,14,21
**contents**
3:1 66:12,19
**contested**
71:1
**contesting**
15:22
**context**
24:7 71:6 86:11 93:7
98:9 99:8 108:18

122:24 127:19
133:20 157:24
158:23 218:21
224:5
**contextualize**
172:8 173:5 217:11
**continue**
102:1 144:9 150:15
155:10
**continued**
173:1
**continuous**
130:9 133:12,19,22
**continuously**
135:4
**contribute**
45:17 106:4 172:22
**contributed**
31:2 70:23
**contributing**
112:2
**contribution**
29:14,17,19 30:20,24
40:2,8 46:16 183:13
**contributions**
46:24
**contributors**
141:19
**control**
152:23 155:4 158:3
231:6,18
**controlled**
41:6 142:23 143:11
153:25 154:3
**convenient**
123:16
**conversations**
46:12
**convey**
179:7
**convince**
184:25 188:13,21
**Cooley**
2:12 5:12,20
**coordinator**
232:13,18

**COPD**
48:17,19 49:12 207:1
208:13 217:3,11,13
218:3,8 223:22
224:9,11 225:19
228:6,11,15
**copy**
10:18,22 11:12,15,20
12:1 17:19 18:8
143:5 224:19
**corner**
77:17
**Corporation**
1:5 5:6 233:24
**correct**
6:24 11:3,21 16:3
19:9 20:6,7 21:1
25:10 26:12,13
28:19 33:1,3,23
36:25 37:19,24,25
38:4,13 39:7,16
45:5,12,15 48:21
49:4,5 51:2,3,16
56:18,22 62:13
65:11,13 72:9,10
75:24 78:8 83:7
88:13 91:11 93:3
96:16 97:25 98:12
102:24,25 110:20
112:10,15 113:6
114:10,16 115:20
119:16,19 123:4,5
130:25 131:5,11
132:10,17,19
133:25 134:7,15
135:5,13,15 139:2
140:17 141:14
142:1 146:11
147:16,23 148:5,12
150:9,10,13,14
151:7 154:6,9,15
157:15,16,20
160:17 162:4,6
165:6,16 169:21
170:7 177:6 178:12
178:23 186:11,15



187:21 189:5
190:10,13,24 192:3
192:11,19,23
193:23,25 194:4
195:18 197:13
208:24 211:22
213:4,13 214:3
215:15 216:6 217:7
217:8 219:4,6 220:1
220:7,22,24 225:8
225:11 229:8,9
238:2 241:10 245:4
249:1,2 253:14,22
**CORRECTION**
259:13
**corrections**
258:7 259:10
**correctly**
55:9 68:2 72:6 116:9
201:11
**corresponding**
32:2
**cough**
124:12,13 128:3
**coughing**
124:14 128:9 136:14
**counsel**
1:14 5:17 7:13,15 8:3
9:9,13,16,22 10:18
13:2,6 18:1,12
19:15 66:25 67:25
68:6,20 69:12 70:20
70:25 143:5 248:2
250:14 255:2,10,17
257:9,10
**counterclaim**
69:20
**country**
81:15
**couple**
71:5 83:6 155:14
178:16 254:14
**course**
231:20
**courses**
80:24 84:7

**court**
1:1 5:7,14 6:24 257:2
**COURTICS**
259:3
**courts**
69:17
**cover**
210:2 242:20 253:17
254:3
**covered**
84:15,22 85:5 184:5
**covers**
192:10 242:25
245:16
**CPFE**
84:5
**criteria**
29:11 91:7
**critical**
20:13
**cross**
77:20
**crossed**
56:10 117:24
**crossover**
77:22
**CRR**
1:22 257:17
**curious**
175:22
**current**
17:19 19:1 24:3
31:14 74:10 235:23
236:20
**currently**
21:21,23 23:1 25:16
35:8 48:10 99:2
127:1 235:5
**cursory**
40:9
**curve**
173:2,21
**curves**
174:3
**cut**
90:18

**cutoff**
140:22
**CV**
17:18,20,21,22,24,25
18:7,17,20,22 19:1
19:23,24 20:6 22:5
22:13 23:25 26:3
28:13,18 31:7 47:11
47:12 50:25 51:23
52:4 57:23 60:25
61:6 235:14
**cystic**
24:15
**C.A**
1:6
**C.Q**
30:3

---

**D**

**D**
1:13 3:2 5:1 6:4
10:15 11:8 154:10
202:18 232:12
258:10
**daily**
200:12
**Dang**
47:2
**data**
30:6 34:22,25 35:2
44:15,15,16 62:7
104:19 123:12
143:20 144:10
155:6,15,16 169:19
172:17 173:24
174:2 184:24
185:11 187:20
188:12 194:5,6,11
194:19,21,23 195:3
195:5,17 205:15
208:3,6 222:13,19
227:9 229:22
**dataset**
52:13 155:4 156:24
**date**
18:22 23:22 31:5

38:25 39:2 259:23
**dated**
12:11
**Davies**
2:13 3:3,5 5:19,19
6:9 9:14,23 10:6
13:12 16:18 17:14
18:9,19 19:8,17
20:19 25:14 27:5
28:3,20 29:13 30:8
31:18 32:23 33:4,19
34:8,15,23 35:15
36:10 37:4,16,23
38:10,17 39:3,13,20
40:15 41:1,17,24
43:1,9,16,23 44:12
45:1,9,16 46:1,7
47:1,10,21 48:18
50:1,13,24 51:11
53:1,24 55:5 56:16
56:23 57:7,22 59:9
60:12,18,24 62:1,17
63:6,16 64:12,21
65:7,14,24 66:9
67:9 68:22 69:23
70:4,18 71:3,15
72:4,16 73:3 74:15
75:20 76:7 77:2
78:5 79:4,18 80:8
80:15 83:5 84:13
85:8,19 86:15,23
87:3,9,17 88:9,18
89:14 90:10 91:8,16
92:14,21 93:13 94:4
94:22 95:22 96:4
97:2,9,23 98:10,16
99:4 100:16 102:4
102:13,22 103:24
104:15,24 106:1
109:4,10 110:24
111:18 112:4,16,24
113:5 115:13,24
116:15 117:11
119:1,7 120:1,9,20
121:3,10 122:11
123:1,19 124:2,9

125:17,21 126:9,17
127:9 128:11,20
129:1,8,15,23 130:3
130:11,18 131:3,9
131:21 132:6,15
133:6,14,23 134:4
135:1,10,16 136:2
136:16 137:10,24
138:23 139:15,21
141:5,13 142:8,19
144:2,24 146:8,14
146:21 147:20
148:1,8,16 151:1,14
153:1,10,18,21
154:23 155:20
156:1 157:13,21
158:20 161:1,23
162:7,16 163:15
164:15 165:1 166:5
166:10,11,20 167:4
167:15,22 168:6
169:1,9 170:3,13
171:5,24 173:8
174:5 175:2,13,24
177:3,14 178:8,21
179:2,10,20,23
180:6,17 181:12
183:14 184:22
185:10 186:7,18
187:17 188:11,24
189:6 190:14 191:3
191:13,23 192:7,17
193:1,19 194:1,14
195:11 196:10,11
196:22 197:14
198:4,10 199:4,14
199:21 200:10,22
202:13 204:4,22
205:7 206:8 207:7
208:19 209:8
210:14,18 211:13
211:18 213:9,22
214:11,23 216:9
217:5,20 218:9
219:10,21 220:5,19
221:1,21 223:7

224:6 225:12
226:16 227:14
228:18 232:10
233:5 234:1 236:16
237:23 238:24
239:13,23 240:9
241:2,6,14 243:1,21
245:1,18 246:12
247:1,14,24 248:4
248:18 249:13,22
250:16,19,22 251:9
253:11 254:13
255:1,24
**day**
21:12 25:5 29:19
108:24 123:18,18
214:8 215:13
**days**
24:24 25:1 259:9
**DC**
2:19
**dead**
110:8,11
**deal**
42:16 173:24
**dealt**
173:17 174:3
**death**
111:22 156:10,18
**deaths**
149:11,12,18,20,25
156:7,8,18
**debate**
78:2 247:5
**decide**
52:8 125:22 247:2
**decided**
74:6 155:15
**decision**
35:16,20 69:19
125:23
**declaration**
3:10 6:20 8:13,19 9:2
9:4,12,25 10:3 11:3
11:8,15,22 12:13,15
14:9 17:17 47:13

66:11,12,17,18
109:6,13,17 134:13
154:8 159:8 166:17
183:22 189:15
197:5 211:21
218:21,24 229:8
233:18 250:11
252:3 255:3,7,10,15
**deduction**
172:7
**deep**
105:22 127:21
**deeper**
37:14 55:1
**defaults**
245:16
**defend**
159:24
**defendant**
1:15 2:11 5:20 10:14
**defense**
159:20
**defined**
75:4 91:6
**definite**
140:22
**definition**
55:13 73:9,11,14,18
74:3,10,16,21,25
75:17,22,23 76:6
93:15,19,20 102:6
102:12 103:6
116:17 138:3
**definitive**
56:12 105:10 183:13
199:2
**degrees**
244:4
**Delaware**
1:2 5:8
**delay**
117:5
**deleting**
255:21
**delineation**
78:23

**delineations**
76:21 97:13
**delivered**
114:15 191:4,14
192:22 198:15
**delivering**
191:18
**delivery**
215:10,15
**demonstrated**
102:7 111:11
**demonstrating**
41:6
**dependent**
137:22
**depending**
17:23 18:5 59:14
128:7
**depends**
73:8 170:24 172:10
185:21
**depicting**
168:22
**deponent**
258:3
**deposed**
6:17 15:12
**deposition**
1:13 3:9 5:4,10 10:14
10:15 17:5 108:15
108:20 118:5,9
224:22 258:5 259:5
**derivation**
58:3
**derivatives**
236:5 239:4
**describe**
9:10 20:8 24:4 58:9
80:10 166:15 190:9
203:17 240:19
**described**
51:22 52:3,9 125:2
135:13 145:23
154:5 163:20 167:7
167:25 168:17
181:2 185:13



189:24,25 192:9
194:5 200:16,17
203:9 208:21
213:12 214:2
219:25 238:23
239:25 243:8,15
**describes**
20:5 180:19 192:2
200:5 215:10 241:7
**describing**
82:25 145:21 181:16
239:17 240:4
241:21 244:13,16
**description**
3:8 4:1 242:2 243:7
243:25
**descriptions**
95:24
**design**
29:6,10,15,23 30:20
30:24 31:3 40:3
45:18 46:16 47:3
49:20 66:2 152:1
**designed**
29:20 39:6,15 76:3
119:2 120:10,15,17
120:21 121:4
**Despite**
52:14
**destroyed**
110:7
**details**
14:23 16:21 17:11
201:5
**determination**
79:3
**determine**
71:9,21 72:1,7
136:18,23 138:10
138:14,25 140:3
141:22,24 142:5
**determined**
119:23
**detriment**
146:25 188:3
**develop**

244:19
**developed**
31:24
**development**
43:2 48:11 58:12
61:20
**deviation**
199:13
**device**
62:16,18,21 63:24
128:22 129:10,14
129:16,22,25,25
130:5,13 131:18,24
132:4,10 133:5,9
135:12,18 136:11
136:15 215:10,14
215:15
**diagnose**
72:22
**diagnosis**
72:25
**die**
150:6 231:7
**died**
149:22 151:11
173:20
**difference**
32:19 33:1,7,22 34:6
34:18,21,25 36:21
37:19 38:3,9,12
54:14 55:25 56:18
57:1 71:11 72:8
107:24 108:1
115:14 141:12
142:1 152:19
156:10 170:11,15
171:3 172:1 174:17
177:4 201:25 204:1
204:11,15,19,24
205:4 212:21 231:4
245:21
**differences**
83:18
**different**
8:21 34:13 36:4
67:21 71:5 75:22

76:22 83:7,11,21,25
106:7 107:15
108:11 111:4 114:2
136:8 139:6 170:23
173:23 183:20
187:13 201:9,18
215:12 217:4 218:8
226:8,10,11,11,12
226:13 237:11
242:22
**differentiate**
104:22
**differentiating**
115:19,23
**differently**
67:19 198:24
**difficult**
24:2 53:9 57:20
78:10 139:10
**diffuse**
80:4
**dilating**
108:6
**dilator**
227:1
**direct**
22:17 51:17 169:24
210:24 250:14
**directed**
105:11 112:7 184:25
185:24 193:2,3
237:5 239:9 242:4
255:2
**direction**
1:22 223:25 224:1
**directly**
198:15 235:9
**director**
22:3,6
**disagree**
148:14 150:3
**disclosure**
183:24
**discontinuation**
155:19
**discordant**

150:5
**discrete**
237:20
**discuss**
158:21 223:8 225:23
**discussed**
7:19 166:16 189:15
229:8
**discussing**
226:2
**discussion**
125:15 160:20 200:3
228:21 247:16
**discussions**
248:1
**disease**
20:16,18,22 21:8,11
22:4 24:6,8,13
25:21,23 26:2 36:2
36:6 42:16 49:8,22
55:8,12,14,22 56:1
58:6 59:1,4 65:23
77:8,9 78:3,15
79:20,21 80:7,10,19
82:5,15,18,21 83:2
84:1,10,21 85:3,4
86:7,9,12,14,18
88:3 89:3,12,24
90:4,7,8 91:1 93:8
93:11 94:21 95:16
95:19 98:6 99:12,25
105:10,21 106:9
107:15 108:18
114:20,22 115:5
122:24 127:20
138:1 152:8,11
160:8,12 162:15
177:18 178:2
180:24 184:11
185:25 193:6,13
201:5,24,25 202:1,5
202:9,12,17 203:2
206:12,19 212:24
216:1,14 218:6,8,13
221:19 230:3 236:7
236:8,12,24,25



237:7,15,17,22
238:2,11 240:22
244:22 245:14
247:10 249:11,20
252:22
**diseases**
24:19 57:2 82:11
98:20 244:6
**disorders**
207:3 244:4
**disproportionate**
89:5,18 244:21
**dispute**
11:24
**distance**
54:1,3,12,15 100:23
101:11 126:1,10
144:18 147:1,14
151:6 153:6 199:7
199:11 221:5,9
222:15 230:10
231:17
**distinct**
77:18 87:24
**distinction**
98:7,18 100:6 245:20
246:4,21
**distinctly**
88:5,25
**distortion**
106:6,18
**distribute**
259:7
**District**
1:1,2,18 5:7 257:1,3
**dive**
55:1 105:22
**divide**
182:25
**divided**
191:24
**dividing**
247:2
**division**
74:3
**divorce**

159:6
**divulge**
9:8
**Doc**
137:17
**Doctor**
10:22 13:15 17:15
20:20 29:1 47:12
52:1 55:7 61:3
64:22 67:10 72:13
72:19 142:20 143:4
145:12 149:3
153:22 156:2
165:10 166:13
180:3 182:5 183:15
189:10,14 194:2
202:21,24 203:6,14
204:5 209:9 210:22
216:10,17,22
218:19 220:7
224:14 229:5
241:15 243:2 252:4
254:15
**document**
3:11,13,16,20,22,24
4:2,3,5,7,8,10,11,13
4:15,16 11:8 68:14
178:15 179:24
189:10 209:19
228:24 233:7,14
**documents**
12:25 142:21 165:9
233:17
**doing**
6:12 18:6 59:5 96:2,5
101:2 126:7 224:21
224:22
**dose**
113:21 190:5 213:19
214:7,13 226:25
227:7
**doses**
191:1
**dosing**
189:24,25 192:8,10
200:6,15,17 213:1,2

213:10,12,20,25
214:2,21 216:2,4
**dots**
242:24
**double**
211:24
**double-blind**
148:23 154:2
**double-check**
50:20 212:1 213:16
218:22
**double-checking**
220:9
**doubt**
24:2 87:8
**doubts**
40:24 41:3 43:15
**downside**
107:17
**DPI**
128:3,10,13 129:3,6
129:9,25 130:12
132:20 135:3,17,20
195:24 210:3,20
211:15 213:21
215:18,22,22 216:3
**Dr**
5:4 6:10 9:7 10:13
11:14 13:20 19:23
20:3 28:24,24 30:20
30:24 41:12,18 64:7
69:9 162:1 198:1
222:25 223:9
228:23 232:2
247:25 248:10
254:2
**draft**
10:2 65:9,16 67:16
68:21 70:24 172:20
**drafted**
10:8 66:16
**draftee**
66:23
**dragged**
173:2,21
**dramatically**

174:4
**draw**
148:18 149:2
**drawings**
134:6
**Dreamboat**
128:21 129:2,7
**drill**
52:22
**driver**
177:19,25 178:11
179:5
**driving**
179:18
**drop**
230:14 231:7
**dropouts**
173:17 230:18
**dropped**
149:22 151:11
172:16,25 230:19
**drug**
35:25 75:18 87:16
88:8 89:8,9 101:7
101:12,15,15 102:7
103:9 108:3,5,15,17
108:19 113:13,21
127:22 128:2,4,10
132:21 154:19
167:5 186:4,4 226:8
226:11,11,15 227:5
230:24 231:2,12
**drugs**
68:2 100:8 105:5
115:7 117:5 118:7
222:21
**drug-drug**
16:11
**dry**
62:11 127:8,11 129:3
131:24 132:9
133:24 134:6 135:8
**due**
48:19 49:1,7 58:6
59:1,3 118:21
202:16 203:2



**dug**
37:14
**Duke**
30:18 232:15,16,18
**duly**
1:16 6:6
**dying**
69:3 156:20
**Dykhuis**
2:5 3:4 5:23,23 8:24
9:6,17 10:4 11:12
13:7 16:4,15 17:7
18:3,13 19:5,16
20:11 25:8 27:1,22
28:17 29:8,24 31:16
32:15 33:2,9,24
34:11,19 35:11,18
36:15 37:10,20 38:5
38:14,23 39:8,17
40:5,21 41:14,21
42:5 43:5,13,19
44:9,18 45:6,13,19
46:4,18 47:5,18
48:7,22 49:16 50:8
50:16 51:4,9 52:10
53:5 54:17 56:2,19
57:4,12 59:2 60:9
60:14,22 61:18
62:14 63:3,10 65:3
65:12,18 66:3,20
67:13 69:4,8 70:2
70:16,21 71:13,18
72:11,24 73:7 74:19
75:25 76:24 77:25
78:9 79:11,22 80:12
82:1,22 83:23 84:17
85:16 86:2,20,25
87:6,13,21 88:14,22
89:20 90:15 91:12
92:3,17 93:4,17
94:11 95:9 96:1,24
97:5,15 98:1,13,25
100:1 101:20 102:9
102:16 103:4
104:13,21 105:18
107:22 109:8

110:21 111:1,24
112:11,20 113:1
114:17 115:21
116:7,24 118:23
119:5,17 120:5,13
120:24 121:6,14
122:3,15 123:6,10
123:24 124:7,23
125:20 126:3,13
127:6,16 128:16,23
129:4,11,17 130:1,6
130:14 131:1,6,12
131:25 132:11,18
132:23 133:10,16
134:1,11 135:6,14
135:22 136:5,20
137:1,15 138:13
139:3,18 140:18
141:9 142:2,12
143:24 144:21
145:2,24 146:12,19
147:6,17,24 148:6
148:13 150:17
151:8 152:3 153:7
154:16 155:1,24
157:10,19 158:13
160:18 161:4 162:5
162:10 163:3,23
164:19 165:7 166:3
166:9,18 167:1,11
167:17 168:1,19
169:6,22 170:8,19
171:13 172:4
173:11 174:10
175:6,18 176:21
177:7,11,21 178:13
178:24 179:8,13
180:10 181:4
182:14 184:6 185:2
185:15 186:12
187:7,22 188:17
189:3 190:11,25
191:9,19 192:4,12
192:24 193:14,16
193:24 194:8,25
195:14 196:8

197:12,25 198:2,7
198:21 199:9,17
200:8,19 201:20
203:18 204:17
205:2 206:5,21
207:5,11 208:25
210:17 211:3,10,16
213:5,14 214:4,14
216:7,25 217:17,24
219:5,14 220:2,8,23
221:11 223:3,13
224:18 225:9 226:6
226:20 227:25
229:14 232:5,24
233:22 236:13
237:8 238:3 239:10
239:20 240:6,25
241:4,11 242:5
243:16 244:14
245:5,24 246:17
248:9,21 249:16
251:5 252:1 253:15
254:10,23 255:11
256:1
**dynamic**
78:24
**dysfunction**
3:15 145:8,19
**D.C**
1:10,20 5:11

**E**

**E**
5:1,1
**earlier**
55:7 58:12 64:25
71:6 76:8 92:6,6
94:23 114:4 116:1
118:8 138:2 146:10
150:6 152:17 154:5
162:3,3 203:6
215:13 224:2 225:5
228:9 244:18 247:8
252:18 253:1,18
**early**
39:1 48:14 83:2

118:4,5
**easier**
96:8 109:16
**easiest**
89:9
**easy**
35:19
**echocardiographic**
145:18
**editing**
255:12
**education**
20:6 22:22 23:4
**effect**
53:21 54:23 57:9,11
59:6 84:1 101:6,24
103:3,10,12,20
105:2,6 155:13
231:12
**effective**
101:18 190:4,6
236:23
**effectively**
23:21 25:11 199:23
**effects**
104:20 116:19
118:20 119:3
152:24 157:18
173:13 206:25
224:9 240:13
**efficacy**
48:15 51:24 135:21
143:19 148:12
229:17,25 230:4,11
231:21
**effort**
9:21
**eight**
30:12 156:8,18
**eighties**
81:8,19
**either**
13:14 17:5 116:21
140:12 240:4,14
246:20
**eke**

231:3,3
**element**
103:11
**email**
9:19
**emerge**
83:4
**emergency**
25:4
**Emery**
2:4 5:24
**emphysema**
84:6 220:18
**employed**
21:21,24,25
**employee**
46:5 257:10
**employers**
22:25
**employment**
22:20,21
**enabled**
62:5
**enabling**
107:16
**enclosed**
258:8 259:5
**encompasses**
239:3
**ended**
23:14,23 161:14
**endopulmonary**
80:22
**endpoint**
27:15,16 28:1 36:9
   44:22 58:21 120:8
   120:19 168:2
   169:12,13 229:18
**endpoints**
27:21,24 28:2 29:12
   44:23 45:5 164:3
   169:13
**ends**
186:6
**end-stage**
166:16 167:6,24

**England**
92:11 143:13 146:5
   150:7 165:19,24
   166:6,24 202:15
   203:3 207:9 219:2
   225:6
**enhance**
236:21
**enolated**
183:18
**enrolled**
32:1 81:17 155:10
**enter**
145:4 179:24 202:14
   209:9 216:10
   218:10 224:7
**entered**
155:9 201:10
**entering**
189:10
**entire**
56:24
**entirely**
171:2 217:4 226:13
**entities**
237:21
**entitled**
3:13,16 10:14 26:7
   70:9 142:23 145:5
   189:11 196:2
   202:15 203:1
   206:10,17,24
   209:11,19 210:2
   216:12 218:11
   224:8 233:7
**entry**
28:6 50:18 57:25
   61:11
**equals**
147:1 221:15
**equate**
103:21 164:13
   184:21
**equating**
130:24
**equipoise**

143:20 144:11,12,13
**errata**
258:8 259:7
**error**
13:13,20,21 56:9
   117:24 180:24
**errors**
12:14 14:5 207:8,14
**ESCERS**
74:9
**especially**
80:19 127:19
**espoused**
160:6
**ESQ**
2:5,13,14,15,16
**essential**
46:24
**established**
143:19
**estimate**
53:15 56:3,7,13
**estimates**
53:11
**et**
142:25 145:8 163:17
   206:16,24 224:10
   233:8
**Etiology**
182:6
**Eugene**
234:17,18
**European**
73:25 74:1 83:16
   158:17
**EuroQol**
147:2 148:3
**evaluate**
83:20 119:3 120:16
   120:22
**evaluating**
126:22
**evaluation**
145:21
**event**
58:19 190:16

**events**
58:20
**eventually**
231:3
**evidence**
145:18 186:9 187:5
   229:16,25
**exacerbate**
110:18
**exacerbation**
55:11,14,21 137:25
   139:1,14
**exacerbations**
53:16 55:7 56:1 57:2
   57:11 138:12,22
   139:9,12,13
**exact**
38:25 39:2 141:15
   178:17 230:3
**exactly**
9:20 16:21 25:10,13
   50:11 56:8 67:22
   92:19 113:15,18
   114:1 209:4 214:10
   220:10 235:16
**examination**
1:14 6:8 248:8
   254:12
**examine**
53:25 144:17
**examined**
6:7 54:11 167:6,10
   201:19
**example**
12:18 59:15 77:22
   103:14 106:23
   107:14,24 108:10
   110:17 138:9 159:3
   163:6 190:23
   195:21 230:1
   231:15 237:25
   240:10,13 241:16
   241:17 242:13
   243:4,6
**examples**
107:14 242:9,11

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000756

243:7,8,14 251:12
**exchange**
55:18 107:3,12
   109:19 110:3,10,20
   181:18 206:25
   224:8
**excluded**
83:22
**excludes**
254:20
**exclusionary**
29:11
**Excuse**
169:23 224:18
**exercisability**
212:25
**exercise**
3:13 123:22 124:5,21
   126:2,11,15,23
   136:19 137:8,14
   145:6 193:4,11
   240:21 241:9
   248:17 249:9,18
   250:7 251:2,8
   252:20 253:7
   254:21
**exercise-type**
136:25
**exhaustive**
122:6
**exhibit**
3:8,9,10,11,13,16,20
   3:21,22,24 4:1,2,3,5
   4:7,8,10,11,13,15
   4:16 10:11,13 11:5
   11:7,14 14:9 17:16
   47:13 66:11 142:22
   143:2,8,10 145:5,10
   145:23 146:9,17
   147:8,10,10,11
   148:11 150:8 151:2
   151:4 153:11,16
   163:16 165:10,12
   165:22,25 166:1,4,5
   166:7,12,15,21,22
   166:25 167:7,25

168:12,18 171:8
   174:7 179:21,24
   180:2 189:7,9,10,14
   189:21 196:1,6,23
   200:23 202:14,22
   202:24,25 208:23
   208:24 209:10,16
   209:19,23,25 210:1
   210:9,12,15,19,20
   210:25 211:7,14
   212:4,6,13,20
   215:17 216:11,18
   218:10,16 219:12
   219:25 221:23
   224:7,15 227:15,22
   228:19,24 231:23
   232:22 233:6,11
   248:22,25 249:25
   250:11
**exhibits**
3:6 209:10 211:20
**exist**
52:15
**existed**
75:23
**existing**
227:12
**expected**
185:11
**experience**
42:1,3 76:23 79:5,7
   214:17,18 223:15
**experienced**
146:25
**expert**
14:18 15:10 198:6
   234:11
**expertise**
20:15,21,24 21:7
   198:9 242:19
   243:20
**Expires**
257:20
**explain**
69:13 77:3 109:15,19
**explained**

67:2 109:12
**explanation**
111:14
**explicitly**
249:18
**exposure**
16:25
**expressed**
160:17
**expressing**
41:12,19 44:7
**extension**
148:25 156:16
**extent**
95:18 98:5 141:7
   244:21
**extra**
11:12
**extremely**
84:25
**extremes**
109:25 110:11
**E-R-R-A-T-A**
259:1

---

## F

**F**
181:23 182:2
**fact**
62:4 103:19 111:19
   114:4 115:17
   133:17 219:22
   242:3
**factor**
112:2 115:19
**factors**
115:23
**fail**
53:16
**failed**
49:15,19 111:23
   115:9
**failure**
55:19 138:9 154:15
   154:18
**fair**

77:24 118:18 195:13
**Fairfax**
21:25 22:6,20 23:1
**fairly**
156:12
**fall**
49:8 76:12
**familiar**
62:9 63:1 70:25
   128:21 129:5 246:2
**fan**
30:18
**far**
96:11 143:19 173:14
   242:10
**Faria-Urbina**
206:10 208:21
   218:13 219:12,25
   220:21
**fast**
107:1
**favor**
37:21 53:13,17
**favorable**
53:21 56:4
**favoring**
32:19
**favorite**
77:12
**favors**
172:1
**FD**
25:12
**FDA**
234:21
**feasible**
171:2
**February**
8:6,7,15,16 12:11
   19:4,22 43:22 44:13
   92:7 177:16
**feed**
178:5
**feel**
34:10 99:8 100:21,24
   101:23,25 102:3



127:23,25 137:18
150:5 211:24
**feeling**
160:3 248:12
**feelings**
41:25
**feels**
102:19
**fellow**
81:14,18
**fellowship**
21:14,18
**felt**
101:2,5
**Ferrante**
2:16 6:2
**fewer**
139:11
**fiberblast**
118:5,8
**fibrosis**
3:14 24:14,15 33:18
42:17 80:5,17,21,23
80:24 82:7 84:5
106:3 107:5,9 110:6
117:3,6,14 118:2,3
118:4,11 119:4
142:25 143:13,22
144:20 145:7
165:18 167:13
173:13 181:22,24
182:2,4,11 220:18
237:1,13 238:8,9
241:24 244:5,7
**fibrotic**
85:3 108:18
**field**
114:13 160:5,6 161:7
236:1 245:19 246:2
**figure**
81:1 161:18 168:14
168:17,21 169:19
169:25 170:2,6
171:6,12,25 174:6,9
175:14,21 176:10
176:18 178:17

179:17 246:20
**figures**
194:19
**figuring**
30:5
**find**
28:4 111:14 162:24
203:12,13 248:23
**findings**
194:12
**fine**
109:18 196:10 212:2
224:22
**fine-tuning**
48:12
**finished**
250:21
**first**
6:6 8:2,16 13:1 15:9
26:15 43:17 45:10
63:17 66:23 67:11
67:16 68:21 70:24
81:3,5,19,24 82:3
82:10 85:9,11,20,25
86:16 91:17,21 92:4
92:15 93:14 94:9
116:3 131:18 143:7
144:3 146:16
154:11 158:7,15
159:25 165:10,18
172:6 177:8 202:18
207:18 209:6,10
216:14 218:13
221:3 229:1 233:13
**five**
39:6 49:3,6 76:16
220:17 245:17
**fix**
107:12
**flip**
61:5 209:11 235:24
**flipped**
157:5
**flipping**
194:20
**flow**

106:16,24,25 110:1,5
110:6 236:22,22
**flowing**
107:4
**folks**
31:4
**follow**
152:13 230:13
**followed**
42:11 207:19 209:7
230:23
**following**
38:3 186:10 241:22
**follows**
6:7 25:17
**follow-up**
164:9 230:5 248:6
**footnote**
12:21 13:3,16 14:4,5
**footnotes**
12:19 13:14
**forced**
90:20,21 139:19,22
140:2,5,7,15
**foregoing**
258:4
**forget**
195:23
**form**
9:6,17 10:4 16:4,16
17:7 18:3,13 19:5
19:16 20:11 25:8
27:1,22 28:17 29:8
29:24 31:16 32:15
33:2,9,24 34:11,19
35:12,18 36:15
37:10,20 38:5,14,23
39:9,17 40:6,22
41:15,22 42:6 43:6
43:14,20 44:10,19
45:7,14,19 46:4,19
47:5,19 48:8,23
49:17 50:8,16 51:4
51:9 52:10 53:5
54:17 56:2,20 57:4
57:13 59:2 60:9,14

60:22 61:18 62:14
63:3,10 65:3,12,18
66:3,20 67:13 69:4
70:2,16,21 71:13,19
72:11,24 73:7 74:19
76:1,24 77:25 78:9
79:11,22 80:12 82:1
82:22 83:23 84:18
85:16,17 86:2,21
87:1,6,13,22 88:14
88:23 89:11,20,25
90:15 91:12 92:3,17
93:4,17 94:11 95:9
96:1,24 97:6,16
98:1,13,25 100:2
101:21 102:10,17
103:4 104:13,21
105:18 107:22
109:8 110:21 111:1
111:25 112:11,21
113:2 114:17
115:21 116:7,24
118:23 119:5,18
120:5,14,24 121:7
121:15 122:4,16,21
123:6,10,25 124:23
126:4,13 127:6,16
128:16,23 129:4,12
129:17 130:1,7,15
131:1,6,12,25
132:11,18,23
133:10,16 134:1,11
135:6,14,23 136:5
136:21 137:2,15
138:3,13 139:4,18
141:10 142:3
143:24 144:21
145:2,25 146:12,19
147:6,17,24 148:6
148:13 150:17
151:9 152:3 153:7
154:16 155:1,24
157:10,19 158:13
160:18 161:4 162:5
162:10 163:4,23
164:19 165:7



166:18 167:1,11,17
168:1,20 169:6,22
170:8,19 171:14
172:5 173:11
174:10 175:6,18
176:22 177:7,11,22
178:13,24 179:8,13
180:11 181:5,10
182:14 184:7,9
185:2,15 186:12
187:8,23 188:18
190:12,25 191:10
191:20 192:5,13,24
193:14,17,24 194:9
195:1,14 197:12,25
198:2,7,21 199:9,17
200:8,19 201:20
203:18 204:17
205:2 206:5,21
207:5,11 208:13,25
211:3,11,16 213:5
213:15 214:4,14
216:7,25 217:17,21
219:5,12,15 220:2,8
220:23 221:11
223:3,13 225:10
226:6,20 228:1
229:14 232:5,25
233:22 236:14
237:9 238:4 239:11
239:21 240:1,7,14
240:25 241:4,11
242:5,6 243:16,22
244:14 245:6,25
246:17 248:19
249:14,23 250:17
251:10 253:12
254:23 255:12
**formal**
21:3,10
**formed**
28:12 217:25 232:3
**former**
156:19 235:21
**forms**
49:22 83:25 126:22

240:5 244:9
**formulated**
9:12 65:6 74:24
242:20
**formulation**
114:9 128:15 226:12
**formulations**
239:18,25
**forward**
18:7,7
**forwards**
69:17 255:18
**foul**
155:8
**found**
159:19
**foundation**
24:15,16 40:13 66:24
68:21 144:22
145:25 160:1 162:4
162:9 165:8 167:2
168:20 170:20
172:5 175:19
186:13 193:18
194:9 195:1 198:22
200:20 207:12
213:6,15 217:1,18
219:7,13 220:3
226:21 228:1
232:25 242:6
243:17 254:24
**four**
6:21 14:13 17:3
23:25 54:22 55:17
77:14 149:11 150:2
183:8 200:12
201:11 214:8
226:24
**four-week**
138:5
**frequent**
103:20
**frequently**
77:7 101:3
**front**
54:9 159:23 196:24

210:15 248:23
252:4 253:23
**full**
139:24 209:7
**fully**
107:7
**function**
16:10 79:1 135:25
136:3
**functional**
205:17 208:9 221:4
**functioning**
76:5
**funded**
232:22 233:2
**funding**
60:3 235:15
**further**
33:16 35:7 143:21
144:15 148:10
160:23 164:24
201:5 222:22 248:5
254:10 255:25
256:1 257:9
**FVC**
32:8,14,16,20 33:7
33:22 34:1,14 35:5
35:10,17,21,23
36:14 37:8,18 38:2
38:12,22 51:6,14
52:7 90:24 117:21
117:25 120:8
139:16,17 141:7
142:1 171:16,23
172:1,22 203:7,17
204:8,9,10,14,24
251:2
**FVCs**
202:4
**F5**
171:6,7

_____ G _____

**G**
5:1
**Gabriel**

2:16 6:1
**gain**
21:6
**gas**
55:18 107:3,12
109:19 110:3,9
181:17 206:24
224:8
**Genentech**
15:8 16:1
**general**
112:15 125:10 136:6
**generally**
9:4,10 15:4,18 16:5
24:4 27:10 46:8
58:10,16 59:1,4
89:10 114:19
125:13 126:21
133:18 163:11
**generating**
149:24 172:9 173:10
**gentleman**
8:10
**George's**
168:4 169:21 170:17
**gestures**
7:4
**getting**
36:6 128:2 156:25
174:17 251:13
253:5
**give**
7:3 12:23 42:15
65:20 69:5 72:13
122:13 202:6
203:23
**given**
42:3 115:18 122:18
123:17 132:8,12
157:14 192:22
204:15 226:9,12
228:23 258:6
**gives**
117:23 137:7 179:1
182:7 213:20
**giving**



35:24 101:18
110:16 113:8 163:6
185:22
**glance**
172:6
**go**
12:25 14:1,2,8 17:15
18:17 20:3 26:3,14
28:4,5,6 36:17
50:17 54:18 66:10
66:12 67:5 70:6
82:23 93:18 101:8
103:5,14 106:2
107:16 108:16
110:19 115:25
121:16,23 123:15
126:18,21 133:3
137:20 144:3
148:20,20 155:25
156:17 157:22
163:16 169:15
174:17,25 180:21
182:5 189:18 190:6
203:11,14,15 205:8
205:24 210:24
211:19,19 214:22
214:24,24 215:17
216:21 227:15
231:9 238:12,25
239:14 240:10
242:17 243:2,24
246:6 250:2,11
255:6
**goal**
200:11
**goes**
60:16 86:4 90:23
113:20 157:2 202:1
240:19 244:18
245:7
**going**
10:16 11:11 17:23
30:6,17 47:11 57:23
59:14 64:8 69:16
79:15 87:23 89:10
89:22 92:19 106:7

106:25 108:3,5,19
109:13,20 110:8,9
110:14,15 114:14
122:5 125:18
131:20 137:19
142:8,21 143:4
145:4 151:2 156:13
156:23 165:9,22,25
169:14 177:9
179:23 185:7
188:21 189:9,19
196:1,23 202:14
208:5 209:9,18
210:24 212:4
216:10 218:10
224:7 229:21
230:23,24 231:13
242:17 245:8
252:18 255:18
**good**
6:10,12 7:12 25:25
60:10 62:20 64:10
105:2,12 111:14
115:8 131:7 142:12
177:9 196:8 211:25
232:8
**GOODWIN**
1:19
**Googled**
134:23
**gosh**
12:23 100:21 137:17
210:23
**go-to**
89:8 96:6
**grab**
142:11,21
**gradation**
110:13
**grades**
30:13
**grant**
233:4
**grants**
60:4,7,20 61:7
**granularity**

183:12
**Granulomatous**
24:19
**gravitated**
21:4
**great**
101:3 223:21,22
230:17
**greater**
73:21 74:5,14 75:6
90:22 93:21,21
125:7,8 141:8 147:2
**grew**
152:15
**group**
25:18 26:18 35:19
36:4 48:20 49:9
53:21 55:4 57:16
58:15,16,16 59:15
59:17,21,21 76:12
76:14,18,18,18,18
76:19 77:12,13,23
77:24 78:2,4,8,8,12
78:13,16,16,19,21
83:12 86:5,6,10
89:6,23 90:1,6,12
90:18 91:6,24 93:11
94:3 95:20 101:14
101:15,19 104:23
104:23 105:1,8,12
105:13,17 106:8
114:5,19,21 121:12
121:13,25 122:2,13
122:23 123:8
138:17,19 149:8
151:23 163:21,22
183:3 196:3 197:9
197:10 199:7,23
201:3,4,7 204:11,12
204:15,16,25 205:1
205:18 208:10,14
208:17,20 212:7,22
213:3,4 217:9 218:2
219:8,19 222:11,22
226:5,18,19 227:23
227:24 228:10

238:16 244:17,23
245:8,14,16,17
246:11,16,16,22,22
247:5,6,12,13
**groups**
49:4,6 76:9,16,20,23
79:10 83:22 97:14
152:19 174:13
183:19
**guess**
16:24 29:17 235:24
242:16
**guessing**
128:18
**guesstimate**
85:6
**guidelines**
55:15 74:9 83:16
**guise**
74:24 76:5 86:13
**guys**
210:16

---

**H**

**half**
25:1 77:12 158:2
222:16
**halfway**
74:8 158:7
**halting**
156:11
**Han**
145:8
**hand**
7:4 185:25 255:14
**hands**
62:24
**handy**
250:10
**hang**
180:20 203:19
**happen**
71:23 96:22 97:3
111:3,17 198:25
199:1
**happened**

97:19 156:14
222:16 230:14,18
**happening**
97:1,8
**happens**
111:4 156:11 199:3
**happy**
105:21
**hard**
23:22 79:12 139:25
178:6 179:17
**harm**
36:7 48:16 155:8,17
163:9 184:17 188:9
**harmed**
103:19 161:17
**harmful**
41:11 106:17 154:20
159:5 163:7,12
164:11
**hazard**
53:12
**head**
7:4 121:17 159:15
**heading**
26:7 236:1
**heads**
159:11
**healthier**
112:14
**healthy**
112:7,13
**hear**
43:17
**heard**
43:7,10 45:2 72:6
95:12 151:15
**hearing**
63:18 99:22
**heart**
55:19 73:1,5 77:9
106:13 138:9
175:11,12,16
**held**
62:24 125:15 228:21
247:16

**help**
109:2 143:5
**helped**
67:25 68:20
**helpful**
163:8 213:24
**helping**
9:2 100:6 163:10
188:10
**helps**
47:7 137:4
**hemodynamic**
104:9,10,19 105:1,5
123:21 124:3,19
181:17 186:24
206:24 224:8
247:11
**hemodynamics**
86:7 103:1 104:1
205:17 208:9
**high**
26:18 58:17,18,25
59:3 125:5,6 182:21
183:2 184:13 185:6
201:4,8 222:8,9
251:19
**higher**
58:23 175:10
**Highlights**
209:12,19 210:2
**highly**
161:7
**High-dose**
228:25
**high-resistance**
129:10,14,16,25
135:18
**high-risk**
58:15
**historically**
69:22
**history**
42:13 68:24 69:1,16
69:25
**hit**
57:21 128:3 131:16

**hits**
53:23
**hoc**
31:11,14,20 32:7,13
32:22 35:9,17 37:2
37:6,13 38:22 51:5
51:21 52:2,9 53:3,6
54:1,7 56:11 117:20
118:14 146:3
149:21 173:5
**Hoeper**
158:15 162:3 164:7
**hold**
96:8 157:1 252:13
**holes**
173:3 229:19
**Homes**
16:20
**honest**
34:22 63:11 87:25
129:19 255:13
**Honestly**
54:5 70:22
**honeycombing**
118:6
**hope**
125:8
**Hopefully**
176:15
**hoping**
100:4
**horizontal**
156:6
**Horowitz**
8:11
**Hospital**
22:1
**hospitalization**
58:20
**hour**
30:14,16 64:8
**human**
78:24 119:22
**hundred**
46:21 54:10 96:9
97:20 106:24

134:25 158:18
209:2 255:19
**hurting**
36:3
**hypersensitivity**
84:4
**hypertension**
3:18 14:22 20:17,22
21:8,11,14,16,18
24:9,11 25:15,19,22
26:1 31:23 32:5
49:1,4,7,23 52:6,19
52:22,25 54:5,16
58:5 65:22 72:18,19
72:20,23 73:6 74:18
75:2,4,8,12 76:9
77:9,10,11,13 80:20
81:4,6,10,12 82:13
82:17,20 83:1,15
85:18 86:11 89:4,13
91:25 94:15,20,25
95:17 98:4 99:11
100:11 103:21
106:5 117:10 122:1
122:21 125:13
150:22 152:7,10
153:14 154:2 159:4
159:6 160:11
162:13 180:15,23
180:25 181:2,8,11
182:7,23 183:1,7,9
184:9,12,20 186:17
188:6 193:5,12
196:3 197:9,11
201:14 202:16
203:2 205:18
206:11,18 207:1
208:11,14 212:8,23
215:24,25 216:13
217:9 218:2,5,12
219:9,19 224:5,10
229:1 232:18
237:19 238:20
241:24 242:16
244:8,17,20,24
245:11,12 246:3,7,9



246:11 249:10,19 251:17,18 252:21
**hypothesis**
118:17 149:23 172:9 173:9 228:5
**hypothesis-generat...**
118:16 164:6 173:4,7 219:17 222:20
**hypothesize**
136:10 177:24
**hypothesizing**
163:5
**hypothetical**
178:19 191:20
**H-o-3-p-e-r**
158:16

**I**

**idea**
62:20 119:10 130:2 135:24 137:8 179:3 230:15
**ideas**
52:12
**identification**
10:12 11:6 143:3 145:11 153:17 165:13 166:2 179:22 189:8 196:7 202:23 209:17,24 210:10 216:19 218:17 224:16 228:20 233:12
**identified**
165:24
**identifies**
22:5
**identify**
58:15 66:18
**idiopathic**
3:14,17 33:15,18 42:17 81:12 82:7 142:24 143:12,22 144:19 145:6 153:12,25 165:18 167:13 241:23

**IDL**
87:19
**III**
212:8
**IIP**
154:4,7
**ILD**
57:11 81:1,2,25 82:4 82:7 83:19,21 84:14 87:12 88:12,21 89:18 90:14 94:17 95:1 98:3,9,15,19 116:21 161:20 178:11 208:18 217:4 218:3,7 220:13 223:21 228:8,11 230:15 238:14,15,17 244:9 245:3,10,22
**ILDs**
83:12
**illustrations**
243:14
**illustrative**
243:8
**iloprost**
94:10,14,19 95:13 121:19 206:25 224:9 226:9,25
**image**
134:23
**imagine**
128:8
**imaging**
55:16 138:8
**imbalance**
114:21
**immediate**
26:18
**impact**
102:8 117:9 120:11 138:21 144:18
**impacted**
99:24 103:1
**impacting**
116:6

**impacts**
106:20
**impaired**
107:13
**impairment**
78:24,25 247:11
**implemented**
76:4
**impose**
188:9
**impossible**
246:19,24
**improve**
205:17 208:9 212:25 231:16
**improvement**
36:14 37:8 38:7 102:20 104:12 116:22,25 117:24 118:2 123:22 124:5 124:21 136:18,24 137:13 140:4,8 147:2,14,22 148:3 153:5 168:7,8 169:5 199:16 208:16 221:4,8 229:17
**improvements**
38:2 104:10 231:11
**improving**
138:25 193:4,10 248:17 249:9,18 250:7 251:2,8 252:20 253:7 254:21
**imputed**
173:18
**inactive**
22:10,12
**incidence**
138:18 139:12
**include**
26:10 167:16 176:24 184:10 220:21 238:19
**included**
83:24 91:4 120:8

201:17 230:20
**includes**
11:21 181:3 193:10 218:3 220:1 228:11 252:20
**including**
24:9 31:4 33:14 227:2 237:7 242:4 259:8
**inclusion**
29:11
**Incomplete**
191:20
**incorrect**
13:23 30:11
**increase**
28:8,12,22 29:1,7,15 29:23 30:21,25 31:6 31:11,15 32:1,14,25 33:6,21 36:14 37:18 38:4,12 39:5,14 40:4 43:3,11,18 44:7 45:18 46:10,13 46:17 47:4 51:7,22 52:3,16 54:3 56:25 58:13 65:1,5,16 66:2 68:16 73:12 74:23 75:21 76:3 83:20 84:15,22 86:24 87:14 88:6,13 88:25 89:19 91:20 92:2 93:2 95:25 96:15,23 99:2,6,10 99:13,19,23 101:9 101:14 107:21 108:22 112:19 116:3,12,18 117:13 118:15,20 119:2,12 120:2,10,21 122:14 123:4,9 138:17 139:11 141:6 151:6 152:2 177:10 194:7 194:13,24 195:6,8 195:10 197:23 201:10,19 203:4,8 216:24 217:7 219:3



219:3,13 223:2,18
225:7,25 231:9
**increased**
100:23 111:22 126:2
126:11 138:7
195:21 200:11
**increases**
101:11
**increasing**
236:22
**independent**
118:13 119:11
**independently**
132:21
**indicate**
73:5
**indicates**
28:15
**indication**
41:9 212:5
**indications**
216:6
**indicative**
104:11 123:21
**individual**
29:16 71:24 101:16
128:7 137:23
138:15,20 141:18
142:7 223:16
**individuals**
155:9
**induce**
136:13
**infection**
55:19
**infer**
152:21
**infiltrates**
55:16 138:7
**infiltration**
80:3
**inflammation**
80:6 244:5
**inflection**
178:10,18
**influenced**

160:5 161:12
**inform**
103:2 137:13
**information**
15:18 137:11 209:12
209:20 210:3
**informing**
156:25
**infringe**
70:9
**infringement**
70:14
**inhalation**
130:5,12 131:24
132:4,10,22 133:8
209:13,21 211:9
215:3 240:1
**inhalative**
181:19
**inhaled**
32:19 33:8 35:25
36:6,12 37:21 38:3
48:16 49:12 50:22
53:13,17,22 56:4
57:3 58:25 59:7
65:20 75:16 85:21
86:1,18 87:4,10,18
88:11,20 89:7,16
90:12 91:18,22
94:19 95:7,12,13,24
96:13 100:8 101:10
104:2 107:20 108:1
108:2 112:6,18
114:13 115:1,19
116:20 117:12
118:12,20 119:3
120:3,11,22 121:19
122:8 127:1 185:13
186:10 187:6,20,25
188:15 190:10
191:5,15 192:9
193:22 194:22
196:2 197:8 198:14
199:8,24 200:6,16
202:16 203:1
204:12,15 205:16

206:11,17,25 208:8
211:2 213:11,25
216:12 217:12,15
217:22 218:11
219:20 220:15
221:9,24 224:9
225:14 226:4 228:5
228:14,25 229:12
232:4 240:4,15
241:8
**inhaler**
62:11 63:2 127:8,12
129:3 131:24 132:9
133:25 134:6
**inherent**
140:6 230:21,25
**inhibitor**
123:15,17
**initial**
20:15,21 32:24 33:6
33:20 37:5,9,12
65:1 68:20 197:19
**initially**
22:16 35:23 114:5
172:22
**initiate**
231:19
**initiation**
99:14
**injunction**
11:10
**Inova**
21:25 22:2,6,14,20
22:25 23:15 24:3
**inpatients**
165:17 208:10
**input**
20:1 39:21 40:2,10
48:13 65:11 66:22
67:17 71:2
**inspiration**
139:25
**instances**
102:7 105:3,5
**institution**
60:17 64:6

**instructs**
7:16
**insufficient**
56:12
**intend**
164:18
**intended**
243:9
**intent**
149:6,14,15,15
**intents**
202:10
**interactions**
16:11
**interchangeably**
246:8
**interested**
257:12
**interesting**
35:6 63:19
**interests**
59:8
**interface**
109:23
**interlaced**
107:5
**intern**
82:8
**international**
207:2,19 224:11
**interpret**
238:18
**interpretation**
176:14,25 238:21,22
**intersect**
178:4
**intersects**
80:1
**interstitial**
3:17 20:16,21 21:7
21:10 24:13 25:20
25:22 26:1 33:16
36:1 55:8,12,14,22
56:1 57:2 58:6
65:23 79:20,20 80:7
80:10,19 82:4,11,14



82:18,21 83:1 84:2
85:3,4 86:12,18
88:2 89:3 93:8
94:20 95:16,19
99:12 105:9,21
127:20 138:1 152:7
152:11 153:12
154:1 162:14
180:23 184:11
193:6,12 202:1,4,12
202:17 203:2
212:24 215:25
221:19 236:6,8,12
236:24,25 237:6,14
237:17,22 238:1,11
244:6 249:10,20
252:22
**interstitium**
79:23 80:2,4
**intertwined**
179:16
**interval**
176:13 230:7,8
**intervals**
174:22 176:11,24
**intravenous**
241:22 242:14
**intravenously**
122:20
**introduce**
209:18
**introduced**
208:24
**introducing**
233:6
**invalidated**
183:24
**invariably**
169:14
**invasive**
104:6
**invention**
236:4,21 239:3,18,25
243:9
**inventions**
243:15

**inventors**
234:2 254:4,7
**investigating**
49:11
**investigator**
61:23
**involved**
8:23 16:24 21:13
23:5 29:9 30:5
61:19 68:15 79:9
106:16 232:14
235:11
**involvement**
28:16 29:22 61:16
**involves**
249:18
**involving**
143:21 144:15
235:17
**in-person**
9:24
**in-preparation**
51:12
**IOTF**
182:3
**IOVPH**
26:2
**IP**
41:8 68:10 103:14
**IPF**
26:17 84:2 94:15,16
144:16 150:24,24
242:15
**IPH**
243:22
**irritation**
136:9
**Irvine**
2:7
**issue**
16:6 111:9
**issued**
26:24
**issues**
157:8
**iteration**

19:1
**iterations**
22:15 255:17
**IV**
122:8,12,17

## J

**J**
1:17 254:7
**Jamboree**
2:6
**January**
18:21 92:12
**Jdavies@cooley.com**
2:21
**Jeffs**
235:18,19,20,21
**job**
224:21
**jobs**
80:25
**jokingly**
77:12
**Jonathan**
2:13 5:19
**Journal**
92:11 143:13 146:5
150:7 158:18
165:19,24 166:6,24
202:15 203:3 207:2
207:9 219:2 224:11
225:6
**journals**
178:16
**judging**
16:23
**judgment**
247:12
**July**
209:13 211:5
**jumped**
159:20
**June**
92:11 145:9
**justification**
221:24 223:1,12,18

223:20,23 224:4
225:14 226:4,18
227:22 228:13
229:11 232:3
**justify**
217:15

## K

**keen**
77:15
**keep**
10:22 13:4 17:21
23:22 24:1 125:17
250:10
**kept**
74:4
**key**
103:11
**kind**
29:18 69:3 77:16
81:1 83:13 115:11
152:21 173:13
178:5 188:7 208:15
251:21
**kinds**
83:7,11,21
**Kishan**
229:1
**knew**
87:15 227:13 235:6
**knock**
162:23
**know**
9:1 14:11 18:15 36:2
40:11 42:22 46:8,15
49:10,18 57:24
59:14,15 62:18 64:5
65:15 66:5,8,13,23
67:6 68:13,19 75:18
78:11 79:14 81:20
87:23 88:4 90:9
91:2,15 92:19,24
97:22 100:3,7,12
101:5,7,17 103:15
106:17,18 108:19
108:21 109:2 112:1



112:3,23 113:7,15
113:17,20,22,23,25
115:6 118:1,14
120:6 124:12
125:24 129:6 131:4
131:10,13,17,19
132:13,20 133:1,21
134:21 138:21
140:9 150:20
152:24 153:2,4
155:6 159:20,24
160:2 173:16,25
174:25 177:23
178:2,19 181:13
183:4,8 184:14
185:9 186:20
188:20 190:1
197:15 198:1,12
201:6 205:11 210:7
212:17 222:25
223:5 225:20
229:22 230:17
231:11,14,22,24
232:1,2,9,21 234:5
234:8,9,17,18,24,25
235:4,18,19 236:18
241:19 242:7,16
243:25 246:9,23
250:21 254:17
**knowing**
46:21 209:3
**knowledge**
19:22 46:2 135:3
**known**
47:23 73:13 88:7
**knows**
160:11 246:3
**Kolb**
165:19
**Kun**
47:2

**L**

**label**
134:15,19 210:12,19
210:20 211:1,8,15

212:14,20 213:2,11
213:13 214:1,2,24
215:10,18,21 216:4
**labeled**
36:8
**labels**
212:21
**lack**
48:15 97:13 186:13
**laid**
67:18 118:3 159:25
162:3
**Lan**
224:10
**language**
95:6,14,23
**large**
71:20 101:14,15,19
138:16 139:1
**larger**
57:9 148:5 222:22
**late**
81:8,18 244:8
**lattice**
79:24
**lawsuit**
69:18
**lay**
68:20 162:9
**layer**
105:20
**lead**
160:10 161:18,24
**leader**
160:4 161:7
**lean**
111:13
**leaned**
66:8
**leaning**
222:10
**leave**
231:19
**led**
44:4 46:22
**left**

55:21 56:4 252:6
253:16
**legal**
5:14,15 67:8,12
70:15 243:17
**legalese**
66:24
**legend**
181:24
**Leigh**
45:17 46:2,13
**let's**
64:13 99:5 106:9,10
107:1 134:15 176:1
183:4,5 203:21
211:19 230:10
247:14 248:22
249:3 250:2,10,11
253:17
**level**
113:23 175:10,11
179:4
**levels**
175:3 176:18,19
**Lewis**
162:1 254:2,7
**likelihood**
125:7
**limit**
237:25
**limitations**
222:24 243:10
**limited**
192:15,16 214:17
222:13
**limits**
62:6
**line**
22:16,17 56:10 69:9
92:9 107:4 117:21
117:21,25 181:21
182:6 247:3 259:13
**liquid**
240:1,5
**Liquidia**
1:8 5:6,20,25 10:14

11:2 70:9 235:4,4
235:23 259:3
**Liquidia's**
63:21
**LIQ-861**
63:18
**list**
16:13 50:3,7 51:1
122:6 182:8
**listed**
63:25 234:2 259:10
**lists**
254:4
**literature**
66:7 80:11 82:24
83:3 88:16 115:12
227:12 242:11
**litigation**
15:1,2 17:12
**little**
48:25 71:4 75:2 78:2
90:25 121:23
123:12 133:19
134:18 139:6
157:23 181:21
182:20 194:15
235:3 246:23
252:12
**liver**
16:10
**LLC**
5:12
**LLP**
1:19 2:12
**local**
108:20
**lock**
79:24
**locked**
44:15,21 45:4
**long**
23:25 101:22 152:18
235:6
**longer**
152:20 173:20
**long-term**



152:25 156:15 227:9
**look**
34:1,2,4,21,25 35:1,5
35:10 36:16,23
42:16 61:11 67:23
78:17,20,22,23 79:1
89:23 90:2 137:6
139:1 149:10 155:5
156:5 166:21
167:19 172:11,20
181:13 183:2,4
186:19 189:23
193:3 194:18,20
195:2 199:5 203:15
210:8,21 213:1
216:2 219:22 221:2
230:1 235:25
236:17 241:15
242:13 247:9 249:6
253:17 254:16
**looked**
32:16 33:14 34:6
35:21,23 66:6
155:16 157:6 225:5
**looking**
13:4 34:14 52:5 55:2
58:12,13 59:5 94:14
146:16 151:19
168:23 171:22
182:15 188:2 195:7
204:7 205:10 219:7
230:4 233:14
**looks**
17:18 26:6 67:7 68:3
149:12 150:8
155:15 174:22
199:12 203:23,24
207:16
**lost**
30:14,15,16
**lot**
12:24 45:22 67:3
71:22 73:10 79:19
106:7 124:14
160:19 172:18

173:3 195:3,5
207:17 214:18
224:20 234:6 247:4
251:11
**lower**
58:15 100:9 103:6,7
159:4 175:11
184:13 185:7 186:5
251:20
**lowered**
73:21
**lowering**
100:13 107:16
**lowers**
103:17
**low-resistance**
129:22 135:20
136:11
**Loy**
2:24 5:13
**LTI-301**
61:17 63:8
**lunch**
125:18 142:10
248:14
**lung**
20:14,16,18,21 21:8
21:10 22:4,4 24:6,7
24:8,13 25:21,22
26:2 36:1,5 49:22
55:8,12,14,22 56:1
57:2 58:6 65:23
77:8 78:3,14,25,25
79:2,20,21,24,25
80:7,10,18,19 82:4
82:11,14,18,21 83:2
84:10 85:3,4 86:7,9
86:12,14,18 88:3
89:3,12 90:3,8 91:1
93:8,10 94:20 95:16
95:19 98:5 99:12
100:9 105:10,21
106:3,9 107:15
108:4,6,16,18
109:24 110:4 111:4
112:8 114:16,20,22

115:5 122:23
127:20 138:1 152:8
152:11 160:8,12
162:14 180:23
184:11 186:5 193:6
193:12 198:16
201:5 202:1,3,5,12
202:17 203:2
206:12 212:24
216:1 218:6,12
221:19 230:3 236:6
236:8,12,24,25
237:6,14,17,22
238:1,11 240:22
244:4,6,7,22 245:13
247:9 249:11,20
252:22
**lungs**
80:2 106:8 109:21
110:3 251:19

---

## M

**M**
198:11,12
**Magna**
5:14,15
**mail**
137:21
**main**
156:5,7,14 177:25
**maintain**
107:2
**major**
84:3
**majority**
118:19
**making**
79:3 102:2 155:7
184:13 251:19
**malpractice**
15:6 16:14 17:13
**managed**
231:2
**manifest**
100:14 202:8
**manifestations**

100:20
**manifested**
80:6 105:7
**manuscript**
208:1 209:7
**man-made**
77:16
**March**
1:11 5:9
**Mariana**
218:13
**Mario**
159:22
**Marius**
158:15
**mark**
196:1
**marked**
10:11,13 11:5,7
143:2 145:10
153:10,16 165:12
166:1 179:21 189:7
196:6 202:22
209:16,23 210:9
216:18 218:16
224:15 228:19,24
233:11
**market**
105:6
**marking**
142:22
**Martin**
165:19
**match**
110:15
**matching**
109:20
**material**
218:24
**math**
30:11
**matter**
1:15 5:5 8:4 13:24
15:19 16:6 59:12
80:4 116:19 258:7
**matters**



maximum
190:5 214:7
**McDermott**
2:4 5:24
**mean**
19:7 22:12 34:24
58:18 73:14,20 74:4
74:11 75:5,12 77:4
77:5 93:20 103:6
117:15 164:18
171:8 182:19 185:8
186:15 187:11
199:6,10 201:9
227:2 237:13
244:25
**meaning**
227:8
**meaningful**
140:25 141:2,3
**means**
122:19 144:13 227:5
251:18
**measure**
35:24 103:25 104:1
126:2 167:23
173:14 230:4
**measures**
34:9 55:2 126:11
**mechanisms**
117:16
**med**
15:6
**medical**
10:9 16:14 17:12
20:10 22:3,5,22
23:4,16,18 66:17
67:5 68:4 81:14
**medication**
35:25 81:21 96:6
99:20 101:4 102:2
163:7 185:23
188:22
**medications**
163:11
**medicine**
23:9,17 27:4 32:10

42:10,13 92:12
137:18 143:14
150:7 165:20 166:6
166:25 202:15
203:4 207:9 219:2
225:6
**medicolegal**
15:5
**Mee**
16:13
**meet**
27:15 31:9 143:17
234:6
**meeting**
99:17 159:15 160:16
161:2 207:19
**meetings**
9:24
**meets**
155:14
**member**
26:16 28:7,16,21,25
42:2,8 47:16 48:4
**members**
28:23 29:22 39:7,11
39:16 40:17,19 44:3
45:24 222:17
225:24 231:25
**membership**
26:11 31:6 47:14
**mention**
51:24 99:9 186:15
188:7 195:20
242:21,23 251:21
253:7
**mentioned**
17:8 23:7 39:5 55:6
58:11 64:25 66:16
68:7,12 76:15 83:6
84:8 94:23 96:6
97:24,24 121:17
122:7 123:13,14
135:17 142:4 146:6
150:11 157:5 162:2
181:7 203:6 244:18
**mercury**

73:22 74:6,12 75:6
75:14
**met**
234:7 235:16
**meters**
147:1 151:7 199:12
199:13 230:17
231:4
**method**
34:17 180:9,14,19,22
180:24 181:2 184:5
184:25 193:4,10
249:8 252:20
254:20
**methods**
148:19,20 200:3,4
205:14 239:3
**mic**
195:15
**Michael**
234:5
**micrograms**
186:25,25 187:1
190:4,10,17,23
191:4,6,15,15,17
192:2
**middle**
197:19
**mild**
31:22 52:18,21,24
53:3 54:4,16 55:23
57:10,17 125:12
**milliliters**
33:12 34:3 73:15,22
74:6,12 75:6,14
204:14
**mind**
10:18 60:1 64:13
83:10,16 98:18
100:17,25 102:5,6
103:2 104:11
105:15 165:3
177:18
**minor**
13:21 14:4,4
**minus**

174:18 176:12,12,25
**minute**
12:23 54:11 203:23
**minutes**
125:19 230:8,9
**Mischaracterizes**
187:23 192:5,13
201:21 241:12
**misconception**
246:5
**misheard**
19:12
**mismatch**
109:5,11,25 110:14
110:18 111:8 112:9
**missing**
173:24 174:2 213:19
222:13,19
**Misstates**
240:7
**mistake**
30:10 215:16 253:8
**mistaken**
14:13
**mistakes**
12:14
**mix**
76:22 77:1,4 78:7
79:9
**MLs**
204:8,10,19
**modality**
162:12
**model**
63:2 215:6
**models**
119:20
**moderate**
91:24 125:12
**moment**
54:9 60:2 69:5 72:13
252:15
**money**
60:7,16
**monitoring**
104:3 155:5,13



156:11,24
**months**
155:14
**Moore**
1:17,21 5:15 257:2
257:17
**Moreau**
61:21
**morning**
6:10 64:25 71:6
**mortality**
58:19 149:7 157:3,4
**motion**
11:9
**move**
142:9 203:22
**moved**
235:3
**moving**
49:19 194:17
**MPAP**
93:20
**Multicenter**
61:7
**multiple**
100:19 114:2
**multiply**
191:22
**muscle**
202:7
**M.D**
1:13 6:4 11:9 202:19
259:24

_____
**N**
**N**
1:19 5:1,11 221:15
**nagging**
224:24
**naive**
115:11
**name**
8:11 26:21 47:22
**names**
9:15 16:23 17:1 68:1
**narrow**

75:23
**nasal**
224:25 227:1
**Nathan**
1:13 3:2 5:5 6:4,10
9:7 10:13,15 11:8
11:14 13:20 19:23
20:3 69:9 145:4
154:10 202:18
228:23 247:25
248:10 258:10
259:24
**natriuretic**
174:12 175:4
**nature**
13:19
**near**
143:16
**nearly**
151:7
**nebulized**
114:9 127:4,7,12,24
128:14 211:2,8
213:13 214:3
215:14
**nebulizer**
133:7,18,20 195:24
**nebulizers**
133:22
**necessarily**
42:15 45:25 49:24
67:16 103:22
105:14,16 135:25
199:1
**necessary**
255:22
**need**
7:14,19 25:3 36:23
64:11,12 71:17,20
75:8 104:7 107:3
109:20 139:1 146:6
160:23 185:25
188:19,22,25
200:25 211:24
231:5,17
**needed**

143:20 188:12
**needle**
246:25
**negative**
27:12,13 35:2,3
41:10 42:10,14
94:18 107:17
161:16 164:14
224:1 228:16
**network**
79:25
**neutral**
185:8
**never**
62:24 63:23,24 64:4
77:15 96:5 129:18
131:16 133:24
134:5 135:12
161:20,21 235:9
**new**
50:21 74:3 81:7
92:11 93:19 143:13
146:4 150:7 165:19
165:24 166:6,24
173:21 202:14
203:3 207:8 219:1
225:6
**night**
30:14,16
**NIH**
233:3
**nine**
29:17 30:11 128:1
140:20 214:8,20
220:16
**nintedanib**
165:11,15 167:14
171:17,20,22 172:2
172:3,20 174:14
175:15,16
**NJM**
228:10
**nods**
7:4
**nomenclature**
81:11

**normal**
106:9 107:6
**normally**
224:21
**notable**
58:20
**Notary**
1:17
**note**
80:19 124:11 193:16
201:2
**noted**
258:8
**notice**
1:16 3:9 10:14,15
96:15
**notion**
185:22
**notional**
119:10
**NT-ProBNP**
53:20,23
**number**
5:4 9:18 25:24 34:2
51:20,25 52:3 57:18
57:25 61:11 79:12
97:12 108:2 109:5
140:11 141:16
142:22 143:1 147:8
149:25 172:11
176:24 189:12
194:19 195:19
196:2,5 201:23
202:19 207:16
209:14,22 216:15
218:14 224:12
229:2 233:8 248:23
**numbers**
53:7,8 56:8,12,22
57:15,20 117:20
149:24 153:20
157:4 165:20 180:1
182:25 210:4
231:11 233:9 253:5
**numeric**
204:18



**numerically**
84:20 149:10,13
156:9 187:14
**numerous**
31:20
**NW**
1:19 2:17 5:11
**NYHA**
212:8

**O**

**O**
5:1
**oath**
6:23,23
**obesity**
202:8
**object**
7:13 9:6,17 10:4 13:5
16:4,15 17:7 18:3
18:13 19:5,16 20:11
25:8 27:1,22 28:17
29:8,24 31:16 32:15
33:2,9,24 34:11,19
35:11,18 36:15
37:10,20 38:5,14,23
39:17 40:21 41:21
43:5,13 45:19 46:4
46:18 47:5,18 48:7
48:22 50:8,16 51:4
51:9 52:10 53:5
54:17 56:2 57:4
59:2 60:9,14,22
61:18 62:14 63:3,10
65:3,12,18 66:3,20
67:13 69:4 70:2,16
70:21 71:13,18
72:11,24 73:7 74:19
75:25 76:24 77:25
78:9 79:11,22 80:12
82:1,22 83:23 85:16
86:2 87:6,13 88:14
89:20 90:15 91:12
92:3,17 93:4,17
94:11 95:9 96:1,24
97:5 98:1,13,25

103:4 104:13
105:18 107:22
109:8 110:21 111:1
112:11 114:17
115:21 116:7,24
118:23 119:5,17
120:5,24 123:6,10
124:23 126:13
127:6,16 128:16,23
129:4,17 130:1
131:1,6,12,25
132:11,18,23
133:10,16 134:1,11
135:6,14 137:15
138:13 139:3,18
142:2 143:24
144:21 145:2,24
146:12,19 147:6,17
147:24 148:6,13
150:17 151:8 152:3
153:7 154:16 155:1
155:24 157:10,19
158:13 160:18
161:4 162:5,10
163:23 164:19
165:7 166:18 167:1
167:11,17 168:1
169:6,22 170:8,19
172:4 173:11
174:10 175:6,18
177:7,11 178:13,24
179:8,13 182:14
185:2,15 186:12
190:11,25 192:24
193:14,24 194:8
195:14 197:12,25
198:2,7,21 199:9,17
200:8,19 201:20
203:18 204:17
205:2 206:5,21
207:5,11 208:25
211:3,16 213:5
214:4,14 216:7,25
217:17 219:5 220:2
220:8,23 221:11
223:3,13 226:6,20

229:14 232:5
233:22 240:25
241:4,11 242:5
243:16 244:14
246:17 254:23
**objection**
39:8 40:5 41:14 42:5
43:19 44:9,18 45:6
45:13 49:16 56:19
57:12 84:17 86:20
86:25 87:21 88:22
97:15 100:1 101:20
102:9,16 111:24
112:20 113:1
120:13 121:6,14
122:3,15 123:24
124:7 126:3 129:11
130:6,14 135:22
136:20 137:1
140:18 141:9 163:3
168:19 171:13
176:21 177:21
180:10 181:4 184:6
187:7,22 188:17
191:9,19 192:4,12
193:17,17 194:25
211:10 213:14
217:24 219:14
225:9 227:25
232:24 236:13
237:8 238:3 239:10
239:20 240:6 245:5
245:24 248:18
249:13,22 250:16
250:22 251:9
252:23 253:11
255:11
**objections**
69:6 72:14 189:4
**obliterated**
106:12
**obliteration**
106:5
**observation**
35:6
**observed**

203:7
**obstructive**
49:2,8 206:19 207:2
216:14
**obvious**
115:10
**obviously**
230:22 248:5
**occasions**
28:1
**occupational**
84:10
**occur**
133:1 177:25
**occurring**
127:15
**odd**
163:8
**offer**
180:4
**offered**
39:22 184:3
**offering**
183:23 184:1
**office**
259:9
**offices**
1:18
**off-label**
88:7 95:5
**Oh**
12:23 210:23 216:21
**okay**
6:10 7:1,18,22 12:23
13:3,17,22 14:8,21
15:3 17:15 18:23
21:2 22:10 23:8
24:24 28:11 31:5
38:18 39:14,21
41:18,25 49:6 50:4
61:5 63:7 87:4 97:3
102:14 104:25
110:25 117:12
130:4 131:10 134:9
135:2 144:5 147:7
149:5 157:7 162:8



165:14 166:10
168:12 178:22
179:11 181:1
189:22 190:5,22
192:1,21 196:15
209:9 210:13 212:4
212:13 215:1,12
227:18 230:12
236:20 239:16
240:12 241:18
247:15 248:4 249:5
250:1 252:2,11,16
254:19 255:8
**old**
74:24 75:17 76:6
93:19
**older**
73:14
**once**
14:11 53:6 57:19
91:23 96:17 99:8
104:4 110:13 117:6
123:17 169:11,17
173:16 186:21
187:9 188:8 205:11
212:17 217:3
229:19 231:12
236:18 241:19
243:25 254:17
**ones**
84:25 125:3 230:20
230:23
**one's**
185:21
**one-third**
79:14 107:8
**ongoing**
31:12,15 35:8 44:16
**onset**
228:3
**ON-100/7**
215:6
**open**
80:23 189:20 252:8
**open-label**
148:25 156:16,21

**operating**
182:24
**opining**
250:24
**opinion**
33:5 37:7 70:15,17
76:17 83:19 98:12
107:19 111:19
112:17,25 123:20
124:3,19 129:9
130:4 135:18
155:21 184:4,23
186:8 187:4 217:14
217:22 221:22
225:13 227:21
229:10 251:6
254:19
**opinions**
180:4 183:23 184:1,3
245:21
**opportunity**
42:9 110:3 190:2
**opposed**
106:8
**opposite**
110:4
**optimistic**
43:3,11 45:11 177:9
**OPTINEB-ir**
215:6
**oral**
110:17 210:3
**orally**
111:20 115:18
157:15
**order**
78:15
**organize**
22:15
**original**
251:22 255:16
**originally**
149:8
**outcome**
27:10 55:2 58:23,23
143:18 167:24

179:6 257:12
**outcomes**
52:5 126:19 150:5
170:23 177:20
178:1,11 179:19
**output**
107:2
**outputs**
106:14
**outside**
176:12
**overall**
106:20
**overlaid**
77:10
**overlap**
192:15,19,20,25
**overlaps**
200:16
**oversee**
24:6
**overseen**
79:9
**oversight**
14:16
**overwhelmingly**
52:14
**Oxanna**
64:7
**oxygen**
110:20
**oxygenated**
107:8
**oxygenation**
111:15 138:6

---

**P**

**P**
2:5 3:12 4:4 5:1 35:4
147:1 174:15,25
176:5,6,8 199:18
204:20 205:5
221:12
**PA**
228:15
**page**

3:8 4:1 11:22 12:4,4
12:9 13:10,14 14:12
20:3,4 26:3,5,7,14
50:2,3,25 51:22
52:3 57:23 60:25
61:5,12 68:23 70:6
143:15,16 146:16
148:20 156:2
157:22 176:3
180:13 203:16
204:5,6 205:9,10,25
209:11 210:1 211:4
211:5 214:25 221:3
235:24 239:15
240:10 243:3
253:17 259:8,13
**pages**
23:25
**PAH**
36:4 77:23 86:14,17
87:11,19 88:12,21
90:13,18 91:6 93:6
93:11 94:3 106:8
114:19 122:23
201:7 212:22 213:3
214:16,17 244:8,16
245:2,14,15,17,22
246:7,10,16
**paper**
18:16 27:7,9 31:21
31:24 32:11 36:18
36:23 48:9,12 54:8
54:9,19,20 58:9,11
85:23 143:16
145:12,16 146:4,7
149:23 150:8 151:3
151:13 157:23
158:22 162:3
163:17 174:21
207:16,20,24 209:3
216:17,24 217:21
218:18 221:23
223:1,8,23 224:3,8
224:14 225:14
226:2 229:23
**papers**



18:15 82:24 88:16
208:12 222:6
**paragraph**
13:8 148:21 160:9
236:1,3,17 238:25
239:14,17 240:11
241:16 242:2 243:2
243:24 244:3
250:12,15 255:3,6,9
**paragraphs**
67:11,21
**parameters**
104:11 181:17
186:24
**parenchymal**
36:5 79:25 105:20
125:4
**parenchymally**
122:18
**Parikh**
229:1,7,10 231:23
232:22
**part**
9:2,21 14:16 59:16
63:8 85:7 90:14
91:14 94:12 102:23
104:2 112:17
157:12 208:17
217:2,21 218:23
219:7 224:21
**participants**
160:17
**participate**
110:20
**participated**
175:5
**participating**
110:9
**particles**
107:10 136:9,12
**particular**
89:16 132:17 194:16
228:7
**parties**
15:23 257:10,11
259:8

**parts**
49:20
**pass**
10:16 11:11,12 165:9
165:22,25 202:21
210:5
**passed**
11:15,20
**passing**
10:18 143:5
**patent**
14:25 15:2,21 16:6
17:11 68:19,24 69:2
69:25 70:10 179:25
180:3,8,9 181:3,7
183:23,25 184:5,24
185:12 186:8,20
187:18 188:13,20
189:11,14,19,20,21
190:1,8,9,15,19,24
191:5,8,16 192:1
193:10,21,21 194:6
194:18,24 195:18
200:18 233:7,21
237:4 239:8 240:3
241:7 242:3 243:14
243:15,25 248:16
249:1,17,25 250:3,6
250:24 251:1,7,8,15
251:23,23 252:4,20
253:4,6,10,17 254:3
254:16,20
**patentee**
16:2
**patents**
242:19 251:13
**pathways**
113:24
**patient**
26:2 53:4 54:15
56:24 57:9 64:4
71:11,24 72:3,9,22
77:22 81:1,5,25
82:4,6,11,12 84:15
85:10,21 86:17 88:1
90:23,24 91:18,22

91:23 92:16 93:1,1
93:16 95:15 96:14
98:22,23 99:20,24
100:7,21,25 101:16
101:22 102:8,18
103:13,23 106:21
111:5 113:17 116:5
116:10,11,13,19,23
117:1 120:4 122:13
123:23 124:6,22
126:19 128:8
130:21 131:15
132:24 136:7
137:11,23 138:15
138:20,24 139:24
140:4,16 141:18,24
142:7 151:16,18,24
152:1,5,10 155:11
157:9 162:18,22,24
163:8 167:9 170:22
181:16 184:21
185:1,4,5,18,20
186:3,10 187:20,25
188:10,10 193:5,11
199:2 219:24
220:20 226:5,19
245:2,4,8,22,23
246:13 249:9,19
252:21 254:21
**patients**
3:14 21:15,17 24:22
24:25 25:2,3,16,18
25:20,25 26:1 31:22
31:25 32:5 33:15,17
33:17,23 36:1,3,5
38:19 48:17 52:6,18
52:21,24 54:4,21
55:4,24 57:10,16
58:5,13,16 62:5,10
63:7,9,13,15,23
65:21 75:16,19 76:9
76:12,22 77:6,15,18
77:18 78:7 79:8
80:18 81:4 83:20
84:12 85:2 86:6,14
87:11,19 88:11,21

89:1,2,11,17,23,24
90:1,7,13 91:4,5,10
93:6 94:2,24 95:6
97:12 98:2,11 99:10
101:9,18 103:18
104:2,3 107:21
109:3 111:17 114:1
114:19,21,22 115:3
115:5 117:14
121:13 122:2,22,25
123:3,8 125:2 126:6
127:2,5,11,23 128:6
128:13 135:20
136:14,19,23 137:4
143:21 144:16,19
145:6,18,22 148:4
148:10 149:1,7,17
149:22,25 150:5,6
150:12,21,24 151:5
151:10,20 152:6,9
153:2,4 154:21
156:15,19,22
157:15 159:5
161:17 162:13,23
162:24,25 163:1,10
163:13 167:12,16
167:20 171:1
172:12,16,17,21,24
174:2 177:20 183:5
183:6,19 187:6
188:16 201:4,10,17
202:2,11 205:18
206:18,25 207:22
207:24 208:17,20
209:4 214:13
216:13 220:13,16
220:22 221:9,16,17
221:25 222:10,15
223:16 224:9
226:24 228:8 230:2
230:13,15,16,19,22
230:25 231:2,6,7,8
231:10,13,14,18
240:15,21 241:23
244:19 247:3
**patient's**



**HIGHLY CONFIDENTIAL**
LIQ_PH-ILD_00000771

132:21
**pause**
13:9 72:12 176:2
**PDE5**
123:15,17
**PDR**
182:23
**PDRs**
183:2
**pending**
7:21
**Pennsylvania**
2:17
**people**
9:19 78:17,19 83:14
114:25 159:19
160:2,6,20,21 161:9
161:12,13 173:19
234:6 245:19 246:6
246:8 253:24 254:5
**peptide**
174:12 175:4
**perceive**
102:2
**percent**
33:11 34:4,7 36:17
37:19 46:21 54:10
56:6 78:12 79:5,8
84:21 85:5 90:1,22
90:25 96:9 97:20
106:10,14,23,24,25
128:12,17 134:25
140:8,8,11,15,20,21
140:23,23,24 141:2
141:4,8,17,17,20
158:18 173:25
174:1 176:11,23
204:1,9,24 205:4
209:2 230:2 231:1
255:19
**percentage**
78:12
**PERFECT**
47:24 48:1 68:12
223:20 228:17
**performing**

137:12
**perfusion**
106:12 110:15
198:17
**period**
55:17 138:6 148:23
148:24
**periodically**
7:19
**periods**
148:22
**peripheral**
63:22
**permissible**
78:15
**person**
68:17 81:17 107:6
254:9
**personally**
41:7 60:19 88:19
140:16 162:18
**pertain**
52:7
**pertaining**
16:9,11 31:25 48:9
50:22
**pertinent**
13:25
**Peter**
30:3 44:1,2,14 45:3
46:15
**Peterson**
45:17 46:3,13
**PH**
26:18 28:7 47:16
48:19 49:12 53:3
55:23 57:10,17
75:22 76:15 79:8,10
88:2 89:17,17 90:1
90:6 97:14 98:8,15
98:20,23 99:25
100:6 116:6,20
117:2 118:21
120:12,17,23 121:2
121:12,13 136:23
150:18,24 160:5,7

161:7,19,20 163:22
167:19,21 175:5
177:19 178:10
179:4,5,18 184:10
199:23 214:13
217:13 222:22
224:4 225:19
226:18,19 227:23
227:24 230:3,15,16
234:11 242:4
243:22 245:16
246:7
**Pharma**
15:8
**Pharmaceutical**
61:7
**pharmaceutically**
236:5 239:4
**phase**
3:19 26:16 153:15
156:5,7,15 158:2,9
158:25,25 165:5
188:25
**phenotype**
89:6 91:24 93:7,12
94:3 95:21 201:7,13
222:11 246:22
**phenotypes**
201:12
**phenotyping**
151:16,18,25 152:1,5
152:11
**phon**
61:22 159:22
**phrase**
94:23 198:23
**physician**
234:20
**physiology**
110:12 202:3
**PH-ILD**
41:6,10 59:16,21
76:12 77:24 83:7,10
83:12,20,25 86:1
91:18,22 92:16 93:1
93:9,15,18,25 94:10

95:6 96:14 97:25
98:8,12,20,22,24
99:7,9,20,24 105:8
105:11 107:21
116:5 119:4 120:4
120:12,23 123:22
124:5,21 125:11
127:2,5,11 150:12
153:4 162:20 163:2
167:16 177:20
180:9 181:3 182:13
184:5 185:1,4,13
197:10 198:6
201:18 212:11,25
213:4 214:18
217:10,16,23 220:1
220:21 221:25
222:11 225:15,18
228:13 229:12
232:4 236:11 237:7
242:4 243:22
244:13 245:4,23
246:16 254:22
**PH-ILD-009772**
3:23
**PH-specific**
222:21
**PI**
64:2,5
**pick**
68:14 164:1
**picked**
14:15
**picture**
62:24 134:13,19
**pilot**
205:16 208:7
**pinpoint**
114:1
**pirfenidone**
26:17 68:10 152:18
**place**
109:20 257:4,5
**placebo**
32:21 37:22 59:6
101:8,11,24 102:14

102:20 131:18 141:12 147:3,15 149:12,14,17,19 150:2 156:9,19,20 156:23 169:5 171:22 172:3 174:16 175:17 186:24 194:22 204:16 205:1 231:10

**placebo-controlled** 3:18 148:24 153:15 154:3 165:5 189:1

**placebo-corrected** 38:8

**placed** 156:15

**plaintiff** 1:6 2:3 5:25 6:6 16:25

**Plaintiff's** 11:9

**plan** 47:9

**Plastiape** 63:1

**play** 151:25 152:1

**please** 5:17 11:13 17:16 19:23 20:3 249:4 250:12 259:6

**plus** 152:17 165:17 171:20,22 172:20 174:14 175:15,17

**pneumonia** 33:16 154:1

**pneumonias** 84:2

**Pneumonia-Associ...** 3:17 153:13

**pocket** 133:3

**point** 12:21 13:2 44:15,17

49:21 53:11,14 56:7 56:13 82:16 89:7 90:19 99:15 101:1 108:21 150:19 155:16 178:9,10,18 179:3 183:16 201:12 203:8 211:4 222:7 224:2 234:7 234:15 245:21

**pointed** 63:20 222:13

**points** 56:3 67:7,10 172:17

**Poms** 232:1,12,13,19,20

**Pond** 6:15

**population** 53:4 54:15 56:25 57:9 75:19 84:15 111:23 120:4 125:11 139:2 157:9 162:19 167:9 219:24 220:11,21 226:5

**population-based** 101:13 141:18 163:12

**portions** 10:2,8 66:17,18,21 70:19 112:8 114:16

**posed** 253:4

**position** 22:2,6 23:3,9 24:3,5

**positions** 22:19 23:12

**positive** 35:2 42:11,21 52:14 108:23,24 113:4,24 164:13 169:15,17 223:24

**possibility** 36:7

**possible** 71:9 91:13 111:2,3

112:13,22 118:10 179:9,18

**post** 31:11,14,20 32:7,13 32:22 35:9,17 37:2 37:6,13 38:22 51:5 51:21 52:2,9 53:3,6 54:1,7 56:11 117:20 118:14 146:3 149:21 173:5

**postgraduate** 20:5

**post-INCREASE** 95:15

**potent** 103:16

**potential** 48:16 52:23 138:8 217:8,10 222:21

**potentially** 100:13 162:12 201:6

**powder** 62:11 127:8,12 129:3 131:24 132:9 133:25 134:6 135:4 135:8

**power** 35:13

**powered** 35:5,9 121:5

**practice** 20:10 25:7 72:23 76:23 78:7 96:11 104:1 136:17 246:14

**practitioners** 114:13

**precapillary** 75:7 76:15,16

**predict** 104:19

**predicted** 33:11 34:5,7 36:17 37:19 204:1,9,24

**predicting** 58:4

**predictive** 124:4,20 125:1

**preface** 224:23

**preferably** 214:20

**preferentially** 112:7 114:15

**preliminary** 11:10

**premise** 65:19

**preparation** 9:16 51:2,18

**prepare** 9:25 67:12,15,15 70:13,19,20 255:9

**prepared** 9:5 66:19 255:10

**preparing** 8:19 70:1

**prescribe** 95:7 123:7

**prescribed** 99:19 121:13 122:1 123:2

**prescribing** 85:10 88:20 95:11 96:13 209:12,20

**prescription** 96:10,18

**prescriptions** 95:4,7 97:21 210:2

**present** 73:6 207:18 239:2 243:9,15

**presentation** 132:8

**presentations** 132:13

**presented** 159:9 178:22,25 220:14

**preservation** 32:20

**Preserves**



3:13 145:5
**preserving**
198:16
**prespecified**
143:18
**press**
92:8
**pressure**
72:21 73:15,21 74:5
74:11 75:5,13 93:21
103:7 125:6 182:16
182:18,19,22
184:13 187:11,12
222:9 227:3
**pressures**
73:2,4 100:9,13
103:17 107:16
159:5 183:9 185:6
186:5 187:13 188:1
188:9 226:23
251:18
**pretty**
46:20 54:10 58:16
103:16 109:12
174:4 205:14
**prevent**
236:6,24
**preventing**
138:22
**Prevention**
139:6
**previously**
19:11 114:24 142:5
156:20 205:15
208:3,6,7 222:7
**primarily**
10:10
**primary**
21:16 27:15,16,20,24
27:25 28:2 44:22
45:5 54:3,19,20
68:17 81:6,9 108:25
120:19 143:18
148:19 149:4
167:24 168:2
169:11,12,16 170:1

170:10 178:2
188:23 229:17
**principal**
61:23
**principle**
112:15
**prior**
15:9 19:13 41:5
42:20 66:1,7 68:5
89:1 95:24 96:14,22
99:2,5,9,13,14,16
99:18,22 115:12
120:2 122:13 123:3
123:8
**prisoner**
169:12
**privy**
45:25
**probability**
26:18
**probably**
23:14 31:12 35:3
38:25 80:24 84:20
85:4 88:4 89:21
96:22 105:3 111:10
111:16 114:2
123:11 134:24
160:23 161:8,12
211:23 230:23,24
**problem**
30:13 39:4 124:10,16
213:23 247:4
**proceedings**
1:20 256:5 257:4,5,7
**processed**
107:1
**PROCTOR**
1:19
**produced**
36:13 178:16
**produces**
34:17
**product**
63:21 211:15
**production**
142:25 189:12 196:4

202:19 209:14
210:4 224:12 229:2
233:9
**professional**
23:8
**professor**
22:21 23:4,9,17
**program**
22:4 24:7,8,10,14,15
24:17 118:17
232:15
**programs**
24:9
**progresses**
172:14
**progression**
117:6 177:19
**proliferation**
118:9
**proof**
163:21,24 164:8,12
164:16,20 165:3
193:4 219:16
**properties**
117:17 118:13
119:11,14,21
**proportion**
25:25 86:8 94:25
95:18 99:11 245:13
**proposed**
134:14
**PROs**
170:22
**prosecuted**
69:21
**prosecution**
68:24 69:1,16,25
**proteinoids**
181:19 183:18
**protocol**
39:14 40:10 61:17,20
63:14 65:1,9,16
66:2
**prove**
164:5
**proved**

164:10
**provide**
7:9,25 113:21 137:12
158:23 176:5,6
187:5 194:19
221:23 223:1
225:14 227:22
228:12 229:11
**provided**
40:10,13 65:10 66:25
68:1,8 133:8 135:20
159:1 166:23
174:25 184:24
187:21 188:13
219:16
**providers**
25:24
**provides**
135:3 143:20 186:9
226:4,18 228:3,14
243:6
**providing**
92:9 114:3 144:10
185:18
**proving**
173:14
**Public**
1:17
**publically**
253:20
**publication**
26:24 51:12,20 54:4
92:10 131:23
142:23 145:20
146:11 148:11,19
149:4 150:16
153:11,23 154:11
158:22 163:20
166:23 203:9
206:10,16,23
208:22 217:7,15
218:11 225:7
226:17 229:4
231:23 232:23
233:8,8
**publications**



17:21 50:3,7,10,22
51:1 216:23 219:1
225:5
**published**
18:16,17 27:3 32:9
51:19 143:13 145:8
146:4 150:8 158:17
165:19 202:17
203:3 206:20 207:1
224:11
**pulled**
250:3
**pulmonary**
3:14,17 14:22 20:13
20:16,22 21:8,11,13
21:16,17 22:15,16
24:9,10,14 25:15,18
25:21,25 31:22 32:5
33:18 42:17 49:1,4
49:7,8,23 52:6,18
52:22,25 54:4,16,21
58:5 65:22 72:17,19
72:20,21,23 73:6,14
73:16,20,22 74:4,7
74:11,13,18 75:4,5
75:8,9,12,13 76:9
77:8,9,11,13 80:17
80:20,21,24 81:4,6
81:9,12 82:7,13,17
82:20,25 83:15
85:18 86:10 89:4,12
91:25 93:20 94:14
94:19,24 95:17 98:3
99:10 100:10 103:7
103:8,21 105:20
106:5,11 117:9,14
122:1 125:6,12
142:24 143:12,22
144:19 145:7
150:21 152:6,10
153:13 154:1 159:4
159:6 160:11
162:13 165:18
167:13 180:15,22
180:25 181:2,8,10
181:22,24 182:2,4,6

182:8,11,16,18,19
182:21,22 183:1,7,8
184:9,12,20 186:17
187:11,12 188:6
193:5,11 196:3
197:9,10 201:2,8,9
201:14 202:16
203:1 205:18
206:11,18,19 207:1
207:3 208:11,14
212:8,23 215:24,25
216:11,13,14 217:9
218:2,5,12 219:8,18
220:17 222:7,9
224:5,10 226:23
227:2,3,7 229:1
231:15,16,19
232:14,18 237:1,12
237:19 238:8,9,19
241:23,24 242:15
244:7,17,20,23
245:11,12 246:2,6,9
246:11 249:10,19
251:16,17 252:21
**pulmonologist**
234:21
**pulse**
130:10,12,21,24
131:14,20,24 132:4
133:1 215:10,14
**pulsed**
130:5 132:9 133:8
135:9
**pulses**
132:21 133:20 135:4
**purely**
57:14 245:17
**Purpose**
198:14
**purposes**
60:21 202:10
**pursuant**
1:16
**put**
58:21 67:25 77:17
106:13 200:23

238:6 242:21
**putting**
75:15 229:23
**p.m**
142:16 196:18,19,21
247:20,21 256:6

────── **Q** ──────

**qualify**
84:21 93:5 99:9
164:7 221:13
**quality**
141:17
**question**
7:21,21 51:15 78:14
104:5,7 113:8
114:24 115:25
121:22 124:17
143:7 173:15
180:16 185:25
195:6 213:23
233:13 252:15,17
252:25 253:4
**questioning**
7:8 69:10
**questionnaire**
168:5,9,24 169:3,21
170:16,17
**questions**
7:9,10,15 113:14
170:24,25 172:19
248:5,10,15 253:18
254:11,14 255:25
256:2
**quick**
64:14
**Quinn**
30:3
**quite**
34:22 77:15 87:25
118:9 174:23 183:2
222:8,9
**quote**
159:10

────── **R** ──────

**R**
5:1
**raises**
172:18 173:15
**randomized**
3:18 41:6 42:20
152:22 153:14,24
154:2 155:4 158:3
165:5 189:1 231:5
231:18
**range**
25:17 230:9,9
**rare**
28:1 84:25
**rationale**
65:16 159:1 216:24
217:22 218:1 219:3
225:8 228:4,14
**ratios**
53:12
**RCTs**
42:19
**reach**
53:18
**reaches**
179:4
**read**
23:14 109:13,14,16
146:6 178:15 208:3
208:6 210:23
250:20 252:18
258:4
**reading**
187:18 258:1
**reads**
245:9
**real**
101:25 140:10,13,17
156:18
**really**
13:21,25,25 34:20
40:13 68:8 98:20
101:23 137:22
170:24 174:23
179:17 208:15
228:12 231:20



HIGHLY CONFIDENTIAL     LIQ_PH-ILD_00000775

realm
242:18
reask
121:22
reason
7:24 31:13 52:20
55:1 64:2 111:21,23
112:18 113:9,10,11
113:13 117:17
176:7 229:24
259:13
reasonable
46:23
reasons
222:18
recall
9:15 10:7 13:19
14:23,25 15:13
16:21 17:6 18:10
19:10 25:12 26:21
26:23 27:8,10,17
29:12 30:9,19,23
33:10 36:20 38:24
39:2,7,24 40:1,16
40:18 41:12,16,18
41:23 43:24 44:6
45:8,20 46:14 50:11
51:8 54:5,13 55:9
56:7 57:15 61:20
63:18,22 65:2 67:21
68:2 69:24 71:7
76:10 81:13,24 82:3
82:19 84:9 85:10,14
85:21 86:3,17,22
87:8 89:15 91:18,21
92:16,18 93:15
94:10,18 95:2,11
96:2,5,25 97:7,11
109:7 111:9 114:7
131:23 132:5,8,16
134:3 141:6,15,16
145:16 159:18
183:15,22 184:1
203:10 211:20
216:21,22 226:1
235:13 248:15

252:25 253:2 255:3
255:5,14,15
receive
60:19 156:21
received
44:14 60:3,7 116:2
226:25
receiving
93:2 96:14,22 116:2
122:14 123:3,8
147:3
Recess
64:17 142:15 196:18
247:20
recites
249:8
recognition
82:20
recognize
211:1 222:23
recognized
114:14
recognizes
246:3
recollection
37:1,17 38:16 96:13
96:17,21
recommendation
214:21
recommended
213:19 214:7
recommends
156:11
record
5:3 6:14 64:16,20
124:14,14 125:16
142:14,18 153:19
172:18 196:17,21
228:22 247:17,19
247:23 256:4 257:7
recorded
7:1 257:6
recruitment
88:12
red
107:6,10

redirected
108:9
reduced
174:15 202:4
reducing
198:17
reduction
56:7 138:11 226:23
REE
81:16,21
refer
110:1 183:21
reference
13:24 68:23 158:1
206:2 208:15
213:17 215:3
216:20
references
205:21,24 207:15
225:2
referral
21:15
referred
131:23 132:9 144:25
215:5 244:5
referring
67:11 94:6 98:14
147:9 158:11
246:10 253:10
refers
58:3 79:24 80:17
144:10 165:23
181:22 182:10
190:16,20 206:2
240:13
reflect
194:12
reflecting
203:4
reflects
161:8 175:9
regard
20:9 38:6 51:6 56:24
75:1,11 86:10 93:9
93:10 98:11 102:21
126:5 140:24

181:10 244:20,23
regarded
89:5 130:17 133:21
161:7 163:12 201:6
245:14
regarding
15:20 18:12 19:6
41:3,25 44:14 46:13
144:11 194:21
regards
48:11 75:15 220:11
regime
192:10
Registered
257:2
rehab
231:15,16,19 232:14
reiterate
138:3
relate
248:16
related
117:2,8 257:11
relates
131:20 236:4,21
relation
247:10
relatively
112:13
release
92:8
reliable
128:5
relied
65:25 206:10,16,23
233:18
relies
73:1
remain
31:12
remained
35:7
remaining
73:23
remains
119:23 164:24



remember
  16:5 17:10 25:10
    29:16 30:10 35:4
    39:21 57:18 63:12
    70:23 81:5 82:6
    87:24 88:5,25 96:9
    96:18 106:22
    159:12,22 160:14
    177:12 201:11
    235:16 250:23
reminder
  69:10
Remodulin
  240:14
renowned
  160:4 161:18
reorganize
  22:17
repeat
  28:25 124:17
rephrase
  48:25 82:2
report
  12:1,4 14:6 15:10
    70:1,8,14,15 116:3
    126:19 143:11
    145:1 146:23
    147:21 148:2
    153:24 160:9 180:4
    189:15 207:24
    210:16 221:3 225:2
    230:5
reported
  54:3,6 151:4,13
    170:23 199:7
    207:25 222:14
reporter
  5:15 27:19 121:21
    171:18 208:4 257:2
reporting
  147:12,19 221:18
represent
  5:18
representatives
  30:1 40:3
reproduction

202:25
request
  5:12 12:6 14:10 26:4
    61:1,13 64:23 66:14
    70:7 143:6 168:15
    212:16 215:19
    227:17 243:5
    248:24 252:10
require
  125:4 165:4 193:21
required
  155:22 165:2
research
  60:4,7,16,21 61:7
    157:24
researched
  129:19
reserve
  122:20 248:5
reside
  247:12
resident
  21:20 81:7
residual
  106:25
resistance
  73:17,23 74:7,13
    75:9 103:8 125:7
    129:21 136:1 201:3
    201:8,9 222:8 227:4
resistances
  54:22
respect
  12:13 29:6 32:14,24
    37:18 38:1 46:9
    53:3 55:23,25 57:11
    71:11 72:9 74:17
    76:20 83:18 122:12
    146:15 147:12
    148:9 151:4 164:17
    204:10,14,23
    210:25 211:7
respiratory
  27:4 32:10 74:2
    158:17 168:4
    169:21 170:17

respond
  7:15 49:24
responders
  52:19
response
  158:4 220:6
responses
  7:3 55:7
responsibilities
  24:4 46:9
responsibility
  29:5
restart
  141:23
restate
  136:22
restricted
  202:3
restriction
  202:2,6
restrictive
  201:24,25 202:9
result
  100:14 164:13
    177:10 184:16,17
resulted
  102:20
resulting
  194:19
results
  43:8,10,18,25 45:3
    51:13 52:15 53:2
    66:1 74:23 80:6
    87:15 88:6 91:20
    92:1,5,10 93:2
    95:25 96:15,23
    99:16,17,19,22
    116:3 122:14 123:3
    123:9 146:17,18
    159:9 164:1 165:4
    177:13 199:5 203:4
    219:23 221:2
    226:13
retrospective
  222:5,6,12,19,23
    229:20 230:22

retrospectively
  35:14
reveal
  69:11
reverse
  117:7 118:8,11
reversing
  117:14
revert
  75:17
review
  259:6
reviewing
  69:24
revise
  158:25
revised
  69:19 209:13,21
    210:4
revision
  54:8
rich
  52:13 234:8,9,10
Richard
  28:24
right
  18:21 50:11 73:1,4
    89:19 106:13 128:9
    145:19 156:25
    170:1,4 176:16,20
    182:1 200:18 243:3
    243:22 248:6
Right-sided
  3:15 145:7
rigors
  231:17
RIN
  28:7 47:16
Rio
  159:3 162:11,19
riociguat
  3:16 103:16 115:15
    115:17 121:18
    153:11,25 155:18
    156:8,21,24 157:14
    158:3,22,24 159:17



**riociquat**
41:9 103:19 104:6
107:25 111:20
115:7 150:23
**RISE**
41:8 42:1,4 68:10
103:14 154:4,7
162:4,9,17
**RISE-IIP**
3:18 153:14 159:9
253:21
**risk**
31:25 32:3,4,4 53:15
56:6 58:4,15,17,18
58:22,23,24 59:1,3
230:18
**risks**
128:1
**RMR**
1:22 257:17
**Road**
2:6
**Robert**
234:24,25 235:1,7,12
**Robertson**
16:13
**robust**
152:22
**Roger**
235:18,19,20,21
**role**
47:3 62:2,10 63:8
112:23 117:13
151:24 152:1
222:21 255:20
**rolling**
156:21
**Roscigno**
234:24,25 235:1,8,12
**rough**
85:6
**roughly**
82:19
**row**
159:23
**RS00**

63:2
**Rubin**
162:1 254:2,8
**rule**
55:20 59:6 90:23
162:21
**ruling**
55:18 138:8
**run**
13:1
**rush**
136:12
**ruts**
92:5
**RVSD**
146:24

---

**S**

**s**
5:1 10:15
**sac**
109:21
**saccharidosis**
24:17,19
**safe**
120:3 229:18,24
**safeguard**
155:11
**safely**
199:24
**safety**
35:24 36:8 120:8
148:12 149:20
155:12,22 157:8
206:17 216:12
228:24
**salt**
236:5
**salts**
239:5
**Sanya**
2:15 5:22
**saw**
12:18 32:18,25 35:20
63:23,24 82:10
97:13 116:18

117:19 118:20
139:10 157:7
177:13 218:21
**saying**
36:19 75:21 95:2
97:11 105:12
152:14 159:12
185:6 201:18
**says**
22:10 100:21 143:17
144:7 157:23 172:9
180:24 182:4,6
186:3 190:3,6
193:15 198:14
205:15 210:14
214:9 238:10 239:2
252:24 253:10
**scan**
79:2
**scans**
90:2
**scarring**
79:2 80:5,18 117:7
118:6
**scenario**
108:12
**scenes**
45:23
**schematics**
134:5
**school**
23:16,18
**scientific**
67:23 159:1
**scleredema-related**
238:8
**scleroderma**
89:25
**score**
31:25 32:3,4 168:4
**scores**
147:3 148:4
**screwed**
147:8
**second**
27:8 28:25 180:20

198:14 203:20
209:11 210:1 211:5
239:15
**secondary**
44:23 45:5 108:25
164:2 169:13 230:3
**section**
61:2,6 70:8,13
146:18 200:4
205:14 213:1
214:25 216:3 243:4
254:4
**see**
11:17 13:1 14:12
21:19 22:8 24:22
25:4,24 26:8,19
28:9 47:17 50:18
51:25 52:24 58:1,7
58:14 61:9 62:5
64:3 65:20 70:11
77:6,21 78:7 79:2
80:25 88:2 107:19
115:3 117:18 125:9
134:15 135:19
138:18 143:23
144:6 146:17 147:4
155:21 156:6,7,17
157:22 158:1,5,9,9
160:13 168:8
171:10 172:7,19
173:25 175:21,22
176:1,3 181:15,20
181:23,25 182:1,3
182:10,25 185:12
186:23 187:2,9,13
188:19,22 190:15
190:18,19,21 193:2
193:7 195:20
198:13,18 199:25
200:3,4,5,13,14
201:23 203:12,25
204:8 205:8,13,19
206:13,14,22 207:4
207:6 215:2,7,8,9
215:11 216:20
220:10,12 221:6



224:17 225:1
230:10 233:13
234:2 235:25 236:9
237:2 238:17 239:2
239:6,19,24 240:2
240:17,23 241:25
243:11 244:10
249:12 254:4
**seeing**
21:17 24:25 25:2
62:10 63:12 81:5
140:13,14 181:23
182:3 213:17 214:6
**seen**
25:3 57:9 62:11,15
62:23 63:15 117:4
127:10 133:24
134:5 135:12,12
143:8 145:12
166:12 178:15
196:12 197:2 200:9
216:17 218:18,20
224:14 226:14,15
229:4 233:14 235:6
246:13
**segment**
242:15
**segmented**
83:13
**send**
19:23
**sense**
7:5,11 10:23 27:13
60:6,11 128:12
**sent**
19:24 40:9
**sentence**
144:6 198:14,18,20
**separate**
151:23
**September**
257:21
**series**
228:7
**service**
22:16,17

**Services**
5:14,16
**session**
159:11,15 160:4,10
160:15 161:15,17
161:24
**set**
230:7 257:5
**setting**
101:16,19
**seven**
149:19
**Seventy-five**
68:4
**Seventy-three**
68:3
**severe**
52:6 78:23,24 83:15
86:8 91:25 93:23
94:2 98:4 122:21
125:1,3 201:13
245:12
**severity**
150:19 179:4 247:9
247:10
**SGRC**
147:22
**SGRQ**
147:2,25
**shaded**
157:23
**shape**
10:17
**sharp**
224:23
**sheer**
106:16
**sheet**
258:8 259:7
**Shekel**
126:21
**short**
137:12
**shortness**
55:16 137:19 138:5
168:24 169:3

170:16
**short-term**
152:15
**show**
53:9 55:3 79:17
113:24 149:16
153:5 165:3 168:7
171:3 174:21
178:17
**showed**
37:12,18 53:20
112:18 148:12
152:19 162:11
163:20 175:16
**shown**
119:20 169:5 171:12
174:9 217:12
**shows**
77:22,23 171:25
175:15 176:17,18
241:22
**shunt**
110:2,12
**shunted**
110:2
**sic**
16:14
**sickest**
172:24
**side**
106:13
**side-by-side**
252:13
**signal**
35:20 48:15 155:17
**signals**
155:22
**signature**
12:8 259:23
**signed**
259:7
**significance**
34:16 53:10,18,23
57:21 71:5 72:2
142:6 174:24
**significant**

33:7,13,21 34:18
36:13,21 37:8,18
38:2,11 50:6 54:14
55:25 56:18 57:1
71:10,22 72:8
141:17,21,25
147:13,22 148:3
151:5 170:11,15
174:20 175:23
176:10,15,20 177:2
177:5 187:15 188:3
199:16,20 204:2,20
205:5 221:3,10,14
**significantly**
147:13,21
**SIGNING**
258:1
**signs**
77:23,23
**Sildenafil**
3:13 26:17 68:10
89:9 92:16 93:1,16
96:8 97:25 100:8
121:18 122:7
123:14 142:24
143:12,19 144:18
145:5 146:25
147:15 148:24
149:1,11,13,18,19
150:2,12 152:17
165:17 167:8 168:9
169:4 171:21 172:2
172:21 173:12
174:14 175:15
**silence**
159:21
**similar**
157:6
**simple**
58:4 115:6
**Sinai**
21:14 81:14
**single**
71:11 72:2 190:16
226:25
**single-centered**



229:20
**sir**
227:20
**sitting**
8:22 10:7 12:15 17:6
18:10 36:11 39:24
40:1,16,18 96:12
121:11 131:22
132:7,16 135:2
159:23 176:19
179:12 195:12,16
207:10
**situation**
107:9
**six**
54:11 128:1 190:17
191:25 192:2
**Sixth**
73:19
**six-minute**
53:25 54:2,6,14,24
100:23 126:1,10,23
137:7,12 144:18
146:25 147:14
151:6 153:5 199:6
199:11 221:4,8
222:14 230:5,11
231:4,16 240:15,20
241:9
**skeptical**
108:22
**skepticism**
44:7 52:16 54:25
**slightly**
237:11
**Slobin**
64:7
**slower**
121:24
**small**
56:9,21 141:20 158:2
158:9 181:16
242:15
**smaller**
53:7,8 57:19 236:22
**Smith**

30:3 44:1,2,14 45:3
46:15
**society**
74:1,2 138:4
**solely**
82:14
**solid**
240:1,5
**solution**
209:13,21 211:9
**somewhat**
35:21 124:25 218:7
**soon**
85:24 87:4
**sorry**
12:24 17:16 28:5
39:2 47:12 48:24
52:1 53:16 61:2
69:5,7 71:18 74:3
101:10 126:18
143:25 149:3
153:18 174:16
180:20 191:14
193:16 194:2 204:6
204:12 211:20
213:20,21 218:23
224:17 251:12
**sort**
78:11 253:19
**sorts**
113:24
**sound**
113:13
**sounds**
7:12 142:12 178:14
230:17
**source**
195:17
**South**
82:8
**space**
110:8,11
**speak**
86:9 232:7
**speakers**
59:17,21

**speaking**
161:9,10,11
**Speaks**
181:5
**specialty**
20:9,13
**specific**
39:25 40:2 94:16
96:21 104:7 151:12
151:21 181:9
213:17 242:9,12
252:14
**specifically**
45:21 52:17 87:8
117:19 189:23
228:6 250:14 253:2
**specification**
194:20
**spectrum**
78:17 86:5 93:22,24
110:5,13 140:20
141:3 247:7
**speculating**
90:16 91:3 111:10
163:6
**speculation**
185:16 188:18 223:4
232:6 245:25
**speculative**
91:14 117:15 118:2
169:8,10 176:6
242:6
**spirometry**
120:7
**split**
25:6
**spoke**
68:11
**sponsor**
39:12,19,22 44:4
**springs**
60:1
**squeeze**
25:4
**SS**
257:1

**St**
168:4 169:21 170:17
**stage**
44:16 118:6
**stages**
118:4,8
**standard**
96:10 199:13 240:20
**standpoint**
44:4
**stands**
139:17 197:19
**start**
21:18 39:23 63:25
99:5,21 104:4
115:16 162:22
241:16 251:14
**started**
23:24 38:22 81:19
127:11 128:13
172:12
**starting**
117:22 200:6
**state**
5:17 6:13 160:10
220:13
**statement**
198:13 205:13 206:9
208:2,6 241:3
**states**
1:1 179:25 180:16
189:11 233:7,21
236:3,20 243:7
244:3
**statistical**
34:5 47:8 53:9,18,23
57:21 71:5,21 72:2
142:6 174:24
**statistically**
30:7 33:7 34:17
36:13,20 37:7 54:14
55:24 56:17 57:1
71:10 72:8 141:16
141:21,25 142:6
147:13,22 148:2
174:20 175:22



176:9,15,20 177:1,5
187:15 199:15,19
204:2,20 221:10,14
**steering**
26:11,16 28:7,11,16
28:22 29:1,6,21
31:6,7,9 39:11
40:19 41:8 42:3,8
45:24 47:14,15,25
48:5,12 59:23
197:22 225:24
231:25
**stenographically**
7:2 257:6
**Stenotype**
1:21
**STEP**
146:3 157:4
**STEP-IPF**
145:1,17,22 146:10
148:5,11 152:14
157:2 163:19
**Steven**
1:13 3:2 5:4 6:4
10:15 11:8 154:10
202:18 258:10
259:24
**Stewart**
234:8,9,10
**stick**
230:23 231:2
**stickers**
10:23
**stiff**
244:7
**stop**
101:3
**stopped**
48:14 154:25 155:3
155:23
**straight**
203:12
**strain**
175:9
**stratify**
32:4

**Street**
1:19 5:11
**stress**
175:9,10,12,16
**stretch**
106:16
**strict**
55:13 76:21 77:7
**strike**
39:22 40:17 49:2
79:6 104:9 153:3
219:23 232:11
**strongly**
56:14
**studied**
158:24
**studies**
26:12 27:25 42:10,12
42:20 61:8 66:1,5,6
66:6 68:5,7,9 91:11
101:13 111:6,10
119:15 138:16
150:4 175:4 183:20
183:21 195:20
205:16 208:7 231:6
235:12
**study**
3:19 26:15,16,21,25
27:11,12,12,14 28:8
29:15,20,23,23 30:2
30:21,25 31:2,7,11
32:1,6,14,18,25
33:21 35:5,14 36:14
38:4,12 39:5 40:4
40:14,17,19 41:4,6
41:9,10,11,13,19
42:1,2,15 43:3,11
43:12,18 44:4,8,15
44:20 45:3,11,18
46:10,13,17,22 47:4
47:16,22,24 48:1,10
48:14 49:14,19,20
51:7 52:17 56:25
58:13 59:24 61:17
62:3,6 63:8,22 64:1
65:1,5 68:12,16

71:21 73:12 74:23
75:19,21 76:3 81:15
81:17 83:20 84:16
84:22 86:24 87:15
88:6,13 89:19 90:14
90:19,23 91:5,20
93:2 94:13,13,18
95:25 96:15,23 99:3
99:6,10,15,19,23
101:1,9 103:15
107:21 108:22
111:9,22,23 112:19
113:3 116:4,12,18
117:13,18 118:15
119:2,10,12,24
120:2,10,21 122:14
123:4,9 139:2,11
141:6,19 143:17
144:7,17,25 145:1
145:17 146:3,3,10
148:5,24 150:16,23
152:16,18,23
153:15,25 154:3,4,7
154:15,21,22 155:3
155:4,10,19,22
156:6,8,12,23 157:1
157:3,9 158:3,11,14
158:24,25 159:2,10
159:16,24,25 160:1
161:16 162:4,9,9,17
163:20 164:2,10,13
164:14,17 165:3
166:16 167:6,24
168:22 169:14,17
170:18 172:13,14
188:20,23 194:7,13
194:24 195:6,8,21
195:22 201:10
203:1,5,8 216:24
217:7 219:4,13
222:5,12,23 223:2
223:15,18,20 225:7
225:8,21,23,25
226:3 228:15,17,17
229:19 230:22
231:9,18,20 232:22

235:17 241:22
253:21
**studying**
218:1 228:14
**stuff**
10:10 66:24 67:6,8
67:12 142:9
**stuffiness**
224:25
**subcutaneous**
122:9,17
**subcutaneously**
85:12 122:19
**subgroup**
33:17 37:15 54:15
55:24 57:10 84:3
145:17,21 146:10
146:15,22,23
147:12,23 148:4,10
151:4,12 152:14
**subgroups**
33:14 38:20 117:19
**subinvestigator**
61:22 62:3,5,10 63:9
**subject**
13:24 15:19 16:6
31:23 247:11
**subjects**
119:23 146:23,24,24
147:3
**submission**
31:21 51:2
**submitted**
8:13 11:2,16 12:1
63:14
**subpopulation**
94:17
**subsequent**
20:15,21,24 21:7
23:19
**subsequently**
12:18 42:11 67:17
73:18 164:9,24
217:12
**subset**
201:18

**substance**
9:8 69:11
**substantial**
40:8 56:14
**substantive**
17:24
**substitute**
64:3
**sub-I**
63:13,25
**Succa**
159:22
**succeed**
43:4,12
**success**
41:3,7
**successful**
40:20,24 41:13,20
44:8 45:11 49:20
**successfully**
154:19 201:15
**suddenly**
136:11
**suffered**
56:11
**suffering**
246:15
**sufficient**
150:19
**suggest**
205:16 208:8
**suggested**
56:13 158:3
**suggesting**
124:4,20 144:14
**Suite**
2:6,18
**Sukduang**
2:15 5:22
**Sullivan**
234:17,18
**summation**
173:6
**Sunday**
1:11
**superimposed**

80:20 105:9
**supplement**
54:19 203:16,17
205:9
**supplementary**
3:21 165:23 166:7,22
168:18
**supplements**
203:11
**support**
11:9 37:7 66:1 225:7
**supported**
218:6
**supposed**
227:6
**sure**
8:23 9:1,20 10:20
14:1 16:22 29:18
36:18,24 40:25
46:20,25 54:11 66:5
88:4 105:4 109:14
113:10,12,22 116:8
125:20 155:8
174:19,23 175:25
176:9 178:3,20
187:16 194:10
195:4,16 197:18
207:21 211:23
220:11 221:16
223:6,16 232:15
235:5 242:22
**surprising**
35:22
**surrogate**
105:2,13,14,16 126:6
**surrounds**
80:1
**suspect**
9:2 45:22 129:20
160:21 176:5 209:5
223:6,11
**suspended**
163:9
**switch**
195:22
**switched**

128:14 149:17 150:1
**switching**
127:10,12 135:19
**sworn**
1:16 6:6
**Symposium**
73:19 74:21
**symptoms**
212:9
**system**
215:3 226:10,12
**systemic**
110:17 111:20
115:17 157:17
182:21
**systemically**
108:13,17 115:15
**systolic**
182:18 187:10
**S2**
170:2,6 203:14,16
**S3**
168:14,17 169:19
170:6
**S343**
196:2
**S5**
171:7,8,12,25
**S6**
203:24,24 204:6
**S7**
174:6,9 175:14 176:1
176:18

─────────────
**T**
**table**
3:1 10:17 66:12,19
67:25 149:2,6
155:25 181:13,15
181:19,22 182:5
183:12 186:19,23
187:4,21 195:7,20
195:24 203:14,16
204:6 213:20
220:15
**tables**

195:9,10
**tadalafil**
122:10 123:7,12,16
**take**
7:18,22 64:9,11,12
64:13 74:7 106:22
109:20 113:17
125:18 127:21
129:20 142:10
151:12 163:24
186:4 232:17
237:11 247:14
**taken**
1:18,21 5:10 64:17
131:16 142:15
196:18 247:20
**takes**
131:15 138:16
**talk**
65:4 83:12,14 106:15
109:5 110:7 139:16
159:8 176:1,3 185:3
185:5 232:11 246:7
**talked**
17:4 51:5 71:4 72:17
76:8 79:19 114:4
146:2 154:8
**talking**
13:11 29:17 73:9
75:7 82:18 99:1,14
137:3 141:11 206:4
238:13 245:10
**talks**
17:22 59:16 113:8
251:16
**tangential**
218:7
**Tapson**
28:24 29:2,3 41:19
48:2,3,3 231:24
232:2
**Tapson's**
30:24
**teach**
250:25 251:7
**technicalities**

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000782

131:14
**technically**
131:19
**TECHNOLOGIES**
1:8
**Technology**
5:7
**tell**
15:18 34:13 46:24
54:10 101:12
139:16 211:25
235:13 242:10
250:3
**telling**
36:24
**tells**
101:23
**tend**
77:20
**term**
98:8 151:15 152:18
152:20 164:16
**terms**
29:10,20 30:5 31:25
32:20 33:12 40:11
55:15 62:7 68:21
69:17,25 79:3 84:24
107:15 114:3
126:24 137:4
148:19 151:21
192:21 208:18
222:13 227:8
231:21 242:19,24
251:1 255:21
**test**
104:6,7 111:8 120:17
126:21,22 137:7,13
175:7,20 240:16,20
241:9
**tested**
164:25
**testified**
6:7 17:5 50:5 65:8
154:14
**testify**
15:14

**testifying**
6:24 11:1
**testimony**
7:25 15:9,19 19:13
20:25 72:7 104:18
248:2,14 258:6
259:6
**testing**
118:16 126:15
**tests**
16:10 79:1
**test-test**
140:9
**Teton**
59:24 117:18 118:17
119:24
**textbooks**
80:23
**Thank**
10:21 20:2 64:22
69:14 166:9
**thankfully**
109:1
**thanks**
137:17
**theoretic**
246:19
**Theoretically**
112:12
**theories**
113:19
**theorize**
198:24
**theory**
110:22,25 111:12
**THERAPEUTHE**
259:3
**therapeutic**
143:18
**Therapeutics**
1:5 5:6 6:1 8:3 11:2
18:1 19:3,11,15
30:2 31:4 44:5,6
46:6 49:11 59:11,19
59:22 60:4,8,20
65:10,17 232:21

233:3,23 234:14,22
235:3,22
**Therapeutics's**
40:3
**therapies**
122:7,25 218:1 219:8
236:21
**therapy**
49:25 112:6 125:4
149:25 163:21
164:4,23 198:15
226:19 231:8 241:8
**thereabouts**
85:13
**thereof**
236:6 239:5
**thereon**
243:10
**thing**
7:20 23:13 37:12
69:8 99:21 156:25
**things**
67:17 71:22 106:4,7
126:14 132:2 202:5
227:2 242:22 251:3
255:22
**think**
8:10,17 13:7,16
20:20 38:25 40:11
40:12 42:13 46:22
49:21 53:22 54:7
56:5 67:6 68:1,5
72:6 78:18,21 82:16
85:22 87:7 92:12
97:17 107:23
111:16 112:5
113:10 115:9
127:14 128:5 131:7
135:25 136:3 139:8
142:11 146:2,5
179:14 181:6
188:23 191:24
194:2 195:22 198:8
198:24 222:18
231:1 232:14,17
243:19 246:1 247:7

248:25 253:3,16,19
255:22
**thinking**
13:8 161:19 253:3
**thought**
19:13 30:17 95:12
109:12 120:25
134:13,16,18 161:6
**thousands**
97:20
**thread**
246:25
**three**
6:21 29:21 39:10,15
54:22 73:17,24
77:14 123:18 156:9
162:24 183:19,20
190:20 191:6,12,17
191:22,24 200:6
209:10 210:11
246:24
**three-different**
183:21
**threshold**
140:25
**throat**
136:13
**thromboembolic**
77:10
**through-758**
4:7 209:22
**thrown**
251:12
**time**
5:9 7:20 8:2 18:25
19:24 21:16 22:24
23:17,23 27:17
39:25 44:23 45:2,10
55:17 63:17 74:22
81:19,20,24 82:3,10
85:9,20,25 86:16
88:5,7,24 89:16
91:7,17 92:9,15
93:14 94:1,5,6,9
95:5 96:7 99:9,15
113:9 119:9 154:24



156:10 168:25 171:16,23 177:8 196:9 230:7,8 234:16 235:6 245:15 255:25 257:4
**times** 6:19,21 7:14 109:6 123:18 191:22 200:12 207:17 214:8
**tissue** 84:1 89:24 90:7
**tissue-related** 238:7
**title** 181:19 197:7,8
**titled** 11:8 61:6 153:11 165:10,15 179:24 228:24
**today** 5:9,21 6:22 7:1,14,25 8:22 10:7 11:1 12:16 14:6 17:6 18:10 30:13 36:11 39:24 40:1,16,18 42:24 96:12 121:11 131:22 132:7,16 135:2 154:5 179:12 195:12,16 207:10 248:1,13 250:15 253:1,18
**Todd** 48:4
**told** 101:2 160:10 253:3
**tolerability** 136:7 206:17 216:12 228:25
**tolerable** 136:15 229:18,25
**tolerance** 251:2
**tolerate** 127:18

**tolerated** 200:12
**top** 20:6 26:14 92:9 182:16 204:8
**total** 168:3 192:21 230:2
**totally** 106:11 212:2 218:8 226:8 231:20
**training** 21:3,10 234:21
**transcribed** 1:22
**transcript** 257:6 259:5,6,11
**transcription** 258:6
**translates** 103:12 119:22
**transplant** 22:4 24:7
**transplantation** 20:14
**traverses** 107:6
**treat** 82:9 85:15 86:1,13 87:11 88:11 89:2,11 89:17 93:24 94:10 94:14 98:19,20,23 116:10 117:3 127:2 127:5 149:6,14,15 159:4 164:21,22 187:24 219:18 222:17 225:15 236:6,23
**treated** 52:25 93:1 98:12 99:24 101:1,10 146:24 153:3,5 199:24 201:15 221:9
**treating** 31:22 81:3,19,23,25 82:4 86:17 91:18,21

92:16 93:15 99:7 100:4,5,6,10,12 116:4,5,13 128:6 159:6 160:7,11 161:20 180:9,14,22 180:25 181:2,8 184:5,8,11,20,21 185:1,4,5,13 186:16 187:5 188:5 217:23 218:4 224:4 228:13 251:16,17
**treatment** 33:8,22 38:3 57:3 58:24 71:12,25 72:1 72:9 79:8 82:10 97:25 98:24 102:5,6 102:12,15,15,21 103:3,10,12 104:5 107:20 116:17,22 118:19,21 119:3 139:7,9,13 147:15 150:12 157:3,4 162:12,19 165:4 168:9 169:4 171:17 171:19 174:16 177:19 178:11 179:4,6 181:3 185:18,19,22,24 187:19 194:21 198:6 204:11,25 212:11 213:3 215:23 217:9,10 221:25 227:23,23 229:12 239:9 240:5
**treatments** 42:23 101:17 121:11 121:25 237:5
**tremendous** 202:8
**trend** 35:3
**trepostinil** 37:22 48:17 50:23 53:14,17 56:5 57:3 59:7 89:17 90:12 91:19 101:10 104:2

118:21 185:14 197:8 205:16 206:11,18 208:8 213:11 214:1 216:13 217:12,15 217:23 218:11 219:20 220:16 221:10,24 225:15 226:5 228:5,15,25 229:12 232:4 240:4 241:8
**treprostinil** 32:19 33:8,22 36:13 38:4 49:12 50:15 53:22 58:25 65:20 75:16 81:16,22 85:10,21 86:1,19 87:11,18 88:11,20 89:8 91:22 95:8,13 95:24 96:14 100:8 102:23 103:2 104:20 107:20 108:1 112:18 114:14 115:1,20 116:20 117:13 118:12 119:4,14 120:3,11,23 122:8,8 122:9,12,18 127:2 186:11,25 187:1,1,6 187:20,25 188:15 190:10 191:6,16,17 192:10 193:22 194:22 196:3 198:15 199:8,24 200:7,16 202:16 203:1 204:12,16,25 209:13,20 226:9 239:3,9 240:14 241:23 242:14
**treprostinils** 236:4
**treprostinil's** 87:5
**trial** 15:14 17:5 142:23 143:11 145:22



148:12,22 152:2
154:24 155:2 165:5
177:10 189:1 219:3
**trials**
90:5,12,17 126:25
143:21 144:11,15
**trick**
149:16,16,16
**tried**
159:23
**TRIUMPH**
195:21,22
**true**
25:7 76:2 116:16
257:7 258:5
**truth**
36:19
**truthful**
7:25
**try**
7:7 39:25 48:25
78:22 81:1 105:24
121:23 204:13
214:19
**trying**
77:17 85:1 164:21,22
179:6 195:3
**turn**
12:3 50:2,25 60:25
143:15 168:12,14
171:6 174:6 210:1
212:13 249:3,24
**two**
12:17 16:9 23:12
28:2,23 34:1,9
42:18 44:3 50:11
61:6 74:8,14 77:14
84:12 98:20 107:14
109:25 110:11
128:19 142:21
148:22 158:9
163:13 165:9
168:22 170:12
171:16,19 174:13
178:4,6 179:16
183:20 208:12,12

212:21 216:5 230:6
238:12 250:10
**two-week**
19:25
**type**
15:3 16:20 83:9
**types**
84:14 182:8
**typically**
27:24 89:7 104:4,8
106:9 107:5 140:24
214:19
**typo**
12:20,22 14:4
**typos**
12:17 14:5
**Tyvaso**
114:5,13 127:4,12
128:13,14 129:3,6
129:10,24 130:12
132:20 133:8
135:17 195:23,24
209:12,20 210:3,12
210:20 211:1,2,9,15
212:5,10,14,19,22
213:11,13 214:1,3,8
214:13,16 215:3,21
215:22 216:3
**t-a-d-a-l-a-f-i-l**
122:10

---

**U**

**UCSD**
168:24 169:2 170:15
**Uh-huh**
234:4 239:1
**ultimately**
31:3 223:17
**ultrasonic**
195:23
**umbrella**
237:22
**unavailable**
106:12
**uncertain**
37:8 182:20 187:10

188:4
**uncommon**
208:2 209:6
**underlying**
83:19,21 86:18 87:12
87:19 88:12,21
89:18 90:14 93:8
95:1,19 98:5 178:1
245:22
**underscores**
49:21 224:1
**understand**
6:22 7:14,17,23
10:25 67:2,18 181:1
182:13 184:4 237:4
237:24 238:5,10
240:3 242:3 243:13
244:12
**understanding**
69:15 133:11,13,15
180:7 194:23
215:13 235:22
248:12
**understood**
7:10 20:2 116:9
215:14
**undertaken**
73:13 76:4
**undesirable**
198:17
**unequivocably**
108:24
**unexpected**
35:22
**unfortunately**
228:16
**uninformative**
231:21
**United**
1:1,5 5:5 8:3 11:1
18:1 19:3,11,15
30:1 31:4 40:2 44:5
44:6 46:6 49:10
59:11,19,22 60:4,8
60:20 65:10,17
179:25 189:11

232:21 233:3,7,21
233:23 234:13,22
235:2,22 259:3
**units**
73:17,24 74:14 111:4
182:24 198:16
**unity**
56:10 117:22
**universe**
85:2
**University**
22:22 23:4,10
**unknown**
185:20
**unpredictive**
125:14
**unusual**
90:3
**unwind**
178:6
**update**
17:25 18:18 20:1
**updated**
17:21,22 18:11,20,25
19:14,24
**updating**
18:5
**use**
49:11 50:15 87:10
95:6,14,23 121:19
128:7 168:8 169:19
169:20 175:3 190:9
192:2 214:16
217:22 221:24
224:3 227:23
229:11 232:4 236:4
239:9 240:4
**usually**
80:4 175:8
**UT**
44:3 235:15
**UTC**
3:22 18:12 39:22
180:1 256:2
**UTC_PH-ILD**
4:15 165:21 229:2



UTC_PH-ILD-009...
180:1
UTC_PH-ILD_005...
3:24 189:12
UTC_PH-ILD_009...
4:10 216:16
UTC_PH-ILD_009...
4:12 218:15
UTC_PH-ILD_010...
3:20
UTC_PH-ILD_010...
153:20
UTC_PH-ILD_010...
4:6 209:14
UTC_PH-ILD_010...
4:9 210:5
UTC_PH-ILD_010...
4:7 209:22
UTC_PH-ILD_010...
4:17 233:10
UTC_PH-ILD_010...
4:14 224:12
UTC_PH-ILD_010...
4:4 202:19
UTC_PH-ILD_010...
143:1
UTC_PH-ILD_9828
4:2 196:5
UTC_PH-IL_010830
3:11
UVA
23:19,24
U.S
233:8

**V**

v
1:7 5:6 15:8 259:3
vacillations
117:25
vague
214:5 238:4
validate
117:18 152:23
validated
35:7

validity
15:20
value
35:4 124:20 174:25
176:5,7,8 199:19
204:20 205:5
221:12
valued
42:8
values
173:18 181:18
183:17,19
variability
140:6,9
variable
244:4
various
7:13 22:14 24:8
26:11 31:11 33:14
118:4 126:22
vascular
54:21 73:16,23 74:7
74:13 75:9 103:8
106:25 125:6 201:3
201:8,9 222:8 227:4
vasculature
106:11,14,17,19
vaso
114:15
vasodilation
107:12
vasodilator
102:24 103:9,16
110:17 111:21
115:2,3,10,18 227:7
vasodilators
115:8
VCU
23:16,17
vehicle
241:22
velocity
106:15 107:1
ventilated
108:3,6,8,9 113:20
114:15

ventilation
110:8,12,14
ventricular
3:15 145:7,19
verbal
7:3
verbiage
68:8
version
123:17 127:24
255:16
versus
16:13 37:22 58:15
78:16 86:5 93:19
100:6 123:18 128:2
129:22 131:15
137:5 138:19 139:7
139:13 172:13,15
172:23 186:24
194:22 204:16
217:4 221:20
verus
16:19
vessels
106:6,6 108:7 110:7
236:23
Vic
48:2
Victor
29:2,3 30:24 41:18
48:2 231:24
video
7:2
videographer
2:24 5:2,13 64:15,19
142:13,17 196:16
196:20 247:18,22
256:3
videotape
5:3
Vienna
6:15
view
29:15 76:21 160:17
245:19
views

161:8
Virginia
6:16 22:22 23:5,9
virtue
17:1 88:1
visits
230:6
visual
148:3
vital
90:20,21 139:19,22
140:2,5,7,15
volume
218:23
volumes
88:2
VQ
109:5,11,20,25
110:13,18 111:8
112:9 114:21
198:16

**W**

Wade
233:8 234:5
Wait
166:3
walk
54:1,2,6,11,15,24
100:23 101:11
126:1,10,23 137:7
137:12 144:18
147:1,14 151:6
153:6 199:7,11
221:5,9 222:14
230:5,10,12 231:17
240:16,20 241:9
walking
133:2
walks
231:4
Wang
206:24 224:10 225:2
225:13
want
11:17 22:15 25:4



48:24 64:9 98:6
108:16 114:23
115:25 116:8,10
124:11 125:23
127:22 142:9 152:8
158:16,23 162:23
189:23 191:21
201:22 203:15
210:23 220:12
252:14
**wanted**
47:15 68:13 248:13
**warrant**
151:22
**warranted**
155:18
**Washington**
1:10,20 2:19 5:11
16:19
**wasn't**
13:25 14:15 17:11
21:12 35:5 61:19,23
63:20 70:25 88:8
89:8 96:10 119:6
120:17 170:11
177:1 204:19
212:12
**Waxman**
28:24 41:12 196:4
197:15,18 198:1
202:18 206:3
208:22 218:14
222:25 223:9 232:1
**Waxman's**
30:20
**Waxman-Agarwal**
208:23
**way**
6:15 10:18 17:9 31:2
40:8 56:4 59:5
68:14 77:19 101:12
104:19 107:8
116:21 128:6 135:4
158:2 162:8,18
164:10 173:22
176:16 195:13,17

214:12 245:9,20
257:11
**ways**
34:1,14 59:18 114:3
173:23 238:12
**weakness**
202:7
**week**
8:16 24:24 149:11
168:5 174:13
203:25
**weekly**
17:23
**weeks**
55:18 117:22 168:25
172:15 173:1 205:6
**weird**
10:17
**Welcome**
64:22 142:20 247:25
**well-being**
106:20
**well-done**
154:22
**well-ventilated**
198:16
**went**
22:19 25:11 26:22
67:3 68:9 164:10
223:24,25 227:4
231:14 235:14
**weren't**
151:11 176:6
**we'll**
98:19 121:23 186:4,5
**we're**
29:17 30:6 35:24
59:5,5 82:18 89:22
118:16 185:6
224:20 245:9
**we've**
17:4 31:1,20 64:8
72:17 79:19 206:4
208:24
**whichever**
149:8

**wide**
56:9 174:23 230:8
**wider**
230:9
**willing**
42:2
**window**
19:25
**withdraw**
95:11
**witness**
1:14,16 5:25 6:5 9:11
9:18 10:5 12:6
13:10 14:10 16:17
17:8 18:4,14 19:6
20:12 25:9 26:4
27:2,23 28:18 29:9
29:25 31:17 32:16
33:3,10,25 34:12,20
35:13,19 36:16
37:11,21 38:6,15,24
39:10,18 40:7,23
41:16,23 42:7 43:7
43:15,21 44:11,20
45:8,15,20 46:5,20
47:6,20 48:9 49:18
50:9,17 51:10 52:11
53:6 54:18 56:3,21
57:5,14 59:3 60:10
60:15,23 61:1,13,19
62:15 63:4,11 65:4
65:13,19 66:4,14
67:14 69:7,14 70:3
70:7,17,22 71:14,20
72:15,25 73:8 74:20
76:2,25 78:1,10
79:12,23 80:13
82:23 83:24 84:19
85:17 86:3,22 87:2
87:7,14,23 88:15,24
89:21 90:16 91:13
92:4,18 93:5,18
94:12 95:10 96:2,25
97:7,17 98:2,14
99:1 100:3 101:22
102:11,18 103:5

104:14,22 105:19
107:23 109:9
110:22 111:2 112:1
112:12,22 113:3
114:18 115:22
116:8,25 118:24
119:6,19 120:6,15
120:25 121:8,16
122:5,17 123:11
124:1,8,24 126:5,14
127:7,17 128:17,24
129:5,13,18 130:2,8
130:16 131:2,7,13
132:1,12,19,24
133:11,17 134:2,12
135:7,15,24 136:6
137:3,16 138:14
139:5,19 140:19
141:11 142:4 143:6
143:25 144:23
145:3 146:1,13,20
147:18,25 148:7,14
150:18 151:10
152:4 153:8 154:17
155:2,25 157:11,20
158:14 160:19
161:5 162:6,11
163:5,24 164:20
166:19 167:3,12,18
168:2,15,21 169:7
169:24 170:9,21
171:15,19 172:6
173:12 174:11
175:7,20 176:23
177:12,23 178:14
178:25 179:9,14
180:12 181:6
182:15 184:8 185:3
185:17 186:14
187:9,24 188:19
189:5 190:13 191:1
191:11,21 192:6,14
192:25 193:15,25
194:10 195:2
197:13 198:3,8,23
199:10,18 200:9,21

201:22 203:19
204:18 205:3 206:6
206:22 207:6,13
208:5 209:1 211:12
211:17 212:15
213:7,16 214:6,15
215:19 216:8 217:2
217:19,25 219:6,16
220:4,9,24 221:12
223:5,14 225:11
226:7,22 227:17
228:2 232:7 233:1
233:23 236:15
237:10 238:5
239:12,22 240:8
241:1,5,13 242:7
243:5,19 244:15
245:7 246:1,18
248:20,24 249:15
250:18,23 251:11
252:10 253:14
254:25 255:13
**wood**
73:17,24 74:14
182:24
**word**
24:21
**wording**
80:13
**words**
72:18 79:21 80:9
156:19 181:16
182:1 250:7 255:23
**wordsmithing**
67:3,20
**work**
8:20,24 18:12 25:1,1
59:10 113:14,15
154:20 159:2
160:12,24 161:3,21
163:2 217:13
223:22 234:13
**worked**
8:21 40:9 81:21
115:4,10 223:21
235:7,9

**working**
8:12 24:25 59:15,17
59:20
**works**
25:11 75:18 101:12
109:1 113:18,22
114:2,2 115:1
**world**
73:19 74:21 161:19
**World's**
24:18
**worse**
140:23
**worsening**
27:18 53:13 55:15,16
55:18 58:5,22
111:15 138:4,6
**wouldn't**
35:3 38:6 42:23
67:14 93:9 152:4
154:17 156:12
162:21 176:7
214:15 238:20
**write**
95:4 120:18
**written**
96:19 97:20 132:1
200:1
**wrong**
24:21 134:16 157:8
218:22 253:3
**wrote**
10:10 68:5,17 96:10

— **X** —

**X**
230:12

— **Y** —

**yeah**
23:6 61:15 68:25
83:11 98:19 125:25
160:2 164:3 186:22
213:18 215:16
216:21,21 244:2
**year**

8:7
**years**
14:14,17,19 21:9
29:17 30:11,12 60:8
79:13 87:24 89:22
92:19,22 94:6,8
97:21 111:7 132:2
134:22 235:15
**yellow**
10:23
**York**
81:7
**Yutrepia**
62:12,16,18 63:18
133:25 134:6 135:3

— **Z** —

**zero**
117:21,24 168:25
173:18,19
**Zisman**
142:25 146:10
163:17

— **$** —

**$100,000**
60:13

— **0** —

**01**
147:1
**010487**
165:21
**010599**
4:15 229:2
**022**
221:13
**03**
204:3 205:5
**03/2021**
209:21
**0496**
3:20
**06/2023**
210:4
**09943**

4:12 218:15

— **1** —

**1**
3:9 5:4 10:11,13
25:18 36:4 76:18,18
77:23 78:2,8,12,16
78:19 86:5,10 89:6
90:1,6,12,18 91:6
91:24 93:11 94:3
95:20 104:23 105:1
105:12 106:8 114:5
114:19,21 121:12
121:25 122:23
140:21 141:20
148:23 163:21
189:24,25 190:8
193:3,3,9,20,21
200:17 201:7 212:7
212:22 213:3
220:15 222:11
226:18 227:23
235:24 244:17,23
245:14,16,17
246:11,16,22 247:6
247:12 249:6,8,17
250:6 252:19
254:17,20
**1.21**
204:21
**1.8**
204:1 205:4
**1/17**
19:24
**1:57**
196:18
**10**
1:11 3:9 4:2 5:9 25:1
42:19 77:13 140:8
140:11,15,23,24
141:4,17 162:22,24
162:25 163:1 196:1
196:6,23 206:2
207:22 208:24
**10,716,793**
179:25



**10:12**
64:16,18
**10:21**
64:18,20
**100**
13:14 151:7
**101**
13:14
**108**
172:15
**109**
172:15
**11**
3:10 4:3 25:20
140:23 149:12
150:1 186:20
202:14,22,24,25
221:15,17 222:15
**11,826,327**
189:11
**11:51**
142:14,15
**119**
13:8
**12**
4:5 128:1 168:5
200:12 205:21
209:10,16 210:12
210:19,25 211:20
212:4,6 213:18
214:9,20
**12-week**
148:23,25
**12:46**
142:16,18
**1200**
25:20
**1252**
6:15
**1299**
2:17
**13**
4:7 181:14 209:19,23
210:20 211:7,20
212:13,20
**13:57**

196:17
**136**
172:13
**137**
51:20 172:13
**14**
4:8 181:14 209:25
210:9,20 211:14,14
211:20 215:17
221:18
**145**
3:13
**15**
4:10 92:19,22 94:6,8
190:7,9,24 191:1
216:11,18 227:15
227:22
**15:18**
247:19
**15:43**
247:23
**15:54**
256:4
**153**
3:16
**16**
4:11 117:22 195:7
203:25 205:5
218:10,16 219:12
219:25 221:23
**165**
3:20
**166**
3:21
**17**
4:13 18:21 19:4
221:16 224:7,15
236:17
**17.6**
176:12
**172**
176:3
**176**
250:12,13,15,20
255:3,6,9
**179**

3:22
**18**
4:15 51:12,22,25
52:3,9 180:13
190:23 191:1,4,14
191:15,22,24
228:19,24 231:23
232:22
**18565**
2:6
**189**
3:24
**19**
4:16 143:2 190:7
191:2 195:20 233:6
233:11 242:10
**1900**
1:19 5:11
**196**
4:2
**1980s**
82:25
**1982**
82:8,18
**1988**
21:19 81:18
**1994**
81:22
**1996**
81:13

----

**2**

**2**
3:10 11:5,7,14 14:9
20:3,4 47:13 66:11
141:20 146:9
148:24 155:25
158:2,25 186:19,23
187:5,21 210:15
214:25 236:1,3
250:11
**2A**
158:25
**2B**
3:19 26:16 153:15
**2.1**

214:25
**2.5**
25:11
**2:07**
196:19,21
**20**
73:21 74:6,11 75:6
75:13 93:21 169:13
174:1 230:9
**200**
80:24
**2000s**
83:3
**20004**
2:19
**2002**
85:12
**2009**
87:5 114:6,10,12
209:13 210:12,17
210:19 211:1,5
212:5,10 213:12
214:2,7,13,24
**201**
28:7
**2010**
85:22 143:14 150:9
150:16
**2013**
145:9
**2013/0096200**
233:9
**2016**
26:15 28:14 47:15
87:19
**2017**
206:20 207:3 225:13
227:21
**2018**
22:7 25:7 73:20
74:22 165:20
**202.842-7889**
2:20
**2020**
43:22 44:13 74:17,20
74:22 75:11,23 92:7



177:17 195:10
**2021**
26:15 39:1,1 92:13
202:17 210:19
211:8 212:14,19,20
212:23 213:2,11
214:1
**2022**
74:10 85:15
**2023**
211:15 215:21 216:3
**2024**
1:11 5:9 8:8 12:11
18:21 19:4
**2028**
257:21
**203**
47:16
**209**
4:5,7
**21**
203:16
**210**
4:8
**216**
4:10
**218**
4:11
**22**
221:16 222:15
**22182**
6:16
**224**
4:13
**228**
4:15
**23**
210:20
**23-975**
5:8
**23-975(RGA)**
1:6
**233**
4:16
**24**
57:25 168:25 172:14

173:1 174:13
243:24 244:3
**248**
3:4
**25**
20:17 73:15 93:22
128:17
**250**
2:6
**254**
3:5
**26**
12:11 204:6
**28**
149:11 172:21,25
**29**
50:25 51:22 52:3
57:23

_____ 3 _____
**3**
3:11 26:18 48:20
49:9 76:14,18 77:24
78:4,8,13,16,21
86:6 104:23 105:8
105:13,17 121:13
122:2,13 123:8
140:8 141:8 142:22
143:8,10 145:23
149:2,6 150:8
163:16,22 165:5
181:13 189:1 196:3
197:9,10 199:23
205:18 208:10,14
213:4 217:9 218:2
219:8,19 222:22
226:5,19 227:24
228:10 239:15
246:16,22 247:5,13
**3.9**
230:12
**3:18**
247:20
**3:43**
247:21
**3:54**

256:6
**30**
90:1 125:19 128:17
186:25 238:25
257:21 259:9
**31**
61:11 230:2
**31.6**
230:2,3,17 231:4
**32**
230:2
**326**
205:9,10
**327**
68:24 69:2,25 70:10
70:15 183:23
189:14,18,19,24
190:3,8,15 192:1,9
193:2,20,21 194:6
194:18,24 195:17
200:17 248:25
249:17 251:1,3,7,23
252:4,5 253:4,10
**336**
57:15
**34**
231:1
**36**
68:23
**37**
239:14,17
**39**
230:13

_____ 4 _____
**4**
3:13 26:7 76:18
145:5,10 147:10,11
148:11 151:2,4
156:17 240:10,13
243:3
**400**
25:18
**41**
230:14
**43**

13:10,14 70:6
**44**
60:25 61:12
**44.4**
204:19
**45**
186:25

_____ 5 _____
**5**
3:16 25:12 26:3,5,14
76:19 141:2,17
153:11,16 240:10
**5.2**
230:8
**50**
106:10,14,23,25
190:4 231:1 243:2,6
**500**
25:18 160:16 253:24
**51**
176:25
**51.3**
174:18
**5360**
189:13
**540**
153:20
**58**
67:7,11
**59**
67:24

_____ 6 _____
**6**
3:3,20 165:10,12,25
166:4,5,12,15,25
167:7,25 241:16,17
**60**
57:18 187:1
**60.85**
199:12
**61**
240:11
**610**
4:15 229:3

**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000790

**62**
146:17 147:10
**621**
148:20
**627**
143:15
**68**
67:24
**69**
67:24

— 7 —

**7**
3:21 165:22 166:1,7
166:21,22 168:12
168:18 171:8 174:7
175:21
**70**
67:24 90:22
**700**
2:18
**708**
4:6 209:15
**72**
90:25
**74**
68:3
**742**
4:9 210:5
**76**
68:4
**77**
68:4
**781**
4:17 157:22 233:10
**785**
156:3
**789**
4:14 224:13
**793**
180:3,8,8 181:3
183:24 184:4,24
185:12 186:8,20
187:18 188:13
189:21 190:1,6,9,19
190:24 191:5,7,16

192:9 193:10,21
248:15 249:24
250:3,6,24 251:7,15
251:22 252:4,5,7,8
252:19 253:6,17
254:3,16,20
**796**
3:23 180:2

— 8 —

**8**
3:22 50:2,3 63:2
179:21,24 180:2
189:21 248:22,23
249:25
**8.7**
201:3
**80**
56:6 57:19 182:25
230:2,13 231:2
**82**
241:16 242:3
**829**
202:20
**829TR:1**
4:4
**838**
143:1
**838TR:1**
3:12
**84**
160:9
**85**
176:12

— 9 —

**9**
3:24 189:7,10,14
200:11 205:21
207:16,23 213:18
214:9 248:22,23,25
**9:00**
1:20
**9:01**
5:10
**90**

11:22,23 12:4,9
190:24
**92.6**
199:13
**92612-2565**
2:7
**949.989.8292**
2:8
**95**
84:20 85:5 176:11,23
**9852**
4:10 216:16
**99**
13:14 84:21 85:5
**99.3**
147:1

MAGNA
LEGAL SERVICES

# EXHIBIT 10

```
1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    UNITED THERAPEUTICS CORPORATION,)
                                    )
5                   Plaintiff,      )
                                    ) C.A. No. 20-755-RGA-JLH
6    v.                             )
                                    ) Volume III
7    LIQUIDIA TECHNOLOGIES, INC.,   )
                                    )
8                   Defendant.      )

9
                                    J. Caleb Boggs Courthouse
10                                  844 North King Street
                                    Wilmington, Delaware
11
                                    Wednesday, March 30, 2022
12                                  8:30 a.m.
                                    Bench Trial
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16

17           MORRIS NICHOLS ARSHT & TUNNELL LLP
             BY:  JACK B. BLUMENFELD, ESQUIRE
18           BY:  MICHAEL J. FLYNN, ESQUIRE
             BY:  SARAH E. SIMONETTI, ESQUIRE
19
                     -and-
20
             GOODWIN PROCTER LLP
21           BY:  WILLIAM C. JACKSON, ESQUIRE
             BY:  HUIYA WU, ESQUIRE
22           BY:  IAN B. BROOKS, ESQUIRE
             BY:  JOEL BROUSSARD, ESQUIRE
23           BY:  HARRISON GUNN, ESQUIRE
             BY:  ERIC LEVI, ESQUIRE
24
25                   - and -
```

```
1   APPEARANCES CONTINUED:

2

3               McDERMOTT WILL & EMERY LLP
                BY:  DOUGLAS H. CARSTEN, ESQUIRE
4               BY:  ADAM W. BURROWBRIDGE, ESQUIRE
                BY:  KATHERINE PAPPAS, ESQUIRE
5               BY:  TIMOTHY M. DUNKER, ESQUIRE
                BY:  ART P. DYKHUIS, ESQUIRE
6               BY:  AMY MAHAN, ESQUIRE
                BY:  JOSHUA REVILLA, ESQUIRE
7               BY:  JIAXIAO ZHANG, ESQUIRE

8                                   For the Plaintiffs

9

10              SHAW KELLER LLP
                BY:  KAREN E. KELLER, ESQUIRE
11              BY:  NATHAN R. HOESCHEN, ESQUIRE
                BY:  EMILY DiBENEDETTO, ESQUIRE
12
                         -and-
13
                COOLEY LLP
14              BY:  SANYA SUKDUANG, ESQUIRE
                BY:  ADAM M. PIVOVAR, ESQUIRE
15              BY:  BRITTANY CAZAKOFF, ESQUIRE
                BY:  DOUGLAS W. CHEEK, ESQUIRE
16              BY:  JONATHAN R. DAVIES, ESQUIRE
                BY:  IVOR ELRIFI, ESQUIRE
17              BY:  DEEPA KANNAPPAN, ESQUIRE
                BY:  LAUREN KRICKL, ESQUIRE
18              BY:  ERIK B. MILCH, ESQUIRE
                BY:  KYUNG TAECK MINN, ESQUIRE
19
                                    For the Defendants
20

21                    ***  PROCEEDINGS  ***

22          DEPUTY CLERK:  All rise.  Court is now in

23   session.  The Honorable Richard G. Andrews presiding.

24          THE COURT:  All right.  Good morning, please be

25   seated.
```

Waxman - Direct

08:29:59 1          I'm not sure exactly what the order is here, but

08:30:03 2     whoever is next, please do something.

08:30:07 3          MS. KIM:  Good morning, Your Honor.  Mandy Kim

08:30:09 4     on behalf of UT.  And we call Dr. Waxman to the stand.

08:34:32 5          MR. FLYNN:  Your Honor, may I approach?

08:34:32 6          THE COURT:  Sure.

08:34:32 7          DEPUTY CLERK:  Please state and spell your full

08:34:32 8     name for the record.

08:34:32 9          THE WITNESS:  Aaron B. Waxman, A-A-R-O-N.

08:34:32 10    Middle initial B.  Last name W-A-X-M-A-N.

08:34:32 11         DEPUTY CLERK:  Do you affirm that the testimony

08:34:32 12    you are about to give to the Court in the case now pending

08:34:32 13    will be the truth, the whole truth, and nothing but the

08:34:32 14    truth, you do so affirm?

08:34:32 15         THE WITNESS:  I do.

08:34:32 16         DEPUTY CLERK:  Please speak in the microphone.

08:34:32 17    Please make sure you speak into it.

08:34:32 18         THE COURT:  Thank you.

08:34:32 19         MS. KIM:  May I proceed, Your Honor?

08:34:32 20         THE COURT:  Yes.

08:34:32 21                  DIRECT EXAMINATION

08:34:32 22    BY MS. KIM:

08:34:32 23    Q.    Good morning, Dr. Waxman.  Please introduce yourself

08:34:32 24    to the Court and what you do for a living.

08:34:32 25    A.    My name is Aaron Waxman, and I'm a physician,

Waxman - Direct

08:34:32 1  pulmonary critical care medicine, at the Brigham and Women's

08:34:32 2  Hospital in Boston and Associate professor of medicine at

08:34:32 3  Harvard Medical School.  And I'm the executive director of

08:34:32 4  the Center for Pulmonary Heart Disease and more specifically

08:34:32 5  the director of the pulmonary vascular disease program at

08:34:33 6  Brigham and Women's Hospital.

08:34:33 7  Q.     What are your responsibilities in these positions?

08:34:33 8  A.     So as the executive director, I oversee the broader

08:34:33 9  pulmonary heart disease program, which includes all aspects

08:34:33 10  of pulmonary vascular disease and right-heart failure and

08:34:33 11  oversee eight faculty that work on the program as well as a

08:34:33 12  large clinical trials and basic research program.

08:34:33 13  Q.     Please briefly describe your educational background.

08:34:33 14  A.     Undergraduate, I went to GW, George Washington

08:34:33 15  University, in D.C. and then went on to get a Ph.D. in

08:34:33 16  anatomy and neuroscience, and then after that, an M.D. at

08:34:33 17  Yale University where I also did a number of research

08:34:33 18  fellowships and then all my post-graduate training in

08:34:33 19  internal medicine, pulmonary, and critical care medicine.

08:34:33 20  Q.     And what area of medicine have you been focused on

08:34:33 21  after medical school and fellowships?

08:34:33 22  A.     Again, broadly speaking, I've practiced the full

08:34:33 23  range of pulmonary and, specifically, critical care medicine

08:34:33 24  and then more specifically pulmonary vascular disease and

08:34:33 25  care of patients with pulmonary hypertension.

Waxman - Direct

08:50:11 1    yes.

08:50:13 2    Q.     So reading Claim 1 in the context of the patent,

08:50:16 3    would a POSA, in your opinion, know whether isolated

08:50:20 4    postcapillary PH is within the scope of the claims?

08:50:25 5    A.     I think a POSA would understand that isolated

08:50:28 6    postcapillary disease, again, would be treated with a

08:50:32 7    diuretic and not a pulmonary vasodilator.

08:50:35 8    Q.     As of May 2006, would a POSA have understood that

08:50:40 9    prostacyclins would not be -- would not likely work for

08:50:43 10   isolated postcapillary PH patients?

08:50:46 11   A.     Yes.  I mean, essentially, any pulmonary vasodilator

08:50:51 12   would probably not be needed.

08:50:53 13   Q.     Thank you.  Let's turn to enablement.  Have you

08:50:59 14   prepared a slide of your opinions on enablement?

08:51:02 15   A.     Yes.

08:51:03 16   Q.     What are your opinions -- what are your -- at a high

08:51:06 17   level, what are your opinions on enablement?

08:51:08 18   A.     So, I think that the information provided in the

08:51:11 19   patent provides plenty of information to enable someone

08:51:15 20   who's skilled in the art to be able to make the invention.

08:51:20 21   Q.     And what's the basis for your opinions?

08:51:24 22   A.     Well, in the examples that are in the patent, there's

08:51:27 23   plenty of information as far as the patient population to

08:51:31 24   treat, how to treat, as far as a single-event therapeutic

08:51:36 25   dosing that results in improved hemodynamics.  There's

Waxman - Direct

08:51:39  1    information about delivering it as an inhaled therapy, and

08:51:43  2    there's information, I think very importantly, on dosing to

08:51:48  3    get that single-event therapeutic dose.

08:51:51  4    Q.     And do you recall Dr. Hill opining that, once again,

08:51:54  5    a POSA or the patent is not enabled because -- he used the

08:51:59  6    same rationale of isolated postcapillary group two PH

08:52:03  7    patients not being enabled with the description in this

08:52:07  8    patent?

08:52:08  9             Do you recall that?

08:52:08 10    A.     I recall that, yes.

08:52:09 11    Q.     Do you agree with his opinions?

08:52:11 12    A.     Well, I think, again, as I've said, I don't agree in

08:52:15 13    the sense that we wouldn't treat a postcapillary disease

08:52:18 14    with a pulmonary vasodilator of any kind.

08:52:24 15    Q.     And does the patent support your opinions?

08:52:27 16    A.     I think it does.  Like I said, there's a description

08:52:31 17    in there of treating idiopathic or group one, group five

08:52:36 18    with PH other, chronic thromboembolic, group four, pulmonary

08:52:42 19    fibrosis, group three, and if we look at that table up

08:52:44 20    there, it does describe pulmonary hypertension, but you can

08:52:48 21    see there's no pulmonary capillary wedge pressure listed

08:52:51 22    anywhere, so we really don't know if anyone had combined

08:52:55 23    pre- or postcapillary PH.

08:52:57 24    Q.     Do you recall Dr. Hill also opined that in 2006 there

08:53:01 25    was no evidence that prostacyclins could treat any group two

651

Waxman - Direct

09:08:34 1    Q.    Could one expect for that to translate into

09:08:38 2    therapeutic efficacy?

09:08:38 3    A.    Well, that would speak to therapeutically effective

09:08:41 4    dosing when you see a hemodynamic response.  Yes.

09:08:45 5    Q.    So, I want to briefly talk about one of the

09:08:47 6    limitations in Claim 1, a therapeutically effective

09:08:51 7    single-event dose.  Can you explain to the Court what this

09:08:54 8    term means.

09:08:55 9    A.    So, a single event therapeutically effective dose

09:08:59 10   refers to providing an effective dose of the drug in a

09:09:05 11   single sitting.

09:09:07 12   Q.    And in your opinion, can a single-event dose be

09:09:10 13   therapeutically effective?

09:09:11 14   A.    Well, especially in the case where we're talking

09:09:14 15   about a hemodynamic disease, you want to see a

09:09:17 16   therapeutically effective dose cause a positive change in

09:09:22 17   those hemodynamics.  So any anything - -- a therapeutically

09:09:26 18   effective dose should cause a reduction in pulmonary artery

09:09:29 19   pressure and cause a reduction in pulmonary vascular

09:09:32 20   resistance, and one would expect then that that hemodynamic

09:09:35 21   effect would translate into a patient feeling better, doing

09:09:39 22   more, and probably living longer.

09:09:43 23   Q.    Do you recall Dr. Hill's opinions in his expert

09:09:46 24   report regarding what "therapeutic effective" means?

09:09:50 25   A.    I do, yes.

Waxman - Direct

09:09:51  1     Q.      What are his opinions, to your understanding?

09:09:53  2     A.      His opinions are that a therapeutically effective

09:09:56  3     dose should make a patient feel better, do more, and live

09:10:00  4     longer.

09:10:01  5     Q.      Do you agree with Dr. Hill's opinions?

09:10:03  6     A.      Well, I think those opinions are taken from an FDA

09:10:06  7     mandate that came down, especially in pulmonary hypertension

09:10:10  8     clinical trial development, where the goal of these drugs

09:10:14  9     are to make patients feel better, live -- and do more and

09:10:18 10     live longer.  But that applies to a clinical trial.

09:10:21 11             But when we're talking about the clinically

09:10:23 12     effective dose in a hemodynamic disease, it has to be able

09:10:28 13     to improve the hemodynamics, which then would translate into

09:10:32 14     all of those features:  a patient feeling better, doing

09:10:35 15     more, and living longer.

09:10:37 16     Q.      Even if the Court were to agree with Dr. Hill's

09:10:40 17     opinion with respect to therapeutically effective, in your

09:10:45 18     opinion, does Liquidia's LIQ861 product still meet this

09:10:49 19     claim limitation?

09:10:50 20     A.      Yes.  I mean, it's been compared nicely to TYVASO and

09:10:55 21     has the same -- same therapeutically effective single-event

09:11:00 22     dosing.

09:11:01 23     Q.      Even just taking it once?

09:11:02 24     A.      It -- taking it once impacts the hemodynamics in a

09:11:06 25     positive way that would translate into those three features

Waxman - Direct

09:11:10  1    that I mentioned, feeling better, doing more, and living

09:11:12  2    longer.

09:11:14  3    Q.      Thank you Dr. Waxman.

09:11:15  4            Let's move on to Claim 4.  Can you explain to

09:11:19  5    the Court what the basis for your opinions with respect to

09:11:22  6    Claim 4 are.

09:11:23  7    A.      Well, Claim 4 describes an inhalation device as a

09:11:29  8    dry-powder inhaler.  And I think it's very clear from all

09:11:32  9    the documents we just reviewed that Liquidia 861 is a

09:11:38 10    dry-powder inhaler.

09:11:40 11    Q.      And I think you have a slide on that.  Can you

09:11:42 12    explain some of the highlights from the documents that you

09:11:45 13    looked at right now with respect to Claim 4.

09:11:47 14    A.      Yeah.  As I said, all of the documents describe --

09:11:52 15    especially the package inserts and the instructions to the

09:11:55 16    patient -- specifically describe a dry-powder oral

09:12:00 17    inhalation and provide it has a dry-powder inhaler, and it

09:12:06 18    also speaks to the single-event dosing.

09:12:09 19    Q.      Thank you.  Let's move on to dependent Claim 6.

09:12:12 20            Can you explain the basis for your opinions.

09:12:15 21    A.      Yeah.  Essentially, the same as Claim 4, in that this

09:12:18 22    is simply talking about the administration as a powder, and

09:12:23 23    we've just reviewed how it's not only a powder, it is a

09:12:26 24    dry-powder delivered through a dry-powder inhaler, and it is

09:12:31 25    obviously Treprostinil.

HIGHLY CONFIDENTIAL          DA0323                    LIQ_PH-ILD_00000800

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755 (RGA) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

**EXHIBIT 2: PLAINTIFF'S STATEMENT OF CONTESTED FACTS**

i

## I.      INTRODUCTION

In accordance with Local Rule 16.3(c)(3) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, Plaintiff United Therapeutics Corporation ("Plaintiff" or "UTC") submits the following statement of contested facts with respect to United States Patent Nos. 9,593,066 (the "'066 patent"); 9,604,901 (the "'901 patent"); and 10,716,793 (the "'793 patent") (collectively, the "Patents-in-Suit").

The following statements are meant to serve as an overview of the contested facts to be litigated at trial.  Accordingly, Plaintiff reserves the right to prove additional details regarding the below facts, including any facts identified in its pleadings, discovery responses, including in its contentions, and/or expert reports and depositions, which Plaintiff incorporates by reference. Plaintiff further intends to offer evidence to rebut evidence offered by Defendant. Plaintiff reserves the right to modify or amend this Exhibit to the extent necessary to reflect any future rulings by the Court, and to supplement or amend this Exhibit to fairly respond to any new issues that Defendant may raise.  To the extent Plaintiff's statement of the issues of law that remain to be litigated, which is submitted as Exhibit 4 hereto, contains issues of fact, those issues are incorporated herein by reference.  Moreover, if any issue of fact identified below should properly be considered an issue of law, then such statement should be considered to be part of Plaintiff's statement of issues of law that remain to be litigated.  Plaintiff incorporates by reference its expert reports in support of any proof to be presented by expert testimony.

## II.      THE PATENTS-IN-SUIT

1.      Plaintiff is the lawful owner of the Patents-in-Suit by assignment of all right, title, and interest in and to the Patents-in-Suit, including the right to bring infringement suits.

HIGHLY CONFIDENTIAL           LIQ_PH-ILD_00000802

III.    **FACTS PERTAINING TO INFRINGEMENT OF THE '066 AND '793 PATENTS**

A.    **Defendant's Proposed Product**

2.    On January 24, 2020, Defendant submitted New Drug Application (NDA) No. 213005 ("Defendant's NDA") under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (the "505(b)(2) Application") to the United States Food and Drug Administration ("FDA") seeking approval, prior to the expiration of the '066, '901, and '793 patents, to manufacture, market, and sell a copy (the "Proposed Product") of Plaintiff's TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/ml.

3.    Defendant's 505(b)(2) Application was submitted prior to the expiration date of the '793 patent and the expiration date of the '066 and '901 patents.

4.    Defendant's 505(b)(2) Application contains a "Paragraph IV" certification pursuant to 21 U.S.C. § 355(b)(2)(A)(iv) alleging that the '066 and '901 patents are invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Defendant's Proposed Product.

5.    In a "Notice Letter" dated April 24, 2020, Defendant informed Plaintiff that Defendant's 505(b)(2) Application contained, *inter alia*, a Paragraph IV certification regarding the '066 and '901 patents.

6.    Defendant's Notice Letter further indicated that Defendant was seeking FDA approval to engage in the commercial manufacture, use, and/or sale of Defendant's Proposed Product prior to the expiration of the '066 and '901 patents.

7.    Plaintiff commenced this action before the expiration of forty-five days from the date it received Defendant's Notice Letter.

8.    Defendant's Proposed Product is a dry powder formulation of treprostinil sodium

**HIGHLY CONFIDENTIAL**       LIQ_PH-ILD_00000803

to be inhaled from a ████████████████████████████████ Defendant's

dry powder formulation is contained in capsules of ███████████████ of treprostinil

sodium. Two capsules can be combined to create larger doses, such as ██████.

9.      Defendant has imported and will import treprostinil sodium drug substance for use

in Defendant's Proposed Product.  The treprostinil sodium drug substance is manufactured by

Yonsung Fine Chemicals Co., Ltd. ("Yonsung") in Korea.  Yonsung manufactures treprostinil

sodium drug substance according to Drug Master File ("DMF") No. 27680. Defendant's NDA

cites Yonsung's DMF.

10.     Defendant uses LGM Pharma as its broker and LGM Pharma ships treprostinil

sodium from Yonsung to Defendant.

11.     Defendant's Proposed Label describes Defendant's Proposed Product as ████

████████████████████████████████████████████

12.     Defendant's Proposed Label identifies the ingredients in Defendant's Proposed

Product as: treprostinil (the active ingredient) █████████████████████

████████████████████████████████████████████

████████████████████

13.     Defendant's Proposed Label states that the ██████████████████

████████████████████████████

14.     ████████████████████████████████████

████████████████████████████████████████████

██████████████████████

15.     The dry powder particles are █████████████████████████

████████████████████████████████████████████

3

████████████████████████████████████████████████

16.    The particles have an aerodynamic size of between ████████████ for the powder's mass median aerodynamic diameter.

17.    The inhaler provided with Defendant's Proposed Product is an ████████████ ████████ dry powder inhaler (DPI) manufactured by ████████

18.    ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

19.    Defendant's Proposed Product is provided to patients in a ████████████ which includes a LIQ861 dry powder inhaler and ████████████████.

20.    ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

21.    The capsules are provided in ██████████████████████████
████████████████

22.    These ██████████████████████████████████████████
████████████████ respectively, through the inhaler.

23.    Defendant's Proposed Label instructs physicians to prescribe Defendant's Proposed Product in ████████████████████████████████████████
████████████████████.

24.    ██████████████████████████████████████ are achieved by instructing patients to inhale the contents of ████████████.

25.    ████████████████████████████████

4

HIGHLY CONFIDENTIAL   LIQ_PH-ILD_00000805

26.     To achieve a dose that requires ████████████████, patients must select their capsules from ████████████████

27.     Defendant's Proposed Label describes administration of inhalation ████████████
████████████

28.     Defendant's Proposed Product uses "PRINT" particles, which the LIQ861 NDA describes as having an ████████████████████████████████
████████████████

29.     The LIQ861 NDA states that ████████████████████████████
████████████████████████████

30.     ████████████████████████████████
████████████████

**B.     The Yonsung Manufacturing Process**

31.     In synthetic chemistry, no reaction product is 100% pure.

32.     ████████████████████████████

██     ████████████████████████████████

████████████████

██     ████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

35.     ████████████████████████████

36.



HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000807

7



8

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000809

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 340 of 1048 PageID #: 4848

███████████████████████████████████████████████████

■ ████████████████████████████████████████████

███████████████████████████████████

■ ████████████████████████████████████████████

███████████████████████████████████

■ ████████████████████████████████████████████

███████████████

■ ████████████████████████████████████████████

███████████████████████

■ ████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

69.    A drug substance may be used in the commercial manufacture of a drug product despite exposure to temperatures outside the suggested storage temperature range specified in the DMF and/or NDA for that drug substance.

70.    ████████████████████████████████████████

███████████████████████████████████████████████████

■ ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

■ ████████████████████████████████████████████

███████████████████████████████

HIGHLY CONFIDENTIAL                    DA0334                    LIQ_PH-ILD_00000810

73. 

79.     There is no temporal limitation on storage.

**C.     Administration of Liquidia's Proposed Product**

80.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered for the treatment of pulmonary arterial hypertension.

81.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered to a human suffering from pulmonary hypertension.

82.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is a dry powder formulation comprising treprostinil sodium, which is a pharmaceutically acceptable salt of treprostinil. The dry powder formulation in Liquidia's Proposed Product includes particles ████████████████ The dry

**HIGHLY CONFIDENTIAL**
LIQ_PH-ILD_00000811

powder formulation in Liquidia's Proposed Product does not contain ██████████

83.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered using the ████████████ ██████████████, which is a dry powder inhaler, which is an inhalation device.

84.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered ███████████ Each of those ██████████████ is a single event dose. Each of those ███████ ████████ is to be done in ██████.

85.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, includes administration of ██████ containing ████████████████ of treprostinil.

86.     The ███████████████ of Liquidia's Proposed Product of ██████ ████████████████████████████████████ of treprostinil. The ████████████████████ ████████ of treprostinil or a pharmaceutically acceptable salt thereof.

87.     Liquidia intends physicians to prescribe, and patients to use, Liquidia's Proposed Product according to the ██████████████████████ ████████████

88.     Liquidia's Proposed Product is to be stored at ███████████ ███████████

**D.    Defendant's Proposed Product Infringes the '066 Patent**

89.     The ████████████████████████████████████ unless otherwise specified.

11

90. ███████████████████████████

██ ████████████████████████████████████

92.    FDA regulations and other applicable law allow a pharmaceutical company to use a batch of a drug substance in the commercial manufacture of a drug product even though the batch has been exposed to storage temperatures outside of the range established in the DMF and/or NDA, provided there is stability data that supports the use of that material and the company has conducted a proper deviation investigation.

93. ████████████████████████████████

██████████████████████

██ ████████████████████████████

███████████████████████

██ █████████████████████████████

█████████████████████████

██ ███████████████████████████

█████████████████████████████████

██████████████████████████████████

████████████████████

██ ██████████████████████████

██████████████████████████████████

███████████████████████████████████

███████

██ ████████████████████████████

████████████████████████████

12

99. 

HIGHLY CONFIDENTIAL   DA0338   LIQ_PH-ILD_00000814



**E.      Defendant's Proposed Product Infringes the '793 Patent**

115.     The plain and ordinary meaning of "therapeutically effective" in the claims of the '793 patent is not limited to clinical study endpoints. It includes beneficial effects for the patient, including vasodilatory effects on the pulmonary arteries detectable in hemodynamic measurements, such as those described in the '793 patent.

116.     Administration of Liquidia's Proposed Product to patients will meet the claim limitation requiring a "therapeutically effective" single event dose.

117.     Administration of Liquidia's Proposed Product by patients will directly infringe claims 1, 4, and 6-8 of the '793 patent.

14

118.    Defendant's Proposed Label and Instructions for Use would encourage, recommend, or promote infringement of claims 1, 4, and 6-8 of the '793 patent by physicians, caregivers, and patients.

119.    Based on the contents of its Proposed Label and Instructions for Use, Defendant specifically intends to encourage, recommend, or promote infringement of claims 1, 4, and 6-8 of the '793 patent by physicians, caregivers, and patients.

120.    Liquidia will actively induce direct infringement by patients through its press releases, marketing, label, instructions for use, and conduct.

121.    Through the sale or offer for sale of Defendant's Proposed Product, Defendant will contribute to the infringement of claims 1, 4, and 6-8 of the '793 patent by patients or physicians or caregivers who administer Defendant's Proposed Product.

122.    Defendant has knowledge of the '793 patent at least as early as July 22, 2020; will sell or offer for sale its Proposed Product, which is a product for practicing a patented method, and which is not a staple article or commodity capable of substantial non-infringing use and which constitutes a material part of the invention; and Defendant knows that its Proposed Product was especially made or adapted for use in an infringing method. Thus, Defendant will also contribute to infringement of claims 1, 4, and 6-8 of the '793 patent.

## IV.    FACTS PERTAINING TO THE VALIDITY OF THE '066, '901, AND '793 PATENTS

### A.    The '066 and '901 Patents are Valid

123.    A POSA would have understood that the '066 and '901 patents satisfy the written description requirement.

124.    A POSA would have understood that the inventors were in possession of the "Impurities" limitation of the '066 and '901 patents.

15

125.    A POSA would have understood that the inventors were in possession of the "Salt" limitation of the '066 and '901 patents.

126.    A POSA would have understood that the inventors were in possession of the "Stored"/ "Storing"/ "Storage" at "Ambient Temperature" limitations of the '066 and '901 patents.

127.    There is no limitation prohibiting column chromatography in the '066 and '901 patents, but nevertheless a POSA would have understood that the inventors were in possession of such a limitation.

128.    There is no limitation prohibiting isolation of treprostinil before combining with a base to form a salt in the '066 and '901 patents, but nevertheless a POSA would have understood that the inventors were in possession of such a limitation.

129.    A POSA would have understood that the inventors were in possession of the "Therapeutically Effective Amount" limitation of the '901 patent.

130.    A POSA would have understood that the '066 and '901 patents satisfy the enablement requirement.

131.    A POSA would have been able to practice the "Salt" limitation of the '066 and '901 patents without undue experimentation.

132.    A POSA would have been able to practice the "Stored"/ "Storing"/ "Storage" at "Ambient Temperature" limitations of the '066 and '901 patents without undue experimentation.

133.    There is no limitation prohibiting column chromatography in the '066 and '901 patents, but nevertheless a POSA would have been able to practice such a limitation without undue experimentation.

134.    There is no limitation prohibiting isolation of treprostinil before combining with a base to form a salt in the '066 and '901 patents, but nevertheless a POSA would have been able to

16

practice such a limitation without undue experimentation.

135.    A POSA would have been able to practice the "Therapeutically Effective Amount" limitation of the '901 patent without undue experimentation.

136.    A POSA would have understood that the '066 and '901 patents satisfy the definiteness requirement.

137.    A POSA would have been able to discern the scope and meaning of the "Impurities" limitation of the '066 and '901 patents with reasonable certainty.

138.    A POSA would have been able to discern the scope and meaning of the "Stored"/ "Storing"/ "Storage" at "Ambient Temperature" limitations of the '066 and '901 patents with reasonable certainty.

139.    A POSA would have been an experienced chemical engineer or process research chemist with experience in or access to an individual with experience in the production and manufacture of pharmaceutical API and final drug product for pharmaceutical compositions and pharmaceutical products.

140.    A POSA would have understood from the '066 and '901 patent specifications that impurities generated during the alkylation step are described in the '066 and '901 patent specifications.

141.    A POSA would have understood from the '066 and '901 patent specifications that impurities generated during the hydrolysis step are described in the '066 and '901 patent specifications.

142.    Example 1 of each of the '066 and '901 patent specifications  describes the alkylation of benzindene triol and provides exemplary reactants and reaction conditions that may be used in that step.  A POSA would have understood from Example 1 that impurities would be

17

generated during the alkylation step.

143.    A POSA would have understood that filtering the alkylation product of the '066 and '901 patent specifications with Celite pad and washing the filter cake in acetone does not remove all impurities.

144.    A POSA would have understood that a light brown color of the benzindene nitrile of the '066 and '901 patent specifications indicates the presence of impurities.

145.    A POSA would have understood that the '066 and '901 patent specifications' reference to the benzindene nitrile as crude indicates a product that is not in pure form and that contains impurities.

146.    Example 2 of the '066 and '901 patent specifications describes the hydrolysis of benzindene nitrile and provides exemplary reactants and reaction conditions that may be used in that step.  A POSA would have understood from Example 2 that impurities would be generated during the hydrolysis step.

147.    A POSA would have understood from the "*Note" in Example 2 of the '066 and '901 patent specifications that impurities introduced during the alkylation step are not removed prior to the hydrolysis step.

148.    A POSA would have understood from the '066 and '901 patent specifications that impurities introduced during the alkylation step that are either carried through or react during the hydrolysis step are impurities resulting from the alkylation and hydrolysis steps.

149.    A POSA would have understood from Example 2 in the '066 and '901 patent specifications that ethyl acetate extraction does not remove all impurities.

150.    A POSA would have understood from Example 2 in the '066 and '901 patent specifications that a starting batch of treprostinil, containing impurities resulting from prior

18

alkylation and hydrolysis steps, was formed prior to the addition of activated carbon.

151.    A POSA would have understood from the '066 and '901 patent specifications that a pale-yellow color of treprostinil indicates the presence of impurities.

152.    A POSA would have understood from the prior art that pure treprostinil is a colorless crystalline solid.

153.    A POSA would have understood from Example 2 in the '066 and '901 patent specifications that TLC can be used to measure the presence of impurities.

154.    A POSA would have understood from the prior art that TLC can be used to measure the presence of impurities.

155.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that impurities are present in the treprostinil after the alkylation and hydrolysis steps, for example, from the "*Note" explaining that the treprostinil is not an isolated yield.

156.    A POSA would have understood from step 21 in Example 6 in the '066 and '901 patent specifications that impurities are present in the hydrolysis product because the step is titled "Removal of impurities."

157.    A POSA would have understood from Example 5 in the '066 and '901 patent specifications that the level of one or more impurities were lowered from the starting batch of treprostinil due to the off-white color of the treprostinil after the salt formation step.

158.    A POSA would have understood from the '066 and '901 patent specifications that the level of one or more impurities is lowered from the starting batch of treprostinil to the pharmaceutical composition from the statement in the specifications that "The impurities carried over from intermediate steps (i.e., alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step."

19

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000820

159.    A POSA would have understood from the prior art how to identify and quantify specific impurities, for example, by using chromatographic techniques.  A POSA would also have understood from the prior art how to track the reduction in impurities, even if the identity of the impurities was not known, for example, by correlating impurity peaks at particular retention times.

160.    A POSA would have understood from the '066 and '901 patents that only bases that will result in the formation of a pharmaceutically acceptable salt can be used during the salt formation step.

161.    A POSA would have understood that the '066 and '901 patent specifications define the terms "pharmaceutically acceptable," "pharmaceutically acceptable salts," and "pharmaceutically acceptable salt."  A POSA would have understood from these definitions which bases could be used to form pharmaceutically acceptable salts.

162.    A POSA would have understood from the non-limiting examples in the '066 and '901 patent specifications that the following bases could be used during the salt formation step: diethanolamine, ammonia, N-methylglucamine, procaine, tromethamine, magnesium, L-lysine, L-arginine, and triethanolamine.

163.    A POSA would have understood from claim 3 of the '066 patent that the following bases could be used during the salt formation step: sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.

164.    There is no temporal limitation on storage.

165.    Storage can occur between manufacturing steps and during transportation.

166.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that treprostinil salt is formed once the seed of polymorph B of treprostinil diethanolamine was added.

20

167.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that treprostinil salt is stored at ambient temperature when the suspension was cooled to $20 \pm 2°$ C overnight.

168.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that treprostinil salt is stored at ambient temperature when the treprostinil diethanolamine salt was transferred to a container for air drying in hood.

169.    A POSA would have understood from Example 4 in the '066 and '901 patent specifications that isolated salt is stored at ambient temperature when it was transferred to trays for air-drying overnight in hood.

170.    A POSA would have understood from steps 32 and 34 of Example 6 in the '066 and '901 patent specifications that isolated salt is stored at ambient temperature.

171.    A POSA would have understood from the '066 and '901 patent specifications that isolated salt and treprostinil salt could be stored at ambient temperature where it states "crude treprostinil salts can be stored as raw material at ambient temperature."

172.    A POSA would have understood from the prior art how to control for non-temperature storage conditions such as humidity, light, and oxygen levels.

173.    A POSA would have understood that prohibition of column chromatography is not claimed in the '066 and '901 patents.

174.    Claims 1 and 8 of the '066 patent and claim 8 of the '901 patent are comprising claims such that steps in addition to those claimed could be present and still be within the scope of the claim.

175.    A POSA would have understood from the '066 and '901 patent specifications that the inventors were showing a preferred embodiment whereby column chromatography could be

HIGHLY CONFIDENTIAL LIQ_PH-ILD_00000822

eliminated, rather than a disclaimer or disavowal of the use of column chromatography.

176.    A POSA would have understood that the '066 and '901 patents define "comprising" as "including but not limited to" such that "other non-mentioned…steps may be present."

177.    A POSA would have understood from step 12 of Example 6 of the '066 and '901 patent specifications that column chromatography could be practiced between the alkylation and salt formation steps.

178.    A POSA would have understood from the prior art that column chromatography was a routine and well-known purification technique.

179.    A POSA would have understood from the '066 and '901 patent specifications that there can be isolation prior to salt formation.

180.    A POSA would have understood from the '066 and '901 patent specifications that various other purification techniques besides column chromatography could be used between alkylation and salt formation such as Celite pad filtering, ethyl acetate extraction, NaCl washing, carbon filtration, and ethyl acetate washing.

181.    A POSA would have understood from the prior art that column chromatography does not always result in a more pure product.

182.    A POSA would have understood that prohibition of isolation of treprostinil before combining with a base is not claimed in the '066 and '901 patents.

183.    A POSA would have understood from the '066 and '901 patent specifications that the inventors were showing a preferred embodiment whereby of isolation of treprostinil before combining with a base could be eliminated, rather than a disclaimer or disavowal of isolation of treprostinil before combining with a base.

184.    A POSA would have understood from Example 2 in the '066 and '901 patent

22

specifications that the volume of a solution of treprostinil was reduced prior to combination with a base. A POSA would have understood from this disclosure that the treprostinil could have been isolated by continuing to reduce the volume of the filtrate.

185. A POSA would have understood from the '066 and '901 patent specifications that treprostinil was an FDA approved medication and would have been able to determine a therapeutically effective amount of treprostinil or salt thereof based on the numerous references described in the specification.

186. A POSA would have understood from the '066 and '901 patent specifications that treprostinil is the active ingredient in Remodulin®.

187. A POSA would have understood from the prior art, for example the March 2006 Remodulin® label, information on disease, dosing, and route of administration.

188. As to the '066 and '901 patents, the critical date for availability as prior art is December 17, 2007.

189. U.S. Patent No. 8,497,393 ("the '393 patent") issued July 30, 2013, resulting from U.S. Patent Application Number 13/548,446, which is a continuation of U.S. Patent Application No. 12/334,731, filed on December 15, 2008, now U.S. Patent No. 8,242,305. The '393 patent claims priority to U.S. Provisional Patent Application No. 61/014,232, the same provisional application to which the '066 and '901 patents claim priority.

190. The '066 and '901 patent specifications at 1:8-15 cite and incorporate by reference the application of the '393 patent.

191. The '393 patent is not prior art to the '066 patent.

192. The '393 patent is not prior art to the '901 patent.

193. The '066 patent claims contain limitations not found in the '393 patent claims.

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000824

194.    The '901 patent claims contain limitations not found in the '393 patent claims.

195.    Claim 1 of the '393 patent is a genus claim.

196.    Claim 1 of the '393 patent does not contain a limitation on impurities.

197.    Claim 1 of the '393 patent does not contain a limitation on stability.

198.    The '066 and '901 patent specifications at 1:27-34 cite and incorporate by reference the paper "Moriarty, *et al* in J. Org. Chem. 2004, 69, 1890-1902" ("Moriarty").

199.    During prosecution of the '066 patent, the examiner considered the reference WO 2005/007081 ("Phares") listed on page 2 of the '066 patent under references cited.

200.    During prosecution of the '901 patent, the examiner considered the reference WO 2005/007081 ("Phares") listed on page 2 of the '901 patent under references cited.

201.    The '066 and '901 patents do not claim the same product as in the prior art.

202.    The pharmaceutical compositions and batches claimed in the '066 and '901 patents are distinct from products in the prior art.

203.    The '066 and '901 patents have claims directed towards making pharmaceutical compositions and pharmaceutical products that are different from methods found in the prior art.

204.    The storage of isolated treprostinil salt at ambient temperature during manufacture of a pharmaceutical composition is claimed in the '066 and '901 patents and is not disclosed in the prior art.

205.    Prior art does not render obvious claim 1 of the '066 patent.

206.    The prior art does not disclose the lowering of impurities from a starting batch of treprostinil.

207.    The prior art does not disclose the impurities present in the product of Moriarty.

208.    Prior art does not render obvious claim 2 of the '066 patent

24

209.    Prior art does not render obvious claim 3 of the '066 patent.

210.    Prior art does not render obvious claim 6 of the '066 patent.

211.    The prior art does not disclose storing an isolated salt of treprostinil at ambient temperature.

212.    Prior art does not render obvious claim 8 of the '066 patent.

213.    Prior art does not render obvious claim 9 of the '066 patent.

214.    Prior art does not render obvious claim 1 of the '901 patent.

215.    Prior art does not render obvious claim 2 of the '901 patent.

216.    Prior art does not render obvious claim 3 of the '901 patent.

217.    Prior art does not render obvious claim 4 of the '901 patent.

218.    Prior art does not render obvious claim 6 of the '901 patent.

219.    Prior art does not render obvious claim 8 of the '901 patent.

220.    Prior art does not render obvious claim 9 of the '901 patent.

221.    UTC release specifications and other FDA submissions do not show that the claimed compositions were in the prior art.

222.    UTC release specifications do not affect the scope of the '066 patent.

223.    UTC release specifications do not affect the validity of the '066 patent.

224.    UTC release specifications do not affect the scope of the '901 patent.

225.    UTC release specifications do not affect the validity of the '901 patent.

226.     FDA submissions do not impact the scope of the '066 patent.

227.    FDA submissions do not impact the validity of the '066 patent.

228.    FDA submissions do not impact the scope of the '901 patent.

229.    FDA submissions do not impact the validity of the '901 patent.

HIGHLY CONFIDENTIAL                               LIQ_PH-ILD_00000826

230.   A POSA would not have been motivated to combine Moriarty and Phares with a reasonable expectation of success.

231.   A POSA would not have been motivated to combine Moriarty and Phares.

232.   Phares does not disclose the stability of any polymorphic form of treprostinil diethanolamine at ambient temperature.

233.   A POSA would understand that more thermodynamic stability does not equate to stability at room temperature.

234.   A POSA would not be motivated to combine Phares based on the bioavailability disclosed in Phares.

235.   The pharmaceutical composition of the '066 patent is structurally and functionally different from products of the prior art.

236.   The pharmaceutical batch of the '901 patent is structurally and functionally different from products of the prior art.

237.   In issuing the '066 patent, the examiner considered Moriarty and Phares and found the claims nonobvious over the combination.

238.   Liquidia petitioned for *inter partes* review (IPR) of the '066 patent, arguing obviousness in the combination of Moriarty and Phares.  The PTAB denied institution of IPR for the '066 patent.

239.   Liquidia petitioned for IPR of the '901 patent, arguing Moriarty and Phares obviousness in the combination of Moriarty and Phares.

240.   The PTAB instituted review of the '901 patent based on Liquidia's petition.

241.   The PTAB issued a Final Written Decision on the '901 patent.

242.   Liquidia is estopped under § 315 from arguing invalidity based on grounds it raised

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000827

or reasonably could have raised in the '901 IPR.

243.    In issuing the '901 patent, the examiner considered Moriarty and Phares and found the claims nonobvious over the combination.

244.    Tyvaso practices the claimed invention.

245.    Tyvaso is a commercial success.

246.    A POSA would not know UTC confidential information in considering motivation to combine prior art.

247.    ████████████████████████████████████████████

████████████████

██   ████████████████████████████████████

████████████████████████████████████████

249.    A POSA would not know UTC confidential information in considering the disclosure of prior art.

250.    A POSA would not use the invention as a roadmap in looking at the prior art.

251.    There is no evidence of a motivation to combine the teachings of the prior art other than using hindsight of the invention as a roadmap.

252.    A POSA would not have a reasonable expectation of success in scaling up the prior art processes.

253.    A POSA would understand the prior art did not teach commercial scale manufacturing of treprostinil.

254.    A POSA would understand that laboratory scale experiments are not always able to be scaled to commercial scale.

255.    The prior art does not disclose any problems with the white-needle crystalline

HIGHLY CONFIDENTIAL     LIQ_PH-ILD_00000828

appearance of treprostinil.

256. A POSA would not consider white-needles to be an issue from the prior art.

257. ███████████████████████████████████████████████████

███████████████████████████████████

258. A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the scope of the '066 patent.

259. A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the validity of the '066 patent.

260. A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the scope of the '901 patent.

261. A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the validity of the '901 patent.

262. The diethanolamine salt disclosed in the '066 is not identical to the diethanolamine salt in Phares.

263. The diethanolamine salt disclosed in the '901 is not identical to the diethanolamine salt in Phares.

**B. The Claims of the '793 Patent are Valid**

**1. The '793 Patent**

264. The '793 patent, filed on January 31, 2020, is entitled "Treprostinil Administration by Inhalation," and was issued on July 21, 2020. The '793 Patent is directed to the treatment of pulmonary hypertension by administering treprostinil (or salts thereof) by inhalation.

265. The '793 patent was granted on application number 16/778,662, filed January 31, 2020, and claims priority through a series of applications dating back to a provisional patent

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000829

application, 60/800,016, filed on May 15, 2006. The priority date for the '793 patent is not later than May 15, 2006.

266.    The named inventors of the '793 patent are Horst Olschewski, Robert Roscigno, Lewis J. Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt and Robert Voswinckel.

267.    The '793 patent relates to a therapy involving treatment of pulmonary hypertension using inhaled treprostinil. Specifically, the '793 patent relates to a method of treating pulmonary hypertension by administering an inhaled, therapeutically effective, single event dose that comprises from 15 to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof, delivered in 1 to 3 breaths.

268.    The '793 patent claims several inhalation devices for administration, including administration using a dry powder inhaler. The '793 patent also claims a formulation including treprostinil, or a pharmaceutically acceptable salt thereof, wherein the formulation is a dry powder formulation.

269.    UTC has asserted that Liquidia infringes five claims of the '793 patent: Claims 1, 4, 6, 7 and 8 of the '793 patent.

270.    Claims 4, 6, 7 and 8 depend from Claim 1 of the '793 patent.

**2.    Person of Ordinary Skill in the Art**

271.    The named inventors of the '793 patent have post-graduate degrees in the field of medicine or drug development disciplines and all had at least several years of research, executive, and/or clinical experience in the investigation and treatment of pulmonary hypertension and in developing pharmaceutical products for the treatment of pulmonary hypertension.

272.    A POSA with respect to the '793 patent would have a graduate degree in medicine or a field relating to drug development, such as an M.D. or a Ph.D., with at least two years practical

HIGHLY CONFIDENTIAL     LIQ_PH-ILD_00000830

experience in either (i) the investigation or treatment of pulmonary hypertension or (ii) in the development of potential drug candidates, specifically in the delivery of drugs by inhalation.

273.    The POSA could have a lower level of formal education if such a person had more years of experience in the development of inhalable drugs.

274.    Because drug development involves a multidisciplinary approach, the POSA would consult with individuals having specialized expertise, for example, a pharmacologist with experience in development of inhaled formulations or inhalation devices and/or a physician with experience in the administration, dosing and efficacy of drugs for the treatment of a particular disease state.

### 3.    Relevant Claim Construction

275.    The Court did not construe any terms or phrases in the '793 patent and as such, the terms should have their plain and ordinary meaning to the POSA .

### 4.    Relevant Background

276.    Pulmonary hypertension is a term for a hemodynamic abnormality, elevated pressure. For pulmonary hypertension, a hemodynamic effect is a therapeutic effect showing improvement on the underlying state of the disease. Administration of a drug like treprostinil that has a vasodilatory effect on pulmonary arteries and reduces pressure (e.g., PAP) and pulmonary resistance (e.g., PVR) directly addresses the elevated pressure associated with pulmonary hypertension. This reduction in the pressure load on the heart is a therapeutic effect that is demonstrated by the data presented in the '793 patent specification.

277.    Hemodynamics can be and are used to assess efficacy of drugs, including in clinical studies and drug development. The benefit of hemodynamics when assessing therapeutic effectiveness against pulmonary hypertension is clear from numerous clinical studies gathering

HIGHLY CONFIDENTIAL                     LIQ_PH-ILD_00000831

hemodynamic data to determine test effectiveness.

278.    The first FDA approved treatment for pulmonary hypertension – and the sole approved treatment for over five years (from 1995-2001) – was epoprostenol, which had substantial shortcomings and posed significant burdens to patients.

279.    Epoprostenol can only be administered by continuous intravenous infusion because it has a short half-life of only a few minutes and is cleared from the body very quickly. Further, the short duration of action of epoprostenol means that even a brief interruption in infusion could increase the risk of hemodynamic collapse and even death because of delivery complications. Moreover, epoprostenol requires daily mixing and refrigeration, thus requiring the patient to carry a cold pack to avoid degradation at room temperature and an infusion pump in order to safely administer the drug.

280.    Later-approved subcutaneous (in 2002) and intravenous (in 2004) administration of treprostinil had some benefits over epoprostenol. For example, it is stable at room temperature and has a half-life of several hours rather than several minutes. This freed patients of having to carry ice packs to ensure the safety and efficacy of the drug. There were still limitations to intravenous and subcutaneous delivery of treprostinil, such as intolerable site pain in some instances and systemic side effects.

281.    By the May 2006 priority date of the '793 patent, the only FDA-approved prostacyclin-type drug that could be given in an inhalable form was iloprost, marketed as Ventavis®. Clinicians were still largely of the opinion however, that intravenous administration of a prostacyclin analog was preferable to inhaled delivery of iloprost for a number of reasons, including iloprost's relatively short half-life.

282.    By May 2006, a large number and variety of devices suitable for use with powder

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000832

formulations were known.

283.     Specifically, one such company in Italy known as Plastiape made devices (e.g., dry powder inhalers) that were known, available, and used widely in the market with many milled and/or spray-dried powders.

284.     At the time of the priority date, the basic principles of dry powder formulation development were known and available. The basic steps in formulating dry powder formulations of drugs were known and studied by 2006. Known techniques included micronization and spray drying, as well as ways to evaluate, modify process steps, and improve or optimize processes to achieve respirable particle sizes. It was known to test and evaluate formulations and devices using in vitro methods, including, among others, impaction studies. Further optimization regarding formulation, drug and carrier to reach a desired performance was known and routine at the time of the priority date.

285.     At the time of the priority date, the basic principles of dry powder formulation development were known and available. Information regarding the active pharmaceutical ingredient, preparation of the active pharmaceutical ingredient, use of excipients and formulations for dry powder inhalers, how formulations are processed, and techniques used to characterize dry powder formulation systems was readily available.

286.     Information regarding drug properties, milling, excipient selection, blending, and filling into a dry powder inhaler device was similarly known and available. Furthermore, guides concerning dry powder inhaler devices and knowledge regarding the accuracy and reproducibility of dose emissions from those devices was available.

287.     Salt synthesis for APIs, physical and chemical screening, XRPD, laser diffraction, cascade impaction, HPLC, blending, mixing, blend uniformity, and many other techniques, were

32

known as part of the drug development and formulation evaluation and improvement processes.

### 5.    Prior Art

#### a)    The '212 Patent

288.    The '212 patent describes testing done in tracheotomized sheep, involving UT-15 delivered by inhalation using a continuous nebulizer.

289.    The '212 patent is listed on the face of the '793 patent under "References Cited," and was considered by the patent examiner before the '793 patent was allowed.

290.    The '212 patent does not disclose a dose to be administered to sheep or humans in a single event.

291.    The '212 patent does not contain sufficient information to allow a POSA to calculate a therapeutically effective single event dose of 15-90 µg delivered in 1-3 breaths from the information given in the abstract, let alone to do so reliably, for a sheep or human.

292.    The '212 patent does not disclose, teach, or render obvious the administration of inhaled treprostinil to a human in 1-3 breaths.

293.    The '212 patent does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

#### b)    Voswinckel JESC

294.    Voswinckel JESC is a brief abstract spanning approximately one quarter of a single page that generally describes a clinical study that used continuous nebulization at concentrations of 16, 32, 48, and 64 µg/mL of treprostinil with a time period of 6 minutes.

295.    Voswinckel JESC provides the concentration of the drug in the pre-aerosolized solution but does not specify the dose delivered to the patient. Voswinckel JESC does not describe a therapeutically effective single event dose of 15 micrograms to 90 micrograms.

33

296.    Voswinckel JESC does not contain sufficient information to allow a POSA to calculate a therapeutically effective single event dose of 15-90 μg delivered in 1-3 breaths from the information given in the abstract, let alone to do so reliably.

297.    In general, a POSA would not rely on an abstract like Voswinckel JESC because conference abstracts are not peer-reviewed to the same rigor as published journal articles, and further often report only preliminary data which may or may not translate into actual results.

298.    Voswinckel JESC is listed on the face of the '793 patent under "References Cited," and was thus considered by the patent examiner before the '793 patent was allowed.

299.    Voswinckel JESC does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

### c)    Voswinckel JAHA

300.    Voswinckel JAHA is a brief abstract spanning approximately one quarter of a single page in the Circulation Journal of the American Heart Association. It generally describes preliminary data of an open-label study of "TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml)." This abstract discloses a pre-aerosolized concentration for the treprostinil solution of 600 μg/mL for inhalation over a specific number of breaths. Voswinckel JAHA also does not describe a therapeutically effective single event dose of 15 micrograms to 90 micrograms.

301.    Voswinckel JAHA does not contain sufficient information to allow a POSA to calculate a therapeutically effective single event dose of 15-90 μg delivered in 1-3 breaths from the information given in the abstract, let alone to do so reliably.

302.    In general, a POSA would not rely on an abstract like Voswinckel JAHA because conference abstracts are not peer-reviewed to the same rigor as published journal articles, and

HIGHLY CONFIDENTIAL                               LIQ_PH-ILD_00000835

further often report only preliminary data which may or may not translate into actual results.

303.     Voswinckel JAHA is listed on the face of the '793 patent under "References Cited,"

and was considered by the patent examiner before the '793 patent was allowed.

304.     Voswinckel JAHA does not alone, or in combination with Liquidia's other asserted

prior art, anticipate or render obvious any claims of the '793 patent.

### d)     Ghofrani

305.     Ghofrani is a review article, published in German, describing "New therapies in the

treatment of pulmonary hypertension." In addition to describing recent developments relating to

inhaled treprostinil, the review article also describes other "new therapy approaches, which are

partially still under development, and that can find their way into the therapy guidelines in the near

future" including inhaled iloprost, selective endothelin A receptor antagonists (sitaxsentan and

ambrisentan), and PDE-5 inhibitors.

306.     Ghofrani was co-authored by Dr. Werner Seeger and Dr. Robert Voswinckel

(inventors of the '793 patent) as well as Dr. Hossein A. Ghofrani, Dr. Frank Reichenberger, and

Dr. Friedrich Grimminger. Ghofrani was published in June of 2005.

307.     The work described in Ghofrani and relied upon by Liquidia is not "by another."

308.     Ghofrani does not qualify as prior art.

309.     Ghofrani is listed on the face of the '793 patent under "References Cited," and was

considered by the patent examiner before the '793 patent was allowed.

310.     Ghofrani does not alone, or in combination with Liquidia's other asserted prior art,

anticipate or render obvious any claims of the '793 patent.

### e)     Voswinckel 2006

311.     Voswinckel 2006 is a short "Clinical Observation" published in the Annals of

HIGHLY CONFIDENTIAL                                       LIQ_PH-ILD_00000836

Internal Medicine, titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," which describes clinical observations on three patients with severe pulmonary hypertension, who were treated with administration of a single 15 µg dose of treprostinil, inhaled in three breaths through a modified Optineb ultrasonic inhalation device.

312.    Voswinckel 2006 was co-authored by Dr. Werner Seeger, Dr. Robert Voswinckel, and Dr. Horst Olschewski (inventors of the '793 patent) as well as Dr. Hossein A. Ghofrani and Dr. Friedrich Grimminger. Voswinckel 2006 was published in January of 2006.

313.    The work described in Voswinckel 2006 and relied upon by Liquidia is not "by another."

314.    Voswinckel 2006 does not qualify as prior art.

315.    Voswinckel 2006 is listed on the face of the '793 patent under "References Cited," and was considered by the patent examiner before the '793 patent was allowed.

316.    Voswinckel 2006 does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

**6.    Secondary Considerations**

317.    Tyvaso is a commercial embodiment of the '793 patent. Tyvaso is used to treat pulmonary hypertension in humans suffering from pulmonary hypertension and is administered in a therapeutically effective single event dose comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, and the therapeutically effective single event dose is between 15 to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof and is delivered in 1 to 3 breaths.

318.    The '793 patent satisfied a long-felt but unmet need.

319.    The '793 patent allowed for an inhaled dosing regimen and maximized therapeutic

HIGHLY CONFIDENTIAL                       LIQ_PH-ILD_00000837

benefits by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy to use inhaler.

320.    Inhaled treprostinil is approved to treat a broader range of pulmonary hypertension patients than the therapeutics available at the time of the invention.

321.    The '793 patent showed unexpected results including that therapeutically effective, high doses of treprostinil could be delivered to a patient in a shorter period of time with fewer side effects be developing a method that combined higher dosing in fewer breaths using a modified inhalation device.

322.    The pharmacodynamics of inhaled treprostinil also presented unexpected results.

323.    Tyvaso is currently approved in the U.S. for the treatment of PAH and PH-ILD.

### 7.    The Asserted Claims of the '793 Patent Are Enabled And Have Adequate Written Description

324.    The '793 patent satisfies the written description and enablement requirements.

325.    The '793 patent discloses both an inhalable solution and an inhalable dry powder and devices for administering both types of formulations.

326.    The '793 patent provides for both a dry powder with a particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter as well as an inhalation device that can be a dry powder inhaler.

327.    The '793 patent describes treprostinil dosing information, the use of dry powder inhalers, and powder formulations.

328.    The POSA would recognize based on the '793 patent that the inventors were in possession of, i.e., had invented what is claimed, an inhaled dry powder formulation of treprostinil.

329.    The '793 patent contains adequate written description supporting the asserted claims, including the claims including methods of treatment using dry powder formulations and/or

37

dry powder inhalers.

330.    A POSA in 2006 would have had access to numerous dry powder inhalers (DPIs), excipients, and methods of manufacturing dry powder formulations.

331.    Numerous devices existed by 2006 that would have been suitable for use with inhaled dry powder formulations.

332.    A sufficient number of carriers existed in 2006 that a POSA could have chosen from, including lactose.

333.    Methods were also known to a POSA as of the priority date that would allow a POSA to adjust API and excipient particle size to achieve the desired particle sizes and formulation performance.

334.    Starting with the information disclosed in the '793 patent, a POSA could have used known excipient(s) and known techniques such as milling or spray drying to create an inhalable dry powder formulation of treprostinil (or a salt thereof) and practice the asserted claims of the '793 patent without undue experimentation.

335.    The experimentation required to prepare an inhalable dry powder formulation of treprostinil (or a salt thereof) for use in a dry powder inhaler (DPI) and practicing the asserted claims of the '793 was routine and would not be considered undue.

336.    In 2006, a POSA reviewing the claim limitation requiring a method of treating pulmonary hypertension would immediately understand that the claim was referring to pulmonary arterial hypertension.

337.    To the extent the claim is interpreted to cover all forms of pulmonary hypertension, a POSA would have understood that as of the priority date inhaled treprostinil could be used to treat multiple forms of pulmonary hypertension, including based upon the '793 patent

38

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000839

specification.

338.     A POSA would have understood that the '793 patent includes WHO Groups 1, 3, and 4 within the patent specification, that WHO Group 5 could also be included, and that inhaled treprostinil could be used to treat a mixed form of WHO Group 2.

339.     As of the priority date a POSA would have known and understood that inhaled treprostinil would not be used to treat a pure WHO Group 2 post-capillary patient.

340.     The POSA could readily determine from his or her knowledge and skill, or from routine testing, whether inhaled treprostinil could be used to treat WHO Group 2 postcapillary PH.

341.     The POSA would recognize based on the '793 patent that the inventors were in possession of, i.e., had invented what is claimed, a method of treating pulmonary hypertension.

342.     The POSA would have been able to practice the claimed methods of treating pulmonary hypertension without undue experimentation based on the teachings of the '793 patent and the background knowledge of those of skill in the art.

343.     The POSA could have practiced the asserted claims of the '793 patent—i.e., could have administered a formulation (e.g., a liquid or dry powder) to a human consistent with the claims—without undue experimentation. The POSA knew how to prepare and administer formulations and would have been able to instruct the patient on how to use the formulations to administer the drug using routine techniques and without undue experimentation.

39

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION | C.A. No. 20-755 (RGA) (JLH) |
| Plaintiff, | **HIGHLY CONFIDENTIAL** |
| v. | |
| LIQUIDIA TECHNOLOGIES, INC., | |
| Defendant. | |

<u>**REBUTTAL EXPERT REPORT OF ANDREW CLARK, PH.D.**</u>

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 7

    A.  Scope of Analysis ............................................................................. 8

    B.  Qualifications .................................................................................... 8

    C.  Materials Considered ........................................................................ 9

II. LEGAL STANDARDS PROVIDED BY COUNSEL ................................... 10

    A.  Claim Construction .......................................................................... 11

    B.  Presumption of Validity ................................................................... 13

    C.  Anticipation ..................................................................................... 13

    D.  Obviousness ..................................................................................... 17

    E.  Written Description ........................................................................... 18

    F.  Enablement ....................................................................................... 18

III. BACKGROUND ........................................................................................... 26

    A.  Pulmonary Hypertension ................................................................. 27

    B.  The '793 Patent ................................................................................ 28

    C.  File History ....................................................................................... 30

IV. PERSON OF ORDINARY SKILL IN THE ART ........................................ 30

V.  VALIDITY OF THE '793 PATENT ............................................................ 32

    A.  The Asserted Claims of the '793 Patent Are Supported By
        Adequate Written Description .......................................................... 13

    B.  The Asserted Claims Are Enabled .................................................. 17

        1.  Devices ................................................................................. 18

        2.  Formulations ......................................................................... 18

        3.  Dosing ................................................................................... 26

4.     Patients ......................................................................................................... 27

5.     *Wands* Factors ............................................................................................... 28

6.     Industry Development ...................................................................................... 30

C.     Dr. Gonda Takes Inconsistent Positions ................................................................. 30

VI.    CONCLUSION ................................................................................................................. 32

## I.      INTRODUCTION

### A.      Scope of Analysis

1.      I have been retained by counsel for the Plaintiff, United Therapeutics Corporation ("UTC") to provide expert opinions related to U.S. Patent No. 10,716,793 ("the '793 patent").

2.      I am being compensated for my time spent on this matter at the rate of $400 per hour, plus reasonable expenses. I have no other interest in this litigation or in any party to this litigation. My compensation does not depend on my performance, the substance of my opinions, the outcome of the case, or any issues involved in or related to this case.

### B.      Qualifications

3.      My *curriculum vitae*, which is attached as **Exhibit 1**, summarizes my professional experience. I provide below further details about my experience that may be pertinent to this matter.

4.      I provided my background and qualifications in paragraphs 9–18 of my Initial Expert Report. I hereby incorporate by reference that background information.

### C.      Materials Considered

5.      In forming the opinions described in this report, I have relied on my professional experience and personal knowledge. I have also reviewed a number of documents and materials in this case. A full list of the materials considered, in whole or in part, in forming my opinions is set forth in **Exhibit 2**, attached hereto.

6.      My analysis of the issues of validity discussed in this report and my rebuttal to assertions made by Dr. Hill and/or Dr. Gonda has taken into account the Court's Construction of the Asserted Claims as set forth in the Court's June 16, 2021, Claim Construction Order (D.I. 119), which I have reviewed in full, and the hearing transcript from the Claim Construction Hearing, which I have reviewed in relevant part. If any claim terms were construed or addressed by the

1

> Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

*Id.* at (57); *see also*, *id.* at 7:13-15 (describing a metered dose inhaler as a "device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs.").

34.     The '793 patent relates to a therapy involving treatment of pulmonary hypertension using inhaled treprostinil. Specifically, the '793 patent relates to a method of treating pulmonary hypertension by administering an inhaled, therapeutically effective, single event dose that comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof, delivered in 1 to 3 breaths. *See, e.g.*, '793 patent, claim 1. I understand that the '793 patent claims several inhalation devices for administration, including administration using a dry powder inhaler. I further understand the '793 patent claims a formulation including treprostinil, or a pharmaceutically acceptable salt thereof, wherein the formulation is a dry powder formulation.

35.     I understand that the '793 patent was granted on application number 16/778,662, filed January 31, 2020. *Id.* at (21), (22). The '793 claims priority through several other applications, as described under the "Related U.S. Application Data" heading on the cover of the patent. According to the '793 patent, the earliest application filed is provisional application 60/800,016, filed on May 15, 2006. I understand this to be the relevant date—the "priority date"—from which the level of ordinary skill of the POSA is to be determined and the obviousness, written description, and enablement analyses are to be assessed.

**C.     File History**

36.     As mentioned, U.S. patent application number 16/778,662 was filed on January 31, 2020. *See, e.g.*, U.S. Patent No. 10,716,793 File History ("'793 File History") (UTC_LIQ00007134-UTC_LIQ00007341) at UTC_LIQ00007137. On May 15, 2020, I

10

of the priority date, the POSA would understand that the inventors possessed the claimed invention.

46.     Claim 1 recites a method of treating pulmonary hypertension through administration of treprostinil, or a pharmaceutically acceptable salt, by inhalation 15-90 µg delivered in 1-3 breaths. The specification of the '793 patent as 12 pages of figures and 9 pages of narrative description, including two examples showing example devices and resulting data therefrom. Example 1 shows doses of 30-60 µg delivered in 1-3 breaths, resulting in the effective amount of treprostinil can be delivered in a single breath and was well tolerated at higher doses. Example 1 also showed a high concentration treprostinil solution delivered by soft mist inhaler. Example 2 showed doses of 15-90 µg delivered in 1-3 breaths delivered by a pulsed ultrasonic nebulizer. The results showed high doses delivered in minimal inhalation time lead to long-lasting pulmonary vasodilation.

47.     Dr. Gonda nevertheless contends that the '793 patent does not disclose enough about powder formulations and DPIs. In my opinion, he is incorrect. As he acknowledges, the '793 patent describes treprostinil dosing information (Gonda Report, ¶54) and the use of DPIs and describes powder formulations. '793 Patent 7:22-26 (discussing powder 5 or 10 micrometers in diameter for use in DPI), 9:14-17 (discussing doses of 30, 45, and 60 µg), 17:42-18:5 (describing doses of 15 µg up to 90 µg), 18:23-31. I also note that the provisional application to which the '793 patent claims priority, filed May 15, 2006, also describes powder formulations and DPIs. '016 Provisional at ¶[0036] ("The inhalation device can also be a dry powder. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter."); *id.* at 27 (reciting,

14

# EXHIBIT 13

LAW OFFICES

# HYMAN, PHELPS & McNAMARA, P.C.

700 THIRTEENTH STREET, N.W.

KURT R. KARST
MICHAEL D. SHUMSKY
SARA W. KOBLITZ

SUITE 1200

WASHINGTON, D.C. 20005-5929
(202) 737-5600

FACSIMILE
(202) 737-9329
———
www.hpm.com

Direct Dial (202) 737-7544

February 12, 2024

**SUBMITTED BY EMAIL**

***CONFIDENTIAL TREATMENT
REQUESTED PER 21 C.F.R. § 20.61***

Kim Dettelbach, Esq.
Assistant Deputy Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
White Oak Building 1
Silver Spring, Maryland 20993-0002

Email: Kim.Dettelbach@fda.hhs.gov

Brian Cooney, MS, PSM
Regulatory Health Project Manager
Cardiology and Nephrology
Division of Regulatory Operations for
   Cardiology, Hematology,
   Endocrinology, & Nephrology
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

Email: brian.cooney@fda.hhs.gov

> Re:   **NDA 213005 – YUTREPIA (Treprostinil) Inhalation Powder
> Response to February 2, 2024 Letter from Liquidia Technologies, Inc.**

Dear Ms. Dettelbach and Mr. Cooney:

On behalf of our client, United Therapeutics Corporation ("UTC"), we write in response to the letter dated February 2, 2024 from Liquidia Technologies, Inc. ("Liquidia") pertaining to its pending New Drug Application ("NDA") 213005 ("the YUTREPIA 505(b)(2) NDA") submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDC Act") and referencing UTC's TYVASO® (treprostinil) inhalation powder approved under NDA 022387. Ltr. from S. Lassman re Liquidia (Feb. 2, 2024) ("Liquidia Ltr.").

As UTC's December 29, 2023 letter explained, the U.S. Food and Drug Administration ("FDA" or "the Agency") erred in accepting Liquidia's attempt to amend its pending 505(b)(2) NDA because that course of action is foreclosed by FDA's

ACTIVE/127690147.3

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 2

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

longstanding, consistently applied, and never-previously-challenged Bundling Rule.  Ltr. from K. Karst re Liquidia (Dec. 29, 2023) ("UTC Ltr.").  Accordingly, the UTC Letter requested that FDA comply with its Bundling Rule and past precedents by withdrawing—or directing Liquidia to withdraw—the YUTREPIA 505(b)(2) NDA amendment and requiring a new NDA submission.

Liquidia's letter provides no persuasive reason why this request should not be granted.  Although it claims that the Bundling Rule is outdated and was superseded by rulemaking, the very same rulemaking materials cited in the Liquidia Letter expressly provide that FDA's Bundling Rule remains in full force and effect.  Indeed, while the Liquidia Letter paints a picture of a new regulatory scheme permitting the addition of new indications to pending NDAs by way of amendment, that "new" regulatory scheme makes clear that the Bundling Rule remains very much in effect.  With its convoluted explanation of FDA's Medicare Modernization Act of 2003 ("MMA") rulemakings, Liquidia encourages FDA to ignore more than 30 years of clear policy—policy directly cited in the very preambles enacting the rulemaking Liquidia relies upon—in a blatant attempt to circumvent both FDA's longstanding Bundling Rule and the 30-month stay provisions Congress enacted in order to provide for an orderly resolution of patent disputes prior to the approval of pending 505(b)(2) NDAs and Abbreviated New Drug Applications ("ANDAs").

Given the misleading nature of the Liquidia Letter and the continued relevance of the Bundling Rule, UTC reiterates that Liquidia wrongly submitted, and that FDA erred in accepting, Liquidia's amendment adding a new indication to its YUTREPIA 505(b)(2) NDA.  For that reason, UTC continues to request that FDA require Liquidia to submit a new 505(b)(2) NDA to request approval of a new indication; certify to the patent information listed in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") as of the submission of that new NDA for any listed drug relied on for approval; and stay the approval of any new YUTREPIA 505(b)(2) NDA if there is timely filed patent infringement litigation in response to a notice of Paragraph IV certification to Orange Book-listed patent information.

## I.    BACKGROUND

### A.    Legal Background

The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act" or "Hatch-Waxman"), Pub. L. No. 98-417, 98 Stat. 1585, amended the FDC Act to remove barriers to entry, increase availability of drugs, and reduce prescription

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 3

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

costs. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). In so doing, the Hatch-Waxman Act established an abbreviated pathway to market for drug products, including both duplicates and follow-on products, by allowing applicants to rely on FDA's findings of safety and effectiveness for other drug products—"listed drugs"—as the basis of approval. 21 U.S.C. § 355(j), (b)(2). Applicants submit either an ANDA or a 505(b)(2) NDA referencing a drug listed in the Orange Book with data "bridging" the proposed drug to the listed drug so that the applicant need not duplicate the extensive testing performed by the listed drug sponsor for approval. *Id.* This process allows more affordable drugs to come to market more quickly than if full studies for safety and effectiveness were required.

At the same time, however, the Hatch-Waxman Act recognized that many listed drugs are protected by valuable patents, and thus struck a balance between expediting follow-on product entry and respecting innovators' patent rights. To that end, Hatch-Waxman requires an NDA sponsor to file with FDA "the patent number and the expiration date of any patent which claims the drug . . . and with respect to which a claim of patent infringement could reasonably be asserted [against a competitor]," 21 U.S.C. § 355(b)(1); *see also* 21 C.F.R. § 314.50(h), and obligates FDA to "publish" and "make available to the public" a list of the patent data NDA holders have submitted to the Agency. 21 U.S.C. § 355(j)(7)(A)(i); *see also id.* § 355(c)(2). FDA publishes this patent information in the Orange Book. *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004).

To speed the resolution of patent disputes between brands and follow-on sponsors so that competition can start as soon as the law permits, Congress required each ANDA or 505(b)(2) NDA relying on a listed drug to include "a certification . . . with respect to each [Orange Book-listed] patent which claims the listed drug . . . or . . . a use for such listed drug." 21 U.S.C. § 355(j)(2)(A)(vii); *see also* 21 C.F.R. § 314.53(f). Several patent certification types are available. *See* 21 U.S.C. § 355(j)(2)(A)(vii).

Paragraph IV certifications are particularly integral to the statutory and regulatory scheme. To help follow-on sponsors obtain certainty about a listed patent's coverage without subjecting them to the *in terrorem* threat of massive damages, the Patent Act deemed an applicant's submission of a Paragraph IV certification to FDA to be a "highly artificial" act of patent infringement that immediately can be litigated without subjecting the follow-on applicant to damages. 35 U.S.C. § 271(e); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990) ("Quite obviously, the purpose of [35 U.S.C. § 271](e)(2) and (e)(4) is to enable the judicial adjudication upon which the ANDA and paper NDA schemes depend."). Where an applicant submits a Paragraph IV certification in its original 505(b)(2) NDA, such notice must be provided "not later than 20 days after the date … [on]

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

which [FDA] informs the applicant that the application has been filed. *Id.* § 355(b)(3)(B)(i).

Because the whole point of Hatch-Waxman's patent-submission, patent-listing, Paragraph IV certification, and Paragraph IV notice provisions is to resolve patent disputes before FDA approval, the statute incentivizes brand manufacturers to sue as soon as they receive the legally-required notice.  When the brand manufacturer sues within 45 days of receiving the legally-required notice, FDA may not approve the follow-on application until 30 months after the brand manufacturer receives the legally-required notice. 21 U.S.C. § 355(c)(3)(C).  This 30-month stay permits the innovator and follow-on manufacturer to litigate all relevant patents prior to approval and market entry of the follow-on product. *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009).  A 30-month stay is available only with respect to patent information submitted to FDA before the date a 505(b)(2) NDA is submitted to the Agency, and typically only a single 30-month stay is available for each 505(b)(2) NDA containing a Paragraph IV certification.  Ltr. to Gerald Masoudi, Docket No. FDA-2010-P-0223, at 5  (Oct. 19, 2010).

During the 30-month stay, FDA reviews the follow-on application.  While a pending follow-on application may be amended during that review—or supplemented after approval—there are limits to such submissions.  Specifically, the FDC Act states that "[a]n applicant may not amend or supplement an application . . . to seek approval of a drug that is a different drug that the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A).  FDA has interpreted this provision to prohibit "an applicant from amending or supplementing a 505(b)(2) application to seek approval of a drug that has been modified to have a *different active ingredient, different route of administration, different dosage form, or certain differences in excipients* than the drug proposed in the original submission of the 505(b)(2) application," which "conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application (see guidance for industry on 'Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees' (December 2004) [the '2004 Bundling Rule']."  Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69580, 69635 (Oct. 6, 2016) (emphasis added).  Conversely, the statute expressly permits the submission of an amendment or supplement to a pending NDA to seek approval for *a different strength*. 21 U.S.C. § 355(b)(4)(B).

No such permission is granted for a change in indication.  Absent direction from Congress on the addition of a new indication to a pending 505(b)(2) NDA, FDA has interpreted its regulations such that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should *not* be made as an amendment to the

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

505(b)(2) application," in accordance with the 2004 Bundling Rule.   The 2004 Bundling Rule sets forth FDA's clear requirements for "what will be considered a separate marketing application."  2004 Bundling Rule, at 1.  As explained in UTC's December 2023 letter, the Bundling Rule states:

> If submitted simultaneously in one application, requests for approval of different indications and uses for the same dosage form to be administered by the same route of administration . . . can be regarded, for the purposes of assessing user fees, as one application. . . .  *After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim*.  . . .  If the original application is not yet approved, *a request for approval of other new indications or claims should be submitted in a separate, original application*.  If the initial application is approved, the application can be subsequently supplemented to add a new indication.

*Id.* at 4-5 (emphasis added).  This Bundling Rule continues to be cited by the Agency in various documents, including, most recently, in a Standard Operating Procedures and Policies ("SOPP") publication dated *January 2024*.  SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA), at 12 (Jan. 8, 2024) ("In limited circumstances, an applicant may submit two BLAs/NDAs for the same product that are concurrently reviewed as stand-alone applications with separate [Submission Tracking Numbers ('STNs')].  This occurs when an applicant has a pending BLA/NDA and seeks approval for another reason (for example a different indication or dosage) for the same product (refer to the [2004 Bundling Rule]")).  Liquidia did not do this in their current application.

###    B.    Factual Background

As UTC's December 2023 letter explained, UTC is the holder of five NDAs for drug products containing treprostinil, including TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/mL, approved under NDA 022387.  FDA initially approved TYVASO on July 30, 2009 for the treatment of Pulmonary Arterial Hypertension (WHO Group I) in patients with NYHA Class III symptoms, to increase walk distance (the "PAH Indication").  On March 31, 2021, FDA approved Supplement S-017 to the TYVASO NDA for a new indication: "for the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability" (the "PH-ILD Indication").

In January 2020, Liquidia submitted a 505(b)(2) NDA seeking approval of YUTREPIA (treprostinil) for the PAH Indication relying on UTC's TYVASO as the listed

**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000851

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 6

HYMAN, PHELPS & McNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

drug. Liquidia's YUTREPIA 505(b)(2) NDA contained Paragraph IV certifications to some of the then-listed Orange Book patents for TYVASO, including, in particular, U.S. Patent Nos. 9,593,066 ("the '066 patent") and 9,604,901 ("the '901 patent"). UTC timely sued Liquidia for patent infringement, thereby triggering a 30-month stay on the approval of the YUTREPIA 505(b)(2) NDA that expired on or about October 24, 2022. Liquidia later amended its 505(b)(2) NDA and provided a Paragraph IV certification to a later-listed patent, U.S. Patent No. 10,716,793 ("the '793 patent"), but because that patent was later-listed, the Paragraph IV certification did not result in a 30-month stay. In May 2021, Liquidia responded to a Complete Response Letter ("CRL") from FDA resulting in an amendment to the YUTREPIA 505(b)(2) NDA and additional patent certifications. FDA tentatively approved the YUTREPIA 505(b)(2) NDA for the treatment of PAH, but, due to an ongoing 30-month stay, FDA could not grant final approval for the Liquidia 505(b)(2) NDA.

During the pendency of the 30-month stay for the PAH indication, UTC received approval of the new PH-ILD indication. Supplement Approval, NDA 22387/s-017 (Mar. 31, 2021). In July 2023, Liquidia—fully aware of FDA's Bundling Rule—decided to amend the YUTREPIA 505(b)(2) NDA instead of submitting a new 505(b)(2) NDA to add the PH-ILD indication. In that amendment, Liquidia certified to the Orange Book patent information for TYVASO, and UTC timely sued Liquidia for patent infringement, but the subsequent litigation on the patents covering the new indication—the '793 patent, and U.S. Patent No. 11,826,327 ("the '327 patent")—did not trigger a 30-month stay because those patents were added to the Orange Book for TYVASO after the January 20, 2020 submission of the original YUTREPIA 505(b)(2) NDA. According to the Liquidia Letter, the amendment contained no additional data.

FDA assigned the July 2023 amendment a goal date of January 2024—6 months after submission. In January 2024, however, FDA notified Liquidia that it was not going to issue an action letter in time to meet the . . . PDUFA goal date of January 24, 2024." Liquidia Ltr. at 10.

## II.    LIQUIDIA'S AMENDMENT MUST BE WITHDRAWN

Liquidia misleadingly suggests that UTC is manipulating the regulatory process to thwart competition, but the real issue here is that Liquidia failed to comply with longstanding, repeatedly applied, and recently reaffirmed FDA requirements (and FDA erred in failing to apply them). FDA's Bundling Rule is clear: a new NDA must be submitted to add a new indication to a pending NDA. Liquidia's attempts to circumvent those requirements by framing FDA's longstanding Bundling Rule as a "recommendation"

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 7

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

and outdated "policy" is unpersuasive.  FDA cannot condone Liquidia's disregard of FDA's requirements and thereby allow Liquidia to deprive UTC of its statutorily-enabled right to enforce its intellectual property prior to the market entry of a flood of potentially infringing product.

Liquidia takes the position that FDA's 2016 final rule implementing the MMA ("2016 MMA Final Rule") obviates the Bundling Rule, but FDA repeatedly and consistently has emphasized its continued applicability, including when FDA promulgated the very regulations Liquidia claims to have superseded the Bundling Rule.  *See, e.g.*, 81 Fed. Reg. at 69616, 69635 ("This final requirement conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application (see guidance for industry on [the Bundling Rule] (December 2004). . ."). Contrary to Liquidia's position, nothing in FDA regulations expressly permits the addition of a new indication to a pending 505(b)(2) NDA, and the one regulation which arguably implies such an amendment might be permissible is applicable only in limited circumstances, such as prescription to over-the-counter switches ("RX-to-OTC").  *See* 81 Fed. Reg. at 69616 ("[W]e expect there would be limited circumstances in which [21 C.F.R. § 314.60(f)(1)] would apply to a 505(b)(2) application.").  Liquidia fails to address FDA's explicit re-affirmation of the Bundling Rule's ongoing vitality in the very rulemaking proceeding that Liquidia now claims to have overturned decades of uninterrupted and consistently applied Agency rules.

In short, Liquidia—which appears to be represented by experienced FDA counsel in this matter—knew or should have known that a new 505(b)(2) NDA was required to seek approval of a new indication for YUTREPIA; the preamble to the "superseding" rules is clear.  But Liquidia chose not to do so.  Rather than administrative bifurcation or continuing review of the improperly filed amendment—the implied solutions suggested in the Liquidia Letter—FDA must withdraw the PH-ILD indication supplement and require Liquidia to submit a new NDA so that UTC can do exactly what Congress intended: File suit in order to litigate patents that are specifically related to the new PH-ILD indication before FDA barrels forward with an approval of the pending amendment for that indication. Any other interpretation would be contrary to the text and structure of the Hatch Waxman Act, FDA's longstanding Bundling Rule, and decades of uninterrupted FDA practice in materially indistinguishable cases.

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 8

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

### A.   UTC's Letter Submission Was Proper

At the outset, UTC disagrees with Liquidia's insistence that UTC's December 2023 letter should have been submitted to FDA as a citizen petition.  UTC's December 2023 letter was properly submitted to FDA and shared with Liquidia at FDA's request.

Liquidia begins its assault on UTC's letter submission by noting that it "was submitted as a 'confidential' letter to FDA" rather than as a citizen petition, but in the same breath Liquidia accepts FDA's offer to participate in FDA's letter exchange process and likewise identifies its submission as "confidential."  Liquidia Ltr. at 1, n.2.  FDA's letter submission and exchange process is well-established in circumstances like those here, where a company wishes to raise with FDA a discrete, application-specific issue that is likely to lead to litigation with the Agency.  Indeed, Liquidia's counsel has used the FDA letter submission process to do just that.  *E.g.*, Letter from Scott M. Lassman to Grail Sipes dated Dec. 5, 2017, and Letter from Scott M. Lassman to Grail Sipes dated July 23, 2018, *Braeburn Inc. v. FDA*, No. 1:19-cv-00982 (D.D.C.), ECF Nos. 7-5 and 7-6 (Apr. 9, 2019); *see* ECF No. 7-5, at 2 (providing a "detailed legal analysis and position explaining why any exclusivity awarded to SUBLOCADE must be interpreted narrowly and in a manner that does <u>not</u> block approval of CAM2038 or any of its proposed conditions of use.").

In this case, UTC's counsel, in submitting the UTC Letter to FDA on December 29, 2023, requested an urgent call with FDA to discuss the letter submission and a path forward.  Email from K. Karst, Counsel to UTC, to Kim Dettelbach, Office of Chief Counsel, FDA (Dec. 29, 2023) ("In an effort to avoid litigation over this matter, UTC requests a meeting with FDA's Office of Chief Counsel and other appropriate FDA representatives to discuss resolution of the matter.  To that end, perhaps we can connect early next week after the holiday to schedule a meeting.").  FDA responded and offered to speak with UTC's counsel on January 18, 2024.  During the scheduled January 18, 2024 teleconference with FDA's Office of Chief Counsel, UTC's counsel asked FDA how it would like to proceed in seeking to resolve the discrete issue raised in the December 29, 2023 letter submission (and for the avoidance of doubt, UTC promptly would have agreed to submit a citizen petition to the Agency if FDA had asked it do so).  Yet rather than asking UTC to withdraw its correspondence and re-file it as a citizen petition, FDA instead asked UTC for permission to share a copy of the December 29, 2023 submission with Liquidia.  And UTC promptly agreed to participate in the Agency-requested process. In an email sent the same day as the FDA-UTC teleconference, UTC informed the Agency: "As to your question about sharing the December 29, 2023 correspondence, we discussed and would agree to such an arrangement provided Liquidia agrees to share any response with [UTC].  Please let us know if you decide to go down this road, and prior to sharing our

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 9

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

December letter."  Email from K. Karst, Counsel to UTC, to Kim Dettelbach, Office of Chief Counsel, FDA (Jan. 18, 2024).

Liquidia itself did not appear to raise any concerns about the process FDA proposed; to the contrary, it appears to have agreed that the process was appropriate.  After all, on January 23, 2024, FDA informed UTC counsel not only that the Agency intended to share the December 29, 2023 letter with Liquidia, but also that Liquidia had agreed to share any response with UTC.  Email from Kim Dettelbach, Office of Chief Counsel, FDA, to K. Karst, Counsel to UTC (Jan. 23, 2024) ("FDA plans to share your Dec. 29, 2023 correspondence with Liquidia.  Liquidia has agreed to share any response with UTC.").  Given FDA's choice to proceed with a traditional letter exchange, and Liquidia's own agreement to participate in that process, its contention that UTC somehow engaged in an "unlawful regulatory process" rings hollow.  Liquidia Ltr. at 10.  In this case, FDA decided that the best path forward to resolve the issue presented was to initiate the well-established letter exchange process; Liquidia agreed to participate in it.  That should be the end of this sideshow.

## B.     FDA Clearly Requires a New NDA for the Addition of a New Indication

On the merits, Liquidia argues that submission of a new NDA should not be required for its attempt to seek approval for a new indication because the Bundling Rule "has been superseded in relevant part by both the [FDC Act] and FDA's regulations."  Liquidia Ltr. at 2.  But that simply is not true.  FDA, as recently as January 2024, made clear that the Bundling Rule remains in full force and effect.  *See, e.g.*, SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA), at 12 (Jan. 8, 2024) ("In limited circumstances, an applicant may submit two BLAs/NDAs for the same product that are concurrently reviewed as stand-alone applications with separate STNs.  This occurs when an applicant has a pending BLA/NDA and seeks approval for another reason (for example a different indication or dosage) for the same product (refer to the Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees) [*i.e.*, 2004 Bundling Rule]")).  And indeed, the very rulemaking proceedings that allegedly "supersede[d]" the Bundling Rule expressly direct industry to the Bundling Rule to support the premise that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application."  81 Fed. Reg. at 69616.

Liquidia does not contest the substance of the Bundling Rule; nor could it, as the Bundling Rule unambiguously states that "[i]f the original application is not yet approved,

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

a request for approval of other new indications or claims should be submitted in a separate, original application." 2004 Bundling Rule, at 4-5. Instead, Liquidia dismisses it as relevant only to user fees. Liquidia Ltr. at 7. While indeed the 2004 Bundling Rule was issued to establish when new applications are required for purposes of user fees, that history is irrelevant. That the Bundling Rule was developed for user-fee purposes does not negate its substantive import: That a new NDA (with a new NDA user fee) is required in order to seek a new indication.[1] 2004 Bundling Rule, at 4-5. Notwithstanding Liquidia's unsupported protests, the Bundling Rule reflects FDA's *current* interpretation of the governing statute and regulations.

Nor does the 2004 Bundling Rule stand alone. The FDC Act itself and the accompanying legislative history support the Bundling Rule. As Liquidia points out, FDC Act § 505(b)(4) precludes a pending 505(b)(2) NDA—which includes a tentatively approved 505(b)(2) NDA—from seeking "approval of a drug that is a different drug than the drug identified in the application as submitted" but "does not define the term 'different drug.'" Liquidia Ltr. at 12. Yet the very next provision of the statute expressly permits the submission of an amendment "to seek approval of a different strength." 21 U.S.C. § 355(b)(4)(b). It contains no comparable authorization for applicants to add new indications, and there is accordingly no reason to read into the statute a requirement that would abrogate the Bundling Rule and compel FDA to accept amendments to pending 505(b)(2) applications adding new indications. As the courts repeatedly have made clear, the inclusion of one specific permission is the exclusion of another. *See, e.g.*, *Jennings v. Rodriguez,* 583 U.S. 281, 300 (2018) ("That express exception to detention implies that there are no *other* circumstances under which aliens detained under §1225(b) may be released" (citing A. Scalia & B. Garner, Reading Law 107 (2012) ("Negative-Implication Canon: The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)")).

In the context of this case, that isn't just a background canon of statutory interpretation; its applicability is sharply underscored by the legislative history accompanying FDC Act § 505(b)(4). Indeed, the legislative history expressly indicates that the "different drug provision" was not intended to upend the Agency's longstanding Bundling Rule:

---

[1] As noted in both the UTC Letter and the Liquidia Letter, the Bundling Rule was first promulgated in 1993 and then revised in 2004 to its current form. UTC Ltr. at 10, n.27; Liquidia Ltr. at 7.

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 11

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

> Congress d[id] not intend this provision to alter current [FDA's] practice regarding acceptance of supplements to approved new drug applications ("NDAs"), or amendments and supplements to pending and approved abbreviated new drug applications ("ANDAs"). Instead, Congress intend[ed] this provision to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments . . . ."

H.R. Rep. No. 108-891, at 835 (2003). Thus, that silence was intended to maintain the FDA's 1993 Bundling Rule.

Rather than giving blanket permission to submit an amendment for a new indication to a pending 505(b)(2) NDA, FDA rulemakings implementing the statute prove that the 2004 Bundling Rule remains applicable. Indeed, each of these documents unambiguously directs applicants to the Bundling Rule for questions as to whether a new 505(b)(2) NDA must be submitted. In the 2015 notice of proposed rulemaking for FDA's implementation of the MMA ("2015 NPRM"), FDA makes no fewer than *five* references to the 2004 Bundling Rule, and the 2016 MMA Final Rule preamble references it twice.[2] All of the instances provide direction from the Agency to consult the Bundling Rule precisely because the Agency *expects* industry to consult and rely on the Bundling Rule to determine whether a new NDA is required. The idea that the 2004 Bundling Rule has been superseded by these rulemakings is simply preposterous.

Despite the clear meaning of the statute in light of settled norms of statutory interpretation and the direction from FDA in its rulemakings, Liquidia argues that FDA regulations nonetheless permit the addition of a new indication in an amendment to its 505(b)(2) NDA. Liquidia is wrong.

Pointing to FDA's definition of a "different drug"—which, statutorily, cannot be included in an amendment to a 505(b)(2)—in 21 C.F.R. § 314.60(e), Liquidia argues that FDA did not intend to preclude the filing of an amendment for a new indication. Liquidia Ltr. at 12. This is because, as Liquidia explains, FDA defined "different drug" only as one that "has been modified to have a different active ingredient, different route of administration, different dosage form, or difference in excipients that requires either a separate clinical study to establish safety or effectiveness or, for topical products, that requires a separate in vivo demonstration of bioequivalence." 21 C.F.R. § 314.60(e).

---

[2]     *See* 80 Fed. Reg. at 6823, 6849, 6850, 6851, and 6874; *see also* 81 Fed. Reg. at 69616, 69635.

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

These, according to Liquidia, are the only types of changes to a 505(b)(2) that cannot be submitted in an amendment. Liquidia Ltr. at 12. This argument, however, ignores the final sentence of that provision, which states: "*However, notwithstanding the limitation described in this paragraph (e), an applicant may amend the 505(b)(2) application to seek approval of a different strength.*" 21 C.F.R. § 314.60(e) (emphasis added). That sentence provides an express authorization for a different strength to be submitted in an amendment but says *nothing* about a new indication; if FDA had intended to authorize the addition of new indication through an amendment, it just as easily could have said that. Applying Liquidia's own logic, the absence of a new indication from the second half of the provision supports UTC's position that an amendment *cannot* be submitted for a new indication. Thus, at best, the regulation is a wash, but it assuredly provides no concrete support for Liquidia's claims.

Despite the limitations of the argument, the Liquidia Letter makes much of the omission of a new indication from the definition of a "different drug." It implies that FDA "specifically considered—and rejected—proposals and interpretations" that would have considered a new indication a "different drug." *See* Liquidia Ltr. at 12. But Liquidia chooses its words carefully for a reason: FDA considered and rejected proposals related to *labeling* changes, which could include almost any change to a product, but FDA *never* rejected the addition a new indication to the definition of a "different drug." With no evidence that FDA or Congress considered and rejected a new indication in the definition of a "different drug" and without specific permission for an amendment submission (like for a change in strength), Liquidia's attempt to invoke 21 C.F.R. § 314.60(e) falls well short of the mark.

The same analysis applies to 21 C.F.R. § 314.60(b). These regulations, governing the submission of major amendments, specifically prohibit the submission of a major amendment that includes "data to support an indication or claim that was not included in the original NDA;" it may, however, include data "to support a minor modification of an indication or claim that was included in the original NDA . . . ." 21 C.F.R. § 314.60(b)(6). To the extent that Liquidia's amendment *does* include new data (whether by disclosing Liquidia data or by referencing UTC's TYVASO® NDA to rely on UTC clinical data regarding PH-ILD), 21 C.F.R. § 314.60(b)(6) *compels* the submission of a new NDA, and thus Liquidia's amendment independently violates this regulation. For example, although Liquidia asserts that its amendment did not include any data to support its new request for approval of the PH-ILD indication, Liquidia Ltr. at 9, the amendment seeking approval of such an indication necessarily references and relies upon UTC's INCREASE Phase 3 clinical study, submitted by UTC in support of its own supplemental NDA adding the PH-ILD indication. Information as to that study was not included in Liquidia's original

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 13

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

application. To the extent that Liquidia's application actually contains no clinical data to support the PH-ILD indication, then it is facially deficient under 21 C.F.R. § 314.50(d)(5)(v).

In any event, nothing in these regulations affirmatively *permits* the submission of an amendment for a new indication where data is not required to support it. *Id.* Although 21 C.F.R § 314.60(f)(1) does appear to contemplate that an amendment for a new indication may be submitted in certain circumstances, FDA itself repeatedly emphasized that the scope of this narrow exception is exceptionally "limited." *See* 81 Fed. Reg. at 69616 (discussing the need for additional certifications under 21 C.F.R. § 314.60(f)(1) and stating that "we expect there would be limited circumstances in which this provision would apply to a 505(b)(2) application"). Indeed, both the 2015 NPRM and the preamble to the 2016 MMA Final Rule make very clear that 21 C.F.R. § 314.60(f)(1) applies only in narrow circumstances. The 2015 NPRM states that "most requests for approval of a different indication or condition of use by a 505(b)(2) applicant could not be made as an amendment to the 505(b)(2) application." Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6849 (Feb. 6, 2015). While the 2015 NPRM recognized that "there are certain scenarios in which an applicant may submit an amendment to a 505(b)(2) application (or ANDA) for a new indication or condition of use," FDA noted only a single circumstance in which doing so might be permissible: Where the "indication has changed from prescription status to OTC use." *Id.* The 2016 MMA Final Rule takes the same position, noting that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application" and that "there would be limited circumstances in which [an amendment to add a new indication] would apply to a 505(b)(2) application (e.g., indication changed from prescription status to OTC use.)" 81 Fed. Reg. at 69616. In other words, it is abundantly clear that this narrow proviso for an amendment to add an indication is a carefully circumscribed exception to the general rule that such amendments are impermissible. Liquidia's reading of the regulations, however, would make this narrow window wide enough to drive a truck through.

To be clear, *nothing* in the 2004 Bundling Rule conflicts with FDA's regulations or the statute; the Bundling Rule merely clarifies. The notion that the Bundling Rule has been "superseded" and "trump[ed]" by these regulations, *see* Liquidia Ltr. at 2, 13, is misleading, unsupported, and nonsensical. And, in fact, FDA's most recent Manual of Policies and Procedures ("MAPP") for NDA Classification Codes, updated in December 2022, has a code specifically for these types of NDAs for new indications, anticipating that they will be filed. FDA, MAPP 5018.2, at 6 (Dec. 8, 2022). That MAPP notes "Generally,

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 14

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

a Type 9 NDA is submitted as a separate NDA so as to be in compliance with the [2004 Bundling Rule]." *Id.*

Liquidia seems to believe that its amendment is somehow special enough not to trigger the 2004 Bundling Rule and is thus exempt from its requirements. But Liquidia has failed to show any reason why its NDA is not subject to the Bundling Rule. Absent an exemption from the Bundling Rule, 21 C.F.R. § 314.60(f)(1) is inapplicable, because, as FDA explained, "most requests for approval of a different indication or condition of use by a 505(b)(2) applicant could not be made as an amendment to the 505(b)(2) application . . . ." 80 Fed. Reg. at 6849. As noted, FDA was clear in its preambles that an amendment to a pending NDA for a new indication is reserved for exceptional circumstances, and Liquidia highlights no reason why its NDA is exceptional.

### C.    A New 30-Month Stay Logically Follows the Addition of a New Indication

Liquidia positions UTC's request as an anticompetitive attempt to usurp an undeserved additional 30-month stay in "nothing more than an 11th hour attempt to delay the approval" of a competitor, *see* Liquidia Ltr. at 1, but this blatantly mischaracterizes UTC's position. UTC is simply asking that Liquidia (and FDA) follow the law so that UTC can do exactly what Congress wanted: File suit and allow the parties to obtain clarity about their patent dispute prior to a drastic change in the marketplace. That's the tradeoff Liquidia accepted when it shortcut its own approval process by relying on TYVASO data. Liquidia may not like that, but FDA and Congress have repeatedly emphasized that the 30-month stay is a critical element of the Hatch-Waxman Act that was intended to aid *both parties* by providing certainty before any launch. That Liquidia is willing to risk that certainty—and treble damages for willfully infringing UTC's patents—for an earlier launch date is its prerogative, but Liquidia's decision not to follow the law (and FDA's failure to correct that error) is not a legitimate basis for ignoring the delicate balance Congress struck between the interests of generics in launching earlier and the intellectual property rights of brand manufacturers.

The importance of the 30-month stay for the effective application of the Hatch-Waxman Act cannot be overstated. Congress created the 30-month stay "not necessarily to extend the patent holder's monopoly, but to create an adequate window of time during which to litigate the question of whether a generic will infringe the patented product, without actually having to introduce the generic product to the market." *Ben Venue Labs. Inc. v. Novartis Pharm. Corp.*, 146 F. Supp. 2d 572, 579 (D. N.J. 2001). That 30-month period, intended both to give assurance to the innovator that a follow-on drug manufacturer

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 15

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

would not obtain approval and market its product until the patent is litigated and to remove the risk that brands would hold patents in reserve and thereby lead generics to delay the launch of approved drugs because of patent uncertainty, was critical to the "compromise" that allowed the Hatch-Waxman Act to be enacted. 130 Cong. Rec. H9118 (daily ed. Sept. 6, 1984) (statement of Rep. Waxman) (explaining the support for a 30-month stay rather than an 18-month stay).

As FDA explained in adopting its 2016 MMA Final Rule regulations, "[o]ur interpretation of section [FDC Act § 505(b)(4)] seeks to preserve the legislative balance of the Hatch-Waxman Amendments with respect to facilitating the availability of drug products that meet the statutory requirements for approval while protecting innovator intellectual property rights (and allowing for an early resolution of any patent infringement litigation)." 80 Fed. Reg. at 6851. While this discussion was in the context of FDA's interpretation of "different drug," FDA's logic is equally applicable to a new indication: "Consistent with FDA's 'bundling' policy in effect at the time of enactment of the MMA," changes listed in the 2004 Bundling Rule "are significant enough that it is reasonable to assume that one or more patents for the listed drug might be implicated by the change and, if an action for patent infringement is brought in response to a paragraph IV certification to a listed patent, an opportunity for 30-month stay would be appropriate." 80 Fed. Reg. at 6851. The situation here clearly was not anticipated by the statute, but it was anticipated by FDA, which is exactly why FDA has been clear that most changes to indications will require a new NDA.

And an additional 30-month stay here simply makes sense. The intent of the bar on 30-month stays for later-listed patents assumes that the later-listed patents could have covered the product at approval. Where a new indication is developed and approved, the relevant patents can be listed only after approval of the new indication. These patents, even though they are "later-listed," cover the new aspects of the product that only became relevant because of an additional approval; such patents are not the same as, and cannot be treated the same as, later-listed patents that could have been listed at approval, had they been issued. This, again, is precisely why FDA requires new NDAs where a change to the product might implicate other patent rights. The absence of a 30-month stay for a patent covering a newly-approved condition of use provides no opportunity for the innovator to protect its intellectual property on that indication without immediate competition. This not only disrupts the balance intended by the Hatch-Waxman Act, but it also undermines patent protections covering the further development of existing drugs, diluting incentives to repurpose older drugs.

**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000861

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 16

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

In this case, the absence of a 30-month stay would allow Liquidia to flood the market with an infringing product—a bell that cannot be unrung even in the face of treble damages.

### D.    FDA Must Withdraw the Liquidia PH-ILD Amendment

Liquidia argues that the 2004 Bundling Rule does not require FDA to refuse to file or review the pending NDA.  But even if FDA may sometimes excuse minor, inadvertent errors under the Bundling Rule, Liquidia's clear disregard of unambiguous FDA policy to avoid the requirements of the Hatch-Waxman Act cannot be countenanced.   Nor can the FDA disregard Liquidia's violation of binding regulations.  *See* 21 C.F.R. §§ 314.50(d)(5), 314.60(b)(6).  At a minimum, nothing in the Bundling Rule precludes FDA from requiring Liquidia to file an NDA rather than an amendment—and nothing in the rule permits FDA to approve the amendment in its improper form.   That FDA erred in accepting an amendment unlawfully submitted by Liquidia in the first instance provides no justification for the agency to compound that error by continuing review of or approving the unlawful submission, particularly in a situation that would undermine the essential bargain at the heart of Hatch-Waxman.  And FDA clearly has the authority to mandate withdrawal of the amendment that it never should have accepted in the first place.  *See Ranbaxy Labs., LTD v. Burwell*, 82 F. Supp. 3d 159, 193 (D.D.C. 2015) (holding that the Agency has the ability to correct its administrative errors to ensure that the FDC Act's "statutory purpose is followed"); *Ivy Sports Medicine, LLC v. Burwell* (*Ivy Sports*), 767 F.3d 81, 86, 412 U.S. App. D.C. 452 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions . . . .").

The Liquidia Letter urges FDA not to withdraw the amendment on the theory that, essentially, this is a harmless error; but this is neither harmless nor, on Liquidia's part, an error.   First, Liquidia, advised by counsel and led by experienced pharmaceutical executives, knew or should have known that a separate NDA submission was required by FDA.  Even a cursory reading of the Bundling Rule and the 2015 NPRM and 2016 MMA Final Rule preambles makes that clear.  Second, even if it were simply an error, it is far from harmless: UTC is being deprived of the opportunity to take advantage of an important statutory protection, which includes the opportunity to enforce its patents before the market is overrun with infringing product.

Rather than withdrawal and submission of a new 505(b)(2) NDA, Liquidia also suggests administrative bifurcation of the NDA, assigning the new indication a submission date of July 2023.  But this would reward Liquidia for its nonconformance to plain FDA requirements.  Indeed, Liquidia's proposed solution results in the avoidance of the timely-submitted patents, which, other than ignorance of controlling law, is the only plausible

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 17

HYMAN, PHELPS & McNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

reason that Liquidia submitted an amendment to add the PH-ILD indication rather than submitting a new NDA to begin with. Liquidia should not be rewarded for its avoidance of well-known FDA requirements.

That Liquidia claims it will refuse to submit a new NDA is immaterial to the discussion at hand. This is not about what Liquidia is willing to do but what the law requires FDA to do. Here, the law requires FDA to rectify this situation and restore UTC's Hatch-Waxman rights. In this case that means FDA must consider Liquidia's July 24, 2023 PH-ILD Indication amendment null and void and require Liquidia to submit a new original 505(b)(2) NDA with certifications to patent information currently listed in the Orange Book for the TYVASO Listed Drug (*i.e.*, as of the date Liquidia submits a new original 505(b)(2) NDA for the PH-ILD Indication).

### E.    FDA Must Treat Similar Applicants Similarly

Liquidia dismisses the multitude of examples cited in UTC's previous letter as inapt, as more recent examples involve amendments to applications for reasons other than changes in indication. But Liquidia misses the point: Liquidia insists that the 2004 Bundling Rule is just a recommendation, non-binding on the Agency, and cannot be the source of an Administrative Procedure Act argument that FDA is treating similarly-situated applications dissimilarly. *See* Liquidia Ltr. at 14 ("[T]he 'litany' of examples provided in the UTC Letter are . . . inapplicable to the July Amendment."). The point is that FDA has consistently applied the Bundling Rule for more than 30 years. Liquidia's argument that the Bundling Rule is inapplicable because it is superseded by regulation is proved incorrect by the continued application of that rule. *See* UTC Ltr. at 11. In other words, it is not the treatment of the specific applications referenced that render the applicants similar—it is the fact that the 2004 Bundling Rule was equally applied in all situations covered by that rule that makes the situations comparable. Timing, type of application, and type of change are all irrelevant; what is relevant is that FDA applied the 2004 Bundling Rule as written to all of those applications. There is no reason that Liquidia should not also have followed the Bundling Rule, or that FDA should not apply the rule to Liquidia.

### III.    CONCLUSION

As explained in our December 29, 2023 letter, FDA has, for decades, applied the Bundling Rule to require the submission of a new NDA to add a new indication. Liquidia depicts the Bundling Rule as an outdated, superseded recommendation, but this obfuscates FDA's continued reliance and reference to the Bundling Rule. There is no reason that Liquidia would not have known that a separate NDA is required for such a change, and

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 18

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

Liquidia cannot be rewarded for its duplicity with acceptance of that amendment as of July 2023.  To be consistent with its rulemakings, its policies, congressional intent, and its history of enforcement as described in our earlier letter, FDA must consider Liquidia's July 2023 amendment null and void and require the company to submit a new 505(b)(2) NDA for the PH-ILD indication.

### 

We look forward to hearing from FDA on this matter.  To that end, FDA's failure to take prompt action consistent with the Bundling Rule, and to UTC's satisfaction, will leave UTC with no other option than to initiate litigation against FDA.

Respectfully submitted,

Kurt R. Karst
Michael D. Shumsky
Sara W. Koblitz
*Counsel for United Therapeutics Corporation*

# EXHIBIT 14

IPR2021-00406
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

IPR2021-00406
U.S. Patent No. 10,716,793

———————————

**PATENT OWNER RESPONSE**

LIQ_PH-ILD_00000110

IPR2021-00406
U.S. Patent No. 10,716,793 B2

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................. 1

II. BACKGROUND ................................................................................. 2

   A. Pulmonary Hypertension ............................................................. 2

   B. The Inventors Developed a Novel Method of Treating PAH That Overcame Limitations of Existing Treatments ................... 4

III. Claim Construction and Person of Ordinary Skill in the Art ................... 7

IV. PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR OBVIOUS ........................................................................................ 8

   A. Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA Fail to Render Claims 1-8 Obvious ..................... 10

      1. Petitioner Has Not Established That Voswinckel JAHA And Voswinckel JESC Were Publicly Accessible Prior Art Before The Priority Date ......................... 11

      2. None of the identified references teaches a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths ................................................................ 18

      3. A POSA would not have a reasonable expectation of success in combining the '212 patent, Voswinckel JESC and JAHA or have been motivated to combine them ................................................. 23

   B. Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious ......................................................... 38

   C. Grounds 3-6 Fail Because Each Ground Relies On Publications That Petitioner Has Failed to Establish Are Prior Art ................................................................................... 44

      1. Ghofrani .............................................................. 46

      2. Voswinckel 2006 ................................................... 51

V. OBJECTIVE INDICIA OF NONOBVIOUSNESS ............................... 55

   A. Unexpected Results .................................................................. 55

   B. Copying .................................................................................. 57

   C. Long-Felt Unmet Need ............................................................. 61

VI. CONCLUSION ................................................................................ 63

i

LIQ_PH-ILD_00000111

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acceleration Bay, LLC v. Activision Blizzard Inc.*,
  908 F.3d 765 (Fed. Cir. 2018) ....................................................12, 13, 14, 15, 18

*In re Aller*,
  220 F.2d 240 (CCPA 1955) ...................................................................................55

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ...........................................................45, 50, 54

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016) .......................................................11, 12, 18, 27

*Cellco Partnership v. Bridge and Post, Inc.*,
  IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019)................................45, 50

*In re Cronyn*,
  890 F.2d 1158 (Fed. Cir. 1989) ...........................................................................27

*CSL Behring LLC v. Bioverative Therapeutics Inc.*,
  IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019)............................................52

*E.I. DuPont de Nemours & Company v. Synvina C.V.*,
  904 F.3d 996 (Fed. Cir. 2018) ............................................................................55

*In re Geisler*,
  116 F.3d 1465 (Fed. Cir. 1997) ..........................................................................55

*In re Katz*,
  687 F.2d 450 (CCPA 1982) ...........................................................45, 48, 49, 52

*In re Klopfenstein*,
  380 F.3d 1345 (Fed. Cir. 2004) ...........................................................................12

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
  545 F.3d 1340 (Fed. Cir. 2008) ...........................................................................12

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*
  322 F.3d 1335 (Fed. Cir. 2003) ...........................................................................44

ii

LIQ_PH-ILD_00000112

IPR2021-00406
U.S. Patent No. 10,716,793 B2

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
   941 F.3d 1133 (Fed. Cir. 2019) ....................................................................57, 58

*In re Lister*,
   583 F.3d 1307 (Fed. Cir. 2009) ........................................................................15

*Ormco Corp. v. Align Technology, Inc*,
   463 F.3d 1299 (Fed. Cir. 2006) ........................................................................55

*Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ..........................................................................61

*Trans Ova Genetics, LC v. XY, LLC*,
   IPR2018-00250, paper 35 (PTAB Jun. 26, 2019) .......................................45, 50

**Federal Statutes**

35 U.S.C. § 102(a) .............................................................................10, 44, 45, 50

35 U.S.C. § 316I...................................................................................................8

**Regulations**

37 C.F.R. § 42.108 ..............................................................................................8

**Other Authorities**

IPR2017-01621 and -01622 .........................................................................47, 48

IPR2017-01622, Paper 9 ..............................................................................49, 50

MPEP § 2132.01 ................................................................................................45

PubMed, *available at* https://pubmed.ncbi.nlm.nih.gov/ (last visited Nov. 1,
   2021) ................................................................................................................16

iii

LIQ_PH-ILD_00000113

IPR2021-00406
U.S. Patent No. 10,716,793 B2

EXHIBIT LIST

| Exhibit | Description |
| --- | --- |
| EX2001 | Declaration of Dr. Aaron Waxman |
| EX2002 | Dr. Waxman's *curriculum vitae* |
| EX2003 | Declaration of Dr. Werner Seeger |
| EX2004 | Declaration of Dr. Hossein A. Ghofrani |
| EX2005 | Declaration of Dr. Frank Reichenberger |
| EX2006 | Declaration of Dr. Friedrich Grimminger |
| EX2007 | Tyvaso Orange Book listing |
| EX2008 | Hill, N., 2005, *Therapeutic Options for the Treatment of Pulmonary Hypertension,* Medscape Pulmonary Medicine 9(2). |
| EX2009 | Substantive Submission filed in 12/591,200 (Mar. 9, 2015) |
| EX2010 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-1 (public docket). |
| EX2011 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-11 (public docket). |
| EX2012 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-16 (public docket). |
| EX2013 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), unnumbered docket entry dated 7/30/2020 |
| EX2014 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-20 (public docket)(excerpted). |
| EX2015 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-29 (public docket). |
| EX2016 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-45 (public docket). |

iv

LIQ_PH-ILD_00000114

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2017 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-21 (public docket). |
| EX2018 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-41 (public docket). |
| EX2019 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-49 (public docket). |
| EX2020 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-68 (public docket). |
| EX2021 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-71 (public docket). |
| EX2022 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-40 (public docket). |
| EX2023 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-47 (public docket). |
| EX2024 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-75 (public docket). |
| EX2025 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-80 (public docket). |
| EX2026 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-81 (public docket). |
| EX2027 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-92 (public docket). |

v

LIQ_PH-ILD_00000115

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---|---|
| EX2028 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-74 (public docket). |
| EX2029 | Hess *et al.,* 2007, A guide to aerosol delivery devices for respiratory therapists. American Association for Respiratory Care |
| EX2030 | Dennis JH, 2002, Standardization issues: in vitro assessment of nebulizer performance. Respir. Care. 47(12):1455-1458 |
| EX2031 | Hess *et al.*, 1996, Medication nebulizer performance. Effects of diluent volume, nebulizer flow, and nebulizer brand. Chest, 110(2):498-505 |
| EX2032 | Rubin BK *et al.*, 2008 Treatment Delivery Systems (in Clinical Asthma), *available at* https://www.sciencedirect.com/topics/medicine-anddentistry/ nebulizer |
| EX2033 | Gardenhire, D.S. *et al.*, 2017, A Guide to Aerosol Delivery Devices for Respiratory Therapists (4th Ed.) American Association for Respiratory Care |
| EX2034 | Tyvaso® Label 2021 |
| EX2035 | Bourge *et al., Cardiovascular Therapeutics*, 31:38-44 (2013) |
| EX2036 | McLaughlin *et al.*, *Efficacy and safety of treprostinil: an epoprostenol analog for primary pulmonary hypertension*, J. Cardiovascular Pharmacology, 41:293-299 (2003) |
| EX2037 | Springer website (from fn 13 of Hall-Ellis Decl) |
| EX2038 | (Intentionally Left Blank) |
| EX2039 | Springer website (from fn 14 of Hall-Ellis Decl) |
| EX2040 | University of Wisconsin–Madison Library Catalog Search for holdings of *Circulation: the journal of the American Heart Association* |
| EX2041 | Declaration of Ms. Pilar Wyman |
| EX2042 | Ms. Pilar Wyman's *curriculum vitae* |
| EX2043 | Deposition Transcript of Sylvia Hall-Ellis, Ph. D. |
| EX2044 | American Heart Association Listing of *Circulation* Supplements |

vi

LIQ_PH-ILD_00000116

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2045 | Chemical Abstracts Plus Search Results Transcript |
| EX2046 | Ovid Search Results for "Voswinckel" |
| EX2047 | PubMed Search Results for "Voswinckel" |
| EX2048 | Compilation Showing Search Results for Descriptor Terms |
| EX2049 | Oxford Academic Listing of *European Heart Journal* Supplements |
| EX2050 | Simonneau *et al.*, *Updated Clinical Classification of Pulmonary Hypertension.*, J Am. College of Cardiol, 62(25)D34-D42 at D34-D35 (2013) |
| EX2051 | Sitbon and Noordegraaf, *Epoprostenol and pulmonary arterial hypertension:* 20 years of clinical experience, Eur. Respir Rev. 26:160055 (2017) |
| EX2052 | Second Declaration of Dr. Aaron Waxman |
| EX2053 | Declaration of Dr. Jason McConville |
| EX2054 | Dr. McConville's *curriculum vitae* |
| EX2055 | Deposition of Dr. Nicholas Hill |
| EX2056 | Deposition of Igor Gonda, Ph. D. |
| EX2057 | *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, Johns Hopkins Medicine, *available at* https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure |
| EX2058 | Pharmacokinetics of Inhaled Drugs, *available at* https://media.lanecc.edu/users/ driscolln/RT127/Softchalk/Pharmcology_SFTCHLK_Lesson/ Pharmacology_lesson10.html |
| EX2059 | (Intentionally Left Blank) |
| EX2060 | Waxman *et al., Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, N. Eng. J. Med. 384:325-334 (2021) |
| EX2061 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, Declaration of Dr. Robert Roscigno (EX2048) |

LIQ_PH-ILD_00000117

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2062 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2049) |
| EX2063 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2050) |
| EX2064 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2051) |
| EX2065 | Declaration of Dr. Werner Seeger regarding Application No. 11/748,205 |
| EX2066 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2020) |
| EX2067 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Hossein A. Ghofrani (EX2026) |
| EX2068 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Frank Reichenberger (EX2027) |
| EX2069 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Friedich Grimminger (EX2028) |
| EX2070 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2097) |
| EX2071 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Second Declaration of Dr. Werner Seeger (EX2098) |
| EX2072 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2101) |
| EX2073 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2102) |
| EX2074 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Second Declaration of Dr. Hossein A. Ghofrani (EX2099) |
| EX2075 | Le Brun *et al.*, *A review of the technical aspects of drug nebulization*, Pharmacy World & Science, 22(3):75-81 (2000) |
| EX2076 | Kendrick, *et al.*, *Selecting and Using Nebuliser Equipment*, Thorax, 52(Suppl 2):S92-S101 (1997) |
| EX2077 | Rau *et al.*, *Performance Comparison of Nebulizer Designs: Constant-Output, Breath-Enhanced, and Dosimetric*, Respiratory Care, 49(2):174-179 (2004) |

viii

LIQ_PH-ILD_00000118

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---|---|
| EX2078 | Rau, *The Inhalation of Drugs: Advantages and Problems*, Respiratory Care, 50(3):367-382 (2005) |
| EX2079 | Hess *et al.*, *Medication Nebulizer Performance*, Laboratory and Animal Investigations, 110(2):498-505 (1996) |
| EX2080 | FDA Guidance 2002 |
| EX2081 | Newman *et al.*, *Efficient Delivery to the Lungs of Flunisolide Aerosol from a New Portable Hand-Held Multidose Nebulizer*, 1996 85(9) J. Pharm Sciences 960 (1996) |
| EX2082 | Dubus *et al.*, *Aerosol Deposition in Neonatal Ventilation*, PEDIATRIC RESEARCH, 58(1):10-15 (2005) |
| EX2083 | Treprostinil, PubChem, *available at* https://pubchem.ncbi.nlm.nih.gov/compound/Treprostinil |
| EX2084 | Roscigno *et al.*, 2020 *Pharmacokinetics and tolerability of LIQ861, a novel dry-powder formulation of treprostinil.* Pulmonary Circulation, 10(4):1-9 (2020) |
| EX2085 | Roscigno *et al.*, *Comparative bioavailability of inhaled treprostinil administered as LIQ861 and Tyvaso® in healthy subjects,* Vascular Pharmacology 138:106840 (2021) |
| EX2086 | Declaration of Dr. Roham T. Zamanian regarding Application No. 12/591,200 |
| EX2087 | Sandifer *et al.*, *Potent Effects of aerosol compared with intravenous Treprostinil on the pulmonary circulation*, J. Appl. Physiol. 99:2363-2368 (2005) |
| EX2088 | U.S. Patent Publication No. 2012/0177693 (Cipolla *et al.*) |
| EX2089 | Liquidia SEC Form 10-K (2020) |
| EX2090 | Preston *et al.*, *Safety and efficacy of transition from inhaled treprostinil to parenteral treprostinil in selected patients with pulmonary arterial hypertension.* Pulm Cir. 4(3):456-461 (2014) |
| EX2091 | Expert Report of Dr. Igor Gonda (D. Del) (excerpts) |

ix

LIQ_PH-ILD_00000119

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## I.   INTRODUCTION

Liquidia Technologies, Inc. ("Petitioner") has failed to meet its burden of proving claims 1-8 of U.S. Patent No. 10,716,793 ("the '793 patent") are unpatentable because it relies on references that are not, in fact, prior art and bases its arguments on impermissible hindsight rather than teachings in the prior art.

First, each of Petitioner's six unpatentabily grounds rely upon references that Petitioner has failed to establish constitute prior art.  Grounds 1, 2, and 4 expressly rely on Voswinckel JESC and/or Voswinckel JAHA, but Petitioner has not set forth sufficient evidence to show that either abstract was publicly accessible as of the priority date of the claimed inventions.  Grounds 3-6 expressly rely on Ghofrani and/or Voswinckel 2006, but Petitioner has not set forth sufficient evidence to show that either of these references are antedating or "by others."  This fundamental failure of proof is fatal to Petitioner's case-in-chief.

Second, Petitioner's unpatentability grounds based on the combination of the '212 patent, Voswinckel JESC, and/or Voswinckel JAHA cobble together bits of disclosure guided by impermissible hindsight and expert declarations that rely on unsupported assumptions and unreliable calculations.  None of these references disclose administration of a single event dose from 15-90 µg to a human, let alone delivery of that dose in 1-3 breaths.  The '212 patent discloses sheep data delivered over 30 or more minutes. Voswinckel JESC and JAHA disclose concentrations, but

1

LIQ_PH-ILD_00000120

not single event doses. Petitioner therefore cites an undated device manual that Petitioner has not proven was publicly available and relies on assumptions of its experts in an attempt to calculate a single event dose. The POSA, however, would not perform these calculations and the calculations are flawed. Without disclosure of the claimed single event dose, Petitioner's grounds fail.

Accordingly, Petitioner has not carried its burden to prove unpatentability and the claims are patentable over all of the cited grounds.

## II.   BACKGROUND

The '793 patent relates to the treatment of pulmonary hypertension and is listed in the Orange Book for Tyvaso® (treprostinil) Inhalation Solution, a drug-device combination for delivery of treprostinil by inhalation marketed by Patent Owner, United Therapeutics Corporation ("UTC"). EX1001, 18:22-23; EX2007.

### A.   Pulmonary Hypertension

Pulmonary hypertension is a disease associated with high blood pressure in the pulmonary vasculature. *See generally* EX2050. At the time of the invention, as is the case even today, pulmonary hypertension is a poorly understood, often fatal, disease with limited treatment options.

Epoprostenol is a prostacyclin and was the first and only FDA-approved drug for the treatment of pulmonary arterial hypertension ("PAH") from 1995 to 2001. EX2051. The use of epoprostenol had substantial shortcomings. The half-life of

2

LIQ_PH-ILD_00000121

epoprostenol is only a few minutes, meaning that it is cleared from the body very quickly has a short duration of action.  EX2008, 7-10.  Thus, epoprostenol required administration by continuous intravenous infusion to maintain adequate levels in the body.  Unfortunately, the need for a permanent transcutaneous intravenous catheter posed risks of infection, occlusion, and sepsis.  Moreover, even a short interruption in infusion could increase the risk of hemodynamic collapse and even death because the half-life of epoprostenol is so short.  Epoprostenol also requires daily mixing and refrigeration, which meant the patient must carry a cold pack to avoid degradation at room temperature and an infusion pump to administer the drug, which adversely affect patient compliance.

In 2004, a synthetic prostacyclin analog, iloprost (Ventavis®), was approved as an inhaled treatment for PAH.  *Id.* at 10.  Although inhaled iloprost had a slightly longer duration of action than epoprostenol, doctors still preferred intravenous administration of a prostacyclin analog over inhaled delivery of iloprost for a number of reasons.  *Id.*  For instance, iloprost has a half-life between 20-25 minutes and needs to be used 6-9 times a day, as frequently as every 2 hours, which is considered challenging for patients.  *Id.* at 21, 23-24.  Moreover, the fact that iloprost has a short half-life results in periods of patients being under-medicated while asleep unless they wake at regular intervals to take another dose.  *Id.*

3

LIQ_PH-ILD_00000122

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Treprostinil, the compound described in the '793 patent, was approved to treat PAH as a subcutaneous formulation (Remodulin®) by 2002 and for intravenous use in 2004.  *Id.*  Treprostinil offered benefits over both epoprostenol and iloprost such as room temperature stability and a half-life of several hours versus several minutes. Patients no longer needed to carry ice packs to ensure the stability, safety, and efficacy of the drug.  *Id.*  However, there were still significant limitations to subcutaneous and intravenous delivery of treprostinil, such as severe site pain for some patients, and systemic side effects.  EX1018, 1.

## B.    The Inventors Developed a Novel Method of Treating PAH That Overcame Limitations of Existing Treatments

At the time of the invention, the inventors recognized a need for improving existing pulmonary hypertension treatments.  The '793 patent relates to a breakthrough method of treating pulmonary hypertension using high dose administration of inhaled treprostinil that addressed many of the substantial shortcomings of other existing treatments.  The '793 patent claims methods of treating pulmonary hypertension using a single event dose of 15-90 micrograms of treprostinil, or a salt thereof, delivered by inhalation in only 1 to 3 breaths.  By using the inhalation route of administration, the claimed methods overcame limitations to subcutaneous and intravenous administration, such as site pain injection, systemic side effects, and the need for patients to lug around bulky pumps.  The inventors also improved the safety and efficacy of treatment with the surprising discovery that

4

LIQ_PH-ILD_00000123

IPR2021-00406
U.S. Patent No. 10,716,793 B2

treprostinil could be delivered at higher drug concentrations and shorter inhalation times (3 breaths) with fewer side effects.

The '793 patent issued from an application filed on January 31, 2020 and claims priority to a provisional application, 60/800,016, filed on May 15, 2006. Petitioner does not contest this priority date.

The '793 patent has 1 independent claim and 7 dependent claims. Independent claim 1 recites:

> A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

EX. 1001, claim 1.  Dependent claims 2 through 5 require specific types of inhalation devices, namely a soft mist inhaler (claim 2), a pulsed ultrasonic nebulizer (claim 3), a dry powder inhaler (claim 4) or a pressurized metered dose inhaler (claim 5).  Dependent claim 6 requires the formulation to be a dry powder, and dependent claim 7 requires the powder to comprise particles less than 5 micrometers in diameter.  Dependent claim 8 requires the formulation to contain no metacresol.

The '793 patent teaches that administration of treprostinil using the claimed methods resulted in a significant reduction in pulmonary vascular resistance (PVR) and pulmonary artery pressure (PAP) and an increase in cardiac output.  EX1001,

5

LIQ_PH-ILD_00000124

FIG. 10; 16:32-42.  The specification describes the surprising result of clinical studies showing that the time of inhalation could be reduced by increasing the concentration of treprostinil aerosol.  *Id.* at 16:61-63, 17:44-46.  This single-breath drug administration induced pulmonary vasodilation for longer than 3 hours with minimal side effects.  *Id.* at 18:1-6. Surprisingly, very high concentrations of treprostinil were well tolerated (*id.*), even though initial clinical trials showed that increasing concentration from 16 mcg/ml to 64 mcg/ml led to significant side effects without increasing pulmonary vasodilation.  EX1007 (at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects").

The commercial embodiment of the '793 patent, Tyvaso® (treprostinil) Inhalation Solution, has shown distinct advantages over the other available treatments for pulmonary hypertension.  Tyvaso® has a much longer half-life than Ventavis®.  Thus, there is less risk of undermedication when the patient is asleep or otherwise unable to take the medication.  Additionally, Tyvaso® does not need to be administered as frequently as Ventavis® (only 4 times a day, down from 6-9 times/day).  Less frequent dosing leads to higher patient compliance, time savings of 1.4 hours per day (EX2052, ¶43) and lower risk of rebound hypertension.  Patients transferring from inhaled iloprost to inhaled treprostinil also had improved six-minute walk distances (a common metric to assess pulmonary hypertension), improved patient satisfaction, and improved quality of life.  *Id.* at 8-9.  Notably, once

6

LIQ_PH-ILD_00000125

Tyvaso® entered the market, it was clinically preferred to Ventavis®.  As illustrated below, Tyvaso® rapidly increased its market share after launch at Ventavis®'s expense, indicating the clinical advantages that Tyvaso® has over Ventavis®:



EX2086, ¶18.

## III.   CLAIM CONSTRUCTION AND PERSON OF ORDINARY SKILL

The parties agree that all claim limitations of the '793 patent should be given their plain and ordinary meaning in the art by a person of ordinary skill in the art (POSA) as of May 15, 2006.

A POSA, with respect to the '793 patent, would have an M.D. or a graduate degree (Masters or Ph.D.) in a field relating to drug development and at least two years practical experience in either (i) the investigation or treatment of pulmonary

LIQ_PH-ILD_00000126

IPR2021-00406
U.S. Patent No. 10,716,793 B2

hypertension; or (ii) in the development of potential drug candidates, specifically in

the delivery of drugs by inhalation.  EX2052, ¶¶13-16; EX2053, ¶¶28-31.

## IV.   PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR OBVIOUS

Petitioner has "the burden of proving a proposition of unpatentability by a

preponderance of the evidence." 35 U.S.C. § 316I; *see also* 37 C.F.R. § 42.108.

Petitioner has failed to carry that burden for any of its six Grounds:

> **Ground 1 (Claims 1-8)**: Obvious over '212 Patent, Voswinckel JESC, and Voswinckel JAHA
> **Ground 2 (Claims 1-8)**: Obvious over '212 Patent and Voswinckel JESC
> **Ground 3 (Claim 1)**: Anticipated by Ghofrani
> **Ground 4 (Claims 1, 3, and 8)**: Obvious over Voswinckel JAHA and Ghofrani
> **Ground 5 (Claims 1 and 3)**: Anticipated by Voswinckel 2006
> **Ground 6 (Claims 2 and 4-8)**: Obvious over Voswinckel 2006 and the '212 Patent

Grounds 1 and 2 rely upon a combination of the '212 patent and Voswinckel

JESC (Ground 2) and in further view of Voswinckel JAHA (Ground 1).  Petitioner

has failed to show that Voswinckel JAHA and Voswinckel JESC were publicly

accessible prior art.  Even setting aside this fatal flaw, none of the references

LIQ_PH-ILD_00000127

IPR2021-00406
U.S. Patent No. 10,716,793 B2

expressly teach a "single event dose"[1] of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." In an effort to fill this gap, Petitioner relies on flawed calculations and assumptions and an undated Operating Instruction Manual (EX1037) for a device referred to by Petitioner as "Optineb 2005." Pet., 23; *see also, e.g.*, EX1004, ¶¶74, 108; EX1002, ¶47.[2]  In addition to improperly relying on the undated OptiNeb Manual, the POSA would not be able to calculate a delivered dose based on the scant information in Voswinckel JAHA or JESC, let alone with any reasonable accuracy.  Accordingly, Petitioner cannot meet its burden of establishing that the '212 patent, Voswinckel JESC and/or Voswinckel JAHA teaches or suggests the claimed dose or that a POSA would have been motivated to combine the teachings of these prior art references to achieve the claimed invention with a reasonable expectation of success.

---

[1] A POSA would understand "single event dose" to mean the dose administered in one sitting, which could be one or multiple breaths.  EX2053, ¶50 n.5; EX2052, ¶48 n.4.

[2] Both Drs. Gonda (EX1004, ¶108) and Hill (EX1002, ¶47) rely on the specification of the '793 patent as disclosing that a "pulsed" feature of the Optineb device was known, but the modifications that gave rise to this "pulsed" feature in the Optineb device are not prior art.  EX2003, ¶26.

9

LIQ_PH-ILD_00000128

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Further, Grounds 3 through 6 explicitly rely on Ghofrani and/or Voswinckel 2006.  Ghofrani and Voswinckel 2006 do not qualify as prior art under § 102(a) because they are not "by another" as Drs. Seeger, Ghofrani, Reichenberger, and Grimminger explain, the information relied upon by Petitioner for these two references was solely the work of the inventors of the '793 patent.  As discussed below, these references are also antedated because the claimed invention was invented prior to the publication date of Ghofrani and Voswinckel 2006 and are thus, not qualifying prior art.

### A.     Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA Fail to Render Claims 1-8 Obvious

The Petition fails to establish by a preponderance of the evidence that any of the challenged claims are invalid as obvious over the combination in Ground 1 for several reasons.  First, Petitioner has not set forth sufficient evidence to show that Voswinckel JAHA and Voswinckel JESC were publicly accessible prior art.  Specifically, Petitioner failed to establish that either of these abstracts were received by a library before the priority date.  Furthermore, Petitioner failed to identify how a POSA could allegedly locate these abstracts through the exercise of reasonable diligence before the priority date.  To the contrary, the evidence shows that the Voswinckel JAHA and Voswinckel JESC abstracts are not indexed and difficult to find even today.

10

LIQ_PH-ILD_00000129

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Second, none of the cited prior art references teaches or suggests a "single event dose" of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." The '212 patent specified a broad range of delivered doses, but on a per kilogram and a per minute basis – not a total dose delivered. Voswinckel JESC and Voswinckel JAHA only provide the initial concentration of a pre-aerosolized drug solution and the length of time that the drug is inhaled. As explained in more detail below, the single event dose delivered for any given patient using an inhalation device depends upon numerous factors relating to the type of inhalation device used and use by the patient. The information provided by Voswinckel JESC and Voswinckel JAHA is insufficient for a POSA to determine what single event dosage was administered. Only impermissible hindsight fills this hole in the references.

Third, Petitioner has failed to show that a POSA would have had a reasonable expectation of success for treatment of a patient with pulmonary hypertension by modifying the dosage ranges of the '212 patent to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths.

### 1. Petitioner Has Not Established That Voswinckel JAHA And Voswinckel JESC Were Publicly Accessible Prior Art Before The Priority Date

The determination of whether a document is a "printed publication" that qualifies as prior art hinges on "public accessibility." *Blue Calypso, LLC v.*

11

LIQ_PH-ILD_00000130

*Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)).  Public accessibility is the "touchstone in determining whether a reference constitutes a printed publication," and a reference is considered publicly accessible only if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence[] can locate it."  *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (internal citations omitted).

For references stored in libraries, public accessibility requires that the reference be both available at the library and sufficiently indexed or catalogued by the priority date.  *Blue Calypso, LLC v. Groupon, Inc.,* 815 F.3d 1331, 1348 (Fed. Cir. 2016); *In re Klopfenstein,* 380 F.3d 1345, 1349 (Fed. Cir. 2004).  In many circumstances, whether a reference is publicly accessible will turn on whether it was "meaningfully indexed such that an interested artisan exercising reasonable diligence would have found it."  *Acceleration Bay, LLC v. Activision Blizzard Inc.,* 908 F.3d 765, 774 (Fed. Cir. 2018).

> ### a) No Evidence That A Library Received Voswinckel JAHA Or Voswinckel JESC Before The Priority Date

Petitioner has failed to show that either Voswinckel JAHA (EX1008) or Voswinckel JESC (EX1007) were received by a library before the priority date.  Neither reference contains a "received by" or "accepted" stamp or notation and

LIQ_PH-ILD_00000131

Petitioner's expert, Dr. Hall-Ellis, admitted the same. *See generally* EX1007; EX1008; EX2043, 150:16-23; EX2041, ¶¶13, 18-19, 33.

Dr. Hall-Ellis' reliance on the publication frequency for the journal *Circulation* and the *European Heart Journal* does not establish the public availability of the relevant abstracts appearing in the *supplements* of those journals. *See* EX2041, ¶¶10-14, 30-33. Voswinckel JAHA and Voswinckel JESC are abstracts appearing in special supplements of the journal *Circulation*, published by the American Heart Association (the "Circulation Supplement"), and the *European Heart Journal*, published by the European Society of Cardiology ("EHJ Supplement"), respectively. *Id.*, ¶¶6, 10, 28, 30; *see also* EX2043, 108:15-25, 219:1-23. The *Circulation* and *EHJ* Supplements are not normal issues, and instead constitute irregularly published supplements, each containing thousands of disjointed abstracts. *Id.*

Importantly, supplements compiling conference abstracts can sometimes publish years after the conference in question, putting the *Circulation* and *EHJ* Supplements' availability (if any) past the priority date. EX2041, ¶¶10-11, 30-31. Thus, the publication frequencies for normal issues of *Circulation* and *EHJ* do not establish when a library might have received a print copy of the irregularly published supplements. *Id.* at ¶¶9-14, 29-33. Accordingly, Petitioner has not provided any evidence showing if or when *Circulation* and *EHJ* Supplements were actually

13

LIQ_PH-ILD_00000132

received by a library.  *Id*. at ¶¶14, 27, 33; *see also* EX2043, 150:16-151:7, 157:6-11, 217:11-13, 222:1-10.

Library Machine-Readable Cataloging ("MARC") and Library of Congress ("LOC") records containing metadata fields cited by Dr. Hall-Ellis likewise fail to establish when the *Circulation* or *EHJ* Supplements were publicly accessible.  All of the records provided by Dr. Hall-Ellis relate only to the journal *Circulation* and the *EHJ – i.e.*, the publications at large, comprising all published issues spanning decades – not the *Circulation* and *EHJ* Supplements that actually contain the Voswinckel JAHA and JESC abstracts.  *See* EX1036, ¶¶63, 69; *see also* EX2043, 157:1-5, 222:12–224:2; EX2041, ¶¶20-22, 34-35.  Because the metadata fields in MARC and LOC records cited by Dr. Hall-Ellis also relate to the entire journals Circulation and the EHJ, the records do not establish receipt of the *Circulation* or *EHJ* Supplements before the priority date.  *Id.*

> **b)**   **Insufficient Evidence that Voswinckel JAHA and JESC Could Have Been Located with Reasonable Diligence**

Even assuming Voswinckel JAHA and JESC were received by the University of Wisconsin-Madison and University of Iowa libraries, respectively, before the priority date, Petitioner has still failed to show that the abstracts were meaningfully catalogued and indexed before the priority date such that a POSA could have located

LIQ_PH-ILD_00000133

them through reasonable diligence.[3]  *Acceleration Bay*, 908 F.3d at 774.  There are two major shortcomings with Petitioner's alleged evidence.

First, Petitioner has not offered any evidence that Voswinckel JAHA and Voswinckel JESC were meaningfully catalogued or indexed at a library or in a database before the priority date, or why and how a POSA would search for or find the *Circulation* and *EHJ* Supplements.  *See* EX2041, ¶¶16-17, 34-37.  Even if a POSA found the Supplements, Voswinckel JAHA shares the page with three-and-a-half other abstracts and is just one of many thousands of abstracts spanning 1,102 pages in the full version of the *Circulation* Supplement.  *Id*. at ¶10.  Petitioner has not submitted any evidence that the *Circulation* Supplement contained a table of contents or subject matter index through which the cited abstract (number 1,414) could be located.  *Id*. at ¶¶7-8, 25-26.  Similarly, Voswinckel JESC cited by Petitioner shares the page with three other abstracts and is just one of 3,850 abstracts spanning over 700 pages in the full version of the *EHJ* Supplement.  *Id*. at ¶28.  Although there is a list of "Contents" included within Voswinckel JESC, it is not

---

[3] The Federal Circuit has held that proof of indexing in a "meaningful way," together with evidence that the indexing occurred by the critical date, may be necessary before the burden shifts to Patent Owner to prove otherwise.  *In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009).

15

LIQ_PH-ILD_00000134

organized alphabetically or otherwise ordered by subject. *Id.* at ¶35. As a result, Petitioner has not shown that the POSA could locate either Voswinckel JAHA or JESC using reasonable diligence.

To the contrary, it is undisputed that Voswinckel JAHA and Voswinckel JESC remain difficult to find even today. For example, Dr. Hall-Ellis admitted she either did not search for Voswinckel JESC using typical searches, such as through a common database like PubMed,[4] or was unable to locate Voswinckel JESC. *See* EX2043, 242:11–245:22. Ms. Wyman searched all of the databases cited by Dr. Hall-Ellis (*see id.* at 41:1-42:4; 242:11-243:18 (listing Ovid, PubMed, MEDLINE, Index Medicus, and Chemical Abstracts)), but neither abstract is listed in any of these databases today, and Petitioner has failed to show they were listed in 2006. EX2041, ¶¶5, 16-17, 37. Moreover, the *Circulation* Supplement cannot be found on the *Circulation* Journal's website, AHA online archives, or even in a list of supplements to the journal. *Id.* at ¶¶12, 15. Similarly, the *EHJ* Supplement cannot be found on *European Heart Journal's* website or online archives. *Id.* at ¶32.

---

[4] PubMed.gov searches "more than 33 million citations for biomedical literature from MEDLINE, life science journals, and online books." *See* PubMed, *available at* https://pubmed.ncbi.nlm.nih.gov/ (last visited Nov. 1, 2021).

16

LIQ_PH-ILD_00000135

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Second, the MARC and LOC records cited by Dr. Hall-Ellis do not establish meaningful indexing either.  Dr. Hall-Ellis cites two subject headings or descriptor terms, "Cardiology $x Societies" and "Heart $x Diseases $v Periodicals," as alleged evidence of meaningful indexing.  EX1036, ¶64.  However, these terms only indicate the entire journals themselves were allegedly indexed with these terms and are not unique to the cited abstracts.  EX2041, ¶¶20-23, 34-35.  *Circulation* has been published for more than 50 years (*id*. at ¶24), and the *EHJ* has been published for about 40 years (*id*. at ¶35), so merely locating the journals would not help a POSA find the Supplements, let alone the specific Voswinckel abstracts buried among many thousands of other disparate abstracts.  *Id.* at ¶¶4, 20-24, 34-35.  Any searches using Dr. Hall-Ellis' descriptor search terms would be futile as they would return hundreds of thousands of hits, including hundreds of journals having decades of issues.[5]  *Id.* at ¶¶4, 23-25, 34-35; *see also* EX2043, 158:5-160:2.

_____

[5] Dr. Hall-Ellis admitted that researchers typically only look at the first three pages of search results, (EX2043, 88:7-9), which confirms the difficulty the POSA would have in locating the Voswinckel abstracts when faced with so many journals, issues, and articles hitting on Dr. Hall-Ellis's search terms.

17

LIQ_PH-ILD_00000136

IPR2021-00406
U.S. Patent No. 10,716,793 B2

The law requires Petitioner to provide evidence establishing that Voswinckel JAHA and Voswinckel JESC were received at a library and meaningfully indexed before the priority date.[6]  Petitioner's evidence falls far short of that standard (EX2041, ¶¶3-4, 27, 38), and the Board should find that Petitioner has failed to prove that the Voswinckel JAHA and JESC abstracts were publicly accessible prior art.

### 2. None of the identified references teaches a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths

None of the '212 patent, Voswinckel JAHA, or Voswinckel JESC references teach a single event dose of treprostinil of 15 micrograms to 90 micrograms, delivered in 1 to 3 breaths.  Petitioner concedes that the '212 patent and Voswinckel JESC do not explicitly disclose these limitations.  Pet., 37-39.

### a) The '212 patent

U.S. Patent No. 6,521,212 ("the '212 patent") issued February 8, 2003 and is titled "Method for Treating Peripheral Vascular Disease by Administering Benzindene Prostaglandins by Inhalation."  The '212 patent teaches methods of delivering benzindene prostaglandins by inhalation generally.  EX1006, Abstract. The '212 patent states, "aerosolized treprostinil] has a greater potency as compared to intravascularly administered [treprostinil]."  *Id.* at 8:9-10.  The '212 patent

---

[6] *Blue Calypso,* 815 F.3d at 1348; *Acceleration Bay,* 908 F.3d at 774.

LIQ_PH-ILD_00000137

IPR2021-00406
U.S. Patent No. 10,716,793 B2

provides examples, wherein intravenous or aerosolized treprostinil is administered to sheep at 30, 60 or 90 minutes at a concentration of 250, 500, or 1000 ng/kg/min. *See, e.g., Id.* at FIGS 3-18, Examples I-V.

The '212 patent does not teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. Instead, the '212 patent describes a very broad range of dosages delivered over a period of minutes. The disclosed dosages either specify a "daily infusion dose" or "per kilogram bodyweight per minute" dose, which are not inhaled single event doses as claimed by the '793 patent but *rates* (*e.g.*, µg per unit of body mass per day) or *daily* doses:

> In the case of treating *peripheral vascular disease* by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to **a daily infusion dose** in the range of 25 µg to 250 mg; typically from 0.5 tg[sic] to 2.5 mg, preferably from 7 µg to 285 µg, **per day per kilogram bodyweight**. For example, an intravenous dose in the range 0.5 µg to 1.5 mg **per kilogram bodyweight per day** may conveniently be administered as an infusion of from 0.5 [µg] to 1.0 µg **per kilogram bodyweight per minute**. A preferred dosage is 10 **ng/kg/min**.

EX1006, 5:56-67 (emphasis added).

Further, the dosages described in the '212 patent are contemplated for use in a continuous nebulization device. For example, the '212 patent describes an "AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM" as the preferred device, and it is the only specific device mentioned anywhere in the patent. EX1006, 5:34-36;

19

LIQ_PH-ILD_00000138

EX2052, ¶53.  This device is a *continuous* nebulizer designed to deliver small amounts of medication in a dosing event *spread over several minutes using dozens or hundreds of breaths*.  EX2087, 2364; EX2052, ¶50.  This type of device lacks the precision to deliver a measured amount of drug in the range of 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in only 1 to 3 breaths.  EX2052. ¶55.

Similarly, the working examples of the '212 patent use continuous delivery of a treprostinil solution over 30, 60, or 90-minute intervals.  EX1006, 10:44, 11:11-13.  Treprostinil is delivered at a concentration of 250, 500 or 1000 ng/kg/min. None of these modes of administration disclose or teach a single event dose of 15 micrograms to 90 micrograms.  EX2041, ¶52.  Nor could a POSA determine the amount delivered in 1 to 3 breaths from the experimental descriptions of Examples I-V.  EX2053, ¶¶49-50.

> **b)   Voswinckel JESC**

Voswinckel JESC is a quarter-page abstract dated August/September 2004 and titled "Inhaled treprostinil is a potent vasodilator in severe pulmonary hypertension."  EX1007.  Voswinckel JESC generally describes the delivery of treprostinil over a six-minute interval using an OptiNeb ultrasound nebulizer with a pre-aerosolized starting solution of 16, 32, 48 and 64 µg/mL. EX1007.  The abstract observed that "[a]t higher doses, local and systemic side effects may occur."  *Id.*

20

Indeed, all patients who received the 64 µg/mL complained of headache, cough or bronchoconstriction, including one patient who complained of a major headache. *Id.* The reference concludes that, at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects." *Id.* Thus, Voswinckel JESC teaches away from titrating up to higher drug concentrations over an even shorter time interval.

Petitioner admits that Voswinckel JESC does not teach a single event dose of 15 micrograms to 90 micrograms, but instead describe solution concentrations and a nebulization time of 6 minutes[7] that their experts admit lack many details that bear on the actual delivered dose. Pet., 38. As explained in more detail below, the actual dose delivered for any given patient using an inhalation device depends upon a number of factors including the type of inhalation device used, pre-aerosolized drug concentration, gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions. Without accounting for any of these factors, Petitioner relies on unsupported calculations (discussed in section IV.A.3 below), that Petitioner alleges would lead a POSA to the claimed dosage range.

---

[7] A POSA would understand that the plain and ordinary meaning of the claimed dose of 15-90 µg is the dose delivered to the patient (as opposed to a quantity placed into a nebulizer or starting solution). EX2053, ¶55; EX2052, ¶65 n. 8.

21

LIQ_PH-ILD_00000140

### c)    Voswinckel JAHA

Voswinckel JAHA is a quarter-page abstract dated October 26, 2004 and titled

"Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary

Hypertension."  EX1008.  Voswinckel JAHA generally describes the delivery of

inhaled treprostinil sodium to 17 patients with severe pulmonary hypertension using

a "pulsed" Optineb® ultrasound nebulizer in three breaths, with a pre-aerosolized

treprostinil solution of 600 μg/ml.  *Id.*

Petitioner does not contend that Voswinckel JAHA teaches a dosage of 15

micrograms to 90 micrograms.  Instead, Petitioner relies on Voswinckel JAHA for

teaching "a low number of breaths for the aerosolized delivery of treprostinil

specifically for the treatment of pulmonary hypertension."  *Id.* at 40.  A POSA,

reading Voswinckel JAHA, would not be able to determine the delivered dose in 1

to 3 breaths based on the disclosure of JAHA.  EX2053, ¶52.  The dosage delivered

using an unknown pulsed nebulizer would depend on a number of factors including

the amount of aerosol delivered per pulse, the number of pulses generated per breath,

the shape of the mouthpiece or mask, and the breathing pattern of the patient.  *Id.*

Accordingly, because none of the identified references in Ground 1 teach a

single event dosage of 15 micrograms to 90 micrograms or provide any motivation

for administering this amount, this ground must fail even if all of the references are

prior art (which they are not).

22

LIQ_PH-ILD_00000141

### 3.    The POSA Would Not Be Motivated To Combine The '212 Patent, Voswinckel JESC, and Voswinckel JAHA With A Reasonable Expectation of Success

Petitioner concedes that neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths.  Instead, Petitioner incorrectly argues that these two references render this limitation obvious based on three erroneous calculations.  The first erroneous calculation relies on an undated Optineb manual, which Petitioner suggests provides a nebulization rate for an OptiNeb® ultrasound nebulizer.  Yet there is no evidence that this manual is prior art or refers to a device that was available, much less used, in the reported studies. Petitioner incorrectly relies on this assumption to argue that the patients described in Voswinckel JESC may have received more than 1 ml of solution and leaps to conclude that these subjects received dosages of treprostinil within the claimed ranges.

The second erroneous calculation relies on unsupported assumptions provided by the testimony of Drs. Hill and Gonda that nebulizers are usually prescribed to deliver more than 1 ml of solution.  Moreover, Dr. Hill relies on his experience as an investigator in the Tyvaso® clinical trials and approved drug label – the drug embodying disclosure of the '793 patent.   EX2055, 96:3-101:12.   Petitioner incorrectly relies on these unsupported assumptions to argue that the patients

23

LIQ_PH-ILD_00000142

IPR2021-00406
U.S. Patent No. 10,716,793 B2

described in Voswinckel JESC received more than 1 ml of solution and further received dosages of treprostinil within the claimed ranges.

The third erroneous calculation relies on the teaching in the '212 patent that "the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  EX1006, 8:8-12, *see* Pet., 38-39.  Petitioner and Dr. Hill provide calculations of an inhaled dose based on this 10-50% fraction and the dosing calculations approved by the FDA for intravascular treatment with treprostinil. But as Dr. Hill acknowledged, it is misleading to compare blood levels during infusion as compared to after inhalation and not an accurate measure of the relative potency of treprostinil in aerosolization versus intravascular administration.  EX2055, 102:13-104:15.

As discussed in detail below, each of these erroneous calculations is unsupported by the record.

    a)    **Petitioner Fails to Establish That the Undated Optineb Manual or Optineb Device Was Publicly Available at the Priority Date**

As a preliminary matter, while agreeing that Petitioner has not established that the undated Optineb manual is prior art (Institution Decision at 23), the Institution Decision relied on the undated Optineb manual "as evidence of the general knowledge in the art at around the time of the invention."  *Id.* at 24 (citing *Koninklijke Philips N.V. v. Google LLC,* 948 F.3d 1330, 1337-1338 (Fed. Cir.

24

LIQ_PH-ILD_00000143

IPR2021-00406
U.S. Patent No. 10,716,793 B2

2020)).  But even on this basis, Petitioner fails to show that the information disclosed in the undated Optineb manual was general knowledge as of the priority date.

The undated Optineb manual appears to be a translation of an Operating Instruction manual for "Optineb®-ir", a microprocessor-controlled, mobile ultrasonic nebulizer (Model No. ON-100/2-2.4 MHz).   EX1037.   This undated Optineb manual discloses certain technical features, including that the nebulizer output (what Petitioner's expert, Dr. Hill refers to as "nebulizing rate") is provided as 0.6 mL/min.  *Id*. at 28. Petitioner relies on this technical detail to argue that Voswinckel JESC teaches "an effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil."

Dr. Hill first notes that Voswinckel JESC teaches "[d]oses of treprostinil in solution . . . of 16, 32, 48, and 64 µg/mL using an OptiNeb® ultrasound nebulizer." EX1002, ¶64.  Dr. Hill next argues, without evidence, that nebulizers at the time were known to nebulize at least 1 mL by citing his personal experience and Petitioner's other expert, Dr. Gonda.[8]   *Id*. at ¶65.  As an initial matter, Dr. Hill

_____

[8] But Dr. Hill admitted that he did not recall reviewing Dr. Gonda's declaration prior to signing his own declaration that cites to Dr. Gonda's declaration; rather he relied on his attorneys' "verbal" explanations "relay[ing] the content to [him]."  EX2055, 132:20-134:5.

LIQ_PH-ILD_00000144

testified that his personal experience was based drugs for other indications, not prostcyclins for the treatment of pulmonary hypertension.  EX2055, 146:16-23. Dr. Gonda cites three drug labels, but only one involved a pulmonary hypertension treatment and none of the cited drugs used an OptiNeb device.  Dr. Hill further argues that "[a] POSA would further confirm that 16-64 μg was the administered dosage in Voswinckel JESC by using his understanding of the rate of solution delivery for OptiNeb® device available before 2006." *Id.* at ¶67.  Citing only the undated Optineb manual for the proposition that the nebulizing rate of Voswinckel JESC would be 0.6 mL/min, Dr. Hill argues that continuous delivery of inhaled treprostinil across 6 minutes as described in Voswinckel JESC would have resulted in a dosage of 57.6 μg (16 μg/mL * 0.6 mL/min * 6 min).  *Id.*

Dr. Hill's analysis of Voswinckel JESC in view of the undated Optineb manual fails based on several unsupported assumptions.

*First*, neither Petitioner nor Dr. Hill provide any evidence for their assertion that the undated Optineb manual was publicly available before 2006.  The undated Optineb manual does not provide any copyright information that would indicate when it was first published.  Nor does Petitioner make any effort to fulfill its burden to demonstrate public accessibility before 2006.  Indeed, Petitioner provides no indication that the Optineb manual was disseminated or publicly available and indexed in a manner substantiating public accessibility since there is no evidence

26

LIQ_PH-ILD_00000145

that it could be located before the critical date using key words. *Blue Calypso*, 815

F.3d at 1349; *see also In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989)."  Dr. Hill

merely assumed that the undated Optineb manual was available before 2006 and

testified that the only basis for his conclusion that this document was available in

2005 was "from the attorneys."  He did not "know where the derivation was beyond

that."   EX2055, 63:3-64:2, 83:8-22.   Further, Petitioner retained an expert to

authenticate the publication date of other documents, but that declaration is

completely silent on EX1037.  *See* EX1036.  Regardless, the inventors of the '793

patent, who contributed to development of Optineb, have confirmed it was not

available before the 2006.   EX2003, ¶26; EX2071 (IPR2017-01621, EX2098)

(Seeger Decl.), ¶14 (citing EX2101-EX2102). In sum, Petitioner has failed to make

*any* evidentiary showing that Exhibit 1037, the undated Optineb manual was

publicly accessible as of the critical date of the '793 patent.

*Second*, there is no evidence that the Optineb manual reflects "general

knowledge in the art at around the time of the invention."  Institution Decision at 24.

The Optineb manual is not being used for general knowledge, such as the existence

of nebulizers capable of delivering drug within the recited parameters.  Dr. Hill

specifically used the Optineb manual to determine "the rate of solution delivery for

the OptiNeb® device available before 2006," *i.e.*, the deliver rate of a prior art

device. EX1002, ¶67.  Dr. Hill confirmed that in addition to relying on EX1037 in

LIQ_PH-ILD_00000146

forming his opinion, he had no personal basis for his conclusion that this document was available in 2005, stating only that he "got it from the attorneys." EX2055, 63:3-64:2. He further testified that as of 2006 he had never used an OptiNeb device and that he had not tried to verify whether EX1037 came from the 2005. *Id.* Nonetheless, Dr. Hill relies on the Optineb manual for a specific fact integral to his calculations: an alleged nebulizing rate of 0.6 mL/min. There is no evidence that 0.6 mL/min or even a similar nebulization rate was general knowledge at the time of invention, suggesting reliance on hindsight.

*Third*, Dr. Hill assumes without evidence that the "OptiNeb ultrasound nebulizer, Nebu-tec, Germany" is *the same Optineb device* described in the undated Optineb manual. However, Dr. Hill conceded that he did not know what the "IR" refers to or whether the various Optineb models are the same or different devices. EX2055, 61:10-62:25. In fact, Dr. Hill did not know whether the Optineb device of EX1037 was the same device used in Voswinckel JESC because the reference does not identify which model was used. *Id.* at 81:12-22; 83:3-7.

Further, while the undated Optineb manual states the nebulizer output is 0.6 ml/min (EX1037, 28), that number is far too unsubstantiated and unclear to support any conclusions about actual nebulizer output in any specific instance. EX2053, ¶81. For example, the manual states that this particular nebulizer model has six different programs or modes (EX1037 at 18-20). In certain modes (P1, P2, and P3),

LIQ_PH-ILD_00000147

IPR2021-00406
U.S. Patent No. 10,716,793 B2

the device generates aerosol at intermittent intervals, while in other modes, it generates aerosol continuously. *Id.* Moreover, EX1037 fails to explain whether the 0.6 number is a maximum, minimum, or average; whether the number is a theoretical output based on the electrical components in the nebulizer or the ultrasonic horn driving nebulization of the aerosol; or, if the 0.6 ml/min was derived empirically, whether the measurements were of nebulization of pure water, or a solvent, or a mix of both, or if there was a drug or placebo in the solution. EX2053, ¶¶81-83. All of these variables could affect the amount of drug in the nebulizer output. *Id.*

As a result, even if the Optineb device disclosed in Voswinckel JESC were the same nebulizer described in the undated Optineb manual, there are too many unknowns such that a POSA could not calculate a single event dose. For example, Voswinckel JESC does not describe which program, face mask or mouthpiece, type of tubing, operation frequency, or which baffle plate was used, and all of these variations can effect the device's output. EX2053, ¶¶75-83. Thus, a POSA would not have been able to determine the dosage delivered in Voswinckel JESC with any reasonable certainty.

Because all of the factors addressed above affect the amount of aerosolized treprostinil delivered to the patient and are thus necessary factual predicates for Petitioner's statement that Voswinckel JESC teaches the claim element "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90

29

LIQ_PH-ILD_00000148

micrograms of treprostinil or a pharmaceutically acceptable salt thereof," Grounds 1 and 2, which rely only upon Voswinckel JESC when read in view of the undated Optineb manual to supply this limitation, must fail.

### b) Petitioner Fails to Establish That Fill Volume is Sufficient to Determine the Single Event Dose

With respect to Voswinckel JESC, Petitioner's argument that "a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least 16, 32, 48, or 64 µg of treprostinil were delivered to different dosing groups in this study" (*see* Petition at 23, EX1002, ¶99; EX1004, ¶56) is flawed on several grounds.

*First*, the single event dose of treprostinil delivered to a patient using a continuous nebulizer cannot be meaningfully determined using only the fill volume (*i.e.* the amount of pre-aerosolized solution loaded into the nebulizer).  In practice, patients may be administered an inhaled therapeutic through a continuous nebulizer until the solution in the reservoir has been completely nebulized.  *See* EX2052, ¶83.  For example, each of the FDA approved labels, which Dr. Gonda cites to in his declaration, involve administering the solution until the contents of the reservoir of the nebulizer are emptied.  EX.1004, 56, n. 4.  But Voswinckel JESC does not describe nebulization until the reservoir is emptied.  It mentions a six-minute time period, and there is no guarantee that the entire fill volume would be completely nebulized in six minutes.  EX2052, ¶83; EX2053, ¶45.

30

LIQ_PH-ILD_00000149

The labels Dr. Gonda relies on indicate wide variability in the time required to nebulizer all of the solution.  For example, the AccuNeb® Label referred to by Dr. Gonda teaches that it may take anywhere from 5 to 15 minutes for the 3 mL solution to be nebulized.[9]  EX.1004, 56, n. 4; EX1066.  Voswinckel JESC does not provide either the starting volume of treprostinil solution or identify whether the entire volume had been nebulized at 6 minutes.  The AccuNeb® label also explicitly recognizes that *delivery* of a dose to the patient – as opposed to what is converted to an aerosol by nebulization – depends not only the nebulizer itself, but also on patient factors.  EX2053, ¶61.

*Second*, even if Voswinckel JESC taught a starting volume of solution with a specified concentration of treprostinil, and further taught that the solution was completely nebulized – which Voswinckel JESC does not – a POSA still would not be able determine the single event dosage over that six-minute interval without additional information about the nebulization device.  Fill volume is just one of many variables that may affect drug dosage.  EX2001, ¶41; EX2053, ¶¶55-56.  Additional factors that may affect the dose of drug received by a patient through a continuous

---

[9] Dr. Hill admitted that AccuNeb® is not used to treat pulmonary hypertension and there may be different considerations in determining whether a particular medication is suitable via a particular mode of administration.  EX2055, 136:8-141:18.

31

LIQ_PH-ILD_00000150

nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern, and device interface. *See, e.g.,* EX2033, 11-12; EX2001, ¶13; EX2053, ¶55-56. These factors are not uniform between nebulization devices or patients; EX2053, ¶61. Thus, without additional information regarding the numerous factors mentioned above, the single event dose delivered to patients in Voswinckel JESC cannot be determined. EX2053, ¶¶55-60, 68.

*Third*, it is not true that all continuous nebulizers deliver a dosage of between 1 and 5 mL of aerosolized solution. *See, e.g.,* EX2082, 13; EX2053, ¶¶69-73. Certain commercially available nebulizers –available as of the priority date – were suitable for use with at least 0.5 mLs. *See, e.g.,* EX2082; EX2053, ¶71. Other nebulizers were known to deliver more than 5 mL of aerosolized solution. *See, e.g.,* EX2053, ¶71. A POSA would not know one way or the other whether the ultrasonic Optineb device of Voswinckel JESC was filled with more than 1 mL or less than 5 mL of solution. EX2053, ¶72.

*Finally*, as discussed in Section IV.A.2.a), it is impossible to extrapolate what an appropriate single event dose should be from the data included in Voswinckel JESC because the delivery efficiencies and pharmacokinetics of a continuous nebulizer to do not predictably translate to devices capable of delivering consistent

32

LIQ_PH-ILD_00000151

IPR2021-00406
U.S. Patent No. 10,716,793 B2

dosages in just 1 to 3 breaths.  *See, e.g.*, EX2061, ¶¶11, 14-15 (citing IPR2017-01622, EX2049, EX2050, EX2051).

   **c)    Petitioner's Calculation of Dose Based on the Teachings of the '212 Patent are Flawed For Several Reasons.**

Alternatively, Petitioner starts from the premise that the '212 patent "discloses a dosage range for intravascular administration of treprostinil for the treatment of pulmonary vascular disease, and discloses that only 10-50% of the dosage delivered intravascularly would be needed via inhalation *to have the same therapeutic effect*." *See, e.g.,* Petition at 30-31, 38-39.  Petitioner's incorrect calculation starts with the fact that intravascular treprostinil is approved to treat pulmonary hypertension at a dosage of 1.25 ng/kg/min.  Petitioner then calculates that a patient weighing between 60 and 65 kg would receive a dosage of 108 to 117 micrograms per day.  Petitioner argues that a POSA would then "apply the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing to achieve a dosage of 10.8 to 58.5 micrograms." This analysis is flawed, because (i) the '212 patent does not provide a mathematical calculation for converting an intravascular dosage to an inhaled dosage; and (ii) Petitioner's flawed calculation establishes a *daily* dose not a *single event* dose.

What the '212 patent actually teaches is that "aerosolized [treprostinil] has a *greater potency* as compared to intravascularly administered [treprostinil]." EX1006, 8:8-10 (emphasis added).  The '212 patent further explains, "the actual

33

LIQ_PH-ILD_00000152

amount of [treprostinil] delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:10-13.  However, the '212 patent notes that "the mechanism(s) that accounts for the greater potency and efficacy for aerosolized UT-15 is unknown." *Id.* at 8:13-15.

Petitioner improperly reads into this disclosure a mathematical formula for converting a therapeutically effective dose of intravascularly administered treprostinil into a therapeutically effective dose of inhaled treprostinil.  But the '212 patent provides no such formula.  The '212 patent simply notes that inhaled solutions are more potent despite the fact that the delivered dose may only be 10-50% of the aerosolized solution.  Nor do the examples support such a calculation.  The examples described in the '212 patent simply demonstrate that at the *same dosage* (250, 500 and 1000 ng/kg/min) and *same duration* (30 and 60 minutes), UT-15 is more potent in aerosolized form than intravenous form.  *See* EX1006, 11:7-13.  There is nothing in this data to suggest a formula for calculating the therapeutic dosage of inhaled treprostinil from an approved intravascular treprostinil treatment.

Further, Petitioner's oversimplified calculation fails to take into account the difference in pharmacokinetic effects of a large dose of treprostinil delivered in 1-3 breaths.  Large doses of treprostinil were known to produce "dose-limiting side effects" such as nausea, vomiting, headache, dizziness, and anxiety.  *See, e.g.,* EX2037.  For subcutaneous administration, the maximal tolerated dose is just 10

34

LIQ_PH-ILD_00000153

ng/kg/min, which is 2 orders of magnitude lower than the claimed dosage of the '793 patent.  *Id.*  As discussed above, intravascular treprostinil is approved at a much lower dosage of 1.25 ng/kg/min.  EX1018.

Dr. Hill admits that it "is misleading to rely on blood levels, circulating levels" and "rough measures of relative potency between intravascular and aerosolized delivery."  EX2055, 103:21-104:6; *see also* EX2090, 460. And Dr. Hill, outside of this IPR proceeding, would never rely upon the calculation he puts forward here.  In his own publications, including one 8 years after the priority date, when not being paid by Liquidia to say the opposite, Dr. Hill told his colleagues that "how the pharmacokinetics and the effectiveness of inhaled forms compare to parental forms [i.e. intravenous and subcutaneous] of prostanoids at the currently approved doses . . . has not been adequately studied."  EX2090, 460; *see also* EX2061, ¶11 (noting risk of spillover effect when inhaled amount of treprostinil is increased).  Instead, "clinicians need to rely on clinical assessment as proof of response to therapy."  *Id.*

Iloprost, the only other inhaled prostacyclin analogue as of the priority date, approved for dosages of 5 micrograms or less in a single event dose, demonstrated adverse systemic effects at doses as low as 7.5 micrograms per single event dosage. EX1001, 17:15-22.  Given these dose limiting side effects, a POSA would not have been motivated to achieve a dose of 15 to 90 micrograms in just 1 to 3 breaths with any reasonable expectation of success.

35

LIQ_PH-ILD_00000154

Finally, even if the Board were to accept Petitioner's calculation, it does not result in a single event dose between 15 micrograms and 90 micrograms. Remodulin® intravenous infusion is dosed *continuously*, and 108 to 117 micrograms would be the dosage over *24 hours*. *Id.*, EX1018. The '212 patent teaches, therefore, that 10.8 to 58.5 micrograms would be the expected *daily* inhaled dose, and not a single event dosage. *Id.* As Dr. Hill admits, this calculation is comparing "apples and oranges." EX2055, 100:15-25.

The continuous nature of the drug delivery in the prior art confirms that one single event dose is insufficient to control PAH for an entire day. *Id.* For example, Voswinckel JAHA, which has itself not been established to be prior art, confirms that 4 individual dosing events were required throughout the day to treat pulmonary hypertension. *Id*; EX1008. Even at the high end, the simple math demonstrates that a 58.5 microgram daily dose would amount to less than 15 micrograms of treprostinil sodium per single event dose when spread over four individual dosing events. *Id.*

Surprisingly, during Dr. Hill's deposition, Petitioner asked about "dose adjustments" of Remodulin as described on the label on redirect. Dr. Hill testified that the dose of Remodulin may be adjusted "no more than 2.5 nanograms per kilogram per minute per week". *Id.* at 174:15-21. Dr. Hill then testified that these dose adjustments would "end up in that 15 to 90 microgram range taking into account dividing the dose in paragraph 100 by four." *Id.* at 176:5-10. Patent Owner

LIQ_PH-ILD_00000155

objects to this testimony because it is outside the scope of a proper redirect examination and presents new theories of invalidity that were not presented in the Petition.  Further, following the dosage instructions from the Remodulin label would ultimately result in dosages significantly above a single event dose of 15 to 90 micrograms even if Petitioner's calculation methodology had any scientific merit, which it does not.  *See, e.g.,* EX2052, ¶60.

For at least these reasons, a POSA would not be motivated to combine the disclosure of the '212 patent with the teachings of Voswinckel JESC and JAHA in a way that would result in a single event dose of 15 to 90 micrograms in 1 to 3 breaths with a reasonable expectation of success.  There is simply no motivation offered by Petitioner that would override a POSA's serious concerns about side effects to support modifying the Voswinckel references and '212 patent in order to achieve a single event dose of 15 to 90 micrograms in 1 to 3 breaths.  In fact, Voswinckel JESC warns in its Conclusion that "at a concentration of 16 μg/ml, near maximal pulmonary vasodilation is achieved without adverse effects" but "[a]t higher doses, local and systemic side effects may occur."  EX1007.  Nowhere does the Petition address why a POSA would increase the dose or have a reasonable expectation of success if the dose is increased by shortening the single event dose of Voswinckel JESC to 1 to 3 breaths using a much higher dose per breath.  In fact, Petitioner's expert Dr. Gonda remarks in his own inhaled treprostinil patent

37

LIQ_PH-ILD_00000156

IPR2021-00406
U.S. Patent No. 10,716,793 B2

application that it would be preferable to *reduce* the treprostinil dosage taught by Voswinckel 2006 in order to reduce systemic levels and adverse side effects. EX2091, ¶¶25, 26, 29-32.  If anything, a POSA would be motivated to lower the dose based on Voswinckel 2006 (if it were prior art at all).

### 4.   Claims 4, 6, and 7: Petitioner's Arguments Regarding Obviousness Are Contradicted And Undermined By Its Arguments Regarding Enablement

Here, Petitioner asserts that claims 4, 6, and 7 are obvious. But in co-pending litigation between Petitioner and Patent Owner, Petitioner says the claims are not enabled. Petitioner cannot have it both ways.

Petitioner uses half of a page to assert that claim 4 would be obvious. Pet. 44. Petitioner cites the '212 patent, which describes an "inhaler" and references powder formulations in the specification and a claim, and an article stating that "dry powder inhalers were well known and 'widely accepted' as of 2006." *Id.* (citing EX1038, 1311). Petitioner cites the '212 patent again for claims 6-7, using four and three lines, respectively. Pet. 45.  Dr. Gonda's declaration asserts that "because dry powder inhalers were well-known and 'widely accepted' by May 2006, … a POSA would have had a reasonable expectation of success that the "powder" disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." EX1004, ¶80 (citing EX1019, 33).

LIQ_PH-ILD_00000157

Dr. Gonda asserts the opposite in his district court expert report. Spanning twenty pages, Dr. Gonda identifies a litany of alleged challenges that he contends demonstrate a lack of enablement.[10] EX2091, 40-61. According to Dr. Gonda, "a POSA would have to engage in excessive (undue) experimentation to develop a treprostinil powder formulation and corresponding dry powder inhaler that achieve [sic] effective administration as required by claims 1, 4, 6, and 7 of the '793 patent." *Id.* at 42. "[T]he level of unpredictability in the art was high." *Id.* at 44. "Without guidance from the '793 Patent, *a POSA would be unable* to formulate a treprostinil powder suitable for administration via a dry powder inhaler for PH patients without excessive experimentation." *Id.* at 47 (emphasis added); *see also, e.g.*, *id.* at 49 (treprostinil would be more challenging that other drugs used with DPIs); 51 (powders present unique challenges).

Dr. Gonda's opinions in the district court completely contradict his assertions before the Board. *Compare* EX2091, 40-61 *with* Pet. 44 *and* EX1004, ¶¶76-80. This is particularly true where Petitioner and Dr. Gonda contend that "the '212 patent's disclosure that one can use a powder formulation of treprostinil is nearly identical to that of the '793 patent's disclosure of treprostinil powder formulations." EX1004,

---

[10] Patent Owner disputes Petitioner's claims of invalidity for lack of written description and enablement and obviousness.

LIQ_PH-ILD_00000158

IPR2021-00406
U.S. Patent No. 10,716,793 B2

¶78 n.8. "[N]early identical" disclosures cannot support both a reasonable expectation of success (*without* the '793 patent's guidance on dosing) and a conclusion of undue experimentation (*with* the '793 patent's guidance).

Dr. Gonda purports to condition his opinions on enablement, stating that the claims are not enabled "[t]o the extent [Petitioner] contends that he asserted claims are not obvious," but this does not resolve his inconsistency. *See, e.g.*, EX2091, 40. Patent Owner primarily contends the claims are nonobvious because the prior art lacks disclosure of a single event dose of 15-90 μg delivered in 1-3 breaths, regardless of the form of administration (liquid or powder). Whether the Board or Court agrees does not affect how difficult it allegedly was in 2006 to prepare a powder formulation for use with a DPI. Petitioner's conclusory evidence of obviousness is contradicted by its lengthy district court assertions and it has therefore failed to show Claims 4, 6, or 7 to be obvious by a preponderance of the evidence.

**B.     Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious**

Petitioner's rationale under Ground 2 is identical to Ground 1, except with respect to the claim limitation "delivered in 1 to 3 breaths."  Rather than relying on Voswinckel JAHA for this limitation, Petitioner argues that this limitation "would have been obvious over the '212 Patent and Voswinckel JESC in view of a POSA's general knowledge in the field and/or by applying routine optimization."  To the

40

LIQ_PH-ILD_00000159

extent that Ground 2 relies on arguments set forth under Ground 1, Patent Owner incorporates the arguments from Section IV.A.

Petitioner is incorrect that a "POSA's general knowledge in the field" would motivate a POSA to "minimize the number of breaths required for administration of treprostinil." As discussed above, there were known dose limiting side effects associated with treprostinil and prostacyclin molecules generally that would have prevented a POSA from expecting that such a high dosage in just 1 to 3 breaths would be well tolerated. *See* Section IV.A.3.c). The "general knowledge" relied upon by Petitioner does not support the notion that the "the general state of the art had established safety and efficacy of high dosages of inhaled therapeutics delivered over a small number of breaths."

As a preliminary matter, Petitioner relies on publications that are not "prior art" as discussed in Section IV.C below (*i.e.*, Voswinckel 2006 (EX1009) and Ghofrani (EX1010)).

Second, even the actual prior art relied upon relate to different types of molecules with different indications and mechanisms of action. Geller 2003, for example, which Petitioner also relies upon, teaches inhalation of recombinant human deoxyribonuclease (rhDNase) for the treatment of cystic fibrosis. EX1034, Abstract. A POSA would understand that the ability of an inhaled therapeutic to be well tolerated at high concentrations in just 1 to 3 breaths is highly dependent on the

41

LIQ_PH-ILD_00000160

nature of the compound inhaled.  EX2052, ¶89.  The pharmacokinetic profile and potential side effects of inhaled rhDNase are completely unrelated to treprostinil or other prostacyclin analogues.  *Id*.  And Frijlink 2004 (EX1039) simply teaches that dry powder inhalers may be used to deliver high fine particle fractions to the lung resulting in relatively high lung deposition.  It does not teach that high concentrations of treprostinil in just 1 to 3 breaths would be well tolerated in the case of a totally different patient population, namely pulmonary hypertension patients.  Indeed, Dr. Hill acknowledged that there are different considerations in determining whether a particular medication is suitable via a particular mode of administration when treating different diseases.  EX2055, 136:8-141:18.  Finally, Petitioner relies upon Voswinckel JAHA, but as explained in Section IV.A.2.c) above, this abstract does not teach dosages of treprostinil of 15 micrograms to 90 micrograms.

Petitioner has likewise failed to explain *why* it would have been "routine optimization" to arrive at the claimed dosage in just 1 to 3 breaths in view of the general disclosures of the '212 patent and Voswinckel JESC.  As discussed in Sections IV.A.2.a) and IV.A.2.b) above, neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms or teach administration of treprostinil in just 1 to 3 breaths.  In fact, Voswinckel JESC teaches away from using higher concentrations due to side effects as described above.

LIQ_PH-ILD_00000161

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Petitioner incorrectly assumes that a POSA could readily titrate dosage up from the teachings of the '212 patent and Voswinckel JESC to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths.  However, both the '212 patent and Voswinckel JESC utilize continuous nebulization to deliver a dosage of treprostinil over a longer duration.  It would not be possible to administer a single event dose in 1 to 3 breaths of the claimed invention using these devices.  Further, as discussed *supra*, with continuous nebulization, a patient breathes in a very small fraction of the nebulized output of the device over a substantial time period without knowing the precise dosage that is ultimately administered.  *Id.* ("only 10% of the total dose loaded in a [continuous] nebulizer is in reality deposited in the lungs").  The patient wears a mask and breathes in unmeasured portions of the entire nebulized output delivered through the mask:



EX2033, EX2052, ¶37.

43

LIQ_PH-ILD_00000162

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Various factors that would affect the dose of drug received by a patient through a continuous nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface. *Id.* at ¶38. Petitioner overlooks the fundamental difference between operating principles of continuous nebulization devices and other types of inhalation devices and erroneously combines elements from incompatible references throughout its Petition.

Petitioner's assertions of obviousness of claims 4, 6, and 7 fail for the same reasons as cited above with respect to Ground 1.

### C.    Grounds 3-6 Fail Because Each Ground Relies On Publications That Petitioner Has Failed to Establish Are Prior Art

Petitioner does not dispute that Ghofrani and Voswinckel 2006 were both published less than one year prior to the date of the application that resulted in the '793 patent. *See, e.g.,* Petition at 25 (admitting that Ghofrani was published in June of 2005, *i.e.*, less than one year prior to the date of application); *Id.* at 27 (admitting that Voswinckel 2006 was published on January 17, 2006, *i.e.*, less than one year prior to the date of application).   Accordingly, Petitioner bears the burden of establishing that Ghofrani and Voswinckel 2006 are prior art "by others" under 35 U.S.C. § 102(a).  *See, e.g., Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.* 322 F.3d 1335, 1346 (Fed. Cir. 2003) (an inventor's own disclosure 'will

44

LIQ_PH-ILD_00000163

IPR2021-00406
U.S. Patent No. 10,716,793 B2

not anticipate his later invention" unless published more than one year prior to the application date).

Ghofrani and Voswinckel 2006 are not prior art unless they are the work of another. *In re Katz,* 687 F.2d 450, 454 (CCPA 1982). "[T]he fact that a reference does not list any co-inventors as authors, or that it lists other authors, is certainly not dispositive in itself." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); MPEP § 2132.01 (II) ("[a]n inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). A common inventive entity may still exist even where a co-inventor is not listed as an author on the purported prior art reference. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, paper 35, at 7-8, n. 8 (PTAB Jun. 26, 2019). The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019) (citing *In re Land,* 368 F.2d 866, 878 (CCPA 1996) and *In re DeBaun*, 687 F.2d 459, 462-63 (CCPA 1982)).

The declarations of inventors Drs. Seeger and Roscigno, together with the deposition testimony of Dr. Rubin and the corroboration provided by non-inventor Dr. Ghofrani, establish that the relevant portion of the Ghofrani reference was

45

LIQ_PH-ILD_00000164

reduced to practice by the present inventors prior to the publication date of the Ghofrani reference. EX2071, ¶5; EX2074, ¶8.  In addition, Dr. Roscigno confirms and identifies corroborating regulatory documents demonstrating that the inventors had conceived of and reduced to practice all limitations of the independent claims by 2003, and certainly no later than January 2005.  EX2061, ¶¶16-17 (citing EX2062-EX2064).  Certainly, the inventors had reduced to practice at least the limitations alleged in Ghofrani by the end of 2003 and no later than January 2005. *Id.* at ¶14-15.  The same is true in relation to Voswinckel 2006.  Accordingly, Ghofrani and Voswinckel 2006 are not qualifying prior art.

### 1.  Ghofrani

Ghofrani is a review article, published in German, describing "New therapies in the treatment of pulmonary hypertension."  In addition to describing recent developments relating to inhaled treprostinil, the review article also describes other "new therapy approaches, which are partially still under development, and that can find their way into the therapy guidelines in the near future" including inhaled iloprost, selective endothelin A receptor antagonists (sitaxsentan and ambrisentan), and PDE5-inhibors (e.g., sildenafil).  EX1010, 297.

The Ghofrani review article was co-authored by Drs. Seeger and Voswinckel (inventors of the '793 patent) as well as Drs. Ghofrani, Reichenberger, and Grimminger (non-inventors).  Drs. Seeger and Voswinckel testified that they

LIQ_PH-ILD_00000165

contributed to portions of the Ghofrani review article relating to inhaled iloprost and inhaled treprostinnil.  *See* EX2066, 3 (IPR2017-01621, EX2020) (Seeger Decl.). Drs. Ghofrani, Reichenberger, and Grimminger have each submitted declarations stating that they did not contribute to the sections of the Ghofrani review article relating to the studies on inhaled treprostinil.  EX2004, ¶ 5; EX2005, ¶ 5; EX2006, ¶ 5;  *see also*  EX2067-EX2069 (IPR2017-01621 and -01622) (Ghofrani, Grimminger, Reichenberg Decls.) (EX2026, EX2099, EX2028, EX2027).  Further, Drs. Ghofrani, Reichenberger, and Grimminger have each declared that they did not design the inhaled treprostinil clinical trials and that the information on the clinical trials mentioned in the Ghofrani article were designed and conducted by Drs. Voswinckel and Seeger based on their work with Drs. Olschewski, Rubin, Schmehl, Sterritt, and Roscigno.  *Id.*

Instead, Drs. Ghofrani, Reichenberger, and Grimminger contributed to other sections of Ghofrani not relevant to the Petitioner's grounds for *inter partes* review. Dr. Ghofrani stated that his contribution was to the section on phosphodiesterase inhibitors.  EX2004, ¶4. Dr. Ghofrani has experience in the use of phosphodiesterase inhibitors for treatment of pulmonary hypertension.  *Id*.  His contribution to the Ghofrani publication was drafting the section of the article relating to phosphodiesterase inhibitors and jointly drafting the sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of

47

LIQ_PH-ILD_00000166

pulmonary hypertension, as well as the introduction. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Reichenberger stated that his contribution was to the section on selective endothelin A receptor antagonists. EX2005, ¶4. Dr. Reichenberger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani was jointly drafting the section on selective endothelin A receptor agonists with Dr. Grimminger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Grimminger stated that his contribution was also to the section on selective endothelin A receptor antagonists. EX2006, ¶4. Dr. Grimminger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani consisted of jointly drafting the section on selective endothelin A receptor agonists with Dr. Reichenberger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Petitioner. *Id.* at ¶¶4-6.

As noted in *In re Katz*, "authorship of an article by itself does not raise a presumption of inventorship with respect to the subject matter disclosed in the article. Thus, co-authors may not be presumed to be co-inventors merely from the

LIQ_PH-ILD_00000167

fact of co-authorship." 687 F.2d at 455. The explanations provided by Seeger and *each of the non-inventor co-authors* – Drs. Seeger, Ghofrani, Reichenberger, and Grimminger – is consistent not only with the content of the article, but also with the nature of the publication, *i.e.*, a review article summarizing different advances in the treatment of pulmonary hypertension. *Id.* (accepting the Appellant's explanation "consistent not only with the content of the article but with the nature of the publication"). From such a fact pattern, joint inventorship with Drs. Ghofrani, Reichenberger, and Grimminger cannot be inferred.

Further, Petitioner appears to accept UTC's explanation for why Drs. Ghofrani, Reichenberger, and Grimminger are not inventors of the relevant subject matter of Ghofrani based on declarations submitted by these authors in IPR2017-01621. *See,* Pet. at 26 ("PO encountered this issue in IPR2017-01621 and IPR2017-01622 and submitted an affidavit attesting that these authors did not contribute to the relevant portion of Ghofrani. *See* IPR2017-01621; Paper 10 at 12-14; IPR2017-01622, Paper 9 at 12-15.")

LIQ_PH-ILD_00000168

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Nonetheless, Petitioner contends that because "Olschewski, Rubin, Schmehl, Sterritt, and Roscigno were not listed as authors on the Ghofrani article"[11] there is an "inference that they did not make any contribution to Ghofrani's disclosure." *Id.* at 27. This distinction between authorship and inventorship is legally irrelevant. The fact that a reference does not list certain co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. There is no requirement that every listed inventor on the '793 patent be listed as a co-author to disqualify a reference under § 102(a) as not by another. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, Paper 35 at 7-8, n. 8. The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *See, e.g., Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, Paper 40 at 20.

Here, the declaration of Dr. Seeger explains that these other co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical

---

[11] Robert Roscigno is a named inventor of the '793 patent, and was later employed as an executive of, and is currently a consultant for, Liquidia. Petitioner failed to present *any* evidence on these points.

LIQ_PH-ILD_00000169

studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶12, 22-27.   Many of the specific parameters used in these studies performed by the co-inventors were not fully reported in Ghofrani.   *Id.* at ¶¶11-12. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Ghofrani were conceived by the named inventors and not by the non-inventor co-authors of these references.   EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on the Ghofrani review article is irrelevant to whether Ghofrani is "by another."

## 2. Voswinckel 2006

Voswinckel 2006 is a short "Clinical Observation" published in the Annals of Internal Medicine, titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," which describes clinical observations on three patients with severe pulmonary hypertension, who were treated with administration of a single 15 µg dose of treprostinil, inhaled in three breaths through a modified Optineb ultrasonic inhalation device.

Voswinckel 2006 was co-authored by Drs. Seeger, Voswinckel, and Dr. Olschewski (inventors of the '793 patent) as well as Drs. Ghofrani and Grimminger (non-inventors).   Drs. Ghofrani and Grimminger have each submitted declarations stating that they did not contribute to design or control of the clinical trial described in Voswinckel 2006, and that all of the work performed by Drs. Ghofrani and/or

LIQ_PH-ILD_00000170

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Grimminger was at the direction of or under the supervision and control of Drs. Seeger, Voswinckel, and Olschewski.  EX2004, ¶¶7-12; EX2006, ¶¶7-12; *see also* EX2070, ¶6; EX2065.  A publication is not the work of another where the work described was performed solely at the direction and supervision of the listed inventor(s).  *See In re Katz,* 687 F.2d at 450, 455-456 (holding that a publication that identified an inventor and two students as authors was not the work of others, and thus not prior art, because the work performed by students in "testing features of the invention" was performed under the direction and supervision of the inventor); *see also CSL Behring LLC v. Bioverative Therapeutics Inc.,* IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019) (holding a publication is not the work of another where the patent owner can show that the non-inventor co-authors "carried out experiments under [the inventor's] direction and control," and that it was the inventor who "designed and lead the … project, and experiments performed by the co-authors.").

As set forth in the declarations, the dosage amounts of administered inhaled treprostinil to give to patients, the inhalation time and/or number of breaths employed, the particular equipment and administration devices and methods to use, the spacing between inhalation events, the analysis of the hemodynamic and pharmacokinetic effects over time in the study with inhaled treprostinil were all determined Drs. Seeger, Voswinckel, and/or Olschewski.  Drs. Ghofrani and Grimminger did not participate in the design of any of the studies, did not select the

52

LIQ_PH-ILD_00000171

dosing regimen, and did not conduct analysis of patient results discussed in Voswinckel 2006.  EX2004, ¶¶11-12; EX2006, ¶¶11-12.

As explained in the declarations of Drs. Seeger, Ghofrani, and Grimminger, it was standard practice within the group to include *all* group members as authors on clinical observation reports such as Voswinckel 2006, even when that group is broader than the individuals actually involved in inventing the methods or devices and designing the trials disclosed in that publication.  EX2003, ¶21; EX2004, ¶¶10-11; EX2006, ¶¶10-11.  This explanation is consistent with industry practice for publishing clinical observation reports such as this one.  Joint inventorship with Ghofrani and Grimminger cannot be inferred in these circumstances.

Petitioner contends that "Olschewski, Roscigno,[12] Rubin, Schmehl, and Sterritt are identified as inventors of the '793 patent, but are not authors of Voswinckel 2006."  Pet., 29.  As a preliminary matter, UTC notes that Dr. Olschewski is an author on Voswinckel 2006.

Petitioner is also incorrect to state that, because these other co-inventors "are not authors on Voswinckel 2006, [this] supports the inference that they did not make any contribution to that disclosure."  Pet. at 29.  As discussed above with respect to Ghofrani, this fact is legally irrelevant.  The fact that a reference does not list certain

---

[12] *See* footnote 4, above.

LIQ_PH-ILD_00000172

co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. Rather, as is the case here, the non-author co-inventors, contributed to aspects of one or more of the claimed inventions, not disclosed by the publication that Petitioner is relying on.

Here, Dr. Seeger explains that these co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶19-20, 22-27. Many of the specific parameters used and the particulars of these studies performed by the co-inventors were not fully reported in Voswinckel 2006 (for example, the particular details of the "*modified* OptiNeb® ultrasonic device"). *Id.* at ¶19. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Voswinckel 2006 were conceived by the named inventors and not by the non-inventor co-authors of these references. EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on Voswinckel 2006 is not dispositive on the issue.

54

LIQ_PH-ILD_00000173

# V. OBJECTIVE INDICIA OF NONOBVIOUSNESS

There are a number of secondary considerations that establish that the claims of the '793 patent are not obvious as of the priority date, including unexpected results, copying and unmet need.

## A. Unexpected Results

For the reasons discussed above, Petitioner has failed to establish a prima facie case of obviousness under any one of Grounds 1-6. Moreover, the specification teaches the claimed single event dose of "15 micrograms to 90 micrograms of treprostinil" "delivered in 1 to 3 breaths" unexpectedly achieved a therapeutically effective dose that was well tolerated which further supports non-obviousness of the claimed inventions. A claimed dosage regimen as claimed in the '793 patent is non-obvious where it "produce[s] a new and unexpected result which is different in kind and not merely in degree from the results of the prior art." *In re Aller*, 220 F.2d 240, 456 (CCPA 1955); *E.I. DuPont de Nemours & Company v. Synvina C.V.,* 904 F.3d 996, 1007 (Fed. Cir. 2018); *In re Geisler,* 116 F.3d 1465, 1471 (Fed. Cir. 1997). Further, said critical range may be non-obvious, where the prior art taught away from the claimed range. *Ormco Corp. v. Align Technology, Inc*, 463 F.3d 1299, 1311 (Fed. Cir. 2006). Here, high doses of treprostinil were known in the art to produce dose-limiting side effects. As a result, a POSA would not have expected such dosage ranges delivered in just a few breaths to be well tolerated. EX2061, ¶¶11, 14-16

55

LIQ_PH-ILD_00000174

(citing IPR2017-01622, EX2049, EX2050, EX2051) (inventors "discovered unexpectedly that [they] could deliver more treprostinil in a shorter period of time with fewer side effects (increasing the treprotinil [sic] dose more than 10-fold compared with iloprost…was not obvious to anyone")).

Prostacyclin analogues were known to produce dose limiting adverse side effects. EX2036. For example, intravenous epoprostenol and intravenous treprostinil can induce headache, nausea, chest pain, jaw pain, backache and restlessness at certain concentrations. *Id*. EX2037 teaches that the maximum tolerated dose for intravenous treprostinil is 24.6 ± 4.0 ng/kg/min. Based on Dr. Hill's assumptions for a person's weight between 60 and 65 kg, the average maximal tolerated dose would have been between 1.47 micrograms/min and 1.59 micrograms/min. Even if a person were to take an entire minute to inhale the one to three breaths, the dosage of 15 micrograms to 90 micrograms, would be an order of magnitude larger than what was considered the maximal tolerated dose. *See also* EX2055, 113:23-114:10 (testifying that if he applied the calculation described in paragraph 100 of his report to the maximal tolerated dose of intravenous treprostinil the maximal tolerated dose of inhaled treprostinil should be 53.125 micrograms).

As of the priority date, only one approved inhalation therapy for the treatment of pulmonary hypertension – Ventavis® (iloprost) – was available. EX1029. Ventavis® was approved for a single event dose of 2.5 micrograms or 5 micrograms

56

LIQ_PH-ILD_00000175

to be taken 6 to 9 times per day.  Even at these doses, at least 39% of patients experienced at least one adverse event.  *Id.* at 8.  The Ventavis® label further teaches – in a study where health volunteers were given inhaled doses of iloprost solution every 2 hours increasing from 5 mcg to up to 20 mcg – 32% of subjects failed to reach the highest scheduled dose.  Both iloprost and treprostinil are prostacyclin analogs.  A POSA reading the iloprost label, would not have thought that dosages as high as 15 micrograms to 90 micrograms delivered in 1 to 3 breaths would have been well tolerated.

### B.    Copying

Petitioner's deliberate copying of Tyvaso®, Patent Owner's commercial product embodying the claimed invention, is further evidence of nonobviousness of the claimed inventions.  *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1136 (Fed. Cir. 2019) (copying by a competitor is evidence of nonobviousness) (citing *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1325 (Fed. Cir. 2004)).  Petitioner's commercial product is referred to in its press releases, corporate filings, patents and publications as LIQ861.  LIQ861 is an inhaled, dry-powder formulation of treprostinil.  It comes in four "capsule strengths" ranging from approximately 25 to 100 micrograms.  EX2084.  In clinical trials, LIQ861 has been administered using the Plastiape RS00 Model 8 dry powder inhaler in 2 breaths per capsule.  *Id.* at 2.  The pharmacokinetics and bioavailability of a 79.5 microgram capsule dose (which

LIQ_PH-ILD_00000176

IPR2021-00406
U.S. Patent No. 10,716,793 B2

delivers a single event dose of approximately 58.1 micrograms) was directly compared with Patent Owner's commercial product.   EX2085.   This study demonstrated that Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range.   *Id.* at Abstract, 5; *see also* EX2036.

Evidence of copying is further supported by Petitioner's patent filings, which disclose that LIQ861 can deliver a single event dosage of treprostinil between 15 micrograms to 90 micrograms in 1 to 3 breaths.   EX2088.   Finally, Petitioner has chosen to submit an NDA to the FDA for LIQ861 under the 505(b)(2) regulatory pathway with Tyvaso® as the reference listed drug – relying in part on FDA's previous findings of efficacy and safety of Tyvaso® for the treatment of PAH. EX2089, 3.

**Comparison of Claims of '793 Patent to LIQ861**

| Claim 1 | LIQ861 |
|---|---|
| 1. A method of treating pulmonary hypertension comprising | "***LIQ861 is*** an investigational, inhaled, dry-powder formulation of treprostinil…***for the treatment of PAH***" EX2084, 2 <br><br> "Based on these results, a phase 3 study (INSPIRE; Clinicaltrials.gov Identifier NCT03399604) evaluating the long-term safety and tolerability of ***LIQ861 in patients with pulmonary arterial hypertension*** was initiated." EX2084, Abstract |

58

LIQ_PH-ILD_00000177

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| | |
|---|---|
| administering by inhalation to a human suffering from pulmonary hypertension | "***LIQ861*** is an investigational, ***inhaled***, dry-powder formulation of treprostinil…"<br>EX2084, 2 |
| a therapeutically effective single event dose of a formulation | "***LIQ861*** has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***."<br>EX2084, 2<br><br>"***LIQ861***…safely delivering doses to the lungs ***in 1 to 2 breaths***."<br>EX2085, Abstract |
| comprising treprostinil or a pharmaceutically acceptable salt thereof | "***LIQ861 is*** an investigational, inhaled, dry-***powder formulation of treprostinil***…"<br>EX2084, 2 |
| with an inhalation device, | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH."<br>EX2084, 2 |
| wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of | "…treprostinil exposure from LIQ861 (79.5 µg capsule [approximate delivered dose of 58.1 µg treprostinil])…"<br>EX2085, Abstract |

59

LIQ_PH-ILD_00000178

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| | |
|---|---|
| treprostinil or a pharmaceutically acceptable salt thereof | |
| delivered in 1 to 3 breaths. | "***LIQ861*** has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***." EX2084, 2 "***LIQ861***…safely delivering doses to the lungs ***in 1 to 2 breaths***." EX2085, Abstract |
| **Claim 4** | **LIQ861** |
| 4. The method of claim 1, | *See* above |
| wherein the inhalation device is a dry powder inhaler. | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH." EX2084, 2 |
| **Claim 6** | **LIQ861** |
| 6. The method of claim 4, | *See* above |
| wherein the formulation is a powder. | "***LIQ861*** is an investigational, inhaled, ***dry-powder formulation*** of treprostinil…" EX2084, 2 |
| **Claim 7** | **LIQ861** |
| 7. The method of claim 6, | *See* above |

60

LIQ_PH-ILD_00000179

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| wherein the powder comprises particles less than 5 micrometers in diameter. | "LIQ861 particles are a precise, uniform size (1µm) and trefoil pollen-like shape." <br> Roscigno, Poster presentation at the Pulmonary Vascular Research Institute (PVRI) 12th Annual World Congress, Jan. 2018. Available online here. |
| --- | --- |

### C.    Long-Felt Unmet Need

The claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension. *See, e.g., Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.,* 566 F.3d 989, 998 (Fed. Cir. 2009) ("Secondary considerations of non-obviousness include . . . [the claimed invention's] satisfaction of a long-felt need."). *First*, inhaled treprostinil is indicated for a broader range of pulmonary hypertension patients than the therapeutics available at the time. *Second*, even for the treatment of pulmonary arterial hypertension, many patients found the existing therapies either intolerable or ineffective.

Inhaled treprostinil is currently approved for pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease. *Compare* EX2034 (2021 Tyvaso® label) *with* EX1018. The '793 patent further suggests that inhaled treprostinil in doses of 15 to 90 micrograms may also be effective for other types of pulmonary hypertension. *See, e.g.,* EX1001, 9:44-50 (explaining that the study described in example 1 included patients with idiopathic PAH, PAH other,

61

LIQ_PH-ILD_00000180

IPR2021-00406
U.S. Patent No. 10,716,793 B2

chronic thromboembolic pulmonary hypertension (CTEPH) and pulmonary fibrosis).

As of May 2006 – in fact, even as of January 28, 2021 – no therapies were approved for the treatment of pulmonary hypertension in patients with interstitial lung disease. EX2060, 325. As Petitioner's own expert acknowledged, there is "a completely unmet medical need" where "[t]here [is] nothing that these patients were getting as a therapy for their problems." EX2056, 105:6-8 (discussing the unmet need provided by Pulmozyme).

Even where other therapies had been approved, for example, for the treatment of pulmonary arterial hypertension, there still existed a need for the inhaled dosing regimen described in the claims of the '793 patent. By Petitioner's own admission, the claimed invention of the '793 patent satisfies a long-felt unmet need. EX2089, F-7. In promoting its own product, LIQ861 – which infringes and is an embodiment of the claimed invention, Petitioner touts that the claimed invention as embodied by LIQ861 satisfies a long-felt unmet need. EX2085. ("Given the comparable treprostinil bioavailability and similar safety profiles of LIQ861 and Tyvaso®, LIQ861 fulfills a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler").

LIQ_PH-ILD_00000181

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## VI.    CONCLUSION

For the foregoing reasons, the claims are patentable over the cited grounds,

and Petitioner has not carried its burden to prove unpatentability.

Respectfully submitted,

Date November 10, 2021                        By /Stephen B. Maebius/
FOLEY & LARDNER LLP                           Stephen B. Maebius
3000 K St., NW                                Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

LIQ_PH-ILD_00000182

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Patent Owner Response complies with the type-volume limits of 37 C.F.R. § 42.24(b)(1) because it contains 13,906 words (which is less than the 14,000 permitted), according to the word-processing system used to prepare this Patent Owner Preliminary Response, excluding the portions exempted by 37 C.F.R. 42.24(a)(1).

Date November 10, 2021                          By /Stephen B. Maebius/
FOLEY & LARDNER LLP                             Stephen B. Maebius
3000 K St., NW                                  Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

64

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Patent Owner

Response and accompanying Exhibits was served on counsel of record

for Petitioner on November 10, 2021 by delivering a copy via email to the counsel

of record for the Petitioner at the following addresses:

zLiquidiaIPR@cooley.com
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com

Date November 10, 2021                              By /Stephen B. Maebius/
FOLEY & LARDNER LLP                                 Stephen B. Maebius
3000 K St., NW                                      Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

65

4890-3750-8611.1

LIQ_PH-ILD_00000184

# EXHIBIT 15

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use TYVASO safely and effectively. See full prescribing information for TYVASO.**

**TYVASO® (treprostinil) inhalation solution, for oral inhalation use**
**Initial U.S. Approval: 2002**

-------------------------**RECENT MAJOR CHANGES** --------------------------
Warnings and Precautions (5.4)                                          05/2022

--------------------------- **INDICATIONS AND USAGE**--------------------------
Tyvaso is a prostacyclin mimetic indicated for the treatment of:
- Pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability. Studies establishing effectiveness predominately included patients with NYHA Functional Class III symptoms and etiologies of idiopathic or heritable PAH (56%) or PAH associated with connective tissue diseases (33%). (1.1)
- Pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability. The study establishing effectiveness predominately included patients with etiologies of idiopathic interstitial pneumonia (IIP) (45%) inclusive of idiopathic pulmonary fibrosis (IPF), combined pulmonary fibrosis and emphysema (CPFE) (25%), and WHO Group 3 connective tissue disease (22%). (1.2)

---------------------**DOSAGE AND ADMINISTRATION**-----------------------
- Use only with the Tyvaso Inhalation System. (2.1)
- Administer undiluted, as supplied. A single breath of Tyvaso delivers approximately 6 mcg of treprostinil. (2.1)
- Administer in 4 separate treatment sessions each day approximately 4 hours apart, during waking hours. (2.1)
- Initial dosage: 3 breaths (18 mcg) per treatment session. If 3 breaths are not tolerated, reduce to 1 or 2 breaths. (2.1)
- Dosage should be increased by an additional 3 breaths per treatment session at approximately 1- to 2-week intervals, if tolerated. (2.1)
- Titrate to target maintenance doses of 9 to 12 breaths per treatment session, 4 times daily. (2.1)

-------------------- **DOSAGE FORMS AND STRENGTHS**-------------------
Sterile solution for oral inhalation: 2.9 mL ampule containing 1.74 mg treprostinil (0.6 mg per mL). (3)

----------------------- **CONTRAINDICATIONS** --------------------------
None. (4)

----------------------- **WARNINGS AND PRECAUTIONS** ------------------
- Tyvaso may cause symptomatic hypotension. (5.1)
- Tyvaso inhibits platelet aggregation and increases the risk of bleeding. (5.2)
- Tyvaso dosage adjustments may be necessary if inhibitors or inducers of CYP2C8 are added or withdrawn. (5.3, 7.3)
- May cause bronchospasm: Patients with a history of hyperreactive airway disease may be more sensitive. (5.4)

----------------------- **ADVERSE REACTIONS** -------------------------
Most common adverse reactions (≥4%) are cough, headache, nausea, dizziness, flushing, throat irritation, pharyngolaryngeal pain, diarrhea, and syncope. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact United Therapeutics Corp. at 1-866-458-6479 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revised: 05/2022**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**1 INDICATIONS AND USAGE**
    1.1 Pulmonary Arterial Hypertension
    1.2 Pulmonary Hypertension Associated with ILD
**2 DOSAGE AND ADMINISTRATION**
    2.1 Usual Dosage in Adults
    2.2 Administration
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
    5.1 Risk of Symptomatic Hypotension
    5.2 Risk of Bleeding
    5.3 Effect of Other Drugs on Treprostinil
    5.4 Bronchospasm
**6 ADVERSE REACTIONS**
    6.1 Clinical Trials Experience
    6.2 Post-Marketing Experience
**7 DRUG INTERACTIONS**
    7.1 Bosentan
    7.2 Sildenafil
    7.3 Effect of Cytochrome P450 Inhibitors and Inducers
    7.4 Effect of Other Drugs on Treprostinil
**8 USE IN SPECIFIC POPULATIONS**
    8.1 Pregnancy
    8.2 Lactation
    8.4 Pediatric Use
    8.5 Geriatric Use
    8.6 Patients with Hepatic Insufficiency
    8.7 Patients with Renal Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
    12.1 Mechanism of Action
    12.2 Pharmacodynamics
    12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
    13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
    13.2 Animal Toxicology and/or Pharmacology
**14 CLINICAL STUDIES**
    14.1 Pulmonary Arterial Hypertension (WHO Group 1)
    14.2 Long-term Treatment of PAH
    14.3 Pulmonary Hypertension Associated with ILD (WHO Group 3)
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

* Sections or subsections omitted from the full prescribing information are not listed.

**UTC_PH-ILD_005268**

**FULL PRESCRIBING INFORMATION**

**1 INDICATIONS AND USAGE**

**1.1 Pulmonary Arterial Hypertension**

Tyvaso is indicated for the treatment of pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability. Studies establishing effectiveness predominately included patients with NYHA Functional Class III symptoms and etiologies of idiopathic or heritable PAH (56%) or PAH associated with connective tissue diseases (33%).

The effects diminish over the minimum recommended dosing interval of 4 hours; treatment timing can be adjusted for planned activities.

While there are long-term data on use of treprostinil by other routes of administration, nearly all controlled clinical experience with inhaled treprostinil has been on a background of bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase type 5 inhibitor). The controlled clinical experience was limited to 12 weeks in duration *[see Clinical Studies (14)]*.

**1.2 Pulmonary Hypertension Associated with ILD**

Tyvaso is indicated for the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability. The study establishing effectiveness predominately included patients with etiologies of idiopathic interstitial pneumonia (IIP) (45%) inclusive of idiopathic pulmonary fibrosis (IPF), combined pulmonary fibrosis and emphysema (CPFE) (25%), and WHO Group 3 connective tissue disease (22%) *[see Clinical Studies (14)]*.

**2 DOSAGE AND ADMINISTRATION**

**2.1 Usual Dosage in Adults**

Tyvaso is intended for oral inhalation using the Tyvaso Inhalation System, which consists of an ultrasonic, pulsed delivery device and its accessories.

Tyvaso is dosed in 4 separate, equally spaced treatment sessions per day, during waking hours. Each treatment session will take 2 to 3 minutes. The treatment sessions should be approximately 4 hours apart.

*Initial Dosage:*
Therapy should begin with 3 breaths of Tyvaso (18 mcg of treprostinil) per treatment session 4 times daily. If 3 breaths are not tolerated, reduce to 1 or 2 breaths and subsequently increase to 3 breaths, as tolerated.

*Maintenance Dosage:*
Dosage should be increased by an additional 3 breaths per treatment session, 4 times daily at approximately 1- to 2-week intervals. Studies establishing effectiveness in patients with PAH and PH-ILD have used target doses of 9 to 12 breaths per treatment session, 4 times daily. If adverse effects preclude titration to target dose, Tyvaso should be continued at the highest tolerated dose.

If a scheduled treatment session is missed or interrupted, therapy should be resumed as soon as possible at the usual dose.

Page 2

**UTC_PH-ILD_005269**

**2.2 Administration**

Tyvaso must be used only with the Tyvaso Inhalation System. Patients should follow the instructions for use for operation of the Tyvaso Inhalation System and for daily cleaning of the device components after the last treatment session of the day. To avoid potential interruptions in drug delivery because of equipment malfunction, patients should have access to a back-up Tyvaso Inhalation System device.

Do not mix Tyvaso with other medications in the Tyvaso Inhalation System. Compatibility of Tyvaso with other medications has not been studied.

The Tyvaso Inhalation System should be prepared for use each day according to the instructions for use. One ampule of Tyvaso contains a sufficient volume of medication for all 4 treatment sessions in a single day. Prior to the first treatment session, the patient should twist the top off a single Tyvaso ampule and squeeze the entire contents into the medicine cup. Between each of the 4 daily treatment sessions, the device should be capped and stored upright with the remaining medication inside.

At the end of each day, the medicine cup and any remaining medication must be discarded. The device must be cleaned each day according to the instructions for use.

Avoid skin or eye contact with Tyvaso solution. Do not orally ingest the Tyvaso solution.

**3 DOSAGE FORMS AND STRENGTHS**

Sterile solution for oral inhalation: 2.9 mL ampule containing 1.74 mg of treprostinil (0.6 mg per mL).

**4 CONTRAINDICATIONS**

None.

**5 WARNINGS AND PRECAUTIONS**

**5.1 Risk of Symptomatic Hypotension**

Treprostinil is a pulmonary and systemic vasodilator. In patients with low systemic arterial pressure, treatment with Tyvaso may produce symptomatic hypotension.

**5.2 Risk of Bleeding**

Tyvaso inhibits platelet aggregation and increases the risk of bleeding.

**5.3 Effect of Other Drugs on Treprostinil**

Co-administration of a cytochrome P450 (CYP) 2C8 enzyme inhibitor (e.g., gemfibrozil) may increase exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of a CYP2C8 enzyme inducer (e.g., rifampin) may decrease exposure to treprostinil. Increased exposure is likely to increase adverse events associated with treprostinil administration, whereas decreased exposure is likely to reduce clinical effectiveness *[see Drug Interactions (7.3) and Clinical Pharmacology (12.3)]*.

**5.4 Bronchospasm**

Like other inhaled prostaglandins, Tyvaso may cause acute bronchospasm. Patients with asthma or chronic obstructive pulmonary disease (COPD), or other bronchial hyperreactivity, are at increased risk

UTC_PH-ILD_005270

for bronchospasm. Ensure that such patients are treated optimally for reactive airway disease prior to and during treatment with Tyvaso Inhalation Solution.

## 6 ADVERSE REACTIONS

The following potential adverse reactions are described in Warnings and Precautions (5):
- Decrease in systemic blood pressure *[see Warnings and Precautions (5.1)]*.
- Bleeding *[see Warnings and Precautions (5.2)]*.

### 6.1 Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

Pulmonary Arterial Hypertension

In a 12-week, placebo-controlled study (TRIUMPH I) of 235 patients with PAH (WHO Group 1 and nearly all NYHA Functional Class III), the most commonly reported adverse reactions on Tyvaso included cough and throat irritation, headache, gastrointestinal effects, muscle, jaw or bone pain, dizziness, flushing, and syncope. Table 1 lists the adverse reactions that occurred at a rate of at least 4% and were more frequent in patients treated with Tyvaso than with placebo.

**Table 1:** **Adverse Events in ≥4% of PAH Patients Receiving Tyvaso and More Frequent[a] than Placebo in TRIUMPH I**

| Adverse Event | Treatment n (%) | |
|---|---|---|
| | **Tyvaso n=115** | **Placebo n=120** |
| Cough | 62 (54) | 35 (29) |
| Headache | 47 (41) | 27 (23) |
| Throat Irritation / Pharyngolaryngeal Pain | 29 (25) | 17 (14) |
| Nausea | 22 (19) | 13 (11) |
| Flushing | 17 (15) | 1 (<1) |
| Syncope | 7 (6) | 1 (<1) |

[a] More than 3% greater than placebo

The safety of Tyvaso was also studied in a long-term, open-label extension study in which 206 patients were dosed for a mean duration of 2.3 years, with a maximum exposure of 5.4 years. Eighty-nine percent (89%) of patients achieved the target dose of 9 breaths, 4 times daily. Forty-two percent (42%) achieved a dose of 12 breaths, 4 times daily. The adverse events during this chronic dosing study were qualitatively similar to those observed in the 12-week placebo-controlled trial.

In a prospective, observational study comparing patients taking Tyvaso (958 patient-years of exposure) and a control group (treatment with other approved therapies for PAH; 1094 patient-years), Tyvaso was associated with a higher rate of cough (16.2 vs. 10.9 per 100 patient-years), throat irritation (4.5 vs.

UTC_PH-ILD_005271

1.2 per 100 pt-years), nasal discomfort (2.6 vs. 1.3 per 100 pt-years), and hemoptysis (2.5 vs. 1.3 per 100 pt-years) compared to the control group.

Pulmonary Hypertension Associated with ILD

In a 16-week, placebo-controlled study (INCREASE) of 326 patients with PH-ILD (WHO Group 3), adverse reactions were similar to the experience in studies of PAH.

**6.2 Post-Marketing Experience**

The adverse reaction of angioedema has been identified during the post-approval use of Tyvaso. Because this reaction is reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate the frequency or establish a causal relationship to drug exposure.

**7 DRUG INTERACTIONS**

**7.1 Bosentan**

In a human pharmacokinetic study conducted with bosentan (250 mg/day) and an oral formulation of treprostinil (treprostinil diolamine), no pharmacokinetic interactions between treprostinil and bosentan were observed.

**7.2 Sildenafil**

In a human pharmacokinetic study conducted with sildenafil (60 mg/day) and an oral formulation of treprostinil (treprostinil diolamine), no pharmacokinetic interactions between treprostinil and sildenafil were observed.

**7.3 Effect of Cytochrome P450 Inhibitors and Inducers**

*In vitro* studies of human hepatic microsomes showed that treprostinil does not inhibit cytochrome P450 (CYP) isoenzymes CYP1A2, CYP2A6, CYP2C8, CYP2C9, CYP2C19, CYP2D6, CYP2E1, and CYP3A. Additionally, treprostinil does not induce cytochrome P450 isoenzymes CYP1A2, CYP2B6, CYP2C9, CYP2C19, and CYP3A.

Human pharmacokinetic studies with an oral formulation of treprostinil (treprostinil diolamine) indicated that co-administration of the cytochrome P450 (CYP) 2C8 enzyme inhibitor, gemfibrozil, increases exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of the CYP2C8 enzyme inducer, rifampin, decreases exposure to treprostinil. It is unclear if the safety and efficacy of treprostinil by the inhalation route are altered by inhibitors or inducers of CYP2C8 *[see Warnings and Precautions (5.3)]*.

**7.4 Effect of Other Drugs on Treprostinil**

Drug interaction studies have been carried out with treprostinil (oral or subcutaneous) co-administered with acetaminophen (4 g/day), warfarin (25 mg/day), and fluconazole (200 mg/day), respectively, in healthy volunteers. These studies did not show a clinically significant effect on the pharmacokinetics of treprostinil. Treprostinil does not affect the pharmacokinetics or pharmacodynamics of warfarin. The pharmacokinetics of R- and S- warfarin and the international normalized ratio (INR) in healthy subjects given a single 25 mg dose of warfarin were unaffected by continuous subcutaneous infusion of treprostinil at an infusion rate of 10 ng/kg/min.

UTC_PH-ILD_005272

## 8 USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

Risk Summary

Limited case reports of treprostinil use in pregnant women are insufficient to inform a drug-associated risk of adverse developmental outcomes. However, there are risks to the mother and the fetus associated with pulmonary arterial hypertension *(see Clinical Considerations)*. In animal studies, no adverse reproductive and developmental effects were seen for treprostinil at ≥9 and ≥145 times the human exposure when based on $C_{max}$ and AUC, respectively, following a single treprostinil dose of 54 mcg.

The estimated background risk of major birth defects and miscarriage for the indicated populations is unknown. All pregnancies have a background risk of birth defect, loss, or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2 to 4% and 15 to 20%, respectively.

Clinical Considerations
*Disease-associated maternal and embryo-fetal risk*
Pulmonary arterial hypertension is associated with an increased risk of maternal and fetal mortality.

Data

Animal reproduction studies have been conducted with treprostinil via continuous subcutaneous administration and with treprostinil diolamine administered orally. In studies with orally administered treprostinil diolamine, no adverse effect doses for fetal viability/growth, fetal development (teratogenicity), and postnatal development were determined in rats. In pregnant rats, no evidence of harm to the fetus was observed following oral administration of treprostinil diolamine at the highest dose tested (20 mg/kg/day), which represents about 154 and 1479 times the human exposure, when based on $C_{max}$ and AUC, respectively, following a single Tyvaso dose of 54 mcg. In pregnant rabbits, external fetal and soft tissue malformations and fetal skeletal malformation occurred. The dose at which no adverse effects were seen (0.5 mg/kg/day) represents about 9 and 145 times the human exposure, when based on $C_{max}$ and AUC, respectively, following a single Tyvaso dose of 54 mcg. No treprostinil treatment-related effects on labor and delivery were seen in animal studies. Animal reproduction studies are not always predictive of human response.

### 8.2 Lactation

Risk Summary

There are no data on the presence of treprostinil in human milk, the effects on the breastfed infant, or the effects on milk production.

### 8.4 Pediatric Use

Safety and effectiveness in pediatric patients have not been established. Clinical studies of Tyvaso did not include patients younger than 18 years to determine whether they respond differently from older patients.

### 8.5 Geriatric Use

Across clinical studies used to establish the effectiveness of Tyvaso in patients with PAH and PH-ILD, 268 (47.8%) patients aged 65 years and over were enrolled. The treatment effects and safety profile observed in geriatric patients were similar to younger patients. In general, dose selection for an elderly

Page 6

UTC_PH-ILD_005273

patient should be cautious, reflecting the greater frequency of hepatic, renal, or cardiac dysfunction, and of concomitant diseases or other drug therapy.

**8.6 Patients with Hepatic Insufficiency**

Plasma clearance of treprostinil, delivered subcutaneously, was reduced up to 80% in subjects with mild-to-moderate hepatic insufficiency. Uptitrate slowly when treating patients with hepatic insufficiency because of the risk of an increase in systemic exposure which may lead to an increase in dose-dependent adverse effects. Treprostinil has not been studied in patients with severe hepatic insufficiency *[see Clinical Pharmacology (12.3)]*.

**8.7 Patients with Renal Impairment**

No dose adjustments are required in patients with renal impairment. Treprostinil is not cleared by dialysis *[see Clinical Pharmacology (12.3)]*.

**10 OVERDOSAGE**

In general, symptoms of overdose with Tyvaso include flushing, headache, hypotension, nausea, vomiting, and diarrhea. Provide general supportive care until the symptoms of overdose have resolved.

**11 DESCRIPTION**

Tyvaso is a sterile formulation of treprostinil, a prostacyclin mimetic, intended for administration by oral inhalation using the Tyvaso Inhalation System. Tyvaso is supplied in 2.9 mL low density polyethylene (LDPE) ampules, containing 1.74 mg treprostinil (0.6 mg/mL). Each ampule also contains 18.9 mg sodium chloride, 18.3 mg sodium citrate dihydrate, 0.58 mg sodium hydroxide, 11.7 mg 1 N hydrochloric acid, and water for injection. Sodium hydroxide and hydrochloric acid may be added to adjust pH between 6.0 and 7.2.

Treprostinil is (1$R$,2$R$,3a$S$,9a$S$)-[[2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3$S$)-3-hydroxyoctyl]-1$H$-benz[$f$]inden-5-yl]oxy]acetic acid. Treprostinil has a molecular weight of 390.52 and a molecular formula of $C_{23}H_{34}O_5$.

The structural formula of treprostinil is:



**12 CLINICAL PHARMACOLOGY**

**12.1 Mechanism of Action**

Treprostinil is a prostacyclin analogue. The major pharmacologic actions of treprostinil are direct vasodilation of pulmonary and systemic arterial vascular beds and inhibition of platelet aggregation.

Page 7

UTC_PH-ILD_005274

## 12.2 Pharmacodynamics

In a clinical trial of 240 healthy volunteers, single doses of Tyvaso 54 mcg (the target maintenance dose per session) and 84 mcg (supratherapeutic inhalation dose) prolonged the corrected QTc interval by approximately 10 ms. The QTc effect dissipated rapidly as the concentration of treprostinil decreased.

## 12.3 Pharmacokinetics

Pharmacokinetic information for single doses of inhaled treprostinil was obtained in healthy volunteers in 3 separate studies. Treprostinil systemic exposure (AUC and $C_{max}$) post-inhalation was shown to be proportional to the doses administered (18 mcg to 90 mcg).

### Absorption

In a 3-period crossover study, the bioavailability of 2 single doses of Tyvaso (18 mcg and 36 mcg) was compared with that of intravenous treprostinil in 18 healthy volunteers. Mean estimates of the absolute systemic bioavailability of treprostinil after inhalation were approximately 64% (18 mcg) and 72% (36 mcg).

Treprostinil plasma exposure data were obtained from 2 studies at the target maintenance dose, 54 mcg. The mean $C_{max}$ at the target dose was 0.91 and 1.32 ng/mL with corresponding mean $T_{max}$ of 0.25 and 0.12 hr, respectively. The mean AUC for the 54-mcg dose was 0.81 and 0.97 hr·ng/mL, respectively.

### Distribution

Following parenteral infusion, the apparent steady state volume of distribution ($V_{ss}$) of treprostinil is approximately 14 L/70 kg ideal body weight.

*In vitro* treprostinil is 91% bound to human plasma proteins over the 330 to 10,000 mcg/L concentration range.

### Metabolism and Excretion

Of subcutaneously administered treprostinil, only 4% is excreted unchanged in urine. Treprostinil is substantially metabolized by the liver, primarily by CYP2C8. Metabolites are excreted in urine (79%) and feces (13%) over 10 days. Five apparently inactive metabolites were detected in the urine, each accounting for 10 to 15% of the dose administered. Four of the metabolites are products of oxidation of the 3-hydroxyloctyl side chain and 1 is a glucuroconjugated derivative (treprostinil glucuronide).

The elimination of treprostinil (following subcutaneous administration of treprostinil) is biphasic, with a terminal elimination half-life of approximately 4 hours using a 2-compartment model.

### Specific Populations

*Hepatic Insufficiency*
Plasma clearance of treprostinil, delivered subcutaneously, was reduced up to 80% in subjects presenting with mild-to-moderate hepatic insufficiency. Treprostinil has not been studied in patients with severe hepatic insufficiency *[see Use in Specific Populations (8.6)]*.

*Renal Impairment*
In patients with severe renal impairment requiring dialysis (n=8), administration of a single 1 mg dose of orally administered treprostinil pre- and post-dialysis resulted in $AUC_{0-inf}$ that was not significantly altered compared to healthy subjects *[see Use in Specific Populations (8.7)]*.

Page 8

UTC_PH-ILD_005275

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

A 2-year rat carcinogenicity study was performed with treprostinil inhalation at target doses of 5.26, 10.6, and 34.1 mcg/kg/day. There was no evidence for carcinogenic potential associated with treprostinil inhalation in rats at systemic exposure levels up to 35 times the clinical exposure at the target maintenance dose of 54 mcg. *In vitro* and *in vivo* genetic toxicology studies did not demonstrate any mutagenic or clastogenic effects of treprostinil. Treprostinil sodium did not affect fertility or mating performance of male or female rats given continuous subcutaneous infusions at rates of up to 450 ng treprostinil/kg/min. In this study, males were dosed from 10 weeks prior to mating and through the 2-week mating period. Females were dosed from 2 weeks prior to mating until gestational day 6.

Oral administration of treprostinil diolamine to Tg.rasH2 mice at 0, 5, 10, and 20 mg/kg/day in males and 0, 3, 7.5, and 15 mg/kg/day in females daily for 26 weeks did not significantly increase the incidence of tumors.

Treprostinil diolamine was tested *in vivo* in a rat micronucleus assay and did not induce an increased incidence of micronucleated polychromatic erythrocytes.

### 13.2 Animal Toxicology and/or Pharmacology

In a 2-year rat study with treprostinil inhalation at target doses of 5.26, 10.6, and 34.1 mcg/kg/day, there were more deaths (11) in the mid- and high-dose treprostinil groups during the first 9 weeks of the study, compared to 1 in control groups. At the high-dose level, males showed a higher incidence of inflammation in teeth and preputial gland, and females showed higher incidences of inflammation and urothelial hyperplasia in the urinary bladder. The exposures in rats at mid- and high-dose levels were about 15 and 35 times, respectively, the clinical exposure at the target maintenance dose of 54 mcg.

## 14 CLINICAL STUDIES

### 14.1 Pulmonary Arterial Hypertension (WHO Group 1)

TRIUMPH I, was a 12-week, randomized, double-blind, placebo-controlled, multicenter study of patients with PAH. The study population included 235 clinically stable subjects with PAH (WHO Group 1), nearly all with NYHA Class III (98%) symptoms who were receiving either bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase-5 inhibitor) for at least 3 months prior to study initiation. Concomitant therapy also could have included anticoagulants, other vasodilators (e.g., calcium channel blockers), diuretics, oxygen, and digitalis, but not a prostacyclin. These patients were administered either placebo or Tyvaso in 4 daily treatment sessions with a target dose of 9 breaths (54 mcg) per session over the course of the 12-week study. Patients were predominantly female (82%), had the origin of PAH as idiopathic/heritable (56%), secondary to connective tissue diseases (33%) or secondary to HIV or previous use of anorexigens (12%); bosentan was the concomitant oral medication in 70% of those enrolled, sildenafil in 30%.

The primary efficacy endpoint of the trial was the change in 6-Minute Walk Distance (6MWD) relative to baseline at 12 weeks. 6MWD was measured at peak exposure (between 10 and 60 minutes after dosing), and 3 to 5 hours after bosentan or 0.5 to 2 hours after sildenafil. Patients receiving Tyvaso had a placebo-corrected median change from baseline in peak 6MWD of 20 meters at Week 12 (p<0.001). The distribution of these 6MWD changes from baseline at Week 12 were plotted across the range of observed values (Figure 1). 6MWD measured at trough exposure (defined as measurement of 6MWD at

Page 9

least 4 hours after dosing) improved by 14 meters. There were no placebo-controlled 6MWD assessments made after 12 weeks.

**Figure 1:**     **Distributions of 6MWD Changes from Baseline at Week 12 During Peak Plasma Concentration of Tyvaso**



The placebo-corrected median treatment effect on 6MWD was estimated (using the Hodges-Lehmann estimator) within various subpopulations defined by age quartile, gender, geographic region of the study site, disease etiology, baseline 6MWD quartile, and type of background therapy (Figure 2).

UTC_PH-ILD_005277

DA0477

**Figure 2:**     **Placebo-Corrected Median Treatment Effect (Hodges-Lehmann Estimate with 95% CI) on 6MWD Change from Baseline at Week 12 During Peak Plasma Concentration of Tyvaso for Various Subgroups**



## 14.2 Long-term Treatment of PAH

In long-term follow-up of patients who were treated with Tyvaso in the pivotal study and the open-label extension (N=206), Kaplan-Meier estimates of survival at 1, 2, and 3 years were 97%, 91%, and 82%, respectively. These uncontrolled observations do not allow comparison with a control group not given Tyvaso and cannot be used to determine the long-term effect of Tyvaso on mortality.

## 14.3 Pulmonary Hypertension Associated with ILD (WHO Group 3)

INCREASE was a 16-week, randomized, double-blind, placebo-controlled, multicenter study that enrolled 326 patients with PH-ILD. Enrolled study patients predominately had etiologies of idiopathic interstitial pneumonia (45%) inclusive of idiopathic pulmonary fibrosis, combined pulmonary fibrosis and emphysema (25%), and WHO Group 3 connective tissue disease (22%). The mean baseline 6MWD was 260 meters.

UTC_PH-ILD_005278

Patients in the INCREASE study were randomized (1:1) to either placebo or Tyvaso in 4 daily treatment sessions with a target dose of 9 breaths (54 mcg) per session and a maximum dose of 12 breaths (72 mcg) per session over the course of the 16-week study. Approximately 75% of patients randomized to Tyvaso titrated up to a dose of 9 breaths, 4 times daily or greater, with 48% of patients randomized to Tyvaso reaching a dose of 12 breaths, 4 times daily during the study.

The primary efficacy endpoint was the change in 6MWD measured at peak exposure (between 10 and 60 minutes after dosing) from baseline to Week 16. Patients receiving Tyvaso had a placebo-corrected median change from baseline in peak 6MWD of 21 meters at Week 16 (p=0.004) using Hodges-Lehmann estimate (Figure 3).

**Figure 3:**    **Hodges-Lehmann Estimate of Treatment Effect by Visit for 6MWD at Peak Exposure (PH-ILD)**



The treatment effect on 6MWD at Week 16 was consistent for various subgroups, including etiology of PH-ILD, disease severity, age, sex, baseline hemodynamics, and dose (Figure 4).

UTC_PH-ILD_005279

**Figure 4:**       **Forest Plot on Subgroup Analyses of Peak 6MWD (Meter) at Week 16 (PH-ILD)**



Time to clinical worsening in the INCREASE study was defined as the time of randomization until 1 of the following criteria were met: hospitalization due to a cardiopulmonary indication, decrease in 6MWD >15% from baseline directly related to PH-ILD at 2 consecutive visits and at least 24 hours apart, death (all causes), or lung transplantation. Treatment with Tyvaso in patients with PH-ILD resulted in numerically fewer hospitalizations. The numbers of reported deaths were the same for both treatment groups (Table 2). Overall, treatment with Tyvaso demonstrated a statistically significant increase in the time to first clinical worsening event (log-rank test p=0.041; Figure 5), and a 39% overall reduction in the risk of a clinical worsening event (HR=0.61 [95% CI; 0.40, 0.92]; Figure 5).

Page 13

**UTC_PH-ILD_005280**

**Table 2:        Clinical Worsening Events (PH-ILD)**

| | | Tyvaso n=163 n (%) | Placebo n=163 n (%) | HR (95% CI) |
|---|---|---|---|---|
| **Clinical worsening** | | 37 (22.7%) | 54 (33.1%) | 0.61 (0.40, 0.92) |
| **First contributing event** | **Hospitalization due to a cardiopulmonary indication** | 18 (11.0%) | 24 (14.7%) | |
| | **Decrease in 6MWD >15% from baseline directly related to PH-ILD** | 13 (8.0%) | 26 (16.0%) | |
| | **Death (all causes)** | 4 (2.5%) | 4 (2.5%) | |
| | **Lung transplantation** | 2 (1.2%) | 0 | |
| **First of each event** | **Hospitalization due to a cardiopulmonary indication** | 21 (12.9%) | 30 (18.4%) | |
| | **Decrease in 6MWD >15% from baseline directly related to PH-ILD** | 16 (9.8%) | 31 (19.0%) | |
| | **Death (all causes)** | 8 (4.9%) | 10 (6.1%) | |
| | **Lung transplantation** | 2 (1.2%) | 1 (0.6%) | |

**Figure 5:        Kaplan-Meier Plot of Time to Clinical Worsening Events (PH-ILD)**



UTC_PH-ILD_005281

DA0481

**16 HOW SUPPLIED/STORAGE AND HANDLING**

Tyvaso (treprostinil) inhalation solution is supplied in 2.9 mL clear LDPE ampules packaged as 4 ampules in a foil pouch. Tyvaso is a clear colorless to slightly yellow solution containing 1.74 mg treprostinil per ampule at a concentration of 0.6 mg/mL.

Ampules of Tyvaso are stable until the date indicated when stored in the unopened foil pouch at 20-25°C (68-77°F) with excursions permitted to 15-30°C (59-86°F) [see USP Controlled Room Temperature]. Once the foil pack is opened, ampules should be used within 7 days. Because Tyvaso is light-sensitive, unopened ampules should be stored in the foil pouch.

One ampule of Tyvaso should be used each day in the Tyvaso Inhalation System. After a Tyvaso ampule is opened and transferred to the medicine cup, the solution should remain in the device for no more than 1 day (24 hours). Any remaining solution should be discarded at the end of the day.

Tyvaso Inhalation System Starter Kit containing a 28-ampule carton of Tyvaso (7 foil pouches each containing four 2.9 mL ampules; each ampule contains 1.74 mg treprostinil [0.6 mg per mL]) and the Tyvaso Inhalation System. (NDC 66302-206-01)

Tyvaso Inhalation System Refill Kit containing a 28-ampule carton of Tyvaso (7 foil pouches each containing four 2.9 mL ampules; each ampule contains 1.74 mg treprostinil [0.6 mg per mL]) and accessories. (NDC 66302-206-02)

Tyvaso 4 Pack Carton with 1 foil pouch containing four 2.9 mL ampules. Each ampule contains 1.74 mg treprostinil (0.6 mg per mL). (NDC 66302-206-03)

Tyvaso Inhalation System Institutional Starter Kit containing a 4-ampule carton of Tyvaso (1 foil pouch containing four 2.9 mL ampules; each ampule contains 1.74 mg treprostinil [0.6 mg per mL]) and the Tyvaso Inhalation System. (NDC 66302-206-04)

**17 PATIENT COUNSELING INFORMATION**

Advise the patient to read the FDA-approved patient labeling (Instructions for Use).

Train patients in the administration process for Tyvaso, including dosing, Tyvaso Inhalation System set up, operation, cleaning, and maintenance, according to the instructions for use *[see Dosage and Administration (2.1, 2.2)]*.

To avoid potential interruptions in drug delivery because of equipment malfunction, patients should have access to a back-up Tyvaso Inhalation System device *[see Dosage and Administration (2.2)]*.

In the event that a scheduled treatment session is missed or interrupted, resume therapy as soon as possible *[see Dosage and Administration (2.1)]*.

If Tyvaso comes in contact with the skin or eyes, instruct patients to rinse immediately with water *[see Dosage and Administration (2.2)]*.

©Copyright 2022 United Therapeutics Corp. All rights reserved.

UTC_PH-ILD_005282

Tyvaso manufactured for:

United Therapeutics Corp.
Research Triangle Park, NC 27709

**UTC_PH-ILD_005283**

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION | |
| Plaintiff, | C.A. No. 20-755 (RGA) (JLH) |
| v. | |
| LIQUIDIA TECHNOLOGIES, INC., | **HIGHLY CONFIDENTIAL** |
| Defendant. | |

**INITIAL EXPERT REPORT OF ANDREW CLARK, PH.D.**

**Table of Contents**

I.     INTRODUCTION ............................................................................................. 1

    A.    Scope of Analysis ............................................................................. 1

    B.    Qualifications ................................................................................... 2

    C.    Materials Considered ....................................................................... 5

II.    LEGAL STANDARDS PROVIDED BY COUNSEL ....................................... 6

    A.    Burdens of Proof ............................................................................. 6

    B.    Infringement: Claim Construction ................................................... 6

    C.    Infringement: Direct and Indirect ................................................... 7

III.    SUMMARY OF OPINIONS ........................................................................... 8

IV.    PERSON OF ORDINARY SKILL IN THE ART .......................................... 9

V.    LIQUIDIA'S PROPOSED PRODUCT ......................................................... 11

VI.    U.S. PATENT NO. 10,716,793 ...................................................................... 15

    A.    Overview ........................................................................................ 15

    B.    File History ..................................................................................... 16

VII.    INFRINGEMENT ANALYSIS ..................................................................... 17

    A.    Direct Infringement ........................................................................ 17

        1.    Claim 1 ................................................................................ 17

        2.    Claim 4 ................................................................................ 30

        3.    Claim 6 ................................................................................ 30

        4.    Claim 7 ................................................................................ 31

        5.    Claim 8 ................................................................................ 33

    B.    Indirect Infringement ..................................................................... 33

VIII.    CONCLUSION.............................................................................................. 36

i

## I.   INTRODUCTION

### A.   Scope of Analysis

1.   I have been retained by counsel for the Plaintiff, United Therapeutics Corporation ("UTC") to provide expert opinions related to U.S. Patent No. 10,716,793 (the "'793 patent").

2.   I have been informed that Liquidia has filed a New Drug Application No. 213005 with the FDA ("Liquidia NDA") seeking approval to manufacture, market, and sell a generic copy of UTC's TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/ml that is approved by FDA for treatment of pulmonary arterial hypertension ("Liquidia's Proposed Product").

3.   I have been informed that UTC has asserted that Liquidia's Proposed Product infringes claims 1, 4, and 6-8 of the '793 patent (the "Asserted Claims") when used in the intended manner and as taught and described in Liquidia's proposed label/package insert ("Liquidia's Proposed Label")[1], Liquidia's Proposed Instructions for Use[2], and other NDA documentation.

4.   I have been asked to opine on whether, upon FDA approval, administration of Liquidia's Proposed Product, as described in Liquidia's Proposed Label, Instructions for Use, and related NDA documentation, would infringe the asserted claims of the '793 patent. I have also been asked to give my opinion as to whether Liquidia induces or contributes to infringement.

5.   This report presents my opinions regarding infringement of the '793 patent and lays out the bases for my opinions. My opinions are based on my education, research, professional experience, and the materials that I reviewed in preparing the opinions described in this report.

---

[1] Liquidia's Proposed Label (LIQ02790995-LIQ02791011) at LIQ02790995.
[2] Liquidia's Proposed Instructions for Use (LIQ00029269) at LIQ00029269.

HIGHLY CONFIDENTIAL     LIQ_PH-ILD_00000867

6. My opinions and the bases for them are based on presently available information that I have reviewed and that I am currently aware exists. I understand that discovery is ongoing in this case, and more information or documents may therefore become available. For example, I understand that there are a number of outstanding depositions, including of a Liquidia corporate representative, LGM Pharma, LLC, Dr. Lewis Rubin, and others. I further understand that there continues to be additional non-testimonial discovery, including amendments to interrogatory responses and discovery of documents from the parties and/or from third parties. Accordingly, I reserve the right to take into account further information that I may learn, and adjust, modify, or supplement my opinions based on any additional information that I become aware of.

7. If asked to testify at trial, I may rely on physical objects, samples, visual aids, and demonstrative exhibits, such as claim charts and graphs, to demonstrate the bases for my opinions.

8. I am being compensated for my time spent on this matter at the rate of $400 per hour plus reimbursement of reasonable expenses. I have no other interest in this litigation or in any party to this litigation. My compensation does not depend on my performance, the substance of my opinions, the outcome of the case, or any issues involved in or related to this case.

**B.     Qualifications**

9. My *curriculum vitae*, which is attached as **Exhibit 1**, summarizes my professional experience. I provide below further details about my experience that may be pertinent to this matter.

10. I am currently President and General Manager of the Aerogen Pharma Corporation. Aerogen Pharma is dedicated to the development of drug device combination products for

**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000868

59.    In view of the foregoing evidence, and presumably from his perspective as a clinician, I understand that Dr. Waxman has interpreted a "single event dose" to refer to a single treatment session. I agree with that interpretation, rely on it, and note that it is consistent with the '793 patent specification and claims. ██████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████

60.    Regarding therapeutic effectiveness, as an initial matter, in my experience, companies generally do not seek approval for drugs that lack any benefit to the patient; indeed, my understanding is that FDA approval requires showing safety and efficacy.[51] ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████

61.    Further, the '793 provides explanation and hemodynamic data showing a beneficial effect on the patient.[52] In addition to the descriptions in the text, the Figures show a beneficial effect. For example, Figure 1 shows a reduction in pulmonary arterial pressure ("PAP") and pulmonary vascular resistance ("PVR") relative to placebo upon administration of 30, 45, and 60 μg of treprostinil.[53] In view of the foregoing evidence, I understand that Dr.

---

[50] Liquidia's Proposed Label at LIQ02790996.

[51] See, e.g., FDA, The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective, available at https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

[52] See, e.g., U.S. Patent No. 10,716,793 at 9:5-34 (describing administration of 30 μg, 45 μg, and 60 μg of treprostinil that achieved reduction of PVR for longer than two hours); id. at 8:67-9:3 (delivery of 30, 60, 90 μg of treprostinil through ultrasonic nebulizer reduced PVR for up to 3 hours); see also id. at Tables I-III.

[53] See also id. Figs. 2-11.

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000869

Waxman has concluded that single doses of treprostinil have a beneficial effect on patients. I agree with that conclusion, rely on it, and, in my opinion, it is supported by the data (including the hemodynamic data) in the '793 patent.

62. ███████████████████████████████████████████████ As such, it is my opinion that patients following Liquidia's Proposed Label and Instructions for Use will administer a therapeutically effective single event dose.

### d) "of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof"

63. It is my opinion that administration of Liquidia's Proposed Product as described in Liquidia's Proposed Label and Liquidia's Proposed Instructions for Use and other documentation results in administration of "a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof."

64. █████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████

65. These documents make clear that LIQ861 is a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof.

---

[54] Liquidia's Proposed Label at LIQ02790995.
[55] Id. at LIQ02791003; see also Deposition of Tushar Shah, Sept. 24, 2021, at p. 42:22-24.
[56] Liquidia's Proposed Instructions for Use at LIQ00029269.
[57] Pre-IND Briefing at LIQ00000696.

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000870

# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION, | |
| Plaintiff, | C.A. No. 20-755 (RGA) (JLH) |
| v. | |
| LIQUIDIA TECHNOLOGIES, INC., | **HIGHLY CONFIDENTIAL** |
| Defendant. | |

**<u>INITIAL EXPERT REPORT OF AARON WAXMAN, M.D., Ph.D.</u>**

# Table of Contents

I.  Introduction ...................................................................................................1

    A.  Purpose of Report ...............................................................................1

    B.  Materials Considered .........................................................................2

    C.  Qualifications ......................................................................................3

II.  Background .....................................................................................................7

    A.  Pulmonary Hypertension ....................................................................7

    B.  The '793 Patent ................................................................................13

    C.  Liquidia's Proposed Generic Product - LIQ861 ...............................16

III.  Analysis .......................................................................................................20

    A.  Legal Standards ...............................................................................21

    B.  Person of Ordinary Skill in the Art ...................................................24

IV.  Infringement of U.S. Patent No. 10,716,793 ..............................................26

    A.  Claim 1 .............................................................................................26

        1.  "A method of treating pulmonary hypertension comprising" ..........................................................................26

        2.  "administering by inhalation to a human suffering from pulmonary hypertension" ...........................................29

        3.  "a therapeutically effective" .....................................................32

        4.  "single event dose" ..................................................................37

        5.  "of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof" ...........................39

        6.  "with an inhalation device" ......................................................40

i

7.  "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"................41

8.  "delivered in 1 to 3 breaths" ....................................................42

B.  Claim 4 ....................................................................................43

1.  "The method of claim 1, wherein the inhalation device is a dry powder inhaler.".........................................................43

C.  Claim 6 ....................................................................................44

1.  "The method of claim 4, wherein the formulation is a powder"....................................................................................44

D.  Claim 7 ....................................................................................45

1.  "The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter"................45

E.  Claim 8 ....................................................................................46

1.  "The method of claim 1, wherein the formulation contains no metacresol" ....................................................................46

F.  Induced Infringement .........................................................47

G.  Contributory Infringement ................................................49

V.  Conclusion ....................................................................................50

ii

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000873

## I.      Introduction

### A.      Purpose of Report

1.      I have been retained by counsel for the Plaintiff, United Therapeutics Corporation ("UTC") as an expert consultant.  I may provide expert testimony related to U.S. Patent No. 10,716,793 ("the '793 patent") and regarding the background and understanding of pulmonary hypertension ("PH") and/or pulmonary arterial hypertension ("PAH") and the treatment of the same with inhaled treprostinil.  I understand that Liquidia is seeking approval for LIQ861, an inhaled dry powder formulation of treprostinil, and has filed an NDA with the FDA (the "LIQ861 NDA").[1]  I may provide expert testimony regarding whether the product described in the LIQ861 NDA ("Liquidia's Proposed Generic Product"), including as taught in Liquidia's proposed label/package insert ("Liquidia's Proposed Label")[2] and as taught in Liquidia's Proposed Instructions for Use,[3] infringes the claims of the '793 patent.  This report presents my opinions regarding the alleged infringement of the '793 patent and the bases for the opinions.

2.      I am being compensated for the time I spend at the rate of $500 per hour.  My compensation does not depend on the outcome of the case, and I am not

---

[1] Throughout this report, I may refer to the proposed product described in Liquidia's NDA and relevant documentation, such as the label and instructions for use, as "Liquidia's Proposed Product" or "LIQ861."
[2] *E.g.*, LIQ02790995.
[3] *E.g.*, LIQ00029269.

1

affiliated with or employed by Plaintiff UTC or Defendant Liquidia Technologies, Inc.

### B.    Materials Considered

3.    To form my opinions I have reviewed and/or relied on the documents and things listed in **Exhibit 1**, attached, or referenced in the text or footnotes of this report as well as my educational and professional experience. My opinions and the bases for them are based on information that I know and that I have reviewed. I may use the materials I have cited or listed, including those attached hereto, in order to assist me in preparing demonstratives such as graphics, models, and animations for my testimony.

4.    I reserve the right to adjust, modify or supplement my opinions in light of any response, critique, or comments on my report or different opinions made by or on behalf of Liquidia, including, but not limited to, any deposition testimony or rebuttal reports that Liquidia's experts submit.

5.    I understand that discovery is ongoing in this case, and more information or documents may therefore become available.  For example, I understand that there are a number of outstanding depositions, including of a Liquidia corporate representative, LGM Pharma, LLC, Dr. Lewis Rubin, and others. I further understand that there continues to be additional non-testimonial discovery, including amendments to interrogatory responses and discovery of documents from

2

██████████████████████████████████████████

████████████████████████████████

███ █████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████ It is my opinion that the INSPIRE study indicates that that the prescribed doses of delivered treprostinil Liquidia has proposed are "therapeutically effective."

---

[70] *Id*.
[71] Liquidia's Proposed Label at LIQ02791006–02791009 at LIQ02791007.

34

74.     Another clinical study—referred to as "TRIUMPH I"—was a 12-week, randomized, double blind, placebo-controlled multi-center study of patients with PAH.  The study population included 235 clinically stable patients with pulmonary arterial hypertension (WHO Group 1), nearly all with NYHA Class III (98%) symptoms who were receiving either bosentan or sildenafil for at least three months prior to the study initiation.  These patients were administered either placebo or treprostinil inhalation solution (*e.g.*, Tyvaso) in four daily treatment sessions (i.e. single event doses) with a target single event dose of 9 breaths (54 micrograms) per session over the course of the 12 week study. The primary efficacy endpoint of the trial was the change in six-minute walk distance (6MWD) relative to baseline at 12 weeks.  Patients receiving single event dosages of 54 micrograms had a placebo-corrected median change from baseline in peak 6MWD of 20 meters at Week 12.  In my opinion, these results indicate that a single event dosage of 54 micrograms is therapeutically effective.

75.     With my significant experience in the field, it is also clear that the only reason to put a patient suffering from pulmonary hypertension on a drug like LIQ861 would be to introduce to the patient a therapeutically effective amount of the drug. There would be nothing to gain from giving a patient an amount of the drug that would not be effective to do what it needs to do.  By intending to provide and sell LIQ861, Liquidia demonstrates its intent for physicians to prescribe and patients to

35

HIGHLY CONFIDENTIAL

DA0498

LIQ_PH-ILD_00000877

administer LIQ861 in an amount that would help the patient. Similarly, for patients and caretakers, the reason to take the drug is for the benefit, so patients and caretakers would be induced by the product to receive a therapeutically effective amount.

76.



77.    My opinion regarding "therapeutically effective" is further supported by the fact that

---

[72] LIQ861 NDA Resubmission 3.2.P.5.6 Response to Complete Response Justification of Specifications (LIQ02793078–02793104) at LIQ02793085.
[73] LIQ861 NDA 3.2.5.1 Specification(s) (LIQ00030834–00030847) at LIQ00030835–00030847.

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000878

# EXHIBIT 18



Deposition of:

**Andrew Clark, Ph.D.**

*January 14, 2022*

In the Matter of:

**United Therapeutics Corporation vs Liquidia Technologies Inc**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

1
                    UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF DELAWARE

3      _____        )Case No.
       UNITED THERAPEUTICS              )1:20-cv-00755
4      CORPORATION                      )
                                        )
5          Plaintiff                    )
                                        )
6      vs.                              )
                                        )
7      LIQUIDIA TECHNOLOGIES, INC.,     )
                                        )
8          Defendant                    )
       _____

9
10
11                   - HIGHLY CONFIDENTIAL -
12
13
                     Remote Videotaped Deposition of
14
                       ANDREW CLARK, Ph.D.
15
                        January 14, 2022
16
                           9:00 a.m.
17
18
19
20
21     Reported by:  Bonnie L. Russo
22     Job No. 5008733

HIGHLY CONFIDENTIAL

Page 2

1       Remote Videotaped Deposition of Andrew Clark,

2       Ph.D. held through:

3

4

5

6

7                   Veritext Legal Solutions

8                   1250 I Street, N.W.

9                   Washington, D.C.

10

11

12

13

14

15

16

        Pursuant to Notice, when were present on behalf

17

        of the respective parties:

18

19

20

21

22

HIGHLY CONFIDENTIAL                    DA0503                    LIQ_PH-ILD_00000881

HIGHLY CONFIDENTIAL

```
                                            Page 3
 1          APPEARANCES:
 2          On behalf of the Plaintiff:
                ART DYKHUIS, ESQUIRE
 3              McDERMOTT WILL & EMERY
                2049 Century Park E
 4              Suite 3200
                Los Angeles, California 90067
 5              adykhuis@mwe.com
                     -and-
 6              TIMOTHY DUNKER, ESQUIRE
                McDERMOTT WILL & EMERY
 7              500 N. Capitol Street, N.W.
                Washington, D.C. 20001
 8              tdunker@mwe.com
 9          On behalf of the Defendant:
                LAUREN KRICKL, ESQUIRE
10              COOLEY LLP
                3175 Hanover Street
11              Palo Alto, California 94304
                lkrickl@cooley.com
12                   -and-
                DOUGLAS WILLIAM CHEEK, ESQUIRE
13              JONATHAN DAVIES, ESQUIRE
                COOLEY LLP
14              1299 Pennsylvania Avenue, N.W.
                Suite 700
15              Washington, D.C. 20004
                dcheek@cooley.com
16              jdavies@cooley.com
                     -and-
17              BRITTANY CAZAKOFF, ESQUIRE
                COOLEY LLP
18              11951 Freedom Drive
                1 Freedom Square
19              Reston Town Center
                Reston, Virginia 20190
20              bcazakoff@cooley.com
21
22          Also Present:
            Orson Braithwaite, Videographer
```

Page 4

1                       I N D E X
2            EXAMINATION OF ANDREW CLARK, Ph.D.          PAGE
3            BY MS. KRICKL                               9
4            BY MR. DYKHUIS                              252
5
6
                            EXHIBITS
7
8            Exhibit 1   Initial Expert Report          19
                         of Andrew Clark, Ph.D.
9
             Exhibit 2   Rebuttal Expert Report         21
10                       of Andrew Clark, Ph.D.
11           Exhibit 3   Reply Expert Report            26
                         of Andrew Clark, Ph.D.
12
             Exhibit 4   United States Patent           62
13                       No. 10,716,793 B2
                         LIQ02799887-911
14
             Exhibit 5   Article titled                 77
15                       "LTI-201:  Evaluation of
                         the hemodynamics and safety
16                       of inhaled LIQ861(treprostinil)
                         in pulmonary arterial
17                       hypertension(WHO Group 1)
                         patients"
18
             Exhibit 6   Liquidia Press Release         80
19                       6-5-19
                         UTC-LIQ00264028-029
20
             Exhibit 7   Tentative Approval Letter      92
21                       NDA 213005
                         LIQ02818821-855
22

Page 5

1          EXHIBITS (CONTINUED):
2

           Exhibit 8     Highlights of Prescribing      103
3                        Information
                         Tyvaso
4                        UTC_LIQ00246884-898
5          Exhibit 9     European Heart Journal          110
                         August/September 2004
6

           Exhibit 10    Supplement of Circulation       116
7                        Abstracts from Scientific
                         Session 2004
8

           Exhibit 11    Article titled                  119
9                        "Neue Therapieoptionen
                         in der Behandlung der
10                       pulmonalarteriellen
                         Hypertonie"
11                       LIQ02800749-764
12         Exhibit 12    Ebling Library                  123
                         Annals of Internal Medicine
13

           Exhibit 13    Reply Expert Report of          144
14                       Dr. Igor Gonda
15         Exhibit 14    Reply Expert Report of          145
                         Dr. Igor Gonda
16

           Exhibit 15    Reply Expert Report of          151
17                       Dr. Nicholas Hill Regarding
                         Invalidity of U.S. Patent
18                       No. 10,716,793
19         Exhibit 16    Article titled                  168
                         "Pulmonary drug delivery.
20                       Part II:  The role of
                         inhalant delivery devices
21                       and drug formulations in
                         therapeutic effectiveness
22                       of aerosolized medications
                         UTC_LIQ00257677-689

Page 6

```
 1          EXHIBITS (CONTINUED):
 2          Exhibit 17   Article titled            198
                         "Medical Aerosol Inhalers:
 3                       Past, Present, and Future
                         LIQ02802121-139
 4
            Exhibit 18   Article titled            207
 5                       "Design of fine particles
                         for pulmonary drug delivery"
 6
            Exhibit 19   Article titled            220
 7                       "The Relationship Between
                         Powder Inhaler Resistance
 8                       and Peak Inspiratory
                         Conditions in Healthy
 9                       Volunteers - Implications
                         for In Vitro Testing"
10
            Exhibit 20   Article titled            227
11                       "Effect of Dry Powder
                         Inhaler Resistance on the
12                       Inspiratory Flow Rates
                         and Volumes of Cystic
13                       Fibrosis Patients of Six
                         Years and Older
14                       LIQ02819741-750
15          Exhibit 21   Article titled            229
                         "Inspiratory flow patterns
16                       with dry powder inhalers
                         of low and medium flow
17                       resistance in patients
                         with pulmonary arterial
18                       hypertension
19          Exhibit 22   Deposition Transcript     244
                         of Gilles Cloutier, Ph.D.
20                       1-27-17
                         UTC_LIQ00222753-906
21
22          (Exhibits bound separately.)
```

HIGHLY CONFIDENTIAL

Page 7

```
 1              P R O C E E D I N G S

 2                  (9:00 a.m.)

 3                                        12:00:48

 4          THE VIDEOGRAPHER:  Good morning.   12:00:48

 5          We are going on the record at 9:00   12:00:58

 6    a.m. on January 14, 2022.  This is Media Unit 1   12:01:00

 7    of the remote-recorded deposition of Dr. Andrew   12:01:05

 8    Clark in the matter of United Therapeutics   12:01:09

 9    Corporation versus Liquidia Technologies, Inc.,   12:01:11

10    filed in the United States District Court for   12:01:14

11    the District of Delaware, Case No. 20-755.   12:01:18

12          My name is Orson Braithwaite from   12:01:22

13    the firm Veritext Legal Solutions, and I am the   12:01:24

14    videographer.  The court reporter is Bonnie   12:01:26

15    Russo from the firm Veritext Legal Solutions.   12:01:29

16          Counsel will now state their appears   12:01:31

17    and affiliations for the record.   12:01:34

18          MS. KRICKL:  Lauren Krickl of Cooley   12:01:36

19    on behalf of defendant, Liquidia, and with me   12:01:38

20    is Brittany Cazakoff and Doug Cheek, and John   12:01:41

21    Davies will be joining later.   12:01:45

22          MR. DYKHUIS:  Art Dykhuis on behalf   12:01:47
```

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000886

HIGHLY CONFIDENTIAL

Page 8

1      of United Therapeutics Corporation.  I am with      12:01:51

2      McDermott Will & Emery.  Also with me is Tim      12:01:54

3      Dunker from McDermott for UTC.      12:01:58

4                    THE VIDEOGRAPHER:  Thank you.      12:02:01

5                    Will the court reporter please swear      12:02:02

6      in the witness.      12:02:03

7                    THE COURT REPORTER:  Yes.  First, I

8      have a stipulation to put on the record.

9                    The attorneys participating in this

10     deposition acknowledge that I am not physically

11     present in the deposition room and that I will

12     be remote -- reporting this deposition

13     remotely.

14                    They further acknowledge that, in

15     lieu of an oath administered in person, I will

16     administer the oath remotely.

17                    The parties further agree that if

18     the witness is testifying from a state where I

19     am not a notary, that the witness may be sworn

20     in by an out-of-state notary.

21                    If any party has an objection to

22     this manner of reporting, please state it now.

HIGHLY CONFIDENTIAL      DA0509      LIQ_PH-ILD_00000887

HIGHLY CONFIDENTIAL

```
                                          Page 9

  1            (Pause.)

  2            THE COURT REPORTER:  Hearing none,

  3       we can proceed and I will swear in the witness.

  4

  5                 ANDREW CLARK, Ph.D.

  6       being first duly sworn, to tell the truth, the

  7       whole truth, and nothing but the truth,

  8       testified as follows:

  9         EXAMINATION BY COUNSEL FOR DEFENDANT    12:02:48

 10            BY MS. KRICKL:                       12:02:48

 11       Q.   Good morning, Dr. Clark.             12:02:49

 12       A.   Good morning.                        12:02:50

 13       Q.   Please state your full name for the  12:02:51

 14       record.                                   12:02:54

 15       A.   Andrew Reginald Clark.               12:02:54

 16       Q.   Do you understand that you just      12:02:56

 17       swore under oath to tell the truth at this 12:02:58

 18       deposition today?                         12:03:01

 19       A.   I did, yes.                          12:03:01

 20       Q.   Do you understand that the testimony 12:03:03

 21       you give will be just as binding as if you were 12:03:04

 22       sitting in court today?                   12:03:08
```

HIGHLY CONFIDENTIAL

Page 10

| | | |
|---|---|---|
| 1 | A. Yes, I do. | 12:03:09 |
| 2 | Q. Is there any reason why you cannot | 12:03:10 |
| 3 | completely and truthfully answer my questions | 12:03:12 |
| 4 | today? | 12:03:14 |
| 5 | A. Nope. | 12:03:15 |
| 6 | Q. Have you testified before at a | 12:03:16 |
| 7 | deposition? | 12:03:19 |
| 8 | A. Nope. | 12:03:19 |
| 9 | Q. I'll just go over a few ground | 12:03:21 |
| 10 | rules. | 12:03:21 |
| 11 | If you do not understand a question, | 12:03:24 |
| 12 | please let me know. Otherwise, I'll assume | 12:03:26 |
| 13 | that you understood. Okay? | 12:03:31 |
| 14 | A. Yep. | 12:03:31 |
| 15 | Q. Do you understand that we can't | 12:03:31 |
| 16 | speak over each other to help the court | 12:03:34 |
| 17 | reporter? | 12:03:37 |
| 18 | A. Yes. Understood. | 12:03:37 |
| 19 | Q. And the court reporter can't record | 12:03:38 |
| 20 | a nod or gestures, so you will need to make a | 12:03:41 |
| 21 | verbal response to my question, please. | 12:03:45 |
| 22 | A. Yes. Understood. | 12:03:47 |

HIGHLY CONFIDENTIAL

Page 55

| | | |
|---|---|---|
| 1 | course, spending an awful lot of money running | 12:51:35 |
| 2 | very large Phase 3 trials. | 12:51:38 |
| 3 | Q.   Can you explain to me how | 12:51:45 |
| 4 | pharmacological effects relate to hemodynamics? | 12:51:47 |
| 5 | MR. DYKHUIS:  Objection to form. | 12:51:50 |
| 6 | THE WITNESS:  In the case of -- | 12:51:52 |
| 7 | Sorry, art.  Do you want to -- | 12:51:53 |
| 8 | MR. DYKHUIS:  Yeah.  I -- I'm done. | 12:51:58 |
| 9 | Just objected to form.  Thank you. | 12:52:00 |
| 10 | THE WITNESS:  Okay.  All right. | 12:52:01 |
| 11 | I -- I -- I got to slow down there a little bit | 12:52:02 |
| 12 | here. | 12:52:04 |
| 13 | Can you repeat the question. | 12:52:04 |
| 14 | BY MS. KRICKL: | 12:52:06 |
| 15 | Q.   Yeah.  I'm just trying to | 12:52:06 |
| 16 | understand.  You mentioned pharmacological | 12:52:07 |
| 17 | effect.  Does -- does that relate to | 12:52:10 |
| 18 | hemodynamics in any way? | 12:52:13 |
| 19 | A.   Yeah.  Essentially, what these | 12:52:16 |
| 20 | molecules do is they cause dilation of the | 12:52:20 |
| 21 | pulmonary vasculature which reduces the | 12:52:24 |
| 22 | pulmonary vascular resistance which reduces the | 12:52:28 |

HIGHLY CONFIDENTIAL     LIQ_PH-ILD_00000890

HIGHLY CONFIDENTIAL

Page 56

| | | |
|---|---|---|
| 1 | pulmonary artery pressure, and that's a | 12:52:31 |
| 2 | prerequisite to having a long-term clinical | 12:52:34 |
| 3 | benefit. | 12:52:36 |
| 4 | Q.   What do you mean when you say | 12:52:39 |
| 5 | "long-term clinical benefit"? | 12:52:43 |
| 6 | A.   In terms of the patient feeling some | 12:52:45 |
| 7 | effect in terms of exercise capacity or -- | 12:52:54 |
| 8 | yeah.  I mean, exercise capacity.  Leave it at | 12:53:00 |
| 9 | that. | 12:53:04 |
| 10 | So the clinical benefit as described | 12:53:06 |
| 11 | in the 79 -- '793 patent is actually its | 12:53:09 |
| 12 | effects on the malady that causes pulmonary | 12:53:13 |
| 13 | arterial hypertension, and it's clinically | 12:53:19 |
| 14 | effective in improving hemodynamics. | 12:53:23 |
| 15 | Q.   And you -- you just -- I apologize | 12:53:30 |
| 16 | if I am misstating, but you said those -- those | 12:53:36 |
| 17 | improvement in hemodynamics are a prerequisite | 12:53:42 |
| 18 | for having long-term clinical benefit? | 12:53:46 |
| 19 | MR. DYKHUIS:  Object to form. | 12:53:48 |
| 20 | THE WITNESS:  Yes.  The -- the -- | 12:53:53 |
| 21 | the -- the disease of pulmonary arterial | 12:53:56 |
| 22 | hypertension is relieved by dilating the | 12:53:59 |

HIGHLY CONFIDENTIAL                    DA0513                    LIQ_PH-ILD_00000891

HIGHLY CONFIDENTIAL

Page 57

| | | |
|---|---|---|
| 1 | pulmonary vasculature and, hence, reducing | 12:54:05 |
| 2 | pulmonary artery pressure.  And that's what | 12:54:10 |
| 3 | these drugs do. | 12:54:12 |
| 4 | BY MS. KRICKL: | 12:54:13 |
| 5 | Q.   So it's your opinion that a drug is | 12:54:13 |
| 6 | therapeutically effective if it benefits the | 12:54:16 |
| 7 | patient in terms of hemodynamic data, right? | 12:54:17 |
| 8 | A.   Correct.  Yeah. | 12:54:21 |
| 9 | Q.   And it's also your opinion that a | 12:54:22 |
| 10 | drug is therapeutically effective if it | 12:54:26 |
| 11 | benefits a patient's exercise ability? | 12:54:28 |
| 12 | MR. DYKHUIS:  Objection to form. | 12:54:30 |
| 13 | THE WITNESS:  In the longer term, | 12:54:34 |
| 14 | yes. | 12:54:36 |
| 15 | BY MS. KRICKL: | 12:54:36 |
| 16 | Q.   So you agree that a drug is | 12:54:38 |
| 17 | therapeutically effective if it in the | 12:54:40 |
| 18 | long-term improves how a patient feels, | 12:54:41 |
| 19 | functions, or survives? | 12:54:47 |
| 20 | MR. DYKHUIS:  Objection to form and | 12:54:48 |
| 21 | foundation and to the extent it calls for a | 12:54:53 |
| 22 | legal conclusion. | 12:54:53 |

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000892

Page 58

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yeah.  I -- I -- I -- | 12:54:57 |
| 2 | yeah.  I would answer that question slightly | 12:54:57 |
| 3 | differently in that -- in that I interpreted | 12:55:00 |
| 4 | therapeutically effective in the context of the | 12:55:01 |
| 5 | specification in the patent which demonstrates | 12:55:04 |
| 6 | that exercising the claims in the patent | 12:55:09 |
| 7 | actually improves hemodynamics in the patient | 12:55:12 |
| 8 | and, therefore, is therapeutically effective. | 12:55:15 |
| 9 | I do not believe you have to do | 12:55:28 |
| 10 | long-term, Phase 3 clinical trials to | 12:55:31 |
| 11 | demonstrate a therapeutic effect. | 12:55:35 |
| 12 | BY MS. KRICKL: | 12:55:37 |
| 13 | Q.   Understood.  But would a drug that | 12:55:37 |
| 14 | improved how a patient feels, functions, and | 12:55:40 |
| 15 | survives be considered therapeutically | 12:55:43 |
| 16 | effective as well? | 12:55:45 |
| 17 | MR. DYKHUIS:  Objection to form. | 12:55:47 |
| 18 | THE WITNESS:  Yeah.  It's just a | 12:55:50 |
| 19 | different definition of therapeutically | 12:55:53 |
| 20 | effective. | 12:55:53 |
| 21 | BY MS. KRICKL: | 12:55:56 |
| 22 | Q.   Okay. | 12:55:56 |

HIGHLY CONFIDENTIAL                   LIQ_PH-ILD_00000893

HIGHLY CONFIDENTIAL

Page 59

| | | |
|---|---|---|
| 1 | A.    It doesn't have to do that to be | 12:56:00 |
| 2 | therapeutically effective. | 12:56:04 |
| 3 | Q.    If a pulmonary hypertension drug | 12:56:05 |
| 4 | improved a patient's hemodynamic measures but | 12:56:08 |
| 5 | did not benefit how a patient felt, functioned, | 12:56:11 |
| 6 | or survived, would you consider that drug | 12:56:15 |
| 7 | therapeutically effective? | 12:56:17 |
| 8 | MR. DYKHUIS:  Objection.  Form and | 12:56:18 |
| 9 | hypothetical. | 12:56:20 |
| 10 | You can answer. | 12:56:25 |
| 11 | THE WITNESS:  I mean, it -- it is | 12:56:26 |
| 12 | hypothetical.  I have -- I have -- you know, | 12:56:26 |
| 13 | I've got no idea.  I would certainly consider | 12:56:30 |
| 14 | it therapeutically effective during development | 12:56:35 |
| 15 | because it affects the correct physiology and | 12:56:37 |
| 16 | has the correct pharmacology. | 12:56:41 |
| 17 | BY MS. KRICKL: | 12:56:43 |
| 18 | Q.    Are you aware of any pulmonary | 12:56:43 |
| 19 | hypertension drugs that affect a patient's | 12:56:45 |
| 20 | hemodynamics but do not affect how a patient | 12:56:52 |
| 21 | feels, functions, or survives? | 12:56:55 |
| 22 | MR. DYKHUIS:  Object to form. | 12:56:57 |

HIGHLY CONFIDENTIAL     DA0516     LIQ_PH-ILD_00000894

HIGHLY CONFIDENTIAL

Page 60

```
 1              THE WITNESS:  None that I can think    12:57:03

 2         of at the moment.                           12:57:04

 3              BY MS. KRICKL:                          12:57:07

 4         Q.   Do you know if the FDA would approve   12:57:07

 5    such a drug?                                     12:57:10

 6              MR. DYKHUIS:  Object to form.          12:57:11

 7    Scope.                                           12:57:14

 8              THE WITNESS:  I -- that -- that --     12:57:16

 9    that, again, is hypothetical.  I'm not sure      12:57:17

10    anybody would ask the FDA to approve, and in     12:57:25

11    the context of the '793 patent, there is no      12:57:27

12    limitation that says the FDA have to approve it  12:57:31

13    on clinical benefit, as opposed to therapeutic   12:57:34

14    benefit, which is demonstrated in the patent.    12:57:37

15              BY MS. KRICKL:                         12:57:40

16         Q.   You said the claims are directed to    12:57:40

17    methods of treatments, though, right?            12:57:44

18         A.   Yes.                                   12:57:45

19         Q.   Okay.  In your experience as a drug    12:57:46

20    developer, would you find a drug that improves   12:57:55

21    hemodynamics but does not improve how a patient  12:57:57

22    feels, functions, or survives lucrative to       12:58:00
```

HIGHLY CONFIDENTIAL

DA0517

LIQ_PH-ILD_00000895

# EXHIBIT 19

Case 1:23-cv-00975-RGA-SRF    Document 71-2    Filed 04/09/24    Page 525 of 1048 PageID #: 5033



**ClinicalTrials.gov**

Go to the classic website



**Record 1 of 1**

⚠️ **The U.S. government does not review or approve the safety and science of all studies listed on this website.**

Read our full disclaimer (https://clinicaltrials.gov/about-site/disclaimer) for details.

COMPLETED ⓘ

### Safety and Efficacy of Inhaled Treprostinil in Adult PH With ILD Including CPFE

**ClinicalTrials.gov ID** ⓘ NCT02630316

**Sponsor** ⓘ United Therapeutics

**Information provided by** ⓘ United Therapeutics (Responsible Party)

**Last Update Posted** ⓘ 2022-07-27

# Record History Tab

## Study Record Versions

- This table shows all the versions of this study record arranged in order by submitted date.
  - To view one version of the study record, click the submitted date.
  - To compare two versions, select them using the check boxes and click "Compare" at the bottom of the list.

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 1 | 2015-12-11 | • None (earliest version on record) |
| ☐ | 2 | 2016-02-24 | • Recruitment Status<br>• Study Status<br>• Contacts/Locations |
| ☐ | 3 | 2016-03-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 4 | 2016-05-05 | • Study Status<br>• Contacts/Locations |
| ☐ | 5 | 2016-05-23 | • Study Status<br>• Contacts/Locations |
| ☐ | 6 | 2016-05-31 | • Study Status<br>• Contacts/Locations |
| ☐ | 7 | 2016-06-06 | • Study Status |

Feedback

Compare

DA0519

LIQ_PH-ILD_00000185

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | | | • Contacts/Locations |
| ☐ | 8 | 2016-06-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 9 | 2016-06-23 | • Study Status<br>• Contacts/Locations |
| ☐ | 10 | 2016-07-05 | • Study Status<br>• Contacts/Locations |
| ☐ | 11 | 2016-07-12 | • Study Status<br>• Contacts/Locations |
| ☐ | 12 | 2016-07-21 | • Study Status<br>• Contacts/Locations<br>• Study Identification |
| ☐ | 13 | 2016-08-15 | • Recruitment Status<br>• Study Status |
| ☐ | 14 | 2016-08-26 | • Recruitment Status<br>• Study Status<br>• Contacts/Locations |
| ☐ | 15 | 2016-09-09 | • Study Status<br>• Eligibility<br>• Study Description |
| ☐ | 16 | 2016-11-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 17 | 2016-11-09 | • Study Status<br>• Contacts/Locations |
| ☐ | 18 | 2016-11-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 19 | 2016-12-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 20 | 2016-12-19 | • Study Status |
| ☐ | 21 | 2017-01-12 | • Study Status<br>• Contacts/Locations |
| ☐ | 22 | 2017-02-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 23 | 2017-02-09 | • Study Status<br>• Contacts/Locations |

DA0520

LIQ_PH-ILD_00000186

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 24 | 2017-03-01 | • Study Status<br>• Eligibility<br>• Study Description |
| ☐ | 25 | 2017-03-09 | • Study Status<br>• Contacts/Locations |
| ☐ | 26 | 2017-03-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 27 | 2017-03-27 | • Study Status<br>• Contacts/Locations |
| ☐ | 28 | 2017-04-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 29 | 2017-05-19 | • Study Status<br>• Contacts/Locations |
| ☐ | 30 | 2017-06-02 | • Study Status<br>• Contacts/Locations |
| ☐ | 31 | 2017-06-19 | • Study Status<br>• Contacts/Locations |
| ☐ | 32 | 2017-07-05 | • Study Status<br>• Contacts/Locations |
| ☐ | 33 | 2017-07-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 34 | 2017-07-19 | • Study Status<br>• Contacts/Locations |
| ☐ | 35 | 2017-07-31 | • Study Status<br>• Contacts/Locations |
| ☐ | 36 | 2017-08-16 | • Study Status<br>• Contacts/Locations |
| ☐ | 37 | 2017-09-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 38 | 2017-09-08 | • Study Status<br>• Contacts/Locations |
| ☐ | 39 | 2017-09-12 | • Study Status<br>• Contacts/Locations |
| ☐ | 40 | 2017-09-14 | • Study Status<br>• Contacts/Locations |

DA0521

LIQ_PH-ILD_00000187

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 41 | 2017-09-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 42 | 2017-10-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 43 | 2017-10-25 | • Study Status<br>• Contacts/Locations |
| ☐ | 44 | 2017-11-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 45 | 2018-03-06 | • Study Status<br>• Contacts/Locations |
| ☐ | 46 | 2018-04-24 | • Study Status<br>• Contacts/Locations |
| ☐ | 47 | 2018-05-16 | • Study Status<br>• Contacts/Locations |
| ☐ | 48 | 2018-06-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 49 | 2018-06-18 | • Study Status<br>• Contacts/Locations |
| ☐ | 50 | 2018-06-25 | • Study Status<br>• Contacts/Locations |
| ☐ | 51 | 2018-07-11 | • Study Status<br>• Contacts/Locations |
| ☐ | 52 | 2018-07-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 53 | 2018-08-03 | • Study Status<br>• Contacts/Locations |
| ☐ | 54 | 2018-08-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 55 | 2018-08-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 56 | 2018-08-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 57 | 2018-09-24 | • Study Status<br>• Contacts/Locations |

3/18/24, 5:56 PM    Case 1:23-cv-00975-RGA-SRF    Document 71-23    Filed 04/09/24    Page 529 of 1048 PageID #:
History of Changes for Study: NCT02630316
5037

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 58 | 2018-10-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 59 | 2018-10-11 | • Study Status<br>• Contacts/Locations |
| ☐ | 60 | 2018-10-22 | • Study Status<br>• Contacts/Locations |
| ☐ | 61 | 2018-11-02 | • Study Status<br>• Contacts/Locations |
| ☐ | 62 | 2018-11-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 63 | 2018-11-21 | • Study Status<br>• Contacts/Locations |
| ☐ | 64 | 2018-12-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 65 | 2018-12-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 66 | 2018-12-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 67 | 2019-01-08 | • Study Status |
| ☐ | 68 | 2019-01-09 | • Study Status<br>• Contacts/Locations |
| ☐ | 69 | 2019-01-24 | • Study Status<br>• Contacts/Locations |
| ☐ | 70 | 2019-02-04 | • Study Status<br>• Contacts/Locations |
| ☐ | 71 | 2019-02-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 72 | 2019-03-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 73 | 2019-03-29 | • Study Status<br>• Contacts/Locations |
| ☐ | 74 | 2019-04-15 | • Study Status<br>• Contacts/Locations |
| ☐ | 75 | 2019-04-19 | • Study Status |

DA0523                                                    LIQ_PH-ILD_00000189

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | | | • Contacts/Locations |
| ☐ | 76 | 2019-05-24 | • Study Status<br>• Contacts/Locations |
| ☐ | 77 | 2019-06-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 78 | 2019-06-21 | • Study Status<br>• Contacts/Locations |
| ☐ | 79 | 2019-08-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 80 | 2019-10-08 | • Study Status<br>• Contacts/Locations |
| ☐ | 81 | 2019-10-10 | • Study Status<br>• Contacts/Locations |
| ☐ | 82 | 2019-10-23 | • Study Status<br>• Contacts/Locations |
| ☐ | 83 | 2019-10-28 | • Study Status<br>• Contacts/Locations |
| ☐ | 84 | 2019-12-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 85 | 2020-01-07 | • Recruitment Status<br>• Study Status<br>• Study Design<br>• Contacts/Locations |
| ☐ | 86 | 2020-02-26 | • Study Status |
| ☐ | 87 | 2020-04-30 | • Study Status |
| ☐ | 88 | 2020-05-29 | • Study Status<br>• Outcome Measures<br>• Contacts/Locations<br>• Oversight<br>• Study Description |
| ☐ | 89 | 2021-04-29 | • Study Status<br>• Eligibility<br>• Baseline Characteristics<br>• Outcome Measures<br>• Adverse Events<br>• Study Description<br>• Arms and Interventions |

DA0524

LIQ_PH-ILD_00000190

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| | | | <ul><li>Contacts/Locations</li><li>Participant Flow</li><li>More Information</li><li>Document Section</li></ul> **Quality Control Review Has Not Concluded** Returned: 2021-05-21 |
| ☐ | 90 | 2021-05-25 | <ul><li>Study Status</li><li>Study Description</li><li>Outcome Measures</li><li>Eligibility</li><li>Baseline Characteristics</li><li>Adverse Events</li></ul> **Quality Control Review Has Not Concluded** Returned: 2021-06-17 |
| ☐ | 91 | 2021-06-21 | <ul><li>Study Status</li><li>Study Description</li><li>Outcome Measures</li></ul> |
| ☐ | 92 | 2021-10-11 | <ul><li>Study Status</li><li>More Information</li></ul> |
| ☐ | 93 | 2022-07-21 | <ul><li>Study Status</li><li>Document Section</li></ul> |

Version 23: 2017-02-09

## Study Details

### Study Identification

**Unique Protocol ID**

RIN-PH-201

**Brief Title**

Safety and Efficacy of Inhaled Treprostinil in Adult PH With ILD Including CPFE

**Official Title**

A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects With Pulmonary Hypertension Due to Parenchymal Lung Disease

DA0525

LIQ_PH-ILD_00000191

Secondary IDs

## Study Status

| | |
|---|---|
| **Record Verification** | |
| 2017-02 | |
| **Overall Status** | |
| Recruiting | |
| **Study Start** | |
| 2016-02 | |
| **Primary Completion** | |
| 2018-10 [Estimated] | |
| **Study Completion** | |
| 2018-10 [Estimated] | |
| **First Submitted** | |
| 2015-12-11 | |
| **First Submitted that Met QC Criteria** | |
| 2015-12-11 | |
| **First Posted** | |
| 2015-12-15 | |
| **Last Update Submitted that Met QC Criteria** | |
| 2017-02-09 | |
| **Last Update Posted** | |
| 2017-02-10 [Actual] | |

## Sponsor/Collaborators

| | |
|---|---|
| **Sponsor** | |
| United Therapeutics | |
| **Responsible Party** | |
| Sponsor | |
| **Collaborators** | |
| | |

## Oversight

| | |
|---|---|
| **U.S. FDA-regulated Drug** | |
| | |

DA0526                                    LIQ_PH-ILD_00000192

**U.S. FDA-regulated Device**

**Data Monitoring**

Yes

## Study Description

**Brief Summary**

This is a multicenter, randomized (1:1 inhaled treprostinil: placebo), double-blinded, placebo-controlled trial to evaluate the safety and efficacy of inhaled treprostinil in subjects with pre-capillary pulmonary hypertension (PH) associated with interstitial lung disease (ILD) including combined pulmonary fibrosis and emphysema (CPFE). The study will include about 314 patients at approximately 100 clinical trial centers. The treatment phase of the study will last approximately 16 weeks. Patients who complete all required assessments will also be eligible to enter an open-label, extension study (RIN-PH-202).

**Detailed Description**

## Conditions

**Condition**

Pulmonary Hypertension
Interstitial Lung Disease
Combined Pulmonary Fibrosis and Emphysema

**Keywords**

Treprostinil
PH
ILD
CPFE
6 Minute Walk Test

## Study Design

**Study Type**

Interventional

**Primary Purpose**

Treatment

**Study Phase**

Phase 2
Phase 3

**Interventional Study Model**

Parallel Assignment

**Interventional Model Description**

3/18/24, 5:59 PM                                    RecondutSiment n71: 231Filed-04AC9/240319 acg clinCB al4 of 1
Case 1:23-cv-00975-RGA-SRF    Document 71-3    Filed 04/09/24    Page 534 of 1048 PageID #:
5042

| Number of Arms |
| --- |
| 2 |

| Masking |
| --- |
| Quadruple (Participant, Care Provider, Investigator, Outcomes Assessor) |

| Masking Description |
| --- |
| |

| Allocation |
| --- |
| Randomized |

| Enrollment |
| --- |
| 314 [Estimated] |

## Arms and Interventions

| Arms | Assigned Interventions |
| --- | --- |
| Placebo Comparator: Placebo<br><br>Matching placebo inhaled using an ultrasonic nebulizer four times daily | Drug: Placebo<br><br>• Placebo administered four times daily |
| Active Comparator: Active Inhaled Treprostinil<br><br>Active Treprostinil for inhalation solution (0.6 mg/mL) delivered via an ultrasonic nebulizer which emits a dose of approximately 6 mcg per breath. Inhaled four times daily and titrated up to a maximum of 12 breaths four times daily | Drug: Inhaled Treprostinil<br><br>• Inhaled treprostinil (6 mcg/breath) administered four times daily<br><br>• Other Names:<br>   ◦ Tyvaso |

## Outcome Measures

### Primary Outcome Measures

1. Change in 6-minute Walk Distance (6MWD) Measured at Peak Exposure from Baseline to Week 16
   The intent of the 6MWT test is to evaluate exercise capacity associated with carrying out activities of daily living. Change in 6MWD from Baseline to Week 16, correlates with the current clinical standard for assessing patient functional status in the treatment of PH and is considered an objective measure of patient functional status. Subjects will be instructed to walk down a corridor at a comfortable speed as far as they can manage for six minutes. Distance <500 meters suggests considerable exercise limitation; Distance 500-800 meters suggests moderate limitation; Distance >800 meters (with no rests) suggests mild or no limitation. Peak exposure 6MWD will occur by conducting 6-minute walk test (6MWT) within 10 to 60 minutes after the most recent dose of study drug dose. [Time Frame: Baseline and Week 16]

### Secondary Outcome Measures

1. Change in Peak 6-minute Walk Distance (6MWD) from Baseline to Week 12
   The intent of the 6MWD test is to evaluate exercise capacity associated with carrying out activities of daily living. Change in 6MWD from Baseline to Week 12, correlates with the current clinical standard for assessing patient functional status in the treatment of PH and is considered an objective measure of patient functional status. Subjects will be instructed to walk down a corridor at a comfortable speed as far as they can manage for six minutes. Distance <500 meters suggests considerable exercise limitation; Distance 500-800 meters suggests moderate limitation; Distance >800 meters

DA0528                                                    LIQ_PH-ILD_00000194

(with no rests) suggests mild or no limitation. Peak exposure 6MWD will occur by conducting 6-minute walk test (6MWT) within 10 to 60 minutes after the most recent dose of study drug dose.
[Time Frame: Baseline and Week 12]

2.  Change in Trough 6-minute Walk Distance (6MWD) from Baseline to Week 15
    The intent of the 6MWD test is to evaluate exercise capacity associated with carrying out activities of daily living. Change in 6MWD from Baseline to Week 15, correlates with the current clinical standard for assessing patient functional status in the treatment of PH and is considered an objective measure of patient functional status. Subjects will be instructed to walk down a corridor at a comfortable speed as far as they can manage for six minutes. Distance <500 meters suggests considerable exercise limitation; Distance 500-800 meters suggests moderate limitation; Distance >800 meters (with no rests) suggests mild or no limitation. Trough exposure 6MWD will occur by conducting 6-minute walk test (6MWT) at least four hours after the most recent study drug dose.
    [Time Frame: Baseline and Week 15]

3.  Change in plasma concentration of N-terminal pro-Brain Natriuretic Peptide (NT-proBNP) from Baseline to Week 16
    The N-terminal pro-BNP (NT-proBNP) serum concentration is a useful biomarker associated with changes in right heart morphology and function. NT-proBNP serum concentration will be assessed to compare the severity of heart failure at Baseline and Week 16. Blood for NT-proBNP assessment must be drawn prior to conducting the 6-minute walk test (6MWT).
    [Time Frame: Baseline and Week 16]

4.  Change in Forced Expiratory Volume (FEV1) in One Second from Baseline to Week 16
    Change in pulmonary function following inhaled treprostinil therapy will be measured by Forced Expiratory Volume in One Second (FEV1), the maximal amount of air forcefully exhaled in 1 second, calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
    [Time Frame: Baseline and Week 16]

5.  Change in Forced Vital Capacity (FVC) from Baseline to Week 16
    Change in pulmonary function following inhaled treprostinil therapy will be measured by Forced Vital Capacity (FVC), calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
    [Time Frame: Baseline and Week 16]

6.  Change in Total Lung Capacity (TLC) from Baseline to Week 16
    Change in pulmonary function following inhaled treprostinil therapy will be measured by Total Lung Capacity (TLC), calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
    [Time Frame: Baseline and Week 16]

7.  Change in Lung Diffusion Capacity (DLCO) from Baseline to Week 16
    Change in pulmonary function following inhaled treprostinil therapy will be measured by Lung Diffusion Capacity (DLCO), calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
    [Time Frame: Baseline and Week 16]

8.  Incidence of Adverse Events Among Participants through 16 Weeks
    The incidence of adverse events among participants throughout the 16 week study will be measured by the number of participants analyzed and the percentage of those participants who experienced an adverse event.
    [Time Frame: 16 Weeks]

## Eligibility

| Minimum Age |
| --- |
| 18 Years |

| Maximum Age |
| --- |
| 79 Years |

| Sex |
| --- |
| All |

| Gender-based Eligibility |
| --- |
| |

| Gender Eligibility Description |
| --- |
| |

| Accepts Healthy Volunteers |
| --- |
| No |

| Criteria |
| --- |

Inclusion Criteria:

1. Subject voluntarily gives informed consent to participate in the study.
2. Males and females aged 18 - 79 years at the time of informed consent.

   a. Females of reproductive potential must be non-pregnant (as confirmed by a urine pregnancy test at screening) and non-lactating, and will: i. Either abstain from intercourse (when it is in line with their preferred and usual lifestyle), or ii. Use two medically acceptable, highly-effective forms of contraception for the duration of study, and at least 30 days after discontinuing study drug.

   b. Males must use a condom for the duration of treatment and for at least 48 hours after discontinuing study drug.

3. The subject has a confirmed diagnosis (based on computed tomography [CT] imaging and pulmonary function tests [PFTs] performed within six months prior to randomization) of World Health Organization (WHO) Group 3 PH associated with one of the following:

   a. Idiopathic interstitial pneumonia (IIP) including: i. Idiopathic pulmonary fibrosis (IPF) ii. Idiopathic nonspecific interstitial pneumonia iii. Respiratory bronchiolitis-associated interstitial lung disease (RB-ILD) iv. Desquamative interstitial pneumonia (DIP) v. Cryptogenic organizing pneumonia (COP) vi. Acute interstitial pneumonitis (AIP) vii. Idiopathic lymphoid interstitial pneumonia viii. Idiopathic pleuroparenchymal fibroelastosis iix. Unclassifiable idiopathic interstitial pneumonia b. Chronic hypersensitivity pneumonitis (CHP) c. Occupational or environmental lung disease (drug or radiation-induced) d. Combined pulmonary fibrosis and emphysema (CPFE)

4. Subjects are required to have a right heart catheterization (RHC) within one year prior to randomization with the following documented parameters:

   1. Pulmonary vascular resistance (PVR) ≥ 4 Wood Units (WU) or
   2. A left ventricular end diastolic pressure (LVEDP) or pulmonary capillary wedge pressure (PCWP) of ≤ 12 mmHg if PVR ≥ 4 WU to < 6.25 WU or ≤ 15 mmHg if PVR ≥ 6.25 WU and
   3. A mean pulmonary arterial pressure (mPAP) of ≥ 30 mmHg

5. A baseline diffusing capacity of the lungs for carbon monoxide (DLCO) of < 50%
6. Baseline 6MWD ≥ 100 meters
7. The subject has not received any PAH approved therapy including: prostacyclin therapy (i.e., epoprostenol, treprostinil, iloprost, or beraprost; except for acute vasoreactivity testing), IP receptor agonist (selexipag), endothelin receptor antagonist (ERA), phosphodiesterase type 5 inhibitor (PDE-5I), or soluble guanylate cyclase stimulator (sGC) within 60 days of randomization.
8. Subjects on a chronic medication for underlying lung disease must be on a stable and optimized dose for ≥ 30 days prior to randomization. Subjects receiving pirfenidone or nintedanib must have been receiving treatment for at least 90 days and on a stable dose for at least 30 days prior to randomization.
9. Subjects on a supportive medication therapy (e.g., anticoagulants, diuretics, oxygen, etc.) must be on a stable and optimized dose for ≥ 30 days prior to randomization. Exceptions are the discontinuation or dose changes of anticoagulants and / or dose change of diuretics.

DA0530

LIQ_PH-ILD_00000196

Case 1:23-cv-00975-RGA-SRF    Document 71    Filed 04/09/24    Page 537 of 1048 PageID #: 5945

10. In the opinion of the Investigator, the subject is able to communicate effectively with study personnel, and is considered reliable, willing and likely to be cooperative with protocol requirements, including attending all study visits.

Exclusion criteria:

1. The subject has a diagnosis of pulmonary arterial hypertension (PAH) or PH for reasons other than ILD as outlined in inclusion criterion 3. This would include, but is not limited to, the concomitant presence of thromboembolic disease (acute or chronic), untreated or inadequately treated obstructive sleep apnea (OSA), connective tissue disease (including but not limited to systemic sclerosis, scleroderma, or systemic lupus erythematosus [SLE]), sarcoidosis, human immunodeficiency virus (HIV)-1 infection, portopulmonary hypertension, and other conditions of the WHO Group I, II, IV, and V classification.
2. The subject has shown intolerance or significant lack of efficacy to a prostacyclin or prostacyclin analogue that resulted in discontinuation or inability to effectively titrate that therapy.
3. The subject has received any PAH approved therapy including: prostacyclin therapy (i.e., epoprostenol, treprostinil, iloprost, or beraprost; except for acute vasoreactivity testing), IP receptor agonist (selexipag), ERA, PDE-5I, or sGC within 60 days of randomization.
4. The subject has evidence of clinically significant left-sided heart disease as defined by:

   1. LVEDP or PCWP > 15 mmHg (or > 12 mmHg if PVR ≥ 4 to < 6.25 WU)
   2. Left ventricular ejection fraction < 40% as assessed by either multigated angiogram (MUGA), angiography or echocardiography.

   Note: Subjects with abnormal left ventricular function attributable entirely to impaired left ventricular filling due to the effects of right ventricular overload (i.e., right ventricular hypertrophy and/or dilatation) will not be excluded.

5. Subjects must not have three or more of the following left ventricular disease/dysfunction risk factors:

   1. Body Mass Index (BMI) ≥ 30 kg/m2
   2. History of Essential Hypertension
   3. Diabetes Mellitus - any type
   4. Historical evidence of significant coronary disease established by any one of the following:

   i. history of myocardial infarction or percutaneous coronary intervention or angiographic, or ii. evidence of coronary artery disease (> 50% stenosis in at least one coronary artery), or iii. positive stress test with imaging, or previous coronary artery bypass graft, or stable angina

6. The subject is receiving > 10 L/min of oxygen supplementation by any mode of delivery at rest at Baseline.
7. Use of any inhaled tobacco/marijuana products or significant history of drug abuse within six months prior to randomization.
8. Exacerbation of underlying lung disease or active pulmonary or upper respiratory infection within 30 days of randomization.
9. Initiation of pulmonary rehabilitation within 12 weeks prior to the randomization.
10. The subject has uncontrolled systemic hypertension as evidenced by systolic blood pressure > 160 mmHg or diastolic blood pressure > 100 mmHg.
11. The subject has any form of congenital heart disease or congenital heart defect (repaired or unrepaired) other than a patent foramen ovale (PFO).
12. The subject has anemia as defined by a screening hemoglobin value < 9.0 g/dL, active infection, or any other condition that would interfere with the interpretation of study assessments.
13. The subject has a Body Mass Index ≥ 40 kg/m2.
14. The subject has any musculoskeletal disorder (i.e., arthritis affecting the lower limbs, recent hip or knee joint replacement, artificial leg), is using a device to assist walking (i.e., cane or walker), or has any other condition that would limit ambulation.
15. Use of any investigational drug/device, or participation in any investigational study within 30 days prior to randomization.

DA0531                                        LIQ_PH-ILD_00000197

## Contacts/Locations

### Central Contact Person

- Name
  Nicole Leedom

  Email
  nleedom@unither.com
- Name
  Hilary Mauney

  Email
  hmauney@unither.com

### Study Officials

- Name
  Aaron Waxman, MD

  Role
  Principal Investigator

  Affiliation
  Brigham and Women's Hospital

### Location

- **Birmingham, Alabama, United States, 35294**

  Status:
  **Recruiting**

  Facility:
  University of Alabama at Birmingham

  Contact:
  - Contact
    - Leigh Powell
    - 205-975-9859
    - lcpowell@uabmc.edu
  - Principal Investigator
    - Robert Bourge, MD

- **Phoenix, Arizona, United States, 85012**

  Status:
  **Recruiting**

  Facility:
  Arizona Pulmonary Specialists, Ltd.

  Contact:
  - Contact
    - Monya Pierce
    - 602-271-0832
    - monya-research@hotmail.com
  - Principal Investigator
    - Jeremy Feldman, MD

- **Tucson, Arizona, United States, 85724**

  Status:
  **Recruiting**

DA0532    LIQ_PH-ILD_00000198

Facility:

University of Arizona

Contact:
- Contact
  - Stacey Palm
  - 520-626-8034
  - staceypalm@email.arizona.edu
- Principal Investigator
  - Franz Rischard, DO
- **Fresno, California, United States, 93701**

  Status:

  **Recruiting**

  Facility:

  University of California San Francisco - Fresno

  Contact:
  - Contact
    - Sonia Garcia
    - 559-499-6637
    - sgarcia@fresno.ucsf.edu
  - Principal Investigator
    - Vijay Balasubramanian

- **Riverside, California, United States, 92505**

  Status:

  **Recruiting**

  Facility:

  Pacific Pulmonary Medical Group

  Contact:
  - Contact
    - Mostafa Elsiah
    - 951-373-5827
    - mostafa.ppmg@gmail.com
  - Principal Investigator
    - Heba Ismail, MD

- **Sacramento, California, United States, 95817**

  Status:

  **Recruiting**

  Facility:

  University of California Davis Medical Center

  Contact:
  - Contact
    - Megan Suderow
    - 916-734-1554
    - mlsuderow@ucdavis.edu
  - Principal Investigator
    - Roblee Allen

- **Aurora, Colorado, United States, 80045**

  Status:

  **Recruiting**

  Facility:

  University of Colorado Hospital - Cardiac and Vascular Center

DA0533                                                                    LIQ_PH-ILD_00000199

3/18/24, 9:28 PM    Recruitment for... Document 71-2 Filed 04/09/24 Page 540 of 1048 PageID #:
Case 1:23-cv-00975-RGA-SRF    Document 71-2 Filed 04/09/24 Page 540 of 1048 PageID #:
5048

- Contact
  - Cheryl Abbott, RN, CCRP
  - 303-724-7466
  - cheryl.abbott@ucdenver.edu
- Principal Investigator
  - Todd Bull, MD

- **Denver, Colorado, United States, 80206**

  Status:
  **Recruiting**

  Facility:
  National Jewish Health

  Contact:
  - Contact
    - Carmen Egidio
    - 303-270-2622
    - egidioc@njhealth.org
  - Principal Investigator
    - Amy Olson, MD

- **Washington, District of Columbia, United States, 20007**

  Status:
  **Recruiting**

  Facility:
  Georgetown University Hospital

  Contact:
  - Contact
    - Michele Cooney
    - 202-444-0895
    - Cooneym@gunet.georgetown.edu
  - Principal Investigator
    - Tunay Kuru, MD

- **Clearwater, Florida, United States, 33765**

  Status:
  **Recruiting**

  Facility:
  St. Francis Sleep, Allergy and Lung Institute

  Contact:
  - Contact
    - Ellen Linden
    - 727-210-4606
    - elinden@stfrancismed.com
  - Principal Investigator
    - Francis Averill, MD

- **Jacksonville, Florida, United States, 32209**

  Status:
  **Recruiting**

  Facility:
  University of Florida College of Medicine, Jacksonville

  Contact:
  - Contact
    - Minal Patel

DA0534    LIQ_PH-ILD_00000200

- 904-244-1106
- Minal.patel@jax.ufl.edu
○ Principal Investigator
- Vandana Seeram, MD

- **Miami, Florida, United States, 33136**

Status:
**Recruiting**

Facility:
University of Miami

Contact:
○ Contact
- Eliana Mendes, MD
○ Contact
- 
- 305-243-2568
- emendes@med.miami.edu
○ Principal Investigator
- David De La Zerda, MD

- **Orlando, Florida, United States, 32803**

Status:
**Recruiting**

Facility:
Central Florida Pulmonary Group, P.A.

Contact:
○ Contact
- Zarah Rodriguez
- 407-841-1100, 107
- zrodriguez@cfpulmonary.com
○ Principal Investigator
- Syed Mobin, MD

- **South Miami, Florida, United States, 33143**

Status:
**Recruiting**

Facility:
South Miami Heart Specialists

Contact:
○ Contact
- Jojie Calderin
- 305-999-3301
- gcalderin@ampmrc.com
○ Principal Investigator
- Javier Jimenez, MD

- **Weston, Florida, United States, 33331**

Status:
**Recruiting**

Facility:
Cleveland Clinic Florida

Contact:
○ Contact
- Norma Jean Barton
- 954-659-6213

DA0535

LIQ_PH-ILD_00000201

- bartonn2@ccf.org
  - Principal Investigator
    - Franck Rahaghi, MD
- **Atlanta, Georgia, United States, 30322**

  Status:
  **Recruiting**

  Facility:
  The Emory Clinic

  Contact:
  - Contact
    - Jane Gillespie, RN
  - Contact
    - 
    - 404-712-8204
    - jane.gillespie@emory.edu
  - Principal Investigator
    - Micah Fisher, MD

- **Chicago, Illinois, United States, 60611**

  Status:
  **Recruiting**

  Facility:
  Northwestern University

  Contact:
  - Contact
    - Margaret Travis, RN, BSN
    - 312-695-2269
    - margaret.travis@northwestern.edu
  - Principal Investigator
    - Hector Cajigas, MD

- **Chicago, Illinois, United States, 60612**

  Status:
  **Recruiting**

  Facility:
  University of Illinois at Chicago Hospital

  Contact:
  - Contact
    - Adam Ostrower
    - 312-355-5934
    - ostrower@uic.edu
  - Principal Investigator
    - Roberto Machado, MD

- **Chicago, Illinois, United States, 60637**

  Status:
  **Recruiting**

  Facility:
  University of Chicago Medical Center

  Contact:
  - Contact
    - Sandy Coslet
  - Contact
    - 

DA0536

LIQ_PH-ILD_00000202

3/18/24, 3:03 PM Recruiting Interstitial Lung Disease Study ...

Case 1:23-cv-00975-RGA-SRF Document 71-3 Filed 04/03/24 Page 543 of 1048 PageID #: 5051

- 773-864-5768
- scoslet@medicine.bsd.uchicago.edu
  ○ Principal Investigator
    - Remzi Bag, MD
- **Maywood, Illinois, United States, 60153**

  Status:

  **Recruiting**

  Facility:

  Loyola University Medical Center

  Contact:
  ○ Contact
    - Jessica Shore
    - 708-216-2027
    - jshore@luc.edu
  ○ Principal Investigator
    - James Gagermeier, MD

- **Indianapolis, Indiana, United States, 46202**

  Status:

  **Recruiting**

  Facility:

  IU Health Physicians Advanced Heart & Lung Clinic

  Contact:
  ○ Contact
    - Erin Turk
    - 317-962-3183
    - eturk@iuhealth.org
  ○ Principal Investigator
    - William Harvey, MD

- **Indianapolis, Indiana, United States, 46250**

  Status:

  **Recruiting**

  Facility:

  Community Heart and Vascular Hospital

  Contact:
  ○ Contact
    - Joanna Greene-Nashold, RN
    - 317-621-8629
    - jgnashold@ecommunity.com
  ○ Principal Investigator
    - Navneet Lather, MD

- **Indianapolis, Indiana, United States, 46260**

  Status:

  **Recruiting**

  Facility:

  St. Vincent Medical Group, Inc.

  Contact:
  ○ Contact
    - Regina Margiotti
    - 317-338-6151
    - ramargio@stvincent.org
  ○ Principal Investigator

DA0537                                                                                    LIQ_PH-ILD_00000203

- Ashwin Ravichandran, MD
- **Kansas City, Kansas, United States, 66160**

  Status:

  **Recruiting**

  Facility:

  University of Kansas Medical Center

  Contact:
  - Contact
    - Mia Zou
    - 913-588-7117
    - mzou@kumc.edu
  - Principal Investigator
    - Leslie Spikes, MD

- **Lexington, Kentucky, United States, 40536**

  Status:

  **Recruiting**

  Facility:

  University of Kentucky Medical Center

  Contact:
  - Contact
    - April Butler
  - Contact
    -
    - 859-218-6740
    - april.evans@uky.edu
  - Principal Investigator
    - Ketan Buch, MD

- **Louisville, Kentucky, United States, 40202**

  Status:

  **Recruiting**

  Facility:

  Kentuckiana Pulmonary Associates

  Contact:
  - Contact
    - Martha Royse, APRN
    - 502-587-8000
    - roysenp@gmail.com
  - Principal Investigator
    - John McConnell, MD

- **Louisville, Kentucky, United States, 40202**

  Status:

  **Recruiting**

  Facility:

  University of Louisville Physicians Outpatient Center

  Contact:
  - Contact
    - Joan Hamlyn
    - 502-852-8739
    - Joan.hamlyn@louisville.edu
  - Principal Investigator
    - Jimmy Shaun Smith, DO

DA0538

LIQ_PH-ILD_00000204

3/18/24, 8:56 PM                                Repository interface: 2 Filed 04/09/24 - clinicaltrials.gov

- **New Orleans, Louisiana, United States, 70112**

  Status:
  **Recruiting**

  Facility:
  Louisiana State University Health Sciences Center New Orleans

  Contact:
  ○ Contact
    ▪ Paula Lauto, RN
    ▪ 504-568-3451
    ▪ plauto@lsuhsc.edu
  ○ Principal Investigator
    ▪ Matthew Lammi, MD

- **New Orleans, Louisiana, United States, 70112**

  Status:
  **Recruiting**

  Facility:
  Tulane University

  Contact:
  ○ Contact
    ▪ Sandy Ditta
    ▪ 504-988-4040
    ▪ sditta@tulane.edu
  ○ Principal Investigator
    ▪ Shigeki Saito, MD

- **Baltimore, Maryland, United States, 21202**

  Status:
  **Recruiting**

  Facility:
  University of Maryland Medical Center

  Contact:
  ○ Contact
    ▪ Lioubov Poliakova
    ▪ 410-328-6885
    ▪ lpoliako@medicine.umaryland.edu
  ○ Principal Investigator
    ▪ Gautam V. Ramani, MD

- **Boston, Massachusetts, United States, 02111**

  Status:
  **Recruiting**

  Facility:
  Tufts Medical Center

  Contact:
  ○ Contact
    ▪ Karen Visnaw, RN
    ▪ 617-636-1334
    ▪ Kvisnaw@tuftsmedicalcenter.org
  ○ Principal Investigator
    ▪ Nicholas Hill, MD

- **Boston, Massachusetts, United States, 02115**

  Status:

DA0539                                                    LIQ_PH-ILD_00000205

Recruiting

Facility:

Brigham & Women's Hospital

Contact:
- Contact
  - Laurie Lawler, RN
  - 617-525-9731
  - llawler@partners.org
- Principal Investigator
  - Aaron B. Waxman, MD
- **Detroit, Michigan, United States, 48202**

Status:
Recruiting

Facility:

Henry Ford Health System

Contact:
- Contact
  - Jackie Day
  - 313-916-1254
  - jday5@hfhs.org
- Principal Investigator
  - Rana Awdish, MD

- **Grand Rapids, Michigan, United States, 49503**

Status:
Recruiting

Facility:

Spectrum Health Medical Center

Contact:
- Contact
  - Molly Cope, RN
  - 616-391-3869
  - molly.cope@spectrumhealth.org
- Principal Investigator
  - Reda Girgis, MD

- **Minneapolis, Minnesota, United States, 55455**

Status:
Not yet recruiting

Facility:

University of Minnesota

Contact:
- Contact
  - Gretchen Peichel
  - 612-626-6237
  - gpeichel@umn.edu
- Principal Investigator
  - Thenappan Thenappan, MD

- **Omaha, Nebraska, United States, 68198**

Status:
Recruiting

Facility:

DA0540                                        LIQ_PH-ILD_00000206

University of Nebraska Medical Center

Contact:
- Contact
  - Traci Nelson
  - 402-559-7585
  - trnelson@unmc.edu
- Principal Investigator
  - Austin Thompson, MD

- **Albuquerque, New Mexico, United States, 87131**

  Status:
  **Recruiting**

  Facility:
  The University of New Mexico

  Contact:
  - Contact
    - Barbara Butcher, PhD, BSN, RN
    - 505-925-1160
    - BButcher@salud.unm.edu
  - Principal Investigator
    - Lana Melendres-Groves, MD

- **Albany, New York, United States, 12208**

  Status:
  **Recruiting**

  Facility:
  Albany Medical College

  Contact:
  - Contact
    - Furqan Ilyas
    - 518-262-1542
    - ilyasf@mail.amc.edu
  - Principal Investigator
    - Boris Medarov, MD

- **Brooklyn, New York, United States, 11215**

  Status:
  **Recruiting**

  Facility:
  New York Methodist Hospital

  Contact:
  - Contact
    - Puja Chadha
    - 718-780-5614
    - puc9004@nyp.org
  - Principal Investigator
    - Ruth Minkin, MD

- **Fayetteville, New York, United States, 13066**

  Status:
  **Recruiting**

  Facility:
  Pulmonary Health Physicians, PC

  Contact:

DA0541                                        LIQ_PH-ILD_00000207

Case 1:23-cv-00975-RGA-SRF   Document 71-1   Filed 04/03/24   Page 548 of 1048 PageID #: 5056

- Contact
  - Victoria Gabris, RN
- Contact
  -
  - 315-234-0816
  - Victoria.Gabris@CNYLungs.com
- Principal Investigator
  - Sherif El Bayadi, MD
- **Mineola, New York, United States, 11501**

  Status:

  **Recruiting**

  Facility:

  Winthrop University Hospital

  Contact:
  - Contact
    - Kimberly Byrnes
    - 516-663-9582
    - kbyrnes@winthrop.org
  - Principal Investigator
    - Shilpa DeSouza, MD

- **New Hyde Park, New York, United States, 11040**

  Status:

  **Recruiting**

  Facility:

  Northwell Health

  Contact:
  - Contact
    - Sameer Verma, MD
    - 516-465-5437
    - SVerma3@northwell.edu
  - Principal Investigator
    - Arunabh Talwar, MD

- **New York, New York, United States, 10003**

  Status:

  **Recruiting**

  Facility:

  ICAHN School of Medicine - Mount Sinai Beth Israel

  Contact:
  - Contact
    - Anabela Barroso
    - 212-844-8824
    - abarroso@CHPNET.ORG
  - Principal Investigator
    - Roxana Sulica, MD

- **New York, New York, United States, 10029**

  Status:

  **Recruiting**

  Facility:

  The Mount Sinai Hospital

  Contact:
  - Contact

DA0542                                LIQ_PH-ILD_00000208

- Ewelina Wojtaszek
  - Contact
    - 
    - 917-501-5255
    - ewelina.wojtaszek@mountsinai.org
  - Principal Investigator
    - Radha Gopalan, MD
- **Chapel Hill, North Carolina, United States, 27599**

  Status:
  **Recruiting**

  Facility:
  University of North Carolina at Chapel Hill

  Contact:
  - Contact
    - Dakota Buhrman
    - 919-445-0353
    - dakota_buhrman@med.unc.edu
  - Principal Investigator
    - Hubert James (Jimmy) Ford III, MD

- **Cincinnati, Ohio, United States, 45219**

  Status:
  **Recruiting**

  Facility:
  The Carl and Edyth Lindner Research Center at The Christ Hospital

  Contact:
  - Contact
    - Christine Lawrence
    - 513-585-1777
    - christine.lawrence@thechristhospital.com
  - Principal Investigator
    - Peter Engel, MD

- **Cincinnati, Ohio, United States, 45267**

  Status:
  **Recruiting**

  Facility:
  University of Cincinnati Health

  Contact:
  - Contact
    - Tammy Roads
    - 513-558-2148
    - roadst@ucmail.uc.edu
  - Principal Investigator
    - Jean Elwing, MD

- **Cleveland, Ohio, United States, 44106**

  Status:
  **Recruiting**

  Facility:
  University Hospitals Cleveland Medical Center

  Contact:
  - Contact
    - Mary Andrews

DA0543                                              LIQ_PH-ILD_00000209

mary.andrews@uhhospitals.org
- Contact
  - ▪
  - ▪ 216-844-2386
- Principal Investigator
  - ▪ Robert Schilz, DO

- **Oklahoma City, Oklahoma, United States, 73104**

  Status:
  **Recruiting**

  Facility:
  The University of Oklahoma Health Sciences Center (OUHSC)

  Contact:
  - Contact
    - ▪ Jennifer Robertson
    - ▪ 405-271-6173
    - ▪ jennifer-robertson@ouhsc.edu
  - Principal Investigator
    - ▪ Himanshu Bhardwaj, MD

- **Lancaster, Pennsylvania, United States, 17603**

  Status:
  **Recruiting**

  Facility:
  Lancaster General Health

  Contact:
  - Contact
    - ▪ Lou Anne Kruse, RN, BSN
    - ▪ 717-544-1777
    - ▪ lakruse@LGHealth.org
  - Principal Investigator
    - ▪ Justin Roberts, DO

- **Philadelphia, Pennsylvania, United States, 19140**

  Status:
  **Recruiting**

  Facility:
  Temple University Hospital

  Contact:
  - Contact
    - ▪ Gayle Jones, RN
    - ▪ 215-707-1041
    - ▪ Gayle.Jones@tuhs.temple.edu
  - Principal Investigator
    - ▪ Sheila Weaver, DO

- **Pittsburgh, Pennsylvania, United States, 15212**

  Status:
  **Not yet recruiting**

  Facility:
  Allegheny General Hospital

  Contact:
  - Contact
    - ▪ Joan Rossi, RN
    - ▪ 412-359-3293

DA0544

LIQ_PH-ILD_00000210

- joan.rossi@ahn.org
    - Principal Investigator
        - Amresh Raina, MD
- **Pittsburgh, Pennsylvania, United States, 15213**

    Status:
    **Recruiting**

    Facility:
    University of Pittsburgh Medical Center

    Contact:
    - Contact
        - Swati Gulati
        - 412-864-6371
        - gulatis2@upmc.edu
    - Principal Investigator
        - Michael Risbano

- **Anderson, South Carolina, United States, 29621**

    Status:
    **Recruiting**

    Facility:
    AnMed Health Pulmonary and Sleep Medicine

    Contact:
    - Contact
        - Charlesa Davis
        - 864-512-8519
        - charlesa.davis2@anmedhealth.org
    - Principal Investigator
        - Abhijit Raval, MD

- **Charleston, South Carolina, United States, 29425**

    Status:
    **Recruiting**

    Facility:
    Medical University of South Carolina

    Contact:
    - Contact
        - Robyn Do
        - 843-792-1221
        - dorobyn@musc.edu
    - Principal Investigator
        - Rahul Argula, MD

- **Knoxville, Tennessee, United States, 37909**

    Status:
    **Recruiting**

    Facility:
    Statcare Pulmonary Consultants

    Contact:
    - Contact
        - Krista Tibbs
        - 865-934-2676
        - ktibbs@biomed-research.com
    - Principal Investigator
        - John Swisher, MD

DA0545                                                LIQ_PH-ILD_00000211

Case 1:23-cv-00975-RGA-SRF   Document 71-2   Filed 04/03/24   Page 552 of 1048 PageID #: 5060

- **Dallas, Texas, United States, 75390**

  Status:
  <span style="color:green">**Recruiting**</span>

  Facility:
  UT Southwestern Medical Center

  Contact:
  - Contact
    - Adetoun Sodimu
    - 214-645-6439
    - Adetoun.Sodimu@UTSouthwestern.edu
  - Principal Investigator
    - Sonja Bartolome, MD

- **Houston, Texas, United States, 77030**

  Status:
  <span style="color:green">**Recruiting**</span>

  Facility:
  Houston Methodist

  Contact:
  - Contact
    - Ann Saulino, RN
    - 713-441-7182
    - asaulino@houstonmethodist.org
  - Principal Investigator
    - Adaani Frost, MD

- **Houston, Texas, United States, 77030**

  Status:
  <span style="color:green">**Recruiting**</span>

  Facility:
  Michael E. DeBakey VA Medical Center

  Contact:
  - Contact
    - Sarah Perusich
    - 713-794-7294
    - Sarah.Perusich@va.gov
  - Principal Investigator
    - Lavannya Pandit, MD

- **Houston, Texas, United States, 77030**

  Status:
  <span style="color:green">**Recruiting**</span>

  Facility:
  The University of Texas Health Science Center at Houston

  Contact:
  - Contact
    - Tiffany Ostovar-Kermani
    - 713-500-6851
    - Tiffany.G.OstovarKermani@uth.tmc.edu
  - Principal Investigator
    - Bela Patel, MD

- **San Antonio, Texas, United States, 78229**

  Status:

DA0546                                                                                  LIQ_PH-ILD_00000212

Not yet recruiting

Facility:

The University of Texas Health Science Center at San Antonio

Contact:
- Contact
  - Olga Dib
  - 210-415-1180
  - Dibo@uthscsa.edu
- Principal Investigator
  - Deborah Levine, MD
- **Temple, Texas, United States, 76508**

  Status:

  Recruiting

  Facility:

  Scott & White Memorial Hospital

  Contact:
  - Contact
    - Lori Murdoch
    - 254-724-7168
    - Lori.Murdoch@BSWHealth.org
  - Principal Investigator
    - Peter Yau, MD

- **Colchester, Vermont, United States, 05446**

  Status:

  Recruiting

  Facility:

  University of Vermont, Vermont Lung Center

  Contact:
  - Contact
    - Kathy Meehan
    - 802-847-3627
    - Kathy.Meehan@uvmhealth.org
  - Principal Investigator
    - Maryellen Antkowiak, MD

- **Norfolk, Virginia, United States, 23507**

  Status:

  Recruiting

  Facility:

  Sentara Cardiovascular Research Institute

  Contact:
  - Contact
    - Melinda Bullivant
    - 757-388-4024
    - MMBULLIV@sentara.com
  - Principal Investigator
    - Michael Eggert

- **Richmond, Virginia, United States, 23229**

  Status:

  Recruiting

  Facility:

DA0547

LIQ_PH-ILD_00000213

3/18/24, 5:53 PM                                    Recruiting Inter-73: ...                                    1 of 1

Pulmonary Associates of Richmond

Contact:
- Contact
  - Rose Sidell
  - 804-288-5945
  - rsidell@paraccess.com
- Principal Investigator
  - Shilpa Johri, MD

- **Madison, Wisconsin, United States, 53792**

  Status:

  **Recruiting**

  Facility:

  University of Wisconsin School of Medicine and Public Health

  Contact:
  - Contact
    - Lori Wollet
    - 608-263-0524
    - ljwollet@medicine.wisc.edu
  - Principal Investigator
    - James Runo, MD

- **Milwaukee, Wisconsin, United States, 53215**

  Status:

  **Recruiting**

  Facility:

  Aurora St. Luke's Medical Center

  Contact:
  - Contact
    - Linda Boehm, RN
    - 414-649-5664
    - linda.boehm@aurora.org
  - Principal Investigator
    - Dianne Zwicke, MD

## IPD Sharing

| Available IPD/Information |
| --- |
|  |

| IPD information |
| --- |
|  |

## References

| Citations |
| --- |
|  |

| Links |
| --- |
|  |

DA0548                                                    LIQ_PH-ILD_00000214

**Document Section**

DA0549                                    LIQ_PH-ILD_00000215

# EXHIBIT 20

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/349100850

# Inhaled Treprostinil and FVC Change in Patients With Interstitial Lung Disease and Associated Pulmonary Hypertension

**Article**  *in*  SSRN Electronic Journal · January 2021

DOI: 10.2139/ssrn.3771319

CITATIONS
10

READS
308

15 authors, including:



Aaron B Waxman
Brigham and Women's Hospital
**340** PUBLICATIONS   **8,504** CITATIONS

Sudarshan Rajagopal
Duke University Medical Center
**164** PUBLICATIONS   **8,512** CITATIONS

Christopher S King
**229** PUBLICATIONS   **5,592** CITATIONS

SEE PROFILE

SEE PROFILE

SEE PROFILE

All content following this page was uploaded by Aaron B Waxman on 01 July 2021.

The user has requested enhancement of the downloaded file.

LIQ_PH-ILD_00000216

# Inhaled treprostinil and forced vital capacity in patients with interstitial lung disease and associated pulmonary hypertension: a post-hoc analysis of the INCREASE study

 

Steven D Nathan, Aaron Waxman, Sudarshan Rajagopal, Amy Case, Shilpa Johri, Hilary DuBrock, David J De La Zerda, Sandeep Sahay, Christopher King, Lana Melendres-Groves, Peter Smith, Eric Shen, Lisa D Edwards, Andrew Nelsen, Victor F Tapson

## Summary

**Background** INCREASE was a randomised, placebo-controlled, phase 3 trial that evaluated inhaled treprostinil in patients with interstitial lung disease (ILD) and associated pulmonary hypertension. Treprostinil improved exercise capacity from baseline to week 16, assessed with the use of a 6-min walk test, compared with placebo. Improvements in forced vital capacity (FVC) were also reported. The aim of this post-hoc analysis was to further characterise the effects of inhaled treprostinil on FVC in the overall study population and in various subgroups of interest.

**Methods** In this post-hoc analysis, we evaluated FVC changes in the overall study population and in various subgroups defined by cause of disease or baseline clinical parameters. The study population included patients aged 18 years and older who had a diagnosis of ILD based on evidence of diffuse parenchymal lung disease on chest CT done within 6 months before random assignment (not centrally adjudicated). All analyses were done on the intention-to-treat population, defined as individuals who were randomly assigned and received at least one dose of study drug. The INCREASE study is registered with ClinicalTrials.gov, NCT02630316.

**Findings** Between Feb 3, 2017, and Aug 30, 2019, 326 patients were enrolled in the INCREASE trial. Inhaled treprostinil was associated with a placebo-corrected least squares mean improvement in FVC of 28·5 mL (SE 30·1; 95% CI −30·8 to 87·7; p=0·35) at week 8 and 44·4 mL (35·4; −25·2 to 114·0; p=0·21) at week 16, with associated percentage of predicted FVC improvements of 1·8% (0·7; 0·4 to 3·2; p=0·014) and 1·8% (0·8; 0·2 to 3·4; p=0·028). Subgroup analysis of patients with idiopathic interstitial pneumonia showed FVC differences of 46·5 mL (SE 39·9; 95% CI −32·5 to 125·5; p=0·25) at week 8 and 108·2 mL (46·9; 15·3 to 201·1; p=0·023) at week 16. Analysis of patients with idiopathic pulmonary fibrosis showed FVC differences of 84·5 mL (52·7; −20·4 to 189·5; p=0·11) at week 8 and 168·5 mL (64·5; 40·1 to 297·0; p=0·011) at week 16. The most frequent adverse events included cough, headache, dyspnoea, dizziness, nausea, fatigue, and diarrhoea.

**Interpretation** In patients with ILD and associated pulmonary hypertension, inhaled treprostinil was associated with improvements in FVC versus placebo at 16 weeks. This difference was most evident in patients with idiopathic interstitial pneumonia, particularly idiopathic pulmonary fibrosis. Inhaled treprostinil appears to be a promising therapy for idiopathic pulmonary fibrosis that warrants further investigation in a prospective, randomised, placebo-controlled study.

**Funding** United Therapeutics Corporation.

**Copyright** © 2021 Elsevier Ltd. All rights reserved.

## Introduction

Interstitial lung diseases (ILDs) encompass a broad range of conditions that are categorised by varying amounts of inflammation and fibrosis. Idiopathic interstitial pneumonias are a category of ILD, of which idiopathic pulmonary fibrosis is the most common form.[1] Clinical trials of idiopathic pulmonary fibrosis treatments have resulted in approval in many countries of two so-called antifibrotic agents, pirfenidone and nintedanib.[2,3,4] Both drugs have been shown to slow loss of lung function, as measured by forced vital capacity (FVC). Results of clinical trials for both drugs in other forms of fibrotic lung disease—including scleroderma-associated ILD, ILDs characterised by progressive fibrosis, and unclassifiable ILD—indicate that both agents have antifibrotic effects beyond idiopathic pulmonary fibrosis.[5,6,7] These results suggest that once lung fibrosis supervenes, there are pathways common to various forms of ILD that might be targets for therapy.

Treprostinil is a stable analogue of prostacyclin, which promotes vasodilation of pulmonary and systemic arterial vascular beds and inhibits platelet aggregation.[8] The inhaled formulation of treprostinil is approved in the USA for the treatment of WHO group 1 pulmonary hypertension.[8,9] In addition to its effects on the pulmonary vasculature, there are data to suggest that treprostinil has antifibrotic properties. Specifically, treprostinil has been shown to affect extracellular matrix

*Lancet Respir Med 2021*

Published Online
June 29, 2021
https://doi.org/10.1016/
S2213-2600(21)00165-X

See Online/Comment
https://doi.org/10.1016/
S2213-2600(21)00264-2

Advanced Lung Disease and Transplant Program, Inova Fairfax Hospital, Falls Church, VA, USA (Prof S D Nathan MD, C King MD); Pulmonary and Critical Care Medicine, Department of Internal Medicine, Brigham and Women's Hospital, Boston, MA, USA (A Waxman MD); Division of Cardiology, Department of Medicine, Duke University Medical Center, Durham, NC, USA (S Rajagopal MD); Piedmont Healthcare, Austell, GA, USA (A Case MD); Pulmonary Associates of Richmond, Richmond, VA, USA (S Johri MD); Department of Internal Medicine, Division of Pulmonary and Critical Care, Mayo Clinic, Rochester, MN, USA (H DuBrock MD); Division of Pulmonary & Critical Care Medicine, University of Miami Health System, Miami, FL, USA (D J De La Zerda MD); Division of Pulmonary, Critical Care, and Sleep Medicine, Houston Methodist Hospital, Houston, TX, USA (S Sahay MD); Pulmonary & Critical Care Division, University of New Mexico, 1 University of New Mexico, DoIM MSC10-5550, Albuquerque, NM, USA (L Melendres-Groves MD); United Therapeutics Corporation, Research Triangle Park, NC, USA (P Smith PharmD, E Shen PharmD, L D Edwards PhD, A Nelsen PharmD); Division of Pulmonary and Critical Care Medicine, Cedars-Sinai Medical Center, Los Angeles, CA, USA (Prof V F Tapson MD)

DA0552

LIQ_PH-ILD_00000217

**Articles**

Correspondence to:
Prof Steven D Nathan, Advanced
Lung Disease and Lung
Transplant Program,
Falls Church, VA 22042, USA
steven.nathan@inova.org

**Research in context**

**Evidence before this study**

Clinical trials in patients with chronic fibrosing interstitial lung diseases (ILDs) have led to the development of two antifibrotic agents, nintedanib and pirfenidone. These therapies have been shown to reduce the rate of decline in lung function and are now recommended in clinical practice guidelines for patients with idiopathic pulmonary fibrosis. The INCREASE study was a randomised clinical trial of patients with ILD and pulmonary hypertension that evaluated the safety and efficacy of inhaled treprostinil. The study met its primary endpoint of change in the peak 6-min walk distance at week 16. Pulmonary function testing was obtained as a safety parameter in this study. Somewhat unexpectedly, this study also showed that inhaled treprostinil was associated with improvements in forced vital capacity (FVC) over a 16-week period. We searched PubMed on June 9, 2021, using the search terms "treprostinil" and "lung function" for all articles published from database inception up to June 9, 2021, with no language restrictions. One retrospective study of 22 patients with interstitial lung disease and associated pulmonary hypertension treated with inhaled treprostinil assessed lung function. No significant changes were observed in percentage predicted FVC but this study was limited by its observational, uncontrolled design. The effects of inhaled treprostinil on lung function in this disease population have otherwise not been studied.

**Added value of this study**

In this post-hoc analysis of the INCREASE trial, inhaled treprostinil was associated with significant improvements in the percentage of predicted FVC at week 8 and week 16. Improvement in FVC was greatest among patients with idiopathic interstitial pneumonia, particularly those with idiopathic pulmonary fibrosis. These results suggest that inhaled treprostinil might have independent antifibrotic properties beyond traditional vasodilatory effects. Whether this will be substantiated in a study of patients with interstitial lung disease, with or without pulmonary hypertension, remains to be determined.

**Implications of all the available evidence**

The present study serves as proof of concept that inhaled treprostinil can have a beneficial effect on the loss of lung function in patients with ILDs and associated pulmonary hypertension. These findings were most pronounced in patients with idiopathic pulmonary fibrosis. Further studies are needed to investigate the clinical benefits of inhaled treprostinil in this patient population, with or without associated pulmonary hypertension, and to explore potential mechanisms of action.

remodelling and fibrosis in vitro by reducing recruitment of fibrocytes to sites of vascular remodelling, as well as suppressing profibrotic fibroblast activity and the synthesis and deposition of collagen and fibronectin in mice.[10,11]

The INCREASE study was a 16-week randomised controlled trial that was designed to evaluate the safety and efficacy of inhaled treprostinil in patients with ILD and pulmonary hypertension documented by right heart catheterisation. Patients received inhaled treprostinil, up to 12 breaths (72 µg) four times daily, or placebo.[12] The dose of drug or placebo was adjusted, with dose escalation (an additional breath, four times daily) occurring as often as every 3 days, with a target dose of nine breaths four times daily and a maximum dose of 12 breaths four times daily. Investigators adjusted the dose for each individual patient to achieve the maximum tolerated dose. The study met its primary endpoint of change in the peak 6-min walk distance, a measure of exercise capacity, at week 16. Secondary endpoints, including change in N-terminal pro-brain natriuretic peptide (NT-proBNP) concentration at week 16 and time to clinical worsening, were also met. Pulmonary function testing was done as a safety assessment at baseline, week 8, and week 16, and was previously reported.[12]

The aim of this post-hoc analysis was to further characterise the effects of inhaled treprostinil on FVC among the overall study population and in various subgroups of interest, including specific disease subgroups and patients stratified by median baseline clinical characteristics.

## Methods

### Study design and participants

INCREASE was a multicentre, randomised, double-blind, placebo-controlled, parallel-group trial. The steering committee in collaboration with the sponsor (United Therapeutics Corporation) designed the study and oversaw its conduct. Detailed study procedures and results have been described previously.[12] The study population included patients aged 18 years and older with a diagnosis of ILD based on evidence of diffuse parenchymal lung disease on chest CT done within 6 months before random assignment (not centrally adjudicated). Confirmation of WHO group 3 pulmonary hypertension was required, based on right heart catheterisation within 1 year before random assignment (including pulmonary vascular resistance >3 Wood units, pulmonary capillary wedge pressure ≤15 mm Hg, and mean pulmonary arterial pressure ≥25 mm Hg). Patients with connective tissue disease-associated ILD were additionally required to have a baseline FVC <70%. Patients were randomly assigned (1:1) to inhaled treprostinil (Tyvaso; United Therapeutics Corporation, Research Triangle Park, NC, USA) or placebo in a double-blind manner. No new antifibrotics or anti-inflammatory

www.thelancet.com/respiratory   Published online June 29, 2021   https://doi.org/10.1016/S2213-2600(21)00165-X

DA0553

LIQ_PH-ILD_00000218

| | Idiopathic interstitial pneumonia including idiopathic pulmonary fibrosis (n=146) | Idiopathic pulmonary fibrosis only (n=92) | Combined pulmonary fibrosis and emphysema (n=82) | Connective tissue disease-associated ILD (n=72) | p value* |
|---|---|---|---|---|---|
| Sex | .. | .. | .. | .. | <0·0001 |
| Female | 60 (41%) | 31 (34%) | 23 (28%) | 55 (76%) | .. |
| Male | 86 (59%) | 61 (66%) | 59 (72%) | 17 (24%) | .. |
| Age, years | 67·8 (11·2) | 70·8 (9·1) | 71·7 (9·8) | 57·2 (11·5) | .. |
| Age group, years | .. | .. | .. | .. | <0·0001 |
| <65 | 41 (28%) | 15 (16%) | 12 (15%) | 53 (74%) | .. |
| 65 to <80 | 93 (64%) | 67 (73%) | 54 (66%) | 19 (26%) | .. |
| ≥80 | 12 (8%) | 10 (11%) | 16 (20%) | 0 | .. |
| Race | .. | .. | .. | .. | <0·0001 |
| White | 113 (77%) | 76 (83%) | 69 (84%) | 34 (47%) | .. |
| Black | 24 (16%) | 10 (11%) | 12 (15%) | 32 (44%) | .. |
| American Indian or Alaska Native | 2 (1%) | 2 (2%) | 0 | 1 (1%) | .. |
| Asian | 6 (4%) | 4 (4%) | 1 (1%) | 4 (6%) | .. |
| Multiple | 0 | 0 | 0 | 1 (1%) | .. |
| Unknown | 1 (1%) | 0 | 0 | 0 | .. |
| Ethnicity† | .. | .. | .. | .. | 0·35 |
| Hispanic or Latino | 14 (10%) | 10 (11%) | 4 (5%) | 8 (11%) | .. |
| Not Hispanic or Latino | 132 (90%) | 82 (89%) | 77 (95%) | 64 (89%) | .. |
| Time since diagnosis, years | 0·6 (1·58) | 0·5 (1·52) | 0·4 (0·63) | 0·6 (1·15) | 0·59 |
| Use of supplemental oxygen | 102 (70%) | 68 (74%) | 64 (78%) | 44 (61%) | 0·073 |
| Use of background therapy | .. | .. | .. | .. | <0·0001 |
| None | 91 (62%) | 43 (47%) | 69 (84%) | 69 (96%) | .. |
| Pirfenidone only | 34 (23%) | 30 (33%) | 6 (7%) | 2 (3%) | .. |
| Nintedanib only | 21 (14%) | 19 (21%) | 7 (9%) | 1 (1%) | · |
| Pulmonary function tests | | | | | |
| Total lung capacity % predicted, % | 60·7 (16·1) | 60·2 (16·0) | 77·8 (14·7) | 52·9 (13·5) | <0·0001 |
| Total lung capacity, L | 3·6 (1·2) | 3·7 (1·1) | 4·8 (1·2) | 2·9 (1·2) | <0·0001 |
| FVC% predicted, % | 59·5 (17·2) | 60·8 (17·7) | 82·5 (18·8) | 49·5 (13·4) | <0·0001 |
| FVC, mL | 2175·7 (764·6) | 2192·1 (724·6) | 2992·6 (799·8) | 1630·6 (552·4) | <0·0001 |
| FEV₁% predicted, % | 64·3 (19·0) | 67·4 (18·8) | 77·0 (21·1) | 51·0 (15·1) | <0·0001 |
| FEV₁, mL | 1757·0 (585·8) | 1793·1 (551·4) | 2051·3 (598·6) | 1320·1 (456·2) | <0·0001 |
| DLCO% predicted, % | 30·0 (12·1) | 29·1 (11·5) | 27·6 (11·3) | 28·3 (11·7) | 0·35 |
| DLCO, mL/min/mm Hg | 8·2 (4·6) | 8·0 (4·7) | 6·9 (3·0) | 7·0 (4·0) | 0·058 |

Data are n (%) or mean (SD). DCO=diffusing capacity for carbon monoxide. FVC=forced vital capacity. ILD=interstitial lung disease. *p value compares idiopathic interstitial pneumonia including idiopathic pulmonary fibrosis, combined pulmonary fibrosis and emphysema, and connective tissue disease populations only. †One patient in the placebo group had a missing response for ethnicity.

*Table 1:* Baseline characteristics by disease cause

therapies could be started during the study. The protocol was approved by the institutional review board at each participating site; all participants provided written informed consent.

**Procedures and outcomes**
This post-hoc analysis assessed the results of pulmonary function testing, which was prespecified as a safety endpoint and done at baseline, week 8, and week 16 (or at early termination) after sufficient recovery from the 6-min walk tests. Pulmonary function tests were done locally at

each study site. We evaluated pulmonary function testing for the overall study population and by subgroup based on disease cause (idiopathic interstitial pneumonia [including idiopathic pulmonary fibrosis], idiopathic pulmonary fibrosis alone, combined pulmonary fibrosis and emphysema, and connective tissue disease-associated ILD) and subgroups stratified by median baseline characteristics (percentage of predicted FVC, percentage of predicted diffusing capacity for carbon monoxide [DLCO], pulmonary vascular resistance, mean pulmonary arterial pressure, NT-proBNP concentration, and 6-min

3

DA0554

LIQ_PH-ILD_00000219



***Figure 1:* Change in FVC at week 8 and week 16 for the overall population**
(A) LSM change in FVC (mL) by week for the overall intention-to-treat population. (B) LSM change in percentage of predicted FVC by week for the overall intention-to-treat population. Bars above and below the dots represent the SE. Mixed model repeated measures methodology was used to compare differences between the inhaled treprostinil and placebo group. FVC=forced vital capacity. LSM=least squares mean.



***Figure 2:* Change in FVC at week 8 and week 16 for patients with idiopathic interstitial pneumonia**
(A) LSM change in FVC (mL) by week for the subgroup of patients with idiopathic interstitial pneumonia who received treprostinil or placebo. (B) LSM change in percentage of predicted FVC by week for the subgroup of patients with idiopathic interstitial pneumonia. Bars above and below the dots represent the SE. Mixed model repeated measures methodology was used to compare differences between the inhaled treprostinil and placebo group. FVC=forced vital capacity.

walk distance). An additional safety endpoint was the incidence of acute exacerbations of disease, determined by individual site principal investigators. Other prespecified safety endpoints (not included in the present analysis) were adverse events, oxygenation measured by pulse oximetry and supplemental oxygen requirement, clinical laboratory parameters, vital signs, electrocardiograms, and cardiopulmonary hospitalisations.[12]

### Statistical analysis

The analyses reported here were post-hoc and exploratory. All assessments are summarised by descriptive statistics, as appropriate. Comparisons for categorical assessments were done by Mantel-Haenszel tests and comparisons for continuous assessments were done by Mann-Whitney tests. All analyses were done on the intention-to-treat population, defined as individuals who were randomly assigned and received at least one dose of study drug. The change in FVC was analysed using mixed model repeated measures (MMRM) methodology. The MMRM model included the change from baseline in FVC as the dependent variable, with treatment, week, and treatment-by-week

interaction as fixed effects, and baseline FVC as a covariate. An unstructured variance or covariance structure shared across treatment groups was used to model the within-subject errors. Treatment differences, associated 95% CIs, and p values were calculated. Change in percentage of predicted FVC was analysed similarly using the MMRM model, with the percentage of predicted FVC as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and baseline percentage of predicted FVC as a covariate. An unstructured variance or covariance structure shared across treatment groups was used to model the within-subject errors. Changes during the 16-week study were evaluated for the entire cohort and for disease-specific subgroups. Only observed data were included in the analysis; no data were imputed. When stratifying by baseline characteristics, median values were used as a cutoff (eg, below vs above median). The time to first acute exacerbation was analysed via Kaplan-Meier curves and log-rank test. p<0·05 was considered to indicate

DA0555

**LIQ_PH-ILD_00000220**

a statistically significant difference and no adjustments were made for multiplicity because this was an unplanned, post-hoc analysis. Analyses were done with SAS version 9.4. The INCREASE study is registered with ClinicalTrials.gov, NCT02630316.

### Role of the funding source

In collaboration with the authors, the funder of the study participated in study design, data collection, data analysis, data interpretation, and writing of the report.

### Results

Between Feb 3, 2017, and Aug 30, 2019, 326 patients were enrolled in the INCREASE trial. Reasons for screen failures, baseline characteristics by treatment assignment, and study discontinuations have been described previously.[12] 146 (45%) of 326 patients had idiopathic interstitial pneumonia, of whom 92 (28%) had idiopathic pulmonary fibrosis, 37 (11%) had non-specific interstitial pneumonia, and 13 (4%) had unclassified idiopathic interstitial pneumonia. 82 (25%) of 326 patients had combined pulmonary fibrosis and emphysema, and 72 (22%) patients had connective tissue disease-associated ILD. 19 (6%) of 326 patients had chronic hypersensitivity pneumonitis, six (2%) had occupational lung disease, and one (<1%) had other idiopathic interstitial pneumonia. Demographic details of the four largest groups—idiopathic interstitial pneumonia (including idiopathic pulmonary fibrosis), idiopathic pulmonary fibrosis alone, combined pulmonary fibrosis and emphysema, and connective tissue disease-associated ILD—are shown in table 1. Notable differences included variable baseline pulmonary function tests between disease subtypes and younger age of patients with connective tissue disease-associated ILD. Antifibrotic therapy was most prevalent in patients with idiopathic pulmonary fibrosis, with 19 (21%) of 92 patients on nintedanib and 30 (33%) patients on pirfenidone. Baseline pulmonary function tests, haemodynamics, 6-min walk distance, NT-proBNP concentration, and St George's Respiratory Questionnaire data by disease group and treatment assignment are shown in the appendix (p 2).

In the inhaled treprostinil group, a median of ten breaths (IQR 8·5–12) and 12 breaths (9–12), corresponding to 66 µg and 72 µg per session, was achieved at week 8 and week 16, respectively, in 67 (51%) of 132 patients at week 8 and 67 (58%) of 116 patients at week 16 achieving 10–12 breaths (60–72 µg). 40 (25%) of 163 patients in the inhaled treprostinil group and 38 (23%) of 163 patients in the placebo group discontinued study drug prematurely but were encouraged to remain in the study and complete study assessments up to week 16. 33 patients assigned to inhaled treprostinil and 35 assigned to placebo discontinued study participation.[12]

Inhaled treprostinil was associated with a non-significant increase in placebo-corrected (the treatment



*Figure 3:* **Change in FVC at week 8 and week 16 for patients with idiopathic pulmonary fibrosis**
(A) LSM change in FVC (mL) by week for the subgroup of patients with idiopathic pulmonary fibrosis who received treprostinil or placebo. (B) LSM change in percentage of predicted FVC by week for the subgroup of patients with idiopathic pulmonary fibrosis. Bars above and below the dots represent the SE. Mixed model repeated measures methodology was used to compare differences between the inhaled treprostinil and placebo groups. FVC=forced vital capacity. LSM=least squares mean.

difference between inhaled treprostinil and placebo) least squares mean FVC of 28·5 mL (SE 30·1; 95% CI –30·8 to 87·7; p=0·35) at week 8 and 44·4 mL (35·4; –25·2 to 114·0; p=0·21) at week 16 (figure 1A). The percentage of predicted FVC differences at week 8 (least squares mean 1·8%; SE 0·7; 95% CI 0·4 to 3·2; p=0·014) and week 16 (1·8%; 0·8; 0·2 to 3·4; p=0·028) were statistically significant, indicating potential benefit of inhaled treprostinil compared with placebo (figure 1B). A subgroup analysis of patients with idiopathic interstitial pneumonia showed significant FVC differences at week 16 (108·2 mL; SE 46·9; 95% CI 15·3 to 201·1; p=0·023) although not at week 8 (46·5 mL; 39·9; –32·5 to 125·5; p=0·25; figure 2A), and significant differences in percentage of predicted FVC at week 8 (2·0%; SE 0·9; 95% CI 0·1 to 3·8; p=0·037) and week 16 (2·9%; 1·1; 0·7 to 5·0; p=0·0096) favouring inhaled treprostinil (figure 2B). Further analysis of patients with idiopathic pulmonary fibrosis showed non-significant FVC differences of 84·5 mL (SE 52·7; 95% CI –20·4 to 189·5;

See Online for appendix

DA0556

LIQ_PH-ILD_00000221

**Articles**

| | Inhaled treprostinil (n) | Placebo (n) | Placebo-corrected difference in week-16 FVC, mL | p value |
|---|---|---|---|---|
| **FVC% predicted** | | | | |
| <60 | 62 | 50 | 27·5 (53·3; −77·4 to 132·4) | 0·61 |
| ≥60 | 67 | 74 | 59·2 (47·8; −34·9 to 153·4) | 0·22 |
| **DLCO% predicted** | | | | |
| <27 | 52 | 61 | 35·4 (51·6; −66·2 to 137·1) | 0·49 |
| ≥27 | 70 | 60 | 33·3 (48·5; −62·3 to 128·9) | 0·49 |
| **Pulmonary vascular resistance, Wood units** | | | | |
| <5·275 | 64 | 75 | −1·6 (47·9; −95·9 to 92·8) | 0·97 |
| ≥5·275 | 65 | 49 | 112·5 (52·6; 9·0 to 215·9) | 0·033 |
| **Mean pulmonary arterial pressure, mm Hg** | | | | |
| <35 | 63 | 63 | 63·4 (50·2; −35·4 to 162·1) | 0·21 |
| ≥35 | 66 | 61 | 25·6 (50·2; −73·2 to 124·4) | 0·61 |
| **NT-proBNP, pg/mL** | | | | |
| <503·85 | 62 | 75 | 19·9 (53·7; −86·3 to 126·1) | 0·71 |
| ≥503·85 | 63 | 47 | 94·4 (47·4; 0·7 to 188·2) | 0·048 |
| **6-min walk distance, m** | | | | |
| <259 | 63 | 56 | 64·5 (51·7; −37·3 to 166·4) | 0·21 |
| ≥259 | 66 | 68 | 27·6 (48·7; −68·4 to 123·5) | 0·57 |

Data are mean (SE; 95% CI) unless otherwise indicated. DLCO=diffusing capacity for carbon monoxide. FVC=forced vital capacity. NT-proBNP=N-terminal pro-brain natriuretic peptide.

*Table 2:* **Placebo-corrected difference in week-16 FVC stratified by median baseline clinical characteristics**

p=0·11) at week 8 and significant differences of 168·5 mL (64·5; 40·1 to 297·0; p=0·011) at week 16 (figure 3A), and differences in percentage of predicted FVC at week 8 and week 16 of 2·5% (SE 1·2; 95% CI 0·1 to 4·9; p=0·038) and 3·5% (1·4; 0·7 to 6·3; p=0·015), respectively, compared with placebo (figure 3B). Of note, 49 (53%) of 92 patients with idiopathic pulmonary fibrosis were on antifibrotic therapy at baseline. FVC changes for patients with connective tissue disease-associated ILD and combined pulmonary fibrosis and emphysema are shown in the appendix (pp 4–5). Histograms showing FVC categorical changes in 5% increments for the overall study population and the four disease categories are provided in the appendix (pp 6–8).

We stratified change in FVC over 16 weeks by baseline lung function (median percentage of predicted FVC and median percentage of predicted DLCO), haemodynamics (median pulmonary vascular resistance and mean pulmonary arterial pressure), median baseline NT-proBNP concentration, and median baseline 6-min walk distance (table 2). We identified no responder or non-responder subgroup based on analyses of percentage of predicted FVC (<60% or ≥60%), percentage of predicted DLCO (<27% or ≥27%), or mean pulmonary arterial pressure (<35 mm Hg or ≥35 mm Hg). However, a subgroup analysis of 114 patients with pulmonary vascular resistance of 5·275 Wood units or greater showed a significant difference favouring inhaled treprostinil versus placebo, with a mean placebo-corrected difference in FVC of 112·5 mL at 16 weeks (SE 52·6; 95% CI 9·0 to 215·9; p=0·033; table 2). Similarly, a subgroup analysis of 110 patients with NT-proBNP concentration of 503·85 pg/mL or greater showed a significant difference favouring inhaled treprostinil compared with placebo, with a placebo-corrected difference in FVC of 94·4 mL at 16 weeks (SE 47·4; 95% CI 0·7 to 188·2; p=0·048; table 2).

14 patients in the inhaled treprostinil group were on pirfenidone versus 18 patients in the placebo group. There was no significant placebo-corrected difference favouring inhaled treprostinil at 16 weeks (91·5 mL; SE 110·2; 95% CI −134·2 to 317·1; p=0·41) in the pirfenidone-treated subgroup. Seven patients in the inhaled treprostinil group were on nintedanib versus 15 patients in the placebo group. The placebo-corrected difference for inhaled treprostinil was 113·0 mL at 16 weeks (SE 77·1; 95% CI −46·9 to 272·8; p=0·16) in the nintedanib-treated subgroup. When patients on pirfenidone or nintedanib were evaluated as a group, those receiving inhaled treprostinil had no statistically significant difference in placebo-corrected FVC (81·5 mL; SE 71·0; 95% CI −60·9 to 223·8; p=0·26) or percentage of predicted FVC (1·2%; 1·5; −1·8 to 4·2; p=0·43) at week 16.

The most frequent adverse events, which have been reported previously, included cough, headache, dyspnoea, dizziness, nausea, fatigue, and diarrhoea.[12] We found no difference in the frequency of these adverse events according to disease subtype (table 3). We also observed no difference in exacerbations between disease subtypes (appendix p 3).

Regarding safety, no significant treatment-related changes associated with inhaled treprostinil in pulse oximetry or supplemental oxygen use were reported during the study. However, there were significantly fewer lung disease exacerbations in the treprostinil group than the placebo group. Specifically, 43 (26%) of 163 patients in the treatment group had an exacerbation of underlying lung disease compared with 63 (39%) of 163 patients in the placebo group (p=0·02 by Fisher's exact test).[12] Time to investigator-reported exacerbations in the two groups is shown in the appendix (p 8), with inhaled treprostinil associated with a significant treatment effect (log-rank p=0·040).

## Discussion

The INCREASE study was designed to evaluate the effects of inhaled treprostinil in patients with various

DA0557

LIQ_PH-ILD_00000222

ILDs and associated pulmonary hypertension. The study met its primary endpoint: compared with placebo, treprostinil improved exercise capacity, assessed by 6-min walk distance, from baseline at 16 weeks.[12] The study also met several secondary endpoints, including time to clinical worsening and change in concentration of NT-proBNP, a marker of cardiac dysfunction that likely reflects right ventricular strain in patients with pulmonary hypertension due to interstitial lung disease. Lung function, specifically spirometry, was measured at baseline and at week 8 and week 16 as a safety measure to ensure that there were no deleterious effects of inhaled treprostinil. We felt that investigation of any deleterious effects was important because of the patients' pre-existing lung disease. A noteworthy finding previously reported in the primary publication[12] was that, rather than causing any decrement, inhaled treprostinil was unexpectedly associated with a placebo-corrected improvement in FVC. Further subgroup analyses revealed the FVC difference between the inhaled treprostinil group and placebo group to be larger in the idiopathic interstitial pneumonia subgroup, and even more so in the idiopathic pulmonary fibrosis subpopulation.

FVC is widely accepted as the standard efficacy endpoint for clinical trials in idiopathic pulmonary fibrosis and other fibrotic lung disorders.[13] Indeed, clinical trials evaluating change in FVC over 52 weeks have resulted in the approval of both pirfenidone and nintedanib for the treatment of idiopathic pulmonary fibrosis.[3,4] Nintedanib has since been approved for other fibrotic disorders, including scleroderma-associated ILD and a broader group of ILDs characterised by a progressive fibrotic phenotype.[5,6] The disease groups included in a previous cohort study[6] of nintedanib were very similar to those of the INCREASE study.[12] Our findings lend support to the study of different forms of fibrotic disease as a group, although the idiopathic pulmonary fibrosis subgroup did show the strongest efficacy signal.

No drug has been shown to have an effect on fibrosis when administered via inhalation. However, there is inherent attractiveness to this mode of delivery because of greater deposition of drug at the site of disease, resulting in fewer systemic side-effects and preservation, or possibly improvement, of ventilation–perfusion matching. Fibrotic lung diseases, and idiopathic pulmonary fibrosis in particular, are characterised by areas of vascular ablation and perivascular fibrosis, which raises the issue of adequate systemic drug delivery to high-value target cells, including fibroblasts and myofibroblasts.[14] The finding of a placebo-corrected improvement in FVC indicates that inhaled treprostinil might have distinct antifibrotic properties. Indeed, animal studies and biological pathways support this concept.[10,11] Amelioration of loss of lung function has been described previously with sildenafil, another

| | Idiopathic interstitial pneumonia including idiopathic pulmonary fibrosis (n=146) | Idiopathic pulmonary fibrosis only (n=92) | Combined pulmonary fibrosis and emphysema (n=82) | Connective tissue disease-associated ILD (n=72) |
|---|---|---|---|---|
| Number of subjects with adverse event of interest | 115 (79%) | 71 (77%) | 63 (77%) | 49 (68%) |
| Cough | 55 (38%) | 30 (33%) | 32 (39%) | 31 (43%) |
| Dyspnoea | 44 (30%) | 24 (26%) | 28 (34%) | 17 (24%) |
| Headache | 35 (24%) | 19 (21%) | 22 (27%) | 15 (21%) |
| Dizziness | 29 (20%) | 17 (18%) | 15 (18%) | 5 (7%) |
| Nausea | 28 (19%) | 18 (20%) | 11 (13%) | 9 (13%) |
| Fatigue | 20 (14%) | 12 (13%) | 13 (16%) | 11 (15%) |
| Diarrhoea | 23 (16%) | 13 (14%) | 9 (11%) | 6 (8%) |
| Productive cough | 4 (3%) | 3 (3%) | 2 (2%) | 5 (7%) |
| Dyspnoea on exertion | 4 (3%) | 2 (2%) | 2 (2%) | 1 (1%) |
| Upper-airway cough syndrome | 3 (2%) | 1 (1%) | 1 (1%) | 2 (3%) |
| Sinus headache | 2 (1%) | 1 (1%) | 1 (1%) | 0 |
| Muscle fatigue | 1 (1%) | 1 (1%) | 1 (1%) | 0 |

Data are n (%). ILD=interstitial lung disease.

*Table 3:* Adverse events by disease cause

medication approved in the USA and Europe for the treatment of pulmonary arterial hypertension, in patients with idiopathic pulmonary fibrosis on background nintedanib.[15] This observation lends credence to the possibility that the pulmonary vasculature itself might be involved in the perpetuation of the fibrotic process or that pulmonary hypertension and fibrosis have shared pathways. However, this synergy was not replicated when sildenafil was combined with pirfenidone.[16]

Two of our subgroup analyses showed a significant difference in FVC change between the inhaled treprostinil group and the placebo group. These analyses were in patients with higher pulmonary vascular resistance and higher NT-proBNP concentration. Therefore, pulmonary vessels themselves might contribute to the restrictive physiology, perhaps through vascular compliance, which is ameliorated by inhaled treprostinil. An alternative, speculative concept is that the presence of more severe pulmonary hypertension might hasten the progression of fibrosis. A further hypothesis is that these FVC findings are related to improved right ventricular function or cardiac output in those receiving inhaled treprostinil, as evidenced by the greater treatment effect in those with higher baseline pulmonary vascular resistance and NT-proBNP concentration, but less striking differences when stratifying by baseline mean pulmonary arterial pressure. Decreased right ventricular size and function and improved cardiac output in those with more severe pulmonary hypertension could lead to improvement in respiratory muscle function and thus FVC.

It is interesting to compare the findings in our idiopathic pulmonary fibrosis population with those of the pivotal phase 3 studies of pirfenidone and

DA0558

LIQ_PH-ILD_00000223

nintedanib.[2–4,17,18] First, INCREASE was only a 16-week study compared with 52-week and 72-week studies for these other agents. Whether our results will dissipate, be sustained, or improve up to 52 weeks is open to speculation given how unpredictable disease behaviour can be over time. The magnitude of the difference was very similar with inhaled treprostinil at 16 weeks (168·5 mL) compared with the combined pirfenidone (148 mL per year) and nintedanib (110·9 ml per year) datasets at 52 weeks.[17,18] However, in addition to the different follow-up periods, there were varying imputation methods and nuanced differences that limit meaningful comparisons between studies.[18,19] The difference in the FVC change in INCREASE was partly driven by a numerical FVC increase in the treatment group, which contrasts with the pirfenidone and nintedanib studies, where the difference lay in the rate of decrement in both groups (although there were some patients with numerical increases in FVC).[18,19] This fact raises the question of whether inhaled treprostinil can ameliorate fibrosis; this is conceivable perhaps for areas of fresh collagen deposition or through so-called switching off of myofibroblasts that might contribute to restrictive physiology through their contractile properties.[20–22] An alternative explanation is that treprostinil improved vessel capacitance and stiffness, affecting the measured FVC.

Although we observed a significant difference in the change in percentage of predicted FVC over the 16-week study period for the cohort as a whole, the difference was not significant when evaluated FVC by change in mL. This apparent discrepancy could be due to the narrower CIs when FVC is expressed as a percentage of the predicted value. Many patients with idiopathic pulmonary fibrosis were already on antifibrotic therapy; however, the number of patients on nintedanib or pirfenidone in combination with inhaled treprostinil was too small to draw efficacy conclusions. The smaller numerical difference when combining the two antifibrotics (81·5 mL) versus each individually (113·0 mL for patients on nintedanib and 91·5 mL for patients on pirfenidone) is a function of MMRM statistical methodology. Nonetheless, the numerical differences show the potential role of combination therapy for idiopathic pulmonary fibrosis and targeting the disease concomitantly via the systemic and inhaled routes.

FVC was measured as a safety endpoint in the context of the INCREASE study. Other pulmonary function tests, including DLCO, were also measured as safety endpoints but did not show a difference between groups. A longer-term study of inhaled treprostinil in patients with ILD and pulmonary hypertension is ongoing and will provide information on gas exchange (NCT02633293). Other safety endpoints, including pulse oximetry and change in supplemental oxygen needs, did not show any deleterious effects, mitigating concerns about potential worsening of ventilation–perfusion matching. Additionally, the incidence of investigator-reported acute

exacerbations was significantly less in the treprostinil group, allaying any concerns that this inhaled medication might induce acute exacerbations. Therefore, it is possible that inhaled treprostinil might actually ameliorate acute exacerbations of the underlying ILD.

Our analysis has its limitations. First, this was a post-hoc analysis of a parameter that was initially intended as a safety endpoint, and the study was not powered to detect differences in FVC among the different subgroups in the analysis. The study was of relatively short duration, with 21% of patients discontinuing prematurely before week 16.[12] The number of patients was relatively small for the subgroup analyses. There was no efficacy signal from the connective tissue disease-associated ILD group or the combined pulmonary fibrosis and emphysema group, which raises questions about global antifibrotic properties and whether our findings are relevant for only certain subgroups of fibrotic disorders. Also, the relatively rapid rate of FVC decrement in the placebo group over a short period of time was unexpected. Aside from patients with more severe disease being at higher risk of progression, an interesting hypothesis is that perhaps the pulmonary vasculature is mechanistically linked to the progression of fibrosis.[23] Finally, the finding of fewer acute exacerbations in the inhaled treprostinil group should be regarded with caution, since these acute exacerbations were investigator-determined and not centrally adjudicated. The unusually high rate of acute exacerbations in both study groups is noteworthy. It is possible that patients with more advanced disease who have any worsening are more likely to be increasingly symptomatic, with the default labelling of an acute exacerbation, without necessarily fulfilling all the criteria. We cannot rule out the possibility that any inhaled therapy, be it placebo or treatment, might increase the propensity for acute exacerbations.

In conclusion, inhaled treprostinil appears to have a salutary effect on loss of lung function in patients with ILD and associated pulmonary hypertension. This finding, although intriguing and hypothesis generating, warrants further validation in a prospective, randomised, placebo-controlled study. A clinical trial of inhaled treprostinil is underway in patients with idiopathic pulmonary fibrosis, with or without associated pulmonary hypertension (NCT04708782). This study will use a primary endpoint of change in FVC over 52 weeks and will support the findings of our post-hoc analysis.

Contributors
SDN, AW, PS, ES, LDE, AN, and VFT made substantial contributions to the conception and design of the work. SDN, AW, SR, AC, SJ, HD, DJDLZ, SS, CK, LM-G, and VFT contributed to the acquisition of the study data. Data were analysed by SDN, AW, PS, ES, LDE, AN, and VFT. LDE was responsible for the statistical analysis. SDN, AW, and VFT participated on the INCREASE steering committee during the study. SDN, AW, SR, AC, SJ, HD, DJDLZ, SS, CK, LM-G, PS, ES, AN, and VFT contributed to data interpretation, and to drafting and revision of the manuscript. SDN, ES, and LDE have accessed and verified the data. All authors agree to be accountable for all aspects of the work, ensuring that questions related to the accuracy or integrity of any part of the work are appropriately investigated and resolved. All authors have read and

DA0559                                                          LIQ_PH-ILD_00000224

approved the manuscript. The corresponding author and all co-authors had full access to all the data in the study and had final responsibility for the decision to submit for publication.

**Declaration of interests**
SDN has received research funding and consulting fees from United Therapeutics, and consulting fees from Boehringer Ingelheim, Roche-Genentech, and Galapagos; he is on the speaker's bureau for Boehringer Ingelheim and Roche-Genentech. AW reports grants from United Therapeutics, during the conduct of the study. SR reports grants from United Therapeutics, during the conduct of the study; grants and personal fees from United Therapeutics and Janssen Pharmaceuticals; and personal fees from Altavant Sciences, Liquidia Technologies, Insmed, and Bayer Pharmaceuticals, outside the submitted work. AC reports grants from United Therapeutics, during the conduct of the study. SJ reports grants from United Therapeutics, during the conduct of the study; grants and personal fees from Bayer Pharmaceuticals and Janssen Research & Development; and grants from Bellerophon Therapeutics, outside the submitted work. HD reports grants from United Therapeutics, during the conduct of the study; and grants and personal fees from Actelion Pharmaceuticals, outside the submitted work. DJDLZ reports grants from United Therapeutics, during the conduct of the study. SS reports grants from United Therapeutics, during the conduct of the study; personal fees and non-financial support from Bayer Pharmaceuticals, United Therapeutics, and Actelion Pharmaceuticals; personal fees from Liquidia, Altavant Sciences, GSK, and Boehringer Ingelheim; and grants from ACCP CHEST ILD, outside the submitted work. CK reports grants from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, Actelion, Boehringer Ingelheim, and Genentech, outside the submitted work. LM-G reports grants and personal fees from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, Janssen Pharmaceuticals, and Bayer Pharmaceuticals, outside the submitted work. PS, ES, LDE, and AN report personal fees from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, outside the submitted work. VFT reports grants from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, outside the submitted work.

**Data sharing**
Qualified researchers who provide methodologically sound, genuine research proposals can submit data requests to United Therapeutics Corporation to obtain specific de-identified clinical trial data.

**Acknowledgments**
We thank all patients who volunteered for the study, and the clinical and research teams at the INCREASE centres.

**References**
1   Travis WD, Costabel U, Hansell DM, et al. An official American Thoracic Society/European Respiratory Society statement: update of the international multidisciplinary classification of the idiopathic interstitial pneumonias. *Am J Respir Crit Care Med* 2013; **188**: 733–48.
2   Noble PW, Albera C, Bradford WZ, et al. Pirfenidone in patients with idiopathic pulmonary fibrosis (CAPACITY): two randomised trials. *Lancet* 2011; **377**: 1760–69.
3   King TE Jr, Bradford WZ, Castro-Bernardini S, et al. A phase 3 trial of pirfenidone in patients with idiopathic pulmonary fibrosis. *N Engl J Med* 2014; **370**: 2083–92.
4   Richeldi L, du Bois RM, Raghu G, et al. Efficacy and safety of nintedanib in idiopathic pulmonary fibrosis. *N Engl J Med* 2014; **370**: 2071–82.
5   Distler O, Highland KB, Gahlemann M, et al. Nintedanib for systemic sclerosis-associated interstitial lung disease. *N Engl J Med* 2019; **380**: 2518–28.
6   Flaherty KR, Wells AU, Cottin V, et al. Nintedanib in progressive fibrosing interstitial lung diseases. *N Engl J Med* 2019; **381**: 1718–27.
7   Maher TM, Corte TJ, Fischer A, et al. Pirfenidone in patients with unclassifiable progressive fibrosing interstitial lung disease: a double-blind, randomised, placebo-controlled, phase 2 trial. *Lancet Respir Med* 2020; **8**: 147–57.
8   Whittle BJ, Silverstein AM, Mottola DM, Clapp LH. Binding and activity of the prostacyclin receptor (IP) agonists, treprostinil and iloprost, at human prostanoid receptors: treprostinil is a potent DP1 and EP2 agonist. *Biochem Pharmacol* 2012; **84**: 68–75.
9   McLaughlin VV, Benza RL, Rubin LJ, et al. Addition of inhaled treprostinil to oral therapy for pulmonary arterial hypertension: a randomized controlled clinical trial. *J Am Coll Cardiol* 2010; **55**: 1915–22.
10  Lambers C, Roth M, Jaksch P, et al. Treprostinil inhibits proliferation and extracellular matrix deposition by fibroblasts through cAMP activation. *Sci Rep* 2018; **8**: 1087.
11  Nikitopoulou I, Manitsopoulos N, Kotanidou A, et al. Orotracheal treprostinil administration attenuates bleomycin-induced lung injury, vascular remodeling, and fibrosis in mice. *Pulm Circ* 2019; **9**: 2045894019881954.
12  Waxman A, Restrepo-Jaramillo R, Thenappan T, et al. Inhaled treprostinil in pulmonary hypertension due to interstitial lung disease. *N Engl J Med* 2021; **384**: 325–34.
13  Paterniti MO, Bi Y, Rekić D, Wang Y, Karimi-Shah BA, Chowdhury BA. Acute exacerbation and decline in forced vital capacity are associated with increased mortality in idiopathic pulmonary fibrosis. *Ann Am Thorac Soc* 2017; **14**: 1395–402.
14  Nathan SD, Martinez FJ. Pitfalls in developing new compounds for idiopathic pulmonary fibrosis. *Curr Opin Pulm Med* 2017; **23**: 426–31.
15  Kolb M, Raghu G, Wells AU, et al. Nintedanib plus sildenafil in patients with idiopathic pulmonary fibrosis. *N Engl J Med* 2018; **379**: 1722–31.
16  Behr J, Nathan SD, Wuyts WA, et al. Efficacy and safety of sildenafil added to pirfenidone in patients with advanced idiopathic pulmonary fibrosis and risk of pulmonary hypertension: a double-blind, randomised, placebo-controlled, phase 2b trial. *Lancet Respir Med* 2021; **9**: 85–95.
17  Richeldi L, Cottin V, du Bois RM, et al. Nintedanib in patients with idiopathic pulmonary fibrosis: Combined evidence from the TOMORROW and INPULSIS(®) trials. *Respir Med* 2016; **113**: 74–79.
18  Noble PW, Albera C, Bradford WZ, et al. Pirfenidone for idiopathic pulmonary fibrosis: analysis of pooled data from three multinational phase 3 trials. *Eur Respir J* 2016; **47**: 243–53.
19  Flaherty KR, Kolb M, Vancheri C, Tang W, Conoscenti CS, Richeldi L. Stability or improvement in forced vital capacity with nintedanib in patients with idiopathic pulmonary fibrosis. *Eur Respir J* 2018; **52**: 1702593.
20  Lehtonen ST, Veijola A, Karvonen H, et al. Pirfenidone and nintedanib modulate properties of fibroblasts and myofibroblasts in idiopathic pulmonary fibrosis. *Respir Res* 2016; **17**: 14.
21  Hostettler KE, Zhong J, Papakonstantinou E, et al. Anti-fibrotic effects of nintedanib in lung fibroblasts derived from patients with idiopathic pulmonary fibrosis. *Respir Res* 2014; **15**: 157.
22  Ackermann M, Kim YO, Wagner WL, et al. Effects of nintedanib on the microvascular architecture in a lung fibrosis model. *Angiogenesis* 2017; **20**: 359–72.
23  Jacob J, Nicholson AG, Wells AU, Hansell DM. Impact of pulmonary vascular volume on mortality in IPF: is it time to reconsider the role of vasculature in disease pathogenesis and progression? *Eur Respir J* 2017; **49**: 1602524.

To **submit data requests** see www.utcrequests.com

View publication stats

DA0560

LIQ_PH-ILD_00000225

# EXHIBITS  21 - 39

# EXHIBIT 21



**958**

**A Comparative Study of Right Ventricular Strain to Established Echocardiographic Parameters in Pulmonary Hypertension**

D. Seaton,[1] A. Yamada,[2] J. Chan,[3] B. Shearer,[1] K. Aldridge,[1] F. Kermeen.[4] [1]Queensland Nuclear Imaging, The Prince Charles Hospital, Brisbane, Australia; [2]Heart Foundation Research Centre, Griffith University, Gold Coast, Australia; [3]Cardiology Department, The Prince Charles Hospital, Brisbane, Australia; [4]Queensland Lung Transplant Unit, The Prince Charles Hospital, Brisbane, Australia.

**Purpose:** Right ventricular (RV) function is a strong predictor of morbidity and mortality in pulmonary hypertension (PH). The measurement of right ventricular global strain (RVGS) is a developing quantitative, non-invasive parameter in the assessment of the RV. The aim of this study was to compare global RV longitudinal strain (RVLS) relative to established echocardiographic indices in the assessment RV dysfunction in a cohort of PH patients with pseudo-normalised tricuspid annular plane systolic excursion (TAPSE) and S' velocity.
**Methods:** 52 consecutive patients (mean age 56±2.2, mean NYHA-FC 3.2, 25 IPAH, 13 PAH-CVD, 5 PAH-CHD, 5 CTEPH, 5 out of proportion PHT & 1 Porto-pulmonary-PH) underwent 2D transthoracic speckle tracking echocardiography with modified apical 4 chamber view focused on RV. Global RVLS was measured offline using EchoPAC BT011 GE software. Global RVLS was compared to established RV echocardiographic parameters using Pearson's correlation.
**Results:** Global RVLS demonstrated modest correlation with RV dysfunction by visual estimation (r=0.458, p=0.001; r=0.512,p=0.001) and NYHA functional class (r=0.487,p<0.001; r=.0481,p<0.001) compared with other parameters of RV function, including TAPSE ( r=0.017; p=0.916), RV S' tissue Doppler (r=-0.273; p=0.069 ), PAEDP (r=0.063; p=0.71 ) and fractional area change (r=-0.337; p = 0.025).

**Conclusion:** Our study failed to show correlation of global RVLS to established echocardiographic parameters of RV dysfunction in a cohort of patients with severe PH. However, RVGS is a developing quantitative, non-invasive parameter that requires more study to define the relationship of RVGS to mortality and morbidity in PH.

**959**

**Inhaled Treprostinil in Group-3 Pulmonary Hypertension**

M. Agarwal,[1] A.B. Waxman.[2] [1]Pulmonary Critical Care and Cardiovascular Medicine, Brigham & Women's Hospital, Boston, MA; [2]Center for Pulmonary Heart Disease, Brigham & Women's Hosp, Boston, MA.

**Purpose:** WHO Group-3PH is frequently encountered and adversely affects patients' quality of life and survival. Treatment with systemic pulmonary vasodilators may result in V/Q imbalance. Inhaled prostanoid therapy is delivered directly to well ventilated lung units preserving V/Q, and reducing undesirable alterations in perfusion. We conducted a retrospective assessment of Group-3 PH patients (pts) receiving inhaled Treprostinil (iTre) to investigate the effects of iTre on dyspnea, 6MWD, BDI, and WHO FC.
**Methods:** We followed 35 WHO Group-3PH pts treated with iTre for 6 months (mo). 15 had obstructive, 15 restrictive disease and 5 were classified as mixed obstructive/restrictive. All pts had a diagnostic right heart cath prior to treatment. Baseline (BL) hemodynamics: mPAP 44.37 +/- 9.80, PAOP 9.68 +/- 4.71. In one patient CO and PVR was not reported. For the remaining 34 pts CO 4.7 +/- 1.34, and PVR 8.775WU +/- 4.7625. All pts started on 3-breaths (br) 4x daily and increased to goal of 9-12 br 4x daily as tolerated. 6-MWD, BDI, WHO FC, AE's, number of breaths and subjective improvement were assessed.
**Results:** All 35 pts started iTre, 16 women, 19 men, mean age of 68.77 +/- 9.77. There were no significant changes in WHO FC (p= 0.08), 30 pts had subjective improvement. The most common AE was cough. Of the 35 pts, 9 were on therapy less than 6 mo; 1 death unrelated to therapy, 2 stopped because of intolerance, 3 stopped for lack of efficacy, 2 lost to follow up, and 1 who entered hospice. 26 pts remained on therapy for at least 6 mo. Number of breaths at 6 months was 6 (n=2), 9 (n=15), 12 (n=3), and 15 (n=1). 24 of these pts reported subjective improvement and 21 had 6MWD available at BL and 6mos. Mean change in 6 MWD +60.85m +/- 92.60 (median change +45m, p = 0.0019). In patients with obstruction 6MWD improved by a mean of 71m +/- 120 (median +26m), and restriction by 50m +/- 57 (median +61m). There was no significant change in the Borg Dyspnea Index (p=0.8783).
**Conclusion:** Group-3 PH can be effectively and safely treated with iTre. Inhaled Treprostinil may offer a well-tolerated treatment in advanced lung disease patients complicated by pulmonary vascular remodeling. A prospective clinical trial is indicated.

**UTC_PH-ILD_009828**

# EXHIBIT 22

Thorax: first published as 10.1136/thoraxjnl-2013-204150 on 15 January 2014. Downloaded from http://thorax.bmj.com/ on February 23, 2024 by guest. Protected by copyright.

ORIGINAL ARTICLE

# Changes in right heart haemodynamics and echocardiographic function in an advanced phenotype of pulmonary hypertension and right heart dysfunction associated with pulmonary fibrosis

Rajeev Saggar,[1] Dinesh Khanna,[2] Anjali Vaidya,[3] Ariss Derhovanessian,[4] Paul Maranian,[2] Erin Duffy,[5] John A Belperio,[4] Sam S Weigt,[4] Shiv Dua,[6] Shelley S Shapiro,[4] Jonathan G Goldin,[7] Fereidoun Abtin,[7] Joseph P Lynch III,[4] David J Ross,[4] Paul R Forfia,[8] Rajan Saggar[4]

► Additional material is published online only. To view please visit the journal online (http://dx.doi.org/10.1136/thoraxjnl-2013-204150).

For numbered affiliations see end of article.

Correspondence to
Dr Rajan Saggar, David Geffen School of Medicine, University of California Los Angeles, 10833 Le Conte Ave. CHS 37-131, Los Angeles, CA 90095, USA; rsaggar@mednet.ucla.edu

Received 8 July 2013
Revised 19 December 2013
Accepted 20 December 2013

## ABSTRACT

**Background** Pulmonary hypertension (PH)-targeted therapy in the setting of pulmonary fibrosis (PF) is controversial; the main clinical concern is worsening of systemic hypoxaemia. We sought to determine the effects of gentle initiation and chronic administration of parenteral treprostinil on right heart function in patients with PF associated with an advanced PH phenotype.

**Methods** Open-label, prospective analysis of patients with PF-PH referred for lung transplantation (LT). Advanced PH was defined as mean pulmonary artery pressure (mPAP) ≥35 mm Hg. We compared haemodynamics, Doppler echocardiography (DE), oxygenation, dyspnoea and quality of life indices, and 6 min walk distance (6MWD) before and 12 weeks after parenteral treprostinil.

**Results** 15 patients were recruited in the study. After therapy, there were significant improvements in right heart haemodynamics (right atrial pressure (9.5 ± 3.4 vs 6.0 ± 3.7); mPAP (47 ± 8 vs 38.9 ± 13.4); CI (2.3 ± 0.5 vs 2.7 ± 0.6); pulmonary vascular resistance (698 ± 278 vs 496 ± 229); transpulmonary gradient (34.7 ± 8.7 vs 28.5 ± 10.3); mvO$_2$ (65 ± 7.2 vs 70.9 ± 7.4); and stroke volume index (29.2 ± 6.7 vs 33 ± 7.3)) and DE parameters reflecting right heart function (right ventricular (RV) end diastolic area (36.4 ± 5.2 vs 30.9 ± 8.2 cm²), left ventricular eccentricity index (1.7 ± 0.6 vs 1.3 ± 0.5), tricuspid annular planar systolic excursion (1.6 ± 0.5 vs 1.9 ± 0.2 cm)). These changes occurred without significant alteration in systemic oxygenation, heart rate, or mean systemic arterial pressure. In addition, improvements were seen in 6MWD (171 ± 93 vs 230 ± 114), 36-Item Short Form Health Survey Mental Component Summary aggregate (38 ± 11 vs 44.2 ± 10.7), University of California, San Diego Shortness of Breath Questionnaire (87 ± 17.1 vs 73.1 ± 21), and brain natriuretic peptide (558 ± 859 vs 228 ± 340).

**Conclusions** PH-targeted therapy may improve right heart haemodynamics and echocardiographic function without affecting systemic oxygen saturation in an advanced PH phenotype associated with RV dysfunction in the setting of PF.



► http://dx.doi.org/10.1136/thoraxjnl-2013-204964

To cite: Saggar R, Khanna D, Vaidya A, et al. Thorax 2014;69:123–129.

## Key messages

**What is the key question?**
► What are the effects of parenteral treprostinil on right heart function of patients with pulmonary fibrosis (PF) referred for lung transplantation (LT) with an advanced pulmonary hypertension (PH) phenotype?

**What is the bottom line?**
► Parenteral treprostinil improves right heart haemodynamics and echocardiographic function without affecting systemic oxygen saturation in PH-PF with an advanced PH phenotype.

**Why read on?**
► This pilot study suggests parenteral treprostinil improves right ventricle function and is a safe therapeutic option in patients with PH-PF with an advanced PH phenotype; as such, this approach may be a consideration for patients with advanced PH-PF if they are ineligible for, or as a bridge to, LT.

studies have focused on the treatment of advanced PH in this context.[1–4] Furthermore, no prospective chronic parenteral prostanoid administration studies are available in patients with PF homogenised for the less common advanced PH phenotype, characterised by significantly altered right heart haemodynamics and right ventricular (RV) dysfunction. We previously reported a case where the rationale for parenteral treprostinil as a bridge to lung transplantation (LT) was outlined in the index patient with PF-PH for this study.[5] Importantly, parenteral prostanoid therapy associated with worsening of ventilation-perfusion (V-Q) mismatch and subsequent hypoxaemia remains a major clinical concern. The purpose of this pilot study was to evaluate the effects of acute and subsequent chronic parenteral treprostinil therapy on right heart haemodynamics and echocardiographic function in patients with PH referred for LT in the setting of an advanced PH phenotype and right heart dysfunction.

## INTRODUCTION

Pulmonary hypertension (PH) may complicate pulmonary fibrosis (PF) of different causes, but few

DA0564
LIQ_PH-ILD_00000226

Thorax: first published as 10.1136/thoraxjnl-2013-204150 on 15 January 2014. Downloaded from http://thorax.bmj.com/ on February 23, 2024 by guest. Protected by copyright.

## MATERIALS AND METHODS

This study was approved by the IRB at University of California, Los Angeles (UCLA IRB# 07-11-087-03; clinicaltrials.gov Identifier NCT00705133). We recruited 15 outpatients with PF referred to our LT programme between July 2008 and January 2011 who had advanced PH based on right heart catheterisation (RHC) (figure 1). Sarcoidosis and systemic sclerosis spectrum of disease were excluded, as were patients requiring >10 L/min of oxygen at baseline. Importantly, threshold measures of right heart size and/or function were not required for study enrolment. Patients with combined pulmonary fibrosis emphysema were included.[6] Formal pulmonary rehabilitation was not prescribed during the study period.

Advanced PH was defined using haemodynamic criteria: mean pulmonary artery pressure (mPAP) $\geq 35$ mm Hg, pulmonary artery wedge pressure (PAWP) $\leq 15$ mm Hg, and pulmonary vascular resistance (PVR) > 240 dyn s/cm[5]. Other PH aetiologies were ruled out based on current recommendations.[7] All follow-up RHCs were performed after $\geq 12$ weeks of stable dose background PH-targeted therapy, and background PF-related therapy remained unaltered during the study period.

### Six minute walk distance and oxygen supplementation protocols

Patients were ambulated per American Thoracic Society criteria with a modification regarding oxygen supplementation (OS), given the inherent hypoxaemia in this patient population (see online supplementary repository).[8]

### Pulmonary function testing and Doppler echocardiogram protocols

Pulmonary function testing (PFT) was obtained at treprostinil initiation and at 12 weeks and included forced vital capacity (FVC), forced expiratory volume in 1 s ($FEV_1$), $FEV_1$/FVC ratio and single-breath diffusing capacity for carbon monoxide

(DLCO). Total lung capacity (TLC) was only performed at baseline. Doppler echocardiogram (DE) was performed using conventional equipment (Hewlett-Packard, Palo Alto, California, USA) at baseline and 12 weeks (see online supplementary repository).

### Dyspnoea and quality of life assessments

Dyspnoea was measured with the University of California, San Diego Shortness of Breath (UCSD SOB) questionnaire and the Borg Dyspnoea Index (BDI) (see online supplementary repository).

Health-related quality of life was measured with the 36-Item Short Form Health Survey (SF-36). SF-36 scales are summarised into Physical Component (PCS) and Mental Component (MCS) Summary scores. The eight SF-36 scales and the PCS and MCS scores are standardised to a mean of 50 and an SD of 10 in the general US population. Minimally important difference (MID) estimates for SF-36 PCS and MCS are 2.5 points (see online supplementary repository).

### Parenteral treprostinil titration protocol

All patients were hospitalised for 48 h for treprostinil initiation and uptitration (see online supplementary repository).

### High-resolution CT lung parenchymal scoring

Thin slice (<3 mm) CT scans were used for objective assessment of lung parenchymal abnormality at baseline (see online supplementary repository).

### Study parameters

Patient assessments were made at baseline and after 12 weeks of parenteral treprostinil and included RHC and systemic haemodynamics, echocardiographic parameters, 6 min walk distance (6MWD), PFT, systemic and central oxygenation, brain natriuretic peptide (BNP), and SF-36/UCSD SOB questionnaires.



**Figure 1**   Recruitment of patients (n=15) with pulmonary fibrosis and advanced pulmonary hypertension being evaluated for lung transplantation at a single tertiary medical centre between July 2008 and January 2011. CPFE, combined pulmonary fibrosis emphysema;  mPAP, mean pulmonary artery pressure; NSIP-F, non-specific interstitial pneumonia fibrosis; PAH, pulmonary arterial hypertension; PF, pulmonary fibrosis; PVR, pulmonary vascular resistance.

Saggar R, et al. Thorax 2014;69:123–129. doi:10.1136/thoraxjnl-2013-204150

DA0565                                                                                    LIQ_PH-ILD_00000227

Thorax: first published as 10.1136/thoraxjnl-2013-204150 on 15 January 2014. Downloaded from http://thorax.bmj.com/ on February 23, 2024 by guest. Protected by copyright.

## Statistics

Baseline characteristics were described as frequencies (%) for categorical variables and means (SD) for continuous variables. Clinical, haemodynamic, and echocardiographic data were reported at baseline and 12 weeks, and the Shapiro–Wilk test was used to assess the normality of the distributions of baseline and week 12 data. For variables where normality was rejected at the p<0.05 level, median (IQR) values were reported and the Wilcoxon signed rank test was used to compare DLCO (% predicted), FVC%/DLCO%, 6 min walk 10 L face mask (FM) (% saturation), SF-36 Physical Functioning, stroke volume (SV), and systolic blood pressure (SBP) measures at baseline and week 12. For all other clinical, haemodynamic, and echocardiographic variables, mean (SD) were reported and paired t tests were used to compare variables at baseline and week 12. Q-values were computed to assess the impact of multiple comparisons in the domains of pulmonary function, quality of life, and haemodynamics. Analyses were conducted with Stata V.13 (Stata Corp LP, College Station, Texas, USA), and p values <0.05 were considered statistically significant.

## RESULTS

### Demographics

Fifteen patients aged 63 ± 15 years (mean ± SD) (20% female) referred for LT met all study criteria and agreed to enrolment (figure 1). Baseline WHO functional class was equally split with 53% class III (n=8) and 47% class IV (n=7). Background PH therapy (≥12 weeks of stable dose therapy) and the underlying clinical diagnoses regarding the aetiology of the PF are displayed in table 1. A subgroup of clinical diagnoses (n=10) had pathological confirmation made by surgical lung biopsy (n=7), eventual explantation (n=7), or autopsy (n=1) (see online supplementary repository table S2). Individual patient data are presented in the repository (see online supplementary table S1). The extent of baseline lung parenchymal abnormality by high-resolution CT (HRCT) chest imaging is reported for each patient in the repository (see online supplementary table S2).

### Safety/adverse events

Of the 15 patients, 14 patients received subcutaneous treprostinil and 1 patient was placed on intravenous treprostinil.[5] The treprostinil dose for the group at 12 weeks was 34 ± 21 ng/kg/min (mean ± SD) and a range of 18–97 ng/kg/min. During inpatient treprostinil initiation, there were no changes in vital signs, particularly oxygen saturation by peripheral pulse oximetry (PPO), or adverse haemodynamic changes that led to acute discontinuation of the medication. During inpatient and outpatient treprostinil uptitration, patients experienced typical prostanoid effects, including jaw pain, diarrhoea, lower extremity bone pain, site pain/reaction, headache, and/or flushing.[9]

### Pulmonary function testing, 6MWD, and oxygen status

The mean (±SD) baseline % predicted values for FEV$_1$, FVC, TLC, and FEV$_1$/FVC ratio were 62 (17), 62 (21), 70 (15), 77 (11), and 24 (13), respectively and the median (IQR) baseline % predicted value for DLCO was 24 (13); for the cohort of patients without CPFE (n=12), baseline TLC was 67 (16). There were no significant changes in PFT parameters following 12 weeks of treprostinil (table 2). Comprehensive individual patient data are presented in the repository (see online supplementary table S3).

The baseline 6MWD (mean ± SD) was 171 ± 93 m with a resting room air pulse oximetry of 83 ± 7%. All except one

**Table 1** Patient demographics, underlying fibrotic lung disease clinical subtype, and background PH-targeted therapy

| Patient characteristics | N=15 | |
|---|---|---|
| | Mean | SD |
| Age in years | 63 | 15 |
| | N | Per cent |
| NYHA class | | |
| III | 8 | 53 |
| IV | 7 | 47 |
| Race | | |
| Hispanic | 8 | 53 |
| Caucasian | 4 | 27 |
| Filipino/Japanese | 2 | 13 |
| Middle Eastern | 1 | 7 |
| Fibrotic lung disease clinical subtype | | |
| Idiopathic pulmonary fibrosis | 8 | 53 |
| NSIP-fibrosis | 2 | 13 |
| PF/emphysema (CPFE) | 3 | 20 |
| Chronic Hypersensitivity Pneumonitis (HP) | 1 | 7 |
| Silicosis | 1 | 7 |
| Background therapy | | |
| Sildenafil monotherapy | 4 | 27 |
| Bosentan monotherapy | 2 | 13 |
| Sildenafil/bosentan combination | 3 | 20 |
| None | 6 | 40 |

CPFE, combined pulmonary fibrosis/emphysema; NSIP, non-specific interstitial pneumonia; NYHA, New York Heart Association; PF, pulmonary fibrosis; PH, pulmonary hypertension.

**Table 2** Pulmonary function testing, oxygen requirements, and 6 min walk distance with Borg Dyspnoea Index (BDI) scores at baseline and end of study

| | Baseline N=15 Mean (SD) | 12 weeks N=15 Mean (SD) | p Value* |
|---|---|---|---|
| Pulmonary function | | | |
| FVC, % predicted | 62 (21) | 63 (18) | 0.687 |
| FEV$_1$, % predicted | 62 (17) | 64 (16) | 0.215 |
| FEV$_1$/FVC | 77 (11) | 80 (12) | 0.134 |
| TLC, % predicted | | | |
| All patients | 70 (15) | – | |
| Patients without CPFE, n=12 | 67 (16) | – | |
| DLCO, % predicted† | 24 (13) | 22 (11) | 0.206† |
| FVC%/DLCO%† | 2.5 (2.4) | 3.0 (1.6) | 0.625† |
| Oxygen flow (L/min) | 3.9 (1.9) | 3.9 (2.1) | >0.999 |
| 6 min walk: | | | |
| 6 min walk distance (m) | 171 (93) | 230 (114) | <0.001 |
| Room air % saturation | 83 (7) | 80 (10) | 0.078 |
| 10 L face mask, % saturation† | 98 (3) | 99 (4) | 0.372† |
| 10 L face mask, % saturation nadir | 85 (9) | 82 (10) | 0.084 |
| BDI score | 13.7 (2.3) | 13.1 (2.6) | 0.203 |

*Paired t test p value presented, except when Wilcoxon signed rank indicated.
†Data are non-normally distributed; median (IQR) and Wilcoxon signed rank p value presented.
CPFE, combined pulmonary fibrosis emphysema; DLCO, diffusing capacity for carbon monoxide; FEV$_1$, forced expiratory volume in 1 s; FVC, forced vital capacity; TLC, total lung capacity.

DA0566

LIQ_PH-ILD_00000228

Thorax: first published as 10.1136/thoraxjnl-2013-204150 on 15 January 2014. Downloaded from http://thorax.bmj.com/ on February 23, 2024 by guest. Protected by copyright.

patient required oxygen supplementation at rest; 11 of 15 (73%) required ≥3 L of oxygen supplementation at rest. Table 2 shows the 6MWD improvements following 12 weeks of parenteral treprostinil therapy (mean 59 m; p<.001). Specifically, 8 of 15 patients improved by ≥57 m (range 57–150); 5 improved by ≥17 m (range 17–30); and 2 patients each improved by 10 m (figure 2). At 12 weeks, there were no significant differences in baseline oxygen requirements (see online supplementary repository figure S1) or oxygenation parameters by PPO either at rest on room air, at rest on 10 L FM, or at the completion of the 6MWD test on 10 L FM (table 2). Individual patient data are presented in the repository (see online supplementary table S3).

### SF-36, UCSD SOB and BDI assessments

Patients had a statistically significant improvement in UCSD SOB and SF-36 MCS scores at the end of the study (p<0.05; table 3). When we assessed the clinical significance of these improvements, 77% and 50% had improvement ≥MID estimates for UCSD SOB and SF-36 MCS, respectively. Additionally, there was no significant change in SF-36 PCS and BDI (table 3) between baseline and 12 weeks. Individual patient data are presented in the repository (see online supplementary table S4).

### Haemodynamics, BNP and Doppler echocardiography

All 15 patients had baseline mPAP ≥ 35 mm Hg; 10 (66%) had mPAP ≥ 40 mm Hg and 7 (47%) had mPAP ≥ 50 mm Hg. The transpulmonary gradient (TPG) at baseline was ≥20 mm Hg for all patients and ≥30 mm Hg in 12 of 15 (80%) patients. The average PVR was 698 ± 278 dyn s/cm$^5$, representing 44% of

**Table 3** Quality of life and dyspnoea score changes using Short Form 36 (SF-36) and University of California San Diego Shortness of Breath (UCSD SOB) questionnaire

| Quality of life/dyspnoea | Baseline N=15 Mean (SD) | 12 weeks N=15 Mean (SD) | p Value* |
|---|---|---|---|
| UCSD SOB | 87 (17.1) | 73.1 (21) | 0.002 |
| SF-36 PCS aggregate | 27.1 (5.8) | 28 (8.8) | 0.479 |
| SF-36 MCS aggregate | 38 (11) | 44.2 (10.7) | 0.005 |
| Individual SF-36 domains | | | |
| Physical functioning† | 10.0 (15.0) | 25.0 (30.0) | 0.003† |
| Role—physical | 22.4 (6.6) | 28.6 (9.4) | 0.024 |
| Bodily pain | 47.6 (11.1) | 39.4 (9.4) | 0.049 |
| General health | 28.4 (7.6) | 30.8 (7.6) | 0.173 |
| Vitality | 36.9 (10.4) | 41.9 (9.1) | 0.026 |
| Social functioning | 28.0 (9.4) | 33.9 (13.6) | 0.014 |
| Role—emotional | 25.9 (13.2) | 34.4 (11.1) | 0.006 |
| Mental health | 42.4 (10.8) | 45.3 (9.6) | 0.150 |

*Paired t test p value presented, except when Wilcoxon signed rank indicated.
†Data are non-normally distributed; median (IQR) and Wilcoxon signed rank p value presented.
MCS, Mental Component Summary; PCS, Physical Component Summary.

the mean systemic vascular resistance (SVR). The baseline PVR was ≥480 dyn s/cm$^5$ in all but three patients. Following 12 weeks of treprostinil, there was evidence of decreased RV afterload, as per significant reductions in mPAP, TPG, PVR, and increased pulmonary capacitance (table 4; see online supplementary repository figure S2). Right heart function improved, as per reductions in right atrial pressure and increased mixed venous oxygen saturation, cardiac index and SV index (table 4). Although the SBP fell by 11 mm Hg (124 ± 21 to 113 ± 13 mm Hg; p=0.028), the mean systemic arterial pressure was not altered and there was a downward trend in the PVR/systemic vascular resistance (SVR) ratio (p=0.060), suggesting proportionally greater pulmonary than systemic vasodilation. Importantly, there were no significant changes in resting heart rate, arterial oxygen content, or oxygen delivery. Individual patient data are presented in the repository (see online supplementary table S5).

The two-dimensional echocardiographic examination at baseline revealed normal left ventricular cavity size (LV end-diastolic dimension 4.1 ± 0.5 cm) and systolic function (LV ejection fraction 64 ± 6%), and Doppler evidence of normal left atrial pressure (transmitral Doppler E/e' ratio 5.4 ± 1.4). In contrast, subjects were noted to have severe RV dilatation (RV end-diastolic area 36.4 ± 5.2 cm$^2$), marked right-to-left displacement of the interventricular septum (systolic eccentricity index 1.7 ± 0.6) and moderate RV systolic dysfunction (tricuspid annular planar systolic excursion (TAPSE) 1.6 ± 0.5 cm; see online supplementary repository figure S3). Doppler estimated pulmonary artery systolic pressure at baseline was 72 ± 12 mm Hg. The RV outflow tract (RVOT) acceleration time was markedly reduced (66 ± 16 ms) and 100% of subjects showed evidence of systolic flow deceleration or 'notching' of the RVOT Doppler envelope. Of note, 85% of subjects showed evidence of both a TAPSE <2.0 cm and RVOT Doppler notching, consistent with afterload-dependent RV dysfunction at baseline.

Figure 3 illustrates that following 12 weeks of parenteral treprostinil treatment, there were significant reductions in RV size (p=0.021), less evidence of interventricular septal flattening



**Figure 2** Individual 6 minute walk (6MW) distance responses to parenteral treprostinil at baseline and 12 weeks.

Saggar R, et al. Thorax 2014;69:123–129. doi:10.1136/thoraxjnl-2013-204150

Thorax: first published as 10.1136/thoraxjnl-2013-204150 on 15 January 2014. Downloaded from http://thorax.bmj.com/ on February 23, 2024 by guest. Protected by copyright.

**Table 4** Systemic and pulmonary haemodynamics and oxygenation at baseline compared with 12 weeks after parenteral treprostinil therapy

|  | Baseline N=15 Mean (SD) | 12 weeks N=15 Mean (SD) | p Value* |
|---|---|---|---|
| **Haemodynamics, mm Hg** | | | |
| Right atrial pressure | 9.5 (3.4) | 6.0 (3.7) | <0.001 |
| Mean pulmonary pressure | 47.0 (8.0) | 38.9 (13.4) | 0.005 |
| Pulmonary artery wedge pressure | 12.5 (4.1) | 10.5 (6.1) | 0.247 |
| Cardiac output (L/min) | 4.3 (1.1) | 4.9 (1.1) | 0.042 |
| Cardiac index (L/min/m²) | 2.3 (0.5) | 2.7 (0.6) | 0.017 |
| PVR (dyn s/cm⁵) | 698 (278) | 496 (229) | <0.001 |
| Mixed venous $O_2$ saturation (%) | 65 (7.2) | 70.9 (7.4) | 0.023 |
| Haemoglobin (g/dL) | 14.1 (2.1) | 13.6 (2.2) | 0.310 |
| Arterial $O_2$ content (mL $O_2$/100 mL) | 16.6 (3.1) | 15.4 (3.6) | 0.086 |
| $O_2$ delivery (mL/min)† | 6332 (2295) | 7263 (5337) | 0.246† |
| Pulmonary capacitance (mL/mm Hg)‡ | 1.28 (0.54) | 1.64 (0.91) | 0.013 |
| RV pulsatility | 0.94 (0.16) | 1.04 (0.16) | 0.010 |
| Pulse pressure | 44.1 (8.9) | 40.3 (14.1) | 0.182 |
| Stroke volume (mL) † | 51.8 (8.7) | 61.8 (21.7) | 0.031† |
| Stroke volume index | 29.2 (6.7) | 33 (7.3) | 0.037 |
| Systolic blood pressure† | 125 (25) | 109 (13) | 0.028† |
| Mean arterial pressure | 88.6 (15.8) | 84.8 (9.4) | 0.278 |
| HR (beats/min) | 79 (9.9) | 80 (11.8) | 0.490 |
| Rs (dyn s/cm⁵) | 1575 (487) | 1306 (357) | 0.015 |
| PVR/SVR | 0.46 (0.13) | 0.39 (0.15) | 0.060 |
| TPG | 34.7 (8.7) | 28.5 (10.3) | 0.014 |
| BNP (pg/mL) | 558 (859) | 228 (340) | 0.004† |

*Paired t test p value presented, except when Wilcoxon signed rank indicated.
†Data are non-normally distributed; median (IQR) and Wilcoxon signed rank p value presented.
‡Pulmonary capacitance = stroke volume/pulse pressure.
BNP, brain natriuretic peptide; PVR, pulmonary vascular resistance; RV, right ventricular; SVR, systemic vascular resistance; TPG, transpulmonary gradient.

(p=0.037), and improved RV systolic function (p=0.006). In parallel with haemodynamic and echocardiographic evidence of RV unloading, BNP levels fell significantly in subjects at 12-week follow-up (table 4).

**Patient status**

Of the 15 patients, 8 were actively listed for LT (figure 1). Of the 7 patients not offered LT, 5 died (mean ± SD) 504 ± 295 days after treprostinil initiation, while 2 patients remained alive 1059 and 1401 days after treprostinil initiation. After active listing, 7 patients were successfully bridged to LT which occurred at a median of 268 days (range 140–1379 days) after

the baseline RHC and treprostinil initiation. The remaining listed patient died 272 days after treprostinil initiation.

**DISCUSSION**

The purpose of this investigation was to assess the effects of *chronic* parenteral treprostinil administration on right heart haemodynamics and echocardiographic function in a PF population referred for LT with an advanced PH phenotype, characterised by significantly increased PVR and RV dysfunction.[10] We studied this population either as a bridge to LT or to achieve clinical stabilisation in otherwise transplant ineligible patients at risk of clinical deterioration due to advanced PH and right heart dysfunction.[5 7 10] Significant improvements were demonstrated in right heart haemodynamics and echocardiographic function in response to chronic parenteral treprostinil infusion, without significant decrement in peripheral oxygen saturation, arterial oxygen content, or oxygen delivery.

At baseline, our subjects had a markedly elevated PVR, moderate to severe RV dysfunction, and thus abnormal coupling between the RV and pulmonary vascular load. In the context of significant RV–pulmonary artery uncoupling, RV afterload reduction leads to a predictable, afterload-dependent improvement in right heart function, as was seen in our cohort by way of improved haemodynamics and echocardiographic parameters.[11] These improvements in RV afterload and RV function (enhanced RV coupling) likely augmented the circulatory reserve of our patients, explaining their functional advantage and decreased dyspnoea.

The potential for worsening gas exchange with PH-targeted therapy deserves particular attention. We did not appreciate any significant hypoxaemia as assessed by PPO after treprostinil therapy, either at rest or after 6MWD testing. Importantly, pulmonary function (ie, degree of PF) remained unaltered during the study and would not likely confound these findings. Although arterial blood gases (ABG) were not obtained to confirm this finding, we can suggest a rationale based on the available literature. Prior work using multiple inert gas elimination technique (MIGET) has demonstrated a relatively preserved V-Q spectrum at rest, manifesting absent or mild resting hypoxaemia in patients with either WHO Group I pulmonary arterial hypertension (PAH)[12] or isolated PF.[13] Importantly, during exercise, the MIGET-derived V-Q spectrum remains preserved in both conditions, despite predictable widening of the alveolar-arterial gradient and hypoxaemia.[13–15] In PAH, this hypoxaemia is driven by a low mixed venous $pO_2$,[14] while in PF, hypoxaemia is characterised by a relative augmentation in diffusion abnormality, which in turn is further accentuated by low mixed venous oxygenation.[16] Consequently, a PH-targeted therapy that augments mixed venous oxygenation may be particularly desirable in a cohort of patients with PF and advanced PH to attenuate any predisposition for hypoxaemia at rest or during exercise.



**Figure 3** Bar graphs comparing indices of right ventricular size (RV end diastolic area), interventricular septal position (systolic eccentricity index), and RV systolic function (tricuspid annular planar systolic excursion) at baseline (open bars; n=15) and following 12 weeks of parenteral treprostinil (solid black bars; n=14), with error bars indicating SE. Paired t test results indicate significant improvements in RV size (p=0.021), interventricular septal flattening (p=0.037), and RV systolic function (p=0.006) indices from baseline to week 12. TAPSE, tricuspid annular planar systolic excursion.

DA0568

LIQ_PH-ILD_00000230

The use of acute[15] or chronic[17–20] PH-targeted, non-prostanoid therapy does not appear to alter gas exchange in patients with PF without advanced PH during rest or exercise, which challenges the notion of predictable V-Q inequality and hypoxaemia as a direct result of underlying fibrotic lung disease. Despite this finding, acute parenteral prostanoid administration in patients with PF and advanced PH raises concern for predictable intrapulmonary shunt and hypoxaemia.[3 21] Interestingly, even patients with PAH (WHO Group I) demonstrated increased shunt by MIGET during acute parenteral prostanoid administration.[22] The question is whether this potential shunt and hypoxaemia are related to the parenteral route of administration or to the aggressive uptitration strategy routinely implemented when initiating parenteral prostanoid therapy.[23] In fact, prior studies evaluating acute parenteral prostanoid administration in PAH[22] and PF associated with advanced PH[3 21] employed this same aggressive uptitration protocol and report relatively worsened gas exchange, V-Q spectrum, and systemic haemodynamic data specifically at the prostanoid dose associated with intolerable adverse reaction and/or unacceptable haemodynamic deterioration. Similar and predictable V-Q inequality has also been demonstrated with other aggressively titrated, non-prostanoid vasodilators in patients with PAH.[24]

This approach may result in undesired physiology driven by decreased SVR, including reflex tachycardia, increased cardiac output (CO), systemic hypotension, and unchanged or increased PVR/SVR ratio. Comparable untoward physiology was recently demonstrated after riociguat therapy in patients with PF and advanced PH with resultant mild hypoxaemia.[25] While a patient with PAH may be able to tolerate an aggressive uptitration of parenteral prostanoid,[22] this strategy may place a patient with PF and advanced PH at risk of acute cardiopulmonary decompensation.[3] Consequently, a more gradual parenteral prostanoid uptitration approach may attenuate shunt physiology and subsequent hypoxaemia, especially if significant systemic vasodilation and the resulting abrupt rise in CO are avoided. Cardiac output may itself be associated with increased intrapulmonary shunt.[26] Based on the above, we surmise that a gentler uptitration of parenteral prostanoid, as employed in our study PF population with advanced PH, may lessen the potential for haemodynamic instability and/or hypoxaemia and rather parallel the chronic parenteral prostanoid administration haemodynamic and gas exchange data reported in WHO Group I PAH.

The inclusion of patients restricted to a severe baseline PH phenotype likely decreased the predisposition to arterial oxygen desaturation in response to treprostinil. Our subjects had a markedly elevated PVR and borderline reduced CO at baseline with evidence of significantly improved right heart function following treprostinil infusion, delineated by less septal bowing, a falling right atrial pressure, and improved CO. These salutary effects on right heart function may further optimise arterial oxygen content via enhanced mixed venous oxygen saturation.[16 27]

The improvement of 59 m in 6MWD following 12 weeks of parenteral treprostinil was noted in parallel with improvements in the UCSD SOB questionnaire and the SF-36 MCS, representing preliminary but encouraging findings. Recent independent studies in subjects with idiopathic pulmonary fibrosis (IPF) and Group I PAH suggested the minimally clinically important significant 6MWD difference to 24–45 m and 25–38 m, respectively.[28 29] The augmentation in functional capacity seen in our subjects with PF-PH in response to treprostinil does not contravene prior studies reporting a lack of improvement in functional parameters in patients with PF treated with PH-targeted therapies.[17–19] Patients in these prior studies had

no or mild PH, while our subjects had an average mPAP>45 mm Hg, a markedly elevated PVR, and degrees of RV dilatation and dysfunction comparable to severe WHO Group I PAH.[30]

These physiological differences are likely critical when considering the potential response to PH-targeted therapies, given that patients with advanced lung disease in the absence of advanced PH typically do not possess evidence of a circulatory limitation to exercise.[31 32] In contrast, patients with parenchymal lung disease (COPD or PF) and advanced PH demonstrate (in addition to their inherent ventilatory limitation) a circulatory limitation on exertion and an overall cardiopulmonary exercise stress test profile similar to isolated Group I PAH, with blunted oxygen pulse and marked ventilatory inefficiency (ie, increased $V_E/V_{CO_2}$).[31 32] Importantly, the moderate degree of restrictive lung disease in our patient cohort may not have warranted consideration of LT, had it been isolated from the severe extent of superimposed PH. Interestingly, a recent post hoc analysis of a placebo-controlled randomised clinical trial in IPF[20] showed that the subgroup of patients with, compared with those without, RV dysfunction and RV hypertrophy improved their 6MWD in response to sildenafil.[33] In addition, the Royal Brompton group retrospectively reported a significant 6MWD improvement with sildenafil in a mixed interstitial lung disease population with pulmonary function and right heart haemodynamics similar to our experience.[2]

The combined observations of improved right heart function and stable arterial oxygen saturation in our PF-PH cohort after chronic parenteral treprostinil suggests the advanced PH phenotype may be critical when considering PH-targeted therapy, as it lends itself towards an increased likelihood of improved circulatory reserve and decreased risk of hypoxaemia. As such, an advanced PH phenotype in the context of chronic respiratory disease may be essential for predicting a beneficial response and minimising potential adverse effects of therapy.

## LIMITATIONS

Limitations of this study include the heterogeneity of the PF population, variable background PH-targeted therapy, and the absence of ABG testing. The absence of a placebo arm is a particularly significant limitation; therefore, our findings must be confirmed with a randomised, placebo-controlled trial. At this point, the routine use of PH-targeted therapy in PF-PH is not recommended and should only be cautiously considered at specialised PH centres to avoid the serious potential for worsening cardiopulmonary status in this patient population. In addition, the explanation proposed for the lack of significant hypoxaemia with parenteral prostanoid in our PF-PH cohort remains speculative and requires further investigation. To address the limitation of multiple comparisons in the domains of pulmonary function, quality of life, and haemodynamics, we calculated that observed p values < 0.05 corresponded to a maximum q-value of 0.067, indicating that the proportion of significant findings attributable to false discovery is small. As such, we were reassured to see encouraging results in a real-world cohort of patients with PF referred for LT, characterised by an 'advanced PH and right heart dysfunction' phenotype. The lack of ABG testing is offset by stable arterial oxygen content, oxygen delivery, and oxygen saturation values at rest and 6MWD testing, following treprostinil therapy.

## CONCLUSION

This open-label study suggests that gradual initiation and chronic administration of parenteral treprostinil therapy may

Thorax: first published as 10.1136/thoraxjnl-2013-204150 on 15 January 2014. Downloaded from http://thorax.bmj.com/ on February 23, 2024 by guest. Protected by copyright.

DA0569

LIQ_PH-ILD_00000231

improve haemodynamics and right heart function without compromising systemic oxygenation in an advanced PH phenotype with RV dysfunction in the setting of PF. These findings are only hypothesis generating and require confirmation in a multicentre, randomised study design. Future studies of PH-targeted therapy for PF should focus on patients with PF with the combination of advanced PH and RV dysfunction, as these subjects may have greater capacity for benefit. Finally, given the high mortality inherent to this population, a future study may consider survival as an endpoint.

**Author affiliations**
[1]Thoracic Transplantation, Heart-Lung Institute, St Joseph Hospital & Medical Center, Phoenix, Arizona, USA
[2]Division of Rheumatology, Department of Medicine, University of Michigan, Ann Arbor, Michigan, USA
[3]Cardiovascular Division, Department of Medicine, Perelman School of Medicine at the University of Pennsylvania, Philadelphia, Pennsylvania, USA
[4]Division of Pulmonary and Critical Care Medicine, Department of Medicine, David Geffen School of Medicine at UCLA, Los Angeles, California, USA
[5]Department of Medicine Statistics Core, David Geffen School of Medicine at UCLA, Los Angeles, California, USA
[6]George Washington University, School of Medicine and Health Sciences, Washington, DC, USA
[7]Department of Radiology, Department of Medicine, David Geffen School of Medicine at UCLA, Los Angeles, California, USA
[8]Cardiovascular Division, Temple University School of Medicine, Philadelphia, Pennsylvania, USA

**Acknowledgements** The authors would like to acknowledge Lynne Yoder RN, Bryant Torres BS, Glenna Traiger RN, Eileen Callahan CCRP, and Paul Lopez LVN for their dedicated support with data collection and study coordination as well as NHLBI HL112990 to JAB.

**Contributors** RS: conceptual design; patient care and procedures; writing of manuscript; data collection. DK: conceptual design; editing of manuscript; statistical support. AV: blinded review of echocardiograms. AD: patient care and procedures; statistical support. PM: statistical support. ED: statistical support. JAB: patient care and procedures. SSW: patient care and procedures. SD: patient care and procedures; data collection. SSS: patient care. JGG: blinded review of chest CT scans. FA: blinded review of chest CT scans. JPLIII: conceptual design; patient care. DJR: patient care. PRF: editing of manuscript; blinded review of echocardiograms. RS: conceptual design; patient care and procedures; writing of manuscript; data collection.

**Funding** NHLBI and United Therapeutics.

**Competing interests** None.

**Ethics approval** Institutional Review Board at University of California, Los Angeles.

**Provenance and peer review** Not commissioned; externally peer reviewed.

**REFERENCES**
1  Minai OA, Sahoo D, Chapman JT, *et al*. Vaso-active therapy can improve 6-min walk distance in patients with pulmonary hypertension and fibrotic interstitial lung disease. *Respir Med.* 2008;102:1015–20.
2  Corte TJ, Gatzoulis MA, Parfitt L, *et al*. The use of sildenafil to treat pulmonary hypertension associated with interstitial lung disease. *Respirology* 2010;15:1226–32.
3  Olschewski H, Ghofrani HA, Walmrath D, *et al*. Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis. *Am J Respir Crit Care Med* 1999;160:600–7.
4  Le Pavec J, Girgis RE, Lechtzin N, *et al*. Systemic sclerosis-related pulmonary hypertension associated with interstitial lung disease: impact of pulmonary arterial hypertension therapies. *Arthritis Rheum* 2011;63:2456–64.
5  Saggar R, Shapiro SS, Ross DJ, *et al*. Treprostinil to reverse pulmonary hypertension associated with idiopathic pulmonary fibrosis as a bridge to single-lung transplantation. *J Heart Lung Transplant* 2009;28:964–7.
6  Cottin V, Le Pavec J, Prevot G, *et al*. Pulmonary hypertension in patients with combined pulmonary fibrosis and emphysema syndrome. *Eur Respir J* 2010;35:105–11.
7  McLaughlin VV, Archer SL, Badesch DB, *et al*. ACCF/AHA 2009 expert consensus document on pulmonary hypertension: a report of the American College of Cardiology Foundation Task Force on Expert Consensus Documents and the American Heart Association: developed in collaboration with the American College of Chest Physicians, American Thoracic Society, Inc., and the Pulmonary Hypertension Association. *Circulation* 2009;119:2250–94.
8  American Thoracic Society Statement. Guideline for the six-minute walk test. *Am J Respir Crit Care Med* 2002;166:111–17.
9  Mathier MA, McDevitt S, Saggar R. Subcutaneous treprostinil in pulmonary arterial hypertension: practical considerations. *J Heart Lung Transplant* 2010;29: 1210–17.
10  Hoeper MM, Andreas S, Bastian A, *et al*. Pulmonary hypertension due to chronic lung disease: updated Recommendations of the Cologne Consensus Conference 2011. *Int J Cardiol* 154(Suppl 1):S45–53.
11  Van de Veerdonk MC, Kind T, Marcus JT, *et al*. Progressive right ventricular dysfunction in patients with pulmonary arterial hypertension responding to therapy. *J Am Coll Cardiol* 2011;58:2511–19.
12  Dantzker DR, Bower JS. Mechanisms of gas exchange abnormality in patients with chronic obliterative pulmonary vascular disease. *J Clin Invest* 1979;64:1050–5.
13  Agusti AG, Roca J, Gea J, *et al*. Mechanisms of gas-exchange impairment in idiopathic pulmonary fibrosis. *Am Rev Respir Dis* 1991;143:219–25.
14  Dantzker DR, D'Alonzo GE, Bower JS, *et al*. Pulmonary gas exchange during exercise in patients with chronic obliterative pulmonary hypertension. *Am Rev Respir Dis* 1984;130:412–16.
15  Blanco I, Ribas J, Xaubet A, *et al*. Effects of inhaled nitric oxide at rest and during exercise in idiopathic pulmonary fibrosis. *J Appl Physiol* 2011;110:638–45.
16  Wagner PD. Influence of mixed venous PO2 on diffusion of O2 across the pulmonary blood:gas barrier. *Clin Physiol* 1982;2:105–15.
17  King TE Jr, Brown KK, Raghu G, *et al*. BUILD-3: a randomized, controlled trial of bosentan in idiopathic pulmonary fibrosis. *Am J Respir Crit Care Med* 2011;184: 92–9.
18  Raghu G, Behr J, Brown KK, *et al*. Treatment of idiopathic pulmonary fibrosis with ambrisentan: a parallel, randomized trial. *Ann Intern Med* 2013;158:641–9.
19  Raghu G, Million-Rousseau R, Morganti A, *et al*. Macitentan for the treatment of idiopathic pulmonary fibrosis: the randomised controlled MUSIC trial. *Eur Respir J* 2013;42:1622–32.
20  Zisman DA, Schwarz M, Anstrom KJ, *et al*. A controlled trial of sildenafil in advanced idiopathic pulmonary fibrosis. *N Engl J Med* 2010;363:620–8.
21  Ghofrani HA, Wiedemann R, Rose F, *et al*. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. *Lancet* 2002;360:895–900.
22  Bratel T, Lagerstrand L, Brodin LA, *et al*. Ventilation-perfusion relationships in pulmonary arterial hypertension: effect of intravenous and inhaled prostacyclin treatment. *Respir Physiol Neurobiol* 2007;158:59–69.
23  Barst RJ, Rubin LJ, Long WA, *et al*. A comparison of continuous intravenous epoprostenol (prostacyclin) with conventional therapy for primary pulmonary hypertension. *N Engl J Med* 1996;334:296–301.
24  Dantzker DR, Bower JS. Pulmonary vascular tone improves VA/Q matching in obliterative pulmonary hypertension. *J Appl Physiol* 1981;51:607–13.
25  Hoeper MM, Halank M, Wilkens H, *et al*. Riociguat for interstitial lung disease and pulmonary hypertension: a pilot trial. *Eur Respir J* 41:853–60.
26  Lynch JP, Mhyre JG, Dantzker DR. Influence of cardiac output on intrapulmonary shunt. *J Appl Physiol* 1979;46:315–21.
27  Agusti AG, Rodriguez-Roisin R. Effect of pulmonary hypertension on gas exchange. *Eur Respir J.* 1993;6:1371–7.
28  du Bois RM, Weycker D, Albera C, *et al*. Six-minute-walk test in idiopathic pulmonary fibrosis: test validation and minimal clinically important difference. *Am J Respir Crit Care Med* 2011;183:1231–7.
29  Mathai SC, Puhan MA, Lam D, *et al*. The minimal important difference in the 6-minute walk test for patients with pulmonary arterial hypertension. *Am J Respir Crit Care Med* 2012;186:428–33.
30  Forfia PR, Fisher MR, Mathai SC, *et al*. Tricuspid annular displacement predicts survival in pulmonary hypertension. *Am J Respir Crit Care Med* 2006;174: 1034–41.
31  Boutou AK, Pitsiou GG, Trigonis I, *et al*. Exercise capacity in idiopathic pulmonary fibrosis: the effect of pulmonary hypertension. *Respirology* 2011;16:451–8.
32  Glaser S, Noga O, Koch B, *et al*. Impact of pulmonary hypertension on gas exchange and exercise capacity in patients with pulmonary fibrosis. *Respir Med* 2009;103:317–24.
33  Han MK, Bach DS, Hagan PG, *et al*. Sildenafil preserves exercise capacity in patients with idiopathic pulmonary fibrosis and right-sided ventricular dysfunction. *Chest* 2013;143:1699–1708.

Thorax: first published as 10.1136/thoraxjnl-2013-204150 on 15 January 2014. Downloaded from http://thorax.bmj.com/ on February 23, 2024 by guest. Protected by copyright.

LIQ_PH-ILD_00000232

<u>CHANGES IN RIGHT HEART HEMODYNAMICS AND ECHOCARDIOGRAPHIC FUNCTION IN AN ADVANCED PHENOTYPE OF PULMONARY HYPERTENSION AND RIGHT HEART DYSFUNCTION ASSOCIATED WITH PULMONARY FIBROSIS</u>

DATA REPOSITORY FIGURES



Figure 1: Individual oxygen requirements (liters/minute) at baseline and 12 weeks

LIQ_PH-ILD_00000233



Figure 2: Individual pulmonary vascular resistance (PVR) calculations at baseline and 12 weeks

LIQ_PH-ILD_00000234



Figure 3: Individual tricuspid annular planar systolic excursion (TAPSE) measurements at baseline and 12 weeks

LIQ_PH-ILD_00000235

Repository:

Materials and Methods

Six minute walk distance (6MWD) and Oxygen Supplementation (OS) protocols:

Patients were seated for 10 minutes on room air and peripheral pulse oximetry (PPO) was recorded. A 10 liter oxygen face-mask (FM) was then applied and PPO was recorded after an additional 10 minutes at rest. 6MW testing was subsequently performed on a 10 liter oxygen FM with recording of the nadir oxygen saturation by PPO and the Borg Dyspnea Index (BDI) at the end of six minutes or at the end of the final ambulatory effort. The 6MW test was not interrupted or terminated for any degree of hypoxemia. No baseline 6MWD minimum was required for study entry. All RHCs and associated measurements were performed on a 10 liter oxygen FM.

Pulmonary function testing (PFT) and Doppler Echocardiogram (DE) protocols:

All measurements were made by 2 experienced echocardiographers (AF, PF) blinded to invasive hemodynamics and clinical data. Standard parameters were measured, including left ventricular ejection fraction, dimensions of the left atrium, left ventricular cavity and wall thickness, transtricuspid flow velocity, valvular regurgitation, transmitral E and A wave velocities, tissue Doppler of the mitral annulus, and inferior vena cava dimensions and collapse. In addition, parameters specific to pulmonary vascular disease and right ventricular size and function were assessed, including systolic eccentricity index, notching of the right ventricular outflow tract (RVOT) Doppler profile, acceleration time of this profile, RV two-dimensional area, and tricuspid annular plane systolic excursion (TAPSE). All measurements were made in accordance with American Society of Echocardiography guidelines and previously published literature,[1-3]

Dyspnea and Quality of Life Assessments:

A higher UCSD SOBQ score indicates more dyspnea with a minimally important difference (MID) of 5 points.[4] The BDI measures perceived breathlessness on a scale of 0 to 10 (maximum) with a MID of 1 point.[4]

LIQ_PH-ILD_00000236

The 8 SF-36 scales and the PCS and MCS scores are standardized to a mean of 50 and standard deviation of 10 in the US general population.  MID estimates for SF-36 PCS and MCS are 2.5 points.[5]

Parenteral treprostinil titration protocol:

After treprostinil initiation at 2ng/kg/min and at any subsequent dose uptitration, vital signs including PPO were recorded every 15 minutes for 1 hour, then every hour for 3 hours, and subsequently every 4 hours until discharge.  Arterial blood gases were not obtained in a standardized fashion.  Inpatient treprostinil was increased by a maximum of 1ng/kg/min every 12 hours such that patients were discharged from the hospital at 48 hours on treprostinil doses of 3 to 5 ng/kg/min.  After discharge, all attempts were made to uptitrate treprostinil by a maximum of 1ng/kg/min every 48 to 72 hours; however, the frequency and final dose of treprostinil was determined by the individual patient adverse reaction profile.[6]

High Resolution Computed Tomography (HRCT) Lung Parenchymal Scoring:

A likert scoring system was used based on percentage of area affected (0 = absent, 1= 1 to 5%, 2= 6 to 25%, 3= 26 to 50%, 4= 51 to 75% and 5= 76 to 100%) and assessed the extent of parenchymal abnormality involving three categories: groundglass opacity, lung fibrosis, and honeycombing.  Each lobe and then both lungs were scored separately.  Our scoring system is modified from earlier scoring systems reported by Kazerooni et al. and Kim et al.[7-8]  In addition, both lungs were scored for total extent of ground glass opacity, fibrosis and/or honeycombing as being definitively less than 20%, definitively more than 20%, or indeterminate (10-30%).[9]  In the few patients with combined pulmonary fibrosis and emphysema (CPFE), the extent of parenchymal abnormality was calculated without taking into account the extent of emphysema.

The following definitions were used for description of each of the radiographic findings: (1) ground-glass opacity; hazy parenchymal opacity with preservation of bronchial and vascular markings in the absence of reticular opacity, (2) architectural distortion/lung fibrosis; reticular opacification,

LIQ_PH-ILD_00000237

inter and intralobular septal thickening, traction bronchiectasis, or bronchiolectasis and architectural distortion, and (3) honeycombing; clustered air-filled cysts with well defined walls.[10]

LIQ_PH-ILD_00000238

1.      Forfia PR, Fisher MR, Mathai SC et al. Tricuspid annular displacement predicts survival in pulmonary hypertension. *Am J Respir Crit Care Med*. 2006;174(9):1034-41.Epub 2006/08/05.

2.      Rudski LG, Lai WW, Afilalo J et al. Guidelines for the echocardiographic assessment of the right heart in adults: a report from the American Society of Echocardiography endorsed by the European Association of Echocardiography, a registered branch of the European Society of Cardiology, and the Canadian Society of Echocardiography. *J Am Soc Echocardiogr*. 2010;23(7):685-713.;quiz 86- 8. Epub 2010/07/14.

3.      Arkles JS, Opotowsky AR, Ojeda J et al. Shape of the right ventricular Doppler envelope predicts hemodynamics and right heart function in pulmonary hypertension. *Am J Respir Crit Care Med*. 2011;183(2):268-76. Epub 2010/08/17.

4.      Kupferberg DH, Kaplan RM, Slymen DJ et al. Minimal clinically important difference for the UCSD Shortness of Breath Questionnaire. *J Cardiopulm Rehabil*. 2005;25(6):370-7. Epub 2005/12/06.

5.      Khanna D, Yan X, Tashkin DP et al. Impact of oral cyclophosphamide on health-related quality of life in patients with active scleroderma lung disease: results from the scleroderma lung study. *Arthritis Rheum*. 2007;56(5):1676-84. Epub 2007/05/01.

6.      Mathier MA, McDevitt S, Saggar R. Subcutaneous treprostinil in pulmonary arterial hypertension: Practical considerations. *J Heart Lung Transplant*. 2010;29(11):1210-7. Epub 2010/09/22.

7.      Kazerooni EA, Martinez FJ, Flint A et al. Thin- section CT obtained at 10-mm increments versus limited three-level thin-section CT for idiopathic pulmonary fibrosis: correlation with pathologic scoring. *AJR Am J Roentgenol*. 1997;169(4):977-83. Epub 1997/10/06.

LIQ_PH-ILD_00000239

8.      Kim HG, Tashkin DP, Clements PJ et al. A computer-aided diagnosis system for quantitative scoring of extent of lung fibrosis in scleroderma patients. *Clin Exp Rheumatol*. 2010;28(5 Suppl 62):S26-35. Epub 2010/11/26.

9.      Goh NS, Desai SR, Veeraraghavan S et al. Interstitial lung disease in systemic sclerosis: a simple staging system. *Am J Respir Crit Care Med*. 2008;177(11):1248-54. Epub 2008/03/29.

10.     Hansell DM, Bankier AA, MacMahon H et al. Remy J. Fleischner Society: glossary of terms for thoracic imaging. *Radiology*. 2008;246(3):697-722. Epub 2008/01/16.

LIQ_PH-ILD_00000240

CHANGES IN RIGHT HEART HEMODYNAMICS AND ECHOCARDIOGRAPHIC FUNCTION IN AN ADVANCED PHENOTYPE OF PULMONARY HYPERTENSION AND RIGHT HEART DYSFUNCTION ASSOCIATED WITH PULMONARY FIBROSIS

DATA REPOSITORY TABLES

| | Patients | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Characteristics | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| NYHA | IV | IV | III | IV | III | III | III | IV | III | IV | IV | III | IV | III | III |
| Age in Years (at study entry) | 69 | 75 | 67 | 84 | 60 | 44 | 40 | 71 | 34 | 68 | 71 | 65 | 65 | 65 | 69 |
| Background Therapy | P | E/P | E | N | E | P | P | E/P | P | N | E/P | N | N | N | N |
| Clinical Subtype | IPF | IPF | IPF | IPF | NSIP-F | S | NSIP-F | CPFE | HP | CPFE | IPF | CPFE | IPF | IPF | IPF |
| Treprostinil dose at discharge | 2 | 1 | 2 | 3 | 5 | 6 | 2 | 6 | 2 | 4 | 2 | 2 | 2 | 2 | 2 |
| Treprostinil dose at 3 months | 33 | 19 | 32 | 18 | 32 | 17 | 30 | 23 | 25 | 19 | 36 | 18 | 25 | 38 | 50 |
| Treprostinil dose at 6 months | 32 | 19 | - | 18 | 52 | 17 | 34 | 42 | 30 | 27 | 29 | 80 | 36 | 38 | - |
| Treprostinil dose at 12 months | - | 19 | - | - | 52 | 17 | 34 | - | 30 | 27 | - | - | 36 | 41 | - |
| Treprostinil dose at last visit (i.e at time of lung transplant or at last clinic visit just before death) | 36 | 19 | 32 | 18 | 52 | 17 | 34 | 55 | 29 | 16 | 29 | 80 | 56 | 26 | 58 |
| Outcome | T | D | T | D | T | T | A | D | T | D | D | D | A | T | T |
| Time from treatment initiation to Outcome/Censor (days) | 257 | 858 | 118 | 199 | 267 | 348 | 1498 | 311 | 1255 | 576 | 275 | 272 | 1351 | 606 | 148 |

Table 1: Patient demographics, underlying fibrotic lung disease clinical subtype, and background PH-targeted therapy

Background Endothelin receptor antagonist (E); Phosphodiesterase 5 inhibitor (P); No background therapy (N)
Clinical Subtypes: Idiopathic Pulmonary Fibrosis (IPF); NSIP-Fibrosis (NSIP-F); PF/Emphysema (CPFE); Chronic Hypersensitivity Pneumonitis (HP); Silicosis (S)
Outcome: Transplant (T); Death (D); Alive/Censor (A)

[1]

LIQ_PH-ILD_00000241

| | Patients | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Pathologic Confirmation | Y | Y | Y | N | Y | Y | Y | N | Y | N | N | N | Y | Y | Y |
| | | | | | | | | | | | | | | | |
| < or > 20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% | >20% |
| Total Combined Score | 5 | 4 | 3 | 3 | 5 | 3 | 3 | 3 | 5 | 3 | 5 | 4 | 4 | 5 | 4 |
| | | | | | | | | | | | | | | | |
| Total Fibrosis RT Lung | 2 | 4 | 2 | 3 | 2 | 1 | 1 | 3 | 3 | 2 | 1 | 3 | 3 | 3 | 2 |
| Total Fibrosis LT Lung | 2 | 4 | 2 | 3 | 2 | 1 | 1 | 3 | 3 | 2 | 0 | 3 | 3 | 3 | 2 |
| Fibrosis RT Upper Lobe | 1 | 3 | 2 | 2 | 2 | 1 | 1 | 2 | 3 | 1 | 0 | 2 | 2 | 3 | 2 |
| Fibrosis RT Middle Lobe | 2 | 3 | 2 | 2 | 3 | 1 | 1 | 2 | 3 | 1 | 1 | 3 | 3 | 3 | 2 |
| Fibrosis RT Lower Lobe | 2 | 4 | 1 | 3 | 3 | 1 | 1 | 3 | 3 | 2 | 0 | 3 | 4 | 3 | 1 |
| Fibrosis LT Upper Lobe | 1 | 3 | 2 | 2 | 2 | 1 | 1 | 2 | 3 | 1 | 0 | 2 | 2 | 3 | 2 |
| Fibrosis LT Lower Lobe | 2 | 4 | 1 | 3 | 3 | 1 | 1 | 3 | 3 | 2 | 0 | 3 | 4 | 3 | 2 |
| | | | | | | | | | | | | | | | |
| Total GGO RT Lung | 4 | 2 | 1 | 2 | 4 | 2 | 1 | 0 | 2 | 2 | 1 | 1 | 2 | 1 | 0 |
| Total GGO LT Lung | 4 | 1 | 1 | 2 | 4 | 2 | 1 | 0 | 2 | 2 | 0 | 1 | 2 | 1 | 0 |
| GGO RT Upper Lobe | 4 | 1 | 1 | 2 | 4 | 2 | 1 | 0 | 2 | 1 | 1 | 1 | 3 | 1 | 0 |
| GGO RT Middle Lobe | 4 | 1 | 1 | 2 | 4 | 2 | 1 | 0 | 2 | 1 | 1 | 1 | 2 | 1 | 0 |
| GGO RT Lower Lobe | 4 | 2 | 1 | 2 | 4 | 2 | 1 | 0 | 2 | 2 | 0 | 1 | 1 | 1 | 0 |
| GGO LT Upper Lobe | 4 | 2 | 1 | 2 | 4 | 2 | 1 | 0 | 2 | 1 | 0 | 1 | 2 | 1 | 0 |
| GGO LT Lower Lobe | 4 | 2 | 1 | 2 | 4 | 2 | 1 | 0 | 2 | 2 | 0 | 1 | 1 | 1 | 0 |
| | | | | | | | | | | | | | | | |
| Total HC RT Lung | 1 | 1 | 0 | 2 | 0 | 0 | 3 | 1 | 0 | 0 | 4 | 2 | 0 | 2 | 3 |
| Total HC LT Lung | 0 | 1 | 0 | 2 | 0 | 0 | 3 | 1 | 0 | 0 | 5 | 2 | 0 | 2 | 2 |
| HC RT Upper Lobe | 0 | 1 | 0 | 2 | 0 | 0 | 2 | 1 | 0 | 0 | 3 | 1 | 0 | 3 | 1 |
| HC RT Middle Lobe | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 1 | 0 | 0 | 2 | 2 | 0 | 1 | 2 |
| HC RT Lower Lobe | 1 | 1 | 0 | 2 | 0 | 0 | 4 | 1 | 0 | 0 | 5 | 2 | 0 | 1 | 3 |
| HC LT Upper Lobe | 0 | 1 | 0 | 2 | 0 | 0 | 2 | 1 | 0 | 0 | 5 | 2 | 0 | 2 | 1 |
| HC LT Lower Lobe | 0 | 1 | 0 | 2 | 0 | 0 | 4 | 1 | 0 | 0 | 5 | 2 | 0 | 1 | 3 |

Table 2: Baseline high resolution computed tomography (HRCT) analysis of lung parenchymal abnormalities
RT: Right; LT: Left; GGO: Ground Glass Opacity; HC: Honeycombing; Ordinal Scoring System for Degree of Radiographic Involvement: 0= None; 1= 1 to 5%; 2= 6 to 25%; 3= 25 to 50%; 4= 51 to 75%; 5= >75%

[2]

LIQ_PH-ILD_00000242

| | Week | Patients | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Pulmonary Function | | | | | | | | | | | | | | | | |
| FVC, % Predicted | 0 | 57 | 38 | 78 | 54 | 69 | 57 | 50 | 88 | 58 | 77 | 37 | 105 | 84 | 44 | 38 |
| | 12 | 66 | 33 | 82 | 62 | 74 | 64 | 54 | 66 | 63 | 82 | 38 | 94 | 84 | 44 | 41 |
| FEV$_1$, % Predicted | 0 | 58 | 48 | 74 | 70 | 74 | 43 | 51 | 90 | 49 | 71 | 43 | 95 | 70 | 46 | 49 |
| | 12 | 71 | 43 | 80 | 75 | 80 | 52 | 55 | 76 | 54 | 79 | 43 | 90 | 70 | 44 | 53 |
| FEV$_1$/FVC | 0 | - | 93 | 70 | 91 | 85 | 59 | 82 | 75 | 70 | 68 | 84 | 67 | 64 | 79 | 87 |
| | 12 | 81 | 96 | 73 | 85 | 109 | 65 | 82 | 85 | 70 | 71 | 82 | 71 | 64 | 76 | 88 |
| TLC, % Predicted | 0 | 71 | 45 | 78 | 58 | 51 | 89 | 64 | 78 | 75 | 84 | 59 | 98 | 84 | 55 | 55 |
| | 12 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DLCO, % Predicted | 0 | 24 | 31 | 34 | 12 | 15 | 61 | 28 | 9 | 27 | 26 | 15 | 26 | 18 | 17 | 16 |
| | 12 | 29 | - | - | 14 | 19 | 61 | 33 | 22 | 23 | 29 | 12 | 22 | 18 | 14 | 25 |
| FVC%/DLCO% | 0 | 2.4 | 1.2 | 2.3 | 4.5 | 4.6 | 0.9 | 1.8 | 9.8 | 2.1 | 3 | 2.5 | 4 | 4.7 | 2.6 | 2.4 |
| | 12 | 2.3 | - | - | 4.4 | 3.9 | 1 | 1.6 | 3 | 2.7 | 2.8 | 3.2 | 4.3 | 4.7 | 3.1 | 1.6 |
| Oxygen Flow (Liters/min) | 0 | 2 | 5 | 3 | 6 | 6 | 4 | 0 | 5 | 3 | 3 | 6 | 2 | 6 | 5 | 2 |
| | 12 | 2 | 4 | 3.5 | 6 | 6 | 6 | 0 | 4 | 2.5 | 1 | 7 | 3 | 6 | 5 | 2 |
| | 26 | 2 | 4 | - | 6 | 6 | 8 | 3 | 4 | 2.5 | 3 | 8 | 6 | 6 | 5 | - |
| | 52 | - | 5 | - | - | - | - | 3 | - | 2 | 4 | - | - | - | 4 | - |
| Six Minute Walk: | | | | | | | | | | | | | | | | |
| 6-minute walk distance (meters) | 0 | 93 | 190 | 330 | 1 | 159 | 120 | 324 | 78 | 210 | 210 | 90 | 210 | 210 | 90 | 255 |
| | 12 | 240 | 180 | 390 | 18 | 216 | 150 | 414 | 99 | 360 | 303 | 120 | 200 | 327 | 160 | 275 |
| | 26 | 235 | 178 | - | 0 | 126 | 190 | 420 | 75 | 363 | 272 | 80 | 291 | 240 | 142 | - |
| | 52 | - | 165 | - | - | - | - | 507 | - | 333 | 275 | - | - | | 80 | - |
| Room Air % saturation (RA) | 0 | - | 87 | 84 | 79 | 79 | 90 | 82 | 84 | 94 | 84 | 66 | 85 | 80 | 74 | 89 |
| | 12 | - | 85 | 79 | 78 | 65 | 86 | 92 | 80 | 94 | 84 | 61 | 88 | 79 | 64 | 80 |
| 10L face mask, % saturation | 0 | 97 | 98 | 97 | 100 | 95 | 98 | 100 | 100 | 99 | 97 | 100 | 99 | 98 | 92 | 100 |
| | 12 | 100 | 94 | 95 | 96 | 100 | 97 | 100 | 99 | 100 | 98 | 99 | 100 | 97 | 86 | 100 |
| 10L face mask, % saturation  nadir | 0 | 93 | 75 | 76 | 89 | 81 | 97 | 92 | 80 | 98 | 82 | 77 | 87 | 85 | 70 | 95 |
| | 12 | - | 80 | 76 | 89 | 72 | 91 | 87 | 86 | 96 | 86 | 70 | 89 | 72 | 60 | 88 |
| BDI Score | 0 | - | - | - | - | 13 | 9 | 14 | 12 | 16 | 17 | 17 | 13 | 13 | 14 | 13 |
| | 12 | - | 17 | 13 | 13 | 13 | 9 | 14 | 13 | 13 | 17 | 15 | 11 | 13 | 8 | 15 |

Table 3: Pulmonary function testing, oxygen requirements, and 6 minute walk distance with Borg dyspnea index scores at baseline and end of study

[3]

LIQ_PH-ILD_00000243

| | Week | Patients | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Quality of Life/Dyspnea | | | | | | | | | | | | | | | | |
| UCSD SOB | 0 | 97 | 63 | 54 | 103 | 81 | - | 89 | 115 | 100 | 101 | 94 | 76 | 79 | - | 79 |
| | 12 | 67 | 77 | 32 | 101 | 70 | - | 68 | 104 | 71 | 88 | 72 | 43 | 52 | 97 | 81 |
| SF36 PCS aggregate | 0 | - | 15 | 87 | 33 | 56 | 21 | 52 | . | 17 | 16 | 22 | 40.4 | 20.2 | 13.2 | 63 |
| | 12 | - | 38 | 97 | 17 | 17 | 61 | 54 | 9 | 82 | 65 | 86 | 59.4 | 24.4 | 45.2 | 68 |
| SF36 MCS aggregate | 0 | - | 58 | 129 | 28 | 64 | 31 | 50 | . | 68 | 27 | 67 | 37.9 | 43.97 | 48.27 | 108.37 |
| | 12 | - | 80 | 137 | 48 | 112 | 42 | 74 | 63 | 108 | 72 | 79 | 73.63 | 56.53 | 68.53 | 106.3 |
| Individual SF36 Domains | | | | | | | | | | | | | | | | |
| Physical Functioning | 0 | - | 10 | 25 | 0 | 0 | 0 | 25 | - | 15 | 0 | 0 | 15 | 10 | 0 | 20 |
| | 12 | - | 25 | 35 | 0 | 0 | 100 | 30 | 0 | 45 | 15 | 15 | 50 | 5 | 15 | 30 |
| Role-Physical | 0 | - | 0 | 200 | 0 | 100 | 0 | 125 | - | 0 | 0 | 0 | 25 | 0 | 0 | 100 |
| | 12 | - | 100 | 300 | 0 | 0 | 100 | 125 | 0 | 200 | 200 | 275 | 100 | 0 | 100 | 100 |
| Bodily Pain | 0 | - | 32 | 100 | 100 | 100 | 52 | 52 | - | 41 | 42 | 62 | 62 | 61 | 31 | 100 |
| | 12 | - | 12 | 52 | 32 | 31 | 50 | 41 | 22 | 74 | 31 | 62 | 52 | 62 | 41 | 100 |
| General Health | 0 | - | 10 | 52 | 45 | 45 | 20 | 30 | - | 10 | 25 | 20 | 45 | 0 | 10 | 25 |
| | 12 | - | 25 | 42 | 35 | 25 | 10 | 30 | 5 | 25 | 40 | 30 | 40 | 15 | 25 | 40 |
| Vitality | 0 | - | 25 | 60 | 20 | 35 | 35 | 30 | - | 20 | 15 | 30 | 55 | 30 | 25 | 70 |
| | 12 | - | 30 | 55 | 20 | 30 | 45 | 45 | 20 | 65 | 40 | 50 | 55 | 40 | 45 | 70 |
| Social Functioning | 0 | - | 63 | 88 | 13 | 25 | 38 | 38 | - | 25 | 0 | 38 | 37.5 | 12.5 | 25 | 37.5 |
| | 12 | - | 75 | 100 | 13 | 38 | 0 | 63 | 0 | 88 | 25 | 63 | 62.5 | 25 | 50 | 37.5 |
| Role-Emotional | 0 | - | 133 | 367 | 0 | 133 | 0 | 100 | - | 233 | 67 | 200 | 0 | 133.33 | 133.33 | 333.33 |
| | 12 | - | 200 | 400 | 100 | 400 | 100 | 167 | 233 | 300 | 200 | 200 | 166.67 | 166.67 | 166.67 | 300 |
| Mental Health | 0 | - | 60 | 80 | 64 | 84 | 64 | 52 | - | 52 | 28 | 48 | 52 | 44 | 48 | 76 |
| | 12 | - | 68 | 88 | 72 | 68 | 56 | 64 | 56 | 60 | 56 | 52 | 44 | 36 | 56 | 84 |

Table 4: Quality of life and dyspnea score changes using Short Form 36 (SF-36) and University of California San Diego shortness of breath questionnaire
PCS: Physical Component Summary; MCS: Mental Component Summary

[4]

LIQ_PH-ILD_00000244

| | Week | Patients | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Hemodynamics, mmHg | | | | | | | | | | | | | | | | |
| Right atrial pressure (RA) | 0 | 11 | 12 | 18 | 8 | 8 | 9 | 8 | 14 | 11 | 7 | 6 | 10 | 10 | 5 | 6 |
| | 12 | 5 | 9 | 11 | 1 | 8 | 11 | 0 | 8 | 9 | 4 | 6 | 8 | 2 | 2 | 3 |
| mean Pulmonary Pressure (mPA) | 0 | 49 | 56 | 59 | 40 | 50 | 55 | 46 | 53 | 52 | 40 | 56 | 42 | 36 | 38 | 36 |
| | 12 | 20 | 51 | 51 | 30 | 48 | 70 | 29 | 49 | 35 | 31 | 47 | 35 | 22 | 32 | 34 |
| Pulmonary Artery Wedge Pressure | 0 | 18 | 12 | 18 | 6 | 10 | 15 | 15 | 5 | 14 | 10 | 9 | 12 | 14 | 18 | 11 |
| | 12 | 10 | 15 | 25 | 7 | 9 | 20 | 4 | 7 | 15 | 6 | 12 | 8 | 4 | 10 | 5 |
| Cardiac Output (L/min) | 0 | 3.73 | 3.75 | 3.87 | 3 | 4.1 | 3.07 | 7.2 | 2.9 | 5 | 3.7 | 4.5 | 5 | 5.7 | 4.6 | 3.6 |
| | 12 | 4 | 5.5 | 6.23 | 2.8 | 5.5 | 4.2 | 5.9 | 4.2 | 5.9 | 3.9 | 3.3 | 6.2 | 5.1 | 5.7 | 4.5 |
| Cardiac Index (L/min/$m_2$) | 0 | 2.2 | 2.25 | 2.02 | 1.75 | 2.3 | 1.68 | 3.36 | 1.31 | 2.7 | 1.96 | 2.6 | 2.8 | 3.05 | 2.2 | 2.1 |
| | 12 | 2.63 | 3.35 | 3.31 | 1.6 | 3.13 | 2.28 | 2.75 | 2.28 | 3.17 | 2.16 | 1.92 | 3.46 | 2.8 | 3.54 | 2.6 |
| PVR (dyn sec/$cm^5$) | 0 | 600 | 874 | 786 | 906 | 784 | 1040 | 344 | 1324 | 608 | 649 | 835 | 480 | 336 | 347 | 555 |
| | 12 | 200 | 378 | 462 | 657 | 567 | 952 | 338 | 800 | 271 | 512 | 848 | 348 | 282 | 313 | 515 |
| Mixed Venous $O_2$ Saturation (%) | 0 | 60 | 61 | 65 | 60 | 72 | - | 49 | - | 65 | 75 | 69 | . | 69 | . | |
| | 12 | 66 | 68 | 77 | 69 | 79 | 58 | - | 59 | 76 | 79 | 72 | 80 | . | 72 | 66 |
| Hemoglobin (g/dL) | 0 | 10.1 | 12.8 | 17.1 | 14.5 | 12.5 | 16.1 | 16.4 | 13 | 17.3 | 15 | 11.2 | 14 | 12.5 | 14.5 | 13.8 |
| | 12 | 10.8 | 13 | 16.5 | 13.8 | 13.1 | 12.9 | 14.9 | 11.3 | 14.6 | 18.7 | 10.1 | 15 | 12.9 | 14.4 | 11.8 |
| Arterial $O_2$ Content (mL $O_2$/100mL) | 0 | - | 1547.9 | 1996.6 | 1592.23 | 1372.63 | 2014.1 | 1869.27 | 1517.88 | 2260.42 | 1751.49 | 1027.45 | 1654.1 | 1390 | 1491.44 | 1707.2 |
| | 12 | - | 1535.95 | 1811.87 | 1496.2 | 1183.55 | 1542.09 | 1905.44 | 1256.56 | 1907.64 | 2183.41 | 856.38 | 1834.8 | 1416.55 | 1281.01 | 1312.12 |
| $O_2$ Delivery (mL/min) | 0 | - | 5804.64 | 7726.83 | 4776.74 | 5627.74 | 6183.32 | 13458.6 | 4401.85 | 11302.68 | | 4623.7 | 8270.5 | 7923 | 6860.74 | 6145.9 |
| | 12 | - | 8447.73 | 11287.9 | 4189.35 | 6509.72 | 6476.66 | 11241.5 | 5277.55 | 11255.11 | 8515.3 | 2826.05 | 11375.8 | 7224.4 | 7301.84 | 5904.72 |
| Pulmonary Capacitance (mL/mmHg) | 0 | 1.15 | 1.25 | 1.06 | 0.87 | 1.06 | 0.56 | 2.5 | 0.96 | 1.09 | 1.27 | 0.85 | 1.79 | 2.06 | 1.6 | 1.51 |
| | 12 | 3.03 | 1.34 | 1.84 | 1.17 | 1.16 | 0.63 | 3.29 | 1 | 2.45 | 1.54 | 0.62 | 1.75 | 3.8 | 1.78 | 1.6 |
| RV Pulsatility | 0 | 0.92 | 0.71 | 0.78 | 1.35 | 0.98 | 1.07 | 0.87 | 0.85 | 0.92 | 0.9 | 1.07 | 0.74 | 0.92 | 1.05 | 0.97 |
| | 12 | 1 | 0.902 | 0.9216 | 1.4 | 1.125 | 0.9714 | 0.9655 | 1.0204 | 0.8286 | 1.0323 | 1.234 | 1.0571 | 0.7727 | 1.25 | 1.0588 |
| Pulse Pressure | 0 | 45 | 40 | 46 | 54 | 49 | 59 | 40 | 45 | 48 | 36 | 60 | 31 | 33 | 40 | 35 |
| | 12 | 20 | 46 | 47 | 42 | 54 | 68 | 28 | 50 | 29 | 32 | 58 | 37 | 17 | 40 | 36 |
| Stroke Volume (mL) | 0 | 51.81 | 50 | 48.99 | 46.88 | 51.9 | 33.01 | 100 | 43.28 | 52.08 | 45.68 | 51.14 | 55.56 | 67.86 | 63.89 | 52.94 |
| | 12 | 60.61 | 61.8 | 86.53 | 49.12 | 62.5 | 42.86 | 92.19 | 50 | 71.08 | 49.37 | 35.87 | 64.58 | 64.56 | 71.25 | 57.69 |
| Stroke Volume Index | 0 | 30.56 | 30 | 25.57 | 27.34 | 29.11 | 18.06 | 46.67 | 19.55 | 28.13 | 24.2 | 25.51 | 31.11 | 36.31 | 30.56 | 30.96 |
| | 12 | 35.75 | 37.08 | 45.16 | 28.66 | 35.06 | 23.45 | 43.02 | 22.59 | 38.39 | 26.15 | 20.72 | 36.17 | 34.54 | 34.08 | 33.74 |
| Systolic Blood Pressure | 0 | 125 | 160 | 124 | 136 | 109 | 119 | - | 90 | 128 | 135 | 159 | 110 | 135 | 91 | 120 |
| | 12 | 107 | 147 | 101 | 103 | 106 | 113 | - | 100 | 126 | 109 | 127 | 105 | 108 | 118 | 116 |
| Mean Arterial Pressure | 0 | 75 | 114 | 91 | 98 | 68 | 96 | - | 70 | 92 | 105 | 113 | 83 | 92 | 73 | 70 |
| | 12 | 81 | 108 | 87 | 75 | 76 | 90 | - | 82 | 94 | 85 | 94 | 75 | 75 | 81 | 84 |
| HR (beats/minute) | 0 | 72 | 75 | 79 | 64 | 79 | 93 | 72 | 67 | 96 | 81 | 88 | 90 | 84 | 72 | 68 |
| | 12 | 66 | 89 | 72 | 57 | 88 | 98 | 64 | 84 | 83 | 79 | 92 | 96 | 79 | 80 | 78 |
| Rs (dyn sec/$cm^5$) | 0 | 1222.52 | 2176 | 1509.04 | 2453.33 | 1131.75 | 2110.75 | - | 1793.1 | 1248 | 2054.05 | 1848.89 | 1136 | 1094.74 | 956.52 | 1311.11 |
| | 12 | 1420 | 1207.2 | 924.56 | 1942.86 | 974.55 | 1333.33 | - | 1428.57 | 1071.19 | 1620.5 | 1987.88 | 864.52 | 1113.73 | 996.49 | 1404.44 |
| PVR/Rs | 0 | 0.49 | 0.4 | 0.52 | 0.37 | 0.69 | 0.49 | - | 0.74 | 0.49 | 0.32 | 0.45 | 0.42 | 0.31 | 0.36 | 0.42 |
| | 12 | 0.14 | 0.31 | 0.5 | 0.34 | 0.58 | 0.71 | - | 0.56 | 0.25 | 0.32 | 0.43 | 0.4 | 0.25 | 0.31 | 0.37 |
| TPG | 0 | 31 | 44 | 41 | 34 | 40 | 40 | 31 | 48 | 38 | 30 | 47 | 30 | 22 | 20 | 25 |

[5]

LIQ_PH-ILD_00000245

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12 | 10 | 26 | 36 | 23 | 39 | 50 | 25 | 42 | 20 | 25 | 35 | 27 | 18 | 22 | 29 |
| BNP (pg/mL) | 0 | 352 | 368 | 858 | 839 | 171 | 125 | 21 | 3470 | 20 | 66 | 250 | 408 | 54 | 554 | 810 |
| | 12 | 150 | 31 | 644 | 288 | 77 | 213 | 20 | 1310 | 20 | 123 | 20 | 102 | 20 | 165 | 244 |
| | 26 | 84 | 64 | - | 251 | 165 | 113 | 20 | 2030 | 20 | 20 | 240 | 189 | 21 | 102 | - |
| | 52 | - | 39 | - | - | - | - | 20 | - | 20 | 81 | - | - | - | 607 | - |

Table 5: Systemic & pulmonary hemodynamics and oxygenation at baseline compared to 12 weeks after parenteral treprostinil therapy

PVR: pulmonary vascular resistance; pulmonary capacitance = (stroke Volume/pulse pressure); Rs: systemic vascular resistance
TPG: transpulmonary gradient
BNP: brain natriuretic peptide

[6]

LIQ_PH-ILD_00000246

# EXHIBIT 23

*The* NEW ENGLAND JOURNAL *of* MEDICINE

---

## ORIGINAL ARTICLE

# Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease

Aaron Waxman, M.D., Ph.D., Ricardo Restrepo-Jaramillo, M.D.,
Thenappan Thenappan, M.D., Ashwin Ravichandran, M.D., Peter Engel, M.D.,
Abubakr Bajwa, M.D., Roblee Allen, M.D., Jeremy Feldman, M.D.,
Rahul Argula, M.D., Peter Smith, Pharm.D., Kristan Rollins, Pharm.D.,
Chunqin Deng, M.D., Ph.D., Leigh Peterson, Ph.D., Heidi Bell, M.D.,
Victor Tapson, M.D., and Steven D. Nathan, M.D.

---

### ABSTRACT

**BACKGROUND**

No therapies are currently approved for the treatment of pulmonary hypertension in patients with interstitial lung disease. The safety and efficacy of inhaled treprostinil for patients with this condition are unclear.

**METHODS**

We enrolled patients with interstitial lung disease and pulmonary hypertension (documented by right heart catheterization) in a multicenter, randomized, double-blind, placebo-controlled, 16-week trial. Patients were assigned in a 1:1 ratio to receive inhaled treprostinil, administered by means of an ultrasonic, pulsed-delivery nebulizer in up to 12 breaths (total, 72 $\mu$g) four times daily, or placebo. The primary efficacy end point was the difference between the two groups in the change in peak 6-minute walk distance from baseline to week 16. Secondary end points included the change in N-terminal pro–B-type natriuretic peptide (NT-proBNP) level at week 16 and the time to clinical worsening.

**RESULTS**

A total of 326 patients underwent randomization, with 163 assigned to inhaled treprostinil and 163 to placebo. Baseline characteristics were similar in the two groups. At week 16, the least-squares mean difference between the treprostinil group and the placebo group in the change from baseline in the 6-minute walk distance was 31.12 m (95% confidence interval [CI], 16.85 to 45.39; P<0.001). There was a reduction of 15% in NT-proBNP levels from baseline with inhaled treprostinil as compared with an increase of 46% with placebo (treatment ratio, 0.58; 95% CI, 0.47 to 0.72; P<0.001). Clinical worsening occurred in 37 patients (22.7%) in the treprostinil group as compared with 54 patients (33.1%) in the placebo group (hazard ratio, 0.61; 95% CI, 0.40 to 0.92; P=0.04 by the log-rank test). The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea.

**CONCLUSIONS**

In patients with pulmonary hypertension due to interstitial lung disease, inhaled treprostinil improved exercise capacity from baseline, assessed with the use of a 6-minute walk test, as compared with placebo. (Funded by United Therapeutics; INCREASE ClinicalTrials.gov number, NCT02630316.)

From Brigham and Women's Hospital, Boston (A.W.); the University of South Florida, Tampa (R.R.-J.), and St. Vincent's Lung, Sleep, and Critical Care Specialists, Jacksonville (A.B.) — both in FL; the University of Minnesota, Minneapolis (T.T.); St. Vincent Medical Group, Indianapolis (A.R.); the Carl and Edyth Lindner Research Center at the Christ Hospital, Cincinnati (P.E.); University of California Davis Medical Center, Sacramento (R. Allen), and Cedars–Sinai, Los Angeles (V.T.); Arizona Pulmonary Specialists, Phoenix (J.F.); the Medical University of South Carolina, Charleston (R. Argula); United Therapeutics Corporation, Silver Spring, MD (P.S., K.R., C.D., L.P., H.B.); and Inova Fairfax Hospital, Falls Church, VA (S.D.N.). Address reprint requests to Dr. Nathan at the Advanced Lung Disease and Lung Transplant Program, Inova Heart and Vascular Institute, 3300 Gallows Rd., Falls Church, VA 22042, or at steven.nathan@inova.org.

This article was published on January 13, 2021, at NEJM.org.

N Engl J Med 2021;384:325-34.
DOI: 10.1056/NEJMoa2008470
*Copyright © 2021 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

**UTC_PH-ILD_010790**

DA0586

*The* NEW ENGLAND JOURNAL *of* MEDICINE

Precapillary pulmonary hypertension is defined as an elevation in mean pulmonary arterial pressure and pulmonary vascular resistance.[1] In the World Health Organization (WHO) classification of pulmonary hypertension, precapillary pulmonary hypertension due to lung disease is classified as group 3. The most common lung diseases associated with group 3 pulmonary hypertension are chronic obstructive pulmonary disease and interstitial lung disease.

Pulmonary hypertension has been reported in up to 86% of patients with interstitial lung disease and is associated with reduced exercise capacity, greater need for supplemental oxygen, decreased quality of life, and earlier death.[2-4] Despite the global prevalence and poor clinical course of pulmonary hypertension due to interstitial lung disease, there are currently no approved therapies for these patients. Although data are limited, therapies approved for group 1 pulmonary hypertension (pulmonary arterial hypertension) have been used to treat group 3 pulmonary hypertension.[5] Previous studies of vasodilator therapies have shown conflicting results. The largest trial to date evaluated the soluble guanylate cyclase stimulator riociguat in a patient population with group 3 pulmonary hypertension and was stopped early owing to serious harm.[6]

Treprostinil is a stable analogue of prostacyclin, which promotes direct vasodilation of pulmonary and systemic arterial vascular beds and inhibits platelet aggregation.[7] An inhaled formulation of treprostinil was previously shown to improve exercise capacity after 12 weeks of therapy in patients with group 1 pulmonary hypertension.[8] Data from previously completed pilot studies suggest that inhaled treprostinil can improve hemodynamics and functional capacity in patients with group 3 pulmonary hypertension.[9-12] Therefore, the objective of the INCREASE trial was to evaluate the safety and efficacy of inhaled treprostinil in patients with pulmonary hypertension due to interstitial lung disease.

## METHODS

### TRIAL DESIGN AND OVERSIGHT

INCREASE was a multicenter, randomized, double-blind, placebo-controlled trial. The steering committee (the first author and last two authors), in collaboration with the trial sponsor (United Therapeutics), designed the trial and oversaw its conduct. The trial protocol (available with the full text of this article at NEJM.org) was approved by the institutional review board at each participating site. The trial was monitored by an independent data and safety monitoring committee and was conducted in accordance with Good Clinical Practice guidelines. A full list of trial personnel, including the investigators and trial committees, is provided in Section S1 in the Supplementary Appendix, available at NEJM.org.

The collection, management, and analysis of the data were performed by the sponsor according to a prespecified statistical analysis plan (provided in the protocol). An independent academic statistician reviewed the statistical analysis plan and confirmed the primary efficacy analyses. Authors had independent access to the data and authority to conduct and confirm statistical analyses. All manuscript drafts were written by the steering committee and authors affiliated with the sponsor and were reviewed and approved by all the authors. The authors assume responsibility for the accuracy and completeness of the data, as well as for the fidelity of the trial to the protocol.

### TRIAL POPULATION

The trial population consisted of patients 18 years of age or older in whom interstitial lung disease was diagnosed on the basis of evidence of diffuse parenchymal lung disease on computed tomography of the chest (not centrally adjudicated) performed within 6 months before randomization. Confirmation of group 3 pulmonary hypertension by right heart catheterization within 1 year before randomization was required. Group 3 pulmonary hypertension was defined by pulmonary vascular resistance of more than 3 Wood units, pulmonary capillary wedge pressure of 15 mm Hg or lower, and mean pulmonary arterial pressure of 25 mm Hg or higher. Patients with group 3 pulmonary hypertension due to connective tissue disease were also required to have a baseline forced vital capacity of less than 70%. Eligible patients also had to walk at least 100 m during a 6-minute walk test. Patients receiving drug treatment (i.e., pirfenidone or nintedanib) for their underlying lung disease were required to have been receiving a stable dose for at least 30 days before undergoing randomization. Patients re-

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010791

DA0587

ceiving approved therapy for pulmonary arterial hypertension within 60 days before randomization were not eligible for enrollment. A complete list of trial enrollment criteria is provided in Section S2. Written informed consent was obtained from all the patients.

### TRIAL PROCEDURES

Within 30 days after screening, eligible patients were randomly assigned in a 1:1 ratio to receive inhaled treprostinil (Tyvaso, United Therapeutics) or placebo in a double-blind manner. Randomization, based on permuted blocks, was stratified by baseline 6-minute walk distance (≤350 m vs. >350 m) and was implemented through an interactive Web-response system.

Inhaled treprostinil (0.6 mg per milliliter) was administered by means of an ultrasonic, pulsed-delivery nebulizer at 6 $\mu$g per breath. Placebo was administered similarly as a visually identical solution. The first dose of trial drug (3 breaths) was administered in the clinic, followed by at least a 1-hour observation period. The dose of treprostinil or placebo was adjusted, with dose escalation (an additional 1 breath four times daily) occurring as often as every 3 days, with a target dose of 9 breaths four times daily and a maximum dose of 12 breaths four times daily. Investigators adjusted the dose on an individual patient basis to achieve the maximum tolerated dose leading to functional improvement.

### TRIAL ASSESSMENTS

The 6-minute walk test was performed and laboratory data were obtained at baseline and at weeks 4, 8, 12, and 16, or at the time of early discontinuation of treprostinil or placebo. Each 6-minute walk test was performed 10 to 60 minutes after the most recent dose of active drug or placebo, which is the time of peak plasma treprostinil exposure. (A description of the procedure for the 6-minute walk test is provided in Section S3.) A trough test was performed at week 15 at least 4 hours after the participant received a dose of treprostinil or placebo and at least 24 hours before the week 16 test. Pulse oximetry was performed immediately before, during, and after each 6-minute walk test. Measurement of N-terminal pro–B-type natriuretic peptide (NT-proBNP) levels and pulmonary function tests were performed at baseline and at

weeks 8 and 16 (or at early discontinuation) after the patients recovered from the 6-minute walk test. The St. George's Respiratory Questionnaire (SGRQ), a quality-of-life measure, was completed at baseline and week 16 or at the time of early discontinuation.

### OUTCOME MEASURES

The primary end point of the trial was the difference between the two groups in the change in peak 6-minute walk distance from baseline to week 16. Secondary efficacy end points were analyzed in the following hierarchical testing order: the change in NT-proBNP level from baseline to week 16, the time to clinical worsening, the change in 6-minute walk distance at peak plasma treprostinil level at week 12, and the change in 6-minute walk distance at trough treprostinil level at week 15. The time to clinical worsening was evaluated from the time of randomization until the patient's withdrawal from the trial and was defined as the time until the occurrence of any one of the following events: hospitalization for a cardiopulmonary indication, a decrease in 6-minute walk distance greater than 15% from baseline that was directly related to the disease under study at two consecutive visits and at least 24 hours apart, death from any cause, or lung transplantation.

Exploratory end points were the changes in peak 6-minute walk distance at weeks 4 and 8, quality of life as measured with the use of the SGRQ at week 16, and the distance–saturation product (calculated by multiplying the total distance walked by the lowest oxygen saturation measurement during the 6-minute walk) at week 16. Safety end points included adverse events, abnormal laboratory results, oxygenation as measured by pulse oximetry ($Spo_2$) and supplemental oxygen requirement, changes in pulmonary function test results, hospitalization for a cardiopulmonary indication, and investigator-reported exacerbations of underlying lung disease, defined as acute, clinically significant respiratory deterioration characterized by evidence of new widespread alveolar abnormality. A full list of trial end points is provided in Section S4.

### STATISTICAL ANALYSIS

Original estimates suggested that with 266 patients randomly assigned in a 1:1 ratio to receive

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010792

DA0588

The NEW ENGLAND JOURNAL of MEDICINE

inhaled treprostinil or placebo, the trial would have at least 90% power at a significance level of 0.05 (two-sided) to detect a between-group difference of 30 m in the change in peak 6-minute walk distance from baseline at week 16, assuming a standard deviation of 75 m. To account for approximately 15% of participants discontinuing the trial, 314 patients would need to be enrolled.

For the primary efficacy analysis, the change in 6-minute walk distance was analyzed by mixed-model repeated-measures methods, under the assumption that missing data were missing at random. The model included the change from baseline to peak 6-minute walk distance as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and the baseline 6-minute walk distance as a covariate. A sensitivity analysis for the primary end point was performed by means of a multiple imputation approach with a multivariate normal imputation model according to the Markov chain Monte Carlo method. The imputation model included treatment group, all scheduled visits, the patient's sex, and the patient's age at randomization. If the result for the primary efficacy end point was significant, secondary efficacy end points were to be evaluated according to a hierarchical testing procedure. Confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects for secondary efficacy end points. Additional details of the statistical methods are provided in Section S5.

## RESULTS

### PATIENTS

Of 462 patients screened for eligibility, 326 were enrolled at 93 centers from February 3, 2017, through August 30, 2019, and were randomly assigned to receive placebo (163 patients) or inhaled treprostinil (163 patients) (Fig. 1). Reasons for screening failure for the 136 patients who were excluded are shown in Table S1. Baseline characteristics were similar in the two groups (Table 1). The mean age of the patients was 66.5 years, 46.9% were female, and the most common diagnosis was idiopathic interstitial pneumonia (in 44.8%). Baseline test data are provided in Table S2. At baseline, the mean 6-minute walk distance was 259.6 m, the mean pulmonary vascular resistance

was 6.2 Wood units, and the mean NT-proBNP level was 1832.9 pg per milliliter.

### EXPOSURE AND FOLLOW-UP

Patients in the treprostinil group took a median of 11 breaths from the inhaler (66 $\mu$g) at each of four daily sessions at week 12 and 12 breaths (72 $\mu$g) per session at week 16. The percentage of patients in this group who took 10 to 12 breaths (60 to 72 $\mu$g) per session was 57.0% at week 12 and 57.8% at week 16. Patients in the placebo group took a median of 12 breaths from the inhaler per session at weeks 12 and 16.

The date of the database lock was February 18, 2020. Forty patients assigned to receive inhaled treprostinil (24.5%) and 38 assigned to placebo (23.3%) discontinued the assigned regimen prematurely. These patients were encouraged to remain in the trial and complete assessments through week 16; 33 patients in the treprostinil group and 35 in the placebo group discontinued participation in the trial. The reasons for discontinuation are shown in Figure 1.

### PRIMARY END POINT

Mean within-group changes in the 6-minute walk distance are shown in Figure 2. Mixed-model repeated-measures analysis showed that the least-squares mean difference between the treprostinil group and the placebo group in the change from baseline in peak 6-minute walk distance was 31.12 m (95% confidence interval [CI], 16.85 to 45.39; P<0.001) (Table 2 and Fig. S1). Similar effects were observed across subgroups, including subgroups defined by disease cause and severity (as measured by baseline 6-minute walk distance), baseline hemodynamics, and dose group (Fig. S2). In addition, the between-group difference in the change from baseline in peak 6-minute walk distance at week 16 was significant when analyzed with multiple imputation according to the Markov chain Monte Carlo method (30.97 m; 95% CI, 16.53 to 45.41; P<0.001) (Fig. S3).

### SECONDARY AND EXPLORATORY END POINTS

Patients assigned to inhaled treprostinil, as compared with those assigned to placebo, showed significant improvements in each of the secondary end points (Table 2). The NT-proBNP level decreased 15% from baseline with inhaled treprostinil and increased 46% from baseline with

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010793

DA0589



**Figure 1. Screening, Randomization, and Follow-up.**

Of 462 patients screened for eligibility, 326 patients underwent randomization and received at least one dose of the assigned treprostinil or placebo (included in the intention-to-treat and safety populations). Reasons for screening failure (136 patients) are shown in Table S1. Of the patients who underwent randomization, 40 patients in the treprostinil group and 38 in the placebo group discontinued the assigned regimen prematurely. These patients were not withdrawn from the trial but were encouraged to remain and complete assessments through week 16; 33 patients in the treprostinil group and 35 in the placebo group discontinued trial participation before week 16.

placebo, as assessed by the least-squares mean for the log-transformed ratio to the baseline level at week 16 (treatment ratio, 0.58; 95% CI, 0.47 to 0.72; P<0.001) (Fig. S4). Clinical worsening occurred in 37 patients (22.7%) in the treprostinil group, as compared with 54 patients (33.1%) in the placebo group (hazard ratio, 0.61; 95% CI, 0.40 to 0.92; P=0.04 by the log-rank test) (Fig. S5). The least-squares mean change from baseline to week 12 in peak 6-minute walk distance was 31.29 m greater in the treprostinil group than in the placebo group (P<0.001), and the change

from baseline to week 15 in trough 6-minute walk distance was 21.99 m greater in the treprostinil group (P=0.004). There was no significant between-group difference in patient-reported quality of life as assessed with the SGRQ or in the distance–saturation product at week 16 (Tables S3 and S4).

**SAFETY END POINTS**

The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea (Table 3). Most of these

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010794

DA0590

The NEW ENGLAND JOURNAL of MEDICINE

**Table 1. Characteristics of the Patients at Baseline.***

| Characteristic | Inhaled Treprostinil (N=163) | Placebo (N=163) | All Patients (N=326) |
|---|---|---|---|
| Female sex — no. (%) | 85 (52.1) | 68 (41.7) | 153 (46.9) |
| Mean age at randomization (range) — yr | 65.6 (26–90) | 67.4 (36–85) | 66.5 (26–90) |
| Age distribution — no. (%) | | | |
| <65 yr | 64 (39.3) | 48 (29.4) | 112 (34.4) |
| 65 to <80 yr | 83 (50.9) | 100 (61.3) | 183 (56.1) |
| ≥80 yr | 16 (9.8) | 15 (9.2) | 31 (9.5) |
| Race or ethnic group — no. (%)† | | | |
| White | 112 (68.7) | 126 (77.3) | 238 (73.0) |
| Black or African American | 41 (25.2) | 30 (18.4) | 71 (21.8) |
| American Indian or Alaska Native | 2 (1.2) | 1 (0.6) | 3 (0.9) |
| Asian | 7 (4.3) | 5 (3.1) | 12 (3.7) |
| Multiple | 0 | 1 (0.6) | 1 (0.3) |
| Unknown | 1 (0.6) | 0 | 1 (0.3) |
| Hispanic or Latino ethnic group — no. (%)† | | | |
| Yes | 11 (6.7) | 16 (9.8) | 27 (8.3) |
| No | 152 (93.3) | 146 (89.6) | 298 (91.4) |
| Data missing | 0 | 1 (0.6) | 1 (0.3) |
| Mean time since diagnosis — yr | 0.54±1.16 | 0.54±1.31 | 0.54±1.23 |
| Cause of lung disease — no. (%) | | | |
| Idiopathic interstitial pneumonia | 65 (39.9) | 81 (49.7) | 146 (44.8) |
| Chronic hypersensitivity pneumonitis | 10 (6.1) | 9 (5.5) | 19 (5.8) |
| Occupational lung disease | 5 (3.1) | 1 (0.6) | 6 (1.8) |
| Combined pulmonary fibrosis and emphysema | 42 (25.8) | 40 (24.5) | 82 (25.2) |
| Connective tissue disease | 40 (24.5) | 32 (19.6) | 72 (22.1) |
| Other | 1 (0.6) | 0 | 1 (0.3) |
| Idiopathic interstitial pneumonia subcategory — no. (%) | | | |
| Idiopathic pulmonary fibrosis | 37 (22.7) | 55 (33.7) | 92 (28.2) |
| Idiopathic nonspecific interstitial pneumonia | 21 (12.9) | 16 (9.8) | 37 (11.3) |
| Respiratory bronchiolitis associated with interstitial lung disease | 2 (1.2) | 0 | 2 (0.6) |
| Desquamative interstitial pneumonia | 0 | 1 (0.6) | 1 (0.3) |
| Acute interstitial pneumonia | 0 | 1 (0.6) | 1 (0.3) |
| Unclassified idiopathic interstitial pneumonia | 5 (3.1) | 8 (4.9) | 13 (4.0) |
| Use of supplemental oxygen — no. (%) | 119 (73.0) | 114 (69.9) | 233 (71.5) |
| Background therapy — no. (%) | | | |
| None | 133 (81.6) | 119 (73.0) | 252 (77.3) |
| Pirfenidone only | 19 (11.7) | 25 (15.3) | 44 (13.5) |
| Nintedanib only | 11 (6.7) | 19 (11.7) | 30 (9.2) |

\* Plus–minus values are means ±SD. Additional patient characteristics at baseline are provided in Table S2 in the Supplementary Appendix. Percentages may not total 100 because of rounding.
† Race and ethnic group were reported by the patient.

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010795

DA0591

events were of mild-to-moderate intensity. Serious adverse events occurred in 23.3% of the patients who received inhaled treprostinil and in 25.8% of those who received placebo (Table S5). No serious adverse events were reported significantly more frequently in the treprostinil group than in the placebo group. A full list of serious adverse events is provided in Table S5.

Significantly fewer patients in the treprostinil group than in the placebo group had exacerbations of underlying lung disease (43 [26.4%] vs. 63 [38.7%]; P=0.02 by Fisher's exact test). Fewer patients in the treprostinil group than in the placebo group had a first occurrence of clinical worsening that involved hospitalization for a cardiopulmonary indication (18 [11.0%] vs. 24 [14.7%]; P=0.41). Inhaled treprostinil had no deleterious effect on any pulmonary function test variable during the trial (Table S6). There were no significant treatment-related changes in pulse oximetry or supplemental oxygen use in either group over the trial period (Tables S7 and S8).

## DISCUSSION

Pulmonary hypertension frequently complicates the treatment of patients with interstitial lung disease and is associated with worse functional status, greater need for supplemental oxygen, and worse outcomes.[3,13] In the INCREASE trial, patients treated with inhaled treprostinil had significant improvements in exercise capacity, as evidenced by changes in the 6-minute walk distance. Treatment with inhaled treprostinil was also associated with a lower risk of clinical worsening than that in patients who received placebo, as well as reductions in NT-proBNP levels and fewer exacerbations of underlying lung disease, over the 16-week treatment period. The safety profile of inhaled treprostinil observed in this vulnerable patient population was similar to that reported in previous studies. The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea. The use of inhaled treprostinil was not associated with any decrement in lung function.

Patients with group 3 pulmonary hypertension are often treated with systemic pulmonary vasodilators, which are currently approved only for treatment of group 1 pulmonary hypertension. However, there is concern that such agents



**Figure 2. Mean Change from Baseline in Peak 6-Minute Walk Distance through Week 16.**
Shown are mean (±SE) changes from baseline (dashed line) in peak 6-minute walk distance over the 16-week trial period. The data shown are for patients with available data (observed) as well as for the results of two analysis methods used to account for missing data. The values shown at each data point indicate the number of patients assessed at that time point. The primary analysis used mixed-model repeat-measurement (MMRM) methods, with the assumption that missing data were missing at random. The model included the change from baseline to peak 6-minute walk distance as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and the baseline 6-minute walk distance as a covariate. A sensitivity analysis for the primary end point was performed with the use of a multiple imputation approach with a multivariate normal imputation model using the Markov chain Monte Carlo (MCMC) method. The imputation model included treatment group, all scheduled visits, patient's sex, and patient's age at randomization. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

could worsen ventilation–perfusion matching in patients with group 3 pulmonary hypertension. Inhaled agents have the advantage of preferentially redirecting blood flow to the best-ventilated lung units, thus reducing the risk of ventilation–perfusion mismatching.[9,14] Indeed, a retrospective study of inhaled treprostinil in patients with group 3 pulmonary hypertension showed that such patients had improvements in functional class and 6-minute walk distance without any adverse effect on peripheral oxygen saturation, reinforcing the concept of unchanged or even improved ventilation–perfusion matching with inhaled treprostinil.[10] Similarly, in the current trial, we found no evidence of worsened oxygenation, which further allays concerns about ventilation–perfusion mismatching.

The INCREASE trial was not without its limi-

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010796

DA0592

The NEW ENGLAND JOURNAL of MEDICINE

**Table 2. Summary of Primary and Secondary End Points.\***

| End Point | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | Treatment Effect (95% CI) | P Value |
|---|---|---|---|---|
| **Primary end point** | | | | |
| Change in peak 6-minute walk distance from baseline to wk 16 — m† | 21.08±5.12 | −10.04±5.12 | 31.12±7.25 (16.85 to 45.39)‡ | <0.001 |
| **Secondary end points§** | | | | |
| Change in plasma concentration of NT-proBNP from baseline to wk 16¶ | | | | |
| Mean (±SD) change — pg/ml | −396.35±1904.90 | 1453.95±7296.20 | | |
| Median — pg/ml | −22.65 | 20.65 | | |
| Range — pg/ml | −11,433.0 to 5373.1 | −5483.3 to 87,148.3 | | |
| Ratio to baseline | 0.85±0.06 | 1.46±0.11 | 0.58±0.06 (0.47 to 0.72)‖ | <0.001 |
| Occurrence of clinical worsening — no. (%) | | | 0.61 (0.4 to 0.92)\*\* | 0.04 |
| Any event | 37 (22.7) | 54 (33.1) | | |
| Hospitalization for cardiopulmonary indication | 18 (11.0) | 24 (14.7) | | |
| Decrease in 6-minute walk distance of >15% from baseline | 13 (8.0) | 26 (16.0) | | |
| Death from any cause | 4 (2.5) | 4 (2.5) | | |
| Lung transplantation | 2 (1.2) | 0 | | |
| Least-squares mean change in peak 6-minute walk distance from baseline to wk 12 — m† | 18.77±4.99 | −12.52±5.01 | 31.29±7.07 (17.37 to 45.21)‡ | <0.001 |
| Least-squares mean change in trough 6-minute walk distance from baseline to wk 15 — m | 9.3±5.5 | −12.7±5.5 | 21.99±7.7 (6.85 to 37.14)‡ | 0.005††|

\*  Plus–minus values are means ±SE, unless otherwise indicated. For secondary end points, the confidence intervals (CIs) have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects. NT-proBNP denotes N-terminal pro–B-type natriuretic peptide.

†  The effect of inhaled treprostinil as compared with placebo on the change in 6-minute walk distance was evaluated with the use of a mixed-model repeat measurement with the change from baseline in peak 6-minute walk distance as the dependent variable; treatment, week, and treatment-by-week interaction as the fixed effects; baseline 6-minute walk distance as the covariate; and subject as the random effect. Results are shown in Figures S1 and S3.

‡  This is a least-squares mean difference between the groups.

§  The effect of inhaled treprostinil as compared with placebo on the change in log-transformed NT-proBNP was evaluated with the use of a mixed-model repeat measurement with the change from baseline in log-transformed NT-proBNP as the dependent variable; treatment, week, and treatment-by-week interaction as the fixed effects; and log-transformed baseline NT-proBNP as the covariate. Ratio to baseline is the least-squares mean of the change from baseline in log-transformed data.

¶  The change in plasma concentration of NT-proBNP from baseline to week 16 was assessed in 156 patients in the treprostinil group and 160 in the placebo group.

‖  This is the treatment ratio, which is the ratio of ratios between two treatment groups.

\*\*  This is a hazard ratio, calculated from a Cox proportional-hazards model. The P value was calculated with the use of a log-rank test stratified by the baseline 6-minute walk distance category.

††  The P value was obtained from 100 multiple imputations with Markov chain Monte Carlo estimation with the use of analysis of covariance (ANCOVA) modeling, with the change from baseline in peak 6-minute walk distance as the dependent variable, treatment as a fixed effect, and baseline 6-minute walk distance as a covariate.

tations. The trial was of short duration, and 21% of the patients discontinued the trial prematurely (before week 16). In addition, events of clinical worsening and exacerbation of underlying lung disease were investigator-reported and not adjudicated by an independent review committee. Finally, the size of the favorable treatment effect on the 6-minute walk distance with inhaled treprostinil is similar to estimates of the minimum clinically important difference for this test in patients with pulmonary disease (21.7 to 37 m in a study by Nathan et al., and 24 to 45 m in a study by du Bois et al.).[15,16]

This study showed that among patients with

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010797

DA0593

**Table 3. Summary of Adverse Events.**

| Variable | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | P Value* |
|---|---|---|---|
| Total no. of adverse events | 890 | 793 | |
| Patients with ≥1 adverse event — no. (%) | 152 (93.3) | 149 (91.4) | 0.68 |
| Total no. of serious adverse events† | 53 | 89 | |
| Patients with ≥1 serious adverse event — no. (%) | 38 (23.3) | 42 (25.8) | 0.70 |
| Total no. of adverse events leading to withdrawal of treprostinil or placebo | 47 | 38 | |
| Most frequently occurring adverse events — no. of patients (%)‡ | | | |
| Cough | 71 (43.6) | 54 (33.1) | 0.07 |
| Headache | 45 (27.6) | 32 (19.6) | 0.12 |
| Dyspnea | 41 (25.2) | 51 (31.3) | 0.27 |
| Dizziness | 30 (18.4) | 23 (14.1) | 0.37 |
| Nausea | 25 (15.3) | 26 (16.0) | >0.99 |
| Fatigue | 23 (14.1) | 23 (14.1) | >0.99 |
| Diarrhea | 22 (13.5) | 19 (11.7) | 0.74 |
| Throat irritation | 20 (12.3) | 6 (3.7) | 0.007 |
| Oropharyngeal pain | 18 (11.0) | 4 (2.5) | 0.003 |
| NT-proBNP increased | 9 (5.5) | 25 (15.3) | 0.006 |

* P values were calculated with the use of Fisher's exact test.
† A list of serious adverse events is shown in Table S5.
‡ Shown are the most frequently occurring adverse events occurring in more than 10% of patients in either group in the safety population, which comprised all patients who underwent randomization and received at least one dose of treprostinil or placebo.

pulmonary hypertension due to interstitial lung disease, treatment with inhaled treprostinil improved exercise capacity as shown by improvement in the 6-minute walk distance through the end of the 16-week treatment period. In addition, treatment with inhaled treprostinil was associated with a lower risk of clinical worsening than that with placebo, a reduction in NT-proBNP levels, and fewer exacerbations of underlying lung disease.

Supported by United Therapeutics.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

A data sharing statement provided by the authors is available with the full text of this article at NEJM.org.

We thank Lisa Edwards, Ph.D. (United Therapeutics), for statistical expertise and support provided in the conduct of the trial; and Eric Shen, Pharm.D. (United Therapeutics), and April Ingram (Upstart Medical Communications) for editorial support with an earlier version of the manuscript, funded by United Therapeutics.

**REFERENCES**

1. Simonneau G, Montani D, Celermajer DS, et al. Haemodynamic definitions and updated clinical classification of pulmonary hypertension. Eur Respir J 2019;53: 1801913.
2. Nathan SD. Pulmonary hypertension in interstitial lung disease. Int J Clin Pract Suppl 2008;160:21-8.
3. Nathan SD, Hassoun PM. Pulmonary hypertension due to lung disease and/or hypoxia. Clin Chest Med 2013;34:695-705.

4. King CS, Shlobin OA. The trouble with group 3 pulmonary hypertension in interstitial lung disease: dilemmas in diagnosis and the conundrum of treatment. Chest 2020;158:1651-64.
5. Trammell AW, Pugh ME, Newman JH, Hemnes AR, Robbins IM. Use of pulmonary arterial hypertension-approved therapy in the treatment of non-group 1 pulmonary hypertension at US referral centers. Pulm Circ 2015;5:356-63.

6. Nathan SD, Behr J, Collard HR, et al. Riociguat for idiopathic interstitial pneumonia-associated pulmonary hypertension (RISE-IIP): a randomised, placebo-controlled phase 2b study. Lancet Respir Med 2019;7:780-90.
7. Whittle BJ, Silverstein AM, Mottola DM, Clapp LH. Binding and activity of the prostacyclin receptor (IP) agonists, treprostinil and iloprost, at human prostanoid receptors: treprostinil is a potent

The New England Journal of Medicine
Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.
Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010798

DA0594

DP1 and EP2 agonist. Biochem Pharmacol 2012;84:68-75.

**8.** McLaughlin VV, Benza RL, Rubin LJ, et al. Addition of inhaled treprostinil to oral therapy for pulmonary arterial hypertension: a randomized controlled clinical trial. J Am Coll Cardiol 2010;55:1915-22.

**9.** Faria-Urbina M, Oliveira RKF, Agarwal M, Waxman AB. Inhaled treprostinil in pulmonary hypertension associated with lung disease. Lung 2018;196:139-46.

**10.** Agarwal M, Waxman AB. Inhaled treprostinil in group-3 pulmonary hypertension. J Heart Lung Transplant 2015;34: Suppl:S343. abstract.

**11.** Bajwa AA, Shujaat A, Patel M, Thomas C, Rahaghi F, Burger CD. The safety and tolerability of inhaled treprostinil in patients with pulmonary hypertension and chronic obstructive pulmonary disease. Pulm Circ 2017;7:82-8.

**12.** Wang L, Jin Y-Z, Zhao Q-H, et al. Hemodynamic and gas exchange effects of inhaled iloprost in patients with COPD and pulmonary hypertension. Int J Chron Obstruct Pulmon Dis 2017;12: 3353-60.

**13.** Lettieri CJ, Nathan SD, Browning RF, Barnett SD, Ahmad S, Shorr AF. The distance-saturation product predicts mortality in idiopathic pulmonary fibrosis. Respir Med 2006;100:1734-41.

**14.** Dernaika TA, Beavin M, Kinasewitz GT. Iloprost improves gas exchange and exercise tolerance in patients with pulmonary hypertension and chronic obstructive pulmonary disease. Respiration 2010; 79:377-82.

**15.** Nathan SD, du Bois RM, Albera C, et al. Validation of test performance characteristics and minimal clinically important difference of the 6-minute walk test in patients with idiopathic pulmonary fibrosis. Respir Med 2015;109:914-22.

**16.** du Bois RM, Weycker D, Albera C, et al. Six-minute-walk test in idiopathic pulmonary fibrosis: test validation and minimal clinically important difference. Am J Respir Crit Care Med 2011;183:1231-7.

*Copyright © 2021 Massachusetts Medical Society.*

RECEIVE IMMEDIATE NOTIFICATION WHEN AN ARTICLE IS PUBLISHED ONLINE FIRST

To be notified by email when *Journal* articles are published online first, sign up at NEJM.org.

The New England Journal of Medicine

Downloaded from nejm.org on February 16, 2024. For personal use only. No other uses without permission.

Copyright © 2021 Massachusetts Medical Society. All rights reserved.

UTC_PH-ILD_010799

DA0595

# Supplementary Appendix

This appendix has been provided by the authors to give readers additional information about their work.

Supplement to: Waxman A, Restrepo-Jaramillo R, Thenappan T, et al. Inhaled treprostinil in pulmonary hypertension due to interstitial lung disease. N Engl J Med 2021;384:325-34. DOI: 10.1056/NEJMoa2008470

UTC_PH-ILD_010800

INCREASE Supplementary Appendix

# Table of Contents

1. List of Investigators and Trial Committees .......................................................................... 3

2. Study Inclusion and Exclusion Criteria ............................................................................... 6

    **2.1 Inclusion Criteria**........................................................................................................**6**

    **2.2 Exclusion Criteria** ......................................................................................................**7**

3. Methods .............................................................................................................................. 8

    **3.1  Procedure for 6-Minute Walk Test** .........................................................................**8**

4. Study Endpoints ................................................................................................................ 10

5. Statistical Methods ........................................................................................................... 12

6. Supplementary Figures ..................................................................................................... 14

    **Figure S1. 6-Minute Walk Distance Treatment Effect Using Mixed Model Repeated Measurement Through Week 16.**........................................................................................**14**

    **Figure S2. Forest Plot on Subgroup Analyses of Peak 6-Minute Walk Distance (meter) at Week 16. 15**

    **Figure S3. 6-Minute Walk Distance Treatment Effect Using Multiple Imputation Through Week 16.16**

    **Figure S4. NT-proBNP Results by Study Visit (pg/mL).** .....................................................**17**

    **Figure S5. Kaplan-Meier Plot of Time to First Clinical Worsening Event.** ..........................**18**

    **Figure S6. Hodges-Lehmann Estimate of Treatment Effect for 6-Minute Walk Distance Through Week 16.**........................................................................................................................**19**

7. Supplementary Tables ...................................................................................................... 20

    **Table S1. Summary of Screen Failure Reasons.** ..............................................................**20**

    **Table S2. Additional Baseline Patient Characteristics.**....................................................**21**

    **Table S3. St. George's Respiratory Questionnaire Results.** .............................................**22**

    **Table S4. Distance Saturation Product Results by Study Visit (m%).** ...............................**23**

    **Table S5. Serious Adverse Events by Preferred Term** .....................................................**24**

    **Table S6. Analysis of Lung Function Test Parameters Using Mixed Model Repeated Measurement. 26**

    **Table S7. SpO$_2$ (%) Measured by Pulse Oximetry Results at Baseline and Week 16.** ........**28**

    **Table S8. Supplemental Oxygen Use (L/min) at Baseline and Week 16.** ...........................**29**

8. References ......................................................................................................................... 30

2

**UTC_PH-ILD_010801**

INCREASE Supplementary Appendix

# 1. List of Investigators and Trial Committees

**The INCREASE Investigators are as follows:**

Roblee Allen, MD, University of California, Davis Medical Center; Hassan Alnuaimat, MD, University of Florida Clinical Research Center; MaryEllen Antkowiak, MD, Vermont Lung Center; Alvaro Aranda, MD, Auxilio Mutuo Hospital; Rahul Argula, MD, Medical University of South Carolina; Francis J Averill, MD, JD, St. Francis Sleep Allergy and Lung Institute; Rana Awdish, MD, Henry Ford Health System; Remzi Bag, MD, University of Chicago Medical Center; Abubakr A. Bajwa, MD, St. Vincent's Lung, Sleep, and Critical Care Specialists; Vandana Kavita Seeram, MD, Abubakr A. Bajwa, MD, University of Florida College of Medicine; Vijay Balasubramanian, MD, University of California San Francisco – Fresno; Christopher Barnett, MD, MedStar Washington Hospital Center; Sonja Bartolome, MD, UT Southwestern Medical School; Himanshu Bhardwaj, MD, OU Medical Center; Robert C Bourge, MD, The Kirklin Clinic of UAB Hospital; Jeffrey Robinson, MD, John Butler, MD, The Oregon Clinic-Pulmonary, Critical Care & Sleep Medicine-West; Andrew Kolodziej, MD, Ketan Buch, MD, University of Kentucky Medical Center; Todd M. Bull, MD, University of Colorado Hospital – Cardiac and Vascular Center; Charles Burger, MD, Mayo Clinic Florida; Hector Cajigas, MD, Northwestern University School of Medicine; Michael Campos, MD, Miami Veterans Affairs Medical Center; Amy Case, MD, Piedmont – Georgia Lung Associates; Roxana Sulica, MD, Rany Condos, MD, NYU Langone Health; David De La Zerda, MD, University of Miami Pulmonary Research Center; Shilpa DeSouza, MD, Winthrop-University Hospital, Clinical Trials Center; Adrian G. DiVittorio, MD, IMC - Diagnostic & Medical Clinic; Hilary M. DuBrock, MD, MMSc, Mayo Clinic; Michael S. Eggert, MD, Sentara Norfolk General Hospital; Sherif G. El Bayadi, MD, Pulmonary Health Physicians, PC; Jean Elwing, MD, UC Health; Peter J. Engel, MD, The Carl and Edyth Lindner Research Center at The Christ Hospital; Karen A. Fagan, MD, University of South Alabama; Peter S. Marshall, MD, Wassim Fares, MD, Yale New Haven Hospital; Jeremy P. Feldman, MD, Arizona Pulmonary Specialists, Ltd.; Micah Fisher, MD, The Emory Clinic; Hubert James Ford III, MD, University of North Carolina Hospitals; Dr. Sandeep Sahay, MD, Adaani Frost, MD, Houston Methodist; James Patrick Gagermeier, MD, Loyola University Medical Center; Sivagini Ganesh, MD, University of Southern California, Health Sciences Campus; Hernando Garcia, MD, Texas Tech University, Health Sciences Center at El Paso; Alicia Gerke, MD, University of Iowa Hospitals & Clinics; Reda Ebeid Girgis, MD, Spectrum Health Heart & Lung Specialized Care Clinic; Jeffrey Golden, MD, University of California San Francisco; Maria Giovanna Trivieri, MD, Radha Gopalan, MD, Mount Sinai Medical Center; John Kingrey, MD, Janardhana Gorthi, MD, INTEGRIS Baptist Medical Center; Dana McGlothlin, MD, Sachin Gupta, MD, Kaiser Permanente; Antoine Hage, MD, Cedars - Sinai Medical Center; William Harvey, MD, IU Health Physicians Advanced Heart & Lung Clinic; Paul Hassoun, MD, Johns Hopkins University, Pulmonary and Critical Care Medicine; Nicholas Hill, MD, Tufts Medical Center; Lawrence Ho, MD, University of Washington Medical Center; Ahmed El-Bershawi, MD, Heba Ismail, MD, Pacific Pulmonary Medical Group; Behrouz Jafari, MD, VA Long Beach Healthcare System; Javier Jimenez, MD, South Miami Heart Specialists; Shilpa Johri,

3

UTC_PH-ILD_010802

INCREASE Supplementary Appendix

MD, Pulmonary Associates of Richmond, Inc.; Christopher King, MD, Inova Fairfax Medical Campus; Tunay Kuru, MD, MedStar Georgetown University Hospital; Matthew Lammi, MD, Louisiana State University Health Sciences Center – New Orleans; Jennifer Davel, MD, Navneet Lather, MD, Community Heart and Vascular Facility of Community Hospital East; Deborah J. Levine, MD, University of Texas Health Science Center; Dustin R. Fraidenburg, MD, Roberto F. Machado, MD, University of Illinois at Chicago Hospital; Yolanda Mageto, MD, MPH, Baylor University Medical Center; Catherine J. Markin, MD, Legacy Medical Group - Pulmonary and Sleep Clinic; Scott E. Mattson, DO, Lutheran Medical Group; John W. McConnell, MD, Kentuckiana Pulmonary Associates; Colleen A. McEvoy, MD, Washington University; Boris I. Medarov, MD, Albany Medical College; Lana Melendres-Groves, MD, University of New Mexico; Jeffrey E. Michaelson, MD, Wellstar Medical Group - Pulmonary Medicine; Ruth Minkin, MD, New York Methodist Hospital; Hadi Chohan, MD, Syed I. Mobin, MD, Central Florida Pulmonary Group, PA; Sydney B. Montesi, MD, Massachusetts General Hospital; Majid Mughal, MD, McLaren Greater Lansing; Rachel E. Nisbet, MD, Hamilton Mill Clinical Research; Amy Olson, MD, National Jewish Health; Lavannya Pandit, MD, Michael E. DeBakey VA Medical Center; Joseph Parambil, MD, Cleveland Clinic; Bela Patel, MD, Memorial Hermann Hospital - Texas Medical Center; David Poch, MD, USCD Medical Center; Kenneth W. Presberg, MD, Medical College of Wisconsin/Froedtert Hospital; Michael A. Pritchett, DO, Pinehurst Medical Clinic; Jinesh Mehta, MD, Franck Rahaghi, MD, Cleveland Clinic Florida; Sudarshan Rajagopal, MD, PhD, Duke University Medical Center - Duke South Clinic; Amresh Raina, MD, Allegheny General Hospital; Gautam V. Ramani, MD, University of Maryland Medical Center Division of Cardiology; Abhijit Raval, MD, AnMed Health Pulmonary and Sleep Medicine; Ashwin K. Ravichandran, MD, St. Vincent Medical Group, Inc.; Ricardo Restrepo-Jaramillo, MD, University of South Florida; Michael Risbano, MD, UPMC Montfiore University Hospital; Franz Rischard, DO, University of Arizona; Justin Roberts, DO, Lancaster General Health; James Runo, MD, University of Wisconsin School of Medicine and Public Health; Shigeki Saito, MD, Tulane Medical Center; Jeffrey Sager, MD, Santa Barbara Cottage Hospital; Robert J Schilz, DO, PhD, University Hospitals Case Medical Center (UHCMC); Karim El-Kersh, MD, Jimmy Shaun Smith, DO, University of Louisville Physicians Outpatient Center; Shelley Shapiro, MD, PhD, Department of Veterans Affairs Greater Los Angeles Healthcare System; Kerri Akaya Smith, MD, Penn Medicine University City; Lewis Gilmer Satterwhite, MD, Leslie Spikes, MD, University of Kansas Medical Center; Irina Sobol, MD, New York Presbyterian - Weill Cornell Medicine; John Robert Spurzem, MD, University of Mississippi Medical Center; Joseph Stevenson, DO, Saint Mary's Regional Medical Center, Saint Mary's Health Network; John Swisher, PhD, MD, Statcare Pulmonary Consultants; Roxana Sulica, MD, ICAHN School of Medicine – Mount Sinai Beth Israel; Arunabh Talwar, MD, FCCP, Northwell Health; Nitin Y. Bhatt, MD, Rajive Tandon, MD, The Ohio State University Wexner Medical Center; James Tarver, MD, Florida Hospital; Thenappan Thenappan, MD, University of Minnesota; Austin B. Thompson III, MD, Nebraska Medicine; Fred Umeh, MD, Clinical Research Specialists, LLC; Rajat Walia, MD, St. Joseph's Hospital and Medical Center; Aaron B. Waxman, MD, PhD, Brigham and Women's Hospital; Sheila Weaver, DO, Temple

4

UTC_PH-ILD_010803

INCREASE Supplementary Appendix

University Hospital, Temple Lung Center; Joel A. Wirth, MD, Chest Medicine Associates; Mark Yagan, MD, Saint Luke's Hospital of Kansas City; Peter Yau, MD, FCCP, Scott & White Memorial Hospital and Clinic; Mark Yoder, MD, Rush University Medical Center; Dianne L. Zwicke, MD, Aurora St. Luke's Medical Center.

**INCREASE Steering Committee Members:** Aaron Waxman, MD, PhD, Brigham and Women's Hospital; Victor Tapson, MD, Cedars Sinai; Steven D. Nathan, MD, Inova Fairfax Hospital

**INCREASE Data Monitoring Committee:** David Badesch, MD, FACP, FCCP, University of Colorado Denver; David Langleben, MD, Jewish General Hospital; Ronald Oudiz, MD, FACP, FACC, FCCP, UCLA Medical Center; Lisa Weisfeld, PhD, Statistics Collaborative

**Independent Academic Statistician:** Joseph Ibrahim, PhD, Gillings School of Global Public Health, University of North Carolina at Chapel Hill

5

UTC_PH-ILD_010804

INCREASE Supplementary Appendix

# 2. Study Inclusion and Exclusion Criteria

## 2.1 Inclusion Criteria

1. Subject voluntarily gives informed consent to participate in the study.
2. Males and females aged 18 years or older at the time of informed consent.
   a. Females of reproductive potential[1] must be non-pregnant (as confirmed by a urine pregnancy test at screening) and non-lactating, and will:
      i. Either abstain from intercourse (when it is in line with their preferred and usual lifestyle), or
      ii. Use 2 medically acceptable, highly effective forms of contraception[2] for the duration of the study, and at least 30 days after discontinuing study drug.
   b. Males with a partner of childbearing potential must use a condom for the duration of treatment and for at least 48 hours after discontinuing study drug.
3. The subject has a confirmed diagnosis of World Health Organization Group 3 pulmonary hypertension based on computed tomography imaging, which demonstrates evidence of diffuse parenchymal lung disease performed within 6 months prior to randomization. Subjects may have any form of interstitial lung disease or combined pulmonary fibrosis and emphysema.
4. Subjects are required to have a right heart catheterization within 1 year prior to randomization with the following documented parameters:
   a. Pulmonary vascular resistance >3 Wood Units and
   b. A pulmonary capillary wedge pressure of ≤15 mmHg and
   c. A mean pulmonary arterial pressure of ≥25 mmHg
5. Baseline 6-minute walk distance ≥ 100 meters.
6. Subjects on a chronic medication for underlying lung disease (ie, pirfenidone, nintedanib, etc) must be on a stable and optimized dose for ≥30 days prior to randomization.
7. In the opinion of the Investigator, the subject is able to communicate effectively with study personnel, and is considered reliable, willing and likely to be cooperative with protocol requirements, including attending all study visits.
8. Subjects with connective tissue disease must have a Baseline forced vital capacity of <70%.

[1] Females who are successfully sterilized (surgical sterilization methods include hysterectomy, bilateral tubal ligation, or bilateral oophorectomy) or are postmenopausal (defined as amenorrhea for at least 12 consecutive months) are not considered to be of reproductive potential.

[2] Medically acceptable, highly effective forms of contraception can include approved hormonal contraceptives (oral, injectable, and implantable), and barrier methods (such as a condom or diaphragm) when used with a spermicide.  For women of reproductive potential, a negative pregnancy test is required at Screening and Baseline prior to initiating study drug.

6

UTC_PH-ILD_010805

INCREASE Supplementary Appendix

## 2.2 Exclusion Criteria

1. The subject has a diagnosis of pulmonary arterial hypertension or pulmonary hypertension for reasons other than World Health Organization Group 3 pulmonary hypertension due to interstitial lung disease as outlined in inclusion criterion 3.
2. The subject has shown intolerance or significant lack of efficacy to a prostacyclin or prostacyclin analogue that resulted in discontinuation or inability to effectively titrate that therapy.
3. The subject has received any pulmonary arterial hypertension approved therapy including: prostacyclin therapy (ie, epoprostenol, treprostinil, iloprost, or beraprost; except for acute vasoreactivity testing), IP receptor agonist (selexipag), endothelin receptor antagonist, phosphodiesterase type 5 inhibitor, or soluble guanylate cyclase stimulator within 60 days of randomization.
4. The subject has evidence of clinically significant left-sided heart disease as defined by:
   a. Pulmonary capillary wedge pressure >15 mmHg
   b. Left ventricular ejection fraction <40%.

*Note: Subjects with abnormal left ventricular function attributable entirely to impaired left ventricular filling due to the effects of right ventricular overload (ie, right ventricular hypertrophy and/or dilatation) will not be excluded.*

5. The subject is receiving >10 L/min of oxygen supplementation by any mode of delivery at rest at Baseline.
6. Current use of any inhaled tobacco/marijuana products or significant history of drug abuse at the time of informed consent.
7. Exacerbation of underlying lung disease or active pulmonary or upper respiratory infection within 30 days of randomization.
8. Initiation of pulmonary rehabilitation within 12 weeks prior to randomization.
9. In the opinion of the investigator, the subject has any condition that would interfere with the interpretation of study assessments or has any disease or condition (ie, peripheral vascular disease, musculoskeletal disorder, morbid obesity) that would likely be the primary limit to ambulation (as opposed to pulmonary hypertension).
10. Use of any investigational drug/device, or participation in any investigational study with therapeutic intent within 30 days prior to randomization.
11. Severe concomitant illness limiting life expectancy (<6 months).
12. Acute pulmonary embolism within 90 days of randomization.

7

UTC_PH-ILD_010806

INCREASE Supplementary Appendix

## 3. Methods

### 3.1 Procedure for 6-Minute Walk Test

The 6-minute walk test at peak plasma treprostinil exposure was conducted between 10 to 60 minutes after the most recent dose of study drug and the trough 6-minute walk test, at Week 15, was conducted at least 4 hours after the most recent study drug dose and at least 24 hours prior to the Week 16 6-minute walk test.

The 6-minute walk test was administered by the same tester at each study site throughout the study, whenever possible. The administration of the test and specifications of the testing area should be generally consistent with the American Thoracic Society guidelines[1,2] and the usual practice of the investigative site. Subjects receiving supplemental oxygen during the baseline 6-minute walk test continued to receive the same flow rate at all subsequent 6-minute walk test assessments.

The area used for the 6-minute walk test was pre-measured at approximately 30 meters in length and at least 2 to 3 m in width. There were no turns or significant curves to the 6-minute walk test area. The length was marked with gradations to ensure the accurate measurement of the distance walked. The area was well ventilated. The tester may be at the starting end of the corridor or at the midpoint of the corridor with a stop-watch. Intermittent rest periods were allowed if the subject could no longer continue. If the subject needed to rest briefly, he/she could stand or sit and then begin again when he/she is sufficiently rested but the clock continued to run. At the end of 6 minutes, the tester called, "stop where you are" while simultaneously stopping the watch and then measured the distance walked.

**Instructions to the Subject**

Subjects were instructed that the preceding meal should be light. Subjects were told to wear comfortable clothing and sneakers or comfortable walking shoes. The person administering the test used the following exact dialogue with the subject:

> "The purpose of this test is to find out how far you can walk in 6 minutes. You will start from this point and follow the hallway to the marker (eg, chair) at the end, turn around and walk back. When you arrive back at the starting point you will go back and forth again. You will go back and forth as many times as you can in the 6-minute period. You may stop and rest if you need to. Just remain where you are until you can go on again. However, the most important thing about the test is that you cover as much ground as you possibly can during the 6 minutes. I will tell you the time, and I will let you know when the 6 minutes are up. When I say 'STOP,' please stand right where you are."

After these instructions are given to the subject, the person administering the test then asked:

> "Do you have any questions about the test?"

The person administering the test then started the test by saying the following to the subject:

8

INCREASE Supplementary Appendix

"Are you ready?"
"Start when I say 'GO.'"

The person administering the test told the subject the time at each minute by saying:

"You have 5 minutes to go."
"You have 4 minutes to go."
"You have 3 minutes to go."
"You have 2 minutes to go."
"You have 1 minute to go."

At 6 minutes, the person administering the test told the subject:

"Stop where you are."

No other instruction or encouragement were given during the test. Eye contact with the subject was to be avoided during the test.

9

**UTC_PH-ILD_010808**

INCREASE Supplementary Appendix

# 4. Study Endpoints

**PRIMARY ENDPOINT**

- The primary endpoint is the change in 6-minute walk distance measured at peak exposure from Baseline to Week 16.

**SECONDARY ENDPOINTS**

- The secondary efficacy endpoints are (listed in hierarchical testing order):

  1. Change in plasma concentration of N-terminal pro-brain natriuretic peptide (NT-proBNP) from Baseline to Week 16
  2. Time to clinical worsening calculated as the time from randomization until 1 of the following criteria are met:
     a. Hospitalization due to a cardiopulmonary indication
     b. Decrease in 6-minute walk distance >15% from Baseline directly related to disease under study, at 2 consecutive visits, and at least 24 hours apart
     c. Death (all causes)
     d. Lung transplantation
  3. Change in peak 6-minute walk distance from Baseline to Week 12
  4. Change in trough 6-minute walk distance from Baseline to Week 15

**EXPLORATORY ENDPOINTS**

- Exploratory endpoints are (not included in hierarchical testing):

  1. Change in peak 6-minute walk distance from Baseline to Week 4
  2. Change in peak 6-minute walk distance from Baseline to Week 8
  3. Change in quality of life as measured by the St. George's Respiratory Questionnaire (SGRQ) from Baseline to Week 16
  4. Change in distance saturation product from Baseline to Week 16

Exploratory endpoints of optional evaluation are change in biomarkers from Baseline to Week 16, and optional evaluation of whole genome sequence. They are specified in separate documents and are not covered in the statistical analysis plan.

**SAFETY ENDPOINTS**

- Safety endpoints are (not included in hierarchical testing):
  1. Adverse events
  2. Oxygenation as measured by pulse oximetry (saturation of peripheral capillary oxygenation) and supplemental oxygen requirement (L/min)
  3. Pulmonary function tests, specifically: forced expiratory volume in 1 second, forced vital capacity, total lung capacity, and lung diffusion capacity

10

**UTC_PH-ILD_010809**

INCREASE Supplementary Appendix

4. Clinical laboratory parameters
5. Vital signs
6. Electrocardiograms
7. Hospitalizations due to a cardiopulmonary indication
8. Exacerbations of underlying lung disease; defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality

11

**UTC_PH-ILD_010810**

INCREASE Supplementary Appendix

# 5. Statistical Methods

**Primary End Point Analyses**

MMRM methodology was used to assess treatment differences at Week 16 for change from baseline in peak 6-minute walk distance.  The model included the change from baseline at Week 16 as the dependent variable with treatment, week, and treatment by week interaction as fixed effects and baseline 6-minute walk distance as a covariate.  This method allows for use of all available data in the analysis of longitudinal continuous outcomes; however, it assumes that the data are "missing at random" (MAR).  That is, the probability that a value is missing depends only on the observed values and not the unobserved values.  In some cases, this assumption is untenable, and the data are considered "missing not at random" (MNAR).

The assumption of MAR was examined by the sensitivity analyses using the control-based pattern-mixture model (PMM) method of Yuan (2014) and the approach of Permutt (2016), Mehrotra (2017) under MNAR.[3,4,5] If the results under MNAR differ from the results from the MMRM method, then the conclusion under the MAR assumption is questionable.  In particular, (1) multiple imputation (MI) was done under control-based imputation and the MMRM analysis was carried out on the imputed data; and (2) tests of treatment effect were carried out over a range of plausible values for the treatment differences in a systematic manner.

The control-based PMM model creates imputed values for the active treatment group from the observed data in the placebo treatment group.  This assumes that subjects who discontinue from active treatment would behave similarly after dropout to those in the placebo group.  Treatment, baseline 6-minute walk distance, age at randomization, sex, and all observed values of the 6-minute walk were included in the multiple imputation model with 100 imputations, 200 burn-in imputations, and a noninformative prior.  The results are shown below, which are similar with the results from the MMRM method

| Estimated Treatment Difference (SE) | 95% CI | p-value |
|---|---|---|
| 24.69 (7.70) | 9.59, 39.79 | 0.0014 |

The method of Permutt allows for a systematic and comprehensive exploration over the space of plausible assumptions and does not require imputation.  The shift in change in 6MWD at Week 16 in the placebo group ranged from -60 meters to 0 meters and the shift in the active group ranged from -50 meters to -10 meters.  These ranges were determined from a review of changes from baseline based on the pattern of missingness.  The p-values for the test treatment effect were all significant (p<0.033) for all possible assumptions.  Since the plausible range of deviations from MAR lies entirely within the range of statistical significance, the evidence for efficacy was convincing despite the missing data.

MI was designated as a sensitivity analysis for the MMRM.  The imputed values were generated using the Markov chain Monte Carlo method assuming a multivariate normal distribution for the data.  The Jeffreys prior with 100 imputations and 200 burn-in imputations was used.  The ANCOVA model was fit to each set of imputed data and the results of the 100 estimates were combined under the Rubin (1987)

12

UTC_PH-ILD_010811

rule.[6]  Note that MI generates imputed values under the MAR assumption.  As discussed in the MMRM section above, there was no reason to discount the MAR assumption.

The protocol-specified analysis of the primary efficacy endpoint of change from baseline in peak 6-minute walk distance at Week 16 was analysis of covariance (ANCOVA).  Change from baseline at Week 16 was the dependent variable with independent terms for baseline 6-minute walk distance and treatment in the ANCOVA model.  Missing data were imputed as zero if the subject had died, was too ill to walk, or had experienced a clinical worsening event.  For all other reasons, the last observation was carried forward.  Since the assumptions for the ANCOVA were not met, a non-parametric ANCOVA was conducted under the single imputation rules above.  Median treatment difference was estimated via the Hodges-Lehmann estimator.  The conclusions of this analysis were concordant with the MMRM and MI analyses.  This preplanned analysis has been deemed supplementary (Figure S6) in this manuscript due to the journal's policy with regards to missing data handling.

**Secondary End Point Analyses**

The NT-proBNP data were log-transformed prior to analysis due to non-normal distribution.  Similar methods as described for the primary end point were applied to the NT-proBNP data.

Time to clinical worsening was assessed by calculation of the associated Kaplan-Meier estimates and the log-rank test stratified by baseline 6-minute walk distance.  The hazard ratio was estimated from a Cox proportional hazards model that adjusted for baseline 6-minute walk distance.

The change in peak 6-minute walk distance at Week 12 was analyzed similarly to the primary end point. The change in 6-minute walk distance at Week 15 was analyzed via ANCOVA with missing data imputed using MI.

13

**UTC_PH-ILD_010812**

INCREASE Supplementary Appendix

## 6. Supplementary Figures

**Figure S1. 6-Minute Walk Distance Treatment Effect Using Mixed Model Repeated Measurement Through Week 16.**



A longitudinal data analysis using mixed model repeated measurement was also performed to estimate the treatment difference in change in peak 6-minute walk distance at Week 16. The mixed model repeated measurement includes the change from baseline in peak 6-minute walk distance as the dependent variable; treatment, week, and treatment by week interaction as fixed effects; and baseline 6-minute walk distance as a covariate. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors

14

UTC_PH-ILD_010813

INCREASE Supplementary Appendix

**Figure S2. Forest Plot on Subgroup Analyses of Peak 6-Minute Walk Distance (meter) at Week 16.**



| Subgroup | Inhaled Treprostinil # Patients | Placebo # Patients | LS Mean Difference (95% CI) |
|---|---|---|---|
| Overall | 121 | 120 | 31.1 (16.9, 45.4) |
| **Age Group** | | | |
| <65 years | 48 | 32 | 27.0 (-2.2, 56.1) |
| 65 to 80 years | 63 | 78 | 32.9 (15.2, 50.5) |
| ≥80 years | 10 | 10 | 28.3 (-16.2, 72.9) |
| **Sex** | | | |
| Male | 55 | 68 | 24.3 (6.1, 42.5) |
| Female | 66 | 52 | 36.9 (13.7, 60.0) |
| **Baseline 6MWD Category** | | | |
| ≤350 meters | 99 | 100 | 33.8 (18.0, 49.6) |
| >350 meters | 22 | 20 | 14.6 (-19.5, 48.7) |
| **Baseline DLCO (% Predicted)** | | | |
| <40% | 90 | 98 | 33.0 (17.7, 48.3) |
| ≥40% | 23 | 18 | 10.7 (-23.5, 45.0) |
| **PH-ILD Etiology** | | | |
| Idiopathic Interstitial Pneumonia | 48 | 62 | 39.5 (18.3, 60.7) |
| Combined Pulmonary Fibrosis and  Emphysema | 30 | 28 | 7.9 (-15.4, 31.3) |
| Connective Tissue Disease | 34 | 24 | 43.5 (9.6, 77.4) |
| Other | 9 | 6 | 22.4 (-61.4, 106.3) |
| **Baseline PVR Category** | | | |
| <4 Wood units | 27 | 25 | --7.6 (-30.9, 15.6) |
| ≥4 Wood units | 94 | 95 | 40.8 (24.1, 57.6) |
| **Maximum Study Drug Dose** | | | |
| 4-6 breaths | 6 | 2 | -9.5 (-52.2, 33.1) |
| 7-9 breaths | 37 | 24 | 17.7 (-10.9, 46.2) |
| 10-12 breaths | 77 | 92 | 33.7 (15.8, 51.7) |
| >12 breaths | 1 | 2 | |

-100    -50    0    50    100
Placebo Better    Inhaled Treprostinil Better

6MWD, 6-minute walk distance; CI, confidence interval; ILD, interstitial lung disease; PH, pulmonary hypertension; PVR, pulmonary vascular resistance

LS mean differences and their 95% confidence intervals, and p-values are from the mixed model repeated measures. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

For etiology, the "other" category includes chronic hypersensitivity pneumonitis and occupational lung disease.

15

**UTC_PH-ILD_010814**

INCREASE Supplementary Appendix

**Figure S3. 6-Minute Walk Distance Treatment Effect Using Multiple Imputation Through Week 16.**



Multiple imputation approach using a multivariate normal imputation model with the Markov Chain Monte Carlo method.

P-values are obtained from 100 multiple imputations using Markov Chain Monte Carlo estimation with ANCOVA model with change from Baseline in 6-minute walk distance as the dependent variable, treatment as fixed effect, and Baseline 6-minute walk distance measurement as a covariate.

16

UTC_PH-ILD_010815

INCREASE Supplementary Appendix

**Figure S4. NT-proBNP Results by Study Visit (pg/mL).**



CI, confidence interval; IQR, interquartile range; NT-proBNP, N-terminal pro-brain natriuretic peptide

As displayed above, inhaled treprostinil was associated with a 42% reduction in NT-proBNP compared to placebo at Week 16 (Treatment Ratio 0.58; 95% CI: 0.47, 0.72; P<0.001). Only subjects with a Baseline NT-proBNP measurement are included in this analysis.  P-values, estimated treatment ratio, and associated 95% CIs (LS Mean difference expressed as ratio) are obtained from the analysis of covariance with change from baseline in log-transformed data in NT-proBNP as the dependent variable, treatment as the fixed effect, and log-transformed baseline NT-proBNP as a covariate. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

17

**UTC_PH-ILD_010816**

**Figure S5. Kaplan-Meier Plot of Time to First Clinical Worsening Event.**



CI, confidence interval; HR, hazard ratio

Subjects who discontinued from the study early had their time to first clinical worsening event censored at their last visit. Subjects who did not experience a clinical worsening event had their time to first clinical worsening event censored at the study termination date.

The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

(1) P-value was calculated with log-rank test stratified by baseline 6-minute walk distance category.

(2) Hazard ratio, 95% CI, and p-value were calculated with proportional hazards model with treatment and baseline 6-minute walk distance (continuous) as explanatory variables.

18

UTC_PH-ILD_010817

INCREASE Supplementary Appendix

**Figure S6. Hodges-Lehmann Estimate of Treatment Effect for 6-Minute Walk Distance Through Week 16.**



For those subjects who withdrew early due to death, were too ill to walk, or had no 6-minute walk distance measurement due to a clinical worsening event, the 6-minute walk distance was set to 0; for all other withdrawals without a measurement, last observation carried forward was used for imputation.

P-values are obtained from nonparametric ANCOVA adjusted for Baseline 6-minute walk distance category.

19

UTC_PH-ILD_010818

DA0614

INCREASE Supplementary Appendix

# 7. Supplementary Tables

**Table S1. Summary of Screen Failure Reasons.**

| Screen Failure Reason Reported | N=136* |
|---|---|
| • Did not meet inclusion criteria per right heart catheterization parameters | 58 |
| • Consent withdrawn/decided not to continue | 14 |
| • Did not have qualifying computed tomography scan | 12 |
| • Baseline 6-minute walk test <100 m | 12 |
| • Exacerbation of underlying lung disease/active upper respiratory infection within 30 days prior to randomization | 11 |
| • Connective tissue disease patient did not have Baseline FVC <70% | 11 |
| • Receiving other pulmonary arterial hypertension therapy | 6 |
| • Subject has a diagnosis of pulmonary hypertension other than Group 3 | 5 |
| • In the opinion of the Investigator, the subject had any condition that would interfere with the interpretation of study assessments or meeting protocol requirements, including attending all study visits | 6 |
| • Subject not on stabilized dose of background medication for at least 30 days prior to randomization | 4 |
| • Pulmonary rehabilitation initiated within 12 weeks prior to randomization | 3 |
| • Hospitalization prior to randomization | 2 |
| • Receiving greater than 10L/min of $O_2$ at rest at Baseline | 2 |
| • Current use of any inhaled tobacco/marijuana products or significant history of drug abuse | 1 |
| • Did not meet age/agree to birth control requirement | 1 |
| • Severe concomitant illness limiting life expectancy (< 6 months) | 1 |
| • Subject passed away while in screening window | 1 |

FVC, forced vital capacity

*Note, 10 patients had 2 reasons and 1 patient had 5 reasons for screen failure reported.

20

**UTC_PH-ILD_010819**

INCREASE Supplementary Appendix

**Table S2. Additional Baseline Patient Characteristics.**

| | Inhaled Treprostinil (N=163) | Placebo (N=163) | All Patients (N=326) |
|---|---|---|---|
| 6-minute walk distance, meters; mean (range) | 254.1 (100-538) | 265.1 (30-505) | 259.6 (30-538) |
| Median | 256.0 | 260.0 | 259.0 |
| | | | |
| Pulmonary vascular resistance, Woods units; mean (range) | 6.369 (3.11-18.05) | 6.013 (3.06-17.62) | 6.191 (3.06-18.05) |
| Median | 5.570 | 5.060 | 5.275 |
| | | | |
| NT-proBNP, pg/mL; mean (range) | 1857.53 (10.2-21942.0) | 1808.86 (23.0-16297.0) | 1832.88 (10.2-21942.0) |
| Median* | 550.50 | 420.80 | 503.85 |
| | | | |
| Pulmonary arterial pressure, mmHg; mean (range) | 37.2 (25-74) | 36.0 (25-61) | 36.6 (25-74) |
| Median | 35.0 | 35.0 | 35.0 |
| | | | |
| Pulmonary capillary wedge pressure, mmHg; mean (range) | 10.1 (2-20) | 9.6 (0-15) | 9.8 (0-20) |
| Median | 10.0 | 10.0 | 10.0 |
| | | | |
| Pulmonary function tests | | | |
| FEV$_1$ % Predicted; mean (range) | 63.9 (23, 120) | 65.0 (22, 145) | |
| Median | 63.0 | 63.0 | |
| | | | |
| FVC % Predicted; mean (range) | 62.5 (24, 130) | 63.8 (20, 134) | |
| Median | 60.0 | 61.0 | |
| | | | |
| TLC % Predicted; mean (range) | 62.9 (25, 126) | 64.2 (30, 109) | |
| Median | 62.0 | 62.5 | |
| | | | |
| DLCO % Predicted; mean (range) | 30.0 (5, 86) | 28.1 (1, 86) | |
| Median | 29.0 | 26.0 | |

DLCO, lung diffusion capacity; FEV$_1$, forced expiratory volume in 1 second; FVC, forced vital capacity; NT-proBNP, N-terminal pro-brain natriuretic peptide; TLC, total lung capacity

*N=156 inhaled treprostinil; N=160 placebo.

21

**UTC_PH-ILD_010820**

**Table S3. St. George's Respiratory Questionnaire Results.**

The St. George's Respiratory Questionnaire has a range of results from 0 to 100, with higher scores indicating greater impairment and with a minimum clinically important difference of 4 points.

| Visit<br>Statistic | Inhaled Treprostinil<br>N=163 | | Placebo<br>N=163 | |
| --- | --- | --- | --- | --- |
| | Value | Change from<br>Baseline | Value | Change from<br>Baseline |
| Baseline | | | | |
| n | 143 | | 134 | |
| Mean (SD) | 57.17 (15.77) | | 57.67 (15.78) | |
| Median | 59.80 | | 56.30 | |
| Interquartile | 45.60, 67.90 | | 46.50, 70.70 | |
| Min, Max | 14.7, 94.9 | | 18.4, 88.6 | |
| | | | | |
| Week 16 | | | | |
| n | 143 | 143 | 134 | 134 |
| Mean (SD) | 55.91 (17.07) | -1.25 (10.99) | 57.49 (15.33) | -0.18 (10.72) |
| Median | 56.30 | -0.70 | 55.50 | 0.10 |
| Interquartile | 40.50, 67.00 | -7.10, 5.20 | 46.80, 69.70 | -6.50, 6.10 |
| Min, Max | 3.5, 92.0 | -40.4, 29.0 | 16.9, 96.5 | -31.9, 33.3 |
| | | | | |
| LS Mean (SE) | | -1.30 (0.87) | | -0.13 (0.90) |
| | | | | |
| LS Mean Difference (SE) and (95% CI) | | -1.18 (1.25) (-3.63, 1.28) | | |

ANCOVA, analysis of covariance; CI, confidence interval; LS Mean, least squares mean; SD, standard deviation; SE, standard error

The changes from baseline in Total Score and each of the 3 domain scores were analyzed by parametric ANCOVA with no imputation for missing data.

The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

22

UTC_PH-ILD_010821

DA0617

INCREASE Supplementary Appendix

**Table S4. Distance Saturation Product Results by Study Visit (m%).**

| Visit / Variable Statistic | Inhaled Treprostinil N=163 | Placebo N=163 |
|---|---|---|
| **Baseline** | | |
| n | 118 | 109 |
| Mean (SD) | 208.140 (81.130) | 218.247 (77.405) |
| Median | 201.320 | 215.760 |
| Interquartile | 150.060, 256.750 | 170.800, 268.800 |
| Min, Max | 77.04, 421.07 | 63.00, 417.35 |
| **Week 16 Change from Baseline** | | |
| n | 118 | 109 |
| Mean (SD) | 7.607 (45.680) | -4.803 (53.026) |
| Median | 8.385 | -1.950 |
| Interquartile | -12.960, 34.890 | -38.180, 32.000 |
| Min, Max | -217.26, 117.42 | -184.85, 129.28 |
| LS Mean (SE) | 7.2 (4.5) | -4.3 (4.7) |
| LS Mean Difference (SE) and 95% CI | 11.51 (6.5), 95% CI (-1.33, 24.35) | |

ANCOVA, analysis of covariance; CI, confidence interval; LS Mean, least squares mean; SD, standard deviation; SE, standard error; SpO2, saturation of peripheral capillary oxygenation

Change in distance saturation product is the product of distance walked and lowest SpO2 recorded during the 6-minute walk test.[7] Change from baseline to Week 16 in distance saturation product was analyzed by parametric ANCOVA with no imputation for missing distance saturation product values.

The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

23

UTC_PH-ILD_010822

INCREASE Supplementary Appendix

## Table S5. Serious Adverse Events by Preferred Term

| Serious Adverse Events | Inhaled treprostinil<br>N=163<br>n | Placebo<br>N=163<br>n |
|---|---|---|
| Any Serious Event | 53 events in 38 patients<br>(23.3%) | 89 events in 42 patients<br>(25.8%) |
| Acute respiratory failure | 4 | 5 |
| Death with unknown cause | 3 | 1 |
| Dyspnoea | 3 | 7 |
| Interstitial lung disease | 3 | 2 |
| Bronchitis | 2 | 1 |
| Chronic obstructive pulmonary disease | 2 | 2 |
| Chronic respiratory failure | 2 | 0 |
| Respiratory failure | 2 | 5 |
| Upper respiratory tract infection | 2 | 1 |
| Acute myocardial infarction | 1 | 2 |
| Acute right ventricular failure | 1 | 0 |
| Arrhythmia | 1 | 0 |
| B-cell lymphoma | 1 | 0 |
| Bronchopulmonary aspergillosis | 1 | 0 |
| Cardiac arrest | 1 | 2 |
| Cardiac failure congestive | 1 | 2 |
| Cardiopulmonary failure | 1 | 0 |
| Cellulitis | 1 | 0 |
| Cerebral haemorrhage | 1 | 0 |
| Chest pain | 1 | 1 |
| Combined pulmonary fibrosis and emphysema | 1 | 0 |
| Cor pulmonale | 1 | 0 |
| Haemoptysis | 1 | 0 |
| Hyperglycaemia | 1 | 0 |
| Hypervolaemia | 1 | 0 |
| Hypoxia | 1 | 0 |
| Idiopathic pulmonary fibrosis | 1 | 4 |
| Influenza | 1 | 1 |
| Left ventricular failure | 1 | 0 |
| Pain in extremity | 1 | 0 |
| Pneumonia | 1 | 9 |
| Pneumothorax | 1 | 1 |
| Pulmonary hypertension | 1 | 1 |
| Pulmonary oedema | 1 | 0 |
| Rhinovirus infection | 1 | 0 |
| Right ventricular failure | 1 | 2 |
| Syncope | 1 | 1 |
| Tachycardia | 1 | 0 |
| Abdominal pain | 0 | 2 |
| Acute kidney injury | 0 | 1 |
| Aspiration | 0 | 1 |
| Atrial fibrillation | 0 | 1 |
| Bradycardia | 0 | 1 |
| Cardiac failure | 0 | 2 |
| Cardiac failure acute | 0 | 1 |
| Cardiogenic shock | 0 | 1 |
| Chronic right ventricular failure | 0 | 1 |
| Coagulopathy | 0 | 1 |
| Cor pulmonale acute | 0 | 1 |
| Coronary artery disease | 0 | 1 |
| Disease progression | 0 | 2 |
| Epistaxis | 0 | 1 |

24

UTC_PH-ILD_010823

INCREASE Supplementary Appendix

| | | |
|---|---|---|
| Fluid overload | 0 | 4 |
| Haematochezia | 0 | 1 |
| Hypertension | 0 | 1 |
| Lumbar vertebral fracture | 0 | 1 |
| Metabolic encephalopathy | 0 | 1 |
| Pain | 0 | 1 |
| Pneumonia influenzal | 0 | 1 |
| Post procedural infection | 0 | 1 |
| Presyncope | 0 | 2 |
| Pulmonary congestion | 0 | 1 |
| Respiratory distress | 0 | 1 |
| Scleroderma | 0 | 1 |
| Sepsis | 0 | 2 |
| Transplant dysfunction | 0 | 1 |
| Urosepsis | 0 | 1 |

25

**UTC_PH-ILD_010824**

INCREASE Supplementary Appendix

**Table S6. Analysis of Lung Function Test Parameters Using Mixed Model Repeated Measurement.**

| Variable Visit Treatment | N | LS Mean | Contrast: Inhaled treprostinil - Placebo Estimated Difference (95% CI) | P-value |
|---|---|---|---|---|
| **FVC (mL)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 142 | 5.49 | 28.47 | |
| Placebo | 141 | -22.98 | (-30.81, 87.74) | 0.35 |
| **Week 16** | | | | |
| Inhaled treprostinil | 130 | 9.77 | 44.40 | |
| Placebo | 126 | -34.63 | (-25.25, 114.05) | 0.21 |
| **FVC (% predicted)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 142 | 0.77 | 1.79 | |
| Placebo | 141 | -1.02 | (0.37, 3.21) | 0.01 |
| **Week 16** | | | | |
| Inhaled treprostinil | 130 | 1.07 | 1.80 | |
| Placebo | 126 | -0.72 | (0.20, 3.39) | 0.03 |
| **FEV$_1$ (mL)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 142 | -21.34 | -8.95 | |
| Placebo | 141 | -12.39 | (-57.16, 39.26) | 0.72 |
| **Week 16** | | | | |
| Inhaled treprostinil | 130 | -32.18 | -2.56 | |
| Placebo | 126 | -29.62 | (-57.67, 52.55) | 0.93 |
| **FEV$_1$ (% predicted)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 142 | -0.18 | 0.57 | |
| Placebo | 141 | -0.75 | (-0.83, 1.96) | 0.43 |
| **Week 16** | | | | |
| Inhaled treprostinil | 130 | -0.24 | 0.38 | |
| Placebo | 126 | -0.62 | (-1.25, 2.01) | 0.65 |
| **TLC (mL)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 135 | -38.75 | -16.23 | |
| Placebo | 136 | -22.51 | (-141.9, 109.41) | 0.80 |
| **Week 16** | | | | |
| Inhaled treprostinil | 127 | 45.43 | 17.37 | |
| Placebo | 116 | 28.06 | (-158.9, 193.61) | 0.85 |
| **TLC (% predicted)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 135 | -0.05 | 0.28 | |
| Placebo | 136 | -0.32 | (-1.49, 2.05) | 0.76 |
| **Week 16** | | | | |
| Inhaled treprostinil | 127 | 2.52 | 1.49 | |
| Placebo | 116 | 1.03 | (-1.57, 4.54) | 0.34 |

26

**UTC_PH-ILD_010825**

INCREASE Supplementary Appendix

| | | | | |
|---|---|---|---|---|
| **DLCO (mL/min/mmHg)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 136 | -0.27 | 0.19 | 0.56 |
| Placebo | 136 | -0.47 | (-0.45, 0.84) | |
| **Week 16** | | | | |
| Inhaled treprostinil | 128 | -0.61 | 0.02 | 0.96 |
| Placebo | 112 | -0.63 | (-0.73, 0.76) | |
| **DLCO (% predicted)** | | | | |
| **Week 8** | | | | |
| Inhaled treprostinil | 136 | -0.13 | 1.07 | 0.13 |
| Placebo | 136 | -1.20 | (-0.32, 2.47) | |
| **Week 16** | | | | |
| Inhaled treprostinil | 128 | -1.14 | 0.60 | 0.44 |
| Placebo | 112 | -1.74 | (-0.93, 2.14) | |

CI, confidence interval; DLCO, diffusing capacity of the lungs for carbon monoxide; FEV$_1$, forced expiratory volume in 1 second; FVC, forced vital capacity; TLC, total lung capacity;; LS Mean, least squares mean; SE, standard error; TLC, total lung capacity

LS Mean (SE), P-values, estimated difference (SE), and associated 95% CIs are from the mixed model repeated measurement with the change from Baseline in pulmonary function test parameter as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; Baseline measurement as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

The confidence intervals and p-values have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

27

UTC_PH-ILD_010826

INCREASE Supplementary Appendix

**Table S7. SpO$_2$ (%) Measured by Pulse Oximetry Results at Baseline and Week 16.**

| Visit Statistic | Inhaled Treprostinil N=163 | | Placebo N=163 | | P-value* |
|---|---|---|---|---|---|
| | Value | Change from Pre-walk | Value | Change from Pre-Walk | |
| **Baseline Pre-walk SpO$_2$ (%)** | | | | | |
| n | 163 | | 162 | | |
| Mean (SD) | 95.3 (3.95) | | 94.5 (4.81) | | |
| Median | 96.0 | | 96.0 | | |
| Min, Max | 72, 100 | | 68, 100 | | |
| **Baseline During Walk SpO$_2$ (%)** | | | | | |
| n | 154 | 154 | 153 | 153 | 0.13 |
| Mean (SD) | 80.3 (8.22) | -15.0 (7.87) | 78.5 (8.20) | -16.1 (7.76) | |
| Median | 81.0 | -14.0 | 78.0 | -15.0 | |
| Min, Max | 53, 99 | -41, 2 | 53, 98 | -39, 4 | |
| **Baseline Post-walk SpO$_2$ (%)** | | | | | |
| n | 163 | 163 | 162 | 162 | 0.17 |
| Mean (SD) | 85.3 (7.31) | -9.9 (6.50) | 83.7 (8.74) | -10.9 (8.06) | |
| Median | 86.0 | -10.0 | 83.5 | -11.0 | |
| Min, Max | 59, 100 | -26, 5 | 57, 99 | -39, 7 | |
| **Week 16 Pre-walk SpO$_2$ (%)** | | | | | |
| n | 130 | | 122 | | |
| Mean (SD) | 94.5 (4.35) | | 94.5 (4.22) | | |
| Median | 95.0 | | 95.0 | | |
| Min, Max | 74, 100 | | 78, 100 | | |
| **Week 16 During Walk SpO$_2$ (%)** | | | | | |
| n | 123 | 123 | 114 | 114 | 0.27 |
| Mean (SD) | 76.8 (7.70) | -17.6 (7.01) | 78.2 (9.28) | -16.6 (9.04) | |
| Median | 77.0 | -17.0 | 79.0 | -16.0 | |
| Min, Max | 46, 99 | -38, -1 | 28, 98 | -61, -1 | |
| **Week 16 Post-walk SpO$_2$ (%)** | | | | | |
| n | 128 | 128 | 122 | 122 | 0.07 |
| Mean (SD) | 82.1 (9.24) | -12.4 (8.05) | 83.7 (7.75) | -10.8 (7.09) | |
| Median | 83.0 | -13.0 | 84.0 | -11.5 | |
| Min, Max | 51, 100 | -29, 3 | 65, 100 | -31, 6 | |

SD, standard deviation; SpO$_2$, saturation of peripheral capillary oxygenation

*P-values are calculated from analysis of covariance with change from pre-walk as dependent variable, treatment as fixed effect, and baseline SpO2 as covariate.

28

**UTC_PH-ILD_010827**

**Table S8. Supplemental Oxygen Use (L/min) at Baseline and Week 16.**

| Visit Statistic | Inhaled Treprostinil N=163 | | Placebo N=163 | | P-value* |
| --- | --- | --- | --- | --- | --- |
| | Value | Change from Baseline | Value | Change from Baseline | |
| **Baseline Pre-walk (L/min)** | | | | | |
| n | 163 | | 163 | | |
| Mean (SD) | 2.7 (2.2) | | 2.4 (2.0) | | |
| Median | 3.0 | | 2.0 | | |
| Min, Max | 0, 10 | | 0, 8 | | |
| **Baseline During Walk (L/min)** | | | | | |
| n | 163 | | 163 | | |
| Mean (SD) | 4.9 (4.0) | | 4.5 (3.8) | | |
| Median | 4.0 | | 4.0 | | |
| Min, Max | 0, 25 | | 0, 15 | | |
| **Week 16 Pre-walk (L/min)** | | | | | |
| n | 131 | 131 | 129 | 129 | 0.18 |
| Mean (SD) | 3.0 (2.5) | 0.4 (1.4) | 2.9 (2.4) | 0.6 (1.3) | |
| Median | 3.0 | 0.0 | 3.0 | 0.0 | |
| Min, Max | 0, 10 | -3, 6 | 0, 10 | -3, 5 | |
| **Week 16 During Walk (L/min)** | | | | | |
| n | 129 | 129 | 123 | 123 | 0.39 |
| Mean (SD) | 4.9 (4.0) | 0.1 (0.8) | 4.6 (3.7) | 0.1 (0.3) | |
| Median | 4.0 | 0.0 | 4.0 | 0.0 | |
| Min, Max | 0, 25 | -2, 8 | 0, 15 | 0, 3 | |

SD, standard deviation

Subjects who did not use supplemental oxygen were coded as 0 in the summaries.

Subjects who received supplemental oxygen during the Baseline 6-minute walk test continued to receive the same flow rate at all subsequent 6-minute walk test assessments.

*P-values are calculated from analysis of covariance with change from baseline as dependent variable, treatment as fixed effect, and baseline oxygen use as covariate.

UTC_PH-ILD_010828

## 8. References

1. ATS Statement: Guidelines for the Six-Minute Walk Test. Am J Respir Crit Care Med 2002;166:111-7.

2. Holland AE, Spruit MA, Troosters T, et al. An official European Respiratory Society/American Thoracic Society technical standard: field walking tests in chronic respiratory disease. Eur Respir J 2014;44(6):1428-46.

3. Yuan Y. Sensitivity analysis in multiple imputation for missing data.  2014 SAS Global Forum.

4. Permutt T. Sensitivity analysis for missing data in regulatory submissions. Stat Med. 2016 Jul 30;35(17):2876-9.

5. Mehrotra DV, Liu F, Permutt T. Missing data in clinical trials: control-based mean imputation and sensitivity analysis. Pharm Stat 2017; 16:378-392.

6. Rubin DB. Multiple imputation for nonresponse in surveys.  1987 John Wiley and Sons, Inc.: New York.

7. Lettieri CJ, Nathan SD, Browning RF, Barnett SD, Ahmad S, Shorr AF. The distance-saturation product predicts mortality in idiopathic pulmonary fibrosis. Respir Med 2006;100:1734-41.

30

# EXHIBIT 24

# Protocol

This trial protocol has been provided by the authors to give readers additional information about their work.

Protocol for: Waxman A, Restrepo-Jaramillo R, Thenappan T, et al. Inhaled treprostinil in pulmonary hypertension due to interstitial lung disease. N Engl J Med 2021;384:325-34. DOI: 10.1056/NEJMoa2008470

LIQ_PH-ILD_00000247

This supplement containing the following items:

- Original Protocol, 21Oct2015 (Link)
- Final Protocol, Amendment 3, 15Feb2017 (Link)
- Study Protocol Summary of Changes document (Link)
  - Amendment 1, 20Nov2015
  - Amendment 2, 13Sept2016
  - Amendment 3, 15Feb2017
- Original Statistical Analysis Plan, 27Feb2019 (Link)
- Final Statistical Analysis Plan, Amendment 1, 12Dec2019 (Link)
- Statistical Analysis Plan Summary of Changes document (Link)

LIQ_PH-ILD_00000248

Original Protocol - RIN-PH-201

21October 2015

**LIQ-PH-ILD_00000249**

United Therapeutics Corp.

RIN-PH-201
Original Protocol

# A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease

## IND 70,362

## Protocol RIN-PH-201

## CONFIDENTIAL

## UNITED THERAPEUTICS CORPORATION

Original Protocol Date:    21 October 2015

**CONFIDENTIAL AND PROPRIETARY, UNITED THERAPEUTICS CORPORATION**
All content contained herein is confidential and proprietary information of United Therapeutics Corporation and shall not be disclosed in whole or in part except as permitted by a signed contract with United Therapeutics Corporation.
© 2015 United Therapeutics Corporation

DA0630

LIQ_PH-ILD_00000250

**United Therapeutics Corp.**                                          **RIN-PH-201**
                                                                       **Original Protocol**

## LIST OF CONTACTS FOR STUDY

Study Sponsor                    United Therapeutics Corp.
                                 55 TW Alexander Drive
                                 Research Triangle Park, NC 27709



**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                **Original Protocol**

**INVESTIGATOR'S AGREEMENT**

I have read the attached protocol entitled "A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease," dated 21 October 2015 and agree to abide by all provisions set forth therein.

I agree to comply with the International Conference on Harmonisation (ICH) Guideline for Good Clinical Practice and applicable Food and Drug Administration regulations/guidelines set forth in 21 Code of Federal Regulations Parts 50, 54, 56 and 312 and any local regulations per country.

I agree to ensure that the confidential information contained in this document will not be used for any purpose other than the evaluation or conduct of the clinical investigation without the prior written consent of United Therapeutics Corp.

I also have read the current Clinical Investigators' Brochure for inhaled treprostinil and acknowledge that review of the information contained in the Clinical Investigators' Brochure is a requirement for Investigators before using inhaled treprostinil in a clinical trial.

This protocol has been received for information only and must not be implemented before all necessary regulatory agency and Ethics Committee / Institutional Review Board approval documents have been obtained.

_____          _____
Signature of Principal Investigator                  Date


_____          _____
Printed Name of Principal Investigator

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                          **Original Protocol**

## PROTOCOL SYNOPSIS

| | |
|---|---|
| **Title** | A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease |
| **Study Phase** | Phase II/III |
| **Indication** | Pre-capillary pulmonary hypertension (PH) associated with interstitial lung disease (ILD) including combined pulmonary fibrosis and emphysema (CPFE) |
| **Primary Objective** | To evaluate the safety and efficacy of inhaled treprostinil in subjects with PH associated with ILD including CPFE |
| **Primary Endpoint** | To evaluate the change in six-minute walk distance (6MWD) measured at peak exposure from Baseline to Week 16 |
| **Secondary Endpoints** | To evaluate the effect of inhaled treprostinil on the following parameters: <br> 1. Change in peak 6MWD from Baseline to Week 12 <br> 2. Change in plasma concentration of N-terminal pro-Brain Natriuretic Peptide (NT-proBNP) from Baseline to Week 16 <br> 3. Change in trough 6MWD from Baseline to Week 15 |
| **Exploratory Endpoints** | To evaluate the effect of inhaled treprostinil on the following parameters: <br> 1. Change in peak 6MWD at Week 4 <br> 2. Change in peak 6MWD at Week 8 <br> 3. Change in quality of life as measured by the St. George's Respiratory Questionnaire (SGRQ) from Baseline to Week 16 <br> 4. Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met: <br>     a. Hospitalization due to a cardiopulmonary indication |

**Version Date 21 Oct 2015**                 **Confidential**                 **Page 4**

LIQ_PH-ILD_00000253

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                **Original Protocol**

|  |  |
|---|---|
|  | b. Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart |
|  | c. Death (all causes) |
|  | d. Lung transplantation |
|  | 5. Optional evaluation of change in biomarkers (specific targets to be determined) from Baseline to Week 16 |
|  | 6. Change in distance saturation product (DSP) from Baseline to Week 16 |
| **Safety Endpoints** | 1. Adverse events (AEs) |
|  | 2. Oxygenation |
|  | a. Pulse oximetry (saturation of peripheral capillary oxygenation [$SpO_2$]) |
|  | b. Supplemental oxygen requirement (L/min) |
|  | 3. Pulmonary function: |
|  | a. Forced expiratory volume in one second ($FEV_1$) |
|  | b. Forced vital capacity (FVC) |
|  | c. Total lung capacity (TLC) |
|  | d. Lung diffusion capacity (DLCO) |
|  | 4. Clinical laboratory parameters |
|  | 5. Vital signs |
|  | 6. Electrocardiograms (ECG) |
|  | 7. Hospitalization due to a cardiopulmonary indication |
|  | 8. Exacerbations of underlying lung disease; defined as worsening of respiratory symptoms which require the modification or addition of systemic corticosteroids, antibiotics, or both |
| **Study Design** | Multi-center, randomized, double-blinded, placebo-controlled, 16-week, parallel group study |
| **Sample Size** | Approximately 314 subjects at approximately 75 centers |
| **Summary of Subject Eligibility Criteria** | Inclusion criteria: |
|  | 1. Subject voluntarily gives informed consent to participate in the study. |

**Version Date 21 Oct 2015**          **Confidential**          **Page 5**

LIQ_PH-ILD_00000254

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

2. Males and females aged 18 – 79 years at the time of informed consent.

   a. Females of reproductive potential must be non-pregnant (as confirmed by a serum pregnancy test at screening) and non-lactating, and will:

      i. Either abstain from intercourse (when it is in line with their preferred and usual lifestyle), or

      ii. Use two medically acceptable, highly-effective forms of contraception for the duration of study, and <u>at least</u> 30 days after discontinuing study drug.

   b. Males must use a condom for the duration of treatment and for at least 48 hours after discontinuing study drug.

3. The subject has a confirmed diagnosis (based on computed tomography [CT] imaging and pulmonary function tests [PFTs] performed within six months prior to the first dose of study drug) of World Health Organization (WHO) Group 3 PH associated with one of the following:

   a. Idiopathic interstitial pneumonia (IIP) including:

      i. Idiopathic pulmonary fibrosis (IPF)

      ii. Idiopathic nonspecific interstitial pneumonia

      iii. Respiratory bronchiolitis-associated interstitial lung disease (RB-ILD)

      iv. Desquamative interstitial pneumonia (DIP)

      v. Cryptogenic organizing pneumonia (COP)

      vi. Acute interstitial pneumonitis (AIP)

      vii. Idiopathic lymphoid interstitial pneumonia

      viii. Idiopathic pleuroparenchymal fibroelastosis

LIQ_PH-ILD_00000255

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

ix. Unclassifiable idiopathic interstitial pneumonia

b. Chronic hypersensitivity pneumonitis (CHP)

c. Occupational lung disease (drug or radiation-induced)

d. Combined pulmonary fibrosis and emphysema (CPFE)

4. Subjects are required to have a right heart catheterization (RHC) within one year prior to the first dose of study drug with the following documented parameters:

a. Pulmonary vascular resistance (PVR) $\geq$ 4 Wood Units (WU) and

b. A left ventricular end diastolic pressure (LVEDP) or pulmonary capillary wedge pressure (PCWP) of $\leq$ 12 mmHg if PVR $\geq$ 4 WU to < 6.25 WU or $\leq$ 15 mmHg if PVR $\geq$ 6.25 WU and

c. A mean pulmonary arterial pressure (mPAP) of $\geq$ 30 mmHg

*Note: For subjects receiving background therapy with an FDA approved medication (i.e., endothelin receptor antagonist [ERA], phosphodiesterase type-5 inhibitor [PDE-5I], or soluble guanylate cyclase stimulator [sGC]) for pulmonary arterial hypertension (PAH), the RHC must be performed after the initiation of aforementioned PAH therapy to ensure the subject meets the required RHC parameters.*

5. An uncorrected diffusing capacity of the lungs for carbon monoxide (DLCO) of < 50%

6. Baseline 6MWD $\geq$ 100 meters

7. The subject is either not receiving any PAH-approved oral therapy (ERA, PDE-5I, or sGC), or is receiving monotherapy (ERA, PDE-5I, or sGC) for at least 90 days and receiving a stable dose for $\geq$ 30 days prior to randomization.

8. Subjects on a chronic medication for underlying lung disease must be on a stable and optimized dose for $\geq$ 30 days prior to the first dose of study drug. Subjects receiving pirfenidone or nintedanib must have been receiving treatment for at least

LIQ_PH-ILD_00000256

**United Therapeutics Corp.**                                                    **RIN-PH-201**
                                                                      **Original Protocol**

90 days and on a stable dose for at least 30 days prior to the first dose of study drug.

9. Subjects on a supportive medication therapy (*e.g.,* anticoagulants, diuretics, oxygen, etc.) must be on a stable and optimized dose for $\geq 30$ days prior to the first dose of study drug. Exceptions are the discontinuation or dose changes of anticoagulants and / or dose change of diuretics.

10. In the opinion of the Investigator, the subject is able to communicate effectively with study personnel, and is considered reliable, willing and likely to be cooperative with protocol requirements, including attending all study visits.

Exclusion criteria:

1. The subject has a diagnosis of pulmonary arterial hypertension (PAH) or PH for reasons other than ILD as outlined in inclusion criterion 3. This would include, but is not limited to, the concomitant presence of thromboembolic disease (acute or chronic), untreated or inadequately treated obstructive sleep apnea (OSA), connective tissue disease (including but not limited to systemic sclerosis, scleroderma, or systemic lupus erythematosus [SLE]), sarcoidosis, human immunodeficiency virus (HIV)-1 infection, toxin exposure such as methamphetamine or anorexigen use, and other conditions of the WHO Group I, II, IV, and V classification.

2. The subject has shown intolerance or significant lack of efficacy to a prostacyclin or prostacyclin analogue that resulted in discontinuation or inability to effectively titrate that therapy.

3. The subject has received any prostacyclin therapy (i.e., epoprostenol, treprostinil, iloprost, or beraprost) within 30 days of informed consent, except for acute vasoreactivity testing.

4. The subject has evidence of clinically significant left-sided heart disease as defined by:
   a. LVEDP or PCWP > 15 mmHg (or > 12 mmHg if PVR $\geq 4$ to < 6.25 WU)

**Version Date 21 Oct 2015**                **Confidential**                **Page 8**

LIQ_PH-ILD_00000257

**United Therapeutics Corp.**                    **RIN-PH-201**
                                                  **Original Protocol**

b. Left ventricular ejection fraction < 40% as assessed by either multigated angiogram (MUGA), angiography or echocardiography.

*Note: Subjects with abnormal left ventricular function attributable entirely to impaired left ventricular filling due to the effects of right ventricular overload (i.e., right ventricular hypertrophy and/or dilatation) will not be excluded.*

5. Subjects must not have three or more of the following left ventricular disease/dysfunction risk factors:
   a. Body Mass Index (BMI) ≥ 30 kg/m$^2$
   b. History of Essential Hypertension
   c. Diabetes Mellitus – any type
   d. Historical evidence of significant coronary disease established by any one of the following:
      i. history of myocardial infarction or percutaneous coronary intervention or angiographic, or
      ii. evidence of coronary artery disease (> 50% stenosis in at least one coronary artery), or
      iii. positive stress test with imaging, or previous coronary artery bypass graft, or stable angina

6. The subject is receiving > 10 L/min of oxygen supplementation by any mode of delivery at rest at Baseline.

7. Use of any inhaled tobacco products or significant history of drug abuse within six months prior to first dose of study drug.

8. Exacerbation of underlying lung disease or active pulmonary or upper respiratory infection within 30 days of the first dose of study drug.

9. Initiation of pulmonary rehabilitation within 12 weeks prior to the first dose of study drug.

10. The subject has uncontrolled systemic hypertension as evidenced by systolic blood pressure > 160 mmHg or diastolic blood pressure > 100 mmHg.

DA0638                    LIQ_PH-ILD_00000258

**United Therapeutics Corp.**                              **RIN-PH-201**
                                                    **Original Protocol**

---

| | |
|---|---|
| | 11. The subject has any form of congenital heart disease or congenital heart defect (repaired or unrepaired) (other than a patent foramen ovale [PFO]). |
| | 12. The subject has anemia as defined by a screening hemoglobin value < 9.0 g/dL, active infection, or any other condition that would interfere with the interpretation of study assessments. |
| | 13. The subject has a Body Mass Index $\geq$ 40 kg/m$^2$. |
| | 14. The subject has any musculoskeletal disorder (*i.e.,* arthritis affecting the lower limbs, recent hip or knee joint replacement, artificial leg), is using a device to assist walking (*i.e.,* cane or walker), or has any other condition that would limit ambulation. |
| | 15. Use of any investigational drug/device, or participation in any investigational study within 30 days prior to the first dose of study drug. |
| **Drug Dosage and Formulation** | Inhaled treprostinil (6 mcg/breath) or placebo

Treatment phase:

All subjects will initiate inhaled treprostinil or placebo at a dose of 3 breaths (18 mcg) four times daily (during waking hours). Study drug doses should be maximized throughout the study, dose escalations (additional one breath four times daily) can occur up to every three days with a target dosing regimen of 9 breaths (54 mcg) four times daily and a maximum dose of up to 12 breaths (72 mcg) four times daily, as clinically tolerated. |
| **Control Group** | Placebo |
| **Route of Administration** | Inhaled |
| **Procedures** | Subjects will be assessed during Screening and Baseline to determine eligibility for the study. Once eligible, five Treatment Phase visits to the clinic will be required at Weeks 4, Week 8, Week 12, Week 15, and Week 16 (Final study visit). An early termination (ET) visit will be conducted for subjects who end treatment prior to Week 16; all assessments planned for the final Week 16 visit will be conducted during the ET visit, as applicable. Subjects will |

**LIQ_PH-ILD_00000259**

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                **Original Protocol**

also be contacted at least weekly by telephone or email to assess tolerance to study drug, AEs, and changes to concomitant medications.

Key Assessments:

- Pregnancy test: Females of childbearing potential will undergo a serum pregnancy test at Screening followed by urine pregnancy tests at Baseline and every subsequent scheduled study visit.
- Blood for NT-Pro-BNP and clinical labs will be obtained at Baseline, Week 8, and Week 16.
- A peak 6MWT will be conducted at Baseline, Week 4, Week 8, Week 12, and Week 16/ET.
- A trough 6MWT will be performed at Week 15 (at least 24 hours prior to the Week 16/ET visit).
- Pulse oximetry will be performed immediately prior to, during, and immediately after each 6MWT.
- PFTs will be conducted at Baseline, Week 8, and Week 16/ET.
- SGRQ will be completed at Baseline and Week 16/ET.
- An optional blood sample will be collected for the analysis of biomarkers (specific targets to be determined) at Baseline and Week 16/ET.
- An ECG will be conducted at Baseline and Week 16/ET.
- Time to clinical worsening, hospitalizations due to cardiopulmonary indications, and exacerbations of underlying lung disease will be evaluated from the time of informed consent until study discontinuation.

| **Statistical Considerations** | Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (two-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline to Week 16 in 6MWD measured at peak exposure assuming a standard deviation of 75 meters. The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%. |
|---|---|

The primary efficacy endpoint is the change in 6MWD measured at peak exposure from Baseline to Week 16. The

**Version Date 21 Oct 2015**                **Confidential**                **Page 11**

LIQ_PH-ILD_00000260

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

| | |
|---|---|
| | clinical hypothesis is that inhaled treprostinil will improve exercise capacity after 16 weeks of therapy as compared with placebo when administered to subjects with PH associated with ILD including CPFE.  Non-parametric analysis of covariance will be used to estimate the treatment effect.  The magnitude of treatment effect will be estimated with the Hodges-Lehmann median difference between two treatment groups.  For subjects who discontinue from the study early, the last observation carried forward method will be used to impute the 6MWD at Week 16. |
| **Sponsor** | United Therapeutics Corp.<br>55 T.W. Alexander Dr.<br>P.O. Box 14186<br>Research Triangle Park, NC 27709<br>United States of America |

LIQ_PH-ILD_00000261

United Therapeutics Corp.

RIN-PH-201
Original Protocol

## TABLE OF CONTENTS

LIST OF CONTACTS FOR STUDY ............................................................ 2

INVESTIGATOR'S AGREEMENT ............................................................ 3

PROTOCOL SYNOPSIS .......................................................................... 4

TABLE OF CONTENTS ......................................................................... 13

Table of In-Text Tables ...................................................................... 15

1    BACKGROUND AND RATIONALE .............................................. 16

1.1    DEFINITION OF CLINICAL PROBLEM ..................................... 16

1.2    INHALED TREPROSTINIL BACKGROUND ................................ 16

1.2.1    General Pharmacology ......................................................... 16

1.2.2    General Toxicology ............................................................. 17

1.2.3    Clinical Experience ............................................................ 17

1.3    RATIONALE FOR DEVELOPMENT OF STUDY DRUG IN
DISEASE/CONDITION ............................................................. 18

1.4    CLINICAL HYPOTHESIS ......................................................... 19

2    OBJECTIVES ............................................................................... 19

2.1    Primary Endpoint .................................................................... 19

2.2    Secondary Endpoints ............................................................... 19

2.3    Exploratory Endpoints ............................................................ 19

2.4    Safety Endpoints ..................................................................... 20

3    EXPERIMENTAL PLAN .............................................................. 20

3.1    STUDY DESIGN ....................................................................... 20

3.2    OVERALL SCHEDULE OF TIMES AND EVENTS ....................... 22

3.3    CLINICAL ASSESSMENTS ....................................................... 26

3.3.1    Efficacy .............................................................................. 26

3.3.1.1    Six-Minute Walk Test (6MWT) .......................................... 26

3.3.1.2    St. George's Respiratory Questionnaire ............................... 27

3.3.1.3    N-terminal pro-brain natriuretic peptide (NT-proBNP) .......... 27

3.3.1.4    Optional Biomarker ......................................................... 27

3.3.1.5    Time to Clinical Worsening .............................................. 27

3.3.1.6    Change in DSP ................................................................ 28

3.3.2    Safety ................................................................................ 28

3.3.2.1    Medical History and Physical Examinations ....................... 28

3.3.2.2    Vital Signs ..................................................................... 28

3.3.2.3    12-Lead ECG .................................................................. 28

3.3.2.4    Clinical Laboratory Assessments ...................................... 29

3.3.2.5    Pulmonary Function Tests (PFTs) ..................................... 30

3.3.2.6    Oxygenation ................................................................... 30

3.3.2.7    Adverse Events ............................................................... 30

3.3.2.8    Concomitant Medications ................................................. 31

3.3.2.9    Hospitalization due to Cardiopulmonary Indications ............ 31

3.3.2.10   Exacerbations of Underlying Lung Disease ......................... 31

3.3.2.11   Weekly Telephone/Email Contact ...................................... 31

3.4    NUMBER OF SUBJECTS ........................................................... 31

3.5    NUMBER OF CENTERS ............................................................ 32

Version Date 21 Oct 2015                Confidential                Page 13

LIQ_PH-ILD_00000262

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 650 of 1048 PageID #: 5158

United Therapeutics Corp.                                                    RIN-PH-201
                                                                   Original Protocol

3.6    ESTIMATED STUDY DURATION ..................................................... 32
4     SUBJECT ELIGIBILITY ................................................................... 32
4.1    INCLUSION CRITERIA ................................................................ 32
4.2    EXCLUSION CRITERIA ................................................................ 34
4.3    PRESCRIBED THERAPY ............................................................. 35
5     SUBJECT ENROLLMENT ............................................................... 36
5.1    TREATMENT ASSIGNMENT ......................................................... 36
5.2    RANDOMIZATION ...................................................................... 36
5.3    BLINDING ................................................................................. 36
6     DRUGS AND DOSING (OR TREATMENT PROCEDURES) ................ 36
6.1    DRUG DOSAGE, ADMINISTRATION AND SCHEDULE ................. 36
6.2    ACCESS TO BLINDED TREATMENT ASSIGNMENT .................... 37
6.3    COMPLIANCE ............................................................................ 37
7     EXPERIMENTAL PROCEDURES .................................................... 38
7.1    SCREENING VISIT ...................................................................... 38
7.2    BASELINE/RANDOMIZATION VISIT ............................................. 39
7.3    COMBINED SCREENING AND BASELINE ..................................... 40
7.4    TREATMENT PHASE: WEEKS 4, 8, AND 12 ................................... 41
7.5    TREATMENT PHASE: WEEK 15 (TROUGH) .................................. 42
7.6    END OF STUDY (WEEK 16) OR EARLY TERMINATION (ET) VISIT ... 43
7.6.1   Study Contacts ......................................................................... 44
8     STUDY TERMINATION ................................................................... 44
8.1    CRITERIA FOR SUBJECT WITHDRAWAL ..................................... 44
8.2    LOST TO FOLLOW-UP ................................................................ 45
8.3    CRITERIA FOR TERMINATING THE STUDY ................................. 45
8.4    CRITERIA FOR DISCONTINUING THE SITE ................................. 45
9     ADVERSE EVENT REPORTING ...................................................... 45
9.1    DEFINITIONS ............................................................................ 45
9.1.1   Adverse Event .......................................................................... 45
9.1.2   Serious Adverse Event ............................................................... 46
9.2    DOCUMENTATION OF ADVERSE EVENTS ................................... 46
9.3    FOLLOW UP OF ADVERSE EVENTS ............................................ 47
9.4    REPORTING RESPONSIBILITIES OF THE INVESTIGATOR ........... 47
9.5    PREGNANCY .............................................................................. 47
9.6    SAFETY REPORTS ..................................................................... 47
10    STATISTICAL CONSIDERATIONS .................................................. 48
10.1   DATA PROCESSING .................................................................... 48
10.2   SAMPLE SIZE ............................................................................ 48
10.3   ANALYSIS PLAN ........................................................................ 48
10.3.1  Primary Efficacy Endpoint .......................................................... 49
10.3.2  Secondary Efficacy Endpoints ..................................................... 49
10.3.3  Exploratory Endpoints ............................................................... 49
10.3.4  Safety Analyses ....................................................................... 50
10.4   INTERIM ANALYSES ................................................................... 50
10.5   OTHER ANALYSES ..................................................................... 50

United Therapeutics Corp.

**RIN-PH-201**
**Original Protocol**

10.6    DATA LISTINGS AND SUMMARIES ........................................ 51
10.7    DATA MONITORING COMMITTEE ....................................... 51
11  PACKAGING AND FORMULATION ........................................... 51
11.1    CONTENTS OF STUDY DRUG ............................................. 51
11.1.1    Study Drug ......................................................................... 51
11.1.2    Study Device ...................................................................... 51
11.2    LABELING ........................................................................... 51
11.2.1    Study Drug ......................................................................... 51
11.2.2    Study Device ...................................................................... 51
11.3    STORAGE AND HANDLING OF CLINICAL TRIAL MATERIAL (CTM) .... 52
11.4    SUPPLY AND RETURN OF CTM ........................................ 52
11.5    DRUG ACCOUNTABILITY ................................................. 52
12  REGULATORY AND ETHICAL OBLIGATION ............................ 53
12.1    APPLICABLE REGULATORY REQUIREMENTS ................... 53
12.2    INFORMED CONSENT REQUIREMENTS ............................ 53
12.3    INDEPENDENT ETHICS COMMITTEE/INSTITUTIONAL REVIEW BOARD ................................................................................. 53
12.4    PRESTUDY DOCUMENTATION REQUIREMENTS .............. 54
12.5    SUBJECT CONFIDENTIALITY ......................................... 54
13  ADMINISTRATIVE AND LEGAL OBLIGATIONS ....................... 54
13.1    PROTOCOL AMENDMENTS AND STUDY TERMINATION ... 54
13.2    STUDY DOCUMENTATION AND STORAGE ....................... 54
13.3    STUDY MONITORING AND DATA COLLECTION ............... 55
14  REFERENCES ....................................................................... 56
15  APPENDICES ....................................................................... 58
15.1    PROCEDURE FOR SIX-MINUTE WALK TEST ................... 58
15.2    GUIDELINES AND DEFINITIONS FOR RECORDING ADVERSE EVENTS 60
15.3    ST. GEORGE'S RESPIRATORY QUESTIONNAIRE ............. 63

*Table of In-Text Tables*

Table 6-1    Recommended Inhaled Treprostinil Dose Escalation Table .............................. 37

LIQ_PH-ILD_00000264

United Therapeutics Corp.

RIN-PH-201
Original Protocol

# 1    BACKGROUND AND RATIONALE

## 1.1    DEFINITION OF CLINICAL PROBLEM

Pulmonary hypertension (PH) is defined as an elevation in pulmonary arterial pressure and pulmonary vascular resistance.  The World Health Organization (WHO) classifies PH due to lung diseases and/or hypoxemia as WHO Group 3 PH (Simonneau 2009).  This classification includes PH due to interstitial lung disease (ILD) including combined pulmonary fibrosis and emphysema (CPFE).

Interstitial lung disease encompasses a heterogeneous group of parenchymal lung diseases that are characterized by significant scarring or fibrosis of the bronchioles and alveolar sacs within the lungs (Travis 2013, Seeger 2013).  Increased fibrotic tissue in ILD prevents oxygenation and free gas exchange between the pulmonary capillaries and alveolar sacs.  The symptomatology of ILD is non-specific, and covers a wide range of symptoms, whose severity can vary substantially among patients.  The incidence of PH in ILD has been reported in up to 86% of patients and is associated with a poorer prognosis and decreased quality of life (Nathan 2008, Nathan 2013).

Combined pulmonary fibrosis and emphysema characterized by emphysema, fibrosis, and abnormalities of gas exchange (Jankowich 2012).  Up to 50% of CPFE patients have been reported to develop PH with increased pulmonary vascular resistance (PVR) associated with a decreased survival (Cottin 2010; Seeger 2013).

There are no approved treatments for PH in patients with ILD or CPFE; however, the results of some approved therapies for pulmonary arterial hypertension (PAH) have stimulated further investigation in these indications (Seeger 2013, Saggar 2014, Agarwal 2015, Roccia 2013).

## 1.2    INHALED TREPROSTINIL BACKGROUND

### 1.2.1    General Pharmacology

Treprostinil, 2-[[(1R,2R,3aS,9aS)-[[2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1Hbenz[f]inden-5-yl]oxy]acetic acid, is a chemically stable tricyclic analogue of prostacyclin.  The pharmacology of treprostinil is well-characterized and approved for the treatment of PAH following either the subcutaneous (SC), intravenous (IV), inhaled (as treprostinil sodium), or oral (as treprostinil diolamine) routes of administration.

Prostacyclin is known to lower pulmonary artery pressure, increase cardiac output without affecting the heart rate, improve systemic oxygen transport and possibly reverse pulmonary arterial remodeling.  There is increasing evidence that the ability to block the proliferation of pulmonary artery smooth muscle cells, along with vasodilation, may contribute to the therapeutic effects of prostacyclin in the treatment of PAH.  Treprostinil acts by triggering direct vasodilation of the pulmonary and systemic arterial vascular beds and inhibition of platelet aggregation.  *In vitro*, treprostinil induced concentration dependent relaxation of rabbit isolated pre-contracted mesenteric arteries and inhibited adenosine diphosphate induced platelet aggregation in human and rat platelet rich plasma.  In animals, the vasodilatory effects

Version Date 21 Oct 2015                     Confidential                          Page 16

LIQ_PH-ILD_00000265

of treprostinil reduce right and left ventricular afterload, thereby increasing cardiac output and stroke volume.  The mechanism of action of treprostinil is therefore likely to be multifactorial.

Treprostinil for inhalation (Tyvaso®) is approved in the United States and Israel for the treatment of PAH (WHO Group I) in patients with New York Heart Association (NYHA) functional classification III symptoms, to increase exercise ability.

### 1.2.2     General Toxicology

A well-defined clinical safety profile exists for treprostinil sodium; acute toxicity studies, repeat-dose toxicity studies, reproductive toxicity studies, and genotoxicity studies have been performed in both rats and dogs and support the chronic administration to patients (Remodulin® Package Insert 2014).

The toxicokinetic profile of treprostinil was also evaluated in acute and repeat dose toxicity studies of up to 13 weeks in duration in rodents and dogs which supported the chronic administration of inhaled treprostinil to patients.  In addition, a two-year rat carcinogenicity study was performed with treprostinil inhalation at target doses up to 5.26, 10.6, and 34.1 mcg/kg/day which found no evidence for carcinogenic potential associated with inhaled treprostinil in rats at systemic exposure levels up to 35 times the clinical exposure at the target maintenance dose of 54 mcg.  Refer to the inhaled treprostinil Clinical Investigators Brochure for a full description of nonclinical data.

### 1.2.3     Clinical Experience

A series of acute and chronic investigator-initiated clinical studies were conducted with inhaled treprostinil to optimize the formulation for inhalation, determine dose response, tolerability, and safety and also to evaluate safety and tolerability when combined with other PAH therapies (Channick 2006, Voswinckel 2006).  In the acute dosing studies, administration of inhaled treprostinil resulted in pulmonary vasodilation at relatively low doses.  In the chronic studies, administration of inhaled treprostinil resulted in sustained improvement of exercise capacity.

A randomized, double blind, placebo controlled, Phase III study (TRIUMPH-I) was conducted to assess the safety and efficacy of inhaled treprostinil in combination with approved PAH therapies.  Two hundred and thirty-five subjects who were clinically stable on an approved background oral PAH therapy (bosentan or sildenafil) were randomly allocated to receive either placebo or inhaled treprostinil for 12 weeks.  The primary efficacy endpoint was change in exercise capacity at Week 12 as measured by six-minute walk distance (6MWD).  At Week 12, subjects receiving inhaled treprostinil had a median improvement of +21.6 meters in 6MWD and subjects in the placebo group had a median improvement of +3.0 meters.  The Hodges-Lehmann placebo-corrected median change from baseline in peak 6MWD was +20.0 meters (p=0.00044).  The durability of this result was supported by secondary measures related to the trough 6MWD, which was measured at least four hours after the last dose of inhaled treprostinil.  At Week 12, trough 6MWD showed a placebo-corrected median treatment effect of 13.7 meters (p=0.0066).  The most commonly reported

adverse events (AEs) in the inhaled treprostinil group were cough (54%), headache (41%), and nausea (19%). There were no remarkable treatment related changes in vital signs, physical examination findings, chest x-rays, pulmonary function tests, or clinical laboratory parameters (McLaughlin 2010).

An open-label, extension study of the TRIUMPH-I study to evaluate the use of long-term inhaled treprostinil therapy was also conducted (TRIUMPH-OL). Subjects received one to 12 breaths (6 to 72 mcg) four times daily to achieve daily doses of 24 to 288 mcg. The longest duration of inhaled treprostinil exposure in the open-label study was 5.4 years and the mean duration 2.3 years. There were observed improvements in median 6MWD at 6, 12, 18, and 24 months of 28, 31, 32, and 18 meters, respectively. These data support the durability of improvement in 6MWD obtained with inhaled treprostinil as demonstrated during the double-blind phase of the study. Therapeutic benefit was also noted with improvements in the Borg dyspnea score, NYHA functional classification and quality of life (QOL). Survival was robust with one and two year Kaplan-Meier survival estimates of 97% and 91%, respectively, for subjects that remained in the trial. The most frequently reported AEs during the open-label study were cough (39%), headache (31%), upper respiratory tract infection (22%), and nausea (22%). There were no clinically significant changes in clinical chemistry or hematology parameters. Unique findings that related to the inhaled route of administration, in addition to cough, were throat pain and throat irritation, occurring in 12% and 10% of subjects, respectively. These events were usually of mild or moderate severity and transient in duration. In a few subjects, these specific AEs were more pronounced as six subjects (3%) discontinued inhaled treprostinil due to cough, including one subject (<1%) with dry throat (Benza 2011).

## 1.3     RATIONALE FOR DEVELOPMENT OF STUDY DRUG IN DISEASE/CONDITION

Inhaled treprostinil has shown clinical improvements in exercise capacity after 12 weeks of therapy in patients with WHO Group I PH (McLaughlin 2010). Inhaled treprostinil is expected to directly target the more ventilated portion of the lungs in patients with WHO Group 3 PH minimizing the risk of ventilation perfusion mismatch and allowing for improvements in exercise capacity (Seeger 2013).

The use of inhaled prostacyclin therapy in patients with WHO Group 3 PH has been recently evaluated. In particular, Wang and colleagues (Wang 2015) reported data on 67 COPD patients with PH and found no change in arterial blood gases when a single dose of iloprost was administered during right heart catheterization (RHC). In addition, Bajwa and colleagues recently completed a prospective 16-Week study in nine COPD subjects with PH which reported no notable changes in arterial blood gases over the 16-Week treatment period (Bajwa submitted). Finally, Agarwal and colleagues (Agarwal 2015) recently presented data on 35 patients with WHO Group 3 PH who received treatment with inhaled treprostinil for six months. This retrospective review reported a mean increase from baseline in 6MWD of 61 meters with obstructive and restrictive patients reporting mean increases of 71 meters and 50 meters, respectively. Notably, this study also found that inhaled treprostinil was well tolerated with cough being the most commonly reported AE. Data from these recently

**United Therapeutics Corp.**                                   **RIN-PH-201**
                                                                 **Original Protocol**

completed pilot studies suggest that inhaled treprostinil can be safely administered in patients with WHO Group 3 PH.

## 1.4   CLINICAL HYPOTHESIS

This study hypothesizes that inhaled treprostinil will improve exercise capacity after 16 weeks of therapy as compared with placebo when administered to subjects with PH associated with ILD including CPFE.

## 2   OBJECTIVES

To evaluate the safety and efficacy of inhaled treprostinil in subjects with PH associated with ILD including CPFE.

## 2.1   PRIMARY ENDPOINT

To evaluate the change in 6MWD measured at peak exposure from Baseline to Week 16.

## 2.2   SECONDARY ENDPOINTS

To evaluate the effect of inhaled treprostinil on the following parameters:

1. Change in peak 6MWD from Baseline to Week 12

2. Change in plasma concentration of N-terminal pro-Brain Natriuretic Peptide (NT-proBNP) from Baseline to Week 16

3. Change in trough 6MWD from Baseline to Week 15

## 2.3   EXPLORATORY ENDPOINTS

To evaluate the effect of inhaled treprostinil on the following parameters:

1. Change in peak 6MWD at Week 4

2. Change in peak 6MWD at Week 8

3. Change in quality of life as measured by the St. George's Respiratory Questionnaire (SGRQ) from Baseline to Week 16

4. Time to clinical worsening from the time of randomization until one of the following criteria are met:

   a. Hospitalization due to a cardiopulmonary indication
   b. Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart
   c. Death (all causes)
   d. Lung transplantation

5. Optional evaluation of change in biomarkers (specific targets to be determined) from Baseline to Week 16

**Version Date 21 Oct 2015**                **Confidential**                **Page 19**

LIQ_PH-ILD_00000268

**United Therapeutics Corp.**                                         **RIN-PH-201**
                                                                      **Original Protocol**

6. Change in distance saturation product (DSP) from Baseline to Week 16

## 2.4   SAFETY ENDPOINTS

To evaluate the effect of inhaled treprostinil on the following parameters:

1. Adverse events (AEs)
2. Oxygenation
    a. Pulse oximetry (saturation of peripheral capillary oxygenation [$SpO_2$])
    b. Supplemental oxygen requirement (L/min)
3. Pulmonary function:
    a. Forced expiratory volume in one second ($FEV_1$)
    b. Forced vital capacity (FVC)
    c. Total lung capacity (TLC)
    d. Lung diffusion capacity (DLCO)
4. Clinical laboratory parameters
5. Vital signs
6. Electrocardiograms (ECG)
7. Hospitalizations due to a cardiopulmonary indication
8. Exacerbations of underlying lung disease; defined as worsening of respiratory symptoms which require the modification or addition of systemic corticosteroids, antibiotics, or both.

## 3   EXPERIMENTAL PLAN

## 3.1   STUDY DESIGN

This is a multi-center, randomized, double-blinded, placebo-controlled, 16-Week, parallel group study.  Subject eligibility will be based on inclusion and exclusion criteria described in Section 4.  Approximately 314 eligible subjects will be randomized to study treatment in a 1:1 ratio.  Subjects will be stratified based on Baseline 6MWD (≤ 350 m and > 350 m). Subjects will be treated with either inhaled treprostinil (6 mcg/breath) or placebo.

The study will consist of the following phases:

**Screening Phase**: Prospective subjects will undergo a screening evaluation within 30 days prior to the Baseline Visit (first dose of study drug).  During this phase, eligible subjects will sign the informed consent form (ICF) and undergo screening assessments as described in Sections 7.1 and 7.3.  The Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug.  Baseline pulmonary function tests (PFTs), 6MWT, and computed topography (CT) scan used to confirm eligibility criteria may be performed on the same day but prior to the first dose of study drug.

**Version Date 21 Oct 2015**                 **Confidential**                        **Page 20**

**LIQ_PH-ILD_00000269**

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                **Original Protocol**

**Baseline Visit**: The Baseline assessments may be conducted over a 48 hour period prior to the first dose of study drug to allow for scheduling of all activities.  Eligible subjects will undergo Baseline assessments (Sections 7.2 and 7.3), be assigned to a treatment group based on the randomization schedule, and receive the first dose of study drug (Day 1 is defined as the day the first dose of study drug is given).  The Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug.  Baseline PFTs, 6MWT, and CT scan used to confirm eligibility criteria may be performed on the same day but prior to the first dose of study drug.

**Treatment Phase**: The Treatment phase consists of five study visits to the clinic at Week 4, Week 8, Week 12, Week 15, and Week 16 (at least 24 hours after the Week 15 visit [Final study visit/early termination [ET]])]).  Subjects will also be contacted at least weekly by telephone or email to assess subject tolerance to study drug, AEs, and changes to concomitant medications.

A schedule of visits and assessments is presented in Section 3.2.

United Therapeutics Corp.

RIN-PH-201
Original Protocol

## 3.2    OVERALL SCHEDULE OF TIMES AND EVENTS

| Study Procedures | Screening Phase | Baseline[1] | Combined Screening & Baseline Visit[1] | Treatment Phase | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Week 4[2] | Week 8[2] | Week 12[2] | Week 15[2] (Trough 6MWD) | Week 16[2]/ Early Termination (at least 24 hours after Week 15) |
| **Study Week** | | | | | | | | |
| **Study Day** | -30 to -1 | 1 | 1 | 29 | 57 | 85 | 106 | 113 |
| Informed Consent | X | | X | | | | | |
| Subject Eligibility[3] | X | X | X | | | | | |
| Medical History with PH History and Demographics | X | | X | | | | | |
| SGRQ | | X | X | | | | | X |
| Physical Examination | X | X | X | | | | | X |
| Vital Signs[4] | X | X | X | X | X | X | X | X |
| Clinical Laboratory Assessments | X | X | X | | X | | | X |
| N-terminal proBNP[5] | | X | X | | X | | | X |
| Blood sample for biomarker evaluation (optional)[6] | | X | X | | | | | X |
| Serum Pregnancy Test[7] | X | | X | | | | | |
| Urine Pregnancy Test[7] | | X | X | X | X | X | X | X |
| 12-Lead ECG | X | X | X | | | | | X |
| Peak 6MWT[8] | | X | X | X | X | X | | X |
| Trough 6MWT[9] | | | | | | | X | |

LIQ_PH-ILD_00000271

United Therapeutics Corp.

RIN-PH-201
Original Protocol

| Study Procedures | Screening Phase | Baseline[1] | Combined Screening & Baseline Visit[1] | Treatment Phase | | | | |
|---|---|---|---|---|---|---|---|---|
| Study Week | | | | Week 4[2] | Week 8[2] | Week 12[2] | Week 15[2] (Trough 6MWD) | Week 16[2]/ Early Termination (at least 24 hours after Week 15) |
| Pulse Oximetry[10] | X | | X | X | X | X | X | X |
| Documentation of Supplemental Oxygen Requirement | X | | X | X | X | X | X | X |
| PFTs[11] | | X | X | | X | | | X |
| Randomization | | X | X | | | | | |
| Device Training | | X | X | | | | | |
| Dosing instructions / Dosing / Accountability | | X[17] | X[17] | X | X | X | X | X |
| Weekly Telephone/Email Contact[12] | | | | --- | --- | --- | | |
| Adverse Events[13] | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X |
| Concomitant Medications[14] | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X |
| Hospitalizations[14] | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X |
| Exacerbations of Underlying Lung Disease[15] | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X |
| Time to Clinical Worsening[16] | | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X-- |

ECG: electrocardiogram; N-terminal pro-brain natriuretic peptide; PFTs: pulmonary function tests; PH: pulmonary hypertension; SGRQ: St. George Respiratory Questionnaire; 6MWT: six-minute walk test

[1] Screening visit assessments can occur up to 30 days prior to the first dose of study drug. Baseline assessments can occur up to 48 hours prior to the first dose of study drug to allow for scheduling of all activities; however the Baseline 6MWT must be performed prior to but on the same day as the first dose of study drug. Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug. Baseline

**Version Date 21 Oct 2015**                    **Confidential**                    **Page 23**

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

PFTs, 6MWT, and CT (if a historical scan within 6 months is not available) assessments used to determine eligibility criteria may be performed on the same day as but prior to the first dose of study drug.

[2] The visit window for Week 4, Week 8, Week 12, Week 15, and Week 16 is ± 5 days.  The Week 16 visit must occur at least 24 hours after the Week 15 visit.

[3] For the Screening and Baseline visits, the subject must be evaluated for and meet all inclusion/exclusion criteria.

[4] Vital signs must be collected after five minutes of rest (seated); no other measurements or procedures should be performed during this five minute period.  When possible, vital signs should be collected prior to the 6MWT.  If vital signs cannot be obtained prior to the 6MWT then they should be obtained after recovery from the 6MWT.

[5] Blood for NT-proBNP assessment must be drawn prior to conducting the 6MWT and will occur prior to the first dose of study drug at Baseline (or as part of the Screening visit assessment if the Screening and Baseline visits are combined.

[6] For subjects consenting to the optional biomarker sample.

[7] For females of childbearing potential.  If the Screening and Baseline visits are combined, only a serum pregnancy test will be required.

[8] If the subject has not previously undergone a 6MWT at the study site, a practice test must be conducted at the Screening visit and must precede the Baseline 6MWT by at least one day.  The Baseline 6MWT must precede the first dose of study drug.  The Week 4, Week 8, Week 12, and Week 16 peak 6MWT must occur within 10 to 60 minutes after the most recent study drug dose.  Prior to the start of each 6MWT the subject should rest (seated) for at least 10 minutes.  Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate by simple face mask at all subsequent 6MWT assessments.  The supplemental oxygen flow rate must be recorded at each study visit, as applicable.

[9] The Week 15 trough 6MWT must occur at least four hours after the most recent study drug dose and at least 24 hours prior to the Week 16 visit.  Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate by simple face mask at all subsequent 6MWT assessments.  The supplemental oxygen flow rate must be recorded at each study visit, as applicable.

[10] Pulse oximetry will be performed immediately prior to, during and immediately following each 6MWT.  Pulse oximetry will include the measurement of SpO$_2$ and HR.  The SpO$_2$ and HR obtained immediately prior to and immediately following completion of the 6MWT will be recorded in the eCRF.  In addition, the lowest recorded SpO$_2$ obtained during each 6MWT will be recorded in the eCRF.

[11] PFTs will include the evaluation of FEV$_1$, FVC, TLC, and DLCO.  In the event of a combined Screening/Baseline visit, Baseline PFTs should be performed prior to the first dose of study drug.  PFTs should be performed after recovering from the Baseline, Week 8, and Week 16/ET 6MWTs.

[12] At least weekly telephone contact is required throughout the study (may be replaced by a face-to-face interaction on the weeks where study visits occur and the information can be obtained during the visit).  Subjects may be contacted via email in lieu of a telephone call.  A copy of the emails and/or telephone contact sheets must be documented in the subject's source documentation.  Email should not replace direct follow-up by phone or in clinic for clinically significant AEs or other emergent issues.

[13] All AEs will be documented from the time of informed consent until the time screen failure is documented, or until the subject is either discontinued from the study or all Week 16 study assessments have been completed and should be followed until either resolution (or return to normal or baseline values), until they are judged by the Investigator to no longer be clinically significant, or for at least 30 days if the AE extends beyond the final study visit (Week 16).

[14] Hospitalizations due to cardiopulmonary indications must be recorded in the eCRF from the time of informed consent until study termination.  Adverse events resulting in hospitalizations, regardless of cause or duration, should also be recorded as SAEs per Appendix 15.2.

[15] Exacerbations of underlying lung disease; defined as worsening of respiratory symptoms which require the modification or addition of systemic corticosteroids, antibiotics, or both.  Exacerbations will also be recorded as AEs or SAEs per Appendix 15.2.

**Version Date 21 Oct 2015**

**Confidential**

**Page 24**

LIQ_PH-ILD_00000273

United Therapeutics Corp.

[16] Time to clinical worsening will be measured from the time of randomization until one of the following criteria are met: Hospitalization due to a cardiopulmonary indication, decrease in 6MWD > 15% from Baseline directly related to the disease under study, at two consecutive visits and at least 24 hours apart, death (all causes), or lung transplantation.

[17] Once all entry criteria have been met and the randomized treatment assignment confirmed, the first dose of study drug (3 breaths; 18 mcg) will be inhaled in the clinic, followed by at least a one hour observation period (Defined as Day 1).

LIQ_PH-ILD_00000274

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

### 3.3     CLINICAL ASSESSMENTS

### *3.3.1      Efficacy*

### *3.3.1.1     Six-Minute Walk Test (6MWT)*

The 6MWT is a validated and reliable measure of exercise capacity in patients with chronic respiratory diseases (Holland 2014). This study will utilize an unencouraged 6MWT to minimize potential bias associated with encouragement. All 6MWTs will be conducted by qualified, trained personnel in a designated 6MWT area which meets the requirements as described in Appendix 15.1. Prior to the start of each 6MWT the subject must rest (seated) for at least 10 minutes. This 6MWT protocol applies to practice (if applicable), Baseline, and treatment 6MWTs. Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate by simple face mask at all subsequent 6MWT assessments. Pulmonary rehabilitation may not be introduced to a subject's treatment regimen between Baseline (first dose of study drug) and Week 16. Pulse oximetry is to be performed immediately prior to, during, and immediately following each scheduled 6MWT as outlined in Section 3.3.2.6.1.

#### *3.3.1.1.1      Practice Six-Minute Walk Test*

All subjects must have a documented 6MWT conducted at the study site on the course intended for use during the study. Subjects who have not previously performed the 6MWT at the study site on the course intended for use during the study, must perform a practice 6MWT at the study site at least one day prior to the Baseline Visit.

#### *3.3.1.1.2      Baseline Six-Minute Walk Test*

Baseline 6MWT must be performed in the following fashion: a) prior to initiation of study drug and b) on the day of randomization (*i.e.,* the Baseline Visit on same day but prior to the first dose of study drug). Pulse oximetry is to be performed immediately prior to, during, and immediately following each scheduled 6MWT as outlined in Section 3.3.2.6.1.

Note: The Baseline 6MWT (not the practice 6MWT) will determine the subject's eligibility to participate in the study (6MWD ≥ 100 meters per inclusion criteria).

#### *3.3.1.1.3      Treatment Six-Minute Walk Tests*

#### *3.3.1.1.3.1      Peak Six-Minute Walk Tests*

Peak 6MWTs will be conducted at Weeks 4, 8, 12, and 16/ET. The 6MWT must be conducted between 10 to 60 minutes after the most recent dose of study drug. If subjects are receiving supplemental oxygen during the Baseline 6MWT, they must continue to receive the same flow rate by simple face mask at all subsequent 6MWT assessments. The Week 16 peak 6MWT should occur at least 24 hours after the Week 15 visit. Refer to Appendix 15.1 for guidelines regarding the 6MWT assessment. Pulse oximetry is to be performed immediately prior to, during, and immediately following each scheduled 6MWT as outlined in Section 3.3.2.6.1.

LIQ_PH-ILD_00000275

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

*3.3.1.1.3.2     Trough Six-Minute Walk Test*

A trough 6MWT will be performed during the Week 15 visit.  The trough 6MWT must be performed at least four hours after the most recent dose of study drug and at least 24 hours prior to the end of study visit (Week 16).  If subjects are receiving supplemental oxygen during the Baseline 6MWT, they must continue to receive the same flow rate by simple face mask at all subsequent 6MWT assessments.  Refer to Appendix 15.1 for guidelines regarding the 6MWT assessment.  Pulse oximetry is to be performed immediately prior to, during, and immediately following each scheduled 6MWT as outlined in Section 3.3.2.6.1.

### 3.3.1.2     St. George's Respiratory Questionnaire

The SGRQ will be conducted at Baseline (prior to study drug) or as part of the Screening visit assessment if the Screening and Baseline visits are combined and at Week 16 (or ET for those subjects discontinuing the study prematurely).  The SGRQ should be completed as the first assessment during these visits (after informed consent is obtained) before the subject completes any of the other scheduled visit assessments.  A copy of the SGRQ can be found in Appendix 15.3.

### 3.3.1.3     N-terminal pro-brain natriuretic peptide (NT-proBNP)

Plasma NT-proBNP concentration is a useful biomarker associated with changes in right heart morphology and function (Fijalkowska 2006).  NT-proBNP sample collection will occur at Baseline (or as part of the Screening visit assessment if the Screening and Baseline visits are combined) prior to starting study drug, at Week 8, and at Week 16/ET.  Blood for NT-proBNP assessment must be drawn prior to conducting the 6MWT.

### 3.3.1.4     Optional Biomarker

For subjects consenting to the optional biomarker sample, blood will be collected for the evaluation of biomarkers (specific targets to be determined) at Baseline and at Week 16/ET.

### 3.3.1.5     Time to Clinical Worsening

Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met:

a.  Hospitalization due to a cardiopulmonary indication
b.  Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart
c.  Death (all causes)
d.  Lung transplantation

Because there are no Food and Drug Administration (FDA) approved therapies for the treatment of WHO Group 3 PH, subjects experiencing clinical worsening will remain on study therapy for the duration of the study (or until criteria for study termination are met per Section 8.1 of the protocol).  Subjects experiencing death or lung transplantation will be discontinued from the study per Section 8.1 of the protocol.

LIQ_PH-ILD_00000276

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

### 3.3.1.6    Change in DSP

Change in DSP is the product of distance walked and lowest oxygen saturation recorded during the 6MWT.  This assessment has been shown to be predictive of mortality in patients with idiopathic pulmonary fibrosis and as such will be evaluated as an exploratory endpoint in this study (Lettieri 2006).  Change from Baseline to Week 16 in DSP will be calculated.

### 3.3.2    Safety

During this study, treatment emergent changes in physical examination (PE) findings, vital signs, clinical laboratory parameters, ECG parameters, PFTs, oxygenation, and the development of AEs after treatment will be the primary assessments of safety.  Hospitalizations due to cardiopulmonary indications will also be recorded from the time of informed consent until study termination (or ET for those subjects discontinuing the study prematurely).  Exacerbations of underlying lung disease will also be recorded from the time of informed consent until study termination.

### 3.3.2.1    Medical History and Physical Examinations

A complete medical history, demographics, PH history, and PE will be conducted during Screening.  If any changes to the medical history occur between the Screening and Baseline visit, those should be recorded.  Significant past or present illnesses, current prescription or nonprescription medications (including vitamins and herbal products), and history of allergies or idiosyncratic responses to drugs should be recorded.  Any significant changes to the subject's medical condition and PE must be documented throughout the course of the study.  A complete PE will also be conducted by appropriate study personnel (as documented on the Delegation of Authority Log) at the Week 16/ET visit.  Any clinically significant changes from Baseline noted during the Week 16/ET PE should be reported as AEs.

### 3.3.2.2    Vital Signs

Vital signs will be assessed at Screening, Baseline, each subsequent study visit, and at Study Termination.  Vital signs measured will include blood pressure (systolic and diastolic), heart rate (HR), respiratory rate (RR), temperature, and weight.  Height will be assessed at Baseline only.  Vital signs must be assessed following at least five minutes of rest (sitting) to ensure accurate measurement.  No other measurements or procedures should be performed during this five-minute period.  When possible, vital signs should be collected prior to the 6MWT.  If vital signs cannot be obtained prior to the 6MWT, they should be obtained after recovery of the 6MWT.  Vital signs should also be assessed in the case of abnormal clinical signs and symptoms.

### 3.3.2.3    12-Lead ECG

A 12-lead ECG will be recorded after at least five minutes of rest in the semi-recumbent position at Baseline (prior to study drug) and repeated at the Week 16/ET visit.  Recordings should include lead II as a rhythm strip and contain at least five QRS complexes.  ECG parameters to be collected include rhythm, HR, PR interval, QT interval, QRS duration, and any clinically significant abnormalities.

**Version Date 21 Oct 2015**                    **Confidential**                    **Page 28**

**LIQ_PH-ILD_00000277**

United Therapeutics Corp.

RIN-PH-201
Original Protocol

### 3.3.2.4    Clinical Laboratory Assessments

The results of all clinical laboratory tests conducted at Screening and Baseline must be assessed by the Investigator to determine each subject's eligibility to participate in the study prior to starting study drug.  Screening and Baseline clinical laboratory assessments can be combined into a single blood draw if all eligibility criteria are met within 48 hours prior to the first dose of study drug at Baseline.  Central laboratory data are ultimately used to qualify subjects for the study.  However, for subjects who are well known to the Investigator and who are clinically stable, the Investigator may confirm eligibility using local laboratory values so as not to delay randomization while waiting for central laboratory results if the Screening and Baseline visits are combined.

Clinical laboratory results outside the normal reference range must be assessed for clinical significance by the Investigator.  Clinically significant refers to a laboratory value that is unusual with respect to the subject's medical history or current health status.

Clinically significant abnormal laboratory test values will be reported as AEs and treated and/or followed-up until the symptoms or values return to normal or acceptable levels, as judged by the Investigator.  Where appropriate, medical tests and examinations will be performed to assess and document resolution.

### 3.3.2.4.1    Clinical Chemistry and Hematology

Blood for the measurement and evaluation of clinical chemistry and hematology, will be collected at the Screening and Baseline visits prior to administration of study drug and repeated at Week 8 and Week 16/ET to assess for treatment-emergent changes in clinical chemistry and hematological laboratory parameters.  Values for the following parameters will be obtained:

| Electrolyte Panel | Chemistry Panel | Hematology Panel |
|---|---|---|
| • Sodium | • Total bilirubin | • Hemoglobin |
| • Potassium | • Alkaline phosphatase | • Hematocrit |
| • Bicarbonate | • Alanine aminotransferase | • Red blood cell count |
| • Chloride | • Aspartate aminotransferase | • Red blood cell morphology |
| | • Urea nitrogen | • White blood cell count |
| | • Creatinine | • Platelet count |
| | • Calcium | |
| | • Albumin | |

### 3.3.2.4.2    Pregnancy Testing

Females of childbearing potential will undergo a serum pregnancy test at Screening followed by urine pregnancy tests at Baseline and each subsequent study visit.  A serum pregnancy test will be collected at the Screening Visit (or Baseline visit if the Screening and Baseline visits

are combined).  A positive pregnancy test will exclude the subject from further participation in the study.  Pregnant subjects who are discontinued from the study will be transitioned to an alternate therapy at the discretion of the Investigator.

### 3.3.2.5    Pulmonary Function Tests (PFTs)

Pulmonary Function Tests (PFTs) will be assessed at Baseline and repeated at Week 8 and Week 16/ET.  Baseline PFTs are to be conducted prior to the first dose of study drug and after recovery from 6MWT.  The Week 8 and Week 16/ET PFTs should be conducted after recovery from the 6MWT.  If the PFTs are done both prior to and after a bronchodilator, only the pre-bronchodilator values will be recorded.

The following parameters will be recorded (absolute values and % predicted): $FEV_1$, FVC, TLC, and DLCO (uncorrected and corrected for hemoglobin).

### 3.3.2.6    Oxygenation

#### 3.3.2.6.1    Pulse Oximetry

Pulse oximetry will be assessed immediately prior to, throughout the conduct of, and immediately after each scheduled 6MWT assessment at Baseline, Week 4, Week 8, Week 12, Week 15, and Week 16/ET.  Pulse oximetry will also be performed during the practice 6MWT assessment as applicable.  Pulse oximetry will include the collection of $SpO_2$ and HR.  The $SpO_2$ and HR obtained immediately prior to and immediately following completion of the 6MWT will be recorded in the electronic case report form (eCRF).  In addition, the lowest recorded $SpO_2$ (and associated HR) obtained during each 6MWT will be recorded in the eCRF.

#### 3.3.2.6.2    Supplemental Oxygen Requirement

The amount of supplemental oxygen (L/min) required at rest will be assessed at Baseline and at regularly scheduled visits.  The amount of supplemental oxygen required at the 6MWT assessment will also be recorded for each 6MWT assessment.

### 3.3.2.7    Adverse Events

Adverse events will be recorded throughout the course of the study from the time that each subject signs the ICF until the time screen failure is documented, or until the subject is either discontinued from the study or all Week 16 study assessments have been completed.  Each subject will be questioned for AEs at each scheduled study visit and during required telephone/email contacts.  Subjects will also be instructed to spontaneously report all AEs throughout the study.

All AEs should be followed until either resolution (or return to normal or Baseline values), until they are judged by the Investigator to no longer be clinically significant, or for at least 30 days if the AE extends beyond the final study visit.  All AEs meeting the criteria for serious (*i.e.,* serious adverse events [SAEs]) should be followed until resolution, death, or the subject is lost to follow-up even if they are ongoing more than 30 days after completion of the

LIQ_PH-ILD_00000279

final study visit (Week 16/ET).  All AEs/SAEs that occur while the subject is on study drug will be recorded as instructed in this protocol.

Sections 9 and 15.2 provide the guidelines and definitions for recording AEs.

### 3.3.2.8    Concomitant Medications

All concomitant medications taken during the conduct of the study, including those taken for AEs or other medical events, should be recorded in the subject's source documents and captured in the eCRF as required.

### 3.3.2.9    Hospitalization due to Cardiopulmonary Indications

Hospitalizations due to cardiopulmonary indications must be recorded in the eCRF from the time of informed consent until study termination.  Adverse events resulting in hospitalizations, regardless of cause or duration should also be recorded as SAEs per Appendix 15.2.  Please note that, when possible, study medication should be continued during hospitalizations.

### 3.3.2.10    Exacerbations of Underlying Lung Disease

Exacerbations of underlying lung disease are defined as the worsening of respiratory symptoms which require the modification or addition of systemic corticosteroids, antibiotics, or both.  Exacerbations of underlying lung disease should be recorded throughout the duration of the study from the time of informed consent until study termination.  Exacerbations of underlying lung disease will also be reported as AEs or SAEs per Appendix 15.2.

### 3.3.2.11    Weekly Telephone/Email Contact

Weekly telephone/email contact is required throughout the 16 week study to instruct the subject to titrate their dose of study drug and to assess for AEs and concomitant medications. Weekly telephone/email contact may be replaced by a face-to-face interaction on the weeks where study visits occur and the information can be obtained during the visit).  The subject may be contacted via email in lieu of a telephone call; however, email should not replace direct follow-up by telephone or in clinic for clinically significant AEs or other emergent issues.  All telephone or email contacts (*i.e.*, any dosing instructions, AEs reported and/or medication changes) with the subject must be noted in the source documentation.

## 3.4    NUMBER OF SUBJECTS

Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (two-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline to Week 16 in 6MWD assuming a standard deviation of 75 meters.  The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%.

LIQ_PH-ILD_00000280

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

### 3.5   NUMBER OF CENTERS

This study is a multi-center with approximately 75 participating study centers.

### 3.6   ESTIMATED STUDY DURATION

From Screening until study completion, expected duration of study participation is approximately 20 weeks (includes a four week Screening period and 16 week treatment period).

### 4   SUBJECT ELIGIBILITY

Inclusion and exclusion criteria are to be assessed during the Screening period and reconfirmed at the Baseline visit prior to the first dose of study drug.  Study related procedures must be conducted during the Screening period after obtaining informed consent to determine subject eligibility for the study.

### 4.1   INCLUSION CRITERIA

1. Subject voluntarily gives informed consent to participate in the study.

2. Males and females aged 18 – 79 years at the time of informed consent.

    a. Females of reproductive potential[1] must be non-pregnant (as confirmed by a serum pregnancy test at screening) and non-lactating, and will:

        i. Either abstain from intercourse (when it is in line with their preferred and usual lifestyle), or

        ii. Use two medically acceptable, highly-effective forms of contraception[2] for the duration of study, and <u>at least</u> 30 days after discontinuing study drug.

    b. Males must use a condom for the duration of treatment and for at least 48 hours after discontinuing study drug.

[1] Females who are successfully sterilized (surgical sterilization methods include hysterectomy, bilateral tubal ligation, or bilateral oophorectomy) or are postmenopausal (defined as amenorrhea for at least 12 consecutive months) are not considered to be of reproductive potential.

[2] Medically acceptable, highly-effective forms of contraception can include approved hormonal contraceptives (oral, injectable, and implantable), and barrier methods (such as a condom or diaphragm) when used with a spermicide. For women of reproductive potential, a negative pregnancy test is required at Screening and Baseline prior to initiating study drug.

3. The subject has a confirmed diagnosis (based on CT imaging and PFTs performed within six months prior to the first dose of study drug) of WHO Group 3 PH associated with one of the following:

    a. Idiopathic interstitial pneumonia (IIP) including:

        i. Idiopathic pulmonary fibrosis (IPF)

**Version Date 21 Oct 2015**                **Confidential**                **Page 32**

LIQ_PH-ILD_00000281

ii.  Idiopathic nonspecific interstitial pneumonia

iii.  Respiratory bronchiolitis-associated interstitial lung disease (RB-ILD)

iv.  Desquamative interstitial pneumonia (DIP)

v.  Cryptogenic organizing pneumonia (COP)

vi.  Acute interstitial pneumonitis (AIP)

vii.  Idiopathic lymphoid interstitial pneumonia

viii.  Idiopathic pleuroparenchymal fibroelastosis

ix.  Unclassifiable idiopathic interstitial pneumonia

b.  Chronic hypersensitivity pneumonitis (CHP)

c.  Occupational lung disease (drug or radiation-induced)

d.  Combined pulmonary fibrosis and emphysema (CPFE)

4.  Subjects are required to have a RHC within one year prior to the first dose of study drug with the following documented parameters:

a.  Pulmonary vascular resistance (PVR) $\geq$ 4 Wood Units (WU) and

b.  A left ventricular end diastolic pressure (LVEDP) or pulmonary capillary wedge pressure (PCWP) of $\leq$ 12 mmHg if PVR $\geq$ 4 WU to < 6.25 WU or $\leq$ 15 mmHg if PVR $\geq$ 6.25 WU and

c.  A mean pulmonary arterial pressure (mPAP) of $\geq$ 30 mmHg

*Note: For subjects receiving background therapy with an FDA approved medication (i.e., endothelin receptor antagonist [ERA], phosphodiesterase type-5 inhibitor [PDE-5I], or soluble guanylate cyclase stimulator [sGC]) for PAH, the RHC must be performed after the initiation of aforementioned PAH therapy to ensure the subject meets the required RHC parameters.*

5.  An uncorrected diffusing capacity of the lungs for carbon monoxide (DLCO) of < 50%.

6.  Baseline 6MWD $\geq$ 100 meters.

7.  The subject is either not receiving any PAH-approved oral therapy (ERA, PDE-5I, or sGC), or is receiving monotherapy (ERA, PDE-5I, or sGC) for at least 90 days and receiving a stable dose for $\geq$ 30 days prior to randomization.

8.  Subjects on a chronic medication for underlying lung disease must be on a stable and optimized dose for $\geq$ 30 days prior to the first dose of study drug.  Subjects receiving pirfenidone or nintedanib must have been receiving treatment for at least 90 days and on a stable dose for at least 30 days prior to the first dose of study drug.

9.  Subjects on a supportive medication therapy (*e.g.,* anticoagulants, diuretics, oxygen, etc.) must be on a stable and optimized dose for $\geq$ 30 days prior to the first dose of study drug.  Exceptions are the discontinuation or dose changes of anticoagulants and / or dose change of diuretics.

10. In the opinion of the Investigator, the subject is able to communicate effectively with study personnel, and is considered reliable, willing and likely to be cooperative with protocol requirements, including attending all study visits.

## 4.2    EXCLUSION CRITERIA

1. The subject has a diagnosis of PAH or PH for reasons other than ILD as outlined in inclusion criterion 3.  This would include, but is not limited to, the concomitant presence of thromboembolic disease (acute or chronic), untreated or inadequately treated obstructive sleep apnea (OSA), sarcoidosis, human immunodeficiency virus (HIV)-1 infection, toxin exposure such as methamphetamine or anorexigen use, and other conditions of the WHO Group I, II, IV, and V classification.

2. The subject has shown intolerance or significant lack of efficacy to a prostacyclin or prostacyclin analogue that resulted in discontinuation or inability to effectively titrate that therapy.

3. The subject has received any prostacyclin therapy (i.e., epoprostenol, treprostinil, iloprost, or beraprost) within 30 days of informed consent, except for acute vasoreactivity testing.

4. The subject has evidence of clinically significant left-sided heart disease as defined by:

    a.  LVEDP or PCWP > 15 mmHg (or >12 if PVR $\geq$ 4 to < 6.25 WU)

    b.  Left ventricular ejection fraction < 40% as assessed by either multigated angiogram (MUGA), angiography or echocardiography.

    *Note: Subjects with abnormal left ventricular function attributable entirely to impaired left ventricular filling due to the effects of right ventricular overload (i.e., right ventricular hypertrophy and/or dilatation) will not be excluded.*

5. Subjects must not have three or more of the following left ventricular disease/dysfunction risk factors:

    a.  Body Mass Index (BMI) $\geq$ 30 kg/m$^2$

    b.  History of Essential Hypertension

    c.  Diabetes Mellitus – any type

    d.  Historical evidence of significant coronary disease established by any one of the following:

        i.   history of myocardial infarction or percutaneous coronary intervention or angiographic, or

        ii.  evidence of coronary artery disease (> 50% stenosis in at least one coronary artery), or

        iii. positive stress test with imaging, or previous coronary artery bypass graft, or stable angina

6. The subject is receiving > 10 L/min of oxygen supplementation by any mode of delivery at rest at Baseline.

7. Use of any inhaled tobacco products or significant history of drug abuse within six months prior to first dose of study drug.

8. Exacerbation of underlying lung disease or active pulmonary or upper respiratory infection within 30 days of the first dose of study drug.

9. Initiation of pulmonary rehabilitation within 12 weeks prior to the first dose of study drug.

10. The subject has uncontrolled systemic hypertension as evidenced by systolic blood pressure > 160 mmHg or diastolic blood pressure > 100 mmHg.

11. The subject has any form of congenital heart disease or congenital heart defect (repaired or unrepaired) (other than a patent foramen ovale [PFO]).

12. The subject has anemia as defined by a screening hemoglobin value < 9.0 g/dL, active infection, or any other condition that would interfere with the interpretation of study assessments.

13. The subject has a Body Mass Index $\geq$ 40 kg/m$^2$.

14. The subject has any musculoskeletal disorder (*i.e.,* arthritis affecting the lower limbs, recent hip or knee joint replacement, artificial leg), is using a device to assist walking (*i.e.,* cane or walker), or has any other condition that would limit ambulation.

15. Use of any investigational drug/device, or participation in any investigational study within 30 days prior to the first dose of study drug.

## 4.3   PRESCRIBED THERAPY

Subjects must not be receiving any prostacyclin (i.e., epoprostenol, treprostinil, iloprost, beraprost, or any other prostacyclin therapy) within 30 days prior to informed consent (unless used for acute vasoreactivity testing).  Subjects can either be on no FDA approved PAH background therapy or on a single FDA approved PAH therapy including: an ERA, a PDE-5I, or a sGC so long as they have been receiving treatment for a minimum of 90 days and on a stable dose for at least 30 days prior to randomization.

Subjects on a supportive therapy (*e.g.,* anticoagulants, diuretics, oxygen) must have been on a stable and optimized dose for $\geq$ 30 days prior to the first dose of study drug.  Exceptions are the discontinuation or dose changes of anticoagulants and / or dose change of diuretics. Subjects on a chronic medication for underlying lung disease should be on a stable and optimized dose for $\geq$ 30 days prior to the first dose of study drug.  Subjects receiving pirfenidone or nintedanib should have been receiving treatment for a minimum of 90 days and at the current dose for at least 30 days prior to the first dose of study drug.  Subjects may not newly initiate pirfenidone or nintedanib from the first dose of study drug (Baseline) through study termination.

Subjects may not initiate pulmonary rehabilitation (rehab) within 12 weeks prior to the first dose of study drug until the end of the study (Week 16).

All concomitant medications taken during the conduct of the study, including those taken for AEs or other medical events, should be recorded in the subject's source documents and transcribed into the eCRF as required.  The flow rate of supplemental oxygen should be recorded as outlined in Section 3.3.2.6.2.

LIQ_PH-ILD_00000284

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                          **Original Protocol**

## 5        SUBJECT ENROLLMENT

### 5.1        TREATMENT ASSIGNMENT

Subjects will be randomized (1:1) to receive treatment with inhaled treprostinil (6 mcg/breath) or placebo.

### 5.2        RANDOMIZATION

Subjects will be randomized (1:1) to receive treatment with inhaled treprostinil (6 mcg/breath) or placebo.  An IXRS will be utilized for the central randomization procedure.  Sites will enter values of the qualifying 6MWT and the date the test was conducted into the IXRS and will be notified if the subject qualifies for the study.

All subjects will be randomized using a centrally administered stratified permuted block randomization, stratified by Baseline 6MWD ($\leq$ 350 m and > 350 m) and receipt of background FDA approved therapy for PAH (i.e., treatment naïve or receiving an FDA approved therapy for PAH [i.e., ERA, PDE-5I, or sGC]).

### 5.3        BLINDING

The Investigator, study site, subject and Sponsor will not be aware of the treatment allocation.  All clinical trial material will be provided as blinded study drug.

## 6        DRUGS AND DOSING (OR TREATMENT PROCEDURES)

### 6.1        DRUG DOSAGE, ADMINISTRATION AND SCHEDULE

Treprostinil for inhalation solution (0.6 mg/mL) is delivered via an ultrasonic nebulizer which emits a dose of approximately 6 mcg per breath.  Placebo will be provided as an identical solution that will be inhaled using the same ultrasonic nebulizer.  All subjects will receive study drug (inhaled treprostinil or placebo) using the commercially available TD-100 ultrasonic nebulizer (Tyvaso Inhalation System).  Subjects will be trained on inhalation of study drug using the nebulizer device.  Detailed instructions for the use of these devices will be provided to all study subjects.  In addition, all subjects will receive a copy of the commercially available Tyvaso Inhalation System Instructions for Use (IFU) for the TD-100 ultrasonic nebulizer.

Once informed consent has been signed, all entry criteria have been met, and the randomized treatment assignment confirmed, the first dose of study drug (3 breaths; 18 mcg) will be inhaled in the clinic, followed by at least a one hour observation period (defined as Day 1).  Study drug doses should be maximized throughout the study, dose escalations (additional one breath four times daily) can occur up to every three days with a target dosing regimen of 9 breaths (54 mcg) four times daily and a maximum of 12 breaths (72 mcg) four times daily within four weeks of beginning the treatment.  Table 6-1 provides a guideline for recommended dose escalations.

**Version Date 21 Oct 2015**            **Confidential**            **Page 36**

LIQ_PH-ILD_00000285

United Therapeutics Corp.

**RIN-PH-201**
**Original Protocol**

**Table 6-1          Recommended Inhaled Treprostinil Dose Escalation Table**

| Study Day[1] | Single Dose | Total Daily Dose |
|---|---|---|
| **Titrating to maximum dose of 12 breaths** | | |
| 1-3 | 3 breaths QID (18 mcg) | 72 mcg |
| 4-6 | 4 breaths QID (24 mcg) | 96 mcg |
| 7-9 | 5 breaths QID (30 mcg) | 120 mcg |
| 10-12 | 6 breaths QID (36 mcg) | 144 mcg |
| 13-15 | 7 breaths QID (42 mcg) | 168 mcg |
| 16-18 | 8 breaths QID (48 mcg) | 192 mcg |
| 19-21 | 9 breaths QID (54 mcg) | 216 mcg |
| 22-24 | 10 breaths QID (60 mcg) | 240 mcg |
| 25-27 | 11 breaths QID (66 mcg) | 264 mcg |
| 28 (and beyond) | 12 breaths QID (72 mcg) | 288 mcg |

\*   QID: four times daily; mcg: micrograms
[1]  Study day refers to the days on study drug with Day 1 referring to the first dose of study drug.

The dosing schedule is recommended as a guide only.  The Investigator may determine the appropriate dosing schedule on an individual subject basis, considering tolerability and functional improvement.

If subjects are unable to tolerate the initial three breaths, they may decrease their next dose to one or two breaths of study drug (as determined by the Investigator) four times a day during waking hours.  The subject will then gradually increase their dose to reach a minimum of three breaths and titrate to a target of 9 breaths and a maximum dose of 12 breaths four times a day during waking hours, as tolerated.

Dose changes should be conducted under appropriate medical supervision in consultation with the study site.  Telephone calls/emails between the site and subject should occur prior to each dose adjustment or at least weekly to monitor for AEs, clinical worsening events and make decisions about dose titration.

## 6.2      ACCESS TO BLINDED TREATMENT ASSIGNMENT

During the study, the site personnel, subject, and Sponsor will remain blinded to the treatment assignment of all subjects.  A medical emergency (*e.g.,* a life threatening event) constitutes the only reason for unblinding during the treatment phase.  Appropriate communications must take place between the site and the Sponsor before accessing the IXRS to allow unblinding of a subject's treatment assignment.

## 6.3      COMPLIANCE

Each subject will be provided with a dosing diary in order to record dosing information from Randomization until Week 16/ET.  Subjects will be required to bring the completed dosing diary and all empty and unused study drug ampoules to each scheduled study visit.  At each visit, all study drug returned by the subject (used and unused) will be collected and new study

**Version Date 21 Oct 2015**                    **Confidential**                              **Page 37**

**United Therapeutics Corp.**                                **RIN-PH-201**
                                                        **Original Protocol**

drug will be dispensed.  The appropriate study personnel must document the number of used and unused ampoules and determine if the appropriate amount of study drug remains based on the dose of study drug prescribed.

Subject compliance with the prescribed dosage regimen will be monitored throughout the study.  At each study visit, the subject will be asked whether he or she has been compliant with dosing instructions.  If it is determined that a subject is not compliant with study drug then site personnel must re-educate the subject on proper dosing compliance and its importance.  Continued non-compliance may lead to withdrawal of the subject from the study, after consultation between the Investigator and the Sponsor.

## 7    EXPERIMENTAL PROCEDURES

Screening may begin up to 30 days prior to first dose of study drug.  Baseline assessments may be conducted over a 48 hour period prior to the first dose of study drug to allow for scheduling of all activities.  Alternately, the Screening and Baseline assessments may be conducted in one visit if all assessments are performed and all entry criteria are satisfied within the 48 hours prior to randomization and first dose of study drug.

## 7.1   SCREENING VISIT

The recommended sequence of assessments for the Screening visit is as follows (if not combined with the Baseline visit [See Section 7.2 for the recommended sequence of events for the combined Screening/Baseline visit]):

- Informed consent
- Inclusion/exclusion criteria review
  - If necessary, the following procedure may be performed during the 30 day Screening window if required to satisfy inclusion/exclusion criteria (previous medical records documenting eligibility criteria may also be used provided the previous records document subject eligibility within the protocol mandated timelines, as applicable):
    - RHC (Must be performed within one year prior to the first dose of study drug and after initiating PAH background therapy [if applicable]. If a historical RHC is not available in this timeframe, a RHC may be performed during Screening so long as it is performed at least five days prior to the first dose of study drug [Baseline (Day 1)]; a RHC cannot be combined with the Baseline visit)
    - CT scan (must be performed within six months prior to the first dose of study drug)
- Demographics
- PH history
- Medical history
- Physical exam

**Version Date 21 Oct 2015**            **Confidential**                **Page 38**

LIQ_PH-ILD_00000287

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

- Vital signs (following at least five minutes of rest; collected prior to 6MWT or after recovery from the 6MWT, if practice 6MWT is applicable) including: height, weight, RR, HR, systolic blood pressure (SBP), diastolic blood pressure (DBP), and temperature.
- Serum pregnancy test, for women of childbearing potential
- Blood draws for clinical laboratory parameters
- Practice 6MWT (only required if the subject has not previously performed a 6MWT at the study site; to be conducted following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT, if applicable)
- Documentation of supplemental oxygen requirement (L/min)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- Adverse events
- Concomitant medications

## 7.2 BASELINE/RANDOMIZATION VISIT

All Baseline assessments must be performed prior to the first dose of study drug. Baseline assessments may be conducted over a 48 hour period prior to the first dose of study drug to allow for scheduling of assessments; however, the Baseline 6MWT must occur on the same day as but prior to the first dose of study drug. The recommended sequence of assessments for the Baseline visit is as follows (if not combined with the Screening visit):

- SGRQ (questionnaire must be administered prior to any results, procedures, or blood draws)
- Vital signs (following at least five minutes of rest; collected prior to 6MWT or after recovery from the 6MWT); including weight, RR, HR, SBP, DBP, and temperature.
- Urine pregnancy test, for women of childbearing potential
- Blood draws for clinical laboratory parameters
- NT-proBNP (must be drawn prior to 6MWT and first dose of study drug; for central laboratory processing only)
- Collection of blood sample for evaluation of biomarkers (optional)
- 12-lead ECG (following at least five minutes of rest in the semi-recumbent position)
- Documentation of supplemental oxygen requirement (L/min)
- 6MWT (must be conducted prior to first dose of study drug on the day of randomization; to be conducted following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (must be done prior to first dose of study drug and after recovery from the Baseline 6MWT)
- Hospitalizations due to a cardiopulmonary indication

**Version Date 21 Oct 2015**          **Confidential**          **Page 39**

LIQ_PH-ILD_00000288

**United Technologies Corp.**                          **RIN-PH-201**
                                                       **Original Protocol**

- Exacerbations of underlying lung disease
- Adverse events
- Concomitant medications
- Re-confirm inclusion/exclusion criteria (Baseline 6MWD [not the practice Screening 6MWD] will be used for inclusion/exclusion verification)
- Randomization using IXRS
- Administer study drug and provide dosing instructions and device training (subject must remain in the clinic for at least one hour after the first dose of study drug for observation)
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met:
  - Hospitalization due to a cardiopulmonary indication
  - Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart
  - Death (all causes)
  - Lung transplantation

### 7.3   COMBINED SCREENING AND BASELINE

The Screening and Baseline assessments may be conducted in one visit if all assessments are performed and all entry criteria are satisfied within 48 hours prior to randomization and dosing of study drug.  Baseline PFTs, 6MWT, and CT (if a historical assessment is not available within six months prior to the first dose of study drug) assessments used to determine eligibility criteria may be performed on the same day but prior to the first dose of study drug.  The recommended order of assessments for a combined Screening and Baseline Visit is outlined below.

Assessments to be completed as part of the Screening phase:

- Informed consent
- SGRQ (questionnaire must be administered prior to any results, procedures, or blood draws)
- Inclusion/exclusion criteria review
- Blood draws for clinical laboratory parameters and serum pregnancy test (enough blood should be drawn for local laboratory to confirm the entry criteria for hemoglobin and serum pregnancy test [as applicable], as well as for the complete panel for central laboratory processing)
- NT-proBNP (must be drawn prior to 6MWT and first dose of study drug; for central laboratory processing only)
- Collection of blood sample for evaluation of biomarkers (optional)
- Demographics
- PH history
- Medical history

**Version Date 21 Oct 2015**               **Confidential**                    **Page 40**

LIQ_PH-ILD_00000289

**United Therapeutics Corp.**                                        **RIN-PH-201**
                                                                     **Original Protocol**

- Physical examination
- Vital Signs (following at least five minutes of rest; collected prior to the 6MWT or after recovery from the 6MWT) including: weight, RR, HR, SBP, DBP, and temperature.
- Documentation of supplemental oxygen requirement (L/min)
- Practice 6MWT to be conducted one day prior to Baseline assessments (only required if the subject has not previously performed a 6MWT at the study site; to be conducted following at least 10 minutes of rest [sitting])
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- Adverse events
- Concomitant medications

Assessments to be completed as part of the Baseline Visit:

- 12-Lead ECG (following at least five minutes of rest in the semi-recumbent position)
- 6MWT (must be conducted on the same day as but prior to first dose of study drug; to be conducted following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (must be done prior to first dose of study drug and after recovery from the Baseline 6MWT).
- Re-confirm inclusion/exclusion criteria (Baseline 6MWD [not the practice Screening 6MWD] will be used for inclusion/exclusion verification)
- Randomization using IXRS
- Administer study drug and provide dosing instructions and device training (subject must remain in the clinic for at least one hour after the first dose of study drug for observation)
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met:
  o Hospitalization due to a cardiopulmonary indication
  o Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart
  o Death (all causes)
  o Lung transplantation

## 7.4    TREATMENT PHASE: WEEKS 4, 8, AND 12

The following assessments to be completed during the Treatment phase:

- Vital signs (following at least five minutes of rest; collected prior to 6MWT or after recovery from 6MWT)
- Documentation of supplemental oxygen requirement (L/min)

**Version Date 21 Oct 2015**            **Confidential**            **Page 41**

LIQ_PH-ILD_00000290

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

- Urine pregnancy test, for women of childbearing potential
- Blood draws for clinical laboratory parameters (Week 8 only)
- NT-proBNP (for central laboratory processing only [Week 8 only])
- Peak 6MWT (must be conducted between 10 to 60 minutes after the most recent dose of study drug and following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (Week 8 only; to be performed after recovery from the 6MWT)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met:

  - Hospitalization due to a cardiopulmonary indication
  - Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart.
  - Death (all causes)
  - Lung transplantation

- Adverse events
- Concomitant medications
- Study drug accountability

Please note the visit window for the Week 4, Week 8, and Week 12 visits is ± 5 days.

**7.5    TREATMENT PHASE: WEEK 15 (TROUGH)**

- Vital signs (following at least five minutes of rest; collected prior to 6MWT or after recovery from the 6MWT)
- Documentation of supplemental oxygen requirement (L/min)
- Urine pregnancy test, for women of childbearing potential
- Trough 6MWT (at least four hours after the last dose of study drug)
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met:

  - Hospitalization due to a cardiopulmonary indication
  - Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart
  - Death (all causes)

**Version Date 21 Oct 2015**          **Confidential**          **Page 42**

LIQ_PH-ILD_00000291

United Therapeutics Corp.

**RIN-PH-201**
**Original Protocol**

   o Lung transplantation
- Adverse events
- Concomitant medications
- Dosing instructions/study drug accountability

Please note the visit window for the Week 15 visit is ± 5 days and at least 24 hours prior to the Week 16 visit.

## 7.6  END OF STUDY (WEEK 16) OR EARLY TERMINATION (ET) VISIT

The assessments to be completed during the Week 16 visit are listed below in recommended sequence of events.  If a decision is made to early terminate a subject, the following assessments should be conducted as soon as possible and prior to study drug discontinuation, if possible:

- SGRQ (questionnaire must be administered prior to any results, procedures, or blood draws)
- Physical examination
- Vital signs (following at least five minutes of rest; collected prior to 6MWT or after recovery from the 6MWT)
- Documentation of supplemental oxygen requirement (L/min)
- 12-Lead ECG (following at least five minutes of rest in the semi-recumbent position)
- Urine pregnancy test, for women of childbearing potential
- Blood draws for clinical laboratory parameters
- NT-proBNP (must be drawn prior to 6MWT; for central laboratory processing only)
- Collection of blood sample for evaluation of biomarkers (optional)
- Peak 6MWT (must be conducted between 10 to 60 minutes after the most recent dose of study drug and following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (to be performed after recovery from the 6MWT)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met:
  - Hospitalization due to a cardiopulmonary indication
  - Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart
  - Death (all causes)
  - Lung transplantation
- Adverse events

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

- Concomitant medications
- Study drug accountability

Subjects who remain on study drug, complete all assessments during the 16 week Treatment Phase, and who meet all eligibility criteria for the open-label extension study (RIN-PH-202) are eligible for an open-label extension study (RIN-PH-202).  Subjects who permanently discontinue study drug during the 16 week Treatment Phase are not eligible for entry in the open-label extension study.

### 7.6.1    Study Contacts

During the treatment phase, all subjects will be contacted at least once a week via telephone or email (or more often as needed) to follow-up on adherence of the correct dose titration of study drug, and to assess for AEs and concomitant medications.  A copy of emails and/or telephone contact sheets must be documented in the subject's source documentation.  Email should not replace direct follow-up by telephone or in clinic for clinically significant AEs or other emergent issues.  All study contacts (*i.e.,* any dosing instructions, AEs reported, and/or medication changes) with the subject will be recorded.

The weekly study contacts may be replaced by a face-to-face interaction on the weeks where study visits occur and the information can be obtained during the visit.

## 8    STUDY TERMINATION

## 8.1    CRITERIA FOR SUBJECT WITHDRAWAL

A subject may voluntarily withdraw or be withdrawn from the study and/or study drug by the Investigator at any time for reasons including, but not limited to, the following:

- The subject wishes to withdraw from further participation.
- A serious or life-threatening AE occurs or the Investigator considers that it is necessary to discontinue study drug to protect the safety of the subject.
- The subject consistently deviated from the protocol.
- Lung transplantation.
- The subject becomes pregnant.
- The subject's behavior is likely to undermine the validity of his/her results.

If a subject is discontinued from the study prematurely, the Investigator must provide an explanation in the eCRF and complete the End of Study Record for that subject.  If study drug has been administered, the Investigator should make every effort to perform all scheduled evaluations prior to discharge.  In the event that a subject discontinues study drug prematurely due to an AE, the subject will be followed until either the Investigator determines that the AE has resolved, it is no longer considered clinically significant, the subject is lost to further follow-up, or for 30 days if the AE extends beyond the final visit.

LIQ_PH-ILD_00000293

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

## 8.2    LOST TO FOLLOW-UP

If a subject fails to return to clinic or respond after at least three documented attempts by the site to contact the subject by telephone or email, the Investigator should issue a written letter by certified mail requesting the subject to contact the clinic.  If no response is received, the subject will be considered lost to follow-up.  The site will record the last date of contact in the eCRF as the termination date.

## 8.3    CRITERIA FOR TERMINATING THE STUDY

The study may be stopped at any time if, in the opinion of the Investigator and/or Sponsor, continuation of the study represents a serious medical risk to the subjects.  This may include, but is not limited to, the presence of serious, life-threatening, or fatal AEs, or AEs that are unacceptable in nature, severity, or frequency.  The Sponsor reserves the right to discontinue the study for any reason at any time.

## 8.4    CRITERIA FOR DISCONTINUING THE SITE

The study may also be terminated at a given site if:

- The Investigator elects to discontinue the study.
- The Sponsor elects to discontinue the study at the site.
- U.S. FDA, European, or national regulations are not observed.
- The protocol is consistently violated.
- Changes in personnel or facilities adversely affect performance of the study.

## 9    ADVERSE EVENT REPORTING

## 9.1    DEFINITIONS

### 9.1.1    Adverse Event

An AE is any untoward medical occurrence in a subject administered a pharmaceutical product which does not necessarily have to have a causal relationship with this treatment.  An AE can therefore be any unfavorable and unintended sign (including an abnormal laboratory finding for example), symptom, or disease temporally associated with the use of a medicinal product, whether or not related to the use of the medicinal product.

An AE may include:

- An intercurrent illness, injury, or any other concomitant impairment of the subject's health, as well as abnormal laboratory findings if deemed to have clinical significance.
- A worsening of an existing symptom or condition or post-treatment events that occur as a result of protocol-mandated procedures (*e.g.,* exacerbation of a pre-existing illness following the start of the study or an increase in frequency or intensity of a pre-existing episodic event or condition).

**Version Date 21 Oct 2015**          **Confidential**          **Page 45**

LIQ_PH-ILD_00000294

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

Thus, no causal relationship with the study drug is implied by the use of the term "adverse event".

An AE does not include the following:

- Medical or surgical procedures (*e.g.,* surgery, endoscopy, tooth extraction, transfusion); however, the condition for which the surgery is required may be an AE.
- Planned surgical measures permitted by the study protocol and the condition(s) leading to these measures are not AEs.
- Day to day fluctuations of pre-existing disease or conditions present or detected at the start of the study that do not worsen.
- Situations where an untoward medical occurrence has not occurred (*e.g.,* hospitalizations for cosmetic elective surgery, social and/or convenience admissions).
- The disease or disorder being studied or a sign or symptom associated with the disease or disorder unless more severe than expected for the subject's condition.

### *9.1.2      Serious Adverse Event*

A serious adverse event (SAE) is an AE occurring at any time after informed consent that results in any of the following outcomes:

- Death
- A life-threatening AE
- Inpatient hospitalization or prolongation of existing hospitalization
- A persistent or significant disability/incapacity
- A congenital anomaly/birth defect
- Results in a medically important event of reaction

Life-threatening in this context refers to a reaction in which the subject was at risk of death at the time of the reaction; it does not refer to a reaction that hypothetically might have caused death if more severe.

Medical and scientific judgment should be exercised in deciding whether other situations should be considered serious reactions, such as important medical events that might not be immediately life threatening or result in death or hospitalization, but might jeopardize the subject or might require intervention to prevent one of the other outcomes listed above. Examples of such events are intensive treatment in an emergency room or at home for allergic bronchospasm, blood dyscrasias, or convulsions that do not result in hospitalization or development of dependency or abuse.  Any suspected transmission via a medicinal product of an infectious agent is also considered a serious adverse reaction.

## 9.2      DOCUMENTATION OF ADVERSE EVENTS

An AE or SAE occurring during the study must be documented in the subject's source documents and on the appropriate eCRF page.  Information relating to the AE such as onset and cessation date and times, intensity, seriousness, relationship to study drug, and outcome is

**Version Date 21 Oct 2015**              **Confidential**                          **Page 46**

LIQ_PH-ILD_00000295

also to be documented in the eCRF (see Appendix 15.2 for definitions).  Where possible, AEs should be recorded using standard medical terminology.  The Investigator should attempt, if possible, to establish a diagnosis based on the presenting signs and symptoms.  If several signs or symptoms are clearly related to a medically-defined diagnosis or syndrome, the diagnosis or syndrome should be recorded on the eCRF page, not the individual signs and symptoms.

### 9.3     FOLLOW UP OF ADVERSE EVENTS

All AEs should be followed until either resolution (or return to normal or baseline values), until they are judged by the Investigator to no longer be clinically significant, or for at least 30 days if the AE extends beyond the final visit.  All SAEs that occur during the study will be followed until resolution, death, or the subject is lost to follow-up even if they are ongoing more than four weeks after completion of the final study visit.  Supplemental measurements and/or evaluations may be necessary to investigate fully the nature and/or causality of an AE or SAE.  This may include additional laboratory tests, diagnostic procedures, or consultation with other healthcare professionals.  The eCRF pages should be updated with any new or additional information as appropriate.

### 9.4     REPORTING RESPONSIBILITIES OF THE INVESTIGATOR

**All SAEs, regardless of expectedness or causality, must be reported to the Sponsor by fax/email (+ 1 919-313-1297 or drugsafety@unither.com) within 24 hours of awareness.**  A completed SAE Notification Report form along with any relevant hospital records and autopsy reports should be provided to Global Drug Safety at United Therapeutics Corporation.  A follow-up SAE Notification Report form must be forwarded to Global Drug Safety at United Therapeutics Corporation within 24 hours of the receipt of any new or updated information.  The Investigator must also promptly notify their Investigational Review Board (IRB) or Ethics Committee (EC) of the SAE, including any follow-up information, in accordance with applicable national regulations and guidelines set forth by the IRB or EC.

### 9.5     PREGNANCY

If a study subject becomes pregnant during participation in this clinical study, site staff must notify the Sponsor within 24 hours of learning of the pregnancy by completing the Pregnancy Notification Form and submitting via fax or e-mail to Global Drug Safety at United Therapeutics Corporation (+ 1 919-313-1297 or drugsafety@unither.com).  The United Therapeutics Global Drug Safety department will follow-up with the Investigator to ensure appropriate data are provided regarding the outcome of the pregnancy, and to ask the Investigator to update the Pregnancy Notification Form.  Pregnancy only becomes an AE/SAE if there is an abnormal outcome, a spontaneous abortion, an elective termination for medical reasons, or a congenital anomaly in the offspring.

### 9.6     SAFETY REPORTS

In accordance with national regulations, the sponsor will notify the appropriate regulatory authority(ies), and all participating Investigators of any AE that is considered to be possibly attributable to study drug and is both serious and unexpected.  The Investigator must report

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                 **Original Protocol**

these AEs to their IRB or EC in accordance with applicable national regulations and guidelines set forth by the IRB or EC.

## 10      STATISTICAL CONSIDERATIONS

## 10.1    DATA PROCESSING

The results of assessments will be transcribed into an eCRF for each subject who signs an ICF until study completion, or study discontinuation for any reason.  A representative from the sponsor will verify eCRF data fields against source documentation.  All data transmitted from the site will be reviewed and entered into a quality assured computerized database.  Data clarifications will be generated and the database will be edited as appropriate.  The eCRF screens are to be reviewed by the Investigator for completeness and accuracy.  The Investigator must electronically sign each subject's eCRF to signify his/her approval of the data.  The Investigator will be required to re-sign an eCRF if changes are made to a subject's eCRF by the site after the Investigator initially signs the eCRF.  The database will be final when all outstanding queries have been resolved and all data management quality assurance procedures are complete.

## 10.2    SAMPLE SIZE

Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (two-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline in 6MWD assuming a standard deviation of 75 meters. The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%.

## 10.3    ANALYSIS PLAN

Details of the efficacy and safety analyses are provided below.  A separate statistical analysis plan will document further details of the statistical methods to be employed, including any changes to planned analyses specified within this protocol.  The analysis plan will be finalized prior to any unblinding of study data by the Sponsor.  Unless otherwise specified, all statistical tests will be two-sided at alpha level of 0.05.  All statistical calculations will be completed using the latest version of SAS[®].

The Intent-to-Treat (ITT) population will be defined as all subjects randomized into the study; all ITT subjects will be counted in the group to which they were randomized, regardless of the study drug they were actually given.  All efficacy analyses will be performed on this ITT population, unless otherwise specified.  The Safety population will be defined as all subjects enrolled into the study who received at least one dose of study drug; all safety population subjects will be counted in the group corresponding to the study drug actually received, regardless of randomized assignment.  All safety analyses will be performed on this Safety population, unless otherwise specified.

**Version Date 21 Oct 2015**              **Confidential**                    **Page 48**

**LIQ_PH-ILD_00000297**

United Therapeutics Corp.

**RIN-PH-201**
**Original Protocol**

### 10.3.1    Primary Efficacy Endpoint

The primary efficacy endpoint is the change in 6MWD measured at peak exposure from Baseline to Week 16.  This study hypothesizes that inhaled treprostinil will improve exercise capacity after 16 weeks of therapy as compared with placebo when administered to subjects with PH associated with ILD including CPFE.  Non-parametric analysis of covariance will be used to estimate the treatment effect.  The magnitude of treatment effect will be estimated with the Hodges-Lehmann median difference between two treatment groups.  For subjects who discontinue from the study early, the last observation carried forward method will be used to impute the 6MWD at Week 16.

### 10.3.2    Secondary Efficacy Endpoints

The effect of inhaled treprostinil will be formally tested on the following three secondary efficacy endpoints:

1.  Change in peak 6MWD from Baseline to Week 12
2.  Change in plasma concentration of NT-proBNP from Baseline to Week 16
3.  Change in trough 6MWD from Baseline to Week 15

The similar approach for the analysis of primary efficacy endpoint will be used.  No adjustment for multiplicity is planned.

### 10.3.3    Exploratory Endpoints

The effect of inhaled treprostinil will be evaluated on the following parameters:

1.  Change in peak 6MWD from Baseline to Week 4
2.  Change in peak 6MWD at from Baseline to Week 8
3.  Change in SGRQ from Baseline to Week 16
4.  Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until one of the following criteria are met:

    a.  Hospitalization due to a cardiopulmonary indication
    b.  Decrease in 6MWD > 15% from Baseline directly related to disease under study, at two consecutive visits and at least 24 hours apart
    c.  Death (all causes)
    d.  Lung transplantation

5.  Optional evaluation of change in biomarkers (specific targets to be determined) from Baseline to Week 16
6.  Change in distance saturation product (DSP) from Baseline to Week 16

For changes in peak 6MWD and SGRQ, a similar approach for the analysis of primary efficacy endpoint will be used.  For time to clinical worsening, Kaplan-Meier estimator will be provided and log-rank test will be used to compare the treatment difference.

LIQ_PH-ILD_00000298

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

### 10.3.4    *Safety Analyses*

The safety of inhaled treprostinil will be evaluated by comparison of the following parameters between the two treatment groups:

1. AEs
2. Oxygenation
   a. Pulse oximetry ($SpO_2$)
   b. Supplemental oxygen (L/min) requirement
3. Pulmonary function:
   a. $FEV_1$
   b. FVC
   c. TLC
   d. DLCO
4. Clinical laboratory parameters
5. Vital signs
6. 12-Lead ECG
7. Hospitalizations due to cardiopulmonary indications
8. Exacerbations of underlying lung disease; defined as worsening of respiratory symptoms which require the modification or addition of systemic corticosteroids, antibiotics, or both.

All AEs as recorded by the Investigators will be assigned a Medical Dictionary for Regulatory Activities (MedDRA) preferred term and system organ class by the Sponsor for reporting purposes. The summary of AEs will include the number and percentage of subjects, as well as the number of events reported for each preferred term. No inferential analyses are planned for the AEs.

Data collected prior to dosing will serve as Baseline values for the evaluation of data collected during the treatment phase. Summary statistics will be calculated for measured values and changes from Baseline values. Treatment-emergent changes in vital signs, ECGs, PFTs, oxygenation parameters and clinical laboratory parameters will be summarized by treatment group. Incidence of hospitalization due to cardiopulmonary indications and exacerbations of underlying lung disease will be summarized by treatment group. No inferential analyses are planned on these safety endpoints.

## 10.4   INTERIM ANALYSES

Interim analyses for safety data will be performed at the request of the Data Monitoring Committee (DMC). Interim analyses for efficacy data are not planned for this study.

## 10.5   OTHER ANALYSES

Exploratory analyses may be conducted based on available study data.

**United Therapeutics Corp.**                                                    **RIN-PH-201**
                                                                                **Original Protocol**

## 10.6    DATA LISTINGS AND SUMMARIES

All data gathered in this study will be presented in summary tables and listings in the clinical study report.

## 10.7    DATA MONITORING COMMITTEE

A DMC will be established for the study including physicians knowledgeable in the treatment of PH.  Throughout the course of the study the DMC will meet on a regular basis to monitor the safety of the study.  Meetings will occur as outlined in the DMC charter.  The DMC will be blinded to individual subject treatment allocation during the review process.  All analyses will be prepared by an independent external consultant and reviewed only by the DMC as defined in the DMC charter.  The sponsor will only have access to blinded study data during this process.

## 11      PACKAGING AND FORMULATION

## 11.1    CONTENTS OF STUDY DRUG

### 11.1.1      Study Drug

The Sponsor will supply study medication (treprostinil inhalation solution, 0.6 mg/mL or placebo), as clear liquid in 2.9 mL ampoules.  The ampoules will be packaged in groups of four, sealed in aluminum pouches.  There will be nine pouches per carton.

### 11.1.2      Study Device

The Sponsor will supply commercially available TD-100 nebulizers (Tyvaso Inhalation System®) and accessories to the site in standard packaging labeled with the study number.  The Tyvaso Inhalation will also be provided with the commercially available Instructions for Use (IFU).

Each subject will receive two nebulizers at the start of the study.  In addition, the subjects will be provided with a month worth of plastic accessories at each study visit.

## 11.2    LABELING

### 11.2.1      Study Drug

The foil pouch and the outer carton will each be labeled with the same information and sent to the site.  At a minimum, the study medication outer packaging (pouch and carton) will be labeled to disclose clearly the product name, study number, kit identification number, expiry date, Sponsor's name and address, instructions for use, and storage information (subject to regulatory requirements in each study region or country).

### 11.2.2      Study Device

Study subjects will receive commercially available TD-100 nebulizers and accessories separately from study drug.  Study subjects will receive two devices at Baseline supplied as a device starter kit.  Subjects will receive replacement parts as part of a monthly device

**Version Date 21 Oct 2015**                    **Confidential**                    **Page 51**

**LIQ_PH-ILD_00000300**

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                **Original Protocol**

resupply kit.  The nebulizers and accessories will be supplied using standard packaging labeled with the study number.

## 11.3    STORAGE AND HANDLING OF CLINICAL TRIAL MATERIAL (CTM)

All study drug will be stored at room temperature 25°C (77°F) with excursions permitted to 15°C-30°C (59°F – 86°F).  Study drug should not be frozen, refrigerated, or exposed to heat. Keep the ampoules in the foil pouch to protect from light.  Once the foil pouch is opened, use within seven days.  See investigational medicinal product label for information on use and storage of the product.

Study drug will be stored in a securely locked cabinet or enclosure with appropriate temperature monitoring.  Access should be strictly limited to the Investigators and their designees.  Neither the Investigators nor any designees may provide study drug to any subject not participating in this protocol.

## 11.4    SUPPLY AND RETURN OF CTM

Study sites will be supplied with a sufficient quantity of study drug to begin enrollment in the study.  At Baseline, an IXRS will be utilized to randomize the subjects and assign the appropriate study drug for the first four-week treatment interval.  At subsequent study visits, the IXRS will be utilized by study staff to assign subsequent study drug kits to the subjects based upon their current treatment allocation.  At each study visit, all study drug dispensed to a subject should be returned to the study site, including all used and unused ampoules.

At the end of the study, nebulizers used during the study should be collected from each subject not continuing into the open-label extension study.  Subjects continuing into the open-label extension study will retain their devices for use in the open-label extension study.

## 11.5    DRUG ACCOUNTABILITY

The Investigator is responsible for study drug accountability and reconciliation overall and on a per subject basis.  Drug accountability records are to be maintained during the study and these records include, but are not limited to: the amount of study drug received from the sponsor, the amount dispensed to each subject, and the amount of used/unused study drug returned to the site from the subject.

At each visit, site personnel will:

- Collect and document all study drug returned by the subject (both used and unused).
- Compute study drug compliance using the dosing instructions given to the subject since the previous study visit and the amount of study drug returned.
- Re-educate the subject about the importance of following the prescribed dosing regimen (if compliance is low).

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                **Original Protocol**

Once a representative from the Sponsor is able to confirm drug accountability for a completed subject, unused study drug and nebulizers will be returned to a Sponsor designated location for destruction.

## 12    REGULATORY AND ETHICAL OBLIGATION

### 12.1    APPLICABLE REGULATORY REQUIREMENTS

The study will be conducted in accordance with ICH and GCP guidelines and all applicable national regulations.  The Sponsor will obtain the required approval from each national regulatory authority to conduct the study.  During the conduct of the study, an annual safety report will be compiled by the sponsor for submission to those regulatory authorities and IRBs/ECs that require it.  Any additional national reporting requirements as specified by the applicable regulations, regulatory authorities, or IRB/EC will also be fulfilled during the conduct of the study.

### 12.2    INFORMED CONSENT REQUIREMENTS

Before a subject is enrolled in the study, the Investigator or his/her designees must explain the purpose and nature of the study, including potential benefits and risks and all study procedures to the subject.  The subject must sign and date an IRB/EC-approved informed consent form prior to the conduct of any study-related activities.  A copy of the signed consent form will be given to the subject and the original will be retained in the study site's records.

### 12.3    INDEPENDENT ETHICS COMMITTEE/INSTITUTIONAL REVIEW BOARD

Prior to study initiation at each site, the Investigator will obtain approval for the study from an appropriate IRB/EC and provide the sponsor with a copy of the approval letter.  The IRB/EC must also review and approve the study site's informed consent form and any other written information provided to the subject prior to enrollment, as well as any advertising materials used for subject recruitment.  Copies of the informed consent form and advertising materials must be forwarded to the Sponsor for review before submission to the IRB/EC prior to the start of the study.

If, during the study, it is necessary to amend either the protocol or the informed consent form, the Investigator is responsible for obtaining IRB/EC approval of these amended documents prior to implementation.  Copies of the IRB/EC correspondence and approval letters must be sent to the Sponsor.

During the conduct of the study, an annual progress report will be compiled by the Sponsor for submission to those IRBs/ECs that require it.

A written summary of the study will be provided by the Investigator to the IRB/EC following study completion or termination according to the IRB or EC standard procedures.  Additional updates will also be provided in accordance with the IRB/EC's standard procedures.

**United Therapeutics Corp.**  **RIN-PH-201**
**Original Protocol**

## 12.4  PRESTUDY DOCUMENTATION REQUIREMENTS

Before the commencement of the clinical trial, at a minimum, the following documents will be provided to the site: Investigators' Brochure, Protocol, Informed Consent Form, Subject Dosing Diary, the Tyvaso Inhalation System IFU, Budget Agreement, and Case Report Form.

At a minimum, the site will be required to provide the following documents to United Therapeutics Corporation or designee prior to study start: Signature page of the protocol, Form FDA 1572, Financial Disclosure Form, IRB/EC Composition and Roster, IRB/EC protocol and informed consent approval letters, and Curriculum Vitae of study staff listed on the 1572.

## 12.5  SUBJECT CONFIDENTIALITY

Every effort will be made to keep medical information confidential. United Therapeutics Corporation, the FDA or other regulatory bodies, and the IRB/EC governing this study may inspect the medical records of any subject involved in this study. The Investigator may release the subject's medical records to employees or agents of the Sponsor, the IRB/EC or the FDA or appropriate local regulatory agencies for purposes of checking the accuracy of the data. A number will be assigned to all subjects and any report published will not identify the subject's name.

## 13  ADMINISTRATIVE AND LEGAL OBLIGATIONS

## 13.1  PROTOCOL AMENDMENTS AND STUDY TERMINATION

Protocol amendments that could potentially adversely affect the safety of participating subjects or that alter the scope of the investigation, the scientific quality of the study, the experimental design, dosages, duration of therapy, assessment variables, the number of subjects treated, or subject selection criteria may be made only after consultation between United Therapeutics Corporation or its designee and the Investigator.

All protocol amendments must be submitted to and approved by the appropriate regulatory authorities and IRB/EC prior to implementation.

A report documenting study termination must also be submitted to and acknowledged by the appropriate IRB/EC for each study site.

At the end of the study, where applicable, a final report will be provided to the local regulatory agencies.

## 13.2  STUDY DOCUMENTATION AND STORAGE

In accordance with federal/national regulations, ICH, and GCP guidelines, the Investigator must retain study records for at least two years after the last approval of a marketing application in an ICH region and until there are no pending or contemplated marketing applications in an ICH region or at least two years have elapsed since the formal discontinuation of clinical development of the investigational product. The Investigator must

**United Therapeutics Corp.**                                         **RIN-PH-201**
                                                                      **Original Protocol**

notify United Therapeutics Corporation before any disposal or change in location of study records.

### 13.3    STUDY MONITORING AND DATA COLLECTION

In accordance with federal/national regulations, ICH, and GCP guidelines, monitors for United Therapeutics Corporation or its designee will periodically contact the site and conduct on-site visits.  During these visits, the monitor will at a minimum:  confirm ethical treatment of subjects, assess study progress, review data collected, conduct source document verification, verify drug accountability periodically, and identify any issues requiring resolution.

The Investigator agrees to allow the monitor direct access to all relevant documents and to allocate his/her time and his/her staff to the monitor to discuss any findings or any relevant issues.

United Therapeutics Corp.

RIN-PH-201
Original Protocol

## 14    REFERENCES

Agarwal, M. and A. Waxman (2015).  Inhaled Treprostinil in Group-3 Pulmonary Hypertension.  International Heart and Lung Transplant.  Nice France.

ATS Statement: Guidelines for the Six-Minute Walk Test.  Am J Respir Crit Care Med 2002; 166: 111–117.

Bajwa, A., A. Shujaat, C. Thomas, et al (2015).  The impact of inhaled treprostinil sodium inhalation on ventilation perfusion matching when used in patients with group 1 PAH with concomitant COPD.  Chest.  Montreal Canada.

Benza, R. L., W. Seeger, V. V. McLaughlin, et al (2011). "Long-term effects of inhaled treprostinil in patients with pulmonary arterial hypertension: the Treprostinil Sodium Inhalation Used in the Management of Pulmonary Arterial Hypertension (TRIUMPH) study open-label extension." Journal of Heart Lung Transplantion 30(12): 1327-1333.

Channick, R. N., H. Olschewski, W. Seeger, et al (2006). "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension." Journal of the American College of Cardiology 48(7): 1433-1437.

Cottin, V., J. Le Pavec, G. Prèvot, et al (2010).  "Pulmonary hypertension in patients with combined pulmonary fibrosis and emphysema syndrome."  European Respiratory Journal 351: 105-111.

Fijalkowska, A., M. Kurzyna, A. Torbicki, et al (2006). "Serum N-terminal brain natriuretic peptide as a prognostic parameter in patients with pulmonary hypertension." Chest 129(5): 1313-1321.

Holland, A. E., M. A. Spruit, T. Troosters, et al (2014). "An official European Respiratory Society/American Thoracic Society technical standard: field walking tests in chronic respiratory disease." European Respiratory Journal 44(6): 1428-1446.

Jankowich, M. D. and S. I. Rounds (2012).  "Combined pulmonary fibrosis and emphysema syndrome: a review."  Chest 141(1): 222-231.

Lettieri, C. J., S. D. Nathan, R. F. Browning, et al (2006).  "The distance-saturation product predicts mortality in idiopathic pulmonary fibrosis".  Respiratory Medicine 100:  1734-1741.

McLaughlin, V. V., R. L. Benza, L. J. Rubin, et al (2010). "Addition of inhaled treprostinil to oral therapy for pulmonary arterial hypertension: a randomized controlled clinical trial." Journal of the American College of Cardiology 55(18): 1915-1922.

Nathan, S. D. (2008). "Pulmonary hypertension in interstitial lung disease." International Journal of Clinical Practice 62(SUPPL.160): 21-28.

Nathan, S. D. and P. M. Hassoun (2013). "Pulmonary hypertension due to lung disease and/or hypoxia." Clinical Chest Medicine 34(4): 695-705.

LIQ_PH-ILD_00000305

Remodulin (treprostinil) Injection package insert.  United Therapeutics Corp.  Research Triangle Park, NC.  December 2014.

Roccia, F., B. Campolo, and L. Gallelli, et al.  "Effects of ambrisentan in a patient affected by combined pulmonary fibrosis and emphysema and by severe pulmonary hypertension: clinical, functional, and biomolecular findings."  Clinical Drug Investigation 33(6): 451-457.

Saggar R, D. Khanna, A. Vaidya, et al (2014).  "Changes in right heart hemodynamics and echocardiographic function in an advanced phenotype of pulmonary hypertension and right heart dysfunction associated with pulmonary fibrosis." Thorax 69, no. 2: 123-9.

Seeger, W., Y. Adir, J. A. Barbera, et al (2013). "Pulmonary hypertension in chronic lung diseases." Journal of the American College of Cardiology 62(25 Suppl): D109-116.

Simonneau, G., I. M. Robbins, M. Beghetti, et al (2009). "Updated clinical classification of pulmonary hypertension." Journal of the American College of Cardiology 54(1 Suppl): S43-54.

Travis, W., U. Costabel, D. Hansell, et al (2013).  "An Official American Thoracic Society/European Respiratory Society Statement: Update of the International Multidisciplinary Classification of the Idiopathic Interstitial Pneumonias."  American Journal of Respiratory and Critical Care medicine 188(6): 733-748.

Voswinckel, R., H. A. Ghofrani, F. Grimminger, et al (2006). "Inhaled treprostinil [corrected] for treatment of chronic pulmonary arterial hypertension."  Annals of Internal Medicine 144(2): 149-150.

Wang, L., L. Bai, R. Sapkota, et al (2015).  Hemodynamic and gas exchange effects of iloprost in patients with chronic obstructive pulmonary disease and pulmonary hypertension.  Pulmonary Vascular Research Institute.  Guangzhou, China.

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

## 15      APPENDICES

### 15.1    PROCEDURE FOR SIX-MINUTE WALK TEST

General Procedures

The 6MWT should be administered by the same tester at each study site throughout the study, whenever possible.  The administration of the test and specifications of the testing area should be generally consistent with the American Thoracic Society guidelines[1,2] and the usual practice of the investigative site.  Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate by simple face mask at all subsequent 6MWT assessments.

The area used for the 6MWT should be pre-measured at approximately 30 meters in length and at least 2 to 3 meters in width.  There must be no turns or significant curves to the 6MWT area.  The length should be marked with gradations to ensure the accurate measurement of the distance walked.  The area should be well ventilated.  The tester may be at the starting end of the corridor or at the midpoint of the corridor with a stop-watch.  Intermittent rest periods are allowed if the subject can no longer continue.  If the subject needs to rest briefly, he/she may stand or sit and then begin again when he/she is sufficiently rested but the clock will continue to run.  At the end of 6 minutes, the tester will call "stop where you are" while simultaneously stopping the watch and then measure the distance walked.

Instructions to the Subject

Subjects will be instructed that the preceding meal should be light.  Subjects should be told to wear comfortable clothing and sneakers or comfortable walking shoes.  The person administering the test will use the following **exact** dialogue with the subject:

"The purpose of this test is to find out how far you can walk in 6 minutes.  You will start from this point and follow the hallway to the marker (e.g., chair) at the end, turn around and walk back.  When you arrive back at the starting point you will go back and forth again.  You will go back and forth as many times as you can in the 6-minute period.  You may stop and rest if you need to.  Just remain where you are until you can go on again.  However, the most important thing about the test is that you cover as much ground as you possibly can during the six-minutes.  I will tell you the time, and I will let you know when the 6 minutes are up.  When I say STOP, please stand right where you are."

After these instructions are given to the subject, the person administering the test will then ask:

"Do you have any questions about the test?"

The person administering the test will then start the test by saying the following to the subject:

"Are you ready?"

"Start when I say "GO."

The person administering the test will tell the subject the time at each minute by saying:

"You have 5 minutes to go."

**Version Date 21 Oct 2015**                    **Confidential**                    **Page 58**

LIQ_PH-ILD_00000307

United Therapeutics Corp.                                    **RIN-PH-201**
                                                          **Original Protocol**

"You have 4 minutes to go."

"You have 3 minutes to go."

"You have 2 minutes to go."

"You have 1 minute to go."

At 6 minutes, the person administering the test will tell the subject: "stop where you are."

No other instruction or encouragement will be given during the test.  Eye contact with the subject should be avoided during the test.

[1] ATS Statement: Guidelines for the Six-Minute Walk Test.  Am J Respir Crit Care Med 2002; 166: 111–117.
[2] Holland, A. E., M. A. Spruit, T. Troosters, M. A. Puhan, V. Pepin, D. Saey, M. C. McCormack, B. W. Carlin, F. C. Sciurba, F. Pitta, J. Wanger, N. MacIntyre, D. A. Kaminsky, B. H. Culver, S. M. Revill, N. A. Hernandes, V. Andrianopoulos, C. A. Camillo, K. E. Mitchell, A. L. Lee, C. J. Hill and S. J. Singh (2014). "An official European Respiratory Society/American Thoracic Society technical standard: field walking tests in chronic respiratory disease." Eur Respir J 44(6): 1428-1446.

**Version Date 21 Oct 2015**          **Confidential**          **Page 59**

LIQ_PH-ILD_00000308

**United Therapeutics Corp.**                                    **RIN-PH-201**
                                                                 **Original Protocol**

### 15.2    GUIDELINES AND DEFINITIONS FOR RECORDING ADVERSE EVENTS

The Investigator or a designated member of his/her staff will probe each subject for any AEs that may have occurred.  The Investigator should always ask the same question when conducting the verbal probe in order to ensure uniformity between subjects.  The Investigator should ask:

> "How are you doing (feeling)?"

Based on the subject's response to this question, the Investigator should ask additional questions relevant to the specific complaint such as:

> "How severe is/was the symptom?"
>
> "How often did the symptom occur?"
>
> "How long did the symptom last?"

It is the Investigator's responsibility to review the results of all diagnostic and laboratory tests as they become available and ascertain if there is a clinically significant change from Baseline.  If the results are determined to be a clinically significant change from Baseline, this should be reported as an AE.  The Investigator may repeat the diagnostic procedure or laboratory test or request additional tests to verify the results of the original tests.  When possible, a diagnosis associated with the abnormality should be used as the reported AE.

Using provided definitions, the Investigator will then:

(1) rate the intensity and seriousness of the AE, (2) estimate the causality of the AE to study drug, and (3) note actions taken to counteract the AE.

<u>Definitions of Intensity, Seriousness, Causality, Action Taken, and Outcome</u>

**INTENSITY**

An assessment of the relative intensity (severity) of an AE is based on the Investigator's clinical judgment.  The maximum intensity encountered during the evaluation period should be checked.  The assessment of intensity should be independent of the assessment of the seriousness of the AE.

**SERIOUSNESS**

A serious AE is one that represents an actual or potential significant hazard.  This includes, but is not limited to, an event that is fatal, life-threatening, permanently or severely disabling, requires or prolongs inpatient hospitalization*, is a congenital abnormality (offspring of subject) or is medically significant (important medical events that may not result in death, be life-threatening, or require hospitalization may be considered an SAE when, based upon appropriate medical judgment, they may jeopardize the subject and may require medical or surgical intervention to prevent one of the outcomes listed in this definition).

*Hospitalizations that would not be considered SAEs include those for:

- Routine treatment or monitoring of the study indication not associated with any deterioration in condition (e.g., hospitalization for a routine RHC).

**Version Date 21 Oct 2015**            **Confidential**                **Page 60**

**LIQ_PH-ILD_00000309**

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

- Treatment which was elective or pre-planned, for a pre-existing condition not associated with any deterioration in condition (e.g., pre-planned operation which does not lead to further complications etc.).
- Treatment of an emergency, in an outpatient setting for an event not fulfilling any of the definitions of serious as given above and not resulting in hospital admission.

## CAUSALITY

An estimate of causality between a specified AE and the study drug is made by the Investigator. Several factors should be considered when determining causality. These factors include temporal relationship and response to withdrawal or reintroduction of the study drug.

Definitions of the causality categories are as follows:

- NOT RELATED – There is not a temporal relationship to study drug administration (too early, or late, or study drug not taken), or there is a reasonable causal relationship between another drug, or concurrent disease and the SAE, or any of the following:
  - An event that precedes the first administration of study drug
  - An event for which the cause is clearly related to an external event
  - Temporal relationship to study drug is atypical
  - Is readily explained by an intercurrent illness AND has an expected level of severity, duration and resolution
  - An alternative explanation (concomitant drug, intercurrent illness) is likely

- POSSIBLE – There is a reasonable causal relationship between the study drug and the SAE. Dechallenge information is lacking or unclear, study drug administration was not modified in response to the SAE, or any of the following:
  - Has a reasonable temporal relationship to study drug
  - The event has a plausible biological link to the activity of the study drug
  - Is unlikely to be related to an intercurrent illness or has an unexpected degree of severity, duration or complication

- PROBABLE – There is a reasonable causal relationship between the study drug and the SAE. The event responds to dechallenge - the event resolves or improves with modification of study drug administration. Rechallenge (the original study drug was restarted) is not required, or any of the following:
  - Has a reasonable temporal relationship to study drug
  - The event has a plausible biologic link to the activity of the study drug
  - Not readily explained by an intercurrent illness
  - Not readily explained by external event
  - Improves on discontinuation of study drug
  - If study drug has been discontinued, may recur or reintroduction of study drug

**Version Date 21 Oct 2015**  **Confidential**  **Page 61**

LIQ_PH-ILD_00000310

**United Technologies Corp.**

**RIN-PH-201**
**Original Protocol**

**ACTION TAKEN**

STUDY DRUG DOSE MODIFICATION*

- Dose Not Changed – The dose or regimen of the study drug was not changed.

- Dose Increased – The dose or regimen of study drug was increased

- Dose Decreased – The dose or regimen of study drug was decreased

- Drug Interrupted – Administration of the study drug was stopped temporarily

- Drug Withdrawn – Administration of the study drug was stopped permanently and not restarted

- Unknown – Changes to the administration of the study drug cannot be determined

- Not Applicable

*NOTE:  Only the last study drug action should be recorded in the eCRF.  For example, if the study drug is withdrawn and then the decision is made to restart, the dose modification of "Drug interrupted" should be reported on the SAE form.

**OUTCOME**

- Fatal – The study subject died.

- Not Recovered/Not Resolved – The AE was ongoing at the time of death or at the time the subject was lost to follow up.

- Recovered/Resolved – The AE resolved.

- Recovered/Resolved with Sequelae – The AE is considered resolved however there is residual sequelae.  Some events do not return to baseline, such as metastasis or progression of disease; however, once these events are determined by the Investigator to be stable or chronic, the Investigator may consider the event to be resolved or resolved with sequelae.

- Recovering/Resolving – The AE is improving but is not yet completely recovered/resolved.

- Unknown – The outcome of the AE cannot be determined.

DA0691

LIQ_PH-ILD_00000311

**United Therapeutics Corp.**

**RIN-PH-201**
**Original Protocol**

**15.3    ST. GEORGE'S RESPIRATORY QUESTIONNAIRE**

# ST. GEORGE'S RESPIRATORY QUESTIONNAIRE
# ENGLISH FOR THE UNITED STATES

## ST. GEORGE'S RESPIRATORY QUESTIONNAIRE (SGRQ)

*This questionnaire is designed to help us learn much more about how your breathing is troubling you and how it affects your life. We are using it to find out which aspects of your illness cause you the most problems, rather than what the doctors and nurses think your problems are.*

*Please read the instructions carefully and ask if you do not understand anything. Do not spend too long deciding about your answers.*

*Before completing the rest of the questionnaire:*

*Please check one box to show how you describe your current health:*

| Very good | Good | Fair | Poor | Very poor |
|-----------|------|------|------|-----------|
| ☐ | ☐ | ☐ | ☐ | ☐ |

**Copyright reserved**
P.W. Jones, PhD FRCP
Professor of Respiratory Medicine,
St. George's University of London,
Jenner Wing,
Cranmer Terrace,                    Tel.  +44 (0) 20 8725 5371
London SW17 ORE, UK.                Fax  +44 (0) 20 8725 5955

**USA / US English version**                    1

f:\institut\cultadap\project\gsk1881\question\final versions\sgrqusaq.doc 18/04/03

*continued…*

# St. George's Respiratory Questionnaire
## PART 1

*Please describe how often your respiratory problems have affected you over the past 4 weeks.*

Please check (✔) *one box for each question*:

| | almost every day | several days a week | a few days a month | only with respiratory infections | not at all |
|---|---|---|---|---|---|
| 1. Over the past 4 weeks, I have coughed: | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2. Over the past 4 weeks, I have brought up phlegm (sputum): | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3. Over the past 4 weeks, I have had shortness of breath: | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4. Over the past 4 weeks, I have had wheezing attacks: | ☐ | ☐ | ☐ | ☐ | ☐ |

5.  How many times during the past 4 weeks have you suffered from severe or very unpleasant respiratory attacks?

Please check (✔) *one*:

more than 3 times ☐
3 times ☐
2 times ☐
1 time ☐
none of the time ☐

6.  How long did the worst respiratory attack last?
    *(Go to Question 7 if you did not have a severe attack)*

Please check (✔) *one*:

a week or more ☐
3 or more days ☐
1 or 2 days ☐
less than a day ☐

7.  Over the past 4 weeks, in a typical week, how many good days (with few respiratory problems) have you had?

Please check (✔) *one*:

No good days ☐
1 or 2 good days ☐
3 or 4 good days ☐
nearly every day was good ☐
every day was good ☐

8.  If you wheeze, is it worse when you get up in the morning?

Please check (✔) *one*:

No ☐
Yes ☐

**USA / US English version**    2

*continued…*

f:\institut\cultadap\project\gsk1881\question\final versions\sgrqusaq.doc 18/04/03

LIQ_PH-ILD_00000314

# St. George's Respiratory Questionnaire
## PART 2

**Section 1**

How would you describe your respiratory condition?

Please check (✔) *one*:

| | |
|---|---|
| The most important problem I have | ☐ |
| Causes me quite a lot of problems | ☐ |
| Causes me a few problems | ☐ |
| Causes no problems | ☐ |

If you have ever held a job:

Please check (✔) *one*:

| | |
|---|---|
| My respiratory problems made me stop working altogether | ☐ |
| My respiratory problems interfere with my job or made me change my job | ☐ |
| My respiratory problems do not affect my job | ☐ |

**Section 2**

***These are questions about what activities usually make you feel short of breath these days.***

For each statement please check (✔) **the box** that applies to you ***these days***:

| | True | False |
|---|---|---|
| Sitting or lying still | ☐ | ☐ |
| Washing or dressing yourself | ☐ | ☐ |
| Walking around the house | ☐ | ☐ |
| Walking outside on level ground | ☐ | ☐ |
| Walking up a flight of stairs | ☐ | ☐ |
| Walking up hills | ☐ | ☐ |
| Playing sports or other physical activities | ☐ | ☐ |

**USA / US English version**

3

*continued…*

# St. George's Respiratory Questionnaire
## PART 2

**Section 3**

*These are more questions about your cough and shortness of breath <u>these days</u>.*

For each statement please check (✔) *the box* that applies to you *these days*:

| | True | False |
|---|:---:|:---:|
| Coughing hurts | ☐ | ☐ |
| Coughing makes me tired | ☐ | ☐ |
| I am short of breath when I talk | ☐ | ☐ |
| I am short of breath when I bend over | ☐ | ☐ |
| My coughing or breathing disturbs my sleep | ☐ | ☐ |
| I get exhausted easily | ☐ | ☐ |

**Section 4**

*These are questions about other effects that your respiratory problems may have on you <u>these days</u>.*

For each statement, please check (✔) *the box* that applies to you *these days*:

| | True | False |
|---|:---:|:---:|
| My cough or breathing is embarrassing in public | ☐ | ☐ |
| My respiratory problems are a nuisance to my family, friends or neighbors | ☐ | ☐ |
| I get afraid or panic when I cannot catch my breath | ☐ | ☐ |
| I feel that I am not in control of my respiratory problems | ☐ | ☐ |
| I do not expect my respiratory problems to get any better | ☐ | ☐ |
| I have become frail or an invalid because of my respiratory problems | ☐ | ☐ |
| Exercise is not safe for me | ☐ | ☐ |
| Everything seems too much of an effort | ☐ | ☐ |

**Section 5**

*These are questions about your respiratory treatment.  If you are not receiving treatment go to section 6.*

For each statement, please check (✔) *the box* that applies to you *these days*:

| | True | False |
|---|:---:|:---:|
| My treatment does not help me very much | ☐ | ☐ |
| I get embarrassed using my medication in public | ☐ | ☐ |
| I have unpleasant side effects from my medication | ☐ | ☐ |
| My treatment interferes with my life a lot | ☐ | ☐ |

**USA / US English version**           4

*continued…*

LIQ_PH-ILD_00000316

# St. George's Respiratory Questionnaire
## PART 2

**Section 6**

***These are questions about how your activities might be affected by your respiratory problems.***

For each statement, please check (✔)
***the box*** that applies to you
***because of your respiratory problems***:

|  | True | False |
|---|:---:|:---:|
| I take a long time to get washed or dressed | ☐ | ☐ |
| I cannot take a bath or shower, or I take a long time to do it | ☐ | ☐ |
| I walk slower than other people my age, or I stop to rest | ☐ | ☐ |
| Jobs such as household chores take a long time, or I have to stop to rest | ☐ | ☐ |
| If I walk up one flight of stairs, I have to go slowly or stop | ☐ | ☐ |
| If I hurry or walk fast, I have to stop or slow down | ☐ | ☐ |
| My breathing makes it difficult to do things such as walk up hills, carry things up stairs, light gardening such as weeding, dance, bowl or play golf | ☐ | ☐ |
| My breathing makes it difficult to do things such as carry heavy loads, dig in the garden or shovel snow, jog or walk briskly (5 miles per hour), play tennis or swim | ☐ | ☐ |
| My breathing makes it difficult to do things such as very heavy manual work, ride a bike, run, swim fast, or play competitive sports | ☐ | ☐ |

**Section 7**

***We would like to know how your respiratory problems <u>usually</u> affect your daily life.***

For each statement, please check (✔)
***the box*** that applies to you ***because of
your respiratory problems***:

|  | True | False |
|---|:---:|:---:|
| I cannot play sports or do other physical activities | ☐ | ☐ |
| I cannot go out for entertainment or recreation | ☐ | ☐ |
| I cannot go out of the house to do the shopping | ☐ | ☐ |
| I cannot do household chores | ☐ | ☐ |
| I cannot move far from my bed or chair | ☐ | ☐ |

**USA / US English version**                    5

*continued…*

# St. George's Respiratory Questionnaire

*Here is a list of other activities that your respiratory problems may prevent you from doing. (You do not have to check these, they are just to remind you of ways your shortness of breath may affect you):*

Going for walks or walking the dog

Doing activities or chores at home or in the garden

Sexual intercourse

Going to a place of worship, or a place of entertainment

Going out in bad weather or into smoky rooms

Visiting family or friends or playing with children

Please write in any other important activities that your respiratory problems may stop you from doing:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Now please check the box (one only) that you think best describes how your respiratory problems affect you:

It does not stop me from doing anything I would like to do ☐

It stops me from doing one or two things I would like to do ☐

It stops me from doing most of the things I would like to do ☐

It stops me from doing everything I would like to do ☐

*Thank you for completing this questionnaire. Before you finish would you please make sure that you have answered all the questions.*

f:\institut\cultadap\project\gsk1881\question\final versions\sgrqusaq.doc 18/04/03

DA0698                                                    LIQ_PH-ILD_00000318

Final Protocol - RIN-PH-201

Amendment 3

15February2017

**LIQ_PH-ILD_00000319**

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 707 of 1048 PageID #: 5215

United Therapeutics Corp.                                RIN-PH-201 Protocol Amendment 3
                                                              Inhaled Treprostinil



# A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease

### IND 70,362

### Protocol RIN-PH-201

### CONFIDENTIAL

### UNITED THERAPEUTICS CORPORATION

Original Protocol Date:   21 October 2015
Amendment 1               20 November 2015
Amendment 2               13 September 2016
Amendment 3               15 February 2017

**CONFIDENTIAL AND PROPRIETARY, UNITED THERAPEUTICS CORPORATION**
All content contained herein is confidential and proprietary information of United Therapeutics Corporation and shall not be disclosed in whole or in part except as permitted by a signed contract with United Therapeutics Corporation. © 2017 United Therapeutics Corporation

**Page 1**

Case 1:23-cv-00975-RGA-SRF Document 71 Filed 04/19/24 Page 708 of 1048 PageID #: 5216

## LIST OF CONTACTS FOR STUDY

| | |
|---|---|
| Study Sponsor | United Therapeutics Corp.<br>55 TW Alexander Drive<br>Research Triangle Park, NC 27709 |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| [redacted] | [redacted] |

**United Therapeutics Corp.**                              **RIN-PH-201 Protocol Amendment 3**
                                                                                **Inhaled Treprostinil**

**INVESTIGATOR'S AGREEMENT**

I have read the attached protocol entitled "A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease," protocol amendment 3 dated 15 February 2017 and agree to abide by all provisions set forth therein.

I agree to comply with the International Council for Harmonisation (ICH) Guideline for Good Clinical Practice and applicable Food and Drug Administration regulations/guidelines set forth in 21 Code of Federal Regulations Parts 50, 54, 56, and 312 and any local regulations per country.

I agree to ensure that the confidential information contained in this document will not be used for any purpose other than the evaluation or conduct of the clinical investigation without the prior written consent of United Therapeutics Corp.

I also have read the current Investigator's Brochure for inhaled treprostinil and acknowledge that review of the information contained in the Investigator's Brochure is a requirement for Investigators before using inhaled treprostinil in a clinical study.

This protocol has been received for information only and must not be implemented before all necessary regulatory agency and Ethics Committee/Institutional Review Board approval documents have been obtained.

_____          _____
Signature of Principal Investigator                               Date


_____          _____
Printed Name of Principal Investigator

LIQ_PH-ILD_00000322

United Therapeutics Corp.                    **RIN-PH-201 Protocol Amendment 3**
                                             **Inhaled Treprostinil**

## PROTOCOL SYNOPSIS

| | |
|---|---|
| **Title** | A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease |
| **Study Phase** | Phase II/III |
| **Indication** | Pre-capillary pulmonary hypertension (PH) associated with interstitial lung disease (ILD) including combined pulmonary fibrosis and emphysema (CPFE) |
| **Primary Objective** | To evaluate the safety and efficacy of inhaled treprostinil in subjects with PH associated with ILD including CPFE |
| **Primary Endpoint** | To evaluate the change in 6-minute walk distance (6MWD) measured at peak exposure from Baseline to Week 16 |
| **Secondary Endpoints** | To evaluate the effect of inhaled treprostinil on the following parameters:<br><br>1. Change in peak 6MWD from Baseline to Week 12<br>2. Change in plasma concentration of N-terminal pro-brain natriuretic peptide (NT-proBNP) from Baseline to Week 16<br>3. Change in trough 6MWD from Baseline to Week 15 |
| **Exploratory Endpoints** | To evaluate the effect of inhaled treprostinil on the following parameters:<br><br>1. Change in peak 6MWD from Baseline to Week 4<br>2. Change in peak 6MWD from Baseline to Week 8<br>3. Change in quality of life (QOL) as measured by the St. George's Respiratory Questionnaire (SGRQ) from Baseline to Week 16<br>4. Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:<br>   a. Hospitalization due to a cardiopulmonary indication |

**Version Date 15 Feb 2017**                **Confidential**                **Page 4**

LIQ_PH-ILD_00000323

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
                                                              **Inhaled Treprostinil**

|   |   |
|---|---|
|   | b.  Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart |
|   | c.  Death (all causes) |
|   | d.  Lung transplantation |
|   | 5.  Change in distance saturation product (DSP) from Baseline to Week 16 |
|   | 6.  Optional evaluation of change in biomarkers (specific targets to be determined) from Baseline to Week 16 |
|   | 7.  Optional evaluation of whole genome sequence at Baseline |
| **Safety Endpoints** | 1.  Adverse events (AEs) |
|   | 2.  Oxygenation |
|   | a.  Pulse oximetry (saturation of peripheral capillary oxygenation [$SpO_2$]) |
|   | b.  Supplemental oxygen requirement (L/min) |
|   | 3.  Pulmonary function: |
|   | a.  Forced expiratory volume in 1 second (FEV1) |
|   | b.  Forced vital capacity (FVC) |
|   | c.  Total lung capacity (TLC) |
|   | d.  Lung diffusion capacity (DLCO) |
|   | 4.  Clinical laboratory parameters |
|   | 5.  Vital signs |
|   | 6.  Electrocardiograms (ECG) |
|   | 7.  Hospitalization due to a cardiopulmonary indication |
|   | 8.  Exacerbations of underlying lung disease; defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality |
| **Study Design** | Multicenter, randomized, double-blinded, placebo-controlled, 16-week, parallel group study |
| **Sample Size** | Approximately 314 subjects at approximately 120 centers |

LIQ_PH-ILD_00000324

United Therapeutics Corp.                    RIN-PH-201 Protocol Amendment 3
                                                      Inhaled Treprostinil

---

**Summary of Subject Eligibility Criteria**

Inclusion criteria:

1. Subject voluntarily gives informed consent to participate in the study.

2. Males and females aged 18 years or older at the time of informed consent.

   a. Females of reproductive potential must be non-pregnant (as confirmed by a urine pregnancy test at screening) and non-lactating, and will:

      i. Either abstain from intercourse (when it is in line with their preferred and usual lifestyle), or
      ii. Use 2 medically acceptable, highly-effective forms of contraception for the duration of study, and <u>at least</u> 30 days after discontinuing study drug.

   b. Males with a partner of childbearing potential must use a condom for the duration of treatment and for at least 48 hours after discontinuing study drug.

3. The subject has a confirmed diagnosis of World Health Organization (WHO) Group 3 PH based on computed tomography (CT) imaging, which demonstrates evidence of diffuse parenchymal lung disease performed within 6 months prior to randomization.  Subjects may have any form of ILD or CPFE.

4. Subjects are required to have a right heart catheterization (RHC) within 1 year prior to randomization with the following documented parameters:

   a. Pulmonary vascular resistance (PVR) > 3 Wood Units (WU) and
   b. A pulmonary capillary wedge pressure (PCWP) of $\leq 15$ mmHg and
   c. A mean pulmonary arterial pressure (mPAP) of $\geq 25$ mmHg

5. Baseline 6MWD $\geq 100$ meters

---

DA0705                                              LIQ_PH-ILD_00000325

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

6.  Subjects on a chronic medication for underlying lung disease (ie, pirfenidone, nintedanib, etc) must be on a stable and optimized dose for $\geq 30$ days prior to randomization.

7.  In the opinion of the Investigator, the subject is able to communicate effectively with study personnel, and is considered reliable, willing and likely to be cooperative with protocol requirements, including attending all study visits.

8.  Subjects with connective tissue disease (CTD) must have a Baseline FVC of < 70%.

Exclusion criteria:

1.  The subject has a diagnosis of pulmonary arterial hypertension (PAH) or PH for reasons other than WHO Group 3 PH-ILD as outlined in inclusion criterion 3.

2.  The subject has shown intolerance or significant lack of efficacy to a prostacyclin or prostacyclin analogue that resulted in discontinuation or inability to effectively titrate that therapy.

3.  The subject has received any PAH approved therapy including: prostacyclin therapy (ie, epoprostenol, treprostinil, iloprost, or beraprost; except for acute vasoreactivity testing), IP receptor agonist (selexipag), endothelin receptor antagonist (ERA), phosphodiesterase type 5 inhibitor (PDE5-I), or soluble guanylate cyclase (sGC) stimulator within 60 days of randomization.

4.  The subject has evidence of clinically significant left-sided heart disease as defined by:

    a.  PCWP > 15 mmHg

    b.  Left ventricular ejection fraction < 40%.

    *Note: Subjects with abnormal left ventricular function attributable entirely to impaired left ventricular filling due to the effects of right ventricular overload (ie, right ventricular hypertrophy and/or dilatation) will not be excluded.*

5.  The subject is receiving > 10 L/min of oxygen supplementation by any mode of delivery at rest at Baseline.

6.  Current use of any inhaled tobacco/marijuana products or a significant history of drug abuse at the time of informed consent.

7.  Exacerbation of underlying lung disease or active pulmonary or upper respiratory infection within 30 days of randomization.

8.  Initiation of pulmonary rehabilitation within 12 weeks prior to randomization.

9.  In the opinion of the Investigator, the subject has any condition that would interfere with the interpretation of study assessments or has any disease or condition (ie, peripheral vascular disease, musculoskeletal disorder, morbid obesity) that would likely be the primary limit to ambulation (as opposed to PH).

10. Use of any investigational drug/device, or participation in any investigational study with therapeutic intent within 30 days prior to randomization.

11. Severe concomitant illness limiting life expectancy (< 6 months).

12. Acute pulmonary embolism within 90 days of randomization.

| | |
|---|---|
| **Drug Dosage and Formulation** | Inhaled treprostinil (6 mcg/breath) or placebo<br><br>Treatment Phase:<br>All subjects will initiate inhaled treprostinil or placebo at a dose of 3 breaths (18 mcg) 4 times daily (during waking hours). Study drug doses should be maximized throughout the study, dose escalations (additional 1 breath 4 times daily) can occur up to every 3 days with a target dosing regimen of 9 breaths (54 mcg) 4 times daily and a maximum dose of 12 breaths (72 mcg) 4 times daily, as clinically tolerated. |
| **Control Group** | Placebo |
| **Route of Administration** | Inhaled |

LIQ_PH-ILD_00000327

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

| | |
|---|---|
| **Procedures** | Subjects will be assessed during Screening and Baseline to determine eligibility for the study.  Once eligible, 5 Treatment Phase visits to the clinic will be required at Week 4, Week 8, Week 12, Week 15, and Week 16 (final study visit).  An Early Termination (ET) Visit will be conducted for subjects who end treatment prior to Week 16; all assessments planned for the final Week 16 Visit will be conducted during the ET Visit, as applicable.  Subjects will also be contacted at least weekly by telephone or email to assess tolerance to study drug, AEs, and changes to concomitant medications. |

Key Assessments:

- Pregnancy test: Females of childbearing potential will undergo a urine pregnancy test at Screening followed by urine pregnancy tests at Baseline and every subsequent scheduled study visit or ET.
- Blood for NT-proBNP and clinical labs will be obtained at Baseline, Week 8, and Week 16 or ET.
- A peak 6-minute walk test (6MWT) will be conducted at Baseline, Week 4, Week 8, Week 12, and Week 16 or ET.
- A trough 6MWT will be performed at Week 15 (at least 24 hours prior to the Week 16 6MWT).
- Pulse oximetry will be performed immediately prior to, during, and immediately after each 6MWT.
- Pulmonary function tests (PFTs) will be conducted at Baseline, Week 8, and Week 16 or ET.
- SGRQ will be completed at Baseline and Week 16 or ET.
- An optional blood sample will be collected for whole genome sequencing at Baseline.
- An optional blood sample will be collected for the analysis of biomarkers (specific targets to be determined) at Baseline and Week 16 or ET.
- An ECG will be conducted at Baseline and Week 16 or ET.
- Hospitalizations due to cardiopulmonary indications and exacerbations of underlying lung disease will be evaluated from the time of informed consent until study discontinuation.

DA0708

LIQ_PH-ILD_00000328

- Time to clinical worsening will be evaluated from the time of randomization until study discontinuation.

| | |
|---|---|
| **Statistical Considerations** | Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (2-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline to Week 16 in 6MWD measured at peak exposure assuming a standard deviation of 75 meters.  The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%. |
| | The primary efficacy endpoint is the change in 6MWD measured at peak exposure from Baseline to Week 16.  The clinical hypothesis is that inhaled treprostinil will improve exercise capacity after 16 weeks of therapy as compared with placebo when administered to subjects with PH associated with ILD including CPFE.  Non-parametric analysis of covariance will be used to estimate the treatment effect.  The magnitude of treatment effect will be estimated with the Hodges-Lehmann median difference between 2 treatment groups.  For subjects who discontinue from the study early, the last observation carried forward method will be used to impute the 6MWD at Week 16. |
| **Sponsor** | United Therapeutics Corp. 55 TW Alexander Drive P.O. Box 14186 Research Triangle Park, NC 27709 United States of America |

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

**TABLE OF CONTENTS**

LIST OF CONTACTS FOR STUDY ....................................................................... 2

INVESTIGATOR'S AGREEMENT ....................................................................... 3

PROTOCOL SYNOPSIS ........................................................................................ 4

TABLE OF CONTENTS ........................................................................................ 11

Table of In-Text Tables ........................................................................................ 14

1   BACKGROUND AND RATIONALE ............................................................. 15

1.1   DEFINITION OF CLINICAL PROBLEM ................................................ 15

1.2   INHALED TREPROSTINIL BACKGROUND ........................................ 15

1.2.1   General Pharmacology ........................................................................ 15

1.2.2   General Toxicology .............................................................................. 16

1.2.3   Clinical Experience .............................................................................. 17

1.3   RATIONALE FOR DEVELOPMENT OF STUDY DRUG IN DISEASE/CONDITION ........................................................................ 18

1.4   CLINICAL HYPOTHESIS ....................................................................... 19

2   OBJECTIVES ................................................................................................... 19

2.1   Primary Endpoint ..................................................................................... 19

2.2   Secondary Endpoints ............................................................................... 19

2.3   Exploratory Endpoints ............................................................................. 19

2.4   Safety Endpoints ...................................................................................... 20

3   EXPERIMENTAL PLAN ................................................................................ 20

3.1   STUDY DESIGN ...................................................................................... 20

3.2   OVERALL SCHEDULE OF TIMES AND EVENTS ............................. 22

3.3   CLINICAL ASSESSMENTS ................................................................... 26

3.3.1   Efficacy ................................................................................................. 26

3.3.1.1   6-Minute Walk Test ............................................................................ 26

3.3.1.2   St. George's Respiratory Questionnaire ............................................. 27

3.3.1.3   N-terminal Pro-brain Natriuretic Peptide .......................................... 28

3.3.1.4   Time to Clinical Worsening ................................................................ 28

3.3.1.5   Change in Distance Saturation Product .............................................. 28

3.3.1.6   Optional Biomarker ............................................................................ 29

3.3.1.7   Optional Whole Genome Sequencing ................................................. 29

3.3.2   Safety .................................................................................................... 29

3.3.2.1   Medical History and Physical Examinations ...................................... 29

3.3.2.2   Vital Signs .......................................................................................... 29

3.3.2.3   12-Lead Electrocardiogram ................................................................ 30

3.3.2.4   Clinical Laboratory Assessments ....................................................... 30

3.3.2.5   Pulmonary Function Tests .................................................................. 31

3.3.2.6   Oxygenation ....................................................................................... 32

3.3.2.7   Adverse Events ................................................................................... 32

Version Date 15 Feb 2017                    Confidential                    Page 11

LIQ_PH-ILD_00000330

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 718 of 1048 PageID #: 5226

United Therapeutics Corp.                          RIN-PH-201 Protocol Amendment 3
                                                          Inhaled Treprostinil

3.3.2.8    Concomitant Medications .................................................................... 33
3.3.2.9    Hospitalization due to Cardiopulmonary Indications ...................... 33
3.3.2.10   Exacerbations of Underlying Lung Disease .................................... 33
3.3.2.11   Weekly Telephone/Email Contact .................................................. 34
3.4    NUMBER OF SUBJECTS ............................................................................. 34
3.5    NUMBER OF CENTERS ............................................................................... 34
3.6    ESTIMATED STUDY DURATION ............................................................. 34
4    SUBJECT ELIGIBILITY ............................................................................. 34
4.1    INCLUSION CRITERIA ............................................................................... 35
4.2    EXCLUSION CRITERIA .............................................................................. 35
4.3    PRESCRIBED THERAPY ............................................................................ 36
5    SUBJECT ENROLLMENT ........................................................................... 37
5.1    TREATMENT ASSIGNMENT ..................................................................... 37
5.2    RANDOMIZATION ...................................................................................... 37
5.3    BLINDING ...................................................................................................... 37
6    DRUGS AND DOSING (OR TREATMENT PROCEDURES) .................... 38
6.1    DRUG DOSAGE, ADMINISTRATION, AND SCHEDULE ..................... 38
6.2    ACCESS TO BLINDED TREATMENT ASSIGNMENT ........................... 39
6.3    COMPLIANCE ............................................................................................... 39
7    EXPERIMENTAL PROCEDURES ............................................................. 40
7.1    SCREENING VISIT ....................................................................................... 40
7.2    BASELINE/RANDOMIZATION VISIT ...................................................... 41
7.3    COMBINED SCREENING AND BASELINE ............................................. 42
7.4    TREATMENT PHASE: WEEKS 4, 8, AND 12 ........................................... 44
7.5    TREATMENT PHASE: WEEK 15 (TROUGH) .......................................... 45
7.6    END OF STUDY (WEEK 16) AND/OR EARLY TERMINATION VISIT ......... 46
7.7    STUDY CONTACTS ...................................................................................... 47
7.8    ACCESS TO OPEN-LABEL STUDY ........................................................... 47
8    STUDY TERMINATION .............................................................................. 48
8.1    CRITERIA FOR SUBJECT WITHDRAWAL ........................................... 48
8.2    LOST TO FOLLOW-UP ................................................................................ 48
8.3    CRITERIA FOR TERMINATING THE STUDY ....................................... 49
8.4    CRITERIA FOR DISCONTINUING THE SITE ....................................... 49
9    ADVERSE EVENT REPORTING ................................................................ 49
9.1    DEFINITIONS ................................................................................................ 49
9.1.1    Adverse Event ............................................................................................. 49
9.1.2    Serious Adverse Event ............................................................................... 50
9.2    DOCUMENTATION OF ADVERSE EVENTS .......................................... 51
9.3    FOLLOW-UP OF ADVERSE EVENTS ....................................................... 51
9.4    REPORTING RESPONSIBILITIES OF THE INVESTIGATOR ..................... 51

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 719 of 1048 PageID #: 5227

United Therapeutics Corp.                                    RIN-PH-201 Protocol Amendment 3
                                                            Inhaled Treprostinil

9.5      PREGNANCY ........................................................................................... 52

9.6      SAFETY REPORTS ................................................................................. 52

10  STATISTICAL CONSIDERATIONS ............................................................ 52

10.1     DATA PROCESSING ............................................................................. 52

10.2     SAMPLE SIZE ......................................................................................... 53

10.3     ANALYSIS PLAN ................................................................................... 53

10.3.1     Primary Efficacy Endpoint ................................................................. 53

10.3.2     Secondary Efficacy Endpoints ........................................................... 54

10.3.3     Exploratory Endpoints ....................................................................... 54

10.3.4     Safety Analyses .................................................................................... 55

10.4     INTERIM ANALYSES ........................................................................... 56

10.5     OTHER ANALYSES ............................................................................... 56

10.6     DATA LISTINGS AND SUMMARIES ................................................ 56

10.7     DATA MONITORING COMMITTEE .................................................. 56

11  PACKAGING AND FORMULATION .......................................................... 56

11.1     CONTENTS OF STUDY DRUG ........................................................... 56

11.1.1     Study Drug ........................................................................................... 56

11.1.2     Study Device ......................................................................................... 56

11.2     LABELING ............................................................................................... 57

11.2.1     Study Drug ........................................................................................... 57

11.2.2     Study Device ......................................................................................... 57

11.3     STORAGE AND HANDLING OF CLINICAL STUDY MATERIAL .... 57

11.4     SUPPLY AND RETURN OF CLINICAL STUDY MATERIAL ............ 57

11.5     DRUG ACCOUNTABILITY .................................................................. 58

12  REGULATORY AND ETHICAL OBLIGATION ........................................ 58

12.1     APPLICABLE REGULATORY REQUIREMENTS ............................ 58

12.2     INFORMED CONSENT REQUIREMENTS ........................................ 59

12.3     INDEPENDENT ETHICS COMMITTEE/INSTITUTIONAL REVIEW
          BOARD .................................................................................................... 59

12.4     PRESTUDY DOCUMENTATION REQUIREMENTS ........................ 60

12.5     SUBJECT CONFIDENTIALITY .......................................................... 60

13  ADMINISTRATIVE AND LEGAL OBLIGATIONS .................................... 60

13.1     PROTOCOL AMENDMENTS AND STUDY TERMINATION ........... 60

13.2     STUDY DOCUMENTATION AND STORAGE ................................... 61

13.3     STUDY MONITORING AND DATA COLLECTION .......................... 61

14  REFERENCES ................................................................................................. 62

15  APPENDICES ................................................................................................... 64

15.1     PROCEDURE FOR 6-MINUTE WALK TEST .................................... 64

15.2     GUIDELINES AND DEFINITIONS FOR RECORDING ADVERSE
          EVENTS ................................................................................................... 66

15.3   ST. GEORGE'S RESPIRATORY QUESTIONNAIRE ......................................... 70

**Table of In-Text Tables**

Table 6-1      Recommended Inhaled Treprostinil Dose Escalation Table .......................... 38

LIQ_PH-ILD_00000333

# 1       BACKGROUND AND RATIONALE

## 1.1     DEFINITION OF CLINICAL PROBLEM

Pulmonary hypertension (PH) is defined as an elevation in pulmonary arterial pressure and pulmonary vascular resistance (PVR).  The World Health Organization (WHO) classifies PH due to lung diseases and/or hypoxemia as WHO Group 3 PH (Simonneau 2009).  This classification includes PH due to interstitial lung disease (ILD) including combined pulmonary fibrosis and emphysema (CPFE).

Interstitial lung disease encompasses a heterogeneous group of parenchymal lung diseases that are characterized by significant scarring or fibrosis of the bronchioles and alveolar sacs within the lungs (Travis 2013, Seeger 2013).  Increased fibrotic tissue in ILD prevents oxygenation and free gas exchange between the pulmonary capillaries and alveolar sacs.  The symptomatology of ILD is non-specific, and covers a wide range of symptoms, whose severity can vary substantially among patients.  The incidence of PH in ILD has been reported in up to 86% of patients and is associated with a poorer prognosis and decreased quality of life (QOL) (Nathan 2008, Nathan 2013).

Combined pulmonary fibrosis and emphysema is characterized by emphysema, fibrosis, and abnormalities of gas exchange (Jankowich 2012).  Up to 50% of CPFE patients have been reported to develop PH with increased PVR associated with a decreased survival (Cottin 2010, Seeger 2013).

There are no approved treatments for PH in patients with ILD or CPFE; however, the results of some approved therapies for pulmonary arterial hypertension (PAH) have stimulated further investigation in these indications (Seeger 2013, Saggar 2014, Agarwal 2015, Roccia 2013).

## 1.2     INHALED TREPROSTINIL BACKGROUND

### 1.2.1     General Pharmacology

Treprostinil, 2-[[(1R,2R,3aS,9aS)-[2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1Hbenz[f]inden-5-yl]oxy]acetic acid, is a chemically stable tricyclic analogue of prostacyclin.  The pharmacology of treprostinil is well-characterized and approved for the

LIQ_PH-ILD_00000334

treatment of PAH following either the subcutaneous (SC), intravenous (IV), inhaled (as treprostinil sodium), or oral (as treprostinil diolamine) routes of administration.

Prostacyclin is known to lower pulmonary artery pressure, increase cardiac output without affecting the heart rate (HR), improve systemic oxygen transport and possibly reverse pulmonary arterial remodeling.  There is increasing evidence that the ability to block the proliferation of pulmonary artery smooth muscle cells, along with vasodilation, may contribute to the therapeutic effects of prostacyclin in the treatment of PAH.  Treprostinil acts by triggering direct vasodilation of the pulmonary and systemic arterial vascular beds and inhibition of platelet aggregation.  In vitro, treprostinil induced concentration dependent relaxation of rabbit isolated pre-contracted mesenteric arteries and inhibited adenosine diphosphate induced platelet aggregation in human and rat platelet rich plasma.  In animals, the vasodilatory effects of treprostinil reduce right and left ventricular afterload, thereby increasing cardiac output and stroke volume.  The mechanism of action of treprostinil is therefore likely to be multifactorial.

Treprostinil for inhalation (Tyvaso®) is approved in the United States, Argentina, and Israel for the treatment of PAH (WHO Group 1) in patients with New York Heart Association (NYHA) Functional Classification III symptoms, to increase exercise ability.

### 1.2.2    General Toxicology

A well-defined clinical safety profile exists for treprostinil sodium; acute toxicity studies, repeat-dose toxicity studies, reproductive toxicity studies, and genotoxicity studies have been performed in both rats and dogs and support the chronic administration to patients (Remodulin® Package Insert 2014).

The toxicokinetic profile of treprostinil was also evaluated in acute and repeat dose toxicity studies of up to 13 weeks in duration in rodents and dogs which supported the chronic administration of inhaled treprostinil to patients.  In addition, a 2-year rat carcinogenicity study was performed with treprostinil inhalation at target doses up to 5.26, 10.6, and 34.1 mcg/kg/day which found no evidence for carcinogenic potential associated with inhaled treprostinil in rats at systemic exposure levels up to 35 times the clinical exposure at the target

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

maintenance dose of 54 mcg.  Refer to the inhaled treprostinil Investigator's Brochure for a full description of nonclinical data.

### 1.2.3    Clinical Experience

A series of acute and chronic investigator-initiated clinical studies were conducted with inhaled treprostinil to optimize the formulation for inhalation, determine dose response, tolerability, and safety and also to evaluate safety and tolerability when combined with other PAH therapies (Channick 2006, Voswinckel 2006).  In the acute dosing studies, administration of inhaled treprostinil resulted in pulmonary vasodilation at relatively low doses.  In the chronic studies, administration of inhaled treprostinil resulted in sustained improvement of exercise capacity.

A randomized, double blind, placebo controlled, Phase III study (TRIUMPH-I) was conducted to assess the safety and efficacy of inhaled treprostinil in combination with approved PAH therapies.  Two hundred and thirty-five subjects who were clinically stable on an approved background oral PAH therapy (bosentan or sildenafil) were randomly allocated to receive either placebo or inhaled treprostinil for 12 weeks.  The primary efficacy endpoint was change in exercise capacity at Week 12 as measured by 6-minute walk distance (6MWD). At Week 12, subjects receiving inhaled treprostinil had a median improvement of +21.6 meters in 6MWD and subjects in the placebo group had a median improvement of +3.0 meters.  The Hodges-Lehmann placebo-corrected median change from baseline in peak 6MWD was +20.0 meters (p=0.00044).  The durability of this result was supported by secondary measures related to the trough 6MWD, which was measured at least 4 hours after the last dose of inhaled treprostinil.  At Week 12, trough 6MWD showed a placebo-corrected median treatment effect of 13.7 meters (p=0.0066).  The most commonly reported adverse events (AEs) in the inhaled treprostinil group were cough (54%), headache (41%), and nausea (19%).  There were no remarkable treatment-related changes in vital signs, physical examination (PE) findings, chest x-rays, pulmonary function tests (PFTs), or clinical laboratory parameters (McLaughlin 2010).

An open-label, extension study of the TRIUMPH-I study to evaluate the use of long-term inhaled treprostinil therapy was also conducted (TRIUMPH-OL).  Subjects received 1 to

Version Date 15 Feb 2017                    Confidential                    Page 17

LIQ_PH-ILD_00000336

United Therapeutics Corp.                          RIN-PH-201 Protocol Amendment 3
                                                            Inhaled Treprostinil

12 breaths (6 to 72 mcg) 4 times daily to achieve daily doses of 24 to 288 mcg.  The longest duration of inhaled treprostinil exposure in the open-label study was 5.4 years and the mean duration 2.3 years.  There were observed improvements in median 6MWD at 6, 12, 18, and 24 months of 28, 31, 32, and 18 meters, respectively.  These data support the durability of improvement in 6MWD obtained with inhaled treprostinil as demonstrated during the double-blind phase of the study.  Therapeutic benefit was also noted with improvements in the Borg dyspnea score, NYHA Functional Classification, and QOL.  Survival was robust with 1 and 2 year Kaplan-Meier survival estimates of 97% and 91%, respectively, for subjects that remained in the study.  The most frequently reported AEs during the open-label study were cough (39%), headache (31%), upper respiratory tract infection (22%), and nausea (22%).  There were no clinically significant changes in clinical chemistry or hematology parameters.  Unique findings that related to the inhaled route of administration, in addition to cough, were throat pain and throat irritation, occurring in 12% and 10% of subjects, respectively.  These events were usually of mild or moderate severity and transient in duration.  In a few subjects, these specific AEs were more pronounced as 6 subjects (3%) discontinued inhaled treprostinil due to cough, including 1 subject (<1%) with dry throat (Benza 2011).

### 1.3    RATIONALE FOR DEVELOPMENT OF STUDY DRUG IN DISEASE/CONDITION

Inhaled treprostinil has shown clinical improvements in exercise capacity after 12 weeks of therapy in patients with WHO Group 1 PH (McLaughlin 2010).  Inhaled treprostinil is expected to directly target the more ventilated portion of the lungs in patients with WHO Group 3 PH minimizing the risk of ventilation perfusion mismatch and allowing for improvements in exercise capacity (Seeger 2013).

The use of inhaled prostacyclin therapy in patients with WHO Group 3 PH has been recently evaluated.  In particular, Wang and colleagues (Wang 2015) reported data on 67 chronic obstructive pulmonary disease (COPD) patients with PH and found no change in arterial blood gases when a single dose of iloprost was administered during right heart catheterization (RHC).  In addition, Bajwa and colleagues recently completed a prospective 16-Week study in 9 COPD subjects with PH which reported no notable changes in arterial blood gases over the 16-Week treatment period (Bajwa 2016).  Finally, Agarwal and colleagues (Agarwal

United Therapeutics Corp.                              RIN-PH-201 Protocol Amendment 3
                                                                Inhaled Treprostinil

2015) recently presented data on 35 patients with WHO Group 3 PH who received treatment with inhaled treprostinil for 6 months.  This retrospective review reported a mean increase from baseline in 6MWD of 61 meters with obstructive and restrictive patients reporting mean increases of 71 meters and 50 meters, respectively.  Notably, this study also found that inhaled treprostinil was well tolerated with cough being the most commonly reported AE. Data from these recently completed pilot studies suggest that inhaled treprostinil can be safely administered in patients with WHO Group 3 PH.

## 1.4    CLINICAL HYPOTHESIS

This study hypothesizes that inhaled treprostinil will improve exercise capacity after 16 weeks of therapy as compared with placebo when administered to subjects with PH associated with ILD including CPFE.

## 2      OBJECTIVES

To evaluate the safety and efficacy of inhaled treprostinil in subjects with PH associated with ILD including CPFE.

## 2.1    PRIMARY ENDPOINT

To evaluate the change in 6MWD measured at peak exposure from Baseline to Week 16.

## 2.2    SECONDARY ENDPOINTS

To evaluate the effect of inhaled treprostinil on the following parameters:

1. Change in peak 6MWD from Baseline to Week 12
2. Change in plasma concentration of N-terminal pro-brain natriuretic peptide (NT-proBNP) from Baseline to Week 16
3. Change in trough 6MWD from Baseline to Week 15

## 2.3    EXPLORATORY ENDPOINTS

To evaluate the effect of inhaled treprostinil on the following parameters:

1. Change in peak 6MWD from Baseline to Week 4
2. Change in peak 6MWD from Baseline to Week 8
3. Change in QOL as measured by the St. George's Respiratory Questionnaire (SGRQ) from Baseline to Week 16
4. Time to clinical worsening from the time of randomization until 1 of the following criteria are met:

    a.  Hospitalization due to a cardiopulmonary indication

    b.  Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart

    c.  Death (all causes)

    d.  Lung transplantation

5. Change in distance saturation product (DSP) from Baseline to Week 16

6. Optional evaluation of change in biomarkers (specific targets to be determined) from Baseline to Week 16

7. Optional evaluation of whole genome sequence at Baseline

## 2.4   SAFETY ENDPOINTS

To evaluate the effect of inhaled treprostinil on the following parameters:

1. AEs

2. Oxygenation

    a.  Pulse oximetry (saturation of peripheral capillary oxygenation [$SpO_2$])

    b.  Supplemental oxygen requirement (L/min)

3. Pulmonary function:

    a.  Forced expiratory volume in 1 second (FEV1)

    b.  Forced vital capacity (FVC)

    c.  Total lung capacity (TLC)

    d.  Lung diffusion capacity (DLCO)

4. Clinical laboratory parameters

5. Vital signs

6. Electrocardiograms (ECG)

7. Hospitalization due to a cardiopulmonary indication

8. Exacerbations of underlying lung disease; defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality

## 3   EXPERIMENTAL PLAN

## 3.1   STUDY DESIGN

This is a multicenter, randomized, double-blinded, placebo-controlled, 16-week, parallel group study.  Subject eligibility will be based on inclusion and exclusion criteria described in Section 4.  Approximately 314 eligible subjects will be randomized to study treatment in a 1:1 ratio.  Subjects will be stratified based on Baseline 6MWD (≤ 350 meters and > 350 meters).  Subjects will be treated with either inhaled treprostinil (6 mcg/breath) or placebo.

LIQ_PH-ILD_00000339

The study will consist of the following phases:

**Screening Phase**: Prospective subjects will undergo a screening evaluation within 30 days prior to the Baseline Visit (first dose of study drug).  During this phase, eligible subjects will sign the informed consent form (ICF) and undergo screening assessments as described in Sections 7.1 and 7.3.  The Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug.  Baseline PFTs and 6-minute walk test (6MWT) used to confirm eligibility criteria must be performed prior to randomization.

**Baseline Visit**: The Baseline assessments may be conducted over a 48-hour period prior to the first dose of study drug to allow for scheduling of all activities.  Eligible subjects will undergo Baseline assessments (Sections 7.2 and 7.3), be assigned to a treatment group based on the randomization schedule, and receive the first dose of study drug (Day 1 is defined as the day the first dose of study drug is given).  The Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug.  Baseline PFTs and 6MWT used to confirm eligibility criteria must be performed prior to randomization.

**Treatment Phase**: The Treatment Phase consists of 5 study visits to the clinic at Week 4, Week 8, Week 12, Week 15, and Week 16 (final study visit; at least 24 hours after the Week 15 Visit).  Subjects will also be contacted at least weekly by telephone or email to assess subject tolerance to study drug, AEs, and changes to concomitant medications.

A schedule of visits and assessments is presented in Section 3.2.

LIQ_PH-ILD_00000340

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

## 3.2   OVERALL SCHEDULE OF TIMES AND EVENTS

| Study Procedures | Screening Phase[a] | Baseline[a] | Combined Screening & Baseline Visit[a] | Treatment Phase | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Week 4[b] | Week 8[b] | Week 12[b] | Week 15[b,s] (Trough 6MWD) | Week 16[b] (at least 24 hours after Week 15) | Premature Discontinuation of Study Drug / Early Study Termination[s,t] |
| **Study Day** | -30 to -1 | 1 | 1 | 29 | 57 | 85 | 106 | 113 | |
| Informed Consent | X | | X | | | | | | |
| Subject Eligibility[c] | X | X | X | | | | | | |
| Pre-Baseline Review Form[c] | X | | X | | | | | | |
| Medical History with PH History and Demographics | X | | X | | | | | | |
| SGRQ | | X | X | | | | | | |
| Physical Examination[d] | X | X | X | | | | | | |
| Vital Signs[d] | X | X | X | X | X | X | X | X | X |
| Clinical Laboratory Assessments | X | X | X | | X | | | X | X |
| NT-proBNP[e] | X | X | X | | X | | | X | X |
| Blood Sample for Biomarker Evaluation (Optional)[f] | | X | X | | | | | X | X |
| Blood Sample for Whole Genome Sequencing (Optional)[g] | | X | X | | | | | | |
| Urine Pregnancy Test[h] | X | X | X | X | X | X | X | X | X |

DA0721

LIQ_PH-ILD_00000341

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

| Study Procedures / Study Week | Screening Phase[a] | Baseline[a] | Combined Screening & Baseline Visit[a] | Treatment Phase | | | | | Premature Discontinuation of Study Drug / Early Study Termination[s,t] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Week 4[b] | Week 8[b] | Week 12[b] | Week 15[b,s] (Trough 6MWD) | Week 16[b] (at least 24 hours after Week 15) | |
| 12-Lead ECG | | X | X | X | X | X | | X | X |
| 6MWT[i] | X | X | X | X | X | X | | X | X |
| Trough 6MWT[j] | | | | | | | X | | |
| Pulse Oximetry[k] | X | X | X | X | X | X | X | X | X |
| Documentation of Supplemental Oxygen Requirement | X | X | X | X | X | X | X | X | X |
| PFTs[l] | | X | X | | X | | | X | X |
| Randomization | | X | X | | | | | | |
| Device Training | | X | X | | | | | | |
| Dosing instructions / Dosing Diary / Accountability | | X[r] | X[r] | X | X | X | X | X | X |
| Weekly Telephone / Email Contact[m] | | --X-- | X-- | --X-- | --X-- | --X-- | --X-- | --X | |
| Adverse Events[n] | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X | X |
| Concomitant Medications | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X | X |
| Hospitalization due to a cardiopulmonary indication[o] | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X | X |
| Exacerbations of Underlying Lung Disease[p] | X-- | --X-- | --X-- | --X-- | --X-- | --X-- | --X | --X | X |

LIQ_PH-ILD_00000342

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

| Study Procedures | Screening Phase[a] | Baseline[a] | Combined Screening & Baseline Visit[a] | Treatment Phase | | | | | | Premature Discontinuation of Study Drug / Early Study Termination[a,f] |
| | | | | Week 4[b] | Week 8[b] | Week 12[b] | Week 15[b,s] (Trough 6MWD) | Week 16[b] (at least 24 hours after Week 15) | |
| Time to Clinical Worsening[d] | X | X | X | X | X | X | X | X | X |

Abbreviations: ECG, electrocardiogram; NT-proBNP, N-terminal pro-brain natriuretic peptide; PFTs, pulmonary function tests; PH, pulmonary hypertension; SGRQ, St. George's Respiratory Questionnaire; 6MWT, 6-minute walk test; 6MWD, 6-minute walk distance; CT, computed topography; $SpO_2$, saturation of peripheral capillary oxygenation; HR, heart rate; eCRF, electronic case report form; $FEV_1$, forced expiratory volume in 1 second; FVC, forced vital capacity; TLC, total lung capacity; DLCO, lung diffusion capacity; AE, adverse event; SAE, serious adverse event; ET, early termination

[a] Screening Visit assessments can occur up to 30 days prior to the first dose of study drug. Baseline assessments can occur up to 48 hours prior to the first dose of study drug to allow for scheduling of all activities; however, the Baseline 6MWT must be performed prior to randomization. Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug. Baseline PFTs, 6MWT, and CT scan (if a historical scan within 6 months is not available) assessments used to determine eligibility criteria must be performed prior to randomization. Sites should provide a completed Pre-Baseline review form to the Medical Monitor which will be reviewed, signed, and returned to the site prior to randomization.

[b] The visit window for Week 4, Week 8, Week 12, Week 15, and Week 16 is ± 5 days. The Week 16 visit must occur at least 24 hours after the Week 15 visit.

[c] For the Screening and Baseline Visits, the subject must be evaluated for and meet all inclusion/exclusion criteria.

[d] Vital signs must be collected after 5 minutes of rest (seated); no other measurements or procedures should be performed during this 5-minute period. When possible, vital signs should be collected prior to the 6MWT. If vital signs cannot be obtained prior to the 6MWT then they should be obtained after recovery from the 6MWT.

[e] Blood for NT-proBNP assessment must be drawn prior to conducting the 6MWT and will occur prior to randomization at Baseline (or as part of the Screening Visit assessment if the Screening and Baseline Visits are combined).

[f] For subjects consenting to the optional biomarker sample.

[g] For subjects consenting to the optional whole genome sequencing sample.

[h] For females of childbearing potential.

[i] If the subject has not previously undergone a 6MWT at the study site on the course intended for use during the study, a practice test must be conducted at the Screening Visit and must precede the Baseline 6MWT by at least 1 day. The Baseline 6MWT must precede randomization. The Week 4, Week 8, Week 12, and Week 16 peak 6MWT must occur within 10 to 60 minutes after the most recent study drug dose. Prior to the start of each 6MWT the subject should rest (seated) for at least 10 minutes. Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate at all subsequent 6MWT assessments. The supplemental oxygen flow rate must be recorded at each study visit, as applicable.

[j] The Week 15 trough 6MWT must occur at least 4 hours after the most recent study drug dose and at least 24 hours prior to the Week 16 6MWT. Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate at all subsequent 6MWT assessments. The supplemental oxygen flow rate must be recorded at each study visit, as applicable.

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

k   Pulse oximetry will be performed immediately prior to, during, and immediately following each 6MWT. Pulse oximetry will include the measurement of $SpO_2$ and HR. The $SpO_2$ and HR obtained immediately prior to and immediately following completion of the 6MWT will be recorded in the eCRF. In addition, the lowest recorded $SpO_2$ obtained during each 6MWT will be recorded in the eCRF.

l   PFTs will include the evaluation of FEV1, FVC, TLC, and DLCO. Baseline PFTs must be performed prior to randomization. PFTs should be performed after recovering from the Baseline, Week 8, and Week 16 or ET 6MWTs.

m   At least weekly telephone contact is required throughout the study (may be replaced by a face-to-face interaction on the weeks where study visits occur and the information can be obtained during the visit). Subjects may be contacted via email in lieu of a telephone call. A copy of the emails and/or telephone contact sheets must be documented in the subject's source documentation. Email should not replace direct follow-up by phone or in clinic for clinically significant AEs or other emergent issues.

n   All AEs will be documented from the time of informed consent until the time screen failure is documented, or until the subject is either discontinued from the study or all Week 16 study assessments have been completed and should be followed until either resolution (or return to normal or baseline values), until they are judged by the Investigator to no longer be clinically significant, or for at least 30 days if the AE extends beyond the final study visit (Week 16).

o   Hospitalizations due to cardiopulmonary indications must be recorded in the eCRF from the time of informed consent until study termination. Adverse events resulting in hospitalizations, regardless of cause or duration, should also be recorded as SAEs per Appendix 15.2.

p   Exacerbations of underlying lung disease; defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality (see Section 3.3.2.10). Exacerbations will also be recorded as AEs or SAEs per Appendix 15.2.

q   Time to clinical worsening will be measured from the time of randomization until 1 of the following criteria are met: hospitalization due to a cardiopulmonary indication; decrease in 6MWD > 15% from Baseline directly related to the disease under study, at 2 consecutive visits and at least 24 hours apart; death (all causes); or lung transplantation.

r   Once all entry criteria have been met and the randomized treatment assignment confirmed, the first dose of study drug (3 breaths; 18 mcg) will be inhaled in the clinic, followed by at least a 1 hour observation period (Defined as Day 1).

s   Subjects who permanently discontinue study drug during the 16-week Treatment Phase are encouraged to undergo premature termination assessments prior to discontinuing study drug and are required complete all remaining scheduled study visits through Week 16 (excluding the Week 15 Visit) to be eligible for entry into the open-label study.

t   The premature termination of study drug visit should be conducted prior to study drug discontinuation or as close as possible to the last dose of study drug.

**Version Date 15 Feb 2017**                    **Confidential**                    **Page 25**

LIQ_PH-ILD_00000344

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
                                                 **Inhaled Treprostinil**

### 3.3    CLINICAL ASSESSMENTS

#### *3.3.1    Efficacy*

##### *3.3.1.1    6-Minute Walk Test*

The 6MWT is a validated and reliable measure of exercise capacity in patients with chronic respiratory diseases (Holland 2014).  This study will utilize an unencouraged 6MWT to minimize potential bias associated with encouragement.  All 6MWTs will be conducted by qualified, trained personnel in a designated 6MWT area which meets the requirements as described in Appendix 15.1.  Prior to the start of each 6MWT the subject must rest (seated) for at least 10 minutes.  This 6MWT protocol applies to the practice (if applicable), Baseline, and treatment 6MWTs.  Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate at all subsequent 6MWT assessments.  Pulmonary rehabilitation may not be introduced to a subject's treatment regimen between randomization and Week 16 or until the permanent discontinuation of study drug.  Pulse oximetry is to be performed immediately prior to, during, and immediately following each scheduled 6MWT as outlined in Section 3.3.2.6.1.

###### *3.3.1.1.1    Practice 6-Minute Walk Test*

All subjects must have a documented 6MWT conducted at the study site on the course intended for use during the study.  Subjects who have not previously performed the 6MWT at the study site on the course intended for use during the study, must perform a practice 6MWT at the study site at least 1 day prior to the Baseline Visit.

###### *3.3.1.1.2    Baseline 6-Minute Walk Test*

The Baseline 6MWT must be performed prior to randomization.  Pulse oximetry is to be performed immediately prior to, during, and immediately following each scheduled 6MWT as outlined in Section 3.3.2.6.1.

Note:  The Baseline 6MWT (not the practice 6MWT) will determine the subject's eligibility to participate in the study (6MWD $\geq$ 100 meters per inclusion criteria).

**LIQ_PH-ILD_00000345**

United Therapeutics Corp.                                RIN-PH-201 Protocol Amendment 3
                                                          Inhaled Treprostinil

*3.3.1.1.3      Treatment 6-Minute Walk Tests*

*3.3.1.1.3.1      Peak 6-Minute Walk Tests*

Peak 6MWTs will be conducted at Weeks 4, 8, 12, and 16 or Early Termination (ET).  The
6MWT must be conducted between 10 to 60 minutes after the most recent dose of study drug.
If subjects are receiving supplemental oxygen during the Baseline 6MWT, they must continue
to receive the same flow rate at all subsequent 6MWT assessments.  The Week 16 peak
6MWT should occur at least 24 hours after the Week 15 Visit.  Refer to Appendix 15.1 for
guidelines regarding the 6MWT assessment.  Pulse oximetry is to be performed immediately
prior to, during, and immediately following each scheduled 6MWT as outlined in Section
3.3.2.6.1.

*3.3.1.1.3.2      Trough 6-Minute Walk Test*

A trough 6MWT will be performed during the Week 15 Visit.  The trough 6MWT must be
performed at least 4 hours after the most recent dose of study drug and at least 24 hours prior
to the Week 16 6MWT.  If subjects are receiving supplemental oxygen during the Baseline
6MWT, they must continue to receive the same flow rate at all subsequent 6MWT
assessments.  Refer to Appendix 15.1 for guidelines regarding the 6MWT assessment.  Pulse
oximetry is to be performed immediately prior to, during, and immediately following each
scheduled 6MWT as outlined in Section 3.3.2.6.1.

Subjects who discontinue study drug prematurely prior to the Week 15 Visit do not need to
return to the clinic for the Week 15 Visit to be eligible for participation in the open-label
extension study (Section 7.8).

### 3.3.1.2     St. George's Respiratory Questionnaire

The SGRQ will be conducted at Baseline (prior to study drug) or as part of the Screening
Visit assessment if the Screening and Baseline Visits are combined and at Week 16 (or ET for
those subjects discontinuing study drug/study prematurely).  The SGRQ should be completed
as the first assessment during these visits (after informed consent is obtained) before the
subject completes any of the other scheduled visit assessments.  A copy of the SGRQ can be
found in Appendix 15.3.

**Version Date 15 Feb 2017**              **Confidential**                  **Page 27**

**LIQ_PH-ILD_00000346**

### 3.3.1.3    N-terminal Pro-brain Natriuretic Peptide

Plasma NT-proBNP concentration is a useful biomarker associated with changes in right heart morphology and function (Fijalkowska 2006).  NT-proBNP sample collection will occur at Baseline (or as part of the Screening Visit assessment if the Screening and Baseline Visits are combined) prior to starting study drug, Week 8, and Week 16 or ET.  Blood for NT-proBNP assessment must be drawn prior to conducting the 6MWT.

### 3.3.1.4    Time to Clinical Worsening

Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:

a.  Hospitalization due to a cardiopulmonary indication
b.  Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
c.  Death (all causes)
d.  Lung transplantation

Because there are no Food and Drug Administration (FDA) approved therapies for the treatment of WHO Group 3 PH, subjects experiencing clinical worsening may remain on study therapy for the duration of the study (or until criteria for study termination are met per Section 8.1 of the protocol).  However, if a subject is removed from study therapy due to clinical worsening, the subject must return to the clinic for regularly scheduled study visits (excluding the Week 15 Visit) to be eligible for the open-label extension study (Section 7.8).  Subjects experiencing death or lung transplantation will be discontinued from the study per Section 8.1 of the protocol.

### 3.3.1.5    Change in Distance Saturation Product

Change in DSP is the product of distance walked and lowest $SpO_2$ recorded during the 6MWT.  This assessment has been shown to be predictive of mortality in patients with idiopathic pulmonary fibrosis and as such will be evaluated as an exploratory endpoint in this study (Lettieri 2006).  Change from Baseline to Week 16 or ET in DSP will be calculated.

LIQ_PH-ILD_00000347

United Technologies Corp.          **RIN-PH-201 Protocol Amendment 3**
                                              **Inhaled Treprostinil**

### 3.3.1.6    Optional Biomarker

For subjects consenting to the optional biomarker sample, blood will be collected for the evaluation of biomarkers (specific targets to be determined) at Baseline and at Week 16 or ET.

### 3.3.1.7    Optional Whole Genome Sequencing

For subjects consenting to whole genome sequence analysis, a blood sample will be collected at Baseline.  These samples will be shipped to the central laboratory for processing and storage prior to analysis.  Whole genome sequences will be analyzed for genetic makers that may be associated with clinical response and tolerability.

### 3.3.2    Safety

During this study, treatment emergent changes in PE findings, vital signs, clinical laboratory parameters, ECG parameters, PFTs, oxygenation, and the development of AEs after treatment will be the primary assessments of safety.  Hospitalizations due to cardiopulmonary indications will also be recorded from the time of informed consent until study termination (or ET for those subjects discontinuing the study prematurely).  Exacerbations of underlying lung disease will also be recorded from the time of informed consent until study termination.

### 3.3.2.1    Medical History and Physical Examinations

A complete medical history, demographics, PH history, and PE will be conducted during Screening.  If any changes to the medical history occur between the Screening and Baseline Visit, those should be recorded.  Significant past or present illnesses, current prescription or nonprescription medications (including vitamins and herbal products), and history of allergies or idiosyncratic responses to drugs should be recorded.  Any significant changes to the subject's medical condition and PE must be documented throughout the course of the study. A complete PE will also be conducted by appropriate study personnel (as documented on the Delegation of Authority Log) at the Week 16 or ET Visit.  Any clinically significant changes from Baseline noted during the Week 16 or ET PE should be reported as AEs.

### 3.3.2.2    Vital Signs

Vital signs will be assessed at Screening, Baseline, and each subsequent study visit or ET. Vital signs measured will include blood pressure (systolic and diastolic), HR, respiratory rate

LIQ_PH-ILD_00000348

(RR), temperature, and weight.  Height will be assessed at Screening only.  Vital signs must be assessed following at least 5 minutes of rest (sitting) to ensure accurate measurement.  No other measurements or procedures should be performed during this 5-minute period.  When possible, vital signs should be collected prior to the 6MWT.  If vital signs cannot be obtained prior to the 6MWT, they should be obtained after recovery of the 6MWT.  Vital signs should also be assessed in the case of abnormal clinical signs and symptoms.

### 3.3.2.3    12-Lead Electrocardiogram

A 12-lead ECG will be recorded after at least 5 minutes of rest in the semi-recumbent position at Baseline (prior to study drug) and repeated at the Week 16 or ET Visit.  Recordings should include lead II as a rhythm strip and contain at least 5 QRS complexes.  ECG parameters to be collected include rhythm, HR, PR interval, QT interval, QRS duration, and any clinically significant abnormalities.

### 3.3.2.4    Clinical Laboratory Assessments

The results of all clinical laboratory tests conducted at Screening and Baseline must be assessed by the Investigator to determine each subject's eligibility to participate in the study prior to starting study drug.  Screening and Baseline clinical laboratory assessments can be combined into a single blood draw if all eligibility criteria are met within 48 hours prior to the first dose of study drug at Baseline.  Central laboratory data are ultimately used to qualify subjects for the study.  However, for subjects who are well known to the Investigator and who are clinically stable, the Investigator may confirm eligibility using local laboratory values so as not to delay randomization while waiting for central laboratory results if the Screening and Baseline Visits are combined.

Clinical laboratory results outside the normal reference range must be assessed for clinical significance by the Investigator.  Clinically significant refers to a laboratory value that is unusual with respect to the subject's medical history or current health status.

Clinically significant abnormal laboratory test values will be reported as AEs and treated and/or followed-up until the symptoms or values return to normal or acceptable levels, as judged by the Investigator.  Where appropriate, medical tests and examinations will be performed to assess and document resolution.

LIQ_PH-ILD_00000349

**United Therapeutics Corp.**

**RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

*3.3.2.4.1      Clinical Chemistry and Hematology*

Blood for the measurement and evaluation of clinical chemistry and hematology, will be collected at the Screening and Baseline Visits prior to administration of study drug and repeated at Week 8 and Week 16 or ET to assess for treatment-emergent changes in clinical chemistry and hematological laboratory parameters.  Values for the following parameters will be obtained:

| **Electrolyte Panel** | **Chemistry Panel** | **Hematology Panel** |
|---|---|---|
| • Sodium | • Total bilirubin | • Hemoglobin |
| • Potassium | • Alkaline phosphatase | • Hematocrit |
| • Bicarbonate | • Alanine aminotransferase | • Red blood cell count |
| • Chloride | • Aspartate aminotransferase | • Red blood cell morphology |
| | • Urea nitrogen | • White blood cell count |
| | • Creatinine | • Platelet count |
| | • Calcium | |
| | • Albumin | |

*3.3.2.4.2      Pregnancy Testing*

Females of childbearing potential will undergo a urine pregnancy test at Screening followed by urine pregnancy tests at Baseline and each subsequent study visit (or Baseline Visit if the Screening and Baseline Visits are combined) or ET.  A positive pregnancy test will exclude the subject from further participation in the study.  Pregnant subjects who are discontinued from the study will be transitioned to an alternate therapy at the discretion of the Investigator.

### 3.3.2.5      Pulmonary Function Tests

Pulmonary Function Tests will be assessed at Baseline and repeated at Week 8 and Week 16 or ET.  Baseline PFTs are to be conducted prior to randomization and after recovery from the 6MWT.  The Week 8 and Week 16 or ET PFTs should be conducted after recovery from the 6MWT.  If the PFTs are done both prior to and after a bronchodilator, only the pre-bronchodilator values will be recorded.

The following parameters will be recorded (absolute values and % predicted): FEV1, FVC, TLC, and DLCO (uncorrected for hemoglobin and lung volume).

**Version Date 15 Feb 2017**          **Confidential**          **Page 31**

LIQ_PH-ILD_00000350

**United Therapeutics Corp.**                           **RIN-PH-201 Protocol Amendment 3**
                                                            **Inhaled Treprostinil**

### *3.3.2.6     Oxygenation*

#### *3.3.2.6.1     Pulse Oximetry*

Pulse oximetry will be assessed immediately prior to, throughout the conduct of, and immediately after each scheduled 6MWT assessment at Baseline, Week 4, Week 8, Week 12, Week 15, and Week 16 or ET.  Pulse oximetry will also be performed at Screening during the practice 6MWT assessment as applicable.  Pulse oximetry will include the collection of $SpO_2$ and HR.  The $SpO_2$ and HR obtained immediately prior to and immediately following completion of the 6MWT will be recorded in the electronic case report form (eCRF).  In addition, the lowest recorded $SpO_2$ obtained during each 6MWT will be recorded in the eCRF.

When possible, pulse oximetry should be recorded using the provided pulse oximeter (Nonin 3150).  In the event the provided pulse oximeter cannot be used (ie, subject has known issues with obtaining accurate readings from a finger probe, etc) an alternative device may be used with prior Sponsor approval so long as the same device is used for all planned 6MWT.

#### *3.3.2.6.2     Supplemental Oxygen Requirement*

The amount of supplemental oxygen (L/min) required at rest will be assessed at Baseline and at regularly scheduled visits or ET.  The amount of supplemental oxygen required at the 6MWT assessment will also be recorded for each 6MWT assessment.

### *3.3.2.7     Adverse Events*

Adverse events will be recorded throughout the course of the study from the time that each subject signs the ICF until the time screen failure is documented, or until the subject is either discontinued from the study or all Week 16 study assessments have been completed.  Each subject will be questioned for AEs at each scheduled study visit and during required telephone/email contacts.  Subjects will also be instructed to spontaneously report all AEs throughout the study.

All AEs should be followed until either resolution (or return to normal or baseline values), until they are judged by the Investigator to no longer be clinically significant, or for at least 30 days if the AE extends beyond the final study visit.  All AEs meeting the criteria for serious (ie, serious adverse events [SAEs]) should be followed until resolution, death, or the

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
                                                 **Inhaled Treprostinil**

subject is lost to follow-up even if they are ongoing more than 30 days after completion of the final study visit (Week 16 or ET).  All AEs/SAEs that occur while the subject is in study will be recorded as instructed in this protocol.

Sections 9 and 15.2 provide the guidelines and definitions for recording AEs.

### 3.3.2.8    *Concomitant Medications*

All concomitant medications taken during the conduct of the study, including those taken for AEs or other medical events, should be recorded in the subject's source documents and captured in the eCRF as required.

### 3.3.2.9    *Hospitalization due to Cardiopulmonary Indications*

Hospitalizations due to cardiopulmonary indications must be recorded in the eCRF from the time of informed consent until study termination.  Adverse events resulting in hospitalizations, regardless of cause or duration should also be recorded as SAEs per Appendix 15.2.  Please note that, when possible, study medication should be continued during hospitalizations.

### 3.3.2.10   *Exacerbations of Underlying Lung Disease*

An exacerbation of underlying lung disease is defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality (Collard 2016).  As adapted from the publication by Collard and colleagues (Collard 2016), the following diagnostic criteria may be used to help support a diagnosis of acute exacerbation:

1. Previous or concurrent diagnosis of ILD including CPFE
2. Acute worsening or development of dyspnea typically of less than 1 month duration
3. Computed topography (CT) with new bilateral ground-glass opacity and/or consolidation superimposed on a background pattern consistent with usual interstitial pneumonia pattern
4. Deterioration not fully explained by cardiac failure or fluid overload

For the purposes of this protocol, events that are clinically considered to meet the definition of acute exacerbation but fail to meet all 4 diagnostic criteria due to missing CT data should still be considered an exacerbation for reporting purposes.

**Version Date 15 Feb 2017**              **Confidential**              **Page 33**

United Therapeutics Corp.                                    RIN-PH-201 Protocol Amendment 3
                                                                    Inhaled Treprostinil

Exacerbations of underlying lung disease should be recorded throughout the duration of the study from the time of informed consent until study termination.  Exacerbations of underlying lung disease will also be reported as AEs or SAEs per Appendix 15.2.

### 3.3.2.11    *Weekly Telephone/Email Contact*

Weekly telephone/email contact is required throughout the 16-week study to instruct the subject to titrate their dose of study drug and to assess for AEs and concomitant medications. Weekly telephone/email contact may be replaced by a face-to-face interaction on the weeks where study visits occur and the information can be obtained during the visit).  The subject may be contacted via email in lieu of a telephone call; however, email should not replace direct follow-up by telephone or in clinic for clinically significant AEs or other emergent issues.  All telephone or email contacts (ie, any dosing instructions, AEs reported and/or medication changes) with the subject must be noted in the source documentation.

## 3.4    NUMBER OF SUBJECTS

Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (2-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline to Week 16 in 6MWD assuming a standard deviation of 75 meters.  The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%.

## 3.5    NUMBER OF CENTERS

This study is multicenter with approximately 120 participating study centers.

## 3.6    ESTIMATED STUDY DURATION

From Screening until study completion, expected duration of study participation is approximately 20 weeks (includes a 4-week Screening period and 16-week Treatment Phase).

## 4    SUBJECT ELIGIBILITY

Inclusion and exclusion criteria are to be assessed during the Screening period and reconfirmed at the Baseline Visit prior to the first dose of study drug.  Study related procedures must be conducted during the Screening period after obtaining informed consent to determine subject eligibility for the study.

**Version Date 15 Feb 2017**                **Confidential**                **Page 34**

                LIQ_PH-ILD_00000353

**United Therapeutics Corp.**

**RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

### 4.1    INCLUSION CRITERIA

1. Subject voluntarily gives informed consent to participate in the study.
2. Males and females aged 18 years or older at the time of informed consent.
   a. Females of reproductive potential[1] must be non-pregnant (as confirmed by a urine pregnancy test at screening) and non-lactating, and will:
      i. Either abstain from intercourse (when it is in line with their preferred and usual lifestyle), or
      ii. Use 2 medically acceptable, highly-effective forms of contraception[2] for the duration of study, and <u>at least</u> 30 days after discontinuing study drug.
   b. Males with a partner of childbearing potential must use a condom for the duration of treatment and for at least 48 hours after discontinuing study drug.
3. The subject has a confirmed diagnosis of WHO Group 3 PH based on CT imaging, which demonstrates evidence of diffuse parenchymal lung disease performed within 6 months prior to randomization.  Subjects may have any form of ILD or CPFE.
4. Subjects are required to have a RHC within 1 year prior to randomization with the following documented parameters:
   a. Pulmonary vascular resistance (PVR) > 3 Wood Units (WU) and
   b. A pulmonary capillary wedge pressure (PCWP) of $\leq$ 15 mmHg and
   c. A mean pulmonary arterial pressure (mPAP) of $\geq$ 25 mmHg
5. Baseline 6MWD $\geq$ 100 meters.
6. Subjects on a chronic medication for underlying lung disease (ie, pirfenidone, nintedanib, etc) must be on a stable and optimized dose for $\geq$ 30 days prior to randomization.
7. In the opinion of the Investigator, the subject is able to communicate effectively with study personnel, and is considered reliable, willing and likely to be cooperative with protocol requirements, including attending all study visits.
8. Subjects with connective tissue disease (CTD) must have a Baseline FVC of < 70%.

### 4.2    EXCLUSION CRITERIA

1. The subject has a diagnosis of PAH or PH for reasons other than WHO Group 3 PH-ILD as outlined in inclusion criterion 3.
2. The subject has shown intolerance or significant lack of efficacy to a prostacyclin or prostacyclin analogue that resulted in discontinuation or inability to effectively titrate that therapy.

---

[1] Females who are successfully sterilized (surgical sterilization methods include hysterectomy, bilateral tubal ligation, or bilateral oophorectomy) or are postmenopausal (defined as amenorrhea for at least 12 consecutive months) are not considered to be of reproductive potential.

[2] Medically acceptable, highly-effective forms of contraception can include approved hormonal contraceptives (oral, injectable, and implantable), and barrier methods (such as a condom or diaphragm) when used with a spermicide. For women of reproductive potential, a negative pregnancy test is required at Screening and Baseline prior to initiating study drug.

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 742 of 1048 PageID #: 5250

United Therapeutics Corp.                    RIN-PH-201 Protocol Amendment 3
                                                         Inhaled Treprostinil

3.  The subject has received any PAH approved therapy including: prostacyclin therapy (ie, epoprostenol, treprostinil, iloprost, or beraprost; except for acute vasoreactivity testing), IP receptor agonist (selexipag), endothelin receptor antagonist (ERA), phosphodiesterase type 5 inhibitor (PDE5-I), or soluble guanylate cyclase (sGC) stimulator within 60 days of randomization.

4.  The subject has evidence of clinically significant left-sided heart disease as defined by:

    a.  PCWP > 15 mmHg

    b.  Left ventricular ejection fraction < 40%.

*Note: Subjects with abnormal left ventricular function attributable entirely to impaired left ventricular filling due to the effects of right ventricular overload (ie, right ventricular hypertrophy and/or dilatation) will not be excluded.*

5.  The subject is receiving > 10 L/min of oxygen supplementation by any mode of delivery at rest at Baseline.

6.  Current use of any inhaled tobacco/marijuana products or significant history of drug abuse at the time of informed consent.

7.  Exacerbation of underlying lung disease or active pulmonary or upper respiratory infection within 30 days of randomization.

8.  Initiation of pulmonary rehabilitation within 12 weeks prior to randomization.

9.  In the opinion of the Investigator, the subject has any condition that would interfere with the interpretation of study assessments or has any disease or condition (ie, peripheral vascular disease, musculoskeletal disorder, morbid obesity) that would likely be the primary limit to ambulation (as opposed to PH).

10. Use of any investigational drug/device, or participation in any investigational study with therapeutic intent within 30 days prior to randomization.

11. Severe concomitant illness limiting life expectancy (< 6 months).

12. Acute pulmonary embolism within 90 days of randomization.

## 4.3    PRESCRIBED THERAPY

Subjects must not be receiving any prostacyclin (ie, epoprostenol, treprostinil, iloprost, beraprost, or any other prostacyclin therapy) within 60 days prior to randomization (unless used for acute vasoreactivity testing) until study termination.  Subjects must also not be receiving any other FDA approved PAH background therapies including:  an IP receptor agonist, ERA, PDE5-I, and/or sGC stimulator within 60 days of randomization through the permanent discontinuation of study drug or study termination.

Subjects on a chronic medication for underlying lung disease (ie, pirfenidone, nintedanib, etc) must be on a stable and optimized dose for ≥ 30 days prior to randomization.  Subjects may

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

not newly initiate pirfenidone or nintedanib from randomization through the permanent discontinuation of study drug or study termination.

Subjects may not initiate pulmonary rehabilitation (rehab) within 12 weeks prior to randomization until the permanent discontinuation of study drug or study termination.

All concomitant medications taken during the conduct of the study, including those taken for AEs or other medical events, should be recorded in the subject's source documents and transcribed into the eCRF as required.  The flow rate of supplemental oxygen should be recorded as outlined in Section 3.3.2.6.2.

## 5    SUBJECT ENROLLMENT

### 5.1    TREATMENT ASSIGNMENT

Subjects will be randomized (1:1) to receive treatment with inhaled treprostinil (6 mcg/breath) or placebo.

### 5.2    RANDOMIZATION

Subjects will be randomized (1:1) to receive treatment with inhaled treprostinil (6 mcg/breath) or placebo.  An IXRS will be utilized for the central randomization procedure.  Sites will enter values of the qualifying 6MWT and the date the test was conducted into the IXRS and will be notified if the subject qualifies for the study.

All subjects will be randomized using a centrally administered stratified permuted block randomization, stratified by Baseline 6MWD ($\leq$ 350 meters and > 350 meters).

Prior to randomization, site personnel should complete a Pre-Baseline Review Form for review and approval by the Medical Monitor.

### 5.3    BLINDING

The Investigator, study site, subject and Sponsor will not be aware of the treatment allocation. All clinical study material will be provided as blinded study drug.

LIQ_PH-ILD_00000356

**United Technologies Corp.**                       **RIN-PH-201 Protocol Amendment 3**
                                                     **Inhaled Treprostinil**

# 6      DRUGS AND DOSING (OR TREATMENT PROCEDURES)

## 6.1    DRUG DOSAGE, ADMINISTRATION, AND SCHEDULE

Treprostinil for inhalation solution (0.6 mg/mL) is delivered via an ultrasonic nebulizer which emits a dose of approximately 6 mcg per breath.  Placebo will be provided as an identical solution that will be inhaled using the same ultrasonic nebulizer.  All subjects will receive study drug (inhaled treprostinil or placebo) using the commercially available TD-100 ultrasonic nebulizer (Tyvaso Inhalation System®).  Subjects will be trained on inhalation of study drug using the nebulizer device.  Detailed instructions for the use of these devices will be provided to all study subjects.  In addition, all subjects will receive a copy of the commercially available Tyvaso Inhalation System Instructions for Use (IFU) for the TD-100 ultrasonic nebulizer.

Once informed consent has been signed, all entry criteria have been met, and the randomized treatment assignment confirmed, the first dose of study drug (3 breaths; 18 mcg) will be inhaled in the clinic, followed by at least a 1 hour observation period (defined as Day 1).  Study drug doses should be maximized throughout the study, dose escalations (additional 1 breath 4 times daily) can occur up to every 3 days with a target dosing regimen of 9 breaths (54 mcg) 4 times daily and a maximum dose of 12 breaths (72 mcg) 4 times daily within 4 weeks of beginning the treatment, as clinically tolerated.  Table 6-1 provides a guideline for the recommended dose escalations.

**Table 6-1       Recommended Inhaled Treprostinil Dose Escalation Table**

| Study Day[a] | Single Dose | Total Daily Dose |
|---|---|---|
| **Titrating to maximum dose of 12 breaths** | | |
| 1-3 | 3 breaths QID (18 mcg) | 72 mcg |
| 4-6 | 4 breaths QID (24 mcg) | 96 mcg |
| 7-9 | 5 breaths QID (30 mcg) | 120 mcg |
| 10-12 | 6 breaths QID (36 mcg) | 144 mcg |
| 13-15 | 7 breaths QID (42 mcg) | 168 mcg |
| 16-18 | 8 breaths QID (48 mcg) | 192 mcg |
| 19-21 | 9 breaths QID (54 mcg) | 216 mcg |
| 22-24 | 10 breaths QID (60 mcg) | 240 mcg |
| 25-27 | 11 breaths QID (66 mcg) | 264 mcg |
| 28 (and beyond) | 12 breaths QID (72 mcg) | 288 mcg |

Abbreviations: QID, 4 times daily; mcg,: micrograms
[a]  Study day refers to the days on study drug with Day 1 referring to the first dose of study drug.

LIQ_PH-ILD_00000357

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

The dosing schedule is recommended as a guide only.  The Investigator may determine the appropriate dosing schedule on an individual subject basis, considering tolerability and functional improvement.

If subjects are unable to tolerate the initial 3 breaths, they may decrease their next dose to 1 or 2 breaths of study drug (as determined by the Investigator) 4 times a day during waking hours.  The subject will then gradually increase their dose to reach a minimum of 3 breaths, and titrate to a target dose of 9 breaths and a maximum dose of 12 breaths 4 times a day during waking hours, as clinically tolerated.

Dose changes should be conducted under appropriate medical supervision in consultation with the study site.  Telephone calls/emails between the site and subject should occur prior to each dose adjustment or at least weekly to monitor for AEs, clinical worsening events, and make decisions about dose titration.

## 6.2     ACCESS TO BLINDED TREATMENT ASSIGNMENT

During the study, the site personnel, subject, and Sponsor will remain blinded to the treatment assignment of all subjects.  A medical emergency (eg, a life threatening event) constitutes the only reason for unblinding during the Treatment Phase.  Appropriate communications must take place between the site and the Sponsor before accessing the IXRS to allow unblinding of a subject's treatment assignment.

## 6.3     COMPLIANCE

Each subject will be provided with a dosing diary in order to record dosing information from randomization until Week 16.  Subjects will be required to bring the completed dosing diary and all empty and unused study drug ampoules to each scheduled study visit.  At each visit, all study drug returned by the subject (used and unused) will be collected and new study drug will be dispensed.  The appropriate study personnel must document the number of used and unused ampoules and determine if the appropriate amount of study drug remains based on the dose of study drug prescribed.

Subject compliance with the prescribed dosage regimen will be monitored throughout the study.  At each study visit, the subject will be asked whether he or she has been compliant

LIQ_PH-ILD_00000358

with dosing instructions.  If it is determined that a subject is not compliant with study drug then site personnel must re-educate the subject on proper dosing compliance and its importance.  Continued non-compliance may lead to withdrawal of the subject from the study, after consultation between the Investigator and the Sponsor.

## 7    EXPERIMENTAL PROCEDURES

Screening may begin up to 30 days prior to first dose of study drug.  Baseline assessments may be conducted over a 48-hour period prior to the first dose of study drug to allow for scheduling of all activities.  Alternately, the Screening and Baseline assessments may be conducted in 1 visit if all assessments are performed and all entry criteria are satisfied within the 48 hours prior to randomization and first dose of study drug.

### 7.1    SCREENING VISIT

The recommended sequence of assessments for the Screening Visit is as follows (if not combined with the Baseline Visit [see Section 7.3 for the recommended sequence of events for the combined Screening/Baseline Visit]):

- Informed consent
- Inclusion/exclusion criteria review
  - If necessary, the following procedures may be performed during the 30 day Screening window if required to satisfy inclusion/exclusion criteria (previous medical records documenting eligibility criteria may also be used provided the previous records document subject eligibility within the protocol mandated timelines, as applicable):
    - RHC (Must be performed within 1 year prior to randomization.  If a historical RHC is not available in this timeframe, a RHC may be performed during Screening so long as it is performed at least 5 days prior to randomization [Baseline (Day 1)]; a RHC cannot be combined with the Baseline Visit). Select RHC parameters will be recorded in the eCRF including: mPAP, PVR, PCWP, and vasodilator response (as applicable).
    - CT scan (must be performed within 6 months prior to randomization).  A redacted copy of the CT scan used to confirm subject eligibility should be sent to the Sponsor.
    - Although not required for eligibility, the date of lung biopsy for subjects with a biopsy confirmed diagnosis of ILD will be recorded in the eCRF.
- Demographics
- PH history
- Medical history

LIQ_PH-ILD_00000359

**United Therapeutics Corp.**                              **RIN-PH-201 Protocol Amendment 3**
                                                                        **Inhaled Treprostinil**

- PE
- Vital signs (following at least 5 minutes of rest; collected prior to 6MWT or after recovery from the 6MWT, if practice 6MWT is applicable); including height, weight, RR, HR, systolic blood pressure (SBP), diastolic blood pressure (DBP), and temperature.
- Blood draws for clinical laboratory parameters
- Urine pregnancy test, for women of childbearing potential
- Practice 6MWT (only required if the subject has not previously performed a 6MWT at the study site; to be conducted following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT, if applicable)
- Documentation of supplemental oxygen requirement (L/min)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- AEs
- Concomitant medications
- Complete and submit Pre-Baseline Review Form to the Sponsor for Medical Monitor review prior to randomization

## 7.2   BASELINE/RANDOMIZATION VISIT

All Baseline assessments must be performed prior to the first dose of study drug.  Baseline assessments may be conducted over a 48-hour period prior to the first dose of study drug to allow for scheduling of assessments; however, the Baseline 6MWT must occur prior to randomization.  The recommended sequence of assessments for the Baseline Visit is as follows (if not combined with the Screening Visit [see Section 7.3 for the recommended sequence of events for the combined Screening/Baseline Visit]):

- SGRQ (questionnaire must be administered prior to any results, procedures, or blood draws)
- Vital signs (following at least 5 minutes of rest; collected prior to 6MWT or after recovery from the 6MWT); including weight, RR, HR, SBP, DBP, and temperature.
- Urine pregnancy test, for women of childbearing potential
- Blood draws for clinical laboratory parameters
- NT-proBNP (must be drawn prior to 6MWT and first dose of study drug; for central laboratory processing only)
- Collection of blood sample for evaluation of biomarkers (optional)
- Collection of blood sample for evaluation of whole genome sequence (optional)
- 12-lead ECG (following at least 5 minutes of rest in the semi-recumbent position)

**Version Date 15 Feb 2017**              **Confidential**              **Page 41**

LIQ_PH-ILD_00000360

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
                                                 **Inhaled Treprostinil**

- Documentation of supplemental oxygen requirement (L/min)
- 6MWT (must be conducted prior to randomization; to be conducted following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (must be done prior to randomization and after recovery from the Baseline 6MWT)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- AEs
- Concomitant medications
- Re-confirm inclusion/exclusion criteria (Baseline 6MWD [not the practice Screening 6MWD] will be used for inclusion/exclusion verification)
- Randomization using IXRS
- Administer study drug and provide dosing instructions and device training (subject must remain in the clinic for at least 1 hour after the first dose of study drug for observation)
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:
  - Hospitalization due to a cardiopulmonary indication
  - Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
  - Death (all causes)
  - Lung transplantation

## 7.3    COMBINED SCREENING AND BASELINE

The Screening and Baseline assessments may be conducted in 1 visit if all assessments are performed and all entry criteria are satisfied within 48 hours prior to randomization and dosing of study drug.  Baseline PFTs, 6MWT, and CT (if a historical assessment is not available within 6 months prior to randomization) assessments used to determine eligibility criteria may be performed on the same day but prior to randomization.  The recommended order of assessments for a combined Screening and Baseline Visit is outlined below.

Assessments to be completed as part of the Screening Visit:

- Informed consent
- SGRQ (questionnaire must be administered prior to any results, procedures, or blood draws)
- Inclusion/exclusion criteria review

**Version Date 15 Feb 2017**              **Confidential**                    **Page 42**

LIQ_PH-ILD_00000361

**United Therapeutics Corp.**  **RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

- o   RHC (Must be performed within 1 year prior to randomization.  If a historical RHC is not available in this timeframe, a RHC may be performed during Screening so long as it is performed at least 5 days prior to randomization [Baseline (Day 1)]; a RHC cannot be combined with the Baseline Visit).  Select RHC parameters will be recorded in the eCRF including: mPAP, PVR, and PCWP, and vasodilator response (as applicable).
- o   CT scan (must be performed within 6 months prior to randomization).  A redacted copy of the CT scan used to confirm subject eligibility should be sent to the Sponsor.
- o   Although not required for eligibility, the date of lung biopsy for subjects with a biopsy confirmed diagnosis of ILD will be recorded in the eCRF.

- Blood draws for clinical laboratory parameters (enough blood should be drawn for local laboratory to confirm the entry criteria for hemoglobin, as well as for the complete panel for central laboratory processing)
- NT-proBNP (must be drawn prior to 6MWT and first dose of study drug; for central laboratory processing only)
- Collection of blood sample for evaluation of biomarkers (optional)
- Collection of blood sample for evaluation of whole genome sequence (optional)
- Demographics
- PH history
- Medical history
- PE
- Vital signs (following at least 5 minutes of rest; collected prior to the 6MWT or after recovery from the 6MWT); including height, weight, RR, HR, SBP, DBP, and temperature.
- Documentation of supplemental oxygen requirement (L/min)
- Practice 6MWT to be conducted 1 day prior to Baseline assessments (only required if the subject has not previously performed a 6MWT at the study site; to be conducted following at least 10 minutes of rest [sitting])
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- AEs
- Concomitant medications
- Complete and submit the Pre-Baseline Review Form to the Sponsor for Medical Monitor review prior to randomization

DA0742

LIQ_PH-ILD_00000362

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
                                                 **Inhaled Treprostinil**

<u>Assessments to be completed as part of the Baseline Visit</u>:

- Urine pregnancy test, for women of childbearing potential
- 12-Lead ECG (following at least 5 minutes of rest in the semi-recumbent position)
- 6MWT (must be conducted prior to randomization; to be conducted following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (must be done prior to randomization and after recovery from the Baseline 6MWT).
- Re-confirm inclusion/exclusion criteria (Baseline 6MWD [not the practice Screening 6MWD] will be used for inclusion/exclusion verification)
- Randomization using IXRS
- Administer study drug and provide dosing instructions and device training (subject must remain in the clinic for at least 1 hour after the first dose of study drug for observation)
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:
  - Hospitalization due to a cardiopulmonary indication
  - Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
  - Death (all causes)
  - Lung transplantation

## 7.4    TREATMENT PHASE: WEEKS 4, 8, AND 12

The following assessments to be completed during the Treatment Phase:

- Vital signs (following at least 5 minutes of rest; collected prior to 6MWT or after recovery from 6MWT); including weight, RR, HR, SBP, DBP, and temperature.
- Documentation of supplemental oxygen requirement (L/min)
- Urine pregnancy test, for women of childbearing potential
- Blood draws for clinical laboratory parameters (Week 8 only)
- NT-proBNP (must be drawn prior to 6MWT; for central laboratory processing only [Week 8 only])
- Peak 6MWT (must be conducted between 10 to 60 minutes after the most recent dose of study drug and following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (Week 8 only; to be performed after recovery from the 6MWT)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease

**Version Date 15 Feb 2017**              **Confidential**              **Page 44**

LIQ_PH-ILD_00000363

**United Therapeutics Corp.**                         **RIN-PH-201 Protocol Amendment 3**
                                                                      **Inhaled Treprostinil**

- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:
  o  Hospitalization due to a cardiopulmonary indication
  o  Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart.
  o  Death (all causes)
  o  Lung transplantation
- AEs
- Concomitant medications
- Dosing instructions/study drug accountability

Please note the visit window for the Week 4, Week 8, and Week 12 Visits is ± 5 days.

## 7.5   TREATMENT PHASE: WEEK 15 (TROUGH)

- Vital signs (following at least 5 minutes of rest; collected prior to 6MWT or after recovery from the 6MWT); including weight, RR, HR, SBP, DBP, and temperature.
- Documentation of supplemental oxygen requirement (L/min)
- Urine pregnancy test, for women of childbearing potential
- Trough 6MWT (at least 4 hours after the last dose of study drug)
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:
  o  Hospitalization due to a cardiopulmonary indication
  o  Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
  o  Death (all causes)
  o  Lung transplantation
- AEs
- Concomitant medications
- Dosing instructions/study drug accountability

Please note the visit window for the Week 15 Visit is ± 5 days and at least 24 hours prior to the Week 16 6MWT.  If a subject discontinues study drug prematurely, the subject does not need to return to the clinic for the Week 15 Visit.

**Version Date 15 Feb 2017**              **Confidential**                         **Page 45**

LIQ_PH-ILD_00000364

**United Therapeutics Corp.**

**RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

## 7.6    END OF STUDY (WEEK 16) AND/OR EARLY TERMINATION VISIT

The assessments to be completed during the Week 16 Visit are listed below in the recommended sequence of events.  If a decision is made to early terminate a subject from study drug or from the study in its entirety, the following assessments should be conducted as soon as possible and prior to study drug discontinuation, if possible.  If the subject permanently discontinues study drug prior to Week 16 for any reason, the subject should be encouraged to remain in the study and complete all visits (excluding the Week 15 Visit) up to and including Week 16:

- SGRQ (questionnaire must be administered prior to any results, procedures, or blood draws)
- PE
- Vital signs (following at least 5 minutes of rest; collected prior to 6MWT or after recovery from the 6MWT); including weight, RR, HR, SBP, DBP, and temperature.
- Documentation of supplemental oxygen requirement (L/min)
- 12-Lead ECG (following at least 5 minutes of rest in the semi-recumbent position)
- Urine pregnancy test, for women of childbearing potential
- Blood draws for clinical laboratory parameters
- NT-proBNP (must be drawn prior to 6MWT; for central laboratory processing only)
- Collection of blood sample for evaluation of biomarkers (optional)
- Peak 6MWT (must be conducted between 10 to 60 minutes after the most recent dose of study drug and following at least 10 minutes of rest [sitting])
- Pulse oximetry (to be performed immediately prior to, throughout the conduct of, and immediately following the 6MWT)
- PFTs (to be performed after recovery from the 6MWT)
- Hospitalizations due to a cardiopulmonary indication
- Exacerbations of underlying lung disease
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:
  - Hospitalization due to a cardiopulmonary indication
  - Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
  - Death (all causes)
  - Lung transplantation
- AEs
- Concomitant medications
- Study drug accountability

**Version Date 15 Feb 2017**          **Confidential**                    **Page 46**

LIQ_PH-ILD_00000365

**United Therapeutics Corp.**                      **RIN-PH-201 Protocol Amendment 3**
                                                   **Inhaled Treprostinil**

Subjects who remain on study drug, complete all assessments during the 16-week Treatment Phase, and meet all eligibility criteria for the open-label extension study (RIN-PH-202) are eligible for an open-label extension study (RIN-PH-202).  Additionally, subjects who are withdrawn from study drug prior to Week 16 due to clinical worsening should continue to return to the clinic for scheduled visits (excluding the Week 15 Visit) to be eligible for the open-label study.  Refer to Section 7.8 for more information regarding access to the open-label study.

## 7.7    STUDY CONTACTS

During the Treatment Phase, all subjects will be contacted at least once a week via telephone or email (or more often as needed) to follow-up on adherence of the correct dose titration of study drug, and to assess for AEs and concomitant medications.  A copy of emails and/or telephone contact sheets must be documented in the subject's source documentation.  Email should not replace direct follow-up by telephone or in clinic for clinically significant AEs or other emergent issues.  All study contacts (ie, any dosing instructions, AEs reported, and/or medication changes) with the subject will be recorded.

The weekly study contacts may be replaced by a face-to-face interaction on the weeks where study visits occur and the information can be obtained during the visit.

## 7.8    ACCESS TO OPEN-LABEL STUDY

Subjects who remain on study drug, complete all assessments during the 16-week Treatment Phase, and who meet all eligibility criteria for the open-label extension study (RIN-PH-202) are eligible for an open-label extension study (RIN-PH-202).  Additionally, subjects who experience clinical worsening and are withdrawn from study drug prior to Week 16 should undergo premature termination assessments prior to discontinuing study drug (when possible) and complete all remaining scheduled study visits (excluding the Week 15 Visit) through Week 16 to be eligible for entry into the open-label study.

Subjects who permanently discontinue study drug during the 16-week Treatment Phase due to treatment-related AEs are not eligible for entry into the open-label study even if they complete all remaining scheduled study visits.  The site personnel must never be unblinded to the treatment assignment of these subjects unless required for safety reasons.

Subjects who permanently discontinue study drug during the 16-week Treatment Phase and do not undergo premature termination assessments prior to discontinuing study drug and/or who do not complete all remaining study visits (excluding the Week 15 Visit) through the Week 16 Visit are also not eligible for entry into the open-label study.  The site personnel must never be unblinded to the treatment assignment of these subjects, unless medically necessary.

## 8      STUDY TERMINATION

### 8.1      CRITERIA FOR SUBJECT WITHDRAWAL

A subject may voluntarily withdraw or be withdrawn from the study and/or study drug by the Investigator at any time for reasons including, but not limited to, the following:

- The subject wishes to withdraw from further participation.
- A serious or life-threatening AE occurs or the Investigator considers that it is necessary to discontinue study drug to protect the safety of the subject.
- The subject consistently deviated from the protocol.
- Lung transplantation.
- The subject becomes pregnant.
- The subject's behavior is likely to undermine the validity of his/her results.

If a subject is discontinued from the study prematurely, the Investigator must provide an explanation in the eCRF and complete the End of Study Record for that subject.  If study drug has been administered, the Investigator should make every effort to perform all scheduled evaluations prior to discharge.  In the event that a subject discontinues study drug prematurely due to an AE, the subject will be followed until either the Investigator determines that the AE has resolved, it is no longer considered clinically significant, the subject is lost to further follow-up, or for 30 days if the AE extends beyond the final visit.

If a subject discontinues study drug prematurely for any reason, the subject should be encouraged to remain in the study and attend the remaining scheduled study visits (excluding the Week 15 Visit) up to and including Week 16.

### 8.2      LOST TO FOLLOW-UP

If a subject fails to return to clinic or respond after at least three documented attempts by the site to contact the subject by telephone or email, the Investigator should issue a written letter

                LIQ_PH-ILD_00000367

by certified mail requesting the subject to contact the clinic.  If no response is received, the subject will be considered lost to follow-up.  The site will record the last date of contact in the eCRF as the termination date.

## 8.3    CRITERIA FOR TERMINATING THE STUDY

The study may be stopped at any time if, in the opinion of the Investigator and/or Sponsor, continuation of the study represents a serious medical risk to the subjects.  This may include, but is not limited to, the presence of serious, life-threatening, or fatal AEs, or AEs that are unacceptable in nature, severity, or frequency.  The Sponsor reserves the right to discontinue the study for any reason at any time.

## 8.4    CRITERIA FOR DISCONTINUING THE SITE

The study may also be terminated at a given site if:

- The Investigator elects to discontinue the study.
- The Sponsor elects to discontinue the study at the site.
- United States FDA, European, or national regulations are not observed.
- The protocol is consistently violated.
- Changes in personnel or facilities adversely affect performance of the study.

## 9    ADVERSE EVENT REPORTING

All AEs/SAEs that occur while the subject is participating in the study will be recorded as instructed in this protocol (Section 9.2).

## 9.1    DEFINITIONS

### 9.1.1    Adverse Event

An AE is any untoward medical occurrence in a subject administered a pharmaceutical product which does not necessarily have to have a causal relationship with this treatment.  An AE can therefore be any unfavorable and unintended sign (including an abnormal laboratory finding for example), symptom, or disease temporally associated with the use of a medicinal product, whether or not related to the use of the medicinal product.

An AE may include:

- An intercurrent illness, injury, or any other concomitant impairment of the subject's health, as well as abnormal laboratory findings if deemed to have clinical significance.

LIQ_PH-ILD_00000368

**United Therapeutics Corp.**                  **RIN-PH-201 Protocol Amendment 3**
                                                          **Inhaled Treprostinil**

- A worsening of an existing symptom or condition or post-treatment events that occur as a result of protocol-mandated procedures (eg, exacerbation of a pre-existing illness following the start of the study or an increase in frequency or intensity of a pre-existing episodic event or condition).

Thus, no causal relationship with the study drug is implied by use of the term "adverse event."

An AE does not include the following:

- Medical or surgical procedures (eg, surgery, endoscopy, tooth extraction, transfusion); however, the condition for which the surgery is required may be an AE.
- Planned surgical measures permitted by the study protocol and the condition(s) leading to these measures are not AEs.
- Day to day fluctuations of pre-existing disease or conditions present or detected at the start of the study that do not worsen.
- Situations where an untoward medical occurrence has not occurred (eg, hospitalizations for cosmetic elective surgery, social and/or convenience admissions).
- The disease or disorder being studied or a sign or symptom associated with the disease or disorder unless more severe than expected for the subject's condition.

### 9.1.2     Serious Adverse Event

A SAE is an AE occurring at any time after informed consent that results in any of the following outcomes:

- Death
- A life-threatening AE
- Inpatient hospitalization or prolongation of existing hospitalization
- A persistent or significant disability/incapacity
- A congenital anomaly/birth defect
- Results in a medically important event of reaction

Life-threatening in this context refers to a reaction in which the subject was at risk of death at the time of the reaction; it does not refer to a reaction that hypothetically might have caused death if more severe.

Medical and scientific judgment should be exercised in deciding whether other situations should be considered serious reactions, such as important medical events that might not be immediately life-threatening or result in death or hospitalization, but might jeopardize the subject or might require intervention to prevent 1 of the other outcomes listed above.

**Version Date 15 Feb 2017**          **Confidential**                    **Page 50**

**LIQ_PH-ILD_00000369**

**United Therapeutics Corp.**                              **RIN-PH-201 Protocol Amendment 3**
                                                                      **Inhaled Treprostinil**

Examples of such events are intensive treatment in an emergency room or at home for allergic bronchospasm, blood dyscrasias, or convulsions that do not result in hospitalization or development of dependency or abuse.  Any suspected transmission via a medicinal product of an infectious agent is also considered a serious adverse reaction.

## 9.2     DOCUMENTATION OF ADVERSE EVENTS

An AE or SAE occurring during the study must be documented in the subject's source documents and on the appropriate eCRF page.  Information relating to the AE such as onset and cessation date and times, intensity, seriousness, relationship to study drug, and outcome is also to be documented in the eCRF (see Appendix 15.2 for definitions).  Where possible, AEs should be recorded using standard medical terminology.  The Investigator should attempt, if possible, to establish a diagnosis based on the presenting signs and symptoms.  If several signs or symptoms are clearly related to a medically-defined diagnosis or syndrome, the diagnosis or syndrome should be recorded on the eCRF page, not the individual signs and symptoms.

## 9.3     FOLLOW-UP OF ADVERSE EVENTS

All AEs should be followed until either resolution (or return to normal or baseline values), until they are judged by the Investigator to no longer be clinically significant, or for at least 30 days if the AE extends beyond the final visit.  All SAEs that occur during the study will be followed until resolution, death, or the subject is lost to follow-up even if they are ongoing more than 4 weeks after completion of the final study visit.  Supplemental measurements and/or evaluations may be necessary to investigate fully the nature and/or causality of an AE or SAE.  This may include additional laboratory tests, diagnostic procedures, or consultation with other healthcare professionals.  The eCRF pages should be updated with any new or additional information as appropriate.

## 9.4     REPORTING RESPONSIBILITIES OF THE INVESTIGATOR

**All SAEs, regardless of expectedness or causality, must be reported to the Sponsor by fax/email (+ 1-919-313-1297 or drugsafety@unither.com) within 24 hours of awareness**.  A completed SAE Notification Report form along with any relevant hospital records and autopsy reports should be provided to Global Drug Safety at United Therapeutics Corporation.  A follow-up SAE Notification Report form must be forwarded to Global Drug

**Version Date 15 Feb 2017**                    **Confidential**                         **Page 51**

United Therapeutics Corp.  **RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

Safety at United Therapeutics Corporation within 24 hours of the receipt of any new or updated information.  The Investigator must also promptly notify their Institutional Review Board (IRB) or Ethics Committee (EC) of the SAE, including any follow-up information, in accordance with applicable national regulations and guidelines set forth by the IRB or EC.

## 9.5    PREGNANCY

If a study subject becomes pregnant during participation in this clinical study, site staff must notify the Sponsor within 24 hours of learning of the pregnancy by completing the Pregnancy Notification Form and submitting via fax or email to Global Drug Safety at United Therapeutics Corporation (+ 1-919-313-1297 or drugsafety@unither.com).  The United Therapeutics Global Drug Safety department will follow-up with the Investigator to ensure appropriate data are provided regarding the outcome of the pregnancy, and to ask the Investigator to update the Pregnancy Notification Form.  Pregnancy only becomes an AE/SAE if there is an abnormal outcome, a spontaneous abortion, an elective termination for medical reasons, or a congenital anomaly in the offspring.

## 9.6    SAFETY REPORTS

In accordance with national regulations, the Sponsor will notify the appropriate regulatory authority(ies), and all participating Investigators of any AE that is considered to be possibly attributable to study drug and is both serious and unexpected.  The Investigator must report these AEs to their IRB or EC in accordance with applicable national regulations and guidelines set forth by the IRB or EC.

## 10    STATISTICAL CONSIDERATIONS

## 10.1    DATA PROCESSING

The results of assessments will be transcribed into an eCRF for each subject who signs an ICF until study completion, or study discontinuation for any reason.  A representative from the Sponsor will verify eCRF data fields against source documentation.  All data transmitted from the site will be reviewed and entered into a quality assured computerized database.  Data clarifications will be generated and the database will be edited as appropriate.  The eCRF screens are to be reviewed by the Investigator for completeness and accuracy.  The Investigator must electronically sign each subject's eCRF to signify his/her approval of the data.  The Investigator will be required to re-sign an eCRF if changes are made to a subject's

United Therapeutics Corp.

**RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil**

eCRF by the site after the Investigator initially signs the eCRF.  The database will be final when all outstanding queries have been resolved and all data management quality assurance procedures are complete.

## 10.2    SAMPLE SIZE

Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (2-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline in 6MWD assuming a standard deviation of 75 meters. The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%.

## 10.3    ANALYSIS PLAN

Details of the efficacy and safety analyses are provided below.  A separate statistical analysis plan will document further details of the statistical methods to be employed, including any changes to planned analyses specified within this protocol.  The analysis plan will be finalized prior to any unblinding of study data by the Sponsor.  Unless otherwise specified, all statistical tests will be 2-sided at alpha level of 0.05.  All statistical calculations will be completed using the latest version of SAS®.

The Intent-to-Treat (ITT) population will be defined as all subjects randomized into the study and receive at least 1 dose of study drug; all ITT subjects will be counted in the group to which they were randomized, regardless of the study drug they were actually given.  All efficacy analyses will be performed on this ITT population, unless otherwise specified.  The Safety population will be defined as all subjects enrolled into the study who received at least 1 dose of study drug; all Safety population subjects will be counted in the group corresponding to the study drug actually received, regardless of randomized assignment.  All safety analyses will be performed on this Safety population, unless otherwise specified.

### 10.3.1    Primary Efficacy Endpoint

The primary efficacy endpoint is the change in 6MWD measured at peak exposure from Baseline to Week 16.  This study hypothesizes that inhaled treprostinil will improve exercise capacity after 16 weeks of therapy as compared with placebo when administered to subjects

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
                                                        **Inhaled Treprostinil**

with PH associated with ILD including CPFE.  Non-parametric analysis of covariance will be used to estimate the treatment effect.  The magnitude of treatment effect will be estimated with the Hodges-Lehmann median difference between 2 treatment groups.  For subjects who discontinue from the study early, the last observation carried forward method will be used to impute the 6MWD at Week 16.

### 10.3.2    Secondary Efficacy Endpoints

The effect of inhaled treprostinil will be formally tested on the following 3 secondary efficacy endpoints:

1. Change in peak 6MWD from Baseline to Week 12
2. Change in plasma concentration of NT-proBNP from Baseline to Week 16
3. Change in trough 6MWD from Baseline to Week 15

The similar approach for the analysis of primary efficacy endpoint will be used.  No adjustment for multiplicity is planned.

### 10.3.3    Exploratory Endpoints

The effect of inhaled treprostinil will be evaluated on the following parameters:

1. Change in peak 6MWD from Baseline to Week 4
2. Change in peak 6MWD at from Baseline to Week 8
3. Change in SGRQ from Baseline to Week 16
4. Time to clinical worsening will be evaluated as an exploratory endpoint from the time of randomization until 1 of the following criteria are met:
   a. Hospitalization due to a cardiopulmonary indication
   b. Decrease in 6MWD > 15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
   c. Death (all causes)
   d. Lung transplantation
5. Change in DSP from Baseline to Week 16
6. Optional evaluation of change in biomarkers (specific targets to be determined) from Baseline to Week 16
7. Optional evaluation of whole genome sequence at Baseline

For changes in peak 6MWD and SGRQ, a similar approach for the analysis of primary efficacy endpoint will be used.  For time to clinical worsening, Kaplan-Meier estimator will be provided and log-rank test will be used to compare the treatment difference.

**Version Date 15 Feb 2017**              **Confidential**                  **Page 54**

LIQ_PH-ILD_00000373

United Therapeutics Corp.                    **RIN-PH-201 Protocol Amendment 3**
                                             **Inhaled Treprostinil**

*10.3.4    Safety Analyses*

The safety of inhaled treprostinil will be evaluated by comparison of the following parameters between the 2 treatment groups:

1. AEs
2. Oxygenation
    a. Pulse oximetry ($SpO_2$)
    b. Supplemental oxygen (L/min) requirement
3. Pulmonary function:
    a. FEV1
    b. FVC
    c. TLC
    d. DLCO
4. Clinical laboratory parameters
5. Vital signs
6. 12-Lead ECG
7. Hospitalization due to cardiopulmonary indications
8. Exacerbations of underlying lung disease; defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality

All AEs as recorded by the Investigators will be assigned a Medical Dictionary for Regulatory Activities (MedDRA) preferred term and system organ class by the Sponsor for reporting purposes. The summary of AEs will include the number and percentage of subjects, as well as the number of events reported for each preferred term. No inferential analyses are planned for the AEs.

Data collected prior to dosing will serve as Baseline values for the evaluation of data collected during the Treatment Phase. Summary statistics will be calculated for measured values and changes from Baseline values. Treatment-emergent changes in vital signs, ECGs, PFTs, oxygenation parameters, and clinical laboratory parameters will be summarized by treatment group. Incidence of hospitalization due to cardiopulmonary indications and exacerbations of underlying lung disease will be summarized by treatment group. No inferential analyses are planned on these safety endpoints.

            LIQ_PH-ILD_00000374

United Therapeutics Corp.                          RIN-PH-201 Protocol Amendment 3
                                                   Inhaled Treprostinil

## 10.4   INTERIM ANALYSES

Interim analyses for safety data will be performed at the request of the Data Monitoring Committee (DMC).  Interim analyses for efficacy data are not planned for this study.

## 10.5   OTHER ANALYSES

Exploratory analyses may be conducted based on available study data.

## 10.6   DATA LISTINGS AND SUMMARIES

All data gathered in this study will be presented in summary tables and listings in the clinical study report.

## 10.7   DATA MONITORING COMMITTEE

A DMC will be established for the study including physicians knowledgeable in the treatment of PH.  Throughout the course of the study the DMC will meet on a regular basis to monitor the safety of the study.  Meetings will occur as outlined in the DMC charter.  The DMC will be blinded to individual subject treatment allocation during the review process.  All analyses will be prepared by an independent external consultant and reviewed only by the DMC as defined in the DMC charter.  The Sponsor will only have access to blinded study data during this process.

## 11   PACKAGING AND FORMULATION

## 11.1   CONTENTS OF STUDY DRUG

### 11.1.1   Study Drug

The Sponsor will supply study medication (treprostinil inhalation solution, 0.6 mg/mL or placebo), as clear liquid in 2.9 mL ampoules.  The ampoules will be packaged in groups of 4, sealed in aluminum pouches.  There will be 9 pouches per carton.

### 11.1.2   Study Device

The Sponsor will supply commercially available TD-100 nebulizers (Tyvaso Inhalation System) and accessories to the site in standard packaging labeled with the study number.  The Tyvaso Inhalation System will also be provided with the commercially available IFU.

Each subject will receive 2 nebulizers at the start of the study.  In addition, the subjects will be provided with a month worth of plastic accessories at each study visit.

Version Date 15 Feb 2017              Confidential                   Page 56

LIQ_PH-ILD_00000375

**United Therapeutics Corp.**                          **RIN-PH-201 Protocol Amendment 3**
                                                       **Inhaled Treprostinil**

## 11.2    LABELING

### 11.2.1     Study Drug

The foil pouch and the outer carton will each be labeled with the same information and sent to the site.  At a minimum, the study medication outer packaging (pouch and carton) will be labeled to disclose clearly the product name, study number, kit identification number, expiry date, Sponsor's name and address, IFU, and storage information (subject to regulatory requirements in each study region or country).

### 11.2.2     Study Device

Study subjects will receive commercially available TD-100 nebulizers and accessories separately from study drug.  Study subjects will receive 2 devices at Baseline supplied as a device starter kit.  Subjects will receive replacement parts as part of a monthly device resupply kit.  The nebulizers and accessories will be supplied using standard packaging labeled with the study number.

## 11.3    STORAGE AND HANDLING OF CLINICAL STUDY MATERIAL

All study drug will be stored at room temperature 25°C (77°F) with excursions permitted to 15°C to 30°C (59°F to 86°F).  Study drug should not be frozen, refrigerated, or exposed to heat.  Keep the ampoules in the foil pouch to protect from light.  Once the foil pouch is opened, use within 7 days.  See investigational medicinal product label for information on use and storage of the product.

Study drug will be stored in a securely locked cabinet or enclosure with appropriate temperature monitoring.  Access should be strictly limited to the Investigators and their designees.  Neither the Investigators nor any designees may provide study drug to any subject not participating in this protocol.

## 11.4    SUPPLY AND RETURN OF CLINICAL STUDY MATERIAL

Study sites will be supplied with a sufficient quantity of study drug to begin enrollment in the study.  At Baseline, an IXRS will be utilized to randomize the subjects and assign the appropriate study drug for the first 4-week treatment interval.  At subsequent study visits, the IXRS will be utilized by study staff to assign subsequent study drug kits to the subjects based

LIQ_PH-ILD_00000376

**United Therapeutics Corp.**                                    **RIN-PH-201 Protocol Amendment 3**
                                                                **Inhaled Treprostinil**

upon their current treatment allocation.  At each study visit, all study drug dispensed to a subject should be returned to the study site, including all used and unused ampoules.

At the end of the study, nebulizers used during the study should be collected from each subject not continuing into the open-label extension study.  Subjects continuing into the open-label extension study will retain their devices for use in the open-label extension study.

## 11.5   DRUG ACCOUNTABILITY

The Investigator is responsible for study drug accountability and reconciliation overall and on a per subject basis.  Drug accountability records are to be maintained during the study and these records include, but are not limited to: the amount of study drug received from the Sponsor, the amount dispensed to each subject, and the amount of used/unused study drug returned to the site from the subject.

At each visit, site personnel will:

- Collect and document all study drug returned by the subject (both used and unused).
- Compute study drug compliance using the dosing instructions given to the subject since the previous study visit and the amount of study drug returned.
- Re-educate the subject about the importance of following the prescribed dosing regimen (if compliance is low).

Once a representative from the Sponsor is able to confirm drug accountability for a completed subject, study drug will be returned to a Sponsor designated location for destruction and/or destroyed onsite per institutional policy.  At the end of the study, nebulizers used during the study should be collected from each subject not continuing into the open-label extension study.  These nebulizers will be returned to a Sponsor designated location for destruction.  In the event of device malfunction, at any point during the study, the nebulizer should be returned to the Sponsor.  Subjects continuing into the open-label extension study will retain their devices for use in the open-label extension study.

## 12     REGULATORY AND ETHICAL OBLIGATION

## 12.1   APPLICABLE REGULATORY REQUIREMENTS

The study will be conducted in accordance with International Council for Harmonisation (ICH) and Good Clinical Practice (GCP) guidelines and all applicable national regulations.

The Sponsor will obtain the required approval from each national regulatory authority to conduct the study.  During the conduct of the study, an annual safety report will be compiled by the Sponsor for submission to those regulatory authorities and IRBs/ECs that require it. Any additional national reporting requirements as specified by the applicable regulations, regulatory authorities, or IRB/EC will also be fulfilled during the conduct of the study.

## 12.2    INFORMED CONSENT REQUIREMENTS

Before a subject is enrolled in the study, the Investigator or his/her designees must explain the purpose and nature of the study, including potential benefits and risks and all study procedures to the subject.  The subject must sign and date an IRB/EC-approved ICF prior to the conduct of any study-related activities.  A copy of the signed consent form will be given to the subject and the original will be retained in the study site's records.

## 12.3    INDEPENDENT ETHICS COMMITTEE/INSTITUTIONAL REVIEW BOARD

Prior to study initiation at each site, the Investigator will obtain approval for the study from an appropriate IRB/EC and provide the Sponsor with a copy of the approval letter.  The IRB/EC must also review and approve the study site's ICF and any other written information provided to the subject prior to enrollment, as well as any advertising materials used for subject recruitment.  Copies of the ICF and advertising materials must be forwarded to the Sponsor for review before submission to the IRB/EC prior to the start of the study.

If, during the study, it is necessary to amend either the protocol or the ICF, the Investigator is responsible for obtaining IRB/EC approval of these amended documents prior to implementation.  Copies of the IRB/EC correspondence and approval letters must be sent to the Sponsor.

During the conduct of the study, an annual progress report will be compiled by the Sponsor for submission to those IRBs/ECs that require it.

A written summary of the study will be provided by the Investigator to the IRB/EC following study completion or termination according to the IRB/EC's standard procedures.  Additional updates will also be provided in accordance with the IRB/EC's standard procedures.

United Therapeutics Corp.                         RIN-PH-201 Protocol Amendment 3
                                                         Inhaled Treprostinil

## 12.4    PRESTUDY DOCUMENTATION REQUIREMENTS

Before the commencement of the clinical study, at a minimum, the following documents will
be provided to the site:  Investigator's Brochure, Protocol, ICF, Subject Dosing Diary, the
Tyvaso Inhalation System IFU, Clinical Trial Agreement, Budget Agreement, and eCRF.

At a minimum, the site will be required to provide the following documents to United
Therapeutics Corporation or designee prior to study start:  Signature page of the protocol,
Form FDA 1572, Financial Disclosure Form, IRB/EC Composition and Roster, IRB/EC
protocol and informed consent approval letters, and Curriculum Vitae of study staff listed on
the Form FDA 1572.

## 12.5    SUBJECT CONFIDENTIALITY

Every effort will be made to keep medical information confidential.  United Therapeutics
Corporation, the FDA or other regulatory bodies, and the IRB/EC governing this study may
inspect the medical records of any subject involved in this study.  The Investigator may
release the subject's medical records to employees or agents of the Sponsor, the IRB/EC or
the FDA or appropriate local regulatory agencies for purposes of checking the accuracy of the
data.  A number will be assigned to all subjects and any report published will not identify the
subject's name.

## 13    ADMINISTRATIVE AND LEGAL OBLIGATIONS

## 13.1    PROTOCOL AMENDMENTS AND STUDY TERMINATION

Protocol amendments that could potentially adversely affect the safety of participating
subjects or that alter the scope of the investigation, the scientific quality of the study, the
experimental design, dosages, duration of therapy, assessment variables, the number of
subjects treated, or subject selection criteria may be made only after consultation between
United Therapeutics Corporation or its designee and the Investigator.

All protocol amendments must be submitted to and approved by the appropriate regulatory
authorities and IRB/EC prior to implementation.

A report documenting study termination must also be submitted to and acknowledged by the
appropriate IRB/EC for each study site.

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

At the end of the study, where applicable, a final report will be provided to the local regulatory agencies.

## 13.2   STUDY DOCUMENTATION AND STORAGE

In accordance with federal/national regulations, ICH, and GCP guidelines, the Investigator must retain study records for at least 2 years after the last approval of a marketing application in an ICH region and until there are no pending or contemplated marketing applications in an ICH region or at least 2 years have elapsed since the formal discontinuation of clinical development of the investigational product.  The Investigator must notify United Therapeutics Corporation before any disposal or change in location of study records.

## 13.3   STUDY MONITORING AND DATA COLLECTION

In accordance with federal/national regulations, ICH, and GCP guidelines, monitors for United Therapeutics Corporation or its designee will periodically contact the site and conduct on-site visits.  During these visits, the monitor will at a minimum:  confirm ethical treatment of subjects, assess study progress, review data collected, conduct source document verification, verify drug accountability periodically, and identify any issues requiring resolution.

The Investigator agrees to allow the monitor direct access to all relevant documents and to allocate his/her time and his/her staff to the monitor to discuss any findings or any relevant issues.

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

## 14    REFERENCES

Agarwal M, Waxman AB.  Inhaled treprostinil in group-3 pulmonary hypertension.  J Heart Lung Transplant.  2015;34(4):S343.

ATS Committee on Proficiency Standards for Clinical Pulmonary Function Laboratories.  ATS Statement: Guidelines for the Six-Minute Walk Test.  Am J Respir Crit Care Med.  2002;166(1):111–117.

Bajwa A, Shujaat A, Thomas C, et al.  The safety and tolerability of inhaled treprostinil in patients with pulmonary hypertension and chronic obstructive pulmonary disease.  Pulm Circ.  2016.  Epub ahead of print.

Benza RL, Seeger W, McLaughlin VV, et al.  Long-term effects of inhaled treprostinil in patients with pulmonary arterial hypertension: the Treprostinil Sodium Inhalation Used in the Management of Pulmonary Arterial Hypertension (TRIUMPH) study open-label extension.  J Heart Lung Transplant.  2011;30(12):1327-1333.

Channick RN, Olschewski H, Seeger W, et al.  Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension.  J Am Coll of Cardiol.  2006;48(7):1433-1437.

Collard HR, Ryerson CJ, Corte TJ, et al.  Acute exacerbation of idiopathic pulmonary fibrosis: an international working group report.  Am J Respir Crit Care Med.  2016;194(3):265-275.

Cottin V, Le Pavec J, Prévot G, et al.  Pulmonary hypertension in patients with combined pulmonary fibrosis and emphysema syndrome.  Eur Respir J.  2010;35(1):105-111.

Fijalkowska A, Kurzyna M, Torbicki A, et al.  Serum N-terminal brain natriuretic peptide as a prognostic parameter in patients with pulmonary hypertension.  Chest.  2006;129(5):1313-1321.

Holland AE, Spruit MA, Troosters T, et al.  An official European Respiratory Society/American Thoracic Society technical standard: field walking tests in chronic respiratory disease.  Eur Respir J.  2014;44(6):1428-1446.

Jankowich MD, Rounds SI.  Combined pulmonary fibrosis and emphysema syndrome: a review.  Chest.  2012;141(1):222-231.

Lettieri CJ, Nathan SD, Browning RF, et al.  The distance-saturation product predicts mortality in idiopathic pulmonary fibrosis.  Respir Med.  2006;100(10):1734-1741.

McLaughlin VV, Benza RL, Rubin LJ, et al.  Addition of inhaled treprostinil to oral therapy for pulmonary arterial hypertension: a randomized controlled clinical trial.  J Am Coll Cardiol.  2010;55(18):1915-1922.

Nathan SD.  Pulmonary hypertension in interstitial lung disease.  Int J Clin Pract.  2008;62(Suppl 160):21-28.

DA0761                                    LIQ_PH-ILD_00000381

United Therapeutics Corp.

**RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil**

Nathan SD, Hassoun PM.  Pulmonary hypertension due to lung disease and/or hypoxia.  Clin Chest Med.  2013;34(4):695-705.

Remodulin (treprostinil) Injection Package Insert.  United Therapeutics Corp.:Research Triangle Park, NC; December 2014.

Roccia F, Campolo B, Gallelli L, et al.  Effects of ambrisentan in a patient affected by combined pulmonary fibrosis and emphysema and by severe pulmonary hypertension: clinical, functional, and biomolecular findings.  Clin Drug Investig.  2013;33(6):451-457.

Saggar R, Khanna D, Vaidya A, et al.  Changes in right heart hemodynamics and echocardiographic function in an advanced phenotype of pulmonary hypertension and right heart dysfunction associated with pulmonary fibrosis.  Thorax.  2014;69(2):123-129.

Seeger W, Adir Y, Barbera JA, et al.  Pulmonary hypertension in chronic lung diseases.  J Am Coll Cardiol.  2013;62(25 Suppl): D109-116.

Simonneau G, Robbins IM, Beghetti M, et al.  Updated clinical classification of pulmonary hypertension.  J Am Coll Cardiol.  2009;54(1 Suppl):S43-54.

Travis WD, Costabel U, Hansell DM, et al.  An official American Thoracic Society/European Respiratory Society statement: Update of the international multidisciplinary classification of the idiopathic interstitial pneumonias.  Am J Respir Crit Care Med.  2013;188(6):733-748.

Voswinckel R, Ghofrani HA, Grimminger F, et al.  Inhaled treprostinil [corrected] for treatment of chronic pulmonary arterial hypertension.  Ann Intern Med.  2006;144(2):149-150.

Wang L, Bai L, Sapkota R, et al.  Hemodynamic and gas exchange effects of iloprost in patients with chronic obstructive pulmonary disease and pulmonary hypertension.  The PVRI 8th Annual World Congress on Pulmonary Vascular Disease.  The 7th Annual National Congress on Pulmonary Embolism and Pulmonary Vascular Diseases.  January 14-18, 2015.  Guangzhou, China.

LIQ_PH-ILD_00000382

**United Therapeutics Corp.**

**RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

## 15    APPENDICES

## 15.1    PROCEDURE FOR 6-MINUTE WALK TEST

<u>General Procedures</u>

The 6MWT should be administered by the same tester at each study site throughout the study, whenever possible.  The administration of the test and specifications of the testing area should be generally consistent with the American Thoracic Society guidelines[1,2] and the usual practice of the investigative site.  Subjects receiving supplemental oxygen during the Baseline 6MWT must continue to receive the same flow rate at all subsequent 6MWT assessments.

The area used for the 6MWT should be pre-measured at approximately 30 meters in length and at least 2 to 3 meters in width.  There must be no turns or significant curves to the 6MWT area.  The length should be marked with gradations to ensure the accurate measurement of the distance walked.  The area should be well ventilated.  The tester may be at the starting end of the corridor or at the midpoint of the corridor with a stop-watch.  Intermittent rest periods are allowed if the subject can no longer continue.  If the subject needs to rest briefly, he/she may stand or sit and then begin again when he/she is sufficiently rested but the clock will continue to run.  At the end of 6 minutes, the tester will call "stop where you are" while simultaneously stopping the watch and then measure the distance walked.

<u>Instructions to the Subject</u>

Subjects will be instructed that the preceding meal should be light.  Subjects should be told to wear comfortable clothing and sneakers or comfortable walking shoes.  The person administering the test will use the following **<u>exact</u>** dialogue with the subject:

"The purpose of this test is to find out how far you can walk in 6 minutes.  You will start from this point and follow the hallway to the marker (eg, chair) at the end, turn around and walk back.  When you arrive back at the starting point you will go back

---

[1] ATS Statement: Guidelines for the Six-Minute Walk Test.  Am J Respir Crit Care Med 2002; 166: 111–117.
[2] Holland, A. E., M. A. Spruit, T. Troosters, M. A. Puhan, V. Pepin, D. Saey, M. C. McCormack, B. W. Carlin, F. C. Sciurba, F. Pitta, J. Wanger, N. MacIntyre, D. A. Kaminsky, B. H. Culver, S. M. Revill, N. A. Hernandes, V. Andrianopoulos, C. A. Camillo, K. E. Mitchell, A. L. Lee, C. J. Hill and S. J. Singh (2014). "An official European Respiratory Society/American Thoracic Society technical standard: field walking tests in chronic respiratory disease." Eur Respir J 44(6): 1428-1446.

**Version Date 15 Feb 2017**            **Confidential**            **Page 64**

and forth again.  You will go back and forth as many times as you can in the 6-minute period.  You may stop and rest if you need to.  Just remain where you are until you can go on again.  However, the most important thing about the test is that you cover as much ground as you possibly can during the 6-minutes.  I will tell you the time, and I will let you know when the 6 minutes are up.  When I say 'STOP,' please stand right where you are."

After these instructions are given to the subject, the person administering the test will then ask:

"Do you have any questions about the test?"

The person administering the test will then start the test by saying the following to the subject:

"Are you ready?"
"Start when I say 'GO.'"

The person administering the test will tell the subject the time at each minute by saying:

"You have 5 minutes to go."
"You have 4 minutes to go."
"You have 3 minutes to go."
"You have 2 minutes to go."
"You have 1 minute to go."

At 6 minutes, the person administering the test will tell the subject:

"Stop where you are."

No other instruction or encouragement will be given during the test.  Eye contact with the subject should be avoided during the test.

United Therapeutics Corp.

RIN-PH-201 Protocol Amendment 3
Inhaled Treprostinil

## 15.2    GUIDELINES AND DEFINITIONS FOR RECORDING ADVERSE EVENTS

The Investigator or a designated member of his/her staff will probe each subject for any AEs that may have occurred.  The Investigator should always ask the same question when conducting the verbal probe in order to ensure uniformity between subjects.  The Investigator should ask:

> "How are you doing (feeling)?"

Based on the subject's response to this question, the Investigator should ask additional questions relevant to the specific complaint such as:

> "How severe is/was the symptom?"
> "How often did the symptom occur?"
> "How long did the symptom last?"

It is the Investigator's responsibility to review the results of all diagnostic and laboratory tests as they become available and ascertain if there is a clinically significant change from Baseline.  If the results are determined to be a clinically significant change from Baseline, this should be reported as an AE.  The Investigator may repeat the diagnostic procedure or laboratory test or request additional tests to verify the results of the original tests.  When possible, a diagnosis associated with the abnormality should be used as the reported AE.

Using provided definitions, the Investigator will then:

(1) rate the intensity and seriousness of the AE, (2) estimate the causality of the AE to study drug, and (3) note actions taken to counteract the AE.

Definitions of Intensity, Seriousness, Causality, Action Taken, and Outcome

**INTENSITY**

An assessment of the relative intensity (severity) of an AE is based on the Investigator's clinical judgment.  The maximum intensity encountered during the evaluation period should be checked.  The assessment of intensity should be independent of the assessment of the seriousness of the AE.

LIQ_PH-ILD_00000385

**United Therapeutics Corp.**                                      **RIN-PH-201 Protocol Amendment 3**
                                                                   **Inhaled Treprostinil**

**SERIOUSNESS**

A serious AE is one that represents an actual or potential significant hazard.  This includes, but is not limited to, an event that is fatal, life-threatening, permanently or severely disabling, requires or prolongs inpatient hospitalization*, is a congenital abnormality (offspring of subject) or is medically significant (important medical events that may not result in death, be life-threatening, or require hospitalization may be considered an SAE when, based upon appropriate medical judgment, they may jeopardize the subject and may require medical or surgical intervention to prevent 1 of the outcomes listed in this definition).

*Hospitalizations that would not be considered SAEs include those for:

- Routine treatment or monitoring of the study indication not associated with any deterioration in condition (eg, hospitalization for a routine RHC).
- Treatment which was elective or pre-planned, for a pre-existing condition not associated with any deterioration in condition (eg, pre-planned operation which does not lead to further complications etc).
- Treatment of an emergency, in an outpatient setting for an event not fulfilling any of the definitions of serious as given above and not resulting in hospital admission.

**CAUSALITY**

An estimate of causality between a specified AE and the study drug is made by the Investigator.  Several factors should be considered when determining causality.  These factors include temporal relationship and response to withdrawal or reintroduction of the study drug.

Definitions of the causality categories are as follows:

- NOT RELATED – There is not a temporal relationship to study drug administration (too early, or late, or study drug not taken), or there is a reasonable causal relationship between another drug, or concurrent disease and the SAE, or any of the following:
  - An event that precedes the first administration of study drug
  - An event for which the cause is clearly related to an external event
  - Temporal relationship to study drug is atypical
  - Is readily explained by an intercurrent illness AND has an expected level of severity, duration, and resolution
  - An alternative explanation (concomitant drug, intercurrent illness) is likely
- POSSIBLE – There is a reasonable causal relationship between the study drug and the SAE.  Dechallenge information is lacking or unclear, study drug administration was not modified in response to the SAE, or any of the following:

**Version Date 15 Feb 2017**                    **Confidential**                                    **Page 67**

LIQ_PH-ILD_00000386

- o   Has a reasonable temporal relationship to study drug
- o   The event has a plausible biological link to the activity of the study drug
- o   Is unlikely to be related to an intercurrent illness or has an unexpected degree of severity, duration or complication
- PROBABLE – There is a reasonable causal relationship between the study drug and the SAE.  The event responds to dechallenge - the event resolves or improves with modification of study drug administration.  Rechallenge (the original study drug was restarted) is not required, or any of the following:
  - o   Has a reasonable temporal relationship to study drug
  - o   The event has a plausible biologic link to the activity of the study drug
  - o   Not readily explained by an intercurrent illness
  - o   Not readily explained by external event
  - o   Improves on discontinuation of study drug
  - o   If study drug has been discontinued, may recur or reintroduction of study drug

**ACTION TAKEN**

STUDY DRUG DOSE MODIFICATION*

- Dose Not Changed – The dose or regimen of the study drug was not changed.
- Dose Increased – The dose or regimen of study drug was increased
- Dose Decreased – The dose or regimen of study drug was decreased
- Drug Interrupted – Administration of the study drug was stopped temporarily
- Drug Withdrawn – Administration of the study drug was stopped permanently and not restarted
- Unknown – Changes to the administration of the study drug cannot be determined
- Not Applicable

*NOTE:  Only the last study drug action should be recorded in the eCRF.  For example, if the study drug is withdrawn and then the decision is made to restart, the dose modification of "Drug interrupted" should be reported on the SAE form.*

**OUTCOME**

- Fatal – The study subject died.
- Not Recovered/Not Resolved – The AE was ongoing at the time of death or at the time the subject was lost to follow up.
- Recovered/Resolved – The AE resolved.
- Recovered/Resolved with Sequelae – The AE is considered resolved however there is residual sequelae.  Some events do not return to baseline, such as metastasis or progression of disease; however, once these events are determined by the Investigator to be stable or chronic, the Investigator may consider the event to be resolved or resolved with sequelae.

LIQ_PH-ILD_00000387

**United Therapeutics Corp.**                    **RIN-PH-201 Protocol Amendment 3**
**Inhaled Treprostinil**

- Recovering/Resolving – The AE is improving but is not yet completely recovered/resolved.
- Unknown – The outcome of the AE cannot be determined.

United Therapeutics Corp.                    **RIN-PH-201 Protocol Amendment 3**
                                                        **Inhaled Treprostinil**

**15.3    ST. GEORGE'S RESPIRATORY QUESTIONNAIRE**

# ST. GEORGE'S RESPIRATORY QUESTIONNAIRE
# ENGLISH FOR THE UNITED STATES

## ST. GEORGE'S RESPIRATORY QUESTIONNAIRE (SGRQ)

*This questionnaire is designed to help us learn much more about how your breathing is troubling you and how it affects your life. We are using it to find out which aspects of your illness cause you the most problems, rather than what the doctors and nurses think your problems are.*

*Please read the instructions carefully and ask if you do not understand anything. Do not spend too long deciding about your answers.*

*Before completing the rest of the questionnaire:*

*Please check one box to show how you describe your current health:*

| Very good | Good | Fair | Poor | Very poor |
|-----------|------|------|------|-----------|
| ☐ | ☐ | ☐ | ☐ | ☐ |

**Copyright reserved**
P.W. Jones, PhD FRCP
Professor of Respiratory Medicine,
St. George's University of London,
Jenner Wing,
Cranmer Terrace,                     Tel.  +44 (0) 20 8725 5371
London SW17 ORE, UK.                 Fax  +44 (0) 20 8725 5955

**USA / US English version**                    1

f:\institut\cultadap\project\gsk1881\question\final versions\sgrqusaq.doc 18/04/03

*continued…*

DA0770                              **LIQ_PH-ILD_00000390**

# St. George's Respiratory Questionnaire
## PART 1

*Please describe how often your respiratory problems have affected you over the past 4 weeks.*

Please check (✔) *one box for each question*:

| | almost every day | several days a week | a few days a month | only with respiratory infections | not at all |
|---|---|---|---|---|---|
| 1. Over the past 4 weeks, I have coughed: | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2. Over the past 4 weeks, I have brought up phlegm (sputum): | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3. Over the past 4 weeks, I have had shortness of breath: | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4. Over the past 4 weeks, I have had wheezing attacks: | ☐ | ☐ | ☐ | ☐ | ☐ |

5. How many times during the past 4 weeks have you suffered from severe or very unpleasant respiratory attacks?

Please check (✔) *one*:

| | |
|---|---|
| more than 3 times | ☐ |
| 3 times | ☐ |
| 2 times | ☐ |
| 1 time | ☐ |
| none of the time | ☐ |

6. How long did the worst respiratory attack last?
*(Go to Question 7 if you did not have a severe attack)*

Please check (✔) *one*:

| | |
|---|---|
| a week or more | ☐ |
| 3 or more days | ☐ |
| 1 or 2 days | ☐ |
| less than a day | ☐ |

7. Over the past 4 weeks, in a typical week, how many good days (with few respiratory problems) have you had?

Please check (✔) *one*:

| | |
|---|---|
| No good days | ☐ |
| 1 or 2 good days | ☐ |
| 3 or 4 good days | ☐ |
| nearly every day was good | ☐ |
| every day was good | ☐ |

8. If you wheeze, is it worse when you get up in the morning?

Please check (✔) *one*:

| | |
|---|---|
| No | ☐ |
| Yes | ☐ |

**USA / US English version**                    2

f:\institut\cultadap\project\gsk1881\question\final versions\sgrqusaq.doc 18/04/03

*continued…*

LIQ_PH-ILD_00000391

# St. George's Respiratory Questionnaire
## PART 2

**Section 1**

How would you describe your respiratory condition?

Please check (✔) *one*:

| | |
|---|---|
| The most important problem I have | ☐ |
| Causes me quite a lot of problems | ☐ |
| Causes me a few problems | ☐ |
| Causes no problems | ☐ |

If you have ever held a job:

Please check (✔) *one*:

| | |
|---|---|
| My respiratory problems made me stop working altogether | ☐ |
| My respiratory problems interfere with my job or made me change my job | ☐ |
| My respiratory problems do not affect my job | ☐ |

**Section 2**

***These are questions about what activities usually make you feel short of breath these days.***

For each statement please check (✔) *the box* that applies to you *these days*:

| | True | False |
|---|---|---|
| Sitting or lying still | ☐ | ☐ |
| Washing or dressing yourself | ☐ | ☐ |
| Walking around the house | ☐ | ☐ |
| Walking outside on level ground | ☐ | ☐ |
| Walking up a flight of stairs | ☐ | ☐ |
| Walking up hills | ☐ | ☐ |
| Playing sports or other physical activities | ☐ | ☐ |

**USA / US English version**                                    3

*continued…*

## St. George's Respiratory Questionnaire
### PART 2

**Section 3**

*These are more questions about your cough and shortness of breath <u>these days</u>.*

For each statement please check (✔) *the box* that applies to you *these days*:

| | True | False |
|---|---|---|
| Coughing hurts | ☐ | ☐ |
| Coughing makes me tired | ☐ | ☐ |
| I am short of breath when I talk | ☐ | ☐ |
| I am short of breath when I bend over | ☐ | ☐ |
| My coughing or breathing disturbs my sleep | ☐ | ☐ |
| I get exhausted easily | ☐ | ☐ |

**Section 4**

*These are questions about other effects that your respiratory problems may have on you <u>these days</u>.*

For each statement, please check (✔) *the box* that applies to you *these days*:

| | True | False |
|---|---|---|
| My cough or breathing is embarrassing in public | ☐ | ☐ |
| My respiratory problems are a nuisance to my family, friends or neighbors | ☐ | ☐ |
| I get afraid or panic when I cannot catch my breath | ☐ | ☐ |
| I feel that I am not in control of my respiratory problems | ☐ | ☐ |
| I do not expect my respiratory problems to get any better | ☐ | ☐ |
| I have become frail or an invalid because of my respiratory problems | ☐ | ☐ |
| Exercise is not safe for me | ☐ | ☐ |
| Everything seems too much of an effort | ☐ | ☐ |

**Section 5**

*These are questions about your respiratory treatment.  If you are not receiving treatment go to section 6.*

For each statement, please check (✔) *the box* that applies to you *these days*:

| | True | False |
|---|---|---|
| My treatment does not help me very much | ☐ | ☐ |
| I get embarrassed using my medication in public | ☐ | ☐ |
| I have unpleasant side effects from my medication | ☐ | ☐ |
| My treatment interferes with my life a lot | ☐ | ☐ |

**USA / US English version**                    4

*continued…*

DA0773                                LIQ_PH-ILD_00000393

# St. George's Respiratory Questionnaire
## PART 2

**Section 6**

***These are questions about how your activities might be affected by your respiratory problems.***

For each statement, please check (✔)
***the box*** that applies to you
***because of your respiratory problems***:

|  | True | False |
|---|:---:|:---:|
| I take a long time to get washed or dressed | ☐ | ☐ |
| I cannot take a bath or shower, or I take a long time to do it | ☐ | ☐ |
| I walk slower than other people my age, or I stop to rest | ☐ | ☐ |
| Jobs such as household chores take a long time, or I have to stop to rest | ☐ | ☐ |
| If I walk up one flight of stairs, I have to go slowly or stop | ☐ | ☐ |
| If I hurry or walk fast, I have to stop or slow down | ☐ | ☐ |
| My breathing makes it difficult to do things such as walk up hills, carry things up stairs, light gardening such as weeding, dance, bowl or play golf | ☐ | ☐ |
| My breathing makes it difficult to do things such as carry heavy loads, dig in the garden or shovel snow, jog or walk briskly (5 miles per hour), play tennis or swim | ☐ | ☐ |
| My breathing makes it difficult to do things such as very heavy manual work, ride a bike, run, swim fast, or play competitive sports | ☐ | ☐ |

**Section 7**

***We would like to know how your respiratory problems <u>usually</u> affect your daily life.***

For each statement, please check (✔)
***the box*** that applies to you ***because of
your respiratory problems***:

|  | True | False |
|---|:---:|:---:|
| I cannot play sports or do other physical activities | ☐ | ☐ |
| I cannot go out for entertainment or recreation | ☐ | ☐ |
| I cannot go out of the house to do the shopping | ☐ | ☐ |
| I cannot do household chores | ☐ | ☐ |
| I cannot move far from my bed or chair | ☐ | ☐ |

**USA / US English version**                    5

*continued…*

# St. George's Respiratory Questionnaire

*Here is a list of other activities that your respiratory problems may prevent you from doing. (You do not have to check these, they are just to remind you of ways your shortness of breath may affect you):*

Going for walks or walking the dog

Doing activities or chores at home or in the garden

Sexual intercourse

Going to a place of worship, or a place of entertainment

Going out in bad weather or into smoky rooms

Visiting family or friends or playing with children

Please write in any other important activities that your respiratory problems may stop you from doing:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Now please check the box (one only) that you think best describes how your respiratory problems affect you:

It does not stop me from doing anything I would like to do ☐

It stops me from doing one or two things I would like to do ☐

It stops me from doing most of the things I would like to do ☐

It stops me from doing everything I would like to do ☐

*Thank you for completing this questionnaire. Before you finish would you please make sure that you have answered all the questions.*

f:\institut\cultadap\project\gsk1881\question\final versions\sgrqusaq.doc 18/04/03

**LIQ_PH-ILD_00000395**

# Summary of Changes

# Protocol - RIN-PH-201

Amendment 1 - 20November2015

Amendment 2 -  13September2016

Amendment 3 (Final Protocol) -  15February2017

**LIQ_PH-ILD_00000396**

**Original Protocol (21 October 2015)**

**Amendment 1 (20 November 2015):**

- Correction for diffusing capacity method to calculate DLCO

- Clarified the language in exclusion criteria 1

- Minor clarifying administrative text added throughout.

**Amendment 2 (13 September 2016):**

- Addition of exploratory optional evaluation of whole genome sequencing

- Time period for meeting inclusion (3 and 4) and exclusion criteria (8, 9 and 15) relative to baseline updated

- Change in definition for exacerbation of underlying lung disease

- Increased number of planned study sites

- Changed to screening urine pregnancy test

- Revised method to calculate DLCO for eligibility

- Revised to exclude background PAH therapies

- Clarifying administrative text added throughout.

**Amendment 3 (15 February 2017):**

- Eligibility criteria were updated to streamline and broaden entry to address slow study enrollment.

- Removed upper age limit

- Revised eligibility to broad ILD requirement for pulmonary hypertension

- Revised right heart catheterization criteria

- Remove DLCO eligibility criteria

- Revised criteria for time period for stable doses of nintedinab and pirefenidone relative to baseline

- Included subjects with Group 3 connective tissue disease with FVC < 70% requirement

- Modified Exclusion criteria 4, 5, 9, 10, 13 and 14 to broaden patient population in alignment with clinical practice

- Added exclusion for acute pulmonary embolism within 90 days of randomization

- Clarifying administrative text added throughout.

LIQ_PH-ILD_00000397

# Original Statistical Analysis Plan - RIN-PH-201

# 27February 2019

LIQ_PH-ILD_00000398

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
**Inhaled Treprostinil**

| | | | |
|---|---|---|---|
| **Document Type:** | Statistical Analysis Plan | **Protocol / Study No.:** | RIN-PH-201 |
| **First Draft Date:** | 10 APR 2018 | **Total Number of** | 39 |
| **Finalization Date:** | 27 FEB 2019 | **Pages including** | |
| | | **Appendices:** | |
| **Classification:** | Confidential | **Version:** | 2.0 |

**Title:**

A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease

**Author:** ████████████████████████

**CONFIDENTIAL AND PROPRIETARY, UNITED THERAPEUTICS CORPORATION**

All content contained herein is confidential and proprietary information of United Therapeutics Corporation and shall not be disclosed in whole or in part except as permitted by a signed contract with United Therapeutics Corporation. © 2019 United Therapeutics Corporation

Case 1:23-cv-00975-RGA-SRF  Document 71  Filed 04/19/24  Page 787 of 1048 PageID #: 5295

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan
                                                        Inhaled Treprostinil

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. 2

Table of In-Text Tables ................................................................................................. 3

ABBREVIATIONS AND DEFINITIONS ....................................................................... 4

1   PREFACE ................................................................................................................ 6

2   STUDY OBJECTIVES AND ENDPOINTS ............................................................ 6

2.1   PRIMARY ENDPOINT ........................................................................................ 6

2.2   SECONDARY ENDPOINTS ................................................................................. 6

2.3   EXPLORATORY ENDPOINTS ............................................................................ 6

2.4   SAFETY ENDPOINTS ......................................................................................... 7

3   STUDY DESIGN ..................................................................................................... 7

4   SEQUENCE OF PLANNED ANALYSES ............................................................... 8

5   SAMPLE SIZE CONSIDERATIONS ...................................................................... 9

6   ANALYSIS POPULATIONS ................................................................................... 9

7   INTERIM ANALYSES ........................................................................................... 10

8   GENERAL CONSIDERATIONS FOR DATA ANALYSES .................................. 10

8.1   COVARIATES .................................................................................................... 11

8.2   EXAMINATION OF SUBGROUPS .................................................................... 11

8.3   PREMATURE DISCONTINUATION AND MISSING DATA ............................ 12

8.3.1   Missing Data Handling for 6MWD ................................................................. 12

8.3.2   Missing Data Handling for Other Efficacy Assessments ................................ 13

8.4   MULTIPLE COMPARISONS AND MULTIPLICITY ....................................... 13

8.5   DERIVED AND TRANSFORMED DATA .......................................................... 14

8.6   ASSESSMENT WINDOWS ................................................................................ 15

9   STUDY POPULATION .......................................................................................... 17

9.1   SUBJECT ACCOUNTABILITY ......................................................................... 17

9.2   PROTOCOL DEVIATIONS ................................................................................ 18

9.3   OTHER DESCRIPTIONS OF STUDY POPULATION ...................................... 18

9.3.1   Demographics ................................................................................................. 18

9.3.2   Baseline Characteristics ................................................................................. 19

9.3.3   Medical History and PH-ILD History ............................................................. 19

9.3.4   Concomitant Medications .............................................................................. 19

10   EFFICACY ANALYSES ........................................................................................ 20

10.1   PRIMARY EFFICACY MEASURES ................................................................ 20

10.1.1   Primary Efficacy Analyses ........................................................................... 20

10.1.1.1   Hypothesis ................................................................................................. 20

10.1.1.2   Primary Efficacy Analysis ......................................................................... 20

10.1.1.3   Sensitivity and Subgroup Analyses ........................................................... 23

10.2   SECONDARY EFFICACY MEASURES .......................................................... 24

DA0780                                                          LIQ_PH-ILD_00000400

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan
                                                        Inhaled Treprostinil

10.2.1   Change in Peak 6MWD at Week 12 ................................................... 24
10.2.2   Change in NT-proBNP at Week 16 ................................................... 24
10.2.3   Change in Trough 6MWD at Week 15 .............................................. 25
10.3   EXPLORATORY EFFICACY MEASURES ............................................ 26
10.3.1   Change in Peak 6MWD at Weeks 4 and 8 ...................................... 26
10.3.2   Change in SGRQ at Week 16 .......................................................... 26
10.3.3   Time to Clinical Worsening ............................................................. 27
10.3.4   Change in DSP ................................................................................. 28
11  HEALTH OUTCOMES ............................................................................ 29
11.1   QUALITY OF LIFE MEASURES ........................................................ 29
11.2   RESOURCE UTILIZATION MEASURES ............................................ 29
12  SAFETY ANALYSES ............................................................................... 29
12.1   EXTENT OF EXPOSURE ................................................................... 29
12.2   ADVERSE EVENTS ........................................................................... 30
12.3   OXYGENATION ................................................................................ 31
12.4   PULMONARY FUNCTION TESTS ..................................................... 32
12.5   CLINICAL LABORATORY EVALUATIONS ....................................... 32
12.5.1   Clinical Chemistry .......................................................................... 32
12.5.2   Hematology ...................................................................................... 33
12.5.3   Pregnancy Test ................................................................................ 34
12.6   OTHER SAFETY MEASURES ........................................................... 34
12.6.1   Electrocardiograms ......................................................................... 34
12.6.2   Hospitalizations ............................................................................... 34
12.6.3   Vital Signs ....................................................................................... 34
12.6.4   Exacerbations of Underlying Lung Disease .................................... 35
13  PHARMACOKINETICS ........................................................................... 35
14  REFERENCES ......................................................................................... 35
15  LIST OF TABLES, LISTINGS AND FIGURES ......................................... 36
15.1   LIST OF TABLES .............................................................................. 36
15.2   LIST OF LISTINGS ........................................................................... 38
15.3   LIST OF FIGURES ............................................................................ 39

**Table of In-Text Tables**

Table 8-1   Imputation Rules for Peak 6MWD ............................................... 12
Table 8-2   Imputation Rules for Trough 6MWD ............................................ 13
Table 8-3   Derivation of Time to Clinical Worsening .................................... 14
Table 8-4   Assessment Windows for Scheduled Visits ................................... 16

United Therapeutics Corp.                          RIN-PH-201 Statistical Analysis Plan
                                                              Inhaled Treprostinil

**ABBREVIATIONS AND DEFINITIONS**

| | |
|---|---|
| 6MWD | 6-Minute Walk Distance |
| 6MWT | 6-Minute Walk Test |
| AE | Adverse event |
| ANCOVA | Analysis of covariance |
| BMI | Body mass index |
| BOCF | Baseline Observation Carried Forward |
| CHP | Chronic Hypersensitivity Pneumonitis |
| CPFE | Combined Pulmonary Fibrosis and Emphysema |
| CSR | Clinical study report |
| CT | Computed Tomography |
| CTD | Connective tissue disease |
| DLCO | Lung diffusion capacity |
| DMC | Data Monitoring Committee |
| DSP | Distance saturation product |
| ECG | Electrocardiogram |
| eCRF | Electronic Case Report Form |
| ET | Early termination |
| $FEV_1$ | Forced expiratory volume in 1 second |
| FVC | Forced vital capacity |
| HR | Heart rate |
| ICF | Informed consent form |
| IIP | Idiopathic interstitial pneumonia |
| ILD | Interstitial lung disease |
| ITT | Intent-to-treat |
| LOCF | Last observation carried forward |
| LRCF | Last rank carried forward |
| MedDRA | Medical Dictionary for Regulatory Activities |
| MMRM | Mixed model repeated measurement |
| NT-proBNP | N-Terminal pro-brain natriuretic peptide |
| PAPm | Pulmonary artery pressure mean |
| PCWP | Pulmonary capillary wedge pressure |
| PFT | Pulmonary function test |
| PH | Pulmonary hypertension |
| PH-ILD | Pulmonary hypertension associated with interstitial lung disease |

**Version 27 FEB 2019**                    **Confidential**                    **Page 4**

LIQ_PH-ILD_00000402

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
                                                              **Inhaled Treprostinil**

| | |
|---|---|
| P-R | Time between P wave and beginning of QRS complex in electrocardiography |
| PT | Preferred Term |
| PVR | Pulmonary vascular resistance |
| Q-T | Electrocardiographic interval from beginning of QRS complex to end of the T wave |
| QTc | QT interval corrected for heart rate |
| QRS | Electrocardiographic wave interval |
| RHC | Right heart catheterization |
| RMST | Restricted mean survival time |
| SAE | Serious adverse event |
| SAP | Statistical analysis plan |
| SGRQ | St. George's Respiratory Questionnaire |
| SOC | System Organ Class |
| SpO$_2$ | Saturation of Peripheral Capillary Oxygenation |
| TLC | Total lung capacity |
| WHO-DD | World Health Organization Drug Dictionary |
| WU | Wood Units |

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
                                                  **Inhaled Treprostinil**

## 1      PREFACE

This plan provides further details of the planned analyses for the RIN-PH-201 study as presented in the study protocol.  This plan, based on the original RIN-PH-201 study protocol dated 21 Oct 2015 and the subsequent study protocol amendments (latest version study protocol amendment 3 dated 15 February 2017), provides further details of the planned analyses stated in the study protocol as well as any additional planned analyses.  Additional post hoc or unplanned analyses that are not defined in this statistical analysis plan (SAP) may be performed.  Such analyses will be documented in the clinical study report (CSR).

## 2      STUDY OBJECTIVES AND ENDPOINTS

The primary objective of this study is to evaluate the safety and efficacy of inhaled treprostinil in subjects with Pulmonary Hypertension (PH) associated with Interstitial Lung Disease (ILD), including Combined Pulmonary Fibrosis and Emphysema (CPFE).

### 2.1      PRIMARY ENDPOINT

The primary endpoint is the change in 6-Minute Walk Distance (6MWD) measured at peak exposure from Baseline to Week 16.

### 2.2      SECONDARY ENDPOINTS

The secondary endpoints are:

1.  Change in peak 6MWD from Baseline to Week 12
2.  Change in plasma concentration of N-terminal pro-brain natriuretic peptide (NT-proBNP) from Baseline to Week 16
3.  Change in trough 6MWD from Baseline to Week 15

### 2.3      EXPLORATORY ENDPOINTS

Exploratory endpoints are:

1.  Change in peak 6MWD from Baseline to Week 4
2.  Change in peak 6MWD from Baseline to Week 8
3.  Change in quality of life as measured by the St. George's Respiratory Questionnaire (SGRQ) from Baseline to Week 16
4.  Time to clinical worsening will be evaluated as an exploratory endpoint from the time to randomization until 1 of the following criteria are met:

**Version 27 FEB 2019**              **Confidential**                    **Page 6**

LIQ_PH-ILD_00000404

United Therapeutics Corp.
RIN-PH-201 Statistical Analysis Plan
Inhaled Treprostinil

    a. Hospitalization due to a cardiopulmonary indication
    b. Decrease in 6MWD >15% from Baseline directly related to disease under study, at 2 consecutive visits, and at least 24 hours apart
    c. Death (all causes)
    d. Lung transplantation
5. Change in distance saturation product (DSP) from Baseline to Week 16

Exploratory endpoints of optional evaluation are change in biomarkers from Baseline to Week 16, and optional evaluation of whole genome sequence. They will be specified in separate documents and not covered in this statistical analysis plan.

## 2.4    SAFETY ENDPOINTS

Safety endpoints will be used to evaluate safety based on the following assessments:

1. Adverse events (AEs)
2. Oxygenation:
    a. Pulse oximetry (saturation of peripheral capillary oxygenation [SpO2])
    b. Supplemental oxygen requirement (L/min)
3. Pulmonary function:
    a. Forced expiratory volume in 1 second (FEV1)
    b. Forced vital capacity (FVC)
    c. Total lung capacity (TLC)
    d. Lung diffusion capacity (DLCO)
4. Clinical laboratory parameters
5. Vital signs
6. Electrocardiograms (ECG)
7. Hospitalization due to a cardiopulmonary indication.
8. Exacerbations of underlying lung disease; defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality.

## 3    STUDY DESIGN

This is a multicenter, randomized, double-blinded, placebo-controlled, 16-week, parallel group study. Subject eligibility will be based on the inclusion and exclusion criteria described in Section 4 of the protocol. Approximately 314 eligible subjects will be randomized to study

LIQ_PH-ILD_00000405

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan
                                                     Inhaled Treprostinil

treatments (inhaled treprostinil or placebo) in a 1:1 ratio.  Subjects will be stratified based on
Baseline 6MWD (≤350 meters versus >350 meters).

Subjects will be treated with either inhaled treprostinil (6 mcg/breath) or placebo.

The study will consist of the following phases:

**Screening Phase:** Prospective subjects will undergo a screening evaluation within
30 days prior to the Baseline Visit (randomization and first dose of study drug).
During this phase, eligible subjects will sign the informed consent form (ICF) and
undergo Screening assessments.  The Screening and Baseline assessments may be
combined if all entry criteria are satisfied within 48 hours prior to the first dose of
study drug.  Baseline pulmonary function tests (PFTs) and 6-Minute Walk Test
(6MWT) used to confirm eligibility criteria may be performed on the same day but
prior to the first dose of study drug.

**Baseline Visit:** The Baseline assessments may be conducted over a 48-hour period prior
to the first dose of study drug to allow for scheduling of all activities.  Eligible
subjects will undergo Baseline assessments, be assigned to a treatment group based on
the randomization schedule, and receive the first dose of study drug (Day 1 is defined
as the day the first dose of study drug is given).  The Screening and Baseline
assessments may be combined if all entry criteria are satisfied within 48 hours prior to
the first dose of study drug.  Baseline PFTs and 6MWT used to confirm eligibility
criteria may be performed on the same day but prior to the first dose of study drug.

**Treatment Phase:** The Treatment phase consists of 5 study visits to the clinic at Week 4,
Week 8, Week 12, Week 15, and Week 16 (final study visit; at least 24 hours after the
Week 15 Visit [final study visit/early termination {ET}]).  Subjects will also be
contacted at least weekly by telephone or email to assess subject tolerance to study
drug, AEs, and changes to concomitant medications.

# 4    SEQUENCE OF PLANNED ANALYSES

*Interim Safety Analyses*

Interim safety analyses are intended to be performed according to the Data Monitoring
Committee (DMC) Charter.  In particular, interim safety analyses are planned following the
enrollment of approximately 25%, 50%, and 75% of subjects in the study, or at least annually
(whichever is sooner).  All analyses will be prepared by an independent external consultant and
reviewed only by the independent DMC as defined in the DMC Charter.  The Sponsor will
only have access to the blinded study data during this process.  Interim efficacy analyses are
not planned in this study.

United Therapeutics Corp.                     RIN-PH-201 Statistical Analysis Plan
                                                           Inhaled Treprostinil

*Dry-run Analysis Prior to Database Lock (Soft Lock)*

At the completion of the study enrollment and prior to the database lock, a dry-run analysis is planned.  This dry-run analysis utilizes a dummy randomization schedule in a blinded fashion. The purpose of the dry-run analysis is to verify programming of the analysis data sets and the planned tables, listings, and figures, and to identify any data issues.  Programming and data issues identified through the dry-run process will be resolved prior to the database lock and study unblinding.

*Final Analysis after Database Lock and Study Unblinding*

After the database has been quality assured and locked, the treatment assignments will be provided to the sponsor's project statistician by the central randomization service and all planned analyses described in this document will be performed.  By intent, no changes will be made to the clinical database after unblinding.  However, any changes that are deemed necessary, after unblinding, will be clearly documented in the CSR.

## 5    SAMPLE SIZE CONSIDERATIONS

Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (2-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline to Week 16 in 6MWD, assuming a standard deviation of 75 meters.

The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%.

## 6    ANALYSIS POPULATIONS

The Intent-to-Treat (ITT) population is defined as all subjects randomized into the study who received at least 1 dose of study drug.  All ITT subjects will be counted in the group to which they were randomized, regardless of the study drug they were given.  All efficacy analyses will be performed on this ITT population, unless otherwise specified.

United Therapeutics Corp.                      **RIN-PH-201 Statistical Analysis Plan**
                                                            **Inhaled Treprostinil**

The Safety population is defined as all subjects enrolled into the study who received at least 1 dose of study drug. All Safety population subjects will be counted in the group corresponding to the study drug received, regardless of randomized assignment. All safety analyses will be performed on this Safety population, unless otherwise specified.

The Per-protocol population will include all subjects in ITT population, excluding subjects with major protocol deviations that may have an impact on the primary efficacy analyses. The major protocol deviations and the subject's exclusion from the Per-protocol population will be reviewed at a blinded data review meeting and documented prior to the database lock and the study unblinding.

## 7      INTERIM ANALYSES

There is no interim efficacy analysis for this study.

A DMC will be established for the study including physicians knowledgeable in the treatment of PH and a statistician. Throughout the course of the study the DMC will meet on a regular basis to monitor the safety of the study. Meetings will occur as outlined in the DMC Charter. All analyses will be prepared by an independent external consultant and reviewed only by the DMC as defined in the DMC Charter. The Sponsor will only have access to blinded study data during this process. The details regarding the interim safety analysis will be included in a separate statistical analysis plan.

## 8      GENERAL CONSIDERATIONS FOR DATA ANALYSES

All the data collected in the electronic Case Report Form (eCRF) will be listed. In general, listings will be sorted by treatment group, subject number, and scheduled assessment (if applicable). Listings will include assessment date, assessment time (if available), study day, and all relevant data collected in the eCRFs. For data collected on a fixed schedule, the assessment identifier or the nominal time point will also be included on the listing. Repeat or redundant observations within an assessment window and observations that do not fall within any predefined assessment window (and will, therefore, be excluded from summaries) will be flagged in these listings. Subjects who are not to be included in the analysis population (eg, Safety population, Per-protocol population) will be flagged.

**United Therapeutics Corp.**                     **RIN-PH-201 Statistical Analysis Plan**
**Inhaled Treprostinil**

In general, the data will be summarized by scheduled assessment (if applicable) within each treatment group. For continuous variables, summary statistics will include the mean, standard deviation, median, minimum, and maximum. For summaries of non-normal data such as 6MWD, interquartile range (lower quartile, upper quartile) may also be included. Minimums and maximums will be expressed using the level of precision in which the variable was collected. All other statistics will be rounded, using an additional decimal place than was collected. For discrete variables, summaries will include the frequency and percentage in each category. Percentages will be rounded to 1 decimal place. For all inferential analyses and descriptive comparisons, p-values will be rounded to 4 decimal places. Values less than 0.0001 will be denoted as <0.0001, and values greater than 0.9999 will be denoted as >0.9999 whenever practical, categories of discrete variables will be ordered and labelled as they appear in the eCRF, and all categories represented on the case report form will be included in summaries, even when they do not apply to any subjects in the study.

Unless otherwise specified, all statistical tests will be 2-sided at alpha level 0.05. All statistical calculations will be completed using SAS® Version 9.4 or above.

## 8.1    COVARIATES

The primary efficacy analyses of change in 6MWD at Week 16 will be adjusted for Baseline 6MWD (as a continuous variable). For sensitivity analyses of the primary efficacy endpoints and the secondary/exploratory endpoints with continuous variables, the baseline measure will always be the covariate.

## 8.2    EXAMINATION OF SUBGROUPS

For primary efficacy endpoints of change in 6MWD at Week 16, subgroup analyses will be performed. These subgroups will include:

- Etiology of ILD (Idiopathic Interstitial Pneumonia [IIP], Chronic Hypersensitivity Pneumonitis [CHP], Occupational, CPFE, Connective Tissue Disease [CTD], and Other)
- Baseline walk categories (≤350 meters versus >350 meters, ≤ median baseline 6MWD versus > median baseline 6MWD)
- ILD disease severity as measured by Baseline DLCO (<40% predicted versus ≥40% predicted)

**Version 27 FEB 2019**                **Confidential**                **Page 11**

                        LIQ_PH-ILD_00000409

United Therapeutics Corp.                                    RIN-PH-201 Statistical Analysis Plan
                                                                         Inhaled Treprostinil

- Sex (male versus female)
- Pulmonary Vascular Resistance (PVR) (<4 versus ≥4 Wood Units [WU])
- Age group (<65 years of age, 65 to <80 years of age, and ≥80 years of age)
- Study drug dose at Week 16 (0 to 3 breaths, 4 to 6 breaths, 7 to 9 breaths, and 10 to 12 breaths)

No Type 1 error adjustments will be performed for these subgroup analyses.

## 8.3    PREMATURE DISCONTINUATION AND MISSING DATA

### 8.3.1      Missing Data Handling for 6MWD

For the analysis of 6MWD, subjects may not have completed the treatment with study drug prior to the Week 16 visit for the following reasons: death, progressive disease, AE, withdrawal of consent by the subject, protocol violation, loss to follow-up, termination of study by the sponsor, or withdrawal for other reasons.  Every attempt must be made to perform all efficacy assessments immediately prior to premature termination of study drug or withdrawal from the study.  In addition, subjects still receiving study drug may be too critically ill to perform the 6MWT, resulting in missing data for that assessment.

Every effort should be made to complete all scheduled study assessments for all randomized subjects.  Although attempts will be made to continue to collect data after termination of study drug, these data are being collected for sensitivity analyses and descriptive purposes only.  Assessments performed after treatment unblinding or more than 24 hours after the last dose of study drug will not be included in the main analyses of peak 6MWD.

For subjects whose peak 6MWD measures at Week 4, Week 8, Week 12, or Week 16 are missing, the missing value will be imputed as described in Table 8-1.

**Table 8-1      Imputation Rules for Peak 6MWD**

| Reason for missing 6MWD measure | Imputation |
|---|---|
| Death (all causes) | Worst score (0 meters) |
| Clinical worsening event | Worst score (0 meters) |
| Too ill to perform 6MWT | Worst score (0 meters) |
| All other reasons | Last (peak) Observation Carried Forward (LOCF) |

Abbreviations: 6MWD, 6-Minute Walk Distance; 6MWT, 6-Minute Walk Test.

LIQ_PH-ILD_00000410

For subjects whose trough 6MWD measures at Week 15 are missing, the missing values will be imputed as described in Table 8-2.

**Table 8-2      Imputation Rules for Trough 6MWD**

| Reason for missing 6MWD measure | Imputation |
|---|---|
| Death (all causes) | Worst score (0 meters) |
| Clinical worsening | Worst score (0 meters) |
| Too ill to perform 6MWT | Worst score (0 meters) |
| All other reasons | Baseline Observation Carried Forward (BOCF) |

Abbreviations: 6MWD, 6-Minute Walk Distance; 6MWT, 6-Minute Walk Test, BOCF, Baseline observation carried forward.

### 8.3.2      Missing Data Handling for Other Efficacy Assessments

For the secondary endpoints of NT-proBNP, the missing value at Week 16 will be imputed using LOCF.  If the NT-proBNP measure at Baseline is missing, the change from Baseline will not be calculated.  The subject will not be included in the analyses.

For exploratory endpoints of SGRQ, biomarkers, and DSP, the missing values will not be imputed, and all analyses will be based on the observed cases.

### 8.4      MULTIPLE COMPARISONS AND MULTIPLICITY

The primary efficacy endpoint of change in 6MWD measured at peak exposure from Baseline to Week 16 will be tested at alpha level 0.05.  If the primary efficacy endpoint is statistically significant at alpha level 0.05, the statistical tests for secondary efficacy endpoints will be performed.

To control the Type 1 error rate, the secondary efficacy endpoints will be tested using a hierarchical (fixed-sequence) testing procedure.  The change from Baseline in peak 6MWD at Week 12 will be tested at a 2-sided Type 1 error rate of 0.05.  The subsequent tests for change from Baseline in NT-proBNP at Week 16, and then the change from Baseline in trough 6MWD at Week 15, will be tested sequentially only if the preceding test is statistically significant.

LIQ_PH-ILD_00000411

United Therapeutics Corp.

RIN-PH-201 Statistical Analysis Plan
Inhaled Treprostinil

## 8.5     DERIVED AND TRANSFORMED DATA

Time to clinical worsening will be evaluated as an exploratory endpoint from the time to randomization until 1 of the following criteria are met:

- Hospitalization due to a cardiopulmonary indication
- Decrease in 6MWD >15% from Baseline directly related to disease under study at 2 consecutive visits and at least 24 hours apart
- Death (all causes)
- Lung transplantation

Time to clinical worsening is calculated as described in Table 8-3.

**Table 8-3     Derivation of Time to Clinical Worsening**

| Parameter | Scenario | Formula | Status |
|---|---|---|---|
| Time to clinical worsening (weeks) | Subjects with clinical worsening event reported | = (Worsening date – Randomization date +1)/7 | 0 (event) |
| | Subjects who died during the study | = (Death date – Randomization date +1)/7 | 0 (event) |
| | Subjects without clinical worsening event during the study | = (Last assessment date – Randomization date +1)/7 | 1 (censored) |
| | Subjects discontinued from the study prematurely | = (Last assessment date – Randomization date +1)/7 | 1 (censored) |

For subjects with clinical worsening due to decrease from Baseline in 6MWD, a confirmatory 6MWT should be conducted.  The event time is based on the date of the confirmatory 6MWT. If the confirmatory 6MWT is not conducted, the event time is then based on the date of the first 6MWT.

LIQ_PH-ILD_00000412

United Therapeutics Corp.                    **RIN-PH-201 Statistical Analysis Plan**
                                                        **Inhaled Treprostinil**

Distance Saturation Product (DSP) is calculated as follows:

| Parameter | Formula |
|---|---|
| DSP (m%) | = (Distance walked in meters) x (Lowest oxygen saturation recorded during the 6MWT) |

Abbreviations: 6MWT, 6-Minute Walk Test; DSP, Distance Saturation Product.

Adjustments to the QT intervals will be calculated as follows:

| Parameter | Formula |
|---|---|
| QTc (Bazett) | $= Q\text{-}T/\sqrt{60/HR}$ |
| QTc (Fridericia) | $= Q\text{-}T/\sqrt[3]{60/HR}$ |

Abbreviations: HR, Heart rate; QTc, Q-T interval corrected for heart rate; Q-T, Electrocardiographic interval from beginning of QRS complex to end of the T wave.

## 8.6    ASSESSMENT WINDOWS

For any data summarized by scheduled visit, an analysis visit window will be used.  The scheduled visits, as recorded on the eCRFs, and the corresponding target days and study day intervals are specified in Table 8-4.  The analysis visit window will be derived based on the information specified in Table 8-4.

In the protocol, the visit window for Week 4, Week 8, Week 12, and Week 16 is ±5 days and the visit window for the Week 15 visit is ±5 days and at least 24 hours prior to Week 16 6MWT.  In order to allow slotting of discontinuation visits and visits outside the planned schedule, the visit windows have been expanded for analysis purposes for Week 4, Week 8, Week 12, and Week 16.  The nominal study visit identified as Week 15 in the eCRF will be used for the Week 15 visit provided it is at least 24 hours prior to Week 16 6MWT or there is no Week 16 visit.

LIQ_PH-ILD_00000413

United Therapeutics Corp.

RIN-PH-201 Statistical Analysis Plan
Inhaled Treprostinil

**Table 8-4      Assessment Windows for Scheduled Visits**

| Visit | Target Study Day | Study Day Interval |
|---|---|---|
| **ECGs, SGRQ:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the date of the first dose) |
| Week 16 | 113 | 1 < Study Day |
| **PFTs, Clinical laboratory assessments and NT-proBNP:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the first dose) |
| Week 8 | 57 | 1 < Study Day ≤ 71 |
| Week 16 | 113 | 99 < Study Day |
| **Peak 6MWT:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the first dose) |
| Week 4 | 29 | 1 < Study Day ≤ 43 |
| Week 8 | 57 | 43 < Study Day ≤ 71 |
| Week 12 | 85 | 71 < Study Day ≤ 99 |
| Week 16 | 113 | 99 < Study Day |
| **Trough 6MWT:** | | |
| Week 15 | 106 | Nominal study visit and at least 24 hours prior to Week 16 6MWT or no Week 16 visit |
| **Vital signs, Pulse oximetry:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the first dose) |
| Week 4 | 29 | 1 < Study Day ≤ 43 |
| Week 8 | 57 | 43 < Study Day ≤ 71 |
| Week 12 | 85 | 71 < Study Day ≤ 99 |
| Week 15 | 106 | Nominal study visit and at least 24 hours prior to Week 16 6MWT or no Week 16 visit |
| Week 16 | 113 | 99 < Study Day |

Note: Study Day = (Assessment Date) − (First Dosing Date) +1
Abbreviations: 6MWT, 6-Minute Walk Test; ECG, Electrocardiogram; NT-proBNP, N-Terminal pro-brain natriuretic peptide; PFT, Pulmonary function test.

**Multiple Evaluations within the Same Analysis Window**

After all the observations have been slotted based on the table above, if there are multiple valid observations for an assessment within an assigned analysis visit window, only 1 of these observations will be used for summary statistics and analyses.  The observation to be used is determined using the following hierarchy (in decreasing order):

**United Therapeutics Corp.**

**RIN-PH-201 Statistical Analysis Plan**
**Inhaled Treprostinil**

- The observation closest to the target study day
- The later observation if 2 observations are equally close to the target study day

For missing values where the LOCF algorithm is applied, it is always the last valid observation on treatment carried forward, even though this might not be the observation obtained by the above hierarchy and used in the summaries by visit window.

# 9    STUDY POPULATION

Unless otherwise specified, all efficacy analyses will be performed on the ITT population and all safety analyses will be based on the Safety population.  In the ITT population, the treatment assignment is based on the assignment upon randomization.  In the Safety population, the treatment assignment is based on the actual treatment the subject received.

The comparability between the 2 treatment groups will be checked for demographic and baseline characteristics.  The p-values from Fisher's exact test (for discrete variables) or Group t-test or Wilcoxon rank sum test (for continuous variables) will be included on summaries but are not intended to be used to test formal hypotheses.  For these comparisons, missing or unknown values will be excluded from the calculations.

## 9.1    SUBJECT ACCOUNTABILITY

All subjects' disposition information will be listed by individual subject number, including the analysis population the subjects belong to, premature study drug discontinuation status, primary reason for premature study drug discontinuation, premature study discontinuation status, primary reason for premature study discontinuation, number of days on the study drug, and enrollment in the open label extension study (RIN-PH-202).

The listing of subject accountability will include the dates of informed consent and randomization, the first study drug dose, last study drug dose, and last assessment dates and times, and the last dose and assessment weeks.  Whether subjects received the study drug, whether subjects completed the Weeks 4, 8, 12, 15, 16 assessments, and study discontinuation status will be summarized.

LIQ_PH-ILD_00000415

United Therapeutics Corp.                          RIN-PH-201 Statistical Analysis Plan
                                                                Inhaled Treprostinil

Information regarding whether each subject is included in each analysis population (see Section 6) will be listed.  If a subject is not included in a particular analysis population, the reason for exclusion will be noted on the listing.  Also noted on the listing will be the randomized treatment assignment and the actual treatment subjects have received.  The summary will include the frequency and percentage of all subjects in each analysis population.

The stratification information used in the random assignment of subjects to treatment group (from the central randomization database) will be listed, including date and time of randomization and Baseline 6MWD category (≤350 meters versus >350 meters).  Status of the treatment blind, and if broken, date/time of blind broken will be listed.  The number of subjects in each stratum will be summarized by treatment group and overall.

## 9.2    PROTOCOL DEVIATIONS

The status of the entry criteria will be listed for all subjects.  The listing will include the date of the initial screening assessment, whether all eligibility criteria were met (Yes/No), and a list of any specific entry criteria not met.  This listing will also include the protocol version that the subject was enrolled under.  Entry criteria violations will be summarized by treatment group and overall.

Additional protocol deviations will be documented throughout the study.  All deviations will be reviewed by the clinical team prior to database lock and those that might affect subject safety or efficacy outcomes will be considered 'Major'.  All other deviations will be classified as 'Minor'.  Protocol deviations will be listed, including the date of the deviation, the type of deviation, the severity of the deviation (Major/Minor), and a description of the deviation.  The protocol deviations will also be summarized by treatment group and overall.

## 9.3    OTHER DESCRIPTIONS OF STUDY POPULATION

### 9.3.1    Demographics

All demographic data will be listed for all subjects, including assessment date, date of birth, country, age, sex, ethnicity, race, weight, height, and body mass index (BMI).  Age, age category (<65 years of age, 65 to <80 years of age, and ≥80 years of age), sex, ethnicity, race,

LIQ_PH-ILD_00000416

height, weight, and BMI will be summarized by treatment group and overall.  The summary will include p-values (2-sided) from Fisher's exact test (for age category, sex, ethnicity, and race) and group t-test or Wilcoxon rank sum test (for age, weight, height, and BMI) comparing treatment groups.

### 9.3.2    Baseline Characteristics

Baseline characteristics will include the Baseline 6MWD, Baseline NT-proBNP, and hemodynamic parameters.  Hemodynamic parameters, measured by the right heart catheterization (RHC), will include PVR, pulmonary artery pressure mean (PAPm), pulmonary capillary wedge pressure (PCWP), and details concerning vasodilator testing will be listed and summarized.

### 9.3.3    Medical History and PH-ILD History

All significant past or ongoing medical conditions will be listed for all subjects.  The listing will include the Medical Dictionary for Regulatory Activities (MedDRA) system organ class (SOC) and preferred term (PT) for each condition listed, and whether the condition is ongoing at Randomization.  These medical conditions will be summarized by PT within each SOC.

Information related to subjects' PH-ILD history will be listed.  The listing will include the date of initial PH diagnosis, years since PH diagnosis, etiology of ILD (including IIP subcategory), date of confirmatory computed tomography (CT) scan, whether ILD diagnosis confirmed with a lung biopsy, and if so, the date of lung biopsy.

The current ILD diagnosis (ILD category) and IIP subcategory, time since PH diagnosis, and whether ILD diagnosis was confirmed via lung biopsy will be summarized by treatment group and overall.  The summary will include p-values (2-sided) from Fisher's exact test (for current ILD diagnosis) or Wilcoxon rank sum test (for time since diagnosis) comparing treatment groups.

### 9.3.4    Concomitant Medications

All concomitant medications specified on the eCRF will be mapped to a standard name using the World Health Organization Drug Dictionary (WHO-DD).

LIQ_PH-ILD_00000417

United Therapeutics Corp.                                    RIN-PH-201 Statistical Analysis Plan
                                                                          Inhaled Treprostinil

The standard name and verbatim term of all concomitant medications will be listed for all subjects. This listing will include the date started (or indication that drug was ongoing at randomization), date discontinued (or indication that drug was ongoing at end of study), and the condition(s) treated/indication(s). If a subject received no medications, this will be indicated on the listing. Summary of concomitant medications present at Baseline and summary of concomitant medications added during the study will include the frequency and percentage of subjects in each treatment group receiving each drug (by coded standard name).

## 10      EFFICACY ANALYSES

Except where otherwise noted, all efficacy analyses will only be performed on the ITT population (see Section 6).

### 10.1    PRIMARY EFFICACY MEASURES

#### 10.1.1    *Primary Efficacy Analyses*

#### 10.1.1.1    *Hypothesis*

The primary efficacy endpoint of peak 6MWD assesses if inhaled treprostinil will increase the distance traversed in the peak 6MWT at Week 16 over placebo in subjects with PH-ILD. The null and alternative hypotheses are:

$$H_0: \mu_1 = \mu_2$$
$$H_a: \mu_1 \neq \mu_2,$$

where $\mu_1$ and $\mu_2$ are the median change from Baseline in 6MWD of the inhaled treprostinil and placebo treatment groups, respectively.

#### 10.1.1.2    *Primary Efficacy Analysis*

All 6MWT data will be listed for all subjects. For each scheduled assessment, this listing will include the date test was performed (or date test was intended to be performed if subject is unable to attempt the test), start time of the test, nominal time point, last treatment dose, hours from last treatment dose to 6MWT start, if walk was attempted, total distance walked (in meters), whether subject received oxygen during the test, amount of supplemental oxygen, and any circumstances that adversely affected the walk (if any) including reason for not

LIQ_PH-ILD_00000418

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan
                                                            Inhaled Treprostinil

attempting test (if any).  The trough 6MWT measure will also be indicated.  In addition, a listing of 6MWD with imputed values will be included for both peak and trough 6MWD data.

For the primary efficacy analysis, the effect of inhaled treprostinil versus placebo on change in peak 6MWD at Week 16 will be evaluated via analysis of covariance (ANCOVA).  Change from Baseline in peak 6MWD is the dependent variable, and treatment and Baseline 6MWD are covariates in this ANCOVA model.  Least squares means and standard errors for each treatment group, the least squares mean difference and its standard error, as well as a 95% confidence interval for the treatment group difference and p-value for treatment group comparison will be calculated from the ANCOVA model.  This methodology will be carried out as follows:

1. Walk distances obtained after study drug termination or unblinding will be excluded (as described in Section 8).
2. Imputation rules in Table 8-1 will be applied.
3. The LOCF algorithm will be applied.
4. ANCOVA will be conducted based on the pseudo SAS code:
   proc glm;
     class Treatment;
     model DistC = Treatment Dist0;
   run;

where DistC is the change from Baseline in peak 6MWD at Week 16 and Dist0 is the baseline measure of the 6MWD.

If the ANCOVA assumptions are violated, the primary efficacy analysis will be based on non-parametric analysis of covariance within the framework of the extended Cochran-Mantel-Haenszel test (Koch 1990, Koch 1998, Stokes 2000).  Specifically, a Cochran-Mantel-Haenszel mean score test will be used on the standardized mid-ranks (ie, overall rank divided by the number of ranks +1, or "modified ridit" scores) of the residuals from an ordinary least squares regression with change from Baseline in peak 6MWD at Week 16 as a linear function of distance walked at Baseline (as a continuous variable).  This methodology will be carried out as follows:

LIQ_PH-ILD_00000419

**United Therapeutics Corp.**                                    **RIN-PH-201 Statistical Analysis Plan**
                                                                **Inhaled Treprostinil**

1. Walk distances obtained after study drug termination or unblinding will be excluded (as described in Section 8).

2. Imputation rules in Table 8-1 will be applied.

3. Calculate ranks. The pseudo SAS code is as follows:

   proc rank nplus1 ties=mean out=ranks;
     var DistC Dist0;
   run;

   where DistC is the change from Baseline in peak 6MWD at Week 16 and Dist0 is the baseline measure of the 6MWD.

4. Linear regression model will be fit using the rank values generated above. The pseudo SAS code is as follows:

   proc reg data=ranks noprint;
     model DistC=Dist0;
     output out=residual r=resid;
   run;

   where DistC is the rank value of the change from Baseline in peak 6MWD at Week 16 and Dist0 is the rank value of the baseline measure of the 6MWD.

5. A mean score test, using the values of the residuals as scores, compares the treatment groups. Cochran-Mantel-Haenszel mean score statistic and p-value will be calculated, using the NOPRINT and CMH2 options in the TABLES statement of the FREQ procedure of SAS. The pseudo SAS code is as follows:

   proc freq data=residual;
     tables Treatment*Resid / noprint cmh2;
   run;

   where Treatment indicates the randomized treatment group, and Resid represents the residuals obtained from the above linear regression models.

In addition to the p-value from the non-parametric method described above, the Wilcoxon rank sum test and the Hodges-Lehmann estimate of median difference (as an estimate of location shift between 2 treatment groups for the placebo-controlled treatment effect) will be provided. The Wilcoxon rank sum test and the Hodges-Lehmann estimate can be obtained through the following pseudo SAS code:

```
proc npar1way hl Wilcoxon;
    class treatment;
    var DistC;
run;
```

where DistC is the change from Baseline in peak 6MWD at Week 16.

**Version 27 FEB 2019**                    **Confidential**                    **Page 22**

                    LIQ_PH-ILD_00000420

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
                                                                **Inhaled Treprostinil**

*10.1.1.3    Sensitivity and Subgroup Analyses*

In order to analyze walk distances at each scheduled assessment, values for missing or excluded assessments up to and including Week 16 will be imputed according to rules described in Section 8.3.1.

To further support the robustness and assess the sensitivity of the primary efficacy analysis of change in peak 6MWD at Week 16 (provided that the primary analysis yields significant results), the above non-parametric and parametric analyses and summaries will be repeated using each of the following modifications (as data permit):

- The Per-protocol population will be used instead of the ITT population
- Missing data imputation using the LOCF method (based on peak values)
- Missing data imputation using the last rank carried forward (LRCF) method (based on peak values) (O'Brien 2005)
- Using only the observed values without imputation
- Including data collected after termination of the study drug
- ITT population excluding subjects with a reported exacerbation within 3 days of the Week 16 peak 6MWT measure
- Stratified by ILD etiology categories (IIP, CHP, Occupational, CPFE, and Other)
- Stratified by Baseline 6MWD categories (≤350 meters versus >350 meters, ≤median baseline 6MWD versus > median baseline 6MWD)
- Stratified by Baseline DLCO percent predicted (<40% versus ≥40%)
- Stratified by Baseline pulmonary vascular resistance (PVR) (<4 versus ≥4 WU)
- Stratified by sex (male versus female)
- Stratified by age group (<65 years of age, 65 to <80 years of age, and ≥80 years of age)
- Stratified by study drug dose at Week 16 (0 to 3 breaths, 4 to 6 breaths, 7 to 9 breaths, and 10 to 12 breaths).

A longitudinal data analysis using mixed model repeated measurement (MMRM) will also be performed to estimate the treatment difference in change in peak 6MWD at Week 16. The MMRM will include the change from Baseline in peak 6MWD as the dependent variable, treatment, week, and treatment by week interaction as fixed effects, and Baseline 6MWD as a covariate. An unstructured variance/covariance structure shared across treatment groups will be used to model the within-subject errors.

**Version 27 FEB 2019**                    **Confidential**                    **Page 23**

LIQ_PH-ILD_00000421

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
                                                                 **Inhaled Treprostinil**

An additional sensitivity analysis will be performed for percent change from Baseline to Week 16 in peak 6MWD using the same approach as the primary analysis method where the percent change from Baseline is calculated as

$$\frac{\text{peak 6MWD at Week 16} - \text{Baseline 6MWD}}{\text{Baseline 6MWD}} \times (100\%).$$

In addition, the impact of Baseline hemodynamics and Baseline PFTs, including PVR, PAPm, PCWP, $FEV_1$, FVC, TLC, and DLCO as continuous variables, on peak 6MWD, will be explored using the regression approach.

## 10.2    SECONDARY EFFICACY MEASURES

Secondary efficacy endpoints include the following:

- Change in peak 6MWD from Baseline to Week 12
- Change in plasma concentration of NT-proBNP from Baseline to Week 16
- Change in trough 6MWD from Baseline to Week 15

As specified in Section 8.4 above, the hierarchical (fixed-sequence) testing procedure will be employed to control the overall alpha level at 0.05.

### 10.2.1    *Change in Peak 6MWD at Week 12*

The methodology for primary efficacy analysis of change in peak 6MWD at Week 16 will also be carried out for the Week 12 assessment, as described above in Section 10.1.1.2.

### 10.2.2    *Change in NT-proBNP at Week 16*

The efficacy endpoint of change in NT-proBNP assesses if inhaled treprostinil decreases the level of NT-proBNP at Week 16 over placebo in subjects with PH-ILD.  The null and alternative hypotheses are:

$$H_0: \mu_1 = \mu_2$$
$$H_a: \mu_1 \neq \mu_2,$$

where $\mu_1$ and $\mu_2$ are the median change from Baseline to Week 16 in NT-proBNP of the inhaled treprostinil and placebo treatment groups, respectively.

**Version 27 FEB 2019**                    **Confidential**                    **Page 24**

LIQ_PH-ILD_00000422

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan
                                                      Inhaled Treprostinil

The NT-proBNP values will be listed for all subjects, including the nominal time point, collection date/time, normal range and "High/Low" flag.  The values and their respective changes from Baseline will be summarized for each assessment.  The difference between treatment groups for the change from Baseline to Week 16 will be tested using the analysis of covariance with change from Baseline in NT-proBNP as the dependent variable, treatment as the fixed effect, and Baseline NT-proBNP as the covariate.  The pseudo SAS code is as follows:

```
proc glm;
    class treatment;
    model BNP_C=Treatment BNP_B;
run;
```

where BNP_C is the change from Baseline to Week 16 in NT-proBNP and BNP_B is the NT-proBNP at Baseline.

If assumptions (normality and equal variance) for the parametric test are violated, the nonparametric Wilcoxon rank-sum test will be used.  For subjects who do not have NT-proBNP measurements at Week 16, the LOCF imputation will be used.  The analyses will also be performed for the data without imputation for the missing measures.

As an exploratory analysis, the NT-proBNP at Week 8 will be analysed using the same method as the NT-proBNP at Week 16.

### 10.2.3    Change in Trough 6MWD at Week 15

The methodology for primary efficacy analysis of change in peak 6MWD described in Section 10.1.1.2 will also be carried out for the change in trough 6MWD from Baseline to Week 15.  Missing trough 6MWD will be imputed as described in Table 8-2 in Section 8.3.1.  The analysis will be repeated to include only subjects with trough 6MWD at Week 15 (ie, missing trough 6MWD at Week 15 is not imputed).

LIQ_PH-ILD_00000423

United Therapeutics Corp.                                RIN-PH-201 Statistical Analysis Plan
                                                                        Inhaled Treprostinil

## 10.3    EXPLORATORY EFFICACY MEASURES

Exploratory efficacy endpoints include the following parameters:

- Change in peak 6MWD from Baseline to Week 4
- Change in peak 6MWD from Baseline to Week 8
- Change in quality of life as measured by SGRQ from Baseline to Week 16
- Time to clinical worsening will be evaluated as an exploratory endpoint from the time to randomization until 1 of the following criteria are met:
    a.  Hospitalization due to a cardiopulmonary indication
    b.  Decrease in 6MWD >15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
    c.  Death (all causes)
    d.  Lung transplantation
- Change in DSP from Baseline to Week 16

### 10.3.1    Change in Peak 6MWD at Weeks 4 and 8

The methodology for primary efficacy analysis of change in peak 6MWD described in Section 10.1.1.2 will also be carried out for the assessments obtained at Week 4 and Week 8.

### 10.3.2    Change in SGRQ at Week 16

The responses to the SGRQ questionnaire at Baseline and Week 16 will be converted to the Total score and 3 domain scores according to the SGRQ manual (Jones 2002).  Scores for Total and each domain will range from 0 to 100, with higher scores indicating more limitations.  Both individual item responses as well as calculated scores will be listed.  The change from Baseline for the Total and 3 domain scores (Symptoms, Activity, and Impacts) will be calculated.

The Total score and for the 3 domain scores as well as their changes from Baseline will be summarized by treatment group using descriptive statistics.

For the Total score and each of the 3 domain scores, treatment differences (inhaled treprostinil vs. placebo) will be tested by using analysis of covariance with change from Baseline as the dependent variable, treatment as a fixed effect, and baseline score as the covariate.  The analyses will be based on the observed data with no imputation.

The pseudo SAS code is as follows:

```
proc glm;
   class treatment;
   model Score_C=Treatment Score_B;
run;
```

where Score_C is the change from Baseline in Total score or each of the 3 domain scores and Score_B is the corresponding score at Baseline.

### 10.3.3   Time to Clinical Worsening

- Data on the clinical worsening assessment page of the eCRF will be used to determine clinical worsening status.  Investigator-reported clinical worsening events including the date (study day) of the event, category of the clinical worsening event, Baseline 6MWD, first 6MWT details, and second 6MWT details will be listed.  The time to clinical worsening will be calculated according to the rules described in Table 8-3 in Section 8.5.

The number and percentage of subjects with any clinical worsening and with each category of clinical worsening will be summarized by treatment group.  Time to clinical worsening will be summarized by treatment group using product-limit estimates calculated by the Kaplan-Meier method and displayed graphically as Kaplan-Meier curves.  A tabular summary of this analysis will include the number of subjects at risk (sample size), estimated median duration, and a 95% confidence interval for the median duration for each treatment group.  The log-rank test, adjusted for Baseline 6MWD category, will be used to calculate the p-value for treatment differences in the ITT population.

The SAS Procedure LIFETEST will be used.  The pseudo SAS statements are listed below:

```
proc lifetest;
   time TimeToWorsening*Censor_Status(1);
   strata B_6MWD / group = Treatment test=all;
run;
```

where B_6MWD denotes the categorical Baseline 6MWD variable (≤350 meters versus >350 meters).

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
                                                          **Inhaled Treprostinil**

In addition, the Cox proportional hazards model will be fit to obtain the hazard ratio and its associated 95% confidence interval.  The model will include treatment and Baseline 6MWD as explanatory variables.  The SAS procedure PHREG will be used.  The pseudo SAS statements are listed below:

```
proc phreg;
   class Treatment;
   model TimeToWorsening*Censor_Status(1) = Treatment Dist0
           / risklimits alpha=0.05 ties=efron;
   assess var=Dist0 ph;
run;
```

where Dist0 denotes the Baseline 6MWD variable (continuous).  If it is determined that the proportional hazards assumption does not hold for Baseline 6MWD, a stratified analysis will be conducted.  The above SAS code will be amended to remove Dist0 from the model statement and add the 'strata B_6MWD;' statement.

If the proportional hazards assumption does not hold for the Cox model, the restricted mean survival time (RMST) and its associated standard error will be calculated for each treatment group at Week 16 (Royston 2013).  A 95% confidence interval will be constructed for the difference in RMST between the 2 treatment groups at Week 16.

### 10.3.4    Change in DSP

The DSP will be calculated, and DSP results will be included in the data listing for pulse oximetry.  DSP values and their respective changes from Baseline to Week 16 will be summarized by treatment group.  The difference between treatment groups for the change from Baseline to Week 16 will be tested using analysis of covariance with change from Baseline in DSP as the dependent variable, treatment as a fixed effect, and Baseline DSP measure as the covariate.  The analyses will be based on the observed data with no imputation.

LIQ_PH-ILD_00000426

**United Therapeutics Corp.**          **RIN-PH-201 Statistical Analysis Plan**
                                              **Inhaled Treprostinil**

The pseudo SAS code is as follows:

```
proc glm;
  class treatment;
  model DSP_C=Treatment DSP_B;
run;
```

where DSP_C is the change from Baseline to Week 16 in DSP (m%) and DSP_B is DSP at Baseline.

In addition, the DSP at Week 4, Week 8, and Week 12 will each be analyzed in the same way as the DSP at Week 16.

## 11      HEALTH OUTCOMES

### 11.1    QUALITY OF LIFE MEASURES

Quality of life was assessed using SGRQ.  The analyses of SGRQ are described in Section 10.3.2.

### 11.2    RESOURCE UTILIZATION MEASURES

Hospitalizations and hospitalizations related to cardiopulmonary indications are collected during the study.  The analysis is discussed in Section 12.6.2.

## 12      SAFETY ANALYSES

All safety analyses will be performed only on the Safety population (see Section 6).

### 12.1    EXTENT OF EXPOSURE

All study drug dosing will be listed for all subjects.  The listing will include initial dose (number of breaths for each session and number of breaths for the day) and date of this initial dose and dose and date of each subsequent dose change.  Dosing at Weeks 4, 8, 12, 15, and 16 will be summarized for subjects still receiving study drug at each of these assessments.  The summary will include both the numeric summaries and the categorical summaries for number of breaths per session as well as the number of breaths per day.  If study drug is dosed differently across different sessions on the same day, the maximum number of breaths is used for summarization.  Summary of overall duration of exposure will be included as well as the

LIQ_PH-ILD_00000427

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
                                                              **Inhaled Treprostinil**

final dose (breath/session) and the maximum study drug dose (breath/session) reached for each subject (numerically and categorically).

For study treatment compliance, the number and percentage of days with dose >0 breaths will be calculated and summarized.

## 12.2   ADVERSE EVENTS

All AEs will be coded to the appropriate PT and SOC using MedDRA.  AEs will be listed by treatment group including all details recorded on the eCRF plus an indicator of whether the event was treatment-emergent.  The AE listings will include the AE verbatim term and its corresponding PT and SOC.

The AE summaries will be limited to include only treatment-emergent AEs.  Treatment-emergent AEs are those AEs with onset date equal to or after the start date of the study drug. The non-treatment-emergent AEs (the AEs occur after signing the informed consent form but before receiving study drug) will be listed but not included in summary tables.

All summaries will include the number and percentage of subjects experiencing each type of adverse event and the total number of each type of adverse event, in order of overall frequency and/or SOC.  Serious adverse events (SAE) and non-serious AEs will also be summarized by SOC and PT.

The total number of AEs and the AE rates will be calculated and summarized for each display, as appropriate.  The AE rate will be calculated as the total number of AEs divided by the total patient years of exposure to study drug per treatment group.

Adverse events possibly or probably related to study drug will be summarized.  An AE summary by severity (mild, moderate, and severe) will also be provided.

Separate listings and summary tables will be provided for all SAEs, AEs leading to the discontinuation of study drug, and all deaths during the study (if data permit).  For listing of deaths, information for all subjects who die during the study period from the randomization to the end of study (including 30 days after the last study treatment dosing) will be included.

LIQ_PH-ILD_00000428

United Therapeutics Corp.

RIN-PH-201 Statistical Analysis Plan
Inhaled Treprostinil

## 12.3   OXYGENATION

Oxygenation is measured by pulse oximetry ($SpO_2$ and supplemental oxygen requirement [L/min]) during each 6MWT.  At each 6MWT, pulse oximetry (for $SpO_2$) will be measured at pre-walk, during walk, and post-walk.  During walk, the lowest $SpO_2$ will be recorded.  All pulse oximetry results along with the collection date/time (study day) will be listed.  Heart rate will be listed for pre-walk and post-walk only.

The $SpO_2$ will be summarized by treatment group, visit, and time point (pre-walk, during walk, and post-walk).  The summary will be provided for the original values, change from pre-walk for each visit, and change from baseline values.  For change from Baseline calculations, the measurements pre-walk, during walk, and post walk at post-Baseline Visits will be compared with the measurements at corresponding pre-walk, during walk, and post-walk at Baseline.

In addition, for each time point at each visit, the number and percentage of subjects with $SpO_2$ or lowest $SpO_2$ <80%, ≥80 to <88, and ≥88%, and with $SpO_2$ dropping ≥10% during walk and/or post-walk from pre-walk will be summarized by treatment group.

At each visit, supplemental oxygen requirements will be collected at rest and during 6MWT. These data will be listed, including visit, 6MWT date/time, and oxygen use at rest and during walk.  The number and percentage of subjects requiring supplemental oxygen use at rest and during the 6MWT will also be summarized by the treatment group.  Supplemental oxygen level at rest at each visit and the corresponding changes from Baseline will be summarized by treatment group.

Heart rate will be summarized by treatment group, by time point (pre-walk and post-walk) and visit.  The summary will be provided for the original values, change from pre-walk for each visit, and change from baseline values.  For change from baseline calculations, the measurements pre-walk and post-walk at post-Baseline Visits will be compared with the measurements at corresponding pre-walk and post-walk at Baseline.

LIQ_PH-ILD_00000429

United Therapeutics Corp.                          RIN-PH-201 Statistical Analysis Plan
                                                              Inhaled Treprostinil

## 12.4   PULMONARY FUNCTION TESTS

The PFT parameters include:

- Forced expiratory volume in 1 second ($FEV_1$)
- Forced vital capacity (FVC)
- Total lung capacity (TLC)
- Lung diffusion capacity (DLCO)

Only pre-bronchodilator values will be recorded on eCRF and will be listed.  All PFT parameters and their change from baseline values will be summarized by treatment group and visit.

For $FEV_1$ results, the number and percentage of subjects with $FEV_1$ decreasing more than 20% from Baseline at any post-Baseline Visit will be summarized by treatment group.

## 12.5   CLINICAL LABORATORY EVALUATIONS

Blood samples will be taken at Screening and/or Baseline, Week 8, and Week 16.  All samples will be sent to a central laboratory for evaluation of clinical chemistry and hematology.

### 12.5.1   Clinical Chemistry

The following clinical chemistry parameters will be evaluated by the central laboratory:

| Parameter | Units |
|---|---|
| Sodium | mmol/L |
| Potassium | mmol/L |
| Bicarbonate | mmol/L |
| Chloride | mmol/L |
| Total bilirubin | umol/dL |
| Alkaline phosphatase | U/L |
| Alanine aminotrasferase | U/L |
| Aspartate aminotransferase | U/L |
| Urea nitrogen | mmol/dL |
| Creatinine | umol/L |
| Calcium | mmol/L |
| Albumin | g/L |

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan
                                                          Inhaled Treprostinil

Values that are "High" or "Low" with respect to the reference range provided by the central laboratory will be flagged with an "H" or an "L," respectively.  All parameters will be listed for all subjects and assessments, along with their respective "High/Low" flags.

Values of these parameters at each visit, and their corresponding changes from Baseline will be descriptively summarized by treatment group.

For each parameter, the frequency and percentage of subjects within each treatment group who had "Low," "Normal," or "High" Baseline values, then subsequently had "Low," "Normal," or "High" follow-up values at each visit will be presented in a shift summary.

### 12.5.2    *Hematology*

The following hematology parameters will be evaluated by the central laboratory:

| Parameter | Units |
|---|---|
| Hemoglobin | g/dL |
| Hematocrit | % |
| Red blood cell count | $10^6$/uL |
| Red blood cell morphology |  |
| White blood cell count | $10^3$/uL |
| Platelet count | $10^3$/uL |

Values that are "High" or "Low" with respect to the reference range provided by the central laboratory will be flagged with an "H" or an "L," respectively.  All parameters will be listed for all subjects and assessments, along with their respective "High/Low" flags.

Numeric values of these parameters at each visit and their corresponding changes from Baseline will be summarized by treatment group.

For each parameter, the frequency and percentage of subjects within each treatment group who have "Low," "Normal," or "High" Baseline values, then subsequently have "Low," "Normal," or "High" follow-up values at each assessment will be presented in a shift summary.

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan**
                                                              **Inhaled Treprostinil**

### 12.5.3    Pregnancy Test

Females of childbearing potential will undergo a urine pregnancy test at Screening followed by urine pregnancy tests at Baseline and every subsequent scheduled study visit.  All pregnancy tests will be performed at study sites.  Pregnancy status during the study will be listed.

## 12.6    OTHER SAFETY MEASURES

### 12.6.1    Electrocardiograms

All ECG assessments will be listed for all subjects.  This listing will include the heart rate, the ECG interval from the beginning of QRS complex to end of the T wave (Q-T interval), the QT interval corrected for heart rate (QTc) (calculated using formulas by both Bazett and Fridericia as described in Section 8.4), the time between P wave and beginning of QRS complex in ECG (P-R interval), the electrocardiographic wave (QRS) duration, ECG results (Normal/Abnormal), whether there were clinically significant changes from Screening visit, whether abnormalities were present, and details and comments on any abnormalities.  The ECG results at Baseline and changes at Week 16 will be descriptively summarized by treatment group.  In addition, for QTc intervals calculated using both the Bazett and Fridericia methods, the number and percent of subjects with values $\geq 500$ msec and the number and percent of subjects with changes from Screening of <30 msec, 30 to <60 msec, and $\geq 60$ msec will be presented.  Additionally, each abnormality will be summarized by number and percentage of subjects reporting at each visit by treatment group.

### 12.6.2    Hospitalizations

Details for all hospitalizations will be listed.  Number of hospitalizations for cardiopulmonary indications and total duration of hospitalization for cardiopulmonary indications will be summarized for each treatment group as well as overall number of hospitalizations and total duration regardless of indication.

### 12.6.3    Vital Signs

All vital sign assessments will be listed for all subjects.  This listing will include height, weight, body mass index (BMI), heart rate, systolic and diastolic blood pressures, respiratory

LIQ_PH-ILD_00000432

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan
                                                       Inhaled Treprostinil

rate, and temperature.  The vital sign results at each assessment and changes for each post-Baseline assessment will be descriptively summarized by treatment group.

### 12.6.4    *Exacerbations of Underlying Lung Disease*

Exacerbation of underlying lung disease is defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality. Number of subjects with exacerbation of underlying lung disease will be summarized for each treatment group and included in the overall AE summary table.  A listing of these events will also be provided.

## 13    PHARMACOKINETICS

No pharmacokinetic measures will be assessed in this study.

## 14    REFERENCES

Jones PW.  Interpreting thresholds for a clinically significant change in health status in asthma and COPD.  *Eur Respiratory J.*  2002;19:398–404.

Koch GG, Carr GJ, Amara IA, et al.  Categorical data analysis.  In Berry DA ed. *Statistical Methodology in the Pharmaceutical Sciences.*  New York, NY: Marcel Dekker Inc.; 1990:391–475.

Koch GG, Tangen CM, Jung JW, et al.  Issues for covariance analysis of dichotomous and ordered categorical data from randomized clinical trials and non-parametric strategies for addressing them.  *Stat Med.*  1998;17(15-16):1863–1892.

O'Brien PC, Zhang D, Bailey KR. Semi-parametric and non-parametric methods for clinical trials with incomplete data.  *Statist. Med.*  2005;24:341–358.

Royston P, Parmar MKB.  Restricted mean survival time: an alternative to the hazard ratio for the design and analysis of randomized trials with a time-to-event outcome.  *BMC Medical Research Methodology*  2013;13:152.

Stokes ME, Davis CS, Koch GG.  *Categorical Data Analysis Using the SAS System.*  2nd Edition.  Cary, NC: SAS Institute Inc.; 2000.

United Therapeutics Corp.

RIN-PH-201 Statistical Analysis Plan
Inhaled Treprostinil

## 15    LIST OF TABLES, LISTINGS AND FIGURES

### 15.1    LIST OF TABLES

| Table Number | Table Title |
|---|---|
| 14.1.1 | Summary of Subject Accountability |
| 14.1.2 | Summary of Analysis Population Information |
| 14.1.3 | Summary of Demographic Data |
| 14.1.4 | Summary of Baseline Characteristics |
| 14.1.5 | Summary of PH-ILD History |
| 14.1.6.1 | Summary of Entry Criteria Violations |
| 14.1.6.2 | Summary of Protocol Deviations |
| 14.1.7 | Summary of Randomization Information |
| 14.1.8 | Summary of Medical History |
| 14.1.9 | Summary of Concomitant Medications Ongoing at Baseline |
| 14.1.10 | Summary of Concomitant Medications Added During the Study |
| 14.1.11 | Summary of Study Drug Dosing and Exposure |
| 14.1.12 | Summary of Study Drug Treatment Compliance |
| 14.2.1.1 | Summary and Analysis of Peak 6MWD (meter) at Week 16 – Primary Efficacy Endpoint |
| 14.2.1.2 | Summary and Analysis of Peak 6MWD (meter) at Week 16 – Per Protocol Population |
| 14.2.1.3 | Summary and Analysis of Peak 6MWD (meter) at Week 16 with LOCF Imputation for Missing Data |
| 14.2.1.4 | Summary and Analysis of Peak 6MWD (meter) at Week 16 with LRCF Imputation for Missing Data |
| 14.2.1.5 | Summary and Analysis of Peak 6MWD (meter) at Week 16 with No Imputation for Missing Data |
| 14.2.1.6 | Summary and Analysis of Peak 6MWD (meter) at Week 16 Including Data Collected after Termination of Study Drug |
| 14.2.1.7 | Summary and Analysis of Peak 6MWD (meter) at Week 16 Excluding Subjects with a Reported Exacerbation within 3 Days of the Week 16 6MWD Measure |
| 14.2.1.8 | Analysis of Peak 6MWD (meter) at Week 16 Using Mixed Model Repeated Measurement (MMRM) |
| 14.2.1.9 | Summary and Analysis of Percent Change from Baseline to Week 16 in Peak 6MWD |
| 14.2.1.10 | Summary and Analysis of Peak 6-Minute Walk Distance (meter) at Week 16 by ILD Etiology Category |
| 14.2.1.11.1 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline 6MWD Category (≤350 meters versus >350 meters) |
| 14.2.1.11.2 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline 6MWD Category (≤baseline median meters versus>baseline median meters) |

Version 27 FEB 2019                    Confidential                    Page 36

United Therapeutics Corp.

RIN-PH-201 Statistical Analysis Plan
Inhaled Treprostinil

| Table Number | Table Title |
|---|---|
| 14.2.1.12 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline DLCO Percent Predicted |
| 14.2.1.13 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline PVR |
| 14.2.1.14 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Sex |
| 14.2.1.15 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Age Group |
| 14.2.1.16 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Study Drug Dose at Week 16 |
| 14.2.1.17 | Summary of Effects of Baseline Hemodynamics and Baseline PFTs on Peak 6MWD by Week |
| 14.2.2.1 | Summary and Analysis of Peak 6MWD (meter) at Week 12 – Secondary Efficacy Endpoint |
| 14.2.2.2 | Summary and Analysis of Peak 6MWD (meter) at Weeks 4 and 8 |
| 14.2.3.1 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 16 – Secondary Efficacy Endpoint |
| 14.2.3.2 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 16 – with Observed Case |
| 14.2.3.3 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 8 |
| 14.2.3.4 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 8 with Observed Case |
| 14.2.4.1 | Summary and Analysis of Trough 6MWD (meter) at Week 15 – Secondary Efficacy Endpoint |
| 14.2.4.2 | Summary and Analysis of Trough 6MWD (meter) at Week 15 with Observed Case |
| 14.2.5.1 | Summary and Analysis of Clinical Worsening Events |
| 14.2.5.2 | Summary of Hospitalization Information |
| 14.2.6.1 | Summary and Analysis of SGRQ Total Score |
| 14.2.6.2 | Summary and Analysis of SGRQ Symptoms Score |
| 14.2.6.3 | Summary and Analysis of SGRQ Activity Score |
| 14.2.6.4 | Summary and Analysis of SGRQ Impacts Score |
| 14.2.7 | Summary and Analysis of Distance Saturation Product (DSP) (m%) |
| 14.3.1.1 | Overall Summary of Adverse Events and Exacerbations of Underlying Lung Diseases |
| 14.3.1.2 | Summary of Adverse Events by System Organ Class and Preferred Term |
| 14.3.1.3 | Summary of Adverse Events by Preferred Term |
| 14.3.1.4 | Summary of Deaths |
| 14.3.1.5 | Summary of Serious Adverse Events by System Organ Class and Preferred Term |
| 14.3.1.6 | Summary of Non-Serious Adverse Events by System Organ Class and Preferred Term |
| 14.3.1.7 | Summary of Adverse Events Probably or Possibly Related to Study Drug by System Organ Class and Preferred Term |

Version 27 FEB 2019                    Confidential                    Page 37

LIQ_PH-ILD_00000435

**United Therapeutics Corp.**

**RIN-PH-201 Statistical Analysis Plan**
**Inhaled Treprostinil**

| Table Number | Table Title |
|---|---|
| 14.3.1.8 | Summary of Adverse Events Leading to Permanent Discontinuation of Study Drug by Preferred Term |
| 14.3.1.9 | Summary of Adverse Events by System Organ Class, Preferred Term, and Severity |
| 14.3.1.10 | Summary of Adverse Events by Study Drug Dose at AE Onset |
| 14.3.2.1 | List of Deaths |
| 14.3.2.2 | List of Serious Adverse Events |
| 14.3.4.1 | Summary of SpO2 (%) Measured by Pulse Oximetry |
| 14.3.4.2 | Categorical Summary of SpO2 (%) Measured by Pulse Oximetry |
| 14.3.4.3 | Summary of Heart Rate (beats/min) by Pulse Oximetry |
| 14.3.4.4 | Summary of Supplemental Oxygen Use |
| 14.3.4.5 | Summary of Supplemental Oxygen (L/min) |
| 14.3.4.6 | Summary of Pulmonary Function Test Results |
| 14.3.4.7 | Summary of Subjects with ≥20% Decrease in FEV1 from Baseline |
| 14.3.4.8.1 | Summary of Laboratory Data – Clinical Chemistry |
| 14.3.4.8.2 | Summary of Clinical Chemistry Shift from Baseline |
| 14.3.4.8.3 | Summary of Laboratory Data – Hematology |
| 14.3.4.8.4 | Summary of Hematology Shift from Baseline |
| 14.3.4.9 | Summary of Vital Signs |
| 14.3.4.10.1 | Summary of Electrocardiogram Parameters |
| 14.3.4.10.2 | Summary of Electrocardiogram Categorical Results |

## 15.2   LIST OF LISTINGS

| Listing Number | Listing Title |
|---|---|
| 16.2.1.1 | Subject Dispositions |
| 16.2.1.2 | Subject Accountability |
| 16.2.2 | Protocol Deviations |
| 16.2.3.1 | Subject Randomization |
| 16.2.3.2 | Analysis Population Information |
| 16.2.3.3 | Entry Criteria |
| 16.2.4.1 | Demographics |
| 16.2.4.2 | PH-ILD History |
| 16.2.4.3 | Medical History |
| 16.2.4.4 | Concomitant Medications |
| 16.2.5 | Study Drug Dosing |
| 16.2.6.1 | 6-Minute Walk Test |
| 16.2.6.2 | 6MWT Information with Imputed Data – Peak 6MWD |
| 16.2.6.3 | 6MWT Information with Imputed Data – Trough 6MWD |
| 16.2.6.4 | Plasma NT-proBNP (pg/mL) |

**Version 27 FEB 2019**              **Confidential**              **Page 38**

**LIQ_PH-ILD_00000436**

**United Therapeutics Corp.**

**RIN-PH-201 Statistical Analysis Plan**
**Inhaled Treprostinil**

| Listing Number | Listing Title |
|---|---|
| 16.2.6.5 | Clinical Worsening Events |
| 16.2.6.6 | The St. George's Hospital Respiratory Questionnaire |
| 16.2.6.7 | The St. George's Hospital Respiratory Questionnaire Score by Domain |
| 16.2.6.8 | Hospitalizations |
| 16.2.6.9 | Death Records |
| 16.2.6.10 | RHC and Hemodynamic Measures |
| 16.2.7.1 | Adverse Events |
| 16.2.7.2 | Serious Adverse Events |
| 16.2.7.3 | Adverse Events Leading to Discontinuation of Study Drug |
| 16.2.7.4 | Exacerbations of Underlying Lung Disease |
| 16.2.8.1 | Pulse Oximetry and DSP |
| 16.2.8.2 | Supplemental Oxygen |
| 16.2.8.3 | Pulmonary Function Test Results |
| 16.2.8.4 | Laboratory Results – Clinical Chemistry |
| 16.2.8.5 | Laboratory Results – Hematology |
| 16.2.8.6 | Pregnancy Status |
| 16.2.8.7 | Vital Signs |
| 16.2.8.8 | ECG Results |

## 15.3   LIST OF FIGURES

| Figure Number | Figure Title |
|---|---|
| 14.2.1 | Mean Change from Baseline in Peak 6MWD (meter) by Visit |
| 14.2.2 | Mean Change from Baseline in Peak 6MWD (meter) at Week 16 by Inhaled Treprostinil Dose at Week 16 |
| 14.2.3 | Forest Plot on Subgroup Analyses of Peak 6MWD (meter) at Week 16 |
| 14.2.4 | Kaplan-Meier Plot of Time to Clinical Worsening Events |

# Final Statistical Analysis Plan - RIN-PH-201

# 12December 2019

**LIQ_PH-ILD_00000438**

**United Therapeutics Corp.**          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

| | | | |
|---|---|---|---|
| **Document Type:** | Statistical Analysis Plan Amendment 1 | **Protocol / Study No.:** | RIN-PH-201 |
| **Finalization Date:** | 12 DEC 2019 | **Total Number of Pages including Appendices:** | 40 |
| **Classification:** | Confidential | **Version:** | 2.0 |

**Title:**

A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease

**Author:** ███████████

**CONFIDENTIAL AND PROPRIETARY, UNITED THERAPEUTICS CORPORATION**

All content contained herein is confidential and proprietary information of United Therapeutics Corporation and shall not be disclosed in whole or in part except as permitted by a signed contract with United Therapeutics Corporation.

© 2019 United Therapeutics Corporation

United Therapeutics Corp.          RIN-PH-201 Statistical Analysis Plan Amendment 1
                                                      Inhaled Treprostinil

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... 2

Table of In-Text Tables ..................................................................................................... 3

ABBREVIATIONS AND DEFINITIONS ......................................................................... 4

1   PREFACE ...................................................................................................................... 6

1.1   CHANGES FROM PROTOCOL-SPECIFIED ANALYSES ................................. 6

2   STUDY OBJECTIVES AND ENDPOINTS ............................................................... 6

2.1   PRIMARY ENDPOINT ............................................................................................ 6

2.2   SECONDARY ENDPOINTS .................................................................................... 6

2.3   EXPLORATORY ENDPOINTS ............................................................................... 7

2.4   SAFETY ENDPOINTS .............................................................................................. 7

3   STUDY DESIGN ........................................................................................................... 8

4   SEQUENCE OF PLANNED ANALYSES .................................................................. 9

5   SAMPLE SIZE CONSIDERATIONS ......................................................................... 9

6   ANALYSIS POPULATIONS ...................................................................................... 10

7   INTERIM ANALYSES ............................................................................................... 10

8   GENERAL CONSIDERATIONS FOR DATA ANALYSES ................................... 11

8.1   COVARIATES .......................................................................................................... 11

8.2   EXAMINATION OF SUBGROUPS ...................................................................... 12

8.3   PREMATURE DISCONTINUATION AND MISSING DATA ............................ 12

8.3.1   Missing Data Handling for 6MWD .................................................................... 12

8.3.2   Missing Data Handling for Other Efficacy Assessments ................................. 13

8.4   MULTIPLE COMPARISONS AND MULTIPLICITY ....................................... 13

8.5   DERIVED AND TRANSFORMED DATA ............................................................ 14

8.6   ASSESSMENT WINDOWS ................................................................................... 16

9   STUDY POPULATION .............................................................................................. 17

9.1   SUBJECT ACCOUNTABILITY ........................................................................... 18

9.2   PROTOCOL DEVIATIONS ................................................................................... 19

9.3   OTHER DESCRIPTIONS OF STUDY POPULATION ...................................... 19

9.3.1   Demographics ...................................................................................................... 19

9.3.2   Baseline Characteristics .................................................................................... 19

9.3.3   Medical History and PH-ILD History ............................................................... 20

9.3.4   Concomitant Medications ................................................................................... 20

10   EFFICACY ANALYSES .......................................................................................... 21

10.1   PRIMARY EFFICACY MEASURES .................................................................. 21

10.1.1   Primary Efficacy Analyses .............................................................................. 21

10.1.1.1   Hypothesis ...................................................................................................... 21

10.1.1.2   Primary Efficacy Analysis ........................................................................... 21

10.1.1.3   Sensitivity and Subgroup Analyses ............................................................. 23

DA0820                                                          LIQ_PH-ILD_00000440

10.2     SECONDARY EFFICACY MEASURES.........................................................25
10.2.1     Change in NT-proBNP at Week 16.................................................25
10.2.2     Time to Clinical Worsening.............................................................27
10.2.3     Change in Peak 6MWD at Week 12...............................................28
10.2.4     Change in Trough 6MWD at Week 15............................................28
10.3     EXPLORATORY EFFICACY MEASURES....................................................29
10.3.1     Change in Peak 6MWD at Weeks 4 and 8......................................29
10.3.2     Change in SGRQ at Week 16...........................................................29
10.3.3     Change in DSP..................................................................................30
11  HEALTH OUTCOMES...................................................................................30
11.1     QUALITY OF LIFE MEASURES...................................................................30
11.2     RESOURCE UTILIZATION MEASURES.....................................................30
12  SAFETY ANALYSES.....................................................................................31
12.1     EXTENT OF EXPOSURE................................................................................31
12.2     ADVERSE EVENTS........................................................................................31
12.3     OXYGENATION..............................................................................................32
12.4     PULMONARY FUNCTION TESTS................................................................33
12.5     CLINICAL LABORATORY EVALUATIONS................................................33
12.5.1     Clinical Chemistry..........................................................................34
12.5.2     Hematology.......................................................................................34
12.5.3     Pregnancy Test.................................................................................35
12.6     OTHER SAFETY MEASURES.......................................................................35
12.6.1     Electrocardiograms..........................................................................35
12.6.2     Hospitalizations................................................................................36
12.6.3     Vital Signs.........................................................................................36
12.6.4     Exacerbations of Underlying Lung Disease...................................36
13  PHARMACOKINETICS..............................................................................36
14  REFERENCES................................................................................................37
15  LIST OF TABLES, LISTINGS, AND FIGURES.......................................38
15.1     LIST OF TABLES............................................................................................38
15.2     LIST OF LISTINGS........................................................................................40
15.3     LIST OF FIGURES..........................................................................................41

**Table of In-Text Tables**

Table 8-1     Imputation Rules for Peak 6MWD ...................................................... 13
Table 8-2     Imputation Rules for Trough 6MWD .................................................. 13
Table 8-3     Derivation of Time to Clinical Worsening............................................ 15
Table 8-4     Assessment Windows for Scheduled Visits.......................................... 16

United Therapeutics Corp.          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
                                                                           **Inhaled Treprostinil**

## ABBREVIATIONS AND DEFINITIONS

| | |
|---|---|
| 6MWD | 6-Minute Walk Distance |
| 6MWT | 6-Minute Walk Test |
| AE | Adverse event |
| ANCOVA | Analysis of covariance |
| ATC | Anatomical therapeutic chemical |
| BMI | Body mass index |
| BOCF | Baseline Observation Carried Forward |
| CHP | Chronic Hypersensitivity Pneumonitis |
| CPFE | Combined Pulmonary Fibrosis and Emphysema |
| CSR | Clinical study report |
| CT | Computed Tomography |
| CTD | Connective tissue disease |
| DLCO | Lung diffusion capacity |
| DMC | Data Monitoring Committee |
| DSP | Distance saturation product |
| ECG | Electrocardiogram |
| eCRF | Electronic Case Report Form |
| ET | Early termination |
| $FEV_1$ | Forced expiratory volume in 1 second |
| FVC | Forced vital capacity |
| HR | Heart rate |
| ICF | Informed consent form |
| IIP | Idiopathic interstitial pneumonia |
| ILD | Interstitial lung disease |
| ITT | Intent-to-treat |
| LOCF | Last observation carried forward |
| LRCF | Last rank carried forward |
| MCMC | Markov chain Monte Carlo |
| MedDRA | Medical Dictionary for Regulatory Activities |
| MMRM | Mixed model repeated measurement |
| NT-proBNP | N-Terminal pro-brain natriuretic peptide |
| PAPm | Pulmonary artery pressure mean |
| PCWP | Pulmonary capillary wedge pressure |
| PFT | Pulmonary function test |
| PH | Pulmonary hypertension |

**Version 12 DEC 2019**                      **Confidential**                      **Page 4**

LIQ_PH-ILD_00000442

United Therapeutics Corp.          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
                                                    **Inhaled Treprostinil**

| | |
|---|---|
| PH-ILD | Pulmonary hypertension associated with interstitial lung disease |
| P-R | Time between P wave and beginning of QRS complex in electrocardiography |
| PT | Preferred Term |
| PVR | Pulmonary vascular resistance |
| Q-T | Electrocardiographic interval from beginning of QRS complex to end of the T wave |
| QTc | QT interval corrected for heart rate |
| QRS | Electrocardiographic wave interval |
| RHC | Right heart catheterization |
| RMST | Restricted mean survival time |
| SAE | Serious adverse event |
| SAP | Statistical analysis plan |
| SGRQ | St. George's Respiratory Questionnaire |
| SOC | System Organ Class |
| $SpO_2$ | Saturation of Peripheral Capillary Oxygenation |
| TLC | Total lung capacity |
| WHO | World Health Organization |
| WU | Wood Units |

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan Amendment 1
                                                                          Inhaled Treprostinil

# 1      PREFACE

This plan provides further details of the planned analyses for the RIN-PH-201 study as presented in the study protocol.  This plan, based on the original RIN-PH-201 study protocol dated 21 Oct 2015 and the subsequent study protocol amendments (latest version study protocol amendment 3 dated 15 February 2017), provides further details of the planned analyses stated in the study protocol as well as any additional planned analyses.  Additional post hoc or unplanned analyses that are not defined in this statistical analysis plan (SAP) may be performed.  Such analyses will be documented in the clinical study report (CSR).

## 1.1     CHANGES FROM PROTOCOL-SPECIFIED ANALYSES

The ordering of secondary and exploratory endpoints were re-ordered in the SAP Amendment 1 and differ from the order specified in RIN-PH-201 Protocol Amendment 3.  In the protocol, time to clinical worsening was identified as an exploratory endpoint.  In the SAP Amendment 1 analyses, time to clinical worsening will be analyzed as a secondary endpoint.

# 2      STUDY OBJECTIVES AND ENDPOINTS

The primary objective of this study is to evaluate the safety and efficacy of inhaled treprostinil in subjects with Pulmonary Hypertension (PH) associated with Interstitial Lung Disease (ILD), including Combined Pulmonary Fibrosis and Emphysema (CPFE).

## 2.1     PRIMARY ENDPOINT

The primary endpoint is the change in 6-Minute Walk Distance (6MWD) measured at peak exposure from Baseline to Week 16.

## 2.2     SECONDARY ENDPOINTS

The secondary endpoints are:

1. Change in plasma concentration of N-terminal pro-brain natriuretic peptide (NT-proBNP) from Baseline to Week 16
2. Time to clinical worsening calculated as the time from randomization until 1 of the following criteria are met:
   a. Hospitalization due to a cardiopulmonary indication

LIQ_PH-ILD_00000444

    b. Decrease in 6MWD >15% from Baseline directly related to disease under study, at 2 consecutive visits, and at least 24 hours apart

    c. Death (all causes)

    d. Lung transplantation

3. Change in peak 6MWD from Baseline to Week 12
4. Change in trough 6MWD from Baseline to Week 15

## 2.3   EXPLORATORY ENDPOINTS

Exploratory endpoints are:

1. Change in peak 6MWD from Baseline to Week 4
2. Change in peak 6MWD from Baseline to Week 8
3. Change in quality of life as measured by the St. George's Respiratory Questionnaire (SGRQ) from Baseline to Week 16
4. Change in distance saturation product (DSP) from Baseline to Week 16

Exploratory endpoints of optional evaluation are change in biomarkers from Baseline to Week 16, and optional evaluation of whole genome sequence. They will be specified in separate documents and are not covered in this SAP.

## 2.4   SAFETY ENDPOINTS

Safety endpoints will be used to evaluate safety based on the following assessments:

1. Adverse events (AEs)
2. Oxygenation:
    a. Pulse oximetry (saturation of peripheral capillary oxygenation [SpO2])
    b. Supplemental oxygen requirement (L/min)
3. Pulmonary function:
    a. Forced expiratory volume in 1 second (FEV1)
    b. Forced vital capacity (FVC)
    c. Total lung capacity (TLC)
    d. Lung diffusion capacity (DLCO)
4. Clinical laboratory parameters
5. Vital signs
6. Electrocardiograms (ECG)
7. Hospitalization due to a cardiopulmonary indication.

LIQ_PH-ILD_00000445

**United Therapeutics Corp.**          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
                                                            **Inhaled Treprostinil**

   8.  Exacerbations of underlying lung disease; defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality.

## 3    STUDY DESIGN

This is a multicenter, randomized, double-blinded, placebo-controlled, 16-week, parallel group study.  Subject eligibility will be based on the inclusion and exclusion criteria described in Section 4 of the protocol.  Approximately 314 eligible subjects will be randomized to study treatments (inhaled treprostinil or placebo) in a 1:1 ratio.  Subjects will be stratified based on Baseline 6MWD (≤350 meters versus >350 meters).

Subjects will be treated with either inhaled treprostinil (6 mcg/breath) or placebo.

The study will consist of the following phases:

   **Screening Phase:** Prospective subjects will undergo a screening evaluation within 30 days prior to the Baseline Visit (randomization and first dose of study drug). During this phase, eligible subjects will sign the informed consent form (ICF) and undergo Screening assessments.  The Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug.  Baseline pulmonary function tests (PFTs) and 6-Minute Walk Test (6MWT) used to confirm eligibility criteria may be performed on the same day but prior to the first dose of study drug.

   **Baseline Visit:** The Baseline assessments may be conducted over a 48-hour period prior to the first dose of study drug to allow for scheduling of all activities.  Eligible subjects will undergo Baseline assessments, be assigned to a treatment group based on the randomization schedule, and receive the first dose of study drug (Day 1 is defined as the day the first dose of study drug is given).  The Screening and Baseline assessments may be combined if all entry criteria are satisfied within 48 hours prior to the first dose of study drug.  Baseline PFTs and 6MWT used to confirm eligibility criteria may be performed on the same day but prior to the first dose of study drug.

   **Treatment Phase:** The Treatment phase consists of 5 study visits to the clinic at Week 4, Week 8, Week 12, Week 15, and Week 16 (final study visit; at least 24 hours after the Week 15 Visit [final study visit/early termination {ET}]).  Subjects will also be contacted at least weekly by telephone or email to assess subject tolerance to study drug, AEs, and changes to concomitant medications.

DA0826                                                                                    LIQ_PH-ILD_00000446

## 4    SEQUENCE OF PLANNED ANALYSES

*Interim Safety Analyses*

Interim safety analyses are intended to be performed according to the Data Monitoring Committee (DMC) Charter.  In particular, interim safety analyses are planned following the enrollment of approximately 25%, 50%, and 75% of subjects in the study, or at least annually (whichever is sooner).  All analyses will be prepared by an independent external consultant and reviewed only by the independent DMC as defined in the DMC Charter.  The Sponsor will only have access to the blinded study data during this process.  Interim efficacy analyses are not planned in this study.

*Dry-run Analysis Prior to Database Lock (Soft Lock)*

At the completion of the study enrollment and prior to the database lock, a dry-run analysis is planned.  This dry-run analysis utilizes a dummy randomization schedule in a blinded fashion. The purpose of the dry-run analysis is to verify programming of the analysis data sets and the planned tables, listings, and figures, and to identify any data issues.  Programming and data issues identified through the dry-run process will be resolved prior to the database lock and study unblinding.

*Final Analysis after Database Lock and Study Unblinding*

After the database has been quality assured and locked, the treatment assignments will be provided to the sponsor's project statistician by the central randomization service and all planned analyses described in this document will be performed.  By intent, no changes will be made to the clinical database after unblinding.  However, any changes that are deemed necessary, after unblinding, will be clearly documented in the CSR.

## 5    SAMPLE SIZE CONSIDERATIONS

Using an allocation ratio of 1:1 between inhaled treprostinil and placebo, a sample size of approximately 266 subjects (133 per treatment) would provide at least 90% power at a significance level of 0.05 (2-sided hypothesis) to detect a 30 meter between-treatment difference in the change from Baseline to Week 16 in 6MWD, assuming a standard deviation of 75 meters.

The total sample size will be approximately 314 subjects to account for a discontinuation rate of approximately 15%.

## 6      ANALYSIS POPULATIONS

The Intent-to-Treat (ITT) population is defined as all subjects randomized into the study who received at least 1 dose of study drug.  All ITT subjects will be counted in the group to which they were randomized, regardless of the study drug they were given.  All efficacy analyses will be performed on this ITT population, unless otherwise specified.

The Safety population is defined as all subjects enrolled into the study who received at least 1 dose of study drug.  All Safety population subjects will be counted in the group corresponding to the study drug received, regardless of randomized assignment.  All safety analyses will be performed on this Safety population, unless otherwise specified.

The Per-protocol population will include all subjects in ITT population, excluding subjects with major protocol deviations that may have an impact on the primary efficacy analyses. The major protocol deviations and the subject's exclusion from the Per-protocol population will be reviewed at a blinded data review meeting and documented prior to the database lock and the study unblinding.

## 7      INTERIM ANALYSES

There is no interim efficacy analysis for this study.

A DMC will be established for the study including physicians knowledgeable in the treatment of PH and a statistician.  Throughout the course of the study the DMC will meet on a regular basis to monitor the safety of the study.  Meetings will occur as outlined in the DMC Charter. All analyses will be prepared by an independent external consultant and reviewed only by the DMC as defined in the DMC Charter.  The Sponsor will only have access to blinded study data during this process. The details regarding the interim safety analysis will be included in a separate SAP.

LIQ_PH-ILD_00000448

## 8        GENERAL CONSIDERATIONS FOR DATA ANALYSES

All the data collected in the electronic Case Report Form (eCRF) will be listed.  In general, listings will be sorted by treatment group, subject number, and scheduled assessment (if applicable).  Listings will include assessment date, assessment time (if available), study day, and all relevant data collected in the eCRFs.  For data collected on a fixed schedule, the assessment identifier or the nominal time point will also be included on the listing.  Repeat or redundant observations within an assessment window and observations that do not fall within any predefined assessment window (and will, therefore, be excluded from summaries) will be flagged in these listings.  Subjects who are not to be included in the analysis population (eg, Safety population, Per-protocol population) will be flagged.

In general, the data will be summarized by scheduled assessment (if applicable) within each treatment group.  For continuous variables, summary statistics will include the mean, standard deviation, median, minimum, and maximum.  For summaries of non-normal data such as 6MWD, interquartile range (lower quartile, upper quartile) may also be included.  Minimums and maximums will be expressed using the level of precision in which the variable was collected.  All other statistics will be rounded, using an additional decimal place than was collected.  For discrete variables, summaries will include the frequency and percentage in each category.  Percentages will be rounded to 1 decimal place.  For all inferential analyses and descriptive comparisons, p-values will be rounded to 4 decimal places.  Values less than 0.0001 will be denoted as <0.0001, and values greater than 0.9999 will be denoted as >0.9999 whenever practical, categories of discrete variables will be ordered and labelled as they appear in the eCRF, and all categories represented on the case report form will be included in summaries, even when they do not apply to any subjects in the study.

Unless otherwise specified, all statistical tests will be 2-sided at alpha level 0.05.  All statistical calculations will be completed using SAS® Version 9.4 or above.

## 8.1        COVARIATES

The primary efficacy analyses of change in 6MWD at Week 16 will be adjusted for Baseline 6MWD (as a continuous variable).  For sensitivity analyses of the primary efficacy endpoints

United Therapeutics Corp.                    **RIN-PH-201 Statistical Analysis Plan Amendment 1**
                                                              **Inhaled Treprostinil**

and the secondary/exploratory endpoints with continuous variables, the baseline measure will always be the covariate.

## 8.2    EXAMINATION OF SUBGROUPS

For primary efficacy endpoints of change in 6MWD at Week 16, subgroup analyses will be performed. These subgroups will include:

- Etiology of ILD (Idiopathic Interstitial Pneumonia [IIP], Chronic Hypersensitivity Pneumonitis [CHP], Occupational, CPFE, Connective Tissue Disease [CTD], and Other)
- Baseline walk categories (≤350 meters versus >350 meters, ≤ median baseline 6MWD versus > median baseline 6MWD)
- ILD disease severity as measured by Baseline DLCO (<40% predicted versus ≥40% predicted)
- Sex (male versus female)
- Pulmonary Vascular Resistance (PVR) (<4 versus ≥4 Wood Units [WU])
- Age group (<65 years of age, 65 to <80 years of age, and ≥80 years of age)
- Study drug dose at Week 16 (0 to 3 breaths, 4 to 6 breaths, 7 to 9 breaths, and 10 to 12 breaths)

No Type 1 error adjustments will be performed for these subgroup analyses.

## 8.3    PREMATURE DISCONTINUATION AND MISSING DATA

### 8.3.1    *Missing Data Handling for 6MWD*

For the analysis of 6MWD, subjects may not have completed the treatment with study drug prior to the Week 16 visit for the following reasons: death, progressive disease, AE, withdrawal of consent by the subject, protocol violation, loss to follow-up, termination of study by the sponsor, or withdrawal for other reasons.  Every attempt must be made to perform all efficacy assessments immediately prior to premature termination of study drug or withdrawal from the study.  In addition, subjects still receiving study drug may be too critically ill to perform the 6MWT, resulting in missing data for that assessment.

Every effort should be made to complete all scheduled study assessments for all randomized subjects.  Although attempts will be made to continue to collect data after termination of study drug, these data are being collected for sensitivity analyses and descriptive purposes

only.  Assessments performed after treatment unblinding or more than 24 hours after the last dose of study drug will not be included in the main analyses of peak 6MWD.

For subjects whose peak 6MWD measures at Week 4, Week 8, Week 12, or Week 16 are missing, the missing value will be imputed as described in Table 8-1.

**Table 8-1       Imputation Rules for Peak 6MWD**

| Reason for missing 6MWD measure | Imputation |
|---|---|
| Death (all causes) | Worst score (0 meters) |
| Clinical worsening event | Worst score (0 meters) |
| Too ill to perform 6MWT | Worst score (0 meters) |
| All other reasons | Last (peak) Observation Carried Forward (LOCF) |

Abbreviations: 6MWD, 6-Minute Walk Distance; 6MWT, 6-Minute Walk Test

For subjects whose trough 6MWD measures at Week 15 are missing, the missing values will be imputed as described in Table 8-2.

**Table 8-2       Imputation Rules for Trough 6MWD**

| Reason for missing 6MWD measure | Imputation |
|---|---|
| Death (all causes) | Worst score (0 meters) |
| Clinical worsening | Worst score (0 meters) |
| Too ill to perform 6MWT | Worst score (0 meters) |
| All other reasons | Baseline Observation Carried Forward (BOCF) |

Abbreviations: 6MWD, 6-Minute Walk Distance; 6MWT, 6-Minute Walk Test

### 8.3.2       Missing Data Handling for Other Efficacy Assessments

For the secondary endpoints of NT-proBNP, the missing value at Week 16 will be imputed using LOCF.  If the NT-proBNP measure at Baseline is missing, the change from Baseline will not be calculated.  The subject will not be included in the analyses.

For exploratory endpoints of SGRQ, biomarkers, and DSP, the missing values will not be imputed, and all analyses will be based on the observed cases.

### 8.4       MULTIPLE COMPARISONS AND MULTIPLICITY

The primary efficacy endpoint of change in 6MWD measured at peak exposure from Baseline to Week 16 will be tested at alpha level 0.05.  If the primary efficacy endpoint is statistically

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan Amendment 1
                                                              Inhaled Treprostinil

significant at alpha level 0.05, the statistical tests for secondary efficacy endpoints will be performed.

To control the Type 1 error rate, the secondary efficacy endpoints will be tested using a hierarchical (fixed sequence) testing procedure.  The secondary endpoints will be tested in the following order:

1. Change from Baseline in plasma concentration of NT-proBNP at Week 16
2. Time to clinical worsening
3. Change from Baseline in peak 6MWD at Week 12
4. Change from Baseline in trough 6MWD at Week 15

Testing will proceed only if the preceding test is statistically significant at 2-sided alpha level equal to 0.05 and will stop if non-significance is reached.

## 8.5    DERIVED AND TRANSFORMED DATA

Time to clinical worsening will be evaluated as a secondary endpoint and calculated as the time from randomization until 1 of the following criteria are met:

- Hospitalization due to a cardiopulmonary indication
- Decrease in 6MWD >15% from Baseline directly related to disease under study at 2 consecutive visits and at least 24 hours apart
- Death (all causes)
- Lung transplantation

Time to clinical worsening is calculated as described in Table 8-3.

LIQ_PH-ILD_00000452

**Table 8-3        Derivation of Time to Clinical Worsening**

| Parameter | Scenario | Formula | Status |
|---|---|---|---|
| Time to clinical worsening (weeks) | Subjects with clinical worsening event reported | = (Worsening date – Randomization date +1)/7 | 0 (event) |
| | Subjects who died during the study | = (Death date – Randomization date +1)/7 | 0 (event) |
| | Subjects without clinical worsening event during the study | = (Last assessment date – Randomization date +1)/7 | 1 (censored) |
| | Subjects discontinued from the study prematurely | = (Last assessment date – Randomization date +1)/7 | 1 (censored) |

For subjects with clinical worsening due to decrease from Baseline in 6MWD, a confirmatory 6MWT should be conducted.  The event time is based on the date of the confirmatory 6MWT. If the confirmatory 6MWT is not conducted, the event time is then based on the date of the first 6MWT.

Distance Saturation Product (DSP) is calculated as follows:

| Parameter | Formula |
|---|---|
| DSP (m%) | = (Distance walked in meters) x (Lowest oxygen saturation recorded during the 6MWT) |

Abbreviations: 6MWT, 6-Minute Walk Test; DSP, Distance Saturation Product

Adjustments to the QT intervals will be calculated as follows:

| Parameter | Formula |
|---|---|
| QTc (Bazett) | $= Q\text{-}T / \sqrt{60/HR}$ |
| QTc (Fridericia) | $= Q\text{-}T / \sqrt[3]{60/HR}$ |

Abbreviations: HR, Heart rate; QTc, Q-T interval corrected for heart rate; Q-T, Electrocardiographic interval from beginning of QRS complex to end of the T wave

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan Amendment 1
                                                              Inhaled Treprostinil

**8.6      ASSESSMENT WINDOWS**

For any data summarized by scheduled visit, an analysis visit window will be used.  The scheduled visits, as recorded on the eCRFs, and the corresponding target days and study day intervals are specified in Table 8-4.  The analysis visit window will be derived based on the information specified in Table 8-4.

In the protocol, the visit window for Week 4, Week 8, Week 12, and Week 16 is ±5 days and the visit window for the Week 15 visit is ±5 days and at least 24 hours prior to Week 16 6MWT.  In order to allow slotting of discontinuation visits and visits outside the planned schedule, the visit windows have been expanded for analysis purposes for Week 4, Week 8, Week 12, and Week 16.  The nominal study visit identified as Week 15 in the eCRF will be used for the Week 15 visit.

**Table 8-4      Assessment Windows for Scheduled Visits**

| Visit | Target Study Day | Study Day Interval |
|---|---|---|
| **ECGs, SGRQ:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the date of the first dose) |
| Week 16 | 113 | 1 < Study Day |
| **PFTs, Clinical laboratory assessments and NT-proBNP:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the first dose) |
| Week 8 | 57 | 1 < Study Day ≤ 84 |
| Week 16 | 113 | 84 < Study Day |
| **Peak 6MWT:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the first dose) |
| Week 4 | 29 | 1 < Study Day ≤ 43 |
| Week 8 | 57 | 43 < Study Day ≤ 71 |
| Week 12 | 85 | 71 < Study Day ≤ 99 |
| Week 16 | 113 | 99 < Study Day |
| **Trough 6MWT:** | | |
| Week 15 | 106 | Nominal study visit |

United Therapeutics Corp.    **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

| Visit | Target Study Day | Study Day Interval |
|---|---|---|
| **Vital signs, Pulse oximetry:** | | |
| Baseline | 1 | Study Day ≤1 (prior to the first dose) |
| Week 4 | 29 | 1 < Study Day ≤ 43 |
| Week 8 | 57 | 43 < Study Day ≤ 71 |
| Week 12 | 85 | 71 < Study Day ≤ 99 |
| Week 15 | 106 | Nominal study visit |
| Week 16 | 113 | 99 < Study Day |

Abbreviations: 6MWT, 6-Minute Walk Test; ECG, Electrocardiogram; NT-proBNP, N-Terminal pro-brain natriuretic peptide; PFT, Pulmonary function test, SGRQ, St. George's Respiratory Questionnaire
Note: Study Day = (Assessment Date) − (First Dosing Date) +1

**Multiple Evaluations within the Same Analysis Window**

After all the observations have been slotted based on the table above, if there are multiple valid observations for an assessment within an assigned analysis visit window, only 1 of these observations will be used for summary statistics and analyses.  The observation to be used is determined using the following hierarchy (in decreasing order):

- The observation closest to the target study day
- The later observation if 2 observations are equally close to the target study day

For missing values where the LOCF algorithm is applied, it is always the last valid observation on treatment carried forward, even though this might not be the observation obtained by the above hierarchy and used in the summaries by visit window.

**9      STUDY POPULATION**

Unless otherwise specified, all efficacy analyses will be performed on the ITT population and all safety analyses will be based on the Safety population.  In the ITT population, the treatment assignment is based on the assignment upon randomization.  In the Safety population, the treatment assignment is based on the actual treatment the subject received.

The comparability between the 2 treatment groups will be checked for demographic and baseline characteristics.  The p-values from Fisher's exact test (for discrete variables) or Group t-test or Wilcoxon rank sum test (for continuous variables) will be included on

LIQ_PH-ILD_00000455

summaries but are not intended to be used to test formal hypotheses.  For these comparisons, missing or unknown values will be excluded from the calculations.

## 9.1    SUBJECT ACCOUNTABILITY

All subjects' disposition information will be listed by individual subject number, including the analysis population the subjects belong to, premature study drug discontinuation status, primary reason for premature study drug discontinuation, premature study discontinuation status, primary reason for premature study discontinuation, number of days on the study drug, and enrollment in the open label extension study (RIN-PH-202).

The listing of subject accountability will include the dates of informed consent and randomization, the first study drug dose, last study drug dose, and last assessment dates and times, and the last dose and assessment weeks.  Whether subjects received the study drug, whether subjects completed the Weeks 4, 8, 12, 15, 16 assessments, and study discontinuation status will be summarized.

Information regarding whether each subject is included in each analysis population (see Section 6) will be listed.  If a subject is not included in a particular analysis population, the reason for exclusion will be noted on the listing.  Also noted on the listing will be the randomized treatment assignment and the actual treatment subjects have received.  The summary will include the frequency and percentage of all subjects in each analysis population.

The stratification information used in the random assignment of subjects to treatment group (from the central randomization database) will be listed, including date and time of randomization and Baseline 6MWD category ($\leq$350 meters versus >350 meters).  Status of the treatment blind, and if broken, date/time of blind broken will be listed.  The number of subjects in each stratum will be summarized by treatment group and overall.

LIQ_PH-ILD_00000456

## 9.2    PROTOCOL DEVIATIONS

The status of the entry criteria will be listed for all subjects.  The listing will include the date of the initial screening assessment, whether all eligibility criteria were met (Yes/No), and a list of any specific entry criteria not met.  This listing will also include the protocol version that the subject was enrolled under.  Entry criteria violations will be summarized by treatment group and overall.

Additional protocol deviations will be documented throughout the study.  All deviations will be reviewed by the clinical team prior to database lock and those that might affect subject safety or efficacy outcomes will be considered 'Major'.  All other deviations will be classified as 'Minor'.  Protocol deviations will be listed, including the date of the deviation, the type of deviation, the severity of the deviation (Major/Minor), and a description of the deviation.  The protocol deviations will also be summarized by treatment group and overall.

## 9.3    OTHER DESCRIPTIONS OF STUDY POPULATION

### 9.3.1    Demographics

All demographic data will be listed for all subjects, including assessment date, date of birth, country, age, sex, ethnicity, race, weight, height, and body mass index (BMI).  Age, age category (<65 years of age, 65 to <80 years of age, and ≥80 years of age), sex, ethnicity, race, height, weight, and BMI will be summarized by treatment group and overall.  The summary will include p-values (2-sided) from Fisher's exact test (for age category, sex, ethnicity, and race) and group t-test or Wilcoxon rank sum test (for age, weight, height, and BMI) comparing treatment groups.

### 9.3.2    Baseline Characteristics

Baseline characteristics will include the Baseline 6MWD, Baseline NT-proBNP, and hemodynamic parameters.  Hemodynamic parameters, measured by the right heart catheterization (RHC), will include PVR, pulmonary artery pressure mean (PAPm), pulmonary capillary wedge pressure (PCWP), and details concerning vasodilator testing will be listed and summarized.

LIQ_PH-ILD_00000457

### 9.3.3        Medical History and PH-ILD History

All significant past or ongoing medical conditions will be listed for all subjects.  The listing will include the Medical Dictionary for Regulatory Activities (MedDRA) system organ class (SOC) and preferred term (PT) for each condition listed, and whether the condition is ongoing at Randomization.  These medical conditions will be summarized by PT within each SOC.

Information related to subjects' PH-ILD history will be listed.  The listing will include the date of initial PH diagnosis, years since PH diagnosis, etiology of ILD (including IIP subcategory), date of confirmatory computed tomography (CT) scan, whether ILD diagnosis confirmed with a lung biopsy, and if so, the date of lung biopsy.

The current ILD diagnosis (ILD category) and IIP subcategory, time since PH diagnosis, and whether ILD diagnosis was confirmed via lung biopsy will be summarized by treatment group and overall.  The summary will include p-values (2-sided) from Fisher's exact test (for current ILD diagnosis) or Wilcoxon rank sum test (for time since diagnosis) comparing treatment groups.

### 9.3.4        Concomitant Medications

All concomitant medications recorded on the eCRF will be mapped to a standard name and Anatomical Therapeutic Chemical (ATC) Levels 1 to 4 using the World Health Organization (WHO) WHODrug Global drug dictionary.  The ATC Levels 2 and 4 and verbatim term of all concomitant medications will be listed for all subjects.  This listing will include the date started (or indication that drug was ongoing at randomization), date discontinued (or indication that drug was ongoing at end of study), and the condition(s) treated/indication(s). Summary of concomitant medications present at Baseline and summary of concomitant medications added during the study will include the frequency and percentage of subjects in each treatment group receiving each drug by ATC Level 2 and Level 4.  If ATC Level 4 is not available for a medication, ATC Level 3 will be substituted.  If ATC Level 3 is not available, ATC Level 2 will be substituted.  If ATC Level 2 is not available, ATC Level 1 will be substituted.

LIQ_PH-ILD_00000458

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan Amendment 1
                                                              Inhaled Treprostinil

## 10      EFFICACY ANALYSES

Except where otherwise noted, all efficacy analyses will only be performed on the ITT population (see Section 6).

### 10.1      PRIMARY EFFICACY MEASURES

#### 10.1.1      *Primary Efficacy Analyses*

##### 10.1.1.1      *Hypothesis*

The primary efficacy endpoint of peak 6MWD assesses if inhaled treprostinil will increase the distance traversed in the peak 6MWT at Week 16 over placebo in subjects with PH-ILD.  The null and alternative hypotheses are:

$$H_0: \mu_1 = \mu_2$$
$$H_a: \mu_1 \neq \mu_2,$$

where $\mu_1$ and $\mu_2$ are the median change from Baseline in 6MWD of the inhaled treprostinil and placebo treatment groups, respectively.

##### 10.1.1.2      *Primary Efficacy Analysis*

All 6MWT data will be listed for all subjects.  For each scheduled assessment, this listing will include the date test was performed (or date test was intended to be performed if subject is unable to attempt the test), start time of the test, nominal time point, last treatment dose, hours from last treatment dose to 6MWT start, if walk was attempted, total distance walked (in meters), whether subject received oxygen during the test, amount of supplemental oxygen, and any circumstances that adversely affected the walk (if any) including reason for not attempting test (if any).  The trough 6MWT measure will also be indicated.  In addition, a listing of 6MWD with imputed values will be included for both peak and trough 6MWD data.

For the primary efficacy analysis, the effect of inhaled treprostinil versus placebo on change in peak 6MWD at Week 16 will be evaluated via analysis of covariance (ANCOVA).  Change from Baseline in peak 6MWD is the dependent variable, and treatment and Baseline 6MWD are covariates in this ANCOVA model.  Least squares means and standard errors for each treatment group, the least squares mean difference and its standard error, as well as a 95% confidence interval for the treatment group difference and p-value for treatment group

Version 12 DEC 2019                    Confidential                         Page 21

LIQ_PH-ILD_00000459

comparison will be calculated from the ANCOVA model.  This methodology will be carried out as follows:

1. Walk distances obtained after study drug termination or unblinding will be excluded (as described in Section 8).
2. Imputation rules in Table 8-1 will be applied.
3. The LOCF algorithm will be applied.
4. ANCOVA will be conducted based on the pseudo SAS code:
   proc glm;
       class Treatment;
       model DistC = Treatment Dist0;
   run;

where DistC is the change from Baseline in peak 6MWD at Week 16 and Dist0 is the baseline measure of the 6MWD.

If the ANCOVA assumptions are violated, the primary efficacy analysis will be based on non-parametric analysis of covariance within the framework of the extended Cochran-Mantel-Haenszel test (Koch 1990, Koch 1998, Stokes 2000).  Specifically, a Cochran-Mantel-Haenszel mean score test will be used on the standardized mid-ranks (ie, overall rank divided by the number of ranks +1, or "modified ridit" scores) of the residuals from an ordinary least squares regression with change from Baseline in peak 6MWD at Week 16 as a linear function of distance walked at Baseline (as a continuous variable).  This methodology will be carried out as follows:

1. Walk distances obtained after study drug termination or unblinding will be excluded (as described in Section 8).
2. Imputation rules in Table 8-1 will be applied.
3. Calculate ranks. The pseudo SAS code is as follows:
   proc rank nplus1 ties=mean out=ranks;
       var DistC Dist0;
   run;
   where DistC is the change from Baseline in peak 6MWD at Week 16 and Dist0 is the baseline measure of the 6MWD.
4. Linear regression model will be fit using the rank values generated above.  The pseudo SAS code is as follows:

LIQ_PH-ILD_00000460

**United Therapeutics Corp.**          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

```
proc reg data=ranks noprint;
  model DistC=Dist0;
  output out=residual r=resid;
run;
```

where DistC is the rank value of the change from Baseline in peak 6MWD at Week 16 and Dist0 is the rank value of the baseline measure of the 6MWD.

5. A mean score test, using the values of the residuals as scores, compares the treatment groups. Cochran-Mantel-Haenszel mean score statistic and p-value will be calculated, using the NOPRINT and CMH2 options in the TABLES statement of the FREQ procedure of SAS. The pseudo SAS code is as follows:

```
proc freq data=residual;
  tables Treatment*Resid / noprint cmh2;
run;
```

where Treatment indicates the randomized treatment group, and Resid represents the residuals obtained from the above linear regression models.

In addition to the p-value from the non-parametric method described above, the Wilcoxon rank sum test and the Hodges-Lehmann estimate of median difference (as an estimate of location shift between 2 treatment groups for the placebo-controlled treatment effect) will be provided. The Wilcoxon rank sum test and the Hodges-Lehmann estimate can be obtained through the following pseudo SAS code:

```
proc npar1way hl Wilcoxon;
    class treatment;
    var DistC;
run;
```

where DistC is the change from Baseline in peak 6MWD at Week 16.

### 10.1.1.3   Sensitivity and Subgroup Analyses

In order to analyze walk distances at each scheduled assessment, values for missing or excluded assessments up to and including Week 16 will be imputed according to rules described in Section 8.3.1.

To further support the robustness and assess the sensitivity of the primary efficacy analysis of change in peak 6MWD at Week 16 (provided that the primary analysis yields significant

**Version 12 DEC 2019**                    **Confidential**                    **Page 23**

LIQ_PH-ILD_00000461

results), the above non-parametric and parametric analyses and summaries will be repeated
using each of the following modifications (as data permit):

- The Per-protocol population will be used instead of the ITT population
- Missing data imputation using the LOCF method (based on peak values)
- Missing data imputation using the last rank carried forward (LRCF) method (based on peak values) (O'Brien 2005)
- Using only the observed values without imputation
- Including data collected after termination of the study drug
- ITT population excluding subjects with a reported exacerbation within 3 days of the Week 16 peak 6MWT measure
- Stratified by ILD etiology categories (IIP, CHP, Occupational, CPFE, and Other)
- Stratified by Baseline 6MWD categories ($\leq$350 meters versus >350 meters, $\leq$median baseline 6MWD versus > median baseline 6MWD)
- Stratified by Baseline DLCO percent predicted (<40% versus $\geq$40%)
- Stratified by Baseline pulmonary vascular resistance (PVR) (<4 versus $\geq$4 WU)
- Stratified by sex (male versus female)
- Stratified by age group (<65 years of age, 65 to <80 years of age, and $\geq$80 years of age)
- Stratified by study drug dose at Week 16 (0 to 3 breaths, 4 to 6 breaths, 7 to 9 breaths, and 10 to 12 breaths).

A longitudinal data analysis using mixed model repeated measurement (MMRM) will also be
performed to estimate the treatment difference in change in peak 6MWD at Week 16. The
MMRM will include the change from Baseline in peak 6MWD as the dependent variable,
treatment, week, and treatment by week interaction as fixed effects, and Baseline 6MWD as a
covariate. An unstructured variance/covariance structure shared across treatment groups will
be used to model the within-subject errors.

Additional sensitivity analyses on the ITT and Per-protocol populations for change from
Baseline to Week 16 in peak 6MWD will be based on a multivariate normal imputation model
using the Markov chain Monte Carlo (MCMC) method. The imputation model will include
treatment group, all scheduled visits (Baseline and Weeks 4, 8, 12, and 16), subject's sex, and
subject's age at randomization.

LIQ_PH-ILD_00000462

**United Therapeutics Corp.**                    **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

An additional sensitivity analysis will be performed for percent change from Baseline to Week 16 in peak 6MWD using the same approach as the primary analysis method where the percent change from Baseline is calculated as

$$\frac{\text{peak 6MWD at Week 16} - \text{Baseline 6MWD}}{\text{Baseline 6MWD}} \text{X} (100\%).$$

In addition, the impact of Baseline hemodynamics and Baseline PFTs, including PVR, PAPm, PCWP, $FEV_1$, FVC, TLC, and DLCO as continuous variables, on peak 6MWD, will be explored using the regression approach.

Finally, to determine whether site has an effect on treatment estimates, site will be added to the ANCOVA model in Section 10.1.1.2 as a random effect.  If necessary, sites with small numbers of subjects may be pooled.

## 10.2    SECONDARY EFFICACY MEASURES

Secondary efficacy endpoints include the following:

- Change in plasma concentration of NT-proBNP from Baseline to Week 16
- Time to clinical worsening calculated as the time from randomization until 1 of the following criteria are met:
    a. Hospitalization due to a cardiopulmonary indication
    b. Decrease in 6MWD >15% from Baseline directly related to disease under study, at 2 consecutive visits and at least 24 hours apart
    c. Death (all causes)
    d. Lung transplantation
- Change in peak 6MWD from Baseline to Week 12
- Change in trough 6MWD from Baseline to Week 15

As specified in Section 8.4 above, the hierarchical (fixed-sequence) testing procedure will be employed to control the overall alpha level at 0.05.

### 10.2.1    *Change in NT-proBNP at Week 16*

The efficacy endpoint of the change in NT-proBNP plasma concentration assesses if inhaled treprostinil decreases the level of NT-proBNP at Week 16 over placebo in subjects with PH-ILD.  The null and alternative hypotheses are:

LIQ_PH-ILD_00000463

$$H_0: \mu_1 = \mu_2$$
$$H_a: \mu_1 \neq \mu_2,$$

where $\mu_1$ and $\mu_2$ are the mean changes from Baseline to Week 16 in log-transformed NT-proBNP of the inhaled treprostinil and placebo treatment groups, respectively, and change from Baseline is calculated as log(value at Week 16) – log(value at Baseline).

The NT-proBNP values will be listed for all subjects, including the nominal time point, collection date/time, normal range and "High/Low" flag.  The values and their respective changes from Baseline will be summarized for each assessment.  The summary will also include the geometric mean and geometric standard deviation.  The difference between treatment groups for the change from Baseline to Week 16 will be tested using the analysis of covariance with change from Baseline in log-transformed NT-proBNP as the dependent variable, treatment as the fixed effect, and Baseline log-transformed NT-proBNP as the covariate.  The pseudo SAS code is as follows:

```
proc glm;
   class treatment;
   model BNP_C=Treatment BNP_B;
run;
```

where BNP_C is the change from Baseline to Week 16 in log-transformed NT-proBNP and BNP_B is the log-transformed NT-proBNP at Baseline.

For subjects who do not have NT-proBNP measurements at Week 16, the LOCF imputation will be used.  The analyses will also be performed for the data without imputation for the missing measures.

As an exploratory analysis, the NT-proBNP at Week 8 will be analyzed using the same method as the NT-proBNP at Week 16.

A longitudinal data analysis using MMRM will also be performed to estimate the treatment difference in changes from Baseline for log-transformed data in NT-proBNP.  The MMRM will include log-transformed NT-proBNP as the dependent variable; treatment, week, and

treatment by week interaction as fixed effects; and Baseline log-transformed NT-proBNP as a covariate.  An unstructured variance/covariance structure shared across treatment groups will be used to model the within-subject errors and the Kenward-Roger method will be used for calculating the denominator degrees of freedom.  The appropriate contrasts will be constructed in order to estimate treatment effect at Weeks 8 and 16.

### 10.2.2    Time to Clinical Worsening

Data on the clinical worsening assessment page of the eCRF will be used to determine clinical worsening status.  Investigator-reported clinical worsening events including the date (study day) of the event, category of the clinical worsening event, Baseline 6MWD, first 6MWT details, and second 6MWT details will be listed.  The time to clinical worsening will be calculated according to the rules described in Table 8-3 in Section 8.5.

The number and percentage of subjects with any clinical worsening and with each category of clinical worsening will be summarized by treatment group.  Time to clinical worsening will be summarized by treatment group using product-limit estimates calculated by the Kaplan-Meier method and displayed graphically as Kaplan-Meier curves.  A tabular summary of this analysis will include the number of subjects at risk (sample size), estimated median duration, and a 95% confidence interval for the median duration for each treatment group. The log-rank test, adjusted for Baseline 6MWD category, will be used to calculate the p-value for treatment differences in the ITT population.

The SAS Procedure LIFETEST will be used.  The pseudo SAS statements are listed below:

```
proc lifetest;
   time TimeToWorsening*Censor_Status(1);
   strata B_6MWD / group = Treatment test=all;
run;
```

where B_6MWD denotes the categorical Baseline 6MWD variable ($\leq$350 meters versus >350 meters).

LIQ_PH-ILD_00000465

**United Therapeutics Corp.**          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
                                                                **Inhaled Treprostinil**

In addition, the Cox proportional hazards model will be fit to obtain the hazard ratio and its associated 95% confidence interval.  The model will include treatment and Baseline 6MWD as explanatory variables.  The SAS procedure PHREG will be used.  The pseudo SAS statements are listed below:

```
proc phreg;
   class Treatment;
   model TimeToWorsening*Censor_Status(1) = Treatment Dist0
          / risklimits alpha=0.05 ties=efron;
   assess var=Dist0 ph;
run;
```

where Dist0 denotes the Baseline 6MWD variable (continuous).  If it is determined that the proportional hazards assumption does not hold for Baseline 6MWD, a stratified analysis will be conducted.  The above SAS code will be amended to remove Dist0 from the model statement and add the 'strata B_6MWD;' statement.

If the proportional hazards assumption does not hold for the Cox model, the restricted mean survival time (RMST) and its associated standard error will be calculated for each treatment group at Week 16 (Royston 2013).  A 95% confidence interval will be constructed for the difference in RMST between the 2 treatment groups at Week 16.

### 10.2.3    Change in Peak 6MWD at Week 12
The methodology for primary efficacy analysis of change in peak 6MWD at Week 16 will also be carried out for the Week 12 assessment, as described above in Section 10.1.1.2.

### 10.2.4    Change in Trough 6MWD at Week 15
The methodology for primary efficacy analysis of change in peak 6MWD described in Section 10.1.1.2 will also be carried out for the change in trough 6MWD from Baseline to Week 15.  Missing trough 6MWD will be imputed as described in Table 8-2 in Section 8.3.1. The analysis will be repeated to include only subjects with trough 6MWD at Week 15 (ie, missing trough 6MWD at Week 15 is not imputed).

**Version 12 DEC 2019**                    **Confidential**                    **Page 28**

LIQ_PH-ILD_00000466

United Therapeutics Corp.        **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

## 10.3    EXPLORATORY EFFICACY MEASURES

Exploratory efficacy endpoints include the following parameters:

- Change in peak 6MWD from Baseline to Week 4
- Change in peak 6MWD from Baseline to Week 8
- Change in quality of life as measured by SGRQ from Baseline to Week 16
- Change in DSP from Baseline to Week 16

### 10.3.1    *Change in Peak 6MWD at Weeks 4 and 8*

The methodology for primary efficacy analysis of change in peak 6MWD described in Section 10.1.1.2 will also be carried out for the assessments obtained at Week 4 and Week 8.

### 10.3.2    *Change in SGRQ at Week 16*

The responses to the SGRQ questionnaire at Baseline and Week 16 will be converted to the Total score and 3 domain scores according to the SGRQ manual (Jones 2002).  Scores for Total and each domain will range from 0 to 100, with higher scores indicating more limitations.  Both individual item responses as well as calculated scores will be listed.  The change from Baseline for the Total and 3 domain scores (Symptoms, Activity, and Impacts) will be calculated.

The Total score and for the 3 domain scores as well as their changes from Baseline will be summarized by treatment group using descriptive statistics.

For the Total score and each of the 3 domain scores, treatment differences (inhaled treprostinil vs. placebo) will be tested by using analysis of covariance with change from Baseline as the dependent variable, treatment as a fixed effect, and baseline score as the covariate.  The analyses will be based on the observed data with no imputation.

The pseudo SAS code is as follows:

```
proc glm;
   class treatment;
   model Score_C=Treatment Score_B;
run;
```

DA0847        **LIQ_PH-ILD_00000467**

where Score_C is the change from Baseline in Total score or each of the 3 domain scores and Score_B is the corresponding score at Baseline.

### 10.3.3    *Change in DSP*

The DSP will be calculated, and DSP results will be included in the data listing for pulse oximetry.  DSP values and their respective changes from Baseline to Week 16 will be summarized by treatment group.  The difference between treatment groups for the change from Baseline to Week 16 will be tested using analysis of covariance with change from Baseline in DSP as the dependent variable, treatment as a fixed effect, and Baseline DSP measure as the covariate.  The analyses will be based on the observed data with no imputation.

The pseudo SAS code is as follows:

```
proc glm;
   class treatment;
   model DSP_C=Treatment DSP_B;
run;
```

where DSP_C is the change from Baseline to Week 16 in DSP (m%) and DSP_B is DSP at Baseline.

In addition, the DSP at Week 4, Week 8, and Week 12 will each be analyzed in the same way as the DSP at Week 16.

## 11       HEALTH OUTCOMES

### 11.1    QUALITY OF LIFE MEASURES

Quality of life was assessed using SGRQ.  The analyses of SGRQ are described in Section 10.3.2.

### 11.2    RESOURCE UTILIZATION MEASURES

Hospitalizations and hospitalizations related to cardiopulmonary indications are collected during the study.  The analysis is discussed in Section 12.6.2.

LIQ_PH-ILD_00000468

United Therapeutics Corp.                RIN-PH-201 Statistical Analysis Plan Amendment 1
                                                          Inhaled Treprostinil

## 12      SAFETY ANALYSES

All safety analyses will be performed only on the Safety population (see Section 6).

## 12.1     EXTENT OF EXPOSURE

All study drug dosing will be listed for all subjects.  The listing will include initial dose (number of breaths for each session and number of breaths for the day) and date of this initial dose and dose and date of each subsequent dose change.  Dosing at Weeks 4, 8, 12, 15, and 16 will be summarized for subjects still receiving study drug at each of these assessments.  The summary will include both the numeric summaries and the categorical summaries for number of breaths per session as well as the number of breaths per day.  If study drug is dosed differently across different sessions on the same day, the maximum number of breaths is used for summarization.  Summary of overall duration of exposure will be included as well as the final dose (breath/session) and the maximum study drug dose (breath/session) reached for each subject (numerically and categorically).

For study treatment compliance, the number and percentage of days with dose >0 breaths will be calculated and summarized.

## 12.2     ADVERSE EVENTS

All AEs will be coded to the appropriate PT and SOC using MedDRA.  AEs will be listed by treatment group including all details recorded on the eCRF plus an indicator of whether the event was treatment-emergent.  The AE listings will include the AE verbatim term and its corresponding PT and SOC.

The AE summaries will be limited to include only treatment-emergent AEs.  Treatment-emergent AEs are those AEs with onset date equal to or after the start date of the study drug.  The non-treatment-emergent AEs (the AEs occur after signing the informed consent form but before receiving study drug) will be listed but not included in summary tables.

All summaries will include the number and percentage of subjects experiencing each type of adverse event and the total number of each type of adverse event, in order of overall frequency and/or SOC.  Serious adverse events (SAE) and non-serious AEs will also be summarized by SOC and PT.

Version 12 DEC 2019                    Confidential                    Page 31

The total number of AEs and the AE rates will be calculated and summarized for each display, as appropriate.  The AE rate will be calculated as the total number of AEs divided by the total patient years of exposure to study drug per treatment group.

Adverse events possibly or probably related to study drug will be summarized.  An AE summary by severity (mild, moderate, and severe) will also be provided.

Separate listings and summary tables will be provided for all SAEs, AEs leading to the discontinuation of study drug, and all deaths during the study (if data permit).  For listing of deaths, information for all subjects who die during the study period from the randomization to the end of study (including 30 days after the last study treatment dosing) will be included.

### 12.3    OXYGENATION

Oxygenation is measured by pulse oximetry ($SpO_2$ and supplemental oxygen requirement [L/min]) during each 6MWT.  At each 6MWT, pulse oximetry (for $SpO_2$) will be measured at pre-walk, during walk, and post-walk.  During walk, the lowest $SpO_2$ will be recorded.  All pulse oximetry results along with the collection date/time (study day) will be listed.  Heart rate will be listed for pre-walk and post-walk only.

The $SpO_2$ will be summarized by treatment group, visit, and time point (pre-walk, during walk, and post-walk).  The summary will be provided for the original values, change from pre-walk for each visit, and change from baseline values.  For change from Baseline calculations, the measurements pre-walk, during walk, and post walk at post-Baseline Visits will be compared with the measurements at corresponding pre-walk, during walk, and post-walk at Baseline.

In addition, for each time point at each visit, the number and percentage of subjects with $SpO_2$ or lowest $SpO_2$ <80%, ≥80 to <88, and ≥88%, and with $SpO_2$ dropping ≥10% during walk and/or post-walk from pre-walk will be summarized by treatment group.

At each visit, supplemental oxygen requirements will be collected at rest and during 6MWT. These data will be listed, including visit, 6MWT date/time, and oxygen use at rest and during walk.  The number and percentage of subjects requiring supplemental oxygen use at rest and

LIQ_PH-ILD_00000470

United Therapeutics Corp.                    **RIN-PH-201 Statistical Analysis Plan Amendment 1**
                                                       **Inhaled Treprostinil**

during the 6MWT will also be summarized by the treatment group.  Supplemental oxygen level at rest at each visit and the corresponding changes from Baseline will be summarized by treatment group.

Heart rate will be summarized by treatment group, by time point (pre-walk and post-walk) and visit.  The summary will be provided for the original values, change from pre-walk for each visit, and change from baseline values.  For change from baseline calculations, the measurements pre-walk and post-walk at post-Baseline Visits will be compared with the measurements at corresponding pre-walk and post-walk at Baseline.

### 12.4   PULMONARY FUNCTION TESTS

The PFT parameters include:

- Forced expiratory volume in 1 second ($FEV_1$)
- Forced vital capacity (FVC)
- Total lung capacity (TLC)
- Lung diffusion capacity (DLCO)

Only pre-bronchodilator values will be recorded on eCRF and will be listed.  All PFT parameters and their change from baseline values will be summarized by treatment group and visit.

For $FEV_1$ results, the number and percentage of subjects with $FEV_1$ decreasing more than 20% from Baseline at any post-Baseline Visit will be summarized by treatment group.

### 12.5   CLINICAL LABORATORY EVALUATIONS

Blood samples will be taken at Screening and/or Baseline, Week 8, and Week 16.  All samples will be sent to a central laboratory for evaluation of clinical chemistry and hematology.

**United Therapeutics Corp.**          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

### 12.5.1    Clinical Chemistry

The following clinical chemistry parameters will be evaluated by the central laboratory:

| Parameter | Units |
|---|---|
| Sodium | mmol/L |
| Potassium | mmol/L |
| Bicarbonate | mmol/L |
| Chloride | mmol/L |
| Total bilirubin | umol/dL |
| Alkaline phosphatase | U/L |
| Alanine aminotrasferase | U/L |
| Aspartate aminotransferase | U/L |
| Urea nitrogen | mmol/dL |
| Creatinine | umol/L |
| Calcium | mmol/L |
| Albumin | g/L |

Values that are "High" or "Low" with respect to the reference range provided by the central laboratory will be flagged with an "H" or an "L," respectively.  All parameters will be listed for all subjects and assessments, along with their respective "High/Low" flags.

Values of these parameters at each visit, and their corresponding changes from Baseline will be descriptively summarized by treatment group.

For each parameter, the frequency and percentage of subjects within each treatment group who had "Low," "Normal," or "High" Baseline values, then subsequently had "Low," "Normal," or "High" follow-up values at each visit will be presented in a shift summary.

### 12.5.2    Hematology

The following hematology parameters will be evaluated by the central laboratory:

| Parameter | Units |
|---|---|
| Hemoglobin | g/dL |
| Hematocrit | % |
| Red blood cell count | $10^6$/uL |
| Red blood cell morphology | |
| White blood cell count | $10^3$/uL |
| Platelet count | $10^3$/uL |

LIQ_PH-ILD_00000472

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan Amendment 1
                                             Inhaled Treprostinil

Values that are "High" or "Low" with respect to the reference range provided by the central laboratory will be flagged with an "H" or an "L," respectively.  All parameters will be listed for all subjects and assessments, along with their respective "High/Low" flags.

Numeric values of these parameters at each visit and their corresponding changes from Baseline will be summarized by treatment group.

For each parameter, the frequency and percentage of subjects within each treatment group who have "Low," "Normal," or "High" Baseline values, then subsequently have "Low," "Normal," or "High" follow-up values at each assessment will be presented in a shift summary.

### 12.5.3    *Pregnancy Test*

Females of childbearing potential will undergo a urine pregnancy test at Screening followed by urine pregnancy tests at Baseline and every subsequent scheduled study visit.  All pregnancy tests will be performed at study sites.  Pregnancy status during the study will be listed.

## 12.6    OTHER SAFETY MEASURES

### 12.6.1    *Electrocardiograms*

All ECG assessments will be listed for all subjects.  This listing will include the heart rate, the ECG interval from the beginning of QRS complex to end of the T wave (Q-T interval), the QT interval corrected for heart rate (QTc) (calculated using formulas by both Bazett and Fridericia as described in Section 8.4), the time between P wave and beginning of QRS complex in ECG (P-R interval), the electrocardiographic wave (QRS) duration, ECG results (Normal/Abnormal), whether there were clinically significant changes from Screening visit, whether abnormalities were present, and details and comments on any abnormalities.  The ECG results at Baseline and changes at Week 16 will be descriptively summarized by treatment group.  In addition, for QTc intervals calculated using both the Bazett and Fridericia methods, the number and percent of subjects with values $\geq 500$ msec and the number and percent of subjects with changes from Screening of <30 msec, 30 to <60 msec, and $\geq 60$ msec

DA0853                                        LIQ_PH-ILD_00000473

United Therapeutics Corp.          **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

will be presented.  Additionally, each abnormality will be summarized by number and percentage of subjects reporting at each visit by treatment group.

### 12.6.2    Hospitalizations

Details for all hospitalizations will be listed.  Number of hospitalizations for cardiopulmonary indications and total duration of hospitalization for cardiopulmonary indications will be summarized for each treatment group as well as overall number of hospitalizations and total duration regardless of indication.

### 12.6.3    Vital Signs

All vital sign assessments will be listed for all subjects.  This listing will include height, weight, body mass index (BMI), heart rate, systolic and diastolic blood pressures, respiratory rate, and temperature.  The vital sign results at each assessment and changes for each post-Baseline assessment will be descriptively summarized by treatment group.

### 12.6.4    Exacerbations of Underlying Lung Disease

Exacerbation of underlying lung disease is defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality. Number of subjects with exacerbation of underlying lung disease will be summarized for each treatment group and included in the overall AE summary table.  A listing of these events will also be provided.

## 13     PHARMACOKINETICS

No pharmacokinetic measures will be assessed in this study.

LIQ_PH-ILD_00000474

United Therapeutics Corp.            **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

## 14     REFERENCES

Jones PW.  Interpreting thresholds for a clinically significant change in health status in asthma and COPD.  Eur. Respir. J.  2002;19:398–404.

Koch GG, Carr GJ, Amara IA, et al.  Categorical data analysis.  In Berry DA ed. *Statistical Methodology in the Pharmaceutical Sciences.*  New York, NY: Marcel Dekker Inc.; 1990:391–475.

Koch GG, Tangen CM, Jung JW, et al.  Issues for covariance analysis of dichotomous and ordered categorical data from randomized clinical trials and non-parametric strategies for addressing them.  Statist. Med.  1998;17:1863–1892.

O'Brien PC, Zhang D, Bailey KR.  Semi-parametric and non-parametric methods for clinical trials with incomplete data.  Statist. Med.  2005(3);24:341–358.

Royston P, Parmar MKB.  Restricted mean survival time: an alternative to the hazard ratio for the design and analysis of randomized trials with a time-to-event outcome.  BMC Medical Research Methodology  2013;13:152.

Stokes ME, Davis CS, Koch GG.  *Categorical Data Analysis Using the SAS System.*  2nd Edition.  Cary, NC: SAS Institute Inc.; 2000.

United Therapeutics Corp.

RIN-PH-201 Statistical Analysis Plan Amendment 1
Inhaled Treprostinil

## 15    LIST OF TABLES, LISTINGS, AND FIGURES

### 15.1    LIST OF TABLES

| Table Number | Table Title |
|---|---|
| 14.1.1 | Summary of Subject Accountability |
| 14.1.2 | Summary of Analysis Population Information |
| 14.1.3 | Summary of Demographic Data |
| 14.1.4 | Summary of Baseline Characteristics |
| 14.1.5 | Summary of PH-ILD History |
| 14.1.6.1 | Summary of Entry Criteria Violations |
| 14.1.6.2 | Summary of Protocol Deviations |
| 14.1.7 | Summary of Randomization Information |
| 14.1.8 | Summary of Medical History |
| 14.1.9 | Summary of Concomitant Medications Ongoing at Baseline |
| 14.1.10 | Summary of Concomitant Medications Added During the Study |
| 14.1.11 | Summary of Study Drug Dosing and Exposure |
| 14.1.12 | Summary of Study Drug Treatment Compliance |
| 14.2.1.1 | Summary and Analysis of Peak 6MWD (meter) at Week 16 – Primary Efficacy Endpoint |
| 14.2.1.2 | Summary and Analysis of Peak 6MWD (meter) at Week 16 – Per Protocol Population |
| 14.2.1.3 | Summary and Analysis of Peak 6MWD (meter) at Week 16 with LOCF Imputation for Missing Data |
| 14.2.1.4 | Summary and Analysis of Peak 6MWD (meter) at Week 16 with LRCF Imputation for Missing Data |
| 14.2.1.5 | Summary and Analysis of Peak 6MWD (meter) at Week 16 with No Imputation for Missing Data |
| 14.2.1.6 | Summary and Analysis of Peak 6MWD (meter) at Week 16 Including Data Collected after Termination of Study Drug |
| 14.2.1.7 | Summary and Analysis of Peak 6MWD (meter) at Week 16 Excluding Subjects with a Reported Exacerbation within 3 Days of the Week 16 6MWD Measure |
| 14.2.1.8 | Analysis of Peak 6MWD (meter) at Week 16 Using Mixed Model Repeated Measurement (MMRM) |
| 14.2.1.9 | Summary and Analysis of Percent Change from Baseline to Week 16 in Peak 6MWD |
| 14.2.1.10 | Summary and Analysis of Peak 6-Minute Walk Distance (meter) at Week 16 by ILD Etiology Category |
| 14.2.1.11.1 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline 6MWD Category ($\leq$350 meters versus >350 meters) |
| 14.2.1.11.2 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline 6MWD Category ($\leq$baseline median meters versus>baseline median meters) |

LIQ_PH-ILD_00000476

United Therapeutics Corp.                    **RIN-PH-201 Statistical Analysis Plan Amendment 1**
                                             **Inhaled Treprostinil**

| Table Number | Table Title |
|---|---|
| 14.2.1.12 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline DLCO Percent Predicted |
| 14.2.1.13 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Baseline PVR |
| 14.2.1.14 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Sex |
| 14.2.1.15 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Age Group |
| 14.2.1.16 | Summary and Analysis of Peak 6MWD (meter) at Week 16 by Study Drug Dose at Week 16 |
| 14.2.1.17 | Summary of Effects of Baseline Hemodynamics and Baseline PFTs on Peak 6MWD by Week |
| 14.2.1.18 | Summary and Analysis of Peak 6MWD (meter) at Week 16 – Multiple Imputation for Missing Values |
| 14.2.1.19 | Summary and Analysis of Peak 6MWD (meter) at Week 16 – ANCOVA Model with Random Site Effects |
| 14.2.2.1 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 16 – Secondary Efficacy Endpoint |
| 14.2.2.2 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 16 – with Observed Case |
| 14.2.2.3 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 8 |
| 14.2.2.4 | Summary and Analysis of NT-proBNP (pg/mL) Data at Week 8 with Observed Case |
| 14.2.2.5 | Analysis of NT-proBNP (pg/mL) Data Using Mixed Model Repeated Measurement (MMRM) |
| 14.2.3.1 | Summary and Analysis of Clinical Worsening Events – Secondary Efficacy Endpoint |
| 14.2.3.2 | Summary of Hospitalization Information |
| 14.2.4.1 | Summary and Analysis of Peak 6MWD (meter) at Week 12 – Secondary Efficacy Endpoint |
| 14.2.4.2 | Summary and Analysis of Peak 6MWD (meter) at Weeks 4 and 8 |
| 14.2.5.1 | Summary and Analysis of Trough 6MWD (meter) at Week 15 – Secondary Efficacy Endpoint |
| 14.2.5.2 | Summary and Analysis of Trough 6MWD (meter) at Week 15 with Observed Case |
| 14.2.6.1 | Summary and Analysis of SGRQ Total Score |
| 14.2.6.2 | Summary and Analysis of SGRQ Symptoms Score |
| 14.2.6.3 | Summary and Analysis of SGRQ Activity Score |
| 14.2.6.4 | Summary and Analysis of SGRQ Impacts Score |
| 14.2.7 | Summary and Analysis of Distance Saturation Product (DSP) (m%) |
| 14.3.1.1 | Overall Summary of Adverse Events and Exacerbations of Underlying Lung Diseases |
| 14.3.1.2 | Summary of Adverse Events by System Organ Class and Preferred Term |
| 14.3.1.3 | Summary of Adverse Events by Preferred Term |

United Therapeutics Corp.                    **RIN-PH-201 Statistical Analysis Plan Amendment 1**
**Inhaled Treprostinil**

| Table Number | Table Title |
|---|---|
| 14.3.1.4 | Summary of Deaths |
| 14.3.1.5 | Summary of Serious Adverse Events by System Organ Class and Preferred Term |
| 14.3.1.6 | Summary of Non-Serious Adverse Events by System Organ Class and Preferred Term |
| 14.3.1.7 | Summary of Adverse Events Probably or Possibly Related to Study Drug by System Organ Class and Preferred Term |
| 14.3.1.8 | Summary of Adverse Events Leading to Permanent Discontinuation of Study Drug by Preferred Term |
| 14.3.1.9 | Summary of Adverse Events by System Organ Class, Preferred Term, and Severity |
| 14.3.1.10 | Summary of Adverse Events by Study Drug Dose at AE Onset |
| 14.3.2.1 | List of Deaths |
| 14.3.2.2 | List of Serious Adverse Events |
| 14.3.4.1 | Summary of SpO2 (%) Measured by Pulse Oximetry |
| 14.3.4.2 | Categorical Summary of SpO2 (%) Measured by Pulse Oximetry |
| 14.3.4.3 | Summary of Heart Rate (beats/min) by Pulse Oximetry |
| 14.3.4.4 | Summary of Supplemental Oxygen Use |
| 14.3.4.5 | Summary of Supplemental Oxygen (L/min) |
| 14.3.4.6 | Summary of Pulmonary Function Test Results |
| 14.3.4.7 | Summary of Subjects with ≥20% Decrease in FEV1 from Baseline |
| 14.3.4.8.1 | Summary of Laboratory Data – Clinical Chemistry |
| 14.3.4.8.2 | Summary of Clinical Chemistry Shift from Baseline |
| 14.3.4.8.3 | Summary of Laboratory Data – Hematology |
| 14.3.4.8.4 | Summary of Hematology Shift from Baseline |
| 14.3.4.9 | Summary of Vital Signs |
| 14.3.4.10.1 | Summary of Electrocardiogram Parameters |
| 14.3.4.10.2 | Summary of Electrocardiogram Categorical Results |

## 15.2   LIST OF LISTINGS

| Listing Number | Listing Title |
|---|---|
| 16.2.1.1 | Subject Dispositions |
| 16.2.1.2 | Subject Accountability |
| 16.2.2 | Protocol Deviations |
| 16.2.3.1 | Subject Randomization |
| 16.2.3.2 | Analysis Population Information |
| 16.2.3.3 | Entry Criteria |
| 16.2.4.1 | Demographics |
| 16.2.4.2 | PH-ILD History |

**LIQ_PH-ILD_00000478**

United Therapeutics Corp.                    RIN-PH-201 Statistical Analysis Plan Amendment 1
                                                                        Inhaled Treprostinil

| Listing Number | Listing Title |
|---|---|
| 16.2.4.3 | Medical History |
| 16.2.4.4 | Concomitant Medications |
| 16.2.5 | Study Drug Dosing |
| 16.2.6.1 | 6-Minute Walk Test |
| 16.2.6.2 | 6MWT Information with Imputed Data – Peak 6MWD |
| 16.2.6.3 | 6MWT Information with Imputed Data – Trough 6MWD |
| 16.2.6.4 | Plasma NT-proBNP (pg/mL) |
| 16.2.6.5 | Clinical Worsening Events |
| 16.2.6.6 | The St. George's Hospital Respiratory Questionnaire |
| 16.2.6.7 | The St. George's Hospital Respiratory Questionnaire Score by Domain |
| 16.2.6.8 | Hospitalizations |
| 16.2.6.9 | Death Records |
| 16.2.6.10 | RHC and Hemodynamic Measures |
| 16.2.7.1 | Adverse Events |
| 16.2.7.2 | Serious Adverse Events |
| 16.2.7.3 | Adverse Events Leading to Discontinuation of Study Drug |
| 16.2.7.4 | Exacerbations of Underlying Lung Disease |
| 16.2.8.1 | Pulse Oximetry and DSP |
| 16.2.8.2 | Supplemental Oxygen |
| 16.2.8.3 | Pulmonary Function Test Results |
| 16.2.8.4 | Laboratory Results – Clinical Chemistry |
| 16.2.8.5 | Laboratory Results – Hematology |
| 16.2.8.6 | Pregnancy Status |
| 16.2.8.7 | Vital Signs |
| 16.2.8.8 | ECG Results |

## 15.3   LIST OF FIGURES

| Figure Number | Figure Title |
|---|---|
| 14.2.1 | Mean Change from Baseline in Peak 6MWD (meter) by Visit |
| 14.2.2 | Mean Change from Baseline in Peak 6MWD (meter) at Week 16 by Inhaled Treprostinil Dose at Week 16 |
| 14.2.3 | Forest Plot on Subgroup Analyses of Peak 6MWD (meter) at Week 16 |
| 14.2.4 | Kaplan-Meier Plot of Time to Clinical Worsening |

DA0859                                                    LIQ_PH-ILD_00000479

# Summary of Changes

# Statistical Analysis Plan - RIN-PH-201

## Amendment 1 (Final SAP) - 12Dec2019

**LIQ_PH-ILD_00000480**

**Original Statistical Analysis Plan (27 February 2019)**

<u>**Amendment 1 (12 December 2019):**</u>

— The ordering of secondary and exploratory endpoints were re-ordered in the SAP Amendment 1 and differ from the order specified in RIN-PH-201 Protocol Amendment 3.

— In the protocol, time to clinical worsening was identified as an exploratory endpoint.

— In the SAP Amendment 1 analyses, time to clinical worsening will be analyzed as a secondary endpoint.

LIQ_PH-ILD_00000481

# EXHIBIT 25

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use YUTREPIA™ safely and effectively. See full prescribing information for YUTREPIA™.**

**YUTREPIA™ (treprostinil) inhalation powder, for oral inhalation**
**Initial U.S. Approval:  2002**

-------------------------INDICATIONS AND USAGE--------------------------

---------------------DOSAGE AND ADMINISTRATION----------------------

---------------------DOSAGE FORMS AND STRENGTHS---------------------

--------------------------CONTRAINDICATIONS---------------------------

---------------------WARNINGS AND PRECAUTIONS----------------------

----------------------------ADVERSE REACTIONS----------------------------

**Revised: 01/2024**

**FULL PRESCRIBING INFORMATION**

**1   INDICATIONS AND USAGE**

**2   DOSAGE AND ADMINISTRATION**

| | | |
|---|---|---|
| ███ █ | | █ |
| ███ █ | | █ |
| ███ █ | | █ |
| ███ █ | | ██ |
| █ | | █ |

████████████████

████████████████████████████████
███████████████████████████

## 3  DOSAGE FORMS AND STRENGTHS

███████████████████████

█ ████████████████████████████████████

█ ████████████████████████████████

█ ██████████████████████████████████

█ ████████████████████████████████████

## 4  CONTRAINDICATIONS

██

## 5  WARNINGS AND PRECAUTIONS

█ ███████████████████

███████████████████████████████████

█ ████████

██████████████████████

█ ██████████████

████████████████████████████████
████████████████████████
███████████████████

## 5.4    Bronchospasm

████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████

## 6    ADVERSE REACTIONS

█████████████████████████████████████████

▪ ████████████████████████████████████
▪ █████████████████████████

## 6.1    Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the
████████████████████████████████████████████████
██████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████
██

| | ████ | ████ |
|---|---|---|
| ██████████ | ██ | ██ |
| ███ | ██ | ██ |
| █████ | ██ | ██ |
| ████ | ██ | ██ |
| ████ | █ | ██ |
| ██████ | █ | ██ |
| ██ | ██ | ██ |
| ████ | ██ | ██ |
| █████ | ██ | ██ |
| ███████ | ██ | ██ |



**6.2** **Adverse Reactions Identified in Post-Marketing Experience**

**7** **DRUG INTERACTIONS**

**8** **USE IN SPECIFIC POPULATIONS**





**10 OVERDOSAGE**

**11 DESCRIPTION**

## 12 CLINICAL PHARMACOLOGY





## 13 NONCLINICAL TOXICOLOGY

## 14 CLINICAL STUDIES

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000904



**HIGHLY CONFIDENTIAL**

DA0872

**LIQ_PH-ILD_00000905**



HIGHLY CONFIDENTIAL
DA0873
LIQ_PH-ILD_00000906





HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000908

## 16 HOW SUPPLIED/STORAGE AND HANDLING

██████████████████████████████████████████████
██████████████████████████████████████

| ████████ | ████████ | ██████ |
|---|---|---|
| ████████ | ████████████ | ██████ |
| ██ | ████████████████ | ██████ |
| ██ | ████████████████ | ██████ |
| ██ | ████████████████ | ██████ |
| ██ | ████████████████ | ██████ |

███████████████████████████████████████████
██████████████████
████████████████████████████
████████████████████████████████
██████████████

## 17 PATIENT COUNSELING INFORMATION

████████████████████████████
████████████████████████████████████

®Copyright 2021 Liquidia Technologies, Inc. All rights reserved.

Distributed by: Liquidia Technologies, Inc. Morrisville, NC 27560

# EXHIBIT 26



CONFIDENTIAL – OUTSIDE COUNSEL ONLY PURSUANT TO L.R. 26.2

UTC_PH-ILD_009410



CONFIDENTIAL – OUTSIDE COUNSEL
ONLY PURSUANT TO L.R. 26.2

DA0880



CONFIDENTIAL – OUTSIDE COUNSEL
ONLY PURSUANT TO L.R. 26.2

DA0881

UTC_PH-ILD_009412



CONFIDENTIAL – OUTSIDE COUNSEL ONLY PURSUANT TO L.R. 26.2

UTC_PH-ILD_009413





CONFIDENTIAL – OUTSIDE COUNSEL ONLY PURSUANT TO L.R. 26.2

UTC_PH-ILD_009415



CONFIDENTIAL – OUTSIDE COUNSEL ONLY PURSUANT TO L.R. 26.2

UTC_PH-ILD_009416





CONFIDENTIAL – OUTSIDE COUNSEL ONLY PURSUANT TO L.R. 26.2

UTC_PH-ILD_009418

# EXHIBIT 27

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

UTHR.OQ - United Therapeutics Corp at TD Cowen Health Care Conference

EVENT DATE/TIME: MARCH 05, 2024 / 5:50PM GMT

**OVERVIEW:**

Company Summary

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000482

MARCH 05, 2024 / 5:50PM, UTHR.OQ - United Therapeutics Corp at TD Cowen Health Care Conference

## CORPORATE PARTICIPANTS

**James C. Edgemond** *United Therapeutics Corporation - CFO & Treasurer*
**Michael I. Benkowitz** *United Therapeutics Corporation - President & COO*

## CONFERENCE CALL PARTICIPANTS

**Joseph John-Charles Thome** *TD Cowen, Research Division - MD & Senior Research Analyst*

## PRESENTATION

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

44th Annual TD Cowen Healthcare Conference. I'm Joe Thome, I'm one of the senior biotech analyst here on the team at TD Cowen. And it's my pleasure to have with me today the team from United Therapeutics. We have President and COO, Mike Benkowitz and CFO and Treasurer, James Edgemond. Thank you both for joining us.

## QUESTIONS AND ANSWERS

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

So maybe just to start things off, congrats on the record revenues in 2023. Maybe just give us a brief overview of the company's recent progress and your outline goals for the rest of this year?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Thanks, Joe, and thanks for hosting us today. Before I get started, my lawyers would want me to say something about forward-looking statements. So there you go. You guys can check out our public filings with the SEC to look at the risks and uncertainties associated with that.

So yes, 2023 was really a fantastic year for us, and I think it sets us up well for the future. What we're really focusing on, really last year, this year and in the future is executing on what we've called the 3 ways of growth that we've been talking about the last few investor conferences and at our last earnings call. So the first wave is what we call the foundational wave, which is really about commercial execution with respect to our already approved products, continuing on the recent growth trajectory from a revenue standpoint with those products.

The second wave is the innovation wave and really there, what we're focused on is development and then eventually commercialization of ralinepag in pulmonary arterial hypertension, PAH and then Tyvaso in IPF and PPF or progressive pulmonary fibrosis.

And then the third wave is what we call a revolutionary wave and that's our organ manufacturing business. And so we now have a really well-rounded multiple shots on goal approach to developing an unlimited supply of commercial organs in the kidney, heart, lung and liver space.

So that's really, I think, at a high level, what we're focused on, specifically with respect to 2024, it's really 4 things. One is to continue, like I said, continued revenue growth in the -- along the same trends that we saw in the last couple of years, 20% plus. We're looking on the innovation side, we're looking to complete enrollment in the ralinepag study and the 2 IPF studies with Tyvaso.

On the revolutionary side, where we expect to complete the preclinical work for the xenokidney and this quarter actually and then hopefully get a meeting with the FDA later this year that will lead to commencing a clinical trial as early as 2025. And then we're also excited with one of our recent acquisitions, Miromatrix, to begin the first human clinical trial with a bioengineered organ, which is the miroliverELAP.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000483

MARCH 05, 2024 / 5:50PM, UTHR.OQ - United Therapeutics Corp at TD Cowen Health Care Conference

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

And the company has previously indicated, hoping to achieve a $4 billion run rate by the end of 2025. I guess what are sort of the key aspects of the commercial franchise that get you there? And maybe what proportion of that is going to come from? Tyvaso versus the rest of the franchise?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So we said $4 billion run rate by mid-decade. So 2025, 2026 in that time frame. And really, if you just kind of draw a line or extend the growth over the last couple of years, we're well positioned to do that. The lion's share of that growth will come from Tyvaso, particularly (inaudible) associated (inaudible) where we are currently the only approved therapy for that disease. Continue to make good traction in identifying those patients that are good candidates for that therapy.

But we also expect to, at a minimum, maintain Remodulin revenues. Though even with that said, last year, we actually had modest growth in Remodulin on our U.S. business, which is, we think, pretty phenomenal given that we've had a generic competitor for 5 years now. And then we expect to run (inaudible) to continue to grow on the heels of the expedite data, which we published a couple of years ago. And then we have a new study with Remodulin to Orenitram transitions, which is our ARTISAN study.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Okay. And obviously, the Tyvaso expansion into PH-ILD has been a huge investor focus and good for the top line. Can you tell us a little bit how many patients have you treated with PH-ILD or rather how penetrated into this market are you? Just kind of overall, where is the franchise there in terms of patient finding and how penetrated drug is?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So for PH-ILD, if you look at the epi data, it's a pretty broad range. I think the epi data suggests anywhere from 15% tied to 85% of the 230,000 ILD patients have or will get pulmonary hypertension. We've tended to really kind of focused on the low end of that range, 15%. So we look at the market as being around 30,000. I think you talked to various KOLs. I'd say it's significantly higher, but 30,000 is a good number for us to start with. It's almost as large as the PAH market. And as I said earlier, we're the only approved product in that space. So that's really kind of how we think about the size of the market right now.

And then in terms of penetration, we're in kind of the low double-digit range there, kind of in that 10% to 15% range and then continue to make progress every month, every quarter, every year and growing that patient base. And so we've undertaken, I think, several steps, which I'm sure I'm going to talk about, to continue to increase that penetration, educate those ILD physicians about pulmonary hypertension, steps they need to go through to screen those patients. And then at that point, they have a decision about whether they want to treat or refer to a PAH clinic.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

And maybe along that point, the company did expand the Tyvaso sales effort and sales force in 2023. Maybe if you can just remind us how large an expansion this was maybe what was driving this decision, if anything different than what you just highlighted? And maybe when will we start to see the impact from that expansion in revenues?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So I mean the expansion actually, I would say, the expansion of our field-based teams actually started about 12 to 15 months ago. So it was broader than just the sales representatives. We increased our medical science liaisons. We increased a team that we call our regional nurse specialists.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000484

MARCH 05, 2024 / 5:50PM, UTHR.OQ - United Therapeutics Corp at TD Cowen Health Care Conference

So these are nurses that we employ to go in and work with nurses in the office and teach them how to use our products, how to titrate, how to manage side effects.

And then we also deployed last year a team of what we call field reimbursement managers and the goal of that team or the objective of that team is, again, to go work with offices, particularly new prescribers and help them navigate the reimbursement process. We're filling out the referral form with how to write an appeals letter. So educating them on that whole process, because it's a pretty complex process for those practices that are used to dealing with our therapies.

And then the second half of last year, we augmented the sales team. So on a numbers basis, the sales team, we increased like say by maybe 25%. But really, I think the impact is going to be greater than that, because in addition to increasing the size of the teams, we also realign promotional priorities. So we now have a group of sales representatives that are only calling on ILD doctors and talking about PH-ILD. So the magnitude impact of that is greater than 25%, because they're now spending 100% of their time talking about PH-ILD.

And so really, what I think was just a recognition -- the reason we did it was just a recognition by us that we needed to provide more support, there was more opportunity out there that we maybe weren't optimizing. I think we felt like the -- maybe the sales representatives were spread a little (inaudible) of why they were reaching all the prescribers, the frequency by which they were able to talk to them and educate them wasn't where we thought it needed to be.

So that expansion on the sales force started middle of last year. You have to go through the hiring process, the training. So really, they deployed in earnest 1st of this year. And so it'll probably take a couple of quarters, really, I think, to start to see traction on the benefit of that. So as we get to the second half of the year, we would expect to see the payoff from that investment.

---

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. And the company does typically highlight seasonality in the fourth quarter and first quarter, at least relative to Q2, Q3. But obviously, in the last quarter, we did see quarter-over-quarter growth in Tyvaso specifically. Did this kind of buck the trend? Or is there underlying seasonality still in Tyvaso? Or what was sort of behind that growth?

---

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So there's a natural seasonality to our business. We talked about this on prior calls. It's really a function of when we look -- at least when you look at the revenue line, because we have 2 specialty pharmacies, right? So it's a closed channel really 2 customers. They have an algorithm for which they can determine how much they're going to order, that's tied predominantly to shipping data in the quarter. So when you get into the fourth quarter, you really lose 2 to 3 weeks with the holidays in terms of shipping days. On the physician patient side, there's also fewer clinic days. So fewer days for physicians to see the patients.

And then we see this phenomenon often typically between Thanksgiving and Christmas where, just because of the complex nature of our therapies, patients will often wait until after the first of the year. So we may have referrals and prescriptions coming in. The starts may not occur until after the 1st of the year. And so that happens really across what we see that to varying degrees across all of our products. And so that -- we saw that in Q4 on a relative basis. But particularly with Tyvaso, we were able to grow through it, right, just because of the volume that was coming through.

Now the interesting thing is we didn't see it the prior year when you're looking at the revenue line, if you look at the underlying drug product going out to patients, we actually grew through it last year, too. The challenge we had last year, as you recall, is we had this inventory adjustment, because we were -- we had the nebulizer. We launched DPI. And so the specialty pharmacies were having to adjust their inventory levels to draw down their nebulizer inventory while they were stocking up on the DPI side. And so when you look at the revenues last year, it looks a little wacky. It looks like we actually had a down quarter, but the underlying metrics were still really strong. And so we saw that again this year as well.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000485

MARCH 05, 2024 / 5:50PM, UTHR.OQ - United Therapeutics Corp at TD Cowen Health Care Conference

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. And then maybe on the capacity with the DPI is all of that now behind us, nothing related to that? And then maybe if you can give a high-level update on the capacity expansion, just in preparation for IPF and PPF successful?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Yes. So the capacity issues that we were running into last year are behind us. MannKind, who's our partner and is manufacturing DPI for us, made some enhancements to their production lines, so they're able to increase production in the middle part of last year. And then as we move to the second half of the year, where we're seeing the benefit of that. We're bringing online actually this month, a kitting line down in North Carolina, so to keep this at a high-speed kitting line, because that has been sort of our last bottleneck to the extent there was one is that we were using a third party and they weren't moving as they were limited on how fast it could move. So now we've got a high-speed kitting line.

So those issues are behind us and the specialty pharmacies are able to order, rely on fleet within their contractual limits. We're starting to build up a little bit of inventory ourselves and that will just continue as we move into the balance of the year. Not to mention MannKind is adding 2 high-speed filling lines. And so that will increase our capacity when that comes online later this year, that will increase our capacity to support up to 25,000 patients a year.

And then as we think about IPF, just to kind of round that out, we have a new production facility that we broke ground on last year in North Carolina to further manufacture DPI and that will have a capacity for an additional 50,000 patients. And that should come online right around the time that we launch into IPF.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. Maybe on the Tyvaso DPI uptake in the field yesterday on our physician panel, the doctor indicated, there's actually still quite a bit of use of the nebulized product, especially during maybe dose titration and getting patients up to speed. Maybe overall, can you tell us where are people using the DPI? Are they converting their new patients? And are you seeing the same level of use of nebulizer to DPI? Or how is it fitting in?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So if you look at our revenues the last few quarters and the last couple of quarters, I guess, where we've broken out DPI and nebulizer, I think it's roughly a 60-40 split in terms of DPI. And that's tracking well when we look at the patient level data in terms of the mix of patients. I would say that new prescriptions coming in, new referrals coming in are more along the lines of 70-30. So over time, you would expect -- we would expect that the revenue is going to reflect that, and I think it will.

So in terms of where the DPI is coming from, initially, it was a lot of transitions of patients on nebulizer that wanted the benefit or the convenience of the DPI. That's largely played out at this point. So patients that were on the maintenance dose of neb and wondering to transition to DPI have transitioned over. And so DPI now is really -- I think it's really kind of starting to solidify itself as sort of frontline prostacyclin therapy in PAH and then obviously in PH-ILD which we've talked about.

So those are -- on the PHI there's going to be prostacyclin-naive patients. Could also -- we are also seeing some transitions from the orals. So selexipag, for instance, if patients aren't doing well. That might be the next stop, depending on where the patient is in their disease progression.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Okay. And then we do have an FDA decision coming up for Merck sotatercept later this month. Maybe if you could talk just a little bit about how you expect sotatercept to impact the PAH business, I guess just the landscape overall and then -- and as it relates to your top line as well or any of the product usage?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000486

MARCH 05, 2024 / 5:50PM, UTHR.OQ - United Therapeutics Corp at TD Cowen Health Care Conference

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. I think over the, I mean, the medium to long term, we don't really see it impacting our business in a material way. And it's another therapy, they have very good clinical data. It's great for patients. I think as you look at -- you peel back the onion or the covers and look at their data and where it was used, how it was used. I think the things that we're really encouraged about is that 70% of the patients were on a background prostacyclin, like a Remodulin or Orenitram. So it does seem to suggest that those 2 products work well together.

So it's -- the other thing I would say is it's not a cure, it's not a replacement for prostacyclin. I think patients are still going to need prostacyclin. Increasingly, polytherapy is becoming the norm in PAH. And so you have the various pathways you cover with a PDE5 and the [RRA] prostacyclin, and this is the fourth pathway. So I think it's additive to the products that are out there. I don't really see it as being a replacement for any one product, including ours.

And I think the nice thing for the patients and us from a financial standpoint is if the drug is working really well, then sensibly the patients are going to live longer, they're going to stand our therapies longer. So that's kind of how we see it's another the tool of the toolkit for the physicians to use. But long term, we don't really see it impacting our business.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. And obviously, there's some ongoing litigation with Liquidia. So we're not going to ask specifically about those decisions. But I guess how do you see Liquidia as a potential competitor? Is that factored into your business model at all? Or maybe why is the DPI, even if liquidity were to come to market saying PAH could be the preferred agent?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Did you say why would Liquidia become the -- I think I believe -- we believe Tyvaso will continue to be the preferred agent for very -- I mean the big one is that we've got 2 years of patient data, thousands of patients on the product. The patients are -- satisfaction level is incredibly high both by the physicians and by the patients. And so they have that experience with our product, which is incredibly helpful.

I think -- we think the convenience of our device as a differentiator. Ours is one (inaudible) per session. Their's 2. Ours doesn't require cleaning. Their's does. We don't have a max label dose. And so we just think, all in all, the patients and the physicians are going to prefer our product. We think the other thing that's attractive about our devices are just what's called a low-flow device and so that means that it requires less patient effort to actually breed the drug.

And then as a result of that, that property or that characteristic. The drug is actually getting deeper into the lungs. So what you see with a high flow device, which is what their device is. So we think all in all, the totality of the characteristics of our device are going to be preferred by physicians and patients.

And then on the payer side, you were in these discussions right now with payers and kind of working that out. But I think we're feeling increasingly confident that there's not going to be preference, so it's going to be a level playing field. So it's really going to be up to the patient and the physician, and we feel confident about how we're going to do there.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. And then you mentioned earlier the Tyvaso in IPF and PPF yesterday on the panel, again, the physicians are really impressed with the increased data and sort of even in the placebo patients when you give Tyvaso, you do see that recovery in FVC. I guess what in the data package has resonated best with physicians? And maybe what -- can you update us on the status of the IPF and PPF program?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000487

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Well, I think the main thing is the FVC improvement that we saw in the increased data, the physicians have been really excited about it. This trial has been enrolling incredibly fast. We were able to actually increase the sample size last year without sacrificing any of our time lines. So I think both trials now are -- there's 2 trials. There's a U.S. trial. There's a rest of world trial, both our sides are around 575 patients. And we expect to complete enrollment this year in both trials. It's a 52-week study. So we'll get the last patient in end of -- towards the end of 2025 and then expect to have a readout soon thereafter.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. And can you talk a little bit about the addressable patient population in IPF, PPF? I guess, where would the drug fit in into this treatment paradigm?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. So for IPF in the U.S. We see that as a patient population of about 100,000 patients. And in the TETON trials, patients can be on background therapy. So it will be additive to the existing therapies that are out there. In PPF, it's we think it's roughly 60,000 patients in the U.S.

So again, another unmet need that where patients can benefit from Tyvaso. And then in the case of IPF, I think we'll actually do this in PPF, but IPF for sure, we designed that to support our European filing. So we would expect to file in Europe and launch there soon after getting FDA approval.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. Maybe jumping over to the oral prostacyclin side of the business. I know we've discussed previously how some of the Orenitram data maybe hasn't or kind of was impacted by COVID in terms of relaying that to physicians, which maybe didn't get the full impact of that data set out to the market. I guess how is Orenitram launching now? How big do you think this could get? And then we'll dive into ralinepag after that.

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So I mean, it's interesting with Orenitram, because if you look at the clinical data for all of our products, it's far and away our best data. I mean you've got clinical works team, you've got improvement in some of the risk factors that physicians look at for patients in PAH. You've got an indication of survival at a cost that's actually less expensive than (inaudible).

So the whole package there is -- the value prop for Orenitram, we think is really high. I think the challenges that we see sometimes with Orenitram is its titration is good and bad, right? I mean it's good that you can titrate up. It's also a little bit more complicated to communicate to the patient. And then you have just the normal side effect things that happen with the prostacyclin. And so I think the words getting out on the data. I think what we have seen or what we found is that the -- I think the ideal place to use Orenitram is after Remodulin.

So that was the whole point behind the expedite study. So these aren't Remodulin patients that are sitting on Remodulin for years and transitioning over. Although we do have patients like that. But the idea with the expedite study was to take a patient that you would otherwise start on Orenitram, start them with Remodulin, get them up to a good dose over a period of weeks. Some doctors have done it in days, but really the study was to do it over a number of weeks, then be able to transition the patient over to a higher level dose of Orenitram with fewer side effects.

And so I think we're finding increasingly that the doctors are using that protocol to start patients on Orenitram. So that's really starting to get traction. And I think that's why we're seeing continued growth on Orenitram and that should continue.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000488

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

And then you have ralinepag in clinical development. I guess, how would this fit into the treatment paradigm as it is right now? Would this be sort of a direct swap for Orenitram? Obviously, we talked about dose titration just now and sort of some of the data you have in relation to Remodulin. But could all of that be essentially seen as also captured in ralinepag? Or do you see it in a different setting?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

I think it remains to be seen. I think we'll see what the trial bears out in terms of the efficacy titration, how high (inaudible) and patient outcomes. And I think we certainly see it as a direct competitor to selexipag is the same class of drug, IP receptor agonist. And so -- and with the once-daily dosing, we think that that's going to be an attractive option or alternative to selexipag. And then like I said, depending on the data, we'll see how that competes with Orenitram and there are properties of prostacyclin that patients benefit from over an IP receptor agonist. I think regardless of how this plays out, there's always going to be a role for Orenitram.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. Maybe on the xenotransplantation side, the company has indicated that they're now in pivotal preclinical studies for the xenotransplantation therapy. Maybe just at a high-level progress on that side of things? And what are sort of the pivotal preclinical studies that you need ahead of moving into the clinic?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Going to let my friend, James, answer a question.

**James C. Edgemond** - *United Therapeutics Corporation - CFO & Treasurer*

Yes. Thank you. So overall, we are continuing to make very good progress. And as lead Dr. Leigh Peterson said on the last earnings call, we are in discussions with the FDA in terms of satisfying their request for data in baboon studies. And so we're progressing those final studies this year, continuing conversations with the FDA with the goal next year, Joe, early of 2025 to get an IND approved for human clinical trials in xenotransplantation. So that's kind of the goal. And I think the progress has continued. And as an organization, we're very excited, and we're doing what the FDA has asked at this point.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. And as it relates to the xenotransplantation side of the business. Can you remind us the current footprint that you do have in terms of facilities and maybe what spend was associated with the current (inaudible)?

**James C. Edgemond** - *United Therapeutics Corporation - CFO & Treasurer*

Sure. So what we announced a few weeks ago was we did a ribbon-cutting grand opening for a facility in Christiansberg, Virginia that we will use for growing the pigs that will be used for human clinical trials. And what we've said publicly is that facility was about $75 million that we established, we finished construction, and that will -- we're starting to get ready again to play into the time lines of working with the FDA to start human clinical trials in early or 2025. And that should be a good footprint for us to get to where we need. And then from there, we would expand into the commercial designated pathogen-free facilities.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000489

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

And that is one of the questions that we do get is how large of an expansion you would need to do for commercial opportunities. So what is the company thinking in regards to that? How many facilities would you need? And maybe what are the major derisking steps? Obviously, you mentioned the derisking steps to get to where you're at right now. But in order to turn on that additional investment, what would you want to see, I guess, in the clinic?

**James C. Edgemond** - *United Therapeutics Corporation - CFO & Treasurer*

Yes. Thank you. So we've talked publicly about in terms of these areas, we do want to initially start, and I'll talk about when. But with the commercial DPF facility and we've targeted a range for a cost to be between $1 billion and $2 billion. I think it will settle out somewhere in between and you can average use an average of $1.5 billion. What we are anticipating and planning to do is once we get an IND approved with the FDA, we will evaluate kind of the protocol there and start to understand how the clinical trial can roll out.

What we will do at that point because it's going to take about 3 years to build a commercial-scale designated pathogen-free facility, but we want to make sure we're doing it in a very thoughtful and methodical way. So that the human clinical trial moves forward, we're understanding that process and then starting to construct the facility. But we're going to do it in a way where we can watch the clinical trial and we can start to spend money because we won't downstroke a check in day 1 for $1.5 billion on average, but that will happen in time, and we want to be very thoughtful, methodical about how we spend the money and making sure that we understand the clinical trial and where it's going so that we can make sure at the end of that clinical trial, we're in a situation and a position to be able to supply transplantable organs to those in the.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. And on the last quarterly update, the company did announce that the FDA has cleared the IND for the miroliver ELAP program. Maybe just overall. Can you discuss the rationale for the Miromatrix acquisition? And what would an initial trial look like post this IND?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Yes. So the Miro we did -- we actually did 2 acquisitions last year, Miromatrix, and IVIVA. And really, the goal there, the objective there was really to kind of round out our organ programs. That gives us some more shots on goal. So we had been -- we had the xeno programs that we've talked about. We have a regenerated lung program, and then we have an autologous lung program on a 3D-printed scaffold that we've been working on. So this gives us another shot -- more shots on goal in the kidney and the liver. So that was really the rationale behind doing those.

In terms of the miroliver ELAP trial, I think the important thing there is that it serves the first bioengineer organ that's going into clinical trial. I think as a product, it's probably a niche product, but it kind of starts or continues our discussion with the FDA around what this clinical trial design look like and for all of our programs. So that's really, I think, the more important thing to think about with the ELAP.

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. Obviously, touch on those 2 acquisitions, discussed about investment in the facilities for the xeno pipeline. Potentially, we'll have a lot of cash if you mean your goals over the next several years. I guess how does BD factor into that is BD a priority for the pipeline? And what would you be interested in?

**James C. Edgemond** - *United Therapeutics Corporation - CFO & Treasurer*

Yes. So thank you. So just to remind maybe the audience, we do have a capital allocation kind of waterfall. And in order the priorities for us continue to be research and development, which means we're investing in ourselves, both in clinical trials as well as facilities. And the second capital allocation

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000490

priority is business development. And there, we do dedicate time, dedicate resources to look at opportunities that we can bring into the organization to provide the highest and best use of capital. We try and be very thoughtful. And we look at organizations that are synergistic to the strengths of UT and the unitarians for manufacturing to sales, the clinical trials and even as Michael just discussed, show in manufactured organs.

So it is something that we continue to look at. We just want to be very thoughtful about bringing something in and making sure we have the right resources to advance that forward and the areas could be cardiovascular, again, things where we have strength and knowledge of rare lung disease. Again, as Michael talked about, getting into the organ manufacturing space to supplement and bring in new ideas and technologies that advance that overall program forward.

---

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Perfect. Excellent. And with that, we are out of time. So thank you all for joining us.

---

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Thank you.

---

**James C. Edgemond** - *United Therapeutics Corporation - CFO & Treasurer*

Thank you.

---

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2024, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000491

# EXHIBIT 28

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

UTHR.OQ - Q1 2023 United Therapeutics Corp Earnings Call

EVENT DATE/TIME: MAY 03, 2023 / 1:00PM GMT

**OVERVIEW:**

UTHR reported 1Q23 revenues of $0.5b.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000503

## MAY 03, 2023 / 1:00PM, UTHR.OQ - Q1 2023 United Therapeutics Corp Earnings Call

### CORPORATE PARTICIPANTS

**Dewey Steadman** *United Therapeutics Corporation - Head of IR*

**Leigh Peterson** *United Therapeutics Corporation - SVP of Product Development*

**Martine A. Rothblatt** *United Therapeutics Corporation - Founder, Chairman & CEO*

**Michael I. Benkowitz** *United Therapeutics Corporation - President & COO*

### CONFERENCE CALL PARTICIPANTS

**Andreas Argyrides** *Wedbush Securities Inc., Research Division - Analyst*

**Ashwani Verma** *UBS Investment Bank, Research Division - Director of Americas Equity Research & US Specialty Pharma Analyst*

**Eun Kyung Yang** *Jefferies LLC, Research Division - MD & Senior Equity Research Analyst*

**Hartaj Singh** *Oppenheimer & Co. Inc., Research Division - Research Analyst*

**Jessica Macomber Fye** *JPMorgan Chase & Co, Research Division - Analyst*

**Joseph John-Charles Thome** *TD Cowen, Research Division - MD & Senior Research Analyst*

### PRESENTATION

**Operator**

Good morning, and welcome to the United Therapeutics Corporation First Quarter 2023 Earnings Webcast. My name is Danielle, and I will be your conference operator today. (Operator Instructions)

Please note this call is being recorded. I would now like to turn the webcast over to Dewey Steadman, Head of Investor Relations at United Therapeutics.

---

**Dewey Steadman** - *United Therapeutics Corporation - Head of IR*

Thank you, Danielle, and good morning. It's my pleasure to welcome you to the United Therapeutics Corporation First Quarter 2023 Earnings Webcast. Accompanying me on today's call are Dr. Martine Rothblatt, our Chairperson and Chief Executive Officer; Michael Benkowitz, our President and Chief Operating Officer; James Edgemond, our Chief Financial Officer and Treasurer; and then Pat Poisson, our Executive Vice President of Technical Operations; and finally, Dr. Leigh Peterson, our Senior Vice President of Product Development.

Remarks today will include forward-looking statements representing our expectations or beliefs regarding future events. These statements involve risks and uncertainties that may cause actual results to differ materially. Our latest SEC filings, including Forms 10-K and 10-Q, contain additional information on these risks and uncertainties, and we assume no obligation to update these forward-looking statements.

Today's remarks also may discuss the progress and results of clinical trials or other developments with respect to our products. These remarks are intended solely to educate investors and are not intended to serve as the basis for medical decision-making or to suggest that any products are safe and effective for any unapproved or investigational uses. Full prescribing information for these products are available on the products' websites.

Now I will turn the webcast over to Dr. Rothblatt for an overview of our first quarter 2023 financial results and the business activities of United Therapeutics. Martine?

---

2

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000504

MAY 03, 2023 / 1:00PM, UTHR.OQ - Q1 2023 United Therapeutics Corp Earnings Call

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Dewey. Very excited to welcome everyone to another great quarter at United Therapeutics. We are thrilled to continue on course toward our mid-decade goals of 25,000 patients being treated for pulmonary hypertension and the doubling of our revenue run rate. This quarter, we moved toward those goals with double-digit revenue growth from first quarter '22 to first quarter '23. And that also includes, by the way, nearly 40% growth in our main growth driver, which is Tyvaso.

I think our double-digit growth rate remains a solid forecast even with the possibility of new FDA approvals of sotatercept or Liquidia. The reason is that sotatercept has not even been tested in our main growth market of Group 3 pulmonary hypertension. Indeed, systemic drugs are generally contraindicated there due to them causing V/Q or ventilation-perfusion mismatch. In the disease sotatercept was tested in, Group 1 pulmonary arterial hypertension, we expect it to be complementary to either our Orenitram, Tyvaso or Remodulin products. So we don't forecast a realistic threat from sotatercept to our growth.

(inaudible) Liquidia, if approved, also does not challenge our projected double-digit growth. It's because it's not a generic product, but is instead a strongly differentiated drug device product requiring 65% more drug to even match Tyvaso's effect based on their own clinical trial data.

Also exciting to report this quarter is the robust progress in our pipeline. We are spot-on target to fully enroll our current big Phase III trials by the end of next year, each of which have their own billion-dollar potential. In other words, the pipeline [shown] embeds more than double our current total revenues, and then there is the aforementioned organic doubling of our revenues from our existing products already commercialized and now entering the market, such as Tyvaso DPI, Remunity and our new Orenitram dose titration kits.

I'm also very excited to report big news on the use of capital front. We have allocated $0.5 billion to a new Tyvaso DPI manufacturing facility in Research Triangle Park, North Carolina, with 50,000 patient capacity. And by the way, this is in addition to our existing nearly $100 million allocation of capital to our new clinical xenotransplantation facility in Virginia.

By the way, speaking about transplant, I'd like to thank the dozens of our shareholders and other stakeholders who sent me Amy Silverstein's superb story of her heroism in the face of heart transplants and immunosuppressants. In that vein, I wanted to take a moment to update everyone on what we at United Therapeutics are doing to effectuate Amy's quest.

In our own lab center company, we reprogrammed differentiated cells from patients back to stem cells called iPSCs, or inducible pluripotent stem cells. By the end of this year, we'll be creating iPSCs from 2 patient donors every single month. In our own labs, we differentiate cells into different types of cells needed for cellularizing different organs, such as lung, including stromal cells and epithelial cells and different types of alveolar cells.

In our own labs, we grow differentiated cells in 3D chambers into the billions of cells needed to cover each organ. Indeed, in our own labs over the past 3 years, we have produced about 2 trillion cells every year.

Also in our own labs, we cellularize our organ scaffolds with the cells that we have expanded. Indeed, last month, we achieved a kind of (inaudible) level of proof of concept for one of our own cellularized lungs, provided a pig model with the level of (inaudible) considered acceptable for human lung transplants.

Again, in our own labs, we produce this time under GMP conditions about 500 lung scaffolds every year and are now working on 3D printing kidney and liver scaffolds in partnership with 3D Systems. In short, Amy's vision of an immunosuppressant-free organ transplant is realistic for this decade, the 2020s.

Here at United Therapeutics, we expect to have patient-derived, stem cell-differentiated autologous lungs, kidneys and livers in the clinic within 5 years. Hearts could also be done. No immunosuppressants would be needed because the transplanted organs will have the same DNA as the patient. So it is really the best of times here at United Therapeutics with record revenues, another $0.5 billion quarter, record pipeline potential, $2 billion-plus opportunities and record deployment of capital and business expansion.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000505

At UT, our mantra is go big or go home. We are going big on pulmonary hypertension. We are going big on pulmonary fibrosis. And we are going big on creating an unlimited supply of transplantable, tolerable organs. Mike Benkowitz, our President and Chief Operating Officer, will now give you a deeper dive into the business. Mike?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Thanks, Martine, and good morning, everyone. We're pleased to report yet another quarter of meaningful growth for our treprostinil business. And as Martine said, we're really excited to have quarterly revenues of more than $500 million for the second time in our company's history.

As usual, I'm going to provide some color around what we're seeing with respect to each of our treprostinil products: Tyvaso, Remodulin and Orenitram. For Tyvaso and Tyvaso DPI, underlying physician and patient demand for Tyvaso remained exceptionally strong in the first quarter as we continue to grow our Tyvaso active patients at a clip consistent with the patient growth trends for the prior 3 quarters.

We saw a record number of referrals, which is what we call prescriptions, and new patient starts during the first quarter. We also continued to increase the breadth and depth of the Tyvaso prescriber base. Since the PH-ILD launch in 2021, we have now doubled the number of Tyvaso prescribers. That's our breadth metric. And in terms of prescribing depth, I've mentioned on prior calls that our key metric here is the number of prescribers with 3 or more Tyvaso patients.

I'm really happy to report that we've also doubled the number of prescribers in this category. The 3-plus Tyvaso prescribers now represent about 40% of all prescribers, which means we still have an opportunity to expand depth, which should pave the way to further accelerate Tyvaso growth over time.

The first quarter performance for Tyvaso saw the usual early year seasonality with respect to patient discontinuations due to insurance changes and also as usual, discontinuations returned to normal levels in February, March and in April. Importantly, discontinuations for Tyvaso DPI continue to run well below that of nebulized Tyvaso, reflecting patient satisfaction with Tyvaso DPI. So overall, we believe the underlying strength of the Tyvaso business is great.

Looking at first quarter revenue, as I said in the past, due to the nature of our business, we regularly encourage investors to look at longer-term revenue trends compared to quarterly revenue fluctuations. With that said, there were 3 main factors that impacted Tyvaso revenue in the first quarter, given that we're essentially in the middle of 2 product launches within the Tyvaso franchise, PH-ILD and then Tyvaso DPI.

First, and as we discussed last quarter, our specialty pharmacies are still rightsizing orders for the correct DPI and nebulized mix. In the third quarter of last year, specialty pharmacies made significant orders of nebulized Tyvaso in anticipation of increased PH-ILD demand without fully appreciating the potential for Tyvaso DPI demand.

Moving to the fourth quarter of last year and the first quarter of this year, we saw unexpectedly strong demand for Tyvaso DPI relative to nebulized Tyvaso. And the specialty pharmacies needed to reduce its nebulized inventory, which reduced Tyvaso revenue well under patient -- well under actual patient demand in the fourth quarter of 2022 and the first quarter of this year.

Second, we're seeing a higher level of PAP utilization for Tyvaso DPI than we expected. We believe this is a short-term phenomenon and will subside to a large degree when the Medicare changes that are part of the Inflation Reduction Act go into effect starting next year.

Finally, due to the incredible demand for DPI and the fact that we launched immediately upon approval without building inventory, we have not been able to allow specialty pharmacies up to their contractual minimum inventories each month. Based on our DPI demand trends and forecast, this is something that could persist for the balance of the year. Having said that, we are taking steps to increase DPI production capacity in both the short and medium term.

First, our partner, MannKind, is activating a second production line and additional kitting capacity from which we expect to see increased DPI supply as soon as this quarter. Second, and in parallel, MannKind is also on track to significantly expand manufacturing capacity in the first half of

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000506

MAY 03, 2023 / 1:00PM, UTHR.OQ - Q1 2023 United Therapeutics Corp Earnings Call

next year to support up to 25,000 Tyvaso DPI patients a year. And finally, as Martine mentioned, we have initiated a construction project to build a new UT-owned and operated Tyvaso DPI manufacturing facility. That facility is intended to provide enough capacity to support an additional 50,000 DPI patients per year and with expansion capacity for up to 75,000 DPI patients.

Turning to Remodulin. This business continues to be incredibly resilient, even though it's faced a generic competitor for almost 4 years now. We saw the second highest number of referrals for Remodulin in the first quarter. And after a small dip in active patients following the generic launch of a subcutaneous version of Remodulin, our active patients are back to pre-generic levels. Remunity continues to gain traction in the market as it is the only subcutaneous pump widely available for new Remodulin patient starts, with Remunity representing over half of our monthly subcu Remodulin shipments during the quarter.

Finally, Orenitram had a very solid quarter, achieving record number of patients on therapy and record revenues. We launched a 90-day titration kit during the first quarter, which simplifies dosing and titration for new patients. While still early, physician and patient feedback has been very positive around the convenience of these new kits. There continues to be a lot of buzz in the physician community around the EXPEDITE data we top-lined last October, demonstrating that prostacyclin induction with Remodulin can lead to double the average Orenitram dose when patients shift to oral therapy and in a shorter period of time as compared to patients who do not have a Remodulin induction. We expect to publish a peer-reviewed manuscript detailing the study in the coming months.

To wrap up, we're very pleased with the overall treprostinil business, led by the incredible demand for Tyvaso DPI, and we believe we're on our way to hitting our goal of a $4 billion revenue run rate. With that, I'll turn the call back over to Martine to start the Q&A session.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you so much, Mike. Those were terrific insights into every one of the products. Really appreciate that color that you shared with everyone. Operator, could you please open the phones, and I will sort the questions to the person most appropriate for answering them.

---

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) The first question comes from Joseph Thome of TD Cowen.

---

**Joseph John-Charles Thome** - *TD Cowen, Research Division - MD & Senior Research Analyst*

Mike, I know you mentioned that the Tyvaso DPI discontinuations are a little bit lower than what you were seeing with the nebulized Tyvaso. Maybe what are the expectations for the Tyvaso DPI average time on therapy versus what you were seeing with the nebulizer? And as we see sotatercept potentially launching maybe next year, do you expect the Tyvaso time on therapy could actually increase as these patients kind of continue to do maybe better than they did without sotatercept? Or would they intend -- maybe ramp down their prostacyclin use? How do you expect that to kind of play out?

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Mike, looks like Joe directs his question to you.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000507

MAY 03, 2023 / 1:00PM, UTHR.OQ - Q1 2023 United Therapeutics Corp Earnings Call

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Thanks, Joe. So I think overall, we're really encouraged by the lower level of discontinuation rates with Tyvaso DPI. And we do think that, that augurs well for increased time on therapy. To put a number on that, I think it's still a little early to kind of say definitively what that's going to be. But certainly, patient satisfaction has been really high with Tyvaso DPI. I think it's led to better adherence, better compliance and that leads to patients doing better, and then that will ultimately lead to patients staying on therapy longer. So I think your premise, your hypothesis that time on therapy will increase with DPI over time is absolutely right. And that's something we're certainly expecting.

Similarly, I think sotatercept probably helps in that regard as well. If you look at the underlying data in the sotatercept study, 70% of the patients in that study were on a background prostacyclin. So as Martine said in her opening comments, we think there's a lot of complementary effects between prostacyclin and sotatercept. And so we would expect that when sotatercept is launched into the market, that will continue and patients will experience a nice benefit between the 2 products as well as the other products on background therapy and should continue to lead to increased time on therapy.

**Operator**

Next question comes from Hartaj Singh of Oppenheimer.

**Hartaj Singh** - *Oppenheimer & Co. Inc., Research Division - Research Analyst*

Nice update, everybody. Just had a question on Orenitram and the EXPEDITE study. I know at ERS last year in Barcelona, really big updates there and educating the patient-physician community. It seems like at ATS this year, again, you will kind of delve into that. If you can just talk to us a little bit about what the patient flow is. Are patients mostly starting on Remodulin and then going over to Orenitram? Or are they still starting on Orenitram -- or what's the breakdown? And then how can we expect sort of that to benefit Orenitram going forward? I know it already is, but could that add even more going forward?

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Great question, Hartaj. Mike, I think you'd, again, be the best person to address that question.

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Thanks, Hartaj, for the question. So in terms of kind of the mix of patients between starting de novo on Orenitram and transitioning from Remodulin, I think it's roughly, call it -- 2/3 roughly, 2/3 of patients are starting de novo on Orenitram right now. And as I mentioned in my comments, I think the fact that we've got that titration -- new titration kit, I think that's going to continue to help patients titrate up on Orenitram, starting de novo, and then the balance are transitions from Remodulin.

I still believe that there will be patients that will start de novo on Orenitram over time once we really fully, I think, take advantage of the EXPEDITE data. But I also think it's true that Tyvaso DPI is proving to be so convenient for patients, and it's almost sort of your gateway drug to prostacyclin. So I think over time, you're going to see a higher number -- higher percentage of patients initiate prostacyclin therapy on DPI, even over the orals, both Orenitram and selexipag.

And so the thing that we really like about the EXPEDITE data and then the ARTISAN study, which we've talked about on prior calls, is it's an opportunity to take these maybe functional class III patients or even IV patients in the case of ARTISAN, start them on Remodulin, get their hemodynamics down -- closer to normal levels. And then you can flip them over to Orenitram and really use Orenitram as their maintenance drug and continue to titrate up as you need. And if they -- if over time, they decline, then you can obviously switch them back to Remodulin.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000508

But we really see that as sort of a key position for Orenitram as we move forward over the next several years. And in some, it really just kind of speaks to the flexibility of treprostinil and the fact that we've got these different delivery options. And so it really just, I think, allows us to kind of meet the patient -- the physician where the patient is in their disease progression.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Great. Thanks so much, Mike. That was really beautiful, the way you were able to describe that with ARTISAN and EXPEDITE and the whole rapid transition to oral. We're able to get patients into a stable equilibria, if you will, with their pulmonary artery pressures down around, I would say, below 40 millimeters of mercury. And there's like an increasing volume of data out there, well over a dozen scientific papers that have shown that patients with pulmonary hypertension who are managed in this kind of potential, well between 30 and 40 millimeters of mercury, are able to achieve very long-term survival, 10, 20 years out to the limit of the papers -- of the data that the papers had access to. And those are papers by independent physicians, not from us.

So we really believe that our initial mission of the company of being able to keep patients with pulmonary hypertension living with pulmonary hypertension instead of dying from pulmonary hypertension has been very largely achieved with the combination of parenteral prostacyclin to rapidly get their pressures down and then oral prostacyclin, Orenitram, to be able to keep them stable in the long term.

**Operator**

The next question comes from Jessica Fye of JPMorgan.

**Jessica Macomber Fye** - *JPMorgan Chase & Co, Research Division - Analyst*

On the plans to increase capacity for Tyvaso DPI, that sounds pretty bullish with respect to the anticipated demand trends there. And it sounds like you're seeing nice net patient adds as well. But can you just confirm whether there's any capacity constraint on DPI right now that's at all limiting to patient adds? Or is it that you're keeping up with patient demand and then in the near term, the capacity is maybe just keeping the specialty pharmacies from reaching target inventory levels?

And just related to that, I think you said Tyvaso net patient adds were in line with the past 3 quarters. Can you just remind me what that run rate was that you're tracking in line with?

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Okay. Thanks so much for the questions, Jess. There were several questions there. So let me start with the production expansion questions. And then, Mike, if you could queue up your responses to the rest of the questions that Jess asked there.

So Jess -- so we are pretty bullish on our forecast for Tyvaso DPI. And the maximum capacity of the MannKind facility up in Danbury, Connecticut will be -- by the beginning of next year will be for 25,000 DPI patients. So we'll be entering '24 with a capacity for 25,000 patients.

Now as I mentioned in my introductory remarks, our company's goals for the middle of the decade are being able to treat 25,000 pulmonary hypertension patients. So if a large proportion of those 25,000 patients are on Tyvaso DPI, which is, I think, reasonable, then it would be like, well, where is the production capacity for the go big on pulmonary fibrosis? Where is the production capacity for what we think the pulmonary fibrosis market will be?

Well, best as we can tell, we expect the pulmonary fibrosis market to actually be for Tyvaso DPI even larger than the pulmonary hypertension market. So we would need more than an additional 25,000 patient capacity for the pulmonary fibrosis market. And indeed, the market research and the disease-modifying hypotheses that we have for Tyvaso DPI in pulmonary fibrosis is such that we could easily expect to have 50,000

7

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000509

pulmonary fibrosis patients being treated in addition to the 25,000 mid-decade pulmonary hypertension patients. So that's the reason why we need to start now deploying a substantial amount of capital to build this brand-new Tyvaso DPI production facility in Research Triangle Park, North Carolina.

As Mike mentioned, even that facility, even though its launch capacity will be 50,000 patients, it will have a surge capacity to go up to 75,000 patients. So we think between the 25,000 at MannKind, the 50,000 in North Carolina, the surge to 75,000 in North Carolina, as we enter the 2026 time frame, we then have a capacity to support 75,000 to 100,000 DPI patients, which would cover our needs for both Group 1 pulmonary hypertension, Group 3 pulmonary hypertension, idiopathic pulmonary fibrosis and additional forms of pulmonary fibrosis that go under the rubric of proliferative -- progressive pulmonary fibrosis, which in fact, we are embarking on the other additional Phase III trial for.

So Mike, with those comments in terms of the production capacity, can you answer the other questions that Jess had?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Absolutely. So Jess, I think your question around your first -- first part of your question was around sort of patient demand versus SP demand to build up their inventory. So we're definitely in the category of the latter. So we're not having to halt or delay patient starts on DPI. We're making enough to meet the patient demand.

I think the issue that I was referencing in my opening comments is typically, specialty pharmacy, they have an algorithm for figuring out how much -- how they order every month. They typically try to order up to have, call it, roughly 2 months of inventory on hand and then over the course of the month, they'll get down to about 30 days. So they generally like to keep at least -- always be in a position where they have at a minimum 30 days of inventory on hand. So due to the demand, we're not able to kind of meet that need on the part of specialty pharmacy.

Like I said, we have some additional production capacity coming online as soon as this quarter. That will start to open things up a little bit. But I think really, as we're continuing to grow over the balance of the year, we're probably going to be in this situation where they're not going to be able to order up to the levels they're accustomed to ordering up to until, as Martine said, we get the significant expansion next year to get up to 25,000 patients.

Second part of your question was just sort of the average, I guess, the run rate in terms of patient adds. So if you look back over the last -- this quarter or the prior 3 quarters, it's kind of averaged out to around 500 patient adds per quarter on Tyvaso, and that's between both DPI and nebulized.

**Operator**

The next question comes from Eun Yang from Jefferies.

**Eun Kyung Yang** - *Jefferies LLC, Research Division - MD & Senior Equity Research Analyst*

I have a question on TETON trial. So we are expecting data in 2025. So based on the Phase III INCREASE trial, subgroup of patients with underlying IPF, we saw benefits on FVC up to 16 weeks. So TETON trial is a 52-week time point. So do you expect benefits on FVC to continue to increase to 52 weeks? And then can you comment on powering assumptions for the TETON trial?

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thanks. Nice to hear your questions. I think it will be best to have Dr. Peterson -- she is in charge of running the TETON trial, answer your questions.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000510

**Leigh Peterson** - *United Therapeutics Corporation - SVP of Product Development*

Yes. Thank you for your question. Yes, so in fact, the INCREASE study, indeed, the main study, the placebo-controlled study, was 16 weeks, as you mentioned. However, we do have an open-label extension study of the INCREASE data where we've looked to see how the patients do over the longer period of time, including the 52-week time period. And we still see benefits of patients on Tyvaso in the INCREASE population. So we feel confident that, that will translate to the longer period in the TETON studies.

And as far as the TETON study, they are definitely powered, I mean, we have 90% power to detect the difference that we've seen in the INCREASE studies with regard to absolute FVC. So we have sufficient power to see the difference over the 52-week period. So again, we feel confident on that.

---

**Operator**

The next question comes from Andreas Argyrides of Wedbush Securities.

---

**Andreas Argyrides** - *Wedbush Securities Inc., Research Division - Analyst*

Congrats on the quarter. When thinking -- so quickly, first, what's the status of the organ manufacturing programs? And when can we expect [first] program to enter clinical trial? And then how should we think about spend when it comes to organ manufacturing? And I have one follow-up.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Okay. We won't be able to take your follow-up, and Andreas, thanks for the congrats on the quarter. Your line broke up a little bit, but I think the gist of the question was to get an overview of the organ manufacturing situation and when we expect results of the organ manufacturing to enter into clinical trials. And I think you asked something about the capital associated with other spending.

So the organ manufacturing program is a broad, multifaceted, multiple shots on goal program. So it won't be really realistic to give an overview of everything beyond the really exciting things I mentioned this morning, in response to Amy Silverstein's passionate arguments, that part of our organ manufacturing program is strongly focused on organs that would not require immunosuppressants. In other words, autologous organs that are manufactured with the cells downstream from a patient's own donated cells.

And within different laboratories at United Therapeutics, we currently produce iPSC cells. In other words, we reprogram PBMCs and another differentiated cells from patients back into stem cells. We then used techniques proprietary to the company to then differentiate those stem cells into the different types of cells that we would cellularize organs with.

Other programs at other laboratories within United Therapeutics are based on allogeneic cell lines that we are able to MHC segment. So patients could expect a much lighter immunosuppressant load than if they were just taking kind of an average donor organ.

And then let me get to your question about the clinical trial. So the organs we have closest to clinical trials are our xenohearts and xeno-kidneys. These are hearts and kidneys from donor animals that have been grown under the equivalent of good manufacturing practices conditions, what are called pathogen-free conditions. And they have 10 genetic modifications that we believe will allow them to surmount hyperacute and acute rejection with no more than the normal commercially available immunosuppressants today and be able to continue on to a long-term duration in the recipient's body with the management of chronic rejection as is done today with allografts.

So those organs are currently in what's called by the FDA a pivotal preclinical program. That means it's the last preclinical program before going into a human study. And that program is -- hopefully, we will be able to complete that program by the end of '24 and be able to then enter into the first clinical trials in '25. So that would be kind of a bottom line answer to your question, that the first manufactured kidneys and hearts, hopefully, knock on wood, should be able to enter into clinical trials in '25.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000511

MAY 03, 2023 / 1:00PM, UTHR.OQ - Q1 2023 United Therapeutics Corp Earnings Call

**Operator**

The next question comes from Ash Verma of UBS.

**Ashwani Verma** - *UBS Investment Bank, Research Division - Director of Americas Equity Research & US Specialty Pharma Analyst*

I had one on sotatercept impact. So the feedback that we've heard from physicians indicates that Merck's product positioning and payer reception can have an important bearing on what part of your portfolio may get impacted. In your view, does that matter? And like what is the assumption that you have on competitors' pricing in line of therapy positioning?

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Okay. Thanks for the questions, Ash.

(technical difficulty)

like a frontline question, then Mike -- I mean, answer, then Mike will give you more of a definitive answer. But as I noted in our introductory remarks, we don't see sotatercept having any effect whatsoever on the growth guidance that we've provided for our company. And the reason for that is a lot of people are not completely clear that there are 2 different diseases that are treated with drugs such as ours that sound very similar and it's easy to get them confused.

So the disease that sotatercept was tested in and the disease that all of our drugs are approved for, all of our non-cancer drugs are approved for is called Group 1 pulmonary arterial hypertension, and the acronym is PAH. A different disease is called Group 3 pulmonary hypertension or just Group 3 PH. Sotatercept has never been tested, at least anything published that we're aware of, in Group 3 pulmonary hypertension. The only drug approved for Group 3 pulmonary hypertension is Tyvaso, including Tyvaso DPI.

And as Mike described very well, most of our growth in the coming years, we expect to come from Group 3 pulmonary hypertension. So by definition, sotatercept cannot have any effect on that growth trajectory whatsoever.

In addition to that, within the Group 1 pulmonary arterial hypertension, where we do continue to have growth across our franchise, I think Mike mentioned we had our highest quarterly sales of Orenitram ever, we expect sotatercept to be complementary. And Mike, would you like to expand on that?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. I'll just kind of pick up right there, which is, I think I said in response to an earlier question around this, we definitely look at sotatercept as complementary to our drug and the other drugs that are currently on the market to treat Group 1 PAH. It's another pathway. So now we have a drug to treat 4 different pathways associated with pulmonary arterial hypertension. If you look at the -- as I said, if you look at the data in the sotatercept trial, 70, 7-0, 70% of those patients were on prostacyclin therapy. So clearly, there appears to be a complementary or synergistic effects between prostacyclin and sotatercept.

So we think that all of the drugs will continue to be used. I think some physicians that we've talked to have talked about this sort of four corners approach of treating PAH, so you have a drug to treat each of the 4 pathways. How that gets sequenced and -- in the grand scheme of things, doesn't really matter because I think it's still a progressive disease. There was nothing in the sotatercept data really that suggest that it's a cure or even a disease-modifying agent. I know there were some speculation that, that might be the case, but I don't think that's borne out in the data.

10

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000512

So clearly, patients are benefiting from it, but I think it's a combination with the other drugs. And so we think over time, it's another drug that physicians can add to their treatment armamentarium, but it doesn't appear to be something that's going to replace or displace our products.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thanks so much, Mike. And thank you, operator, and everybody, for joining our first quarter conference call. Great work, Dewey Steadman. We'll be presenting at various and sundry health care conferences during the balance of the year, and we look forward to seeing you there and providing additional insights and color on United Therapeutics' business. Operator, you can disconnect the call.

**Operator**

Thank you for participating in today's United Therapeutics Corporation earnings webcast. A rebroadcast of this webcast will be available for replay for 1 week by visiting the Events & Presentations section of the United Therapeutics Investor Relations website at ir.unither.com.

DISCLAIMER

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2023, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000513

# EXHIBIT 29



# Instructions for Use

TYVASO [tī-vā′-sō] DPI®
(treprostinil) Inhalation Powder
For oral inhalation only



30131100602

LIQ_PH-ILD_00000514

# Table of Contents

| | page(s) |
|---|---|
| **Read Before Starting** | **1** |
| **Important Information** | **2** |
| **Storing TYVASO DPI Inhalers and Cartridges** | **3** |
| **Preparing to Inhale TYVASO DPI** | **4-7** |
| **Inhaling TYVASO DPI** | **8-9** |
| **Removing the Used Cartridge** | **10** |
| **Disposing of TYVASO DPI Cartridge** | **11** |
| **Inhaling Multiple Cartridges of TYVASO DPI** | **12** |
| **Caring for Your TYVASO DPI Inhaler** | **13** |
| **Disposing of Your TYVASO DPI Inhaler** | **13** |

LIQ_PH-ILD_00000515

# Read Before Starting

This Instructions for Use contains information on how to inhale TYVASO DPI (treprostinil) Inhalation Powder. Read this Instructions for Use carefully before you start using your inhaler and each time you get a new inhaler. There may be new information. This information does not take the place of talking to your healthcare provider about your medical condition or your treatment.

**Your healthcare provider should show you how to use your inhaler the right way before you use it for the first time.**

## Parts of the TYVASO DPI Inhaler (see **Figure A**)



top of inhaler

bottom of inhaler

removable blue mouthpiece cover

white mouthpiece

cartridge

cartridge cup

blue base

**Figure A**

## Your Starter Kit includes a Carrying Case (see **Figure B**)

The TYVASO DPI inhaler and blister strips can be stored in the carrying case when using outside of your home or traveling.



**Figure B**

## TYVASO DPI Blister Cards (see **Figure C**)



blister card (7 strips per blister card)

strip (4 cartridges per strip)

**Figure C**

1

LIQ_PH-ILD_00000516

**Important information you need to know before inhaling TYVASO DPI Inhalation Powder using the TYVASO DPI Inhaler**

**TYVASO DPI cartridges come in 4 strengths** (see **Figure D**).

**Important:** Always make sure you have the right number of TYVASO DPI cartridges for your dose before you start. Only use TYVASO DPI cartridges with the TYVASO DPI Inhaler.



| 16 mcg | 32 mcg | 48 mcg | 64 mcg |

**Figure D**

**If you are having problems with your TYVASO DPI Inhaler, have any side effects, or if your TYVASO DPI Inhaler breaks and you need a new one, please call 1-877-UNITHER (1-877-864-8437).**

- Take TYVASO DPI exactly as prescribed by your healthcare provider.
- Take TYVASO DPI 4 times per day while you are awake, about 4 hours apart.
- If you miss a dose, take it as soon as possible at your usual dose.
- If your prescribed dose is higher than 64 mcg per treatment session, you will need to use more than 1 cartridge. If using more than 1 cartridge, the cartridges can be used in any order, regardless of cartridge strength.
- If you need to use more than 1 cartridge for your dose, remove the used cartridge from the inhaler before getting a new one. You can tell a cartridge has been used when the cartridge cup has moved from the front to the middle position in the cartridge base.
- **Only TYVASO DPI cartridges should be used with the TYVASO DPI Inhaler.**
- **Each cartridge is for 1 time (single use) only.** Use a new cartridge for each treatment session. After each treatment session, throw away the used cartridge right away.
- **Do not** open the cartridges. The inhaler opens the cartridge automatically during use.
- **Warning:** If any powder from the cartridge spills on your hands, throw away the cartridge right away into regular household trash and wash your hands. Then start with a new cartridge.
- **Do not** breathe in the TYVASO DPI treprostinil powder in any other way.
- **Do not** put cartridges in your mouth.
- **Do not** swallow cartridges.
- Use only 1 inhaler at a time. The same inhaler should be used even when needing to use more than 1 cartridge for your dose. Inhale 1 cartridge at a time.
- The inhaler lasts for 7 days. After 7 days of use, throw away your used inhaler and get a new one.
- Store the inhaler in a clean, dry place with the mouthpiece cover on until your next dose.

2

# Storing TYVASO DPI Inhalers and Cartridges

## Storing TYVASO DPI Inhalers

Store TYVASO DPI Inhalers, with the mouthpiece on, in a clean, dry place at room temperature between 68°F to 77°F (20°C to 25°C), such as a drawer or medicine cabinet (see **Figure E**).

Inhalers may be stored in the refrigerator between 36°F to 46°F (2°C to 8°C), but should be left out at room temperature for 10 minutes before use.

> **Do not** leave or store cartridges in the inhaler.

> **Keep out of the reach of children.**



**Figure E**

## Storing Unopened Blister Cards and Strips

Store unopened blister cards and strips in a clean, dry place at room temperature, such as a drawer or medicine cabinet. You can store in the carrying case when using outside your home or traveling (see **Figure F**).

> **Do not** use after 8 weeks if stored at room temperature.

Unopened blister cards and strips may also be stored in the refrigerator (see **Figure G**).

> **Do not** use after the Expiration Date has passed.



**Figure F**

---

**Important:** If refrigerated, cartridges and inhaler should be left out at room temperature for 10 minutes before use.

ROOM TEMPERATURE          **10 mins.**

---



**Figure G**

## Storing Opened Blister Strips

Store opened blister strips in a clean, dry place at room temperature (see **Figure H**), such as a drawer or medicine cabinet.

Opened blister strips must be used within 3 days.

> **Do not** put a blister strip back into the refrigerator after being opened or stored at room temperature.

3



**Figure H**

# Preparing to Inhale TYVASO DPI

## Step 1: Select the TYVASO DPI cartridges for your dose (see **Figure I**)

Select the TYVASO DPI cartridges for your dose (see **Figure I**).

> **Note:** If using more than 1 cartridge, the cartridges can be used in any order, regardless of cartridge strength.

| If your prescribed TYVASO DPI dose is 16 mcg, use... **1 purple cartridge.** | If your prescribed TYVASO DPI dose is 32 mcg, use... **1 dark blue cartridge.** | If your prescribed TYVASO DPI dose is 48 mcg, use... **1 light blue cartridge.** | If your prescribed TYVASO DPI dose is 64 mcg, use... **1 light green cartridge.** |
|---|---|---|---|
|  |  |  |  |

**If your prescribed TYVASO DPI dose is more than 64 mcg per treatment session, you will need to use more than 1 cartridge to get the right dose.**

**Example:** If your prescribed TYVASO DPI dose is 80 mcg per treatment session, you can use...

**1 dark blue cartridge (32 mcg)**  + **1 light blue cartridge (48 mcg)** 

**Figure I**

## Step 2: Tear off 1 strip

Tear along the perforation to remove 1 strip from the blister card (see **Figure J**).





**Figure J**

## Step 3: Check the expiration date on the strip

Check the expiration date on the foil strip label (see **Figure K**).

> **Do not** use the cartridges if the Expiration Date on the strip has passed.

EXP: YYYY/MM



**Figure K**

4

## Step 4: Remove cartridge(s) from strip

- Remove cartridge(s) from the strip by pushing on the white plastic to push the cartridge out (see **Figure L**).
  **Note:** Pushing on the cup will not damage the cartridge.
- Make sure to remove the right number of cartridges for your dose.
- After you have removed a cartridge (or cartridges) from the strip, if any unused cartridges remain in the strip, store the strip at room temperature.
  **Do not** put a blister strip back into the refrigerator after being opened.



**Figure L**

**Important:** If refrigerated, cartridges and inhaler should be left out at room temperature for 10 minutes before use.  **ROOM TEMPERATURE**  **10 mins.**

## Step 5: Check supplies before continuing

 Check that you have the right cartridge(s) for your dose.

 Only use one inhaler for multiple cartridges. Your inhaler lasts for 7 days.

5

## Step 6: Load a cartridge

### Place Inhaler on Flat Surface

Place the inhaler on a flat surface (see **Figure M**).



**Figure M**

### Open Inhaler

Open the inhaler by lifting the mouthpiece to an upright (vertical) position (see **Figure N**).

**Important:** If the cartridge came from a strip stored in the refrigerator (or if you stored the inhaler in the refrigerator), leave the cartridge and inhaler at room temperature for 10 minutes to remove condensation.



10 mins.

**Figure N**

### Place Cartridge in Inhaler

• Hold the cartridge with the cup facing down (see **Figure O**).

• Line up the cartridge with the opening in the inhaler. The pointed end of the cartridge should line up with the pointed end in the inhaler (see **Figure P**).

• Place the cartridge into the inhaler so that it lies flat.



**Figure O**



**POINTED END ALIGNS**

**Figure P**

6

## Step 6: Load a cartridge (continued)

### Close Inhaler

Close the inhaler (this will open the cartridge). You should feel a snap when the inhaler is closed (see **Figure Q**).

**Important:** Now that the cartridge is loaded, keep the inhaler level to avoid loss of the TYVASO DPI powder, until it is in your mouth (see **Figure R**).



**Figure Q**

**KEEP INHALER LEVEL**

**Figure R**

> ### Not keeping the inhaler level could cause a loss of TYVASO DPI powder (see Figure S)
>
> **If any powder from the cartridge spills:**
> • Wash your hands right away if the powder comes into contact with your hands,
> • Throw away the cartridge into household trash, and
> • Repeat Steps 4, 5, and 6 to load a new cartridge
>
> 
>
> DO NOT turn inhaler upside down.    DO NOT point the mouthpiece down.    DO NOT shake or drop the inhaler.
>
> **This can cause a loss of TYVASO DPI powder.**

**Figure S**

7

LIQ_PH-ILD_00000522

# Inhaling TYVASO DPI

**Before inhaling TYVASO DPI, fully review all parts of Step 7 <u>before</u> you take your dose.**

**Step 7: Inhale Your Dose**

8

### Remove the Mouthpiece Cover (see **Figure T**).

**Important:** Keep the inhaler level during and after removal of the blue mouthpiece cover to prevent loss of TYVASO DPI powder.



**Figure T**

### Hold Inhaler Near Cheek

While keeping the inhaler level, carefully pick up the inhaler and bring it near your cheek, but not in front of your mouth (see **Figure U**).



KEEP INHALER LEVEL

**Figure U**

### Exhale

Holding the inhaler away from your mouth, fully blow out (exhale) (see **Figure V**).

**Figure V**

LIQ_PH-ILD_00000523

## Step 7: Inhale Your Dose (continued)

### Position Inhaler in Mouth

- Keeping your head level, place the mouthpiece in your mouth and close your lips around the mouthpiece to form a seal.
- Tilt the inhaler slightly downward while keeping your head level (see **Figure W**).

    **Note:** This helps prevent the powder from being blocked by your tongue.

### Inhale Deeply, Hold Breath, then Exhale

- With your mouth closed around the mouthpiece, **inhale** deeply through the inhaler (see **Figure X**).
- Then remove the inhaler from your mouth and **hold your breath** for as long as you comfortably can (see **Figure Y**).
- Then **blow out** (exhale) and continue to breathe normally (see **Figure Z**).

9



**Figure W**





**Figure X**



**Figure Y**



**Figure Z**

LIQ_PH-ILD_00000524

# Removing the Used Cartridge

## Step 8: Remove the used cartridge

### Replace Mouthpiece Cover

Place the mouthpiece cover back onto the inhaler (see **Figure AA**).

> **Note:** This keeps your fingers off the exposed mouthpiece.

### Open Inhaler

Open the inhaler by lifting up the mouthpiece to an upright (vertical) position (see **Figure AB**).

### Remove Cartridge

- Remove the used cartridge from the blue base (see **Figure AC**).
- The cup should now be in the middle of the used cartridge (see **Figure AD**).

> **Warning:** If any powder from the cartridge spills on your hands, wash your hands right away.

**Figure AA**

**Figure AB**



**Figure AC**



✓ NEW

⊘ USED

The cup moves to the middle of the cartridge when it has been used.

**Figure AD**

# Disposing of TYVASO DPI Cartridges

## Step 9: Throw away used cartridge

Throw away the used cartridge in your regular household trash (see **Figure AE**).



**Figure AE**

**LIQ_PH-ILD_00000526**

# Inhaling Multiple Cartridges of TYVASO DPI

## Step 10: Inhaling multiple cartridges (skip if not needed)

If your dose requires you to inhale multiple cartridges, **repeat steps 6 through 9** for each cartridge.

    **Example:** If your prescribed TYVASO DPI dose is 80 mcg per treatment session, you can use one 32 mcg cartridge and one 48 mcg cartridge (see **Figure AF**):

**1 dark blue cartridge (32 mcg)**    +    **1 light blue cartridge (48 mcg)**

Figure AF

**Warning:** Be careful not to mix NEW cartridges with used cartridges (see **Figure AG**).



NEW

USED

The cup moves to the middle of the cartridge when it has been used.

Figure AG

12

LIQ_PH-ILD_00000527

## Inhaler Care Instructions

### Cleaning

After taking your dose, powder residue in the mouthpiece is normal; this will not affect your dose.

The outside of the inhaler can be wiped with a clean, dry cloth only, if needed.

**Never wash the inhaler.** Always keep the inhaler dry.

### Use Time

Only use 1 inhaler at a time. The same inhaler can be used to take 16 mcg, 32 mcg, 48 mcg, or 64 mcg cartridges.

Replace the inhaler after 7 days (see **Figure AH** and **Figure AI**). Keep track of 7 days from when you start using the inhaler with a calendar.



**REPLACE AFTER 7 DAYS**

**Figure AH**

## Throw away used inhaler after 7 days of use

After 7 days of use, throw away the used inhaler in your regular household trash (see **Figure AH** and **Figure AI**).



**Figure AI**

13

For further questions and information, or to report a problem with your device or any side effects with your TYVASO DPI, please call 1-877-UNITHER (1-877-864-8437).

This Instructions for Use has been approved by the U.S. Food and Drug Administration.
Revised: November 2023

TYVASO DPI® is a registered trademark of United Therapeutics Corporation.

Patents: www.tyvasodpi.com/patent



Distributed by:
United Therapeutics Corporation
Research Triangle Park, NC 27709
USA

Manufactured by:
MannKind Corporation
Danbury, CT 06810
USA

11/2023    30-1311-006-02

# EXHIBIT 30



For Immediate Release

## UNITED THERAPEUTICS ANNOUNCES FDA ACCEPTANCE
## OF TYVASO DPI™ NEW DRUG APPLICATION FOR PRIORITY REVIEW

*FDA action expected in October 2021*

SILVER SPRING, Md., and RESEARCH TRIANGLE PARK, N.C., Wednesday, June 16, 2021 – United Therapeutics Corporation (Nasdaq: UTHR) today announced that the U.S. Food and Drug Administration (**FDA**) accepted for priority review the New Drug Application (**NDA**) for Tyvaso DPI™ (inhaled treprostinil) for the treatment of pulmonary arterial hypertension (**PAH**) and pulmonary hypertension associated with interstitial lung disease (**PH-ILD**). United Therapeutics expects the agency's review to be complete in October 2021. FDA also indicated that they have not identified any potential review issues at this time.

Tyvaso DPI is a next-generation dry powder formulation of Tyvaso. If approved, Tyvaso DPI is expected to provide a more convenient method of administration as compared with traditional nebulized Tyvaso therapy.

"The acceptance of the Tyvaso DPI NDA for review represents an important regulatory step toward offering this meaningful new product to both PAH and PH-ILD patients," said Martine Rothblatt, Ph.D., Chairperson and Chief Executive Officer of United Therapeutics. "If approved, Tyvaso DPI will represent yet another path to help us achieve our goal of serving 25,000 patients by the end of 2025."

The NDA includes data from the *BREEZE* study that demonstrated safety and tolerability of Tyvaso DPI in patients with PAH transitioning from Tyvaso® (treprostinil) Inhalation Solution. A separate study in healthy volunteers demonstrated comparable treprostinil exposure between Tyvaso DPI and Tyvaso Inhalation Solution.

In its communications with United Therapeutics, the FDA indicated that approval of the NDA will be subject to an inspection of the Tyvaso DPI manufacturing facility operated by MannKind Corporation; FDA and MannKind have jointly targeted the third quarter of 2021 to complete the inspection.

### About Tyvaso DPI™
Tyvaso DPI™ is an investigational drug-device combination therapy comprised of a dry powder formulation of treprostinil and a small, portable, dry powder inhaler. If approved, Tyvaso DPI is expected to provide a more convenient method of administration compared with traditional nebulized Tyvaso® therapy. United Therapeutics is developing Tyvaso DPI under a collaboration and license agreement with MannKind Corporation (Nasdaq: MNKD). Tyvaso DPI incorporates the dry powder formulation technology and Dreamboat® inhalation device technology used in MannKind's Afrezza® (insulin human) Inhalation Powder product, which was approved by the FDA in 2014.

United Therapeutics and MannKind are also developing BluHale®, a Bluetooth-connected accessory for the Tyvaso DPI inhaler with a companion mobile application intended to help the patient track information about inhaler use.

### About the *BREEZE* and healthy volunteer PK studies
The *BREEZE* study was a single-sequence study in which 51 subjects on a stable regimen of Tyvaso Inhalation Solution were transitioned to Tyvaso DPI at a corresponding treprostinil dose. The primary objective of the study was to evaluate the safety and tolerability of Tyvaso DPI during a three-week treatment phase in PAH patients previously treated with Tyvaso Inhalation Solution.

LIQ_PH-ILD_00000530

Secondary objectives of the study were to evaluate: (1) the systemic exposure and pharmacokinetics of treprostinil when delivered as Tyvaso Inhalation Solution and Tyvaso DPI; (2) six-minute walk distance (**6MWD**) at study entry and after three weeks of treatment with Tyvaso DPI; (3) the long-term safety and tolerability of Tyvaso DPI during an optional extension phase (**OEP**) in patients previously treated with Tyvaso Inhalation Solution; (4) patient satisfaction with and preference for inhaled treprostinil devices assessed at study entry when patients were using Tyvaso Inhalation Solution and after three weeks using Tyvaso DPI; and (5) patient-reported PAH symptoms and impact (**PAH-SYMPACT®**) assessed at study entry when patients were using Tyvaso Inhalation Solution and after three weeks using Tyvaso DPI.

**Primary safety and tolerability objective.** Transition from Tyvaso Inhalation Solution to Tyvaso DPI was safe and well tolerated. Forty-nine out of 51 patients (96%) completed the treatment phase and there were no study drug related adverse events. Most adverse events experienced during the study were mild to moderate in severity and occurred at severities and frequencies consistent with those seen in other inhaled treprostinil studies in patients with PAH.

**Secondary objectives.** Three weeks after switching from Tyvaso Inhalation Solution to Tyvaso DPI, patients in the *BREEZE* study demonstrated:

- Improvements in 6MWD compared to baseline. These improvements in 6MWD compared to baseline were sustained in the OEP through the data cut-off date.
- Improvements in overall satisfaction with the Tyvaso DPI inhaler compared to the Tyvaso Inhalation Solution nebulizer at baseline using an internally developed satisfaction and preference questionnaire.
- Improvement in patient-reported outcomes using the validated PAH-SYMPACT questionnaire.

**Optional extension phase.** Subjects in *BREEZE* were given the opportunity to continue in an OEP. All subjects who completed the treatment phase (49/51) elected to continue in the OEP.

***BREEZE* PK observations.** The *BREEZE* study demonstrated comparable PK between Tyvaso inhalation solution and Tyvaso DPI in PAH patients.

Detailed data from the *BREEZE* study will be presented in upcoming publications and scientific conferences.

**Healthy volunteer PK study.** The healthy volunteer pharmacokinetic (**PK**) study was a randomized six-period, six-sequence crossover study of three dose levels of Tyvaso DPI and three dose levels of Tyvaso Inhalation Solution in 36 healthy volunteers. The primary objective of the study was to evaluate the systemic exposure and PK of treprostinil administered as Tyvaso DPI and Tyvaso Inhalation Solution. Secondary objectives of the study evaluated the safety and tolerability of Tyvaso DPI.

**Study results.** Subjects demonstrated comparable systemic treprostinil exposure for each corresponding Tyvaso DPI and Tyvaso Inhalation Solution dose level. Between-subject variability for both $AUC_{0-5h}$ and $C_{max}$ was approximately 50% less for Tyvaso DPI compared to Tyvaso Inhalation Solution, suggesting a more precise dosing profile for Tyvaso DPI relative to nebulized Tyvaso.

**Safety.** The adverse event profile for Tyvaso DPI in healthy volunteers was consistent with known prostacyclin effects and previous studies of Tyvaso Inhalation Solution.

Detailed data from the healthy volunteer PK study will be presented in upcoming publications and scientific conferences.

LIQ_PH-ILD_00000531

**About PH-ILD**

Interstitial lung disease (**ILD**) is a group of lung diseases that are characterized by significant scarring or fibrosis of the bronchioles and alveolar sacs within the lungs. Increased fibrotic tissue in ILD prevents oxygenation and free gas exchange between the pulmonary capillaries and alveolar sacs, and the condition can present with a wide range of symptoms, including shortness of breath with activity, labored breathing and fatigue. Pulmonary hypertension (**PH**) frequently complicates the course of patients with interstitial lung disease and is associated with worse functional status measured by exercise capacity, greater supplemental oxygen needs, decreased quality of life, and worse outcomes.

An estimated 30,000 patients in the United States may suffer from PH-ILD, which is included within Group 3 of the World Health Organization (**WHO**) classification of PH. Only Tyvaso Inhalation Solution is approved to treat patients with this disease.

**About PAH**

Also known as World Health Organization (**WHO**) Group 1 Pulmonary Hypertension, Pulmonary arterial hypertension (**PAH**) is life-threatening high blood pressure in the arteries of the lungs, affecting the ability of the heart and lungs to work properly in afflicted patients. PAH is a serious, progressive disease for which there is no cure.

**About TYVASO® (treprostinil) Inhalation Solution**

INDICATION

TYVASO (treprostinil) is a prostacyclin mimetic indicated for the treatment of:

- Pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability. Studies establishing effectiveness predominantly included patients with NYHA Functional Class III symptoms and etiologies of idiopathic or heritable PAH (56%) or PAH associated with connective tissue diseases (33%).

  The effects diminish over the minimum recommended dosing interval of 4 hours; treatment timing can be adjusted for planned activities.

  While there are long-term data on use of treprostinil by other routes of administration, nearly all controlled clinical experience with inhaled treprostinil has been on a background of bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase type 5 inhibitor). The controlled clinical experience was limited to 12 weeks in duration.

- Pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability. The study establishing effectiveness predominantly included patients with etiologies of idiopathic interstitial pneumonia (IIP) (45%) inclusive of idiopathic pulmonary fibrosis (IPF), combined pulmonary fibrosis and emphysema (CPFE) (25%), and WHO Group 3 connective tissue disease (22%).

IMPORTANT SAFETY INFORMATION

WARNINGS AND PRECAUTIONS

- TYVASO is a pulmonary and systemic vasodilator. In patients with low systemic arterial pressure, TYVASO may produce symptomatic hypotension.
- TYVASO inhibits platelet aggregation and increases the risk of bleeding.

3

LIQ_PH-ILD_00000532

- Co-administration of a cytochrome P450 (CYP) 2C8 enzyme inhibitor (e.g., gemfibrozil) may increase exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of a CYP2C8 enzyme inducer (e.g., rifampin) may decrease exposure to treprostinil. Increased exposure is likely to increase adverse events associated with treprostinil administration, whereas decreased exposure is likely to reduce clinical effectiveness.

DRUG INTERACTIONS/SPECIFIC POPULATIONS

- The concomitant use of TYVASO with diuretics, antihypertensives, or other vasodilators may increase the risk of symptomatic hypotension.
- Human pharmacokinetic studies with an oral formulation of treprostinil (treprostinil diolamine) indicated that co-administration of the cytochrome P450 (CYP) 2C8 enzyme inhibitor, gemfibrozil, increases exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of the CYP2C8 enzyme inducer, rifampin, decreases exposure to treprostinil. It is unclear if the safety and efficacy of treprostinil by the inhalation route are altered by inhibitors or inducers of CYP2C8.
- Limited case reports of treprostinil use in pregnant women are insufficient to inform a drug-associated risk of adverse developmental outcomes. However, pulmonary arterial hypertension is associated with an increased risk of maternal and fetal mortality. There are no data on the presence of treprostinil in human milk, the effects on the breastfed infant, or the effects on milk production.
- Safety and effectiveness in pediatric patients have not been established.
- Across clinical studies used to establish the effectiveness of TYVASO in patients with PAH and PH-ILD, 268 (47.8%) patients aged 65 years and over were enrolled. The treatment effects and safety profile observed in geriatric patients were similar to younger patients. In general, dose selection for an elderly patient should be cautious, reflecting the greater frequency of hepatic, renal, or cardiac dysfunction, and of concomitant diseases or other drug therapy.

ADVERSE REACTIONS

- <u>Pulmonary Arterial Hypertension (WHO Group 1)</u>
  In a 12-week, placebo-controlled study (TRIUMPH I) of 235 patients with PAH (WHO Group 1 and nearly all NYHA Functional Class III), the most common adverse reactions seen with TYVASO in ≥4% of PAH patients and more than 3% greater than placebo in the placebo-controlled study were cough (54% vs 29%), headache (41% vs 23%), throat irritation/pharyngolaryngeal pain (25% vs 14%), nausea (19% vs 11%), flushing (15% vs <1%), and syncope (6% vs <1%). In addition, adverse reactions occurring in ≥4% of patients were dizziness and diarrhea.

- <u>Pulmonary Hypertension Associated with ILD (WHO Group 3)</u>
  In a 16-week, placebo-controlled study (INCREASE) of 326 patients with PH-ILD (WHO Group 3), adverse reactions were similar to the experience in studies of PAH.

Please see <u>Full Prescribing Information</u>, the <u>TD-100</u> and <u>TD-300</u> TYVASO® Inhalation System Instructions for Use manuals, and other additional information at <u>www.tyvaso.com</u> or call 1-877-UNITHER (1-877-864-8437).

**United Therapeutics: Enabling Inspiration**
United Therapeutics Corporation focuses on the strength of a balanced, value-creating biotechnology model. We are confident in our future thanks to our fundamental attributes, namely our obsession with quality and innovation, the power of our brands, our entrepreneurial culture, and our bioinformatics leadership. We also believe that our determination to be responsible citizens – having a positive impact on patients, the environment, and society – will sustain our success in the long term.

LIQ_PH-ILD_00000533

Through our wholly owned subsidiary, Lung Biotechnology PBC, we are focused on addressing the acute national shortage of transplantable lungs and other organs with a variety of technologies that either delay the need for such organs or expand the supply. Lung Biotechnology is the first public benefit corporation subsidiary of a public biotechnology or pharmaceutical company.

Please visit unither.com to learn more.

**Forward-looking Statements**
Statements included in this press release that are not historical in nature are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, among others, statements relating to the timing and outcome of FDA review of our NDA for Tyvaso DPI, our goal of serving 25,000 patients by 2025, the potential benefits of Tyvaso DPI for patients, our ability to create value and sustain our success in the long-term, and our efforts to develop technologies that either delay the need for transplantable organs or expand the supply of transplantable organs. These forward-looking statements are subject to certain risks and uncertainties, such as those described in our periodic reports filed with the Securities and Exchange Commission, that could cause actual results to differ materially from anticipated results. Consequently, such forward-looking statements are qualified by the cautionary statements, cautionary language and risk factors set forth in our periodic reports and documents filed with the Securities and Exchange Commission, including our most recent Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K. We claim the protection of the safe harbor contained in the Private Securities Litigation Reform Act of 1995 for forward-looking statements. We are providing this information as of June 16, 2021 and assume no obligation to update or revise the information contained in this press release whether as a result of new information, future events or any other reason.

TYVASO is a registered trademark of United Therapeutics Corporation.

TYVASO DPI is a trademark of United Therapeutics Corporation.

AFREZZA, BLUHALE, and DREAMBOAT are registered trademarks of MannKind Corporation.

PAH-SYMPACT is a registered trademark of Actelion Pharmaceuticals Ltd société anonyme.

For Further Information Contact:
Dewey Steadman at (202) 919-4097
Email: ir@unither.com

\*      \*      \*

LIQ_PH-ILD_00000534

# EXHIBIT 31

# Robustness of YUTREPIA™, a Dry-Powder Inhaled Formulation of Treprostinil, in Patient Misuse Scenarios

Savan Patel[1], Jason Prabel[1], Drew MacLennan[1], Gavin Rosen[1]

[1]Liquidia Technologies, Inc., Morrisville, NC, USA.



## Background

The current standard of care for inhaled treatment of pulmonary arterial hypertension (PAH) is a nebulized treprostinil solution administered four times a day (QID). A robust and easily used alternative inhaled treprostinil would improve patient compliance and quality of life.

Investigational drug, YUTREPIA™ (LIQ861) is a novel dry-powder formulation of treprostinil designed using proprietary PRINT® Technology. The PRINT® process enables the development of drug particles that are precise and uniform in size, shape, and composition. YUTREPIA particles are monodisperse and have minimal agglomeration allowing efficient delivery to the lungs by a simple capsule-based, dry powder inhaler (DPI, Plastiape RS00 Model 8) with low resistance and high robustness to potential patient misuse.

*In vitro* aerosol performance results are presented to support the robustness of the dosage form to potential patient misuse scenarios[1].

## Methods

Liquidia studied the effect of varying DPI orientation on YUTREPIA dosing *in vitro* by measuring aerosol performance at inhaler angles of –47°, 0°, and +47° relative to horizontal after loading and puncturing the capsule within the device.



The effects of patients accidentally dropping the DPI were investigated *in vitro* using a drop height of 5 feet to approximate mouth distance from the ground and simulate two potential patient misuse scenarios. The first scenario investigated the effects of dropping the DPI with the mouthpiece facing down after loading and puncturing the capsule. The second scenario explored the effects of dropping the DPI with the mouthpiece facing up after loading but before puncturing the capsule.

Each study used capsules containing doses of 26.5 mcg and 106 mcg of YUTREPIA. These doses bracket the YUTREPIA capsule strength range as the lowest and highest strengths currently available and results are considered to support all four dosage strengths.

Standard USP <601> *in vitro* methods assessed aerosol performance. Emitted dose (ED) was measured using a Dosage Unit Sampling Apparatus (DUSA); Aerodynamic Particle Size Distribution (APSD) results were collected using a Next Generation Impactor (NGI).

1. Melani AS, Bonavia M, Cilenti V, et al. Inhaler mishandling remains common in real life and is associated with reduced disease control [published correction appears in Respir Med. 2012 May;106(5):757. DelDonno, Mario [corrected to Del Donno, Mario]]. *Respir Med.* 2011;105(6):930-938. doi:10.1016/j.rmed.2011.01.005

## Results

**Emitted Dose (ED), Fine Particle Dose (FPD), and Median Mass Aerodynamic Diameter (MMAD) demonstrate consistent *in vitro* exposure while varying device orientation and dropping the inhaler before or after puncturing the capsule.**

DUSA and APSD assessments for 26.5 mcg and 106 mcg doses show no significant differences in ED and FPD at –47° and +47° compared to results at 0°. APSD results show MMAD is not significantly altered and is ≤2.0 μm for both dosage strengths at all orientations.



DUSA and APSD evaluations for 26.5 mcg and 106 mcg doses show dropping the DPI from 5 feet before or after puncturing the capsule has no significant effect on ED and FPD. APSD results for both doses show dropping the device does not significantly alter the MMAD.



## Conclusions

The aerosol performance of YUTREPIA is not affected by real-world patient misuse scenarios such as varying the inhalation orientation or dropping the DPI. The robustness of YUTREPIA results in consistent drug exposure to patients.

LIQ_PH-ILD_00000535

# EXHIBIT 32





# Corporate Overview

June 20, 2022

LIQ_PH-ILD_00000536

# Forward-Looking Statements

This presentation includes, and our response to questions may include, forward-looking statements within the meaning of the federal securities laws, including Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements contained in this presentation other than statements of historical facts, including statements regarding our future results of operations and financial position, our strategic and financial initiatives, our business strategy and plans and our objectives for future operations, are forward-looking statements. The words "anticipate," "believe," "continue," "estimate," "expect," "intend," "may," "will" and similar expressions are intended to identify forward-looking statements. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives and financial needs. These forward-looking statements include statements regarding our operating results, clinical trials, clinical studies and other clinical work (including the funding therefor, anticipated patient enrollment, safety data, study data, trial outcomes, timing or associated costs), regulatory applications and NDA submission contents and timelines, the potential for FDA final approval of the NDA for YUTREPIA™ (treprostinil) inhalation powder, previously referred to as LIQ861, the timeline or outcome related to our patent litigation pending in the U.S. District Court for the District of Delaware or the *inter partes review* with the PTAB or any appeals related thereto, the issuance of patents by the USPTO, our ability to execute on our strategic or financial initiatives and the impact of the coronavirus (COVID-19) pandemic on our Company. Moreover, we operate in a very competitive and rapidly changing environment and our industry has inherent risks. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this presentation may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that future results, levels of activity, performance, achievements or events and circumstances reflected in the forward-looking statements will occur. We are under no duty to update any of these forward-looking statements after the date of this presentation to conform these statements to actual results or revised expectations, except as required by law. This presentation also contains estimates and other statistical data made by independent parties and by us relating to market size and growth and other data about our industry. This data involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. In addition, projections, assumptions and estimates of our future performance and the future performance of the markets in which we operate are necessarily subject to a high degree of uncertainty and risk. This presentation includes long-term goals that are forward-looking, are subject to significant business, economic, regulatory and competitive uncertainties and contingencies, many of which are beyond our control and are based upon assumptions with respect to future decisions, which are subject to change. Actual results will vary, and those variations may be material. Nothing in this presentation should be regarded as a representation by any person that these goals will be achieved, and we undertake no duty to update our goals.

 | 2

LIQ_PH-ILD_00000537

# Transformational time for Liquidia

*A growing company focused on PAH and PH-ILD*

- **Established commercial footprint with RareGen merger**
  - Treprostinil Injection, generic for Remodulin®
  - Enabled both Intravenous & Subcutaneous administration

- **Received Tentative FDA Approval of YUTREPIA™ (treprostinil) inhalation powder**
  - Confirmed full draft labeling in November 2021
  - Seeking resolution of ongoing patent litigation with UTHR

- **Prepared to expand commercial efforts**
  - Building on core team with deep experience in PAH
  - Fortified balance sheet to enable launch when ready
  - Per FDA guidance, can request PH-ILD indication in 1H2024 without need for additional studies in sNDA

**YUTREPIA™ DPI Device**



**Dry Powder Treprostinil Developed Using PRINT**





Pulmonary Arterial hypertension (PAH); Pulmonary Hypertension with Interstitial Lung Disease (PH-ILD)
Remodulin® is a registered trademark of United Therapeutics Corporation (UTHR)

 Liquidia® CORPORATION | 3

DA0939

LIQ_PH-ILD_00000538

# Propriety Advantage In PRINT® Technology Platform

*Particle Replication In Non-wetting Templates (PRINT®) for precise particle engineering*



- **Applicable to any therapeutic area, molecule, and route**

- **Proven science and scalable manufacturing**

- **FDA approved In-House GMP Facility**

- Utilizes manufacturing techniques from the microelectronics industry to manufacture drug product particles with precise size, shape, weight, and chemical composition to target minute absorptive lung surfaces



Milliscale implants sustained release

Microscale inhaled dry powder

Nanoscale co-delivery immunomodulation

Liquidia CORPORATION | 4

DA0940

LIQ_PH-ILD_00000539

# Engineered Particles to Enhance Delivery to Lower Lung

*Monodisperse Particles with Precise Geometries for Inhalation*

| Shape influences aerodynamic performance | Size influences alveolar deposition |
|---|---|

*Inspired by nature*

*Particle sizes ≤ 5 µm are respirable but deposit differently*

**Pollen Particle**

**YUTREPIA PRINT particles**



*Eperua schomburgkiana*



- **1.3 µm MMAD**
- **Trefoil shape**

**4.6 µm MMAD particle**

**1.3 µm MMAD particle**

 

Tc[99] scintigraphy of PRINT particles in canine model[1]

▶ **Provides preferential delivery to alveolar region and less upper airway deposition**

Median mass aerodynamic diameter (MMAD); 1. Garcia A, et al., Journal of Drug Delivery Volume 2012, Article ID 941243

 Liquidia CORPORATION | 5

LIQ_PH-ILD_00000540

# YUTREPIA™ (treprostinil) inhalation powder

*Engineered to enhance delivery to lower lung of PAH patients*

## FDA Tentative Approval on November 8, 2021[1]



- **Approved based on safety data from INSPIRE trial (n=121)**

- **Demonstrated comparable bioavailability of 9 breaths Tyvaso® with only 2 breaths from a single capsule**

- **Administered doses comparable to 24 breaths of Tyvaso® 4x daily**

- **No Maximum Tolerated Dose identified**

- **IP position protected with patent claims into 2037**

  – Includes claims that cover the use of ~100 to 300mcg dry-power treprostinil to treat pulmonary hypertension[2]

- **Potential commercial launch subject to ongoing IP litigation with UTHR**

1. Pulmonary Hypertension (PH), 1. Nov 8, 2021 press release; 2. Aug 28, 2020 press release; Tyvaso® is a registered trademarks of United Therapeutics Corporation (UTHR)

 | 6

LIQ_PH-ILD_00000541

# YUTREPIA™ Checks All the Boxes for a Preferred Product Profile

*We believe YUTREPIA is positioned to become the prostacyclin of first-choice*



**YUTREPIA™**

| | |
|---|---|
| **Portability** | Replace burden of nebulizers with palm-sized, simple device; potential for earlier use | ✔ |
| **Tolerability** | Reduce systemic toxicity when adding prostacyclin to naïve patients or escalating dose | ✔ |
| **Titratability** | Demonstrate safe titration to doses comparable to 24 breaths Tyvaso, 4x day | ✔ |
| **Durability** | Potential to treat patients longer before transitioning to more invasive parenteral forms | ✔ |
| **Storage** | Store at room temperature for product lifetime | ✔ |
| **Device Resistance** | Accommodate wide range of lung capacities by using low resistance device | ✔ |
| **Device Position** | Avoid product spillage by using capsule-based drug and trusted device | ✔ |

Tyvaso® is a registered trademarks of United Therapeutics Corporation (UTHR)



 7

LIQ_PH-ILD_00000542

# YUTREPIA Has Potential to Rapidly Garner Significant Market Share

*Goal of prostanoid therapy is to dose to highest tolerable level to provide symptomatic benefit*



■ **Prostanoid** ■ **ERA** ■ **sGC** ■ **PDE5**
*Analogs & IPa*

**$4.3 Billion PAH Market**
2020 U.S. Net Sales

53%

31%

14%

**>50% of prostanoid market included treprostinil formulations ($1.2 billion)**

**Expect paradigm shift in treatment as DPIs grow inhaled market in PAH**

+ Fewer systemic toxicities with targeted lower lung delivery

+ Portability, Tolerability, Titratability, Durability

+ Cannibalize nebulizers, capture oral share, earlier use, & delay parenteral



**DPI Addressable Market**

**Nebulizer**
~$500M

**Non-Prostacyclin**
~$2.0B

**IV & SC Prostanoid**
~$500M

**Oral Prostanoid**
~$1.2B

*NYHA Functional Class*

U.S. sales sourced from 2020 10-K SEC filings from United Therapeutics, JNJ, Gilead, Bayer, Merck; New York Heart Association (NYHA)

 | 8

LIQ_PH-ILD_00000543

# WHO Group 1 Represents a Significant Initial Market Opportunity

*Additional WHO Groups Provide Market Expansion Opportunities*



**Our Portfolio**

*Tentative FDA approval YUTREPIA™*

*Potential 1st line prostacyclin in PAH*

**Pulmonary Hypertension**

**WHO Group 1**
*Due to PAH*

**PAH**

~45,000 patients
2 local options (nebulized)

| | |
|---|---|
| Oral | orenitram treprostinil / Uptravi selexipag |
| IV/SC | REMODULIN (treprostinil) Injection / epoprostenol |
| Nebulized | TYVASO treprostinil / Ventavis iloprost INHALATION SOLUTION |

WHO Group 2
*Due to Left Heart Disease*

**WHO Group 3**
*Due to Chronic Lung Disease*

**PH-ILD**

~30,000 patients
Only 1 approved Rx

**PH-COPD**

• ~100,000 pts with No Approved Treatments
• 1 nebulized pivotal trial on-going[2]

TYVASO treprostinil
For PH-ILD
(FDA 2021)[1]

*Potential future indications for YUTREPIA*

Clinical data support PH-ILD indication once Tyvaso data exclusivity expires March 2024

WHO Group 4
*Due to CTEPH*

WHO Group 5
*Due to unclear MOA*

**Not PH**

**IPF**
*Idiopathic Pulmonary Fibrosis*

**IPF**

• ~100,000 pts with No Inhaled Treatments
• 1 nebulized pivotal trial on-going[3]

*Potential future indications for YUTREPIA*

Pulmonary Arterial Hypertension (PAH); Pulmonary Hypertension (PH); Interstitial Lung Disease (ILD); Chronic Obstructive Pulmonary Disorder (COPD); Idiopathic Pulmonary Fibrosis (IPF); Patient estimates sourced by combination of Liquidia internal estimate and public statements by United Therapeutics (Feb 2022);
1. https://www.nejm.org/doi/full/10.1056/NEJMoa2008470;  2. https://clinicaltrials.gov/ct2/show/NCT03496623;  3. https://www.clinicaltrials.gov/ct2/show/NCT04708782



| 9

LIQ_PH-ILD_00000544

# Deep Experience Within PAH, Rare Disease and Inhaled Products



**Roger Jeffs**
**Chief Executive Officer**

- Former UTHR Executive (18 yrs) including President/COO (2001-14) & co-CEO (2015-16)
- Led R&D, secured FDA approval of 6 rare diseases products at United Therapeutics



**Rajeev Saggar, M.D.**
**Chief Medical Officer**

- 20+ yrs practicing pulmonologist with 60+ peer-reviewed publications incl. PAH & PH-ILD

Announced Jun 20th with July 18, 2022 start

- Served as Interim Chief of Div. of Pulmonary Critical Care at Univ. of Arizona, College of Medicine; Medical Director of PH & Fibrosis Pgms and Lung Transplant at Banner University Medical Center



**Scott Moomaw**
**Senior VP Commercial**

- Former UTHR VP Marketing (5 yrs) responsible for Remodulin®, Tyvaso® & Orenitram®
- Co-founded RareGen as COO (2018) launching generic Treprostinil Injection



**Matt Snow**
**Vice President National Sales**

- Former UTHR  commercial leader (7 yrs) in multiple roles in sales leadership and training
- Launched rare disease products for SOBI (National Sales Dir.) & INSMED (Regional Lead)

United Therapeutics (UTHR), Remodulin®, Tyvaso®, Orenitram® are registered trademarks of United Therapeutics Corporation

**Liquidia** CORPORATION | 10

DA0946

LIQ_PH-ILD_00000545

# Existing Commercial Presence in PAH with Treprostinil Injection

*Specialty field sales team & co-pay programs replicate experience with branded drug*



- ✓ **Equivalent product**
- ✓ **Reliable Supply**
- ✓ **Seamless Service**
- ✓ **Lower Price**

- **400+ unique prescribers switched patients from brand to generic**
- **More than doubled active patients after SC route added (Apr'21)**
- **~500 active treprostinil injections patients in 1Q2022**
- **Planning for growth as payer generic mandates enforced**
- **Additional larger payers plan to implement mandates in 2022**

Liquidia Data from Specialty Pharmacies as of March 17, 2022

**Liquidia** | 11
CORPORATION

LIQ_PH-ILD_00000546



# Pulmonary Arterial Hypertension

DA0948

LIQ_PH-ILD_00000547

# Currently Focused On Maximizing the Benefits of Prostenoid Treatment of PAH

*WHO Group 1 (Pulmonary Arterial Hypertension)*

**Multiple pathways are involved in pathogenesis**



**Abnormal changes in arteries of the lungs increase pressure in pulmonary arteries that leads to remodeling of the right ventricle (RV)**



**Prostacyclin Deficiency**

- **Prostacyclin inhibits platelet aggregation, relaxes smooth muscle, and vasodilates the pulmonary arteries**



**Nitric Oxide Deficiency**

- Nitric Oxide (NO) leads to vasodilation by increasing cGMP levels



**Endothelin Overexpress**

- Endothelin (ET-1) mediates vasoconstriction, fibrosis, proliferation, hypertrophy, and inflammation

World Health Organization (WHO)
Farber *Eur Respir Rev* 2016; Lang *Eur Respir Rev* 2014; Channik *Advances in Pulmonary Hypertension Spring,* 2002, Yen-Chun Lai et al. Circ Res. 2014;115:115-130

 | 13

LIQ_PH-ILD_00000548

# Current Options Are Suboptimal and Potentially Delay Benefit of Prostacyclin



Inhaled administration:
Treprostinil*, iloprost

Oral administration:
Beraprost*, treprostinil*,
selexipag (under
development)

Intravenous
administration via
central venous catheter:
Epoprostenol,
treprostinil, iloprost*

Intravenous administration
via implantable pump*:
Treprostinil

Subcutaneous administration
via infusion pump:
Treprostinil

Image from 2015 publication[2]

| Route | Key Benefit... | ...But known issues | Notes |
|-------|----------------|---------------------|-------|
| Oral | + Convenient | − Systemic toxicities<br>− Minimal symptom relief | • Increases side effects in GI, nervous, and vascular systems, making up-titration challenging[1,2]<br>• Requires up-titration which is challenging given side effects[2] |
| Infused | + Effective | − Systemic toxicities<br>− Site pain<br>− Lifestyle limitations<br>− Infection risk[1-3] | • Up to 63% of PAH patients describe side effects as impairing therapeutic function[6] |
| Nebulized | + Targeted | − Many breaths to achieve therapeutic doses | • Limits max dose due to throat irritation and adverse events[3]<br>• Requires water, power, supplies, cleaning, time to administer[4] |
| NET IMPACT | **Many patients never experience the benefit of prostacyclin analogs** | | • Only 34% of patients enrolled in the REVEAL registry received a Prostacyclin analog[7]<br>• Only 56% of patients with a PAH-related death were treated with parenteral prostacyclin before death (30% were not receiving any prostacyclin therapy)[8] |

GI, gastrointestinal; IV, intravenous.

1. Garcia A, et al. *J Drug Deliv*. 2012;2012:941243. 2. Coons JC, et al. *Pulm Circ*. 2016 Mar;6(1):132-135. 3. Lang IM, Gaine SP. *Eur Respir Rev*. 2015;24(138):630-641. 4. Hill NS, et al. INSPIRE: A Phase 3, Open-Label, Multicenter Study to Evaluate the Safety and Tolerability of LIQ861 in Pulmonary Arterial Hypertension (PAH) (Investigation of the Safety and Pharmacology of Dry Powder Inhalation of Treprostinil NCT03399604). Poster presented at: The American Thoracic Society (ATS) Conference 2019; May 21, 2019; Dallas, TX. 5. Klinger JR, et al. Chest. 2019 Mar;155(3):565-586. 6. Burger CD, et al. Psychosocial and Financial Burden of Medical Treatment in Pulmonary Artery Hypertension. Poster presented via: Pulmonary Vascular Research Institute, February 15, 2020. 7.Badesch DB, Raskob GE, Elliott CG, et al. Pulmonary arterial hypertension: baseline characteristics from the REVEAL Registry. Chest. 2010;137(2):376-387. doi:10.1378/chest.09-1140 8.Farber HW, Miller DP, Meltzer LA, McGoon MD. Treatment of patients with pulmonary arterial hypertension at the time of death or deterioration to functional class IV: insights from the REVEAL Registry. J Heart Lung Transplant. 2013;32(11):1114-1122. doi:10.1016/j.healun.2013.08.010



14

LIQ_PH-ILD_00000549

# Higher Doses of Inhaled Treprostinil Resulted in Improved Disease Control

*Retrospective study of 5,000 patients from specialty pharmacy records*

**Higher dosed patients (>9 breaths)…**

- **Improved survival rates** were seen in each time period analyzed (yrs. 1 thru 3)

- **Longer time to transition to parenteral therapy** (17.5 months vs 9.5 months)

- **Greater drug persistence** was seen in each time period analyzed (yrs. 1 thru 3)



Shapiro S, Mandras S, Restrepo-Jaramillo R, et al. Survival and drug persistence in patients receiving inhaled treprostinil at doses greater than 54 µg (nine breaths) four times daily. *Pulm Circ.* 2021;11(4):20458940211052228. Published 2021 Oct 29.

 | 15

LIQ_PH-ILD_00000550

# Tyvaso WAC Price Within the Branded Prostanoid Class Supports Market Value

## Wholesale Acquisition Cost Per Year in 2022



Source: Medi-Span April 2022; the annual WAC price is calculated by dividing the package SKU into a price per day multiplied by 365 days per year. Ventavis price is shown at 6 doses per day, lower end of range of 6-9 times/day, Tyvaso price is derived from its 28-day package quantity price, Remodulin price is shown at a dose of 10 mgs per day, Orenitram price is shown at a dose of 2.5 mg TID, Uptravi price is shown for doses ranging from 400 – 1600 mcg BID

 | 16

LIQ_PH-ILD_00000551



# YUTREPIA™ (treprostinil) inhalation powder

## Clinical Overview

LIQ_PH-ILD_00000552

# YUTREPIA™ Leverages PRINT to Enhance Deep Lung Deposition

*Each particle has a uniform size and shape[1]*

| Treprostinil | YUTREPIA Dry-Powder Formulation | Dry-Powder Inhaler |
|:---:|:---:|:---:|
|  |  |  |
| **Treprostinil (prostacyclin analog)** | **Particles are 1.3 μm in size with trefoil shape** | **Compact, disposable inhaler previously approved by FDA and EMEA** |

1.Liquidia Data on File.

Liquidia® | 18
CORPORATION

DA0954

LIQ_PH-ILD_00000553

# Inhaled Device Design Trusted for Decades Across Diseases

*Plastiape sells millions of units globally of the RS00 & RS01 devices to deliver generic and branded drugs*



| Examples of Plastiape devices (not exhaustive) | | |
|---|---|---|
| *Company* | *Program (Stage)* | *Disease* |
| **NOVARTIS** | **Foradil®** *FDA Approved 2001* | **COPD & Asthma** |
| **Chiesi** | **Bronchitol®** *FDA Approved 2020* | **Cystic Fibrosis** |
| **insmed** | **TPIP, pro-drug** *Phase 2a & 2b 2022* | **PAH & PH-ILD** |
| **gossamerbio** | **GB-002, seralutinib** *Phase 2b 2022* | **PAH & PH-ILD** |

https://bronchitol.com/hcp/dosing-and-administration/; https://investor.insmed.com/index; https://ir.gossamerbio.com;

Liquidia® CORPORATION | 19

LIQ_PH-ILD_00000554

# Well-Tolerated in Phase 1 Studies with Dose Proportional Pharmacokinetics

## Observed dose proportionality & no MTD[1]

- Conducted multiple Phase 1 studies in healthy volunteers to establish safety and PK

- All Treatment Emergent Adverse Events (TEAEs) were expected based on the known safety profile of inhaled treprostinil

- Most commonly reported were cough and nausea

- No Serious Adverse Events (SAEs)

- No observed Maximum Tolerated Dose (MTD)

- Treprostinil exposure was dose proportional across 5 doses administered

## Established comparable PK to Tyvaso (9 breaths)[2]

**Table 3. Summary of statistical assessment of comparative bioavailability results**

| Agent | Parameter | GMR | 90% CI | Within Subject % CV |
|---|---|---|---|---|
| LIQ861 79.5 µg vs Tyvaso® 54 µg | $AUC_{inf}$ | 0.923 | 0.802, 1.064 | 14.6 |
| LIQ861 79.5 µg vs Tyvaso® 54 µg | $AUC_{last}$ | 0.947 | 0.812, 1.103 | 15.8 |
| LIQ861 79.5 µg vs Tyvaso® 54 µg | $C_{max}$ | 0.931 | 0.819, 1.059 | 13.3 |

CI, confidence interval; CV, coefficient of variation; GMR, geometric least-squares mean ratio.



"…the **90% CIs for these ratios were within the acceptable equivalence limits of 0.80 to 1.25** (Table 3)."

1. Royal M, et al. Preclinical and Phase 1 Clinical Characterization of LIQ861, a New Dry Powder Formulation of Treprostinil [poster]. PVRI Annual World Congress 2018
2. Roscigno R, et al. Pharmacokinetic (PK) performance of LIQ861 and evaluation of comparative bioavailability with Tyvaso® in healthy subjects (Study LTI-102) [poster]. 14th PVRI Annual World Congress on Pulmonary Vascular Disease 2020

DA0956

 | 20

LIQ_PH-ILD_00000555

# INSPIRE Study was Informed by FDA and 505(b)(2) Regulatory Pathway

**In**vestigation of the **S**afety and **P**harmacology of Dry Powder **In**halation of T**re**prostinil

| | |
|---|---|
| **Design** | • Open-label, U.S. multicenter |
| **Population** | • At least 100 WHO Group I (PAH) patients<br>• NYHA Class II, III and IV |
| **Criteria** | • **Transitions**…on stable dose of Tyvaso® for ≥3 months<br>• **PCY Naïve (Add-Ons)**…≤2 approved non-PGI oral Rx |
| **Primary endpoint** | • **Incidence of TEAEs and SAEs at 2 months** |
| **Exploratory endpoints** | • 6 minute walk distance (6MWD)<br>• Sustained treatment transition (Tyvaso® transitions)<br>• NYHA functional class improvement<br>• Quality of life using Minnesota Living with Heart Failure Questionnaire (MLHFQ) |



**Enrolled**
(N=121)

**Transitions**
(n=55; 45.5%)

**Add-Ons**
(n=66; 54.5%)

**Discontinued Study Drug or Study Participation**
(n=5; 9.1%)
• Adverse events (n=3; 5.5%)
• Lost to follow-up (n=0; 0.0%)
• Patient withdrawal (n=2; 3.6%)

**Discontinued Study Drug or Study Participation**
(n=6; 9.1%)
• Adverse events (n=5; 7.6%)
• Lost to follow-up (n=1; 1.5%)
• Patient withdrawal (n=0; 0.0%)

**Completed Month 2 Visit***
(n=53)

**Completed Month 2 Visit**
(n=60)

*3 of the Transitions patients discontinued after the Month 2 timepoint.

Sources: https://clinicaltrials.gov/ct2/show/NCT03399604; PCY – prostacyclin; TEAEs – treatment-emergent adverse events; SAEs – serious adverse events



Liquidia® | 21
CORPORATION

DA0957

LIQ_PH-ILD_00000556

# Enrollment Driven Primarily By Functional Class II & Faster Than Expected

*Suggests potential interest to use as a first-line prostacyclin*

| | | Transitions (n=55) | Prostacyclin Naïve (n=66) | Overall (n=121) |
|---|---|---|---|---|
| **Sex** | Female | 47 (85.5%) | 52 (78.8%) | 99 (81.8%) |
| **Age (years)** | Mean ± SD | 53 ± 14.1 | 55 ± 14.6 | 54 ± 14.3 |
| **BMI (kg/m²)** | Mean ± SD | 30.07 ± 7.9 | 29.31 ± 7.8 | 29.66 ± 7.8 |
| **NYHA Functional Class at Screening** | Class II | 43 (78.2%) | 37 (56.1%) | 80 (66.1%) |
| | Class III | 12 (21.8%) | 29 (43.9%) | 41 (33.9%) |
| **PAH Duration (years)** | Mean ± SD | 7.25 ± 5.1 | 4.71 ± 5.1 | 5.87 ± 5.2 |
| **Sustained Therapy at Month 2** | | 53 (96%) | 60 (91%) | 113 (93%) |
| *Discontinued ≤ Month 2^* | | *5* | *6* | *11* |

^Patients discontinued at or prior to Month 2 due to adverse events, patient choice, investigator decision, lost to follow up;
Hill N. S., et al. INSPIRE: Final Results from a Phase 3, Open-Label, Pivotal Study to Evaluate the Safety and Tolerability of LIQ861 in PAH [virtual presentation]



| 22

LIQ_PH-ILD_00000557

# Established Favorable Safety Profile Across Doses Studied Without Seeing MTD

*Primary endpoint at Month 2 presented at ISHLTv 2020 and Year 1 update presented at ATS 2022*

| TEAEs at Month 2[1]<br>in ≥ 4% of Patients<br>Receiving  LIQ861 | YUTREPIA  (treprostinil) inhalation powder | | |
|---|---|---|---|
| | Transitions<br>(n=55) | Naïve<br>(n=66) | All treated<br>(n=121) |
| Cough | 27.3% | 54.5% | 42.1% |
| Headache | 25.5% | 27.3% | 26.4% |
| Throat irritation | 9.1% | 21.2% | 15.7% |
| Dizziness | 10.9% | 10.6% | 10.7% |
| Diarrhea | 5.5% | 12.1% | 9.1% |
| Chest discomfort | 9.1% | 7.6% | 8.3% |
| Nausea | 7.3% | 7.6% | 7.4% |
| Flushing | 1.8% | 7.6% | 5.0% |
| Dyspnea | 5.5% | 4.5% | 5.0% |
| Oropharyngeal pain | 1.8% | 6.1% | 4.1% |

- No SAEs related to study drug

- TEAEs mostly mild to moderate & during first 2 weeks

- Titrated most patients ≥ 79.5 mcg doses by Month 2

- Dosed up to 159 mcg at Month 2 in INSPIRE study

- Dosed up to 238.5 mcg in Extension study

- Have not yet reached an MTD

- No important adverse safety outcomes at Year 1[2]

Serious Adverse Events (SAEs); Treatment Emergent Adverse Events (TEAEs) deemed related to LIQ861; Maximum Tolerated Dose (MTD);

1. Hill et al, ISHLTv 2020 [virtual presentation]. 2. Hill et al, ATS 2022 [Symposium, Poster]



23

DA0959

LIQ_PH-ILD_00000558

# Positive Trends in Exploratory Endpoint Data at Month 2 Primary Endpoint

*Exploratory endpoints from INSPIRE study, not controlled, open-label*

| Maintained or improved NYHA Functional Class at Month 2[1]

98% for Transition pts
95% for Naïve pts | Increased Median 6MWD at Month 2[1]

+ 18.9m for Transition pts
+ 6.5m for Naïve pts | Significant improvement in quality of life as measured by MLHFQ[2,3]

Emotional and Physical Dimensions scored |

- **Greater percentage of subjects met 2 or 3 PAH low-risk criteria**

- **Did not observe clinically meaningful change in NT-proBNP**

- **Majority of transition patients preferred dry powder inhaler to Tyvaso® Inhalation System**

New York Heart Association (NYHA); Six Minute Walk Distance (6MWD); Minnesota Living with Heart Failure Questionnaire (MLHFQ); N-terminal pro b-type natriuretic peptide (NT-proBNP)

1. Hill et al, ATS 2020 [ePoster]; 2. Hill et al, ATS 2020 [Poster] 3. Kingman et al; PHA 2022 [Poster] Tyvaso® is a registered trademark of United Therapeutics

Liquidia® CORPORATION | 24

DA0960

LIQ_PH-ILD_00000559



**Legal & Financial Positioning**

DA0961

LIQ_PH-ILD_00000560

# Legal Events are Gating to Final FDA Approval of YUTREPIA™

| | Q1 2022 | | Q2 2022 | | | Q3 2022 | | Q4 2022 | |
|---|---|---|---|---|---|---|---|---|---|
| **Key Dates** | | Hatch-Waxman Trial △ *Mar 28-31* | '793 IPR oral arguments △ *May-13* | Submit H-W Post-trial briefs △ *Jun-15* | | '793 IPR Written Decision ◁‑‑‑‑‑‑*by Aug-11* | Hatch-Waxman Decision ▷ | 30-Mo Stay Expires ▲ *Oct-27* | |

| U.S. Patents Asserted by UTHR | Legal Proceeding | Next Step | Comments |
|---|---|---|---|
| **'901** | Hatch-Waxman Litigation[1,2] | ✓ Withdrawn | • **PTAB stated 7 of 9 claims unpatentable in IPR decision (Oct 2021)**[3]<br>• **UTHR stipulated LQDA's non-infringement with appellate rights reserved (Dec 2021)**[4]<br>• **PTAB denied UTHR's request for re-hearing on IPR (June 2022)** |
| **'066** | | **Await H-W Decision** | • **Product-by-process claims relate to product that is similar to product claimed in related patent invalidated by IPR**[5]<br>• **Process claim requires actual storage at ambient temperature** |
| **'793** | H-W Litigation | **Await H-W Decision** | • **'793 IPR instituted 1 year after patent was granted (Aug 2021)**[6]<br>• **PTAB stated reasonable likelihood that at least one challenged claim is unpatentable**<br>• **Conducted IPR oral arguments on May-13; written decision expected near Aug-11** |
| | *Inter Partes* Review | **Await Written Decision** | |

- **U.S. Patent numbers**: Patent 9,604,**901**, Patents 9,593,**066**, Patent 10,716,**793**
- **Under Hatch-Waxman Act:** FDA is automatically precluded from granting final approval of YUTREPIA for up to 30 months or earlier favorable resolution of lawsuit filed by UTHR in Jun-2020

Patent Trial And review Board (PTAB); *Inter Partes* Review (IPR); Press releases: 1. Jun 2020; 2. Jul 2020; 3. Oct 2021; 4. Dec 2021 5. Nov 2017 (SteadyMed); 6. Aug 2021
PACER: Civil Docket For Case#: 1:20-cv-00755-RGA-JLH on https://ecf.ded.uscourts.gov/;  PTAB:  IPR2021-00406 on https://ptab.uspto.gov/#/external/search

Liquidia CORPORATION | 26

DA0962

LIQ_PH-ILD_00000561

# Well Capitalized Through Potential Value Creating Events In 2022

- **Positive contribution from Treprostinil Injection**
  - 50:50 profit split with Sandoz
  - $15.5 million cash contribution 2021 EOY
  - $12.9 million revenue 2021 EOY, net of $2.7 in amortization of contract acquisition costs from Sandoz agreement
  - $3.5 million revenue for 1Q'2022

- **Preparing to launch YUTREPIA™ into PAH market**
  - Pre-commercial activity with key stakeholders
  - R&D activity to increase future value proposition
  - Early-stage program for life-cycle management

| Cash & Equivalents 2022 Q1 | **$57.8 million** as of 31-Mar-2022 |
|---|---|
| SVB Debt Facility January 2022 | $20.0 million drawn +$5.0 million available now +$15.0 million on future milestones |
| Equity Raise April 2022 | ~$53.7 million in net proceeds |
| Shares Outstanding | 64.4 million shares |



27

LIQ_PH-ILD_00000562





# Thank You

LIQ_PH-ILD_00000563

# EXHIBIT 33

# PRESS RELEASE

## UNITED THERAPEUTICS CORPORATION REPORTS FOURTH QUARTER AND FULL YEAR 2023 FINANCIAL RESULTS

SILVER SPRING, Md. & RESEARCH TRIANGLE PARK, N.C.--(BUSINESS WIRE)-- United Therapeutics Corporation (Nasdaq: **UTHR**), a public benefit corporation, today announced its financial results for the quarter and year ended December 31, 2023. Full year 2023 revenues rose to a record $2.33 billion, reflecting 20% growth over 2022.

"Congratulations to the dedicated Unitherians who worked tirelessly to help us achieve our third straight quarter and second straight year of record revenue," said **Martine Rothblatt, Ph.D.**, Chairperson and Chief Executive Officer of United Therapeutics. "This represents only the beginning of our growth, driven by a strong foundation in our current commercial business and upcoming enrollment milestones for our innovative pipeline. On top of this, we have continued momentum for our revolutionary organ manufacturing programs, with the first human clinical study of a bioengineered organ, the miroliver*ELAP*, cleared by the FDA, and the recent opening of the world's first designated pathogen-free clinical supply facility to support our upcoming xenotransplantation clinical program."

"Our commercial business remains a solid foundation supporting our innovative and revolutionary efforts to cure end stage organ disease," said **Michael Benkowitz**, President and Chief Operating Officer of United Therapeutics. "To that end, in the fourth quarter we saw record revenue for our Tyvaso business, and we achieved solid growth in our U.S. Remodulin business, with strong revenue growth and a record number of patients on therapy despite the presence of generic competition since 2019."

Fourth Quarter and Full Year 2023 Financial Results

Key financial highlights include (in millions, except per share data):

DA0966

LIQ_PH-ILD_00000564

3/26/24, 1:00 PM    United Therapeutics Corporation Announces Fourth Quarter and Full Year 2023 Financial Results | United Therapeutics Corp... Rel...

Case 1:23-cv-00975-RGA-SRF  Document 77  Filed 04/12/24  Page 974 of 1048 PageID #: 5482

|  | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
|  | 2023 | 2022 | 2023 | 2022 |
| Total revenues | $ 614.7 | $ 491.5 | $ 2,327.5 | $ 1,936.3 |
| Net income | 217.1 | 132.1 | 984.8 | 727.3 |
| Net income, per basic share | 4.62 | 2.88 | 21.04 | 15.98 |
| Net income, per diluted share | 4.36 | 2.67 | 19.81 | 15.00 |

### Revenues

The table below presents the components of total revenues (dollars in millions):

|  | Three Months Ended December 31, | | Dollar Change | Percentage Change | Year Ended December 31, | | Dollar Change | Percentage Change |
|---|---|---|---|---|---|---|---|---|
|  | 2023 | 2022 | | | 2023 | 2022 | | |
| Net product sales: | | | | | | | | |
| Tyvaso DPI[®(1)] | $213.7 | $ 92.2 | $ 121.5 | 132% | $ 731.1 | $ 158.3 | $ 572.8 | 362% |
| Nebulized Tyvaso[®(1)] | 136.9 | 150.1 | (13.2) | (9)% | 502.6 | 714.7 | (212.1) | (30)% |
| Total Tyvaso | 350.6 | 242.3 | 108.3 | 45% | 1,233.7 | 873.0 | 360.7 | 41% |
| Remodulin[®(2)] | 115.1 | 122.5 | (7.4) | (6)% | 494.8 | 500.2 | (5.4) | (1)% |
| Orenitram[®] | 84.1 | 75.8 | 8.3 | 11% | 359.4 | 325.1 | 34.3 | 11% |
| Unituxin[®] | 54.2 | 36.7 | 17.5 | 48% | 198.9 | 182.9 | 16.0 | 9% |
| Adcirca[®] | 6.8 | 10.4 | (3.6) | (35)% | 28.9 | 41.3 | (12.4) | (30)% |
| Other | 3.9 | 3.8 | 0.1 | 3% | 11.8 | 13.8 | (2.0) | (14)% |
| Total revenues | $614.7 | $491.5 | $ 123.2 | 25% | $2,327.5 | $1,936.3 | $ 391.2 | 20% |

(1) Net product sales include both the drug product and the respective inhalation device.

(2) Net product sales include sales of infusion devices including the Remunity[®] Pump.

**Fourth Quarter 2023 Compared to Fourth Quarter 2022.** Total Tyvaso revenues grew by 45% to $350.6 million in the fourth quarter of 2023, compared to $242.3 million in the fourth quarter of 2022. This growth was primarily due to an increase in quantities sold, driven by the commercial launch of Tyvaso DPI in June 2022 and continued growth in utilization by patients with pulmonary hypertension associated with interstitial lung disease (**PH-ILD**). The growth in Tyvaso DPI revenues resulted primarily from an increase in quantities sold. The decrease in nebulized Tyvaso revenues was primarily due to a decrease in U.S. quantities sold following the commercial launch of Tyvaso DPI, partially offset by an increase in international nebulized Tyvaso revenues, primarily due to the commercial launch of nebulized Tyvaso in Japan in December 2022, as shown in the table below. The decrease in Remodulin revenues resulted from a decrease in international Remodulin revenues, partially offset by an increase in U.S. Remodulin revenues, as shown in the table below. The increase in Orenitram revenues resulted from a price increase and an increase in quantities sold. The increase in Unituxin revenues resulted from an increase in quantities sold and a price increase.

**Full Year 2023 Compared to Full Year 2022.** Total Tyvaso revenues grew by 41% to $1,233.7 million in 2023, compared to $873.0 million in 2022. This growth was primarily due to an increase in quantities sold, driven by the commercial launch of Tyvaso DPI in June 2022 and continued growth in utilization by patients with PH-ILD. The growth in Tyvaso DPI revenues resulted primarily from an increase in quantities sold. The decrease in nebulized Tyvaso revenues was driven by a decrease in U.S. nebulized Tyvaso revenues, primarily due to a decrease in quantities sold following the commercial launch of Tyvaso DPI, partially offset by an increase in international nebulized Tyvaso revenues, primarily due to the commercial launch of nebulized Tyvaso in Japan in December 2022, as shown in the table below. The decrease in Remodulin revenues resulted from a decrease in international Remodulin revenues, partially offset by an increase in U.S. Remodulin



The table below presents the breakdown of total revenues between the United States and rest-of-world (**ROW**) (in millions):

| | Three Months Ended December 31, | | | | | | Year Ended December 3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2023 | | | 2022 | | | 2023 | | | 2 | |
| | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | F |
| Net product sales: | | | | | | | | | | | |

https://ir.unither.com/press-releases/2024/02-21-2024-110027752                                                          3/13

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tyvaso DPI[1] | $213.7 | $ — | $213.7 | $ 92.2 | $ — | $ 92.2 | $ 731.1 | $ — | $ 731.1 | $ 158.3 |
| Nebulized Tyvaso[1] | 123.7 | 13.2 | 136.9 | 148.4 | 1.7 | 150.1 | 477.1 | 25.5 | 502.6 | 708.6 |
| **Total Tyvaso** | **337.4** | **13.2** | **350.6** | **240.6** | **1.7** | **242.3** | **1,208.2** | **25.5** | **1,233.7** | **866.9** |
| Remodulin[2] | 106.3 | 8.8 | 115.1 | 97.7 | 24.8 | 122.5 | 414.6 | 80.2 | 494.8 | 407.5 |
| Orenitram | 84.1 | — | 84.1 | 75.8 | — | 75.8 | 359.4 | — | 359.4 | 325.1 |
| Unituxin | 48.7 | 5.5 | 54.2 | 36.4 | 0.3 | 36.7 | 181.3 | 17.6 | 198.9 | 170.5 |
| Adcirca | 6.8 | — | 6.8 | 10.4 | — | 10.4 | 28.9 | — | 28.9 | 41.3 |
| Other | 2.6 | 1.3 | 3.9 | 2.8 | 1.0 | 3.8 | 9.8 | 2.0 | 11.8 | 2.8 |
| Total revenues | $585.9 | $28.8 | $614.7 | $463.7 | $27.8 | $491.5 | $2,202.2 | $125.3 | $2,327.5 | $1,814.1 |

(1) Net product sales include both the drug product and the respective inhalation device.

(2) Net product sales include sales of infusion devices including the Remunity Pump.

**Expenses**

**Cost of sales.** The table below summarizes cost of sales by major category (dollars in millions):

| | Three Months Ended December 31, | | | | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | Dollar Change | Percentage Change | 2023 | 2022 | Dollar Change | Percentage Change |
| Category: | | | | | | | | |
| Cost of sales | $ 70.1 | $ 55.9 | $ 14.2 | 25% | $255.1 | $146.7 | $ 108.4 | 74% |
| Share-based compensation expense[1] | 0.9 | 2.9 | (2.0) | (69)% | 2.4 | 4.9 | (2.5) | (51)% |
| Total cost of sales | $ 71.0 | $ 58.8 | $ 12.2 | 21% | $257.5 | $151.6 | $ 105.9 | 70% |

(1) See *Share-based compensation* below.

*Cost of sales, excluding share-based compensation.* The increase in cost of sales for the quarter ended December 31, 2023, as compared to the same period in 2022, was primarily due to an increase in Tyvaso DPI royalty expense and product costs following its commercial launch in June 2022.

The increase in cost of sales for the year ended December 31, 2023, as compared to the same period in 2022, was primarily due to an increase in Tyvaso DPI royalty expense and product costs, following its commercial launch in June 2022, and an increase in Remunity product sales.

**Research and development expense.** The table below summarizes the nature of research and development expense by major expense category (dollars in millions):

| Category: | Three Months Ended December 31, 2023 | 2022 | Dollar Change | Percentage Change | Year Ended December 31, 2023 | 2022 | Dollar Change | Percentage Change |
|---|---|---|---|---|---|---|---|---|
| External research and development[1] | $ 50.4 | $ 46.7 | $ 3.7 | 8% | $192.0 | $168.8 | $ 23.2 | 14% |
| Internal research and development[2] | 43.2 | 35.4 | 7.8 | 22% | 146.6 | 131.4 | 15.2 | 12% |
| Share-based compensation expense[3] | 5.7 | 11.0 | (5.3) | (48)% | 15.6 | 23.8 | (8.2) | (34)% |
| Impairments[4] | — | — | — | —% | — | — | — | —% |
| Other[5] | 52.1 | 0.8 | 51.3 | NM[6] | 53.8 | (1.1) | 54.9 | NM[6] |
| Total research and development expense | $151.4 | $ 93.9 | $ 57.5 | 61% | $408.0 | $322.9 | $ 85.1 | 26% |

(1) *External research and development* primarily includes fees paid to third parties (such as clinical trial sites, contract research organizations, and contract laboratories) for preclinical and clinical studies and payments to third-party contract manufacturers before FDA approval of the relevant product.

(2) *Internal research and development* primarily includes salary-related expenses for research and development functions, internal costs to manufacture product candidates before FDA approval, and internal facilities-related expenses, including depreciation, related to research and development activities.

(3) See *Share-based compensation* below.

(4) *Impairments* primarily includes impairment charges to write down the carrying value of in-process research and development (**IPR&D**) and of certain property, plant, and equipment as a result of research and development activities. There were no impairment charges during the years ended December 31, 2023 and December 31, 2022.

(5) *Other* primarily includes upfront fees and milestone payments to third parties under license agreements related to development-stage products, adjustments to the fair value of our contingent consideration obligations, and costs to acquire certain IPR&D assets. During the quarter and year ended December 31, 2023, we recorded $46.0 million in IPR&D expense in connection with the acquisition of IVIVA Medical, Inc. (**IVIVA**).

(6) Calculation is not meaningful.

*Research and development, excluding share-based compensation.* The increase in research and development expense for the quarter ended December 31, 2023, as compared to the same period in 2022, was due to an increase in IPR&D expense in connection with the acquisition of IVIVA and increased expenditures related to the *TETON 1* and *TETON 2* clinical studies of nebulized Tyvaso in patients with idiopathic pulmonary fibrosis (**IPF**).

The increase in research and development expense for the year ended December 31, 2023, as compared to the same period in 2022, was due to: (1) an increase in IPR&D expense in connection with the acquisition of IVIVA; (2) increased expenditures related to the *TETON 1* and *TETON 2* clinical studies of nebulized Tyvaso in patients with IPF; and (3) increased expenditures related to organ manufacturing projects.

**Selling, general, and administrative expense.** The table below summarizes selling, general, and administrative expense by major category (dollars in millions):

|  | Three Months Ended December 31, | | Dollar Change | Percentage Change | Year Ended December 31, | | Dollar Change | Percentage Change |
|---|---|---|---|---|---|---|---|---|
|  | 2023 | 2022 | | | 2023 | 2022 | | |
| Category: | | | | | | | | |

LIQ_PH-ILD_00000569

| | Three Months Ended December 31, | | Dollar Change | Percentage Change | Year Ended December 31, | | Dollar Change | Percentage Change |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | | | 2023 | 2022 | | |
| General and administrative | $ 98.1 | $ 89.3 | $ 8.8 | 10% | $374.2 | $333.2 | $ 41.0 | 12% |
| Sales and marketing | 24.1 | 23.0 | 1.1 | 5% | 81.8 | 70.8 | 11.0 | 16% |
| Share-based compensation expense[1] | 10.0 | 50.9 | (40.9) | (80)% | 21.1 | 78.1 | (57.0) | (73)% |
| Total selling, general, and administrative expense | $132.2 | $163.2 | $ (31.0) | (19)% | $477.1 | $482.1 | $ (5.0) | (1)% |

(1) See *Share-based compensation* below.

*General and administrative, excluding share-based compensation.* The increase in general and administrative expense for the year ended December 31, 2023, as compared to the same period in 2022, was primarily due to increases in: (1) office expenses; (2) personnel expense due to growth in headcount; and (3) sponsorships and grants.

*Sales and marketing, excluding share-based compensation.* The increase in sales and marketing expense for the year ended December 31, 2023, as compared to the same period in 2022, was primarily due to increases in: (1) personnel expense due to growth in headcount; and (2) consulting expenses.

**Share-based compensation.** The table below summarizes share-based compensation expense by major category (dollars in millions):

| | Three Months Ended December 31, | | Dollar Change | Percentage Change | Year Ended December 31, | | Dollar Change | Percentage Change |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | | | 2023 | 2022 | | |
| Category: | | | | | | | | |
| Stock options | $ 2.9 | $ 5.8 | $ (2.9) | (50)% | $ 15.4 | $ 22.6 | $ (7.2) | (32)% |
| Restricted stock units | 14.1 | 12.1 | 2.0 | 17% | 52.4 | 35.7 | 16.7 | 47% |
| Share tracking awards plan (STAP) | (0.9) | 46.5 | (47.4) | (102)% | (30.7) | 46.7 | (77.4) | (166)% |

DA0972                LIQ_PH-ILD_00000570

3/26/24, 11:20 AM    Unither Provides Preliminary Reported Fourth Quarter and Full Year 2023 Financial Results Under Constructor Debtor, Rel...

Case 1:23-cv-00975-RGA-SRF    Document 74    Filed 04/19/24    Page 980 of 1048 PageID #: 5488

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Employee stock purchase plan | 0.5 | 0.4 | 0.1 | 25% | 2.0 | 1.8 | 0.2 | 11% |
| Total share-based compensation expense | $ 16.6 | $ 64.8 | $ (48.2) | (74)% | $ 39.1 | $106.8 | $(67.7) | (63)% |

The decrease in share-based compensation expense for the quarter ended December 31, 2023, as compared to the same period in 2022, was primarily due to an increase in STAP benefit driven by a three percent decrease in our stock price during the quarter ended December 31, 2023, as compared to a 33 percent increase in our stock price for the same period in 2022. The decrease in share-based compensation expense for the year ended December 31, 2023, as compared to the same period in 2022, was primarily due to: (1) an increase in STAP benefit driven by a 21 percent decrease in our stock price during 2023, as compared to a 29 percent increase in our stock price during 2022; and (2) a decrease in stock option expense due to fewer awards remaining outstanding in 2023, as compared to the same period in 2022, partially offset by an increase in restricted stock unit expense.

**Other expense, net.** The change in other expense, net for the year ended December 31, 2023, as compared to the same period in 2022, was primarily due to net unrealized and realized gains and losses on equity securities.

**Income tax expense.** Income tax expense was $289.5 million for the year ended December 31, 2023, compared to $223.3 million for the same period in 2022. Our effective income tax rate was approximately 23 percent for the years ended December 31, 2023 and 2022.

### Inducement Restricted Stock Units

On February 19, 2024, we granted a total of 11,250 restricted stock units under our 2019 Inducement Stock Incentive Plan to six newly hired employees. All of these restricted stock units will vest in full on February 19, 2027, the third anniversary of the grant date, assuming continued employment on such date, and subject to the standard terms and conditions we filed with the SEC as Exhibit 10.2 to our Current Report on Form 8-K on March 1, 2019. We are providing this information in accordance with Nasdaq Listing Rule 5635(c)(4).

### Webcast

We will host a webcast to discuss our fourth quarter and full year 2023 financial results on Wednesday, February 21, 2024, at 9:00 a.m. Eastern Time. The webcast can be accessed live via our website at https://ir.unither.com/events-and-presentations/default.aspx. A replay of the webcast will also be available at the same location on our website.

DA0973

LIQ_PH-ILD_00000571

## United Therapeutics: Enabling Inspiration

At United Therapeutics, our vision and mission are one. We use our enthusiasm, creativity, and persistence to innovate for the unmet medical needs of our patients and to benefit our other stakeholders. We are bold and unconventional. We have fun, we do good. We are the first publicly-traded biotech or pharmaceutical company to take the form of a public benefit corporation (**PBC**). Our public benefit purpose is
*to provide a brighter future for patients through (a) the development of novel pharmaceutical therapies; and (b) technologies that expand the availability of transplantable organs*
.

You can learn more about what it means to be a PBC here: unither.com/pbc.

## Forward-Looking Statements

Statements included in this press release that are not historical in nature are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, among others, statements related to our future growth expectations from both our current commercial operations and our pipeline; our organ manufacturing programs, including our efforts to cure end-stage organ disease and the anticipated clinical trials of miroliver*ELAP* and our xenotransplantation program; and our goals of innovating for the unmet medical needs of our patients and to benefit our other stakeholders, furthering our public benefit purpose of developing novel pharmaceutical therapies and technologies that expand the availability of transplantable organs. These forward-looking statements are subject to certain risks and uncertainties, such as those described in our periodic reports filed with the Securities and Exchange Commission, that could cause actual results to differ materially from anticipated results. Consequently, such forward-looking statements are qualified by the cautionary statements, cautionary language and risk factors set forth in our periodic reports and documents filed with the Securities and Exchange Commission, including our most recent Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K. We claim the protection of the safe harbor contained in the Private Securities Litigation Reform Act of 1995 for forward-looking statements. We are providing this information as of February 21, 2024, and assume no obligation to update or revise the information contained in this press release whether as a result of new information, future events, or any other reason.

MIROLIVERELAP, ORENITRAM, REMODULIN, REMUNITY, TYVASO, TYVASO DPI, and UNITUXIN are registered trademarks of United Therapeutics Corporation and/or its subsidiaries.

LIQ_PH-ILD_00000572

3/26/24, 9:75 PM    United Therapeutics Corporation - Boston Therapeutics Quarterly and Full Year 2024 Financial Results and Other Recent...

Case 1:23-cv-00975-RGA-SRF    Document 74    Filed 04/29/24    Page 982 of 1048 PageID #: 5490

ADCIRCA is a registered trademark of Eli Lilly and Company.

## UNITED THERAPEUTICS CORPORATION
## CONSOLIDATED STATEMENTS OF OPERATIONS
### (In millions, except per share data)

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | (Unaudited) | | | |
| Total revenues | $ 614.7 | $ 491.5 | $ 2,327.5 | $ 1,936.3 |
| Operating expenses: | | | | |
| Cost of sales | 71.0 | 58.8 | 257.5 | 151.6 |
| Research and development | 151.4 | 93.9 | 408.0 | 322.9 |
| Selling, general, and administrative | 132.2 | 163.2 | 477.1 | 482.1 |
| Total operating expenses | 354.6 | 315.9 | 1,142.6 | 956.6 |
| Operating income | 260.1 | 175.6 | 1,184.9 | 979.7 |
| Interest income | 51.0 | 20.8 | 162.7 | 45.2 |
| Interest expense | (15.1) | (12.3) | (59.3) | (32.4) |
| Other expense, net | (0.6) | (5.3) | (14.0) | (40.2) |
| Impairment of investment in privately-held company | — | — | — | (1.7) |
| Total other income (expense), net | 35.3 | 3.2 | 89.4 | (29.1) |
| Income before income taxes | 295.4 | 178.8 | 1,274.3 | 950.6 |
| Income tax expense | (78.3) | (46.7) | (289.5) | (223.3) |
| Net income | $ 217.1 | $ 132.1 | $ 984.8 | $ 727.3 |
| Net income per common share: | | | | |
| Basic | $ 4.62 | $ 2.88 | $ 21.04 | $ 15.98 |
| Diluted | $ 4.36 | $ 2.67 | $ 19.81 | $ 15.00 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 47.0 | 45.8 | 46.8 | 45.5 |
| Diluted | 49.8 | 49.4 | 49.7 | 48.5 |

LIQ_PH-ILD_00000573

## SELECTED CONSOLIDATED BALANCE SHEET DATA
### (In millions)

|  | December 31, | |
| --- | --- | --- |
|  | 2023 | 2022 |
| Cash, cash equivalents, and marketable investments | $ 4,903.9 | $ 4,154.9 |
| Total assets | 7,167.0 | 6,044.5 |
| Total liabilities | 1,182.2 | 1,247.8 |
| Total stockholders' equity | 5,984.8 | 4,796.7 |

The table below presents the breakdown of select historical total revenues between the United States and ROW (in millions):

| | Three Months Ended | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2023 | | | June 30, 2023 | | | September 30, 2023 | | | Decemb | |
| | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | R |
| **Net product sales:** | | | | | | | | | | | |
| Tyvaso DPI[1] | $118.7 | $ — | $118.7 | $193.6 | $ — | $193.6 | $205.1 | $ — | $205.1 | $213.7 | $ |
| Nebulized Tyvaso[1] | 115.7 | 4.0 | 119.7 | 119.6 | 5.7 | 125.3 | 118.1 | 2.6 | 120.7 | 123.7 | |
| Total Tyvaso | 234.4 | 4.0 | 238.4 | 313.2 | 5.7 | 318.9 | 323.2 | 2.6 | 325.8 | 337.4 | |
| Remodulin[2] | 93.2 | 28.2 | 121.4 | 103.5 | 23.7 | 127.2 | 111.6 | 19.5 | 131.1 | 106.3 | |
| Orenitram | 88.2 | — | 88.2 | 95.1 | — | 95.1 | 92.0 | — | 92.0 | 84.1 | |
| Unituxin | 44.3 | 4.8 | 49.1 | 39.5 | 4.8 | 44.3 | 48.8 | 2.5 | 51.3 | 48.7 | |
| Adcirca | 7.3 | — | 7.3 | 7.5 | — | 7.5 | 7.3 | — | 7.3 | 6.8 | |
| Other | 2.3 | 0.2 | 2.5 | 3.2 | 0.3 | 3.5 | 1.7 | 0.2 | 1.9 | 2.6 | |
| Total revenues | $469.7 | $37.2 | $506.9 | $562.0 | $34.5 | $596.5 | $584.6 | $24.8 | $609.4 | $585.9 | $ |

| | Three Months Ended | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2022 | | | June 30, 2022 | | | September 30, 2022 | | | Decemb | |
| | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | R |
| **Net product sales:** | | | | | | | | | | | |

| | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | ROW | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tyvaso DPI[1] | $ — | $ — | $ — | $ 3.0 | $ — | $ 3.0 | $ 63.1 | $ — | $ 63.1 | $ 92.2 $ |
| Nebulized Tyvaso[1] | 170.1 | 1.9 | 172.0 | 196.2 | 1.8 | 198.0 | 193.9 | 0.7 | 194.6 | 148.4 |
| Total Tyvaso | 170.1 | 1.9 | 172.0 | 199.2 | 1.8 | 201.0 | 257.0 | 0.7 | 257.7 | 240.6 |
| Remodulin[2] | 99.1 | 32.6 | 131.7 | 108.5 | 23.5 | 132.0 | 102.2 | 11.8 | 114.0 | 97.7 |
| Orenitram | 82.8 | — | 82.8 | 79.0 | — | 79.0 | 87.5 | — | 87.5 | 75.8 |
| Unituxin | 48.0 | 7.6 | 55.6 | 43.3 | 1.2 | 44.5 | 42.8 | 3.3 | 46.1 | 36.4 |
| Adcirca | 9.8 | — | 9.8 | 10.4 | — | 10.4 | 10.7 | — | 10.7 | 10.4 |
| Other | — | 10.0 | 10.0 | — | — | — | — | — | — | 2.8 |
| Total revenues | $409.8 | $52.1 | $461.9 | $440.4 | $26.5 | $466.9 | $500.2 | $15.8 | $516.0 | $463.7 $ |

| | Three Months Ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2021 | | | June 30, 2021 | | | September 30, 2021 | | | Decemb… |
| | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | R… |

**Net product sales:**

| | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | ROW | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tyvaso DPI[1] | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — $ |
| Nebulized Tyvaso[1] | 122.4 | 0.6 | 123.0 | 152.6 | 1.2 | 153.8 | 160.7 | 3.5 | 164.2 | 165.0 |
| Total Tyvaso | 122.4 | 0.6 | 123.0 | 152.6 | 1.2 | 153.8 | 160.7 | 3.5 | 164.2 | 165.0 |
| Remodulin[2] | 107.1 | 23.1 | 130.2 | 111.0 | 28.8 | 139.8 | 106.8 | 18.6 | 125.4 | 98.5 |
| Orenitram | 72.4 | — | 72.4 | 76.2 | — | 76.2 | 85.2 | — | 85.2 | 72.3 |
| Unituxin | 42.8 | 1.1 | 43.9 | 48.3 | 4.8 | 53.1 | 44.8 | 10.5 | 55.3 | 42.2 |
| Adcirca | 9.6 | — | 9.6 | 23.6 | — | 23.6 | 14.6 | — | 14.6 | 8.1 |
| Other | — | — | — | — | — | — | — | — | — | — |
| Total revenues | $354.3 | $24.8 | $379.1 | $411.7 | $34.8 | $446.5 | $412.1 | $32.6 | $444.7 | $386.1 $ |

(1) Net product sales include both the drug product and the respective inhalation device.

(2) Net product sales include sales of infusion devices including the Remunity Pump.

Category: Earnings

3/26/24, 4:14 PM  United Therapeutics Corporation Reports Third Quarterand Nine Months 2023 Financial Results | United Therapeutics Corp. Investor Rel...

Case 1:23-cv-00975-RGA-SRF   Document 74   Filed 04/19/24   Page 985 of 1048 PageID #: 5493

View source version on businesswire.com:
https://www.businesswire.com/news/home/20240221477756/en/

Dewey Steadman at (202) 919-4097

https://ir.unither.com/contact-ir

Source: United Therapeutics Corporation

DA0978                                    LIQ_PH-ILD_00000576

# EXHIBIT 34



# HHS Public Access

Author manuscript

*J Cardiovasc Pharmacol.* Author manuscript; available in PMC 2017 April 01.

Published in final edited form as:

*J Cardiovasc Pharmacol.* 2016 April ; 67(4): 322–325. doi:10.1097/FJC.0000000000000357.

# Safety and Tolerability of High-dose Inhaled Treprostinil in Pulmonary Hypertension

**Kishan S. Parikh, MD**[1], **Sudarshan Rajagopal, MD, PhD**[1], **Terry Fortin, MD, MS**[1], **Victor F. Tapson, MD**[2], and **Abby D. Poms, RRT**[1]

[1]Department of Medicine, Duke University Medical Center, Durham, USA

[2]Department of Medicine, Cedars-Sinai Medical Center, Los Angeles, USA

## Abstract

Pulmonary arterial hypertension (PAH) has emerging therapeutic options including prostacyclin analogs. Inhaled therapy offers advantages compared to alternative routes of administration. We aimed to determine the safety and tolerability of inhaled treprostinil (iTRE) titrated to target maintenance dose higher than the labeled dose for PAH. Our study included 80 consecutive patients (69% female, 70% White) followed at Duke University Medical Center prescribed iTRE at dose > 9 breaths (54 mcg). Etiology of PH was most frequently pulmonary arterial hypertension (PAH) (51%) or secondary to lung disease (35%). Median follow-up was 20.3 months (IQR 14.2–33.2). Most patients (91%) had titrated iTRE dose to 12 breaths (72 mcg) four times daily. Common side effects reported with drug initiation were cough (41%), headache (28%) and throat irritation (8%); the majority of side effects improved at follow-up. Overall, 25% patients discontinued iTRE: 9 transitioned to parenteral therapy, 4 had untolerable side effects, 3 died, and 4 had other reasons. Overall, iTRE taken at a higher dose than approved for use in PAH was safe and well-tolerated in our cohort of PH patients.

## Keywords

pulmonary hypertension; treprostinil; prostacyclin analog; inhaled therapy; optimal dose; Tyvaso

## Introduction

Pulmonary hypertension (PH) is defined hemodynamically as mean pulmonary arterial pressure greater than 25 mmHg at rest. Whether it occurs as a primary disease of the pulmonary arteries (pulmonary arterial hypertension [PAH], World Health Organization [WHO] Group 1) or secondary to left heart disease, lung disease, chronic thromboembolic disease, or other causes (WHO Groups 2–5, respectively), the diagnosis of PH portends a poor prognosis. The pathogenesis of PAH is directly related to abnormal pulmonary vasculature (i.e., increased vasoconstriction, vascular remodeling, and thrombosis) associated with an imbalance of prostacyclin, endothelin-1, and nitric oxide. (1–3) Current approved therapeutics for PAH target these molecular pathways and fall into one of several

Correspondence to: Kishan S. Parikh, MD, Duke Clinical Research Institute, 2400 Pratt St, Durham, NC USA 27710, Phone: 1-919-668-7835, Fax: 1-919-681-9607, Kishan.parikh@dm.duke.edu.

UTC_PH-ILD_010599

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

classes: prostacyclin analogs, endothelin receptor antagonists, phosphodiesterase-5 inhibitors, and soluble guanylate cyclase stimulators. Occasionally, WHO Groups 2 and 3 patients who have a significant precapillary component of disease are also treated with PAH-specific therapies, although evidence is lacking. (4, 5)

Treprostinil is a tricyclic benzindene prostacyclin analog that is stable at room temperature. (6) As shown in several monotherapy and combination therapy trials, treprostinil in various forms (i.e., parenteral, subcutaneous, and inhaled) improves symptom burden and 6 minute walk distance (6MWD) in PAH patients. (7–16) In particular, compared to parenteral administration, inhaled treprostinil (iTRE) therapy offers the advantage of avoiding long-term invasive access and associated complications, (16, 17) as well as potentially lowering the risk of systemic vasodilation and ventilation-perfusion mismatch in patients with lung disease. (18–20) Inhaled treprostinil was approved for PAH patients with New York Heart Association class III symptoms based on the results of the pivotal Treprostinil Sodium Inhalation Used in the Management of Pulmonary Arterial Hypertension (TRIUMPH) trial in 2009, which randomized 235 patients on bosentan or sildenafil to added iTRE (mean dose $50 \pm 10$ μg) or placebo and showed an increase of 20 meters in 6MWD at 12 weeks in the treatment arm. (13) The currently approved iTRE dosing titration algorithm reaches a maximum of 9 breaths (54 mcg) four times daily.

However, a dose-dependent relationship with duration of pulmonary vascular resistance reduction has been previously shown. (21) Furthermore, iTRE has a half-life of only 44–52 minutes, (22, 23) making optimal dosage with each administration critical. Although doses of up to 12 breaths (72 mcg) four times daily have been reported, the safety and tolerability of > 9 breaths four times daily have not been studied. (7, 8) Of note, iTRE has not been FDA approved for WHO groups II–V. We aimed to characterize safety and tolerability of higher iTRE doses (>9 breaths four times daily and/or greater than 216 mcg/day) from our single tertiary center experience in treating PH patients.

## Methods

### Study Population

We performed a retrospective cohort study of all WHO Group 1–5 PH patients followed at the Duke University Medical Center PH Clinic prescribed high-dose iTRE (> 9 breaths four times daily) prior to August 2012. The PH clinic standard iTRE dosing protocol is as follows: 3 breaths (18 mcg)/initial session, 6 breaths (36 mcg)/second session, and then titration as tolerated, based on side effects, by 1 breath daily until a maximum dosage of 12 breaths (72 mcg) four times daily is achieved (Figure 1). Of note, iTRE initiation (first and second sessions) was performed in clinic under physician supervision with 4 hours in between the sessions.

### Data Sources

Data were collected by chart abstraction from the electronic medical record for three separate time points for each patient: 1) Baseline at 9 breaths four times daily (up to 3 months prior to beginning iTRE); 2) Follow-up 1 (3–6 months post initiation of high-dose

UTC_PH-ILD_010600

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

iTRE), and Follow-up 2 (most recent visit prior to August 2012). If a patient stopped high-dose iTRE (either dose reduced or stopped completely) prior to Follow-up 1 or Follow-up 2, data were collected from the most recent visit closest to the high-dose discontinuation. Patient demographics, past medical history, and WHO classification of PH were collected for each patient from the Baseline visit. Start date and initial and subsequent iTRE doses were also obtained for each patient. Study data were collected and managed using Research Electronic Data Capture (REDCap) tools hosted at Duke University Medical Center.

## Endpoints

The primary endpoints for our study were safety and tolerability. Safety parameters consisted of adverse events (AEs), routine clinical laboratory tests (serum creatinine, hematocrit, platelet count), vital signs (pulse, respiratory rate, systolic and diastolic blood pressure, body mass index), and physical examination findings (jugular venous distension, lung sounds, peripheral edema, ascites). Tolerability of high-dose iTRE was assessed by a need for dose reduction, discontinuation, and reasons for discontinuation.

In addition, the following data related to PH severity were captured for all visits: 6MWD, Borg Dyspnea Index, Dyspnea-Fatigue Index, WHO or NYHA functional class, echocardiographic findings, pulmonary function test (PFT) values, amino-terminal pro-B-type natriuretic peptide (NT-proBNP) value, and concomitant PH medications. Statistical analysis of continuous variables was performed with descriptive statistics. Continuous variables were expressed as mean ± standard deviation unless otherwise stated. Student's t-test for paired samples was performed to determine statistical significance of efficacy results. Statistical tests were performed using GraphPad Prism version 5.0a for Mac OS X, GraphPad Softare, La Jolla California USA, www.graphpad.com. Duke University Institutional Review Board determined that the study protocol adheres to ethical principles, and its approval was granted to this study prior to data collection.

## Results

A total of 80 patients were included in our study with baseline characteristics described in Table 1. Most patients had PAH (51.9%) or PH secondary to lung disease (31.6%). Dates of iTRE initiation ranged from 12/2005 to 7/2012. Among all patients, the median duration of titration from 9 breaths/dose to 12 breaths/dose was 3 days (25–75% interquartile range [Q1-Q3], 1–3; mean 32.2 days; range 0–685). Median times from start of high-dose iTRE therapy to Follow-up Visits 1 and 2 were 5.2 months (Q1-Q3: 4.0–8.7) and 20.3 months (Q1-Q3: 14.2–33.2), respectively. Finally, of the original cohort, 49 patients had available data for the Follow-up Visit 1 analysis, and 39 patients continued to Follow-up Visit 2.

### Adverse Events

Patients at baseline most frequently reported cough (39%) and headache (29%) although both decreased over time. All noted AEs by frequency at Baseline and Follow-up Visits 1 and 2 are listed in Table 2. Additionally, 26 patients (32.5%) had no AE at baseline, and 29 (59.2%) and 25 (64.1%) had no AE at Follow-up Visits 1 and 2, respectively. There were 3 patient deaths attributed to worsening PH or post-operative complications.

UTC_PH-ILD_010601

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**Tolerability**

Of the total cohort, 78 patients had titrated their dose to 12 breaths (72 mcg) four times daily, while two received 10–11 breaths. During the study period, 15/78 (19.2%) patients decreased the iTRE dose below 12 breaths four times daily due to intolerable medication side effects (Table 3). Of these patients, 5 eventually discontinued iTRE completely (2 secondary to continued medication intolerance at lower dose and 3 required parenteral prostacyclin therapy). Overall, 20/78 (25.6%) patients discontinued iTRE in follow-up: 9 transitioned to parenteral therapy, 4 stopped due to side effects, 3 died, 2 self-discontinued, 1 had worsening PH symptoms on high-dose iTRE (parenteral therapy not appropriate), and 1 had lack of clinical response.

**Efficacy Parameters**

Routinely used measures including 6-minute walk distance, Borg dyspnea index, and NT-proBNP were tracked over time as biomarkers of PH severity. The average change in 6-minute walk distance was 3.9 meters (95% confidence interval: −13.4, 21.2) from Baseline to Follow-up 1 ($n$=39; $p$=0.65), and 31.6 meters (−3.8, 67.0) from the Baseline to Follow-up 2 ($n$=34; $p$=0.08). Mean Borg Dyspnea Index changed by −0.2 (−0.7, 0.2) ($n$=37; $p$=0.31) and 0.0 (−0.76, 0.76) ($n$=32; $p$=1.00) between corresponding visits. Finally, NT-proBNP decreased by 39 ng/L (−312, 234) at Follow-up 1 ($n$=32, $p$=0.77) and 630 ng/L (−1456, 197) at Follow-up 2 ($n$=23, $p$=0.13).

## Discussion

We found that adverse events in PH patients on iTRE at 12 breaths (72 mcg) four times daily were relatively few and this dose was generally well-tolerated. Approximately one-third of our patient population did not experience any untoward effects. Of patients requiring dose reduction, cough and/or headache were responsible in 42% of the cases. Furthermore, among the patients who discontinued iTRE, only 20% cited intolerable side effects. Instead, the most common reason for discontinuation was the need to transition to parenteral therapy for worsening PH.

We found the safety profile of high-dose iTRE to be comparable to prior cited adverse effect/event rates of iTRE therapy. For example, in the TRIUMPH study of 235 patients on iTRE (maximum dose 9 breaths four times daily), cough (54% of patients) and headache (41% of patients) were the most frequent AEs in a 12 week follow-up period. (13) Furthermore, our cohort of patients did not experience previously documented rates of throat irritation (14%) and pharyngolaryngeal pain (11%). Instead, we observed a decrease in throat irritation over time among patients who remained on the drug (7.5% to 2.0% and 0.0% in follow-up visits), and only 2 patients cited throat irritation as a reason for discontinuation. To provide a longer-term profile and outcomes assessment of these patients, the TRIUMPH study open-label extension cohort of 206 patients was followed to 24 months. (7) Mean iTRE doses were 7.8 ± 2.9, 8.9 ± 2.5, 9.4 ± 2.6, and 9.5 ± 2.6 breaths at 6, 12, 18, and 24 months, respectively. Adverse effects (cough and headache) accounted for 6% of events resulting in discontinuation in this longer-term follow-up.

UTC_PH-ILD_010602

In a sick patient population with significant functional limitations and poor reserve, rapid titration of therapy to optimal dose (one that provides increased efficacy with tolerable side effects) is a critical part of management whenever possible. In prior studies, titration has spanned 18–21 days to achieve a dose of 9 breaths. (8, 13) It is possible that a more aggressive approach when appropriate may be preferred and well-tolerated.

The iTRE delivery system allows for titration of medication beyond the recommended package insert dosing instructions. Thus, PH clinicians can vary dosing for individual patients similar to standard practice with intravenous and subcutaneous prostacyclin therapies. This allows for patient-specific medication titration to maximal clinical benefit while minimizing side effects. Finally, we report a favorable safety and tolerability profile among PH WHO group 3 patients in our study for whom there are currently no approved therapies, and iTRE may provide benefit in this patient population.

## Limitations

This study was limited by the retrospective study design and only included patients thought to be good candidates for higher dose iTRE. Because this was an observational study in clinical practice it also suffers from follow-up loss. The iTRE dosing changes were made according to a standardized protocol that resulted in most patients achieving target dose in a few days. In this analysis we did not assess the association of high-dose iTRE with the adjustment of other medications such as diuretics. There were insufficient follow-up data to analyze efficacy endpoints.

## Conclusions

In conclusion, iTRE appears to be safe and generally well-tolerated at doses > 9 breaths four times daily among PH patients in our single center experience. These results warrant further investigation into the efficacy of high-dose iTRE in PH.

## Acknowledgements

Database creation and analysis was funded by United Therapeutics. Data analysis and manuscript preparation was supported by NIH grants 5T32GM086330-05 (KSP) and HL114643 (SR) and Burroughs Wellcome Career Award for Medical Scientists (SR).

Funding Source: United Therapeutics, NIH grant 5T32GM086330-05 (KSP)

**Disclosures:** Parikh: research funding from St. Jude Medical/ Rajagopal: research funding from National Heart, Lung, and Blood Institute (NHLBI), Wellcome Burroughs Fund, Gilead, and Bayer; Advisory Board for Gilead/ Fortin: nothing to disclose/ Tapson: Research funding: Actelion, Bayer, United Therapeutics; Consulting: Actelion, Bayer, United Therapeutics, Gilead, Lung Biotechnology, Janssen, Daiichi, Portola; Speaking: Bayer, Janssen/ Poms: Speaker Bureau: Actelion, United Therapeutics; Consulting: Ikariq, Actelion, Reatta; Advisory Board: Actelion, United Therapeutics, Bayer

## References

1. Barst RJ, Gibbs JS, Ghofrani HA, Hoeper MM, McLaughlin VV, Rubin LJ, Sitbon O, Tapson VF, Galie N. Updated evidence-based treatment algorithm in pulmonary arterial hypertension. J Am Coll Cardiol. Jun 30; 2009 54(1 Suppl):S78–84. [PubMed: 19555861]
2. Galie N, Hoeper MM, Humbert M, Torbicki A, Vachiery JL, Barbera JA, Beghetti M, Corris P, Gaine S, Gibbs JS, Gomez-Sanchez MA, Jondeau G, Klepetko W, Opitz C, Peacock A, Rubin L,

UTC_PH-ILD_010603

DA0984

Case 1:23-cv-00975-RGA-SRF   Document 71   Filed 04/19/24   Page 992 of 1048 PageID #: 5500

Zellweger M, Simonneau G, Guidelines ESCCfP. Guidelines for the diagnosis and treatment of pulmonary hypertension: the Task Force for the Diagnosis and Treatment of Pulmonary Hypertension of the European Society of Cardiology (ESC) and the European Respiratory Society (ERS), endorsed by the International Society of Heart and Lung Transplantation (ISHLT). Eur Heart J. Oct; 2009 30(20):2493–537. [PubMed: 19713419]

3. McLaughlin VV, Archer SL, Badesch DB, Barst RJ, Farber HW, Lindner JR, Mathier MA, McGoon MD, Park MH, Rosenson RS, Rubin LJ, Tapson VF, Varga J, American College of Cardiology Foundation Task Force on Expert Consensus D; American Heart A; American College of Chest P; American Thoracic Society I; Pulmonary Hypertension A. ACCF/AHA 2009 expert consensus document on pulmonary hypertension a report of the American College of Cardiology Foundation Task Force on Expert Consensus Documents and the American Heart Association developed in collaboration with the American College of Chest Physicians; American Thoracic Society, Inc.; and the Pulmonary Hypertension Association. J Am Coll Cardiol. Apr 28; 2009 53(17):1573–619. [PubMed: 19389575]

4. Seeger W, Adir Y, Barbera JA, Champion H, Coghlan JG, Cottin V, De Marco T, Galie N, Ghio S, Gibbs S, Martinez FJ, Semigran MJ, Simonneau G, Wells AU, Vachiery JL. Pulmonary hypertension in chronic lung diseases. J Am Coll Cardiol. Dec 24; 2013 62(25 Suppl):D109–16. [PubMed: 24355635]

5. Vachiery JL, Adir Y, Barbera JA, Champion H, Coghlan JG, Cottin V, De Marco T, Galie N, Ghio S, Gibbs JS, Martinez F, Semigran M, Simonneau G, Wells A, Seeger W. Pulmonary hypertension due to left heart diseases. J Am Coll Cardiol. Dec 24; 2013 62(25 Suppl):D100–8. [PubMed: 24355634]

6. Laliberte K, Arneson C, Jeffs R, Hunt T, Wade M. Pharmacokinetics and steady-state bioequivalence of treprostinil sodium (Remodulin) administered by the intravenous and subcutaneous route to normal volunteers. J Cardiovasc Pharmacol. Aug; 2004 44(2):209–14. [PubMed: 15243302]

7. Benza RL, Seeger W, McLaughlin VV, Channick RN, Voswinckel R, Tapson VF, Robbins IM, Olschewski H, Rubin LJ. Long-term effects of inhaled treprostinil in patients with pulmonary arterial hypertension: the Treprostinil Sodium Inhalation Used in the Management of Pulmonary Arterial Hypertension (TRIUMPH) study open-label extension. J Heart Lung Transplant. Dec; 2011 30(12):1327–33. [PubMed: 22055098]

8. Bourge RC, Tapson VF, Safdar Z, Benza RL, Channick RN, Rosenzweig EB, Shapiro S, White RJ, McSwain CS, Gotzkowsky SK, Nelsen AC, Rubin LJ. Rapid transition from inhaled iloprost to inhaled treprostinil in patients with pulmonary arterial hypertension. Cardiovasc Ther. Feb; 2013 31(1):38–44. [PubMed: 22970909]

9. Chen H, Rosenzweig EB, Gotzkowsky SK, Arneson C, Nelsen AC, Bourge RC. Treatment satisfaction is associated with improved quality of life in patients treated with inhaled treprostinil for pulmonary arterial hypertension. Health Qual Life Outcomes. 2013; 11:31. [PubMed: 23496856]

10. Gomberg-Maitland M, McLaughlin V, Gulati M, Rich S. Efficacy and safety of sildenafil added to treprostinil in pulmonary hypertension. Am J Cardiol. Nov 1; 2005 96(9):1334–6. [PubMed: 16253609]

11. Hiremath J, Thanikachalam S, Parikh K, Shanmugasundaram S, Bangera S, Shapiro L, Pott GB, Vnencak-Jones CL, Arneson C, Wade M, White RJ, Group TS. Exercise improvement and plasma biomarker changes with intravenous treprostinil therapy for pulmonary arterial hypertension: a placebo-controlled trial. J Heart Lung Transplant. Feb; 2010 29(2):137–49. [PubMed: 20022264]

12. Jing ZC, Parikh K, Pulido T, Jerjes-Sanchez C, White RJ, Allen R, Torbicki A, Xu KF, Yehle D, Laliberte K, Arneson C, Rubin LJ. Efficacy and safety of oral treprostinil monotherapy for the treatment of pulmonary arterial hypertension: a randomized, controlled trial. Circulation. Feb 5; 2013 127(5):624–33. [PubMed: 23307827]

13. McLaughlin VV, Benza RL, Rubin LJ, Channick RN, Voswinckel R, Tapson VF, Robbins IM, Olschewski H, Rubenfire M, Seeger W. Addition of inhaled treprostinil to oral therapy for pulmonary arterial hypertension: a randomized controlled clinical trial. J Am Coll Cardiol. May 4; 2010 55(18):1915–22. [PubMed: 20430262]

14. Oudiz RJ, Schilz RJ, Barst RJ, Galie N, Rich S, Rubin LJ, Simonneau G, Treprostinil Study G. Treprostinil, a prostacyclin analogue, in pulmonary arterial hypertension associated with connective tissue disease. Chest. Aug; 2004 126(2):420–7. [PubMed: 15302727]

UTC_PH-ILD_010604

DA0985

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

15. Simonneau G, Barst RJ, Galie N, Naeije R, Rich S, Bourge RC, Keogh A, Oudiz R, Frost A, Blackburn SD, Crow JW, Rubin LJ, Treprostinil Study G. Continuous subcutaneous infusion of treprostinil, a prostacyclin analogue, in patients with pulmonary arterial hypertension: a double-blind, randomized, placebo-controlled trial. Am J Respir Crit Care Med. Mar 15; 2002 165(6): 800–4. [PubMed: 11897647]

16. Barst RJ, Galie N, Naeije R, Simonneau G, Jeffs R, Arneson C, Rubin LJ. Long-term outcome in pulmonary arterial hypertension patients treated with subcutaneous treprostinil. Eur Respir J. Dec; 2006 28(6):1195–203. [PubMed: 16899485]

17. Kallen AJ, Lederman E, Balaji A, Trevino I, Petersen EE, Shoulson R, Saiman L, Horn EM, Gomberg-Maitland M, Barst RJ, Srinivasan A. Bloodstream infections in patients given treatment with intravenous prostanoids. Infect Control Hosp Epidemiol. Apr; 2008 29(4):342–9. [PubMed: 18462147]

18. Blanco I, Ribas J, Xaubet A, Gomez FP, Roca J, Rodriguez-Roisin R, Barbera JA. Effects of inhaled nitric oxide at rest and during exercise in idiopathic pulmonary fibrosis. J Appl Physiol (1985). Mar; 2011 110(3):638–45. [PubMed: 21183625]

19. Olschewski H, Ghofrani HA, Walmrath D, Schermuly R, Temmesfeld-Wollbruck B, Grimminger F, Seeger W. Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis. Am J Respir Crit Care Med. Aug; 1999 160(2):600–7. [PubMed: 10430735]

20. Voswinckel R, Reichenberger F, Enke B, Kreckel A, Krick S, Gall H, Schermuly RT, Grimminger F, Rubin LJ, Olschewski H, Seeger W, Ghofrani HA. Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension. Pulm Pharmacol Ther. Oct; 2008 21(5):824–32. [PubMed: 18657627]

21. Voswinckel R, Enke B, Reichenberger F, Kohstall M, Kreckel A, Krick S, Gall H, Gessler T, Schmehl T, Ghofrani HA, Schermuly RT, Grimminger F, Rubin LJ, Seeger W, Olschewski H. Favorable effects of inhaled treprostinil in severe pulmonary hypertension: results from randomized controlled pilot studies. J Am Coll Cardiol. Oct 17; 2006 48(8):1672–81. [PubMed: 17045906]

22. Channick RN, Olschewski H, Seeger W, Staub T, Voswinckel R, Rubin LJ. Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension. J Am Coll Cardiol. Oct 3; 2006 48(7):1433–7. [PubMed: 17010807]

23. Safdar Z. Treatment of pulmonary arterial hypertension: the role of prostacyclin and prostaglandin analogs. Respir Med. Jun; 2011 105(6):818–27. [PubMed: 21273054]

UTC_PH-ILD_010605

Parikh et al.                                                                                                     Page 8



**Figure 1.**
High-dose inhaled treprostinil titration protocol.

UTC_PH-ILD_010606

DA0987

**Table 1**

Baseline Characteristics of Study Population ($n$=80). Continuous variables are expressed as mean±standard deviation.

| Patient Characteristic | |
| --- | --- |
| Mean age (years) | 63.1 |
| Female (%) | 55 (68.8) |
| White (%) | 55 (68.8) |
| Body Mass Index (kilogram/meter$^2$) Comorbid conditions | 30±7.0 |
| • Left heart disease | 17 (21.3) |
| • Diabetes mellitus | 18 (22.5) |
| • Hypertension | 36 (45.0) |
| • Depression | 4 (5.0) |
| • Obesity | 25 (31.3) |
| • Obstructive sleep apnea | 20 (25.0) |
| • Renal disease | 11 (13.8) |
| • Interstitial lung disease/ pulmonary fibrosis | 20 (25.0) |
| • Obstructive lung disease | 23 (28.8) |
| • Sarcoidosis | 2 (2.5) |
| • Venous thromboembolic disease | 11 (13.8) |
| • Non-skin cancer | 9 (11.3) |
| **PH World Health Organization Classification** | |
| • Group 1 | 41 (51.9) |
| ◦ Idiopathic | 16 (40.0) |
| ◦ Familial | 1 (2.5) |
| ◦ Drug/toxin-induced | 2 (5.0) |
| ◦ Connective tissue disease | 15 (37.5) |
| ◦ Human Immunodeficiency Virus | 2 (5.0) |
| ◦ Portopulmonary hypertension | 1 (2.5) |
| ◦ Congenital heart disease | 3 (7.5) |
| • Group 2 | 3 (3.8) |
| • Group 3 | 25 (31.6) |
| ◦ Obstructive disease | 13 (52.0) |
| ◦ Interstitial lung disease/fibrosis | 6 (24.0) |
| ◦ Mixed pattern | 6 (24.0) |
| • Group 4 | 9 (11.4) |
| • Group 5 | 1 (1.3) |
| **Concomitant pulmonary hypertension medications** | |
| • Endothelin receptor antagonist | 46 (57.5) |
| • Phosphodiesterase-5 inhibitor | 53 (66.3) |
| • Oxygen (continuous) | 46 (57.5) |
| **Biomarkers** | |
| World Health Organization Functional Class III/IV | 62 (77.5) |

*J Cardiovasc Pharmacol*. Author manuscript; available in PMC 2017 April 01.

UTC_PH-ILD_010607

Author Manuscript   Author Manuscript   Author Manuscript   Author Manuscript

| Patient Characteristic | |
|---|---|
| Bo Borg Dyspnea Index Score core | 3.6±2.2 |
| Mean 6-minute walk distance (meters) | 302±135 |
| NT-proBNP (ng/L) (reference range < 125) | 1923±3086 |

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

UTC_PH-ILD_010608

**Table 2**

Adverse Events at Baseline (9 breaths/dose) and Follow-up Visits.

| Adverse effect | Baseline (%) (*n*=80) | Follow-up 1 (%) (*n*=49) | Follow-up 2 (%) (*n*=39) |
|---|---|---|---|
| Cough | 31 (38.8) | 10 (20.4) | 7 (17.9) |
| Headache | 23 (28.8) | 7 (14.3) | 5 (12.8) |
| Other | 16 (20.0) | 4 (8.2) | 5 (12.8) |
| Flushing | 13 (16.3) | 2 (4.1) | 3 (7.7) |
| Nausea/vomiting | 6 (7.5) | 0 (0.0) | 2 (5.1) |
| Throat irritation | 6 (7.5) | 1 (2.0) | 0 (0.0) |
| Diarrhea | 5 (6.3) | 3 (6.1) | 3 (7.7) |
| Lightheadedness | 4 (5.0) | 3 (6.1) | 0 (0.0) |
| Syncope | 1 (1.3) | 0 (0.0) | 0 (0.0) |
| Hypotension | 1 (1.3) | 0 (0.0) | 1 (2.6) |

*J Cardiovasc Pharmacol*. Author manuscript; available in PMC 2017 April 01.

Author Manuscript

UTC_PH-ILD_010609

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Parikh et al. Page 12

**Table 3**

Reasons for dose reduction in high-dose iTRE cohort (15/80 patients).

| Adverse Effect | Number of Occurrences |
|---|---|
| Headache | 6 |
| Cough | 4 |
| Throat irritation | 2 |
| Jaw pain | 2 |
| Diarrhea | 2 |
| Tremulousness | 2 |

*J Cardiovasc Pharmacol*. Author manuscript; available in PMC 2017 April 01.

UTC_PH-ILD_010610

# EXHIBIT 35

Lung (2018) 196:139–146
https://doi.org/10.1007/s00408-017-0081-7

**PULMONARY HYPERTENSION**



# Inhaled Treprostinil in Pulmonary Hypertension Associated with Lung Disease

**Mariana Faria-Urbina[1,2] · Rudolf K. F. Oliveira[1,2,3] · Manyoo Agarwal[4] · Aaron B. Waxman[1,2,5]**

Received: 7 August 2017 / Accepted: 15 December 2017 / Published online: 23 December 2017
© Springer Science+Business Media, LLC, part of Springer Nature 2017

## Abstract

**Purpose** Pulmonary hypertension (PH) in the setting of parenchymal lung disease adversely affects quality of life and survival. However, PH-specific drugs may result in ventilation/perfusion imbalance and currently, there are no approved PH treatments for this patient population. In the present retrospective study, data from 22 patients with PH associated with lung disease treated with inhaled treprostinil (iTre) and followed up clinically for at least 3 months are presented.

**Methods** PH was defined by resting right heart catheterization as a mean pulmonary artery pressure (mPAP) $\geq 35$ mmHg, or mPAP $\geq 25$ mmHg associated with pulmonary vascular resistance $\geq 4$ Woods Units. Follow-up evaluation was performed at the discretion of the attending physician.

**Results** From baseline to follow-up, we observed significant improvement in functional class ($n = 22$, functional class III-IV 82 vs. 59%, $p = 0.041$) and 6-min walk distance ($n = 11$, $243 \pm 106$ vs. $308 \pm 109$; $p = 0.022$), without a deleterious effect on resting peripheral oxygen saturation ($n = 22$, $92 \pm 6$ vs. $94 \pm 4$; $p = 0.014$). Most of the patients (86%, $n = 19/22$) were using long-term nasal supplemental oxygen at baseline. During follow-up, only one patient had increased supplemental oxygen requirement. The most common adverse events were cough, headache, and diarrhea. No severe adverse event was reported.

**Conclusions** The results suggest that iTre is safe in patients with Group 3 PH and evidence of pulmonary vascular remodeling in terms of functional class, gas exchange, and exercise capacity. Additionally, iTre was well tolerated. The potential role of PH-specific drugs in Group 3 PH should be further assessed in larger prospective studies.

**Keywords** Pulmonary hypertension · Lung disease · Treprostinil · Exercise capacity

---

Mariana Faria-Urbina, Rudolf K. F. Oliveira contributed equally to the study.

**Electronic supplementary material** The online version of this article (https://doi.org/10.1007/s00408-017-0081-7) contains supplementary material, which is available to authorized users.

✉ Aaron B. Waxman
abwaxman@bwh.harvard.edu

[1] Pulmonary and Critical Care Medicine, Brigham and Women's Hospital and Harvard Medical School, Boston, MA, USA

[2] Center for Pulmonary Heart Disease, Heart & Vascular Center, Brigham and Women's Hospital, Boston, MA, USA

[3] Division of Respiratory Diseases, Department of Medicine, Federal University of Sao Paulo (UNIFESP), Sao Paulo, Brazil

[4] Department of Medicine, University of Tennessee Health Science Center, Memphis, TN, USA

[5] Pulmonary and Critical Care Medicine, Department of Medicine, Brigham and Women's Hospital, 75 Francis Street, PBB Clinics-3, Boston, MA 02115, USA

## Introduction

Pulmonary hypertension (PH) in the setting of parenchymal lung disease, termed as World Health Organization (WHO) Group 3 PH, is frequently encountered and adversely affects patients' quality of life and survival [1–3]. Among Group 3 PH, the most common etiologies are chronic obstructive pulmonary disease (COPD), interstitial lung disease (ILD), and combined pulmonary fibrosis and emphysema (CPFE) [4].

It has been shown that pulmonary vascular remodeling is a major contributor to Group 3 PH [5], being mainly characterized by changes in the media, as opposed to Group 1 PH where intima and media remodeling predominate [6]. However, animal models of hypoxia-induced PH have shown heterogeneity of findings in intimal thickness with increasingly elevated mean pulmonary arterial pressure (mPAP) levels [7]. Additionally, in COPD with severe PH, medial and intimal fibrosis and even plexiform lesions have been described, findings similar to Group I PH [8].

 Springer

UTC_PH-ILD_009936

Despite the poor survival, compromised functional capacity, and reduced quality of life in Group 3 PH, there are no approved PH treatments for this patient population [1]. This is mainly because in patients with parenchymal lung disease, PH-specific drugs may result in ventilation/perfusion (V/Q) imbalance, particularly in the setting of significant oxygen deficit [9]. However, previous studies have shown improvement in hemodynamics without deleterious effect on gas exchange in patients with Group 3 PH treated with endothelin receptor antagonists and phosphodiesterase-5 inhibitors [10, 11]. Conversely, previous clinical trials with ambrisentan [12] in idiopathic pulmonary fibrosis (IPF) and riociguat (NCT02138825) were terminated due to worse outcome when compared to placebo in Group 3 PH.

Among the available PH-specific drugs, prostacyclin is known to lower mPAP, increase cardiac output, and reduce pulmonary vascular remodeling through its effect on vascular smooth muscle proliferation [13]. Additionally, prostacyclin has demonstrated antiapoptotic properties in the pulmonary vasculature after chronic cigarette smoke exposure [14], and in an animal model of bleomycin-induced pulmonary fibrosis, prostacyclin prevented fibroblast proliferation and showed a protective effect against deterioration of lung function [15]. Furthermore, previous reports have suggested that Iloprost, a prostacyclin analogue, may represent a safe option in Group 3 PH as it is delivered directly to well-ventilated lung units, reducing undesirable alterations in perfusion and subsequently preserving V/Q matching [16].

Treprostinil, a chemically stable tricyclic analogue of prostacyclin, is approved for the treatment of Group 1 PH via subcutaneous, intravenous, inhaled (as treprostinil sodium), or oral (as treprostinil diolamine) routes of administration [1]. It provides sustained pulmonary vasodilation thanks to its longer plasma half-life [17] and specific tissue-binding characteristics [18]. In the present study, we present our experience with the use of inhaled treprostinil (iTre) in 22 WHO Group 3 PH patients who were followed up clinically for at least 3 months after initiation of therapy. We hypothesize that iTre vasodilates well-ventilated lung areas, preserving V/Q matching when administered in PH associated with lung disease.

## Methods

### Design and study population

In this single-center retrospective observational study, data from 72 patients evaluated at the Pulmonary Vascular Disease (PVD) Clinic at the Brigham and Women's Hospital (Boston, MA, USA) and treated with iTre from December 2009 to November 2016 were reviewed to identify patients with lung disease, based on pulmonary function test (PFT)

and high-resolution computed tomography (HRCT) scans of the lungs, and PH with evidence of pulmonary vascular remodeling as defined below. This retrospective analysis was approved by the Partners Human Research Committee.

Lung disease was defined by as follows: (1) COPD: post-bronchodilator FEV1/FVC < 0.7 [19] and/or evidence of emphysema on HRCT; (2) ILD: presence of fibrosis, defined as reticular septal thickening associated with architectural distortion with traction bronchiectasis, or honeycombing on HRCT [20, 21]; (3) CPFE: presence of emphysema and diffuse parenchymal lung disease with significant pulmonary fibrosis on HRCT [22].

PH was defined by resting right heart catheterization (RHC) as a mPAP ≥ 35 mmHg (severe PH) [23] or a mPAP ≥ 25 mmHg associated with pulmonary vascular resistance (PVR) ≥ 4 Woods Units (WU). No patients with isolated postcapillary PH (i.e., high PAWP and normal PVR) were included in the study.

Exclusion criteria included the following: identification of another known cause of PH (such as chronic thromboembolic disease); follow-up < 3 months; treatment with another PH-specific drug added in a period < 3 months from iTre initiation; lung transplantation during follow-up (< 3 months); recent hospitalization due to unstable lung disease (≤ 1 month), extemporaneous RHC, and/or inability to review baseline PFT or RHC data.

### Treatment regimen and follow-up

All patients consented to receive treatment based on medical judgment [23] after being informed of the potential risks and benefits of iTre. Patients received iTre at three breaths (18 μg) four times daily (72 μg/day). iTre doses were increased as tolerated by three additional breaths (18 μg) per dosing session every 3–7 days to achieve a dose of at least 9–12 breaths or more (≥ 54 μg) four times daily (≥ 216 μg/day) unless limited by side effects. If patients had dose-limiting side effects, then either a slower dose titration or a lower goal dose was prescribed. All patients were on optimized therapies for the treatment of baseline lung disease prior to consideration for iTre treatment, were followed for at least 3 months, and were compliant with the medication. Therapies related to the underlying lung disease were continued throughout the observation period.

Follow-up was performed at the discretion of the attending physician, using WHO functional class (WHO-FC), pulse oxygen saturation (SpO$_2$), and supplementary oxygen requirement, in addition to at least one of the following tests: resting echocardiography, 6-min walking test (6MWT), and/or 3-min step test with a portable metabolic cart (Shape Medical Systems, Inc., St. Paul, MN, USA), and/or resting RHC. Functional class was systematically estimated by the

UTC_PH-ILD_009937

Lung (2018) 196:139–146

treating physician at each visit. Adverse events and discontinuation of iTre were also assessed.

## Statistical analysis

Data are presented as mean ± standard deviation or as absolute numbers, unless otherwise stated. The distribution of continuous variables was evaluated using Shapiro–Wilk test. Comparisons between parameters obtained at baseline and during follow-up were performed using paired $t$ test or Wilcoxon signed-rank test, as appropriate. $p < 0.05$ was considered statistically significant. The statistical analyses were performed using SPSS software, version 19 (IBM Company, Armonk, NY, USA).

## Results

### Baseline characteristics

Out of 72 patients receiving iTre, 67 had PH with evidence of pulmonary vascular remodeling (per the criteria described above), of which 61 had lung disease. Thirty-nine patients were excluded due to recent hospitalization due to unstable lung disease ($n = 8$), lung transplantation during follow-up ($n = 1$), PH related to chronic thromboembolic pulmonary disease ($n = 1$), initiation of other PH-specific drug in a period < 3 months from iTre initiation ($n = 17$), extemporaneous and/or unretrievable RHC ($n = 7$), and missing clinical/functional data at baseline ($n = 5$). Therefore, the study population was constituted by 22 Group 3 PH patients (Fig. 1).

The mean age was 66 ± 10 years (14 males and 8 females). Eight patients (36%) had COPD, nine (41%) had ILD, and five (23%) were classified as having CPFE. Of

the nine ILD patients, two had associated connective tissue disease. Nineteen patients (86%) were using long-term nasal supplemental oxygen therapy at baseline. Eighteen patients (82%) were in WHO-FC III-IV. The mPAP, pulmonary arterial wedge pressure (PAWP), and PVR for the entire population were 44 ± 10 mmHg, 10 ± 4 mmHg, and 8.1 ± 3.6 WU, respectively. Sixteen (73%) of the subjects had severe PH (mPAP ≥ 35 mmHg). Twenty-two (100%) patients had PVR > 4 WU. Three patients had PAWP > 15 mmHg (16–18 mmHg), but they additionally had PVR > 4 WU and therefore, were considered to have PVD as the predominant physiopathologic mechanism for PH. At baseline, the mean 6MWT distance was 242 ± 99 m. Ventilatory efficiency was evaluated by the step test with a portable metabolic cart, showing a baseline VE/VCO$_2$ *slope* of 46.6 ± 20.1. The baseline characteristics of the 22 patients of the study are summarized in Table 1.

### Follow-up assessment

Follow-up information is presented in Fig. 1 and Table 2. The mean final dose of iTre for the entire study cohort was 274 ± 103 μg/day and 82% of the patients ($n = 18/22$) achieved a target dose > 216 μg/day. None of the patients were undergoing pulmonary rehabilitation during the assessment period.

There was significant improvement in WHO-FC (Fig. 2) and no deleterious effect on SpO$_2$ (Table 2). Only one patient had increased supplemental oxygen requirement after iTre was started. No significant differences were observed in PFT and resting echocardiography after treatment with iTre. Eleven patients with follow-up 6MWT showed significant improvement in the distance walked (Table 2), regardless of iTre being added as the first or second PH-specific drug (Fig. 3). There were no significant changes among the 13

**Fig. 1** Study flow diagram. *iTre* inhaled treprostinil sodium, *PH* pulmonary hypertension (mPAP ≥ 35 mmHg or mPAP ≥ 25 mmHg and PVR ≥ 3 Woods Units on resting RHC), *CTEPH* chronic thromboembolic pulmonary hypertension, *RHC* right heart catheterization, *WHO-FC* World Health Organization functional class, *SpO₂* pulse oxygen saturation, *PFT* pulmonary function test, *RHC* right heart catheterization



UTC_PH-ILD_009938

DA0995

Lung (2018) 196:139–146

**Table 1** Baseline characteristics of group 3 pulmonary hypertension patients treated with inhaled treprostinil ($n=22$)

| Variable | Value |
| --- | --- |
| Age, years | $66 \pm 10$ |
| Male/female ($n$) | 14/8 |
| Body mass index | $26.7 \pm 4.2$ |
| WHO functional class I/II/III/IV ($n$) | 0/4/15/3 |
| $SpO_2$ at rest (%) | $92 \pm 6$ |
| Lung disease n (%) | |
| Chronic obstructive pulmonary disease | 8 (36) |
| Interstitial lung disease | 9 (41) |
| Combined pulmonary fibrosis and emphysema | 5 (23) |
| Pulmonary function test* | |
| $FEV_1$ (L) | $1.7 \pm 0.8$ |
| $FEV_1$ (% predicted) | $61 \pm 29$ |
| FVC (L) | $2.4 \pm 1.0$ |
| FVC (% predicted) | $64 \pm 28$ |
| $FEV_1/FVC$ | $72 \pm 13$ |
| $FEV_1/FVC$ (% predicted) | $93 \pm 17$ |
| TLC (L) | $5.1 \pm 0.8$ |
| TLC (% predicted) | $71 \pm 18$ |
| $D_LCO$ (%) | $32 \pm 6$ |
| Echocardiography | |
| LA AP diameter (mm) | $35 \pm 7$ |
| LVEF (%) | $60 \pm 6$ |
| TRV (m/s) | $3.7 \pm 0.5$ |
| Estimated sPAP (mmHg) | $60 \pm 16$ |
| Right heart catheterization | |
| RAP (mmHg) | $9 \pm 6$ |
| mPAP (mmHg) | $44 \pm 10$ |
| PAWP (mmHg) | $10 \pm 4$ |
| TPG (mmHg) | $33 \pm 10$ |
| CO (L/min) | $4.7 \pm 1.3$ |
| CI (L/min/m²) | $2.5 \pm 0.6$ |
| PVR (WU) | $7.8 \pm 3.4$ |
| 6-min walk test† | |
| Distance (m) | $242 \pm 99$ |
| Final dyspnea Borg score | $6 \pm 2$ |
| Final $SpO_2$ (%) | $83 \pm 8$ |
| 3-min step test with metabolic cart‡ | |
| $VE/VCO_2$ slope | $46.6 \pm 20.1$ |
| $\Delta P_{ET}CO_2$ (mmHg) | $-0.7 \pm 2.6$ |
| Final $SpO_2$ (%) | $80 \pm 4$ |

Data are presented as $n$, $n$ (%) or mean $\pm$ SD.

*WHO* World Health Organization, *$SpO_2$* arterial oxygen saturation measured by pulse oximetry, *$FEV_1$* forced expiratory volume in 1 s, *FVC* forced vital capacity, *TLC* total lung capacity, *$D_LCO$* diffusing capacity of the lung for carbon monoxide, *LAAP* left atrial anteroposterior, *LVEF* left ventricular ejection fraction, *TRV* tricuspid regurgitant jet velocity, *sPAP* systolic pulmonary arterial pressure, *RAP* right atrial pressure, *mPAP* mean pulmonary arterial pressure, *PAWP* pulmonary arterial wedge pressure, *TPG* transpulmonary gradient, *CO* cardiac output, *CI* cardiac index, *PVR* pulmonary vascular

**Table 1** (continued)

resistance, *WU* Wood units *VE* minute ventilation, *$VCO_2$* carbon dioxide production, $\Delta$ change in, *$P_{ET}CO_2$* end-tidal carbon dioxide tension

*$n=10$ for TLC and $D_LCO$

†$n=17$

‡$n=15$

patients reevaluated with step test and a portable metabolic cart (Table 2).

Specifically, out of 22 patients included in our study, 21 improved (or maintained) functional class from baseline to follow-up, after treatment with iTre. Of these 21 patients: 19 improved $SpO_2$; 10 had follow-up with 6MWT—all of them showing improvement in the distance walked; 12 had follow-up with 3-min step test with metabolic data—6 of them reporting better $VE/VCO_2$ *slope*. Regarding echocardiographic parameters: 7 out of 11, showed improvement in sPAP.

Three patients with severe PH had follow-up RHC that demonstrated significant improvement in systolic PAP (baseline: $82 \pm 13$ mmHg; follow-up $57 \pm 19$ mmHg; $p=0.042$), a trend toward decreased mPAP (baseline: $51 \pm 9$ mmHg; follow-up $36 \pm 13$ mmHg; $p=0.14$) and a trend toward decreased PVR (baseline: $10.3 \pm 4.4$ WU; follow-up: $4.0 \pm 2.2$ WU $p=0.160$). Individual RHC data are presented in the online supplementary material.

Adverse events were reported in ten patients, including cough ($n=3$), headache ($n=2$), diarrhea ($n=2$), cyanosis ($n=1$), dyspnea ($n=1$), and pruritus ($n=1$). None of the patients reported adverse events severe enough to cause cessation of the treatment.

## Discussion

In this retrospective study of patients with Group 3 PH treated with iTre at a specialized PVD center, therapy with iTre significantly improved WHO-FC and 6MWT distance, with no significant changes in resting $SpO_2$ and supplemental oxygen therapy requirement during follow-up. iTre was well tolerated, with cough being the most commonly reported adverse event. Taken together, the current findings suggest that iTre might be a therapeutic option in patients with Group 3 PH, since iTre may improve perfusion to areas where the ventilation is preserved, improving therefore V/Q matching.

The presence of PH in patients with lung disease has been shown to be correlated with poor prognosis [4, 24, 25]. In this context, the potential benefit of PH-specific drugs in subjects with lung disease has been assessed in several studies, with conflicting results. One critical question is whether PH-specific drugs may worsen hypoxia in patients with Group 3 PH.

Deleterious effect of inhaled nitric oxide (NO) on gas exchange has been reported in patients with lung disease

 Springer

UTC_PH-ILD_009939

DA0996

Lung (2018) 196:139–146
143

**Table 2** Changes in clinical indices from baseline to follow-up after treatment with inhaled treprostinil

| | N | Baseline | Follow-up | p value |
|---|---|---|---|---|
| Clinical assessment | 22 | | | |
| WHO functional class I/II/III/IV (n) | | 0/4/15/3 | 2/7/12/1 | 0.041 |
| $SpO_2$ at rest (%) | | 92±6 | 94±4 | 0.014 |
| Pulmonary function test | 16 | | | |
| $FEV_1$ (% predicted) | | 65±27 | 60±25 | 0.23 |
| FVC (% predicted) | | 67±26 | 59±22 | 0.12 |
| $FEV_1$/FVC (% predicted) | | 96±15 | 96±18 | 0.99 |
| Echocardiography | 13 | | | |
| TRV (m/s) | | 3.7±0.5 | 3.6±0.5 | 0.66 |
| Estimated sPAP (mmHg) | | 62±18 | 60±22 | 0.68 |
| 6-min walk test | 11 | | | |
| Distance (m) | | 243±106 | 308±109 | 0.022 |
| Final dyspnea Borg score | | 6±2 | 4±2 | 0.15 |
| Final $SpO_2$ (%) | | 82±8 | 76±9 | 0.12 |
| 3-min step test with metabolic cart | 13 | | | |
| $VE/VCO_2$ slope | | 45.9±19.7 | 47.8±20.1 | 0.55 |
| Δ $P_{ET}CO_2$ (mmHg) | | 0.0±1.9 | -0.9±2.6 | 0.081 |
| Final $SpO_2$ (%) | | 81±8 | 80±7 | 0.76 |

Data are presented as $n$ or mean±SD

*WHO* World Health Organization, *$SpO_2$* arterial oxygen saturation measured by pulse oximetry, *$FEV_1$* forced expiratory volume in 1 s, *FVC* forced vital capacity, *TRV* tricuspid regurgitant jet velocity, *sPAP* systolic pulmonary arterial pressure, *VE* minute ventilation, *$VCO_2$* carbon dioxide production, Δ change in, *$P_{ET}CO_2$* end-tidal carbon dioxide tension



**Fig. 2** New York Heart Association functional class changes from baseline to follow-up after treatment with inhaled treprostinil. At baseline, 0, 18, 68, and 14% had functional class I, II, III, and IV, respectively. During follow-up, 9, 32, 55, and 4% had functional class I, II, III, and IV, respectively



**Fig. 3** 6-min walk distance changes from baseline to follow-up after treatment with inhaled treprostinil ($n=11$). Bold lines indicate patients treated with treprostinil monotherapy ($n=7$). Dotted lines indicate patients treated with dual therapy (treprostinil plus sildenafil or tadalafil, $n=4$)

and hypoxemia [9]. The results suggest that NO led to dilation of vessels in poorly ventilated lung areas causing reversion of hypoxic vasoconstriction, interfering therefore in the physiologic mechanism by which V/Q matching is achieved in these subjects [9]. Previous studies have reported a negative impact of PH-specific drugs in gas

exchange [26, 27] and a clinical trial of ambrisentan in IPF was terminated due to increased risk of disease progression and respiratory hospitalization. However, it is important to mention that only 10% of patients enrolled in this trial had PH [12]. A trial of riociguat in idiopathic interstitial pneumonias was also terminated due to increased risk of death and other serious adverse events as compared to placebo. (NCT02138825). However, others have found

⚙ Springer

UTC_PH-ILD_009940

only mild worsening of arterial oxygen tension [28] or even the absence of deleterious effect in gas exchange [10, 11, 16, 29]. In our study, most of the patients (86%) were using supplementary oxygen at baseline, but only one subject experienced increased oxygen requirement after iTre. Additionally, we observed no significant change in resting $SpO_2$ at follow-up. These findings suggest that iTre might be well tolerated in Group 3 PH.

We also observed significant improvement in WHO-FC and 6MWD. Similar findings have been described previously in a population of ILD patients treated with epoprostenol or bosentan [30]. Additionally, Madden et al. reported the beneficial effect on 6MWD in 7 patients with parenchymal lung disease and PH after treatment with sildenafil [31]. In accordance with our findings, previous reports using parenteral treprostinil in ILD with PH have shown improvement in 6MWT distance and pulmonary hemodynamics without negative impact on systemic oxygen saturation [32]. Additionally, a long-term study in 27 COPD patients with PH treated with different PH-specific drugs supported our observations of significant improvement in functional class and 6MWD [33]. However, in contrast with our results, other reports have described no significant changes in 6MWT distance in lung disease patients after PH-specific treatment [10, 11].

We did not find significant changes in ventilatory efficiency (as measured by VE/VCO$_2$ *slope*) in a subgroup of 13 patients evaluated with a step test and a portable metabolic cart (a submaximum exercise test). This observation might be reflective of the severity of the lung disease of the studied sample. However, a previous study with inhaled iloprost in COPD and PH described significant improvement in VE/VCO$_2$ and narrowing of alveolar to arterial oxygen gradient (16), suggesting a better V/Q matching after iloprost inhalation. Therefore, more studies evaluating the effect of inhaled prostacyclin in different populations and in different intensities of exercise (submaximum vs. maximum) are needed to confirm our findings and those of others.

Three patients in our study had follow-up RHC. We observed significant improvement in systolic PAP, a trend toward decreased mPAP and a trend toward decrease in PVR. Previous studies have described significant improvement in hemodynamics when PH-specific drugs were used in Group 3 PH [10, 11, 28]. Others, however, have reported no hemodynamic improvement in severe ILD with PH treated with bosentan [34] and similar negative findings were reported in severe COPD [27].

iTre has been described to have a slow but sustained pulmonary vasodilatory effect, likely secondary to deposit of the drug in the lung after inhalation, followed by subsequent slow release to the pulmonary vascular smooth muscle cells [35]. Therefore, this pharmacodynamic characteristic of iTre might be correlated with our observations. Nevertheless, more studies are needed to evaluate the use of iTre in patients with mild/moderate lung disease and hemodynamically proven severe PH and/or PH with elevated PVR and thus, predominant pulmonary vascular remodeling.

## Limitations

This study is limited by its retrospective, single-center, observational, uncontrolled design. Results should be interpreted carefully in view of the small sample size and the heterogeneity of the population (COPD, ILD, and CPFE). However, a subanalysis of each subgroup (Tables S2–S4) demonstrated that the tendency for improved functional class and 6-min walk distance, without significant deleterious effect on SpO$_2$ that was observed in the entire study population was maintained when analyzing each subcohort. Nonetheless, COPD patients tended to have greater benefit from iTre treatment by the aforementioned parameters. It is possible that our results favoring the potential use of iTRe in Group 3-PH might have been influenced by the presence of pulmonary vascular disease (by study design). However, Group 3 PH with impaired circulatory reserve is of major clinical interest in regard to PH-specific treatment. Additionally, our findings might also be limited by the intrinsic subjective nature of FC assessment, and the lack of a control group. Finally, information about the timing of SpO$_2$ assessment in relation to the administration of iTre was not available, and therefore, we are not able to comment on the acute effect of iTre on SpO$_2$.

## Conclusion

In this retrospective analysis, we showed that inhaled treprostinil sodium (iTre) was safe in patients with Group 3 PH and evidence of pulmonary vascular remodeling. iTre improved WHO-FC and 6MWT distance, without deleterious effects on resting SpO$_2$. iTre was well tolerated, with no serious adverse events reported. The potential role of inhaled PH-specific drugs in Group 3 PH should be further assessed in larger prospective studies. Until then, its use in Group 3 PH should be cautiously evaluated in specialized PH Centers, after an individualized assessment and risk–benefit consideration.

**Acknowledgements** We thank Julie A. Tracy and Abbey L. Karin from the Heart & Vascular Centre, BWH, HMS for their technical expertise.

**Funding** RKFO received funds from the São Paulo Research Foundation (FAPESP, Grant #2014/12212-5) and from the Brazilian National Council for Scientific and Technological Development (CNPq, Grant #232643/2014-8). ABW is funded by NIH U01HL125215.

 Springer

UTC_PH-ILD_009941

## Compliance with Ethical Standards

**Conflict of interest** The authors declare that they have no conflicts of interest.

**Ethical Approval** The study protocol was approved by the Partners Human Research Committee (2011P000272).

## References

1. Galiè N, Humbert M, Vachiery J-L, Gibbs S, Lang I, Torbicki A et al (2016) 2015 ESC/ERS guidelines for the diagnosis and treatment of pulmonary hypertension: the joint task force for the diagnosis and treatment of pulmonary hypertension of the European Society of Cardiology (ESC) and the European Respiratory Society (ERS): endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC), International Society for Heart and Lung Transplantation (ISHLT). Eur Heart J 37(1):67–119
2. Lettieri CJ, Nathan SD, Barnett SD, Ahmad S, Shorr AF (2006) Prevalence and outcomes of pulmonary arterial hypertension in advanced idiopathic pulmonary fibrosis. Chest 129(3):746–752
3. Weitzenblum E, Chaouat A, Canuet M, Kessler R (2009) Pulmonary hypertension in chronic obstructive pulmonary disease and interstitial lung diseases. Semin Respir Crit Care Med 30(4):458–470
4. Cottin V, Le Pavec J, Prévot G, Mal H, Humbert M, Simonneau G et al (2010) Pulmonary hypertension in patients with combined pulmonary fibrosis and emphysema syndrome. Eur Respir J 35(1):105–111
5. Ward JPT, McMurtry IF (2009) Mechanisms of hypoxic pulmonary vasoconstriction and their roles in pulmonary hypertension: new findings from an old problem. Curr Opin Pharmacol 9(3):287–296
6. Tuder RM (2017) Pulmonary vascular remodeling in pulmonary hypertension. Cell Tissue Res 367(3):643–649
7. Stenmark KR, Fagan KA, Frid MG (2006) Hypoxia-induced pulmonary vascular remodeling: cellular and molecular mechanisms. Circ Res 99(7):675–691
8. Carlsen J, Hasseriis Andersen K, Boesgaard S, Iversen M, Steinbrüchel D, Bøgelund Andersen C (2013) Pulmonary arterial lesions in explanted lungs after transplantation correlate with severity of pulmonary hypertension in chronic obstructive pulmonary disease. J Heart Lung Transplant 32(3):347–354
9. Barberà JA, Roger N, Roca J, Rovira I, Higenbottam TW, Rodriguez-Roisin R (1996) Worsening of pulmonary gas exchange with nitric oxide inhalation in chronic obstructive pulmonary disease. Lancet 347(8999):436–440
10. Girard A, Jouneau S, Chabanne C, Khouatra C, Lannes M, Traclet J et al (2015) Severe pulmonary hypertension associated with COPD: hemodynamic improvement with specific therapy. Respir Int Rev Thorac Dis 90(3):220–228
11. Vitulo P, Stanziola A, Confalonieri M, Libertucci D, Oggionni T, Rottoli P, Paciocco G, Tuzzolino F, Martino L, Beretta M, Callari A, Amaducci A, Badagliacca R, Poscia R, Meloni F, Refini RM, Geri P, Baldi S, Ghio S, D'Alto M, Argiento P, Sofia M, Guardamagna M, Pezzuto B, Vizza CD (2017) Sildenafil in severe pulmonary hypertension associated with chronic obstructive pulmonary disease: a randomized controlled multicenter clinical trial. J Heart Lung Transplant 36:166–174
12. Raghu G, Behr J, Brown KK, Egan JJ, Kawut SM, Flaherty KR et al (2013) Treatment of idiopathic pulmonary fibrosis with ambrisentan: a parallel, randomized trial. Ann Intern Med 158(9):641–649
13. Zhang H, Li X, Huang J, Li H, Su Z, Wang J (2016) Comparative efficacy and safety of prostacyclin analogs for pulmonary arterial hypertension: a network meta-analysis. Medicine 95(4):e2575
14. Nana-Sinkam SP, Lee JD, Sotto-Santiago S, Stearman RS, Keith RL, Choudhury Q et al (2007) Prostacyclin prevents pulmonary endothelial cell apoptosis induced by cigarette smoke. Am J Respir Crit Care Med 175(7):676–685
15. Lovgren AK, Jania LA, Hartney JM, Parsons KK, Audoly LP, Fitzgerald GA et al (2006) COX-2-derived prostacyclin protects against bleomycin-induced pulmonary fibrosis. Am J Physiol Lung Cell Mol Physiol 291(2):L144–L156
16. Dernaika TA, Beavin M, Kinasewitz GT (2010) Iloprost improves gas exchange and exercise tolerance in patients with pulmonary hypertension and chronic obstructive pulmonary disease. Respir Int Rev Thorac Dis 79(5):377–382
17. Laliberte K, Arneson C, Jeffs R, Hunt T, Wade M (2004) Pharmacokinetics and steady-state bioequivalence of treprostinil sodium (Remodulin) administered by the intravenous and subcutaneous route to normal volunteers. J Cardiovasc Pharmacol 44(2):209–214
18. Olschewski H, Rose F, Schermuly R, Ghofrani HA, Enke B, Olschewski A et al (2004) Prostacyclin and its analogues in the treatment of pulmonary hypertension. Pharmacol Ther 102(2):139–153
19. Vogelmeier CF, Criner GJ, Martinez FJ, Anzueto A, Barnes PJ, Bourbeau J et al (2017) Global strategy for the diagnosis, management, and prevention of chronic obstructive lung disease 2017 report: GOLD executive summary. Eur Respir J 49(3):1700214. https://doi.org/10.1183/13993003.00214-2017
20. Andreu J, Hidalgo A, Pallisa E, Majó J, Martinez-Rodriguez M, Cáceres J (2004) Septal thickening: HRCT findings and differential diagnosis. Curr Probl Diagn Radiol 33(5):226–237
21. Galvin JR, Frazier AA, Franks TJ (2010) Collaborative radiologic and histopathologic assessment of fibrotic lung disease. Radiology 255(3):692–706
22. Cottin V, Nunes H, Brillet P-Y, Delaval P, Devouassoux G, Tillie-Leblond I et al (2005) Combined pulmonary fibrosis and emphysema: a distinct underrecognised entity. Eur Respir J 26(4):586–593
23. Seeger W, Adir Y, Barberà JA, Champion H, Coghlan JG, Cottin V et al (2013) Pulmonary hypertension in chronic lung diseases. J Am Coll Cardiol 62(25 Supplement):D109–D116
24. Andersen KH, Iversen M, Kjaergaard J, Mortensen J, Nielsen-Kudsk JE, Bendstrup E, Videbaek R, Carlsen J (2012) Prevalence, predictors, and survival in pulmonary hypertension related to end-stage chronic obstructive pulmonary disease. J Heart Lung Transplant 31:373–380
25. Minai OA, Santacruz JF, Alster JM, Budev MM, McCarthy K (2012) Impact of pulmonary hemodynamics on 6-min walk test in idiopathic pulmonary fibrosis. Respir Med 106(11):1613–1621
26. Blanco I, Gimeno E, Munoz PA, Pizarro S, Gistau C, Rodriguez-Roisin R et al (2010) Hemodynamic and gas exchange effects of sildenafil in patients with chronic obstructive pulmonary disease and pulmonary hypertension. Am J Respir Crit Care Med 181(3):270–278
27. Stolz D, Rasch H, Linka A, Di Valentino M, Meyer A, Brutsche M et al (2008) A randomised, controlled trial of bosentan in severe COPD. Eur Respir J 32(3):619–628
28. Calcaianu G, Canuet M, Schuller A, Enache I, Chaouat A, Kessler R (2016) Pulmonary arterial hypertension-specific drug therapy in COPD patients with severe pulmonary hypertension and mild-to-moderate airflow limitation. Respir Int Rev Thorac Dis 91(1):9–17
29. Sato T, Tsujino I, Sugimoto A, Nakaya T, Watanabe T, Ohira H et al (2016) The effects of pulmonary vasodilating agents on right ventricular parameters in severe group 3 pulmonary hypertension: a pilot study. Pulm Circ 6(4):524–531

 Springer

UTC_PH-ILD_009942

146                                                                    Lung (2018) 196:139–146

30. Minai OA, Sahoo D, Chapman JT, Mehta AC (2008) Vaso-active therapy can improve 6-min walk distance in patients with pulmonary hypertension and fibrotic interstitial lung disease. Respir Med 102(7):1015–1020

31. Madden BP, Allenby M, Loke T-K, Sheth A (2006) A potential role for sildenafil in the management of pulmonary hypertension in patients with parenchymal lung disease. Vascul Pharmacol 44(5):372–376

32. Saggar R, Khanna D, Vaidya A, Derhovanessian A, Maranian P, Duffy E et al (2014) Changes in right heart haemodynamics and echocardiographic function in an advanced phenotype of pulmonary hypertension and right heart dysfunction associated with pulmonary fibrosis. Thorax 69(2):123–129

33. Fossati L, Müller-Mottet S, Hasler E, Speich R, Bloch KE, Huber LC et al (2014) Long-term effect of vasodilator therapy in pulmonary hypertension due to COPD: a retrospective analysis. Lung 192(6):987–995

34. Corte TJ, Keir GJ, Dimopoulos K, Howard L, Corris PA, Parfitt L et al (2014) Bosentan in pulmonary hypertension associated with fibrotic idiopathic interstitial pneumonia. Am J Respir Crit Care Med 190(2):208–217

35. Voswinckel R, Enke B, Reichenberger F, Kohstall M, Kreckel A, Krick S et al (2006) Favorable effects of inhaled treprostinil in severe pulmonary hypertension: results from randomized controlled pilot studies. J Am Coll Cardiol 48(8):1672–1681

 Springer

UTC_PH-ILD_009943

# EXHIBIT 36



For Immediate Release

# United Therapeutics Corporation Announces $1 Billion Accelerated Share Repurchase Program

*Repurchase reflects the strength of United Therapeutics' balance sheet and confidence in its near-term prospects*

SILVER SPRING, Md. and RESEARCH TRIANGLE PARK, N.C., March 25, 2024: United Therapeutics Corporation (Nasdaq: **UTHR**), a public benefit corporation, today announced that its Board of Directors has authorized the company to purchase up to $1 billion of United Therapeutics' common stock. This program builds on United Therapeutics' planned $400 million paydown of its revolving credit facility in 2024, of which $100 million was paid down during the first quarter of 2024.

To enact the program, United Therapeutics today will enter into an Accelerated Share Repurchase (**ASR**) agreement with Citibank, N.A. (**Citi**) to repurchase $1 billion of the company's common stock.

"We're in a unique position with a solid, growing, and profitable cash-generating business along with the potential to revolutionize the way end-stage organ disease is treated through an unlimited supply of tolerable, transplantable organs," said **Martine Rothblatt, Ph.D.**, Chairperson and Chief Executive Officer of United Therapeutics. "Having learned a great deal through the construction and commissioning of the world's first clinical-scale designated pathogen-free facility to support our xenotransplantation efforts, we are confident in our ability to fund future facilities while balancing prudent capital allocation for all of our stakeholders. The current valuation of United Therapeutics' stock makes repurchases of UTHR shares a solid investment and represents a chance to enhance long-term shareholder value."

Under the terms of the ASR agreement, on March 27, 2024, United Therapeutics will make an aggregate upfront payment of $1 billion to Citi and will receive an initial delivery of shares representing approximately 80% of the total shares that would be repurchased under the ASR agreement measured based on the closing stock price of UTHR's common stock on March 25, 2024. The final number of shares that United Therapeutics will ultimately repurchase pursuant to the ASR agreement will be based on the average of the daily volume-weighted average price per share of United Therapeutics' common stock during the term of the ASR, less a discount and subject to adjustments pursuant to the terms and conditions of the ASR agreement. At final settlement of the ASR agreement, United Therapeutics may be entitled to receive additional shares of United Therapeutics' common stock, or, under certain limited circumstances, be required to make cash payment to Citi or, if United Therapeutics elects, deliver shares to Citi. The final settlement of the ASR is expected to be completed in the second quarter of 2024 with respect to $300 million of the ASR and in the third quarter of 2024 with respect to $700 million of the ASR. As of February 14, 2024, United Therapeutics had approximately 47.1 million shares outstanding.

This press release does not constitute an offer to sell or the solicitation of an offer to buy any securities, nor shall it constitute an offer, solicitation, or sale in any jurisdiction in which such offer, solicitation, or sale is unlawful.

1

# United Therapeutics: Enabling Inspiration

At United Therapeutics, our vision and mission are one. We use our enthusiasm, creativity, and persistence to innovate for the unmet medical needs of our patients and to benefit our other stakeholders. We are bold and unconventional. We have fun; we do good. We are the first publicly-traded biotech or pharmaceutical company to take the form of a public benefit corporation (PBC). Our public benefit purpose is to provide a brighter future for patients through (a) the development of novel pharmaceutical therapies; and (b) technologies that expand the availability of transplantable organs.

You can learn more about what it means to be a PBC here: unither.com/pbc.


# Forward-Looking Statements

Statements included in this press release that are not historical in nature are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, among others, statements related to our confidence in our near-term prospects; the amount of our planned paydown of our revolving credit facility; the growth of our business; our potential to revolutionize the way end-stage organ disease is treated; our ability to fund future facilities; the benefits of the share repurchase to shareholders; our plan to enter into an ASR agreement; the number of shares to be repurchased under the ASR agreement; the timing and manner of the final settlement under the ASR agreement; and our goals of innovating for the unmet medical needs of our patients and to benefit our other stakeholders, furthering our public benefit purpose of developing novel pharmaceutical therapies and technologies that expand the availability of transplantable organs. These forward-looking statements are subject to certain risks and uncertainties, such as those described in our periodic reports filed with the Securities and Exchange Commission, that could cause actual results to differ materially from anticipated results. Consequently, such forward-looking statements are qualified by the cautionary statements, cautionary language and risk factors set forth in our periodic reports and documents filed with the Securities and Exchange Commission, including our most recent Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K. We claim the protection of the safe harbor contained in the Private Securities Litigation Reform Act of 1995 for forward-looking statements. We are providing this information as of March 25, 2024, and assume no obligation to update or revise the information contained in this press release whether as a result of new information, future events, or any other reason.

**For Further Information Contact:**

Dewey Steadman at (202) 919-4097
https://ir.unither.com/contact-ir/

2

LIQ_PH-ILD_00000578

# EXHIBIT 37



Deposition of:

**Aaron Waxman , M.D., Ph.D.**

*January 8, 2022*

In the Matter of:

**United Therapeutics Corporation vs. Liquidia Technologies (IPR)**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Liquidia's Exhibit 1108

**LIQ_PH-ILD_00000579**

Page 1

1

UNITED STATES PATENT AND TRADEMARK OFFICE

2          BEFORE THE PATENT TRIAL AND APPEAL BOARD

3      _____

4      LIQUIDIA TECHNOLOGIES, INC.,

5          Petitioner

6      vs.

7      UNITED THERAPEUTICS CORPORATION,

8          Patent Owner

_____

9

10                  IPR2021-00406

11           U.S. Patent No. 10,716,793

12

13

14           Remote Videotaped Deposition of

15           AARON B. WAXMAN, M.D., Ph.D.

16                January 8, 2022

17                  10:34 a.m.

18

19

20

21      Reported by:  Bonnie L. Russo

22      Job No. 5008601

Liquidia's Exhibit 1108
Page 1

LIQ_PH-ILD_00000580

1      Remote Videotaped Deposition of Aaron B.

2      Waxman, M.D., Ph.D. held through:

3

4

5

6

7                      Veritext Legal Solutions

8                      1250 I Street, N.W.

9                      Washington, D.C.

10

11

12

13

14

15

16

       Pursuant to Notice, when were present on behalf

17

       of the respective parties:

18

19

20

21

22

Liquidia's Exhibit 1108
Page 2

LIQ_PH-ILD_00000581

```
                                              Page 3

  1         APPEARANCES:
  2
            On behalf of the Petitioner:
  3
                 JONATHAN DAVIES, ESQUIRE
  4              COOLEY LLP
                 1299 Pennsylvania Avenue, N.W.
  5              Suite 700
                 Washington, D.C. 20004
  6              jdavies@cooley.com
                      -and-
  7              BRITTANY CAZAKOFF, ESQUIRE
                 11951 Freedom Drive
  8              1 Freedom Square
                 Reston Town Center
  9              Reston, Virginia 20190
                 bcazakoff@cooley.com
 10
 11         On behalf of the Patent Owner:
 12              MANDY KIM, ESQUIRE
                 McDERMOTT WILL & EMERY
 13              18565 Jamboree Road, Suite 250
                 Irvine, California 92612
 14              mhkim@mwe.com
                      -and-
 15              STEPHEN MAEBIUS, ESQUIRE
                 FOLEY & LARDNER, LLP
 16              321 North Clark Street
                 Suite 2800
 17              Chicago, Illinois 60654
                 smaebius@foley.com
 18
 19         Also Present:
            Orson Braithwaite, Videographer
 20         Peter Curran, Concierge
 21
 22
```

Page 4

1                         I N D E X
2          EXAMINATION OF
           AARON B. WAXMAN, M.D., Ph.D.              PAGE
3
           BY MR. DAVIES                             8
4
                                                     168
5          BY MS. KIM                                165
6
7
8                         EXHIBITS
9
           Exhibit 1        Curriculum Vitae of      54
10                          Aaron B. Waxman,
                            M.D., Ph.D.
11
           Exhibit 2        Annual Report 2005       112
12                          European Society of
                            Cardiology
13
           Exhibit 1001     United States Patent     31
14                          No. 10,716,793 B2
15         Exhibit 1006     United States Patent     67
                            No. 6,521,212 B1
16
           Exhibit 1007     Excerpt of European      88
17                          Heart Journal
                            August/September 2004
18
           Exhibit 1008     Supplement to            72
19                          Circulation
                            Excerpt of Abstracts
20                          from Scientific
                            Sessions 2004
21
22

Page 5

```
 1          EXHIBITS (CONTINUED):
 2          Exhibit 1018      Product Information      136
                              Remodulin (Treprostinil
 3                            sodium) Injection
                              Description
 4
            Exhibit 1062      Article entitled        122
 5                            "Ultrasonic versus
                              jet nebulization or
 6                            iloprost in severe
                              pulmonary hypertension"
 7
            Exhibit 1065      Article entitled        119
 8                            "Inhaled Iloprost for
                              Severe Pulmonary
 9                            Hypertension"
10          Exhibit 1083      Ventavis               161
                              (iloprost) Inhalation
11                            Solution
                              Description
12
            Exhibit 2001      Declaration of          21
13                            Dr. Aaron Waxman
14          Exhibit 2002      Harvard Medical School  46
                              Curriculum Vitae of
15                            Aaron B. Waxman,
                              M.D., Ph.D.
16
            Exhibit 2034      Highlights of Prescribing 97
17                            Information for Tyvaso
18          Exhibit 2036      Article entitled        156
                              "Efficacy and Safety
19                            of Treprostinil:  An
                              Epoprostenol Analog for
20                            Primary Pulmonary Hypertension
21          Exhibit 2052      Declaration of          24
                              Aaron Waxman, M.D., Ph.D.
22          (Exhibits bound separately.)
```

Liquidia's Exhibit 1108
Page 5

LIQ_PH-ILD_00000584

Page 6

```
 1                   P R O E E D I N G S

 2                      (10:34 a.m.)

 3                                             10:34:44

 4           THE VIDEOGRAPHER:  Good morning.   10:34:48

 5           We are going on the record at 10:34  10:34:52

 6  a.m. on January 8, 2022.                   10:34:55

 7           This is Media Unit 1 of the        10:34:58

 8  remote-recorded deposition of Dr. Aaron Waxman  10:35:01

 9  in the matter of Liquidia Technologies versus  10:35:03

10  United Therapeutics Corporation filed in the  10:35:07

11  United States Patent and Trademark Office,   10:35:11

12  Patent Trial and Appeal Board, Case No. IPR  10:35:16

13  2021-0046 -- excuse me -00406.             10:35:19

14           My name is Orson Braithwaite from   10:35:24

15  the firm Veritext Legal Solutions.  I am the  10:35:27

16  videographer.  The court reporter is Bonnie  10:35:29

17  Russo from the firm Veritext Legal Solutions.  10:35:30

18           Counsel will now state their       10:35:32

19  appearances and affiliations for the record.  10:35:34

20           MR. DAVIES:  Jonathan Davies from   10:35:37

21  Cooley.  With me today is my colleague,     10:35:39

22  Brittany Cazakoff, representing the petitioner,  10:35:44
```

Liquidia's Exhibit 1108
Page 6

LIQ_PH-ILD_00000585

Page 7

1       Liquidia Technologies.                          10:35:46

2               MS. KIM:  Mandy Kim with McDermott       10:35:48

3       Will & Emery on behalf of the patent owner,     10:35:55

4       United Therapeutics Corporation.

5               THE VIDEOGRAPHER:  Thank you.

6               Will the court reporter please swear

7       in the witness.

8               THE COURT REPORTER:  Yes.  Before I

9       do that I have a quick stipulation to put on

10      the record.

11              The attorneys participating in this

12      deposition acknowledge that I am not physically

13      present in the deposition room, and that I will

14      be reporting this deposition remotely.

15              They further acknowledge that, in

16      lieu of an oath administered in person, I will

17      administer the oath remotely.

18              The parties further agree that if

19      the witness is testifying from a state where I

20      am not a notary, that the witness may be sworn

21      in by an out-of-state notary.

22              If any party has an objection to

Liquidia's Exhibit 1108
Page 7

LIQ_PH-ILD_00000586

Page 8

```
 1        this manner of reporting, please state it now.

 2                    (Pause.)

 3                    THE COURT REPORTER:  Hearing, none

 4        we can proceed and I will swear in the witness.

 5

 6                    AARON B. WAXMAN, M.D., Ph.D.,

 7        being first duly sworn, to tell the truth, the

 8        whole truth, and nothing but the truth,

 9        testified as follows:

10           EXAMINATION BY COUNSEL FOR PETITIONER     10:36:45

11                    BY MR. DAVIES:                   10:36:45

12           Q.    Good morning, Dr. Waxman, and thank 10:36:45

13        you for giving us a little bit of your time on 10:36:50

14        a Saturday.                                  10:36:50

15           A.    Thanks for accommodating me.        10:36:50

16           Q.    Can you state your full name for the 10:36:52

17        record.                                      10:36:54

18           A.    Aaron B. Waxman.                    10:36:55

19           Q.    And can you provide your current    10:36:57

20        address?                                     10:36:59

21           A.    Home or business?                   10:36:59

22           Q.    Home.                               10:37:02
```

Liquidia's Exhibit 1108
Page 8

LIQ_PH-ILD_00000587

Page 39

| | | |
|---|---|---|
| 1 | to a patient, do you? | 11:16:27 |
| 2 | A.    Not solely, no. | 11:16:28 |
| 3 | Q.    What is the other evidence that you | 11:16:30 |
| 4 | rely on in your clinical practice? | 11:16:31 |
| 5 | A.    Well, that requires not only | 11:16:34 |
| 6 | hemodynamic but also a patient's subjective | 11:16:38 |
| 7 | response to a treatment. | 11:16:41 |
| 8 | Q.    And the patient's subjective | 11:16:53 |
| 9 | response would not include the hemodynamic | 11:16:55 |
| 10 | responses that we have already discussed, | 11:16:57 |
| 11 | correct? | 11:16:57 |
| 12 | A.    I guess it depends on how you define | 11:17:01 |
| 13 | that. | 11:17:04 |
| 14 | Q.    Well, how do you define it, Doctor? | 11:17:04 |
| 15 | A.    Well, I expect there to be a | 11:17:07 |
| 16 | hemodynamic improvement that results in | 11:17:14 |
| 17 | improved blood flow which results in the | 11:17:17 |
| 18 | patient feeling better. | 11:17:20 |
| 19 | Q.    In your experience though it is not | 11:17:23 |
| 20 | always the case that a hemodynamic improvement | 11:17:25 |
| 21 | results in a subjective improvement, correct, | 11:17:29 |
| 22 | in the patient? | 11:17:31 |

Liquidia's Exhibit 1108
Page 39

LIQ_PH-ILD_00000588

Page 40

| | | |
|---|---|---|
| 1 | A.     Not always, no. | 11:17:33 |
| 2 | Q.     And in your clinical practice you | 11:17:35 |
| 3 | would not be able to determine from hemodynamic | 11:17:51 |
| 4 | data alone whether there was a therapeutic | 11:17:55 |
| 5 | benefit to a person suffering from pulmonary | 11:18:00 |
| 6 | hypertension, correct? | 11:18:03 |
| 7 | A.     That I would not agree with. | 11:18:04 |
| 8 | Q.     Okay.  Why not? | 11:18:06 |
| 9 | A.     Well, because the disease is quite | 11:18:07 |
| 10 | complicated and it is not just a hemodynamic | 11:18:13 |
| 11 | problem, but the hemodynamics are what define | 11:18:15 |
| 12 | the disease pulmonary hypertension, and if I | 11:18:15 |
| 13 | see a hemodynamic improvement, that likely does | 11:18:25 |
| 14 | result in some improvement.  Whether it's a | 11:18:25 |
| 15 | subjective or physiologic improvement, that may | 11:18:28 |
| 16 | be different, but nonetheless, if a patient has | 11:18:29 |
| 17 | hemodynamic improvement, it's likely that their | 11:18:32 |
| 18 | heart function will improve and I would | 11:18:35 |
| 19 | anticipate that their survival will improve. | 11:18:38 |
| 20 | Q.     So let me re-ask the question more | 11:18:41 |
| 21 | specifically. | 11:18:44 |
| 22 | You are not able to tell based on | 11:18:45 |

Liquidia's Exhibit 1108
Page 40

LIQ_PH-ILD_00000589

Page 41

| | | |
|---|---|---|
| 1 | hemodynamic data alone whether there would be a | 11:18:48 |
| 2 | subjective improvement in a patient, correct? | 11:18:52 |
| 3 | MS. KIM:  Objection.  Asked and | 11:18:56 |
| 4 | answered. | 11:18:56 |
| 5 | THE WITNESS:  Just so I understand | 11:19:00 |
| 6 | the question, are you asking me if a patient | 11:19:01 |
| 7 | has a hemodynamic improvement will they always | 11:19:05 |
| 8 | have a subjective improvement? | 11:19:11 |
| 9 | BY MR. DAVIES: | 11:19:12 |
| 10 | Q.   That's correct, Doctor. | 11:19:12 |
| 11 | MS. KIM:  Same objection.  Asked and | 11:19:14 |
| 12 | answered. | 11:19:14 |
| 13 | THE WITNESS:  I would say the answer | 11:19:17 |
| 14 | is not 100 percent of the time. | 11:19:18 |
| 15 | BY MR. DAVIES: | 11:19:22 |
| 16 | Q.   So relying on hemodynamic data alone | 11:19:31 |
| 17 | you could not say with certainty that a patient | 11:19:35 |
| 18 | would experience a subjective improvement if | 11:19:39 |
| 19 | they were suffering from pulmonary | 11:19:43 |
| 20 | hypertension, correct? | 11:19:45 |
| 21 | MS. KIM:  Objection.  Asked and | 11:19:46 |
| 22 | answered.  Mischaracterizes testimony. | 11:19:47 |

Liquidia's Exhibit 1108
Page 41

Page 42

| | | |
|---|---|---|
| 1 | THE WITNESS:  Not for every patient. | 11:19:50 |
| 2 | BY MR. DAVIES: | 11:19:53 |
| 3 | Q.    For purposes -- strike that. | 11:20:51 |
| 4 | So for the definition of | 11:21:16 |
| 5 | therapeutically effective -- strike that. | 11:21:20 |
| 6 | So the plain and ordinary meaning of | 11:21:22 |
| 7 | therapeutically effective that you applied in | 11:21:29 |
| 8 | your opinions expressed in your two | 11:21:30 |
| 9 | declarations, hemodynamic changes alone could | 11:21:32 |
| 10 | be sufficient to demonstrate therapeutically | 11:21:37 |
| 11 | effectiveness, right? | 11:21:44 |
| 12 | MS. KIM:  Objection.  Vague. | 11:21:45 |
| 13 | Mischaracterizes testimony. | 11:21:47 |
| 14 | THE WITNESS:  I think importantly, | 11:21:49 |
| 15 | pulmonary hypertension is a hemodynamic disease | 11:21:51 |
| 16 | and it is defined by hemodynamics, and if you | 11:21:57 |
| 17 | are talking about a drug that is a vasodilator | 11:22:00 |
| 18 | if you don't see a hemodynamic response it | 11:22:04 |
| 19 | would suggest the drug probably doesn't work. | 11:22:07 |
| 20 | Whereas, if you do see a hemodynamic response | 11:22:10 |
| 21 | that would suggest the drug is effective and is | 11:22:13 |
| 22 | worth pursuing. | 11:22:17 |

Page 43

| | | |
|---|---|---|
| 1 | BY MR. DAVIES: | 11:22:20 |
| 2 | Q.   Does that hemodynamic response that | 11:22:20 |
| 3 | you just described, Dr. Waxman, does that for | 11:22:23 |
| 4 | purpose of your analysis of the '793 patent | 11:22:26 |
| 5 | indicate that the drug is also therapeutically | 11:22:30 |
| 6 | effective? | 11:22:35 |
| 7 | A.   Yes. | 11:22:35 |
| 8 | Q.   So for purposes of the plain and | 11:22:50 |
| 9 | ordinary meaning of therapeutically effective | 11:22:53 |
| 10 | that you applied in your two IPR declarations | 11:22:55 |
| 11 | you did not need to rely on subjective | 11:23:02 |
| 12 | improvement data of patients suffering from | 11:23:05 |
| 13 | pulmonary hypertension, correct? | 11:23:09 |
| 14 | A.   Well, at the time it was not | 11:23:10 |
| 15 | available from an inhaled standpoint, but it | 11:23:15 |
| 16 | was from a subcutaneous standpoint. | 11:23:19 |
| 17 | Q.   If you could turn to Page 21 of your | 11:23:43 |
| 18 | second declaration and let me know when you are | 11:24:14 |
| 19 | there. | 11:24:18 |
| 20 | A.   I am there. | 11:24:20 |
| 21 | Q.   Okay.  And do you see a Footnote 4? | 11:24:21 |
| 22 | A.   Yes. | 11:24:27 |

Page 150

```
 1        exercise test with gas exchange so it's an        14:17:20

 2        objective test.                                    14:17:23

 3                 BY MR. DAVIES:                             14:17:25

 4            Q.    Is there anything else you use to         14:17:26

 5        assess therapeutic effectiveness in the clinic    14:17:27

 6        for PH treatments?                                 14:17:31

 7            A.    I also ask the patient how they are       14:17:33

 8        feeling.                                           14:17:38

 9            Q.    Anything else?                            14:17:38

10            A.    Like I said, right heart                 14:17:38

11        catheterization at certain time points.            14:17:43

12            Q.    Anything else?                            14:17:46

13            A.    Echocardiography at certain time          14:17:47

14        points.                                            14:17:52

15            Q.    Anything else?                            14:17:54

16            A.    More and more cardiac MR at certain       14:17:56

17        time points.                                       14:18:02

18            Q.    Anything else?                            14:18:05

19            A.    I think that is probably everything.      14:18:06

20                 Well, I should add that,                   14:18:13

21        occasionally, we will also check some blood         14:18:15

22        tests like the NT-proBNP but not routinely.         14:18:18
```

Liquidia's Exhibit 1108
Page 150

LIQ_PH-ILD_00000593

Page 151

```
 1          Q.    In the clinic setting you don't rely    14:18:24

 2     exclusively on hemodynamic data to assess         14:18:31

 3     therapeutic effectiveness, correct?               14:18:35

 4          A.    I do not rely exclusively on it, no.    14:18:38

 5          Q.    Is it true that you don't rely          14:18:40

 6     exclusively on it in the clinical setting          14:19:16

 7     because improvements in hemodynamics do not        14:19:20

 8     necessarily result in therapeutic                  14:19:28

 9     effectiveness; is that correct?                    14:19:35

10          MS. KIM:   Objection.                         14:19:36

11     Mischaracterizes testimony.                        14:19:36

12          THE WITNESS:   Yeah, I would say              14:19:37

13     that's not the case.  I think that that            14:19:39

14     mischaracterizes what I said earlier.              14:19:41

15          BY MR. DAVIES:                                14:19:43

16          Q.    Okay.  How so?                          14:19:43

17          A.    Well, we don't do it routinely and      14:19:47

18     visit to visit because it's -- it's an invasive    14:19:50

19     test that is somewhat cumbersome for the           14:19:56

20     patient.  It doesn't take very long, and it's a    14:19:59

21     pretty easy test to do, but it means going to      14:20:02

22     the cath lab.                                      14:20:05
```

Page 152

| | | |
|---|---|---|
| 1 | Q.   You would agree, though, that in | 14:20:08 |
| 2 | your experience, including with patients taking | 14:20:10 |
| 3 | Tyvaso, that some patients may experience | 14:20:13 |
| 4 | improvements in hemodynamics and not see a | 14:20:17 |
| 5 | corresponding change in other nonhemodynamic | 14:20:23 |
| 6 | measures as you've described that you apply in | 14:20:26 |
| 7 | the clinic, correct? | 14:20:29 |
| 8 | A.    No. | 14:20:31 |
| 9 | MS. KIM:  Objection.  Vague. | 14:20:31 |
| 10 | THE WITNESS:  Sorry.  No. | 14:20:33 |
| 11 | MS. KIM:  That's okay. | 14:20:36 |
| 12 | BY MR. DAVIES: | 14:20:38 |
| 13 | Q.    You have patients, Dr. Waxman, on | 14:21:27 |
| 14 | pulmonary hypertension treatments that utilize | 14:21:37 |
| 15 | nebulizers for delivery of the drug, correct? | 14:21:40 |
| 16 | A.    I -- well, yes. | 14:21:50 |
| 17 | Q.    What are the products for treatment | 14:21:54 |
| 18 | of PH that utilize nebulizers for delivery? | 14:22:00 |
| 19 | A.    There are only two that I use and | 14:22:03 |
| 20 | that would include inhaled treprostinil or | 14:22:09 |
| 21 | Tyvaso and epoprostenol which generally we | 14:22:14 |
| 22 | would only use that in the hospital. | 14:22:21 |

Liquidia's Exhibit 1108
Page 152

DA1021

LIQ_PH-ILD_00000595

# EXHIBIT 38



To Whom It May Concern:

Pulmonary hypertension in patients with interstitial lung disease (PH-ILD) remains a progressive and fatal condition that can lead to heart failure and death.

YUTREPIA™ was introduced to the pulmonary hypertension community in 2015 and was the first clinical program to explore the benefits of an inhaled dry powder formulation of treprostinil for pulmonary hypertension patients.

Since that time, TYVASO has become available for the treatment of PH-ILD in nebulized and dry powder formulations. This is a significant step forward for patients suffering from the disease. However, YUTREPIA has some key differences to the profile of TYVASO that may, for at least some patients, lead to improvements in patient outcomes and quality of life.

For instance, YUTREPIA, in part due to its unique PRINT formulation, is the first low-resistance dry powder inhaler, which may be an important attribute for patients with compromised lung function. In addition, YUTREPIA provides patients with a wider and higher range of therapeutic doses, which could allow patients to delay more invasive therapies, such as parenterally administered treprostinil.

Pulmonary hypertension represents a chronic and rare disease. Our patient communities rely on the FDA to approve innovative, safe, and effective treatment to reach those in need. We believe Yutrepia meets these high-quality standards and has the potential to be a critical treatment option for our patients.

Based on these key attributes, we believe Yutrepia offers an important treatment choice for providers and patients and support the recommendation for commercial availability as soon as possible.

Sincerely,

| | | |
|---|---|---|
| *Dr. Hill* | *Dr. Farber* | *signature* |
| Dr. Hill (Mar 28, 2024 22:28 EDT) | Dr. Farber (Mar 28, 2024 11:44 MDT) | Dr. McConnell (Mar 28, 2024 12:27 EDT) |
| Nicholas Hill, MD | Harrison Farber, MD | John W. McConnell, MD |
| *signature* | *signature* | *Dr. Jeremy Feldman* |
| Dr. Ravichandran (Mar 28, 2024 16:24 EDT) | Dr. Ricardo Restrepo (Mar 28, 2024 11:21 EDT) | Dr. Jeremy Feldman (Mar 28, 2024 07:12 PDT) |
| Ashwin Ravichandran, MD | Ricardo Restrepo-Jaramillo, MD | Jeremy Feldman, MD |
| *Rajan Saggar* | *Sandeep Sahay* | *Akram Khan, MBBS* |
| | | Akram Khan, MBBS (Mar 28, 2024 14:07 PDT) |
| Rajan Saggar, MD | Sandeep Sahay, MD, FCCP | Akram Khan, MD |

# EXHIBIT 39

# EXHIBIT 2

UTC_PH-ILD_010692

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use TYVASO safely and effectively.  See full prescribing information for TYVASO.**

**TYVASO (treprostinil) inhalation solution**
**Initial U.S. Approval: 2002**
**For Oral Inhalation Only**

---------------------------**INDICATIONS AND USAGE**-------------------------
Tyvaso is a prostacyclin vasodilator indicated for the treatment of pulmonary arterial hypertension (WHO Group I) in patients with NYHA Class III symptoms, to increase walk distance. (1)

---------------------**DOSAGE AND ADMINISTRATION**---------------------
- Use only with the Tyvaso Inhalation System. (2.1)
- Administer undiluted, as supplied. A single breath of Tyvaso delivers approximately 6 mcg of treprostinil. (2.1)
- Administer in 4 separate treatment sessions each day approximately four hours apart, during waking hours. (2.1)
- Initial dosage: 3 breaths [18 mcg] per treatment session.  If 3 breaths are not tolerated, reduce to 1 or 2 breaths. (2.1)
- Dosage should be increased by an additional 3 breaths at approximately 1-2 week intervals, if tolerated. (2.1)
- Titrate to target maintenance dosage of 9 breaths or 54 mcg per treatment session as tolerated. (2.1)

---------------------**DOSAGE FORMS AND STRENGTHS**---------------------
Sterile solution for oral inhalation:  2.9 mL ampule containing 1.74 mg treprostinil (0.6 mg per mL). (3)

----------------------------**CONTRAINDICATIONS**--------------------------
None (4)

-----------------------**WARNINGS AND PRECAUTIONS**----------------------
- Safety and efficacy have not been established in patients with significant underlying lung disease (such as asthma or chronic obstructive pulmonary disease). (5.1)
- In patients with low systemic arterial pressure, Tyvaso may cause symptomatic hypotension. (5.2)
- Tyvaso may increase the risk of bleeding, particularly in patients receiving anticoagulants. (5.4, 7.2)
- Tyvaso dosage adjustments may be necessary if inhibitors or inducers of CYP2C8 are added or withdrawn. (5.5, 7.5)
- Hepatic or renal insufficiency may increase exposure and decrease tolerability. (2.2, 2.3, 5.3)

----------------------------**ADVERSE REACTIONS**-------------------------
Most common adverse reactions ($\geq$ 10%) are cough, headache, nausea dizziness, flushing, throat irritation, pharyngolaryngeal pain and diarrhea. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact United Therapeutics Corp. at 1-866-458-6479 or via e-mail at drugsafety@unither.com, or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

----------------------------**DRUG INTERACTIONS**-------------------------
- Concomitant diuretics, antihypertensives or other vasodilators may increase the risk of systemic hypotension. (7.1)

----------------------**USE IN SPECIFIC POPULATIONS**--------------------
- Pregnancy: Tyvaso should be used only if clearly needed. (8.1)
- Nursing women: Caution should be exercised when administered to a nursing woman. (8.3)

**See 17 for PATIENT COUNSELING INFORMATION.**

**\*Sections or subsections omitted from the full prescribing information are not listed.**

**Revised: [July/2009]**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
**WARNING**
**1    INDICATIONS AND USAGE**
**2    DOSAGE AND ADMINISTRATION**
    2.1    Usual Dosage in Adults
    2.2    Patients with Hepatic Insufficiency
    2.3    Patients with Renal Insufficiency
    2.4    Administration
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
**5    WARNINGS AND PRECAUTIONS**
    5.1    Patients with Pulmonary Disease or Pulmonary Infections
    5.2    Risk of Symptomatic Hypotension
    5.3    Patients with Hepatic or Renal Insufficiency
    5.4    Risk of Bleeding
    5.5    Effect of Other Drugs on Treprostinil
**6    ADVERSE REACTIONS**
    6.1    Adverse Reactions Identified in Clinical Trials
**7    DRUG INTERACTIONS**
    7.1    Antihypertensive Agents or Other Vasodilators
    7.2    Anticoagulants
    7.3    Bosentan
    7.4    Sildenafil
    7.5    Effect of Cytochrome P450 Inhibitors and Inducers
    7.6    Effect of Other Drugs on Treprostinil

**8    USE IN SPECIFIC POPULATIONS**
    8.1    Pregnancy
    8.2    Labor and Delivery
    8.3    Nursing Mothers
    8.4    Pediatric Use
    8.5    Geriatric Use
    8.6    Patients with Hepatic Insufficiency
    8.7    Patients with Renal Insufficiency
**10   OVERDOSAGE**
**11   DESCRIPTION**
**12   CLINICAL PHARMACOLOGY**
    12.1   Mechanism of Action
    12.2   Pharmacodynamics
    12.3   Pharmacokinetics
**13   NONCLINICAL TOXICOLOGY**
    13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
    13.3   Developmental Toxicity
    13.4   Inhalational Toxicity
**14   CLINICAL STUDIES**
**16   HOW SUPPLIED/STORAGE AND HANDLING**
**17   PATIENT COUNSELING INFORMATION**

1

**UTC_PH-ILD_010693**

**FULL PRESCRIBING INFORMATION**
**Tyvaso™ (treprostinil) inhalation solution**

**For Oral Inhalation Only**

**1    INDICATIONS AND USAGE**

Tyvaso is indicated to increase walk distance in patients with WHO Group I pulmonary arterial hypertension and NYHA Class III symptoms. The effects diminish over the minimum recommended dosing interval of 4 hours; treatment timing can be adjusted for planned activities.

While there are long-term data on use of treprostinil by other routes of administration, nearly all controlled clinical experience with inhaled treprostinil has been on a background of bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase type 5 inhibitor). The controlled clinical experience was limited to 12 weeks in duration *[see Clinical Studies (14)]*.

**2    DOSAGE AND ADMINISTRATION**

**2.1   Usual Dosage in Adults**

Tyvaso is intended for oral inhalation using the Tyvaso Inhalation System, which consists of the Optineb-ir Model ON-100/7 (an ultrasonic, pulsed-delivery device) and its accessories.

Tyvaso is dosed in 4 separate, equally spaced treatment sessions per day, during waking hours. The treatment sessions should be approximately 4 hours apart.

*Initial Dosage:*

Therapy should begin with 3 breaths of Tyvaso (18 mcg of treprostinil), per treatment session, 4 times daily. If 3 breaths are not tolerated, reduce to 1 or 2 breaths and subsequently increase to 3 breaths, as tolerated.

*Maintenance Dosage:*

Dosage should be increased by an additional 3 breaths at approximately 1-2 week intervals, if tolerated, until the target dose of 9 breaths (54 mcg of treprostinil) is reached per treatment session, 4 times daily. If adverse effects preclude titration to target dose, Tyvaso should be continued at the highest tolerated dose.

If a scheduled treatment session is missed or interrupted, therapy should be resumed as soon as possible at the usual dose.

The maximum recommended dosage is 9 breaths per treatment session, 4 times daily.

**2.2   Patients with Hepatic Insufficiency**

Plasma clearance of treprostinil is reduced in patients with hepatic insufficiency. Patients with hepatic insufficiency may therefore be at increased risk of dose-dependent adverse reactions because of an increase in systemic exposure *[see Warnings and Precautions (5.3), Use in Specific Populations (8.6) and Clinical Pharmacology (12.3)]*.

2

UTC_PH-ILD_010694

**2.3   Patients with Renal Insufficiency**

Plasma clearance of treprostinil may be reduced in patients with renal insufficiency, since treprostinil and its metabolites are excreted mainly through the urinary route. Patients with renal insufficiency may therefore be at increased risk of dose-dependent adverse reactions *[see Warnings and Precautions (5.3), Use in Specific Populations (8.7) and Clinical Pharmacology (12.3)]*.

**2.4   Administration**

Tyvaso must be used only with the Tyvaso Inhalation System. Patients should follow the instructions for use for operation of the Tyvaso Inhalation System and for daily cleaning of the device components after the last treatment session of the day. To avoid potential interruptions in drug delivery because of equipment malfunction, patients should have access to a back-up Optineb-ir device.

Do not mix Tyvaso with other medications in the Optineb-ir device. Compatibility of Tyvaso with other medications has not been studied.

The Tyvaso Inhalation System should be prepared for use each day according to the instructions for use. One ampule of Tyvaso contains a sufficient volume of medication for all 4 treatment sessions in a single day. Prior to the first treatment session, the patient should twist the top off a single Tyvaso ampule and squeeze the entire contents into the medicine cup. Between each of the 4 daily treatment sessions, the device should be capped and stored upright with the remaining medication inside.

At the end of each day, the medicine cup and any remaining medication must be discarded. The device must be cleaned each day according to the instructions for use.

Avoid skin or eye contact with Tyvaso solution. Do not orally ingest the Tyvaso solution.

**3   DOSAGE FORMS AND STRENGTHS**

Sterile solution for oral inhalation:  2.9 mL ampule containing 1.74 mg of treprostinil (0.6 mg per mL).

**4   CONTRAINDICATIONS**

None.

**5   WARNINGS AND PRECAUTIONS**

**5.1   Patients with Pulmonary Disease or Pulmonary Infections**

The safety and efficacy of Tyvaso have not been established in patients with significant underlying lung disease (e.g., asthma or chronic obstructive pulmonary disease). Patients with acute pulmonary infections should be carefully monitored to detect any worsening of lung disease and loss of drug effect.

**5.2   Risk of Symptomatic Hypotension**

Treprostinil is a pulmonary and systemic vasodilator. In patients with low systemic arterial pressure, treatment with Tyvaso may produce symptomatic hypotension.

3

**UTC_PH-ILD_010695**

**5.3   Patients with Hepatic or Renal Insufficiency**

Titrate slowly in patients with hepatic or renal insufficiency, because such patients will likely be exposed to greater systemic concentrations relative to patients with normal hepatic or renal function *[see Dosage and Administration (2.2, 2.3), Use in Specific Populations (8.6, 8.7) and Clinical Pharmacology (12.3)]*.

**5.4   Risk of Bleeding**

Since Tyvaso inhibits platelet aggregation, there may be an increased risk of bleeding, particularly among patients receiving anticoagulant therapy.

**5.5   Effect of Other Drugs on Treprostinil**

Co-administration of a cytochrome P450 (CYP) 2C8 enzyme inhibitor (e.g., gemfibrozil) may increase exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of a CYP2C8 enzyme inducer (e.g., rifampin) may decrease exposure to treprostinil. Increased exposure is likely to increase adverse events associated with treprostinil administration, whereas decreased exposure is likely to reduce clinical effectiveness *[see Drug Interactions (7.5) and Clinical Pharmacology (12.3)]*.

**6   ADVERSE REACTIONS**

The following potential adverse reactions are described in Warnings and Precautions (5):
- Decrease in systemic blood pressure *[see Warnings and Precautions (5.2)]*.
- Bleeding [*see Warnings and Precautions (5.4)]*.

4

UTC_PH-ILD_010696

**6.1   Adverse Reactions Identified in Clinical Trials**

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

In a 12-week placebo-controlled study (TRIUMPH I) of 235 patients with PAH (WHO Group I and nearly all NYHA Functional Class III), the most commonly reported adverse reactions on Tyvaso included:  cough and throat irritation; headache, gastrointestinal effects, muscle, jaw or bone pain, flushing and syncope. Table 1 lists the adverse reactions that occurred at a rate of at least 4% and were more frequent in patients treated with Tyvaso than with placebo.

| Table 1: Adverse Events in ≥ 4% of PAH Patients Receiving Tyvaso and More Frequent* than Placebo | | |
|---|---|---|
| **Adverse Event** | **Treatment n (%)** | |
| | **Tyvaso n = 115** | **Placebo n = 120** |
| Cough | 62 (54) | 35 (29) |
| Headache | 47 (41) | 27 (23) |
| Throat Irritation / Pharyngolaryngeal Pain | 29 (25) | 17 (14) |
| Nausea | 22 (19) | 13 (11) |
| Flushing | 17 (15) | 1 (<1) |
| Syncope | 7 (6) | 1 (<1) |

*More than 3% greater than placebo

The safety of Tyvaso was also studied in a long-term, open-label extension study in which 206 patients were dosed for a mean duration of one year. The adverse events during this chronic dosing study were qualitatively similar to those observed in the 12-week placebo controlled trial.

***Adverse Events Associated with Route of Administration***

Adverse events in the treated group during the double-blind and open-label phase reflecting irritation to the respiratory tract included: cough, throat irritation, pharyngeal pain, epistaxis, hemoptysis and wheezing. Serious adverse events during the open-label portion of the study included pneumonia in 8 subjects. There were three serious episodes of hemoptysis (one fatal) noted during the open-label experience.

**7   DRUG INTERACTIONS**

Pharmacokinetic/pharmacodynamic interaction studies have not been conducted with inhaled treprostinil (Tyvaso); however, some of such studies have been conducted with orally (treprostinil diethanolamine) and subcutaneously administered treprostinil (Remodulin®).

5

UTC_PH-ILD_010697

*Pharmacodynamics*

**7.1   Antihypertensive Agents or Other Vasodilators**

Concomitant administration of Tyvaso with diuretics, antihypertensive agents or other vasodilators may increase the risk of symptomatic hypotension.

**7.2   Anticoagulants**

Since treprostinil inhibits platelet aggregation, there may be an increased risk of bleeding, particularly among patients receiving anticoagulants.

*Pharmacokinetics*

**7.3   Bosentan**

In a human pharmacokinetic study conducted with bosentan (250 mg/day) and an oral formulation of treprostinil (treprostinil diethanolamine), no pharmacokinetic interactions between treprostinil and bosentan were observed.

**7.4   Sildenafil**

In a human pharmacokinetic study conducted with sildenafil (60 mg/day) and an oral formulation of treprostinil (treprostinil diethanolamine), no pharmacokinetic interactions between treprostinil and sildenafil were observed.

**7.5   Effect of Cytochrome P450 Inhibitors and Inducers**

*In vitro* studies of human hepatic microsomes showed that treprostinil does not inhibit cytochrome P450 (CYP) isoenzymes CYP1A2, CYP2A6, CYP2C8, CYP2C9, CYP2C19, CYP2D6, CYP2E1 and CYP3A. Additionally, treprostinil does not induce cytochrome P450 isoenzymes CYP1A2, CYP2B6, CYP2C9, CYP2C19, and CYP3A.

Human pharmacokinetic studies with an oral formulation of treprostinil (treprostinil diethanolamine) indicated that co-administration of the cytochrome P450 (CYP) 2C8 enzyme inhibitor gemfibrozil increases exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of the CYP2C8 enzyme inducer rifampin decreases exposure to treprostinil. It is unclear if the safety and efficacy of treprostinil by the inhalation route are altered by inhibitors or inducers of CYP2C8 *[see Warnings and Precautions (5.5)]*.

**7.6   Effect of Other Drugs on Treprostinil**

Drug interaction studies have been carried out with treprostinil (oral or subcutaneous) co-administered with acetaminophen (4 g/day), warfarin (25 mg/day), and fluconazole (200 mg/day), respectively in healthy volunteers. These studies did not show a clinically significant effect on the pharmacokinetics of treprostinil. Treprostinil does not affect the pharmacokinetics or pharmacodynamics of warfarin. The pharmacokinetics of R- and S- warfarin and the INR in healthy subjects given a single 25 mg dose of warfarin were unaffected by continuous subcutaneous infusion of treprostinil at an infusion rate of 10 ng/kg/min.

6

UTC_PH-ILD_010698

## 8    USE IN SPECIFIC POPULATIONS

### 8.1   Pregnancy

Pregnancy Category B

There are no adequate and well controlled studies with Tyvaso in pregnant women. Animal reproduction studies have not been conducted with treprostinil administered by the inhalation route. However, studies in pregnant rabbits using continuous subcutaneous (sc) infusions of treprostinil sodium at infusion rates higher than the recommended human sc infusion rate resulted in an increased incidence of fetal skeletal variations associated with maternal toxicity *[see Developmental Toxicity (13.3)]*. Animal reproduction studies are not always predictive of human response; Tyvaso should be used during pregnancy only if clearly needed.

### 8.2   Labor and Delivery

No treprostinil treatment-related effects on labor and delivery were seen in animal studies. The effect of treprostinil on labor and delivery in humans is unknown.

### 8.3   Nursing Mothers

It is not known whether treprostinil is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when treprostinil is administered to nursing women.

### 8.4   Pediatric Use

Safety and effectiveness in pediatric patients have not been established. Clinical studies of Tyvaso did not include patients younger than 18 years to determine whether they respond differently from older patients.

### 8.5   Geriatric Use

Clinical studies of Tyvaso did not include sufficient numbers of patients aged 65 years and over to determine whether they respond differently from younger patients. In general, dose selection for an elderly patient should be cautious, reflecting the greater frequency of hepatic, renal, or cardiac dysfunction, and of concomitant diseases or other drug therapy.

### 8.6   Patients with Hepatic Insufficiency

Plasma clearance of treprostinil, delivered subcutaneously, was reduced up to 80% in subjects with mild-to-moderate hepatic insufficiency. Uptitrate slowly when treating patients with hepatic insufficiency because of the risk of an increase in systemic exposure which may lead to an increase in dose-dependent adverse effects. Treprostinil has not been studied in patients with severe hepatic insufficiency *[see Clinical Pharmacology (12.3), Dosage and Administration (2.2) and Warnings and Precautions (5.3)]*.

### 8.7   Patients with Renal Insufficiency

No studies have been performed in patients with renal insufficiency. Since treprostinil and its metabolites are excreted mainly through the urinary route, patients with renal insufficiency may have decreased clearance of the drug and its metabolites and consequently, dose-related adverse outcomes may be more frequent *[see Clinical Pharmacology (12.3), Dosage and Administration (2.3) and Warnings and Precautions (5.3)]*.

7

UTC_PH-ILD_010699

## 10   OVERDOSAGE

In general, symptoms of overdose with Tyvaso include flushing, headache, hypotension, nausea, vomiting, and diarrhea. Provide general supportive care until the symptoms of overdose have resolved.

## 11   DESCRIPTION

Tyvaso is a sterile formulation of treprostinil intended for administration by oral inhalation using the Optineb-ir device. Tyvaso is supplied in 2.9 mL low density polyethylene (LDPE) ampules, containing 1.74 mg treprostinil (0.6 mg/mL). Each ampule also contains 18.9 mg sodium chloride, 18.3 mg sodium citrate, 0.58 mg sodium hydroxide, 11.7 mg 1 N hydrochloric acid, and water for injection. Sodium hydroxide and hydrochloric acid may be added to adjust pH between 6.0 and 7.2.

Treprostinil is (1R,2R,3aS,9aS)-[[2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid. Treprostinil has a molecular weight of 390.51 and a molecular formula of $C_{23}H_{34}O_5$.

The structural formula of treprostinil is:



## 12   CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Treprostinil is a prostacyclin analogue. The major pharmacologic actions of treprostinil are direct vasodilation of pulmonary and systemic arterial vascular beds and inhibition of platelet aggregation.

### 12.2 Pharmacodynamics

In a clinical trial of 240 healthy volunteers, single doses of Tyvaso 54 mcg (the target maintenance dose per session) and 84 mcg (supratherapeutic inhalation dose) prolonged the corrected QTc interval by approximately 10 ms. The QTc effect dissipated rapidly as the concentration of treprostinil decreased.

### 12.3 Pharmacokinetics

Pharmacokinetic information for single doses of inhaled treprostinil was obtained in healthy volunteers in three separate studies. Treprostinil systemic exposure (AUC and $C_{max}$) post-inhalation was shown to be proportional to the doses administered (18 mcg – 90 mcg).

**Absorption and Distribution**

In a three-period crossover study, the bioavailability of two single doses of Tyvaso (18 mcg and 36 mcg) was compared with that of intravenous treprostinil in 18 healthy volunteers. Mean estimates of the

8

absolute systemic bioavailability of treprostinil after inhalation were approximately 64% (18 mcg) and 72% (36 mcg).

Treprostinil plasma exposure data were obtained from two studies at the target maintenance dose, 54 mcg. The mean $C_{max}$ at the target dose was 0.91 and 1.32 ng/mL with corresponding mean $T_{max}$ of 0.25 and 0.12 hr, respectively. The mean AUC for the 54 mcg dose was 0.81 and 0.97 hr•ng/mL, respectively.

Following parenteral infusion, the apparent steady state volume of distribution ($V_{ss}$) of treprostinil is approximately 14 L/70 kg ideal body weight.

*In vitro* treprostinil is 91% bound to human plasma proteins over the 330-10,000 mcg/L concentration range.

### Metabolism and Excretion

Of subcutaneously administered treprostinil, only 4% is excreted unchanged in urine. Treprostinil is substantially metabolized by the liver, primarily by CYP2C8. Metabolites are excreted in urine (79%) and feces (13%) over 10 days. Five apparently inactive metabolites were detected in the urine, each accounting for 10-15% of the dose administered. Four of the metabolites are products of oxidation of the 3-hydroxyloctyl side chain and one is a glucuroconjugated derivative (treprostinil glucuronide).

The elimination of treprostinil (following subcutaneous administration of treprostinil) is biphasic, with a terminal elimination half-life of approximately 4 hours using a two compartment model.

### Special Populations

*Hepatic Insufficiency*

Plasma clearance of treprostinil, delivered subcutaneously, was reduced up to 80% in subjects presenting with mild-to-moderate hepatic insufficiency. Treprostinil has not been studied in patients with severe hepatic insufficiency *[see Dosage and Administration (2.2), Warnings and Precautions (5.3) and Use in Specific Populations (8.6)]*.

*Renal Insufficiency*

No studies have been performed in patients with renal insufficiency; therefore, since treprostinil and its metabolites are excreted mainly through the urinary route, there is the potential for an increase in both parent drug and its metabolites and an increase in systemic exposure *[see Dosage and Administration (2.3), Warnings and Precautions (5.3) and Use in Specific Populations (8.7)]*.

9

UTC_PH-ILD_010701

## 13   NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term studies have not been performed to evaluate the carcinogenic potential of treprostinil. In vitro and in vivo genetic toxicology studies did not demonstrate any mutagenic or clastogenic effects of treprostinil. Treprostinil sodium did not affect fertility or mating performance of male or female rats given continuous subcutaneous (sc) infusions at rates of up to 450 ng treprostinil/kg/min [about 59 times the recommended starting human sc infusion rate (1.25 ng/kg/min) and 8 times the average rate (9.3 ng/kg/min) achieved in clinical trials, on a ng/m$^2$ basis]. In this study, males were dosed from 10 weeks prior to mating and through the 2-week mating period. Females were dosed from 2 weeks prior to mating until gestational day 6.

### 13.3 Developmental Toxicity

In pregnant rats, continuous sc infusions of treprostinil sodium during organogenesis and late gestational development, at rates as high as 900 ng treprostinil/kg/min (about 117 times the recommended starting human sc infusion rate and about 16 times the average rate achieved in clinical trials, on a ng/m$^2$ basis), resulted in no evidence of harm to the fetus. In pregnant rabbits, effects of continuous sc infusions of treprostinil during organogenesis were limited to an increased incidence of fetal skeletal variations (bilateral full rib or right rudimentary rib on lumbar vertebra 1) associated with maternal toxicity (reduction in body weight and food consumption) at an infusion rate of 150 ng treprostinil/kg/min (about 41 times the starting human sc infusion rate and 5 times the average rate achieved in clinical trials, on a ng/m$^2$ basis).

### 13.4 Inhalational Toxicity

Rats and dogs that received daily administrations of treprostinil by inhalation for 3 months developed respiratory tract lesions (respiratory epithelial degeneration, goblet cell hyperplasia/hypertrophy, epithelial ulceration, squamous epithelial degeneration and necrosis, and lung hemorrhage). Some of the same lesions seen in animals sacrificed at the end of treatment (larynx, lung and nasal cavity lesions in rats, and lesions of the larynx in dogs) were also observed in animals sacrificed after a 4-week recovery period. Rats also developed cardiac changes (degeneration/fibrosis). A no-effect dose level for these effects was not demonstrated in rats (doses as low as 7 µg/kg/day were administered); whereas 107 µg/kg/day was a no-effect dose level in dogs.

10

UTC_PH-ILD_010702

## 14   CLINICAL STUDIES

TRIUMPH I, was a 12-week, randomized, double-blind, placebo-controlled multi-center study of patients with PAH. The study population included 235 clinically stable subjects with pulmonary arterial hypertension (WHO Group I), nearly all with NYHA Class III symptoms who were receiving either bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase-5 inhibitor) for at least three months prior to study initiation. Concomitant therapy also could have included anticoagulants, other vasodilators (e.g., calcium channel blockers), diuretics, oxygen, and digitalis, but not a prostacyclin. These patients were administered either placebo or Tyvaso in four daily treatment sessions with a target dose of 9 breaths (54 mcg) per session over the course of the 12-week study. Patients were predominantly female (82%), had the origin of PAH as idiopathic/familial (56%), secondary to collagen vascular disease (33%) or secondary to HIV or previous use of anorexigens (12%); bosentan was the concomitant oral medication in 70% of those enrolled, sildenafil in 30%.

The primary efficacy endpoint of the trial was the change in six-minute walk distance (6MWD) relative to baseline at 12 weeks. 6MWD was measured at peak exposure (between 10 and 60 minutes after dosing), and 3-5 hours after bosentan or 0.5-2 hours after sildenafil. Patients receiving Tyvaso had a placebo-corrected median change from baseline in peak 6MWD of 20 meters at Week 12 ($p < 0.001$). The distribution of these 6MWD changes from baseline at Week 12 were plotted across the range of observed values (Figure 1). 6MWD measured at trough exposure (defined as measurement of 6MWD at least 4 hours after dosing) improved by 14 meters. There were no placebo-controlled 6MWD assessments made after 12 weeks.



**Figure 1:  Distributions of 6MWD Changes from Baseline at Week 12 during Peak Plasma Concentration of Tyvaso**

11

UTC_PH-ILD_010703

The placebo-corrected median treatment effect on 6MWD was estimated (using the Hodges-Lehmann estimator) within various subpopulations defined by age quartile, gender, geographic region of the study site, disease etiology, baseline 6MWD quartile, and type of background therapy (Figure 2).



**Figure 2. Placebo Corrected Median Treatment Effect (Hodges-Lehmann estimate with 95% CI) on 6MWD Change from Baseline at Week 12 During Peak Plasma Concentration of Tyvaso for Various Subgroups**

## 16   HOW SUPPLIED/STORAGE AND HANDLING

Tyvaso (treprostinil) inhalation solution is supplied in 2.9 mL clear LDPE ampules packaged as four ampules in a foil pouch. Tyvaso is a clear colorless to slightly yellow solution containing 1.74 mg treprostinil per ampule at a concentration of 0.6 mg/mL.

Ampules of Tyvaso are stable until the date indicated when stored in the unopened foil pouch at 25°C (77°F), with excursions permitted to 15-30°C (59-86°F) [see USP Controlled Room Temperature]. Once the foil pack is opened, ampules should be used within 7 days. Because Tyvaso is light-sensitive, unopened ampules should be stored in the foil pouch.

One ampule of Tyvaso should be used each day in the Tyvaso Inhalation System.  After a Tyvaso ampule is opened and transferred to the medicine cup, the solution should remain in the device for no more than one day (24 hours). Any remaining solution should be discarded at the end of the day.

12

UTC_PH-ILD_010704

Tyvaso Inhalation System Starter Kit containing 28 ampule carton of Tyvaso [seven foil pouches each containing four 2.9 mL ampules. Each ampule contains 1.74 mg treprostinil (0.6 mg per mL)] and the Tyvaso Inhalation System. (NDC 66302-206-01)

Tyvaso Inhalation System Refill Kit containing 28 ampule carton of Tyvaso [seven foil pouches each containing four 2.9 mL ampules. Each ampule contains 1.74 mg treprostinil (0.6 mg per mL)] and accessories. (NDC 66302-206-02)

2.9 mL LDPE ampule containing 1.74 mg treprostinil (0.6 mg per mL), carton containing 1 foil pouch with 4 ampules. (NDC 66302-206-03)

## 17    PATIENT COUNSELING INFORMATION

Patients should be properly trained in the administration process for Tyvaso, including dosing, Optineb-ir device set up, operation, cleaning, and maintenance, according to the instructions for use *[see Dosage and Administration (2.1)]*.

To avoid potential interruptions in drug delivery because of equipment malfunction, patients should have access to a back-up Optineb-ir device *[see Dosage and Administration (2.4)]*.

In the event that a scheduled treatment session is missed or interrupted, therapy should be resumed as soon as possible *[see Dosage and Administration (2.1)]*.

Patients should avoid skin or eye contact with Tyvaso. If Tyvaso comes in contact with the skin or eyes, instruct patients to rinse immediately with water *[see Dosage and Administration (2.4)]*.

US Patent No. 5,153,222
US Patent No. 6,765,117
US Patent No. 6,521,212
US Patent No. 6,756,033

United Therapeutics Corp.
Research Triangle Park, NC 27709

©Copyright 2009 United Therapeutics Corp. All rights reserved.

Tyvaso manufactured by:

Catalent Pharma Solutions
Woodstock, IL  60098

For United Therapeutics Corp.
Research Triangle Park, NC 27709

July 2009

13

UTC_PH-ILD_010705

<div align="center">

**PATIENT PACKAGE INSERT**

**Tyvaso (Tī-vāsō)**

**(treprostinil)**

**Inhalation Solution**

</div>

Read this Patient Package Insert before you start taking Tyvaso and each time you get a refill. There may be new information. This leaflet does not take the place of talking with your healthcare provider about your medical condition or your treatment.


**What is Tyvaso?**

Tyvaso is a prescription medicine used in adults to treat pulmonary arterial hypertension (PAH), which is high blood pressure in the arteries of your lungs. Tyvaso can improve the ability to do exercise in people who also take bosentan (an endothelin receptor antagonist (ERA)) or sildenafil (a phosphodiesterase-5 (PDE-5) inhibitor). Your ability to do exercise decreases 4 hours after taking Tyvaso.

It is not known if Tyvaso is safe or effective in people under 18 years of age.


**What should I tell my healthcare provider before taking Tyvaso?**

Before taking Tyvaso, tell your healthcare provider about all of your medical conditions, including if you:
- have lung disease, such as asthma or chronic obstructive pulmonary disease (COPD)
- have a lung infection
- have liver problems or kidney problems
- have low blood pressure
- are pregnant or plan to become pregnant. It is not known if Tyvaso will harm your unborn baby. Women who can become pregnant should use effective birth control while taking Tyvaso.
- are breast-feeding or plan to breast-feed. It is not known if Tyvaso passes into your breast milk. Talk to your healthcare provider about the best way to feed your baby while taking Tyvaso.


**Tell your healthcare provider about all the medicines you take**, including prescription and non-prescription medicines, vitamins, and herbal supplements. Tyvaso and other medicines may affect each other.

Especially tell your healthcare provider if you take any of these medicines:
- medicines that decrease blood clotting
- water pills (diuretics)
- medicines used to treat high blood pressure or heart disease
- gemfibrozil (Lopid) (for high cholesterol)
- rifampin (Rimactane, Rifadin, Rifamate, Rifater) (for infection)

Know the medicines you take.  Keep a list of them and show it to your healthcare provider and specialty pharmacist when you get a new medicine.

UTC_PH-ILD_010706

**How should I take Tyvaso?**
- Take Tyvaso each day exactly as your healthcare provider tells you.
- See the detailed Tyvaso Inhalation System Instructions for Use.
- Tyvaso is breathed in (inhaled) through your mouth into your lungs. Tyvaso should only be used with the Tyvaso Inhalation System.
- Tyvaso is taken in 4 treatment sessions each day during waking hours.  The sessions should be at about 4 hours apart.
- At the beginning of each day, it will take about 5 minutes to prepare the Tyvaso Inhalation System. Each treatment session will take 2 to 3 minutes.
- Take your first Tyvaso treatment session in the morning and take your last treatment session before bedtime.
- Your healthcare provider may change your dose if needed.
- If you miss a dose of Tyvaso take it as soon as you remember.
- Do not let Tyvaso solution get into your eyes or onto your skin. If it does, rinse your skin or eyes right away with water.

**What are the possible side effects of Tyvaso?**

Tyvaso can cause serious side effects, including:
- Tyvaso may increase the risk of bleeding in people who take blood thinners (anticoagulants).
- If you have low blood pressure, Tyvaso may lower your blood pressure further.

Ask your healthcare provider if you are not sure if this applies to you.
The most common side effects of Tyvaso include:
- coughing
- headache
- nausea
- reddening of your face and neck (flushing)
- throat irritation and pain
- fainting or loss of consciousness

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.  These are not all the possible side effects of Tyvaso. For more information, ask your healthcare provider or specialty pharmacist.

Call your healthcare provider for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**How should I store Tyvaso?**
- Store Tyvaso ampules in the unopened foil pack between 59°F to 86°F (15°C to 30°C) until ready to use.
- When the foil pouch is opened, Tyvaso ampules should be used within 7 days.
- Tyvaso is sensitive to light.  The unopened Tyvaso ampules should be stored in the foil pouch.
- After a Tyvaso ampule is opened and put into the medicine cup in the Tyvaso Inhalation System, Tyvaso can be kept in the medicine cup for no more than 1 day (24 hours).
- Tyvaso that is left in the medicine cup at the end of the day must be thrown away.

UTC_PH-ILD_010707

**3**

**Keep Tyvaso and all medicines out of the reach of children.**

**General information about the safe and effective use of Tyvaso.**

Medicines are sometimes prescribed for conditions that are not mentioned in a patient information leaflet.  Do not use Tyvaso for a condition for which it was not prescribed. Do not give Tyvaso to other people, even if they have the same symptoms you have. It may harm them.

This patient information leaflet summarizes the most important information about Tyvaso. You can ask your healthcare provider or specialty pharmacist for information about Tyvaso that is written for health professionals.

For more information, go to www.tyvaso.com or call 1-866-458-6479.

**What are the ingredients in Tyvaso?**
Active ingredient: treprostinil
Inactive ingredients: sodium chloride, sodium citrate, sodium hydroxide, hydrochloric acid, and water for injection.

Tyvaso is a trademark of United Therapeutics Corporation.

Tyvaso is jointly marketed by United Therapeutics Corporation and Lung Rx, Inc.

Literature issued July 2009

**United Therapeutics Corp.**
**Research Triangle Park, NC  27709 USA**
Copyright © 2009, United Therapeutics Corp. All rights reserved.

**UTC_PH-ILD_010708**