# EXHIBITS  1 - 20

# EXHIBIT 1

**S&P Global**
Market Intelligence

# United Therapeutics Corporation
# NasdaqGS:UTHR
# FQ1 2018 Earnings Call Transcripts
## Wednesday, May 02, 2018 1:00 PM GMT
## S&P Global Market Intelligence Estimates

|  | -FQ1 2018- | | | -FQ2 2018- | -FY 2018- | -FY 2019- |
|---|---|---|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** | **CONSENSUS** | **CONSENSUS** | **CONSENSUS** |
| **EPS Normalized** | 4.00 | 3.76 | ▼(6.00 %) | 3.90 | 13.14 | 11.35 |
| **Revenue (mm)** | 393.96 | 389.20 | ▼(1.21 %) | 379.61 | 1432.88 | 1221.76 |

Currency: USD
Consensus as of May-01-2018 11:15 AM GMT



Stock Price [USD] vs. Volume [mm] with earnings surprise annotations

| - EPS NORMALIZED - | | | |
|---|---|---|---|
|  | **CONSENSUS** | **ACTUAL** | **SURPRISE** |
| **FQ2 2017** | 3.66 | 4.37 | ① 19.40 % |
| **FQ3 2017** | 4.80 | 4.69 | ▼② (2.29 %) |
| **FQ4 2017** | 4.58 | 3.89 | ▼③ (15.07 %) |
| **FQ1 2018** | 4.00 | 3.76 | ▼④ (6.00 %) |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

DA0002

LIQ_PH-ILD_00000001

# Table of Contents

Call Participants ................................................................. 3

Presentation ................................................................. 4

Question and Answer ................................................................. 8

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**LIQ_PH-ILD_00000002**

# Call Participants

**EXECUTIVES**

**James C. Edgemond**
*CFO & Treasurer*

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

**Michael I. Benkowitz**
*President & COO*

**ANALYSTS**

**Geoffrey Christopher Meacham**
*Barclays Bank PLC, Research Division*

**Hartaj Singh**
*Oppenheimer & Co. Inc., Research Division*

**Terence C. Flynn**
*Goldman Sachs Group Inc., Research Division*

**Vasiliana Vireen Moussatos**
*Wedbush Securities Inc., Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

DA0004

LIQ_PH-ILD_00000003

# Presentation

**Operator**

Good morning and welcome to the United Therapeutics Corporation First Quarter 2018 Earnings Call. My name is Ashley, and I will be your conference operator today. [Operator Instructions]

I would now like to turn the conference over to James Edgemond, Chief Financial Officer of United Therapeutics.

**James C. Edgemond**
*CFO & Treasurer*

Good morning. It is my pleasure to welcome you to the United Therapeutics Corporation First Quarter 2018 Earnings Call. Accompanying me today on the call are Dr. Martine Rothblatt, our Chairman and Chief Executive Officer; and Mr. Michael Benkowitz, our President and Chief Operating Officer.

Remarks today will include forward-looking statements representing our expectations or beliefs regarding future events. These statements involve risks and uncertainties that may cause actual results to differ materially. Our latest SEC filings, including Form 10-K and 10-Q, contain additional information on these risks and uncertainties. We assume no obligation to update forward-looking statements.

Today's remarks may also include financial measures that are not prepared in accordance with U.S. Generally Accepted Accounting Principles. Reconciliations of non-GAAP financial measures to the most directly comparable GAAP financial measures can be found on our earnings release available on our website at www.unither.com.

Today's remarks may discuss the progress and results of clinical trials or other developments with respect to our products. These remarks are intended to solely educate investors and are not intended to serve as the basis for medical decision making or to suggest that the products are safe and effective for any unapproved or investigational uses. Full prescribing information for the products is available on our website.

Now I want to turn the call over to Dr. Rothblatt for an overview of the first quarter 2018 business activity of United Therapeutics.

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Thank you, James. Good morning, everyone. As James mentioned, I'm glad to also be joined on this earnings call for the first time, Mike Benkowitz, our President and Chief Operating Officer.

After my introductory remarks, we'll open up the call to any questions. And if there are questions of a financial nature, I will ask that they be answered by James, our CFO. If there are questions of a commercial nature, I'll ask that they be answered by Mike Benkowitz as our President. And if there are questions of a clinical development type of nature, then I will handle those myself.

Starting with our top line financial results. For the first quarter of 2018, our quarterly revenues totaled $389 million, an increase of 5% year-over-year. Orenitram posted a fourth consecutive quarter of greater than 20% revenue growth on a year-over-year basis. In addition, we continue to treat an increasing number of pulmonary arterial hypertension patients with our prostacyclin product franchise, which consists of Orenitram, Remodulin and Tyvaso, confirming our belief in the organic growth opportunity for these proven therapies.

The sequential drop in our total revenues from the fourth quarter of 2017 reflects consistent historical patterns as our first quarter revenues tend to be either down or virtually flat when compared to the prior year fourth quarter. This pattern reflects distributor purchases that are typically placed once a month based on current utilization trends and contractual minimum inventory requirements. As a result, quarterly

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**LIQ_PH-ILD_00000004**

sales of Remodulin, Tyvaso and Orenitram can vary depending on the timing and magnitude of these orders and do not precisely reflect changes in underlying patient demand.

So let's now transition to our pipeline, which currently has over 20 investigational programs, including therapies for PH and other forms of pulmonary hypertension, drug delivery devices, gene therapy, oncology and technologies to ultimately create an unlimited supply of tolerable, transplantable manufactured organs for those who suffer from end-stage organ disease.

The first of our near-term and medium-term pipeline products is the Implantable System for Remodulin, or ISR. Excitement and anticipation from both physicians and patients continues to build around potential FDA approval of the ISR. This should be a game-changing technology for PH patients, and we continue to believe that thousands of patients will eventually use the ISR.

I am reminded through videos and e-mails directly from ISR clinical trial patients of the numerous ways that the ISR has impacted their lives, even for some of the most basic activities that many of us just take for granted. Activities like sleeping, showering and swimming become more straightforward for patients using the ISR. The ISR also has the potential to address complications currently associated with the use of external microinfusion pumps, including the serious risk of external catheter-related infections, like sepsis, while returning to patients the lost several hours of pump management and therapy preparation time each day to productive use.

From a regulatory perspective, the FDA approved Medtronic's PMA for the ISR in December 2017, which is 1/2 of the regulatory process. We then resubmitted our NDA for use of Remodulin in the ISR, which has been accepted as a Class II resubmission for a 6-month review. We anticipate FDA action on our NDA by July 30, 2018.

Although no FDA process is free from doubt, we remain confident that the FDA will approve the ISR in 2018. We are approaching the ISR launch with our partner, Medtronic, with precision and care to ensure that implant surgeons, refill centers, reimbursement pathways and other healthcare service organizations are all in place and properly trained and ready for commercial launch by early 2019. Our expectation that it will be ultimately used by thousands of patients is a longer-term goal as launching a surgically impacted device needs to be done carefully, thoughtfully and systematically.

Yet another next-generation drug delivery system we are advancing is RemUnity, a small, lightweight external subcutaneous pump we are developing under an exclusive agreement with DEKA Research & Development Corp. The RemUnity system uses acoustic volume-sensing technology to deliver Remodulin with a high degree of precision, representing a significant advance in microinfusion technology. In February 2018, DEKA filed RemUnity with the FDA under a 510(k) submission that was accepted for review by the FDA.

Let me now provide you an update on 4 of our 7 ongoing Phase III clinical trials.

FREEDOM-EV. FREEDOM-EV is a Phase III clinical trial using Orenitram in combination with a single ETRA or PDE-5 background therapy for PAH WHO Group I patients. This trial has a primary endpoint of time to clinical worsening. FREEDOM-EV enrolled nearly 700 patients. And we have now accumulated enough events needed to meet the required 205 adjudicated clinical worsening events that's required to unblind the study, which are expecting to do later this year.

It is also worth noting that Orenitram is the only true oral prostacyclin analog which could be dosed to therapeutic benefit. Based on patient and physician feedback, I believe that we will see continued Orenitram growth, further accelerated in the event that a possible FREEDOM-EV readout, providing the Orenitram label with a morbidity, mortality endpoint supported by good clinical trial data in use of combination therapy.

Another major and exciting event we anticipate by year end 2018 is the unblinding of our BEAT combination therapy clinical trial for PAH WHO Group I patients. This is a unique clinical trial that has never been tried in PAH before combining Tyvaso, our inhaled treprostinil therapy to treat PAH where the alveoli meet the pulmonary arterials, with Tysuberprost, and orally administered therapy to treat PAH systemically, where the blood flows from the right side of the heart into the pulmonary arteries all the way

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

down to the pulmonary arterials. Our data demonstrates that attacking the disease in these 2 different ways may yield better results. And similar to FREEDOM-EV, the BEAT clinical trial has a primary endpoint of time to clinical worsening.

To illustrate how we are endeavoring to create new Blue Ocean market opportunities in pulmonary hypertension WHO Group III, where we think we can have a significant and positive impact on patients with unmet medical needs, I would like to now discuss 2 additional Phase III clinical trials.

Our INCREASE trial is examining the effect of Tyvaso for WHO Group III PH associated with interstitial lung disease. Currently, this Phase III study is about 50% enrolled. There are no approved therapies for this indication. And in fact, systemic drugs like our own tablets and parenteral therapies, as well as those of our competitors, are contraindicated for this condition.

Next, I would like to move to another subset of WHO Group III PH associated with chronic obstructive pulmonary disease, or COPD, in our PERFECT Phase III clinical trial. No therapy has ever been approved by the FDA for pulmonary hypertension incident to so many of these COPD patients. And I really want to salute Dr. Waxman and his great team up at Boston who have brought this unmet medical need to our attention.

Finally, I would like to talk about UT's revenue growth strategy, particularly as we are facing increasing generic competition. As previously discussed, we expect our 2018 revenues to decrease compared to 2017 primarily due to the impact of anticipated generic competition for Adcirca beginning in mid-2018 as well as generic Remodulin, which could be launched as early as June '18. Our strategy to take advantage of the existing organic growth opportunity we have within the treated PAH patient with our existing prostacyclin product franchise including Remodulin, Tyvaso and Orenitram and to combine this with our new and improved formulations and delivery devices that I described earlier to enable us to resume revenue growth by the end of 2019.

Now I'd like to walk you through how we expect to drive this growth. First, we believe that Remodulin will continue to be a steady performer, but it will look very different from the Remodulin you see today. It will be delivered through multiple next-generation drug delivery systems intended to enhance safety, tolerability and convenience, including the ISR and RemUnity which I previously mentioned. In addition, we are developing RemoPro, a prodrug version of treprostinil expected to reduce or eliminate site pain associated with the subcutaneous Remodulin. We expect to file an IND for RemoPro later this year as we begin Phase I clinical studies.

On Monday, we also announced an agreement to acquire SteadyMed Limited. Assuming that deal closes later this year, their pipeline product, Trevyent, will sit well within UT's next generation of innovative drug-delivery systems for PAH patients.

Second, we will continue to believe in the organic growth opportunity of the treated PAH population, which we believe currently underutilizes prostacyclin therapy. Unlike other therapies on the market, UT's prostacyclin analogs can be titrated to therapeutic benefit as PAH progresses, therefore offering patients the opportunity to transition between Remodulin, Tyvaso and Orenitram as each contains the same proven active ingredient, treprostinil. This is our continuum of care advantage.

Third, we expect to grow through the introduction of new products and new indications. We currently have 6 Phase III studies in PH and 1 Phase III study in oncology. Let me itemize what these are. Two clinical trials, FREEDOM-EV and BEAT in PAH, are expected to unblinded in 2018. Three clinical trials, INCREASE, PERFECT and SOUTHPAW in PH, are currently enrolling patients and remain on track to launch commercially within the timelines currently provided in our website. These 3 clinical trials for PH are in indications which we do not have any approved therapies in place today. Three, our SAPPHIRE gene therapy study for PAH. And lastly, our DISTINCT study of dinutuximab in small cell lung cancer. These and other R&D programs are designed to provide revenue growth in the near and medium term while additional R&D programs are underway to develop technologies in organ manufacturing over the longer term.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000006

In closing, at United Therapeutics, we are focused on the development and commercialization of innovative products to address the unmet medical needs of patients to deliver long-term revenue growth to our stakeholders. We continue to advance numerous pipeline priorities to help keep patients alive, and in effect, building bridges for them as we pursue new technologies to create an unlimited supply of tolerable, transplantable manufactured organs.

Thank you for joining us on the call today. Operator, I would like now to open the call to questions.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

DA0008

LIQ_PH-ILD_00000007

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Terence Flynn of Goldman Sachs.

**Terence C. Flynn**
*Goldman Sachs Group Inc., Research Division*

Martine, I think there was some new commentary in the Q about potential launch dynamics of the implantable pump. I think you're -- it sounds like Medtronics Limited do about 100 pumps out of the gates and then maybe making some improvements upon that. Can you give us a little bit more details about kind of the process, next steps and how to think about that ramp as we look into 2019 and beyond?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Yes, Terence. Good to actually hear you on the phone, so that's amazing. As far as the implantable pump program, I don't -- I wouldn't get hung up on any limits or I can't give credence to the numbers that you mentioned at all. What is the situation with the Medtronic pump is that we are awaiting approval of the second half of the NDA from the FDA. And we expect that we should have -- we should hear from the FDA by the end of July. Once that happens, Medtronic and us intend to roll out these pumps to every pulmonary hypertension patient that can benefit from it. And I do believe that, that number is in the thousands, and in the high thousands. The reason for that, Terence, is that the pump allows the treatment of the disease to be all but forgettable for the patients. There's nothing they have to do to prepare their infusions. They have no open wounds or painful marks on their skin. And the drug can automatically be delivered systemically, providing them an ideal sort of PK/PD situation on treprostinil. The physicians are very, very happy with the drug. The patients are very, very happy with the drug. Now there is a fair amount of intriguing research, although nothing that has ever been approved on a label, to show that the earlier you start treating a patient with a true prostacyclin, the longer the patient is going to live. And this data has been presented at medical conferences like the American Heart, American Thoracic Society, going back to the early 2000s. The problem, Terence, is that it's been so difficult to provide a patient continuously bioavailables, in other words, 0-order delivery, true prostacyclin that patients, instead of starting on it at the very beginning of their disease, they take it at the very end. And as we all know, when 1 or 2 leaves are maybe turning brown on a plant, you could do some nutrients and get it going again. But once the plant is on its last leg, it's very hard to do things to bring it back to being a fresh, green plant again. So the remarkable thing about the Implantable System for Remodulin is that physicians could prescribe this as a front line therapy for person that has pulmonary hypertension. And instead of a patient saying, "Oh, why do I have to be burdened with an indwelling Hickman catheter?" Or "Why do I have to be burdened with transcutaneous, transdermal site pain?" They won't have to ask those questions. It will be actually easier than the Adcirca pill that they would swallow. So it will become the easiest way to treat pulmonary hypertension. And at least from the study that was used for Flolan to be approved, a very, very potent and powerful study, drug when used earlier. As you know, in the Flolan study, it was actually shown to provide a [indiscernible] benefit by starting the patients on Flolan. So we're really excited about that. I think the numbers of patients, I think I mentioned a couple of times, are going to be in the thousands. To give -- and actually, as I mentioned, I think we're probably looking at much closer to 10,000 than the number of patients that you see on parenteral drugs today which are in the low single digit thousands. And in fact, there are some physicians that we've been talking to that, if they went ahead and were to use this as front line therapy, as I've just sketched out, you would actually have something like 20,000, 30,000 patients on the Implantable System for Remodulin. As these patients live longer, that number would grow to 40,000 to 50,000 because the total prevalence of pulmonary hypertension would increase, given that the incidence is fairly constant. So this is a -- I think the word I used in my introductory remarks, this is a game-changer, Terence. And we at UT are really not hung up, we're not counting, we're not projecting what the number of patients are going to be quarter to quarter to quarter. We're committed to this program for the long haul, for the balance of the 2020s. And I personally am quite

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000008

convinced that once approved by the FDA and opened up to the market, you will see high numbers of thousands of patients on this therapy. Thanks, Terence, for the question.

**Operator**

Our next question comes from Geoff Meacham of Barclays.

**Geoffrey Christopher Meacham**
*Barclays Bank PLC, Research Division*

So let me ask you a question on Orenitram. When you look at the FREEDOM-EV study, it sounds like you have -- may have data by year end. What would you characterize as an incremental PH patient that could go on, assuming you have positive data? And is there a hurdle you think you have to hit in terms of time to worsening? Is it comparative to Actellion, or is it just a stat sig benefit?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Yes, thanks, Geoff. Great question. Because that's really a kind of a commercial operations question in terms of who would be the patients that would most likely form the growing number of Orenitram patients. As you heard, we're doing quarter after quarter after quarter of strong revenue growth on that, over 20% up every time year-over-year. But all that is great tribute to the med affairs and the reimbursement. There's global supply chain management. And last but not least, the sales and marketing force that is under Mike Benkowitz. So Mike, could you answer Geoff's question?

**Michael I. Benkowitz**
*President & COO*

Sure. Thanks, Martine. Thanks for the question. Yes, I think the -- what we're seeing in the marketplace right now is the typical Orenitram patient tend to be your earlier-diagnosed patients or patients that are earlier on in their disease state because they need the time to start on therapy, titrate up. And what we have found is starting those patients earlier, when they have time to titrate up on therapy, they're able to manage the side effects better, and they just have, just generally, a better experience with the drug. And I think even without the clinical worsening label, we feel like we're getting a good share of those patients in relation to what J&J is seeing with Uptravi. I think the label -- the benefit of the clinical worsening label will put us on par with Uptravi, and I think, will allow us to capture even a greater portion of those patients because we'll now have the same clinical worsening benefit on our label in addition to being, really, a true prostacyclin. And then having the ability to put patients on that prostacyclin earlier, titrate them up, and then as Martine talked about in her comments, as the disease progresses, easily transition them over to Tyvaso or Remodulin as they continue in their disease.

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Excellent, Mike. Excellent, excellent.

**Operator**

Our next question comes from Hartaj Singh of Oppenheimer.

**Hartaj Singh**
*Oppenheimer & Co. Inc., Research Division*

Just -- I just want to see, Martine, if you could dig a little bit deeper into the scientific rationale going in Tyvaso in ILD and then also in COPD; and then Orenitram and the heart failure, the Phase III studies. I mean, what's the thought, the scientific sort of rationale behind, and the mechanism of action using treprostinil to go after these disorders?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000009

DA0010

Thank you, Hartaj. Great, great question. So let's talk about the science between -- behind the INCREASE and the PERFECT studies which are the ILD and COPD studies, respectively; and the science behind the SOUTHPAW study, which is the left heart failure study. So given the limitations on the time on the call, let me, in a sense, drop to one kind of bottom line, starting with the COPD and ILD. Treprostinil, Tyvaso is not on label for patients with these indications. And as you would expect, it's not an inexpensive therapy, and payers don't just, like, blindly push the pay button on Tyvaso. Every patient is carefully assessed by payers in ensuring that it's an appropriate patient that they're obligated to pay for and not an experimental patient. Having said that, both through the effort of our medical affairs group over the years in supporting investigator-sponsored studies and through the kindness and generosity of certain payers around the country who have gone ahead and upon the initiative of their physicians, were able to enable some WHO Group III patients to benefit, there were unmistakable signals the some of the leading physicians in this field. I called out one of them on the call, Dr. Waxman, but there are many others, who said to UT, "This drug works." In fact, they believe that this drug works even better in that indication than in the Group I indication in terms of, at least, the exercise ability that they saw in their patients, discounting any placebo effects that might be involved. So with that kind of data, some of which has been presented in posters and maybe even publications -- I don't know, but I've definitely seen posters, we went ahead and then had the statistics to power of the study for statistical significance, the one in the ILD population and the other in the COPD population, which are 2 distinct populations. I believe that when you take a look at animal models of pulmonary hypertension and even when you take a look at autopsy of pulmonary hypertensive lungs after they've -- autopsy is not the right word, sorry. Biopsied. Pulmonary hypertension lungs, after they've been ex-planted for a lung transplant, you could see that the disease has a unique, and I would say, worst-case phenotype in the pulmonary arterial immediately adjacent to the alveoli. And this is the part of the arterial that is being reached most densely by Tyvaso before it dissipates through the venous drainage and circulation. So we think that the triple properties that treprostinil and Tyvaso in particular are known for, namely the vasodilating, the de-platelet-ing, but most important of all, the cytoprotective property of prostacyclin is they will lead to stop a damaged phenotype from getting more damaged, and in fact, to mitigate against damage setting in, in an inflammation setting in the first place. This cytoprotective property for this kind of -- it's hard to imagine, but if you dive deep, deep, deep in the lungs, when you get, like, past 16, 17 branches and you're have at these 10-micron wide arterials that then wrap around the air sac or alveoli, those are the ones that spell doom for the patients with pulmonary hypertension secondary to ILD or COPD. And that's what Tyvaso directs itself to immediately. At the same time, because these patients have a great difficulty with ventilation due to these deteriorated arterials around their alveoli, if you go ahead and you just give -- you just take advantage of the anatropic properties of prostacyclin, mainly kind of making the heart pump stronger, then you get into this thing called perfusion ventilation mismatch or V/Q mismatch. And that, unfortunately, can lead to fatal events for the patient. So the strongest science here is really on the ability to help pulmonary hypertension patients who have COPD and ILD, so-called WHO Group III pulmonary hypertensions. They have some other distinctive characteristics. They're in the tens of thousands. They are not being treated for their pulmonary hypertension today. There's nothing on label for it. To be able to treat them with the only type of agent, an inhaled agent that can successfully treat them where they need the help the most and where it will not cause the devastating side effects of V/Q mismatch. Now turning over to the last part of your question, on SOUTHPAW, there are 2. Hartaj, it's gone back for -- actually for decades, that people thought treprostinil would be useful for left heart failure. And indeed, it was -- its very first trial was in congestive heart failure back when this was a molecule owned by Burroughs Wellcome. So what the problem is though is, to do a proper CHF trial, you're usually talking about thousands of patients, and it was tried just in a couple dozen patients. And it was a -- what we would call, I mean, if you wanted to map the word from cancer over to left heart failure, it was like a basket study. It was just everybody was thrown in there with no understanding of the distinctions among the patients. There has been opinions over the years, strengthened again with the same kind of evidence that I described for the PERFECT and INCREASE studies, that if you targeted just the subset of heart failure patients that had preserved ejection fraction, that the suite of properties associated with prostacyclin, I had mentioned the unique anatropic profile of this agent, would in fact be very, very helpful for these patients. And we were really blessed to be led in the area by a superb cardiologist with great experience, Dr. Mardi Gomberg. And she is the lead investigator for our SOUTHPAW study. And I think it has always been a strong property of prostacyclin to impact the heart. The problem is to do so in the way without making things worse and to do so in a

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000010

way that it addresses a particular type of heart failures that the individual has. SOUTHPAW is -- I'm sorry, Orenitram, of course, is not any kind of a cure for heart failure per se. But if part of your heart failure is accompanied by HFpEF heart failure with preserved injection fraction, then we believe the data that led us to our hypothesis with HF, is that there is a significant likelihood that we can moderate the overall heart failure rate of decline by addressing the subset that has HFpEF. And so that's the group that we'll be targeting with this agent.

I'm being told that we have time for one more question.

**Operator**

Our last question comes from Liana Moussatos of Wedbush.

**Vasiliana Vireen Moussatos**
*Wedbush Securities Inc., Research Division*

You mentioned that the DEKA pump has been accepted by the FDA, a 510(K). And when do you think you can get it approved? Last call, you said early 2019. Is it on track for that?

**Martine A. Rothblatt**
*Founder, Chairman & CEO*

Thanks, Hartaj -- I mean, thanks, Liana. Sorry about that. Yes. So let me, like, back up. Whatever I said in the last call, I still think is good. So I'm not changing anything from the last call. The pump is a really fascinating piece of machinery, Liana. And the more I see it in operation, the more just kind of completely blown away I am by it. It's got virtually no moving parts. In fact, actually the pump itself has no moving parts. And I think it's a kind of like a Tesla of pumps. Like a regular car has something like thousands of moving parts, and a Tesla, I think they advertised it as 20 or 25 moving parts. So of course, regular infusion pumps don't have thousands of parts, but they got a lot of parts. And just ask the poor patients who have to put all the pieces together every day or 2 on their table, takes up like half a dining room table. But with the DEKA unity pump, there are no moving parts due to the inventive geniuses of those folks. So this is going to be a super cool device. Of course, we will ship it to the patient with the drug already supplied to eliminate the need for the patients to have any errors in the process of drug fill. And also to buy back for the patient a very, very valuable hours of their time, which is otherwise spent on refilling these pumps. We also have the rights, Liana, to use this pump technology for additional drugs for other [ orphan ] diseases. And we have now begun a program in Parkinson's disease based on using the same pump technology, the same pumps, actually. So it's really a super exciting program. Of course, and as I mentioned in my introductory remarks, nobody can predict the FDA. And the FDA is going to make the decision. And I've been right sometimes, been wrong sometimes, I'm not going to -- like, I don't make any more bets on the these things. But I will say this, that you were looking at a sponsor, DEKA, that has successfully obtained FDA approvals for every product that they have taken through the FDA, including some truly revolutionary products, such as bioelectronic prosthetic arms, Class III medical devices. I mean, very, very challenging approval. Dialysis machines for Baxter, multiple generations of those. So this is an organization that definitely has, to my knowledge, 100% success record at the FDA. And I'm confident that they will take this through. And wow, these are not -- United Therapeutics also has 100% success record at the FDA, because Remodulin, Tyvaso, Orenitram, Unituxin. So I believe, between the 2 of us, I could not be more confident, Liana, that we will be able to successfully launch this RemUnity pump. Exactly which month, who knows? It's up to the FDA. But I stand by everything I've said before.

Thanks, Liana. And operator, if you could please do your wrap up comments.

**Operator**
Thank you for participating in today's United Therapeutics Corporation Conference Call. A rebroadcast will be available for replay for 1 week by dialing 1 (855) 859-2056, with international callers dialing 1 (404) 537-3406 and using access code 5778455.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

LIQ_PH-ILD_00000011

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.

LIQ_PH-ILD_00000012

# EXHIBIT 2

DA0014

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

EVENT DATE/TIME: FEBRUARY 22, 2023 / 2:00PM GMT

**OVERVIEW:**

Co. reported 4Q22 results.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



REFINITIV

LIQ_PH-ILD_00000013

## FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

### CORPORATE PARTICIPANTS

**Dewey Steadman** *United Therapeutics Corporation - Head of IR*

**James C. Edgemond** *United Therapeutics Corporation - CFO & Treasurer*

**Leigh Peterson**

**Martine A. Rothblatt** *United Therapeutics Corporation - Founder, Chairman & CEO*

**Michael I. Benkowitz** *United Therapeutics Corporation - President & COO*

### CONFERENCE CALL PARTICIPANTS

**Andreas Argyrides** *Wedbush Securities Inc., Research Division - Analyst*

**Ashwani Verma** *UBS Investment Bank, Research Division - Director of Americas Equity Research & US Specialty Pharma Analyst*

**Hartaj Singh** *Oppenheimer & Co. Inc., Research Division - Research Analyst*

**Jessica Macomber Fye** *JPMorgan Chase & Co, Research Division - Analyst*

**Joseph John-Charles Thome** *Cowen and Company, LLC, Research Division - MD & Senior Research Analyst*

**Justin Hovsep Simonian Phillips** *Morgan Stanley, Research Division - Research Associate*

### PRESENTATION

**Operator**

Good morning and welcome to the United Therapeutics Corporation Fourth Quarter and Full Year 2022 Earnings Webcast. My name is Devin, and I will be your conference operator today. (Operator Instructions) I will now turn the webcast over to Dewey Steadman, Head of Investor Relations at United Therapeutics.

---

**Dewey Steadman** *- United Therapeutics Corporation - Head of IR*

Thanks, Devin, and good morning. It is my pleasure to welcome you to the United Therapeutics Corporation Fourth Quarter and Full Year 2022 Earnings Webcast. Accompanying on today's webcast are Dr. Martine Rothblatt, our Chairperson and Chief Executive Officer; Michael Benkowitz, our President and Chief Operating Officer; James Edgemond, our Chief Financial Officer and Treasurer; Pat Poisson, our Executive Vice President of Technical Operations; and Dr. Leigh Peterson, our Senior Vice President of Product Development.

Remarks today will include forward-looking statements representing our expectations or beliefs regarding future events. These statements involve risks and uncertainties that may cause actual results to differ materially. Our latest SEC filings, including Forms 10-K and 10-Q, contain additional information on these risks and uncertainties. We assume no obligation to update these forward-looking statements.

Today's remarks may also discuss the progress and results of clinical trials or other developments with respect to our products. These remarks are intended solely to educate investors and are not intended to service the basis for medical decision-making or to suggest that any products are safe and effective for any unapproved or investigational use. Full prescribing information for the products are available on our website.

And United Therapeutics executives will participate in 3 investor conferences in March. First, Michael Benkowitz will participate in a fireside chat at the Cowen Healthcare Conference on Tuesday, March 7. Dr. Martine Rothblatt will participate in a fireside chat at the Oppenheimer Healthcare Conference on Monday, March 13, and our Chief Medical Officer, Gil Golden will participate in the JPMorgan Napa Valley Biotech Forum on Tuesday, March 21.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000014

FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

Now I will turn the call over to Dr. Rothblatt for an overview of the fourth quarter and full year 2022 financial results and business activities of United Therapeutics. Dr. Rothblatt?

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Dewey, and good morning, everyone. I feel very excited to lead this call because we have so much positive news to report about 2022.

In fact, I -- reflecting back on the past few years, this is actually the best year United Therapeutics has ever had. And it augurs even more, I think, positively to what we're going to see coming up in 2023, 2024 and 2025.

Let me hit a few highlights. First, 2022 was our highest revenue year ever. Second, 2022 was our most profitable year ever. Third, 2022 was our highest operational cash flow year ever. And fourth, we ended 2022 with more patients on our treprostinil medicines than ever before.

I think you have to agree with me that these are fantastic results. And now I'd like to give a few indications of why I think that as great as these results are, they are not laurels for us to rest upon but instead a launching pad for yet greater results in 2023, 2024 and 2025.

In fact, the patient uptake of our new Tyvaso DPI medicine has been so rapid that we can project a doubling of our revenues by 2025. This doubling of revenues is helped by the unique nature of each of our medicines including Tyvaso DPI. For example, Tyvaso DPI is the only inhaled treprostinil product that enables deep lung penetration via high-resistance low-flow device.

Another example, our Remodulin product is the only parenteral prostacyclin delivered by the small, easy, super accurate Remunity device. The differentiated aspects of Remodulin has allowed us revenues to remain steady at about $0.5 billion a year through the past 3 years running.

Our Orenitram product is also very unique because it is the only titratable oral prostacyclin product. We currently expect it's 1/3 of $1 billion a year revenue to continue growing as physicians become aware of the results of our recently released EXPEDITE study. That study showed Remodulin patients can be switched directly to Orenitram. And Orenitram will soon be joined by new products from our pipeline.

In the field of pulmonary arterial hypertension, we expect to complete our Phase III trials of ralinepag by 2025. That will enable the first once-daily dosing of a prostacyclin pill in the pulmonary hypertension field.

In the field of pulmonary fibrosis, we expect to complete our Phase III trials of Tyvaso by 2025 as well. That will, we hope, create the first disease-modifying treatment for pulmonary fibrosis, a true landmark in the field.

And in the area of transplantation we hope to commence clinical trials of manufactured organs within the next few years. That would be a major contribution to ending so many deaths on the organ transplant list and unfortunately, even more deaths from end-stage organ disease off the transplant list.

In summary, our business, our patient count, our pipeline is growing longer and faster than ever before. 2022 marked the continuation of that growth factor into 2023. We have achieved a very nice balance of growth and strength. We intend to continue building on this platform in the years to come.

To provide now some additional, very median I think, extremely exciting details of how we are continuing to build on this platform, I'd like to introduce our President and Chief Operating Officer, Michael Benkowitz. Mike?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000015

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

**Michael I. Benkowitz** *- United Therapeutics Corporation - President & COO*

Thanks, Martine, and good morning, everyone. From a commercial standpoint, as Martine said, 2022 was a phenomenal year for us. We're extremely pleased with the progress of the Tyvaso DPI launch as referrals starts and active patients for both Tyvaso and Tyvaso DPI are among the best that we've seen to date.

We were also very excited to achieve our goal of doubling the number of Tyvaso patients following the PH-ILD approval in early 2021. This was a goal that Unitarians across the organization rallied around and supported. So we're really proud and appreciative of everyone's hard work over the last couple of years to help us reach this milestone.

Importantly, reaching this goal reinforces to us the impact that Tyvaso and Tyvaso DPI are having not only in helping patients with PH-ILD treat this serious progressive disease for which there are no other available options, but also the impact Tyvaso DPI will have in PAH. With the simple convenience of a small inhaler that fits in the palm of the patient's hand and an elegant ease of use following the simple mantra of open, load, inhale. We believe Tyvaso DPI will meaningfully expand the use of inhaled treprostinil in both indications.

The Tyvaso DPI inhaler device developed by our partner, MannKind, is able to efficiently deliver treprostinil deep into the lung and one breadth per cartridge using less active ingredient to the nebulizer reference. The convenience and efficacy of our DPI device, coupled with Tyvaso's known tolerability profile has us well positioned to expand our reach in PH-ILD and to move the use of treprostinil therapies like Tyvaso DPI and PAH even earlier than IP receptor agonist like selexipag.

We're seeing this play out with our prescribers as evidenced by several positive trends. Since the PH-ILD launch, we've increased the total number of Tyvaso prescribers by about 70%, an increase by almost 60%, the number of prescribers with 3 or more patients in their practice.

This last point is an intra marker we look at to gauge product support. We have found that once a physician has at least 3 patients on one of our products, they tend to become what we call supporters and start using the product much more frequently and regularly.

We're also making headway with traditionally loyal selexipag prescribers. Of the top 100 selexipag prescribers, 70% have now written Tyvaso DPI and 50% of those have written 5 or more prescriptions. From a revenue standpoint, we're very pleased with how the quarter and the year wrapped up for Tyvaso, but there are a few key points I want to highlight.

First and most relevant to the fourth quarter of 2022 is that we're still in a launch mode for Tyvaso DPI and even for the PH-ILD indication for that matter. As such, our specialty pharmacy distributors are still rightsizing product orders based on estimated underlying patient demand, both in total and between Tyvaso nebulized and Tyvaso DPI. Therefore, our distributors are placing orders more frequently than their once or twice a month historical cadence. And these new ordering patterns did impact the timing and size of product orders and thus our product revenues during the quarter.

Second, we're also building Tyvaso DPI inventory as we're launching a product. So our distributors are not yet able to order a sufficient product to reach contractual inventory levels per their usual practice. We expect over the next several quarters, these 2 factors will normalize, and our specialty pharmacy distributors will shift back to a more historical type cadence of product orders. For these reasons and the usual historical seasonality to our business that we have discussed on prior calls, we think annual revenue trends are a better lens through which to view and evaluate our business.

The last thing I want to touch on with Tyvaso is our patient assistance program or PAP. Patient utilization of our program -- of our PAP program for Tyvaso DPI which is covered under Medicare Part D and has high patient co-pays, has been higher than anticipated, including by many PH-ILD patients who were on the nebulizer and nPAP last year and has since transitioned to DPI.

We anticipate that this will be a short-term phenomenon and that many of these patients will be covered under their Medicare Part D plan starting in 2024 and continuing into 2025, once changes to the Part D provisions of the Inflation Reduction Act begin to go into effect.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000016

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

Turning to Orenitram. We see continued momentum for Orenitram as we ended the fourth quarter with the highest number of patients on therapy since its launch. We're also excited about the recent top line EXPEDITE data we press released in October of last year that demonstrated that prostacyclin induction with Remodulin can lead to double the average Orenitram dose when patients shift to oral therapy compared to patients who do not have a Remodulin induction.

Following up on this top line data, we plan to present additional details on EXPEDITE at scientific meetings this year, along with a peer-reviewed manuscript detailing the study in the second quarter.

And finally, we continue to be pleased with the performance of Remodulin in the U.S. as the fourth quarter was one of our highest referral quarters ever. The Remunity pump for Remodulin is gaining momentum with approximately 1/3 of subcutaneous patients now on Remunity especially as Remunity is the only subcu pump widely available for any patients to treprostinil therapy.

So to wrap up, after reaching our goal of doubling the number of Tyvaso patients, we're confident in our ability to double our annual revenue run rate for approximately $2 billion today to $4 billion by the end of 2025. We expect continued Tyvaso and Tyvaso DPI uptake in both PAH and PH-ILD to drive most of our near-term revenue growth, supplemented by Orenitram growth through the expedite protocol and other research and supported by continued Remodulin resilience. With that, I'll turn the call back over to Martine.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Michael, thank you so much for providing this wealth of detailed information supporting this great growth vector we have going here from 2022 into 2023, '24, '25.

Operator, feel free to open up the lines to any questions now.

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) Our first question comes from Jessica Fye with JPMorgan.

**Jessica Macomber Fye** - *JPMorgan Chase & Co, Research Division - Analyst*

I have 2, if that's okay. First, can you provide some of the assumptions, specifically around Tyvaso and Tyvaso DPI to help underpin your target to roughly double your revenue run rate for the overall company by the end of 2025.

And then second, just following up on Michael's comments in prepared remarks, I was hoping if you could elaborate a little bit more on that comment about the utilization of the PAP program for DPI being higher than anticipated among PH-ILD patients who transitioned to DPI. Is that to say that because of the higher out-of-pocket in Part D in the short term that they're receiving free drug? And how should we reconcile that with, I think, what was anticipated to be a bit of a tailwind in 2023 from PAP patients transitioning on to reimbursed product this year?

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Yes. Thank you, Jess, and good morning. Good to hear your voice this morning. Generally, we try to like limit to one question for questioner because there are so many people in queue. But because your 2 questions are in a sense kind of like a tag team question, one way close into the next, Mike, I'll kind of ask if you can handle both questions.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV** ↗

LIQ_PH-ILD_00000017

FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Yes. So I think, Jess, your first question around the assumption, the underlying assumptions for our confidence in the growth of Tyvaso in both PAH and PH-ILD is, in some ways, it's a little bit of a math -- kind of a math exercise, but also just I think -- I think just the excitement and enthusiasm we're seeing around DPI.

So if you think about in the PAH or the WHO Group 1 market, there's about, I mean, roughly 50,000 patients in the U.S. diagnosed with PAH, still and shockingly and sadly, it's probably only about, I would say, about 30% to 35% of those patients are on a prostacyclin. And there's a lot of reasons for that, and a lot of it comes down to the fact that the delivery mechanisms for prostacyclin are -- they're not terribly convenient. But I think that is changing on Tyvaso DPI. So we feel very confident that we will be able to -- with the convenience of the DPI inhaler to be able to expand the use of prostacyclins in the PAH market meaningfully.

So I think we feel like even though it's a crowded market, even though Tyvaso has been out there, we still think that there's a lot of opportunity within the WHO Group 1 market to grow the use of prostacyclin and particularly Tyvaso.

And then a similar story, but maybe a little bit easier on the PH-ILD side because there, you have a market that's conservatively 30,000 patients with no other approved therapy. And so we've roughly tapped into about 10% of that over the last couple of years, and we think we have another other 90% available to us. So we still feel like we have a lot of runway there to grow with Tyvaso. And again, I think just with the convenience of DPI, it's going to get easier for doctors to prescribe that drug for those patients that have PH-ILD.

And then shifting to your second point on the PAP. So yes, so the issue is that we had patients in PH-ILD, patients on Medicare and our PAP program for 2021, 2022, expected a lot of those to roll over starting in 2023. And a lot of those have started to roll over in 2023. It's not as high as -- the number that are rolled over, it's not as high as we expected for a couple of reasons.

One is I think at the end of the third quarter, I think we reported that there were about 700-ish patients in the PAP program. So some of those discontinued which we expected. Some of those even after becoming -- even with the CMS coverage, still qualified for PAP. And so they stayed in PAP. And then as I said in my prepared remarks, we did have a number of patients that transition to DPI between the end of the third quarter and the beginning of the first quarter. And so with the higher co-pays and Part D, they were then eligible to remain in PAP.

So I think we still had about half, slightly more than half of those patients convert over. I think they're still -- they're kind of working through the system, but it's a little bit less than we were expecting, I think, when we had the call in the third quarter.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Those are great answers. Jess, one just additional shade of color I could add on top of Mike's remarks with regard to your question as to what kind of parameters can I provide to provide greater assurance about the doubling of revenues by the end of '25 is the uptake of Tyvaso DPI has been dramatic. And as Mike mentioned, he provided some metrics, for example, the very high number of selexipag prescribers who have not previously prescribed on Tyvaso now prescribing Tyvaso DPI.

So when we achieve the doubling of our patients on Tyvaso over a period of just 18 months, I can't really overemphasize what an important metric that is. Just to give you kind of a sense, Tyvaso was approved 10 years ago. So it took like 10 years to get up to a certain level of patient penetration for this drug and then in under 2 years, it doubles. I mean that's -- it's an unmistakable sign in addition to the steps that Mike shared with you that this product is going to penetrate very, very rapidly.

Now while one might think that in an area such as PH Group III, which has been penetrated by no pulmonary hypertension medicines like, oh, these are all just like people dying of thirst and just going to just slap up this new medicine right away, the reality in a disease like pulmonary hypertension is that it just doesn't happen like that. Instead, it's a very kind of blocking and tackling exercise of physician by physician, center by center working through all of the rigorous of talking to the right payers and getting the payers to understand the right procedures and going through all the procedures and the pre-approval, diagnoses, requirements, the catheterizations and all of these things.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000018

So while we did create like special teams focused on PH Group III before we launched into that indication, in the field of pulmonary hypertension, one year of kind of preparation is sort of like nothing compared to how much activity is needed to build a bulk of patients. So now that 1 year is more than 2 years behind us, we've now had a year of actual practice, okay, you can actually put these patients on medicines.

As Mike referred to, the payer aspects, especially with regard to Medicare, we're just very, very recently resolved favorably in our direction. And so the -- it's just you have to like first have not just 1 year and not just like there wasn't like a waiting bolus of patients in Group III just waiting for a launch, you have to like develop this market and really kind of till the soil for a number of years. We've now done that, and we're experienced in those clinics and it's this reason why we think out of those 30,000 PH Group III patients. Fortunately, none of them have been touched by pulmonary hypertension treatment that we can rapidly grow our numbers of patients at the same rate that we've been growing them for the past year with this doubling of the number of patients on Tyvaso and thereby reach a number of total treprostinil patients, something that would be in the 20,000 that would correlate when you multiply that times the reimbursement per patient to the $4 billion per year.

And of course, it's important. In addition to this, not to be losing revenue from Remodulin or Orenitram. But not only are we not losing revenue, we're solidifying our hold on the Remodulin revenues as Mike referred to the very rapid penetration that the Remunity pump has made and we're growing our revenues in Remodulin -- in Orenitram as a result of the EXPEDITE study that Mike described. So we feel that doubling revenues in 3 years is really a very doable too.

Operator, next question, please?

**Operator**

Our next question comes from Terence Flynn with Morgan Stanley.

**Justin Hovsep Simonian Phillips** - *Morgan Stanley, Research Division - Research Associate*

This is Justin Phillips on for Terence. Just one question for me. I was wondering if you could provide any details today on the Tyvaso trends for January and February.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Sure. Mike, would you like to take that?

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. I'm not going to get into too much detail in terms of previewing the quarter. I mean, I think what I can tell you is and really I have got about a month of data behind us, but I can tell you that the trends in terms of referrals, that's what we call prescriptions for Tyvaso in January are very strong, had like a record level for January.

So -- and at least what I'm seeing through kind of there's a lag on the February data, but February is continuing that. So again, I think we're really pleased, just to echo what Martine said, I think we're really pleased with the uptake of generally and specifically with DPI.

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Mike. That's so nice to hear. Record January referrals after a record year, fantastic. Next question, please.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

LIQ_PH-ILD_00000019

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

**Operator**

Our next question comes from Hartaj Singh with Oppenheimer & Company.

---

**Hartaj Singh** - *Oppenheimer & Co. Inc., Research Division - Research Analyst*

Just a quick question on a slightly different topic with your plan to potentially double revenues by 2025, you still got the Tyvaso IPF Phase III trial reading out around then which is positive. Martine sense another nice little runway there. Could you maybe just go over -- remind us again if Gil is on the call, the data behind that, your certainty around that project? And then just some basic sizing of the market.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Sure, Dr. Singh, so happy to hear your voice this morning, and thank you for asking a science question. We love those questions best of all. We have on our call, Dr. Leigh Peterson, and she is our Chief Scientist for the program, and she's also running the TETON clinical trials. People often wonder why they are named TETON, and it's because Dr. Peterson is from Wyoming. So it makes perfect sense. And Leigh, if you could provide Hartaj with some of the scientific reasons why we feel very confident that the Phase III trials of Tyvaso in IPF are rightly sized and that the endpoints are rightly chosen.

---

**Leigh Peterson**

Yes, sure. Thank you for the question. As you know from the results of our INCREASE study, we had an exploratory endpoint, which was forced vital capacity. And that was really -- for the PH-ILD population, it was really a safety assessment in the study but it turned out, we actually saw an improvement of that endpoint in patients on Tyvaso and so -- relative to placebo.

And so between the results of this study, increase in PH-ILD patients as well as quite a few -- quite a bit of evidence in the literature of in vitro in nonclinical studies that Tyvaso or treprostinil does have an impact on fibrosis.

It's very reasonable that we would be able to have a positive impact in an IPF population. And so using the statistics and the treatment effect that we saw, an increase in specifically IPF patients, we were able to do sample size calculations in order to predict that we would have a successful study with a sufficient p-value to get approval. And we're actually doing 2 studies, one TETON 1 study in the U.S. and Canada as well as TETON 2, which is outside of U.S. and Canada in order to -- in each of those studies, about 400 patients -- almost 400 patients, and enrollment is going well as expected.

And as Martine -- that we expect to read out in around the 2025 time frame of both of those studies. They both have an FVC endpoint again, same as what we saw, a positive sense in INCREASE. And we have a year-long follow-up period. We've also had some published results of the INCREASE. You might remember that the randomized part of the study an INCREASE was 16 weeks, but we continue to follow patients -- those patients in a long-term open-label extension study. And so we've been collecting long-term FVC data as well, which looks promising and also gives us confidence that the TETON studies will be successful, but to be determined in 2025 time frame.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Well, thank you so much, Leigh. And I just want to and toot your horn just for a moment to the hundreds of people on the call that there was similar skepticism as to whether or not Tyvaso could work in Group III patients and you proved that it could. And I believe your results were published in the New England Journal of Medicine. So congratulations again. Next caller, please.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

LIQ_PH-ILD_00000020

FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call

**Leigh Peterson**

Thank you. Yes, they were.

---

**Operator**

Our next question comes from Ash Verma with UBS.

---

**Ashwani Verma** - *UBS Investment Bank, Research Division - Director of Americas Equity Research & US Specialty Pharma Analyst*

I have one. So for Tyvaso, was there any inventory buildup in 3Q that bind you down mostly in 4Q or do you think inventory is still at an elevated level during 4Q? I think you mentioned that specialty distributors are still rightsizing the orders.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Ash. Thank you for that question. Fortunately, we have our Chief Financial Officer, on the phone, James Edgemond. And James, if you could perhaps help Ash with the inventory question.

---

**James C. Edgemond** - *United Therapeutics Corporation - CFO & Treasurer*

Yes. Thank you, Martine. Thank you for your question. I think there's kind of 2 ways to answer. One is Michael addressed and talked about the Tyvaso and Tyvaso DPI ordering patterns in his prepared remarks. And I think if you look at B as part of the answer, the other products there was no unusual ordering or inventory activity and our specialty pharmaceutical distributors were in line with their contractual requirements on inventory. So hopefully, that provides you insight in terms of your question this morning. So thank you, and back to you, Martine.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, James. Operator, next question please.

---

**Operator**

Our next question comes from Joseph Thome with Cowen and Company.

---

**Joseph John-Charles Thome** - *Cowen and Company, LLC, Research Division - MD & Senior Research Analyst*

We're going to be seeing the full mark of sotatercept Phase III data at ACC in about 11 days. And I was just curious how you see a potential future sotatercept launch impacting the PAH market broadly and maybe how this is reflected in that 2025 revenue run rate guidance that you announced.

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Yes. Thanks for the question. So it's really like super speculative to provide any kind of a meaningful answer to the question because we don't know what the regulatory time frame is going to be for sotatercept. So it's all but impossible to give you any kind of accurate sense.

I will say that our revenue forecast is agnostic with regard to whether or not sotatercept is approved or not. In other words, we will remain confident about achieving the doubling of our revenues by 2025 without regard to its launch. There -- it's a very large and diversely treated patient population. Changes in treatment patterns are relatively slow and cautious especially other than frontline treatments such as like ETRAs or PD5s. So I'd be very,

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

9



LIQ_PH-ILD_00000021

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

very skeptical that you would see an impact of sotatercept on United Therapeutics revenue profile or product uptake across the board, whether it's Remodulin, Tyvaso, Tyvaso DPI or Orenitram.

More broadly, the experience has been that when new agents have been introduced into the market, it has grown the market for all of the existing patients. It's kind of like a market growth thing. You saw this with, for example, back in the day when we launched Remodulin and J&J's precursor Actelion launched bosentan, the treprostinil revenues did not shrink. In fact, they grew and then later on, when PD5s were introduced, the market for ETRAs, and treprostinil did not shrink. In fact, it grew, it grew quite a bit. And this has been just a continuous process, and it harkens back to the landmark number that you should keep in your mind that Michael Benkowitz mentioned in his remarks was 50,000, that's 5-0 thousand. That's the number of patients diagnosed with pulmonary hypertension. And all of these drugs have just like scratched the surface of being able to really treat the patients and get them back to a New York Heart Association Functional Class I or even Functional Class II level.

So there is so much robust room for growth and improvement in pulmonary hypertension. We at United Therapeutics, welcome any new agent that can help the health of the pulmonary hypertension patient population. And by the way, all that is with respect to WHO Group I pulmonary hypertension. So everything I just said, then you've got this other huge pool that Dr. Peterson opened up with her New England Journal article, WHO Group III, 30,000 patients, that's 3-0 thousand, of which the only approved treatment right now is our Tyvaso drug.

And I think sotatercept, I would love to see another good drug to help people with pulmonary hypertension. I don't think it's going to have any effect on our revenue growth.

Next question, operator, and we'll have to cut it after that due to coming to the end of time.

---

**Operator**

Our final question comes from Andreas Argyrides with Wedbush Securities.

---

**Andreas Argyrides** - *Wedbush Securities Inc., Research Division - Analyst*

Congrats on a great year. Just a quick one here on Tyvaso DPI. Are you still seeing more rapid up taking new patients versus transition? And what is the split between new and transition patients?

---

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

A very good question. Mike, can you give us our final answer on the call?

---

**Michael I. Benkowitz** - *United Therapeutics Corporation - President & COO*

Sure. Yes. So it's -- I think it's -- I have to go back to look, I haven't look at it in a couple of weeks, but I think it's still weighted towards new patients in terms of DPI. I mean the transitions are coming. It's just as I think I said on the last call, I think what physicians are doing is they're waiting until patients come in for the regular checkup. So they're kind of coming -- they are coming in at a healthy clip, healthier than what we were seeing and I think that will continue through the course of the year.

And so I fully expect at the end of the year, those patients that want to transition to DPI will transition to DPI. So it's certainly a kind of a point of emphasis for our sales team. And certainly, as I said -- certainly, I think the physicians are aware of it and as those patients come in and they decide that the patient is eligible to transition, they'll move them over.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

10



LIQ_PH-ILD_00000022

**FEBRUARY 22, 2023 / 2:00PM, UTHR.OQ - Q4 2022 United Therapeutics Corp Earnings Call**

**Martine A. Rothblatt** - *United Therapeutics Corporation - Founder, Chairman & CEO*

Thank you, Mike. Well, to wrap up the call, we are tremendously excited about 2022. This is the year that we hit our $2 billion revenue run rate that has been our goal for really much of the past several years. And we are even more jazzed and more pumped by the fact that the $2 billion level, makes it very clear to us that $4 billion is achievable with all of the products that we are currently marketing and explaining to physicians, the scientific and medical benefits of.

And then beyond that, as Hartaj indicated in his question, we have a whole another slew of type -- of products coming out of our Phase III pipeline, particularly a whole new disease indication, pulmonary fibrosis and then on top of that, a best-in-class treatment for pulmonary hypertension, which would be Ralinepag. So 2022 was amazing, a huge kudos to everybody on the team for achieving it. 2023 is looking even better. And with that, operator, you can close out the call.

**Operator**

Thank you for participating in today's United Therapeutics Corporation Earnings Webcast. A rebroadcast of this webcast will be available for one week by visiting the Events and Presentations section of the United Therapeutics Investor Relations website at ir.unither.com. Have a good day.

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2023, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



LIQ_PH-ILD_00000023

# EXHIBIT 3

| **From:** | Sukduang, Sanya |
|---|---|
| **Sent:** | Monday, February 26, 2024 6:05 PM |
| **To:** | Jackson, William C; Flynn, Michael J. |
| **Cc:** | Davies, Jonathan; kkeller@shawkeller.com; Nate Hoeschen; Dcarsten@mwe.com; Cheng, Katherine; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis; Romeo, Eric; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 |
| **Subject:** | RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion |

William,

We agree a TRO is a waste of time, resources and not well supported. This is an issue completely of UTC's own making. UTC knew from the date of FDA approval of PH-ILD that its regulatory exclusivity would expire at the end of March 2024. UTC filed suit in September 2023 asserting the 793 patent based on Liquidia's addition of PH-ILD and knew Liquidia intended to launch upon FDA approval. Yet, UTC did not file a PI at that time. UTC amended its complaint on November 30, 2023 to add the '327 patent, knowing Liquidia would launch and knowing the date of expiry of regulatory exclusivity—no PI was filed. On December 6, 2023, upon a direct request from you, Liquidia expressly and unequivocally informed UTC that it will launch upon final FDA approval. UTC did not file a PI then. Thus, the immediacy and harm UTC alleges is a fallacy and nonetheless, caused by UTC. These facts are not in dispute.

Liquidia will not agree to delay launching until resolution of UTC's PI motion.

Thanks
Sanya

---

**From:** Jackson, William C <WJackson@goodwinlaw.com>
**Sent:** Monday, February 26, 2024 5:02 PM
**To:** Sukduang, Sanya <ssukduang@cooley.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

**[External]**

---

Sanya:

It has occurred to us that the briefing schedule that you requested means that UTC's regulatory exclusivity on ILD will expire before the briefing on the PI is complete. It is possible that the FDA may act in the interim. Will Liquidia agree not to launch before Judge Andrews rules on the preliminary injunction motion? If not, we will be forced to file a request for a temporary restraining order, which we think is a waste of time and resources.

Let us know.

**William C Jackson**



Goodwin Procter LLP

LIQ_PH-ILD_00000024

1900 N Street, NW
Washington, DC 20036
o  +1 202 346 4216
m +1 202 270 6622
f   +1 202 478 0819
WJackson@goodwinlaw.com



---

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Monday, February 26, 2024 9:11 AM
**To:** Jackson, William C <WJackson@goodwinlaw.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

***EXTERNAL***
William,

We disagree with many of UTC's positions below, but the facts concerning UTC's prior notice of Liquidia's intent to launch have been confirmed in your email below.  We see no need for a further meet and confer.

Thanks
Sanya

---

**From:** Jackson, William C <WJackson@goodwinlaw.com>
**Sent:** Saturday, February 24, 2024 3:54 PM
**To:** Sukduang, Sanya <ssukduang@cooley.com>; Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

**[External]**

---

Sanya:

As I am sure you expected, there are a number of statements and characterizations in your email below with which we disagree.  For example:

1. **Question 1**:  Liquidia currently is enjoined from launching based on the judgment from the prior D. Del. case.  But Liquidia has a pending Rule 60 motion for relief from that judgment.  The Court could rule on that motion at any time.  Should that motion be granted, there would be no impediment to Liquidia launching its LIQ861 product.  Should the Court grant the motion and Liquidia launch its product for ILD, UTC would be irreparably harmed.  **UTC proposed that, in order to avoid having to brief a preliminary injunction now, the parties agree that, if the Court were to grant the pending Rule 60 motion in the prior case, UTC would have 5 days to file a preliminary injunction motion and Liquidia would not launch its product for the ILD indication**

2

LIQ_PH-ILD_00000025

**during the pendency of those preliminary injunction proceedings.**  Such an agreement would obviate the need for a preliminary injunction motion now (and potentially at all).  Liquidia has now rejected that proposal.

2. **Question 2**:  The APA action against the FDA asserts that the FDA violated its own "Bundling Rule" and allowed Liquidia to seek to add the ILD indication as an amendment rather than a separate NDA.  Those proceedings, alleging a violation of the Administrative Procedures Act, are entirely distinct from these proceedings in which UTC alleges that Liquidia is infringing its '327 patent.  Nor is Liquidia even a party to those proceedings.

3. **Questions 3-4**:  The parties did meet and confer in December about entirely different issues in this case.  During that conversation, the possibility of a preliminary injunction was referenced.  But I believe the focus of the meet and confer in December was the schedule for Liquidia answering or otherwise responding to the Amended Complaint that UTC had filed.

4. **Question 5**:  As I indicated, in the NC case UTC has consistently sought to accommodate both parties' reasonable scheduling requests.  By contrast, after providing an expert report in the NC case, Liquidia stated that its expert was available for deposition on a single day in the entire expert discovery period, including weekends, and refused to agree to extend the expert discovery period to accommodate the schedules of those involved.  It was for that reason that we were forced to seek the NC court's assistance.  We are corresponding with you and NC counsel with respect to the proposal to adjust the NC expert deposition calendar.

5. **Questions 6-8**:  We agree with your summaries below and look forward to hearing from you with respect to the deposition dates for Dr. Nathan and Mr. Selck.

We are available should Liquidia believe that further meet and confer efforts would be productive.  Thanks.

**William C Jackson**



Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
o  +1 202 346 4216
m  +1 202 270 6622
f   +1 202 478 0819
WJackson@goodwinlaw.com



---

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Friday, February 23, 2024 4:47 PM
**To:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; Jackson, William C <WJackson@goodwinlaw.com>; Dcarsten@mwe.com; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Adykhuis@mwe.com; aburrowbridge@mwe.com; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

***EXTERNAL***
Counsel,

I write to summarize the parties' meet and confer concerning UTC's anticipated PI motion, which was attended by Sanya Sukduang, Karen Keller, and Lauren Strosnick for Liquidia and William Jackson, Doug Carsten, and Michael Flynn for UTC.

The parties addressed the questions presented below.

3

LIQ_PH-ILD_00000026

Question 1, UTC recognized that it was seeking an injunction despite already having an injunction preventing the launch of Yutrepia.  UTC offered to hold-back its proposed PI until after the Court decides Liquidia's Rule 60 Motion if Liquidia agreed to (a) grant UTC 5 days to decide to file a PI; and (b) if filed, not launch until the PI was resolved.  **We presented this offer to Liquidia, but Liquidia cannot agree to this proposal**.

Question 2, UTC asserted that the APA action against the FDA seeks different relief than the proposed PI.  Liquidia disagreed, indicating that the PI seeks to enjoin Liquidia from launching in PH-ILD and UTC's FDA action seeks to compel the FDA to revoke any approval of Yutrepia for PH-ILD and force Liquidia to refile.  In short, both seek to enjoin Liquidia from launching Yutrepia in PH-ILD.

Questions 3-4, UTC asserted that it became aware of "recent" press release regarding Liquidia's anticipated launch and this "recent" notice was required to file a PI.  UTC acknowledged, however, that the parties did conduct a meet and confer prior to December 25, 2023 (the exact date was December 6, 2023), where Liquidia provided notice, as expressly requested by UTC's counsel Mr. Jackson, that it would launch Yutrepia immediately upon FDA approval.  UTC's counsel also agreed that during the December 6, 2023 meet and confer, Mr. Flynn suggested the parties contact the Court to address a PI briefing schedule.

Question 5, Liquidia asked if UTC would be amenable to postpone the UTC witness expert depositions in the NC trade secret case, to which UTC said it was.  **Liquidia will submit a proposal to NC counsel shortly**.

Question 6, UTC indicated it intends to file its PI motion on Monday or Tuesday of next week.

Question 7, UTC has identified 2 experts (Dr. Nelson and Mr. Selck).  Dr. Nelson is available for deposition on March 10 and Mr. Selck sometime thereafter.  Liquidia is looking to see if those dates work.

Question 8, Liquidia requests an extension, until **April 5, 2024** to file its opposition, which UTC indicated it would consent to.  UTC's requested two-weeks after Liquidia files its opposition to file its reply, to which Liquidia consents.

Thanks
Sanya

---

**From:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Sent:** Thursday, February 22, 2024 12:50 PM
**To:** Sukduang, Sanya <ssukduang@cooley.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; jkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; William Jackson (Goodwin) <wjackson@goodwinlaw.com>; Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com) <dcarsten@mwe.com>; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com) <adykhuis@mwe.com>; Burrowbridge, Adam W. (MWE) <aburrowbridge@mwe.com>; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

**[External]**

---

Sanya,

We are available at 12:00 ET on Friday for a call and look forward to discussing your questions below.

   Click to join meeting: https://meet.loopup.com/45xeX0IXC8

   **Or dial in:**

LIQ_PH-ILD_00000027

US Toll Free: 1 877 304 9269
Passcode: **3023519661#**

Mobile Quick Join: tel://+18773049269,,3023519661#

---

**MICHAEL J. FLYNN**
Partner | Morris, Nichols, Arsht & Tunnell LLP
(302) 351-9661 Direct
**mflynn@morrisnichols.com**

---

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Wednesday, February 21, 2024 9:51 PM
**To:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; William Jackson (Goodwin) <wjackson@goodwinlaw.com>; Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com) <dcarsten@mwe.com>; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com) <adykhuis@mwe.com>; Burrowbridge, Adam W. (MWE) <aburrowbridge@mwe.com>; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** [EXT] Re: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

Michael

We aren't available tomorrow, but can be Friday except between 3:00-4:00 pm, contingent upon UTC's ability to respond to the issues below .

During the call, we expect UTC to specifically address the following, and failure to do so will be raised with the Court:

1. Why UTC believes a PI is needed in this action given UTC's position, articulated as recently as yesterday, that the Court's 793 injunction cannot be lifted until the 793 claims are cancelled by the Director;

2. Why a PI is needed given UTC's complaint against the FDA that Yutrepia should not be launched;

3. UTC's delay, until February 21, 2024, to address a PI given the parties' specific discussion with you and William Jackson of a PI request prior to December 25, 2023 and Liquidia's request to address any potential PI briefing such that UTC does not force Judge Andrews to act expeditiously;

4. Why, despite filing a complaint 3 months ago concerning the '327 patent, UTC has waited to file a PI;

5. Why a PI is warranted given UTC's request for a 30 day extension of time to answer Liquidia's counterclaims based on proceedings in an unrelated litigation in NC and why Liquidia is also not entitled to rely on the schedule in NC to support a non-conflicting schedule;

6. The specific date UTC intends to file its PI motion and any declarations it may file in support;

7. The dates any UTC declarant is available for a deposition; and

8. The briefing schedule UTC proposes.

This above list is non-limiting and Liquidia may raise additional issues based on UTC's responses.

5

LIQ_PH-ILD_00000028

If UTC is prepared to fully address each issue above, Liquidia can be available on Friday except between 3:00-4:00 PM EST.

Thanks
Sanya

On Feb 21, 2024, at 6:07 PM, Flynn, Michael J. <mflynn@morrisnichols.com> wrote:

[External]

Counsel,

UTC intends to file a Motion for Preliminary Injunction to enjoin the launch of Yutrepia for treatment of pulmonary hypertension associated with interstitial lung disease upon the expiration of UTC's regulatory exclusivity on April 1, 2024, pending resolution of UTC's infringement claims for U.S. Patent No. 11,826,327 asserted in this action. We would like to discuss with you the timing of that motion and a briefing schedule.

Can you please let us know your availability **tomorrow**, **February 22,** for a call to discuss? We are available any time except 12-1 ET.

Thanks,
Michael

_____

**MICHAEL J. FLYNN**
Partner | Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 351-9661 Direct
**mflynn@morrisnichols.com | vcard | bio | www.morrisnichols.com**

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

LIQ_PH-ILD_00000029

If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

*********************************************************************

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

*********************************************************************

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

LIQ_PH-ILD_00000030

# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED THERAPEUTICS
CORPORATION,

       Plaintiff,

                            Case No. 23-975

   v.

LIQUIDIA TECHNOLOGIES, INC.,

       Defendant.

_____

HIGHLY CONFIDENTIAL

ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF

FREDERIC SELCK, Ph.D.

Washington, D.C.
March 15, 2014

Reported by:
Misty Klapper, RMR, CRR, CSR
Job No.: 1111116



Page 2

```
 1
 2
 3                Friday, March 15, 2024
 4                   9:11 a.m. EDT
 5
 6   Held at the offices of:
 7       GOODWIN PROCTER LLP
         1900 N Street, N.W.
 8       Washington, D.C. 20036
         (202) 346-4000
 9
10
11
12
13
14
15
16
17       Taken pursuant to notice, before Misty
18   Klapper, Registered Professional Reporter,
19   Certified Realtime Reporter, Certified Shorthand
20   Reporter and Notary Public in and for the District
21   of Columbia.
22
```

Page 3

```
 1   APPEARANCES:
 2   ON BEHALF OF PLAINTIFFS:
 3       KATHERINE CHENG, ESQUIRE
         GOODWIN PROCTER LLP
 4       1900 N Street, N.W.
         Washington, D.C. 20036
 5       (202) 346-4000
         E-mail: katherinecheng@goodwinlaw.com
 6
 7            AND
 8       ADAM W. BURROWBRIDGE, ESQUIRE
         LILLIAN J. SPETRINO, ESQUIRE
 9       McDERMOTT WILL & EMERY LLP
         500 North Capitol Street, N.W.
10       Washington, D.C. 20001-1531
         (202) 756-8000
11       E-mail: aburrowbridge@mwe.com
            lspetrino@mwe.com
12
13   ON BEHALF OF DEFENDANT LIQUIDIA TECHNOLOGIES, INC.:
14       PHILLIP MORTON, ESQUIRE
         SANYA SUKDUANG, ESQUIRE
15       JOHN HABIBI, ESQUIRE
         COOLEY LLP
16       1299 Pennsylvania Avenue, N.W., Suite 700
         Washington, D.C. 20004-2400
17       (202) 842-7800
         E-mail: pmorton@cooley.com
18          ssukduang@cooley.com
            jhabibi@cooley.com
19
20   ALSO PRESENT:
21       NORMAN REYNOLDS, VIDEO OPERATOR
22
```

Page 4

```
 1              C O N T E N T S
 2   WITNESS:      EXAMINATION BY:       PAGE:
 3   Frederic Selck   Mr. Morton         6
 4
 5
 6
 7              E X H I B I T S
 8   NO.:      DESCRIPTION:        PAGE:
 9   Exhibit 1   Preliminary Injunction Declaration
10       of Frederic Selck, Ph.D., dated
11       2/26/24               7
12   Exhibit 2   United Therapeutics Tyvaso
13       Forecast (2023-2035)      81
14
15
16
17
18
19
20
21
22
```

Page 5

```
 1              P R O C E E D I N G S
 2       VIDEO OPERATOR:  We are now on
 3   the record.  This begins the
 4   videotaped deposition of Frederic
 5   Selck, Ph.D., taken in the matter of
 6   United Therapeutic Corporation versus
 7   Liquidia Technologies, in the United
 8   States District Court for the District
 9   of Delaware, Case Number 23975.
10       Today's date is March 15th
11   2024.  The time is 9:11.  This
12   deposition is being held at
13   1900 N Street, Northwest, Washington,
14   D.C.
15       The court reporter is Misty
16   Klapper on behalf of Magna Legal
17   Services.  The videographer is Norman
18   Reynolds on behalf of Magna Legal
19   Services.  All counsel will be noted
20   on the stenographic record.
21       Will the court reporter please
22   swear in the witness.
```



2  (Pages 2 to 5)

Page 6

1       MS. REPORTER:  One moment.
2       FREDERIC SELCK, Ph.D.,
3       The witness herein, called for
4  examination by counsel for the Defendant ,
5  having been duly sworn, was examined and
6  testified as follows:
7    EXAMINATION BY COUNSEL FOR DEFENDANT
8       BY MR. MORTON:
9     Q.    All right.  Good morning.
10    A.    Good morning.
11    Q.    Please state your name for the
12  record.
13    A.    Fred Selck.
14    Q.    And where do you reside,
15  Dr. Selck?
16    A.    My home address is
17  ██████████████████████████,
18  ████████████████.
19    Q.    All right.  And I -- I take it
20  you've been deposed before?
21    A.    Yes.
22    Q.    So you understand that you're

Page 7

1  under oath and you have an obligation to
2  answer my questions as truthfully and
3  completely as possible?
4    A.    Yes.
5    Q.    If you don't understand any of my
6  questions today, please ask me to clarify.
7  Can we do that?
8    A.    Yes.
9    Q.    All right.  Is there any reason
10  you can't give your best and complete
11  testimony today?
12    A.    No.
13    Q.    All right.  We've premarked
14  Exhibit 1, which is a copy of your
15  preliminary injunction declaration.
16       (Thereupon, Selck Exhibit 1 was
17       marked for identification.)
18       MR. MORTON:  I'll hand you a
19  copy.
20       MS. CHENG:  Thank you.
21       BY MR. MORTON:
22    Q.    Could you please confirm this is

Page 8

1  the declaration that you submitted in this
2  case.
3    A.    Yes, it is.
4    Q.    How many times have you had your
5  deposition taken before?
6    A.    This is my tenth time.
7    Q.    Okay.  And is -- if you turn to
8  Attachment A-1 of your Exhibit 1., that's a
9  copy of your CV, right?
10    A.    Yes, it is.
11    Q.    All right.  And if you turn to
12  the second page of that Attachment A-1,
13  there's a list of testimony there.
14       Is that a complete list of the
15  cases in which you've provided testimony?
16    A.    Yes.
17    Q.    And how many of those cases were
18  patent infringement cases?
19    A.    None of these were -- were patent
20  infringement cases.
21    Q.    Have you ever given expert
22  testimony on damages in a patent infringement

Page 9

1  case?
2    A.    Submitted an expert report
3  rebutting a damages claim by Sanofi/Regeneron
4  related to an injunction in Germany.  And
5  that report was submitted to the Munich court
6  in -- in Germany.
7    Q.    Okay.  So you've never quantified
8  damages in a U.S. patent infringement case?
9    A.    I've -- I've quantified damages.
10  As -- as far as offering expert testimony or
11  testifying in court to those damages, I -- I
12  have not done that.
13    Q.    All right.  Turn back to the
14  first page of Attachment A-1.  This reflects
15  your -- our education and -- and prior work
16  experience; is that correct?
17    A.    That's correct.
18    Q.    And looks like you've got several
19  degrees in economics; is that right?
20    A.    Yes.
21    Q.    And you do not have a medical
22  degree?

**MAGNA** ❯
LEGAL SERVICES

3  (Pages 6 to 9)

Page 10

1    A.    No, I do not.
2    Q.    Do you have any type of life
3  sciences degree?
4    A.    I'm a -- my field as -- as -- as
5  a Ph.D. economist was in health and -- and
6  a -- and a subset of health is -- is life
7  sciences.
8    Q.    Okay.  But you're not holding
9  yourself out here as a -- a medical expert,
10 right?
11   A.    No.
12   Q.    Or a scientific expert?
13   A.    I do have graduate training in
14 epidemiology and -- and biostatistics.  So
15 from that perspective, in -- in terms of
16 quantification of -- or comparisons of things
17 like clinical trial data and -- and things of
18 that sort, I feel like I'm qualified to do.
19 But I'm not a -- I'm not somebody that you
20 would come and see and -- and get health care
21 for.
22   Q.    Fair enough.

Page 11

1          Have you ever been involved in
2  the treatment of pulmonary hypertension?
3    A.    No.
4    Q.    Or -- or pulmonary arterial
5  hypertension?
6    A.    No.
7    Q.    Or pulmonary hypertension-
8  interstitial lung disease?
9    A.    No.
10   Q.    Is this the first time you've
11 worked on a matter on behalf of United
12 Therapeutics?
13   A.    Yes.
14   Q.    Is this the first time you've
15 worked on a matter involving any form of
16 pulmonary hypertension?
17   A.    Yes.
18   Q.    And you're relying on Dr. Nathan
19 for your understanding of the infringement
20 and issues in this case?
21         MS. CHENG:  Object to form.
22         THE WITNESS:  With respect to

Page 12

1  infringement, but in addition to that,
2  I'm relying on Dr. Nathan for his
3  descriptions on how prescribers or
4  providers would view Yutrepia and --
5  and -- and Tyvaso.
6          BY MR. MORTON:
7    Q.    Do you rely on Dr. Nathan for
8  anything else?
9    A.    No.
10   Q.    When were you retained in this
11 case?
12   A.    Can't recall the -- the exact
13 date, but the retention occurred in -- in
14 middle of -- mid of -- middle of December.
15   Q.    Middle of December of 2023?
16   A.    '23.
17   Q.    And when did you start work on
18 your declaration in this case?
19   A.    Immediately after -- after my
20 retention.
21   Q.    So you started work on your --
22 your declaration in December of 2023?

Page 13

1    A.    That's correct.
2    Q.    And how much time did you spend
3  preparing your declaration?
4    A.    Do you mean in -- in terms of
5  hours?
6    Q.    Um-hmm.
7    A.    I can't say for sure, given
8  the -- I haven't looked specifically at --
9  at -- at the bills yet, but anywhere between
10 150 to -- to 200 hours.
11   Q.    And you -- you -- you said you
12 started work on this declaration in December.
13         Were there -- were you working on
14 it consistently from December to February,
15 when it was served?
16   A.    Yes.  And I should add in -- in
17 conjunction with staff members who -- who
18 reported to me in -- in -- in preparing
19 this -- this declaration.
20   Q.    Okay.  Who are those staff
21 members that reported to you?
22   A.    Ryan Marsh.  He's a Ph.D. at --

4  (Pages 10 to 13)

Page 14

1  at my firm, Intensity.
2  Q.    Um-hmm.  Anyone else?
3  A.    Anu Subramaniam, who's also a
4  Ph.D.
5  Q.    I -- I didn't catch that.  Arun
6  Subramaniam?
7  A.    Anu.
8  Q.    Anu?
9  A.    Yes.
10  Q.    Any Subramaniam.  Okay.  Thank
11  you.
12     Anyone else?
13  A.    And Kristyn Berretta.  There were
14  other staff members on that team as well,
15  Ryan Sherrard, but Anu, Ryan Marsh and -- and
16  Kristyn were the -- the principals on the
17  team.
18  Q.    How much time did your team spend
19  on the declaration?
20  A.    I haven't looked at the total
21  number of hours that -- that -- that --
22  billed to the case, so I -- I -- can't tell

Page 15

1  you for sure.
2  Q.    Okay.  And I assume you're being
3  compensated for your work on this declaration
4  here?
5  A.    Yes.
6  Q.    Okay.  And what -- what is your
7  hourly rate that you're being compensated at?
8  A.    Looking --
9  Q.    Not sure I saw it in there.
10  That's why I'm asking.
11  A.    I believe --
12  Q.    Maybe I overlooked it.
13  A.    No, I -- I don't think it's in
14  there.  It's $1,050 an hour.
15  Q.    Who drafted your declaration?
16  A.    I drafted my declaration.
17  Q.    You drafted every word in your
18  declaration?
19  A.    I had assistance from -- from my
20  team, but I reviewed everything that was --
21  that was put into the declaration and I'm
22  responsible for everything that's in my

Page 16

1  declaration.
2  Q.    And which portions of the
3  declaration did you write?
4  A.    I wrote the entire declaration.
5  Q.    You wrote every word in the
6  declaration?
7  A.    I've had team members provide
8  material to me as part of research tasks that
9  I've given them.  But as -- as it's put into
10  the declaration, I review it and put it into
11  my own words.  So I -- I -- from my
12  perspective, I've -- I've written my
13  declaration.
14  Q.    Are there any sections of the
15  declaration you did not write?
16  A.    No.
17  Q.    So just so I'm clear, you wrote
18  every word in this declaration?  That's your
19  testimony here?
20  MS. CHENG:  Object to form.
21  THE WITNESS:  I've reviewed
22  material that was provided to me by my

Page 17

1  team and, as it was put into the
2  declaration, reviewed and refined
3  every word that's -- that's in this
4  declaration.
5  BY MR. MORTON:
6  Q.    Are there any errors that you
7  want to correct at this time in your
8  declaration?
9  A.    I think in the headers where I
10  describe PCSK9 inhibitors, we may have
11  transposed or I may have transposed the S and
12  the C and -- and so I'd like to -- yes.
13     So if you look at paragraph 82,
14  where -- where we have -- where I have PSCK9
15  inhibitors, that should be PCSK9 inhibitors.
16  Q.    Fair enough.  All right.
17     Looks like it may not only be in
18  the header, but there's a few other places
19  that have that typo.
20  A.    I -- I apologize ahead of time.
21  Q.    Any other errors that you want to
22  correct in your declaration?

**MAGNA** ▶
**LEGAL SERVICES**

5  (Pages 14 to 17)

Page 18

1      A.     Not that I'm aware of.
2      Q.     I see that you spoke to several
3  people in support of your declaration; is
4  that correct?
5      A.     Yes.
6      Q.     You spoke to Dr. Steven Nathan,
7  correct?
8      A.     Yes.
9      Q.     And when did you speak to
10 Dr. Nathan?
11     A.     On February 9th 2024.
12     Q.     Is that the only time you spoke
13 to Dr. Nathan?
14     A.     Yes.
15     Q.     How long was your conversation
16 with Dr. Nathan?
17     A.     We had scheduled an hour.  I
18 don't think we took the -- the whole hour,
19 but -- but up to an hour.
20     Q.     You spoke to Dr. Nathan for less
21 than an hour, right?
22     A.     Up to an hour.

Page 19

1      Q.     Was it closer to 30 minutes?
2      A.     No, I -- I -- I think it was
3  closer to an hour or up to an hour.
4      Q.     All right.  And was that a phone
5  conversation or a videoconference?
6      A.     Videoconference.
7      Q.     Who else was present for that
8  conversation?
9      A.     I know United's counsel was --
10 was on that call.  I don't know if I can
11 recall everybody that was there.  I know
12 Katie Cheng was -- was there.  The three
13 individuals that I described on my team, Ryan
14 Marsh, Anu Subramaniam and -- and Kristyn
15 Berretta, were -- were also there.
16     Q.     Anyone else you recall that was
17 present for the conversation with Dr. Nathan?
18     A.     I -- I don't want to misremember
19 who was there on -- on United's counsel.
20 The -- the -- the only one I know for sure
21 was -- was Katie.
22     Q.     You think there may have been

Page 20

1  other counsel there?
2      A.     Yes.
3      Q.     Was there any in-house counsel
4  from United Therapeutics there?
5      A.     Not that I recall.
6      Q.     Is there any written record of
7  the conversation you had with Dr. Nathan?
8      A.     I didn't take any notes.
9      Q.     Did anybody take notes for you?
10     A.     I'm not aware if anybody took
11 notes for me.
12     Q.     Did anybody provide you notes
13 after the conversation with Dr. Nathan?
14     A.     No.
15     Q.     Did you have a copy of
16 Dr. Nathan's declaration when you had the
17 conversation --
18     A.     No.
19     Q.     -- with him?
20         Did you ever have a copy of
21 Dr. Nathan's declaration?
22     A.     The only time I saw Dr. Nathan's

Page 21

1  declaration was after it was submitted.
2      Q.     Okay.  So before your declaration
3  was submitted, you did not review
4  Dr. Nathan's declaration; is that correct?
5      A.     That is correct.
6      Q.     And what did you discuss with
7  Dr. Nathan during this conversation?
8      A.     I was primarily interested in --
9  in getting background on treprostinil and
10 more detail on pulmonary hypertension, as
11 well as pulmonary arterial hypertension
12 and -- and pulmonary hypertension-
13 interstitial lung disease or -- I often refer
14 to it as PH-ILD in my report.
15         There are also -- and -- and I
16 might use this interchangeably as -- as we --
17 as we talk, but they're also referred to
18 as -- as Group 1 or -- or Group 3 under the
19 WHO classifications.
20         So I -- I -- we -- we talked a
21 bit about that.  And then we had a
22 conversation as to whether he thought

**MAGNA**
**LEGAL SERVICES**

6 (Pages 18 to 21)

Page 22

1    providers and prescribers would -- would view
2    Yutrepia and -- and Tyvaso DPI as
3    interchangeable.
4         Q.    Did you discuss anything else
5    with Dr. Nathan?
6         A.    I think that summarizes the
7    entirety of our conversation.
8         Q.    Okay.  Just so the record's
9    clear, you -- you referred to Group 1.
10        That refers to pulmonary arterial
11   hypertension, or PAH, right?
12        A.    That's correct.
13        Q.    Okay.  And then Group 3, that
14   refers to pulmonary hypertension-interstitial
15   lung disease, or PH-ILD?
16        A.    That's correct.
17        Q.    Okay.  And we'll use -- probably
18   end up using those terms interchangeably
19   today, so -- but you understand that
20   terminology?
21        A.    Group 3 rolls -- rolls off the
22   tongue a -- a little bit better.

Page 23

1         Q.    It does.  I -- I -- I will agree
2    with you on that.
3         And you also prepared a
4    declaration in a matter involving the FDA; is
5    that correct?
6         A.    That's right.
7         Q.    And -- and when did you start
8    your work on that declaration?
9         A.    The scope of charge for the FDA
10   matter was exactly what the scope of charge
11   was in -- in this declaration.  And so the
12   identification and -- and description of the
13   harms, that work started in mid-December.
14        Q.    Okay.  When you say the scope of
15   charge is the same, what do you mean by that?
16        A.    My assignment.
17        Q.    And -- and what do you view your
18   assignment as here?
19        A.    From a high level is to describe
20   the -- the economic harms that United
21   would -- would suffer as a result of
22   Yutrepia's entry in the PH-ILD market.

Page 24

1         Q.    Is your declaration in the FDA
2    matter the same as the declaration that you
3    submitted in this matter?
4         A.    There are modest differences
5    between -- or modest changes between my -- my
6    FDA declaration and -- and this one, in part
7    because the -- what's being asserted as the
8    mechanism for -- that the assertions with --
9    in -- in the FDA matter are different than
10   they are in -- in this -- in this matter.
11        Q.    I'll -- we'll unpack that a
12   little bit.
13        So what you -- what are the
14   changes that you made to this declaration for
15   submission for the FDA declaration?
16        A.    In this -- in this particular --
17   in this matter we're describing the harms
18   that would -- that would result, absent a --
19   a -- a preliminary injunction as -- as the
20   infringement allegations are -- are
21   litigated.
22        In the FDA matter the allegations

Page 25

1    are that the FDA improperly moved forward on
2    the application for -- for PH-ILD or for
3    Liquidia and, as a result, did not give
4    United the opportunity to -- to assert a
5    30-month stay.
6         Q.    Okay.  But my question was about
7    what are the changes that you made to the
8    declaration.  You told me what the difference
9    was between the -- the cases.
10        What are the changes you made to
11   the declaration for submission to the -- in
12   the FDA matter?
13        A.    In terms of -- in terms of the
14   substance, the descriptions of -- of the
15   matter itself are specific to -- to the two
16   matters.  And -- and those -- those were
17   changes.
18        To the degree that the context
19   of -- of the matters were different, you
20   know, I -- I think that resulted in some
21   modest changes between the -- the two
22   declarations.

**MAGNA** ◗
**LEGAL SERVICES**

7 (Pages 22 to 25)

Page 26

```
 1          But, for the most part, in terms
 2   of substance, the -- the declarations are the
 3   same.
 4      Q.    So if we go through the table of
 5   contents in your declaration here -- because
 6   I don't have a copy of the FDA declaration,
 7   so I don't know what you said in there --
 8   what -- what are the difference -- or what
 9   sections are the same in the FDA matter as in
10   this matter?
11          MS. CHENG:  And, Counsel, you
12      don't have the a copy of the FDA
13      declaration that we could compare?
14          MR. MORTON:  No, I don't.  It
15      wasn't provided to us.
16          THE WITNESS:  No, I would --
17      I'd -- I'd -- I'd -- I'd hesitate
18      to -- to offer an exact comparison
19      without having the -- the FDA
20      declaration in front of me.
21          BY MR. MORTON:
22      Q.    All right.  You also spoke with
```

Page 27

```
 1   David Barton in preparation for your
 2   declaration here; is that right?
 3      A.    That's correct.
 4      Q.    And David Barton, I understand,
 5   is United Therapeutic's Associate VP of
 6   managed markets and reimbursements; is that
 7   right?
 8      A.    I don't have his exact title in
 9   front of me, but, yes, I spoke with -- with
10   David Barton and I -- I do understand that he
11   is the lead in -- in discussions with -- with
12   payors and -- and PBMs on behalf of United.
13      Q.    And I understand you spoke with
14   Dr. Barton on February 14th; is that right?
15      A.    That's -- that's correct, but
16   I -- I'm not sure if he's Dr. Barton.  I
17   think it's --
18      Q.    Fair enough.  Mr. Barton.
19          And how long did you speak with
20   Mr. Barton?
21      A.    We had a -- we had an hour
22   scheduled.  I think we took a little bit less
```

Page 28

```
 1   than an hour.
 2      Q.    Was that also a videoconference?
 3      A.    Yes.
 4      Q.    And who else was present for the
 5   conversation with Mr. Barton?
 6      A.    The same folks from my team, Ryan
 7   Marsh, Anu Subramaniam and -- and Kristyn
 8   Berretta.  And United counsel was there as
 9   well.
10      Q.    The outside counsel that are in
11   this room?
12      A.    I know Katie Cheng was there.  I
13   don't recall the -- the other folks that were
14   there, in part because when you're doing the
15   videoconferencing and if there's more than --
16   than three or four people, you can't see all
17   the names of the -- of the attendees.
18      Q.    Is there any written record of
19   the conversation with Mr. Barton?
20      A.    No.
21      Q.    Did anybody take notes of the
22   conversation with Mr. Barton, to your
```

Page 29

```
 1   knowledge?
 2      A.    I didn't take notes.  I'm not
 3   aware if anybody else took notes.
 4      Q.    And nobody provided you any notes
 5   after the fact, after the conversation with
 6   Dr. Barton?
 7      A.    No.
 8      Q.    Was Dr. Barton under oath during
 9   your conversation?
10      A.    Mr. Barton I don't think was --
11   was -- was under -- was under any kind of
12   oath.
13      Q.    He was not under any kind of
14   oath?
15      A.    That -- that's my understanding.
16      Q.    Did you receive any documentation
17   in advance about what Mr. Barton would say in
18   the conversation?
19      A.    No.
20      Q.    What did you discuss with
21   Mr. Barton during the February 14
22   conversation?
```

**MAGNA** ❯
LEGAL SERVICES

HIGHLY CONFIDENTIAL

DA0042

LIQ_PH-ILD_00000604

Page 30

```
 1      A.   I was interested primarily in his
 2   background, United's positioning with respect
 3
 4
 5
 6
 7
 8
 9      Q.
10
11      A.
12      Q.   What else did you discuss with
13   Mr. Barton?
14      A.   Believe that was the extent of
15   our conversation.  And to -- just -- just to
16   clarify, both
17
18
19      Q.   And what did Mr. Barton say about
20                                              ?
21      A.   So I'll have to paraphrase, but
22
```

Page 31

```
 1
 2
 3
 4
 5
 6
 7
 8      Q.
 9
10      A.   He specified -- specifically I
11   recall
12                                             t
13
14
15      Q.
16
17      A.
18
19
20                                          acy
21
22
```

Page 32

```
 1      Q.   You -- you reference United's --
 2   that -- strike that.
 3
 4
 5                                           .
 6      What do you mean by that?
 7      A.
 8
 9
10
11
12
13
14      t.
15
16
17                                     ailable
18                              .
19      Q.
20
21
22
```

Page 33

```
 1                                        ?
 2      A.   That is correct, yes.
 3      Q.
 4
 5
 6             ?
 7      MS. CHENG:  Object to form.
 8      THE WITNESS:  I guess I
 9   would --
10
11
12
13
14
15             .
16      BY MR. MORTON:
17      Q.   You understand that United has
18   other treprostinil products that predate
19   Tyvaso, right?
20      A.   Yes.
21      Q.   And those go back to 2004 or
22   earlier, right?
```



9  (Pages 30 to 33)



Page 34

```
 1            MS. CHENG:  Object to form.
 2       THE WITNESS:  I -- I -- I can't
 3  recall exactly what -- what -- what
 4  year it goes back to.
 5            BY MR. MORTON:
 6       Q.   Okay.  You -- you -- you say that
 7  ████████████████████████████████
 8  ████████████████████████████████
 9  ████████████████████████████████?
10       A.   That's correct.
11       Q.  ████████████████████████
12  ████████████████████████████████
13  ██████████?
14       A.  ██████████████████████████
15  ████████████████████████████████
16  ████████████████████████████████
17  ████████████████████████████████
18  ████████████████████████████████
19  ████████████████████████████████
20  ████████████████████████████████
21  ████████████████████████████████
22  ████████████████████████████████
```

Page 35

```
 1  ████████████████████████████████
 2  ████████████████████████████████
 3       Q.  ██████████████████████████
 4  ██████████████████████████?
 5       A.  ██████████████████████████
 6  ████████████████████████████████
 7  ████████████████████████████████
 8  ████████████████████████████████
 9  ████████████████████████████████
10  ████████████████████████████████
11  ████████████████████████████████
12  █████████████.
13       Q.  ██████████████████████████
14  ████████████████████████████████?
15       A.  ██████████████████████████
16  ████████████████████████████████
17  ████████████████████████████████nd
18  ████████████████████████████████or
19  ████████████████████████████████
20  ████████████████████████████████
21       Q.   Okay.  ██████████████████
22  ████████████████████?
```

Page 36

```
 1            MS. CHENG:  Object to form.
 2       THE WITNESS:  ████████████████
 3  ████████████████████████████████
 4  ████████████████████████████████
 5  ████████████████████████████████
 6  ████████████████████████████████
 7  ████████████████████████████████
 8            BY MR. MORTON:
 9       Q.   Did Mr. Barton tell you that
10  ████████████████████?  Yes
11  or no?
12            MS. CHENG:  Object to form.
13       THE WITNESS:  I can't -- I
14  can't recall ███████████████████████
15  ████████████.████████████████████
16  ████████████████████████████████
17  ████████████████████████████████
18  ████████████.
19            BY MR. MORTON:
20       Q.   Did Mr. Barton tell you that any
21  ████████████████████████████████
22  ██████████?
```

Page 37

```
 1       A.   I don't -- I don't recall a -- a
 2  ████████████████████████████████
 3  ████████.
 4       Q.   So --
 5  ████████████████████████████████
 6  ████████████████████████████████;
 7  ████████?
 8            MS. CHENG:  Object to form.
 9       THE WITNESS:  ████████████████--
10  ████████████████████████████████
11  ████████████████████████████████
12  ████████.
13            BY MR. MORTON:
14       Q.  ████████████████████████████d
15  ████████████████████████████████
16  ██████████?
17            MS. CHENG:  Object to form.
18       THE WITNESS:  As I indicated
19  before, ████████████████████████████
20  ████████████████████████████████
21  ████████████████████████████████t
22  ████████████████████████████████
```



LEGAL SERVICES

10  (Pages 34 to 37)



Page 38

1   █████████████.
2       BY MR. MORTON:
3       Q.    Okay.  But you can't tell me here
4   today ████████████████████████████
5   █████████████?
6       MS. CHENG:  Object to form,
7   asked and answered.
8       THE WITNESS:  No, I cannot.
9       BY MR. MORTON:
10      Q.  █████████████████████
11  █████████?
12      MS. CHENG:  Object to form.
13      THE WITNESS: ████████████
14  ████████████████████████████
15  ████████████████████████
16  ███████████████████.
17      BY MR. MORTON:
18      Q.  ████████████████████████
19  ████████████████████████
20  ████████████████████████
21      MS. CHENG:  Object to form.
22      THE WITNESS: ██████████

Page 39

1   ████████████████████████
2   ████.
3       BY MR. MORTON:
4       Q.    Do -- ████████████████
5   █████████████████████████
6   ████?
7       MS. CHENG:  Object to form.
8       THE WITNESS: ████████.
9       BY MR. MORTON:
10      Q.  █████████████████████
11  ███████████████████████
12  ████?
13      MS. CHENG:  Object to form.
14      THE WITNESS: ████████████
15  ████████████████████ --
16  ███████████████████.
17      BY MR. MORTON:
18      Q.  ████████████████████████
19  ████████████████████████
20  ██████████████████?
21      MS. CHENG:  Object to form.
22      THE WITNESS: ██████████

Page 40

1   ████████████████████████
2   ████████████████████████
3   ████████████████████████
4   ████████████.
5       BY MR. MORTON:
6       Q.    When did Mr. Barton have these
7   conversations ████████████████
8   ████████████████████?
9       A. ██████████████████████.
10  ████████████████████████
11  ████████████████████████
12  ████████████████████████
13  ████████████████████████
14  ████████████████.
15      Q. ████████████████████████
16  ████████████████████████
17  ████████████████████████
18  ████?
19      MS. CHENG:  Object to form.
20      THE WITNESS:  These were
21  conversations -- so this was
22  ████████████████████████

Page 41

1   ████████████████████████
2   ████████████████████████
3   ████████████████████████
4   ████████████████████████
5   ████████████████████
6       BY MR. MORTON:
7       Q. ████████████████████████
8   ████████████████████████
9       A. ████████████████████████?
10      A. ████████████████████████
11  ████████████████████████
12  ████████████████████████
13  ████████████████████████
14      Q. █████████████████████.
15  ████████████████████████
16  ████████████████████████?
17      MS. CHENG:  Object to form.
18      THE WITNESS: ██████████████
19  ████████████████████████
20  ████████████████████████
21  ████████████████████████
22



11  (Pages 38 to 41)

Page 42

```
1    ████████████████ .
2         BY MR. MORTON:
3         Q.    Okay.
4    █████████████████████
5    █████████████████████████
6    ████████████████████████ ?
7         A. ████████
8         Q. ████████████████
9    ████████████████████████
10   ██████████ ?
11        That's your testimony here?
12        MS. CHENG:  Object to form.
13        THE WITNESS:
14
15
16
17
18
19
20
21
22
```



Page 43

```
1         BY MR. MORTON:
2         Q.    Did you discuss anything else
3    with Mr. Barton during your February 14
4    conversation beyond what we've already
5    covered here today?
6         A.    Not that I recall.
7         Q.    Have you had any further
8    conversation with Mr. Barton since the
9    February 14 conversation?
10        A.    No.
11        Q.    Did you ask Mr. Barton for any
12   documentation related to ██████████████
13   ████████████████████████████ ?
14        A.    Actually, if we could go back
15   to -- to the earlier question.
16        We did discuss what the
17   current -- with -- with Mr. Barton during
18   that conversation ████████████████████
19   ████████████████████████████████
20   ████████████████████████████████
21   ████████████████████████████
22        I don't know if I -- I -- I can't
```

Page 44

```
1    recall if I mentioned that earlier, but
2    that's -- that's -- that's one of the things
3    that we discussed.
4         Q.    No, we didn't cover that earlier.
5         So what did Mr. Barton say about
6    ████████████████████████████ ?
7         A. ████████
8    ████████████████████████
9    ████████████████████ .
10        Q.    Anything else?
11        A.    Not that I -- I can recall at
12   this point.
13        Q.    All right.  You also spoke with a
14   Mr. Greg Bottorff; is that correct?
15        A.    Bottorff.
16        Q.    Bottorff, I'm -- I apologize.
17        I could be mispronouncing it
18   myself.
19        Q.    You spoke with Mr. Bottorff --
20        A.    Yes.
21        Q.    -- on February 14th?
22        A.    Yes.
```

Page 45

```
1         Q.    And that was a separate
2    conversation than the conversation with
3    Mr. Barton; is that right?
4         A.    That's right.
5         Q.    Right.  Mr. Barton wasn't present
6    for your conversation with Mr. Bottorff?
7         A.    No.
8         Q.    How long did you speak with
9    Mr. Bottorff?
10        A.    We had up to an hour.  I believe
11   we didn't take the full hour.  Anywhere
12   between 30 and 45 minutes.
13        Q.    Was that another videoconference?
14        A.    It was.
15        Q.    And who else was present for your
16   conversation with Mr. Bottorff?
17        A.    The same folks from my team.  And
18   Katie Cheng was there, along with others
19   from -- from United counsel.
20        Q.    There any written record of the
21   conversation with Mr. Bottorff?
22        A.    No.
```



12  (Pages 42 to 45)

Page 46

1   Q.   You didn't take any notes?
2   A.   I did not.
3   Q.   Nobody took any notes for you?
4   A.   Not that I'm aware of.
5   Q.   And Mr. Bottorff was not under
6   oath?
7   A.   Not that I'm aware of.
8   Q.   Did you receive any documentation
9   in advance indicating what Mr. Bottorff might
10  say to you?
11  A.   I didn't receive anything in
12  writing or -- or anything along those lines.
13  I knew, based on his position, the
14  information I was looking for.
15  Q.   And -- and Mr. Bottorff, he's the
16  senior vice president of sales and marketing
17  at UTC; is that right?
18  A.   I can't recall his exact title,
19  but that -- that sounds correct.
20  Q.   I think you have it listed in
21  Attachment A-2.
22  A.   Oh.

Page 47

1   Q.   Might make -- make it a little
2   easier on you, but ...
3   A.   Okay.
4   Q.   But what did you discuss with
5   Mr. Bottorff?
6   A.   I -- we had discussions about
7   United's strategy with -- with respect to
8   marketing the Tyvaso products in PAH and
9   PH-ILD.  We also had discussions about his
10  expectations with respect to Liquidia and
11  Liquidia's sales and -- and marketing efforts
12  once Yutrepia entered the market.
13  Q.   Anything else?
14  A.   That's all I recall.
15  Q.   And -- and what did Mr. Bottorff
16  tell you about the strategy for marketing the
17  Tyvaso products in PAH and PH-ILD?
18  A.   They -- they ██████████████
19  ████████████████████████████████████████
20  ████████████████████████████████████████
21  ████████████████████████████████.
22       He also indicated that the market

Page 48

1   for ████████████████████████████████████
2   ████████████████████████.
3
4        He also discussed and confirmed
5   what -- what -- what I've read as well about
6   United's marketing strategy with respect to
7   ████████████████████████████████████████
8   ████████████████.
9        And then finally, he described
10  what he thought would be -- and what they
11  anticipate to be a robust marketing effort by
12  Liquidia.
13  Q.   Okay.  What -- what did he say
14  about Liquidia's marketing efforts?
15  A.   Just that he expects that they
16  would field a -- a sales and marketing team
17  that would be competitive with -- with
18  United.
19  Q.   What else did he say about
20  Liquidia's marketing efforts?
21  A.   That's -- that's all I recall.
22  Q.   He just -- did he say anything

Page 49

1   more than Liquidia would field a competitive
2   sales and marketing team?
3        MS. CHENG:  Object to form.
4        THE WITNESS:  That's -- that's
5   all I -- that's all I recall.
6        BY MR. MORTON:
7   Q.   Did he give any specifics about
8   why he thought it would be a competitive
9   sales and marketing team?
10  A.   I know that he's seen Liquidia's
11  disclosures or -- or public announcements of
12  efforts that they'll be engaged in to -- to
13  market to physicians.  And I believe there
14  are some former United staff that are going
15  to be part of Liquidia's sales force.  And,
16  given that perspective, I think he felt like
17  they would be a competitive sales force.
18  Q.   So Dr. -- or sorry.
19       So Mr. Bottorff, he discussed
20  Liquidia's disclosures or public
21  announcements about their efforts to market
22  to physicians?



13  (Pages 46 to 49)

Page 50

1  A.   This was a conversation.  So
2  he -- he described how Liquidia indicated
3  that this -- this is what they were going to
4  do.  And they've -- they've said so in, you
5  know, various presentations in -- in
6  materials that -- that they've made public.
7  Q.   No, I'm trying to understand what
8  he told you, okay, not what you might know
9  from other materials you reviewed.  I want --
10  because you're the only record I have of this
11  conversation.
12       So what did he tell you about
13  Liquidia's marketing efforts?
14       MS. CHENG:  Object to form.
15       THE WITNESS:  Again, he's -- he
16  indicated, based on what he's seen,
17  exactly what -- what I said, that --
18  that he expects Liquidia to field a
19  competitive sales and marketing team.
20       BY MR. MORTON:
21  Q.   All right.  Anything else that
22  you discussed with Dr. -- Mr. Bottorff?

Page 51

1  A.   No.
2  Q.   And you also spoke with Mr. Brian
3  Patterson on February 16th; is that right?
4  A.   February 16th, yes.
5  Q.   And Mr. Patterson, he's the
6  manager of corporate accounting at United
7  Therapeutics?
8  A.   That's correct.
9  Q.   And how long did you speak with
10  Mr. Patterson?
11  A.   Half an hour.
12  Q.   And that was another
13  videoconference?
14  A.   That's correct.
15  Q.   And who else was present for the
16  conversation with Mr. Patterson?
17  A.   The same folks from my team, as
18  well as Katie Cheng and others from United
19  counsel.
20  Q.   Anyone else?
21  A.   Not that I'm aware of.
22  Q.   There any written record of the

Page 52

1  conversation with Mr. Patterson?
2  A.   No.
3  Q.   Did you take any notes of the
4  conversation with Mr. Patterson?
5  A.   No.
6  Q.   Did anyone take notes for you?
7  A.   No, at least not that I'm aware
8  of.
9  Q.   Was Mr. Patterson under oath?
10  A.   Not that I'm aware of.
11  Q.   Did you receive any document --
12  documentation in advance indicating what
13  Mr. Patterson might say?
14  A.   No.
15  Q.   And what did you discuss with
16  Mr. Patterson?
17  A.   I asked Mr. Patterson, based on
18  ████████████████████████████████
19  ████████████████████████████████
20  ████████████████████████████ .
21  ████████████████████████████ ,
22  ████████████████████████

Page 53

1  ████████████████████████████
2  ████████████████████████ .
3  Q.   Anything else you discussed with
4  Mr. Patterson?
5  A.   (Nodding in the negative.)
6  Q.   That was it?
7  A.   That was it.
8  Q.   Now, in preparation for your
9  declaration, you didn't speak to any payors
10  directly, correct?
11  A.   That is correct.
12  Q.   You didn't speak to any insurance
13  companies, right?
14  A.   Not -- not specifically to this
15  matter.  And even if I did, payors are quite
16  reluctant to disclose any -- any negotiating
17  posture or anything like that with -- with
18  respect to manufacturers.
19  Q.   You didn't discuss -- or you
20  didn't -- strike that.
21       You didn't speak to any pharmacy
22  benefit managers?



HIGHLY CONFIDENTIAL    DA0048    LIQ_PH-ILD_00000610

Page 54

1    A.    Not for this matter, no.
2    Q.    You didn't speak to anyone from
3  Medicare or Medicaid?
4    A.    No.
5    Q.    You didn't speak to any other
6  providers, other than Dr. Nathan; is that
7  right?
8    A.    That's correct.
9    Q.    And you didn't speak to any
10 patients that have been diagnosed with PAH or
11 PH-ILD?
12   A.    I didn't speak to any patients.
13 I did review some YouTube videos that were
14 available that showed patients taking either
15 the nebulized or -- or -- or the dry powder
16 formulations.
17   Q.    What YouTube videos were those?
18   A.    They were ones that I just
19 Googled and -- and -- and found online.
20   Q.    Are they cited in your materials
21 considered in Attachment A-2?
22   A.    No, they -- they weren't

Page 55

1  necessary for my opinion.  It was just
2  something that -- that did I out of
3  curiosity.
4    Q.    Okay.  Besides the YouTube
5  videos, is Attachment A-2 a complete list of
6  the materials you considered in rendering
7  your opinions in the declaration you've
8  entered in this matter?
9    A.    Yes, it is.  And -- and -- and to
10 be clear, the YouTube videos I didn't -- I
11 didn't consider at all in -- in formulating
12 my opinion.
13   Q.    During any of your conversations
14 with Mr. Barton, Mr. Bottorff or
15 Mr. Patterson, did they provide you with any
16 documents?
17   A.    No.
18   Q.    Did they -- did Mr. Barton,
19 Mr. Bottorff or Mr. Patterson provide you
20 with any documents after any of your
21 conversations with them?
22   A.    No.

Page 56

1    Q.    Did you review any documents with
2  Mr. Barton, Mr. Bottorff or Mr. Patterson
3  during your conversations?
4    A.    No, I did not.
5    Q.    Did you ask Mr. Barton,
6  Mr. Bottorff or Mr. Patterson about any
7  documents that you had received in this
8  matter during your conversations?
9    A.    Not that I can recall.
10   Q.    Did Mr. Barton provide you with
11 any notes ███████████████████████████h
12 ████████████████████████████
13 ██████████████████?
14   A.    No.
15   Q.    Are you aware of any internal
16 memos or other documentation memorializing
17 Mr. Barton's ████████████████████?
18   A.    I'm -- I'm not aware of any of
19 those materials, no.
20   Q.    What did you do to prepare for
21 your deposition here today?
22   A.    I read my declaration; reviewed

Page 57

1  the -- the materials that -- that I
2  considered; and I spent several hours with
3  counsel yesterday.
4    Q.    Okay.  How -- how much time did
5  you spend with counsel?
6    A.    We were together from 10:00 in
7  the morning until about 5:00 in the
8  afternoon.
9    Q.    How much time in total did you
10 spend preparing for your deposition today?
11   A.    In -- in between reviewing my
12 declaration, time with counsel, and reviewing
13 materials and, you know, discussing things
14 with my team, anywhere between 25 or
15 30 hours.
16   Q.    Did you speak with any United
17 Therapeutics personnel in preparation for
18 your deposition?
19   A.    No.
20   Q.    Did you speak with Dr. Nathan in
21 preparation for your deposition?
22   A.    No.

MAGNA
LEGAL SERVICES

HIGHLY CONFIDENTIAL          DA0049          LIQ_PH-ILD_00000611

Page 58

1        MS. CHENG:  Counsel, we've been
2    going about an hour.  Could we get a
3    break --
4        MR. MORTON:  Yeah, sure.
5        MS. CHENG:  -- at a good point?
6        MR. MORTON:  We can do that.
7        VIDEO OPERATOR:  Going off the
8    record at 10:15.
9        (Thereupon, a brief recess was
10   taken.)
11       VIDEO OPERATOR:  We're back on
12   the record at 10:31.
13       BY MR. MORTON:
14   Q.    Welcome back.
15       Were you involved in any
16   discussions about your testimony during the
17   break?
18   A.    No.
19   Q.    What is your understanding of
20   Liquidia's Yutrepia product?
21   A.    Yutrepia is a treprostinil-based
22   dry powdered inhaler.

Page 59

1    Q.    Are there -- or how is Yutrepia
2    different than Tyvaso DPI?
3        MS. CHENG:  Object to form.
4        THE WITNESS:  Based on my
5    understanding, the particle shapes,
6    what constitutes the powder within --
7    within -- within the capsules are
8    different between Yutrepia and -- and
9    Tyvaso.  And I understand that the --
10   the device that's used to -- to
11   contain the capsule is different from
12   the one that's containing the Tyvaso
13   capsule.
14       BY MR. MORTON:
15   Q.    Any other differences that you're
16   aware of between Yutrepia and Tyvaso DPI?
17   A.    No.
18   Q.    You agree that Yutrepia is not a
19   generic version of the Tyvaso products,
20   right?
21   A.    I agree that Yutrepia was
22   approved under the 505(b)(2) FDA approval

Page 60

1    process.
2    Q.    You agree that Yutrepia's a
3    branded product, right?
4    A.    Yes.
5    Q.    You'd agree that Yutrepia is a
6    strongly differentiated product from the
7    Tyvaso products, right?
8        MS. CHENG:  Object to form.
9        THE WITNESS:  I disagree.
10   Performed my -- my own comparisons
11   where I looked at the proposed labels,
12   assessed the addressable patient
13   populations for -- for both products.
14       I also understand that they
15   both share the same active ingredient.
16   And I also understand from Dr. Nathan
17   that he thinks it's likely that
18   prescribers and providers will view
19   these products as interchangeable.
20       BY MR. MORTON:
21   Q.    You agree that Liquidia has
22   preliminary approval from the FDA to -- to

Page 61

1    launch Yutrepia for the PAH indication?
2        MS. CHENG:  Object to form.
3        THE WITNESS:  I understand that
4    they have received tentative approval
5    for -- for PAH from the FDA.
6        BY MR. MORTON:
7    Q.    And -- and you'd agree that the
8    injunction that's being sought in this case,
9    that would not impact the launch of Yutrepia
10   for at least the PAH indication, right?
11       MS. CHENG:  Object to form.
12       THE WITNESS:  I understand that
13   the injunction that's being sought is
14   specific -- specific to the PH-ILD
15   indication.
16       BY MR. MORTON:
17   Q.    Okay.  So the injunction that is
18   being sought in this case would not impact
19   Liquidia's ability to launch Yutrepia for
20   PAH, right?
21       MS. CHENG:  Object to form.
22       THE WITNESS:  I think even with



16  (Pages 58 to 61)

Page 62

1     a -- with an injunction in place for
2   PH-ILD that Yutrepia would enter
3   and -- and compete in the PAH
4   indication space.
5           BY MR. MORTON:
6       Q.    And you're not claiming there is
7   any irreparable harm here based on Liquidia
8   launching Yutrepia for the PAH indication,
9   right?
10          MS. CHENG:  Object to form.
11          THE WITNESS:  I think the entry
12   of Yutrepia in -- in PAH is going to
13   affect United's behavior in the PH-ILD
14   space ███████████████████
15   ██████████████████████████
16   ████████████████████ .
17          BY MR. MORTON:
18      Q.    When Yutrepia launches for the
19   PAH indication, the only inhaled treprostinil
20   products on the market will be the Tyvaso
21   products and Yutrepia; is that correct?
22      A.    In inhaled products, yes, that --

Page 63

1   that's my understanding.  I just want to
2   refer back and -- and confirm that -- there
3   is one other product.  I just want to confirm
4   it's -- it's not inhalable in PAH.
5           I guess I -- I would say that
6   Yutrepia and -- and Tyvaso would be the --
7   the only treprostinil-based inhalation
8   products for -- for PAH.
9       Q.    And if Yutrepia launches for the
10   PH-ILD indication as well, Yutrepia and
11   Tyvaso would be the only treprostinil-based
12   inhalation products for PH-ILD on the market,
13   right?
14      A.    That's my understanding, yes.
15      Q.    Now, you acknowledge in your
16   report that there -- based on your
17   conversation with Dr. Nathan that there can
18   be challenges in diagnosing whether a patient
19   has PAH or PH-ILD, right?
20      A.    Yes, in particular, that for --
21   diagnosing pulmonary hypertension in general
22   requires an invasive procedure called the

Page 64

1   right heart catheterization.
2       Q.    But you agree that it can be
3   challenging to diagnose whether a patient has
4   PAH or PH-ILD?
5       A.    My understanding is that from
6   what Dr. Nathan indicated, the ability to
7   differentiate between the two groups can be
8   difficult for some patients.
9       Q.    And -- and you rely on your
10   conversations with Dr. Nathan for your
11   understanding of the challenges of diagnosing
12   patients with PAH or PH-ILD?
13      A.    In addition to -- to Dr. Nathan,
14   I have some background on -- on both -- some
15   cited materials and background in the
16   background in my report.
17      Q.    But you don't have any of your
18   own opinions about how patients are diagnosed
19   with PAH or PH-ILD, right?
20      A.    That's correct.
21      Q.    You don't have any opinions about
22   the -- I mean -- strike that.

Page 65

1           You don't have any of your own
2   opinions about the challenges of diagnosing
3   patients with PAH or PH-ILD, correct?
4       A.    That's correct.
5       Q.    And you don't have any of your
6   own opinions about how medical professionals
7   categorize patients with PAH or PH-ILD?
8       A.    Only that medical professionals
9   or providers generally categorize --
10   categorize these patients in -- in one group
11   or the other.
12      Q.    Is that your opinion, that
13   medical professionals categorize patients in
14   one group or another or is that -- you're
15   just reciting what Dr. Nathan told you?
16      A.    Excuse me.  My understanding is
17   that, you know, patients are diagnosed in --
18   in one group or -- or the other.
19      Q.    And your understanding that
20   patients are diagnosed in one group or the
21   other, that comes from Dr. Nathan; is that
22   right?

**MAGNA** ◆
**LEGAL SERVICES**

17  (Pages 62 to 65)

Page 66

```
1       A.    And my reading of -- of -- of --
2   of the other materials that I cite in the
3   background of my report.
4       Q.    Now, you acknowledge in your
5   report there are other products on the market
6   that are used to treat PH-ILD but are not
7   approved for PH-ILD, right?
8       MS. CHENG:  Object to form.
9       THE WITNESS:  Can you point
10  to -- to me in my report where I say
11  that?
12      BY MR. MORTON:
13      Q.    You have a discussion of PDE-5
14  inhibitors as one example.  Paragraph 151 is
15  one place where you talk about that.
16      A.    151?
17      Q.    Yes.
18      A.    Yes.
19      Q.    And your understanding is that
20  these PDE-5 inhibitors, such as sildenafil,
21  are described for PH-ILD off label?
22      MS. CHENG:  Object to form.
```

Page 67

```
1       THE WITNESS:  That's my
2   understanding, yes.
3       BY MR. MORTON:
4       Q.    And when Yutrepia's on the market
5   and in the event there's an injunction
6   entered here for PH-ILD, a physician could
7   still prescribe Yutrepia for PH-ILD off
8   label, right?
9       MS. CHENG:  Object to form,
10  foundation.
11      THE WITNESS:  So the -- the use
12  of other products or off-label use of
13  other products is -- you know, my
14  health economist, whose dissertation
15  was -- was studying physician and --
16  and prescriber behaviors.
17      If -- if there are no other
18  treatments available, it's not unusual
19  to -- to see physicians try therapies
20  that -- that aren't necessarily
21  indicated for a particular disease.
22      However, the introduction of
```

Page 68

```
1   Tyvaso is the first product that's
2   been shown to -- to -- to be safe and
3   effective in -- in -- in the treatment
4   of PH-ILD.  And I think the available
5   of a -- of an on-label treatment that
6   has demonstrated safety and efficacy
7   for the treatment of -- of ILD
8   incentivizes physicians to prescribe
9   Tyvaso for -- for PH-ILD, as opposed
10  to a -- to -- to an off-label
11  alternative.
12      BY MR. MORTON:
13      Q.    All right.  Well, my -- my
14  question was much simpler.  I'm -- all I'm
15  asking is a physician -- if Yutrepia was on
16  the market, a physician could prescribe --
17  strike that.
18      If Yutrepia was on the market and
19  the injunction was entered in the -- that's
20  being sought in this case for PH-ILD, a
21  physician could still prescribe Yutrepia for
22  PH-ILD off label if they chose to do so?
```

Page 69

```
1       MS. CHENG:  Object to form,
2   asked and answered, foundation,
3   outside the scope.
4       THE WITNESS:  Not necessarily.
5   One of the features of this particular
6   market, I think one of the
7   idiosyncrasies of this particular
8   market, is you have payors and PBMs
9   who are held to having products on
10  their formularies that are consistent
11  with their label.  And the only
12  product, if there was an injunction in
13  place, that would be available in the
14  formulary for the treatment of PH-ILD
15  would be Tyvaso D -- Tyvaso.
16      BY MR. MORTON:
17      Q.    Okay.  My -- my question wasn't
18  about the PBMs or the payors.  My question
19  was just about the doctors.
20      Could the doctor prescribe
21  Yutrepia for PH-ILD off label if the
22  injunction was entered in this case?
```



18  (Pages 66 to 69)

Page 70

1      MS. CHENG:  Object to form,
2  asked and answered, foundation,
3  outside the scope.
4      THE WITNESS:  The -- a -- a
5  physician is able to prescribe, you
6  know, according to -- to what their
7  practice is.  But in practicality, in
8  writing a prescription for Yutrepia
9  for an indication for which it's not
10  indicated would likely be rejected by
11  the payor or the PBM.
12      BY MR. MORTON:
13      Q.   Given that the -- strike that.
14          Given that the Tyvaso products
15  have been approved for PH-ILD, have doctors
16  stopped using PDE-5 inhibitors like
17  sildenafil for PH-ILD?
18      MS. CHENG:  Object to form,
19  foundation, outside the scope.
20      THE WITNESS:  I -- I -- I
21  haven't evaluated, nor was it my
22  assignment to -- to assess the -- the

Page 71

1  level of off-label use of -- of other
2  products for -- for PH-ILD.
3      I do know that with the
4  introduction of -- of Tyvaso for --
5  for PH-ILD, the growth in -- in -- the
6  use of Tyvaso for that indication has
7  been substantial and is an indication
8  of physicians and -- and other
9  prescribers' desire for -- for
10  treatment for -- for -- for this
11  indication.
12      BY MR. MORTON:
13      Q.   Do you know whether Dr. Nathan
14  still uses sildenafil for PH-ILD?
15      A.   I'm not aware.
16      Q.   If the -- if Yutrepia's device
17  were easier to use for PH-ILD patients than
18  the Tyvaso DPI device, wouldn't that be
19  another reason for doctors to use Yutrepia
20  off label for PH-ILD?
21      MS. CHENG:  Object to form,
22  foundation, outside the scope,

Page 72

1  incomplete hypothetical.
2      THE WITNESS:  I haven't seen
3  any -- any indication or any kind of
4  head-to-head comparisons demonstrating
5  that Yutrepia is -- is easier or -- or
6  better to use or superior in any
7  fashion to -- to -- to Tyvaso dry
8  powder formulation.
9      BY MR. MORTON:
10      Q.   So throughout your report you
11  reference a, quote, PH-ILD market.  But I --
12  I didn't see a definition for that clearly.
13          Could you please tell me what
14  your definition of the PH-ILD market is.
15      A.   PH-ILD market consists of
16  patients who have interstitial lung disease
17  and also have pulmonary hypertension and who
18  would be an eligible population for the
19  treatments that are available for -- for
20  PH-ILD.
21      Q.   Did you use any test to define
22  the PH-ILD market?

Page 73

1      A.   What -- what -- what -- what kind
2  of tests are -- are you referring to?
3      Q.   Well, for example, I -- I'm
4  familiar with a test called the -- the SSNIP
5  test.
6          Are you familiar with that test?
7      A.   I'm familiar with the SSNIP test.
8      Q.   Okay.  Did you use the SSNIP test
9  to define the PH-ILD market?
10      A.   For -- for -- for the purposes
11  of -- of identifying the addressable
12  population or -- or the addressable market
13  in -- in -- in this particular instance, I
14  didn't think a -- a -- a SSNIP test was --
15  was necessary.
16      Q.   Did you apply -- well, strike
17  that.
18          What -- what is your
19  understanding of the SSNIP test?
20      MS. CHENG:  Objection, outside
21  the scope.
22      THE WITNESS:  As a -- as -- as



19 (Pages 70 to 73)

Page 74

```
 1    a general matter, SSNIP stands for
 2    the -- a -- small, but
 3    significant -- or significant
 4    sustainable increase in price to
 5    evaluate whether the market would
 6    tolerate that increase in price.
 7           And again, I'm -- I'm -- I'm
 8    probably mangling the -- the -- the
 9    definition, but it's a way of
10    evaluating whether there are
11    elasticities in the background that
12    cause switching or substitution.
13           BY MR. MORTON:
14      Q.    And -- and just so the record's
15    clear, the SSNIP test is SSNIP, correct?
16      A.    Correct.
17      Q.    But you didn't use any test like
18    the SSNIP test or any -- any other economics
19    test to define the market here?
20           MS. CHENG:  Object to form.
21           THE WITNESS:  For -- for -- for
22    the purposes of my opinion and from --
```

Page 75

```
 1    from a -- from a -- from a high level,
 2    the market is already well-defined
 3    in -- in part because the market
 4    consists of observable
 5    characteristics.  And -- and the
 6    observable characteristics in this
 7    case are sufferers of interstitial
 8    lung disease who also have pulmonary
 9    hypertension.
10           BY MR. MORTON:
11      Q.    You also reference a PAH market
12    in your report.  How are you defining the PAH
13    market?
14      A.    In essentially the same fashion.
15    These are observable characteristics amongst
16    patients who suffer from pulmonary arterial
17    hypertension.
18      Q.    So like the PH-ILD market, you're
19    defining the PAH market as the -- the
20    patients that have either PAH or PH-ILD,
21    right?
22           MS. CHENG:  Object to form,
```

Page 76

```
 1    mischaracterizes --
 2           BY MR. MORTON:
 3      Q.    That -- yeah, let me redo that
 4    question.
 5           So you're defining the -- the --
 6    the PAH market in your declaration as the
 7    group of patients that have observable
 8    characteristics of pulmonary arterial
 9    hypertension, right?
10           MS. CHENG:  Object to form.
11           THE WITNESS:  I'm defining it
12    as -- as patients that have the
13    condition that could or -- that could
14    be diagnosed using right heart
15    catheterization as -- as having
16    pulmonary arterial hypertension.
17           MS. REPORTER:  Would you repeat
18    the end of that answer?
19           THE WITNESS:  Sorry.  Pulmonary
20    arterial --
21           MS. REPORTER:  No.
22           THE WITNESS:  Right -- right
```

Page 77

```
 1    heart catheterization.  Sorry.
 2           BY MR. MORTON:
 3      Q.    ████████████████████████
 4    ████████████████████████████████
 5    ████████████████████████████████
 6    ████████████████████████████████
 7    ████████████████████████████████
 8           MS. CHENG:  Object to form.
 9           THE WITNESS:  █████████████
10    ████████████████████████████ hat
11    ████████████████████████████████
12    ██████████████████████
13           BY MR. MORTON:
14      Q.    ████████████████████████
15    ████████████████████████████████
16    █████████?
17           MS. CHENG:  Object to form,
18    asked --
19           BY MR. MORTON:
20      Q.    Yes or no?
21           MS. CHENG:  Object to form,
22    asked and answered.
```



20  (Pages 74 to 77)

Page 78

1     THE WITNESS:  First, just to --
2  just to clarify, what do you -- what
3  do you mean by ▓▓▓▓▓▓
4  ▓▓▓▓▓▓
5  ▓▓▓▓▓▓
6  ▓▓▓▓▓▓
7  ▓▓▓▓▓▓
8     BY MR. MORTON:
9     Q.    Well, I -- I understand there's
10 a -- a concept of ▓▓▓▓▓.
11        You're familiar with that?
12    A.    Yes.
13    Q.    That's the ▓▓▓▓▓▓▓?
14    A.    Yes.
15    Q.    Correct?
16    A.    Yes.
17    Q.   ▓▓▓▓▓▓
18 ▓▓▓▓▓▓
19 ▓▓▓▓▓▓
20 ▓▓▓▓▓▓?
21        MS. CHENG:  Object to form.
22        THE WITNESS:  What I got from

Page 79

1  Mr. Barton is ▓▓▓▓▓▓
2  ▓▓▓▓▓▓
3  ▓▓▓▓▓▓
4  ▓▓▓▓▓▓
5  ▓▓▓▓▓▓
6  ▓▓▓▓▓▓
7  ▓▓▓▓▓▓
8  ▓▓▓▓▓▓
9  ▓▓▓▓▓▓
10 ▓▓▓▓▓▓
11        BY MR. MORTON:
12    Q.    Okay.  So sitting here today, you
13 ▓▓▓▓▓▓
14 ▓▓▓▓▓▓
15 ▓▓▓▓▓▓?
16        MS. CHENG:  Object to form,
17 asked and answered.
18        THE WITNESS:  Again, I -- I --
19 I expect, both from -- from what
20 Mr. Barton told me, but also with --
21 with my general experience in these
22 markets, ▓▓▓▓▓▓

Page 80

1  ▓▓▓▓▓▓
2  ▓▓▓▓▓▓
3  ▓▓▓▓▓▓
4  ▓▓▓▓▓▓
5        BY MR. MORTON:
6     Q.    You did not have a specific
7  conversation with Mr. Barton that ▓▓▓
8  ▓▓▓▓▓▓
9  ▓▓▓▓▓▓
10 ▓▓▓▓▓▓
11        MS. CHENG:  Object to form,
12 asked and --
13        BY MR. MORTON:
14    Q.    -- right?
15        MS. CHENG:  Object to form,
16 asked and answered.
17        THE WITNESS:  Again, my sense
18 is that ▓▓▓▓▓▓
19 ▓▓▓▓▓▓
20 ▓▓▓▓▓▓
21 ▓▓▓▓▓▓
22 ▓▓▓▓▓▓

Page 81

1  ▓▓▓▓▓▓.
2        BY MR. MORTON:
3     Q.    Okay.  Did Mr. Barton say that
4  ▓▓▓▓▓▓
5  ▓▓▓▓▓▓
6  ▓▓▓▓▓▓
7     A.    I think by -- by virtue of the
8  fact that ▓▓▓▓▓▓
9  ▓▓▓▓▓▓
10 ▓▓▓.
11        (Thereupon, Selck Exhibit 2 was
12     marked for identification.)
13        BY MR. MORTON:
14    Q.    All right.  Dr. Selck, I'm
15 handing you what's been marked as Selck
16 Exhibit 2.  This is a document that was
17 produced to us in this matter that starts
18 with the Bates number UTC_PH-ILD_009410.
19        Are you familiar with the
20 document?
21    A.    Yes.
22    Q.    What's your understanding of this



21  (Pages 78 to 81)

Page 82

1    document, Dr. Selck?
2       A.   This is a forecast put together
3 by United Therapeutics, I believe, in the
4 beginning of September of 2023.
5       Q.   Yeah, I think you identified in
6 your report as being dated September 6, 2023.
7    Does that sound right?
8       A.   Yes.
9       Q.   And did you discuss this document
10 with anyone at United Therapeutics?
11       A.   No.
12       Q.   You didn't ask any questions
13 about this document?
14       A.   No.
15       Q.   You -- you reviewed it and -- and
16 used it in your opinions though, correct?
17       A.   I used some data points that were
18 within the forecast as a means of performing
19 a calculation.
20       Q.   And did you use this document for
21 anything else, Exhibit 2?
22       A.   No.

Page 83

1       Q.   Now, you -- you'd agree that
2 UTC's -- that this forecast would accurately
3 reflect ████████████████████████████████
4 ████████?
5       MS. CHENG:  Object to form,
6 foundation.
7       THE WITNESS:  I don't know to
8 what purposes United Therapeutics
9 produced this forecast.  I did note
10 that, you know, there -- there's some
11 values in here that would be helpful
12 for a calculation that I wanted to
13 perform and -- and so I used those
14 numbers.
15       BY MR. MORTON:
16       Q.   What calculation did you want to
17 perform?
18       A.   Wanted to perform, in essence,
19 a -- for -- for lack of a better term, a
20 back-of-the-envelope calculation of, from a
21 lower bound perspective, ████████████████████
22 ████████████████████████████████████████████

Page 84

1 ████████████████████████.
2       Q.   That's what you included in
3 Appendix C-1 of your report, is that right?
4 Or Attachment C-1, to be specific.
5       A.   That's correct.  Should -- should
6 add it's a -- yes, that's correct.
7       Q.   Now, do you have any reason to
8 believe that this forecast that Tyvaso
9 prepared does not accurately reflect what UTC
10 believed?
11       MS. CHENG:  Object to form.
12       THE WITNESS:  I don't know for
13 what purposes this -- this forecast
14 was compiled, whether it accurately
15 reflects what United believes how the
16 market will materialize at this point.
17       BY MR. MORTON:
18       Q.   All right.  Well, you considered
19 this forecast reliable enough to -- to rely
20 upon it in your report, right?
21       A.   I relied on specific data points
22 within the forecast to use as part of a -- a

Page 85

1 calculation.  I don't -- you know, I didn't
2 use anything else in this forecast as a --
3 to -- to inform my opinions.
4       Q.   Well, you considered the data
5 points that you relied upon in this forecast,
6 Exhibit 2, to be reliable?
7       A.   There were two or three data
8 points in -- in the forecast that I thought
9 were -- were consistent with both Liquidia's
10 and -- and United's view of -- of -- of the
11 market and I used those for -- for -- for my
12 back-of-the-envelope calculation.
13       But to be clear, they were, in
14 essence, three or four data points out of
15 what looks to be at least 100 or 200 data
16 points.
17       Q.   But the data points that you
18 chose to use in your Attachment C-1, you
19 considered those to be reliable, right?
20       MS. CHENG:  Object to form,
21 asked and answered.
22       THE WITNESS:  I -- I used the

22  (Pages 82 to 85)

MAGNA
LEGAL SERVICES



Page 86

1    data points that I thought were
2    consistent with the ████████ that
3    were -- that were projected by both
4    United and Liquidia, along with the
5    ██████████████████████████████
6    ████████████████████████ --
7    which I can -- you know, only -- only
8    United has that data -- and I used
9    those as inputs to this
10   back-of-the-envelope calculation.
11        BY MR. MORTON:
12   Q.    But you considered -- United
13   Therapeutics' estimates of the U.S. market by
14   indications for PAH or PH-ILD, you considered
15   that to be reliable, right?
16        MS. CHENG:  Object to form.
17        THE WITNESS:  I -- I think as
18   indicated by, you know, the marketing
19   documents that are out there from both
20   parties, there's quite a bit of
21   uncertainty with respect to the
22   overall population for PAH, but -- but

Page 87

1    particularly for PH-ILD.
2        The numbers that were -- that
3    were here are roughly consistent
4    with -- with the ████████████ that --
5    that both parties have expressed.  And
6    in doing so, I -- for the purposes of
7    my back-of-the-envelope calculation, I
8    thought they were sufficient.
9        BY MR. MORTON:
10   Q.    Okay.  And you thought that
11   United Therapeutics' projections of the
12   number of Tyvaso treated patients, that was
13   reliable, right?
14        MS. CHENG:  Object to form.
15        THE WITNESS:  I thought it was
16   consistent with both -- both
17   manufacturers' assessments of -- of
18   what the addressable population is.
19        BY MR. MORTON:
20   Q.    And with respect to United
21   Therapeutics' ██████████████████████
22   ████████████████████ you -- you relied on

Page 88

1    that, right?
2    A.    ████████████████████████████
3    ██████████████████████████████████.
4    Q.    You don't have any reason to
5    believe that United Therapeutics' forecasts
6    about ████████████████████████████ are
7    inaccurate, do you?
8        MS. CHENG:  Object to form.
9        THE WITNESS:  Again, I don't --
10   I don't know what the purposes of --
11   of this forecast were.  I -- I don't
12   know how these -- what underlying
13   assumptions were made.
14        So I -- I -- I -- I took what I
15   knew what was an observable variable,
16   one that was -- ████████████████████,
17   ██████████████████████████████████████
18   ██████████████████████████████████████
19   ██████████████████████████████████████.
20        BY MR. MORTON:
21   Q.    When did you get this document,
22   Exhibit 2?

Page 89

1    A.    I can't tell you for sure.  I --
2    it -- it's -- I may have received it in -- in
3    January or -- or early February.
4    Q.    Who gave you Exhibit 2?
5    A.    United's counsel.
6    Q.    And you understand they -- that
7    United's counsel got Exhibit 2 from United
8    Therapeutics, right?
9    A.    Yes.
10   Q.    Did -- did you express any
11   skepticism about the accuracy of this
12   document to United Therapeutics or its
13   counsel?
14        MS. CHENG:  Object to form.
15        And I would advise the witness
16   not to reveal the contents of any
17   attorney-client or privileged
18   communications.
19        THE WITNESS:  So I believe I'm
20   being instructed not to answer.
21        BY MR. MORTON:
22   Q.    Do you think your answer would

**MAGNA**
**LEGAL SERVICES**

23  (Pages 86 to 89)

Page 90

1  reveal privileged information?
2      MS. CHENG:  Object to form,
3  calls for a legal conclusion.
4      BY MR. MORTON:
5      Q.   Why don't I break up the
6  question.
7          Did you express any skepticism
8  about the accuracy of this document to anyone
9  at United Therapeutics?
10     A.   No.
11     Q.   Did you express any skepticism
12 about the accuracy of this document to United
13 Therapeutics' counsel?
14         MS. CHENG:  Same instruction.
15     Advise the witness not to reveal the
16     contents of any privileged or
17     attorney-client communications.
18         THE WITNESS:  On the
19     instruction of counsel, I'm not going
20     to answer.
21         BY MR. MORTON:
22     Q.   Did you receive any other version

Page 91

1  of this forecast?
2      A.   No.
3      Q.   Did you ask for any other
4  versions of this forecast?
5      A.   I did and I was provided with
6  materials that I cited in -- in my report
7  with respect to any forecasts that -- that I
8  ultimately utilized in -- in -- in my
9  opinion.
10     Q.   What other forecasts did you
11 utilize in your opinion?
12     A.   There were some marketing
13 documents and -- and presentations that
14 were -- that were provided to me that I think
15 I -- I -- I cite in my report.  But these
16 were all either developed or -- or formed
17 prior to expectations of -- of Yutrepia
18 entry.
19     Q.   So all the forecasts that you
20 received from United Therapeutics, you cited
21 those in your report?
22     A.   Any -- any -- anything that --

Page 92

1  that I used or -- or considered is listed in
2  my report.
3      Q.   Did -- did you receive any other
4  forecasts that you did not use or consider in
5  your report?
6      A.   No.
7      Q.   In preparation for your
8  deposition, did you ask for an updated
9  forecast of the information included in
10 Exhibit 2?
11         MS. CHENG:  I'm going to object
12     and advise the witness not to reveal
13     the contents of any attorney-client or
14     otherwise privileged information.
15         THE WITNESS:  Given that was
16     likely a conversation with counsel,
17     under -- under instruction, I'm not
18     going to answer.
19         BY MR. MORTON:
20     Q.   Do you know whether the forecasts
21 in Exhibit 2 have been updated?
22         MS. CHENG:  I'm going to advise

Page 93

1  the witness not to reveal the contents
2  of any discussions with attorneys or
3  that would reveal the contents of
4  privileged information.
5          But to the extent you can
6  answer that question without revealing
7  the contents of privileged
8  information, please go ahead.
9          THE WITNESS:  I understand that
10 United does update its -- its
11 forecasts on a -- on a regular cycle
12 and I -- I don't think we -- or United
13 has -- has reached the end of that
14 cycle yet.
15         BY MR. MORTON:
16     Q.   Let -- I mean, my -- my question
17 was, do you know whether the forecasts in
18 Exhibit 2 have been updated.  Just yes or no.
19         MS. CHENG:  Same instruction.
20         THE WITNESS:  Under the
21 instruction of counsel, I -- I -- I
22 don't think I can answer the question



24  (Pages 90 to 93)

Page 94

1    or I'm unable -- I -- under the
2    instruction of counsel, I'm not -- I'm
3    unable to answer the question.
4        BY MR. MORTON:
5        Q.    Okay.  Did you ask if the
6    forecasts in Exhibit 2 have been updated, yes
7    or no?
8        MS. CHENG:  Same instruction.
9        THE WITNESS:  And for -- based
10       on instruction from counsel, I'm
11       unable to answer.
12       BY MR. MORTON:
13       Q.    Do you have any plans to
14   supplement your report with any updated
15   information from UTC?
16       A.    Given that this is a -- you know,
17   we're -- we're at the beginning of stages of
18   litigation and my understanding is -- is that
19   we haven't entered into any substantial
20   discovery yet, I -- I do -- I do expect other
21   materials to become available.  And when they
22   do become available, I -- I -- I certainly

Page 95

1    will use the ones that are helpful for my
2    opinion.
3        Q.    Do you expect to update your
4    declaration here, based on any updated
5    forecasts of Tyvaso sales from UTC?
6        A.    No, but I -- but I'll point out
7    this -- this particular forecast, given that
8    it was generated in the beginning of
9    September, doesn't incorporate any new
10   information about, you know, the -- the
11   likelihood of Yutrepia entry that would occur
12   near the end of -- that new information
13   becoming available near the end of 2023 or up
14   until now.
15       Q.    So is it your testimony that the
16   forecast in Exhibit 2 does not take into
17   account the entry of Yutrepia in the market?
18       A.    No, I'm -- I'm saying that this
19   forecast was generated at a point in time
20   where more information regarding the
21   likelihood of -- of the entry of -- of
22   Yutrepia wasn't available.

Page 96

1        Q.    So are -- is it your testimony
2    that in September of 2023 United Therapeutics
3    was not anticipating the entry of Yutrepia in
4    the market?
5        MS. CHENG:  Object to form,
6    mischaracterizes testimony,
7    foundation.
8        THE WITNESS:  No, I -- I -- I
9        think United was aware that -- that
10       there's a -- a possibility of
11       Yutrepia's entry.  But the likelihood
12       and information about that likelihood,
13       this was -- this was produced prior to
14       that information being available.
15       BY MR. MORTON:
16       Q.    Okay.  It -- but it's your
17   understanding that the forecasts in
18   Exhibit 2 -- or strike that.
19       It's your belief that the
20   forecasts in Exhibit 2 do not reflect the
21   entry of Yutrepia in the market in 2024?
22       MS. CHENG:  Object to form,

Page 97

1    foundation, mischaracterizes
2    testimony.
3        THE WITNESS:  When I -- when I
4    examined the -- the -- the forecast --
5    again, this is a forecast from -- from
6    the beginning of September -- the only
7    data points that I thought were
8    helpful to me were the projections of
9    the addressable population, as well as
10   the ████████████████████████
11   ████████████████████████████
12   ████████████████████.
13       The other information I looked
14   at, but it -- given the -- given the
15   timing of the forecast, I didn't think
16   the information was helpful to me.
17       BY MR. MORTON:
18       Q.    But my -- my question was
19   different.
20       Is it your belief that the
21   forecasts in Exhibit 2 do not reflect the
22   entry of Yutrepia in the market in 2024?



25   (Pages 94 to 97)

Page 98

1     MS. CHENG:  Object to form,
2  asked and answered, foundation,
3  mischaracterizes testimony.
4     THE WITNESS:  Again, it's --
5  it -- it's not clear to me what
6  information or assumptions Tyvaso
7  made -- oh, sorry, not Tyvaso --
8  United had made in -- in generating
9  this forecast.
10     What I can observe are the data
11  points that I described.  And for the
12  one -- for those, they -- they were
13  roughly consistent with what I think
14  both parties had -- had expressed
15  as -- as to what the -- what the
16  market was going to look like.  And --
17  and to the extent that I thought I
18  could use them, I -- I used them.
19     BY MR. MORTON:
20     Q.    And if I recall correctly, you
21  got this forecast, Exhibit 2, in February,
22  right?

Page 99

1     MS. CHENG:  Object to form.
2     THE WITNESS:  I -- I -- I think
3  either -- I -- I can't remember
4  exactly when I received the forecast,
5  but sometime in January or February.
6     BY MR. MORTON:
7     Q.    Okay.  But did UTC's counsel give
8  you stale information for your declaration,
9  since it's not -- hasn't apparently been
10  updated?
11     MS. CHENG:  Object to form,
12  foundation, mischaracterizes
13  testimony.
14     And I'm going to caution the
15  witness not to reveal the contents of
16  any discussions between -- with
17  counsel that would reveal privileged
18  information.
19     THE WITNESS:  I received
20  every -- all -- all the information
21  that I required to formulate my
22  opinion with respect to the harms

Page 100

1  that -- that United would suffer as --
2  as a result of Yutrepia's entry.
3     BY MR. MORTON:
4     Q.    But in your view, is this
5  information, Exhibit 2, this forecast, is it
6  stale information?
7     MS. CHENG:  Object to form,
8  vague.
9     THE WITNESS:  What do -- what
10  do you mean by stale?
11     BY MR. MORTON:
12     Q.    Outdated.
13     MS. CHENG:  Object to form.
14     THE WITNESS:  Not -- not with
15  respect to -- to the data points
16  that -- that I leveraged in -- in --
17  in the performance of the calculation
18  that I -- that I described.  But,
19  again, the -- as -- as to the other
20  data points, they weren't necessary
21  for me to formulate my opinion.
22

Page 101

1     BY MR. MORTON:
2     Q.    And -- and -- and you didn't talk
3  to anybody at United Therapeutics about
4  whether the information in Exhibit 2 was
5  outdated, right?
6     MS. CHENG:  Object to form.
7     THE WITNESS:  I didn't think it
8  was necessary, given I wasn't relying
9  on -- on this document to formulate my
10  opinion about -- out -- outside of
11  this calculation, formulate my opinion
12  about the harms to United.
13     BY MR. MORTON:
14     Q.    This document, Exhibit 2, it
15  appears to indicate that the -- ███████
16  ████████████████████████████████████
17  ████████████████████████████████████?
18     MS. CHENG:  Object to form,
19  foundation.
20     THE WITNESS:  For the -- for
21  ████████████████████████████████████
22  ████████████████████████████████████



26  (Pages 98 to 101)



Page 102

1
2
3
4          BY MR. MORTON:
5     Q.    But according to Exhibit 2, the
6                                                ;
7   is that right?
8          MS. CHENG:  Object to form,
9   foundation.
10          THE WITNESS:  No.  If -- if you
11   go down to the forecast numbers
12   related to Tyvaso treated patients, if
13
14
15                                    .
16          And by 2023, last year, the
17   number of patients on
18
19                            .
20          BY MR. MORTON:
21     Q.    All right.  But I -- I'm talking
22   about -- we're in this first section still.

Page 103

1   I know you skipped down to where the Tyvaso
2   treated patients are.  I'm talking about the
3   available patient population in the first
4   section, US Market by Indications.
5          See that?
6     A.    I do.
7     Q.    Okay.  And according to that
8   section of the forecast,
9
10                                            ;  is
11   that right?
12          MS. CHENG:  Object to form,
13   foundation.
14          THE WITNESS:  The line -- the
15
16
17
18                          .  Those are the
19   estimates that are -- that are written
20   here.
21          I've seen estimates that are
22   higher than that.  I think Liquidia

Page 104

1   has --
2                              .
3          So, you know, there -- there --
4   there's some uncertainty about, you
5   know, what -- what that -- what that
6   ILD population is.
7          BY MR. MORTON:
8     Q.    All right.  According to the
9   forecast in Exhibit 2, United Therapeutics
10   believed that the U.S. patient population
11   with the PAH indication, that would grow over
12   time, right?
13          MS. CHENG:  Object to form,
14   foundation, speculation.
15          THE WITNESS:  I don't -- I
16   don't know what the -- what the
17   assumptions were made to -- to kind of
18   build in this -- this U.S. market for
19   either the trend for -- for PAH or
20   PH-ILD.  I only noted that the treated
21   patient trend was -- was roughly
22   consistent with both public

Page 105

1   disclosures by United and Liquidia
2   in their expectations on market growth.
3          BY MR. MORTON:
4     Q.    Turning now to the -- towards the
5   bottom of -- of the first page of Exhibit 2,
6   the Tyvaso treated patients, do you have any
7   reason to believe that the forecasts provided
8   by United Therapeutics about the number of
9   Tyvaso treated patients is inaccurate?
10          MS. CHENG:  Object to form,
11   foundation.
12          THE WITNESS:  Again, I'm not --
13   not -- from my perspective, I'm -- I'm
14   not familiar with the assumptions
15   internally that the United folks made
16   in -- in -- in generating these
17   numbers.  But from my perspective,
18   since they were, again, roughly
19   consistent with what both
20   manufacturers kind of viewed the
21   market, for -- for the purposes of my
22   calculation, I -- I used those



27  (Pages 102 to 105)



Page 106

1  numbers.
2      BY MR. MORTON:
3      Q.    Okay.  And for the -- the PAH
4  indication, looks like United Therapeutics is
5  ██████████████████████████████████████
6  ██████████ .
7      Do you agree with that?
8      MS. CHENG:  Object to form,
9  foundation, mischaracterizes the
10 document.
11     THE WITNESS:  For
12 ████████████████████████████████████
13 ████████████████████████████████████
14 ████████████████████████████████████
15     BY MR. MORTON:
16     Q.    Do you have any reason to believe
17 that forecast is inaccurate?
18     MS. CHENG:  Object to form,
19 foundation, speculation.
20     THE WITNESS:  Again, from --
21 from -- from my perspective, I don't
22 know if it's accurate or not.  It --

Page 107

1  it -- it just -- from the PH-ILD line,
2  the numbers that -- that are here
3  are -- were again roughly consistent
4  with expectations of both Liquidia and
5  United.  And -- and given that, I
6  thought that was a -- a sufficient
7  basis to do this back-of-the-envelope
8  calculation.
9      MS. CHENG:  Sorry to interrupt,
10 I think the real time stopped working.
11     MR. MORTON:  It did, yeah.
12     Yeah, take a break.
13     VIDEO OPERATOR:  Going off the
14 record at 11:32.
15     (Thereupon, a brief recess was
16 taken.)
17     VIDEO OPERATOR:  We're back on
18 the record at 11:47.
19     BY MR. MORTON:
20     Q.    Welcome back.
21     Were you involved in any
22 discussions about your testimony during the

Page 108

1  break?
2      A.    No.
3      BY MR. MORTON:
4      Q.    All right.  Let's -- I have a few
5  more questions about Exhibit 2.
6      Back on the first page of
7  Exhibit 2 under Tyvaso Treated Patients
8  there's Tyvaso WHO Group 1, PAH.
9  ████████████████████████████████████
10 ████████████████████████████████████
11 ██████████████████████████████████ ?
12     MS. CHENG:  Object to form,
13 foundation.
14     THE WITNESS:  I believe it
15 does.
16     BY MR. MORTON:
17     Q.    Same question for the line Tyvaso
18 WHO Group 3, PH-ILD.
19 ████████████████████████████████████
20 ████████████████████████████████████
21 ████████████████████████████████
22     MS. CHENG:  Same objections.

Page 109

1      THE WITNESS:  When I -- when I
2  did the math and tied out the numbers,
3  I believe I concluded ████████████
4  ██████████████████ .
5      BY MR. MORTON:
6      Q.    All right.  Let's turn to the
7  next page of Exhibit 2, Bates number 9411.
8  And you see the section on ████████████ .
9      And under ██████████████████████
10 ██████████████████████████████████████ .
11     Your understanding that's the
12 ██████████████████████████████████ ?
13     MS. CHENG:  Object to form.
14     THE WITNESS:  My understanding
15 is ████████████████████████████████████
16 ██████████████████████████████████████ .
17     BY MR. MORTON:
18     Q.    Okay.  And then there's the
19 ████████████████████████████████████████
20 ████████████████████████████████ , right?
21     A.    ████████████████████████████████
22 ██████████████████████████ .



28  (Pages 106 to 109)



**Page 110**

```
 1      Q.    And you -- you see the pricing
 2   that United Therapeutics has included in its
 3   forecasts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 5   ▮▮▮▮▮▮
 6          You see that?
 7      A.   Yes.
 8      Q.   Okay.  And that -- and you -- you
 9   see that United Therapeutics is forecasting
10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, right?
12          MS. CHENG:  Object to form.
13          THE WITNESS:  I see that it's
14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15   ▮▮▮▮▮▮▮.
16          BY MR. MORTON:
17      Q.   Yeah, it looks like it's
18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19          Do you agree with that?
20          MS. CHENG:  Object to form.
21          THE WITNESS:  I agree that
22   the -- the numbers appear to reflect
```

**Page 111**

```
 1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
 2          BY MR. MORTON:
 3      Q.   Okay.  Turn to Bates number 9416,
 4   please, in Exhibit 2.
 5          See this is a notes section of
 6   the forecasts in Exhibit 2?
 7      A.   Yes.
 8      Q.   And there are some notes about
 9   Tyvaso treated patients here down at the
10   bottom of the page.
11          Do you see next to Tyvaso WHO
12   Group 1, PAH it says, ▮▮▮▮▮▮▮▮▮▮▮▮
13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16          What's your understanding of that
17   note?
18          MS. CHENG:  Object to form,
19   foundation.
20          THE WITNESS:  I have -- I have
21   no understanding of -- of this note.
22
```

**Page 112**

```
 1   I -- I didn't use this note as part of
 2   my back-of-the-envelope calculation
 3   that I did.
 4          BY MR. MORTON:
 5      Q.   Did you consider this note before
 6   submitting your declaration?
 7          MS. CHENG:  Object to form.
 8          THE WITNESS:  I saw the note.
 9   I also noted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10   we were just talking about ▮▮▮▮▮▮▮▮▮▮
11   ▮▮▮▮▮▮▮▮ and reminded myself that
12   this was a forecast that was put
13   together in the beginning of September
14   of -- of 2023.
15          And so in performing my
16   back-of-the-envelope calculation, I --
17   I ignored these ▮▮▮▮▮▮▮▮▮▮
18   ▮▮▮▮▮▮▮▮▮ because I -- from my
19   perspective, they're not an accurate
20   reflection of how the market's going
21   to manifest itself moving forward.
22
```

**Page 113**

```
 1          BY MR. MORTON:
 2      Q.   And -- and you didn't ask anyone
 3   at United Therapeutics about this note
 4   regarding Liquidia?
 5      A.   Again, for -- for -- for my
 6   purposes, the only thing that I -- that I
 7   wanted to use from -- from this forecast were
 8   the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
 9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10   ▮▮▮▮▮.  And that was sufficient for this --
11   this calculation that I performed.
12      Q.   Um-hmm.  Before this case, did
13   you ever look at the market for treprostinil
14   products?
15      A.   Prior -- prior to being
16   retained --
17      Q.   Yes.
18      A.   -- by -- by United?
19          No.
20      Q.   And you understand that UTC has
21   been looking at the treprostinil market for
22   about 20 years, correct?
```

29   (Pages 110 to 113)

**MAGNA** ❯
**LEGAL SERVICES**



**Page 114**

1    MS. CHENG: Object to form.
2    THE WITNESS: I understand
3  that -- that United Therapeutics is
4  taking the lead at developing
5  treprostinil-based -- based products
6  for pulmonary hypertension.
7    BY MR. MORTON:
8    Q.    And -- and they have been doing
9  this for about 20 years, right?
10    A.    I think we talked about when
11  Tyvaso came onto the market in -- in 2009. I
12  understand that there were other products
13  that were on the market prior to that, but
14  it's -- I don't know if it's 20 years.
15    Q.    All right. The next note is
16  about the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮.
19    What's your understanding of
20  that?
21    MS. CHENG: Object to form,
22  foundation.

**Page 115**

1    THE WITNESS: I see the note
2  there. I -- I don't have an
3  understanding of what that -- what
4  that statement is.
5    BY MR. MORTON:
6    Q.    Did you apply that note in your
7  calculations of damages you did in
8  Appendix C-1?
9    A.    Well, first, I wouldn't
10  characterize what I did as a -- as a
11  calculation of damages. This is just an --
12  the calculation is just an illustration of
13  what could happen and one that doesn't
14  sufficiently capture all the harms that I
15  describe in my report.
16    And from my perspective, the
17  numbers that are -- that are in this
18  worksheet for -- for PH-ILD for the purposes
19  of -- of performing the calculation were
20  roughly consistent with both United and --
21  and Liquidia's views of -- of growth in
22  the -- in the ILD market.

**Page 116**

1    Q.    Okay. Well, in Attachment C-1 in
2  your report, Exhibit 1, you're using this --
3  the projections of PH-ILD treated patients
4  that UTC included in their forecast in
5  Exhibit 2, right?
6    A.    Attachment C-1 contains three --
7  I believe three of the data points from --
8  from -- from this forecast.
9    Q.    Which three data points, the --
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮? That's
11  one, right?
12    A.    That's one.
13    MS. CHENG: Object to form.
14    BY MR. MORTON:
15    Q.    Second is the ▮▮▮▮▮▮▮
16  ▮▮▮▮ --
17    MS. CHENG: Object to form.
18    BY MR. MORTON:
19    Q.    -- in 2024?
20    MS. CHENG: Same objection.
21    BY MR. MORTON:
22    Q.    Is that right?

**Page 117**

1    A.    So I used the trend in -- in
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮. And then I
4  also used a ▮▮▮▮▮▮▮▮▮▮▮ -
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮ from --
6  from the forecast.
7    And then finally, I used just the
8  ▮▮▮▮▮▮▮▮▮▮.
9    Q.    Okay. But the ▮▮▮▮▮▮
10  ▮▮▮▮▮ number that you've used,
11  which is in Attachment C-1, you --▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮?
13    A. ▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮.
16    Q.    Okay. ▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮?
19    MS. CHENG: Object to form.
20    THE WITNESS: ▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮.
22



30  (Pages 114 to 117)



Page 118

```
 1          BY MR. MORTON:
 2      Q.   Okay.  So UTC was -- according to
 3   the forecast in Exhibit 2 that you applied in
 4   Attachment C-1,
 5
 6                                          ?
 7          MS. CHENG:  Object to form,
 8   foundation.
 9          THE WITNESS:  Where -- where --
10   where do you see that?
11          BY MR. MORTON:
12      Q.   Well, we looked at the note
13   earlier in Exhibit 2 that
14
15      A.
16                            .
17      Q.   Yeah.  So according to the
18   forecast in Exhibit 2 that you applied in
19   Attachment C-1,
20
21                                        --
22          MS. CHENG:  Object to form.
```

Page 119

```
 1          BY MR. MORTON:
 2      Q.   -- right?
 3          MS. CHENG:  Object to form,
 4   foundation.
 5          THE WITNESS:  I don't know if
 6   that's the case.  I do know, looking
 7   at the                       , the
 8                            .  I don't
 9   know what the expectations of the
10   series are beyond that, so it's hard
11   for me to say what the -- what UTC's
12   assumptions with -- with respect to
13   market capture are.
14          BY MR. MORTON:
15      Q.   Well, you at least applied that
16   assumption that
17
18                                   ?
19          MS. CHENG:  Object to form,
20   foundation.
21          THE WITNESS:  All I did was I
22   took a -- a number of -- of what
```

Page 120

```
 1   United expected to have as the number
 2   of patients that were being treated by
 3   Tyvaso in those years and -- and apply
 4   this illustrative, you know,
 5   calculation to.
 6          BY MR. MORTON:
 7      Q.   Okay.  And then in -- in your
 8   calculation in Attachment C-1
 9
10                             ?
11          MS. CHENG:  Object to form.
12          THE WITNESS:  I assumed that
13   the number of DPI treated patients
14
15   to -- to what Tyvaso had as a -- as --
16   as their number in this -- in this
17   September 2023 forecast.
18          BY MR. MORTON:
19      Q.   Okay.  And is that -- that --
20
21
22                            ?
```

Page 121

```
 1      A.   This is just a -- a
 2   back-of-the-envelope assumption with -- with
 3   respect to -- to
 4                                          .
 5      Q.   Well, did somebody give you that
 6                        or is that a number that
 7   you came up with?
 8      A.   It's a number that -- that I came
 9   up with and -- and I think is a -- I think the
10   conservative estimate of what I think the
11
12                        for -- for the
13   purposes of -- of this calculation.
14      Q.   Did you ever ask anyone at United
15   Therapeutics what percent of patients would
16   be reduced?
17      A.   As I indicated before, based on
18   my conversations with Mr. Barton, United is
19   still in the process of -- of formulating
20   its -- its strategy and I think is still
21   trying to gain an understanding as to the --
22   the degree of -- of
```

31   (Pages 118 to 121)

**MAGNA** ▶
**LEGAL SERVICES**



Page 122

1  ███████████████████████
2  ████████.
3          But as I discuss in my report,
4  when -- in the examples concerning
5  hepatitis C treatments and -- and PCSK9
6  inhibitors, ██████ is a -- is a fairly
7  conservative estimate of what that ████
8  ████████████████████
9  ████████████.
10         Q.    My -- my question is about did
11  you ask anyone at UTC about what you call
12  this ████████████████.
13         Did you ever ask them the
14  question what do you think the ████████
15  ██████ will be?
16         MS. CHENG:  Object to form,
17  asked and answered.
18         THE WITNESS:  And, you know,
19  as -- again, by -- by virtue of my
20  conversation with Mr. Barton, United
21  is still in the process of -- of
22  formulating its strategy in --

Page 123

1  ████████████.  And so I think
2  it's -- I think there's still --
3  for -- at least from United's
4  perspective, they don't have an actual
5  number in mind yet.
6          BY MR. MORTON:
7          Q.    And that -- that ████████
8  ██████ in treated patients, you're assuming
9  that's going to come only out of UTC's
10  projected treated patients, right?
11         MS. CHENG:  Object to form.
12         THE WITNESS:  If I -- if I
13  could ask you to clarify, what do you
14  mean by only UTC's projected patients?
15         BY MR. MORTON:
16         Q.    Well, it looks like from the
17  numbers that you've calculated in
18  Attachment C-1 that you're asserting that
19  the -- ████████████████████████
20  ████████████████████████
21  ████████████████████████
22  patients, right?

Page 124

1          A.    I think you can extend that a
2  little bit, where, given that UTC is the only
3  provider for -- for a product that -- that
4  treats PH-ILD here, that this -- this
5  represents an estimate of the total market
6  for PH-ILD.
7          Q.    Well, but the total market of
8  ████████████████████████████
9  ████████████████, according to the
10  forecast in Exhibit 2, right?
11         MS. CHENG:  Object to form,
12  mischaracterizes testimony and the
13  document, foundation.
14         THE WITNESS:  This -- so at --
15  at -- at the top is -- is an
16  assumption made by United about what
17  the -- what the total market is.
18  There are other estimates that are out
19  there, including Liquidia's estimates,
20  I think that put that number either
21  ████████████████████████████
22  ████████████████████████████

Page 125

1  the market being defined here in -- in
2  the top could be the number of
3  patients that United thinks has
4  pulmonary hypertension along with
5  interstitial lung disease.
6          There are varying estimates for
7  that.  But if you break it down to how
8  many patients overcome a variety of
9  different hurdles, including being
10  seen by a physician who recognizes
11  the -- the possibility of -- of
12  pulmonary hypertension and then also
13  gets diagnosed with pulmonary
14  hypertension along with interstitial
15  lung disease, that -- that's
16  potentially what this number down here
17  represents and these would be the
18  individuals that would be available to
19  have -- to have a treatment prescribed
20  to them.
21         BY MR. MORTON:
22         Q.    What do -- you're pointing to



32  (Pages 122 to 125)

Page 126

1  your document and saying this number down
2  here.
3          What are you referring to?
4      A.   Oh, I -- sorry about that.
5          Looking -- looking at the
6  Exhibit 2, if you -- if you see Tyvaso WHO
7  Group 3, ███████████████████████████
8  ███████████████████████████████████
9  █████ these patients potentially fulfill
10 that -- that scenario that I just described.
11     Q.   I had understood that that row
12 reflected the number of patients that UTC was
13 forecasting to be treated by Tyvaso products
14 in those years.
15         MS. CHENG:  Object to --
16         BY MR. MORTON:
17     Q.   Are you saying it's -- reflects
18 something different?
19         MS. CHENG:  Object to form,
20     foundation, mischaracterizes testimony
21     and the document.
22         THE WITNESS:  Yeah, that --

Page 127

1  that's -- that's not what I said.
2  I -- I don't see any indication in
3  here -- and -- and -- and to be clear,
4  I don't see an indication -- well,
5  let -- let me back up.
6          The -- the -- the trend -- the
7  trend that I see in ILD is consistent
8  with the growth trend in -- in --
9  in -- in the total market that both
10 Liquidia and United point to for --
11 for ILD.
12         BY MR. MORTON:
13     Q.   Okay.  Are -- but in -- in your
14 calculations in Attachment C-1, are you
15 saying that in the year 2024, there is a --
16 ██████████████████████████████████████
17 ████████████ treated with Tyvaso with
18 PH-ILD, right?
19         MS. CHENG:  Object to form.
20         THE WITNESS:  For -- for
21     illustrative purposes, I'm -- I'm

Page 128

1  being treated with a -- with a
2  treprostinil-based inhaler.
3          BY MR. MORTON:
4      Q.   Well, no.  It said -- it says
5  here ██████████████████████████████████.
6      A.   Yes.
7      Q.   So those are patients you
8  assumed, based on the forecast in Exhibit 2,
9  would have been treated with Tyvaso products
10 for the PH-ILD indication in 2024, right?
11     A.   It's -- it's a number that's
12 labeled Tyvaso PH-ILD treated patients.  But
13 for the purposes of this calculation, what
14 I'm describing is the total number of people
15 who -- or patients who would be treated with
16 a treprostinil-based inhaler.
17         And then I make further
18 adjustments, moving -- moving down to what
19 those two -- █████████████████████████
20 ███████████████████, because of the
21 Yutrepia competition.
22     Q.   Okay.  And the -- ████████████

Page 129

1  ██████████████████████████, are
2  those all going to become Yutrepia patients,
3  in your view?
4      A.   For -- for the purposes of this
5  illustration, yes.
6      Q.   Okay. ████████████████████████
7  ████████████████████████████████████████
8  ████████████████████████████████████████
9  ████████████████████?
10     A.   That's right.
11     Q.   That's your assumption?
12     A.   That -- for -- for -- for the
13 purposes of this calculation, yes.
14     Q.   Okay.  Why couldn't the patients
15 that UT -- strike -- strike that.
16         Why couldn't the patients that
17 Yutrepia captured, ██████████████████████
18 ████████████████████████████████████
19 ████████████
20         MS. CHENG:  Object to form,
21     foundation.
22         THE WITNESS:  I don't



33  (Pages 126 to 129)

HIGHLY CONFIDENTIAL  DA0067  LIQ_PH-ILD_00000629



**Page 130**

1  understand what -- why -- why would --
2  why would they come from that other
3  portion of the market?
4        BY MR. MORTON:
5    Q.    Well, wouldn't -- with Yutrepia
6  coming on the market, couldn't it expand the
7  market for inhaled treprostinil therapies for
8  PH-ILD?
9    A.    So one of the -- the -- the
10 ███████████████████████████
11 ███████████████████████████
12 ████████████████████.
13       And, again, from -- from my
14 understanding of reading some of the
15 background materials, as well as my
16 conversation with Dr. Nathan, that requires
17 a -- at least what sounds to be a -- a ████
18 ███████████████████████
19 ███████████████████████
20 ███████████████████████
21 ███████████████████████
22 ███████████████████████

**Page 131**

1  ████████████████████
2        I'm not sure if Liquidia's entry
3  would somehow jump-start physicians in
4  engaging that kind of diagnosis simply
5  because Yutrepia is -- is -- is available
6  outside of, you know, the marketing efforts
7  that United has already engaged in to -- to
8  educate physicians.
9    Q.    So you -- you wouldn't agree that
10 when new products are introduced into a
11 market, it could grow the market?
12       MS. CHENG:  Object to form.
13       THE WITNESS:  As a -- as a
14 general matter, product entry can --
15 can result in what economists refer to
16 as an increase in the extrinsic margin
17 or expanding -- expanding the market.
18       But I think there's -- in -- in
19 this particular case and -- and in
20 some -- in other, you know, marketing
21 examples, there's a -- a rate limiting
22 step.  And -- and in this market, that

**Page 132**

1  ██████████████████████████
2  ██████████████████████████
3  ██████████
4        And it's not just, you know, in
5  essence, ████████████████████
6  ██████████████████████████
7  ██████████████████████████
8  ████████████████.
9        BY MR. MORTON:
10   Q.    So just so I'm clear, that in --
11 in UTC's business in this market, you don't
12 agree that when new products are introduced
13 into the market, it grows the market?
14       MS. CHENG:  Object to form.
15       THE WITNESS:  I think in the --
16 in the -- in the case of ILD, the
17 introduction of -- of a new product --
18 there are different -- let me back up
19 for a moment and -- and just say as a
20 general matter, there are a variety of
21 different mechanisms that cause market
22 expansion.

**Page 133**

1        One is, you know, the -- the --
2  the increase in marketing and the --
3  and the increase of awareness of -- of
4  options that are available.
5        The other is just -- just
6  having additional choice.
7        But as I -- but as I mentioned
8  before, in -- in the ILD market,
9  ██████████████████████████
10 ██████████████████████████
11 ██████████████████████████
12 ██████████████████.
13       BY MR. MORTON:
14   Q.    Okay.  So -- but just so I
15 understand, in -- in this market, the ILD
16 market, you don't agree that when new
17 products are introduced into the market, it
18 grows the market?
19       Do I have that right?
20       MS. CHENG:  Object to form.
21       THE WITNESS:  I don't think
22 it's something that -- that we should



34  (Pages 130 to 133)

Page 134

1    assume immediately, given -- given the
2    structure of this market.
3        BY MR. MORTON:
4        Q.    Do you know how ILD is diagnosed?
5        A.    In general, I understand that
6    interstitial lung disease is a -- is a
7    disease that involves the tissue of -- of the
8    lungs.
9        So -- so taking me back to
10   Anatomy 101, you know, there's lung sacs.
11   There's the cells that comprise the -- the --
12   the lung tissue and -- and then there's
13   the -- the blood vessels that go into the
14   lung.  And -- and what interstitial lung
15   disease, I believe, at least based on my
16   rudimentary understanding, is -- is it's the
17   structure of the lung that's -- that's
18   affected by disease.
19       Q.    And how -- how is PH-ILD
20   diagnosed?
21       A.    So you have this structural
22   disease of the lung and then to -- because of

Page 135

1    that, in essence, disease of the -- of the --
2    of the tissue of the lung that could, for
3    lack of a better term, mess with the
4    plumbing.  And because of the way the
5    plumbing is rearranged, that could cause
6    pulmonary hypertension.
7        And the way you diagnose
8    pulmonary hypertension is -- is through a
9    right heart catheterization.
10       Q.    Okay.  Turning back to our
11   discussion of the market, you don't agree
12   that in the PH-ILD market, that when new
13   products are introduced, it grows the market,
14   right?
15       MS. CHENG:  Object to form,
16   asked and answered, foundation.
17       THE WITNESS:  As I indicated
18   before, as -- as a general matter or,
19   you know, just as a general
20   proposition in economics, the
21   introduction of a new product can
22   potentially expand the market.

Page 136

1        But as I -- as I indicated for
2    reasons that are -- that are specific
3    to this disease, it's -- one shouldn't
4    automatically assume that the
5    introduction of a new product
6    automatically expands this market.
7        BY MR. MORTON:
8        Q.    So for your calculations that you
9    did in Attachment C-1, your -- you based it
10   on the assumption that the ▮▮▮▮▮▮▮
11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12   ▮▮▮▮▮▮▮?
13       MS. CHENG:  Object to form.
14       THE WITNESS:  For -- for this
15   back-of-the-envelope calculation,
16   that's -- that's -- the assumption is
17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19   ▮▮▮▮.
20       BY MR. MORTON:
21       Q.    Okay.  And you didn't assume that
22   Yutrepia would capture other patients that

Page 137

1    are available in the PH-ILD market?
2        MS. CHENG:  Object to form.
3        THE WITNESS:  Well, if you look
4    at the numbers, there's a -- there's a
5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6    ▮▮▮▮.
7    So the market is growing.
8        Part of that, my understanding
9    from talking to Mr. Bottorff and --
10   and -- and -- and Mr. Barton, is
11   because, you know -- and Dr. Nathan is
12   that the availability of a new and --
13   and indicated treatment for -- for ILD
14   has physicians interested in -- in
15   prescribing that treatment for -- for
16   their patients.
17       In addition to that, I
18   understand that United's been engaged
19   in educational efforts to talk to
20   physicians who -- who care for ILD
21   patients and are encouraging the
22   diagnosis of pulmonary hypertension.



35  (Pages 134 to 137)

Page 138

1      And those educational efforts,
2   in turn, will increase diagnosis rates
3   and -- and increase the number of
4   patients who are correctly diagnosed
5   with PH-ILD and -- and then available
6   to be treated for inhaled
7   treprostinil-based products.
8      And then by virtue of that
9   growth, there are patients that are
10  within -- at least what United's
11  numbers here indicate are -- are --
12  are -- ███████████████
13  eligible for -- for -- for treatment
14  as -- as Group 3 patients.  And -- and
15  that's part of -- that's part of that
16  growth.
17      I don't assume any other growth
18  outside of that.
19      BY MR. MORTON:
20  Q.    Okay.  So just to simplify your
21  answer a little bit, you -- you're not
22  assuming in your calculations in

Page 139

1   Attachment C-1 that the patients that
2   ███████████████████████████
3   ███████████████████████████
4   ████████████████████████████ ?
5      A.    I'm assuming that there are no
6   other -- for the purposes of this
7   illustrative calculation, I'm assuming that
8   ███████████████████████████
9   ███████████████████████████
10  ███████████████████████████
11  ███████████████████████████
12  ███████████████████.
13      MR. MORTON:  All right.  Why
14  don't we take a break.
15      VIDEO OPERATOR:  Going off the
16  record at 12:28.
17      (Thereupon, at 12:28 p.m. EDT, a
18      lunch recess was taken.)
19
20
21
22

Page 140

1      AFTERNOON SESSION    (1:13 p.m. EDT)
2      VIDEO OPERATOR:  We're back on
3   the record at 13:13.
4      BY MR. MORTON:
5   Q.    Welcome back.
6   A.    Thank you.
7   Q.    Were you involved in any
8   discussions regarding your testimony during
9   the break?
10  A.    No.
11  Q.    So this document, Exhibit 2, when
12  did you receive this?
13      MS. CHENG:  Objection, asked
14  and answered.
15      THE WITNESS:  Again, I can't
16  recall exactly.  I believe it was at
17  some point in -- in January or -- or
18  early February.
19      BY MR. MORTON:
20  Q.    Would it have been before your
21  discussions with the UTC employees that you
22  talked to for your declaration?

Page 141

1      MS. CHENG:  Object to form.
2      THE WITNESS:  It may have been.
3      BY MR. MORTON:
4   Q.    Do you have any reason to believe
5   you received this document, Exhibit 2, after
6   you spoke to the UTC employees for your
7   declaration?
8      A.    It may have been.  I -- again, I
9   can't recall exactly when -- when -- when
10  it -- when it was -- was forecast.
11  Q.    Do you know whether there's a
12  version of this forecast from 2022?
13  A.    I'm not aware of any other
14  versions of this -- of this forecast.
15  Q.    Okay.  So you're not aware if
16  there's a version from 2021 either?
17  A.    That's correct.
18  Q.    You said that's correct?
19  A.    Yes.
20  Q.    Okay.  And you didn't ask for the
21  2022 or 2021 versions of the forecast?
22  A.    I asked in general for materials



36  (Pages 138 to 141)

Page 142

1  related to financial projections and -- and
2  things of that sort. And I think, as I
3  indicated earlier, based on the public
4  financial disclosures and the marketing
5  materials and some of the --
6  ███████████████████████████████
7  ███████████████████████████████
8  ███████████, were -- were sufficient for my
9  opinion.
10     Q.   Okay. But back to the question I
11 asked, you didn't ask for the 2022 or 2021
12 versions of the forecast --
13         MS. CHENG: Object --
14         BY MR. MORTON:
15     Q.   -- yes or no?
16         MS. CHENG: Object to form.
17         THE WITNESS: And as I
18 indicated, I -- I did not ask for --
19 for the 2021 forecast because I
20 believe there was some form of
21 forecast in the materials from that
22 period that I had already received

Page 143

1  and -- so I had what I needed to -- to
2  formulate my opinion.
3         BY MR. MORTON:
4     Q.   All right. I'd like to turn to
5  Section 5.5 of your report, which starts at
6  page 68.
7         Let me know when you're there.
8     A.   I'm there.
9     Q.   And in -- in this section you are
10 discussing your opinions about Liquidia's
11 ability to compensate United for any damages
12 in this case; is that right?
13     A.   What I'm describing is a -- is
14 Liquidia's limited ability to compensate
15 United, properly compensate United.
16     Q.   Yeah, when -- when I read this
17 section, it -- you appear to discuss the
18 sales of PH-ILD and whether Liquidia could
19 compensate United for the sales of PH-ILD
20 that are allegedly lost. But I didn't see
21 you have any discussion in here about sales
22 of PAH.

Page 144

1         Did -- did you talk -- did you
2  consider that at all in your consideration of
3  whether Liquidia could pay any damages award
4  in this case?
5         MS. CHENG: Object to form.
6         THE WITNESS: From a high
7  level, from a -- from an economics
8  perspective, one of the things that
9  express the expected value of the firm
10 is its market capitalization. So
11 Liquidia is a publicly traded firm,
12 has shares that are traded and -- and
13 have a -- a price and a market
14 capitalization that we can -- that we
15 can capture.
16         And, in essence, that market
17 capitalization captures what investors
18 think is both the -- well, what --
19 what they think the value of -- of
20 Liquidia's enterprise is moving
21 forward.
22         That implicitly captures

Page 145

1  expectations regarding PAH sales.
2         BY MR. MORTON:
3     Q.   But did you consider the revenues
4  that Liquidia would obtain from PAH sales
5  once it is permitted to launch that?
6         MS. CHENG: Object to form.
7         THE WITNESS: I -- I considered
8  PAH sales, along with expectations of
9  other products and -- and their -- and
10 their revenue performance in -- in
11 Liquidia's portfolio by using
12 Liquidia's market capitalization as
13 a -- an indicator for that.
14         BY MR. MORTON:
15     Q.   So you only used the market
16 capitalization. You didn't take into account
17 any revenues that Liquidia may earn from
18 selling Yutrepia for the PAH indication?
19         MS. CHENG: Object to form,
20 mischaracterizes testimony.
21         THE WITNESS: I did -- I did
22 consider PAH revenues, as well as --

37  (Pages 142 to 145)

Page 146

```
 1       and -- and really, the -- the correct
 2       financial metric to -- to apply in
 3       this particular instance is profits
 4       from the portfolio products that
 5       Liquidia has and -- and potentially
 6       will -- will bring to market and
 7       Liquidia's market capitalization can
 8       in some ways -- and -- and -- and to
 9       be clear, there are limitations to
10       this, but can in some ways be a
11       reflection of what that value is.
12            BY MR. MORTON:
13            Q.    Okay.  Besides Liquidia's market
14       capitalization on February 12th 2024, can you
15       point me to anywhere in your report where
16       you're discussing Liquidia's revenues for
17       Yutrepia for the PAH indication?
18            A.    Well, what -- what I'm showing
19       here is even under conservative assumptions
20       with respect to market share and -- and price
21       erosion in the ILD market as a result of
22       Yutrepia's entry, under those conservative
```

Page 147

```
 1       assumptions, it would just take a -- a short
 2       period of time of that entry to exceed
 3       Liquidia's market capitalization, which, in
 4       turn, captures all these streams of revenues.
 5            But from a forward-looking what
 6       would revenues be for -- for PAH for -- for
 7       Liquidia, I didn't consider that specifically
 8       as part of this analysis.
 9            Q.    Okay.  And you didn't consider
10       specifically Liquidia's profits on a
11       going-forward basis for PAH?
12            MS. CHENG:  Object to form.
13            THE WITNESS:  My calculation
14       and my approach to this assumes that
15       the market capitalization captures the
16       expectations of not just profits,
17       but -- profits from PAH, but also
18       profits from all the other potential
19       portfolio products for Liquidia.
20            BY MR. MORTON:
21            Q.    Okay.  But it's -- you didn't
22       consider on a stand-alone basis Liquidia's
```

Page 148

```
 1       profits for selling Yutrepia for PAH?
 2            A.    For the purposes of this
 3       calculation, I -- I did not.
 4            Q.    And the -- the calculations that
 5       you performed in Attachment C-1, those go out
 6       ██████████████████████████████████████
 7       ██████████████?
 8            A.    The forecast or the -- the
 9       ████████████ -- oh, I'm
10       sorry -- ██████  Excuse me.
11            Q.    Yeah.  Okay.  I had that right.
12       Thank you.
13            A.    Yeah.
14            Q.    You understand the injunction
15       that is sought here that you're providing a
16       declaration about, that -- that injunction is
17       only through the conclusion of the trial in
18       this case, right?
19            MS. CHENG:  Object to form.
20            THE WITNESS:  I understand that
21       the cumulative loss that occurs could
22       be constrained by whatever outcome
```

Page 149

```
 1       occurs as a -- as a result of this
 2       litigation.
 3            BY MR. MORTON:
 4            Q.    Okay.  But the injunction that
 5       we're focused on right now for the purposes
 6       of your declaration, that's from the time
 7       period from when Yutrepia launches for the
 8       PH-ILD indication to trial and the decision
 9       in the trial of this case, right?
10            MS. CHENG:  Object to form.
11            THE WITNESS:  Yes, I -- I -- I
12       don't know exactly when the -- the
13       preliminary injunction would expire,
14       for lack of a better term, but it
15       would be -- that would limit the --
16       the cumulative losses that -- that are
17       projected here.
18            BY MR. MORTON:
19            Q.    So it would only be for that time
20       period between the launch of Yutrepia for
21       PH-ILD and whenever the preliminary
22       injunction expires in this case, right?
```

MAGNA
LEGAL SERVICES

HIGHLY CONFIDENTIAL

DA0072

LIQ_PH-ILD_00000634

Page 150

1    A.    Conditional on whatever outcomes
2  extend beyond that. You know, obviously
3  there's a -- there -- there's uncertainty
4  with whether there will be, you know,
5  depending upon the outcome, other injunctions
6  or things of that sort. But that -- that
7  could be a constraint, yes.
8    Q.    Or the outcome could be that my
9  client wins and there is no injunction,
10 right?
11   A.    That's correct.
12   Q.    Okay. So the time period of
13 potential loss that you're addressing with
14 this preliminary injunction is from the time
15 that Yutrepia launches for the PH-ILD
16 indication until the preliminary injunction
17 expires, right?
18   A.    That's -- that's one -- one way
19 to limit the -- the projection in this case,
20 yes.
21   Q.    Okay. So the amount of loss that
22 Liquidia might need to compensate United for

Page 151

1  would be limited to the revenues that are
2  allegedly lost from the time that Yutrepia
3  launches for the PH-ILD indication until the
4  preliminary injunction expires, right?
5    MS. CHENG: Object to form.
6    THE WITNESS: I would
7  characterize it a little -- a little
8  bit differently.
9    So -- so, again, I -- I want to
10 revisit specifically the -- that the
11 purpose of -- of the calculation, one,
12 is -- is it doesn't encompass all the
13 loss. As I describe in my report,
14 ███████████████████████████
15 ███████████████████████████
16   So, you know, this, again, just
17 kind of illustrates, you know,
18 under -- under a set of assumptions
19 what -- what those numbers could be.
20   But the point of -- of the --
21 of the calculation itself was to
22 indicate even -- even with the

Page 152

1  relatively short period of time, from
2  ████████████████████████████████████
3  ████████████████████████████████████
4  ███████████████ and -- and not
5  really encompassing all the -- all the
6  ████████████, I still --
7  we still end up with a cumulative
8  ████████████████████████████████████
9  ████████████.
10   BY MR. MORTON:
11   Q.    During what time period is that
12 ████████████ calculation?
13   A.    From 2024 through 2026.
14   Q.    Okay. Well, you understand the
15 trial in this case has been scheduled for
16 June 23rd of 2025?
17   A.    Yes.
18   Q.    Okay. So that -- that's when
19 there would be some sort of decision that
20 would result in the preliminary injunction
21 being lifted or, you know, some other
22 injunction being entered, right?

Page 153

1    MS. CHENG: Object to form,
2  incomplete hypothetical.
3    THE WITNESS: It -- it's --
4  it's conditioned on a variety of
5  different things, including if the --
6  if the trial date holds.
7    So there -- you know, I'm not
8  setting a definitive line here as --
9  as to what -- what I think that
10 constraint is going to be. Again, I'm
11 trying to illustrate that even if you
12 took into account the entire market
13 capitalization of Liquidia now, given
14 conservative assumptions with respect
15 to market share and price erosion,
16 those losses could be substantial.
17   It would comprise -- even if
18 you were to limit it to just one or
19 two years, would comprise a
20 significant proportion of Liquidia's
21 market capitalization.
22

**MAGNA** ▶
LEGAL SERVICES

39  (Pages 150 to 153)

Page 154

1    BY MR. MORTON:
2    Q.   Okay.  But then Liquidia would
3   still be able to sell Yutrepia for the PAH
4   indication going into the future, right,
5   because there would be no limitation on that
6   once Yutrepia is permitted to launch for PAH,
7   right?
8        MS. CHENG:  Object to form,
9     incomplete hypothetical.
10       THE WITNESS:  It's hard to say
11    what -- what Liquidia is going to be
12    able to do in the event that it does
13    have to compensate, even under
14    conservative assumptions, for damages
15    to -- to United.  And that might
16    include insolvency for -- for
17    Liquidia.
18   BY MR. MORTON:
19    Q.   Setting that aside, I -- I just
20   want to get to the basic point that you agree
21   that Yutrepia could be sold for the PAH
22   indication going into the future and Liquidia

Page 155

1   could continue to accrue revenues and earn
2   profits on those sales, right?
3        MS. CHENG:  Same objections,
4     asked and answered.
5        THE WITNESS:  Yeah, I -- I -- I
6     guess I wasn't clear.  That assumes
7     Liquidia's ability to continue to
8     finance its -- its PAH production
9     operations, given its exposure to a --
10    a substantial liability of several
11    hundreds of millions of dollars in an
12    initial period of time.  So that's why
13    I mentioned the -- the insolvency
14    point.
15   BY MR. MORTON:
16    Q.   Okay.  Do you have any
17   understanding of what type of revenues
18   Liquidia may be able to earn on the sale of
19   PAH-indicated Yutrepia?
20    A.   It would be some fraction of --
21   of revenues that are currently generated by
22   United through its Tyvaso franchise for PAH.

Page 156

1    Q.   But do you know how much those
2   revenues would be?
3    A.   It depends on a variety of
4   different factors.  The aggressiveness of --
5   of Liquidia's discounting of its -- of its
6   Yutrepia product as it competes head to head
7   with Tyvaso in -- in PAH has a direct
8   relationship on the net revenues that it's
9   going to receive.
10       On the flip side of that, based
11   on that aggressive or -- or not aggressive
12   stance with -- with respect to discounting,
13   is Liquidia's market share that it's able to
14   capture in -- in PAH as -- as a result of
15   that competition.
16       So it's hard to say exactly, you
17   know, what -- what that percentage is going
18   to be.
19    Q.   Okay.  And you haven't considered
20   here what revenues Liquidia may be able to
21   earn for selling Yutrepia for PAH, right?
22       MS. CHENG:  Object -- object to

Page 157

1     form, asked and answered,
2     mischaracterizes testimony.
3        THE WITNESS:  So what I
4     would -- again, just to summarize, you
5     know, what -- what I've done here,
6     is -- is just illustrate how quickly a
7     lower bound or what one could consider
8     a lower bound of damages would be,
9     making conservative assumptions.
10       That doesn't include all the
11    other harms that -- that United will
12    suffer as a result of Yutrepia entry
13    that become a substantial fraction of
14    Liquidia's market capitalization,
15    which in turn is, in some respects, a
16    reflection of the market's expectation
17    for Liquidia's ability to earn profits
18    not just from PAH, but from its
19    other --
20   BY MR. MORTON:
21    Q.   Okay.  And you --
22    A.   -- portfolio products.

**MAGNA** ▶
**LEGAL SERVICES**

40  (Pages 154 to 157)

Page 158

1    BY MR. MORTON:
2    Q.    And you haven't attempted to
3  protect what revenues Liquidia may earn from
4  selling Yutrepia for the PAH indication, have
5  you?
6        MS. CHENG:  Object to form.
7        THE WITNESS:  As I've indicated
8    before, it's -- it's dependent upon a
9    variety of different factors and ones
10   that we haven't observed yet.  That
11   includes Liquidia's stance with --
12   with respect to discounting Yutrepia
13   as part of its efforts to -- to
14   capture market share; its success
15   in -- in being able to capture that
16   market share.
17       There's -- there's a lot --
18   there's a lot of moving parts that go
19   into what the expected revenues are
20   going to be.
21       BY MR. MORTON:
22   Q.    I'm just -- I asked for a simple

Page 159

1  question.
2        Have you attempted to project
3  what the revenues would be for Liquidia
4  selling PAH or selling Yutrepia for the PAH
5  indication?
6        MS. CHENG:  Object to form.
7        BY MR. MORTON:
8    Q.    Yes or no?
9        MS. CHENG:  Same objection.
10       THE WITNESS:  For all -- for
11   all the reasons that I've described,
12   I've -- I've not done a projection.
13       BY MR. MORTON:
14   Q.    Okay.  And you haven't done a
15  projection of Liquidia's profits for the sale
16  of Yutrepia for the PAH indication, correct?
17   A.    For all the reasons that I've
18  described, you know, the -- not knowing, you
19  know, the -- the different parameters that
20  kind of go into estimating those -- those
21  type -- those type of projections, I
22  haven't -- I haven't done a projection of --

Page 160

1  of -- of what those sales might be.
2    Q.    My question was about profits,
3  but --
4    A.    Excuse me, for -- for profits.
5    Q.    Gotcha.  Okay.
6        All right.  Earlier you mentioned
7  that you had other forecasts for Tyvaso sales
8  when I was asking you about the 2021 or 2022
9  projections.
10       What -- what documents were those
11  in, because I haven't seen those?
12   A.    I -- I thought that there were
13  projections in -- in either United's 10-Ks or
14  in some of the slide decks that describe
15  United's marketing strategy.  But I would --
16  I would have to have them in front of me in
17  order for me to point them out.
18   Q.    Okay.  You don't recall right now
19  which document that was in?
20   A.    Not -- not immediately.
21   Q.    Want to talk a little bit about
22  your section on first mover advantages,

Page 161

1  Section 4.4.  It starts on page 49.
2    A.    Okay.
3    Q.    You there?
4    A.    Yes.
5    Q.    Okay.  Thank you.
6        So you claim that United will
7  lose its first mover advantage if Yutrepia is
8  on the market for the PH-ILD indication; is
9  that right?
10   A.    My understanding is Tyvaso is --
11  is the first indicated treatment for -- for
12  PH-ILD and -- and as a result, United is a --
13  is a first mover in that space.
14   Q.    Okay.  Did you take into account
15  any impact on United's first mover advantage
16  due to Yutrepia being on the market for the
17  PAH indication?
18       MS. CHENG:  Object to form.
19       THE WITNESS:  I wasn't asked
20   to -- to examine the -- the -- the PAH
21   market or the effect of -- of Yutrepia
22   on -- on the PAH market.

41  (Pages 158 to 161)

Page 162

1  BY MR. MORTON:
2      Q.    Do you agree that United claims
3  that it's built substantial brand recognition
4  through its investments in the Tyvaso
5  products prior to obtaining approval for the
6  PH-ILD indication?
7      A.    Where do -- where do you see
8  that?
9      Q.    I was summarizing what -- what
10  you said in your report.
11           Well, you do talk about brand
12  recognition in your report, don't you?  Like
13  it -- for example, paragraph 97 you mention
14  it.  96 also talks about the brand name of
15  Tyvaso.
16      A.    Think your question related to
17  brand recognition within the -- within the
18  PAH market; am I -- is -- is that correct?
19      Q.    It -- my question was about you
20  contend that United has built substantial
21  brand recognition through its investments in
22  the Tyvaso products prior to obtaining

Page 163

1  approval for the PH-ILD indication; is that
2  right?
3           MS. CHENG:  I say, you know,
4  through its investments in the Tyvaso
5  products in -- in paragraph 95.  I
6  say, Through its investments in -- in
7  the Tyvaso products, United has
8  engaged in an effort to increase its
9  brand recognition for the Tyvaso
10  products among both physicians and
11  patients.
12           BY MR. MORTON:
13      Q.    Yeah.  And United has long been
14  known as one of the most significant
15  suppliers of therapies to treat pulmonary
16  hypertension, right?
17           MS. CHENG:  Object to form and
18  foundation.
19           THE WITNESS:  I don't know if
20  I -- if I say that to -- if -- if you
21  have an area in my report where I say
22  that, I'm -- I'm happy to review it.

Page 164

1  BY MR. MORTON:
2      Q.    Well, we've talked about today
3  how United's been in -- in the market for
4  almost 20 years in various treatments for
5  pulmonary hypertension, right?
6           MS. CHENG:  Object to form,
7  mischaracterizes testimony.
8           THE WITNESS:  I think we --
9  we -- we specifically discussed that
10  United had introduced a Tyvaso
11  nebulizer in 2009 and has had that
12  product on the -- on the market since
13  2009 and then introduced Tyvaso dry
14  powdered inhalation form in -- in
15  2022.  And I think we discussed how
16  they've -- they had other products on
17  the market prior to that.
18           But that's -- whether that's
19  resulted in brand recognition for --
20  for United, I don't think I -- I -- I
21  state anything specifically in my
22  report about that.

Page 165

1  BY MR. MORTON:
2      Q.    Okay.  So you didn't take into
3  account the other therapies that United has,
4  like Remodulin or Orenitram for PAH?
5           MS. CHENG:  Object to form.
6           THE WITNESS:  No.  And --
7  and -- and with respect to the --
8  the -- the first mover advantage I
9  describe here, as I understand it,
10  both in my conversations with
11  Dr. Nathan and Mr. Bottorff, the
12  physicians that engage in treatment
13  for PH-ILD are in many ways distinct
14  from the physicians that -- that treat
15  PAH.
16           So even if there were brand
17  recognition within the PAH market,
18  it's not clear to me that that carries
19  over and has the same effect for the
20  physicians or -- or prescribers that
21  would -- that would prescribe
22  treatment for PH-ILD.

**MAGNA ●**
LEGAL SERVICES

42  (Pages 162 to 165)

Page 166

```
1          BY MR. MORTON:
2      Q.    All right.  Setting -- setting
3  that aside, are you contending that all of
4  the first mover advantage that United had
5  built over the years is going to be disrupted
6  or eliminated based on a small startup
7  entrant that you claim could go bankrupt?
8          MS. CHENG:  Object to form.
9          THE WITNESS:  I think
10  innovators like United who expend
11  considerable resources to develop new
12  products and -- and enter into a -- a
13  new space that is populated by
14  providers that may not have been
15  exposed to their -- to their products
16  before in many -- in many respects, I
17  expect to be recognized for that
18  innovation and -- and -- and for those
19  efforts.
20          And that could be
21  short-circuited by -- by premature
22  entry by another entrant, small or
```

Page 167

```
1  otherwise.
2          BY MR. MORTON:
3      Q.    So you're saying that Liquidia,
4  a -- a small startup entrant, is going to
5  disrupt United's first mover advantage in the
6  treprostinil market?
7          MS. CHENG:  Object to form.
8          THE WITNESS:  To be clear,
9  it's -- it's not the treprostinil
10  market.  It's -- it's the market
11  for -- for PH-ILD patients, which,
12  again, as I understand it, is -- is
13  distinct from the physicians and
14  prescribers that treat PAH patients.
15          And because they're -- they're
16  different and distinct, there's no
17  reason to assume that the PH-ILD
18  physicians are aware of the innovator
19  status that -- that United has.
20          BY MR. MORTON:
21      Q.    And -- and your understanding of
22  the distinction that you're drawing between
```

Page 168

```
1  the physicians and prescribers of P -- for
2  PAH patients and PH-ILD patients, you got
3  that understanding from Dr. Nathan, correct?
4          MS. CHENG:  Object to form,
5  mischaracterizes testimony.
6          THE WITNESS:  I got it from
7  both Dr. Nathan and -- and
8  Mr. Bottorff.  I also understand that
9  from United's marketing documents as
10  well.
11          BY MR. MORTON:
12      Q.    All right.  I think I'm wrapped
13  up.
14          MS. CHENG:  No questions.
15          MR. MORTON:  Okay.  We're done.
16          VIDEO OPERATOR:  Okay.  Stand
17  by.  This concludes today's
18  deposition.
19          We're off the record at 13:51.
20          (Thereupon, signature having not
21          been waived, at 1:51 p.m. EDT
22          the deposition concluded.)
```

Page 169

```
1          CERTIFICATE OF DEPONENT
2      I, Frederic Selck, Ph.D., do hereby
3  certify that I have read the foregoing pages,
4  which contain a correct transcript of the
5  answers given by me to the questions
6  propounded to me herein, except for changes,
7  if any, duly noted on the enclosed errata
8  sheet.
9
10
11  _____
           FREDERIC SELCK, Ph.D.
12
13
14
15      Sworn and subscribed to before me
16  this ___ day of _____, 2024.
17
18
19  My commission expires:     Notary Public:
20  _____     _____
21
22
```



43 (Pages 166 to 169)

Page 170

```
 1    CASE:  United Therapeutics Corporation v.
 2          Liquidia Technologies, Inc., et al.
 3    DEPOSITION OF:  Frederic Selck, Ph.D.
 4    TAKEN:  March 15, 2024
 5    PAGE LINE ERROR        CORRECTION        REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21              _____
              FREDERIC SELCK, Ph.D.
22
```

Page 171

```
 1              CERTIFICATE OF NOTARY
 2          I, MISTY KLAPPER, the officer before whom
 3    the foregoing deposition was taken, do hereby
 4    certify that the witness whose testimony appears in
 5    the foregoing deposition was duly sworn by me; that
 6    the testimony of said witness was taken by me in
 7    shorthand and thereafter reduced to typewriting by
 8    me; that said deposition is a true record of the
 9    testimony given by said witness; that I am neither
10    counsel for, related to, nor employed by any of the
11    parties to the action in which this deposition was
12    taken; and, further, that I am not a relative or
13    employee of any attorney or counsel employed by the
14    parties hereto, nor financially or otherwise
15    interested in the outcome of this action.
16
17              _____
              Misty Klapper, RMR, CRR, CSR
18            Notary Public
19
20
21
22
```



44 (Pages 170 to 171)

## A

**ability**
61:19 64:6 143:11,14
155:7 157:17
**able**
70:5 132:5 154:3,12
155:18 156:13,20
158:15
**absent**
24:18
**aburrowbridge@...**
3:10
**account**
95:17 145:16 153:12
161:14 165:3
**accounting**
51:6 52:18
**accrue**
155:1
**accuracy**
89:11 90:8,12
**accurate**
106:22 112:19
**accurately**
83:2 84:9,14
**acknowledge**
63:15 66:4
**action**
171:11,15
**active**
60:15
**actual**
117:2 123:4
**actuality**
88:16
**ADAM**
3:7
**add**
13:16 84:6
**addition**
12:1 64:13 137:17
**additional**
133:6
**address**
6:16

**addressable**
60:12 73:11,12 87:18
97:9
**addressing**
150:13
**adjustments**
128:18 148:9
**advance**
29:17 31:7 46:9
52:12
**advantage**
161:7,15 165:8 166:4
167:5
**advantages**
160:22
**advise**
89:15 90:15 92:12,22
**affect**
62:13
**afternoon**
57:8 140:1
**aggressive**
31:3 34:7,20 156:11
156:11
**aggressiveness**
156:4
**agree**
23:1 59:18,21 60:2,5
60:21 61:7 64:2
83:1 106:7 110:19
110:21 131:9
132:12 133:16
135:11 154:20
162:2
**ahead**
17:20 93:8
**al**
170:2
**allegations**
24:20,22
**alleged**
148:6
**allegedly**
143:20 151:2
**alternative**
68:11

**amount**
37:2 150:21
**analysis**
147:8
**Anatomy**
134:10
**announcements**
49:11,21
**answer**
7:2 76:18 89:20,22
90:20 92:18 93:6,22
94:3,11 138:21
**answered**
38:7 69:2 70:2 77:22
79:17 80:16 85:21
98:2 122:17 135:16
140:14 155:4 157:1
**answers**
169:5
**anticipate**
48:11
**anticipating**
96:3
**anticipation**
35:7
**Anu**
14:3,7,8,15 19:14
28:7
**anybody**
20:9,10,12 28:21
29:3 101:3
**apologize**
17:20 44:16
**apparently**
99:9
**appear**
110:22 143:17
**APPEARANCES**
3:1
**appears**
101:15 171:4
**Appendix**
84:3 115:8
**application**
25:2
**applied**

**118:3,18 119:15**
**apply**
73:16 115:6 120:3
146:2
**appreciably**
133:11
**appreciate**
31:6
**approach**
79:6 147:14
**approval**
59:22 60:22 61:4
162:5 163:1
**approved**
32:22 59:22 66:7
70:15
**area**
163:21
**arterial**
11:4 21:11 22:10
75:16 76:8,16,20
**Arun**
14:5
**aside**
154:19 166:3
**asked**
38:7 41:1 42:13
52:17,21 69:2 70:2
77:18,22 79:17
80:12,16 85:21 98:2
122:17 135:16
140:13 141:22
142:11 155:4 157:1
158:22 161:19
**asking**
15:10 68:15 160:8
**assert**
25:4
**asserted**
24:7
**asserting**
123:18
**assertions**
24:8
**assess**
70:22



**assessed**
60:12
**assessments**
87:17
**assignment**
23:16,18 70:22
**assistance**
15:19
**Associate**
27:5
**assume**
15:2 120:8 134:1
    136:4,21 138:17
    167:17
**assumed**
120:12 128:8
**assumes**
147:14 155:6
**assuming**
120:21 123:8 127:22
    138:22 139:5,7
**assumption**
102:1 119:16 120:22
    121:2 124:16
    129:11 136:10,16
**assumptions**
83:22 88:13 98:6
    104:17 105:14
    119:12 146:19
    147:1 151:18 152:4
    153:14 154:14
    157:9
**Attachment**
8:8,12 9:14 46:21
    54:21 55:5 84:4
    85:18 116:1,6
    117:11 118:4,19
    120:8 123:18
    127:14 136:9 139:1
    148:5
**attempted**
158:2 159:2
**attendees**
28:17
**attorney**
171:13

**attorneys**
1:11 93:2
**attorney-client**
89:17 90:17 92:13
**authorization**
43:20 44:8
**automatically**
136:4,6
**availability**
137:12
**available**
32:17,20 54:14 67:18
    68:4 69:13 72:19
    94:21,22 95:13,22
    96:14 103:3 125:18
    131:5 133:4 137:1
    138:5
**Avenue**
3:15 6:17
**avenues**
151:14
**award**
144:3
**aware**
18:1 20:10 29:3 46:4
    46:7 51:21 52:7,10
    56:15,18 59:16
    71:15 96:9 141:13
    141:15 167:18
**awareness**
30:6 133:3
**A-1**
8:8,12 9:14
**A-2**
46:21 54:21 55:5
**a.m**
2:3

_____
**B**
_____
**B**
4:7
**back**
9:13 33:21 34:4
    40:10 43:14 58:11
    58:14 63:2 107:17
    107:20 108:6 127:5

132:18 134:9
135:10 140:2,5
142:10
**background**
21:9 30:2 64:14,15
    64:16 66:3 74:11
    130:15
**back-of-the-envelo...**
83:20 85:12 86:10
    87:7 88:19 107:7
    112:2,16 121:2
    136:15
**bankrupt**
166:7
**bargain**
36:7
**Barton**
27:1,4,10,14,16,18
    27:20 28:5,19,22
    29:6,8,10,17,21
    30:13,19 34:7,14
    35:4,12,14 36:9,15
    36:20 37:4 40:6
    41:7 42:14 43:3,8
    43:11,17 44:5 45:3
    45:5 55:14,18 56:2
    56:5,10 77:4 78:17
    79:1,20 80:7,21
    81:3 121:18 122:20
    137:10
**Barton's**
40:22 56:17
**based**
46:13 50:16 52:17
    59:4 62:7 63:16
    94:9 95:4 114:5
    121:17 128:8
    134:15 136:9 142:3
    156:10 166:6
**basic**
154:20
**basis**
107:7 147:11,22
**Bates**
81:18 109:7 111:3
**becoming**

95:13 138:12
**beginning**
82:4 94:17 95:8 97:6
    112:13
**begins**
5:3
**behalf**
3:2,12 5:16,18 11:11
    27:12
**behavior**
62:13
**behaviors**
67:16
**belief**
96:19 97:20
**believe**
15:11 30:14 45:10
    49:13 82:3 84:8
    88:5 89:19 105:7
    106:16 108:14
    109:3 116:7 134:15
    140:16 141:4
    142:20
**believed**
84:10 104:10
**believes**
84:15
**benchmark**
88:18
**benefit**
30:4 31:21 53:22
**Berretta**
14:13 19:15 28:8
**best**
7:10
**better**
22:22 72:6 83:19
    135:3 149:14
**beyond**
43:4 119:10 150:2
**bids**
35:8
**billed**
14:22
**billion**
152:9,12

MAGNA
LEGAL SERVICES

**bills**
13:9
**biostatistics**
10:14
**bit**
21:21 22:22 24:12
27:22 86:20 124:2
138:21 151:8
160:21
**blood**
132:7 134:13
**bottom**
105:5 111:10
**Bottorff**
44:14,15,16,19 45:6
45:9,16,21 46:5,9
46:15 47:5,15 49:19
50:22 55:14,19 56:2
56:6 137:9 165:11
168:8
**bound**
83:21 157:7,8
**brand**
162:3,11,14,17,21
163:9 164:19
165:16
**branded**
60:3
**break**
58:3,17 90:5 107:12
108:1 125:7 139:14
140:9
**Brian**
51:2
**brief**
58:9 107:15
**bring**
52:20 146:6
**broad**
152:4
**build**
104:18
**built**
162:3,20 166:5
**BURROWBRIDGE**
3:7

**business**
132:11

— C —

**C**
4:1 5:1 17:12 122:5
**calculated**
123:17
**calculation**
82:19 83:12,16,20
85:1,12 86:10 87:7
88:19 100:17
101:11 105:22
107:8 112:2,16
113:11 115:11,12
115:19 120:5,8
121:13 128:13
129:13 136:15
139:7 147:13 148:3
151:11,21 152:12
**calculations**
112:17 115:7 127:14
136:8 138:22 148:4
**call**
19:10 42:6 122:11
**called**
6:3 63:22 73:4
**calls**
90:3
**cannibalize**
136:11
**capitalization**
144:10,14,17 145:12
145:16 146:7,14
147:3,15 153:13,21
157:14
**Capitol**
3:9
**capsule**
59:11,13
**capsules**
59:7
**capture**
114:18 115:14 118:4
118:14,16,20
119:13,16 136:22

139:2 144:15
156:14 158:14,15
**captured**
129:17
**captures**
144:17,22 147:4,15
**care**
10:20 137:20
**cared**
48:3
**Caremark**
31:12
**carries**
165:18
**case**
1:5 5:9 8:2 9:1,8
11:20 12:11,18
14:22 61:8,18 68:20
69:22 75:7 113:12
119:6 131:19
132:16 143:12
144:4 148:18 149:9
149:22 150:19
152:15 170:1
**cases**
8:15,17,18,20 25:9
**catch**
14:5
**categorize**
65:7,9,10,13
**catheterization**
64:1 76:15 77:1
130:19 135:9
**cause**
74:12 132:21 135:5
**caution**
99:14
**cells**
134:11
**certain**
34:8
**certainly**
94:22
**CERTIFICATE**
169:1 171:1
**Certified**

2:19,19
**certify**
169:3 171:4
**challenges**
63:18 64:11 65:2
**challenging**
64:3
**change**
139:10
**changes**
24:5,14 25:7,10,17
25:21 169:6
**characteristics**
75:5,6,15 76:8
**characterize**
115:10 151:7
**charge**
23:9,10,15
**Cheng**
3:3 7:20 11:21 16:20
19:12 26:11 28:12
33:7 34:1 36:1,12
37:8,17 38:6,12,21
39:7,13,21 40:19
41:17 42:12 45:18
49:3 50:14 51:18
58:1,5 59:3 60:8
61:2,11,21 62:10
66:8,22 67:9 69:1
70:1,18 71:21 73:20
74:20 75:22 76:10
77:8,17,21 78:21
79:16 80:11,15 83:5
84:11 85:20 86:16
87:14 88:8 89:14
90:2,14 92:11,22
93:19 94:8 96:5,22
98:1 99:1,11 100:7
100:13 101:6,18
102:8 103:12
104:13 105:10
106:8,18 107:9
108:12,22 109:13
110:12,20 111:19
112:7 114:1,21
116:13,17,20



117:19 118:7,22
119:3,19 120:11
122:16 123:11
124:11 126:15,19
127:19 129:20
131:12 132:14
133:20 135:15
136:13 137:2
140:13 141:1
142:13,16 144:5
145:6,19 147:12
148:19 149:10
151:5 153:1 154:8
155:3 156:22 158:6
159:6,9 161:18
163:3,17 164:6
165:5 166:8 167:7
168:4,14
**choice**
133:6
**chose**
68:22 85:18
**CIGNA**
31:19
**cite**
66:2 91:15
**cited**
54:20 64:15 91:6,20
**claim**
9:3 161:6 166:7
**claiming**
62:6
**claims**
162:2
**clarify**
7:6 30:16 33:9 78:2
123:13
**classifications**
21:19
**clear**
16:17 22:9 55:10
74:15 85:13 98:5
127:3 132:10 146:9
155:6 165:18 167:8
**clearly**
72:12

**client**
150:9
**clinical**
10:17 53:2
**closer**
19:1,3
**Columbia**
2:21
**come**
10:20 123:9 129:17
130:2
**comes**
65:21
**coming**
123:20 129:7 130:6
139:3
**commission**
169:19
**communications**
89:18 90:17
**companies**
53:13
**compare**
26:13
**comparison**
26:18
**comparisons**
10:16 60:10 72:4
**compensate**
143:11,14,15,19
150:22 154:13
**compensated**
15:3,7
**compete**
62:3
**competes**
156:6
**competition**
35:7 80:1 111:12,15
121:4,12 122:2,9
128:21 156:15
**competitive**
48:17 49:1,8,17
50:19
**competitors**
32:11

**compiled**
84:14
**complement**
111:16
**complete**
7:10 8:14 55:5
**completely**
7:3
**comprise**
134:11 153:17,19
**concept**
78:10
**concerning**
122:4
**concessions**
79:2
**concluded**
109:3 168:22
**concludes**
168:17
**conclusion**
90:3 148:17
**condition**
76:13
**Conditional**
150:1
**conditioned**
153:4
**CONFIDENTIAL**
1:10
**confirm**
7:22 63:2,3
**confirmed**
48:4
**conjunction**
13:17
**conservative**
83:22 121:10 122:7
146:19,22 153:14
154:14 157:9
**consider**
55:11 92:4 112:5
144:2 145:3,22
147:7,9,22 157:7
**considerable**
166:11

**consideration**
144:2
**considered**
54:21 55:6 57:2
84:18 85:4,19 86:12
86:14 92:1 145:7
156:19
**consistent**
35:1 40:3 69:10 85:9
86:2 87:3,16 98:13
104:22 105:19
107:3 115:20 127:7
**consistently**
13:14
**consists**
72:15 75:4
**constitutes**
59:6
**constrained**
148:22
**constraint**
150:7 153:10
**contain**
59:11 169:4
**containing**
59:12
**contains**
116:6
**contend**
162:20
**contending**
166:3
**contents**
26:5 89:16 90:16
92:13 93:1,3,7
99:15
**context**
25:18
**continue**
155:1,7
**continuing**
48:1
**conversation**
18:15 19:5,8,17 20:7
20:13,17 21:7,22
22:7 28:5,19,22



29:5,9,18,22 30:15
40:10 43:4,8,9,18
45:2,2,6,16,21 50:1
50:11 51:16 52:1,4
63:17 80:7,20 92:16
122:20 130:16
**conversations**
40:7,12,15,17,21
55:13,21 56:3,8,17
64:10 77:3 121:18
165:10
**convincing**
130:20
**COOLEY**
3:15
**copy**
7:14,19 8:9 20:15,20
26:6,12
**corporate**
51:6
**Corporation**
1:3 5:6 170:1
**correct**
9:16,17 13:1 17:7,22
18:4,7 21:4,5 22:12
22:16 23:5 27:3,15
33:2 34:10 44:14
46:19 51:8,14 53:10
53:11 54:8 62:21
64:20 65:3,4 74:15
74:16 78:15 82:16
84:5,6 113:22
141:17,18 146:1
150:11 159:16
162:18 168:3 169:4
**CORRECTION**
170:5
**correctly**
98:20 138:4
**counsel**
5:19 6:4,7 19:9,19
20:1,3 26:11 28:8
28:10 45:19 51:19
57:3,5,12 58:1 89:5
89:7,13 90:13,19
92:16 93:21 94:2,10

99:7,17 171:10,13
**court**
1:1 5:8,15,21 9:5,11
**cover**
44:4
**covered**
43:5
**CRR**
1:20 171:17
**CSR**
1:20 171:17
**cumulative**
148:21 149:16 152:7
**curiosity**
55:3
**current**
43:17,18 44:6
**currently**
155:21
**CV**
8:9
**CVS**
31:12
**cycle**
93:11,14
**C-1**
84:3,4 85:18 115:8
116:1,6 117:11
118:4,19 120:8
123:18 127:14
136:9 139:1 148:5

─────── **D** ───────

**D**
5:1 69:15
**damages**
8:22 9:3,8,9,11 115:7
115:11 143:11
144:3 154:14 157:8
**data**
10:17 82:17 84:21
85:4,7,14,15,17
86:1,8 97:7 98:10
100:15,20 116:7,9
**date**
5:10 12:13 153:6

**dated**
4:10 82:6
**David**
27:1,4,10
**day**
169:16
**December**
12:14,15,22 13:12,14
**decided**
80:8 81:9
**decision**
149:8 152:19
**decks**
160:14
**declaration**
4:9 7:15 8:1 12:18,22
13:3,12,19 14:19
15:3,15,16,18,21
16:1,3,4,6,10,13,15
16:18 17:2,4,8,22
18:3 20:16,21 21:1
21:2,4 23:4,8,11
24:1,2,6,14,15 25:8
25:11 26:5,6,13,20
27:2 53:9 55:7
56:22 57:12 76:6
95:4 99:8 112:6
140:22 141:7
148:16 149:6
**declarations**
25:22 26:2
**decrease**
120:9 123:8,19 129:7
**Defendant**
1:7 3:12 6:4,7
**define**
72:21 73:9 74:19
**defined**
125:1
**defining**
75:12,19 76:5,11
**definition**
72:12,14 74:9
**definitions**
78:6
**definitive**

153:8
**degree**
9:22 10:3 25:18
52:22 121:22
**degrees**
9:19
**Delaware**
1:2 5:9
**demand**
77:11 79:2
**demanded**
34:12 36:10,21 37:3
**demanding**
34:21 40:8 56:13
80:3
**demands**
35:18
**demonstrated**
68:6
**demonstrating**
72:4
**dependent**
158:8
**depending**
150:5
**depends**
156:3
**DEPONENT**
169:1
**deposed**
6:20
**deposition**
1:13 5:4,12 8:5 56:21
57:10,18,21 92:8
168:18,22 170:3
171:3,5,8,11
**describe**
17:10 23:19 38:14
115:15 142:6
151:13 160:14
165:9
**described**
19:13 34:14 37:19
48:9 50:2 66:21
98:11 100:18 102:2
126:10 139:9

159:11,18
**describing**
24:17 31:11 128:14
143:13
**description**
4:8 23:12
**descriptions**
12:3 25:14
**designation**
109:15
**desire**
71:9
**detail**
21:10
**develop**
35:5 52:19 166:11
**developed**
91:16
**developing**
114:4
**device**
59:10 71:16,18
**diagnose**
64:3 135:7
**diagnosed**
54:10 64:18 65:17,20
76:14 125:13 132:2
134:4,20 138:4
**diagnosing**
63:18,21 64:11 65:2
**diagnosis**
48:7 130:11,21 131:4
133:12 137:22
138:2
**difference**
25:8 26:8
**differences**
24:4 59:15
**different**
24:9 25:19 59:2,8,11
97:19 125:9 126:18
132:18,21 153:5
156:4 158:9 159:19
167:16
**differentiate**
64:7

**differentiated**
60:6
**differently**
151:8
**difficult**
64:8
**digit**
38:15 39:10
**direct**
80:1 156:7
**directly**
53:10
**disagree**
60:9
**disclose**
53:16
**disclosures**
49:11,20 105:1 142:4
**discount**
35:22 36:10,22 37:6
37:15 38:5 43:13
**discounting**
34:22 156:5,12
158:12
**discounts**
31:6 34:16 35:8,16
35:19 36:5,17 37:11
37:22 38:11,16,19
39:1,5,19 40:1,8,16
41:8,11,15 42:1,4,9
42:21 56:12 77:12
80:3,22 81:5
**discovery**
94:20
**discuss**
21:6 22:4 29:20
30:12 43:2,16 47:4
52:15 53:19 82:9
122:3 143:17
**discussed**
34:7 44:3 48:4 49:19
50:22 53:3 124:8
164:9,15
**discussing**
57:13 143:10 146:16
**discussion**

66:13 135:11 143:21
**discussions**
27:11 47:6,9 58:16
93:2 99:16 107:22
140:8,21
**disease**
11:8 21:13 22:15
67:21 72:16 75:8
125:5,15 134:6,7,15
134:18,22 135:1
136:3
**disrupt**
167:5
**disrupted**
166:5
**dissertation**
67:14
**distinct**
165:13 167:13,16
**distinction**
167:22
**District**
1:1,2 2:20 5:8,8
**doctor**
69:20
**doctors**
69:19 70:15 71:19
**document**
52:11 81:16,20 82:1
82:9,13,20 88:21
89:12 90:8,12 101:9
101:14 106:10
124:13 126:1,21
140:11 141:5
160:19
**documentation**
29:16 43:12 46:8
52:12 56:16
**documents**
55:16,20 56:1,7
86:19 91:13 142:6
160:10 168:9
**doing**
28:14 87:6 114:8
**dollars**
155:11

**DPI**
22:2 59:2,16 71:18
108:11,20 109:19
109:21 110:10
113:10 116:15
120:9,13
**Dr**
6:15 11:18 12:2,7
18:6,10,13,16,20
19:17 20:7,13,16,21
20:22 21:4,7 22:5
27:14,16 29:6,8
49:18 50:22 54:6
57:20 60:16 63:17
64:6,10,13 65:15,21
71:13 81:14 82:1
130:16 137:11
165:11 168:3,7
**drafted**
15:15,16,17
**drawing**
167:22
**drug**
78:5
**dry**
32:10 52:19 54:15
58:22 72:7 86:6
97:11 109:19,21
117:5 164:13
**due**
161:16
**duly**
6:5 169:7 171:5
**D.C**
1:17 2:8 3:4,9,16
5:14 6:18

---

**E**

**E**
4:1,7 5:1,1
**earlier**
33:22 43:15 44:1,4
118:13 124:8 142:3
160:6
**early**
89:3 140:18



**earn**
145:17 155:1,18
156:21 157:17
158:3
**easier**
47:2 71:17 72:5
**economic**
23:20 83:21
**economics**
9:19 74:18 135:20
144:7
**economist**
10:5 67:14
**economists**
131:15
**EDT**
2:3 139:17 140:1
168:21
**educate**
131:8
**education**
9:15
**educational**
137:19 138:1
**effect**
84:1 161:21 165:19
**effective**
68:3
**effects**
62:15
**efficacy**
68:6
**effort**
48:11 163:8
**efforts**
47:11 48:14,20 49:12
49:21 50:13 131:6
137:19 138:1
158:13 166:19
**either**
41:19 42:5 54:14
75:20 91:16 99:3
104:19 108:10,20
124:20 141:16
160:13
**elasticities**

74:11
**eligible**
72:18 138:13
**eliminated**
166:6
**EMERY**
3:8
**employed**
171:10,13
**employee**
171:13
**employees**
140:21 141:6
**enclosed**
169:7
**encompass**
151:12
**encompassing**
152:5
**encouraging**
48:7 137:21
**ends**
119:8 126:8
**engage**
165:12
**engaged**
49:12 131:7 137:18
163:8
**engaging**
130:19 131:4
**enjoyed**
32:7 33:14
**enjoys**
32:16 40:4
**enter**
62:2 166:12
**entered**
41:19 42:5 47:12
55:8 67:6 68:19
69:22 94:19 152:22
**enterprise**
144:20
**enters**
41:4
**entire**
16:4 153:12

**entirely**
129:7
**entirety**
22:7
**entrant**
166:7,22 167:4
**entry**
23:22 30:7,9,16,17
30:20 31:7 41:13
42:18 62:11,16 84:1
88:3 91:18 95:11,17
95:21 96:3,11,21
97:22 100:2 131:2
131:14 139:12
146:22 147:2
157:12 166:22
**environment**
42:17 43:19 44:6
**epidemiology**
10:14
**erode**
136:17
**erosion**
62:15 121:11,22
122:8,12,15 146:21
153:15
**errata**
169:7
**ERROR**
170:5
**errors**
17:6,21
**ESQUIRE**
3:3,7,8,13,14,14
**essence**
83:18 85:14 132:5
135:1 144:16
**essentially**
75:14
**estimate**
101:22 121:10 122:7
124:5
**estimates**
86:13 103:19,21
104:1 124:18,19
125:6

**estimating**
159:20
**et**
170:2
**evaluate**
74:5
**evaluated**
70:21
**evaluating**
74:10
**event**
67:5 154:12
**everybody**
19:11
**exact**
12:12 26:18 27:8
46:18
**exactly**
23:10 34:3 50:17
99:4 140:16 141:9
149:12 156:16
**examination**
4:2 6:4,7
**examine**
161:20
**examined**
6:5 97:4
**example**
66:14 73:3 162:13
**examples**
122:4 131:21
**exceed**
147:2
**excess**
102:18
**exchange**
80:4 81:1
**exclusivity**
32:7,16 33:3,10,12
33:14 40:4
**Excuse**
65:16 148:10 160:4
**Exhibit**
4:9,12 7:14,16 8:8
81:11,16 82:21 85:6
88:22 89:4,7 92:10

92:21 93:18 94:6
95:16 96:18,20
97:21 98:21 100:5
101:4,14 102:5
104:9 105:5 108:5,7
109:7 111:4,6 116:2
116:5 117:18 118:3
118:13,18 124:10
126:6 128:8 140:11
141:5
**expand**
130:6 133:12 135:22
**expanding**
131:17,17
**expands**
136:6
**expansion**
132:22
**expect**
37:10 41:4,11,20
42:9,15,20 79:19
94:20 95:3 166:17
**expectation**
157:16
**expectations**
35:5,11 36:3,16
47:10 91:17 105:2
107:4 119:9 142:7
145:1,8 147:16
**expected**
38:1 41:15 79:1
120:1 144:9 158:19
**expecting**
34:16 118:4,19
**expects**
48:15 50:18 103:10
**expend**
166:10
**experience**
9:16 47:18 79:21
**expert**
8:21 9:2,10 10:9,12
**expire**
149:13
**expires**
149:22 150:17 151:4

169:19
**exposed**
166:15
**exposure**
155:9
**express**
31:21 89:10 90:7,11
144:9
**expressed**
87:5 98:14
**extend**
124:1 150:2
**extending**
112:10
**extent**
30:14 93:5 98:17
**extrinsic**
131:16
**EYES**
1:11
**E-mail**
3:5,10,17

———————————
**F**
———————————
**faces**
123:1
**fact**
29:5 81:8
**factors**
156:4 158:9
**Fair**
10:22 17:16 27:18
**fairly**
122:6 130:17
**familiar**
73:4,6,7 78:11 81:19
105:14
**far**
9:10
**fashion**
72:7 75:14
**FDA**
23:4,9 24:1,6,9,15,22
25:1,12 26:6,9,12
26:19 59:22 60:22
61:5

**features**
69:5
**February**
13:14 18:11 27:14
29:21 43:3,9 44:21
51:3,4 89:3 98:21
99:5 140:18 146:14
**feel**
10:18
**felt**
49:16
**field**
10:4 48:16 49:1
50:18
**figuring**
79:5
**fill**
132:5
**finally**
48:9 117:7
**finance**
155:8
**financial**
142:1,4 146:2
**financially**
171:14
**firm**
14:1 144:9,11
**first**
9:14 11:10,14 68:1
78:1 102:22 103:3
105:5 108:6 115:9
117:3 160:22 161:7
161:11,13,15 165:8
166:4 167:5
**flip**
156:10
**focused**
149:5
**folks**
28:6,13 45:17 51:17
102:18 105:15
132:1
**follows**
6:6
**force**

49:15,17
**forecast**
4:13 82:2,18 83:2,9
84:8,13,19,22 85:2
85:5,8 88:11 91:1,4
92:9 95:7,16,19
97:4,5,15 98:9,21
99:4 100:5 102:11
103:8 104:9 106:17
112:12 113:7 116:4
116:8 117:6,18
118:3,18 119:8
120:17 124:10
128:8 141:10,12,14
141:21 142:12,19
142:21 148:8
**forecasting**
83:3 106:5 110:9
126:13 129:9
**forecasts**
88:5 91:7,10,19 92:4
92:20 93:11,17 94:6
95:5 96:17,20 97:21
105:7 110:3 111:6
160:7
**foregoing**
169:3 171:3,5
**form**
11:15,21 16:20 33:7
34:1 36:1,12 37:8
37:17 38:6,12,21
39:7,13,21 40:19
41:17,21 42:1,12
49:3 50:14 59:3
60:8 61:2,11,21
62:10 66:8,22 67:9
69:1 70:1,18 71:21
74:20 75:22 76:10
77:8,17,21 78:21
79:16 80:11,15 83:5
84:11 85:20 86:16
87:14 88:8 89:14
90:2 96:5,22 98:1
99:1,11 100:7,13
101:6,18 102:8
103:12 104:13



105:10 106:8,18
108:12 109:13,16
109:22 110:12,20
111:19 112:7 114:1
114:21 116:13,17
117:19 118:7,22
119:3,19 120:11
122:16 123:11
124:11 126:19
127:19 129:20
131:12 132:14
133:20 135:15
136:13 137:2 141:1
142:16,20 144:5
145:6,19 147:12
148:19 149:10
151:5 153:1 154:8
157:1 158:6 159:6
161:18 163:17
164:6,14 165:5
166:8 167:7 168:4
**formed**
91:16
**former**
49:14
**formularies**
69:10
**formulary**
36:7 43:18 44:6
69:14 80:4 81:1
**formulate**
99:21 100:21 101:9
101:11 143:2
**formulated**
32:10
**formulating**
55:11 80:18 81:8
121:19 122:22
**formulation**
52:20 72:8 86:6
**formulations**
54:16
**forward**
25:1 112:18,21
144:21
**forward-looking**

147:5
**found**
54:19
**foundation**
67:10 69:2 70:2,19
71:22 83:6 96:7
97:1 98:2 99:12
101:19 102:9
103:13 104:14
105:11 106:9,19
108:13 111:20
114:22 118:8 119:4
119:20 124:13
126:20 129:21
135:16 163:18
**four**
28:16 85:14
**fraction**
155:20 157:13
**franchise**
155:22
**Fred**
6:13
**Frederic**
1:14 4:3,10 5:4 6:2
169:2,11 170:3,21
**Friday**
2:2
**front**
26:20 27:9 160:16
**fulfill**
126:9
**full**
45:11
**further**
43:7 128:17 171:12
**future**
154:4,22

---

**G**

**G**
5:1
**gain**
121:21
**general**
30:10 36:16 37:5,20

40:18 63:21 74:1
79:21 131:14
132:20 134:5
135:18,19 141:22
**generally**
65:9
**generated**
95:8,19 155:21
**generating**
98:8 105:16
**generic**
59:19
**Germany**
9:4,6
**getting**
21:9
**give**
7:10 25:3 35:14 49:7
99:7 121:5
**given**
8:21 13:7 16:9 31:1
32:4 49:16 70:13,14
92:15 94:16 95:7
97:14,14 101:8
107:5 124:2 134:1,1
153:13 155:9 169:5
171:9
**go**
26:4 33:21 43:14
93:8 102:11 134:13
148:5,9 158:18
159:20 166:7
**goes**
34:4 117:13
**going**
35:9 49:14 50:3 58:2
58:7 62:12 79:6,10
90:19 92:11,18,22
98:16 99:14 107:13
110:3 112:20 122:1
122:8 123:9 129:2
136:18 139:15
153:10 154:4,11,22
156:9,17 158:20
166:5 167:4
**going-forward**

147:11
**good**
6:9,10 58:5
**GOODWIN**
2:7 3:3
**Googled**
54:19
**Gotcha**
160:5
**gotten**
41:2
**GPO**
31:11
**GPOs**
35:17,20
**graduate**
10:13
**Greg**
44:14
**group**
21:18,18 22:9,13,21
30:17,18,18,20,20
32:16,18,20 33:1
65:10,14,18,20 76:7
101:21 102:3,13,18
102:19 103:18
106:12 108:8,18
111:12 114:16
126:7 138:14
**groups**
64:7
**grow**
104:11 131:11
**growing**
102:3 137:7
**grows**
132:13 133:18
135:13
**growth**
71:5 86:2 87:4 105:2
111:14,15 115:21
127:8 137:5 138:9
138:16,17 139:9,11
**guess**
33:8 63:5 155:6



**H**

**H**
4:7
**HABIBI**
3:14
**half**
51:11 117:21
**hand**
7:18
**handing**
81:15
**happen**
115:13
**happy**
163:22
**hard**
119:10 154:10
156:16
**harm**
62:7 83:21
**harms**
23:13,20 24:17 99:22
101:12 115:14
151:15 157:11
**head**
156:6,6
**header**
17:18
**headers**
17:9
**head-to-head**
72:4 80:1 122:2,9
**health**
10:5,6,20 67:14
**heart**
64:1 76:14 77:1
130:18 135:9
**held**
2:6 5:12 69:9
**helpful**
83:11 95:1 97:8,16
**hepatitis**
122:5
**hereto**
171:14

**hesitate**
26:17
**high**
23:19 75:1 144:6
**higher**
103:22
**highlighted**
34:19
**HIGHLY**
1:10
**hints**
34:14 35:3,13
**historically**
30:22 35:15 40:2
**holding**
10:8
**holds**
153:6
**home**
6:16
**hour**
15:14 18:17,18,19,21
18:22 19:3,3 27:21
28:1 45:10,11 51:11
58:2
**hourly**
15:7
**hours**
13:5,10 14:21 57:2
57:15
**hundreds**
155:11
**hurdle**
133:9
**hurdles**
125:9
**hypertension**
11:2,5,7,16 21:10,11
21:12 22:11 48:8
63:21 72:17 75:9,17
76:9,16 114:6 125:4
125:12,14 130:12
132:3 135:6,8
137:22 163:16
164:5
**hypertension-inter...**

22:14
**hypothetical**
72:1 153:2 154:9

**I**

**identification**
7:17 23:12 81:12
130:10
**identified**
82:5 109:10
**identify**
48:2
**identifying**
73:11
**idiosyncrasies**
69:7
**ignored**
112:17
**ILD**
32:15 48:1,3 68:7
102:14 104:6
115:22 127:7,11
130:11 132:16
133:8,15 134:4
137:13,20 146:21
**illustrate**
153:11 157:6
**illustrates**
151:17
**illustration**
115:12 129:5
**illustrative**
120:4 127:21 139:7
**immediately**
12:19 134:1 160:20
**impact**
61:9,18 111:13
161:15
**implicitly**
144:22
**improperly**
25:1
**inaccurate**
88:7 105:9 106:17
**incentivizes**
68:8

**include**
108:9,19 154:16
157:10
**included**
84:2 92:9 109:4
110:2 116:4
**includes**
158:11
**including**
32:9 43:20 124:19
125:9 153:5
**incomplete**
72:1 153:2 154:9
**incorporate**
95:9
**increase**
74:4,6 81:4 111:1
131:16 133:2,3
138:2,3 163:8
**increased**
35:18
**increases**
106:13
**increasing**
110:4,11,14,15,18
**indicate**
101:15 138:11
151:22
**indicated**
30:5 31:12 34:22
37:18,21 40:11
41:10,18 42:3,19
47:22 50:2,16 64:6
67:21 70:10 77:9
86:18 121:17
135:17 136:1
137:13 142:3,18
158:7 161:11
**indicating**
31:5 46:9 52:12
**indication**
41:9 61:1,10,15 62:4
62:8,19 63:10 70:9
71:6,7,11 72:3
104:11 106:4
117:17 127:2,4



128:10 145:18
146:17 149:8
150:16 151:3 154:4
154:22 158:4 159:5
159:16 161:8,17
162:6 163:1
**indications**
41:12,16 42:20 80:21
86:14 103:4
**indicator**
145:13
**individuals**
19:13 125:18
**inform**
85:3
**information**
46:1 52:18 90:1
92:9,14 93:4,8
94:15 95:10,12,20
96:12,14 97:13,16
98:6 99:8,18,20
100:5,6 101:4
**infringement**
8:18,20,22 9:8 11:19
12:1 24:20
**ingredient**
60:15
**inhalable**
63:4
**inhalation**
63:7,12 97:12 109:21
117:5 164:14
**inhaled**
62:19,22 109:20
130:7 138:6
**inhaler**
58:22 128:2,16
**inhibitors**
17:10,15,15 66:14,20
70:16 122:6
**initial**
35:8 113:8 155:12
**injunction**
4:9 7:15 9:4 24:19
61:8,13,17 62:1
67:5 68:19 69:12,22

148:14,16 149:4,13
149:22 150:9,14,16
151:4 152:20,22
**injunctions**
150:5
**innovation**
166:18
**innovator**
167:18
**innovators**
166:10
**inputs**
86:9
**insolvency**
154:16 155:13
**instance**
73:13 146:3
**instructed**
89:20
**instruction**
90:14,19 92:17 93:19
93:21 94:2,8,10
**insurance**
53:12
**Intensity**
14:1
**interchangeable**
22:3 60:19
**interchangeably**
21:16 22:18
**interested**
21:8 30:1 137:14
171:15
**internal**
56:15 142:6
**internally**
105:15
**interrupt**
107:9
**interstitial**
11:8 21:13 72:16
75:7 125:5,14 134:6
134:14
**introduced**
131:10 132:12
133:17 135:13

164:10,13
**introduction**
67:22 71:4 77:10
79:22 132:17
135:21 136:5,10
**invasive**
63:22 130:18 132:8
**investments**
162:4,21 163:4,6
**investors**
144:17
**involved**
11:1 58:15 107:21
140:7
**involves**
134:7
**involving**
11:15 23:4
**in-house**
20:3
**irreparable**
62:7
**issues**
11:20
**item**
101:21

_____
J
_____
**J**
3:8
**January**
89:3 99:5 140:17
**jhabibi@cooley.com**
3:18
**Job**
1:21
**JOHN**
3:14
**July**
33:15
**jump-start**
131:3
**June**
152:16

_____
K
_____

**KATHERINE**
3:3
**katherinecheng@g...**
3:5
**Katie**
19:12,21 28:12 45:18
51:18
**kind**
29:11,13 72:3 73:1
104:17 105:20
131:4 151:17
159:20
**Klapper**
1:20 2:18 5:16 171:2
171:17
**knew**
46:13 88:15
**know**
18:18 19:9,10,11,20
25:20 26:7 28:12
31:18 33:9 35:19
37:19 39:4,18,22
41:2 43:22 47:19
49:10 50:5,8 57:13
65:17 67:13 70:6
71:3,13 79:3,13
83:7,10 84:12 85:1
86:7,18 88:10,12
92:20 93:17 94:16
95:10 103:1 104:3,5
104:16 106:22
114:14 119:5,6,9
120:4 122:18
124:22 130:22
131:6,20 132:4
133:1 134:4,10
135:19 137:11
141:11 143:7
149:12 150:2,4
151:16,17 152:21
153:7 156:1,17
157:5 159:18,19
163:3,19
**knowing**
159:18
**knowledge**



29:1
**known**
163:14
**Kristyn**
14:13,16 19:14 28:7

**L**

**label**
66:21 67:8 68:22
69:11,21 71:20
**labeled**
128:12
**labels**
60:11
**lack**
83:19 135:3 149:14
**larger**
101:16 102:6 103:10
**largest**
32:13
**launch**
61:1,9,19 77:7 78:20
79:15 80:10 145:5
149:20 154:6
**launches**
62:18 63:9 149:7
150:15 151:3
**launching**
62:8
**lead**
27:11 114:4
**legal**
5:16,18 90:3
**Let's**
108:4 109:6
**level**
23:19 71:1 75:1
144:7
**leveraged**
100:16
**liability**
155:10
**life**
10:2,6
**lifted**
152:21

**likelihood**
95:11,21 96:11,12
**LILLIAN**
3:8
**limit**
149:15 150:19
153:18
**limitation**
154:5
**limitations**
146:9
**limited**
143:14 151:1
**limiting**
130:10,22 131:21
132:1
**line**
101:21 103:14,15
106:12 107:1
108:17 153:8 170:5
**lines**
46:12
**Liquidia**
1:6 3:12 5:7 25:3
42:5 47:10 48:12
49:1 50:2,18 60:21
62:7 86:4 103:22
105:1 107:4 111:12
113:4 127:10
143:18 144:3,11
145:4,17 146:5
147:7,19 150:22
153:13 154:2,11,17
154:22 155:18
156:20 158:3 159:3
167:3 170:2
**Liquidia's**
47:11 48:14,20 49:10
49:15,20 50:13
58:20 61:19 85:9
115:21 124:19
131:2 143:10,14
144:20 145:11,12
146:7,13,16 147:3
147:10,22 153:20
155:7 156:5,13

157:14,17 158:11
159:15
**list**
8:13,14 55:5
**listed**
46:20 92:1
**litigated**
24:21
**litigation**
94:18 149:2
**little**
22:22 24:12 27:22
47:1 124:2 138:21
151:7,7 160:21
**LLP**
2:7 3:3,8,15
**long**
18:15 27:19 45:8
51:9 163:13
**long-standing**
31:4
**look**
17:13 42:17 98:16
102:13 113:13
122:8 137:3
**looked**
13:8 14:20 43:19
60:11 97:13 118:12
**looking**
15:8 46:14 113:21
119:6 126:5,5
**looks**
9:18 17:17 85:15
106:4 110:17
123:16
**lose**
129:1 161:7
**losing**
128:19
**loss**
148:21 150:13,21
151:13 152:6,8
**losses**
149:16 153:16
**lost**
121:3 143:20 148:6

151:2
**lot**
158:17,18
**low**
40:2
**lower**
83:21 120:14,21
157:7,8
**lspetrino@mwe.com**
3:11
**lunch**
139:18
**lung**
11:8 21:13 22:15
72:16 75:8 125:5,15
134:6,10,12,14,14
134:17,22 135:2
**lungs**
134:8

**M**

**Magna**
5:16,18
**major**
31:13,18,20 35:1
**making**
83:22 157:9
**managed**
27:6
**management**
44:9
**manager**
51:6
**managers**
30:4 31:21 53:22
**mangling**
74:8
**manifest**
112:21
**manufacturers**
53:18 87:17 105:20
**March**
1:17 2:2 5:10 170:4
**margin**
131:16
**marked**



7:17 81:12,15
**market**
23:22 31:2 32:5,12
32:13,14,15,16 33:5
41:5 42:6 47:12,22
49:13,21 52:20
62:20 63:12 66:5
67:4 68:16,18 69:6
69:8 72:11,14,15,22
73:9,12 74:5,19
75:2,3,11,13,18,19
76:6 77:7 78:5 79:6
84:16 85:11 86:5,13
95:17 96:4,21 97:22
98:16 101:16,17
102:6,6 103:4
104:18 105:2,21
113:13,21 114:11
114:13,18 115:22
117:17 118:5,14,16
118:20 119:13,17
121:3,11,22 122:7
122:12,14 123:21
124:5,7,17 125:1
127:9 129:19 130:3
130:6,7 131:1,11,11
131:17,22 132:11
132:13,13,21 133:8
133:11,15,16,17,18
134:2 135:11,12,13
135:22 136:6 137:1
137:7 139:2 144:10
144:13,16 145:12
145:15 146:6,7,13
146:20,21 147:3,15
153:12,15,21
156:13 157:14
158:14,16 161:8,16
161:21,22 162:18
164:3,12,17 165:17
167:6,10,10
**marketing**
46:16 47:8,11,16
48:6,11,14,16,20
49:2,9 50:13,19
86:18 91:12 131:6

131:20 133:2 142:4
142:7 160:15 168:9
**markets**
27:6 41:20 79:22
**market's**
112:20 157:16
**Marsh**
13:22 14:15 19:14
28:7
**Massachusetts**
6:17
**material**
16:8,22
**materialize**
84:16
**materials**
50:6,9 54:20 55:6
56:19 57:1,13 64:15
66:2 91:6 94:21
130:15 141:22
142:5,21
**math**
109:2
**matter**
5:5 11:11,15 23:4,10
24:2,3,9,10,17,22
25:12,15 26:9,10
53:15 54:1 55:8
56:8 74:1 81:17
131:14 132:20
135:18
**matters**
25:16,19
**max**
106:5 114:17 118:13
118:15
**maxes**
117:11
**McDERMOTT**
3:8
**mean**
13:4 23:15 32:6,21
64:22 78:3 93:16
100:10 123:14
**means**
36:6 82:18

**mechanism**
24:8
**mechanisms**
132:21
**Medicaid**
54:3
**medical**
9:21 10:9 65:6,8,13
**Medicare**
54:3
**members**
13:17,21 14:14 16:7
**memorializing**
56:16
**memos**
56:16
**mention**
162:13
**mentioned**
44:1 133:7 155:13
160:6
**mess**
135:3
**metric**
146:2
**mid**
12:14
**middle**
12:14,14,15
**mid-December**
23:13
**mid-February**
40:11
**millions**
155:11
**mind**
123:5
**minutes**
19:1 45:12
**mischaracterizes**
76:1 96:6 97:1 98:3
99:12 106:9 124:12
126:20 145:20
157:2 164:7 168:5
**mispronouncing**
44:17

**misremember**
19:18
**Misty**
1:20 2:17 5:15 171:2
171:17
**modest**
24:4,5 25:21
**moment**
6:1 132:19
**morning**
6:9,10 57:7
**Morton**
3:13 4:3 6:8 7:18,21
12:6 17:5 26:14,21
33:16 34:5 36:8,19
37:13 38:2,9,17
39:3,9,17 40:5 41:6
42:2 43:1 49:6
50:20 58:4,6,13
59:14 60:20 61:6,16
62:5,17 66:12 67:3
68:12 69:16 70:12
71:12 72:9 74:13
75:10 76:2 77:2,13
77:19 78:8 79:11
80:5,13 81:2,13
83:15 84:17 86:11
87:9,19 88:20 89:21
90:4,21 92:19 93:15
94:4,12 96:15 97:17
98:19 99:6 100:3,11
101:1,13 102:4,20
104:7 105:3 106:2
106:15 107:11,19
108:3,16 109:5,17
110:16 111:2 112:4
113:1 114:7 115:5
116:14,18,21 118:1
118:11 119:1,14
120:6,18 123:6,15
125:21 126:16
127:12 128:3 130:4
132:9 133:13 134:3
136:7,20 138:19
139:13 140:4,19
141:3 142:14 143:3



145:2,14 146:12 147:20 149:3,18 152:10 154:1,18 155:15 157:20 158:1,21 159:7,13 162:1 163:12 164:1 165:1 166:1 167:2 167:20 168:11,15

**moved**
25:1

**mover**
160:22 161:7,13,15 165:8 166:4 167:5

**moving**
112:21 128:18,18 144:20 158:18

**multiple**
151:14

**Munich**
9:5

— N —

**N**
2:7 3:4 4:1,1 5:1,13

**name**
6:11 162:14

**names**
28:17

**Nathan**
11:18 12:2,7 18:6,10 18:13,16,20 19:17 20:7,13 21:7 22:5 54:6 57:20 60:16 63:17 64:6,10,13 65:15,21 71:13 130:16 137:11 165:11 168:3,7

**Nathan's**
20:16,21,22 21:4

**near**
95:12,13

**nebulized**
54:15 86:5 97:11 109:16 113:9 117:4

**nebulizer**
32:10 108:11,21

109:12 164:11

**necessarily**
67:20 69:4

**necessary**
55:1 73:15 100:20 101:8

**need**
150:22

**needed**
143:1

**needs**
133:10

**negative**
53:5

**negotiate**
30:22 32:4 41:21

**negotiating**
42:17 53:16

**negotiations**
30:3 42:21

**neither**
171:9

**net**
78:10,18 79:14 80:9 87:21 88:6,17 97:10 109:8,9 112:9,17 113:8 116:15 117:8 156:8

**never**
9:7

**new**
48:1 95:9,12 131:10 132:12,17 133:16 135:12,21 136:5 137:12 166:11,13

**Nodding**
53:5

**Norman**
3:21 5:17

**north**
3:9 124:21 152:8

**Northwest**
5:13

**Notary**
2:20 169:19 171:1,18

**note**

83:9 111:18,22 112:1 112:5,8 113:3 114:15 115:1,6 118:12,15

**noted**
5:19 104:20 112:9 169:7

**notes**
20:8,9,11,12 28:21 29:2,3,4 46:1,3 52:3 52:6 56:11 111:5,8

**notice**
2:17

**number**
5:9 14:21 81:18 87:12 102:17 103:8 104:2 105:8 109:7 111:3 117:10 119:22 120:1,13,16 121:6,6,8 123:5 124:20 125:2,16 126:1,12 128:11,14 138:3

**numbers**
83:14 87:2 102:2,11 105:17 106:1 107:2 109:2 110:22 115:17 117:3 123:17 137:4 138:11 139:10 151:19

**N.W**
2:7 3:4,9,15

— O —

**O**
4:1 5:1

**oath**
7:1 29:8,12,14 46:6 52:9

**object**
11:21 16:20 33:7 34:1 36:1,12 37:8 37:17 38:6,12,21 39:7,13,21 40:19 41:17 42:12 49:3

50:14 59:3 60:8 61:2,11,21 62:10 66:8,22 67:9 69:1 70:1,18 71:21 74:20 75:22 76:10 77:8,17 77:21 78:21 79:16 80:11,15 83:5 84:11 85:20 86:16 87:14 88:8 89:14 90:2 92:11 96:5,22 98:1 99:1,11 100:7,13 101:6,18 102:8 103:12 104:13 105:10 106:8,18 108:12 109:13 110:12,20 111:19 112:7 114:1,21 116:13,17 117:19 118:7,22 119:3,19 120:11 122:16 123:11 124:11 126:15,19 127:19 129:20 131:12 132:14 133:20 135:15 136:13 137:2 141:1 142:13 142:16 144:5 145:6 145:19 147:12 148:19 149:10 151:5 153:1 154:8 156:22,22 158:6 159:6 161:18 163:17 164:6 165:5 166:8 167:7 168:4

**objection**
73:20 116:20 140:13 159:9

**objections**
108:22 155:3

**obligation**
7:1

**observable**
75:4,6,15 76:7 88:15

**observe**
98:10

**observed**



117:8 158:10
**obtain**
145:4
**obtaining**
162:5,22
**obviously**
150:2
**occur**
95:11 122:1
**occurred**
12:13 88:16
**occurs**
148:21 149:1
**offer**
26:18
**offered**
38:14,18 39:5,19
**offering**
9:10 35:11
**officer**
171:2
**offices**
2:6
**off-label**
67:12 68:10 71:1
**oh**
46:22 98:7 126:4
  148:9
**okay**
8:7 9:7 10:8 13:20
  14:10 15:2,6 21:2
  22:8,13,17 23:14
  25:6 34:6 35:21
  38:3 42:3 47:3
  48:13 50:8 55:4
  57:4 61:17 69:17
  73:8 79:12 81:3
  87:10 94:5 96:16
  99:7 103:7 106:3
  109:18 110:8 111:3
  116:1 117:9,16
  118:2 120:7,19
  127:13 128:22
  129:6,14 133:14
  135:10 136:21
  138:20 141:15,20

142:10 146:13
147:9,21 148:11
149:4 150:12,21
152:14,18 154:2
155:16 156:19
157:21 159:14
160:5,18 161:2,5,14
165:2 168:15,16
**once**
47:12 145:5 154:6
**ones**
54:18 95:1 158:9
**ongoing**
40:14
**online**
54:19
**on-label**
68:5
**operations**
155:9
**OPERATOR**
3:21 5:2 58:7,11
  107:13,17 139:15
  140:2 168:16
**opinion**
55:1,12 65:12 74:22
  91:9,11 95:2 99:22
  100:21 101:10,11
  142:9 143:2
**opinions**
55:7 64:18,21 65:2,6
  82:16 85:3 143:10
**opportunity**
25:4
**opposed**
68:9 103:15,17
**options**
133:4
**Optum**
31:21
**order**
133:11 160:17
**Orenitram**
165:4
**outcome**
148:22 150:5,8

171:15
**outcomes**
150:1
**outdated**
100:12 101:5
**outside**
28:10 69:3 70:3,19
  71:22 73:20 101:10
  131:6 138:18 139:3
  139:8
**overall**
86:22 123:21
**overcome**
125:8 133:10
**overlooked**
15:12

---
**P**

**P**
5:1 168:1
**page**
4:2,8 8:12 9:14 105:5
  108:6 109:7 111:10
  143:6 161:1 170:5
**pages**
169:3
**PAH**
22:11 32:12 41:12
  42:5,10 47:8,17,19
  47:21 54:10 61:1,5
  61:10,20 62:3,8,12
  62:16,19 63:4,8,19
  64:4,12,19 65:3,7
  75:11,12,19,20 76:6
  86:14,22 101:15
  102:6 103:10
  104:11,19 106:3
  108:8 111:12
  143:22 145:1,4,8,18
  145:22 146:17
  147:6,11,17 148:1
  154:3,6,21 155:8,22
  156:7,14,21 157:18
  158:4 159:4,4,16
  161:17,20,22
  162:18 165:4,15,17

167:14 168:2
**PAH-indicated**
155:19
**paragraph**
17:13 66:14 162:13
  163:5
**parameters**
159:19
**paraphrase**
30:21
**part**
16:8 24:6 26:1 28:14
  49:15 75:3 84:22
  112:1 137:8 138:15
  138:15 147:8
  158:13
**particle**
59:5
**particular**
24:16 63:20 67:21
  69:5,7 73:13 95:7
  131:1,19 146:3
**particularly**
34:19 78:4 87:1
**parties**
86:20 87:5 98:14
  171:11,14
**parts**
158:18
**patent**
8:18,19,22 9:8 33:10
  33:11
**patient**
60:12 63:18 64:3
  103:3 104:10,21
  139:3
**patients**
47:21 48:3,8 54:10
  54:12,14 64:8,12,18
  65:3,7,10,13,17,20
  71:17 72:16 75:16
  75:20 76:7,12 87:12
  97:12 102:12,15,17
  103:2,9 105:6,9
  106:6 108:7,9,19
  111:9 114:17 116:3

**MAGNA** ▶
**LEGAL SERVICES**

116:10 117:2,5,10 118:6,21 119:7,18 120:2,10,13,20 121:15 123:8,10,14 123:20,22 124:8 125:3,8 126:9,12 127:17,22 128:5,7 128:12,15,20 129:2 129:7,8,14,16,18 130:11 136:12,17 136:22 137:16,21 138:4,9,14 139:1,8 163:11 167:11,14 168:2,2

**Patterson**
51:3,5,10,16 52:1,4,9 52:13,16,17 53:4 55:15,19 56:2,6

**pay**
144:3

**payor**
36:21 37:2,16 38:4 70:11

**payors**
27:12 30:3,5 31:1,3,8 31:13,15,20 32:4 34:8,15 35:2,5,17 35:19 37:6,20 38:11 38:16,19 39:2,6,19 40:7,16 41:1,3,8,10 41:14 42:3,8,16 44:9 53:9,15 56:12 56:17 69:8,18 77:11 79:1 80:3 123:1

**payor's**
31:18

**PBM**
70:11

**PBMs**
27:12 30:4 35:17,20 69:8,18 80:3

**PCSK9**
17:10,15 122:5

**PCY**
111:14

**PDE-5**

66:13,20 70:16
**Pennsylvania**
3:15
**people**
18:3 28:16 128:14
**percent**
34:17,22 36:6,10,18 36:21 37:6,12,15 38:1,5 39:5,12,16 110:18 111:1,13,14 111:14 114:17 117:16 118:5,13,16 118:20 119:17 120:9,14,20,22 121:6,15 122:6,12 123:7,19 128:19,22 129:6
**percentage**
38:15,16,19,22 39:5 39:11,14 156:17
**perform**
83:13,17,18
**performance**
100:17 145:10
**performed**
60:10 113:11 130:21 148:5
**performing**
82:18 112:15 115:19
**period**
142:22 147:2 149:7 149:20 150:12 152:1,11 155:12
**permitted**
145:5 154:6
**personnel**
57:17
**perspective**
10:15 16:12 31:18 49:16 83:21 105:13 105:17 106:21 112:19 115:16 123:4 144:8
**pharmacy**
30:4 31:20 53:21
**PHILLIP**

3:13
**phone**
19:4
**physician**
67:6,15 68:15,16,21 70:5 125:10
**physicians**
49:13,22 67:19 68:8 71:8 130:20 131:3,8 137:14,20 163:10 165:12,14,20 167:13,18 168:1
**PH-ILD**
21:14 22:15 23:22 25:2 41:9,12 42:6 42:10 47:9,17 53:2 54:11 61:14 62:2,13 63:10,12,19 64:4,12 64:19 65:3,7 66:6,7 66:21 67:6,7 68:4,9 68:20,22 69:14,21 70:15,17 71:2,5,14 71:17,20 72:11,14 72:15,20,22 73:9 75:18,20 86:14 87:1 101:17,22 102:6 103:10 104:20 107:1 108:18 114:16 115:18 116:3,10 117:2,9,17 118:5,21 119:17 123:21 124:4,6,8 127:18 128:5,10,12 130:8 134:19 135:12 136:11 137:1 138:5 139:2 143:18,19 149:8,21 150:15 151:3 161:8 161:12 162:6 163:1 165:13,22 167:11 167:17 168:2
**Ph.D**
1:14 4:10 5:5 6:2 10:5 13:22 14:4 169:2,11 170:3,21
**place**

62:1 66:15 69:13
**placement**
36:7 80:4 81:1
**places**
17:18
**Plaintiff**
1:4
**PLAINTIFFS**
3:2
**plans**
94:13
**please**
5:21 6:11 7:6,22 72:13 93:8 111:4
**plumbing**
135:4,5
**pmorton@cooley.c...**
3:17
**point**
39:1 44:12 58:5 66:9 84:16 95:6,19 127:10 140:17 146:15 151:20 154:20 155:14 160:17
**pointing**
125:22
**points**
82:17 84:21 85:5,8 85:14,16,17 86:1 97:7 98:11 100:15 100:20 116:7,9
**populated**
166:13
**population**
72:18 73:12 86:22 87:18 97:9 102:2 103:3 104:6,10 127:16 139:4
**populations**
60:13
**portfolio**
145:11 146:4 147:19 157:22
**portion**
130:3



portions
16:2
position
46:13
positioning
30:2 31:1 32:5
positions
31:14,16
possibility
96:10 125:11
possible
7:3
posture
53:17
potential
30:7,9 62:14 147:18
150:13
potentially
125:16 126:9 135:22
146:5 152:3
powder
32:10 54:15 59:6
72:8 86:6 109:20,21
117:5
powdered
52:19 58:22 97:11
164:14
practicality
70:7
practice
70:7
predate
33:18
preliminary
4:9 7:15 24:19 60:22
149:13,21 150:14
150:16 151:4
152:20
premarked
7:13
premature
166:21
preparation
27:1 53:8 57:17,21
92:7
prepare

56:20
prepared
23:3 84:9
preparing
13:3,18 57:10
prescribe
67:7 68:8,16,21
69:20 70:5 165:21
prescribed
125:19
prescriber
67:16
prescribers
12:3 22:1 47:20 48:2
60:18 71:9 165:20
167:14 168:1
prescribing
137:15
prescription
70:8 78:5
prescriptions
47:21
present
3:20 19:7,17 28:4
45:5,15 51:15 152:8
presentations
50:5 91:13
president
46:16
pretty
35:1
previously
38:18
price
62:15 74:4,6 77:5,15
78:3,7,13,19 79:14
80:9 97:10 110:4,10
112:9,17 113:8
117:8 144:13
146:20 153:15
prices
88:17
pricing
78:10 79:2 87:21
88:6 109:8,9,10,19
110:1 116:16

primarily
21:8 30:1
primary
130:10
principals
14:16
prior
9:15 43:20 44:7 88:3
91:17 96:13 113:15
113:15 114:13
162:5,22 164:17
privileged
89:17 90:1,16 92:14
93:4,7 99:17
probably
22:17 74:8
procedure
63:22 130:18 132:8
process
60:1 79:5 121:19
122:21
PROCTER
2:7 3:3
produced
81:17 83:9 96:13
product
32:11 33:13 40:3
58:20 60:3,6 63:3
68:1 69:12 80:2
124:3 131:14
132:17 135:21
136:5 156:6 164:12
production
155:8
products
32:9 33:18 34:13
37:16 39:20 47:8,17
59:19 60:7,13,19
62:20,21,22 63:8,12
66:5 67:12,13 69:9
70:14 71:2 77:6,16
78:19 79:14 80:9
81:5 87:22 88:6
113:14 114:5,12
126:13 128:9
131:10 132:12

133:17 135:13
138:7 145:9 146:4
147:19 157:22
162:5,22 163:5,7,10
164:16 166:12,15
Professional
2:18
professionals
65:6,8,13
profits
146:3 147:10,16,17
147:18 148:1 155:2
157:17 159:15
160:2,4
project
159:2
projected
86:3 123:10,14
149:17
projection
150:19 159:12,15,22
projections
87:11,21 97:8 116:3
142:1 159:21 160:9
160:13
projects
136:18
properly
143:15
proportion
153:20
proposed
60:11
proposition
135:20
propounded
169:6
protect
158:3
provide
16:7 20:12 35:16
37:11 55:15,19
56:10
provided
8:15 16:22 26:15
29:4 38:10 40:1



91:5,14 105:7
**provider**
124:3
**providers**
12:4 22:1 47:20 48:2
54:6 60:18 65:9
166:14
**providing**
148:15
**PSCK9**
17:14
**public**
2:20 49:11,20 50:6
104:22 142:3
169:19 171:18
**publicly**
144:11
**pulmonary**
11:2,4,7,16 21:10,11
21:12 22:10,14 48:8
63:21 72:17 75:8,16
76:8,16,19 114:6
125:4,12,13 130:12
132:2 135:6,8
137:22 163:15
164:5
**purpose**
151:11
**purposes**
73:10 74:22 83:8
84:13 87:6 88:10
105:21 113:6
115:18 121:13
127:21 128:13
129:4,13 139:6
148:2 149:5
**pursuant**
2:17
**put**
15:21 16:9,10 17:1
82:2 104:1 112:12
124:20
**p.m**
139:17 140:1 168:21

**Q**

**qualified**
10:18
**quantification**
10:16
**quantified**
9:7,9
**quantify**
53:1
**question**
25:6 43:15 68:14
69:17,18 76:4 90:6
93:6,16,22 94:3
97:18 108:17
122:10,14 142:10
159:1 160:2 162:16
162:19
**questionnaire**
132:6
**questions**
7:2,6 82:12 108:5
168:14 169:5
**quickly**
157:6
**quite**
53:15 86:20
**quote**
34:7 72:11

**R**

**R**
5:1
**range**
34:16 36:5,14 37:22
**rate**
15:7 130:10,21
131:21 132:1 139:9
139:11
**rates**
86:2 87:4 138:2
**reached**
93:13
**reaches**
117:14
**reacting**
30:7
**read**

48:5 56:22 143:16
169:3
**reading**
66:1 130:14
**real**
107:10
**really**
146:1 152:5
**Realtime**
2:19
**rearranged**
135:5
**reason**
7:9 71:19 84:7 88:4
105:7 106:16 141:4
167:17 170:5
**reasons**
136:2 159:11,17
**rebates**
31:6 78:13
**rebutting**
9:3
**recall**
12:12 19:11,16 20:5
28:13 31:11 34:3,17
36:14 37:1 43:6
44:1,11 46:18 47:14
48:21 49:5 56:9
98:20 140:16 141:9
160:18
**receive**
29:16 46:8,11 52:11
90:22 92:3 140:12
156:9
**received**
35:4 56:7 61:4 80:20
89:2 91:20 99:4,19
141:5 142:22
**receiving**
42:16
**recess**
58:9 107:15 139:18
**reciting**
65:15
**recognition**
162:3,12,17,21 163:9

164:19 165:17
**recognized**
166:17
**recognizes**
125:10
**record**
5:3,20 6:12 20:6
28:18 45:20 50:10
51:22 58:8,12
107:14,18 139:16
140:3 168:19 171:8
**record's**
22:8 74:14
**redo**
76:3
**reduce**
77:15 79:14 80:8
**reduced**
121:16 171:7
**reducing**
77:5 78:18
**refer**
21:13 63:2 131:15
**reference**
32:1,3 34:9 72:11
75:11
**referred**
21:17 22:9
**referring**
33:4 73:2 126:3
**refers**
22:10,14
**refined**
17:2
**reflect**
83:3 84:9 96:20
97:21 110:22
**reflected**
126:12
**reflection**
112:20 146:11
157:16
**reflects**
9:14 84:15 126:17
**regarding**
95:20 113:4 140:8



145:1
**Registered**
2:18
**regular**
93:11
**reimbursements**
27:6
**rejected**
70:10
**related**
9:4 41:9 43:12
102:12 142:1
162:16 171:10
**relationship**
156:8
**relationships**
31:4
**relative**
120:14 171:12
**relatively**
40:9 152:1
**reliable**
84:19 85:6,19 86:15
87:13
**relied**
84:21 85:5 87:22
**reluctant**
53:16
**rely**
12:7 64:9 84:19
**relying**
11:18 12:2 101:8
**remains**
117:14
**remember**
99:3
**reminded**
112:11
**Remodulin**
165:4
**rendering**
55:6
**repeat**
76:17
**replacement**
41:22

**report**
9:2,5 21:14 38:14
63:16 64:16 66:3,5
66:10 72:10 75:12
82:6 84:3,20 91:6
91:15,21 92:2,5
94:14 115:15 116:2
122:3 143:5 146:15
151:13 162:10,12
163:21 164:22
**reported**
1:20 13:18,21
**reporter**
2:18,19,20 5:15,21
6:1 76:17,21
**represents**
124:5 125:17
**request**
35:22
**requested**
38:4
**requesting**
40:16 41:8
**requests**
43:13
**required**
80:22 99:21
**requirements**
43:21 44:9
**requires**
63:22 130:16
**research**
16:8
**reside**
6:14
**resources**
166:11
**respect**
11:22 30:2 32:8
34:12 35:6 47:7,10
48:6 53:18 86:21
87:20 91:7 99:22
100:15 119:12
121:3 146:20
153:14 156:12
158:12 165:7

**respects**
157:15 166:16
**response**
40:22
**responsible**
15:22
**result**
23:21 24:18 25:3
80:2 100:2 121:4,11
122:1 131:15
139:11 146:21
149:1 152:20
156:14 157:12
161:12
**resulted**
25:20 164:19
**retained**
12:10 113:16
**retention**
12:13,20
**reveal**
89:16 90:1,15 92:12
93:1,3 99:15,17
**revealing**
93:6
**revenue**
145:10
**revenues**
145:3,17,22 146:16
147:4,6 148:6 151:1
155:1,17,21 156:2,8
156:20 158:3,19
159:3
**review**
16:10 21:3 54:13
56:1 163:22
**reviewed**
15:20 16:21 17:2
50:9 56:22 82:15
**reviewing**
57:11,12
**revisit**
151:10
**Reynolds**
3:21 5:18
**right**

6:9,19 7:9,13 8:9,11
9:13,19 10:10 17:16
18:21 19:4 22:11
23:6 26:22 27:2,7
27:14 33:1,6,19,22
34:9 37:7 38:5
39:20 41:16 44:13
45:3,4,5 46:17
50:21 51:3 53:13
54:7 59:20 60:3,7
61:10,20 62:9 63:13
63:19 64:1,19 65:22
66:7 67:8 68:13
75:21 76:9,14,22,22
80:14 81:14 82:7
84:3,18,20 85:19
86:15 87:13 88:1
89:8 98:22 101:5,17
102:7,21 103:11
104:8,12 108:4
109:6,20 110:11
114:9,15 116:5,11
116:22 117:12,18
118:6,14 119:2,18
120:10 123:10,22
124:10 127:18
128:10 129:9,10
130:18 133:19
135:9,14 136:12
139:13 143:4,12
148:7,11,18 149:5,9
149:22 150:10,17
151:4 152:22 154:4
154:7 155:2 156:21
160:6,18 161:9
163:2,16 164:5
166:2 168:12
**RMR**
1:20 171:17
**robust**
48:11
**rolls**
22:21,21
**room**
28:11
**roughly**



87:3 98:13 104:21
105:18 107:3
115:20
**row**
117:3 126:7,11
**rudimentary**
134:16
**Ryan**
13:22 14:15,15 19:13
28:6

**S**

**S**
4:1,7 5:1 17:11
**sacs**
134:10
**safe**
68:2
**safety**
68:6
**sale**
155:18 159:15
**sales**
46:16 47:11 48:16
49:2,9,15,17 50:19
83:4 95:5 142:8
143:18,19,21 145:1
145:4,8 155:2 160:1
160:7
**Sanofi/Regeneron**
9:3
**SANYA**
3:14
**saw**
15:9 20:22 112:8
**saying**
95:18 126:1,17
127:15 129:1 167:3
**says**
111:12 114:17
118:15 128:4
**scenario**
126:10
**scheduled**
18:17 27:22 152:15
**sciences**

10:3,7
**scientific**
10:12
**scope**
23:9,10,14 69:3 70:3
70:19 71:22 73:21
**Scripts**
31:22
**second**
8:12 116:15
**section**
102:22 103:4,8 109:8
111:5 143:5,9,17
160:22 161:1
**sections**
16:14 26:9
**see**
10:20 18:2 28:16
36:4 67:19 72:12
103:5 109:8 110:1,6
110:9,13 111:5,11
115:1 118:10 126:6
127:2,4,7 143:20
162:7
**seeing**
36:16
**seen**
49:10 50:16 72:2
103:21 125:10
160:11
**Selck**
1:14 4:3,10 5:5 6:2
6:13,15 7:16 81:11
81:14,15 82:1 169:2
169:11 170:3,21
**sell**
154:3
**selling**
145:18 148:1 156:21
158:4 159:4,4
**senior**
46:16
**sense**
79:4,8,9 80:17
**separate**
45:1

**September**
82:4,6 95:9 96:2 97:6
112:13 120:17
**series**
119:10
**served**
13:15
**Services**
5:17,19
**SESSION**
140:1
**set**
151:18
**setting**
36:3 153:8 154:19
166:2,2
**shapes**
59:5
**share**
32:13 60:15 121:3,11
121:22 122:8,12,14
123:21 146:20
153:15 156:13
158:14,16
**shares**
144:12
**sheet**
169:8
**Sherrard**
14:15
**short**
147:1 152:1
**shorthand**
2:19 171:7
**short-circuited**
166:21
**showed**
54:14
**showing**
146:18
**shown**
68:2
**shows**
110:3
**side**
156:10

**signaling**
41:11
**signals**
34:15 35:3,14 41:3
42:15
**signature**
168:20
**significant**
35:16 74:3,3 133:9
153:20 163:14
**sildenafil**
66:20 70:17 71:14
**similar**
31:14,16 111:13
**simple**
158:22
**simpler**
68:14
**simplify**
138:20
**simply**
131:4
**single**
38:15,15,19,22 39:10
39:14
**sitting**
79:12
**skepticism**
89:11 90:7,11
**skipped**
103:1
**slide**
160:14
**small**
74:2 166:6,22 167:4
**sold**
154:21
**somebody**
10:19 121:5
**sorry**
30:4,17 49:18 76:19
77:1 98:7 107:9
126:4 148:10
**sort**
10:18 43:21 142:2
150:6 152:19



Sotaracept
111:15
sought
61:8,13,18 68:20
    148:15
sound
82:7
sounds
46:19 130:17
sources
152:6
**Southeast**
6:17
space
62:4,14 161:13
    166:13
speak
18:9 27:19 45:8 51:9
    53:9,12,21 54:2,5,9
    54:12 57:16,20
speaking
56:11
specific
25:15 34:18 35:13
    36:15,21 37:2,2
    38:4 39:4 61:14,14
    79:9 80:6 84:4,21
    136:2
specifically
13:8 31:10 34:11,21
    35:21 39:18 42:14
    53:14 147:7,10
    151:10 164:9,21
specifics
49:7
specified
31:10
speculation
104:14 106:19
spend
13:2 14:18 52:19
    57:5,10
spent
53:1 57:2
**SPETRINO**
3:8

split
86:5 97:10 113:9
    117:4
spoke
18:2,6,12,20 26:22
    27:9,13 44:13,19
    51:2 141:6
**SSNIP**
73:4,7,8,14,19 74:1
    74:15,15,18
ssukduang@coole...
3:17
staff
13:17,20 14:14 49:14
stages
94:17
stale
99:8 100:6,10
stance
31:3 34:8 156:12
    158:11
**Stand**
168:16
stands
74:1
stand-alone
147:22
start
12:17 23:7
started
12:21 13:12 23:13
    33:13 40:13
starting
117:14
starts
81:17 102:14 106:12
    126:7 143:5 161:1
startup
166:6 167:4
state
6:11 164:21
statement
115:4
**States**
1:1 5:8 101:16 103:9
    118:6,21 119:18

124:9
status
167:19
stay
25:5
stays
106:14
stenographic
5:20
step
130:10,22 131:22
    132:1
**Steven**
18:6
stopped
70:16 107:10
stops
137:6
strategies
142:7
strategy
47:7,16 48:6 79:10
    80:19 81:9 121:20
    122:22 160:15
streams
147:4
**Street**
2:7 3:4,9 5:13
strike
32:2 53:20 64:22
    68:17 70:13 73:16
    96:18 129:15,15
strongly
60:6
structural
134:21
structure
134:2,17
studying
67:15
subject
44:7
subjecting
132:6
submission
24:15 25:11

submitted
8:1 9:2,5 21:1,3 24:3
submitting
112:6
**Subramaniam**
14:3,6,10 19:14 28:7
subscribed
169:15
subset
10:6
substance
25:14 26:2
substantial
71:7 94:19 153:16
    155:10 157:13
    162:3,20
substitution
74:12
success
158:14
suffer
23:21 75:16 100:1
    151:15 157:12
sufferers
75:7
sufficient
87:8 107:6 113:10
    142:8
sufficiently
115:14
suggested
43:13
**Suite**
3:15
**SUKDUANG**
3:14
summarize
157:4
summarizes
22:6
summarizing
162:9
superior
72:6
supplement
94:14

HIGHLY CONFIDENTIAL                    DA0099                    LIQ_PH-ILD_00000661

suppliers
163:15
support
18:3
sure
13:7 15:1,9 19:20
27:16 58:4 89:1
131:2
surprised
31:2,9 35:18
sustainable
74:4
swear
5:22
switching
74:12
sworn
6:5 169:15 171:5

**T**

T
4:1,1,7
table
26:4
take
6:19 20:8,9 28:21
29:2 45:11 46:1
52:3,6 95:16 107:12
139:14 145:16
147:1 161:14 165:2
taken
2:17 5:5 8:5 58:10
107:16 139:18
170:4 171:3,6,12
talk
21:17 66:15 101:2
137:19 144:1
160:21 162:11
talked
21:20 114:10 140:22
164:2
talking
102:21 103:2 112:10
137:9
talks
162:14

tasks
16:8
TD-300
109:10,15 110:4
120:9
team
14:14,17,18 15:20
16:7 17:1 19:13
28:6 45:17 48:16
49:2,9 50:19 51:17
57:14
Technologies
1:6 3:12 5:7 170:2
tell
14:22 36:9,20 38:3
47:16 50:12 72:13
78:17 89:1
telling
37:5
tentative
61:4
tenth
8:6
term
83:19 135:3 149:14
terminology
22:20
terms
10:15 13:4 22:18
25:13,13 26:1
test
72:21 73:4,5,6,7,8,14
73:19 74:15,17,18
74:19 132:7
testified
6:6
testifying
9:11
testimony
7:11 8:13,15,22 9:10
16:19 41:14 42:11
58:16 95:15 96:1,6
97:2 98:3 99:13
107:22 124:12
126:20 140:8
145:20 157:2 164:7

168:5 171:4,6,9
tests
73:2
Thank
7:20 14:10 140:6
148:12 161:5
Therapeutic
5:6
Therapeutics
1:3 4:12 11:12 20:4
51:7 57:17 77:5,15
78:18 79:13 80:8
81:4 82:3,10 83:8
86:13 87:11,21 88:5
89:8,12 90:9,13
91:20 96:2 101:3
104:9 105:8 106:4
110:2,9 113:3 114:3
121:15 170:1
Therapeutic's
27:5
therapies
67:19 130:7 163:15
165:3
thing
113:6
things
10:16,17 43:21 44:2
57:13 142:2 144:8
150:6 153:5
think
15:13 17:9 19:2,22
22:6 25:20 27:17,22
29:10 31:19 35:6,8
35:10 36:2 46:20
49:16 61:22 62:11
68:4 69:6 73:14
81:7,9 82:5 86:17
89:22 91:14 93:12
93:22 96:9 97:15
98:13 99:2 101:7
103:22 107:10
114:10 121:9,10,20
122:14 123:1,2
124:1,20 131:18
132:15 133:21

142:2 144:18,19
153:9 162:16 164:8
164:15,20 166:9
168:12
thinking
40:10
thinks
60:17 125:3
thought
21:22 37:5 48:10
49:8 85:8 86:1 87:8
87:10,15 97:7 98:17
107:6 160:12
three
19:12 28:16 85:7,14
116:6,7,9
tied
109:2
time
5:11 8:6 11:10,14
13:2 14:18 17:7,20
18:12 20:22 57:4,9
57:12 95:19 104:12
107:10 147:2 148:7
149:6,19 150:12,14
151:2 152:1,11
155:12
times
8:4
timing
97:15
tissue
134:7,12 135:2
title
27:8 46:18
today
7:6,11 22:19 38:4
43:5 56:21 57:10
79:12 164:2
today's
5:10 168:17
told
25:8 37:10,14 50:8
65:15 79:20
tolerate
74:6



**tongue**
22:22
**top**
124:15 125:2
**total**
14:20 57:9 124:5,7
124:17 127:9
128:14
**traded**
144:11,12
**training**
10:13
**transcript**
169:4
**transposed**
17:11,11
**treat**
66:6 163:15 165:14
167:14
**treated**
87:12 102:12,15
103:2 104:20 105:6
105:9 106:6 108:7
108:10,20 111:9
114:16 116:3,10
117:10 119:7 120:2
120:10,13 123:8,10
123:19 126:13
127:17 128:1,5,9,12
128:15 138:6 139:4
**treatment**
11:2 32:17,21,22
68:3,5,7 69:14
71:10 125:19
137:13,15 138:13
161:11 165:12,22
**treatments**
32:20 67:18 72:19
122:5 164:4
**treats**
124:4
**trend**
104:19,21 112:9
117:1 127:6,7,8
137:5
**trends**

113:8
**treprostinil**
21:9 33:4,11,12,18
62:19 113:13,21
130:7 167:6,9
**treprostinil-based**
32:9 58:21 63:7,11
114:5 128:2,16
138:7
**trial**
10:17 148:17 149:8,9
152:15 153:6
**trials**
53:2
**true**
171:8
**truthfully**
7:2
**try**
67:19
**trying**
50:7 121:21 153:11
**turn**
8:7,11 9:13 109:6
111:3 138:2 143:4
147:4 157:15
**Turning**
105:4 135:10
**two**
25:15,21 64:7 85:7
128:19 153:19
**type**
10:2 38:10 155:17
159:21,21
**typewriting**
171:7
**typo**
17:19
**Tyv**
111:14
**Tyvaso**
4:12 12:5 22:2 31:2
32:5,16 33:13,19
34:13 36:22 37:15
38:5,20 39:1,20
42:4 43:19 44:6,7

47:8,17,21 52:19
56:13 59:2,9,12,16
59:19 60:7 62:20
63:6,11 68:1,9
69:15,15 70:14 71:4
71:6,18 72:7 77:6
77:16 78:19 79:14
80:9 81:5 83:4 84:8
87:12,22 88:6 95:5
98:6,7 102:12,13,17
103:1 105:6,9
106:11 108:7,8,11
108:11,17,20,20
109:10,12,16,19,20
110:4,10 111:9,11
114:11,16 116:10
116:15 117:9 119:7
120:3,15 126:6,13
127:17 128:5,9,12
136:12,19 139:4
155:22 156:7 160:7
161:10 162:4,15,22
163:4,7,9 164:10,13

**U**

**ultimately**
91:8
**Um-hmm**
13:6 14:2 113:12
**unable**
94:1,3,11
**uncertainty**
86:21 104:4 150:3
**underlying**
88:12
**understand**
6:22 7:5 22:19 27:4
27:10,13 33:17 50:7
59:9 60:14,16 61:3
61:12 78:9 89:6
93:9 113:20 114:2
114:12 130:1
133:15 134:5
137:18 148:14,20
152:14 165:9
167:12 168:8

**understanding**
11:19 29:15 58:19
59:5 63:1,14 64:5
64:11 65:16,19
66:19 67:2 73:19
81:22 94:18 96:17
109:11,14 111:17
111:22 114:19
115:3 121:21
130:14 134:16
137:8 155:17
161:10 167:21
168:3
**understood**
126:11
**United**
1:1,3 4:12 5:6,7
11:11 20:4 23:20
25:4 27:5,12 28:8
30:22 32:3,7,12
33:17 34:12 35:15
36:6 41:20 45:19
48:18 49:14 51:6,18
52:19 53:1 57:16
77:4,14 78:18 79:4
79:13 80:7,18 81:4
82:3,10 83:8,22
84:15 86:4,8,12
87:11,20 88:5 89:7
89:12 90:9,12 91:20
93:10,12 96:2,9
98:8 100:1 101:3,12
101:16 103:9 104:9
105:1,8,15 106:4
107:5 110:2,9 113:3
113:18 114:3
115:20 118:6,21
119:18 120:1
121:14,18 122:20
124:9,16 125:3
127:10 131:7
136:18 143:11,15
143:15,19 150:22
151:15 152:6
154:15 155:22
157:11 161:6,12



162:2,20 163:7,13
164:10,20 165:3
166:4,10 167:19
170:1
**UnitedHealthcare**
31:19
**United's**
19:9,19 30:2 32:1
33:11 47:7 48:6
62:13 79:9 85:10
89:5,7 123:3 137:18
138:10 142:5
160:13,15 161:15
164:3 167:5 168:9
**unpack**
24:11
**unusual**
67:18
**update**
93:10 95:3
**updated**
92:8,21 93:18 94:6
94:14 95:4 99:10
**use**
21:16 22:17 67:11,12
71:1,6,17,19 72:6
72:21 73:8 74:17
82:20 84:22 85:2,18
92:4 95:1 98:18
112:1 113:7
**uses**
71:14
**UT**
129:15
**UTC**
33:4 38:10,13,18
39:19 46:17 83:3
84:9 94:15 95:5
103:9 113:20 116:4
118:2,19 119:16
122:11 124:2
126:12 129:1,8
140:21 141:6
**UTC's**
83:2 99:7 117:18
119:11 123:9,14,20

132:11
**UTC_PH-ILD_009...**
81:18
**utilization**
44:8
**utilize**
91:11
**utilized**
91:8
**U.S**
9:8 86:13 104:10,18
117:17 129:18

---
**V**
---

**v**
1:5 170:1
**vague**
100:8
**value**
144:9,19 146:11
152:8
**values**
83:11
**variable**
88:15
**variety**
125:8 132:20 153:4
156:3 158:9
**various**
50:5 78:6 164:4
**varying**
125:6
**Ventavis**
111:13
**version**
59:19 90:22 109:12
109:20 141:12,16
**versions**
91:4 141:14,21
142:12
**versus**
5:6 97:11
**vessels**
134:13
**vice**
46:16

**VIDEO**
3:21 5:2 58:7,11
107:13,17 139:15
140:2 168:16
**videoconference**
19:5,6 28:2 45:13
51:13
**videoconferencing**
28:15
**videographer**
5:17
**videos**
54:13,17 55:5,10
**videotaped**
1:13 5:4
**view**
12:4 22:1 23:17
60:18 77:6 78:19
79:15 80:9 85:10
100:4 129:3
**viewed**
105:20
**views**
115:21
**virtue**
81:7 122:19 128:19
138:8
**VP**
27:5

---
**W**
---

**W**
3:7
**waived**
168:21
**want**
17:7,21 19:18 36:4
50:9 63:1,3 83:16
151:9 154:20
160:21
**wanted**
37:6,14 42:4 83:12
83:18 113:7
**Washington**
1:17 2:8 3:4,9,16
5:13 6:18

**wasn't**
26:15 45:5 69:17
95:22 101:8 155:6
161:19
**way**
74:9 135:4,7 150:18
**ways**
146:8,10 165:13
**Welcome**
58:14 107:20 140:5
**well-defined**
75:2
**weren't**
54:22 100:20
**we'll**
22:17 24:11
**we're**
24:17 58:11 94:17,17
102:22 107:17
140:2 149:5 168:15
168:19
**we've**
7:13 43:4 58:1 164:2
**wins**
150:9
**witness**
4:2 5:22 6:3 11:22
16:21 26:16 33:8
34:2 36:2,13 37:9
37:18 38:8,13,22
39:8,14,22 40:20
41:18 42:13 49:4
50:15 59:4 60:9
61:3,12,22 62:11
66:9 67:1,11 69:4
70:4,20 72:2 73:22
74:21 76:11,19,22
77:9 78:1,22 79:18
80:17 83:7 84:12
85:22 86:17 87:15
88:9 89:15,19 90:15
90:18 92:12,15 93:1
93:9,20 94:9 96:8
97:3 98:4 99:2,15
99:19 100:9,14
101:7,20 102:10



**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000664

103:14 104:15
105:12 106:11,20
108:14 109:1,14
110:13,21 111:21
112:8 114:2 115:1
117:20 118:9 119:5
119:21 120:12
122:18 123:12
124:14 126:22
127:20 129:22
131:13 132:15
133:21 135:17
136:14 137:3
140:15 141:2
142:17 144:6 145:7
145:21 147:13
148:20 149:11
151:6 153:3 154:10
155:5 157:3 158:7
159:10 161:19
163:19 164:8 165:6
166:9 167:8 168:6
171:4,6,9
**word**
15:17 16:5,18 17:3
**words**
16:11 31:16
**work**
9:15 12:17,21 13:12
15:3 23:8,13
**worked**
11:11,15
**working**
13:13 107:10
**worksheet**
110:15 115:18
**wouldn't**
71:18 115:9 130:5
131:9
**wrapped**
168:12
**write**
16:3,15 47:20
**writing**
46:12 70:8
**written**

16:12 20:6 28:18
45:20 51:22 103:19
**wrote**
16:4,5,17

---

**X**

**X**
4:7

---

**Y**

**yeah**
58:4 76:3 82:5
107:11,12 110:17
118:17 126:22
143:16 148:11,13
155:5 163:13
**year**
34:4 102:16 110:5,11
110:18 111:1
117:12 127:15
**years**
113:22 114:9,14
120:3 126:14
153:19 164:4 166:5
**yesterday**
57:3
**YouTube**
54:13,17 55:4,10
**Yutrepia**
12:4 22:2 30:8,10,16
30:17,20 40:17 41:4
41:9,19 42:6 47:12
58:20,21 59:1,8,16
59:18,21 60:5 61:1
61:9,19 62:2,8,12
62:18,21 63:6,9,10
67:7 68:15,18,21
69:21 70:8 71:19
72:5 77:10 78:20
79:15 80:10 81:6
91:17 95:11,17,22
96:3,21 97:22 121:4
121:12 122:2
128:21 129:2,17
130:5 131:5 136:11
136:17,22 139:2,12

145:18 146:17
148:1 149:7,20
150:15 151:2 154:3
154:6,21 155:19
156:6,21 157:12
158:4,12 159:4,16
161:7,16,21
**Yutrepia's**
23:22 31:7 41:13
42:18 60:2 62:16
67:4 71:16 77:6
84:1 96:11 100:2
146:22

---

**Z**

**zero**
39:15
**Zinc**
31:11 34:9,12,18,19
34:20 35:14,17,20
35:21 36:2,9,15

---

**$**

**$1,050**
15:14
**$1.4**
152:9,12

---

**1**

**1**
4:9 7:14,16 8:8 21:18
22:9 30:17,18,20
39:11 102:3,13,19
103:18 106:12
108:8 111:12 116:2
**1,950**
102:15 126:7
**1:13**
140:1
**1:51**
168:21
**10**
111:13
**10-Ks**
160:13
**10:00**

57:6
**10:15**
58:8
**10:31**
58:12
**100**
85:15
**101**
134:10
**11:32**
107:14
**11:47**
107:18
**1111116**
1:21
**12th**
146:14
**12:28**
139:16,17
**1299**
3:15
**13:13**
140:3
**13:51**
168:19
**1320**
6:17
**14**
29:21 43:3,9
**14th**
27:14 44:21
**15**
1:17 2:2 170:4
**15th**
5:10
**15,000**
117:12,14,15,20
126:8 137:6
**150**
13:10
**151**
66:14,16
**16th**
51:3,4
**1900**
2:7 3:4 5:13

**2**

**2**
4:12 81:11,16 82:21
85:6 88:22 89:4,7
92:10,21 93:18 94:6
95:16 96:18,20
97:21 98:21 100:5
101:4,14 102:5
104:9 105:5 108:5,7
109:7 111:4,6 116:5
117:18 118:3,13,18
124:10 126:6 128:8
140:11 141:5
**2/26/24**
4:11
**20**
34:17,22 36:5,10,17
36:21 37:6,11,15,22
38:4 113:22 114:9
114:14 120:9,14,20
120:22 121:6 122:6
123:7,19 128:19,22
129:6 164:4
**200**
13:10 85:15
**20001-1531**
3:9
**20003**
6:18
**20004-2400**
3:16
**20036**
2:8 3:4
**2004**
33:5,21
**2009**
33:15 114:11 164:11
164:13
**2014**
1:17
**202**
2:8 3:5,10,16
**2021**
141:16,21 142:11,19
160:8

**2022**
88:2,17 97:10 103:16
117:8 137:5 141:12
141:21 142:11
160:8 164:15
**2023**
12:15,22 40:14 82:4
82:6 95:13 96:2
102:16 112:14,18
120:17
**2023-2035**
4:13
**2024**
2:2 5:11 18:11 96:21
97:22 103:18
111:13 116:19
117:13 127:15
128:10 129:9
146:14 152:2,13
169:16 170:4
**2025**
106:14 152:2,16
**2026**
152:3,13
**2030**
117:12,14,15 137:6
**2031**
106:14 112:11 119:8
126:9
**2032**
148:9
**2035**
110:3,11 148:6,10
**23**
12:16
**23rd**
152:16
**23-975**
1:5
**23975**
5:9
**24,400**
129:18
**25**
57:14

**3**

**3**
21:18 22:13,21 30:18
30:20 32:16,18,20
33:1 101:21 102:18
108:18 114:16
126:7 138:14
**3,150**
102:14 106:13
**3,500**
106:13,14
**30**
19:1 34:17,22 36:6
36:10,18,21 37:6,12
37:15 38:1,5 45:12
57:15
**30,000**
101:22 103:15,21
117:21 124:9
138:12
**30-month**
25:5
**31**
117:15
**32**
117:15
**346-4000**
2:8 3:5
**3500**
106:5

**4**

**4.4**
161:1
**45**
45:12
**49**
161:1

**5**

**5**
110:18 111:1,14,14
**5,600**
117:13 127:22
128:20
**5.5**

143:5
**5:00**
57:7
**50**
114:17 117:16 118:5
118:13,16,20
119:17
**50,000**
102:3 103:16
**500**
3:9
**505(b)(2)**
59:22
**54,000**
103:17
**5600**
127:16 128:5 129:8

**6**

**6**
4:3 82:6
**68**
143:6

**7**

**7**
4:11
**70,000**
104:2 124:21,22
**700**
3:15
**756-8000**
3:10

**8**

**81**
4:13
**82**
17:13
**842-7800**
3:16

**9**

**9**
39:12,16
**9th**

18:11
**9:11**
2:3 5:11
**9411**
109:7
**9416**
111:3
**95**
163:5
**96**
162:14
**97**
162:13



**HIGHLY CONFIDENTIAL**
**LIQ_PH-ILD_00000667**

# EXHIBIT 5

## Minn, Robert

| | |
|---|---|
| **From:** | Flynn, Michael J. <mflynn@morrisnichols.com> |
| **Sent:** | Thursday, February 22, 2024 9:50 AM |
| **To:** | Sukduang, Sanya |
| **Cc:** | Davies, Jonathan; kkeller@shawkeller.com; Nate Hoeschen; William Jackson (Goodwin); Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com); Cheng, Katherine; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com); Burrowbridge, Adam W. (MWE); Lobel, Louis; Romeo, Eric; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 |
| **Subject:** | RE: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion |

**[External]**

Sanya,

We are available at 12:00 ET on Friday for a call and look forward to discussing your questions below.

Click to join meeting: https://meet.loopup.com/45xeX0IXC8

**Or dial in:**
US Toll Free: 1 877 304 9269
Passcode: **3023519661#**

Mobile Quick Join: tel://+18773049269,,3023519661#

_____

**MICHAEL J. FLYNN**
Partner | Morris, Nichols, Arsht & Tunnell LLP
(302) 351-9661 Direct
**mflynn@morrisnichols.com**

**From:** Sukduang, Sanya <ssukduang@cooley.com>
**Sent:** Wednesday, February 21, 2024 9:51 PM
**To:** Flynn, Michael J. <mflynn@morrisnichols.com>
**Cc:** Davies, Jonathan <jdavies@cooley.com>; kkeller@shawkeller.com; Nate Hoeschen <nhoeschen@shawkeller.com>; William Jackson (Goodwin) <wjackson@goodwinlaw.com>; Douglas H. Carsten - McDermott Will & Emery LLP (dcarsten@mwe.com) <dcarsten@mwe.com>; Cheng, Katherine <KatherineCheng@goodwinlaw.com>; Art Dykhuis - McDermott Will & Emery LLP (adykhuis@mwe.com) <adykhuis@mwe.com>; Burrowbridge, Adam W. (MWE) <aburrowbridge@mwe.com>; Lobel, Louis <LLobel@goodwinlaw.com>; Romeo, Eric <ERomeo@goodwinlaw.com>; Mhkim@mwe.com; z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** [EXT] Re: UTC/Liquidia (23-975) - Meet & Confer on Prelim. Inj. Motion

Michael

We aren't available tomorrow, but can be Friday except between 3:00-4:00 pm, contingent upon UTC's ability to respond to the issues below .

During the call, we expect UTC to specifically address the following, and failure to do so will be raised with the Court:

LIQ_PH-ILD_00000031

1.  Why UTC believes a PI is needed in this action given UTC's position, articulated as recently as yesterday, that the Court's 793 injunction cannot be lifted until the 793 claims are cancelled by the Director;

2.  Why a PI is needed given UTC's complaint against the FDA that Yutrepia should not be launched;

3.  UTC's delay, until February 21, 2024, to address a PI given the parties' specific discussion with you and William Jackson of a PI request prior to December 25, 2023 and Liquidia's request to address any potential PI briefing such that UTC does not force Judge Andrews to act expeditiously;

4. Why, despite filing a complaint 3 months ago concerning the '327 patent, UTC has waited to file a PI;

5. Why a PI is warranted given UTC's request for a 30 day extension of time to answer Liquidia's counterclaims based on proceedings in an unrelated litigation in NC and why Liquidia is also not entitled to rely on the schedule in NC to support a non-conflicting schedule;

6. The specific date UTC intends to file its PI motion and any declarations it may file in support;

7.  The dates any UTC declarant is available for a deposition; and

8. The briefing schedule UTC proposes.

This above list is non-limiting and Liquidia may raise additional issues based on UTC's responses.

If UTC is prepared to fully address each issue above, Liquidia can be available on Friday except between 3:00-4:00 PM EST.

Thanks
Sanya


On Feb 21, 2024, at 6:07 PM, Flynn, Michael J. <mflynn@morrisnichols.com> wrote:

[External]

Counsel,

UTC intends to file a Motion for Preliminary Injunction to enjoin the launch of Yutrepia for treatment of pulmonary hypertension associated with interstitial lung disease upon the expiration of UTC's regulatory exclusivity on April 1, 2024, pending resolution of UTC's infringement claims for U.S. Patent No. 11,826,327 asserted in this action.  We would like to discuss with you the timing of that motion and a briefing schedule.

Can you please let us know your availability **tomorrow**, **February 22,** for a call to discuss?  We are available any time except 12-1 ET.

Thanks,
Michael

_____
**MICHAEL J. FLYNN**
Partner | Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347

2

LIQ_PH-ILD_00000032

Wilmington, DE  19899-1347
(302) 351-9661 Direct
**mflynn@morrisnichols.com** | **vcard** | **bio** | **www.morrisnichols.com**

---

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

**LIQ_PH-ILD_00000033**

# EXHIBIT 6



US011826327B2

(12) **United States Patent**    (10) **Patent No.:** **US 11,826,327 B2**

Peterson et al.    (45) **Date of Patent:** **Nov. 28, 2023**

(54) **TREATMENT FOR INTERSTITIAL LUNG DISEASE**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Leigh Peterson**, Hillsborough, NC (US); **Peter Smith**, Durham, NC (US); **Chunqin Deng**, Chapel Hill, NC (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 263 days.

(21) Appl. No.: **17/233,061**

(22) Filed: **Apr. 16, 2021**

(65) **Prior Publication Data**

US 2021/0330621 A1    Oct. 28, 2021

**Related U.S. Application Data**

(60) Provisional application No. 63/011,810, filed on Apr. 17, 2020, provisional application No. 63/160,611, filed on Mar. 12, 2021.

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 31/192* | (2006.01) |
| *A61P 9/12* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *A61K 31/192* (2013.01); *A61K 9/0075* (2013.01); *A61K 9/0078* (2013.01); *A61P 9/12* (2018.01)

(58) **Field of Classification Search**
CPC .................................................. A61K 31/192
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,664,337 | A | 5/1972 | Lindsey et al. |
| 4,001,650 | A | 1/1977 | Romain |
| 4,007,238 | A | 2/1977 | Glenn |
| 4,281,113 | A | 7/1981 | Axen et al. |
| 4,306,075 | A | 12/1981 | Aristoff |
| 4,306,076 | A | 12/1981 | Nelson |
| 4,349,689 | A | 9/1982 | Aristoff |
| 4,473,296 | A | 9/1984 | Shofner et al. |
| 4,486,598 | A | 12/1984 | Aristoff |
| 4,495,944 | A | 1/1985 | Brisson et al. |
| 4,635,647 | A | 1/1987 | Choksi |
| 4,668,814 | A | 5/1987 | Aristoff |
| 4,677,975 | A | 6/1987 | Edgar et al. |
| 4,683,330 | A | 7/1987 | Aristoff |
| 4,692,464 | A | 9/1987 | Skuballa et al. |

| | | | |
|---|---|---|---|
| 4,708,963 | A | 11/1987 | Skuballa et al. |
| 4,976,259 | A | 12/1990 | Higson et al. |
| 4,984,158 | A | 1/1991 | Hillsman |
| 5,063,922 | A | 11/1991 | Haekkinen |
| 5,080,093 | A | 1/1992 | Raabe et al. |
| 5,153,222 | A | 10/1992 | Tadepalli et al. |
| 5,234,953 | A | 8/1993 | Crow et al. |
| 5,322,057 | A | 6/1994 | Raabe et al. |
| 5,361,989 | A | 11/1994 | Merchat et al. |
| 5,363,842 | A | 11/1994 | Mishelevich et al. |
| 5,497,763 | A | 3/1996 | Lloyd et al. |
| 5,551,416 | A | 9/1996 | Stimpson et al. |
| 5,727,542 | A | 3/1998 | King |
| 5,865,171 | A | 2/1999 | Cinquin |
| 5,881,715 | A | 3/1999 | Shibasaki |
| 5,908,158 | A | 6/1999 | Cheiman |
| 6,054,486 | A | 4/2000 | Crow et al. |
| 6,123,068 | A | 9/2000 | Lloyd et al. |
| 6,242,482 | B1 | 6/2001 | Shorr et al. |
| 6,357,671 | B1 | 3/2002 | Cewers |
| 6,441,245 | B1 | 8/2002 | Moriarty et al. |
| 6,521,212 | B1 | 2/2003 | Cloutier et al. |
| 6,528,688 | B2 | 3/2003 | Moriarty et al. |
| 6,626,843 | B2 | 9/2003 | Hillsman |
| 6,700,025 | B2 | 3/2004 | Moriarty et al. |
| 6,756,033 | B2 | 6/2004 | Cloutier et al. |
| 6,756,117 | B1 | 6/2004 | Barnes |
| 6,765,117 | B2 | 7/2004 | Moriarty et al. |
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,172,557 | B1 | 2/2007 | Parker et al. |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,261,102 | B2 | 8/2007 | Barney et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,544,713 | B2 | 6/2009 | Phares et al. |
| 7,726,303 | B2 | 6/2010 | Tyvoll et al. |
| 7,879,909 | B2 | 2/2011 | Wade et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 1999959533 | B2 | 2/2000 |
| DE | 19838711.1 | C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 63/036,561, filed Jun. 9, 2020, Batra et al.

(Continued)

*Primary Examiner* — Paul V Ward

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Methods of treating of interstitial lung disease, reducing pulmonary function decline in a subject with interstitial lung disease (ILD), and increasing forced vital capacity (FVC) in a subject suffering from ILD are provided, wherein the methods include administration of treprostinil.

**19 Claims, 15 Drawing Sheets**

UTC_PH-ILD_005310

**US 11,826,327 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,999,007 | B2 | 8/2011 | Jeffs et al. |
| 8,232,316 | B2 | 7/2012 | Phares et al. |
| 8,242,305 | B2 | 8/2012 | Batra et al. |
| 8,252,839 | B2 | 8/2012 | Phares et al. |
| 8,349,892 | B2 | 1/2013 | Phares |
| 8,350,079 | B2 | 1/2013 | Walsh |
| 8,410,169 | B2 | 4/2013 | Phares et al. |
| 8,461,393 | B2 | 6/2013 | Sharma |
| 8,481,782 | B2 | 7/2013 | Batra et al. |
| 8,497,393 | B2 | 7/2013 | Batra et al. |
| 8,536,363 | B2 | 9/2013 | Phares et al. |
| 8,563,614 | B2 | 10/2013 | Wade et al. |
| 8,609,728 | B2 | 12/2013 | Rothblatt et al. |
| 8,653,137 | B2 | 2/2014 | Jeffs et al. |
| 8,658,694 | B2 | 2/2014 | Jeffs et al. |
| 8,747,897 | B2 | 6/2014 | Kidane et al. |
| 8,765,813 | B2 | 7/2014 | Wade et al. |
| 8,940,930 | B2 | 1/2015 | Batra et al. |
| 9,029,607 | B2 | 5/2015 | Mcgowan et al. |
| 9,050,311 | B2 | 6/2015 | Phares et al. |
| 9,155,846 | B2 | 10/2015 | Kern |
| 9,156,786 | B2 | 10/2015 | Batra et al. |
| 9,199,908 | B2 | 12/2015 | Phares et al. |
| 9,255,064 | B2 | 2/2016 | Malinin et al. |
| 9,278,901 | B2 | 3/2016 | Phares et al. |
| 9,278,902 | B2 | 3/2016 | Tang et al. |
| 9,278,903 | B2 | 3/2016 | Tang et al. |
| 9,339,507 | B2 | 5/2016 | Olschewski et al. |
| 9,346,738 | B2 | 5/2016 | Jain et al. |
| 9,358,240 | B2 | 6/2016 | Olschewski et al. |
| 9,371,264 | B2 | 6/2016 | Becker et al. |
| 9,388,154 | B2 | 7/2016 | Yiannikouros et al. |
| 9,394,227 | B1 | 7/2016 | Zhang et al. |
| 9,422,223 | B2 | 8/2016 | Phares et al. |
| 9,469,600 | B2 | 10/2016 | Malinin et al. |
| 9,505,737 | B2 | 11/2016 | Becker et al. |
| 9,624,156 | B2 | 4/2017 | Phares et al. |
| 9,643,911 | B2 | 5/2017 | Zhang et al. |
| 9,701,616 | B2 | 7/2017 | Zhang et al. |
| 9,713,599 | B2 | 7/2017 | Wade |
| 9,758,465 | B2 | 9/2017 | Laing |
| 9,776,982 | B2 | 10/2017 | Becker et al. |
| 9,845,305 | B2 | 12/2017 | Becker et al. |
| 9,878,972 | B2 | 1/2018 | Phares et al. |
| 9,957,200 | B2 | 5/2018 | Beall et al. |
| 10,010,518 | B2 | 7/2018 | Malinin et al. |
| 10,053,414 | B2 | 8/2018 | Zhang et al. |
| 10,076,505 | B2 | 9/2018 | Wade |
| 10,246,403 | B2 | 4/2019 | Zhang et al. |
| 10,343,979 | B2 | 7/2019 | Malinin et al. |
| 10,344,012 | B2 | 7/2019 | Becker et al. |
| 10,376,525 | B2 | 8/2019 | Olschewski et al. |
| 10,450,290 | B2 | 10/2019 | Becker et al. |
| 10,464,877 | B2 | 11/2019 | Zhang et al. |
| 10,464,878 | B2 | 11/2019 | Zhang et al. |
| 10,494,327 | B2 | 12/2019 | Laing |
| 10,526,274 | B2 | 1/2020 | Malinin et al. |
| 10,695,308 | B2 | 6/2020 | Wade |
| 10,703,706 | B2 | 7/2020 | Zhang et al. |
| 10,716,793 | B2 | 7/2020 | Olschewski et al. |
| 10,752,733 | B2 | 8/2020 | Ishihara |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0080140 | A1 | 4/2005 | Hatae et al. |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |

| | | | |
|---|---|---|---|
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2009/0124697 | A1 | 5/2009 | Cloutier et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0191941 | A1 | 5/2012 | Wade et al. |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |
| 2012/0197041 | A1 | 8/2012 | Batra et al. |
| 2012/0216801 | A1 | 8/2012 | Olschewski et al. |
| 2013/0096200 | A1 | 4/2013 | Wade et al. |
| 2013/0184295 | A1 | 7/2013 | Sprague et al. |
| 2013/0331593 | A1 | 12/2013 | Mcgowan et al. |
| 2014/0018431 | A1 | 1/2014 | Phares et al. |
| 2014/0024856 | A1 | 1/2014 | Giust et al. |
| 2014/0275262 | A1 | 9/2014 | Phares et al. |
| 2014/0275616 | A1 | 9/2014 | Batra et al. |
| 2014/0323567 | A1 | 10/2014 | Laing |
| 2015/0148414 | A1 | 5/2015 | Malinin et al. |
| 2015/0299091 | A1 | 10/2015 | Batra et al. |
| 2015/0315114 | A1 | 11/2015 | Hering et al. |
| 2015/0328232 | A1 | 11/2015 | Malinin et al. |
| 2015/0376106 | A1 | 12/2015 | Batra et al. |
| 2016/0030355 | A1 | 2/2016 | Kidane et al. |
| 2016/0030371 | A1 | 2/2016 | Phares et al. |
| 2016/0045470 | A1 | 2/2016 | Reddy et al. |
| 2016/0051505 | A1 | 2/2016 | Phares et al. |
| 2016/0107973 | A1 | 4/2016 | Batra et al. |
| 2016/0129087 | A1 | 5/2016 | Christe et al. |
| 2016/0143868 | A1 | 5/2016 | Olschewski et al. |
| 2016/0152548 | A1 | 6/2016 | Gao et al. |
| 2016/0175319 | A1 | 6/2016 | Freissmuth et al. |
| 2017/0095432 | A1 | 4/2017 | Phares et al. |
| 2018/0153847 | A1 | 6/2018 | Phares et al. |
| 2019/0321290 | A1 | 10/2019 | Guarneri et al. |
| 2019/0365778 | A1 | 12/2019 | Olschewski et al. |
| 2021/0054009 | A1 | 2/2021 | Phares et al. |
| 2021/0177787 | A1 | 6/2021 | Wade |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 19934582.2 C2 | 9/2003 | |
| FR | 2783431 A1 | 3/2000 | |
| JP | 2003-522003 A | 7/2003 | |
| JP | 2004-512101 A | 4/2004 | |
| JP | 2005-034341 A | 2/2005 | |
| WO | WO-93/00951 A1 | 1/1993 | |
| WO | WO-00/57701 A1 | 10/2000 | |
| WO | WO-01/58514 A1 | 8/2001 | |
| WO | WO-01/85241 A1 | 11/2001 | |
| WO | WO-02/34318 A2 | 5/2002 | |
| WO | WO-2005/007081 A3 | 1/2005 | |
| WO | WO2008/098196 * | 8/2008 | .......... A61K 31/496 |
| WO | WO-2008/098196 A1 | 8/2008 | |
| WO | WO2012/009097 * | 1/2012 | .......... A61K 31/496 |
| WO | WO-2012/009097 A1 | 1/2012 | |
| WO | WO-2014/085813 A1 | 6/2014 | |
| WO | WO2015/138423 * | 9/2015 | .......... A61K 31/496 |
| WO | WO-2015/138423 A1 | 9/2015 | |
| WO | WO-2016/038532 A1 | 3/2016 | |
| WO | WO-2016/055819 A1 | 4/2016 | |
| WO | WO-2016/081658 A1 | 5/2016 | |
| WO | WO-2016/105538 A1 | 6/2016 | |
| WO | WO2016/176399 * | 11/2016 | .......... A61K 31/496 |
| WO | WO-2016/176399 A1 | 11/2016 | |
| WO | WO2016/205202 * | 12/2016 | .......... A61K 31/496 |
| WO | WO-2016/205202 A1 | 12/2016 | |
| WO | WO-2017/192993 A1 | 11/2017 | |
| WO | WO-2018/058124 A1 | 3/2018 | |
| WO | WO-2019/237028 A1 | 12/2019 | |

OTHER PUBLICATIONS

U.S. Appl. No. 63/125,145, filed Dec. 14, 2020, Phares et al.

Agarwal et al., "Inhaled Treprostinil in Group-3 Pulmonary Hypertension," J. Heart Lung Transplant., 2015 34(Suppl S343):959, abstract.

US 11,826,327 B2

Page 3

(56)         References Cited

OTHER PUBLICATIONS

Bajwa et al., "The safety and tolerability of inhaled treprostinil in patients with pulmonary hypertension and chronic obstructive pulmonary disease," Pulmonary Circulation, 2017, 7(1):82-88.

Bonner et al., "Susceptibility of Cyclooxygenase-2-Deficient Mice to Pulmonary Fibrogenesis," American Journal of Pathology, Aug. 2002, 161(2):459-470.

Collard et al., "Acute Exacerbation of Idiopathic Pulmonary Fibrosis: An International Working Group Report," Am. J. Respir. Crit. Care Med., Aug. 1, 2016, 194(3):265-275.

Dernaika et al., "Iloprost Improves Gas Exchange and Exercise Tolerance in Patients with Pulmonary Hypertension and Chronic Obstructive Pulmonary Disease," Respiration, 2010, 79:377-382.

Du Bois et al., "Six-Minute-Walk Test in Idiopathic Pulmonary Fibrosis," Am. J. Respir. Crit. Care Med., 2011, 183:1231-1237.

Faria-Urbina et al., "Inhaled Treprostinil in Pulmonary Hypertension Associated with Lung Disease," Lung, 2018, 196:139-146.

Keerthisingham et al., "Cyclooxygenase-2 Deficiency Results in a Loss of the Anti-Proliferative Response to Transforming Growth Factor-Beta in Human Fibrotic Lung Fibroblasts and Promotes Bleomycin-Induced Pulmonary Fibrosis in Mice," American Journal of Pathology, Apr. 2001, 158(4):1411-1422.

King et al., "The Trouble With Group 3 Pulmonary Hypertension in Interstitial Lung Disease," Chest, 2020, 158(4):1651-1664.

Lettieri et al., "The distance-saturation product predicts mortality in idiopathic pulmonary fibrosis," Respiratory Medicine, 2006, 100:1734-1741.

McLaughlin et al., "Addition of Inhaled Treprostinil to Oral Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2010, 55(18):1915-1922.

Meyer et al., "Role of pirfenidone in the management of pulmonary fibrosis," Therapeutics and Clinical Risk Management, 2017, 13:427-437.

Nathan et al., "Pulmonary Hypertension due to Lung Disease and/or Hypoxia," Clin. Chest Med., 2013, 34:695-705.

Nathan et al., "Pulmonary hypertension in interstitial lung disease," Int. J. Clin. Pract., Jul. 2008, 62(Suppl. 160):21-28.

Nathan et al., "Riociguat for idiopathic interstitial pneumonia-associated pulmonary hypertension (RISE-IIP): a randomised, placebo-controlled phase 2b study," Lancet Respir. Med., 2019, 7:780-790.

Nathan et al., "Validation of test performance characteristics and minimal clinically important difference of the 6-minute walk test in patients with idiopathic pulmonary fibrosis," Respiratory Medicine, 2015, 109:914-922.

Simonneau et al., "Haemodynamic definitions and updated clinical classification of pulmonary hypertension," Eur. Respir. J., 2019, 53:1801913, 13 pages.

Sorbera et al.n "UT-15. Treatment of Pulmonary Hypertension Treatment of Peripheral Vascular Disease," Drug of the Future, 2001, 26(4):364-374.

Trammell et al., "Use of pulmonary arterial hypertension-approved therapy in the treatment of non-group 1 pulmonary hypertension at US referral centers," Pulm. Circ., 2015, 5(2):356-363.

Wang et al., "Hemodynamic and gas exchange effects of inhaled iloprost in patients with COPD and pulmonary hypertension," International Journal of COPD, 2017, 12:3353-3360.

Whittle et al., "Binding and activity of the prostacyclin receptor (IP) agonists, treprostinil and iloprost, at human prostanoid receptors: Treprostinil is a potent DP1 and EP2 agonist," Biochemical Pharmacology, 2012, 84:68-75.

Osterweil, Neil, "Inhaled treprostinil improves walk distance in patients with ILD-associated pulmonary hypertension," Chest Physician, Jul. 6, 2020, 1-5.

Steven et al., "Pulmonary hypertension in chronic lung disease and hypoxia," Eur. Respir. J., Dec. 13, 2018, https://doi: 10.1183/13993003.01914-2018, 15 pages.

U.S. Appl. No. 17/486,721, filed Sep. 27, 2021, Olschewski et al.

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.

AccuNeb label, Jun. 2005, 2 pages.

Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

Anderson, Paula J. M.D., "History of Aerosol Therapy: Liquid Nebulization to MDIs to DPIs," Respiratory Care, Sep. 2005, 50(9):1139-1150.

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation Form 10-Q for the quarterly period ended Jun. 30, 2009, 37 pages.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Atkins, Paul J., Ph.D., "Dry Powder Inhalers: An Overview," Respiratory Care, Oct. 2005, 50(10):1304-1312.

ATS 2020 Virtual Preview: Clinical Trials Session, Jun. 24, 2020, conference.thoracic.org/program/session-information/virtual-clinical-trials.php.

Azmacort label, May 2003, 16 pages.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:SupplS):56S-61S.

Beasley et al., "Preservatives in Nebulizer Solutons: Risks without Benefit," Pharmacotherapy, 1998, 18(1):130-139.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Bender et al., "Nonadherence in asthmatic patients: is there a solution to the problem?", Ann. Allergy Asthma Immunol., 1997, 79:177-186.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor, G. and Starko, K. (2003) Lung Deposition of Interferon Gamma-1 b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Boyle et al., "So Many Drugs, So Little Time: The Future Challenge of Cystic Fibrosis Care," Chest, Jan. 2003, 123(1):3-5.

Byron, Peter R. "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Chattaraj, Sarat C., "Treprostinil sodium Pharmacy," Current Opinion in Investigational Drugs, Apr. 2002, 3(4):582-586.

Chew et al., "Pharmaceutical Dry Powder Aerosol Delivery," Kona, 2001, 19:46-56.

Clark, A.R., "Medical Aerosol Inhalers: Past, Present, and Future," Aerosol Science and Technology, Jun. 12, 2007, 22(4):374-391.

US 11,826,327 B2

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Dalby et al., "A review of the development of Respimat Soft Mist Inhaler," International Journal of Pharmaceutics, 2004, 283:1-9.

De Wet et al., "Inhaled prostacyclin is safe, effective ana affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery," J. Thoracic Cardiovasc. Surg., 2004, 127:1058-1067.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and U.S. Pat. No. 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Denyer et al., "The Adaptive Aerosol Delivery (AAD) Technology: Past, Present, and Future," Journal of Aerosol Medicine and Pulmonary Drug Delivery, 2010, 23(Suppl):S1-S10.

Dolovich et al., "Device Selection and Outcomes of Aerosol Therapy: Evidence-Based Guidelines," Chest, Jan. 2005, 127(1):335-371.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al,. "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

Eli Lilly Press Release, "Eli Lilly and Company Licenses U.S. Rights forTadalafil PAH Indication to United Therapeutics Corporation," Nov. 17, 2008, 4 pages.

English translation of OptiNeb User Manual, 2005, 33 pages.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf(Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999, English summary on first page.

Farber et al., "Pulmonary Arterial Hypertension," The New England Journal of Medicine, 2004, 351:1655-1665.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Flolan label, Sep. 2002, 24 pages.

Frijlink et al., "Dry Powder inhalers for pulmonary drug delivery," Expert Opin. Drug Deliv., 2004, 1(1):67-86.

Geller et al., "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis," Journal of Aerosol Medicine, 2003, 16(2):175-182.

Geller, David E., M.D., "Comparing Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler," Respir. Care, 2005, 50(10):1313-1321.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), Jun. 2005, 30(4):296-302, with English translation.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Goldsmith et al., "Inhaled Iloprost In Primary Pulmonary Hypertension," Drugs, 2004, 64(7):763-773.

Gonda, Igor, "A semi-empirical model of aerosol deposition in the human respiratory tract for mouth inhalation," J. Pharm. Pharmacol., 1981, 33:692-696.

Gonda, Igor, "Study of the effects of polydispersity of aerosols on regional deposition in the respiratory tract," J. Pharm. Pharmacol., 1981, 33(Supp):52P.

Hache et al., "Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac surgery," The Journal of Thoracic and Cardiovascular Surgery, Mar. 2003, 125:642-649.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous Iloprost in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hill et al., "Inhaled Therapies for Pulmonary Hypertension," Respiratory Care, Jun. 2015, 60(6):794-805.

Hoeper et al., "Long-term Treatment of Primary Pulmonary Hypertension with Aerosolized Iloprost, a Prostacyclin Analogue," The New England Journal of Medicine, Jun. 22, 2000, 342:1866-1870.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and Pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Laliberte et al., "Pharmacokinetics and Steady-State Bioequivalence of Treprostinil Sodium (Remodulin) Administered by the Intravenous and Subcutaneous Route to Normal Volunteers," J. Cardiovasc. Pharmacol, Aug. 2004, 44(2):209-214.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Liquidia Technologies Press Release, "Liquidia Announces FDA Acceptance of New Drug Application for LIQ861 (treprostinil) Inhalation Powder for the Treatment of Pulmonary Arterial Hypertension," Apr. 8, 2020, 3 pages.

Liquidia Technologies Press Release, "Liquidia Submits New Drug Application for LIQ861 (treprostinil) Inhalation Powder to U.S. Food and Drug Administration for the Treatment of Pulmonary Arterial Hypertension (PAH)," Jan. 27, 2020, 3 pages.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320,aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

US 11,826,327 B2

Page 5

(56)        References Cited

OTHER PUBLICATIONS

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.
Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.
Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21 (Suppl.33):3, Abstract No. 084.
National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.
Nauser et al., "Pulmonary Hypertension: New Perspectives," CHF, 2003, 9:155-162.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 10 pages, Dec. 19, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 10 pages, Dec. 7, 2016.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Feb. 1, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Jan. 12, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Mar. 1, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Mar. 17, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 11 pages, Mar. 9, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Apr. 13, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Feb. 9, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 13, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 19, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 31, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jul. 5, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jun. 19, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Jun. 2, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, Mar. 27, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 12 pages, May 19, 2017.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13, pages, Aug. 16, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Oct. 13, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 1, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 12, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 14, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 20, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 13 pages, Sep. 8, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 14 pages, Nov. 14, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 14 pages, Oct. 25, 2017.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Dec. 20, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Mar. 6, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 10, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 23, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 28, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 15 pages, Oct. 8, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Apr. 15, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Apr. 19, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Apr. 24, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 13, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 14, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 17, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 3, 2018.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Aug. 7, 2019.
NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Dec. 13, 2018.

UTC_PH-ILD_005314

**US 11,826,327 B2**

Page 6

(56)          **References Cited**

OTHER PUBLICATIONS

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Dec. 17, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Dec. 20, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Feb. 14, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Feb. 4, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jan. 24, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jan. 8, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jan. 9, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jul. 11, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jul. 20, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 14, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 14, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 18, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 21, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Jun. 25, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Mar. 13, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Mar. 29, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, May 16, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, May 24, 2019.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Nov. 2, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Nov. 21, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Nov. 7, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Oct. 1, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Oct. 11, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Oct. 22, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Sep. 24, 2018.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 5 pages, Dec. 11, 2015.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 5 pages, Feb. 24, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 16 pages, Mar. 14, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Aug. 15, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Jun. 23, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Jun. 6, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, Jun. 7, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, May 23, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, May 31, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 6 pages, May 5, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Aug. 26, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Jul. 12, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Jul. 21, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Jul. 5, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 7 pages, Sep. 9, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Apr. 30, 2020.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Feb. 26, 2020.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Jan. 7, 2020.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, May 29, 2020.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Nov. 17, 2016.

NCT02630316, Safety and Efficacy of Inhaled Treprostinil in Adult PH with ILD Including CPFE, ClinicalTrials.gov, 9 pages, Nov. 9, 2016.

Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instrutions, Sep. 2005.

Newman, S.P., "Aerosols," Chapter from Encyclopedia of Respiratory Medicine, 2006, 58-64.

UTC_PH-ILD_005315

# US 11,826,327 B2

Page 7

(56)        References Cited

OTHER PUBLICATIONS

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources. Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Olin, Jeffrey W., D.O., "Thromboangiitis Obliterans (Buerger's Disease)," N. Engl. J. Med., 2000, 343:864-869.

Olschewski et al. for the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," The New England Journal of Medicine, Aug. 1, 2002, 347(5):322-329.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

Optineb®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.

Orenitram label, Oct. 2019, 17 pages.

Osterweil, Neil, "Treprostinil Improves Walk Distance in Pulmonary Hypertension," Jul. 9, 2020, 9 pages, www.medscape.com/viewarticle/933674.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Petition for Inter Partes Review of U.S. Pat. No. 10,716,793, *Liquidia Technologies, Inc.* (petitioner) v. *United Therapeutics Corporation* (patent owner), IPR2021-00406, and Exhibits 1002, 1003, 1004, 1005 and 1036.

Pitcairn et al., "Deposition of Corticosteroid Aerosol in the Human Lung by Respimat Soft Mist Inhaler Compared to Deposition by Metered Dose Inhaler or by Turbuhaler Dry Powder Inhaler," Journal of Aerosol Medicine, 2005, 18(3):264-272.

Prober et al., "Technical Report: Precautions Regarding the Use of Aerosolized Antibiotics," Pediatrics, Dec. 2000, 106(6):1-6.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Pulmozyme label, Apr. 2005, 2 pages.

Rau, Joseph L., "Determinants of Patient Adherence to an Aerosol Regimen," Respiratory Care, Oct. 2005, 50(10):1346-1359.

Remodulin label, Nov. 2004, 11 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 11 pages.

Ruan et al., "Prostacyclin therapy for pulmonary arterial hypertension," Texas Heart Institute Journal (2010) vol. 37, No. 4, pp. 391-399.

Rubin et al., "Evaluation and Management of the Patient with Pulmonary Arterial Hypertension," Ann. Intern. Med., 2005, 143:282-292.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin H2 Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a persistent infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensis Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stein et al., "The History of Therapeutic Aerosols: A Chronological Review," Journal of Aerosol Medicine and Pulmonary Drug Delivery, 2017, 30(1):20-41.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Telko et al., "Dry Powder Inhalation Formulation," Respiratory Care, Sep. 2005, 50(9):1209-1227.

Tyvaso label, 2009, 49 pages.

United Therapeutics Press Release, "United Therapeutics Announces FDA Approval of Third Generation Nebulizer for the Tyvaso Inhalation System," Oct. 23, 2017, 5 pages.

Vachiery et al., "Transitioning From IV Epoprostenol to Subcutaneous Treprostinil in Pulmonary Arterial Hypertension," Chest, 2002, 121:1561-1565.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.

Ventavis (iloprost) Inhalation Solution product information, Dec. 2004, 15 pages.

Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.

Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension: Results from Randomized Controlled Pilot Studies" J. Am. Coll. Cardiol., 48(8):1672-1681 (2006).

Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.

Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.

Voswinckel et al., Abstract 1414, "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, Circulation, Oct. 26, 2004, 110(17Supp):III-295.

US 11,826,327 B2

Page 8

(56)        References Cited

OTHER PUBLICATIONS

Voswinckel et al., Abstract 218, "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, 2004, 25:22.
Walmrath et al., "Aerosolized prostacyclin in adult respiratory distress syndrome," Lancet, 1993, 342:961-962.
Walmrath et al., "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome," Am. J. Respir. Crit. Care Med., 1996, 153:991-996.
Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.
Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.
Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.
Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.
Watson Laboratories, Inc. (Petitioner) v. United Therapeutics, Inc. (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C318.
Watson Laboratories, Inc. (Petitioner) v. United Therapeutics, Inc. (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.
Waxman et al., "Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease," The New England Journal of Medicine, 2021, 284:325-334.

Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.
Welsh, Erin T., Ma, "Inhaled treprostinil improves outcomes in ILD-associated pulmonary hypertension," Jun. 30, 2020, 2 pages, www.healio.com/news/pulmonology/20200630/inhaled-treprostinil-improves-outcomes-in-ildassociated-pulmonary-hypertension.
Welsh, Erin T., Ma., FDA approves inhaled treprostinil for pulmonary hypertension associated with ILD, Apr. 5, 2021, www.healio.com/news/pulmonology/20210405/fda-approves-inhaled-treprostinil-for-pulmonary-hypertension-associated-with-ild.
Wensel et al., "Effects or iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.
Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.
Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iliprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.
Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.
Zanen et al., "The optimal particle size for -adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.
Ziegler et al., "Comparison of Cascade Impaction and Laser Diffraction for Particle Size Distribution Measurements," Journal of Aerosol Medicine, 2005, 18(3):311-324.
Zierenberg et al., "The Respimat, a New Soft Mist Inhaler for Delivering Drugs to the Lungs," Modified-Release Drug Delivery Technology, 2002, Chapter 78, 925-933.

* cited by examiner

Figure 1



UTC_PH-ILD_005318



Figure 2

UTC_PH-ILD_005319



Figure 3

UTC_PH-ILD_005320

U.S. Patent     Nov. 28, 2023     Sheet 4 of 15     US 11,826,327 B2



Figure 4

UTC_PH-ILD_005321

Figure 5





Figure 6

UTC_PH-ILD_005323

U.S. Patent    Nov. 28, 2023    Sheet 7 of 15    US 11,826,327 B2



Figure 7

UTC_PH-ILD_005324



Figure 8

UTC_PH-ILD_005325



Figure 9

UTC_PH-ILD_005326



Figure 10

UTC_PH-ILD_005327

Figure 11



removable purple mouthpiece cover

white mouthpiece

cartridge

cartridge cup

purple base

UTC_PH-ILD_005328



Figure 12

UTC_PH-ILD_005329



Figure 13

UTC_PH-ILD_005330



Figure 14

UTC_PH-ILD_005331



Figure 15

UTC_PH-ILD_005332

US 11,826,327 B2

**1**

## TREATMENT FOR INTERSTITIAL LUNG DISEASE

### RELATED APPLICATIONS

The present application claims priority to U.S. provisional application No. 63/011,810 filed Apr. 17, 2020 and U.S. provisional application No. 63/160,611 filed Mar. 12, 2021, each of which is incorporated herein by reference in its entirety.

### FIELD

The present application generally relates to methods of treating a disease with prostacyclins and more particularly, to treating a disease with treprostinil.

### BACKGROUND

Interstitial lung disease (ILD), or diffuse parenchymal lung disease (DPLD), is a group of lung diseases affecting the interstitium (the tissue and space around the alveoli, including air sacs of the lungs). It concerns alveolar epithelium, pulmonary capillary endothelium, basement membrane, and perivascular and perilymphatic tissues. It may occur when an injury to the lungs triggers an abnormal healing response. Such abnormal response may result in idiopathic pulmonary fibrosis (IPF). Currently, two drugs are approved by FDA for treatment of IPF, which is the most common form of PF: nintedanib and pirfenidone. The average rate of survival for someone with interstitial lung disease is currently between 3 and 5 years (Meyer et al., 2017). There exists a need for the identification of new pharmaceutical treatments for ILD.

### SUMMARY

In one aspect, a method of treating a pulmonary hypertension due to a condition which is selected from a chronic lung disease, hypoxia and a combination thereof, comprises administering to a subject having the pulmonary hypertension due to the condition selected from a chronic lung disease, hypoxia and a combination thereof an effective amount of treprostinil, a prodrug thereof or a pharmaceutically acceptable salt thereof.

In one aspect, a method of treating interstitial lung disease (ILD) in a subject in need thereof is provided, comprises administering to the subject a therapeutically effective amount of treprostinil, a prodrug, salt, or ester thereof. In an embodiment, the subject has pulmonary hypertension associated with ILD.

In one aspect, a method of reducing pulmonary function decline in a subject with ILD is provided, comprises administering to the subject treprostinil, a prodrug, salt, or ester thereof.

In one aspect, a method of increasing forced vital capacity (FVC) in a subject suffering from ILD is provided, comprises administering to the subject treprostinil, a prodrug, salt, or ester thereof. In some embodiments, administration of treprostinil, a prodrug, salt, or ester thereof may result in an increase of FVC of at least 20%, at least 40%, at least 60%, at least 80%, at least 90%, or at least 100% compared to the FVC prior to the start of treatment. The FVC can be assessed prior to the start of treatment and at intervals after the start of treatment. For example, the pre-treatment FVC

**2**

can be compared to the FVC measured at one week, four weeks, eight weeks, or sixteen weeks after the start of treatment.

In some embodiments, administering an effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide an improvement, which may be statistically significant, in forced vital capacity (FVC) in a subject with a condition selected from a chronic lung disease, such as an ILD or IPF and/or hypoxia. For example, the FVC may be higher in a patient subpopulation with the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks, or at least 28 weeks or at least 32 weeks, or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks, compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the FVC value may be higher by at least 10 ml or at least 15 ml or at least 20 ml or at least 25 ml or at least 30 ml or at least 35 ml or at least 40 ml or at least 45 ml after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering in the patient subpopulation with the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug compared to the patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. In patients with a chronic lung disease, such as interstitial lung disease, and/or hypoxia, an FVC value usually decreases with time when untreated. Thus, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt may increase an FVC value compared to an FVC value before the administering; maintain an FVC value within 5%, 10% or 20% within the FVC value prior to the administering; or reduce a decrease of an FVC value with time compared to a decrease in an FVC value with no administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt, such a decrease in an FVC value when placebo is administered instead of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt.

In some embodiments, the ILD comprises one or more of idiopathic pulmonary fibrosis (IPF), desquamative interstitial pneumonia (DIP), acute interstitial pneumonia (AIP), nonspecific interstitial pneumonia (NSIP), respiratory bronchiolitis-associated interstitial lung disease (RB-ILD), cryptogenic organizing pneumonia (COP), lymphoid interstitial pneumonia (LIP), sarcoidosis, rheumatoid arthritis, systemic lupus erythematosus, systemic sclerosis, polymyositis, dermatomyositis, antisynthetase syndrome, silicosis, asbestosis, occupational lung disease, chronic hypersensitivity pneumonitis, idiopathic interstitial pneumonia (IIP), an autoimmune ILD, lymphangioleiomyomatosis (LAM), Langerhan's cell histiocytosis (LCH), drug associated ILD, vasculitis, granulomatosis, and berylliosis. In some embodiments, the ILD comprises IPF.

UTC_PH-ILD_005333

US 11,826,327 B2

3

In some embodiments, the ILD comprises systemic sclerosis-associated interstitial lung disease (SSc-ILD).

In some embodiments, the ILD was induced from antibiotics, chemotherapy, antiarrhythmic agents, coronavirus disease 2019 (COVID-19), atypical pneumonia, pneumocystis pneumonia, tuberculosis (TB), *Chlamydia trachomatis*, respiratory syncytial virus, or lymphangitic carcinomatosis.

In some embodiments, the subject has one or more of surfactant-protein-B deficiency, surfactant-protein-C deficiency, ABCA3-deficiency, brain lung thyroid syndrome, congenital pulmonary alveolar proteinosis, alveolar capillary dysplasia, mutations in telomerase reverse transcriptase, mutations in telomerase RNA component, mutations in the regulator of telomere elongation helicase 1, and mutations in poly(A)-specific ribonuclease.

In some embodiments, the subject has one or more symptoms of shortness of breath, fatigue, weight loss, dry cough, chest pain, and lung hemorrhage. In some embodiments, after administration the symptom is improved by about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, about 80%, about 85%, about 90%, about 95%, or about 100%, as measured by a medically-recognized technique. In some embodiments, the medically-recognized technique comprises one or more of Modified Medical Research Council (MMRC) Dyspnoea Scale, Modified Borg Dyspnoea Scale (0-10), Chalder Fatigue Scale, weight measurement scale, visual analogue scale (VAS) for cough, King's Brief Interstitial Lung Disease Questionnaire, Leicester Cough Questionnaire (LCQ), Living with IPF (L-IPF, see e.g. Am J Respir Crit Care Med Vol 202, Iss 12, pp 1689-1697, Dec. 15, 2020), computed tomography (CT) scan, X-ray, multiple magnetic resonance imaging (MRI), pulmonary function testing (PFT), spirometry, lung volumes, maximal respiratory pressure, diffusing capacity, oxygen desaturation, and arterial blood gas evaluation.

In some embodiments, treprostinil, a prodrug, salt, or ester thereof is administered in a pharmaceutical composition comprising treprostinil, a prodrug, salt, or ester thereof and a pharmaceutically acceptable carrier or excipient.

In some embodiments, the administration comprises at least one of oral, inhalation, subcutaneous, nasal, intravenous, intramuscular, sublingual, buccal, rectal, vaginal, and transdermal administration. In some embodiments, the administration comprises inhalation. In some embodiments, one inhalation dosing event comprises from 1 to 20 breaths, wherein at least one inhalation dosing event per day is administered.

In some embodiments, the method comprises administration of at least one additional active agent to treat the ILD. In some embodiments, the at least one additional active agent comprises a corticosteroid, mycophenolic acid, mycophenolate mofetil, azathioprine, cyclophosphamide, rituximab, pirfenidone, or nintedanib. In some embodiments, the at least one additional active agent and treprostinil, a prodrug, salt, or ester thereof, are administered via a method selected from the group consisting of (a) concomitantly; (b) as an admixture; (c) separately and simultaneously or concurrently; and (d) separately and sequentially.

In some embodiments, administration is once, twice, thrice, four times, five times, or six times per day. In some embodiments, administration is for a period selected from the group consisting of about 1 day, about 1 day to about 3 days, about 3 days to about 6 days, about 6 days to about 9 days, about 9 days to about 12 days, about 12 days to about

4

15 days, about 15 days to about 18 days, about 18 days to about 21 days, about 21 days to about 24 days, about 24 days to about 27 days, about 27 days to about 30 days, or about greater than 30 days.

In some embodiments, a method of treating a pulmonary hypertension due to a condition which is selected from a chronic lung disease, hypoxia and a combination thereof, comprises administering to a subject having the pulmonary hypertension due to the condition selected from a chronic lung disease, hypoxia and a combination thereof an effective amount of treprostinil, a prodrug thereof or a pharmaceutically acceptable salt thereof.

In some embodiments, the subject is a human.

FIGURES

FIG. **1** shows a Kaplan-Meier plot of time to exacerbation of underlying lung disease over a 16-week period of t8 reprostinil treatment. CI stands for confidence interval; HR stands for hazard ratio. Subjects who discontinued from the study early had their time to first clinical worsening event censored at their last visit. Subjects who did not experience a clinical worsening event had their time to first clinical worsening event censored at the study termination date. (1) P-value was calculated with log-rank test stratified by baseline 6-minute walk distance category. (2) Hazard ratio, 95% CI, and p-value were calculated with proportional hazards model with treatment and baseline 6-minute walk distance (continuous) as explanatory variables.

FIG. **2** outlines a plan for the clinical study presented in Example 3. Of 462 patients screened for eligibility, 326 patients underwent randomization and received at least one dose of the assigned treprostinil or placebo (included in the intention-to-treat and safety populations). Of the patients who underwent randomization, 40 patients in the treprostinil group and 38 in the placebo group discontinued the assigned regimen prematurely. These patients were not withdrawn from the trial but were encouraged to remain and complete assessments through week 16; 33 patients in the treprostinil group and 35 in the placebo group discontinued trial participation before week 16.

FIG. **3** shows mean change from baseline in peak 6-minute walking distance through week 16 in the clinical study presented in Example 3. Shown are mean (±SE) changes from baseline (dashed line) in peak 6-minute walk distance over the 16-week trial period. The data shown are for patients with available data (observed) as well as for the results of two analysis methods used to account for missing data. The values shown at each data point indicate the number of patients assessed at that time point. The primary analysis used mixed-model repeat-measurement (MMRM) methods, with the assumption that missing data were missing at random. The model included the change from baseline to peak 6-minute walk distance as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and the baseline 6-minute walk distance as a covariate. A sensitivity analysis for the primary end point was performed with the use of a multiple imputation approach with a multivariate normal imputation model using the Markov chain Monte Carlo (MCMC) method. The imputation model included treatment group, all scheduled visits, patient's sex, and patient's age at randomization. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

FIG. **4** shows 6-Minute Walk Distance Treatment Effect Using Mixed Model Repeated Measurement Through Week 16. A longitudinal data analysis using mixed model repeated

UTC_PH-ILD_005334

US 11,826,327 B2

5                                                          6

measurement was also performed to estimate the treatment difference in change in peak 6-minute walk distance at Week 16. The mixed model repeated measurement includes the change from baseline in peak 6-minute walk distance as the dependent variable; treatment, week, and treatment by week interaction as fixed effects; and baseline 6-minute walk distance as a covariate. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

FIG. 5 shows Forest Plot on Subgroup Analyses of Peak 6-Minute Walk Distance (meter) at Week 16. 6MWD stands for 6-minute walk distance; CI stands for confidence interval; ILD stands for interstitial lung disease; PH stands for pulmonary hypertension; PVR stands for pulmonary vascular resistance; LS mean differences and their 95% confidence intervals, and p-values are from the mixed model repeated measures. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects. For etiology, the "other" category includes chronic hypersensitivity pneumonitis and occupational lung disease.

FIG. 6 shows 6-Minute Walk Distance Treatment Effect Using Multiple Imputation Through Week 16. Multiple imputation approach using a multivariate normal imputation model with the Markov Chain Monte Carlo method. P-values are obtained from 100 multiple imputations using Markov Chain Monte Carlo estimation with ANCOVA model with change from Baseline in 6-minute walk distance as the dependent variable, treatment as fixed effect, and Baseline 6-minute walk distance measurement as a covariate.

FIG. 7 shows NT-proBNP Results by Study Visit (pg/mL). CI stands for confidence interval; IQR stands for interquartile range; NT-proBNP stands for N-terminal pro-brain natriuretic peptide. As displayed above, inhaled treprostinil was associated with a 42% reduction in NT-proBNP compared to placebo at Week 16 (Treatment Ratio 0.58; 95% CI: 0.47, 0.72; P<0.001). Only subjects with a Baseline NT-proBNP measurement are included in this analysis. P-values, estimated treatment ratio, and associated 95% CIs (LS Mean difference expressed as ratio) are obtained from the analysis of covariance with change from baseline in log transformed data in NT-proBNP as the dependent variable, treatment as the fixed effect, and log-transformed baseline NT-proBNP as a covariate. The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

FIG. 8 shows Hodges-Lehmann Estimate of Treatment Effect for 6-Minute Walk Distance Through Week 16. For those subjects who withdrew early due to death, were too ill to walk, or had no 6-minute walk distance measurement due to a clinical worsening event, the 6-minute walk distance was set to 0; for all other withdrawals without a measurement, last observation carried forward was used for imputation. P-values are obtained from nonparametric ANCOVA adjusted for Baseline 6-minute walk distance category.

FIG. 9 is a plot showing a relationship between treprostinil AUC0-5 and dose for Treprostinil Inhalation Powder (TreT) administered by a dry powder inhaler and nebulized treprostinil administered by Tyvaso nebulizer.

FIG. 10 is a plot showing a relationship between treprostinil Cmax and dose for Treprostinil Inhalation Powder (TreT) administered by a dry powder inhaler and nebulized treprostinil administered by Tyvaso nebulizer.

FIG. 11 shows a dry powder inhaler, which has a cartridge with a dose of Treprostinil Inhalation Powder (TreT).

FIG. 12 shows a design of a study of Example 5. During the Optional Extension Phase (OEP), dosing titration is encouraged; the dose of TreT is titrated upward, as clinically tolerated, to identify a maximum stable dose in each subject.

FIG. 13 shows a number of subjects for various maintenance TreT doses in the OEP.

FIG. 14 shows a change in 6 minute walk distance (6MWD) with respect to a baseline 6MWD as a function of duration of TreT treatment.

FIG. 15 is a plot reporting satisfaction of participants of the study of Example 5.

DETAILED DESCRIPTION

It is noted that, as used herein and in the appended claims, the singular forms "a," "an," and "the" include plural referents unless the context clearly dictates otherwise. It is further noted that the claims may be drafted to exclude any optional element. As such, this statement is intended to serve as antecedent basis for use of such exclusive terminology as "solely," "only" and the like in connection with the recitation of claim elements or use of a "negative" limitation.

As used herein, the term "comprising" or "comprises" is intended to mean that the compositions and methods include the recited elements, but do not exclude others. A composition or method "consisting essentially of" the elements as defined herein would not exclude other materials or steps that do not materially affect the basic and novel characteristic(s) of the claimed technology. "Consisting of" shall mean excluding more than trace elements of other ingredients and substantial method steps. Embodiments defined by each of these transition terms are within the scope of this technology. When an embodiment is defined by one of these terms (e.g., "comprising") it should be understood that this disclosure also includes alternative embodiments, such as "consisting essentially of" and "consisting of" for said embodiment.

"Subject" refers to an animal, such as a mammal (including a human), that has been or will be the object of treatment, observation or experiment. "Subject" and "patient" may be used interchangeably, unless otherwise indicated. The methods described herein may be useful in human therapy and/or veterinary applications. In some embodiments, the subject is a mammal. In some embodiments, the subject is a human.

The terms "therapeutically effective amount," "effective amount," and "pharmaceutically effective amount" are used interchangeably and refer to an amount of a compound that is sufficient to effect treatment as defined below, when administered to a patient (e.g., a human) in need of such treatment in one or more doses. The therapeutically effective amount will vary depending upon the patient, the disease being treated, the weight and/or age of the patient, the severity of the disease, or the manner of administration as determined by a qualified prescriber or care giver. The therapeutically effective amount can be determined by titrating the dose upwards from a starting dose, either in terms of dose by administration or frequency of administration. In some embodiments, the therapeutically effective dose is determined by titrating the dose upwards until the maximum tolerated dose for the individual subject is determined.

The term "treatment" or "treating" means administering a compound disclosed herein for the purpose of (i) delaying the onset of a disease, that is, causing the clinical symptoms of the disease not to develop or delaying the development thereof, (ii) inhibiting the disease, that is, arresting the

UTC_PH-ILD_005335

US 11,826,327 B2

**7**

development of clinical symptoms; and/or (iii) relieving the disease, that is, causing the regression of clinical symptoms or the severity thereof.

The term "pulmonary fibrosis" is a condition characterized by scarring and thickening of the lungs. Symptoms include shortness of breath, fatigue, weakness, chronic dry, hacking cough, loss of appetite, and discomfort in the chest. Eventually the scarring in the lung becomes replaced with fibrotic tissue resulting in loss of the lung's ability to transfer oxygen to the blood.

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this present technology belongs. Although any methods and materials similar or equivalent to those described herein can also be used in the practice or testing of the present technology, representative illustrative methods and materials are described herein.

All numerical designations, e.g., pH, temperature, time, concentration, dose, and molecular weight, including ranges, are approximations which are varied (+) or (−) by increments of 0.05%, 1%, 2%, 5%, 10% or 20%. It is to be understood, although not always explicitly stated that all numerical designations are preceded by the term "about."

Where a range of values is provided, it is understood that each intervening value, to the tenth of the unit of the lower limit unless the context clearly dictates otherwise, between the upper and lower limit of that range and any other stated or intervening value in that stated range, is encompassed within the present technology. The upper and lower limits of these smaller ranges may independently be included in the smaller ranges and are also encompassed within the present technology, subject to any specifically excluded limit in the stated range. Where the stated range includes one or both of the limits, ranges excluding either or both of those included limits are also included in the present technology.

In an aspect, the present disclosure provides a method of treating interstitial lung disease (ILD) in a subject in need, comprising administering to the subject a therapeutically effective amount of treprostinil, a prodrug, salt, or ester thereof.

Treprostinil is used for the treatment of pulmonary arterial hypertension. Treprostinil is a synthetic analog of prostacyclin ($PGI_2$) having the structure:



**8**

Treprostinil, the active ingredient in Remodulin® (treprostinil) Injection, Tyvaso® (treprostinil) Inhalation Solution, and Orenitram® (treprostinil) Extended Release Tablets, was described in U.S. Pat. No. 4,306,075. Methods of making treprostinil and other prostacyclin derivatives are described, for example, in Moriarty, et al., J. Org. Chem. 2004, 69, 1890-1902, Drug of the Future, 2001, 26(4), 364-374, U.S. Pat. Nos. 6,441,245, 6,528,688, 6,700,025, 6,809,223, 6,756,117, 8,461,393, 8,481,782; 8,242,305, 8,497,393, 8,940,930, 9,029,607, 9,156,786 and 9,388,154 9,346,738; U.S. Published Patent Applications Nos. 2012-0197041, 2013-0331593, 2014-0024856, 2015-0299091, 2015-0376106, 2016-0107973, 2015-0315114, 2016-0152548, and 2016-0175319; PCT Publications No. WO2016/0055819 and WO2016/081658.

Various uses and/or various forms of treprostinil are disclosed, for example, in U.S. Pat. Nos. 5,153,222, 5,234,953, 6,521,212, 6,756,033, 6,803,386, 7,199,157, 6,054,486, 7,417,070, 7,384,978, 7,879,909, 8,563,614, 8,252,839, 8,536,363, 8,410,169, 8,232,316, 8,609,728, 8,350,079, 8,349,892, 7,999,007, 8,658,694, 8,653,137, 9,029,607, 8,765,813, 9,050,311, 9,199,908, 9,278,901, 8,747,897, 9,358,240, 9,339,507, 9,255,064, 9,278,902, 9,278,903, 9,758,465; 9,422,223; 9,878,972; 9,624,156; U.S. Published Patent Applications Nos. 2009-0036465, 2008-0200449, 2008-0280986, 2009-0124697, 2014-0275616, 2014-0275262, 2013-0184295, 2014-0323567, 2016-0030371, 2016-0051505, 2016-0030355, 2016-0143868, 2015-0328232, 2015-0148414, 2016-0045470, 2016-0129087, 2017-0095432; 2018-0153847 and PCT Publications Nos. WO00/57701, WO20160105538, WO2016038532, WO2018/058124.

A "prodrug" of treprostinil may refer to compounds which are converted in vivo to treprostinil or its pharmaceutically active derivatives thereof, or to a compound described in PCT publication No. WO2005/007081; U.S. Pat. Nos. 7,384,978, 7,417,070, 7,544,713, 8,252,839, 8,410,169, 8,536,363, 9,050,311, 9,199,908, 9,278,901, 9,422,223; 9,624,156, 9,878,972, 9,371,264, 9,394,227, 9,505,737, 9,758,465, 9,643,911, 9,701,616, 9,776,982, 9,845,305, 9,957,200, 10,494,327, 10,053,414, 10,246,403, 10,344,012, 10,450,290, 10,464,877, 10,464,878, 10,703,706, 10,752,733, 9,255,064, 9,469,600, 10,010,518, 10,343,979, 10,526,274; U.S. Patent Application Publications Nos. 2018-0153847 and 2021-0054009; U.S. provisional patent application No. 63/036,561 filed Jun. 9, 2020; U.S. provisional patent application No. 63/125,145 filed Dec. 14, 2020, each of which is incorporated herein by reference in their entirety.

Prostacyclin is a small molecule that has been previously shown to cause dilation of large blood vessels, relaxation of smooth muscle, inhibition of smooth muscle proliferation, as well as inhibition of platelet aggregation, which is involved in the blood clotting process. Similar actions by treprostinil at the microvascular level and on capillaries near the skin are believed to help enhance cutaneous blood flow and heal and/or prevent ischemia lesions or ulcers associated with scleroderma, Buerger's disease, Raynaud's disease, Raynaud's phenomenon, and other conditions.

UTC_PH-ILD_005336

US 11,826,327 B2

9 | 10

An "ester" of treprostinil may refer to a compound of formula:



wherein

$R^1$ is H, optionally substituted $C_1$-$C_{10}$ alkyl, optionally substituted $C_3$-$C_{10}$ cycloalkyl, optionally substituted $C_2$-$C_{10}$ alkenyl, optionally substituted $C_2$-$C_{10}$ alkynyl, optionally substituted aryl, optionally substituted heteroaryl, or optionally substituted heterocyclyl;

$R^2$ and $R^3$ are each independently —C(O)$R^4$; and

each $R^4$ is independently optionally substituted $C_1$-$C_{10}$ alkyl, optionally substituted $C_3$-$C_{10}$ cycloalkyl, optionally substituted $C_2$-$C_{10}$ alkenyl, optionally substituted $C_2$-$C_{10}$ alkynyl, optionally substituted aryl, optionally substituted heteroaryl, or optionally substituted heterocyclyl;

wherein at least one of $R^1$, $R^2$, and $R^3$, is not H.

"Optionally substituted" refers to a group selected from that group and a substituted form of that group. Substituents may include any of the groups defined below. In one embodiment, substituents are selected from $C_1$-$C_{10}$ or $C_1$-$C_6$ alkyl, substituted $C_1$-$C_{10}$ or $C_1$-$C_6$ alkyl, $C_2$-$C_6$ alkenyl, $C_2$-$C_6$ alkynyl, $C_6$-$C_{10}$ aryl, $C_3$-$C_5$ cycloalkyl, $C_2$-$C_{10}$ heterocyclyl, $C_1$-$C_{10}$ heteroaryl, substituted $C_2$-$C_6$ alkenyl, substituted $C_2$-$C_6$ alkynyl, substituted $C_6$-$C_{10}$ aryl, substituted $C_3$-$C_8$ cycloalkyl, substituted $C_2$-$C_{10}$ heterocyclyl, substituted $C_1$-$C_{10}$ heteroaryl, halo, nitro, cyano, —CO$_2$H or a $C_1$-$C_6$ alkyl ester thereof.

"Alkyl" refers to monovalent saturated aliphatic hydrocarbyl groups having from 1 to 10 carbon atoms and preferably 1 to 6 carbon atoms. This term includes, by way of example, linear and branched hydrocarbyl groups such as methyl (CH$_3$—), ethyl (CH$_3$CH$_2$—), n-propyl (CH$_3$CH$_2$CH$_2$—), isopropyl ((CH$_3$)$_2$CH—), n-butyl (CH$_3$CH$_2$CH$_2$CH$_2$—), isobutyl ((CH$_3$)$_2$CHCH$_2$—), sec-butyl ((CH$_3$)(CH$_3$CH$_2$)CH—), t-butyl ((CH$_3$)$_3$C—), n-pentyl (CH$_3$CH$_2$CH$_2$CH$_2$CH$_2$—), and neopentyl ((CH$_3$)$_3$ CCH$_2$—).

"Alkenyl" refers to monovalent straight or branched hydrocarbyl groups having from 2 to 10 carbon atoms and preferably 2 to 6 carbon atoms or preferably 2 to 4 carbon atoms and having at least 1 and preferably from 1 to 2 sites of vinyl (>C═C<) unsaturation. Such groups are exemplified, for example, by vinyl, allyl, and but 3-en-1-yl. Included within this term are the cis and trans isomers or mixtures of these isomers.

"Alkynyl" refers to straight or branched monovalent hydrocarbyl groups having from 2 to 10 carbon atoms and preferably 2 to 6 carbon atoms or preferably 2 to 3 carbon atoms and having at least 1 and preferably from 1 to 2 sites of acetylenic (—C≡C—) unsaturation. Examples of such alkynyl groups include acetylenyl (—C≡CH), and propargyl (—CH$_2$C≡CH).

"Substituted alkyl" refers to an alkyl group having from 1 to 5, preferably 1 to 3, or more preferably 1 to 2 substituents selected from the group consisting of alkoxy, substituted alkoxy, acyl, acylamino, acyloxy, amino, substituted amino, aminocarbonyl, aminothiocarbonyl, aminocarbonylamino, aminothiocarbonylamino, aminocarbonyloxy, aminosulfonyl, aminosulfonyloxy, aminosulfonylamino, amidino, aryl, substituted aryl, aryloxy, substituted aryloxy, arylthio, substituted arylthio, carboxyl, carboxyl ester, (carboxyl ester)amino, (carboxyl ester)oxy, cyano, cycloalkyl, substituted cycloalkyl, cycloalkyloxy, substituted cycloalkyloxy, cycloalkylthio, substituted cycloalkylthio, cycloalkenyl, substituted cycloalkenyl, cycloalkenyloxy, substituted cycloalkenyloxy, cycloalkenylthio, substituted cycloalkenylthio, guanidino, substituted guanidino, halo, hydroxy, heteroaryl, substituted heteroaryl, heteroaryloxy, substituted heteroaryloxy, heteroarylthio, substituted heteroarylthio, heterocyclic, substituted heterocyclic, heterocyclyloxy, substituted heterocyclyloxy, heterocyclylthio, substituted heterocyclylthio, nitro, SO$_3$H, substituted sulfonyl, substituted sulfonyloxy, thioacyl, thiol, alkylthio, and substituted alkylthio, wherein said substituents are as defined herein.

"Substituted alkenyl" refers to alkenyl groups having from 1 to 3 substituents, and preferably 1 to 2 substituents, selected from the group consisting of alkoxy, substituted alkoxy, acyl, acylamino, acyloxy, amino, substituted amino, aminocarbonyl, aminothiocarbonyl, aminocarbonylamino, aminothiocarbonylamino, aminocarbonyloxy, aminosulfonyl, aminosulfonyloxy, aminosulfonylamino, amidino, aryl, substituted aryl, aryloxy, substituted aryloxy, arylthio, substituted arylthio, carboxyl, carboxyl ester, (carboxyl ester) amino, (carboxyl ester)oxy, cyano, cycloalkyl, substituted cycloalkyl, cycloalkyloxy, substituted cycloalkyloxy, cycloalkylthio, substituted cycloalkylthio, cycloalkenyl, substituted cycloalkenyl, cycloalkenyloxy, substituted cycloalkenyloxy, cycloalkenylthio, substituted cycloalkenylthio, guanidino, substituted guanidino, halo, hydroxyl, heteroaryl, substituted heteroaryl, heteroaryloxy, substituted heteroaryloxy, heteroarylthio, substituted heteroarylthio, heterocyclic, substituted heterocyclic, heterocyclyloxy, substituted heterocyclyloxy, heterocyclylthio, substituted heterocyclylthio, nitro, SO$_3$H, substituted sulfonyl, substituted sulfonyloxy, thioacyl, thiol, alkylthio, and substituted alkylthio, wherein said substituents are as defined herein and with the proviso that any hydroxyl or thiol substitution is not attached to a vinyl (unsaturated) carbon atom.

"Substituted alkynyl" refers to alkynyl groups having from 1 to 3 substituents, and preferably 1 to 2 substituents, selected from the group consisting of alkoxy, substituted alkoxy, acyl, acylamino, acyloxy, amino, substituted amino, aminocarbonyl, aminothiocarbonyl, aminocarbonylamino, aminothiocarbonylamino, aminocarbonyloxy, aminosulfonyl, aminosulfonyloxy, aminosulfonylamino, amidino, aryl, substituted aryl, aryloxy, substituted aryloxy, arylthio, substituted arylthio, carboxyl, carboxyl ester, (carboxyl ester) amino, (carboxyl ester)oxy, cyano, cycloalkyl, substituted cycloalkyl, cycloalkyloxy, substituted cycloalkyloxy, cycloalkylthio, substituted cycloalkylthio, cycloalkenyl, substituted cycloalkenyl, cycloalkenyloxy, cycloalkenylthio, substituted cycloalkenylthio, guanidino, substituted guanidino, halo, hydroxy, heteroaryl, substituted heteroaryl, heteroaryloxy, heteroarylthio, substituted heteroarylthio, heterocyclic, substituted heterocyclic, heterocyclyloxy, sub-

UTC_PH-ILD_005337

US 11,826,327 B2

11

stituted heterocyclyloxy, heterocyclylthio, substituted heterocyclylthio, nitro, $SO_3H$, substituted sulfonyl, substituted sulfonyloxy, thioacyl, thiol, alkylthio, and substituted alkylthio, wherein said substituents are as defined herein and with the proviso that any hydroxyl or thiol substitution is not attached to an acetylenic carbon atom.

"Alkoxy" refers to the group 0 alkyl wherein alkyl is defined herein. Alkoxy includes, by way of example, methoxy, ethoxy, n propoxy, isopropoxy, n butoxy, t butoxy, sec butoxy, and n pentoxy.

"Substituted alkoxy" refers to the group 0 (substituted alkyl) wherein substituted alkyl is defined herein.

"Acyl" refers to the groups H—C(O)—, alkyl-C(O)—, substituted alkyl-C(O)—, alkenyl-C(O)—, substituted alkenyl-C(O)—, alkynyl-C(O)—, substituted alkynyl-C(O)—, cycloalkyl-C(O)—, substituted cycloalkyl-C(O)—, cycloalkenyl-C(O)—, substituted cycloalkenyl-C(O)—, aryl-C(O)—, substituted aryl-C(O)—, heteroaryl-C(O)—, substituted heteroaryl-C(O)—, heterocyclic-C(O)—, and substituted heterocyclic-C(O)—, wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein. Acyl includes the "acetyl" group $CH_3C(O)$—.

"Acylamino" refers to the groups —$NR^{47}C(O)$alkyl, —$NR^{47}C(O)$substituted alkyl, —$NR^{47}C(O)$cycloalkyl, —$NR^{47}C(O)$substituted cycloalkyl, —$NR^{47}C(O)$cycloalkenyl, —$NR^{47}C(O)$substituted cycloalkenyl, —$NR^{47}C(O)$alkenyl, —$NR^{47}C(O)$substituted alkenyl, —$NR^{47}C(O)$alkynyl, —$NR^{47}C(O)$substituted alkynyl, —$NR^{47}C(O)$aryl, —$NR^{47}C(O)$substituted aryl, —$NR^{47}C(O)$heteroaryl, —$NR^{47}C(O)$substituted heteroaryl, —$NR^{47}C(O)$heterocyclic, and $NR^{47}C(O)$substituted heterocyclic wherein $R^{47}$ is hydrogen or alkyl and wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein.

"Acyloxy" refers to the groups alkyl-C(O)O—, substituted alkyl-C(O)O—, alkenyl-C(O)O—, substituted alkenyl-C(O)O—, alkynyl-C(O)O—, substituted alkynyl-C(O)O—, aryl-C(O)O—, substituted aryl-C(O)O—, cycloalkyl-C(O)O—, substituted cycloalkyl-C(O)O—, cycloalkenyl-C(O)O—, substituted cycloalkenyl-C(O)O—, heteroaryl-C(O)O—, substituted heteroaryl-C(O)O—, heterocyclic-C(O)O—, and substituted heterocyclic-C(O)O— wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein.

"Amino" refers to the group $NH_2$.

"Substituted amino" refers to the group —$NR^{48}R^{49}$ where $R^{48}$ and $R^{49}$ are independently selected from the group consisting of hydrogen, alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, aryl, substituted aryl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, heteroaryl, substituted heteroaryl, heterocyclic, substituted heterocyclic, $SO_2$ alkyl, —$SO_2$-substituted alkyl, —$SO_2$-alkenyl, —$SO_2$-substituted alkenyl, —$SO_2$-cycloalkyl, —$SO_2$-substituted cycloalkyl, —$SO_2$-cycloalkenyl, —$SO_2$-substituted cylcoalkenyl, —$SO_2$-aryl, —$SO_2$-substituted aryl, —$SO_2$-heteroaryl, —$SO_2$-substituted heteroaryl, —$SO_2$-heterocyclic, and

12

—$SO_2$-substituted heterocyclic and wherein $R^{48}$ and $R^{49}$ are optionally joined, together with the nitrogen bound thereto to form a heterocyclic or substituted heterocyclic group, provided that $R^{48}$ and $R^{49}$ are both not hydrogen, and wherein alkyl, substituted alkyl, alkenyl, substituted alkenyl, alkynyl, substituted alkynyl, cycloalkyl, substituted cycloalkyl, cycloalkenyl, substituted cycloalkenyl, aryl, substituted aryl, heteroaryl, substituted heteroaryl, heterocyclic, and substituted heterocyclic are as defined herein. When $R^{48}$ is hydrogen and $R^{49}$ is alkyl, the substituted amino group is sometimes referred to herein as alkylamino. When $R^{48}$ and $R^{49}$ are alkyl, the substituted amino group is sometimes referred to herein as dialkylamino.

When referring to a monosubstituted amino, it is meant that either $R^{48}$ or $R^{49}$ is hydrogen but not both. When referring to a disubstituted amino, it is meant that neither $R^{48}$ nor $R^{49}$ are hydrogen.

"Pharmaceutically acceptable salt" may refer to physiologically acceptable salts of treprostinil, as well as non-physiologically acceptable salts of treprostinil. Pharmaceutically acceptable salts of compounds described herein are within the scope of the present technology and include acid or base addition salts which retain the desired pharmacological activity and is not biologically undesirable (e.g., the salt is not unduly toxic, allergenic, or irritating, and is bioavailable). When the compound of the present technology has a basic group, such as, for example, an amino group, pharmaceutically acceptable salts can be formed with inorganic acids (such as hydrochloric acid, hydroboric acid, nitric acid, sulfuric acid, and phosphoric acid), organic acids (e.g., alginate, formic acid, acetic acid, benzoic acid, gluconic acid, fumaric acid, oxalic acid, tartaric acid, lactic acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, naphthalene sulfonic acid, and p toluenesulfonic acid) or acidic amino acids (such as aspartic acid and glutamic acid). When the compound of the present technology (treprostinil, an ester, prodrug, or derivative thereof) has an acidic group, such as for example, a carboxylic acid group, it can form salts with metals, such as alkali and earth alkali metals (e.g., $Na^+$, $Li^+$, $K^+$, $Ca^{2+}$, $Mg^{2+}$, $Zn^{2+}$), ammonia or organic amines (e.g., dicyclohexylamine, trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, triethanolamine) or basic amino acids (e.g., arginine, lysine and ornithine). Such salts can be prepared in situ during isolation and purification of the compounds or by separately reacting the purified compound in its free base or free acid form with a suitable acid or base, respectively, and isolating the salt thus formed.

ILD may include a range of diseases and disorders, for example, idiopathic pulmonary fibrosis (IPF), desquamative interstitial pneumonia (DIP), acute interstitial pneumonia (AIP), nonspecific interstitial pneumonia (NSIP), respiratory bronchiolitis-associated interstitial lung disease (RB-ILD), cryptogenic organizing pneumonia (COP), lymphoid interstitial pneumonia (LIP), sarcoidosis, rheumatoid arthritis, systemic lupus erythematosus, systemic sclerosis, polymyositis, dermatomyositis, antisynthetase syndrome, silicosis, asbestosis, occupational lung disease, chronic hypersensitivity pneumonitis, idiopathic interstitial pneumonia (IIP), an autoimmune ILD, lymphangioleiomyomatosis (LAM), Langerhans cell histiocytosis (LCH), drug associated ILD, vasculitis, granulomatosis, and berylliosis.

"Pulmonary function" as used herein, refers to the ability of the lungs to absorb oxygen and expand and contract. Pulmonary function, decline thereof, or reduction of the decline, may be assessed using medically recognized tools known to those having ordinary skill in the art. Methods

UTC_PH-ILD_005338

US 11,826,327 B2

13                                              14

include pulmonary function testing (PFT), spirometry, lung volumes, maximal respiratory pressure, diffusing capacity, oxygen desaturation, and arterial blood gas evaluation.

"Forced vital capacity" as used herein, refers to the amount of air that can be forcibly exhaled from the lungs after taking the deepest breath possible, as measured by spirometry.

Further aspects of the present invention are concerned with the use of treprostinil or its derivatives, prodrugs, esters, or pharmaceutically acceptable salts thereof, in the manufacture of a medicament for the treatment or prevention of interstitial lung disease or a condition associated with interstitial lung disease. In some embodiments, the medicament is formulated for inhalation. When administered by inhalation, the formulation can be nebulized or formulated for a dry powder inhaler (DPI).

The amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof, that is required in methods may depend on a number of factors, such as the specific indication it is being used for, the nature of the particular compound used, the mode of administration, the concentration, and the weight and condition of the subject. A daily dose per subject for ILD, or conditions associated with ILD may be in the range 25 μg to 250 mg or 7 μg to 285 μg, per day per kilogram bodyweight. In some embodiments, the daily dose may be in the range of about 150 μg to about 350 μg per day, about 200 μg to about 300 μg per day, or about 225 μg to about 275 μg per day. Intravenous doses in the range 0.5 μg to 1.5 mg per kilogram bodyweight per day may be administered as an infusion of from 0.5 ng to 1.0 μg per kilogram bodyweight per minute.

The treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, can be administered using any suitable treatment schedule. In some embodiments, the drug will be administered multiple times a day (1, 2, 3, 4, or 5), and in other embodiments, the drug can be continuously administered, such as by using an infusion pump. The duration of treatment can vary depending on the severity of disease, treatment goals, or individual circumstances. In some embodiments, the duration of treatment is at least one week, at least two weeks, at least four weeks, at least eight weeks, or at least sixteen weeks. In some embodiments, the duration of treatment is indefinite, e.g., treatment can continue for the life of the subject or until disease symptoms decrease below some threshold.

Pharmaceutical compositions described herein or administered to subjects, hereinafter referred to as a "formulation" or "composition," of treprostinil and/or its prodrugs, esters, derivatives, and/or pharmaceutically acceptable salts thereof, may be admixed with, inter alia, an acceptable carrier. The carrier may be compatible with any other ingredients in the formulation and not deleterious to the subject. The carrier may be a solid or a liquid, or both. One or more of treprostinil or its derivatives, esters, prodrugs, or pharmaceutically acceptable salts thereof, may be incorporated in the formulations of the invention. Formulations administered include those suitable for parenteral, oral, inhalation, rectal, topical, buccal and transdermal administration.

Parenterally administered compositions may be isotonic with the blood of the intended recipient. Subcutaneous injection, intravenous, intramuscular or intradermal injection may be used. Such preparations may conveniently be prepared by admixing the compound with water or a glycine or citrate buffer and rendering the resulting solution sterile and isotonic with the blood.

Formulations suitable for oral administration may be presented as capsules, cachets, lozenges, or tablets, each containing a specific amount of treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof; as a powder or granules; as a solution or a suspension in an aqueous or non-aqueous liquid; or as an oil-in-water or water-in-oil emulsion. Oral formulations that may be administered include those described in U.S. Pat. Nos. 7,384,978 and 8,747,897 (including the commercial product Orenitram® (treprostinil) Extended-Release Tablets), the entire disclosures of which are hereby incorporated by reference. In general, the formulations of the invention are prepared by uniformly and intimately admixing treprostinil, an ester, prodrug, or salt thereof with a liquid or finely divided solid carrier, or both, and then, if necessary, shaping the resulting mixture.

Formulations suitable for buccal (sub-lingual) administration include lozenges comprising treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, in a flavored base, usually sucrose and acacia or tragacanth; and pastilles comprising the compound in an inert base such as gelatin and glycerin or sucrose and acacia.

Formulations suitable for rectal administration are preferably presented as unit dose suppositories. These may be prepared by admixing treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, with one or more solid carriers.

Topical and transdermal formulations me be an ointment, cream, lotion, paste, gel, spray, aerosol, or oil. Carriers possible include vaseline, lanoline, polyethylene glycols, alcohols, and combinations thereof.

Treprostinil, prodrugs, esters, and salts thereof are conveniently prepared by methods the same as or analogous to those described in U.S. Pat. Nos. 4,306,075, 6,528,688 and 6,441,245, the disclosures of which are hereby incorporated by reference.

In some embodiments of the present methods, the treprostinil administered is provided as a kit with instructions for use in treating ILD. In certain kit embodiments, the treprostinil or its derivative, prodrug, ester, or a pharmaceutically acceptable salt thereof, is in a form suitable for subcutaneous administration, continuous subcutaneous infusion, intravenously administration or inhalation. Subcutaneous formulations administered to the subject may include any of those described in U.S. Pat. No. 7,999,007 (including the commercial product Remodulin® (treprostinil) Injection), the entire disclosure of which is hereby incorporated by reference. In other kit embodiments, the treprostinil or its derivative, or a pharmaceutically acceptable salt thereof, is in an orally available form selected from the group consisting of tablets and capsules.

The effects of the method on pulmonary fibroses (PF) can be ascertained via an animal model of PF such as bleomycin and vanadium pentoxide (V205) models as described in Bonner J C, Rice A B, Ingram J L, Moomaw C R, Nyska A, Bradbury A, Sessoms A R, Chulada P C, Morgan D L, Zeldin D C, and Langenbach R. Susceptibility of cyclooxygenase-2-deficient mice to pulmonary fibrogenesis. *Am J Pathol* 161: 459-470, 2002; 23; and Keerthisingam C B, Jenkins R G, Harrison N K, Hernandez-Rodriguez N A, Booth H, Laurent G J, Hart S L, Foster M L, and McAnulty R J. Cyclooxygenase-2 deficiency results in a loss of the antiproliferative response to transforming growth 31 factor-beta in human fibrotic lung fibroblasts and promotes bleomycin-induced pulmonary fibrosis in mice. *Am J Pathol* 158: 1411-1422, 2001, incorporated herein by reference in their entirety.

UTC_PH-ILD_005339

US 11,826,327 B2

15

In preferred embodiments, treprostinil is administered via inhalation. Inhaled compositions comprising treprostinil may include sprays, aerosols, and dry powder compositions. Said compositions may include a variety of excipients. Inhalable compositions administered may include any of those described in U.S. Pat. No. 9,339,507 (including the commercial product Tyvaso® (treprostinil) Inhalation Solution), WO2017192993 and WO2014085813, the entire disclosures of which are hereby incorporated by reference.

The excipient or excipients of the pharmaceutical composition according to the invention may have water solubility greater than 5 g/l and often greater than 100 g/l and more. They are preferably chosen among sugars, salts or amino acids and have double function of minimizing the effect of the inhaled composition on the fluid's cellular outcome. Regarding the composition in its solid dry form, the excipient also forms the solid matrix in which the treprostinil, a prodrug, ester, salt, or derivative thereof is dispersed.

The composition may include excipients such as lactose, corn starch, or the like, glidants such as magnesium stearate, etc., emulsifying agents, suspending agents, stabilizers, and isotonic agents, etc. If desired, a sweetening agent and/or a flavoring agent may be added. Exemplary excipients include, without limitation, polyethylene glycol (PEG), hydrogenated castor oil (HCO), cremophors, carbohydrates, starches (e.g., corn starch), inorganic salts, antimicrobial agents, antioxidants, binders/fillers, surfactants, lubricants (e.g., calcium or magnesium stearate), glidants such as talc, disintegrants, diluents, buffers, acids, bases, film coats, combinations thereof, and the like. Other examples of soluble excipients that may be used in the composition according to the invention are alitame, acesulfame potassium, aspartame, saccharin, sodium saccharin, sodium cyclamate, sucralose, threalose, xylitol, citric acid, tartaric acid, cyclodextrins, dextrins, hydroxyethylcellulose, gelatine, malic acid, maltitol, maltodextrin, maltose, polydextrose, tartaric acid, sodium or potassium bicarbonate, sodium or potassium chloride, sodium or potassium citrate, phospholipids, lactose, sucrose, glucose, fructose, mannitol, sorbitol, natural aminoacids, alanine, glycine, serine, cysteine, phenylalanine, tyrosine, tryptophan, histidine, methionine, threonine, valine, isoleucine, leucine, arginine, lysine, aspartic acid, glutamic acid, asparagine, glutamine, proline, their salts, and their possible simple chemical modifications such as in N-acetylcysteine, and carbocysteine.

The preferred soluble excipients are alkaline metals salts such as sodium chloride or potassium chloride, and sugars, such as lactose. Specific carbohydrate excipients include, for example, monosaccharides, such as fructose, maltose, galactose, glucose, D-mannose, sorbose, and the like; disaccharides, such as lactose, sucrose, trehalose, cellobiose, and the like; polysaccharides, such as raffinose, melezitose, maltodextrins, dextrans, starches, and the like; and alditols, such as mannitol, xylitol, maltitol, lactitol, xylitol, sorbitol (glucitol), pyranosyl sorbitol, myoinositol, and the like.

As far as the morphology of the particles of the dry powder is concerned, the composition requires the presence of a soluble excipient, preferably a sugar like lactose, able to form in the beginning of the solvent evaporation phase during preparation of the composition, during spray-drying, the backbone of the particle, producing high porosity particles.

In some embodiments, the excipient comprises a surfactant. The surfactant of the composition can be chosen among different classes of surfactants of pharmaceutical use.

Surfactants suitable to be used in the present invention are all those substances characterized by medium or low

16

molecular weight that contain a hydrophobic moiety, generally readily soluble in an organic solvent but weakly soluble or insoluble in water, and a hydrophilic (or polar) moiety, weakly soluble or insoluble in an organic solvent but readily soluble in water. Surfactants are classified according to their polar moiety. Therefore, surfactant with a negatively charged polar moiety are called anionic surfactants, while cationic surfactants have a positively charged polar moiety. Uncharged surfactant are generally called non-ionic, while surfactant charged both positively and negatively are called zwitterionic. Examples of anionic surfactants are salts of fatty acids (better known as soaps), sulfates, sulfate ethers and phosphate esters. Cationic surfactants are frequently based on polar groups containing amino groups. Most common non-ionic surfactants are based on polar groups containing oligo-(ethylene-oxide) groups. Zwitterionic surfactants are generally characterized by a polar group formed by a quaternary amine and a sulfuric or carboxylic group.

Specific examples of this application are the following surfactants: benzalkonium chloride, cetrimide, docusate sodium, glyceryl monolaurate, sorbitan esters, sodium lauryl sulfate, polysorbates, phospholipids, biliary salts.

Non-ionic surfactants, such as polysorbates and polyethylene and polyoxypropylene block copolymers, known as "Poloxamers" may be used. Polysorbates are described in the CTFA International Cosmetic Ingredient Dictionary as mixtures of sorbitol and sorbitol anhydride fatty acid esters condensed with ethylene oxide. Particularly preferred are non-ionic surfactants of the series known as "Tween," in particular the surfactant known as "Tween 80," a polyoxyethylensorbitan. Additional exemplary excipients include surfactants such as other polysorbates, e.g., "Tween 20" and pluronics such as F68 and F88 (both of which are available from BASF, Mount Olive, N.J.), sorbitan esters, lipids (e.g., phospholipids such as lecithin and other phosphatidylcholines, and phosphatidylethanolamines), fatty acids and fatty esters, steroids such as cholesterol, and chelating agents, such as EDTA, zinc and other such suitable cations.

The presence of a surfactant, and preferably of Tween 80, may be necessary to reduce electrostatic charges found in compositions without it, the flow of the powder and the maintenance of the solid state in a homogeneous way without initial crystallization. According to the present invention, phospholipids are included in the above-mentioned definition of surfactants or excipients.

The inhalatory formulation according administered can include a hydrophobic substance in order to reduce sensitivity to humidity. Such hydrophobic substance is preferably leucine, which makes the particle disaggregation easier.

In case of production of a solid product in powder form, this can occur using different techniques, well consolidated in the pharmaceutical industry. The preparation of fine particles through spray-drying represents a preferred method according to the invention. In case of industrial production, this technique is undoubtedly preferred to freeze-drying, which at the moment is the most expensive drying process, both for the apparatus used, and for the yield and production times.

The pharmaceutical composition according to the invention can include other components, such as pH buffers and preservatives. Buffers include, but are not limited to, citric acid, sodium chloride, potassium chloride, sodium sulfate, potassium nitrate, sodium phosphate monobasic, sodium phosphate dibasic, and combinations thereof.

Further, a composition administered may optionally include one or more acids or bases. Non-limiting examples of acids that can be used include those acids selected from

UTC_PH-ILD_005340

US 11,826,327 B2

17                                                                18

the group consisting of hydrochloric acid, acetic acid, phos-phoric acid, citric acid, malic acid, lactic acid, formic acid, trichloroacetic acid, nitric acid, perchloric acid, phosphoric acid, sulfuric acid, fumaric acid, and combinations thereof. Non-limiting examples of suitable bases include bases selected from the group consisting of sodium hydroxide, sodium acetate, ammonium hydroxide, potassium hydrox-ide, ammonium acetate, potassium acetate, sodium phos-phate, potassium phosphate, sodium citrate, sodium formate, sodium sulfate, potassium sulfate, potassium fumerate, and combinations thereof.

The excipients may include an antioxidant, for example, ascorbyl palmitate, butylated hydroxyanisole, butylated hydroxytoluene, hypophosphorous acid, monothioglycerol, propyl gallate, sodium bisulfite, sodium formaldehyde sulfoxylate, sodium metabisulfite, and combinations thereof.

The term "dry powder" in reference to the composition of the invention, refers to a powder, granulate, tablet form composition, or any other solid form with a humidity content that assures to the composition chemical stability in time. More precisely, the term "dry" refers to a solid composition with water content lower than 10% w/w, normally less than 5% and preferably less than 3%.

The amount of any excipient in the dry powder compo-sition of the invention can change within a wide range. The amount of any individual excipient in the composition will vary depending on the role of the excipient, the dosage requirements of the active agent components, and particular needs of the composition. Generally, however, the excipient will be present in the composition in an amount of about 1% to about 99% by weight, preferably from about 5% to about 98% by weight, more preferably from about 15% to about 95% by weight of the excipient. In general, the amount of excipient present in a composition of the disclosure is selected from the following: at least about 2%, 5%, 10%, 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, or even 95% by weight.

The treprostinil composition administered may be pro-vided as a kit that includes a metered dose inhaler containing a pharmaceutical composition comprising treprostinil or its derivative, ester, prodrug, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with ILD that can be treated by treprostinil. In some cases, the kit is a kit for treating ILD, that includes (i) a metered dose inhaler containing a pharmaceutical composition comprising treprostinil or its derivative, ester, prodrug, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler contain-ing treprostinil in treating pulmonary hypertension.

The present disclosure also provides a method of treating a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia (low oxygen levels) by administering to a subject, such as a human being, with such the pulmonary hypertension an effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug. Pulmo-nary hypertension due to a chronic lung disease and/or hypoxia belongs Group 3 pulmonary hypertension accord-ing to the World Health Organization (WHO) classification.

The chronic lung disease may include an obstructive lung disease in which the lung airways are narrow and make it difficult to exhale, such as chronic obstructive pulmonary disease (COPD) and emphysema; a restrictive lung disease

in which the lungs have a difficult time expanding when one inhales, such as interstitial lung disease or pulmonary fibro-sis; sleep apnea; living in an area of high altitude for a long period of time; and various combinations of the above conditions.

In some embodiments, the chronic lung disease may include idiopathic interstitial pneumonia, such as idiopathic pulmonary fibrosis, idiopathic nonspecific interstitial pneu-monia, respiratory bronchiolitis (e.g. respiratory bronchioli-tis associated with interstitial lung disease), desquamative interstitial pneumonia, acute interstitial pneumonia; chronic hypersensitivity pneumonitis, occupational lung disease, pulmonary fibrosis, emphysema, connective tissue disease or any combination of the above conditions.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide an increase, which may be statistically significant, in a six minute walk distance (6MWD) in a subject with a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia compared to a baseline 6MWD value, i.e. a 6MWD value prior to the administering. For example, the 6MWD value may be statistically signifi-cantly increased after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks of the administering. In some embodi-ments, the administering may provide an increase of at least 5 m, at least 10 m or at least 15 m in the 6MWD compared to the baseline 6MWD value after at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks of the administering. In some embodi-ments, the administering may provide an increase of at least 5 m, at least 10 m, at least 15 m, at least 18 m or at least 20 m in the 6MWD compared to the baseline 6MWD value after at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide a reduction, which may be statistically significant, in a plasma concentration of NT-proBNP in a subject with a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia compared to a baseline NT-proBNP plasma concentration, i.e. a NT-proBNP plasma concentration value prior to the administering. For example, the NT-proBNP plasma concentration may be statistically significantly reduced after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks of the administering. In some embodi-ments, the administering may provide a reduction of at least 50 pg/ml, at least 100 pg/ml, at least 150 pg/ml, at least 200 pg/ml, at least 250 pg/ml, at least 300 pg/ml or at least 350 pg/ml in the NT-proBNP plasma concentration compared to

UTC_PH-ILD_005341

US 11,826,327 B2

19                                                        20

the baseline the NT-proBNP plasma concentration value after at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug to a subject with a pulmonary hypertension due to a chronic lung disease may provide a reduction, which may be statistically significant, of a number of exacerbation(s) of the chronic lung disease. For example, a number of exacerbation(s) of the chronic lung disease may be lower in a patient subpopulation with the pulmonary hypertension due to the chronic lung disease, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks, compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the number of exacerbation(s) may be lowered by at least 10%, at least 20%, at least 30%, at least 40%, at least 50%, at least 60%, at least 70% or at least 80%. The exacerbation(s) may include an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug to a subject with a pulmonary hypertension due to a chronic lung disease and/or hypoxia may provide a reduction, which may be statistically significant, of a number of clinical worsening event(s). For example, a number of clinical worsening event(s) may be lower in a patient subpopulation with the pulmonary hypertension due to the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the number of clinical worsening event(s) may be lowered by at least 10%, at least 20%, at least 30%, at least 40%, at least 50%, at least 60%, at least 70% or at least 80%. The clinical worsening event(s) may include one or more of hospitalization due to a cardiopulmonary indication, a decrease in a 6MWD by more than 15% from a baseline 6MWD value, death or a lung transplantation.

In some embodiments, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may provide an improvement, which may be statistically significant, in forced vital capacity (FVC) in a subject with a pulmonary hypertension due to a condition selected from a chronic lung disease and/or hypoxia. For example, the FVC

may be higher in a patient subpopulation with the pulmonary hypertension due to the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug for at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks, or at least 20 weeks or at least 24 weeks or at least 28 weeks or at least 32 weeks or at least 36 weeks or at least 40 weeks or at least 44 weeks or at least 48 weeks or at least 52 weeks, compared to a patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. For example, the FVC value may be higher by at least 10 ml or at least 15 ml or at least 20 ml or at least 25 ml or at least 30 ml or at least 35 ml or at least 40 ml or at least 45 ml after at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks, at least 12 weeks, at least 13 weeks, at least 14 weeks, at least 15 weeks or at least 16 weeks of the administering in the patient subpopulation with the pulmonary hypertension due to the chronic lung disease and/or hypoxia, who was administered the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug compared to the patient subpopulation with the same condition, which was administered a placebo instead of treprostinil. In patients with a chronic lung disease, such as interstitial lung disease, and/or hypoxia, an FVC value usually decreases with time when untreated. Thus, administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt may increase an FVC value compared to an FVC value before the administering; maintain an FVC value within 5%, 10% or 20% within the FVC value prior to the administering; or reduce a decrease of an FVC value with time compared to a decrease in an FVC value with no administering the effective amount of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug, such a decrease in an FVC value when placebo is administered instead of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt.

In some embodiments, treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may be administered by inhalation, which may be, for example, an oral inhalation or a nasal inhalation. In some embodiments, treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may be administered by an inhalation device, which may be for example, a pulsed inhalation device, such as a metered dose inhaler and/or a pulsed nebulizer. Pulsed inhalation devices are disclosed, for example, in U.S. patent application publication No. 20080200449, U.S. Pat. Nos. 9,358,240; 9,339,507; 10,376, 525; and 10,716,793, each of which is incorporated herein by reference in its entirety.

In some embodiments, the inhalation device, such as a pulsed inhalation device, may contain a solution or a suspension comprising treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug. For example, such solution or suspension may be used for aerosolizing or a nebulizing by an inhalation device, such as a nebulizer and/or a metered dose inhaler. One example of a solution may be a commercial product Tyvaso®. A concentration of treprostinil in such solution may vary. In some embodiments, the treprostinil concentra-

UTC_PH-ILD_005342

US 11,826,327 B2

21

tion may be from 200 µg/ml to 2000 µg/ml or from 300 µg/ml to 1500 µg/ml or from 400 µg/ml to 1200 µg/ml or any value or subrange within these ranges. For example, in a certain embodiment, the treprostinil concentration may be 600 µg/ml.

In some embodiments, the inhalation device, such as a pulsed inhalation device, may be a dry powder inhaler, which may contain a dry powder composition or formulation comprising treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug. For example, a dry powder inhaler and a dry powder composition or formulation comprising treprostinil are disclosed in WO2019/237028, which incorporated herein by reference in its entirety. In some embodiments, in addition to treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug, the dry powder composition may further a diketopiperazine, such as (E)-3,6-bis[4-(N-carbonyl-2-propenyl) amidobutyl]-2,5-diketopiperazine (FDKP).

Treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug may be administered by inhalation in a single administering event which may involve a limited number of breaths (or inhalations) by the subject. For example, in some embodiments, a number of breaths in the single administering event may not exceed 20 breaths (or inhalations) or 19 breaths (or inhalations) or 18 breaths (or inhalations) or 17 breaths (or inhalations) or 16 breaths (or inhalations) or 15 breaths (or inhalations) or 14 breaths (or inhalations) or 13 breaths (or inhalations) or 12 breaths (or inhalations) or 11 breaths (or inhalations) or 10 breaths (or inhalations) or 9 breaths (or breaths (or inhalations) inhalations) or 8 breaths (or inhalations) or 7 breaths (or inhalations) or 6 breaths (or inhalations) or 5 breaths (or inhalations) or 4 breaths (or inhalations) or 3 breaths (or inhalations) or 2 breaths (or inhalations) or 1 breath (or inhalation).

A dose of treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug administered by inhalation in a single administering event may vary. In some embodiments, the single administering event dose may be from 7.5 µg to 100 µg or 10 µg to 100 µg or 15 µg to 100 µg from 15 µg to 90 µg or from 15 µg to 75 µg or from 30 µg to 75 µg or any value or subrange within these ranges.

A number of single administering events per day for administering treprostinil, its prodrug, its pharmaceutically acceptable salt or a pharmaceutically acceptable salt of its prodrug administered by inhalation may vary. For example, the number of single administering events per day may be 1, 2, 3, 4, 5 or 6 per day.

The table below provides exemplary doses of treprostinil in a dry powder formulation, which may be used in a dry powder inhaler, and how they may compare with treprostinil doses in Tyvaso® inhalation solution.

| DPI (treprostinil) Inhalation Powder Cartridge Strength (QID) | Tyvaso (treprostinil) Inhalation Solution Number of Breaths (QID) |
| --- | --- |
| 16 mcg | 2 to 4 (18 to 24 mcg) |
| 32 mcg | 5 to 7 (30 to 42 mcg) |
| 48 mcg | 8 to 10 (48 to 60 mcg) |
| 64 mcg | 11 to 13 (66 to 78 mcg) |

The disclosure of all publications cited above are expressly incorporated herein by reference in their entireties to the same extent as if each were incorporated by reference individually.

The examples described herein are illustrative of the present invention and are not intended to be limitations thereon. Different embodiments of the present invention

22

have been described according to the present invention. Many modifications and variations may be made to the techniques described and illustrated herein without departing from the spirit and scope of the invention. Accordingly, it should be understood that the examples are illustrative only and are not limiting upon the scope of the invention.

EXAMPLES

Example 1: Inhaled Treprostinil Results on Underlying Lung Disease

An exacerbation of underlying lung disease is defined as an acute, clinically significant, respiratory deterioration characterized by evidence of new widespread alveolar abnormality (Collard et al., 2016). The present example shows that treatment with inhaled treprostinil resulted in significantly fewer exacerbations of underlying lung disease in patients.

Subjects receiving inhaled lung disease were treated with inhaled treprostinil over 16 weeks. Subjects initiated inhaled treprostinil or placebo at a dose of 3 breaths (18 mcg) 4 times daily (during waking hours). Study drug doses were maximized throughout the study. Dose escalations (additional 1 breath 4 times daily) could occur up to every 3 days with a target dosing regimen of 9 breaths (54 mcg) 4 times daily and a maximum dose of 12 breaths (72 mcg) 4 times daily, as clinically tolerated. Subjects were assessed during Screening and Baseline to determine eligibility for the study. Once eligible, 5 Treatment Phase visits to the clinic were required at Week 4, Week 8, Week 12, Week 15, and Week 16 (final study visit). An Early Termination (ET) Visit was conducted for subjects who discontinued prior to Week 16; all assessments planned for the final Week 16 Visit were conducted during the ET Visit, if applicable. Subjects were contacted at least weekly by telephone or email to assess tolerance to study drug, adverse events (AEs), and changes to concomitant medications.

Efficacy assessments consisted of 6MWD, plasma NT-proBNP concentration, and time to clinical worsening. Exploratory endpoints included SGRQ, change in DSP, time to exacerbation of underlying disease, and pulmonary function tests. Safety assessments consisted of the development of AEs, vital signs, clinical laboratory parameters, ECG parameters, hospitalizations due to cardiopulmonary indications, exacerbations of underlying lung disease, and oxygenation.

Treatment resulted in significantly fewer exacerbations of underlying lung disease over the 16-week treatment period (26.4% in Inhaled Treprostinil group and 38.7% in placebo group; p=0.018) and decreased risk of an exacerbation of underlying lung disease (hazard ratio 0.66 or 34% reduction in risk) as shown in FIG. 1.

In addition, the following FVC suggestive data was obtained from this study. Among patients treated with inhaled treprostinil, overall results from intent to treat group were:

Overall ITT

    28.47 mL and 44.40 mL in FVC at Weeks 8 and 16

    Percent predicted FVC at Week 8 (1.79%; p=0.0139) and Week 16 (1.80%; p=0.0277).

    Subset IIP etiology:

        46.48 mL and 108.18 mL (p=0.0229) at Weeks 8 and 16

        Percent predicted FVC at Week 8 (1.95%, p=0.0373) and Week 16 (2.88%; p=0.0096)

    Subset IPF etiology:

        84.52 mL and 168.52 mL (p=0.0108) at Weeks 8 and 16

        Percent predicted FVC at Week 8 (2.54%; p=0.0380) and Week 16 (3.50%; p=0.0147)

Nintedanib: IPF~109 mL (3.2% predicted) at 52 weeks

Pirfenidone: IPF~153-193 mL at 52 weeks

UTC_PH-ILD_005343

US 11,826,327 B2

**23**

Placebo corrected, rate of decline (not improvements)

In comparison to the known treatments for ILD (nintedanib and pirfenidone) shown above, inhaled treprostinil achieves comparable effects with shorter treatment duration.

Pulmonary function testing was initially conducted as a safety assessment (Safety Population) during the study. The results indicated that although most PFT parameters remained stable for subjects in the study, a notable improve-

**24**

ment in FVC (% predicted) was observed at Week 16 in the inhaled treprostinil group (median improvement of 1.0% compared to a 1.0% reduction in the placebo group). As a result, post hoc MMRM analyses of FVC data were performed for the ITT Population and are presented in Table 1 (ITT Population), Table 2 (by PH ILD Etiology of IIP) and Table 3 (for subjects with IPF), shown below.

TABLE 1

Analysis of FVC Data Using Mixed Model Repeated Measurement - ITT Population

| Visit | Treatment | N | LS Mean | Contrast | Estimated Difference | 95% CI | p-value |
|---|---|---|---|---|---|---|---|
| | | | | FVC (mL) | | | |
| Week 8 | Inhaled treprostinil | 142 | 5.49 | Inhaled treprostinil – Placebo | 28.47 | −30.81, 87.74 | 0.3453 |
| | Placebo | 141 | −22.98 | | | | |
| Week 16 | Inhaled treprostinil | 130 | 9.77 | Inhaled treprostinil – Placebo | 44.40 | −25.25, 114.05 | 0.2106 |
| | Placebo | 126 | −34.63 | | | | |
| | | | | FVC (% predicted) | | | |
| Week 8 | Inhaled treprostinil | 142 | 0.77 | Inhaled treprostinil – Placebo | 1.79 | 0.37, 3.21 | 0.0139 |
| | Placebo | 141 | −1.02 | | | | |
| Week 16 | Inhaled treprostinil | 130 | 1.07 | Inhaled treprostinil – Placebo | 1.80 | 0.20, 3.39 | 0.0277 |
| | Placebo | 126 | −0.72 | | | | |

Abbreviations:
CI, confidence interval;
FVC, forced vital capacity;
ITT, Intent-to-Treat;
LS, least square;
MMRM, mixed model repeated measurement

LSMean, p-values, estimated difference, and associated 95% CI were from the MMRM with the change from baseline in FVC/% predicted FVC as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; baseline FVC/% predicted FVC as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

TABLE 2

Analysis of FVC Data Using Mixed Model Repeated Measurement
for PH-ILD Etiology of IIP - ITT Population

| Visit | Treatment | N | LS Mean | Contrast | Estimated Difference | 95% CI | p-value |
|---|---|---|---|---|---|---|---|
| | | | | PH-ILD Etiology: IIP | | | |
| | | | | FVC (mL) | | | |
| Week 8 | Inhaled treprostinil | 58 | 9.27 | Inhaled treprostinil – Placebo | 46.48 | −32.55, 125.51 | 0.2467 |
| | Placebo | 71 | −37.21 | | | | |
| Week 16 | Inhaled treprostinil | 52 | 22.16 | Inhaled treprostinil – Placebo | 108.18 | 15.25, 201.10 | 0.0229 |
| | Placebo | 63 | −86.02 | | | | |
| | | | | FVC (% predicted) | | | |
| Week 8 | Inhaled treprostinil | 58 | 0.92 | Inhaled treprostinil – Placebo | 1.95 | 0.12, 3.79 | 0.0373 |
| | Placebo | 71 | −1.03 | | | | |
| Week 16 | Inhaled treprostinil | 52 | 1.66 | Inhaled treprostinil – Placebo | 2.88 | 0.72, 5.05 | 0.0096 |
| | Placebo | 63 | −1.23 | | | | |

Abbreviations:
CI, confidence interval;
CPFE, combined pulmonary fibrosis and emphysema;
CTD, connective tissue disease;
FVC, forced vital capacity;
ILD, interstitial lung disease;
IIP, idiopathic interstitial pneumonia;
ITT, Intent-to-Treat;
LS, least square;
MMRM, mixed model repeated measurement

LSMean, p-values, estimated difference, and associated 95% CI were from the MMRM with the change from baseline in FVC/% predicted FVC as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; baseline FVC/% predicted FVC as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

UTC_PH-ILD_005344

US 11,826,327 B2

25                                       26

Table 3: Analysis of FVC Data Using Mixed Model Repeated Measurement for Subjects with IPF - ITT for IIP Subjects

| | | | | IPF FVC (mL) | | | |
|---|---|---|---|---|---|---|---|
| Week 8 | Inhaled treprostinil | 31 | 41.69 | Inhaled treprostinil - Placebo | 84.522 | −20.409, 189.454 | 0.1128 |
| | Placebo | 47 | −42.83 | | | | |
| Week 16 | Inhaled treprostinil | 28 | 38.24 | Inhaled treprostinil - Placebo | 168.520 | 40.078, 296.970 | 0.0108 |
| | Placebo | 42 | −130.3 | | | | |
| | | | | FVC (% predicted) | | | |
| Week 8 | Inhaled treprostinil | 31 | 1.60 | Inhaled treprostinil - Placebo | 2.543 | 0.145, 4.941 | 0.0380 |
| | Placebo | 47 | −0.94 | | | | |
| Week 16 | Inhaled treprostinil | 28 | 1.62 | Inhaled treprostinil - Placebo | 3.504 | 0.712, 6.295 | 0.0147 |
| | Placebo | 42 | −1.88 | | | | |

Abbreviations:
CI, confidence interval;
FVC, forced vital capacity;
IPF, idiopathic pulmonary fibrosis;
ITT, Intent-to-Treat;
LS, least square; MMRM, mixed model repeated measurement
LSMean, p-values, estimated difference, and associated 95% CI were from the MMRM with the change from baseline in FVC/% predicted FVC as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; baseline FVC/% predicted FVC as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

Treatment with inhaled treprostinil resulted in improvements of 28.47 mL and 44.40 mL in FVC at Weeks 8 and 16, respectively; significant when presented as % predicted FVC at Week 8 (1.79%; p=0.0139) and Week 16 (1.80%; p=0.0277).

When FVC was analyzed by PH-ILD etiology of IIP, treatment with inhaled treprostinil resulted in improvements of 46.48 mL and 108.18 mL (p=0.0229) when compared to placebo at Weeks 8 and 16, respectively. The between group differences for % predicted FVC were statistically significant at Week 8 (1.95%; p=0.0373) and Week 16 (2.88%; p=0.0096).

Further analysis of FVC for subjects with an IPF etiology (using only the IIP subjects in the ITT Population), showed that treatment with inhaled treprostinil resulted in improvements of 84.52 mL and 168.52 mL (p=0.0108) compared to placebo at Weeks 8 and 16, respectively. The between group differences for % predicted FVC were statistically significant at Week 8 (2.54%; p=0.0380) and Week 16 (3.50%; p=0.0147).

Example 2

The following prophetic example will assess efficacy of treprostinil as indicated for the treatment of chronic fibrosing interstitial lung diseases (CF-ILDs) including Idiopathic Interstitial Pneumonias (IIPs) including IPF, chronic hypersensitivity pneumonitis (CHP), and environmental/occupational fibrosing lung disease.

Patients may be treated with inhaled treprostinil up to 15 breaths QID based upon tolerability. Change from baseline to Week 24 of treatment in FVC (absolute or percent predicted) as primary efficacy endpoint will be assessed. Parameters that may be assessed include time to exacerbation of underlying lung disease, 6 meter walk distance test (6MWD), all-cause mortality/survival, time to death, additional analyses of FVC (e.g. absolute and relative change), changes from baseline in $SpO_2$, diffusing capacity of the lungs for carbon monoxide (DLCO), NT-proBNP, and King's Brief Interstitial Lung Disease Questionnaire.

REFERENCES

1. Collard et al., *American Journal of Respiratory and Critical Care Medicine*, Volume 194 Number 3, pg. 265.

2. Meyer et al., (Apr. 3, 2017). *Therapeutics and Clinical Risk Management*. 13: 427-437.

Example 3: Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease

No therapies are currently approved for the treatment of pulmonary hypertension in patients with interstitial lung disease. The safety and efficacy of inhaled treprostinil for patients with this condition are unclear.

Methods

We enrolled patients with interstitial lung disease and pulmonary hypertension (documented by right heart catheterization) in a multicenter, randomized, double-blind, placebo-controlled, 16-week trial. Patients were assigned in a 1:1 ratio to receive inhaled treprostinil, administered by means of an ultrasonic, pulsed-delivery nebulizer in up to 12 breaths (total, 72 μg) four times daily, or placebo. The primary efficacy end point was the difference between the two treatment groups in the change in peak 6-minute walk distance from baseline to week 16. Secondary end points included the change in N-terminal pro-B-type natriuretic peptide (NT-proBNP) level at week 16 and the time to clinical worsening.

Results

A total of 326 patients underwent randomization, with 163 assigned to inhaled treprostinil and 163 to placebo. Baseline characteristics were similar in the two groups. At week 16, the least-squares mean difference between the treprostinil group and the placebo group in the change from baseline in the 6-minute walk distance was 31.12 m (95% confidence interval [CI], 16.85 to 45.39; P<0.001). There was a reduction of 15% in NT-proBNP levels from baseline with inhaled treprostinil as compared with an increase of 46% with placebo (treatment ratio, 0.58; 95% CI, 0.47 to 0.72; P<0.001). Clinical worsening occurred in 37 patients (22.7%) in the treprostinil group as compared with 54 patients (33.1%) in the placebo group (hazard ratio, 0.61;

UTC_PH-ILD_005345

US 11,826,327 B2

27

95% CI, 0.40 to 0.92; P=0.04 by the log-rank test). The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea.

### Conclusions

In patients with pulmonary hypertension due to interstitial lung disease, inhaled treprostinil improved exercise capacity from baseline, assessed with the use of a 6-minute walk test, as compared with placebo.

Precapillary pulmonary hypertension is defined as an elevation in mean pulmonary arterial pressure and pulmonary vascular resistance.[1] In the World Health Organization (WHO) classification of pulmonary hypertension, precapillary pulmonary hypertension due to lung disease is classified as group 3. The most common lung diseases associated with group 3 pulmonary hypertension are chronic obstructive pulmonary disease and interstitial lung disease.

Pulmonary hypertension has been reported in up to 86% of patients with interstitial lung disease and is associated with reduced exercise capacity, greater need for supplemental oxygen, decreased quality of life, and earlier death.[2-4] Despite the global prevalence and poor clinical course of pulmonary hypertension due to interstitial lung disease, there are currently no approved therapies for these patients. Although data are limited, therapies approved for group 1 pulmonary hyper-tension (pulmonary arterial hypertension) have been used to treat group 3 pulmonary hypertension.[5] Previous studies of vasodilator therapies have shown conflicting results. The largest trial to date evaluated the soluble guanylate cyclase stimulator riociguat in a patient population with group 2 pulmonary hypertension and was stopped early owing to serious harm.[6] Treprostinil is a stable analogue of prostacyclin, which promotes direct vasodilation of pulmonary and systemic arterial vascular beds and inhibits platelet aggregation.[7] An inhaled formulation of treprostinil was previously shown to improve exercise capacity after 12 weeks of therapy in patients with group 1 pulmonary hypertension.[8] Data from previously completed pilot studies sug-

28

gest that inhaled treprostinil can improve hemodynamics and functional capacity in patients with group 3 pulmonary hypertension.[9-12] Therefore, the objective of the INCREASE trial was to evaluate the safety and efficacy of inhaled treprostinil in patients with pulmonary hypertension due to interstitial lung disease.

### Trial Design and Oversight

INCREASE was a multicenter, randomized, double-blind, placebo-controlled trial. The trial was monitored by an independent data and safety monitoring committee and was conducted in accordance with Good Clinical Practice guidelines.

### Trial Population

The trial population consisted of patients 18 years of age or older in whom interstitial lung disease was diagnosed on the basis of evidence of diffuse parenchymal lung disease on computed tomography of the chest (not centrally adjudicated) performed within 6 months before randomization. Confirmation of group 3 pulmonary hypertension by right heart catheterization within 1 year before randomization was required. Group 3 pulmonary hypertension was defined by pulmonary vascular resistance of more than 3 Wood units, pulmonary capillary wedge pressure of 15 mm Hg or lower, and mean pulmonary arterial pressure of 25 mm Hg or higher. Patients with group 3 pulmonary hypertension due to connective tissue disease were also required to have a baseline forced vital capacity of less than 70%. Eligible patients also had to walk at least 100 m during a 6-minute walk test. Patients receiving drug treatment (i.e., pirfenidone or nintedanib) for their underlying lung disease were required to have been receiving a stable dose for at least 30 days before undergoing randomization. Patients receiving approved therapy for pulmonary arterial hypertension within 60 days before randomization were not eligible for enrollment. Written informed consent was obtained from all the patients.

#### TABLE 4

| Characteristics of the Patients at Baseline.* | | | |
|---|---|---|---|
| Characteristic | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
| Female sex - no. (%) | 85 (52.1) | 68 (41.7) | 153 (46.9) |
| Mean age at randomization (range) - yr | 65.6 (26-90) | 67.4 (36-85) | 66.5 (26-90) |
| Age distribution - no. (%) | | | |
| <65 yr | 64 (39.3) | 48 (29.4) | 112 (34.4) |
| 65 to <80 yr | 83 (50.9) | 100 (61.3) | 183 (56.1) |
| ≥80 yr | 16 (9.8) | 15 (9.2) | 31 (9.5) |
| Race or ethnic group - no. (%)† | | | |
| White | 112 (68.7) | 126 (77.3) | 238 (73.0) |
| Black or African American | 41 (25.2) | 30 (18.4) | 71 (21.8) |
| American Indian or Alaska Native | 2 (1.2) | 1 (0.6) | 3 (0.9) |
| Asian | 7 (4.3 | 5 (3.1) | 12 (3.7) |
| Multiple | 0 | 1 (0.6) | 1 (0.3) |
| Unknown | 1 (0.6) | 0 | 1 (0.03) |
| Hispanic or Latino ethnic group - no. (%)† | | | |
| Yes | 11 (6.7) | 16 (9.8) | 27 (8.3) |
| No | 152 (93.3) | 146 (89.6) | 298 (91.4) |
| Data missing | 0 | 1 (0.6) | 1 (0.3) |
| Mean time since diagnosis - yr | 0.54 ± 1.16 | 0.54 ± 1.31 | 0.54 ± 1.23 |

UTC_PH-ILD_005346

US 11,826,327 B2

29                                                                              30

TABLE 4-continued

| Characteristic | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
|---|---|---|---|
| Characteristics of the Patients at Baseline.* | | | |
| Cause of lung disease - no. (%) | | | |
| Idiopathic interstitial pneumonia | 65 (39.9) | 81 (49.7) | 146 (44.8) |
| Chronic hypersensitivity pneumonitis | 10 (6.1) | 9 (5.5) | 19 (5.8) |
| Occupational lung disease | 5 (3.1) | 1 (0.6) | 6 (1.8) |
| Combined pulmonary fibrosis and emphysema | 42 (25.8) | 40 (24.5) | 82 (25.2) |
| Connective tissue disease | 40 (24.5) | 32 (19.6) | 72 (22.1) |
| Other | 1 (0.6) | 0 | 1 (0.3) |
| Idiopathic interstitial pneumonia subcategory - no. (%) | | | |
| Idiopathic pulmonary fibrosis | 37 (22.7) | 55 (33.7) | 92 (28.2) |
| Idiopathic nonspecific interstitial pneumonia | 21 (12.9) | 16 (9.8) | 37 (11.3) |
| Respiratory bronchiolitis associated with interstitial lung disease | 2 (1.2) | 0 | 2 (0.6) |
| Desquamative interstitial pneumonia | 0 | 1 (0.6) | 1 (0.3) |
| Acute interstitial pneumonia | 0 | 1 (0.6) | 1 (0.3) |
| Unclassified idiopathic interstitial pneumonia | 5 (3.1) | 8 (4.9) | 13 (4.0) |
| Use of supplemental oxygen - no. (%) | 119 (73.0) | 114 (69.9) | 233 (71.5) |
| Background therapy - no (%) | | | |
| None | 133 (81.6) | 119 (73.0) | 252 (77.3) |
| Pirfenidone only | 19 (11.7) | 25 (15.3) | 44 (13.5) |
| Nintedanib only | 11 (6.7) | 19 (11.7) | 30 (9.2) |

*Plus-minus values are means ± SD. Additional patient characteristics at baseline are provided in Table S2 in the Supplementary Appendix. Percentages may not total 100 because of rounding.
†Race and ethnic group were reported by the patient.

### Trial Procedures

Within 30 days after screening, eligible patients were randomly assigned in a 1:1 ratio to receive inhaled treprostinil (Tyvaso, United Therapeutics) or placebo in a double-blind manner. Randomization, based on permuted blocks, was stratified by baseline 6-minute walk distance (≤350 m vs. >350 m) and was implemented through an interactive Web-response system.

Inhaled treprostinil (0.6 mg per milliliter) was administered by means of an ultrasonic, pulsed-delivery nebulizer at 6 μg per breath. Placebo was administered similarly as a visually identical solution. The first dose of trial drug (3 breaths) was administered in the clinic, followed by at least a 1-hour observation period. The dose of treprostinil or placebo was adjusted, with dose escalation (an additional 1 breath four times daily) occurring as often as every 3 days, with a target dose of 9 breaths four times daily and a maxi-mum dose of 12 breaths four times daily. Investigators adjusted the dose on an individual patient basis to achieve the maximum tolerated dose leading to functional improvement.

### Trial Assessments

The 6-minute walk test was performed and laboratory data were obtained at baseline and at weeks 4, 8, 12, and 16, or at the time of early discontinuation of treprostinil or placebo. Each 6-minute walk test was performed 10 to 60 minutes after the most recent dose of active drug or placebo, which is the time of peak plasma treprostinil exposure. A trough test was performed at week 15 at least 4 hours after the participant received a dose of treprostinil or placebo and at least 24 hours before the week 16 test. Pulse oximetry was performed immediately before, during, and after each 6-minute walk test. Measurement of N-terminal pro-B-type natriuretic peptide (NT-proBNP) levels and pulmonary function tests were performed at baseline and at weeks 8 and 16 (or at early discontinuation) after the patients recovered from the 6-minute walk test. The St. George's Respiratory Questionnaire (SGRQ), a quality-of-life measure, was completed at baseline and week 16 or at the time of early discontinuation.

### Outcome Measures

The primary end point of the trial was the difference between the two groups in the change in peak 6-minute walk distance from baseline to week 16. Secondary efficacy end points were analyzed in the following hierarchical testing order: the change in NT-proBNP level from baseline to week 16, the time to clinical worsening, the change in 6-minute walk distance at peak plasma treprostinil level at week 12, and the change in 6-minute walk distance at trough treprostinil level at week 15. The time to clinical worsening was evaluated from the time of randomization until the patient's withdrawal from the trial and was defined as the time until the occurrence of any one of the following events: hospitalization for a cardiopulmonary indication, a decrease in 6-minute walk distance greater than 15% from baseline that was directly related to the disease under study at two consecutive visits and at least 24 hours apart, death from any cause, or lung transplantation.

Exploratory end points were the changes in peak 6-minute walk distance at weeks 4 and 8, quality of life as measured with the use of the SGRQ at week 16, and the distance-saturation product (calculated by multiplying the total distance walked by the lowest oxygen saturation measurement during the 6-minute walk) at week 16. Safety end points included adverse events, abnormal laboratory results, oxy-

UTC_PH-ILD_005347

US 11,826,327 B2

31

genation as measured by pulse oximetry (Spo2) and supplemental oxygen requirement, changes in pulmonary function test results, hospitalization for a cardiopulmonary indication, and investigator-reported exacerbations of underlying lung disease, defined as acute, clinically significant respiratory deterioration characterized by evidence of new widespread alveolar abnormality.

Statistical Analysis

Original estimates suggested that with 266 patients randomly assigned in a 1:1 ratio to receive inhaled treprostinil or placebo, the trial would have at least 90% power at a significance level of 0.05 (two-sided) to detect a between-group difference of 30 m in the change in peak 6-minute walk distance from baseline at week 16, assuming a standard deviation of 75 m. To account for approximately 15% of participants discontinuing the trial, 314 patients would need to be enrolled.

For the primary efficacy analysis, the change in 6-minute walk distance was analyzed by mixed-model repeated-measures methods, under the assumption that missing data were missing at random. The model included the change from baseline to peak 6-minute walk distance as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and the baseline 6-minute walk distance as a covariate. A sensitivity analysis for the primary end point was performed by means of a multiple imputation approach with a multivariate normal imputation model according to the Markov chain Monte Carlo method. The imputation model included treatment group, all scheduled visits, the patient's sex, and the patient's age at randomization. If the result for the primary efficacy end point was significant, secondary efficacy end points were to be evaluated according to a hierarchical testing procedure. Confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects for secondary efficacy end points.

Results

Patients

Of 462 patients screened for eligibility, 326 were enrolled at 93 centers and were randomly assigned to receive placebo

32

(163 patients) or inhaled treprostinil (163 patients) (FIG. 2). Baseline characteristics were similar in the two groups (Table 4). The mean age of the patients was 66.5 years, 46.9% were female, and the most common diagnosis was idiopathic interstitial pneumonia (in 44.8%). At baseline, the mean 6-minute walk distance was 259.6 m, the mean pulmonary vascular resistance was 6.2 Wood units, and the mean NT-proBNP level was 1832.9 pg per milliliter.

Exposure and Follow-up

Patients in the treprostinil group took a median of 11 breaths from the inhaler (66 μg) at each of four daily sessions at week 12 and 12 breaths (72 μg) per session at week 16. The percentage of patients in this group who took 10 to 12 breaths (60 to 72 μg) per session was 57.0% at week 12 and 57.8% at week 16. In the placebo group patients took a median of 12 breaths from the inhaler per session at weeks 12 and 16.

Forty patients assigned to receive inhaled treprostinil (24.5%) and 38 assigned to placebo (23.3%) discontinued the assigned regimen pre-maturely. These patients were encouraged to remain in the trial and complete assessments through week 16; 33 patients in the treprostinil group and 35 in the placebo group discontinued participation in the trial. The reasons for discontinuation are shown in FIG. 2.

Primary End Point

Mean within-group changes in the 6-minute walk distance are shown in FIG. 2. Mixed-model repeated-measures analysis showed that the least-squares mean difference between the treprostinil group and the placebo group in the change from baseline in peak 6-minute walk distance was 31.12 m (95% confidence interval [CI], 16.85 to 45.39; P<0.001) (Table 5 and FIG. 4). Similar effects were observed across subgroups, including subgroups defined by disease cause and severity (as measured by baseline 6-minute walk distance), baseline hemodynamics, and dose group (FIG. 5). In addition, the between-group difference in the change from baseline in peak 6-minute walk distance at week 16 was significant when analyzed with multiple imputation according to the Markov chain Monte Carlo method (30.97 m; 95% CI, 16.53 to 45.41; P<0.001) (FIG. 6).

TABLE 5

| Summary of Primary and Secondary End Points.* | | | | |
|---|---|---|---|---|
| End Point | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | Treatment Effect (95% CI) | P Value |
| Primary end point | | | | |
| Change in peak 6-minute walk distance from baseline to wk 16 - m¶ | 21.08 ± 5.12 | −10.04 ± 5.12 | 31.12 ± 7.25 (16.85 to 45.39)‡ | <0.001 |
| Secondary end points§ | | | | |
| Change in plasma concentration of NT-proBNP from baseline to wk 16¶ | | | | |
| Mean (±SD) change - pg/ml | −396.35 ± 1904.90 | 1453.95 ± 7296.20 | | |
| Median - pg/ml | −22.65 | 20.65 | | |
| Range - pg/ml | −11,433.0 to 5373.1 | −5483.3 to 87,148.3 | | |
| Ratio to baseline | 0.85 ± 0.06 | 1.46 ± 0.11 | ±0.58 ± 0.06 (0.47 to 0.72)‖ | <0.001 |

UTC_PH-ILD_005348

US 11,826,327 B2

33 34

TABLE 5-continued

Summary of Primary and Secondary End Points.*

| End Point | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | Treatment Effect (95% CI) | P Value |
|---|---|---|---|---|
| Occurrence of clinical worsening - no. (%) | | | 0.61 (0.4 to 0.92)** | 0.04 |
| Any event | 37 (22.7) | 54 (33.1) | | |
| Hospitalization for cardiopulmonary indication | 18 (11.0) | 24 (14.7) | | |
| Decrease in 6 minute walk distance of >15% from baseline | 13 (8.0) | 26 (16.0) | | |
| Death from any cause | 4 (2.5) | 4 (2.5) | | |
| Lung transplantation | 2 (1.2) | 0 | | |
| Least-squares mean change in peak 6- minute walk distance from baseline to wk 12 - m† | 18.77 ± 4.99 | −12.52 ± 5.01 | 31.29 ± 7.07 (17.37 to 45.21)‡ | <0.001 |
| Least-squares mean change in trough 6- minute walk distance from baseline to wk 15 - m | 9.3 ± 5.5 | −12.7 ± 5.5 | 21.99 ± 7.7± (6.85 to 37.14)† | 0.005††‡ |

*Plus-minus values are means ± SE, unless otherwise indicated. For secondary end points, the confidence intervals (CIs) have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects. NT-proBNP denotes N-terminal pro-B-type natriuretic peptide.
†The effect of inhaled treprostinil as compared with placebo on the change in 6-minute walk distance was evaluated with the use of a mixed-model repeat measurement with the change from baseline in peak 6-minute walk distance as the dependent variable; treatment, week, and treatment-by-week interaction as the fixed effects; baseline 6-minute walk distance as the covariate; and subject as the random effect. Results are shown in Figures S1 and S3.
‡This is a least-squares mean difference between the groups.
§The effect of inhaled treprostinil as compared with placebo on the change in log-transformed NT-proBNP was evaluated with the use of a mixed-model repeat measurement with the change from baseline in log-transformed NT-proBNP as the dependent variable; treatment, week, and treatment-by-week interaction as the fixed effects; and log-transformed baseline NT-proBNP as the covariate. Ratio to baseline is the least-squares mean of the change from baseline in log-transformed data.
¶The change in plasma concentration of NT-proBNP from baseline to week 16 was assessed in 156 patients in the treprostinil group and 160 in the placebo group.
‖This is the treatment ratio, which is the ratio of ratios between two treatment groups.
**This is a hazard ratio, calculated from a Cox proportional-hazards model. The P value was calculated with the use of a log-rank test stratified by the baseline 6-minute walk distance category.
††The P value was obtained from 100 multiple imputations with Markov chain Monte Carlo estimation with the use of analysis of covariance (ANCOVA) modeling, with the change from baseline in peak 6-minute walk distance as the dependent variable, treatment as a fixed effect, and baseline 6-minute walk distance as a covariate.

## Secondary and Exploratory End Points

Patients assigned to inhaled treprostinil, as compared with those assigned to placebo, showed significant improvements in each of the secondary end points (Table 5). The NT-proBNP level decreased 15% from baseline with inhaled treprostinil and increased 46% from baseline with placebo, as assessed by the least-squares mean for the log-transformed ratio to the baseline level at week 16 (treatment ratio, 0.58; 95% CI, 0.47 to 0.72; P<0.001) (FIG. 7). Clinical worsening occurred in 37 patients (22.7%) in the treprostinil group, as compared with 54 patients (33.1%) in the placebo group (hazard ratio, 0.61; 95% CI, 0.40 to 0.92; P=0.04 by the log-rank test) (FIG. 1). The least-squares mean change from baseline to week 12 in peak 6-minute walk distance was 31.29 m greater in the treprostinil group than in the placebo group (P<0.001), and the change from baseline to week 15 in trough 6-minute walk distance was 21.99 m greater in the treprostinil group (P=0.004). There was no significant between-group difference in patient-reported quality of life as assessed with the SGRQ or in the distance-saturation product at week 16.

### Safety End Points

TABLE 6

Summary of Adverse Events

| Variable | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | P Value* |
|---|---|---|---|
| Total no. of adverse events | 890 | 793 | |
| Patients with ≥1 adverse event - no. (%) | 152 (93.3) | 149 (91.4) | 0.68 |
| Total no. of serious adverse events† | 53 | 89 | |
| Patients with ≥1 serious adverse event - no. (%) | 38 (23.3) | 42 (25.8) | 0.70 |
| Total no. of adverse events leading to withdrawal of treprostinil or placebo | 47 | 38 | |
| Most frequently occurring adverse events - no. of patients (%)‡ | | | |
| Cough | 71 (43.6) | 54 (33.1) | 0.07 |
| Headache | 45 (27.6) | 32 (19.6) | 0.12 |
| Dyspnea | 41 (25.2) | 51 (31.3) | 0.27 |
| Dizziness | 30 (18.4) | 23 (14.1) | 0.37 |
| Nausea | 25 (15.3) | 26 (16.0) | >0.99 |

UTC_PH-ILD_005349

US 11,826,327 B2

35                                                                     36

TABLE 6-continued

| | Summary of Adverse Events | | |
|---|---|---|---|
| Variable | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | P Value* |
| Fatigue | 23 (14.1) | 23 (14.1) | >0.99 |
| Diarrhea | 22 (13.5) | 19 (11.7) | 0.74 |
| Throat irritation | 20 (12.3) | 6 (3.7) | 0.007 |
| Oropharyngeal pain | 18 (11.0) | 4 (2.5) | 0.003 |
| NT-proBNP increased | 9 (5.5) | 25 (15.3) | 0.006 |

*P values were calculated with the use of Fisher's exact test.
‡Shown are the most frequently occurring adverse events occurring in more than 10% of patients in either group in the safety population, which comprised all patients who underwent randomization and received at least one dose of treprostinil or placebo.

The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea (Table 6). Most of these events were of mild-to-moderate intensity.

Serious adverse events occurred in 23.3% of the patients who received inhaled treprostinil and in 25.8% of those who received placebo. No serious adverse events were reported significantly more frequently in the treprostinil group than in the placebo group.

Significantly fewer patients in the treprostinil group than in the placebo group had exacerbations of underlying lung disease (43 [26.4%] vs. 63 [38.7%]; P=0.02 by Fisher's exact test). Fewer patients in the treprostinil group than in the placebo group had a first occurrence of clinical worsening that involved hospitalization for a cardiopulmonary indication (18 [11.0%] vs. 24 [14.7%]; P=0.41). Inhaled treprostinil had no deleterious effect on any pulmonary function test variable during the trial. There were no significant treatment-related changes in pulse oximetry or supplemental oxygen use in either group over the trial period.

Discussion

Pulmonary hypertension frequently complicates the treatment of patients with interstitial lung disease and is associated with worse functional status, greater need for supplemental oxygen, and worse outcomes.[3, 13] In the INCREASE trial, patients treated with inhaled treprostinil had significant improvements in exercise capacity, as evidenced by changes in the 6-minute walk distance. Treatment with inhaled treprostinil was also associated with a lower risk of clinical worsening than that in patients who received placebo, as well as reductions in NT-proBNP levels and fewer exacerbations of underlying lung disease, over the 16-week treatment period. The safety profile of inhaled treprostinil observed in this vulnerable patient population was similar to that reported in previous studies. The most frequently reported adverse events were cough, headache, dyspnea, dizziness, nausea, fatigue, and diarrhea. The use of inhaled treprostinil was not associated with any decrement in lung function.

Patients with group 3 pulmonary hypertension are often treated with systemic pulmonary vasodilators, which are currently approved only for treatment of group 1 pulmonary hypertension. However, there is concern that such agents could worsen ventilation-perfusion matching in patients with group 3 pulmonary hypertension. Inhaled agents have the advantage of preferentially redirecting blood flow to the best-ventilated lung units, thus reducing the risk of ventilation-perfusion mismatching.[9, 14] Indeed, a retrospective study of inhaled treprostinil in patients with group 3 pulmonary hypertension showed that such patients had improvements in functional class and 6-minute walk distance without any adverse effect on peripheral oxygen saturation, rein-forcing the concept of unchanged or even improved ventilation-perfusion matching with inhaled treprostinil.[10] Similarly, in the current trial, we found no evidence of worsened oxygenation, which further allays concerns about ventilation-perfusion mismatching.

The INCREASE trial was not without its limitations. The trial was of short duration, and 21% of the patients discontinued the trial prematurely (before week 16). In addition, events of clinical worsening and exacerbation of underlying lung disease were investigator-reported and not adjudicated by an independent review committee. Finally, the size of the favorable treatment effect on the 6-minute walk distance with inhaled treprostinil is similar to estimates of the minimum clinically important difference for this test in patients with pulmonary disease (21.7 to 37 m in a study by Nathan et al., and 24 to 45 m in a study by du Bois et al.).[15, 16]

This study showed that among patients with pulmonary hypertension due to interstitial lung disease, treatment with inhaled treprostinil improved exercise capacity as shown by improvement in the 6-minute walk distance through the end of the 16-week treatment period. In addition, treatment with inhaled treprostinil was associated with a lower risk of clinical worsening than that with placebo, a reduction in NT-proBNP levels, and fewer exacerbations of underlying lung disease.

Supplemental Information

TABLE 7

| | Additional Baseline Patient Characteristics. | | |
|---|---|---|---|
| | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
| 6-minute walk distance, meters; mean (range) Median | 254.1 (100-538) 256.0 | 265.1 (30-505) 260.0 | 259.6 (30-538) 259.0 |
| Pulmonary vascular resistance, Woods units; mean (range) Median | 6.369 (3.11-8.05) 5.570 | 6.013 (3.06-17.62) 5.060 | 6.191 (3.06-18.05) 5.275 |
| NT-proBNP, pg/mL; mean (range) | 1857.53 (10.2-21942.0) | 1808.86 (23.0-16297.0) | 1832.88 (10.2-21942.0) |

UTC_PH-ILD_005350

US 11,826,327 B2

| 37 | 38 |

TABLE 7-continued

Additional Baseline Patient Characteristics.

| | Inhaled Treprostinil (N = 163) | Placebo (N = 163) | All Patients (N = 326) |
|---|---|---|---|
| Median* | 550.50 | 420.80 | 503.85 |
| Pulmonary arterial pressure, mmHg; mean (range) | 37.2 (25-74) | 36.0 (25-61) | 36.6 (25-74) |
| Median | 35.0 | 35.0 | 35.0 |
| Pulmonary capillary wedge pressure, mmHg; mean (range) | 10.1 (2-20) | 9.6 (0-15) | 9.8 (0-20) |
| Median | 10.0 | 10.0 | 10.0 |
| Pulmonary function tests | | | |
| FEV1% Predicted; mean (range) | 63.9 (23, 120) | 65.0 (22, 145) | |
| Median | 63.0 | 63.0 | |
| FVC % Predicted (range) | 62.5 (24, 130) | 63.8 (20, 134) | |
| Median | 60.0 | 61.0 | |
| TLC % Predicted; mean (range) | 62.9 (25, 126) | 64.2 (30, 109) | |
| Median | 62.0 | 62.5 | |
| DLCO % Predicted; mean (range) | 30.0 (5, 86) | 28.1 (1, 86) | |
| Median | 29.0 | 26.0 | |

DLCO, lung diffusion capacity;

FEV1, forced expiratory volume in 1 second;

FVC, forced vital capacity;

NT-proBNP, N-terminal pro-brain natriuretic peptide;

TLC, total lung capacity

*N = 156 inhaled treprostinil; N = 160 placebo

TABLE 8

St. George's Respiratory Questionnaire Results.

| | Inhaled Treprostinil N = 163 | | Placebo N = 163 | |
|---|---|---|---|---|
| Visit Statistic | Value | Change from Baseline | Value | Change from Baseline |
| Baseline | | | | |
| n | 143 | | 134 | |
| Mean (SD) | 57.17 (15.77) | | 57.67 (15.78) | |
| Median | 59.80 | | 56.30 | |
| Interquartile | 45.60, 67.90 | | 46.50 70.70 | |
| Min, Max | 14.7, 94.9 | | 18.4 88.6 | |
| Week 16 | | | | |
| n | 143 | 143 | 134 | 134 |
| Mean (SD) | 55.91 (17.07) | −1.25 (10.99) | 57.49 (15.33) | −0.18 (10.72) |
| Median | 56.30 | −0.70 | 55.50 | 0.10 |
| Interquartile | 40.50, 67.00 | −7.10, 5.20 | 46.80 69.70 | −6.50, 6.10 |
| Min, Max | 3.5, 92.0 | −40.4, 29.0 | 16.9 96.5 | −31.9, 33.3 |
| LS Mean (SE) | | −1.30 (0.87) | | −0.13 (0.90) |
| LS Mean Difference (SE) and (95% CI) | | −1.18, (1.25) (−3.63, 1.28) | | |

ANCOVA, analysis of covariance;

CI, confidence interval;

LS Mean, least squares mean;

SD, standard deviation;

SE, standard error

UTC_PH-ILD_005351

US 11,826,327 B2

| 39 | 40 |

The St. George's Respiratory Questionnaire has a range of results from 0 to 100, with higher scores indicating greater impairment and with a minimum clinically important difference of 4 points.

The changes from baseline in Total Score and each of the 3 domain scores were analyzed by parametric ANCOVA with no imputation for missing data.

The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

### TABLE S4

Distance Saturation Product Results by Study Visit (m %).

| Visit/Variable Statistic | Inhaled Treprostinil N = 163 | Placebo N = 163 |
|---|---|---|
| Baseline | | |
| n | 118 | 109 |
| Mean (SD) | 208.140 (81.130) | 218.247 (77.405) |
| Median | 201.320 | 215.760 |
| Interquartile | 150.060, 256.750 | 170.800, 268.800 |
| Min, Max | 77.04, 421.07 | 63.00, 417.35 |
| Week 16 Change from Baseline | | |
| n | 118 | 109 |
| Mean (SD) | 7.607 (45.680) | −4.803 (53.026) |
| Median | 8.385 | −1.950 |
| Interquartile | −12.960, 34.890 | −38.180, 32.000 |
| Min, Max | −217.26, 117.42 | −184.85, 129.28 |
| LS Mean (SE) | 7.2 (4.5) | −4.3 (4.7) |
| LS Mean Difference (SE) and 95% CI | 11.51 (6.5), 95% CI (−1.33, 24.35) | |

ANCOVA, analysis of covariance;
CI, confidence interval;
LS Mean, least squares mean;
SD, standard deviation;
SE, standard error;
SpO$_2$, saturation of peripheral capillary oxygenation

Change in distance saturation product is the product of distance walked and lowest SpO$_2$ recorded during the 6-minute walk test.[7] Change from baseline to Week 16 in distance saturation product was analyzed by parametric ANCOVA with no imputation for missing distance saturation product values.

The confidence intervals have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

### TABLE 9

Serious Adverse Events by Preferred Term

| Serious Adverse Events | Inhaled treprostinil N = 163 n | Placebo N = 163 n |
|---|---|---|
| Any Serious Event | 53 events in 38 patients (23.3%) | 89 events in 42 patients (25.8%) |
| Acute respiratory failure | 4 | 5 |
| Death with unknown cause | 3 | 1 |
| Dyspnoea | 3 | 7 |
| Interstitial lung disease | 3 | 2 |
| Bronchitis | 2 | 1 |
| Chronic obstructive pulmonary disease | 2 | 1 |
| Chronic respiratory failure | 2 | 0 |
| Respiratory failure | 2 | 5 |
| Upper respiratory tract infection | 2 | 1 |
| Acute myocardial infarction | 1 | 2 |
| Acute right ventricular failure | 1 | 0 |

### TABLE 9-continued

Serious Adverse Events by Preferred Term

| Serious Adverse Events | Inhaled treprostinil N = 163 n | Placebo N = 163 n |
|---|---|---|
| Arrhythmia | 1 | 0 |
| B-cell lymphoma | 1 | 0 |
| Bronchopulmonary aspergillosis | 1 | 0 |
| Cardiac arrest | 1 | 2 |
| Cardiac failure congestive | 1 | 2 |
| Cardiopulmonary failure | 1 | 0 |
| Cellulitis | 1 | 0 |
| Cerebral haemorrhage | 1 | 0 |
| Chest pain | 1 | 1 |
| Combined pulmonary fibrosis and emphysema | 1 | 0 |
| Cor pulmonale | 1 | 0 |
| Haemoptysis | 1 | 0 |
| Hyperglycaemia | 1 | 0 |
| Hypervolaemia | 1 | 0 |
| Hypoxia | 1 | 0 |
| Idiopathic pulmonary fibrosis | 1 | 4 |
| Influenza | 1 | 1 |
| Left ventricular failure | 1 | 0 |
| Pain in extremity | 1 | 0 |
| Pneumonia | 1 | 9 |
| Pneumothorax | 1 | 1 |
| Pulmonary hypertension | 1 | 1 |
| Pulmonary oedema | 1 | 0 |
| Rhinovirus infection | 1 | 0 |
| Right ventricular failure | 1 | 2 |
| Syncope | 1 | 1 |
| Tachycardia | 1 | 0 |
| Abdominal pain | 0 | 2 |
| Acute kidney injury | 0 | 1 |
| Aspiration | 0 | 1 |
| Atrial fibrillation | 0 | 1 |
| Bradycardia | 0 | 1 |
| Cardiac failure | 0 | 2 |
| Cardiac failure acute | 0 | 1 |
| Cardiogenic shock | 0 | 1 |
| Chronic right ventricular failure | 0 | 1 |
| Coagulopathy | 0 | 1 |
| Cor pulmonale acute | 0 | 1 |
| Coronary artery disease | 0 | 1 |
| Disease progression | 0 | 2 |
| Epistaxis | 0 | 1 |
| Fluid overload | 0 | 4 |
| Haematochezia | 0 | 1 |
| Hypertension | 0 | 1 |
| Lumbar vertebral fracture | 0 | 1 |
| Metabolic encephalopathy | 0 | 1 |
| Pain | 0 | 1 |
| Pneumonia influenzal | 0 | 1 |
| Post procedural infection | 0 | 1 |
| Presyncope | 0 | 2 |
| Pulmonary congestion | 0 | 1 |
| Respiratory distress | 0 | 1 |
| Scleroderma | 0 | 1 |
| Sepsis | 0 | 2 |
| Transplant dysfunction | 0 | 1 |
| Urosepsis | 0 | 1 |

UTC_PH-ILD_005352

US 11,826,327 B2

41

TABLE 10

Analysis of Lung Function Test Parameters
Using Mixed Model Repeated Measurement.

| Variable Visit Treatment | N | LS Mean | Contrast: Inhaled treprostinil − Placebo Estimated Difference (95% CI) | P-value |
|---|---|---|---|---|
| FVC (mL) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | 5.49 | 28.47 | 0.35 |
| Placebo | 141 | −22.98 | (−30.81, 87.74) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | 9.77 | 44.40 | 0.21 |
| Placebo | 126 | −34.63 | (−25.25, 114.05) | |
| FVC (% predicted) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | 0.77 | 1.79 | 0.01 |
| Placebo | 141 | −1.02 | (0.37, 3.21) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | 1.07 | 1.80 | 0.03 |
| Placebo | 126 | −0.72 | (0.20, 3.39) | |
| FEV1 (mL) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | −21.34 | −8.95 | 0.72 |
| Placebo | 141 | −12.39 | (−57.16, 39.26) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | −32.18 | −2.56 | 0.93 |
| Placebo | 126 | −29.62 | (−57.67, 52.55) | |
| FEV1 (% predicted) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 142 | −0.18 | 0.57 | 0.43 |
| Placebo | 141 | −0.75 | (−0.83, 1.96) | |
| Week 16 | | | | |
| Inhaled treprostinil | 130 | −0.24 | 0.38 | 0.65 |
| Placebo | 126 | −0.62 | (−1.25, 2.01) | |
| TLC (mL) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 135 | −38.75 | −16.23 | 0.80 |
| Placebo | 136 | −22.51 | (−141.9, 109.41) | |
| Week 16 | | | | |
| Inhaled treprostinil | 127 | 45.43 | 17.37 | 0.85 |
| Placebo | 116 | 28.06 | (−158.9, 193.61) | |
| TLC (% predicted) | | | | |

42

TABLE 10-continued

Analysis of Lung Function Test Parameters
Using Mixed Model Repeated Measurement.

| Variable Visit Treatment | N | LS Mean | Contrast: Inhaled treprostinil − Placebo Estimated Difference (95% CI) | P-value |
|---|---|---|---|---|
| Week 8 | | | | |
| Inhaled treprostinil | 135 | −0.05 | 0.28 | 0.76 |
| Placebo | 136 | −0.32 | (−1.49, 2.05) | |
| Week 16 | | | | |
| Inhaled treprostinil | 127 | 2.52 | 1.49 | 0.34 |
| Placebo | 116 | 1.03 | (−1.57, 4.54) | |
| DLCO (mL/min/mmHg) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 136 | −0.27 | 0.19 | 0.56 |
| Placebo | 136 | −0.47 | (−0.45, 0.84) | |
| Week 16 | | | | |
| Inhaled treprostinil | 128 | −0.61 | 0.02 | 0.96 |
| Placebo | 112 | −0.63 | (−0.73, 0.76) | |
| DLCO (% predicted) | | | | |
| Week 8 | | | | |
| Inhaled treprostinil | 136 | −0.13 | 1.07 | 0.13 |
| Placebo | 136 | −1.20 | (−0.32, 2.47) | |
| Week 16 | | | | |
| Inhaled treprostinil | 128 | −1.14 | 0.60 | 0.44 |
| Placebo | 112 | −1.74 | (−0.93, 2.14) | |

CI, confidence interval;
DLCO, diffusing capacity of the lungs for carbon monoxide;
FEV1, forced expiratory volume in 1 second;
FVC, forced vital capacity;
TLC, total lung capacity;
LS Mean, least squares mean;
SE, standard error;
TLC, total lung capacity

LS Mean (SE), P-values, estimated difference (SE), and associated 95% CIs are from the mixed model repeated measurement with the change from Baseline in pulmonary function test parameter as the dependent variable; treatment, week, treatment by week interaction as the fixed effects; Baseline measurement as the covariate; and subject as the random effect. An unstructured variance/covariance structure shared across treatment groups was used to model the within-subject errors.

The confidence intervals and p-values have not been adjusted for multiplicity and cannot be used to infer definitive treatment effects.

TABLE 11

SpO$_2$ (%) Measured by Pulse Oximetry Results at Baseline and Week 16.

| | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | |
|---|---|---|---|---|---|
| Visit Statistic | Value | Change from Pre- walk | Value | Change from Pre- Walk | P-value* |
| Baseline Pre-walk SpO$_2$ (%) | | | | | |
| n | 163 | | 162 | | |
| Mean (SD) | 95.3 (3.95) | | 94.5 (4.81) | | |
| Median | 96.0 | | 96.0 | | |
| Min, Max | 72, 100 | | 68, 100 | | |

UTC_PH-ILD_005353

US 11,826,327 B2

43

44

TABLE 11-continued

SpO$_2$ (%) Measured by Pulse Oximetry Results at Baseline and Week 16.

| Visit Statistic | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | |
|---|---|---|---|---|---|
| | Value | Change from Pre-walk | Value | Change from Pre-walk | P-value* |
| Baseline During Walk SpO$_2$ (%) | | | | | |
| n | 154 | 154 | 153 | 153 | 0.13 |
| Mean (SD) | 80.3 (8.22) | −15.0 (7.87) | 78.5 (8.20) | −16.1 (7.76) | |
| Median | 81.0 | −14.0 | 78.0 | −15.0 | |
| Min, Max | 53, 99 | −41, 2 | 53, 98 | −39, 4 | |
| Baseline Post-walk SpO$_2$ (%) | | | | | |
| n | 163 | 163 | 162 | 162 | 0.17 |
| Mean (SD) | 85.3 (7.31) | −9.9 (6.50) | 83.7 (8.74) | −10.9 (8.06) | |
| Median | 86.0 | −10.0 | 83.5 | −11.0 | |
| Min, Max | 59, 100 | −26, 5 | 57, 99 | −39, 7 | |
| Week 16 Pre-walk SpO$_2$ (%) | | | | | |
| n | 130 | | 122 | | |
| Mean (SD) | 94.5 (4.35) | | 94.5 (4.22) | | |
| Median | 95.0 | | 95.0 | | |
| Min, Max | 74, 100 | | 78, 100 | | |
| Week 16 During Walk SpO$_2$ (%) | | | | | |
| n | 123 | 123 | 114 | 114 | 0.27 |
| Mean (SD) | 76.8 (7.70) | −17.6 (7.01) | 78.2 (9.28) | −16.6 (9.04) | |
| Median | 77.0 | −17.0 | 79.0 | −16.0 | |
| Min, Max | 46, 99 | −38, −1 | 28, 98 | −61, −1 | |
| Week 16 Post-walk SpO$_2$ (%) | | | | | |
| n | 128 | 128 | 122 | 122 | 0.07 |
| Mean (SD) | 82.1 (9.24) | −12.4 (8.05) | 83.7 (7.75) | −10.8 (7.09) | |
| Median | 83.0 | −13.0 | 84.0 | −11.5 | |
| Min, Max | 51, 100 | −29, 3 | 65, 100 | −31, 6 | |

SD, standard deviation;
SpO$_2$, saturation of peripheral capillary oxygenation
*P-values are calculated from analysis of covariance with change from pre-walk as dependent variable, treatment as fixed effect, and baseline SpO$_2$ as covariate.

TABLE 12

Supplemental Oxygen Use (L/min) at Baseline and Week 16.

| Visit Statistic | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | |
|---|---|---|---|---|---|
| | Value | Change from Baseline | Value | Change from Baseline | P-value* |
| Baseline Pre-walk (L/min) | | | | | |
| n | 163 | | 163 | | |
| Mean (SD) | 2.7 (2.2) | | 2.4 (2.0) | | |
| Median | 3.0 | | 2.0 | | |
| Min, Max | 0, 10 | | 0, 8 | | |
| Baseline During Walk (L/min) | | | | | |
| n | 163 | | 163 | | |
| Mean (SD) | 4.9 (4.0) | | 4.5 (3.8) | | |
| Median | 4.0 | | 4.0 | | |
| Min, Max | 0, 25 | | 0, 15 | | |
| Week 16 Pre-walk (L/min) | | | | | |
| n | 131 | 131 | 129 | 129 | 0.18 |
| Mean (SD) | 3.0 (2.5) | 0.4 (1.4) | 2.9 (2.4) | 0.6 (1.3) | |
| Median | 3.0 | 0.0 | 3.0 | 0.0 | |
| Min, Max | 0, 10 | −3, 6 | 0, 10 | −3, 5 | |

UTC_PH-ILD_005354

US 11,826,327 B2

45 46

#### TABLE 12-continued

Supplemental Oxygen Use (L/min) at Baseline and Week 16.

| | Inhaled Treprostinil N = 163 | | Placebo N = 163 | | |
|---|---|---|---|---|---|
| Visit Statistic | Value | Change from Baseline | Value | Change from Baseline | P-value* |
| Baseline During Walk (L/min) | | | | | |
| n | 129 | 129 | 123 | 123 | 0.39 |
| Mean (SD) | 4.9 (4.0) | 0.1 (0.8) | 4.6 (3.7) | 0.1 (0.3) | |
| Median | 4.0 | 0.0 | 4.0 | 0.0 | |
| Min, Max | 0, 25 | −2, 8 | 0, 15 | 0, 3 | |

SD, standard deviation
Subjects who did not use supplemental oxygen were coded as 0 in the summaries.
Subjects who received supplemental oxygen during the Baseline 6-minute walk test continued to receive the same flow rate at all subsequent 6-minute walk test assessments.
*P-values are calculated from analysis of covariance with change from baseline as dependent variable, treatment as fixed effect, and baseline oxygen use as covariate.

### REFERENCES

1. Simonneau G, et al Eur Respir J 2019; 53: 1801913.
2. Nathan S D. Int J Clin Pract Suppl 2008; 160:21-8.
3. Nathan S D, et al. Clin Chest Med 2013; 34:695-705.
4. King C S, et al. Chest 2020; 158:1651-64.
5. Trammell A W, et al. Pulm Circ 2015; 5:356-63.
6. Nathan S D, et al. Lancet Respir Med 2019; 7:780-90.
7. Whittle B J, et al. Biochem Pharmacol 2012; 84:68-75.
8. McLaughlin V V, et al. J Am Coll Cardiol 2010; 55:1915-22.
9. Faria-Urbina M, et al. Lung 2018; 196:139-46.
10. Agarwal M, et al. J Heart Lung Transplant 2015; 34: Suppl:S343. abstract.
11. Bajwa A A, et al. Pulm Circ 2017; 7:82-8.
12. Wang L, et al. Int J Chron Obstruct Pulmon Dis 2017; 12:3353-60.
13. Lettieri C J, et al. Respir Med 2006; 100:1734-41.
14. Dernaika T A, et al. Respiration 2010; 79:377-82.
15. Nathan S D, et al. Respir Med 2015; 109:914-22.
16. du Bois R M, et al. Am J Respir Crit Care Med 2011; 183:1231-7.

#### Example 4. Aerosolized and Powder Inhaled Treprostinil

Randomized, 6-treatment, 6-period, 6-sequence, cross-over study (6x6 Williams design) in 36 healthy volunteers was performed to compare nebulized inhaled treprostinil administered by Tyvaso® nebulizer and Treprostinil inhalation powder (TreT) administered via a dry powder inhaler (published US Patent Application 20190321290). 4 subjects discontinued the study early (COVID-19, n=2; withdrawal by subject, n=1; non-compliance with study requirements, n=1).

| Tyvaso Dose | TreT Dose |
|---|---|
| 18 μg (3 nebulizer breaths) | 16 μg cartridge |
| 54 μg (9 nebulizer breaths) | 48 μg cartridge |
| 72 μg (12 nebulizer breaths) | 64 μg cartridge |

#### TABLE 14

Pharmacokinetic results for various doses for Tyvaso and TreT administered treprostinil. See also FIG. 9 and 10.

| Comparison | Parameter | Geometric LSM (TreT) [CV %] | Geometric LSM (Tyvaso) [CV %] | Geometric LSM Ratio (%) [TreT/Tyvaso] | 90% Confidence Interval |
|---|---|---|---|---|---|
| TreT 16 μg vs. Tyvaso 18 μg | AUC0-5 | 0.268 [24.1%] | 0.233 [44.1%] | 115 | (104.59, 127.42) |
| | Cmax | 0.377 [26.6%] | 0.291 [59.8%] | 130 | (115.55, 145.95) |
| TreT 48 μg vs. Tyvaso 54 μg | AUC0-5 | 0.766 [21.8%] | 0.757 [42.5%] | 101 | (91.63, 111.65) |
| | Cmax | 1.07 [28.9%] | 0.764 [53.4%] | 139 | (124.13, 156.73) |
| TreT 64 μg vs. Tyvaso 72 μg | AUC0-5 | 0.937 [23.8%] | 1.02 [41.9%] | 91.5 | (83.16, 100.78) |
| | Cmax | 1.27 [28.5%] | 1.02 [54.7%] | 124 | (110.56, 139.61) |

UTC_PH-ILD_005355

US 11,826,327 B2

47                                                                                    48

TABLE 15

Adverse events for various doses for Tyvaso and TreT administered treprostinil.

| | TreT 16 µg N = 34 n (%) | Tyvaso 18 µg N = 34 n (%) | TreT 48 µg N = 34 n (%) | Tyvaso 54 µg N = 34 n (%) | TreT 64 µg N = 33 n (%) | Tyvaso 72 µg N = 35 n (%) |
|---|---|---|---|---|---|---|
| Adverse Events | 16 (47.1) | 13 (38.2) | 23 (67.6) | 21 (61.8) | 22 (66.7) | 25 (71.4) |
| Cough | 15 (44.1) | 11 (32.4) | 20 (58.8) | 18 (52.9) | 21 (63.6) | 24 (68.6) |
| Headache | 2 (5.9) | 3 (8.8) | 4 (11.8) | 7 (20.6) | 6 (18.2) | 6 (17.1) |
| Throat irritation | 1 (2.9) | 1 (2.9) | 3 (8.8) | 5 (14.7) | 3 (9.1) | 4 (11.4) |
| Dizziness | 1 (2.9) | 2 (5.9) | 1 (2.9) | 4 (11.8) | 2 (6.1) | 2 (5.7) |
| Nausea | 0 | 0 | 0 | 2 (5.9) | 2 (6.1) | 1 (2.9) |
| Chest discomfort | 1 (2.9) | 0 | 3 (8.8) | 2 (5.9) | 0 | 2 (5.7) |

### Conclusions

AUC0-5 was generally comparable for each TreT and Tyvaso dose level. Cmax values for TreT were slightly higher than Tyvaso Cmax values across dose comparisons. AE profile consistent with known prostacyclin effects and previous studies of Tyvaso. Between-subject variability for both AUC0-5 and Cmax was approximately two-fold less for TreT compared to Tyvaso. AUC0-5 and Cmax for TreT and Tyvaso increased in an approximately dose-proportional manner. Median Tmax: ~10 minutes for TreT and ~10 to 15 minutes with Tyvaso.

### Example 5. Aerosolized and Powder Inhaled Treprostinil. Safety Evaluation

#### Primary Objective

To evaluate the safety and tolerability of Treprostinil Inhalation Powder (TreT) administered by a dry powder inhaler, such as the one shown in FIG. **11**, in subjects with pulmonary arterial hypertension (PAH) currently treated with Tyvaso® (treprostinil inhalation solution administered via a nebulizer).

#### Secondary Objectives

To evaluate systemic exposure and pharmacokinetics (PK) of treprostinil in subjects with PAH when delivered as Tyvaso® and TreT. To evaluate 6-Minute Walk Distance (6MWD) at study entry and after 3 weeks of treatment with TreT. To evaluate subject satisfaction with and preference for TreT with the Preference Questionnaire for Inhaled Treprostinil Devices (PQ-ITD). To evaluate patient reported PAH symptoms and impact with the PAH-Symptoms and Impact Questionnaire (PAH-SYMPACT).

#### Eligibility Criteria

Diagnosis of WHO Group I PAH.

Subject must have started Tyvaso≥3 months prior to Baseline and on a stable regimen (no change in dose within 30 days of Baseline Visit) of Tyvaso (6 to 12 breaths QID).

Background therapy for PAH (eg, endothelin receptor antagonist or phosphodiesterase-5-inhibitor or both), on a stable dose for a minimum of 30 days prior to Screening. Exclude other prostacyclin analogue or agonist (selexipag, epoprostenol, iloprost, or beraprost).

Excluding subjects with WHO Functional Class IV at Screening.

Subject is not able to perform inhalation maneuvers that meet inspiratory training criteria.

Exclude conditions which limits ambulation or ability to complete 6MWT (Baseline 6MWD>150 m).

Excluded initiation of pulmonary rehabilitation within 12 weeks prior to the Baseline Visit.

FIG. **12** shows a design of the study. Table 16 presents information relating Tret and Tyvaso doses.

TABLE 16

| Tyvaso dose (QID) | TreT Dose (QID) | Device usage |
|---|---|---|
| 6 to 7 breaths | 32 µg | 32 µg cartridge |
| 8 to 10 breaths | 48 µg | 48 µg cartridge |
| 11 to 12 breaths | 64 µg | 32 µg + 32 µg cartridges |

TABLE 17

Baseline demographics

| Age (years) | |
|---|---|
| Median | 57.0 (range: 23-82) |
| Sex, n (%) | |
| Female | 43 (84.3) |
| Male | 8 (15.7) |
| Current PAH Diagnosis, n (%) | |
| Idiopathic/familial | 29 (56.9) |
| Associated with unrepaired/repaired congenital shunts | 4 (7.8) |
| Associated with collagen vascular disease | 14 (27.5) |
| Associated with HIV | 1 (2.0) |
| Associated with appetite suppressant/ other drug or toxin use | 3 (5.9) |
| WHO Functional Class at Screening, n (%) | |
| I | 6 (11.8) |
| II | 31 (60.8) |
| III | 14 (27.5) |

UTC_PH-ILD_005356

US 11,826,327 B2

49      50

### TABLE 12

Summary of Subject Accountability

| | TreT Dose in Treatment Phase | | | |
| | 32 mcg N = 2 n (%) | 48 mcg N = 27 n (%) | 64 mcg N = 22 n (%) | Overall N = 51 n (%) |
|---|---|---|---|---|
| Number of Subjects Enrolled | 2 | 27 | 22 | 51 |
| Received TreT | 2 (100.0) | 27 (100.0) | 22 (100.0) | 51 (100.0) |
| Enrolled in Optional Extension Phase | 2 (100.0) | 26 (96.3) | 21 (95.5) | 49 (96.1) |
| Subjects Who Discontinued Treatment Phase | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) |
| Adverse Event | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) |
| Subjects Who Discontinued OEP* | 0 | 3 (11.1) | 0 | 3 (5.9) |
| Adverse Event | 0 | 2 (7.4) | 0 | 2 (3.9) |
| Lost to Follow-up | 0 | 1 (3.7) | 0 | 1 (2.0) |

### TABLE 13

Summary of background PAH medication

| | Overall N = 51; n (%) |
|---|---|
| ERA | 43 (84.3%) |
| Ambrisentan | 24 (47.1%) |
| Bosentan | 2 (3.9%) |
| Macitentan | 17 (33.3%) |
| PDE5-I | 41 (80.4%) |
| Sildenafil | 17 (33.3%) |
| Tadalafil | 24 (47.1%) |
| sGC | 7 (13.7%) |
| Riociguat | 7 (13.7%) |

Of the 51 subjects enrolled, assigned TreT doses for 3-week treatment period were 32 µg for 2 subjects; 48 µg for 27 subjects; 64 µg for 22 subjects. 49 subjects rolled into the Optional Extension Phase (OEP). FIG. **13** shows a number of subjects for various maintenance TreT doses in the OEP.

FIG. **14** shows a change in 6 minute walk distance (6MWD) with respect to a baseline 6MWD as a function of duration of TreT treatment. The change from Baseline in 6MWD for TreT overall demonstrated a significant improvement (11.5 m increase; p=0.0217) at Week 3. The improvements in 6MWD for TreT overall were sustained in the Optional Extension Phase.

#### Patient Reported Outcome Measures

The PQ-ITD is a patient-reported outcome questionnaire to evaluate subject satisfaction with and preference for inhaled treprostinil devices. The PQ-ITD was given at Baseline to evaluate the Tyvaso Inhalation System and at Week 3 to evaluate the TreT Inhaler.

The distribution of responses to each question on the PQ-ITD was significantly improved (p≤0.0003) between Baseline (Tyvaso nebulizer) and Week 3 (TreT inhaler).

Overall satisfaction with the TreT inhaler was significantly improved at Week 3 (95.7%, p<0.0001) compared to satisfaction with the Tyvaso nebulizer at Baseline, FIG. **14**.

#### PAH SYMPACT

The PAH-SYMPACT is a well validated patient-reported outcome questionnaire given to assess PAH symptoms and effects. The PAH-SYMPACT contains four domains (Cardiopulmonary Symptoms, Cardiovascular Symptoms, Physical Impacts, Cognitive/Emotional Impacts) and was given at Baseline, Week 3, and Week 11.

Analysis of patient-reported PAH SYMPACT data revealed a trend of improvement at both Week 3 and Week 11 for subjects receiving TreT.

Mean change from Baseline was lower for all domain scores of the PAH-SYMPACT at both weeks (range: −0.05 to −0.22), with significant improvements for physical impacts (range: −1.1 to 1.0; p=0.0438) and cognitive/emotional impacts (range: −1.3 to 0.5; p=0.0048) at Week 3.

### TABLE 18

Overall Safety

| | TreT Dose in Treatment Phase | | | |
| | 32 mcg N = 2 n (%) | 48 mcg N = 27 n (%) | 64 mcg N = 22 n (%) | Overall N = 51 n (%) |
|---|---|---|---|---|
| Treatment Phase | | | | |
| Total number of AEs | 0 | 37 | 22 | 59 |
| Total number of SAEs | 0 | 1 | 1 | 2 |
| AEs leading to withdrawal of study drug | 0 | 1 | 1 | 2 |
| Optional Extension Phase | 0 | | | |
| Total number of AEs | 2 | 51 | 29 | 82 |
| Total number of SAEs | 0 | 10 | 4 | 14 |
| AEs leading to withdrawal of study drug | 0 | 3 | 0 | 3 |

### TABLE 19

Most frequent adverse events during the treatment phase

| | Treatment Phase Dose | | | | TRIUMPH | |
| | 32 mcg N = 2 n (%) | 48 mcg N = 27 n (%) | 64 mcg N = 22 n (%) | Overall N = 51 n (%) | Tyvaso n (%) | Placebo n (%) |
| Preferred Term | | | | | | |
|---|---|---|---|---|---|---|
| Cough | 0 | 9 (33.3) | 4 (18.2) | 13 (25.5) | 62 (54) | 35 (29) |
| Headache | 0 | 4 (14.8) | 4 (18.2) | 8 (15.7) | 47 (41) | 27 (23) |

UTC_PH-ILD_005357

US 11,826,327 B2

51

**TABLE 19-continued**

Most frequent adverse events during the treatment phase

| | Treatment Phase Dose | | | | TRIUMPH | |
| | 32 mcg | 48 mcg | 64 mcg | Overall | | |
| Preferred Term | N = 2 n (%) | N = 27 n (%) | N = 22 n (%) | N = 51 n (%) | Tyvaso n (%) | Placebo n (%) |
|---|---|---|---|---|---|---|
| Dyspnoea | 0 | 2 (7.4) | 1 (4.5) | 3 (5.9) | 6 (5) | 6 (5) |
| Flushing | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) | 17 (15) | 1 (<1) |
| Nausea | 0 | 2 (7.4) | 0 | 2 (3.9) | 22 (19) | 13 (11) |
| Throat irritation | 0 | 1 (3.7) | 1 (4.5) | 2 (3.9) | 29 (25)* | 17 (14)* |

*TRIUMPH groups together Throat Irritation and Pharyngolaryngeal Pain.

**TABLE 20**

Most frequent adverse events during the treatment
phase during the optional extension phase

| | TreT Dose in Treatment Phase | | | |
| | 32 mcg | 48 mcg | 64 mcg | Overall |
| Preferred Term | N = 2 n (%) | N = 26 n (%) | N = 21 n (%) | N = 49 n (%) |
|---|---|---|---|---|
| Cough | 0 | 3 (11.5) | 2 (9.5) | 5 (10.2) |
| Dyspnoea | 1 (50.0) | 2 (7.7) | 2 (9.5) | 5 (10.2) |
| Headache | 0 | 2 (7.7) | 2 (9.5) | 4 (8.2) |
| Diarrhoea | 0 | 1 (3.8) | 2 (9.5) | 3 (6.1) |
| Pneumonia | 0 | 2 (7.7) | 1 (4.8) | 3 (6.1) |
| Arthralgia | 0 | 2 (7.7) | 1 (4.8) | 3 (6.1) |
| Dizziness | 0 | 2 (7.7) | 1 (4.8) | 3 (6.1) |

Conclusions

Transition from Tyvaso to TreT was safe and well tolerated in this study. Most adverse effects (AEs) were mild to moderate in severity and occurred at severities and frequencies consistent with those seen in other inhaled treprostinil studies in patients with PAH.

Following 3 weeks of TreT administration, subjects switching from Tyvaso to TreT demonstrated:

Significant improvements in 6MWD (8.0 m increase; p=0.0217) at Week 3. As of 23 Dec. 2020 (data cut-off date), improvements in 6MWD for TreT overall were sustained in the OEP Significant satisfaction with and preference for the use of the TreT inhaler (PQ-ITD) Significant improvement in PAH impact scores, and a trend of improvement in PAH symptom scores (PAH SYMPACT).

Additional Embodiments

1. A method of treating interstitial lung disease (ILD) or pulmonary fibrosis in a subject in need, comprising administering to the subject a therapeutically effective amount of treprostinil, a prodrug, salt, or ester thereof.

2. A method of reducing pulmonary function decline in a subject with interstitial lung disease (ILD) or pulmonary fibrosis, comprising administering to the subject treprostinil, a prodrug, salt, or ester thereof.

3. A method of increasing forced vital capacity (FVC) in a subject suffering from ILD or pulmonary fibrosis, comprising administering to the subject treprostinil, a prodrug, salt, or ester thereof.

4. The method of any one of embodiments 1-3, wherein the ILD comprises one or more of idiopathic pulmonary fibrosis (IPF), desquamative interstitial pneumonia (DIP),

52

acute interstitial pneumonia (AIP), nonspecific interstitial pneumonia (NSIP), respiratory bronchiolitis-associated interstitial lung disease (RB-ILD), cryptogenic organizing pneumonia (COP), lymphoid interstitial pneumonia (LIP), sarcoidosis, rheumatoid arthritis, systemic lupus erythematosus, systemic sclerosis, polymyositis, dermatomyositis, antisynthetase syndrome, silicosis, asbestosis, occupational lung disease, chronic hypersensitivity pneumonitis, idiopathic interstitial pneumonia (IIP), an autoimmune ILD, lymphangioleiomyomatosis (LAM), Langerhan's cell histiocytosis (LCH), drug associated ILD, vasculitis, granulomatosis, and berylliosis.

5. The method of embodiment 4, wherein the ILD comprises IPF.

6. The method of any one of embodiments 1-5, wherein the ILD comprises systemic sclerosis-associated interstitial lung disease (SSc-ILD).

7. The method of any one of embodiments 1-6, wherein the ILD was induced from antibiotics, chemotherapy, antiarrhythmic agents, coronavirus disease 2019, atypical pneumonia, pneumocystis pneumonia, tuberculosis (TB), *Chlamydia trachomatis*, respiratory syncytial virus, or lymphangitic carcinomatosis.

8. The method of any one of embodiments 1-7, wherein the subject has one or more of surfactant-protein-B deficiency, surfactant-protein-C deficiency, ABCA3-deficiency, brain lung thyroid syndrome, congenital pulmonary alveolar proteinosis, alveolar capillary dysplasia, mutations in telomerase reverse transcriptase, mutations in telomerase RNA component, mutations in the regulator of telomere elongation helicase 1, and mutations in poly(A)-specific ribonuclease.

9. The method of any one of embodiments 1-8, wherein the subject has one or more symptoms of shortness of breath, fatigue, weight loss, dry cough, chest pain, and lung hemorrhage.

10. The method of embodiment 9, wherein after administration the symptom is improved by about 5%, about 10%, about 15%, about 20%, about 25%, about 30%, about 35%, about 40%, about 45%, about 50%, about 55%, about 60%, about 65%, about 70%, about 75%, about 80%, about 85%, about 90%, about 95%, or about 100%, as measured by a medically-recognized technique.

11. The method of embodiment 10, wherein the medically-recognized technique comprises one or more of Modified Medical Research Council (MMRC) Dyspnoea Scale, Modified Borg Dyspnoea Scale (0-10), Chalder Fatigue Scale, weight measurement scale, visual analogue scale (VAS) for cough, King's Brief Interstitial Lung Disease Questionnaire, Leicester Cough Questionnaire (LCQ), computed tomography (CT) scan, X-ray, multiple magnetic

UTC_PH-ILD_005358

US 11,826,327 B2

53

resonance imaging (MRI), pulmonary function testing (PFT), spirometry, lung volumes, maximal respiratory pressure, diffusing capacity, oxygen desaturation, and arterial blood gas evaluation.

12. The method of any one of embodiments 1-11, wherein treprostinil, a prodrug, salt, or ester thereof is administered in a pharmaceutical composition comprising treprostinil, a prodrug, salt, or ester thereof and a pharmaceutically acceptable carrier or excipient.

13. The method of claim any one of embodiments 1-12, wherein the administration comprises at least one of oral, inhalation, subcutaneous, nasal, intravenous, intramuscular, sublingual, buccal, rectal, vaginal, and transdermal administration.

14. The method of any one of embodiments 1-13, wherein the administration comprises inhalation.

15. The method of any one of embodiments 1-14, wherein a single inhalation administration event comprises from 1 to 20 breaths.

16. The method of any one of embodiments 1-15, comprising administration of at least one additional active agent to treat the IRD.

17. The method of embodiment 16, wherein the at least one additional active agent comprises a corticosteroid, mycophenolic acid, mycophenolate mofetil, azathioprine, cyclophosphamide, rituximab, pirfenidone, or nintedanib.

18. The method of embodiment 16 or 17, wherein the at least one additional active agent and treprostinil, a prodrug, salt, or ester thereof, are administered via a method selected from the group consisting of

(a) concomitantly;
(b) as an admixture;
(c) separately and simultaneously or concurrently; and
(d) separately and sequentially.

19. The method of any one of embodiments 1-18, wherein administration is once, twice, thrice, four times, five times, or six times per day.

20. The method of any one of embodiments 1-19, wherein administration is for a period selected from the group consisting of about 1 day, about 1 day to about 3 days, about 3 days to about 6 days, about 6 days to about 9 days, about 9 days to about 12 days, about 12 days to about 15 days, about 15 days to about 18 days, about 18 days to about 21 days, about 21 days to about 24 days, about 24 days to about 27 days, about 27 days to about 30 days, or about greater than 30 days.

21. The method of any one of embodiments 1-20, wherein the subject is a human.

22. The method of any one of embodiments 1-21, wherein the method results in an increased FVC compared to the FVC at the start of or prior to the start of administration.

23. The method of embodiment 22, wherein the administration results in an increased FVC at sixteen weeks after the start of administration compared to the FVC at the start of or prior to the start of administration.

24. The method of any one of embodiments 22-23, wherein the increase in FVC is at least 20%.

25. The method of embodiment 24, wherein the increase is FVC is at least 75%.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

54

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

1. A method of improving exercise capacity in a patient having pulmonary hypertension associated with interstitial lung disease, comprising administering by inhalation to the patient having pulmonary hypertension associated with interstitial lung disease an effective amount of at least 15 micrograms up to a maximum tolerated dose of treprostinil or a pharmaceutically acceptable salt thereof in a single administration event that comprises at least 6 micrograms per breath.

2. The method of claim 1, wherein said administering provides a statistically significant increase of a 6 minutes walk distance in the patient after 8 weeks, 12 weeks, or 16 weeks of the administering.

3. The method of claim 1, wherein said administering increases a 6 minutes walk distance of the patient by at least 10 m at 8 weeks, 12 weeks, or 16 weeks of the administering.

4. The method of claim 1, wherein said administering provides a statistically significant reduction of a plasma concentration of NT-proBNP in the patient after 8 weeks, 12 weeks, or 16 weeks of the administering.

5. The method of claim 1, wherein said administering reduces a plasma concentration of NT-proBNP in the patient by at least 200 pg/ml after 8 weeks, 12 weeks, or 16 weeks of the administering.

6. The method of claim 1, wherein said administering provides a statistically significant reduction of at least one exacerbations of the interstitial lung disease.

7. The method of claim 1, wherein said administering provides a statistically significant reduction of clinical worsening events due to the interstitial lung disease.

8. The method of claim 7, wherein the clinical worsening events comprise at least one of hospitalization for cardiopulmonary indication and a decrease in a 6-minute walk distance by more than 15% compared a baseline 6-minute walk distance prior to the administering.

9. The method of claim 1, wherein said administering provides a statistically significant improves of forced vital capacity (FVC) in the patient after 8 weeks, 12 weeks or 16 weeks of the administering.

10. The method of claim 9, wherein said administering improves the forced vital capacity (FVC) in the patient by at least 20 ml after 8 weeks, 12 weeks, or 16 weeks of the administering.

11. The method of claim 1, wherein said administering is performed by a pulsed inhalation device.

12. The method of claim 11, wherein the pulsed inhalation device contains an inhalation solution comprising treprostinil or a pharmaceutically acceptable salt thereof.

13. The method of claim 11, wherein the pulsed inhalation device is a nebulizer.

14. The method of claim 11, wherein the pulsed inhalation device is a dry powder inhaler comprising a dry powder comprising treprostinil or a pharmaceutically acceptable salt thereof.

15. The method of claim 1, wherein the effective amount of treprostinil or a pharmaceutically acceptable salt administered to the patient in a single inhalation administration event is from 15 μg to 100 μg.

16. The method of claim 15, wherein the single inhalation administration event does not exceed 15 breaths by the patient.

UTC_PH-ILD_005359

US 11,826,327 B2

55

56

**17**. The method of claim **1**, wherein said administering increases a 6 minutes walk distance of the patient by at least 10 m after 8 weeks of the administering.

**18**. The method of claim **1**, wherein said administering increases a 6 minutes walk distance of the patient by at least 15 m after 12 weeks of the administering.

**19**. The method of claim **1**, wherein said administering increases a 6 minutes walk distance of the patient by at least 15 m after 16 weeks of the administering.

\* \* \* \* \*

UTC_PH-ILD_005360

# EXHIBIT 7



US010716793B2

(12) **United States Patent**
Olschewski et al.

(10) **Patent No.:**  **US 10,716,793 B2**
(45) **Date of Patent:**  **\*Jul. 21, 2020**

(54) **TREPROSTINIL ADMINISTRATION BY INHALATION**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Horst Olschewski**, Graz (AT); **Robert Roscigno**, Chapel Hill, NC (US); **Lewis J. Rubin**, LaJolla, CA (US); **Thomas Schmehl**, Giessen (DE); **Werner Seeger**, Giessen (DE); **Carl Sterritt**, Weybridge (GB); **Robert Voswinckel**, Giessen (DE)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/778,662**

(22) Filed: **Jan. 31, 2020**

(65) **Prior Publication Data**

US 2020/0171044 A1    Jun. 4, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/536,954, filed on Aug. 9, 2019, which is a continuation of application No. 15/011,999, filed on Feb. 1, 2016, now Pat. No. 10,376,525, which is a division of application No. 13/469,854, filed on May 11, 2012, now Pat. No. 9,339,507, which is a division of application No. 12/591,200, filed on Nov. 12, 2009, now Pat. No. 9,358,240, which is a continuation of application No. 11/748,205, filed on May 14, 2007, now abandoned.

(60) Provisional application No. 60/800,016, filed on May 15, 2006.

(51) **Int. Cl.**
  *A61K 31/557*    (2006.01)
  *A61K 9/00*    (2006.01)
  *A61K 31/192*    (2006.01)

(52) **U.S. Cl.**
  CPC ............ *A61K 31/557* (2013.01); *A61K 9/008* (2013.01); *A61K 9/0078* (2013.01); *A61K 31/192* (2013.01)

(58) **Field of Classification Search**
  None
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,664,337 A | 5/1972 | Lindsey et al. |
| 4,001,650 A | 1/1977 | Romain |
| 4,007,238 A | 2/1977 | Glenn |
| 4,281,113 A | 7/1981 | Axen et al. |
| 4,306,075 A | 12/1981 | Aristoff |
| 4,306,076 A | 12/1981 | Nelson |
| 4,349,689 A | 9/1982 | Aristoff |
| 4,473,296 A | 9/1984 | Shofner et al. |
| 4,486,598 A | 12/1984 | Aristoff |
| 4,495,944 A | 1/1985 | Brisson et al. |
| 4,635,647 A | 1/1987 | Choksi |
| 4,668,814 A | 5/1987 | Aristoff |
| 4,677,975 A | 7/1987 | Edgar et al. |
| 4,683,330 A | 7/1987 | Aristoff |
| 4,692,464 A | 9/1987 | Skuballa et al. |
| 4,708,963 A | 11/1987 | Skuballa et al. |
| 4,976,259 A | 12/1990 | Higson et al. |
| 4,984,158 A | 1/1991 | Hillsman |
| 5,063,922 A | 11/1991 | Hakkinen |
| 5,080,093 A | 1/1992 | Raabe et al. |
| 5,153,222 A | 10/1992 | Tadepalli et al. |
| 5,234,953 A | 8/1993 | Crow et al. |
| 5,322,057 A | 6/1994 | Raabe et al. |
| 5,361,989 A | 11/1994 | Merchat et al. |
| 5,363,842 A | 11/1994 | Mishelevich et al. |
| 5,497,763 A | 3/1996 | Lloyd et al. |
| 5,551,416 A | 9/1996 | Stimpson et al. |
| 5,727,542 A | 3/1998 | King |
| 5,865,171 A | 2/1999 | Cinquin |
| 5,881,715 A | 3/1999 | Shibasaki |
| 5,908,158 A | 6/1999 | Cheiman |
| 6,054,486 A | 4/2000 | Crow et al. |
| 6,123,068 A | 9/2000 | Lloyd et al. |
| 6,357,671 B1 | 3/2002 | Cewers |
| 6,521,212 B1 | 2/2003 | Gilles et al. |
| 6,626,843 B2 | 9/2003 | Hillsman |
| 6,756,033 B2 | 6/2004 | Cloutier et al. |
| 6,765,117 B2 | 7/2004 | Moriarty et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 1999595533 B2 | 2/2000 |
| DE | 19838711 C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension." J. Cardiovascular Pharmacology, 2001, 37, 239 251.

Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

**8 Claims, 12 Drawing Sheets**

UTC_PH-ILD_009772

US 10,716,793 B2

Page 2

(56)                References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,172,557 | B1 | 2/2007 | Parker |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,261,102 | B2 | 8/2007 | Barney et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,544,713 | B2 | 6/2009 | Phares et al. |
| 7,726,303 | B2 | 7/2010 | Tyvoll et al. |
| 9,339,507 | B2 * | 5/2016 | Olschewski .............. A61P 9/12 |
| 9,358,240 | B2 * | 6/2016 | Olschewski .............. A61P 43/00 |
| 10,376,525 | B2 * | 8/2019 | Olschewski .............. A61P 11/00 |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19934582 A1 | 1/2001 |
| FR | 2783431 A1 | 3/2000 |
| JP | 2003-522003 A | 7/2003 |
| JP | 2004-512101 A | 4/2004 |
| JP | 2005-034341 A | 2/2005 |
| WO | WO 93/00951 A1 | 1/1993 |
| WO | WO 01/58514 A1 | 8/2001 |
| WO | WO 01/85241 A1 | 11/2001 |
| WO | WO 02/34318 A2 | 5/2002 |

OTHER PUBLICATIONS

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:Suppl.S):56S-61S.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulizing system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor, G. and Starko, K. (2003) Lung Deposition of

Interferon Gamma-1b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Byron, Peter R., "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al., "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf (Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primaer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Final Office Action dated Oct. 10, 2014 in U.S. Appl. No. 12/591,200.
Final Office Action dated Oct. 17, 2012 in U.S. Appl. No. 12/591,200.
Final Office Action dated Nov. 4, 2013 in U.S. Appl. No. 12/303,877.
Final Office Action dated Dec. 22, 2011 in U.S. Appl. No. 12/591,200.
Final Office Action dated Jul. 2, 2013 in U.S. Appl. No. 13/120,015.
Final Office Action dated Jul. 20, 2015 in U.S. Appl. No. 13/120,015.
Final Office Action dated Aug. 1, 2012 in U.S. Appl. No. 12/303,877.
Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), 2005, 4:296-302, with English translation.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous Iloprost in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

UTC_PH-ILD_009773

## US 10,716,793 B2
Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Hoeper et al., "Long term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue," New England Journal of Medicine, 2000, 342, 1866-1870.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320.aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.

Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.

Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21(Suppl.33):3, Abstract No. 084.

National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.

Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instrutions, Sep. 2005, 2 pages.

Non-Final Office Action dated Jan. 29, 2015 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Oct. 11, 2011 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Oct. 31, 2012 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Dec. 30, 2014 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 15, 2013 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 9, 2014 in U.S. Appl. No. 12/591,200.

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources.

Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Notice of Allowance dated Jun. 11, 2015 in U.S. Appl. No. 12/303,877.

Olschewski et al. For the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

OPTINEB®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin H2 Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensin Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

UTC_PH-ILD_009774

**US 10,716,793 B2**

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.

Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.

Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension," Journal of the American College of Cardiology, 2006, 48(8):1672-1681.

Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.

Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 2004, Abstract 1414, 110, 17 Supplement.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.

Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.

Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner). Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner). Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C2.

Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.

Wensel et al., "Effects of iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.

Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.

Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iloprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.

Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with exhibits airflow obstruction," Thorax, 1996, 51, 977-980.

Zanen et al., "The optimal particle size for β-adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.

* cited by examiner

UTC_PH-ILD_009775

FIGURE 1



UTC_PH-ILD_009776



FIGURE 2

UTC_PH-ILD_009777



FIGURE 3

UTC_PH-ILD_009778



FIGURE 4

UTC_PH-ILD_009779

FIGURE 5





UTC_PH-ILD_009780

FIGURE 6



FIGURE 7



UTC_PH-ILD_009782

FIGURE 8



UTC_PH-ILD_009783

FIGURE 9



UTC_PH-ILD_009784

FIGURE 10



UTC_PH-ILD_009785

U.S. Patent       Jul. 21, 2020       Sheet 11 of 12       US 10,716,793 B2

FIGURE 11



UTC_PH-ILD_009786





FIGURE 12

UTC_PH-ILD_009787

US 10,716,793 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# TREPROSTINIL ADMINISTRATION BY INHALATION

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 16/536,954, filed Aug. 9, 2019, which is a Continuation of U.S. application Ser. No. 15/011,999, filed Feb. 1, 2016, which is a Divisional of U.S. application Ser. No. 13/469,854, filed May 11, 2012, Divisional of U.S. application Ser. No. 12/591,200, filed Nov. 12, 2009, which is a Continuation of U.S. application Ser. No. 11/748,205, filed May 14, 2007, which claims priority to U.S. provisional application No. 60/800,016 filed May 15, 2006, which are incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present application relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits.

## BACKGROUND OF THE INVENTION

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. The above described condition is referred to as pulmonary hypertension (PH). Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S. Pulmonary hypertension can be a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to alveolar hypoxia due to lung diseases or high altitude, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. In addition, certain infectious diseases, such as HIV and liver diseases with portal hypertension may cause pulmonary hypertension. Autoimmune disorders, such as collagen vascular diseases, also often lead to pulmonary vascular narrowing and contribute to a significant number of pulmonary hypertension patients. The cases of pulmonary hypertension remain where the cause of the increased resistance is as yet inexplicable are defined as idiopathic (primary) pulmonary hypertension (iPAH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension and are in the majority of cases related to a genetic mutation in the bone morphogenetic protein receptor-2 gene. The cases of idiopathic

pulmonary arterial hypertension tend to comprise a recognizable entity of about 40% of patients cared for in large specialized pulmonary hypertension centers. Approximately 65% of the most commonly afflicted are female and young adults, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short without specific treatment, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, disease progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12-15 mm Hg. Pulmonary hypertension, on the other hand, can be defined as mean PAP above 25 mmHg, assessed by right heart catheter measurement. Pulmonary arterial pressure may reach systemic pressure levels or even exceed these in severe forms of pulmonary hypertension. When the PAP markedly increases due to pulmonary venous congestion, i.e. in left heart failure or valve dysfunction, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal. Pulmonary edema, however, is not a feature of even severe pulmonary hypertension due to pulmonary vascular changes in all other entities of this disease.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, collagen vascular diseases, pulmonary hypercirculation due to left-to-right shunt, HIV infection, portal hypertension or a combination of genetic mutation and unknown causes as in idiopathic pulmonary arterial hypertension.

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241-273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12-50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also ultimately result in a potentially fatal heart condition known as "cor pulmonale," or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device, such as a metered dose inhaler.

## SUMMARY OF THE INVENTION

One embodiment is a method of delivering to a subject in need thereof a therapeutically effective amount of trepros-

UTC_PH-ILD_009788

US 10,716,793 B2

3

tinil, or treprostinil derivative or a pharmaceutically accept-able salt thereof comprising administering to the subject a therapeutically effective amount of the treprostinil or trepro-stinil derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Another embodiment is a method for treating pulmonary hypertension comprising administering to a subject in need thereof treprostinil or its derivative, or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Yet another embodiment is a kit comprising a metered dose inhaler containing a pharmaceutical formulation com-prising treprostinil or treprostinil derivative, or a pharma-ceutically acceptable salt thereof.

And yet another embodiment is a kit for treating pulmo-nary hypertension in a subject, comprising (i) an effective amount of treprostinil or its derivative, or a pharmaceuti-cally acceptable salt thereof; (ii) a metered dose inhaler; (iii) instructions for use in treating pulmonary hypertension.

Administration of treprostinil using a metered dose inhaler can provide patients, such as pulmonary hyperten-sion patients, with a high degree of autonomy.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 pulmonary and systemic changes in hemodynam-ics following the inhalation of placebo (open circles), 30 μg treprostinil (triangles), 45 μg treprostinil (squares) or 60 μg TREprostinil (black circles) applied by a Metered Dose Inhaler (MDI-TRE). A single short inhalation of treprostinil induced sustained reduction of PAP and PVR that outlasted the observation period of 120 minutes at doses of 45 and 60 μg MDI-TRE. Systemic arterial pressure and resistance were not significantly affected. PAP=mean pulmonary artery pres-sure; PVR=pulmonary vascular resistance; SAP=mean sys-temic arterial pressure; SVR=systemic vascular resistance. Data are given as mean value±standard error of the mean (SEM).

FIG. 2 presents hemodynamic changes induced by the inhalation of placebo (open circles), 30 μg treprostinil (tri-angles), 45 μg treprostinil (squares) or 60 μg treprostinil (black circles) applied by a metered dose inhaler. Trepros-tinil induced sustained elevation of cardiac output. Heart rate was rather unchanged as a sign for low spillover of MDI-TRE to the systemic circulation. Gas exchange was not negatively affected. CO=cardiac output; HR=heart rate; SaO2=arterial oxygen saturation; SvO2=central venous oxygen saturation. Data are given as mean value±SEM.

FIG. 3 shows areas under the curve for changes in pulmonary vascular resistance (PVR) calculated for an observation period of 120 minutes after inhalation trepros-tinil using a metered dose inhaler. PVR was markedly lowered by treprostinil inhalation. The increased pulmonary vasodilation over time with the two highest doses mainly relies on the more sustained effect over time. Data are shown as mean value±95% confidence intervals.

FIG. 4 demonstrates Ventilation-perfusion matching mea-sured with the multiple inert gas elimination technique. Five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems were investigated for changes in ventilation-perfusion ratios. All patients had significant shunt flow at baseline. Shunt-flow and low V/Q areas were not significantly changed by nitric oxide (NO) inhalation or treprostinil inhalation using a metered dose inhaler (MDI-TRE). MDI-TRE applied at high treprostinil concentrations did not negatively affect ventilation-perfu-sion matching and gas-exchange. Data are given as mean value±95% confidence intervals.

4

FIG. 5 presents response of pulmonary vascular resistance (PVR) to inhaled treprostinil vs. iloprost—period effects. a) First inhalation with treprostinil (n=22) vs. first inhalation with iloprost (n=22); b) second inhalation with treprostinil (n=22) vs. second inhalation with iloprost (n=22). The PVR decrease with treprostinil was delayed and prolonged, com-pared to iloprost. Due to carryover effects from the first period, in the second period, the effects of both drugs appeared shortened. Data are shown as percent of baseline values (mean value±95% confidence interval).

FIG. 6 presents response of PVR and systemic arterial pressure (SAP) to inhalation of treprostinil vs. iloprost—dose effects. a) Inhalation of 7.5 μg iloprost (in 6 min) vs. 7.5 μg treprostinil (6 min) (n=14, in a randomized order). b) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (6 min) (n=14, in randomized order). c) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (3 min) (n=16, in randomized order). Data are shown as percent of baseline values (mean±95% confidence interval). Iloprost, filled circles; Treprostinil, open triangles.

FIG. 7 presents hemodynamic response to inhalation of treprostinil vs. iloprost. Data from n=44 patients, who inhaled both drugs in randomized order, shown as percent of baseline values (mean value±95% confidence interval). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 8 presents pharmacodynamics after treprostinil inha-lation vs. placebo. Placebo or treprostinil in doses of 30 μg, 60 μg or 90 μg were inhaled (means±95% confidence intervals). Maximal decrease of PVR was comparable for all doses. The duration of pulmonary vasodilation (PVR-de-crease) appeared to be dose dependent. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output; SaO2, arterial oxygen saturation; SvO2, mixed venous oxy-gen saturation.

FIG. 9 presents Areas Between the placebo and the treprostinil Curves (ABC). ABCs were calculated for a 3-hour period after inhalation of TRE or placebo from the relative changes of hemodynamic parameters (means±95% confidence intervals). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; SVR, systemic vascular resistance.

FIG. 10 presents hemodynamic responses to the inhala-tion of 15 μg treprostinil. The inhalation time by increasing treprostinil concentration. A pulse of aerosol was generated every 6 seconds. TRE aerosol was inhaled in concentrations of 100 μg/ml (18 pulses; n=6), 200 μg/ml (9 pulses; n=6), 600 μg/ml (3 pulses; n=21), 1000 μg/ml (2 pulses; n=7) and 2000 μg/ml (1 pulse; n=8). Placebo data correspond to FIG. 8. Data are shown as means±95% confidence intervals. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 11 presents areas between the placebo curve and the responses to 15 μg treprostinil applied at increasing concen-trations to minimize inhalation time. Mean±SEM of relative changes of hemodynamic parameters (observation time 120 min). PAP, pulmonary arterial pressure, SAP, systemic arte-rial pressure, PVR, pulmonary vascular resistance, CO, cardiac output, SaO2, systemic arterial oxygen saturation, SvO2, pulmonary arterial oxygen saturation.

FIG. 12 presents pharmacokinetics of treprostinil after a single inhalation. Treprostinil plasma levels after inhalation of 30 μg, 60 μg, 90 μg or 120 μg treprostinil (6 min

UTC_PH-ILD_009789

US 10,716,793 B2

5

inhalation period; experiments correspond to those shown in FIGS. **8** and **9**). Data with error bars represent mean values±SEM.

### DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, the term "a" or "an" used herein shall mean "one or more."

The present application incorporates herein by reference in its entirety Voswinckel R, et al. J. Am. Coll. Cardiol. 2006; 48:1672-1681.

The inventors discovered that a therapeutically effective dose of treprostinil can be administered in a few single inhalations using a compact inhalation device, such as a metered dose inhaler. Furthermore, the inventors discovered that such administering does not cause significant side effects, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Accordingly, one embodiment of the invention is a method of delivering to a subject in need thereof, such as a human being, a therapeutically effective amount of treprostinil comprising administering to the subject a formulation comprising a therapeutically effective amount of treprostinil, its derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler. Treprostinil can be administered via a metered dose inhaler to a subject affected with a condition or disease, which can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

Another embodiment of the invention is a method for treating pulmonary hypertension, comprising administering to a subject in need thereof, such as a human being, treprostinil or its derivative, or a pharmaceutically acceptable salt using a metered dose inhaler.

Treprostinil, or 9-deoxy-2′,9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1′3′-interphenylene)-13,14-dihydro-prostaglandin F1, is a prostacyclin analogue, first described in U.S. Pat. No. 4,306,075. U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. US patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. US patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. provisional application No. 60/900, 320 filed Feb. 9, 2007, discloses treprostinil treatment of pulmonary fibrosis.

The term "acid derivative" is used herein to describe C1-4 alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C1-4 alkyl groups.

The present invention also encompasses methods of using treprostinil or its derivatives, or pharmaceutically acceptable salts thereof. In one embodiment, a method uses treprostinil sodium, currently marketed under the trade name of REMODULIN®. The FDA has approved Trepro-

6

stinil sodium for the treatment of pulmonary arterial hypertension by injection of dose concentrations of 1.0 mg/mL, 2.5 mg/mL, 5.0 mg/mL and 10.0 mg/mL. The chemical structure formula for Treprostinil sodium is:



Treprostinil sodium is sometimes designated by the chemical names: (a) [(1R,2R,3aS,9aS)-2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid; or (b) 9-deoxy-2′,9-α-methano-3-oxa-4,5,6-trinor-3,7-(1′,3′-interphenylene)-13,14-dihydro-prostaglandin F1. Treprostinil is also known as: UT-15; LRX-15; 15AU81; UNIPROST™; BW A15AU; and U-62,840. The molecular weight of Treprostinil sodium is 390.52, and its empirical formula is $C_{23}H_{34}O_5$.

In certain embodiments, treprostinil can be administered in combination with one or more additional active agents. In some embodiments, such one or more additional active agents can be also administered together with treprostinil using a metered dose inhaler. Yet in some embodiments, such one or more additional active agents can be administered separately from treprostinil. Particular additional active agents that can be administered in combination with treprostinil may depend on a particular disease or condition for treatment or prevention of which treprostinil is administered. In some cases, the additional active agent can be a cardiovascular agent such as a calcium channel blocker, a phosphodiesterase inhibitor, an endothelial antagonist, or an antiplatelet agent.

The present invention extends to methods of using physiologically acceptable salts of Treprostinil, as well as nonphysiologically acceptable salts of Treprostinil that may be used in the preparation of the pharmacologically active compounds of the invention.

The term "pharmaceutically acceptable salt" refers to a salt of Treprostinil with an inorganic base, organic base, inorganic acid, organic acid, or basic or acidic amino acid. Salts of inorganic bases can be, for example, salts of alkali metals such as sodium or potassium; alkaline earth metals such as calcium and magnesium or aluminum; and ammonia. Salts of organic bases can be, for example, salts trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, and triethanolamine. Salts of inorganic acids can be, for example, salts of hydrochloric acid, hydrobroric acid, nitric acid, sulfuric acid, and phosphoric acid. Salts of organic acids can be, for example, salts of formic acid, acetic acid, trifluoroacetic acid, fumaric acid, oxalic acid, lactic acid, tartaric acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, and p-toluenesulfonic acid. Salts of basic amino acids can be, for example, salts of arginine, lysine and ornithine. Salts of acidic amino acids can include, for example, salts of aspartic acid and glutamic acid. Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sul-

UTC_PH-ILD_009790

US 10,716,793 B2

7

phates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Preferred pharmaceutically acceptable salts are disclosed, for example, in US patent application publication No. 20050085540.

Treprostinil can be administered by inhalation, which in the present context refers to the delivery of the active ingredient or a combination of active ingredients through a respiratory passage, wherein the subject in need of the active ingredient(s) through the subject's airways, such as the subject's nose or mouth.

A metered dose inhaler in the present context means a device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs. One example of the inhalation device can be a pressurized metered dose inhaler, a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions.

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.

The metered dose inhaler can be a soft mist inhaler (SMI), in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles. The aerosol generation can be achieved in SMI, for example, by mechanical, electromechanical or thermomechanical process. Examples of soft mist inhalers include the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated). For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34. The aerosol for SMI can be generated from a solution of the respiratory drug further containing pharmaceutically acceptable excipients. In the present case, the respiratory drug is treprostinil, its derivative or a pharmaceutically acceptable salt thereof, which can be formulated in SMI is as a solution. The solution can be, for example, a solution of treprostinil in water, ethanol or a mixture thereof. Preferably, the diameter of the treprostinil-containing aerosol particles is less than about 10 microns, or less than about 5 microns, or less than about 4 microns.

Treprostinil concentration in an aerosolable formulation, such as a solution, used in a metered dose inhaler can range from about 500 μg/ml to about 2500 μg/ml, or from about 800 μg/ml to about 2200 μg/ml, or from about 1000 μg/ml to about 2000 μg/ml.

The dose of treprostinil that can be administered using a metered dose inhaler in a single event can be from about 15 μg to about 100 μg or from about 15 μg to about 90 μg or from about 30 μg to about 90 μg or from about 30 μg to about 60 μg.

Administering of treprostinil in a single event can be carried out in a limited number of breaths by a patient. For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less. Preferably, treprostinil is administered in 3, 2 or 1 breaths.

The total time of a single administering event can be less than 5 minutes, or less than 1 minute, or less than 30 seconds.

8

Treprostinil can be administered a single time per day or several times per day.

In some embodiments, the method of treatment of pulmonary hypertension can further comprise administering at least one supplementary agent selected from the group consisting of sildenafil, tadalafil, calcium channel blockers (diltiazem, amlodipine, nifedipine), bosentan, sitaxsentan, ambrisentan, and pharmaceutically acceptable salts thereof. In some embodiments, the supplementary agents can be included in the treprostinil formulation and, thus, can be administered simultaneously with treprostinil using a metered dose inhaler. In some embodiments, the supplementary agents can be administered separately from treprostinil. In some embodiments, the application of intravenous prostacyclin (flolan), intravenous iloprost or intravenous or subcutaneous treprostinil can be administered in addition to treprostinil administered via inhalation using a metered dose inhaler.

The present invention also provides a kit that includes a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with a disease or condition that can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

In some cases, the kit is a kit for treating pulmonary hypertension, that includes (i) a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

As used herein, the phrase "instructions for use" shall mean any FDA-mandated labeling, instructions, or package inserts that relate to the administration of Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof, for treatment of pulmonary hypertension by inhalation. For example, instructions for use may include, but are not limited to, indications for pulmonary hypertension, identification of specific symptoms associated with pulmonary hypertension, that can be ameliorated by Treprostinil, recommended dosage amounts for subjects suffering from pulmonary hypertension and instructions on coordination of individual's breathing and actuation of the metered dose inhaler.

The present invention can be illustrated in more detail by the following example, however, it should be understood that the present invention is not limited thereto.

Example 1

Open Label Study Upon Acute Safety, Tolerability and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds

A study was conducted of acute vasodilator challenge during right heart catheter investigation to determine the safety, tolerability and pulmonary vasodilatory potency of inhaled treprostinil applied in seconds by a soft mist inhaler (SMI-TRE). The study produced evidence for a long lasting

UTC_PH-ILD_009791

US 10,716,793 B2

9

favourable effect of SMI-TRE on pulmonary hemodynamics in absence of systemic side effects and gas exchange disruptions.

Summary:

Inhaled nitric oxide (20 ppm; n=45) and inhaled treprostinil sodium (TRE; n=41) or placebo (n=4) were applied once during right heart catheter investigation. TRE was delivered in 2 breaths (1000 μg/ml aerosol concentration; 30 μg dose; n=12), 3 breaths (1000 μg/ml; 45 μg; n=9) or 2 breaths (2000 μg/ml; 60 μg; n=20) from a Respimat® SMI. Pulmonary hemodynamics and blood gases were measured at defined time points, observation time following TRE application was 120 minutes. TRE doses of 30 μg, 45 μg and 60 μg reduced pulmonary vascular resistance (PVR) to 84.4±8.7%, 71.4±17.5% and 77.5±7.2% of baseline values, respectively (mean±95% confidence interval). The 120 minute area under the curve for PVR for placebo, 30 μg, 45 μg and 60 μg TRE was 1230±1310, −870±940, −2450±2070 and −2000±900 min %, respectively. Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes. Reduction of systemic vascular resistance and pressure was negligible, showing a high pulmonary selectivity for SMI-TRE. Intrapulmonary selectivity was also provided by SMI-TRE as ventilation/perfusion matching, assessed by the multiple inert gas elimination technique in 5 patients with gas exchange problems, was not significantly different after SMI-TRE compared to inhaled nitric oxide or no treatment. No significant side effects were observed.

Conclusions: The acute application of inhaled treprostinil with a metered dose inhaler in 2-3 breaths was safe, well tolerated and induced a strong and sustained pulmonary selective vasodilation.

Methods and Patients

A total number of 45 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics were: female to male ratio (f/m)=29/16, age 59±2.3 years, pulmonary artery pressure (PAP) 45±1.8 mmHg, pulmonary vascular resistance (PVR) 743±52 dynes·s·cm⁻⁵, pulmonary artery wedge pressure (PAWP) 8.6±0.5 mmHg, central venous pressure (CVP) 6.4±0.7 mmHg, cardiac output (CO) 4.5±0.2 l/min, central venous oxygen saturation (SvO2) 62.3±1.2 mmHg (mean±Standard Error of the Mean). Disease etiologies were idiopathic PAH (iPAH) (n=13), PAH (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4). Table 1 presents the patient characteristics of the different groups.

TABLE 1

Patient characteristics of the different treatment groups.
Data are given as mean ± Standard Error of the Mean (SEM).

|  | Placebo (n = 4) | 30 μg TRE (n = 12) | 45 μg TRE (n = 9) | 60 μg TRE (n = 20) |
|---|---|---|---|---|
| Age [years] | 61 ± 8 | 53.9 ± 3.9 | 54.2 ± 5.7 | 65.5 ± 3.1 |
| PAP [mmHg] | 46.0 ± 10.1 | 45 ± 3.1 | 54.3 ± 2.8 | 39.7 ± 2.0 |
| PVR [Dynes] | 896 ± 163 | 597 ± 53.9 | 1049 ± 107 | 663 ± 81 |
| CO [l/min] | 4.46 ± 0.9 | 5.2 ± 0.4 | 3.9 ± 0.4 | 4.4 ± 0.3 |
| SAP [mmHg] | 98 ± 8.1 | 90.1 ± 3.2 | 82.8 ± 3.9 | 86.1 ± 2.0 |
| SaO2 [%] | 85.3 ± 4.5 | 90.0 ± 1.1 | 89.6 ± 1.1 | 90.6 ± 0.5 |
| SvO2 [%] | 57.5 ± 3.9 | 66.0 ± 1.6 | 59.1 ± 3.4 | 62.5 ± 1.6 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

Baseline values were determined 20-30 minutes after placement of the catheter. Heart rate, pulmonary and sys-

10

temic blood pressure and cardiac output were measured and blood gases were taken during each pharmacological intervention at defined time points. Pharmacological interventions included the inhalation of 20 ppm nitric oxide (NO) after evaluation of baseline parameters (n=45) and the consecutive inhalation of placebo (n=4), 30 μg SMI-TRE (n=12), 45 μg SMI-TRE (n=9) or 60 μg SMI-TRE (n=20) SMI-TRE. Placebo and treprostinil was applied with the Respimat® SMI. For filling of this device with treprostinil solution, the placebo solution was withdrawn from the device with a syringe and treprostinil solution was injected into the device under sterile conditions. Aerosol quality was controlled before and after refilling of the SMI devices by laser diffractometry, see e.g. Gessler T., Schmehl T., Hoeper M. M., Rose F., Ghofrani H. A., Olschewski H. et al. Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension. Eur. Respir. J. 2001; 17:14-19 incorporated herein in its entirety. The aerosol sizes before (placebo) and after filling (treprostinil) were unchanged. The aerosol particles mass median aerodynamic diameter of treprostinil-aerosol was 4-5 μm, which can be at the upper limit for alveolar deposition. The aerosol volume delivered by one cycle from the SMI was 15 μl. The solution used for aerosol generation was prepared from treprostinil sodium salt using a standard protocol. The SMI was either filled with a concentration of 1000 μg/ml treprostinil sodium (one aerosol puff=15 μg TRE) or with 2000 μg/ml (one puff=30 μg TRE). The different doses were applied as 2 puffs 1000 μg/ml (30 μg), 3 puffs 1000 μg/ml (45 μg) and 2 puffs 2000 μg/ml (60 μg). The placebo was inhaled as 2 puffs from a placebo-SMI. Hemodynamics and gas-exchange parameters were recorded for 120 minutes after TRE inhalation. This study used the Respimat® device, because the implemented "soft mist" technology was well suited for the deposition of such highly active drugs like prostanoids.

The impact of SMI-TRE on ventilation-perfusion matching was assessed in five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems by use of the multiple inert gas elimination technique (MIGET), see e.g. Wagner P D, Saltzman H A, West J B. Measurement of continuous distributions of ventilation-perfusion ratios: theory. J Appl Physiol. 1974; 36:588-99; Ghofrani H A, Wiedemann R, Rose F, Schermuly R T, Olschewski H, Weissmann N et al. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. Lancet. 2002; 360:895-900, both incorporated herein in their entirety.

Statistics:

Mean values, standard deviation, standard error of the mean and 95% confidence intervals were calculated. Statistical analysis was done by use of a paired t-test.

Results:

The inhalation of treprostinil sodium from the metered dose inhaler (SMI-TRE) was well tolerated, only mild and transient cough for a maximum of one minute was reported. No systemic side effects like headache, flush, nausea or dizziness were observed.

Two to three breaths of SMI-TRE induced a strong pulmonary vasodilation that outlasted the observation time of 120 minutes (45 and 60 μg). The lower dose of 30 μg TRE induced a somewhat shorter effect on pulmonary vascular resistance; however, the maximal pulmonary vasodilation was comparable. In contrast, placebo inhalation did not induce pulmonary vasodilation. In fact a slight increase in PVR over the time of the right heart catheter investigation could be recorded following placebo inhalation (FIG. 1). The effect of SMI-TRE on systemic vascular resistance and

UTC_PH-ILD_009792

US 10,716,793 B2

**11**

pressure was very small and not clinically significant. Cardiac output was significantly increased over the whole observation period, whereas heart rate was rather unchanged. Gas exchange was not influenced by SMI-TRE (FIG. **2**). The maximal changes in hemodynamic and gas-exchange parameters compared to baseline values are depicted in Table 2.

TABLE 2

Extremes of the relative changes of hemodynamic and gas exchange parameters compared to baseline after inhalation of Placebo (n = 4), 30 µg treprostinil (n = 12), 45 µg treprostinil (n = 9) and 60 µg treprostinil (n = 20). Highest (max) and lowest (min) values during the observation period are shown. Data are given as percent of baseline values (mean ± SEM).

|  | Placebo | 30 µg TRE | 45 µg TRE | 60 µg TRE |
|---|---|---|---|---|
| PAP (min) | 99.4 ± 3.0 | 83.4 ± 3.2 | 77.6 ± 6.8 | 79.5 ± 2.4 |
| PVR (min) | 101.4 ± 1.9 | 84.4 ± 4.4 | 71.4 ± 8.9 | 77.5 ± 3.7 |
| CO (max) | 99.7 ± 1.1 | 108.8 ± 3.8 | 108.6 ± 5.6 | 103.8 ± 2.0 |
| SVR (min) | 104.3 ± 4.3 | 97.7 ± 4.2 | 92 ± 3.9 | 91.3 ± 2.1 |
| SAP (min) | 102.7 ± 1.7 | 97.3 ± 1.9 | 96.1 ± 1.5 | 93.6 ± 2.9 |
| HR (max) | 105 ± 2.1 | 106.1 ± 2.9 | 99.1 ± 2.4 | 101.1 ± 0.9 |
| SaO2 (min) | 98.2 ± 0.4 | 101 ± 0.3 | 94.4 ± 1.8 | 95.8 ± 0.9 |
| SvO2 (max) | 100.5 ± 1.4 | 102.4 ± 1.3 | 104.5 ± 4.4 | 102 ± 1.0 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; SVR = systemic vascular resistance, CO = cardiac output; SAP = systemic arterial pressure; HR = heart rate; SaO2 = arterial oxygen saturation, SvO2 = central venous oxygen saturation.

The areas under the curve for PVR were calculated for placebo and the different SMI-TRE doses over the 120 minute observation period (FIG. **3**). A dose effect of SMI-TRE with a trend to a more sustained effect with the two highest doses could be observed.

The inhalation of a highly concentrated aerosol can be in theory prone to disturbances of gas exchange because the deposition of even small amounts of aerosol may deliver high doses locally and thereby antagonize the hypoxic pulmonary vasoconstriction in poorly ventilated areas. This would then lead to increased shunt flow or increase of low ventilation/perfusion (V/Q) areas. This question was addressed in five patients with the multiple inert gas elimination technique (MIGET), the gold-standard for intrapulmonary V/Q ratio determination. The MIGET patients were selected for pre-existing gas exchange limitations. Characteristics of these patients were: PAP 54.6±3.2 mmHg, PVR 892±88 dynes, SaO2 91.7±0.5%, SvO2 65.2±1.8%. Etiologies were iPAH (n=1), CTEPH (n=3), pulmonary fibrosis (n=1). The maximal relative reduction of SaO2 after inhalation of SMI-TRE in these patients was −3.8±1.5% compared to baseline values. Shunt flow at baseline, NO-inhalation and 60 minutes after SMI-TRE was 6.4±4.3%, 5.4±3.0% and 8.3±3.4%, respectively (mean±95% confidence interval; FIG. **4**).

No significant increase in low V/Q areas or shunt fraction after inhalation of SMI-TRE was observed, in fact the distribution of perfusion was not different to that at baseline and during nitric oxide inhalation. This proves an excellent intrapulmonary selectivity of SMI-TRE, which is also reflected by unchanged arterial oxygen saturation.

Conclusion:

Treprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution. Treprostinil can be applied by a metered dose inhaler, such as Respimat® soft mist inhaler.

**12**

Example 2

Investigation of the Effects of Inhaled Treprostinil on Pulmonary Hemodynamics and Gas Exchange in Severe Pulmonary Hypertension

This study investigated the effects of inhaled treprostinil on pulmonary vascular resistance in severe pulmonary hypertension and addressed systemic effects and gas exchange as well as tolerability and efficacy of high doses of treprostinil given in short time. A total of 123 patients with a mean pulmonary artery pressure of about 50 mmHg were investigated in three separate randomized studies. Inhaled treprostinil exerted potent sustained pulmonary vasodilation with excellent tolerability and could be safely applied in a few breaths or even one breath.

Summary:

Three different studies were conducted on a total of 123 patients by means of right heart catheterization: i) a randomized crossover-design study (44 patients), ii) a dose escalation study (31 patients) and iii) a study of reduction of inhalation time while keeping the dose fixed (48 patients). The primary endpoint was the change in pulmonary vascular resistance (PVR).

The mean pulmonary artery pressure of the enrolled patients was about 50 mmHg. Hemodynamics and patient characteristics were similar in all studies. In study i) TRE and Iloprost (ILO), at an inhaled dose of 7.5 µg, displayed comparable PVR decrease, with a significantly different time course (p<0.001), TRE exhibiting a more sustained effect on PVR (p<0.0001) and less systemic side effects. In study ii) placebo, 30 µg, 60 µg, 90 µg or 120 µg TRE were applied with drug effects being observed for 3 hours after inhalation. A near-maximal acute PVR decrease was observed at 30 µg TRE. In study iii) TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered dose inhaler. 15 µg TRE was inhaled with 18 pulses (TRE concentration 100 µg/ml), 9 pulses (200 µg/ml), 3 pulses (600 µg/ml), 2 pulses (1000 µg/ml) or 1 pulse (2000 µg/ml), each mode achieving comparable, sustained pulmonary vasodilation.

Inhaled treprostinil exerts sustained pulmonary vasodilation with excellent tolerability at doses, which may be inhaled in a few or even one breath. Inhaled treprostinil is advantageous to inhaled iloprost in terms of duration of effect and systemic side effects. Inhaled treprostinil is well tolerated in concentrations up to 2000 mg/ml (bringing down inhalation time to a single breath) and in high doses (up to 90 µg).

Methods:

All inhalations were performed with the OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany).

Study i) was a randomized, open-label, single-blind cross-over study. The primary objective was to compare the acute hemodynamic effects and the systemic side effects of inhaled treprostinil with inhaled iloprost at comparable doses. A total number of 44 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics and hemodynamic as well as gas exchange parameters are outlined in Table 3.

UTC_PH-ILD_009793

US 10,716,793 B2

13      14

TABLE 3

Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids.

| | N | Age | Gender f/m | Etiology i/o/t/f | PAP [mmHg] | PVR [dyn * s * cm⁻⁵] | SAP [mmHg] | CVP [mmHg] | PAWP [mmHg] | CO [l/min] | SaO2 [%] | SvO2 [%] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a | 14 | 55.1 ± 4.8 | 11/3 | 4/4/2/4 | 53.8 ± 3.1 | 911 ± 102 | 95.4 ± 3.6 | 7.4 ± 1 | 8.0 ± 0.8 | 4.3 ± 0.4 | 93.8 ± 2 | 63.9 ± 2.4 |
| 1b | 14 | 54.1 ± 3.3 | 10/4 | 1/6/5/2 | 47.4 ± 3.8 | 716 ± 80 | 90.6 ± 3.3 | 5.9 ± 1.4 | 6.8 ± 0.7 | 4.7 ± 0.4 | 92 ± 1 | 64.4 ± 2.3 |
| 1c | 16 | 56 ± 2.9 | 7/9 | 6/3/6/1 | 47.5 ± 4.5 | 777 ± 102 | 92 ± 4.5 | 8.3 ± 1.4 | 8.6 ± 1.4 | 4.4 ± 0.5 | 91.4 ± 0.9 | 59.8 ± 2.6 |
| 2a | 8 | 60.8 ± 4 | 4/4 | 2/2/3/1 | 51.9 ± 4.9 | 849 ± 152 | 95.9 ± 4.8 | 7.6 ± 1.4 | 11.1 ± 1.7 | 4.4 ± 0.6 | 89.6 ± 2.8 | 60.1 ± 2.8 |
| 2b | 8 | 52.8 ± 6.6 | 6/2 | 1/3/3/1 | 49 ± 4 | 902 ± 189 | 92.4 ± 2.4 | 4.8 ± 1.1 | 7.2 ± 1.3 | 4.0 ± 0.4 | 92.4 ± 2.4 | 62.5 ± 1.7 |
| 2c | 6 | 56.8 ± 5.9 | 4/2 | 0/2/2/2 | 44.2 ± 3.5 | 856 ± 123 | 96.3 ± 3.9 | 5.1 ± 1.1 | 6 ± 1 | 3.8 ± 0.3 | 92.8 ± 1.5 | 63.6 ± 1.8 |
| 2d | 6 | 51.2 ± 3.8 | 4/2 | 2/2/2/0 | 55.5 ± 4.9 | 940 ± 110 | 91.2 ± 8.1 | 11.2 ± 1.2 | 10 ± 0.7 | 3.9 ± 0.4 | 92 ± 1.9 | 62 ± 5.8 |
| 2e | 3 | 57.3 ± 9.1 | 1/2 | 0/1/0/2 | 45.3 ± 5.2 | 769 ± 267 | 99 ± 3.2 | 5 ± 2.1 | 9 ± 0.6 | 4.5 ± 0.6 | 94.2 ± 1.3 | 66.3 ± 1.5 |
| 3a | 6 | 52.7 ± 6.6 | 4/2 | 2/4/0/0 | 53.8 ± 6.7 | 928 ± 145 | 92.7 ± 7.9 | 8.7 ± 2.7 | 8.8 ± 1.3 | 4.2 ± 0.6 | 90.4 ± 2.8 | 64.8 ± 4.3 |
| 3b | 6 | 58.3 ± 3.5 | 4/2 | 3/1/1/1 | 54.2 ± 6.1 | 808 ± 156 | 94.3 ± 2.8 | 7 ± 1.4 | 10 ± 1.3 | 5 ± 0.7 | 91.9 ± 0.7 | 63.5 ± 2.9 |
| 3c | 21 | 57.4 ± 5.6 | 8/3 | 7/7/6/1 | 46.1 ± 2.5 | 900 ± 99 | 88 ± 2.8 | 9 ± 1.4 | 9.2 ± 0.5 | 3.7 ± 0.3 | 91.7 ± 0.8 | 59.7 ± 2 |
| 3d | 7 | 55.6 ± 5.8 | 3/4 | 0/4/3/0 | 53.1 ± 7.1 | 732 ± 123 | 91.4 ± 5.6 | 7.9 ± 3.1 | 8.6 ± 1.3 | 5 ± 0.4 | 90.7 ± 1.4 | 61.3 ± 3.7 |
| 3e | 8 | 59 ± 5.2 | 7/1 | 0/4/4/0 | 45.1 ± 3.9 | 733 ± 114 | 92.8 ± 4.6 | 6 ± 0.8 | 8.1 ± 1.1 | 4.3 ± 0.2 | 90.7 ± 0.8 | 66.3 ± 2.8 |

Group 1 corresponds to study i); randomized crossover study comparing inhaled iloprost (ILO) and inhaled treprostinil (TRE).
a = 7.5 g ILO vs. 7.5 µg TRE,
b = 7.5 g ILO vs. 15 µg TRE (6 min inhalation time),
c = 7.5 g ILO vs. 15 µg TRE (3 min inhalation time).
Group 2 corresponds to study ii), evaluation of maximal tolerated dose of TRE.
a = placebo inhalation,
b = 30 µg TRE,
c = 60 µg TRE,
d = 90 µg TRE,
e = 120 µg TRE.
Group 3 corresponds to study iii), reduction of inhalation time by increase of TRE concentration, aiming at a total inhaled dose of 15 µg.
a = 18 pulses of 100 µg/ml TRE,
b = 9 pulses of 200 µg/ml TRE,
c = 3 pulses of 600 µg/ml TRE,
d = 2 pulses of 1000 µg/ml TRE,
e = 1 pulse 2000 µg/ml TRE.
Etiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f).

Each patient inhaled both iloprost and treprostinil on the same day during right heart catheter investigation; the drugs were administered consecutively with a one hour interval between the drug applications. One half of the study patients initially inhaled treprostinil and then inhaled iloprost (n=22), while the other half initially inhaled iloprost and then inhaled treprostinil (n=22). Patients were randomized to one of the two groups and blinded as to the study drugs. Drug effects were monitored for 60 minutes after each inhalation. Iloprost was inhaled at 4 µg/ml (6 min inhalation time; n=44) and treprostinil was inhaled at a concentration of 4 µg/ml (6 min inhalation; n=14), 8 µg/ml (6 min inhalation; n=14) or 16 µg/ml (3 min inhalation; n=16). Based on previous biophysical characterization of the ultrasonic device with iloprost- and treprostinil-solution, this corresponds to a total inhaled dose of 7.5 µg iloprost and treprostinil (4 µg/ml) and 15 µg treprostinil (8 µg/ml and 16 µg/ml), respectively.

Study ii) was a randomized, open-label, single blind, placebo controlled study. The primary objectives were to describe the pharmacodynamic and pharmacokinetic effects of inhaled treprostinil at a well tolerated dose (30 µg) and to explore the highest tolerated single dose. A total number of 31 patients inhaled either placebo or treprostinil; each patient received one inhalation. The first 16 patients were randomized to 30 µg TRE (16 µg/ml, n=8) or placebo (stock solution in a concentration corresponding to TRE 16 µg/ml). Subsequent patients received 60 µg TRE (32 µg/ml; n=6), 90 µg TRE (48 µg/ml; n=6) and 120 µg TRE (64 µg/ml; n=3). Inhalation time was 6 minutes in all groups. Hemodynamics and gas-exchange as well as arterial treprostinil concentrations were recorded for 180 minutes.

Study iii) was a randomized, open-label, single blind study. The primary objective was to explore the shortest possible inhalation time for a 15 µg dose of inhaled trepro-

stinil. A total of 48 patients inhaled one dose of TRE during right heart catheter investigation. The drug was applied in 18, 9, 3, 2 or 1 breaths. The aerosol was generated by a pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Elsenfeld, Germany) in cycles consisting of 2 seconds aerosol production (pulse) and 4 seconds pause. The device included an opto-acoustical trigger for the patient to synchronize the inspiration to the end of the aerosol pulse, thereby providing exact dosage. The TRE dose of 15 µg was either generated during 18 cycles (OPTINEB® filled with 100 µg/ml TRE, n=6), 9 cycles (200 µg/ml TRE, n=6), 3 cycles (600 µg/ml TRE, n=21), 2 cycles (1000 µg/ml TRE, n=7) or 1 cycle (2000 µg/ml TRE, n=8). Hemodynamics and gas exchange were recorded for 120-180 minutes.

Treprostinil plasma concentrations were assessed in study ii) at 10, 15, 30, 60 and 120 minutes after inhalation. Treprostinil quantification was done by Alta Analytical Laboratory (El Dorado Hills, Calif., USA) with a validated liquid chromatography atmospheric-pressure ionization tandem mass spectrometry as previously described Wade M., et al. J. Clin. Pharmacol. 2004; 44:503-9. Mixed venous blood was drawn at the depicted time points (FIG. 11) after inhalation, centrifuged and the plasma frozen at −80° C. until temperature controlled shipping on dry ice.

Statistics:

For statistical analysis of study i) the repeated PVR measurements after inhaled iloprost and treprostinil were subjected to a three-factorial analysis of variance (ANOVA; factors: time (A), drug (B), treprostinil concentration (C)) to avoid multiple testing. The time to maximum PVR decrease after inhalation of iloprost versus treprostinil was compared by paired t-test. Area under the curve (AUC) was calculated from start of inhalation until 60 min after inhalation. Means, standard error of the mean (SEM) and 95% confidence

UTC_PH-ILD_009794

US 10,716,793 B2

15

intervals were calculated. For study ii) and iii) areas between curves (ABC) were calculated between placebo inhalation (study ii) and the respective treprostinil inhalation until 180 min (study ii)) and 120 min (study iii)) after end of inhalation.

Results:

The inhalation of iloprost as well as treprostinil in study i) resulted in a rapid decrease in PVR and PAP (FIG. 5-7). No significant differences were observed for the areas under the curve (AUC) of PVR decrease after inhalation of 7.5 µg TRE in 6 minutes (AUC −12.6±7.0%), 15 µg TRE in 6 minutes (AUC −13.3±3.2%) and 15 µg TRE in 3 minutes (AUC −13.6±4.3%). The AUC for PVR after the inhalation of 7.5 µg iloprost in 6 minutes was −7.7±3.7% (mean±95% confidence interval). An overview of the pooled data of treprostinil inhalation as compared to iloprost inhalation is given in FIG. 7. The maximum effect of iloprost and treprostinil on PVR was comparable but this effect was reached significantly later after treprostinil inhalation (18±2 min) compared to iloprost (8±1 min; mean±SEM, p<0.0001) and lasted considerably longer (after 60 min, PVR values in the treprostinil group had not yet returned to baseline). The increase in cardiac output was less acute but prolonged after treprostinil inhalation. Systemic arterial pressure (SAP) was unaffected by treprostinil inhalation, whereas a transient decrease was observed after iloprost inhalation. Iloprost and treprostinil did not affect gas exchange. Three-factorial ANOVA for treprostinil demonstrated a significant difference between repeated measurements after inhalation ($p_{(A)}$<0.0001), no significant difference between drugs ($p_B$=0.1), no difference between treprostinil concentrations ($p_{(C)}$=0.74) and a significant drug×time interaction ($p_{(A×B)}$<0.0001). This translates into a significant effect of both drugs on PVR with comparable drug potency but a prolonged drug effect of treprostinil compared to iloprost.

In this study the occasionally observed mild side effects of iloprost inhalation at the given dose (transient flush, headache) were not observed with inhaled treprostinil. Bad taste was reported by most of the patients after inhalation of TRE. This was later found to be attributable to the metacresol preservative contained in the treprostinil solution.

In study ii) pharmacodynamics of inhaled placebo or treprostinil were observed for 180 minutes. Placebo inhalation was followed by a gradual increase in PVR over the entire observation time. Due to reduced patient numbers in the 120 µg TRE group (because of side effects, see below), the hemodynamic values for this group were not included in the graphs of this study (FIG. 8-9). All TRE doses led to comparable maximal decreases of PVR to 76.5±4.7% (30 µg), 73.7±5.8% (60 µg), 73.3±4.3% (90 µg) and 65.4±4.1% (120 µg) of baseline values. An extended duration of pulmonary vasodilation was noted, surpassing the 3 hour observation period for the 60 µg and 90 µg (and 120 µg) TRE doses, whereas in the 30 µg dose group the hemodynamic changes had just returned to baseline within this period. Even at the highest doses, TRE had only minor effects on systemic arterial pressure (FIG. 8). Cardiac output was increased to a maximum of 106.8±3.2% (30 µg), 122.9±4.3% (60 µg), 114.3±4.8% (90 µg) and 111.3±3.9% (120 µg TRE). The areas between the response curves after placebo versus TRE inhalation were calculated for PVR, PAP, SVR and SAP (FIG. 9). Areas between the curves for PVR were not significantly different for 30 µg, 60 µg and 90 µg TRE, a nearly maximal effect on PVR was already observed with 30 µg TRE. Effects on PAP and SAP were small and did not show a dose-response relationship. Gas exchange was not affected at doses up to 90 µg TRE, but

16

arterial oxygen saturation was significantly decreased at a dose of 120 µg TRE in all 3 patients. Further dose increments were omitted due to this side effect and severe headache in one patient.

Again, bad taste of the TRE aerosol was reported by most patients. Other side effects were flushing (n=1; 30 µg TRE), mild transient cough (n=3; 60 µg TRE), mild transient bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 30 µg TRE), moderate bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 120 µg TRE), and severe headache (n=1; 120 µg TRE). The bad taste, the bronchoconstriction and the drop in SaO2 was attributed to metacresol in the original TRE solution. With the use of a metacresol-free solution of TRE (University Hospital Giessen, Germany; produced according to the manufacturer's protocol) in the following study, these side effects did no longer occur.

Study iii) was performed with metacresol-free TRE solution, having no specific taste and smell. A total of 48 patients were enrolled. This study aimed at the reduction of inhalation time and aerosol volume needed for pulmonary drug delivery. A modified OPTINEB® inhalation device was programmed to produce a constant amount of aerosol during repeatable pulses of aerosol generation. With this device, treprostinil could be safely utilized up to a concentration of 2000 µg/ml without considerable side effects. No relationship of number or type of side effects to TRE concentration was observed. Reported side effects were mild transient cough (n=6), mild headache (n=2) and mild jaw pain (n=1).

The reduction of PVR and PAP was comparable between all groups (FIG. 10). TRE inhalation reduced PVR to 76.3±5.6% (18 pulses, 100 µg/ml), 72.9±4.9% (9 pulses, 200 µg/ml), 71.2±6.0% (3 pulses, 600 µg/ml), 77.4±4.5% (2 pulses, 1000 µg/ml) and 80.3±5.2% (1 pulse, 2000 µg/ml). PAP was reduced to 84.2±4.5% (18 pulses, 100 µg/ml), 84.2±4.1% (9 pulses, 200 µg/ml), 81.1±4.1% (3 pulses, 600 µg/ml), 86±4% (2 pulses, 1000 µg/ml) and 88±5.4% (1 pulse, 2000 µg/ml). Cardiac output was moderately increased in all groups, whereas systemic arterial pressure was not significantly affected.

The areas between the curves (ABC) for changes in hemodynamic and gas-exchange parameters after inhalation of 15 µg TRE versus placebo were calculated for an observation time of 120 minutes (FIG. 11). The ABC for both PVR and PAP was comparable between all groups.

Pharmacokinetic results from study ii): Peak plasma concentrations of treprostinil were found 10-15 minutes after inhalation. Maximal treprostinil plasma concentrations ($C_{max}$) for the 30 µg, 60 µg, 90 µg and 120 µg doses were 0.65±0.28 ng/ml (n=4), 1.59±0.17 ng/ml (n=4), 1.74 ng/ml (n=1) and 3.51±1.04 ng/ml (n=2), respectively (mean±SEM; FIG. 12).

Discussion:

These studies investigated whether i) the acute effects of inhaled treprostinil would be comparable to or possibly advantageous over inhaled iloprost in pulmonary hypertensive patients, ii) the inhaled prostanoid dose might be increased without substantial local or systemic side effects, and iii) if the time of inhalation, which is 6-12 minutes for iloprost, could be reduced significantly by increasing the concentration of treprostinil aerosol.

The patient population in these studies included different forms of precapillary pulmonary hypertension. All these patients had a need for therapy of pulmonary hypertension and reflected the typical population of a pulmonary hyper-

UTC_PH-ILD_009795

DA0186

US 10,716,793 B2

17

tension center. No major differences in patient characteristics or hemodynamic baseline values existed between the different groups (table 3).

In study i) it was shown that the inhalation of treprostinil and iloprost in similar doses resulted in a comparable maximum pulmonary vasodilatory effect. However, marked differences in the response profile were noted. The onset of the pulmonary vasodilatory effect of inhaled treprostinil was delayed compared to iloprost, but lasted considerably longer, with the PVR decrease continuing beyond the one-hour observation period. Although the average dose of treprostinil was higher than the iloprost dose, no systemic effects were noted after treprostinil inhalation, whereas flush and transient SAP decrease, accompanied by more prominent cardiac output increase, occurred after iloprost inhalation. Such side effects were more prominent than in previous studies with inhaled iloprost. This may have been caused by the fact that the iloprost dose used in this study was 50% higher than the recommended single inhalation dose (5 μg) and that the preceding treprostinil inhalation may have added to the systemic side effects caused by the iloprost inhalation. Surprisingly, with TRE there was no such systemic side effect, although the average effect on PVR was as potent as with iloprost.

This study used a cross-over design in order to minimize the effects of inter-individual differences in response to prostanoids. The short observation period of 1 hour was used to avoid an uncomfortably long catheter investigation. As a study limitation, the short observation interval may have caused carryover effects of the first to the second period as suggested by FIG. 5. However, this still allowed for the interpretation of the study, that both drugs are potent pulmonary vasodilators and that treprostinil effects are significantly sustained compared to the iloprost effects.

The longer duration of action and the virtual absence of side effects (except the bitter taste of treprostinil aerosol, later attributed to metacresol) encouraged increasing the applied treprostinil dose in study ii). Observation time was extended to 3 hours to obtain precise pharmacodynamic data. Inhaled treprostinil resulted in a strong pulmonary vasodilation that outlasted the observation time of 3 hours when compared to placebo inhalation. Surprisingly, inhaled treprostinil was tolerated in doses up to 90 μg.

Study iii) successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 μg/ml treprostinil solution, thereby applying a dose of 15 μg.

18

This drug administration with a single breath induced pulmonary vasodilation for longer than 3 hours compared to placebo inhalation. Side effects were minor, of low frequency and not related to drug concentration. It was a surprising finding that such high concentrations of treprostinil were so well tolerated.

Conclusion:

Inhaled treprostinil can be applied in high doses (up to 90 μg) with a minimal inhalation time. Inhaled treprostinil exerts high pulmonary selectivity and leads to a long-lasting pulmonary vasodilation.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

1. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

2. The method of claim 1, wherein the inhalation device is a soft mist inhaler.

3. The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer.

4. The method of claim 1, wherein the inhalation device is a dry powder inhaler.

5. The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler.

6. The method of claim 4, wherein the formulation is a powder.

7. The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter.

8. The method of claim 1, wherein the formulation contains no metacresol.

* * * * *

UTC_PH-ILD_009796

# EXHIBIT 8



Deposition of:
## Lewis J. Rubin, M.D.

*September 15, 2021*

In the Matter of:

## United Therapeutics Corporation vs Liquidia Technologies Inc

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

**HIGHLY CONFIDENTIAL**

**LIQ_PH-ILD_00000668**

Page 1

1          HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.
2               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
3

     UNITED THERAPEUTICS    :
4    CORPORATION,           :  C.A. No. 20-755-RGA
               Plaintiff,   :
5                           :
               vs.          :
6    LIQUIDIA               :
     TECHNOLOGIES, INC.,    :
7          Defendant.       :
8
9               VIDEOTAPE DEPOSITION OF:
10               LEWIS J. RUBIN, M.D.
11               NEW YORK, NEW YORK
12            WEDNESDAY, SEPTEMBER 15, 2021
13
14
15
16
17
18
19
20
21
22
23
24    REPORTED BY:
      SILVIA P. WAGE, CCR, CRR, RPR
25    JOB NO. 4792048

```
                                          Page 2

 1       HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.

 2

 3

                                  SEPTEMBER 15, 2021

 4                                   9:10 a.m.

 5            Videotape deposition of LEWIS J. RUBIN,

 6       M.D., held at the offices of COOLEY LLP, 55

 7       Hudson Yards, 44th Floor Conference Room, New

 8       York, New York, pursuant to agreement before

 9       SILVIA P. WAGE, a Certified Shorthand Reporter,

10       Certified Realtime Reporter, Registered

11       Professional Reporter, and Notary Public for the

12       States of New Jersey, New York and Pennsylvania.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL       LIQ_PH-ILD_00000670

                                                        Page 3

 1        HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.
 2        A P P E A R A N C E S:
 3
          GOODWIN PROCTER LLP
 4        Attorneys for Plaintiff
          1900 N Street N.W.
 5        Washington D.C.  20036
          (202) 346-4216
 6        Wjackson@goodwinlaw.com
          Hgunn@goodwinlaw.com
 7        BY:  WILLIAM JACKSON, ESQ.
          BY:  HARRISON GUNN, ESQ.
 8
 9        COOLEY LLP
          Attorneys for Defendant
10        1299 Pennsylvania Avenue NW, Suite 700
          Washington, DC 20004
11        (202) 776-2982
          Ssukduang@cooley.com
12        Bcazakoff@cooley.com
          BY:  SANYA SUKDUANG, ESQ.
13        BY:  BRITTANY CAZAKOFF, ESQ.
14
          OSTRAGER CHONG FLAHERTY & BROITMAN P.C.
15        Attorneys for Deponent
          437 Madison Avenue
16        New York, New York
          (212) 681-0600
17        Gostrager@ocfblaw.com
          BY:  GLENN OSTRAGER, ESQ.
18
19        A L S O   P R E S E N T
20        CARLOS KING
          VIDEOGRAPHER
21
22
23
24
25

HIGHLY CONFIDENTIAL                DA0192                LIQ_PH-ILD_00000671

Page 7

1    HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D.

2              THE VIDEOGRAPHER:  Good morning.  We    09:08:17

3    are going on the record at 9:10 a.m. on            09:08:18

4    September 15, 2021.                                 09:08:23

5              Please note that the microphones are     09:08:26

6    sensitive and may pick up whispering, private      09:08:27

7    conversations and cellular interference.  Please   09:08:30

8    turn off all cell phones or place them away from   09:08:33

9    the microphones, as they can interfere with the    09:08:36

10   deposition audio.                                   09:08:38

11             Audio and video recording will           09:08:39

12   continue to take place unless all parties agree    09:08:40

13   to go off the record.                               09:08:42

14             This is Media Unit No. 1 of the video    09:08:44

15   recorded deposition of Mr. Lewis J. Rubin taken    09:08:47

16   by Counsel for Defendant in the matter of United   09:08:51

17   Therapeutics Corporation versus Liquidia           09:08:56

18   Technologies Inc., filed in the United States      09:08:59

19   District Court for the District of Delaware, Case  09:09:01

20   No. 20-755-RGA.                                     09:09:09

21             This deposition is being held at the     09:09:12

22   offices of Cooley LLP located at 55 Hudson Yards,  09:09:14

23   New York, New York.                                 09:09:18

24             My name is Carlos King from the firm     09:09:20

25   of Veritext and I'm the Videographer.  The Court   09:09:21

HIGHLY CONFIDENTIAL                    DA0193                    LIQ_PH-ILD_00000672

Page 8

| | | |
|---|---|---|
| 1 | HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D. | |
| 2 | Reporter is Silvia Wage also from Veritext.  I'm | 09:09:24 |
| 3 | not authorized to administer an oath.  I'm not | 09:09:26 |
| 4 | related to any party in this action.  Nor am I | 09:09:29 |
| 5 | financially interested in the outcome. | 09:09:31 |
| 6 | Counsel and all present in the room | 09:09:32 |
| 7 | and everyone attending remotely will now state | 09:09:35 |
| 8 | their appearance and affiliation for the record. | 09:09:37 |
| 9 | If there are any objections to the proceedings, | 09:09:39 |
| 10 | please state them at the time of your appearance | 09:09:42 |
| 11 | beginning with the noticing attorney. | 09:09:43 |
| 12 | MR. SUKDUANG:  Sanya Sukduang and | 09:09:46 |
| 13 | Brittany Cazakoff from Cooley LLP on behalf of | 09:09:48 |
| 14 | Defendant Liquidia. | 09:09:51 |
| 15 | MR. OSTRAGER:  Glenn Ostrager of the | 09:09:55 |
| 16 | firm of Ostrager Chong Flaherty & Broitman on | 09:09:56 |
| 17 | behalf of Dr. Rubin. | 09:09:57 |
| 18 | MR. JACKSON:  William Jackson and | 09:10:00 |
| 19 | Harrison Gunn from the law firm of Goodwin | 09:10:01 |
| 20 | Procter LLP on behalf of United Therapeutics. | 09:10:04 |
| 21 | THE VIDEOGRAPHER:  Can the Court | 09:10:08 |
| 22 | Reporter please swear in the witness. | 09:10:09 |
| 23 | LEWIS J. RUBIN, M.D., | 09:10:09 |
| 24 | ████████████████████████████ | 09:10:09 |
| 25 | ████, after having been duly sworn, was | 09:10:09 |

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 9

```
1         HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D.

2           examined and testified as follows:        09:10:16

3               THE STENOGRAPHER:  Thank you.          09:10:16

4               You may proceed.                       09:10:18

5    EXAMINATION BY MR. SUKDUANG:                      09:10:19

6           Q.  Good morning, Dr. Rubin.               09:10:19

7           A.  Good morning.                          09:10:19

8           Q.  My name is Sanya Sukduang.  And I'm    09:10:20

9    here to ask you some questions today regarding    09:10:23

10   some of the work you've done on pulmonary         09:10:26

11   arterial hypertension and treprostinil, okay?     09:10:30

12          A.  Sure.                                  09:10:33

13          Q.  I understand you've been deposed in    09:10:34

14   the past; is that correct?                        09:10:36

15          A.  Yes.                                   09:10:38

16          Q.  Okay.  It's probably been a while, so  09:10:38

17   I'm going to go a little bit of the ground rules  09:10:40

18   just to refresh everyone's memory.                09:10:44

19              So, as I said before, I'm here to ask  09:10:45

20   you questions and I ask that you answer them to   09:10:47

21   the best of your ability; is that okay?           09:10:50

22          A.  Sure.                                  09:10:52

23          Q.  If I ask you something and my          09:10:53

24   question is unclear or you don't understand what  09:10:54

25   I'm -- what I'm asking, please let me know and    09:10:58
```

HIGHLY CONFIDENTIAL                    DA0195                    LIQ_PH-ILD_00000674

Page 38

```
 1        HIGHLY CONFIDENTIAL - LEWIS J. RUBIN, M.D.

 2            A.  Yes.                              10:01:22

 3            Q.  Okay.  Under the umbrella of PH,  10:01:22

 4      pulmonary hypertension, other than PVH and PAH, 10:01:25

 5      are there any other manifestations that would 10:01:27

 6      fall under that umbrella?                   10:01:29

 7            A.  Well, I wouldn't say,             10:01:31

 8      "manifestations."  I would say etiologies or 10:01:34

 9      conditions, again, according to the         10:01:41

10      classification.                             10:01:45

11            So classification very simply is --   10:01:46

12      No. 1 is pulmonary arterial hypertension, PAH, 10:01:51

13      and then the subclassification lists a number of 10:01:54

14      different disease processes that cause PAH.  10:01:57

15            No. 2 is pulmonary hypertension due   10:02:03

16      to left heart disease and that, in general,  10:02:07

17      causes pulmonary venous hypertension, but it's 10:02:13

18      not the only cause of pulmonary venous       10:02:20

19      hypertension.  It's the most common but it's not 10:02:23

20      the only one.                               10:02:26

21            And then Group 3 is chronic lung      10:02:26

22      diseases that can cause pulmonary hypertension, 10:02:29

23      emphysema, pulmonary fibrosis, those sorts of 10:02:32

24      things, cystic fibrosis.                    10:02:38

25            Group 4 is chronic thromboembolic      10:02:41
```

HIGHLY CONFIDENTIAL                DA0196                LIQ_PH-ILD_00000675

Page 39

```
 1        HIGHLY CONFIDENTIAL -  LEWIS J. RUBIN, M.D.

 2        pulmonary hypertension.  So blood clots that are    10:02:44

 3        chronic that plug up the vasculature in the lungs    10:02:48

 4        and cause the back pressure to be elevated.          10:02:53

 5        That's intrinsic clots within the lungs.             10:03:00

 6               And Group 5 is a grab bag of                  10:03:04

 7        miscellaneous causes, less common diseases that      10:03:06

 8        can be associated with pulmonary hypertension.       10:03:14

 9        Cycle cell disease is one, sarcoidosis is            10:03:15

10        another.  There is a list of, you know,              10:03:20

11        relatively uncommon diseases that, you know, the     10:03:24

12        experts will see from time to time, but, you         10:03:27

13        know, that practitioners in the field it's worth     10:03:32

14        their, at least, having some awareness that can      10:03:37

15        be associated.                                       10:03:40

16             Q.  I want to turn to your discussion           10:03:46

17        about or your testimony regarding working on FDA     10:03:47

18        approved drugs for PAH.                              10:03:53

19             A.  Uh-huh.                                     10:03:55

20             Q.  Okay.  In your testimony, you               10:03:57

21        mentioned you worked on the first drug FDA           10:04:01

22        approved for PAH.                                    10:04:04

23               Do you recall that?                           10:04:06

24             A.  Yes.                                        10:04:07

25             Q.  What was that drug?                         10:04:07
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

# EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


--------------------------------

UNITED THERAPEUTICS CORPORATION, )

      Plaintiff,            )C.A. No. 23-975(RGA)

      v.                    )

LIQUIDIA TECHNOLOGIES, INC.,    )

--------------------------------

Washington, D.C.

Sunday, March 10, 2024


Deposition of STEVEN D. NATHAN, M.D., a

witness herein, called for examination by counsel

for the Defendant in the above-entitled matter,

pursuant to notice, the witness being duly sworn by

Barbara J. Moore, a Notary Public in and for the

District of Columbia, taken at the offices of

GOODWIN PROCTOR, LLP, 1900 N Street, NW,

Washington, D.C., at 9:00 a.m., and the proceedings

being taken down by Stenotype by BARBARA MOORE,

CRR, RMR, and transcribed under her direction.



Page 2

1  APPEARANCES:
2
3        On Behalf of the Plaintiff:
4        McDermott Will & Emery
5        BY: ARTHUR P. DYKHUIS, ESQ.
6        18565 Jamboree Road, Suite 250
7        Irvine, CA 92612-2565
8        949.989.8292
9        adykhuis@mwe.com
10
11       On behalf of the Defendant:
12       Cooley LLP
13       BY:  JONATHAN DAVIES, ESQ.
14       BRITTANY CAZAKOFF, ESQ.
15       SANYA SUKDUANG, ESQ.
16       GABRIEL FERRANTE, ESQ.
17       1299 Pennsylvania Avenue, NW
18       Suite 700
19       Washington, DC 20004
20       202.842-7889
21       Jdavies@cooley.com
22
23
24   Bradley Loy, Videographer
25

Page 3

1             TABLE OF CONTENTS
2   STEVEN D. NATHAN
3   By Attorney Davies              6
4   By Attorney Dykhuis            248
5   By Attorney Davies             254
6             EXHIBITS
7
8   EXHIBIT      DESCRIPTION          PAGE
9   Exhibit 1   Notice of Deposition       10
10  Exhibit 2   Declaration               11
11  Exhibit 3   Document Bates-stamped
                UTC_PH-IL_010830 to
12              -838TR:1}{P}
13  Exhibit 4   Document entitled Sildenafil   145
                Preserves Exercise Capacity in
14              Patients with Idiopathic
                Pulmonary Fibrosis and
15              Right-sided Ventricular
                Dysfunction
16
    Exhibit 5   Document entitled Riociguat for  153
17              Idiopathic Interstitial
                Pneumonia-Associated Pulmonary
18              Hypertension, (RISE-IIP): a
                Randomized Placebo-Controlled
19              Phase 2B Study
20  Exhibit 6   Document Bates-stamped    165
                UTC_PH-ILD_010487 through -0496
21
    Exhibit 7   Supplementary Appendix      166
22
23  Exhibit 8   Document Bates-stamped UTC   179
                PH-ILD-009772 through -796
24  Exhibit 9   Document Bates-stamped    189
                UTC_PH-ILD_005310
25

Page 4

1   EXHIBIT      DESCRIPTION          PAGE
2   Exhibit 10  Document Bates-stamped    196
                UTC_PH-ILD_9828
3
    Exhibit 11  Document Bates-stamped
4               UTC_PH-ILD_010790 through
                -829TR:1}{P}
5
    Exhibit 12  Document Bates-stamped    209
6               UTC_PH-ILD_010692 to -708
7   Exhibit 13  Document Bates-stamped    209
                UTC_PH-ILD_010744 through-758.
8
    Exhibit 14  Document Bates-stamped    210
9               UTC_PH-ILD_010727 through -742
10  Exhibit 15  Document Bates-stamped    216
                UTC_PH-ILD_009844 through -9852
11
    Exhibit 16  Document Bates-stamped    218
12              UTC_PH-ILD_009936 through
                -09943
13
    Exhibit 17  Document Bates-stamped    224
14              UTC_PH-ILD_010782 through -789
15  Exhibit 18  Document Bates-stamped    228
                UTC_PH-ILD_010599 through -610
16
    Exhibit 19  Document Bates-stamped    233
17              UTC_PH-ILD_010774 through -781
18
19
20
21
22
23
24
25

Page 5

1           P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are now on
3   the record.  This begins videotape
4   Number 1 in the deposition of Dr. Steven
5   Nathan in the matter of United
6   Therapeutics Corporation v. Liquidia
7   Technology in the District Court of
8   Delaware, Case No. 23-975.
9        Today is March 10, 2024.  The time
10  is 9:01.  This deposition is being taken
11  at 1900 N Street, NW, Washington, D.C.,
12  at the request of Cooley, LLC.
13       The videographer is Bradley Loy of
14  Magna Legal Services, and the court
15  reporter is Barbara Moore, Magna Legal
16  Services.
17       Would counsel please state their
18  appearances and who they represent.
19       ATTORNEY DAVIES:  Jonathan Davies
20  from Cooley for the defendant Liquidia,
21  and with me today are my colleagues,
22  Brittney Cazakoff and Sanya Sukduang.
23       ATTORNEY DYKHUIS:  Art Dykhuis
24  with McDermott Will & Emery for the
25  plaintiff and the witness, Liquidia



2  (Pages 2 to 5)

Page 6

1    Therapeutics. Also with me is Gabriel
2    Ferrante.
3    ************************
4            STEVEN D. NATHAN, M.D.,
5    having been called as a witness on behalf of the
6    Plaintiff and having been first duly sworn, was
7    examined and testified as follows:
8    EXAMINATION BY
9    ATTORNEY DAVIES:
10       Q.    Okay. Good morning, Dr. Nathan.
11   How are you?
12       A.    I'm good. How are you doing?
13       Q.    Could you state your address for the
14   record.
15       A.    ████████████████████████
16   ███████████ .
17       Q.    Have you been deposed before?
18       A.    Yes, I have.
19       Q.    About how many times?
20       A.    It's in my declaration, but I
21   believe it's three or four times.
22       Q.    So today you understand you're under
23   oath, and it's the same oath that you would be
24   under if you were testifying in court; correct?
25       A.    Yes.

Page 7

1        Q.    Okay. Today you're being recorded
2    both by video and also stenographically, so we ask
3    that you give verbal responses rather than just
4    head nods or hand gestures.
5            Does that make sense?
6        A.    Yes.
7        Q.    I'll try to be clear with my
8    questioning. If I'm not clear, you can ask me to
9    clarify my questions, but if you provide an answer,
10   I'll assume that you understood my questions.
11           Does that make sense?
12       A.    Sounds good.
13       Q.    Your counsel may object at various
14   times today, but you understand that you still need
15   to respond to my questions unless your counsel
16   instructs you not to answer?
17       A.    I understand.
18       Q.    Okay. I'll take breaks, as we
19   discussed, periodically. If you need a break, at
20   any time, the only thing I ask is that if there's a
21   pending question, you answer that question and we
22   can take a break, okay?
23       A.    I understand.
24       Q.    Is there any reason why you can't
25   provide truthful and accurate testimony today?

Page 8

1        A.    None.
2        Q.    When was the first time that you
3    were contacted by counsel for United Therapeutics
4    about assisting in this matter?
5        A.    It was sometime at the beginning of
6    February.
7        Q.    February of this year?
8        A.    2024, yes.
9        Q.    And who contacted you?
10       A.    I think it was a gentleman by the
11   name of Adam Horowitz.
12       Q.    When did you begin working on the
13   declaration that you submitted in this case?
14       A.    It was also sometime around the
15   beginning of February.
16       Q.    First week of February, do you
17   think?
18       A.    Approximately.
19       Q.    And in preparing your declaration,
20   what attorneys did you work with?
21       A.    I worked with a bunch of different
22   attorneys, some of whom are sitting here today, and
23   the others I'm sure were involved as well.
24       Q.    Did you work with Mr. Dykhuis on the
25   case?

Page 9

1        A.    You know, I'm not sure if he was
2    part of helping with the declaration, but I suspect
3    he did.
4        Q.    How generally was your declaration
5    in this case prepared?
6            ATTORNEY DYKHUIS: Object to form
7        and also just caution you, Dr. Nathan,
8        don't divulge of substance of any
9        communications with counsel, but you can
10       describe generally.
11           THE WITNESS: It was a -- the
12       declaration was formulated by myself
13       together with assistance of the counsel.
14   BY ATTORNEY DAVIES:
15       Q.    Do you recall any of the names of
16   the counsel that assisted with the preparation?
17           ATTORNEY DYKHUIS: Object to form.
18           THE WITNESS: There were a number
19       of people on the email chain, and I'm not
20       sure who exactly assisted. It seems like
21       it was a combined effort on the part of
22       counsel.
23   BY ATTORNEY DAVIES:
24       Q.    Did you have any in-person meetings
25   to prepare your declaration?



3 (Pages 6 to 9)

| Page 10 | Page 11 |
|---|---|

**Page 10**

```
1      A.    No.
2      Q.    Did you draft any portions of your
3  declaration?
4           ATTORNEY DYKHUIS:  Object to form.
5           THE WITNESS:  Yes, I did.
6  BY ATTORNEY DAVIES:
7      Q.    Do you recall, sitting here today,
8  which portions you drafted?
9      A.    Most -- or if not all of the medical
10 stuff is what I wrote, primarily.
11          (Exhibit 1 was marked for
12          identification.)
13     Q.    Dr. Nathan, I've marked as Exhibit 1
14 a deposition notice entitled Defendant Liquidia,
15 Inc.'s Notice of Deposition of Steven D. Nathan.
16 I'm going to pass that to you.  I just ask you
17 because of the weird shape of the table, would you
18 mind passing one copy to counsel all the way
19 around?
20     A.    Sure.
21     Q.    Thank you very much.
22          Doctor, you should keep the copy with the
23 yellow stickers on it, if that makes sense.
24     A.    Yes.
25     Q.    And you understand that you're here
```

**Page 11**

```
1  today testifying in a case between United
2  Therapeutics and Liquidia in which you submitted a
3  declaration; correct?
4      A.    Yes.
5           (Exhibit 2 was marked for
6           identification.)
7      Q.    So I've marked as Exhibit 2 a
8  document titled "Declaration of Steven D. Nathan,
9  M.D, in support of Plaintiff's motion for
10 preliminary injunction."
11          And, again, I'm going to pass to you one
12 extra copy if you can pass that to Mr. Dykhuis,
13 please.
14          And Dr. Nathan, is Exhibit 2 that I just
15 passed you, is that the copy of the declaration
16 that you submitted in this case?
17     A.    I just want to check to see what
18 else is in there.
19          Yes, it is.
20     Q.    This copy that I passed you to
21 includes Attachments A, B, and C; correct?  And
22 they begin after page 90 of your declaration.
23     A.    Attachment A?  After 90?  This is C
24 at the end.  I don't dispute it.
25     Q.    Does this appear to be a complete
```

| Page 12 | Page 13 |
|---|---|

**Page 12**

```
1  copy of the report that you submitted in this case?
2      A.    It does appears to be it.
3      Q.    Could you turn to what would be
4  page 90.  It's the last page of your report before
5  the attachments.
6      A.    (Witness complies with request.)
7  Yes.
8      Q.    And that's your signature on
9  page 90?
10     A.    Yes, it is.
11     Q.    And it's dated February 26, 2024?
12     A.    Yes.
13     Q.    With respect to this declaration,
14 are there any mistakes or errors in this
15 declaration that you're aware of sitting here
16 today?
17     A.    There must be one or two typos that
18 I saw subsequently.  For example, an "and" instead
19 of "an" and one of the footnotes there's also a
20 typo.
21     Q.    Could you point me to the footnote
22 that's a typo.
23     A.    Oh, gosh.  Give me a minute.  Okay.
24 Sorry it's taking a while.  I have a lot of
25 documents to go through.
```

**Page 13**

```
1           I didn't see it in the first run.  If I
2  may, may I ask counsel to point me to where there's
3  that footnote?  Would that be okay, or do I have to
4  keep looking?
5      Q.    I would not object to asking your
6  counsel which one it is.
7           ATTORNEY DYKHUIS:  I think you
8      might be thinking of Paragraph 119.
9           (Pause)
10          THE WITNESS:  So that's page 43
11     you're talking about?
12 BY ATTORNEY DAVIES:
13     Q.    Do you believe the error is in
14 either footnotes 99, 100, or 101 on page 43,
15 Doctor?
16     A.    No, I think it's another footnote.
17     Q.    Okay.
18     A.    I apologize.
19     Q.    Do you recall the nature of the
20 error, Dr. Nathan?
21     A.    It was just really a minor error --
22     Q.    Okay.
23     A.    -- that just had an incorrect
24 reference to what the subject matter was.  It
25 wasn't really pertinent to anything, really.  And
```

**MAGNA** ▶
**LEGAL SERVICES**

4 (Pages 10 to 13)

Page 14

1  I'm not sure if we go through this if I might come
2  across it as we go through.
3      Q.    So other than an "and" rather than
4  and "an" and a minor footnote -- a minor typo in a
5  footnote, are there any other errors or typos that
6  you're aware of in your report today?
7      A.    None that I'm aware of.
8      Q.    Okay.  Can you go to Attachment B of
9  your declaration, Exhibit 2.
10     A.    (Witness complies with request.)
11     Q.    Just let me know once you're there.
12     A.    Attachment B is one page, and I see
13 here that I had said four.  I might be mistaken.
14 There might have been one many, many years ago that
15 wasn't picked up.  I apologize if that is an
16 oversight on my part.
17     Q.    The one many, many years ago, was
18 that a -- did you act as an expert in that case
19 many, many years ago?
20     A.    I believe so, yes.
21     Q.    Okay.  Did that case concern
22 pulmonary hypertension?
23     A.    I don't recall the details of the
24 case.
25     Q.    Do you recall if that was a patent

Page 15

1  litigation case?
2      A.    It was not a patent litigation case.
3      Q.    Okay.  What type of case was it,
4  generally?
5      A.    It was an medicolegal case.
6      Q.    Like a med malpractice?
7      A.    Yes.
8      Q.    In the Genentech v. Aurobindo Pharma
9  case, that's the first one in your prior testimony,
10 did you author an expert report in that case?
11     A.    I believe I did, yes.
12     Q.    Were you deposed in that case?
13     A.    As I recall, I was.
14     Q.    Did you testify at trial in that
15 case?
16     A.    That I did, yes.
17     Q.    And I'm not asking for confidential
18 information, but can you tell me generally what the
19 subject matter of your testimony in that case?
20     A.    It was regarding the validity of the
21 patent over which the companies were having -- were
22 contesting.
23     Q.    And which of the parties were you
24 consulting with?
25     A.    I was consulting on behalf of

Page 16

1  Genentech.
2      Q.    So on behalf of the patentee?
3      A.    That's correct.
4      ATTORNEY DYKHUIS:  Object to form.
5      Q.    Do you remember generally the
6  subject matter of the patent at issue in that case?
7      A.    I do.
8      Q.    And what was it?
9      A.    There were two clauses pertaining to
10 checking liver function tests and another clause
11 pertaining to drug-drug interactions.
12     Q.    Is the Christopher -- the next case
13 on your list, the Christopher Mee versus Robertson
14 [sic], is that a medical malpractice case?
15     ATTORNEY DYKHUIS:  Object to the
16        form.
17     THE WITNESS:  It is.
18 BY ATTORNEY DAVIES:
19     Q.    And the Washington verus American
20 Homes, what type of case was that?
21     A.    I don't recall exactly the details
22 of that.  It might have been, but I'm not sure,
23 just by judging by the names, there was one case I
24 was involved in where the -- I guess it would be
25 the plaintiff had some exposure to chlorine.  And

Page 17

1  just by virtue of the names here, it might have
2  been that one, but I'm not certain.
3      Q.    So other than the four cases that
4  we've talked about, any other cases that you've
5  testified either by deposition or at trial that you
6  can recall sitting here today?
7      ATTORNEY DYKHUIS:  Object to form.
8      THE WITNESS:  As I mentioned,
9        there might have been another one way
10       back, and I just don't remember the
11       details of that.  It wasn't patent
12       litigation.  It was not medical
13       malpractice.
14 BY ATTORNEY DAVIES:
15     Q.    Okay.  Can you go, Doctor, to
16 Exhibit A, please.  I'm sorry, Attachment A of your
17 declaration.  Apologies.
18     A.    Attachment A looks like my CV.
19     Q.    Is this the most current copy of
20 your CV?
21     A.    I keep my CV updated as publications
22 and talks come out.  So my CV is updated, can be
23 weekly, depending on what's going on.  There
24 haven't been substantive changes to my CV.
25     Q.    Did you update this CV after being

5 (Pages 14 to 17)

Page 18

```
 1   contacted by counsel for United Therapeutics in
 2   this case?
 3              ATTORNEY DYKHUIS:  Object to form.
 4              THE WITNESS:  As I say, I'm
 5          constantly updating it depending on what
 6          I'm doing.  And so whenever I'm contacted
 7          to forward my CV, I forward the most
 8          recent copy of it.
 9      BY ATTORNEY DAVIES:
10      Q.    Do you recall, sitting here today,
11   whether you updated it after being contacted by
12   counsel for UTC regarding work in this case?
13              ATTORNEY DYKHUIS:  Object to form.
14              THE WITNESS:  Yes, I do, because I
15          know that I've had papers accepted or
16          published.  When I have a paper accepted
17          or published, I'll go back to my CV and
18          update it.
19      BY ATTORNEY DAVIES:
20      Q.    This CV was updated in -- on
21   January 17 of 2024.  Is that right?
22      A.    That's the date on the CV.
23      Q.    Okay.
24      A.    So that was -- whenever I was
25   contacted, that was the last time I updated it, so
```

Page 19

```
 1   this is the most current iteration of my CV when I
 2   was asked for it.
 3      Q.    So United Therapeutics would have
 4   contacted you before February 17, 2024?
 5              ATTORNEY DYKHUIS:  Object to form.
 6              THE WITNESS:  Regarding this case
 7          do you mean?
 8      BY ATTORNEY DAVIES:
 9      Q.    Correct, yes.
10      A.    I don't recall being contacted
11   previously by United Therapeutics.
12      Q.    I apologize.  I may have misheard
13   your prior testimony, but I thought you said that
14   you had updated this after being contacted by
15   counsel for United Therapeutics.
16              ATTORNEY DYKHUIS:  Object to form.
17      BY ATTORNEY DAVIES:
18      Q.    For this case.
19      A.    No.
20      Q.    You did not.
21      A.    I got contacted, to the best of my
22   knowledge, at the beginning of February,
23   Dr. Nathan, please send us your CV.  I got back and
24   I sent my CV.  The last time I updated was on 1/17.
25   So there might have been a two-week window where I
```

Page 20

```
 1   had nothing to input to update it.
 2      Q.    Understood.  Thank you.
 3          Can you go to page 2, please, Dr. Nathan.
 4      A.    I'm on page 2.
 5      Q.    And it describes your postgraduate
 6   education at the top of the CV.  Is that correct?
 7      A.    That's correct.
 8      Q.    Can you describe what you consider
 9   to be your areas of specialty with regard to
10   medical practice?
11              ATTORNEY DYKHUIS:  Object to form.
12              THE WITNESS:  My areas of
13          specialty would be pulmonary and critical
14          as well as lung transplantation with
15          subsequent initial expertise in
16          interstitial lung disease, pulmonary
17          hypertension, in other 25 of advanced
18          lung disease.
19      BY ATTORNEY DAVIES:
20      Q.    Doctor, I think you said "with
21   subsequent initial expertise in interstitial lung
22   disease and pulmonary hypertension."
23      A.    Additional.
24      Q.    Subsequent additional expertise.
25   Was that your testimony?
```

Page 21

```
 1      A.    Correct.
 2      Q.    Okay.
 3      A.    There's no formal training for
 4   those, but those are areas that I've gravitated
 5   towards.
 6      Q.    And when did you gain this
 7   subsequent additional expertise in interstitial
 8   lung disease and pulmonary hypertension?
 9      A.    It's accrued over the years.
10   There's no formal training for interstitial lung
11   disease and pulmonary hypertension, at least that
12   wasn't in my day.
13          But I've been involved in pulmonary
14   hypertension since my fellowship at Cedar Sinai,
15   which was the referral center for patients with
16   primary pulmonary hypertension at that time.  So
17   I've been seeing patients with pulmonary
18   hypertension since the start of my fellowship,
19   which was in 1988, if not before.  I did see some
20   cases as well as a resident.
21      Q.    Are you currently employed?
22      A.    Yes, I am.
23      Q.    And where are you currently
24   employed?
25      A.    I'm employed at Inova Fairfax
```

**MAGNA** ◗
LEGAL SERVICES

6 (Pages 18 to 21)

Page 22

1  Hospital.
2      Q.    And what is your position at Inova?
3      A.    I'm the medical director of the
4  advanced lung disease and lung transplant program.
5      Q.    In your CV it identifies a medical
6  director position at Inova Fairfax that began in
7  May 2018.
8      Do you see that?
9      A.    Yes.
10     Q.    Okay.  And then it says "inactive."
11     A.    Yes.
12     Q.    What does "inactive" mean in your
13 CV?
14     A.    Inova has gone through various
15 iterations of how they want to organize pulmonary.
16 And initially the pulmonary service line asked us
17 to direct, to reorganize.  And so the service line
18 concept went away.
19     Q.    Do you have any academic positions
20 other than your employment at Inova Fairfax?
21     A.    I have an employment as professor of
22 medical education at University of Virginia.
23     Q.    Any other academic appointments?
24     A.    Not at this time.
25     Q.    Any other employers other than Inova

Page 23

1  Fairfax currently?
2      A.    No.
3      Q.    It also has a position as a
4  professor of medical education at the University of
5  Virginia.  Are you still involved with that?
6      A.    Yeah, that's the appointment that I
7  just mentioned.
8      Q.    Okay.  There is also a professional
9  professor of medicine position at Virginia
10 Commonwealth University.
11     A.    Yes.
12     Q.    Are they two positions, or are they
13 the same thing?
14     A.    That probably should read as ended,
15 because what happened was that Inova has
16 affiliations with VCU Medical School, and at that
17 time I was professor of medicine at VCU.  And then
18 they changed their medical school affiliation to
19 UVA, and that's when I got the subsequent
20 appointment.
21     So effectively -- and I apologize, it's
22 very hard to keep everything up to date -- that
23 that should have ended at the same time that the
24 UVA appointment started.
25     Q.    My CV is about four pages long, and

Page 24

1  I don't even keep that accurate so I have no
2  doubt that it's more difficult for you to do so.
3      In your current position at Inova, can you
4  describe to me generally your responsibilities in
5  that position.
6      A.    I oversee the advanced lung disease
7  and lung transplant program.  In the context of
8  their advanced lung disease program, we had various
9  other programs, including a pulmonary hypertension
10 program, which is accredited by the Pulmonary
11 Hypertension Association as one of the care
12 centers.
13     We have an interstitial lung disease
14 program that's accredited by the Pulmonary Fibrosis
15 Foundation.  We have a cystic fibrosis program
16 that's accredited by the CF Foundation, and we have
17 a comprehension saccharidosis program, that's
18 accredited by the World's Association for
19 Saccharidosis and Other Granulomatous Diseases.
20     Q.    Do you still -- maybe I used the
21 wrong word there.
22     Do you still see patients in the clinic?
23     A.    Yes, I do.
24     Q.    Okay.  And how many days a week are
25 you working in the clinic seeing patients?

Page 25

1      A.    I work -- I work 10 and a half days
2  in the clinic seeing patients, but then sometimes
3  I'll add patients on if they need to be seen on an
4  emergency or I want to squeeze them in, I might see
5  them on a day that I'm not in the clinic.
6      Q.    And is that split with your clinical
7  practice, has that been true since about 2018?
8      ATTORNEY DYKHUIS:  Object to form.
9      THE WITNESS:  That's approximately
10 correct.  I don't remember exactly when I
11 went to 2.5 or what effectively works out
12 at a .5 clinical FD.  I don't recall
13 exactly when that was.
14 BY ATTORNEY DAVIES:
15     Q.    How many pulmonary hypertension
16 patients are currently under your care?
17     A.    Since it follows, in the range of
18 about 400 to 500 patients with group 1 pulmonary
19 arterial hypertension.  And then we have
20 approximately 11 to 1200 patients with interstitial
21 lung disease, many of whom have pulmonary
22 hypertension associated with interstitial lung
23 disease.
24     There are a number of providers, but I see
25 a good proportion of patients with pulmonary

MAGNA ●
LEGAL SERVICES

7 (Pages 22 to 25)

Page 26

```
1   arterial hypertension, patients with interstitial
2   lung disease and patient with IOVPH.
3       Q.    Can you go to page 5 of your CV.
4       A.    (Witness complies with request.)
5   I'm on page 5.
6       Q.    And it looks like it actually begins
7   on page 4, there's a heading entitled "Committees."
8       Do you see that?
9       A.    Yes.
10      Q.    And it appears to include your
11  membership on steering committees for various
12  clinical studies.  Is that correct?
13      A.    That's correct.
14      Q.    If you go to the top of page 5,
15  there's a study, the very first one, 2016 to 2021,
16  steering committee member of phase 2B study of
17  Sildenafil added to pirfenidone in advanced IPF in
18  an immediate or high probability of Group 3 PH.
19      Do you see that?
20      A.    I do.
21      Q.    Do you recall the study name?
22      A.    There was an acronym that went with
23  it.  I don't recall what that acronym was.
24      Q.    Was there a publication that issued
25  from that study?
```

Page 27

```
1           ATTORNEY DYKHUIS:  Object to form.
2           THE WITNESS:  Yes, it was.  I
3   believe it was published in the Advanced
4   Respiratory Medicine.
5   BY ATTORNEY DAVIES:
6       Q.    Were you one of the authors on that
7   paper?
8       A.    As I recall, I was the second author
9   on that paper.
10      Q.    Do you recall generally the outcome
11  of that study?
12      A.    The study was a negative study.
13      Q.    In what sense was it a negative
14  study?
15      A.    It didn't meet its primary endpoint.
16      Q.    What was the primary endpoint?
17      A.    As I recall, it was time to clinical
18  worsening.
19          (Reporter clarification)
20      Q.    Were there any other primary
21  endpoints?
22          ATTORNEY DYKHUIS:  Object to form.
23          THE WITNESS:  There were -- not at
24  the primary endpoints.  Typically in the
25  studies you only have one primary
```

Page 28

```
1           endpoint.  On rare occasions there could
2           be two primary endpoints.
3   BY ATTORNEY DAVIES:
4       Q.    If you go down -- I'll find it.  If
5   you go down to the next -- I'm sorry.
6       If you go down to the next entry, there's a
7   steering committee member for RIN PH 201, the
8   INCREASE study.
9       Do you see that?
10      A.    I do.
11      Q.    Okay.  When was the steering
12  committee formed for INCREASE?
13      A.    Based on my CV, it appeared that it
14  was in 2016.
15      Q.    So that indicates the beginning of
16  your involvement as a steering committee member?
17          ATTORNEY DYKHUIS:  Object to form.
18          THE WITNESS:  Based on my CV, I
19  believe that would be correct.
20  BY ATTORNEY DAVIES:
21      Q.    Who else was a member of the
22  steering committee for INCREASE?
23      A.    There were two other members:
24  Dr. Aaron Waxman and Dr. Richard Tapson.
25      Q.    Can you repeat the second member of
```

Page 29

```
1   the steering committee for INCREASE, Doctor.
2       A.    Victor Tapson.
3       Q.    Victor Tapson?
4       A.    Yes.
5       Q.    What was the responsibility of the
6   steering committee with respect to the design of
7   the INCREASE?
8           ATTORNEY DYKHUIS:  Object to form.
9           THE WITNESS:  We were all involved
10  in coming up with the design in terms of
11  inclusion, exclusionary criteria, and
12  endpoints, as I best recall.
13  BY ATTORNEY DAVIES:
14      Q.    What was your contribution, in your
15  view, to the design of the INCREASE study?
16      A.    I don't remember my individual
17  contribution.  We're talking, I guess, nine years
18  ago now.  I'm sure that I had some kind of
19  contribution, and at the end of the day it was a
20  consensus in terms of how the study was designed.
21      Q.    Other than the three steering
22  committee members, did anyone else have involvement
23  in the study design of the INCREASE study?
24          ATTORNEY DYKHUIS:  Object to form.
25          THE WITNESS:  Yes, there were.
```



8 (Pages 26 to 29)

Page 30

```
 1        There were representatives from United
 2     Therapeutics.  It was their study, and
 3     Peter Smith was one of them.  C.Q. Quinn,
 4     who was the biostatistician, was also
 5     involved in terms of figuring out how
 6     we're going to analyze the data
 7     statistically.
 8     BY ATTORNEY DAVIES:
 9        Q.    Anyone else you recall?
10        A.    I don't remember.  I made a mistake.
11     I said nine years ago.  My math was incorrect.
12     It's eight years ago.
13        Q.    No problem.  We all get grades today
14     because we lost an hour last night.
15        A.    We lost what?
16        Q.    We lost an hour last night.
17        A.    I thought you were going to say that
18     you were a Duke fan.
19        Q.    Do you recall anything about
20     Dr. Aaron Waxman's contribution to the design of
21     the INCREASE study?
22        A.    I do not.
23        Q.    Do you recall anything about
24     Dr. Victor Tapson's contribution to the design of
25     the INCREASE study?
```

Page 31

```
 1        A.    I do not.  As I said, we've all
 2     contributed in our own way, and then the study
 3     design ultimately was a consensus against everyone,
 4     including the folks from United Therapeutics.
 5        Q.    Okay.  There's no end date for the
 6     steering committee membership for the INCREASE
 7     study in your CV.  Is that steering committee still
 8     active?
 9        A.    We don't meet as a steering
10     committee.  However, where there is activity are
11     various post hoc analyses of the INCREASE study
12     which remain ongoing, and that's probably the
13     reason that I haven't closed it out.
14        Q.    Are there any current post hoc
15     analyses of INCREASE that are ongoing?
16              ATTORNEY DYKHUIS:  Object to form.
17              THE WITNESS:  Yes, they there.
18     BY ATTORNEY DAVIES:
19        Q.    And what are they?
20        A.    We've done numerous post hoc
21     analyses.  There's one paper that's in submission
22     about treating patients with more mild pulmonary
23     hypertension as the subject of analysis.
24        There is another paper being developed
25     pertaining to a risk score in terms of the patients
```

Page 32

```
 1     who were enrolled in the INCREASE study.
 2        Q.    You said it's corresponding to a
 3     risk score?
 4        A.    Risk score.  Risk stratify the
 5     patients who have pulmonary hypertension who were
 6     in the study.
 7        Q.    Are there any post hoc analyses
 8     concerning FVC?
 9        A.    There was one that was published in
10     Advanced Respiratory Medicine.
11        Q.    Are you an author on that paper?
12        A.    Yes.
13        Q.    Why was there a post hoc analysis of
14     the INCREASE study done with respect to FVC?
15              ATTORNEY DYKHUIS:  Object to form.
16              THE WITNESS:  The FVC looked at --
17        at baseline and then at the end of the
18        study, and what we saw appeared to be a
19        difference favoring inhaled treprostinil
20        in terms of preservation of the FVC in
21        comparison to the placebo arm, and that
22        was the basis for the post hoc analysis.
23     BY ATTORNEY DAVIES:
24        Q.    So with respect to the initial
25     INCREASE study, you said you saw what appeared to
```

Page 33

```
 1     be a difference; is that correct?
 2              ATTORNEY DYKHUIS:  Object to form.
 3              THE WITNESS:  Correct.
 4     BY ATTORNEY DAVIES:
 5        Q.    Was in your opinion -- with the
 6     initial analysis of INCREASE, was there a
 7     statistically significant difference in FVC with
 8     inhaled treprostinil treatment?
 9              ATTORNEY DYKHUIS:  Object to form.
10              THE WITNESS:  As best I recall,
11        there was based on percent predicted, but
12        not absolute in terms of milliliters.
13        However, those became significant when we
14        looked at various subgroups, including
15        those patients with idiopathic
16        interstitial pneumonia and a further
17        subgroup of those patients, the patients
18        with idiopathic pulmonary fibrosis.
19     BY ATTORNEY DAVIES:
20        Q.    So at least with the initial
21     INCREASE study, there was not a significant
22     difference in FVC with treprostinil treatment
23     across all patients; correct?
24              ATTORNEY DYKHUIS:  Object to form.
25              THE WITNESS:  There was.  There
```



9  (Pages 30 to 33)

Page 34

1    are two ways you can look at the FVC.
2    You can look at the absolute number,
3    which is how many ccs or milliliters, or
4    you can look at it as a percent
5    predicted, and there was a statistical
6    difference when you looked at it based on
7    percent predicted.
8    BY ATTORNEY DAVIES:
9    Q.    Which of those two measures or
10   analyses do you feel is more accurate?
11          ATTORNEY DYKHUIS:  Object to form.
12          THE WITNESS:  They are both
13          accurate.  They just tell you different
14          ways of looking at the FVC.
15   BY ATTORNEY DAVIES:
16   Q.    What's the significance to you as a
17   clinician where one method produces a statistically
18   significant difference and the other does not?
19          ATTORNEY DYKHUIS:  Object to form.
20          THE WITNESS:  It really doesn't
21          make a difference to me how I look at the
22          data, to be quite honest.
23   BY ATTORNEY DAVIES:
24   Q.    What do you mean, it doesn't make a
25   difference to you how you look at the data?

Page 35

1    A.    I look at the compendium of the
2    data.  One is positive, one is negative.  I
3    wouldn't say "negative."  It probably was a trend;
4    I don't remember what the P value was.  But the
5    study wasn't powered to look at the FVC.
6          So it's an interesting observation that
7    remained to be further validated and that is
8    currently ongoing.
9    Q.    Was the post hoc analysis powered to
10   look at FVC?
11          ATTORNEY DYKHUIS:  Object to the
12          form.
13          THE WITNESS:  No, you can't power
14          a study retrospectively.
15   BY ATTORNEY DAVIES:
16   Q.    Why -- whose decision was it to do
17   the post hoc analysis for FVC?
18          ATTORNEY DYKHUIS:  Object to form.
19          THE WITNESS:  It was an easy group
20          decision, because we saw the signal when
21          we looked at the FVC, and it was somewhat
22          surprising and unexpected.
23          FVC was initially looked at as a
24          safety measure.  We're giving a
25          medication by the inhaled drug to

Page 36

1    patients who had interstitial lung
2    disease, and we didn't know if we would
3    be hurting these patients because they
4    are very different from Group 1 PAH
5    patients that have parenchymal lung
6    disease and getting anything inhaled is
7    the possibility you could harm them.  And
8    that was why it was labeled as a safety
9    endpoint.
10   BY ATTORNEY DAVIES:
11   Q.    Sitting here today, are you
12   confident that administration of inhaled
13   treprostinil produced a statistically significant
14   improvement in FVC in the INCREASE study?
15          ATTORNEY DYKHUIS:  Object to form.
16          THE WITNESS:  If you look at
17          percent predicted, I'd have to go to the
18          paper, if you have it, just to make sure
19          what I'm saying is the truth.  But as
20          best I recall, there was a statistically
21          significant difference.  So I'm confident
22          with that.
23          I would need to look at the paper
24          to make sure that what I'm telling you is
25          correct, but that's the best of my

Page 37

1    recollection.  So I'm confident in the
2    analyses that were done in the post hoc
3    analysis.
4    BY ATTORNEY DAVIES:
5    Q.    And what about the initial analyses
6    in the absence of the post hoc analyses?  In your
7    opinion, does that support a statistically
8    significant improvement in FVC, or was it uncertain
9    with the initial analysis?
10          ATTORNEY DYKHUIS:  Object to form.
11          THE WITNESS:  I believe the
12          initial analysis showed the same thing.
13          It's just that in the post hoc analysis
14          we dug deeper into it, and that's when we
15          did the subgroup analyses.
16   BY ATTORNEY DAVIES:
17   Q.    So to the best of your recollection,
18   with respect to FVC, INCREASE showed a significant
19   difference in percent predicted.  Is that correct?
20          ATTORNEY DYKHUIS:  Object to form.
21          THE WITNESS:  In favor of inhaled
22          treprostinil versus placebo.
23   BY ATTORNEY DAVIES:
24   Q.    Is that correct?
25   A.    Correct.



10  (Pages 34 to 37)

Page 38

1    Q.    But with respect to absolute
2 improvements in FVC, there was not a significant
3 difference following treatment with inhaled
4 treprostinil in the INCREASE study; correct?
5              ATTORNEY DYKHUIS:  Object to form.
6              THE WITNESS:  I wouldn't regard it
7         as improvement.  I believe that's what
8         you said.  It was placebo-corrected
9         difference.
10   BY ATTORNEY DAVIES:
11   Q.    So there was not a significant
12 difference in absolute FVC in the INCREASE study;
13 correct?
14             ATTORNEY DYKHUIS:  Object to form.
15             THE WITNESS:  That's to the best
16         of my recollection.
17   BY ATTORNEY DAVIES:
18   Q.    Okay.
19   A.    For the patients as a whole, but for
20 the subgroups it was.
21   Q.    When was the -- when was the
22 post hoc analysis on FVC, when was that started?
23             ATTORNEY DYKHUIS:  Object to form.
24             THE WITNESS:  I don't recall the
25         exact date.  I think that it was probably

Page 39

1         2021 sometime, early 2021, but I don't
2         recall the exact date.  Sorry.
3  BY ATTORNEY DAVIES:
4     Q.    No problem.
5     You mentioned that the INCREASE study was
6 designed by a consensus of the five committee
7 members that you can recall; correct?
8              ATTORNEY DYKHUIS:  Objection to
9         form.
10            THE WITNESS:  It was the three
11        steering committee members and the
12        sponsor.
13 BY ATTORNEY DAVIES:
14    Q.    Okay.  And the protocol for INCREASE
15 was designed as a consensus of the three committee
16 members; is that correct?
17            ATTORNEY DYKHUIS:  Object to form.
18            THE WITNESS:  Together with the
19        sponsor.
20 BY ATTORNEY DAVIES:
21    Q.    Okay.  Do you remember any input
22 that the sponsor offered UTC -- strike that.  Let
23 me start over.
24    Can you recall sitting here today
25 any specific -- let me try it one more time.

Page 40

1    Sitting here today, can you recall any
2 specific input or contribution of United
3 Therapeutics's representatives to the design of the
4 INCREASE study?
5              ATTORNEY DYKHUIS:  Objection to
6         form.
7              THE WITNESS:  They had a
8         substantial contribution.  The way it
9         worked is that we were sent a cursory
10        protocol, and then we provided input in
11        terms of, you know, maybe think about
12        this, maybe think about that, but they
13        really provided the foundation for the
14        study.
15   BY ATTORNEY DAVIES:
16   Q.    Do you recall sitting here today any
17 belief by the study members -- strike that.
18   Do you recall sitting here today any belief
19 by the steering committee members that the study
20 would not be successful?
21             ATTORNEY DYKHUIS:  Object to the
22        form.
23             THE WITNESS:  Yes.  I had my
24        doubts that it would be successful for
25        sure.

Page 41

1  BY ATTORNEY DAVIES:
2     Q.    Why did you believe it would not --
3  well, why did you have doubts regarding the success
4  of the study?
5     A.    Because it had been no prior
6  randomized controlled study in PH-ILD demonstrating
7  success, and personally I had just come off being
8  the chair of the steering committee of the RISE IP
9  study, which was riociguat for the same indication,
10 PH-ILD, and not only was that a negative study, but
11 it was a harmful study.
12    Q.    Do you recall Dr. Waxman expressing
13 any belief that the study would not be successful?
14             ATTORNEY DYKHUIS:  Objection,
15        form.
16             THE WITNESS:  I don't recall that.
17 BY ATTORNEY DAVIES:
18    Q.    Okay.  Do you recall Dr. Victor
19 Tapson expressing any belief that the study would
20 not be successful?
21             ATTORNEY DYKHUIS:  Object to the
22        form.
23             THE WITNESS:  I don't recall that.
24 BY ATTORNEY DAVIES:
25    Q.    Okay.  Regarding your feelings about



11 (Pages 38 to 41)

Page 42

1 the study in your past experience from the RISE
2 study, why were you willing to be a member of the
3 steering committee, given your past experience with
4 RISE?
5     ATTORNEY DYKHUIS: Objection to
6     the form.
7     THE WITNESS: I was asked to be a
8     steering committee member, and I valued
9     the opportunity. And we have many
10     negative studies in medicine that have
11     subsequently been followed by positive
12     studies.
13     So I think the history of medicine
14     is such that if you have one negative
15     study, you don't necessarily give up. If
16     you look at another disease that I deal
17     with, idiopathic pulmonary fibrosis, for
18     which there are two anti-fibrotics that
19     are approved, there are about 10 RCTs,
20     randomized studies, prior to that before
21     those came back positive.
22     So, you know, if we just gave up
23     on all treatments, we wouldn't have
24     anything for cancer today.
25

Page 43

1 BY ATTORNEY DAVIES:
2   Q. So when during the development of
3 the INCREASE study did you become optimistic that
4 it would succeed?
5     ATTORNEY DYKHUIS: Object to the
6     form.
7     THE WITNESS: When I heard the
8     results.
9 BY ATTORNEY DAVIES:
10   Q. So until you heard the results of
11 the INCREASE study, you were not optimistic that
12 the study would succeed?
13     ATTORNEY DYKHUIS: Object to the
14     form.
15     THE WITNESS: I had my doubts.
16 BY ATTORNEY DAVIES:
17   Q. And when did you first hear the
18 results of the INCREASE study?
19     ATTORNEY DYKHUIS: Objection to
20     form.
21     THE WITNESS: It was sometime
22     towards the end of February of 2020.
23 BY ATTORNEY DAVIES:
24   Q. Do you recall who communicated those
25 results to you?

Page 44

1   A. Peter Smith.
2   Q. Who is Peter Smith?
3   A. He was one of the two UT members,
4 and he led the study from the sponsor standpoint
5 for United Therapeutics.
6   Q. Do you recall United Therapeutics
7 ever expressing any skepticism that the INCREASE
8 study would not be successful?
9     ATTORNEY DYKHUIS: Objection to
10     form.
11     THE WITNESS: No.
12 BY ATTORNEY DAVIES:
13   Q. The communication in February 2020
14 that you received from Peter Smith regarding the
15 data, was the study data locked at that point, or
16 what stage in data collection was ongoing at that
17 point?
18     ATTORNEY DYKHUIS: Objection to
19     form.
20     THE WITNESS: The study was
21     locked, and they had done the analysis of
22     the primary endpoint, and I believe at
23     that time some of the secondary endpoints
24     as well.
25

Page 45

1 BY ATTORNEY DAVIES:
2   Q. So by the time you got -- you heard
3 the results from Peter Smith, the study had been
4 locked and there had been analysis on both the
5 primary and secondary endpoints as well; correct?
6     ATTORNEY DYKHUIS: Objection to
7     form.
8     THE WITNESS: As best I recall.
9 BY ATTORNEY DAVIES:
10   Q. And this was the first time that you
11 were optimistic that the study would be successful;
12 correct?
13     ATTORNEY DYKHUIS: Objection to
14     form.
15     THE WITNESS: That's correct.
16 BY ATTORNEY DAVIES:
17   Q. Did Leigh Peterson contribute to the
18 design or conduct of the INCREASE study?
19     ATTORNEY DYKHUIS: Object to form.
20     THE WITNESS: I don't recall
21     specifically that she could well have. I
22     suspect that there was a lot of
23     communication behind the scenes that the
24     steering committee members were not
25     necessarily privy to.



12 (Pages 42 to 45)

Page 46

```
 1        BY ATTORNEY DAVIES:
 2        Q.   To your knowledge, who is Leigh
 3   Peterson?
 4             ATTORNEY DYKHUIS:  Object to form.
 5             THE WITNESS:  She's an employee of
 6        United Therapeutics.
 7        BY ATTORNEY DAVIES:
 8        Q.   Do you know generally what her
 9   responsibilities were, if any, with respect to the
10   INCREASE study?
11        A.   I do not.
12        Q.   Did you ever have any conversations
13   with Leigh Peterson regarding the INCREASE study?
14        A.   I don't recall any.
15        Q.   Do you know if Peter Smith had any
16   contribution to the design or conduct of the
17   INCREASE study?
18             ATTORNEY DYKHUIS:  Object to the
19        form.
20             THE WITNESS:  I'm pretty sure he
21        did without knowing a hundred percent.
22        He led the study, so I think it's
23        reasonable to assume that he had some
24        essential contributions, but I can't tell
25        you for sure.
```

Page 47

```
 1        BY ATTORNEY DAVIES:
 2        Q.   What about Chung Kun Dang?  Did he
 3   have any role in the conduct or design of the
 4   INCREASE study?
 5             ATTORNEY DYKHUIS:  Object to form.
 6             THE WITNESS:  Yes, he did, because
 7        he's the biostatistician that helps to
 8        come up with the statistical analysis
 9        plan.
10        BY ATTORNEY DAVIES:
11        Q.   Below -- going back to your CV,
12   Doctor, I'm sorry, your CV is Attachment A to your
13   declaration, which is Exhibit 2.
14             The next steering committee membership I
15   wanted to ask you about began in 2016, steering
16   committee member for RIN PH 203 study.
17        Do you see that?
18             ATTORNEY DYKHUIS:  Object to the
19        form.
20             THE WITNESS:  Yes, I do.
21        BY ATTORNEY DAVIES:
22        Q.   Does that have a study name?
23        A.   Yes, it does.  That is known as the
24   PERFECT study.
25        Q.   Who else was on the steering
```

Page 48

```
 1   committee for the PERFECT study?
 2        A.   It was myself, Vic Tapson -- Victor
 3   Tapson, Aaron Tapson, and there was an additional
 4   member, Todd Bull, B-u-l-l.
 5        Q.   And is that steering committee still
 6   active as well?
 7             ATTORNEY DYKHUIS:  Object to the
 8        form.
 9             THE WITNESS:  The paper pertaining
10        to that study is currently in
11        development, and so with regards to
12        fine-tuning the paper, the steering
13        committee still has input into that.
14             The study got stopped early for
15        lack of efficacy and a signal of
16        potential harm, and this was inhaled
17        trepostinil in patients, with COPD.
18        BY ATTORNEY DAVIES:
19        Q.   Is PH due to COPD, is that a
20   Group 3?
21        A.   That's correct.
22             ATTORNEY DYKHUIS:  Object to the
23        form.
24        Q.   I'm sorry.  I want to just ask, I'll
25   try to rephrase that a little bit better.
```

Page 49

```
 1        Is pulmonary hypertension due to chronic
 2   obstructive -- strike that.
 3             How many -- you're aware that there's five
 4   groups of pulmonary hypertension; correct?
 5        A.   That's correct.
 6        Q.   Okay.  Which of those five groups
 7   does pulmonary hypertension due to chronic
 8   obstructive pulmonary disease fall into?
 9        A.   Group 3.
10        Q.   Do you know whether United
11   Therapeutics was still investigating the use of
12   inhaled treprostinil for PH COPD?
13        A.   I don't believe they are.
14        Q.   Why do you believe that that study
15   failed?
16             ATTORNEY DYKHUIS:  Objection to
17        form.
18             THE WITNESS:  I don't know why the
19        study failed.  There are many moving
20        parts to a successful study design.  I
21        think it just underscores a point that
22        not all forms of lung disease which are
23        conflicted by pulmonary hypertension
24        necessarily behave the same or respond
25        the same to therapy.
```



13  (Pages 46 to 49)

Page 50

```
 1          BY ATTORNEY DAVIES:
 2          Q.   If you turn to page 8, there's a
 3   list of your publications that begins on page 8.
 4          A.   Okay.
 5          Q.   And I believe you testified that
 6   you're not aware of any significant additions to
 7   that list of publications.
 8               ATTORNEY DYKHUIS:  Object to form.
 9               THE WITNESS:  There have been some
10          publications that have been added.  Maybe
11          one or two.  I can't recall exactly right
12          now.
13          BY ATTORNEY DAVIES:
14          Q.   Are there any that you're aware of
15   that are or that concern the use of treprostinil?
16               ATTORNEY DYKHUIS:  Object to form.
17               THE WITNESS:  I'll have to go and
18          see what the last entry is here.
19               No, I don't believe -- let me just
20          double-check, I apologize.  I don't
21          believe that there are any new
22          publications pertaining to inhaled --
23          trepostinil.
24          BY ATTORNEY DAVIES:
25          Q.   If you turn to page 29 of your CV,
```

Page 51

```
 1   and this appears to be a list of publications in
 2   submission or preparation.  Is that correct?
 3          A.   Correct.
 4               ATTORNEY DYKHUIS:  Object to form.
 5          Q.   We talked about the post hoc
 6   analysis with regard to FVC that was done for the
 7   INCREASE study.
 8          Do you recall that?
 9               ATTORNEY DYKHUIS:  Object to form.
10               THE WITNESS:  Yes.
11          BY ATTORNEY DAVIES:
12          Q.   Is 18 in the in-preparation publication
13   of those results and analysis?
14          A.   No.  This isn't the FVC.  That was
15   the question you had.
16          Q.   Correct.
17          A.   I can direct you to that one,
18   because that's not in preparation.  That has been
19   published.
20          It's publication number 137.
21          Q.   What is the post hoc analysis of
22   INCREASE that's described at 18 on page 29 of your
23   CV?
24          A.   There's no mention of efficacy that
25   I can see in Number 18.
```

Page 52

```
 1          Q.   And I'm sorry, Doctor, I may not
 2   have been clear.  What is the post hoc analysis of
 3   INCREASE that's described at Number 18 on page 29
 4   of your CV?
 5          A.   That was looking at outcomes in
 6   patients with less severe pulmonary hypertension.
 7   It didn't pertain to the FVC.
 8          Q.   And why did you decide to do this
 9   post hoc analysis that's described in 18?
10               ATTORNEY DYKHUIS:  Object to form.
11               THE WITNESS:  There have been many
12          ideas that have come out with this very
13          rich dataset, and that was one of them.
14          Despite the overwhelmingly positive
15          results, that does still exist in the
16          community skepticism around the INCREASE
17          study, and specifically with enough
18          patients with more mild pulmonary
19          hypertension as responders.
20               And that was a reason to do an
21          analysis into patients who had more mild
22          pulmonary hypertension just to drill down
23          on all the potential benefits that you
24          could see with if patients with mild
25          pulmonary hypertension were treated.
```

Page 53

```
 1          BY ATTORNEY DAVIES:
 2          Q.   And what were the results of that
 3   post hoc analysis with respect to this more mild PH
 4   patient population?
 5               ATTORNEY DYKHUIS:  Object to form.
 6               THE WITNESS:  Once you do post hoc
 7          analyses, the numbers get smaller.  And
 8          when the numbers get smaller, it becomes
 9          much more difficult to show statistical
10          significance.
11               But the point estimates in what we
12          call the hazard ratios for clinical
13          worsening did appear to favor inhaled
14          trepostinil, as well as the point
15          estimate for the risk of acute
16          exacerbations did fail to -- I'm sorry,
17          did favor inhaled trepostinil.  It didn't
18          reach statistical significance, and then
19          the change in the biomarker were used,
20          which is called the NT-ProBNP also showed
21          a favorable effect in the group that got
22          inhaled trepostinil.  And I think the
23          NT-ProBNP hits statistical significance.
24          BY ATTORNEY DAVIES:
25          Q.   Did you examine change in six-minute
```

**MAGNA** ◗
LEGAL SERVICES

14  (Pages 50 to 53)

Page 54

1 walk distance analysis in this post hoc analysis?
2    A.    The change in the six-minute walk
3 distance had been reported in the primary INCREASE
4 publication in patients with more mild pulmonary
5 hypertension.  Honestly, I don't recall how much we
6 reported out on the six-minute walk in this
7 post hoc analysis.  I think we did.
8        The paper is still in revision at the
9 moment, but without having the paper in front of
10 me, I can't tell you a hundred percent.  I'm pretty
11 sure that we must have examined the six minute walk
12 distance.
13    Q.    Do you recall whether there was a
14 statistically significant difference in six-minute
15 walk distance in this patient population subgroup
16 with more mild pulmonary hypertension?
17        ATTORNEY DYKHUIS:  Object to form.
18        THE WITNESS:  Well, if you go back
19    to the primary paper, in the supplement
20    to the primary paper there's an analysis
21    of patients with pulmonary vascular
22    resistances between three and four, and
23    it did not appear to be any effect on the
24    six-minute walk.
25        Hence, the skepticism, and hence

Page 55

1    the reason we did this deeper dive
2    looking at these other outcome measures
3    which did appear to show benefit in this
4    group of patients.
5 BY ATTORNEY DAVIES:
6    Q.    You mentioned, I believe, in one of
7 your earlier responses, Doctor, exacerbations of
8 interstitial lung disease.
9        Did I recall that correctly?
10    A.    Yes.
11    Q.    What is an exacerbation of
12 interstitial lung disease?
13    A.    There's a strict definition for what
14 an exacerbation of interstitial lung disease is and
15 the guidelines for that in terms of worsening
16 infiltrates on chest imaging, worsening shortness
17 of breath over a time period of less than four
18 weeks.  Worsening gas exchange and ruling out other
19 causes like infection or heart failure.
20        So it's -- and then if you rule all those
21 out, you're left with an acute exacerbation of
22 interstitial lung disease.
23    Q.    With respect to this more mild PH
24 subgroup of patients, was there a statistically
25 significant difference with respect to

Page 56

1 exacerbations of interstitial lung disease?
2        ATTORNEY DYKHUIS:  Object to form.
3        THE WITNESS:  The points estimate
4    was way to the left favorable for inhaled
5    trepostinil.  I think that it was
6    something like an 80 percent risk
7    reduction, if I recall the point estimate
8    exactly.  Because the numbers were very
9    small, the error bars were very wide and
10    crossed the line of unity so that the
11    post hoc analysis suffered from
12    insufficient numbers to have a definitive
13    answer that the point estimate suggested
14    strongly that there was a substantial
15    benefit.
16 BY ATTORNEY DAVIES:
17    Q.    But there was not a statistically
18 significant difference; correct?
19        ATTORNEY DYKHUIS:  Objection to
20    form.
21        THE WITNESS:  Because of the small
22    numbers, that's correct, yes.
23 BY ATTORNEY DAVIES:
24    Q.    With regard to the entire patient
25 population within the INCREASE study, was there a

Page 57

1 statistically significant difference in
2 exacerbations of interstitial lung diseases on
3 treatment with inhaled trepostinil?
4        ATTORNEY DYKHUIS:  Object to form.
5        THE WITNESS:  I believe that there
6    was.
7 BY ATTORNEY DAVIES:
8    Q.    Why do you believe there was an
9 effect seen in the larger patient population but
10 not in the subgroup of more mild PH patients with
11 respect to an effect on exacerbations in ILD?
12        ATTORNEY DYKHUIS:  Objection.
13    Form.
14        THE WITNESS:  It's purely because
15    of the numbers.  We had, as I recall, 336
16    patients in the group as a whole, and
17    then those who had mild PH -- I don't
18    remember what the number was, it was 60
19    to 80 -- and once you have smaller
20    numbers, it becomes much more difficult
21    to hit statistical significance.
22 BY ATTORNEY DAVIES:
23    Q.    Going back to your CV on page 29 --
24 and just let me know when you're back there --
25 there's an entry Number 24.



15  (Pages 54 to 57)

Page 58

1    Do you see that?
2    A.    I do.
3    Q.    And it refers to a derivation of a
4  simple risk calculator for predicting clinical
5  worsening in patients with pulmonary hypertension
6  due to interstitial lung disease.
7    Do you see that?
8    A.    I do.
9    Q.    And what does that paper describe,
10  generally?
11    A.    That's the paper that I mentioned
12  earlier that's still in development, looking at all
13  the patients from an INCREASE study and looking at
14  their baseline characteristics to see if we can
15  identify a high-risk group versus a lower risk
16  group, a group of patients who are generally pretty
17  high risk.
18    Q.    And what do you mean by "high risk"?
19    A.    For having an event like mortality,
20  hospitalization, being events that are notable or
21  sometimes you put that in a compass endpoint of
22  clinical worsening.  So that risk of having a bad
23  outcome or higher risk of having a bad outcome.
24    Q.    Is that risk based on treatment with
25  inhaled treprostinil, or is that just they're high

Page 59

1  risk due to their disease generally?
2    ATTORNEY DYKHUIS:  Object to form.
3    THE WITNESS:  High risk due to
4    their disease generally.  I believe the
5    way we're doing it is we're just looking
6    at the placebo arm to rule out the effect
7    of inhaled trepostinil on their own
8    interests.
9  BY ATTORNEY DAVIES:
10    Q.    Other than your work in this case,
11  are you consulting with United Therapeutics in any
12  other matter?
13    A.    I do consult with them in other
14  matters, you know, depending on what's going on.
15  You know, they have a working group, for example,
16  that talks about PH-ILD, and I'm part of that
17  working group.  I'm on their speakers bureau.
18    So are there other ways in which I
19  collaborate with United Therapeutics.
20    Q.    Other than being on the working
21  group with PH-ILD and the speakers group, how else
22  do you collaborate with United Therapeutics?
23    A.    I'm the chair of the steering
24  committee for the Teton study.
25    Q.    Anything else?

Page 60

1    A.    Not that springs to mind at the
2  moment.
3    Q.    Have you received funding as
4  research grants from United Therapeutics?
5    A.    Yes, I have.
6    Q.    Do you have any sense for the amount
7  of money that you received in research grants from
8  United Therapeutics over the years?
9    ATTORNEY DYKHUIS:  Object to form.
10    THE WITNESS:  I don't have a good
11    sense.
12  BY ATTORNEY DAVIES:
13    Q.    Is it more than $100,000?
14    ATTORNEY DYKHUIS:  Object to form.
15    THE WITNESS:  I didn't get any
16    money from them for research.  It goes to
17    my institution.
18  BY ATTORNEY DAVIES:
19    Q.    Do you personally receive any other
20  grants from United Therapeutics which aren't for
21  research purposes?
22    ATTORNEY DYKHUIS:  Object to form.
23    THE WITNESS:  No.
24  BY ATTORNEY DAVIES:
25    Q.    Can you turn to page 44 of your CV.

Page 61

1    A.    (Witness complies with request.)
2    Q.    This is in a section -- I'm sorry.
3  Are you there, Doctor?
4    A.    I am there, yes.
5    Q.    Okay.  And if you flip over a page
6  or two, this is in a section of your CV titled
7  "Research Grants, Pharmaceutical Multicenter
8  Studies."
9    Do you see that?
10    A.    Yes.
11    Q.    Can you look at entry Number 31 on
12  page 44.
13    A.    (Witness complies with request.)
14    Q.    Are you there?
15    A.    Yeah.
16    Q.    What was your involvement in the
17  protocol for the LTI-301 study?
18    ATTORNEY DYKHUIS:  Object to form.
19    THE WITNESS:  I wasn't involved in
20    this protocol development.  As I recall,
21    we were asked to be a center, and Moreau
22    [phon.] was the subinvestigator.  I
23    wasn't even the principal investigator on
24    that.
25

HIGHLY CONFIDENTIAL                    DA0214                    LIQ_PH-ILD_00000692

Page 62

```
 1        BY ATTORNEY DAVIES:
 2        Q.    What was your role as a
 3   subinvestigator in the study?
 4        A.    The fact that I was a
 5   subinvestigator just enabled me to see patients
 6   when they come in for study limits.  Nothing more
 7   than that in terms of data analysis or anything
 8   else.
 9        Q.    Are you familiar with -- well, as
10   your role as a subinvestigator and seeing patients
11   as they came in, you've seen the dry powder inhaler
12   that's used for administration of Yutrepia;
13   correct?
14              ATTORNEY DYKHUIS:  Object to form.
15              THE WITNESS:  I haven't seen the
16        Yutrepia device.
17        BY ATTORNEY DAVIES:
18        Q.    Do you know what the Yutrepia device
19   is?
20        A.    I don't have a good idea what the
21   device is.
22        Q.    You do not?
23        A.    I do not.  I might have seen a
24   picture of it, but I've never held one in my hands,
25   no.
```

Page 63

```
 1        Q.    Were you familiar with a Plastiape
 2   inhaler, that's RS00 Model 8?
 3              ATTORNEY DYKHUIS:  Object to form.
 4              THE WITNESS:  I don't believe I
 5        am.
 6        BY ATTORNEY DAVIES:
 7        Q.    Okay.  So when patients came in as
 8   part of the LTI-301 study, what was your role as a
 9   subinvestigator when those patients came in?
10              ATTORNEY DYKHUIS:  Object to form.
11              THE WITNESS:  To be honest, I
12        don't even remember seeing any of these
13        patients.  I might have been a sub-I on
14        the protocol that we submitted without
15        ever having seen one of these patients.
16        BY ATTORNEY DAVIES:
17        Q.    When is the first time that you can
18   recall hearing about Yutrepia or LIQ-861?
19        A.    It's actually interesting, if I may.
20   When you pointed me to this, I wasn't even aware
21   that this was Liquidia's product.  That's how much
22   I recall about this study.  I was very peripheral,
23   and I've never saw any of these patients, and I
24   never saw the device.
25              I was just listed as a sub-I at the start
```

Page 64

```
 1   of the study, as were a bunch of our associates.
 2   The reason we do that is in case a PI is not
 3   available, someone can substitute for them and see
 4   a patient, but that never happened to me.
 5        Q.    Do you know who the PI was at your
 6   institution for this?
 7        A.    I believe it was Dr. Oxanna Slobin.
 8        Q.    We've been going for about an hour.
 9   Do you want take a break?
10        A.    I'm good.  We can carry on unless
11   you need to take a break.
12              ATTORNEY DAVIES:  I need to take a
13        break, so if you don't mind, let's take a
14        quick break.
15              THE VIDEOGRAPHER:  We are off the
16        record at 10:12.
17              (Recess taken from
18        10:12 a.m. to 10:21 a.m.)
19              THE VIDEOGRAPHER:  We are on the
20        record at 10:21.
21        BY ATTORNEY DAVIES:
22        Q.    Welcome back, Doctor.  Thank you for
23   accommodating my request for a break, I appreciate
24   that.
25              You mentioned earlier this morning an
```

Page 65

```
 1   initial protocol for the INCREASE study.
 2        Do you recall that?
 3              ATTORNEY DYKHUIS:  Object to form.
 4              THE WITNESS:  We did talk about
 5        the INCREASE study and how it was
 6        formulated, yes.
 7        BY ATTORNEY DAVIES:
 8        Q.    And I believe you testified that
 9   there had been a draft of a protocol that was
10   provided from United Therapeutics, that you
11   commented and had input on that; is that correct?
12              ATTORNEY DYKHUIS:  Object to form.
13              THE WITNESS:  That's correct.
14        BY ATTORNEY DAVIES:
15        Q.    Do you know what the basis or
16   rationale was for the INCREASE protocol draft from
17   United Therapeutics?
18              ATTORNEY DYKHUIS:  Object to form.
19              THE WITNESS:  The premise was to
20        give inhaled treprostinil and to see if
21        it would be of benefit in patients with
22        pulmonary hypertension associated with --
23        interstitial lung disease.
24        BY ATTORNEY DAVIES:
25        Q.    Are you aware of whether it relied
```

**MAGNA** ◆
LEGAL SERVICES

17  (Pages 62 to 65)

Page 66

```
1   on any results from prior studies to support in the
2   design of the INCREASE protocol?
3           ATTORNEY DYKHUIS:  Object to form.
4           THE WITNESS:  I'm not aware of,
5       you know, the studies, I'm sure the
6       studies looked at all the studies in the
7       literature prior to that, but I don't
8       know of anyone that they leaned on.
9   BY ATTORNEY DAVIES:
10      Q.   Can you go back to the beginning of
11  your declaration, which is Exhibit 2.  And if you
12  go to the table of contents for your declaration,
13  just let me know when you're there.
14      A.   (Witness complies with request.)
15      Yes.
16      Q.   You mentioned that you drafted the
17  medical portions of your declaration.  Can you
18  identify the portions of your declaration in the
19  table of contents that you prepared?
20          ATTORNEY DYKHUIS:  Object to form.
21      I would say that I -- all portions I had
22      input on.  I might have not been the
23      first draftee, but, you know, the
24      legalese stuff, there was the foundation
25      provided by counsel and, certainly if
```

Page 67

```
1       there was anything that I didn't
2       understand it was explained to me.  So it
3       was a lot of wordsmithing that went
4       around that.
5           But if we go through the medical
6       stuff, I know that -- I think it's just
7       about 58 points looks like it's more
8       legal stuff.
9   BY ATTORNEY DAVIES:
10      Q.   When you said "points," Doctor,
11  you're referring to the first 58 paragraphs or more
12  of legal stuff that you didn't prepare?
13          ATTORNEY DYKHUIS:  Object to form.
14          THE WITNESS:  I wouldn't say I
15      didn't prepare it.  I didn't prepare
16      necessarily the first draft, but then I
17      had input subsequently of the things that
18      I didn't understand; they were laid out
19      differently and I might have done some
20      wordsmithing myself amongst all the
21      different paragraphs.  I don't recall
22      exactly what.
23          But if you look at from Scientific
24      Background, 59, 68, 69, 70, I believe
25      counsel helped put this table together.
```

Page 68

```
1       I think I provided the names of the
2       drugs, if I recall correctly.
3           Seventy-three, 74, this all looks
4       medical.  Seventy-five, 76, 77, and then
5       all prior studies, I wrote that.  I think
6       counsel was aware of some of these
7       studies and might have mentioned it, but
8       I really provided the verbiage that I
9       went through with each of these studies.
10      RISE IP, Sildenafil, pirfenidone, we
11      spoke about that.
12          The PERFECT study was mentioned.
13      I don't know if you wanted me to make my
14      way through the whole document and pick
15      out areas that I was involved in.  The
16      INCREASE study, I believe that I was a
17      primary person who wrote that.
18          But then when you come to areas
19      like patent, you know, that's where
20      counsel helped to lay out the initial
21      foundation in terms of the first draft.
22  BY ATTORNEY DAVIES:
23      Q.   There's reference on page 36 to the
24  prosecution history of the '327 patent.
25      A.   Yeah.
```

Page 69

```
1       Q.   What is the prosecution history of
2   the '327 patent?
3       A.   It's kind of a dying --
4           ATTORNEY DYKHUIS:  Object to form.
5       Sorry, give me a moment to make any
6       objections.
7           THE WITNESS:  I'm sorry.
8           ATTORNEY DYKHUIS:  The other thing
9       I would say, Dr. Nathan, in this line of
10      questioning just a reminder I caution you
11      not to reveal of substance of any
12      communications with counsel, but you can
13      explain.
14          THE WITNESS:  Thank you.
15          To my understanding, the
16      prosecution history is going backwards
17      and forwards between the courts in terms
18      of the lawsuit is brought and it's
19      revised and then the decision and then
20      you've got a counterclaim or whatever.
21      So that's how it's being prosecuted
22      historically.
23  BY ATTORNEY DAVIES:
24      Q.   Do you recall reviewing the
25  prosecution history of the '327 patent in terms of
```



18  (Pages 66 to 69)

Page 70

```
1    preparing your report?
2              ATTORNEY DYKHUIS:  Object to form.
3              THE WITNESS:  I did.
4      BY ATTORNEY DAVIES:
5         Q.    You did.
6    Can you go to page 43.
7         A.    (Witness complies with request.)
8         Q.    And there's a section of your report
9    here entitled, "Liquidia will infringe the asserted
10   claims of the '327 patent."
11        Do you see that?
12        A.    I do.
13        Q.    Did you prepare this section of the
14   report on the infringement of the claims of the
15   '327 report, or is this legal opinion?
16             ATTORNEY DYKHUIS:  Object to form.
17             THE WITNESS:  It's my opinion.
18     BY ATTORNEY DAVIES:
19        Q.    Did you prepare any portions of
20   those, or did counsel prepare them?
21             ATTORNEY DYKHUIS:  Object to form.
22             THE WITNESS:  Honestly, I can't
23        remember who contributed what to this
24        first draft.  It might well have been
25        counsel because I wasn't familiar which
```

Page 71

```
1         claims were being contested, but I
2         certainly had input into this.
3      BY ATTORNEY DAVIES:
4         Q.    We talked a little bit about
5    statistical significance in a couple of different
6    context earlier this morning.
7         Do you recall that?
8         A.    Yes.
9         Q.    Is it possible to determine whether
10   there has been a statistically significant
11   difference within a single patient with respect to
12   a treatment?
13             ATTORNEY DYKHUIS:  Object to form.
14             THE WITNESS:  No.
15     BY ATTORNEY DAVIES:
16        Q.    Why not?
17        A.    You need --
18             ATTORNEY DYKHUIS:  Sorry, object
19        to form.
20             THE WITNESS:  You need a large
21        study to determine the statistical
22        significant.  There's a lot of things
23        that can happen by chance in an
24        individual patient, which if under
25        treatment may or may not be attributable
```

Page 72

```
1         to the treatment.  So you can't determine
2         statistical significance in a single
3         patient.
4      BY ATTORNEY DAVIES:
5         Q.    Just to make it clear, and I don't
6    think you heard me correctly, but I believe your
7    testimony was that you cannot determine whether
8    there is a statistically significant difference in
9    a patient with respect to a treatment; correct?
10        A.    Correct.
11             ATTORNEY DYKHUIS:  Object to form.
12             Just while there's a pause again,
13        Doctor, just give me a moment to get in
14        any objections.
15             THE WITNESS:  Yes.
16     BY ATTORNEY DAVIES:
17        Q.    We've talked about pulmonary
18   hypertension.  What in your -- what in your words
19   is pulmonary hypertension, Doctor?
20        A.    Pulmonary hypertension is a build-up
21   of pressure in the pulmonary arterial circulation.
22        Q.    And how do you diagnose a patient
23   with pulmonary hypertension in your practice?
24             ATTORNEY DYKHUIS:  Object to form.
25             THE WITNESS:  The diagnosis always
```

Page 73

```
1         relies on a right heart catheterization
2         to analyze the pressures.
3      BY ATTORNEY DAVIES:
4         Q.    And what pressures from that right
5    heart catheterization would indicate to you as a
6    clinician there is pulmonary hypertension present?
7              ATTORNEY DYKHUIS:  Object to form.
8              THE WITNESS:  It depends which
9         definition you're talking about, because
10        there have been a lot of changes to the
11        definition.
12             When the INCREASE study was
13        undertaken, we used what is known, an
14        older definition of a mean pulmonary
15        artery pressure of 25 milliliters or more
16        accompanied by pulmonary vascular
17        resistance of three or more wood units.
18             That definition was subsequently
19        changed at the Sixth World Symposium in
20        2018, and the mean pulmonary artery
21        pressure was lowered to greater than 20
22        milliliters of mercury with the pulmonary
23        vascular resistance remaining the same at
24        three or more wood units.
25             More recently, the European
```



19 (Pages 70 to 73)

Page 74

1      Society of Cardiology and the European
2 Respiratory Society came up with another
3 new division -- sorry, definition, where
4 they kept the mean pulmonary artery
5 pressure the same, greater than
6 20 milliliters of mercury but decided to
7 take the pulmonary vascular resistance
8 halfway down to two.
9      So based on the ESCERS guidelines
10 from 2022, the current definition is a
11 mean pulmonary artery pressure of 20 or
12 more milliliters of mercury accompanied
13 by a pulmonary vascular resistance of
14 greater than two wood units.
15 BY ATTORNEY DAVIES:
16    Q.   And what was the definition that you
17 would have applied as of April 2020 with respect to
18 pulmonary hypertension?
19      ATTORNEY DYKHUIS:  Object to form.
20      THE WITNESS:  In 2020, we had the
21 definition from the World Symposium in
22 2018.  But 2020 was the time that the
23 INCREASE study results came out, which
24 was formulated under the guise of the old
25 definition.

Page 75

1      So what I would regard as
2 hypertension -- let me back up a little
3 bit.
4      Pulmonary hypertension is defined
5 by a mean pulmonary artery pressure of
6 greater than 20 milliliters of mercury.
7 You're talking about precapillary
8 pulmonary hypertension, then you need the
9 pulmonary vascular resistance component
10 of it.
11      So in 2020 what I would regard as
12 pulmonary hypertension would be a mean
13 pulmonary artery pressure of 20 or more
14 milliliters of mercury.
15      However, with regards to putting
16 patients on inhaled treprostinil, we have
17 to revert to the old definition because
18 we only know that the drug works in that
19 population of patients in the study.
20 BY ATTORNEY DAVIES:
21    Q.   So you're saying the INCREASE study
22 applied a different definition of PH, which is more
23 narrow than the definition that existed in 2020; is
24 that correct?
25      ATTORNEY DYKHUIS:  Object to the

Page 76

1 form.
2      THE WITNESS:  That's true.  It's
3 not by designed.  The INCREASE study was
4 implemented and undertaken when we were
5 all functioning under the guise of the
6 old definition.
7 BY ATTORNEY DAVIES:
8    Q.   We had talked earlier about the
9 groups of patients within pulmonary hypertension.
10 Do you recall that?
11    A.   Yes.
12    Q.   Which group do PH-ILD patients fall
13 into?
14    A.   That would be Group 3.
15    Q.   You also mentioned precapillary PH.
16 Which groups out of the five are precapillary, in
17 your opinion?
18    A.   Group 1, Group 1, Group 3, Group 4,
19 and Group 5.
20    Q.   And with respect to these groups, do
21 you view them as strict delineations, or do you
22 have patients that may have a mix of different
23 groups in your practice and experience?
24      ATTORNEY DYKHUIS:  Object to form.
25      THE WITNESS:  Most commonly it is

Page 77

1 a mix.
2 BY ATTORNEY DAVIES:
3    Q.   Can you explain that?  What do you
4 mean by "Most commonly it is a mix"?  What does
5 that mean?
6    A.   The patients we see don't behave in
7 strict categories and frequently have comorbidities
8 where they have some lung disease and pulmonary
9 hypertension.  Some heart disease and pulmonary
10 hypertension overlaid with chronic thromboembolic
11 pulmonary hypertension.
12      I said half jokingly that my favorite group
13 of pulmonary hypertension is group 10 where you
14 have some one, some two, some three, and some four,
15 because some patients are never quite that keen.
16      These categories are man-made, and we kind
17 of box ourselves into a corner by trying to put
18 patients in distinct categories, and the patients
19 don't always behave the way we would like it to be,
20 so they tend to cross over.
21    Q.   So it would be common to see a
22 crossover, for example, of a patient who shows
23 signs of PAH, Group 1 might also shows signs of
24 Group 3 PH-ILD.  Is that fair?
25      ATTORNEY DYKHUIS:  Object to form.

**MAGNA** ▶
LEGAL SERVICES

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000696

Page 78

1       THE WITNESS:  That's a common
2   debate when it's a Group 1 with a little
3   bit of lung disease and when it's a
4   Group 3.
5   BY ATTORNEY DAVIES:
6       Q.   So you would agree that in your
7   practice you do see patients who are a mix of both
8   Group 1 and Group 3; correct?
9           ATTORNEY DYKHUIS:  Object to form.
10          THE WITNESS:  It's very difficult
11  to sort out well, you know, this
12  percentage from Group 1 and this percent
13  is from Group 3.
14      The question becomes how much lung
15  disease is permissible in order to call
16  it Group 1 versus Group 3.  And it's a
17  spectrum.  And some people can look at
18  the same case and say, Well, I think this
19  is more Group 1, and other people might
20  look at the same case and say, No, I
21  think this is more Group 3.
22      When we look and try to make that
23  delineation, we look at how severe the
24  human dynamic impairment is, how severe
25  the lung impairment is based on lung

Page 79

1   function tests, and we look at the CAT
2   scan to see how much lung scarring there
3   is in terms of making that determination.
4   BY ATTORNEY DAVIES:
5       Q.   In your experience, what percent
6   of -- strike that.
7       So in your clinical experience, what
8   percent of the PH patients with treatment you've
9   overseen or been involved in have been a mix of
10  more than one of the groups of PH?
11          ATTORNEY DYKHUIS:  Object to form.
12          THE WITNESS:  That's a hard number
13  through the years to come up with.  You
14  know, I would say maybe one-third could
15  have a compound into something else going
16  on, but that's not something I actively
17  collect to show.
18  BY ATTORNEY DAVIES:
19      Q.   We've talked a lot about
20  interstitial lung disease.  What is interstitial
21  lung disease, in your words?
22          ATTORNEY DYKHUIS:  Object to form.
23          THE WITNESS:  The interstitium of
24  the lung refers to the lattice lock
25  network within the lung parenchymal which

Page 80

1   surrounds the alveola or intersects.  The
2   interstitium of the lungs.
3       When there's infiltration of the
4   interstitium usually in a diffuse matter
5   by scarring or fibrosis and/or
6   inflammation, the results are manifested
7   in interstitial lung disease.
8   BY ATTORNEY DAVIES:
9       Q.   And have there been other words that
10  are used to describe interstitial lung disease in
11  the literature?
12          ATTORNEY DYKHUIS:  Object to form.
13          THE WITNESS:  The wording can be
14  confusing.
15  BY ATTORNEY DAVIES:
16      Q.   I agree.
17      A.   Pulmonary fibrosis, it refers to
18  lung scarring, and most of the patients with
19  interstitial lung disease of note, especially those
20  who have superimposed pulmonary hypertension, will
21  have pulmonary fibrosis.
22      And then even within the endopulmonary
23  fibrosis, if you open any textbooks, there are
24  probably over 200 courses of pulmonary fibrosis.
25  And so, one of the jobs we have when you see a

Page 81

1   patient with ILD is to try to figure out what kind
2   of ILD they have.
3       Q.   When did you first begin treating
4   pulmonary hypertension patients?
5       A.   I remember seeing my first patient
6   with primary pulmonary hypertension, which is what
7   I used to call it when I was a resident in New York
8   in the late eighties.
9       Q.   What is primary pulmonary
10  hypertension?
11      A.   We changed the nomenclature.  It's
12  now idiopathic pulmonary arterial hypertension.  It
13  was changed in about 1996, if I recall.  When I was
14  a fellow at Cedar Sinai Medical Center, we were one
15  of the few centers in the country to do the study
16  of REE treprostinil.
17      So as a person who enrolled in the study as
18  a fellow in 1988, and so you can say the late
19  eighties was the first time I started treating.
20  Although at that time we didn't know if the
21  medication worked or not.  But then REE
22  treprostinil got approved in 1994, and then I was
23  treating off of it.
24      Q.   What was the first time you recall
25  treating an ILD patient?



21  (Pages 78 to 81)

Page 82

1          ATTORNEY DYKHUIS:  Object to form.
2     Q.    I'll rephrase it.
3          When was the first time you can recall
4 treating a patient with ILD, interstitial lung
5 disease?
6     A.    I actually do remember the patient I
7 had with ILD, idiopathic pulmonary fibrosis, and
8 that was in 1982 when I was an intern back in South
9 Africa.  I didn't treat her, because we had no
10 treatment.  But that was the first time I saw a
11 patient with interstitial lung diseases.
12     Q.    Did that patient have -- also have
13 pulmonary hypertension, or were they just -- not
14 just, but did they solely have interstitial lung
15 disease?
16     A.    At that point, I don't think we were
17 even aware of pulmonary hypertension complicating
18 interstitial lung disease.  We're talking 1982.
19     Q.    Do you recall roughly when there was
20 a recognition in the art of pulmonary hypertension
21 complicating interstitial lung disease?
22          ATTORNEY DYKHUIS:  Object to form.
23          THE WITNESS:  If you go back to
24     the literature, there are some papers
25     from the 1980s describing pulmonary

Page 83

1 hypertension complicating interstitial
2     lung disease.  It was only in the early
3     2000s that more literature began to
4     emerge about this.
5     BY ATTORNEY DAVIES:
6     Q.    You mentioned, I believe, a couple
7 different kinds of PH-ILD.  Is that correct?
8     A.    I didn't.
9     Q.    You didn't?  Is there only one type
10 of PH-ILD, in your mind?
11     A.    Yeah.  You have different kinds of
12 ILDs.  When you talk about PH-ILD as a group, and
13 there's just one kind.  It hasn't been segmented
14 out.  There might be some people who talk about
15 severe pulmonary hypertension, and that came out
16 from the European guidelines.  But in my mind, it's
17 all one big basket.
18     Q.    With respect to the differences in
19 the underlying ILD, in your opinion did the
20 INCREASE study evaluate PH-ILD patients who had all
21 the different kinds of underlying ILD, or were
22 there some groups that were excluded?
23          ATTORNEY DYKHUIS:  Object to form.
24          THE WITNESS:  We included many
25     different forms of PH-ILD.  Connective

Page 84

1     tissue disease, the effect of
2     interstitial pneumonias with IPF
3     being the major subgroup.  Chronic
4     hypersensitivity being another one.
5     CPFE, combined chronic fibrosis with
6     emphysema being another one.
7          There are other courses, as I
8     mentioned.  Some of those are broad
9     categories.  I don't recall if we had
10     occupational lung disease in there or
11     not.  If we did, it might have been one
12     or two patients at the most.
13     BY ATTORNEY DAVIES:
14     Q.    Any other types of ILD that were not
15 covered by the patient population in the INCREASE
16 study?
17          ATTORNEY DYKHUIS:  Objection to
18     form.
19          THE WITNESS:  What I would say is
20     just numerically, probably 95 to
21     99 percent of the disease categories were
22     covered by the INCREASE study.
23          So let me qualify that.  I said in
24     terms of causes, some of them are
25     extremely rare.  The most common ones and

Page 85

1     what I'm trying to articulate is that of
2     the universe of patients with
3     interstitial lung disease, fibrotic
4     interstitial lung disease, we probably
5     covered the bases for 95 to 99 percent.
6     And that's a rough guesstimate on my
7     part.
8     BY ATTORNEY DAVIES:
9     Q.    When was the first time that you
10 recall prescribing treprostinil to a patient?
11     A.    When it first became available
12 subcutaneously, and I believe it was in 2002 or
13 thereabouts.
14     Q.    Do you recall what you used that to
15 treat in 2022?
16          ATTORNEY DYKHUIS:  Object to form.
17          THE WITNESS:  Some form of
18     pulmonary arterial hypertension.
19     BY ATTORNEY DAVIES:
20     Q.    And when is the first time you can
21 recall using inhaled treprostinil in a patient?
22     A.    I think it was approved around 2010,
23 I believe.  At least that's when the paper came
24 out.  So soon thereafter, I believe.
25     Q.    When was the first time that you



22  (Pages 82 to 85)

Page 86

```
1    used inhaled treprostinil to treat PH-ILD?
2          ATTORNEY DYKHUIS:  Object to form.
3          THE WITNESS:  I don't recall that.
4          What I would say -- and this goes back to
5          that spectrum of Group 1 versus
6          Group 3 -- there are patients who have
7          lung disease whose hemodynamics are
8          severe enough out of proportion, so to
9          speak, from the lung disease that I would
10         regard them as having Group 1 pulmonary
11         arterial hypertension even in the context
12         of having interstitial lung disease.
13             So under that guise, I would treat
14         patients with PAH who had lung disease.
15   BY ATTORNEY DAVIES:
16      Q.   When was the first time that you can
17   recall treating a patient who had PAH with
18   underlying interstitial lung disease with inhaled
19   treprostinil?
20         ATTORNEY DYKHUIS:  Objection to
21         form.
22         THE WITNESS:  I don't recall that.
23   BY ATTORNEY DAVIES:
24      Q.   Was it before the INCREASE study?
25         ATTORNEY DYKHUIS:  Objection to
```

Page 87

```
1          form.
2          THE WITNESS:  Yes.
3    BY ATTORNEY DAVIES:
4       Q.   Okay.  Was it soon after inhaled
5    treprostinil's approval around 2009?
6          ATTORNEY DYKHUIS:  Object to form.
7          THE WITNESS:  I don't think so.  I
8          doubt it.  I don't recall specifically.
9    BY ATTORNEY DAVIES:
10      Q.   Why did you choose to use inhaled
11   treprostinil to treat patients with PAH and
12   underlying ILD?
13         ATTORNEY DYKHUIS:  Object to form.
14         THE WITNESS:  We had the INCREASE
15         study results, and I knew about them
16         before the drug was approved.
17   BY ATTORNEY DAVIES:
18      Q.   But you used inhaled treprostinil in
19   PAH patients with underlying IDL before 2016,
20   didn't you?
21         ATTORNEY DYKHUIS:  Objection to
22         form.
23         THE WITNESS:  You know, going back
24         many years, I don't remember a distinct
25         case, to be quite honest.
```

Page 88

```
1              Just by virtue of the patient
2          volumes I see with PH, with interstitial
3          lung disease, I'm assuming that I
4          probably did, but I don't know for sure.
5          Any time distinctly that I remember using
6          it was after the INCREASE study results
7          were known and off-label at that time
8          because the drug wasn't approved as yet.
9    BY ATTORNEY DAVIES:
10      Q.   You were aware that others were
11   using inhaled treprostinil to treat patients with
12   PAH and underlying ILD before recruitment for the
13   INCREASE study, though; correct?
14         ATTORNEY DYKHUIS:  Object to form.
15         THE WITNESS:  Based on some of the
16         papers in the literature, it does appear
17         so, yes.
18   BY ATTORNEY DAVIES:
19      Q.   So why were you personally
20   comfortable prescribing inhaled treprostinil to
21   these PAH patients with underlying ILD?
22         ATTORNEY DYKHUIS:  Objection to
23         form.
24         THE WITNESS:  As I said, any time
25         I remember distinctly was after INCREASE
```

Page 89

```
1          became available.  Patients -- prior to
2          that I would treat patients with some
3          interstitial lung disease if their
4          pulmonary hypertension was
5          disproportionate and I regarded them as
6          having more of a Group 1 phenotype.
7              Typically at that point inhaled
8          treprostinil wasn't my go-to drug.  The
9          easiest drug to get was Sildenafil, which
10         is generally what I used if I was going
11         to treat patients who had any form of
12         lung disease and associated pulmonary
13         hypertension.
14   BY ATTORNEY DAVIES:
15      Q.   So even though you can't recall a
16   particular time, you do agree that you used inhaled
17   treprostinil to treat PH patients whose PH was
18   disproportionate to their underlying ILD before the
19   INCREASE study; right?
20         ATTORNEY DYKHUIS:  Object to form.
21         THE WITNESS:  I probably did.
22         We're going back many years now.  If you
23         look at one group of patients, and that's
24         connective tissue disease patients like
25         scleroderma who form at least about
```



23  (Pages 86 to 89)

Page 90

```
1         30 percent of the Group 1 PH patients, if
2     you look at the CAT scans, it's very
3     unusual for them not to have some lung
4     disease.
5             And so even if the clinical trials
6     of Group 1 PH, there were likely a bunch
7     of connective tissue disease patients who
8     had some lung disease that we just didn't
9     know about.
10    BY ATTORNEY DAVIES:
11        Q.   So I believe you said even in the
12    clinical trials of inhaled trepostinil for Group 1
13    PAH, there were likely some patients with
14    underlying ILD as part of that study as well?
15            ATTORNEY DYKHUIS:  Object to form.
16            THE WITNESS:  I'm speculating.
17    What we -- for all the clinical trials in
18    Group 1 PAH, what we used as the cut
19    point to get into the study was the
20    forced vital capacity.
21            If the forced vital capacity was
22    greater than about 70 percent, then the
23    patient goes into the study.  Can we rule
24    out that a patient with the FVC of
25    72 percent didn't have a little bit of
```

Page 91

```
1     lung disease, no, we can't, but we don't
2     know.
3             So I'm speculating that maybe
4     there was some patients who were included
5     in the study, but these were patients who
6     were defined as Group 1 PAH based on our
7     criteria at the time.
8     BY ATTORNEY DAVIES:
9         Q.   I believe you said it was likely
10    that such patients would have been in those
11    studies; correct?
12            ATTORNEY DYKHUIS:  Object to form.
13            THE WITNESS:  It's possible, and
14    it's speculative on my part, because I
15    don't know.
16    BY ATTORNEY DAVIES:
17        Q.   When was the first time that you can
18    recall treating a PH-ILD patient with inhaled
19    trepostinil?
20        A.   After the INCREASE study results
21    came out.  That's when I first can recall treating
22    a patient with PH-ILD with inhaled treprostinil.
23            But it was a patient, once again, who had
24    more of the Group 1 phenotype with more moderate to
25    severe pulmonary hypertension.
```

Page 92

```
1         Q.   And when did the results come out
2     for INCREASE?
3             ATTORNEY DYKHUIS:  Object to form.
4             THE WITNESS:  I was first made
5     aware of the results ruts, as I said
6     earlier when you asked me earlier towards
7     the end of February 2020.  There was a
8     press release from the company around
9     that time just providing the top line
10    results, and then there was a publication
11    in the New England June Journal of
12    Medicine which I think was around January
13    of 2021.
14    BY ATTORNEY DAVIES:
15        Q.   And when was the first time that you
16    recall treating a PH-ILD patient with Sildenafil?
17            ATTORNEY DYKHUIS:  Object to form.
18            THE WITNESS:  I don't recall
19    exactly, you know, going back 15 years,
20    maybe more.
21    BY ATTORNEY DAVIES:
22        Q.   So at least 15 years ago?
23        A.   It could have been less than that.
24    I don't know.
25        Q.   But it would have -- you would have
```

Page 93

```
1     treated a patient, a PH-ILD patient with Sildenafil
2     before receiving the results of the INCREASE study;
3     correct?
4             ATTORNEY DYKHUIS:  Object to form.
5             THE WITNESS:  Let me qualify that.
6     These are patients who had more of a PAH
7     phenotype in the context of some
8     underlying interstitial lung disease.  So
9     I wouldn't regard them as PH-ILD.  I
10    would regard them as having some lung
11    disease but more of a Group 1 PAH
12    phenotype.
13    BY ATTORNEY DAVIES:
14        Q.   When was the first time under your
15    definition of PH-ILD you can recall treating a
16    patient with Sildenafil?
17            ATTORNEY DYKHUIS:  Object to form.
18            THE WITNESS:  PH-ILD, if you go by
19    the new definition versus the old
20    definition, MPAP, mean pulmonary artery
21    pressure greater than 20, greater than
22    25.  It's a spectrum.  And only if they
23    were on the more severe end of the
24    spectrum would I treat them.
25            So when you say PH-ILD, it was
```



24  (Pages 90 to 93)

Page 94

1      around that time, but it was the much
2      more severe patients who had more of the
3      Group 1 PAH phenotype.
4      BY ATTORNEY DAVIES:
5          Q.    You said it was around that time.
6   What time are you referring to?  About 15 years
7   ago?
8          A.    About 15 years ago.
9          Q.    When is the first time that you
10  recall using Iloprost to treat PH-ILD?
11              ATTORNEY DYKHUIS:  Object to form.
12              THE WITNESS:  We were part of the
13         a study that's called Active Study
14         looking at Iloprost to treat pulmonary
15         hypertension associated with IPF.
16             So it was a specific IPF
17         subpopulation of ILD, and it was a
18         negative study.  And I don't recall ever
19         using inhaled Iloprost for pulmonary
20         hypertension with interstitial lung
21         disease.
22      BY ATTORNEY DAVIES:
23         Q.    You mentioned the phrase earlier
24  that in some of these patients their pulmonary
25  hypertension is out of proportion to their

Page 95

1   underlying ILD.
2          Do you recall saying that?
3          A.    I do.
4          Q.    And when you write prescriptions
5   that would have been off-label at the time for
6   PH-ILD patients, is that the language that you use
7   on those prescriptions when you prescribe inhaled
8   treprostinil?
9              ATTORNEY DYKHUIS:  Object to form.
10             THE WITNESS:  As I said, I don't
11         recall prescribing it.  I withdraw that.
12         I thought you said, I heard inhaled
13         Iloprost.  Inhaled treprostinil.
14             The language I would use
15         post-INCREASE was that this patient gets
16         to have interstitial lung disease, but
17         clearly the pulmonary hypertension is out
18         of proportion to the extent of the
19         underlying interstitial lung disease;
20         therefore I believe they have a Group 1
21         phenotype.
22      BY ATTORNEY DAVIES:
23         Q.    Did you use that language and
24  descriptions for inhaled treprostinil prior to
25  results of the INCREASE study?

Page 96

1              ATTORNEY DYKHUIS:  Object to form.
2              THE WITNESS:  I don't recall doing
3         that.
4      BY ATTORNEY DAVIES:
5          Q.    You never recall doing that?
6          A.    As I mentioned, my go-to medication
7   at that time just because it was cheaper to get a
8   hold of and easier was Sildenafil.  Can I attest to
9   that a hundred percent?  I can't remember every
10  prescription I wrote.  But that wasn't my standard
11  practice by far.
12         Q.    So sitting here today, you have no
13  recollection of ever prescribing inhaled
14  treprostinil in a PH-ILD patient prior to receiving
15  notice of the results of the INCREASE study; is
16  that correct?
17         A.    Not to my recollection, but once
18  again, I can't remember every prescription I've
19  written.
20         Q.    And even though you don't have a
21  specific recollection, you would agree that
22  probably did happen prior to you receiving the
23  results of the INCREASE study?
24             ATTORNEY DYKHUIS:  Object to form.
25             THE WITNESS:  I don't recall it

Page 97

1   happening.
2      BY ATTORNEY DAVIES:
3          Q.    Okay.  Do you believe it did happen
4   nonetheless?
5              ATTORNEY DYKHUIS:  Object to the
6         form.
7              THE WITNESS:  I don't recall it
8         happening.
9      BY ATTORNEY DAVIES:
10         Q.    And I'm not asking whether or not
11  you recall or not.  I'm saying do you believe that
12  it happened based on the number of patients that
13  you saw, based on the lack of clear delineations
14  between the groups of PH?
15             ATTORNEY DYKHUIS:  Objection to
16         form.
17             THE WITNESS:  I don't think it
18         happened, because I don't believe it
19         happened, but I can't attest to it a
20         hundred percent, having written thousands
21         of prescriptions over the years.  I don't
22         know.
23      BY ATTORNEY DAVIES:
24         Q.    You mentioned -- you mentioned using
25  Sildenafil for treatment of PH-ILD; correct?



25  (Pages 94 to 97)

Page 98

1    ATTORNEY DYKHUIS:  Object to form.
2    THE WITNESS:  For patients who had
3    some ILD and associated pulmonary
4    hypertension that appeared more severe
5    than the extent of the underlying lung
6    disease.  I do want to make that
7    distinction rather than the broad blanket
8    term of PH-ILD, which can be any PH in
9    the context of ILD.
10    BY ATTORNEY DAVIES:
11    Q.    And with regard to those patients,
12    in your opinion their PH-ILD was treated; correct?
13    ATTORNEY DYKHUIS:  Object to form.
14    THE WITNESS:  Are you referring to
15    the PH component or the ILD component?
16    BY ATTORNEY DAVIES:
17    Q.    Well, let me -- is there a
18    distinction in your mind?
19    A.    Yeah, we treat the ILD and we'll
20    treat the PH.  PH-ILD is really two diseases
21    together.
22    Q.    So if I have a PH-ILD patient and I
23    treat the PH component in that patient, do you
24    consider that treatment of PH-ILD or not?
25    ATTORNEY DYKHUIS:  Object to form.

Page 99

1    THE WITNESS:  Are you talking
2    about currently or prior to the INCREASE
3    study?
4    BY ATTORNEY DAVIES:
5    Q.    Let's start with prior to the
6    INCREASE study.
7    A.    Yes.  I considered treating PH-ILD
8    in that context, but once again, I feel like I have
9    to qualify it every time you mention PH-ILD prior
10    to the INCREASE study as patients who had pulmonary
11    hypertension that appeared to be out of proportion
12    to their interstitial lung disease.
13    Q.    When you say prior to the INCREASE,
14    you're talking about the prior to initiation of
15    that study or some other time point?
16    A.    Prior to the results coming out of
17    the meeting where there were results.
18    Q.    So prior to you being aware of the
19    results from the INCREASE study, if you prescribed
20    a medication to a patient with PH-ILD, did you
21    consider -- let me start this whole thing over.
22    Prior to you hearing the results of the
23    INCREASE study, did you consider yourself to have
24    treated PH-ILD in a patient if you just impacted
25    the PH component of the disease?

Page 100

1    ATTORNEY DYKHUIS:  Objection to
2    form.
3    THE WITNESS:  I didn't know if I
4    was treating it.  I was hoping I was
5    treating it.  I'd like to make the
6    distinction of treating PH versus helping
7    the patient, because we know that these
8    drugs, Sildenafil, inhaled treprostinil,
9    they lower the pressures in the lung.
10    That's treating the pulmonary
11    hypertension.
12    What I didn't know is if treating
13    and lowering the pressures potentially
14    would result or manifest as a clinical
15    benefit.
16    BY ATTORNEY DAVIES:
17    Q.    And what in your mind was a clinical
18    benefit?
19    A.    There could be multiple
20    manifestations of the clinical benefit.  If the
21    patient comes back and says, Gosh, I feel better,
22    that's benefit.  If they come back and their
23    six-minute walk distance has increased, they say I
24    feel better, then that's a benefit.
25    So in my mind, every patient who I've

Page 101

1    treated like that was an end of point study.  They
2    told me how they were doing.  If they felt better,
3    great.  If not, then frequently I would stop the
4    medication.
5    What I didn't know, even if they felt
6    better, is whether or not it was an effect of the
7    drug or not.  Because you know that there could be
8    a big placebo component even if you go to the
9    INCREASE study.  There were patients who were
10    treated with inhaled trepostinil -- sorry, with
11    placebo who had increases in their walk distance.
12    The only way you can tell if the drug works or not
13    are these big population-based studies like
14    INCREASE, where you have a large group that gets
15    drug and a large group that doesn't get drug.
16    Q.    So in an individual patient setting,
17    how do you know if the treatments that you are
18    giving to your patients are actually effective or
19    not since it's not in a large group setting?
20    ATTORNEY DYKHUIS:  Objection to
21    form.
22    THE WITNESS:  As long as a patient
23    tells me they feel better, I don't really
24    concern myself if it's a placebo effect
25    or if it's real.  If they feel better,



26 (Pages 98 to 101)

Page 102

```
 1          I'll do anything and continue any
 2     medication that they perceive as making
 3     them feel better.
 4     BY ATTORNEY DAVIES:
 5          Q.    But in your mind, is treatment -- in
 6     your mind, is the definition of treatment only
 7     those instances where the drug has a demonstrated
 8     impact on the patient?
 9              ATTORNEY DYKHUIS:  Objection to
10     form.
11              THE WITNESS:  No, that's not my
12     definition of treatment.
13     BY ATTORNEY DAVIES:
14          Q.    Okay.  If there's a placebo
15     treatment, is that treatment?
16              ATTORNEY DYKHUIS:  Objection to
17     form.
18              THE WITNESS:  Yes.  If the patient
19     feels better, you've done something via
20     placebo and it's resulted in improvement,
21     so I would regard that as treatment.
22     BY ATTORNEY DAVIES:
23          Q.    Treprostinil is in part a
24     vasodilator; correct?
25          A.    That's correct.
```

Page 103

```
 1          Q.    What hemodynamics impacted by
 2     treprostinil, in your mind, inform whether or not
 3     there has been a treatment effect?
 4              ATTORNEY DYKHUIS:  Object to form.
 5              THE WITNESS:  If you go back to
 6     the definition, if you lower the mean
 7     pulmonary artery pressure and you lower
 8     the pulmonary vascular resistance, then
 9     the drug has acted as a vasodilator and
10     has been a treatment effect.
11              The key element is whether or not
12     that treatment effect translates to
13     clinical benefit for the patient.  Let me
14     go back as an example to the RISE IP
15     study where we know clearly that
16     riociguat is a pretty potent vasodilator
17     and lowers the pressures, and yet
18     patients didn't benefit and in actual
19     fact they were harmed by then riociguat.
20              So A frequent effect on the
21     pulmonary hypertension doesn't equate
22     necessarily to clinical benefit for the
23     patient.
24     BY ATTORNEY DAVIES:
25          Q.    Do you measure -- in your clinical
```

Page 104

```
 1     practice, do you measure the hemodynamics of
 2     patients on inhaled trepostinil as part of
 3     monitoring those patients?
 4          A.    Typically, no.  Once we start them
 5     on treatment, unless an additional question arises,
 6     it is an invasive test on riociguat and I ask a
 7     specific question you need answered by the test,
 8     then typically no.
 9          Q.    Which hemodynamic -- strike that.
10          Which improvements in which hemodynamic
11     parameters would, in your mind, be indicative of a
12     clinical improvement?
13              ATTORNEY DYKHUIS:  Object to form.
14              THE WITNESS:  None.
15     BY ATTORNEY DAVIES:
16          Q.    None?
17          A.    None.
18          Q.    Is it your testimony that based on
19     hemodynamic data you cannot predict in any way the
20     clinical effects of treprostinil?
21              ATTORNEY DYKHUIS:  Form.
22              THE WITNESS:  Let me differentiate
23     Group 1 from Group 3.
24     BY ATTORNEY DAVIES:
25          Q.    Okay.
```

Page 105

```
 1          A.    Because Group 1, the hemodynamic
 2     effect is a good surrogate for likely clinical
 3     benefit.  There probably have been instances, I
 4     can't cite them and I'm sure there have been
 5     instances of drugs that have had a hemodynamic
 6     effect that haven't come to market because they
 7     haven't manifested clinical benefit.
 8          In Group 3 or PH-ILD, all bets are off,
 9     because now you have the superimposed interstitial
10     lung disease, and so my definitive no was more
11     directed to PH-ILD.
12          What I'm saying is Group 1 is a good
13     surrogate, not always, but in Group 3 it's not
14     necessarily a surrogate for benefit.
15          Q.    Why, in your mind, is it not
16     necessarily a surrogate for clinical benefit in
17     Group 3?
18              ATTORNEY DYKHUIS:  Object to form.
19              THE WITNESS:  Because you have the
20     added layer of the pulmonary parenchymal
21     interstitial lung disease.  I'm happy to
22     do a deep dive into it if you like.  Let
23     me do it so maybe you can -- because I'll
24     try to do it as best I can.
25
```

27 (Pages 102 to 105)

Page 106

```
 1        BY ATTORNEY DAVIES:
 2        Q.    Go ahead.
 3        A.    If you have fibrosis of the lung,
 4   there are many things that contribute to the
 5   pulmonary hypertension.  You have obliteration of
 6   the vessels, you have distortion of the vessels.
 7   There's a lot of different things going on in the
 8   lungs as opposed to Group 1 PAH where they
 9   typically have normal lung disease, let's say.
10        When -- let's say you have 50 percent of
11   your pulmonary vasculature that's totally
12   obliterated and unavailable for perfusion, then the
13   right side of the heart has to put out the whole
14   cardiac outputs into 50 percent of the vasculature.
15        So when you talk about the velocity of the
16   blood flow, the sheer stretch involved, we don't
17   know if that's harmful to the vasculature itself.
18   And we don't know when you have distortion of the
19   vasculature and you have these accelerated blood
20   cells coming in how that impacts overall well-being
21   of the patient.
22        Another concept to remember is take the
23   same example where you have 50 percent of your
24   blood flow -- say a hundred percent of your blood
25   flow going to residual 50 percent of the vascular,
```

Page 107

```
 1   and let's say the velocity has to be processed fast
 2   to maintain your cardiac output.
 3        Well, you also need gas exchange between
 4   the alveoli line and the blood flowing through it,
 5   and now you have fibrosis interlaced.  Typically in
 6   a normal person when a red blood cell traverses the
 7   alveoli and the capillaries, it gets fully
 8   oxygenated one-third of the way through.
 9        But now you have a situation of fibrosis
10   and you have these accelerated red cell particles
11   that are more accelerated because there's been
12   vasodilation, an ability to fix gas exchange
13   becomes impaired.
14        So that just one example -- two examples of
15   how lung disease makes it very different in terms
16   of lowering the pressures enabling more blood to go
17   through, and there can be a negative downside to
18   that.
19        Q.    Why, in your opinion, see a
20   treatment affect with inhaled treprostinil in
21   PH-ILD patients in the INCREASE study?
22             ATTORNEY DYKHUIS:  Object to form.
23             THE WITNESS:  I think a
24        difference, for example, we can apply
25        riociquat to what I just said.  A
```

Page 108

```
 1        difference with inhaled treprostinil is,
 2        number one, it's inhaled.  So most of the
 3        drug is going to the best ventilated
 4        areas of the lung.
 5             If the drug is going to the best
 6        ventilated areas of the lung and dilating
 7        the blood vessels in those best
 8        ventilated areas, then you get the blood
 9        redirected to the best ventilated areas.
10             That's would be just one example
11        of how that might be different to the
12        scenario you I gave you, which is more
13        applicable, say, to a systemically
14        administered agent.  You also have more
15        drug deposition within the area of the
16        lung where you want it to go compared to
17        a systemically administered drug where in
18        the context of fibrotic lung disease you
19        don't know where the drug is going.
20             So more local deposition and, you
21        know -- but to your point, that's how I
22        was skeptical that the INCREASE study
23        would be positive.  And -- but at the end
24        of the day it was unequivocably positive
25        with benefit in the primary secondary
```

Page 109

```
 1        biomarker.  And so thankfully it works
 2        and, you know, it's available to help the
 3        patients.
 4   BY ATTORNEY DAVIES:
 5        Q.    You talk about VQ mismatch a number
 6   of times in your declaration.
 7        Do you recall that?
 8             ATTORNEY DYKHUIS:  Object to form.
 9             THE WITNESS:  Yes.
10   BY ATTORNEY DAVIES:
11        Q.    What is VQ mismatch?
12        A.    I thought I explained it pretty well
13   in my declaration.  I'm not going to read it.  I'm
14   sure you've read it.
15        Q.    If you can explain it.
16        A.    It's easier for me just to read from
17   my declaration.
18        Q.    That's fine.
19        A.    I'll explain.  For gas exchange to
20   take place, you need VQ matching.  The air going
21   into the lungs and into the alveola sac has to be
22   accompanied by blood through the capillaries to
23   interface with the air.
24             If you have areas of the lung where you
25   have VQ mismatch, there are two extremes of that.
```



28  (Pages 106 to 109)

Page 110

1  You can have no air and blood flow; and we refer to
2  it as shunt.  The area is being shunted to the
3  lungs without opportunity for gas exchange.
4       If you have areas of the lung, opposite end
5  of the spectrum where you just have air flow, no
6  blood flow because there's been fibrosis, the blood
7  vessels has been destroyed, then we could talk
8  about that as dead space ventilation.  Air is going
9  in and going out and not participating in gas
10  exchange.
11       Between those two extremes of dead space
12  ventilation and shunt physiology, we have a
13  gradation in the spectrum once again and VQ
14  mismatch with the amount of ventilation going in
15  doesn't match up with the perfusion going by.
16       Q.   So a concern with giving a, for
17  example, systemic oral vasodilator, maybe you
18  actually exacerbate that VQ mismatch by attempting
19  to have blood go to areas of the alveoli that can't
20  actively participate in oxygen exchange; correct?
21            ATTORNEY DYKHUIS:  Object to form.
22            THE WITNESS:  That is a theory of
23       concern.
24  BY ATTORNEY DAVIES:
25       Q.   Okay.  Do you believe that theory?

Page 111

1            ATTORNEY DYKHUIS:  Object to form.
2            THE WITNESS:  It's possible that
3       it does happen.  It's possible that it
4       happens in different lung units in the
5       same patient.
6            There have been studies around
7       this, I believe, for many years ago that
8       maybe a test of VQ mismatch being an
9       issue.  I can't recall that study.  I'm
10       speculating, there are probably studies
11       out there that demonstrated that.
12            So it's a theory, and it's
13       something we lean on sometimes when you
14       can't find a good explanation for
15       worsening oxygenation.
16            So, I think it probably does
17       happen in some patients, yes.
18  BY ATTORNEY DAVIES:
19       Q.   In your opinion, was the fact that
20  riociguat was a systemic orally administered
21  vasodilator, do you believe that that was a reason
22  for why you had increased death in the study
23  population and the reason why that study failed?
24            ATTORNEY DYKHUIS:  Objection to
25       form.

Page 112

1            THE WITNESS:  We don't know, but
2       it could have been a contributing factor,
3       but we don't know.
4  BY ATTORNEY DAVIES:
5       Q.   I think you said one of the
6  advantages of an inhaled therapy is that it
7  actually preferentially directed to the healthy
8  portions of the lung and you avoid some of the
9  concerns associated with the VQ mismatch.  Is that
10  correct?
11            ATTORNEY DYKHUIS:  Object to form.
12            THE WITNESS:  Theoretically
13       possible.  Not healthy, relatively
14       healthier, and so -- but you've got the
15       general principle correct.
16  BY ATTORNEY DAVIES:
17       Q.   In your opinion, is that part of the
18  reason why inhaled treprostinil showed a clinical
19  benefit in the INCREASE study?
20            ATTORNEY DYKHUIS:  Objection to
21       form.
22            THE WITNESS:  It's possible it
23       might have had a role, but we don't know.
24  BY ATTORNEY DAVIES:
25       Q.   What is your opinion?

Page 113

1            ATTORNEY DYKHUIS:  Objection to
2       form.
3            THE WITNESS:  Why the study was
4       positive?
5  BY ATTORNEY DAVIES:
6       Q.   Correct.
7       A.   I don't know.  I actually when I'm
8  giving talks I get asked this question all the
9  time.  What is the reason, what's the biologic
10  reason, and I don't think anyone can say for sure
11  what the biologic reason is.
12       But what I say is we can make sure they
13  have a sound biologic reason of why a drug should
14  work but doesn't, or would you have some questions
15  about how it does work and not know exactly and yet
16  it has clinical benefits -- benefit.  I would much
17  rather take the benefits to the patient than know
18  exactly how it works.
19       There are all these theories that, you
20  know, it goes to the best ventilated areas.  Just
21  enough drug and the enough dose to provide benefit,
22  but we don't know for sure how or why it works.
23       You know, on a cellular level there are all
24  sorts of pathways to show positive benefits, and we
25  don't know which one might have been of benefit to



29 (Pages 110 to 113)

Page 114

1    the patients. So we can't pinpoint exactly how it
2    works, and it probably works by multiple different
3    ways in terms of providing benefit.
4        Q.    We talked earlier about the fact
5    that Tyvaso was initially approved in Group 1 in
6    2009.
7        Do you recall that?
8        A.    Yes.
9        Q.    That was a nebulized formulation in
10   2009; is that correct?
11       A.    Yes.
12       Q.    So in 2009 with the approval of
13   Tyvaso inhaled, practitioners in the field would
14   have recognized that that treprostinil was going to
15   be preferentially delivered to the vaso ventilated
16   portions of the lung; correct?
17           ATTORNEY DYKHUIS:  Object to form.
18           THE WITNESS:  It was approved for
19       Group 1 PAH patients who generally don't
20       have lung disease, so you don't have this
21       VQ imbalance in Group 1 patients as you
22       do with patients with lung disease.
23           I just want to come back to the
24       question that you asked previously.
25           There might be people who say that

Page 115

1    inhaled treprostinil works because it's a
2    vasodilator, it's clear it's a
3    vasodilator that you see in patients and
4    that's why it worked.
5        But in patients with lung disease,
6    we know it's not as simple as that we
7    have other drugs like riociguat, which
8    are also very good vasodilators and it
9    failed. So I think to say well, it's a
10   vasodilator, it's obvious that it worked.
11   It's kind of naive without taking into
12   account the prior literature.
13   BY ATTORNEY DAVIES:
14       Q.    Isn't the difference in
15   administration between riociguat being systemically
16   administered -- let me start over.
17       The fact that riociguat is a systemic
18   vasodilator because it's given orally, it's a
19   differentiating factor as compared to inhaled
20   treprostinil; correct?
21           ATTORNEY DYKHUIS:  Object to form.
22           THE WITNESS:  It's one of many
23       differentiating factors.
24   BY ATTORNEY DAVIES:
25       Q.    I want to go back to a question I

Page 116

1    asked you earlier.
2        So after receiving -- after you received
3    the first report of results from the INCREASE
4    study, did you believe that you were treating the
5    PH-ILD in a patient if you were just treating the,
6    or impacting the PH component?
7            ATTORNEY DYKHUIS:  Object to form.
8            THE WITNESS:  I want to make sure
9        I understood that correctly.  Whenever I
10       treat a patient, I want to benefit the
11       patient.
12           So after the INCREASE study, I
13       believe that we were treating the patient
14       because they were having benefit.
15   BY ATTORNEY DAVIES:
16       Q.    So your -- is it true that your
17   definition of treatment, both before and after the
18   INCREASE study, was that if you saw a benefit in
19   the patient, it didn't matter whether the effects
20   of the inhaled treprostinil were on PH or were on
21   the ILD component.  Either way you consider that to
22   be treatment if there was an improvement in the
23   patient?
24           ATTORNEY DYKHUIS:  Object to form.
25           THE WITNESS:  Improvement in the

Page 117

1        patient is very likely -- much more
2        likely related to the PH component.
3            When you treat the fibrosis
4        component and you've seen this with
5        anti-fibrotic drugs, all it does is delay
6        progression of the fibrosis.  Once
7        scarring is there, you can't reverse it.
8        So my belief was that it was related
9        mostly to an impact on the pulmonary
10       hypertension.
11   BY ATTORNEY DAVIES:
12       Q.    Okay.  Do you believe that inhaled
13   treprostinil in the INCREASE study had any role on
14   reversing the pulmonary fibrosis in those patients?
15       A.    That would be speculative.  I mean,
16   there are mechanisms whereby it could have
17   anti-fibrotic properties, and that's the reason for
18   the Teton study to see if we can validate that.
19       What we saw, specifically in the subgroups
20   post hoc analysis or the numbers, is that it did
21   appear, the FVC was about the zero line, the line
22   of unity starting out at 16 weeks.
23       So it gives the appearance of apparent
24   improvement.  But the error bars crossed the zero
25   line, and so there can be vacillations in the FVC.



30 (Pages 114 to 117)

Page 118

1  So we don't know.  To say that there's an
2  improvement in the fibrosis is very speculative.
3       When you have fibrosis being laid down,
4  there are various stages of fibrosis from early
5  collagen deposition, fiberblast activation, early
6  scarring to end stage honeycombing.
7       Is it conceivable that anti-fibrotic drugs
8  can reverse the earlier stages of fiberblast
9  proliferation and collagen deposition?  It's quite
10 possible.
11      But advanced fibrosis it doesn't reverse.
12 Whether the inhaled treprostinil has any
13 independent anti-fibrotic properties, we don't
14 know.  What we can say about the post hoc analysis
15 from the INCREASE study was that it was
16 hypothesis-generating and now we're testing that
17 hypothesis in the Teton program.
18   Q.   So based on that, is it fair to say
19 that you believe the majority of the treatment
20 effects that you saw an increase for inhaled
21 trepostinil are due to treatment of the PH
22 component?
23           ATTORNEY DYKHUIS:  Object to form.
24           THE WITNESS:  I believe that's
25      much more likely.

Page 119

1      BY ATTORNEY DAVIES:
2   Q.   Was the INCREASE study designed to
3  evaluate the treatment effects of inhaled
4  treprostinil on the fibrosis component of PH-ILD?
5           ATTORNEY DYKHUIS:  Object to form.
6           THE WITNESS:  No, it wasn't.
7      BY ATTORNEY DAVIES:
8   Q.   Why not?
9   A.   Because at that time before the
10 study we had no notional idea that it might have
11 independent anti-fibrotic properties.
12   Q.   And even after the INCREASE study,
13 you can't say with certainty whether or not
14 treprostinil has anti-fibrotic properties and
15 that's why you're conducting additional studies;
16 correct?
17           ATTORNEY DYKHUIS:  Object to the
18      form.
19           THE WITNESS:  That's correct.
20      It's been shown in animal models that it
21      might have anti-fibrotic properties.  But
22      whether or not that translates into human
23      subjects remains to be determined by the
24      Teton study.
25

Page 120

1      BY ATTORNEY DAVIES:
2   Q.   Prior to the INCREASE study, did you
3  believe inhaled treprostinil would be safe in the
4  PH-ILD patient population?
5           ATTORNEY DYKHUIS:  Object to form.
6           THE WITNESS:  We didn't know, and
7      that's why spirometry, which captures
8      FVC, was included as a safety endpoint.
9      BY ATTORNEY DAVIES:
10  Q.   So was the INCREASE study designed
11 to assess the impact of inhaled treprostinil on
12 PH component of PH-ILD?
13           ATTORNEY DYKHUIS:  Objection to
14      form.
15           THE WITNESS:  It was designed to
16      evaluate if it had clinical benefit.  It
17      wasn't designed to test PH, because
18      otherwise we would have had to write off
19      that as our primary endpoint.
20      BY ATTORNEY DAVIES:
21  Q.   Was the INCREASE study designed to
22 evaluate the clinical benefit of inhaled
23 treprostinil in the PH component of PH-ILD?
24           ATTORNEY DYKHUIS:  Object to form.
25           THE WITNESS:  The thought was that

Page 121

1      if it were to have benefit, it would be
2      through the PH component, yes.
3      BY ATTORNEY DAVIES:
4   Q.   Was it designed to actually assess
5  that, though?  Was it powered to assess that?
6           ATTORNEY DYKHUIS:  Objection to
7      form.
8           THE WITNESS:  The clinical
9      benefit, yes.
10      BY ATTORNEY DAVIES:
11  Q.   Sitting here today, what treatments
12 that are approved for Group 1 PH have you
13 prescribed in your Group 3 PH patients?
14           ATTORNEY DYKHUIS:  Objection to
15      form.
16           THE WITNESS:  I have to go through
17      them all in my head.  I mentioned
18      Sildenafil.  Certainly not riociguat.
19      Not inhaled iloprost.  We don't use
20      anti-receptive antagonists.
21           (Reporter clarification)
22   Q.   Maybe just let me reask my question
23 and we'll just try to go through a little bit
24 slower.
25      So what treatments approved for Group 1



31  (Pages 118 to 121)

Page 122

1  pulmonary hypertension have you prescribed for
2  Group 3 patients?
3          ATTORNEY DYKHUIS:  Objection to
4      form.
5          THE WITNESS:  Without going
6      through the exhaustive list of available
7      therapies, Sildenafil, as I mentioned.
8      Inhaled treprostinil, IV treprostinil,
9      and maybe subcutaneous treprostinil.  And
10     maybe tadalafil, t-a-d-a-l-a-f-i-l.
11  BY ATTORNEY DAVIES:
12     Q.    With respect to IV treprostinil, did
13  you give that to a Group 3 patient prior to
14  receiving the results of the INCREASE study?
15         ATTORNEY DYKHUIS:  Objection to
16     form.
17         THE WITNESS:  IV and subcutaneous
18     treprostinil are given parenchymally,
19     which means subcutaneously or
20     intravenously.  Those we reserve for the
21     most severe form of hypertension, so
22     these were patients clearly below the
23     Group 1 PAH component but had some lung
24     disease in the context of that.  Those
25     are the patients who got those therapies.

Page 123

1  BY ATTORNEY DAVIES:
2      Q.    You prescribed that in those
3  patients prior to receiving the results of the
4  INCREASE study; correct?
5      A.    Correct.
6          ATTORNEY DYKHUIS:  Object to form.
7      Q.    With Tadalafil, did you prescribe
8  that in Group 3 patients prior to receiving the
9  results of the INCREASE study?
10         ATTORNEY DYKHUIS:  Object to form.
11         THE WITNESS:  Probably so.
12     There's very little data on Tadalafil.
13     And I might have mentioned it because I
14     might have.  As I mentioned, Sildenafil
15     was more about go to PDE5 inhibitor.
16     Tadalafil is just a more convenient
17     version of a PDE5 inhibitor given once a
18     day versus three times a day.
19  BY ATTORNEY DAVIES:
20     Q.    In your opinion, are there any
21  hemodynamic changes that would be indicative of an
22  improvement in exercise capacity for a PH-ILD
23  patient?
24         ATTORNEY DYKHUIS:  Objection to
25     form.

Page 124

1          THE WITNESS:  None.
2  BY ATTORNEY DAVIES:
3      Q.    In your opinion, do hemodynamic
4  changes have any predictive benefit in suggesting
5  an improvement in exercise capacity for a PH-ILD
6  patient?
7          ATTORNEY DYKHUIS:  Objection.
8          THE WITNESS:  I apologize.
9  BY ATTORNEY DAVIES:
10     Q.    That's no problem at all.
11     A.    I just want to note that I
12  apologized for the cough.  I don't know if you
13  capture a cough, but I was apologizing for the
14  record.  For the record, I'm coughing a lot, and I
15  apologize for that.
16     Q.    Not a problem.  Would you like me to
17  repeat the question?
18     A.    Yes.
19     Q.    So in your opinion, do hemodynamic
20  changes have any predictive value in suggesting an
21  improvement in exercise capacity for a PH-ILD
22  patient?
23         ATTORNEY DYKHUIS:  Object to form.
24         THE WITNESS:  What I would say is
25     that they do have somewhat of a

Page 125

1      predictive capability in the more severe
2      patients that I just described to you.
3      The ones who are so severe that they
4      require parenchymal therapy.
5          So when you have very high
6      pressure in a high pulmonary vascular
7      resistance there's a greater likelihood
8      and certainly a greater hope that we will
9      see some benefit.
10         Otherwise, for more general
11     population of PH-ILD, most of whom have
12     more mild to moderate pulmonary
13     hypertension, they are generally
14     unpredictive.
15         (Discussion held off the
16     record.)
17         ATTORNEY DAVIES:  We can keep
18     going until lunch and we can take a
19     break?  It's another 30 minutes?
20         ATTORNEY DYKHUIS:  Sure.
21  BY ATTORNEY DAVIES:
22     Q.    And if you decide that was a bad
23  decision and you want to break before then, you can
24  let me know.
25     A.    Yeah.



32  (Pages 122 to 125)

Page 126

```
1        Q.   Is six-minute walk distance a
2  measure of increased exercise capacity?
3               ATTORNEY DYKHUIS:  Objection to
4        form.
5               THE WITNESS:  We regard it as a
6        surrogate for what patients might be
7        capable of doing.  So the answer to that
8        would be yes.
9    BY ATTORNEY DAVIES:
10       Q.   Other than six-minute walk distance,
11 are there any other measures of increased exercise
12 capacity?
13              ATTORNEY DYKHUIS:  Object to form.
14              THE WITNESS:  There are things
15       like cardiopulmonary exercise testing.
16       There are --
17   BY ATTORNEY DAVIES:
18       Q.   I'm sorry, go ahead.
19       A.   There are patient report outcomes
20 where we ask them about how much they can do.  The
21 other test that we generally go to, like the Shekel
22 test, and so there are various forms of evaluating
23 exercise.  But the six-minute walk is the most
24 commonly accepted one in terms of what we do in the
25 clinic and in clinical trials.
```

Page 127

```
1        Q.   Are you currently using inhaled
2  treprostinil to treat PH-ILD patients?
3        A.   Yes.
4        Q.   Are you using nebulized Tyvaso to
5  treat PH-ILD patients?
6               ATTORNEY DYKHUIS:  Object to form.
7               THE WITNESS:  Nebulized and the
8        dry powder inhaler.
9    BY ATTORNEY DAVIES:
10       Q.   Have you seen any switching in your
11 PH-ILD patients who you've started on the dry
12 powder inhaler switching to the nebulized Tyvaso?
13       A.   Yes.
14       Q.   And why do you think that is
15 occurring?
16              ATTORNEY DYKHUIS:  Object to form.
17              THE WITNESS:  They sometimes don't
18       tolerate it.  Sometimes because it's one
19       breath, especially in the context of
20       interstitial lung disease, they might not
21       be able to take a deep breath to get the
22       drug down into the areas you want it.
23              So in some patients I feel more
24       comfortable using the nebulized version
25       because I feel more assured that at least
```

Page 128

```
1        they're taking six, nine, 12 risks that
2        some of the drug is getting down versus
3        one hit of the DPI, one cough, and the
4        drug comes out.
5               So I think it's the most reliable
6        way of treating these patients that I do
7        use both, depending on the individual
8        patient.  But you can well imagine
9        someone coughing right after they get the
10       DPI and they get into drug.
11   BY ATTORNEY DAVIES:
12       Q.   Do you have a sense for the percent
13 of patients that you started on Tyvaso DPI that
14 have switched back to the Tyvaso nebulized
15 formulation?
16              ATTORNEY DYKHUIS:  Object to form.
17              THE WITNESS:  25, 30 percent.  I'm
18       guessing, though, that it's not one of
19       two.
20   BY ATTORNEY DAVIES:
21       Q.   Are you familiar with the Dreamboat
22 device?
23              ATTORNEY DYKHUIS:  Object to form.
24              THE WITNESS:  I am not.
25
```

Page 129

```
1    BY ATTORNEY DAVIES:
2        Q.   Are you aware that the Dreamboat is
3  the dry powder inhaler that's used for Tyvaso DPI?
4               ATTORNEY DYKHUIS:  Object to form.
5               THE WITNESS:  I'm familiar with
6        the DPI for Tyvaso.  I didn't know if it
7        was called the Dreamboat.
8    BY ATTORNEY DAVIES:
9        Q.   In your opinion, is the DPI for
10 Tyvaso a high-resistance device?
11              ATTORNEY DYKHUIS:  Objection to
12       form.
13              THE WITNESS:  I believe it is a
14       high-resistance device.
15   BY ATTORNEY DAVIES:
16       Q.   What is a high-resistance device?
17              ATTORNEY DYKHUIS:  Object to form.
18              THE WITNESS:  I've never
19       researched it myself, to be honest, but I
20       suspect when they take a breath in, it's
21       more of a resistance to taking the breath
22       in versus a low-resistance device.
23   BY ATTORNEY DAVIES:
24       Q.   Why do you believe that the Tyvaso
25 DPI device is a high-resistance device?
```



33 (Pages 126 to 129)

Page 130

1      ATTORNEY DYKHUIS:  Object to form.
2         THE WITNESS:  I have no idea.
3    BY ATTORNEY DAVIES:
4      Q.    Okay.  What, in your opinion, is a
5    pulsed inhalation device?
6         ATTORNEY DYKHUIS:  Objection to
7      form.
8         THE WITNESS:  One that's not
9      continuous, that it comes out in one
10     pulse.
11   BY ATTORNEY DAVIES:
12     Q.    Is the Tyvaso DPI a pulse inhalation
13   device?
14        ATTORNEY DYKHUIS:  Objection to
15     form.
16        THE WITNESS:  I believe it is
17     regarded as such.
18   BY ATTORNEY DAVIES:
19     Q.    And what is that belief based on?
20     A.    That you actuate it, and it comes
21   out as a pulse while the patient is taking a breath
22   in.
23     Q.    When you say you actuate it, you're
24   equating the breath in with the pulse; is that
25   correct?

Page 131

1      ATTORNEY DYKHUIS:  Object to form.
2         THE WITNESS:  I'm assuming it is.
3    BY ATTORNEY DAVIES:
4      Q.    But you don't know for certain;
5    correct?
6         ATTORNEY DYKHUIS:  Object to form.
7         THE WITNESS:  I think it's a good
8      assumption.
9    BY ATTORNEY DAVIES:
10     Q.    Okay.  But you don't know for
11   certain; correct?
12        ATTORNEY DYKHUIS:  Object to form.
13        THE WITNESS:  I don't know the
14     technicalities of when the pulse comes
15     out versus when the patient takes the
16     breath in.  I've never taken a hit
17     myself.  I might have, you know, on a
18     placebo device when it first came out,
19     but I don't know technically how the
20     pulse relates to the breath going in.
21   BY ATTORNEY DAVIES:
22     Q.    Have you ever -- sitting here today,
23   do you recall any publication where you referred to
24   a dry powder inhaler as a pulse inhalation device?
25        ATTORNEY DYKHUIS:  Object to form.

Page 132

1         THE WITNESS:  I've written
2      things over the years, and it could be
3      something where there's something about a
4      pulse inhalation device, but I don't
5      recall if I did or I didn't.
6    BY ATTORNEY DAVIES:
7      Q.    And sitting here today, you can't
8    recall any presentation that you've given where
9    you've referred to a dry powder inhaler as a pulsed
10   inhalation device; correct?
11        ATTORNEY DYKHUIS:  Object to form.
12        THE WITNESS:  I've given many
13     presentations.  And I don't know if I
14     have or I haven't.  I may have.
15   BY ATTORNEY DAVIES:
16     Q.    Sitting here today you can't recall
17   any particular circumstance; correct?
18        ATTORNEY DYKHUIS:  Object to form.
19        THE WITNESS:  That's correct.
20     Q.    Do you know whether the Tyvaso DPI
21   pulses the drug independently of the patient's
22   inhalation?
23        ATTORNEY DYKHUIS:  Object to form.
24        THE WITNESS:  No, the patient has
25     got to be taking a breath in for the

Page 133

1      pulse to occur.  Otherwise, you know,
2      they would be walking around with it in
3      their pocket and it would go off.  So
4      there's got to be something to activate
5      the device.
6    BY ATTORNEY DAVIES:
7      Q.    Do you consider the nebulizer that's
8    provided with Tyvaso to be a pulsed inhalation
9    device?
10        ATTORNEY DYKHUIS:  Object to form.
11        THE WITNESS:  My understanding is
12     that it's more continuous.  That's my
13     understanding.
14   BY ATTORNEY DAVIES:
15     Q.    What is that understanding based on?
16        ATTORNEY DYKHUIS:  Object to form.
17        THE WITNESS:  The fact that it's a
18     nebulizer, which are generally
19     continuous.  Whether there are little
20     pulses in the context of that nebulizer,
21     I don't know, but I've always regarded
22     nebulizers to be more continuous.
23   BY ATTORNEY DAVIES:
24     Q.    And you have never seen the dry
25   powder inhaler for Yutrepia; correct?



34  (Pages 130 to 133)

Page 134

```
1              ATTORNEY DYKHUIS:  Object to form.
2         THE WITNESS:  Not that I can
3     recall.
4      BY ATTORNEY DAVIES:
5         Q.    You've never seen any schematics or
6     drawings of the dry powder inhaler for Yutrepia;
7     correct?
8         A.    I believe I might have.
9         Q.    Okay.  When do you believe you might
10    have?
11             ATTORNEY DYKHUIS:  Object to form.
12             THE WITNESS:  There might be a
13         picture in my declaration.  I thought
14         there was something from the proposed
15         label.  Let's see if I'm correct.  I
16         thought there was.  I could be wrong.
17         No.
18             I thought there might be a little
19         picture of it on this label, but there
20         isn't.  My apologies.
21             I might have -- you know, it's
22         been around for all these years, I can't
23         answer to if I haven't Googled an image
24         before, so I probably have, but I'm not a
25         hundred percent certain.
```

Page 135

```
1             ATTORNEY DAVIES:
2         Q.    Okay.  Sitting here today, you have
3     no knowledge of whether the Yutrepia DPI provides
4     the powder continuously or in pulses in any way;
5     correct?
6             ATTORNEY DYKHUIS:  Object to form.
7             THE WITNESS:  My assumption is if
8         it's a dry powder, then it should be
9         pulsed, that's my assumption.
10     BY ATTORNEY DAVIES:
11         Q.    But you can't say with certainty
12    because you've never seen the device or seen it
13    described; correct?
14             ATTORNEY DYKHUIS:  Object to form.
15             THE WITNESS:  That's correct.
16     BY ATTORNEY DAVIES:
17         Q.    You mentioned that the Tyvaso DPI,
18    in your opinion, was a high-resistance device.  Do
19    you believe that you would see less switching if
20    patients were provided with a low-resistance DPI
21    with the same efficacy?
22             ATTORNEY DYKHUIS:  Objection to
23         form.
24             THE WITNESS:  No idea.  I don't
25         think it's necessarily a function of the
```

Page 136

```
1         resistance.
2      BY ATTORNEY DAVIES:
3         Q.    What do you think it's a function
4     of?
5             ATTORNEY DYKHUIS:  Form.
6             THE WITNESS:  Just general
7         tolerability.  Every patient is
8         different, and there could be an
9         irritation of the particles.
10             I would hypothesize if you have a
11         low-resistance device and suddenly you
12         get a rush of the particles to the back
13         of your throat, that might induce more
14         coughing and perhaps make patients less
15         tolerable of the device.
16     BY ATTORNEY DAVIES:
17         Q.    In your clinical practice, how do
18    you determine whether there's been an improvement
19    in exercise capacity in your patients?
20             ATTORNEY DYKHUIS:  Objection to
21         form.
22         Q.    Let me restate that.
23         In your PH patients, how do you determine
24    whether there has been an improvement in
25    exercise-type capacity?
```

Page 137

```
1             ATTORNEY DYKHUIS:  Objection to
2         form.
3             THE WITNESS:  Talking to the
4         patients always helps in terms of what
5         they can do versus what they used to be
6         able to do.  And then we look at the
7         six-minute walk test, and that gives us
8         an idea of what the exercise capabilities
9         are.
10     BY ATTORNEY DAVIES:
11         Q.    What information would a patient
12    provide you, short of performing a six-minute walk
13    test, that would inform you as to improvement of
14    the exercise capacity?
15             ATTORNEY DYKHUIS:  Object to form.
16             THE WITNESS:  They might come in
17         and say, Gosh, Doc, thanks for that
18         medicine.  I feel so much better.  Before
19         I got shortness of breath going to the
20         bathroom, and now I can go to the
21         bathroom and get the mail that I couldn't
22         do before.  That's really dependent on
23         the individual patient.
24     BY ATTORNEY DAVIES:
25         Q.    What is an exacerbation of
```



35 (Pages 134 to 137)

Page 138

1  interstitial lung disease?
2       A.    I believe you asked that earlier,
3  but just to reiterate, our form of the definition
4  from our society where it's a worsening of
5  shortness of breath over approximately a four-week
6  period accompanied by worsening oxygenation,
7  accompanied by increased infiltrates on chest
8  imaging, and ruling out other potential causes for
9  this such as heart failure, for example.
10      Q.    And how would you determine whether
11 there had been a reduction in one of those
12 exacerbations?
13           ATTORNEY DYKHUIS:  Object to form.
14           THE WITNESS:  You cannot determine
15      that on an individual patient basis.  It
16      takes large studies, much like we had in
17      INCREASE where you compare the one group
18      to the other to see what the incidence is
19      in the one group versus the other.
20           So on an individual patient you
21      can't know if you're having any impact on
22      preventing acute exacerbations.
23 BY ATTORNEY DAVIES:
24      Q.    So in a patient you couldn't
25 determine whether or not you were improving an

Page 139

1  exacerbation.  You would need to look at a large
2  study population to do that; correct?
3           ATTORNEY DYKHUIS:  Object to the
4      form.
5           THE WITNESS:  What you just said
6      is a little bit different.  Prevention
7      versus treatment, which is what you just
8      alluded to, I think.
9           Treatment of acute exacerbations
10      is very, very difficult.  What we saw in
11      the INCREASE study was fewer acute
12      exacerbations.  So less incidence of
13      acute exacerbations versus as a treatment
14      for acute exacerbation.
15 BY ATTORNEY DAVIES:
16      Q.    We talk about FVC.  Could you tell
17 me what FVC stands for?
18           ATTORNEY DYKHUIS:  Object to form.
19           THE WITNESS:  Forced vital
20      capacity.
21 BY ATTORNEY DAVIES:
22      Q.    What is forced vital capacity?
23      A.    It's the amount of air that a
24 patient can blow out after taking a full
25 inspiration and then blowing out as hard as they

Page 140

1  can until they can't blow out anymore.  That would
2  be the forced vital capacity.
3       Q.    And how would you determine in a
4  patient that there has been an improvement in
5  forced vital capacity?
6       A.    There's some inherent variability
7  around the forced vital capacity as much as
8  10 percent.  So if there's a 3 percent improvement,
9  we don't know if it's test-test variability or if
10 it's real.
11           When we get beyond the 10 percent number,
12 either up or down, then you can be more certain
13 that the change you're seeing is real.
14      Q.    So if you're seeing less than a
15 10 percent change in forced vital capacity in a
16 patient, you personally would not be confident that
17 that's a real change; correct?
18           ATTORNEY DYKHUIS:  Objection.
19           THE WITNESS:  Like everything
20      else, it's a spectrum.  Nine percent is
21      more of a change than 1 percent, so
22      there's no definite cutoff.  And
23      11 percent is worse than 10 percent, but
24      we typically regard 10 percent as a
25      threshold of a meaningful change.  But it

Page 141

1      could be that changes of less than
2      5 percent are meaningful, but because
3      it's a spectrum it's not as meaningful as
4      a 10 percent change.
5  BY ATTORNEY DAVIES:
6       Q.    In the INCREASE study, do you recall
7  to the extent there was a change in FVC if that was
8  greater than or less than 3 percent?
9           ATTORNEY DYKHUIS:  Objection to
10      form.
11           THE WITNESS:  Are you talking
12      about the difference to the placebo arm?
13 BY ATTORNEY DAVIES:
14      Q.    Correct.
15      A.    I don't recall what that exact
16 number was.  I do recall that it was statistically
17 significant.  The 5 percent, 10 percent quality is
18 for the individual patient.  For a population-based
19 study where you have many contributors, you can
20 have a change as small as 1 or 2 percent which
21 might be statistically significant.
22      Q.    But you could not determine whether
23 there had been a -- let me restart here.
24           You couldn't determine in a patient whether
25 there had been a statistically significant

36  (Pages 138 to 141)

Page 142

1  difference in FVC; correct?
2      ATTORNEY DYKHUIS:  Object to the
3  form.
4      THE WITNESS:  No.  As I mentioned
5  previously, you can't determine
6  statistically -- statistical significance
7  in an individual patient.
8      ATTORNEY DAVIES:  I'm going to
9  move to some other stuff.  Do you want to
10  take a break for lunch now, because I
11  think we have to grab something.
12      ATTORNEY DYKHUIS:  Sounds good.
13      THE VIDEOGRAPHER:  We are off the
14  record at 11:51.
15      (Recess taken from 11:51 a.m
16  to 12:46 p.m.)
17      THE VIDEOGRAPHER:  We are on the
18  record at 12:46.
19  BY ATTORNEY DAVIES:
20      Q.    Welcome back, Doctor.  I'm just
21  going to grab two documents here.
22  So I'm marking as Exhibit Number 3 a
23  publication entitled "Controlled Trial of
24  Sildenafil and Advanced Idiopathic Pulmonary
25  Fibrosis" by Zisman, et al., and bearing production

Page 143

1  number UTC_PH-ILD_010830 to -838.
2      (Exhibit 19 was marked for
3  identification.)
4      Q.    And, Doctor, I'm going to ask for
5  your help in passing a copy to counsel as well.
6      A.    (Witness complies with request.)
7      Q.    My first question for you is have
8  you seen Exhibit 3 before?
9      A.    Yes, I have.
10      Q.    And what is Exhibit 3?
11      A.    It's a report of a controlled trial
12  of "Sildenafil and Advanced Idiopathic Pulmonary
13  Fibrosis" published in the New England Journal of
14  Medicine in 2010.
15      Q.    If you turn to page 627 of this
16  paper, and it's near the bottom of the page the
17  author says, "Although the study did not meet its
18  prespecified primary outcome and the therapeutic
19  efficacy of Sildenafil is far from established, our
20  data provides the clinical equipoise needed to
21  conduct further trials involving patients with
22  advanced idiopathic pulmonary fibrosis."
23  Do you see that?
24      ATTORNEY DYKHUIS:  Object to form.
25      THE WITNESS:  I'm sorry.  Where

Page 144

1  about did you say it was?
2  BY ATTORNEY DAVIES:
3      Q.    If you go to the bottom of the first
4  column --
5      A.    Okay.
6      Q.    -- do you see there's a sentence
7  that says, "Although this study"?
8      A.    Yes.
9      Q.    And then if you continue on to the
10  next column, it refers to the data providing the
11  clinical equipoise regarding the trials.  What is
12  clinical equipoise?
13      A.    Equipoise to me always means the
14  balance, clinical balance, so they're suggesting
15  that there should be further trials involving
16  patients with advanced IPF.
17      Q.    And does this study examine the
18  impact of Sildenafil in six-minute walk distance in
19  patients with advanced idiopathic pulmonary
20  fibrosis?
21      ATTORNEY DYKHUIS:  Object to form
22  and foundation.
23      THE WITNESS:  Yes, it did.
24  BY ATTORNEY DAVIES:
25      Q.    Is this study referred to as the

Page 145

1  STEP-IPF study in your report?
2      ATTORNEY DYKHUIS:  Object to form.
3      THE WITNESS:  Yes.
4      Q.    I'm now going to enter as Nathan
5  Exhibit 4 an article entitled "Sildenafil Preserves
6  Exercise Capacity in Patients with Idiopathic
7  Pulmonary Fibrosis and Right-sided Ventricular
8  Dysfunction" published in Chest by Han et al. in
9  June of 2013.
10      (Exhibit 4 was marked for
11  identification.)
12      Q.    Doctor, have you seen this paper
13  before?
14      A.    Yes, I have.
15      Q.    What is this?
16      A.    This paper, as best I recall, was a
17  subgroup analysis of the STEP-IPF study in those
18  patients who had echocardiographic evidence of
19  right ventricular dysfunction.
20      Q.    So in the Chest publication, are
21  they describing an evaluation of a subgroup of the
22  patients within the STEP-IPF trial that was
23  described in Exhibit 3?
24      ATTORNEY DYKHUIS:  Object to the
25  form and foundation.

37 (Pages 142 to 145)

Page 146

1    THE WITNESS: I'd have to check,
2  but I don't think they talked about the
3  STEP study, which is a post hoc study in
4  the paper that was published in the New
5  England Journal, and I think that I
6  mentioned that, and I need to read
7  the paper to be certain about that.
8  BY ATTORNEY DAVIES:
9    Q.   But you agree that Exhibit 2 is a
10 subgroup study of the earlier STEP-IPF Zisman
11 publication; correct?
12   ATTORNEY DYKHUIS: Object to form.
13   THE WITNESS: Yes, I do.
14 BY ATTORNEY DAVIES:
15   Q.   And with respect to this subgroup
16 analysis, I'm looking on the first page of
17 Exhibit 62, in the -- under Results, do you see the
18 Results section in that box?
19   ATTORNEY DYKHUIS: Object to form.
20   THE WITNESS: Yes, I do.
21 BY ATTORNEY DAVIES:
22   Q.   So at least with this subgroup of
23 subjects, the authors report, "In the subgroup of
24 subjects with RVSD, subjects treated with
25 Sildenafil experienced less detriment in six-minute

Page 147

1  walk distance, 99.3 meters, P equals .01 and
2  greater improvement in SGRQ and EuroQol analog
3  scores than subjects receiving placebo."
4    Do you see that?
5    A.   I do.
6    ATTORNEY DYKHUIS: Object to form.
7    Q.   Okay. I apologize. Just so it's --
8  and I screwed up the exhibit number, so just to
9  make it clear, I apologize. I was referring to
10 Exhibit 4 instead of Exhibit 62.
11   So in Exhibit 4 you would agree that the
12 authors with respect to this subgroup are reporting
13 a significantly -- a statistically significant
14 improvement in six-minute walk distance with
15 treatment of Sildenafil as compared to placebo;
16 correct?
17   ATTORNEY DYKHUIS: Object to form.
18   THE WITNESS: That's what they're
19   reporting on, yes.
20 BY ATTORNEY DAVIES:
21   Q.   They also report a significantly --
22 a statistically significant improvement in SGRC
23 within this subgroup as well; correct?
24   ATTORNEY DYKHUIS: Object to form.
25   THE WITNESS: SGRQ, yes.

Page 148

1  BY ATTORNEY DAVIES:
2    Q.   And they also report a statistically
3  significant improvement in the EuroQOL visual
4  analog scores within this subgroup of patients from
5  the larger STEP-IPF study; correct?
6    ATTORNEY DYKHUIS: Object to form.
7    THE WITNESS: Yes.
8  BY ATTORNEY DAVIES:
9    Q.   So at least with respect to the
10 subgroup of patients that are further analyzed in
11 the Chest publication in Exhibit 4, the STEP-IPF
12 trial showed safety and efficacy; correct?
13   ATTORNEY DYKHUIS: Object to form.
14   THE WITNESS: I disagree with
15   that.
16 BY ATTORNEY DAVIES:
17   Q.   Why.
18   A.   Let me draw your attention to the
19 primary publication, and in terms of the methods,
20 if you go to the methods, if you go to page 621,
21 the last paragraph.
22   "The trial was conducted in two periods:
23 Period 1 was a 12-week double-blind
24 placebo-controlled study of Sildenafil. Period 2
25 was a 12-week open-label extension with all

Page 149

1  patients on Sildenafil."
2    Now, draw your attention to Table 3.
3    Q.   I'm sorry, Doctor. Which are we --
4    A.   Still the primary publication.
5    Q.   Okay.
6    A.   Table 3, this was an intent to treat
7  analysis of mortality. So patients were analyzed
8  in whichever group they were originally assigned
9  to.
10   So if you look numerically, they were at
11 week 28. There were four deaths in the Sildenafil
12 arm, 11 deaths in the placebo arm. So it looks
13 like numerically Sildenafil does better than
14 placebo because this is an intent to treat.
15   Sometimes I say intent to treat is intent
16 to trick. I'll show you the trick here. The trick
17 is that all patients on placebo were switched to
18 Sildenafil. So the additional deaths in the
19 placebo arm were on Sildenafil. There were seven
20 additional deaths. So safety, no.
21   When you do a post hoc analysis, you are
22 taking out patients who died or dropped out, and at
23 best I would say that Chest paper is hypothesis
24 generating. But these numbers if they had analyzed
25 the patients on therapy, the number of deaths would



38 (Pages 146 to 149)

Page 150

1  have switched.  There would have been 11 on
2  Sildenafil and four on placebo, and that's why I
3  disagree.
4        Sometimes you have studies that have
5  discordant outcomes.  They might make patients feel
6  better, but patients can die earlier.
7     Q.    The New England Journal of Medicine
8  paper at Exhibit 3 looks like it was published in
9  2010; correct?
10    A.    Correct.
11    Q.    And you mentioned that you used
12  Sildenafil in the treatment of PH-ILD patients;
13  correct?
14    A.    Correct.
15    Q.    And did you continue to do so after
16  the publication of this study in 2010?
17        ATTORNEY DYKHUIS:  Object to form.
18        THE WITNESS:  I did if they had PH
19    of sufficient severity.  Another point
20    around this is we don't know which of
21    these patients have pulmonary
22    hypertension because they didn't have
23    riociquat.  This was a study in advanced
24    IPF, not in patients with PH and IPF.
25

Page 151

1     BY ATTORNEY DAVIES:
2     Q.    Going back to Exhibit 4, which is
3  the Chest paper.  You would agree though, that with
4  respect to the subgroup reported on, in Exhibit 4,
5  these patients did appear to have a significant
6  increase in their six-minute walk distance of
7  nearly 100 meters; correct?
8        ATTORNEY DYKHUIS:  Object to the
9    form.
10        THE WITNESS:  After the patients
11    who died dropped out and weren't analyzed
12    and you take a specific subgroup, that's
13    what's reported in the paper.
14     BY ATTORNEY DAVIES:
15     Q.    Have you ever heard of the term
16  "patient phenotyping"?
17    A.    Yes.
18    Q.    What's patient phenotyping?
19    A.    That's looking at the chemical
20  characteristics of patients that bind them together
21  in terms of having specific clinical
22  characteristics that warrant them being considered
23  as a separate group.
24     Q.    And what role does patient
25  phenotyping play in -- let me ask you this.  Did

Page 152

1  patient phenotyping play any role in the design of
2  the INCREASE trial?
3        ATTORNEY DYKHUIS:  Object to form.
4        THE WITNESS:  I wouldn't
5    characterize it as patient phenotyping.
6    Patients had to have pulmonary
7    hypertension associated with interstitial
8    lung disease.  If you want to call
9    patients who are associated with
10    pulmonary hypertension in a patient with
11    interstitial lung disease phenotyping,
12    then you can make that argument.
13        Let me follow that up as well by
14    saying that STEP-IPF in the subgroup
15    analysis grew to be short-term.  The one
16    study that you brought to my attention
17    earlier, which was Sildenafil plus
18    pirfenidone, which was a long term study,
19    showed no difference between the groups.
20        So the longer term even if you
21    infer that there was some kind of benefit
22    from this, another robust randomized
23    control study did not validate that these
24    effects were -- you know, there were any
25    long-term benefits.

Page 153

1     BY ATTORNEY DAVIES:
2     Q.    Do you know whether the patients
3  that you've treated with -- strike that.
4        Do you know whether the PH-ILD patients
5  you've treated show an improvement in six-minute
6  walk distance?
7        ATTORNEY DYKHUIS:  Object to form.
8        THE WITNESS:  Some of them do and
9    some of them don't.
10        ATTORNEY DAVIES:  I've marked as
11    Exhibit 5 a publication titled "riociquat
12    for Idiopathic Interstitial
13    Pneumonia-Associated Pulmonary
14    Hypertension, (RISE-IIP):  A randomized
15    Placebo-Controlled Phase 2B Study."
16        (Exhibit 5 was marked for
17        identification.)
18        ATTORNEY DAVIES:  I'm sorry, just
19    for clarity of the record, it bears Bates
20    numbers UTC_PH-ILD_010530 to -540.
21     BY ATTORNEY DAVIES:
22     Q.    And, Doctor, what is this
23  publication?
24    A.    This is a report on the randomized
25  controlled study of riociguat for idiopathic



39 (Pages 150 to 153)

Page 154

1  interstitial pneumonia associated with pulmonary
2  hypertension, which was a randomized double-blind
3  controlled, placebo-controlled study.
4      Q.    And this is the RISE IIP study that
5  you've described earlier today?
6      A.    That's correct.
7      Q.    And this is the RISE IIP study
8  that's talked about in your declaration?
9      A.    Correct.
10     Q.    And there's a Steven D. Nathan
11  that's the first author on this publication.  Is
12  that you?
13     A.    That would be me.
14     Q.    You've testified that you believe
15  that the study was a failure.  Is that correct?
16          ATTORNEY DYKHUIS:  Object to form.
17          THE WITNESS:  I wouldn't
18      characterize it as a failure.  It was
19      successfully completed.  The drug didn't
20      work and appeared to be harmful to
21      patients, but study itself was a very
22      well-done study.
23  BY ATTORNEY DAVIES:
24     Q.    At the time -- why was the trial
25  stopped?

Page 155

1          ATTORNEY DYKHUIS:  Object to form.
2          THE WITNESS:  The trial was
3      stopped -- every study such as this
4      randomized control study has a dataset
5      for the monitoring committee.  You look
6      at the data, blind it and, you know,
7      sometimes blind and sometimes not, making
8      sure that there's no harm, no foul to the
9      individuals that have entered and
10     continue to be enrolled in the study.
11     And that's a safeguard for patient
12     safety.
13         And that effect, the monitoring
14     committee meets every couple of months,
15     looks at the data and decided when they
16     looked at the data at one point that
17     there was a signal of harm in the
18     riociguat arm that warranted
19     discontinuation of the study.
20  BY ATTORNEY DAVIES:
21     Q.    Why, in your opinion, did you see
22  the safety signals that required the study to be
23  stopped?
24          ATTORNEY DYKHUIS:  Object to form.
25          THE WITNESS:  If you go Table 2 --

Page 156

1  BY ATTORNEY DAVIES:
2      Q.    Which page is that on, Doctor?
3      A.    -785.
4      Q.    Yes.
5      A.    And you look at the main phase of
6  the study and you see in the last horizontal
7  deaths, you can see that in the main phase of the
8  study there were eight deaths on riociguat and
9  three on placebo, which numerically by itself is
10  not a big difference.  And any time a death
11  happens, a monitoring committee recommends halting
12  a study, they wouldn't be fairly certain of what's
13  going on.
14         But then what happened is after the main
15  phase, all patients were placed on long-term
16  open-label extension.
17         Now go across to Column C and 4, and we see
18  one death in the real arm and eight deaths in the
19  former placebo arm.  In other words, patients who
20  are dying who were previously on placebo and then
21  rolling over to receive open-label riociguat.
22         And there are more patients coming through
23  the study who are going over from placebo to get
24  riociguat.  So the dataset monitoring committee did
25  the right thing in informing us and getting us to

Page 157

1  hold the study.
2      This goes actually back to the STEP-IPF
3  study, because this was on treatment mortality.  If
4  STEP had done on treatment mortality those numbers,
5  as I mentioned, would have flipped around and might
6  have looked similar to this.
7      Q.    Okay.  Do you believe you saw the
8  safety issues because of the -- you had the wrong
9  patient population in the study?
10          ATTORNEY DYKHUIS:  Object to form.
11          THE WITNESS:  That might have been
12      a part of it.
13  BY ATTORNEY DAVIES:
14     Q.    Riociguat was given to these
15  patients orally; is that correct?
16     A.    That's correct.
17     Q.    So it would have had systemic
18  effects?
19          ATTORNEY DYKHUIS:  Object to form.
20          THE WITNESS:  That's correct.
21  BY ATTORNEY DAVIES:
22     Q.    If you go to page 781 and you see a
23  little shaded box here in your paper that says,
24  "Research in context."
25     A.    Yes.



40  (Pages 154 to 157)

Page 158

1    Q.    Do you see there's a reference, it's
2  about half the way down, to a small phase 2
3  randomized control study of riociguat suggested a
4  beneficial response.
5    Do you see that?
6    A.    Yes.
7    Q.    It's about halfway down in the first
8  column.
9    A.    I see small phase two, yes, I see
10 that.
11   Q.    What study are you referring to
12 there?
13       ATTORNEY DYKHUIS:  Object to form.
14       THE WITNESS:  It was a study that
15   had as the first author Marius Hoeper,
16   H-o-3-p-e-r.  I want to say it was
17   published in the European Respiratory
18   Journal, but I'm not a hundred percent
19   certain about that.
20 BY ATTORNEY DAVIES:
21   Q.    And why did you choose to discuss
22 that publication in your paper on riociguat?
23   A.    I want to provide a context for why
24 riociguat was studied in this study, and that's
25 phase 2 -- I would revise the phase 2A study,

Page 159

1  provided scientific rationale for why it did not
2  work in the study that we did.
3    And this is an example of Rio can -- will
4  treat pulmonary hypertension or lower the
5  pressures, but it was harmful to patients.  So you
6  have to divorce treating pulmonary hypertension
7  away or from clinical benefit.
8    Q.    In your declaration, you talk about
9  when you presented the results of this RISE-IIP
10 study you were, quote, admonished by one of the
11 session heads.
12   Do you remember saying that?
13   A.    I do.
14   Q.    Other than being admonished by that
15 one session head, did anyone else at the meeting
16 admonish you for conducting this study with
17 riociguat?
18   A.    I don't recall that.  As I said, I
19 found the people in the audience, none of the other
20 chairs jumped to my defense.  You know, you could
21 construe silence as complicity.
22   I do remember that Mario Succa [phon.]
23 himself was sitting in the front row, and he tried
24 to defend, you know, having done the study because
25 he was the first author on the study that laid the

Page 160

1  foundation for the study.
2    But, yeah, I don't know what other people
3  are feeling, but the chairperson who was the
4  chairperson in that session who was renowned leader
5  in the PH field, and he might have influenced
6  people in the field to believe what he espoused,
7  and that was that we shouldn't be treating PH
8  associated with lung disease.
9    Q.    And in your report at Paragraph 84
10 you state that the session lead told you, "Everyone
11 knows that treating pulmonary hypertension
12 associated with lung disease does not work."
13   Do you see that?
14   A.    I remember that, yes.
15   Q.    And other than this one session
16 chair, no one else at this meeting of over 500
17 participants expressed that view to you; correct?
18       ATTORNEY DYKHUIS:  Object to form.
19       THE WITNESS:  There was a lot of
20   discussion afterwards and people coming
21   up to me.  I suspect that people were of
22   that belief, and he had said what he
23   said.  There was probably no further need
24   to come up and admonish me.  The work had
25   been done.

Page 161

1  BY ATTORNEY DAVIES:
2    Q.    Did anyone else at the meeting come
3  up and admonish you for the work?
4        ATTORNEY DYKHUIS:  Object to form.
5        THE WITNESS:  No one else came up
6    to me, but I do believe that this thought
7    leader, highly regarded in the PH field,
8    probably reflects the views of many other
9    people he was speaking for.  It might not
10   have just been speaking for himself.  He
11   might have been speaking for many other
12   people, and he probably influenced a
13   bunch of the people in the audience who
14   ended up being the same after the
15   session.
16     You have a negative study that
17   harmed patients, and then the session
18   lead, who is a very renowned figure in
19   the PH world, admonishing me for thinking
20   that treating PH and ILD could never
21   work, and this should never have been
22   done.
23 BY ATTORNEY DAVIES:
24   Q.    Who was the session lead who
25 admonished you?



41  (Pages 158 to 161)

Page 162

1    A.    Dr. Lewis Rubin.
2    Q.    You had mentioned that this
3  earlier -- this earlier paper by Hoeper laid the
4  foundation for your RISE study; correct?
5         ATTORNEY DYKHUIS:  Object to form.
6         THE WITNESS:  That's correct.
7  BY ATTORNEY DAVIES:
8    Q.    Okay.  And in what way did that
9  study lay the foundation for your RISE study?
10         ATTORNEY DYKHUIS:  Object to form.
11         THE WITNESS:  It showed that Rio
12    could potentially be a treatment modality
13    for patients with pulmonary hypertension
14    associated with interstitial lung
15    disease.
16  BY ATTORNEY DAVIES:
17    Q.    After your RISE study, do you
18  personally still believe that in the way patient
19  population Rio could be used for treatment of
20  PH-ILD?
21    A.    I can't rule it out.  But I wouldn't
22  start it in any patient.  There could be one in 10
23  patients, but I don't want to knock off another
24  three patients to find that one in 10 patient.
25    Q.    When you say "one in 10 patients,"

Page 163

1  what one in 10 patients do you believe it would be
2  likely to work in for PH-ILD?
3         ATTORNEY DYKHUIS:  Objection to
4    form.
5         THE WITNESS:  I'm hypothesizing
6    and speculating.  I'm giving an example.
7    Any medication that's harmful, it might
8    be the odd patient that it's helpful, but
9    we suspended it because we would harm
10    more patients than helping.  And those
11    are the medications that are generally
12    population-based regarded as harmful even
13    though there might be one or two patients
14    who actually benefit.
15  BY ATTORNEY DAVIES:
16    Q.    Can you go back to Exhibit 3, which
17  should be the Zisman, et al, paper.
18    A.    Yes.
19    Q.    And do you agree that this STEP-IPF
20  study described in this publication showed the
21  proof of concept for using a Group 1 therapy
22  Group 3 PH?
23         ATTORNEY DYKHUIS:  Object to form.
24         THE WITNESS:  You can take proof
25    of concept -- let me say that you could

Page 164

1    pick out some of the results from the
2    study like some of the secondary
3    endpoints and say, Yeah, it benefited
4    there, and maybe this is a therapy that
5    you can consider, but it didn't prove
6    anything.  It was hypothesis-generating.
7    Let me qualify that.  The Hoeper
8    article was proof of concept as well, and
9    then subsequently we had a follow-up
10    study that went the other way and proved
11    to be harmful.
12    So proof of concept don't always
13    equate to a positive study and can result
14    in a negative study.
15  BY ATTORNEY DAVIES:
16    Q.    So when you used the term "proof of
17  concept" with respect to a clinical study, what do
18  you intend that to mean?
19         ATTORNEY DYKHUIS:  Object to form.
20         THE WITNESS:  As proof that the
21    concepts of what you're trying to treat
22    with what you're trying to treat must be
23    a beneficial therapy.  It's the concept
24    that subsequently remains to be further
25    tested.

Page 165

1  BY ATTORNEY DAVIES:
2    Q.    And when -- what would be required
3  in your mind to show that a proof of concept study
4  actually results in treatment?  Does that require a
5  phase 3 placebo-controlled randomized trial?
6    A.    Correct.
7         ATTORNEY DYKHUIS:  Object to form,
8    foundation.
9    Q.    I'm going to pass you two documents,
10  Doctor.  The first is Exhibit 6, titled
11  "Nintedanib."
12         (Exhibit 6 was marked for
13         identification.)
14    A.    Okay.
15    Q.    It's titled "Nintedanib."
16    A.    Correct.
17    Q.    Plus Sildenafil inpatients with
18  idiopathic pulmonary fibrosis.  The first author is
19  Martin Kolb published in the New England Journal of
20  Medicine 2018, bearing Bates numbers beginning
21  UTC_PH-ILD 010487.
22    And I'm also going to pass you Exhibit 7,
23  which is Supplementary Appendix and refers to the
24  New England Journal that I just identified as
25  Exhibit 6.  I'm going to pass you that.



42  (Pages 162 to 165)

Page 166

```
1              (Exhibit 7 was marked for
2         identification.)
3              ATTORNEY DYKHUIS:  Wait.
4         Exhibit 6?
5              ATTORNEY DAVIES:  Exhibit 6 is the
6         New England Journal of Medicine article,
7         and then Exhibit 7 is the supplementary
8         appendix to that same article.
9              ATTORNEY DYKHUIS:  Thank you.
10             ATTORNEY DAVIES:  Okay.
11        BY ATTORNEY DAVIES:
12             Q.    So have you seen Exhibit 6 before,
13        Doctor?
14             A.    Yes, I have.
15             Q.    And does Exhibit 6 describe the
16        end-stage study that's discussed in your
17        declaration?
18             ATTORNEY DYKHUIS:  Object to form.
19             THE WITNESS:  Yes, it does.
20        BY ATTORNEY DAVIES:
21             Q.    And if you look at Exhibit 7, is
22        Exhibit 7 the Supplementary Appendix that the
23        authors provided along with the publication of
24        their article in the New England Journal of
25        Medicine in Exhibit 6?
```

Page 167

```
1              ATTORNEY DYKHUIS:  Object to form
2         and foundation.
3              THE WITNESS:  Yes, it is.
4         BY ATTORNEY DAVIES:
5              Q.    What were the authors -- what drug
6         was being examined in the end-stage study that's
7         described in Exhibit 6?
8              A.    Sildenafil.
9              Q.    In what patient population was it
10        being examined in?
11             ATTORNEY DYKHUIS:  Object to form.
12             THE WITNESS:  Patients with
13        idiopathic pulmonary fibrosis who are on
14        Nintedanib.
15        BY ATTORNEY DAVIES:
16             Q.    Would that include PH-ILD patients?
17             ATTORNEY DYKHUIS:  Object to form.
18             THE WITNESS:  It might.  It
19        doesn't look for PH.  But there might
20        have been some patients in there who had
21        PH.
22        BY ATTORNEY DAVIES:
23             Q.    What was the measure that they used
24        for the primary outcome in the end-stage study
25        described in Exhibit 6?
```

Page 168

```
1              ATTORNEY DYKHUIS:  Object to form.
2              THE WITNESS:  The primary endpoint
3         was changed from baseline in the total
4         score in St. George's Respiratory
5         Questionnaire at week 12.
6         BY ATTORNEY DAVIES:
7              Q.    And did that show an improvement?
8         Did they see an improvement in the use of that
9         questionnaire after treatment with Sildenafil or
10        not?
11             A.    No, they did not.
12             Q.    Okay.  Can you turn to Exhibit 7.
13             A.    I've got it.
14             Q.    Can you turn to Figure S3.
15             A.    (Witness complies with request.)
16        Yes.
17             Q.    What is described in Figure S3 of
18        the Exhibit 7 supplementary appendix?
19             ATTORNEY DYKHUIS:  Objection to
20        form and foundation.
21             THE WITNESS:  This is a figure
22        depicting the two arms of the study
23        looking at change from baseline in the
24        UCSD shortness of breath questionnaire at
25        the time from zero to 24 weeks.
```

Page 169

```
1         BY ATTORNEY DAVIES:
2              Q.    So if the authors had used the UCSD
3         shortness of breath questionnaire, do you agree
4         that their treatment with Sildenafil would have
5         shown an improvement over placebo?
6              ATTORNEY DYKHUIS:  Object to form.
7              THE WITNESS:  That is, I would
8         say, speculative.
9         BY ATTORNEY DAVIES:
10             Q.    Why do you say it's speculative?
11             A.    Once you choose your primary
12        endpoint, you are a prisoner of your primary
13        endpoint.  If you have 20 secondary endpoints in a
14        clinical study, invariably one of them is going to
15        be positive and you can go back and say, If we had
16        chosen this as our primary, this would have been a
17        positive study.  This is, once again,
18        baseline-generated.
19             Q.    They use the same data in Figure S3,
20        though, that they use for their analysis using the
21        St. George's respiratory questionnaire; correct?
22             ATTORNEY DYKHUIS:  Object to form.
23        Excuse me.
24             THE WITNESS:  You have to direct
25        me to that figure so I can compare them
```

43  (Pages 166 to 169)

Page 170

1       off the primary.  Actually, it's right
2     next to it.  It's Figure S2.
3   BY ATTORNEY DAVIES:
4     Q.   Right.
5     A.   So you're asking me the same
6 analysis in Figure S3 is the same as S2?
7     Q.   Correct.
8        ATTORNEY DYKHUIS:  Object to form.
9        THE WITNESS:  It's the same
10    analysis, but based on the primary, there
11    wasn't a significant difference between
12    the two arms.
13   BY ATTORNEY DAVIES:
14     Q.   Why do you believe that there was a
15 significant difference if analasized using the UCSD
16 shortness of breath questionnaire when there was
17 not with the St. George's respiratory questionnaire
18 in this study?
19        ATTORNEY DYKHUIS:  Object to form,
20    foundation.
21        THE WITNESS:  They asked -- these
22    are both what we call PROs, patient
23    reported outcomes that ask very different
24    questions.  So it really depends on the
25    questions that are asked and how the

Page 171

1    patients answer them.
2        So it's entirely feasible that one
3    can show a difference and the other one
4    does not.
5   BY ATTORNEY DAVIES:
6     Q.   Can you turn to Figure F5.
7     A.   S5 or F5?
8     Q.   S5, I mean.  Still on Exhibit 7 in
9 the appendix.
10    Do you see that?
11     A.   I do.
12     Q.   What is shown in Figure S5?
13        ATTORNEY DYKHUIS:  Objection to
14    form.
15        THE WITNESS:  It's a change from
16    baseline in FVC over time.  And the two
17    treatment arms Nintedanib --
18        (Reporter clarification)
19        THE WITNESS:  The two treatment
20    arms, the one is nintedanib plus
21    Sildenafil, and the other one is
22    Nintedanib plus placebo, and it's looking
23    at FVC over time.
24   BY ATTORNEY DAVIES:
25     Q.   Would you agree that Figure S5 shows

Page 172

1 a difference in the change of FVC, which favors the
2 combination of Sildenafil and Nintedanib as
3 compared to Nintedanib and placebo alone?
4        ATTORNEY DYKHUIS:  Object to the
5    form and foundation.
6        THE WITNESS:  At first glance I
7    can see how you make the deduction, but
8    you always have to contextualize it.  But
9    says this is hypothesis generating and it
10    depends on how they did the analysis.
11        If you look at the number of
12    patients at the bottom, you started out
13    from the study, it was 137 versus 136.
14    And then as the study progresses at 24
15    weeks, you have 109 versus 108.
16        So you had patients who dropped
17    out, patients who didn't have data points
18    to record.  Which raises a whole lot of
19    questions about what you see in the
20    draft.  If you look at Nintedanib plus
21    Sildenafil, that's 28 patients.  How do
22    they contribute to the FVC initially
23    versus the end.
24        If these were the sickest patients
25    who dropped out, those 28, if they

Page 173

1    continued to 24 weeks, they would have
2    dragged this curve down.  So there are a
3    lot of holes in this, and as I said, it's
4    at best hypothesis-generating, but you
5    have to contextualize it as a post hoc
6    analysis.  And my best summation is that
7    this is hypothesis-generating.
8   BY ATTORNEY DAVIES:
9     Q.   What is the hypothesis that it's
10 generating?
11        ATTORNEY DYKHUIS:  Object to form.
12        THE WITNESS:  That does Sildenafil
13    have some kind of effects on fibrosis.
14    But this is a far measure from proving
15    anything.  It just raises that question.
16        So once again, I don't know how
17    that dealt with the dropouts.  If they
18    had imputed zero values, which some
19    people do, and assume that there was zero
20    that were no longer around if they died,
21    would that have dragged the new curve all
22    the way down?
23        So there are many different ways
24    to deal with missing data, but when you
25    see that -- I don't know what the percent



44 (Pages 170 to 173)

Page 174

1    is, it's at least 20 percent of the
2    patients with missing data and how that
3    was dealt with can alter these curves
4    pretty dramatically.
5    BY ATTORNEY DAVIES:
6        Q.    Can you turn to Figure S7 in the
7    appendix in Exhibit 7?
8        A.    Yes.
9        Q.    What's shown at Figure S7?
10            ATTORNEY DYKHUIS:  Object to form.
11            THE WITNESS:  This is change from
12       baseline in brain natriuretic peptide at
13       week 24 between the two groups in the
14       Nintedanib plus Sildenafil arm, the
15       antichromium P was reduced and in the
16       treatment arm -- sorry, in the placebo
17       arm it did go up, getting a difference
18       there of minus 51.3.
19            I'm not sure if this is
20       statistically significant or not.  I'm
21       not if they show that in the paper.  It
22       looks like the confidence intervals are
23       really quite wide.  So I'm not sure if
24       it's of statistical significance or not.
25       I know that they provided a P value to go

Page 175

1    with this.
2    BY ATTORNEY DAVIES:
3        Q.    What do you use levels of brain
4    natriuretic peptide for in clinical studies you've
5    participated in for PH?
6            ATTORNEY DYKHUIS:  Object to form.
7            THE WITNESS:  It's a blood test
8       that's a biomarker, which usually
9       reflects cardiac stress and strain.  The
10      higher the level, the more stress the
11      heart is under, and the lower the level,
12      the less stress the heart is in.
13   BY ATTORNEY DAVIES:
14       Q.    So would you agree that Figure S7
15   shows that in the Nintedanib plus Sildenafil arm it
16   showed less stress on the heart than the Nintedanib
17   plus placebo alone?
18            ATTORNEY DYKHUIS:  Object to form
19      and foundation.
20            THE WITNESS:  That is a test and
21      see what they said about Figure 7.  I'm
22      just curious to see if it's statistically
23      significant.
24   BY ATTORNEY DAVIES:
25       Q.    Sure.

Page 176

1        A.    Let's see if I talk about S7 here.
2            (Pause)
3        A.    I see on page 172 that I do talk
4    about the BNP change of baseline.  They didn't even
5    provide a P value.  I suspect that because it's
6    speculative they weren't allowed to provide a P
7    value.  That is not a reason why there wouldn't be
8    a P value here.
9        So I'm not sure if it was statistically
10   significant or not.  But actually you can figure it
11   out because 95 percent confidence intervals are
12   minus 85 to minus 17.6.  So this isn't outside the
13   confidence interval.
14       So my interpretation of this would be that
15   it's not statistically significant.  Hopefully I've
16   got that the right way around.
17       Q.    So you would agree it shows a change
18   in the levels -- Figure S7 shows a change in the
19   levels, but you can't say sitting here whether or
20   not it was statistically significant; right?
21            ATTORNEY DYKHUIS:  Objection to
22      form.
23            THE WITNESS:  The 95 percent
24      confidence intervals include the number
25      minus 51.  So my interpretation based on

Page 177

1    this is that it wasn't statistically
2    significant.
3    BY ATTORNEY DAVIES:
4        Q.    So there's a difference, but it's
5    not statistically significant?
6        A.    Correct.
7            ATTORNEY DYKHUIS:  Object to form.
8        Q.    When was the first time that you
9    were optimistic that you were going to get a good
10   result out of the INCREASE trial?
11            ATTORNEY DYKHUIS:  Object to form.
12            THE WITNESS:  I don't remember.
13      When I saw the results.
14   BY ATTORNEY DAVIES:
15       Q.    When was that again.
16       A.    It was towards the end of February
17   of 2020.
18       Q.    When in your mind during disease
19   progression does PH become a driver for treatment
20   outcomes in PH-ILD patients?
21            ATTORNEY DYKHUIS:  Objection to
22      form.
23            THE WITNESS:  We don't know that.
24      We hypothesize, though, that when it does
25      occur it becomes the main driver of



45 (Pages 174 to 177)

Page 178

1    outcomes compared to the underlying
2    primary disease, but we don't know that
3    for sure.
4        The two intersect so closely and
5    kind of feed off one another that it's
6    hard to unwind the two from one another
7    is what I would say.
8    BY ATTORNEY DAVIES:
9        Q.   You would agree that at some point
10   there's an inflection point where PH becomes the
11   driver of treatment outcomes rather than ILD;
12   correct?
13       ATTORNEY DYKHUIS:  Object to form.
14       THE WITNESS:  It sounds like
15   you've read a -- you've seen a document
16   that I produced in a couple of journals
17   where I show that exact figure of an
18   inflection point where -- but that's
19   hypothetical.  I don't know that for
20   sure.
21   BY ATTORNEY DAVIES:
22       Q.   Okay.  But you presented on that;
23   correct?
24       ATTORNEY DYKHUIS:  Object to form.
25       THE WITNESS:  I presented on that

Page 179

1    because it gives the concept, yes.
2    BY ATTORNEY DAVIES:
3        Q.   So the idea that at some point the
4    PH severity reaches a level that the treatment of
5    the PH component becomes the driver for the
6    treatment outcome.  Is that what you're trying to
7    convey by that?
8        ATTORNEY DYKHUIS:  Object to form.
9        THE WITNESS:  That's possible.
10   BY ATTORNEY DAVIES:
11       Q.   Okay.  Do you agree with that
12   sitting here today?
13       ATTORNEY DYKHUIS:  Object to form.
14       THE WITNESS:  I think it's more
15   complex than this or that.  As I said,
16   the two are so closely intertwined that
17   it's hard to really figure out.  But it's
18   possible that the PH is what's driving
19   the outcomes.
20   BY ATTORNEY DAVIES:
21       (Exhibit 8 was marked for
22   identification.)
23       ATTORNEY DAVIES:  I'm going to
24   enter as Exhibit 8 a document titled
25   United States Patent 10,716,793 bearing

Page 180

1    UTC Bates numbers UTC_PH-ILD-009772
2    through -796.  Exhibit 8.
3        Q.   And Doctor, is this the '793 patent
4    that you offer opinions on in your report?
5        A.   Yes, it appears to be.
6    BY ATTORNEY DAVIES:
7        Q.   Do you have any understanding as to
8    whether the '793 patent -- the claims of the '793
9    patent claims a method of treating PH-ILD?
10       ATTORNEY DYKHUIS:  Objection to
11   form.
12       THE WITNESS:  That is the last
13   page in this Column 18.  What it's
14   claiming is a method of treating
15   pulmonary hypertension.  So in answer to
16   your question, it states it there.
17   BY ATTORNEY DAVIES:
18       Q.   So you would agree that it
19   describes a method of --
20       A.   Sorry, hang on one second.
21       Q.   Go ahead.
22       A.   A method of treating pulmonary
23   hypertension, it doesn't say interstitial lung
24   disease.  So my error.  It says a method of
25   treating pulmonary hypertension.

Page 181

1        Q.   Okay.  Do you understand that that
2    method of treating pulmonary hypertension described
3    in the '793 patent includes treatment of PH-ILD?
4        ATTORNEY DYKHUIS:  Objection to
5    form.  Speaks for itself.
6        THE WITNESS:  I think there is
7    mentioned somewhere in the patent of
8    treating pulmonary hypertension without
9    being specific to the cause.  So I would
10   regard that as any form of pulmonary
11   hypertension.
12   BY ATTORNEY DAVIES:
13       Q.   If you look at table 3.  Let me know
14   when you're there.  Columns 13 and 14.
15       And do you see under the table there's some
16   very small words where it's describing the patient
17   characteristics, hemodynamic parameters and gas
18   exchange values of baseline before challenged with
19   inhalative proteinoids is the title of the table.
20       A.   Yes, I see that.
21       Q.   And the last little line at the
22   bottom of the table refers to pulmonary fibrosis.
23       A.   I see the F.  I'm not seeing the
24   legend to say that it's pulmonary fibrosis.  Let me
25   see.



46 (Pages 178 to 181)

Page 182

1     Q.   Do you see the words right before
2  the F that say "pulmonary fibrosis"?
3     A.   I see IOTF. I'm not seeing where it
4  says "pulmonary fibrosis."
5     Q.   So, Doctor, go below the table. The
6  very last line there says, "Etiology of pulmonary
7  hypertension was classified as," and then it gives
8  a list of the types of pulmonary --
9     A.   Yes.
10     Q.   Do you see there that it refers to
11  pulmonary fibrosis?
12     A.   Yes.
13     Q.   Do you understand that to be PH-ILD?
14         ATTORNEY DYKHUIS:  Object to form.
15         THE WITNESS: I'm looking at the
16     pulmonary artery pressure in the top.
17     But it doesn't say that this is the
18     systolic pulmonary artery pressure, the
19     mean pulmonary artery pressure.
20         So I'm a little uncertain.  You
21     can have a high systemic pulmonary
22     pressure without having pulmonary
23     hypertension.  The PDR, I'm used to
24     operating in wood units.  You have to
25     divide these numbers by 80 to see if they

Page 183

1  have pulmonary hypertension.
2         But the PDRs do look quite high
3  for the group as a whole.  What I don't
4  know, though, is if you look at -- let's
5  assume all these patients -- let's assume
6  some of these patients at least might
7  have had pulmonary hypertension.  I don't
8  know how many of the four had pulmonary
9  hypertension and what their pressures
10  were.
11         So there's not enough clarity and
12  granularity to this table to make any
13  definitive contribution.
14  BY ATTORNEY DAVIES:
15     Q.   Doctor, do you recall --
16     A.   Let me make one more point.  This
17  is values at baseline before challenge with
18  enolated proteinoids.  It's just some baseline
19  values of groups of patients from assumably three
20  different studies.  I'm assuming one, two and three
21  refer to three-different studies.
22     Q.   In your declaration, do you recall
23  offering opinions that the '327 patent is not
24  invalidated by the disclosure or claims of the '793
25  patent.

Page 184

1     Do you recall offering those opinions?
2     A.   I do.
3     Q.   When you offered those opinions, did
4  you, in your opinion, understand that the '793
5  patent covered a method of treating PH-ILD?
6         ATTORNEY DYKHUIS:  Objection to
7     form.
8         THE WITNESS: It was treating any
9     form of pulmonary hypertension, which
10     does include PH associated with
11     interstitial lung disease. But treating
12     pulmonary hypertension is taking a
13     pressure that's high and making it lower.
14         And what we don't know and what
15     I've alluded to is if it can or will
16     result in clinical benefit or if that can
17     or will result in clinical harm and what
18     that clinical benefit may or may not be
19     if, indeed, there is a clinical benefit.
20         So treating pulmonary hypertension
21     does not equate to treating the patient.
22  BY ATTORNEY DAVIES:
23     Q.   So is it your opinion that there's
24  not enough data provided in the '793 patent to
25  convince you that it's directed to a method of

Page 185

1  treating PH-ILD in a patient?
2         ATTORNEY DYKHUIS:  Object to form.
3         THE WITNESS:  It does talk about
4     treating PH-ILD in a patient, but it
5     doesn't talk about treating the patient.
6     It's saying the pressures are high, we're
7     going to make them lower.  What does that
8     mean?  Benefit arm neutral, we don't
9     know.
10  BY ATTORNEY DAVIES:
11     Q.   What data would you have expected to
12  see in the '793 patent for you to conclude that --
13  you described treating a PH-ILD with inhaled
14  trepostinil?
15         ATTORNEY DYKHUIS:  Object to form.
16     Speculation.
17         THE WITNESS:  As I just said, it's
18     providing a treatment to the patient.
19     Whether the treatment will be beneficial
20     to the patient is an unknown.
21         It also depends on your -- one's
22     notion of what treatment is.  Giving
23     someone a medication is arguably
24     treatment, but is it directed to the
25     question or disease in hand.  You need to

47  (Pages 182 to 185)

Page 186

1     make that connection.  There's no
2     connection here to having any clinical
3     benefit for the patient, or it just says
4     we have a drug, we'll take a drug, and
5     we'll lower the pressures in the lung,
6     and that's where it ends.
7     BY ATTORNEY DAVIES:
8     Q.    So in your opinion, the '793 patent
9  provides no evidence as to a clinical benefit for a
10  patient following administration of an inhaled
11  treprostinil; correct?
12          ATTORNEY DYKHUIS:  Object to form.
13     Lack of foundation.
14          THE WITNESS:  That would be
15     correct.  I mean, there's no mention of
16     any clinical consequence of treating a
17     pulmonary hypertension.
18     BY ATTORNEY DAVIES:
19     Q.    If you look at Table 2, and that's
20  at Column 11 in the '793 patent.  Just let me know
21  once you're there.
22     A.    Yeah.
23     Q.    And you see Table 2 has some
24  hemodynamic parameters that compares placebo versus
25  30 micrograms treprostinil, 45 micrograms

Page 187

1  treprostinil, and 60 micrograms treprostinil.
2     Q.    Do you see that?
3     A.    Yes.
4     Q.    And in your opinion, does Table
5  2 provide any evidence of actually treating the
6  patients with inhaled treprostinil?
7          ATTORNEY DYKHUIS:  Objection to
8     form.
9          THE WITNESS:  I see the -- once
10     again, I'm uncertain if it's a systolic
11     pulmonary artery pressure or the mean
12     pulmonary artery pressure because they
13     are different.  I see the pressures do
14     come down numerically.  Whether that's
15     statistically significant or not, I'm not
16     sure.
17     BY ATTORNEY DAVIES:
18     Q.    So you reading the '793 patent could
19  not conclude anything about the treatment of a
20  patient with inhaled treprostinil from the data
21  provided in Table 2; correct?
22          ATTORNEY DYKHUIS:  Objection to
23     form.  Mischaracterizes.
24          THE WITNESS:  You can treat a
25     patient with inhaled treprostinil, and

Page 188

1     you can cause the pressures to come down.
2     And this might be what you're looking at.
3     Whether it's significant detriment or
4     not, I'm uncertain.  There's not enough
5     there yet.  So it is treating the
6     pulmonary hypertension, but there's no
7     mention of any kind of clinical benefit.
8          And, once again, sometimes taking
9     the pressures down might impose harm in a
10     patient rather than helping the patient.
11     BY ATTORNEY DAVIES:
12     Q.    And what data would you have needed
13  to be provided in the '793 patent to convince you
14  that there was a clinical benefit based on
15  administration of inhaled treprostinil in these
16  patients?
17          ATTORNEY DYKHUIS:  Objection to
18     form.  Speculation.
19          THE WITNESS:  I would need to see
20     the study.  I don't know if a patent
21     application is going to convince me that
22     medication is of benefit.  I need to see
23     primary study, I think.
24     BY ATTORNEY DAVIES:
25     Q.    Would you need a phase

Page 189

1  3 placebo-controlled randomized trial to conclude
2  that?
3          ATTORNEY DYKHUIS:  Same
4     objections.
5          THE WITNESS:  Correct.
6     BY ATTORNEY DAVIES:
7          (Exhibit 9 was marked for
8          identification.)
9     Q.    This is going to be Exhibit --
10  Doctor, I'm entering as Exhibit 9 a document
11  entitled United States patent 11,826,327 B2,
12  bearing production Number UTC_PH-ILD_005310 through
13  -5360.
14     And, Doctor, is Exhibit 9 the '327 patent
15  that you discussed in your report, your declaration
16  in this case?
17     A.    It appears to be.
18     Q.    Can you go to the claims of the '327
19  patent, and I'm going to ask you to have the '793
20  patent open to the claims at the end and also the
21  '793 patent, which is Exhibit 8.
22     A.    Okay.
23     Q.    I want you to specifically look at
24  the dosing that's described in Claim 1 of the '327
25  and the dosing that's described in Claim 1 of the



HIGHLY CONFIDENTIAL     DA0246     LIQ_PH-ILD_00000724

Page 190

1  '793 patent. Just let me know if you've had an
2  opportunity to do that.
3      A.   So the '327 says an amount -- an
4  effective amount of at least 50 micrograms up to a
5  maximum accelerated dose, okay.
6      Now, go to the '793, that says effective
7  comprises from 15 to 19.
8      Q.   So Claim 1 of both the '327 patent
9  and the '793 patent describe the use of at least 15
10 micrograms of inhaled treprostinil; correct?
11             ATTORNEY DYKHUIS:  Object to the
12        form.
13             THE WITNESS:  Correct.
14      BY ATTORNEY DAVIES:
15      Q.   And then do you see the '327 patent
16 refers to a single administration event that
17 comprises at least six micrograms per breath?
18      A.   I see that.
19      Q.   And the '793 patent, do you see it
20 refers to one to three breaths?
21      A.   I see that.
22      Q.   Okay.  If I administered -- and you
23 agree that, for example, 18 micrograms would be
24 between 15 and 90 in the '793 patent; correct?
25             ATTORNEY DYKHUIS:  Object to form.

Page 191

1             THE WITNESS:  18 doses between 15
2        and 19.
3      BY ATTORNEY DAVIES:
4      Q.   And if I delivered 18 micrograms in
5  accordance with the '793 patent of inhaled
6  treprostinil in three breaths, how many micrograms
7  per breath would I be administering under the '793
8  patent?
9             ATTORNEY DYKHUIS:  Objection to
10        form.
11             THE WITNESS:  I believe it would
12        be three breaths.
13      BY ATTORNEY DAVIES:
14      Q.   I'm sorry.  If I delivered 18
15 micrograms -- 18 micrograms of inhaled
16 treprostinil, according to the '793 patent, in
17 three breaths, how many micrograms of treprostinil
18 would I be delivering per breath?
19             ATTORNEY DYKHUIS:  Objection to
20        form.  Incomplete hypothetical.
21             THE WITNESS:  Do you want me to
22        multiply 18 times three?
23      BY ATTORNEY DAVIES:
24      Q.   I think it's 18 divided by three?
25      A.   I said that.  Six.

Page 192

1      Q.   Okay.  I apologize.  And '327 patent
2  also describes the use of six micrograms per
3  breath; correct?
4             ATTORNEY DYKHUIS:  Objection to
5        the form.  Mischaracterizes.
6             THE WITNESS:  Yes.
7      BY ATTORNEY DAVIES:
8      Q.   So you would agree that the dosing
9  described in the '793 and the '327 of inhaled
10 treprostinil covers the same dosing regime;
11 correct?
12             ATTORNEY DYKHUIS:  Objection to
13        form.  Mischaracterizes.
14             THE WITNESS:  They appear to
15        overlap.  It seems to be limited in one
16        and not limited in the other.
17      BY ATTORNEY DAVIES:
18      Q.   But you would agree that they
19 overlap; correct?
20      A.   They overlap.
21      Q.   Okay.  Both in terms of the total
22 amount delivered and the amount given per breath;
23 correct?
24             ATTORNEY DYKHUIS:  Object to form.
25             THE WITNESS:  They overlap.

Page 193

1      BY ATTORNEY DAVIES:
2      Q.   Do you see that '327 is directed
3  to -- look at Claim 1.  So Claim 1 is directed to a
4  method of proof, improving exercise capacity in a
5  patient having pulmonary hypertension associated
6  with interstitial lung disease.
7      Do you see that?
8      A.   Yes, I do.
9      Q.   Do you believe that Claim 1 of the
10 '793 patent also includes a method of improving
11 exercise capacity in a patient having pulmonary
12 hypertension associated with interstitial lung
13 disease?
14             ATTORNEY DYKHUIS:  Object to form.
15             THE WITNESS:  That's what it says.
16             ATTORNEY DYKHUIS:  Sorry.  I note
17        my objection.  My objection is to form
18        and foundation.
19      BY ATTORNEY DAVIES:
20      Q.   Both the '327 -- both Claim 1 of the
21 '327 patent and Claim 1 of the '793 patent require
22 the administration of inhaled treprostinil;
23 correct?
24             ATTORNEY DYKHUIS:  Object to form.
25             THE WITNESS:  That's correct.



49  (Pages 190 to 193)

Page 194

1    BY ATTORNEY DAVIES:
2        Q.    I'm sorry, Doctor.  I don't think
3    your answer came through.
4        A.    That's correct.
5        Q.    The data that's described in the
6    '327 patent, does this -- was this data from the
7    INCREASE study?
8            ATTORNEY DYKHUIS:  Object to the
9        form.  Foundation.
10           THE WITNESS:  I'm not sure you can
11       call it data.  It's a claim that appears
12       to reflect some of the findings from the
13       INCREASE study.
14    BY ATTORNEY DAVIES:
15       Q.    Maybe just let me be a little bit
16    more particular.
17           So moving away from the claim, and if you
18    just look through the '327 patent, there is a
19    number of figures that provide resulting data.  And
20    then if you look in the specification, flipping
21    through it again, there's data regarding treatment
22    using inhaled treprostinil versus placebo.
23           Is it your understanding that this data in
24    the '327 patent came from the INCREASE study?
25           ATTORNEY DYKHUIS:  Objection to

Page 195

1        form.  Foundation.
2            THE WITNESS:  Let me look.
3            There's a lot of data.  I'm trying
4        to be sure.
5            A lot of the data is from the
6        INCREASE study, that was your question.
7        I'm looking at something on Table 16,
8        which is not from the INCREASE study.
9        Unless there's other tables amongst the
10       2020 tables, that is from the INCREASE.
11    BY ATTORNEY DAVIES:
12       Q.    So sitting here today, you can't say
13    for certain one way or the other; is that fair?
14           ATTORNEY DYKHUIS:  Object to form.
15       Q.    I'll ask that again with the mic on.
16    So sitting here today, you're not sure one
17    way or another the source of the data in the '327
18    patent, where it came from; correct?
19       A.    It seems to be from a number of
20    studies.  I see Table 19 there's mention of the
21    TRIUMPH study, for example.  It could be increased
22    TRIUMPH, and then I think the switch study -- I
23    forget what it was called -- from Tyvaso ultrasonic
24    nebulizer to Tyvaso DPI.  There might be one table
25    from there.

Page 196

1        Q.    I'm going to mark as Exhibit 10 an
2    abstract bearing the number S343 entitled "Inhaled
3    treprostinil in Group 3 pulmonary hypertension by
4    Agarwal and AV Waxman" and bearing production
5    number UTC_PH-ILD_9828.
6            (Exhibit 10 was marked for
7        identification)
8            ATTORNEY DYKHUIS:  Is this a good
9        time for a break?
10           ATTORNEY DAVIES:  That's fine.
11    BY ATTORNEY DAVIES:
12       Q.    Let me just -- have you seen this
13    before.
14       A.    I have.
15       Q.    Okay.
16           THE VIDEOGRAPHER:  We are off the
17       record at 13:57.
18           (Recess taken from 1:57 p.m.
19       to 2:07 p.m.)
20           THE VIDEOGRAPHER:  We are on the
21       record at 2:07 p.m.
22    BY ATTORNEY DAVIES:
23       Q.    Going back to the Exhibit 10, which
24    is the Agarwal abstract.  Do you have that in front
25    of you?

Page 197

1        A.    Yes.
2        Q.    Have you seen this abstract before?
3        A.    Yes.
4        Q.    Do you cite to this abstract in your
5    declaration?
6        A.    Yes, I do.
7        Q.    What's the title of this abstract?
8        A.    The title is "Inhaled treprostinil in
9    Group 3 pulmonary hypertension."
10       Q.    And PH-ILD is a Group 3 pulmonary
11    hypertension?
12           ATTORNEY DYKHUIS:  Object to form.
13           THE WITNESS:  That's correct.
14    BY ATTORNEY DAVIES:
15       Q.    Do you know who AB Waxman is?
16       A.    Yes, I do.
17       Q.    Who is he?
18       A.    Aaron Waxman.  I'm not sure what his
19    middle initial stands for.
20       Q.    And he's an author on this abstract?
21       A.    Yes, he is.
22       Q.    Was he also on the steering
23    committee for INCREASE?
24       A.    Yes, he is.
25           ATTORNEY DYKHUIS:  Object to form.



50  (Pages 194 to 197)

Page 198

```
1       Q.    Do you know Dr. Waxman?
2             ATTORNEY DYKHUIS:  Object to form.
3             THE WITNESS:  Yes, I do.
4    BY ATTORNEY DAVIES:
5       Q.    Would you consider him to be an
6    expert in the treatment of PH-ILD?
7             ATTORNEY DYKHUIS:  Object to form.
8             THE WITNESS:  I think he has
9         expertise in this area.
10   BY ATTORNEY DAVIES:
11      Q.    Who is M. Agarwal?
12      A.    I don't know who M. Agarwal is.
13      Q.    Do you see the statement in the
14   second sentence of the Purpose says, "Inhaled
15   treprostinil therapy is delivered directly to
16   well-ventilated lung units, preserving VQ, and
17   reducing undesirable alterations in perfusion."
18        Do you see that sentence?
19      A.    Yes.
20      Q.    Do you agree with that sentence?
21            ATTORNEY DYKHUIS:  Object to form.
22       Foundation.
23            THE WITNESS:  I would phrase it
24        differently.  I think that we theorize
25        that this is something that might happen,
```

Page 199

```
1        and it doesn't happen necessarily in
2        every patient, but it's not definitive as
3        to what happens.
4    BY ATTORNEY DAVIES:
5       Q.    If you look under results in this
6    abstract, what is the mean change in the six-minute
7    walk distance that's reported for the group who
8    were administered inhaled treprostinil?
9             ATTORNEY DYKHUIS:  Object to form.
10            THE WITNESS:  The mean change in
11        the six-minute walk distance was
12        60.85 meters with what looks like a
13        standard deviation of 92.6 meters.
14   BY ATTORNEY DAVIES:
15      Q.    And was that a statistically
16   significant improvement?
17            ATTORNEY DYKHUIS:  Object to form.
18            THE WITNESS:  Based on the P
19        value, it does appear to be statistically
20        significant.
21   BY ATTORNEY DAVIES:
22      Q.    And the author concluded in this
23   abstract that Group 3 PH can be effectively and
24   safely treated with inhaled treprostinil.
25        Do you see that?
```

Page 200

```
1       A.    That's what's written in the
2    conclusion.
3       Q.    Do you see the Methods discussion?
4       A.    I see the Methods section, yes.
5       Q.    And do you see it describes the
6    dosing starting at three breaths of inhaled
7    treprostinil?
8             ATTORNEY DYKHUIS:  Object to form.
9             THE WITNESS:  Yes, I've seen it.
10   BY ATTORNEY DAVIES:
11      Q.    And it's increased to a goal of 9 to
12   12 breaths four times daily as tolerated.
13        Do you see that?
14      A.    I do see that.
15      Q.    And you would agree that the dosing
16   of inhaled treprostinil described here overlaps
17   with the dosing described in Claim 1 of the '327
18   patent; right?
19            ATTORNEY DYKHUIS:  Object to form.
20       Foundation.
21            THE WITNESS:  Yes, I do.
22   BY ATTORNEY DAVIES:
23      Q.    You can put that exhibit aside.
24      A.    Can I make a comment?
25      Q.    You can make a comment if you need
```

Page 201

```
1    to.
2       A.    I do note here that the pulmonary
3    vascular resistance of the group was 8.7, which is
4    very high.  And in this group of patients without
5    having further details about their lung disease,
6    they could potentially be regarded as, you know,
7    more than Group 1 PAH phenotype based on the very
8    high pulmonary vascular resistance, which is
9    different to the mean pulmonary vascular resistance
10   of the patients which entered the INCREASE study
11   which is around four, if I remember correctly.
12        So to your point about phenotypes, it
13   appears to be a phenotype with more severe
14   pulmonary hypertension that could be more
15   successfully treated based on this abstract.
16      Q.    But you would agree that the
17   patients in this abstract would have included
18   PH-ILD, you're saying a different subset from those
19   that you examined in INCREASE?
20            ATTORNEY DYKHUIS:  Object to form.
21       Mischaracterizes.
22            THE WITNESS:  They were -- I want
23        to see the number.  They called them
24        restrictive disease.  There's a
25        difference between restrictive disease
```

MAGNA
LEGAL SERVICES

HIGHLY CONFIDENTIAL          DA0249          LIQ_PH-ILD_00000727

Page 202

```
 1          and interstitial lung disease, which goes
 2      to what restriction is in patients who
 3      have restricted lung physiology and have
 4      reduced FVCs, which could be interstitial
 5      lung disease.  But there are other things
 6      that could give restriction like if you
 7      have muscle weakness or if you have
 8      tremendous obesity, it can also manifest
 9      as restrictive disease.  But I would
10      assume for all intents and purposes that
11      most, if not all of these patients, did
12      have interstitial lung disease.
13  BY ATTORNEY DAVIES:
14      Q.   I'm going to enter as Exhibit 11 New
15  England Journal of Medicine article entitled
16  "Inhaled Treprostinil in Pulmonary Hypertension Due
17  to Interstitial Lung Disease" published in 2021,
18  first author Waxman, last author Steven D. Nathan,
19  M.D., bearing production number UTC_PH-ILD_010790
20  through -829.
21      Pass to you, Doctor.
22          (Exhibit 11 was marked for
23          identification.)
24      Q.   Doctor, what is Exhibit 11?
25      A.   Exhibit 11 is a reproduction of a
```

Page 203

```
 1  study entitled, "Inhaled treprostinil in pulmonary
 2  hypertension due to interstitial lung disease" that
 3  was published in the New England Journal of
 4  Medicine reflecting the results of the INCREASE
 5  study.
 6      Q.   And Doctor, you mentioned earlier
 7  that -- a change in FVC that was observed during
 8  the INCREASE study.  Can you point me to where in
 9  this publication that's described?
10      A.   As I recall, and it's been a while,
11  it might just be in the supplements.  Let me go
12  straight there and see if I can find it -- I can
13  find it.
14      Q.   Doctor, if you go to Table S2, and
15  you can look at whatever you want, but if you go to
16  Table S2, the supplement, it's page 21 of the
17  supplement, does that describe a change in FVC?
18          ATTORNEY DYKHUIS:  Object to form.
19          THE WITNESS:  It does.  No.  Hang
20      on a second.  This is baseline
21      characteristics so it doesn't.  Let's
22      move on.
23          Give me one minute.  It looks like
24      it could be in S6.  S6, this looks like
25      it.  So what we see at week 16 is a
```

Page 204

```
 1          difference in percent predicted at 1.8,
 2          which was statistically significant at
 3          .03.
 4  BY ATTORNEY DAVIES:
 5      Q.   Doctor, which page is that on?
 6      A.   I'm sorry, it's page 26, Table S6.
 7      Q.   You're looking at --
 8      A.   At the top you can see FVC and MLs
 9  and FVC in percent predicted.
10      Q.   So with respect to FVC MLs, was
11  there a difference between the treatment group and
12  the inhaled treprostinil group?  I'm sorry.  Let me
13  try that again.
14      With respect to FVC milliliters, was there
15  a difference between the group given inhaled
16  treprostinil versus the placebo group?
17          ATTORNEY DYKHUIS:  Object to form.
18          THE WITNESS:  It was a numeric
19      difference of 44.4 MLs, but it wasn't
20      statistically significant with a P value
21      of 1.21.
22  BY ATTORNEY DAVIES:
23      Q.   And with respect to the change in
24  FVC percent predicted, was there a difference
25  between the treprostinil treatment group and the
```

Page 205

```
 1  placebo group?
 2          ATTORNEY DYKHUIS:  Object to form.
 3          THE WITNESS:  There was a
 4      difference of 1.8 percent, which was
 5      significant with a P value of .03 at 16
 6      weeks.
 7  BY ATTORNEY DAVIES:
 8      Q.   Do you see if you go to the
 9  page 326, so out of the supplement but back into
10  the article itself, and I'm looking at page 326.
11  Just let me know once you're there.
12      A.   Yes, I'm there.
13      Q.   Do you see the statement, it's
14  pretty close to the Methods section at the bottom
15  that says, "The data from previously completed
16  pilot studies suggest that inhaled treprostinil
17  could improve hemodynamics and functional capacity
18  in patients with Group 3 pulmonary hypertension."
19      Do you see that?
20      A.   I do.
21      Q.   And there's references 9 through 12
22  that are cited there?
23      A.   Yes.
24      Q.   If you go to the references in the
25  last page of the article.  Are you there?
```

**MAGNA** ❯
LEGAL SERVICES

52 (Pages 202 to 205)

Page 206

1    A.    I am.
2    Q.    And reference 10 refers to an
3   abstract by Agarwal and Waxman.  Is that the
4   Agarwal abstract that we've been talking about?
5           ATTORNEY DYKHUIS:  Object to form.
6           THE WITNESS:  Yes, it appears to
7   be.
8   BY ATTORNEY DAVIES:
9    Q.    And for that statement you also
10  relied on a publication by Faria-Urbina entitled
11  "Inhaled Trepostinil and Pulmonary Hypertension
12  Associated with Lung Disease."
13       Do you see that?
14   A.    I do see that.
15   Q.    Do you agree that you also cited to
16  and relied on a publication by Bajwa, et al,
17  entitled "The Safety and Tolerability of Inhaled
18  Trepostinil in Patients with Pulmonary Hypertension
19  and Chronic Obstructive Pulmonary Disease"
20  published in circulation in 2017?
21           ATTORNEY DYKHUIS:  Object to form.
22           THE WITNESS:  I see that.
23   Q.    And you also relied on a publication
24  by Wang et al entitled "Hemodynamic and Gas
25  Exchange Effects of Inhaled iloprost in patients

Page 207

1   with COPD and Pulmonary Hypertension" published in
2   the International Journal of Chronic Obstructive
3   Pulmonary Disorders in 2017.
4        Do you see that?
5           ATTORNEY DYKHUIS:  Object to form.
6           THE WITNESS:  I do see that.
7    BY ATTORNEY DAVIES:
8    Q.    Are there any errors in this New
9   England Journal of Medicine article that you're
10  aware of sitting here today?
11           ATTORNEY DYKHUIS:  Object to form.
12  Foundation.
13           THE WITNESS:  I'm not aware of any
14           errors, but if I may comment on those
15           references.
16           It looks like the paper number 9,
17           a lot of times when you have this, you
18           have an abstract first, you present it at
19           international meeting followed by a
20           paper.
21           So I'm not sure how many of the
22           same patients that were in 10 carried
23           over to 9.  There's a chance that this is
24           a report on the same paper -- patients,
25           just that one was reported as an abstract

Page 208

1           and the other as a manuscript, and that's
2           not uncommon.  The statement that you
3           read is data from previously computed --
4           (Reporter admonition)
5           THE WITNESS:  Going back to the
6           statement you previously read, data from
7           previously computed pilot studies
8           suggest that inhaled trepostinil can
9           improve hemodynamics and functional
10          capacity inpatients with Group 3
11          pulmonary hypertension.
12          Two of these papers, the last two
13          appears to be COPD, which is another form
14          of Group 3 pulmonary hypertension.  So
15          the reference really to this kind of
16          improvement, this comes back to that one
17          group of patients for the most part in
18          terms of ILD.
19  BY ATTORNEY DAVIES:
20   Q.    Those are the group of patients that
21  you believe are described in both the Faria-Urbina
22  publication and the Waxman abstract, which is
23  Exhibit -- the Waxman-Agarwal abstract which is
24  Exhibit 10 that we've introduced already; correct?
25           ATTORNEY DYKHUIS:  Object to form.

Page 209

1           THE WITNESS:  Yes, I'm not a
2           hundred percent certain about it, but
3           without having that paper and knowing
4           exactly that it's the same patients, but
5           that's what I suspect because it's not
6           uncommon to have an abstract first
7           followed by a full manuscript.
8   BY ATTORNEY DAVIES:
9    Q.    Okay, Doctor.  So I'm going to enter
10  three exhibits.  The first is Exhibit 12, which if
11  you to the flip to the second page is entitled
12  "Highlights of Prescribing Information" From Tyvaso
13  treprostinil inhalation solution, revised July 2009
14  and bearing production number UTC_PH-ILD_010692 to
15  -708.
16           (Exhibit 12 was marked for
17           identification.)
18   Q.    I'm going to also introduce as
19  Exhibit 13 a document entitled "Highlights of
20  Prescribing Information" Tyvaso, treprostinil
21  inhalation solution revised both 03/2021 bearing
22  Bates number UTC_PH-ILD_010744 through-758.
23           (Exhibit 13 was marked for
24           identification.)
25   Q.    And the last one, Exhibit 14.  If

53 (Pages 206 to 209)

**MAGNA** ◆
**LEGAL SERVICES**

Page 210

1  you turn to the second page after the exhibit
2  cover, it is entitled Highlights of Prescriptions
3  information, Tyvaso DPI for oral administration,
4  revised 06/2023 and bearing production numbers
5  UTC_PH-ILD_010727 through -742. I'll pass these
6  over to you.
7       And let me know when you've had a chance to
8  look at them.
9            (Exhibit 14 was marked for
10            identification.)
11      Q.   There should be three there. So
12  Exhibit 12 was the Tyvaso 2009 label.
13      A.   Okay.
14           ATTORNEY DAVIES: It says
15      Exhibit 2 on the front. That's how you
16      guys cite it in the report.
17           ATTORNEY DYKHUIS: So 2009.
18  BY ATTORNEY DAVIES:
19      Q.   2009 is Exhibit 12. The 2021 label
20  is Exhibit 13. And the Tyvaso DPI 23 label is 14.
21      Have you had a chance to look at them,
22  Doctor?
23      A.   Oh, gosh, do you want me to read all
24  of them, or are you going to direct me where to go?
25      Q.   And with respect to Exhibit 12, do

Page 211

1  you recognize that as the Tyvaso 2009 label for
2  nebulized inhaled Tyvaso?
3           ATTORNEY DYKHUIS: Object to form.
4      Q.   And I'll point you to the next page
5  on the second page is the July 2009.
6      A.   Yes, I do.
7      Q.   And with respect to Exhibit 13, do
8  you agree that is the 2021 label for nebulized
9  Tyvaso inhalation solution?
10           ATTORNEY DYKHUIS: Objection to
11      form.
12      THE WITNESS: Yes.
13  BY ATTORNEY DAVIES:
14      Q.   For Exhibit 14, do you agree that 14
15  is the 2023 label for the Tyvaso DPI product?
16           ATTORNEY DYKHUIS: Object to form.
17      THE WITNESS: Yes.
18  BY ATTORNEY DAVIES:
19      Q.   So if you go to the -- let's go
20  to -- sorry. Exhibits 12, 13, and 14 you'll recall
21  are all cited in your declaration in this case;
22  correct?
23      A.   I'm sure they probably were, and I
24  feel like I'll need to double check. But if you
25  tell me that they were, then I'm good with that.

Page 212

1      Q.   If you would like to double-check,
2  that's totally fine.
3      A.   I believe that they were.
4      Q.   Okay. Going to Exhibit 12, what
5  indication was Tyvaso approved for in 2009 in
6  Exhibit 12?
7      A.   It was approved for WHO Group 1
8  pulmonary arterial hypertension and NYHA Class III
9  symptoms.
10      Q.   In 2009, was Tyvaso approved for
11  treatment of PH-ILD?
12      A.   No, it wasn't.
13      Q.   Okay. Can you turn to Exhibit 13,
14  the 2021 Tyvaso label.
15      A.   Yes. (Witness complies with
16  request.)
17      Q.   Just let me know once you're there.
18      A.   I'm there.
19      Q.   What was Tyvaso approved for in 2021
20  in the 2021 label of Exhibit 13?
21      A.   So the difference in the two labels
22  is that in addition to Group 1 PAH, Tyvaso was then
23  approved in 2021 for pulmonary hypertension
24  associated with interstitial lung disease -- that's
25  PH-ILD -- to improve exercisability.

Page 213

1      Q.   If you look at the dosing section of
2  the 2021 label, you'll agree that the same dosing
3  is used for treatment of both PAH Group 1 and
4  PH-ILD Group 3; correct?
5           ATTORNEY DYKHUIS: Object to form.
6      Foundation.
7      THE WITNESS: That appears to be
8      the case, yes.
9  BY ATTORNEY DAVIES:
10      Q.   And you agree that the dosing of
11  inhaled trepostinil in the 2021 Tyvaso label is the
12  same dosing administration described in the 2009
13  label for nebulized Tyvaso; correct?
14           ATTORNEY DYKHUIS: Objection to
15      form. Foundation.
16      THE WITNESS: Let me double-check
17      that. I'm not seeing specific reference
18      to 9 to 12 breaths, yeah, as the
19      recommended dose unless I'm missing it.
20      It gives a dosing table. Sorry, that's
21      the DPI. I'm sorry.
22  BY ATTORNEY DAVIES:
23      Q.   No problem. I can ask my question
24  again, if that would be helpful.
25      Do you agree that the dosing of inhaled



54  (Pages 210 to 213)

Page 214

1  trepostinil in the 2021 Tyvaso label is the same
2  dosing administration described in the 2009 label
3  for nebulized Tyvaso; correct?
4          ATTORNEY DYKHUIS:  Object to form
5      and vague.
6          THE WITNESS:  What I'm seeing in
7      the 2009 is maximum recommended dose is
8      nine breaths of Tyvaso four times a day.
9      It says 9 to 12 breaths.  So it's not
10     exactly the same.
11 BY ATTORNEY DAVIES:
12     Q.   Have you changed the way that you
13 dose Tyvaso to PH patients as compared to 2009?
14         ATTORNEY DYKHUIS:  Object to form.
15         THE WITNESS:  I wouldn't say so.
16     I didn't use much Tyvaso for PAH.  So
17     limited experience for PAH, but certainly
18     a lot of experience with PH-ILD, where
19     typically I'll try and get them to at
20     least nine and preferably 12.  And even
21     though that's a dosing recommendation,
22     sometimes we go beyond there.
23 BY ATTORNEY DAVIES:
24     Q.   If you go to the 2009 label and go
25 to page 2 at Section 2.1.

Page 215

1      A.   Okay.
2      Q.   And do you see there there's a
3  reference to the Tyvaso inhalation system?
4      A.   Yes.
5      Q.   And it's referred to as the
6  OPTINEB-ir model ON-100/7.
7      Do you see that?
8      A.   I do see that.
9      Q.   Do you see there that at least the
10 label describes it as a pulse delivery device?
11     A.   I do see that, yes.
12     Q.   Okay.  And that's different than
13 your understanding earlier in the day when you
14 understood the nebulized device to be not a pulse
15 delivery device; correct?
16     A.   Yeah, that was my mistake.
17     Q.   If you go to Exhibit 14, which is
18 the DPI label.
19     A.   (Witness complies with request.)
20     Yes.
21     Q.   And in the 2023 label for Tyvaso
22 DPI, what is Tyvaso DPI approved for?
23     A.   It's approved for the treatment of
24 pulmonary arterial hypertension as well as
25 pulmonary hypertension associated with interstitial

Page 216

1  lung disease.
2      Q.   And if you look at the dosing and
3  administration section in the 2023 Tyvaso DPI
4  label, do you agree that the same dosing and
5  administration is used for both of those two
6  indications; correct?
7          ATTORNEY DYKHUIS:  Object to form.
8          THE WITNESS:  It appears to be so.
9  BY ATTORNEY DAVIES:
10     Q.   Doctor, I'm going to enter as
11 Exhibit 15 an article from Pulmonary Circulation
12 entitled "The safety and Tolerability of Inhaled
13 Trepostinil in Patients with Pulmonary Hypertension
14 and Chronic Obstructive Pulmonary Disease," first
15 author Aboobacker A. Bajwa bearing Bates number
16 UTC_PH-ILD_009844 through -9852.
17     Doctor, have you seen this paper before.
18         (Exhibit 15 was marked for
19         identification.)
20     A.   Let me see if I reference that.  I
21 don't recall.  Oh, yeah, here we go, yeah.
22     Q.   And Doctor, do you recall that this
23 was also one of the publications that was cited in
24 your INCREASE paper as a rationale for the study?
25         ATTORNEY DYKHUIS:  Object to form.

Page 217

1      Foundation.
2          THE WITNESS:  It was part of the
3      background.  Once again, this is COPD
4      versus ILD, which are entirely different.
5  BY ATTORNEY DAVIES:
6      Q.   You as the author, though, did cite
7  it in that INCREASE study publication; correct?
8      A.   Correct, as background for potential
9  treatment of Group 3 pulmonary hypertension, not
10 for potential treatment of PH-ILD.  And just to
11 contextualize it, even though it's COPD,
12 subsequently inhaled trepostinil has been shown not
13 to work in PH associated with COPD.
14     Q.   In your opinion, does this
15 publication justify using inhaled trepostinil for
16 PH-ILD or not?
17         ATTORNEY DYKHUIS:  Object to form
18     and foundation.
19         THE WITNESS:  No, it does not.
20 BY ATTORNEY DAVIES:
21     Q.   Does this paper form any part of the
22 rationale, in your opinion, for the use of inhaled
23 trepostinil in treating PH-ILD?
24         ATTORNEY DYKHUIS:  Same objection.
25         THE WITNESS:  It formed the



55 (Pages 214 to 217)

Page 218

1    rationale for studying therapies for
2    Group 3 pulmonary hypertension, which
3    includes both ILD and COPD.
4        So the concept of treating
5    pulmonary hypertension associated with
6    lung disease was supported, but this was
7    somewhat tangential to ILD because this
8    was COPD, a totally different disease.
9    BY ATTORNEY DAVIES:
10    Q.    I'm going to enter as Exhibit 16 a
11    publication entitled "Inhaled Trepostinil and
12    Pulmonary Hypertension Associated with Lung
13    Disease," first author Mariana Faria-Urbina, last
14    author Aaron B. Waxman bearing Bates number
15    UTC_PH-ILD_009936 through -09943.
16        (Exhibit 16 was marked for
17        identification.)
18    Q.    Have you seen this paper before,
19    Doctor?
20    A.    I have seen it before, but I don't
21    believe I saw it in the context of my declaration,
22    but I could be wrong.  Let me double-check that.
23        Sorry.  Yes, so it was part of the volume
24    of material that I considered for my declaration.
25    Q.    And this also is one of the

Page 219

1    publications that you as an author in the New
2    England Journal of Medicine article for the
3    INCREASE trial cited as rationale for that INCREASE
4    study; correct?
5        ATTORNEY DYKHUIS:  Object to form.
6        THE WITNESS:  That is correct.
7        Part of the foundation for looking at the
8        therapies in Group 3 pulmonary
9        hypertension, yes.
10    BY ATTORNEY DAVIES:
11    Q.    And this article at what is
12    Exhibit 16 by Faria-Urbina, how did this form the
13    foundation for the INCREASE study?
14        ATTORNEY DYKHUIS:  Objection to
15        form.
16        THE WITNESS:  It provided proof of
17        concept.  It was hypothesis-generating
18        that we actually could treat pulmonary
19        hypertension associated with Group 3 with
20        inhaled trepostinil.
21    BY ATTORNEY DAVIES:
22    Q.    And, in fact, if you look at the
23    results -- strike that.
24        You would agree that the patient population
25    described in Exhibit 16 in the Faria-Urbina article

Page 220

1    includes PH-ILD; correct?
2        ATTORNEY DYKHUIS:  Object to form.
3        Foundation.
4        THE WITNESS:  Yes, it did.
5    BY ATTORNEY DAVIES:
6    Q.    Your response was "Yes, it did,"
7    Doctor; is that correct?
8        ATTORNEY DYKHUIS:  Object to form.
9        THE WITNESS:  I'm double-checking
10        to see exactly what they said with
11        regards to the population, but I'm sure
12        that it did.  I just want to see how they
13        state the patients with ILD, how they
14        presented them.
15        Well, in Table 1 they have inhaled
16        trepostinil as nine of the patients.  An
17        additional five with combined pulmonary
18        fibrosis and emphysema.
19    BY ATTORNEY DAVIES:
20    Q.    So you would agree that the patient
21    population in Faria-Urbina does include PH-ILD
22    patients; correct?
23        ATTORNEY DYKHUIS:  Object to form.
24        THE WITNESS:  Correct.
25

Page 221

1    BY ATTORNEY DAVIES:
2    Q.    And if you look at the results on
3    the first page, the authors report a significant
4    improvement in both functional class and six-minute
5    walk distance.
6        Do you see that?
7    A.    I do.
8    Q.    And that improvement in six-minute
9    walk distance for patients treated with inhaled
10    trepostinil, is that statistically significant?
11        ATTORNEY DYKHUIS:  Object to form.
12        THE WITNESS:  It has a P value of
13        .022, which would qualify it as
14        statistically significant.
15        However, N equals 11, and there
16        were 17 -- 22 patients.  So I'm not sure
17        who those 11 patients are they're
18        reporting on.  There were 14 and how many
19        of them had interstitial lung disease
20        versus the other condition.
21    BY ATTORNEY DAVIES:
22    Q.    In your opinion, does this -- this
23    paper in Exhibit 16, does this provide a
24    justification to use inhaled trepostinil for the
25    treatment of PH-ILD patients?



56  (Pages 218 to 221)

Page 222

1     A.    No, not at all.  Not at all.
2     Q.    Not at all?
3     A.    No.
4     Q.    Why not?
5     A.    It's a retrospective study.  So
6  arguably there's some bias to retrospective papers.
7  I did point out previously that the pulmonary
8  vascular resistance was quite high and the
9  pulmonary artery pressure was quite high.
10      So these were the patients who were leaning
11  more to Group 1 PH-ILD phenotype.  And then
12  whenever you have a retrospective study, you are
13  limited in terms of missing data, and I pointed
14  that out that they reported on the six-minute walk
15  distance of only 11 out of 22 patients.  So what
16  happened to the other half and what did they do.
17  How did they treat their members.
18      So I think for all those reasons
19  retrospective, missing data, this is
20  hypothesis-generating.  Even the authors themselves
21  say the potential role of PH-specific drugs in
22  Group 3 PH should be further assessed in the larger
23  retrospective study.  So they recognize their
24  limitations.
25      Q.    Do you know whether Dr. Waxman

Page 223

1  considered this paper to provide a justification
2  for the INCREASE study?
3           ATTORNEY DYKHUIS:  Object to form.
4       Calls for speculation.
5           THE WITNESS:  I don't know for
6       sure, but I suspect he did.
7     BY ATTORNEY DAVIES:
8     Q.    Did you ever discuss this paper with
9  Dr. Waxman?
10      A.    I did not.
11      Q.    Why do you suspect that he did
12  believe this was a justification?
13           ATTORNEY DYKHUIS:  Object to form.
14           THE WITNESS:  Because he had the
15       study.  He had the experience of the
16       individual patients, and so I'm sure that
17       he ultimately believed this was a
18       justification for an INCREASE study.
19           And I also believe that there was
20       a justification for the PERFECT study.
21       One worked for out great for ILD, the
22       other one didn't work great for COPD
23       using the same paper as justification.
24           So one went in a positive
25       direction, the other one went to a

Page 224

1       negative direction, which underscores the
2       point that I made earlier which is that
3       you cannot use this paper as a
4       justification for treating PH as in the
5       context of pulmonary hypertension.
6     BY ATTORNEY DAVIES:
7     Q.    I'm going to enter as Exhibit 17 a
8  paper entitled "Hemodynamic and Gas Exchange
9  Effects on Inhaled iloprost in patients with COPD,
10  Pulmonary Hypertension" by Lan Wang, et al,
11  published in the International Journal of COPD
12  bearing production Number UTC_PH-ILD_010782 through
13  -789.
14      Doctor, have you seen this paper before?
15           (Exhibit 17 was marked for
16       identification.)
17      A.    Let me see.  Sorry.
18           ATTORNEY DYKHUIS:  Excuse me.
19       Could I have a copy?
20      Q.    We're asking you to do a lot.
21  That's normally not part of your job doing a
22  deposition, but you're doing fine.
23      A.    I preface that, I'm not as sharp as
24  I should be because of this nagging cold and my
25  nasal stuffiness.

Page 225

1       Let me see if this is one of the cited
2  references from my report.  So this is Wang.
3  Indeed it was.
4     Q.    And this was also one of the
5  publications that we looked at earlier that you had
6  cited to in your New England Journal of Medicine
7  INCREASE study publication for support for the
8  rationale of that study; correct?
9           ATTORNEY DYKHUIS:  Objection to
10       form.
11           THE WITNESS:  That's correct.
12      BY ATTORNEY DAVIES:
13      Q.    In your opinion, does this Wang 2017
14  paper provide a justification for using inhaled
15  trepostinil to treat PH-ILD?
16      A.    No, not at all.
17      Q.    Why not?
18      A.    Because this isn't PH-ILD.  This is
19  PH COPD.
20      Q.    Do you know any of the authors of
21  this study?
22      A.    I do not.
23      Q.    Did you ever discuss this study with
24  any of the other members of the steering committee
25  for the INCREASE study?

**MAGNA** ◗
**LEGAL SERVICES**

HIGHLY CONFIDENTIAL                    DA0255                    LIQ_PH-ILD_00000733

Page 226

1      A.   I did not.  I don't recall
2 discussing this paper at all.
3      Q.   Do you believe that this study
4 provides a justification for using inhaled
5 trepostinil in a Group 3 patient population?
6           ATTORNEY DYKHUIS:  Object to form.
7           THE WITNESS:  No.  Not at all.
8     It's a totally different drug.  It's
9     iloprost, not treprostinil.  Given by a
10     different system.  If you have a
11     different drug or a different drug
12     formulation given by a different system,
13     the results can be entirely different
14     than what has been seen or what might be
15     seen with another drug.
16   BY ATTORNEY DAVIES:
17      Q.   Do you believe that this publication
18 provides any justification for using a Group 1 PH
19 therapy in a Group 3 PH patient?
20           ATTORNEY DYKHUIS:  Object to form.
21     Foundation.
22           THE WITNESS:  It does appear to be
23     a reduction in the pulmonary pressures
24     as much as I can say.  Four patients
25     received a single dose of iloprost; it's

Page 227

1     a nasal dilator.  Then there's a bunch of
2     things including the mean pulmonary
3     arterial pressure and the pulmonary
4     vascular resistance and it went down.
5         So what that means is the drug did
6     what it's supposed to do.  It's a
7     pulmonary vasodilator with one dose.  It
8     has no meaning in terms of clinical
9     benefit, and there's no long-term data
10     here.
11         So this just is very, very -- just
12     adds to the existing literature of what
13     we knew already.
14   BY ATTORNEY DAVIES:
15      Q.   Can you go back to Exhibit 15, which
16 is the Bajwa article.
17      A.   (Witness complies with request.)
18     Okay.
19      Q.   Are you there?
20      A.   Yes, sir.
21      Q.   In your opinion, does the Bajwa 2017
22 article at Exhibit 15 provide any justification for
23 the use of a Group 1 PH treatment in the treatment
24 of Group 3 PH?
25           ATTORNEY DYKHUIS:  Objection to

Page 228

1     form and foundation.
2           THE WITNESS:  No, it doesn't.
3     It's the same onset, provides a
4     rationale, perhaps, to chase the
5     hypothesis of inhaled trepostinil, and in
6     this case specifically in COPD.  But I
7     don't believe that this particular series
8     had any ILD patients.
9         So as I said earlier, this was
10     cited in NJM article for Group 3 as a
11     whole, which includes COPD and ILD.  This
12     by itself doesn't really provide
13     justification for treating PH-ILD.  It
14     provides a rationale for studying inhaled
15     trepostinil in PA COPD.  That study was
16     done and unfortunately was a negative
17     study.  And that was a PERFECT study.
18   BY ATTORNEY DAVIES:
19     (Exhibit 18 was marked for
20     identification.)
21     (Discussion held off the
22     record.)
23      Q.   Dr. Nathan, I've given you what I've
24 marked as Exhibit 18, a document titled "Safety and
25 Tolerability of High-dose Inhaled Trepostinil in

Page 229

1 Pulmonary Hypertension," first author Kishan Parikh
2 bearing production number UTC_PH-ILD_ 010599
3 through -610.
4         Have you seen this publication before,
5 Doctor?
6      A.   Yes, I have.
7      Q.   And this is the Parikh article that
8 you discussed in your declaration; is that correct?
9      A.   That's correct.
10      Q.   In your opinion, does the Parikh
11 article provide any justification for the use of
12 inhaled trepostinil in the treatment of PH-ILD?
13      A.   No, it does not.
14           ATTORNEY DYKHUIS:  Object to form.
15      Q.   Why not?
16      A.   Because there's no evidence of any
17 efficacy of clinical improvement, or their primary
18 endpoint was that it was safe and tolerable.  But
19 there, once again, are holes in any study that's
20 retrospective and single-centered.
21        So basically it's just going back through I
22 don't know how many charts in cobbling the data
23 together and putting this paper together.  For that
24 very reason all I can say is it was safe and
25 tolerable but there's no evidence of efficacy.

58  (Pages 226 to 229)

Page 230

```
 1        If you look, for example, there were a
 2   total of 80 patients, 31 -- 32 percent -- 31.6 to
 3   be exact, had PH secondary to lung disease.  31.6.
 4   Then if you're looking for any efficacy measure,
 5   they do report the six-minute walk at follow-up
 6   visits one and two.
 7        There's no set time interval.  This is just
 8   the average time interval, 5.2 minutes is a wide
 9   range, and 20 minutes was an even wider range.  And
10   let's see what they said for the walk distance.
11        Something in here.  Efficacy, six-minute
12   walk, okay.  Average change was 3.9 X from baseline
13   to follow app.  Out of 80 patients, there were 39.
14   So what happened to the other 41?  Did that drop
15   out all the patients with PH ILD?  We have no idea.
16        These could all be patients with PH, for
17   all we know.  And 31.6 meters sounds great, but
18   what happened to the risk of the dropouts and who
19   were the patients who dropped out and who were the
20   ones that were included?
21        So there's always inherent bias to a
22   retrospective study.  Obviously the patients who we
23   followed up on are the ones probably going to stick
24   on the drug and probably going to do well.  So
25   there's inherent bias to the patients who were less
```

Page 231

```
 1   than 50 percent, and here we have I think 34
 2   patients out of 80 who managed to stick on drug and
 3   eventually eke out -- not eke out, have a
 4   difference in the six-minute walks of 31.6 meters.
 5        But that's why you need the randomized
 6   control studies to account for the patients who
 7   drop out, the patients who die, and for the
 8   patients to be blinded to therapy.
 9        If we go back to the INCREASE study, there
10   were patients in the placebo arms who had
11   improvements in their numbers.  So we don't know,
12   once again, if this is a drug effect or if this is
13   something else that's going on in these patients.
14   We don't know how many of these patients went into
15   pulmonary rehab, for example.
16        Pulmonary rehab will improve the six-minute
17   walk distance.  That's why you need the rigors of a
18   randomized control study where patients can't
19   leave.  They can't initiate pulmonary rehab during
20   the course of the study.  So this really is totally
21   uninformative in terms of efficacy.
22        Q.   Do you know any of the authors on
23   the Parikh publication in Exhibit 18?
24        A.   I do.  I know Victor Tapson.  He was
25   one of the steering committee members together with
```

Page 232

```
 1   myself and Aaron Waxman.  And I do know Abby Poms.
 2        Q.   Do you know whether Dr. Tapson
 3   believed that this article formed a justification
 4   for the use of inhaled trepostinil in PH-ILD?
 5             ATTORNEY DYKHUIS:  Object to form.
 6        Speculation.
 7             THE WITNESS:  I can't speak for
 8        him.  There's a good chance that he might
 9        have.  I don't know.
10   BY ATTORNEY DAVIES:
11        Q.   Did you ever talk to -- strike that.
12        Who is Abbe D. Poms?
13        A.   Abby Poms is a coordinator there.  I
14   think she is involved in the pulmonary rehab
15   program at Duke.  I'm not sure if she's still at
16   Duke or not.
17        Can I take that back.  I think she's the
18   pulmonary hypertension coordinator at Duke or was.
19        Q.   That's Abby Poms?
20        A.   Abby Poms, yes.
21        Q.   Do you know if United Therapeutics
22   funded this study at Exhibit 18, the Parikh
23   publication?
24             ATTORNEY DYKHUIS:  Objection to
25        form and foundation.
```

Page 233

```
 1             THE WITNESS:  It does say at the
 2        end, Acknowledgments, that it was funded
 3        by United Therapeutics as well as an NIH
 4        grant.
 5   BY ATTORNEY DAVIES:
 6        Q.   I'm introducing as Exhibit 19 a
 7   document entitled "United States Patent Application
 8   publication" to Wade et al, Publication Number U.S.
 9   2013/0096200 A1 and bearing production numbers
10   UTC_PH-ILD_010774 through -781.
11             (Exhibit 19 was marked for
12        identification.)
13        Q.   My first question, and I see you're
14   already looking, is have you seen this document
15   before?
16        A.   Yes, I have.
17        Q.   And is this one of the documents
18   that you relied on in your declaration?
19        A.   Yes, it is.
20        Q.   Who was the applicant for this
21   United States patent application?
22             ATTORNEY DYKHUIS:  Object to form.
23             THE WITNESS:  United Therapeutics
24        Corporation.
25
```

**MAGNA** ◗
**LEGAL SERVICES**

HIGHLY CONFIDENTIAL     DA0257     LIQ_PH-ILD_00000735

Page 234

1    BY ATTORNEY DAVIES:
2       Q.    Then you see some inventors listed
3    below there?
4       A.    Uh-huh.
5       Q.    Do you know Michael Wade?
6       A.    I do not.  I meet a lot of people.
7    I might have met him at some point.
8       Q.    Do you know Stewart Rich?
9       A.    I do know Stewart Rich, yes.
10      Q.    Who is Stewart Rich?
11      A.    He's a PH expert and cardiologist in
12   the Chicago area.
13      Q.    Does he work for United
14   Therapeutics?
15      A.    At one point he did, but at this
16   time I don't believe he does.
17      Q.    Do you know Eugene Sullivan?
18      A.    I do know Eugene Sullivan.
19      Q.    Who is that?
20      A.    He's a physician.  I believe he's a
21   pulmonologist by training.  He used to be with FDA
22   and then United Therapeutics, and now he's with
23   another company.
24      Q.    Do you know Robert Roscigno?
25      A.    I do know Robert Roscigno, yes.

Page 235

1       Q.    Who is Robert Roscigno?
2       A.    He used to have been with United
3    Therapeutics, and he's moved around a little bit.
4    I know that he has Liquidia -- with Liquidia and
5    I'm not sure currently, it was a while ago that I
6    knew him.  I haven't seen him for a long time.
7       Q.    Have you ever worked with Robert
8    Roscigno?
9       A.    I've never worked directly with him,
10   no.
11      Q.    Have you ever been involved in any
12   clinical studies with Robert Roscigno?
13      A.    Not that I recall.  As you can tell
14   from my CV when you went through it, there was some
15   funding from UT many few years ago.  I can't
16   remember when exactly I met him.  And it was
17   involving a study somewhere.
18      Q.    Do you know Roger Jeffs?
19      A.    I do know Roger Jeffs, yes.
20      Q.    Who is Roger Jeffs?
21      A.    Roger Jeffs is the former CEO of
22   United Therapeutics and to my understanding the
23   current CEO of Liquidia.
24      Q.    If you flip over to, I guess, page 1
25   of this application and look at the -- do you see

Page 236

1    the heading "Field" for paragraph 2?
2       A.    Yes.
3       Q.    And paragraph 2 states, "The
4    invention relates to the use of treprostinils or
5    its derivatives or pharmaceutically acceptable salt
6    thereof to treat and/or prevent interstitial lung
7    disease or asthma or a condition associated with
8    interstitial lung disease or asthma."
9       Do you see that?
10      A.    I do.
11      Q.    Is PH-ILD a condition associated
12   with interstitial lung disease?
13      ATTORNEY DYKHUIS:  Objection to
14   form.
15      THE WITNESS:  Yes, it is.
16   BY ATTORNEY DAVIES:
17      Q.    If you look at paragraph 17, let me
18   know once you're there.
19      A.    Yes.
20      Q.    Okay.  It states, "The current
21   invention relates to therapies that enhance blood
22   flow by increasing blood flow through smaller
23   vessels and capillaries and are effective to treat
24   and prevent interstitial lung disease or conditions
25   associated with interstitial lung disease such as

Page 237

1    pulmonary fibrosis."
2       Do you see that?
3       A.    Yes.
4       Q.    So do you understand this patent
5    application be directed to treatments for
6    conditions associated with interstitial lung
7    disease including PH-ILD?
8       ATTORNEY DYKHUIS:  Objection to
9    form.
10      THE WITNESS:  Actually, I have a
11   slightly different take on that, because
12   when they say "such as pulmonary
13   fibrosis," what they mean by "conditions
14   associated with interstitial lung
15   disease" appears to be conditions
16   associated under the broad banner of
17   interstitial lung disease.
18      Otherwise they might have said
19   pulmonary hypertension, which is more
20   like a complication rather than discrete
21   clinical entities under the broad
22   umbrella of interstitial lung disease.
23   BY ATTORNEY DAVIES:
24      Q.    You understand that's just an
25   example, though, and it doesn't limit the



60  (Pages 234 to 237)

Page 238

1 associated conditions for interstitial lung
2 disease, correct?
3         ATTORNEY DYKHUIS: Objection to
4     form. Vague.
5         THE WITNESS: I do understand
6     that, and they could have put other
7     conditions like connective tissue-related
8     pulmonary fibrosis, scleredema-related
9     pulmonary fibrosis. So to me they -- I
10    can understand when it says conditions
11    associated with interstitial lung disease
12    you can go one of two ways. Are they
13    talking about condition under the banner
14    of ILD or conditions associated as
15    comorbidities with the ILD.
16        That seems like the broad group of
17    conditions and the ILD that I can see how
18    someone else might interpret this is
19    well, maybe this could include pulmonary
20    hypertension, but that wouldn't have been
21    my interpretation of this. My
22    interpretation would have been what I
23    described.
24 BY ATTORNEY DAVIES:
25    Q.   If you go to Paragraph 30.

Page 239

1    A.    Uh-huh.
2    Q.    Do you see it says, "The present
3 invention encompasses methods of using treprostinil
4 or its derivatives or pharmaceutically acceptable
5 salts thereof."
6     Do you see that?
7    A.    I do.
8    Q.    So this patent application is
9 directed to the use of treprostinil as a treatment?
10        ATTORNEY DYKHUIS: Objection to
11    form.
12        THE WITNESS: Yes.
13 BY ATTORNEY DAVIES:
14    Q.    If you go to Paragraph 37, it's on
15 page 3, second column.
16    A.    Okay.
17    Q.    In Paragraph 37 it's describing some
18 formulations of the invention.
19    Do you see that?
20        ATTORNEY DYKHUIS: Objection to
21    form.
22        THE WITNESS: Yes, I do.
23 BY ATTORNEY DAVIES:
24    Q.    And do you see one of the
25 formulations of the invention that is described as

Page 240

1 inhalation in solid and liquid form?
2    A.    I see it.
3    Q.    So you understand this patent to be
4 describing the use of inhaled treprostinil in either
5 solid or liquid forms as a treatment?
6         ATTORNEY DYKHUIS: Objection to
7     form. Misstates.
8         THE WITNESS: Yes.
9 BY ATTORNEY DAVIES:
10    Q.    Could you go to Example 4 on page 5
11 beginning with paragraph 61.
12    A.    Okay.
13    Q.    Here Example 4 refers to the effects
14 of treprostinil, either in the form of Remodulin or
15 inhaled, on patients analyzed using the six-minute
16 walk test.
17    Do you see that?
18    A.    I do.
19    Q.    And then it goes on to describe the
20 six-minute walk test as a standard assessment of
21 exercise capacity and breathlessness in patients
22 with lung disease.
23    Do you see that?
24    A.    I do.
25        ATTORNEY DYKHUIS: Object to form.

Page 241

1         THE WITNESS: I do.
2 BY ATTORNEY DAVIES:
3    Q.    Do you agree with that statement?
4         ATTORNEY DYKHUIS: Object to form.
5         THE WITNESS: Yes.
6 BY ATTORNEY DAVIES:
7    Q.    So this patent application describes
8 the assessment of inhaled trepostinil therapy using
9 a six-minute walk test as an assessment of exercise
10 capacity; correct?
11        ATTORNEY DYKHUIS: Object to form.
12    Mischaracterizes.
13        THE WITNESS: It appears to be so.
14 BY ATTORNEY DAVIES:
15    Q.    Doctor, can you look at
16 Paragraph 82, which is Example 6 or the start of
17 Example 6, I should say.
18    A.    Okay.
19    Q.    Just let me know once you're there.
20    A.    Yes.
21    Q.    So here it's describing, "The
22 following study shows the vehicle of intravenous
23 treprostinil in patients with idiopathic pulmonary
24 fibrosis and pulmonary hypertension."
25    Do you see that?

61 (Pages 238 to 241)

Page 242

1     A.    I do.
2     Q.    With that description in Paragraph
3   82, do you understand that this patent is, in fact,
4   directed to PH including PH-ILD?
5           ATTORNEY DYKHUIS:  Object to form.
6   Form. Foundation. Speculative.
7           THE WITNESS:  You know, I can't
8           answer that because these are just
9           examples. These are not specific claims,
10          as far as I can tell. These are just 19
11          examples in the literature. So there's
12          no specific claim here.
13          So if you look at this example,
14          it's intravenous treprostinil anyway.
15          Small segment of IPF for pulmonary
16          hypertension. I guess I don't know if
17          you're going to go to the claim, there's
18          a claim, and this is beyond my realm of
19          expertise in terms of how the patents are
20          formulated and what they cover.
21          But there's mention put in this of
22          many different things, and I'm not sure
23          just because they mention it you can
24          connect the dots in terms of what it
25          covers.

Page 243

1   BY ATTORNEY DAVIES:
2     Q.    Can you go to Paragraph 50, Doctor,
3   and that's back on page 4. And it's right before
4   the Example section.
5     A.    (Witness complies with request.)
6     Q.    And Example 50 provides a
7   description of what the examples are. It states,
8   "The examples described herein are illustrative of
9   present invention and are not intended to be
10  limitations thereon."
11          Do you see that?
12    A.    I do.
13    Q.    So from what you understand the
14  examples in the patent to actually be illustrations
15  of the present inventions described in this patent?
16          ATTORNEY DYKHUIS:  Object to form.
17          Foundation and calls for a legal
18          conclusion.
19          THE WITNESS:  I think it's beyond
20          my expertise to comment on that.
21  BY ATTORNEY DAVIES:
22    Q.    PH IPH is a form of PH-ILD; right?
23    A.    Yes.
24    Q.    If you go to Paragraph 24 of this
25  patent application description, let me know once

Page 244

1   you're there.
2     A.    Yeah.
3     Q.    And Paragraph 24 states, "Many acute
4   and chronic lung disorders with variable degrees of
5   inflammation and fibrosis are collectively referred
6   to as interstitial lung diseases. Because of the
7   stiff fibrosis of the lung, pulmonary or arterial
8   hypertension, PAH, is often a late complication of
9   some forms of ILD."
10          Do you see that?
11    A.    I do.
12    Q.    Do you understand that to be
13  describing PH-ILD?
14          ATTORNEY DYKHUIS:  Object to form.
15          THE WITNESS:  That actually
16          doesn't. It's describing PAH, which is
17          Group 1 pulmonary hypertension, and this
18          goes to what I mentioned earlier that
19          sometimes patients will develop what I
20          would regard as pulmonary hypertension
21          disproportionate to the extent of their
22          lung disease, in which case I would
23          regard them as having Group 1 pulmonary
24          arterial hypertension. So that's what I
25          mean.

Page 245

1   BY ATTORNEY DAVIES:
2     Q.    So if you have a patient with PAH as
3   well as ILD complications, you would not consider
4   that to be a PH-ILD patient. Is that correct?
5           ATTORNEY DYKHUIS:  Objection to
6           form.
7           THE WITNESS:  It goes down to
8           where are you going to group the patient.
9           And so to me, the way this reads is we're
10          talking about ILD complicated by
11          pulmonary hypertension or associated with
12          pulmonary hypertension that is severe
13          enough and out of proportion to the lung
14          disease to be regarded as Group 1 PAH.
15          Any time you say "PAH," that
16          defaults to Group 1. PH covers one to
17          five, but PAH is purely Group 1.
18  BY ATTORNEY DAVIES:
19    Q.    Do other people in the field view
20  that distinction the same way as you, or is there a
21  difference in opinions as to that point as to
22  whether a patient with PAH and underlying ILD would
23  be a PH-ILD patient or not?
24          ATTORNEY DYKHUIS:  Objection to
25          form. Speculation.

**MAGNA◗**
LEGAL SERVICES

62 (Pages 242 to 245)

Page 246

1    THE WITNESS: I think anyone who
2  is familiar with the field of pulmonary
3  hypertension knows and recognizes that
4  distinction. You could catch someone who
5  is not. It's a common misconception
6  amongst people who go into pulmonary
7  hypertension to talk about PAH and PH
8  interchangeably, but not amongst people
9  who know pulmonary hypertension.
10    If you say "PAH," you're referring
11  to Group 1 pulmonary hypertension.
12  BY ATTORNEY DAVIES:
13    Q.   Have you ever seen a patient in your
14  clinical practice who you would consider to have --
15  who you would consider to have been suffering from
16  both Group 1 PAH and Group 3 PH-ILD?
17    ATTORNEY DYKHUIS: Object to form.
18    THE WITNESS: No. That's a
19  theoretic concept that's impossible to
20  figure out. You either make the
21  distinction that that is more of a
22  Group 1 phenotype or this is Group 3.
23  You can't say there's, you know, a little
24  bit of three in some. It's impossible to
25  thread that needle.

Page 247

1  BY ATTORNEY DAVIES:
2    Q.   How do you decide where the dividing
3  line is between these patients?
4    A.   That's a problem and one of a lot of
5  debate. There are cases that are clearly Group 3,
6  cases that are clearly Group 1, and there's a
7  spectrum between them. And I think I've alluded to
8  it earlier.
9    You look at the severity of the lung
10  disease in relation to the severity of the
11  hemodynamic impairment, and it becomes a subject of
12  judgment call where they best reside, Group 1 or
13  Group 3.
14    ATTORNEY DAVIES: Let's take a
15  break if that's okay.
16    (Discussion held off the
17  record.)
18    THE VIDEOGRAPHER: We are off the
19  record at 15:18.
20    (Recess taken from 3:18 p.m.
21  to 3:43 p.m.)
22    THE VIDEOGRAPHER: We are the
23  record at 15:43.
24  BY ATTORNEY DAVIES:
25    Q.   Welcome back, Dr. Nathan. At any of

Page 248

1  the breaks today, did you have any discussions with
2  counsel about your testimony?
3    A.   No.
4    ATTORNEY DAVIES: Okay. I have no
5  further questions, but obviously reserve
6  the right to follow-up based on what you
7  may or may not ask, Art.
8  EXAMINATION BY
9  ATTORNEY DYKHUIS:
10    Q.   Dr. Nathan, I have a few questions
11  for you.
12    Understanding you have not been feeling all
13  that well today and wanted to clarify some of the
14  testimony after lunch.
15    Do you recall some questions about the '793
16  patent claims and how, if at all, they relate
17  to improving exercise capacity?
18    ATTORNEY DAVIES: Objection.
19  Form.
20    THE WITNESS: I do.
21  BY ATTORNEY DYKHUIS:
22    Q.   Let's get out, it's Exhibit 8 and 9.
23  You have a number in front of you. Find 8 and 9.
24    A.   (Witness complies with request.)
25    Q.   I think Exhibit 9 is the '327

Page 249

1  patent; correct?
2    A.   That's correct.
3    Q.   Let's turn to the claim at the end
4  if you would, please.
5    A.   Okay.
6    Q.   Can you look at Claim 1.
7    A.   Yes.
8    Q.   And Claim 1 recites a method of
9  improving exercise capacity in a patient having
10  pulmonary hypertension associated with interstitial
11  lung disease.
12    Do you see that?
13    ATTORNEY DAVIES: Objection.
14  Form.
15    THE WITNESS: I do.
16  BY ATTORNEY DYKHUIS:
17    Q.   So Claim 1 of the '327 patent
18  involves explicitly improving exercise capacity in
19  a patient having pulmonary hypertension associated
20  with interstitial lung disease?
21    A.   Yes.
22    ATTORNEY DAVIES: Objection.
23  Form.
24    Q.   Then if you can turn to the '793
25  patent, which is Exhibit 8.



63 (Pages 246 to 249)

Page 250

```
1      A.   Okay.
2      Q.   And let's go to the claims of the
3  '793 patent.  Tell me when you've got those pulled
4  up.
5      A.   I'm here.
6      Q.   Does Claim 1 of the '793 patent
7  say -- have any words about improving exercise
8  capacity?
9      A.   No, it does not.
10     Q.   Let's keep those two handy, but then
11 your declaration is Exhibit 2.  And then let's go
12 to Paragraph 176, please.
13     A.   Yes.  I'm at 176.
14     Q.   Did counsel direct you specifically
15 to Paragraph 176 at all today?
16          ATTORNEY DAVIES:  Objection.
17     Form.
18          THE WITNESS:  No.
19 BY ATTORNEY DAVIES:
20     Q.   Could you read 176 just to yourself
21 and let me know when you're finished.
22          ATTORNEY DAVIES:  Same objection.
23          THE WITNESS:  I remember now
24     opining on this, that the '793 patent
25     does not teach anything about what the
```

Page 251

```
1  '327 patent has as its claim in terms of
2  improving exercise tolerance, FVC and
3  other things that are within the -327
4  claim.
5  BY ATTORNEY DYKHUIS:
6      Q.   So why is it your opinion that the
7  '793 patent doesn't teach anything about the '327
8  patent improving exercise capacity?
9          ATTORNEY DAVIES:  Objection.
10     Form.
11          THE WITNESS:  There are a lot of
12     examples thrown within it.  I'm sorry.
13     This is -- I was getting my patents
14     confused.  Let me start again.
15          The '793 patent, all that does is
16     it talks about treating pulmonary
17     hypertension.  And treating pulmonary
18     hypertension means taking pressures that
19     are high within the lungs and making them
20     lower.
21          There's no mention of any kind of
22     clinical benefit in the original '793
23     patent, and that's what the '327 patent
24     gets into.
25
```

Page 252

```
1  BY ATTORNEY DYKHUIS:
2      Q.   Okay.  You can close your
3  declaration there.  And then you still have the
4  '327 and '793 patent in front of you, Doctor?
5      A.   '793 and '327, yes.
6      Q.   Which one do you have on the left?
7      A.   This is the '793.
8      Q.   Could you open that '793 back to the
9  claims again.
10     A.   (Witness complies with request.)
11     Okay.
12     Q.   And I'd like to do a little
13 side-by-side there.  You can hold it if you like.
14 I actually want to ask you about a specific
15 question again in a moment.
16     A.   Okay.
17     Q.   So you were asked a question
18 earlier, and I'm just going to read it.
19     "Do you believe that Claim 1 of the '793
20 patent also includes a method of improving exercise
21 capacity in a patient having pulmonary hypertension
22 associated with interstitial lung disease?"
23     There was an objection, and then you said,
24 "That's what it says."
25     Do you recall that question and answer from
```

Page 253

```
1  earlier today?
2      A.   I don't recall specifically, but I
3  told you wrong.  I think that I was thinking about
4  the '327 patent when that question was posed at me.
5  So I apologize for getting the numbers confused.
6  Clearly it does, which the '793 patent does not
7  mention anything about improving exercise capacity,
8  so that was not -- my mistake.
9      Q.   So when you said "That's what it
10 says," you were referring to the '327 patent?
11          ATTORNEY DAVIES:  Objection.
12     Form.
13          You can answer.
14          THE WITNESS:  Yes, that's correct.
15 BY ATTORNEY DYKHUIS:
16     Q.   I think on the left you have the
17 '793 patent.  Let's look at the cover page.
18     You were asked some questions earlier today
19 about -- I think it was a conference of some sort
20 where you were admonished publically over the
21 RISE-IIP study?
22     A.   That's correct.
23     Q.   That was something that was in front
24 of 500 people or so?
25     A.   Yes.
```

**MAGNA** ●
**LEGAL SERVICES**

64 (Pages 250 to 253)

Page 254

1    Q.    Who was it who was admonishing you?
2    A.    It was Dr. Lewis Rubin.
3    Q.    So on the cover of the '793 patent,
4  do you see a section Inventors, and it lists a few
5  people?
6    A.    Yes.
7    Q.    One of the inventors is Lewis J.
8  Rubin?
9    A.    Yes, indeed.  It's the same person.
10         ATTORNEY DYKHUIS:  No further
11    questions.
12  EXAMINATION BY
13  ATTORNEY DAVIES::
14    Q.    Just a couple additional questions
15  for me, Doctor.
16         If you look back at the '793 patent at
17  Claim 1, just let me know once you're there.
18    A.    I'm there.
19    Q.    Okay.  So is it your opinion that
20  Claim 1 of the '793 patent excludes a method of
21  improving exercise capacity in a patient with
22  PH-ILD?
23         ATTORNEY DYKHUIS:  Object to form.
24    Foundation.
25         THE WITNESS:  Yes, it does.

Page 255

1  BY ATTORNEY DAVIES:
2    Q.    Counsel directed you to
3  paragraph 176 of your declaration.  Do you recall
4  that?
5    A.    I don't recall that.
6    Q.    Can you go to paragraph 176 of your
7  declaration.
8    A.    Okay.
9    Q.    Did you prepare paragraph 176 in
10  your declaration, or was that prepared by counsel?
11         ATTORNEY DYKHUIS:  Objection to
12  form.
13         THE WITNESS:  To be honest, I
14    don't recall.  We all had a hand in this
15    declaration, and I don't recall who had
16    the original version.  It might have been
17    counsel.  There were many iterations
18    going backwards and forwards.  So I can't
19    a hundred percent attest to that.
20         I certainly had a role in this in
21    terms of editing, adding, and deleting
22    things that I didn't think was necessary
23    to make it my own words.
24         ATTORNEY DAVIES:  We have no
25    further questions at this time.

Page 256

1         ATTORNEY DYKHUIS:  No further
2  questions for UTC.
3         THE VIDEOGRAPHER:  We are off the
4  record at 15:54.
5         (Proceedings adjourned at
6         3:54 p.m.)

Page 257

1  DISTRICT OF COLUMBIA:              SS
2    I, Barbara Moore, a Registered Court Reporter
3  of the District of Columbia, do hereby certify that
4  these proceedings took place before me at the time
5  and place herein set out, and the proceedings were
6  recorded stenographically by me and this transcript
7  is a true record of the proceedings.

9    I further certify that I am not of counsel to
10  any of the parties, nor an employee of counsel nor
11  related to any of the parties, nor in any way
12  interested in the outcome of this action.

16         _____
17         BARBARA MOORE, CRR, RMR
18
19  _____
20  My Commission Expires:
21  September 30, 2028



65 (Pages 254 to 257)

Page 258

```
1   CERTIFICATE OF READING AND SIGNING
2
3   I, _____, the deponent herein, do
4   hereby certify that I have read the foregoing
5   deposition and certify that it is a true and
6   accurate transcription of my testimony given in the
7   above-captioned matter, except for any corrections
8   as noted on the enclosed errata sheet.
9          _____
10              STEVEN D. NATHAN
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 259

```
1                  E-R-R-A-T-A
2
3   RE:  UNITED THERAPEUTHE COURTICS v. LIQUIDIA
4
5   Enclosed is the transcript of your deposition
6   testimony.  Please review the transcript,  complete
7   and distribute the signed errata sheet and
8   acknowledgment page to all parties, including this
9   office, within 30 days.  Any changes and/or
10  corrections should be listed below and not made
11  upon the transcript itself:
12
13    PAGE  LINE  CHANGE OR CORRECTION        REASON
14
15
16
17
18
19
20
21
22
23  DATE_____ SIGNATURE_____
24              STEVEN NATHAN, M.D.
25
```



66 (Pages 258 to 259)

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000742

**A**

**Aaron**
28:24 30:20 48:3
197:18 218:14
232:1

**AB**
197:15

**Abbe**
232:12

**Abby**
232:1,13,19,20

**ability**
107:12

**able**
127:21 137:6

**Aboobacker**
216:15

**above-captioned**
258:7

**above-entitled**
1:15

**absence**
37:6

**absolute**
33:12 34:2 38:1,12

**abstract**
196:2,24 197:2,4,7
197:20 199:6,23
201:15,17 206:3,4
207:18,25 208:22
208:23 209:6

**academic**
22:19,23

**accelerated**
106:19 107:10,11
190:5

**acceptable**
236:5 239:4

**accepted**
18:15,16 126:24

**accommodating**
64:23

**accompanied**
73:16 74:12 109:22
138:6,7

**account**
115:12 231:6

**accredited**
24:10,14,16,18

**accrued**
21:9

**accurate**
7:25 24:1 34:10,13
258:6

**acknowledgment**
259:8

**Acknowledgments**
233:2

**acronym**
26:22,23

**act**
14:18

**acted**
103:9

**action**
257:12

**activate**
133:4

**activation**
118:5

**active**
31:8 48:6 94:13

**actively**
79:16 110:20

**activity**
31:10

**actual**
103:18

**actuate**
130:20,23

**acute**
53:15 55:21 138:22
139:9,11,13,14
244:3

**Adam**
8:11

**add**
25:3

**added**
26:17 50:10 105:20

**adding**

**255:21**

**addition**
212:22

**additional**
20:23,24 21:7 48:3
104:5 119:15
149:18,20 220:17
254:14

**additions**
50:6

**address**
6:13

**adds**
227:12

**adjourned**
256:5

**administered**
108:14,17 111:20
115:16 190:22
199:8

**administering**
191:7

**administration**
36:12 62:12 115:15
186:10 188:15
190:16 193:22
210:3 213:12 214:2
216:3,5

**admonish**
159:16 160:24 161:3

**admonished**
159:10,14 161:25
253:20

**admonishing**
161:19 254:1

**admonition**
208:4

**advanced**
20:17 22:4 24:6,8
26:17 27:3 32:10
118:11 142:24
143:12,22 144:16
144:19 150:23

**advantages**
112:6

**adykhuis@mwe.com**

**2:9**

**affect**
107:20

**affiliation**
23:18

**affiliations**
23:16

**Africa**
82:9

**Agarwal**
196:4,24 198:11,12
206:3,4

**agent**
108:14

**ago**
14:14,17,19 29:18
30:11,12 92:22 94:7
94:8 111:7 235:5,15

**agree**
78:6 80:16 89:16
96:21 146:9 147:11
151:3 163:19 169:3
171:25 175:14
176:17 178:9
179:11 180:18
190:23 192:8,18
198:20 200:15
201:16 206:15
211:8,14 213:2,10
213:25 216:4
219:24 220:20
241:3

**ahead**
106:2 126:18 180:21

**air**
109:20,23 110:1,5,8
139:23

**al**
142:25 145:8 163:17
206:16,24 224:10
233:8

**allowed**
176:6

**alluded**
139:8 184:15 247:7

**alter**



174:3
**alterations**
198:17
**alveola**
80:1 109:21
**alveoli**
107:4,7 110:19
**American**
16:19
**amount**
60:6 110:14 139:23
190:3,4 192:22,22
**analasized**
170:15
**analog**
147:2 148:4
**analyses**
31:11,15,21 32:7
34:10 37:2,5,6,15
53:7
**analysis**
31:23 32:13,22 33:6
35:9,17 37:3,9,12
37:13 38:22 44:21
45:4 47:8 51:6,13
51:21 52:2,9,21
53:3 54:1,1,7,20
56:11 62:7 117:20
118:14 145:17
146:16 149:7,21
152:15 169:20
170:6,10 172:10
173:6
**analyze**
30:6 73:2
**analyzed**
148:10 149:7,24
151:11 240:15
**and/or**
80:5 236:6 259:9
**animal**
119:20
**answer**
7:9,16,21 56:13
126:7 134:23 171:1
180:15 194:3 242:8

252:25 253:13
**answered**
104:7
**antagonists**
121:20
**antichromium**
174:15
**anti-fibrotic**
117:5,17 118:7,13
119:11,14,21
**anti-fibrotics**
42:18
**anti-receptive**
121:20
**anymore**
140:1
**anyway**
242:14
**apologies**
17:17 134:20
**apologize**
13:18 14:15 19:12
23:21 50:20 124:8
124:15 147:7,9
192:1 253:5
**apologized**
124:12
**apologizing**
124:13
**app**
230:13
**apparent**
117:23
**appear**
11:25 53:13 54:23
55:3 88:16 117:21
151:5 192:14
199:19 226:22
**appearance**
117:23
**appearances**
2:1 5:18
**appeared**
28:13 32:18,25 98:4
99:11 154:20
**appears**

12:2 26:10 51:1
180:5 189:17
194:11 201:13
206:6 208:13 213:7
216:8 237:15
241:13
**appendix**
3:21 165:23 166:8,22
168:18 171:9 174:7
**applicable**
108:13
**applicant**
233:20
**application**
188:21 233:7,21
235:25 237:5 239:8
241:7 243:25
**applied**
74:17 75:22
**apply**
107:24
**appointment**
23:6,20,24
**appointments**
22:23
**appreciate**
64:23
**approval**
87:5 114:12
**approved**
42:19 81:22 85:22
87:16 88:8 114:5,18
121:12,25 212:5,7
212:10,19,23
215:22,23
**approximately**
8:18 25:9,20 138:5
**April**
74:17
**area**
108:15 110:2 198:9
234:12
**areas**
20:9,12 21:4 68:15
68:18 108:4,6,8,9
109:24 110:4,19

113:20 127:22
**arguably**
185:23 222:6
**argument**
152:12
**arises**
104:5
**arm**
32:21 59:6 141:12
149:12,12,19
155:18 156:18,19
174:14,16,17
175:15 185:8
**arms**
168:22 170:12
171:17,20 231:10
**art**
5:23 82:20 248:7
**arterial**
25:19 26:1 72:21
81:12 85:18 86:11
212:8 215:24 227:3
244:7,24
**artery**
73:15,20 74:4,11
75:5,13 93:20 103:7
182:16,18,19
187:11,12 222:9
**ARTHUR**
2:5
**article**
145:5 164:8 166:6,8
166:24 202:15
205:10,25 207:9
216:11 219:2,11,25
227:16,22 228:10
229:7,11 232:3
**articulate**
85:1
**aside**
200:23
**asked**
19:2 22:16 42:7
61:21 92:6 113:8
114:24 116:1 138:2
170:21,25 252:17



253:18
**asking**
13:5 15:17 97:10
170:5 224:20
**asserted**
70:9
**assess**
120:11 121:4,5
**assessed**
222:22
**assessment**
240:20 241:8,9
**assigned**
149:8
**assistance**
9:13
**assisted**
9:16,20
**assisting**
8:4
**associated**
25:22 65:22 89:12
94:15 98:3 112:9
152:7,9 154:1 160:8
160:12 162:14
184:10 193:5,12
206:12 212:24
215:25 217:13
218:5,12 219:19
236:7,11,25 237:6
237:14,16 238:1,11
238:14 245:11
249:10,19 252:22
**associates**
64:1
**Association**
24:11,18
**assumably**
183:19
**assume**
7:10 46:23 173:19
183:5,5 202:10
**assuming**
88:3 131:2 183:20
**assumption**
131:8 135:7,9

**assured**
127:25
**asthma**
236:7,8
**Attachment**
11:23 14:8,12 17:16
17:18 47:12
**attachments**
11:21 12:5
**attempting**
110:18
**attention**
148:18 149:2 152:16
**attest**
96:8 97:19 255:19
**Attorney**
3:3,4,5 5:19,23 6:9
9:6,14,17,23 10:4,6
13:7,12 16:4,15,18
17:7,14 18:3,9,13
18:19 19:5,8,16,17
20:11,19 25:8,14
27:1,5,22 28:3,17
28:20 29:8,13,24
30:8 31:16,18 32:15
32:23 33:2,4,9,19
33:24 34:8,11,15,19
34:23 35:11,15,18
36:10,15 37:4,10,16
37:20,23 38:5,10,14
38:17,23 39:3,8,13
39:17,20 40:5,15,21
41:1,14,17,21,24
42:5 43:1,5,9,13,16
43:19,23 44:9,12,18
45:1,6,9,13,16,19
46:1,4,7,18 47:1,5
47:10,18,21 48:7,18
48:22 49:16 50:1,8
50:13,16,24 51:4,9
51:11 52:10 53:1,5
53:24 54:17 55:5
56:2,16,19,23 57:4
57:7,12,22 59:2,9
60:9,12,14,18,22,24
61:18 62:1,14,17

63:3,6,10,16 64:12
64:21 65:3,7,12,14
65:18,24 66:3,9,20
67:9,13 68:22 69:4
69:8,23 70:2,4,16
70:18,21 71:3,13,15
71:18 72:4,11,16,24
73:3,7 74:15,19
75:20,25 76:7,24
77:2,25 78:5,9 79:4
79:11,18,22 80:8,12
80:15 82:1,22 83:5
83:23 84:13,17 85:8
85:16,19 86:2,15,20
86:23,25 87:3,6,9
87:13,17,21 88:9,14
88:18,22 89:14,20
90:10,15 91:8,12,16
92:3,14,17,21 93:4
93:13,17 94:4,11,22
95:9,22 96:1,4,24
97:2,5,9,15,23 98:1
98:10,13,16,25 99:4
100:1,16 101:20
102:4,9,13,16,22
103:4,24 104:13,15
104:21,24 105:18
106:1 107:22 109:4
109:8,10 110:21,24
111:1,18,24 112:4
112:11,16,20,24
113:1,5 114:17
115:13,21,24 116:7
116:15,24 117:11
118:23 119:1,5,7,17
120:1,5,9,13,20,24
121:3,6,10,14 122:3
122:11,15 123:1,6
123:10,19,24 124:2
124:7,9,23 125:17
125:20,21 126:3,9
126:13,17 127:6,9
127:16 128:11,16
128:20,23 129:1,4,8
129:11,15,17,23
130:1,3,6,11,14,18

131:1,3,6,9,12,21
131:25 132:6,11,15
132:18,23 133:6,10
133:14,16,23 134:1
134:4,11 135:1,6,10
135:14,16,22 136:2
136:5,16,20 137:1
137:10,15,24
138:13,23 139:3,15
139:18,21 140:18
141:5,9,13 142:2,8
142:12,19 143:24
144:2,21,24 145:2
145:24 146:8,12,14
146:19,21 147:6,17
147:20,24 148:1,6,8
148:13,16 150:17
151:1,8,14 152:3
153:1,7,10,18,21
154:16,23 155:1,20
155:24 156:1
157:10,13,19,21
158:13,20 160:18
161:1,4,23 162:5,7
162:10,16 163:3,15
163:23 164:15,19
165:1,7 166:3,5,9
166:10,11,18,20
167:1,4,11,15,17,22
168:1,6,19 169:1,6
169:9,22 170:3,8,13
170:19 171:5,13,24
172:4 173:8,11
174:5,10 175:2,6,13
175:18,24 176:21
177:3,7,11,14,21
178:8,13,21,24
179:2,8,10,13,20,23
180:6,10,17 181:4
181:12 182:14
183:14 184:6,22
185:2,10,15 186:7
186:12,18 187:7,17
187:22 188:11,17
188:24 189:3,6
190:11,14,25 191:3

191:9,13,19,23
192:4,7,12,17,24
193:1,14,16,19,24
194:1,8,14,25
195:11,14 196:8,10
196:11,22 197:12
197:14,25 198:2,4,7
198:10,21 199:4,9
199:14,17,21 200:8
200:10,19,22
201:20 202:13
203:18 204:4,17,22
205:2,7 206:5,8,21
207:5,7,11 208:19
208:25 209:8
210:14,17,18 211:3
211:10,13,16,18
213:5,9,14,22 214:4
214:11,14,23 216:7
216:9,25 217:5,17
217:20,24 218:9
219:5,10,14,21
220:2,5,8,19,23
221:1,11,21 223:3,7
223:13 224:6,18
225:9,12 226:6,16
226:20 227:14,25
228:18 229:14
232:5,10,24 233:5
233:22 234:1
236:13,16 237:8,23
238:3,24 239:10,13
239:20,23 240:6,9
240:25 241:2,4,6,11
241:14 242:5 243:1
243:16,21 244:14
245:1,5,18,24
246:12,17 247:1,14
247:24 248:4,9,18
248:21 249:13,16
249:22 250:16,19
250:22 251:5,9
252:1 253:11,15
254:10,13,23 255:1
255:11,24 256:1
**attorneys**

8:20,22
**attributable**
71:25
**audience**
159:19 161:13
**Aurobindo**
15:8
**author**
15:10 27:8 32:11
143:17 154:11
158:15 159:25
165:18 197:20
199:22 202:18,18
216:15 217:6
218:13,14 219:1
229:1
**authors**
27:6 146:23 147:12
166:23 167:5 169:2
221:3 222:20
225:20 231:22
**AV**
196:4
**available**
64:3 85:11 89:1
109:2 122:6
**Avenue**
2:17
**average**
230:8,12
**avoid**
112:8
**aware**
12:15 14:6,7 49:3
50:6,14 63:20 65:25
66:4 68:6 82:17
88:10 92:5 99:18
129:2 207:10,13
**a.m**
1:20 64:18,18 142:15
**A1**
233:9

———————————
B
———————————
**B**
11:21 14:8,12 218:14

**back**
17:10 18:17 19:23
42:21 47:11 54:18
57:23,24 64:22
66:10 75:2 82:8,23
86:4 87:23 89:22
92:19 100:21,22
103:5,14 114:23
115:25 128:14
136:12 142:20
151:2 157:2 163:16
169:15 196:23
205:9 208:5,16
227:15 229:21
231:9 232:17 243:3
247:25 252:8
254:16
**background**
67:24 217:3,8
**backwards**
69:16 255:18
**bad**
58:22,23 125:22
**Bajwa**
206:16 216:15
227:16,21
**balance**
144:14,14
**banner**
237:16 238:13
**Barbara**
1:17,21 5:15 257:2
257:17
**bars**
56:9 117:24
**based**
28:13,18 33:11 34:6
58:24 74:9 78:25
88:15 91:6 97:12,13
104:18 118:18
130:19 133:15
170:10 176:25
188:14 199:18
201:7,15 248:6
**baseline**
32:17 58:14 168:3,23

171:16 174:12
176:4 181:18
183:17,18 203:20
230:12
**baseline-generated**
169:18
**bases**
85:5
**basically**
229:21
**basis**
32:22 65:15 138:15
**basket**
83:17
**Bates**
153:19 165:20 180:1
209:22 216:15
218:14
**Bates-stamped**
3:11,20,22,24 4:2,3,5
4:7,8,10,11,13,15
4:16
**bathroom**
137:20,21
**bearing**
142:25 165:20
179:25 189:12
196:2,4 202:19
209:14,21 210:4
216:15 218:14
224:12 229:2 233:9
**bears**
153:19
**began**
22:6 47:15 83:3
**beginning**
8:5,15 19:22 28:15
66:10 165:20
240:11
**begins**
5:3 26:6 50:3
**behalf**
2:3,11 6:5 15:25 16:2
**behave**
49:24 77:6,19
**belief**

40:17,18 41:13,19
117:8 130:19
160:22
**believe**
6:21 13:13 14:20
15:11 27:3 28:19
37:11 38:7 41:2
44:22 49:13,14 50:5
50:19,21 55:6 57:5
57:8 59:4 63:4 64:7
65:8 67:24 68:16
72:6 83:6 85:12,23
85:24 90:11 91:9
95:20 97:3,11,18
110:25 111:7,21
116:4,13 117:12
118:19,24 120:3
129:13,24 130:16
134:8,9 135:19
138:2 154:14 157:7
160:6 161:6 162:18
163:1 170:14
191:11 193:9
208:21 212:3
218:21 223:12,19
226:3,17 228:7
234:16,20 252:19
**believed**
223:17 232:3
**beneficial**
158:4 164:23 185:19
**benefit**
55:3 56:15 65:21
100:15,18,20,22,24
103:13,18,22 105:3
105:7,14,16 108:25
112:19 113:16,21
113:25 114:3
116:10,14,18
120:16,22 121:1,9
124:4 125:9 152:21
159:7 163:14
184:16,18,19 185:8
186:3,9 188:7,14,22
227:9 251:22
**benefited**

164:3
**benefits**
52:23 113:16,17,24
152:25
**best**
19:21 29:12 33:10
36:20,25 37:17
38:15 45:8 105:24
108:3,5,7,9 113:20
145:16 149:23
173:4,6 247:12
**bets**
105:8
**better**
48:25 100:21,24
101:2,6,23,25 102:3
102:19 137:18
149:13 150:6
**beyond**
140:11 214:22
242:18 243:19
**bias**
222:6 230:21,25
**big**
83:17 101:8,13
156:10
**bind**
151:20
**biologic**
113:9,11,13
**biomarker**
53:19 109:1 175:8
**biostatistician**
30:4 47:7
**bit**
48:25 71:4 75:3 78:3
90:25 121:23 139:6
194:15 235:3
246:24
**blanket**
98:7
**blind**
155:6,7
**blinded**
231:8
**blood**

106:16,19,24,24
107:4,6,16 108:7,8
109:22 110:1,6,6,19
175:7 236:21,22
**blow**
139:24 140:1
**blowing**
139:25
**BNP**
176:4
**bottom**
143:16 144:3 172:12
181:22 205:14
**box**
77:17 146:18 157:23
**Bradley**
2:24 5:13
**brain**
174:12 175:3
**break**
7:19,22 64:9,11,13
64:14,23 125:19,23
142:10 196:9
247:15
**breaks**
7:18 248:1
**breath**
55:17 127:19,21
129:20,21 130:21
130:24 131:16,20
132:25 137:19
138:5 168:24 169:3
170:16 190:17
191:7,18 192:3,22
**breathlessness**
240:21
**breaths**
190:20 191:6,12,17
200:6,12 213:18
214:8,9
**BRITTANY**
2:14
**Brittney**
5:22
**broad**
84:8 98:7 237:16,21

238:16
**brought**
69:18 152:16
**build-up**
72:20
**Bull**
48:4
**bunch**
8:21 64:1 90:6
161:13 227:1
**bureau**
59:17
**B-u-l-l**
48:4
**B2**
189:11

---
**C**

**C**
5:1 11:21,23 156:17
**CA**
2:7
**calculator**
58:4
**call**
53:12 78:15 81:7
152:8 170:22
194:11 247:12
**called**
1:14 6:5 53:20 94:13
129:7 195:23
201:23
**calls**
223:4 243:17
**cancer**
42:24
**capabilities**
137:8
**capability**
125:1
**capable**
126:7
**capacity**
3:13 90:20,21 123:22
124:5,21 126:2,12
136:19,25 137:14

**MAGNA** ▶
**LEGAL SERVICES**

139:20,22 140:2,5,7
140:15 145:6 193:4
193:11 205:17
208:10 240:21
241:10 248:17
249:9,18 250:8
251:8 252:21 253:7
254:21
**capillaries**
107:7 109:22 236:23
**capture**
124:13
**captures**
120:7
**cardiac**
106:14 107:2 175:9
**cardiologist**
234:11
**Cardiology**
74:1
**cardiopulmonary**
126:15
**care**
24:11 25:16
**carried**
207:22
**carry**
64:10
**case**
5:8 8:13,25 9:5 11:1
11:16 12:1 14:18,21
14:24 15:1,2,3,5,9
15:10,12,15,19 16:6
16:12,14,20,23 18:2
18:12 19:6,18 59:10
64:2 78:18,20 87:25
189:16 211:21
213:8 228:6 244:22
**cases**
17:3,4 21:20 247:5,6
**CAT**
79:1 90:2
**catch**
246:4
**categories**
77:7,16,18 84:9,21

**catheterization**
73:1,5
**cause**
181:9 188:1
**causes**
55:19 84:24 138:8
**caution**
9:7 69:10
**Cazakoff**
2:14 5:22
**ccs**
34:3
**Cedar**
21:14 81:14
**cell**
107:6,10
**cells**
106:20
**cellular**
113:23
**center**
21:15 61:21 81:14
**centers**
24:12 81:15
**CEO**
235:21,23
**certain**
17:2 131:4,11 134:25
140:12 146:7
156:12 158:19
195:13 209:2
**certainly**
66:25 71:2 121:18
125:8 214:17
255:20
**certainty**
119:13 135:11
**CERTIFICATE**
258:1
**certify**
257:3,9 258:4,5
**CF**
24:16
**chain**
9:19
**chair**

41:8 59:23 160:16
**chairperson**
160:3,4
**chairs**
159:20
**challenge**
183:17
**challenged**
181:18
**chance**
71:23 207:23 210:7
210:21 232:8
**change**
53:19,25 54:2 140:13
140:15,17,21,25
141:4,7,20 168:23
171:15 172:1
174:11 176:4,17,18
199:6,10 203:7,17
204:23 230:12
259:13
**changed**
23:18 73:19 81:11,13
168:3 214:12
**changes**
17:24 73:10 123:21
124:4,20 141:1
259:9
**characteristics**
58:14 151:20,22
181:17 203:21
**characterize**
152:5 154:18
**charts**
229:22
**chase**
228:4
**cheaper**
96:7
**check**
11:17 146:1 211:24
**checking**
16:10
**chemical**
151:19
**chest**

55:16 138:7 145:8,20
148:11 149:23
151:3
**Chicago**
234:12
**chlorine**
16:25
**choose**
87:10 158:21 169:11
**chosen**
169:16
**Christopher**
16:12,13
**chronic**
49:1,7 77:10 84:3,5
206:19 207:2
216:14 244:4
**Chung**
47:2
**circulation**
72:21 206:20 216:11
**circumstance**
132:17
**cite**
105:4 197:4 210:16
217:6
**cited**
205:22 206:15
211:21 216:23
219:3 225:1,6
228:10
**claim**
189:24,25 190:8
193:3,3,9,20,21
194:11,17 200:17
242:12,17,18 249:3
249:6,8,17 250:6
251:1,4 252:19
254:17,20
**claiming**
180:14
**claims**
70:10,14 71:1 180:8
180:9 183:24
189:18,20 242:9
248:16 250:2 252:9

**clarification**
27:19 121:21 171:18
**clarify**
7:9 248:13
**clarity**
153:19 183:11
**class**
212:8 221:4
**classified**
182:7
**clause**
16:10
**clauses**
16:9
**clear**
7:7,8 52:2 72:5 97:13
  115:2 147:9
**clearly**
95:17 103:15 122:22
  247:5,6 253:6
**clinic**
24:22,25 25:2,5
  126:25
**clinical**
25:6,12 26:12 27:17
  53:12 58:4,22 79:7
  90:5,12,17 100:14
  100:17,20 103:13
  103:22,25 104:12
  104:20 105:2,7,16
  112:18 113:16
  120:16,22 121:8
  126:25 136:17
  143:20 144:11,12
  144:14 151:21
  159:7 164:17
  169:14 175:4
  184:16,17,18,19
  186:2,9,16 188:7,14
  227:8 229:17
  235:12 237:21
  246:14 251:22
**clinician**
34:17 73:6
**close**
205:14 252:2

**closed**
31:13
**closely**
178:4 179:16
**Cobble**
6:15
**cobbling**
229:22
**cold**
224:24
**collaborate**
59:19,22
**collagen**
118:5,9
**colleagues**
5:21
**collect**
79:17
**collection**
44:16
**collectively**
244:5
**Columbia**
1:18 257:1,3
**column**
144:4,10 156:17
  158:8 180:13
  186:20 239:15
**Columns**
181:14
**combination**
172:2
**combined**
9:21 84:5 220:17
**come**
14:1 17:22 41:7 47:8
  52:12 62:6 68:18
  79:13 92:1 100:22
  105:6 114:23
  137:16 160:24
  161:2 187:14 188:1
**comes**
100:21 128:4 130:9
  130:20 131:14
  208:16
**comfortable**

88:20 127:24
**coming**
29:10 99:16 106:20
  156:22 160:20
**comment**
200:24,25 207:14
  243:20
**commented**
65:11
**Commission**
257:20
**committee**
26:16 28:7,12,16,22
  29:1,6,22 31:6,7,10
  39:6,11,15 40:19
  41:8 42:3,8 45:24
  47:14,16 48:1,5,13
  59:24 155:5,14
  156:11,24 197:23
  225:24 231:25
**committees**
26:7,11
**common**
77:21 78:1 84:25
  246:5
**commonly**
76:25 77:4 126:24
**Commonwealth**
23:10
**communicated**
43:24
**communication**
44:13 45:23
**communications**
9:9 69:12
**community**
52:16
**comorbidities**
77:7 238:15
**companies**
15:21
**company**
92:8 234:23
**compare**
138:17 169:25
**compared**

108:16 115:19
  147:15 172:3 178:1
  214:13
**compares**
186:24
**comparison**
32:21
**compass**
58:21
**compendium**
35:1
**complete**
11:25 259:6
**completed**
154:19 205:15 208:7
**complex**
179:15
**complicated**
245:10
**complicating**
82:17,21 83:1
**complication**
237:20 244:8
**complications**
245:3
**complicity**
159:21
**complies**
12:6 14:10 26:4 61:1
  61:13 66:14 70:7
  143:6 168:15
  212:15 215:19
  227:17 243:5
  248:24 252:10
**component**
75:9 98:15,15,23
  99:25 101:8 116:6
  116:21 117:2,4
  118:22 119:4
  120:12,23 121:2
  122:23 179:5
**compound**
79:15
**comprehension**
24:17
**comprises**



190:7,17
**computed**
208:3
**conceivable**
118:7
**concept**
22:18 106:22 163:21
   163:25 164:8,12,17
   164:23 165:3 179:1
   218:4 219:17
   246:19
**concepts**
164:21
**concern**
14:21 50:15 101:24
   110:16,23
**concerning**
32:8
**concerns**
112:9
**conclude**
185:12 187:19 189:1
**concluded**
199:22
**conclusion**
200:2 243:18
**condition**
221:20 236:7,11
   238:13
**conditions**
236:24 237:6,13,15
   238:1,7,10,14,17
**conduct**
45:18 46:16 47:3
   143:21
**conducted**
148:22
**conducting**
119:15 159:16
**conference**
253:19
**confidence**
174:22 176:11,13,24
**confident**
36:12,21 37:1 140:16
**confidential**

15:17
**conflicted**
49:23
**confused**
251:14 253:5
**confusing**
80:14
**connect**
242:24
**connection**
186:1,2
**connective**
83:25 89:24 90:7
   238:7
**consensus**
29:20 31:3 39:6,15
**consequence**
186:16
**consider**
20:8 98:24 99:21,23
   116:21 133:7 164:5
   198:5 245:3 246:14
   246:15
**considered**
99:7 151:22 218:24
   223:1
**constantly**
18:5
**construe**
159:21
**consult**
59:13
**consulting**
15:24,25 59:11
**contacted**
8:3,9 18:1,6,11,25
   19:4,10,14,21
**contents**
3:1 66:12,19
**contested**
71:1
**contesting**
15:22
**context**
24:7 71:6 86:11 93:7
   98:9 99:8 108:18

122:24 127:19
133:20 157:24
158:23 218:21
224:5
**contextualize**
172:8 173:5 217:11
**continue**
102:1 144:9 150:15
   155:10
**continued**
173:1
**continuous**
130:9 133:12,19,22
**continuously**
135:4
**contribute**
45:17 106:4 172:22
**contributed**
31:2 70:23
**contributing**
112:2
**contribution**
29:14,17,19 30:20,24
   40:2,8 46:16 183:13
**contributions**
46:24
**contributors**
141:19
**control**
152:23 155:4 158:3
   231:6,18
**controlled**
41:6 142:23 143:11
   153:25 154:3
**convenient**
123:16
**conversations**
46:12
**convey**
179:7
**convince**
184:25 188:13,21
**Cooley**
2:12 5:12,20
**coordinator**
232:13,18

**COPD**
48:17,19 49:12 207:1
   208:13 217:3,11,13
   218:3,8 223:22
   224:9,11 225:19
   228:6,11,15
**copy**
10:18,22 11:12,15,20
   12:1 17:19 18:8
   143:5 224:19
**corner**
77:17
**Corporation**
1:5 5:6 233:24
**correct**
6:24 11:3,21 16:3
   19:9 20:6,7 21:1
   25:10 26:12,13
   28:19 33:1,3,23
   36:25 37:19,24,25
   38:4,13 39:7,16
   45:5,12,15 48:21
   49:4,5 51:2,3,16
   56:18,22 62:13
   65:11,13 72:9,10
   75:24 78:8 83:7
   88:13 91:11 93:3
   96:16 97:25 98:12
   102:24,25 110:20
   112:10,15 113:6
   114:10,16 115:20
   119:16,19 123:4,5
   130:25 131:5,11
   132:10,17,19
   133:25 134:7,15
   135:5,13,15 139:2
   140:17 141:14
   142:1 146:11
   147:16,23 148:5,12
   150:9,10,13,14
   151:7 154:6,9,15
   157:15,16,20
   160:17 162:4,6
   165:6,16 169:21
   170:7 177:6 178:12
   178:23 186:11,15



187:21 189:5
190:10,13,24 192:3
192:11,19,23
193:23,25 194:4
195:18 197:13
208:24 211:22
213:4,13 214:3
215:15 216:6 217:7
217:8 219:4,6 220:1
220:7,22,24 225:8
225:11 229:8,9
238:2 241:10 245:4
249:1,2 253:14,22
**CORRECTION**
259:13
**corrections**
258:7 259:10
**correctly**
55:9 68:2 72:6 116:9
201:11
**corresponding**
32:2
**cough**
124:12,13 128:3
**coughing**
124:14 128:9 136:14
**counsel**
1:14 5:17 7:13,15 8:3
9:9,13,16,22 10:18
13:2,6 18:1,12
19:15 66:25 67:25
68:6,20 69:12 70:20
70:25 143:5 248:2
250:14 255:2,10,17
257:9,10
**counterclaim**
69:20
**country**
81:15
**couple**
71:5 83:6 155:14
178:16 254:14
**course**
231:20
**courses**
80:24 84:7

**court**
1:1 5:7,14 6:24 257:2
**COURTICS**
259:3
**courts**
69:17
**cover**
210:2 242:20 253:17
254:3
**covered**
84:15,22 85:5 184:5
**covers**
192:10 242:25
245:16
**CPFE**
84:5
**criteria**
29:11 91:7
**critical**
20:13
**cross**
77:20
**crossed**
56:10 117:24
**crossover**
77:22
**CRR**
1:22 257:17
**curious**
175:22
**current**
17:19 19:1 24:3
31:14 74:10 235:23
236:20
**currently**
21:21,23 23:1 25:16
35:8 48:10 99:2
127:1 235:5
**cursory**
40:9
**curve**
173:2,21
**curves**
174:3
**cut**
90:18

**cutoff**
140:22
**CV**
17:18,20,21,22,24,25
18:7,17,20,22 19:1
19:23,24 20:6 22:5
23:13 23:25 26:3
28:13,18 31:7 47:11
47:12 50:25 51:23
52:4 57:23 60:25
61:6 235:14
**cystic**
24:15
**C.A**
1:6
**C.Q**
30:3

---

**D**

**D**
1:13 3:2 5:1 6:4
10:15 11:8 154:10
202:18 232:12
258:10
**daily**
200:12
**Dang**
47:2
**data**
30:6 34:22,25 35:2
44:15,15,16 62:7
104:19 123:12
143:20 144:10
155:6,15,16 169:19
172:17 173:24
174:2 184:24
185:11 187:20
188:12 194:5,6,11
194:19,21,23 195:3
195:5,17 205:15
208:3,6 222:13,19
227:9 229:22
**dataset**
52:13 155:4 156:24
**date**
18:22 23:22 31:5

38:25 39:2 259:23
**dated**
12:11
**Davies**
2:13 3:3,5 5:19,19
6:9 9:14,23 10:6
13:12 16:18 17:14
18:9,19 19:8,17
20:19 25:14 27:5
28:3,20 29:13 30:8
31:18 32:23 33:4,19
34:8,15,23 35:15
36:10 37:4,16,23
38:10,17 39:3,13,20
40:15 41:1,17,24
43:1,9,16,23 44:12
45:1,9,16 46:1,7
47:1,10,21 48:18
50:1,13,24 51:11
53:1,24 55:5 56:16
56:23 57:2,22 59:9
60:12,18,24 62:1,17
63:6,16 64:12,21
65:7,14,24 66:9
67:9 68:22 69:23
70:4,18 71:3,15
72:4,16 73:3 74:15
75:20 76:7 77:2
78:5 79:4,18 80:8
80:15 83:5 84:13
85:8,19 86:15,23
87:3,9,17 88:9,18
89:14 90:10 91:8,16
92:14,21 93:13 94:4
94:22 95:22 96:4
97:2,9,23 98:10,16
99:4 100:16 102:4
102:13,22 103:24
104:15,24 106:1
109:4,10 110:24
111:18 112:4,16,24
113:5 115:13,24
116:15 117:11
119:1,7 120:1,9,20
121:3,10 122:11
123:1,19 124:2,9



125:17,21 126:9,17
127:9 128:11,20
129:1,8,15,23 130:3
130:11,18 131:3,9
131:21 132:6,15
133:6,14,23 134:4
135:1,10,16 136:2
136:16 137:10,24
138:23 139:15,21
141:5,13 142:8,19
144:2,24 146:8,14
146:21 147:20
148:1,8,16 151:1,14
153:1,10,18,21
154:23 155:20
156:1 157:13,21
158:20 161:1,23
162:7,16 163:15
164:15 165:1 166:5
166:10,11,20 167:4
167:15,22 168:6
169:1,9 170:3,13
171:5,24 173:8
174:5 175:2,13,24
177:3,14 178:8,21
179:2,10,20,23
180:6,17 181:12
183:14 184:22
185:10 186:7,18
187:17 188:11,24
189:6 190:14 191:3
191:13,23 192:7,17
193:1,19 194:1,14
195:11 196:10,11
196:22 197:14
198:4,10 199:4,14
199:21 200:10,22
202:13 204:4,22
205:7 206:8 207:7
208:19 209:8
210:14,18 211:13
211:18 213:9,22
214:11,23 216:9
217:5,20 218:9
219:10,21 220:5,19
221:1,21 223:7

224:6 225:12
226:16 227:14
228:18 232:10
233:5 234:1 236:16
237:23 238:24
239:13,23 240:9
241:2,6,14 243:1,21
245:1,18 246:12
247:1,14,24 248:4
248:18 249:13,22
250:16,19,22 251:9
253:11 254:13
255:1,24
**day**
21:12 25:5 29:19
108:24 123:18,18
214:8 215:13
**days**
24:24 25:1 259:9
**DC**
2:19
**dead**
110:8,11
**deal**
42:16 173:24
**dealt**
173:17 174:3
**death**
111:22 156:10,18
**deaths**
149:11,12,18,20,25
156:7,8,18
**debate**
78:2 247:5
**decide**
52:8 125:22 247:2
**decided**
74:6 155:15
**decision**
35:16,20 69:19
125:23
**declaration**
3:10 6:20 8:13,19 9:2
9:4,12,25 10:3 11:3
11:8,15,22 12:13,15
14:9 17:17 47:13

66:11,12,17,18
109:6,13,17 134:13
154:8 159:8 166:17
183:22 189:15
197:5 211:21
218:21,24 229:8
233:18 250:11
252:3 255:3,7,10,15
**deduction**
172:7
**deep**
105:22 127:21
**deeper**
37:14 55:1
**defaults**
245:16
**defend**
159:24
**defendant**
1:15 2:11 5:20 10:14
**defense**
159:20
**defined**
75:4 91:6
**definite**
140:22
**definition**
55:13 73:9,11,14,18
74:3,10,16,21,25
75:17,22,23 76:6
93:15,19,20 102:6
102:12 103:6
116:17 138:3
**definitive**
56:12 105:10 183:13
199:2
**degrees**
244:4
**Delaware**
1:2 5:8
**delay**
117:5
**deleting**
255:21
**delineation**
78:23

**delineations**
76:21 97:13
**delivered**
114:15 191:4,14
192:22 198:15
**delivering**
191:18
**delivery**
215:10,15
**demonstrated**
102:7 111:11
**demonstrating**
41:6
**dependent**
137:22
**depending**
17:23 18:5 59:14
128:7
**depends**
73:8 170:24 172:10
185:21
**depicting**
168:22
**deponent**
258:3
**deposed**
6:17 15:12
**deposition**
1:13 3:9 5:4,10 10:14
10:15 17:5 108:15
108:20 118:5,9
224:22 258:5 259:5
**derivation**
58:3
**derivatives**
236:5 239:4
**describe**
9:10 20:8 24:4 58:9
80:10 166:15 190:9
203:17 240:19
**described**
51:22 52:3,9 125:2
135:13 145:23
154:5 163:20 167:7
167:25 168:17
181:2 185:13

189:24,25 192:9
194:5 200:16,17
203:9 208:21
213:12 214:2
219:25 238:23
239:25 243:8,15
**describes**
20:5 180:19 192:2
200:5 215:10 241:7
**describing**
82:25 145:21 181:16
239:17 240:4
241:21 244:13,16
**description**
3:8 4:1 242:2 243:7
243:25
**descriptions**
95:24
**design**
29:6,10,15,23 30:20
30:24 31:3 40:3
45:18 46:16 47:3
49:20 66:2 152:1
**designed**
29:20 39:6,15 76:3
119:2 120:10,15,17
120:21 121:4
**Despite**
52:14
**destroyed**
110:7
**details**
14:23 16:21 17:11
201:5
**determination**
79:3
**determine**
71:9,21 72:1,7
136:18,23 138:10
138:14,25 140:3
141:22,24 142:5
**determined**
119:23
**detriment**
146:25 188:3
**develop**

244:19
**developed**
31:24
**development**
43:2 48:11 58:12
61:20
**deviation**
199:13
**device**
62:16,18,21 63:24
128:22 129:10,14
129:16,22,25,25
130:5,13 131:18,24
132:4,10 133:5,9
135:12,18 136:11
136:15 215:10,14
215:15
**diagnose**
72:22
**diagnosis**
72:25
**die**
150:6 231:7
**died**
149:22 151:11
173:20
**difference**
32:19 33:1,7,22 34:6
34:18,21,25 36:21
37:19 38:3,9,12
54:14 55:25 56:18
57:1 71:11 72:8
107:24 108:1
115:14 141:12
142:1 152:19
156:10 170:11,15
171:3 172:1 174:17
177:4 201:25 204:1
204:11,15,19,24
205:4 212:21 231:4
245:21
**differences**
83:18
**different**
8:21 34:13 36:4
67:21 71:5 75:22

76:22 83:7,11,21,25
106:7 107:15
108:11 111:4 114:2
136:8 139:6 170:23
173:23 183:20
187:13 201:9,18
215:12 217:4 218:8
226:8,10,11,11,12
226:13 237:11
242:22
**differentiate**
104:22
**differentiating**
115:19,23
**differently**
67:19 198:24
**difficult**
24:2 53:9 57:20
78:10 139:10
**diffuse**
80:4
**dilating**
108:6
**dilator**
227:1
**direct**
22:17 51:17 169:24
210:24 250:14
**directed**
105:11 112:7 184:25
185:24 193:2,3
237:5 239:9 242:4
255:2
**direction**
1:22 223:25 224:1
**directly**
198:15 235:9
**director**
22:3,6
**disagree**
148:14 150:3
**disclosure**
183:24
**discontinuation**
155:19
**discordant**

150:5
**discrete**
237:20
**discuss**
158:21 223:8 225:23
**discussed**
7:19 166:16 189:15
229:8
**discussing**
226:2
**discussion**
125:15 160:20 200:3
228:21 247:16
**discussions**
248:1
**disease**
20:16,18,22 21:8,11
22:4 24:6,8,13
25:21,23 26:2 36:2
36:6 42:16 49:8,22
55:8,12,14,22 56:1
58:6 59:1,4 65:23
77:8,9 78:3,15
79:20,21 80:7,10,19
82:5,15,18,21 83:2
84:1,10,21 85:3,4
86:7,9,12,14,18
88:3 89:3,12,24
90:4,7,8 91:1 93:8
93:11 94:21 95:16
95:19 98:6 99:12,25
105:10,21 106:9
107:15 108:18
114:20,22 115:5
122:24 127:20
138:1 152:8,11
160:8,12 162:15
177:18 178:2
180:24 184:11
185:25 193:6,13
201:5,24,25 202:1,5
202:9,12,17 203:2
206:12,19 212:24
216:1,14 218:6,8,13
221:19 230:3 236:7
236:8,12,24,25



237:7,15,17,22
238:2,11 240:22
244:22 245:14
247:10 249:11,20
252:22
**diseases**
24:19 57:2 82:11
98:20 244:6
**disorders**
207:3 244:4
**disproportionate**
89:5,18 244:21
**dispute**
11:24
**distance**
54:1,3,12,15 100:23
101:11 126:1,10
144:18 147:1,14
151:6 153:6 199:7
199:11 221:5,9
222:15 230:10
231:17
**distinct**
77:18 87:24
**distinction**
98:7,18 100:6 245:20
246:4,21
**distinctly**
88:5,25
**distortion**
106:6,18
**distribute**
259:7
**District**
1:1,2,18 5:7 257:1,3
**dive**
55:1 105:22
**divide**
182:25
**divided**
191:24
**dividing**
247:2
**division**
74:3
**divorce**

159:6
**divulge**
9:8
**Doc**
137:17
**Doctor**
10:22 13:15 17:15
20:20 29:1 47:12
52:1 55:7 61:3
64:22 67:10 72:13
72:19 142:20 143:4
145:12 149:3
153:22 156:2
165:10 166:13
180:3 182:5 183:15
189:10,14 194:2
202:21,24 203:6,14
204:5 209:9 210:22
216:10,17,22
218:19 220:7
224:14 229:5
241:15 243:2 252:4
254:15
**document**
3:11,13,16,20,22,24
4:2,3,5,7,8,10,11,13
4:15,16 11:8 68:14
178:15 179:24
189:10 209:19
228:24 233:7,14
**documents**
12:25 142:21 165:9
233:17
**doing**
6:12 18:6 59:5 96:2,5
101:2 126:7 224:21
224:22
**dose**
113:21 190:5 213:19
214:7,13 226:25
227:7
**doses**
191:1
**dosing**
189:24,25 192:8,10
200:6,15,17 213:1,2

213:10,12,20,25
214:2,21 216:2,4
**dots**
242:24
**double**
211:24
**double-blind**
148:23 154:2
**double-check**
50:20 212:1 213:16
218:22
**double-checking**
220:9
**doubt**
24:2 87:8
**doubts**
40:24 41:3 43:15
**downside**
107:17
**DPI**
128:3,10,13 129:3,6
129:9,25 130:12
132:20 135:3,17,20
195:24 210:3,20
211:15 213:21
215:18,22,22 216:3
**Dr**
5:4 6:10 9:7 10:13
11:14 13:20 19:23
20:3 28:24,24 30:20
30:24 41:12,18 64:7
69:9 162:1 198:1
222:25 223:9
228:23 232:2
247:25 248:10
254:2
**draft**
10:2 65:9,16 67:16
68:21 70:24 172:20
**drafted**
10:8 66:16
**draftee**
66:23
**dragged**
173:2,21
**dramatically**

174:4
**draw**
148:18 149:2
**drawings**
134:6
**Dreamboat**
128:21 129:2,7
**drill**
52:22
**driver**
177:19,25 178:11
179:5
**driving**
179:18
**drop**
230:14 231:7
**dropouts**
173:17 230:18
**dropped**
149:22 151:11
172:16,25 230:19
**drug**
35:25 75:18 87:16
88:8 89:8,9 101:7
101:12,15,15 102:7
103:9 108:3,5,15,17
108:19 113:13,21
127:22 128:2,4,10
132:21 154:19
167:5 186:4,4 226:8
226:11,11,15 227:5
230:24 231:2,12
**drugs**
68:2 100:8 105:5
115:7 117:5 118:7
222:21
**drug-drug**
16:11
**dry**
62:11 127:8,11 129:3
131:24 132:9
133:24 134:6 135:8
**due**
48:19 49:1,7 58:6
59:1,3 118:21
202:16 203:2

**MAGNA** ▶
**LEGAL SERVICES**

**dug**
37:14
**Duke**
30:18 232:15,16,18
**duly**
1:16 6:6
**dying**
69:3 156:20
**Dykhuis**
2:5 3:4 5:23,23 8:24
9:6,17 10:4 11:12
13:7 16:4,15 17:7
18:3,13 19:5,16
20:11 25:8 27:1,22
28:17 29:8,24 31:16
32:15 33:2,9,24
34:11,19 35:11,18
36:15 37:10,20 38:5
38:14,23 39:8,17
40:5,21 41:14,21
42:5 43:5,13,19
44:9,18 45:6,13,19
46:4,18 47:5,18
48:7,22 49:16 50:8
50:16 51:4,9 52:10
53:5 54:17 56:2,19
57:4,12 59:2 60:9
60:14,22 61:18
62:14 63:3,10 65:3
65:12,18 66:3,20
67:13 69:4,8 70:2
70:16,17 71:13,18
72:11,24 73:7 74:19
75:25 76:24 77:25
78:9 79:11,22 80:12
82:1,22 83:23 84:17
85:16 86:2,20,25
87:6,13,21 88:14,22
89:20 90:15 91:12
92:3,17 93:4,17
94:11 95:9 96:1,24
97:5,15 98:1,13,25
100:1 101:20 102:9
102:16 103:4
104:13,21 105:18
107:22 109:8

110:21 111:1,24
112:11,20 113:1
114:17 115:21
116:7,24 118:23
119:5,17 120:5,13
120:24 121:6,14
122:3,15 123:6,10
123:24 124:7,23
125:20 126:3,13
127:6,16 128:16,23
129:4,11,17 130:1,6
130:14 131:1,6,12
131:25 132:11,18
132:23 133:10,16
134:1,11 135:6,14
135:22 136:5,20
137:1,15 138:13
139:3,18 140:18
141:9 142:2,12
143:24 144:21
145:2,24 146:12,19
147:6,17,24 148:6
148:13 150:17
151:8 152:3 153:7
154:16 155:1,24
157:10,19 158:13
160:18 161:4 162:5
162:10 163:3,23
164:19 165:7 166:3
166:9,18 167:1,11
167:17 168:1,19
169:6,22 170:8,19
171:13 172:4
173:11 174:10
175:6,18 176:21
177:7,11,21 178:13
178:24 179:8,13
180:10 181:4
182:14 184:6 185:2
185:15 186:12
187:7,22 188:17
189:3 190:11,25
191:9,19 192:4,12
192:24 193:14,16
193:24 194:8,25
195:14 196:8

197:12,25 198:2,7
198:21 199:9,17
200:8,19 201:20
203:18 204:17
205:2 206:5,21
207:5,11 208:25
210:17 211:3,10,16
213:5,14 214:4,14
216:7,25 217:17,24
219:5,14 220:2,8,23
221:11 223:3,13
224:18 225:9 226:6
226:20 227:25
229:14 232:5,24
233:22 236:13
237:8 238:3 239:10
239:20 240:6,25
241:4,11 242:5
243:16 244:14
245:5,24 246:17
248:9,21 249:16
251:5 252:1 253:15
254:10,23 255:11
256:1
**dynamic**
78:24
**dysfunction**
3:15 145:8,19
**D.C**
1:10,20 5:11

─────────
E
─────────

**E**
5:1,1
**earlier**
55:7 58:12 64:25
71:6 76:8 92:6,6
94:23 114:4 116:1
118:8 138:2 146:10
150:6 152:17 154:5
162:3,3 203:6
215:13 224:2 225:5
228:9 244:18 247:8
252:18 253:1,18
**early**
39:1 48:14 83:2

118:4,5
**easier**
96:8 109:16
**easiest**
89:9
**easy**
35:19
**echocardiographic**
145:18
**editing**
255:12
**education**
20:6 22:22 23:4
**effect**
53:21 54:23 57:9,11
59:6 84:1 101:6,24
103:3,10,12,20
105:2,6 155:13
231:12
**effective**
101:18 190:4,6
236:23
**effectively**
23:21 25:11 199:23
**effects**
104:20 116:19
118:20 119:3
152:24 157:18
173:13 206:25
224:9 240:13
**efficacy**
48:15 51:24 135:21
143:19 148:12
229:17,25 230:4,11
231:21
**effort**
9:21
**eight**
30:12 156:8,18
**eighties**
81:8,19
**either**
13:14 17:5 116:21
140:12 240:4,14
246:20
**eke**



231:3,3
**element**
103:11
**email**
9:19
**emerge**
83:4
**emergency**
25:4
**Emery**
2:4 5:24
**emphysema**
84:6 220:18
**employed**
21:21,24,25
**employee**
46:5 257:10
**employers**
22:25
**employment**
22:20,21
**enabled**
62:5
**enabling**
107:16
**enclosed**
258:8 259:5
**encompasses**
239:3
**ended**
23:14,23 161:14
**endopulmonary**
80:22
**endpoint**
27:15,16 28:1 36:9
    44:22 58:21 120:8
    120:19 168:2
    169:12,13 229:18
**endpoints**
27:21,24 28:2 29:12
    44:23 45:5 164:3
    169:13
**ends**
186:6
**end-stage**
166:16 167:6,24

**England**
92:11 143:13 146:5
    150:7 165:19,24
    166:6,24 202:15
    203:3 207:9 219:2
    225:6
**enhance**
236:21
**enolated**
183:18
**enrolled**
32:1 81:17 155:10
**enter**
145:4 179:24 202:14
    209:9 216:10
    218:10 224:7
**entered**
155:9 201:10
**entering**
189:10
**entire**
56:24
**entirely**
171:2 217:4 226:13
**entities**
237:21
**entitled**
3:13,16 10:14 26:7
    70:9 142:23 145:5
    189:11 196:2
    202:15 203:1
    206:10,17,24
    209:11,19 210:2
    216:12 218:11
    224:8 233:7
**entry**
28:6 50:18 57:25
    61:11
**equals**
147:1 221:15
**equate**
103:21 164:13
    184:21
**equating**
130:24
**equipoise**

143:20 144:11,12,13
**errata**
258:8 259:7
**error**
13:13,20,21 56:9
    117:24 180:24
**errors**
12:14 14:5 207:8,14
**ESCERS**
74:9
**especially**
80:19 127:19
**espoused**
160:6
**ESQ**
2:5,13,14,15,16
**essential**
46:24
**established**
143:19
**estimate**
53:15 56:3,7,13
**estimates**
53:11
**et**
142:25 145:8 163:17
    206:16,24 224:10
    233:8
**Etiology**
182:6
**Eugene**
234:17,18
**European**
73:25 74:1 83:16
    158:17
**EuroQol**
147:2 148:3
**evaluate**
83:20 119:3 120:16
    120:22
**evaluating**
126:22
**evaluation**
145:21
**event**
58:19 190:16

**events**
58:20
**eventually**
231:3
**evidence**
145:18 186:9 187:5
    229:16,25
**exacerbate**
110:18
**exacerbation**
55:11,14,21 137:25
    139:1,14
**exacerbations**
53:16 55:7 56:1 57:2
    57:11 138:12,22
    139:9,12,13
**exact**
38:25 39:2 141:15
    178:17 230:3
**exactly**
9:20 16:21 25:10,13
    50:11 56:8 67:22
    92:19 113:15,18
    114:1 209:4 214:10
    220:10 235:16
**examination**
1:14 6:8 248:8
    254:12
**examine**
53:25 144:17
**examined**
6:7 54:11 167:6,10
    201:19
**example**
12:18 59:15 77:22
    103:14 106:23
    107:14,24 108:10
    110:17 138:9 159:3
    163:6 190:23
    195:21 230:1
    231:15 237:25
    240:10,13 241:16
    241:17 242:13
    243:4,6
**examples**
107:14 242:9,11

243:7,8,14 251:12
**exchange**
55:18 107:3,12
  109:19 110:3,10,20
  181:18 206:25
  224:8
**excluded**
83:22
**excludes**
254:20
**exclusionary**
29:11
**Excuse**
169:23 224:18
**exercisability**
212:25
**exercise**
3:13 123:22 124:5,21
  126:2,11,15,23
  136:19 137:8,14
  145:6 193:4,11
  240:21 241:9
  248:17 249:9,18
  250:7 251:2,8
  252:20 253:7
  254:21
**exercise-type**
136:25
**exhaustive**
122:6
**exhibit**
3:8,9,10,11,13,16,20
  3:21,22,24 4:1,2,3,5
  4:7,8,10,11,13,15
  4:16 10:11,13 11:5
  11:7,14 14:9 17:16
  47:13 66:11 142:22
  143:2,8,10 145:5,10
  145:23 146:9,17
  147:8,10,10,11
  148:11 150:8 151:2
  151:4 153:11,16
  163:16 165:10,12
  165:22,25 166:1,4,5
  166:7,12,15,21,22
  166:25 167:7,25

168:12,18 171:8
  174:7 179:21,24
  180:2 189:7,9,10,14
  189:21 196:1,6,23
  200:23 202:14,22
  202:24,25 208:23
  208:24 209:10,16
  209:19,23,25 210:1
  210:9,12,15,19,20
  210:25 211:7,14
  212:4,6,13,20
  215:17 216:11,18
  218:10,16 219:12
  219:25 221:23
  224:7,15 227:15,22
  228:19,24 231:23
  232:22 233:6,11
  248:22,25 249:25
  250:11
**exhibits**
3:6 209:10 211:20
**exist**
52:15
**existed**
75:23
**existing**
227:12
**expected**
185:11
**experience**
42:1,3 76:23 79:5,7
  214:17,18 223:15
**experienced**
146:25
**expert**
14:18 15:10 198:6
  234:11
**expertise**
20:15,21,24 21:7
  198:9 242:19
  243:20
**Expires**
257:20
**explain**
69:13 77:3 109:15,19
**explained**

67:2 109:12
**explanation**
111:14
**explicitly**
249:18
**exposure**
16:25
**expressed**
160:17
**expressing**
41:12,19 44:7
**extension**
148:25 156:16
**extent**
95:18 98:5 141:7
  244:21
**extra**
11:12
**extremely**
84:25
**extremes**
109:25 110:11
**E-R-R-A-T-A**
259:1

---

**F**

**F**
181:23 182:2
**fact**
62:4 103:19 111:19
  114:4 115:17
  133:17 219:22
  242:3
**factor**
112:2 115:19
**factors**
115:23
**fail**
53:16
**failed**
49:15,19 111:23
  115:9
**failure**
55:19 138:9 154:15
  154:18
**fair**

77:24 118:18 195:13
**Fairfax**
21:25 22:6,20 23:1
**fairly**
156:12
**fall**
49:8 76:12
**familiar**
62:9 63:1 70:25
  128:21 129:5 246:2
**fan**
30:18
**far**
96:11 143:19 173:14
  242:10
**Faria-Urbina**
206:10 208:21
  218:13 219:12,25
  220:21
**fast**
107:1
**favor**
37:21 53:13,17
**favorable**
53:21 56:4
**favoring**
32:19
**favorite**
77:12
**favors**
172:1
**FD**
25:12
**FDA**
234:21
**feasible**
171:2
**February**
8:6,7,15,16 12:11
  19:4,22 43:22 44:13
  92:7 177:16
**feed**
178:5
**feel**
34:10 99:8 100:21,24
  101:23,25 102:3

**MAGNA** ▶
**LEGAL SERVICES**

127:23,25 137:18
150:5 211:24
**feeling**
160:3 248:12
**feelings**
41:25
**feels**
102:19
**fellow**
81:14,18
**fellowship**
21:14,18
**felt**
101:2,5
**Ferrante**
2:16 6:2
**fewer**
139:11
**fiberblast**
118:5,8
**fibrosis**
3:14 24:14,15 33:18
  42:17 80:5,17,21,23
  80:24 82:7 84:5
  106:3 107:5,9 110:6
  117:3,6,14 118:2,3
  118:4,11 119:4
  142:25 143:13,22
  144:20 145:7
  165:18 167:13
  173:13 181:22,24
  182:2,4,11 220:18
  237:1,13 238:8,9
  241:24 244:5,7
**fibrotic**
85:3 108:18
**field**
114:13 160:5,6 161:7
  236:1 245:19 246:2
**figure**
81:1 161:18 168:14
  168:17,21 169:19
  169:25 170:2,6
  171:6,12,25 174:6,9
  175:14,21 176:10
  176:18 178:17

179:17 246:20
**figures**
194:19
**figuring**
30:5
**find**
28:4 111:14 162:24
  203:12,13 248:23
**findings**
194:12
**fine**
109:18 196:10 212:2
  224:22
**fine-tuning**
48:12
**finished**
250:21
**first**
6:6 8:2,16 13:1 15:9
  26:15 43:17 45:10
  63:17 66:23 67:11
  67:16 68:21 70:24
  81:3,5,19,24 82:3
  82:10 85:9,11,20,25
  86:16 91:17,21 92:4
  92:15 93:14 94:9
  116:3 131:18 143:7
  144:3 146:16
  154:11 158:7,15
  159:25 165:10,18
  172:6 177:8 202:18
  207:18 209:6,10
  216:14 218:13
  221:3 229:1 233:13
**five**
39:6 49:3,6 76:16
  220:17 245:17
**fix**
107:12
**flip**
61:5 209:11 235:24
**flipped**
157:5
**flipping**
194:20
**flow**

106:16,24,25 110:1,5
  110:6 236:22,22
**flowing**
107:4
**folks**
31:4
**follow**
152:13 230:13
**followed**
42:11 207:19 209:7
  230:23
**following**
38:3 186:10 241:22
**follows**
6:7 25:17
**follow-up**
164:9 230:5 248:6
**footnote**
12:21 13:3,16 14:4,5
**footnotes**
12:19 13:14
**forced**
90:20,21 139:19,22
  140:2,5,7,15
**foregoing**
258:4
**forget**
195:23
**form**
9:6,17 10:4 16:4,16
  17:7 18:3,13 19:5
  19:16 20:11 25:8
  27:1,22 28:17 29:8
  29:24 31:16 32:15
  33:2,9,24 34:11,19
  35:12,18 36:15
  37:10,20 38:5,14,23
  39:9,17 40:6,22
  41:15,22 42:6 43:6
  43:14,20 44:10,19
  45:7,14,19 46:4,19
  47:5,19 48:8,23
  49:17 50:8,16 51:4
  51:9 52:10 53:5
  54:17 56:2,20 57:4
  57:13 59:2 60:9,14

60:22 61:18 62:14
63:3,10 65:3,12,18
66:3,20 67:13 69:4
70:2,16,21 71:13,19
72:11,24 73:7 74:19
76:1,24 77:25 78:9
79:11,22 80:12 82:1
82:22 83:23 84:18
85:16,17 86:2,21
87:1,6,13,22 88:14
88:23 89:11,20,25
90:15 91:12 92:3,17
93:4,17 94:11 95:9
96:1,24 97:6,16
98:1,13,25 100:2
101:21 102:10,17
103:4 104:13,21
105:18 107:22
109:8 110:21 111:1
111:25 112:11,21
113:2 114:17
115:21 116:7,24
118:23 119:5,18
120:5,14,24 121:7
121:15 122:4,16,21
123:6,10,25 124:23
126:4,13 127:6,16
128:16,23 129:4,12
129:17 130:1,7,15
131:1,6,12,25
132:11,18,23
133:10,16 134:1,11
135:6,14,23 136:5
136:21 137:2,15
138:3,13 139:4,18
141:10 142:3
143:24 144:21
145:2,25 146:12,19
147:6,17,24 148:6
148:13 150:17
151:9 152:3 153:7
154:16 155:1,24
157:10,19 158:13
160:18 161:4 162:5
162:10 163:4,23
164:19 165:7

**HIGHLY CONFIDENTIAL**     LIQ_PH-ILD_00000758

166:18 167:1,11,17
168:1,20 169:6,22
170:8,19 171:14
172:5 173:11
174:10 175:6,18
176:22 177:7,11,22
178:13,24 179:8,13
180:11 181:5,10
182:14 184:7,9
185:2,15 186:12
187:8,23 188:18
190:12,25 191:10
191:20 192:5,13,24
193:14,17,24 194:9
195:1,14 197:12,25
198:2,7,21 199:9,17
200:8,19 201:20
203:18 204:17
205:2 206:5,21
207:5,11 208:13,25
211:3,11,16 213:5
213:15 214:4,14
216:7,25 217:17,21
219:5,12,15 220:2,8
220:23 221:11
223:3,13 225:10
226:6,20 228:1
229:14 232:5,25
233:22 236:14
237:9 238:4 239:11
239:21 240:1,7,14
240:25 241:4,11
242:5,6 243:16,22
244:14 245:6,25
246:17 248:19
249:14,23 250:17
251:10 253:12
254:23 255:12
**formal**
21:3,10
**formed**
28:12 217:25 232:3
**former**
156:19 235:21
**forms**
49:22 83:25 126:22

240:5 244:9
**formulated**
9:12 65:6 74:24
242:20
**formulation**
114:9 128:15 226:12
**formulations**
239:18,25
**forward**
18:7,7
**forwards**
69:17 255:18
**foul**
155:8
**found**
159:19
**foundation**
24:15,16 40:13 66:24
68:21 144:22
145:25 160:1 162:4
162:9 165:8 167:2
168:20 170:20
172:5 175:19
186:13 193:18
194:9 195:1 198:22
200:20 207:12
213:6,15 217:1,18
219:7,13 220:3
226:21 228:1
232:25 242:6
243:17 254:24
**four**
6:21 14:13 17:3
23:25 54:22 55:17
77:14 149:11 150:2
183:8 200:12
201:11 214:8
226:24
**four-week**
138:5
**frequent**
103:20
**frequently**
77:7 101:3
**front**
54:9 159:23 196:24

210:15 248:23
252:4 253:23
**full**
139:24 209:7
**fully**
107:7
**function**
16:10 79:1 135:25
136:3
**functional**
205:17 208:9 221:4
**functioning**
76:5
**funded**
232:22 233:2
**funding**
60:3 235:15
**further**
33:16 35:7 143:21
144:15 148:10
160:23 164:24
201:5 222:22 248:5
254:10 255:25
256:1 257:9
**FVC**
32:8,14,16,20 33:7
33:22 34:1,14 35:5
35:10,17,21,23
36:14 37:8,18 38:2
38:12,22 51:6,14
52:7 90:24 117:21
117:25 120:8
139:16,17 141:7
142:1 171:16,23
172:1,22 203:7,17
204:8,9,10,14,24
251:2
**FVCs**
202:4
**F5**
171:6,7

---
**G**
---
**G**
5:1
**Gabriel**

2:16 6:1
**gain**
21:6
**gas**
55:18 107:3,12
109:19 110:3,9
181:17 206:24
224:8
**Genentech**
15:8 16:1
**general**
112:15 125:10 136:6
**generally**
9:4,10 15:4,18 16:5
24:4 27:10 46:8
58:10,16 59:1,4
89:10 114:19
125:13 126:21
133:18 163:11
**generating**
149:24 172:9 173:10
**gentleman**
8:10
**George's**
168:4 169:21 170:17
**gestures**
7:4
**getting**
36:6 128:2 156:25
174:17 251:13
253:5
**give**
7:3 12:23 42:15
65:20 69:5 72:13
122:13 202:6
203:23
**given**
42:3 115:18 122:18
123:17 132:8,12
157:14 192:22
204:15 226:9,12
228:23 258:6
**gives**
117:23 137:7 179:1
182:7 213:20
**giving**



35:24 101:18
110:16 113:8 163:6
185:22
**glance**
172:6
**go**
12:25 14:1,2,8 17:15
18:17 20:3 26:3,14
28:4,5,6 36:17
50:17 54:18 66:10
66:12 67:5 70:6
82:23 93:18 101:8
103:5,14 106:2
107:16 108:16
110:19 115:25
121:16,23 123:15
126:18,21 133:3
137:20 144:3
148:20,20 155:25
156:17 157:22
163:16 169:15
174:17,25 180:21
182:5 189:18 190:6
203:11,14,15 205:8
205:24 210:24
211:19,19 214:22
214:24,24 215:17
216:21 227:15
231:9 238:12,25
239:14 240:10
242:17 243:2,24
246:9 250:2,11
255:6
**goal**
200:11
**goes**
60:16 86:4 90:23
113:20 157:2 202:1
240:19 244:18
245:7
**going**
10:16 11:11 17:23
30:6,17 47:11 57:23
59:14 64:8 69:16
79:15 87:23 89:10
89:22 92:19 106:7

106:25 108:3,5,19
109:13,20 110:8,9
110:14,15 114:14
122:5 125:18
131:20 137:19
142:8,21 143:4
145:4 151:2 156:13
156:23 165:9,22,25
169:14 177:9
179:23 185:7
188:21 189:9,19
196:1,23 202:14
208:5 209:9,18
210:24 212:4
216:10 218:10
224:7 229:21
230:23,24 231:13
242:17 245:8
252:18 255:18
**good**
6:10,12 7:12 25:25
60:10 62:20 64:10
105:2,12 111:14
115:8 131:7 142:12
177:9 196:8 211:25
232:8
**GOODWIN**
1:19
**Googled**
134:23
**gosh**
12:23 100:21 137:17
210:23
**go-to**
89:8 96:6
**grab**
142:11,21
**gradation**
110:13
**grades**
30:13
**grant**
233:4
**grants**
60:4,7,20 61:7
**granularity**

183:12
**Granulomatous**
24:19
**gravitated**
21:4
**great**
101:3 223:21,22
230:17
**greater**
73:21 74:5,14 75:6
90:22 93:21,21
125:7,8 141:8 147:2
**grew**
152:15
**group**
25:18 26:18 35:19
36:4 48:20 49:9
53:21 55:4 57:16
58:15,16,16 59:15
59:17,21,21 76:12
76:14,18,18,18,18
76:19 77:12,13,23
77:24 78:2,4,8,8,12
78:13,16,16,19,21
83:12 86:5,6,10
89:6,23 90:1,6,12
90:18 91:6,24 93:11
94:3 95:20 101:14
101:15,19 104:23
104:23 105:1,8,12
105:13,17 106:8
114:5,19,21 121:12
121:13,25 122:2,13
122:23 123:8
138:17,19 149:8
151:23 163:21,22
183:3 196:3 197:9
197:10 199:7,23
201:3,4,7 204:11,12
204:15,16,25 205:1
205:18 208:10,14
208:17,20 212:7,22
213:3,4 217:9 218:2
219:8,19 222:11,22
226:5,18,19 227:23
227:24 228:10

238:16 244:17,23
245:8,14,16,17
246:11,16,16,22,22
247:5,6,12,13
**groups**
49:4,6 76:9,16,20,23
79:10 83:22 97:14
152:19 174:13
183:19
**guess**
16:24 29:17 235:24
242:16
**guessing**
128:18
**guesstimate**
85:6
**guidelines**
55:15 74:9 83:16
**guise**
74:24 76:5 86:13
**guys**
210:16

**H**

**half**
25:1 77:12 158:2
222:16
**halfway**
74:8 158:7
**halting**
156:11
**Han**
145:8
**hand**
7:4 185:25 255:14
**hands**
62:24
**handy**
250:10
**hang**
180:20 203:19
**happen**
71:23 96:22 97:3
111:3,17 198:25
199:1
**happened**

97:19 156:14
222:16 230:14,18
**happening**
97:1,8
**happens**
111:4 156:11 199:3
**happy**
105:21
**hard**
23:22 79:12 139:25
178:6 179:17
**harm**
36:7 48:16 155:8,17
163:9 184:17 188:9
**harmed**
103:19 161:17
**harmful**
41:11 106:17 154:20
159:5 163:7,12
164:11
**hazard**
53:12
**head**
7:4 121:17 159:15
**heading**
26:7 236:1
**heads**
159:11
**healthier**
112:14
**healthy**
112:7,13
**hear**
43:17
**heard**
43:7,10 45:2 72:6
95:12 151:15
**hearing**
63:18 99:22
**heart**
55:19 73:1,5 77:9
106:13 138:9
175:11,12,16
**held**
62:24 125:15 228:21
247:16

**help**
109:2 143:5
**helped**
67:25 68:20
**helpful**
163:8 213:24
**helping**
9:2 100:6 163:10
188:10
**helps**
47:7 137:4
**hemodynamic**
104:9,10,19 105:1,5
123:21 124:3,19
181:17 186:24
206:24 224:8
247:11
**hemodynamics**
86:7 103:1 104:1
205:17 208:9
**high**
26:18 58:17,18,25
59:3 125:5,6 182:21
183:2 184:13 185:6
201:4,8 222:8,9
251:19
**higher**
58:23 175:10
**Highlights**
209:12,19 210:2
**highly**
161:7
**High-dose**
228:25
**high-resistance**
129:10,14,16,25
135:18
**high-risk**
58:15
**historically**
69:22
**history**
42:13 68:24 69:1,16
69:25
**hit**
57:21 128:3 131:16

**hits**
53:23
**hoc**
31:11,14,20 32:7,13
32:22 35:9,17 37:2
37:6,13 38:22 51:5
51:21 52:2,9 53:3,6
54:1,7 56:11 117:20
118:14 146:3
149:21 173:5
**Hoeper**
158:15 162:3 164:7
**hold**
96:8 157:1 252:13
**holes**
173:3 229:19
**Homes**
16:20
**honest**
34:22 63:11 87:25
129:19 255:13
**Honestly**
54:5 70:22
**honeycombing**
118:6
**hope**
125:8
**Hopefully**
176:15
**hoping**
100:4
**horizontal**
156:6
**Horowitz**
8:11
**Hospital**
22:1
**hospitalization**
58:20
**hour**
30:14,16 64:8
**human**
78:24 119:22
**hundred**
46:21 54:10 96:9
97:20 106:24

134:25 158:18
209:2 255:19
**hurting**
36:3
**hypersensitivity**
84:4
**hypertension**
3:18 14:22 20:17,22
21:8,11,14,16,18
24:9,11 25:15,19,22
26:1 31:23 32:5
49:1,4,7,23 52:6,19
52:22,25 54:5,16
58:5 65:22 72:18,19
72:20,23 73:6 74:18
75:2,4,8,12 76:9
77:9,10,11,13 80:20
81:4,6,10,12 82:13
82:17,20 83:1,15
85:18 86:11 89:4,13
91:25 94:15,20,25
95:17 98:4 99:11
100:11 103:21
106:5 117:10 122:1
122:21 125:13
150:22 152:7,10
153:14 154:2 159:4
159:6 160:11
162:13 180:15,23
180:25 181:2,8,11
182:7,23 183:1,7,9
184:9,12,20 186:17
188:6 193:5,12
196:3 197:9,11
201:14 202:16
203:2 205:18
206:11,18 207:1
208:11,14 212:8,23
215:24,25 216:13
217:9 218:2,5,12
219:9,19 224:5,10
229:1 232:18
237:19 238:20
241:24 242:16
244:8,17,20,24
245:11,12 246:3,7,9

246:11 249:10,19
251:17,18 252:21
**hypothesis**
118:17 149:23 172:9
173:9 228:5
**hypothesis-generat...**
118:16 164:6 173:4,7
219:17 222:20
**hypothesize**
136:10 177:24
**hypothesizing**
163:5
**hypothetical**
178:19 191:20
**H-o-3-p-e-r**
158:16

**I**

**idea**
62:20 119:10 130:2
135:24 137:8 179:3
230:15
**ideas**
52:12
**identification**
10:12 11:6 143:3
145:11 153:17
165:13 166:2
179:22 189:8 196:7
202:23 209:17,24
210:10 216:19
218:17 224:16
228:20 233:12
**identified**
165:24
**identifies**
22:5
**identify**
58:15 66:18
**idiopathic**
3:14,17 33:15,18
42:17 81:12 82:7
142:24 143:12,22
144:19 145:6
153:12,25 165:18
167:13 241:23

**IDL**
87:19
**III**
212:8
**IIP**
154:4,7
**ILD**
57:11 81:1,2,25 82:4
82:7 83:19,21 84:14
87:12 88:12,21
89:18 90:14 94:17
95:1 98:3,9,15,19
116:21 161:20
178:11 208:18
217:4 218:3,7
220:13 223:21
228:8,11 230:15
238:14,15,17 244:9
245:3,10,22
**ILDs**
83:12
**illustrations**
243:14
**illustrative**
243:8
**iloprost**
94:10,14,19 95:13
121:19 206:25
224:9 226:9,25
**image**
134:23
**imagine**
128:8
**imaging**
55:16 138:8
**imbalance**
114:21
**immediate**
26:18
**impact**
102:8 117:9 120:11
138:21 144:18
**impacted**
99:24 103:1
**impacting**
116:6

**impacts**
106:20
**impaired**
107:13
**impairment**
78:24,25 247:11
**implemented**
76:4
**impose**
188:9
**impossible**
246:19,24
**improve**
205:17 208:9 212:25
231:16
**improvement**
36:14 37:8 38:7
102:20 104:12
116:22,25 117:24
118:2 123:22 124:5
124:21 136:18,24
137:13 140:4,8
147:2,14,22 148:3
153:5 168:7,8 169:5
199:16 208:16
221:4,8 229:17
**improvements**
38:2 104:10 231:11
**improving**
138:25 193:4,10
248:17 249:9,18
250:7 251:2,8
252:20 253:7
254:21
**imputed**
173:18
**inactive**
22:10,12
**incidence**
138:18 139:12
**include**
26:10 167:16 176:24
184:10 220:21
238:19
**included**
83:24 91:4 120:8

201:17 230:20
**includes**
11:21 181:3 193:10
218:3 220:1 228:11
252:20
**including**
24:9 31:4 33:14
227:2 237:7 242:4
259:8
**inclusion**
29:11
**Incomplete**
191:20
**incorrect**
13:23 30:11
**increase**
28:8,12,22 29:1,7,15
29:23 30:21,25 31:6
31:11,15 32:1,14,25
33:6,21 36:14 37:18
38:4,12 39:5,14
40:4 43:3,11,18
44:7 45:18 46:10,13
46:17 47:4 51:7,22
52:3,16 54:3 56:25
58:13 65:1,5,16
66:2 68:16 73:12
74:23 75:21 76:3
83:20 84:15,22
86:24 87:14 88:6,13
88:25 89:19 91:20
92:2 93:2 95:25
96:15,23 99:2,6,10
99:13,19,23 101:9
101:14 107:21
108:22 112:19
116:3,12,18 117:13
118:15,20 119:2,12
120:2,10,21 122:14
123:4,9 138:17
139:11 141:6 151:6
152:2 177:10 194:7
194:13,24 195:6,8
195:10 197:23
201:10,19 203:4,8
216:24 217:7 219:3



219:3,13 223:2,18
225:7,25 231:9
**increased**
100:23 111:22 126:2
126:11 138:7
195:21 200:11
**increases**
101:11
**increasing**
236:22
**independent**
118:13 119:11
**independently**
132:21
**indicate**
73:5
**indicates**
28:15
**indication**
41:9 212:5
**indications**
216:6
**indicative**
104:11 123:21
**individual**
29:16 71:24 101:16
128:7 137:23
138:15,20 141:18
142:7 223:16
**individuals**
155:9
**induce**
136:13
**infection**
55:19
**infer**
152:21
**infiltrates**
55:16 138:7
**infiltration**
80:3
**inflammation**
80:6 244:5
**inflection**
178:10,18
**influenced**

160:5 161:12
**inform**
103:2 137:13
**information**
15:18 137:11 209:12
209:20 210:3
**informing**
156:25
**infringe**
70:9
**infringement**
70:14
**inhalation**
130:5,12 131:24
132:4,10,22 133:8
209:13,21 211:9
215:3 240:1
**inhalative**
181:19
**inhaled**
32:19 33:8 35:25
36:6,12 37:21 38:3
48:16 49:12 50:22
53:13,17,22 56:4
57:3 58:25 59:7
65:20 75:16 85:21
86:1,18 87:4,10,18
88:11,20 89:7,16
90:12 91:18,22
94:19 95:7,12,13,24
96:13 100:8 101:10
104:2 107:20 108:1
108:2 112:6,18
114:13 115:1,19
116:20 117:12
118:12,20 119:3
120:3,11,22 121:19
122:8 127:1 185:13
186:10 187:6,20,25
188:15 190:10
191:5,15 192:9
193:22 194:22
196:2 197:8 198:14
199:8,24 200:6,16
202:16 203:1
204:12,15 205:16

206:11,17,25 208:8
211:2 213:11,25
216:12 217:12,15
217:22 218:11
219:20 220:15
221:9,24 224:9
225:14 226:4 228:5
228:14,25 229:12
232:4 240:4,15
241:8
**inhaler**
62:11 63:2 127:8,12
129:3 131:24 132:9
133:25 134:6
**inherent**
140:6 230:21,25
**inhibitor**
123:15,17
**initial**
20:15,21 32:24 33:6
33:20 37:5,9,12
65:1 68:20 197:19
**initially**
22:16 35:23 114:5
172:22
**initiate**
231:19
**initiation**
99:14
**injunction**
11:10
**Inova**
21:25 22:2,6,14,20
22:25 23:15 24:3
**inpatients**
165:17 208:10
**input**
20:1 39:21 40:2,10
48:13 65:11 66:22
67:17 71:2
**inspiration**
139:25
**instances**
102:7 105:3,5
**institution**
60:17 64:6

**instructs**
7:16
**insufficient**
56:12
**intend**
164:18
**intended**
243:9
**intent**
149:6,14,15,15
**intents**
202:10
**interactions**
16:11
**interchangeably**
246:8
**interested**
257:12
**interesting**
35:6 63:19
**interests**
59:8
**interface**
109:23
**interlaced**
107:5
**intern**
82:8
**international**
207:2,19 224:11
**interpret**
238:18
**interpretation**
176:14,25 238:21,22
**intersect**
178:4
**intersects**
80:1
**interstitial**
3:17 20:16,21 21:7
21:10 24:13 25:20
25:22 26:1 33:16
36:1 55:8,12,14,22
56:1 57:2 58:6
65:23 79:20,20 80:7
80:10,19 82:4,11,14



82:18,21 83:1 84:2
85:3,4 86:12,18
88:2 89:3 93:8
94:20 95:16,19
99:12 105:9,21
127:20 138:1 152:7
152:11 153:12
154:1 162:14
180:23 184:11
193:6,12 202:1,4,12
202:17 203:2
212:24 215:25
221:19 236:6,8,12
236:24,25 237:6,14
237:17,22 238:1,11
244:6 249:10,20
252:22
**interstitium**
79:23 80:2,4
**intertwined**
179:16
**interval**
176:13 230:7,8
**intervals**
174:22 176:11,24
**intravenous**
241:22 242:14
**intravenously**
122:20
**introduce**
209:18
**introduced**
208:24
**introducing**
233:6
**invalidated**
183:24
**invariably**
169:14
**invasive**
104:6
**invention**
236:4,21 239:3,18,25
243:9
**inventions**
243:15

**inventors**
234:2 254:4,7
**investigating**
49:11
**investigator**
61:23
**involved**
8:23 16:24 21:13
23:5 29:9 30:5
61:19 68:15 79:9
106:16 232:14
235:11
**involvement**
28:16 29:22 61:16
**involves**
249:18
**involving**
143:21 144:15
235:17
**in-person**
9:24
**in-preparation**
51:12
**IOTF**
182:3
**IOVPH**
26:2
**IP**
41:8 68:10 103:14
**IPF**
26:17 84:2 94:15,16
144:16 150:24,24
242:15
**IPH**
243:22
**irritation**
136:9
**Irvine**
2:7
**issue**
16:6 111:9
**issued**
26:24
**issues**
157:8
**iteration**

19:1
**iterations**
22:15 255:17
**IV**
122:8,12,17

### J

**J**
1:17 254:7
**Jamboree**
2:6
**January**
18:21 92:12
**Jdavies@cooley.com**
2:21
**Jeffs**
235:18,19,20,21
**job**
224:21
**jobs**
80:25
**jokingly**
77:12
**Jonathan**
2:13 5:19
**Journal**
92:11 143:13 146:5
150:7 158:18
165:19,24 166:6,24
202:15 203:3 207:2
207:9 219:2 224:11
225:6
**journals**
178:16
**judging**
16:23
**judgment**
247:12
**July**
209:13 211:5
**jumped**
159:20
**June**
92:11 145:9
**justification**
221:24 223:1,12,18

223:20,23 224:4
225:14 226:4,18
227:22 228:13
229:11 232:3
**justify**
217:15

### K

**keen**
77:15
**keep**
10:22 13:4 17:21
23:22 24:1 125:17
250:10
**kept**
74:4
**key**
103:11
**kind**
29:18 69:3 77:16
81:1 83:13 115:11
152:21 173:13
178:5 188:7 208:15
251:21
**kinds**
83:7,11,21
**Kishan**
229:1
**knew**
87:15 227:13 235:6
**knock**
162:23
**know**
9:1 14:11 18:15 36:2
40:11 42:22 46:8,15
49:10,18 57:24
59:14,15 62:18 64:5
65:15 66:5,8,13,23
67:6 68:13,19 75:18
78:11 79:14 81:20
87:23 88:4 90:9
91:2,15 92:19,24
97:22 100:3,7,12
101:5,7,17 103:15
106:17,18 108:19
108:21 109:2 112:1

112:3,23 113:7,15
113:17,20,22,23,25
115:6 118:1,14
120:6 124:12
125:24 129:6 131:4
131:10,13,17,19
132:13,20 133:1,21
134:21 138:21
140:9 150:20
152:24 153:2,4
155:6 159:20,24
160:2 173:16,25
174:25 177:23
178:2,19 181:13
183:4,8 184:14
185:9 186:20
188:20 190:1
197:15 198:1,12
201:6 205:11 210:7
212:17 222:25
223:5 225:20
229:22 230:17
231:11,14,22,24
232:1,2,9,21 234:5
234:8,9,17,18,24,25
235:4,18,19 236:18
241:19 242:7,16
243:25 246:9,23
250:21 254:17
**knowing**
46:21 209:3
**knowledge**
19:22 46:2 135:3
**known**
47:23 73:13 88:7
**knows**
160:11 246:3
**Kolb**
165:19
**Kun**
47:2

**L**

**label**
134:15,19 210:12,19
210:20 211:1,8,15

212:14,20 213:2,11
213:13 214:1,2,24
215:10,18,21 216:4
**labeled**
36:8
**labels**
212:21
**lack**
48:15 97:13 186:13
**laid**
67:18 118:3 159:25
162:3
**Lan**
224:10
**language**
95:6,14,23
**large**
71:20 101:14,15,19
138:16 139:1
**larger**
57:9 148:5 222:22
**late**
81:8,18 244:8
**lattice**
79:24
**lawsuit**
69:18
**lay**
68:20 162:9
**layer**
105:20
**lead**
160:10 161:18,24
**leader**
160:4 161:7
**lean**
111:13
**leaned**
66:8
**leaning**
222:10
**leave**
231:19
**led**
44:4 46:22
**left**

55:21 56:4 252:6
253:16
**legal**
5:14,15 67:8,12
70:15 243:17
**legalese**
66:24
**legend**
181:24
**Leigh**
45:17 46:2,13
**let's**
64:13 99:5 106:9,10
107:1 134:15 176:1
183:4,5 203:21
211:19 230:10
247:14 248:22
249:3 250:2,10,11
253:17
**level**
113:23 175:10,11
179:4
**levels**
175:3 176:18,19
**Lewis**
162:1 254:2,7
**likelihood**
125:7
**limit**
237:25
**limitations**
222:24 243:10
**limited**
192:15,16 214:17
222:13
**limits**
62:6
**line**
22:16,17 56:10 69:9
92:9 107:4 117:21
117:21,25 181:21
182:6 247:3 259:13
**liquid**
240:1,5
**Liquidia**
1:8 5:6,20,25 10:14

11:2 70:9 235:4,4
235:23 259:3
**Liquidia's**
63:21
**LIQ-861**
63:18
**list**
16:13 50:3,7 51:1
122:6 182:8
**listed**
63:25 234:2 259:10
**lists**
254:4
**literature**
66:7 80:11 82:24
83:3 88:16 115:12
227:12 242:11
**litigation**
15:1,2 17:12
**little**
48:25 71:4 75:2 78:2
90:25 121:23
123:12 133:19
134:18 139:6
157:23 181:21
182:20 194:15
235:3 246:23
252:12
**liver**
16:10
**LLC**
5:12
**LLP**
1:19 2:12
**local**
108:20
**lock**
79:24
**locked**
44:15,21 45:4
**long**
23:25 101:22 152:18
235:6
**longer**
152:20 173:20
**long-term**



152:25 156:15
227:9
**look**
34:1,2,4,21,25 35:1,5
35:10 36:16,23
42:16 61:11 67:23
78:17,20,22,23 79:1
89:23 90:2 137:6
139:1 149:10 155:5
156:5 166:21
167:19 172:11,20
181:13 183:2,4
186:19 189:23
193:3 194:18,20
195:2 199:5 203:15
210:8,21 213:1
216:2 219:22 221:2
230:1 235:25
236:17 241:15
242:13 247:9 249:6
253:17 254:16
**looked**
32:16 33:14 34:6
35:21,23 66:6
155:16 157:6 225:5
**looking**
13:4 34:14 52:5 55:2
58:12,13 59:5 94:14
146:16 151:19
168:23 171:22
182:15 188:2 195:7
204:7 205:10 219:7
230:4 233:14
**looks**
17:18 26:6 67:7 68:3
149:12 150:8
155:15 174:22
199:12 203:23,24
207:16
**lost**
30:14,15,16
**lot**
12:24 45:22 67:3
71:22 73:10 79:19
106:7 124:14
160:19 172:18

173:1 195:3,5
207:17 214:18
224:20 234:6 247:4
251:11
**lower**
58:15 100:9 103:6,7
159:4 175:11
184:13 185:7 186:5
251:20
**lowered**
73:21
**lowering**
100:13 107:16
**lowers**
103:17
**low-resistance**
129:22 135:20
136:11
**Loy**
2:24 5:13
**LTI-301**
61:17 63:8
**lunch**
125:18 142:10
248:14
**lung**
20:14,16,18,21 21:8
21:10 22:4,4 24:6,7
24:8,13 25:21,22
26:2 36:1,5 49:22
55:8,12,14,22 56:1
57:2 58:6 65:23
77:8 78:3,14,25,25
79:2,20,21,24,25
80:7,10,18,19 82:4
82:11,14,18,21 83:2
84:10 85:3,4 86:7,9
86:12,14,18 88:3
89:3,12 90:3,8 91:1
93:8,10 94:20 95:16
95:19 98:5 99:12
100:9 105:10,21
106:3,9 107:15
108:4,6,16,18
109:24 110:4 111:4
112:8 114:16,20,22

115:5 122:23
127:20 138:1 152:8
152:11 160:8,12
162:14 180:23
184:11 186:5 193:6
193:12 198:16
201:5 202:1,3,5,12
202:17 203:2
206:12 212:24
216:1 218:6,12
221:19 230:3 236:6
236:8,12,24,25
237:6,14,17,22
238:1,11 240:22
244:4,6,7,22 245:13
247:9 249:11,20
252:22
**lungs**
80:2 106:8 109:21
110:3 251:19

## M

**M**
198:11,12
**Magna**
5:14,15
**mail**
137:21
**main**
156:5,7,14 177:25
**maintain**
107:2
**major**
84:3
**majority**
118:19
**making**
79:3 102:2 155:7
184:13 251:19
**malpractice**
15:6 16:14 17:13
**managed**
231:2
**manifest**
100:14 202:8
**manifestations**

100:20
**manifested**
80:6 105:7
**manuscript**
208:1 209:7
**man-made**
77:16
**March**
1:11 5:9
**Mariana**
218:13
**Mario**
159:22
**Marius**
158:15
**mark**
196:1
**marked**
10:11,13 11:5,7
143:2 145:10
153:10,16 165:12
166:1 179:21 189:7
196:6 202:22
209:16,23 210:9
216:18 218:16
224:15 228:19,24
233:11
**market**
105:6
**marking**
142:22
**Martin**
165:19
**match**
110:15
**matching**
109:20
**material**
218:24
**math**
30:11
**matter**
1:15 5:5 8:4 13:24
15:19 16:6 59:12
80:4 116:19 258:7
**matters**

**maximum**
190:5 214:7
**McDermott**
2:4 5:24
**mean**
19:7 22:12 34:24
58:18 73:14,20 74:4
74:11 75:5,12 77:4
77:5 93:20 103:6
117:15 164:18
171:8 182:19 185:8
186:15 187:11
199:6,10 201:9
227:2 237:13
244:25
**meaning**
227:8
**meaningful**
140:25 141:2,3
**means**
122:19 144:13 227:5
251:18
**measure**
35:24 103:25 104:1
126:2 167:23
173:14 230:4
**measures**
34:9 55:2 126:11
**mechanisms**
117:16
**med**
15:6
**medical**
10:9 16:14 17:12
20:10 22:3,5,22
23:4,16,18 66:17
67:5 68:4 81:14
**medication**
35:25 81:21 96:6
99:20 101:4 102:2
163:7 185:23
188:22
**medications**
163:11
**medicine**
23:9,17 27:4 32:10

42:10,13 92:12
137:18 143:14
150:7 165:20 166:6
166:25 202:15
203:4 207:9 219:2
225:6
**medicolegal**
15:5
**Mee**
16:13
**meet**
27:15 31:9 143:17
234:6
**meeting**
99:17 159:15 160:16
161:2 207:19
**meetings**
9:24
**meets**
155:14
**member**
26:16 28:7,16,21,25
42:2,8 47:16 48:4
**members**
28:23 29:22 39:7,11
39:16 40:17,19 44:3
45:24 222:17
225:24 231:25
**membership**
26:11 31:6 47:14
**mention**
51:24 99:9 186:15
188:7 195:20
242:21,23 251:21
253:7
**mentioned**
17:8 23:7 39:5 55:6
58:11 64:25 66:16
68:7,12 76:15 83:6
84:8 94:23 96:6
97:24,24 121:17
122:7 123:13,14
135:17 142:4 146:6
150:11 157:5 162:2
181:7 203:6 244:18
**mercury**

73:22 74:6,12 75:6
75:14
**met**
234:7 235:16
**meters**
147:1 151:7 199:12
199:13 230:17
231:4
**method**
34:17 180:9,14,19,22
180:24 181:2 184:5
184:25 193:4,10
249:8 252:20
254:20
**methods**
148:19,20 200:3,4
205:14 239:3
**mic**
195:15
**Michael**
234:5
**micrograms**
186:25,25 187:1
190:4,10,17,23
191:4,6,15,15,17
192:2
**middle**
197:19
**mild**
31:22 52:18,21,24
53:3 54:4,16 55:23
57:10,17 125:12
**milliliters**
33:12 34:3 73:15,22
74:6,12 75:6,14
204:14
**mind**
10:18 60:1 64:13
83:10,16 98:18
100:17,25 102:5,6
103:2 104:11
105:15 165:3
177:18
**minor**
13:21 14:4,4
**minus**

174:18 176:12,12,25
**minute**
12:23 54:11 203:23
**minutes**
125:19 230:8,9
**Mischaracterizes**
187:23 192:5,13
201:21 241:12
**misconception**
246:5
**misheard**
19:12
**mismatch**
109:5,11,25 110:14
110:18 111:8 112:9
**missing**
173:24 174:2 213:19
222:13,19
**Misstates**
240:7
**mistake**
30:10 215:16 253:8
**mistaken**
14:13
**mistakes**
12:14
**mix**
76:22 77:1,4 78:7
79:9
**MLs**
204:8,10,19
**modality**
162:12
**model**
63:2 215:6
**models**
119:20
**moderate**
91:24 125:12
**moment**
54:9 60:2 69:5 72:13
252:15
**money**
60:7,16
**monitoring**
104:3 155:5,13



156:11,24
**months**
155:14
**Moore**
1:17,21 5:15 257:2
257:17
**Moreau**
61:21
**morning**
6:10 64:25 71:6
**mortality**
58:19 149:7 157:3,4
**motion**
11:9
**move**
142:9 203:22
**moved**
235:3
**moving**
49:19 194:17
**MPAP**
93:20
**Multicenter**
61:7
**multiple**
100:19 114:2
**multiply**
191:22
**muscle**
202:7
**M.D**
1:13 6:4 11:9 202:19
259:24

**—— N ——**

**N**
1:19 5:1,11 221:15
**nagging**
224:24
**naive**
115:11
**name**
8:11 26:21 47:22
**names**
9:15 16:23 17:1 68:1
**narrow**

75:23
**nasal**
224:25 227:1
**Nathan**
1:13 3:2 5:5 6:4,10
9:7 10:13,15 11:8
11:14 13:20 19:23
20:3 69:9 145:4
154:10 202:18
228:23 247:25
248:10 258:10
259:24
**natriuretic**
174:12 175:4
**nature**
13:19
**near**
143:16
**nearly**
151:7
**nebulized**
114:9 127:4,7,12,24
128:14 211:2,8
213:13 214:3
215:14
**nebulizer**
133:7,18,20 195:24
**nebulizers**
133:22
**necessarily**
42:15 45:25 49:24
67:16 103:22
105:14,16 135:25
199:1
**necessary**
255:22
**need**
7:14,19 25:3 36:23
64:11,12 71:17,20
75:8 104:7 107:3
109:20 139:1 146:6
160:23 185:25
188:19,22,25
200:25 211:24
231:5,17
**needed**

143:20 188:12
**needle**
246:25
**negative**
27:12,13 35:2,3
41:10 42:10,14
94:18 107:17
161:16 164:14
224:1 228:16
**network**
79:25
**neutral**
185:8
**never**
62:24 63:23,24 64:4
77:15 96:5 129:18
131:16 133:24
134:5 135:12
161:20,21 235:9
**new**
50:21 74:3 81:7
92:11 93:19 143:13
146:4 150:7 165:19
165:24 166:6,24
173:21 202:14
203:3 207:8 219:1
225:6
**night**
30:14,16
**NIH**
233:3
**nine**
29:17 30:11 128:1
140:20 214:8,20
220:16
**nintedanib**
165:11,15 167:14
171:17,20,22 172:2
172:3,20 174:14
175:15,16
**NJM**
228:10
**nods**
7:4
**nomenclature**
81:11

**normal**
106:9 107:6
**normally**
224:21
**notable**
58:20
**Notary**
1:17
**note**
80:19 124:11 193:16
201:2
**noted**
258:8
**notice**
1:16 3:9 10:14,15
96:15
**notion**
185:22
**notional**
119:10
**NT-ProBNP**
53:20,23
**number**
5:4 9:18 25:24 34:2
51:20,25 52:3 57:18
57:25 61:11 79:12
97:12 108:2 109:5
140:11 141:16
142:22 143:1 147:8
149:25 172:11
176:24 189:12
194:19 195:19
196:2,5 201:23
202:19 207:16
209:14,22 216:15
218:14 224:12
229:2 233:8 248:23
**numbers**
53:7,8 56:8,12,22
57:15,20 117:20
149:24 153:20
157:4 165:20 180:1
182:25 210:4
231:11 233:9 253:5
**numeric**
204:18

**MAGNA**
**LEGAL SERVICES**

**numerically**
84:20 149:10,13
  156:9 187:14
**numerous**
31:20
**NW**
1:19 2:17 5:11
**NYHA**
212:8

**O**

**O**
5:1
**oath**
6:23,23
**obesity**
202:8
**object**
7:13 9:6,17 10:4 13:5
  16:4,15 17:7 18:3
  18:13 19:5,16 20:11
  25:8 27:1,22 28:17
  29:8,24 31:16 32:15
  33:2,9,24 34:11,19
  35:11,18 36:15
  37:10,20 38:5,14,23
  39:17 40:21 41:21
  43:5,13 45:19 46:4
  46:18 47:5,18 48:7
  48:22 50:8,16 51:4
  51:9 52:10 53:5
  54:17 56:2 57:4
  59:2 60:9,14,22
  61:18 62:14 63:3,10
  65:3,12,18 66:3,20
  67:13 69:4 70:2,16
  70:21 71:13,18
  72:11,24 73:7 74:19
  75:25 76:24 77:25
  78:9 79:11,22 80:12
  82:1,22 83:23 85:16
  86:2 87:6,13 88:14
  89:20 90:15 91:12
  92:3,17 93:4,17
  94:11 95:9 96:1,24
  97:5 98:1,13,25

103:4 104:13
105:18 107:22
109:8 110:21 111:1
112:11 114:17
115:21 116:7,24
118:23 119:5,17
120:5,24 123:6,10
124:23 126:13
127:6,16 128:16,23
129:4,17 130:1
131:1,6,12,25
132:11,18,23
133:10,16 134:1,11
135:6,14 137:15
138:13 139:3,18
142:2 143:24
144:21 145:2,24
146:12,19 147:6,17
147:24 148:6,13
150:17 151:8 152:3
153:7 154:16 155:1
155:24 157:10,19
158:13 160:18
161:4 162:5,10
163:23 164:19
165:7 166:18 167:1
167:11,17 168:1
169:6,22 170:8,19
172:4 173:11
174:10 175:6,18
177:7,11 178:13,24
179:8,13 182:14
185:2,15 186:12
190:11,25 192:24
193:14,24 194:8
195:14 197:12,25
198:2,7,21 199:9,17
200:8,19 201:20
203:18 204:17
205:2 206:5,21
207:5,11 208:25
211:3,16 213:5
214:4,14 216:7,25
217:17 219:5 220:2
220:8,23 221:11
223:3,13 226:6,20

229:14 232:5
233:22 240:25
241:4,11 242:5
243:16 244:14
246:17 254:23
**objection**
39:8 40:5 41:14 42:5
  43:19 44:9,18 45:6
  45:13 49:16 56:19
  57:12 84:17 86:20
  86:25 87:21 88:22
  97:15 100:1 101:20
  102:9,16 111:24
  112:20 113:1
  120:13 121:6,14
  122:3,15 123:24
  124:7 126:3 129:11
  130:6,14 135:22
  136:20 137:1
  140:18 141:9 163:3
  168:19 171:13
  176:21 177:21
  180:10 181:4 184:6
  187:7,22 188:17
  191:9,19 192:4,12
  193:17,17 194:25
  211:10 213:14
  217:24 219:14
  225:9 227:25
  232:24 236:13
  237:8 238:3 239:10
  239:20 240:6 245:5
  245:24 248:18
  249:13,22 250:16
  250:22 251:9
  252:23 253:11
  255:11
**objections**
69:6 72:14 189:4
**obliterated**
106:12
**obliteration**
106:5
**observation**
35:6
**observed**

203:7
**obstructive**
49:2,8 206:19 207:2
  216:14
**obvious**
115:10
**obviously**
230:22 248:5
**occasions**
28:1
**occupational**
84:10
**occur**
133:1 177:25
**occurring**
127:15
**odd**
163:8
**offer**
180:4
**offered**
39:22 184:3
**offering**
183:23 184:1
**office**
259:9
**offices**
1:18
**off-label**
88:7 95:5
**Oh**
12:23 210:23 216:21
**okay**
6:10 7:1,18,22 12:23
  13:3,17,22 14:8,21
  15:3 17:15 18:23
  21:2 22:10 23:8
  24:24 28:11 31:5
  38:18 39:14,21
  41:18,25 49:6 50:4
  61:5 63:7 87:4 97:3
  102:14 104:25
  110:25 117:12
  130:4 131:10 134:9
  135:2 144:5 147:7
  149:5 157:7 162:8

165:14 166:10
168:12 178:22
179:11 181:1
189:22 190:5,22
192:1,21 196:15
209:9 210:13 212:4
212:13 215:1,12
227:18 230:12
236:20 239:16
240:12 241:18
247:15 248:4 249:5
250:1 252:2,11,16
254:19 255:8
**old**
74:24 75:17 76:6
93:19
**older**
73:14
**once**
14:11 53:6 57:19
91:23 96:17 99:8
104:4 110:13 117:6
123:17 169:11,17
173:16 186:21
187:9 188:8 205:11
212:17 217:3
229:19 231:12
236:18 241:19
243:25 254:17
**ones**
84:25 125:3 230:20
230:23
**one's**
185:21
**one-third**
79:14 107:8
**ongoing**
31:12,15 35:8 44:16
**onset**
228:3
**ON-100/7**
215:6
**open**
80:23 189:20 252:8
**open-label**
148:25 156:16,21

**operating**
182:24
**opining**
250:24
**opinion**
33:5 37:7 70:15,17
76:17 83:19 98:12
107:19 111:19
112:17,25 123:20
124:3,19 129:9
130:4 135:18
155:21 184:4,23
186:8 187:4 217:14
217:22 221:22
225:13 227:21
229:10 251:6
254:19
**opinions**
180:4 183:23 184:1,3
245:21
**opportunity**
42:9 110:3 190:2
**opposed**
106:8
**opposite**
110:4
**optimistic**
43:3,11 45:11 177:9
**OPTINEB-ir**
215:6
**oral**
110:17 210:3
**orally**
111:20 115:18
157:15
**order**
78:15
**organize**
22:15
**original**
251:22 255:16
**originally**
149:8
**outcome**
27:10 55:2 58:23,23
143:18 167:24

179:6 257:12
**outcomes**
52:5 126:19 150:5
170:23 177:20
178:1,11 179:19
**output**
107:2
**outputs**
106:14
**outside**
176:12
**overall**
106:20
**overlaid**
77:10
**overlap**
192:15,19,20,25
**overlaps**
200:16
**oversee**
24:6
**overseen**
79:9
**oversight**
14:16
**overwhelmingly**
52:14
**Oxanna**
64:7
**oxygen**
110:20
**oxygenated**
107:8
**oxygenation**
111:15 138:6

---

**P**

**P**
2:5 3:12 4:4 5:1 35:4
147:1 174:15,25
176:5,6,8 199:18
204:20 205:5
221:12
**PA**
228:15
**page**

3:8 4:1 11:22 12:4,4
12:9 13:10,14 14:12
20:3,4 26:3,5,7,14
50:2,3,25 51:22
52:3 57:23 60:25
61:5,12 68:23 70:6
143:15,16 146:16
148:20 156:2
157:22 176:3
180:13 203:16
204:5,6 205:9,10,25
209:11 210:1 211:4
211:5 214:25 221:3
235:24 239:15
240:10 243:3
253:17 259:8,13
**pages**
23:25
**PAH**
36:4 77:23 86:14,17
87:11,19 88:12,21
90:13,18 91:6 93:6
93:11 94:3 106:8
114:19 122:23
201:7 212:22 213:3
214:16,17 244:8,16
245:2,14,15,17,22
246:7,10,16
**paper**
18:16 27:7,9 31:21
31:24 32:11 36:18
36:23 48:9,12 54:8
54:9,19,20 58:9,11
85:23 143:16
145:12,16 146:4,7
149:23 150:8 151:3
151:13 157:23
158:22 162:3
163:17 174:21
207:16,20,24 209:3
216:17,24 217:21
218:18 221:23
223:1,8,23 224:3,8
224:14 225:14
226:2 229:23
**papers**



18:15 82:24 88:16
208:12 222:6
**paragraph**
13:8 148:21 160:9
236:1,3,17 238:25
239:14,17 240:11
241:16 242:2 243:2
243:24 244:3
250:12,15 255:3,6,9
**paragraphs**
67:11,21
**parameters**
104:11 181:17
186:24
**parenchymal**
36:5 79:25 105:20
125:4
**parenchymally**
122:18
**Parikh**
229:1,7,10 231:23
232:22
**part**
9:2,21 14:16 59:16
63:8 85:7 90:14
91:14 94:12 102:23
104:2 112:17
157:12 208:17
217:2,21 218:23
219:7 224:21
**participants**
160:17
**participate**
110:20
**participated**
175:5
**participating**
110:9
**particles**
107:10 136:9,12
**particular**
89:16 132:17 194:16
228:7
**parties**
15:23 257:10,11
259:8

**parts**
49:20
**pass**
10:16 11:11,12 165:9
165:22,25 202:21
210:5
**passed**
11:15,20
**passing**
10:18 143:5
**patent**
14:25 15:2,21 16:6
17:11 68:19,24 69:2
69:25 70:10 179:25
180:3,8,9 181:3,7
183:23,25 184:5,24
185:12 186:8,20
187:18 188:13,20
189:11,14,19,20,21
190:1,8,9,15,19,24
191:5,8,16 192:1
193:10,21,21 194:6
194:18,24 195:18
200:18 233:7,21
237:4 239:8 240:3
241:7 242:3 243:14
243:15,25 248:16
249:1,17,25 250:3,6
250:24 251:1,7,8,15
251:23,23 252:4,20
253:4,6,10,17 254:3
254:16,20
**patentee**
16:2
**patents**
242:19 251:13
**pathways**
113:24
**patient**
26:2 53:4 54:15
56:24 57:9 64:4
71:11,24 72:3,9,22
77:22 81:1,5,25
82:4,6,11,12 84:15
85:10,21 86:17 88:1
90:23,24 91:18,22

91:23 92:16 93:1,1
93:16 95:15 96:14
98:22,23 99:20,24
100:7,21,25 101:16
101:22 102:8,18
103:13,23 106:21
111:5 113:17 116:5
116:10,11,13,19,23
117:1 120:4 122:13
123:23 124:6,22
126:19 128:8
130:21 131:15
132:24 136:7
137:11,23 138:15
138:20,24 139:24
140:4,16 141:18,24
142:7 151:16,18,24
152:1,5,10 155:11
157:9 162:18,22,24
163:8 167:9 170:22
181:16 184:21
185:1,4,5,18,20
186:3,10 187:20,25
188:10,10 193:5,11
199:2 219:24
220:20 226:5,19
245:2,4,8,22,23
246:13 249:9,19
252:21 254:21
**patients**
3:14 21:15,17 24:22
24:25 25:2,3,16,18
25:20,25 26:1 31:22
31:25 32:5 33:15,17
33:17,23 36:1,3,5
38:19 48:17 52:6,18
52:21,24 54:4,21
55:4,24 57:10,16
58:5,13,16 62:5,10
63:7,9,13,15,23
65:21 75:16,19 76:9
76:12,22 77:6,15,18
77:18 78:7 79:8
80:18 81:4 83:20
84:12 85:2 86:6,14
87:11,19 88:11,21

89:1,2,11,17,23,24
90:1,7,13 91:4,5,10
93:6 94:2,24 95:6
97:12 98:2,11 99:10
101:9,18 103:18
104:2,3 107:21
109:3 111:17 114:1
114:19,21,22 115:3
115:5 117:14
121:13 122:2,22,25
123:3,8 125:2 126:6
127:2,5,11,23 128:6
128:13 135:20
136:14,19,23 137:4
143:21 144:16,19
145:6,18,22 148:4
148:10 149:1,7,17
149:22,25 150:5,6
150:12,21,24 151:5
151:10,20 152:6,9
153:2,4 154:21
156:15,19,22
157:15 159:5
161:17 162:13,23
162:24,25 163:1,10
163:13 167:12,16
167:20 171:1
172:12,16,17,21,24
174:2 177:20 183:5
183:6,19 187:6
188:16 201:4,10,17
202:2,11 205:18
206:18,25 207:22
207:24 208:17,20
209:4 214:13
216:13 220:13,16
220:22 221:9,16,17
221:25 222:10,15
223:16 224:9
226:24 228:8 230:2
230:13,15,16,19,22
230:25 231:2,6,7,8
231:10,13,14,18
240:15,21 241:23
244:19 247:3
**patient's**

MAGNA
LEGAL SERVICES

132:21
**pause**
13:9 72:12 176:2
**PDE5**
123:15,17
**PDR**
182:23
**PDRs**
183:2
**pending**
7:21
**Pennsylvania**
2:17
**people**
9:19 78:17,19 83:14
140:2,6,20,21 161:9
114:25 159:19
160:2,6,20,21 161:9
161:12,13 173:19
234:6 245:19 246:6
246:8 253:24 254:5
**peptide**
174:12 175:4
**perceive**
102:2
**percent**
33:11 34:4,7 36:17
37:19 46:21 54:10
56:6 78:12 79:5,8
84:21 85:5 90:1,22
90:25 96:9 97:20
106:10,14,23,24,25
128:12,17 134:25
140:8,8,11,15,20,21
140:23,23,24 141:2
141:4,8,17,17,20
158:18 173:25
174:1 176:11,23
204:1,9,24 205:4
209:2 230:2 231:1
255:19
**percentage**
78:12
**PERFECT**
47:24 48:1 68:12
223:20 228:17
**performing**

137:12
**perfusion**
106:12 110:15
198:17
**period**
55:17 138:6 148:23
148:24
**periodically**
7:19
**periods**
148:22
**peripheral**
63:22
**permissible**
78:15
**person**
68:17 81:17 107:6
254:9
**personally**
41:7 60:19 88:19
140:16 162:18
**pertain**
52:7
**pertaining**
16:9,11 31:25 48:9
50:22
**pertinent**
13:25
**Peter**
30:3 44:1,2,14 45:3
46:15
**Peterson**
45:17 46:3,13
**PH**
26:18 28:7 47:16
48:19 49:12 53:3
55:23 57:10,17
75:22 76:15 79:8,10
88:2 89:17,17 90:1
90:6 97:14 98:8,15
98:20,23 99:25
100:6 116:6,20
117:2 118:21
120:12,17,23 121:2
121:12,13 136:23
150:18,24 160:5,7

161:7,19,20 163:22
167:19,21 175:5
177:19 178:10
179:4,5,18 184:10
199:23 214:13
217:13 222:22
224:4 225:19
226:18,19 227:23
227:24 230:3,15,16
234:11 242:4
243:22 245:16
246:7
**Pharma**
15:8
**Pharmaceutical**
61:7
**pharmaceutically**
236:5 239:4
**phase**
3:19 26:16 153:15
156:5,7,15 158:2,9
158:25,25 165:5
188:25
**phenotype**
89:6 91:24 93:7,12
94:3 95:21 201:7,13
222:11 246:22
**phenotypes**
201:12
**phenotyping**
151:16,18,25 152:1,5
152:11
**phon**
61:22 159:22
**phrase**
94:23 198:23
**physician**
234:20
**physiology**
110:12 202:3
**PH-ILD**
41:6,10 59:16,21
76:12 77:24 83:7,10
83:12,20,25 86:1
91:18,22 92:16 93:1
93:9,15,18,25 94:10

95:6 96:14 97:25
98:8,12,20,22,24
99:7,9,20,24 105:8
105:11 107:21
116:5 119:4 120:4
120:12,23 123:22
124:5,21 125:11
127:2,5,11 150:12
153:4 162:20 163:2
167:16 177:20
180:9 181:3 182:13
184:5 185:1,4,13
197:10 198:6
201:18 212:11,25
213:4 214:18
217:10,16,23 220:1
220:21 221:25
222:11 225:15,18
228:13 229:12
232:4 236:11 237:7
242:4 243:22
244:13 245:4,23
246:16 254:22
**PH-ILD-009772**
3:23
**PH-specific**
222:21
**PI**
64:2,5
**pick**
68:14 164:1
**picked**
14:15
**picture**
62:24 134:13,19
**pilot**
205:16 208:7
**pinpoint**
114:1
**pirfenidone**
26:17 68:10 152:18
**place**
109:20 257:4,5
**placebo**
32:21 37:22 59:6
101:8,11,24 102:14

102:20 131:18 141:12 147:3,15 149:12,14,17,19 150:2 156:9,19,20 156:23 169:5 171:22 172:3 174:16 175:17 186:24 194:22 204:16 205:1 231:10

**placebo-controlled**
3:18 148:24 153:15 154:3 165:5 189:1

**placebo-corrected**
38:8

**placed**
156:15

**plaintiff**
1:6 2:3 5:25 6:6 16:25

**Plaintiff's**
11:9

**plan**
47:9

**Plastiape**
63:1

**play**
151:25 152:1

**please**
5:17 11:13 17:16 19:23 20:3 249:4 250:12 259:6

**plus**
152:17 165:17 171:20,22 172:20 174:14 175:15,17

**pneumonia**
33:16 154:1

**pneumonias**
84:2

**Pneumonia-Associ...**
3:17 153:13

**pocket**
133:3

**point**
12:21 13:2 44:15,17

49:21 53:11,14 56:7 56:13 82:16 89:7 90:19 99:15 101:1 108:21 150:19 155:16 178:9,10,18 179:3 183:16 201:12 203:8 211:4 222:7 224:2 234:7 234:15 245:21

**pointed**
63:20 222:13

**points**
56:3 67:7,10 172:17

**Poms**
232:1,12,13,19,20

**Pond**
6:15

**population**
53:4 54:15 56:25 57:9 75:19 84:15 111:23 120:4 125:11 139:2 157:9 162:19 167:9 219:24 220:11,21 226:5

**population-based**
101:13 141:18 163:12

**portions**
10:2,8 66:17,18,21 70:19 112:8 114:16

**posed**
253:4

**position**
22:2,6 23:3,9 24:3,5

**positions**
22:19 23:12

**positive**
35:2 42:11,21 52:14 108:23,24 113:4,24 164:13 169:15,17 223:24

**possibility**
36:7

**possible**
71:9 91:13 111:2,3

112:13,22 118:10 179:9,18

**post**
31:11,14,20 32:7,13 32:22 35:9,17 37:2 37:6,13 38:22 51:5 51:21 52:2,9 53:3,6 54:1,7 56:11 117:20 118:14 146:3 149:21 173:5

**postgraduate**
20:5

**post-INCREASE**
95:15

**potent**
103:16

**potential**
48:16 52:23 138:8 217:8,10 222:21

**potentially**
100:13 162:12 201:6

**powder**
62:11 127:8,12 129:3 131:24 132:9 133:25 134:6 135:4 135:8

**power**
35:13

**powered**
35:5,9 121:5

**practice**
20:10 25:7 72:23 76:23 78:7 96:11 104:1 136:17 246:14

**practitioners**
114:13

**precapillary**
75:7 76:15,16

**predict**
104:19

**predicted**
33:11 34:5,7 36:17 37:19 204:1,9,24

**predicting**
58:4

**predictive**
124:4,20 125:1

**preface**
224:23

**preferably**
214:20

**preferentially**
112:7 114:15

**preliminary**
11:10

**premise**
65:19

**preparation**
9:16 51:2,18

**prepare**
9:25 67:12,15,15 70:13,19,20 255:9

**prepared**
9:5 66:19 255:10

**preparing**
8:19 70:1

**prescribe**
95:7 123:7

**prescribed**
99:19 121:13 122:1 123:2

**prescribing**
85:10 88:20 95:11 96:13 209:12,20

**prescription**
96:10,18

**prescriptions**
95:4,7 97:21 210:2

**present**
73:6 207:18 239:2 243:9,15

**presentation**
132:8

**presentations**
132:13

**presented**
159:9 178:22,25 220:14

**preservation**
32:20

**Preserves**

**MAGNA**
LEGAL SERVICES

3:13 145:5
**preserving**
198:16
**prespecified**
143:18
**press**
92:8
**pressure**
72:21 73:15,21 74:5
74:11 75:5,13 93:21
103:7 125:6 182:16
182:18,19,22
184:13 187:11,12
222:9 227:3
**pressures**
73:2,4 100:9,13
103:17 107:16
159:5 183:9 185:6
186:5 187:13 188:1
188:9 226:23
251:18
**pretty**
46:20 54:10 58:16
103:16 109:12
174:4 205:14
**prevent**
236:6,24
**preventing**
138:22
**Prevention**
139:6
**previously**
19:11 114:24 142:5
156:20 205:15
208:3,6,7 222:7
**primarily**
10:10
**primary**
21:16 27:15,16,20,24
27:25 28:2 44:22
45:5 54:3,19,20
68:17 81:6,9 108:25
120:19 143:18
148:19 149:4
167:24 168:2
169:11,12,16 170:1

170:10 178:2
188:23 229:17
**principal**
61:23
**principle**
112:15
**prior**
15:9 19:13 41:5
42:20 66:1,7 68:5
89:1 95:24 96:14,22
99:2,5,9,13,14,16
99:18,22 115:12
120:2 122:13 123:3
123:8
**prisoner**
169:12
**privy**
45:25
**probability**
26:18
**probably**
23:14 31:12 35:3
38:25 80:24 84:20
85:4 88:4 89:21
96:22 105:3 111:10
111:16 114:2
123:11 134:24
160:23 161:8,12
211:23 230:23,24
**problem**
30:13 39:4 124:10,16
213:23 247:4
**proceedings**
1:20 256:5 257:4,5,7
**processed**
107:1
**PROCTOR**
1:19
**produced**
36:13 178:16
**produces**
34:17
**product**
63:21 211:15
**production**
142:25 189:12 196:4

202:19 209:14
210:4 224:12 229:2
233:9
**professional**
23:8
**professor**
22:21 23:4,9,17
**program**
22:4 24:7,8,10,14,15
24:17 118:17
232:15
**programs**
24:9
**progresses**
172:14
**progression**
117:6 177:19
**proliferation**
118:9
**proof**
163:21,24 164:8,12
164:16,20 165:3
193:4 219:16
**properties**
117:17 118:13
119:11,14,21
**proportion**
25:25 86:8 94:25
95:18 99:11 245:13
**proposed**
134:14
**PROs**
170:22
**prosecuted**
69:21
**prosecution**
68:24 69:1,16,25
**proteinoids**
181:19 183:18
**protocol**
39:14 40:10 61:17,20
63:14 65:1,9,16
66:2
**prove**
164:5
**proved**

164:10
**provide**
7:9,25 113:21 137:12
158:23 176:5,6
187:5 194:19
221:23 223:1
225:14 227:22
228:12 229:11
**provided**
40:10,13 65:10 66:25
68:1,8 133:8 135:20
159:1 166:23
174:25 184:24
187:21 188:13
219:16
**providers**
25:24
**provides**
135:3 143:20 186:9
226:4,18 228:3,14
243:6
**providing**
92:9 114:3 144:10
185:18
**proving**
173:14
**Public**
1:17
**publically**
253:20
**publication**
26:24 51:12,20 54:4
92:10 131:23
142:23 145:20
146:11 148:11,19
149:4 150:16
153:11,23 154:11
158:22 163:20
166:23 203:9
206:10,16,23
208:22 217:7,15
218:11 225:7
226:17 229:4
231:23 232:23
233:8,8
**publications**



17:21 50:3,7,10,22
51:1 216:23 219:1
225:5
**published**
18:16,17 27:3 32:9
51:19 143:13 145:8
146:4 150:8 158:17
165:19 202:17
203:3 206:20 207:1
224:11
**pulled**
250:3
**pulmonary**
3:14,17 14:22 20:13
20:16,22 21:8,11,13
21:16,17 22:15,16
24:9,10,14 25:15,18
25:21,25 31:22 32:5
33:18 42:17 49:1,4
49:7,8,23 52:6,18
52:22,25 54:4,16,21
58:5 65:22 72:17,19
72:20,21,23 73:6,14
73:16,20,22 74:4,7
74:11,13,18 75:4,5
75:8,9,12,13 76:9
77:8,9,11,13 80:17
80:20,21,24 81:4,6
81:9,12 82:7,13,17
82:20,25 83:15
85:18 86:10 89:4,12
91:25 93:20 94:14
94:19,24 95:17 98:3
99:10 100:10 103:7
103:8,21 105:20
106:5,11 117:9,14
122:1 125:6,12
142:24 143:12,22
144:19 145:7
150:21 152:6,10
153:13 154:1 159:4
159:6 160:11
162:13 165:18
167:13 180:15,22
180:25 181:2,8,10
181:22,24 182:2,4,6

182:8,11,16,18,19
182:21,22 183:1,7,8
184:9,12,20 186:17
187:11,12 188:6
193:5,11 196:3
197:9,10 201:2,8,9
201:14 202:16
203:1 205:18
206:11,18,19 207:1
207:3 208:11,14
212:8,23 215:24,25
216:11,13,14 217:9
218:2,5,12 219:8,18
220:17 222:7,9
224:5,10 226:23
227:2,3,7 229:1
231:15,16,19
232:14,18 237:1,12
237:19 238:8,9,19
241:23,24 242:15
244:7,17,20,23
245:11,12 246:2,6,9
246:11 249:10,19
251:16,17 252:21
**pulmonologist**
234:21
**pulse**
130:10,12,21,24
131:14,20,24 132:4
133:1 215:10,14
**pulsed**
130:5 132:9 133:8
135:9
**pulses**
132:21 133:20 135:4
**purely**
57:14 245:17
**Purpose**
198:14
**purposes**
60:21 202:10
**pursuant**
1:16
**put**
58:21 67:25 77:17
106:13 200:23

238:6 242:21
**putting**
75:15 229:23
**p.m**
142:16 196:18,19,21
247:20,21 256:6

---

### Q

**qualify**
84:21 93:5 99:9
164:7 221:13
**quality**
141:17
**question**
7:21,21 51:15 78:14
104:5,7 113:8
114:24 115:25
121:22 124:17
143:7 173:15
180:16 185:25
195:6 213:23
233:13 252:15,17
252:25 253:4
**questioning**
7:8 69:10
**questionnaire**
168:5,9,24 169:3,21
170:16,17
**questions**
7:9,10,15 113:14
170:24,25 172:19
248:5,10,15 253:18
254:11,14 255:25
256:2
**quick**
64:14
**Quinn**
30:3
**quite**
34:22 77:15 87:25
118:9 174:23 183:2
222:8,9
**quote**
159:10

---

### R

**R**
5:1
**raises**
172:18 173:15
**randomized**
3:18 41:6 42:20
152:22 153:14,24
154:2 155:4 158:3
165:5 189:1 231:5
231:18
**range**
25:17 230:9,9
**rare**
28:1 84:25
**rationale**
65:16 159:1 216:24
217:22 218:1 219:3
225:8 228:4,14
**ratios**
53:12
**RCTs**
42:19
**reach**
53:18
**reaches**
179:4
**read**
23:14 109:13,14,16
146:6 178:15 208:3
208:6 210:23
250:20 252:18
258:4
**reading**
187:18 258:1
**reads**
245:9
**real**
101:25 140:10,13,17
156:18
**really**
13:21,25,25 34:20
40:13 68:8 98:20
101:23 137:22
170:24 174:23
179:17 208:15
228:12 231:20



**realm**
242:18
**reask**
121:22
**reason**
7:24 31:13 52:20
55:1 64:2 111:21,23
112:18 113:9,10,11
113:13 117:17
176:7 229:24
259:13
**reasonable**
46:23
**reasons**
222:18
**recall**
9:15 10:7 13:19
14:23,25 15:13
16:21 17:6 18:10
19:10 25:12 26:21
26:23 27:8,10,17
29:12 30:9,19,23
33:10 36:20 38:24
39:2,7,24 40:1,16
40:18 41:12,16,18
41:23 43:24 44:6
45:8,20 46:14 50:11
51:8 54:5,13 55:9
56:7 57:15 61:20
63:18,22 65:2 67:21
68:2 69:24 71:7
76:10 81:13,24 82:3
82:19 84:9 85:10,14
85:21 86:3,17,22
87:8 89:15 91:18,21
92:16,18 93:15
94:10,18 95:2,11
96:2,5,25 97:7,11
109:7 111:9 114:7
131:23 132:5,8,16
134:3 141:6,15,16
145:16 159:18
183:15,22 184:1
203:10 211:20
216:21,22 226:1
235:13 248:15

252:25 253:2 255:3
255:5,14,15
**receive**
60:19 156:21
**received**
44:14 60:3,7 116:2
226:25
**receiving**
93:2 96:14,22 116:2
122:14 123:3,8
147:3
**Recess**
64:17 142:15 196:18
247:20
**recites**
249:8
**recognition**
82:20
**recognize**
211:1 222:23
**recognized**
114:14
**recognizes**
246:3
**recollection**
37:1,17 38:16 96:13
96:17,21
**recommendation**
214:21
**recommended**
213:19 214:7
**recommends**
156:11
**record**
5:3 6:14 64:16,20
124:14,14 125:16
142:14,18 153:19
172:18 196:17,21
228:22 247:17,19
247:23 256:4 257:7
**recorded**
7:1 257:6
**recruitment**
88:12
**red**
107:6,10

**redirected**
108:9
**reduced**
174:15 202:4
**reducing**
198:17
**reduction**
56:7 138:11 226:23
**REE**
81:16,21
**refer**
110:1 183:21
**reference**
13:24 68:23 158:1
206:2 208:15
213:17 215:3
216:20
**references**
205:21,24 207:15
225:2
**referral**
21:15
**referred**
131:23 132:9 144:25
215:5 244:5
**referring**
67:11 94:6 98:14
147:9 158:11
246:10 253:10
**refers**
58:3 79:24 80:17
144:10 165:23
181:22 182:10
190:16,20 206:2
240:13
**reflect**
194:12
**reflecting**
203:4
**reflects**
161:8 175:9
**regard**
20:9 38:6 51:6 56:24
75:1,11 86:10 93:9
93:10 98:11 102:21
126:5 140:24

181:10 244:20,23
**regarded**
89:5 130:17 133:21
161:7 163:12 201:6
245:14
**regarding**
15:20 18:12 19:6
41:3,25 44:14 46:13
144:11 194:21
**regards**
48:11 75:15 220:11
**regime**
192:10
**Registered**
257:2
**rehab**
231:15,16,19 232:14
**reiterate**
138:3
**relate**
248:16
**related**
117:2,8 257:11
**relates**
131:20 236:4,21
**relation**
247:10
**relatively**
112:13
**release**
92:8
**reliable**
128:5
**relied**
65:25 206:10,16,23
233:18
**relies**
73:1
**remain**
31:12
**remained**
35:7
**remaining**
73:23
**remains**
119:23 164:24

remember
  16:5 17:10 25:10
  29:16 30:10 35:4
  39:21 57:18 63:12
  70:23 81:5 82:6
  87:24 88:5,25 96:9
  96:18 106:22
  159:12,22 160:14
  177:12 201:11
  235:16 250:23
reminder
  69:10
Remodulin
  240:14
renowned
  160:4 161:18
reorganize
  22:17
repeat
  28:25 124:17
rephrase
  48:25 82:2
report
  12:1,4 14:6 15:10
  70:1,8,14,15 116:3
  126:19 143:11
  145:1 146:23
  147:21 148:2
  153:24 160:9 180:4
  189:15 207:24
  210:16 221:3 225:2
  230:5
reported
  54:3,6 151:4,13
  170:23 199:7
  207:25 222:14
reporter
  5:15 27:19 121:21
  171:18 208:4 257:2
reporting
  147:12,19 221:18
represent
  5:18
representatives
  30:1 40:3
reproduction

202:25
request
  5:12 12:6 14:10 26:4
  61:1,13 64:23 66:14
  70:7 143:6 168:15
  212:16 215:19
  227:17 243:5
  248:24 252:10
require
  125:4 165:4 193:21
required
  155:22 165:2
research
  60:4,7,16,21 61:7
  157:24
researched
  129:19
reserve
  122:20 248:5
reside
  247:12
resident
  21:20 81:7
residual
  106:25
resistance
  73:17,23 74:7,13
  75:9 103:8 125:7
  129:21 136:1 201:3
  201:8,9 222:8 227:4
resistances
  54:22
respect
  12:13 29:6 32:14,24
  37:18 38:1 46:9
  53:3 55:23,25 57:11
  71:11 72:9 74:17
  76:20 83:18 122:12
  146:15 147:12
  148:9 151:4 164:17
  204:10,14,23
  210:25 211:7
respiratory
  27:4 32:10 74:2
  158:17 168:4
  169:21 170:17

respond
  7:15 49:24
responders
  52:19
response
  158:4 220:6
responses
  7:3 55:7
responsibilities
  24:4 46:9
responsibility
  29:5
restart
  141:23
restate
  136:22
restricted
  202:3
restriction
  202:2,6
restrictive
  201:24,25 202:9
result
  100:14 164:13
  177:10 184:16,17
resulted
  102:20
resulting
  194:19
results
  43:8,10,18,25 45:3
  51:13 52:15 53:2
  66:1 74:23 80:6
  87:15 88:6 91:20
  92:1,5,10 93:2
  95:25 96:15,23
  99:16,17,19,22
  116:3 122:14 123:3
  123:9 146:17,18
  159:9 164:1 165:4
  177:13 199:5 203:4
  219:23 221:2
  226:13
retrospective
  222:5,6,12,19,23
  229:20 230:22

retrospectively
  35:14
reveal
  69:11
reverse
  117:7 118:8,11
reversing
  117:14
revert
  75:17
review
  259:6
reviewing
  69:24
revise
  158:25
revised
  69:19 209:13,21
  210:4
revision
  54:8
rich
  52:13 234:8,9,10
Richard
  28:24
right
  18:21 50:11 73:1,4
  89:19 106:13 128:9
  145:19 156:25
  170:1,4 176:16,20
  182:1 200:18 243:3
  243:22 248:6
Right-sided
  3:15 145:7
rigors
  231:17
RIN
  28:7 47:16
Rio
  159:3 162:11,19
riociguat
  3:16 103:16 115:15
  115:17 121:18
  153:11,25 155:18
  156:8,21,24 157:14
  158:3,22,24 159:17

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000777

**riociquat**
41:9 103:19 104:6
107:25 111:20
115:7 150:23
**RISE**
41:8 42:1,4 68:10
103:14 154:4,7
162:4,9,17
**RISE-IIP**
3:18 153:14 159:9
253:21
**risk**
31:25 32:3,4,4 53:15
56:6 58:4,15,17,18
58:22,23,24 59:1,3
230:18
**risks**
128:1
**RMR**
1:22 257:17
**Road**
2:6
**Robert**
234:24,25 235:1,7,12
**Robertson**
16:13
**robust**
152:22
**Roger**
235:18,19,20,21
**role**
47:3 62:2,10 63:8
112:23 117:13
151:24 152:1
222:21 255:20
**rolling**
156:21
**Roscigno**
234:24,25 235:1,8,12
**rough**
85:6
**roughly**
82:19
**row**
159:23
**RS00**

63:2
**Rubin**
162:1 254:2,8
**rule**
55:20 59:6 90:23
162:21
**ruling**
55:18 138:8
**run**
13:1
**rush**
136:12
**ruts**
92:5
**RVSD**
146:24

---

**S**

**s**
5:1 10:15
**sac**
109:21
**saccharidosis**
24:17,19
**safe**
120:3 229:18,24
**safeguard**
155:11
**safely**
199:24
**safety**
35:24 36:8 120:8
148:12 149:20
155:12,22 157:8
206:17 216:12
228:24
**salt**
236:5
**salts**
239:5
**Sanya**
2:15 5:22
**saw**
12:18 32:18,25 35:20
63:23,24 82:10
97:13 116:18

117:19 118:20
139:10 157:7
177:13 218:21
**saying**
36:19 75:21 95:2
97:11 105:12
152:14 159:12
185:6 201:18
**says**
22:10 100:21 143:17
144:7 157:23 172:9
180:24 182:4,6
186:3 190:3,6
193:15 198:14
205:15 210:14
214:9 238:10 239:2
252:24 253:10
**scan**
79:2
**scans**
90:2
**scarring**
79:2 80:5,18 117:7
118:6
**scenario**
108:12
**scenes**
45:23
**schematics**
134:5
**school**
23:16,18
**scientific**
67:23 159:1
**scleredema-related**
238:8
**scleroderma**
89:25
**score**
31:25 32:3,4 168:4
**scores**
147:3 148:4
**screwed**
147:8
**second**
27:8 28:25 180:20

198:14 203:20
209:11 210:1 211:5
239:15
**secondary**
44:23 45:5 108:25
164:2 169:13 230:3
**section**
61:2,6 70:8,13
146:18 200:4
205:14 213:1
214:25 216:3 243:4
254:4
**see**
11:17 13:1 14:12
21:19 22:8 24:22
25:4,24 26:8,19
28:9 47:17 50:18
51:25 52:24 58:1,7
58:14 61:9 62:5
64:3 65:20 70:11
77:6,21 78:7 79:2
80:25 88:2 107:19
115:3 117:18 125:9
134:15 135:19
138:18 143:23
144:6 146:17 147:4
155:21 156:6,7,17
157:22 158:1,5,9,9
160:13 168:8
171:10 172:7,19
173:25 175:21,22
176:1,3 181:15,20
181:23,25 182:1,3
182:10,25 185:12
186:23 187:2,9,13
188:19,22 190:15
190:18,19,21 193:2
193:7 195:20
198:13,18 199:25
200:3,4,5,13,14
201:23 203:12,25
204:8 205:8,13,19
206:13,14,22 207:4
207:6 215:2,7,8,9
215:11 216:20
220:10,12 221:6



224:17 225:1
230:10 233:13
234:2 235:25 236:9
237:2 238:17 239:2
239:6,19,24 240:2
240:17,23 241:25
243:11 244:10
249:12 254:4
**seeing**
21:17 24:25 25:2
62:10 63:12 81:5
140:13,14 181:23
182:3 213:17 214:6
**seen**
25:3 57:9 62:11,15
62:23 63:15 117:4
127:10 133:24
134:5 135:12,12
143:8 145:12
166:12 178:15
196:12 197:2 200:9
216:17 218:18,20
224:14 226:14,15
229:4 233:14 235:6
246:13
**segment**
242:15
**segmented**
83:13
**send**
19:23
**sense**
7:5,11 10:23 27:13
60:6,11 128:12
**sent**
19:24 40:9
**sentence**
144:6 198:14,18,20
**separate**
151:23
**September**
257:21
**series**
228:7
**service**
22:16,17

**Services**
5:14,16
**session**
159:11,15 160:4,10
160:15 161:15,17
161:24
**set**
230:7 257:5
**setting**
101:16,19
**seven**
149:19
**Seventy-five**
68:4
**Seventy-three**
68:3
**severe**
52:6 78:23,24 83:15
86:8 91:25 93:23
94:2 98:4 122:21
125:1,3 201:13
245:12
**severity**
150:19 179:4 247:9
247:10
**SGRC**
147:22
**SGRQ**
147:2,25
**shaded**
157:23
**shape**
10:17
**sharp**
224:23
**sheer**
106:16
**sheet**
258:8 259:7
**Shekel**
126:21
**short**
137:12
**shortness**
55:16 137:19 138:5
168:24 169:3

170:16
**short-term**
152:15
**show**
53:9 55:3 79:17
113:24 149:16
153:5 165:3 168:7
171:3 174:21
178:17
**showed**
37:12,18 53:20
112:18 148:12
152:19 162:11
163:20 175:16
**shown**
119:20 169:5 171:12
174:9 217:12
**shows**
77:22,23 171:25
175:15 176:17,18
241:22
**shunt**
110:2,12
**shunted**
110:2
**sic**
16:14
**sickest**
172:24
**side**
106:13
**side-by-side**
252:13
**signal**
35:20 48:15 155:17
**signals**
155:22
**signature**
12:8 259:23
**signed**
259:7
**significance**
34:16 53:10,18,23
57:21 71:5 72:2
142:6 174:24
**significant**

33:7,13,21 34:18
36:13,21 37:8,18
38:2,11 50:6 54:14
55:25 56:18 57:1
71:10,22 72:8
141:17,21,25
147:13,22 148:3
151:5 170:11,15
174:20 175:23
176:10,15,20 177:2
177:5 187:15 188:3
199:16,20 204:2,20
205:5 221:3,10,14
**significantly**
147:13,21
**SIGNING**
258:1
**signs**
77:23,23
**Sildenafil**
3:13 26:17 68:10
89:9 92:16 93:1,16
96:8 97:25 100:8
121:18 122:7
123:14 142:24
143:12,19 144:18
145:5 146:25
147:15 148:24
149:1,11,13,18,19
150:2,12 152:17
165:17 167:8 168:9
169:4 171:21 172:2
172:21 173:12
174:14 175:15
**silence**
159:21
**similar**
157:6
**simple**
58:4 115:6
**Sinai**
21:14 81:14
**single**
71:11 72:2 190:16
226:25
**single-centered**

229:20
**sir**
227:20
**sitting**
8:22 10:7 12:15 17:6
  18:10 36:11 39:24
  40:1,16,18 96:12
  121:11 131:22
  132:7,16 135:2
  159:23 176:19
  179:12 195:12,16
  207:10
**situation**
107:9
**six**
54:11 128:1 190:17
  191:25 192:2
**Sixth**
73:19
**six-minute**
53:25 54:2,6,14,24
  100:23 126:1,10,23
  137:7,12 144:18
  146:25 147:14
  151:6 153:5 199:6
  199:11 221:4,8
  222:14 230:5,11
  231:4,16 240:15,20
  241:9
**skeptical**
108:22
**skepticism**
44:7 52:16 54:25
**slightly**
237:11
**Slobin**
64:7
**slower**
121:24
**small**
56:9,21 141:20 158:2
  158:9 181:16
  242:15
**smaller**
53:7,8 57:19 236:22
**Smith**

30:3 44:1,2,14 45:3
  46:15
**society**
74:1,2 138:4
**solely**
82:14
**solid**
240:1,5
**solution**
209:13,21 211:9
**somewhat**
35:21 124:25 218:7
**soon**
85:24 87:4
**sorry**
12:24 17:16 28:5
  39:2 47:12 48:24
  52:1 53:16 61:2
  69:5,7 71:18 74:3
  101:10 126:18
  143:25 149:3
  153:18 174:16
  180:20 191:14
  193:16 194:2 204:6
  204:12 211:20
  213:20,21 218:23
  224:17 251:12
**sort**
78:11 253:19
**sorts**
113:24
**sound**
113:13
**sounds**
7:12 142:12 178:14
  230:17
**source**
195:17
**South**
82:8
**space**
110:8,11
**speak**
86:9 232:7
**speakers**
59:17,21

**speaking**
161:9,10,11
**Speaks**
181:5
**specialty**
20:9,13
**specific**
39:25 40:2 94:16
  96:21 104:7 151:12
  151:21 181:9
  213:17 242:9,12
  252:14
**specifically**
45:21 52:17 87:8
  117:19 189:23
  228:6 250:14 253:2
**specification**
194:20
**spectrum**
78:17 86:5 93:22,24
  110:5,13 140:20
  141:3 247:7
**speculating**
90:16 91:3 111:10
  163:6
**speculation**
185:16 188:18 223:4
  232:6 245:25
**speculative**
91:14 117:15 118:2
  169:8,10 176:6
  242:6
**spirometry**
120:7
**split**
25:6
**spoke**
68:11
**sponsor**
39:12,19,22 44:4
**springs**
60:1
**squeeze**
25:4
**SS**
257:1

**St**
168:4 169:21 170:17
**stage**
44:16 118:6
**stages**
118:4,8
**standard**
96:10 199:13 240:20
**standpoint**
44:4
**stands**
139:17 197:19
**start**
21:18 39:23 63:25
  99:5,21 104:4
  115:16 162:22
  241:16 251:14
**started**
23:24 38:22 81:19
  127:11 128:13
  172:12
**starting**
117:22 200:6
**state**
5:17 6:13 160:10
  220:13
**statement**
198:13 205:13 206:9
  208:2,6 241:3
**states**
1:1 179:25 180:16
  189:11 233:7,21
  236:3,20 243:7
  244:3
**statistical**
34:5 47:8 53:9,18,23
  57:21 71:5,21 72:2
  142:6 174:24
**statistically**
30:7 33:7 34:17
  36:13,20 37:7 54:14
  55:24 56:17 57:1
  71:10 72:8 141:16
  141:21,25 142:6
  147:13,22 148:2
  174:20 175:22



176:9,15,20 177:1,5
187:15 199:15,19
204:2,20 221:10,14
**steering**
26:11,16 28:7,11,16
28:22 29:1,6,21
31:6,7,9 39:11
40:19 41:8 42:3,8
45:24 47:14,15,25
48:5,12 59:23
197:22 225:24
231:25
**stenographically**
7:2 257:6
**Stenotype**
1:21
**STEP**
146:3 157:4
**STEP-IPF**
145:1,17,22 146:10
148:5,11 152:14
157:2 163:19
**Steven**
1:13 3:2 5:4 6:4
10:15 11:8 154:10
202:18 258:10
259:24
**Stewart**
234:8,9,10
**stick**
230:23 231:2
**stickers**
10:23
**stiff**
244:7
**stop**
101:3
**stopped**
48:14 154:25 155:3
155:23
**straight**
203:12
**strain**
175:9
**stratify**
32:4

**Street**
1:19 5:11
**stress**
175:9,10,12,16
**stretch**
106:16
**strict**
55:13 76:21 77:7
**strike**
39:22 40:17 49:2
79:6 104:9 153:3
219:23 232:11
**strongly**
56:14
**studied**
158:24
**studies**
26:12 27:25 42:10,12
42:20 61:8 66:1,5,6
66:6 68:5,7,9 91:11
101:13 111:6,10
119:15 138:16
150:4 175:4 183:20
183:21 195:20
205:16 208:7 231:6
235:12
**study**
3:19 26:15,16,21,25
27:11,12,12,14 28:8
29:15,20,23,23 30:2
30:21,25 31:2,7,11
32:1,6,14,18,25
33:21 35:5,14 36:14
38:4,12 39:5 40:4
40:14,17,19 41:4,6
41:9,10,11,13,19
42:1,2,15 43:3,11
43:12,18 44:4,8,15
44:20 45:3,11,18
46:10,13,17,22 47:4
47:16,22,24 48:1,10
48:14 49:14,19,20
51:7 52:17 56:25
58:13 59:24 61:17
62:3,6 63:8,22 64:1
65:1,5 68:12,16

71:21 73:12 74:23
75:19,21 76:3 81:15
81:17 83:20 84:16
84:22 86:24 87:15
88:6,13 89:19 90:14
90:19,23 91:5,20
93:2 94:13,13,18
95:25 96:15,23 99:3
99:6,10,15,19,23
101:1,9 103:15
107:21 108:22
111:9,22,23 112:19
113:3 116:4,12,18
117:13,18 118:15
119:2,10,12,24
120:2,10,21 122:14
123:4,9 139:2,11
141:6,19 143:17
144:7,17,25 145:1
145:17 146:3,3,10
148:5,24 150:16,23
152:16,18,23
153:15,25 154:3,4,7
154:15,21,22 155:3
155:4,10,19,22
156:6,8,12,23 157:1
157:3,9 158:3,11,14
158:24,25 159:2,10
159:16,24,25 160:1
161:16 162:4,9,9,17
163:20 164:2,10,13
164:14,17 165:3
166:16 167:6,24
168:22 169:14,17
170:18 172:13,14
188:20,23 194:7,13
194:24 195:6,8,21
195:22 201:10
203:1,5,8 216:24
217:7 219:4,13
222:5,12,23 223:2
223:15,18,20 225:7
225:8,21,23,25
226:3 228:15,17,17
229:19 230:22
231:9,18,20 232:22

235:17 241:22
253:21
**studying**
218:1 228:14
**stuff**
10:10 66:24 67:6,8
67:12 142:9
**stuffiness**
224:25
**subcutaneous**
122:9,17
**subcutaneously**
85:12 122:19
**subgroup**
33:17 37:15 54:15
55:24 57:10 84:3
145:17,21 146:10
146:15,22,23
147:12,23 148:4,10
151:4,12 152:14
**subgroups**
33:14 38:20 117:19
**subinvestigator**
61:22 62:3,5,10 63:9
**subject**
13:24 15:19 16:6
31:23 247:11
**subjects**
119:23 146:23,24,24
147:3
**submission**
31:21 51:2
**submitted**
8:13 11:2,16 12:1
63:14
**subpopulation**
94:17
**subsequent**
20:15,21,24 21:7
23:19
**subsequently**
12:18 42:11 67:17
73:18 164:9,24
217:12
**subset**
201:18

**MAGNA** ▶
**LEGAL SERVICES**

**substance**
9:8 69:11
**substantial**
40:8 56:14
**substantive**
17:24
**substitute**
64:3
**sub-I**
63:13,25
**Succa**
159:22
**succeed**
43:4,12
**success**
41:3,7
**successful**
40:20,24 41:13,20
44:8 45:11 49:20
**successfully**
154:19 201:15
**suddenly**
136:11
**suffered**
56:11
**suffering**
246:15
**sufficient**
150:19
**suggest**
205:16 208:8
**suggested**
56:13 158:3
**suggesting**
124:4,20 144:14
**Suite**
2:6,18
**Sukduang**
2:15 5:22
**Sullivan**
234:17,18
**summation**
173:6
**Sunday**
1:11
**superimposed**

80:20 105:9
**supplement**
54:19 203:16,17
205:9
**supplementary**
3:21 165:23 166:7,22
168:18
**supplements**
203:11
**support**
11:9 37:7 66:1 225:7
**supported**
218:6
**supposed**
227:6
**sure**
8:23 9:1,20 10:20
14:1 16:22 29:18
36:18,24 40:25
46:20,25 54:11 66:5
88:4 105:4 109:14
113:10,12,22 116:8
125:20 155:8
174:19,23 175:25
176:9 178:3,20
187:16 194:10
195:4,16 197:18
207:21 211:23
220:11 221:16
223:6,16 232:15
235:5 242:22
**surprising**
35:22
**surrogate**
105:2,13,14,16 126:6
**surrounds**
80:1
**suspect**
9:2 45:22 129:20
160:21 176:5 209:5
223:6,11
**suspended**
163:9
**switch**
195:22
**switched**

128:14 149:17 150:1
**switching**
127:10,12 135:19
**sworn**
1:16 6:6
**Symposium**
73:19 74:21
**symptoms**
212:9
**system**
215:3 226:10,12
**systemic**
110:17 111:20
115:17 157:17
182:21
**systemically**
108:13,17 115:15
**systolic**
182:18 187:10
**S2**
170:2,6 203:14,16
**S3**
168:14,17 169:19
170:6
**S343**
196:2
**S5**
171:7,8,12,25
**S6**
203:24,24 204:6
**S7**
174:6,9 175:14 176:1
176:18

**T**

**table**
3:1 10:17 66:12,19
67:25 149:2,6
155:25 181:13,15
181:19,22 182:5
183:12 186:19,23
187:4,21 195:7,20
195:24 203:14,16
204:6 213:20
220:15
**tables**

195:9,10
**tadalafil**
122:10 123:7,12,16
**take**
7:18,22 64:9,11,12
64:13 74:7 106:22
109:20 113:17
125:18 127:21
129:20 142:10
151:12 163:24
186:4 232:17
237:11 247:14
**taken**
1:18,21 5:10 64:17
131:16 142:15
196:18 247:20
**takes**
131:15 138:16
**talk**
65:4 83:12,14 106:15
109:5 110:7 139:16
159:8 176:1,3 185:3
185:5 232:11 246:7
**talked**
17:4 51:5 71:4 72:17
76:8 79:19 114:4
146:2 154:8
**talking**
13:11 29:17 73:9
75:7 82:18 99:1,14
137:3 141:11 206:4
238:13 245:10
**talks**
17:22 59:16 113:8
251:16
**tangential**
218:7
**Tapson**
28:24 29:2,3 41:19
48:2,3,3 231:24
232:2
**Tapson's**
30:24
**teach**
250:25 251:7
**technicalities**



131:14
**technically**
131:19
**TECHNOLOGIES**
1:8
**Technology**
5:7
**tell**
15:18 34:13 46:24
  54:10 101:12
  139:16 211:25
  235:13 242:10
  250:3
**telling**
36:24
**tells**
101:23
**tend**
77:20
**term**
98:8 151:15 152:18
  152:20 164:16
**terms**
29:10,20 30:5 31:25
  32:20 33:12 40:11
  55:15 62:7 68:21
  69:17,25 79:3 84:24
  107:15 114:3
  126:24 137:4
  148:19 151:21
  192:21 208:18
  222:13 227:8
  231:21 242:19,24
  251:1 255:21
**test**
104:6,7 111:8 120:17
  126:21,22 137:7,13
  175:7,20 240:16,20
  241:9
**tested**
164:25
**testified**
6:7 17:5 50:5 65:8
  154:14
**testify**
15:14

**testifying**
6:24 11:1
**testimony**
7:25 15:9,19 19:13
  20:25 72:7 104:18
  248:2,14 258:6
  259:6
**testing**
118:16 126:15
**tests**
16:10 79:1
**test-test**
140:9
**Teton**
59:24 117:18 118:17
  119:24
**textbooks**
80:23
**Thank**
10:21 20:2 64:22
  69:14 166:9
**thankfully**
109:1
**thanks**
137:17
**theoretic**
246:19
**Theoretically**
112:12
**theories**
113:19
**theorize**
198:24
**theory**
110:22,25 111:12
**THERAPEUTHE**
259:3
**therapeutic**
143:18
**Therapeutics**
1:5 5:6 6:1 8:3 11:2
  18:1 19:3,11,15
  30:2 31:4 44:5,6
  46:6 49:11 59:11,19
  59:22 60:4,8,20
  65:10,17 232:21

233:3,23 234:14,22
  235:3,22
**Therapeutics's**
40:3
**therapies**
122:7,25 218:1 219:8
  236:21
**therapy**
49:25 112:6 125:4
  149:25 163:21
  164:4,23 198:15
  226:19 231:8 241:8
**thereabouts**
85:13
**thereof**
236:6 239:5
**thereon**
243:10
**thing**
7:20 23:13 37:12
  69:8 99:21 156:25
**things**
67:17 71:22 106:4,7
  126:14 132:2 202:5
  227:2 242:22 251:3
  255:22
**think**
8:10,17 13:7,16
  20:20 38:25 40:11
  40:12 42:13 46:22
  49:21 53:22 54:7
  56:5 67:6 68:1,5
  72:6 78:18,21 82:16
  85:22 87:7 92:12
  97:17 107:23
  111:16 112:5
  113:10 115:9
  127:14 128:5 131:7
  135:25 136:3 139:8
  142:11 146:2,5
  179:14 181:6
  188:23 191:24
  194:2 195:22 198:8
  198:24 222:18
  231:1 232:14,17
  243:19 246:1 247:7

248:25 253:3,16,19
  255:22
**thinking**
13:8 161:19 253:3
**thought**
19:13 30:17 95:12
  109:12 120:25
  134:13,16,18 161:6
**thousands**
97:20
**thread**
246:25
**three**
6:21 29:21 39:10,15
  54:22 73:17,24
  77:14 123:18 156:9
  162:24 183:19,20
  190:20 191:6,12,17
  191:22,24 200:6
  209:10 210:11
  246:24
**three-different**
183:21
**threshold**
140:25
**throat**
136:13
**thromboembolic**
77:10
**through-758**
4:7 209:22
**thrown**
251:12
**time**
5:9 7:20 8:2 18:25
  19:24 21:16 22:24
  23:17,23 27:17
  39:25 44:23 45:2,10
  55:17 63:17 74:22
  81:19,20,24 82:3,10
  85:9,20,25 86:16
  88:5,7,24 89:16
  91:7,17 92:9,15
  93:14 94:1,5,6,9
  95:5 96:7 99:9,15
  113:9 119:9 154:24

**MAGNA**
**LEGAL SERVICES**

156:10 168:25 171:16,23 177:8 196:9 230:7,8 234:16 235:6 245:15 255:25 257:4
**times** 6:19,21 7:14 109:6 123:18 191:22 200:12 207:17 214:8
**tissue** 84:1 89:24 90:7
**tissue-related** 238:7
**title** 181:19 197:7,8
**titled** 11:8 61:6 153:11 165:10,15 179:24 228:24
**today** 5:9,21 6:22 7:1,14,25 8:22 10:7 11:1 12:16 14:6 17:6 18:10 30:13 36:11 39:24 40:1,16,18 42:24 96:12 121:11 131:22 132:7,16 135:2 154:5 179:12 195:12,16 207:10 248:1,13 250:15 253:1,18
**Todd** 48:4
**told** 101:2 160:10 253:3
**tolerability** 136:7 206:17 216:12 228:25
**tolerable** 136:15 229:18,25
**tolerance** 251:2
**tolerate** 127:18

**tolerated** 200:12
**top** 20:6 26:14 92:9 182:16 204:8
**total** 168:3 192:21 230:2
**totally** 106:11 212:2 218:8 226:8 231:20
**training** 21:3,10 234:21
**transcribed** 1:22
**transcript** 257:6 259:5,6,11
**transcription** 258:6
**translates** 103:12 119:22
**transplant** 22:4 24:7
**transplantation** 20:14
**traverses** 107:6
**treat** 82:9 85:15 86:1,13 87:11 88:11 89:2,11 89:17 93:24 94:10 94:14 98:19,20,23 116:10 117:3 127:2 127:5 149:6,14,15 159:4 164:21,22 187:24 219:18 222:17 225:15 236:6,23
**treated** 52:25 93:1 98:12 99:24 101:1,10 146:24 153:3,5 199:24 201:15 221:9
**treating** 31:22 81:3,19,23,25 82:4 86:17 91:18,21

92:16 93:15 99:7 100:4,5,6,10,12 116:4,5,13 128:6 159:6 160:7,11 161:20 180:9,14,22 180:25 181:2,8 184:5,8,11,20,21 185:1,4,5,13 186:16 187:5 188:5 217:23 218:4 224:4 228:13 251:16,17
**treatment** 33:8,22 38:3 57:3 58:24 71:12,25 72:1 72:9 79:8 82:10 97:25 98:24 102:5,6 102:12,15,15,21 103:3,10,12 104:5 107:20 116:17,22 118:19,21 119:3 139:7,9,13 147:15 150:12 157:3,4 162:12,19 165:4 168:9 169:4 171:17 171:19 174:16 177:19 178:11 179:4,6 181:3 185:18,19,22,24 187:19 194:21 198:6 204:11,25 212:11 213:3 215:23 217:9,10 221:25 227:23,23 229:12 239:9 240:5
**treatments** 42:23 101:17 121:11 121:25 237:5
**tremendous** 202:8
**trend** 35:3
**trepostinil** 37:22 48:17 50:23 53:14,17 56:5 57:3 59:7 89:17 90:12 91:19 101:10 104:2

118:21 185:14 197:8 205:16 206:11,18 208:8 213:11 214:1 216:13 217:12,15 217:23 218:11 219:20 220:16 221:10,24 225:15 226:5 228:5,15,25 229:12 232:4 240:4 241:8
**treprostinil** 32:19 33:8,22 36:13 38:4 49:12 50:15 53:22 58:25 65:20 75:16 81:16,22 85:10,21 86:1,19 87:11,18 88:11,20 89:8 91:22 95:8,13 95:24 96:14 100:8 102:23 103:2 104:20 107:20 108:1 112:18 114:14 115:1,20 116:20 117:13 118:12 119:4,14 120:3,11,23 122:8,8 122:9,12,18 127:2 186:11,25 187:1,1,6 187:20,25 188:15 190:10 191:6,16,17 192:10 193:22 194:22 196:3 198:15 199:8,24 200:7,16 202:16 203:1 204:12,16,25 209:13,20 226:9 239:3,9 240:14 241:23 242:14
**treprostinils** 236:4
**treprostinil's** 87:5
**trial** 15:14 17:5 142:23 143:11 145:22



148:12,22 152:2
154:24 155:2 165:5
177:10 189:1 219:3
**trials**
90:5,12,17 126:25
143:21 144:11,15
**trick**
149:16,16,16
**tried**
159:23
**TRIUMPH**
195:21,22
**true**
25:7 76:2 116:16
257:7 258:5
**truth**
36:19
**truthful**
7:25
**try**
7:7 39:25 48:25
78:22 81:1 105:24
121:23 204:13
214:19
**trying**
77:17 85:1 164:21,22
179:6 195:3
**turn**
12:3 50:2,25 60:25
143:15 168:12,14
171:6 174:6 210:1
212:13 249:3,24
**two**
12:17 16:9 23:12
28:2,23 34:1,9
42:18 44:3 50:11
61:6 74:8,14 77:14
84:12 98:20 107:14
109:25 110:11
128:19 142:21
148:22 158:9
163:13 165:9
168:22 170:12
171:16,19 174:13
178:4,6 179:16
183:20 208:12,12

212:21 216:5 230:6
238:12 250:10
**two-week**
19:25
**type**
15:3 16:20 83:9
**types**
84:14 182:8
**typically**
27:24 89:7 104:4,8
106:9 107:5 140:24
214:19
**typo**
12:20,22 14:4
**typos**
12:17 14:5
**Tyvaso**
114:5,13 127:4,12
128:13,14 129:3,6
129:10,24 130:12
132:20 133:8
135:17 195:23,24
209:12,20 210:3,12
210:20 211:1,2,9,15
212:5,10,14,19,22
213:11,13 214:1,3,8
214:13,16 215:3,21
215:22 216:3
**t-a-d-a-l-a-f-i-l**
122:10

───────────
**U**
───────────
**UCSD**
168:24 169:2 170:15
**Uh-huh**
234:4 239:1
**ultimately**
31:3 223:17
**ultrasonic**
195:23
**umbrella**
237:22
**unavailable**
106:12
**uncertain**
37:8 182:20 187:10

188:4
**uncommon**
208:2 209:6
**underlying**
83:19,21 86:18 87:12
87:19 88:12,21
89:18 90:14 93:8
95:1,19 98:5 178:1
245:22
**underscores**
49:21 224:1
**understand**
6:22 7:14,17,23
10:25 67:2,18 181:1
182:13 184:4 237:4
237:24 238:5,10
240:3 242:3 243:13
244:12
**understanding**
69:15 133:11,13,15
180:7 194:23
215:13 235:22
248:12
**understood**
7:10 20:2 116:9
215:14
**undertaken**
73:13 76:4
**undesirable**
198:17
**unequivocably**
108:24
**unexpected**
35:22
**unfortunately**
228:16
**uninformative**
231:21
**United**
1:1,5 5:5 8:3 11:1
18:1 19:3,11,15
30:1 31:4 40:2 44:5
44:6 46:6 49:10
59:11,19,22 60:4,8
60:20 65:10,17
179:25 189:11

232:21 233:3,7,21
233:23 234:13,22
235:2,22 259:3
**units**
73:17,24 74:14 111:4
182:24 198:16
**unity**
56:10 117:22
**universe**
85:2
**University**
22:22 23:4,10
**unknown**
185:20
**unpredictive**
125:14
**unusual**
90:3
**unwind**
178:6
**update**
17:25 18:18 20:1
**updated**
17:21,22 18:11,20,25
19:14,24
**updating**
18:5
**use**
49:11 50:15 87:10
95:6,14,23 121:19
128:7 168:8 169:19
169:20 175:3 190:9
192:2 214:16
217:22 221:24
224:3 227:23
229:11 232:4 236:4
239:9 240:4
**usually**
80:4 175:8
**UT**
44:3 235:15
**UTC**
3:22 18:12 39:22
180:1 256:2
**UTC_PH-ILD**
4:15 165:21 229:2

**UTC_PH-ILD-009...**
180:1
**UTC_PH-ILD_005...**
3:24 189:12
**UTC_PH-ILD_009...**
4:10 216:16
**UTC_PH-ILD_009...**
4:12 218:15
**UTC_PH-ILD_010...**
3:20
**UTC_PH-ILD_010...**
153:20
**UTC_PH-ILD_010...**
4:6 209:14
**UTC_PH-ILD_010...**
4:9 210:5
**UTC_PH-ILD_010...**
4:7 209:22
**UTC_PH-ILD_010...**
4:17 233:10
**UTC_PH-ILD_010...**
4:14 224:12
**UTC_PH-ILD_010...**
4:4 202:19
**UTC_PH-ILD_010...**
143:1
**UTC_PH-ILD_9828**
4:2 196:5
**UTC_PH-IL_010830**
3:11
**UVA**
23:19,24
**U.S**
233:8

---
**V**
---

**v**
1:7 5:6 15:8 259:3
**vacillations**
117:25
**vague**
214:5 238:4
**validate**
117:18 152:23
**validated**
35:7

**validity**
15:20
**value**
35:4 124:20 174:25
 176:5,7,8 199:19
 204:20 205:5
 221:12
**valued**
42:8
**values**
173:18 181:18
 183:17,19
**variability**
140:6,9
**variable**
244:4
**various**
7:13 22:14 24:8
 26:11 31:11 33:14
 118:4 126:22
**vascular**
54:21 73:16,23 74:7
 74:13 75:9 103:8
 106:25 125:6 201:3
 201:8,9 222:8 227:4
**vasculature**
106:11,14,17,19
**vaso**
114:15
**vasodilation**
107:12
**vasodilator**
102:24 103:9,16
 110:17 111:21
 115:2,3,10,18 227:7
**vasodilators**
115:8
**VCU**
23:16,17
**vehicle**
241:22
**velocity**
106:15 107:1
**ventilated**
108:3,6,8,9 113:20
 114:15

**ventilation**
110:8,12,14
**ventricular**
3:15 145:7,19
**verbal**
7:3
**verbiage**
68:8
**version**
123:17 127:24
 255:16
**versus**
16:13 37:22 58:15
 78:16 86:5 93:19
 100:6 123:18 128:2
 129:22 131:15
 137:5 138:19 139:7
 139:13 172:13,15
 172:23 186:24
 194:22 204:16
 217:4 221:20
**verus**
16:19
**vessels**
106:6,6 108:7 110:7
 236:23
**Vic**
48:2
**Victor**
29:2,3 30:24 41:18
 48:2 231:24
**video**
7:2
**videographer**
2:24 5:2,13 64:15,19
 142:13,17 196:16
 196:20 247:18,22
 256:3
**videotape**
5:3
**Vienna**
6:15
**view**
29:15 76:21 160:17
 245:19
**views**

**161:8**
**Virginia**
6:16 22:22 23:5,9
**virtue**
17:1 88:1
**visits**
230:6
**visual**
148:3
**vital**
90:20,21 139:19,22
 140:2,5,7,15
**volume**
218:23
**volumes**
88:2
**VQ**
109:5,11,20,25
 110:13,18 111:8
 112:9 114:21
 198:16

---
**W**
---

**Wade**
233:8 234:5
**Wait**
166:3
**walk**
54:1,2,6,11,15,24
 100:23 101:11
 126:1,10,23 137:7
 137:12 144:18
 147:1,14 151:6
 153:6 199:7,11
 221:5,9 222:14
 230:5,10,12 231:17
 240:16,20 241:9
**walking**
133:2
**walks**
231:4
**Wang**
206:24 224:10 225:2
 225:13
**want**
11:17 22:15 25:4



48:24 64:9 98:6
108:16 114:23
115:25 116:8,10
124:11 125:23
127:22 142:9 152:8
158:16,23 162:23
189:23 191:21
201:22 203:15
210:23 220:12
252:14
**wanted**
47:15 68:13 248:13
**warrant**
151:22
**warranted**
155:18
**Washington**
1:10,20 2:19 5:11
16:19
**wasn't**
13:25 14:15 17:11
21:12 35:5 61:19,23
63:20 70:25 88:8
89:6 96:10 119:6
120:17 170:11
177:1 204:19
212:12
**Waxman**
28:24 41:12 196:4
197:15,18 198:1
202:18 206:3
208:22 218:14
222:25 223:9 232:1
**Waxman's**
30:20
**Waxman-Agarwal**
208:23
**way**
6:15 10:18 17:9 31:2
40:8 56:4 59:5
68:14 77:19 101:12
104:19 107:8
116:21 128:6 135:4
158:2 162:8,18
164:10 173:22
176:16 195:13,17

214:12 245:9,20
257:11
**ways**
34:1,14 59:18 114:3
173:23 238:12
**weakness**
202:7
**week**
8:16 24:24 149:11
168:5 174:13
203:25
**weekly**
17:23
**weeks**
55:18 117:22 168:25
172:15 173:1 205:6
**weird**
10:17
**Welcome**
64:22 142:20 247:25
**well-being**
106:20
**well-done**
154:22
**well-ventilated**
198:16
**went**
22:18 25:11 26:22
67:3 68:9 164:10
223:24,25 227:4
231:14 235:14
**weren't**
151:11 176:6
**we'll**
98:19 121:23 186:4,5
**we're**
29:17 30:6 35:24
59:5,5 82:18 89:22
118:16 185:6
224:20 245:9
**we've**
17:4 31:1,20 64:8
72:17 79:19 206:4
208:24
**whichever**
149:8

**wide**
56:9 174:23 230:8
**wider**
230:9
**willing**
42:2
**window**
19:25
**withdraw**
95:11
**witness**
1:14,16 5:25 6:5 9:11
9:18 10:5 12:6
13:10 14:10 16:17
17:8 18:4,14 19:6
20:12 25:9 26:4
27:2,23 28:18 29:9
29:25 31:17 32:16
33:3,10,25 34:12,20
35:13,19 36:16
37:11,21 38:6,15,24
39:10,18 40:7,23
41:16,23 42:7 43:7
43:15,21 44:11,20
45:8,15,20 46:5,20
47:6,20 48:9 49:18
50:9,17 51:10 52:11
53:6 54:18 56:3,21
57:5,14 59:3 60:10
60:15,23 61:1,13,19
62:15 63:4,11 65:4
65:13,19 66:4,14
67:14 69:7,14 70:3
70:7,17,22 71:14,20
72:15,25 73:8 74:20
76:2,25 78:1,10
79:12,23 80:13
82:23 83:24 84:19
85:17 86:3,22 87:2
87:7,14,23 88:15,24
89:21 90:16 91:13
92:4,18 93:5,18
94:12 95:10 96:2,25
97:7,17 98:2,14
99:1 100:3 101:22
102:11,18 103:5

104:14,22 105:19
107:23 109:9
110:22 111:2 112:1
112:12,22 113:3
114:18 115:22
116:8,25 118:24
119:6,19 120:6,15
120:25 121:8,16
122:5,17 123:11
124:1,8,24 126:5,14
127:7,17 128:17,24
129:5,13,18 130:2,8
130:16 131:2,7,13
132:1,12,19,24
133:11,17 134:2,12
135:7,15,24 136:6
137:3,16 138:14
139:5,19 140:19
141:11 142:4 143:6
143:25 144:23
145:3 146:1,13,20
147:18,25 148:7,14
150:18 151:10
152:4 153:8 154:17
155:2,25 157:11,20
158:14 160:19
161:5 162:6,11
163:5,24 164:20
166:19 167:3,12,18
168:2,15,21 169:7
169:24 170:9,21
171:15,19 172:6
173:12 174:11
175:7,20 176:23
177:12,23 178:14
178:25 179:9,14
180:12 181:6
182:15 184:8 185:3
185:17 186:14
187:9,24 188:19
189:5 190:13 191:1
191:11,21 192:6,14
192:25 193:15,25
194:10 195:2
197:13 198:3,8,23
199:10,18 200:9,21

201:22 203:19
204:18 205:3 206:6
206:22 207:6,13
208:5 209:1 211:12
211:17 212:15
213:7,16 214:6,15
215:19 216:8 217:2
217:19,25 219:6,16
220:4,9,24 221:12
223:5,14 225:11
226:7,22 227:17
228:2 232:7 233:1
233:23 236:15
237:10 238:5
239:12,22 240:8
241:1,5,13 242:7
243:5,19 244:15
245:7 246:1,18
248:20,24 249:15
250:18,23 251:11
252:10 253:14
254:25 255:13
**wood**
73:17,24 74:14
182:24
**word**
24:21
**wording**
80:13
**words**
72:18 79:21 80:9
156:19 181:16
182:1 250:7 255:23
**wordsmithing**
67:3,20
**work**
8:20,24 18:12 25:1,1
59:10 113:14,15
154:20 159:2
160:12,24 161:3,21
163:2 217:13
223:22 234:13
**worked**
8:21 40:9 81:21
115:4,10 223:21
235:7,9

**working**
8:12 24:25 59:15,17
59:20
**works**
25:11 75:18 101:12
109:1 113:18,22
114:2,2 115:1
**world**
73:19 74:21 161:19
**World's**
24:18
**worse**
140:23
**worsening**
27:18 53:13 55:15,16
55:18 58:5,22
111:15 138:4,6
**wouldn't**
35:3 38:6 42:23
67:14 93:9 152:4
154:17 156:12
162:21 176:7
214:15 238:20
**write**
95:4 120:18
**written**
96:19 97:20 132:1
200:1
**wrong**
24:21 134:16 157:8
218:22 253:3
**wrote**
10:10 68:5,17 96:10

**X**

**X**
230:12

**Y**

**yeah**
23:6 61:15 68:25
83:11 98:19 125:25
160:2 164:3 186:22
213:18 215:16
216:21,21 244:2
**year**

8:7
**years**
14:14,17,19 21:9
29:17 30:11,12 60:8
79:13 87:24 89:22
92:19,22 94:6,8
97:21 111:7 132:2
134:22 235:15
**yellow**
10:23
**York**
81:7
**Yutrepia**
62:12,16,18 63:18
133:25 134:6 135:3

**Z**

**zero**
117:21,24 168:25
173:18,19
**Zisman**
142:25 146:10
163:17

**$**

**$100,000**
60:13

**0**

**01**
147:1
**010487**
165:21
**010599**
4:15 229:2
**022**
221:13
**03**
204:3 205:5
**03/2021**
209:21
**0496**
3:20
**06/2023**
210:4
**09943**

4:12 218:15

**1**

**1**
3:9 5:4 10:11,13
25:18 36:4 76:18,18
77:23 78:2,8,12,16
78:19 86:5,10 89:6
90:1,6,12,18 91:6
91:24 93:11 94:3
95:20 104:23 105:1
105:12 106:8 114:5
114:19,21 121:12
121:25 122:23
140:21 141:20
148:23 163:21
189:24,25 190:8
193:3,3,9,20,21
200:17 201:7 212:7
212:22 213:3
220:15 222:11
226:18 227:23
235:24 244:17,23
245:14,16,17
246:11,16,22 247:6
247:12 249:6,8,17
250:6 252:19
254:17,20
**1.21**
204:21
**1.8**
204:1 205:4
**1/17**
19:24
**1:57**
196:18
**10**
1:11 3:9 4:2 5:9 25:1
42:19 77:13 140:8
140:11,15,23,24
141:4,17 162:22,24
162:25 163:1 196:1
196:6,23 206:2
207:22 208:24
**10,716,793**
179:25

**10:12**
64:16,18
**10:21**
64:18,20
**100**
13:14 151:7
**101**
13:14
**108**
172:15
**109**
172:15
**11**
3:10 4:3 25:20
  140:23 149:12
  150:1 186:20
  202:14,22,24,25
  221:15,17 222:15
**11,826,327**
189:11
**11:51**
142:14,15
**119**
13:8
**12**
4:5 128:1 168:5
  200:12 205:21
  209:10,16 210:12
  210:19,25 211:20
  212:4,6 213:18
  214:9,20
**12-week**
148:23,25
**12:46**
142:16,18
**1200**
25:20
**1252**
6:15
**1299**
2:17
**13**
4:7 181:14 209:19,23
  210:20 211:7,20
  212:13,20
**13:57**

196:17
**136**
172:13
**137**
51:20 172:13
**14**
4:8 181:14 209:25
  210:9,20 211:14,14
  211:20 215:17
  221:18
**145**
3:13
**15**
4:10 92:19,22 94:6,8
  190:7,9,24 191:1
  216:11,18 227:15
  227:22
**15:18**
247:19
**15:43**
247:23
**15:54**
256:4
**153**
3:16
**16**
4:11 117:22 195:7
  203:25 205:5
  218:10,16 219:12
  219:25 221:23
**165**
3:20
**166**
3:21
**17**
4:13 18:21 19:4
  221:16 224:7,15
  236:17
**17.6**
176:12
**172**
176:3
**176**
250:12,13,15,20
  255:3,6,9
**179**

3:22
**18**
4:15 51:12,22,25
  52:3,9 180:13
  190:23 191:1,4,14
  191:15,22,24
  228:19,24 231:23
  232:22
**18565**
2:6
**189**
3:24
**19**
4:16 143:2 190:7
  191:2 195:20 233:6
  233:11 242:10
**1900**
1:19 5:11
**196**
4:2
**1980s**
82:25
**1982**
82:8,18
**1988**
21:19 81:18
**1994**
81:22
**1996**
81:13

───────────
**2**
───────────
**2**
3:10 11:5,7,14 14:9
  20:3,4 47:13 66:11
  141:20 146:9
  148:24 155:25
  158:2,25 186:19,23
  187:5,21 210:15
  214:25 236:1,3
  250:11
**2A**
158:25
**2B**
3:19 26:16 153:15
**2.1**

214:25
**2.5**
25:11
**2:07**
196:19,21
**20**
73:21 74:6,11 75:6
  75:13 93:21 169:13
  174:1 230:9
**200**
80:24
**2000s**
83:3
**20004**
2:19
**2002**
85:12
**2009**
87:5 114:6,10,12
  209:13 210:12,17
  210:19 211:1,5
  212:5,10 213:12
  214:2,7,13,24
**201**
28:7
**2010**
85:22 143:14 150:9
  150:16
**2013**
145:9
**2013/0096200**
233:9
**2016**
26:15 28:14 47:15
  87:19
**2017**
206:20 207:3 225:13
  227:21
**2018**
22:7 25:7 73:20
  74:22 165:20
**202.842-7889**
2:20
**2020**
43:22 44:13 74:17,20
  74:22 75:11,23 92:7



177:17 195:10
**2021**
26:15 39:1,1 92:13
  202:17 210:19
  211:8 212:14,19,20
  212:23 213:2,11
  214:1
**2022**
74:10 85:15
**2023**
211:15 215:21 216:3
**2024**
1:11 5:9 8:8 12:11
  18:21 19:4
**2028**
257:21
**203**
47:16
**209**
4:5,7
**21**
203:16
**210**
4:8
**216**
4:10
**218**
4:11
**22**
221:16 222:15
**22182**
6:16
**224**
4:13
**228**
4:15
**23**
210:20
**23-975**
5:8
**23-975(RGA)**
1:6
**233**
4:16
**24**
57:25 168:25 172:14

173:1 174:13
243:24 244:3
**248**
3:4
**25**
20:17 73:15 93:22
  128:17
**250**
2:6
**254**
3:5
**26**
12:11 204:6
**28**
149:11 172:21,25
**29**
50:25 51:22 52:3
  57:23

---
      **3**
---
**3**
3:11 26:18 48:20
  49:9 76:14,18 77:24
  78:4,8,13,16,21
  86:6 104:23 105:8
  105:13,17 121:13
  122:2,13 123:8
  140:8 141:8 142:22
  143:8,10 145:23
  149:2,6 150:8
  163:16,22 165:5
  181:13 189:1 196:3
  197:9,10 199:23
  205:18 208:10,14
  213:4 217:9 218:2
  219:8,19 222:22
  226:5,19 227:24
  228:10 239:15
  246:16,22 247:5,13
**3.9**
230:12
**3:18**
247:20
**3:43**
247:21
**3:54**

256:6
**30**
90:1 125:19 128:17
  186:25 238:25
  257:21 259:9
**31**
61:11 230:2
**31.6**
230:2,3,17 231:4
**32**
230:2
**326**
205:9,10
**327**
68:24 69:2,25 70:10
  70:15 183:23
  189:14,18,19,24
  190:3,8,15 192:1,9
  193:2,20,21 194:6
  194:18,24 195:17
  200:17 248:25
  249:17 251:1,3,7,23
  252:4,5 253:4,10
**336**
57:15
**34**
231:1
**36**
68:23
**37**
239:14,17
**39**
230:13

---
      **4**
---
**4**
3:13 26:7 76:18
  145:5,10 147:10,11
  148:11 151:2,4
  156:17 240:10,13
  243:3
**400**
25:18
**41**
230:14
**43**

13:10,14 70:6
**44**
60:25 61:12
**44.4**
204:19
**45**
186:25

---
      **5**
---
**5**
3:16 25:12 26:3,5,14
  76:19 141:2,17
  153:11,16 240:10
**5.2**
230:8
**50**
106:10,14,23,25
  190:4 231:1 243:2,6
**500**
25:18 160:16 253:24
**51**
176:25
**51.3**
174:18
**5360**
189:13
**540**
153:20
**58**
67:7,11
**59**
67:24

---
      **6**
---
**6**
3:3,20 165:10,12,25
  166:4,5,12,15,25
  167:7,25 241:16,17
**60**
57:18 187:1
**60.85**
199:12
**61**
240:11
**610**
4:15 229:3



**62**
146:17 147:10
**621**
148:20
**627**
143:15
**68**
67:24
**69**
67:24

---
**7**

**7**
3:21 165:22 166:1,7
166:21,22 168:12
168:18 171:8 174:7
175:21
**70**
67:24 90:22
**700**
2:18
**708**
4:6 209:15
**72**
90:25
**74**
68:3
**742**
4:9 210:5
**76**
68:4
**77**
68:4
**781**
4:17 157:22 233:10
**785**
156:3
**789**
4:14 224:13
**793**
180:3,8,8 181:3
183:24 184:4,24
185:12 186:8,20
187:18 188:13
189:21 190:1,6,9,19
190:24 191:5,7,16

192:9 193:10,21
248:15 249:24
250:3,6,24 251:7,15
251:22 252:4,5,7,8
252:19 253:6,17
254:3,16,20
**796**
3:23 180:2

---
**8**

**8**
3:22 50:2,3 63:2
179:21,24 180:2
189:21 248:22,23
249:25
**8.7**
201:3
**80**
56:6 57:19 182:25
230:2,13 231:2
**82**
241:16 242:3
**829**
202:20
**829TR:1**
4:4
**838**
143:1
**838TR:1**
3:12
**84**
160:9
**85**
176:12

---
**9**

**9**
3:24 189:7,10,14
200:11 205:21
207:16,23 213:18
214:9 248:22,23,25
**9:00**
1:20
**9:01**
5:10
**90**

11:22,23 12:4,9
190:24
**92.6**
199:13
**92612-2565**
2:7
**949.989.8292**
2:8
**95**
84:20 85:5 176:11,23
**9852**
4:10 216:16
**99**
13:14 84:21 85:5
**99.3**
147:1

# EXHIBIT 10

1                  IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4    UNITED THERAPEUTICS CORPORATION,)
                                     )
5                      Plaintiff,    )
                                     ) C.A. No. 20-755-RGA-JLH
6    v.                              )
                                     ) Volume III
7    LIQUIDIA TECHNOLOGIES, INC.,    )
                                     )
8                      Defendant.    )

9
                                     J. Caleb Boggs Courthouse
10                                   844 North King Street
                                     Wilmington, Delaware
11
                                     Wednesday, March 30, 2022
12                                   8:30 a.m.
                                     Bench Trial
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16

17              MORRIS NICHOLS ARSHT & TUNNELL LLP
                BY:  JACK B. BLUMENFELD, ESQUIRE
18              BY:  MICHAEL J. FLYNN, ESQUIRE
                BY:  SARAH E. SIMONETTI, ESQUIRE
19
                        -and-
20
                GOODWIN PROCTER LLP
21              BY:  WILLIAM C. JACKSON, ESQUIRE
                BY:  HUIYA WU, ESQUIRE
22              BY:  IAN B. BROOKS, ESQUIRE
                BY:  JOEL BROUSSARD, ESQUIRE
23              BY:  HARRISON GUNN, ESQUIRE
                BY:  ERIC LEVI, ESQUIRE
24

25                      - and -

```
 1   APPEARANCES CONTINUED:

 2

 3              McDERMOTT WILL & EMERY LLP
               BY:  DOUGLAS H. CARSTEN, ESQUIRE
 4             BY:  ADAM W. BURROWBRIDGE, ESQUIRE
               BY:  KATHERINE PAPPAS, ESQUIRE
 5             BY:  TIMOTHY M. DUNKER, ESQUIRE
               BY:  ART P. DYKHUIS, ESQUIRE
 6             BY:  AMY MAHAN, ESQUIRE
               BY:  JOSHUA REVILLA, ESQUIRE
 7             BY:  JIAXIAO ZHANG, ESQUIRE

 8                                 For the Plaintiffs

 9

10              SHAW KELLER LLP
                BY:  KAREN E. KELLER, ESQUIRE
11              BY:  NATHAN R. HOESCHEN, ESQUIRE
                BY:  EMILY DiBENEDETTO, ESQUIRE
12                          -and-
13
                COOLEY LLP
14              BY:  SANYA SUKDUANG, ESQUIRE
                BY:  ADAM M. PIVOVAR, ESQUIRE
15              BY:  BRITTANY CAZAKOFF, ESQUIRE
                BY:  DOUGLAS W. CHEEK, ESQUIRE
16              BY:  JONATHAN R. DAVIES, ESQUIRE
                BY:  IVOR ELRIFI, ESQUIRE
17              BY:  DEEPA KANNAPPAN, ESQUIRE
                BY:  LAUREN KRICKL, ESQUIRE
18              BY:  ERIK B. MILCH, ESQUIRE
                BY:  KYUNG TAECK MINN, ESQUIRE
19
                                   For the Defendants
20
                      ***  PROCEEDINGS  ***
21

22              DEPUTY CLERK:  All rise.  Court is now in

23   session.  The Honorable Richard G. Andrews presiding.

24              THE COURT:  All right.  Good morning, please be

25   seated.
```

08:07:47
08:07:47
08:07:47
08:29:49
08:29:50
08:29:51
08:29:56
08:29:58

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000793

Waxman - Direct

08:29:59  1              I'm not sure exactly what the order is here, but

08:30:03  2      whoever is next, please do something.

08:30:07  3              MS. KIM:  Good morning, Your Honor.  Mandy Kim

08:30:09  4      on behalf of UT.  And we call Dr. Waxman to the stand.

08:34:32  5              MR. FLYNN:  Your Honor, may I approach?

08:34:32  6              THE COURT:  Sure.

08:34:32  7              DEPUTY CLERK:  Please state and spell your full

08:34:32  8      name for the record.

08:34:32  9              THE WITNESS:  Aaron B. Waxman, A-A-R-O-N.

08:34:32 10      Middle initial B.  Last name W-A-X-M-A-N.

08:34:32 11              DEPUTY CLERK:  Do you affirm that the testimony

08:34:32 12      you are about to give to the Court in the case now pending

08:34:32 13      will be the truth, the whole truth, and nothing but the

08:34:32 14      truth, you do so affirm?

08:34:32 15              THE WITNESS:  I do.

08:34:32 16              DEPUTY CLERK:  Please speak in the microphone.

08:34:32 17      Please make sure you speak into it.

08:34:32 18              THE COURT:  Thank you.

08:34:32 19              MS. KIM:  May I proceed, Your Honor?

08:34:32 20              THE COURT:  Yes.

08:34:32 21                      DIRECT EXAMINATION

08:34:32 22      BY MS. KIM:

08:34:32 23      Q.    Good morning, Dr. Waxman.  Please introduce yourself

08:34:32 24      to the Court and what you do for a living.

08:34:32 25      A.    My name is Aaron Waxman, and I'm a physician,

Waxman - Direct

08:34:32 1    pulmonary critical care medicine, at the Brigham and Women's

08:34:32 2    Hospital in Boston and Associate professor of medicine at

08:34:32 3    Harvard Medical School.  And I'm the executive director of

08:34:32 4    the Center for Pulmonary Heart Disease and more specifically

08:34:32 5    the director of the pulmonary vascular disease program at

08:34:33 6    Brigham and Women's Hospital.

08:34:33 7    Q.    What are your responsibilities in these positions?

08:34:33 8    A.    So as the executive director, I oversee the broader

08:34:33 9    pulmonary heart disease program, which includes all aspects

08:34:33 10   of pulmonary vascular disease and right-heart failure and

08:34:33 11   oversee eight faculty that work on the program as well as a

08:34:33 12   large clinical trials and basic research program.

08:34:33 13   Q.    Please briefly describe your educational background.

08:34:33 14   A.    Undergraduate, I went to GW, George Washington

08:34:33 15   University, in D.C. and then went on to get a Ph.D. in

08:34:33 16   anatomy and neuroscience, and then after that, an M.D. at

08:34:33 17   Yale University where I also did a number of research

08:34:33 18   fellowships and then all my post-graduate training in

08:34:33 19   internal medicine, pulmonary, and critical care medicine.

08:34:33 20   Q.    And what area of medicine have you been focused on

08:34:33 21   after medical school and fellowships?

08:34:33 22   A.    Again, broadly speaking, I've practiced the full

08:34:33 23   range of pulmonary and, specifically, critical care medicine

08:34:33 24   and then more specifically pulmonary vascular disease and

08:34:33 25   care of patients with pulmonary hypertension.

Waxman - Direct

08:50:11 1    yes.

08:50:13 2    Q.    So reading Claim 1 in the context of the patent,

08:50:16 3    would a POSA, in your opinion, know whether isolated

08:50:20 4    postcapillary PH is within the scope of the claims?

08:50:25 5    A.    I think a POSA would understand that isolated

08:50:28 6    postcapillary disease, again, would be treated with a

08:50:32 7    diuretic and not a pulmonary vasodilator.

08:50:35 8    Q.    As of May 2006, would a POSA have understood that

08:50:40 9    prostacyclins would not be -- would not likely work for

08:50:43 10   isolated postcapillary PH patients?

08:50:46 11   A.    Yes.  I mean, essentially, any pulmonary vasodilator

08:50:51 12   would probably not be needed.

08:50:53 13   Q.    Thank you.  Let's turn to enablement.  Have you

08:50:59 14   prepared a slide of your opinions on enablement?

08:51:02 15   A.    Yes.

08:51:03 16   Q.    What are your opinions -- what are your -- at a high

08:51:06 17   level, what are your opinions on enablement?

08:51:08 18   A.    So, I think that the information provided in the

08:51:11 19   patent provides plenty of information to enable someone

08:51:15 20   who's skilled in the art to be able to make the invention.

08:51:20 21   Q.    And what's the basis for your opinions?

08:51:24 22   A.    Well, in the examples that are in the patent, there's

08:51:27 23   plenty of information as far as the patient population to

08:51:31 24   treat, how to treat, as far as a single-event therapeutic

08:51:36 25   dosing that results in improved hemodynamics.  There's

Waxman - Direct

08:51:39 1    information about delivering it as an inhaled therapy, and

08:51:43 2    there's information, I think very importantly, on dosing to

08:51:48 3    get that single-event therapeutic dose.

08:51:51 4    Q.    And do you recall Dr. Hill opining that, once again,

08:51:54 5    a POSA or the patent is not enabled because -- he used the

08:51:59 6    same rationale of isolated postcapillary group two PH

08:52:03 7    patients not being enabled with the description in this

08:52:07 8    patent?

08:52:08 9              Do you recall that?

08:52:08 10   A.    I recall that, yes.

08:52:09 11   Q.    Do you agree with his opinions?

08:52:11 12   A.    Well, I think, again, as I've said, I don't agree in

08:52:15 13   the sense that we wouldn't treat a postcapillary disease

08:52:18 14   with a pulmonary vasodilator of any kind.

08:52:24 15   Q.    And does the patent support your opinions?

08:52:27 16   A.    I think it does.  Like I said, there's a description

08:52:31 17   in there of treating idiopathic or group one, group five

08:52:36 18   with PH other, chronic thromboembolic, group four, pulmonary

08:52:42 19   fibrosis, group three, and if we look at that table up

08:52:44 20   there, it does describe pulmonary hypertension, but you can

08:52:48 21   see there's no pulmonary capillary wedge pressure listed

08:52:51 22   anywhere, so we really don't know if anyone had combined

08:52:55 23   pre- or postcapillary PH.

08:52:57 24   Q.    Do you recall Dr. Hill also opined that in 2006 there

08:53:01 25   was no evidence that prostacyclins could treat any group two

Waxman - Direct

09:08:34 1    Q.    Could one expect for that to translate into

09:08:38 2    therapeutic efficacy?

09:08:38 3    A.    Well, that would speak to therapeutically effective

09:08:41 4    dosing when you see a hemodynamic response.  Yes.

09:08:45 5    Q.    So, I want to briefly talk about one of the

09:08:47 6    limitations in Claim 1, a therapeutically effective

09:08:51 7    single-event dose.  Can you explain to the Court what this

09:08:54 8    term means.

09:08:55 9    A.    So, a single event therapeutically effective dose

09:08:59 10   refers to providing an effective dose of the drug in a

09:09:05 11   single sitting.

09:09:07 12   Q.    And in your opinion, can a single-event dose be

09:09:10 13   therapeutically effective?

09:09:11 14   A.    Well, especially in the case where we're talking

09:09:14 15   about a hemodynamic disease, you want to see a

09:09:17 16   therapeutically effective dose cause a positive change in

09:09:22 17   those hemodynamics.  So any anything - -- a therapeutically

09:09:26 18   effective dose should cause a reduction in pulmonary artery

09:09:29 19   pressure and cause a reduction in pulmonary vascular

09:09:32 20   resistance, and one would expect then that that hemodynamic

09:09:35 21   effect would translate into a patient feeling better, doing

09:09:39 22   more, and probably living longer.

09:09:43 23   Q.    Do you recall Dr. Hill's opinions in his expert

09:09:46 24   report regarding what "therapeutic effective" means?

09:09:50 25   A.    I do, yes.

Waxman - Direct

09:09:51  1    Q.    What are his opinions, to your understanding?

09:09:53  2    A.    His opinions are that a therapeutically effective

09:09:56  3    dose should make a patient feel better, do more, and live

09:10:00  4    longer.

09:10:01  5    Q.    Do you agree with Dr. Hill's opinions?

09:10:03  6    A.    Well, I think those opinions are taken from an FDA

09:10:06  7    mandate that came down, especially in pulmonary hypertension

09:10:10  8    clinical trial development, where the goal of these drugs

09:10:14  9    are to make patients feel better, live -- and do more and

09:10:18 10    live longer.  But that applies to a clinical trial.

09:10:21 11              But when we're talking about the clinically

09:10:23 12    effective dose in a hemodynamic disease, it has to be able

09:10:28 13    to improve the hemodynamics, which then would translate into

09:10:32 14    all of those features:  a patient feeling better, doing

09:10:35 15    more, and living longer.

09:10:37 16    Q.    Even if the Court were to agree with Dr. Hill's

09:10:40 17    opinion with respect to therapeutically effective, in your

09:10:45 18    opinion, does Liquidia's LIQ861 product still meet this

09:10:49 19    claim limitation?

09:10:50 20    A.    Yes.  I mean, it's been compared nicely to TYVASO and

09:10:55 21    has the same -- same therapeutically effective single-event

09:11:00 22    dosing.

09:11:01 23    Q.    Even just taking it once?

09:11:02 24    A.    It -- taking it once impacts the hemodynamics in a

09:11:06 25    positive way that would translate into those three features

HIGHLY CONFIDENTIAL                    DA0322

Waxman - Direct

09:11:10  1    that I mentioned, feeling better, doing more, and living

09:11:12  2    longer.

09:11:14  3    Q.    Thank you Dr. Waxman.

09:11:15  4          Let's move on to Claim 4.  Can you explain to

09:11:19  5    the Court what the basis for your opinions with respect to

09:11:22  6    Claim 4 are.

09:11:23  7    A.    Well, Claim 4 describes an inhalation device as a

09:11:29  8    dry-powder inhaler.  And I think it's very clear from all

09:11:32  9    the documents we just reviewed that Liquidia 861 is a

09:11:38 10    dry-powder inhaler.

09:11:40 11    Q.    And I think you have a slide on that.  Can you

09:11:42 12    explain some of the highlights from the documents that you

09:11:45 13    looked at right now with respect to Claim 4.

09:11:47 14    A.    Yeah.  As I said, all of the documents describe --

09:11:52 15    especially the package inserts and the instructions to the

09:11:55 16    patient -- specifically describe a dry-powder oral

09:12:00 17    inhalation and provide it has a dry-powder inhaler, and it

09:12:06 18    also speaks to the single-event dosing.

09:12:09 19    Q.    Thank you.  Let's move on to dependent Claim 6.

09:12:12 20          Can you explain the basis for your opinions.

09:12:15 21    A.    Yeah.  Essentially, the same as Claim 4, in that this

09:12:18 22    is simply talking about the administration as a powder, and

09:12:23 23    we've just reviewed how it's not only a powder, it is a

09:12:26 24    dry-powder delivered through a dry-powder inhaler, and it is

09:12:31 25    obviously Treprostinil.

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755 (RGA) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

**<u>EXHIBIT 2: PLAINTIFF'S STATEMENT OF CONTESTED FACTS</u>**

i

## I.    INTRODUCTION

In accordance with Local Rule 16.3(c)(3) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, Plaintiff United Therapeutics Corporation ("Plaintiff" or "UTC") submits the following statement of contested facts with respect to United States Patent Nos. 9,593,066 (the "'066 patent"); 9,604,901 (the "'901 patent"); and 10,716,793 (the "'793 patent") (collectively, the "Patents-in-Suit").

The following statements are meant to serve as an overview of the contested facts to be litigated at trial. Accordingly, Plaintiff reserves the right to prove additional details regarding the below facts, including any facts identified in its pleadings, discovery responses, including in its contentions, and/or expert reports and depositions, which Plaintiff incorporates by reference. Plaintiff further intends to offer evidence to rebut evidence offered by Defendant. Plaintiff reserves the right to modify or amend this Exhibit to the extent necessary to reflect any future rulings by the Court, and to supplement or amend this Exhibit to fairly respond to any new issues that Defendant may raise. To the extent Plaintiff's statement of the issues of law that remain to be litigated, which is submitted as Exhibit 4 hereto, contains issues of fact, those issues are incorporated herein by reference. Moreover, if any issue of fact identified below should properly be considered an issue of law, then such statement should be considered to be part of Plaintiff's statement of issues of law that remain to be litigated. Plaintiff incorporates by reference its expert reports in support of any proof to be presented by expert testimony.

## II.    THE PATENTS-IN-SUIT

1.    Plaintiff is the lawful owner of the Patents-in-Suit by assignment of all right, title, and interest in and to the Patents-in-Suit, including the right to bring infringement suits.

1

III.    **FACTS PERTAINING TO INFRINGEMENT OF THE '066 AND '793 PATENTS**

A.    **Defendant's Proposed Product**

2.    On January 24, 2020, Defendant submitted New Drug Application (NDA) No. 213005 ("Defendant's NDA") under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (the "505(b)(2) Application") to the United States Food and Drug Administration ("FDA") seeking approval, prior to the expiration of the '066, '901, and '793 patents, to manufacture, market, and sell a copy (the "Proposed Product") of Plaintiff's TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/ml.

3.    Defendant's 505(b)(2) Application was submitted prior to the expiration date of the '793 patent and the expiration date of the '066 and '901 patents.

4.    Defendant's 505(b)(2) Application contains a "Paragraph IV" certification pursuant to 21 U.S.C. § 355(b)(2)(A)(iv) alleging that the '066 and '901 patents are invalid, unenforceable, and/or would not be infringed by the commercial manufacture, use, or sale of Defendant's Proposed Product.

5.    In a "Notice Letter" dated April 24, 2020, Defendant informed Plaintiff that Defendant's 505(b)(2) Application contained, *inter alia*, a Paragraph IV certification regarding the '066 and '901 patents.

6.    Defendant's Notice Letter further indicated that Defendant was seeking FDA approval to engage in the commercial manufacture, use, and/or sale of Defendant's Proposed Product prior to the expiration of the '066 and '901 patents.

7.    Plaintiff commenced this action before the expiration of forty-five days from the date it received Defendant's Notice Letter.

8.    Defendant's Proposed Product is a dry powder formulation of treprostinil sodium

**HIGHLY CONFIDENTIAL**       LIQ_PH-ILD_00000803

to be inhaled from a ████████████████████████████████ Defendant's

dry powder formulation is contained in capsules of ██████████████████ of treprostinil

sodium. Two capsules can be combined to create larger doses, such as ████████.

9.     Defendant has imported and will import treprostinil sodium drug substance for use
in Defendant's Proposed Product.  The treprostinil sodium drug substance is manufactured by
Yonsung Fine Chemicals Co., Ltd. ("Yonsung") in Korea.  Yonsung manufactures treprostinil
sodium drug substance according to Drug Master File ("DMF") No. 27680. Defendant's NDA
cites Yonsung's DMF.

10.     Defendant uses LGM Pharma as its broker and LGM Pharma ships treprostinil
sodium from Yonsung to Defendant.

11.     Defendant's Proposed Label describes Defendant's Proposed Product as ████
████████████████████████████████████████████

12.     Defendant's Proposed Label identifies the ingredients in Defendant's Proposed
Product as: treprostinil (the active ingredient) ████████████████████████
████████████████████████████████████████████
████████████████████

13.     Defendant's Proposed Label states that the ████████████████████
████████████████████████

14.     ████████████████████████████████████
████████████████████████████████████████████
████████████████████

15.     The dry powder particles are ████████████████████████
████████████████████████████████████████████

3



16.     The particles have an aerodynamic size of between ███████ for the powder's mass median aerodynamic diameter.

17.     The inhaler provided with Defendant's Proposed Product is an █████ ████ dry powder inhaler (DPI) manufactured by █████.

18.     ████████████████████████



19.     Defendant's Proposed Product is provided to patients in a ██████ which includes a LIQ861 dry powder inhaler and █████████.

20.     ████████████████████████



21.     The capsules are provided in ████████████ ███████.

22.     These ████████████ ███████ respectively, through the inhaler.

23.     Defendant's Proposed Label instructs physicians to prescribe Defendant's Proposed Product in ████████████████ ████████.

24.     ████████████████████ are achieved by instructing patients to inhale the contents of ███████.

25.     ████████████████

HIGHLY CONFIDENTIAL                    DA0329                    LIQ_PH-ILD_00000805

26.    To achieve a dose that requires ██████████████████, patients must select their capsules from ████████████████

27.    Defendant's Proposed Label describes administration of inhalation ████████████

████████████

28.    Defendant's Proposed Product uses "PRINT" particles, which the LIQ861 NDA describes as having an ████████████████████████████████

████████████████████

29.    The LIQ861 NDA states that ████████████████████████

████████████████████████

30.    ████████████████████████████████

████████████

**B.    The Yonsung Manufacturing Process**

31.    In synthetic chemistry, no reaction product is 100% pure.

32.    ████████████████████████████

██    ████████████████████████████████

████████████████

██    ████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

35.    ████████████████████████████

5

36. 

HIGHLY CONFIDENTIAL
LIQ_PH-ILD_00000807



7



HIGHLY CONFIDENTIAL    DA0333    LIQ_PH-ILD_00000809



69.     A drug substance may be used in the commercial manufacture of a drug product despite exposure to temperatures outside the suggested storage temperature range specified in the DMF and/or NDA for that drug substance.

9

73. 

79.     There is no temporal limitation on storage.

**C.     Administration of Liquidia's Proposed Product**

80.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered for the treatment of pulmonary arterial hypertension.

81.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered to a human suffering from pulmonary hypertension.

82.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is a dry powder formulation comprising treprostinil sodium, which is a pharmaceutically acceptable salt of treprostinil. The dry powder formulation in Liquidia's Proposed Product includes particles ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The dry

10

powder formulation in Liquidia's Proposed Product does not contain ███████

83.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered using the ██████████████

██████████████, which is a dry powder inhaler, which is an inhalation device.

84.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, is to be administered ████████████ Each of those ████████████████ is a single event dose. Each of those ████████████ ████████████ is to be done in ████████.

85.     Liquidia's Proposed Product, as described in its Proposed Label, instructions for use, and in Liquidia's 505(b)(2) Application, includes administration of ███████ containing ██████ ████████████████████ of treprostinil.

86.     The ████████████████████████ of Liquidia's Proposed Product of ██████████ ████████████████████████████████████████████████ of treprostinil. The ████████████████████████████████████████ ██████████ of treprostinil or a pharmaceutically acceptable salt thereof.

87.     Liquidia intends physicians to prescribe, and patients to use, Liquidia's Proposed Product according to the ████████████████████████████████████████ ██████████████████████

88.     Liquidia's Proposed Product is to be stored at ████████████████████████ ██████████████████

**D.     Defendant's Proposed Product Infringes the '066 Patent**

89.     The ████████████████████████████████████████████████████ unless otherwise specified.

**HIGHLY CONFIDENTIAL**                    DA0336                    **LIQ_PH-ILD_00000812**

90. ██████████████████████████████████

██ ████████████████████████████████████████

92.    FDA regulations and other applicable law allow a pharmaceutical company to use

a batch of a drug substance in the commercial manufacture of a drug product even though the batch

has been exposed to storage temperatures outside of the range established in the DMF and/or NDA,

provided there is stability data that supports the use of that material and the company has conducted

a proper deviation investigation.

93. ████████████████████████████████████████████

████████████████████████████████

██ ████████████████████████████████████████

████████████████████████████████

██ ████████████████████████████████████████

██████████████████████████████████████

██ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

██ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

██ ████████████████████████████████████████

██████████████████████████████████████████

HIGHLY CONFIDENTIAL                    DA0337                    LIQ_PH-ILD_00000813

99. 

HIGHLY CONFIDENTIAL

DA0338

LIQ_PH-ILD_00000814



**E.    Defendant's Proposed Product Infringes the '793 Patent**

115.    The plain and ordinary meaning of "therapeutically effective" in the claims of the '793 patent is not limited to clinical study endpoints. It includes beneficial effects for the patient, including vasodilatory effects on the pulmonary arteries detectable in hemodynamic measurements, such as those described in the '793 patent.

116.    Administration of Liquidia's Proposed Product to patients will meet the claim limitation requiring a "therapeutically effective" single event dose.

117.    Administration of Liquidia's Proposed Product by patients will directly infringe claims 1, 4, and 6-8 of the '793 patent.

14

118.    Defendant's Proposed Label and Instructions for Use would encourage, recommend, or promote infringement of claims 1, 4, and 6-8 of the '793 patent by physicians, caregivers, and patients.

119.    Based on the contents of its Proposed Label and Instructions for Use, Defendant specifically intends to encourage, recommend, or promote infringement of claims 1, 4, and 6-8 of the '793 patent by physicians, caregivers, and patients.

120.    Liquidia will actively induce direct infringement by patients through its press releases, marketing, label, instructions for use, and conduct.

121.    Through the sale or offer for sale of Defendant's Proposed Product, Defendant will contribute to the infringement of claims 1, 4, and 6-8 of the '793 patent by patients or physicians or caregivers who administer Defendant's Proposed Product.

122.    Defendant has knowledge of the '793 patent at least as early as July 22, 2020; will sell or offer for sale its Proposed Product, which is a product for practicing a patented method, and which is not a staple article or commodity capable of substantial non-infringing use and which constitutes a material part of the invention; and Defendant knows that its Proposed Product was especially made or adapted for use in an infringing method. Thus, Defendant will also contribute to infringement of claims 1, 4, and 6-8 of the '793 patent.

## IV.    FACTS PERTAINING TO THE VALIDITY OF THE '066, '901, AND '793 PATENTS

### A.    The '066 and '901 Patents are Valid

123.    A POSA would have understood that the '066 and '901 patents satisfy the written description requirement.

124.    A POSA would have understood that the inventors were in possession of the "Impurities" limitation of the '066 and '901 patents.

15

125.    A POSA would have understood that the inventors were in possession of the "Salt" limitation of the '066 and '901 patents.

126.    A POSA would have understood that the inventors were in possession of the "Stored"/ "Storing"/ "Storage" at "Ambient Temperature" limitations of the '066 and '901 patents.

127.    There is no limitation prohibiting column chromatography in the '066 and '901 patents, but nevertheless a POSA would have understood that the inventors were in possession of such a limitation.

128.    There is no limitation prohibiting isolation of treprostinil before combining with a base to form a salt in the '066 and '901 patents, but nevertheless a POSA would have understood that the inventors were in possession of such a limitation.

129.    A POSA would have understood that the inventors were in possession of the "Therapeutically Effective Amount" limitation of the '901 patent.

130.    A POSA would have understood that the '066 and '901 patents satisfy the enablement requirement.

131.    A POSA would have been able to practice the "Salt" limitation of the '066 and '901 patents without undue experimentation.

132.    A POSA would have been able to practice the "Stored"/ "Storing"/ "Storage" at "Ambient Temperature" limitations of the '066 and '901 patents without undue experimentation.

133.    There is no limitation prohibiting column chromatography in the '066 and '901 patents, but nevertheless a POSA would have been able to practice such a limitation without undue experimentation.

134.    There is no limitation prohibiting isolation of treprostinil before combining with a base to form a salt in the '066 and '901 patents, but nevertheless a POSA would have been able to

16

practice such a limitation without undue experimentation.

135.    A POSA would have been able to practice the "Therapeutically Effective Amount" limitation of the '901 patent without undue experimentation.

136.    A POSA would have understood that the '066 and '901 patents satisfy the definiteness requirement.

137.    A POSA would have been able to discern the scope and meaning of the "Impurities" limitation of the '066 and '901 patents with reasonable certainty.

138.    A POSA would have been able to discern the scope and meaning of the "Stored"/ "Storing"/ "Storage" at "Ambient Temperature" limitations of the '066 and '901 patents with reasonable certainty.

139.    A POSA would have been an experienced chemical engineer or process research chemist with experience in or access to an individual with experience in the production and manufacture of pharmaceutical API and final drug product for pharmaceutical compositions and pharmaceutical products.

140.    A POSA would have understood from the '066 and '901 patent specifications that impurities generated during the alkylation step are described in the '066 and '901 patent specifications.

141.    A POSA would have understood from the '066 and '901 patent specifications that impurities generated during the hydrolysis step are described in the '066 and '901 patent specifications.

142.    Example 1 of each of the '066 and '901 patent specifications  describes the alkylation of benzindene triol and provides exemplary reactants and reaction conditions that may be used in that step.  A POSA would have understood from Example 1 that impurities would be

17

generated during the alkylation step.

143.    A POSA would have understood that filtering the alkylation product of the '066 and '901 patent specifications with Celite pad and washing the filter cake in acetone does not remove all impurities.

144.    A POSA would have understood that a light brown color of the benzindene nitrile of the '066 and '901 patent specifications indicates the presence of impurities.

145.    A POSA would have understood that the '066 and '901 patent specifications' reference to the benzindene nitrile as crude indicates a product that is not in pure form and that contains impurities.

146.    Example 2 of the '066 and '901 patent specifications describes the hydrolysis of benzindene nitrile and provides exemplary reactants and reaction conditions that may be used in that step.  A POSA would have understood from Example 2 that impurities would be generated during the hydrolysis step.

147.    A POSA would have understood from the "*Note" in Example 2 of the '066 and '901 patent specifications that impurities introduced during the alkylation step are not removed prior to the hydrolysis step.

148.    A POSA would have understood from the '066 and '901 patent specifications that impurities introduced during the alkylation step that are either carried through or react during the hydrolysis step are impurities resulting from the alkylation and hydrolysis steps.

149.    A POSA would have understood from Example 2 in the '066 and '901 patent specifications that ethyl acetate extraction does not remove all impurities.

150.    A POSA would have understood from Example 2 in the '066 and '901 patent specifications that a starting batch of treprostinil, containing impurities resulting from prior

18

alkylation and hydrolysis steps, was formed prior to the addition of activated carbon.

151.    A POSA would have understood from the '066 and '901 patent specifications that a pale-yellow color of treprostinil indicates the presence of impurities.

152.    A POSA would have understood from the prior art that pure treprostinil is a colorless crystalline solid.

153.    A POSA would have understood from Example 2 in the '066 and '901 patent specifications that TLC can be used to measure the presence of impurities.

154.    A POSA would have understood from the prior art that TLC can be used to measure the presence of impurities.

155.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that impurities are present in the treprostinil after the alkylation and hydrolysis steps, for example, from the "*Note" explaining that the treprostinil is not an isolated yield.

156.    A POSA would have understood from step 21 in Example 6 in the '066 and '901 patent specifications that impurities are present in the hydrolysis product because the step is titled "Removal of impurities."

157.    A POSA would have understood from Example 5 in the '066 and '901 patent specifications that the level of one or more impurities were lowered from the starting batch of treprostinil due to the off-white color of the treprostinil after the salt formation step.

158.    A POSA would have understood from the '066 and '901 patent specifications that the level of one or more impurities is lowered from the starting batch of treprostinil to the pharmaceutical composition from the statement in the specifications that "The impurities carried over from intermediate steps (i.e., alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step."

19

159.    A POSA would have understood from the prior art how to identify and quantify specific impurities, for example, by using chromatographic techniques.  A POSA would also have understood from the prior art how to track the reduction in impurities, even if the identity of the impurities was not known, for example, by correlating impurity peaks at particular retention times.

160.    A POSA would have understood from the '066 and '901 patents that only bases that will result in the formation of a pharmaceutically acceptable salt can be used during the salt formation step.

161.    A POSA would have understood that the '066 and '901 patent specifications define the terms "pharmaceutically acceptable," "pharmaceutically acceptable salts," and "pharmaceutically acceptable salt."  A POSA would have understood from these definitions which bases could be used to form pharmaceutically acceptable salts.

162.    A POSA would have understood from the non-limiting examples in the '066 and '901 patent specifications that the following bases could be used during the salt formation step: diethanolamine, ammonia, N-methylglucamine, procaine, tromethamine, magnesium, L-lysine, L-arginine, and triethanolamine.

163.    A POSA would have understood from claim 3 of the '066 patent that the following bases could be used during the salt formation step: sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.

164.    There is no temporal limitation on storage.

165.    Storage can occur between manufacturing steps and during transportation.

166.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that treprostinil salt is formed once the seed of polymorph B of treprostinil diethanolamine was added.

20

167.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that treprostinil salt is stored at ambient temperature when the suspension was cooled to $20 \pm 2°$ C overnight.

168.    A POSA would have understood from Example 3 in the '066 and '901 patent specifications that treprostinil salt is stored at ambient temperature when the treprostinil diethanolamine salt was transferred to a container for air drying in hood.

169.    A POSA would have understood from Example 4 in the '066 and '901 patent specifications that isolated salt is stored at ambient temperature when it was transferred to trays for air-drying overnight in hood.

170.    A POSA would have understood from steps 32 and 34 of Example 6 in the '066 and '901 patent specifications that isolated salt is stored at ambient temperature.

171.    A POSA would have understood from the '066 and '901 patent specifications that isolated salt and treprostinil salt could be stored at ambient temperature where it states "crude treprostinil salts can be stored as raw material at ambient temperature."

172.    A POSA would have understood from the prior art how to control for non-temperature storage conditions such as humidity, light, and oxygen levels.

173.    A POSA would have understood that prohibition of column chromatography is not claimed in the '066 and '901 patents.

174.    Claims 1 and 8 of the '066 patent and claim 8 of the '901 patent are comprising claims such that steps in addition to those claimed could be present and still be within the scope of the claim.

175.    A POSA would have understood from the '066 and '901 patent specifications that the inventors were showing a preferred embodiment whereby column chromatography could be

21

eliminated, rather than a disclaimer or disavowal of the use of column chromatography.

176.    A POSA would have understood that the '066 and '901 patents define "comprising" as "including but not limited to" such that "other non-mentioned…steps may be present."

177.    A POSA would have understood from step 12 of Example 6 of the '066 and '901 patent specifications that column chromatography could be practiced between the alkylation and salt formation steps.

178.    A POSA would have understood from the prior art that column chromatography was a routine and well-known purification technique.

179.    A POSA would have understood from the '066 and '901 patent specifications that there can be isolation prior to salt formation.

180.    A POSA would have understood from the '066 and '901 patent specifications that various other purification techniques besides column chromatography could be used between alkylation and salt formation such as Celite pad filtering, ethyl acetate extraction, NaCl washing, carbon filtration, and ethyl acetate washing.

181.    A POSA would have understood from the prior art that column chromatography does not always result in a more pure product.

182.    A POSA would have understood that prohibition of isolation of treprostinil before combining with a base is not claimed in the '066 and '901 patents.

183.    A POSA would have understood from the '066 and '901 patent specifications that the inventors were showing a preferred embodiment whereby of isolation of treprostinil before combining with a base could be eliminated, rather than a disclaimer or disavowal of isolation of treprostinil before combining with a base.

184.    A POSA would have understood from Example 2 in the '066 and '901 patent

22

specifications that the volume of a solution of treprostinil was reduced prior to combination with a base. A POSA would have understood from this disclosure that the treprostinil could have been isolated by continuing to reduce the volume of the filtrate.

185. A POSA would have understood from the '066 and '901 patent specifications that treprostinil was an FDA approved medication and would have been able to determine a therapeutically effective amount of treprostinil or salt thereof based on the numerous references described in the specification.

186. A POSA would have understood from the '066 and '901 patent specifications that treprostinil is the active ingredient in Remodulin®.

187. A POSA would have understood from the prior art, for example the March 2006 Remodulin® label, information on disease, dosing, and route of administration.

188. As to the '066 and '901 patents, the critical date for availability as prior art is December 17, 2007.

189. U.S. Patent No. 8,497,393 ("the '393 patent") issued July 30, 2013, resulting from U.S. Patent Application Number 13/548,446, which is a continuation of U.S. Patent Application No. 12/334,731, filed on December 15, 2008, now U.S. Patent No. 8,242,305. The '393 patent claims priority to U.S. Provisional Patent Application No. 61/014,232, the same provisional application to which the '066 and '901 patents claim priority.

190. The '066 and '901 patent specifications at 1:8-15 cite and incorporate by reference the application of the '393 patent.

191. The '393 patent is not prior art to the '066 patent.

192. The '393 patent is not prior art to the '901 patent.

193. The '066 patent claims contain limitations not found in the '393 patent claims.

23

194.    The '901 patent claims contain limitations not found in the '393 patent claims.

195.    Claim 1 of the '393 patent is a genus claim.

196.    Claim 1 of the '393 patent does not contain a limitation on impurities.

197.    Claim 1 of the '393 patent does not contain a limitation on stability.

198.    The '066 and '901 patent specifications at 1:27-34 cite and incorporate by reference the paper "Moriarty, *et al* in J. Org. Chem. 2004, 69, 1890-1902" ("Moriarty").

199.    During prosecution of the '066 patent, the examiner considered the reference WO 2005/007081 ("Phares") listed on page 2 of the '066 patent under references cited.

200.    During prosecution of the '901 patent, the examiner considered the reference WO 2005/007081 ("Phares") listed on page 2 of the '901 patent under references cited.

201.    The '066 and '901 patents do not claim the same product as in the prior art.

202.    The pharmaceutical compositions and batches claimed in the '066 and '901 patents are distinct from products in the prior art.

203.    The '066 and '901 patents have claims directed towards making pharmaceutical compositions and pharmaceutical products that are different from methods found in the prior art.

204.    The storage of isolated treprostinil salt at ambient temperature during manufacture of a pharmaceutical composition is claimed in the '066 and '901 patents and is not disclosed in the prior art.

205.    Prior art does not render obvious claim 1 of the '066 patent.

206.    The prior art does not disclose the lowering of impurities from a starting batch of treprostinil.

207.    The prior art does not disclose the impurities present in the product of Moriarty.

208.    Prior art does not render obvious claim 2 of the '066 patent

HIGHLY CONFIDENTIAL                                       LIQ_PH-ILD_00000825

209.    Prior art does not render obvious claim 3 of the '066 patent.

210.    Prior art does not render obvious claim 6 of the '066 patent.

211.    The prior art does not disclose storing an isolated salt of treprostinil at ambient temperature.

212.    Prior art does not render obvious claim 8 of the '066 patent.

213.    Prior art does not render obvious claim 9 of the '066 patent.

214.    Prior art does not render obvious claim 1 of the '901 patent.

215.    Prior art does not render obvious claim 2 of the '901 patent.

216.    Prior art does not render obvious claim 3 of the '901 patent.

217.    Prior art does not render obvious claim 4 of the '901 patent.

218.    Prior art does not render obvious claim 6 of the '901 patent.

219.    Prior art does not render obvious claim 8 of the '901 patent.

220.    Prior art does not render obvious claim 9 of the '901 patent.

221.    UTC release specifications and other FDA submissions do not show that the claimed compositions were in the prior art.

222.    UTC release specifications do not affect the scope of the '066 patent.

223.    UTC release specifications do not affect the validity of the '066 patent.

224.    UTC release specifications do not affect the scope of the '901 patent.

225.    UTC release specifications do not affect the validity of the '901 patent.

226.     FDA submissions do not impact the scope of the '066 patent.

227.    FDA submissions do not impact the validity of the '066 patent.

228.    FDA submissions do not impact the scope of the '901 patent.

229.    FDA submissions do not impact the validity of the '901 patent.

25

230.    A POSA would not have been motivated to combine Moriarty and Phares with a reasonable expectation of success.

231.    A POSA would not have been motivated to combine Moriarty and Phares.

232.    Phares does not disclose the stability of any polymorphic form of treprostinil diethanolamine at ambient temperature.

233.    A POSA would understand that more thermodynamic stability does not equate to stability at room temperature.

234.    A POSA would not be motivated to combine Phares based on the bioavailability disclosed in Phares.

235.    The pharmaceutical composition of the '066 patent is structurally and functionally different from products of the prior art.

236.    The pharmaceutical batch of the '901 patent is structurally and functionally different from products of the prior art.

237.    In issuing the '066 patent, the examiner considered Moriarty and Phares and found the claims nonobvious over the combination.

238.    Liquidia petitioned for *inter partes* review (IPR) of the '066 patent, arguing obviousness in the combination of Moriarty and Phares.  The PTAB denied institution of IPR for the '066 patent.

239.    Liquidia petitioned for IPR of the '901 patent, arguing Moriarty and Phares obviousness in the combination of Moriarty and Phares.

240.    The PTAB instituted review of the '901 patent based on Liquidia's petition.

241.    The PTAB issued a Final Written Decision on the '901 patent.

242.    Liquidia is estopped under § 315 from arguing invalidity based on grounds it raised

26

or reasonably could have raised in the '901 IPR.

243. In issuing the '901 patent, the examiner considered Moriarty and Phares and found the claims nonobvious over the combination.

244. Tyvaso practices the claimed invention.

245. Tyvaso is a commercial success.

246. A POSA would not know UTC confidential information in considering motivation to combine prior art.

247. ████████████████████████████████████

████████████████

██ ████████████████████████████████

████████████████████████████████

249. A POSA would not know UTC confidential information in considering the disclosure of prior art.

250. A POSA would not use the invention as a roadmap in looking at the prior art.

251. There is no evidence of a motivation to combine the teachings of the prior art other than using hindsight of the invention as a roadmap.

252. A POSA would not have a reasonable expectation of success in scaling up the prior art processes.

253. A POSA would understand the prior art did not teach commercial scale manufacturing of treprostinil.

254. A POSA would understand that laboratory scale experiments are not always able to be scaled to commercial scale.

255. The prior art does not disclose any problems with the white-needle crystalline

27

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000828

appearance of treprostinil.

256.    A POSA would not consider white-needles to be an issue from the prior art.

257.    ████████████████████████████████████████████████

████████████████████████████████████

258.    A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the scope of the '066 patent.

259.    A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the validity of the '066 patent.

260.    A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the scope of the '901 patent.

261.    A POSA would know that statements in the prior art of quality and safety made to the FDA do not affect the validity of the '901 patent.

262.    The diethanolamine salt disclosed in the '066 is not identical to the diethanolamine salt in Phares.

263.    The diethanolamine salt disclosed in the '901 is not identical to the diethanolamine salt in Phares.

**B.    The Claims of the '793 Patent are Valid**

**1.    The '793 Patent**

264.    The '793 patent, filed on January 31, 2020, is entitled "Treprostinil Administration by Inhalation," and was issued on July 21, 2020. The '793 Patent is directed to the treatment of pulmonary hypertension by administering treprostinil (or salts thereof) by inhalation.

265.    The '793 patent was granted on application number 16/778,662, filed January 31, 2020, and claims priority through a series of applications dating back to a provisional patent

28

application, 60/800,016, filed on May 15, 2006. The priority date for the '793 patent is not later than May 15, 2006.

266.    The named inventors of the '793 patent are Horst Olschewski, Robert Roscigno, Lewis J. Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt and Robert Voswinckel.

267.    The '793 patent relates to a therapy involving treatment of pulmonary hypertension using inhaled treprostinil. Specifically, the '793 patent relates to a method of treating pulmonary hypertension by administering an inhaled, therapeutically effective, single event dose that comprises from 15 to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof, delivered in 1 to 3 breaths.

268.    The '793 patent claims several inhalation devices for administration, including administration using a dry powder inhaler. The '793 patent also claims a formulation including treprostinil, or a pharmaceutically acceptable salt thereof, wherein the formulation is a dry powder formulation.

269.    UTC has asserted that Liquidia infringes five claims of the '793 patent: Claims 1, 4, 6, 7 and 8 of the '793 patent.

270.    Claims 4, 6, 7 and 8 depend from Claim 1 of the '793 patent.

**2.    Person of Ordinary Skill in the Art**

271.    The named inventors of the '793 patent have post-graduate degrees in the field of medicine or drug development disciplines and all had at least several years of research, executive, and/or clinical experience in the investigation and treatment of pulmonary hypertension and in developing pharmaceutical products for the treatment of pulmonary hypertension.

272.    A POSA with respect to the '793 patent would have a graduate degree in medicine or a field relating to drug development, such as an M.D. or a Ph.D., with at least two years practical

29

experience in either (i) the investigation or treatment of pulmonary hypertension or (ii) in the development of potential drug candidates, specifically in the delivery of drugs by inhalation.

273.    The POSA could have a lower level of formal education if such a person had more years of experience in the development of inhalable drugs.

274.    Because drug development involves a multidisciplinary approach, the POSA would consult with individuals having specialized expertise, for example, a pharmacologist with experience in development of inhaled formulations or inhalation devices and/or a physician with experience in the administration, dosing and efficacy of drugs for the treatment of a particular disease state.

### 3.    Relevant Claim Construction

275.    The Court did not construe any terms or phrases in the '793 patent and as such, the terms should have their plain and ordinary meaning to the POSA .

### 4.    Relevant Background

276.    Pulmonary hypertension is a term for a hemodynamic abnormality, elevated pressure. For pulmonary hypertension, a hemodynamic effect is a therapeutic effect showing improvement on the underlying state of the disease. Administration of a drug like treprostinil that has a vasodilatory effect on pulmonary arteries and reduces pressure (e.g., PAP) and pulmonary resistance (e.g., PVR) directly addresses the elevated pressure associated with pulmonary hypertension. This reduction in the pressure load on the heart is a therapeutic effect that is demonstrated by the data presented in the '793 patent specification.

277.    Hemodynamics can be and are used to assess efficacy of drugs, including in clinical studies and drug development. The benefit of hemodynamics when assessing therapeutic effectiveness against pulmonary hypertension is clear from numerous clinical studies gathering

30

hemodynamic data to determine test effectiveness.

278.    The first FDA approved treatment for pulmonary hypertension – and the sole approved treatment for over five years (from 1995-2001) – was epoprostenol, which had substantial shortcomings and posed significant burdens to patients.

279.    Epoprostenol can only be administered by continuous intravenous infusion because it has a short half-life of only a few minutes and is cleared from the body very quickly. Further, the short duration of action of epoprostenol means that even a brief interruption in infusion could increase the risk of hemodynamic collapse and even death because of delivery complications. Moreover, epoprostenol requires daily mixing and refrigeration, thus requiring the patient to carry a cold pack to avoid degradation at room temperature and an infusion pump in order to safely administer the drug.

280.    Later-approved subcutaneous (in 2002) and intravenous (in 2004) administration of treprostinil had some benefits over epoprostenol. For example, it is stable at room temperature and has a half-life of several hours rather than several minutes. This freed patients of having to carry ice packs to ensure the safety and efficacy of the drug. There were still limitations to intravenous and subcutaneous delivery of treprostinil, such as intolerable site pain in some instances and systemic side effects.

281.    By the May 2006 priority date of the '793 patent, the only FDA-approved prostacyclin-type drug that could be given in an inhalable form was iloprost, marketed as Ventavis®. Clinicians were still largely of the opinion however, that intravenous administration of a prostacyclin analog was preferable to inhaled delivery of iloprost for a number of reasons, including iloprost's relatively short half-life.

282.    By May 2006, a large number and variety of devices suitable for use with powder

31

formulations were known.

283.    Specifically, one such company in Italy known as Plastiape made devices (e.g., dry powder inhalers) that were known, available, and used widely in the market with many milled and/or spray-dried powders.

284.    At the time of the priority date, the basic principles of dry powder formulation development were known and available. The basic steps in formulating dry powder formulations of drugs were known and studied by 2006. Known techniques included micronization and spray drying, as well as ways to evaluate, modify process steps, and improve or optimize processes to achieve respirable particle sizes. It was known to test and evaluate formulations and devices using in vitro methods, including, among others, impaction studies. Further optimization regarding formulation, drug and carrier to reach a desired performance was known and routine at the time of the priority date.

285.    At the time of the priority date, the basic principles of dry powder formulation development were known and available. Information regarding the active pharmaceutical ingredient, preparation of the active pharmaceutical ingredient, use of excipients and formulations for dry powder inhalers, how formulations are processed, and techniques used to characterize dry powder formulation systems was readily available.

286.    Information regarding drug properties, milling, excipient selection, blending, and filling into a dry powder inhaler device was similarly known and available. Furthermore, guides concerning dry powder inhaler devices and knowledge regarding the accuracy and reproducibility of dose emissions from those devices was available.

287.    Salt synthesis for APIs, physical and chemical screening, XRPD, laser diffraction, cascade impaction, HPLC, blending, mixing, blend uniformity, and many other techniques, were

HIGHLY CONFIDENTIAL       LIQ_PH-ILD_00000833

known as part of the drug development and formulation evaluation and improvement processes.

5. **Prior Art**

a) **The '212 Patent**

288. The '212 patent describes testing done in tracheotomized sheep, involving UT-15 delivered by inhalation using a continuous nebulizer.

289. The '212 patent is listed on the face of the '793 patent under "References Cited," and was considered by the patent examiner before the '793 patent was allowed.

290. The '212 patent does not disclose a dose to be administered to sheep or humans in a single event.

291. The '212 patent does not contain sufficient information to allow a POSA to calculate a therapeutically effective single event dose of 15-90 µg delivered in 1-3 breaths from the information given in the abstract, let alone to do so reliably, for a sheep or human.

292. The '212 patent does not disclose, teach, or render obvious the administration of inhaled treprostinil to a human in 1-3 breaths.

293. The '212 patent does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

b) **Voswinckel JESC**

294. Voswinckel JESC is a brief abstract spanning approximately one quarter of a single page that generally describes a clinical study that used continuous nebulization at concentrations of 16, 32, 48, and 64 µg/mL of treprostinil with a time period of 6 minutes.

295. Voswinckel JESC provides the concentration of the drug in the pre-aerosolized solution but does not specify the dose delivered to the patient. Voswinckel JESC does not describe a therapeutically effective single event dose of 15 micrograms to 90 micrograms.

33

296.    Voswinckel JESC does not contain sufficient information to allow a POSA to calculate a therapeutically effective single event dose of 15-90 μg delivered in 1-3 breaths from the information given in the abstract, let alone to do so reliably.

297.    In general, a POSA would not rely on an abstract like Voswinckel JESC because conference abstracts are not peer-reviewed to the same rigor as published journal articles, and further often report only preliminary data which may or may not translate into actual results.

298.    Voswinckel JESC is listed on the face of the '793 patent under "References Cited," and was thus considered by the patent examiner before the '793 patent was allowed.

299.    Voswinckel JESC does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

### c)    Voswinckel JAHA

300.    Voswinckel JAHA is a brief abstract spanning approximately one quarter of a single page in the Circulation Journal of the American Heart Association. It generally describes preliminary data of an open-label study of "TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml)." This abstract discloses a pre-aerosolized concentration for the treprostinil solution of 600 μg/mL for inhalation over a specific number of breaths. Voswinckel JAHA also does not describe a therapeutically effective single event dose of 15 micrograms to 90 micrograms.

301.    Voswinckel JAHA does not contain sufficient information to allow a POSA to calculate a therapeutically effective single event dose of 15-90 μg delivered in 1-3 breaths from the information given in the abstract, let alone to do so reliably.

302.    In general, a POSA would not rely on an abstract like Voswinckel JAHA because conference abstracts are not peer-reviewed to the same rigor as published journal articles, and

34

further often report only preliminary data which may or may not translate into actual results.

303.    Voswinckel JAHA is listed on the face of the '793 patent under "References Cited," and was considered by the patent examiner before the '793 patent was allowed.

304.    Voswinckel JAHA does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

### d)    Ghofrani

305.    Ghofrani is a review article, published in German, describing "New therapies in the treatment of pulmonary hypertension." In addition to describing recent developments relating to inhaled treprostinil, the review article also describes other "new therapy approaches, which are partially still under development, and that can find their way into the therapy guidelines in the near future" including inhaled iloprost, selective endothelin A receptor antagonists (sitaxsentan and ambrisentan), and PDE-5 inhibitors.

306.    Ghofrani was co-authored by Dr. Werner Seeger and Dr. Robert Voswinckel (inventors of the '793 patent) as well as Dr. Hossein A. Ghofrani, Dr. Frank Reichenberger, and Dr. Friedrich Grimminger. Ghofrani was published in June of 2005.

307.    The work described in Ghofrani and relied upon by Liquidia is not "by another."

308.    Ghofrani does not qualify as prior art.

309.    Ghofrani is listed on the face of the '793 patent under "References Cited," and was considered by the patent examiner before the '793 patent was allowed.

310.    Ghofrani does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

### e)    Voswinckel 2006

311.    Voswinckel 2006 is a short "Clinical Observation" published in the Annals of

35

Internal Medicine, titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," which describes clinical observations on three patients with severe pulmonary hypertension, who were treated with administration of a single 15 µg dose of treprostinil, inhaled in three breaths through a modified Optineb ultrasonic inhalation device.

312.    Voswinckel 2006 was co-authored by Dr. Werner Seeger, Dr. Robert Voswinckel, and Dr. Horst Olschewski (inventors of the '793 patent) as well as Dr. Hossein A. Ghofrani and Dr. Friedrich Grimminger. Voswinckel 2006 was published in January of 2006.

313.    The work described in Voswinckel 2006 and relied upon by Liquidia is not "by another."

314.    Voswinckel 2006 does not qualify as prior art.

315.    Voswinckel 2006 is listed on the face of the '793 patent under "References Cited," and was considered by the patent examiner before the '793 patent was allowed.

316.    Voswinckel 2006 does not alone, or in combination with Liquidia's other asserted prior art, anticipate or render obvious any claims of the '793 patent.

**6.    Secondary Considerations**

317.    Tyvaso is a commercial embodiment of the '793 patent. Tyvaso is used to treat pulmonary hypertension in humans suffering from pulmonary hypertension and is administered in a therapeutically effective single event dose comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, and the therapeutically effective single event dose is between 15 to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof and is delivered in 1 to 3 breaths.

318.    The '793 patent satisfied a long-felt but unmet need.

319.    The '793 patent allowed for an inhaled dosing regimen and maximized therapeutic

HIGHLY CONFIDENTIAL                               LIQ_PH-ILD_00000837

benefits by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy to use inhaler.

320.    Inhaled treprostinil is approved to treat a broader range of pulmonary hypertension patients than the therapeutics available at the time of the invention.

321.    The '793 patent showed unexpected results including that therapeutically effective, high doses of treprostinil could be delivered to a patient in a shorter period of time with fewer side effects be developing a method that combined higher dosing in fewer breaths using a modified inhalation device.

322.    The pharmacodynamics of inhaled treprostinil also presented unexpected results.

323.    Tyvaso is currently approved in the U.S. for the treatment of PAH and PH-ILD.

### 7.    The Asserted Claims of the '793 Patent Are Enabled And Have Adequate Written Description

324.    The '793 patent satisfies the written description and enablement requirements.

325.    The '793 patent discloses both an inhalable solution and an inhalable dry powder and devices for administering both types of formulations.

326.    The '793 patent provides for both a dry powder with a particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter as well as an inhalation device that can be a dry powder inhaler.

327.    The '793 patent describes treprostinil dosing information, the use of dry powder inhalers, and powder formulations.

328.    The POSA would recognize based on the '793 patent that the inventors were in possession of, i.e., had invented what is claimed, an inhaled dry powder formulation of treprostinil.

329.    The '793 patent contains adequate written description supporting the asserted claims, including the claims including methods of treatment using dry powder formulations and/or

37

dry powder inhalers.

330.    A POSA in 2006 would have had access to numerous dry powder inhalers (DPIs), excipients, and methods of manufacturing dry powder formulations.

331.    Numerous devices existed by 2006 that would have been suitable for use with inhaled dry powder formulations.

332.    A sufficient number of carriers existed in 2006 that a POSA could have chosen from, including lactose.

333.    Methods were also known to a POSA as of the priority date that would allow a POSA to adjust API and excipient particle size to achieve the desired particle sizes and formulation performance.

334.    Starting with the information disclosed in the '793 patent, a POSA could have used known excipient(s) and known techniques such as milling or spray drying to create an inhalable dry powder formulation of treprostinil (or a salt thereof) and practice the asserted claims of the '793 patent without undue experimentation.

335.    The experimentation required to prepare an inhalable dry powder formulation of treprostinil (or a salt thereof) for use in a dry powder inhaler (DPI) and practicing the asserted claims of the '793 was routine and would not be considered undue.

336.    In 2006, a POSA reviewing the claim limitation requiring a method of treating pulmonary hypertension would immediately understand that the claim was referring to pulmonary arterial hypertension.

337.    To the extent the claim is interpreted to cover all forms of pulmonary hypertension, a POSA would have understood that as of the priority date inhaled treprostinil could be used to treat multiple forms of pulmonary hypertension, including based upon the '793 patent

38

specification.

338.    A POSA would have understood that the '793 patent includes WHO Groups 1, 3, and 4 within the patent specification, that WHO Group 5 could also be included, and that inhaled treprostinil could be used to treat a mixed form of WHO Group 2.

339.    As of the priority date a POSA would have known and understood that inhaled treprostinil would not be used to treat a pure WHO Group 2 post-capillary patient.

340.    The POSA could readily determine from his or her knowledge and skill, or from routine testing, whether inhaled treprostinil could be used to treat WHO Group 2 postcapillary PH.

341.    The POSA would recognize based on the '793 patent that the inventors were in possession of, i.e., had invented what is claimed, a method of treating pulmonary hypertension.

342.    The POSA would have been able to practice the claimed methods of treating pulmonary hypertension without undue experimentation based on the teachings of the '793 patent and the background knowledge of those of skill in the art.

343.    The POSA could have practiced the asserted claims of the '793 patent—i.e., could have administered a formulation (e.g., a liquid or dry powder) to a human consistent with the claims—without undue experimentation. The POSA knew how to prepare and administer formulations and would have been able to instruct the patient on how to use the formulations to administer the drug using routine techniques and without undue experimentation.

39

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION<br><br>          Plaintiff,<br><br>v.<br><br>LIQUIDIA TECHNOLOGIES, INC.,<br><br>          Defendant. | C.A. No. 20-755 (RGA) (JLH)<br><br>**HIGHLY CONFIDENTIAL** |

<u>**REBUTTAL EXPERT REPORT OF ANDREW CLARK, PH.D.**</u>

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 7

       A.    Scope of Analysis .................................................................................. 8

       B.    Qualifications ........................................................................................ 8

       C.    Materials Considered ............................................................................ 9

II.    LEGAL STANDARDS PROVIDED BY COUNSEL .................................... 10

       A.    Claim Construction ............................................................................. 11

       B.    Presumption of Validity ...................................................................... 13

       C.    Anticipation ........................................................................................ 13

       D.    Obviousness ........................................................................................ 17

       E.    Written Description ............................................................................. 18

       F.    Enablement ......................................................................................... 18

III.   BACKGROUND ................................................................................................ 26

       A.    Pulmonary Hypertension .................................................................... 27

       B.    The '793 Patent ................................................................................... 28

       C.    File History .......................................................................................... 30

IV.    PERSON OF ORDINARY SKILL IN THE ART ........................................... 30

V.     VALIDITY OF THE '793 PATENT ................................................................ 32

       A.    The Asserted Claims of the '793 Patent Are Supported By
             Adequate Written Description ............................................................. 13

       B.    The Asserted Claims Are Enabled ...................................................... 17

             1.    Devices .................................................................................... 18

             2.    Formulations ........................................................................... 18

             3.    Dosing ..................................................................................... 26

4.      Patients ................................................................................................. 27

5.      *Wands* Factors ..................................................................................... 28

6.      Industry Development ........................................................................... 30

C.      Dr. Gonda Takes Inconsistent Positions ....................................................... 30

VI.   CONCLUSION ............................................................................................... 32

## I.    INTRODUCTION

### A.    Scope of Analysis

1.    I have been retained by counsel for the Plaintiff, United Therapeutics Corporation ("UTC") to provide expert opinions related to U.S. Patent No. 10,716,793 ("the '793 patent").

2.    I am being compensated for my time spent on this matter at the rate of $400 per hour, plus reasonable expenses. I have no other interest in this litigation or in any party to this litigation. My compensation does not depend on my performance, the substance of my opinions, the outcome of the case, or any issues involved in or related to this case.

### B.    Qualifications

3.    My *curriculum vitae*, which is attached as **Exhibit 1**, summarizes my professional experience. I provide below further details about my experience that may be pertinent to this matter.

4.    I provided my background and qualifications in paragraphs 9–18 of my Initial Expert Report. I hereby incorporate by reference that background information.

### C.    Materials Considered

5.    In forming the opinions described in this report, I have relied on my professional experience and personal knowledge. I have also reviewed a number of documents and materials in this case. A full list of the materials considered, in whole or in part, in forming my opinions is set forth in **Exhibit 2**, attached hereto.

6.    My analysis of the issues of validity discussed in this report and my rebuttal to assertions made by Dr. Hill and/or Dr. Gonda has taken into account the Court's Construction of the Asserted Claims as set forth in the Court's June 16, 2021, Claim Construction Order (D.I. 119), which I have reviewed in full, and the hearing transcript from the Claim Construction Hearing, which I have reviewed in relevant part. If any claim terms were construed or addressed by the

1

> Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

*Id.* at (57); *see also*, *id.* at 7:13-15 (describing a metered dose inhaler as a "device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs.").

34.     The '793 patent relates to a therapy involving treatment of pulmonary hypertension using inhaled treprostinil. Specifically, the '793 patent relates to a method of treating pulmonary hypertension by administering an inhaled, therapeutically effective, single event dose that comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof, delivered in 1 to 3 breaths. *See, e.g.*, '793 patent, claim 1. I understand that the '793 patent claims several inhalation devices for administration, including administration using a dry powder inhaler. I further understand the '793 patent claims a formulation including treprostinil, or a pharmaceutically acceptable salt thereof, wherein the formulation is a dry powder formulation.

35.     I understand that the '793 patent was granted on application number 16/778,662, filed January 31, 2020. *Id.* at (21), (22). The '793 claims priority through several other applications, as described under the "Related U.S. Application Data" heading on the cover of the patent. According to the '793 patent, the earliest application filed is provisional application 60/800,016, filed on May 15, 2006. I understand this to be the relevant date—the "priority date"—from which the level of ordinary skill of the POSA is to be determined and the obviousness, written description, and enablement analyses are to be assessed.

### C.     File History

36.     As mentioned, U.S. patent application number 16/778,662 was filed on January 31, 2020. *See, e.g.*, U.S. Patent No. 10,716,793 File History ("'793 File History") (UTC_LIQ00007134-UTC_LIQ00007341) at UTC_LIQ00007137. On May 15, 2020, I

10

of the priority date, the POSA would understand that the inventors possessed the claimed invention.

46.    Claim 1 recites a method of treating pulmonary hypertension through administration of treprostinil, or a pharmaceutically acceptable salt, by inhalation 15-90 µg delivered in 1-3 breaths. The specification of the '793 patent as 12 pages of figures and 9 pages of narrative description, including two examples showing example devices and resulting data therefrom. Example 1 shows doses of 30-60 µg delivered in 1-3 breaths, resulting in the effective amount of treprostinil can be delivered in a single breath and was well tolerated at higher doses. Example 1 also showed a high concentration treprostinil solution delivered by soft mist inhaler. Example 2 showed doses of 15-90 µg delivered in 1-3 breaths delivered by a pulsed ultrasonic nebulizer. The results showed high doses delivered in minimal inhalation time lead to long-lasting pulmonary vasodilation.

47.    Dr. Gonda nevertheless contends that the '793 patent does not disclose enough about powder formulations and DPIs. In my opinion, he is incorrect. As he acknowledges, the '793 patent describes treprostinil dosing information (Gonda Report, ¶54) and the use of DPIs and describes powder formulations. '793 Patent 7:22-26 (discussing powder 5 or 10 micrometers in diameter for use in DPI), 9:14-17 (discussing doses of 30, 45, and 60 µg), 17:42-18:5 (describing doses of 15 µg up to 90 µg), 18:23-31. I also note that the provisional application to which the '793 patent claims priority, filed May 15, 2006, also describes powder formulations and DPIs. '016 Provisional at ¶[0036] ("The inhalation device can also be a dry powder. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter."); *id.* at 27 (reciting,

14

# EXHIBIT 13

LAW OFFICES

HYMAN, PHELPS & MCNAMARA, P.C.

700 THIRTEENTH STREET, N.W.

SUITE 1200

WASHINGTON, D.C. 20005-5929

(202) 737-5600

FACSIMILE

(202) 737-9329

─────

www.hpm.com

KURT R. KARST
MICHAEL D. SHUMSKY
SARA W. KOBLITZ

Direct Dial (202) 737-7544

February 12, 2024

**SUBMITTED BY EMAIL**

***CONFIDENTIAL TREATMENT***
***REQUESTED PER 21 C.F.R. § 20.61***

Kim Dettelbach, Esq.
Assistant Deputy Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
White Oak Building 1
Silver Spring, Maryland 20993-0002

Email: Kim.Dettelbach@fda.hhs.gov

Brian Cooney, MS, PSM
Regulatory Health Project Manager
Cardiology and Nephrology
Division of Regulatory Operations for
   Cardiology, Hematology,
    Endocrinology, & Nephrology
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

Email: brian.cooney@fda.hhs.gov

   **Re:   NDA 213005 – YUTREPIA (Treprostinil) Inhalation Powder
           Response to February 2, 2024 Letter from Liquidia Technologies, Inc.**

Dear Ms. Dettelbach and Mr. Cooney:

     On behalf of our client, United Therapeutics Corporation ("UTC"), we write in response to the letter dated February 2, 2024 from Liquidia Technologies, Inc. ("Liquidia") pertaining to its pending New Drug Application ("NDA") 213005 ("the YUTREPIA 505(b)(2) NDA") submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDC Act") and referencing UTC's TYVASO® (treprostinil) inhalation powder approved under NDA 022387.  Ltr. from S. Lassman re Liquidia (Feb. 2, 2024) ("Liquidia Ltr.").

     As UTC's December 29, 2023 letter explained, the U.S. Food and Drug Administration ("FDA" or "the Agency") erred in accepting Liquidia's attempt to amend its pending 505(b)(2) NDA because that course of action is foreclosed by FDA's

ACTIVE/127690147.3

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 2

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

longstanding, consistently applied, and never-previously-challenged Bundling Rule. Ltr. from K. Karst re Liquidia (Dec. 29, 2023) ("UTC Ltr."). Accordingly, the UTC Letter requested that FDA comply with its Bundling Rule and past precedents by withdrawing—or directing Liquidia to withdraw—the YUTREPIA 505(b)(2) NDA amendment and requiring a new NDA submission.

Liquidia's letter provides no persuasive reason why this request should not be granted. Although it claims that the Bundling Rule is outdated and was superseded by rulemaking, the very same rulemaking materials cited in the Liquidia Letter expressly provide that FDA's Bundling Rule remains in full force and effect. Indeed, while the Liquidia Letter paints a picture of a new regulatory scheme permitting the addition of new indications to pending NDAs by way of amendment, that "new" regulatory scheme makes clear that the Bundling Rule remains very much in effect. With its convoluted explanation of FDA's Medicare Modernization Act of 2003 ("MMA") rulemakings, Liquidia encourages FDA to ignore more than 30 years of clear policy—policy directly cited in the very preambles enacting the rulemaking Liquidia relies upon—in a blatant attempt to circumvent both FDA's longstanding Bundling Rule and the 30-month stay provisions Congress enacted in order to provide for an orderly resolution of patent disputes prior to the approval of pending 505(b)(2) NDAs and Abbreviated New Drug Applications ("ANDAs").

Given the misleading nature of the Liquidia Letter and the continued relevance of the Bundling Rule, UTC reiterates that Liquidia wrongly submitted, and that FDA erred in accepting, Liquidia's amendment adding a new indication to its YUTREPIA 505(b)(2) NDA. For that reason, UTC continues to request that FDA require Liquidia to submit a new 505(b)(2) NDA to request approval of a new indication; certify to the patent information listed in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") as of the submission of that new NDA for any listed drug relied on for approval; and stay the approval of any new YUTREPIA 505(b)(2) NDA if there is timely filed patent infringement litigation in response to a notice of Paragraph IV certification to Orange Book-listed patent information.

## I.  BACKGROUND

### A.  Legal Background

The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act" or "Hatch-Waxman"), Pub. L. No. 98-417, 98 Stat. 1585, amended the FDC Act to remove barriers to entry, increase availability of drugs, and reduce prescription

Kim Dettelbach, Esq.    HYMAN, PHELPS & MCNAMARA, P.C.
Brian Cooney, MS, PSM
February 12, 2024    *Contains Confidential Information*
Page 3    *Exempt from Disclosure*

costs. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). In so doing, the Hatch-Waxman Act established an abbreviated pathway to market for drug products, including both duplicates and follow-on products, by allowing applicants to rely on FDA's findings of safety and effectiveness for other drug products—"listed drugs"—as the basis of approval. 21 U.S.C. § 355(j), (b)(2). Applicants submit either an ANDA or a 505(b)(2) NDA referencing a drug listed in the Orange Book with data "bridging" the proposed drug to the listed drug so that the applicant need not duplicate the extensive testing performed by the listed drug sponsor for approval. *Id.* This process allows more affordable drugs to come to market more quickly than if full studies for safety and effectiveness were required.

At the same time, however, the Hatch-Waxman Act recognized that many listed drugs are protected by valuable patents, and thus struck a balance between expediting follow-on product entry and respecting innovators' patent rights. To that end, Hatch-Waxman requires an NDA sponsor to file with FDA "the patent number and the expiration date of any patent which claims the drug . . . and with respect to which a claim of patent infringement could reasonably be asserted [against a competitor]," 21 U.S.C. § 355(b)(1); *see also* 21 C.F.R. § 314.50(h), and obligates FDA to "publish" and "make available to the public" a list of the patent data NDA holders have submitted to the Agency. 21 U.S.C. § 355(j)(7)(A)(i); *see also id.* § 355(c)(2). FDA publishes this patent information in the Orange Book. *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004).

To speed the resolution of patent disputes between brands and follow-on sponsors so that competition can start as soon as the law permits, Congress required each ANDA or 505(b)(2) NDA relying on a listed drug to include "a certification . . . with respect to each [Orange Book-listed] patent which claims the listed drug . . . or . . . a use for such listed drug." 21 U.S.C. § 355(j)(2)(A)(vii); *see also* 21 C.F.R. § 314.53(f). Several patent certification types are available. *See* 21 U.S.C. § 355(j)(2)(A)(vii).

Paragraph IV certifications are particularly integral to the statutory and regulatory scheme. To help follow-on sponsors obtain certainty about a listed patent's coverage without subjecting them to the *in terrorem* threat of massive damages, the Patent Act deemed an applicant's submission of a Paragraph IV certification to FDA to be a "highly artificial" act of patent infringement that immediately can be litigated without subjecting the follow-on applicant to damages. 35 U.S.C. § 271(e); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990) ("Quite obviously, the purpose of [35 U.S.C. § 271](e)(2) and (e)(4) is to enable the judicial adjudication upon which the ANDA and paper NDA schemes depend."). Where an applicant submits a Paragraph IV certification in its original 505(b)(2) NDA, such notice must be provided "not later than 20 days after the date … [on]

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

which [FDA] informs the applicant that the application has been filed. *Id.* § 355(b)(3)(B)(i).

Because the whole point of Hatch-Waxman's patent-submission, patent-listing, Paragraph IV certification, and Paragraph IV notice provisions is to resolve patent disputes before FDA approval, the statute incentivizes brand manufacturers to sue as soon as they receive the legally-required notice. When the brand manufacturer sues within 45 days of receiving the legally-required notice, FDA may not approve the follow-on application until 30 months after the brand manufacturer receives the legally-required notice. 21 U.S.C. § 355(c)(3)(C). This 30-month stay permits the innovator and follow-on manufacturer to litigate all relevant patents prior to approval and market entry of the follow-on product. *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009). A 30-month stay is available only with respect to patent information submitted to FDA before the date a 505(b)(2) NDA is submitted to the Agency, and typically only a single 30-month stay is available for each 505(b)(2) NDA containing a Paragraph IV certification. Ltr. to Gerald Masoudi, Docket No. FDA-2010-P-0223, at 5 (Oct. 19, 2010).

During the 30-month stay, FDA reviews the follow-on application. While a pending follow-on application may be amended during that review—or supplemented after approval—there are limits to such submissions. Specifically, the FDC Act states that "[a]n applicant may not amend or supplement an application . . . to seek approval of a drug that is a different drug that the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A). FDA has interpreted this provision to prohibit "an applicant from amending or supplementing a 505(b)(2) application to seek approval of a drug that has been modified to have a *different active ingredient, different route of administration, different dosage form, or certain differences in excipients* than the drug proposed in the original submission of the 505(b)(2) application," which "conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application (see guidance for industry on 'Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees' (December 2004) [the '2004 Bundling Rule']." Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69580, 69635 (Oct. 6, 2016) (emphasis added). Conversely, the statute expressly permits the submission of an amendment or supplement to a pending NDA to seek approval for *a different strength*. 21 U.S.C. § 355(b)(4)(B).

No such permission is granted for a change in indication. Absent direction from Congress on the addition of a new indication to a pending 505(b)(2) NDA, FDA has interpreted its regulations such that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should *not* be made as an amendment to the

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

505(b)(2) application," in accordance with the 2004 Bundling Rule.   The 2004 Bundling Rule sets forth FDA's clear requirements for "what will be considered a separate marketing application."  2004 Bundling Rule, at 1.  As explained in UTC's December 2023 letter, the Bundling Rule states:

> If submitted simultaneously in one application, requests for approval of different indications and uses for the same dosage form to be administered by the same route of administration . . . can be regarded, for the purposes of assessing user fees, as one application. . . . *After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim*. . . . If the original application is not yet approved, *a request for approval of other new indications or claims should be submitted in a separate, original application*.  If the initial application is approved, the application can be subsequently supplemented to add a new indication.

*Id.* at 4-5 (emphasis added).  This Bundling Rule continues to be cited by the Agency in various documents, including, most recently, in a Standard Operating Procedures and Policies ("SOPP") publication dated *January 2024*.  SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA), at 12 (Jan. 8, 2024) ("In limited circumstances, an applicant may submit two BLAs/NDAs for the same product that are concurrently reviewed as stand-alone applications with separate [Submission Tracking Numbers ('STNs')].  This occurs when an applicant has a pending BLA/NDA and seeks approval for another reason (for example a different indication or dosage) for the same product (refer to the [2004 Bundling Rule]")).  Liquidia did not do this in their current application.

## B.    Factual Background

As UTC's December 2023 letter explained, UTC is the holder of five NDAs for drug products containing treprostinil, including TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/mL, approved under NDA 022387.  FDA initially approved TYVASO on July 30, 2009 for the treatment of Pulmonary Arterial Hypertension (WHO Group I) in patients with NYHA Class III symptoms, to increase walk distance (the "PAH Indication").  On March 31, 2021, FDA approved Supplement S-017 to the TYVASO NDA for a new indication: "for the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability" (the "PH-ILD Indication").

In January 2020, Liquidia submitted a 505(b)(2) NDA seeking approval of YUTREPIA (treprostinil) for the PAH Indication relying on UTC's TYVASO as the listed

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

drug. Liquidia's YUTREPIA 505(b)(2) NDA contained Paragraph IV certifications to some of the then-listed Orange Book patents for TYVASO, including, in particular, U.S. Patent Nos. 9,593,066 ("the '066 patent") and 9,604,901 ("the '901 patent"). UTC timely sued Liquidia for patent infringement, thereby triggering a 30-month stay on the approval of the YUTREPIA 505(b)(2) NDA that expired on or about October 24, 2022. Liquidia later amended its 505(b)(2) NDA and provided a Paragraph IV certification to a later-listed patent, U.S. Patent No. 10,716,793 ("the '793 patent"), but because that patent was later-listed, the Paragraph IV certification did not result in a 30-month stay. In May 2021, Liquidia responded to a Complete Response Letter ("CRL") from FDA resulting in an amendment to the YUTREPIA 505(b)(2) NDA and additional patent certifications. FDA tentatively approved the YUTREPIA 505(b)(2) NDA for the treatment of PAH, but, due to an ongoing 30-month stay, FDA could not grant final approval for the Liquidia 505(b)(2) NDA.

During the pendency of the 30-month stay for the PAH indication, UTC received approval of the new PH-ILD indication. Supplement Approval, NDA 22387/s-017 (Mar. 31, 2021). In July 2023, Liquidia—fully aware of FDA's Bundling Rule—decided to amend the YUTREPIA 505(b)(2) NDA instead of submitting a new 505(b)(2) NDA to add the PH-ILD indication. In that amendment, Liquidia certified to the Orange Book patent information for TYVASO, and UTC timely sued Liquidia for patent infringement, but the subsequent litigation on the patents covering the new indication—the '793 patent, and U.S. Patent No. 11,826,327 ("the '327 patent")—did not trigger a 30-month stay because those patents were added to the Orange Book for TYVASO after the January 20, 2020 submission of the original YUTREPIA 505(b)(2) NDA. According to the Liquidia Letter, the amendment contained no additional data.

FDA assigned the July 2023 amendment a goal date of January 2024—6 months after submission. In January 2024, however, FDA notified Liquidia that it was not going to issue an action letter in time to meet the . . . PDUFA goal date of January 24, 2024." Liquidia Ltr. at 10.

## II.    LIQUIDIA'S AMENDMENT MUST BE WITHDRAWN

Liquidia misleadingly suggests that UTC is manipulating the regulatory process to thwart competition, but the real issue here is that Liquidia failed to comply with longstanding, repeatedly applied, and recently reaffirmed FDA requirements (and FDA erred in failing to apply them). FDA's Bundling Rule is clear: a new NDA must be submitted to add a new indication to a pending NDA. Liquidia's attempts to circumvent those requirements by framing FDA's longstanding Bundling Rule as a "recommendation"

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 7

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

and outdated "policy" is unpersuasive. FDA cannot condone Liquidia's disregard of FDA's requirements and thereby allow Liquidia to deprive UTC of its statutorily-enabled right to enforce its intellectual property prior to the market entry of a flood of potentially infringing product.

Liquidia takes the position that FDA's 2016 final rule implementing the MMA ("2016 MMA Final Rule") obviates the Bundling Rule, but FDA repeatedly and consistently has emphasized its continued applicability, including when FDA promulgated the very regulations Liquidia claims to have superseded the Bundling Rule. *See, e.g.*, 81 Fed. Reg. at 69616, 69635 ("This final requirement conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application (see guidance for industry on [the Bundling Rule] (December 2004). . ."). Contrary to Liquidia's position, nothing in FDA regulations expressly permits the addition of a new indication to a pending 505(b)(2) NDA, and the one regulation which arguably implies such an amendment might be permissible is applicable only in limited circumstances, such as prescription to over-the-counter switches ("RX-to-OTC"). *See* 81 Fed. Reg. at 69616 ("[W]e expect there would be limited circumstances in which [21 C.F.R. § 314.60(f)(1)] would apply to a 505(b)(2) application."). Liquidia fails to address FDA's explicit re-affirmation of the Bundling Rule's ongoing vitality in the very rulemaking proceeding that Liquidia now claims to have overturned decades of uninterrupted and consistently applied Agency rules.

In short, Liquidia—which appears to be represented by experienced FDA counsel in this matter—knew or should have known that a new 505(b)(2) NDA was required to seek approval of a new indication for YUTREPIA; the preamble to the "superseding" rules is clear. But Liquidia chose not to do so. Rather than administrative bifurcation or continuing review of the improperly filed amendment—the implied solutions suggested in the Liquidia Letter—FDA must withdraw the PH-ILD indication supplement and require Liquidia to submit a new NDA so that UTC can do exactly what Congress intended: File suit in order to litigate patents that are specifically related to the new PH-ILD indication before FDA barrels forward with an approval of the pending amendment for that indication. Any other interpretation would be contrary to the text and structure of the Hatch Waxman Act, FDA's longstanding Bundling Rule, and decades of uninterrupted FDA practice in materially indistinguishable cases.

Kim Dettelbach, Esq.                    HYMAN, PHELPS & McNAMARA, P.C.
Brian Cooney, MS, PSM
February 12, 2024                       *Contains Confidential Information*
Page 8                                  *Exempt from Disclosure*

### A.    UTC's Letter Submission Was Proper

At the outset, UTC disagrees with Liquidia's insistence that UTC's December 2023 letter should have been submitted to FDA as a citizen petition. UTC's December 2023 letter was properly submitted to FDA and shared with Liquidia at FDA's request.

Liquidia begins its assault on UTC's letter submission by noting that it "was submitted as a 'confidential' letter to FDA" rather than as a citizen petition, but in the same breath Liquidia accepts FDA's offer to participate in FDA's letter exchange process and likewise identifies its submission as "confidential." Liquidia Ltr. at 1, n.2. FDA's letter submission and exchange process is well-established in circumstances like those here, where a company wishes to raise with FDA a discrete, application-specific issue that is likely to lead to litigation with the Agency. Indeed, Liquidia's counsel has used the FDA letter submission process to do just that. *E.g.*, Letter from Scott M. Lassman to Grail Sipes dated Dec. 5, 2017, and Letter from Scott M. Lassman to Grail Sipes dated July 23, 2018, *Braeburn Inc. v. FDA*, No. 1:19-cv-00982 (D.D.C.), ECF Nos. 7-5 and 7-6 (Apr. 9, 2019); *see* ECF No. 7-5, at 2 (providing a "detailed legal analysis and position explaining why any exclusivity awarded to SUBLOCADE must be interpreted narrowly and in a manner that does not block approval of CAM2038 or any of its proposed conditions of use.").

In this case, UTC's counsel, in submitting the UTC Letter to FDA on December 29, 2023, requested an urgent call with FDA to discuss the letter submission and a path forward. Email from K. Karst, Counsel to UTC, to Kim Dettelbach, Office of Chief Counsel, FDA (Dec. 29, 2023) ("In an effort to avoid litigation over this matter, UTC requests a meeting with FDA's Office of Chief Counsel and other appropriate FDA representatives to discuss resolution of the matter. To that end, perhaps we can connect early next week after the holiday to schedule a meeting."). FDA responded and offered to speak with UTC's counsel on January 18, 2024. During the scheduled January 18, 2024 teleconference with FDA's Office of Chief Counsel, UTC's counsel asked FDA how it would like to proceed in seeking to resolve the discrete issue raised in the December 29, 2023 letter submission (and for the avoidance of doubt, UTC promptly would have agreed to submit a citizen petition to the Agency if FDA had asked it do so). Yet rather than asking UTC to withdraw its correspondence and re-file it as a citizen petition, FDA instead asked UTC for permission to share a copy of the December 29, 2023 submission with Liquidia. And UTC promptly agreed to participate in the Agency-requested process. In an email sent the same day as the FDA-UTC teleconference, UTC informed the Agency: "As to your question about sharing the December 29, 2023 correspondence, we discussed and would agree to such an arrangement provided Liquidia agrees to share any response with [UTC]. Please let us know if you decide to go down this road, and prior to sharing our

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 9

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

December letter."  Email from K. Karst, Counsel to UTC, to Kim Dettelbach, Office of Chief Counsel, FDA (Jan. 18, 2024).

Liquidia itself did not appear to raise any concerns about the process FDA proposed; to the contrary, it appears to have agreed that the process was appropriate.  After all, on January 23, 2024, FDA informed UTC counsel not only that the Agency intended to share the December 29, 2023 letter with Liquidia, but also that Liquidia had agreed to share any response with UTC.  Email from Kim Dettelbach, Office of Chief Counsel, FDA, to K. Karst, Counsel to UTC (Jan. 23, 2024) ("FDA plans to share your Dec. 29, 2023 correspondence with Liquidia.  Liquidia has agreed to share any response with UTC.").  Given FDA's choice to proceed with a traditional letter exchange, and Liquidia's own agreement to participate in that process, its contention that UTC somehow engaged in an "unlawful regulatory process" rings hollow.  Liquidia Ltr. at 10.  In this case, FDA decided that the best path forward to resolve the issue presented was to initiate the well-established letter exchange process; Liquidia agreed to participate in it.  That should be the end of this sideshow.

**B.      FDA Clearly Requires a New NDA for the Addition of a New Indication**

On the merits, Liquidia argues that submission of a new NDA should not be required for its attempt to seek approval for a new indication because the Bundling Rule "has been superseded in relevant part by both the [FDC Act] and FDA's regulations."  Liquidia Ltr. at 2.  But that simply is not true.  FDA, as recently as January 2024, made clear that the Bundling Rule remains in full force and effect.  *See, e.g.*, SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA), at 12 (Jan. 8, 2024) ("In limited circumstances, an applicant may submit two BLAs/NDAs for the same product that are concurrently reviewed as stand-alone applications with separate STNs.  This occurs when an applicant has a pending BLA/NDA and seeks approval for another reason (for example a different indication or dosage) for the same product (refer to the Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees) [*i.e.*, 2004 Bundling Rule]")).  And indeed, the very rulemaking proceedings that allegedly "supersede[d]" the Bundling Rule expressly direct industry to the Bundling Rule to support the premise that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application."  81 Fed. Reg. at 69616.

Liquidia does not contest the substance of the Bundling Rule; nor could it, as the Bundling Rule unambiguously states that "[i]f the original application is not yet approved,

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

a request for approval of other new indications or claims should be submitted in a separate, original application." 2004 Bundling Rule, at 4-5.  Instead, Liquidia dismisses it as relevant only to user fees.  Liquidia Ltr. at 7.  While indeed the 2004 Bundling Rule was issued to establish when new applications are required for purposes of user fees, that history is irrelevant.  That the Bundling Rule was developed for user-fee purposes does not negate its substantive import: That a new NDA (with a new NDA user fee) is required in order to seek a new indication.[1]  2004 Bundling Rule, at 4-5.  Notwithstanding Liquidia's unsupported protests, the Bundling Rule reflects FDA's *current* interpretation of the governing statute and regulations.

Nor does the 2004 Bundling Rule stand alone.  The FDC Act itself and the accompanying legislative history support the Bundling Rule.  As Liquidia points out, FDC Act § 505(b)(4) precludes a pending 505(b)(2) NDA—which includes a tentatively approved 505(b)(2) NDA—from seeking "approval of a drug that is a different drug than the drug identified in the application as submitted" but "does not define the term 'different drug.'"  Liquidia Ltr. at 12.  Yet the very next provision of the statute expressly permits the submission of an amendment "to seek approval of a different strength." 21 U.S.C. § 355(b)(4)(b).  It contains no comparable authorization for applicants to add new indications, and there is accordingly no reason to read into the statute a requirement that would abrogate the Bundling Rule and compel FDA to accept amendments to pending 505(b)(2) applications adding new indications. As the courts repeatedly have made clear, the inclusion of one specific permission is the exclusion of another.  *See, e.g.*, *Jennings v. Rodriguez,* 583 U.S. 281, 300 (2018) ("That express exception to detention implies that there are no *other* circumstances under which aliens detained under §1225(b) may be released" (citing A. Scalia & B. Garner, Reading Law 107 (2012) ("Negative-Implication Canon: The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)")).

In the context of this case, that isn't just a background canon of statutory interpretation; its applicability is sharply underscored by the legislative history accompanying FDC Act § 505(b)(4).  Indeed, the legislative history expressly indicates that the "different drug provision" was not intended to upend the Agency's longstanding Bundling Rule:

---

[1]     As noted in both the UTC Letter and the Liquidia Letter, the Bundling Rule was first promulgated in 1993 and then revised in 2004 to its current form.  UTC Ltr. at 10, n.27; Liquidia Ltr. at 7.

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 11

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

> Congress d[id] not intend this provision to alter current [FDA's] practice regarding acceptance of supplements to approved new drug applications ("NDAs"), or amendments and supplements to pending and approved abbreviated new drug applications ("ANDAs"). Instead, Congress intend[ed] this provision to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments . . . ."

H.R. Rep. No. 108-891, at 835 (2003). Thus, that silence was intended to maintain the FDA's 1993 Bundling Rule.

Rather than giving blanket permission to submit an amendment for a new indication to a pending 505(b)(2) NDA, FDA rulemakings implementing the statute prove that the 2004 Bundling Rule remains applicable. Indeed, each of these documents unambiguously directs applicants to the Bundling Rule for questions as to whether a new 505(b)(2) NDA must be submitted. In the 2015 notice of proposed rulemaking for FDA's implementation of the MMA ("2015 NPRM"), FDA makes no fewer than *five* references to the 2004 Bundling Rule, and the 2016 MMA Final Rule preamble references it twice.[2] All of the instances provide direction from the Agency to consult the Bundling Rule precisely because the Agency *expects* industry to consult and rely on the Bundling Rule to determine whether a new NDA is required. The idea that the 2004 Bundling Rule has been superseded by these rulemakings is simply preposterous.

Despite the clear meaning of the statute in light of settled norms of statutory interpretation and the direction from FDA in its rulemakings, Liquidia argues that FDA regulations nonetheless permit the addition of a new indication in an amendment to its 505(b)(2) NDA. Liquidia is wrong.

Pointing to FDA's definition of a "different drug"—which, statutorily, cannot be included in an amendment to a 505(b)(2)—in 21 C.F.R. § 314.60(e), Liquidia argues that FDA did not intend to preclude the filing of an amendment for a new indication. Liquidia Ltr. at 12. This is because, as Liquidia explains, FDA defined "different drug" only as one that "has been modified to have a different active ingredient, different route of administration, different dosage form, or difference in excipients that requires either a separate clinical study to establish safety or effectiveness or, for topical products, that requires a separate in vivo demonstration of bioequivalence." 21 C.F.R. § 314.60(e).

---

[2]     *See* 80 Fed. Reg. at 6823, 6849, 6850, 6851, and 6874; *see also* 81 Fed. Reg. at 69616, 69635.

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 12

Hᴜᴍᴀɴ, Pʜᴇʟᴘs & McNᴀᴍᴀʀᴀ, P.C.

*Contains Confidential Information
Exempt from Disclosure*

These, according to Liquidia, are the only types of changes to a 505(b)(2) that cannot be submitted in an amendment.  Liquidia Ltr. at 12.  This argument, however, ignores the final sentence of that provision, which states: "*However, notwithstanding the limitation described in this paragraph (e), an applicant may amend the 505(b)(2) application to seek approval of a different strength.*"  21 C.F.R. § 314.60(e) (emphasis added).  That sentence provides an express authorization for a different strength to be submitted in an amendment but says *nothing* about a new indication; if FDA had intended to authorize the addition of new indication through an amendment, it just as easily could have said that.  Applying Liquidia's own logic, the absence of a new indication from the second half of the provision supports UTC's position that an amendment *cannot* be submitted for a new indication.  Thus, at best, the regulation is a wash, but it assuredly provides no concrete support for Liquidia's claims.

Despite the limitations of the argument, the Liquidia Letter makes much of the omission of a new indication from the definition of a "different drug."  It implies that FDA "specifically considered—and rejected—proposals and interpretations" that would have considered a new indication a "different drug." *See* Liquidia Ltr. at 12.  But Liquidia chooses its words carefully for a reason: FDA considered and rejected proposals related to *labeling* changes, which could include almost any change to a product, but FDA *never* rejected the addition a new indication to the definition of a "different drug."  With no evidence that FDA or Congress considered and rejected a new indication in the definition of a "different drug" and without specific permission for an amendment submission (like for a change in strength), Liquidia's attempt to invoke 21 C.F.R. § 314.60(e) falls well short of the mark.

The same analysis applies to 21 C.F.R. § 314.60(b).  These regulations, governing the submission of major amendments, specifically prohibit the submission of a major amendment that includes "data to support an indication or claim that was not included in the original NDA;" it may, however, include data "to support a minor modification of an indication or claim that was included in the original NDA . . . ."  21 C.F.R. § 314.60(b)(6).  To the extent that Liquidia's amendment *does* include new data (whether by disclosing Liquidia data or by referencing UTC's TYVASO® NDA to rely on UTC clinical data regarding PH-ILD), 21 C.F.R. § 314.60(b)(6) *compels* the submission of a new NDA, and thus Liquidia's amendment independently violates this regulation.  For example, although Liquidia asserts that its amendment did not include any data to support its new request for approval of the PH-ILD indication, Liquidia Ltr. at 9, the amendment seeking approval of such an indication necessarily references and relies upon UTC's INCREASE Phase 3 clinical study, submitted by UTC in support of its own supplemental NDA adding the PH-ILD indication.  Information as to that study was not included in Liquidia's original

HYMAN, PHELPS & McNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

application.  To the extent that Liquidia's application actually contains no clinical data to support the PH-ILD indication, then it is facially deficient under 21 C.F.R. § 314.50(d)(5)(v).

In any event, nothing in these regulations affirmatively *permits* the submission of an amendment for a new indication where data is not required to support it.  *Id.*  Although 21 C.F.R § 314.60(f)(1) does appear to contemplate that an amendment for a new indication may be submitted in certain circumstances, FDA itself repeatedly emphasized that the scope of this narrow exception is exceptionally "limited."  *See* 81 Fed. Reg. at 69616 (discussing the need for additional certifications under 21 C.F.R. § 314.60(f)(1) and stating that "we expect there would be limited circumstances in which this provision would apply to a 505(b)(2) application").  Indeed, both the 2015 NPRM and the preamble to the 2016 MMA Final Rule make very clear that 21 C.F.R. § 314.60(f)(1) applies only in narrow circumstances.  The 2015 NPRM states that "most requests for approval of a different indication or condition of use by a 505(b)(2) applicant could not be made as an amendment to the 505(b)(2) application."  Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6849 (Feb. 6, 2015).  While the 2015 NPRM recognized that "there are certain scenarios in which an applicant may submit an amendment to a 505(b)(2) application (or ANDA) for a new indication or condition of use," FDA noted only a single circumstance in which doing so might be permissible: Where the "indication has changed from prescription status to OTC use."  *Id.*  The 2016 MMA Final Rule takes the same position, noting that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application" and that "there would be limited circumstances in which [an amendment to add a new indication] would apply to a 505(b)(2) application (e.g., indication changed from prescription status to OTC use.)"  81 Fed. Reg. at 69616.  In other words, it is abundantly clear that this narrow proviso for an amendment to add an indication is a carefully circumscribed exception to the general rule that such amendments are impermissible.  Liquidia's reading of the regulations, however, would make this narrow window wide enough to drive a truck through.

To be clear, *nothing* in the 2004 Bundling Rule conflicts with FDA's regulations or the statute; the Bundling Rule merely clarifies.  The notion that the Bundling Rule has been "superseded" and "trump[ed]" by these regulations, *see* Liquidia Ltr. at 2, 13, is misleading, unsupported, and nonsensical.  And, in fact, FDA's most recent Manual of Policies and Procedures ("MAPP") for NDA Classification Codes, updated in December 2022, has a code specifically for these types of NDAs for new indications, anticipating that they will be filed.  FDA, MAPP 5018.2, at 6 (Dec. 8, 2022).  That MAPP notes "Generally,

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

a Type 9 NDA is submitted as a separate NDA so as to be in compliance with the [2004 Bundling Rule]." *Id.*

Liquidia seems to believe that its amendment is somehow special enough not to trigger the 2004 Bundling Rule and is thus exempt from its requirements. But Liquidia has failed to show any reason why its NDA is not subject to the Bundling Rule. Absent an exemption from the Bundling Rule, 21 C.F.R. § 314.60(f)(1) is inapplicable, because, as FDA explained, "most requests for approval of a different indication or condition of use by a 505(b)(2) applicant could not be made as an amendment to the 505(b)(2) application . . . ." 80 Fed. Reg. at 6849. As noted, FDA was clear in its preambles that an amendment to a pending NDA for a new indication is reserved for exceptional circumstances, and Liquidia highlights no reason why its NDA is exceptional.

## C.    A New 30-Month Stay Logically Follows the Addition of a New Indication

Liquidia positions UTC's request as an anticompetitive attempt to usurp an undeserved additional 30-month stay in "nothing more than an 11th hour attempt to delay the approval" of a competitor, *see* Liquidia Ltr. at 1, but this blatantly mischaracterizes UTC's position. UTC is simply asking that Liquidia (and FDA) follow the law so that UTC can do exactly what Congress wanted: File suit and allow the parties to obtain clarity about their patent dispute prior to a drastic change in the marketplace. That's the tradeoff Liquidia accepted when it shortcut its own approval process by relying on TYVASO data. Liquidia may not like that, but FDA and Congress have repeatedly emphasized that the 30-month stay is a critical element of the Hatch-Waxman Act that was intended to aid *both parties* by providing certainty before any launch. That Liquidia is willing to risk that certainty—and treble damages for willfully infringing UTC's patents—for an earlier launch date is its prerogative, but Liquidia's decision not to follow the law (and FDA's failure to correct that error) is not a legitimate basis for ignoring the delicate balance Congress struck between the interests of generics in launching earlier and the intellectual property rights of brand manufacturers.

The importance of the 30-month stay for the effective application of the Hatch-Waxman Act cannot be overstated. Congress created the 30-month stay "not necessarily to extend the patent holder's monopoly, but to create an adequate window of time during which to litigate the question of whether a generic will infringe the patented product, without actually having to introduce the generic product to the market." *Ben Venue Labs. Inc. v. Novartis Pharm. Corp.*, 146 F. Supp. 2d 572, 579 (D. N.J. 2001). That 30-month period, intended both to give assurance to the innovator that a follow-on drug manufacturer

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 15

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

would not obtain approval and market its product until the patent is litigated and to remove the risk that brands would hold patents in reserve and thereby lead generics to delay the launch of approved drugs because of patent uncertainty, was critical to the "compromise" that allowed the Hatch-Waxman Act to be enacted.  130 Cong. Rec. H9118 (daily ed. Sept. 6, 1984) (statement of Rep. Waxman) (explaining the support for a 30-month stay rather than an 18-month stay).

    As FDA explained in adopting its 2016 MMA Final Rule regulations, "[o]ur interpretation of section [FDC Act § 505(b)(4)] seeks to preserve the legislative balance of the Hatch-Waxman Amendments with respect to facilitating the availability of drug products that meet the statutory requirements for approval while protecting innovator intellectual property rights (and allowing for an early resolution of any patent infringement litigation)."  80 Fed. Reg. at 6851.  While this discussion was in the context of FDA's interpretation of "different drug," FDA's logic is equally applicable to a new indication: "Consistent with FDA's 'bundling' policy in effect at the time of enactment of the MMA," changes listed in the 2004 Bundling Rule "are significant enough that it is reasonable to assume that one or more patents for the listed drug might be implicated by the change and, if an action for patent infringement is brought in response to a paragraph IV certification to a listed patent, an opportunity for 30-month stay would be appropriate."  80 Fed. Reg. at 6851.  The situation here clearly was not anticipated by the statute, but it was anticipated by FDA, which is exactly why FDA has been clear that most changes to indications will require a new NDA.

    And an additional 30-month stay here simply makes sense.  The intent of the bar on 30-month stays for later-listed patents assumes that the later-listed patents could have covered the product at approval.  Where a new indication is developed and approved, the relevant patents can be listed only after approval of the new indication.  These patents, even though they are "later-listed," cover the new aspects of the product that only became relevant because of an additional approval; such patents are not the same as, and cannot be treated the same as, later-listed patents that could have been listed at approval, had they been issued.  This, again, is precisely why FDA requires new NDAs where a change to the product might implicate other patent rights.  The absence of a 30-month stay for a patent covering a newly-approved condition of use provides no opportunity for the innovator to protect its intellectual property on that indication without immediate competition.  This not only disrupts the balance intended by the Hatch-Waxman Act, but it also undermines patent protections covering the further development of existing drugs, diluting incentives to repurpose older drugs.

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

In this case, the absence of a 30-month stay would allow Liquidia to flood the market with an infringing product—a bell that cannot be unrung even in the face of treble damages.

### D.    FDA Must Withdraw the Liquidia PH-ILD Amendment

Liquidia argues that the 2004 Bundling Rule does not require FDA to refuse to file or review the pending NDA.  But even if FDA may sometimes excuse minor, inadvertent errors under the Bundling Rule, Liquidia's clear disregard of unambiguous FDA policy to avoid the requirements of the Hatch-Waxman Act cannot be countenanced.   Nor can the FDA disregard Liquidia's violation of binding regulations.  *See* 21 C.F.R. §§ 314.50(d)(5), 314.60(b)(6).  At a minimum, nothing in the Bundling Rule precludes FDA from requiring Liquidia to file an NDA rather than an amendment—and nothing in the rule permits FDA to approve the amendment in its improper form.   That FDA erred in accepting an amendment unlawfully submitted by Liquidia in the first instance provides no justification for the agency to compound that error by continuing review of or approving the unlawful submission, particularly in a situation that would undermine the essential bargain at the heart of Hatch-Waxman.  And FDA clearly has the authority to mandate withdrawal of the amendment that it never should have accepted in the first place.  *See Ranbaxy Labs., LTD v. Burwell*, 82 F. Supp. 3d 159, 193 (D.D.C. 2015) (holding that the Agency has the ability to correct its administrative errors to ensure that the FDC Act's "statutory purpose is followed"); *Ivy Sports Medicine, LLC v. Burwell* (*Ivy Sports*), 767 F.3d 81, 86, 412 U.S. App. D.C. 452 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions . . . .").

The Liquidia Letter urges FDA not to withdraw the amendment on the theory that, essentially, this is a harmless error; but this is neither harmless nor, on Liquidia's part, an error.   First, Liquidia, advised by counsel and led by experienced pharmaceutical executives, knew or should have known that a separate NDA submission was required by FDA.  Even a cursory reading of the Bundling Rule and the 2015 NPRM and 2016 MMA Final Rule preambles makes that clear.  Second, even if it were simply an error, it is far from harmless: UTC is being deprived of the opportunity to take advantage of an important statutory protection, which includes the opportunity to enforce its patents before the market is overrun with infringing product.

Rather than withdrawal and submission of a new 505(b)(2) NDA, Liquidia also suggests administrative bifurcation of the NDA, assigning the new indication a submission date of July 2023.  But this would reward Liquidia for its nonconformance to plain FDA requirements.  Indeed, Liquidia's proposed solution results in the avoidance of the timely-submitted patents, which, other than ignorance of controlling law, is the only plausible

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 17

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

reason that Liquidia submitted an amendment to add the PH-ILD indication rather than submitting a new NDA to begin with. Liquidia should not be rewarded for its avoidance of well-known FDA requirements.

That Liquidia claims it will refuse to submit a new NDA is immaterial to the discussion at hand. This is not about what Liquidia is willing to do but what the law requires FDA to do. Here, the law requires FDA to rectify this situation and restore UTC's Hatch-Waxman rights. In this case that means FDA must consider Liquidia's July 24, 2023 PH-ILD Indication amendment null and void and require Liquidia to submit a new original 505(b)(2) NDA with certifications to patent information currently listed in the Orange Book for the TYVASO Listed Drug (*i.e.*, as of the date Liquidia submits a new original 505(b)(2) NDA for the PH-ILD Indication).

### E.    FDA Must Treat Similar Applicants Similarly

Liquidia dismisses the multitude of examples cited in UTC's previous letter as inapt, as more recent examples involve amendments to applications for reasons other than changes in indication. But Liquidia misses the point: Liquidia insists that the 2004 Bundling Rule is just a recommendation, non-binding on the Agency, and cannot be the source of an Administrative Procedure Act argument that FDA is treating similarly-situated applications dissimilarly. *See* Liquidia Ltr. at 14 ("[T]he 'litany' of examples provided in the UTC Letter are . . . inapplicable to the July Amendment."). The point is that FDA has consistently applied the Bundling Rule for more than 30 years. Liquidia's argument that the Bundling Rule is inapplicable because it is superseded by regulation is proved incorrect by the continued application of that rule. *See* UTC Ltr. at 11. In other words, it is not the treatment of the specific applications referenced that render the applicants similar—it is the fact that the 2004 Bundling Rule was equally applied in all situations covered by that rule that makes the situations comparable. Timing, type of application, and type of change are all irrelevant; what is relevant is that FDA applied the 2004 Bundling Rule as written to all of those applications. There is no reason that Liquidia should not also have followed the Bundling Rule, or that FDA should not apply the rule to Liquidia.

### III.    CONCLUSION

As explained in our December 29, 2023 letter, FDA has, for decades, applied the Bundling Rule to require the submission of a new NDA to add a new indication. Liquidia depicts the Bundling Rule as an outdated, superseded recommendation, but this obfuscates FDA's continued reliance and reference to the Bundling Rule. There is no reason that Liquidia would not have known that a separate NDA is required for such a change, and

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 18

Hyman, Phelps & McNamara, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

Liquidia cannot be rewarded for its duplicity with acceptance of that amendment as of July 2023. To be consistent with its rulemakings, its policies, congressional intent, and its history of enforcement as described in our earlier letter, FDA must consider Liquidia's July 2023 amendment null and void and require the company to submit a new 505(b)(2) NDA for the PH-ILD indication.

###

We look forward to hearing from FDA on this matter. To that end, FDA's failure to take prompt action consistent with the Bundling Rule, and to UTC's satisfaction, will leave UTC with no other option than to initiate litigation against FDA.

Respectfully submitted,

Kurt R. Karst
Michael D. Shumsky
Sara W. Koblitz
*Counsel for United Therapeutics
Corporation*

# EXHIBIT 14

IPR2021-00406
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

————————————

IPR2021-00406
U.S. Patent No. 10,716,793

————————————

**PATENT OWNER RESPONSE**

LIQ_PH-ILD_00000110

IPR2021-00406
U.S. Patent No. 10,716,793 B2

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................1

II.   BACKGROUND ................................................................2

    A.    Pulmonary Hypertension ..............................................2

    B.    The Inventors Developed a Novel Method of Treating PAH That Overcame Limitations of Existing Treatments ...................4

III.  Claim Construction and Person of Ordinary Skill in the Art ...................7

IV.  PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR OBVIOUS ................................................................8

    A.    Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA Fail to Render Claims 1-8 Obvious .....................10

        1.    Petitioner Has Not Established That Voswinckel JAHA And Voswinckel JESC Were Publicly Accessible Prior Art Before The Priority Date ........................11

        2.    None of the identified references teaches a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths ................................................................18

        3.    A POSA would not have a reasonable expectation of success in combining the '212 patent, Voswinckel JESC and JAHA or have been motivated to combine them ..........................................23

    B.    Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious ............................................38

    C.    Grounds 3-6 Fail Because Each Ground Relies On Publications That Petitioner Has Failed to Establish Are Prior Art ................................................................44

        1.    Ghofrani ................................................................46

        2.    Voswinckel 2006 ................................................51

V.   OBJECTIVE INDICIA OF NONOBVIOUSNESS .............................55

    A.    Unexpected Results ................................................55

    B.    Copying ................................................................57

    C.    Long-Felt Unmet Need ..........................................61

VI.  CONCLUSION ................................................................63

i

LIQ_PH-ILD_00000111

IPR2021-00406
U.S. Patent No. 10,716,793 B2

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acceleration Bay, LLC v. Activision Blizzard Inc.*,
  908 F.3d 765 (Fed. Cir. 2018) ....................................................12, 13, 14, 15, 18

*In re Aller*,
  220 F.2d 240 (CCPA 1955) ...................................................................................55

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ..............................................................45, 50, 54

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016) .......................................................11, 12, 18, 27

*Cellco Partnership v. Bridge and Post, Inc.*,
  IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019).................................45, 50

*In re Cronyn*,
  890 F.2d 1158 (Fed. Cir. 1989) ...........................................................................27

*CSL Behring LLC v. Bioverative Therapeutics Inc.*,
  IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019)...........................................52

*E.I. DuPont de Nemours & Company v. Synvina C.V.*,
  904 F.3d 996 (Fed. Cir. 2018) .............................................................................55

*In re Geisler*,
  116 F.3d 1465 (Fed. Cir. 1997) ...........................................................................55

*In re Katz*,
  687 F.2d 450 (CCPA 1982) ......................................................45, 48, 49, 52

*In re Klopfenstein*,
  380 F.3d 1345 (Fed. Cir. 2004) ...........................................................................12

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
  545 F.3d 1340 (Fed. Cir. 2008) ...........................................................................12

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*
  322 F.3d 1335 (Fed. Cir. 2003) ...........................................................................44

ii

LIQ_PH-ILD_00000112

IPR2021-00406
U.S. Patent No. 10,716,793 B2

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
    941 F.3d 1133 (Fed. Cir. 2019) .................................................................57, 58

*In re Lister*,
    583 F.3d 1307 (Fed. Cir. 2009) ..........................................................................15

*Ormco Corp. v. Align Technology, Inc*,
    463 F.3d 1299 (Fed. Cir. 2006) ..........................................................................55

*Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009) ..........................................................................61

*Trans Ova Genetics, LC v. XY, LLC*,
    IPR2018-00250, paper 35 (PTAB Jun. 26, 2019) ........................................45, 50

## Federal Statutes

35 U.S.C. § 102(a) ..........................................................................10, 44, 45, 50

35 U.S.C. § 316I..............................................................................................8

## Regulations

37 C.F.R. § 42.108 ..........................................................................................8

## Other Authorities

IPR2017-01621 and -01622 ..........................................................................47, 48

IPR2017-01622, Paper 9 ..............................................................................49, 50

MPEP § 2132.01 ..............................................................................................45

PubMed, *available at* https://pubmed.ncbi.nlm.nih.gov/ (last visited Nov. 1,
    2021) ..............................................................................................................16

iii

LIQ_PH-ILD_00000113

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## EXHIBIT LIST

| Exhibit | Description |
|---------|-------------|
| EX2001 | Declaration of Dr. Aaron Waxman |
| EX2002 | Dr. Waxman's *curriculum vitae* |
| EX2003 | Declaration of Dr. Werner Seeger |
| EX2004 | Declaration of Dr. Hossein A. Ghofrani |
| EX2005 | Declaration of Dr. Frank Reichenberger |
| EX2006 | Declaration of Dr. Friedrich Grimminger |
| EX2007 | Tyvaso Orange Book listing |
| EX2008 | Hill, N., 2005, *Therapeutic Options for the Treatment of Pulmonary Hypertension,* Medscape Pulmonary Medicine 9(2). |
| EX2009 | Substantive Submission filed in 12/591,200 (Mar. 9, 2015) |
| EX2010 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-1 (public docket). |
| EX2011 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-11 (public docket). |
| EX2012 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-16 (public docket). |
| EX2013 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), unnumbered docket entry dated 7/30/2020 |
| EX2014 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-20 (public docket)(excerpted). |
| EX2015 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-29 (public docket). |
| EX2016 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.,* Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-45 (public docket). |

iv

LIQ_PH-ILD_00000114

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2017 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-21 (public docket). |
| EX2018 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-41 (public docket). |
| EX2019 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-49 (public docket). |
| EX2020 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-68 (public docket). |
| EX2021 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-71 (public docket). |
| EX2022 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-40 (public docket). |
| EX2023 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-47 (public docket). |
| EX2024 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-75 (public docket). |
| EX2025 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-80 (public docket). |
| EX2026 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-81 (public docket). |
| EX2027 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-92 (public docket). |

v

LIQ_PH-ILD_00000115

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2028 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-74 (public docket). |
| EX2029 | Hess *et al.,* 2007, A guide to aerosol delivery devices for respiratory therapists. American Association for Respiratory Care |
| EX2030 | Dennis JH, 2002, Standardization issues: in vitro assessment of nebulizer performance. Respir. Care. 47(12):1455-1458 |
| EX2031 | Hess *et al*., 1996, Medication nebulizer performance. Effects of diluent volume, nebulizer flow, and nebulizer brand. Chest, 110(2):498-505 |
| EX2032 | Rubin BK *et al.*, 2008 Treatment Delivery Systems (in Clinical Asthma), *available at* https://www.sciencedirect.com/topics/medicine-anddentistry/ nebulizer |
| EX2033 | Gardenhire, D.S. *et al.*, 2017, A Guide to Aerosol Delivery Devices for Respiratory Therapists (4th Ed.) American Association for Respiratory Care |
| EX2034 | Tyvaso® Label 2021 |
| EX2035 | Bourge *et al., Cardiovascular Therapeutics*, 31:38-44 (2013) |
| EX2036 | McLaughlin *et al.*, *Efficacy and safety of treprostinil: an epoprostenol analog for primary pulmonary hypertension*, J. Cardiovascular Pharmacology, 41:293-299 (2003) |
| EX2037 | Springer website (from fn 13 of Hall-Ellis Decl) |
| EX2038 | (Intentionally Left Blank) |
| EX2039 | Springer website (from fn 14 of Hall-Ellis Decl) |
| EX2040 | University of Wisconsin–Madison Library Catalog Search for holdings of *Circulation: the journal of the American Heart Association* |
| EX2041 | Declaration of Ms. Pilar Wyman |
| EX2042 | Ms. Pilar Wyman's *curriculum vitae* |
| EX2043 | Deposition Transcript of Sylvia Hall-Ellis, Ph. D. |
| EX2044 | American Heart Association Listing of *Circulation* Supplements |

vi

LIQ_PH-ILD_00000116

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2045 | Chemical Abstracts Plus Search Results Transcript |
| EX2046 | Ovid Search Results for "Voswinckel" |
| EX2047 | PubMed Search Results for "Voswinckel" |
| EX2048 | Compilation Showing Search Results for Descriptor Terms |
| EX2049 | Oxford Academic Listing of *European Heart Journal* Supplements |
| EX2050 | Simonneau *et al.*, *Updated Clinical Classification of Pulmonary Hypertension.*, J Am. College of Cardiol, 62(25)D34-D42 at D34-D35 (2013) |
| EX2051 | Sitbon and Noordegraaf, *Epoprostenol and pulmonary arterial hypertension:* 20 years of clinical experience, Eur. Respir Rev. 26:160055 (2017) |
| EX2052 | Second Declaration of Dr. Aaron Waxman |
| EX2053 | Declaration of Dr. Jason McConville |
| EX2054 | Dr. McConville's *curriculum vitae* |
| EX2055 | Deposition of Dr. Nicholas Hill |
| EX2056 | Deposition of Igor Gonda, Ph. D. |
| EX2057 | *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, Johns Hopkins Medicine, *available at* https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure |
| EX2058 | Pharmacokinetics of Inhaled Drugs, *available at* https://media.lanecc.edu/users/ driscolln/RT127/Softchalk/Pharmcology_SFTCHLK_Lesson/ Pharmacology_lesson10.html |
| EX2059 | (Intentionally Left Blank) |
| EX2060 | Waxman *et al., Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, N. Eng. J. Med. 384:325-334 (2021) |
| EX2061 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, Declaration of Dr. Robert Roscigno (EX2048) |

vii

LIQ_PH-ILD_00000117

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2062 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2049) |
| EX2063 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2050) |
| EX2064 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2051) |
| EX2065 | Declaration of Dr. Werner Seeger regarding Application No. 11/748,205 |
| EX2066 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2020) |
| EX2067 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Hossein A. Ghofrani (EX2026) |
| EX2068 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Frank Reichenberger (EX2027) |
| EX2069 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Friedich Grimminger (EX2028) |
| EX2070 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2097) |
| EX2071 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Second Declaration of Dr. Werner Seeger (EX2098) |
| EX2072 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2101) |
| EX2073 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2102) |
| EX2074 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Second Declaration of Dr. Hossein A. Ghofrani (EX2099) |
| EX2075 | Le Brun *et al.*, *A review of the technical aspects of drug nebulization*, Pharmacy World & Science, 22(3):75-81 (2000) |
| EX2076 | Kendrick, *et al.*, *Selecting and Using Nebuliser Equipment*, Thorax, 52(Suppl 2):S92-S101 (1997) |
| EX2077 | Rau *et al.*, *Performance Comparison of Nebulizer Designs: Constant-Output, Breath-Enhanced, and Dosimetric*, Respiratory Care, 49(2):174-179 (2004) |

viii

LIQ_PH-ILD_00000118

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2078 | Rau, *The Inhalation of Drugs: Advantages and Problems*, Respiratory Care, 50(3):367-382 (2005) |
| EX2079 | Hess *et al.*, *Medication Nebulizer Performance*, Laboratory and Animal Investigations, 110(2):498-505 (1996) |
| EX2080 | FDA Guidance 2002 |
| EX2081 | Newman *et al.*, *Efficient Delivery to the Lungs of Flunisolide Aerosol from a New Portable Hand-Held Multidose Nebulizer*, 1996 85(9) J. Pharm Sciences 960 (1996) |
| EX2082 | Dubus *et al.*, *Aerosol Deposition in Neonatal Ventilation*, PEDIATRIC RESEARCH, 58(1):10-15 (2005) |
| EX2083 | Treprostinil, PubChem, *available at* https://pubchem.ncbi.nlm.nih.gov/compound/Treprostinil |
| EX2084 | Roscigno *et al.*, 2020 *Pharmacokinetics and tolerability of LIQ861, a novel dry-powder formulation of treprostinil.* Pulmonary Circulation, 10(4):1-9 (2020) |
| EX2085 | Roscigno *et al.*, *Comparative bioavailability of inhaled treprostinil administered as LIQ861 and Tyvaso® in healthy subjects,* Vascular Pharmacology 138:106840 (2021) |
| EX2086 | Declaration of Dr. Roham T. Zamanian regarding Application No. 12/591,200 |
| EX2087 | Sandifer *et al.*, *Potent Effects of aerosol compared with intravenous Treprostinil on the pulmonary circulation*, J. Appl. Physiol. 99:2363-2368 (2005) |
| EX2088 | U.S. Patent Publication No. 2012/0177693 (Cipolla *et al.*) |
| EX2089 | Liquidia SEC Form 10-K (2020) |
| EX2090 | Preston *et al.*, *Safety and efficacy of transition from inhaled treprostinil to parenteral treprostinil in selected patients with pulmonary arterial hypertension.* Pulm Cir. 4(3):456-461 (2014) |
| EX2091 | Expert Report of Dr. Igor Gonda (D. Del) (excerpts) |

ix

LIQ_PH-ILD_00000119

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## I.   INTRODUCTION

Liquidia Technologies, Inc. ("Petitioner") has failed to meet its burden of proving claims 1-8 of U.S. Patent No. 10,716,793 ("the '793 patent") are unpatentable because it relies on references that are not, in fact, prior art and bases its arguments on impermissible hindsight rather than teachings in the prior art.

First, each of Petitioner's six unpatentabily grounds rely upon references that Petitioner has failed to establish constitute prior art.  Grounds 1, 2, and 4 expressly rely on Voswinckel JESC and/or Voswinckel JAHA, but Petitioner has not set forth sufficient evidence to show that either abstract was publicly accessible as of the priority date of the claimed inventions.  Grounds 3-6 expressly rely on Ghofrani and/or Voswinckel 2006, but Petitioner has not set forth sufficient evidence to show that either of these references are antedating or "by others."  This fundamental failure of proof is fatal to Petitioner's case-in-chief.

Second, Petitioner's unpatentability grounds based on the combination of the '212 patent, Voswinckel JESC, and/or Voswinckel JAHA cobble together bits of disclosure guided by impermissible hindsight and expert declarations that rely on unsupported assumptions and unreliable calculations.  None of these references disclose administration of a single event dose from 15-90 μg to a human, let alone delivery of that dose in 1-3 breaths.  The '212 patent discloses sheep data delivered over 30 or more minutes. Voswinckel JESC and JAHA disclose concentrations, but

1

LIQ_PH-ILD_00000120

IPR2021-00406
U.S. Patent No. 10,716,793 B2

not single event doses. Petitioner therefore cites an undated device manual that Petitioner has not proven was publicly available and relies on assumptions of its experts in an attempt to calculate a single event dose. The POSA, however, would not perform these calculations and the calculations are flawed. Without disclosure of the claimed single event dose, Petitioner's grounds fail.

Accordingly, Petitioner has not carried its burden to prove unpatentability and the claims are patentable over all of the cited grounds.

## II.    BACKGROUND

The '793 patent relates to the treatment of pulmonary hypertension and is listed in the Orange Book for Tyvaso® (treprostinil) Inhalation Solution, a drug-device combination for delivery of treprostinil by inhalation marketed by Patent Owner, United Therapeutics Corporation ("UTC"). EX1001, 18:22-23; EX2007.

### A.    Pulmonary Hypertension

Pulmonary hypertension is a disease associated with high blood pressure in the pulmonary vasculature. *See generally* EX2050. At the time of the invention, as is the case even today, pulmonary hypertension is a poorly understood, often fatal, disease with limited treatment options.

Epoprostenol is a prostacyclin and was the first and only FDA-approved drug for the treatment of pulmonary arterial hypertension ("PAH") from 1995 to 2001. EX2051. The use of epoprostenol had substantial shortcomings. The half-life of

2

LIQ_PH-ILD_00000121

IPR2021-00406
U.S. Patent No. 10,716,793 B2

epoprostenol is only a few minutes, meaning that it is cleared from the body very quickly has a short duration of action.  EX2008, 7-10.  Thus, epoprostenol required administration by continuous intravenous infusion to maintain adequate levels in the body.  Unfortunately, the need for a permanent transcutaneous intravenous catheter posed risks of infection, occlusion, and sepsis.  Moreover, even a short interruption in infusion could increase the risk of hemodynamic collapse and even death because the half-life of epoprostenol is so short.  Epoprostenol also requires daily mixing and refrigeration, which meant the patient must carry a cold pack to avoid degradation at room temperature and an infusion pump to administer the drug, which adversely affect patient compliance.

In 2004, a synthetic prostacyclin analog, iloprost (Ventavis®), was approved as an inhaled treatment for PAH.  *Id.* at 10.  Although inhaled iloprost had a slightly longer duration of action than epoprostenol, doctors still preferred intravenous administration of a prostacyclin analog over inhaled delivery of iloprost for a number of reasons.  *Id.*  For instance, iloprost has a half-life between 20-25 minutes and needs to be used 6-9 times a day, as frequently as every 2 hours, which is considered challenging for patients.  *Id.* at 21, 23-24.  Moreover, the fact that iloprost has a short half-life results in periods of patients being under-medicated while asleep unless they wake at regular intervals to take another dose.  *Id.*

3

LIQ_PH-ILD_00000122

Treprostinil, the compound described in the '793 patent, was approved to treat PAH as a subcutaneous formulation (Remodulin®) by 2002 and for intravenous use in 2004. *Id.* Treprostinil offered benefits over both epoprostenol and iloprost such as room temperature stability and a half-life of several hours versus several minutes. Patients no longer needed to carry ice packs to ensure the stability, safety, and efficacy of the drug. *Id.* However, there were still significant limitations to subcutaneous and intravenous delivery of treprostinil, such as severe site pain for some patients, and systemic side effects. EX1018, 1.

## B. The Inventors Developed a Novel Method of Treating PAH That Overcame Limitations of Existing Treatments

At the time of the invention, the inventors recognized a need for improving existing pulmonary hypertension treatments. The '793 patent relates to a breakthrough method of treating pulmonary hypertension using high dose administration of inhaled treprostinil that addressed many of the substantial shortcomings of other existing treatments. The '793 patent claims methods of treating pulmonary hypertension using a single event dose of 15-90 micrograms of treprostinil, or a salt thereof, delivered by inhalation in only 1 to 3 breaths. By using the inhalation route of administration, the claimed methods overcame limitations to subcutaneous and intravenous administration, such as site pain injection, systemic side effects, and the need for patients to lug around bulky pumps. The inventors also improved the safety and efficacy of treatment with the surprising discovery that

4

LIQ_PH-ILD_00000123

IPR2021-00406
U.S. Patent No. 10,716,793 B2

treprostinil could be delivered at higher drug concentrations and shorter inhalation times (3 breaths) with fewer side effects.

The '793 patent issued from an application filed on January 31, 2020 and claims priority to a provisional application, 60/800,016, filed on May 15, 2006. Petitioner does not contest this priority date.

The '793 patent has 1 independent claim and 7 dependent claims. Independent claim 1 recites:

> A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

EX. 1001, claim 1. Dependent claims 2 through 5 require specific types of inhalation devices, namely a soft mist inhaler (claim 2), a pulsed ultrasonic nebulizer (claim 3), a dry powder inhaler (claim 4) or a pressurized metered dose inhaler (claim 5). Dependent claim 6 requires the formulation to be a dry powder, and dependent claim 7 requires the powder to comprise particles less than 5 micrometers in diameter. Dependent claim 8 requires the formulation to contain no metacresol.

The '793 patent teaches that administration of treprostinil using the claimed methods resulted in a significant reduction in pulmonary vascular resistance (PVR) and pulmonary artery pressure (PAP) and an increase in cardiac output. EX1001,

5

LIQ_PH-ILD_00000124

IPR2021-00406
U.S. Patent No. 10,716,793 B2

FIG. 10; 16:32-42. The specification describes the surprising result of clinical studies showing that the time of inhalation could be reduced by increasing the concentration of treprostinil aerosol. *Id.* at 16:61-63, 17:44-46. This single-breath drug administration induced pulmonary vasodilation for longer than 3 hours with minimal side effects. *Id.* at 18:1-6. Surprisingly, very high concentrations of treprostinil were well tolerated (*id.*), even though initial clinical trials showed that increasing concentration from 16 mcg/ml to 64 mcg/ml led to significant side effects without increasing pulmonary vasodilation. EX1007 (at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects").

The commercial embodiment of the '793 patent, Tyvaso® (treprostinil) Inhalation Solution, has shown distinct advantages over the other available treatments for pulmonary hypertension. Tyvaso® has a much longer half-life than Ventavis®. Thus, there is less risk of undermedication when the patient is asleep or otherwise unable to take the medication. Additionally, Tyvaso® does not need to be administered as frequently as Ventavis® (only 4 times a day, down from 6-9 times/day). Less frequent dosing leads to higher patient compliance, time savings of 1.4 hours per day (EX2052, ¶43) and lower risk of rebound hypertension. Patients transferring from inhaled iloprost to inhaled treprostinil also had improved six-minute walk distances (a common metric to assess pulmonary hypertension), improved patient satisfaction, and improved quality of life. *Id.* at 8-9. Notably, once

6

LIQ_PH-ILD_00000125

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Tyvaso® entered the market, it was clinically preferred to Ventavis®. As illustrated below, Tyvaso® rapidly increased its market share after launch at Ventavis®'s expense, indicating the clinical advantages that Tyvaso® has over Ventavis®:



EX2086, ¶18.

## III. CLAIM CONSTRUCTION AND PERSON OF ORDINARY SKILL

The parties agree that all claim limitations of the '793 patent should be given their plain and ordinary meaning in the art by a person of ordinary skill in the art (POSA) as of May 15, 2006.

A POSA, with respect to the '793 patent, would have an M.D. or a graduate degree (Masters or Ph.D.) in a field relating to drug development and at least two years practical experience in either (i) the investigation or treatment of pulmonary

IPR2021-00406
U.S. Patent No. 10,716,793 B2

hypertension; or (ii) in the development of potential drug candidates, specifically in

the delivery of drugs by inhalation.  EX2052, ¶¶13-16; EX2053, ¶¶28-31.

## IV.  PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR OBVIOUS

Petitioner has "the burden of proving a proposition of unpatentability by a

preponderance of the evidence." 35 U.S.C. § 316I; *see also* 37 C.F.R. § 42.108.

Petitioner has failed to carry that burden for any of its six Grounds:

> **Ground 1 (Claims 1-8)**: Obvious over '212 Patent, Voswinckel JESC, and Voswinckel JAHA
> **Ground 2 (Claims 1-8)**: Obvious over '212 Patent and Voswinckel JESC
> **Ground 3 (Claim 1)**: Anticipated by Ghofrani
> **Ground 4 (Claims 1, 3, and 8)**: Obvious over Voswinckel JAHA and Ghofrani
> **Ground 5 (Claims 1 and 3)**: Anticipated by Voswinckel 2006
> **Ground 6 (Claims 2 and 4-8)**: Obvious over Voswinckel 2006 and the '212 Patent

Grounds 1 and 2 rely upon a combination of the '212 patent and Voswinckel

JESC (Ground 2) and in further view of Voswinckel JAHA (Ground 1).  Petitioner

has failed to show that Voswinckel JAHA and Voswinckel JESC were publicly

accessible prior art. Even setting aside this fatal flaw, none of the references

8

LIQ_PH-ILD_00000127

IPR2021-00406
U.S. Patent No. 10,716,793 B2

expressly teach a "single event dose"[1] of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." In an effort to fill this gap, Petitioner relies on flawed calculations and assumptions and an undated Operating Instruction Manual (EX1037) for a device referred to by Petitioner as "Optineb 2005." Pet., 23; *see also, e.g.*, EX1004, ¶¶74, 108; EX1002, ¶47.[2] In addition to improperly relying on the undated OptiNeb Manual, the POSA would not be able to calculate a delivered dose based on the scant information in Voswinckel JAHA or JESC, let alone with any reasonable accuracy. Accordingly, Petitioner cannot meet its burden of establishing that the '212 patent, Voswinckel JESC and/or Voswinckel JAHA teaches or suggests the claimed dose or that a POSA would have been motivated to combine the teachings of these prior art references to achieve the claimed invention with a reasonable expectation of success.

---

[1] A POSA would understand "single event dose" to mean the dose administered in one sitting, which could be one or multiple breaths. EX2053, ¶50 n.5; EX2052, ¶48 n.4.

[2] Both Drs. Gonda (EX1004, ¶108) and Hill (EX1002, ¶47) rely on the specification of the '793 patent as disclosing that a "pulsed" feature of the Optineb device was known, but the modifications that gave rise to this "pulsed" feature in the Optineb device are not prior art. EX2003, ¶26.

9

LIQ_PH-ILD_00000128

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Further, Grounds 3 through 6 explicitly rely on Ghofrani and/or Voswinckel 2006.  Ghofrani and Voswinckel 2006 do not qualify as prior art under § 102(a) because they are not "by another" as Drs. Seeger, Ghofrani, Reichenberger, and Grimminger explain, the information relied upon by Petitioner for these two references was solely the work of the inventors of the '793 patent.  As discussed below, these references are also antedated because the claimed invention was invented prior to the publication date of Ghofrani and Voswinckel 2006 and are thus, not qualifying prior art.

### A.    Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA Fail to Render Claims 1-8 Obvious

The Petition fails to establish by a preponderance of the evidence that any of the challenged claims are invalid as obvious over the combination in Ground 1 for several reasons.  First, Petitioner has not set forth sufficient evidence to show that Voswinckel JAHA and Voswinckel JESC were publicly accessible prior art.  Specifically, Petitioner failed to establish that either of these abstracts were received by a library before the priority date.  Furthermore, Petitioner failed to identify how a POSA could allegedly locate these abstracts through the exercise of reasonable diligence before the priority date.  To the contrary, the evidence shows that the Voswinckel JAHA and Voswinckel JESC abstracts are not indexed and difficult to find even today.

10

LIQ_PH-ILD_00000129

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Second, none of the cited prior art references teaches or suggests a "single event dose" of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." The '212 patent specified a broad range of delivered doses, but on a per kilogram and a per minute basis – not a total dose delivered. Voswinckel JESC and Voswinckel JAHA only provide the initial concentration of a pre-aerosolized drug solution and the length of time that the drug is inhaled. As explained in more detail below, the single event dose delivered for any given patient using an inhalation device depends upon numerous factors relating to the type of inhalation device used and use by the patient. The information provided by Voswinckel JESC and Voswinckel JAHA is insufficient for a POSA to determine what single event dosage was administered. Only impermissible hindsight fills this hole in the references.

Third, Petitioner has failed to show that a POSA would have had a reasonable expectation of success for treatment of a patient with pulmonary hypertension by modifying the dosage ranges of the '212 patent to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths.

### 1. Petitioner Has Not Established That Voswinckel JAHA And Voswinckel JESC Were Publicly Accessible Prior Art Before The Priority Date

The determination of whether a document is a "printed publication" that qualifies as prior art hinges on "public accessibility." *Blue Calypso, LLC v.*

11

LIQ_PH-ILD_00000130

IPR2021-00406
U.S. Patent No. 10,716,793 B2

*Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)).  Public accessibility is the "touchstone in determining whether a reference constitutes a printed publication," and a reference is considered publicly accessible only if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence[] can locate it."  *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (internal citations omitted).

For references stored in libraries, public accessibility requires that the reference be both available at the library and sufficiently indexed or catalogued by the priority date.  *Blue Calypso, LLC v. Groupon, Inc.,* 815 F.3d 1331, 1348 (Fed. Cir. 2016); *In re Klopfenstein,* 380 F.3d 1345, 1349 (Fed. Cir. 2004).  In many circumstances, whether a reference is publicly accessible will turn on whether it was "meaningfully indexed such that an interested artisan exercising reasonable diligence would have found it."  *Acceleration Bay, LLC v. Activision Blizzard Inc.,* 908 F.3d 765, 774 (Fed. Cir. 2018).

### a) No Evidence That A Library Received Voswinckel JAHA Or Voswinckel JESC Before The Priority Date

Petitioner has failed to show that either Voswinckel JAHA (EX1008) or Voswinckel JESC (EX1007) were received by a library before the priority date.  Neither reference contains a "received by" or "accepted" stamp or notation and

LIQ_PH-ILD_00000131

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Petitioner's expert, Dr. Hall-Ellis, admitted the same. *See generally* EX1007; EX1008; EX2043, 150:16-23; EX2041, ¶¶13, 18-19, 33.

Dr. Hall-Ellis' reliance on the publication frequency for the journal *Circulation* and the *European Heart Journal* does not establish the public availability of the relevant abstracts appearing in the *supplements* of those journals. *See* EX2041, ¶¶10-14, 30-33. Voswinckel JAHA and Voswinckel JESC are abstracts appearing in special supplements of the journal *Circulation*, published by the American Heart Association (the "Circulation Supplement"), and the *European Heart Journal*, published by the European Society of Cardiology ("EHJ Supplement"), respectively. *Id.*, ¶¶6, 10, 28, 30; *see also* EX2043, 108:15-25, 219:1-23. The *Circulation* and *EHJ* Supplements are not normal issues, and instead constitute irregularly published supplements, each containing thousands of disjointed abstracts. *Id*.

Importantly, supplements compiling conference abstracts can sometimes publish years after the conference in question, putting the *Circulation* and *EHJ* Supplements' availability (if any) past the priority date. EX2041, ¶¶10-11, 30-31. Thus, the publication frequencies for normal issues of *Circulation* and *EHJ* do not establish when a library might have received a print copy of the irregularly published supplements. *Id.* at ¶¶9-14, 29-33. Accordingly, Petitioner has not provided any evidence showing if or when *Circulation* and *EHJ* Supplements were actually

13

LIQ_PH-ILD_00000132

IPR2021-00406
U.S. Patent No. 10,716,793 B2

received by a library. *Id.* at ¶¶14, 27, 33; *see also* EX2043, 150:16-151:7, 157:6-11, 217:11-13, 222:1-10.

Library Machine-Readable Cataloging ("MARC") and Library of Congress ("LOC") records containing metadata fields cited by Dr. Hall-Ellis likewise fail to establish when the *Circulation* or *EHJ* Supplements were publicly accessible. All of the records provided by Dr. Hall-Ellis relate only to the journal *Circulation* and the *EHJ* – *i.e.*, the publications at large, comprising all published issues spanning decades – not the *Circulation* and *EHJ* Supplements that actually contain the Voswinckel JAHA and JESC abstracts. *See* EX1036, ¶¶63, 69; *see also* EX2043, 157:1-5, 222:12–224:2; EX2041, ¶¶20-22, 34-35. Because the metadata fields in MARC and LOC records cited by Dr. Hall-Ellis also relate to the entire journals Circulation and the EHJ, the records do not establish receipt of the *Circulation* or *EHJ* Supplements before the priority date. *Id.*

### b) Insufficient Evidence that Voswinckel JAHA and JESC Could Have Been Located with Reasonable Diligence

Even assuming Voswinckel JAHA and JESC were received by the University of Wisconsin-Madison and University of Iowa libraries, respectively, before the priority date, Petitioner has still failed to show that the abstracts were meaningfully catalogued and indexed before the priority date such that a POSA could have located

14

LIQ_PH-ILD_00000133

IPR2021-00406
U.S. Patent No. 10,716,793 B2

them through reasonable diligence.[3]  *Acceleration Bay*, 908 F.3d at 774.  There are

two major shortcomings with Petitioner's alleged evidence.

First, Petitioner has not offered any evidence that Voswinckel JAHA and

Voswinckel JESC were meaningfully catalogued or indexed at a library or in a

database before the priority date, or why and how a POSA would search for or find

the *Circulation* and *EHJ* Supplements.  *See* EX2041, ¶¶16-17, 34-37.  Even if a

POSA found the Supplements, Voswinckel JAHA shares the page with three-and-a-

half other abstracts and is just one of many thousands of abstracts spanning 1,102

pages in the full version of the *Circulation* Supplement.  *Id*. at ¶10.  Petitioner has

not submitted any evidence that the *Circulation* Supplement contained a table of

contents or subject matter index through which the cited abstract (number 1,414)

could be located.  *Id*. at ¶¶7-8, 25-26.  Similarly, Voswinckel JESC cited by

Petitioner shares the page with three other abstracts and is just one of 3,850 abstracts

spanning over 700 pages in the full version of the *EHJ* Supplement.  *Id*. at ¶28.

Although there is a list of "Contents" included within Voswinckel JESC, it is not

---

[3] The Federal Circuit has held that proof of indexing in a "meaningful way," together

with evidence that the indexing occurred by the critical date, may be necessary

before the burden shifts to Patent Owner to prove otherwise.  *In re Lister*, 583 F.3d

1307, 1312 (Fed. Cir. 2009).

15

LIQ_PH-ILD_00000134

IPR2021-00406
U.S. Patent No. 10,716,793 B2

organized alphabetically or otherwise ordered by subject. *Id.* at ¶35. As a result, Petitioner has not shown that the POSA could locate either Voswinckel JAHA or JESC using reasonable diligence.

To the contrary, it is undisputed that Voswinckel JAHA and Voswinckel JESC remain difficult to find even today. For example, Dr. Hall-Ellis admitted she either did not search for Voswinckel JESC using typical searches, such as through a common database like PubMed,[4] or was unable to locate Voswinckel JESC. *See* EX2043, 242:11–245:22. Ms. Wyman searched all of the databases cited by Dr. Hall-Ellis (*see id.* at 41:1-42:4; 242:11-243:18 (listing Ovid, PubMed, MEDLINE, Index Medicus, and Chemical Abstracts)), but neither abstract is listed in any of these databases today, and Petitioner has failed to show they were listed in 2006. EX2041, ¶¶5, 16-17, 37. Moreover, the *Circulation* Supplement cannot be found on the *Circulation* Journal's website, AHA online archives, or even in a list of supplements to the journal. *Id.* at ¶¶12, 15. Similarly, the *EHJ* Supplement cannot be found on *European Heart Journal's* website or online archives. *Id.* at ¶32.

---

[4] PubMed.gov searches "more than 33 million citations for biomedical literature from MEDLINE, life science journals, and online books." *See* PubMed, *available at* https://pubmed.ncbi.nlm.nih.gov/ (last visited Nov. 1, 2021).

16

LIQ_PH-ILD_00000135

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Second, the MARC and LOC records cited by Dr. Hall-Ellis do not establish meaningful indexing either. Dr. Hall-Ellis cites two subject headings or descriptor terms, "Cardiology $x Societies" and "Heart $x Diseases $v Periodicals," as alleged evidence of meaningful indexing. EX1036, ¶64. However, these terms only indicate the entire journals themselves were allegedly indexed with these terms and are not unique to the cited abstracts. EX2041, ¶¶20-23, 34-35. *Circulation* has been published for more than 50 years (*id*. at ¶24), and the *EHJ* has been published for about 40 years (*id*. at ¶35), so merely locating the journals would not help a POSA find the Supplements, let alone the specific Voswinckel abstracts buried among many thousands of other disparate abstracts. *Id.* at ¶¶4, 20-24, 34-35. Any searches using Dr. Hall-Ellis' descriptor search terms would be futile as they would return hundreds of thousands of hits, including hundreds of journals having decades of issues.[5] *Id.* at ¶¶4, 23-25, 34-35; *see also* EX2043, 158:5-160:2.

───────────────────────

[5] Dr. Hall-Ellis admitted that researchers typically only look at the first three pages of search results, (EX2043, 88:7-9), which confirms the difficulty the POSA would have in locating the Voswinckel abstracts when faced with so many journals, issues, and articles hitting on Dr. Hall-Ellis's search terms.

17

LIQ_PH-ILD_00000136

IPR2021-00406
U.S. Patent No. 10,716,793 B2

The law requires Petitioner to provide evidence establishing that Voswinckel JAHA and Voswinckel JESC were received at a library and meaningfully indexed before the priority date.[6]  Petitioner's evidence falls far short of that standard (EX2041, ¶¶3-4, 27, 38), and the Board should find that Petitioner has failed to prove that the Voswinckel JAHA and JESC abstracts were publicly accessible prior art.

### 2.  None of the identified references teaches a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths

None of the '212 patent, Voswinckel JAHA, or Voswinckel JESC references teach a single event dose of treprostinil of 15 micrograms to 90 micrograms, delivered in 1 to 3 breaths.  Petitioner concedes that the '212 patent and Voswinckel JESC do not explicitly disclose these limitations.  Pet., 37-39.

### a)  The '212 patent

U.S. Patent No. 6,521,212 ("the '212 patent") issued February 8, 2003 and is titled "Method for Treating Peripheral Vascular Disease by Administering Benzindene Prostaglandins by Inhalation."  The '212 patent teaches methods of delivering benzindene prostaglandins by inhalation generally.  EX1006, Abstract. The '212 patent states, "aerosolized treprostinil] has a greater potency as compared to intravascularly administered [treprostinil]."  *Id.* at 8:9-10.  The '212 patent

---

[6] *Blue Calypso,* 815 F.3d at 1348; *Acceleration Bay,* 908 F.3d at 774.

18

LIQ_PH-ILD_00000137

IPR2021-00406
U.S. Patent No. 10,716,793 B2

provides examples, wherein intravenous or aerosolized treprostinil is administered to sheep at 30, 60 or 90 minutes at a concentration of 250, 500, or 1000 ng/kg/min. *See, e.g., Id.* at FIGS 3-18, Examples I-V.

The '212 patent does not teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. Instead, the '212 patent describes a very broad range of dosages delivered over a period of minutes. The disclosed dosages either specify a "daily infusion dose" or "per kilogram bodyweight per minute" dose, which are not inhaled single event doses as claimed by the '793 patent but *rates* (*e.g.*, μg per unit of body mass per day) or *daily* doses:

> In the case of treating ***peripheral vascular disease*** by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to **a daily infusion dose** in the range of 25 μg to 250 mg; typically from 0.5 tg[sic] to 2.5 mg, preferably from 7 μg to 285 μg, **per day per kilogram bodyweight**. For example, an intravenous dose in the range 0.5 μg to 1.5 mg **per kilogram bodyweight per day** may conveniently be administered as an infusion of from 0.5 [μg] to 1.0 μg **per kilogram bodyweight per minute**. A preferred dosage is 10 **ng/kg/min**.

EX1006, 5:56-67 (emphasis added).

Further, the dosages described in the '212 patent are contemplated for use in a continuous nebulization device. For example, the '212 patent describes an "AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM" as the preferred device, and it is the only specific device mentioned anywhere in the patent. EX1006, 5:34-36;

19

LIQ_PH-ILD_00000138

IPR2021-00406
U.S. Patent No. 10,716,793 B2

EX2052, ¶53. This device is a *continuous* nebulizer designed to deliver small amounts of medication in a dosing event *spread over several minutes using dozens or hundreds of breaths*. EX2087, 2364; EX2052, ¶50. This type of device lacks the precision to deliver a measured amount of drug in the range of 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in only 1 to 3 breaths. EX2052. ¶55.

Similarly, the working examples of the '212 patent use continuous delivery of a treprostinil solution over 30, 60, or 90-minute intervals. EX1006, 10:44, 11:11-13. Treprostinil is delivered at a concentration of 250, 500 or 1000 ng/kg/min. None of these modes of administration disclose or teach a single event dose of 15 micrograms to 90 micrograms. EX2041, ¶52. Nor could a POSA determine the amount delivered in 1 to 3 breaths from the experimental descriptions of Examples I-V. EX2053, ¶¶49-50.

**b)    Voswinckel JESC**

Voswinckel JESC is a quarter-page abstract dated August/September 2004 and titled "Inhaled treprostinil is a potent vasodilator in severe pulmonary hypertension." EX1007. Voswinckel JESC generally describes the delivery of treprostinil over a six-minute interval using an OptiNeb ultrasound nebulizer with a pre-aerosolized starting solution of 16, 32, 48 and 64 µg/mL. EX1007. The abstract observed that "[a]t higher doses, local and systemic side effects may occur." *Id.*

20

LIQ_PH-ILD_00000139

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Indeed, all patients who received the 64 μg/mL complained of headache, cough or bronchoconstriction, including one patient who complained of a major headache. *Id.* The reference concludes that, at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects." *Id.* Thus, Voswinckel JESC teaches away from titrating up to higher drug concentrations over an even shorter time interval.

Petitioner admits that Voswinckel JESC does not teach a single event dose of 15 micrograms to 90 micrograms, but instead describe solution concentrations and a nebulization time of 6 minutes[7] that their experts admit lack many details that bear on the actual delivered dose. Pet., 38. As explained in more detail below, the actual dose delivered for any given patient using an inhalation device depends upon a number of factors including the type of inhalation device used, pre-aerosolized drug concentration, gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions. Without accounting for any of these factors, Petitioner relies on unsupported calculations (discussed in section IV.A.3 below), that Petitioner alleges would lead a POSA to the claimed dosage range.

---

[7] A POSA would understand that the plain and ordinary meaning of the claimed dose of 15-90 μg is the dose delivered to the patient (as opposed to a quantity placed into a nebulizer or starting solution). EX2053, ¶55; EX2052, ¶65 n. 8.

21

LIQ_PH-ILD_00000140

IPR2021-00406
U.S. Patent No. 10,716,793 B2

### c)    Voswinckel JAHA

Voswinckel JAHA is a quarter-page abstract dated October 26, 2004 and titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension." EX1008. Voswinckel JAHA generally describes the delivery of inhaled treprostinil sodium to 17 patients with severe pulmonary hypertension using a "pulsed" Optineb® ultrasound nebulizer in three breaths, with a pre-aerosolized treprostinil solution of 600 μg/ml. *Id.*

Petitioner does not contend that Voswinckel JAHA teaches a dosage of 15 micrograms to 90 micrograms. Instead, Petitioner relies on Voswinckel JAHA for teaching "a low number of breaths for the aerosolized delivery of treprostinil specifically for the treatment of pulmonary hypertension." *Id.* at 40. A POSA, reading Voswinckel JAHA, would not be able to determine the delivered dose in 1 to 3 breaths based on the disclosure of JAHA. EX2053, ¶52. The dosage delivered using an unknown pulsed nebulizer would depend on a number of factors including the amount of aerosol delivered per pulse, the number of pulses generated per breath, the shape of the mouthpiece or mask, and the breathing pattern of the patient. *Id.*

Accordingly, because none of the identified references in Ground 1 teach a single event dosage of 15 micrograms to 90 micrograms or provide any motivation for administering this amount, this ground must fail even if all of the references are prior art (which they are not).

22

LIQ_PH-ILD_00000141

IPR2021-00406
U.S. Patent No. 10,716,793 B2

### 3.    The POSA Would Not Be Motivated To Combine The '212 Patent, Voswinckel JESC, and Voswinckel JAHA With A Reasonable Expectation of Success

Petitioner concedes that neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths.  Instead, Petitioner incorrectly argues that these two references render this limitation obvious based on three erroneous calculations.  The first erroneous calculation relies on an undated Optineb manual, which Petitioner suggests provides a nebulization rate for an OptiNeb® ultrasound nebulizer.  Yet there is no evidence that this manual is prior art or refers to a device that was available, much less used, in the reported studies. Petitioner incorrectly relies on this assumption to argue that the patients described in Voswinckel JESC may have received more than 1 ml of solution and leaps to conclude that these subjects received dosages of treprostinil within the claimed ranges.

The second erroneous calculation relies on unsupported assumptions provided by the testimony of Drs. Hill and Gonda that nebulizers are usually prescribed to deliver more than 1 ml of solution.  Moreover, Dr. Hill relies on his experience as an investigator in the Tyvaso® clinical trials and approved drug label – the drug embodying disclosure of the '793 patent.  EX2055, 96:3-101:12.  Petitioner incorrectly relies on these unsupported assumptions to argue that the patients

23

LIQ_PH-ILD_00000142

IPR2021-00406
U.S. Patent No. 10,716,793 B2

described in Voswinckel JESC received more than 1 ml of solution and further received dosages of treprostinil within the claimed ranges.

The third erroneous calculation relies on the teaching in the '212 patent that "the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." EX1006, 8:8-12, *see* Pet., 38-39. Petitioner and Dr. Hill provide calculations of an inhaled dose based on this 10-50% fraction and the dosing calculations approved by the FDA for intravascular treatment with treprostinil. But as Dr. Hill acknowledged, it is misleading to compare blood levels during infusion as compared to after inhalation and not an accurate measure of the relative potency of treprostinil in aerosolization versus intravascular administration. EX2055, 102:13-104:15.

As discussed in detail below, each of these erroneous calculations is unsupported by the record.

### a) Petitioner Fails to Establish That the Undated Optineb Manual or Optineb Device Was Publicly Available at the Priority Date

As a preliminary matter, while agreeing that Petitioner has not established that the undated Optineb manual is prior art (Institution Decision at 23), the Institution Decision relied on the undated Optineb manual "as evidence of the general knowledge in the art at around the time of the invention." *Id.* at 24 (citing *Koninklijke Philips N.V. v. Google LLC,* 948 F.3d 1330, 1337-1338 (Fed. Cir.

24

LIQ_PH-ILD_00000143

IPR2021-00406
U.S. Patent No. 10,716,793 B2

2020)).  But even on this basis, Petitioner fails to show that the information disclosed in the undated Optineb manual was general knowledge as of the priority date.

The undated Optineb manual appears to be a translation of an Operating Instruction manual for "Optineb®-ir", a microprocessor-controlled, mobile ultrasonic nebulizer (Model No. ON-100/2-2.4 MHz).  EX1037.  This undated Optineb manual discloses certain technical features, including that the nebulizer output (what Petitioner's expert, Dr. Hill refers to as "nebulizing rate") is provided as 0.6 mL/min. *Id.* at 28. Petitioner relies on this technical detail to argue that Voswinckel JESC teaches "an effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil."

Dr. Hill first notes that Voswinckel JESC teaches "[d]oses of treprostinil in solution . . . of 16, 32, 48, and 64 µg/mL using an OptiNeb® ultrasound nebulizer." EX1002, ¶64.  Dr. Hill next argues, without evidence, that nebulizers at the time were known to nebulize at least 1 mL by citing his personal experience and Petitioner's other expert, Dr. Gonda.[8]   *Id.* at ¶65.  As an initial matter, Dr. Hill

---

[8] But Dr. Hill admitted that he did not recall reviewing Dr. Gonda's declaration prior to signing his own declaration that cites to Dr. Gonda's declaration; rather he relied on his attorneys' "verbal" explanations "relay[ing] the content to [him]."  EX2055, 132:20-134:5.

25

LIQ_PH-ILD_00000144

IPR2021-00406
U.S. Patent No. 10,716,793 B2

testified that his personal experience was based drugs for other indications, not prostcyclins for the treatment of pulmonary hypertension.  EX2055, 146:16-23. Dr. Gonda cites three drug labels, but only one involved a pulmonary hypertension treatment and none of the cited drugs used an OptiNeb device.  Dr. Hill further argues that "[a] POSA would further confirm that 16-64 μg was the administered dosage in Voswinckel JESC by using his understanding of the rate of solution delivery for OptiNeb® device available before 2006."  *Id.* at ¶67.  Citing only the undated Optineb manual for the proposition that the nebulizing rate of Voswinckel JESC would be 0.6 mL/min, Dr. Hill argues that continuous delivery of inhaled treprostinil across 6 minutes as described in Voswinckel JESC would have resulted in a dosage of 57.6 μg (16 μg/mL * 0.6 mL/min * 6 min).  *Id.*

Dr. Hill's analysis of Voswinckel JESC in view of the undated Optineb manual fails based on several unsupported assumptions.

*First*, neither Petitioner nor Dr. Hill provide any evidence for their assertion that the undated Optineb manual was publicly available before 2006.  The undated Optineb manual does not provide any copyright information that would indicate when it was first published.  Nor does Petitioner make any effort to fulfill its burden to demonstrate public accessibility before 2006.  Indeed, Petitioner provides no indication that the Optineb manual was disseminated or publicly available and indexed in a manner substantiating public accessibility since there is no evidence

26

LIQ_PH-ILD_00000145

IPR2021-00406
U.S. Patent No. 10,716,793 B2

that it could be located before the critical date using key words. *Blue Calypso*, 815

F.3d at 1349; *see also In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989)."  Dr. Hill

merely assumed that the undated Optineb manual was available before 2006 and

testified that the only basis for his conclusion that this document was available in

2005 was "from the attorneys."  He did not "know where the derivation was beyond

that."  EX2055, 63:3-64:2, 83:8-22.  Further, Petitioner retained an expert to

authenticate the publication date of other documents, but that declaration is

completely silent on EX1037.  *See* EX1036.  Regardless, the inventors of the '793

patent, who contributed to development of Optineb, have confirmed it was not

available before the 2006.  EX2003, ¶26; EX2071 (IPR2017-01621, EX2098)

(Seeger Decl.), ¶14 (citing EX2101-EX2102). In sum, Petitioner has failed to make

*any* evidentiary showing that Exhibit 1037, the undated Optineb manual was

publicly accessible as of the critical date of the '793 patent.

*Second*, there is no evidence that the Optineb manual reflects "general

knowledge in the art at around the time of the invention."  Institution Decision at 24.

The Optineb manual is not being used for general knowledge, such as the existence

of nebulizers capable of delivering drug within the recited parameters.  Dr. Hill

specifically used the Optineb manual to determine "the rate of solution delivery for

the OptiNeb® device available before 2006," *i.e.*, the deliver rate of a prior art

device. EX1002, ¶67.  Dr. Hill confirmed that in addition to relying on EX1037 in

27

LIQ_PH-ILD_00000146

IPR2021-00406
U.S. Patent No. 10,716,793 B2

forming his opinion, he had no personal basis for his conclusion that this document

was available in 2005, stating only that he "got it from the attorneys."  EX2055,

63:3-64:2.  He further testified that as of 2006 he had never used an OptiNeb device

and that he had not tried to verify whether EX1037 came from the 2005.  *Id.*

Nonetheless, Dr. Hill relies on the Optineb manual for a specific fact integral to his

calculations: an alleged nebulizing rate of 0.6 mL/min.  There is no evidence that

0.6 mL/min or even a similar nebulization rate was general knowledge at the time of

invention, suggesting reliance on hindsight.

*Third*, Dr. Hill assumes without evidence that the "OptiNeb ultrasound

nebulizer, Nebu-tec, Germany" is *the same Optineb device* described in the undated

Optineb manual.  However, Dr. Hill conceded that he did not know what the "IR"

refers to or whether the various Optineb models are the same or different devices.

EX2055, 61:10-62:25.  In fact, Dr. Hill did not know whether the Optineb device of

EX1037 was the same device used in Voswinckel JESC because the reference does

not identify which model was used.  *Id.* at 81:12-22; 83:3-7.

Further, while the undated Optineb manual states the nebulizer output is 0.6

ml/min (EX1037, 28), that number is far too unsubstantiated and unclear to support

any conclusions about actual nebulizer output in any specific instance.  EX2053,

¶81.  For example, the manual states that this particular nebulizer model has six

different programs or modes (EX1037 at 18-20).  In certain modes (P1, P2, and P3),

28

LIQ_PH-ILD_00000147

IPR2021-00406
U.S. Patent No. 10,716,793 B2

the device generates aerosol at intermittent intervals, while in other modes, it generates aerosol continuously. *Id.* Moreover, EX1037 fails to explain whether the 0.6 number is a maximum, minimum, or average; whether the number is a theoretical output based on the electrical components in the nebulizer or the ultrasonic horn driving nebulization of the aerosol; or, if the 0.6 ml/min was derived empirically, whether the measurements were of nebulization of pure water, or a solvent, or a mix of both, or if there was a drug or placebo in the solution. EX2053, ¶¶81-83. All of these variables could affect the amount of drug in the nebulizer output. *Id.*

As a result, even if the Optineb device disclosed in Voswinckel JESC were the same nebulizer described in the undated Optineb manual, there are too many unknowns such that a POSA could not calculate a single event dose. For example, Voswinckel JESC does not describe which program, face mask or mouthpiece, type of tubing, operation frequency, or which baffle plate was used, and all of these variations can effect the device's output. EX2053, ¶¶75-83. Thus, a POSA would not have been able to determine the dosage delivered in Voswinckel JESC with any reasonable certainty.

Because all of the factors addressed above affect the amount of aerosolized treprostinil delivered to the patient and are thus necessary factual predicates for Petitioner's statement that Voswinckel JESC teaches the claim element "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90

29

LIQ_PH-ILD_00000148

IPR2021-00406
U.S. Patent No. 10,716,793 B2

micrograms of treprostinil or a pharmaceutically acceptable salt thereof," Grounds 1 and 2, which rely only upon Voswinckel JESC when read in view of the undated Optineb manual to supply this limitation, must fail.

> **b)    Petitioner Fails to Establish That Fill Volume is Sufficient to Determine the Single Event Dose**

With respect to Voswinckel JESC, Petitioner's argument that "a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least 16, 32, 48, or 64 μg of treprostinil were delivered to different dosing groups in this study" (*see* Petition at 23, EX1002, ¶99; EX1004, ¶56) is flawed on several grounds.

*First*, the single event dose of treprostinil delivered to a patient using a continuous nebulizer cannot be meaningfully determined using only the fill volume (*i.e.* the amount of pre-aerosolized solution loaded into the nebulizer). In practice, patients may be administered an inhaled therapeutic through a continuous nebulizer until the solution in the reservoir has been completely nebulized. *See* EX2052, ¶83. For example, each of the FDA approved labels, which Dr. Gonda cites to in his declaration, involve administering the solution until the contents of the reservoir of the nebulizer are emptied. EX.1004, 56, n. 4. But Voswinckel JESC does not describe nebulization until the reservoir is emptied. It mentions a six-minute time period, and there is no guarantee that the entire fill volume would be completely nebulized in six minutes. EX2052, ¶83; EX2053, ¶45.

30

LIQ_PH-ILD_00000149

IPR2021-00406
U.S. Patent No. 10,716,793 B2

The labels Dr. Gonda relies on indicate wide variability in the time required to nebulizer all of the solution.  For example, the AccuNeb® Label referred to by Dr. Gonda teaches that it may take anywhere from 5 to 15 minutes for the 3 mL solution to be nebulized.[9]  EX.1004, 56, n. 4; EX1066.  Voswinckel JESC does not provide either the starting volume of treprostinil solution or identify whether the entire volume had been nebulized at 6 minutes.  The AccuNeb® label also explicitly recognizes that *delivery* of a dose to the patient – as opposed to what is converted to an aerosol by nebulization – depends not only the nebulizer itself, but also on patient factors.  EX2053, ¶61.

*Second*, even if Voswinckel JESC taught a starting volume of solution with a specified concentration of treprostinil, and further taught that the solution was completely nebulized – which Voswinckel JESC does not – a POSA still would not be able determine the single event dosage over that six-minute interval without additional information about the nebulization device.  Fill volume is just one of many variables that may affect drug dosage.  EX2001, ¶41; EX2053, ¶¶55-56.  Additional factors that may affect the dose of drug received by a patient through a continuous

---

[9] Dr. Hill admitted that AccuNeb® is not used to treat pulmonary hypertension and there may be different considerations in determining whether a particular medication is suitable via a particular mode of administration.  EX2055, 136:8-141:18.

31

LIQ_PH-ILD_00000150

IPR2021-00406
U.S. Patent No. 10,716,793 B2

nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern, and device interface. *See, e.g.,* EX2033, 11-12; EX2001, ¶13; EX2053, ¶55-56. These factors are not uniform between nebulization devices or patients; EX2053, ¶61. Thus, without additional information regarding the numerous factors mentioned above, the single event dose delivered to patients in Voswinckel JESC cannot be determined. EX2053, ¶¶55-60, 68.

*Third*, it is not true that all continuous nebulizers deliver a dosage of between 1 and 5 mL of aerosolized solution. *See, e.g.,* EX2082, 13; EX2053, ¶¶69-73. Certain commercially available nebulizers –available as of the priority date – were suitable for use with at least 0.5 mLs. *See, e.g.,* EX2082; EX2053, ¶71. Other nebulizers were known to deliver more than 5 mL of aerosolized solution. *See, e.g.,* EX2053, ¶71. A POSA would not know one way or the other whether the ultrasonic Optineb device of Voswinckel JESC was filled with more than 1 mL or less than 5 mL of solution. EX2053, ¶72.

*Finally*, as discussed in Section IV.A.2.a), it is impossible to extrapolate what an appropriate single event dose should be from the data included in Voswinckel JESC because the delivery efficiencies and pharmacokinetics of a continuous nebulizer to do not predictably translate to devices capable of delivering consistent

32

LIQ_PH-ILD_00000151

IPR2021-00406
U.S. Patent No. 10,716,793 B2

dosages in just 1 to 3 breaths.  *See, e.g.*, EX2061, ¶¶11, 14-15 (citing IPR2017-01622, EX2049, EX2050, EX2051).

### c) Petitioner's Calculation of Dose Based on the Teachings of the '212 Patent are Flawed For Several Reasons.

Alternatively, Petitioner starts from the premise that the '212 patent "discloses a dosage range for intravascular administration of treprostinil for the treatment of pulmonary vascular disease, and discloses that only 10-50% of the dosage delivered intravascularly would be needed via inhalation *to have the same therapeutic effect*." *See, e.g.,* Petition at 30-31, 38-39.  Petitioner's incorrect calculation starts with the fact that intravascular treprostinil is approved to treat pulmonary hypertension at a dosage of 1.25 ng/kg/min.  Petitioner then calculates that a patient weighing between 60 and 65 kg would receive a dosage of 108 to 117 micrograms per day.  Petitioner argues that a POSA would then "apply the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing to achieve a dosage of 10.8 to 58.5 micrograms." This analysis is flawed, because (i) the '212 patent does not provide a mathematical calculation for converting an intravascular dosage to an inhaled dosage; and (ii) Petitioner's flawed calculation establishes a *daily* dose not a *single event* dose.

What the '212 patent actually teaches is that "aerosolized [treprostinil] has a *greater potency* as compared to intravascularly administered [treprostinil]." EX1006, 8:8-10 (emphasis added).  The '212 patent further explains, "the actual

33

LIQ_PH-ILD_00000152

IPR2021-00406
U.S. Patent No. 10,716,793 B2

amount of [treprostinil] delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:10-13. However, the '212 patent notes that "the mechanism(s) that accounts for the greater potency and efficacy for aerosolized UT-15 is unknown." *Id.* at 8:13-15.

Petitioner improperly reads into this disclosure a mathematical formula for converting a therapeutically effective dose of intravascularly administered treprostinil into a therapeutically effective dose of inhaled treprostinil. But the '212 patent provides no such formula. The '212 patent simply notes that inhaled solutions are more potent despite the fact that the delivered dose may only be 10-50% of the aerosolized solution. Nor do the examples support such a calculation. The examples described in the '212 patent simply demonstrate that at the *same dosage* (250, 500 and 1000 ng/kg/min) and *same duration* (30 and 60 minutes), UT-15 is more potent in aerosolized form than intravenous form. *See* EX1006, 11:7-13. There is nothing in this data to suggest a formula for calculating the therapeutic dosage of inhaled treprostinil from an approved intravascular treprostinil treatment.

Further, Petitioner's oversimplified calculation fails to take into account the difference in pharmacokinetic effects of a large dose of treprostinil delivered in 1-3 breaths. Large doses of treprostinil were known to produce "dose-limiting side effects" such as nausea, vomiting, headache, dizziness, and anxiety. *See, e.g.,* EX2037. For subcutaneous administration, the maximal tolerated dose is just 10

34

LIQ_PH-ILD_00000153

IPR2021-00406
U.S. Patent No. 10,716,793 B2

ng/kg/min, which is 2 orders of magnitude lower than the claimed dosage of the '793 patent.  *Id.*  As discussed above, intravascular treprostinil is approved at a much lower dosage of 1.25 ng/kg/min.  EX1018.

Dr. Hill admits that it "is misleading to rely on blood levels, circulating levels" and "rough measures of relative potency between intravascular and aerosolized delivery."  EX2055, 103:21-104:6; *see also* EX2090, 460. And Dr. Hill, outside of this IPR proceeding, would never rely upon the calculation he puts forward here.  In his own publications, including one 8 years after the priority date, when not being paid by Liquidia to say the opposite, Dr. Hill told his colleagues that "how the pharmacokinetics and the effectiveness of inhaled forms compare to parental forms [i.e. intravenous and subcutaneous] of prostanoids at the currently approved doses . . . has not been adequately studied."  EX2090, 460; *see also* EX2061, ¶11 (noting risk of spillover effect when inhaled amount of treprostinil is increased).  Instead, "clinicians need to rely on clinical assessment as proof of response to therapy."  *Id.*

Iloprost, the only other inhaled prostacyclin analogue as of the priority date, approved for dosages of 5 micrograms or less in a single event dose, demonstrated adverse systemic effects at doses as low as 7.5 micrograms per single event dosage. EX1001, 17:15-22.  Given these dose limiting side effects, a POSA would not have been motivated to achieve a dose of 15 to 90 micrograms in just 1 to 3 breaths with any reasonable expectation of success.

35

LIQ_PH-ILD_00000154

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Finally, even if the Board were to accept Petitioner's calculation, it does not result in a single event dose between 15 micrograms and 90 micrograms. Remodulin® intravenous infusion is dosed *continuously*, and 108 to 117 micrograms would be the dosage over *24 hours*. *Id.*, EX1018. The '212 patent teaches, therefore, that 10.8 to 58.5 micrograms would be the expected *daily* inhaled dose, and not a single event dosage. *Id.* As Dr. Hill admits, this calculation is comparing "apples and oranges." EX2055, 100:15-25.

The continuous nature of the drug delivery in the prior art confirms that one single event dose is insufficient to control PAH for an entire day. *Id.* For example, Voswinckel JAHA, which has itself not been established to be prior art, confirms that 4 individual dosing events were required throughout the day to treat pulmonary hypertension. *Id*; EX1008. Even at the high end, the simple math demonstrates that a 58.5 microgram daily dose would amount to less than 15 micrograms of treprostinil sodium per single event dose when spread over four individual dosing events. *Id.*

Surprisingly, during Dr. Hill's deposition, Petitioner asked about "dose adjustments" of Remodulin as described on the label on redirect. Dr. Hill testified that the dose of Remodulin may be adjusted "no more than 2.5 nanograms per kilogram per minute per week". *Id.* at 174:15-21. Dr. Hill then testified that these dose adjustments would "end up in that 15 to 90 microgram range taking into account dividing the dose in paragraph 100 by four." *Id.* at 176:5-10. Patent Owner

36

LIQ_PH-ILD_00000155

IPR2021-00406
U.S. Patent No. 10,716,793 B2

objects to this testimony because it is outside the scope of a proper redirect examination and presents new theories of invalidity that were not presented in the Petition. Further, following the dosage instructions from the Remodulin label would ultimately result in dosages significantly above a single event dose of 15 to 90 micrograms even if Petitioner's calculation methodology had any scientific merit, which it does not. *See, e.g.,* EX2052, ¶60.

For at least these reasons, a POSA would not be motivated to combine the disclosure of the '212 patent with the teachings of Voswinckel JESC and JAHA in a way that would result in a single event dose of 15 to 90 micrograms in 1 to 3 breaths with a reasonable expectation of success. There is simply no motivation offered by Petitioner that would override a POSA's serious concerns about side effects to support modifying the Voswinckel references and '212 patent in order to achieve a single event dose of 15 to 90 micrograms in 1 to 3 breaths. In fact, Voswinckel JESC warns in its Conclusion that "at a concentration of 16 µg/ml, near maximal pulmonary vasodilation is achieved without adverse effects" but "[a]t higher doses, local and systemic side effects may occur." EX1007. Nowhere does the Petition address why a POSA would increase the dose or have a reasonable expectation of success if the dose is increased by shortening the single event dose of Voswinckel JESC to 1 to 3 breaths using a much higher dose per breath. In fact, Petitioner's expert Dr. Gonda remarks in his own inhaled treprostinil patent

37

LIQ_PH-ILD_00000156

IPR2021-00406
U.S. Patent No. 10,716,793 B2

application that it would be preferable to *reduce* the treprostinil dosage taught by Voswinckel 2006 in order to reduce systemic levels and adverse side effects. EX2091, ¶¶25, 26, 29-32.  If anything, a POSA would be motivated to lower the dose based on Voswinckel 2006 (if it were prior art at all).

### 4.    Claims 4, 6, and 7: Petitioner's Arguments Regarding Obviousness Are Contradicted And Undermined By Its Arguments Regarding Enablement

Here, Petitioner asserts that claims 4, 6, and 7 are obvious. But in co-pending litigation between Petitioner and Patent Owner, Petitioner says the claims are not enabled. Petitioner cannot have it both ways.

Petitioner uses half of a page to assert that claim 4 would be obvious. Pet. 44. Petitioner cites the '212 patent, which describes an "inhaler" and references powder formulations in the specification and a claim, and an article stating that "dry powder inhalers were well known and 'widely accepted' as of 2006." *Id.* (citing EX1038, 1311). Petitioner cites the '212 patent again for claims 6-7, using four and three lines, respectively. Pet. 45.  Dr. Gonda's declaration asserts that "because dry powder inhalers were well-known and 'widely accepted' by May 2006, … a POSA would have had a reasonable expectation of success that the "powder" disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." EX1004, ¶80 (citing EX1019, 33).

38

LIQ_PH-ILD_00000157

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Dr. Gonda asserts the opposite in his district court expert report. Spanning twenty pages, Dr. Gonda identifies a litany of alleged challenges that he contends demonstrate a lack of enablement.[10] EX2091, 40-61. According to Dr. Gonda, "a POSA would have to engage in excessive (undue) experimentation to develop a treprostinil powder formulation and corresponding dry powder inhaler that achieve [sic] effective administration as required by claims 1, 4, 6, and 7 of the '793 patent." *Id.* at 42. "[T]he level of unpredictability in the art was high." *Id.* at 44. "Without guidance from the '793 Patent, *a POSA would be unable* to formulate a treprostinil powder suitable for administration via a dry powder inhaler for PH patients without excessive experimentation." *Id.* at 47 (emphasis added); *see also, e.g.*, *id.* at 49 (treprostinil would be more challenging that other drugs used with DPIs); 51 (powders present unique challenges).

Dr. Gonda's opinions in the district court completely contradict his assertions before the Board. *Compare* EX2091, 40-61 *with* Pet. 44 *and* EX1004, ¶¶76-80. This is particularly true where Petitioner and Dr. Gonda contend that "the '212 patent's disclosure that one can use a powder formulation of treprostinil is nearly identical to that of the '793 patent's disclosure of treprostinil powder formulations." EX1004,

---

[10] Patent Owner disputes Petitioner's claims of invalidity for lack of written description and enablement and obviousness.

39

LIQ_PH-ILD_00000158

IPR2021-00406
U.S. Patent No. 10,716,793 B2

¶78 n.8. "[N]early identical" disclosures cannot support both a reasonable expectation of success (*without* the '793 patent's guidance on dosing) and a conclusion of undue experimentation (*with* the '793 patent's guidance).

Dr. Gonda purports to condition his opinions on enablement, stating that the claims are not enabled "[t]o the extent [Petitioner] contends that he asserted claims are not obvious," but this does not resolve his inconsistency. *See, e.g.*, EX2091, 40. Patent Owner primarily contends the claims are nonobvious because the prior art lacks disclosure of a single event dose of 15-90 μg delivered in 1-3 breaths, regardless of the form of administration (liquid or powder). Whether the Board or Court agrees does not affect how difficult it allegedly was in 2006 to prepare a powder formulation for use with a DPI. Petitioner's conclusory evidence of obviousness is contradicted by its lengthy district court assertions and it has therefore failed to show Claims 4, 6, or 7 to be obvious by a preponderance of the evidence.

## B.    Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious

Petitioner's rationale under Ground 2 is identical to Ground 1, except with respect to the claim limitation "delivered in 1 to 3 breaths." Rather than relying on Voswinckel JAHA for this limitation, Petitioner argues that this limitation "would have been obvious over the '212 Patent and Voswinckel JESC in view of a POSA's general knowledge in the field and/or by applying routine optimization." To the

40

LIQ_PH-ILD_00000159

IPR2021-00406
U.S. Patent No. 10,716,793 B2

extent that Ground 2 relies on arguments set forth under Ground 1, Patent Owner

incorporates the arguments from Section IV.A.

Petitioner is incorrect that a "POSA's general knowledge in the field" would

motivate a POSA to "minimize the number of breaths required for administration of

treprostinil." As discussed above, there were known dose limiting side effects

associated with treprostinil and prostacyclin molecules generally that would have

prevented a POSA from expecting that such a high dosage in just 1 to 3 breaths

would be well tolerated. *See* Section IV.A.3.c). The "general knowledge" relied

upon by Petitioner does not support the notion that the "the general state of the art

had established safety and efficacy of high dosages of inhaled therapeutics delivered

over a small number of breaths."

As a preliminary matter, Petitioner relies on publications that are not "prior

art" as discussed in Section IV.C below (*i.e.*, Voswinckel 2006 (EX1009) and

Ghofrani (EX1010)).

Second, even the actual prior art relied upon relate to different types of

molecules with different indications and mechanisms of action. Geller 2003, for

example, which Petitioner also relies upon, teaches inhalation of recombinant human

deoxyribonuclease (rhDNase) for the treatment of cystic fibrosis. EX1034, Abstract.

A POSA would understand that the ability of an inhaled therapeutic to be well

tolerated at high concentrations in just 1 to 3 breaths is highly dependent on the

41

LIQ_PH-ILD_00000160

IPR2021-00406
U.S. Patent No. 10,716,793 B2

nature of the compound inhaled. EX2052, ¶89. The pharmacokinetic profile and potential side effects of inhaled rhDNase are completely unrelated to treprostinil or other prostacyclin analogues. *Id.* And Frijlink 2004 (EX1039) simply teaches that dry powder inhalers may be used to deliver high fine particle fractions to the lung resulting in relatively high lung deposition. It does not teach that high concentrations of treprostinil in just 1 to 3 breaths would be well tolerated in the case of a totally different patient population, namely pulmonary hypertension patients. Indeed, Dr. Hill acknowledged that there are different considerations in determining whether a particular medication is suitable via a particular mode of administration when treating different diseases. EX2055, 136:8-141:18. Finally, Petitioner relies upon Voswinckel JAHA, but as explained in Section IV.A.2.c) above, this abstract does not teach dosages of treprostinil of 15 micrograms to 90 micrograms.

Petitioner has likewise failed to explain *why* it would have been "routine optimization" to arrive at the claimed dosage in just 1 to 3 breaths in view of the general disclosures of the '212 patent and Voswinckel JESC. As discussed in Sections IV.A.2.a) and IV.A.2.b) above, neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms or teach administration of treprostinil in just 1 to 3 breaths. In fact, Voswinckel JESC teaches away from using higher concentrations due to side effects as described above.

42

LIQ_PH-ILD_00000161

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Petitioner incorrectly assumes that a POSA could readily titrate dosage up from the teachings of the '212 patent and Voswinckel JESC to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. However, both the '212 patent and Voswinckel JESC utilize continuous nebulization to deliver a dosage of treprostinil over a longer duration. It would not be possible to administer a single event dose in 1 to 3 breaths of the claimed invention using these devices. Further, as discussed *supra*, with continuous nebulization, a patient breathes in a very small fraction of the nebulized output of the device over a substantial time period without knowing the precise dosage that is ultimately administered. *Id.* ("only 10% of the total dose loaded in a [continuous] nebulizer is in reality deposited in the lungs"). The patient wears a mask and breathes in unmeasured portions of the entire nebulized output delivered through the mask:



EX2033, EX2052, ¶37.

LIQ_PH-ILD_00000162

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Various factors that would affect the dose of drug received by a patient through a continuous nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface. *Id.* at ¶38. Petitioner overlooks the fundamental difference between operating principles of continuous nebulization devices and other types of inhalation devices and erroneously combines elements from incompatible references throughout its Petition.

Petitioner's assertions of obviousness of claims 4, 6, and 7 fail for the same reasons as cited above with respect to Ground 1.

### C.    Grounds 3-6 Fail Because Each Ground Relies On Publications That Petitioner Has Failed to Establish Are Prior Art

Petitioner does not dispute that Ghofrani and Voswinckel 2006 were both published less than one year prior to the date of the application that resulted in the '793 patent. *See, e.g.,* Petition at 25 (admitting that Ghofrani was published in June of 2005, *i.e.*, less than one year prior to the date of application); *Id.* at 27 (admitting that Voswinckel 2006 was published on January 17, 2006, *i.e.*, less than one year prior to the date of application). Accordingly, Petitioner bears the burden of establishing that Ghofrani and Voswinckel 2006 are prior art "by others" under 35 U.S.C. § 102(a). *See, e.g., Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.* 322 F.3d 1335, 1346 (Fed. Cir. 2003) (an inventor's own disclosure 'will

44

LIQ_PH-ILD_00000163

IPR2021-00406
U.S. Patent No. 10,716,793 B2

not anticipate his later invention" unless published more than one year prior to the application date).

Ghofrani and Voswinckel 2006 are not prior art unless they are the work of another. *In re Katz,* 687 F.2d 450, 454 (CCPA 1982). "[T]he fact that a reference does not list any co-inventors as authors, or that it lists other authors, is certainly not dispositive in itself." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); MPEP § 2132.01 (II) ("[a]n inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). A common inventive entity may still exist even where a co-inventor is not listed as an author on the purported prior art reference. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, paper 35, at 7-8, n. 8 (PTAB Jun. 26, 2019). The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019) (citing *In re Land,* 368 F.2d 866, 878 (CCPA 1996) and *In re DeBaun,* 687 F.2d 459, 462-63 (CCPA 1982)).

The declarations of inventors Drs. Seeger and Roscigno, together with the deposition testimony of Dr. Rubin and the corroboration provided by non-inventor Dr. Ghofrani, establish that the relevant portion of the Ghofrani reference was

45

LIQ_PH-ILD_00000164

IPR2021-00406
U.S. Patent No. 10,716,793 B2

reduced to practice by the present inventors prior to the publication date of the Ghofrani reference. EX2071, ¶5; EX2074, ¶8.  In addition, Dr. Roscigno confirms and identifies corroborating regulatory documents demonstrating that the inventors had conceived of and reduced to practice all limitations of the independent claims by 2003, and certainly no later than January 2005.  EX2061, ¶¶16-17 (citing EX2062-EX2064). Certainly, the inventors had reduced to practice at least the limitations alleged in Ghofrani by the end of 2003 and no later than January 2005. *Id.* at ¶14-15.  The same is true in relation to Voswinckel 2006.  Accordingly, Ghofrani and Voswinckel 2006 are not qualifying prior art.

### 1.    Ghofrani

Ghofrani is a review article, published in German, describing "New therapies in the treatment of pulmonary hypertension."  In addition to describing recent developments relating to inhaled treprostinil, the review article also describes other "new therapy approaches, which are partially still under development, and that can find their way into the therapy guidelines in the near future" including inhaled iloprost, selective endothelin A receptor antagonists (sitaxsentan and ambrisentan), and PDE5-inhibors (e.g., sildenafil).  EX1010, 297.

The Ghofrani review article was co-authored by Drs. Seeger and Voswinckel (inventors of the '793 patent) as well as Drs. Ghofrani, Reichenberger, and Grimminger (non-inventors).  Drs. Seeger and Voswinckel testified that they

46

LIQ_PH-ILD_00000165

contributed to portions of the Ghofrani review article relating to inhaled iloprost and

inhaled treprostinnil.  *See* EX2066, 3 (IPR2017-01621, EX2020) (Seeger Decl.).

Drs. Ghofrani, Reichenberger, and Grimminger have each submitted declarations

stating that they did not contribute to the sections of the Ghofrani review article

relating to the studies on inhaled treprostinil.  EX2004, ¶ 5; EX2005, ¶ 5; EX2006,

¶ 5;  *see also*  EX2067-EX2069 (IPR2017-01621 and -01622) (Ghofrani,

Grimminger, Reichenberg Decls.) (EX2026, EX2099, EX2028, EX2027).  Further,

Drs. Ghofrani, Reichenberger, and Grimminger have each declared that they did not

design the inhaled treprostinil clinical trials and that the information on the clinical

trials mentioned in the Ghofrani article were designed and conducted by Drs.

Voswinckel and Seeger based on their work with Drs. Olschewski, Rubin, Schmehl,

Sterritt, and Roscigno.  *Id.*

Instead, Drs. Ghofrani, Reichenberger, and Grimminger contributed to other

sections of Ghofrani not relevant to the Petitioner's grounds for *inter partes* review.

Dr. Ghofrani stated that his contribution was to the section on phosphodiesterase

inhibitors.  EX2004, ¶4. Dr. Ghofrani has experience in the use of phosphodiesterase

inhibitors for treatment of pulmonary hypertension.  *Id*.  His contribution to the

Ghofrani publication was drafting the section of the article relating to

phosphodiesterase inhibitors and jointly drafting the sections on vasoactive therapy,

inhaled iloprost, combination therapies, and treatment of early forms of treatment of

LIQ_PH-ILD_00000166

pulmonary hypertension, as well as the introduction. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Reichenberger stated that his contribution was to the section on selective endothelin A receptor antagonists. EX2005, ¶4. Dr. Reichenberger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani was jointly drafting the section on selective endothelin A receptor agonists with Dr. Grimminger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Grimminger stated that his contribution was also to the section on selective endothelin A receptor antagonists. EX2006, ¶4. Dr. Grimminger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani consisted of jointly drafting the section on selective endothelin A receptor agonists with Dr. Reichenberger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Petitioner. *Id.* at ¶¶4-6.

As noted in *In re Katz*, "authorship of an article by itself does not raise a presumption of inventorship with respect to the subject matter disclosed in the article. Thus, co-authors may not be presumed to be co-inventors merely from the

48

LIQ_PH-ILD_00000167

IPR2021-00406
U.S. Patent No. 10,716,793 B2

fact of co-authorship."  687 F.2d at 455.  The explanations provided by Seeger and *each of the non-inventor co-authors* – Drs. Seeger, Ghofrani, Reichenberger, and Grimminger – is consistent not only with the content of the article, but also with the nature of the publication, *i.e.*, a review article summarizing different advances in the treatment of pulmonary hypertension.  *Id.* (accepting the Appellant's explanation "consistent not only with the content of the article but with the nature of the publication").  From such a fact pattern, joint inventorship with Drs. Ghofrani, Reichenberger, and Grimminger cannot be inferred.

Further, Petitioner appears to accept UTC's explanation for why Drs. Ghofrani, Reichenberger, and Grimminger are not inventors of the relevant subject matter of Ghofrani based on declarations submitted by these authors in IPR2017-01621.  *See,* Pet. at 26 ("PO encountered this issue in IPR2017-01621 and IPR2017-01622 and submitted an affidavit attesting that these authors did not contribute to the relevant portion of Ghofrani.  *See* IPR2017-01621; Paper 10 at 12-14; IPR2017-01622, Paper 9 at 12-15.")

49

LIQ_PH-ILD_00000168

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Nonetheless, Petitioner contends that because "Olschewski, Rubin, Schmehl, Sterritt, and Roscigno were not listed as authors on the Ghofrani article"[11] there is an "inference that they did not make any contribution to Ghofrani's disclosure." *Id.* at 27. This distinction between authorship and inventorship is legally irrelevant. The fact that a reference does not list certain co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. There is no requirement that every listed inventor on the '793 patent be listed as a co-author to disqualify a reference under § 102(a) as not by another. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, Paper 35 at 7-8, n. 8. The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *See, e.g., Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, Paper 40 at 20.

Here, the declaration of Dr. Seeger explains that these other co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical

---

[11] Robert Roscigno is a named inventor of the '793 patent, and was later employed as an executive of, and is currently a consultant for, Liquidia. Petitioner failed to present *any* evidence on these points.

50

LIQ_PH-ILD_00000169

IPR2021-00406
U.S. Patent No. 10,716,793 B2

studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶12, 22-27. Many of the specific parameters used in these studies performed by the co-inventors were not fully reported in Ghofrani. *Id.* at ¶¶11-12. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Ghofrani were conceived by the named inventors and not by the non-inventor co-authors of these references. EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on the Ghofrani review article is irrelevant to whether Ghofrani is "by another."

## 2. Voswinckel 2006

Voswinckel 2006 is a short "Clinical Observation" published in the Annals of Internal Medicine, titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," which describes clinical observations on three patients with severe pulmonary hypertension, who were treated with administration of a single 15 μg dose of treprostinil, inhaled in three breaths through a modified Optineb ultrasonic inhalation device.

Voswinckel 2006 was co-authored by Drs. Seeger, Voswinckel, and Dr. Olschewski (inventors of the '793 patent) as well as Drs. Ghofrani and Grimminger (non-inventors). Drs. Ghofrani and Grimminger have each submitted declarations stating that they did not contribute to design or control of the clinical trial described in Voswinckel 2006, and that all of the work performed by Drs. Ghofrani and/or

51

LIQ_PH-ILD_00000170

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Grimminger was at the direction of or under the supervision and control of Drs. Seeger, Voswinckel, and Olschewski.  EX2004, ¶¶7-12; EX2006, ¶¶7-12; *see also* EX2070, ¶6; EX2065.  A publication is not the work of another where the work described was performed solely at the direction and supervision of the listed inventor(s).  *See In re Katz,* 687 F.2d at 450, 455-456 (holding that a publication that identified an inventor and two students as authors was not the work of others, and thus not prior art, because the work performed by students in "testing features of the invention" was performed under the direction and supervision of the inventor); *see also CSL Behring LLC v. Bioverative Therapeutics Inc.,* IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019) (holding a publication is not the work of another where the patent owner can show that the non-inventor co-authors "carried out experiments under [the inventor's] direction and control," and that it was the inventor who "designed and lead the … project, and experiments performed by the co-authors.").

As set forth in the declarations, the dosage amounts of administered inhaled treprostinil to give to patients, the inhalation time and/or number of breaths employed, the particular equipment and administration devices and methods to use, the spacing between inhalation events, the analysis of the hemodynamic and pharmacokinetic effects over time in the study with inhaled treprostinil were all determined Drs. Seeger, Voswinckel, and/or Olschewski.  Drs. Ghofrani and Grimminger did not participate in the design of any of the studies, did not select the

52

LIQ_PH-ILD_00000171

IPR2021-00406
U.S. Patent No. 10,716,793 B2

dosing regimen, and did not conduct analysis of patient results discussed in Voswinckel 2006. EX2004, ¶¶11-12; EX2006, ¶¶11-12.

As explained in the declarations of Drs. Seeger, Ghofrani, and Grimminger, it was standard practice within the group to include *all* group members as authors on clinical observation reports such as Voswinckel 2006, even when that group is broader than the individuals actually involved in inventing the methods or devices and designing the trials disclosed in that publication. EX2003, ¶21; EX2004, ¶¶10-11; EX2006, ¶¶10-11. This explanation is consistent with industry practice for publishing clinical observation reports such as this one. Joint inventorship with Ghofrani and Grimminger cannot be inferred in these circumstances.

Petitioner contends that "Olschewski, Roscigno,[12] Rubin, Schmehl, and Sterritt are identified as inventors of the '793 patent, but are not authors of Voswinckel 2006." Pet., 29. As a preliminary matter, UTC notes that Dr. Olschewski is an author on Voswinckel 2006.

Petitioner is also incorrect to state that, because these other co-inventors "are not authors on Voswinckel 2006, [this] supports the inference that they did not make any contribution to that disclosure." Pet. at 29. As discussed above with respect to Ghofrani, this fact is legally irrelevant. The fact that a reference does not list certain

---

[12] *See* footnote 4, above.

53

LIQ_PH-ILD_00000172

IPR2021-00406
U.S. Patent No. 10,716,793 B2

co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. Rather, as is the case here, the non-author co-inventors, contributed to aspects of one or more of the claimed inventions, not disclosed by the publication that Petitioner is relying on.

Here, Dr. Seeger explains that these co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶19-20, 22-27. Many of the specific parameters used and the particulars of these studies performed by the co-inventors were not fully reported in Voswinckel 2006 (for example, the particular details of the "*modified* OptiNeb® ultrasonic device"). *Id.* at ¶19. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Voswinckel 2006 were conceived by the named inventors and not by the non-inventor co-authors of these references. EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on Voswinckel 2006 is not dispositive on the issue.

LIQ_PH-ILD_00000173

IPR2021-00406
U.S. Patent No. 10,716,793 B2

# V.    OBJECTIVE INDICIA OF NONOBVIOUSNESS

There are a number of secondary considerations that establish that the claims

of the '793 patent are not obvious as of the priority date, including unexpected

results, copying and unmet need.

## A.    Unexpected Results

For the reasons discussed above, Petitioner has failed to establish a prima facie

case of obviousness under any one of Grounds 1-6.  Moreover, the specification

teaches the claimed single event dose of "15 micrograms to 90 micrograms of

treprostinil" "delivered in 1 to 3 breaths" unexpectedly achieved a therapeutically

effective dose that was well tolerated which further supports non-obviousness of the

claimed inventions.  A claimed dosage regimen as claimed in the '793 patent is non-

obvious where it "produce[s] a new and unexpected result which is different in kind

and not merely in degree from the results of the prior art."  *In re Aller*, 220 F.2d 240,

456 (CCPA 1955); *E.I. DuPont de Nemours & Company v. Synvina C.V.,* 904 F.3d

996, 1007 (Fed. Cir. 2018); *In re Geisler,* 116 F.3d 1465, 1471 (Fed. Cir. 1997).

Further, said critical range may be non-obvious, where the prior art taught away from

the claimed range.  *Ormco Corp. v. Align Technology, Inc*, 463 F.3d 1299, 1311

(Fed. Cir. 2006).  Here, high doses of treprostinil were known in the art to produce

dose-limiting side effects.  As a result, a POSA would not have expected such dosage

ranges delivered in just a few breaths to be well tolerated.  EX2061, ¶¶11, 14-16

55

LIQ_PH-ILD_00000174

IPR2021-00406
U.S. Patent No. 10,716,793 B2

(citing IPR2017-01622, EX2049, EX2050, EX2051) (inventors "discovered unexpectedly that [they] could deliver more treprostinil in a shorter period of time with fewer side effects (increasing the treprotinil [sic] dose more than 10-fold compared with iloprost…was not obvious to anyone")).

Prostacyclin analogues were known to produce dose limiting adverse side effects. EX2036. For example, intravenous epoprostenol and intravenous treprostinil can induce headache, nausea, chest pain, jaw pain, backache and restlessness at certain concentrations. *Id*. EX2037 teaches that the maximum tolerated dose for intravenous treprostinil is 24.6 ± 4.0 ng/kg/min. Based on Dr. Hill's assumptions for a person's weight between 60 and 65 kg, the average maximal tolerated dose would have been between 1.47 micrograms/min and 1.59 micrograms/min. Even if a person were to take an entire minute to inhale the one to three breaths, the dosage of 15 micrograms to 90 micrograms, would be an order of magnitude larger than what was considered the maximal tolerated dose. *See also* EX2055, 113:23-114:10 (testifying that if he applied the calculation described in paragraph 100 of his report to the maximal tolerated dose of intravenous treprostinil the maximal tolerated dose of inhaled treprostinil should be 53.125 micrograms).

As of the priority date, only one approved inhalation therapy for the treatment of pulmonary hypertension – Ventavis® (iloprost) – was available. EX1029. Ventavis® was approved for a single event dose of 2.5 micrograms or 5 micrograms

56

LIQ_PH-ILD_00000175

IPR2021-00406
U.S. Patent No. 10,716,793 B2

to be taken 6 to 9 times per day. Even at these doses, at least 39% of patients experienced at least one adverse event. *Id.* at 8. The Ventavis® label further teaches – in a study where health volunteers were given inhaled doses of iloprost solution every 2 hours increasing from 5 mcg to up to 20 mcg – 32% of subjects failed to reach the highest scheduled dose. Both iloprost and treprostinil are prostacyclin analogs. A POSA reading the iloprost label, would not have thought that dosages as high as 15 micrograms to 90 micrograms delivered in 1 to 3 breaths would have been well tolerated.

### B.    Copying

Petitioner's deliberate copying of Tyvaso®, Patent Owner's commercial product embodying the claimed invention, is further evidence of nonobviousness of the claimed inventions. *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1136 (Fed. Cir. 2019) (copying by a competitor is evidence of nonobviousness) (citing *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1325 (Fed. Cir. 2004)). Petitioner's commercial product is referred to in its press releases, corporate filings, patents and publications as LIQ861. LIQ861 is an inhaled, dry-powder formulation of treprostinil. It comes in four "capsule strengths" ranging from approximately 25 to 100 micrograms. EX2084. In clinical trials, LIQ861 has been administered using the Plastiape RS00 Model 8 dry powder inhaler in 2 breaths per capsule. *Id.* at 2. The pharmacokinetics and bioavailability of a 79.5 microgram capsule dose (which

57

LIQ_PH-ILD_00000176

IPR2021-00406
U.S. Patent No. 10,716,793 B2

delivers a single event dose of approximately 58.1 micrograms) was directly compared with Patent Owner's commercial product. EX2085. This study demonstrated that Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range. *Id.* at Abstract, 5; *see also* EX2036.

Evidence of copying is further supported by Petitioner's patent filings, which disclose that LIQ861 can deliver a single event dosage of treprostinil between 15 micrograms to 90 micrograms in 1 to 3 breaths. EX2088. Finally, Petitioner has chosen to submit an NDA to the FDA for LIQ861 under the 505(b)(2) regulatory pathway with Tyvaso® as the reference listed drug – relying in part on FDA's previous findings of efficacy and safety of Tyvaso® for the treatment of PAH. EX2089, 3.

**Comparison of Claims of '793 Patent to LIQ861**

| Claim 1 | LIQ861 |
|---|---|
| 1. A method of treating pulmonary hypertension comprising | "***LIQ861 is*** an investigational, inhaled, dry-powder formulation of treprostinil…***for the treatment of PAH***" EX2084, 2 <br><br> "Based on these results, a phase 3 study (INSPIRE; Clinicaltrials.gov Identifier NCT03399604) evaluating the long-term safety and tolerability of ***LIQ861 in patients with pulmonary arterial hypertension*** was initiated." EX2084, Abstract |

58

LIQ_PH-ILD_00000177

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| | |
|---|---|
| administering by inhalation to a human suffering from pulmonary hypertension | "***LIQ861*** is an investigational, ***inhaled***, dry-powder formulation of treprostinil…"<br>EX2084, 2 |
| a therapeutically effective single event dose of a formulation | "***LIQ861*** has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***."<br>EX2084, 2<br><br>"***LIQ861***…safely delivering doses to the lungs ***in 1 to 2 breaths***."<br>EX2085, Abstract |
| comprising treprostinil or a pharmaceutically acceptable salt thereof | "***LIQ861 is*** an investigational, inhaled, dry-***powder formulation of treprostinil***…"<br>EX2084, 2 |
| with an inhalation device, | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH."<br>EX2084, 2 |
| wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of | "…treprostinil exposure from LIQ861 (79.5 µg capsule [approximate delivered dose of 58.1 µg treprostinil])…"<br>EX2085, Abstract |

59

LIQ_PH-ILD_00000178

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| treprostinil or a pharmaceutically acceptable salt thereof | |
|---|---|
| delivered in 1 to 3 breaths. | "***LIQ861*** has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***."<br>    EX2084, 2<br><br>"***LIQ861***…safely delivering doses to the lungs ***in 1 to 2 breaths***."<br>    EX2085, Abstract |
| **Claim 4** | **LIQ861** |
| 4. The method of claim 1, | *See* above |
| wherein the inhalation device is a dry powder inhaler. | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH."<br>    EX2084, 2 |
| **Claim 6** | **LIQ861** |
| 6. The method of claim 4, | *See* above |
| wherein the formulation is a powder. | "***LIQ861*** is an investigational, inhaled, ***dry-powder formulation*** of treprostinil…"<br>    EX2084, 2 |
| **Claim 7** | **LIQ861** |
| 7. The method of claim 6, | *See* above |

60

LIQ_PH-ILD_00000179

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| wherein the powder comprises particles less than 5 micrometers in diameter. | "LIQ861 particles are a precise, uniform size (1μm) and trefoil pollen-like shape." |
| | Roscigno, Poster presentation at the Pulmonary Vascular Research Institute (PVRI) 12th Annual World Congress, Jan. 2018. Available online here. |

## C.    Long-Felt Unmet Need

The claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension. *See, e.g., Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.,* 566 F.3d 989, 998 (Fed. Cir. 2009) ("Secondary considerations of non-obviousness include . . . [the claimed invention's] satisfaction of a long-felt need."). *First,* inhaled treprostinil is indicated for a broader range of pulmonary hypertension patients than the therapeutics available at the time. *Second,* even for the treatment of pulmonary arterial hypertension, many patients found the existing therapies either intolerable or ineffective.

Inhaled treprostinil is currently approved for pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease. *Compare* EX2034 (2021 Tyvaso® label) *with* EX1018. The '793 patent further suggests that inhaled treprostinil in doses of 15 to 90 micrograms may also be effective for other types of pulmonary hypertension. *See, e.g.,* EX1001, 9:44-50 (explaining that the study described in example 1 included patients with idiopathic PAH, PAH other,

61

LIQ_PH-ILD_00000180

IPR2021-00406
U.S. Patent No. 10,716,793 B2

chronic thromboembolic pulmonary hypertension (CTEPH) and pulmonary fibrosis).

As of May 2006 – in fact, even as of January 28, 2021 – no therapies were approved for the treatment of pulmonary hypertension in patients with interstitial lung disease. EX2060, 325. As Petitioner's own expert acknowledged, there is "a completely unmet medical need" where "[t]here [is] nothing that these patients were getting as a therapy for their problems." EX2056, 105:6-8 (discussing the unmet need provided by Pulmozyme).

Even where other therapies had been approved, for example, for the treatment of pulmonary arterial hypertension, there still existed a need for the inhaled dosing regimen described in the claims of the '793 patent. By Petitioner's own admission, the claimed invention of the '793 patent satisfies a long-felt unmet need. EX2089, F-7. In promoting its own product, LIQ861 – which infringes and is an embodiment of the claimed invention, Petitioner touts that the claimed invention as embodied by LIQ861 satisfies a long-felt unmet need. EX2085. ("Given the comparable treprostinil bioavailability and similar safety profiles of LIQ861 and Tyvaso®, LIQ861 fulfills a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler").

62

LIQ_PH-ILD_00000181

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## VI.    CONCLUSION

For the foregoing reasons, the claims are patentable over the cited grounds,

and Petitioner has not carried its burden to prove unpatentability.

Respectfully submitted,

Date November 10, 2021                         By /Stephen B. Maebius/
FOLEY & LARDNER LLP                            Stephen B. Maebius
3000 K St., NW                                 Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

63

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Patent Owner Response

complies with the type-volume limits of 37 C.F.R. § 42.24(b)(1) because it

contains 13,906 words (which is less than the 14,000 permitted), according to the

word-processing system used to prepare this Patent Owner Preliminary Response,

excluding the portions exempted by 37 C.F.R. 42.24(a)(1).


Date November 10, 2021                        By /Stephen B. Maebius/
FOLEY & LARDNER LLP                           Stephen B. Maebius
3000 K St., NW                                Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

64

LIQ_PH-ILD_00000183

IPR2021-00406
U.S. Patent No. 10,716,793 B2

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Patent Owner

Response and accompanying Exhibits was served on counsel of record

for Petitioner on November 10, 2021 by delivering a copy via email to the counsel

of record for the Petitioner at the following addresses:

zLiquidiaIPR@cooley.com
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com

Date November 10, 2021                    By /Stephen B. Maebius/
FOLEY & LARDNER LLP                       Stephen B. Maebius
3000 K St., NW                            Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

65

LIQ_PH-ILD_00000184

# EXHIBIT 15

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use TYVASO safely and effectively. See full prescribing information for TYVASO.**

**TYVASO® (treprostinil) inhalation solution, for oral inhalation use**
**Initial U.S. Approval: 2002**

--------------------------- **RECENT MAJOR CHANGES** ---------------------------
Warnings and Precautions (5.4)                                    05/2022

--------------------------- **INDICATIONS AND USAGE** ---------------------------
Tyvaso is a prostacyclin mimetic indicated for the treatment of:
- Pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability. Studies establishing effectiveness predominately included patients with NYHA Functional Class III symptoms and etiologies of idiopathic or heritable PAH (56%) or PAH associated with connective tissue diseases (33%). (1.1)
- Pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability. The study establishing effectiveness predominately included patients with etiologies of idiopathic interstitial pneumonia (IIP) (45%) inclusive of idiopathic pulmonary fibrosis (IPF), combined pulmonary fibrosis and emphysema (CPFE) (25%), and WHO Group 3 connective tissue disease (22%). (1.2)

--------------------------- **DOSAGE AND ADMINISTRATION** ---------------------------
- Use only with the Tyvaso Inhalation System. (2.1)
- Administer undiluted, as supplied. A single breath of Tyvaso delivers approximately 6 mcg of treprostinil. (2.1)
- Administer in 4 separate treatment sessions each day approximately 4 hours apart, during waking hours. (2.1)
- Initial dosage: 3 breaths (18 mcg) per treatment session. If 3 breaths are not tolerated, reduce to 1 or 2 breaths. (2.1)

- Dosage should be increased by an additional 3 breaths per treatment session at approximately 1- to 2-week intervals, if tolerated. (2.1)
- Titrate to target maintenance doses of 9 to 12 breaths per treatment session, 4 times daily. (2.1)

--------------------------- **DOSAGE FORMS AND STRENGTHS** ---------------------------
Sterile solution for oral inhalation: 2.9 mL ampule containing 1.74 mg treprostinil (0.6 mg per mL). (3)

--------------------------- **CONTRAINDICATIONS** ---------------------------
None. (4)

--------------------------- **WARNINGS AND PRECAUTIONS** ---------------------------
- Tyvaso may cause symptomatic hypotension. (5.1)
- Tyvaso inhibits platelet aggregation and increases the risk of bleeding. (5.2)
- Tyvaso dosage adjustments may be necessary if inhibitors or inducers of CYP2C8 are added or withdrawn. (5.3, 7.3)
- May cause bronchospasm: Patients with a history of hyperreactive airway disease may be more sensitive. (5.4)

--------------------------- **ADVERSE REACTIONS** ---------------------------
Most common adverse reactions (≥4%) are cough, headache, nausea, dizziness, flushing, throat irritation, pharyngolaryngeal pain, diarrhea, and syncope. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact United Therapeutics Corp. at 1-866-458-6479 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revised: 05/2022**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**1 INDICATIONS AND USAGE**
　　1.1 Pulmonary Arterial Hypertension
　　1.2 Pulmonary Hypertension Associated with ILD
**2 DOSAGE AND ADMINISTRATION**
　　2.1 Usual Dosage in Adults
　　2.2 Administration
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
　　5.1 Risk of Symptomatic Hypotension
　　5.2 Risk of Bleeding
　　5.3 Effect of Other Drugs on Treprostinil
　　5.4 Bronchospasm
**6 ADVERSE REACTIONS**
　　6.1 Clinical Trials Experience
　　6.2 Post-Marketing Experience
**7 DRUG INTERACTIONS**
　　7.1 Bosentan
　　7.2 Sildenafil
　　7.3 Effect of Cytochrome P450 Inhibitors and Inducers
　　7.4 Effect of Other Drugs on Treprostinil
**8 USE IN SPECIFIC POPULATIONS**
　　8.1 Pregnancy
　　8.2 Lactation
　　8.4 Pediatric Use
　　8.5 Geriatric Use
　　8.6 Patients with Hepatic Insufficiency
　　8.7 Patients with Renal Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
　　12.1 Mechanism of Action
　　12.2 Pharmacodynamics
　　12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
　　13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
　　13.2 Animal Toxicology and/or Pharmacology
**14 CLINICAL STUDIES**
　　14.1 Pulmonary Arterial Hypertension (WHO Group 1)
　　14.2 Long-term Treatment of PAH
　　14.3 Pulmonary Hypertension Associated with ILD (WHO Group 3)
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

* Sections or subsections omitted from the full prescribing information are not listed.

**UTC_PH-ILD_005268**

**FULL PRESCRIBING INFORMATION**

**1 INDICATIONS AND USAGE**

**1.1 Pulmonary Arterial Hypertension**

Tyvaso is indicated for the treatment of pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability. Studies establishing effectiveness predominately included patients with NYHA Functional Class III symptoms and etiologies of idiopathic or heritable PAH (56%) or PAH associated with connective tissue diseases (33%).

The effects diminish over the minimum recommended dosing interval of 4 hours; treatment timing can be adjusted for planned activities.

While there are long-term data on use of treprostinil by other routes of administration, nearly all controlled clinical experience with inhaled treprostinil has been on a background of bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase type 5 inhibitor). The controlled clinical experience was limited to 12 weeks in duration *[see Clinical Studies (14)]*.

**1.2 Pulmonary Hypertension Associated with ILD**

Tyvaso is indicated for the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability. The study establishing effectiveness predominately included patients with etiologies of idiopathic interstitial pneumonia (IIP) (45%) inclusive of idiopathic pulmonary fibrosis (IPF), combined pulmonary fibrosis and emphysema (CPFE) (25%), and WHO Group 3 connective tissue disease (22%) *[see Clinical Studies (14)]*.

**2 DOSAGE AND ADMINISTRATION**

**2.1 Usual Dosage in Adults**

Tyvaso is intended for oral inhalation using the Tyvaso Inhalation System, which consists of an ultrasonic, pulsed delivery device and its accessories.

Tyvaso is dosed in 4 separate, equally spaced treatment sessions per day, during waking hours. Each treatment session will take 2 to 3 minutes. The treatment sessions should be approximately 4 hours apart.

*Initial Dosage:*
Therapy should begin with 3 breaths of Tyvaso (18 mcg of treprostinil) per treatment session 4 times daily. If 3 breaths are not tolerated, reduce to 1 or 2 breaths and subsequently increase to 3 breaths, as tolerated.

*Maintenance Dosage:*
Dosage should be increased by an additional 3 breaths per treatment session, 4 times daily at approximately 1- to 2-week intervals. Studies establishing effectiveness in patients with PAH and PH-ILD have used target doses of 9 to 12 breaths per treatment session, 4 times daily. If adverse effects preclude titration to target dose, Tyvaso should be continued at the highest tolerated dose.

If a scheduled treatment session is missed or interrupted, therapy should be resumed as soon as possible at the usual dose.

UTC_PH-ILD_005269

## 2.2 Administration

Tyvaso must be used only with the Tyvaso Inhalation System. Patients should follow the instructions for use for operation of the Tyvaso Inhalation System and for daily cleaning of the device components after the last treatment session of the day. To avoid potential interruptions in drug delivery because of equipment malfunction, patients should have access to a back-up Tyvaso Inhalation System device.

Do not mix Tyvaso with other medications in the Tyvaso Inhalation System. Compatibility of Tyvaso with other medications has not been studied.

The Tyvaso Inhalation System should be prepared for use each day according to the instructions for use. One ampule of Tyvaso contains a sufficient volume of medication for all 4 treatment sessions in a single day. Prior to the first treatment session, the patient should twist the top off a single Tyvaso ampule and squeeze the entire contents into the medicine cup. Between each of the 4 daily treatment sessions, the device should be capped and stored upright with the remaining medication inside.

At the end of each day, the medicine cup and any remaining medication must be discarded. The device must be cleaned each day according to the instructions for use.

Avoid skin or eye contact with Tyvaso solution. Do not orally ingest the Tyvaso solution.

## 3 DOSAGE FORMS AND STRENGTHS

Sterile solution for oral inhalation: 2.9 mL ampule containing 1.74 mg of treprostinil (0.6 mg per mL).

## 4 CONTRAINDICATIONS

None.

## 5 WARNINGS AND PRECAUTIONS

### 5.1 Risk of Symptomatic Hypotension

Treprostinil is a pulmonary and systemic vasodilator. In patients with low systemic arterial pressure, treatment with Tyvaso may produce symptomatic hypotension.

### 5.2 Risk of Bleeding

Tyvaso inhibits platelet aggregation and increases the risk of bleeding.

### 5.3 Effect of Other Drugs on Treprostinil

Co-administration of a cytochrome P450 (CYP) 2C8 enzyme inhibitor (e.g., gemfibrozil) may increase exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of a CYP2C8 enzyme inducer (e.g., rifampin) may decrease exposure to treprostinil. Increased exposure is likely to increase adverse events associated with treprostinil administration, whereas decreased exposure is likely to reduce clinical effectiveness *[see Drug Interactions (7.3) and Clinical Pharmacology (12.3)]*.

### 5.4 Bronchospasm

Like other inhaled prostaglandins, Tyvaso may cause acute bronchospasm. Patients with asthma or chronic obstructive pulmonary disease (COPD), or other bronchial hyperreactivity, are at increased risk

Page 3

UTC_PH-ILD_005270

for bronchospasm. Ensure that such patients are treated optimally for reactive airway disease prior to and during treatment with Tyvaso Inhalation Solution.

## 6 ADVERSE REACTIONS

The following potential adverse reactions are described in Warnings and Precautions (5):
- Decrease in systemic blood pressure *[see Warnings and Precautions (5.1)]*.
- Bleeding *[see Warnings and Precautions (5.2)]*.

### 6.1 Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

<u>Pulmonary Arterial Hypertension</u>

In a 12-week, placebo-controlled study (TRIUMPH I) of 235 patients with PAH (WHO Group 1 and nearly all NYHA Functional Class III), the most commonly reported adverse reactions on Tyvaso included cough and throat irritation, headache, gastrointestinal effects, muscle, jaw or bone pain, dizziness, flushing, and syncope. Table 1 lists the adverse reactions that occurred at a rate of at least 4% and were more frequent in patients treated with Tyvaso than with placebo.

**Table 1:**     **Adverse Events in ≥4% of PAH Patients Receiving Tyvaso and More Frequent[a] than Placebo in TRIUMPH I**

| Adverse Event | Treatment n (%) | |
|---|---|---|
| | Tyvaso n=115 | Placebo n=120 |
| Cough | 62 (54) | 35 (29) |
| Headache | 47 (41) | 27 (23) |
| Throat Irritation / Pharyngolaryngeal Pain | 29 (25) | 17 (14) |
| Nausea | 22 (19) | 13 (11) |
| Flushing | 17 (15) | 1 (<1) |
| Syncope | 7 (6) | 1 (<1) |

[a] More than 3% greater than placebo

The safety of Tyvaso was also studied in a long-term, open-label extension study in which 206 patients were dosed for a mean duration of 2.3 years, with a maximum exposure of 5.4 years. Eighty-nine percent (89%) of patients achieved the target dose of 9 breaths, 4 times daily. Forty-two percent (42%) achieved a dose of 12 breaths, 4 times daily. The adverse events during this chronic dosing study were qualitatively similar to those observed in the 12-week placebo-controlled trial.

In a prospective, observational study comparing patients taking Tyvaso (958 patient-years of exposure) and a control group (treatment with other approved therapies for PAH; 1094 patient-years), Tyvaso was associated with a higher rate of cough (16.2 vs. 10.9 per 100 patient-years), throat irritation (4.5 vs.

UTC_PH-ILD_005271

1.2 per 100 pt-years), nasal discomfort (2.6 vs. 1.3 per 100 pt-years), and hemoptysis (2.5 vs. 1.3 per 100 pt-years) compared to the control group.

Pulmonary Hypertension Associated with ILD

In a 16-week, placebo-controlled study (INCREASE) of 326 patients with PH-ILD (WHO Group 3), adverse reactions were similar to the experience in studies of PAH.

**6.2 Post-Marketing Experience**

The adverse reaction of angioedema has been identified during the post-approval use of Tyvaso. Because this reaction is reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate the frequency or establish a causal relationship to drug exposure.

**7 DRUG INTERACTIONS**

**7.1 Bosentan**

In a human pharmacokinetic study conducted with bosentan (250 mg/day) and an oral formulation of treprostinil (treprostinil diolamine), no pharmacokinetic interactions between treprostinil and bosentan were observed.

**7.2 Sildenafil**

In a human pharmacokinetic study conducted with sildenafil (60 mg/day) and an oral formulation of treprostinil (treprostinil diolamine), no pharmacokinetic interactions between treprostinil and sildenafil were observed.

**7.3 Effect of Cytochrome P450 Inhibitors and Inducers**

*In vitro* studies of human hepatic microsomes showed that treprostinil does not inhibit cytochrome P450 (CYP) isoenzymes CYP1A2, CYP2A6, CYP2C8, CYP2C9, CYP2C19, CYP2D6, CYP2E1, and CYP3A. Additionally, treprostinil does not induce cytochrome P450 isoenzymes CYP1A2, CYP2B6, CYP2C9, CYP2C19, and CYP3A.

Human pharmacokinetic studies with an oral formulation of treprostinil (treprostinil diolamine) indicated that co-administration of the cytochrome P450 (CYP) 2C8 enzyme inhibitor, gemfibrozil, increases exposure (both $C_{max}$ and AUC) to treprostinil. Co-administration of the CYP2C8 enzyme inducer, rifampin, decreases exposure to treprostinil. It is unclear if the safety and efficacy of treprostinil by the inhalation route are altered by inhibitors or inducers of CYP2C8 *[see Warnings and Precautions (5.3)]*.

**7.4 Effect of Other Drugs on Treprostinil**

Drug interaction studies have been carried out with treprostinil (oral or subcutaneous) co-administered with acetaminophen (4 g/day), warfarin (25 mg/day), and fluconazole (200 mg/day), respectively, in healthy volunteers. These studies did not show a clinically significant effect on the pharmacokinetics of treprostinil. Treprostinil does not affect the pharmacokinetics or pharmacodynamics of warfarin. The pharmacokinetics of R- and S- warfarin and the international normalized ratio (INR) in healthy subjects given a single 25 mg dose of warfarin were unaffected by continuous subcutaneous infusion of treprostinil at an infusion rate of 10 ng/kg/min.

Page 5

UTC_PH-ILD_005272

# 8 USE IN SPECIFIC POPULATIONS

## 8.1 Pregnancy

Risk Summary

Limited case reports of treprostinil use in pregnant women are insufficient to inform a drug-associated risk of adverse developmental outcomes. However, there are risks to the mother and the fetus associated with pulmonary arterial hypertension *(see Clinical Considerations)*. In animal studies, no adverse reproductive and developmental effects were seen for treprostinil at ≥9 and ≥145 times the human exposure when based on $C_{max}$ and AUC, respectively, following a single treprostinil dose of 54 mcg.

The estimated background risk of major birth defects and miscarriage for the indicated populations is unknown. All pregnancies have a background risk of birth defect, loss, or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2 to 4% and 15 to 20%, respectively.

Clinical Considerations
*Disease-associated maternal and embryo-fetal risk*
Pulmonary arterial hypertension is associated with an increased risk of maternal and fetal mortality.

Data

Animal reproduction studies have been conducted with treprostinil via continuous subcutaneous administration and with treprostinil diolamine administered orally. In studies with orally administered treprostinil diolamine, no adverse effect doses for fetal viability/growth, fetal development (teratogenicity), and postnatal development were determined in rats. In pregnant rats, no evidence of harm to the fetus was observed following oral administration of treprostinil diolamine at the highest dose tested (20 mg/kg/day), which represents about 154 and 1479 times the human exposure, when based on $C_{max}$ and AUC, respectively, following a single Tyvaso dose of 54 mcg. In pregnant rabbits, external fetal and soft tissue malformations and fetal skeletal malformation occurred. The dose at which no adverse effects were seen (0.5 mg/kg/day) represents about 9 and 145 times the human exposure, when based on $C_{max}$ and AUC, respectively, following a single Tyvaso dose of 54 mcg. No treprostinil treatment-related effects on labor and delivery were seen in animal studies. Animal reproduction studies are not always predictive of human response.

## 8.2 Lactation

Risk Summary

There are no data on the presence of treprostinil in human milk, the effects on the breastfed infant, or the effects on milk production.

## 8.4 Pediatric Use

Safety and effectiveness in pediatric patients have not been established. Clinical studies of Tyvaso did not include patients younger than 18 years to determine whether they respond differently from older patients.

## 8.5 Geriatric Use

Across clinical studies used to establish the effectiveness of Tyvaso in patients with PAH and PH-ILD, 268 (47.8%) patients aged 65 years and over were enrolled. The treatment effects and safety profile observed in geriatric patients were similar to younger patients. In general, dose selection for an elderly

UTC_PH-ILD_005273

patient should be cautious, reflecting the greater frequency of hepatic, renal, or cardiac dysfunction, and of concomitant diseases or other drug therapy.

## 8.6 Patients with Hepatic Insufficiency

Plasma clearance of treprostinil, delivered subcutaneously, was reduced up to 80% in subjects with mild-to-moderate hepatic insufficiency. Uptitrate slowly when treating patients with hepatic insufficiency because of the risk of an increase in systemic exposure which may lead to an increase in dose-dependent adverse effects. Treprostinil has not been studied in patients with severe hepatic insufficiency *[see Clinical Pharmacology (12.3)]*.

## 8.7 Patients with Renal Impairment

No dose adjustments are required in patients with renal impairment. Treprostinil is not cleared by dialysis *[see Clinical Pharmacology (12.3)]*.

## 10 OVERDOSAGE

In general, symptoms of overdose with Tyvaso include flushing, headache, hypotension, nausea, vomiting, and diarrhea. Provide general supportive care until the symptoms of overdose have resolved.

## 11 DESCRIPTION

Tyvaso is a sterile formulation of treprostinil, a prostacyclin mimetic, intended for administration by oral inhalation using the Tyvaso Inhalation System. Tyvaso is supplied in 2.9 mL low density polyethylene (LDPE) ampules, containing 1.74 mg treprostinil (0.6 mg/mL). Each ampule also contains 18.9 mg sodium chloride, 18.3 mg sodium citrate dihydrate, 0.58 mg sodium hydroxide, 11.7 mg 1 N hydrochloric acid, and water for injection. Sodium hydroxide and hydrochloric acid may be added to adjust pH between 6.0 and 7.2.

Treprostinil is (1$R$,2$R$,3a$S$,9a$S$)-[[2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3$S$)-3-hydroxyoctyl]-1$H$-benz[$f$]inden-5-yl]oxy]acetic acid. Treprostinil has a molecular weight of 390.52 and a molecular formula of $C_{23}H_{34}O_5$.

The structural formula of treprostinil is:



## 12 CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Treprostinil is a prostacyclin analogue. The major pharmacologic actions of treprostinil are direct vasodilation of pulmonary and systemic arterial vascular beds and inhibition of platelet aggregation.

UTC_PH-ILD_005274

## 12.2 Pharmacodynamics

In a clinical trial of 240 healthy volunteers, single doses of Tyvaso 54 mcg (the target maintenance dose per session) and 84 mcg (supratherapeutic inhalation dose) prolonged the corrected QTc interval by approximately 10 ms. The QTc effect dissipated rapidly as the concentration of treprostinil decreased.

## 12.3 Pharmacokinetics

Pharmacokinetic information for single doses of inhaled treprostinil was obtained in healthy volunteers in 3 separate studies. Treprostinil systemic exposure (AUC and $C_{max}$) post-inhalation was shown to be proportional to the doses administered (18 mcg to 90 mcg).

### Absorption

In a 3-period crossover study, the bioavailability of 2 single doses of Tyvaso (18 mcg and 36 mcg) was compared with that of intravenous treprostinil in 18 healthy volunteers. Mean estimates of the absolute systemic bioavailability of treprostinil after inhalation were approximately 64% (18 mcg) and 72% (36 mcg).

Treprostinil plasma exposure data were obtained from 2 studies at the target maintenance dose, 54 mcg. The mean $C_{max}$ at the target dose was 0.91 and 1.32 ng/mL with corresponding mean $T_{max}$ of 0.25 and 0.12 hr, respectively. The mean AUC for the 54-mcg dose was 0.81 and 0.97 hr·ng/mL, respectively.

### Distribution

Following parenteral infusion, the apparent steady state volume of distribution ($V_{ss}$) of treprostinil is approximately 14 L/70 kg ideal body weight.

*In vitro* treprostinil is 91% bound to human plasma proteins over the 330 to 10,000 mcg/L concentration range.

### Metabolism and Excretion

Of subcutaneously administered treprostinil, only 4% is excreted unchanged in urine. Treprostinil is substantially metabolized by the liver, primarily by CYP2C8. Metabolites are excreted in urine (79%) and feces (13%) over 10 days. Five apparently inactive metabolites were detected in the urine, each accounting for 10 to 15% of the dose administered. Four of the metabolites are products of oxidation of the 3-hydroxyloctyl side chain and 1 is a glucuroconjugated derivative (treprostinil glucuronide).

The elimination of treprostinil (following subcutaneous administration of treprostinil) is biphasic, with a terminal elimination half-life of approximately 4 hours using a 2-compartment model.

### Specific Populations

*Hepatic Insufficiency*
Plasma clearance of treprostinil, delivered subcutaneously, was reduced up to 80% in subjects presenting with mild-to-moderate hepatic insufficiency. Treprostinil has not been studied in patients with severe hepatic insufficiency *[see Use in Specific Populations (8.6)]*.

*Renal Impairment*
In patients with severe renal impairment requiring dialysis (n=8), administration of a single 1 mg dose of orally administered treprostinil pre- and post-dialysis resulted in $AUC_{0-inf}$ that was not significantly altered compared to healthy subjects *[see Use in Specific Populations (8.7)]*.

Page 8

UTC_PH-ILD_005275

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

A 2-year rat carcinogenicity study was performed with treprostinil inhalation at target doses of 5.26, 10.6, and 34.1 mcg/kg/day. There was no evidence for carcinogenic potential associated with treprostinil inhalation in rats at systemic exposure levels up to 35 times the clinical exposure at the target maintenance dose of 54 mcg. *In vitro* and *in vivo* genetic toxicology studies did not demonstrate any mutagenic or clastogenic effects of treprostinil. Treprostinil sodium did not affect fertility or mating performance of male or female rats given continuous subcutaneous infusions at rates of up to 450 ng treprostinil/kg/min. In this study, males were dosed from 10 weeks prior to mating and through the 2-week mating period. Females were dosed from 2 weeks prior to mating until gestational day 6.

Oral administration of treprostinil diolamine to Tg.rasH2 mice at 0, 5, 10, and 20 mg/kg/day in males and 0, 3, 7.5, and 15 mg/kg/day in females daily for 26 weeks did not significantly increase the incidence of tumors.

Treprostinil diolamine was tested *in vivo* in a rat micronucleus assay and did not induce an increased incidence of micronucleated polychromatic erythrocytes.

### 13.2 Animal Toxicology and/or Pharmacology

In a 2-year rat study with treprostinil inhalation at target doses of 5.26, 10.6, and 34.1 mcg/kg/day, there were more deaths (11) in the mid- and high-dose treprostinil groups during the first 9 weeks of the study, compared to 1 in control groups. At the high-dose level, males showed a higher incidence of inflammation in teeth and preputial gland, and females showed higher incidences of inflammation and urothelial hyperplasia in the urinary bladder. The exposures in rats at mid- and high-dose levels were about 15 and 35 times, respectively, the clinical exposure at the target maintenance dose of 54 mcg.

## 14 CLINICAL STUDIES

### 14.1 Pulmonary Arterial Hypertension (WHO Group 1)

TRIUMPH I, was a 12-week, randomized, double-blind, placebo-controlled, multicenter study of patients with PAH. The study population included 235 clinically stable subjects with PAH (WHO Group 1), nearly all with NYHA Class III (98%) symptoms who were receiving either bosentan (an endothelin receptor antagonist) or sildenafil (a phosphodiesterase-5 inhibitor) for at least 3 months prior to study initiation. Concomitant therapy also could have included anticoagulants, other vasodilators (e.g., calcium channel blockers), diuretics, oxygen, and digitalis, but not a prostacyclin. These patients were administered either placebo or Tyvaso in 4 daily treatment sessions with a target dose of 9 breaths (54 mcg) per session over the course of the 12-week study. Patients were predominantly female (82%), had the origin of PAH as idiopathic/heritable (56%), secondary to connective tissue diseases (33%) or secondary to HIV or previous use of anorexigens (12%); bosentan was the concomitant oral medication in 70% of those enrolled, sildenafil in 30%.

The primary efficacy endpoint of the trial was the change in 6-Minute Walk Distance (6MWD) relative to baseline at 12 weeks. 6MWD was measured at peak exposure (between 10 and 60 minutes after dosing), and 3 to 5 hours after bosentan or 0.5 to 2 hours after sildenafil. Patients receiving Tyvaso had a placebo-corrected median change from baseline in peak 6MWD of 20 meters at Week 12 (p<0.001). The distribution of these 6MWD changes from baseline at Week 12 were plotted across the range of observed values (Figure 1). 6MWD measured at trough exposure (defined as measurement of 6MWD at

Page 9

UTC_PH-ILD_005276

least 4 hours after dosing) improved by 14 meters. There were no placebo-controlled 6MWD assessments made after 12 weeks.

**Figure 1:     Distributions of 6MWD Changes from Baseline at Week 12 During Peak Plasma Concentration of Tyvaso**



The placebo-corrected median treatment effect on 6MWD was estimated (using the Hodges-Lehmann estimator) within various subpopulations defined by age quartile, gender, geographic region of the study site, disease etiology, baseline 6MWD quartile, and type of background therapy (Figure 2).

Page 10

UTC_PH-ILD_005277

**Figure 2:**     **Placebo-Corrected Median Treatment Effect (Hodges-Lehmann Estimate with 95% CI) on 6MWD Change from Baseline at Week 12 During Peak Plasma Concentration of Tyvaso for Various Subgroups**



## 14.2 Long-term Treatment of PAH

In long-term follow-up of patients who were treated with Tyvaso in the pivotal study and the open-label extension (N=206), Kaplan-Meier estimates of survival at 1, 2, and 3 years were 97%, 91%, and 82%, respectively. These uncontrolled observations do not allow comparison with a control group not given Tyvaso and cannot be used to determine the long-term effect of Tyvaso on mortality.

## 14.3 Pulmonary Hypertension Associated with ILD (WHO Group 3)

INCREASE was a 16-week, randomized, double-blind, placebo-controlled, multicenter study that enrolled 326 patients with PH-ILD. Enrolled study patients predominately had etiologies of idiopathic interstitial pneumonia (45%) inclusive of idiopathic pulmonary fibrosis, combined pulmonary fibrosis and emphysema (25%), and WHO Group 3 connective tissue disease (22%). The mean baseline 6MWD was 260 meters.

UTC_PH-ILD_005278

DA0478

Patients in the INCREASE study were randomized (1:1) to either placebo or Tyvaso in 4 daily treatment sessions with a target dose of 9 breaths (54 mcg) per session and a maximum dose of 12 breaths (72 mcg) per session over the course of the 16-week study. Approximately 75% of patients randomized to Tyvaso titrated up to a dose of 9 breaths, 4 times daily or greater, with 48% of patients randomized to Tyvaso reaching a dose of 12 breaths, 4 times daily during the study.

The primary efficacy endpoint was the change in 6MWD measured at peak exposure (between 10 and 60 minutes after dosing) from baseline to Week 16. Patients receiving Tyvaso had a placebo-corrected median change from baseline in peak 6MWD of 21 meters at Week 16 (p=0.004) using Hodges-Lehmann estimate (Figure 3).

**Figure 3:    Hodges-Lehmann Estimate of Treatment Effect by Visit for 6MWD at Peak Exposure (PH-ILD)**



The treatment effect on 6MWD at Week 16 was consistent for various subgroups, including etiology of PH-ILD, disease severity, age, sex, baseline hemodynamics, and dose (Figure 4).

UTC_PH-ILD_005279

**Figure 4:**    **Forest Plot on Subgroup Analyses of Peak 6MWD (Meter) at Week 16 (PH-ILD)**



Time to clinical worsening in the INCREASE study was defined as the time of randomization until 1 of the following criteria were met: hospitalization due to a cardiopulmonary indication, decrease in 6MWD >15% from baseline directly related to PH-ILD at 2 consecutive visits and at least 24 hours apart, death (all causes), or lung transplantation. Treatment with Tyvaso in patients with PH-ILD resulted in numerically fewer hospitalizations. The numbers of reported deaths were the same for both treatment groups (Table 2). Overall, treatment with Tyvaso demonstrated a statistically significant increase in the time to first clinical worsening event (log-rank test p=0.041; Figure 5), and a 39% overall reduction in the risk of a clinical worsening event (HR=0.61 [95% CI; 0.40, 0.92]; Figure 5).

UTC_PH-ILD_005280

DA0480

**Table 2:**     **Clinical Worsening Events (PH-ILD)**

| | | Tyvaso n=163 n (%) | Placebo n=163 n (%) | HR (95% CI) |
|---|---|---|---|---|
| **Clinical worsening** | | 37 (22.7%) | 54 (33.1%) | 0.61 (0.40, 0.92) |
| **First contributing event** | **Hospitalization due to a cardiopulmonary indication** | 18 (11.0%) | 24 (14.7%) | |
| | **Decrease in 6MWD >15% from baseline directly related to PH-ILD** | 13 (8.0%) | 26 (16.0%) | |
| | **Death (all causes)** | 4 (2.5%) | 4 (2.5%) | |
| | **Lung transplantation** | 2 (1.2%) | 0 | |
| **First of each event** | **Hospitalization due to a cardiopulmonary indication** | 21 (12.9%) | 30 (18.4%) | |
| | **Decrease in 6MWD >15% from baseline directly related to PH-ILD** | 16 (9.8%) | 31 (19.0%) | |
| | **Death (all causes)** | 8 (4.9%) | 10 (6.1%) | |
| | **Lung transplantation** | 2 (1.2%) | 1 (0.6%) | |

**Figure 5:**     **Kaplan-Meier Plot of Time to Clinical Worsening Events (PH-ILD)**



UTC_PH-ILD_005281

DA0481

**16 HOW SUPPLIED/STORAGE AND HANDLING**

Tyvaso (treprostinil) inhalation solution is supplied in 2.9 mL clear LDPE ampules packaged as 4 ampules in a foil pouch. Tyvaso is a clear colorless to slightly yellow solution containing 1.74 mg treprostinil per ampule at a concentration of 0.6 mg/mL.

Ampules of Tyvaso are stable until the date indicated when stored in the unopened foil pouch at 20-25°C (68-77°F) with excursions permitted to 15-30°C (59-86°F) [see USP Controlled Room Temperature]. Once the foil pack is opened, ampules should be used within 7 days. Because Tyvaso is light-sensitive, unopened ampules should be stored in the foil pouch.

One ampule of Tyvaso should be used each day in the Tyvaso Inhalation System. After a Tyvaso ampule is opened and transferred to the medicine cup, the solution should remain in the device for no more than 1 day (24 hours). Any remaining solution should be discarded at the end of the day.

Tyvaso Inhalation System Starter Kit containing a 28-ampule carton of Tyvaso (7 foil pouches each containing four 2.9 mL ampules; each ampule contains 1.74 mg treprostinil [0.6 mg per mL]) and the Tyvaso Inhalation System. (NDC 66302-206-01)

Tyvaso Inhalation System Refill Kit containing a 28-ampule carton of Tyvaso (7 foil pouches each containing four 2.9 mL ampules; each ampule contains 1.74 mg treprostinil [0.6 mg per mL]) and accessories. (NDC 66302-206-02)

Tyvaso 4 Pack Carton with 1 foil pouch containing four 2.9 mL ampules. Each ampule contains 1.74 mg treprostinil (0.6 mg per mL). (NDC 66302-206-03)

Tyvaso Inhalation System Institutional Starter Kit containing a 4-ampule carton of Tyvaso (1 foil pouch containing four 2.9 mL ampules; each ampule contains 1.74 mg treprostinil [0.6 mg per mL]) and the Tyvaso Inhalation System. (NDC 66302-206-04)

**17 PATIENT COUNSELING INFORMATION**

Advise the patient to read the FDA-approved patient labeling (Instructions for Use).

Train patients in the administration process for Tyvaso, including dosing, Tyvaso Inhalation System set up, operation, cleaning, and maintenance, according to the instructions for use *[see Dosage and Administration (2.1, 2.2)]*.

To avoid potential interruptions in drug delivery because of equipment malfunction, patients should have access to a back-up Tyvaso Inhalation System device *[see Dosage and Administration (2.2)]*.

In the event that a scheduled treatment session is missed or interrupted, resume therapy as soon as possible *[see Dosage and Administration (2.1)]*.

If Tyvaso comes in contact with the skin or eyes, instruct patients to rinse immediately with water *[see Dosage and Administration (2.2)]*.

©Copyright 2022 United Therapeutics Corp. All rights reserved.

UTC_PH-ILD_005282

Tyvaso manufactured for:

United Therapeutics Corp.
Research Triangle Park, NC 27709

UTC_PH-ILD_005283

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>LIQUIDIA TECHNOLOGIES, INC.,<br><br>　　　　　　Defendant. | C.A. No. 20-755 (RGA) (JLH)<br><br><br>**HIGHLY CONFIDENTIAL** |

### INITIAL EXPERT REPORT OF ANDREW CLARK, PH.D.

**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000865

**Table of Contents**

I.     INTRODUCTION ............................................................................................. 1

    A.    Scope of Analysis ................................................................................. 1

    B.    Qualifications ....................................................................................... 2

    C.    Materials Considered .......................................................................... 5

II.    LEGAL STANDARDS PROVIDED BY COUNSEL ...................................... 6

    A.    Burdens of Proof ................................................................................. 6

    B.    Infringement: Claim Construction ...................................................... 6

    C.    Infringement: Direct and Indirect ....................................................... 7

III.    SUMMARY OF OPINIONS .......................................................................... 8

IV.    PERSON OF ORDINARY SKILL IN THE ART ........................................... 9

V.    LIQUIDIA'S PROPOSED PRODUCT ......................................................... 11

VI.    U.S. PATENT NO. 10,716,793 ...................................................................... 15

    A.    Overview ............................................................................................. 15

    B.    File History .......................................................................................... 16

VII.    INFRINGEMENT ANALYSIS ...................................................................... 17

    A.    Direct Infringement ............................................................................. 17

        1.    Claim 1 ..................................................................................... 17

        2.    Claim 4 ..................................................................................... 30

        3.    Claim 6 ..................................................................................... 30

        4.    Claim 7 ..................................................................................... 31

        5.    Claim 8 ..................................................................................... 33

    B.    Indirect Infringement .......................................................................... 33

VIII.    CONCLUSION .............................................................................................. 36

**HIGHLY CONFIDENTIAL**

LIQ_PH-ILD_00000866

## I.     INTRODUCTION

### A.     Scope of Analysis

1.     I have been retained by counsel for the Plaintiff, United Therapeutics Corporation ("UTC")
to provide expert opinions related to U.S. Patent No. 10,716,793 (the "'793 patent").

2.     I have been informed that Liquidia has filed a New Drug Application No. 213005 with the
FDA ("Liquidia NDA") seeking approval to manufacture, market, and sell a generic copy
of UTC's TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/ml that is approved by
FDA for treatment of pulmonary arterial hypertension ("Liquidia's Proposed Product").

3.     I have been informed that UTC has asserted that Liquidia's Proposed Product infringes
claims 1, 4, and 6-8 of the '793 patent (the "Asserted Claims") when used in the intended
manner and as taught and described in Liquidia's proposed label/package insert
("Liquidia's Proposed Label")[1], Liquidia's Proposed Instructions for Use[2], and other NDA
documentation.

4.     I have been asked to opine on whether, upon FDA approval, administration of Liquidia's
Proposed Product, as described in Liquidia's Proposed Label, Instructions for Use, and
related NDA documentation, would infringe the asserted claims of the '793 patent. I have
also been asked to give my opinion as to whether Liquidia induces or contributes to
infringement.

5.     This report presents my opinions regarding infringement of the '793 patent and lays out
the bases for my opinions. My opinions are based on my education, research, professional
experience, and the materials that I reviewed in preparing the opinions described in this
report.

---

[1] Liquidia's Proposed Label (LIQ02790995-LIQ02791011) at LIQ02790995.
[2] Liquidia's Proposed Instructions for Use (LIQ00029269) at LIQ00029269.

HIGHLY CONFIDENTIAL                                       LIQ_PH-ILD_00000867

6.     My opinions and the bases for them are based on presently available information that I have reviewed and that I am currently aware exists. I understand that discovery is ongoing in this case, and more information or documents may therefore become available. For example, I understand that there are a number of outstanding depositions, including of a Liquidia corporate representative, LGM Pharma, LLC, Dr. Lewis Rubin, and others. I further understand that there continues to be additional non-testimonial discovery, including amendments to interrogatory responses and discovery of documents from the parties and/or from third parties. Accordingly, I reserve the right to take into account further information that I may learn, and adjust, modify, or supplement my opinions based on any additional information that I become aware of.

7.     If asked to testify at trial, I may rely on physical objects, samples, visual aids, and demonstrative exhibits, such as claim charts and graphs, to demonstrate the bases for my opinions.

8.     I am being compensated for my time spent on this matter at the rate of $400 per hour plus reimbursement of reasonable expenses. I have no other interest in this litigation or in any party to this litigation. My compensation does not depend on my performance, the substance of my opinions, the outcome of the case, or any issues involved in or related to this case.

## B.     Qualifications

9.     My *curriculum vitae*, which is attached as **Exhibit 1**, summarizes my professional experience. I provide below further details about my experience that may be pertinent to this matter.

10.    I am currently President and General Manager of the Aerogen Pharma Corporation. Aerogen Pharma is dedicated to the development of drug device combination products for

2

59.    In view of the foregoing evidence, and presumably from his perspective as a clinician, I understand that Dr. Waxman has interpreted a "single event dose" to refer to a single treatment session. I agree with that interpretation, rely on it, and note that it is consistent with the '793 patent specification and claims. ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

60.    Regarding therapeutic effectiveness, as an initial matter, in my experience, companies generally do not seek approval for drugs that lack any benefit to the patient; indeed, my understanding is that FDA approval requires showing safety and efficacy.[51] ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████

61.    Further, the '793 provides explanation and hemodynamic data showing a beneficial effect on the patient.[52] In addition to the descriptions in the text, the Figures show a beneficial effect. For example, Figure 1 shows a reduction in pulmonary arterial pressure ("PAP") and pulmonary vascular resistance ("PVR") relative to placebo upon administration of 30, 45, and 60 μg of treprostinil.[53] In view of the foregoing evidence, I understand that Dr.

---

[50] Liquidia's Proposed Label at LIQ02790996.

[51] *See, e.g.*, FDA, The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective, *available at* https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

[52] *See, e.g.*, U.S. Patent No. 10,716,793 at 9:5-34 (describing administration of 30 μg, 45 μg, and 60 μg of treprostinil that achieved reduction of PVR for longer than two hours); *id.* at 8:67-9:3 (delivery of 30, 60, 90 μg of treprostinil through ultrasonic nebulizer reduced PVR for up to 3 hours); *see also id.* at Tables I-III.

[53] *See also id*. Figs. 2-11.

22

Waxman has concluded that single doses of treprostinil have a beneficial effect on patients. I agree with that conclusion, rely on it, and, in my opinion, it is supported by the data (including the hemodynamic data) in the '793 patent.

62.    ███████████████████████████████████████████████ As such, it is my opinion that patients following Liquidia's Proposed Label and Instructions for Use will administer a therapeutically effective single event dose.

### d)    "of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof"

63.    It is my opinion that administration of Liquidia's Proposed Product as described in Liquidia's Proposed Label and Liquidia's Proposed Instructions for Use and other documentation results in administration of "a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof."

64.    █████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████

65.    These documents make clear that LIQ861 is a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof.

---

[54] Liquidia's Proposed Label at LIQ02790995.
[55] *Id*. at LIQ02791003; see also Deposition of Tushar Shah, Sept. 24, 2021, at p. 42:22-24.
[56] Liquidia's Proposed Instructions for Use at LIQ00029269.
[57] Pre-IND Briefing at LIQ00000696.

23

# EXHIBIT 17

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION,<br><br>             Plaintiff,<br><br>v.<br><br>LIQUIDIA TECHNOLOGIES, INC.,<br><br>           Defendant. | C.A. No. 20-755 (RGA) (JLH)<br><br><br>**HIGHLY CONFIDENTIAL** |

### INITIAL EXPERT REPORT OF AARON WAXMAN, M.D., Ph.D.

# Table of Contents

I.      Introduction......................................................................................1

        A.    Purpose of Report........................................................................1

        B.    Materials Considered...................................................................2

        C.    Qualifications ...............................................................................3

II.     Background.......................................................................................7

        A.    Pulmonary Hypertension.............................................................7

        B.    The '793 Patent ..........................................................................13

        C.    Liquidia's Proposed Generic Product - LIQ861 ......................16

III.    Analysis ..........................................................................................20

        A.    Legal Standards..........................................................................21

        B.    Person of Ordinary Skill in the Art ..........................................24

IV.     Infringement of U.S. Patent No. 10,716,793 ...............................26

        A.    Claim 1 .......................................................................................26

              1.    "A method of treating pulmonary hypertension
                    comprising" .......................................................................26

              2.    "administering by inhalation to a human suffering
                    from pulmonary hypertension" .........................................29

              3.    "a therapeutically effective" ............................................32

              4.    "single event dose"...........................................................37

              5.    "of a formulation comprising treprostinil or a
                    pharmaceutically acceptable salt thereof"........................39

              6.    "with an inhalation device".............................................40

**HIGHLY CONFIDENTIAL**       LIQ_PH-ILD_00000872

7.     "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" ................41

8.     "delivered in 1 to 3 breaths" .....................................42

B.     Claim 4 ........................................................43

1.     "The method of claim 1, wherein the inhalation device is a dry powder inhaler." ........................................43

C.     Claim 6 ........................................................44

1.     "The method of claim 4, wherein the formulation is a powder" ........................................................44

D.     Claim 7 ........................................................45

1.     "The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter" ................45

E.     Claim 8 ........................................................46

1.     "The method of claim 1, wherein the formulation contains no metacresol" ........................................46

F.     Induced Infringement ..........................................47

G.     Contributory Infringement .....................................49

V.     Conclusion ........................................................50

HIGHLY CONFIDENTIAL         LIQ_PH-ILD_00000873

## I.     Introduction

### A.     Purpose of Report

1.     I have been retained by counsel for the Plaintiff, United Therapeutics Corporation ("UTC") as an expert consultant.  I may provide expert testimony related to U.S. Patent No. 10,716,793 ("the '793 patent") and regarding the background and understanding of pulmonary hypertension ("PH") and/or pulmonary arterial hypertension ("PAH") and the treatment of the same with inhaled treprostinil.  I understand that Liquidia is seeking approval for LIQ861, an inhaled dry powder formulation of treprostinil, and has filed an NDA with the FDA (the "LIQ861 NDA").[1]  I may provide expert testimony regarding whether the product described in the LIQ861 NDA ("Liquidia's Proposed Generic Product"), including as taught in Liquidia's proposed label/package insert ("Liquidia's Proposed Label")[2] and as taught in Liquidia's Proposed Instructions for Use,[3] infringes the claims of the '793 patent.  This report presents my opinions regarding the alleged infringement of the '793 patent and the bases for the opinions.

2.     I am being compensated for the time I spend at the rate of $500 per hour.  My compensation does not depend on the outcome of the case, and I am not

---

[1] Throughout this report, I may refer to the proposed product described in Liquidia's NDA and relevant documentation, such as the label and instructions for use, as "Liquidia's Proposed Product" or "LIQ861."

[2] *E.g.*, LIQ02790995.

[3] *E.g.*, LIQ00029269.

1

affiliated with or employed by Plaintiff UTC or Defendant Liquidia Technologies, Inc.

### B.    Materials Considered

3.    To form my opinions I have reviewed and/or relied on the documents and things listed in **Exhibit 1**, attached, or referenced in the text or footnotes of this report as well as my educational and professional experience. My opinions and the bases for them are based on information that I know and that I have reviewed. I may use the materials I have cited or listed, including those attached hereto, in order to assist me in preparing demonstratives such as graphics, models, and animations for my testimony.

4.    I reserve the right to adjust, modify or supplement my opinions in light of any response, critique, or comments on my report or different opinions made by or on behalf of Liquidia, including, but not limited to, any deposition testimony or rebuttal reports that Liquidia's experts submit.

5.    I understand that discovery is ongoing in this case, and more information or documents may therefore become available.  For example, I understand that there are a number of outstanding depositions, including of a Liquidia corporate representative, LGM Pharma, LLC, Dr. Lewis Rubin, and others. I further understand that there continues to be additional non-testimonial discovery, including amendments to interrogatory responses and discovery of documents from

2



It is my opinion that the INSPIRE study indicates that that the prescribed doses of delivered treprostinil Liquidia has proposed are "therapeutically effective."

---

[70] *Id*.

[71] Liquidia's Proposed Label at LIQ02791006–02791009 at LIQ02791007.

34

74.    Another clinical study—referred to as "TRIUMPH I"—was a 12-week, randomized, double blind, placebo-controlled multi-center study of patients with PAH.  The study population included 235 clinically stable patients with pulmonary arterial hypertension (WHO Group 1), nearly all with NYHA Class III (98%) symptoms who were receiving either bosentan or sildenafil for at least three months prior to the study initiation.  These patients were administered either placebo or treprostinil inhalation solution (*e.g.*, Tyvaso) in four daily treatment sessions (i.e. single event doses) with a target single event dose of 9 breaths (54 micrograms) per session over the course of the 12 week study. The primary efficacy endpoint of the trial was the change in six-minute walk distance (6MWD) relative to baseline at 12 weeks.  Patients receiving single event dosages of 54 micrograms had a placebo-corrected median change from baseline in peak 6MWD of 20 meters at Week 12.  In my opinion, these results indicate that a single event dosage of 54 micrograms is therapeutically effective.

75.    With my significant experience in the field, it is also clear that the only reason to put a patient suffering from pulmonary hypertension on a drug like LIQ861 would be to introduce to the patient a therapeutically effective amount of the drug. There would be nothing to gain from giving a patient an amount of the drug that would not be effective to do what it needs to do.  By intending to provide and sell LIQ861, Liquidia demonstrates its intent for physicians to prescribe and patients to

35

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000877

administer LIQ861 in an amount that would help the patient. Similarly, for patients and caretakers, the reason to take the drug is for the benefit, so patients and caretakers would be induced by the product to receive a therapeutically effective amount.

76. ██████████████████████████████████

████████████████████████████████████████████

████████████  ██████████████████████████████

████████████████████████████  █

77. My opinion regarding "therapeutically effective" is further supported by the fact that ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

_____

[72] LIQ861 NDA Resubmission 3.2.P.5.6 Response to Complete Response Justification of Specifications (LIQ02793078–02793104) at LIQ02793085.
[73] LIQ861 NDA 3.2.5.1 Specification(s) (LIQ00030834–00030847) at LIQ00030835–00030847.

36

# EXHIBIT 18



Deposition of:

**Andrew Clark, Ph.D.**

*January 14, 2022*

In the Matter of:

**United Therapeutics Corporation vs Liquidia Technologies Inc**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

HIGHLY CONFIDENTIAL

Page 1

1

                    UNITED STATES DISTRICT COURT
2                    FOR THE DISTRICT OF DELAWARE
       ——————————————————————————————
3                                        )Case No.
       UNITED THERAPEUTICS               )1:20-cv-00755
4      CORPORATION                       )
                                         )
5          Plaintiff                     )
                                         )
6      vs.                               )
                                         )
7      LIQUIDIA TECHNOLOGIES, INC.,      )
                                         )
8          Defendant                     )
       ——————————————————————————————
9
10
11                    - HIGHLY CONFIDENTIAL -
12
13
                    Remote Videotaped Deposition of
14
                       ANDREW CLARK, Ph.D.
15
                        January 14, 2022
16
                          9:00 a.m.
17
18
19
20
21      Reported by:  Bonnie L. Russo
22      Job No. 5008733

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 2

1       Remote Videotaped Deposition of Andrew Clark,

2       Ph.D. held through:

3

4

5

6

7                       Veritext Legal Solutions

8                       1250 I Street, N.W.

9                       Washington, D.C.

10

11

12

13

14

15

16

        Pursuant to Notice, when were present on behalf

17

        of the respective parties:

18

19

20

21

22

HIGHLY CONFIDENTIAL

```
                                              Page 3
 1          APPEARANCES:
 2          On behalf of the Plaintiff:
               ART DYKHUIS, ESQUIRE
 3             McDERMOTT WILL & EMERY
               2049 Century Park E
 4             Suite 3200
               Los Angeles, California 90067
 5             adykhuis@mwe.com
                    -and-
 6             TIMOTHY DUNKER, ESQUIRE
               McDERMOTT WILL & EMERY
 7             500 N. Capitol Street, N.W.
               Washington, D.C. 20001
 8             tdunker@mwe.com
 9          On behalf of the Defendant:
               LAUREN KRICKL, ESQUIRE
10             COOLEY LLP
               3175 Hanover Street
11             Palo Alto, California 94304
               lkrickl@cooley.com
12                  -and-
               DOUGLAS WILLIAM CHEEK, ESQUIRE
13             JONATHAN DAVIES, ESQUIRE
               COOLEY LLP
14             1299 Pennsylvania Avenue, N.W.
               Suite 700
15             Washington, D.C. 20004
               dcheek@cooley.com
16             jdavies@cooley.com
                    -and-
17             BRITTANY CAZAKOFF, ESQUIRE
               COOLEY LLP
18             11951 Freedom Drive
               1 Freedom Square
19             Reston Town Center
               Reston, Virginia 20190
20             bcazakoff@cooley.com
21
22          Also Present:
            Orson Braithwaite, Videographer
```

HIGHLY CONFIDENTIAL    DA0504    LIQ_PH-ILD_00000882

Page 4

```
 1                     I N D E X
 2         EXAMINATION OF ANDREW CLARK, Ph.D.         PAGE
 3         BY MS. KRICKL                              9
 4         BY MR. DYKHUIS                             252
 5
 6
                          EXHIBITS
 7
 8         Exhibit 1   Initial Expert Report          19
                       of Andrew Clark, Ph.D.
 9
           Exhibit 2   Rebuttal Expert Report         21
10                     of Andrew Clark, Ph.D.
11         Exhibit 3   Reply Expert Report            26
                       of Andrew Clark, Ph.D.
12
           Exhibit 4   United States Patent           62
13                     No. 10,716,793 B2
                       LIQ02799887-911
14
           Exhibit 5   Article titled                 77
15                     "LTI-201:  Evaluation of
                       the hemodynamics and safety
16                     of inhaled LIQ861(treprostinil)
                       in pulmonary arterial
17                     hypertension(WHO Group 1)
                       patients"
18
           Exhibit 6   Liquidia Press Release         80
19                     6-5-19
                       UTC-LIQ00264028-029
20
           Exhibit 7   Tentative Approval Letter      92
21                     NDA 213005
                       LIQ02818821-855
22
```

Page 5

```
 1          EXHIBITS (CONTINUED):

 2

            Exhibit 8    Highlights of Prescribing    103
 3                       Information
                         Tyvaso
 4                       UTC_LIQ00246884-898
 5          Exhibit 9    European Heart Journal        110
                         August/September 2004
 6

            Exhibit 10   Supplement of Circulation     116
 7                       Abstracts from Scientific
                         Session 2004
 8

            Exhibit 11   Article titled                119
 9                       "Neue Therapieoptionen
                         in der Behandlung der
10                       pulmonalarteriellen
                         Hypertonie"
11                       LIQ02800749-764
12          Exhibit 12   Ebling Library               123
                         Annals of Internal Medicine
13

            Exhibit 13   Reply Expert Report of       144
14                       Dr. Igor Gonda
15          Exhibit 14   Reply Expert Report of       145
                         Dr. Igor Gonda
16

            Exhibit 15   Reply Expert Report of       151
17                       Dr. Nicholas Hill Regarding
                         Invalidity of U.S. Patent
18                       No. 10,716,793
19          Exhibit 16   Article titled               168
                         "Pulmonary drug delivery.
20                       Part II:  The role of
                         inhalant delivery devices
21                       and drug formulations in
                         therapeutic effectiveness
22                       of aerosolized medications
                         UTC_LIQ00257677-689
```

HIGHLY CONFIDENTIAL              DA0506              LIQ_PH-ILD_00000884

HIGHLY CONFIDENTIAL

```
 1          EXHIBITS (CONTINUED):
 2          Exhibit 17   Article titled              198
                         "Medical Aerosol Inhalers:
 3                       Past, Present, and Future
                         LIQ02802121-139
 4

            Exhibit 18   Article titled              207
 5                       "Design of fine particles
                         for pulmonary drug delivery"
 6

            Exhibit 19   Article titled              220
 7                       "The Relationship Between
                         Powder Inhaler Resistance
 8                       and Peak Inspiratory
                         Conditions in Healthy
 9                       Volunteers - Implications
                         for In Vitro Testing"
10

            Exhibit 20   Article titled              227
11                       "Effect of Dry Powder
                         Inhaler Resistance on the
12                       Inspiratory Flow Rates
                         and Volumes of Cystic
13                       Fibrosis Patients of Six
                         Years and Older
14                       LIQ02819741-750
15          Exhibit 21   Article titled              229
                         "Inspiratory flow patterns
16                       with dry powder inhalers
                         of low and medium flow
17                       resistance in patients
                         with pulmonary arterial
18                       hypertension
19          Exhibit 22   Deposition Transcript       244
                         of Gilles Cloutier, Ph.D.
20                       1-27-17
                         UTC_LIQ00222753-906
21
22          (Exhibits bound separately.)
```

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000885

HIGHLY CONFIDENTIAL

```
                                                    Page 7

 1                  P R O C E E D I N G S

 2                  (9:00 a.m.)

 3                                          12:00:48

 4           THE VIDEOGRAPHER:  Good morning.    12:00:48

 5           We are going on the record at 9:00   12:00:58

 6    a.m. on January 14, 2022.  This is Media Unit 1  12:01:00

 7    of the remote-recorded deposition of Dr. Andrew  12:01:05

 8    Clark in the matter of United Therapeutics    12:01:09

 9    Corporation versus Liquidia Technologies, Inc.,  12:01:11

10    filed in the United States District Court for   12:01:14

11    the District of Delaware, Case No. 20-755.    12:01:18

12           My name is Orson Braithwaite from    12:01:22

13    the firm Veritext Legal Solutions, and I am the  12:01:24

14    videographer.  The court reporter is Bonnie   12:01:26

15    Russo from the firm Veritext Legal Solutions.   12:01:29

16           Counsel will now state their appears   12:01:31

17    and affiliations for the record.       12:01:34

18           MS. KRICKL:  Lauren Krickl of Cooley   12:01:36

19    on behalf of defendant, Liquidia, and with me   12:01:38

20    is Brittany Cazakoff and Doug Cheek, and John   12:01:41

21    Davies will be joining later.         12:01:45

22           MR. DYKHUIS:  Art Dykhuis on behalf   12:01:47
```

HIGHLY CONFIDENTIAL

Page 8

| | | |
|---|---|---|
| 1 | of United Therapeutics Corporation.  I am with | 12:01:51 |
| 2 | McDermott Will & Emery.  Also with me is Tim | 12:01:54 |
| 3 | Dunker from McDermott for UTC. | 12:01:58 |
| 4 | THE VIDEOGRAPHER:  Thank you. | 12:02:01 |
| 5 | Will the court reporter please swear | 12:02:02 |
| 6 | in the witness. | 12:02:03 |
| 7 | THE COURT REPORTER:  Yes.  First, I | |
| 8 | have a stipulation to put on the record. | |
| 9 | The attorneys participating in this | |
| 10 | deposition acknowledge that I am not physically | |
| 11 | present in the deposition room and that I will | |
| 12 | be remote -- reporting this deposition | |
| 13 | remotely. | |
| 14 | They further acknowledge that, in | |
| 15 | lieu of an oath administered in person, I will | |
| 16 | administer the oath remotely. | |
| 17 | The parties further agree that if | |
| 18 | the witness is testifying from a state where I | |
| 19 | am not a notary, that the witness may be sworn | |
| 20 | in by an out-of-state notary. | |
| 21 | If any party has an objection to | |
| 22 | this manner of reporting, please state it now. | |

HIGHLY CONFIDENTIAL

Page 9

1              (Pause.)

2              THE COURT REPORTER:  Hearing none,

3         we can proceed and I will swear in the witness.

4

5                   ANDREW CLARK, Ph.D.

6         being first duly sworn, to tell the truth, the

7         whole truth, and nothing but the truth,

8         testified as follows:

9           EXAMINATION BY COUNSEL FOR DEFENDANT    12:02:48

10              BY MS. KRICKL:                       12:02:48

11         Q.    Good morning, Dr. Clark.            12:02:49

12         A.    Good morning.                       12:02:50

13         Q.    Please state your full name for the 12:02:51

14    record.                                        12:02:54

15         A.    Andrew Reginald Clark.              12:02:54

16         Q.    Do you understand that you just     12:02:56

17    swore under oath to tell the truth at this     12:02:58

18    deposition today?                              12:03:01

19         A.    I did, yes.                         12:03:01

20         Q.    Do you understand that the testimony 12:03:03

21    you give will be just as binding as if you were 12:03:04

22    sitting in court today?                        12:03:08

HIGHLY CONFIDENTIAL

Page 10

| | | |
|---|---|---|
| 1 | A.    Yes, I do. | 12:03:09 |
| 2 | Q.    Is there any reason why you cannot | 12:03:10 |
| 3 | completely and truthfully answer my questions | 12:03:12 |
| 4 | today? | 12:03:14 |
| 5 | A.    Nope. | 12:03:15 |
| 6 | Q.    Have you testified before at a | 12:03:16 |
| 7 | deposition? | 12:03:19 |
| 8 | A.    Nope. | 12:03:19 |
| 9 | Q.    I'll just go over a few ground | 12:03:21 |
| 10 | rules. | 12:03:21 |
| 11 | If you do not understand a question, | 12:03:24 |
| 12 | please let me know.  Otherwise, I'll assume | 12:03:26 |
| 13 | that you understood.  Okay? | 12:03:31 |
| 14 | A.    Yep. | 12:03:31 |
| 15 | Q.    Do you understand that we can't | 12:03:31 |
| 16 | speak over each other to help the court | 12:03:34 |
| 17 | reporter? | 12:03:37 |
| 18 | A.    Yes.  Understood. | 12:03:37 |
| 19 | Q.    And the court reporter can't record | 12:03:38 |
| 20 | a nod or gestures, so you will need to make a | 12:03:41 |
| 21 | verbal response to my question, please. | 12:03:45 |
| 22 | A.    Yes.  Understood. | 12:03:47 |

HIGHLY CONFIDENTIAL       LIQ_PH-ILD_00000889

HIGHLY CONFIDENTIAL

Page 55

| | | |
|---|---|---|
| 1 | course, spending an awful lot of money running | 12:51:35 |
| 2 | very large Phase 3 trials. | 12:51:38 |
| 3 | Q.   Can you explain to me how | 12:51:45 |
| 4 | pharmacological effects relate to hemodynamics? | 12:51:47 |
| 5 | MR. DYKHUIS:  Objection to form. | 12:51:50 |
| 6 | THE WITNESS:  In the case of -- | 12:51:52 |
| 7 | Sorry, art.  Do you want to -- | 12:51:53 |
| 8 | MR. DYKHUIS:  Yeah.  I -- I'm done. | 12:51:58 |
| 9 | Just objected to form.  Thank you. | 12:52:00 |
| 10 | THE WITNESS:  Okay.  All right. | 12:52:01 |
| 11 | I -- I -- I got to slow down there a little bit | 12:52:02 |
| 12 | here. | 12:52:04 |
| 13 | Can you repeat the question. | 12:52:04 |
| 14 | BY MS. KRICKL: | 12:52:06 |
| 15 | Q.   Yeah.  I'm just trying to | 12:52:06 |
| 16 | understand.  You mentioned pharmacological | 12:52:07 |
| 17 | effect.  Does -- does that relate to | 12:52:10 |
| 18 | hemodynamics in any way? | 12:52:13 |
| 19 | A.   Yeah.  Essentially, what these | 12:52:16 |
| 20 | molecules do is they cause dilation of the | 12:52:20 |
| 21 | pulmonary vasculature which reduces the | 12:52:24 |
| 22 | pulmonary vascular resistance which reduces the | 12:52:28 |

HIGHLY CONFIDENTIAL    DA0512    LIQ_PH-ILD_00000890

HIGHLY CONFIDENTIAL

Page 56

| | | |
|---|---|---|
| 1 | pulmonary artery pressure, and that's a | 12:52:31 |
| 2 | prerequisite to having a long-term clinical | 12:52:34 |
| 3 | benefit. | 12:52:36 |
| 4 | Q.    What do you mean when you say | 12:52:39 |
| 5 | "long-term clinical benefit"? | 12:52:43 |
| 6 | A.    In terms of the patient feeling some | 12:52:45 |
| 7 | effect in terms of exercise capacity or -- | 12:52:54 |
| 8 | yeah.  I mean, exercise capacity.  Leave it at | 12:53:00 |
| 9 | that. | 12:53:04 |
| 10 | So the clinical benefit as described | 12:53:06 |
| 11 | in the 79 -- '793 patent is actually its | 12:53:09 |
| 12 | effects on the malady that causes pulmonary | 12:53:13 |
| 13 | arterial hypertension, and it's clinically | 12:53:19 |
| 14 | effective in improving hemodynamics. | 12:53:23 |
| 15 | Q.    And you -- you just -- I apologize | 12:53:30 |
| 16 | if I am misstating, but you said those -- those | 12:53:36 |
| 17 | improvement in hemodynamics are a prerequisite | 12:53:42 |
| 18 | for having long-term clinical benefit? | 12:53:46 |
| 19 | MR. DYKHUIS:  Object to form. | 12:53:48 |
| 20 | THE WITNESS:  Yes.  The -- the -- | 12:53:53 |
| 21 | the -- the disease of pulmonary arterial | 12:53:56 |
| 22 | hypertension is relieved by dilating the | 12:53:59 |

HIGHLY CONFIDENTIAL                    DA0513                    LIQ_PH-ILD_00000891

HIGHLY CONFIDENTIAL

Page 57

| | | |
|---|---|---|
| 1 | pulmonary vasculature and, hence, reducing | 12:54:05 |
| 2 | pulmonary artery pressure.  And that's what | 12:54:10 |
| 3 | these drugs do. | 12:54:12 |
| 4 | BY MS. KRICKL: | 12:54:13 |
| 5 | Q.    So it's your opinion that a drug is | 12:54:13 |
| 6 | therapeutically effective if it benefits the | 12:54:16 |
| 7 | patient in terms of hemodynamic data, right? | 12:54:17 |
| 8 | A.    Correct.  Yeah. | 12:54:21 |
| 9 | Q.    And it's also your opinion that a | 12:54:22 |
| 10 | drug is therapeutically effective if it | 12:54:26 |
| 11 | benefits a patient's exercise ability? | 12:54:28 |
| 12 | MR. DYKHUIS:  Objection to form. | 12:54:30 |
| 13 | THE WITNESS:  In the longer term, | 12:54:34 |
| 14 | yes. | 12:54:36 |
| 15 | BY MS. KRICKL: | 12:54:36 |
| 16 | Q.    So you agree that a drug is | 12:54:38 |
| 17 | therapeutically effective if it in the | 12:54:40 |
| 18 | long-term improves how a patient feels, | 12:54:41 |
| 19 | functions, or survives? | 12:54:47 |
| 20 | MR. DYKHUIS:  Objection to form and | 12:54:48 |
| 21 | foundation and to the extent it calls for a | 12:54:53 |
| 22 | legal conclusion. | 12:54:53 |

HIGHLY CONFIDENTIAL                DA0514                LIQ_PH-ILD_00000892

HIGHLY CONFIDENTIAL

Page 58

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yeah.  I -- I -- I -- | 12:54:57 |
| 2 | yeah.  I would answer that question slightly | 12:54:57 |
| 3 | differently in that -- in that I interpreted | 12:55:00 |
| 4 | therapeutically effective in the context of the | 12:55:01 |
| 5 | specification in the patent which demonstrates | 12:55:04 |
| 6 | that exercising the claims in the patent | 12:55:09 |
| 7 | actually improves hemodynamics in the patient | 12:55:12 |
| 8 | and, therefore, is therapeutically effective. | 12:55:15 |
| 9 | I do not believe you have to do | 12:55:28 |
| 10 | long-term, Phase 3 clinical trials to | 12:55:31 |
| 11 | demonstrate a therapeutic effect. | 12:55:35 |
| 12 | BY MS. KRICKL: | 12:55:37 |
| 13 | Q.    Understood.  But would a drug that | 12:55:37 |
| 14 | improved how a patient feels, functions, and | 12:55:40 |
| 15 | survives be considered therapeutically | 12:55:43 |
| 16 | effective as well? | 12:55:45 |
| 17 | MR. DYKHUIS:  Objection to form. | 12:55:47 |
| 18 | THE WITNESS:  Yeah.  It's just a | 12:55:50 |
| 19 | different definition of therapeutically | 12:55:53 |
| 20 | effective. | 12:55:53 |
| 21 | BY MS. KRICKL: | 12:55:56 |
| 22 | Q.    Okay. | 12:55:56 |

HIGHLY CONFIDENTIAL                    DA0515                    LIQ_PH-ILD_00000893

HIGHLY CONFIDENTIAL

Page 59

| | | |
|---|---|---|
| 1 | A.    It doesn't have to do that to be | 12:56:00 |
| 2 | therapeutically effective. | 12:56:04 |
| 3 | Q.    If a pulmonary hypertension drug | 12:56:05 |
| 4 | improved a patient's hemodynamic measures but | 12:56:08 |
| 5 | did not benefit how a patient felt, functioned, | 12:56:11 |
| 6 | or survived, would you consider that drug | 12:56:15 |
| 7 | therapeutically effective? | 12:56:17 |
| 8 | MR. DYKHUIS:  Objection.  Form and | 12:56:18 |
| 9 | hypothetical. | 12:56:20 |
| 10 | You can answer. | 12:56:25 |
| 11 | THE WITNESS:  I mean, it -- it is | 12:56:26 |
| 12 | hypothetical.  I have -- I have -- you know, | 12:56:26 |
| 13 | I've got no idea.  I would certainly consider | 12:56:30 |
| 14 | it therapeutically effective during development | 12:56:35 |
| 15 | because it affects the correct physiology and | 12:56:37 |
| 16 | has the correct pharmacology. | 12:56:41 |
| 17 | BY MS. KRICKL: | 12:56:43 |
| 18 | Q.    Are you aware of any pulmonary | 12:56:43 |
| 19 | hypertension drugs that affect a patient's | 12:56:45 |
| 20 | hemodynamics but do not affect how a patient | 12:56:52 |
| 21 | feels, functions, or survives? | 12:56:55 |
| 22 | MR. DYKHUIS:  Object to form. | 12:56:57 |

HIGHLY CONFIDENTIAL

LIQ_PH-ILD_00000894

HIGHLY CONFIDENTIAL

Page 60

| | | |
|---|---|---|
| 1 | THE WITNESS:  None that I can think | 12:57:03 |
| 2 | of at the moment. | 12:57:04 |
| 3 | BY MS. KRICKL: | 12:57:07 |
| 4 | Q.    Do you know if the FDA would approve | 12:57:07 |
| 5 | such a drug? | 12:57:10 |
| 6 | MR. DYKHUIS:  Object to form. | 12:57:11 |
| 7 | Scope. | 12:57:14 |
| 8 | THE WITNESS:  I -- that -- that -- | 12:57:16 |
| 9 | that, again, is hypothetical.  I'm not sure | 12:57:17 |
| 10 | anybody would ask the FDA to approve, and in | 12:57:25 |
| 11 | the context of the '793 patent, there is no | 12:57:27 |
| 12 | limitation that says the FDA have to approve it | 12:57:31 |
| 13 | on clinical benefit, as opposed to therapeutic | 12:57:34 |
| 14 | benefit, which is demonstrated in the patent. | 12:57:37 |
| 15 | BY MS. KRICKL: | 12:57:40 |
| 16 | Q.    You said the claims are directed to | 12:57:40 |
| 17 | methods of treatments, though, right? | 12:57:44 |
| 18 | A.    Yes. | 12:57:45 |
| 19 | Q.    Okay.  In your experience as a drug | 12:57:46 |
| 20 | developer, would you find a drug that improves | 12:57:55 |
| 21 | hemodynamics but does not improve how a patient | 12:57:57 |
| 22 | feels, functions, or survives lucrative to | 12:58:00 |

HIGHLY CONFIDENTIAL          DA0517          LIQ_PH-ILD_00000895

# EXHIBIT 19

**ClinicalTrials.gov** 

Go to the classic website



Record 1 of 1

⚠️  **The U.S. government does not review or approve the safety and science of all studies listed on this website.**

Read our full disclaimer (https://clinicaltrials.gov/about-site/disclaimer) for details.

COMPLETED ⓘ

**Safety and Efficacy of Inhaled Treprostinil in Adult PH With ILD Including CPFE**

**ClinicalTrials.gov ID** ⓘ NCT02630316

**Sponsor** ⓘ United Therapeutics

**Information provided by** ⓘ United Therapeutics (Responsible Party)

**Last Update Posted** ⓘ 2022-07-27

# Record History Tab

## Study Record Versions

- This table shows all the versions of this study record arranged in order by submitted date.
  - To view one version of the study record, click the submitted date.
  - To compare two versions, select them using the check boxes and click "Compare" at the bottom of the list.

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 1 | 2015-12-11 | • None (earliest version on record) |
| ☐ | 2 | 2016-02-24 | • Recruitment Status<br>• Study Status<br>• Contacts/Locations |
| ☐ | 3 | 2016-03-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 4 | 2016-05-05 | • Study Status<br>• Contacts/Locations |
| ☐ | 5 | 2016-05-23 | • Study Status<br>• Contacts/Locations |
| ☐ | 6 | 2016-05-31 | • Study Status<br>• Contacts/Locations |
| ☐ | 7 | 2016-06-06 | • Study Status |

Compare

DA0519                                    LIQ_PH-ILD_00000185

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | | | • Contacts/Locations |
| ☐ | 8 | 2016-06-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 9 | 2016-06-23 | • Study Status<br>• Contacts/Locations |
| ☐ | 10 | 2016-07-05 | • Study Status<br>• Contacts/Locations |
| ☐ | 11 | 2016-07-12 | • Study Status<br>• Contacts/Locations |
| ☐ | 12 | 2016-07-21 | • Study Status<br>• Contacts/Locations<br>• Study Identification |
| ☐ | 13 | 2016-08-15 | • Recruitment Status<br>• Study Status |
| ☐ | 14 | 2016-08-26 | • Recruitment Status<br>• Study Status<br>• Contacts/Locations |
| ☐ | 15 | 2016-09-09 | • Study Status<br>• Eligibility<br>• Study Description |
| ☐ | 16 | 2016-11-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 17 | 2016-11-09 | • Study Status<br>• Contacts/Locations |
| ☐ | 18 | 2016-11-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 19 | 2016-12-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 20 | 2016-12-19 | • Study Status |
| ☐ | 21 | 2017-01-12 | • Study Status<br>• Contacts/Locations |
| ☐ | 22 | 2017-02-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 23 | 2017-02-09 | • Study Status<br>• Contacts/Locations |

DA0520

LIQ_PH-ILD_00000186

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 24 | 2017-03-01 | • Study Status<br>• Eligibility<br>• Study Description |
| ☐ | 25 | 2017-03-09 | • Study Status<br>• Contacts/Locations |
| ☐ | 26 | 2017-03-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 27 | 2017-03-27 | • Study Status<br>• Contacts/Locations |
| ☐ | 28 | 2017-04-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 29 | 2017-05-19 | • Study Status<br>• Contacts/Locations |
| ☐ | 30 | 2017-06-02 | • Study Status<br>• Contacts/Locations |
| ☐ | 31 | 2017-06-19 | • Study Status<br>• Contacts/Locations |
| ☐ | 32 | 2017-07-05 | • Study Status<br>• Contacts/Locations |
| ☐ | 33 | 2017-07-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 34 | 2017-07-19 | • Study Status<br>• Contacts/Locations |
| ☐ | 35 | 2017-07-31 | • Study Status<br>• Contacts/Locations |
| ☐ | 36 | 2017-08-16 | • Study Status<br>• Contacts/Locations |
| ☐ | 37 | 2017-09-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 38 | 2017-09-08 | • Study Status<br>• Contacts/Locations |
| ☐ | 39 | 2017-09-12 | • Study Status<br>• Contacts/Locations |
| ☐ | 40 | 2017-09-14 | • Study Status<br>• Contacts/Locations |

DA0521

LIQ_PH-ILD_00000187

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 41 | 2017-09-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 42 | 2017-10-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 43 | 2017-10-25 | • Study Status<br>• Contacts/Locations |
| ☐ | 44 | 2017-11-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 45 | 2018-03-06 | • Study Status<br>• Contacts/Locations |
| ☐ | 46 | 2018-04-24 | • Study Status<br>• Contacts/Locations |
| ☐ | 47 | 2018-05-16 | • Study Status<br>• Contacts/Locations |
| ☐ | 48 | 2018-06-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 49 | 2018-06-18 | • Study Status<br>• Contacts/Locations |
| ☐ | 50 | 2018-06-25 | • Study Status<br>• Contacts/Locations |
| ☐ | 51 | 2018-07-11 | • Study Status<br>• Contacts/Locations |
| ☐ | 52 | 2018-07-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 53 | 2018-08-03 | • Study Status<br>• Contacts/Locations |
| ☐ | 54 | 2018-08-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 55 | 2018-08-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 56 | 2018-08-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 57 | 2018-09-24 | • Study Status<br>• Contacts/Locations |

DA0522

LIQ_PH-ILD_00000188

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 58 | 2018-10-01 | • Study Status<br>• Contacts/Locations |
| ☐ | 59 | 2018-10-11 | • Study Status<br>• Contacts/Locations |
| ☐ | 60 | 2018-10-22 | • Study Status<br>• Contacts/Locations |
| ☐ | 61 | 2018-11-02 | • Study Status<br>• Contacts/Locations |
| ☐ | 62 | 2018-11-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 63 | 2018-11-21 | • Study Status<br>• Contacts/Locations |
| ☐ | 64 | 2018-12-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 65 | 2018-12-17 | • Study Status<br>• Contacts/Locations |
| ☐ | 66 | 2018-12-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 67 | 2019-01-08 | • Study Status |
| ☐ | 68 | 2019-01-09 | • Study Status<br>• Contacts/Locations |
| ☐ | 69 | 2019-01-24 | • Study Status<br>• Contacts/Locations |
| ☐ | 70 | 2019-02-04 | • Study Status<br>• Contacts/Locations |
| ☐ | 71 | 2019-02-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 72 | 2019-03-13 | • Study Status<br>• Contacts/Locations |
| ☐ | 73 | 2019-03-29 | • Study Status<br>• Contacts/Locations |
| ☐ | 74 | 2019-04-15 | • Study Status<br>• Contacts/Locations |
| ☐ | 75 | 2019-04-19 | • Study Status |

DA0523

LIQ_PH-ILD_00000189

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| | | | • Contacts/Locations |
| ☐ | 76 | 2019-05-24 | • Study Status<br>• Contacts/Locations |
| ☐ | 77 | 2019-06-14 | • Study Status<br>• Contacts/Locations |
| ☐ | 78 | 2019-06-21 | • Study Status<br>• Contacts/Locations |
| ☐ | 79 | 2019-08-07 | • Study Status<br>• Contacts/Locations |
| ☐ | 80 | 2019-10-08 | • Study Status<br>• Contacts/Locations |
| ☐ | 81 | 2019-10-10 | • Study Status<br>• Contacts/Locations |
| ☐ | 82 | 2019-10-23 | • Study Status<br>• Contacts/Locations |
| ☐ | 83 | 2019-10-28 | • Study Status<br>• Contacts/Locations |
| ☐ | 84 | 2019-12-20 | • Study Status<br>• Contacts/Locations |
| ☐ | 85 | 2020-01-07 | • Recruitment Status<br>• Study Status<br>• Study Design<br>• Contacts/Locations |
| ☐ | 86 | 2020-02-26 | • Study Status |
| ☐ | 87 | 2020-04-30 | • Study Status |
| ☐ | 88 | 2020-05-29 | • Study Status<br>• Outcome Measures<br>• Contacts/Locations<br>• Oversight<br>• Study Description |
| ☐ | 89 | 2021-04-29 | • Study Status<br>• Eligibility<br>• Baseline Characteristics<br>• Outcome Measures<br>• Adverse Events<br>• Study Description<br>• Arms and Interventions |

DA0524

LIQ_PH-ILD_00000190

3/18/24, 4:56 PM    Case 1:23-cv-00975-RGA-SRF    Document 80-2    Filed 04/29/24    Page 526 of 561
Record History Version 23 | NCT02630316 | ClinicalTrials...

PageID #: 6650

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| | | | • Contacts/Locations<br>• Participant Flow<br>• More Information<br>• Document Section<br><br>**Quality Control Review Has Not Concluded**<br>Returned: 2021-05-21 |
| ☐ | 90 | 2021-05-25 | • Study Status<br>• Study Description<br>• Outcome Measures<br>• Eligibility<br>• Baseline Characteristics<br>• Adverse Events<br><br>**Quality Control Review Has Not Concluded**<br>Returned: 2021-06-17 |
| ☐ | 91 | 2021-06-21 | • Study Status<br>• Study Description<br>• Outcome Measures |
| ☐ | 92 | 2021-10-11 | • Study Status<br>• More Information |
| ☐ | 93 | 2022-07-21 | • Study Status<br>• Document Section |

Version 23: 2017-02-09

## Study Details

### Study Identification

**Unique Protocol ID**

RIN-PH-201

**Brief Title**

Safety and Efficacy of Inhaled Treprostinil in Adult PH With ILD Including CPFE

**Official Title**

A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects With Pulmonary Hypertension Due to Parenchymal Lung Disease

DA0525

LIQ_PH-ILD_00000191

**Secondary IDs**

## Study Status

| **Record Verification** |
|---|
| 2017-02 |

| **Overall Status** |
|---|
| Recruiting |

| **Study Start** |
|---|
| 2016-02 |

| **Primary Completion** |
|---|
| 2018-10 [Estimated] |

| **Study Completion** |
|---|
| 2018-10 [Estimated] |

| **First Submitted** |
|---|
| 2015-12-11 |

| **First Submitted that Met QC Criteria** |
|---|
| 2015-12-11 |

| **First Posted** |
|---|
| 2015-12-15 |

| **Last Update Submitted that Met QC Criteria** |
|---|
| 2017-02-09 |

| **Last Update Posted** |
|---|
| 2017-02-10 [Actual] |

## Sponsor/Collaborators

| **Sponsor** |
|---|
| United Therapeutics |

| **Responsible Party** |
|---|
| Sponsor |

| **Collaborators** |
|---|
| |

## Oversight

| **U.S. FDA-regulated Drug** |
|---|
| |

DA0526                                                                                            LIQ_PH-ILD_00000192

**U.S. FDA-regulated Device**

---

**Data Monitoring**

Yes

## Study Description

**Brief Summary**

This is a multicenter, randomized (1:1 inhaled treprostinil: placebo), double-blinded, placebo-controlled trial to evaluate the safety and efficacy of inhaled treprostinil in subjects with pre-capillary pulmonary hypertension (PH) associated with interstitial lung disease (ILD) including combined pulmonary fibrosis and emphysema (CPFE). The study will include about 314 patients at approximately 100 clinical trial centers. The treatment phase of the study will last approximately 16 weeks. Patients who complete all required assessments will also be eligible to enter an open-label, extension study (RIN-PH-202).

**Detailed Description**

## Conditions

**Condition**

Pulmonary Hypertension
Interstitial Lung Disease
Combined Pulmonary Fibrosis and Emphysema

**Keywords**

Treprostinil
PH
ILD
CPFE
6 Minute Walk Test

## Study Design

**Study Type**

Interventional

**Primary Purpose**

Treatment

**Study Phase**

Phase 2
Phase 3

**Interventional Study Model**

Parallel Assignment

**Interventional Model Description**

DA0527

LIQ_PH-ILD_00000193

| Number of Arms |
| --- |
| 2 |

| Masking |
| --- |
| Quadruple (Participant, Care Provider, Investigator, Outcomes Assessor) |

| Masking Description |
| --- |
| |

| Allocation |
| --- |
| Randomized |

| Enrollment |
| --- |
| 314 [Estimated] |

## Arms and Interventions

| Arms | Assigned Interventions |
| --- | --- |
| Placebo Comparator: Placebo<br><br>Matching placebo inhaled using an ultrasonic nebulizer four times daily | Drug: Placebo<br><br>• Placebo administered four times daily |
| Active Comparator: Active Inhaled Treprostinil<br><br>Active Treprostinil for inhalation solution (0.6 mg/mL) delivered via an ultrasonic nebulizer which emits a dose of approximately 6 mcg per breath. Inhaled four times daily and titrated up to a maximum of 12 breaths four times daily | Drug: Inhaled Treprostinil<br><br>• Inhaled treprostinil (6 mcg/breath) administered four times daily<br>• Other Names:<br>  ○ Tyvaso |

## Outcome Measures

**Primary Outcome Measures**

1. Change in 6-minute Walk Distance (6MWD) Measured at Peak Exposure from Baseline to Week 16
   The intent of the 6MWD test is to evaluate exercise capacity associated with carrying out activities of daily living. Change in 6MWD from Baseline to Week 16, correlates with the current clinical standard for assessing patient functional status in the treatment of PH and is considered an objective measure of patient functional status. Subjects will be instructed to walk down a corridor at a comfortable speed as far as they can manage for six minutes. Distance <500 meters suggests considerable exercise limitation; Distance 500-800 meters suggests moderate limitation; Distance >800 meters (with no rests) suggests mild or no limitation. Peak exposure 6MWD will occur by conducting 6-minute walk test (6MWT) within 10 to 60 minutes after the most recent dose of study drug dose. [Time Frame: Baseline and Week 16]

**Secondary Outcome Measures**

1. Change in Peak 6-minute Walk Distance (6MWD) from Baseline to Week 12
   The intent of the 6MWD test is to evaluate exercise capacity associated with carrying out activities of daily living. Change in 6MWD from Baseline to Week 12, correlates with the current clinical standard for assessing patient functional status in the treatment of PH and is considered an objective measure of patient functional status. Subjects will be instructed to walk down a corridor at a comfortable speed as far as they can manage for six minutes. Distance <500 meters suggests considerable exercise limitation; Distance 500-800 meters suggests moderate limitation; Distance >800 meters

DA0528                                    LIQ_PH-ILD_00000194

(with no rests) suggests mild or no limitation. Peak exposure 6MWD will occur by conducting 6-minute walk test (6MWT) within 10 to 60 minutes after the most recent dose of study drug dose.
[Time Frame: Baseline and Week 12]

2. Change in Trough 6-minute Walk Distance (6MWD) from Baseline to Week 15
The intent of the 6MWD test is to evaluate exercise capacity associated with carrying out activities of daily living. Change in 6MWD from Baseline to Week 15, correlates with the current clinical standard for assessing patient functional status in the treatment of PH and is considered an objective measure of patient functional status. Subjects will be instructed to walk down a corridor at a comfortable speed as far as they can manage for six minutes. Distance <500 meters suggests considerable exercise limitation; Distance 500-800 meters suggests moderate limitation; Distance >800 meters (with no rests) suggests mild or no limitation. Trough exposure 6MWD will occur by conducting 6-minute walk test (6MWT) at least four hours after the most recent study drug dose.
[Time Frame: Baseline and Week 15]

3. Change in plasma concentration of N-terminal pro-Brain Natriuretic Peptide (NT-proBNP) from Baseline to Week 16
The N-terminal pro-BNP (NT-proBNP) serum concentration is a useful biomarker associated with changes in right heart morphology and function. NT-proBNP serum concentration will be assessed to compare the severity of heart failure at Baseline and Week 16. Blood for NT-proBNP assessment must be drawn prior to conducting the 6-minute walk test (6MWT).
[Time Frame: Baseline and Week 16]

4. Change in Forced Expiratory Volume (FEV1) in One Second from Baseline to Week 16
Change in pulmonary function following inhaled treprostinil therapy will be measured by Forced Expiratory Volume in One Second (FEV1), the maximal amount of air forcefully exhaled in 1 second, calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
[Time Frame: Baseline and Week 16]

5. Change in Forced Vital Capacity (FVC) from Baseline to Week 16
Change in pulmonary function following inhaled treprostinil therapy will be measured by Forced Vital Capacity (FVC), calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
[Time Frame: Baseline and Week 16]

6. Change in Total Lung Capacity (TLC) from Baseline to Week 16
Change in pulmonary function following inhaled treprostinil therapy will be measured by Total Lung Capacity (TLC), calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
[Time Frame: Baseline and Week 16]

7. Change in Lung Diffusion Capacity (DLCO) from Baseline to Week 16
Change in pulmonary function following inhaled treprostinil therapy will be measured by Lung Diffusion Capacity (DLCO), calculated from a Pulmonary Function Test (PFT) performed at Baseline and Week 16.
[Time Frame: Baseline and Week 16]

8. Incidence of Adverse Events Among Participants through 16 Weeks
The incidence of adverse events among participants throughout the 16 week study will be measured by the number of participants analyzed and the percentage of those participants who experienced an adverse event.
[Time Frame: 16 Weeks]

## Eligibility

| Minimum Age |
| --- |
| 18 Years |

| Maximum Age |
| --- |
| 79 Years |

DA0529
LIQ_PH-ILD_00000195

| Sex |
|---|
| All |

| Gender-based Eligibility |
|---|
| |

| Gender Eligibility Description |
|---|
| |

| Accepts Healthy Volunteers |
|---|
| No |

| Criteria |
|---|

Inclusion Criteria:

1. Subject voluntarily gives informed consent to participate in the study.
2. Males and females aged 18 - 79 years at the time of informed consent.

    a. Females of reproductive potential must be non-pregnant (as confirmed by a urine pregnancy test at screening) and non-lactating, and will: i. Either abstain from intercourse (when it is in line with their preferred and usual lifestyle), or ii. Use two medically acceptable, highly-effective forms of contraception for the duration of study, and at least 30 days after discontinuing study drug.

    b. Males must use a condom for the duration of treatment and for at least 48 hours after discontinuing study drug.

3. The subject has a confirmed diagnosis (based on computed tomography [CT] imaging and pulmonary function tests [PFTs] performed within six months prior to randomization) of World Health Organization (WHO) Group 3 PH associated with one of the following:

    a. Idiopathic interstitial pneumonia (IIP) including: i. Idiopathic pulmonary fibrosis (IPF) ii. Idiopathic nonspecific interstitial pneumonia iii. Respiratory bronchiolitis-associated interstitial lung disease (RB-ILD) iv. Desquamative interstitial pneumonia (DIP) v. Cryptogenic organizing pneumonia (COP) vi. Acute interstitial pneumonitis (AIP) vii. Idiopathic lymphoid interstitial pneumonia viii. Idiopathic pleuroparenchymal fibroelastosis iix. Unclassifiable idiopathic interstitial pneumonia b. Chronic hypersensitivity pneumonitis (CHP) c. Occupational or environmental lung disease (drug or radiation-induced) d. Combined pulmonary fibrosis and emphysema (CPFE)

4. Subjects are required to have a right heart catheterization (RHC) within one year prior to randomization with the following documented parameters:

    1. Pulmonary vascular resistance (PVR) ≥ 4 Wood Units (WU) and
    2. A left ventricular end diastolic pressure (LVEDP) or pulmonary capillary wedge pressure (PCWP) of ≤ 12 mmHg if PVR ≥ 4 WU to < 6.25 WU or ≤ 15 mmHg if PVR ≥ 6.25 WU and
    3. A mean pulmonary arterial pressure (mPAP) of ≥ 30 mmHg

5. A baseline diffusing capacity of the lungs for carbon monoxide (DLCO) of < 50%
6. Baseline 6MWD ≥ 100 meters
7. The subject has not received any PAH approved therapy including: prostacyclin therapy (i.e., epoprostenol, treprostinil, iloprost, or beraprost; except for acute vasoreactivity testing), IP receptor agonist (selexipag), endothelin receptor antagonist (ERA), phosphodiesterase type 5 inhibitor (PDE-5I), or soluble guanylate cyclase stimulator (sGC) within 60 days of randomization.
8. Subjects on a chronic medication for underlying lung disease must be on a stable and optimized dose for ≥ 30 days prior to randomization. Subjects receiving pirfenidone or nintedanib must have been receiving treatment for at least 90 days and on a stable dose for at least 30 days prior to randomization.
9. Subjects on a supportive medication therapy (e.g., anticoagulants, diuretics, oxygen, etc.) must be on a stable and optimized dose for ≥ 30 days prior to randomization. Exceptions are the discontinuation or dose changes of anticoagulants and / or dose change of diuretics.

DA0530    LIQ_PH-ILD_00000196

10. In the opinion of the investigator, subject is able to communicate effectively with study personnel, and is considered reliable, willing and likely to be cooperative with protocol requirements, including attending all study visits.

Exclusion criteria:

1. The subject has a diagnosis of pulmonary arterial hypertension (PAH) or PH for reasons other than ILD as outlined in inclusion criterion 3. This would include, but is not limited to, the concomitant presence of thromboembolic disease (acute or chronic), untreated or inadequately treated obstructive sleep apnea (OSA), connective tissue disease (including but not limited to systemic sclerosis, scleroderma, or systemic lupus erythematosus [SLE]), sarcoidosis, human immunodeficiency virus (HIV)-1 infection, portopulmonary hypertension, and other conditions of the WHO Group I, II, IV, and V classification.

2. The subject has shown intolerance or significant lack of efficacy to a prostacyclin or prostacyclin analogue that resulted in discontinuation or inability to effectively titrate that therapy.

3. The subject has received any PAH approved therapy including: prostacyclin therapy (i.e., epoprostenol, treprostinil, iloprost, or beraprost; except for acute vasoreactivity testing), IP receptor agonist (selexipag), ERA, PDE-5I, or sGC within 60 days of randomization.

4. The subject has evidence of clinically significant left-sided heart disease as defined by:

   1. LVEDP or PCWP > 15 mmHg (or > 12 mmHg if PVR ≥ 4 to < 6.25 WU)
   2. Left ventricular ejection fraction < 40% as assessed by either multigated angiogram (MUGA), angiography or echocardiography.

   Note: Subjects with abnormal left ventricular function attributable entirely to impaired left ventricular filling due to the effects of right ventricular overload (i.e., right ventricular hypertrophy and/or dilatation) will not be excluded.

5. Subjects must not have three or more of the following left ventricular disease/dysfunction risk factors:

   1. Body Mass Index (BMI) ≥ 30 kg/m2
   2. History of Essential Hypertension
   3. Diabetes Mellitus - any type
   4. Historical evidence of significant coronary disease established by any one of the following:

   i. history of myocardial infarction or percutaneous coronary intervention or angiographic, or ii. evidence of coronary artery disease (> 50% stenosis in at least one coronary artery), or iii. positive stress test with imaging, or previous coronary artery bypass graft, or stable angina

6. The subject is receiving > 10 L/min of oxygen supplementation by any mode of delivery at rest at Baseline.

7. Use of any inhaled tobacco/marijuana products or significant history of drug abuse within six months prior to randomization.

8. Exacerbation of underlying lung disease or active pulmonary or upper respiratory infection within 30 days of randomization.

9. Initiation of pulmonary rehabilitation within 12 weeks prior to the randomization.

10. The subject has uncontrolled systemic hypertension as evidenced by systolic blood pressure > 160 mmHg or diastolic blood pressure > 100 mmHg.

11. The subject has any form of congenital heart disease or congenital heart defect (repaired or unrepaired) other than a patent foramen ovale (PFO).

12. The subject has anemia as defined by a screening hemoglobin value < 9.0 g/dL, active infection, or any other condition that would interfere with the interpretation of study assessments.

13. The subject has a Body Mass Index ≥ 40 kg/m2.

14. The subject has any musculoskeletal disorder (i.e., arthritis affecting the lower limbs, recent hip or knee joint replacement, artificial leg), is using a device to assist walking (i.e., cane or walker), or has any other condition that would limit ambulation.

15. Use of any investigational drug/device, or participation in any investigational study within 30 days prior to randomization.

DA0531

LIQ_PH-ILD_00000197

## Contacts/Locations

### Central Contact Person

- Name
  Nicole Leedom

  Email
  nleedom@unither.com
- Name
  Hilary Mauney

  Email
  hmauney@unither.com

### Study Officials

- Name
  Aaron Waxman, MD

  Role
  Principal Investigator

  Affiliation
  Brigham and Women's Hospital

### Location

- **Birmingham, Alabama, United States, 35294**

  Status:
  **Recruiting**

  Facility:
  University of Alabama at Birmingham

  Contact:
  - Contact
    - Leigh Powell
    - 205-975-9859
    - lcpowell@uabmc.edu
  - Principal Investigator
    - Robert Bourge, MD

- **Phoenix, Arizona, United States, 85012**

  Status:
  **Recruiting**

  Facility:
  Arizona Pulmonary Specialists, Ltd.

  Contact:
  - Contact
    - Monya Pierce
    - 602-271-0832
    - monya-research@hotmail.com
  - Principal Investigator
    - Jeremy Feldman, MD

- **Tucson, Arizona, United States, 85724**

  Status:
  **Recruiting**

DA0532                                                                    LIQ_PH-ILD_00000198

Facility:

University of Arizona

Contact:

- Contact
  - Stacey Palm
  - 520-626-8034
  - staceypalm@email.arizona.edu
- Principal Investigator
  - Franz Rischard, DO

- **Fresno, California, United States, 93701**

  Status:

  **Recruiting**

  Facility:

  University of California San Francisco - Fresno

  Contact:

  - Contact
    - Sonia Garcia
    - 559-499-6637
    - sgarcia@fresno.ucsf.edu
  - Principal Investigator
    - Vijay Balasubramanian

- **Riverside, California, United States, 92505**

  Status:

  **Recruiting**

  Facility:

  Pacific Pulmonary Medical Group

  Contact:

  - Contact
    - Mostafa Elsiah
    - 951-373-5827
    - mostafa.ppmg@gmail.com
  - Principal Investigator
    - Heba Ismail, MD

- **Sacramento, California, United States, 95817**

  Status:

  **Recruiting**

  Facility:

  University of California Davis Medical Center

  Contact:

  - Contact
    - Megan Suderow
    - 916-734-1554
    - mlsuderow@ucdavis.edu
  - Principal Investigator
    - Roblee Allen

- **Aurora, Colorado, United States, 80045**

  Status:

  **Recruiting**

  Facility:

  University of Colorado Hospital - Cardiac and Vascular Center

DA0533 LIQ_PH-ILD_00000199

- Contact
  - Cheryl Abbott, RN, CCRP
  - 303-724-7466
  - cheryl.abbott@ucdenver.edu
- Principal Investigator
  - Todd Bull, MD

- **Denver, Colorado, United States, 80206**

  Status:
  **Recruiting**

  Facility:
  National Jewish Health

  Contact:
  - Contact
    - Carmen Egidio
    - 303-270-2622
    - egidioc@njhealth.org
  - Principal Investigator
    - Amy Olson, MD

- **Washington, District of Columbia, United States, 20007**

  Status:
  **Recruiting**

  Facility:
  Georgetown University Hospital

  Contact:
  - Contact
    - Michele Cooney
    - 202-444-0895
    - Cooneym@gunet.georgetown.edu
  - Principal Investigator
    - Tunay Kuru, MD

- **Clearwater, Florida, United States, 33765**

  Status:
  **Recruiting**

  Facility:
  St. Francis Sleep, Allergy and Lung Institute

  Contact:
  - Contact
    - Ellen Linden
    - 727-210-4606
    - elinden@stfrancismed.com
  - Principal Investigator
    - Francis Averill, MD

- **Jacksonville, Florida, United States, 32209**

  Status:
  **Recruiting**

  Facility:
  University of Florida College of Medicine, Jacksonville

  Contact:
  - Contact
    - Minal Patel

DA0534                                                                    LIQ_PH-ILD_00000200

- 904-244-1106
- Minal.patel@jax.ufl.edu
  ○ Principal Investigator
- Vandana Seeram, MD
- **Miami, Florida, United States, 33136**

  Status:

  **Recruiting**

  Facility:

  University of Miami

  Contact:
  ○ Contact
  - Eliana Mendes, MD
  ○ Contact
    -
  - 305-243-2568
  - emendes@med.miami.edu
  ○ Principal Investigator
  - David De La Zerda, MD

- **Orlando, Florida, United States, 32803**

  Status:

  **Recruiting**

  Facility:

  Central Florida Pulmonary Group, P.A.

  Contact:
  ○ Contact
  - Zarah Rodriguez
  - 407-841-1100, 107
  - zrodriguez@cfpulmonary.com
  ○ Principal Investigator
  - Syed Mobin, MD

- **South Miami, Florida, United States, 33143**

  Status:

  **Recruiting**

  Facility:

  South Miami Heart Specialists

  Contact:
  ○ Contact
  - Jojie Calderin
  - 305-999-3301
  - gcalderin@ampmrc.com
  ○ Principal Investigator
  - Javier Jimenez, MD

- **Weston, Florida, United States, 33331**

  Status:

  **Recruiting**

  Facility:

  Cleveland Clinic Florida

  Contact:
  ○ Contact
  - Norma Jean Barton
  - 954-659-6213

DA0535 LIQ_PH-ILD_00000201

- bartonn2@ccf.org
  - Principal Investigator
    - Franck Rahaghi, MD
- **Atlanta, Georgia, United States, 30322**

  Status:

  **Recruiting**

  Facility:

  The Emory Clinic

  Contact:
  - Contact
    - Jane Gillespie, RN
  - Contact
    -
    - 404-712-8204
    - jane.gillespie@emory.edu
  - Principal Investigator
    - Micah Fisher, MD
- **Chicago, Illinois, United States, 60611**

  Status:

  **Recruiting**

  Facility:

  Northwestern University

  Contact:
  - Contact
    - Margaret Travis, RN, BSN
    - 312-695-2269
    - margaret.travis@northwestern.edu
  - Principal Investigator
    - Hector Cajigas, MD
- **Chicago, Illinois, United States, 60612**

  Status:

  **Recruiting**

  Facility:

  University of Illinois at Chicago Hospital

  Contact:
  - Contact
    - Adam Ostrower
    - 312-355-5934
    - ostrower@uic.edu
  - Principal Investigator
    - Roberto Machado, MD
- **Chicago, Illinois, United States, 60637**

  Status:

  **Recruiting**

  Facility:

  University of Chicago Medical Center

  Contact:
  - Contact
    - Sandy Coslet
  - Contact
    -

DA0536                                    LIQ_PH-ILD_00000202

- 773-864-5768
- scoslet@medicine.bsd.uchicago.edu
  ◦ Principal Investigator
    - Remzi Bag, MD
- **Maywood, Illinois, United States, 60153**

  Status:

  **Recruiting**

  Facility:

  Loyola University Medical Center

  Contact:
  ◦ Contact
    - Jessica Shore
    - 708-216-2027
    - jshore@luc.edu
  ◦ Principal Investigator
    - James Gagermeier, MD

- **Indianapolis, Indiana, United States, 46202**

  Status:

  **Recruiting**

  Facility:

  IU Health Physicians Advanced Heart & Lung Clinic

  Contact:
  ◦ Contact
    - Erin Turk
    - 317-962-3183
    - eturk@iuhealth.org
  ◦ Principal Investigator
    - William Harvey, MD

- **Indianapolis, Indiana, United States, 46250**

  Status:

  **Recruiting**

  Facility:

  Community Heart and Vascular Hospital

  Contact:
  ◦ Contact
    - Joanna Greene-Nashold, RN
    - 317-621-8629
    - jgnashold@ecommunity.com
  ◦ Principal Investigator
    - Navneet Lather, MD

- **Indianapolis, Indiana, United States, 46260**

  Status:

  **Recruiting**

  Facility:

  St. Vincent Medical Group, Inc.

  Contact:
  ◦ Contact
    - Regina Margiotti
    - 317-338-6151
    - ramargio@stvincent.org
  ◦ Principal Investigator

DA0537

LIQ_PH-ILD_00000203

- Ashwin Ravichandran

- **Kansas City, Kansas, United States, 66160**

  Status:

  **Recruiting**

  Facility:

  University of Kansas Medical Center

  Contact:

  - Contact
    - Mia Zou
    - 913-588-7117
    - mzou@kumc.edu
  - Principal Investigator
    - Leslie Spikes, MD

- **Lexington, Kentucky, United States, 40536**

  Status:

  **Recruiting**

  Facility:

  University of Kentucky Medical Center

  Contact:

  - Contact
    - April Butler
  - Contact
    -
    - 859-218-6740
    - april.evans@uky.edu
  - Principal Investigator
    - Ketan Buch, MD

- **Louisville, Kentucky, United States, 40202**

  Status:

  **Recruiting**

  Facility:

  Kentuckiana Pulmonary Associates

  Contact:

  - Contact
    - Martha Royse, APRN
    - 502-587-8000
    - roysenp@gmail.com
  - Principal Investigator
    - John McConnell, MD

- **Louisville, Kentucky, United States, 40202**

  Status:

  **Recruiting**

  Facility:

  University of Louisville Physicians Outpatient Center

  Contact:

  - Contact
    - Joan Hamlyn
    - 502-852-8739
    - Joan.hamlyn@louisville.edu
  - Principal Investigator
    - Jimmy Shaun Smith, DO

DA0538                                    LIQ_PH-ILD_00000204

- **New Orleans, Louisiana, United States, 70112**

    Status:

    **Recruiting**

    Facility:

    Louisiana State University Health Sciences Center New Orleans

    Contact:
    - Contact
        - Paula Lauto, RN
        - 504-568-3451
        - plauto@lsuhsc.edu
    - Principal Investigator
        - Matthew Lammi, MD

- **New Orleans, Louisiana, United States, 70112**

    Status:

    **Recruiting**

    Facility:

    Tulane University

    Contact:
    - Contact
        - Sandy Ditta
        - 504-988-4040
        - sditta@tulane.edu
    - Principal Investigator
        - Shigeki Saito, MD

- **Baltimore, Maryland, United States, 21202**

    Status:

    **Recruiting**

    Facility:

    University of Maryland Medical Center

    Contact:
    - Contact
        - Lioubov Poliakova
        - 410-328-6885
        - lpoliako@medicine.umaryland.edu
    - Principal Investigator
        - Gautam V. Ramani, MD

- **Boston, Massachusetts, United States, 02111**

    Status:

    **Recruiting**

    Facility:

    Tufts Medical Center

    Contact:
    - Contact
        - Karen Visnaw, RN
        - 617-636-1334
        - Kvisnaw@tuftsmedicalcenter.org
    - Principal Investigator
        - Nicholas Hill, MD

- **Boston, Massachusetts, United States, 02115**

    Status:

DA0539                                   LIQ_PH-ILD_00000205

Recruiting

Facility:

Brigham & Women's Hospital

Contact:

- Contact
  - Laurie Lawler, RN
  - 617-525-9731
  - llawler@partners.org
- Principal Investigator
  - Aaron B. Waxman, MD

- **Detroit, Michigan, United States, 48202**

  Status:

  Recruiting

  Facility:

  Henry Ford Health System

  Contact:

  - Contact
    - Jackie Day
    - 313-916-1254
    - jday5@hfhs.org
  - Principal Investigator
    - Rana Awdish, MD

- **Grand Rapids, Michigan, United States, 49503**

  Status:

  Recruiting

  Facility:

  Spectrum Health Medical Center

  Contact:

  - Contact
    - Molly Cope, RN
    - 616-391-3869
    - molly.cope@spectrumhealth.org
  - Principal Investigator
    - Reda Girgis, MD

- **Minneapolis, Minnesota, United States, 55455**

  Status:

  Not yet recruiting

  Facility:

  University of Minnesota

  Contact:

  - Contact
    - Gretchen Peichel
    - 612-626-6237
    - gpeichel@umn.edu
  - Principal Investigator
    - Thenappan Thenappan, MD

- **Omaha, Nebraska, United States, 68198**

  Status:

  Recruiting

  Facility:

DA0540                                    LIQ_PH-ILD_00000206

University of Nebraska Medical Center

Contact:
- Contact
  - Traci Nelson
  - 402-559-7585
  - trnelson@unmc.edu
- Principal Investigator
  - Austin Thompson, MD

- **Albuquerque, New Mexico, United States, 87131**

  Status:
  **Recruiting**

  Facility:
  The University of New Mexico

  Contact:
  - Contact
    - Barbara Butcher, PhD, BSN, RN
    - 505-925-1160
    - BButcher@salud.unm.edu
  - Principal Investigator
    - Lana Melendres-Groves, MD

- **Albany, New York, United States, 12208**

  Status:
  **Recruiting**

  Facility:
  Albany Medical College

  Contact:
  - Contact
    - Furqan Ilyas
    - 518-262-1542
    - ilyasf@mail.amc.edu
  - Principal Investigator
    - Boris Medarov, MD

- **Brooklyn, New York, United States, 11215**

  Status:
  **Recruiting**

  Facility:
  New York Methodist Hospital

  Contact:
  - Contact
    - Puja Chadha
    - 718-780-5614
    - puc9004@nyp.org
  - Principal Investigator
    - Ruth Minkin, MD

- **Fayetteville, New York, United States, 13066**

  Status:
  **Recruiting**

  Facility:
  Pulmonary Health Physicians, PC

  Contact:

DA0541    LIQ_PH-ILD_00000207

- Contact
  - Victoria Gabris, RN
- Contact
  - 
  - 315-234-0816
  - Victoria.Gabris@CNYLungs.com
- Principal Investigator
  - Sherif El Bayadi, MD
- **Mineola, New York, United States, 11501**

  Status:

  **Recruiting**

  Facility:

  Winthrop University Hospital

  Contact:
  - Contact
    - Kimberly Byrnes
    - 516-663-9582
    - kbyrnes@winthrop.org
  - Principal Investigator
    - Shilpa DeSouza, MD
- **New Hyde Park, New York, United States, 11040**

  Status:

  **Recruiting**

  Facility:

  Northwell Health

  Contact:
  - Contact
    - Sameer Verma, MD
    - 516-465-5437
    - SVerma3@northwell.edu
  - Principal Investigator
    - Arunabh Talwar, MD
- **New York, New York, United States, 10003**

  Status:

  **Recruiting**

  Facility:

  ICAHN School of Medicine - Mount Sinai Beth Israel

  Contact:
  - Contact
    - Anabela Barroso
    - 212-844-8824
    - abarroso@CHPNET.ORG
  - Principal Investigator
    - Roxana Sulica, MD
- **New York, New York, United States, 10029**

  Status:

  **Recruiting**

  Facility:

  The Mount Sinai Hospital

  Contact:
  - Contact

DA0542    LIQ_PH-ILD_00000208

3/18/24, 4:56 PM    Case 1:23-cv-00975-RGA-SRF    Record History | Document 280-2    Filed 04/29/24    Page 544 of 561 Beta | ClinicalTrials...

PageID #: 6668

- ▪ Ewelina Wojtaszek
  - ○ Contact
    - ▪
    - ▪ 917-501-5255
    - ▪ ewelina.wojtaszek@mountsinai.org
  - ○ Principal Investigator
    - ▪ Radha Gopalan, MD
- **Chapel Hill, North Carolina, United States, 27599**

  Status:

  **Recruiting**

  Facility:

  University of North Carolina at Chapel Hill

  Contact:
  - ○ Contact
    - ▪ Dakota Buhrman
    - ▪ 919-445-0353
    - ▪ dakota_buhrman@med.unc.edu
  - ○ Principal Investigator
    - ▪ Hubert James (Jimmy) Ford III, MD
- **Cincinnati, Ohio, United States, 45219**

  Status:

  **Recruiting**

  Facility:

  The Carl and Edyth Lindner Research Center at The Christ Hospital

  Contact:
  - ○ Contact
    - ▪ Christine Lawrence
    - ▪ 513-585-1777
    - ▪ christine.lawrence@thechristhospital.com
  - ○ Principal Investigator
    - ▪ Peter Engel, MD
- **Cincinnati, Ohio, United States, 45267**

  Status:

  **Recruiting**

  Facility:

  University of Cincinnati Health

  Contact:
  - ○ Contact
    - ▪ Tammy Roads
    - ▪ 513-558-2148
    - ▪ roadst@ucmail.uc.edu
  - ○ Principal Investigator
    - ▪ Jean Elwing, MD
- **Cleveland, Ohio, United States, 44106**

  Status:

  **Recruiting**

  Facility:

  University Hospitals Cleveland Medical Center

  Contact:
  - ○ Contact
    - ▪ Mary Andrews

DA0543                                    LIQ_PH-ILD_00000209

- mary.andrews@aultman.com

  - Contact
    - 
    - 216-844-2386
  - Principal Investigator
    - Robert Schilz, DO

- **Oklahoma City, Oklahoma, United States, 73104**

  Status:

  **Recruiting**

  Facility:

  The University of Oklahoma Health Sciences Center (OUHSC)

  Contact:

  - Contact
    - Jennifer Robertson
    - 405-271-6173
    - jennifer-robertson@ouhsc.edu
  - Principal Investigator
    - Himanshu Bhardwaj, MD

- **Lancaster, Pennsylvania, United States, 17603**

  Status:

  **Recruiting**

  Facility:

  Lancaster General Health

  Contact:

  - Contact
    - Lou Anne Kruse, RN, BSN
    - 717-544-1777
    - lakruse@LGHealth.org
  - Principal Investigator
    - Justin Roberts, DO

- **Philadelphia, Pennsylvania, United States, 19140**

  Status:

  **Recruiting**

  Facility:

  Temple University Hospital

  Contact:

  - Contact
    - Gayle Jones, RN
    - 215-707-1041
    - Gayle.Jones@tuhs.temple.edu
  - Principal Investigator
    - Sheila Weaver, DO

- **Pittsburgh, Pennsylvania, United States, 15212**

  Status:

  **Not yet recruiting**

  Facility:

  Allegheny General Hospital

  Contact:

  - Contact
    - Joan Rossi, RN
    - 412-359-3293

DA0544     **LIQ_PH-ILD_00000210**

- joan.rossi@ahn...
  - Principal Investigator
    - Amresh Raina, MD
- **Pittsburgh, Pennsylvania, United States, 15213**

  Status:

  **Recruiting**

  Facility:

  University of Pittsburgh Medical Center

  Contact:
  - Contact
    - Swati Gulati
    - 412-864-6371
    - gulatis2@upmc.edu
  - Principal Investigator
    - Michael Risbano

- **Anderson, South Carolina, United States, 29621**

  Status:

  **Recruiting**

  Facility:

  AnMed Health Pulmonary and Sleep Medicine

  Contact:
  - Contact
    - Charlesa Davis
    - 864-512-8519
    - charlesa.davis2@anmedhealth.org
  - Principal Investigator
    - Abhijit Raval, MD

- **Charleston, South Carolina, United States, 29425**

  Status:

  **Recruiting**

  Facility:

  Medical University of South Carolina

  Contact:
  - Contact
    - Robyn Do
    - 843-792-1221
    - dorobyn@musc.edu
  - Principal Investigator
    - Rahul Argula, MD

- **Knoxville, Tennessee, United States, 37909**

  Status:

  **Recruiting**

  Facility:

  Statcare Pulmonary Consultants

  Contact:
  - Contact
    - Krista Tibbs
    - 865-934-2676
    - ktibbs@biomed-research.com
  - Principal Investigator
    - John Swisher, MD

DA0545    LIQ_PH-ILD_00000211

3/18/24, 4:56 PM Record History | Document 60-2-09 | Beta.ClinicalTrials...

Case 1:23-cv-00975-RGA-SRF Document 80-2 Filed 04/29/24 Page 547 of 561 PageID #: 6671

- **Dallas, Texas, United States, 75390**

  Status:

  **Recruiting**

  Facility:

  UT Southwestern Medical Center

  Contact:
  - Contact
    - Adetoun Sodimu
    - 214-645-6439
    - Adetoun.Sodimu@UTSouthwestern.edu
  - Principal Investigator
    - Sonja Bartolome, MD

- **Houston, Texas, United States, 77030**

  Status:

  **Recruiting**

  Facility:

  Houston Methodist

  Contact:
  - Contact
    - Ann Saulino, RN
    - 713-441-7182
    - asaulino@houstonmethodist.org
  - Principal Investigator
    - Adaani Frost, MD

- **Houston, Texas, United States, 77030**

  Status:

  **Recruiting**

  Facility:

  Michael E. DeBakey VA Medical Center

  Contact:
  - Contact
    - Sarah Perusich
    - 713-794-7294
    - Sarah.Perusich@va.gov
  - Principal Investigator
    - Lavannya Pandit, MD

- **Houston, Texas, United States, 77030**

  Status:

  **Recruiting**

  Facility:

  The University of Texas Health Science Center at Houston

  Contact:
  - Contact
    - Tiffany Ostovar-Kermani
    - 713-500-6851
    - Tiffany.G.OstovarKermani@uth.tmc.edu
  - Principal Investigator
    - Bela Patel, MD

- **San Antonio, Texas, United States, 78229**

  Status:

DA0546

LIQ_PH-ILD_00000212

**Not yet recruiting**

Facility:

The University of Texas Health Science Center at San Antonio

Contact:
- Contact
  - Olga Dib
  - 210-415-1180
  - Dibo@uthscsa.edu
- Principal Investigator
  - Deborah Levine, MD

- **Temple, Texas, United States, 76508**

  Status:
  **Recruiting**

  Facility:
  Scott & White Memorial Hospital

  Contact:
  - Contact
    - Lori Murdoch
    - 254-724-7168
    - Lori.Murdoch@BSWHealth.org
  - Principal Investigator
    - Peter Yau, MD

- **Colchester, Vermont, United States, 05446**

  Status:
  **Recruiting**

  Facility:
  University of Vermont, Vermont Lung Center

  Contact:
  - Contact
    - Kathy Meehan
    - 802-847-3627
    - Kathy.Meehan@uvmhealth.org
  - Principal Investigator
    - Maryellen Antkowiak, MD

- **Norfolk, Virginia, United States, 23507**

  Status:
  **Recruiting**

  Facility:
  Sentara Cardiovascular Research Institute

  Contact:
  - Contact
    - Melinda Bullivant
    - 757-388-4024
    - MMBULLIV@sentara.com
  - Principal Investigator
    - Michael Eggert

- **Richmond, Virginia, United States, 23229**

  Status:
  **Recruiting**

  Facility:

DA0547                                                    LIQ_PH-ILD_00000213

Pulmonary Associates of Richmond

Contact:
- Contact
  - Rose Sidell
  - 804-288-5945
  - rsidell@paraccess.com
- Principal Investigator
  - Shilpa Johri, MD

- **Madison, Wisconsin, United States, 53792**

  Status:
  **Recruiting**

  Facility:
  University of Wisconsin School of Medicine and Public Health

  Contact:
  - Contact
    - Lori Wollet
    - 608-263-0524
    - ljwollet@medicine.wisc.edu
  - Principal Investigator
    - James Runo, MD

- **Milwaukee, Wisconsin, United States, 53215**

  Status:
  **Recruiting**

  Facility:
  Aurora St. Luke's Medical Center

  Contact:
  - Contact
    - Linda Boehm, RN
    - 414-649-5664
    - linda.boehm@aurora.org
  - Principal Investigator
    - Dianne Zwicke, MD

## IPD Sharing

| Available IPD/Information |
| --- |
| |

| IPD information |
| --- |
| |

## References

| Citations |
| --- |

| Links |
| --- |
| |

DA0548                                    LIQ_PH-ILD_00000214

**Document Section**

DA0549                                      LIQ_PH-ILD_00000215

# EXHIBIT 20

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/349100850

# Inhaled Treprostinil and FVC Change in Patients With Interstitial Lung Disease and Associated Pulmonary Hypertension

**Article** *in* SSRN Electronic Journal · January 2021

DOI: 10.2139/ssrn.3771319

CITATIONS
10

READS
308

15 authors, including:



Aaron B Waxman
Brigham and Women's Hospital
**340** PUBLICATIONS   **8,504** CITATIONS

Sudarshan Rajagopal
Duke University Medical Center
**164** PUBLICATIONS   **8,512** CITATIONS

Christopher S King
**229** PUBLICATIONS   **5,592** CITATIONS

SEE PROFILE

SEE PROFILE

SEE PROFILE

All content following this page was uploaded by Aaron B Waxman on 01 July 2021.

The user has requested enhancement of the downloaded file.

LIQ_PH-ILD_00000216

**Articles**

# Inhaled treprostinil and forced vital capacity in patients with interstitial lung disease and associated pulmonary hypertension: a post-hoc analysis of the INCREASE study



Steven D Nathan, Aaron Waxman, Sudarshan Rajagopal, Amy Case, Shilpa Johri, Hilary DuBrock, David J De La Zerda, Sandeep Sahay, Christopher King, Lana Melendres-Groves, Peter Smith, Eric Shen, Lisa D Edwards, Andrew Nelsen, Victor F Tapson

## Summary

**Background** INCREASE was a randomised, placebo-controlled, phase 3 trial that evaluated inhaled treprostinil in patients with interstitial lung disease (ILD) and associated pulmonary hypertension. Treprostinil improved exercise capacity from baseline to week 16, assessed with the use of a 6-min walk test, compared with placebo. Improvements in forced vital capacity (FVC) were also reported. The aim of this post-hoc analysis was to further characterise the effects of inhaled treprostinil on FVC in the overall study population and in various subgroups of interest.

**Methods** In this post-hoc analysis, we evaluated FVC changes in the overall study population and in various subgroups defined by cause of disease or baseline clinical parameters. The study population included patients aged 18 years and older who had a diagnosis of ILD based on evidence of diffuse parenchymal lung disease on chest CT done within 6 months before random assignment (not centrally adjudicated). All analyses were done on the intention-to-treat population, defined as individuals who were randomly assigned and received at least one dose of study drug. The INCREASE study is registered with ClinicalTrials.gov, NCT02630316.

**Findings** Between Feb 3, 2017, and Aug 30, 2019, 326 patients were enrolled in the INCREASE trial. Inhaled treprostinil was associated with a placebo-corrected least squares mean improvement in FVC of 28·5 mL (SE 30·1; 95% CI −30·8 to 87·7; p=0·35) at week 8 and 44·4 mL (35·4; −25·2 to 114·0; p=0·21) at week 16, with associated percentage of predicted FVC improvements of 1·8% (0·7; 0·4 to 3·2; p=0·014) and 1·8% (0·8; 0·2 to 3·4; p=0·028). Subgroup analysis of patients with idiopathic interstitial pneumonia showed FVC differences of 46·5 mL (SE 39·9; 95% CI −32·5 to 125·5; p=0·25) at week 8 and 108·2 mL (46·9; 15·3 to 201·1; p=0·023) at week 16. Analysis of patients with idiopathic pulmonary fibrosis showed FVC differences of 84·5 mL (52·7; −20·4 to 189·5; p=0·11) at week 8 and 168·5 mL (64·5; 40·1 to 297·0; p=0·011) at week 16. The most frequent adverse events included cough, headache, dyspnoea, dizziness, nausea, fatigue, and diarrhoea.

**Interpretation** In patients with ILD and associated pulmonary hypertension, inhaled treprostinil was associated with improvements in FVC versus placebo at 16 weeks. This difference was most evident in patients with idiopathic interstitial pneumonia, particularly idiopathic pulmonary fibrosis. Inhaled treprostinil appears to be a promising therapy for idiopathic pulmonary fibrosis that warrants further investigation in a prospective, randomised, placebo-controlled study.

**Funding** United Therapeutics Corporation.

**Copyright** © 2021 Elsevier Ltd. All rights reserved.

## Introduction

Interstitial lung diseases (ILDs) encompass a broad range of conditions that are categorised by varying amounts of inflammation and fibrosis. Idiopathic interstitial pneumonias are a category of ILD, of which idiopathic pulmonary fibrosis is the most common form.[1] Clinical trials of idiopathic pulmonary fibrosis treatments have resulted in approval in many countries of two so-called antifibrotic agents, pirfenidone and nintedanib.[2,3,4] Both drugs have been shown to slow loss of lung function, as measured by forced vital capacity (FVC). Results of clinical trials for both drugs in other forms of fibrotic lung disease—including scleroderma-associated ILD, ILDs characterised by progressive

fibrosis, and unclassifiable ILD—indicate that both agents have antifibrotic effects beyond idiopathic pulmonary fibrosis.[5,6,7] These results suggest that once lung fibrosis supervenes, there are pathways common to various forms of ILD that might be targets for therapy.

Treprostinil is a stable analogue of prostacyclin, which promotes vasodilation of pulmonary and systemic arterial vascular beds and inhibits platelet aggregation.[8] The inhaled formulation of treprostinil is approved in the USA for the treatment of WHO group 1 pulmonary hypertension.[8,9] In addition to its effects on the pulmonary vasculature, there are data to suggest that treprostinil has antifibrotic properties. Specifically, treprostinil has been shown to affect extracellular matrix

Lancet Respir Med 2021
Published Online
June 29, 2021
https://doi.org/10.1016/
S2213-2600(21)00165-X
See Online/Comment
https://doi.org/10.1016/
S2213-2600(21)00264-2

Advanced Lung Disease and Transplant Program, Inova Fairfax Hospital, Falls Church, VA, USA (Prof S D Nathan MD, C King MD); Pulmonary and Critical Care Medicine, Department of Internal Medicine, Brigham and Women's Hospital, Boston, MA, USA (A Waxman MD); Division of Cardiology, Department of Medicine, Duke University Medical Center, Durham, NC, USA (S Rajagopal MD); Piedmont Healthcare, Austell, GA, USA (A Case MD); Pulmonary Associates of Richmond, Richmond, VA, USA (S Johri MD); Department of Internal Medicine, Division of Pulmonary and Critical Care, Mayo Clinic, Rochester, MN, USA (H DuBrock MD); Division of Pulmonary & Critical Care Medicine, University of Miami Health System, Miami, FL, USA (D J De La Zerda MD); Division of Pulmonary, Critical Care and Sleep Medicine, Houston Methodist Hospital, Houston, TX, USA (S Sahay MD); Pulmonary & Critical Care Division, University of New Mexico, 1 University of New Mexico, DoIM MSC10-5550, Albuquerque, NM, USA (L Melendres-Groves MD); United Therapeutics Corporation, Research Triangle Park, NC, USA (P Smith PharmD, E Shen PharmD, L D Edwards PhD, A Nelsen PharmD); Division of Pulmonary and Critical Care Medicine, Cedars-Sinai Medical Center, Los Angeles, CA, USA (Prof V F Tapson MD)

1

DA0552

**LIQ_PH-ILD_00000217**

**Articles**

Correspondence to:
Prof Steven D Nathan, Advanced
Lung Disease and Lung
Transplant Program,
Falls Church, VA 22042, USA
steven.nathan@inova.org

**Research in context**

**Evidence before this study**

Clinical trials in patients with chronic fibrosing interstitial lung diseases (ILDs) have led to the development of two antifibrotic agents, nintedanib and pirfenidone. These therapies have been shown to reduce the rate of decline in lung function and are now recommended in clinical practice guidelines for patients with idiopathic pulmonary fibrosis. The INCREASE study was a randomised clinical trial of patients with ILD and pulmonary hypertension that evaluated the safety and efficacy of inhaled treprostinil. The study met its primary endpoint of change in the peak 6-min walk distance at week 16. Pulmonary function testing was obtained as a safety parameter in this study. Somewhat unexpectedly, this study also showed that inhaled treprostinil was associated with improvements in forced vital capacity (FVC) over a 16-week period. We searched PubMed on June 9, 2021, using the search terms "treprostinil" and "lung function" for all articles published from database inception up to June 9, 2021, with no language restrictions. One retrospective study of 22 patients with interstitial lung disease and associated pulmonary hypertension treated with inhaled treprostinil assessed lung function. No significant changes were observed in percentage predicted FVC but this study was limited by its observational, uncontrolled design. The effects of inhaled treprostinil on lung function in this disease population have otherwise not been studied.

**Added value of this study**

In this post-hoc analysis of the INCREASE trial, inhaled treprostinil was associated with significant improvements in the percentage of predicted FVC at week 8 and week 16. Improvement in FVC was greatest among patients with idiopathic interstitial pneumonia, particularly those with idiopathic pulmonary fibrosis. These results suggest that inhaled treprostinil might have independent antifibrotic properties beyond traditional vasodilatory effects. Whether this will be substantiated in a study of patients with interstitial lung disease, with or without pulmonary hypertension, remains to be determined.

**Implications of all the available evidence**

The present study serves as proof of concept that inhaled treprostinil can have a beneficial effect on the loss of lung function in patients with ILDs and associated pulmonary hypertension. These findings were most pronounced in patients with idiopathic pulmonary fibrosis. Further studies are needed to investigate the clinical benefits of inhaled treprostinil in this patient population, with or without associated pulmonary hypertension, and to explore potential mechanisms of action.

remodelling and fibrosis in vitro by reducing recruitment of fibrocytes to sites of vascular remodelling, as well as suppressing profibrotic fibroblast activity and the synthesis and deposition of collagen and fibronectin in mice.[10,11]

The INCREASE study was a 16-week randomised controlled trial that was designed to evaluate the safety and efficacy of inhaled treprostinil in patients with ILD and pulmonary hypertension documented by right heart catheterisation. Patients received inhaled treprostinil, up to 12 breaths (72 µg) four times daily, or placebo.[12] The dose of drug or placebo was adjusted, with dose escalation (an additional breath, four times daily) occurring as often as every 3 days, with a target dose of nine breaths four times daily and a maximum dose of 12 breaths four times daily. Investigators adjusted the dose for each individual patient to achieve the maximum tolerated dose. The study met its primary endpoint of change in the peak 6-min walk distance, a measure of exercise capacity, at week 16. Secondary endpoints, including change in N-terminal pro-brain natriuretic peptide (NT-proBNP) concentration at week 16 and time to clinical worsening, were also met. Pulmonary function testing was done as a safety assessment at baseline, week 8, and week 16, and was previously reported.[12]

The aim of this post-hoc analysis was to further characterise the effects of inhaled treprostinil on FVC among the overall study population and in various subgroups of interest, including specific disease subgroups and patients stratified by median baseline clinical characteristics.

## Methods

### Study design and participants

INCREASE was a multicentre, randomised, double-blind, placebo-controlled, parallel-group trial. The steering committee in collaboration with the sponsor (United Therapeutics Corporation) designed the study and oversaw its conduct. Detailed study procedures and results have been described previously.[12] The study population included patients aged 18 years and older with a diagnosis of ILD based on evidence of diffuse parenchymal lung disease on chest CT done within 6 months before random assignment (not centrally adjudicated). Confirmation of WHO group 3 pulmonary hypertension was required, based on right heart catheterisation within 1 year before random assignment (including pulmonary vascular resistance >3 Wood units, pulmonary capillary wedge pressure ≤15 mm Hg, and mean pulmonary arterial pressure ≥25 mm Hg). Patients with connective tissue disease-associated ILD were additionally required to have a baseline FVC <70%. Patients were randomly assigned (1:1) to inhaled treprostinil (Tyvaso; United Therapeutics Corporation, Research Triangle Park, NC, USA) or placebo in a double-blind manner. No new antifibrotics or anti-inflammatory

DA0553

LIQ_PH-ILD_00000218

| | Idiopathic interstitial pneumonia including idiopathic pulmonary fibrosis (n=146) | Idiopathic pulmonary fibrosis only (n=92) | Combined pulmonary fibrosis and emphysema (n=82) | Connective tissue disease-associated ILD (n=72) | p value* |
|---|---|---|---|---|---|
| Sex | .. | .. | .. | .. | <0·0001 |
| Female | 60 (41%) | 31 (34%) | 23 (28%) | 55 (76%) | .. |
| Male | 86 (59%) | 61 (66%) | 59 (72%) | 17 (24%) | .. |
| Age, years | 67·8 (11·2) | 70·8 (9·1) | 71·7 (9·8) | 57·2 (11·5) | .. |
| Age group, years | .. | .. | .. | .. | <0·0001 |
| <65 | 41 (28%) | 15 (16%) | 12 (15%) | 53 (74%) | .. |
| 65 to <80 | 93 (64%) | 67 (73%) | 54 (66%) | 19 (26%) | .. |
| ≥80 | 12 (8%) | 10 (11%) | 16 (20%) | 0 | .. |
| Race | .. | .. | .. | .. | <0·0001 |
| White | 113 (77%) | 76 (83%) | 69 (84%) | 34 (47%) | .. |
| Black | 24 (16%) | 10 (11%) | 12 (15%) | 32 (44%) | .. |
| American Indian or Alaska Native | 2 (1%) | 2 (2%) | 0 | 1 (1%) | .. |
| Asian | 6 (4%) | 4 (4%) | 1 (1%) | 4 (6%) | .. |
| Multiple | 0 | 0 | 0 | 1 (1%) | .. |
| Unknown | 1 (1%) | 0 | 0 | 0 | .. |
| Ethnicity† | .. | .. | .. | .. | 0·35 |
| Hispanic or Latino | 14 (10%) | 10 (11%) | 4 (5%) | 8 (11%) | .. |
| Not Hispanic or Latino | 132 (90%) | 82 (89%) | 77 (95%) | 64 (89%) | .. |
| Time since diagnosis, years | 0·6 (1·58) | 0·5 (1·52) | 0·4 (0·63) | 0·6 (1·15) | 0·59 |
| Use of supplemental oxygen | 102 (70%) | 68 (74%) | 64 (78%) | 44 (61%) | 0·073 |
| Use of background therapy | .. | .. | .. | .. | <0·0001 |
| None | 91 (62%) | 43 (47%) | 69 (84%) | 69 (96%) | .. |
| Pirfenidone only | 34 (23%) | 30 (33%) | 6 (7%) | 2 (3%) | · |
| Nintedanib only | 21 (14%) | 19 (21%) | 7 (9%) | 1 (1%) | · |
| Pulmonary function tests | | | | | |
| Total lung capacity % predicted, % | 60·7 (16·1) | 60·2 (16·0) | 77·8 (14·7) | 52·9 (13·5) | <0·0001 |
| Total lung capacity, L | 3·6 (1·2) | 3·7 (1·1) | 4·8 (1·2) | 2·9 (1·2) | <0·0001 |
| FVC% predicted, % | 59·5 (17·2) | 60·8 (17·7) | 82·5 (18·8) | 49·5 (13·4) | <0·0001 |
| FVC, mL | 2175·7 (764·6) | 2192·1 (724·6) | 2992·6 (799·8) | 1630·6 (552·4) | <0·0001 |
| $FEV_1$% predicted, % | 64·3 (19·0) | 67·4 (18·8) | 77·0 (21·1) | 51·0 (15·1) | <0·0001 |
| $FEV_1$, mL | 1757·0 (585·8) | 1793·1 (551·4) | 2051·1 (598·6) | 1320·1 (456·2) | <0·0001 |
| DLCO% predicted, % | 30·0 (12·1) | 29·1 (11·5) | 27·6 (11·3) | 28·3 (11·7) | 0·35 |
| DLCO, mL/min/mm Hg | 8·2 (4·6) | 8·0 (4·7) | 6·9 (3·0) | 7·0 (4·0) | 0·058 |

Data are n (%) or mean (SD). DLCO=diffusing capacity for carbon monoxide. FVC=forced vital capacity. ILD=interstitial lung disease. *p value compares idiopathic interstitial pneumonia including idiopathic pulmonary fibrosis, combined pulmonary fibrosis and emphysema, and connective tissue disease populations only. †One patient in the placebo group had a missing response for ethnicity.

*Table 1:* Baseline characteristics by disease cause

therapies could be started during the study. The protocol was approved by the institutional review board at each participating site; all participants provided written informed consent.

**Procedures and outcomes**

This post-hoc analysis assessed the results of pulmonary function testing, which was prespecified as a safety endpoint and done at baseline, week 8, and week 16 (or at early termination) after sufficient recovery from the 6-min walk tests. Pulmonary function tests were done locally at

each study site. We evaluated pulmonary function testing for the overall study population and by subgroup based on disease cause (idiopathic interstitial pneumonia [including idiopathic pulmonary fibrosis], idiopathic pulmonary fibrosis alone, combined pulmonary fibrosis and emphysema, and connective tissue disease-associated ILD) and subgroups stratified by median baseline characteristics (percentage of predicted FVC, percentage of predicted diffusing capacity for carbon monoxide [DLCO], pulmonary vascular resistance, mean pulmonary arterial pressure, NT-proBNP concentration, and 6-min

3

DA0554

LIQ_PH-ILD_00000219



**Figure 1: Change in FVC at week 8 and week 16 for the overall population**
(A) LSM change in FVC (mL) by week for the overall intention-to-treat population. (B) LSM change in percentage of predicted FVC by week for the overall intention-to-treat population. Bars above and below the dots represent the SE. Mixed model repeated measures methodology was used to compare differences between the inhaled treprostinil and placebo group. FVC=forced vital capacity. LSM=least squares mean.



**Figure 2: Change in FVC at week 8 and week 16 for patients with idiopathic interstitial pneumonia**
(A) LSM change in FVC (mL) by week for the subgroup of patients with idiopathic interstitial pneumonia who received treprostinil or placebo. (B) LSM change in percentage of predicted FVC by week for the subgroup of patients with idiopathic interstitial pneumonia. Bars above and below the dots represent the SE. Mixed model repeated measures methodology was used to compare differences between the inhaled treprostinil and placebo group. FVC=forced vital capacity. LSM=least squares mean.

walk distance). An additional safety endpoint was the incidence of acute exacerbations of disease, determined by individual site principal investigators. Other prespecified safety endpoints (not included in the present analysis) were adverse events, oxygenation measured by pulse oximetry and supplemental oxygen requirement, clinical laboratory parameters, vital signs, electrocardiograms, and cardiopulmonary hospitalisations.[12]

### Statistical analysis

The analyses reported here were post-hoc and exploratory. All assessments are summarised by descriptive statistics, as appropriate. Comparisons for categorical assessments were done by Mantel-Haenszel tests and comparisons for continuous assessments were done by Mann-Whitney tests. All analyses were done on the intention-to-treat population, defined as individuals who were randomly assigned and received at least one dose of study drug. The change in FVC was analysed using mixed model repeated measures (MMRM) methodology. The MMRM model included the change from baseline in FVC as the dependent variable, with treatment, week, and treatment-by-week

interaction as fixed effects, and baseline FVC as a covariate. An unstructured variance or covariance structure shared across treatment groups was used to model the within-subject errors. Treatment differences, associated 95% CIs, and p values were calculated. Change in percentage of predicted FVC was analysed similarly using the MMRM model, with the percentage of predicted FVC as the dependent variable, with treatment, week, and treatment-by-week interaction as fixed effects, and baseline percentage of predicted FVC as a covariate. An unstructured variance or covariance structure shared across treatment groups was used to model the within-subject errors. Changes during the 16-week study were evaluated for the entire cohort and for disease-specific subgroups. Only observed data were included in the analysis; no data were imputed. When stratifying by baseline characteristics, median values were used as a cutoff (eg, below *vs* above median). The time to first acute exacerbation was analysed via Kaplan-Meier curves and log-rank test. $p<0.05$ was considered to indicate

DA0555

LIQ_PH-ILD_00000220

a statistically significant difference and no adjustments were made for multiplicity because this was an unplanned, post-hoc analysis. Analyses were done with SAS version 9.4. The INCREASE study is registered with ClinicalTrials.gov, NCT02630316.

### Role of the funding source
In collaboration with the authors, the funder of the study participated in study design, data collection, data analysis, data interpretation, and writing of the report.

### Results
Between Feb 3, 2017, and Aug 30, 2019, 326 patients were enrolled in the INCREASE trial. Reasons for screen failures, baseline characteristics by treatment assignment, and study discontinuations have been described previously.[12] 146 (45%) of 326 patients had idiopathic interstitial pneumonia, of whom 92 (28%) had idiopathic pulmonary fibrosis, 37 (11%) had non-specific interstitial pneumonia, and 13 (4%) had unclassified idiopathic interstitial pneumonia. 82 (25%) of 326 patients had combined pulmonary fibrosis and emphysema, and 72 (22%) patients had connective tissue disease-associated ILD. 19 (6%) of 326 patients had chronic hypersensitivity pneumonitis, six (2%) had occupational lung disease, and one (<1%) had other idiopathic interstitial pneumonia. Demographic details of the four largest groups—idiopathic interstitial pneumonia (including idiopathic pulmonary fibrosis), idiopathic pulmonary fibrosis alone, combined pulmonary fibrosis and emphysema, and connective tissue disease-associated ILD—are shown in table 1. Notable differences included variable baseline pulmonary function tests between disease subtypes and younger age of patients with connective tissue disease-associated ILD. Antifibrotic therapy was most prevalent in patients with idiopathic pulmonary fibrosis, with 19 (21%) of 92 patients on nintedanib and 30 (33%) patients on pirfenidone. Baseline pulmonary function tests, haemodynamics, 6-min walk distance, NT-proBNP concentration, and St George's Respiratory Questionnaire data by disease group and treatment assignment are shown in the appendix (p 2).

In the inhaled treprostinil group, a median of ten breaths (IQR 8·5–12) and 12 breaths (9–12), corresponding to 66 µg and 72 µg per session, was achieved at week 8 and week 16, respectively, with 67 (51%) of 132 patients at week 8 and 67 (58%) of 116 patients at week 16 achieving 10–12 breaths (60–72 µg). 40 (25%) of 163 patients in the inhaled treprostinil group and 38 (23%) of 163 patients in the placebo group discontinued study drug prematurely but were encouraged to remain in the study and complete study assessments up to week 16. 33 patients assigned to inhaled treprostinil and 35 assigned to placebo discontinued study participation.[12]

Inhaled treprostinil was associated with a non-significant increase in placebo-corrected (the treatment



**Figure 3: Change in FVC at week 8 and week 16 for patients with idiopathic pulmonary fibrosis**
(A) LSM change in FVC (mL) by week for the subgroup of patients with idiopathic pulmonary fibrosis who received treprostinil or placebo.
(B) LSM change in percentage of predicted FVC by week for the subgroup of patients with idiopathic pulmonary fibrosis. Bars above and below the dots represent the SE. Mixed model repeated measures methodology was used to compare differences between the inhaled treprostinil and placebo groups.
FVC=forced vital capacity. LSM=least squares mean.

difference between inhaled treprostinil and placebo) least squares mean FVC of 28·5 mL (SE 30·1; 95% CI −30·8 to 87·7; p=0·35) at week 8 and 44·4 mL (35·4; −25·2 to 114·0; p=0·21) at week 16 (figure 1A). The percentage of predicted FVC differences at week 8 (least squares mean 1·8%; SE 0·7; 95% CI 0·4 to 3·2; p=0·014) and week 16 (1·8%; 0·8; 0·2 to 3·4; p=0·028) were statistically significant, indicating potential benefit of inhaled treprostinil compared with placebo (figure 1B). A subgroup analysis of patients with idiopathic interstitial pneumonia showed significant FVC differences at week 16 (108·2 mL; SE 46·9; 95% CI 15·3 to 201·1; p=0·023) although not at week 8 (46·5 mL; 39·9; −32·5 to 125·5; p=0·25; figure 2A), and significant differences in percentage of predicted FVC at week 8 (2·0%; SE 0·9; 95% CI 0·1 to 3·8; p=0·037) and week 16 (2·9%; 1·1; 0·7 to 5·0; p=0·0096) favouring inhaled treprostinil (figure 2B). Further analysis of patients with idiopathic pulmonary fibrosis showed non-significant FVC differences of 84·5 mL (SE 52·7; 95% CI −20·4 to 189·5;

See Online for appendix

LIQ_PH-ILD_00000221

|  | Inhaled treprostinil (n) | Placebo (n) | Placebo-corrected difference in week-16 FVC, mL | p value |
|---|---|---|---|---|
| **FVC% predicted** | | | | |
| <60 | 62 | 50 | 27·5 (53·3; −77·4 to 132·4) | 0·61 |
| ≥60 | 67 | 74 | 59·2 (47·8; −34·9 to 153·4) | 0·22 |
| **DLCO% predicted** | | | | |
| <27 | 52 | 61 | 35·4 (51·6; −66·2 to 137·1) | 0·49 |
| ≥27 | 70 | 60 | 33·3 (48·5; −62·3 to 128·9) | 0·49 |
| **Pulmonary vascular resistance, Wood units** | | | | |
| <5·275 | 64 | 75 | −1·6 (47·9; −95·9 to 92·8) | 0·97 |
| ≥5·275 | 65 | 49 | 112·5 (52·6; 9·0 to 215·9) | 0·033 |
| **Mean pulmonary arterial pressure, mm Hg** | | | | |
| <35 | 63 | 63 | 63·4 (50·2; −35·4 to 162·1) | 0·21 |
| ≥35 | 66 | 61 | 25·6 (50·2; −73·2 to 124·4) | 0·61 |
| **NT-proBNP, pg/mL** | | | | |
| <503·85 | 62 | 75 | 19·9 (53·7; −86·3 to 126·1) | 0·71 |
| ≥503·85 | 63 | 47 | 94·4 (47·4; 0·7 to 188·2) | 0·048 |
| **6-min walk distance, m** | | | | |
| <259 | 63 | 56 | 64·5 (51·7; −37·3 to 166·4) | 0·21 |
| ≥259 | 66 | 68 | 27·6 (48·7; −68·4 to 123·5) | 0·57 |

Data are mean (SE; 95% CI) unless otherwise indicated. DLCO=diffusing capacity for carbon monoxide. FVC=forced vital capacity. NT-proBNP=N-terminal pro-brain natriuretic peptide.

*Table 2:* Placebo-corrected difference in week-16 FVC stratified by median baseline clinical characteristics

p=0·11) at week 8 and significant differences of 168·5 mL (64·5; 40·1 to 297·0; p=0·011) at week 16 (figure 3A), and differences in percentage of predicted FVC at week 8 and week 16 of 2·5% (SE 1·2; 95% CI 0·1 to 4·9; p=0·038) and 3·5% (1·4; 0·7 to 6·3; p=0·015), respectively, compared with placebo (figure 3B). Of note, 49 (53%) of 92 patients with idiopathic pulmonary fibrosis were on antifibrotic therapy at baseline. FVC changes for patients with connective tissue disease-associated ILD and combined pulmonary fibrosis and emphysema are shown in the appendix (pp 4–5). Histograms showing FVC categorical changes in 5% increments for the overall study population and the four disease categories are provided in the appendix (pp 6–8).

We stratified change in FVC over 16 weeks by baseline lung function (median percentage of predicted FVC and median percentage of predicted DLCO), haemodynamics (median pulmonary vascular resistance and mean pulmonary arterial pressure), median baseline NT-proBNP

concentration, and median baseline 6-min walk distance (table 2). We identified no responder or non-responder subgroup based on analyses of percentage of predicted FVC (<60% or ≥60%), percentage of predicted DLCO (<27% or ≥27%), or mean pulmonary arterial pressure (<35 mm Hg or ≥35 mm Hg). However, a subgroup analysis of 114 patients with pulmonary vascular resistance of 5·275 Wood units or greater showed a significant difference favouring inhaled treprostinil versus placebo, with a mean placebo-corrected difference in FVC of 112·5 mL at 16 weeks (SE 52·6; 95% CI 9·0 to 215·9; p=0·033; table 2). Similarly, a subgroup analysis of 110 patients with NT-proBNP concentration of 503·85 pg/mL or greater showed a significant difference favouring inhaled treprostinil compared with placebo, with a placebo-corrected difference in FVC of 94·4 mL at 16 weeks (SE 47·4; 95% CI 0·7 to 188·2; p=0·048; table 2).

14 patients in the inhaled treprostinil group were on pirfenidone versus 18 patients in the placebo group. There was no significant placebo-corrected difference favouring inhaled treprostinil at 16 weeks (91·5 mL; SE 110·2; 95% CI −134·2 to 317·1; p=0·41) in the pirfenidone-treated subgroup. Seven patients in the inhaled treprostinil group were on nintedanib versus 15 patients in the placebo group. The placebo-corrected difference for inhaled treprostinil was 113·0 mL at 16 weeks (SE 77·1; 95% CI −46·9 to 272·8; p=0·16) in the nintedanib-treated subgroup. When patients on pirfenidone or nintedanib were evaluated as a group, those receiving inhaled treprostinil had no statistically significant difference in placebo-corrected FVC (81·5 mL; SE 71·0; 95% CI −60·9 to 223·8; p=0·26) or percentage of predicted FVC (1·2%; 1·5; −1·8 to 4·2; p=0·43) at week 16.

The most frequent adverse events, which have been reported previously, included cough, headache, dyspnoea, dizziness, nausea, fatigue, and diarrhoea.[12] We found no difference in the frequency of these adverse events according to disease subtype (table 3). We also observed no difference in exacerbations between disease subtypes (appendix p 3).

Regarding safety, no significant treatment-related changes associated with inhaled treprostinil in pulse oximetry or supplemental oxygen use were reported during the study. However, there were significantly fewer lung disease exacerbations in the treprostinil group than the placebo group. Specifically, 43 (26%) of 163 patients in the treatment group had an exacerbation of underlying lung disease compared with 63 (39%) of 163 patients in the placebo group (p=0·02 by Fisher's exact test).[12] Time to investigator-reported exacerbations in the two groups is shown in the appendix (p 8), with inhaled treprostinil associated with a significant treatment effect (log-rank p=0·040).

## Discussion

The INCREASE study was designed to evaluate the effects of inhaled treprostinil in patients with various

ILDs and associated pulmonary hypertension. The study met its primary endpoint: compared with placebo, treprostinil improved exercise capacity, assessed by 6-min walk distance, from baseline at 16 weeks.[12] The study also met several secondary endpoints, including time to clinical worsening and change in concentration of NT-proBNP, a marker of cardiac dysfunction that likely reflects right ventricular strain in patients with pulmonary hypertension due to interstitial lung disease. Lung function, specifically spirometry, was measured at baseline and at week 8 and week 16 as a safety measure to ensure that there were no deleterious effects of inhaled treprostinil. We felt that investigation of any deleterious effects was important because of the patients' pre-existing lung disease. A noteworthy finding previously reported in the primary publication[12] was that, rather than causing any decrement, inhaled treprostinil was unexpectedly associated with a placebo-corrected improvement in FVC. Further subgroup analyses revealed the FVC difference between the inhaled treprostinil group and placebo group to be larger in the idiopathic interstitial pneumonia subgroup, and even more so in the idiopathic pulmonary fibrosis subpopulation.

FVC is widely accepted as the standard efficacy endpoint for clinical trials in idiopathic pulmonary fibrosis and other fibrotic lung disorders.[13] Indeed, clinical trials evaluating change in FVC over 52 weeks have resulted in the approval of both pirfenidone and nintedanib for the treatment of idiopathic pulmonary fibrosis.[3,4] Nintedanib has since been approved for other fibrotic disorders, including scleroderma-associated ILD and a broader group of ILDs characterised by a progressive fibrotic phenotype.[5,6] The disease groups included in a previous cohort study[4] of nintedanib were very similar to those of the INCREASE study.[12] Our findings lend support to the study of different forms of fibrotic disease as a group, although the idiopathic pulmonary fibrosis subgroup did show the strongest efficacy signal.

No drug has been shown to have an effect on fibrosis when administered via inhalation. However, there is inherent attractiveness to this mode of delivery because of greater deposition of drug at the site of disease, resulting in fewer systemic side-effects and preservation, or possibly improvement, of ventilation–perfusion matching. Fibrotic lung diseases, and idiopathic pulmonary fibrosis in particular, are characterised by areas of vascular ablation and perivascular fibrosis, which raises the issue of adequate systemic drug delivery to high-value target cells, including fibroblasts and myofibroblasts.[14] The finding of a placebo-corrected improvement in FVC indicates that inhaled treprostinil might have distinct antifibrotic properties. Indeed, animal studies and biological pathways support this concept.[10,11] Amelioration of loss of lung function has been described previously with sildenafil, another

medication approved in the USA and Europe for the treatment of pulmonary arterial hypertension, in patients with idiopathic pulmonary fibrosis on background nintedanib.[15] This observation lends credence to the possibility that the pulmonary vasculature itself might be involved in the perpetuation of the fibrotic process or that pulmonary hypertension and fibrosis have shared pathways. However, this synergy was not replicated when sildenafil was combined with pirfenidone.[16]

Two of our subgroup analyses showed a significant difference in FVC change between the inhaled treprostinil group and the placebo group. These analyses were in patients with higher pulmonary vascular resistance and higher NT-proBNP concentration. Therefore, pulmonary vessels themselves might contribute to the restrictive physiology, perhaps through vascular compliance, which is ameliorated by inhaled treprostinil. An alternative, speculative concept is that the presence of more severe pulmonary hypertension might hasten the progression of fibrosis. A further hypothesis is that these FVC findings are related to improved right ventricular function or cardiac output in those receiving inhaled treprostinil, as evidenced by the greater treatment effect in those with higher baseline pulmonary vascular resistance and NT-proBNP concentration, but less striking differences when stratifying by baseline mean pulmonary arterial pressure. Decreased right ventricular size and function and improved cardiac output in those with more severe pulmonary hypertension could lead to improvement in respiratory muscle function and thus FVC.

It is interesting to compare the findings in our idiopathic pulmonary fibrosis population with those of the pivotal phase 3 studies of pirfenidone and

| | Idiopathic interstitial pneumonia including idiopathic pulmonary fibrosis (n=146) | Idiopathic pulmonary fibrosis only (n=92) | Combined pulmonary fibrosis and emphysema (n=82) | Connective tissue disease-associated ILD (n=72) |
|---|---|---|---|---|
| Number of subjects with adverse event of interest | 115 (79%) | 71 (77%) | 63 (77%) | 49 (68%) |
| Cough | 55 (38%) | 30 (33%) | 32 (39%) | 31 (43%) |
| Dyspnoea | 44 (30%) | 24 (26%) | 28 (34%) | 17 (24%) |
| Headache | 35 (24%) | 19 (21%) | 22 (27%) | 15 (21%) |
| Dizziness | 29 (20%) | 17 (18%) | 15 (18%) | 5 (7%) |
| Nausea | 28 (19%) | 18 (20%) | 11 (13%) | 9 (13%) |
| Fatigue | 20 (14%) | 12 (13%) | 13 (16%) | 11 (15%) |
| Diarrhoea | 23 (16%) | 13 (14%) | 9 (11%) | 6 (8%) |
| Productive cough | 4 (3%) | 3 (3%) | 2 (2%) | 5 (7%) |
| Dyspnoea on exertion | 4 (3%) | 2 (2%) | 2 (2%) | 1 (1%) |
| Upper-airway cough syndrome | 3 (2%) | 1 (1%) | 1 (1%) | 2 (3%) |
| Sinus headache | 2 (1%) | 1 (1%) | 1 (1%) | 0 |
| Muscle fatigue | 1 (1%) | 1 (1%) | 1 (1%) | 0 |

Data are n (%). ILD=interstitial lung disease.

*Table 3:* Adverse events by disease cause

DA0558

LIQ_PH-ILD_00000223

**Articles**

---

nitedanib.[2–4,17,18] First, INCREASE was only a 16-week study compared with 52-week and 72-week studies for these other agents. Whether our results will dissipate, be sustained, or improve up to 52 weeks is open to speculation given how unpredictable disease behaviour can be over time. The magnitude of the difference was very similar with inhaled treprostinil at 16 weeks (168·5 mL) compared with the combined pirfenidone (148 mL per year) and nintedanib (110·9 ml per year) datasets at 52 weeks.[17,18] However, in addition to the different follow-up periods, there were varying imputation methods and nuanced differences that limit meaningful comparisons between studies.[18,19] The difference in the FVC change in INCREASE was partly driven by a numerical FVC increase in the treatment group, which contrasts with the pirfenidone and nintedanib studies, where the difference lay in the rate of decrement in both groups (although there were some patients with numerical increases in FVC).[18,19] This fact raises the question of whether inhaled treprostinil can ameliorate fibrosis; this is conceivable perhaps for areas of fresh collagen deposition or through so-called switching off of myofibroblasts that might contribute to restrictive physiology through their contractile properties.[20–22] An alternative explanation is that treprostinil improved vessel capacitance and stiffness, affecting the measured FVC.

Although we observed a significant difference in the change in percentage of predicted FVC over the 16-week study period for the cohort as a whole, the difference was not significant when evaluated FVC by change in mL. This apparent discrepancy could be due to the narrower CIs when FVC is expressed as a percentage of the predicted value. Many patients with idiopathic pulmonary fibrosis were already on antifibrotic therapy; however, the number of patients on nintedanib or pirfenidone in combination with inhaled treprostinil was too small to draw efficacy conclusions. The smaller numerical difference when combining the two antifibrotics (81·5 mL) versus each individually (113·0 mL for patients on nintedanib and 91·5 mL for patients on pirfenidone) is a function of MMRM statistical methodology. Nonetheless, the numerical differences show the potential role of combination therapy for idiopathic pulmonary fibrosis and targeting the disease concomitantly via the systemic and inhaled routes.

FVC was measured as a safety endpoint in the context of the INCREASE study. Other pulmonary function tests, including DLCO, were also measured as safety endpoints but did not show a difference between groups. A longer-term study of inhaled treprostinil in patients with ILD and pulmonary hypertension is ongoing and will provide information on gas exchange (NCT02633293). Other safety endpoints, including pulse oximetry and change in supplemental oxygen needs, did not show any deleterious effects, mitigating concerns about potential worsening of ventilation–perfusion matching. Additionally, the incidence of investigator-reported acute exacerbations was significantly less in the treprostinil group, allaying any concerns that this inhaled medication might induce acute exacerbations. Therefore, it is possible that inhaled treprostinil might actually ameliorate acute exacerbations of the underlying ILD.

Our analysis has its limitations. First, this was a post-hoc analysis of a parameter that was initially intended as a safety endpoint, and the study was not powered to detect differences in FVC among the different subgroups in the analysis. The study was of relatively short duration, with 21% of patients discontinuing prematurely before week 16.[12] The number of patients was relatively small for the subgroup analyses. There was no efficacy signal from the connective tissue disease-associated ILD group or the combined pulmonary fibrosis and emphysema group, which raises questions about global antifibrotic properties and whether our findings are relevant for only certain subgroups of fibrotic disorders. Also, the relatively rapid rate of FVC decrement in the placebo group over a short period of time was unexpected. Aside from patients with more severe disease being at higher risk of progression, an interesting hypothesis is that perhaps the pulmonary vasculature is mechanistically linked to the progression of fibrosis.[23] Finally, the finding of fewer acute exacerbations in the inhaled treprostinil group should be regarded with caution, since these acute exacerbations were investigator-determined and not centrally adjudicated. The unusually high rate of acute exacerbations in both study groups is noteworthy. It is possible that patients with more advanced disease who have any worsening are more likely to be increasingly symptomatic, with the default labelling of an acute exacerbation, without necessarily fulfilling all the criteria. We cannot rule out the possibility that any inhaled therapy, be it placebo or treatment, might increase the propensity for acute exacerbations.

In conclusion, inhaled treprostinil appears to have a salutary effect on loss of lung function in patients with ILD and associated pulmonary hypertension. This finding, although intriguing and hypothesis generating, warrants further validation in a prospective, randomised, placebo-controlled study. A clinical trial of inhaled treprostinil is underway in patients with idiopathic pulmonary fibrosis, with or without associated pulmonary hypertension (NCT04708782). This study will use a primary endpoint of change in FVC over 52 weeks and will support the findings of our post-hoc analysis.

**Contributors**
SDN, AW, PS, ES, LDE, AN, and VFT made substantial contributions to the conception and design of the work. SDN, AW, SR, AC, SJ, HD, DJDLZ, SS, CK, LM-G, and VFT contributed to the acquisition of the study data. Data were analysed by SDN, AW, PS, ES, LDE, AN, and VFT. LDE was responsible for the statistical analysis. SDN, AW, and VFT participated on the INCREASE steering committee during the study. SDN, AW, SR, AC, SJ, HD, DJDLZ, SS, CK, LM-G, PS, ES, AN, and VFT contributed to data interpretation, and to drafting and revision of the manuscript. SDN, ES, and LDE have accessed and verified the data. All authors agree to be accountable for all aspects of the work, ensuring that questions related to the accuracy or integrity of any part of the work are appropriately investigated and resolved. All authors have read and

DA0559

LIQ_PH-ILD_00000224

**Articles**

approved the manuscript. The corresponding author and all co-authors had full access to all the data in the study and had final responsibility for the decision to submit for publication.

**Declaration of interests**
SDN has received research funding and consulting fees from United Therapeutics, and consulting fees from Boehringer Ingelheim, Roche-Genentech, and Galapagos; he is on the speaker's bureau for Boehringer Ingelheim and Roche-Genentech. AW reports grants from United Therapeutics, during the conduct of the study. SR reports grants from United Therapeutics, during the conduct of the study; grants and personal fees from United Therapeutics and Janssen Pharmaceuticals; and personal fees from Altavant Sciences, Liquidia Technologies, Insmed, and Bayer Pharmaceuticals, outside the submitted work. AC reports grants from United Therapeutics, during the conduct of the study. SJ reports grants from United Therapeutics, during the conduct of the study; grants and personal fees from Bayer Pharmaceuticals and Janssen Research & Development; and grants from Bellerophon Therapeutics, outside the submitted work. HD reports grants from United Therapeutics, during the conduct of the study; and grants and personal fees from Actelion Pharmaceuticals, outside the submitted work. DJDLZ reports grants from United Therapeutics, during the conduct of the study. SS reports grants from United Therapeutics, during the conduct of the study; personal fees and non-financial support from Bayer Pharmaceuticals, United Therapeutics, and Actelion Pharmaceuticals; personal fees from Liquidia, Altavant Sciences, GSK, and Boehringer Ingelheim; and grants from ACCP CHEST ILD, outside the submitted work. CK reports grants from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, Actelion, Boehringer Ingelheim, and Genentech, outside the submitted work. LM-G reports grants and personal fees from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, Janssen Pharmaceuticals, and Bayer Pharmaceuticals, outside the submitted work. PS, ES, LDE, and AN report personal fees from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, outside the submitted work. VFT reports grants from United Therapeutics, during the conduct of the study; and personal fees from United Therapeutics, outside the submitted work.

**Data sharing**
Qualified researchers who provide methodologically sound, genuine research proposals can submit data requests to United Therapeutics Corporation to obtain specific de-identified clinical trial data.

**Acknowledgments**
We thank all patients who volunteered for the study, and the clinical and research teams at the INCREASE centres.

**References**
1   Travis WD, Costabel U, Hansell DM, et al. An official American Thoracic Society/European Respiratory Society statement: update of the international multidisciplinary classification of the idiopathic interstitial pneumonias. *Am J Respir Crit Care Med* 2013; **188:** 733–48.
2   Noble PW, Albera C, Bradford WZ, et al. Pirfenidone in patients with idiopathic pulmonary fibrosis (CAPACITY): two randomised trials. *Lancet* 2011; **377:** 1760–69.
3   King TE Jr, Bradford WZ, Castro-Bernardini S, et al. A phase 3 trial of pirfenidone in patients with idiopathic pulmonary fibrosis. *N Engl J Med* 2014; **370:** 2083–92.
4   Richeldi L, du Bois RM, Raghu G, et al. Efficacy and safety of nintedanib in idiopathic pulmonary fibrosis. *N Engl J Med* 2014; **370:** 2071–82.
5   Distler O, Highland KB, Gahlemann M, et al. Nintedanib for systemic sclerosis-associated interstitial lung disease. *N Engl J Med* 2019; **380:** 2518–28.
6   Flaherty KR, Wells AU, Cottin V, et al. Nintedanib in progressive fibrosing interstitial lung diseases. *N Engl J Med* 2019; **381:** 1718–27.
7   Maher TM, Corte TJ, Fischer A, et al. Pirfenidone in patients with unclassifiable progressive fibrosing interstitial lung disease: a double-blind, randomised, placebo-controlled, phase 2 trial. *Lancet Respir Med* 2020; **8:** 147–57.
8   Whittle BJ, Silverstein AM, Mottola DM, Clapp LH. Binding and activity of the prostacyclin receptor (IP) agonists, treprostinil and iloprost, at human prostanoid receptors: treprostinil is a potent DP1 and EP2 agonist. *Biochem Pharmacol* 2012; **84:** 68–75.
9   McLaughlin VV, Benza RL, Rubin LJ, et al. Addition of inhaled treprostinil to oral therapy for pulmonary arterial hypertension: a randomized controlled clinical trial. *J Am Coll Cardiol* 2010; **55:** 1915–22.
10  Lambers C, Roth M, Jaksch P, et al. Treprostinil inhibits proliferation and extracellular matrix deposition by fibroblasts through cAMP activation. *Sci Rep* 2018; **8:** 1087.
11  Nikitopoulou I, Manitsopoulos N, Kotanidou A, et al. Orotracheal treprostinil administration attenuates bleomycin-induced lung injury, vascular remodeling, and fibrosis in mice. *Pulm Circ* 2019; **9:** 2045894019881954.
12  Waxman A, Restrepo-Jaramillo R, Thenappan T, et al. Inhaled treprostinil in pulmonary hypertension due to interstitial lung disease. *N Engl J Med* 2021; **384:** 325–34.
13  Paterniti MO, Bi Y, Rekić D, Wang Y, Karimi-Shah BA, Chowdhury BA. Acute exacerbation and decline in forced vital capacity are associated with increased mortality in idiopathic pulmonary fibrosis. *Ann Am Thorac Soc* 2017; **14:** 1395–402.
14  Nathan SD, Martinez FJ. Pitfalls in developing new compounds for idiopathic pulmonary fibrosis. *Curr Opin Pulm Med* 2017; **23:** 426–31.
15  Kolb M, Raghu G, Wells AU, et al. Nintedanib plus sildenafil in patients with idiopathic pulmonary fibrosis. *N Engl J Med* 2018; **379:** 1722–31.
16  Behr J, Nathan SD, Wuyts WA, et al. Efficacy and safety of sildenafil added to pirfenidone in patients with advanced idiopathic pulmonary fibrosis and risk of pulmonary hypertension: a double-blind, randomised, placebo-controlled, phase 2b trial. *Lancet Respir Med* 2021; **9:** 85–95.
17  Richeldi L, Cottin V, du Bois RM, et al. Nintedanib in patients with idiopathic pulmonary fibrosis: Combined evidence from the TOMORROW and INPULSIS(®) trials. *Respir Med* 2016; **113:** 74–79.
18  Noble PW, Albera C, Bradford WZ, et al. Pirfenidone for idiopathic pulmonary fibrosis: analysis of pooled data from three multinational phase 3 trials. *Eur Respir J* 2016; **47:** 243–53.
19  Flaherty KR, Kolb M, Vancheri C, Tang W, Conoscenti CS, Richeldi L. Stability or improvement in forced vital capacity with nintedanib in patients with idiopathic pulmonary fibrosis. *Eur Respir J* 2018; **52:** 1702593.
20  Lehtonen ST, Veijola A, Karvonen H, et al. Pirfenidone and nintedanib modulate properties of fibroblasts and myofibroblasts in idiopathic pulmonary fibrosis. *Respir Res* 2016; **17:** 14.
21  Hostettler KE, Zhong J, Papakonstantinou E, et al. Anti-fibrotic effects of nintedanib in lung fibroblasts derived from patients with idiopathic pulmonary fibrosis. *Respir Res* 2014; **15:** 157.
22  Ackermann M, Kim YO, Wagner WL, et al. Effects of nintedanib on the microvascular architecture in a lung fibrosis model. *Angiogenesis* 2017; **20:** 359–72.
23  Jacob J, Nicholson AG, Wells AU, Hansell DM. Impact of pulmonary vascular volume on mortality in IPF: is it time to reconsider the role of vasculature in disease pathogenesis and progression? *Eur Respir J* 2017; **49:** 1602524.

To **submit data requests** see www.utcrequests.com

View publication stats

DA0560

LIQ_PH-ILD_00000225