```
 1                IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3
           UNITED THERAPEUTICS CORPORATION,    )
 4                                             )
           --------------------Plaintiff,      )
 5                                             ) Case No.
           vs.                                 ) 23-CV-975-RGA
 6                                             )
           LIQUIDIA TECHNOLOGIES, INC.,        )
 7                                             )
           --------------------Defendant.      )
 8
 9               TRANSCRIPT OF PRETRIAL CONFERENCE

10

11        PRETRIAL CONFERENCE had before the Honorable Richard

12   G. Andrews, U.S.D.C.J., in Courtroom 6A on the 30th of

13   May, 2025.

14                          APPEARANCES

15        MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  MICHAEL FLYNN, ESQ.
16
                              -and-
17
          MCDERMOTT WILL & EMERY
18             BY:  DOUG CARSTEN, ESQ.
                    ADAM BURROWBRIDGE, ESQ.
19                  ART DYKHUIS, ESQ.
                    KATHY PAPPAS, ESQ.
20                  JAKE VALLEN, ESQ.
                    LILLIAN SPETRINO, ESQ.
21
                              -and-
22
          GOODWIN PROCTER LLP
23             BY:  WILLIAM JACKSON, ESQ.
                    ERIC ROMEO, ESQ.
24                  ERIC LEVI, ESQ.
                    GABRIEL FERRANTE, ESQ.
25
                                   Counsel for Plaintiff
```

1    (Appearances continued.)

2

3        SHAW KELLER LLP
              BY:  NATHAN HOESCHEN, ESQ.
4                  KAREN KELLER, ESQ.

5                          -and-

6        COOLEY LLP
              BY:  SANYA SUKDUANG, ESQ.
7                  JON DAVIES, ESQ.
                   PHIL MORTON, ESQ.
8                  DAN KNAUSS, ESQ.
                   ROBERT MINN, ESQ.
9                  RACHEL PRESTON, ESQ.
                   JOHN HABIBI, ESQ.
10                 RUSTY SCHUNDLER, ESQ.

11                              Counsel for Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  Please be seated.  I

2    guess we should start with Mr. Flynn.  You don't have to

3    tell me everybody who's here, but why don't you tell me the

4    people you expect might have speaking roles.

5          MR. FLYNN:  Good morning, Your Honor.  Michael

6    Flynn from Morris Nichols on behalf of United Therapeutics.

7    At counsel table is William Jackson from Goodwin Procter,

8    Doug Carsten from McDermott, Will & Emery; Jake Vallen from

9    McDermott, Will & Emery; and Shaun Snader, who's in-house

10   counsel at UTC.  Others that I expect to have a speaking

11   role are Adam Burrowbridge and Lillian Spetrino from

12   McDermott, Will & Emery and Eric Romeo and Gabriel Ferrante

13   from Goodwin Procter.

14         THE COURT:  Thank you, Mr. Flynn.

15         And I see Mr. Hoeschen out there.  I guess I

16   see -- yes, and I see Ms. Keller too.

17         Mr. Hoeschen.

18         MR. HOESCHEN:  Good morning, Your Honor.  Nathan

19   Hoeschen from Shaw Keller on behalf of Defendant Liquidia.

20   With me at counsel table from Cooley LLP I have Sanya

21   Sukduang, Jon Davies, Dan Knauss, and Phil Morton.  And the

22   next row we have Rachel Preston, John Habibi, and Robert

23   Minn.

24         THE COURT:  And, Mr. Hoeschen, there's asterisks

25   next to the first four people.  Is that because they're

1    special?

2              MR. HOESCHEN:  I believe they're who will be

3    speaking today.

4              MR. SUKDUANG:  The court reporter asked us to

5    identify who will be speaking today.

6              THE REPORTER:  It's my fault.

7              THE COURT:  First time I've seen asterisks.

8              All right.  So everybody in here is associated

9    with one side or the other?  There's no independent

10   individuals?  Okay.

11             THE COURT:  So we're under seal for just a

12   minute.  One of the things that I'm curious about is I saw

13   in the papers that -- reference to Liquidia could launch

14   when they get FDA approval or something like that, and I'm

15   wondering, is that -- is there any information that that's

16   on the horizon?

17             MR. SUKDUANG:  Sanya Sukduang from Cooley on

18   behalf of Liquidia.

19             Yes, on Friday, May 23, last Friday, Liquidia

20   received final FDA approval for Yutrepia and we notified,

21   actually, the Middle District of North Carolina because on

22   May 9, UTC sued Liquidia in the Middle District of North

23   Carolina on a new patent that issued back in June, July of

24   2022.  It's in the same family as the invalidated '793

25   patent.  In that case, they moved for a TRO and PI.  That

1    was argued May 20 Tuesday in front of Judge Schroeder and

2    the parties are awaiting a decision from Judge Schroeder on

3    UTC's TRO PI.

4            THE COURT:  And the communication you got from

5    the FDA on May 23, does that mean that, essentially, if

6    there's no legal impediment from the court, you could have

7    launched on the 24th?  Or is that when you noticed that it's

8    coming and --

9            MR. SUKDUANG:  No, it's not.  We could launch

10    immediately on the 23rd when we received it.  All -- to

11    date, all regulatory and legal impediments have been removed

12    but for adjudication of this case and the TRO PI.

13            THE COURT:  But this case, you're not under any

14    restraints from this case.

15            MR. SUKDUANG:  No, we're not.  As of right now,

16    there are no impediments.

17            THE COURT:  In North Carolina, the judge

18    there -- while this motion is pending, you could, if you

19    want, launch.  There's no sort of interim "don't do anything

20    until I decide this"?

21            MR. SUKDUANG:  Correct.  We can launch.  There's

22    no stopping.  UTC filed for a TRO and he hasn't decided that

23    yet.

24            THE COURT:  Okay.  All right.  Thank you.

25            MR. SUKDUANG:  You're welcome.

1          THE COURT:  In North Carolina, are the parties

2    represented by the same counsel?

3          MR. JACKSON:  Yes, Your Honor.  Mr. Sukduang and

4    I were both the ones arguing that North Carolina TRO a week

5    and a half ago, whenever it was.

6          THE COURT:  All right.  Thank you.

7          So I saw the letter filed last night that

8    said -- that elected what the invalidity and

9    unenforceability defenses are.  Am I correct that the

10   written description is basically only directed to three of

11   the six claims?

12         MR. SUKDUANG:  Again, Sanya Sukduang, Your

13   Honor.  At this point, it's directed to a single claim,

14   Claim 9.  As written in the reports, it covered several

15   claims, but because they dropped, it's Claim 9.

16         THE COURT:  All right.  As long as we're on that

17   tack, the public sale, does that cover all the claims?

18         MR. SUKDUANG:  It will cover all claims.

19         THE COURT:  All right.  And the theory there is

20   that device Tyvaso -- can you explain the --

21         MR. SUKDUANG:  Yes, absolutely.  As of 2009,

22   Tyvaso, the commercial product, was on sale.  The Tyvaso

23   labeling has certain dosing requirements.  Those dosing

24   requirements were --

25         First, Tyvaso was sold.  There's no dispute on

1    Tyvaso being sold.

2              Second, and this goes to the ready-for-patenting

3    issue on public sale, the Tyvaso labeling has initial dosing

4    and maintenance dosing requirements.  Those dosing

5    requirements were used by multiple physicians across the

6    country to treat PH-ILD patients and improve their exercise

7    capacity.  So prior sale of the elements of Claim 1.

8    Dr. Rothblatt confirmed that in her 2018 --

9              THE COURT:  I think I know what the evidence is.

10             MR. SUKDUANG:  With respect to the dependent

11   claims, it's inherent in that the -- what you'll hear at

12   trial is the claims of the '327 patent are the increased

13   trial.

14             THE COURT:  Right.  I sort of have gotten that,

15   is Plaintiff's experts say that increase trial proves all

16   the things that are necessary for the dependent claims.

17             MR. SUKDUANG:  Correct.  So it's inherent there.

18   So Claim 1 and 17 -- 17 is a dependent claim directed to

19   walking distance.  1 and 17 would be literal and 5, 6, and 9

20   inherency.  14 comes under obviousness because it's a dry

21   powder claim.

22             THE COURT:  So the public sale as anticipation

23   doesn't apply to 14?

24             MR. SUKDUANG:  Would not apply to 14.

25             THE COURT:  Okay.  You were going to say?

1      MR. SUKDUANG:  14 is -- depends from 11.  11 is

2   the pulsed inhalation device.  14 is -- we think it's seven

3   claims identified.

4      THE COURT:  I'm satisfied by six.

5      MR. SUKDUANG:  So 14 is the dry powder.  And

6   Tyvaso is inhalation, not a dry powder.

7      THE COURT:  All right.  Hold on a minute.  Thank

8   you.  Thank you.  You can sit down.

9      MR. JACKSON:  Your Honor, on that last point,

10  can I be heard?

11     THE COURT:  Yeah.

12     MR. JACKSON:  On the prior -- we took your order

13  the other day to heart.  We had a meet-and-confer last night

14  and we talked through a bunch of things that are mooted out

15  and what the claims cover.

16     THE COURT:  It may not surprise you I've been

17  trying to figure out the same thing but with less

18  information.  So more information is useful.

19     MR. JACKSON:  During our meet-and-confer last

20  night, we agreed that prior sale is just under 102(a)(1).

21  Their second defense, which is anticipation by the increase

22  trial protocol, we confirmed what exhibit that is.  I think

23  that's Exhibit 8, DTX 8.  We confirmed the scope of

24  obviousness in view of Faria-Urbina includes the

25  Faria-Urbina and supplement thereto that they say is part of

1     the same article.

2               Written description they said is only for

3     Claim 9.

4               THE COURT:  All right.  Yes.

5               MR. JACKSON:  They are no longer contesting

6     priority, the priority date of the patent.

7               THE COURT:  That was on my list because I was

8     thinking that based on, certainly, the first election they

9     had that it seems like that was a moot issue too because

10    public sale seemed the theory.  I can see why it's moot on

11    that too.

12              MR. JACKSON:  Yes.

13              With respect to the various Dauberts and motions

14    in limine --

15              THE COURT:  Hold on just a second.  I can't

16    write as fast as you can talk.

17              Go ahead.

18              MR. JACKSON:  UTC's Daubert regarding Dr. Hill,

19    which is the DTX 284, 285.  I'm sorry.  DI 284, 285.

20              THE COURT:  Yes.

21              MR. JACKSON:  And the response is 299.

22              THE COURT:  Okay.

23              MR. JACKSON:  And the reply is 313.  That's

24    moot.

25              THE COURT:  And Dr. Hill, there were two issues

1    but they're both moot; right?

2                MR. JACKSON:  So the Daubert regarding Dr. Hill

3    is moot.  There's a motion in limine that touches on some of

4    the things he said.  Some of that is moot.  Some of it

5    isn't, but the Daubert itself, correct.

6                THE COURT:  There were -- and possibly I've got

7    the motion in limine and Daubert reversed, but there was one

8    that involved Dr. Hill and I think Dr. Channick.  They were

9    the same thing.  I guess that was a motion in limine.

10               In any event, I understand Dr. Hill, in terms

11   of -- hold on just a minute.  I do really mean hold on a

12   minute because I forgot to bring my motions in limine with

13   me.  I will be right back.  Don't go anywhere.

14               I'm sorry.  For Dr. Hill, you said the Daubert

15   was 285?

16               MR. JACKSON:  284 is the cover motion and 285 is

17   the memo.

18               THE COURT:  Hold on one moment here.  Okay.  Got

19   it.  All right.  So Dr. Hill, 284 is moot; yes?  And that's

20   because he was about inequitable conduct; right?

21               MR. JACKSON:  We only moved to exclude certain

22   portions of his opinions, like he had a couple-hundred-page

23   report and we moved to exclude 20 or so pages, and that was

24   about inequitable conduct.  Inequitable conduct is no longer

25   in the case, so that motion is done.

1          THE COURT:  That's good.  So let's just make

2     sure that we get that in.  Docket Item 284, which is the

3     Daubert motion related to Dr. Hill, is dismissed as moot.

4     All right.  Go ahead.

5          MR. JACKSON:  The Daubert with regard to

6     Dr. Wertheim, the motion itself is 280, memo is 281.  That's

7     also moot.

8          THE COURT:  I'm glad that's moot.  Motion in

9     limine in Docket Item 280, that's dismissed as moot.

10          MR. JACKSON:  I think that is it.  There are

11     aspects of paragraphs in -- of their motions in limine that

12     are no longer relevant because those are out, but I don't

13     think I have to carve those out for you.

14          THE COURT:  I'm hopeful before we're finished

15     today I will have ruled on all the motions in limine and all

16     the Daubert motions, but that's helpful to have that.

17     That's two less I have to recall when I'm thinking about

18     these things.

19          MR. JACKSON:  And to confirm what I think you

20     and Mr. Sukduang discussed, the prior sale -- their prior

21     sale anticipation defense applies to five of the six claims

22     but does not apply to 14.

23          THE COURT:  Right.  Even though I think what I

24     understood Mr. Sukduang to be saying was that it applies to

25     14 through an obviousness defense of some sort.

1          MR. JACKSON:  I don't doubt they have -- I think

2     their defense to 14 is their obviousness in view of

3     Faria-Urbina.

4          THE COURT:  Okay.  Is that what you meant,

5     Mr. Sukduang?

6          MR. SUKDUANG:  Yes.

7          THE COURT:  All right.  That's good to know.

8     All right.  Anything else?

9          MR. JACKSON:  I think that -- I'm just trying to

10    help Your Honor if Your Honor has questions.  I just figured

11    clarifying that would be helpful.

12         THE COURT:  When we get around to discussing

13    these, you can tell me if I start to opine on things that

14    are no longer relevant.  Cut me off.  Okay?  All right.

15    Thank you, Mr. Jackson.

16         MR. JACKSON:  Thank you, sir.

17         THE COURT:  Maybe it makes sense to actually try

18    to go through the rest of these motions because in terms of

19    the pretrial order itself, other than the time limits and --

20    there was really no actual disputes that I saw.

21         MR. SUKDUANG:  There's one correction to be made

22    from the parties' meet-and-confer.  Specifically, last night

23    during the meet-and-confer, the parties forgot to put in

24    that UTC has secondary considerations to bring commercial

25    success, I think copying maybe unexpected results.  So the

1    parties agreed that Liquidia would provide its rebuttal to

2    objective indicia after UTC presents whatever objective

3    indicia.

4            THE COURT:  So basically the agreement is UTC

5    infringement, you all noninfringement and your invalidity

6    defenses, UTC secondary consideration, you rebuttal to

7    secondary consideration.

8            MR. SUKDUANG:  Correct.  The parties are going

9    to submit a revised pretrial cover just to reflect that so

10   it's clear.

11           THE COURT:  Okay.  Well, all right.  That will

12   be fine.  I think it should be clear now, too, but it's good

13   to have it written down someplace that's easily accessible.

14           All right.  So we've got these Dauberts.  And

15   the first one is Docket Item 278, which is the motion to

16   exclude the opinion and testimony of Dr. Thisted, and I

17   think this boils down to whether or not he can testify from

18   the perspective of a POSA that's what the issue is here;

19   right?

20           MR. KNAUSS:  Yes, Your Honor.

21           THE COURT:  So the people we know, Mr. Sukduang

22   he comes up here every time and says who he is.  The people

23   we don't know, not so much.  So anybody who's not

24   Mr. Sukduang or Mr. Jackson ought to identify themselves

25   when they're speaking.  Okay.

1    So yes, this is about Dr. Thisted and whether he

2    testified from the perspective of a POSA.  Are you,

3    Plaintiff, seriously contesting, seriously asserting that

4    he's a POSA?

5    MR. BURROWBRIDGE:  Adam Burrowbridge on behalf

6    of the plaintiff.  Your Honor, our position is that

7    Dr. Thisted has expertise within the scope of the POSA

8    definition.  Both parties agree that --

9    THE COURT:  He's a well-qualified

10   biostatistician and he teaches or taught in medical school

11   so he knows something about medicine, but he's certainly not

12   the POSA that's envisioned by either of your descriptions;

13   right?

14   MR. BURROWBRIDGE:  Well, Your Honor, we would

15   respectfully disagree with respect to the fact that he has a

16   Ph.D. and experience with drug development, which is part of

17   UTC's proposed definition.

18   THE COURT:  There's also the part about two

19   years of treating, which he does not have; right?

20   MR. BURROWBRIDGE:  He does not have that portion

21   of the definition.  Case law permits POSAs to rely on others

22   in the field.

23   THE COURT:  That would permit your doctor to

24   rely on Dr. Thisted, but it doesn't work the other way

25   around.

1          MR. BURROWBRIDGE:  Both parties agree that the

2    POSA would have access to teammates.

3          (Cross-talk).

4          THE COURT:  So Dr. Thisted can testify about

5    stuff that biostatisticians testify about and he can

6    certainly testify he teaches first-year medical students,

7    but then it's up to whoever -- and I forgot whose expert is

8    who -- but it's your medical doctor is the one who's going

9    to be offering opinions on infringement and invalidity, not

10   Dr. Thisted.

11         MR. BURROWBRIDGE:  Correct, Your Honor.  I'd

12   like to make two points in response.

13         First, under *SEB versus Montgomery Ward*, the

14   Federal Circuit has found that experts with an adequate

15   relationship of their expertise to the claimed invention can

16   opine from the perspective of a POSA.  So we have that

17   authority.

18         Second, what we want to preserve is the ability

19   for Dr. Thisted to critique and rebut the experts on the

20   other side that are opining on what a POSA would think.

21   Here, Dr. Thisted is well-positioned to disagree with that

22   because both parties' POSA standards have a biostatistics

23   training built in because they both require M.D.s and M.D.s

24   have biostatistics training.  So what we would like is for

25   Dr. Thisted be able to take the stand and say a POSA would

1    disagree with that because a POSA would have some baseline

2    understanding of how statistics work and how clinical design

3    is important and be able to critique that opinion.

4              THE COURT:  Why can't your medical doctor say

5    that?

6              MR. BURROWBRIDGE:  Our medical doctor says that

7    as well.

8              THE COURT:  So then you're going up against the

9    second thing, which is generally you get one person to say

10   what's infringing and what's invalid, not multiple people.

11   So is there -- the thing that I was curious about is, is

12   there any reason why your medical doctors can't be the

13   infringement invalidity -- they've offered opinions on

14   invalidity and infringement and presumably to the extent

15   it's all biostatistics, they're either relying on what

16   Dr. Thisted said or they're relying on their own knowledge

17   of biostatistics; right?

18             MR. BURROWBRIDGE:  That's correct, Your Honor,

19   and I think our approach was to preserve the ability to

20   critique the POSA's opinion from the other side.

21             THE COURT:  If one of the POSAs or the defendant

22   says something like -- starts spewing bad biostatistical

23   analysis, I think you've got the right to have, assuming

24   that Dr. Thisted is disclosed, that's bad biostatistical

25   analysis because blah, blah, blah.  And, you know,

1    presumably because they have a biostatistical analysis too,

2    biostatistical expert, they may join in this argument, but

3    the -- I think -- so I think you can critique a POSA expert

4    as talking gibberish, but you are just saying they're

5    talking gibberish, not that Dr. Thisted knows what a POSA

6    knows because I don't think he does.

7           MR. BURROWBRIDGE:  So I would agree with

8    everything you said except for I think that Dr. Thisted does

9    understand, again, a portion of what's required in the POSA

10   definition, which would be the biostatistics.  But I think

11   we're generally on the same page, and our approach, again,

12   was to preserve his ability to critique the experts on the

13   other side and what they say the POSA would understand.  So

14   long as we have that ability, I think that is fine for

15   United Therapeutics.

16          THE COURT:  Thank you, Mr. Burrowbridge.

17          Does anybody on the Liquidia side want to -- so

18   remind me who you are.

19          MR. KNAUSS:  Good morning, Judge Andrews.  Dan

20   Knauss from Cooley for Liquidia.  I just want to respond to

21   a couple of points he made.

22          As you correctly stated, because Dr. Thisted is

23   not a POSA, he can't testify to the issue of infringement

24   and invalidity.  The problem we have is working through the

25   paragraphs we identified in our motion that we seek to

1    exclude, when you strip away the opinions of Dr. Thisted

2    that do go to the ultimate issue of infringement and

3    validity, there's virtually nothing left in his report

4    because biostatistics per se are not at issue in this case.

5    There's not actually any dispute, for example, over whether

6    certain prior art discloses a statistically significant

7    result.  It discloses what it discloses, and there's no

8    attack on the statistics in that paper.

9            The whole attack that Thisted makes is be that

10   as it may, a POSA would not reach the conclusions from

11   reading that reference that Liquidia's experts say they

12   would.  But as you pointed out correctly, to the extent UTC

13   is arguing that biostatistics training is part of a POSA's

14   experience, that's for the POSA himself or herself to say.

15   That's for Drs. Nathan and Channick to argue about.

16           It's also not correct that Dr. Nathan relied on

17   Dr. Thisted.  As you pointed out, it doesn't work both ways.

18   A POSA can rely on a biostatistician --

19           THE COURT:  He doesn't actually have to rely on

20   Dr. Thisted for Dr. Thisted to have useful information

21   because, I think my understanding is correct here, medical

22   doctors are not -- they have biostatistics training.  That

23   doesn't make them experts in biostatistics.  If two medical

24   doctors are talking about something related to biostatistics

25   and if it's something other than, well, a doctor would

1    understand this and a doctor would understand that, if the

2    biostatistics experts can add context, color, what have you

3    to perhaps evaluate whether or not what the two doctors, to

4    the extent that they basically conflict with each other, he

5    could add something.  It's hard for me to say.  I mean, I

6    just don't know because I don't have the case yet.

7            So the argument he doesn't have much to say,

8    that's probably -- so what I'd say is this:  I imagine,

9    because I'm not going to sit down and read his report, that

10   to the extent that he really is talking about a POSA would

11   understand this and understand that, you can object, and I

12   would, in all likelihood, sustain the objection.  To the

13   extent he talks about something else -- and I don't know

14   what else he might be talking about.  I seem to recall that

15   there are -- that some of the prior art talks about small

16   groups of people doing stuff and whether or not -- and I

17   imagine that whether or not you've drawn unique conclusions

18   as a biostatistician is something that I take into account

19   for a doctor who says that's compelling or a POSA would

20   think that's compelling.

21           But to the extent that the report is written as

22   a POSA would understand biostatistics to be X, Y, or Z and

23   Dr. Thisted's testimony would be, well, the statistics are

24   X, Y, and Z, I'm not going to sustain an objection just

25   because the report says a POSA would say this.  Do you

1    understand what I'm saying?

2              MR. KNAUSS:  Up to a point.  Where I would

3    respectfully part from Your Honor is we don't think

4    Dr. Thisted can say what a POSA --

5              THE COURT:  In other words, I'm not going to

6    limit him from testifying if the substance of whatever it is

7    he's going to say is in there and just, basically, phrased

8    badly.

9              MR. KNAUSS:  With all due respect, the reports

10   we have to contend with, it's not bad phrasing.  It's a very

11   clear effort to step into the shoes of a POSA, even though

12   he, admittedly, is not one under our agreed definition and

13   even though he admittedly never spoke to Dr. Nathan and does

14   not rely in any way other than a passing record to say he

15   reviewed and considered Dr. Nathan's report.

16             THE COURT:  All right.  Anything else?

17             MR. KNAUSS:  No, thank you, Your Honor.

18             MR. BURROWBRIDGE:  Can I respond?

19             THE COURT:  Sure, Mr. Burrowbridge.

20             MR. BURROWBRIDGE:  I just want to say that we

21   agree with the approach Your Honor outlined.  We think it's

22   most appropriate for Liquidia to object at trial if and when

23   they think it's necessary.  And nothing else, Your Honor.

24             THE COURT:  All right.  And just the case that

25   you cited, which I think you said was SEB versus?

1          MR. BURROWBRIDGE:  Montgomery Ward.

2          THE COURT:  What's the full citation for that.

3          MR. BURROWBRIDGE:  594 F.3d 1360, and so that is

4   a Federal Circuit case from 2010, which is pre-Kyocera, the

5   case Liquidia cites, but Kyocera does not overrule *SEB*.

6          THE COURT:  All right.

7          MR. BURROWBRIDGE:  And Courts have found that

8   *SEB* can coexist with the *Kyocera* standard in such cases as

9   *Giatec Bay v. Neutron*, which is 2023 Westlaw 6614486 out of

10  the Southern District of New York.

11         THE COURT:  All right.  Well, what you're saying

12  you think *SEB* stands for is somebody who doesn't meet the

13  definition of a POSA can testify as to what a POSA would

14  understand if.  What's the if?

15         MR. BURROWBRIDGE:  If the expert's expertise has

16  a sufficiently adequate relationship between the expertise

17  and the claimed invention for the opinions he's providing.

18  For instance, Your Honor, here, Dr. Thisted is not planning

19  to opine on how an M.D. would treat a patient, so he's not

20  going to stand up and say he has two years of treating

21  experience because he doesn't and he's been very careful to

22  not provide opinions on that issue.

23         THE COURT:  All right.  Well, I'm pretty

24  doubtful, but I will look at that case, but at least for

25  today's purposes, the ruling is that Dr. Thisted cannot

1    testify as to the opinions of a POSA because he's not a POSA

2    and -- but that I'm not actually going to strike any of his

3    reports.  And if I think differently after I look at this

4    case, I will put something in writing saying that.  And in

5    any event, Defendant's rights to object to any testimony at

6    trial is preserved.  Okay?

7                 MR. BURROWBRIDGE:  Understood.  Thank you, Your

8    Honor.

9                 MR. KNAUSS:  Thank you.

10                MR. SUKDUANG:  Your Honor, with respect to that

11   ruling, there's a presentation-of-evidence question I want

12   to raise.  My understanding is Dr. Thisted will not be

13   testifying on the issue of infringement based on

14   Mr. Burrowbridge's representations because he has a reply

15   report on infringement and a rebuttal report on invalidity.

16   So based on the conversation, it seems like he would be an

17   invalidity expert only.  We have --

18                THE COURT:  I think he said something about

19   rebutting what your experts say.

20                MR. SUKDUANG:  If they can provide that

21   clarification because we want to make sure our we use our

22   trial time wisely, which goes to my second point.  Our

23   statistician is Dr. Ogenstad.  His report is only in

24   response to whatever Dr. Thisted says.  It's difficult to

25   put Dr. Ogenstad up on our case in chief on invalidity when

1    we don't know what Dr. Thisted is going to say in rebuttal.

2    So in that respect, they either provide a proffer or we call

3    Dr. Ogenstad in our secondary considerations portions

4    because, again, I don't want to spend time, your time,

5    dealing with something that Dr. Thisted will never talk

6    about.

7              THE COURT:  All right.  Mr. Burrowbridge,

8    does -- so I take it Dr. Thisted didn't actually file an

9    opening report based on that?

10             MR. BURROWBRIDGE:  That's correct, Your Honor.

11             THE COURT:  So does that mean that, in fact,

12   you're not planning on calling him in your case in chief?

13             MR. BURROWBRIDGE:  I'm not sure if we determined

14   whether or not we're going to call him in our case in chief.

15   To the extent we call him in our case in chief, it will be

16   along the lines where we would have him opine and critique

17   opinions that he expects their experts to provide.

18             THE COURT:  I understand that.  In response to

19   Mr. Sukduang's comments there, kind of makes a difference

20   for scheduling purposes and maybe other things, including

21   just efficiency, whether you're planning on calling him in

22   the case in chief or not.

23             MR. BURROWBRIDGE:  I think he would primarily be

24   a validity witness.  And just to be clear, we disagree with

25   the idea that Dr. Ogenstad should be able to opine after

1    secondary considerations.  They have the burden on

2    invalidity, so he should opine first and Dr. Thisted should

3    have the opportunity to reply to him as a rebuttal witness

4    for purposes of validity.

5            THE COURT:  Does -- Mr. Sukduang, does

6    Dr. Ogenstad have opinions about infringement or that are

7    infringement-related or does he just have invalidity

8    opinions?

9            MR. SUKDUANG:  He has no infringement opinions

10   at all.  He didn't file an opening report on invalidity.  He

11   did not file a reply report on infringement.  All he does,

12   literally, is respond to Dr. Thisted, so Mr. Burrowbridge is

13   incorrect.  While we bear the burden on invalidity, we don't

14   bear the burden of guessing what their rebuttal witness will

15   say.

16           Dr. Ogenstad is a reply witness.  He's a reply.

17   So he filed an expert report at the end of all the reports

18   addressing specific things that Dr. Thisted said.  And

19   again, it's a trial efficiency point.  When does

20   Dr. Ogenstad -- these experts have things to do.  Does he

21   show up on day one?  Does he show up on day three?  When

22   does he come?  What does he say?  Because it's unclear based

23   on -- your ruling is clear.  It's unclear what UTC will try

24   to do to maneuver around the ruling and, therefore,

25   Dr. Ogenstad needs to know what Dr. Thisted is going to say.

1          Dr. Channick is going to provide his opinions on

2    invalidity.  Dr. Thisted, certainly, under your ruling, can

3    talk about biostatistics but Dr. Ogenstad can't opine

4    because he doesn't give any ultimate opinion on invalidity.

5    He only responds to Dr. Thisted.  If Dr. Thisted says a

6    p-value of .05 is not statistically significant, that's

7    Dr. Ogenstad responding to that.  We don't have Dr. Ogenstad

8    coming up first and saying the prior art shows this and this

9    and this.

10          THE COURT:  How long is Dr. Ogenstad's report?

11          MR. SUKDUANG:  I don't know the number of pages.

12          THE COURT:  Give me a ballpark.

13          MR. SUKDUANG:  A hundred or less.  When you look

14   at his report, it's all "Dr. Thisted says this and my

15   response is this."  So Dr. Ogenstad's report is long because

16   Dr. Thisted's report is very long.  It's just a matter of

17   how -- we're going to be burning trial time guessing and

18   that's why we reached the agreement on secondary

19   considerations, because their expert, Dr. Self only comes up

20   with commercial success.  Our responsive expert,

21   Dr. Kitter --

22          THE COURT:  All right.  Enough.

23          So based on the representation, it actually

24   makes sense to me that Dr. Ogenstad testify after

25   Dr. Thisted.  So I think, based on what I heard, Dr. Thisted

1   ought to testify in Plaintiff's response to the invalidity

2   case and Dr. Ogenstad will come in what is Step 4 of the

3   case.  That's what makes sense to me.  Okay?

4              MR. SUKDUANG:  Yes, Your Honor.

5              THE COURT:  All right.  So we said earlier

6   Docket Item 280 is moot.

7              MR. BURROWBRIDGE:  Your Honor, may I approach?

8   One more issue.  We had a conditional Daubert such that any

9   ruling for Mr. Thisted would equally apply to Mr. Ogenstad.

10  I want to raise that if Your Honor --

11             THE COURT:  I can't remember whether Defendant

12  disagreed with that idea.

13             MR. KNAUSS:  No, Your Honor.  It's true that the

14  two biostatisticians are similarly situated.  We'll take

15  your guidance today.

16             THE COURT:  So the same applies to Dr. Ogenstad

17  and the motion or the Daubert motion on him is denied to the

18  same extent that it's denied in regard to Dr. Thisted.

19             MR. BURROWBRIDGE:  Thank you, Your Honor.

20             THE COURT:  So that resolved Docket Item 286 and

21  that motion is treated the same.  All right.

22             So moving along, so then we've got Docket Item

23  282, which is to exclude some opinions of Plaintiff's

24  experts Dr. Nathan and Dr. Thisted.  All right.  Let me

25  think about this for a second.

1        So this has to do with the testimony of

2   Dr. Thisted and Dr. Nathan, which as I understand it -- and

3   maybe it's not so much Dr. Thisted but Dr. Nathan -- that if

4   you dose Yutrepia according to the label, you will not only

5   infringe Claim 1, you'll infringe all -- not all the

6   dependent claims, some of the dependent claims because the

7   results of the increase study prove whatever the additional

8   limitation in the dependent claims are.  This doesn't apply

9   to the ones that involve the inhalation device which I guess

10  is only 14.  But I think -- and I think -- I didn't write it

11  down here, but I think maybe it doesn't involve Claim 5

12  either.

13        MR. SUKDUANG:  It does apply to Claim 5.  So for

14  clarity it applies to Claim 1, 5, 6, and 9.

15        THE COURT:  Well, it doesn't really apply to

16  Claim 1, does it?

17        MR. SUKDUANG:  Separately, Your Honor.  It's

18  whether the preamble has patentable weight or not.  For the

19  purposes of what you're discussing, 5, 6, 9, and 17, not

20  Claim 14.

21        THE COURT:  Right.  And so this doesn't -- this

22  strikes me as, essentially, being a summary judgment motion

23  and so, therefore, I don't think -- so I think I'd rather

24  decide this after we have the trial.

25        MR. SUKDUANG:  Sure, if you'd allow me a minute

 1    to expound, but that's fine with us.  As long as we have --

 2    the issue we have, Your Honor, again, is trial efficiency.

 3    For the dependent claims, it's clear Dr. Thisted -- excuse

 4    me Dr. Nathan says you don't measure anything.  You just

 5    give the dose and, boom, it's ail all done.  For invalidity,

 6    he says you actually have to measure everything.  As long as

 7    we get to lodge an objection when he raises that and you'll

 8    address it in post-trial briefing when we have to

 9    cross-examine it, then we're okay.  But we wanted to raise

10    this as an issue that this is what you're going to hear, two

11    different theories.

12              THE COURT:  Right.  And I think I understand

13    what plaintiff's response is.  That is something I will

14    resolve later, so I'm going to deny this with, essentially,

15    leave to raise the same issues in post-trial briefing.

16    Okay?

17              MR. SUKDUANG:  Thank you, Your Honor.

18              THE COURT:  That was Docket Item 282.  And

19    Docket Item 284 we said was moot.  Docket Item 286 I ruled

20    on a few minutes ago.  That brings us up to the motions in

21    limine.

22              So the first one is Docket Item 320, and my

23    impression is that this one is just moot because both sides

24    agree that "forced vital capacity" encompasses both the

25    absolute and percent predicted expression of that endpoint,

1    including in the specific context of Claim 9.  So should I

2    dismiss this as moot?

3              MR. DAVIES:  Your Honor, we believe it is moot.

4              THE COURT:  You said what you need to say.

5              What do you all have to say?

6              MR. ROMEO:  Your Honor, Eric Romeo for United

7    Therapeutics.  I think we agree based on the way Your Honor

8    phrased it.  I don't think it's a dispute about claim

9    construction.  I think there's a dispute about written

10   description and consequences.

11             THE COURT:  All right.  So I'm going to dismiss

12   this as moot.  So that takes care of Docket Item 320.

13             All right.  Docket Item 322, which is captioned

14   as being related to "pulmonary hypertension associated with

15   interstitial lung disease" recited in Claim 1 of the '327

16   patent.  And basically, what I think I understand to be

17   going on here is the pulmonary hypertension associated with

18   interstitial lung disease in the patent is not necessarily

19   the same thing as pulmonary hypertension interstitial lung

20   disease that might be referred to in medical journals or

21   possibly even the WHO, whoever it is, groups.

22             And the argument here, this motion is based on

23   Rule 403, and I don't think it actually cites Rule 403 but

24   pretty clear that it talks about confusing, unduly

25   prejudicial, likely to cause delay, waste time as what

1    Defendant is talking about.  And I think that this is not a

2    good motion to be resolving.  I think some things that are

3    complicated you just have to do it in trial, and I think

4    this is complicated.  And I guess the one thing that

5    concerns me is whether or not the parties are raising a

6    claim construction issue with "pulmonary hypertension

7    associated with interstitial lung disease," which is

8    language in Claim 1 and, therefore, is in dependent Claim 2.

9                And remind me who you are.

10               MR. DAVIES:  Jonathan Davies, Your Honor.

11               We don't believe it's a claim construction

12   issue.  We raised it for the inconsistencies Your Honor

13   pointed to, and for a point of clarification, we believe

14   there's two levels of inconsistency, the first thing

15   Dr. Nathan's testimony about the scope of PH-ILD in the

16   context of his infringement opinions, where he offers a

17   broad understanding of what a PH-ILD patient is and then a

18   much narrower understanding of PH-ILD patients when he is

19   seeking to dispute the disclosure of treatment of PH-ILD in

20   the prior art.  That's one level of inconsistency.

21               The second is with that narrow definition that

22   he appears to be offering in the context of invalidity, we

23   believe that's contradicted by the claims themselves, which

24   only require pulmonary hypertension associated with

25   interstitial lung disease and do not believe that there's

1    any causation or due to component that he appears to be

2    reading in.

3            THE COURT:  All right.  So the first point,

4    that's hard to tell in advance, and, certainly, at a point

5    where you think at trial that he's using a different

6    definition or different understanding of the term in the

7    claim, you should probably object.  Probably not going to

8    sustain it, but at least you'll have made a record of where

9    you think he's doing it.  In the absence of an objection,

10   you're probably going to be waiving this.

11           In terms of the second point, that's where it

12   starts to sound more like there is a claim construction

13   dispute because I think it's the case that the defendants

14   say the "PH" associated with "ILD" means PH-ILD where the

15   "PH" is due to the "ILD."  And you're saying no, not right.

16           MR. DAVIES:  That is the plaintiff's position,

17   Your Honor.

18           THE COURT:  Okay all.  Right.

19           MR. DAVIES:  The plaintiff's position, at least

20   in the context of invalidity as set forth by Dr. Nathan is

21   that the --

22           THE COURT:  At least in the context of

23   invalidity?  The context is for both invalidity and

24   infringement.

25           MR. DAVIES:  That's the first inconsistency,

1    Your Honor.  Dr. Nathan, in our opinion, offers two

2    different --

3              THE COURT:  That's part of what starts to make

4    this complicated.  You say something and that sounds like

5    it's coming from you, but you actually attribute it to them;

6    right?

7              MR. DAVIES:  I apologize, Your Honor.

8              THE COURT:  That's okay.  All right.  So what do

9    you say -- in the claim, what do you say "PH associated with

10   ILD," what does that mean?

11             MR. DAVIES:  We believe that it should be given

12   its plain and ordinary meaning as understood by a POSA that

13   it's PH that is associated with ILD, interstitial lung

14   disease, in a patient and that there's no particular

15   causation or severity of either of those components that is

16   required to meet the definition.

17             THE COURT:  So anybody who has PH, even a little

18   bit, and anybody who has ILD, even a little bit, is PH

19   associated with interstitial lung disease?

20             MR. DAVIES:  Your Honor, Dr. Channick is

21   probably best equipped to speak to that, but the claims

22   refer to PH associated with interstitial lung disease and we

23   believe it encompasses the broad disease state of PH

24   concomitant with ILD.

25             THE COURT:  So if a doctor says this person has

1    PH and this person has ILD, they are PH associated with

2    interstitial lung disease, no further questions need to be

3    asked.

4              MR. DAVIES:  We believe the claims support that,

5    Your Honor.

6              THE COURT:  So what do you believe, Defendant?

7              MR. DAVIES:  I am the defendant, Your Honor.

8              THE COURT:  Tough one.  When Mr. Sukduang or

9    Mr. Jackson talks.

10             MR. CARSTEN:  Those fellows like to talk a lot.

11   I'm Doug Carsten on behalf of United Therapeutics.

12             THE COURT:  So your position is -- let me get

13   those positions straight.  Your position is -- before you

14   speak Mr. Carsten, Mr. Davies, your position, you the

15   defendant, your position is if there's PH as recognized by a

16   doctor and if there's ILD as recognized by a doctor then

17   there's PH with interstitial lung disease?

18             MR. DAVIES:  Correct, Your Honor.

19             THE COURT:  Thank you.

20             So what is your position, Mr. Carsten?

21             MR. CARSTEN:  Well, I didn't think there was a

22   claim construction dispute until Mr. Davies started talking

23   and maybe there is.  The patent spec talks about the --

24             THE COURT:  So don't start arguing tell me what

25   is your construction.

1          MR. CARSTEN:  Our construction is that a patient

2    suffering from ILD -- that's the lung disease -- that lung

3    disease has to cause the pulmonary hypertension.

4          THE COURT:  So your construction is much

5    narrower than theirs?

6          MR. CARSTEN:  I think our construction is

7    consistent with the WHO.

8          THE COURT:  You're arguing now.  I'm trying to

9    just get a relative sense of where the two of you are, and

10    they're saying if there's a patient that has PH that has

11    ILD, it's a patient within the meaning of this term.  You're

12    saying that's not enough.

13          MR. CARSTEN:  We don't agree with that.

14          THE COURT:  What is your definition?

15          MR. CARSTEN:  The PH has to be associated with

16    the ILD.  The ILD has to be the basis for the pulmonary

17    hypertension.  There are lot of patients out there that

18    you'll hear from Dr. Nathan and Dr. Channick --

19          THE COURT:  So wait.  You're skipping over --

20    not skipping.  But there has to be PH; there has to be ILD.

21    And the PH has to be associated with ILD.  To be associated

22    with ILD means what?

23          MR. CARSTEN:  It's due to the ILD, and this is

24    the language from the WHO Group 3.  This is the language --

25          THE COURT:  So in any event, your position is

1    the PH has to be due to the ILD.

2            Your position, Defendant, is not so.  It merely

3    has to be concomitant with the ILD; right?

4            MR. DAVIES:  Yes, and, in fact, their expert,

5    Dr. Nathan, offered that precise language.

6            THE COURT:  Thank you, Mr. Davies.  So this

7    sounds to me like a claim construction dispute.

8            And I take it, Mr. Carsten, you were starting to

9    say yes, it sounds like one to you.

10           Mr. Davies, does it sound like one to you?

11           MR. DAVIES:  I don't believe it is, Your Honor.

12   I just note that the claims as originally filed said "due to

13   interstitial lung disease."

14           THE COURT:  You're now kind of arguing, but

15   the -- I think the question here is Mr. Carsten said they

16   think it means this.  You said you think it means that.  Why

17   isn't that a claim construction dispute?  I'm not asking

18   who's right here.  I'm just asking.  Don't you have a term

19   that seems to be pretty important to this patent and you

20   disagree on what it means?

21           MR. DAVIES:  We agree, Your Honor.  If the Court

22   thinks it's best addressed through some sort of claim

23   construction, we're happy to engage in that.

24           MR. CARSTEN:  You might think of this as -- I

25   came into this thinking this really is a battle of the

1    experts.  The term is what the term is and the question is

2    whether these particular groups of patients meet that term

3    as a person of ordinary skill would understand it, but I see

4    how embedded in this now there is this sort of causation

5    issue.

6            In my view, Your Honor, I don't know that you

7    necessarily need briefing on that.  You could just hear from

8    the experts and then if you do need briefing after the fact,

9    you can ask for it.  But obviously, you can do however you

10   like if Your Honor wishes to have briefing on this as a

11   quote/unquote claim construction issue.  But coming in, I

12   saw this as a battle of the experts as to whether these

13   patients were within the definition or not.

14           THE COURT:  The five groups we're sometimes

15   talking about, that's a WHO definition?

16           MR. CARSTEN:  Yes, Your Honor, and those are

17   referenced in the specification of the patent.  In fact,

18   Your Honor, if it's helpful, I have a portion of the

19   specification.

20           THE COURT:  I don't want to argue claim

21   construction right now.  What I would like you to do -- and

22   I'm not saying I'm going to resolve anything before the

23   trial, but I would like you to, say, by Friday of next week

24   submit each side submit a letter explaining why your

25   proposed construction is right.  And maybe the following

1    Tuesday, limited to two pages, you can respond to what the

2    other side said and tell me why they're wrong or whatever.

3    I'm not going to put a limit on the opening letter.  Use

4    your own judgment as to what you need, but I don't want to

5    have rehashing in the following letters.

6                Okay?  Does that work for both of you?

7                MR. DAVIES:  Yes, Your Honor.

8                THE COURT:  All right.  And okay.  So to the

9    extent that the argument in this motion in limine is that

10   Dr. Nathan uses different definitions for infringement and

11   invalidity, I'm going to have to decide that after I hear

12   his testimony.  Obviously, there are a zillion Federal

13   Circuit cases saying you have to use the same definition for

14   both, so that's not really in dispute here.  It's more a

15   question of application, and so I'm going to dismiss that

16   portion with leave to have appropriate objections at trial.

17   And if that looks like it's actually an issue, it will be

18   part of the brief post-trial.

19               And as for the second part, the claim

20   construction or what I think is the claim construction

21   issue, I'm going to dismiss that to be decided either after

22   I get these claim construction letters we talked about or

23   probably more likely to be decided based on when I have the

24   letters also whatever it is I hear in trial.  But you should

25   write the letters like I will decide it on the letters

1    alone.  All right.  So that takes care of Docket Item 322, I

2    think.

3                 MR. CARSTEN:  Very well.  Thank you.

4                 THE COURT:  Thank you.  All right.  Now we've

5    got Docket Item 328.  Wait a second.  Let me make a note

6    here.

7                 So the next one, which is Docket Item 328, is to

8    preclude defendants from eliciting expert testimony not

9    disclosed under federal rule related to disclosure of expert

10   testimony.  And so this is what I was thinking about when we

11   were talking about Dr. Hill because this is the one that has

12   Channick and there were two different things Dr. Hill says.

13                So first off, the Channick issue, as I

14   understand it -- actually, I don't actually understand it.

15   The parties stipulated in the Markman stage that the

16   preamble is a limitation, so for infringement and

17   invalidity, one has to meet that limitation.  And so my

18   impression of the Channick is that at deposition, he didn't

19   answer the questions about preamble very well but that in

20   his report, he has some section where he shows how the

21   preamble is met for infringement.  So that's my impression,

22   but I'll hear from counsel in a minute.

23                For Dr. Hill, are the two things about Dr. Hill

24   actually still live issues?

25                MS. SPETRINO:  Lillian Spetrino with McDermott,

1    Will & Emery on behalf of Plaintiffs.  I don't think the

2    Hill issues specifically are still in play as those legal

3    issues are no longer in the case, but the MIL itself is

4    still in play, in our view.

5                THE COURT:  I'll give you a chance to say more

6    in a moment, Ms. Spetrino.

7                But Mr. Davies?

8                MR. DAVIES:  We agree.  The issues they have

9    directed to Dr. Hill are no longer an issue.

10                THE COURT:  So that portion of the motion in

11    limine is dismissed as moot.  Dr. Channick, Ms. Spetrino,

12    and I summarized what I thought was going on.  How close?

13                MS. SPETRINO:  I think you were quite close,

14    Your Honor, but our issue is, as you said, the Court adopted

15    the parties' agreement that the preamble was limiting.

16    Dr. Channick does not address the significance of the fact

17    that the preamble is limiting in his report, and given some

18    of the testimony that came out during his deposition, we

19    started to wonder is there going to be a new opinion in

20    testimony at trial that's not contained in his report.  We

21    don't contest that he can say whatever is in his report.

22    That's absolutely fine.  What we're concerned about is going

23    beyond the scope of the expert reports themselves for

24    Channick or any of Liquidia's experts.

25                THE COURT:  Okay.  That's helpful.

```
 1              Mr. Davies or whoever's responding here.

 2              MR. DAVIES:  We believe this is sort of an issue

 3   of semantics.  If you look at Dr. Channick's report -- and

 4   I'm not going to go through the citations.

 5              THE COURT:  Do you have a page or two that -- of

 6   his report that you can just hand up?  Because this is kind

 7   of like -- sounds a lot like the sort of thing -- the way

 8   Ms. Spetrino put it is there's an opinion not disclosed in

 9   his expert report, and I take it if you show me it's

10   disclosed in his expert report, that pretty much resolves

11   this.

12              MR. DAVIES:  The citations, Your Honor --

13              THE COURT:  Citations aren't going to do me any

14   good.  You can say what they are.  Do you have the actual

15   pieces of paper here?

16              MR. DAVIES:  I do, Your Honor.  I can pull them

17   out of the binder.

18              THE COURT:  Pull them out.

19              MR. DAVIES:  What we cited, Your Honor, is the

20   numerous places in Dr. Channick's report where he -- for

21   both infringement and invalidity and he discusses in the

22   context, for example, of obviousness and --

23              THE COURT:  So what pages are you going to give

24   me so they can be looking at them?

25              MR. DAVIES:  Your Honor, we cite to them at
```

1    pages -- Exhibit A pages 128 to 130.

2                  THE COURT:  That's enough.  So you have 128 to

3    130?

4                  MR. DAVIES:  Your Honor, this one is right here,

5    so I'll give you Exhibit A 291 through 298.  This is just

6    one example where Dr. Channick is talking about how Claim 1

7    is rendered obvious by Faria-Urbina 2018 and the '793

8    patent.  He discusses expressly Claim 1 and how that is met

9    by the prior art.

10                 THE COURT:  It would be easier for me if you

11   have -- because he's also the infringement expert; right?

12                 MR. DAVIES:  Yes, he is, Your Honor.

13                 THE COURT:  Infringement is easier to

14   understand, usually, the way it's laid out.  He's going to

15   opine, I take it -- actually, I should say he has opined.  I

16   take it --

17                 Wait a second.  I lost track here of who's who

18   again.

19                 MR. DAVIES:  We're the defendant, Your Honor.

20                 THE COURT:  Why don't you show me the invalidity

21   pages you're going to show me.

22                 MR. DAVIES:  Okay.  Your Honor, this is just --

23   may I approach?

24                 THE COURT:  Yes.  So I've got some pages here

25   which have a certain amount of yellow highlighting and

1    underlining.

2              MR. DAVIES:  I think you'll see --

3              THE COURT:  And I'm sorry.  You said 291 to 298

4    and the pages you're giving me --

5              MR. DAVIES:  It's the paragraphs, Your Honor.

6              THE COURT:  Sorry.  Okay.

7              MR. DAVIES:  We cite to numerous other examples

8    in our brief as well.

9              THE COURT:  Let me just look at this for a

10   minute.

11             So looking at paragraphs 291 to 298, they on its

12   face appear to disclose opinions that the preamble of

13   Claim 1 is met.

14             MR. DAVIES:  We agree, Your Honor.

15             THE COURT:  Of course you do.

16             Ms. Spetrino, what do you have to say about

17   those paragraphs?

18             MS. SPETRINO:  We have no objection to

19   Dr. Channick testifying about what's in the report.  The

20   fact that he discusses the preamble is not our issue.  The

21   problem is he doesn't disentangle what it means to be a

22   limiting preamble.  He doesn't talk about the significance

23   of that.

24             THE COURT:  That's a legal issue, isn't it?

25             MS. SPETRINO:  Sure but --

1          THE COURT:  If he says it's met and it's a

2    limiting preamble, it is a limiting preamble.  If he says

3    it's met, he doesn't have to say that's a limiting preamble.

4          MS. SPETRINO:  I agree with that, Your Honor.

5    What we're trying to do is make sure he doesn't expand and

6    go in that direction at trial.

7          THE COURT:  All right.  So basically, I think

8    right now, everything is in a good position for the

9    defendants and certainly -- so I'm going to deny this but

10   with leave to make objections if he goes beyond the scope of

11   his expert report at trial.

12         All right.  So that resolves this one; right?

13         MS. SPETRINO:  Thank you, Your Honor.

14         MR. DAVIES:  Your Honor, I apologize.  May I

15   approach?

16         THE COURT:  Yes.  I'm going to give this back to

17   Mr. Davies.

18         MR. DAVIES:  Thank you, Your Honor.

19         THE COURT:  All right.  So we're now down to

20   Docket Item 330, which is a motion in limine to preclude

21   evidence of noninfringement that is contrary to law.  Based

22   on the title, I do prohibit people from proving infringement

23   by things that are contrary to law, but let's see what the

24   details are.  Let me see if I can read my handwriting here.

25   This is the practicing the prior art.

1          You came from over there; right?

2          MR. FERRANTE:  No.  Gabriel Ferrante from the

3   plaintiff, Your Honor.  Goodwin Procter.

4          THE COURT:  There's a space over there and a

5   space over there.

6          Ms. Ferrante, welcome.  I don't think I've heard

7   you speak before.

8          So hold on a minute.

9          So actually, Mr. Ferrante, I have a question

10  that may or may not be above your pay grade.  I'm looking

11  back this morning at my opinion on the motion for

12  preliminary injunction and at the time -- and of course

13  dependent -- it's a preliminary injunction so things are

14  different -- defendant said they did not contest that if

15  Claim 1 was valid, they infringe it.  I'm guessing their

16  position has changed on that now?

17         MR. SUKDUANG:  Yes, Your Honor.  The issue that

18  we have -- and I think this is the issue that Mr. Ferrante

19  is going to raise in the Claim 1 method-of-treatment claim.

20  At the time for the PI, for purposes of PI, we just said

21  look --

22         THE COURT:  You don't have to justify that.  I

23  just want to make sure.

24         MR. SUKDUANG:  So today, Claim 1 requires

25  inducement, so this is an inducement issue, specific intent.

1    So we're contesting infringement based on inducement.

2            THE COURT:  But you're not contesting direct

3    infringement?

4            MR. SUKDUANG:  We're not contesting that the

5    doctor is direct.  It's an issue of inducement.  That's the

6    part we're contesting.

7            THE COURT:  So I may have some more questions

8    for you on that.  What's your name?

9            MR. MORTON:  Phillip Morton, Your Honor.

10            THE COURT:  Let me hear from Mr. Ferrante.

11            Is that what you understood, that this is

12    basically about, at least for some of these claims, maybe

13    only Claim 1, but it's about inducement?

14            MR. FERRANTE:  Yes, Your Honor.  Our

15    understanding is that Dr. Channick offers his practicing the

16    prior art defense as a defense to induced infringement on

17    Claim 1 only.

18            THE COURT:  So you think that's the entirety of

19    Liquidia's defense to Claim 1, is Dr. Channick's opinion?

20            MR. FERRANTE:  So our understanding,

21    Dr. Channick does intend to offer this opinion.  It's also

22    possible that Liquidia could attempt to present this

23    "practicing the prior art" theory through documentary or

24    fact evidence.

25            THE COURT:  I guess what I'm wondering is, is

1    there somebody at Liquidia whose deposition we're going to

2    hear saying we don't think we infringed because of X, Y, and

3    Z?

4                    MR. FERRANTE:  I think that's for Liquidia's

5    counsel.

6                    THE COURT:  Stand there, Mr. Ferrante.

7                    Mr. Morton, do you have any evidence of to

8    defeat inducement other than Dr. Channick?

9                    MR. MORTON:  So Dr. Sagar, who is Liquidia's

10   chief medical officer, did provide testimony about and

11   conveyed that decision-makers at Liquidia -- that Tyvaso had

12   been used to treat PH-ILD prior to this patent.  We're not

13   offering this, though, for the purposes of "practicing the

14   prior art" defense or relying on invalidity as -- to defeat

15   specific intent to induce infringement.  This is about the

16   state of mind at Liquidia.

17                   THE COURT:  So what do you all think the

18   relevant time frame for Liquidia's state of mind is?  And I

19   guess I should start with you, Mr. Morton.

20                   MR. MORTON:  Before infringement, certainly.

21                   THE COURT:  Well, so that infringement issue

22   here, the technical act of infringement, I guess, occurred

23   maybe some time ago.  But what I'm actually supposed to be

24   doing in this trial is talking about whether your product,

25   when it's on the market, will be infringing or not; right?

1          MR. MORTON:  Yes.  What the issue here is are we

2    inducing infringement.

3          THE COURT:  And so if I -- and in fact, if, as

4    you all said at the preliminary injunction -- or forget the

5    preliminary injunction.  If you all said today we're not

6    going to contest we've been using this for the fact that the

7    claim is valid is infringement of Claim 1, direct

8    infringement of Claim 1, we're just questioning, arguing

9    about our state of mind, haven't you already lost?  Because

10   you know that it's infringing.

11         MR. MORTON:  What's relevant about the state of

12   mind, Your Honor, is that this is something that doctors

13   have been doing for a very long time and that Liquidia

14   believed that doctors, they were doing it and that was

15   something that was in the public domain.  So that's relevant

16   to the state of mind of Liquidia as it relates to induced

17   infringement.

18         THE COURT:  But that's assuming you're right

19   that sometime in the past, perhaps when they started to

20   develop this, is the relevant time frame.  I don't think

21   that's the relevant time frame.  I think the relevant time

22   frame is today and into the future.  If I'm right, don't you

23   just lose?

24         MR. MORTON:  You're saying if --

25         MR. SUKDUANG:  Your Honor, may I?

1          THE COURT:  Well, I'd rather you talk to

2    Mr. Morton for a second and let him represent your side.

3          Mr. Morton.

4          MR. MORTON:  Yes, Your Honor.  They still have

5    to prove that there is some specific intent to induce

6    infringement here.

7          THE COURT:  But the question of yes they still

8    have to prove it, yes, they do.  But isn't the question of

9    specific intent or inducement is not what was Liquidia's

10   state of mind two years ago or three years ago, it's what is

11   its state of mind at the time it would be selling this

12   product with this label?

13         MR. MORTON:  And that evidence of Liquidia's

14   state of mind as to what it knew about what doctors were

15   doing before, that's still relevant today.

16         THE COURT:  And so you think Dr. Sagar if he's

17   asked do doctors who treat patients for PH-ILD as described

18   in Claim 1 that that's what your label is telling people to

19   do, is he going to say yes?

20         MR. MORTON:  I think he's going to testify to

21   what the label says, yes, but he's also going to testify

22   about state of mind of Liquidia.

23         THE COURT:  So Dr. Sagar talking about the state

24   of mind of Liquidia, that's a fine thing, maybe a relevant

25   thing, but -- and it depends.  I say it's a fine thing.

1           All right.  So, Mr. Morton, I may give you more

2      opportunity.

3           Mr. Ferrante, I stole your -- I haven't given

4      you a chance here.  What do you want to say briefly?

5           MR. FERRANTE:  That's quite all right, Your

6      Honor.  I think everything Your Honor said about the time we

7      are analyzing for infringement is right on track.  If

8      Liquidia wants to talk about what it alleges to be in the

9      prior art, that's an issue of validity, but the Federal

10     Circuit case law, including the In Re:  Omeprazole case

11     cited in UTC's opening brief, it's crystal clear that

12     practicing the prior art is not a defense to infringement.

13     So whether Liquidia believed it was practicing the prior art

14     also should not be a defense to induced infringement.

15          And Dr. Sagar's testimony about Liquidia's state

16     of mind in the past is not relevant because, as Your Honor

17     articulated, the question about Liquidia's state of mind is

18     when doctors are actually using its drug consistent with its

19     label.  And Liquidia, I just heard, does not contest that

20     doctors using the drug consistent with the label will

21     directly infringe Claim 1.

22          THE COURT:  Okay.  Thank you, Mr. Ferrante.  So

23     let me just ask one other thing.  Mr. Ferrante, don't go

24     away.

25          Mr. Morton, normally, we don't let experts

 1    testify about people's state of mind.  Is that what you're

 2    proposing to have Dr. Channick do?

 3              MR. MORTON:  He's relying on the testimony of

 4    Dr. Sagar about Liquidia's state of mind.

 5              THE COURT:  So if he's relying on that, then

 6    he's just superfluous because Dr. Sagar says what the state

 7    of mind is, and having experts say, yeah, he said that's his

 8    state of mind, that's adding -- that's not any expertise

 9    coming from an expert.  That's the reason why we generally

10    don't let experts testify about state of mind.

11              MR. MORTON:  Understood, Your Honor.  I do want

12    to raise the *Omega Patents* case.  I think that's an

13    important case for Your Honor to consider in this

14    discussion.  In that case, this is a post-*Alamo* case, the

15    Federal Circuit said it was error to exclude the state of

16    mind testimony of the defendant about both invalidity and

17    infringement as a defense to an induced infringement.

18              THE COURT:  When you say by the defendant, do

19    you mean by coming from the defendant itself or do you

20    mean -- just because I don't think you can possibly mean

21    this -- Federal Circuit just said it's always error to

22    exclude any evidence about the defendant's state of mind?

23              MR. MORTON:  That testimony in that case was

24    from the defendant itself, yes, Your Honor.

25              THE COURT:  So here's how I'm going to resolve

1    this:  I'm going to grant the motion to exclude

2    Dr. Channick's testimony as a defense to induced

3    infringement along the lines of Liquidia was aware that

4    people were using Tyvaso to treat PH-ILD patients or

5    whatever exactly it would be.  I think it actually is a

6    "practicing the prior art" defense it's just a "practicing

7    the prior art" defense repurposed for state of mind, but

8    it's absolutely the exact same thing that the Federal

9    Circuit is always criticizing.

10            Secondly, as far as the expert goes, I don't

11    think he can opine on Liquidia's state of mind anyhow.

12            And third, I do think it's irrelevant because

13    he's talking about yesterday and the state of mind for

14    induced infringement would be when Yutrepia is actually

15    being marketed and sold.

16            And for those reasons, I'm going to exclude that

17    testimony.

18            Mr. Ferrante, Mr. Morton said something about

19    Dr. Sagar having some testimony in his deposition.  Is his

20    deposition something you're familiar with?

21            MR. FERRANTE:  I am familiar with it, Your

22    Honor.

23            THE COURT:  Do you have any comment on that?

24            MR. FERRANTE:  Only to the extent that

25    Dr. Sagar's testimony about Liquidia's state of mind in the

1    past is irrelevant.  It should be excluded under Rule 402.

2              THE COURT:  All right.  Is Dr. Sagar, who I take

3    it is a high-up official in Liquidia, is he testifying in

4    person?

5              MR. SUKDUANG:  We have him identified as live or

6    by depo.  We can bring him live and he can testify as to --

7    the questions asked during the deposition by Plaintiff were

8    in the past tense but the state of mind stays the same, so

9    he can testify live.

10             THE COURT:  All right.  Okay.  Well --

11             MR. SUKDUANG:  Actually, on that issue, there

12   was 30(b)(6) deposition testimony.  The 30(b)(6) issue was

13   specifically statements by Liquidia's CEO, Dr. Roger Jeffs,

14   made post-issuance of the patent and talking about when

15   Yutrepia is on the market.

16             Dr. Sagar, our chief medical officer, was the

17   30(b)(6) designee because UTC asked what is the basis for

18   the post statements.  Dr. Sagar is the witness on that.

19   That's the testimony that he would present at trial talking

20   about what Liquidia understands in the past and today

21   regarding this issue.

22             THE COURT:  Okay.  All right.

23             And I'm sorry.  What -- Mr. Morton, you said

24   there was some case that you wanted to cite to me and you

25   said what the name of it was but I didn't write it down.

1  What is that case citation?

2  MR. MORTON:  *Omega Patents v. Calamp*, 920 F.3d

3  1337, and I draw your attention to pages 1349 and 1353.

4  THE COURT:  What do you think the Federal

5  Circuit said at those pages that's relevant here?

6  MR. MORTON:  That testimony about the state of

7  mind of the infringer, including testimony related to what

8  was in the public domain, what was in the patent landscape,

9  that is relevant to a determination about whether there was

10  specific intent to induce infringement because it was post

11  appeal.

12  THE COURT:  I'll have a look at that.

13  MR. FERRANTE:  Your Honor, if I may be heard

14  quickly on the *Omega Patents* case, it does confirm that the

15  infringer's state of mind as to validity is not relevant.

16  THE COURT:  Okay.  Like I said, I will have a

17  look at that.  The problem here for the defendant is that

18  all this testimony is, basically, just saying the facts that

19  make the patent invalid are facts that we knew about and so,

20  therefore, we don't infringe.  The only logical connection

21  between the first part and the second part is in the middle,

22  therefore the patent is invalid, and I think Defendant is

23  just stripping that out of what the person says.  And so I'm

24  kind of dubious about that.

25  And the thing of it is that I don't think --

1   because this has come up before -- I don't think that the

2   defendant can take the position that, yes, Judge, you've

3   said there's direct infringement and we can ignore the fact

4   that it's been legally determined there's direct

5   infringement and go right on to inducing because before you

6   determined there was direct infringement, we didn't think

7   there was direct infringement.  It would be the equivalent

8   of defendants being given a free pass to infringe.  So I

9   think in this kind of context, it makes very little sense.

10          In any event, the narrower thing is before me in

11  Docket Item 330.  I grant Plaintiff's motion and

12  Dr. Channick's testimony about public use offered for this

13  purpose is going to be excluded.

14          All right.  One more.

15          MR. SUKDUANG:  For clarity, we can present

16  Dr. Sagar?

17          THE COURT:  I'm not preventing you from

18  presenting Dr. Sagar right now, though I have my doubts

19  that -- I think the word I used was "dubious."  I'm dubious

20  but you should go ahead and plan to present Dr. Sagar, and

21  if my dubiousness ripens into relative certainty, then he'll

22  testify about other things but not this.

23          MR. SUKDUANG:  We understand that.  And on that

24  point, we think that would be legal error to collapse direct

25  infringement and inducement.  There's a plethora of Federal

1    Circuit case law that says those two are separate theories,

2    and if there's direct infringement under that theory, then

3    there will inevitably always be inducement, that is not the

4    law.

5              THE COURT:  If you have a case to that effect,

6    send it to me by Friday next week because nobody's sent me

7    such a case yet that's relevant to this situation.

8    Essentially, an ANDA NDA where we're basing it on the

9    future.

10             And of course, there's many other aspects to

11   inducement.  When we're talking about labels, maybe the

12   label doesn't direct the medical people to do things in a

13   certain way.  But it makes no sense to me with the position

14   that Defendant is taking on this issue.

15             So the last thing is Docket Item 332, preclude

16   evidence of anticipation that's contrary to law.  And is

17   this -- so this is still a live motion; right?

18             MR. BURROWBRIDGE:  Yes, Your Honor.  Adam

19   Burrowbridge on behalf of United Therapeutics.

20             THE COURT:  And so this is the plaintiff trying

21   to exclude the defendant from saying, essentially, the

22   increase trial proves the inherency of the dependent claim

23   limitations, or at least the ones based on statistics and

24   maybe everything other than the pulse device; right?

25             MR. BURROWBRIDGE:  This is still partially

1    right, Your Honor.  It also includes Claim 1 to the extent

2    they say that Claim 1 is inherently anticipated by one of

3    their anticipation references.  Currently, in the case they

4    have an on-sale defense as well as an increase 2017 protocol

5    defense.  The on-sale defense, I understand them to say that

6    that covers Claim 1.  And so our motion would exclude them

7    relying on increase for purposes of the on-sale defense as

8    well as their increase 2017 anticipation argument.  So put

9    that differently, I generally agree with Your Honor, but I

10   think it's broader than just the dependent claims.

11           THE COURT:  Okay.  So my reaction to this was --

12   wait a second.  So actually, it would be helpful for me,

13   Mr. Burrowbridge, if you would just say, and you sort of

14   said this, where you think inherency is going to come up in

15   the trial.

16           MR. BURROWBRIDGE:  My understanding is that it

17   will come up for their defense based on increase 2017

18   protocol.

19           THE COURT:  Right.

20           MR. BURROWBRIDGE:  Which is one of their four

21   defenses as well as their on-sale bar.  To the extent they

22   raise inherency anywhere else in the case, we think this MIL

23   would exclude exactly what Your Honor said, which is their

24   reliance on increase to prove that patients necessarily

25   inevitably improved exercise capacity.

1           THE COURT:  This seems a lot like a summary

2    judgment motion to me.

3           MR. BURROWBRIDGE:  Your Honor, I don't believe

4    it is for two reasons.  The first reason is this is an issue

5    you already considered at the PI stage.

6           THE COURT:  But nothing to do with the PI stage

7    is final.

8           MR. BURROWBRIDGE:  I understand, Your Honor, but

9    what I think is final from the PI stage is the legal

10   standard that you applied.  At that stage, you made clear as

11   law of the case that for Liquidia to show that there's

12   inherency, they have to show that virtually all patients

13   have improved exercise capacity.  They couldn't show it at

14   the PI stage, as Your Honor found, and they can't show it

15   now.  Their entire theory is based on the increase study

16   showing inherency because they can't show it, they couldn't

17   show it at the PI stage and not now, we believe the law of

18   the case requires the "virtually all" standard to apply and

19   to preclude the evidence that we're asking for, which is

20   where we think the MIL comes in, to preclude them from

21   putting on testimony or argument that increase is --

22          THE COURT:  So this has come up with me before.

23   I don't think anything that happens at a preliminary

24   injunction is law of the case because it's preliminary.

25   It's subject to revision.  I understand what you said, that

1    the law doesn't change.  You said statements to the law, so

2    that's decided.  Part of reason why it's not decided is

3    because it's preliminary talking about likelihood of

4    success, things -- so in any event, to the extent you said

5    "law of case," you're not going to get anywhere with me

6    right now.

7                MR. BURROWBRIDGE:  Let me try.  So what I'm

8    referring to law of the case should require the standard

9    they have to meet is a "virtually all" standard.  So I

10   understand Your Honor saying that was preliminary opinion

11   with preliminary evidence and not I'm not going to apply

12   this ruling to the full case here.  Understood.

13               But Your Honor made the correct decision, which

14   is they must show that virtually all patients must improve

15   exercise capacity because they're relying on the exact same

16   evidence they were relying on before.  We think that should

17   preclude this issue, but the fallback position would be0 to

18   make clear that the "virtually all" standard was the correct

19   standard at the PI stage and is the correct standard

20   throughout trial as precedent in this district demands.

21               THE COURT:  Anything else?

22               MR. BURROWBRIDGE:  Not unless you have

23   questions, Your Honor.

24               THE COURT:  Why don't I hear from the other

25   side.  From Mr. Davies.

1              MR. DAVIES:  Your Honor, we agree with you,

2     obviously, on the fact that this is not a "law of the case"

3     issue.

4              We also disagree that "virtually all" is the

5     standard that we're required to meet.  The "virtually all"

6     language, as Your Honor knows, comes from the *Glaxo* case

7     that was considered at the PI case.  Our case is not *Glaxo*.

8     Our case is closer to the *In Re:  Montgomery* case.  If you

9     look at the *Glaxo* case, the reason the Court did not find an

10    inherency anticipation in *Glaxo* was because the prior art

11    was not directed to the same purpose as the patents in that

12    case.

13             That's not the case here.  The prior art that we

14    are relying on for inherency in this case is, for example,

15    the 2017 increase protocol UTC followed, that protocol to

16    conduct the increase trial, and there's no dispute that the

17    claims of the '327 patent directly flow from the results of

18    that increase trial.  That's the basis for our inherency

19    position.  It's different than it was in the PI stage.

20             The context in which the *Glaxo* Court discusses

21    "virtually all" is acknowledging that even if, even taking

22    into account that the prior art code reference was not

23    directed to the same purpose, it nevertheless could have

24    inherently anticipated if virtually all the designated

25    recipients of the drug under the prior art, such as

1   schizophrenics and obese, also suffered from nausea.

2            The Court is not equating the necessary and

3   inevitable standard for inherency with virtually all.  What

4   it's saying is that this reference in *Glaxo* could have still

5   necessarily and inevitably anticipated the claims if they

6   had been directed to the same purpose.  They weren't here,

7   but it says the population is totally coextensive if

8   virtually all the patients of your broad patient population

9   from the prior art also had nausea, which is limited to the

10  claims, then it could have nevertheless inherently

11  anticipated.

12           We believe it's incorrect that the Court in any

13  way equated a "virtually all" standard with inherent,

14  necessary, and inevitable and we do not believe that's the

15  proper standard here.

16           THE COURT:  So the increase study determined

17  that whatever the Tyvaso chemical name of it is had, to a

18  statistical level of proof, positive outcomes for people

19  with PH-ILD summarized at a very high level; right?

20           MR. DAVIES:  Correct, Your Honor.

21           THE COURT:  And was the increase -- was there

22  a -- there was a control arm and a --

23           MR. DAVIES:  There was, Your Honor.

24           THE COURT:  And so the people who didn't get the

25  placebo or whatever was in the control arm, they got better

1    results than the people in the control arm, but like any

2    large study, any study, some people got better results than

3    others; right?

4              MR. DAVIES:  Correct, Your Honor.  And if -- I

5    think what Plaintiff's argument is, is that we are required

6    to show, even in the context of claims at issue from a

7    clinical trial like we have here in the '327, that we would

8    be forced to show that virtually all patients achieved that

9    result.  That can't be true because in that scenario, you

10   can never have claims that issued from a clinical trial that

11   can be rendered inherently anticipated.  We know that's not

12   the case --

13             THE COURT:  Just because if that's true, you

14   couldn't have claims inherently anticipated.  It's not like

15   you have a legal right to have an inherency argument.

16             MR. DAVIES:   Correct, Your Honor, but we believe

17   the Federal Circuit *In Re:  Montgomery* addressed that issue

18   and said you could even in the context of a clinical trial.

19   In the *In Re:  Montgomery* case, the Court relied on a prior

20   art protocol which is the same evidence we are relying on

21   here.  It was a prior art protocol that was available for a

22   Phase 3 clinical trial, a registration trial for a drug in

23   that case.  That's, again, the exact same evidence we're

24   relying on here.

25             And the court in *In Re:  Montgomery* said, "The

1    hope protocol, the protocol for the Phase 3 trial for the

2    administration of Ramipril, is far from an abstract theory.

3    It's an advance stage of testing designed to secure

4    regulatory approval.  Hope was designed to obtain data from

5    submission to regulatory agencies on the effect of Ramipril

6    on cardiovascular disease."

7              THE COURT:  Having said that, what was the

8    conclusion?

9              MR. MORTON:  It found the method of treatment

10   claim issuing from that clinical trial inherently

11   anticipated by the protocol, even though not every patient

12   in that clinical trial, not virtually all --

13             THE COURT:  Did the claims there claim the

14   results of the clinical trial?

15             MR. DAVIES:  They claim methods of treatment

16   from the clinical trial, Your Honor.

17             THE COURT:  That seems kind of different.

18             MR. DAVIES:  We don't believe it is different,

19   Your Honor.  The methods of treatment of the '327 patent are

20   the methods of treatment from the increase trial.  It is the

21   use of Tyvaso for the treatment of --

22             THE COURT:  That goes to Claim 1; right?

23             MR. DAVIES:  Correct, Your Honor.

24             THE COURT:  But the dependent claims, it seems

25   to me the difference is the case you're citing and the

1    protocol, they actually describe a method, and Claim 1 is a

2    method.  Some of the dependent claims are a method and its

3    results.

4              MR. DAVIES:  Correct.

5              THE COURT:  And the protocol doesn't describe

6    results, and so the question of whether -- actually, from

7    what you're saying, I can't understand the reason we're

8    talking about inherency because if you have a protocol -- in

9    any event, not your fault.  I don't think I'm making

10   progress here.

11             In any event, you say the case to be considered

12   is *In Re:  Montgomery*; right?

13             MR. DAVIES:  Yes, Your Honor.  We also believe

14   that there is no legal basis to equate necessary and

15   inevitable with virtually all, and there's also nothing in

16   the claims that requires virtually all.

17             THE COURT:  So one thing I'm going to have to

18   figure out at some point is the way that I analogize this is

19   inherency is actually pretty much all.  If you have a claim

20   that says water and then somebody else comes along and says

21   I claim water where there are two hydrogens and one oxygen,

22   that's inherent because that's what water is.

23             MR. DAVIES:  Correct, Your Honor.

24             THE COURT:  The results of taking drugs is

25   variable.  Any particular person can range -- I mean,

1    there's nothing that's inherent.  You can have a headache

2    and you take two aspirin and it doesn't do anything for your

3    headache.

4                MR. DAVIES:  That's correct, Your Honor.

5                THE COURT:  So --

6                MR. DAVIES:  Maybe if I could address the

7    protocol maybe again.

8                THE COURT:  Actually, I think I've got your

9    case.  Mr. Burrowbridge seems to want to say something.  Let

10   me hear from him.

11               I'm not going to grant the plaintiff's motion

12   because I do think it's an issue for trial and it's not

13   really a motion in limine issue, so I've heard enough from

14   you.

15               MR. DAVIES:  Can I make one final point, Your

16   Honor?

17               THE COURT:  Okay.

18               MR. DAVIES:  The last thing, we agree.  We also

19   do not believe we should be required, even in the inherency

20   context, to prove more than what the claim requires.  At the

21   PI stage, we did not have the benefit of your claim

22   construction that says "a" or "the" means one or more.  The

23   claims do not require virtually all patients to achieve the

24   results.  They require one or more patients to achieve those

25   results, and we believe in view of the protocol that you

1    would achieve that because it's the same protocol that

2    United Therapeutics followed, Your Honor.

3              THE COURT:  All right.  Thank you.

4              Mr. Burrowbridge.

5              MR. BURROWBRIDGE:  Thank you, Your Honor.  A few

6    points.

7              First, the *In Re:  Montgomery* case that my

8    colleague or my friend on the other side referenced, that

9    was not in their briefing.  For what it's worth, that's new

10   to this argument.

11             THE COURT:  In that case, can I just have the

12   citation for the case?

13             MR. DAVIES:  Citation is *In Re:  Montgomery* 677

14   F.3d 1375, 2012 of the Federal Circuit.

15             THE COURT:  Why wasn't that in the briefing?

16             MR. DAVIES:  Your Honor, frankly, at that stage,

17   we didn't think it was necessary for the briefing.  It is in

18   our issues of law and Plaintiffs are well aware, Your Honor.

19             THE COURT:  So, Mr. Burrowbridge, yes?

20             MR. BURROWBRIDGE:  Based on my understanding of

21   his representation of that case, he was saying in that case

22   some patients previously received some drug and that was the

23   basis of the inherency argument.  Here, their inherency

24   argument is based on the increase 2017 protocol, which is a

25   protocol that was never used.  The protocol changed, so the

1    increase 2017 protocol is not the same protocol as what gave

2    rise to increase that they now rely on.

3              They have two fatal problems with their case.

4    The first is the prior art is not sufficiently linked to

5    what they say must be linked, which is increase.  There's a

6    void in the link, which is the method of the prior art is

7    different than the method of increase, so that can't be a

8    proxy for what they assert to be inherently anticipated.

9              The larger problem which he just mentioned is

10   the proper analysis looks at whether the prior art method

11   necessarily and inevitably leads to the claimed invention

12   for virtually all patients and they want to flip the entire

13   analysis around and move backwards where they start with the

14   claims and work backward and say what do the claims require,

15   let's see if we can meet what the claims require.  And we

16   know they can't do that based on increase.  They can't show

17   that virtually all patients improved exercise capacity

18   because, as Your Honor found, increase doesn't show that.

19             You cited in your PI order Dr. Nathan's

20   testimony, which showed about 50 percent of patients

21   improved.  Some were worse off, and there was a placebo

22   affect of about 25 percent of patients that did not receive

23   treprostinil still improved.  So no matter which way we cut

24   this, based on the legal standard or the facts, we think

25   they ultimately lose.  But one more point.

1          To speak to the MIL portion of this, I

2    understand where Your Honor is.  I think what would be most

3    helpful and important is to make clear what you made clear

4    at the PI stage, which is that the "virtually all" standard

5    does apply to method-of-treatment claims.

6          He wants to distinguish *Glaxo v. Kali.*  That was

7    a case that had a method-of-treatment claim which was a

8    comprising claim.  It was administered to a human and that

9    "a" was the plain and ordinary meaning, which is the same

10   exact claim construction you gave to the term "a" and "the"

11   in this case, and the claim in *Glaxo v. Kali* was also

12   something that required an effective amount of the drug, and

13   we have an effective amount limitation in our claims as

14   well.

15          THE COURT:  Okay.  All right.  Well, so

16   basically, I do think that, essentially, this is pretty much

17   a merits issue as opposed to a motion in limine or kind of

18   thing that should be resolved in a motion in limine.  So I'm

19   going to deny it without any prejudice to later argue about

20   what the proper standard is or how it fits the facts of this

21   case.  So that's how I'm going to dispose of that.

22          Why don't we take a ten-minute break and we'll

23   come back and deal with the length of trial and witnesses

24   and any other issues that we need to discuss.

25          (A recess was taken, after which the following

1    proceedings were had:)

2          THE COURT:  All right.  So just to be clear, I

3    think this is one of the additional issues raised by

4    Plaintiff.  There's a lot of back and forth about damages.

5    Damages, as I'm sure you -- both sides understand, it's not

6    part of this trial, and to the extent the parties are back

7    and forth about Plaintiff has waived damages or Plaintiff a

8    reserving rights or there's going to be discovery, since

9    it's not relevant to this trial, I'm expressing no opinion

10   on that.  That's just you marking territory.

11          So I think the other thing that's really left to

12   decide is how many hours should be allotted to each side.

13   Plaintiff said 7.  Defendant said 10 and a half.  I'm going

14   to listen to you in a minute, but let me just also tell you

15   what I think the schedule is going to be.

16          So the trial day is going to start at 9:30 and

17   it will end at 5:00 and we'll have an hour for lunch in

18   there plus two 15-minute breaks.  So basically, on a day of

19   full trial, there will be six hours of trial.  The Monday

20   and Tuesday I don't have a problem having a full day of

21   trial.  Wednesday, right now, I have something scheduled in

22   the morning that I won't know until Friday of the week

23   before trial roughly how long that's going to take.  But I

24   think it could easily take up the morning, and so perhaps it

25   makes sense to say everyone ought to be ready to go --

1    though I could be notifying you on Friday or even Monday

2    morning that we will start as late as 1:00.

3              And I also -- so I have some things scheduled

4    on, I believe, on Thursday which I can work around, but I

5    think, basically, the trial is probably going to be spread

6    out over those four days, Monday through Thursday, or at

7    least I'm willing to spread it out over that.

8              And as I think you recognized in the submission,

9    the time that I allot is, basically, for your opening and

10   for direct and cross-examination.  I'm perfectly happy to

11   have closing argument that will just be additional time and

12   chances are, that might be on Friday at some point.

13             So the way the case is now shaped up with the

14   definitive -- first off, I guess I say definitive.  I take

15   it that nothing that I've said or done today is causing a

16   change in what or request for a change in what Plaintiff's

17   six asserted claims are or Defendant's noninfringement and

18   four other defenses, that that is now the universe of what

19   the case the trial could be about; right?

20             MR. JACKSON:  Yes, Your Honor.  We consider

21   those claims to be locked, but it's 1, 5, 6 , 9, 14, and 17.

22   Yes, Your Honor.

23             THE COURT:  Yes.

24             MR. SUKDUANG:  And the same.

25             THE COURT:  Great.  So how long do you think is

1    reasonable, with that understanding as to how much time I

2    should allot each side?

3              MR. JACKSON:  So, Your Honor, we actually think

4    we could do it in six hours apiece.  It is a straightforward

5    case.  It was previously 19 claims and 17 defenses.  It is

6    now down to six.  We used to have fights over priority.

7    Those are out.  We used to have fights other inequitable

8    conduct.  That's out.  We think we could try it in -- each

9    side should get six hours but we could equally see if Your

10   Honor wanted to say six hours --

11             THE COURT:  Let me see what the defense says.

12   And I'll give you a chance to respond based on Mr. Sukduang.

13             What are you thinking?

14             MR. SUKDUANG:  We believe, Your Honor, it should

15   be three full days, full days as in the context of what your

16   trial day looks like, as we originally scheduled.  The

17   defendants have physically narrowed the number of claims.

18             THE COURT:  You mean the plaintiffs.

19             MR. SUKDUANG:  I'm sorry.  We're the defendants;

20   right?

21             THE COURT:  I have the same problem.

22             MR. SUKDUANG:  The plaintiffs have physically

23   reduced the number of claims being asserted but have not

24   reduced the scope of the subject matter.  Each of the

25   dependent claims in and of itself is a different piece of

1    subject matter that bases different claims of infringement,

2    that Claim 5 is an issue of infringement and validity.  So

3    is Claim 6, Claim 9, Claim 17.

4              With respect to validity, same.  Different

5    issues.  We have to bring in art to cover some of those

6    different claims.

7              And with respect to witnesses, as you heard,

8    they've got four experts.  They have four experts.  We have

9    two.  Our other two are just rebuttal to them.  If they

10   don't call Thisted at all, one of ours comes out.  If they

11   don't call Dr. Self on commercial success, one of ours comes

12   out.

13             We had a meet-and-confer yesterday with counsel

14   to try to ask them what's the justification for the seven

15   hours of time.  Tell us who you're calling, who you're

16   bringing.  They wouldn't.  We asked them.  We've got 30 fact

17   witnesses.  Multiple of them are identified as live or by

18   deposition.

19             THE COURT:  I'm guessing -- and we'll talk about

20   witnesses in a minute -- their 30 includes everybody who's

21   on your list; right?

22             MR. SUKDUANG:  Some but additional for them.  So

23   we believe -- their entire goal, Your Honor, is not to get

24   this tried in six hours.  It's to prejudice us from being

25   able to present invalidity and noninfringement.  Six hours,

1    seven hours is not going to be enough.  We think, given the

2    week you outlined, with the parameters you identified in

3    terms of your own schedule, that would allot for ten and a

4    half hours.  We're going to be here anyways.  It's not like

5    we're going to leave early, so we believe we should get the

6    full ten.  Otherwise, we will be prejudiced in terms of the

7    ability to present our evidence on both noninfringement and

8    invalidity.

9                    THE COURT:  Okay.  Thank you.

10                   So, Mr. Jackson, so I guess the underlying

11   premise when I start with saying you should expect it to be

12   ten and a half hours a side is to try to force the parties

13   to narrow down the case to whatever is most important.  I

14   suspect a lot of what -- a lot of narrowing occurred in the

15   last week as a result of my orders.  Much of that would have

16   occurred anyway but just perhaps much closer to the trial

17   date.  And I guess -- so I'm not inclined to do six hours

18   and I'm actually not inclined to do seven hours either.

19                   MR. JACKSON:  Could I convince Your Honor to do

20   eight, which would be Monday, Tuesday, Wednesday, six hours

21   Monday, six hours Tuesday, and four hours or whatever we can

22   get in on the Wednesday?

23                   THE COURT:  Let me ask you this.  If I said,

24   okay, Defendant, you can have ten and a half, how many would

25   you want?

1        MR. JACKSON:  With all due respect, Your Honor,

2   I'd love to have the exact same amount of time they have.

3   Otherwise, they can expound more and more about various

4   things they wouldn't otherwise have expounded and I wouldn't

5   have time to respond.

6        THE COURT:  I didn't think that was going to

7   lead anywhere, but if you don't ask you don't know.

8        MR. JACKSON:  For what it matters, Your Honor,

9   we didn't have a long meet-and-confer about all the

10  witnesses.  We did ask them and they told us they were not

11  intending to bring any fact witnesses, so their witnesses

12  are limited to those two experts and depending on what we do

13  on Thisted, Ogenstad, and commercial success and two others

14  for each us.

15       THE COURT:  I think that right now probably

16  Dr. Sagar is probably going to be -- actually, so let's

17  hold --

18       MR. SUKDUANG:  There are also fact witnesses by

19  deposition.  They're questioning live.  There are fact

20  witnesses by deposition.  We asked them, who are you calling

21  live and by deposition?

22       THE COURT:  So let's put off the hours thing.

23  So I did print out the 22, I guess, fact witnesses that are

24  listed on Plaintiff's -- this is Docket Item 335-1, which I

25  guess is a pretrial order or part of the pretrial order or

1    pendency of the pretrial order.  It was Plaintiff's witness

2    list.

3                The 22 people who are listed on pages 1 and 2 of

4    this, which ones of those, Mr. Jackson, do you expect to

5    call live or do you want to call live?

6                MR. JACKSON:  I don't have the sheet right in

7    front of me, Your Honor.  I can tell you we only expect to

8    call a couple of -- a very small number of fact witnesses

9    live.  As Your Honor is well aware, most of the fight in a

10   Hatch-Waxman case like this is the experts.  We have very

11   few, limited fact witnesses, but I don't have the sheet in

12   front of me, so I apologize.

13               THE COURT:  Maybe one of your team members is

14   gathering it.

15               MR. JACKSON:  I think there are a couple of

16   the -- so Dr. Ferrer is a third party.  Mr. Noah Bird --

17               THE COURT:  I'm not asking who all these people

18   are.  Which ones do you think you're going to call live?

19               MR. JACKSON:  So I expect to call a couple of

20   individuals from United Therapeutics, whether that's

21   Mr. Bunce or Lee Peterson or Peter Smith, I expect to call

22   one or two of those people live.  I expect to call maybe one

23   or two doctor or clinician-type folks live.

24               THE COURT:  Who would they be?

25               MR. JACKSON:  That would be, for example, Victor

 1    Tapsen or someone like that.

 2                MR. SUKDUANG:  Could you be more precise than

 3    someone like that?

 4                MR. JACKSON:  I think we're working through

 5    that.  We haven't determined the exact identity of which

 6    witnesses we're calling live.

 7                THE COURT:  Dr. Tapsen is a medical doctor who's

 8    not affiliated with either party or does he work for you?

 9                MR. JACKSON:  He's not affiliated with us.

10                MR. SUKDUANG:  He is affiliated.  He's a paid

11    consultant and part of the increase study protocol steering

12    committee.

13                MR. JACKSON:  He's a doctor in California at a

14    medical center in California, not employed by United

15    Therapeutics.

16                THE COURT:  So Dr. Tapsen or who else on this

17    list is a clinician you might want to call?

18                MR. JACKSON:  Not sure.  I think we're still

19    working.  We've been talking through that issue to figure

20    out.  We certainly, as I kind of started this colloquy with

21    you, we certainly think we can get it done in, as I said,

22    six hours or, alternatively, eight hours and we will limit

23    and identify our witnesses in association in order to meet

24    that requirement.

25                THE COURT:  Okay.  All right.  So in any

1    event -- and the people who work for UTC, what, generally --

2    without saying which ones they are exactly, what is it you

3    would -- so my impression is, though I don't know exactly

4    what a clinician would be testifying about.  And that's

5    something for you.  I don't need to know that.  But the

6    people who work for UTC, what would they be testifying

7    about?

8         MR. JACKSON:  Testifying about the things that

9    led up to the increase trial and the institution of the

10   increase trial and the claim of the invention.  Usually you

11   have somebody associated with the invention.

12        THE COURT:  Are Dr. Bunce, Dr. Peterson, and

13   Dr. Smith, are they inventors?

14        MR. JACKSON:  Yes.  Bunce is not, but, yes, the

15   other two.

16        THE COURT:  All right.  Okay.

17        And, Mr. Sukduang, in your exhibit list, you

18   have a lot of people identified as testifying by deposition.

19   The only people that I see where you say live or by

20   deposition are Jason Adair, Rajiv Sagar, and Janet Tully.

21        MR. SUKDUANG:  I can limit that to Dr. Sagar.

22        THE COURT:  Okay.

23        MR. SUKDUANG:  With the live.  Other than the

24   experts, Your Honor.

25        THE COURT:  I'm sorry.  That was implicit, but I

1     didn't make it explicit.

2              MR. SUKDUANG:  And then looking at their -- by

3     my count, even being judicious with our time, four people,

4     that's two hours right there, 30 minutes each on direct.

5              And with respect to Dr. Tapsen, Dr. Tapsen is a

6     clinician.  He was deposed.  To the extent UTC intends to

7     have him opine rather than just say -- so Dr. Tapsen could

8     say "I did this and I did that" but if he's going to have an

9     expert, it should be a Rule 26 disclosure, which they have

10    not done.

11             THE COURT:  Okay.  All right.  And just going to

12    the expert witnesses at this point, I actually know who they

13    are.  And I think the only -- so Dr. Self, Plaintiff's

14    economist, if he testifies, it will be about commercial

15    success?

16             MR. SUKDUANG:  Yes.  And Dr. Kitter is our

17    corollary to him.

18             THE COURT:  Okay.  So I think to be safe, in

19    terms of getting this actually done in four days, I think I

20    will just give ten and a half hours per side.  Doesn't mean

21    you have to use all the time.  And while I'm always

22    attracted to fewer hours than more, part of it is -- part of

23    what I sometimes find the difference -- sometimes you

24    truncate it down so much that you all are getting in what

25    you think you need to get in but it's so compressed that my

1    absorption of what is it that people are saying can't keep

2    up with it.  So I think it's better to -- I'm sure we could

3    do this in 10 hours or 9 hours, but I think that 10 and a

4    half, we can make that work over four days.  It will result

5    in a better presentation by you and better comprehension by

6    me, so we'll stick with that.

7            MR. SUKDUANG:  On the Dr. Tapsen issue, I

8    believe he's the only clinician they're contemplating

9    calling live.  We do request -- again, we have no problem

10   with Dr. Tapsen testifying I, I, I.  But to the extent he

11   testifies about others, like what a POSA would do --

12           THE COURT:  He's not going to be testifying

13   about what a POSA would do; right?

14           MR. JACKSON:  We intend to have him testify as a

15   fact witness, not expert.

16           THE COURT:  POSAs are not fact witnesses or

17   people testifying about POSAs, so he's a fact witness and

18   apparently he's been deposed.  Okay.  So in terms of the --

19           MR. JACKSON:  And regardless of whichever

20   witness, if we don't use him or use some other clinician,

21   we're going to abide by the same understanding and

22   restrictions.

23           MR. SUKDUANG:  That's the wiggle room, Your

24   Honor.  Is it Dr. Tapsen or Dr. Waxman or someone else?  UTC

25   is being very cagy who it is.

1          THE COURT:  You have in the pretrial order

2     somewhere a schedule for making the final decisions; right?

3     So it is -- I don't normally have a pretrial conference this

4     far in advance of trial.  I'm not faulting Plaintiff for not

5     having -- and there's a lot of moving parts the last few

6     days.  I'm not faulting the plaintiff for not having the

7     final list of its fact witnesses, which seems to be what you

8     want them to do.

9          MR. SUKDUANG:  Does that allow us to -- because

10    of the presentation of evidence, we have deposition

11    testimony from Tapsen and others.  We can play that.  If

12    they identify that witness as coming live, it gets played

13    and it's their issue?

14         THE COURT:  If you proffer -- you're going to

15    know whether he's coming live by the time you have to play a

16    deposition; right?

17         MR. SUKDUANG:  It depends on when they disclose

18    the witnesses.

19         THE COURT:  That's, you know, you have almost no

20    disputes in the pretrial order.  I assume that's because I

21    already tried this case more or less once in front of me.

22    You went with what the last pretrial order was.  It always

23    provides for good faith.

24         We're talking about someone coming from

25    California.  It's not like they're going to decide on a

1    Monday whether or not he's going to testify on Tuesday.

2    So -- or vice versa.  Plaintiffs can decide, so I'm not sure

3    what the problem is that you're addressing here,

4    Mr. Sukduang.

5              MR. SUKDUANG:  I think the way the order works

6    is we have to disclose depo testimony, I think, before they

7    have to disclose --

8              THE COURT:  Yes, well, so people disclose depo

9    testimony and then if the witness -- well --

10             MR. SUKDUANG:  It's just a weird timing of

11   issues and it may get resolved, Your Honor, but if it

12   doesn't, we might bring that up.

13             THE COURT:  I would discourage you from doing

14   that.  On the other hand, doctors, they're not going to be

15   called at the last minute.  Whether they're consultants or

16   not, they've got schedules to keep.

17             And so I'm just wondering, Mr. Jackson, when you

18   think you'll actually know which clinicians you expect to

19   call.

20             MR. JACKSON:  I think we'll work on that in the

21   next couple of weeks.  Your Honor is right.  There's an

22   exchange of "here's when you have to disclose the witnesses

23   you intend to call in the schedule," and we have worked that

24   out in the past.  I don't know why this is now an issue.

25             THE COURT:  Okay.  The only thing I would

1    encourage you is when you decide who you're going to call,

2    to let them know because there is a tremendous amount of --

3    there can be a significant amount of waste of -- and I guess

4    you're not going to be calling anyone other than Dr. Sagar,

5    who they now identified.  But work it out so you're not --

6    so there's not -- so if you decide you're going to call

7    Dr. Tapsen, I would think you're going to have to decide

8    that pretty soon because he can't just be on standby; right?

9             MR. SUKDUANG:  I think by next week, we should

10   be able to have a good idea.

11            THE COURT:  There's a lot of other things going

12   on.  You all try to work it out amongst yourselves, and I

13   say and I hope it's understood:  Be reasonable.

14            MR. JACKSON:  United Therapeutics took your

15   recent order to heart and absolutely right.  We will be

16   accommodating, reasonable, and we intend to work this out.

17            THE COURT:  That's good enough for me.

18            All right.  So I'm not sure there is anything

19   else on my list.

20            Actually, I forgot to write this down.  So do

21   make sure the court reporter gets sort of a glossary every

22   morning of names and strange diseases and other terms that

23   are beyond most normal understanding so that she has a

24   fighting chance of getting a good transcript.

25            MR. JACKSON:  I think the parties can do that in

1    advance and collaborate on that to prepare that kind of list

2    before so she has it.

3            THE COURT:  One other thing I have on my list

4    here, which I overlooked, was the briefing schedule

5    afterwards.  So it's going to have to be relatively fast.  I

6    started off by asking about launch plans because I was

7    trying to figure out whether it had to be super expedited.

8            In some ways, if the judge in North Carolina

9    grants the TRO or preliminary injunction, that probably

10   relieves a certain amount of pressure.  But a judge could

11   easily deny it too.  And so let me ask this rather than

12   sealing anything:  Does the plaintiff have an understanding

13   of what Liquidia's plans are, what circumstances would cause

14   it to launch and which ones, or do you not?

15           MR. JACKSON:  We do not.  We've been trying to

16   get that information and have not been able to get that

17   information.

18           MR. SUKDUANG:  On that, it's actually incorrect

19   because in front of Judge Schroeder, we can send you the

20   briefing, they clearly said what they know and believe.

21   Mr. Jackson -- they said -- and this is the basis for a TRO

22   and PI.  They have to be imminent.  Mr. Jackson in his

23   briefing said we will launch immediately upon FDA approval,

24   full stop.  That's what they know.  That's what they said.

25   His statement now that we don't know is completely

1    contradictory to what they told Judge Schroeder.

2              MR. JACKSON:  To give you more information,

3    we're just quoting what their CEO and their executives have

4    said in the press.  That's all we know.  They have said they

5    intend to launch as soon as they're given the authority to

6    do so.  That authority came last Friday, and we don't have

7    any details since then.  As a result, I did know that they

8    have been saying that they intend to launch, but that's the

9    stuff they've been saying to Wall Street.

10             THE COURT:  Let's not talk about that anymore.

11             So we don't have to decide this now, but the

12   briefing schedule that is adopted ought to result in this

13   case being fully briefed within one month of when we finish

14   the trial, which is faster than usual in a lot of these

15   cases, most of these cases.  So I want to do that, to be

16   thinking about how to accomplish that.  I don't think we

17   need to get into any further details at this time, but I

18   want you to understand I do want it to be briefed pretty

19   quickly.  Okay?

20             MR. JACKSON:  Yes, Your Honor.

21             MR. SUKDUANG:  We did have one administrative

22   issue.

23             THE COURT:  I was going to give you an

24   opportunity to raise things I haven't raised.

25             MR. SUKDUANG:  We just want to talk about

 1   launching an objection to your order from the 28th with

 2   respect to what we disclose or not disclose.  I don't want

 3   to put more papers in, but would you allow a page or two

 4   extra in our post-trial briefing to lodge that objection

 5   formally to the extent we need it on appeal?

 6               THE COURT:  The order you're talking about is

 7   the one that dealt with Judge Fallon's --

 8               MR. SUKDUANG:  Correct.

 9               THE COURT:  Well, Mr. Sukduang, the only thing

10   that you can really do, I think, is file a motion for

11   reconsideration.  There is no filing an objection to my

12   order.

13               MR. SUKDUANG:  So rather than go through filing

14   the paper and having more paper for you to review, we could

15   either put the reconsideration in our post-trial briefing or

16   I can just ask you to preserve.  We just want to make sure

17   we preserve the issue on appeal and UTC doesn't come in and

18   say --

19               THE COURT:  Generally speaking, preserving an

20   issue on appeal is something that happens before the Court's

21   ruling, not after.

22               MR. SUKDUANG:  No, because we already have by

23   raising this issue through --

24               THE COURT:  So you already have, then you don't

25   need to do anything more.

1          MR. SUKDUANG:  That's fine.  I want to make sure

2    if we bring it up on appeal --

3          THE COURT:  So I'm not ruling on anything here,

4    and what UTC chooses to bring up on appeal is up to UTC.

5    They can figure out the law as well as you can, and so I'm

6    not prohibiting you from filing anything, but there isn't

7    any such thing.

8          I think, Mr. Hoeschen and Ms. Keller, there

9    isn't any such thing as filing objections to a District

10   Court order.

11         MR. HOESCHEN:  I agree, Your Honor.

12         MR. SUKDUANG:  We just want to make sure we can

13   raise it.  I'm fine with that, Your Honor.  I didn't want to

14   leave it unsettled.

15         THE COURT:  That's resolved.

16         MR. SUKDUANG:  We don't have any other issues.

17         THE COURT:  Mr. Jackson?

18         MR. JACKSON:  Nothing from us, and we appreciate

19   your time.

20         THE COURT:  Thank you.  And we'll issue some

21   kind of order that just, basically, adopts the pretrial

22   order.

23         And so you should be here at 9:00 on the Monday

24   even though we won't start until 9:30.  Okay.  Thank you

25   very much.  Have a nice day.

1

2

3

4

5                    **C E R T I F I C A T E**

6          I, Deanna L. Warner, a Registered Professional

7  Report, do hereby certify that as such Registered

8  Professional Reporter, I was present at and reported in

9  Stenotype shorthand the above and foregoing proceedings.

10

11  _____

12  Deanna L. Warner, RPR, CSR
    Official Court Reporter
    U.S. Federal Court

13

14

15

16

17

18

19

20

21

22

23

24

25

'

**'327** [5] - 7:12, 29:15, 59:17, 61:7, 62:19
**'793** [2] - 4:24, 41:7

**0**

**05** [1] - 25:6

**1**

**1** [28] - 7:7, 7:18, 7:19, 27:5, 27:14, 27:16, 29:15, 30:8, 41:6, 41:8, 42:13, 44:15, 44:19, 44:24, 45:13, 45:17, 45:19, 47:7, 47:8, 48:18, 49:21, 56:1, 56:2, 56:6, 62:22, 63:1, 69:21, 74:3
**10** [3] - 68:13, 78:3
**102(a)(1)** [1] - 8:20
**11** [2] - 8:1
**128** [2] - 41:1, 41:2
**130** [2] - 41:1, 41:3
**1337** [1] - 53:3
**1349** [1] - 53:3
**1353** [1] - 53:3
**1360** [1] - 21:3
**1375** [1] - 65:14
**14** [12] - 7:20, 7:23, 7:24, 8:1, 8:2, 8:5, 11:22, 11:25, 12:2, 27:10, 27:20, 69:21
**15-minute** [1] - 68:18
**17** [7] - 7:18, 7:19, 27:19, 69:21, 70:5, 71:3
**19** [1] - 70:5
**1:00** [1] - 69:2

**2**

**2** [2] - 30:8, 74:3
**20** [2] - 5:1, 10:23
**2009** [1] - 6:21
**2010** [1] - 21:4
**2012** [1] - 65:14
**2017** [6] - 56:4, 56:8, 56:17, 59:15, 65:24, 66:1
**2018** [2] - 7:8, 41:7
**2022** [1] - 4:24
**2023** [1] - 21:9
**2025** [1] - 1:13

**22** [2] - 73:23, 74:3
**23** [2] - 4:19, 5:5
**23-CV-975-RGA** [1] - 1:5
**23rd** [1] - 5:10
**24th** [1] - 5:7
**25** [1] - 66:22
**26** [1] - 77:9
**278** [1] - 13:15
**280** [3] - 11:6, 11:9, 26:6
**281** [1] - 11:6
**282** [2] - 26:23, 28:18
**284** [6] - 9:19, 10:16, 10:19, 11:2, 28:19
**285** [4] - 9:19, 10:15, 10:16
**286** [2] - 26:20, 28:19
**28th** [1] - 84:1
**291** [3] - 41:5, 42:3, 42:11
**298** [3] - 41:5, 42:3, 42:11
**299** [1] - 9:21

**3**

**3** [3] - 34:24, 61:22, 62:1
**30** [3] - 71:16, 71:20, 77:4
**30(b)(6** [3] - 52:12, 52:17
**30th** [1] - 1:12
**313** [1] - 9:23
**320** [2] - 28:22, 29:12
**322** [2] - 29:13, 38:1
**328** [2] - 38:5, 38:7
**330** [2] - 43:20, 54:11
**332** [1] - 55:15
**335-1** [1] - 73:24

**4**

**4** [1] - 26:2
**402** [1] - 52:1
**403** [2] - 29:23

**5**

**5** [7] - 7:19, 27:11, 27:13, 27:14, 27:19, 69:21, 71:2
**50** [1] - 66:20
**594** [1] - 21:3
**5:00** [1] - 68:17

**6**

**6** [5] - 7:19, 27:14, 27:19, 69:21, 71:3
**6614486** [1] - 21:9
**677** [1] - 65:13
**6A** [1] - 1:12

**7**

**7** [1] - 68:13

**8**

**8** [2] - 8:23

**9**

**9** [11] - -
6:15, 27:14 69:21
**920** [1]
**9:00** [1]
**9:30** [2] - 68:16, 85:24

**A**

**abide** [1] - 78:21
**ability** [5] - 15:18, 16:19, 17:12, 17:14, 72:7
**able** [6] - 15:25, 16:3, 23:25, 71:25, 81:10, 82:16
**absence** [1] - 31:9
**absolute** [1] - 28:25
**absolutely** [4] - 6:21, 39:22, 51:8, 81:15
**absorption** [1] - 78:1
**abstract** [1] - 62:2
**access** [1] - 15:2
**accessible** [1] - 13:13
**accommodating** [1] - 81:16
**accomplish** [1] - 83:16
**according** [1] - 27:4
**account** [2] - 19:18, 59:22
**achieve** [3] - 64:23, 64:24, 65:1
**achieved** [1] - 61:8
**acknowledging** [1] - 59:21
**act** [1] - 46:22

**actual** [2] - 12:20, 40:14
**Adair** [1] - 76:20
**Adam** [3] - 3:11, 14:5, 55:18
**ADAM** [1] - 1:18
**add** [2] - 19:2, 19:5
**adding** [1] - 50:8
**additional** [4] - 27:7, 68:3, 69:11, 71:22
**address** [3] - 28:8, 39:16, 64:6
**addressed** [2] - 35:22, 61:17
**addressing** [2] - 24:18, 80:3
**adequate** [2] - 15:14, 21:16
**adjudication** [1] - 5:12
**administered** [1] -
**adopted** [2] - 39:14, 83:12
**adopts** [1] - 85:21
**advance** [4] - 31:4, 62:3, 79:4, 82:1
**affect** [1] - 66:22
**affiliated** [2] - 75:8, 75:9, 75:10
**afterwards** [1] - 82:5
**agencies** [1] - 62:5
**ago** [5] - 6:5, 28:20, 46:23, 48:10
**agree** [15] - 14:8, 15:1, 17:7, 20:21, 28:24, 29:7, 34:13, 35:21, 39:8, 42:14, 43:4, 56:9, 59:1, 64:18, 85:11
**agreed** [3] - 8:20, 13:1, 20:12
**agreement** [2] - 13:4, 25:18, 39:15
**ahead** [5] - 9:17, 11:4, 54:20
**ail** [1] - 28:5
**Alamo** [1] - 50:14
**alleges** [1] - 49:8
**allot** [3] - 69:9, 70:2, 72:3
**allotted** [1] - 68:12
**allow** [3] - 27:25, 79:9, 84:3
**almost** [1] - 79:19

**alone** [1] - 38:1
**alternatively** [1] - 75:22
**amount** [7] - 41:25, 67:12, 67:13, 73:2, 81:2, 81:3, 82:10
**analogize** [1] - 63:18
**analysis** [5] - 16:23, 16:25, 17:1, 66:10, 66:13
**analyzing** [1] - 49:7
**AND** [1] - 1:2
**ANDA** [1] - 55:8
**Andrews** [2] - 1:12, 17:19
**answer** [1] - 38:19
**anticipated** [8] - 56:2, 59:24, 60:5, 60:11, 61:11, 61:14, 62:11, 66:8
**anticipation** [7] - 7:22, 8:21, 11:21, 55:16, 56:3, 56:8, 59:19
**anyhow** [1] - 51:11
**anyway** [1] - 72:16
**anyways** [1] - 72:4
**apiece** [1] - 70:4
**apologize** [3] - 32:7, 43:14, 74:12
**appeal** [6] - 53:11, 84:5, 84:17, 84:20, 85:2, 85:4
**appear** [1] - 42:12
**Appearances** [1] - 2:1
**APPEARANCES** [1] - 1:14
**application** [1] - 37:15
**applied** [1] - 57:10
**applies** [4] - 11:21, 11:24, 26:16, 27:14
**apply** [10] - 7:23, 7:24, 11:22, 26:9, 27:8, 27:13, 27:15, 57:18, 58:11, 67:5
**appreciate** [1] - 85:18
**approach** [6] - 16:19, 17:11, 20:21, 26:7, 41:23, 43:15
**appropriate** [2] - 20:22, 37:16
**approval** [4] - 4:14, 4:20, 62:4, 82:23
**argue** [3] - 18:15, 36:20, 67:19
**argued** [1] - 5:1
**arguing** [6] - 6:4, 18:13, 33:24, 34:8, 35:14, 47:8
**argument** [12] - 17:2, 19:7, 29:22, 37:9,

56:8, 57:21, 61:5, 61:15, 65:10, 65:23, 65:24, 69:11
**arm** [3] - 60:22, 60:25, 61:1
**ARSHT** [1] - 1:15
**art** [25] - 18:6, 19:15, 25:8, 30:20, 41:9, 43:25, 45:16, 45:23, 46:14, 49:9, 49:12, 49:13, 51:6, 51:7, 59:10, 59:13, 59:22, 59:25, 60:9, 61:20, 61:21, 66:4, 66:6, 66:10, 71:5
**ART** [1] - 1:19
**article** [1] - 9:1
**articulated** [1] - 49:17
**aspects** [2] - 11:11, 55:10
**aspirin** [1] - 64:2
**assert** [1] - 66:8
**asserted** [2] - 69:17, 70:23
**asserting** [1] - 14:3
**associated** [15] - 4:8, 29:14, 29:17, 30:7, 30:24, 31:14, 32:9, 32:13, 32:19, 32:22, 33:1, 34:15, 34:21, 76:11
**association** [1] - 75:23
**assume** [1] - 79:20
**assuming** [2] - 16:23, 47:18
**asterisks** [2] - 3:24, 4:7
**attack** [2] - 18:8, 18:9
**attempt** [1] - 45:22
**attention** [1] - 53:3
**attracted** [1] - 77:22
**attribute** [1] - 32:5
**authority** [3] - 15:17, 83:5, 83:6
**available** [1] - 61:21
**awaiting** [1] - 5:2
**aware** [3] - 51:3, 65:18, 74:9

### B

**backward** [1] - 66:14
**backwards** [1] - 66:13
**bad** [3] - 16:22, 16:24, 20:10
**badly** [1] - 20:8
**ballpark** [1] - 25:12
**bar** [1] - 56:21

**based** [20] - 9:8, 22:13, 22:16, 23:9, 24:22, 25:23, 25:25, 29:7, 29:22, 37:23, 43:21, 45:1, 55:23, 56:17, 57:15, 65:20, 65:24, 66:16, 66:24, 70:12
**baseline** [1] - 16:1
**bases** [1] - 71:1
**basing** [1] - 55:8
**basis** [6] - 34:16, 52:17, 59:18, 63:14, 65:23, 82:21
**battle** [2] - 35:25, 36:12
**Bay** [1] - 21:9
**be0** [1] - 58:17
**bear** [2] - 24:13, 24:14
**behalf** [7] - 3:6, 3:19, 4:18, 14:5, 33:11, 39:1, 55:19
**benefit** [1] - 64:21
**best** [2] - 32:21, 35:22
**better** [5] - 60:25, 61:2, 78:2, 78:5
**between** [2] - 21:16, 53:21
**beyond** [3] - 39:23, 43:10, 81:23
**binder** [1] - 40:17
**biostatistical** [4] - 16:22, 16:24, 17:1, 17:2
**biostatistician** [3] - 14:10, 18:18, 19:18
**biostatisticians** [2] - 15:5, 26:14
**biostatistics** [13] - 15:22, 15:24, 16:15, 16:17, 17:10, 18:4, 18:13, 18:22, 18:23, 18:24, 19:2, 19:22, 25:3
**bird** [1] - 74:16
**bit** [2] - 32:18
**blah** [3] - 16:25
**boils** [1] - 13:17
**boom** [1] - 28:5
**break** [1] - 67:22
**breaks** [1] - 68:18
**brief** [3] - 37:18, 42:8, 49:11
**briefed** [2] - 83:13, 83:18
**briefing** [14] - 28:8, 28:15, 36:7, 36:8, 36:10, 65:9, 65:15, 65:17, 82:4, 82:20, 82:23, 83:12, 84:4,

84:15
**briefly** [1] - 49:4
**bring** [8] - 10:12, 12:24, 52:6, 71:5, 73:11, 80:12, 85:2, 85:4
**bringing** [1] - 71:16
**brings** [1] - 28:20
**broad** [3] - 30:17, 32:23, 60:8
**broader** [1] - 56:10
**built** [1] - 15:23
**Bunce** [3] - 74:21, 76:12, 76:14
**bunch** [1] - 8:14
**burden** [3] - 24:1, 24:13, 24:14
**burning** [1] - 25:17
**BURROWBRIDGE** [31] - 1:18, 14:5, 14:14
15:11
17:7,
21:1,
21:15
23:13
26:19
56:16, 56:20, 57:3, 57:8, 58:7, 58:22, 65:5, 65:20
**Burrowbridge** [11] - 3:11, 14:5, 17:16, 20:19, 23:7, 24:12, 55:19, 56:13, 64:9, 65:4, 65:19
**Burrowbridge's** [1] - 22:14
**BY** [2] - 1:15, 1:23

### C

**cagy** [1] - 78:25
**Calamp** [1] - 53:2
**California** [3] - 75:13, 75:14, 79:25
**cannot** [1] - 21:25
**capacity** [6] - 7:7, 28:24, 56:25, 57:13, 58:15, 66:17
**captioned** [1] - 29:13
**cardiovascular** [1] - 62:6
**care** [2] - 29:12, 38:1
**careful** [1] - 21:21
**Carolina** [6] - 4:21, 4:23, 5:17, 6:1, 6:4, 82:8
**CARSTEN** [11] - 1:18, 33:10, 33:21, 34:1,

34:6, 34:13, 34:15, 34:23, 35:24, 36:16, 38:3
**Carsten** [6] - 3:8, 33:11, 33:14, 33:20, 35:8, 35:15
**carve** [1] - 11:13
**case** [75] - 4:25, 5:12, 5:13, 5:14, 10:25, 14:21, 18:4, 19:6, 20:24, 21:4, 21:5, 21:24, 22:4, 22:25, 23:12, 23:14, 23:15, 23:22, 26:2, 26:3, 31:13, 39:3, 49:10, 50:12, 50:13, 50:14, 50:23, 52:24, 53:1, 53:14, 55:1, 55:5, 55:7, 56:3, 56:22, 57:11, 57:18, 57:24,
66:3, 67:7, 67:11, 67:21, 69:13, 69:19, 70:5, 72:13, 74:10, 79:21, 83:13
**Case** [1] - 1:5
**cases** [4] - 21:8, 37:13, 83:15
**causation** [3] - 31:1, 32:15, 36:4
**causing** [1] - 69:15
**center** [1] - 75:14
**CEO** [2] - 52:13, 83:3
**certain** [6] - 6:23, 10:21, 18:6, 41:25, 55:13, 82:10
**certainly** [9] - 9:8, 14:11, 15:6, 25:2, 31:4, 43:9, 46:20, 75:20, 75:21
**certainty** [1] - 54:21
**certify** [1] - 86:5
**chance** [4] - 39:5, 49:4, 70:12, 81:24
**chances** [1] - 69:12
**change** [3] - 58:1, 69:16
**changed** [2] - 44:16, 65:25
**Channick** [17] - 10:8, 18:15, 25:1, 32:20, 34:18, 38:12, 38:13, 38:18, 39:11, 39:16, 39:24, 41:6, 42:19,

45:15, 45:21, 46:8, 50:2
**Channick's** [5] - 40:3, 40:20, 45:19, 51:2, 54:12
**chemical** [1] - 60:17
**chief** [7] - 22:25, 23:12, 23:14, 23:15, 23:22, 46:10, 52:16
**chooses** [1] - 85:4
**Circuit** [11] - 15:14, 21:4, 37:13, 49:10, 50:15, 50:21, 51:9, 53:5, 55:1, 61:17, 65:14
**circumstances** [1] - 82:13
**citation** [4] - 21:2, 53:1, 65:12, 65:13
**citations** [3] - 40:4, 40:12, 40:13
**cite** [3] - 40:25, 42:7, 52:24
**cited** [4] - 20:25, 40:19, 49:11, 66:19
**cites** [2] - 21:5, 29:23
**citing** [1] - 62:25
**claim** [33] - 6:13, 7:18, 7:21, 29:8, 30:6, 30:11, 31:7, 31:12, 32:9, 33:22, 35:7, 35:17, 35:22, 36:11, 36:20, 37:19, 37:20, 37:22, 44:19, 47:7, 55:22, 62:10, 62:13, 62:15, 63:19, 63:21, 64:20, 64:21, 67:7, 67:8, 67:10, 67:11, 76:10
**Claim** [37] - 6:14, 6:15, 7:7, 7:18, 9:3, 27:5, 27:11, 27:13, 27:14, 27:16, 27:20, 29:1, 29:15, 30:8, 41:6, 41:8, 42:13, 44:15, 44:19, 44:24, 45:13, 45:17, 45:19, 47:7, 47:8, 48:18, 49:21, 56:1, 56:2, 56:6, 62:22, 63:1, 71:2, 71:3
**claimed** [3] - 15:15, 21:17, 66:11
**claims** [44] - 6:11, 6:15, 6:17, 6:18, 7:11, 7:12, 7:16, 8:3, 8:15, 11:21, 27:6, 27:8, 28:3, 30:23, 32:21, 33:4, 35:12, 45:12, 56:10, 59:17,

60:5, 60:10, 61:6, 61:10, 61:14, 62:13, 62:24, 63:2, 63:16, 64:23, 66:14, 66:15, 67:5, 67:13, 69:17, 69:21, 70:5, 70:17, 70:23, 70:25, 71:1, 71:6

**clarification** [2] - 22:21, 30:13
**clarifying** [1] - 12:11
**clarity** [2] - 27:14, 54:15
**clear** [13] - 13:10, 13:12, 20:11, 23:24, 24:23, 28:3, 29:24, 49:11, 57:10, 58:18, 67:3, 68:2
**clearly** [1] - 82:20
**clinical** [9] - 16:2, 61:7, 61:10, 61:18, 61:22, 62:10, 62:12, 62:14, 62:16
**clinician** [6] - 74:23, 75:17, 76:4, 77:6, 78:8, 78:20
**clinician-type** [1] - 74:23
**clinicians** [1] - 80:18
**close** [2] - 39:12, 39:13
**closer** [2] - 59:8, 72:16
**closing** [1] - 69:11
**code** [1] - 59:22
**coexist** [1] - 21:8
**coextensive** [1] - 60:7
**collaborate** [1] - 82:1
**collapse** [1] - 54:24
**colleague** [1] - 65:8
**colloquy** [1] - 75:20
**color** [1] - 19:2
**coming** [9] - 5:8, 25:8, 32:5, 36:11, 50:9, 50:19, 79:12, 79:15, 79:24
**comment** [1] - 51:23
**comments** [1] - 23:19
**commercial** [6] - 6:22, 12:24, 25:20, 71:11, 73:13, 77:14
**committee** [1] - 75:12
**communication** [1] - 5:4
**compelling** [2] - 19:19, 19:20
**completely** [1] - 82:25
**complicated** [3] - 30:3, 30:4, 32:4
**component** [1] - 31:1

**components** [1] - 32:15
**comprehension** [1] - 78:5
**compressed** [1] - 77:25
**comprising** [1] - 67:8
**concerned** [1] - 39:22
**concerns** [1] - 30:5
**conclusion** [1] - 62:8
**conclusions** [2] - 18:10, 19:17
**concomitant** [2] - 32:24, 35:3
**conditional** [1] - 26:8
**conduct** [5] - 10:20, 10:24, 59:16, 70:8
**confer** [6] - 8:13, 8:19, 12:22, 12:23, 71:13, 73:9
**CONFERENCE** [2] - 1:9, 1:11
**conference** [1] - 79:3
**confirm** [2] - 11:19, 53:14
**confirmed** [3] - 7:8, 8:22, 8:23
**conflict** [1] - 19:4
**confusing** [1] - 29:24
**connection** [1] - 53:20
**consequences** [1] - 29:10
**consider** [2] - 50:13, 69:20
**consideration** [2] - 13:6, 13:7
**considerations** [4] - 12:24, 23:3, 24:1, 25:19
**considered** [4] - 20:15, 57:5, 59:7, 63:11
**consistent** [3] - 34:7, 49:18, 49:20
**construction** [20] - 29:9, 30:6, 30:11, 31:12, 33:22, 33:25, 34:1, 34:4, 34:6, 35:7, 35:17, 35:23, 36:11, 36:21, 36:25, 37:20, 37:22, 64:22, 67:10
**consultant** [1] - 75:11
**consultants** [1] - 80:15
**contained** [1] - 39:20
**contemplating** [1] - 78:8
**contend** [1] - 20:10
**contest** [4] - 39:21,

44:14, 47:6, 49:19
**contesting** [6] - 9:5, 14:3, 45:1, 45:2, 45:4, 45:6
**context** [14] - 19:2, 29:1, 30:16, 30:22, 31:20, 31:22, 31:23, 40:22, 54:9, 59:20, 61:6, 61:18, 64:20, 70:15
**continued** [1] - 2:1
**contradicted** [1] - 30:23
**contradictory** [1] - 83:1
**contrary** [3] - 43:21, 43:23, 55:16
**control** [2] - 60:22, 60:25, 61:1
**conversation** [1] - 22:16
**conve**[...]
**convir**[...]
**COOL**[...]
**Cooley**[...] 4:17,
**copyri**[...]
**corollary** [1] - 77:17
**CORPORATION** [1] - 1:3
**correct** [22] - 5:21, 6:9, 7:17, 10:5, 13:8, 15:11, 16:18, 18:16, 18:21, 23:10, 33:18, 58:13, 58:18, 58:19, 60:20, 61:4, 61:16, 62:23, 63:4, 63:23, 64:4, 84:8
**correction** [1] - 12:21
**correctly** [2] - 17:22, 18:12
**counsel** [8] - 1:25, 3:7, 3:10, 3:20, 6:2, 38:22, 46:5, 71:13
**Counsel** [1] - 2:11
**count** [1] - 77:3
**country** [1] - 7:6
**couple** [6] - 10:22, 17:21, 74:8, 74:15, 74:19, 80:21
**couple-hundred-page** [1] - 10:22
**course** [3] - 42:15, 44:12, 55:10
**Court** [8] - 35:21, 39:14, 59:9, 60:2, 60:12, 61:19, 86:10, 86:10
**COURT** [222] - 1:1, 3:1, 3:14, 3:24, 4:7,

4:11, 5:4, 5:13, 5:17, 5:24, 6:1, 6:6, 6:16, 6:19, 7:9, 7:14, 7:22, 7:25, 8:4, 8:7, 8:11, 8:16, 9:4, 9:7, 9:15, 9:20, 9:22, 9:25, 10:6, 10:18, 11:1, 11:8, 11:14, 11:23, 12:4, 12:7, 12:12, 12:17, 13:4, 13:11, 13:21, 14:9, 14:18, 14:23, 15:4, 16:4, 16:8, 16:21, 17:16, 18:19, 20:5, 20:16, 20:19, 20:24, 21:2, 21:6, 21:11, 21:23, 22:18, 23:7, 23:11, 23:18, 24:5, 25:10, 25:12, 25:22, 26:5, 26:11, 26:16, 26:20, [...]
34:19, 34:25, 35:6, 35:14, 36:14, 36:20, 37:8, 38:4, 39:5, 39:10, 39:25, 40:5, 40:13, 40:18, 40:23, 41:2, 41:10, 41:13, 41:20, 41:24, 42:3, 42:6, 42:9, 42:15, 42:24, 43:1, 43:7, 43:16, 43:19, 44:4, 44:22, 45:2, 45:7, 45:10, 45:18, 45:25, 46:6, 46:17, 46:21, 47:3, 47:18, 48:1, 48:7, 48:16, 48:23, 49:22, 50:5, 50:18, 50:25, 51:23, 52:2, 52:10, 52:22, 53:4, 53:12, 53:16, 54:17, 55:5, 55:20, 56:11, 56:19, 57:1, 57:6, 57:22, 58:21, 58:24, 60:16, 60:21, 60:24, 61:13, 62:7, 62:13, 62:17, 62:22, 62:24, 63:5, 63:17, 63:24, 64:5, 64:8, 64:17, 65:3, 65:11, 65:15, 65:19, 67:15, 68:2, 69:23, 69:25, 70:11, 70:18, 70:21, 71:19, 72:9, 72:23, 73:6, 73:15, 73:22, 74:13, 74:17, 74:24, 75:7,

75:16, 75:25, 76:12, 76:16, 76:22, 76:25, 77:11, 77:18, 78:12, 78:16, 79:1, 79:14, 79:19, 80:8, 80:13, 80:25, 81:11, 81:17, 82:3, 83:10, 83:23, 84:6, 84:9, 84:19, 84:24, 85:3, 85:15, 85:17, 85:20
**court** [6] - 4:4, 5:6, 59:20, 61:25, 81:21, 85:10
**Court's** [1] - 84:20
**Courtroom** [1] - 1:12
**courts** [1] - 21:7
**cover** [6] - 6:17, 6:18, 8:15, 10:16, 13:9, 71:5
**covered** [1] - 6:14
**covers** [1] - 56:6
**criticizing** [1] - 51:9
**critique** [6] - 15:19, 16:3, 16:20, 17:3, 17:12, 23:16
**cross** [2] - 28:9, 69:10
**Cross** [1] - 15:3
**cross-examination** [1] - 69:10
**cross-examine** [1] - 28:9
**Cross-talk)** [1] - 15:3
**crystal** [1] - 49:11
**CSR** [1] - 86:9
**curious** [2] - 4:12, 16:11
**cut** [2] - 12:14, 66:23

## D

**damages** [3] - 68:4, 68:5, 68:7
**DAN** [1] - 2:8
**Dan** [2] - 3:21, 17:19
**data** [1] - 62:4
**date** [3] - 5:11, 9:6, 72:17
**Daubert** [10] - 9:18, 10:2, 10:5, 10:7, 10:14, 11:3, 11:5, 11:16, 26:8, 26:17
**Dauberts** [2] - 9:13, 13:14
**Davies** [10] - 3:21, 30:10, 33:14, 33:22, 35:6, 35:10, 39:7, 40:1, 43:17, 58:25
**DAVIES** [49] - 2:7, 29:3, 30:10, 31:16,

70:5

**definition** [13] - 14:8, 14:17, 14:21, 17:10, 20:12, 21:13, 30:21, 31:6, 32:16, 34:14, 36:13, 36:15, 37:13
**definitions** [1] - 37:10
**definitive** [2] - 69:14
**DELAWARE** [1] - 1:2
**delay** [1] - 29:25
**demands** [1] - 58:20
**denied** [2] - 26:17, 26:18
**deny** [4] - 28:14, 43:9, 67:19, 82:11
**dependent** [14] - 7:10, 7:16, 7:18, 27:6, 27:8, 28:3, 30:8, 44:13, 55:22, 56:10, 62:24, 63:2, 70:25
**depo** [3] - 52:6, 80:6, 80:8
**deposed** [2] - 77:6, 78:18
**deposition** [15] - 38:18, 39:18, 46:1, 51:19, 51:20, 52:7, 52:12, 71:18, 73:19, 73:20, 73:21, 76:18, 76:20, 79:10, 79:16
**describe** [2] - 63:1, 63:5
**described** [1] - 48:17
**description** [3] - 6:10, 9:2, 29:10
**descriptions** [1] - 14:12
**design** [1] - 16:2
**designated** [1] - 59:24
**designed** [2] - 62:3, 62:4
**designee** [1] - 52:17
**details** [3] - 43:24, 83:7, 83:17
**determination** [1] - 53:9
**determined** [5] - 23:13, 54:4, 54:6, 60:16, 75:5
**develop** [1] - 47:20
**development** [1] - 14:16
**device** [4] - 6:20, 8:2, 27:9, 55:24
**DI** [1] - 9:19
**difference** [3] - 23:19, 62:25, 77:23
**different** [15] - 28:11, 31:5, 31:6, 32:2, 37:10, 38:12, 44:14,

59:19, 62:17, 62:18, 66:7, 70:25, 71:1, 71:4, 71:6
**differently** [2] - 22:3, 56:9
**difficult** [1] - 22:24
**direct** [12] - 45:2, 45:5, 47:7, 54:3, 54:4, 54:6, 54:7, 54:24, 55:2, 55:12, 69:10, 77:4
**directed** [7] - 6:10, 6:13, 7:18, 39:9, 59:11, 59:23, 60:6
**direction** [1] - 43:6
**directly** [2] - 49:21, 59:17
**disagree** [4] - 14:15, 15:21, 16:1, 23:24, 35:20, 59:4
disagr
disclo
79:17
80:8,
disclo
38:9
disclo
18:7
**disclosure** [3] - 30:19, 38:9, 77:9
**discourage** [1] - 80:13
**discovery** [1] - 68:8
**discuss** [1] - 67:24
**discussed** [1] - 11:20
**discusses** [4] - 40:21, 41:8, 42:20, 59:20
**discussing** [2] - 12:12, 27:19
**discussion** [1] - 50:14
**disease** [15] - 29:15, 29:18, 29:20, 30:7, 30:25, 32:14, 32:19, 32:22, 32:23, 33:2, 33:17, 34:2, 34:3, 35:13, 62:6
**diseases** [1] - 81:22
**disentangle** [1] - 42:21
**dismiss** [4] - 29:2, 29:11, 37:15, 37:21
**dismissed** [3] - 11:3, 11:9, 39:11
**dispose** [1] - 67:21
**dispute** [11] - 6:25, 18:5, 29:8, 29:9, 30:19, 31:13, 33:22, 35:7, 35:17, 37:14, 59:16
**disputes** [2] - 12:20, 79:20

**distance** [1] - 7:19
**distinguish** [1] - 67:6
**DISTRICT** [2] - 1:1, 1:2
**district** [5] - 4:21, 4:22, 21:10, 58:20, 85:9
**docket** [1] - 28:18
**Docket** [18] - 11:2, 11:9, 13:15, 26:6, 26:20, 26:22, 28:19, 28:22, 29:12, 29:13, 38:1, 38:5, 38:7, 43:20, 54:11, 55:15, 73:24
**doctor** [14] - 14:23, 15:8, 16:4, 16:6, 18:25, 19:1, 19:19, 32:25, 33:16, 45:5, 74:23, 75:7, 75:13
**doctors** [11] - 16:12,

53:8
**done** [6] - 10:25, 28:5, 69:15, 75:21, 77:10, 77:19
**dose** [2] - 27:4, 28:5
**dosing** [5] - 6:23, 7:3, 7:4
**doubt** [1] - 12:1
**doubtful** [1] - 21:24
**doubts** [1] - 54:18
**Doug** [2] - 3:8, 33:11
**DOUG** [1] - 1:18
**down** [11] - 8:8, 13:13, 13:17, 19:9, 27:11, 43:19, 52:25, 70:6, 72:13, 77:24, 81:20
**Dr** [142] - 7:8, 9:18, 9:25, 10:2, 10:8, 10:10, 10:14, 10:19, 11:3, 11:6, 13:16, 14:1, 14:7, 14:24, 15:4, 15:10, 15:19, 15:21, 15:25, 16:16, 16:24, 17:5, 17:8, 17:22, 18:1, 18:16, 18:17, 18:20, 19:23, 20:4, 20:13, 20:15, 21:18, 21:25, 22:12, 22:23, 22:24, 22:25, 23:1, 23:3, 23:5, 23:8, 23:25, 24:2, 24:6, 24:12, 24:16, 24:18, 24:20, 24:25,

25:1, 25:2, 25:3, 25:5, 25:7, 25:10, 25:14, 25:15, 25:16, 25:19, 25:21, 25:24, 25:25, 26:2, 26:16, 26:18, 26:24, 27:2, 27:3, 28:3, 28:4, 30:15, 31:20, 32:1, 32:20, 34:18, 35:5, 37:10, 38:11, 38:12, 38:23, 39:9, 39:11, 39:16, 40:3, 40:20, 41:6, 42:19, 45:15, 45:19, 45:21, 46:8, 46:9, 48:16, 48:23, 49:15, 50:2, 50:4, 50:6, 51:2, 51:19, 51:25, 52:2, 52:13, 52:16, 52:18, 54:12, 54:18, 54:20, 66:19, 71:11, 73:16, 74:16, 75:7, 75:16, 76:12, 76:13, 76:21, 77:5, 77:7, 77:13, 77:16, 78:7, 78:10, 78:24, 81:4, 81:7
**draw** [1] - 53:3
**drawn** [1] - 19:17
**dropped** [1] - 6:15
**Drs** [1] - 18:15
**drug** [7] - 14:16, 49:18, 49:20, 59:25, 61:22, 65:22, 67:12
**drugs** [1] - 63:24
**dry** [3] - 7:20, 8:5, 8:6
**DTX** [2] - 8:23, 9:19
**dubious** [3] - 53:24, 54:19
**dubiousness** [1] - 54:21
**due** [7] - 20:9, 31:1, 31:15, 34:23, 35:1, 35:12, 73:1
**during** [4] - 8:19, 12:23, 39:18, 52:7
**DYKHUIS** [1] - 1:19

**E**

**early** [1] - 72:5
**easier** [2] - 41:10, 41:13
**easily** [3] - 13:13, 68:24, 82:11
**economist** [1] - 77:14
**effect** [2] - 55:5, 62:5
**effective** [2] - 67:12, 67:13
**efficiency** [3] - 23:21,

31:19, 31:25, 32:7, 32:11, 32:20, 33:4, 33:7, 33:18, 35:4, 35:11, 35:21, 37:7, 39:8, 40:2, 40:12, 40:16, 40:19, 40:25, 41:4, 41:12, 41:19, 41:22, 42:2, 42:5, 42:7, 42:14, 43:14, 43:18, 59:1, 60:20, 60:23, 61:4, 61:16, 62:15, 62:18, 62:23, 63:4, 63:13, 63:23, 64:4, 64:6, 64:15, 64:18, 65:13, 65:16
**days** [6] - 69:6, 70:15, 77:19, 78:4, 79:6
**deal** [1] - 67:23
**dealing** [1] - 23:5
**dealt** [1] - 84:7
Deanna [2] - 86:4, 86:9
**decide** [11] - 5:20, 27:24, 37:11, 37:25, 68:12, 79:25, 80:2, 81:1, 81:6, 81:7, 83:11
**decided** [5] - 5:22, 37:21, 37:23, 58:2
**decision** [3] - 5:2, 46:11, 58:13
**decision-makers** [1] - 46:11
**decisions** [1] - 79:2
**defeat** [2] - 46:8, 46:14
**defendant** [21] - 3:19, 16:21, 26:11, 30:1, 33:6, 33:7, 33:15, 35:2, 41:19, 44:14, 50:16, 50:18, 50:19, 50:24, 53:17, 53:22, 54:2, 55:14, 55:21, 68:13, 72:24
**Defendant** [2] - 1:7, 2:11
**defendant's** [3] - 22:5, 50:22, 69:17
**defendants** [6] - 31:13, 38:8, 43:9, 54:8, 70:17, 70:19
**defense** [20] - 8:21, 11:21, 11:25, 12:2, 45:16, 45:19, 46:14, 49:12, 49:14, 50:17, 51:2, 51:6, 51:7, 56:4, 56:5, 56:7, 56:17, 70:11
**defenses** [5] - 6:9, 13:6, 56:21, 69:18,

24:19, 28:2
**effort** [1] - 20:11
**eight** [2] - 72:20, 75:22
**either** [9] - 14:12, 16:15, 23:2, 27:12, 32:15, 37:21, 72:18, 75:8, 84:15
**elected** [1] - 6:8
**election** [1] - 9:8
**elements** [1] - 7:7
**eliciting** [1] - 38:8
**embedded** [1] - 36:4
**Emery** [4] - 3:8, 3:9, 3:12, 39:1
**EMERY** [1] - 1:17
**employed** [1] - 75:14
**encompasses** [2] - 28:24, 32:23
**encourage** [1] - 81:1
**end** [2] - 24:17, 68:17
**endpoint** [1] - 28:25
**engage** [1] - 35:23
**entire** [3] - 57:15, 66:12, 71:23
**entirety** [1] - 45:18
**envisioned** [1] - 14:12
**equally** [2] - 26:9, 70:9
**equate** [1] - 63:14
**equated** [1] - 60:13
**equating** [1] - 60:2
**equipped** [1] - 32:21
**equivalent** [1] - 54:7
**ERIC** [2] - 1:23, 1:24
**Eric** [2] - 3:12, 29:6
**error** [3] - 50:15, 50:21, 54:24
**ESQ** [21] - 1:15, 1:18, 1:18, 1:19, 1:19, 1:20, 1:20, 1:23, 1:23, 1:24, 1:24, 2:3, 2:4, 2:6, 2:7, 2:7, 2:8, 2:8, 2:9, 2:9, 2:10
**essentially** [6] - 5:5, 27:22, 28:14, 55:8, 55:21, 67:16
**evaluate** [1] - 19:3
**event** [8] - 10:10, 22:5, 34:25, 54:10, 58:4, 63:9, 63:11, 76:1
**evidence** [15] - 7:9, 22:11, 43:21, 45:24, 46:7, 48:13, 50:22, 55:16, 57:19, 58:11, 58:16, 61:20, 61:23, 72:7, 79:10
**exact** [6] - 51:8, 58:15, 61:23, 67:10, 73:2, 75:5

**exactly** [4] - 51:5, 56:23, 76:2, 76:3
**examination** [1] - 69:10
**examine** [1] - 28:9
**example** [5] - 18:5, 40:22, 41:6, 59:14, 74:25
**examples** [1] - 42:7
**except** [1] - 17:8
**exchange** [1] - 80:22
**exclude** [12] - 10:21, 10:23, 13:16, 18:1, 26:23, 50:15, 50:22, 51:1, 51:16, 55:21, 56:6, 56:23
**excluded** [2] - 52:1, 54:13
**excuse** [1] - 28:3
**executives** [1] - 83:3
**exercise** [5] - 7:6, 56:25, 57:13, 58:15, 66:17
**exhibit** [4] - 8:22, 41:1, 41:5, 76:17
**Exhibit** [1] - 8:23
**expand** [1] - 43:5
**expect** [9] - 3:4, 3:10, 72:11, 74:4, 74:7, 74:19, 74:21, 74:22, 80:18
**expects** [1] - 23:17
**expedited** [1] - 82:7
**experience** [3] - 14:16, 18:14, 18:21
**expert** [20] - 15:7, 17:2, 17:3, 22:17, 24:17, 25:19, 25:20, 35:4, 38:8, 38:9, 39:23, 40:9, 40:10, 41:11, 43:11, 50:9, 51:10, 77:9, 77:12, 78:15
**expert's** [1] - 21:15
**expertise** [5] - 14:7, 15:15, 21:15, 21:16, 50:8
**experts** [23] - 7:15, 15:14, 15:19, 17:12, 18:11, 18:23, 19:2, 22:19, 23:17, 24:20, 26:24, 36:1, 36:8, 36:12, 39:24, 49:25, 50:7, 50:10, 71:8, 73:12, 74:10, 76:24
**explain** [1] - 6:20
**explaining** [1] - 36:24
**explicit** [1] - 77:1
**expound** [2] - 28:1, 73:3

**expounded** [1] - 73:4
**expressing** [1] - 68:9
**expression** [1] - 28:25
**expressly** [1] - 41:8
**extent** [17] - 16:14, 18:12, 19:4, 19:10, 19:13, 19:21, 23:15, 26:18, 37:9, 51:24, 56:1, 56:21, 58:4, 68:6, 77:6, 78:10, 84:5
**extra** [1] - 84:4

---

## F

**F.3d** [3] - 21:3, 53:2, 65:14
**face** [1] - 42:12
**fact** [23] - 14:15, 23:11, 35:4, 36:8, 36:17, 45:24, 54:3, 73:11, 73:23, 78:15, 79:7
**facts** [4] - 53:18, 53:19, 66:24, 67:20
**faith** [1] - 79:23
**fallback** [1] - 58:17
**Fallon's** [1] - 84:7
**familiar** [2] - 51:20, 51:21
**family** [1] - 4:24
**far** [3] - 51:10, 62:2, 79:4
**Faria** [4] - 8:24, 8:25, 12:3, 41:7
**Faria-Urbina** [4] - 8:24, 8:25, 12:3, 41:7
**fast** [2] - 9:16, 82:5
**faster** [1] - 83:14
**fatal** [1] - 66:3
**fault** [2] - 4:6, 63:9
**faulting** [2] - 79:4, 79:6
**FDA** [4] - 4:14, 4:20, 5:5, 82:23
**Federal** [12] - 15:14, 21:4, 37:12, 49:9, 50:15, 50:21, 51:8, 53:4, 54:25, 61:17, 65:14, 86:10
**federal** [1] - 38:9
**fellows** [1] - 33:10
**Ferrante** [3] - 3:12, 44:2, 44:6, 44:9,

44:18, 45:10, 46:6, 49:3, 49:22, 49:23, 51:18
**FERRANTE** [9] - 1:24, 44:2, 45:14, 45:20, 46:4, 49:5, 51:21, 51:24, 53:13
**Ferrer** [1] - 74:16
**few** [4] - 28:20, 65:5, 74:11, 79:5
**fewer** [1] - 77:22
**field** [1] - 14:22
**fight** [1] - 74:9
**fighting** [1] - 81:24
**fights** [2] - 70:6, 70:7
**figure** [5] - 8:17, 63:18, 75:19, 82:7, 85:5
**figured** [1] - 12:10
**file** [4] - 23:8, 24:10, 79:7
**fine** [8] - 13:12, 17:14, 28:1, 39:22, 48:24, 48:25, 85:1, 85:13
**finish** [1] - 83:13
**finished** [1] - 11:14
**first** [19] - 3:25, 4:7, 6:25, 9:8, 13:15, 15:6, 15:13, 24:2, 25:8, 28:22, 30:14, 31:3, 31:25, 38:13, 53:21, 57:4, 65:7, 66:4, 69:14
**first-year** [1] - 15:6
**fits** [1] - 67:20
**five** [2] - 11:21, 36:14
**flip** [1] - 66:12
**flow** [1] - 59:17
**FLYNN** [2] - 1:15, 3:5
**Flynn** [3] - 3:2, 3:6, 3:14
**folks** [1] - 74:23
**followed** [2] - 59:15, 65:2
**following** [3] - 36:25, 37:5, 67:25
**FOR** [1] - 1:2
**force** [1] - 72:12
**forced** [2] - 28:24, 61:8
**foregoing** [1] - 86:7
**forget** [1] - 47:4
**forgot** [4] - 10:12,

12:23, 15:7, 81:20
**formally** [1] - 84:5
**forth** [3] - 31:20, 68:4, 68:7
**four** [10] - 3:25, 56:20, 69:6, 69:18, 71:8, 72:21, 77:3, 77:19, 78:4
**frame** [4] - 46:18, 47:20, 47:21, 47:22
**frankly** [1] - 65:16
**free** [1] - 54:8
**Friday** [8] - 4:19, 36:23, 55:6, 68:22, 69:1, 69:12, 83:6
**friend** [1] - 65:8
**front** [5] - 5:1, 74:7, 74:12, 79:21, 82:19
**full** [8] - 21:2, 58:12, 68:19, 68:20, 70:15, 72:6, 82:24
**fully** [1] - 83:13
**future** [2] - 47:22, 55:9

---

## G

**Gabriel** [2] - 3:12, 44:2
**GABRIEL** [1] - 1:24
**gathering** [1] - 74:14
**generally** [6] - 16:9, 17:11, 50:9, 56:9, 76:1, 84:19
**Giatec** [1] - 21:9
**gibberish** [2] - 17:4, 17:5
**given** [6] - 32:11, 39:17, 49:3, 54:8, 72:1, 83:5
**glad** [1] - 11:8
**Glaxo** [8] - 59:6, 59:7, 59:9, 59:10, 59:20, 60:4, 67:6, 67:11
**glossary** [1] - 81:21
**goal** [1] - 71:23
**GOODWIN** [1] - 1:22
**Goodwin** [3] - 3:7, 3:13, 44:3
**grade** [1] - 44:10
**grant** [3] - 51:1, 54:11, 64:11
**grants** [1] - 82:9
**great** [1] - 69:25
**group** [1] - 34:24
**groups** [4] - 19:16, 29:21, 36:2, 36:14
**guess** [14] - 3:2, 3:15, 10:9, 27:9, 30:4, 45:25, 46:19, 46:22, 69:14, 72:10, 72:17,

73:23, 73:25, 81:3
**guessing** [4] - 24:14, 25:17, 44:15, 71:19
**guidance** [1] - 26:15

# H

**HABIBI** [1] - 2:9
**Habibi** [1] - 3:22
**half** [7] - 6:5, 68:13, 72:4, 72:12, 72:24, 77:20, 78:4
**hand** [2] - 40:6, 80:14
**handwriting** [1] - 43:24
**happy** [2] - 35:23, 69:10
**hard** [2] - 19:5, 31:4
**Hatch** [1] - 74:10
**Hatch-Waxman** [1] - 74:10
**headache** [2] - 64:1, 64:3
**hear** [11] - 7:11, 28:10, 34:18, 36:7, 37:11, 37:24, 38:22, 45:10, 46:2, 58:24, 64:10
**heard** [7] - 8:10, 25:25, 44:6, 49:19, 53:13, 64:13, 71:7
**heart** [2] - 8:13, 81:15
**help** [1] - 12:10
**helpful** [6] - 11:16, 12:11, 36:18, 39:25, 56:12, 67:3
**hereby** [1] - 86:5
**herself** [1] - 18:14
**high** [2] - 52:3, 60:19
**high-up** [1] - 52:3
**highlighting** [1] - 41:25
**hill** [14] - 9:18, 9:25, 10:2, 10:8, 10:10, 10:14, 10:19, 11:3, 38:11, 38:12, 38:23, 39:2, 39:9
**himself** [1] - 18:14
**Hoeschen** [5] - 3:15, 3:17, 3:19, 3:24, 85:8
**HOESCHEN** [4] - 2:3, 3:18, 4:2, 85:11
**hold** [7] - 8:7, 9:15, 10:11, 10:18, 44:8, 73:17
**Honor** [124] - 3:5, 3:18, 6:3, 6:13, 8:9, 12:10, 13:20, 14:6, 14:14, 15:11, 16:18,

20:3, 20:17, 20:21, 20:23, 21:18, 22:8, 22:10, 23:10, 26:4, 26:7, 26:10, 26:13, 26:19, 27:17, 28:2, 28:17, 29:3, 29:6, 29:7, 30:10, 30:12, 31:17, 32:1, 32:7, 32:20, 33:5, 33:7, 33:18, 35:11, 35:21, 36:6, 36:10, 36:16, 36:18, 37:7, 39:14, 40:12, 40:16, 40:19, 40:25, 41:4, 41:12, 41:19, 41:22, 42:5, 42:14, 43:4, 43:13, 43:14, 43:18, 44:3, 44:17, 45:9, 45:14, 47:12, 47:25, 48:4, 49:6, 49:16, 50:11, 50:13, 50:24, 51:22, 53:13, 55:18, 56:1, 56:9, 56:23, 57:3, 57:8, 57:14, 58:10, 58:13, 58:23, 59:1, 59:6, 60:20, 60:23, 61:4, 61:16, 62:16, 62:19, 62:23, 63:13, 63:23, 64:4, 64:16, 65:2, 65:5, 65:16, 65:18, 66:18, 67:2, 69:20, 69:22, 70:3, 70:10, 70:14, 71:23, 72:19, 73:1, 73:8, 74:7, 74:9, 76:24, 78:24, 80:11, 80:21, 83:20, 85:11, 85:13
**Honorable** [1] - 1:11
**hope** [3] - 62:1, 62:4, 81:13
**hopeful** [1] - 11:14
**horizon** [1] - 4:16
**hour** [1] - 68:17
**hours** [24] - 68:12, 68:19, 70:4, 70:9, 70:10, 71:15, 71:24, 71:25, 72:1, 72:4, 72:12, 72:17, 72:18, 72:20, 72:21, 73:22, 75:22, 77:4, 77:20, 77:22, 78:3
**house** [1] - 3:9
**human** [1] - 67:8
**hundred** [2] - 10:22, 25:13
**hydrogens** [1] - 63:21
**hypertension** [7] - 29:14, 29:17, 29:19, 30:6, 30:24, 34:3, 34:17

# I

**idea** [3] - 23:25, 26:12, 81:10
**identified** [7] - 8:3, 17:25, 52:5, 71:17, 72:2, 76:18, 81:5
**identify** [4] - 4:5, 13:24, 75:23, 79:12
**identity** [1] - 75:5
**ignore** [1] - 54:3
**ILD** [28] - 7:6, 30:15, 30:17, 30:18, 30:19, 31:14, 31:15, 32:10, 32:13, 32:18, 32:24, 33:1, 33:16, 34:2, 34:11, 34:16, 34:20, 34:21, 34:22, 34:23, 35:1, 35:3, 46:12, 48:17, 51:1, 60:18, ...
**imagin** 19:17
**immec** 5:10,
**immin**
**imped**
**impediments** [2] - 5:11, 5:16
**implicit** [1] - 76:25
**important** [5] - 16:3, 35:19, 50:13, 67:3, 72:13
**impression** [4] - 28:23, 38:18, 38:21, 76:3
**improve** [2] - 7:6, 58:14
**improved** [5] - 56:25, 57:13, 66:17, 66:21, 66:23
**IN** [2] - 1:1, 1:2
**in-house** [1] - 3:9
**INC** [1] - 1:6
**inclined** [2] - 72:17, 72:18
**includes** [3] - 8:24, 56:1, 71:20
**including** [4] - 23:20, 29:1, 49:10, 53:7
**inconsistencies** [1] - 30:12
**inconsistency** [3] - 30:14, 30:20, 31:25
**incorrect** [3] - 24:13, 60:12, 82:18
**increase** [27] - 7:15, 8:21, 27:7, 55:22, 56:4, 56:7, 56:8, 56:17, 56:24, 57:15,

57:21, 59:15, 59:16, 59:18, 60:16, 60:21, 62:20, 65:24, 66:1, 66:2, 66:5, 66:7, 66:16, 66:18, 75:11, 76:9, 76:10
**increased** [1] - 7:12
**independent** [1] - 4:9
**indicia** [2] - 13:2, 13:3
**individuals** [2] - 4:10, 74:20
**induce** [3] - 46:15, 48:5, 53:10
**induced** [6] - 45:16, 47:16, 49:14, 50:17, 51:2, 51:14
**inducement** [10] - 44:25, 45:1, 45:5, 45:13, 46:8, 48:9, 54:25, 55:3, 55:11
**information** [7] - 4:15, 8:18, 18:20, 82:16, 82:17, 83:2
**infringe** [6] - 27:5, 44:15, 49:21, 53:20, 54:8
**infringed** [1] - 46:2
**infringement** [49] - 13:5, 15:9, 16:13, 16:14, 17:23, 18:2, 22:13, 22:15, 24:6, 24:7, 24:9, 24:11, 30:16, 31:24, 37:10, 38:16, 38:21, 40:21, 41:11, 41:13, 43:22, 45:1, 45:3, 45:16, 46:15, 46:20, 46:21, 46:22, 47:2, 47:7, 47:8, 47:17, 48:6, 49:7, 49:12, 49:14, 50:17, 51:3, 51:14, 53:10, 54:3, 54:5, 54:6, 54:7, 54:25, 55:2, 71:1, 71:2
**infringement-related** [1] - 24:7
**infringer** [1] - 53:7
**infringer's** [1] - 53:15
**infringing** [3] - 16:10, 46:25, 47:10
**inhalation** [3] - 8:2, 8:6, 27:9

56:25, 60:5, 66:11
**inherency** [16] - 7:20, 55:22, 56:14, 56:22, 57:12, 57:16, 59:10, 59:14, 59:18, 60:3, 61:15, 63:8, 63:19, 64:19, 65:23
**inherent** [5] - 7:11, 7:17, 60:13, 63:22, 64:1
**inherently** [7] - 56:2, 59:24, 60:10, 61:11, 61:14, 62:10, 66:8
**initial** [1] - 7:3
**injunction** [6] - 44:12, 44:13, 47:4, 47:5, 57:24, 82:9
**instance** [1] - 21:18
**institution** [1] - 76:9
**intend** [6] - 45:21, 78:14, 80:23, 81:16, 83:5, 83:8
**intending** [1] - 73:11
**intends** [1] - 77:6
**intent** [5] - 44:25, 46:15, 48:5, 48:9, 53:10
**interim** [1] - 5:19
**interstitial** [11] - 29:15, 29:18, 29:19, 30:7, 30:25, 32:13, 32:19, 32:22, 33:2, 33:17, 35:13
**invalid** [3] - 16:10, 53:19, 53:22
**invalidated** [1] - 4:24
**invalidity** [29] - 6:8, 13:5, 15:9, 16:13, 16:14, 17:24, 22:15, 22:17, 22:25, 24:2, 24:7, 24:10, 24:13, 25:2, 25:4, 26:1, 28:5, 30:22, 31:20, 31:23, 37:11, 38:17, 40:21, 41:20, 46:14, 50:16, 71:25, 72:8
**invention** [5] - 15:15, 21:17, 66:11, 76:10, 76:11
**inventors** [1] - 76:13
**involve** [2] - 27:9, 27:11
**involved** [1] - 10:8
**irrelevant** [2] - 51:12, 52:1
**issuance** [1] - 52:14
**issue** [52] - 7:3, 9:9, 13:18, 17:23, 18:2, 18:4, 21:22, 22:13, 26:8, 28:2, 28:10, 30:6, 30:12, 36:5,

36:11, 37:17, 37:21, 38:13, 39:9, 39:14, 40:2, 42:20, 42:24, 44:17, 44:18, 44:25, 45:5, 46:21, 47:1, 49:9, 52:11, 52:12, 52:21, 55:14, 57:4, 58:17, 59:3, 61:6, 61:17, 64:12, 64:13, 67:17, 71:2, 75:19, 78:7, 79:13, 80:24, 83:22, 84:17, 84:20, 84:23, 85:20
**issued** [2] - 4:23, 61:10
**issues** [12] - 9:25, 28:15, 38:24, 39:2, 39:3, 39:8, 65:18, 67:24, 68:3, 71:5, 80:11, 85:16
**issuing** [1] - 62:10
**Item** [19] - 11:2, 11:9, 13:15, 26:6, 26:20, 26:22, 28:18, 28:19, 28:22, 29:12, 29:13, 38:1, 38:5, 38:7, 43:20, 54:11, 55:15, 73:24
**itself** [7] - 10:5, 11:6, 12:19, 39:3, 50:19, 50:24, 70:25

### J

**JACKSON** [43] - 1:23, 6:3, 8:9, 8:12, 8:19, 9:5, 9:12, 9:18, 9:21, 9:23, 10:2, 10:16, 10:21, 11:5, 11:10, 11:19, 12:1, 12:9, 12:16, 69:20, 70:3, 72:19, 73:1, 73:8, 74:6, 74:15, 74:19, 74:25, 75:4, 75:9, 75:13, 75:18, 76:8, 76:14, 78:14, 78:19, 80:20, 81:14, 81:25, 82:15, 83:2, 83:20, 85:18
**Jackson** [10] - 3:7, 12:15, 13:24, 33:9, 72:10, 74:4, 80:17, 82:21, 82:22, 85:17
**JAKE** [1] - 1:20
**Jake** [1] - 3:8
**Janet** [1] - 76:20
**Jason** [1] - 76:20
**Jeffs** [1] - 52:13
**John** [1] - 3:22
**JOHN** [1] - 2:9

**join** [1] - 17:2
**Jon** [1] - 3:21
**JON** [1] - 2:7
**Jonathan** [1] - 30:10
**journals** [1] - 29:20
**Judge** [6] - 5:1, 5:2, 17:19, 54:2, 82:19, 84:7
**judge** [4] - 5:17, 82:8, 82:10, 83:1
**judgment** [3] - 27:22, 37:4, 57:2
**judicious** [1] - 77:3
**July** [1] - 4:23
**June** [1] - 4:23
**justification** [1] - 71:14
**justify** [1] - 44:22

### K

**Kali** [2] - 67:6, 67:11
**KAREN** [1] - 2:4
**KATHY** [1] - 1:19
**keep** [2] - 78:1, 80:16
**Keller** [3] - 3:16, 3:19, 85:8
**KELLER** [2] - 2:3, 2:4
**kind** [10] - 23:19, 35:14, 40:6, 53:24, 54:9, 62:17, 67:17, 75:20, 82:1, 85:21
**Kitter** [2] - 25:21, 77:16
**KNAUSS** [8] - 2:8, 13:20, 17:19, 20:2, 20:9, 20:17, 22:9, 26:13
**Knauss** [2] - 3:21, 17:20
**knowledge** [1] - 16:16
**knows** [4] - 14:11, 17:5, 17:6, 59:6
**Kyocera** [3] - 21:4, 21:5, 21:8

### L

**label** [7] - 27:4, 48:12, 48:18, 48:21, 49:19, 49:20, 55:12
**labeling** [2] - 6:23, 7:3
**labels** [1] - 55:11
**laid** [1] - 41:14
**landscape** [1] - 53:8
**language** [5] - 30:8, 34:24, 35:5, 59:6
**large** [1] - 61:2

**larger** [1] - 66:9
**last** [13] - 4:19, 6:7, 8:9, 8:13, 8:19, 12:22, 55:15, 64:18, 72:15, 79:5, 79:22, 80:15, 83:6
**late** [1] - 69:2
**launch** [9] - 4:13, 5:9, 5:19, 5:21, 82:6, 82:14, 82:23, 83:5, 83:8
**launched** [1] - 5:7
**launching** [1] - 84:1
**law** [17] - 14:21, 43:21, 43:23, 49:10, 55:1, 55:4, 55:16, 57:11, 57:17, 57:24, 58:1, 58:5, 58:8, 59:2, 65:18, 85:5
**lead** [1] - 73:7
**leads** [
**least** [7
31:19
55:23
**leave** [
37:16
85:14
**led** [1] - 76:9
**lee** [1] - 74:21
**left** [2] - 18:3, 68:11
**legal** [9] - 5:6, 5:11, 39:2, 42:24, 54:24, 57:9, 61:15, 63:14, 66:24
**legally** [1] - 54:4
**length** [1] - 67:23
**less** [4] - 8:17, 11:17, 25:13, 79:21
**letter** [3] - 6:7, 36:24, 37:3
**letters** [5] - 37:5, 37:22, 37:24, 37:25
**level** [3] - 30:20, 60:18, 60:19
**levels** [1] - 30:14
**LEVI** [1] - 1:24
**likelihood** [2] - 19:12, 58:3
**likely** [2] - 29:25, 37:23
**LILLIAN** [1] - 1:20
**Lillian** [2] - 3:11, 38:25
**limine** [15] - 9:14, 10:3, 10:7, 10:9, 10:12, 11:9, 11:11, 11:15, 28:21, 37:9, 39:11, 43:20, 64:13, 67:17, 67:18
**limit** [4] - 20:6, 37:3, 75:22, 76:21

**limitation** [4] - 27:8, 38:16, 38:17, 67:13
**limitations** [1] - 55:23
**limited** [4] - 37:1, 60:9, 73:12, 74:11
**limiting** [6] - 39:15, 39:17, 42:22, 43:2, 43:3
**limits** [1] - 12:19
**lines** [2] - 23:16, 51:3
**link** [1] - 66:6
**linked** [2] - 66:4, 66:5
**Liquidia** [25] - 3:19, 4:13, 4:18, 4:19, 4:22, 13:1, 17:17, 17:20, 20:22, 21:5, 45:22, 46:1, 46:11, 46:16, 47:13, 47:16, 48:22, 48:24, 49:8, 49:13, 49:19, 51:3,
52:13, 82:13
**list** [9] - 9:7, 71:21, 74:2, 75:17, 76:17, 79:7, 81:19, 82:1, 82:3
**listed** [2] - 73:24, 74:3
**listen** [1] - 68:14
**literal** [1] - 7:19
**literally** [1] - 24:12
**live** [20] - 38:24, 52:5, 52:6, 52:9, 55:17, 71:17, 73:19, 73:21, 74:5, 74:9, 74:18, 74:22, 74:23, 75:6, 76:19, 76:23, 78:9, 79:12, 79:15
**LLP** [5] - 1:15, 1:22, 2:3, 2:6, 3:20
**locked** [1] - 69:21
**lodge** [2] - 28:7, 84:4
**logical** [1] - 53:20
**look** [9] - 21:24, 22:3, 25:13, 40:3, 42:9, 44:21, 53:12, 53:17, 59:9
**looking** [4] - 40:24, 42:11, 44:10, 77:2
**looks** [2] - 37:17, 66:10, 70:16
**lose** [2] - 47:23, 66:25
**lost** [2] - 41:17, 47:9
**love** [1] - 73:2
**lunch** [1] - 68:17

**lung** [13] - 29:15, 29:18, 29:19, 30:7, 30:25, 32:13, 32:19, 32:22, 33:2, 33:17, 34:2, 35:13

### M

**M.D** [1] - 21:19
**M.D.s** [2] - 15:23
**maintenance** [1] - 7:4
**makers** [1] - 46:11
**maneuver** [1] - 24:24
**market** [2] - 46:25, 52:15
**marketed** [1] - 51:15
**marking** [1] - 68:10
**Markman** [1] - 38:15
**matter** [4] - 25:16, 66:23, 70:24, 71:1
**matters** [1] - 73:8
**MCDERMOTT** [1] - 1:17
**McDermott** [4] - 3:8, 3:9, 3:12, 38:25
**mean** [11] - 5:5, 10:11, 19:5, 23:11, 32:10, 50:19, 50:20, 63:25, 70:18, 77:20
**meaning** [3] - 32:12, 34:11, 67:9
**means** [7] - 31:14, 34:22, 35:16, 35:20, 42:21, 64:22
**meant** [1] - 12:4
**measure** [2] - 28:4, 28:6
**medical** [14] - 14:10, 15:6, 15:8, 16:4, 16:6, 16:12, 18:21, 18:23, 29:20, 46:10, 52:16, 55:12, 55:7, 75:14
**medicine** [1] - 14:11
**meet** [14] - 8:13, 8:19, 12:22, 12:23, 21:12, 32:16, 36:2, 38:17, 58:9, 59:5, 66:15, 71:13, 73:9, 75:23
**meet-and-confer** [6] - 8:13, 8:19, 12:22, 12:23, 71:13, 73:9
**members** [1] - 74:13
**memo** [2] - 10:17, 11:6
**mentioned** [1] - 66:9
**merely** [1] - 35:2
**merits** [1] - 67:17
**met** [5] - 38:21, 41:8,

42:13, 43:1, 43:3
**method** [10] - 44:19, 62:9, 63:1, 63:2, 66:6, 66:7, 66:10, 67:5, 67:7
**method-of-treatment** [3] - 44:19, 67:5, 67:7
**methods** [2] - 62:15, 62:19, 62:20
**Michael** [1] - 3:5
**MICHAEL** [1] - 1:15
**middle** [3] - 4:21, 4:22, 53:21
**might** [7] - 3:4, 19:14, 29:20, 35:24, 69:12, 75:17, 80:12
**MIL** [4] - 39:3, 56:22, 57:20, 67:1
**mind** [26] - 46:16, 46:18, 47:9, 47:12, 47:16, 48:10, 48:11, 48:14, 48:22, 48:24, 49:16, 49:17, 50:1, 50:4, 50:7, 50:8, 50:10, 50:16, 50:22, 51:7, 51:11, 51:13, 51:25, 52:8, 53:7, 53:15
**Minn** [1] - 3:23
**MINN** [1] - 2:8
**minute** [12] - 4:12, 8:7, 10:11, 10:12, 27:25, 38:22, 42:10, 44:8, 67:22, 68:14, 71:20, 80:15
**minutes** [2] - 28:20, 77:4
**moment** [2] - 10:18, 39:6
**Monday** [7] - 68:19, 69:1, 69:6, 72:20, 72:21, 80:1, 85:23
**Montgomery** [9] - 15:13, 21:1, 59:8, 61:17, 61:19, 61:25, 63:12, 65:7, 65:13
**month** [1] - 83:13
**moot** [18] - 9:9, 9:10, 9:24, 10:1, 10:3, 10:4, 10:19, 11:3, 11:7, 11:8, 11:9, 26:6, 28:19, 28:23, 29:2, 29:3, 29:12, 39:11
**mooted** [1] - 8:14
**morning** [9] - 3:1, 3:5, 3:18, 17:19, 44:11, 68:22, 68:24, 69:2, 81:22
**MORRIS** [1] - 1:15

**Morris** [1] - 3:6
**Morton** [10] - 3:21, 45:9, 46:7, 46:19, 48:2, 48:3, 49:1, 49:25, 51:18, 52:23
**MORTON** [16] - 2:7, 45:9, 46:9, 46:20, 47:1, 47:11, 47:24, 48:4, 48:13, 48:20, 50:3, 50:11, 50:23, 53:2, 53:6, 62:9
**most** [6] - 20:22, 67:2, 72:13, 74:9, 81:23, 83:15
**motion** [31] - 5:18, 10:3, 10:7, 10:9, 10:16, 10:25, 11:3, 11:6, 11:8, 13:15, 17:25, 26:17, 26:21, 27:22, 29:22, 30:2, 37:9, 39:10, 43:20, 44:11, 51:1, 54:11, 51:17, 56:6, 57:2, 64:11, 64:13, 67:17, 67:18, 84:10
**motions** [7] - 9:13, 10:12, 11:11, 11:15, 11:16, 12:18, 28:20
**move** [1] - 66:13
**moved** [4] - 4:25, 10:21, 10:23
**moving** [2] - 26:22, 79:5
**MR** [228] - 3:5, 3:18, 4:2, 4:4, 4:17, 5:9, 5:15, 5:21, 5:25, 6:3, 6:12, 6:18, 6:21, 7:10, 7:17, 7:24, 8:1, 8:5, 8:9, 8:12, 8:19, 9:5, 9:12, 9:18, 9:21, 9:23, 10:2, 10:16, 10:21, 11:5, 11:10, 11:19, 12:1, 12:6, 12:9, 12:16, 12:21, 13:8, 13:20, 14:5, 14:14, 14:20, 15:1, 15:11, 16:6, 16:18, 17:7, 17:19, 20:2, 20:9, 20:17, 20:18, 20:20, 21:1, 21:3, 21:7, 21:15, 22:7, 22:9, 22:10, 22:20, 23:10, 23:13, 23:23, 24:9, 25:11, 25:13, 26:4, 26:7, 26:13, 26:19, 27:13, 27:17, 27:25, 28:17, 29:3, 29:6, 30:10, 31:16, 31:19, 31:25, 32:7, 32:11, 32:20, 33:4,

33:7, 33:10, 33:18, 33:21, 34:1, 34:6, 34:13, 34:15, 34:23, 35:4, 35:11, 35:21, 35:24, 36:16, 37:7, 38:3, 39:8, 40:2, 40:12, 40:16, 40:19, 40:25, 41:4, 41:12, 41:19, 41:22, 42:2, 42:5, 42:7, 42:14, 43:14, 43:18, 44:2, 44:17, 44:24, 45:4, 45:9, 45:14, 45:20, 46:4, 46:9, 46:20, 47:1, 47:11, 47:24, 47:25, 48:4, 48:13, 48:20, 49:5, 50:3, 50:11, 50:23, 51:21, 51:24, 52:5, 52:11, 53:2, 53:6, 53:13, 54:15, 54:22, 55:18, 55:25, 57:3, 58:22, 60:23, 62:9, 62:23, 63:23, 64:4, 64:6, 64:15, 64:18, 65:5, 65:13, 65:16, 65:20, 69:20, 69:24, 70:3, 70:14, 70:19, 70:22, 71:22, 72:19, 73:1, 73:8, 73:18, 74:6, 74:15, 74:19, 74:25, 75:2, 75:4, 75:9, 75:10, 75:13, 75:18, 76:8, 76:14, 76:21, 76:23, 77:2, 77:16, 78:7, 78:14, 78:19, 78:23, 79:9, 79:17, 80:5, 80:10, 80:20, 81:9, 81:14, 81:25, 82:15, 82:18, 83:2, 83:20, 83:21, 83:25, 84:8, 84:13, 84:22, 85:1, 85:11, 85:12, 85:16, 85:18
**MS** [6] - 38:25, 39:13, 42:18, 42:25, 43:4, 43:13
**multiple** [3] - 7:5, 16:10, 71:17
**must** [3] - 58:14, 66:5

**N**

**name** [3] - 45:8, 52:25, 60:17
**names** [1] - 81:22

**narrow** [2] - 30:21, 72:13
**narrowed** [1] - 70:17
**narrower** [3] - 30:18, 34:5, 54:10
**narrowing** [1] - 72:14
**Nathan** [13] - 3:18, 18:15, 18:16, 20:13, 26:24, 27:2, 27:3, 28:4, 31:20, 32:1, 34:18, 35:5, 37:10
**NATHAN** [1] - 2:3
**Nathan's** [3] - 20:15, 30:15, 66:19
**nausea** [2] - 60:1, 60:9
**NDA** [1] - 55:8
**necessarily** [5] - 29:18, 36:7, 56:24, 60:5, 66:11
**necessary** [6] - 7:16,

**neutron** [1] - 21:9
**never** [4] - 20:13, 23:5, 61:10, 65:25
**nevertheless** [2] - 59:23, 60:10
**new** [4] - 4:23, 39:19, 65:9
**New** [1] - 21:10
**next** [7] - 3:22, 3:25, 36:23, 38:7, 55:6, 80:21, 81:9
**nice** [1] - 85:25
**NICHOLS** [1] - 1:15
**Nichols** [1] - 3:6
**night** [4] - 6:7, 8:13, 8:20, 12:22
**Noah** [1] - 74:16
**nobody's** [1] - 55:6
**noninfringement** [5] - 13:5, 43:21, 69:17, 71:25, 72:7
**normal** [1] - 81:23
**normally** [2] - 49:25, 79:3
**North** [6] - 4:21, 4:22, 5:17, 6:1, 6:4, 82:8
**note** [2] - 35:12, 38:5
**nothing** [7] - 18:3, 20:23, 57:6, 63:15, 64:1, 69:15, 85:18
**noticed** [1] - 5:7
**notified** [1] - 4:20
**notifying** [1] - 69:1

**narrow** column continues... **number** [4] - 25:11, 70:17, 70:23, 74:8
**numerous** [2] - 40:20, 42:7

**O**

**obese** [1] - 60:1
**object** [4] - 19:11, 20:22, 22:5, 31:7
**objection** [8] - 19:12, 19:24, 28:7, 31:9, 42:18, 84:1, 84:4, 84:11
**objections** [3] - 37:16, 43:10, 85:9
**objective** [2] - 13:2
**obtain** [1] - 62:4
**obvious** [1] - 41:7
**obviously** [3] - 36:9, 37:12, 59:2
**obviousness** [5] - 7:20, 8:24, 11:25, 12:2, 40:22
**occurred** [3] - 46:22, 72:14, 72:16
**OF** [2] - 1:2, 1:9
**offer** [1] - 45:21
**offered** [3] - 16:13, 35:5, 54:12
**offering** [3] - 15:9, 30:22, 46:13
**offers** [3] - 30:16, 32:1, 45:15
**officer** [2] - 46:10, 52:16
**Official** [1] - 86:10
**official** [1] - 52:3
**Ogenstad** [16] - 22:23, 22:25, 23:3, 23:25, 24:6, 24:16, 24:20, 24:25, 25:3, 25:7, 25:24, 26:2, 26:9, 26:16, 73:13
**Ogenstad's** [2] - 25:10, 25:15
**omega** [3] - 50:12, 53:2, 53:14
**Omeprazole** [1] - 49:10
**on-sale** [4] - 56:4, 56:5, 56:7, 56:21
**once** [1] - 79:21
**one** [45] - 4:9, 4:12, 10:7, 10:18, 12:21, 13:15, 15:8, 16:9, 16:21, 20:12, 24:21, 26:8, 28:22, 28:23, 30:4, 30:20, 33:8,

35:9, 35:10, 38:7, 38:11, 38:17, 41:4, 41:6, 43:12, 49:23, 54:14, 56:2, 56:20, 63:17, 63:21, 64:15, 64:22, 64:24, 66:25, 68:3, 71:10, 71:11, 74:13, 74:22, 82:3, 83:13, 83:21, 84:7
**ones** [7] - 6:4, 27:9, 55:23, 74:4, 74:18, 76:2, 82:14
**opening** [5] - 23:9, 24:10, 37:3, 49:11, 69:9
**opine** [10] - 12:13, 15:16, 21:19, 23:16, 23:25, 24:2, 25:3, 41:15, 51:11, 77:7
**opined** [1] - 41:15
**opining** [1] - 15:20
**opinion** [12] - 13:16, 16:3, 16:20, 25:4, 32:1, 39:19, 40:8, 44:11, 45:19, 45:21, 58:10, 68:9
**opinions** [15] - 10:22, 15:9, 16:13, 18:1, 21:17, 21:22, 22:1, 23:17, 24:6, 24:8, 24:9, 25:1, 26:23, 30:16, 42:12
**opportunity** [3] - 24:3, 49:2, 83:24
**opposed** [1] - 67:17
**order** [8] - 8:12, 12:19, 66:19, 73:25, 74:1, 75:23, 79:1, 79:20, 79:22, 80:5, 81:15, 84:1, 84:6, 84:12, 85:10, 85:21, 85:22
**orders** [1] - 72:15
**ordinary** [3] - 32:12, 36:3, 67:9
**originally** [2] - 35:12, 70:16
**otherwise** [3] - 72:6, 73:3, 73:4
**ought** [4] - 13:24, 26:1, 68:25, 83:12
**outcomes** [1] - 60:18
**outlined** [2] - 20:21, 72:2
**overlooked** [1] - 82:4
**overrule** [1] - 21:5
**own** [3] - 16:16, 37:4, 72:3
**oxygen** [1] - 63:21

**P**

**p-value** [1] - 25:6
**page** [4] - 10:22, 17:11, 40:5, 84:3
**pages** [12] - 10:23, 25:11, 37:1, 40:23, 41:1, 41:21, 41:24, 42:4, 53:3, 53:5, 74:3
**paid** [1] - 75:10
**paper** [4] - 18:8, 40:15, 84:14
**papers** [2] - 4:13, 84:3
**PAPPAS** [1] - 1:19
**paragraphs** [5] - 11:11, 17:25, 42:5, 42:11, 42:17
**parameters** [1] - 72:2
**part** [17] - 8:25, 14:16, 14:18, 18:13, 20:3, 32:3, 37:18, 37:19, 45:6, 53:21, 58:2, 68:6, 73:25, 75:11, 77:22
**partially** [1] - 55:25
**particular** [3] - 32:14, 36:2, 63:25
**parties** [12] - 5:2, 6:1, 12:23, 13:1, 13:8, 14:8, 15:1, 30:5, 38:15, 68:6, 72:12, 81:25
**parties'** [3] - 12:22, 15:22, 39:15
**parts** [1] - 79:5
**party** [2] - 74:16, 75:8
**pass** [1] - 54:8
**passing** [1] - 20:14
**past** [6] - 47:19, 49:16, 52:1, 52:8, 52:20, 80:24
**patent** [17] - 4:23, 4:25, 7:12, 9:6, 29:16, 29:18, 33:23, 35:19, 36:17, 41:8, 46:12, 52:14, 53:8, 53:19, 53:22, 59:17, 62:19
**patentable** [1] - 27:18
**patenting** [1] - 7:2
**patents** [4] - 50:12, 53:2, 53:14, 59:11
**patient** [8] - 21:19, 30:17, 32:14, 34:1, 34:10, 34:11, 60:8, 62:11
**patients** [19] - 7:6, 30:18, 34:17, 36:2,
36:13, 48:17, 51:4, 56:24, 57:12, 58:14, 60:8, 61:8, 64:23, 64:24, 65:22, 66:12, 66:17, 66:20, 66:22
**pay** [1] - 44:10
**pendency** [1] - 74:1
**pending** [1] - 5:18
**people** [25] - 3:4, 3:25, 13:21, 13:22, 16:10, 19:16, 43:22, 48:18, 51:4, 55:12, 60:18, 60:24, 61:1, 61:2, 74:3, 74:17, 74:22, 76:1, 76:6, 76:18, 76:19, 77:3, 78:1, 78:17, 80:8
**people's** [1] - 50:1
**per** [2] - 18:4, 77:20
**percent** [3] - 28:25, 66:20 . . .
**perfec . . .**
**perhap . . .** 47:19 . . .
**permit . . .**
**permit . . .**
**person . . .** 32:25, 33:1, 36:3, 52:4, 53:23, 63:25
**perspective** [3] - 13:18, 14:2, 15:16
**peter** [1] - 74:21
**Peterson** [2] - 74:21, 76:12
**PH** [27] - 7:6, 30:15, 30:17, 30:18, 30:19, 31:14, 31:15, 32:9, 32:13, 32:17, 32:18, 32:22, 32:23, 33:1, 33:15, 33:17, 34:10, 34:15, 34:20, 34:21, 35:1, 46:12, 48:17, 51:4, 60:19
**PH-ILD** [10] - 7:6, 30:15, 30:17, 30:18, 30:19, 31:14, 46:12, 48:17, 51:4, 60:19
**Ph.D** [1] - 14:16
**phase** [1] - 61:22
**Phase** [1] - 62:1
**PHIL** [1] - 2:7
**Phil** [1] - 3:21
**Phillip** [1] - 45:9
**phrased** [2] - 20:7, 29:8
**phrasing** [1] - 20:10
**physically** [2] - 70:17, 70:22
**physicians** [1] - 7:5
**PI** [17] - 4:25, 5:3,
5:12, 44:20, 57:5, 57:6, 57:9, 57:14, 57:17, 58:19, 59:7, 59:19, 64:21, 66:19, 67:4, 82:22
**piece** [1] - 70:25
**pieces** [2] - 40:15
**placebo** [2] - 60:25, 66:21
**places** [1] - 40:20
**plain** [2] - 32:12, 67:9
**plaintiff** [12] - 14:3, 14:6, 44:3, 52:7, 55:20, 68:4, 68:7, 68:13, 79:4, 79:6, 82:12
**Plaintiff** [2] - 1:4, 1:25
**plaintiff's** [13] - 7:15, 26:1, 26:23, 28:13, 31:16, 31:19, 54:11, 23:12, 23:21
**plans** [2] - 82:6, 82:13
**play** [4] - 39:2, 39:4, 79:11, 79:15
**played** [1] - 79:12
**plethora** [1] - 54:25
**plus** [1] - 68:18
**point** [15] - 6:13, 8:9, 20:2, 22:22, 24:19, 30:13, 31:3, 31:4, 31:11, 54:24, 63:18, 64:15, 66:25, 69:12, 77:12
**pointed** [3] - 18:12, 18:17, 30:13
**points** [3] - 15:12, 17:21, 65:6
**population** [2] - 60:7, 60:8
**portion** [6] - 14:20, 17:9, 36:18, 37:16, 39:10, 67:1
**portions** [2] - 10:22, 23:3
**POSA** [32] - 13:18, 14:2, 14:4, 14:7, 14:12, 15:2, 15:16, 15:20, 15:22, 15:25, 16:1, 17:3, 17:5, 17:9, 17:13, 17:23, 18:10, 18:14, 18:18, 19:10, 19:19, 19:22, 19:25, 20:4, 20:11,
21:13, 22:1, 32:12, 78:11, 78:13
**POSA's** [2] - 16:20, 18:13
**POSAs** [4] - 14:21, 16:21, 78:16, 78:17
**position** [16] - 14:6, 31:16, 31:19, 33:12, 33:13, 33:14, 33:15, 33:20, 34:25, 35:2, 43:8, 44:16, 54:2, 55:13, 58:17, 59:19
**positioned** [1] - 15:21
**positions** [1] - 33:13
**positive** [1] - 60:18
**possible** [1] - 45:22
**possibly** [2] - 10:6, 29:21, 50:20
**post** [9] - 28:8, 28:15, 37:18, 50:14, 52:14, 52:18, 53:10, 84:4, 84:15
**post-Alamo** [1] - 50:14
**post-issuance** [1] - 52:14
**post-trial** [5] - 28:8, 28:15, 37:18, 84:4, 84:15
**powder** [3] - 7:21, 8:5, 8:6
**practicing** [8] - 43:25, 45:15, 45:23, 46:13, 49:12, 49:13, 51:6
**pre** [1] - 21:4
**pre-Kyocera** [1] - 21:4
**preamble** [12] - 27:18, 38:16, 38:19, 38:21, 39:15, 39:17, 42:12, 42:20, 42:22, 43:2, 43:3
**precedent** [1] - 58:20
**precise** [2] - 35:5, 75:2
**preclude** [6] - 38:8, 43:20, 55:15, 57:19, 57:20, 58:17
**predicted** [1] - 28:25
**prejudice** [2] - 67:19, 71:24
**prejudiced** [1] - 72:6
**prejudicial** [1] - 29:25
**preliminary** [10] - 44:12, 44:13, 47:4, 47:5, 57:23, 57:24, 58:3, 58:10, 58:11, 82:9
**premise** [1] - 72:11
**prepare** [1] - 82:1
**present** [7] - 45:22,

52:19, 54:15, 54:20, 71:25, 72:7, 86:6
**presentation** [3] - 22:11, 78:5, 79:10
**presentation-of-evidence** [1] - 22:11
**presenting** [1] - 54:18
**presents** [1] - 13:2
**preserve** [5] - 15:18, 16:19, 17:12, 84:16, 84:17
**preserved** [1] - 22:6
**preserving** [1] - 84:19
**press** [1] - 83:4
**pressure** [1] - 82:10
**Preston** [1] - 3:22
**PRESTON** [1] - 2:9
**presumably** [2] - 16:14, 17:1
**PRETRIAL** [2] - 1:9, 1:11
**pretrial** [10] - 12:19, 13:9, 73:25, 74:1, 79:1, 79:3, 79:20, 79:22, 85:21
**pretty** [8] - 21:23, 29:24, 35:19, 40:10, 63:19, 67:16, 81:8, 83:18
**preventing** [1] - 54:17
**previously** [2] - 65:22, 70:5
**primarily** [1] - 23:23
**print** [1] - 73:23
**priority** [3] - 9:6, 70:6
**problem** [8] - 17:24, 42:21, 53:17, 66:9, 68:20, 70:21, 78:9, 80:3
**problems** [1] - 66:3
**proceedings** [2] - 68:1, 86:7
**PROCTER** [1] - 1:22
**Procter** [3] - 3:7, 3:13, 44:3
**product** [3] - 6:22, 46:24, 48:12
**Professional** [2] - 86:4, 86:6
**proffer** [2] - 23:2, 79:14
**progress** [1] - 63:10
**prohibit** [1] - 43:22
**prohibiting** [1] - 85:6
**proof** [1] - 60:18
**proper** [3] - 60:15, 66:10, 67:20
**proposed** [2] - 14:17, 36:25
**proposing** [1] - 50:2

**protocol** [22] - 8:22, 56:4, 56:18, 59:15, 61:20, 61:21, 62:1, 62:11, 63:1, 63:5, 63:8, 64:7, 64:25, 65:1, 65:24, 65:25, 66:1, 75:11
**prove** [5] - 27:7, 48:5, 48:8, 56:24, 64:20
**proves** [2] - 7:15, 55:22
**provide** [7] - 13:1, 21:22, 22:20, 23:2, 23:17, 25:1, 46:10
**provides** [1] - 79:23
**providing** [1] - 21:17
**proving** [1] - 43:22
**proxy** [1] - 66:8
**public** [7] - 6:17, 7:3, 7:22, 9:10, 47:15, 53:8, 54:12
**pull** [2] - 40:16, 40:18
**pulmonary** [7] - 29:14, 29:17, 29:19, 30:6, 30:24, 34:3, 34:16
**pulse** [1] - 55:24
**pulsed** [1] - 8:2
**purpose** [4] - 54:13, 59:11, 59:23, 60:6
**purposes** [7] - 21:25, 23:20, 24:4, 27:19, 44:20, 46:13, 56:7
**put** [9] - 12:23, 22:4, 22:25, 37:3, 40:8, 56:8, 73:22, 84:3, 84:15
**putting** [1] - 57:21

**Q**

**qualified** [1] - 14:9
**questioning** [2] - 47:8, 73:19
**questions** [6] - 12:10, 33:2, 38:19, 45:7, 52:7, 58:23
**quickly** [2] - 53:14, 83:19
**quite** [2] - 39:13, 49:5
**quote/unquote** [1] - 36:11
**quoting** [1] - 83:3

**R**

**RACHEL** [1] - 2:9
**Rachel** [1] - 3:22
**raise** [9] - 22:12, 26:10, 28:9, 28:15,

44:19, 50:12, 56:22, 83:24, 85:13
**raised** [3] - 30:12, 68:3, 83:24
**raises** [1] - 28:7
**raising** [2] - 30:5, 84:23
**Rajiv** [1] - 76:20
**Ramipril** [2] - 62:2, 62:5
**range** [1] - 63:25
**rather** [5] - 27:23, 48:1, 77:7, 82:11, 84:13
**re** [5] - 49:10, 59:8, 63:12, 65:7, 65:13
**Re** [3] - 61:17, 61:19, 61:25
**reach** [1] - 18:10
**reached** [1] - 25:18
reactic
read [2
readin
31:2
**ready** |
**ready-** |
[1] - 7
**really** [9] - 10:11, 12:20, 19:10, 27:15, 35:25, 37:14, 64:13, 68:11, 84:10
**reason** [6] - 16:12, 50:9, 57:4, 58:2, 59:9, 63:7
**reasonable** [3] - 70:1, 81:13, 81:16
**reasons** [2] - 51:16, 57:4
**rebut** [1] - 15:19
**rebuttal** [7] - 13:1, 13:6, 22:15, 23:1, 24:3, 24:14, 71:9
**rebutting** [1] - 22:19
**receive** [1] - 66:22
**received** [3] - 4:20, 5:10, 65:22
**recent** [1] - 81:15
**recess** [1] - 67:25
**recipients** [1] - 59:25
**recited** [1] - 29:15
**recognized** [3] - 33:15, 33:16, 69:8
**reconsideration** [2] - 84:11, 84:15
**record** [2] - 20:14, 31:8
**reduced** [2] - 70:23, 70:24
**refer** [1] - 32:22
**reference** [4] - 4:13,

18:11, 59:22, 60:4
**referenced** [2] - 36:17, 65:8
**references** [1] - 56:3
**referred** [1] - 29:20
**referring** [1] - 58:8
**reflect** [1] - 13:9
**regard** [2] - 11:5, 26:18
**regarding** [3] - 9:18, 10:2, 52:21
**regardless** [1] - 78:19
**Registered** [2] - 86:4, 86:5
**registration** [1] - 61:22
**regulatory** [3] - 5:11, 62:4, 62:5
**rehashing** [1] - 37:5
**related** [6] - 11:3,

**relatively** [1] - 82:5
**relevant** [16] - 11:12, 12:14, 46:18, 47:11, 47:15, 47:20, 47:21, 48:15, 48:24, 49:16, 53:5, 53:9, 53:15, 55:7, 68:9
**reliance** [1] - 56:24
**relied** [2] - 18:16, 61:19
**relieves** [1] - 82:10
**rely** [6] - 14:21, 14:24, 18:18, 18:19, 20:14, 66:2
**relying** [11] - 16:15, 16:16, 46:14, 50:3, 50:5, 56:7, 58:15, 58:16, 59:14, 61:20, 61:24
**remember** [1] - 26:11
**remind** [2] - 17:18, 30:9
**removed** [1] - 5:11
**rendered** [2] - 41:7, 61:11
**reply** [6] - 9:23, 22:14, 24:3, 24:11, 24:16
**Report** [1] - 86:5
**report** [28] - 10:23, 18:3, 19:9, 19:21, 19:25, 20:15, 22:15, 22:23, 23:9, 24:10, 24:11, 24:17, 25:10,

25:14, 25:15, 25:16, 38:20, 39:17, 39:20, 39:21, 40:3, 40:6, 40:9, 40:10, 40:20, 42:19, 43:11
**reported** [1] - 86:6
**reporter** [2] - 4:4, 81:21
**Reporter** [2] - 86:6, 86:10
**REPORTER** [1] - 4:6
**reports** [5] - 6:14, 20:9, 22:3, 24:17, 39:23
**represent** [1] - 48:2
**representation** [2] - 25:23, 65:21
**representations** [1] - 22:14
**represented** [1] - 6:2
**repurposed** [1] - 51:7
**request** [2] - 69:16, 78:9
**require** [7] - 15:23, 30:24, 58:8, 64:23, 64:24, 66:14, 66:15
**required** [6] - 17:9, 32:16, 59:5, 61:5, 64:19, 67:12
**requirement** [1] - 75:24
**requirements** [4] - 6:23, 6:24, 7:4, 7:5
**requires** [4] - 44:24, 57:18, 63:16, 64:20
**reserving** [1] - 68:8
**resolve** [3] - 28:14, 36:22, 50:25
**resolved** [4] - 26:20, 67:18, 80:11, 85:15
**resolves** [2] - 40:10, 43:12
**resolving** [1] - 30:2
**respect** [11] - 7:10, 9:13, 14:15, 20:9, 22:10, 23:2, 71:4, 71:7, 73:1, 77:5, 84:2
**respectfully** [2] - 14:15, 20:3
**respond** [6] - 17:20, 20:18, 24:12, 37:1, 70:12, 73:5
**responding** [2] - 25:7, 40:1
**responds** [1] - 25:5
**response** [7] - 9:21, 15:12, 22:24, 23:18, 25:15, 26:1, 28:13
**responsive** [1] - 25:20

rest [1] - 12:18
restraints [1] - 5:14
restrictions [1] - 78:22
result [6] - 18:7, 61:9, 72:15, 78:4, 83:7, 83:12
results [11] - 12:25, 27:7, 59:17, 61:1, 61:2, 62:14, 63:3, 63:6, 63:24, 64:24, 64:25
reversed [1] - 10:7
review [1] - 84:14
reviewed [1] - 20:15
revised [1] - 13:9
revision [1] - 57:25
Richard [1] - 1:11
rights [2] - 22:5, 68:8
ripens [1] - 54:21
rise [1] - 66:2
Robert [1] - 3:22
ROBERT [1] - 2:8
Roger [1] - 52:13
role [1] - 3:11
roles [1] - 3:4
ROMEO [2] - 1:23, 29:6
Romeo [2] - 3:12, 29:6
room [1] - 78:23
Rothblatt [1] - 7:8
roughly [1] - 68:23
row [1] - 3:22
RPR [1] - 86:9
Rule [4] - 29:23, 52:1, 77:9
rule [1] - 38:9
ruled [2] - 11:15, 28:19
ruling [9] - 21:25, 22:11, 24:23, 24:24, 25:2, 26:9, 58:12, 84:21, 85:3
RUSTY [1] - 2:10

## S

safe [1] - 77:18
Sagar [16] - 46:9, 48:16, 48:23, 50:4, 50:6, 51:19, 52:2, 52:16, 52:18, 54:16, 54:18, 54:20, 73:16, 76:20, 76:21, 81:4
Sagar's [2] - 49:15, 51:25
sale [13] - 6:17, 6:22, 7:3, 7:7, 7:22, 8:20, 9:10, 11:20, 11:21, 56:4, 56:5, 56:7,

56:21
Sanya [3] - 3:20, 4:17, 6:12
SANYA [1] - 2:6
satisfied [1] - 8:4
saw [4] - 4:12, 6:7, 12:20, 36:12
scenario [1] - 61:9
schedule [6] - 68:15, 72:3, 79:2, 80:23, 82:4, 83:12
scheduled [3] - 68:21, 69:3, 70:16
schedules [1] - 80:16
scheduling [1] - 23:20
schizophrenics [1] - 60:1
school [1] - 14:10
Schroeder [4] - 5:1, 5:2, 82:19, 83:1
SCHUNDLER [1] - 2:10
scope [6] - 8:23, 14:7, 30:15, 39:23, 43:10, 70:24
se [1] - 18:4
seal [1] - 4:11
sealing [1] - 82:12
seated [1] - 3:1
SEB [5] - 15:13, 20:25, 21:5, 21:8, 21:12
second [6] - 7:2, 8:21, 9:15, 15:18, 16:9, 22:22, 26:25, 30:21, 31:11, 37:19, 38:5, 41:17, 48:2, 53:21, 56:12
secondary [6] - 12:24, 13:6, 13:7, 23:3, 24:1, 25:18
secondly [1] - 51:10
section [1] - 38:20
secure [1] - 62:3
see [12] - 3:15, 3:16, 9:10, 36:3, 42:2, 43:23, 43:24, 66:15, 70:9, 70:11, 76:19
seek [1] - 17:25
seeking [1] - 30:19
seem [1] - 19:14
self [3] - 25:19, 71:11, 77:13
selling [1] - 48:11
semantics [1] - 40:3
send [2] - 55:6, 82:19
sense [7] - 12:17, 25:24, 26:3, 34:9, 54:9, 55:13, 68:25
sent [1] - 55:6
separate [1] - 55:1

separately [1] - 27:17
seriously [2] - 14:3
set [1] - 31:20
seven [4] - 8:2, 71:14, 72:1, 72:18
several [1] - 6:14
severity [1] - 32:15
shaped [1] - 69:13
Shaun [1] - 3:9
Shaw [1] - 3:19
SHAW [1] - 2:3
sheet [2] - 74:6, 74:11
shoes [1] - 20:11
shorthand [1] - 86:7
show [16] - 24:21, 40:9, 41:20, 41:21, 57:11, 57:12, 57:13, 57:14, 57:16, 57:17, 58:14, 61:6, 61:8, 66:16, 66:18
showe
showi
shows
38:20
side [1
16:20
36:24,
58:25, 65:8, 68:12, 70:2, 70:9, 72:12, 77:20
sides [2] - 28:23, 68:5
significance [2] - 39:16, 42:22
significant [3] - 18:6, 25:6, 81:3
similarly [1] - 26:14
single [1] - 6:13
sit [2] - 8:8, 19:9
situated [1] - 26:14
situation [1] - 55:7
six [5] - 6:11, 8:4, 11:21, 68:19, 69:17, 70:4, 70:6, 70:9, 70:10, 71:24, 71:25, 72:17, 72:20, 72:21, 75:22
skill [1] - 36:3
skipping [2] - 34:19, 34:20
small [2] - 19:15, 74:8
Smith [2] - 74:21, 76:13
Snader [1] - 3:9
sold [3] - 6:25, 7:1, 51:15
someone [4] - 75:1, 75:3, 78:24, 79:24
someplace [1] - 13:13
sometime [1] - 47:19
sometimes [3] -

36:14, 77:23
somewhere [1] - 79:2
soon [2] - 81:8, 83:5
sorry [7] - 9:19, 10:14, 42:3, 42:6, 52:23, 70:19, 76:25
sort [5] - 5:19, 7:14, 11:25, 35:22, 36:4, 40:2, 40:7, 56:13, 81:21
sound [2] - 31:12, 35:10
sounds [4] - 32:4, 35:7, 35:9, 40:7
southern [1] - 21:10
space [2] - 44:4, 44:5
speaking [6] - 3:4, 3:10, 4:3, 4:5, 13:25, 84:19
spec [1] - 33:23

36:17, 36:19
spend [1] - 23:4
SPETRINO [7] - 1:20, 38:25, 39:13, 42:18, 42:25, 43:4, 43:13
Spetrino [6] - 3:11, 38:25, 39:6, 39:11, 40:8, 42:16
spewing [1] - 16:22
spread [2] - 69:5, 69:7
stage [13] - 38:15, 57:5, 57:6, 57:9, 57:10, 57:14, 57:17, 58:19, 59:19, 62:3, 64:21, 65:16, 67:4
stand [3] - 15:25, 21:20, 46:6
standard [15] - 21:8, 57:10, 57:18, 58:8, 58:9, 58:18, 58:19, 59:5, 60:3, 60:13, 60:15, 66:24, 67:4, 67:20
standards [1] - 15:22
standby [1] - 81:8
stands [1] - 21:12
start [9] - 3:2, 12:13, 33:24, 46:19, 66:13, 68:16, 69:2, 72:11, 85:24
started [5] - 33:22, 39:19, 47:19, 75:20, 82:6

starting [1] - 35:8
starts [3] - 16:22, 31:12, 32:3
state [27] - 32:23, 46:16, 46:18, 47:9, 47:11, 47:16, 48:10, 48:11, 48:14, 48:22, 48:23, 49:15, 49:17, 50:1, 50:4, 50:6, 50:8, 50:10, 50:15, 50:22, 51:7, 51:11, 51:13, 51:25, 52:8, 53:6, 53:15
statement [1] - 82:25
statements [3] - 52:13, 52:18, 58:1
STATES [1] - 1:1
statistical [1] - 60:18
statistically [2] - 18:6, 25:6
statistician [1] - 22:23
statistics [4] - 16:2, 18:8, 19:23, 25:23
stays [1] - 52:8
steering [1] - 75:11
Stenotype [1] - 86:7
Step [1] - 26:2
step [1] - 20:11
stick [1] - 78:6
still [11] - 38:24, 39:2, 39:4, 48:4, 48:7, 48:15, 55:17, 55:25, 60:4, 66:23, 75:18
stipulated [1] - 38:15
stole [1] - 49:3
stop [1] - 82:24
stopping [1] - 5:22
straight [1] - 33:13
straightforward [1] - 70:4
strange [1] - 81:22
street [1] - 83:9
strike [1] - 22:2
strikes [1] - 27:22
strip [1] - 18:1
stripping [1] - 53:23
students [1] - 15:6
study [6] - 27:7, 57:15, 60:16, 61:2, 75:11
stuff [3] - 15:5, 19:16, 83:9
subject [1] - 57:25, 70:24, 71:1
submission [2] - 62:5, 69:8
submit [1] - 13:9, 36:24
substance [1] - 20:6
success [6] - 12:25, 55:20, 58:4, 71:11,

73:13, 77:15
**sued** [1] - 4:22
**suffered** [1] - 60:1
**suffering** [1] - 34:2
**sufficiently** [2] -
21:16, 66:4
**SUKDUANG** [64] - 2:6,
4:4, 4:17, 5:9, 5:15,
5:21, 5:25, 6:12,
6:18, 6:21, 7:10,
7:17, 7:24, 8:1, 8:5,
12:6, 12:21, 13:8,
22:10, 22:20, 24:9,
25:11, 25:13, 26:4,
27:13, 27:17, 27:25,
28:17, 44:17, 44:24,
45:4, 47:25, 52:5,
52:11, 54:15, 54:23,
69:24, 70:14, 70:19,
70:22, 71:22, 73:18,
75:2, 75:10, 76:21,
76:23, 77:2, 77:16,
78:7, 78:23, 79:9,
79:17, 80:5, 80:10,
81:9, 82:18, 83:21,
83:25, 84:8, 84:13,
84:22, 85:1, 85:12,
85:16
**Sukduang** [15] - 3:21,
4:17, 6:3, 6:12,
11:20, 11:24, 12:5,
13:21, 13:24, 24:5,
33:8, 70:12, 76:17,
80:4, 84:9
**Sukduang's** [1] -
23:19
**summarized** [2] -
39:12, 60:19
**summary** [2] - 27:22,
57:1
**super** [1] - 82:7
**superfluous** [1] - 50:6
**supplement** [1] - 8:25
**support** [1] - 33:4
**supposed** [1] - 46:23
**surprise** [1] - 8:16
**suspect** [1] - 72:14
**sustain** [3] - 19:12,
19:24, 31:8

**T**

**table** [2] - 3:7, 3:20
**tack** [1] - 6:17
**talk** [1] - 15:3
**talks** [5] - 19:13,
19:15, 29:24, 33:9,
33:23
**Tapsen** [11] - 75:1,

75:7, 75:16, 77:5,
77:7, 78:7, 78:10,
78:24, 79:11, 81:7
**taught** [1] - 14:10
**teaches** [2] - 14:10,
15:6
**team** [1] - 74:13
**teammates** [1] - 15:2
**technical** [1] - 46:22
**TECHNOLOGIES** [1] -
1:6
**ten** [6] - 67:22, 72:3,
72:6, 72:12, 72:24,
77:20
**ten-minute** [1] - 67:22
**tense** [1] - 52:8
**term** [7] - 31:6, 34:11,
35:18, 36:1, 36:2,
67:10
**terms** [8] - 10:10,
12:18, 31:11, 72:3,
72:6, 77:19, 78:18,
81:22
**territory** [1] - 68:10
**testified** [1] - 14:2
**testifies** [2] - 77:14,
78:11
**testify** [18] - 13:17,
15:4, 15:5, 15:6,
17:23, 21:13, 22:1,
25:24, 26:1, 48:20,
48:21, 50:1, 50:10,
52:6, 52:9, 54:22,
78:14, 80:1
**testifying** [11] - 20:6,
22:13, 42:19, 52:3,
76:4, 76:6, 76:8,
76:18, 78:10, 78:12,
78:17
**testimony** [30] - 13:16,
19:23, 22:5, 27:1,
30:15, 37:12, 38:8,
38:10, 39:18, 39:20,
46:10, 49:15, 50:3,
50:16, 50:23, 51:2,
51:17, 51:19, 51:25,
52:12, 52:19, 53:6,
53:7, 53:18, 54:12,
57:21, 66:20, 79:11,
80:6, 80:9
**testing** [1] - 62:3
**THE** [224] - 1:1, 1:2,
3:1, 3:14, 3:24, 4:6,
4:7, 4:11, 5:4, 5:13,
5:17, 5:24, 6:1, 6:6,
6:16, 6:19, 7:9, 7:14,
7:22, 7:25, 8:4, 8:7,
8:11, 8:16, 9:4, 9:7,
9:15, 9:20, 9:22,
9:25, 10:6, 10:18,

11:1, 11:8, 11:14,
11:23, 12:4, 12:7,
12:12, 12:17, 13:4,
13:11, 13:21, 14:9,
14:18, 14:23, 15:4,
16:4, 16:8, 16:21,
17:16, 18:19, 20:5,
20:16, 20:19, 20:24,
21:2, 21:6, 21:11,
21:23, 22:18, 23:7,
23:11, 23:18, 24:5,
25:10, 25:12, 25:22,
26:5, 26:11, 26:16,
26:20, 27:15, 27:21,
28:12, 28:18, 29:4,
29:11, 31:3, 31:18,
31:22, 32:3, 32:8,
32:17, 32:25, 33:6,
33:8, 33:12, 33:19,
33:24, 34:4, 34:8,
34:14, 34:19, 34:25,
35:6,
36:20,
39:5,
40:5,
40:23,
41:13,
42:3, 42:6, 42:9,
42:15, 42:24, 43:1,
43:7, 43:16, 43:19,
44:4, 44:22, 45:2,
45:7, 45:10, 45:18,
45:25, 46:6, 46:17,
46:21, 47:3, 47:18,
48:1, 48:7, 48:16,
48:23, 49:22, 50:5,
50:18, 50:25, 51:23,
52:2, 52:10, 52:22,
53:4, 53:12, 53:16,
54:17, 55:5, 55:20,
56:11, 56:19, 57:1,
57:6, 57:22, 58:21,
58:24, 60:16, 60:21,
60:24, 61:13, 62:7,
62:13, 62:17, 62:22,
62:24, 63:5, 63:17,
63:24, 64:5, 64:8,
64:17, 65:3, 65:11,
65:15, 65:19, 67:15,
68:2, 69:23, 69:25,
70:11, 70:18, 70:21,
71:19, 72:9, 72:23,
73:6, 73:15, 73:22,
74:13, 74:17, 74:24,
75:7, 75:16, 75:25,
76:12, 76:16, 76:22,
76:25, 77:11, 77:18,
78:12, 78:16, 79:1,
79:14, 79:19, 80:8,
80:13, 80:25, 81:11,
81:17, 82:3, 83:10,

83:23, 84:6, 84:9,
84:19, 84:24, 85:3,
85:15, 85:17, 85:20
**theirs** [1] - 34:5
**themselves** [3] -
13:24, 30:23, 39:23
**theories** [2] - 28:11,
55:1
**theory** [6] - 6:19, 9:10,
45:23, 55:2, 57:15,
62:2
**Therapeutics** [7] -
17:15, 29:7, 33:11,
55:19, 65:2, 74:20,
81:14
**therapeutics** [2] - 3:6,
75:15
**THERAPEUTICS** [1] -
1:3
**therefore** [1] - 24:24,

70:13, 83:16
**thinks** [1] - 35:22
**third** [2] - 51:12, 74:16
**Thisted** [45] - 13:16,
14:1, 14:7, 14:24,
15:4, 15:10, 15:19,
15:21, 15:25, 16:16,
16:24, 17:5, 17:8,
17:22, 18:1, 18:9,
18:17, 18:20, 20:4,
21:18, 21:25, 22:12,
22:24, 23:1, 23:5,
23:8, 24:2, 24:12,
24:18, 24:25, 25:2,
25:5, 25:14, 25:25,
26:9, 26:18, 26:24,
27:2, 27:3, 28:3,
71:10, 73:13
**Thisted's** [2] - 19:23,
25:16
**three** [4] - 6:10, 24:21,
48:10, 70:15
**throughout** [1] - 58:20
**Thursday** [2] - 69:4,
69:6
**timing** [1] - 80:10
**title** [1] - 43:22
**today** [10] - 4:3, 4:5,
11:15, 26:15, 44:24,
47:5, 47:22, 48:15,
52:20, 69:15
**today's** [1] - 21:25
**took** [2] - 8:12, 81:14

**totally** [1] - 60:7
**touches** [1] - 10:3
**tough** [1] - 33:8
**track** [2] - 41:17, 49:7
**training** [4] - 15:23,
15:24, 18:13, 18:22
**TRANSCRIPT** [1] - 1:9
**transcript** [1] - 81:24
**treat** [5] - 7:6, 21:19,
46:12, 48:17, 51:4
**treated** [1] - 26:21
**treating** [2] - 14:19,
21:20
**treatment** [9] - 30:19,
44:19, 62:9, 62:15,
62:19, 62:20, 62:21,
67:5, 67:7
**tremendous** [1] - 81:2
**treprostinil** [1] - 66:23
**trial** [59] - 7:12, 7:13,
7:15, 8:22, 20:22,
22:6, 22:22, 24:19,
25:17, 27:24, 28:2,
28:8, 28:15, 30:3,
31:5, 36:23, 37:16,
37:18, 37:24, 39:20,
43:6, 43:11, 46:24,
52:19, 55:22, 56:15,
58:20, 59:16, 59:18,
61:7, 61:10, 61:18,
61:22, 62:1, 62:10,
62:12, 62:14, 62:16,
62:20, 64:12, 67:23,
68:6, 68:9, 68:16,
68:19, 68:21, 68:23,
69:5, 69:19, 70:16,
72:16, 76:9, 76:10,
79:4, 83:14, 84:4,
84:15
**tried** [2] - 71:24, 79:21
**TRO** [7] - 4:25, 5:3,
5:12, 5:22, 6:4, 82:9,
82:21
**true** [3] - 26:13, 61:9,
61:13
**truncate** [1] - 77:24
**try** [7] - 12:17, 24:23,
58:7, 70:8, 71:14,
72:12, 81:12
**trying** [7] - 8:17, 12:9,
34:8, 43:5, 55:20,
82:7, 82:15
**Tuesday** [6] - 5:1,
37:1, 68:20, 72:20,
72:21, 80:1
**Tully** [1] - 76:20
**TUNNELL** [1] - 1:15
**two** [32] - 9:25, 11:17,
14:18, 15:12, 18:23,
19:3, 21:20, 26:14,

28:10, 30:14, 32:1, 34:9, 37:1, 38:12, 38:23, 40:5, 48:10, 55:1, 57:4, 63:21, 64:2, 66:3, 68:18, 71:9, 73:12, 73:13, 74:22, 74:23, 76:15, 77:4, 84:3
**type** [1] - 74:23
**Tyvaso** [11] - 6:20, 6:22, 6:25, 7:1, 7:3, 8:6, 46:11, 51:4, 60:17, 62:21

## U

**U.S** [1] - 86:10
**U.S.D.C.J** [1] - 1:12
**ultimate** [2] - 18:2, 25:4
**ultimately** [1] - 66:25
**unclear** [2] - 24:22, 24:23
**under** [11] - 4:11, 5:13, 7:20, 8:20, 15:13, 20:12, 25:2, 38:9, 52:1, 55:2, 59:25
**underlining** [1] - 42:1
**underlying** [1] - 72:10
**understood** [7] - 11:24, 22:7, 32:12, 45:11, 50:11, 58:12, 81:13
**unduly** [1] - 29:24
**unenforceability** [1] - 6:9
**unexpected** [1] - 12:25
**unique** [1] - 19:17
**UNITED** [2] - 1:1, 1:3
**united** [2] - 3:6, 75:14
**United** [7] - 17:15, 29:6, 33:11, 55:19, 65:2, 74:20, 81:14
**universe** [1] - 69:18
**unless** [1] - 58:22
**unsettled** [1] - 85:14
**up** [25] - 13:22, 15:7, 16:8, 20:2, 21:20, 22:25, 24:21, 25:8, 25:19, 28:20, 40:6, 52:3, 54:1, 56:14, 56:17, 57:22, 68:24, 69:13, 76:9, 78:2, 80:12, 85:2, 85:4
**Urbina** [4] - 8:24, 8:25, 12:3, 41:7
**useful** [2] - 8:18, 18:20

**uses** [1] - 37:10
**usual** [1] - 83:14
**UTC** [18] - 3:10, 4:22, 5:22, 12:24, 13:2, 13:4, 13:6, 18:12, 24:23, 52:17, 59:15, 76:1, 76:6, 77:6, 78:24, 84:17, 85:4
**UTC's** [4] - 5:3, 9:18, 14:17, 49:11

## V

**valid** [2] - 44:15, 47:7
**validity** [7] - 18:3, 23:24, 24:4, 49:9, 53:15, 71:2, 71:4
**VALLEN** [1] - 1:20
**Vallen** [1] - 3:8
**value** [1] - 25:6
**variable** [1] - 63:25
**various** [2] - 9:13, 73:3
**versa** [1] - 80:2
**versus** [2] - 15:13, 20:25
**vice** [1] - 80:2
**victor** [1] - 74:25
**view** [5] - 8:24, 12:2, 36:6, 39:4, 64:25
**virtually** [21] - 18:3, 57:12, 57:18, 58:9, 58:14, 58:18, 59:4, 59:5, 59:21, 59:24, 60:3, 60:8, 60:13, 61:8, 62:12, 63:15, 63:16, 64:23, 66:12, 66:17, 67:4
**vital** [1] - 28:24
**void** [1] - 66:6
**vs** [1] - 1:5

## W

**wait** [4] - 34:19, 38:5, 41:17, 56:12
**waived** [1] - 68:7
**waiving** [1] - 31:10
**walking** [1] - 7:19
**wall** [1] - 83:9
**wants** [2] - 49:8, 67:6
**Ward** [2] - 15:13, 21:1
**warner** [1] - 86:4
**Warner** [1] - 86:9
**waste** [2] - 29:25, 81:3
**water** [3] - 63:20, 63:21, 63:22
**waxman** [1] - 78:24

**Waxman** [1] - 74:10
**ways** [2] - 18:17, 82:8
**Wednesday** [3] - 68:21, 72:20, 72:22
**week** [7] - 6:4, 36:23, 55:6, 68:22, 72:2, 72:15, 81:9
**weeks** [1] - 80:21
**weight** [1] - 27:18
**weird** [1] - 80:10
**welcome** [2] - 5:25, 44:6
**well-positioned** [1] - 15:21
**well-qualified** [1] - 14:9
**Wertheim** [1] - 11:6
**Westlaw** [1] - 21:9
**whichever** [1] - 78:19
**WHO** [4] - 29:21, 34:7, 34:24
**whoev**
**whole**
**wiggle**
**WILL** [
**William**
**WILLI**....,
**willing** [1] - 69:7
**wisely** [1] - 22:22
**wishes** [1] - 36:10
**witness** [11] - 23:24, 24:3, 24:14, 24:16, 52:18, 74:1, 78:15, 78:17, 78:20, 79:12, 80:9
**witnesses** [19] - 67:23, 71:7, 71:17, 71:20, 73:10, 73:11, 73:18, 73:20, 73:23, 74:8, 74:11, 75:6, 75:23, 77:12, 78:16, 79:7, 79:18, 80:22
**wonder** [1] - 39:19
**wondering** [3] - 4:15, 45:25, 80:17
**word** [1] - 54:19
**words** [1] - 20:5
**works** [1] - 80:5
**worse** [1] - 66:21
**worth** [1] - 65:9
**write** [5] - 9:16, 27:10, 37:25, 52:25, 81:20
**writing** [1] - 22:4
**written** [6] - 6:10, 6:14, 9:2, 13:13, 19:21, 29:9

## Y

**year** [1] - 15:6
**years** [4] - 14:19, 21:20, 48:10
**yellow** [1] - 41:25
**yesterday** [2] - 51:13, 71:13
**York** [1] - 21:10
**yourselves** [1] - 81:12
**Yutrepia** [4] - 4:20, 27:4, 51:14, 52:15

## Z

**zillion** [1] - 37:12